# EXHIBIT A

SONAL N. MEHTA (SBN 222086)
Sonal.Mehta@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

DAVID Z. GRINGER (*pro hac vice*)
 David.Gringer@wilmerhale.com
ARI HOLTZBLATT (*pro hac vice*)
 Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
Molly.Jennings@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Attorneys for Defendant*
FACEBOOK, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| REVEAL CHAT HOLDCO, LLC, a Delaware limited liability company, USA TECHNOLOGY AND MANAGEMENT SERVICES, INC. (d/b/a Lenddo USA), a Delaware corporation, and BEEHIVE BIOMETRIC, INC., a dissolved Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC., a Delaware corporation,<br><br>Defendant. | Case No. 5:20-cv-00363-BLF<br><br>**DEFENDANT FACEBOOK, INC.'S MOTION FOR ADMINISTRATIVE RELIEF TO CONSIDER WHETHER CASES SHOULD BE RELATED PURSUANT TO CIVIL L.R. 3-12**<br><br>Judge: Hon. Beth Labson Freeman |

FACEBOOK'S MOTION FOR ADMINISTRATIVE RELIEF TO CONSIDER WHETHER CASES SHOULD BE RELATED

Pursuant to Civil Local Rule 3-12, Defendant Facebook, Inc. respectfully moves the Court to consider whether to relate *Klein et al. v. Facebook, Inc.*, No. 5:20-cv-08570-LHK ("*Klein*") to *Reveal Chat et al. v. Facebook, Inc.*, No. 5:20-cv-00363-BLF ("*Reveal Chat*"). The *Reveal Chat* plaintiffs stipulate to this motion. The *Klein* plaintiffs oppose without explanation. A declaration from David Z. Gringer accompanies this motion.

Under Civil Local Rule 3-12(a), actions are related "when: (1) The actions concern substantially the same parties, property, transaction or event; and (2) It appears likely that there will be an unduly burdensome duplication of labor and expense or conflicting results if the cases are conducted before different Judges." A party that knows or believes that an action may be related to another action that is or was pending in this District "must promptly file in the lowest-numbered case an Administrative Motion to Consider Whether Cases Should be Related, pursuant to Civil L.R. 7-11." Civil L.R. 3-12(b).

The recently filed *Klein* action is a putative antitrust class action brought against Facebook on behalf of Facebook users. Like *Reveal Chat*, it alleges that Facebook unlawfully monopolized or attempted to monopolize markets in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. Both the *Klein* and *Reveal Chat* complaints focus on similar alleged conduct by Facebook as the gravamen of their complaints. As a few examples, the plaintiffs in both actions allege the following as part of their unlawful monopolization theories:

- To eliminate potential competition, Facebook acquired Instagram (*compare Reveal Chat* Am. Compl. ¶¶ 287-299 *with Klein* Compl. ¶¶ 170-177) and WhatsApp (*compare Reveal Chat* Am. Compl. ¶¶ 323-332, *with Klein* Compl. ¶¶ 184-186);

- In 2015, Facebook ended general access to the Friends and News Feed APIs and entered into data-sharing agreements (*compare Reveal Chat* Am. Compl. ¶¶ 247-261, *with Klein* Compl. ¶¶ 164-166, 168);

- Facebook acquired and used Onavo to collect user data and employed that data to identify and target competitive threats (*compare Reveal Chat* Am. Compl. ¶¶ 266-286, *with Klein* Compl. ¶¶ 148-153); and

1

FACEBOOK'S MOTION FOR ADMINISTRATIVE
RELIEF TO CONSIDER WHETHER CASES SHOULD BE RELATED

- Facebook cloned the Snapchat "Stories" feature after acquisition talks failed (*compare Reveal Chat* Am. Compl. ¶¶ 311-312, *with Klein* Compl. ¶¶ 182-183).

In fact, both complaints repeatedly use identical or nearly identical language. For example:

| *Reveal Chat* | *Klein* |
|---|---|
| After the announcement and through the full removal of the APIs in April 2015, Facebook continued to make a series of agreements that forced certain competitors to hand their data over to Facebook. For example, Facebook forced certain third-party developers that it identified as competitive threats with valuable social data to sign Private Extended API agreements—referred to throughout this Complaint as "Whitelist and Data Sharing Agreements" or simply "the Agreements"—in order to obtain access to the Friends and/or News Feed APIs. Am. Compl. ¶ 247. | After the announcement and through the full removal of the APIs in April 2015, Facebook made a series of agreements that forced certain competitors to hand their data over to Facebook. For example, Facebook forced certain third-party developers that it identified as competitive threats with valuable social data to sign Private Extended API agreements—referred to throughout this Complaint as "Whitelist and Data Sharing Agreements" or simply "the Agreements"—in order to obtain access to the Friends and/or News Feed APIs. Compl. ¶ 165. |
| Facebook's Whitelist and Data Sharing Agreements, as of January 2015, included a provision that acknowledged that the APIs they covered are not available to the general public. An exhibit to each Whitelist and Data Sharing Agreement listed the specific Facebook APIs to which a particular developer was being granted access. Am. Compl. ¶ 248. | Facebook's Whitelist and Data Sharing Agreements included a provision that acknowledged that the APIs they covered are not available to the general public. An exhibit to each Whitelist and Data Sharing Agreement listed the specific Facebook APIs to which a particular developer was being granted access. Compl. ¶ 165. |
| These Agreements were only offered in | These Agreements were only offered in |

FACEBOOK'S MOTION FOR ADMINISTRATIVE
RELIEF TO CONSIDER WHETHER CASES SHOULD BE RELATED

| | |
|---|---|
| exchange for massive purchases of Facebook's social data through mobile advertising and/or through the provision of the developer's own social data back to Facebook (so-called "reciprocity"). Am. Compl. ¶ 249. | exchange for massive purchases of Facebook's social data through mobile advertising and/or through the provision of the developer's own social data back to Facebook (so-called "reciprocity"). Compl. ¶ 165. |
| To obtain extensive information on a user's usage of mobile applications and of bandwidth, Onavo cloaked its spyware in virtual private networks ("VPNs"), data compression, and even in mobile privacy apps. Am. Compl. ¶ 266. | To obtain extensive information on a user's usage of mobile applications and of bandwidth, Onavo cloaked its spyware in VPNs, data compression, and even in mobile privacy apps. Compl. ¶ 149. |
| Onavo sold the mobile usage data it collected to Facebook, which in turn used the real-time information it received from Onavo to determine which mobile applications posed a threat to Facebook's dominance and to the SDBE protecting Facebook from new entrants and competition. Am. Compl. ¶ 267. | Onavo sold the mobile usage data it collected to Facebook, which in turn used the real-time information it received from Onavo to determine which mobile applications posed a threat to Facebook's dominance and to the substantial barriers to entry protecting Facebook from new entrants and competition. Compl. ¶ 149. |
| Facebook used Onavo data to: (a) identify and target competitors from which Facebook could demand Whitelist and Data Sharing Agreements; (b) identify and target competitors to whom Facebook would completely deny Platform access; and (c) identify and target competitors that Facebook would remove from the competitive landscape | Facebook used Onavo's data to: (a) identify and target competitors from which Facebook could demand concessions; (b) identify and target competitors to whom Facebook would completely deny access to its platform; and (c) identify and target competitors that Facebook would remove from the competitive landscape entirely through acquisition. Compl. ¶ 150. |

3

FACEBOOK'S MOTION FOR ADMINISTRATIVE
RELIEF TO CONSIDER WHETHER CASES SHOULD BE RELATED

| | |
|---|---|
| entirely through acquisition. Am. Compl. ¶ 267. | |
| When an Onavo Protect user opened a mobile app or website, Onavo software secretly redirected the traffic to Facebook's servers, where the action was logged in a massive database. Facebook product teams then analyzed the aggregated Onavo data to determine which apps and features people were using in real time, how frequently they used the apps, and for how long. If the data in an app was not encrypted, this information was as specific as (for example) the number of photos the average user likes or posts in a week in that app. Am. Compl. ¶ 272. | When an Onavo Protect user opened a mobile app or website, Onavo software secretly redirected the traffic to Facebook's servers, where the action was logged in a massive database. Facebook product teams then analyzed the aggregated Onavo data to determine which apps and features people were using in real time, how frequently they used the apps, and for how long. If the data in an app was not encrypted, this information was as specific as (for example) the number of photos the average user likes or posts in a week in that app. Compl. ¶ 152. |

*Compare also Reveal Chat* Am. Compl. ¶ 266 *with Klein* Compl. ¶ 149; *Reveal Chat* Am. Compl. ¶ 292 *with Klein* Compl. ¶ 171; *Reveal Chat* Am. Compl. ¶ 293 *with Klein* Compl. ¶ 171.

To be sure, the *Klein* complaint contains an additional theory of competitive harm regarding Facebook's privacy policy, but the cases still easily exceed the relevant standard for relation. ***First***, absent relation, there is a serious risk "of conflicting results." *See* Civil L.R. 3-12(a). Facebook anticipates raising similar defenses to the *Klein* allegations as it has in *Reveal Chat*: including that the claims are untimely and that the plaintiffs have failed to plausibly allege exclusionary conduct. And though the complaints focus primarily on the same conduct and claim similar anticompetitive effects, they allege the existence of different relevant markets with different market participants, further increasing the prospect for inconsistent judgments.

***Second***, *Klein* and *Reveal Chat* "concern substantially the same parties, property, transaction or event." Civil L.R. 3-12(a)(2)(1). Facebook is the sole defendant and there is some

overlap between the putative classes (one focused on app developers, the other Facebook users, which itself almost certainly includes the developers). And as discussed, *Klein* relies on "materially identical allegations of misconduct to those proffered by [Reveal Chat]." *Zakinov v. Ripple Labs, Inc.*, No. 18-CV-06753-PJH, 2020 WL 2768966, at *2 (N.D. Cal. May 28, 2020) (granting motion to relate). Recognizing these similarities, the FTC listed both *Reveal Chat* and *Klein* as related to a case it filed on December 9, 2020 in the United States District Court for the District of Columbia alleging that Facebook violated Section 2 of the Sherman Antitrust Act by, among things, acquiring WhatsApp and Instagram after using Onavo to identify those companies as potential competitive threats.

**Third**, given the substantial factual and legal overlap, it is "likely that there will be an unduly burdensome duplication of labor and expense … if the cases are conducted before different Judges." Civil L.R. 3-12(a)(2). Given the time and effort that the Court has already expended in assessing similar legal claims premised on a shared factual predicate, relating *Reveal Chat* and *Klein* would conserve judicial resources. For example, the *Klein* plaintiffs challenge the acquisitions of Instagram and WhatsApp, which this court has already held to be time-barred, rejecting the continuing violation theory that the *Klein* plaintiffs allege. And should the two cases survive motions to dismiss, relation is particularly important to avoid unnecessary labor and expense during discovery. Simply put, it would be inefficient and unduly burdensome to "hav[e] two different judges govern discovery disputes." *Financial Fusion, Inc. v. Ablaise Ltd.*, 2006 WL 3734292, at *3 (N.D. Cal. Dec. 18, 2006). Finally, discovery in *Reveal Chat* has not yet begun, meaning that it is not far ahead of *Klein*. *Id.* at *4 (noting lack of delay as factor in favor of relation).

Because of the substantial overlap between *Reveal Chat* and *Klein*, and because the Court is already familiar with many of the legal and factual issues implicated in the cases, Facebook respectfully requests that the Court enter an order relating *Reveal Chat* and *Klein*.

FACEBOOK'S MOTION FOR ADMINISTRATIVE
RELIEF TO CONSIDER WHETHER CASES SHOULD BE RELATED

Dated: December 10, 2020

Respectfully submitted,

By: /s/ Sonal N. Mehta
SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
david.gringer@wilmerhale.com
ARI HOLTZBLATT (*pro hac vice*)
ari.holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
molly.jennings@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 663-6000

FACEBOOK'S MOTION FOR ADMINISTRATIVE
RELIEF TO CONSIDER WHETHER CASES SHOULD BE RELATED

# CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of December 2020, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System. And I hereby certify that I have served the foregoing document on counsel for the plaintiffs in the action in which relation is sought pursuant to agreement between the parties.

*/s/ Sonal N. Mehta*
Sonal N. Mehta

1  SONAL N. MEHTA (SBN 222086)
    Sonal.Mehta@wilmerhale.com
2  WILMER CUTLER PICKERING
    HALE AND DORR LLP
3  2600 El Camino Real, Suite 400
4  Palo Alto, California 94306
   Telephone: (650) 858-6000
5  Facsimile: (650) 858-6100

6  DAVID Z. GRINGER (*pro hac vice*)
    David.Gringer@wilmerhale.com
7  ARI HOLTZBLATT (*pro hac vice*)
    Ari.Holtzblatt@wilmerhale.com
8  MOLLY M. JENNINGS (*pro hac vice*)
    Molly.Jennings@wilmerhale.com
9  WILMER CUTLER PICKERING
    HALE AND DORR LLP
10 1875 Pennsylvania Ave NW
   Washington, DC 20006
11 Telephone: (202) 663-6000
12 Facsimile: (202) 663-6363

13 *Attorneys for Defendant*
14 FACEBOOK, INC.

15

16                **UNITED STATES DISTRICT COURT**

17               **NORTHERN DISTRICT OF CALIFORNIA**

18                      **SAN JOSE DIVISION**

19 REVEAL CHAT HOLDCO, LLC, a Delaware    Case No. 5:20-CV-00363-BLF
   limited liability company, USA TECHNOLOGY
20 AND MANAGEMENT SERVICES, INC. (d/b/a   **DECLARATION OF DAVID Z.**
   Lenddo USA), a Delaware corporation, CIR.CL,  **GRINGER IN SUPPORT OF**
21 INC., a dissolved Delaware corporation, and   **FACEBOOK'S MOTION FOR**
   BEEHIVE BIOMETRIC, INC., a dissolved    **ADMINISTRATIVE RELIEF TO**
22 Delaware corporation,                   **CONSIDER WHETHER CASES**
                                           **SHOULD BE RELATED**
23
                        Plaintiffs,
24
25        v.

26 FACEBOOK, INC., a Delaware corporation,

27                        Defendant.

28

I, David Z. Gringer, declare as follows:

1.    I am a partner at Wilmer Cutler Pickering Hale and Dorr LLP.  I represent Defendant Facebook, Inc. in the above-captioned action.

2.    On December 8, 2020, I emailed counsel for plaintiffs in the above-captioned action and asked whether Plaintiffs would stipulate to Defendant's motion for administrative relief to consider whether the instant action and the recently filed *Klein* action, No. 5:20-cv-08570-LHK, should be related.  That same day, Plaintiffs' counsel responded that Plaintiffs would agree to so stipulate.

3.    On December 8, 2020, I also emailed counsel for Plaintiffs in the *Klein* action at the Keller Lenkner firm and asked whether *Klein* Plaintiffs would stipulate to Defendant's motion.  The next day, December 9, 2020, counsel for the *Klein* Plaintiffs responded that *Klein* Plaintiffs would not stipulate to Defendant's motion and that they would instead file a motion opposing relation.  No explanation was offered.

4.    The Complaint in *Klein* is attached as Exhibit 1.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 10th day of December 2020 in Washington, District of Columbia.

By:   /s/ David Z. Gringer
David Z. Gringer

### SIGNATURE ATTESTATION

I am the ECF User whose identification and password are being used to file the foregoing.  Pursuant to Civil Local Rule 5-1(i), I hereby attest that the other signatories have concurred in this filing.

Dated:  December 10, 2020         By:   /s/ Sonal N. Mehta
Sonal N. Mehta

# EXHIBIT 1

Stephen A. Swedlow (*pro hac vice forthcoming*)
 stephenswedlow@quinnemanuel.com
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606-1881
(312) 705-7400

Kevin Y. Teruya (Bar No. 235916)
 kevinteruya@quinnemanuel.com
Adam B. Wolfson (Bar No. 262125)
 adamwolfson@quinnemanuel.com
Brantley I. Pepperman (Bar No. 322057)
 brantleypepperman@quinnemanuel.com
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
(213) 443-3000

Warren Postman (Bar No. 330869)
 wdp@kellerlenkner.com
Jason Ethridge (*pro hac vice forthcoming*)
 jason.ethridge@kellerlenkner.com
**KELLER LENKNER LLC**
1300 I Street, N.W., Suite 400E
Washington, DC 20005
(202) 918-1123

Ashley Keller (*pro hac vice forthcoming*)
 ack@kellerlenkner.com
Benjamin Whiting (*pro hac vice forthcoming*)
 ben.whiting@kellerlenkner.com
**KELLER LENKNER LLC**
150 N. Riverside Plaza, Suite 4270
Chicago, IL 60606
(312) 741-5220

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

MAXIMILIAN KLEIN and SARAH GRABERT, individually and on behalf of all others similarly situated,

　　　　　*Plaintiffs,*

　　vs.

FACEBOOK, INC., a Delaware corporation headquartered in California,

　　　　　*Defendant.*

Case No. 20-8570

**CLASS ACTION COMPLAINT**

**(1) MONOPOLIZATION OF SOCIAL NETWORK MARKET**
Violation of the Sherman Act
(15 U.S.C. § 2)

**(2) ATTEMPTED MONOPOLIZATION OF SOCIAL NETWORK MARKET**
Violation of the Sherman Act
(15 U.S.C. § 2)

**(3) MONOPOLIZATION OF SOCIAL MEDIA MARKET**
Violation of the Sherman Act
(15 U.S.C. § 2)

**(4) ATTEMPTED MONOPOLIZATION OF SOCIAL MEDIA MARKET**
Violation of the Sherman Act
(15 U.S.C. § 2)

**(5) UNJUST ENRICHMENT**

**DEMAND FOR JURY TRIAL**

CLASS ACTION COMPLAINT

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

PRELIMINARY STATEMENT.................................................................................................1

PARTIES ...............................................................................................................................5

    Defendant .......................................................................................................................5

    Plaintiffs .........................................................................................................................6

JURISDICTION, VENUE, AND CHOICE OF LAW .....................................................7

INTRADISTRICT ASSIGNMENT ....................................................................................8

FACTUAL ALLEGATIONS................................................................................................8

    General Background on the Social Media Industry ...............................................8

    General Background on Facebook ............................................................................10

    Facebook is Dominant in the Social Network and Social Media Relevant Markets. .........14

        The Social Network Market ..................................................................14

        The Social Media Market........................................................................20

        Relevant Geographic Market ................................................................23

        The Social Network and Social Media Markets Feature High Entry Barriers........23

    Facebook Has Attempted to Acquire Market Power (and Has Succeeded in Acquiring Market Power) by Deceiving Consumers about Its Privacy Practices. ...................................................................................................28

    The Cambridge Analytica Scandal Partially Reveals the Extent of Facebook's Deception. ...............................................................................39

    Facebook is Attempting to Use (and Has Successfully Used) Anticompetitive Acquisitions and Threats to Destroy Competition in the Social Network and Social Media Markets.................................................43

        Facebook's Tracking of Consumers' Personal Data Allowed it to Identify Competitors and then Eliminate Them Through a Strategy of Copy, Acquire, or Kill. ...............................................................43

        Facebook Threatened Competitors with Discriminatory Practices to Help Drive its Anticompetitive Acquisition Strategy..........................46

        Instagram.....................................................................................................51

        Snapchat.......................................................................................................54

        WhatsApp.....................................................................................................56

Other Examples of Facebook's "Copy, Acquire, Kill" Strategy ............................57

Facebook's Use of Onavo Comes to Light. ............................................................58

Facebook's Anticompetitive Practices Have Harmed and Continue to Harm
    Competition in the Social Network and Social Media Markets...............................60

Facebook's Anticompetitive Conduct Has Damaged Consumers in Direct and
    Quantifiable Ways...................................................................................................62

ACCRUAL OF CLAIM, EQUITABLE TOLLING, FRAUDULENT CONCEALMENT,
    CONTINUING VIOLATION, AND ASCERTAINMENT OF DAMAGES ...................63

CLASS ACTION ALLEGATIONS ......................................................................................67

INTERSTATE TRADE AND COMMERCE.........................................................................70

CLAIMS FOR RELIEF .........................................................................................................71

PRAYER FOR RELIEF.........................................................................................................80

DEMAND FOR JURY TRIAL..............................................................................................81

1       1.      Plaintiff(s), by their undersigned counsel, hereby bring(s) this action against

2   Defendant Facebook, Inc. ("Facebook"), individually and on behalf of a class of similarly situated

3   persons, and allege(s) as follows:

4                                    **PRELIMINARY STATEMENT**

5       2.      Founded originally as a website that allowed college students to connect with

6   friends on campus, Facebook has since expanded exponentially and today is the largest social

7   network and also the largest social media platform in the world.  In July 2020, for example,

8   Facebook reported 1.78 billion daily active users and 2.7 billion monthly active users for its

9   Facebook social network alone.  Including *all* of Facebook's primary product offerings—*e.g.*,

10  Facebook, Instagram, Facebook Messenger, WhatsApp, and Oculus—Facebook commands 2.47

11  billion daily active users and 3.14 billion monthly active users.  But Facebook did not, as it would

12  have the public believe, obtain market dominance based on innovation and fair competition.

13  Instead, Facebook has used its behemoth-status as a weapon to clear the field of any and all

14  competitors that threaten to take away market share.  Facebook has done so by engaging in a two-

15  part anticompetitive scheme that originated many years ago but continues to this day, and which

16  has the net effect of destroying competition and harming consumers.

17      3.      First, set on utter domination, Facebook consistently and intentionally deceived

18  consumers about the data privacy protections it provided to its users.  During the early days of

19  social media and social networks, Facebook recognized that promising users stringent privacy

20  protections was necessary for it to win the race for market dominance.  Accordingly, many users

21  chose Facebook over other competing platforms due to Facebook's stated commitment to its

22  users' privacy.  In reality, however, Facebook concealed the scope of the data it harvested from

23  consumers and the ways in which it used that data to squash competition.  By the time

24  Facebook's deception began to come to light in 2018, it was too late—Facebook had cheated its

25  way to market dominance.  Facebook's deceptions allowed the company to gain and then, over

26  the years, illegally maintain a stranglehold on the Social Network and Social Media Markets

27  (defined and discussed further below).  And high barriers to entry, including strong network

28

1  effects and high switching costs, bolstered Facebook's efforts to prevent actual and would-be

2  competitors alike from challenging its monopolistic grip.

3       4.      Second, Facebook exploited the rich data it deceptively extracted from its users to

4  identify nascent competitors and then "acquire, copy, or kill" these firms.  Rather than competing

5  on the merits, Facebook used the valuable consumer data that it was harvesting to identify

6  incipient competitors with the most likely path to meaningful market share gains.  Equipped with

7  the valuable user data it led consumers to believe it was not gathering and would not use in this

8  way, Facebook targeted its users' preferred alternatives for destruction.  Facebook made clear that

9  it would copy incipient competitors' innovations and discriminatorily shut off these firms' access

10 to Facebook's valuable user data if they did not sell their businesses to Facebook first.  The

11 message to its competitors was explicit: sell at a bargain, or Facebook will go into "destroy

12 mode."  All of this was enabled by Facebook's deception.

13      5.      While Facebook's scheme—bolstered by its deception and its serial acquisitions—

14 has allowed Facebook to evolve since Mark Zuckerberg founded the company in 2004, the

15 economic relationship between Facebook and its users has not.  When users sign up for a

16 Facebook account, they agree to certain terms.  Those terms lay out the economic exchange

17 between Facebook and its users.  Consumers give Facebook personal data about themselves;

18 Facebook allows users to access its social media network and pledges to protect users' privacy.

19 Facebook's current Terms of Service state:

20     *Instead of paying* to use Facebook and the other products and services we offer, by
    using the Facebook Products covered by these Terms, *you agree* that we can show

21     you ads that businesses and organizations pay us to promote on and off the
    Facebook Company Products. *We use your personal data, such as information*

22     *about your activity and interests, to show you ads that are more relevant to you.*[1]

23 Notably, Facebook suggests to the user (even to this day) that the extent to which it utilizes their

24 data is limited, and that the extent of the data collection is limited to Facebook's services

25 themselves.

26

27     [1] *Facebook Terms of Service*, https://www.facebook.com/terms.php (last accessed

28 December 3, 2020).

1        6.    The Terms of Service further state that "In exchange [for access to Facebook's

2  services] we need you to make [certain] commitments."  Among those "commitments" is

3  "[p]ermission to use your name, profile picture, and information about your actions with ads and

4  sponsored content."  The Terms then state that protecting user "privacy is central to how

5  [Facebook has] designed [its] ad system."  In other words, consumers give up personal

6  information and agree to receive targeted advertisements on the Facebook platform in exchange

7  for access to Facebook's social media network and for a commitment from Facebook to protect

8  user privacy.  They do not agree to anything beyond that.

9        7.    Facebook derives enormous economic value from the data it harvests from

10  consumers on its platform.  A recent majority staff report from the United States House of

11  Representatives Antitrust Subcommittee explained that "[o]nline platforms rarely charge

12  consumers a monetary price—products appear to be 'free' *but are monetized through people's*

13  *attention or with their data*."[2]  The same House Report recognizes the monstrous monetary value

14  that Facebook reaps from the data that it extracts from its users.[3]

15        8.    In fact, Facebook itself touts the economic value of the data it harvests from

16  consumers.  For example, Facebook describes its massive advertising earnings in terms of

17  average revenue per user ("ARPU") in its public filings.  For 2019, Facebook's ARPU was over

18  $41 per user in the United States and Canada.[4]

19        9.    Facebook's weaponization of user data and its strategy to "acquire, copy, or kill"

20  competitors has been wildly successful at the expense of consumers.  Facebook's anticompetitive

21  scheme has lessened, if not eliminated, competition and harmed consumers.

22        10.    Facebook's destruction of competition has caused consumers to suffer substantial

23  economic injury.  Consumers give up something of material value when agreeing to Facebook's

---

24

25     [2] *See Investigation of Competition in Digital Markets*, Majority Staff Report and Recommendations ("House Report"), Subcommittee on Antitrust, Commercial, and

26  Administrative Law of the Committee on the Judiciary, at 18 (emphasis added), October 6, 2020, available at https://kl.link/3jGISfK.

27     [3] *Id.* at 18.

28     [4] *Facebook Q4 2019 Results* at 4, available at https://kl.link/36yIY5J.

1    Terms of Service: their personal information and their attention.  User information and attention

2    is then sold in measurable units to advertisers in exchange for money.  Consumers thus give up

3    valuable consideration in using Facebook pursuant to Facebook's Terms of Service.  As

4    Facebook's co-founder explained, "[Facebook] is not actually free, and it certainly isn't harmless.

5    . . . We pay for Facebook with our data and our attention, and by either measure it doesn't come

6    cheap."[5]

7         11.    Absent Facebook's anticompetitive scheme, fair competition would have required

8    Facebook to provide consumers greater value in return for consumers' data, but Facebook instead

9    took that data without providing adequate compensation to its users (*i.e.,* the members of the

10   putative class in this action).  That constitutes antitrust injury.  Through its deception and the

11   acquisitions enabled by its deception, Facebook prevented competition on the merits, and as a

12   result of that reduction in competition, users received less value for their data than they would

13   have received in some form absent the reduction.

14        12.    Facebook's acquisition and maintenance of monopoly power continues to harm

15   consumers.  Prior to Facebook's consolidation of the Social Network and Social Media Markets,

16   a number of firms vigorously competed to win over consumers by offering competing products

17   which differed in non-price attributes such as quality.  For instance, early social media

18   companies, including Facebook, competed for market share by offering competing products to

19   consumers which highlighted particular privacy features.  Absent Facebook's anticompetitive

20   scheme, which has allowed Facebook to place consumers under its monopolistic thumb,

21   competition from Facebook's rivals would require Facebook to offer products of quality superior

22   to those it thrusts upon consumers today.  Instead, Facebook's anticompetitive conduct has

23   allowed Facebook to artificially stifle innovation and deprive consumers of any meaningful

24   alternative to Facebook's social media empire.  As such, consumers are faced with a "take it or

25   leave it choice" that provides no choice at all: accept a Facebook of lesser quality or forgo use of

26   the only social media platform used by most consumers' friends and family members.

27   _____

28   [5] Chris Hughes, *It's Time to Break Up Facebook*, NY Times, May 9, 2019, available at
     https://kl.link/3dUTshC.

13.     Facebook's monopolistic conduct violates the antitrust laws and harms consumers. Facebook is dominant in the Social Network Market and the Social Media Market, and has engaged in predatory and exclusionary conduct in order to monopolize, causing Plaintiffs and Class members to suffer substantial economic injury as a result of Facebook's competition-reducing violations of law.  This action seeks recovery for consumers' losses and Facebook's unlawful gains, and it seeks other appropriate equitable relief to prevent Facebook from continuing to destroy competition and harm consumers.

## PARTIES

*Defendant*

14.     Defendant Facebook, Inc. is a publicly traded corporation, incorporated under the laws of Delaware.  Facebook's principal place of business and headquarters are located at 1601 Willow Road in Menlo Park, California.

15.     Founded in 2004 by Mark Zuckerberg, Facebook is a social media company that provides online services to more than 3.14  billion users.  Facebook owns and operates several business divisions, such as:

- Facebook.  Facebook's core social media application, which bears the company's name, is, according to Facebook's filings with shareholders, designed to enable "people to connect, share, discover, and communicate with each other on mobile devices and personal computers."  The Facebook core product contains a "News Feed" that displays an algorithmically ranked series of content and advertisements individualized for each person.

- Instagram.  Instagram is a social media photo-sharing application that allows users to share photos, videos, and messages on mobile devices.  Facebook acquired Instagram in April 2012.

- Messenger.  Facebook's Messenger application is a multimedia messaging application, allowing messages that include photos and videos to be sent from person to person across platforms and devices.

- **WhatsApp**.  WhatsApp is a secure messaging application used by individuals and businesses.  Facebook acquired WhatsApp in 2014.

16.     In exchange for providing services, Facebook collects user data, which it allows advertisers to use for targeted advertising to Facebook users.  Facebook's principal revenue is from targeted social media advertising that it provides to advertisers as a data broker.  In 2019, Facebook collected $70.7 billion in revenue, almost entirely from allowing companies to serve ads to its users.

17.     Facebook has over 50,000 employees and offices worldwide.

***Plaintiffs***

18.     Plaintiff Maximilian Klein is a natural person and citizen of the State of Vermont and a resident of Chittenden County.

19.     Plaintiff Klein created a Facebook account in 2006, maintains an active account, and regularly uses Facebook.  Plaintiff Klein has an active Instagram account and has maintained that account since 2016.  Plaintiff Klein uses Facebook's Messenger feature and actively uses a WhatsApp account.

20.     Plaintiff Klein cares about his online privacy and trusted Facebook to protect his privacy.  But since the Cambridge Analytica scandal broke in 2018 and exposed Facebook's lack of privacy protections and low-quality data privacy practices, he now does not trust Facebook to protect his online privacy.  Plaintiff Klein now does not like the invasiveness of Facebook and its products.  Despite this, Plaintiff Klein continues to use Facebook and its products because virtually everyone he knows uses them and there are no other suitable alternatives to connect with his friends and family.

21.     Facebook lied about its data privacy practices and the scope of the data it collected and made available to third parties.  If Plaintiff Klein had known the truth about Facebook's privacy practices years ago, he would not have agreed to give Facebook access to as much personal data about himself.

22.     Plaintiff Sarah Grabert is a natural person and citizen of the State of Illinois and a resident of Cook County.

---

CLASS ACTION COMPLAINT

6

23.     Plaintiff Grabert created a Facebook account prior to 2007, maintains an active account, and regularly uses Facebook.  Plaintiff Grabert has an active Instagram account and has maintained that account since at least 2010.  Plaintiff Grabert uses Facebook's Messenger feature and has used a WhatsApp account.

24.     Plaintiff Grabert cares about her online privacy and trusted Facebook to protect her privacy.  But since the Cambridge Analytica scandal broke in 2018 and exposed Facebook's lack of privacy protections and low-quality data privacy practices, she now does not trust Facebook to protect her online privacy.  Plaintiff Grabert now does not like the invasiveness of Facebook and its products.  Despite this, Plaintiff Grabert continues to use Facebook and its products because virtually everyone she knows uses them and there are no other suitable alternatives to connect with her friends and family.

25.     Facebook lied about its data privacy practices and the scope of the data it collected and made available to third parties.  If Plaintiff Grabert had known the truth about Facebook's privacy practices years ago, she would not have agreed to give Facebook to as much personal data about herself.

## JURISDICTION, VENUE, AND CHOICE OF LAW

26.     This action arises under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and Section 4 of the Clayton Act, 15 U.S.C. § 15.  The action seeks to recover treble damages or disgorgement of profits, interest, costs of suit, equitable relief, and reasonable attorneys' fees for damages to Plaintiffs and members of the Class resulting from Defendant's restraints of trade and monopolization of the Social Network and Social Media Markets described herein.

27.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1332 (class action diversity jurisdiction), and 1337(a) (antitrust); and under 15 U.S.C. § 15 (antitrust).  The Court also has subject matter jurisdiction over the state-law unjust enrichment claims presented in this action under 28 U.S.C. 1367 (supplemental jurisdiction).

28.     This Court has personal jurisdiction over Facebook because it is subject to general jurisdiction in the State of California, where it maintains its headquarters and its principal place of business, and Facebook's Terms provide that consumers must bring these claims in this Court.

The scheme to monopolize alleged in this Complaint caused injury to persons throughout the United States, including in this District. Moreover, Facebook also conducted substantial business from which the claims in this case arise in California and has agreed to personal jurisdiction in this Court.

29. Venue is appropriate in this District under 15 U.S.C. § 15(a) (Clayton Act), 15 U.S.C. § 22 (nationwide venue for antitrust matters), and 28 U.S.C. § 1391(b) (general venue provision). Facebook transacts business within this District, and it transacts its affairs and carries out interstate trade and commerce, in substantial part, in this District.

30. Facebook's "Terms of Service" provide that "the laws of the State of California," which includes the federal antitrust laws, govern the Terms and "any claim" between Facebook and its users.[6]

**INTRADISTRICT ASSIGNMENT**

31. This action is properly assigned to the San Jose Division of this District, pursuant to Civil Local Rule 3-2(c) and (e), because Facebook is headquartered, and a substantial part of the events or omissions that give rise to the claim occurred, in San Mateo County, which is served by the San Jose Division.

**FACTUAL ALLEGATIONS**

*General Background on the Social Media Industry*

32. At a high level, the various participants in the social media industry include the following: social media platforms, consumers, advertisers, and content providers (which can be any of the previous three types of market participants, or can be third parties).

33. Social media platforms provide social networking, messaging, and/or media tools to consumers "designed to engage people by facilitating sharing, creating, and communicating content and information online."[7]

---

[6] *Facebook Terms of Service*, https://www.facebook.com/terms.php (last accessed: December 3, 2020).

[7] House Report, *supra*, at 88.

34.     Social media platforms typically allow users on their networks to interact with people the users know, participate in "groups" which join together users with a particular background or common interest, and display content through linear feeds.[8]  Facebook's social media platform—which allows users to interact with others, join and participate in groups, and displays content linearly—is pictured below:[9]



35.     A common feature of the social media industry is that social media platforms typically offer their services to consumers for non-cash consideration.[10]  In consideration for providing this service, social media platforms obtain valuable personal data from their users.  The extent of the information obtained from users varies by social media platform, as does the disclosures about what data is obtained and the use(s) to which it is subsequently put.

---

[8] *Id.*

[9] *See* Kessica Guynn, *Facebook is making a big change to your news feed*, USA TODAY, Jan. 11, 2018, available at https://www.usatoday.com/story/tech/2018/01/11/facebook-newsfeed-big-change/1023331001/ (last accessed Nov. 24, 2020).

[10] House Report, *supra*, at 88.

36.     Social media platforms monetize the data they obtain from users by selling the data to third-parties.  As an example, advertisers often pay social media platforms for certain aspects of the platform's user data, in order to learn more about the demographics that are most interested in certain products.  Advertisers, product manufacturers, and service providers also often pay a social media platform to direct curated ads specifically towards particular user segments.  Similarly, application developers ("app developers") purchase users' data from social media platforms to attract users which, in turn, brings profit to the developers in the forms of application purchases and ad-revenue.

### General Background on Facebook

37.     Facebook's core offering to consumers is access to its social media network, which contains the individualized profiles of well over 200 million users in the United States and billions of users worldwide.  In exchange for access to the only social media network that allows consumers to connect online with most of their family, friends, and acquaintances, Facebook requires users to provide their personal data and receive targeted advertisements.

38.     The personal data and user attention that Facebook obtains from consumers in this exchange is not just the users' consideration paid to use Facebook products; they are what provides significant monetary value to Facebook's enterprise.  Facebook uses the data obtained from its massive user base to generate its largest source of income: selling targeted advertisements to its users.  In 2019, Facebook collected $70.7 billion in revenue, almost entirely from allowing companies to serve targeted ads to its users.

39.     Facebook's machine learning algorithms mine patterns in the data for advertisers, which allows advertisers to reach precisely the right audience to convert into sales, user signups, or the generation of sales leads.  To protect its exclusive control over user data and attention, Facebook has brought legal action against actors that have copied publicly available user data and made it available outside of Facebook.[11]

---

[11] Facebook brought one such suit as recently as November 19, 2020.  *See* Jessica Romero, *Combating Clone Sites*, Facebook Newsroom, Nov. 19, 2020, available at https://about.fb.com/news/2020/11/combating-clone-sites/ (last accessed Nov. 24, 2020).

40.     The data is also monetized by commercializing access—for example, by providing application developers, content generators, and advertisers with direct access to the information embedded in Facebook's network, such as the interconnection between users, user attributes, and user behavior.  That data can then be mined by these third parties.

41.     From the beginning, Facebook has sought to entice consumers based on its supposed commitment to maintaining the privacy of its users' data.  Unlike earlier competing social media platforms that allowed anyone interested to join anonymously or by using unverified usernames, Facebook required that those interested in joining to use their real-world identities.

42.     This qualitative distinction had clear privacy implications.  Ironically, early platforms that allowed users to register anonymously or with pseudonyms caused more privacy problems for users because wrongdoers that obtained and/or used fellow users' personal information could hide behind their online (anonymous or unverified) identities.

43.     In contrast, Facebook claimed that it created a level of accountability, because users ostensibly knew who was on the other side of the screen from them and were connected to them in some way in real life.  Indeed, Facebook's website "was one of the first social networks where users actually identified themselves using their real names."[12]  By making users "real," Facebook claimed (and users agreed by voting with their feet) that their social interactions online were better protected and more meaningful.  But all of this required Facebook to promise privacy protection in order to induce users to provide their real-world identities and data.

44.     Prior to founding Facebook, Mark Zuckerberg learned the importance of privacy to consumer preference early on.  While a student at Harvard University, Mr. Zuckerberg created "Facemash," which "juxtaposed the pictures of two random Harvard undergraduates and asked users to judge their physical attractiveness."[13]  Notably, Facemash obtained the students' photos

---

[12] *See* John Gallagher, Getting the Most Out of Information Systems § 8.3, available at https://kl.link/3dX3BKN (last accessed November 21, 2020).

[13] Alan J. Tabak, *Hundreds Register for New Facebook Website*, The Harvard Crimson (Feb. 9, 2004), available at https://www.thecrimson.com/article/2004/2/9/hundreds-register-for-new-facebook-website/ (last accessed Nov. 26, 2020).

without their permission, "dr[a]w[ing] the ire of students and administrators alike[.]"[14]  While

promoting "thefacebook.com," Facebook's predecessor, Zuckerberg vowed that he had learned

from his experience with Facemash, building into "thefacebook.com" "intensive privacy options,"

which "he hoped would help to restore his reputation[.]"[15]  In reality, thefacebook.com's—and

later Facebook's—representations regarding privacy were part of an orchestrated scheme,

designed to secure and prolong its monopoly status.

45.     At first, Facebook was closed to all but those users who could validate their own

real-world identities, such as by verifying that he or she was legitimate via an e-mail address

issued by an organization, such as a university or a firm:[16]

> It was this "realness" that became Facebook's distinguishing feature—bringing
> along with it – and also depending on – a perceived degree of safety and comfort
> that enabled Facebook to become a true social utility and build out a solid social
> graph consisting of verified relationships.  Since "friending" (which is a link
> between nodes in the social graph) required both users to approve the relationship,
> the network fostered an incredible amount of trust.  Today, many Facebook users
> post their cell phone numbers and their birthdays, offer personal photos, and
> otherwise share information they'd never do outside their circle of friends.

46.     The data Facebook has since collected derives much of its value from the ability to

identify Facebook's users by their real-world identity.  Other platforms, such as Twitter, have

only loosely enforced identity rules, and have never required users to disclose granular details

about themselves.

47.     Facebook characterizes each user's disclosure of his or her identity as increasing

the value of the experience for all users, who are purportedly able to benefit from others'

disclosures by connecting with and following the activities of their real-world connections.[17]

---

[14] *Id.*

[15] *Id.*

[16] Gallaugher, *supra*, § 8.3.

[17] Apple's Senior Director for Global Privacy recently expressed skepticism that social media platforms such as Facebook encourage disclosure of personal information solely to create a richer "personalized experience" for other users.  *See* Apple Privacy Letter, November 19, 2020, available at https://kl.link/33bhK2Y ("What some companies call 'personalized experiences' are often veiled attempts to gather as much data as possible about individuals, build extensive profiles on them, and then monetize those profiles.").

Disclosure also increases the market value of the information Facebook obtains from its users. Knowing the internet habits of "YankeesFan123" is less valuable than knowing the browsing habits of a specific individual whose love of the Yankees can be linked with information about his shopping habits, income, family, friends, travel, dining, dating, and a myriad of other data points.

48.     In the years since its inception, Facebook has tracked trillions of data points about consumers with a powerful data structure that it calls the "social graph."  The social graph concept "refers to Facebook's ability to collect, express, and leverage the connections between the site's users, or as some describe it, 'the global mapping of everyone and how they're related.'"[18]  All of the data on Facebook can be thought of as a "node" or "endpoint" that is connected to other data on Facebook:

> You're connected to other users (your friends), photos about you are tagged, comments you've posted carry your name, you're a member of groups, you're connected to applications you've installed—Facebook links them all.[19]

49.     Given Facebook's size and reach, as well as the extent of its surreptitious user data collection (discussed further below) the social graph is a unique and uniquely valuable dataset, even among the giants of the tech world.  Much of this value stems from the fact that the majority of Facebook's social graph cannot be viewed by the public or search engines, and because it contains extraordinary amounts of data that users unwittingly provided Facebook regarding their most minute everyday habits.

50.     Facebook is a so-called "walled garden"—a closed ecosystem run by a single operator.  Advertisers must go through Facebook in order to reach Facebook users.  And Facebook can decide how much of its social graph it allows app developers, including competitors, to access.

---

[18] Gallaugher, *supra*, (quoting A. Iskold, "Social Graph: Concepts and Issues," ReadWriteWeb, September 12, 2007).

[19] *Id.* (citing A. Zeichick, "How Facebook Works," Technology Review, July/August 2008).

51.     The personal data of Facebook's users takes many forms including data about the information users share on their personal profile pages, the photos and profiles users have viewed, what information users share with others, and even what users put in messages to other users. This granular data all allow targeted advertising on a scale that has never before existed. Facebook's platform allows advertisers to target Facebook's user base by their attributes and behavior.  Third party advertisers have been able to use Facebook's advertising platform to track and target consumers all throughout the internet, even when Facebook users are "logged-out" of Facebook.

### *Facebook is Dominant in the Social Network and Social Media Relevant Markets.*

52.     There are two relevant markets applicable to this dispute.  They are: (1) "the Social Network Market"; and (2) "the Social Media Market."  Facebook has unlawfully acquired and maintained monopoly power in both markets.

### *The Social Network Market*

53.     The Social Network Market is the product market consisting of social networks, which are websites (and accompanying mobile applications) that: (1) facilitate users of a given network finding, interacting, and networking with other people either whom the users already know or to whom they are connected through others they already know online; and (2) provide users with additional substantive features beyond the ability to communicate with other users and share multimedia.  As explained more fully below, the definitions of the Social Media and Social Network Markets are distinct, although Social Networks may offer Social Media platforms on their networks (as Facebook, for example, does).[20]  To that extent, the Social Network Market is a distinct part or sub-part of the Social Media Market.

54.     Search engines, such as Google, Yahoo, or Bing, are not "social networks" because they do not provide for interaction between platform members.  Similarly, apps like Apple's "iMessage," which simply allow the sharing of messaging media, such as emails or text

---

[20] The House Antitrust Subcommittee has recognized the Social Network Market as a relevant market which is distinct from the broader Social Media Market.  *See* House Report, *supra*, at 90–91.

1  messages, are not social networks because, although they provide for interaction, they do so only

2  in a device-to-device manner and focus solely on delivering messages rather than facilitating a

3  broader online social experience.  Facebook itself has noted this distinction, explaining in

4  documents provided to the House Antitrust Subcommittee that whereas the growth of Apple's

5  iMessage is "limited by the adoption of iPhones, . . . Facebook's products can be used across

6  devices."[21]

7          55.     Still other types of online networks, such as LinkedIn, are not "social networks,"

8  as that term is defined in this complaint, because they are used for a different purpose, and are

9  used in parallel to—rather than instead of—Social Networks.  Whereas LinkedIn is typically

10  considered the dominant professional social network in the world, it is not a replacement for

11  Facebook.  This is because LinkedIn is used primarily for professional networking and

12  employment-seeking purposes, while Facebook and its like are used primarily for non-

13  professional, personal purposes.[22]  The European Commission explained this distinction during its

14  review of the Microsoft/LinkedIn merger: "the reasons for using a [professional service network]

15  are different from those for using a personal social network.  While the former is used to '*1.*

16  *Maintain professional identity, 2. Make useful contacts, 3. Search for opportunities, 4. Stay in*

17  *touch*', the latter is used to '*1. Socialize, 2. Stay in touch, 3. Be entertained, 4. Kill time'*."[23]  Thus,

18  users will have *both* a LinkedIn and Facebook account, not one or the other, and this other type of

19  network is not viewed or treated as a substitute for a Social Network.[24]

20          [21] House Report, *supra*, at 136 n.752.

21          [22] Facebook has, itself, recognized this distinction in documents it provided to the House
22  Antitrust Subcommittee.  *See id.* at 133–34 n.733 ("Linkedin . . . coexist[s] in the US with similar
    user bases but orthogonal graphs: Facebook connects friends and family, LinkedIn connects
23  coworkers[.]").

          [23] European Commission, *Case M.8124 – Microsoft/LinkedIn* (June 12, 2016) at ¶ 106,
24  available at https://ec.europa.eu/competition/mergers/cases/decisions/m8124_1349_5.pdf (last
25  accessed Nov. 28, 2020) (emphases in original).

26          [24] In addition to recognizing LinkedIn's distinct professional networking purpose, the House
    Antitrust Subcommittee's recent report also distinguished LinkedIn from social networks, like
27  Facebook, on the basis of LinkedIn's economic model.  Whereas users pay for social networks
    like Facebook with their data, time, and attention, some features of LinkedIn, such as "LinkedIn
28  Premium," further require users to pay a monetary fee.  *See* House Report, *supra,* at 88.

56.     LinkedIn itself has recognized Social Networks are a distinct product.[25]  It has, for example, explained the differences between "personal networks" and "professional networks:[26]



57.     Similarly, LinkedIn has recognized the distinct content that Social Network users expect to see when visiting a given social network:[27]



---

[25] *See* LinkedIn, *The Mindset Divide* (Sept. 2012), available at https://business.linkedin.com/content/dam/business/marketing-solutions/global/en_US/site/pdf/wp/linkedin-marketing-solutions-mindset-divide.pdf (last accessed Nov. 28, 2020).

[26] *Id.* at 4.

[27] *Id.* at 6.

58.     There are no reasonable substitutes for Social Networks.  Social Media platforms, such as YouTube and TikTok, primarily exist to allow users to stream, share, and view content. By contrast, firms in the Social Network Market provide users of a particular network an online community that brings together users who specifically choose to associate with one another.  In addition, Social Networks, such as Facebook, provide a "rich social experience" to users through specific product features.[28]  Social Media platforms, like YouTube and TikTok, do not provide or facilitate a similar use and instead offer only limited opportunities for social interaction, or interaction of a very different type that complements, rather than substitutes, for a social networking experience.

59.     Beyond the "rich social experience" that Social Networks provide to users, consumers also use Social Networks for different purposes than other online social options, such as Social Media platforms.  The House Antitrust Subcommittee, Germany's Federal Cartel Office, and the United Kingdom's Competition and Markets Authority have all recognized that "the specific demand for social networks is fundamentally different from the demand for other social media."[29]  That is because users utilize each for different purposes: Social Networks "facilitate their users finding, interacting, and networking with other people they already know online," whereas Social Media platforms "principally facilitate the distribution and consumption of content" between "users with a wide range of relationships to the person posting, including by strangers."[30]  Thus, while a user might use YouTube to access and watch a complete stranger's video—such as a cooking recipe—the same user would use Facebook, not YouTube, to share *that* video with the user's friends, family, and real-world connections.[31]  Similarly, a user that finds a

---

[28] House Report, *supra*, at 91.

[29] *Id.* at 90.

[30] *Id.* at 91.

[31] *See* Administrative Proceedings, Bundeskartellamt, B6-22/16 ("German Federal Cartel Office Report") ¶ 312 (February 2019), available at https://kl.link/39AxErE ("YouTube is hardly ever used for other purposes (e.g. contacts to friends, messaging, looking for people the user knows, share contents")).

funny video of a celebrity (or other stranger) on YouTube may choose to encourage their friends and family to view that video by sharing it with them on Facebook with a note:[32]



60.     Additional factors make clear that Social Media platforms are used in parallel to—rather than instead of—Social Networks.  For one, many consumers use both YouTube and Facebook, rather than one over the other.[33]  Social Media platforms make it easy for a user to share the content he or she finds on a Social Media platform using his or her Social Network account.  By clicking the "SHARE" button that appears underneath a video on YouTube, for example, YouTube pre-populates a hyperlink of the video that the user may then easily copy and paste on Facebook:[34]

_____

[32] Meira Gebel, *How to post a YouTube video on Facebook in several different ways, using YouTube's 'Share' feature*, Business Insider (Aug. 23, 2019), available at https://www.businessinsider.com/how-to-post-a-youtube-video-on-facebook (last accessed Nov. 28, 2020).

[33] Federal Cartel Office Report, *supra*, ¶ 318 (noting that "Facebook.com and YouTube are increasingly used in parallel," and that a "large number of [users utilize] YouTube without registration and thus solely for viewing videos.").

[34] Gebel, *supra*.

61.     There is both indirect and direct evidence of Facebook's market power in the Social Network Market.  Since its initial market entry, in which it competed with early social networking companies such as MySpace and Friendster (which subsequently shifted to a combined social network/social media strategy, same as Facebook), Facebook has become dominant.  As opposed to its defunct early competitors, Facebook has over 2.7 billion users worldwide, which is 42% of the global population (excluding China), including over 200 million users in the United States.

62.     As discussed more fully below, Facebook's market share in the Social Network Market is higher than its share in the Social Media Market.  Moreover, share of consumer time on social networks is an accurate measure of a given network's market share,[35] and more than 80% of the time that consumers in the United States spend using social networks is spent on Facebook and Instagram.[36]  In addition to this demonstrably high market share, Facebook has held this dominant share for years with high barriers to new entry (discussed further below).  There is a reason a movie about Facebook is entitled, "*The* Social Network"; Facebook is now far and away the dominant player in that market.

---

[35] *See* Dina Srinivasan, *The Antitrust Case Against Facebook: A Monopolist's Journey Towards Pervaisve Survaillance In Spite of Consumers' Preference for Privacy*, 16:1 Berkeley Bus. L. J. 39, 87 (2019).

[36] *Id.* at 88.

1

### *The Social Media Market*

2      63.      The Social Media Market is the product market consisting of Social Media

3   platforms and tools, which are websites and mobile applications that allow users of a given

4   platform to communicate and deliver multimedia—such as text messages photos, videos, music,

5   and internet links—to other users of the same platform.

6      64.      Firms in the Social Media Market require users to provide some amount of

7   personal data in order to become members of those firms' platforms, which allows the user to

8   utilize the platform's online services.  Search engines, such as Google, Yahoo, or Bing, are not

9   "social media" because they do not provide for interaction between platform members.[37]

10     65.      Other forms of social interaction and online entertainment are not reasonable

11  substitutes for Social Media platforms because of the unique characteristics a Social Media

12  platform provides, and because user behavior clearly indicates that Social Media platforms are

13  complements to such other types of experiences and options.  As an example, Social Media

14  platforms allow users of a given platform to find, interact, and network with other people online.

15  Other platforms, such as online videogame platforms—like Sony's PlayStation Network and

16  Microsoft's Xbox Live—allow users to play videogames with each other online in real-time.

17  While Social Media platforms and online videogame platforms both allow their users to

18  communicate with other users of the same given service, those interactions take place in different

19  contexts and for different purposes.

20     66.      Videogame platform users may communicate on a videogame platform with the

21  users with whom they are playing a game to tell them "pass the ball."  But that communication is

22  simply to facilitate—and to complement—the videogame platform's intended purpose: providing

23  entertainment through the playing of videogames.  By contrast, the central purpose of Social

24  Media platforms *is* users interacting with each other and sharing aspects of their lives, both on-

25

26     [37] Relatedly, the United States Department of Justice ("DOJ") recently recognized that search
    engines are not "social media" in its recent antitrust complaint against Google.  *See United States,*
27  *et al., v. Google LLC*, 1:20-cv-03010 (D.D.C.), Dkt. 1, ¶ 90 ("[P]latforms . . . are not reasonable
    substitutes for general search services.").
28

---

and offline, as part of the social media experience.[38]  Thus, a video game player seeking to convert their gaming into a Social Media experience would livestream that gaming via a separate Social Media platform, like Facebook Live or Twitch, which shows that users of videogame platforms themselves do not consider videogame platforms a reasonable substitute for their social media accounts.

67.     In addition, Social Media platforms offer an economic model that is distinct from the economic models employed by providers of other forms of social interaction and online entertainment.  Social Media platforms require users to provide some amount of personal data in order to become members, which allows the user to utilize a given platform's online services.  By contrast, providers of social interaction and online entertainment may collect from users a per-use monetary fee or a regularly-occurring (monthly or annual) fee, but users' personal data is otherwise largely irrelevant to the transaction.

68.     Facebook itself recognizes that Social Media is a distinct relevant market.  For example, in an internal presentation prepared for Sheryl Sandberg, Facebook's Chief Operating Officer, Facebook maintained that "[t]he industry consolidates as it matures" and that "Facebook is now 95% of all social media in the US[.]"[39]

69.     Direct evidence of Facebook's monopoly power in the Social Media Market is bountiful.  For example, in an internal presentation, Facebook noted that "[i]n every country we've tipped, we have maintained [market] penetration," and it expressed skepticism that other firms could compete with Facebook.[40]  Moreover, as detailed below, Facebook has the near-unfettered ability to exclude competition from the Social Media market, due to its unrivaled (although anticompetitively-obtained) insight into Social Media users' data and behavior, and its surreptitious insights into nascent competitors, which it has ruthlessly acquired or destroyed.

---

[38] Germany's Federal Cartel Office has indicated that "entertainment only accounts for a small fraction of the applications for which Facebook.com is used."  German Federal Cartel Office Report, *supra*, ¶ 312.

[39] House Report, *supra*, at 138.

[40] *Id.* at 139.

1    Facebook has also proven due to its ubiquity and stranglehold on Social Media that it can control

2    prices for users—in this case, the amount of data it obtains about users without their consent (*i.e.*,

3    the price users "pay" to use Facebook)—with impunity.  With nowhere else to go for Social

4    Media, users largely must accede to Facebook's outsized demands regarding access to, and use

5    of, their data.

6         70.    In addition to direct evidence, there is also irrefutable indirect evidence of

7    Facebook's market power in the Social Media Market, similar to the same evidence alleged above

8    with respect to Facebook's power in the Social Network Market (which is re-alleged here with

9    respect to its Social Media services, which overlap with and are made available on the same

10   Social Network platform Facebook provides).  Facebook is by far the largest Social Media

11   company.  In the United States, Facebook's products include three of the seven most popular

12   mobile apps, measured by monthly active persons, reach, and percentage of daily and monthly

13   active persons.[41]  Indeed, the House Antitrust Subcommittee's recent report revealed that

14   "[a]ccording to Facebook's internal market data, its users spend significantly more time on its

15   family of products than on competing services."[42]

16        71.    Firms in the Social Media Market generate virtually all of their value to

17   shareholders in the form of advertising revenue.  Social media companies allow advertisers to use

18   data about a platform's users in order to deliver targeted advertisements to consumers.  In

19   particular, Facebook's anticompetitive conduct over the years has enabled it to build a network

20   that derives its power and value directly from those users' engagement with that network.  The

21   more data that consumers fed into Facebook's social graph by communicating and interacting

22   with each other, posting their pictures, and publishing their content, the more valuable the

23   Facebook network became to third parties, who could advertise to Facebook's users by targeting

24   them using the very information they provided to Facebook's network.

25

26

27      [41] *Id.* at 136.

28      [42] *Id.* at 137–38.

72.    Facebook, Twitter, Snapchat, and other Social Media companies all compete for the attention and data of their users, which they then convert into revenue by selling advertising. Accordingly, one of the best available metrics of market share in the Social Media Market is advertising revenue.

73.    As measured by advertising revenue, Facebook (including Instagram) has over 85% of the U.S. market, with the second-place competitor, Twitter, claiming *less than 3.5%* market share.  Notably, one or more of Facebook services are considered a "must have" for most Social Media users, whereas other Social Media platforms are not.[43]  This means that most Social Media users that are members of competing Social Media platforms still have an account on a Facebook service (if not all of them), which further means that Facebook's advertising revenues are a conservative estimate of its already obviously-dominant market share.

### *Relevant Geographic Market*

74.    The United States is the relevant geographic scope of both the Social Media Market and the Social Network Market.  Social media platforms each provide services to consumers throughout the United States, and these services do not differ by geographic area within the United States.  For example, neither Facebook nor competing social media platforms, such as YouTube, limit the offering of their services to residents of San Jose, California, as opposed to residents of Little Rock, Arkansas.  To the extent that Facebook has competitors in the United States in the Social Network Market, the same is true in the Social Network Market as well.

### *The Social Network and Social Media Markets Feature High Entry Barriers*

75.    Facebook's monopoly is durable because it operates in an industry with strong network effects and high barriers to entry.[44]  A network effect is the phenomenon by which the value or utility a user derives from a good or service depends on the number of users of the same

---

[43] Salvador Rodriguez, *TikTok passes Instagram as second-most popular social app for U.S. Teens*, CNBC (Oct. 6, 2020), available at https://www.cnbc.com/2020/10/06/tiktok-passes-instagram-as-second-most-popular-social-app-for-us-teens.html (last accessed Nov. 30, 2020).

[44] *See* House Report at 37–45.

good or service.  Network effects may be either direct or indirect.  Direct network effects arise where a product or service becomes more valuable to users as additional others use the product or service.  Indirect network effects exist when greater use of a product or service incentivizes third parties in a different customer group to also engage with that product or service.

76.     As an example of direct network effects, take, for instance, an instant messaging application.  Even if a messaging application has the very best encryption technology, superior look and feel, and is easy and intuitive to use, the product is worth comparatively little to a user if few other users have downloaded it.  Messaging is only valuable if you can send and receive messages with people of your choosing.  The more users who download the application, the more valuable it becomes to each of them.  The Social Network and Social Media Markets exhibit clear and obvious direct network effects: "no person wants to be on a social network without other users."[45]

77.     The powerful direct network effects inherent in the Social Network and Social Media Markets made competition at the early stages *for* the field rather than *within* the field.[46] The House Antitrust Subcommittee's recent report recognized this point as it relates to Facebook, explaining that Facebook's network effects are "very strong" and that "there are strong tipping points in the social networking market that create competition *for the market,* rather than competition within the market."[47] A similar phenomenon has since made itself clear in the Social Media market, such that even when users' preferences shift to non-Facebook options as their *favorite* (*e.g.*, TikTok or Snap), they still engage most often with Facebook's Social Media offerings (*e.g.*, Instagram) because it is the dominant, "must have" Social Media app.[48]

78.     The content generated by Facebook's user base reinforces also creates strong indirect network effects and, in turn, increases the value of the Facebook network to advertisers

---

[45] *Id.* at 41.

[46] *Id.*

[47] *Id.* (emphasis added).

[48] Salvador Rodriguez, *TikTok passes Instagram as second-most popular social app for U.S.* Teens, CNBC (Oct. 6, 2020), available at https://www.cnbc.com/2020/10/06/tiktok-passes-instagram-as-second-most-popular-social-app-for-us-teens.html (last accessed Nov. 30, 2020).

and Facebook itself.  With each photograph, relationship status, check-in, or post by a Facebook user, the Facebook network became more valuable, not just as a means of communicating with directly connected acquaintances, but as a means of learning about more remotely connected ones.  This feedback loop enabled Facebook to use its anticompetitive strategy of consumer deception and monopolistic merger conduct to achieve a scale—bolstered by revenue from third parties such as advertisers and app developers that were drawn to Facebook—which substantially foreclosed competition in the Social Network and Social Media Markets.

79.     As a result of this economic reality, markets that exhibit strong network effects tend to be "sticky," or accompanied by high switching costs.  Once a significant number of users adopt a product, they will be reluctant to switch to even a superior competitive alternative, because the newer offering will not deliver as much value unless many other users make the switch simultaneously.  This feature of network-effect markets produce a period of intense, early competition, after which a single, dominant player often becomes entrenched.  Facebook itself suggested in an internal memorandum, with respect to social media platforms and networks, "either everyone uses them, or no-one uses them."[49]  A fair and level playing field during the initial phase of early competition is thus crucial to maximize consumer welfare, as is a level playing field if a new type of social media platform arises that threatens to supplant the old.

80.     Relatedly, high barriers to entry refer to fixed costs that a competitor must pay to enter a market that incumbent players need not incur.  Switching costs impose a barrier to entry.  To induce a user to adopt a new product in a market that has high switching costs, a competitor must incur not only the expense of building a superior product, but also the added compensation to defray a user's cost of switching.  An incumbent does not incur this added cost, retaining a cost advantage that is at least equal to the switching cost the competitor must absorb.  Where switching costs are high, the incumbent's competitive advantage is high as well.

81.     High switching costs in the Social Network and Social Media Markets have allowed Facebook to prolong its monopoly.  As an example, Facebook users may be connected to

---

[49] House Report, *supra*, at 141.

one another exclusively through Facebook's network, leaving Facebook as the only method for users to remain in contact with one another.  Faced with the possibility of losing contact with each other, Facebook users who *would* switch to another social media platform or network may choose not to do so because of these high switching costs.[50]

82.     Similarly, the lack of portability of Facebook users' data presents an additional switching cost.  To illustrate, "a user may upload a variety of data to Facebook, including photos and personal information, but (by Facebook's design) may not be able to easily download the data and move it to another social media site; instead, the user would have to start from scratch, re-uploading her photos and re-entering her personal information to the new platform."[51]

83.     Facebook's tentacle-like grasp on other social apps likewise presents yet another switching cost for consumers.  For instance, users of the popular Spotify music streaming service frequently sign up for Spotify using their Facebook accounts.[52]  But users who enroll in Spotify using their Facebook accounts "can't disconnect it"—to use Spotify after leaving Facebook, users generally must set up new accounts on Spotify.[53]  In doing so, they lose access to their previous playlists, listening histories, connections with other users on Spotify, and other data.[54]  This discourages would-be defectors from ultimately leaving Facebook.

84.     Many monopolists who seek to deceive consumers and anticompetitively destroy competitors can often be disciplined by market forces.  A battery manufacturer, for example, that lies about the longevity of its batteries might be able to charge an unjustified premium price for a time.  But as soon as the manufacturer's deception is uncovered, consumers would quickly switch to a more fairly priced brand.  However, the robust network effects present in the Social Network and Social Media Markets impeded market forces from overcoming Facebook's market power once Facebook had anticompetitively secured its dominance.  Consumers who discovered in 2018

---

[50] Srinivasan, *supra*, at 89.

[51] House Report, *supra*, at 42.

[52] *Id.* at 146.

[53] *Id.*

[54] *Id.*

1    that Facebook had not actually been protecting their privacy as it promised could not easily

2    switch to an alternative, because their friends and connections were all on Facebook.

3          85.     In addition, the Social Network and Social Media Markets have high barriers to

4    entry.  Once a social media platform like Facebook has achieved dominant market share, the

5    amount of capital investment that would be required to challenge Facebook's monopoly would be

6    large.  A potential competitor would not only have to build its own vast network with features

7    Facebook does not offer, but would also have to pay users' switching costs on a massive scale.

8          86.     Coupled with the network effects and high barriers to entry in the Social Network

9    and Social Media Markets, Facebook's anticompetitive conduct allows it to extract

10    supracompetitive rents from users in the form of personal data and attention and deliver

11    minimum, suboptimal privacy protections and overall quality.  Facebook has been able to reap

12    supracompetitive profits from its anticompetitive conduct without the typical pressures of

13    competition from existing competitors or new entrants.  And Facebook has been able to control

14    and increase the amount of consumer information and attention that it demands.

15          87.     Internal documents show that Facebook has been keenly aware of these market

16    features.  An internal memorandum prepared in October 2018 by a senior data scientist and

17    economist at Facebook recognized that the network effects of Facebook and its products are "very

18    strong."[55]  In a 2012 presentation, Facebook described its network effects as a "flywheel,"

19    remarking that "[n]etwork effects make it very difficult to compete with us" and that its network

20    effects get "stronger every day."[56]  Similarly, Facebook's founder, Mark Zuckerberg, has made

21    clear Facebook's recognitions that "[t]here are network effects around social products"; there are

22    "a finite number of different social mechanics to invent" and "being first is how you build a brand

23    and a network effect."[57]

24          88.     Tellingly, Facebook's own documents show its awareness that due to strong

25    network effects and market tipping, Facebook is much less concerned with competition from

26        [55] *Id.* at 13, 13 n.14.

27        [56] *Id.*

28        [57] *Id.* at 143.

1    other social apps in the market like Snapchat or Twitter, than from competition within Facebook's

2    *own* family of products—Facebook, Instagram, Messenger, and WhatsApp.[58]  In the case of

3    messaging apps, Facebook's documents show that network effects can be even more extreme.

4    And because Facebook is not interoperable with other social networks, its users face high costs to

5    switch to other platforms, locking them into Facebook's platform.

6         89.    Facebook's awareness of these features of the Social Network and Social Media

7    Markets shaped its competitive strategy.  For example, a senior executive at the company

8    described its acquisition strategy as a "land grab," while Zuckerberg has boasted that Facebook

9    "can likely always just buy any competitive startups."[59]  Documents show that Facebook saw

10   Instagram and WhatsApp as maverick competitors and their acquisitions as a way to protect and

11   strengthen the durability of Facebook's monopoly.[60]

12        90.    Facebook's anticompetitive conduct, described more fully below, combined with

13   strong network effects and high barriers to entry, enabled it to obtain and maintain its monopoly

14   over the Social Network and Social Media Markets in the United States.  Indeed, the House

15   Antitrust Subcommittee recently recognized that because of its anticompetitive conduct and

16   strong network effects, "Facebook's monopoly power is firmly entrenched and unlikely to be

17   eroded by competitive pressures from new entrants or existing firms."[61]

18        ***Facebook Has Attempted to Acquire Market Power (and Has Succeeded in Acquiring***

19        ***Market Power) by Deceiving Consumers about Its Privacy Practices.***

20        91.    For years, Facebook has engaged in a pattern of deception about the amount of

21   data it obtains and the extent of the data harvesting and use by third parties its platform has long

22   enabled.  Its deception has only recently begun to come to light.

23        92.    Privacy practices were a crucial form of competition in the early days of the Social

24   Network and Social Media Markets.  After its founding in 2003, Myspace quickly dominated the

25   ───────────────

26   [58] *Id*. at 384.

     [59] *Id*. at 12–13.

27   [60] *See id*. at 149, 160.

28   [61]  *Id.* at 13.

───────────────

CLASS ACTION COMPLAINT

28

Social Network and Social Media Markets.  By 2006, MySpace supplanted Google as the most visited website in the United States.

93.     Notably, MySpace offered an "open" platform, allowing *all* interested users to join MySpace.  Moreover, MySpace users could sign up for MySpace using unverified usernames and pseuodyms.

94.     By 2007, overwhelmingly negative headlines began drawing attention to MySpace's lax privacy practices.  In particular, users, parents, and critics alike attributed sexual assaults, suicides, and murders to MySpace, speculating that MySpace's open platform—which cloaked wrong-doers with relative anonymity, an added-level of covert protection—triggered these events.

95.     By this time, competitors to Myspace including Friendster, Orkut, Flip.com, Bebo, and Facebook had begun to emerge.

96.     Given MySpace's prominence in the Social Network and Social Media Markets, Facebook sought to differentiate itself from MySpace in order to entice users to join Facebook. Facebook initially distinguished itself on the basis of its strict privacy settings, including its closed-network approach.  Importantly, Facebook promised users that it would disclose its "information and privacy practices" and that it would "not use cookies to collect private information from any user."[62]

97.     In 2006, some 250 million people around the world used a social media platform: 100 million used MySpace, 12 million used Facebook, and the remainder used a number of other competitors.[63]  In 2007, user growth at MySpace began to come to a halt—by mid-2007, Facebook had begun to supplant MySpace as the most visited social media platform in the United States.[64]

98.     Facebook's representations to consumers regarding its data policies were instrumental to Facebook's gaining market share at the expense of its rivals, including MySpace.

---

[62] Srinivasan, *supra*, at 39.

[63] *Id.* at 54.

[64] *Id.*

A 2004 consumer survey revealed that a majority of Americans indicated that privacy was a "really important issue that [they] care about often."[65]  Another study focused on early Facebook users' attitudes towards privacy, finding that they cared more about privacy policy than about terrorism.[66]  Individuals in academia compared Facebook users' satisfaction with Facebook's privacy settings to MySpace users' satisfaction with MySpace's privacy settings, concluding that users typically preferred Facebook's settings over Myspace's.[67]

99.    Facebook itself recognized the importance that its supposed stringent privacy protections had in allowing Facebook to quickly amass dominance.  In a November 2011 post on Facebook, Zuckerberg explained:

> When I built the first version of Facebook, almost nobody I knew wanted a public page on the internet.  That seemed scary.  But as long as they could make their page private, they felt safe sharing with their friends on online.  Control was key.  With Facebook, for the first time, people had the tools they needed to do this. *That's how Facebook became the world's biggest community online.*[68]

100.    To this day, consumers continue to care deeply about privacy. That is why many companies market their commitment to privacy as a selling point for their products and services. Apple, for instance, tells the public that "Apple believes that privacy is a fundamental human right" and that "[w]e share your belief that customers should have control over their data."[69]

101.    Despite Facebook's representations about its superior data privacy practices, Facebook spent the next fifteen years deceiving consumers about the lackluster data privacy protections that it provided to users in exchange for their data.  When the scope of commercial surveillance, and the harvesting and use of user data, that Facebook's data-brokering practices enabled was first revealed in 2018, following news coverage about the Cambridge Analytica

---

[65] *Id.* at 52 (brackets in original) (internal citation omitted).

[66] *Id.* (internal citation omitted).

[67] *Id.*

[68] Anita Balakrishnan, Matt Hunter, & Sara Salinas, *Mark Zuckerberg has been talking about privacy for 15 years – here's almost everything he's said*, CNBC News (Apr. 9, 2018), available at https://www.cnbc.com/2018/03/21/facebook-ceo-mark-zuckerbergs-statements-on-privacy-2003-2018.html (last accessed Nov. 26, 2020) (emphasis added).

[69] Apple Privacy Letter, *supra*.

1  scandal, Facebook had already achieved a monopoly in the Social Network and Social Media

2  Markets in the United States.

3        102.    Publicly, Facebook sought to differentiate itself by offering superior privacy

4  protections.  But behind the scenes—and entrenched in a market which provided additional

5  protections to Facebook's monopoly in the forms of powerful network effects, high switching

6  costs, and other significant entry barriers—Facebook created a commercial surveillance

7  infrastructure that enabled it to dominate its competitors.  This would not have been possible if

8  Facebook had not deceived consumers about its data privacy and commercial surveillance

9  practices.

10       103.    In 2006, Facebook introduced News Feed.  The curated feed was intended as a

11 central destination so users did not have to browse through friends' profiles for updates.  About

12 one million users joined a "Facebook News Feed protest group," arguing the feature was too

13 intrusive.[70]

14       104.    Facebook initially brushed off the criticism, but after continued outcry, it instituted

15 what it claimed were enhanced privacy settings that purportedly allowed users greater ability to

16 keep their activities private.[71]  For example, Facebook maintained that it would give users the

17 options to block certain information—such as when a user removes profile information, posts on

18 a Facebook Wall, comments on a photo, adds a friend, removes a relationship status, or leaves a

19 group—from appearing on other users' News Feeds.[72]  In announcing these updates, Facebook

20 publicly assured users that "industry-leading privacy restrictions . . . have made Facebook a

21 trusted site for sharing information."[73]

22       105.    Despite claiming to provide users with enhanced privacy protections, however,

23 Facebook increasingly made user content and information available to advertisers without

---

24       [70] Alyssa Newcomb, *Can You Even Remember How You Coped Before Facebook's News
25 Feed?*, NBC News, Sept. 26, 2016, available at https://kl.link/2G1XF6Q.

26       [71] *See* Facebook, *Facebook Launches Additional Privacy Controls for News Feed and Mini-
   Feed*, available at https://kl.link/3oq7BrY.

27       [72] *Id.*

28       [73] *Id.*

---

CLASS ACTION COMPLAINT

31

disclosure to users.  Facebook's unrelenting deception of its users allowed Facebook to continue

to amass market share in the Social Network and Social Media Markets.

106.    Beginning in 2007, Facebook gave app developers access to user content and

information, encouraging them to build apps to stimulate user engagement.  Facebook paid these

app developers not with cash, but with user content and data, including content marked private.[74]

As Facebook attempted "to become the world's dominant social media service, it struck

agreements allowing phone and other device makers access to vast amounts of its users' personal

information."[75]

107.    Facebook did not disclose to its users the scope of the content and data that

Facebook began providing to third parties at that early date, including user data marked "private."

But Facebook explained to third-party app developers in May 2007 that Facebook's core value

proposition and business model was "providing access to a new kind of data—social data, which

enables you to build applications that are relevant to users."  With respect to that social media

data, Facebook told developers:  "You are on a level playing field with us.  You can build robust

apps, not just widgets.  Complete integration into the Facebook site."

108.    Also in 2007, under the guise of "social advertisement," Facebook introduced its

"Beacon" product.  Beacon allowed participating third-parties to track users' purchases outside

Facebook and notify their Facebook friends.[76]  As an illustration, when a Facebook user rented a

movie from Blockbuster, the user would immediately receive a "pop-up" notification from

Blockbuster requesting permission to share details regarding the user's movie rental with

Facebook.[77]  Unless the user expressly declined permission by selecting the "No, Thanks" option,

---

[74] U.K. House of Commons, Digital, Culture, Media and Sport Committee, *Disinformation and 'Fake News': Final Report*, 2017-19, HC 1791, ("DCMS Report") (Feb. 14, 2019), at ¶ 103, available at https://kl.link/37MnyDf.

[75] Gabriel J.X. Dance, Nicholas Confessore, and Michael LaForgia, *Facebook Gave Device Makers Deep Access to Data on Users and Friends*, N.Y. Times, June 3, 2018, available at https://kl.link/2HwXIYP.

[76] Louise Story, *Facebook Is Marketing Your Brand Preferences (With Your Permission)*, N.Y. Times, Nov. 7, 2007, available at https://kl.link/34tuzXy.

[77] Srinivasan, *supra*, at 56.

Facebook would receive information about the user's rental activity and publish that information on the user's Facebook page.[78]  An example of a Beacon pop-up request displayed to Facebook users on third-party sites is pictured below:[79]



109.    Many of Facebook's representations regarding its Beacon program were subsequently proven to be untrue.  Facebook initially maintained that Beacon only tracked and maintained the activity of users that consented when prompted by the pop-up seeking permission.[80]  In reality, however, Beacon allowed Facebook to track the activity of even those users that clicked the "No, Thanks" prompt.[81]

110.    The Federal Trade Commission ("FTC") expressed concern about Facebook's Beacon program, and public outrage and litigation ensued.[82]  Zuckerberg ultimately apologized, let users opt out, and called Beacon a mistake, the implication being that Facebook had learned its lesson and was now publicly reassuring users that it would not, in fact, use their data in unauthorized or intrusive ways.

111.    As of the third quarter of 2008, Facebook had around 100 million monthly active users worldwide.[83]  This placed it just behind MySpace, which had more than 110 million

---

[78] *Id.*

[79] *Id.*

[80] *Id.* at 57.

[81] *Id.* at 58.

[82] *See id.* at 57–59.

[83] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/ (last accessed: November 22, 2020).

1   monthly active users.[84]  Facebook passed MySpace in terms of monthly active users in the United

2   States in 2009.  MySpace never came close to Facebook again, although it continued to exist as a

3   competitor through 2014.

4       112.    By 2010, bolstered as it was by its ostensible commitment to privacy, Facebook

5   had become the largest social media company in the world and, unknown to nearly all of its users,

6   had transitioned its entire business to selling social media data, which it did by selling access to

7   developers and selling advertisements targeting Facebook's network of engaged and active users.

8   In March 2010, it was reported that Facebook had booked revenues of up to $700 million in 2009

9   and was on track for $1.1 billion in 2010—almost all from advertising to its users.  Facebook had

10   been roughly doubling its revenues every year up until that point—$150 million in 2007; nearly

11   $300 million in 2008; and $700 million in 2009.

12       113.    In early 2010, Facebook launched its "Like" button, which is also referred to as a

13   "Social Plugin."  The "Like" button is a web plug-in that appears on a third party's website.  If a

14   user supports or "likes" a particular piece of content on a third party's website—such as a

15   particular news article—a number ticker besides the "Like" button increases by one.  A preview

16   of the content that the Facebook user "liked" on a third party's website may appear to the user's

17   followers on Facebook in the user's News Feed, potentially drawing additional viewers to visit

18   the third-party website after observing the previewed content in the user's News Feed.  A version

19   of Facebook's "Like" button that appears on third-party websites is pictured below:[85]

20

21


22

23       114.    Marketed as a way to share opinions, the Like button in reality enabled Facebook

24   to obtain consumer data by tracking activity across the internet.  At the time that Facebook

25       [84] https://web-strategist.com/blog/2008/01/09/social-network-stats-facebook-myspace-

26   reunion-jan-2008/

27       [85] Ray C. Hse, *Introducing new Like and Share buttons*, Facebook for Developers News (Nov.
6, 2013), available at https://developers.facebook.com/blog/post/2013/11/06/introducing-new-

28   like-and-share-buttons/ (last accessed Nov. 24, 2020).

1  launched its "Like" button, Facebook's "Frequently Asked Questions" page indicated that "No

2  data is shared about you when you see a social plug-in on an external website."[86]  Independent

3  researchers subsequently determined, however, that the presence of the "Like" button on third-

4  party websites allowed Facebook to monitor users and obtain their data anytime users visited

5  those third-party websites, even when users did *not* click the "Like" button.[87]

6         115.    Investigators soon uncovered this deception, and Facebook settled with the FTC to

7  resolve the agency's charges that "Facebook deceived consumers by telling them they could keep

8  their information on Facebook private, and then repeatedly allowing it to be shared and made

9  public."[88]  Facebook's settlement with the FTC barred Facebook from making any further

10  deceptive privacy claims, required Facebook to get consumers' approval before it changes the

11  way it shared their data, and required Facebook to obtain periodic assessments of its privacy

12  practices by independent, third-party auditors for the next 20 years.  In particular, under the

13  settlement, Facebook was specifically:

14         a)    barred from making misrepresentations about the privacy or security of

15  consumers' personal information;

16         b)    required to obtain consumers' affirmative express consent before enacting

17  changes that override their privacy preferences;

18         c)    required to prevent anyone from accessing a user's material more than 30

19  days after the user has deleted his or her account;

20         d)    required to establish and maintain a comprehensive privacy program

21  designed to address privacy risks associated with the development and management of new and

22

23

24     [86] Declan McCullagh, *Facebook 'Like' button draws privacy scrutiny*, CNET (June 2, 2010),
       available at https://www.cnet.com/news/facebook-like-button-draws-privacy-scrutiny/ (last
25     accessed Nov. 24, 2010).

26     [87] Srinivasan, *supra*, at 65–67.

27     [88] Press Release, Federal Trade Commission, Facebook Settles FTC Charges That It Deceived
       Consumers By Failing To Keep Privacy Promises, Nov. 29, 2011, available at
28     https://kl.link/3mqWAEX.

1   existing products and services, and to protect the privacy and confidentiality of consumers'

2   information; and

3               e)      required, within 180 days, and every two years after that for the next 20

4   years, to obtain independent, third-party audits certifying that it has a privacy program in place

5   that meets or exceeds the requirements of the FTC order, and to ensure that the privacy of

6   consumers' information is protected.[89]

7       116.    As another example of the promises that Facebook made—but subsequently did

8   not keep—regarding its privacy protections, Facebook announced in 2012 that future privacy

9   changes would require user approval through voting.[90]  During a "privacy press conference,"

10  Facebook founder Mark Zuckerberg explained that Facebook is "one of the only services on the

11  web where people are sharing pretty personal and intimate information"; that requiring users'

12  approval for privacy changes "mak[es] it so that we can't just put in a new terms of service

13  without everyone's permission"; and that "[w]e think these changes will increase the bonding and

14  trust users place in the service."[91]  But consistent with its pattern of deception, Facebook

15  ultimately did not keep that commitment, choosing to end the process of requiring users' approval

16  for future privacy changes.[92]

17      117.    Facebook's continued promises regarding privacy negatively impacted potential

18  rivals—even those backed by the largest companies in the world—from ever gaining appreciable

19  market share.  In 2010, Google launched a new product, Google+.  Google+ was Google's

20  attempt to build out a "social graph" that would leverage a common user identity across Google

21  products, including YouTube and Gmail.

22

23      [89] *Id.*

24      [90] Eyder Peralta, *Facebook Will Allow Users to Vote On Privacy Changes*, NPR (June 1,
25  2012), available at https://www.npr.org/sections/thetwo-way/2012/06/01/154162976/facebook-
    will-allow-users-to-vote-on-privacy-changes (last accessed November 24, 2020).

26      [91] Srinivasan, *supra*, at 61–62.

27      [92] Dave Lee, *Facebook criticised over decision to stop public privacy votes*, BBC News (Nov.
    22, 2012), available at https://www.bbc.com/news/technology-20444678 (last accessed Nov. 23,
28  2020).

118.     With Google+, Google sought to replicate the essential product features and functionality of Facebook.  The planned features for Google+ included a continuous scroll product called the "stream"; a companion feature called "sparks," which related the "stream" to users' individual interests; and a sharing app called "Circles" to share information with one's friends, family, contacts, and the public at large.

119.     Google+ represented a massive investment of resources to bring a finished, full-scale social-media network to market.  Google conscripted almost all of the company's products to help build Google+.  At its peak, Google+ involved 1000 employees from divisions across the country.  Google even required employees to use the Google+ Hangouts video chat feature, which was supposed to help drive adoption in the tech industry and beyond.

120.     Google's attempt to compete with Facebook, however, failed because it could not attract the critical mass necessary to deliver a viable social network and therefore to overcome the network-based switching costs Facebook enjoyed as a result of its deception.[93]  Indeed, Germany's Federal Cartel Office has attributed Google+'s difficulty in competing with Facebook to network effects, which Facebook had built and continued to enjoy due to its misrepresentations regarding the privacy protections its users supposedly enjoyed.[94]  Accordingly, even though Google+ continued as a competitor until 2018, it was never able to dethrone Facebook or even take appreciable market share away from Facebook, and all the while Facebook continued to mislead users in order to prevent them from switching to a network that offered similar features, but with better actual privacy practices.

121.     In fact, Facebook's deception about its data privacy practices and anticompetitive string of acquisitions contributed to the rapid growth of Facebook's ever-increasing user base and increased the value of Facebook's social graph.  As Facebook's VP of Product Management explained to Mark Zuckerberg in an October 2012 email, the data that Facebook collects has made Facebook progressively better at collecting and monetizing consumer data:  "We know

---

[93] House Report, *supra*, at 89.

[94] *Id.* at 89 n. 460.

1 more about what people want to see because people look at more stuff on our platform. . . . the

2 more people that use the system, the more information we have on how to make more people use

3 the system."

4   122. Facebook went public in 2012.  In pursuit of revenue, Facebook began using

5 "View Tags," which allow advertisers to track Facebook users across the Internet using cookies.[95]

6 Facebook also gave advertisers the ability to conduct more fine-grained bidding for advertising

7 and to advertise specifically to a "custom audience"—*i.e.*, a list of specific users provided by the

8 advertiser.  Facebook did not disclose that its user data practices allowed third parties to track

9 Facebook users across the internet using cookies.

10   123. At the time of Facebook's 2012 IPO, its filings with the SEC indicated that the

11 company had 845 million monthly active users and that its website featured 2.7 billion daily likes

12 and comments.[96]

13   124. Facebook later combined user content with other third-party data, thereby

14 deanonymizing the third-party data.  For example, in April 2013, Facebook created information

15 dossiers on millions of users and nonusers alike.  The dossiers included names, health

16 information, information about neighbors, and proclivities.  Facebook did not disclose the

17 dossiers to users (or even the fact of the dossiers' existence), using them instead to allow

18 advertisers to target users with more precision.[97]  Users were unaware of the extent of Facebook's

19 commercial surveillance and did not first begin to become aware until the news of the Cambridge

20 Analytica scandal broke—in March 2018, the overwhelming majority of Facebook users

21 incorrectly believed Facebook collected data only when logged in.[98]

22

---

23   [95] Rebecca Greenfield, *2012: The Year Facebook Finally Tried to Make Some Money*, The
24 Atlantic, Dec. 14, 2012, available at https://kl.link/34qhxdd.

   [96] Facebook's Form S-1 Registration Statement under the Securities Act of 1933,
25 https://kl.link/2L9TgRD.

26   [97] Tim Peterson, Facebook Will Remove Advertisers' Other Third-Party Data Option, But
 Loopholes, Questions Remain, DigiDay, Apr. 6, 2018, available at https://kl.link/37Mprjj.

27   [98] Paul Hitlin & Lee Rainie, *Facebook Algorithms and Personal Data*, Pew Research Center
28 (Jan. 16, 2019), available at https://kl.link/37EsidN.

125.    Facebook engaged in this continued pattern of deception with the specific intent to monopolize the Social Network and Social Media Markets and ultimately to maintain its monopoly.  Facebook succeeded in deceiving consumers long enough to solidify its market power in the Social Network and Social Media Markets.  By the time Facebook's deception about its lackluster data privacy practices was revealed in 2018—*i.e.*, the year Google+ left the market due to inability to grow—it had achieved unrivaled dominance.

### *The Cambridge Analytica Scandal Partially Reveals the Extent of Facebook's Deception.*

126.    It was not until the Cambridge Analytica scandal in 2018, that consumers began to fully discover the full scope and implications of Facebook's lax data privacy practices.  In particular, the scandal revealed that Facebook had been giving app developers the ability to harvest Facebook users' private data without the users' consent, and to use that data for purposes beyond targeted advertising on Facebook.

127.    Cambridge Analytica ("CA") was a British political consulting firm that combined data harvesting and analytics for use in political advertising.  The app consisted of a series of questions that were used to build a psychological profile on users.  The app harvested data not only from the app users' own apps, but also from the users' Facebook friends.

128.    CA's practices were uncovered in March 2018, when it was revealed that, based on the 270,000 Facebook users who used a CA app called "This Is Your Digital Life," CA was able to access the personal data of up to 87 *million* Facebook users.  The vast majority of these users had not given CA permission to access their data.

129.    After the scandal broke, Facebook banned the app and claimed that CA had breached Facebook's terms of service.[99]  However, an investigation revealed that, as early as April 2015, Facebook recognized that it was unable to keep track of how many app developers

---

[99] Kurt Wagner, *Here's how Facebook allowed Cambridge Analytica to get data for 50 million users*, Vox, Mar. 17, 2018, available at https://kl.link/2ToOFLZ.

1    were using previously downloaded data.[100]  And Facebook's data permissions allowed apps to

2    access data not only about an app user, but about all of the app user's friends.

3        130.    As early as at least 2010, Facebook allowed third parties to access the data of a

4    Facebook user's friends, and this policy formed part of the basis for the FTC's 2011 complaint.

5    In 2012, as part of its settlement with Facebook, the FTC ordered that Facebook "shall not

6    misrepresent in any matter, expressly or by implication, the extent to which [Facebook] maintains

7    the privacy or security of Covered Information, including . . . [Facebook's collection, use, or

8    disclosure of any Covered Information[.]"  In 2015, in addition to Facebook's other earlier acts of

9    deception, Facebook thereafter represented to users that it was ending the practice of allowing

10   third parties to access the data of users' friends.  Contrary to Facebook's representation, however,

11   and thus in breach of its 2012 settlement with the FTC, most third parties could continue to access

12   this data until 2016.

13       131.    Even after 2016, and until at least 2018, Facebook still allowed some number of

14   third parties to access the data of users' friends.  The DOJ expressly noted Facebook's falsehoods

15   regarding its sharing of the data of its users' data in the DOJ's 2019 complaint against Facebook

16   for Facebook's breach of its 2012 settlement agreement with the FTC.  *See United States, v.*

17   *Facebook, Inc.*, 1:19-cv-02184 (D.D.C.), Dkt. 1, ¶¶ 5–9.  It was only after news of the Cambridge

18   Analytica scandal broke that Facebook's continued deception regarding its sharing of the data of

19   its users' friends began to come to light.  In its 2019 complaint against Facebook, the DOJ

20   cautioned that "[t]he full scale of unauthorized collection, use, and disclosure of consumer

21   information resulting from Facebook's conduct is unknown due, at least in part, to the company's

22   lack of recordkeeping."  *Id.* ¶ 126.

23       132.    By this time in 2018, however, Facebook's social media monopoly was fully

24   entrenched with over 217 million users.  That year, Facebook earned over $55 billion in revenue,

25   almost completely from targeted advertising made more valuable to Facebook and third parties

26   due to a lack of meaningful data privacy protections.

27   _____

28       [100] Deepa Seetharaman and Kirsten Grind, *Facebook's Lax Data Policies Led to Cambridge Analytica Crisis*, N.Y. Times, March 20, 2018, available at https://kl.link/3jt8o86.

1    133.    In September of 2019, Facebook said it suspended tens of thousands of apps for

2    improperly taking users' personal data and other transgressions, "a tacit admission that the scale

3    of its data privacy issues was far larger than it had previously acknowledged."[101]  Facebook

4    eventually disclosed that it had suspended 69,000 apps, and 10,000 of those apps were flagged for

5    potentially misappropriating personal data from Facebook users.[102]  The scale and scope of

6    Facebook's data privacy issues made clear that its lackluster data privacy protections were a

7    feature, not a bug, of Facebook's social network.

8    134.    On July 24, 2019, the FTC and the Department of Justice announced that

9    Facebook would pay a $5 billion penalty, and submit to new restrictions and a modified corporate

10    structure, to settle charges that the company had "deceiv[ed] users about their ability to control

11    the privacy of their personal information."[103]

12    135.    The largest penalty ever imposed by the FTC before that time was $275 million.

13    The FTC explained:

14    136.    "Facebook monetizes user information through targeted advertising, which

15    generated most of the company's $55.8 billion in revenues in 2018. To encourage users to share

16    information on its platform, Facebook promises users they can control the privacy of their

17    information through Facebook's privacy settings."[104]

18    137.    "[But] Facebook repeatedly used deceptive disclosures and settings to undermine

19    users' privacy preferences . . . . These tactics allowed the company to share users' personal

20    information with third-party apps that were downloaded by the user's Facebook "friends."  . . . In

21

22

23    ---

[101] Kate Kogner, Gabriel J.X. Dance, and Mike Isaac, *Facebook's Suspension of 'Tens of
24    Thousands' of Apps Reveals Wider Privacy Issues*, N.Y. Times, Sept. 20, 2019, available at
https://kl.link/31JmImH.

25    [102] *See* Facebook, *An Update on Our App Developer Investigation*, Sept. 20, 2019, available at
26    https://kl.link/31FSVeP.

[103] Federal Trade Commission, *FTC Imposes $5 Billion Penalty and Sweeping New Privacy
27    Restrictions on Facebook*, available at https://kl.link/34snVR0.

28    [104] *Id.*

1    addition, the FTC alleges that Facebook took inadequate steps to deal with apps that it knew were

2    violating its platform policies."[105]

3        138.    The FTC's 2019 charges made clear that Facebook had egregiously violated the

4    FTC's 2012 order, described above, by repeatedly using deceptive disclosures and settings to

5    undermine users' privacy preferences.

6        139.    Consumers had relied on Facebook's 2012 settlement with the FTC in deciding to

7    continue to give Facebook access to their personal data in exchange for use of Facebook's

8    platform.  But by the time consumers learned that Facebook had violated that settlement, they

9    could not reasonably switch to a comparable social media platform.  Facebook had already

10   achieved monopoly power in the Social Network and Social Media Markets, and network effects,

11   high barriers to entry, and immense switching costs made more likely that Facebook's monopoly

12   would be maintained.  Although market forces can sometimes reign in companies who deceive

13   users, the Social Network and Social Media Markets' unique features made it more difficult for

14   the market to discipline Facebook for violating its commitments to consumers.

15       140.    Notwithstanding widespread outrage after the Cambridge Analytica scandal, the

16   vast majority of Facebook users have continued to use Facebook and its family of products.  A

17   consumer survey revealed that 58.1% of Facebook users did not change their behavior on

18   Facebook at all, despite learning of the Cambridge Analytica scandal.[106]  Of the 41.9% of

19   Facebook users that *did* change their behavior, only 9.6% deleted or deactivated their Facebook

20   accounts:[107]

21       141.    The reason that the vast majority of Facebook users have continued to use

22   Facebook and its products despite Facebook's complete and utter disregard for its users' data, as

23   partially illuminated in the Cambridge Analytica scandal's aftermath, is clear.  As Facebook was

24   keenly aware, a social network really only has value if users' friends use it too.  And once a social

---

[105] *Id.*

[106] Julie Beck, *People Are Changing the Way They Use Social Media*, The Atlantic (June 7, 2018), available at https://kl.link/33K1aau (last accessed Nov. 25, 2020).

[107] *Id.*

1  network reaches critical mass, it wins in this market characterized by network effects and users

2  generally no longer have a viable alternative to the social graph, "as there is no reason for users to

3  start using a social network if there is no one there with whom they can connect."[108]  Thus,

4  notwithstanding widespread outrage after the Cambridge Analytica scandal, few Facebook users

5  stopped using Facebook, because there was no longer any other viable platform to use.

6       ***Facebook is Attempting to Use (and Has Successfully Used) Anticompetitive***

7       ***Acquisitions and Threats to Destroy Competition in the Social Network and Social***

8       ***Media Markets.***

9       142.    While Facebook increased its market power through consumer deception about its

10  data privacy practices, Facebook also sought to protect and expand its monopoly by regularly

11  destroying and acquiring competitive threats, and it used its market power and data advantage to

12  anticompetitively achieve its monopolistic objectives.

13       143.    Since its founding in 2004, Facebook has acquired at least 63 companies,[109]

14  conduct that has only recently been revealed as distinctly anticompetitive in that (as has been

15  revealed in the last two years) Facebook used the data it deceptively obtained from users to

16  identify nascent competitors and then to target them for acquisition or destruction.  These

17  anticompetitive acquisitions were enabled by and the result of Facebook's deception.

18       ***Facebook's Tracking of Consumers' Personal Data Allowed it to Identify***

19       ***Competitors and then Eliminate Them Through a Strategy of Copy, Acquire, or***

20       ***Kill.***

21       144.    Facebook used the data that it obtained from users to track the websites and apps

22  visited by its users—often without full disclosure—in order to identify which upstart competitors

23  were gaining traction so that it could target them for acquisition or destruction.  Facebook "led a

24  sustained effort to surveil smaller competitors to benefit Facebook . . . steps taken to abuse data,

25  to harm competitors, and to shield Facebook from competition."[110]  In fact, Facebook

---

26  [108] House Report, *supra*, at 89.

27  [109] *See id.* at 149.

28  [110] *Id.* at 166.

1   intentionally developed its ability to surveil users to aid its acquisition strategy, which has

2   continued from the point at which it first emerged as the largest Social Network through today.

3       145.    Historically, Facebook had used internal data and data from Comscore, a data

4   analytics and measurement firm, to track the growth of competitive threats.[111]  But Facebook's

5   efforts were only as good as that underlying data.  Accordingly, Facebook determined that by

6   securing more robust data from its users through increased surveillance, Facebook could better

7   remove future competitors from the social media chessboard.

8       146.    Accordingly, in April 2012, Facebook's Director of Growth, Javier Olivan,

9   emailed Zuckerberg and Chris Cox, Facebook's Chief Product Officer, about improving

10  Facebook's "competitive research."  Olivan indicated that "getting our data in great shape is

11  going to require effort," but that Facebook's building its own system for identifying competitive

12  threats would "allow us to get 10x better at understanding" competitive threats to Facebook's

13  dominance of mobile devices.[112]  Olivan explained:

14          I keep seeing the same suspects (instagram, pinterest, …) [sic] both on our
            competitive radar / platform strategy as wins . . . I think having the exact data
15          about their users [sic] engagement, value they derive from [Facebook] . . . would
            help us make more bold decisions on whether they are friends or foes. Back to
16          your thread about "copying" vs. "innovating" we could also use this info to inspire
            our next moves.[113]
17

18      147.    Zuckerberg responded "Yeah, let's do it."  Underscoring the importance to

19  Facebook of utilizing its users' data to identify competitive threats, Zuckerberg committed to

20  "find[ing] some time periodically during my weekly reviews to go over this stuff."[114]

21      148.    In 2013, Facebook acquired Onavo, an Israeli mobile web analytics company that

22  ran a virtual private network ("VPN"), for $115 million.  Prior to acquiring Onavo, Facebook had

23  relied on Onavo's surveillance of Facebook's competitors for years, such as during the process of

24  acquiring Instagram, and Facebook ultimately acquired and used Onavo's assets to track potential

25  _____

26      [111] *Id.* at 160–66.

        [112] *Id.* at 161
27
        [113] *Id.*
28
        [114] *Id.*

1    competitors through non-public, internal, real-time data about its users' engagement, usage, and

2    time spent on other apps.[115]  Tellingly, at the time it acquired Onavo, Facebook did *not* intend to

3    place Onavo's employees in Facebook's Data Analytics team.  Instead, in acquiring Onavo,

4    Facebook planned to place Onavo's employees, including its cofounder, Guy Rosen, under

5    Facebook's Growth team, reporting to Javier Olivan.[116]

6          149.    To obtain extensive information on a user's usage of mobile applications and of

7    bandwidth, Onavo cloaked its spyware in VPNs, data compression, and even in mobile privacy

8    apps.  Onavo sold the mobile usage data it collected to Facebook, which in turn used the real-time

9    information it received from Onavo to determine which mobile applications posed a threat to

10   Facebook's dominance and to the substantial barriers to entry protecting Facebook from new

11   entrants and competition.

12         150.    Facebook used Onavo's data to: (a) identify and target competitors from which

13   Facebook could demand concessions; (b) identify and target competitors to whom Facebook

14   would completely deny access to its platform; and (c) identify and target competitors that

15   Facebook would remove from the competitive landscape entirely through acquisition.

16         151.    Facebook immediately began integrating Onavo's applications into both its

17   business operations and its acquisition strategy.  Facebook, for example, began analyzing data

18   secretly collected from Onavo's Protect software, which was a massive surveillance and data

19   collection scheme disguised as VPN software.  Billed as a way to "keep you and your data safe,"

20   Onavo Protect in fact monitored all web and mobile application traffic on a user's mobile device.

21         152.    When an Onavo Protect user opened a mobile app or website, Onavo software

22   secretly redirected the traffic to Facebook's servers, where the action was logged in a massive

23   database.  Facebook product teams then analyzed the aggregated Onavo data to determine which

24   apps and features people were using in real time, how frequently they used the apps, and for how

25

26         [115] Betsy Morris and Deepa Seetharaman, *The New Copycats: How Facebook Squashes
     Competition From Startups*, Wall Street Journal, August 9, 2017, available at
27   https://kl.link/3e6nMpW.

28         [116] House Report, *supra*, at 161.

1    long.  If the data in an app was not encrypted, this information was as specific as (for example)

2    the number of photos the average user likes or posts in a week in that app.  By February 2018,

3    Onavo apps had been downloaded thirty-three million times across both iOS and Android.

4         153.   Facebook has used extensive surveillance of user behavior in order to identify and

5    target nascent competitive threats.  Using the data it obtained from Onavo and other sources,

6    Facebook then eliminated upstart competitors by demanding concessions in agreements, by

7    denying access to vital sources of data and information on Facebook's platform, or by

8    acquisition..  The technology Facebook obtained from Onavo and other data brokers allowed

9    Facebook to protect and further its market dominance.  Some of the ways that Facebook exploited

10   users' data that Facebook obtained from Onavo or other sources to inform Facebook's

11   anticompetitive "copy, acquire, kill" strategy are detailed below.  Notably, however, the extent to

12   which Facebook used ill-gotten user data to pursue these strategies was not known until the last

13   two years.

14              ***Facebook Threatened Competitors with Discriminatory Practices to Help Drive***

15                   ***its Anticompetitive Acquisition Strategy.***

16        154.   In addition to the surveillance Facebook conducted through Onavo, Facebook's

17   "copy, acquire, kill" strategy was also built on the company's willingness to use deceptively-

18   obtained user data to target key competitors by discriminatorily denying them access to the

19   "Facebook Platform."  The Facebook Platform allows third-parties to develop products which

20   work in conjunction with Facebook.  Zuckerberg has described Facebook Platform's purpose as

21   "mak[ing] Facebook into something of an operating system so you can run full applications[.]"[117]

22        155.   Over the last decade, Facebook has also used discriminatory access to its social

23   graph and selective enforcement of its Platform policies to prevent possible competitors from

24   emerging, continuing to harm consumers at every turn.  As Zuckerberg said regarding identified

25

26

27        [117] David Kirkpatric, *Facebook's plan to hook up the world*, CNN Money (May 29, 2007),

28   available at https://kl.link/3qrmFGT (last accessed Nov. 25, 2020).

competitive threats: "I think the right solution here is to just be a lot stricter about enforcing our policies and identifying companies as competitors."[118]

156.    Facebook did exactly that, using supposed violations of Facebook's policies as a pretext to cut off social apps that had become too popular, like Vine, Stackla, Ark, and MessageMe.  Facebook cut off these social apps' access to Facebook's social graph because Facebook was fearful that continued access would allow these apps to launch their own competing services that would challenge any one of Facebook's ever-expanding cache of products.[119]  As an example, Facebook penalized Ark, a third-party app that Facebook users could use in conjunction with Facebook, for the manner in what Ark accessed data on Facebook.[120]  A former Facebook employee explained: "It seemed clear that leadership imposed [a] more severe punishment against Ark because Mr. Zuckerberg viewed Ark as competitive with Facebook, as Facebook was exploring an acquisition of Ark at the same time as it was being investigated for policy violations."[121]

157.    By the end of 2011 and the beginning of 2012, Facebook executives debated a plan to prevent third-party developers from building their own competing social media networks that might be capable of generating engagement and social media data independent of Facebook Platform.  Social media mobile applications, such as Line, WeChat, and Instagram were creating their own independent user bases and were becoming emerging competitive threats.

158.    Facebook's solution to address these potential competitors was a scheme to disrupt the growth of these applications by first attracting third-party app developers to build applications for Facebook Platform and then ultimately remove their access to the application programming interfaces ("APIs"), which removed those developers' access to the functionality of Facebook's social media network as well as information about Facebook users' friends and extended network, users' interactions with each other, and users' newsfeed posts.  This API access was the central

---

[118] House Report, *supra,* at 167.

[119] *Id.* at 166.

[120] *Id.* at 169.

[121] *Id.*

1   value proposition of Facebook Platform.  If developers built apps that enhanced the value of

2   Facebook's social network, they would in return receive the benefits of access to the functionality

3   of Facebook's social media network, as well as to interconnections and interactions among

4   Facebook's users—Facebook's social graph.

5        159.    Facebook's shut off of API access deprived app developers of access to the APIs

6   that were most central to their applications, such as Facebook's "Friends" and "Timeline" APIs,

7   as well as other vital APIs, including those relating to messaging.  Facebook's identification of

8   competitive threats and removal of access to these APIs halted the growth of tens of thousands of

9   third-party applications that relied on these essential APIs and were, in Facebook's view,

10  threatening Facebook's monopoly by eroding the substantial barriers to entry that protected

11  Facebook's business.  Facebook's scheme prevented competitive third-party applications from

12  buying consumer data from Facebook, either through its platform APIs or through its advertising

13  platform.  As a Facebook executive explained in 2012, Facebook would "not allow things which

14  are at all competitive to 'buy' this data from us."

15       160.    In May 2012, Zuckerberg decided to use the threat of shutting off potential

16  competitors' access from Facebook Platform to extract social media user data.  He instructed

17  executives to demand "reciprocity" agreements from major competitors that used Facebook's

18  platform.  Facebook then began to block competitors from using its platform and thereby

19  obtaining access to Facebook's data about consumers.  Competitors such as Twitter, Instagram,

20  Pinterest, and Foursquare were required to hand over their most valuable asset—their social

21  media data—to their rival Facebook in order to retain access to Facebook's APIs and advertising

22  platform.

23       161.    Facebook planned to block competitors from using its platform, thereby preventing

24  them from eroding the substantial barriers to entry and network effects that protected Facebook's

25  market power.  For the companies with social media network data that Facebook needed to

26  further extend its dominance, Facebook would coerce them into agreements to share their most

27  valuable social data with Facebook.  If they refused, Facebook would blacklist them and take it

28  from them anyway with its own crawling software that would scrape their public-facing site for

1    information.  What began as a negotiation strategy to extract social media data from rivals

2    became the foundation of Facebook's Platform strategy.  For competitors that posed enough of a

3    threat to create their own rival network, Facebook required them to hand over the only leverage

4    they had—the social media data they derived from their users' engagement.

5            162.    Facebook's willingness to copy and penalize competitors through discriminatory

6    access to its social graph also made it easier for Facebook to acquire competitors at a reduced

7    price.  For example, during negotiations to acquire Instagram between Zuckerberg and Kevin

8    Systrom, Instagram's Chief Executive Officer, Zuckerberg tied Instagram's response to

9    Facebook's advances to Instagram's continued access to Facebook Platform and Facebook's

10   social graph:

> At some point soon, you'll need to figure out how you actually want to work with
> us. This can be an acquisition, through a close relationship with Open Graph,
> through an arms length relationship using our traditional APIs, or perhaps not at
> all . . . Of course, at the same time we're developing our own photos strategy, so
> how we engage now will determine how much we're partners vs. competitors
> down the line—and I'd like to make sure we decide that thoughtfully as well.[122]

15           163.    Similarly, in an earlier conversation between Systrom and Matt Cohler, an

16   Instagram investor and former senior Facebook adviser, Systrom and Cohler discussed the

17   possibility that Instagram's response to Facebook's acquisition efforts could affect Instagram's

18   access to Facebook Platform down the line."[123]  In discussing how to engage with Zuckerberg

19   regarding Facebook's advances, Cohler cautioned: "we need to make it as hard as possible for fb

20   to mess with our ability to get distribution on the platform[.]"[124]

21           164.    In 2015, Facebook cut off all public access to the Friends and News Feed APIs.

22   Facebook had already extracted valuable social media network data from dozens of competitors

23   in the run-up to the announcement and ultimate removal of the APIs.  This move allowed it to

24   coerce incipient competitive threats to hand over their social media network data.  Facebook

---

[122] *Id.* at 164.

[123] Production of Facebook to H. Comm. on the Judiciary (Feb. 13, 2012) at FB-HJC-ACAL-00101440, available at https://judiciary.house.gov/uploadedfiles/0010143800101441.pdf.

[124] *Id.*

1  denied API access to thousands of potential competitors, and in the process ensured that its

2  platform would be the only viable platform upon which a third-party social media application

3  could be built.

4       165.   After the announcement and through the full removal of the APIs in April 2015,

5  Facebook made a series of agreements that forced certain competitors to hand their data over to

6  Facebook.  For example, Facebook forced certain third-party developers that it identified as

7  competitive threats with valuable social data to sign Private Extended API agreements—referred

8  to throughout this Complaint as "Whitelist and Data Sharing Agreements" or simply "the

9  Agreements"—in order to obtain access to the Friends and/or News Feed APIs.  Facebook's

10 Whitelist and Data Sharing Agreements included a provision that acknowledged that the APIs

11 they covered are not available to the general public.  An exhibit to each Whitelist and Data

12 Sharing Agreement listed the specific Facebook APIs to which a particular developer was being

13 granted access.  These Agreements were only offered in exchange for massive purchases of

14 Facebook's social data through mobile advertising and/or through the provision of the

15 developer's own social data back to Facebook (so-called "reciprocity").

16      166.   That year, Facebook provided Whitelist and Data Sharing agreements to the dating

17 apps Tinder and Hinge.  It also secretly signed Whitelist and Data Sharing agreements with other

18 third-party developers, including Netflix, Nissan, and Lyft.  In total, dozens of app developers

19 entered into such agreements with Facebook.

20      167.   Consistent with Facebook's ploy to maintain its monopolistic grip on the Social

21 Network and Social Media Markets by deceiving consumers about its privacy practices,

22 Facebook's Simon Cross marketed these changes to its third party access policies as triumphs

23 which bolstered the security of its users' data.  Facebook announced a new slogan, "'People

24 First', because 'if people don't feel comfortable using Facebook and specifically logging in

25 Facebook and using Facebook in apps, we don't have a platform, we don't have developers.'"[125]

26

27      [125] Josh Constine, *Facebook Is Shutting Down Its API For Giving Your Friends' Data to Apps*, TechCrunch (Apr. 28, 2015), available at https://techcrunch.com/2015/04/28/facebook-api-

28 shut-down/ (last accessed December 3, 2020).

In reality, however, Facebook described these changes—and its marketing of these changes—as "the Switcheroo Plan": "Facebook bundled in the decision to cut off third-party access to user data with other unrelated privacy updates, and explained it all under the new slogan "people first."[126] "The fact that user data would still be available to some third parties, as long as the companies gave Facebook enough money and didn't pose a competitive threat, was conveniently elided."[127]

168.    Absent these agreements and Facebook's overall scheme to eliminate nascent competitors, other companies could have created their own social media networks.  As the amount of user data was generated and monetized on these other networks, the substantial barriers to entry in the Social Media Market would have eroded.  But because Facebook could coercively demand all of the social media user data generated on a competing platform, the Whitelist and Data Sharing Agreements ensured that competitive threats could not challenge Facebook's stranglehold over the social media network data, which Facebook obtained by leveraging its social media monopoly.

169.    In all of its conduct surrounding potential acquisitions, Facebook intentionally surveilled, copied, acquired, and killed competitors with the specific intent, and result, of destroying competition.  Facebook acquired and maintained its monopoly due to its predatory and anticompetitive conduct that went on during its string of acquisitions, with a specific intent to monopolize, and with a dangerous probability at the outset and, ultimately, its present day success in obtaining and maintaining its market power.

### *Instagram*

170.    Facebook used the undisclosed surveillance of its users to identify Instagram as a threat and ultimately to acquire the company.  Instagram was a photo-sharing mobile application

---

[126] Elena Botella, *Facebook Earns $132.80 From Your Data per Year*, Slate (Nov. 15, 2019), available at https://slate.com/technology/2019/11/facebook-six4three-pikinis-lawsuit-emails-data.html (last accessed Dec. 3, 2020).

[127] *Id.*

1   founded by Kevin Systrom, which allowed users to check in, post plans, and share photos.  The

2   photo sharing feature immediately became the app's most popular.

3        171.    Instagram was launched on iOS, Apple's mobile device operating system, in 2010.

4   That very day, Instagram became the top free photo-sharing app on Apple's App Store, racking

5   up twenty-five thousand downloads.  By the end of the first week, Instagram had been

6   downloaded 100,000 times, and by mid-December 2010, its total downloads had reached one

7   million.  The timing of the app was impeccable, as the iPhone 4, with its improved camera, had

8   launched just a few months earlier in June 2010.  By March 2012, the app's user base had swelled

9   to 27 million.  That April, Instagram was released on Android phones and was downloaded more

10  than one million times in less than one day.  At the time, Instagram was also in talks to receive

11  another $500 million funding round.

12       172.    Internally, Facebook carefully tracked Instagram's rise, including through

13  intelligence that it received from surveilling Facebook users' behavior and that it obtained from

14  Onavo.[128]  Instagram clearly posed a competitive threat to Facebook's dominance, especially due

15  to its superior photo-sharing feature.  Facebook recognized, thanks in part to the commercial

16  surveillance data it was able to obtain regarding Facebook users, that Instagram could become a

17  competing social media network that could rival Facebook in the amount of user engagement and

18  social media data it could produce and monetize.

19       173.    Both line employees and high-level executives at Facebook recognized Instagram

20  as a competitive threat.  In an internal Facebook message, one engineer mused that "Instagram is

21  eating our lunch.  We should've owned this space, but we're already losing quite badly."[129]  At an

22  internal meeting with Facebook employees, Zuckerberg put it bluntly: the "bad news is that

23

24  _____

25       [128] Mike Swift, *Facebook's history with Onavo resonates for privacy experts worried about
    Giphy purchase*, mlex Market Insight (June 23, 2020), available at
26  https://mlexmarketinsight.com/insights-center/editors-picks/area-of-expertise/data-privacy-and-
    security/facebooks-history-with-onavo-resonates-for-privacy-experts-worried-about-giphy-
27  purchase (last accessed November 25, 2020).

28       [129] House Report, *supra*, at 163.

[Instagram is] growing really quickly, they have a lot of momentum, and it's going to be tough to dislodge them."[130]

174.    Consistent with its strategy of "copying" would-be competitors, Facebook initially attempted to create its own product that competed with Instagram.  By June 2011, Facebook had begun developing its own photo-sharing app.[131]  One Facebook employee referred to Facebook's anticipated photo-sharing app as "an Instagram clone."[132]  Facebook subsequently released Facebook Camera, a standalone app allowing users to shoot, filter, and share photos from their mobile devices.[133]

175.    In addition to "cloning" Instagram, Facebook determined there was another way to hedge its bets, protect its monopoly, and neutralize the competitive threat of Instagram: simply buying Instagram outright.  Accordingly, after direct talks with Mark Zuckerberg, Facebook offered to purchase Instagram for $1 billion in April 2012.

176.    In addition to the $1 billion price tag, another consideration motivated Instagram's consideration of Facebook's acquisition offer: Facebook's aggressive and anticompetitve threats, which Facebook was safe to make due to its status as a monopolist.  During negotiations between Facebook and Instagram, Zuckerberg warned Kevin Systrom, Instagram's Chief Executive Officer, that "[a]t some point soon, you'll need to figure out how you actually want to work with us. . . . [H]ow we engage now will determine how much we're partners vs. competitors down the line—and I'd like to make sure we decide that thoughtfully as well."[134]  In a separate communication with Matt Cohler—an Instagram investor and Facebook's former Vice President

---

[130] *Id.*

[131] MG Siegler, *Behold: Facebook's Secret Photo Sharing App*, TechCrunch (June 15, 2015), available at https://techcrunch.com/2011/06/15/facebook-photo-sharing-app/?_ga=2.238331010.340941203.1606233329-687565188.1605321310 (last accessed Nov. 25, 2012).

[132] House Report, *supra*, at 163.

[133] Josh Constine, *FB Launches Facebook Camera – An Instagram-Style Photo Filtering, Sharing, Viewing iOS App*, TechCrunch (May 24, 2012), available at https://techcrunch.com/2012/05/24/facebook-camera/ (last accessed Nov. 25, 2020).

[134] House Report, *supra*, at 163–64.

1  of Product Management—Systrom inquired whether Zuckerberg "will go into destroy mode if I

2  say no" to Facebook's acquisition offer.[135]  Cohler responded that Zuckerberg would "probably"

3  go into "destroy mode" and "conclude that it's best to crush Instagram[.]"[136]  Cohler further

4  lamented that "I don't think we'll ever escape the wrath of [M]ark" Zuckerberg.[137]

5      177.   Clearly crushed into submission and fearful of Facebook's "wrath," Instagram

6  acceded to Facebook's acquisition demand.  Facebook consummated the deal immediately prior

7  to its IPO.

8          ***Snapchat***

9      178.   Facebook's acquisition of Instagram allowed Facebook to exclude third-party apps

10  that provided photo and video sharing functionality from Facebook's platform.  If an image

11  sharing or video app contained an important feature, Facebook simply cloned it, thus paving the

12  way for excluding a competitive rival from its platform, while simultaneously taking away that

13  rival's share of users.  And, high-level Facebook executives were acutely aware of this

14  strategy.[138]

15      179.   For example, by 2012, the photo-sharing app Snapchat began had grown in

16  popularity among consumers.  Founded by Evan Spiegel, Snapchat allows users on that platform

17  to send each other communications—including text, photos, and videos—which appear only for a

18  fixed period of time and then disappear.[139]  Drawn by Snapchat's privacy appeal, users began to

19  flock to Snapchat.

20

21

22

23      [135] Production of Facebook to H. Comm. on the Judiciary (Feb. 13, 2012) at FB-HJC-ACAL-
00101438, available at https://judiciary.house.gov/uploadedfiles/0010143800101441.pdf.

24      [136] *Id.* at FB-HJC-ACAL-00101438–39.

25      [137] *Id.* at FB-HJC-ACAL-00101440.

26      [138] Executives such as Zuckerberg, Sherl Sandberg, Facebook's Chief Operating Officer, and
Sam Lessin, Facebook's Product Management Director, expressly endorsed "cloning" other
27  competing platforms' popular features.  *See* House Report, *supra*, at 163.

28      [139] Srinivasan, *supra*, at 53.

180.   Facing a competitive threat from Snapchat, Facebook engaged in its usual "copy, acquire, kill" strategy in an attempt to annihilate Snapchat.  To formulate that strategy, Facebook relied on data it obtained from Onavo.[140]

181.   In December 2012, Facebook launched "Poke," a standalone app designed to allow users to send photos, videos, or Facebook messages to each other that expire after a few seconds.[141]  But to Facebook, the possibility of competing with Snapchat on the merits provided insufficient guarantee that Facebook's monopoly position would be secure.  So, mere days before Facebook launched Poke, Zuckerberg met with Spiegel, Snapchat's founder, in Los Angeles.[142]  During the meeting, Zuckerberg described Facebook's soon-to-be-released Poke app to Spiegel.  Spiegel has described Zuckerberg's representations during the meeting as follows: "It was basically like, 'We're going to crush you.'"[143]

182.   After the meeting and following Facebook's launch of Poke, Facebook made additional overtures to Snapchat in an attempt to cement its top-of-the-ladder status.[144]  Facebook ultimately offered $3 billion to acquire Snapchat.  Facebook's $3 billion offer made clear that Facebook was willing to pay a premium over Snapchat's then-existing market value with the added value of neutralizing a possible threat to Facebook's market dominance.

183.   Snapchat rejected Facebook's offer, and Facebook responded by copying *even more* of Snapchat's features that are popular with consumers.  For example, Snapchat's "Stories"

---

[140] Karissa Bell, *"Highly confidential" documents reveal Facebook used VPN app to track competitors*, Mashable (Dec. 5, 2018), available at: https://mashable.com/article/facebook-used-onavo-vpn-data-to-watch-snapchat-and-whatsapp/ (last accessed November 25, 2020).

[141] Josh Constine, *Facebook Launches Snapchat Competitor 'Poke', An iOS App for Sending Expiring Text, Photos, And Videos*, TechCrunch (Dec. 21, 2012), available at: https://techcrunch.com/2012/12/21/facebook-poke-app/ (last accessed November 25, 2020).

[142] J.J. Colao, *The Inside Story Of Snapchat: The World's Hottest App Or A $3 Billion Disappearing Act?*, Forbes (Jan. 20, 2014), available at https://www.forbes.com/sites/jjcolao/2014/01/06/the-inside-story-of-snapchat-the-worlds-hottest-app-or-a-3-billion-disappearing-act/?utm_campaign=forbestwittersf&utm_medium=social&utm_source=twitter&sh=7236882067d2 (last accessed Nov. 25, 2020).

[143] *Id.*

[144] *Id.*

1    feature allows Snapchat users to post a collection of images and video in a rapid string that other

2    Snapchat users may view for 24 hours.  In 2016, Facebook (through Instagram) launched its own

3    feature—also called "Stories"—which is "nearly identical" to Snapchat's version.[145]  By April

4    2017, Facebook's "Stories" feature on Instagram had become more popular than Snapchat's

5    version, crippling one of Facebook's largest rivals.[146]

6               ***WhatsApp***

7    184.    Facebook's acquisition of WhatsApp followed a similar pattern.  WhatsApp began

8    as mobile application that displayed user statuses in an address book on a smartphone.  However,

9    WhatsApp exploded in popularity when Apple introduced "push notifications" for the iPhone,

10    allowing developers to ping app users even when they weren't using the app.  This feature

11    became a form of instant messaging, enabling users to broadcast messages to connections within

12    a user's social network, which was built from their phone's contact list.  Because WhatsApp used

13    the mobile phone's internet connection rather than text messages, the app allowed users to avoid

14    text messaging fees entirely.  WhatsApp's ability to send messages to any user with a phone using

15    the internet was its most sought-after feature.

16    185.    As WhatsApp's popularity began to rise in the early 2010s, Facebook harvested

17    user engagement data from Facebook's Onavo spyware in order to carefully track WhatsApp.

18    The data reported that WhatsApp was rivaling Facebook's own Messenger product, and held third

19    place in terms of user reach among mobile messenger apps for iPhone in the U.S. as of April

20    2013.  Facebook used Onavo's data to track messages sent through WhatsApp, which more than

21    doubled messages on Facebook's own mobile product.  This same Onavo data showed massive

22    engagement among WhatsApp users, placing it in fifth place behind Facebook's own core

23    product; Facebook's newly acquired Instagram; Twitter; Foursquare; and Snapchat.  WhatsApp,

24

25    [145] Casey Netwon, *Instagram's new stories are a near-perfect copy of Snapchat stories*, The
26    Verge (Aug. 2, 2016), available at https://www.theverge.com/2016/8/2/12348354/instagram-stories-announced-snapchat-kevin-systrom-interview (last accessed Nov. 25, 2020).

27    [146] Kaya Yurieff, *Instagram's Snapchat clone is more popular than Snapchat*, CNN Business
28    (Apr. 13, 2017), available at https://money.cnn.com/2017/04/13/technology/instagram-stories-snapchat/index.html (last accessed Nov. 25, 2020).

although lacking Facebook's market reach, was drawing from the same pool of limited attention, and it exposed a major vulnerability in Facebook's business model.  WhatsApp threatened Facebook's business, including the barriers to entry and network effects protecting Facebook's dominance—and because of Onavo, Facebook knew that WhatsApp was a direct threat to Facebook's monopoly power.

186.    Facebook then sought to remove WhatsApp as a competitor in order to ensure that Facebook retained its monopoly power in the Social Network and Social Media Markets. Facebook used the insights it had gained from Onavo's data surveillance technology to purchase WhatsApp in 2014 for close to $22 billion, well above its initial bid of $16 billion.  The transaction made no economic sense for Facebook, other than foreclosing competition in the Social Media and Social Network Markets and protecting Facebook's monopoly power. WhatsApp's revenues were a meager $10.2 million in 2013.  Its six-month revenue for the first half of 2014 totaled $15.9 million, and the company had incurred a staggering net loss of $232 million in that same period.  Facebook had paid twenty billion dollars—thousands of times WhatsApp's revenues—to acquire a money-losing company that created software functionality Facebook itself already had as part of its own products, and could easily build from scratch for a fraction of the cost of the acquisition.

### *Other Examples of Facebook's "Copy, Acquire, Kill" Strategy*

187.    In addition to the examples described herein, Facebook has employed its "copy, acquire, kill" strategy against other would-be competitors, and the extent to which it did so based on deceptively-obtained user data was not clear until the last two years.  For example, shortly after "Houseparty"—a social network that referred to itself as "the internet's living room"—turned down an acquisition offer from Facebook, Facebook announced that its Messenger app

1   would become a "virtual living room."  Houseparty's active user base fell by half between 2017

2   and 2018.

3       188.    As another example, Facebook acquired Giphy for $400 million in May 2020.

4   Although Giphy's primary function is to allow users to share GIFs[147] online and through

5   messaging apps, the transaction will also give Facebook competitive insights into other

6   messaging apps.  One commenter said, "While you may successfully block trackers like the

7   Facebook ad pixel following you around online, or even delete your Facebook account, the

8   majority of us wouldn't suspect we're being monitored when we're sending funny images to

9   friends."[148]

10      189.    In addition, Facebook has sometimes acquired companies without the goal of

11  incorporating them into its own business, but rather, simply to eliminate the competitor, a practice

12  referred to as "catch and kill."  For example, Facebook acquired "tbh"—an anonymous social

13  media app—in October 2017.  It then shut the app down less than a year later, having made little

14  effort to maintain the platform.[149]

15      190.    Facebook's acquisition conduct is part of an ongoing attempt to entrench its

16  market power in the Social Network and Social Media Markets.  Facebook's strategy was made

17  possible due to the social data that Facebook obtained as it acquired its monopoly.  And,

18  Facebook has used that data in order to copy, acquire, or kill competitors, instead of competing

19  with them by providing enhanced data privacy protections to consumers.

20              ***Facebook's Use of Onavo Comes to Light.***

21      191.    Ultimately, the world learned the truth about the extent of commercial surveillance

22  that technology like Onavo's made possible for Facebook.  In August 2018, Apple removed

23  Onavo from its app store following reporting that Facebook was using the app to track users and

24  ────────────

25  [147]   A "GIF" is a compilation of still images, akin to a flipbook, played in sequence to create
    a short animated sequence.

26  [148] Owen Williams, *How Facebook Could Use Giphy to Collect Your Data*, ONEZERO, May
    15, 2020, available at https://kl.link/34AW951.

27  [149] *See* Kaya Yurieff, *Facebook Shutters the Teen App it Just Bought*, CNN Business, July 3,
    2018, available at https://kl.link/37G6HBH.

28

other apps.  Apple ejected Facebook's Onavo app from its marketplace because it violated Apple's rules prohibiting apps from using data in ways far beyond what is required to run the app and provide advertising.  In other words, because Onavo Protect was leveraging far more data than any VPN could conceivably need, it was clear that the true purpose of the app was to spy on Onavo users, and Apple would not allow it.  An Apple spokesperson said the company intended to make "it explicitly clear that apps should not collect information about which other apps are installed on a user's device for the purposes of analytics or advertising/marketing and must make it clear what user data will be collected and how it will be used."[150]

192.    The amount of commercial surveillance that Onavo's technology enabled was jaw-dropping.  Facebook's Onavo Protect app reported on users' activities whether their screens were on or off; whether they used WiFi or cellular data; and even when the VPN was turned off.  There was simply no rational relationship between the data collected and the purported purpose of the application.  Put simply, a VPN that collected data even when the VPN was off was an obvious subterfuge for spying on user behavior.

193.    Facebook tried to circumvent Apple's ban by repackaging its Onavo spyware as a Facebook Research VPN app.  Facebook sidestepped the App Store by rewarding teenagers and adults when they downloaded the Research app and gave it root—superuser—access to network traffic on their mobile devices.  Facebook has been leveraging its Onavo code in similar ways since at least 2016, administering the program under the codename "Project Atlas"—a name suited to its goal of surveilling app usage on mobile devices in real time.

194.    When the news broke in January 2019 that Facebook's Research apps were repackaged Onavo apps designed to spy on users, Facebook immediately withdrew the programs from the Apple App store.  Apple again concluded that Facebook had tried to violate its policies by obtaining a level of administrative privileges on an iPhone or iPad that would have been designed for a company's internal IT department.  In addition to Onavo's Protect app, Facebook has attempted to deploy its surveillance software as other forms of utility applications that require

---

[150] House Report, *supra*, at 161.

1    extensive or privileged access to mobile devices.  For example, Facebook released the Onavo

2    Bolt app, which locked apps behind a passcode or fingerprint while it covertly surveilled users—

3    and sent Facebook the results. Facebook also shut that app down the very day that its surveillance

4    functionality was discovered. The Onavo Bolt app had been installed approximately 10 million

5    times.

6              ***Facebook's Anticompetitive Practices Have Harmed and Continue to Harm***

7              ***Competition in the Social Network and Social Media Markets.***

8              195.    Facebook's anticompetitive practices described above have harmed and continue

9    to harm competition the Social Network and Social Media Markets in the United States.

10             196.    Facebook is dangerously close to obtaining, or has obtained, monopoly power in

11   the Social Network and Social Media Markets in the United States, and it has wielded that power

12   to anticompetitively foreclose competition.

13             197.    Facebook's deception of consumers has harmed, and continues to harm,

14   competition.  In many markets, the advantage of consumer deception quickly dissolves once the

15   deception is uncovered.  But the direct and indirect network effects inherent in the Social

16   Network and Social Media Markets create markets with strong network effects and high barriers

17   to entry.  Because of unduly high switching costs, users cannot simply switch to a competitor

18   once the dominant player's deception is exposed, even though they wanted to do so, as evidenced

19   by the "#DeleteFacebook" movement after the revelations regarding Cambridge Analytica in

20   2018.

21             198.    Facebook's deception about its lack of privacy protections acted as a welcome

22   sign, inducing a ground swell of users to join Facebook because of Facebook's avowed privacy

23   appeal.  But once a critical mass of users, continually expanding due to strong network effects

24   obtained through its deception, joined Facebook at the expense of its competitors, Facebook

25   slammed the door shut.  Because of high switching costs—including the possibility of losing

26   contact with friends, family and acquaintances, an inability to access data that Facebook users

27   have spent years or more inputting into Facebook, and the time and opportunity cost of starting

28   over with a competitor—and the lack of viable alternatives as a result of Facebook's deception,

consumers are now trapped.  As a result, Facebook has cheated its way to the finish line in the race for dominance without being the best competitor.  Instead of providing consumers a way out, such as alternatives to Facebook, the Social Network and Social Media Markets help to lock in Facebook's unfair advantage.

199.    Facebook's acquisition conduct also has harmed, and continues to harm, competition.  Facebook built and maintained its monopoly over the Social Network and Social Media Markets by exploiting deceptively-obtained user data to target competitive threats, which Facebook then proceeded to acquire, copy, or kill.  Facebook tracked its users across the internet, often without permission, to identify companies that might threaten its monopoly.  Facebook then used a pattern of discriminatory data access to destroy potential competitors or force them to sell at a discount.  Facebook used its data advantage not to run faster, but to kneecap the competition.  That approach is not surprising given the win-at-all-costs culture at Facebook.

200.    Facebook's two-pronged anticompetitive strategy harmed competition in the Social Network and Social Media Markets.  As detailed herein, Facebook's strategies made it nearly impossible for competitors—both nascent and established—to challenge Facebook's monopoly by competing with Facebook on data privacy protections or by building a higher quality social network.

201.    But for Facebook's anticompetitive practices, consumers would have had more options in the Social Network and Social Media Markets for connecting with other users.  Those companies would have created social networks and social media platforms that competed with Facebook on the merits of data privacy protections and social network and platform quality, without being dependent on Facebook for comprehensive social media network data.  Because Facebook anticompetitively restrained competition in its efforts to acquire and obtain social media and social network monopolies, competition along the dimensions of user privacy and product quality was foreclosed.  Ultimately, consumers suffered, and continue to suffer, as a result of Facebook's wantonly anticompetitive conduct.

*Facebook's Anticompetitive Conduct Has Damaged Consumers in Direct and Quantifiable Ways.*

202.   Facebook's anticompetitive practices described herein have harmed, and continue to harm, consumers in the Social Network and Social Media Markets in the United States.

203.   Facebook's anticompetitive foreclosure of competition has harmed consumers in many ways.  When agreeing to Facebook's Terms of Service, consumers agree to give up things of material value: personal information and attention.  Facebook then sells for money, measurable in quantifiable units, its users' information and attention to third-parties, including advertisers. But for Facebook's anticompetitive conduct, which has substantially reduced, if not eliminated competition, consumers would have had more choices in the Social Network and Social Media Markets, instead of the few, if any, they have today.  Absent Facebook's anticompetitive conduct, Facebook would have had to provide consumers increased incremental value, that is quantifiable in measurable units, in return for consumers' data.  Otherwise, consumers would have given their data and attention to other platforms, which would have provided consumers increased incremental value.  Consumers would have received the fair market value for their data and attention.  That value was artificially decreased by Facebook's anticompetitive conduct.

204.   Absent Facebook's anticompetitive conduct, which has substantially reduced, if not eliminated, competition, consumers would have benefitted from more robust competition in terms of non-price attributes such as data privacy practices and social media platform quality. Users could have benefitted from Facebook's social media network without having to surrender as much personal data to Facebook and other third parties that use Facebook for app development or targeted advertising.  Similarly, users could have benefitted from competition that would have resulted in Facebook or its alternatives offering higher-quality services, such as interoperability between platforms and portability of users' data.

205.   If Facebook had disclosed the scope of the data it collected and the level of fine-grained targeted marketing that it enabled, consumers would have benefitted from competition in the Social Network and Social Media Markets, resulting in a better Facebook or better alternatives and lower consumer costs in the form of information and attention.  Instead,

1  Facebook has artificially stifled innovation, thrusting on consumers a product of reduced-quality

2  and leaving consumers with no meaningful alternative.

3      206.    If Facebook had not used its social media monopoly to target its competition for

4  destruction, consumers would have benefitted from more competition, and hence more options

5  and lower costs, in the Social Network and Social Media Markets.  Even elected officials have

6  recognized that absent Facebook's anticompetitive acquisition strategy, Facebook would have had

7  to compete on privacy issues, benefiting consumers:[151]



8

9

10

11

12

13

14

15

16

17      207.    Because Facebook engaged in the anticompetitive practices described above,

18  consumers suffered substantial, cognizable, and quantifiable economic harm.  Unless these acts

19  are enjoined, consumers will continue to suffer harm caused by Facebook's anticompetitive

20  practices.

21      **ACCRUAL OF CLAIM, EQUITABLE TOLLING, FRAUDULENT CONCEALMENT,**

22      **CONTINUING VIOLATION, AND ASCERTAINMENT OF DAMAGES**

23      208.    Plaintiffs did not discover the existence of the anticompetitive acts alleged herein

24  until, at the earliest, March 17, 2018.  As the House Antitrust Subcommittee recently explained,

25  "[t]o the extent that consumers are aware of data collection practices, it is often in the wake of

26  scandals involving large-scale data breaches or privacy incidents such as Cambridge

27      _____

      [151] United States Representative Ro Khanna, Twitter (Jan. 25, 2019), available at

28  https://twitter.com/RepRoKhanna/status/1088850988218413058.

Analytica."[152]  It was not until the media uncovered the details of the Cambridge Analytica scandal on March 17, 2018, that consumers began to discover Facebook's anticompetitive practices that harmed consumers and that would have enabled consumers to raise the claims presented in this action.  Similarly, it was not until the media revealed the details of Apple's ban of Onavo on August 22, 2018, that consumers learned of the additional facts regarding Facebook's anticompetitive practices necessary for consumers to raise the claims presented in the action.

209.    Nor could plaintiffs have discovered, through the exercise of reasonable diligence, the existence of the anticompetitive acts alleged herein until, at the earliest, March 2018.  That is because, as the House Antitrust Subcommittee has recognized, "nuances in privacy terms are relegated to investigative journalists to discover and explain."[153]  The subsequent investigative reporting that brought to light Facebook's systematic deception and commercial surveillance was not made public until, at the earliest, March 17, 2018, following the Cambridge Analytica scandal.  Accordingly, the statute of limitations should be equitably tolled to March 2018.  As such, all of the anticompetitive conduct described in this complaint presents timely claims, including Facebook's deception and acquisition conduct going back to before it achieved its social media monopoly.

210.    Facebook fraudulently concealed its deceptive practices and commercial surveillance efforts, including the extent of its data privacy practices and anticompetitive acquisition strategy.  As a result, Plaintiffs and Class members were unaware of Facebook's unlawful conduct alleged herein.  Facebook affirmatively and fraudulently concealed its unlawful conduct by, *inter alia*:

a)      Agreeing to a settlement with the FTC in 2011 which "barred [Facebook] from making misrepresentations about the privacy or security of consumers' personal information[.]"

---

[152] House Report, *supra*, at 54.

[153] *Id.*

b)      Publicly misrepresenting, before and after its 2011 settlement with the

FTC, that it was protecting users' privacy.  Examples of such public statements include:

c)      Mark Zuckerberg's May 2010 statement on NPR that "There's this false

rumor that's been going around which says that we're sharing private information with

applications and it's just not true."

d)      Mark Zuckerberg's November 2011 statement on his own Facebook page

that "everyone needs complete control over who they share with at all times."

e)      Mark Zuckerberg's November 2011 statement on his own Facebook page

regarding the 2011 FTC Settlement that the settlement "means we're making a clear and formal

long-term commitment to do the things we've always tried to do and planned to keep doing –

giving you tools to control who can see your information and then making sure only those people

you intend can see it."

f)      Facebook's statement to shareholders in its IPO filing with the Securities

and Exchange Commission, indicating that "[w]e also believe that giving people control over

what they share is a fundamental principle[.]"

g)      Mark Zuckerberg's June 8, 2013 statement, posted on Facebook's

Newsroom, regarding Edward Snowden's allegations of government surveillance: "We will

continue fighting aggressively to keep your information safe and secure."

h)      Mark Zuckerberg's March 2014 statement on his own Facebook page

responding to allegations that the National Security Agency posed as Facebook during a

controversial surveillance program: "To keep the internet strong, we need to keep it secure.

That's why at Facebook we spend a lot of our energy making our services and the whole internet

safer and more secure. . . . Together, we can build a space that is greater and a more important

part of the world than anything we have today, but is also safe and secure.  I'm committed to

seeing this happen, and you can count on Facebook to do our part."

i)      Facebook's statement in its 2016 10-K filing that while "some of our

developers or other partners, such as those that help us measure the effectiveness of ads, may

receive or store information provided by us or by our users through mobile or web applications

1  integrated with Facebook[,]" Facebook only "provide[s] *limited information* to such third parties

2  *based on the scope of services* provided to us."

3             j)      Mark Zuckerberg's March 2016 public statement in response to a statement

4  issued by its subsidiary, WhatsApp, assuring that "Facebook stands with many technology

5  companies to protect you and your information."

6             k)      Mark Zuckerberg's March 2018 statement following news outlets'

7  reporting on the Cambridge Analytica scandal that "[w]e have a responsibility to protect your

8  data, and if we can't then we don't deserve to serve you."

9      211.    Plaintiffs and the class members did not discover, nor could they have discovered

10  through reasonable diligence, that Facebook was violating the antitrust and other laws until less

11  than four years before this litigation was initially commenced.  Facebook did not tell Plaintiffs or

12  other Class members that it was violating its 2011 Settlement with the FTC, deceiving consumers

13  and selling their data to extract revenue from third-parties, or exploiting consumers' trust by

14  surveilling them and using their data to identify competitors to "acquire, copy, or kill."  To the

15  contrary, Mark Zuckerberg—Facebook's founder, Chief Executive Officer, and public face—

16  repeatedly represented otherwise.  Indeed, in announcing its largest-ever $5 billion fine against

17  Facebook following the Cambridge Analytica scandal, the FTC explained that while Facebook

18  "encourages users to share information on its platform" by "promis[ing] users they can control

19  the privacy of their information," Facebook "repeatedly used deceptive disclosures and settings to

20  undermine users' privacy preferences[.]"

21      212.    In addition, Facebook's anticompetitive conduct was, by its very nature, inherently

22  self-concealing because it was performed outside the sight and knowledge of consumers.  As a

23  result, Plaintiffs and Class members did not discover Facebook's scheme, even with the exercise

24  of reasonable diligence.

25      213.    Since the start of the class periods, Facebook has committed continuing violations

26  of the antitrust laws, resulting in monetary injury to Plaintiffs and Class members.  As described

27  herein, Facebook has engaged in a pattern of independent misrepresentations to users, designed to

28  acquire, maintain, and prolong Facebook's monopoly position.  Similarly, Facebook has

weaponized its users' data as a part of its serial acquisition strategy to "acquire, copy, or kill" its competitors. Each of these injurious acts were separate and independent overt acts during the limitations period that were new and independent acts that inflicted new and accumulating injuries on consumers. Each of Facebook's instances of deception as to its data privacy practices and commercial surveillance over time were acts new and independent from its past issues with data privacy and commercial surveillance. Facebook's continued exposure of private information to app developers, advertisers, and other third-parties leading up to 2018 and its anticompetitive acquisition practices were additional, independent, and overt acts that harmed competition and inflicted new and accumulating economic injuries on consumers.

214.    Moreover, Plaintiffs' and Class members' harms were not ascertainable—sufficient to give rise to the claims presented herein—more than four years prior to the date that this action was first commenced. Since the harm that Plaintiffs and Class members allege had not crystallized more than four years prior to the date that this action was initiated, the antitrust claims presented herein are timely.

## CLASS ACTION ALLEGATIONS

215.    Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

216.    Pursuant to Federal Rule of Civil Procedure 23(b)(3), Plaintiffs assert claims on behalf of the following Classes:

a)    **The Antitrust Consumer Class:**  All persons or entities in the United States who maintained a Facebook profile at any point from 2007 up to the date of the filing of this action. Excluded from the Class are Facebook, any entity in which Facebook has an interest, and any of Facebook's: corporate parent, affiliate(s), subsidiary(ies), officers, directors, legal representatives, successors, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

b)    **The Unjust Enrichment Consumer Class:**  All persons or entities in the United States who maintained a Facebook profile at any point from 2007 up to the date of the

filing of this action.  Excluded from the Class are Facebook, any entity in which Facebook has an interest, and any of Facebook's: corporate parent, affiliate(s), subsidiary(ies), officers, directors, legal representatives, successors, and assigns.  Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

217.    Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that the Classes should be expanded, divided into subclasses, or modified in any other way.

218.    This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements of Rule 23(b)(3).  Plaintiffs seek to represent ascertainable Classes, as determining inclusion in the classes can be done through Facebook's own records.

219.    Although the precise number of Class members is unknown and can only be determined through appropriate discovery, the proposed Classes number at least in the tens of millions and is therefore so numerous that joinder of all members would be impracticable.

220.    Questions of law and fact common to the putative Classes exist that predominate over questions affecting only individual members, including:

      a)    Whether Facebook's deception of consumers about its data privacy practices was anticompetitive;

      b)    Whether Facebook's acquisition conduct was anticompetitive;

      c)    Whether Facebook intentionally engaged in anticompetitive acts in order to obtain or maintain monopoly power;

      d)    Whether Facebook is a monopolist in the Social Network Market;

      e)    Whether Facebook is a monopolist in the Social Media Market;

      f)    Whether Facebook intentionally made material misrepresentations about its data privacy practices and the extent of its commercial surveillance;

g)      Whether Facebook's foreclosure of competition in the Social Network Market caused by its anticompetitive conduct led to cognizable and quantifiable economic harms to consumers;

h)      Whether Facebook's foreclosure of competition in the Social Media Market caused by its anticompetitive conduct led to cognizable and quantifiable economic harms to consumers;

i)       Whether consumers would have had more options and competition amongst social media companies if Facebook would have revealed the full extent of its data privacy practices and commercial surveillance long ago;

j)      Whether Facebook's anticompetitive conduct substantially harmed competition in the Social Network Market in the United States;

k)      Whether Facebook's anticompetitive conduct substantially harmed competition in the Social Media Market in the United States;

l)      Whether Facebook's anticompetitive conduct should be enjoined or whether other appropriate equitable relief, including ordering Facebook to divest assets or submit to more invasive third-party audits of its privacy practices and commercial surveillance.

221.    Plaintiff(s) is/are (a) member(s) of the putative Classes.  The claims asserted by the Plaintiff(s) in this action are typical of the claims of the members of the putative Classes, as the claims arise from the same course of conduct by the Defendant and the relief sought is common.

222.    Plaintiff(s) will fairly and adequately represent and protect the interests of the members of the putative Classes, as their interests are coincident with, not antagonistic to, the other members of the Classes.

223.    Plaintiffs have retained counsel competent and experienced in both antitrust and class action litigation.

224.    Certification of the Classes is appropriate pursuant to Fed. R. C. P. 23(b)(3) because questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members.  This predominance makes class

1    litigation superior to any other method available for the fair and efficient adjudication of these

2    claims including consistency of adjudications.  Absent a class action it would be unlikely that

3    many members of the Classes would be able to protect their own interests because the cost of

4    litigation through individual lawsuits might exceed the expected recovery.

5           225.    A class action is a superior method for the adjudication of the controversy in that it

6    will permit a large number of claims to be resolved in a single forum simultaneously, efficiently,

7    and without the unnecessary hardship that would result from the prosecution of numerous

8    individual actions and the duplication of discovery, effort, expense, and the burden of the courts

9    that individual actions would create.

10          226.    In the alternative, the Classes should be certified because:

11          a)      The prosecution of separate actions by the individual members of the

12   proposed class would create a risk of inconsistent adjudications, which could establish

13   incompatible standards of conduct for Facebook;

14          b)      The prosecution of individual actions could result in adjudications, which

15   as a practical matter, would be dispositive of the interests of non-party class members or which

16   would substantially impair their ability to protect their interests; and

17          c)      Facebook has acted or refused to act on grounds generally applicable to the

18   proposed Classes, thereby making appropriate final and injunctive relief with respect to the

19   members of the proposed Classes as a whole.

20                              **INTERSTATE TRADE AND COMMERCE**

21          227.    Plaintiffs re-allege and incorporate by reference herein all the allegations

22   contained above.

23          228.    Facebook's anticompetitive conduct has taken place in, and negatively affected the

24   continuous flow of interstate trade and commerce in the United States in that, *inter alia*:

25          a)      Facebook has provided a social media network and platform and has

26   exchanged consumer information and attention with advertisers and consumers throughout the

27   United States;

28

b)    Facebook has used instrumentalities of interstate commerce to provide social media services to consumers and advertisers throughout the United States;

c)    In furtherance of the anticompetitive scheme alleged herein, Facebook has traveled between states and exchanged communications through interstate wire communications and via the Unites States mail; and

d)    The anticompetitive scheme alleged herein has affected billions of dollars of commerce.  Facebook has inflicted antitrust injury by artificially raising the cost to consumers of using its platform, in terms of personal information and attention, by providing reduced user privacy protections to consumers in exchange for their personal data, and by artificially reducing consumer choice and competition in the Social Media Market in the United States.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF: MONOPOLIZATION OF SOCIAL NETWORK MARKET

### Sherman Antitrust Act, § 2

### (On behalf of the Class)

229.    Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

230.    Facebook has willfully acquired and maintained monopoly power in the relevant Social Network Market.  There are no reasonably interchangeable products that would effectively constrain, or have effectively constrained, Facebook from imposing and profitably sustaining during the relevant period a significant artificial decrease in compensation to consumers for their user information and attention paid to advertisements.  Facebook also has the power to impose and profitably sustain lower levels of data privacy protections and social media network quality than would occur in a world where Facebook had not illegally monopolized the Social Network Market.  Facebook has the power to control prices and exclude competition in the Social Network Market.

231.    By multiple measures, Facebook has dominant market share in the Social Network Market.  As discussed more fully below, Facebook's market share in the Social Network Market

1   is higher than its share in the Social Media Market.  And, more than 80% of the time that

2   consumers in the United States spend using social media is spent on Facebook and Instagram.

3        232.    High barriers to entry, high switching costs, and strong direct and indirect network

4   effects make it unlikely, at any time in the foreseeable future, for a competitor to enter or take

5   away substantial market share from Facebook in the Social Network Market in the United States

6   to compete effectively with Facebook.

7        233.    Facebook has willfully acquired and maintained monopoly power in the Social

8   Network Market by means of predatory, exclusionary, and anticompetitive conduct.  Such

9   conduct includes, but is not limited to: (a) engaging in a scheme to gain market share at the

10   expense of its rivals by inducing consumers to join Facebook through a pattern of deception

11   regarding Facebook's data privacy protections and its commercial surveillance; and (b)

12   weaponizing the data it obtained from consumers by means of deception to destroy competition

13   through its strategy to "acquire, copy, or kill" any and all of its competitors.

14        234.    By eliminating competition and obtaining and maintaining monopoly power over

15   the Social Network Markets as described above, Facebook was able to, and did, artificially

16   decrease compensation to consumers for their information and attention and provide lower value

17   to consumers than it would have provided in a competitive market.

18        235.    Facebook's destruction of competition caused antitrust injury to Plaintiffs and

19   Class members by decreasing compensation and lowering value for consumers, who received

20   lower compensation and lower value from Facebook than those consumers would have received

21   in the but-for world where Facebook competed on the merits.  Plaintiff(s) and the class were

22   injured and received substantially less compensation and lower value than they would have absent

23   Facebook's unlawful and anticompetitive conduct.

24        236.    During the relevant period, Plaintiff(s) and the Class members gave Facebook their

25   personal data and attention in exchange for the use of its social media network.  As a result of

26   Facebook's illegal conduct, Plaintiffs and other Class members received lower compensation and

27   value than they would have absent Facebook's illegal conduct.

28

237.     There are no legitimate pro-competitive or business justifications for the conduct alleged herein, and even if there were, the anticompetitive effects would far outweigh any possible pro-competitive effects.

238.     Facebook's acts and practices have continued to be anticompetitive in nature and tendency and constitute an unfair method of competition, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

239.     Facebook's conduct has had a substantial effect on interstate commerce.

240.     Plaintiffs and Class members have been, and will continue to be, injured in their property as a result of Facebook's conduct.

241.     Plaintiffs and Class members have suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: (a) higher costs in terms of time and attention; (b) a reduction in consumer choice; and (c) being forced to accept a service of lesser quality because of reduced competition.

242.     Plaintiffs and Class members seek an award of treble damages or, in the alternative, disgorgement of Facebook's ill-gotten gains.  Plaintiffs also seek appropriate equitable relief to enjoin Facebook from continuing to engage in anticompetitive behavior to the detriment of consumers and to remedy the harms that Facebook's monopolization of the Social Network Market has caused, including: (a) divestment of assets that would continue to entrench its monopoly power; and (b) requiring Facebook to submit to independent monitoring of its user privacy practices, data surveillance, and acquisition conduct.

**SECOND CLAIM FOR RELIEF: ATTEMPTED MONOPOLIZATION OF SOCIAL NETWORK MARKET**

**Sherman Antitrust Act, § 2**

**(On behalf of the Class)**

243.     Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

244.     With respect to the Social Network Market, Facebook has engaged in predatory, exclusionary, and anticompetitive conduct, including but not limited to; (a) obtaining market

share through a pattern of deceiving consumers; and (b) exploiting the data it obtained from

consumers through deception to systematically destroy competition through its strategy to "copy,

kill, or acquire" any and all of its competitors.

245.     Facebook's conduct has had an anticompetitive effect in the Social Network

Market.

246.     Facebook's conduct has no legitimate business purpose or procompetitive effect,

and even if there were, the anticompetitive effects would far outweigh any possible pro-

competitive effects.

247.     Facebook has engaged in the anticompetitive conduct described herein with the

specific intent of monopolizing the Social Network Market.

248.     Facebook has engaged in the anticompetitive conduct described herein with a

dangerous probability of monopolizing the Social Network Market.

249.     Facebook's conduct has had a substantial effect on interstate commerce.

250.     Plaintiffs and Class members have been, and will continue to be, injured in their

property as a result of Facebook's conduct.

251.     Plaintiffs and Class members have suffered, and will continue to suffer, injury of

the type that the antitrust laws were intended to prevent, including but not limited to: (a) lower

compensation for their time and attention; (b) a reduction in consumer choice; and (c) being

forced to accept a service of lesser quality because of reduced competition.

252.     Plaintiffs and Class members seek an award of treble damages or, in the

alternative, disgorgement of Facebook's ill-gotten gains.  Plaintiffs also seek appropriate

equitable relief to enjoin Facebook from continuing to engage in anticompetitive behavior to the

detriment of consumers and to remedy the harms that Facebook's attempted monopolization of

the Social Network Market has caused, including: (a) divestment of assets that would continue to

entrench its monopoly power; and (b) requiring Facebook to submit to independent monitoring of

its user privacy practices, data surveillance, and acquisition conduct.

**THIRD CLAIM FOR RELIEF: MONOPOLIZATION OF SOCIAL MEDIA MARKET**

**Sherman Antitrust Act, § 2**

**(On behalf of the Class)**

253.    Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

254.    Facebook has willfully acquired and maintained monopoly power in the relevant Social Media Market.  There are no reasonably interchangeable products that would effectively constrain, or have effectively constrained, Facebook from imposing and profitably sustaining during the relevant period a significant artificial decrease in compensation to consumers for their user information and attention paid to advertisements.  Facebook also has the power to impose and profitably sustain lower levels of data privacy protections and social media quality than would occur in a world where Facebook had not illegally monopolized the Social Media Market.  Facebook has the power to control prices and exclude competition in the Social Media Market.

255.    By multiple measures, Facebook has dominant market share in the Social Media Market.  As measured by advertising revenue that is generated by social media platforms in the Social Media Market, Facebook (including Instagram) has market share of at least 85% of the Social Media Market.  By its own measure, and as reflected in Facebook's internal documents, Facebook has estimated that it is "95% of all social media in the US[.]"  And, more than 80% of the time that consumers in the United States spend using social media is spent on Facebook and Instagram.

256.    High barriers to entry, high switching costs, and strong direct and indirect network effects make it unlikely, at any time in the foreseeable future, for a competitor to enter or take away substantial market share from Facebook in the Social Media Market in the United States to compete effectively with Facebook.

257.    Facebook has willfully acquired and maintained monopoly power in the Social Media Market by means of predatory, exclusionary, and anticompetitive conduct.  Such conduct includes, but is not limited to: (a) engaging in a scheme to gain market share at the expense of its rivals by inducing consumers to join Facebook through a pattern of deception regarding

1    Facebook's data privacy protections and its commercial surveillance; and (b) weaponizing the

2    data it obtained from consumers by means of deception to destroy competition through its

3    strategy to "acquire, copy, or kill" any and all of its competitors.

4         258.    By eliminating competition and obtaining and maintaining monopoly power over

5    the Social Media Market as described above, Facebook was able to, and did, artificially decrease

6    compensation to consumers for their information and attention and provide lower value to

7    consumers than it would have provided in a competitive market.

8         259.    Facebook's destruction of competition caused antitrust injury to Plaintiffs and

9    Class members by decreasing compensation and lowering value for consumers, who received

10   lower compensation and lower value from Facebook than those consumers would have received

11   in the but-for world where Facebook competed on the merits.  Plaintiff(s) and the class were

12   injured and received substantially less compensation and lower value than they would have absent

13   Facebook's unlawful and anticompetitive conduct.

14        260.    During the relevant period, Plaintiff(s) and the Class members gave Facebook their

15   personal data and attention in exchange for the use of its social media network.  As a result of

16   Facebook's illegal conduct, Plaintiffs and other Class members received lower compensation and

17   value than they would have absent Facebook's illegal conduct.

18        261.    There are no legitimate pro-competitive or business justifications for the conduct

19   alleged herein, and even if there were, the anticompetitive effects would far outweigh any

20   possible pro-competitive effects.

21        262.    Facebook's acts and practices have continued to be anticompetitive in nature and

22   tendency and constitute an unfair method of competition, in violation of Section 2 of the Sherman

23   Act, 15 U.S.C. § 2.

24        263.    Facebook's conduct has had a substantial effect on interstate commerce.

25        264.    Plaintiffs and Class members have been, and will continue to be, injured in their

26   property as a result of Facebook's conduct.

27        265.    Plaintiffs and Class members have suffered, and will continue to suffer, injury of

28   the type that the antitrust laws were intended to prevent, including but not limited to: (a) higher

costs in terms of time and attention; (b) a reduction in consumer choice; and (c) being forced to
accept a service of lesser quality because of reduced competition.

266.    Plaintiffs and Class members seek an award of treble damages or, in the
alternative, disgorgement of Facebook's ill-gotten gains.  Plaintiffs also seek appropriate
equitable relief to enjoin Facebook from continuing to engage in anticompetitive behavior to the
detriment of consumers and to remedy the harms that Facebook's monopolization of the Social
Media Market has caused, including: (a) divestment of assets that would continue to entrench its
monopoly power; and (b) requiring Facebook to submit to independent monitoring of its user
privacy practices, data surveillance, and acquisition conduct.

### FOURTH CLAIM FOR RELIEF: ATTEMPTED MONOPOLIZATION OF SOCIAL MEDIA MARKET

**Sherman Antitrust Act, § 2**

**(On behalf of the Class)**

267.    Plaintiffs re-allege and incorporate by reference herein all the allegations
contained above.

268.    With respect to the Social Media Market, Facebook has engaged in predatory,
exclusionary, and anticompetitive conduct, including but not limited to; (a) obtaining market
share through a pattern of deceiving consumers; and (b) exploiting the data it obtained from
consumers through deception to systematically destroy competition through its strategy to "copy,
kill, or acquire" any and all of its competitors.

269.    Facebook's conduct has had an anticompetitive effect in the Social Media Market.

270.    Facebook's conduct has no legitimate business purpose or procompetitive effect,
and even if there were, the anticompetitive effects would far outweigh any possible pro-
competitive effects.

271.    Facebook has engaged in the anticompetitive conduct described herein with the
specific intent of monopolizing the Social Media Market.

272.    Facebook has engaged in the anticompetitive conduct described herein with a
dangerous probability of monopolizing the Social Media Market.

273.   Facebook's conduct has had a substantial effect on interstate commerce.

274.   Plaintiffs and Class members have been, and will continue to be, injured in their property as a result of Facebook's conduct.

275.   Plaintiffs and Class members have suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: (a) lower compensation for their time and attention; (b) a reduction in consumer choice; and (c) being forced to accept a service of lesser quality because of reduced competition.

276.   Plaintiffs and Class members seek an award of treble damages or, in the alternative, disgorgement of Facebook's ill-gotten gains.  Plaintiffs also seek appropriate equitable relief to enjoin Facebook from continuing to engage in anticompetitive behavior to the detriment of consumers and to remedy the harms that Facebook's attempted monopolization of the Social Media Market has caused, including: (a) divestment of assets that would continue to entrench its monopoly power; and (b) requiring Facebook to submit to independent monitoring of its user privacy practices, data surveillance, and acquisition conduct.

## FIFTH CLAIM FOR RELIEF: UNJUST ENRICHMENT

### California Common Law

### (On behalf of the Class)

277.   Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

278.   In the Facebook Terms of Service ("Terms"), each class member and Facebook have agreed "that the laws of the State of California will govern these Terms and any claim [against Facebook], without regard to conflict of law provisions."

279.   Facebook has been unjustly enriched through its misconduct as alleged herein.

280.   Plaintiffs and Class members conferred direct benefits on Facebook in the forms of their personal data, time, and attention.

281.   These benefits are quantifiable in measurable units.  Facebook sells access to its users' data, time, and attention to third parties—including advertisers and app developers—for

1   discrete money amounts.  In 2019, for example, Facebook collected $70.7 billion in revenue,

2   almost entirely from allowing companies to serve ads to its users.

3        282.    Facebook appreciated and had knowledge of the fact that Plaintiffs and Class

4   members conferred these benefits on it.  For example, after Facebook's involvement in the

5   Cambridge Analytica scandal came to light in March 2018, Facebook founder Mark Zuckerberg

6   explicitly recognized that Plaintiffs and Class members conferred on Facebook the benefit of their

7   data, stating: "We have a responsibility to protect your data, and if we can't then we don't deserve

8   to serve you."  Facebook has similarly recognized that Plaintiffs and Class members have

9   conferred on it the benefits of their time and attention, as evident from the fact that Facebook

10   internally tracks the time its users spend on Facebook (and its family of products) and compares

11   these figures to the time they spend on other competing services.

12        283.    Facebook acquired these benefits from Plaintiffs and Class members through

13   misrepresentations and deception.  Facebook induced Plaintiffs and Class members to join

14   Facebook based on the promise of stringent privacy protections.  All the while, Facebook

15   concealed the scope of the data it harvested from Plaintiffs and Class members and brokered to

16   third parties.  Nor did Facebook reveal the manner in which it weaponized Plaintiffs' and Class

17   members' data to "copy, kill, or acquire" Facebook's rivals.

18        284.    As a result of Facebook's receipt of the direct benefits of Plaintiffs' and Class

19   members' data, time, and attention, Facebook was able to destroy competition, enriching itself at

20   the expense of Plaintiffs and Class members.  Although Plaintiffs and Class member conferred on

21   Facebook the direct benefits of their data, time, and attention, Plaintiffs and Class members have

22   been, as a result of Facebook's misconduct: (a) deprived of a marketplace that adequately

23   compensates them for their data, time, and attention with benefits of reciprocal value; (b) forced

24   to accept Facebook's services, which are of inferior quality, with no meaningful alternative.

25        285.    Facebook has unjustly reaped monstrous financial gain as a result of the

26   misconduct alleged herein.  In 2019, for example, Facebook collected $70.7 billion in revenue,

27   almost entirely from allowing companies to serve ads to its users.  It would be unfair,

28

---

CLASS ACTION COMPLAINT

1  unscrupulous, unjust, and inequitable to allow Facebook to retain the value it derived from the

2  direct benefits that Plaintiffs and Class members conferred upon it.

3       286.    To the extent that it is required—and solely in the alternative—Plaintiffs and Class

4  members have no other adequate remedy at law available.

5       287.    Plaintiffs and Class members in all of the 50 States and the District of Columbia

6  accordingly seek disgorgement of all of Facebook's profits resulting from the wanton misconduct

7  alleged herein.

8                        **<u>PRAYER FOR RELIEF</u>**

9       288.    WHEREFORE, Plaintiffs Maximilian Klein and Sarah Grabert, on behalf of

10 themselves and the Classes, seek the following relief:

11       a)      An order certifying this action as a class action under Fed.  R. Civ. 23,

12 defining the Classes as requested herein, finding that Plaintiffs are proper representatives of the

13 Classes requested herein, and appointing Plaintiffs' counsel as Class Counsel.

14       b)      Injunctive and other equitable relief as is necessary to protect the interests

15 of the Classes, including: (i) an order prohibiting Facebook from continuing to engage in the

16 wrongful acts described herein; (ii) requiring Facebook to engage third-party auditors to conduct

17 audits and evaluations of Facebook's data privacy practices, commercial surveillance, and

18 acquisition conduct, and ordering them to promptly correct any problems or issues detected by

19 these auditors, and (iii) requiring Facebook to divest assets, such as WhatsApp, Instagram, and its

20 Onavo technology, that tend to substantially entrench Facebook's monopoly power in a timely

21 and complete manner.

22       c)      Treble damages or, alternatively, restitution and/or disgorgement of all

23 amounts wrongfully charged to and received from Plaintiffs and members of Classes.

24       d)      Attorneys' fees, statutory costs and other costs of suit herein incurred, for

25 both pre- and post-judgment interest on any amounts awarded, for corrective advertising to

26 ameliorate consumers' mistaken impressions created by Facebook's anticompetitive conduct.

27       e)      Declaratory relief, including but not limited to a declaration and judgment

28 that Facebook's conduct as alleged herein violates the laws alleged herein.

f) Such other relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand trial by jury in this action of all issues so triable.

Dated: December 3, 2020                Respectfully submitted,

/
_____

Stephen A. Swedlow (*pro hac vice forthcoming*)
  stephenswedlow@quinnemanuel.com
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606-1881
(312) 705-7400

Kevin Y. Teruya (Bar No. 235916)
  kevinteruya@quinnemanuel.com
Adam B. Wolfson (Bar No. 262125)
  adamwolfson@quinnemanuel.com
Brantley I. Pepperman (Bar No. 322057)
  brantleypepperman@quinnemanuel.com
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
(213) 443-3000

Warren Postman (Bar No. 330869)
  wdp@kellerlenkner.com
Jason Ethridge (*pro hac vice forthcoming*)
  jason.ethridge@kellerlenkner.com
**KELLER LENKNER LLC**
1300 I Street, N.W., Suite 400E
Washington, DC 20005
(202) 918-1123

Ashley Keller (*pro hac vice forthcoming*)
  ack@kellerlenkner.com
Ben Whiting (*pro hac vice forthcoming*)
  ben.whiting@kellerlenkner.com
**KELLER LENKNER LLC**
150 N. Riverside Plaza, Suite 4270
Chicago, IL 60606
(312) 741-5220

*Attorneys for Plaintiffs*

**ATTESTATION OF ADAM B. WOLFSON**

This document is being filed through the Electronic Case Filing (ECF) system by attorney Adam B. Wolfson.  By his signature, Mr. Wolfson attests that he has obtained concurrence in the filing of this document from each of the attorneys identified on the caption page and in the above signature block.

Dated: December 3, 2020      By _____
                              Adam B. Wolfson

JS-CAND 44 (Rev. 10/2020)

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

MAXIMILIAN KLEIN and SARAH GRABERT, individually and on behalf of all others similarly situated

**(b)** County of Residence of First Listed Plaintiff   Chittenden County, Vermont
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*   (Additional attorneys listed on attachment)

Stephen A. Swedlow *(Pro Hac Vice)*, Kevin Y. Teruya;
Adam B. Wolfson, Brantley I. Pepperman
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017 (213) 443-3000

Warren Postman
Keller Lenkner LLC
1300 I Street, N.W., Suite 400E
Washington, DC 20005 (202) 918-1123

## DEFENDANTS

Facebook, Inc.

County of Residence of First Listed Defendant   San Mateo County, California
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **LABOR** | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | 710 Fair Labor Standards Act | 820 Copyrights | ☒ 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine | **PERSONAL PROPERTY** | 740 Railway Labor Act | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | 370 Other Fraud | 751 Family and Medical Leave Act | 840 Trademark | 460 Deportation |
| | 350 Motor Vehicle | 371 Truth in Lending | 790 Other Labor Litigation | 880 Defend Trade Secrets Act of 2016 | 470 Racketeer Influenced & Corrupt Organizations |
| 153 Recovery of Overpayment of Veteran's Benefits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | 791 Employee Retirement Income Security Act | **SOCIAL SECURITY** | 480 Consumer Credit |
| 160 Stockholders' Suits | 360 Other Personal Injury | 385 Property Damage Product Liability | **IMMIGRATION** | 861 HIA (1395ff) | 485 Telephone Consumer Protection Act |
| 190 Other Contract | 362 Personal Injury -Medical Malpractice | | 462 Naturalization Application | 862 Black Lung (923) | 490 Cable/Sat TV |
| 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 465 Other Immigration Actions | 863 DIWC/DIWW (405(g)) | 850 Securities/Commodities/ Exchange |
| 196 Franchise | 440 Other Civil Rights | **HABEAS CORPUS** | | 864 SSID Title XVI | 890 Other Statutory Actions |
| **REAL PROPERTY** | 441 Voting | 463 Alien Detainee | | 865 RSI (405(g)) | 891 Agricultural Acts |
| 210 Land Condemnation | 442 Employment | 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | 893 Environmental Matters |
| 220 Foreclosure | 443 Housing/ Accommodations | 530 General | | 870 Taxes (U.S. Plaintiff or Defendant) | 895 Freedom of Information Act |
| 230 Rent Lease & Ejectment | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | 871 IRS–Third Party 26 USC § 7609 | 896 Arbitration |
| 240 Torts to Land | 446 Amer. w/Disabilities–Other | **OTHER** | | | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 245 Tort Product Liability | 448 Education | 540 Mandamus & Other | | | 950 Constitutionality of State Statutes |
| 290 All Other Real Property | | 550 Civil Rights | | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from Another District *(specify)* ☐ 6 Multidistrict Litigation–Transfer ☐ 8 Multidistrict Litigation–Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. § 2

Brief description of cause:
Monopolization; attempted monopolization; unjust enrichment under California law.

## VII. REQUESTED IN COMPLAINT:

☑ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S), IF ANY *(See instructions)*:

JUDGE                    DOCKET NUMBER

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

*(Place an "X" in One Box Only)*   ☐ SAN FRANCISCO/OAKLAND   ☒ SAN JOSE   ☐ EUREKA-MCKINLEYVILLE

DATE   12/03/2020

SIGNATURE OF ATTORNEY OF RECORD   /s/ Adam B. Wolfson

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-CAND 44

**Authority For Civil Cover Sheet.** The JS-CAND 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I. a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**b) County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**c) Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)."

**II. Jurisdiction.** The basis of jurisdiction is set forth under Federal Rule of Civil Procedure 8(a), which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

(1) <u>United States plaintiff</u>. Jurisdiction based on 28 USC §§ 1345 and 1348. Suits by agencies and officers of the United States are included here.

(2) <u>United States defendant</u>. When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

(3) <u>Federal question</u>. This refers to suits under 28 USC § 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

(4) <u>Diversity of citizenship</u>. This refers to suits under 28 USC § 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**. (See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III. Residence (citizenship) of Principal Parties.** This section of the JS-CAND 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV. Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V. Origin.** Place an "X" in one of the six boxes.

(1) <u>Original Proceedings</u>. Cases originating in the United States district courts.

(2) <u>Removed from State Court</u>. Proceedings initiated in state courts may be removed to the district courts under Title 28 USC § 1441. When the petition for removal is granted, check this box.

(3) <u>Remanded from Appellate Court</u>. Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

(4) <u>Reinstated or Reopened</u>. Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

(5) <u>Transferred from Another District</u>. For cases transferred under Title 28 USC § 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

(6) <u>Multidistrict Litigation Transfer</u>. Check this box when a multidistrict case is transferred into the district under authority of Title 28 USC § 1407. When this box is checked, do not check (5) above.

(8) <u>Multidistrict Litigation Direct File</u>. Check this box when a multidistrict litigation case is filed in the same district as the Master MDL docket.

<u>Please note that there is no Origin Code 7</u>. Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI. Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC § 553. Brief Description: Unauthorized reception of cable service.

**VII. Requested in Complaint.** <u>Class Action</u>. Place an "X" in this box if you are filing a class action under Federal Rule of Civil Procedure 23.

<u>Demand</u>. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

<u>Jury Demand</u>. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII. Related Cases.** This section of the JS-CAND 44 is used to identify related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**IX. Divisional Assignment.** If the Nature of Suit is under Property Rights or Prisoner Petitions or the matter is a Securities Class Action, leave this section blank. For all other cases, identify the divisional venue according to Civil Local Rule 3-2: "the county in which a substantial part of the events or omissions which give rise to the claim occurred or in which a substantial part of the property that is the subject of the action is situated."

**Date and Attorney Signature.** Date and sign the civil cover sheet.

## CIVIL COVER SHEET ATTACHMENT

In addition to the attorneys listed on the Civil Cover Sheet, the following attorneys are also attorneys of record in this case:

Jason Ethridge (*pro hac vice forthcoming*)
**KELLER LENKNER LLC**
1300 I Street, N.W., Suite 400E
Washington, DC 20005 (202) 918-1123

Ashley Keller (*pro hac vice forthcoming*)
Benjamin Whiting (*pro hac vice forthcoming*)
**KELLER LENKNER LLC**
150 N. Riverside Plaza, Suite 4270
Chicago, IL 60606 (312) 741-5220

SONAL N. MEHTA (SBN 222086)
  Sonal.Mehta@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

DAVID Z. GRINGER (*pro hac vice*)
  David.Gringer@wilmerhale.com
ARI HOLTZBLATT (*pro hac vice*)
  Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
  Molly.Jennings@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Ave NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Attorneys for Defendant*
FACEBOOK, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| REVEAL CHAT HOLDCO, LLC, a Delaware limited liability company, USA TECHNOLOGY AND MANAGEMENT SERVICES, INC. (d/b/a Lenddo USA), a Delaware corporation, CIR.CL, INC., a dissolved Delaware corporation, and BEEHIVE BIOMETRIC, INC., a dissolved Delaware corporation, <br><br> Plaintiffs, <br><br> v. <br><br> FACEBOOK, INC., a Delaware corporation, <br><br> Defendant. | Case No. 5:20-CV-00363-BLF <br><br> **DEFENDANT FACEBOOK INC.'S [PROPOSED] ORDER GRANTING FACEBOOK'S MOTION FOR ADMINISTRATIVE RELIEF TO CONSIDER WHETHER CASES SHOULD BE RELATED** |

# [PROPOSED] ORDER

IT IS HEREBY ORDERED:  Defendant Facebook, Inc.'s Motion for Administrative Relief to Consider Whether Cases Should Be Related is GRANTED as follows:

1. The action recently filed in this District and captioned *Klein et al. v. Facebook, Inc.*, No. 5:20-cv-08570-LHK, filed on December 3, 2020 (the "*Klein* Action") is hereby related to the instant earlier-filed matter, *Reveal Chat et al. v. Facebook, Inc.*, No. 5:20-cv-00363-BLF; and

2. The *Klein* Action is hereby reassigned to this Court, the Honorable Beth Labson Freeman, accordingly.


DATED: _____          By: _____

                                      Hon. Beth Labson Freeman

                                      United States District Judge



Submitted by:

WILMER CUTLER PICKERING HALE AND DORR LLP

By:     */s/ Sonal N. Mehta*

        *Attorney for Facebook, Inc.*

FACEBOOK'S [PROPOSED] ORDER GRANTING MOTION FOR
ADMINISTRATIVE RELIEF