# EXHIBIT A

SONAL N. MEHTA (SBN 222086)
  Sonal.Mehta@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

DAVID Z. GRINGER (*pro hac vice*)
  David.Gringer@wilmerhale.com
ARI HOLTZBLATT (*pro hac vice*)
  Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
  Molly.Jennings@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Attorneys for Defendant*
FACEBOOK, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| REVEAL CHAT HOLDCO, LLC, a Delaware limited liability company, USA TECHNOLOGY AND MANAGEMENT SERVICES, INC. (d/b/a Lenddo USA), a Delaware corporation, and BEEHIVE BIOMETRIC, INC., a dissolved Delaware corporation, <br><br> Plaintiffs, <br><br> v. <br><br> FACEBOOK, INC., a Delaware corporation, <br><br> Defendant. | Case No. 5:20-cv-00363-BLF <br><br> **DEFENDANT FACEBOOK, INC.'S MOTION FOR ADMINISTRATIVE RELIEF TO CONSIDER WHETHER CASES SHOULD BE RELATED PURSUANT TO CIVIL L.R. 3-12** <br><br> Judge: Hon. Beth Labson Freeman |

Pursuant to Civil Local Rule 3-12, defendant Facebook, Inc. respectfully moves the Court to consider whether to relate *Sherman v. Facebook, Inc.*, No. 3:20-cv-08721-LB ("*Sherman*"), *Kupcho v. Facebook, Inc.*, No. 4:20-cv-08815-JSW ("*Kupcho*"), and *Dames v. Facebook, Inc.*, No. 3:20-cv-08817-TSH ("*Dames*") to *Reveal Chat Holdco, LLC v. Facebook, Inc.*, No. 5:20-cv-00363-BLF ("*Reveal Chat*"). The *Reveal Chat* plaintiffs agree that the cases should be related. The *Sherman* and *Dames* plaintiffs do not agree that the cases should be related. The *Kupcho* plaintiffs did not respond to Facebook's inquiry regarding their position. A declaration from David Z. Gringer accompanies this motion.

Under Civil Local Rule 3-12(a), actions are related "when: (1) The actions concern substantially the same parties, property, transaction or event; and (2) It appears likely that there will be an unduly burdensome duplication of labor and expense or conflicting results if the cases are conducted before different Judges." These putative antitrust class actions, like the recently filed *Klein* case, all follow the highly-publicized antitrust lawsuits filed by the FTC and the Attorneys General of 46 states, D.C., and Guam (collectively "the States") against Facebook. These putative antitrust class actions all proceed under a "monopoly broth" theory of anticompetitive conduct, much like the one alleged in the *Reveal Chat* case. While the cases vary slightly in the "ingredients" they challenge (and with respect to the putative classes themselves), all focus on Facebook's acquisitions of Instagram and WhatsApp, its purported use of Onavo for "surveillance," and its regulation of developer usage of Facebook APIs. As the Court knows, these theories are also at the heart of the *Reveal Chat* case, which has been pending in this Court for nearly a year. It is telling that *both* Facebook and the *Reveal Chat* plaintiffs recognize that *Sherman, Kupcho, and Dames* are related to *Reveal Chat*. Similarly, both the FTC and the States acknowledge that their recently-filed lawsuits, which are predicated on some of the same conduct, are related to each of these private cases. Dispersing these largely identical actions across the dockets of multiple judges on this Court would result in a significant duplication of efforts and ultimately poses a risk of inconsistent judgments and other orders as the litigation advances. These challenges and burdens can be easily avoided by relating the

No. 5:20-cv-00363-BLF

FACEBOOK'S MOTION FOR ADMINISTRATIVE RELIEF TO CONSIDER WHETHER CASES SHOULD BE RELATED

cases.

In light of the substantial factual and legal overlap, the threat of duplicative discovery, and the real threat of inconsistent judgments, the cases easily exceed the relevant standard for relation.

**First**, the cases all "concern substantially the same parties, property, transaction or event." Civil L.R. 3-12(a)(2)(1). Facebook is the defendant in all the cases. With respect to legal theories, the cases all allege that Facebook unlawfully monopolized or attempted to monopolize markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. And the plaintiffs in all cases, like the plaintiffs in *Reveal Chat* (and *Klein*), all allege the following as part of their unlawful monopolization theories:

- Facebook acquired Instagram (*compare Reveal Chat* Am. Compl. ¶¶ 287-299, *with Sherman* Compl. ¶¶ 105-108, *Kupcho* Compl. ¶¶ 171-179, *and Dames* Compl. ¶¶ 59-63; *see also* ECF No. 85-2 ("*Klein* Compl.") ¶¶ 170-177), and WhatsApp (*compare Reveal Chat* Am. Compl. ¶¶ 323-332, *with Sherman* Compl. ¶¶ 110-111, *Kupcho* Compl. ¶¶ 186-188, *and Dames* Compl. ¶¶ 65-68; *see also Klein* Compl. ¶¶ 184-186), allegedly to eliminate potential competition;

- Facebook allegedly imposed conditions on or restricted access to its Platform for third-party developers, including through withdrawal of access to APIs (*compare Reveal Chat* Am. Compl. ¶¶ 247-261, *with Sherman* Compl. ¶¶ 112, 114, *Kupcho* Compl. ¶¶ 165-167, 169, *and Dames* Compl. ¶¶ 74-81; *see also Klein* Compl. ¶¶ 164-166, 168); and

- Facebook allegedly acquired and used Onavo to collect user data and employed that data to identify and target competitive threats (*compare Reveal Chat* Am. Compl. ¶¶ 266-286, *with Sherman* Compl. ¶¶ 112-114, *Kupcho* Compl. ¶¶ 149-154, *and Dames* Compl. ¶¶ 55-56; *see also Klein* Compl. ¶¶ 148-153).

Recognizing these similarities, both the FTC and the States listed *Reveal Chat*, *Sherman*, and *Kupcho* as related to cases they respectively filed on December 9, 2020 in the United States District Court for the District of Columbia challenging Facebook's acquisitions of WhatsApp

FACEBOOK'S MOTION FOR ADMINISTRATIVE
RELIEF TO CONSIDER WHETHER CASES SHOULD BE RELATED

and Instagram and its platform policies. The FTC stated that *Reveal Chat*, *Sherman*, and *Kupcho* "involve[] common issues of fact" and "grow[] out of the same event or transaction" as the FTC's case. ECF Nos. 5, 10, 28, *FTC v. Facebook, Inc.*, No. 1:20-cv-03590-CRC (D.D.C.). The States similarly told the court that *Reveal Chat* and *Sherman* "involve[] common issues of fact," and that *Kupcho* both "involves common issues of fact" and "grows out of the same event or transaction." ECF Nos. 6, 9, 14, *State of N.Y. v. Facebook, Inc.*, No. 1:20-cv-03589-JEB (D.D.C.).[1] Indeed, the timing of the complaints makes it clear that these lawsuits were filed either in anticipation of or in the wake of the FTC's and the States' lawsuits.

To be sure, the plaintiffs in the various cases do differ somewhat. However, "Rule 3-12(a)(1) allows for relation of actions even where plaintiff classes differ, including classes of consumers as opposed to content creators." *Pepper v. Apple Inc.*, 2019 WL 4783951, at *1 (N.D. Cal. Aug. 22, 2019). In *Pepper*, Judge Gonzalez Rogers correctly held that the fact that the plaintiffs in certain of the related cases were "app developers" while others were "consumers" did not defeat relation because the "bases of plaintiffs' complaints[] center around the same technology and economic structure[]." *Id.* So it is here. The plaintiffs all challenge Facebook's supposed dominance over social networking (however denominated), the competitive structure in that market, and the impact of similar or identical conduct on competition in that industry.

Nor is relation defeated by the fact that the *Sherman*, *Kupcho*, and *Dames* complaints, like the complaint in *Klein*, allege as one component of their monopoly broth theory that Facebook deceived users about its data privacy practices, while that theory is currently absent from the *Reveal Chat* complaint. *Compare Klein* Compl. ¶¶ 91-125, *with Sherman* Compl. ¶¶

---

[1] The FTC and the States also listed *Klein* as a related case. The FTC indicated that *Klein* both "involves common issues of fact" and "grows out of the same event or transaction." ECF No. 4, *FTC v. Facebook, Inc.*, No. 1:20-cv-03590-CRC (D.D.C.). The States also indicated that *Klein* "involves common issues of fact." ECF No. 5, *State of N.Y. v. Facebook, Inc.*, No. 1:20-cv-03589-JEB (D.D.C.).

FACEBOOK'S MOTION FOR ADMINISTRATIVE
RELIEF TO CONSIDER WHETHER CASES SHOULD BE RELATED

92-100, *Kupcho* Compl. ¶¶ 93-101, *and Dames* Compl. ¶¶ 83-93.  Relation does not require identical theories of liability.  *See, e.g.*, *Pepper*, 2019 WL 4783951, at *2.  Were it otherwise, parties who wished to defeat relation could do so easily through creative pleading or strategic timing of amendments.

      *Second*, given the substantial factual and legal overlap between the cases, it is "likely that there will be an unduly burdensome duplication of labor and expense … if the cases are conducted before different Judges."  Civil L.R. 3-12(a)(2).  Because all of these cases involve the same activity and substantially the same legal theories, any discovery, motion practice, trials, and potential remedies will substantially overlap.  At the center of all of these cases will be an examination of the relevant markets in which Facebook operated, Facebook's conduct in the relevant markets, including the competitive effects of the challenged acquisitions, the viability of app developers as emergent competitors to Facebook, how, if at all, Facebook used data from Onavo, and Facebook's API practices.  Substantial efficiencies will be available in discovery into each of these theories if these cases are related.  Likewise, it would be inefficient and unduly burdensome to "hav[e] … different judges govern discovery disputes."  *Financial Fusion, Inc. v. Ablaise Ltd.*, 2006 WL 3734292, at *3 (N.D. Cal. Dec. 18, 2006).  Moreover, given the time and effort that the Court has already expended in assessing similar legal claims premised on a shared factual predicate, relating *Reveal Chat*, *Sherman*, *Kupcho*, and *Dames* would conserve judicial resources.  Discovery in *Reveal Chat* has not yet begun, meaning that it is not far ahead of *Sherman*, *Kupcho*, or *Dames*.  *Id*. at *4 (noting lack of delay as factor in favor of relation).

      *Third*, absent relation, there is a serious risk "of conflicting results."  *See* Civil L.R. 3-12(a).  Facebook anticipates raising similar defenses to the *Sherman*, *Kupcho*, and *Dames* allegations as it has raised in *Reveal Chat*, including that the claims are untimely and that the plaintiffs have failed to plausibly allege exclusionary conduct.  If the cases are not related and related to *Reveal Chat*, there is the real prospect, for example, that different courts could reach different conclusions about whether fraudulent concealment theories can ever be resolved on motions to dismiss, whether Facebook owed any duty to any of the plaintiffs to disclose its plan

      FACEBOOK'S MOTION FOR ADMINISTRATIVE
RELIEF TO CONSIDER WHETHER CASES SHOULD BE RELATED

for the API withdrawal, or findings regarding whether Facebook's intent was sufficient to support a fraudulent concealment claim. And while *Sherman*, *Kupcho*, and *Dames* allege the existence of different relevant markets with different market participants than *Reveal Chat*, the allegations all focus on the same *product*: the Facebook platform. *Reveal Chat* Am. Compl. ¶¶ 130-142, *Sherman* Compl. ¶¶ 23-24, *Kupcho* Compl. ¶¶ 38-52, *Dames* Compl. ¶¶ 22-25; *see also Klein* Compl. ¶¶ 37-51. Treating the same product as part of different alleged relevant markets increases the prospect for inconsistent judgments as to Facebook's purported monopoly power and the markets in which Facebook is alleged to participate. If decisions on these pivotal issues are inconsistent, not only would it lead to disarray among the various private and government cases, but also potentially disrupt the operations of the dynamic markets in which Facebook competes today.

Because of the substantial overlap between these cases, and because the Court is already familiar with many of the legal and factual issues implicated in the cases, Facebook respectfully requests that the Court enter an order relating *Reveal Chat*, *Sherman*, *Kupcho*, and *Dames*.

FACEBOOK'S MOTION FOR ADMINISTRATIVE
RELIEF TO CONSIDER WHETHER CASES SHOULD BE RELATED

Dated: December 16, 2020

Respectfully submitted,

By: _/s/ Sonal N. Mehta_
SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
david.gringer@wilmerhale.com
ARI HOLTZBLATT (*pro hac vice*)
ari.holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
molly.jennings@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 663-6000

FACEBOOK'S MOTION FOR ADMINISTRATIVE
RELIEF TO CONSIDER WHETHER CASES SHOULD BE RELATED

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on this 16th day of December 2020, I electronically transmitted the

3

foregoing document to the Clerk's Office using the CM/ECF System. And I hereby certify that I

4

have served the foregoing document on counsel for the plaintiffs in the action in which relation is

5

sought pursuant to agreement between the parties.

6

7

*/s/ Sonal N. Mehta*
Sonal N. Mehta

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FACEBOOK'S MOTION FOR ADMINISTRATIVE
RELIEF TO CONSIDER WHETHER CASES SHOULD BE RELATED

SONAL N. MEHTA (SBN 222086)
 Sonal.Mehta@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

DAVID Z. GRINGER (*pro hac vice*)
 David.Gringer@wilmerhale.com
ARI HOLTZBLATT (*pro hac vice*)
 Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
 Molly.Jennings@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
1875 Pennsylvania Ave NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Attorneys for Defendant*
FACEBOOK, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| REVEAL CHAT HOLDCO, LLC, a Delaware limited liability company, USA TECHNOLOGY AND MANAGEMENT SERVICES, INC. (d/b/a Lenddo USA), a Delaware corporation, and BEEHIVE BIOMETRIC, INC., a dissolved Delaware corporation, <br><br> Plaintiffs, <br><br> v. <br><br> FACEBOOK, INC., a Delaware corporation, <br><br> Defendant. | Case No. 5:20-CV-00363-BLF <br><br> **DECLARATION OF DAVID Z. GRINGER IN SUPPORT OF FACEBOOK'S MOTION FOR ADMINISTRATIVE RELIEF TO CONSIDER WHETHER CASES SHOULD BE RELATED** |

1     I, David Z. Gringer, declare as follows:

2     1.      I am a partner at Wilmer Cutler Pickering Hale and Dorr LLP. I represent

3 Defendant Facebook, Inc. in the above-captioned action.

4     2.      On December 15, 2020, I emailed counsel for plaintiffs in the above-captioned

5 action and asked whether Plaintiffs would stipulate to Facebook's motion for administrative

6 relief to consider whether the instant action and the recently filed *Sherman*, *Kupcho*, and *Dames*

7 actions should be related. That same day, counsel responded that the *Reveal Chat* plaintiffs

8 would agree to so stipulate.

9     3.      On December 15, 2020, I also emailed counsel for plaintiffs in the *Sherman*,

10 *Kupcho*, and *Dames* actions and asked whether they would stipulate to Facebook's motion. That

11 same day, counsel for the *Dames* plaintiffs responded that the *Dames* plaintiffs would not agree

12 to stipulate. On December 16, 2020, counsel for the *Sherman* plaintiffs stated that the *Sherman*

13 plaintiffs would not agree to stipulate. Counsel for the *Kupcho* plaintiffs did not respond.

14     4.      The Complaint in *Sherman* is attached as Exhibit 1.

15     5.      The Complaint in *Kupcho* is attached as Exhibit 2.

16     6.      The Complaint in *Dames* is attached as Exhibit 3.

17     I declare under penalty of perjury that the foregoing is true and correct.

18     Executed on this 16th day of December 2020 in Washington, District of Columbia.

19

20                      By:   /s/ David Z. Gringer

21                           David Z. Gringer

22

23

24

25

26

27

28

## SIGNATURE ATTESTATION

I am the ECF User whose identification and password are being used to file the foregoing.  Pursuant to Civil Local Rule 5-1(i), I hereby attest that the other signatories have concurred in this filing.

Dated:  December 16, 2020

/s/ Sonal N. Mehta
Sonal N. Mehta

# EXHIBIT 1

Tina Wolfson (State Bar No. 174806)
twolfson@ahdootwolfson.com
Robert Ahdoot (State Bar No. 172098)
rahdoot@ahdootwolfson.com
Theodore W. Maya (State Bar No. 223242)
tmaya@ahdootwolfson.com
Rachel Johnson (State Bar No. 331351)
rjohnson@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
Tel: (310) 474-9111
Fax: (310) 474-8585

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| VICKIE SHERMAN, LEZAH NEVILLE-MARRS, KATHERINE LOOPERS, AND JARRED JOHNSON, individually and on behalf of all others similarly situated,<br><br>                           Plaintiffs,<br><br>        v.<br><br>FACEBOOK, INC., a Delaware corporation headquartered in California,<br><br>                           Defendant. | Case No. 5:20-cv-8721<br><br>**CLASS ACTION COMPLAINT**<br><br>**MONOPOLIZATION OF SOCIAL NETWORK MARKET**<br>Violation of the Sherman Act (15 U.S.C. § 2)<br><br>**MONOPOLIZATION OF SOCIAL MEDIA MARKET**<br>Violation of the Sherman Act (15 U.S.C. § 2)<br><br>**VIOLATION OF UNFAIR COMPETITION LAW**<br>Cal. Bus. & Prof. Code § 17200<br><br>**UNJUST ENRICHMENT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Vickie Sherman, Lezah Neville-Marrs, Katherine Loopers, and Jarred Johnson (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this class action complaint for equitable relief and treble damages under the Sherman Act, 15 U.S.C. § 2, and the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*

## I.   NATURE OF THE ACTION

1.   The social network market is now stagnant. Facebook's sites (including Instagram) account for 75% of all user time spent on social networks, and Facebook.com captures roughly 50% of the billions spent annually on digital display advertising. These percentages have been stable for years, but Facebook's revenues, both in an absolute sense and as a multiple of its costs, are rising. No rival in the last decade has captured more than 5% of the social network market. And because the market is characterized by strong network effects, barriers to entry are high already. Facebook collects monopoly rents, manages the flow of information to most of the nation, and engages in virtually unlimited surveillance, and will continue to do so into the foreseeable future.

2.   Facebook's weaponization of user data and its strategy to "acquire, copy, or kill" competitors have been wildly successful at the expense of consumers. Facebook's anticompetitive scheme has lessened, if not eliminated, competition and harmed consumers.

3.   Absent Facebook's anticompetitive scheme, in a competitive market, Facebook's constituents of consumers, digital advertisers and content creators would enjoy the best social network Facebook can provide. Fair competition would require Facebook to provide consumers greater value in return for consumers' data and a more transparent advertising service. Facebook instead took that data without providing adequate compensation to its users (*i.e.,* the members of the putative class in this action). That constitutes antitrust injury. Through its deception and the acquisitions enabled by such deception, Facebook fought for at least a decade to avoid competition on the merits in the social networks market. As a result, users receive a lower quality product for their data than they would receive in a competitive market.

4.      More than 40 attorneys general, the U.S. government, and Federal Trade Commission are preparing to file antitrust actions against Facebook, alleging that the tech giant engaged in unlawful, anticompetitive tactics to buy or kill off its rivals and solidify its dominance in social networking.

5.      Facebook has engaged in a long-term, integrated, anticompetitive strategy of half-truths about its privacy policies, exclusionary API manipulation, and anticompetitive acquisitions of nascent competitors that led to its current dominance of a market in which it now wields significant power over consumers and advertisers. The methods used by Facebook to achieve monopoly violated US antitrust law and harmed consumer welfare.

6.      Like the other Facebook User class members, Plaintiffs have maintained a Facebook account despite having their privacy violated and being very disappointed in what the platform has become.  Advertiser and Marketing Plaintiffs, like the other Advertiser class members, suffered economic losses as a result of Facebook's monopolization of social media advertising market and seek appropriate equitable relief and damages through this action.

## II.   JURISDICTION AND VENUE

7.      This Court has original jurisdiction over Plaintiffs' federal antitrust claim under the Clayton Act, 15 U.S.C. § 15.  The Court also has diversity jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from Defendant, there are more than 100 class members nationally, and the aggregate amount in controversy exceeds $5,000,000.

8.      Venue is proper in this District under 28 U.S.C. § 1391.  Facebook transacts business within this District, and it transacts its affairs and carries out interstate trade and commerce, in substantial part, in this District. A substantial part of the events giving rise to Plaintiffs' causes of action occurred in or emanated from this District.

9.      This Court has personal jurisdiction over Facebook because it is subject to general jurisdiction in the State of California, where it maintains its headquarters and its principal place of business, and Facebook's Terms provide that consumers must bring these claims in this Court. The scheme to monopolize alleged in this Complaint caused injury to

1   persons throughout the United States, including in this District. Moreover, Facebook also
2   conducted substantial business from which the claims in this case arise in California and has
3   agreed to personal jurisdiction in this Court.

4        10.   This action is properly assigned to the San Jose Division of this District, pursuant
5   to Civil Local Rule 3-2(c) and (e), because Facebook is headquartered, and a substantial part
6   of the events or omissions that give rise to the claim occurred, in San Mateo County, which
7   is served by the San Jose Division.

8                                    **III.  PARTIES**

9   **A.   Plaintiffs**

10       11.   Facebook is comprised of a two-sided non-transactional market, the social
11  networking market and the digital advertising market separately.

12       **Facebook Account Holders**

13       12.   **Plaintiff Vickie Sherman** is a citizen of the State of Arizona. Ms. Sherman
14  opened her Facebook account in 2010 to connect with friends and family. Ms. Sherman
15  accesses the Facebook mobile app and also uses Facebook Messenger several times per day.

16       13.   Ms. Sherman cares about her privacy online and initially entrusted her personal
17  information and activity to Facebook. She has tried to adjust her account privacy settings on
18  multiple occasions but found them difficult to navigate. She now feels she has no clear
19  understanding of what Facebook does regarding her data and online privacy, and finds its
20  conduct extremely invasive. Had she known the truth about Facebook's practices, she would
21  not have agreed to provide Facebook with so much of her personal information.

22       14.   Ms. Sherman is generally very unhappy with Facebook's services and would use
23  an alternative platform if one was available to keep in touch with family and friends. Ms.
24  Sherman spends more time on the platform than she would like due to the algorithms
25  intended to increase engagement. She also has observed the quality of content in her feed
26  decrease overtime to become more political in nature, more extreme, and more shocking.

27       15.   **Plaintiff Lezah Neville-Marrs** is a citizen of the State of Texas.  Ms. Neville-
28  Marrs opened her Facebook account in 2004 to connect with friends and family. Ms. Neville-

1  Marrs uses the Facebook app regularly and Facebook Messenger to keep in touch with
2  friends and family daily. She also opened an Instagram account in 2016.

3       16.   Ms. Neville-Marrs cares about her privacy and tried to adjust her privacy settings
4  on multiple occasions but found them confusing to navigate. She feels she has no true
5  understanding of what Facebook does regarding her privacy but feels deceived and
6  manipulated by Facebook's privacy representations. Had she known about Facebook's
7  practices she would not have agreed to provide Facebook with so much personal
8  information.

9       17.   Plaintiff Neville-Marrs is unhappy with Facebook's platform. The content
10  primarily consists of ads that are not relevant to her and other upsetting and outrageous
11  content. Plaintiff Neville-Marrs continues to use Facebook's platform because it is the only
12  option available to connect with family and friends.

13  **Advertisers – Direct Buyers**

14       18.   **Plaintiff Katherine Loopers** is a citizen of the State of California. Ms. Loopers
15  purchased advertising for her non-profit, The Cadillac Hotel, which provides events and
16  concerts for low-income residents. She paid Facebook to place advertisements to promote
17  awareness for these events. Ms. Loopers has spent approximately $1621 purchasing ads on
18  Facebook since 2014.

19       19.   Ms. Loopers has paid supra-competitive prices for Facebook's ad services and
20  has been harmed by lack of transparency that would provide insight into effectiveness of her
21  ad campaigns. The results did not yield the results expected based on the price paid. She had
22  no way of knowing who the ads reached and how many times an ad was viewed.

23  **Advertisers – Marketers**

24       20.   **Plaintiff Jarred Johnson** is president of a marketing firm based in Tennessee.
25  Mr. Johnson spends over $1 million annually on Facebook ads to run online marketing
26  campaigns for legal services.

27       21.   Plaintiff Johnson's profit from his marketing campaigns has continually
28  decreased over the last several years, as more of each of his customer's campaign budget has

1  been diverted to Facebook's supra-competitive advertising costs. As Mr. Johnson's profit

2  margins have been decreasing, he has less resources to reinvest in the quality and innovation

3  of his services. Mr. Johnson has been harmed by lack of transparency and obfuscated ad

4  placement and related transaction details.

5  **B.   Defendant**

6        22.   **Defendant Facebook, Inc.** is a publicly traded corporation, incorporated under

7  the laws of Delaware. Facebook's principal place of business and headquarters are located at

8  1601 Willow Road in Menlo Park, California.

9        23.   Founded in 2004 by Mark Zuckerberg, Facebook is a social media company that

10  provides online services to more than 3.14 billion users. Facebook owns and operates several

11  business divisions, such as:

12
13
14
15
16  - Facebook. Facebook's core social media application, which bears the company's name, is, according to Facebook's filings with shareholders, designed to enable "people to connect, share, discover, and communicate with each other on mobile devices and personal computers." The Facebook core product contains a "News Feed" that displays an algorithmically ranked series of content and advertisements individualized for each person.

17
18  - Instagram. Instagram is a social media photo-sharing application that allows users to share photos, videos, and messages on mobile devices. Facebook acquired Instagram in April 2012.

19
20
21  - Messenger. Facebook's Messenger application is a multimedia messaging application, allowing messages that include photos and videos to be from person to person across platforms and devices.

22
23  - WhatsApp. WhatsApp is a secure messaging application used by individuals and businesses. Facebook acquired WhatsApp in 2014.

24        24.   In exchange for providing services, Facebook collects user data, which it uses to

25  target advertising to Facebook users. In 2019, Facebook collected 98% of its revenue ($70.7

26  billion) almost entirely from allowing companies to serve ads to its users.

27                 **IV.   FACTUAL ALLEGATIONS**

28  **A.   Overview of Social Networking, Social Media, and Digital Advertising**

25.  Facebook's constituents include (1) consumers/users who access the platform and use its services at no out of pocket monetary cost; (2) digital advertisers who pay to gain access to those users; and (3) content creators whose content is distributed on the platform and who earn ad dollars when Facebook funnels readers to them.

26.  Social media products and services include social networking, messaging, and media platforms designed to engage people by facilitating sharing, creating, and communicating content and information online. Although the boundaries of the social media market are imprecise, social media platforms generally allow users on their networks to interact with people or groups they know, display content through linear feeds, or otherwise add socially layered functionality for services online, usually through a mobile app. Social media is driven by networks, while many social media products and services include common functionalities, such as public profiles, curated feeds, followers, messaging, and other use cases. Others focus on certain aspects of public and private communications[1]

27.  Social Networks are distinguishable from Social Media. While a broad view of the social media market is useful for considering the wider landscape for social data and online advertising, it is important to focus on the actual use, demand, and substitutability of social products when examining competition among social platforms online. The critical distinction between social networking and social media markets is how people use the platform. As Germany's Federal Cartel Office (Bundeskartellamt) and the United Kingdoms Competition and Markets Authority (CMA) have noted, the specific demand for social networks "is fundamentally different from the demand for other social media."

28.  Social network platforms facilitate their users finding, interacting, and networking with other people they already know online, and by providing a "rich social experience" through features on their products. People regularly use social network platforms to exchange "experiences, opinions and contents among specific contacts which the users define based on identity."

---

[1] Investigation of Competition in Digital Markets, House Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary, Majority Staff Report and Recommendations, October 2020. ("House Report")

Case 3:20-cv-08721-LB   Document 1   Filed 12/09/20   Page 8 of 57

29.    In contrast, social media platforms principally facilitate the distribution and consumption of content. Much of the content on YouTube, for example, can be enjoyed by users with a wide range of relationships to the person posting, including by strangers. Similarly, TikTok describes itself as a "global platform for users to express their ideas by sharing videos with a broader community." In light of this distinction, YouTube is focused on offering content and does not compete with Facebook, facilitating communication and sharing content among groups of friends who choose each other and enjoy content in large part because of those relationships.

30.    In sum, social networking sites have a robust social graph, whereas content-centric sites do not. Although users can share videos or stream events on Facebook and YouTube in similar ways, there is a fundamental difference between sharing a video among a person's social network on Facebook, Instagram, or WhatsApp—such as a child's first steps—and broadcasting it publicly on YouTube. While people may spend significant time on both YouTube and Facebook, these firms provide distinct services to their users, and including both in the same market would be inconsistent with how users engage with each platform.

31.    Facebook is the largest social networking platform in the world. Its business operates around five primary product offerings, including: (1) Facebook, a social network platform; (2) Instagram, a social network app for photos and videos; (3) Messenger, a cross-platform messaging app for Facebook users; (4) WhatsApp, a cross-platform messaging app; and (5) Oculus, a virtual reality gaming system. Facebook reported in July 2020 that its platform includes 1.79 billion daily active users (DAUs),[2] 2.7 billion monthly active users (MAUs),[3] and an average revenue per user (ARPU) of $7.05.[4] Last year, Facebook's businesses collected about $70 billion in revenue—a 27% increase from the prior year—earning about $24 billion in income from its operations.[5] Facebook reported that its family

---

[2] Facebook, Inc., Quarterly Report (Form 10-Q) 29 (July 31, 2020), https://investor.fb.com/financials/sec-filingsdetails/default.aspx?FilingId=14302237.
[3] *Id.*
[4] *Id.*
[5] *Id.*

of products—including Facebook, Instagram, Messenger, and WhatsApp—includes 2.47 billion daily active people (DAP),[6] 3.14 billion monthly active people (MAP), and a family average revenue per person (ARPP) of $6.10.[7]

32.   Facebook's other group of customers are advertisers who are interested in presenting online consumers with display ads that will attract them to the product or service being advertised. Facebook sells display ads and video ads. Facebook also sells advertising through its Facebook Advertising Network directly on websites.

33.   Facebook has 8 million advertisers.[8] Of those, the highest-spending 100 brands accounted for $4.2 billion in Facebook advertising – only about 6% of the platform's ad revenue in 2019.[9] According to Nicole Perrin, an analyst at eMarketer, "Facebook has an enormous number of advertiser clients…They're definitely pretty reliant on the long tail of small business advertisers."

**B.    Monetization and Advertising (Free is not free)**

34.   Antitrust concerns quality inasmuch as it does price.[10] "Free" is not a special zone where economics or antitrust do not apply. Federal antitrust statutes apply to anticompetitive conduct affecting "trade" and "commerce." The legal definition of these terms include "almost every activity from which [an] actor anticipates economic gain" whether or not money changes hands in that transaction.[11] For "trade" or "commerce" to exist, customers must exchange something of value for the "free" product that they receive, so that both parties anticipate economic gain.

35.   Facebook users exchange both attention and personal data in return for Facebook's services. Facebook is then able to monetize this attention and data through targeted advertising.

---

[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] Rishi Iyengar, Here's how big Facebook's ad business really is, CNN Business, July 1, 2020.
[10] Kristen Limarzi, Facebook is not an illegal monopoly, Law360, January 24, 2020.
[11] John M. Newman, Antitrust in Zero-Price Markets: Foundations, 164 U. PA. L. REV. 149, 160-163 (2015).

36.     In addition to quality and price, the exchange between the social network and the user must account for any barter of goods in kind. In the case of Facebook, users agree to trade their data to the platform in exchange for its services. The combination of these elements generates net consumer surplus: the consumer gains from using a high-quality social network and loses from any barter or monetary price paid. In this way the impact of Facebook use on a consumer fits neatly into the familiar antitrust concept of "quality-adjusted price." For example, a quality-adjusted price rises when the monetary price of a service stays constant while its quality falls or the amount of data required in trade increases.

37.     Facebook derives enormous economic value from the data it harvests from consumers on its platform. The recent House Report explained that "[o]nline platforms rarely charge consumers a monetary price—products appear to be 'free' *but are monetized through people's attention or with their data*." The same House Report recognizes the monstrous monetary value that Facebook reaps from the data that it extracts from its users.

38.     In fact, Facebook itself touts the economic value of the data it harvests from consumers. For example, Facebook describes its massive advertising earnings in terms of average revenue per user ("ARPU") in its public filings. For 2019, Facebook's ARPU was over $41 per user in the United States.

**C.     Facebook Has Sufficient Market Shares To Constitute Market Power, Especially Given The Social Media Industry's High Barriers To Entry.**

### i.     Facebook's dominant market share

39.     Facebook's market shares indicate it has the ability to control prices and exclude competition.

40.     By multiple measures, Facebook has dominant market share in the Social Network Market. Facebook.com has 58% share of the social network market, while the Facebook corporation—including WhatsApp, Instagram, and Facebook.com—has a 75% share of the social network market. The next largest competitor, Snapchat, has 13%.

1    41.   By multiple measures, Facebook has dominant market share in the Social Media
2  Market. By its own measure, and as reflected in Facebook's internal documents, Facebook
3  has estimated that it is "95% of all social media in the US[.]" Another measure, "engagement"
4  is a metric that is essential to the business model because time spent is the primary driver for
5  ads seen and thus more ad dollars earned. As illustrated below, more than 80% of the time
6  that consumers in the United States spend using social media is spent on Facebook and
7  Instagram.[12]



Units are average minutes per day among the entire U.S. population.

17   42.   Another way to think of Facebook's market share is to examine the percentage
18 of digital ad dollars that are spent to buy advertising on Facebook. As measured by advertising
19 revenue that is generated by social media platforms in the Social Media Market, Facebook
20 (including Instagram) has market share of at least 85% of the Social Media Market according
21 to eMarketer.

22   43.   Even if the market is expanded to all display advertisements, Facebook has a
23 high market share of 50%, an amount larger than the entirety of what is called the "open web

_____

26 [12] A fundamental problem with using active users to measure market share is that social media platforms do
27 not compete for users so much as they compete for user attention. From a platform's perspective, having
   two users that spend three hours per day on their site is preferable to having ten users that log on once a
28 month. The insight that social media platforms compete for user attention has given rise to new terms like
   "attention markets" or the "attention economy."

1  display" market, meaning ads placed on websites such as ESPN.com or Time.com, and more
2  than four times larger than the amount earned by YouTube, its next largest competitor.

3      44.   Facebook and Instagram together capture 50–60% of ad spend on video
4  advertising. Video ads serve a purpose that different than the purpose of other display ads.

5      45.   Facebook's high financial returns also indicate market power. Facebook
6  consistently earns returns of 50%, while its cost of capital is only 9%. Moreover, Facebook's
7  revenue growth appears to be outpacing its cost increases. Facebook's 10K filings for 2010
8  through 2018 show that while both its costs and revenues appear to be growing quickly,
9  revenue has grown at a greater rate than the costs, which indicates that Facebook is becoming
10  even more profitable over time not just in an absolute sense, but also when one compares its
11  revenues to its costs. Given that the vast majority of Facebook revenue consists of ad buys
12  on its social media platform, these consistently high returns and the trend toward ever greater
13  profitability indicate market power in social media.

14        **ii.**    **Barriers to entry: network effects make it impossible to leave**
15              **Facebook**

16      46.   Network effects arise because social network platforms are not interoperable. In
17  order to interact with a friend on a social network, both parties must have accounts on the
18  same platform. Contrast this situation with mobile wireless where a Verizon customer can
19  call an AT&T customer and the phones interoperate. If a Verizon customer could only speak
20  with other Verizon customers, a user would care greatly about the size of Verizon's installed
21  base and whether her friends and family had AT&T or Verizon phones.

22      47.   This is the situation in social networks. Choosing a platform determines with
23  whom a user can communicate. Strong network effects make such platforms subject to a
24  phenomenon called tipping. Because users all want to belong to the platform where their
25  friends are, a market that starts out with multiple platforms will not stay that way. When one
26  platform gains a slight advantage, it becomes the platform of choice for new users because it
27  has more of their friends on it. Users who want to interoperate tend to all join the leading
28  platform, causing the market to tip.

48.   As the result of this "winner-takes-all" dynamic whereby a single market participant rapidly gains monopoly or near monopoly power, there is little competition in a market after it has tipped. Economists describe competition in this kind of market as occurring ex ante, when multiple rivals are all vying for the monopoly position. Competition is for the market, rather than in the market, other than by sufficiently differentiated competitors.

49.   A very significant reason that Facebook has market power is that a user cannot change platforms and expect to be able to stay in contact with her friends and family. Because social networks are not compatible, a user's friends and family would have to change platforms with her for her to be able to continue to see their feeds and interact on the platform. Thus, users may be upset about Facebook's invasive surveillance practices and low-quality content and wish they could move to a rival, but there realistically is nothing they can do other than leave the platform entirely.

50.   If they want to remain in touch with their friends they are forced to put up with Facebook's fake news, or exploitation of privacy, or any other increase in quality-adjusted price. Because Facebook has a near monopoly, the vast majority of the people with whom they want to exchange feeds are likely on Facebook already. The switching cost for any one user is therefore enormous. Members of a group that wish to primarily communicate with one another have lower switching costs individually, but very large coordination costs to get everyone to move at once. A single member who wishes to stay in touch on Facebook and finds multi-homing to be costly can prevent such a group move.

51.   There are similarly high barriers to entry in the digital advertising industry. The barriers to entry identified above on the user side, including cost and benefit barriers, consumer behavior barriers, and barriers created by Facebook, also inhibit competition in the digital advertising market. If competitors are unable to overcome those barriers, they will be unable to obtain a sufficient share of the attention economy to effectively compete. Facebook's network effects are an especially important barrier to entry in the digital advertising market. New entrants to the digital advertising market have difficulty attracting

new users, who are tied to Facebook by the presence of other users. Facebook is thus able to raise the quality-adjusted price of its advertising service without losing advertisers to its competitors.

52.    Facebook is also actively raising barriers to entry by limiting data interoperability and portability. APIs that facilitate the transfer of social graph data—for instance, a structured list of friends or an event history of prior interactions with other accounts—ease the process of switching between competing social media services. Thus, APIs enabling interoperability and portability mitigate strong network effects that otherwise serve as near-insurmountable barriers to entry. In recent years, Facebook has rolled back developer access to Facebook's APIs, severely hampering Facebook's interoperability with other services. For example, the deprecation of Facebook's Events API prevents users from using other applications to RSVP to events, and the deprecation of Facebook's Logins API no longer allows the use of other applications to create posts on behalf of a user. Blocking third-party access to these API endpoints prevents users from communicating across social media platforms, making the creation of competing social platforms extremely difficult.

53.    Facebook also has market power enforced by entry barriers due to the substantial amount of data the platform has collected about its users and their activities. It has many years of life events, scrolling activity, and posts from a user. It sees every time a user uses her "Facebook login" on another website, what she looks at, when she looks at it, and when or if she purchases something there. It knows the location of the user because either the Facebook app or a third-party app integrating Facebook's software tools is installed on a mobile device. This complete and detailed dataset permits Facebook to sell its ads at higher prices than they otherwise would garner.

54.    Facebook harvests vast stores of data based on users' interactions with its own platform as well as users' activities off Facebook that Facebook tracks such as location and purchases. Assuming that a new entrant would also be ad supported, no de novo entrant would have access to anywhere near the volume or quality of data that Facebook can access

1    until it reaches the same level of scale (which is difficult because of network effects etc.)
2    and privacy intrusiveness.

3        55.    Data brokers are unlikely to be able fill this data gap in such a way as to allow
4    new entrants to overcome Facebook's data advantage, for a number of reasons. The first is
5    that Facebook exerts total control of users' experience and data. Facebook knows and
6    influences the content they view and with which they engage. Facebook's complete and
7    accurate knowledge about real people gives it a tremendous advantage in attracting
8    advertisers. Facebook doesn't have to match cookies when it serves ads because Facebook
9    knows who its users are. It uses this exclusive knowledge and ability to justify supra-
10   competitive prices for ad placements.

11   **D.    Facebook Is Able To Exclude Competitors And Profitably Charge**
     **Supra-Competitive Quality-Adjusted Prices For Products**
12   **Substantially Degraded In Quality, Thereby Harming Consumers**
     **And Advertisers Because Of Its Market Power.**
13

14                  **i.    Facebook has degraded quality with privacy violations**

15       56.    Consumers have suffered from Facebook's abuse of market power through
16   increased quality-adjusted price. As discussed above, quality and price are interdependent
17   elements of a product for which economists have developed the quality-adjusted price metric.
18   Although product quality may be difficult to define and measure, it is still a vital and widely
19   recognized component of consumer welfare. Facebook's violations of user privacy are a form
20   of quality degradation that is cognizable under the antitrust statutes.

21       57.    The erosion of privacy protections is not merely a consumer protection harm: it
22   is an antitrust harm as well. Though the current social media market contains few-to-no
23   privacy protective offerings, this is not because consumers overwhelmingly prefer privacy-
24   invasive services. Rather, Facebook's market dominance, coupled with consumer difficulty
25   of adequately pricing privacy controls, precludes it from having to compete for users on the
26   basis of privacy. Consumers have little to no real choice in the matter. Dominant firms see
27   little to no reason to compete to improve their privacy practices when users are so unlikely
28   to defect. Moreover, market interactions between social media platforms and users are not

one-time, discrete interactions but rather continuous transactions; consumers may find it difficult to adequately understand the "price" of their data and instead are biased towards under-estimating price.

58.   Facebook's expansive collection of user data extends beyond the primary platform. Facebook's third-party plugins facilitate collection of user data on external sites that allow for users to create accounts linked to their Facebook identities. Facebook's data collection raises the quality- adjusted price of these third-party sites, as users must expose more of their personal data for the same services.

59.   Consumers value their privacy, yet the underlying market conditions--namely, the absence of more privacy-protective alternatives, the difficulty of accurately assessing price during the long term "transactions" between the user and the platform, and the pervasiveness of Facebook third-party plugins--deprive Facebook users of meaningful alternatives.

60.   Consumers must engage with unreasonably long complex terms and conditions and must make several clicks to access their privacy settings. They do not understand the terms and it is unreasonable to expect them to do so. The presence of high default sharing of data by consumers is combined with a lack of effort to offer choice.  Users are forced to accept this low quality to access the platform because of Facebook's market power.

61.   Dark patterns cause consumers to pay a higher data price than they would freely choose. Even when a consumer has been able to navigate to the correct menu, they are often presented with multiple other settings, which serves to reduce the prominence of the location of the privacy settings. For example, on Facebook's Settings Page, consumers are presented with links to 20 different tabs along the left-hand margin of the page, of which 'Privacy', leading to Facebook's Privacy Settings and Tools is one. . . The effect of making navigation towards privacy settings and the selection of alternative options to the default a multi-stepped and partially obfuscated process has been described as a 'dark pattern'. By relying on the fact that consumers generally do not change default settings, platforms are able to maximize the number of consumers that will share the maximum amount of their personal information, to the benefit of the platform.

62.     Framing and communication of privacy settings in a way that takes advantage of consumers' behavioral limitations causes them to give away more data and privacy than they otherwise would and represents a lower quality of the service. When a user gives away more data than she might freely choose, that is also a worsening in the terms of barter between the user and the platform which, along with the lower quality, increases the quality-adjusted price. If that data is then used to serve unwanted advertising or otherwise interrupt the user's experience on the platforms, that causes a further reduction in the quality-adjusted price.

### ii. Facebook degrades quality by saturating its product with ads of irrelevant and poor quality

63.     Consumers also report that online advertisements have generally become more intrusive.[13]  On Facebook, ads are increasingly difficult to distinguish from organic content. Many ads are also inconvenient, forcing users to scroll down to access content they sought when they came to the platform. Facebook allows ads to auto-play and seize the users' attention. Consumers also find that ads are poorly targeted and irrelevant to their interests, further degrading their experience on the platform. Data shows that Facebook users are routinely being served ads that based on demographic information, are unlikely to be relevant to their interests.[14] The irrelevance of ads – defined as ads which they are unlikely to be informed by and whose products they are statistically unlikely to purchase – damages the quality of the user experience.

64.     Users are also targeted with content such as "PayDay" loans, discriminatory housing. User lists are sold such as "people likely to have cancer" or "high risk creditor" or "heavy drinker and spender at home".  Already highly vulnerable users are being targeted with high risk ads. These barter and quality elements to a user's transaction with Facebook

---

[13] Melanie Mohr, Ads are Becoming More Intrusive in 2019, MEDIUM, Jan. 21, 2019, https://medium.com/utopiapress/ads-are-becoming-more-intrusive-in-2019-5908d28db1e2; Mimi An, Why People Block Ads (And What It Means for Marketers and Advertisers), HUBSPOT, https://blog.hubspot.com/marketing/whypeople-block-ads-and-what-it-means-for-marketers-and-advertisers.
[14] *See, e.g.*, Complaint, *Integrity Message Boards v. Facebook, Inc.* (N.D. Cal. Aug 28, 2018)).

1    properly belong in traditional notions of consumer welfare and can be conceptually
2    operationalized as part of quality-adjusted price.

3                    ### iii. Facebook degrades quality via a variety of cognitive and
4                          behavioral harms

5        65.    Facebook inflicts cognitive costs on consumers by intentionally and
6    unintentionally making them experience thoughts and emotions that, given a choice, they
7    would prefer not to experience; or for which, in a competitive market, they, at the very least,
8    would prefer to be compensated. Those include, among others, emotional manipulation, and
9    mental health problems.

10       66.    The quality that users experiences may also be reduced if the platform allows
11   others to share low-quality materials—such as offensive or dangerous materials—among
12   themselves. A user might prefer not to engage with a social media platform that makes money
13   by serving false political ads or by providing tools such as "groups" that serve as virtual
14   meeting rooms for conspiracy theorists and neo-Nazis. For example, marketing research
15   shows consumers are willing to pay more for coffee labeled "fair trade" or "sustainable".[15,16]

16       67.    Facebook can gather, analyze, and sell information about its users and their social
17   networks that is sufficiently detailed to permit construction of precise psychographic profiles.
18   These allow Facebook to exploit its knowledge of the user with advertising or other content
19   that accentuates or provokes emotions such as hate or fear. Facebook can exploit these
20   emotions to enable advertisers to sell products they otherwise would not, e.g., makeup to
21   depressed teenagers.

22       68.    As far back as 2012, Facebook conducted an experiment on 689,003 of its users,
23   aimed at testing whether the platform is capable of influencing what emotions its users
24   experience, based on what content they are being displayed. This capability is useful for
25   Facebook given its business model. First, research suggests that the emotions we experience
26   influence our engagement with content, including with ads. In particular, positive emotions

27   ───────────────────────
     [15] https://www.gsb.stanford.edu/insights/jens-hainmueller-will-consumers-actually-pay-fair-trade
28   [16] https://www.icis.com/explore/resources/news/2019/06/04/10374331/consumers-willing-to-
     pay-more-for-sustainable-products-accenture.38

lead to people "sharing" content more often; while negative emotions increase clicks on pages, including ads. Second, the ability to influence users' emotions leads to more data being generated. Negative emotions like fear, anger and envy lead to people becoming more engaged, and reacting more to content than positive ones. Third, this ability can help Facebook make users spend more time on the platform.

69.   Moreover, several studies suggest that Facebook (and other social media), increase the chance of experiencing psychological problems, including depression and feelings of loneliness. Instilling such emotions in users need not be Facebook's goal, but it does constitute an unintended and tolerated negative consequence. In a competitive market, if consumers did not like this side of the platform and had a choice, they could use social media of higher quality. Hence, negative emotions experienced by Facebook's users as a side effect of using the platform constitute a lower quality of the product that could occur in a competitive market.

70.   Facebook inflicts behavioral costs on its consumers by intentionally and unintentionally making them engage in conduct that they would prefer not to undertake, given a choice, or for which they would prefer to be compensated in a competitive market. This includes both "on the spot purchases" caused by Facebook's ads; and spending more time on the platform than users would prefer to, including the possibility of addiction. Note that these costs are related, and to a certain extent depend upon the cognitive costs.

71.   Facebook deploys various methods to maintain user attention—so that it can serve more ads—using techniques that the medical literature has begun to demonstrate are potentially addictive. These studies show that Facebook's tactics affect the brain in the same manner as cocaine.

72.   The literature shows that users, especially younger users, can be harmed by this emotionally exploitative content. Industry insiders use the anodyne term, "engagement," to describe this sort of content because it causes consumers to spend more time on the platform. Thus, the business model of Facebook creates an incentive and ability to collect very detailed and intrusive information about users and exploit their emotions for profit.

73.    Because Facebook's profits stem from advertising, it has an indirect incentive to prove that advertising through its channels increases sales. A bona fide way of proving that is documenting actually increasing sales (as opposed to lying about it to the advertisers, which is a separate problem). Ads in this environment sometimes lead consumers to engage in purchases against their preferences. This last phenomenon has been theorized by economists under various labels, including "hyperbolic discounting" and "time inconsistency."

### iv.   Facebook degrades the quality of advertising services with lack of transparency in low quality advertising services

74.    Facebook has had a tense relationship with the advertising industry over the years. One of the biggest controversies came in 2016, when the company admitted it had miscalculated — and in some cases, significantly overstated — several ad metrics, including video views and the organic reach for business pages. The incident illustrated not only how little accountability Facebook has, but also Facebook's market power.

75.    In 2018, several advertisers took Facebook to task over data privacy issues following the Cambridge Analytica scandal. And as recently as this January, months before the July 2020 ad boycott, some of the world's biggest advertisers called on Facebook and other tech companies to do more to prevent ads appearing next to violent content and hate speech. But speaking out appeared to be easier than quitting the platform entirely. Despite the repeated pushback, Facebook's powerful ad machine kept rolling along.

76.    Even as Facebook confronted by far the largest advertiser boycott in its history in July 2020, the sheer number of advertisers on its platform insulated the company from financial fallout. Facebook's top advertisers (those accounting for only 6% of Facebook's revenue) had the luxury of experimenting with other media forms of advertising. But the 8 million small businesses found themselves handcuffed to Facebook for access to their customers according to eMarketer.

77.    Ad saturation in turn harms advertisers. When consumers are overwhelmed with ads, they develop ad fatigue or ad blindness. Furthermore, just as users are harmed by saturation of irrelevant ads, based on demographic data, users are also profiled in an

1  extremely detailed yet inaccurate way. Because users often find ads to be irrelevant to them,

2  advertisers pay for ads that are ineffective, yet Facebook obscures these details of metrics to

3  determine true ad effectiveness.

4      **E.**     **Facebook's sordid and willful path to dominance through**

5                  **anticompetitive lies and acquisitions**

6      78.   Facebook has been accused of acquiring or maintaining monopoly power

7  through anticompetitive conduct based on its misrepresentations to consumers regarding

8  data privacy, its depreciation of APIs, and its serial acquisition of nascent competitors.

9      79.   By hiding and falsifying quality, Facebook made competition on the merits

10  impossible. Facebook was able to grow its base at least in part by deceiving users and others

11  about its data policies. Facebook grew its market share in part by deploying dark patterns,

12  skullduggery, and other misleading and fraudulent behavior regarding its data collection

13  efforts so that it could, on one hand, placate users, and on the other, endear itself to

14  advertisers (whose interest was targeted ads) in order to sell them valuable and expensive

15  advertising. Users were not aware that their data was being collected in such abundance,

16  either through deliberate design and control of privacy policies or by the flouting of such

17  policies.

18      80.   Misrepresentation and ultimate degradation of privacy features on the Facebook

19  platform is evidence of anticompetitive conduct. When Facebook was competing for

20  consumers, it misrepresented its commitment to user privacy in order to gain and preserve

21  market share; once it achieved market dominance, Facebook quickly dispensed with such

22  commitments.

23      81.   Privacy was once a crucial form of competition. The social media industry was

24  competitive between 2004 and 2012 and competitive forces restrained Facebook from

25  degrading user privacy to obtain higher profits. In fact, one of Facebook's early strategies to

26  compete with MySpace, for example,  was to present itself as a privacy-centered alternative.

27      82.   Prior to establishing its monopoly, Facebook was held accountable for its touted

28  concern for privacy and its deceptive privacy practices.  In 2007, for example, Facebook

rolled out Beacon, a program intended to increase ad revenue that required lower privacy standards and surveillance across sites other than Facebook. Although Facebook claimed that without a user's consent, it did not track the user's activity, that claim was shown to be false. After user outcry and the competitive pressure from other social media services like MySpace and Bebo, Facebook terminated Beacon.

83. Similarly, in 2010 Facebook introduced social plugins. Like Beacon, social plugins enabled Facebook to collect data across partner sites. Again, Facebook maintained that the social plugins were not used to track user activity across the partner sites. However, once that claim was shown to be false and it became clear that Facebook was indeed using the social plugins to surveil users, social outcry caused Facebook to discontinue the program.

84. By 2014, Facebook's former competitors had exited the market, and Facebook had effectively established its monopoly. Facebook proceeded to deceptively reverse privacy policies instituted from 2004 to 2012, in spite of clearly-expressed user preference for stronger privacy protections. For example, Facebook reinstituted social plugins, established unique user IDs and re-identification technology to track user activity across the web, and ignored Do Not Track settings- all while subtly eliminating the possibility for users to vote on privacy changes. Thus, Facebook's monopoly power allowed it to deteriorate user privacy in order to extract valuable user data without the risk that users would flee to more privacy-oriented competitors. Several antitrust cases have been premised on such behavior, including the FTC's antitrust case against Intel in 2009.[17]

85. Facebook admits that privacy is one of the parameters along which social networks compete, and even submitted to the UK's CMA that it seeks to build a "privacy-focussed [sic] social platform." The privacy Facebook purports to commit itself to, however, relates to efforts to keep user data out of the hands of <u>outsiders</u>; Facebook conveniently makes no mention of the option for users to keep their information out of the hands of <u>Facebook</u>. Facebook makes very little information about data collection available to users, designs its platform so that this information is hard to find, and it takes minimal effort

---

[17] *See* Complaint in the *Matter of Intel Corp.*, Case 0610247 (F.T.C. 2009) (No. 9341); Decision and Order in the Matter of Intel Corp. No. 9341 (F.T.C. 2009)

(relative to other areas of user engagement) to ensure users understand their privacy settings. Facebook does not want its users to know how Facebook uses their own data or the value of that data.

86.   The basis of the bargain and true imbalance is evident in Facebook's exhaustive efforts to keep its user data practices obscured. Facebook has for years undertaken efforts to obscure the fact and the manner in which it has reversed its previously popular data protection policies. Facebook's deception regarding its data privacy policies likely duped users into thinking they were using a high-quality platform when the quality—due to Facebook's abandoning its protective data polices—was actually low.

87.   It also is generally understood that, despite Facebook's seismic shift from its earliest forays into advertising into its current, very profitable ad-supported business model, Facebook never has made any substantial effort to ensure that its users understand the basic bargain: a free social network in exchange for vast amounts of personal data that is sold to enable advertising. Its consistent strategy to make the basic terms of the modern transaction difficult to find and understand, especially given its early disclaimer of any intent to use personalized information to target ads, itself may have helped propel Facebook to dominance among consumers.

88.   In sum, Facebook was able to grow its base by deceiving users and others about its data policies. Now, Users cannot opt out of Facebook's ability to track users. Even if a user leaves Facebook, they are still tracked on other apps, across devices, and it is impossible to remove the detailed, granular profile Facebook has built on that individual.

89.   Facebook's deception of its users was critical to building its monopoly particularly during the time period in which Facebook was growing rapidly. Social networks are subject the "tipping" effect, as described above. A social network becomes more attractive and valuable to new users as more and more of their friends join the same network. If posting on more than one network is a hassle, eventually one network becomes so popular that the market "tips"; small networks are no longer attractive to users, and the winning

network essentially controls the whole market. In the United States, the social network market has tipped, so that virtually everyone is on Facebook.

90.  During this tipping point period, Facebook quietly began collecting user data without being fully transparent with its users or the public about what it was doing. Facebook also duped publishers into assisting in the data collection by convincing them to install plug-ins that allowed Facebook users to share the publisher content on Facebook. The plug-ins, though, also provided Facebook with a backdoor through which to spy on its users and harvest their data.

91.  US antitrust law does not condemn the possession of monopoly by itself, assuming that the monopolist attained dominance based on innovation, the merits of its product or services, or competitive acumen. However, purposefully designing privacy tools to (a) take advantage of the power of defaults; and (b) dissuade even privacy-concerned users from modifying the defaults by obfuscating the tools to modify those defaults is not the strategy of a company with a high quality product it wants users to compare in head to head competition with rivals. It is not competition on the merits, but rather disguise of a competitive weakness. By hiding the nature and extent of data it collects and monetizes and then making it difficult for users to modify the defaults, Facebook suppresses competition in quality. Users who believed that Facebook offered higher quality than in fact it did will have helped Facebook acquire its monopoly power, and currently help maintain it.

92.  Despite "consent" claims, Users are actually entirely unaware of Facebook's egregious practices. In a Pew Research study, 74% of Facebook users say they did not know that a list of their traits and interests existed until they were directed to their page as part of the study.  And once shown how the platform classifies their interests, roughly half of Facebook users (51%) said they were not comfortable that the company created such a list.

93.  Dark patterns cause consumers to pay a higher data price than they would freely choose. Framing and communication of privacy settings in a way that takes advantage of consumers' behavioral limitations causes them to give away more data and privacy than they otherwise would and represents a lower quality of the service. When a user gives away more

data than she might freely choose, that is also a worsening in the terms of barter between the user and the platform which, along with the lower quality, increases the quality-adjusted price. If that data is then used to serve unwanted advertising or otherwise interrupt the user's experience on the platforms, that causes a further reduction in the quality-adjusted price. The business model of Facebook incentivizes the collection and exploitation of consumer data that worsens the consumer experience.

94.    Facebook has a financial incentive to gather as much data about its users as it can, including everything from shopping patterns, reading and browsing habits, to location information. Facebook gathers further data about its users when they use the sign-in-with-Facebook functionality, which allows users to sign into third-party apps without having to create or remember additional passwords. Facebook also deploys tags and pixels to track user behavior on third-party websites. Surveillance extends not only to the consumer herself but to her friends. Facebook's ad targeting benefits not just from information about individual users, but also the data about its users' friends and insights derived from the nature and strength of their social connections. Facebook partners with data brokers to layer even more data on the data it gathers itself. Consumers can experience harm when they are surveilled. Only a small minority of consumers—15%—are happy to share their data in order to get targeted ads. An  even smaller proportion of consumers—9%—report trusting social media networks.

95.    As mentioned above, in 2010 Facebook introduced a feature called "social plug-ins" that ended up providing Facebook a backdoor to gather user data. Facebook would place a small bit of code on third-party sites, NYT.com, for example, that would permit readers on those sites to "like" content. Doing so activated that code to message the Facebook server, via the user's device, so that the "like" would be visible to the user's Facebook social network. Because the code initiated a message to the Facebook server via the user's device, which then served the "like" feature back to that device, the code initiated on the NYT.com site actually provided a backdoor to users' devices. Facebook used that backdoor harvest user data and even write and read tracking cookies—i.e., Facebook could now surveil anyone who "liked"

something they read on a third-party site. At the time Facebook was attempting to grow market share based on its purported superior privacy protections. Facebook assured the public repeatedly it wouldn't use plug-ins to track users or collect their data.

96.   These assurances turned out to be false, but the false assurances allowed Facebook to grow market share and power in a number of ways. First, with respect to consumers, the claims perpetuated the perception that Facebook protected their privacy, allowing Facebook to continue to grow its user base.  Second, even before the market tipped, evidence suggests that Facebook may have been privately using data to target ads while denying it publicly.

97.   For example, every time a Facebook user visited a page with a "like" button, Facebook retrieved the user's Facebook login cookies, possibly for use in its advertising business. This cheating, therefore, may have aided Facebook in selling higher-priced ads. Third, with respect to content providers, the assurances duped many of them into partnering with Facebook by installing the plug-in, thinking that Facebook never would collect or use information about their readers to compete directly with them or expropriate the value of the relationships they had built with their readers. Facebook told publishers the "like" button was to ensure distribution of their content across the Facebook platform, nothing more.

98.   Over the next years, however, a series of revelations and analyses demonstrated that Facebook in fact was collecting data through the installed plug-ins. When caught, Facebook distracted and dissembled, even going so far as to make the nonsensical assertion (through its chief technology officer) that, "We don't use them [the plugins] for tracking and they're not intended for tracking." The evidence, though, was to the contrary. The Wall Street Journal, for example, published an analysis in which it concluded that Facebook knew when a consumer accessed an article on a site that had installed the plug-in, even if the reader had not even "liked" the article and even if she were not a registered Facebook user.

99.   Facebook's strategy of building the technological capacity to collect data, while pretending it would never collect or use such data, worked to disadvantage both types of rivals, social networks and content providers, so that Facebook grew. Then the market

tipped. Facebook went public in 2012, added a billion users to its user base, and rivals exited. It was at this point in its history that Facebook updated its terms to make the "free" use of the platform conditioned on the user's granting permission to Facebook to monetize her data. The effect of this deception, with respect to consumers, was to increase demand, accelerating the network effects that otherwise might have accrued to Facebook's benefit at a later date (absent the arrival of another competitor) and causing the premature exit of rivals that were unable to match Facebook's combination of asserted privacy and targeting.

100. The 2019 FTC complaint against Facebook describes a pattern of deception over the company's treatment of user data. According to the complaint, Facebook attempted to hide the option to disable third-party developers from accessing their data. Facebook was driven primarily by safeguarding its own revenue—at one point considering whether to remove user data access for all but companies spending large advertising sums on Facebook. Despite a public announcement on ending third-party developer user data access, Facebook surreptitiously gave developers a one-year grace period with their collected data.

### i. **Facebook's Anticompetitive Acquisitions**

101. Facebook has completed a number of major acquisitions, most notably of Instagram and WhatsApp. Instagram was, at the time of acquisition, gaining traction in the social network market. Because of its popularity with young people and its large user base, Facebook may have viewed it as a potential rival. WhatsApp is principally an encoded messaging app, also with a huge user base, largely in markets outside the US. Facebook may have acquired WhatsApp to prevent any entry through that route into Facebook's sector of social media. Facebook also has acquired a number of companies and used their technology to enter new verticals, as it did when it launched Facebook Messenger. Facebook also has acquired companies that can be viewed as offering complements to the Facebook.com platform, such as game companies. And most recently, it announced its intent to acquire Giphy, a company that provides GIF access, an important input to social media that is currently available to users of rival messaging apps and social media sites.

102.  Facebook has injured competition by serially identifying and acquiring nascent competitors in order to maintain its dominant position. Research from Facebook's various public financial filings and statements reveal that Facebook acquired somewhere between 92 and 102 firms between 2003 and 2019 as illustrated below. Of those firms, between 32 and 46 of the acquired firms may be fairly characterized as competitors of Facebook. Facebook's acquisitions range widely in their product offerings, but they are most commonly in the packaged software or internet software/services industries.



103.  Facebook has both a strong incentive and ability to acquire smaller firms solely or primarily for the purpose of squashing competition in its incipiency. The "leapfrog competition" nature of the digital platforms market heavily incentivizes Facebook to take advantage of its dominant position to stifle nascent competitors. Unlike many other markets that can support multiple competitors at once, the market for digital platforms is prone to "tipping" in that it appears to be "winner-take-all" or at least "winner-take-most." Nascent competitors may therefore be one of the only real sources of competition for Facebook. As the Stigler Center notes, "[a]cquisition by a dominant platform of a much smaller and possibly

nascent firm could be very damaging to competition if, absent the acquisition, the smaller firm would develop into a major competitive threat or would lead to significant change in the nature of the market." Thus, the development of a nascent competitor into a fully-fledged competitor may pose an existential risk to Facebook. "Potential competition from very small entrants may be the most important source of competition faced by the incumbent."

104.    Eight years after Facebook's $1B acquisition of Instagram, a pattern becomes obvious.  Facebook repeatedly has purchased rivals, nascent rivals, or potential rivals, and paid significant premiums over what one would expect based on the targets' financial results. Facebook used its existing monopoly profits to buy off its nascent competition, thereby preserving those monopoly profits, rather than competing on the merits with those competitors.

105.    Instagram (2012): Facebook paid $1B just days after series B funding closed based on a valuation of $500 million. Facebook's overpayment suggests its purchase was not motivated only by Instagram's earning potential.

106.    Facebook was monitoring Instagram's growth before purchasing it in 2012. Instagram had been using Facebook's Connect (later renamed "Open Graph") API. That API was a way for apps and third-party websites (like Instagram) to interface with the Facebook website and social graph. For example, by integrating Facebook's API into a website, a Facebook user reading a news article on an enabled website could see which of her Facebook friends liked the article and could share the article on her own Facebook profile with just a click. Crucially, interfacing with Facebook was a two-way street: third-party apps and websites sent data on users back to Facebook, giving Facebook the ability to track users outside of Facebook's walled garden. It is not clear whether Facebook revealed that it had access to this real-time data in connection with the acquisition or its regulatory approval.

107.    If Instagram would have been a viable alternative, Facebook would have been forced to compete by offering a better-quality product, which may have included better privacy practices, fewer advertisements, and increased innovation. Facebook characterizes Instagram as a firm with an uncertain future, having only 30 million users and zero revenue when it was acquired by Facebook. But evidence indicates that Instagram had a high chance

of succeeding even if it had not been acquired by Facebook. Social media markets are prone to "tipping." As a result, social media sites that become successful usually experience rapid growth over a short period of time. This was the case with Instagram.

108.  During the year it was acquired, Instagram's user growth rate was outpacing Facebook's growth rate in its prime. Instagram was both more popular on- and better designed for - use on mobile devices. This preceded an explosion in the use of mobile devices to access social media. By 2015, 80% of time spent on social media was done so on mobile devices. Facebook will argue that Instagram would not have been successful without its acquisition. But Instagram had several alternative sources of funding at its disposal, including a $525 million acquisition offer from Twitter.



109.  Facebook in particular has a strong ability to identify nascent competitive threats, due in part to its 2013 acquisition of the mobile analytics company Onavo Mobile Ltd., a company that had developed a VPN app to hide users' IP addresses, thereby protecting them from third-party tracking. The app served as a secure channel through which all of a user's app activity flowed. Facebook bought Onavo and used its data to "assess not only how many

people had downloaded apps, but how often they used them." In a bitter piece of irony, an app downloaded by users to better protect their privacy was instead exploited by Facebook to study those very same users. The knowledge was then used by Facebook to identify and acquire high-performing companies and possible competitors. According to internal documents, Facebook used Onavo data to justify its high purchase price for messaging app WhatsApp in 2014.  Onavo data gave Facebook unique data on WhatsApp user engagement that even WhatsApp itself did not have.

110.  WhatsApp (2014): At the time of the acquisition, WhatsApp had virtually no revenue stream; even today Facebook still has no successful strategy for monetizing WhatsApp, which suggests that the main purpose of the acquisition may have been exclusionary. WhatsApp has an installed base that would have significantly strengthened an entering social networking competitor.

111.  The price that Facebook paid to acquire Whatsapp - $19 Billion - demonstrates Facebook's market power and the anticompetitive effects of the acquisition. In "pay-for-delay" pharmaceutical cases, overpaying to acquire a firm has been used as evidence to show that a firm is trying to share its monopoly profits to stave off a potential competitor. The premise is that both firms are better off splitting monopoly profits rather than splitting the lower duopoly profits that would result from competition. Facebook's offer was a full $9 billion higher than Google's – indicating it may have overpaid to prevent Whatsapp from becoming a competitor.

112.  The dozens of acquisitions by Facebook over the last ten years created a pattern that supports a coherent exclusionary strategy based on  data from the app Onavo. In the chart below, the apps owned by Facebook are shaded in gray. Those that are growing fast— rising by more than 3 ranking spots in the Onavo data—are shaded in red, as is WhatsApp. The red-shaded apps are those that Facebook either acquired, attempted to acquire, or cut off from API access.

| | % US iPhone App Reach, Mar. 2013 | % Increase from Feb. 2013 | Rank | Rank Change from Feb. 2013 | Fate as of 2020 |
|---|---|---|---|---|---|
| Facebook | 72.60% | 0.6 | 1 | – | Part of Facebook |
| Instagram | 34.00% | 1.7 | 3 | – | Part of Facebook. Acquired 2012 |
| Twitter | 27.20% | 0.1 | 6 | – | Still operating as of 2020 |
| FB Messenger | 13.70% | 0.2 | 15 | – | N/A |
| Snapchat | 13.20% | 1.6 | 16 | + 4 | Facebook attempted to purchase, rebuffed |
| Pinterest | 11.30% | 0.2 | 20 | + 1 | Still operating as of 2020 |
| WhatsApp | 8.60% | 0.3 | 30 | – | Part of Facebook. Acquired 2014 |
| Tumblr | 5.90% | 0.4 | 43 | + 3 | Still operating as of 2020 |
| foursquare | 5.00% | 0.2 | 57 | + 1 | Still operating as of 2020 |
| Vine | 3.90% | 1.2 | 71 | + 25 | Cut off by Facebook in 2013 |
| Google + | 2.90% | -0.2 | 97 | - 4 | Failed (2019) |
| Path | 1.00% | 0.1 | 243 | + 22 | Cut off by Facebook in 2013 |

113.  As mentioned above, Facebook acquired the app Onavo in order to identify competitors who were obtaining users and traction among Facebook users. Facebook used the Onavo data to find the rivals that they would either acquire or exclude from the market by removing API functionality ("depreciating the APIs"). For example, Facebook was able to see that Snapchat saw declining usage after Facebook introduced a competing product: Instagram Stories. The strategy of purchasing and using Onavo to identify competitors before they could threaten Facebook's monopoly, and then acquiring those competitors was intentional.

114.  The Onavo data make it clear that Facebook excluded—whether by acquisition or "depreciating the APIs"—a series of nascent competitive threats. An incumbent that buys, over time, a number of small and growing competitors that were trying to compete closes off competition for the market. In a market with strong network effects, much, if not all, of

the benefit from competition occurs on those days when there is a competitor striving to overthrow the incumbent, and both companies improve quality and innovation.

115.  On May 15, 2020 Facebook announced its acquisition of Giphy—a company that makes a library of GIFs available to users of various communications platforms— and incorporate it into Instagram.  Immediately, tech observers raised the concern that Facebook might transform Giphy, which historically has teamed up with many competing communication platforms, into yet another data-harvesting arm of the Facebook family. Facebook's pattern of past acquisitions suggests that connectivity to the Giphy product would be an anticompetitive lever. The acquisition would give Facebook the ability to deny interoperability with Giphy to its rivals or require unfavorable terms such as sharing data with Facebook. A significant swath of messaging apps, all of which could be viewed as competing at some level with the messaging functions of Facebook, Instagram, and, of course WhatsApp, currently interoperate with Giphy. Post-acquisition, Facebook could simply deny access to the Giphy library to any of its perceived rivals in an effort to lower the quality of its rivals or raise their costs of service. Such a disadvantage would steer those apps' users to Facebook's own family of services.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**F.**   **Facebook Maintains Its Digital Advertising Monopoly with Harmful Anticompetitive Conduct**

116.   Facebook's market power allows it to charge supra-competitive prices for its ad inventory. Facebook has the ability to charge high prices not just because it owns such a large percentage of display inventory, but also because it has extracted such extraordinary amounts of data from its often-unwitting users which make the ads more valuable.

117.   Facebook represents that an advertiser's daily spend budget, as it is set in the ad purchase portal, determines which users within the target audience will see the ad and when. But there is no transparency into Facebook's auction algorithm. There is no option for advertisers to precisely control how much money is spent each day. They can only set a maximum that may be spent each day. It is within Facebook's algorithmic discretion not to promote any of the advertiser's campaign materials into users' feeds on a particular day. More crucially, there is no ability for the advertiser to understand, from Facebook, how their purchased service – ad targeting – is delivering the promised views and clicks

118.   Facebook controls, in addition to its vast stores of user data, all information related to ads placed on its inventory, including click-through and conversion rates and the like. Advertisers, despite purchasing ads on Facebook, cannot get Facebook to give them this data, even though Facebook does provide log-level data about ads placed on other properties. This makes it difficult for advertisers to evaluate the actual value of what they are buying. An ad served on a page opened by a bot, for example, does the advertiser no good, nor does an ad at the bottom of a page that is never viewed by the user, nor an ad that runs too fast for the human eye to see. But the advertiser does not know how frequently that happens because Facebook refused to share data that permits truly independent third-party audits. This practice is only possible due to Facebook's market power and represents a decrease in the quality of the ad the advertiser buys.

119.   The harms from Facebook's anticompetitive conduct include harm to advertisers in the form of higher prices and lower quality. These reduce the advertisers' incentive to invest and innovate, which harms them and consumers. Further harm to consumers comes from the higher prices that flow through to goods and services from the higher prices of impressions, clicks, and actions that are marginal costs of obtaining sales.

120.  There is evidence that Facebook does not deliver the targeting views and clicks it promises. Several lawsuits have been filed alleging that Facebook does not deliver on its promises to effectively target ads. In one lawsuit, the plaintiff conducted a survey of over 2600 small businesses and found that Facebook was regularly showing advertisements to users who were outside the targeted demographic. As much as 40% of the ads which these firms paid for were shown to users who did not match the particular characteristics the firms had specified in their initial ad purchases made through Facebook's own Ads Manager portal.

121.  Facebook also charges high fees to its advertisers for its opaque and poorly targeted ad services. The average fee charged by a platform for ad placement is estimated at 18% of the total ad spend – for every $100 spent on an advertising campaign, the platform service will retain $18. But for small advertisers, Facebook retains 27% of ad spend on average. Advertisers may pass on these costs in the form of higher prices to consumers. Though Facebook's rent-seeking may only increase consumer prices marginally for each individual consumer, in the aggregate, the downstream price increase resulting from high ad prices and ineffective targeting is large.

122.  The effect of Facebook's artificially high prices charged to advertisers is not limited to higher prices downstream. By charging high prices to other firms seeking to advertise on its platform, Facebook is indirectly harming the ability of those firms to put resources towards improving their products and engaging in innovative development. Each extra dollar spent on an advertisement impression is a dollar which the advertising business could have spent elsewhere to promote or improve its business. This represents a significant market inefficiency resulting from the Facebook monopoly.

123.  By sinking unnecessary money into Facebook advertising campaigns which are less effective than the platform claims, firms are not dedicating the time and resources to improving their core product in a way that would optimize consumer benefit. A theory of innovation harms that only accounts for Facebook's effects on the advertising market, and not its effect on the consumer economy more broadly, leaves out a large part of the platform's detrimental effects on the consumer experience.

124.  Lack of transparency for advertisers is both a harm and a manifestation of market power. The quality of an advertising service includes the ability to verify that the ad was shown as promised. For there to be effective competition between suppliers of advertising inventory, advertisers need to be able to make informed choices about the inventory that they buy. Effective competition between intermediaries relies on both advertisers and publishers being able to make informed decisions on the channels through which they buy and sell.

125.  Platforms and intermediaries may have the incentive and ability to exploit the asymmetries of information and inertia on the part of advertisers in a number of ways. For instance, platforms with market power can take steps to reduce the degree of transparency in digital advertising markets, or refrain from taking steps to make it transparent, forcing advertisers to rely on information and metrics provided by those platforms.

126.  Additionally, advertisers suffer from lower-quality advertising outcomes than they would in a competitive market. Advertisers expressed concern over restrictions on third-party verification, which can lead to overcharges above and beyond the otherwise supra-competitive price. Facebook in 2016, for example, admitted that it had substantially over-reported view time for video ads, leading to improper overcharges. Advertisers would have had no way to learn about this overcharge had Facebook not disclosed it itself.

127.  The lack of transparency in advertising on Facebook also exposes advertiser's ads to dangerous content and harms the brand. Because Facebook controls the data reflecting the placement and performance of ads and does not fully share it with advertisers, advertisers lack the ability to audit or understand where their ads are appearing. It has been reported, for example, that internet trolls utilize the group feature to form closed "banter groups," specifically for the purpose of exchanging distasteful memes and jokes on topics such as rape and child sexual abuse. Facebook places ads in group feeds, presumably including in groups feeds where few if any advertisers hope to find their next customer. This dangerous content appearing next to an ad for a known brand, e.g. Pampers or Starbucks, harms the reputation of those brands. This is known as "brand safety" and is a critical element of quality from the

point of view of an advertiser.

128. Digital ads are sometimes not delivered at all, displayed on a part of the page that the consumer never scrolls to, or shown too quickly for the human eye to see. Such ads are obviously not delivering value to the advertiser. Facebook has the incentive and ability to overstate the quality and effectiveness of their advertising inventory, for example, or to increase prices. To the extent such instances are common, they raise the price per effective ad that the advertiser is paying. Advertisers therefore prefer to audit the performance of the platform and there are a set of independent tools to help them do that.

129. Facebook does work with a number of 'approved' third-party verification providers, however they restrict access to detailed consumer level. Other display advertising platforms in contrast reported that they do allow advertisers to use tracking tags for third-party verification of impressions served on their advertising inventory.

130. Denying audit and verification raises the quality-adjusted price of the ad and is an exercise of market power. An additional quality element of advertising is brand safety, which is the appearance of the brand next to dangerous or unsuitable content. Facebook prevents brands from having full ability to audit or verify brand safety. Without access to the underlying raw data and the ability to have full independent verification, there was a perception on the part of advertisers and agencies that Facebook was in effect 'grading their own homework' in respect of the effectiveness of their own advertising inventory.

G.   **Government Investigations and Actions Regarding Facebook's Monopolistic Activities**

131. Facebook is currently facing four separate antitrust investigations by the Department of Justice, the Federal Trade Commission, a group of state attorneys general, and the House Judiciary Committee.

132. In September 2019, the United States Department of Justice announced that it had opened an investigation into whether Facebook is committing illegal monopolistic acts. The DOJ stated that its probe would focus on whether and how Facebook and other leading online platforms "have achieved market power and are engaging in practices that have

reduced competition, stifled innovation, or otherwise harmed consumers."

133. On July 29, 2020, the House Subcommittee on Antitrust, Commercial, and Administrative Law of the House Judiciary Committee held hearings on the subject of "Online Platforms and Market Power: Examining the Dominance of Amazon, Apple, Facebook, and Google." Facebook CEO Mark Zuckerberg appeared for questioning by members of Congress, including regarding whether Facebook has abused its position as the default social med. The Subcommittee Chair, Rep. David N. Cicilline (D-RI), noted the "harmful economic effects" of the market dominance of Facebook and the other companies under scrutiny for monopoly conduct: "They discourage entrepreneurship, destroy jobs, hike costs, and degrade quality."

134. On October 6, 2020, the House Subcommittee issued a report entitled "Investigation of Competition in Digital Markets." The report finds that,

135. In addition to the House Subcommittee's investigation of Facebook's monopoly power, state and federal antitrust authorities are investigating Facebook for potential violations of the U.S. antitrust laws. In July 2019, Facebook disclosed that the Federal Trade Commission (FTC) had opened an antitrust investigation of Facebook in June 2019. In September 2019, New York Attorney General Letitia James announced that she joined with eight other attorneys general to lead a multistate investigation of Facebook, Inc. In October 2019, Attorney General James reported that the investigation into Facebook grew to include 47 attorneys general.

136. Several antitrust enforcement agencies have examined Facebook's monopoly in recent years and reached similar conclusions. In July 2020, the United Kingdom's Competition and Markets Authority (CMA) found that Facebook is dominant in the markets for social networks and digital display ads, and that its market power "derives in large part from strong network effects stemming from its large network of connected users and the limited interoperability it allows to other social media platforms." In July 2019, Germany's Federal Cartel Office (Bundeskartellamt) found that "Facebook is the dominant company in the market for social networks," and that in Germany's social network market, "Facebook

achieves a user-based market share of more than 90%." And in June 2019, the Australian Competition & Consumer Commission (ACCC) found that "Facebook has substantial market power in a number of markets and that this market power is unlikely to erode in the short to medium terms."

137. In June 2020, Germany's antimonopoly regulator ordered Facebook to allow people to block the company from combining their Facebook data with information about their activities on other apps and websites. According to the regulator, Facebook unfairly used its dominance to collect data about millions of users of third-party sites that used tools like Facebook's "like" and "share" buttons, and an analytics service called Facebook Pixel. Regulators concluded that consumers faced a false choice: Agree to hand over vast amounts of personal data or not use Facebook's ubiquitous social media services at all.

## V.   INTERSTATE TRADE AND COMMERCE

138. Facebook's conduct as alleged herein has had a substantial effect on interstate and intrastate commerce.

139. At all material times, Facebook has provided a social media network and platform and has exchanged consumer information and attention with advertisers and consumers, and participated in the marketing, promotion, distribution, and sale of advertising services for display advertisements in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

140. Facebook has used instrumentalities of interstate commerce to provide social media and digital advertising services to consumers and advertisers throughout the United States.

141. In furtherance of the anticompetitive scheme alleged herein, Facebook has traveled between states and exchanged communications through interstate wire communications and via the Unites States mail; and

142. The anticompetitive scheme alleged herein has affected billions of dollars of commerce. Facebook has inflicted antitrust injury by artificially raising the cost to consumers of using its platform, in terms of personal information and attention, by providing reduced

1  user privacy protections to consumers in exchange for their personal data, and by artificially

2  reducing consumer choice and competition in the Social Media Market, and by artificially

3  raising prices in digital advertising in the United States

4       143.  Facebook's conduct also had substantial intrastate effects in that, among other

5  things, Facebook's social networking and advertising services for display advertisements were

6  sold in each state, including California.  At least thousands of individuals in each state,

7  including California, were impacted by Facebook's anticompetitive conduct.  As alleged

8  below, absent Facebook's unlawful conduct, Plaintiffs and class members within each state

9  would have paid less or received greater profits for social media and/or digital advertising

10  services.

## VI.   RELEVANT MARKET

12       144.  In a transaction market, in both user groups come to the platform with the intent

13  to transact with one-another. A non-transaction market is one in which one user group does

14  not come to the platform with the intent to transact with the other user group. Facebook is

15  a non-transaction platform because Facebook users do not come to the platform with the

16  purpose of transacting with advertisers. Rather, they access Facebook to interact with other

17  users. Facebook is also an audience providing platform because its business model revolves

18  around providing advertisers with the attention of its users. Advertisers benefit from an

19  increase in the number of users, but users generally do not experience the same benefit from

20  an increase in the number of advertisers.

21       145.  There are two relevant markets applicable to this dispute. They are: (1) "the

22  Social Network Market"; and (2) "the Social Media Market." Facebook has unlawfully

23  acquired and maintained monopoly power in both markets.

### Online Social Networks Are an Antitrust Market

25       146.  The relevant geographic market is the United States. Market participants

26  recognize this in the ordinary course of business. Social network platforms each provide

27  services to consumers throughout the United States, and these services do not differ by

28  geographic area within the United States

---

147.   Communication-focused social networks form a relevant antitrust market that is distinct from other social media. There is a specific demand for social networks (such as Facebook), which is fundamentally different from the demand for social media. Consistent with social media platforms' differentiated strategies, consumers access different platforms for different reasons. For example, a platform that is oriented more towards communication may be more commonly accessed by consumers to have conversations with friends than a platform oriented more towards content. Social media platforms compete more closely (on the consumer side) if they are generally accessed by consumers for similar reasons. Facebook's platforms will therefore likely face the greatest constraint from platforms accessed by consumers for broadly similar reasons.

148.   Social media platforms differentiate themselves from one another in various ways. YouTube and TikTok principally facilitate the distribution and consumption of content. In particular, much of the content on YouTube can be enjoyed by users with a wide range of relationships to the person posting, including complete strangers. YouTube is focused on offering content and does not compete with Facebook. Other platforms, including Facebook, primarily facilitate communication (including the sharing of third-party content) among groups of friends who choose each other and enjoy content in large part because of those relationships. Facebook is a prime example of this second category of social media platforms.

149.   The key purpose of social networks is finding and networking with people the users already know, and to exchange on a daily basis experiences, opinions and contents among specific contacts which the users define based on identity. Providers meet this demand by offering the corresponding core functionalities which grant users a 'rich user experience.

150.   A principal distinguishing feature for Facebook is the "social graph". A social graph is a virtual map of the vast web of connections between users that allows a platform to suggest new friends, display content liked by friends, and gather and create data based not just on a particular user's activity on the platform, but also that of her friends. Facebook.com has a robust social graph; YouTube does not.

151.   The strongest reason to conclude that communication-focused social networks occupy their own antitrust market is that consumers themselves see such platforms, such as Facebook.com, as fulfilling a wholly different function than do the content-focused platforms such as YouTube. Internal Google documents that concluded the most common reasons consumers access YouTube are (1) to view third-party entertainment; or (2) to view "how-to" videos. Consumers generally access Facebook.com for entirely different reasons, such as learning about the lives and events of friends and family. Facebook.com and YouTube do not appear to compete directly and are in separate markets. For example, few consumers could find equivalent services from YouTube if the quality of Facebook.com were to decline and they wanted to leave the platform. By contrast, the Facebook family of platforms, led of course by Facebook.com, operates as a single competitive unit.

152.   Search engines, such as Google, Yahoo, or Bing, are not "social networks" because they do not provide for interaction between platform members. Similarly, apps like Apple's "iMessage," which simply allow the sharing of messaging media, such as emails or text messages, are not social networks because, although they provide for interaction, they do so only in a device-to-device manner and focus solely on delivering messages rather than facilitating a broader online social experience. Facebook itself has noted this distinction, explaining in documents provided to the House Antitrust Subcommittee that whereas the growth of Apple's iMessage is "limited by the adoption of iPhones, . . . Facebook's products can be used across devices."

153.   Social media platforms constitute a market for antitrust purposes. Defining a product market typically is one of the first steps in any antitrust analysis. The goal is to demarcate the boundary between products or services that can be substituted for one another, on one hand, and those that cannot, on the other.

154.   Still other types of online networks, such as LinkedIn, are not "social networks," as that term is defined in this complaint, because they are used for a different purpose, and are used in parallel to—rather than instead of—Social Networks. Whereas LinkedIn is typically considered the dominant professional social network in the world, it is not a

replacement for Facebook. This is because LinkedIn is used primarily for professional networking and employment-seeking purposes, while Facebook and its like are used primarily for non-professional, personal purposes. The European Commission explained this distinction during its review of the Microsoft/LinkedIn merger: "the reasons for using a [professional service network] are different from those for using a personal social network. While the former is used to '1. Maintain professional identity, 2. Make useful contacts, 3. Search for opportunities, 4. Stay in touch', the latter is used to '1. Socialize, 2. Stay in touch, 3. Be entertained, 4. Kill time'."

155. Thus, users will have both a LinkedIn and Facebook account, not one or the other, and this other type of network is not viewed or treated as a substitute for a Social Network.

156. Users don't 'multi-home' such that Facebook has any real competition. Although virtually all visitors to other social network sites also visit Facebook.com, the reverse is not true. For example, 97% of Instagram's users "cross-visit" with Facebook.com, but only 66% of Facebook.com users cross-visit with Instagram. 95% of Snapchat users cross-visit with Facebook.com, but only 68% of Facebook.com users cross-visit with Snapchat. The implications of this pattern are at least two-fold. First, asymmetric multi-homing patterns confirm that Facebook.com is used more than any of its competitors, and therefore is likely to have market power. Second, even the competitor whose users were the least likely to use Facebook.com—TikTok—has a high proportion of users who cross-visit with Facebook.com. 70% of TikTok users (who skew young) also use Facebook.com, suggesting that users even of TikTok, the new kid on the block, do not view this platform as a substitute

for Facebook.com.



**Facebook, YouTube continue to be the most widely used online platforms among U.S. adults**

*% of U.S. adults who say they ever use the following online platforms or messaging apps online or on their cellphone*

YouTube 73%
Facebook 69
Instagram 37
Pinterest 28
LinkedIn 27
Snapchat 24
Twitter 22
WhatsApp 20
Reddit 11

Note: Pre-2018 telephone poll data is not available for YouTube, Snapchat and WhatsApp. Comparable trend data is not available for Reddit.
Source: Survey conducted Jan. 8-Feb. 7, 2019.

PEW RESEARCH CENTER

157.  There are no reasonable substitutes for Social Networks. Social Media platforms, such as YouTube and TikTok, primarily exist to allow users to stream, share, and view content. By contrast, firms in the Social Network Market provide users of a particular network an online community that brings together users who specifically choose to associate with one another. In addition, Social Networks, such as Facebook, provide a "rich social experience" to users through specific product features. Social Media platforms, like YouTube and TikTok, do not provide or facilitate a similar use and instead offer only limited opportunities for social interaction, or interaction of a very different type that complements, rather than substitutes, for a social networking experience.

158. Beyond the "rich social experience" that Social Networks provide to users, consumers also use Social Networks for different purposes than other online social options, such as Social Media platforms. The House Antitrust Subcommittee, Germany's Federal Cartel Office, and the United Kingdom's Competition and Markets Authority have all recognized that "the specific demand for social networks is fundamentally different from the

demand for other social media." That is because users utilize each for different purposes: Social Networks "facilitate their users finding, interacting, and networking with other people they already know online," whereas Social Media platforms "principally facilitate the distribution and consumption of content" between "users with a wide range of relationships to the person posting, including by strangers." Thus, while a user might use YouTube to access and watch a complete stranger's video—such as a cooking recipe—the same user would use Facebook, not YouTube, to share *that* video with the user's friends, family, and real-world connections. Similarly, a user that finds a funny video of a celebrity (or other stranger) on YouTube may choose to encourage their friends and family to view that video by sharing it with them on Facebook with a note.

### The Social Media Market is an Antitrust Market

159. The relevant geographic market is the United States.  Market participants recognize this in the ordinary course of business. Social media platforms each provide services to consumers throughout the United States, and these services do not differ by geographic area within the United States.

160. No other social media platform is a substitute for Facebook because each potential competitor provides a much narrower service that competes with only one element of Facebook's broader portfolio of services. Consumer cross-visiting behavior confirms the lack of substitutability between Facebook and other social media sites. For example, over 90% of Snapchat users also access Facebook, indicating that Facebook has functionality that consumers cannot find on Snapchat.

### Digital Display Advertising is an Antitrust Market

161. There are two principal forms of digital advertising: search advertising and display advertising. Search advertising refers to digital ads on desktop or mobile search engines, such as the Google.com homepage, displayed via "search ad tech" alongside search engine results. Search advertising is often bought and sold via real-time bidding (RTB) auctions among advertisers, where advertisers set the prices that they are willing to pay for a specific keyword in a query. Display advertising refers to the delivery of digital ad content to

ad space on websites and mobile apps, which is referred to as "inventory." Like search advertising, buying and selling display ads often involves real-time bidding

162. Facebook has monopoly power in online advertising in the social networking market. Notwithstanding Google's dominance, Facebook also has a significant share of revenue and growth in online advertising with many market participants referring to them as duopolies in this broad market.

163. Market participants interviewed by the Subcommittee consider Facebook "unavoidable" or "must have" due to the reach and scale of its platform. In particular, some businesses consider Facebook's identity product—its ability to persistently track users' online and offline conduct to serve tailored ads—as a unique feature.

164. As David Hansson, the Chief Technology Officer and Cofounder of Basecamp, explained in his testimony during  the House Subcommittee's fifth hearing, the nature of Facebook's targeted advertising makes it difficult to replace:  "At Basecamp, we ultimately ended up swearing off the use of targeted advertisement based on the exploitation of personal data. Facebook's record of protecting privacy, and gathering their consent in the exploitation of their data for advertisement purposes, is atrocious, and we decided that we wanted no part of it. But choosing to opt out of targeted advertisement on the internet is like competing with one arm behind your back. It is very clear why most companies feel compelled to do this kind of advertisement, even if it's a violation of their ethics. If their competitors are doing it, they're at a significant disadvantage if they don't. And the same is true for us. We have undoubtedly given up growth to competitors because we've refrained from pursuing targeted ads."

## VII. ANTITRUST IMPACT

165. Facebook users agree to trade their data to the platform in exchange for its services. Impact to consumers fits into the anti-trust concept of quality adjusted price.   A quality-adjusted price rises when the monetary price of a service stays constant while its quality falls or the amount of data required in trade increases.

166. Fair and vigorous competition would make Facebook's services better than if it can shelter itself from competitive forces. Economic theory tells us that new entry or even the threat of new entry forces incumbents to innovate and improve quality, which increases consumer welfare. Rival services could compete against Facebook by continuing to offer a service for free, while simply extracting less data or using the data it does extract in less invasive ways, if users were aware of this quality-adjusted price discount and responded to it.

167. Facebook has chosen not to compete on the merits of its products and services and instead has misled, deceived, and exploited consumers and publishers. Facebook fought for at least a decade to avoid competition on the merits in the social networks market. Facebook has engaged in a long-term, integrated, anticompetitive strategy of half-truths about its privacy policies, exclusionary API manipulation, and anticompetitive acquisitions of nascent competitors that led to its current dominance of a market in which it now wields significant power over consumers, advertisers, and publishers. The methods used by Facebook to achieve monopoly violated US antitrust law and harms consumer welfare.

168. In sum, the marked decrease in competition that has resulted from Facebook's conduct has caused economic injury to Plaintiffs and class members because users and advertisers have paid more than they otherwise would have paid.

## VIII. TOLLING OF THE STATUTE OF LIMITATIONS

### A.   The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Their Claims

169. Plaintiffs and class members had no knowledge of Facebook's anticompetitive conduct, or of facts sufficient to place them on inquiry notice of the claims asserted herein, during the class period and continuing thereafter.

170. As described herein, Plaintiffs and class members suffered antitrust injury in the form of economic losses as a result of Facebook's wrongful exercise of monopoly power in the relevant market.  Other than dealing directly with Facebook when using its digital advertising services, Plaintiffs had no direct contact or interaction with Facebook and no means from which they could have discovered these injuries and the other bases for their

1   causes of action set forth in this complaint.

2       171. Throughout the class period, and continuing thereafter, there was no

3   information in the public domain sufficient to put Plaintiffs on notice that Facebook had

4   wrongfully acquired a social networking and digital advertising monopoly or was using its

5   monopoly power to charge advertisers supra-competitive prices for display advertising and

6   to charge supra-competitive quality adjusted prices to users.

7       172. It was reasonable for Plaintiffs and class members not to suspect that Facebook

8   was engaging in any unlawful and injurious anticompetitive behavior.

9       173. While certain of Facebook's anticompetitive acts occurred before the applicable

10  limitations periods, not until recently, with the announcement of governmental investigations

11  into Facebook's monopolization of the market for social networking services and display

12  advertising markets, could Plaintiffs have discovered their antitrust injuries and causes of

13  action set forth in this complaint.  At the time it occurred, no reasonable class member had

14  any basis to discern the anticompetitive purpose and effect of Facebook's conduct described

15  in this complaint that occurred before the applicable limitations periods.

16      174. Plaintiffs allege a continuing course of unlawful conduct by Facebook, including

17  conduct within the applicable limitations periods.  That conduct has inflicted continuing and

18  accumulating harm to Plaintiffs and class members within the applicable statutes of

19  limitations.

20      175. For these reasons, the statutes of limitations applicable to Plaintiffs' and class

21  members' claims have been tolled with respect to the claims asserted herein.

22      **B.   Facebook's Fraudulent Concealment Tolled the Statute of Limitations**

23      176. Additionally, or alternatively, application of the doctrine of fraudulent

24  concealment tolled the statutes of limitations on Plaintiffs' claims.  Plaintiffs had no

25  knowledge of Facebook's wrongful acquisition and maintenance of monopoly power in the

26  relevant market, or of facts sufficient to place them on inquiry notice of their injuries or the

27  other bases for their causes of action, during the class period and continuing thereafter.  No

28  information in the public domain or otherwise available to Plaintiffs during the class period

suggested that Facebook had wrongfully acquired a digital advertising monopoly or was using its monopoly power to charge advertisers supra-competitive prices for display advertising and to pay sub-competitive prices to publishers of such advertising.

177. Facebook concealed its illicit and harmful conduct, both by failing to disclose its wrongful acquisition and maintenance of a social networking, social media, and digital advertising monopoly through exclusionary acts in the relevant market, and by affirmatively denying that it was engaged in such conduct. Facebook has (repeatedly) publicly denied allegations by American and foreign regulators that it has abused its power in social networking markets. These affirmative statements, and Facebook's nondisclosure that it had acted to forestall competition, served to fraudulently conceal Facebook's unlawful monopoly in brokering online display advertising.

178. In addition to its affirmative fraud and nondisclosure, Facebook's anticompetitive conduct also was inherently self-concealing because revealing the true facts concerning Facebook's monopolistic behavior would have prompted governmental enforcement activity and/or class action litigation. Digital advertising is subject to antitrust regulation, so it was reasonable for Plaintiffs and class members not to suspect that digital advertising services were being sold in a noncompetitive market. A reasonable person under the circumstances would not have had occasion to suspect Facebook was engaging in extensive surveillance of consumers, manipulating and exploiting its users, and selling display advertising at supra-competitive prices at any time during the class period.

179. Because Facebook's antitrust violations were self-concealing and affirmatively concealed by Facebook, Plaintiffs and class members had no knowledge of Facebook's antitrust violations or of any facts or information that would have caused a reasonably diligent person to suspect Facebook of having wrongfully acquired and maintained monopoly power during the class period.

180. Therefore, by operation of Facebook's fraudulent concealment, the statutes of limitations applicable to Plaintiffs' and class members' claims were tolled throughout the class period.

# IX. CLASS ACTION ALLEGATIONS

181.  Plaintiffs bring this action on behalf of themselves and, under Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3) and/or (c)(4), as representatives of the following Classes:

    a)  **Antitrust Facebook User Class:** All persons or entities in the United States who maintained a Facebook profile at any point from 2007 up to the date of the filing of this action.

    b)  **Unjust Enrichment Class:** All persons or entities in the United States who maintained a Facebook profile at any point from 2007 up to the date of the filing of this action.

    c)  **Antitrust Facebook Advertiser Class:** All persons and entities in the United States who, from January 1, 2014 to the present, directly paid Facebook for advertising services.

    d)  **Antitrust Facebook Marketer Issue Subclass:** All persons and entities in the United States that, from January 1, 2014 to the present, directly paid Facebook for advertising services as an intermediary for marketing campaign purposes

182.  Excluded from the proposed Class are: Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and court staff assigned to this case.

183.  The proposed Class meets the requirements of Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and/or (b)(3).

184.  Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that the Classes should be expanded, divided into subclasses, or modified in any other way.

185.  The members of the Class are so numerous that joinder is impracticable.  The Class includes at least hundreds of thousands of members that are widely dispersed

throughout the country.

186.  Plaintiffs' claims are typical of the claims of all Class members.  Plaintiffs' claims arise out of a common course of conduct that gives rise to the claims of all other Class members.  Plaintiffs and all Class members were and will continue to be damaged in the same manner by the same wrongful conduct, namely Facebook's unfair business practices and monopolization of the market for display advertising services.

187.  Plaintiffs will fairly and adequately protect and represent the interests of the Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the class.

188.  Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action litigation and have particular expertise with antitrust litigation.

189.  Numerous questions of law or fact common to the class arise from Facebook's course of conduct to exclude competition in the relevant market, including:

    a.    Whether Facebook's deception of consumers about its data privacy practices was anti-competitive;

    b.    Whether Facebook intentionally made material misrepresentations about its data privacy practices and the extent of its commercial surveillance;

    c.    Whether Facebook holds monopoly power in the Social Networking Market;

    d.    Whether Facebook holds monopoly power in the Social Media Market;

    e.    Whether Facebook holds monopoly power in the Digital Advertising Market;

    f.    Whether Facebook unlawfully acquired and maintained monopoly power in the relevant markets;

    g.    Whether Facebook engaged in unfair business practices that reduced competition and caused harm in the relevant markets;

    h.    The form and content of injunctive relief to restore competition; and

    i.    The amount of damages owed the class as a result of Facebook's illegal

1    activity.

2          190.  Questions of law and fact common to members of the class will predominate

3    over any questions that may affect only individual class members because Facebook acted on

4    grounds generally applicable to the class as a whole.  For the same reason, class certification

5    for purposes of adjudicating Plaintiffs' claims for injunctive and declaratory relief is

6    appropriate.

7          191.  This class action is superior to other alternatives for the fair and efficient

8    adjudication of this controversy.  Prosecuting the claims pleaded herein as a class action will

9    eliminate the possibility of repetitive litigation.  There will be no material difficulty in the

10   management of this action as a class action.

11         192.  The prosecution of separate actions by individual Class members would create

12   the risk of inconsistent or varying adjudications, establishing incompatible standards of

13   conduct for Facebook.

14         193.  Plaintiffs reserve the right to seek class certification with respect to common

15   issues, including issues related to Facebook's duties or conduct.

16

17                          **X. CAUSES OF ACTION**

                            **FIRST CAUSE OF ACTION**
18          **VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT**
19                              **15 U.S.C. § 2**

20                   **(On Behalf of Plaintiffs and all Classes)**

21         194.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

22         195.  The market for social networking services in the United States is a relevant

23   antitrust market, and Facebook has monopoly power in that market.

24         196.  The market for social media services in the United States is a relevant antitrust

25   market, and Facebook has monopoly power in that market.

26         197.  The market for social media display advertising services in the United States is a

27   relevant antitrust market, and Facebook has monopoly power in that market.

28         198.  Facebook wrongfully acquired and unlawfully maintained monopoly power in

_____

CLASS ACTION COMPLAINT, Case No. 5:20-cv-8721

the relevant market through the overall scheme and conduct alleged herein, including by deception and misrepresentation regarding privacy practices, acquiring rivals, denying interoperability on several technological fronts, and restricting competing firms' access to information.

199. Facebook's actions were carried out willfully and with the specific intent to acquire and maintain monopoly power in the relevant market through anticompetitive conduct and not through a superior product, business acumen, or a historic accident.

200. Facebook's exclusionary conduct has foreclosed a substantial share of the market for social networking, social media, and display advertising services.

201. As a direct and proximate cause of Facebook's conduct, Plaintiffs and members of their respective Class have suffered antitrust injury in the form of extreme invasions of privacy, degradation of personal data, and economic losses. Those losses constitute antitrust injury, as they are an injury of the type the antitrust laws were intended to prevent and that flows from what makes Facebook's monopolistic acts unlawful. But for Facebook's unlawful deceptive and exclusionary conduct, competition would have prevailed in the relevant market and Plaintiffs and Class members would not have sustained these losses. Facebook's conduct also deprived Plaintiffs and Class members of improved quality and innovation in the relevant markets.

202. There is no legitimate pro-competitive justification for Facebook's anticompetitive conduct, and even if there were, less restrictive alternatives to achieve it would exist.

203. Plaintiffs and members of the Class are entitled to equitable relief as appropriate to halt Facebook's monopoly conduct and restore competition in the relevant market. Members of the Classes are regular users Facebook's services or purchasers of digital advertising services and will continue to use and purchase such services and suffer further injury if Facebook's monopoly is not ended. The primary purpose of such injunctive relief will be to benefit the public from the lower quality-adjusted and monetary prices and greater innovation that will prevail in competitive digital advertising markets in the absence of Facebook's monopoly.

204. Plaintiffs and members of the Class are entitled to damages, including treble damages, sustained as a result of Facebook's monopolistic acts and practices.

**SECOND CAUSE OF ACTION**
**VIOLATIONS OF THE UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code § 17200 *et seq.* (UCL)**
**(On Behalf of Plaintiffs and all Classes)**

205. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

206. Facebook's conduct is unlawful in violation of the UCL because it violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

207. Facebook has engaged in unfair business practices through the overall scheme and conduct alleged herein, which has restrained competition. Facebook's conduct is unfair, in violation of the UCL, because it violates California's clearly established public policy forbidding monopolistic acts. Facebook wrongfully acquired and unlawfully maintained monopoly power in the relevant market through the conduct alleged herein, including by deception and misrepresentation regarding privacy practices, acquiring rivals, denying interoperability on several technological fronts, restricting competing firms' access to information.

208. Facebook's practices also are unfair in violation of the UCL because they offend public policy; are immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm, including from Facebook's supra-competitive quality-adjusted prices that users paid and supra-competitive prices that advertisers paid, that outweighs by a wide margin any possible utility from the practices.

209. Facebook's unlawful and unfair business practices actually and proximately caused Plaintiffs and class members to lose money or property.

210. Plaintiffs and Class members lack an adequate remedy at law to redress certain conduct of Facebook that violates the unfair prong of the UCL. Through the practices described herein, Facebook suppressed competition in its incipiency, violated well-established antitrust policies, and significantly harmed and threatened competition in the relevant market.

211.  Accordingly, on behalf of the Class, Plaintiffs seek injunctive relief, restitution, and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper. The primary purpose of such injunctive relief will be to benefit the public from the lower prices and greater innovation that will prevail in competitive digital advertising markets in the absence of Facebook's monopoly.

### THIRD CAUSE OF ACTION
### Unjust Enrichment/Quasi-Contract
### (On Behalf of Plaintiffs and all Classes)

212.  Plaintiffs incorporate the foregoing allegations as if fully set forth herein

213.  Plaintiffs and Class members conferred direct benefits on Facebook in the forms of their personal data, time, and attention.

214.  These benefits are quantifiable in measurable units. Facebook sells access to its users' data, time, and attention to third parties—including advertisers and app developers—for discrete money amounts. In 2019, for example, Facebook collected $70.7 billion in revenue, almost entirely from allowing companies to serve ads to its users.

215.  Those benefits received by Defendant were at the expense of Plaintiffs and Class members.

216.  Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiffs and Class members. For example, after Facebook's involvement in the Cambridge Analytica scandal came to light in March 2018, Facebook founder Mark Zuckerberg explicitly recognized that Plaintiffs and Class members conferred on Facebook the benefit of their data, stating: "We have a responsibility to protect your data, and if we can't then we don't deserve to serve you." Facebook has similarly recognized that Plaintiffs and Class members have conferred on it the benefits of their time and attention, as evident from the fact that Facebook internally tracks the time its users spend on Facebook (and its family of products) and compares these figures to the time they spend on other competing services.

217.  Facebook acquired these benefits from Plaintiffs and Class members through misrepresentations and deception. Facebook induced Plaintiffs and Class

members to join Facebook based on the promise of stringent privacy protections. All the while, Facebook concealed the scope of the data it harvested from Plaintiffs and Class members and brokered to third parties. Nor did Facebook reveal the manner in which it weaponized Plaintiffs' and Class members' data to "copy, kill, or acquire" Facebook's rivals.

218.  As a result of Facebook's receipt of the direct benefits of Plaintiffs' and Class members' data, time, and attention, Facebook was able to destroy competition, enriching itself at the expense of Plaintiffs and Class members. Although Plaintiffs and Class member conferred on Facebook the direct benefits of their data, time, and attention, Plaintiffs and Class members have been, as a result of Facebook's misconduct: (a) deprived of a marketplace that adequately compensates them for their data, time, and attention with benefits of reciprocal value; (b) forced to accept Facebook's services, which are of inferior quality, with no meaningful alternative.

219.  Facebook has unjustly reaped monstrous financial gain as a result of the misconduct alleged herein. In 2019, for example, Facebook collected $70.7 billion in revenue, almost entirely from allowing companies to serve ads to its users. The circumstances alleged herein are such that it would be unjust for Defendant to retain the portion (if not the entirety) of Plaintiffs' and Class members' payments, or the value of other consideration, that should have been earmarked to provide higher quality social networking services, and adequate privacy protections for Plaintiffs' and the Class' private information, including only surveillance and third-party sharing as authorized by its customers.

220.  Plaintiffs seek an order directing Facebook to disgorge these benefits and profits and pay restitution to Plaintiffs and other Class members.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the class defined herein, respectfully request that this Court:

A.     Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), direct that reasonable notice of this action be given

1   to the class, appoint Plaintiffs as named representatives of the Class, and appoint the
2   undersigned Plaintiffs' counsel as Class Counsel;

3       B.    Enter judgment against Facebook and in favor of Plaintiffs and the Class;

4       C.    Enter injunctive relief to restore competition in the relevant market and
5   its constituent submarkets;

6       D.    Award damages, including treble damages, and/or restitution to the Class
7   in an amount to be determined at trial, plus legal interest;

8       E.    Award Plaintiffs and the Class their costs of suit, including reasonable
9   attorneys' fees, as provided by law; and

10      F.    Award such further and additional relief as is necessary to redress the harm
11  caused by Facebook's unlawful conduct and as the Court may deem just and proper under
    the circumstances.

12                    ## XII. DEMAND FOR JURY TRIAL

13         Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury on all
14  matters so triable.

15
    Dated: December 9, 2020                    Respectfully submitted,
16

17                                             By:  */s/ Tina Wolfson*

18                                             Tina Wolfson (State Bar No. 174806)
19                                             Robert Ahdoot (State Bar. No. 172098)
                                               Theodore W. Maya (State Bar No. 223242)
20                                             Rachel Johnson (State Bar No. 331351)
21                                             **AHDOOT & WOLFSON, PC**
                                               2600 West Olive Avenue, Suite 500
22                                             Burbank, California 91505
                                               Tel: (310) 474-9111
23                                             Fax: (310) 474-8585
24                                             twolfson@ahdootwolfson.com
                                               rahdoot@ahdootwolfson.com
25                                             tmaya@ahdootwolfson.com
26                                             rjohnson@ahdootwolfson.com

27                                             *Attorneys for Plaintiffs*
28

---

CLASS ACTION COMPLAINT, Case No. 5:20-cv-8721
57

JS-CAND 44 (Rev. 10/2020)

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

VICKIE SHERMAN, LEZAH NEVILLE-MARRS, KATHERINE LOOPERS, AND JARRED JOHNSON, individually and on behalf of all others similarly situated,

**(b)** County of Residence of First Listed Plaintiff    NAVAJO
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Tina Wolfson, Ahdoot & Wolfson, PC
2600 West Olive Ave., Suite 500, Burbank, CA 91505
T: 310-474-9111; E: twolfson@ahdootwolfson.com

## DEFENDANTS

Facebook, Inc.

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **LABOR** | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | 710 Fair Labor Standards Act | 820 Copyrights | ☒ 410 Antitrust |
| 150 Recovery of Overpayment of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine | **PERSONAL PROPERTY** | 740 Railway Labor Act | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | 370 Other Fraud | 751 Family and Medical Leave Act | 840 Trademark | 460 Deportation |
| | 350 Motor Vehicle | 371 Truth in Lending | | 880 Defend Trade Secrets Act of 2016 | 470 Racketeer Influenced & Corrupt Organizations |
| 153 Recovery of Overpayment of Veteran's Benefits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | 790 Other Labor Litigation | | 480 Consumer Credit |
| 160 Stockholders' Suits | 360 Other Personal Injury | 385 Property Damage Product Liability | 791 Employee Retirement Income Security Act | **SOCIAL SECURITY** | 485 Telephone Consumer Protection Act |
| 190 Other Contract | 362 Personal Injury -Medical Malpractice | | **IMMIGRATION** | 861 HIA (1395ff) | 490 Cable/Sat TV |
| 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 462 Naturalization Application | 862 Black Lung (923) | 850 Securities/Commodities/ Exchange |
| 196 Franchise | 440 Other Civil Rights | **HABEAS CORPUS** | 465 Other Immigration Actions | 863 DIWC/DIWW (405(g)) | 890 Other Statutory Actions |
| **REAL PROPERTY** | 441 Voting | 463 Alien Detainee | | 864 SSID Title XVI | 891 Agricultural Acts |
| 210 Land Condemnation | 442 Employment | 510 Motions to Vacate Sentence | | 865 RSI (405(g)) | 893 Environmental Matters |
| 220 Foreclosure | 443 Housing/ Accommodations | 530 General | | **FEDERAL TAX SUITS** | 895 Freedom of Information Act |
| 230 Rent Lease & Ejectment | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | 870 Taxes (U.S. Plaintiff or Defendant) | 896 Arbitration |
| 240 Torts to Land | 446 Amer. w/Disabilities–Other | **OTHER** | | 871 IRS–Third Party 26 USC § 7609 | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 245 Tort Product Liability | 448 Education | 540 Mandamus & Other | | | 950 Constitutionality of State Statutes |
| 290 All Other Real Property | | 550 Civil Rights | | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation–Transfer   ☐ 8 Multidistrict Litigation–Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. § 2

Brief description of cause:
Violation of Sherman Act, 15 U.S.C. § 2 and California UCL, Cal. Bus. & Prof. Code § 17200, et seq.

## VII. REQUESTED IN COMPLAINT:

☑ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S), IF ANY *(See instructions)*:

JUDGE                    DOCKET NUMBER

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

**(Place an "X" in One Box Only)**    ☐ SAN FRANCISCO/OAKLAND    ☒ SAN JOSE    ☐ EUREKA-MCKINLEYVILLE

| DATE | 12/09/2020 | SIGNATURE OF ATTORNEY OF RECORD | /s/ Tina Wolfson |
|---|---|---|---|

# EXHIBIT 2

HAGENS BERMAN SOBOL SHAPIRO LLP
STEVE W. BERMAN
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
E-mail:   steve@hbsslaw.com

Counsel for Plaintiff
[Additional Counsel Listed in Signature Block]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| **RACHEL BANKS KUPCHO**, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> **FACEBOOK, INC.**, a Delaware corporation headquartered in California, <br><br> Defendant. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> **(1)   MONOPOLIZATION OF SOCIAL NETWORK MARKET** <br> Violation of the Sherman Act <br> (15 U.S.C. § 2) <br><br> **(2)   ATTEMPTED MONOPOLIZATION OF SOCIAL NETWORK MARKET** <br> Violation of the Sherman Act <br> (15 U.S.C. § 2) <br><br> **(3)   MONOPOLIZATION OF SOCIAL MEDIA MARKET** <br> Violation of the Sherman Act <br> (15 U.S.C. § 2) <br><br> **(4)   ATTEMPTED MONOPOLIZATION OF SOCIAL MEDIA MARKET** <br> Violation of the Sherman Act <br> (15 U.S.C. § 2) <br><br> **(5)   UNJUST ENRICHMENT** <br><br> **(6)   VIOLATION OF UNFAIR COMPETITION ACT** <br><br> **(7)   VIOLATION OF THE CARTWRIGHT ACT** <br><br> **DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

SUMMARY OF THE ACTION ..........................................................................1

PARTIES .......................................................................................................6

    Plaintiff .....................................................................................................6

    Defendant ..................................................................................................7

JURISDICTION, VENUE, AND CHOICE OF LAW ....................................8

INTRADISTRICT ASSIGNMENT ................................................................9

FACTUAL ALLEGATIONS .........................................................................10

    General Background on the Social Media Industry .................................10

    General Background on Facebook .............................................................12

    Facebook is Dominant in the Social Network and Social Media Relevant Markets. ........16

        The Social Network Market.............................................................16

        The Social Media Market.................................................................23

        Relevant Geographic Market ..........................................................27

        The Social Network and Social Media Markets Feature High Entry Barriers..........................27

    Facebook Has Attempted to Acquire Market Power (and Has Succeeded in Acquiring Market Power) by Deceiving Consumers about Its Privacy Practices. ..........33

    The Cambridge Analytica Scandal Partially Reveals the Extent of Facebook's Deception. ..........45

    Facebook is Attempting to Use (and Has Successfully Used) Anticompetitive Acquisitions and Threats to Destroy Competition in the Social Network and Social Media Markets. ..........49

        Facebook's Tracking of Consumers' Personal Data Allowed it to Identify Competitors and then Eliminate Them Through a Strategy of Copy, Acquire, or Kill. ..........50

        Facebook Threatened Competitors with Discriminatory Practices to Help Drive its Anticompetitive Acquisition Strategy..........53

Instagram.................................................................59

Snapchat................................................................62

WhatsApp ...............................................................65

Other Examples of Facebook's "Copy, Acquire, Kill" Strategy ..........................66

Facebook's Use of Onavo Comes to Light. ............................................67

Facebook's Anticompetitive Practices Have Harmed and Continue to Harm
Competition in the Social Network and Social Media Markets. .........................69

Facebook's Anticompetitive Conduct Has Damaged Consumers in Direct and
Quantifiable Ways. .....................................................71

ACCRUAL OF CLAIM, EQUITABLE TOLLING, FRAUDULENT CONCEALMENT,
CONTINUING VIOLATION, AND ASCERTAINMENT OF DAMAGES .................73

CLASS ACTION ALLEGATIONS ................................................78

INTERSTATE TRADE AND COMMERCE ...........................................81

CLAIMS FOR RELIEF .......................................................82

SECOND CLAIM FOR RELIEF: .................................................85

THIRD CLAIM FOR RELIEF: ..................................................86

FOURTH CLAIM FOR RELIEF: ................................................89

FIFTH CLAIM FOR RELIEF: ..................................................90

SIXTH CLAIM FOR RELIEF....................................................92

SEVENTH CLAIM FOR RELIEF .................................................95

PRAYER FOR RELIEF .......................................................96

JURY DEMAND ............................................................97

1.      Plaintiff hereby brings this action against Defendant Facebook, Inc. ("Facebook"), individually and on behalf of a class of similarly situated persons, and alleges as follows:

**SUMMARY OF THE ACTION**

2.      Facebook operates a website (www.facebook.com) and smartphone application ("app") that allow Facebook users to connect with "friends."  With over 2.7 billion monthly active users, Facebook is the most popular social network worldwide. In the United States, Facebook accounts for over 45 percent of monthly social media visits. Moreover, Facebook Messenger, a standalone chat app in 2011, is one of the most popular mobile messenger apps worldwide.

3.      Users do not pay a cash price to use Facebook. Instead, users exchange their time, attention, and personal data for access to Facebook's services and this allows Facebook to profit greatly. Facebook's source of profit is from selling ads –indeed in 2019 alone, Facebook collected $70.7 billion in revenue, almost entirely from allowing companies to serve targeted ads to its users.

4.      For almost a decade, Facebook has had monopoly power in the personal social networking market in the United States. Facebook illegally maintains this monopoly power by deploying a buy-or-bury strategy that thwarts competition and harms both users and advertisers.

5.      Facebook's illegal course of conduct has been driven, in part, by fear that the company has fallen behind in important new segments and that emerging firms were "building networks that were competitive with" Facebook's and could be "very disruptive to" the company's dominance. As Facebook's founder and CEO, Mark Zuckerberg observed, "[o]ne thing about startups . . . is you can often acquire them," indicating at other times that such acquisitions would enable Facebook to "build a competitive moat" or "neutralize a competitor." Zuckerberg recognized early that even when these companies were not inclined to sell, if Facebook offered a "high enough price . . . they'd have to consider it."

6.      Facebook has coupled its acquisition strategy with exclusionary tactics that snuffed out competition.  As a result, Facebook has chilled innovation, deterred investment, and forestalled competition in the markets in which it operates, and it continues to do so.

7.      Facebook's unlawfully maintained monopoly power gives it wide latitude to set the terms for how its users' private information is collected, used, and protected. In addition, because Facebook decides how and whether the content shared by users is displayed to other users, Facebook's monopoly gives it significant control over how users engage with their closest connections and what content users see when they do. Because Facebook users essentially have nowhere else to go for this important service, the company is able to make decisions about how and whether to display content on the platform, and it can use the personal information it collects from users solely to further its business interests, free from competitive constraints, even where those choices conflict with the interests and preferences of Facebook users.

8.      Facebook also uses its popularity and control it gained by consistently and intentionally deceiving its users about the data privacy protections it provided to its users to push this buy-or-bury business plan.  Facebook exploited the rich data it deceptively extracted from its users to identify emerging competitors and then "acquire, copy, or kill" these firms.  Rather than competing on the merits, Facebook used the valuable consumer data that it was harvesting to identify incipient competitors with the most likely path to meaningful market share gains. Equipped with the valuable user data it led its users to believe it was not gathering and would not use in this way, Facebook targeted its users' preferred alternatives for destruction.  Facebook made clear that it would copy incipient competitors' innovations and discriminatorily shut off these firms' access to Facebook's valuable user data if they did not sell their businesses to Facebook first. The message to its competitors was explicit: sell at a bargain, or Facebook will go into "destroy mode." All of this was enabled by Facebook's deception.

9.      Facebook's anticompetitive campaign to forestall competing services that might threaten its dominance in personal social networking services includes a variety of tactics. Facebook has intensively monitored the growth of scores of applications (or "apps") and purchased those it believed might threaten its monopoly power, sometimes snatching them from other firms in whose hands the acquired firms might flourish and become challengers to Facebook's dominant personal social networking service.

10.      Two of Facebook's largest acquisitions, the mobile social photo app Instagram and the mobile messaging service WhatsApp, each posed a unique and dire threat to Facebook's monopoly. Each had enormous and rapidly growing user networks, and each was well positioned to encroach on Facebook's dominant market position. Facebook kept both services running after the acquisitions to fill the void, so they would not be replaced by another app with the potential to erode Facebook's dominance.

11.      While Facebook's scheme—bolstered by its deception and its serial acquisitions— has allowed Facebook to evolve since Mark Zuckerberg founded the company in 2004, the economic relationship between Facebook and its users has not.  When users sign up for a Facebook account, they must agree to certain terms. Those terms lay out the economic exchange between Facebook and its users.  Facebook's users give their personal data about themselves; Facebook allows users to access its social media network and pledges to protect users' privacy. Facebook's current Terms of Service state:

> *Instead of paying* to use Facebook and the other products and services we offer, by using the Facebook Products covered by these Terms, *you agree* that we can show you ads that businesses and organizations pay us to promote on and off the Facebook Company Products. *We use your personal data, such as information about your activity and interests, to show you ads that are more relevant to you*.[1]

---

[1] *Facebook Terms of Service*, https://www.facebook.com/terms.php (last accessed December 11, 2020).

Notably, Facebook suggests to the user (even to this day) that the extent to which it utilizes their data is limited, and that the extent of the data collection is limited to Facebook's services themselves.

12.    The Terms of Service further state that "In exchange [for access to Facebook's services] we need you to make [certain] commitments." Among those "commitments" is "[p]ermission to use your name, profile picture, and information about your actions with ads and sponsored content." The Terms then state that protecting user "privacy is central to how [Facebook has] designed [its] ad system." In other words, users give up personal information and agree to receive targeted advertisements on the Facebook platform in exchange for access to Facebook's social media network and for a commitment from Facebook to protect user privacy. They do not agree to anything beyond that.

13.    Facebook derives enormous economic value from the data it harvests from users on its platform. A recent majority staff report from the United States House of Representatives Antitrust Subcommittee explained that "[o]nline platforms rarely charge consumers a monetary price—products appear to be 'free' *but are monetized through people's attention or with their data*."[2] The same House Report recognizes the monstrous monetary value that Facebook reaps from the data that it extracts from its users.[3]

14.    In fact, Facebook itself touts the economic value of the data it harvests from users. For example, Facebook describes its massive advertising earnings in terms of average revenue

---

[2] *See Investigation of Competition in Digital Markets*, Majority Staff Report and Recommendations ("House Report"), Subcommittee on Antitrust, Commercial, and Administrative Law of the Committee on the Judiciary, at 18 (emphasis added), October 6, 2020, available at https://kl.link/3jGISfK.

[3] *Id.* at 18.

per user ("ARPU") in its public filings.  For 2019, Facebook's ARPU was over $41 per user in the United States and Canada.[4]

15.    Facebook's weaponization of user data and its strategy to "acquire, copy, or kill" competitors has been wildly successful at the expense of users.  Facebook's anticompetitive scheme has lessened, if not eliminated, competition and harmed users.

16.    Facebook's destruction of competition has caused consumers to suffer substantial economic injury. Consumers give up something of material value when agreeing to Facebook's Terms of Service: their personal information and their attention.  User information and attention is then sold in measurable units to advertisers in exchange for money.  Consumers thus give up valuable consideration in using Facebook pursuant to Facebook's Terms of Service.  As Facebook's co-founder explained, "[Facebook] is not actually free, and it certainly isn't harmless. . . . We pay for Facebook with our data and our attention, and by either measure it doesn't come cheap."[5]

17.    Absent Facebook's anticompetitive scheme, fair competition would have required Facebook to provide consumers greater value in return for consumers' data, but Facebook instead took that data without providing adequate compensation to its users (*i.e.,* the members of the putative class in this action). That constitutes antitrust injury. Through its deception and the acquisitions enabled by its deception, Facebook prevented competition on the merits, and as a result of that reduction in competition, users received less value for their data than they would have received in some form absent the reduction.

---

[4] *Facebook Q4 2019 Results* at 4, available at https://kl.link/36yIY5J.

[5] Chris Hughes, *It's Time to Break Up Facebook*, NY Times, May 9, 2019, available at https://kl.link/3dUTshC.

18.     Facebook's acquisition and maintenance of monopoly power continues to harm consumers.  Prior to Facebook's consolidation of the Social Network and Social Media Markets, a number of firms vigorously competed to win over consumers by offering competing products which differed in non-price attributes such as quality.  For instance, early social media companies, including Facebook, competed for market share by offering competing products to consumers that highlighted particular privacy features.  Absent Facebook's anticompetitive scheme, which has allowed Facebook to place consumers under its monopolistic thumb, competition from Facebook's rivals would require Facebook to offer products of quality superior to those it thrusts upon consumers today.  Instead, Facebook's anticompetitive conduct has allowed Facebook to artificially stifle innovation and deprive consumers of any meaningful alternative to Facebook's social media empire.  As such, consumers are faced with a "take it or leave it choice" that provides no choice at all: accept a Facebook of lesser quality or forgo use of the only social media platform used by most consumers' friends and family members.

19.     Facebook's monopolistic conduct violates the antitrust laws and harms consumers. Facebook is dominant in the Social Network Market and the Social Media Market, and has engaged in predatory and exclusionary conduct in order to monopolize, causing Plaintiff and Class members to suffer substantial economic injury as a result of Facebook's competition-reducing violations of law.  This action seeks recovery for consumers' losses and Facebook's unlawful gains, and it seeks other appropriate equitable relief to prevent Facebook from continuing to destroy competition and harm consumers.

**PARTIES**

*Plaintiff*

20.     Plaintiff Rachel Banks Kupcho is a natural person and citizen of the State of Minnesota and a resident of Hennepin County. Plaintiff Banks Kupcho created a Facebook

account in approximately 2008, maintains an active account, and regularly uses Facebook. Plaintiff Banks Kupcho actively uses her Instagram account, Facebook's Messenger feature, and her WhatsApp account.

21.    Plaintiff Banks Kupcho cares about her online privacy and trusted Facebook to protect her privacy.  But since the Cambridge Analytica scandal broke in 2018 and exposed Facebook's lack of privacy protections and subpar data privacy practices, she now questions Facebook's ability and intent to protect her online privacy.  Plaintiff does not like the invasiveness of Facebook and its products.  Despite this, Plaintiff Banks Kupcho continues to use Facebook and its products because virtually everyone she knows uses them and there are no other suitable alternatives to connect with her friends and family and social justice issues that matter to her. Additionally, during the current pandemic, connection via social media is important to Plaintiff Banks Kupcho since she can no longer socialize with people face-to- face.

22.    Facebook lied and mislead its users about its data privacy practices and the scope of the data it collected and made available to third parties.  If Plaintiff Banks Kupcho had known the truth about Facebook's privacy practices years ago, she would not have agreed to give Facebook such all-encompassing access to her personal data.

*Defendant*

23.    Defendant Facebook, founded by Mark Zuckerberg in 2003, is a Delaware corporation with its principal place of business located in Menlo Park, California, where it owns and leases 3 million square feet of office buildings and 130 acres of land for future expansion.

24.    Facebook is a social media company that provides online services to more than 3.14 billion users.  Facebook owns and operates several business divisions, such as:

•    Facebook. Facebook's core social media application, which bears the company's name, is, according to Facebook's filings with shareholders, designed to enable

"people to connect, share, discover, and communicate with each other on mobile devices and personal computers." The Facebook core product contains a "News Feed" that displays an algorithmically ranked series of content and advertisements individualized for each person.

• <u>Instagram</u>. Instagram is a social media photo-sharing application that allows users to share photos, videos, and messages on mobile devices. Facebook acquired Instagram in April 2012.

• <u>Messenger</u>. Facebook's Messenger application is a multimedia messaging application, allowing messages that include photos and videos to be sent from person to person across platforms and devices.

• <u>WhatsApp</u>.  WhatsApp is a secure messaging application used by individuals and businesses.  Facebook acquired WhatsApp in 2014.

25.    In exchange for providing services, Facebook collects user data, which it allows advertisers to use for targeted advertising to Facebook users.  Facebook's principal revenue is from targeted social media advertising that it provides to advertisers as a data broker.  In 2019, Facebook collected $70.7 billion in revenue, almost entirely from allowing companies to serve ads to its users.

26.    Facebook has over 50,000 employees and offices worldwide.

### JURISDICTION, VENUE, AND CHOICE OF LAW

27.    This action arises under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and Section 4 of the Clayton Act, 15 U.S.C. § 15.  The action seeks to recover treble damages or disgorgement of profits, interest, costs of suit, equitable relief, and reasonable attorneys' fees for damages to Plaintiff and members of the Class resulting from Defendant's restraints of trade and monopolization of the Social Network and Social Media Markets described herein.

28.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1332 (class action diversity jurisdiction), and 1337(a) (antitrust); and under 15 U.S.C. § 15 (antitrust).  The Court also has subject matter jurisdiction over the state-law unjust enrichment claims presented in this action under 28 U.S.C. 1367 (supplemental jurisdiction).

29.     This Court has personal jurisdiction over Facebook because it is subject to general jurisdiction in the State of California, where it maintains its headquarters and its principal place of business, and Facebook's Terms provide that consumers must bring these claims in this Court. The scheme to monopolize alleged in this Complaint caused injury to persons throughout the United States, including in this District.  Moreover, Facebook also conducted substantial business from which the claims in this case arise in California and has agreed to personal jurisdiction in this Court.

30.     Venue is appropriate in this District under 15 U.S.C. § 15(a) (Clayton Act), 15 U.S.C. § 22 (nationwide venue for antitrust matters), and 28 U.S.C. § 1391(b) (general venue provision).  Facebook transacts business within this District, and it transacts its affairs and carries out interstate trade and commerce, in substantial part, in this District.

31.     Facebook's "Terms of Service" provide that "the laws of the State of California," which includes the federal antitrust laws, govern the Terms and "any claim" between Facebook and its users.[6]

**INTRADISTRICT ASSIGNMENT**

32.     Under Civil Local Rule 3-2(c) and (e), this action is properly assigned to the San Jose Division of this District because Facebook is headquartered here, and a substantial part of the events or omissions that give rise to the claim occurred in San Mateo County.

---

[6] *Facebook Terms of Service*, https://www.facebook.com/terms.php (last accessed: December 11, 2020).

<br>

**FACTUAL ALLEGATIONS**

*General Background on the Social Media Industry*

33.     At a high level, the various participants in the social media industry include the following: social media platforms, consumers, advertisers, and content providers (which can be any of the previous three types of market participants, or can be third parties).

34.     Social media platforms provide social networking, messaging, and/or media tools to consumers "designed to engage people by facilitating sharing, creating, and communicating content and information online."[7]

35.     Social media platforms typically allow users on their networks to interact with people the users know, participate in "groups" which join users with a particular background or common interest, and display content through linear feeds.[8]  Facebook's social media platform—which allows users to interact with others, join and participate in groups, and displays content linearly—is pictured below:[9]

---

[7] House Report, *supra*, at 88.

[8] *Id.*

[9] *See* Kessica Guynn, *Facebook is making a big change to your news feed*, USA TODAY, Jan. 11, 2018, available at https://www.usatoday.com/story/tech/2018/01/11/facebook-newsfeed-big-change/1023331001/ (last accessed December 11, 2020).



36.     A common feature of the social media industry is that social media platforms typically offer their services to consumers for non-cash consideration.[10]  In consideration for providing this service, social media platforms obtain valuable personal data from their users. The extent of the information obtained from users varies by social media platform, as does the disclosures about what data is obtained and the use(s) to which it is subsequently put.

37.     Social media platforms monetize the data they obtain from users by selling the data to third parties.  As an example, advertisers often pay social media platforms for certain aspects of the platform's user data, in order to learn more about the demographics that are most interested in certain products.  Advertisers, product manufacturers, and service providers also often pay a social media platform to direct curated ads specifically towards particular user segments.  Similarly, application developers ("app developers") purchase users' data from social media platforms to attract users that, in turn, brings profit to the developers in the forms of application purchases and ad-revenue.

_____

[10] House Report, *supra*, at 88.

1

*General Background on Facebook*

2     38.     Facebook's core offering to consumers is access to its social media network,

3 which contains the individualized profiles of well over 200 million users in the United States and

4 billions of users worldwide.  In exchange for access to the only social media network that allows

5 consumers to connect online with most of their family, friends, and acquaintances, Facebook

6 requires users to provide their personal data and receive targeted advertisements.

7     39.     The personal data and user attention that Facebook obtains from consumers in this

8 exchange is not just the users' consideration paid to use Facebook products; they are what

9 provides significant monetary value to Facebook's enterprise.  Facebook uses the data obtained

10 from its massive user base to generate its largest source of income: selling targeted

11 advertisements to its users.

12     40.     Facebook's machine learning algorithms mine patterns in the data for advertisers,

13 which allows advertisers to reach precisely the right audience to convert into sales, user signups,

14

15 or the generation of sales leads.  To protect its exclusive control over user data and attention,

16 Facebook has brought legal action against actors that have copied publicly available user data

17 and made it available outside of Facebook.[11]

18

19     41.     The data is also monetized by commercializing access—for example, by

20 providing application developers, content generators, and advertisers with direct access to the

21 information embedded in Facebook's network, such as the interconnection between users, user

22 attributes, and user behavior.  That data can then be mined by these third parties.

23     42.     From the beginning, Facebook has sought to entice consumers based on its

24 supposed commitment to maintaining the privacy of its users' data. Unlike earlier competing

25

26

27     [11] Facebook brought one such suit as recently as November 19, 2020.  *See* Jessica Romero, *Combating Clone Sites*, Facebook Newsroom, Nov. 19, 2020, available at https://about.fb.com/news/2020/11/combating-clone-sites/ (last accessed December 11, 2020).

28

CLASS ACTION COMPLAINT
12

social media platforms that allowed anyone interested to join anonymously or by using unverified usernames, Facebook required that those interested in joining to use their real-world identities.

43.     This qualitative distinction had clear privacy implications.  Ironically, early platforms that allowed users to register anonymously or with pseudonyms caused more privacy problems for users because wrongdoers that obtained and/or used fellow users' personal information could hide behind their online (anonymous or unverified) identities.

44.     In contrast, Facebook claimed that it created a level of accountability, because users ostensibly knew who was on the other side of the screen from them and were connected to them in some way in real life.  Indeed, Facebook's website "was one of the first social networks where users actually identified themselves using their real names."[12]  By making users "real," Facebook claimed (and users agreed by voting with their feet) that their social interactions online were better protected and more meaningful.  But all of this required Facebook to promise privacy protection in order to induce users to provide their real-world identities and data.

45.     Prior to founding Facebook, Mark Zuckerberg learned the importance of privacy to consumer preference early on. While a student at Harvard University, Mr. Zuckerberg created "Facemash," which "juxtaposed the pictures of two random Harvard undergraduates and asked users to judge their physical attractiveness."[13]  Notably, Facemash obtained the students' photos without their permission, "dr[a]w[ing] the ire of students and administrators alike[.]"[14]  While

---

[12] *See* John Gallaugher, Getting the Most Out of Information Systems § 8.3, available at https://kl.link/3dX3BKN (last accessed December 11, 2020).

[13] Alan J. Tabak, *Hundreds Register for New Facebook Website*, The Harvard Crimson (Feb. 9, 2004), available at https://www.thecrimson.com/article/2004/2/9/hundreds-register-for-new-facebook-website/ (last accessed Dec. 11, 2020).

[14] *Id.*

CLASS ACTION COMPLAINT
13

1   promoting "thefacebook.com," Facebook's predecessor, Zuckerberg vowed that he had learned

2   from his experience with Facemash, building into "thefacebook.com" "intensive privacy

3   options," which "he hoped would help to restore his reputation[.]"[15]  In reality,

4   thefacebook.com's—and later Facebook's—representations regarding privacy were part of an

5   orchestrated scheme, designed to secure and prolong its monopoly status.

6         46.    At first, Facebook was closed to all but those users who could validate their own

7   real-world identities, such as by verifying that he or she was legitimate via an e-mail address

8   issued by an organization, such as a university or a firm:[16]

9
       It was this "realness" that became Facebook's distinguishing feature—bringing
10     along with it – and also depending on – a perceived degree of safety and comfort
       that enabled Facebook to become a true social utility and build out a solid social
11     graph consisting of verified relationships.  Since "friending" (which is a link
       between nodes in the social graph) required both users to approve the relationship,
12     the network fostered an incredible amount of trust. Today, many Facebook users
       post their cell phone numbers and their birthdays, offer personal photos, and
13     otherwise share information they'd never do outside their circle of friends.

14        47.    The data Facebook has since collected derives much of its value from the ability

15  to identify Facebook's users by their real-world identity.  Other platforms, such as Twitter, have

16  only loosely enforced identity rules, and have never required users to disclose granular details

17  about themselves.

18        48.    Facebook characterizes each user's disclosure of his or her identity as increasing

19  the value of the experience for all users, who are purportedly able to benefit from others'

20  disclosures by connecting with and following the activities of their real-world connections.[17]

21

22

23

24     [15] Id.

25     [16] Gallaugher, supra, § 8.3.

26     [17] Apple's Senior Director for Global Privacy recently expressed skepticism that social media
    platforms such as Facebook encourage disclosure of personal information solely to create a
27  richer "personalized experience" for other users. See Apple Privacy Letter, November 19, 2020,
    available at https://kl.link/33bhK2Y ("What some companies call 'personalized experiences' are

28

Disclosure also increases the market value of the information Facebook obtains from its users. Knowing the internet habits of "YankeesFan123" is less valuable than knowing the browsing habits of a specific individual whose love of the Yankees can be linked with information about his shopping habits, income, family, friends, travel, dining, dating, and a myriad of other data points.

49.     In the years since its inception, Facebook has tracked trillions of data points about consumers with a powerful data structure that it calls the "social graph."  The social graph concept "refers to Facebook's ability to collect, express, and leverage the connections between the site's users, or as some describe it, 'the global mapping of everyone and how they're related.'"[18]  All of the data on Facebook can be thought of as a "node" or "endpoint" that is connected to other data on Facebook:

> You're connected to other users (your friends), photos about you are tagged, comments you've posted carry your name, you're a member of groups, you're connected to applications you've installed—Facebook links them all.[19]

50.     Given Facebook's size and reach, as well as the extent of its surreptitious user data collection (discussed further below) the social graph is a unique and uniquely valuable dataset, even among the giants of the tech world.  Much of this value stems from the fact that the majority of Facebook's social graph cannot be viewed by the public or search engines, and because it contains extraordinary amounts of data that users unwittingly provided Facebook regarding their most minute everyday habits.

---

often veiled attempts to gather as much data as possible about individuals, build extensive profiles on them, and then monetize those profiles.").

[18] Gallaugher, *supra*, (quoting A. Iskold, "Social Graph: Concepts and Issues," ReadWriteWeb, September 12, 2007).

[19] *Id.* (citing A. Zeichick, "How Facebook Works," Technology Review, July/August 2008).

51.     Facebook is a so-called "walled garden"—a closed ecosystem run by a single operator.  Advertisers must go through Facebook in order to reach Facebook users.  And Facebook can decide how much of its social graph it allows app developers, including competitors, to access.

52.     The personal data of Facebook's users takes many forms including data about the information users share on their personal profile pages, the photos and profiles users have viewed, what information users share with others, and even what users put in messages to other users. This granular data all allow targeted advertising on a scale that has never before existed. Facebook's platform allows advertisers to target Facebook's user base by their attributes and behavior. Third party advertisers have been able to use Facebook's advertising platform to track and target consumers all throughout the internet, even when Facebook users are "logged-out" of Facebook.

***Facebook is Dominant in the Social Network and Social Media Relevant Markets.***

53.     There are two relevant markets applicable to this dispute. They are: (1) "the Social Network Market"; and (2) "the Social Media Market." Facebook has unlawfully acquired and maintained monopoly power in both markets.

***The Social Network Market***

54.     The Social Network Market is the product market consisting of social networks, which are websites (and accompanying mobile applications) that: (1) facilitate users of a given network finding, interacting, and networking with other people either whom the users already know or to whom they are connected through others they already know online; and (2) provide users with additional substantive features beyond the ability to communicate with other users and share multimedia. As explained more fully below, the definitions of the Social Media and Social Network Markets are distinct, although Social Networks may offer Social Media platforms on

1    their networks (as Facebook, for example, does).[20]  To that extent, the Social Network Market is

2    a distinct part or sub-part of the Social Media Market.

3         55.    Search engines, such as Google, Yahoo, or Bing, are not "social networks"

4    because they do not provide for interaction between platform members.  Similarly, apps like

5    Apple's "iMessage," which simply allow the sharing of messaging media, such as emails or text

6    messages, are not social networks because, although they provide for interaction, they do so only

7    in a device-to-device manner and focus solely on delivering messages rather than facilitating a

8    broader online social experience.  Facebook itself has noted this distinction, explaining in

9    documents provided to the House Antitrust Subcommittee that whereas the growth of Apple's

10   iMessage is "limited by the adoption of iPhones, . . . Facebook's products can be used across

11   devices."[21]

12

13        56.    Still other types of online networks, such as LinkedIn, are not "social networks,"

14   as that term is defined in this complaint, because they are used for a different purpose, and are

15   used in parallel to—rather than instead of—Social Networks.  Whereas LinkedIn is typically

16   considered the dominant professional social network in the world, it is not a replacement for

17   Facebook.  This is because LinkedIn is used primarily for professional networking and

18   employment-seeking purposes, while Facebook and its like are used primarily for non-

19   professional, personal purposes.[22]  The European Commission explained this distinction during

20

21

22

23        [20] The House Antitrust Subcommittee has recognized the Social Network Market as a
     relevant market that is distinct from the broader Social Media Market. *See* House Report, *supra*,

24   at 90– 91.

25        [21] House Report, *supra*, at 136 n.752.

26        [22] Facebook has itself recognized this distinction in documents it provided to the House
     Antitrust Subcommittee. *See id.* at 133–34 n.733 ("Linkedin . . . coexist[s] in the US with similar

27   user bases but orthogonal graphs: Facebook connects friends and family, LinkedIn connects
     coworkers[.]").

28

its review of the Microsoft/LinkedIn merger: "the reasons for using a [professional service network] are different from those for using a personal social network. While the former is used to '*1.  Maintain professional identity, 2. Make useful contacts, 3. Search for opportunities, 4. Stay in touch*', the latter is used to '*1. Socialize, 2. Stay in touch, 3. Be entertained, 4. Kill time*'."[23]  Thus, users will have *both* a LinkedIn and Facebook account, not one or the other, and this other type of network is not viewed or treated as a substitute for a Social Network.[24]

57.     LinkedIn itself has recognized Social Networks are a distinct product.[25]  It has, for example, explained the differences between "personal networks" and "professional networks:[26]

---

[23] European Commission, *Case M.8124 – Microsoft/LinkedIn* (June 12, 2016) at ¶ 106, available at https://ec.europa.eu/competition/mergers/cases/decisions/m8124_1349_5.pdf (last accessed Dec. 11, 2020) (emphases in original).

[24] In addition to recognizing LinkedIn's distinct professional networking purpose, the House Antitrust Subcommittee's recent report also distinguished LinkedIn from social networks, like Facebook, on the basis of LinkedIn's economic model. Whereas users pay for social networks like Facebook with their data, time, and attention, some features of LinkedIn, such as "LinkedIn Premium," further require users to pay a monetary fee.  *See* House Report, *supra,* at 88.

[25] *See* LinkedIn, *The Mindset Divide* (Sept. 2012), available at https://business.linkedin.com/content/dam/business/marketing-solutions/global/en_US/site/pdf/wp/linkedin-marketing-solutions-mindset-divide.pdf (last accessed Dec. 11, 2020).

[26] *Id.* at 4.



58.     Similarly, LinkedIn has recognized the distinct content that Social Network users expect to see when visiting a given social network:[27]



59.     There are no reasonable substitutes for Social Networks.  Social Media platforms, such as YouTube and TikTok, primarily exist to allow users to stream, share, and view content.

---

[27] *Id.* at 6.

By contrast, firms in the Social Network Market provide users of a particular network an online community that brings together users who specifically choose to associate with one another. In addition, Social Networks, such as Facebook, provide a "rich social experience" to users through specific product features.[28] Social Media platforms, like YouTube and TikTok, do not provide or facilitate a similar use and instead offer only limited opportunities for social interaction, or interaction of a very different type that complements, rather than substitutes, for a social networking experience.

60.     Beyond the "rich social experience" that Social Networks provide to users, consumers also use Social Networks for different purposes than other online social options, such as Social Media platforms. The House Antitrust Subcommittee, Germany's Federal Cartel Office, and the United Kingdom's Competition and Markets Authority have all recognized that "the specific demand for social networks is fundamentally different from the demand for other social media."[29] That is because users utilize each for different purposes: Social Networks "facilitate their users finding, interacting, and networking with other people they already know online," whereas Social Media platforms "principally facilitate the distribution and consumption of content" between "users with a wide range of relationships to the person posting, including by strangers."[30] Thus, while a user might use YouTube to access and watch a complete stranger's video—such as a cooking recipe—the same user would use Facebook, not YouTube, to share *that* video with the user's friends, family, and real-world connections.[31] Similarly, a user that

---

[28] House Report, *supra*, at 91.

[29] *Id.* at 90.

[30] *Id.* at 91.

[31] *See* Administrative Proceedings, Bundeskartellamt, B6-22/16 ("German Federal Cartel Office Report") ¶ 312 (February 2019), available at https://kl.link/39AxErE ("YouTube is hardly ever used for other purposes (e.g. contacts to friends, messaging, looking for people the user knows, share contents")).

finds a funny video of a celebrity (or other stranger) on YouTube may choose to encourage their

friends and family to view that video by sharing it with them on Facebook with a note:[32]



61.   Additional factors make clear that Social Media platforms are used in parallel

to— rather than instead of—Social Networks.  For one, many consumers use both YouTube and

Facebook, rather than one over the other.[33]  Social Media platforms make it easy for a user to

share the content he or she finds on a Social Media platform using his or her Social Network

account.  By clicking the "SHARE" button that appears underneath a video on YouTube, for

example, YouTube pre-populates a hyperlink of the video that the user may then easily copy and

paste on Facebook:[34]

---

[32] Meira Gebel, *How to post a YouTube video on Facebook in several different ways, using YouTube's 'Share' feature*, Business Insider (Aug. 23, 2019), available at https://www.businessinsider.com/how-to-post-a-youtube-video-on-facebook (last accessed Dec. 11, 2020).

[33] Federal Cartel Office Report, *supra*, ¶ 318 (noting that "Facebook.com and YouTube are increasingly used in parallel," and that a "large number of [users utilize] YouTube without registration and thus solely for viewing videos.").

[34] Gebel, *supra*.



62.     There is both indirect and direct evidence of Facebook's market power in the Social Network Market.  Since its initial market entry, in which it competed with early social networking companies such as MySpace and Friendster (which subsequently shifted to a combined social network/social media strategy, same as Facebook), Facebook has become dominant.  As opposed to its defunct early competitors, Facebook has over 2.7 billion users worldwide, which is 42% of the global population (excluding China), including over 200 million users in the United States.

63.     As discussed more fully below, Facebook's market share in the Social Network Market is higher than its share in the Social Media Market.  Moreover, share of consumer time on social networks is an accurate measure of a given network's market share,[35] and more than 80% of the time that consumers in the United States spend using social networks is spent on Facebook and Instagram.[36]  In addition to this demonstrably high market share, Facebook has held this dominant share for years with high barriers to new entry (discussed further below).

---

[35] See Dina Srinivasan, *The Antitrust Case Against Facebook: A Monopolist's Journey Towards Pervasive Surveillance In Spite of Consumers' Preference for Privacy*, 16:1 Berkeley Bus. L. J. 39, 87 (2019).

[36] *Id.* at 88.

There is a reason a movie about Facebook is entitled, "*The* Social Network"; Facebook is now far and away the dominant player in that market.

### *The Social Media Market*

64.    The Social Media Market is the product market consisting of Social Media platforms and tools, which are websites and mobile applications that allow users of a given platform to communicate and deliver multimedia—such as text messages photos, videos, music, and internet links—to other users of the same platform.

65.    Firms in the Social Media Market require users to provide some amount of personal data in order to become members of those firms' platforms, which allows the user to utilize the platform's online services. Search engines, such as Google, Yahoo, or Bing, are not "social media" because they do not provide for interaction between platform members.[37]

66.    Other forms of social interaction and online entertainment are not reasonable substitutes for Social Media platforms because of the unique characteristics a Social Media platform provides, and because user behavior clearly indicates that Social Media platforms are complements to such other types of experiences and options. As an example, Social Media platforms allow users of a given platform to find, interact, and network with other people online. Other platforms, such as online videogame platforms—like Sony's PlayStation Network and Microsoft's Xbox Live—allow users to play videogames with each other online in real-time. While Social Media platforms and online videogame platforms both allow their users to communicate with other users of the same given service, those interactions take place in different contexts and for different purposes.

---

[37] Relatedly, the United States Department of Justice ("DOJ") recently recognized that search engines are not "social media" in its recent antitrust complaint against Google. *See United States, et al., v. Google LLC*, 1:20-cv-03010 (D.D.C.), Dkt. 1, ¶ 90 ("[P]latforms . . . are not reasonable substitutes for general search services.").

67.     Videogame platform users may communicate on a videogame platform with the users with whom they are playing a game to tell them "pass the ball." But that communication is simply to facilitate—and to complement—the videogame platform's intended purpose: providing entertainment through the playing of videogames.  By contrast, the central purpose of Social Media platforms *is* users interacting with each other and sharing aspects of their lives, both on- and offline, as part of the social media experience.[38]  Thus, a video game player seeking to convert their gaming into a Social Media experience would livestream that gaming via a separate Social Media platform, like Facebook Live or Twitch, which shows that users of videogame platforms themselves do not consider videogame platforms a reasonable substitute for their social media accounts.

68.     In addition, Social Media platforms offer an economic model that is distinct from the economic models employed by providers of other forms of social interaction and online entertainment.  Social Media platforms require users to provide some amount of personal data in order to become members, which allows the user to utilize a given platform's online services. By contrast, providers of social interaction and online entertainment may collect from users a per-use monetary fee or a regularly occurring (monthly or annual) fee, but users' personal data is otherwise largely irrelevant to the transaction.

69.     Facebook itself recognizes that Social Media is a distinct relevant market.  For example, in an internal presentation prepared for Sheryl Sandberg, Facebook's Chief Operating Officer, Facebook maintained that "[t]he industry consolidates as it matures" and that "Facebook is now 95% of all social media in the US[.]"[39]

---

[38] Germany's Federal Cartel Office has indicated that "entertainment only accounts for a small fraction of the applications for which Facebook.com is used." German Federal Cartel Office Report, *supra*, ¶ 312.

[39] House Report, *supra*, at 138.

70.     Direct evidence of Facebook's monopoly power in the Social Media Market is bountiful.  For example, in an internal presentation, Facebook noted that "[i]n every country we've tipped, we have maintained [market] penetration," and it expressed skepticism that other firms could compete with Facebook.[40]  Moreover, as detailed below, Facebook has the near-unfettered ability to exclude competition from the Social Media market, due to its unrivaled (although anticompetitively obtained) insight into Social Media users' data and behavior, and its surreptitious insights into nascent competitors, which it has ruthlessly acquired or destroyed. Facebook has also proven due to its ubiquity and stranglehold on Social Media that it can control prices for users—in this case, the amount of data it obtains about users without their consent (*i.e.*, the price users "pay" to use Facebook)—with impunity. With nowhere else to go for Social Media, users largely must accede to Facebook's outsized demands regarding access to, and use of, their data.

71.     In addition to direct evidence, there is also irrefutable indirect evidence of Facebook's market power in the Social Media Market, similar to the same evidence alleged above with respect to Facebook's power in the Social Network Market (which is re-alleged here with respect to its Social Media services, which overlap with and are made available on the same Social Network platform Facebook provides).  Facebook is by far the largest Social Media company.  In the United States, Facebook's products include three of the seven most popular mobile apps, measured by monthly active persons, reach, and percentage of daily and monthly active persons.[41]  Indeed, the House Antitrust Subcommittee's recent report revealed that "[a]ccording to Facebook's internal market data, its users spend significantly more time on its

---

[40] *Id.* at 139.

[41] *Id.* at 136.

family of products than on competing services."[42]

72.     Firms in the Social Media Market generate virtually all of their value to shareholders in the form of advertising revenue.  Social media companies allow advertisers to use data about a platform's users in order to deliver targeted advertisements to consumers.  In particular, Facebook's anticompetitive conduct over the years has enabled it to build a network that derives its power and value directly from those users' engagement with that network. The more data that consumers fed into Facebook's social graph by communicating and interacting with each other, posting their pictures, and publishing their content, the more valuable the Facebook network became to third parties, who could advertise to Facebook's users by targeting them using the very information they provided to Facebook's network.

73.     Facebook, Twitter, Snapchat, and other Social Media companies all compete for the attention and data of their users, which they then convert into revenue by selling advertising. Accordingly, one of the best available metrics of market share in the Social Media Market is advertising revenue.

74.     As measured by advertising revenue, Facebook (including Instagram) has over 85% of the U.S. market, with the second-place competitor, Twitter, claiming *less than 3.5%* market share.  Notably, one or more of Facebook services are considered a "must have" for most Social Media users, whereas other Social Media platforms are not.[43]  This means that most Social Media users that are members of competing Social Media platforms still have an account on a Facebook service (if not all of them), which further means that Facebook's advertising revenues are a conservative estimate of its already obviously-dominant market share.

---

[42] *Id.* at 137–38.

[43] Salvador Rodriguez, *TikTok passes Instagram as second-most popular social app for U.S. Teens*, CNBC (Oct. 6, 2020), available at https://www.cnbc.com/2020/10/06/tiktok-passes-instagram-as-second-most-popular-social-app-for-us-teens.html (last accessed Dec. 11, 2020).

*Relevant Geographic Market*

75.     The United States is the relevant geographic scope of both the Social Media Market and the Social Network Market.  Social media platforms each provide services to consumers throughout the United States, and these services do not differ by geographic area within the United States.  For example, neither Facebook nor competing social media platforms, such as YouTube, limit the offering of their services to residents of San Jose, California, as opposed to residents of Little Rock, Arkansas.  To the extent that Facebook has competitors in the United States in the Social Network Market, the same is true in the Social Network Market as well.

*The Social Network and Social Media Markets Feature High Entry Barriers*

76.     Facebook's monopoly is durable because it operates in an industry with strong network effects and high barriers to entry.[44]  A network effect is the phenomenon by which the value or utility a user derives from a good or service depends on the number of users of the same good or service.  Network effects may be either direct or indirect. Direct network effects arise where a product or service becomes more valuable to users as additional others use the product or service.  Indirect network effects exist when greater use of a product or service incentivizes third parties in a different customer group to also engage with that product or service.

77.     As an example of direct network effects, take, for instance, an instant messaging application.  Even if a messaging application has the very best encryption technology, superior look and feel, and is easy and intuitive to use, the product is worth comparatively little to a user if few other users have downloaded it.  Messaging is only valuable if you can send and receive messages with people of your choosing. The more users who download the application, the more valuable it becomes to each of them.  The Social Network and Social Media Markets exhibit

---

[44] *See* House Report at 37–45.

clear and obvious direct network effects: "no person wants to be on a social network without other users."[45]

78.   The powerful direct network effects inherent in the Social Network and Social Media Markets made competition at the early stages *for* the field rather than *within* the field.[46] The House Antitrust Subcommittee's recent report recognized this point as it relates to Facebook, explaining that Facebook's network effects are "very strong" and that "there are strong tipping points in the social networking market that create competition *for the market,* rather than competition within the market."[47] A similar phenomenon has since made itself clear in the Social Media market, such that even when users' preferences shift to non-Facebook options as their *favorite* (*e.g.*, TikTok or Snap), they still engage most often with Facebook's Social Media offerings (*e.g.*, Instagram) because it is the dominant, "must have" Social Media app.[48]

79.   The content generated by Facebook's user base reinforces also creates strong indirect network effects and, in turn, increases the value of the Facebook network to advertisers and Facebook itself.  With each photograph, relationship status, check-in, or post by a Facebook user, the Facebook network became more valuable, not just as a means of communicating with directly connected acquaintances, but as a means of learning about more remotely connected ones. This feedback loop enabled Facebook to use its anticompetitive strategy of consumer deception and monopolistic merger conduct to achieve a scale—bolstered by revenue from third

---

[45] *Id.* at 41.

[46] *Id.*

[47] *Id.* (emphasis added).

[48] Salvador Rodriguez, *TikTok passes Instagram as second-most popular social app for U.S. Teens*, CNBC (Oct. 6, 2020), available at https://www.cnbc.com/2020/10/06/tiktok-passes-instagram-as-second-most-popular-social-app-for-us-teens.html (last accessed Dec. 11, 2020).

parties such as advertisers and app developers that were drawn to Facebook—which substantially foreclosed competition in the Social Network and Social Media Markets.

80. As a result of this economic reality, markets that exhibit strong network effects tend to be "sticky," or accompanied by high switching costs. Once a significant number of users adopt a product, they will be reluctant to switch to even a superior competitive alternative, because the newer offering will not deliver as much value unless many other users make the switch simultaneously. This feature of network-effect markets produce a period of intense, early competition, after which a single, dominant player often becomes entrenched. Facebook itself suggested in an internal memorandum, with respect to social media platforms and networks, "either everyone uses them, or no-one uses them."[49] A fair and level playing field during the initial phase of early competition is thus crucial to maximize consumer welfare, as is a level playing field if a new type of social media platform arises that threatens to supplant the old.

81. Relatedly, high barriers to entry refer to fixed costs that a competitor must pay to enter a market that incumbent players need not incur. Switching costs impose a barrier to entry. To induce a user to adopt a new product in a market that has high switching costs, a competitor must incur not only the expense of building a superior product, but also the added compensation to defray a user's cost of switching. An incumbent does not incur this added cost, retaining a cost advantage that is at least equal to the switching cost the competitor must absorb. Where switching costs are high, the incumbent's competitive advantage is high as well.

82. High switching costs in the Social Network and Social Media Markets have allowed Facebook to prolong its monopoly. As an example, Facebook users may be connected to one another exclusively through Facebook's network, leaving Facebook as the only method for users to remain in contact with one another. Faced with the possibility of losing contact with

---

[49] House Report, *supra*, at 141.

1   each other, Facebook users who *would* switch to another social media platform or network may

2   choose not to do so because of these high switching costs.[50]

3       83.    Similarly, the lack of portability of Facebook users' data presents an additional

4   switching cost. To illustrate, "a user may upload a variety of data to Facebook, including photos

5   and personal information, but (by Facebook's design) may not be able to easily download the

6   data and move it to another social media site; instead, the user would have to start from scratch,

7   re- uploading her photos and re-entering her personal information to the new platform."[51]

8

9       84.    Facebook's tentacle-like grasp on other social apps likewise presents yet another

10  switching cost for consumers. For instance, users of the popular Spotify music streaming service

11  frequently sign up for Spotify using their Facebook accounts.[52] But users who enroll in Spotify

12  using their Facebook accounts "can't disconnect it"—to use Spotify after leaving Facebook,

13  users generally must set up new accounts on Spotify.[53] In doing so, they lose access to their

14  previous playlists, listening histories, connections with other users on Spotify, and other data.[54]

15  This discourages would-be defectors from ultimately leaving Facebook.

16

17      85.    Many monopolists who seek to deceive consumers and anticompetitively destroy

18  competitors can often be disciplined by market forces. A battery manufacturer, for example, that

19  lies about the longevity of its batteries might be able to charge an unjustified premium price for a

20  time. But as soon as the manufacturer's deception is uncovered, consumers would quickly

21  switch to a more fairly priced brand. However, the robust network effects present in the Social

22  Network and Social Media Markets impeded market forces from overcoming Facebook's market

23

24  _____

25      [50] Srinivasan, *supra*, at 89.

        [51] House Report, *supra*, at 42.

26      [52] *Id.* at 146.

27      [53] *Id.*

28      [54] *Id.*

CLASS ACTION COMPLAINT
30

power once Facebook had anticompetitively secured its dominance.  Consumers who discovered in 2018 that Facebook had not actually been protecting their privacy as it promised could not easily switch to an alternative, because their friends and connections were all on Facebook.

86.     In addition, the Social Network and Social Media Markets have high barriers to entry. Once a social media platform like Facebook has achieved dominant market share, the amount of capital investment that would be required to challenge Facebook's monopoly would be large. A potential competitor would not only have to build its own vast network with features Facebook does not offer, but would also have to pay users' switching costs on a massive scale.

87.     Coupled with the network effects and high barriers to entry in the Social Network and Social Media Markets, Facebook's anticompetitive conduct allows it to extract supracompetitive rents from users in the form of personal data and attention and deliver minimum, suboptimal privacy protections and overall quality.  Facebook has been able to reap supracompetitive profits from its anticompetitive conduct without the typical pressures of competition from existing competitors or new entrants.  And Facebook has been able to control and increase the amount of consumer information and attention that it demands.

88.     Internal documents show that Facebook has been keenly aware of these market features.  An internal memorandum prepared in October 2018 by a senior data scientist and economist at Facebook recognized that the network effects of Facebook and its products are "very strong."[55]  In a 2012 presentation, Facebook described its network effects as a "flywheel," remarking that "[n]etwork effects make it very difficult to compete with us" and that its network effects get "stronger every day."[56]  Similarly, Facebook's founder, Mark Zuckerberg, has made

---

[55] *Id.* at 13, 13 n.14.

[56] *Id.*

clear Facebook's recognitions that "[t]here are network effects around social products"; there are "a finite number of different social mechanics to invent" and "being first is how you build a brand and a network effect."[57]

89.    Tellingly, Facebook's own documents show its awareness that due to strong network effects and market tipping, Facebook is much less concerned with competition from other social apps in the market like Snapchat or Twitter, than from competition within Facebook's *own* family of products—Facebook, Instagram, Messenger, and WhatsApp.[58]  In the case of messaging apps, Facebook's documents show that network effects can be even more extreme. And because Facebook is not interoperable with other social networks, its users face high costs to switch to other platforms, locking them into Facebook's platform.

90.    Facebook's awareness of these features of the Social Network and Social Media Markets shaped its competitive strategy. For example, a senior executive at the company described its acquisition strategy as a "land grab," while Zuckerberg has boasted that Facebook "can likely always just buy any competitive startups."[59]  Documents show that Facebook saw Instagram and WhatsApp as maverick competitors and their acquisitions as a way to protect and strengthen the durability of Facebook's monopoly.[60]

91.    Facebook's anticompetitive conduct, described more fully below, combined with strong network effects and high barriers to entry, enabled it to obtain and maintain its monopoly over the Social Network and Social Media Markets in the United States. Indeed, the House Antitrust Subcommittee recently recognized that because of its anticompetitive conduct and

---

[57] *Id.* at 143.

[58] *Id.* at 384.

[59] *Id.* at 12–13.

[60] *See id.* at 149, 160.

strong network effects, "Facebook's monopoly power is firmly entrenched and unlikely to be eroded by competitive pressures from new entrants or existing firms."[61]

> ***Facebook Has Attempted to Acquire Market Power (and Has Succeeded in Acquiring Market Power) by Deceiving Consumers about Its Privacy Practices.***

92.     For years, Facebook has engaged in a pattern of deception about the amount of data it obtains and the extent of the data harvesting and use by third parties its platform has long enabled.  Its deception has only recently begun to come to light.

93.     Privacy practices were a crucial form of competition in the early days of the Social Network and Social Media Markets.  After its founding in 2003, Myspace quickly dominated the Social Network and Social Media Markets.  By 2006, MySpace supplanted Google as the most visited website in the United States.

94.     Notably, MySpace offered an "open" platform, allowing *all* interested users to join MySpace. Moreover, MySpace users could sign up for MySpace using unverified usernames and pseudonyms.

95.     By 2007, overwhelmingly negative headlines began drawing attention to MySpace's lax privacy practices.  In particular, users, parents, and critics alike attributed sexual assaults, suicides, and murders to MySpace, speculating that MySpace's open platform—which cloaked wrongdoers with relative anonymity, an added-level of covert protection—triggered these events.

96.     By this time, competitors to Myspace including Friendster, Orkut, Flip.com, Bebo, and Facebook had begun to emerge.

97.     Given MySpace's prominence in the Social Network and Social Media Markets, Facebook sought to differentiate itself from MySpace in order to entice users to join Facebook.

---

[61] *Id.* at 13.

Facebook initially distinguished itself on the basis of its strict privacy settings, including its closed-network approach. Importantly, Facebook promised users that it would disclose its "information and privacy practices" and that it would "not use cookies to collect private information from any user."[62]

98.     In 2006, some 250 million people around the world used a social media platform: 100 million used MySpace, 12 million used Facebook, and the remainder used a number of other competitors.[63]  In 2007, user growth at MySpace began to come to a halt—by mid-2007, Facebook had begun to supplant MySpace as the most visited social media platform in the United States.[64]

99.     Facebook's representations to consumers regarding its data policies were instrumental to Facebook's gaining market share at the expense of its rivals, including MySpace. A 2004 consumer survey revealed that a majority of Americans indicated that privacy was a "really important issue that [they] care about often."[65]  Another study focused on early Facebook users' attitudes towards privacy, finding that they cared more about privacy policy than about terrorism.[66]  Individuals in academia compared Facebook users' satisfaction with Facebook's privacy settings to MySpace users' satisfaction with MySpace's privacy settings, concluding that users typically preferred Facebook's settings over Myspace's.[67]

---

[62] Srinivasan, *supra*, at 39.

[63] *Id.* at 54.

[64] *Id.*

[65] *Id.* at 52 (brackets in original) (internal citation omitted).

[66] *Id.* (internal citation omitted).

[67] *Id.*

100.    Facebook itself recognized the importance that its supposed stringent privacy protections had in allowing Facebook to quickly amass dominance.  In a November 2011 post on Facebook, Zuckerberg explained:

> When I built the first version of Facebook, almost nobody I knew wanted a public page on the internet. That seemed scary. But as long as they could make their page private, they felt safe sharing with their friends on online. Control was key. With Facebook, for the first time, people had the tools they needed to do this. That's how Facebook became the world's biggest community online.[68]

101.    To this day, consumers continue to care deeply about privacy. That is why many companies market their commitment to privacy as a selling point for their products and services. Apple, for instance, tells the public that "Apple believes that privacy is a fundamental human right" and that "[w]e share your belief that customers should have control over their data."[69]

102.    Despite Facebook's representations about its superior data privacy practices, Facebook spent the next fifteen years deceiving consumers about the lackluster data privacy protections that it provided to users in exchange for their data.  When the scope of commercial surveillance, and the harvesting and use of user data, that Facebook's data-brokering practices enabled was first revealed in 2018, following news coverage about the Cambridge Analytica scandal, Facebook had already achieved a monopoly in the Social Network and Social Media Markets in the United States.

103.    Publicly, Facebook sought to differentiate itself by offering superior privacy protections.  But behind the scenes—and entrenched in a market which provided additional protections to Facebook's monopoly in the forms of powerful network effects, high switching costs, and other significant entry barriers—Facebook created a commercial surveillance

---

[68] Anita Balakrishnan, Matt Hunter, & Sara Salinas, *Mark Zuckerberg has been talking about privacy for 15 years – here's almost everything he's said*, CNBC News (Apr. 9, 2018), available at https://www.cnbc.com/2018/03/21/facebook-ceo-mark-zuckerbergs-statements-on-privacy-2003-2018.html (last accessed Dec. 11, 2020).

[69] Apple Privacy Letter, *supra*.

infrastructure that enabled it to dominate its competitors. This would not have been possible if Facebook had not deceived consumers about its data privacy and commercial surveillance practices.

104.    In 2006, Facebook introduced News Feed. The curated feed was intended as a central destination so users did not have to browse through friends' profiles for updates.  About one million users joined a "Facebook News Feed protest group," arguing the feature was too intrusive.[70]

105.    Facebook initially brushed off the criticism, but after continued outcry, it instituted what it claimed were enhanced privacy settings that purportedly allowed users greater ability to keep their activities private.[71]  For example, Facebook maintained that it would give users the options to block certain information—such as when a user removes profile information, posts on a Facebook Wall, comments on a photo, adds a friend, removes a relationship status, or leaves a group—from appearing on other users' News Feeds.[72]  In announcing these updates, Facebook publicly assured users that "industry-leading privacy restrictions . . . have made Facebook a trusted site for sharing information."[73]

106.    Despite claiming to provide users with enhanced privacy protections, however, Facebook increasingly made user content and information available to advertisers without disclosure to users. Facebook's unrelenting deception of its users allowed Facebook to continue

---

[70] Alyssa Newcomb, *Can You Even Remember How You Coped Before Facebook's News Feed?*, NBC News, Sept. 26, 2016, available at https://kl.link/2G1XF6Q (last accessed Dec. 11, 2020).

[71] *See* Facebook, *Facebook Launches Additional Privacy Controls for News Feed and Mini-Feed*, available at https://about.fb.com/news/2006/09/facebook-launches-additional-privacy-controls-for-news-feed-and-mini-feed (last accessed Dec. 11, 2020).

[72] *Id.*

[73] *Id.*

to amass market share in the Social Network and Social Media Markets.

107.    Beginning in 2007, Facebook gave app developers access to user content and information, encouraging them to build apps to stimulate user engagement.  Facebook paid these app developers not with cash, but with user content and data, including content marked private.[74] As Facebook attempted "to become the world's dominant social media service, it struck agreements allowing phone and other device makers access to vast amounts of its users' personal information."[75]

108.    Facebook did not disclose to its users the scope of the content and data that Facebook began providing to third parties at that early date, including user data marked "private." But Facebook explained to third-party app developers in May 2007 that Facebook's core value proposition and business model was "providing access to a new kind of data—social data, which enables you to build applications that are relevant to users." With respect to that social media data, Facebook told developers:  "You are on a level playing field with us. You can build robust apps, not just widgets.  Complete integration into the Facebook site."

109.    Also in 2007, under the guise of "social advertisement," Facebook introduced its "Beacon" product.  Beacon allowed participating third parties to track users' purchases outside Facebook and notify their Facebook friends.[76]  As an illustration, when a Facebook user rented a movie from Blockbuster, the user would immediately receive a "pop-up" notification from

---

[74] U.K. House of Commons, Digital, Culture, Media and Sport Committee, *Disinformation and 'Fake News': Final Report*, 2017-19, HC 1791, ("DCMS Report") (Feb. 14, 2019), at ¶ 103, available at https://kl.link/37MnyDf.

[75] Gabriel J.X. Dance, Nicholas Confessore, and Michael LaForgia, *Facebook Gave Device Makers Deep Access to Data on Users and Friends*, N.Y. Times, June 3, 2018, available at https://kl.link/2HwXIYP.

[76] Louise Story, *Facebook Is Marketing Your Brand Preferences (With Your Permission)*, N.Y. Times, Nov. 7, 2007, available at https://kl.link/34tuzXy.

Blockbuster requesting permission to share details regarding the user's movie rental with Facebook.[77]  Unless the user expressly declined permission by selecting the "No, Thanks" option, Facebook would receive information about the user's rental activity and publish that information on the user's Facebook page.[78]  An example of a Beacon pop-up request displayed to Facebook users on third-party sites is pictured below:[79]



110.    Many of Facebook's representations regarding its Beacon program were subsequently proven to be untrue.  Facebook initially maintained that Beacon only tracked and maintained the activity of users that consented when prompted by the pop-up seeking permission.[80]  In reality, however, Beacon allowed Facebook to track the activity of even those users that clicked the "No, Thanks" prompt.[81]

111.    The Federal Trade Commission ("FTC") expressed concern about Facebook's Beacon program, and public outrage and litigation ensued.[82]  Zuckerberg ultimately apologized, let users opt out, and called Beacon a mistake, the implication being that Facebook had learned

---

[77] Srinivasan, *supra*, at 56.

[78] *Id.*

[79] *Id.*

[80] *Id.* at 57.

[81] *Id.* at 58.

[82] *See id.* at 57–59.

its lesson and was now publicly reassuring users that it would not, in fact, use their data in unauthorized or intrusive ways.

112.   As of the third quarter of 2008, Facebook had around 100 million monthly active users worldwide.[83]  This placed it just behind MySpace, which had more than 110 million monthly active users.[84] Facebook passed MySpace in terms of monthly active users in the United States in 2009. MySpace never came close to Facebook again, although it continued to exist as a competitor through 2014.

113.   By 2010, bolstered as it was by its ostensible commitment to privacy, Facebook had become the largest social media company in the world and, unknown to nearly all of its users, had transitioned its entire business to selling social media data, which it did by selling access to developers and selling advertisements targeting Facebook's network of engaged and active users. In March 2010, it was reported that Facebook had booked revenues of up to $700 million in 2009 and was on track for $1.1 billion in 2010—almost all from advertising to its users.  Facebook had been roughly doubling its revenues every year up until that point—$150 million in 2007; nearly $300 million in 2008; and $700 million in 2009.

114.   In early 2010, Facebook launched its "Like" button, which is also referred to as a "Social Plugin." The "Like" button is a web plug-in that appears on a third party's website.  If a user supports or "likes" a particular piece of content on a third party's website—such as a particular news article—a number ticker besides the "Like" button increases by one. A preview of the content that the Facebook user "liked" on a third party's website may appear to the user's

---

[83] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/ (last accessed: Dec. 11, 2020).

[84] https://web-strategist.com/blog/2008/01/09/social-network-stats-facebook-myspace-reunion-jan-2008/ (last accessed: Dec. 11, 2020).

followers on Facebook in the user's News Feed, potentially drawing additional viewers to visit the third-party website after observing the previewed content in the user's News Feed. A version of Facebook's "Like" button that appears on third-party websites is pictured below:[85]



115.   Marketed as a way to share opinions, the Like button in reality enabled Facebook to obtain consumer data by tracking activity across the internet. At the time that Facebook launched its "Like" button, Facebook's "Frequently Asked Questions" page indicated that "No data is shared about you when you see a social plug-in on an external website."[86]   Independent researchers subsequently determined, however, that the presence of the "Like" button on third-party websites allowed Facebook to monitor users and obtain their data anytime users visited those third-party websites, even when users did *not* click the "Like" button.[87]

116.   Investigators soon uncovered this deception, and Facebook settled with the FTC to resolve the agency's charges that "Facebook deceived consumers by telling them they could keep their information on Facebook private, and then repeatedly allowing it to be shared and made public."[88]   Facebook's settlement with the FTC barred Facebook from making any further

[85] Ray C. Hse, *Introducing new Like and Share buttons*, Facebook for Developers News (Nov. 6, 2013), available at https://developers.facebook.com/blog/post/2013/11/06/introducing-new-like-and-share-buttons/ (last accessed Dec. 11, 2020).

[86] Declan McCullagh, *Facebook 'Like' button draws privacy scrutiny*, CNET (June 2, 2010), available at https://www.cnet.com/news/facebook-like-button-draws-privacy-scrutiny/ (last accessed Dec. 11, 2020).

[87] Srinivasan, *supra*, at 65–67.

[88] Press Release, Federal Trade Commission, Facebook Settles FTC Charges That It Deceived Consumers By Failing To Keep Privacy Promises, Nov. 29, 2011, available at https://www.ftc.gov/news-events/press-releases/2011/11/facebook-settles-ftc-charges-it-deceived-consumers-failing-keep (last accessed Dec. 11, 2020).

CLASS ACTION COMPLAINT
40

deceptive privacy claims, required Facebook to get consumers' approval before it changes the way it shared their data, and required Facebook to obtain periodic assessments of its privacy practices by independent, third-party auditors for the next 20 years.  In particular, under the settlement, Facebook was specifically:

> a)      barred from making misrepresentations about the privacy or security of consumers' personal information;

> b)      required to obtain consumers' affirmative express consent before enacting changes that override their privacy preferences;

> c)      required to prevent anyone from accessing a user's material more than 30 days after the user has deleted his or her account;

> d)      required to establish and maintain a comprehensive privacy program designed to address privacy risks associated with the development and management of new and existing products and services, and to protect the privacy and confidentiality of consumers' information; and

> e)      required, within 180 days, and every two years after that for the next 20 years, to obtain independent, third-party audits certifying that it has a privacy program in place that meets or exceeds the requirements of the FTC order, and to ensure that the privacy of consumers' information is protected.[89]

117.    As another example of the promises that Facebook made—but subsequently did not keep—regarding its privacy protections, Facebook announced in 2012 that future privacy changes would require user approval through voting.[90]  During a "privacy press conference,"

---

[89] *Id.*

[90] Eyder Peralta, *Facebook Will Allow Users to Vote On Privacy Changes*, NPR (June 1, 2012), available at https://www.npr.org/sections/thetwo-way/2012/06/01/154162976/facebook-will-allow-users-to-vote-on-privacy-changes (last accessed Dec. 11, 2020).

1   Facebook founder Mark Zuckerberg explained that Facebook is "one of the only services on the

2   web where people are sharing pretty personal and intimate information"; that requiring users'

3   approval for privacy changes "mak[es] it so that we can't just put in a new terms of service

4   without everyone's permission"; and that "[w]e think these changes will increase the bonding

5   and trust users place in the service."[91]  But consistent with its pattern of deception, Facebook

6   ultimately did not keep that commitment, choosing to end the process of requiring users'

7   approval for future privacy changes.[92]

8

9        118.    Facebook's continued promises regarding privacy negatively impacted potential

10  rivals—even those backed by the largest companies in the world—from ever gaining appreciable

11  market share.  In 2010, Google launched a new product, Google+. Google+ was Google's

12  attempt to build out a "social graph" that would leverage a common user identity across Google

13  products, including YouTube and Gmail.

14       119.    With Google+, Google sought to replicate the essential product features and

15  functionality of Facebook. The planned features for Google+ included a continuous scroll

16  product called the "stream"; a companion feature called "sparks," which related the "stream" to

17  users' individual interests; and a sharing app called "Circles" to share information with one's

18  friends, family, contacts, and the public at large.

19

20       120.    Google+ represented a massive investment of resources to bring a finished, full-

21  scale social-media network to market.  Google conscripted almost all of the company's products

22  to help build Google+.  At its peak, Google+ involved 1000 employees from divisions across the

23

24

25

26       [91] Srinivasan, *supra*, at 61–62.

27       [92] Dave Lee, *Facebook criticised over decision to stop public privacy votes*, BBC News
    (Nov. 22, 2012), available at https://www.bbc.com/news/technology-20444678 (last accessed
28  Dec. 11, 2020).

country.  Google even required employees to use the Google+ Hangouts video chat feature,
which was supposed to help drive adoption in the tech industry and beyond.

121.    Google's attempt to compete with Facebook, however, failed because it could not
attract the critical mass necessary to deliver a viable social network and therefore to overcome
the network-based switching costs Facebook enjoyed as a result of its deception.[93]  Indeed,
Germany's Federal Cartel Office has attributed Google+'s difficulty in competing with Facebook
to network effects, which Facebook had built and continued to enjoy due to its
misrepresentations regarding the privacy protections its users supposedly enjoyed.[94]
Accordingly, even though Google+ continued as a competitor until 2018, it was never able to
dethrone Facebook or even take appreciable market share away from Facebook, and all the while
Facebook continued to mislead users in order to prevent them from switching to a network that
offered similar features, but with better actual privacy practices.

122.    In fact, Facebook's deception about its data privacy practices and anticompetitive
string of acquisitions contributed to the rapid growth of Facebook's ever-increasing user base
and increased the value of Facebook's social graph.  As Facebook's VP of Product Management
explained to Mark Zuckerberg in an October 2012 email, the data that Facebook collects has
made Facebook progressively better at collecting and monetizing consumer data:  "We know
more about what people want to see because people look at more stuff on our platform. . . . the
more people that use the system, the more information we have on how to make more people use
the system."

---

[93] House Report, *supra*, at 89.

[94] *Id.* at 89 n. 460.

123.     Facebook went public in 2012.  In pursuit of revenue, Facebook began using "View Tags," which allow advertisers to track Facebook users across the Internet using cookies.[95] Facebook also gave advertisers the ability to conduct more fine-grained bidding for advertising and to advertise specifically to a "custom audience"—*i.e.*, a list of specific users provided by the advertiser.  Facebook did not disclose that its user data practices allowed third parties to track Facebook users across the internet using cookies.

124.     At the time of Facebook's 2012 IPO, its filings with the SEC indicated that the company had 845 million monthly active users and that its website featured 2.7 billion daily likes and comments.[96]

125.     Facebook later combined user content with other third-party data, thereby deanonymizing the third-party data.  For example, in April 2013, Facebook created information dossiers on millions of users and nonusers alike.  The dossiers included names, health information, information about neighbors, and proclivities.  Facebook did not disclose the dossiers to users (or even the fact of the dossiers' existence), using them instead to allow advertisers to target users with more precision.[97]  Users were unaware of the extent of Facebook's commercial surveillance and did not first begin to become aware until the news of the Cambridge Analytica scandal broke—in March 2018, the overwhelming majority of Facebook users incorrectly believed Facebook collected data only when logged in.[98]

---

[95] Rebecca Greenfield, *2012: The Year Facebook Finally Tried to Make Some Money*, The Atlantic, Dec. 14, 2012, available at https://kl.link/34qhxdd.

[96] Facebook's Form S-1 Registration Statement under the Securities Act of 1933, https://kl.link/2L9TgRD.

[97] Tim Peterson, Facebook Will Remove Advertisers' Other Third-Party Data Option, But Loopholes, Questions Remain, DigiDay, Apr. 6, 2018, available at https://kl.link/37Mprjj.

[98] Paul Hitlin & Lee Rainie, *Facebook Algorithms and Personal Data*, Pew Research Center (Jan. 16, 2019), available at https://kl.link/37EsidN.

126.     Facebook engaged in this continued pattern of deception with the specific intent to monopolize the Social Network and Social Media Markets and ultimately to maintain its monopoly.  Facebook succeeded in deceiving consumers long enough to solidify its market power in the Social Network and Social Media Markets.  By the time Facebook's deception about its lackluster data privacy practices was revealed in 2018—*i.e.*, the year Google+ left the market due to inability to grow—it had achieved unrivaled dominance.

### *The Cambridge Analytica Scandal Partially Reveals the Extent of Facebook's Deception.*

127.     It was not until the Cambridge Analytica scandal in 2018 that consumers began to fully discover the full scope and implications of Facebook's lax data privacy practices.  In particular, the scandal revealed that Facebook had been giving app developers the ability to harvest Facebook users' private data without the users' consent, and to use that data for purposes beyond targeted advertising on Facebook.

128.     Cambridge Analytica ("CA") was a British political consulting firm that combined data harvesting and analytics for use in political advertising. The app consisted of a series of questions that were used to build a psychological profile on users. The app harvested data not only from the app users' own apps, but also from the users' Facebook friends.

129.     CA's practices were uncovered in March 2018, when it was revealed that, based on the 270,000 Facebook users who used a CA app called "This Is Your Digital Life," CA was able to access the personal data of up to 87 *million* Facebook users. The vast majority of these users had not given CA permission to access their data.

130.     After the scandal broke, Facebook banned the app and claimed that CA had breached Facebook's terms of service.[99]  However, an investigation revealed that, as early as

---

[99] Kurt Wagner, Here's how Facebook allowed Cambridge Analytica to get data for 50 million users, Vox, Mar. 17, 2018, available at https://kl.link/2ToOFLZ.

April 2015, Facebook recognized that it was unable to keep track of how many app developers were using previously downloaded data.[100]  And Facebook's data permissions allowed apps to access data not only about an app user, but about all of the app user's friends.

131.     As early as at least 2010, Facebook allowed third parties to access the data of a Facebook user's friends, and this policy formed part of the basis for the FTC's 2011 complaint. In 2012, as part of its settlement with Facebook, the FTC ordered that Facebook "shall not misrepresent in any matter, expressly or by implication, the extent to which [Facebook] maintains the privacy or security of Covered Information, including . . . [Facebook's collection, use, or disclosure of any Covered Information[.]"  In 2015, in addition to Facebook's other earlier acts of deception, Facebook thereafter represented to users that it was ending the practice of allowing third parties to access the data of users' friends.  Contrary to Facebook's representation, however, and thus in breach of its 2012 settlement with the FTC, most third parties could continue to access this data until 2016.

132.     Even after 2016, and until at least 2018, Facebook still allowed some number of third parties to access the data of users' friends.  The DOJ expressly noted Facebook's falsehoods regarding its sharing of the data of its users' data in the DOJ's 2019 complaint against Facebook for Facebook's breach of its 2012 settlement agreement with the FTC.  *See United States, v. Facebook, Inc.*, 1:19-cv-02184 (D.D.C.), Dkt. 1, ¶¶ 5–9.  It was only after news of the Cambridge Analytica scandal broke that Facebook's continued deception regarding its sharing of the data of its users' friends began to come to light.  In its 2019 complaint against Facebook, the DOJ cautioned that "[t]he full scale of unauthorized collection, use, and disclosure of consumer

---

[100] Deepa Seetharaman and Kirsten Grind, *Facebook's Lax Data Policies Led to Cambridge Analytica Crisis*, N.Y. Times, March 20, 2018, available at https://kl.link/3jt8o86.

1   information resulting from Facebook's conduct is unknown due, at least in part, to the

2   company's lack of recordkeeping."  *Id.* ¶ 126.

3       133.    By this time in 2018, however, Facebook's social media monopoly was fully

4   entrenched with over 217 million users.  That year, Facebook earned over $55 billion in revenue,

5   almost completely from targeted advertising made more valuable to Facebook and third parties

6   due to a lack of meaningful data privacy protections.

7

8       134.    In September of 2019, Facebook said it suspended tens of thousands of apps for

9   improperly taking users' personal data and other transgressions, "a tacit admission that the scale

10  of its data privacy issues was far larger than it had previously acknowledged."[101]  Facebook

11  eventually disclosed that it had suspended 69,000 apps, and 10,000 of those apps were flagged

12  for potentially misappropriating personal data from Facebook users.[102]  The scale and scope of

13  Facebook's data privacy issues made clear that its lackluster data privacy protections were a

14  feature, not a bug, of Facebook's social network.

15

16      135.    On July 24, 2019, the FTC and the Department of Justice announced that

17  Facebook would pay a $5 billion penalty, and submit to new restrictions and a modified

18  corporate structure, to settle charges that the company had "deceiv[ed] users about their ability to

19  control the privacy of their personal information."[103]

20      136.    The largest penalty ever imposed by the FTC before that time was $275 million.

21  The FTC explained:

22

23      [101] Kate Kogner, Gabriel J.X. Dance, and Mike Isaac, *Facebook's Suspension of 'Tens of*

24  *Thousands' of Apps Reveals Wider Privacy Issues*, N.Y. Times, Sept. 20, 2019, available at
    https://kl.link/31JmImH.

25      [102] *See* Facebook, *An Update on Our App Developer Investigation*, Sept. 20, 2019, available

26  at https://kl.link/31FSVeP.

27      [103] Federal Trade Commission, FTC Imposes $5 Billion Penalty and Sweeping New Privacy
    Restrictions on Facebook, available at https://kl.link/34snVR0.

28

137.    "Facebook monetizes user information through targeted advertising, which generated most of the company's $55.8 billion in revenues in 2018. To encourage users to share information on its platform, Facebook promises users they can control the privacy of their information through Facebook's privacy settings."[104]

138.    "[But] Facebook repeatedly used deceptive disclosures and settings to undermine users' privacy preferences . . . . These tactics allowed the company to share users' personal information with third-party apps that were downloaded by the user's Facebook "friends." . . . In addition, the FTC alleges that Facebook took inadequate steps to deal with apps that it knew were violating its platform policies."[105]

139.    The FTC's 2019 charges made clear that Facebook had egregiously violated the FTC's 2012 order, described above, by repeatedly using deceptive disclosures and settings to undermine users' privacy preferences.

140.    Consumers had relied on Facebook's 2012 settlement with the FTC in deciding to continue to give Facebook access to their personal data in exchange for use of Facebook's platform.  But by the time consumers learned that Facebook had violated that settlement, they could not reasonably switch to a comparable social media platform. Facebook had already achieved monopoly power in the Social Network and Social Media Markets, and network effects, high barriers to entry, and immense switching costs made more likely that Facebook's monopoly would be maintained.  Although market forces can sometimes reign in companies who deceive users, the Social Network and Social Media Markets' unique features made it more difficult for the market to discipline Facebook for violating its commitments to consumers.

[104] *Id.*

[105] *Id.*

141.    Notwithstanding widespread outrage after the Cambridge Analytica scandal, the vast majority of Facebook users have continued to use Facebook and its family of products.  A consumer survey revealed that 58.1% of Facebook users did not change their behavior on Facebook at all, despite learning of the Cambridge Analytica scandal.[106]  Of the 41.9% of Facebook users that *did* change their behavior, only 9.6% deleted or deactivated their Facebook accounts:[107]

142.    The reason that the vast majority of Facebook users have continued to use Facebook and its products despite Facebook's complete and utter disregard for its users' data, as partially illuminated in the Cambridge Analytica scandal's aftermath, is clear.  As Facebook was keenly aware, a social network really only has value if users' friends use it too. And once a social network reaches critical mass, it wins in this market characterized by network effects and users generally no longer have a viable alternative to the social graph, "as there is no reason for users to start using a social network if there is no one there with whom they can connect."[108]  Thus, notwithstanding widespread outrage after the Cambridge Analytica scandal, few Facebook users stopped using Facebook, because there was no longer any other viable platform to use.

***Facebook is Attempting to Use (and Has Successfully Used) Anticompetitive Acquisitions and Threats to Destroy Competition in the Social Network and Social Media Markets.***

143.    While Facebook increased its market power through consumer deception about its data privacy practices, Facebook also sought to protect and expand its monopoly by regularly

---

[106] Julie Beck, *People Are Changing the Way They Use Social Media*, The Atlantic (June 7, 2018), available at https://kl.link/33K1aau (last accessed Dec. 11, 2020).

[107] *Id.*

[108] House Report, *supra*, at 89.

1    destroying and acquiring competitive threats, and it used its market power and data advantage to

2    anticompetitively achieve its monopolistic objectives.

3           144.    Since its founding in 2004, Facebook has acquired at least 63 companies,[109]

4    conduct that has only recently been revealed as distinctly anticompetitive in that (as has been

5    revealed in the last two years) Facebook used the data it deceptively obtained from users to

6    identify nascent competitors and then to target them for acquisition or destruction. These

7    anticompetitive acquisitions were enabled by and the result of Facebook's deception.

8

9                   ***Facebook's Tracking of Consumers' Personal Data Allowed it to Identify
                    Competitors and then Eliminate Them Through a Strategy of Copy, Acquire, or
10                  Kill.***

11          145.    Facebook used the data that it obtained from users to track the websites and apps

12   visited by its users—often without full disclosure—in order to identify which upstart competitors

13   were gaining traction so that it could target them for acquisition or destruction. Facebook "led a

14   sustained effort to surveil smaller competitors to benefit Facebook . . . steps taken to abuse data,

15   to harm competitors, and to shield Facebook from competition."[110]  In fact, Facebook

16   intentionally developed its ability to surveil users to aid its acquisition strategy, which has

17   continued from the point at which it first emerged as the largest Social Network through today.

18

19          146.    Historically, Facebook had used internal data and data from Comscore, a data

20   analytics and measurement firm, to track the growth of competitive threats.[111]  But Facebook's

21   efforts were only as good as that underlying data.  Accordingly, Facebook determined that by

22   securing more robust data from its users through increased surveillance, Facebook could better

23   remove future competitors from the social media chessboard.

24

25

26   _____

27   [109] *See id.* at 149.

     [110] *Id.* at 166.

28   [111] *Id.* at 160–66.

147.     Accordingly, in April 2012, Facebook's Director of Growth, Javier Olivan, emailed Zuckerberg and Chris Cox, Facebook's Chief Product Officer, about improving Facebook's "competitive research."  Olivan indicated that "getting our data in great shape is going to require effort," but that Facebook's building its own system for identifying competitive threats would "allow us to get 10x better at understanding" competitive threats to Facebook's dominance of mobile devices.[112]  Olivan explained:

> I keep seeing the same suspects (instagram, pinterest, …) [sic] both on our competitive radar / platform strategy as wins . . . I think having the exact data about their users [sic] engagement, value they derive from [Facebook] . . . would help us make more bold decisions on whether they are friends or foes. Back to your thread about "copying" vs. "innovating" we could also use this info to inspire our next moves.[113]

148.     Zuckerberg responded "Yeah, let's do it."  Underscoring the importance to Facebook of utilizing its users' data to identify competitive threats, Zuckerberg committed to "find[ing] some time periodically during my weekly reviews to go over this stuff."[114]

149.     In 2013, Facebook acquired Onavo, an Israeli mobile web analytics company that ran a virtual private network ("VPN"), for $115 million.  Prior to acquiring Onavo, Facebook had relied on Onavo's surveillance of Facebook's competitors for years, such as during the process of acquiring Instagram, and Facebook ultimately acquired and used Onavo's assets to track potential competitors through non-public, internal, real-time data about its users' engagement, usage, and time spent on other apps.[115]  Tellingly, at the time it acquired Onavo, Facebook did *not* intend to place Onavo's employees in Facebook's Data Analytics team.

---

[112] *Id.* at 161

[113] *Id.*

[114] *Id.*

[115] Betsy Morris and Deepa Seetharaman, *The New Copycats: How Facebook Squashes Competition From Startups*, Wall Street Journal, August 9, 2017, available at https://kl.link/3e6nMpW.

Instead, in acquiring Onavo, Facebook planned to place Onavo's employees, including its cofounder, Guy Rosen, under Facebook's Growth team, reporting to Javier Olivan.[116]

150.    To obtain extensive information on a user's usage of mobile applications and of bandwidth, Onavo cloaked its spyware in VPNs, data compression, and even in mobile privacy apps.  Onavo sold the mobile usage data it collected to Facebook, which in turn used the real-time information it received from Onavo to determine which mobile applications posed a threat to Facebook's dominance and to the substantial barriers to entry protecting Facebook from new entrants and competition.

151.    Facebook used Onavo's data to: (a) identify and target competitors from which Facebook could demand concessions; (b) identify and target competitors to whom Facebook would completely deny access to its platform; and (c) identify and target competitors that Facebook would remove from the competitive landscape entirely through acquisition.

152.    Facebook immediately began integrating Onavo's applications into both its business operations and its acquisition strategy.  Facebook, for example, began analyzing data secretly collected from Onavo's Protect software, which was a massive surveillance and data collection scheme disguised as VPN software.  Billed as a way to "keep you and your data safe," Onavo Protect in fact monitored all web and mobile application traffic on a user's mobile device.

153.    When an Onavo Protect user opened a mobile app or website, Onavo software secretly redirected the traffic to Facebook's servers, where the action was logged in a massive database.  Facebook product teams then analyzed the aggregated Onavo data to determine which apps and features people were using in real time, how frequently they used the apps, and for how long.  If the data in an app was not encrypted, this information was as specific as (for example)

---

[116] House Report, *supra*, at 161.

1    the number of photos the average user likes or posts in a week in that app.  By February 2018,

2    Onavo apps had been downloaded thirty-three million times across both iOS and Android.

3          154.    Facebook has used extensive surveillance of user behavior in order to identify and

4    target nascent competitive threats.  Using the data it obtained from Onavo and other sources,

5    Facebook then eliminated upstart competitors by demanding concessions in agreements, by

6    denying access to vital sources of data and information on Facebook's platform, or by

7    acquisition.  The technology Facebook obtained from Onavo and other data brokers allowed

8    Facebook to protect and further its market dominance. Some of the ways that Facebook exploited

9    users' data that Facebook obtained from Onavo or other sources to inform Facebook's

10   anticompetitive "copy, acquire, kill" strategy are detailed below.  Notably, however, the extent to

11   which Facebook used ill-gotten user data to pursue these strategies was not known until the last

12   two years.

13

14          ***Facebook Threatened Competitors with Discriminatory Practices to Help Drive
            its Anticompetitive Acquisition Strategy.***

15

16          155.    In addition to the surveillance Facebook conducted through Onavo, Facebook's

17   "copy, acquire, kill" strategy was also built on the company's willingness to use deceptively-

18   obtained user data to target key competitors by discriminatorily denying them access to the

19   "Facebook Platform." The Facebook Platform allows third parties to develop products that work

20   in conjunction with Facebook.  Zuckerberg has described Facebook Platform's purpose as

21   "mak[ing] Facebook into something of an operating system so you can run full applications[.]"[117]

22          156.    Over the last decade, Facebook has also used discriminatory access to its social

23   graph and selective enforcement of its Platform policies to prevent possible competitors from

24

25

26   _____

27        [117] David Kirkpatrick, *Facebook's plan to hook up the world*, CNN Money (May 29, 2007),
     available at https://money.cnn.com/2007/05/24/technology/facebook.fortune/ (last accessed
28   December 11, 2020).

emerging, continuing to harm consumers at every turn.  As Zuckerberg said regarding identified competitive threats: "I think the right solution here is to just be a lot stricter about enforcing our policies and identifying companies as competitors."[118]

157.    Facebook did exactly that, using supposed violations of Facebook's policies as a pretext to cut off social apps that had become too popular, like Vine, Stackla, Ark, and MessageMe.  Facebook cut off these social apps' access to Facebook's social graph because Facebook was fearful that continued access would allow these apps to launch their own competing services that would challenge any one of Facebook's ever-expanding cache of products.[119]  As an example, Facebook penalized Ark, a third-party app that Facebook users could use in conjunction with Facebook, for the manner in what Ark accessed data on Facebook.[120]  A former Facebook employee explained: "It seemed clear that leadership imposed [a] more severe punishment against Ark because Mr. Zuckerberg viewed Ark as competitive with Facebook, as Facebook was exploring an acquisition of Ark at the same time as it was being investigated for policy violations."[121]

158.    By the end of 2011 and the beginning of 2012, Facebook executives debated a plan to prevent third-party developers from building their own competing social media networks that might be capable of generating engagement and social media data independent of Facebook Platform.  Social media mobile applications, such as Line, WeChat, and Instagram were creating their own independent user bases and were becoming emerging competitive threats.

159.    Facebook's solution to address these potential competitors was a scheme to disrupt the growth of these applications by first attracting third-party app developers to build

---

[118] House Report, *supra,* at 167.

[119] *Id.* at 166.

[120] *Id.* at 169.

[121] *Id.*

applications for Facebook Platform and then ultimately remove their access to the application

programming interfaces ("APIs"), which removed those developers' access to the functionality

of Facebook's social media network as well as information about Facebook users' friends and

extended network, users' interactions with each other, and users' newsfeed posts. This API

access was the central value proposition of Facebook Platform.  If developers built apps that

enhanced the value of Facebook's social network, they would in return receive the benefits of

access to the functionality of Facebook's social media network, as well as to interconnections

and interactions among Facebook's users—Facebook's social graph.

160.    Facebook's shut off of API access deprived app developers of access to the APIs

that were most central to their applications, such as Facebook's "Friends" and "Timeline" APIs,

as well as other vital APIs, including those relating to messaging.  Facebook's identification of

competitive threats and removal of access to these APIs halted the growth of tens of thousands of

third-party applications that relied on these essential APIs and were, in Facebook's view,

threatening Facebook's monopoly by eroding the substantial barriers to entry that protected

Facebook's business.  Facebook's scheme prevented competitive third-party applications from

buying consumer data from Facebook, either through its platform APIs or through its advertising

platform.  As a Facebook executive explained in 2012, Facebook would "not allow things which

are at all competitive to 'buy' this data from us."

161.    In May 2012, Zuckerberg decided to use the threat of shutting off potential

competitors' access from Facebook Platform to extract social media user data.  He instructed

executives to demand "reciprocity" agreements from major competitors that used Facebook's

platform.  Facebook then began to block competitors from using its platform and thereby

obtaining access to Facebook's data about consumers. Competitors such as Twitter, Instagram,

Pinterest, and Foursquare were required to hand over their most valuable asset—their social

1   media data—to their rival Facebook in order to retain access to Facebook's APIs and advertising

2   platform.

3          162.   Facebook planned to block competitors from using its platform, thereby

4   preventing them from eroding the substantial barriers to entry and network effects that protected

5   Facebook's market power.  For the companies with social media network data that Facebook

6   needed to further extend its dominance, Facebook would coerce them into agreements to share

7   their most valuable social data with Facebook.  If they refused, Facebook would blacklist them

8   and take it from them anyway with its own crawling software that would scrape their public-

9   facing site for information.  What began as a negotiation strategy to extract social media data

10  from rivals became the foundation of Facebook's Platform strategy.  For competitors that posed

11  enough of a threat to create their own rival network, Facebook required them to hand over the

12  only leverage they had—the social media data they derived from their users' engagement.

13

14         163.   Facebook's willingness to copy and penalize competitors through discriminatory

15  access to its social graph also made it easier for Facebook to acquire competitors at a reduced

16  price. For example, during negotiations to acquire Instagram between Zuckerberg and Kevin

17  Systrom, Instagram's Chief Executive Officer, Zuckerberg tied Instagram's response to

18  Facebook's advances to Instagram's continued access to Facebook Platform and Facebook's

19  social graph:

20

21         At some point soon, you'll need to figure out how you actually want to work with
           us. This can be an acquisition, through a close relationship with Open Graph,
22         through an arms length relationship using our traditional APIs, or perhaps not at
           all . . . Of course, at the same time we're developing our own photos strategy, so
23         how we engage now will determine how much we're partners vs. competitors
           down the line—and I'd like to make sure we decide that thoughtfully as well.[122]
24

25

26

27  _____

28  [122] *Id.* at 164.

164.    Similarly, in an earlier conversation between Systrom and Matt Cohler, an Instagram investor and former senior Facebook adviser, Systrom and Cohler discussed the possibility that Instagram's response to Facebook's acquisition efforts could affect Instagram's access to Facebook Platform down the line."[123]  In discussing how to engage with Zuckerberg regarding Facebook's advances, Cohler cautioned: "we need to make it as hard as possible for fb to mess with our ability to get distribution on the platform[.]"[124]

165.    In 2015, Facebook cut off all public access to the Friends and News Feed APIs. Facebook had already extracted valuable social media network data from dozens of competitors in the run-up to the announcement and ultimate removal of the APIs. This move allowed it to coerce incipient competitive threats to hand over their social media network data. Facebook denied API access to thousands of potential competitors, and in the process ensured that its platform would be the only viable platform upon which a third-party social media application could be built.

166.    After the announcement and through the full removal of the APIs in April 2015, Facebook made a series of agreements that forced certain competitors to hand their data over to Facebook.  For example, Facebook forced certain third-party developers that it identified as competitive threats with valuable social data to sign Private Extended API agreements—referred to throughout this Complaint as "Whitelist and Data Sharing Agreements" or simply "the Agreements"—in order to obtain access to the Friends and/or News Feed APIs.  Facebook's Whitelist and Data Sharing Agreements included a provision that acknowledged that the APIs they covered are not available to the general public. An exhibit to each Whitelist and Data

---

[123] Production of Facebook to H. Comm. on the Judiciary (Feb. 13, 2012) at FB-HJC-ACAL-00101440, available at https://judiciary.house.gov/uploadedfiles/0010143800101441.pdf.

[124] Id.

Sharing Agreement listed the specific Facebook APIs to which a particular developer was being granted access.  These Agreements were only offered in exchange for massive purchases of Facebook's social data through mobile advertising and/or through the provision of the developer's own social data back to Facebook (so-called "reciprocity").

167.     That year, Facebook provided Whitelist and Data Sharing agreements to the dating apps Tinder and Hinge.  It also secretly signed Whitelist and Data Sharing agreements with other third-party developers, including Netflix, Nissan, and Lyft.  In total, dozens of app developers entered into such agreements with Facebook.

168.     Consistent with Facebook's ploy to maintain its monopolistic grip on the Social Network and Social Media Markets by deceiving consumers about its privacy practices, Facebook's Simon Cross marketed these changes to its third party access policies as triumphs that bolstered the security of its users' data.  Facebook announced a new slogan, "'People First', because 'if people don't feel comfortable using Facebook and specifically logging in Facebook and using Facebook in apps, we don't have a platform, we don't have developers.'"[125] In reality, however, Facebook described these changes—and its marketing of these changes—as "the Switcheroo Plan": "Facebook bundled in the decision to cut off third-party access to user data with other unrelated privacy updates, and explained it all under the new slogan "people first."[126] "The fact that user data would still be available to some third parties, as long as the companies gave Facebook enough money and didn't pose a competitive threat, was conveniently elided."[127]

---

[125] Josh Constine, *Facebook Is Shutting Down Its API For Giving Your Friends' Data to Apps*, TechCrunch (Apr. 28, 2015), available at https://techcrunch.com/2015/04/28/facebook-api-shut-down/ (last accessed December 11, 2020).

[126] Elena Botella, *Facebook Earns $132.80 From Your Data per Year*, Slate (Nov. 15, 2019), available at https://slate.com/technology/2019/11/facebook-six4three-pikinis-lawsuit-emails-data.html (last accessed Dec. 11, 2020).

[127] *Id.*

169.     Absent these agreements and Facebook's overall scheme to eliminate nascent competitors, other companies could have created their own social media networks. As the amount of user data was generated and monetized on these other networks, the substantial barriers to entry in the Social Media Market would have eroded. But because Facebook could coercively demand all of the social media user data generated on a competing platform, the Whitelist and Data Sharing Agreements ensured that competitive threats could not challenge Facebook's stranglehold over the social media network data, which Facebook obtained by leveraging its social media monopoly.

170.     In all of its conduct surrounding potential acquisitions, Facebook intentionally surveilled, copied, acquired, and killed competitors with the specific intent, and result, of destroying competition.  Facebook acquired and maintained its monopoly due to its predatory and anticompetitive conduct that went on during its string of acquisitions, with a specific intent to monopolize, and with a dangerous probability at the outset and, ultimately, its present day success in obtaining and maintaining its market power.

### *Instagram*

171.     Facebook used the undisclosed surveillance of its users to identify Instagram as a threat and ultimately to acquire the company.  Instagram was a photo-sharing mobile application founded by Kevin Systrom, which allowed users to check in, post plans, and share photos. The photo-sharing feature immediately became the app's most popular.

172.     Instagram was launched on iOS, Apple's mobile device operating system, in 2010. That very day, Instagram became the top free photo-sharing app on Apple's App Store, racking up twenty-five thousand downloads.  By the end of the first week, Instagram had been downloaded 100,000 times, and by mid-December 2010, its total downloads had reached one million. The timing of the app was impeccable, as the iPhone 4, with its improved camera, had

launched just a few months earlier in June 2010. By March 2012, the app's user base had

swelled to 27 million. That April, Instagram was released on Android phones and was

downloaded more than one million times in less than one day. At the time, Instagram was also in

talks to receive another $500 million funding round.

173.    Internally, Facebook carefully tracked Instagram's rise, including through

intelligence that it received from surveilling Facebook users' behavior and that it obtained from

Onavo.[128] Instagram clearly posed a competitive threat to Facebook's dominance, especially due

to its superior photo-sharing feature. Facebook recognized, thanks in part to the commercial

surveillance data it was able to obtain regarding Facebook users, that Instagram could become a

competing social media network that could rival Facebook in the amount of user engagement and

social media data it could produce and monetize.

174.    Both line employees and high-level executives at Facebook recognized Instagram

as a competitive threat. In an internal Facebook message, one engineer mused that "Instagram is

eating our lunch. We should've owned this space, but we're already losing quite badly."[129] At

an internal meeting with Facebook employees, Zuckerberg put it bluntly: the "bad news is that

[Instagram is] growing really quickly, they have a lot of momentum, and it's going to be tough to

dislodge them."[130]

175.    Consistent with its strategy of "copying" would-be competitors, Facebook

initially attempted to create its own product that competed with Instagram. By June 2011,

---

[128] Mike Swift, *Facebook's history with Onavo resonates for privacy experts worried about Giphy purchase*, mlex Market Insight (June 23, 2020), available at https://mlexmarketinsight.com/insights-center/editors-picks/area-of-expertise/data-privacy-and-security/facebooks-history-with-onavo-resonates-for-privacy-experts-worried-about-giphy-purchase (last accessed November 25, 2020).

[129] House Report, *supra*, at 163.

[130] *Id.*

Facebook had begun developing its own photo-sharing app.[131]  One Facebook employee referred to Facebook's anticipated photo-sharing app as "an Instagram clone."[132]  Facebook subsequently released Facebook Camera, a standalone app allowing users to shoot, filter, and share photos from their mobile devices.[133]

176.    In addition to "cloning" Instagram, Facebook determined there was another way to hedge its bets, protect its monopoly, and neutralize the competitive threat of Instagram: simply buying Instagram outright.  Accordingly, after direct talks with Mark Zuckerberg, Facebook offered to purchase Instagram for $1 billion in April 2012.

177.    In addition to the $1 billion price tag, another consideration motivated Instagram's consideration of Facebook's acquisition offer: Facebook's aggressive and anticompetitive threats, which Facebook was safe to make due to its status as a monopolist.

---

[131] MG Siegler, *Behold: Facebook's Secret Photo Sharing App*, TechCrunch (June 15, 2015), available at https://techcrunch.com/2011/06/15/facebook-photo-sharing-app/?_ga=2.238331010.340941203.1606233329-687565188.1605321310 (last accessed Nov. 25, 2012).

[132] House Report, *supra*, at 163.

[133] Josh Constine, *FB Launches Facebook Camera – An Instagram-Style Photo Filtering, Sharing, Viewing iOS App*, TechCrunch (May 24, 2012), available at https://techcrunch.com/2012/05/24/facebook-camera/ (last accessed Nov. 25, 2020).

178.     During negotiations between Facebook and Instagram, Zuckerberg warned Kevin Systrom, Instagram's Chief Executive Officer, that "[a]t some point soon, you'll need to figure out how you actually want to work with us. . . . [H]ow we engage now will determine how much we're partners vs. competitors down the line—and I'd like to make sure we decide that thoughtfully as well."[134]  In a separate communication with Matt Cohler—an Instagram investor and Facebook's former Vice President of Product Management—Systrom inquired whether Zuckerberg "will go into destroy mode if I say no" to Facebook's acquisition offer.[135]  Cohler responded that Zuckerberg would "probably" go into "destroy mode" and "conclude that it's best to crush Instagram[.]"[136]  Cohler further lamented that "I don't think we'll ever escape the wrath of [M]ark" Zuckerberg.[137]

179.     Clearly crushed into submission and fearful of Facebook's "wrath," Instagram acceded to Facebook's acquisition demand.  Facebook consummated the deal immediately prior to its IPO.

### *Snapchat*

180.     Facebook's acquisition of Instagram allowed Facebook to exclude third-party apps that provided photo and video sharing functionality from Facebook's platform.  If an image sharing or video app contained an important feature, Facebook simply cloned it, thus paving the way for excluding a competitive rival from its platform, while simultaneously taking away that

---

[134] House Report, *supra*, at 163–64.

[135] Production of Facebook to H. Comm. on the Judiciary (Feb. 13, 2012) at FB-HJC-ACAL-00101438, available at https://judiciary.house.gov/uploadedfiles/0010143800101441.pdf.

[136] *Id.* at FB-HJC-ACAL-00101438–39.

[137] *Id.* at FB-HJC-ACAL-00101440.

1  rival's share of users.  And high-level Facebook executives were acutely aware of this

2  strategy.[138]

3      181.    For example, by 2012, the photo-sharing app Snapchat began had grown in

4  popularity among consumers.  Founded by Evan Spiegel, Snapchat allows users on that platform

5  to send each other communications—including text, photos, and videos—that appear only for a

6  fixed period of time and then disappear.[139]  Drawn by Snapchat's privacy appeal, users began to

7  flock to Snapchat.

8

9      182.    Facing a competitive threat from Snapchat, Facebook engaged in its usual "copy,

10  acquire, kill" strategy in an attempt to annihilate Snapchat.  To formulate that strategy, Facebook

11  relied on data it obtained from Onavo.[140]

12      183.    In December 2012, Facebook launched "Poke," a standalone app designed to

13  allow users to send photos, videos, or Facebook messages to each other that expire after a few

14  seconds.[141]  But to Facebook, the possibility of competing with Snapchat on the merits provided

15  insufficient guarantee that Facebook's monopoly position would be secure.  So mere days before

16  Facebook launched Poke, Zuckerberg met with Spiegel, Snapchat's founder, in Los Angeles.[142]

17

18

19  _____

20  [138] Executives such as Zuckerberg, Sherl Sandberg, Facebook's Chief Operating Officer, and
   Sam Lessin, Facebook's Product Management Director, expressly endorsed "cloning" other
21  competing platforms' popular features.  *See* House Report, *supra*, at 163.

22  [139] Srinivasan, *supra*, at 53.

23  [140] Karissa Bell, *"Highly confidential" documents reveal Facebook used VPN app to track
   competitors*, Mashable (Dec. 5, 2018), available at: https://mashable.com/article/facebook-used-
24  onavo-vpn-data-to-watch-snapchat-and-whatsapp/ (last accessed November 25, 2020).

25  [141] Josh Constine, *Facebook Launches Snapchat Competitor 'Poke', An iOS App for Sending
   Expiring Text, Photos, And Videos*, TechCrunch (Dec. 21, 2012), available at:
26  https://techcrunch.com/2012/12/21/facebook-poke-app/ (last accessed November 25, 2020).

27  [142] J.J. Colao, *The Inside Story Of Snapchat: The World's Hottest App Or A $3 Billion
   Disappearing Act?*, Forbes (Jan. 20, 2014), available at https://www.forbes.com/sites/jjcolao/
28  2014/01/06/the-inside-story-of-snapchat-the-worlds-hottest-app-or-a-3-billion-disappearing-

1
2
3

During the meeting, Zuckerberg described Facebook's soon-to-be-released Poke app to Spiegel.

Spiegel has described Zuckerberg's representations during the meeting as follows: "It was

basically like, 'We're going to crush you.'"[143]

4
5
6
7
8
9

184.    After the meeting and following Facebook's launch of Poke, Facebook made

additional overtures to Snapchat in an attempt to cement its top-of-the-ladder status.[144]  Facebook

ultimately offered $3 billion to acquire Snapchat.  Facebook's $3 billion offer made clear that

Facebook was willing to pay a premium over Snapchat's then-existing market value with the

added value of neutralizing a possible threat to Facebook's market dominance.

10
11
12
13
14
15
16
17

185.    Snapchat rejected Facebook's offer, and Facebook responded by copying *even

more* of Snapchat's features that are popular with consumers. For example, Snapchat's "Stories"

feature allows Snapchat users to post a collection of images and video in a rapid string that other

Snapchat users may view for 24 hours.  In 2016, Facebook (through Instagram) launched its own

feature—also called "Stories"—which is "nearly identical" to Snapchat's version.[145]  By April

2017, Facebook's "Stories" feature on Instagram had become more popular than Snapchat's

version, crippling one of Facebook's largest rivals.[146]

18
19
20
21
22

act/?utm_campaign=forbestwittersf&utm_medium=social&utm_source=twitter&sh=7236882067d2 (last accessed Nov. 25, 2020).

23    [143] *Id*.

24    [144] *Id*.

25
26    [145] Casey Newton, *Instagram's new stories are a near-perfect copy of Snapchat stories*, The Verge (Aug. 2, 2016), available at https://www.theverge.com/2016/8/2/12348354/instagram-stories-announced-snapchat-kevin-systrom-interview (last accessed Dec. 10, 2020).

27
28    [146] Kaya Yurieff, *Instagram's Snapchat clone is more popular than Snapchat*, CNN Business (Apr. 13, 2017), available at https://money.cnn.com/2017/04/13/technology/instagram-stories-snapchat/index.html (last accessed Nov. 25, 2020).

*WhatsApp*

186.    Facebook's acquisition of WhatsApp followed a similar pattern. WhatsApp began

as mobile application that displayed user statuses in an address book on a smartphone.  However,

WhatsApp exploded in popularity when Apple introduced "push notifications" for the iPhone,

allowing developers to ping app users even when they weren't using the app. This feature

became a form of instant messaging, enabling users to broadcast messages to connections within

a user's social network, which was built from their phone's contact list.  Because WhatsApp

used the mobile phone's internet connection rather than text messages, the app allowed users to

avoid text messaging fees entirely. WhatsApp's ability to send messages to any user with a

phone using the internet was its most sought-after feature.

187.    As WhatsApp's popularity began to rise in the early 2010s, Facebook harvested

user engagement data from Facebook's Onavo spyware in order to carefully track WhatsApp.

The data reported that WhatsApp was rivaling Facebook's own Messenger product, and held

third place in terms of user reach among mobile messenger apps for iPhone in the U.S. as of

April 2013.  Facebook used Onavo's data to track messages sent through WhatsApp, which more

than doubled messages on Facebook's own mobile product.  This same Onavo data showed

massive engagement among WhatsApp users, placing it in fifth place behind Facebook's own

core product; Facebook's newly acquired Instagram; Twitter; Foursquare; and Snapchat.

WhatsApp, although lacking Facebook's market reach, was drawing from the same pool of

limited attention, and it exposed a major vulnerability in Facebook's business model.  WhatsApp

threatened Facebook's business, including the barriers to entry and network effects protecting

Facebook's dominance—and because of Onavo, Facebook knew that WhatsApp was a direct

threat to Facebook's monopoly power.

188.     Facebook then sought to remove WhatsApp as a competitor in order to ensure that Facebook retained its monopoly power in the Social Network and Social Media Markets. Facebook used the insights it had gained from Onavo's data surveillance technology to purchase WhatsApp in 2014 for close to $22 billion, well above its initial bid of $16 billion.  The transaction made no economic sense for Facebook, other than foreclosing competition in the Social Media and Social Network Markets and protecting Facebook's monopoly power. WhatsApp's revenues were a meager $10.2 million in 2013. Its six-month revenue for the first half of 2014 totaled $15.9 million, and the company had incurred a staggering net loss of $232 million in that same period. Facebook had paid twenty billion dollars—thousands of times WhatsApp's revenues—to acquire a money-losing company that created software functionality Facebook itself already had as part of its own products, and could easily build from scratch for a fraction of the cost of the acquisition.

### Other Examples of Facebook's "Copy, Acquire, Kill" Strategy

189.     In addition to the examples described herein, Facebook has employed its "copy, acquire, kill" strategy against other would-be competitors, and the extent to which it did so based on deceptively-obtained user data was not clear until the last two years. For example, shortly after "Houseparty"—a social network that referred to itself as "the internet's living room"—turned down an acquisition offer from Facebook, Facebook announced that its Messenger app would become a "virtual living room." Houseparty's active user base fell by half between 2017 and 2018.

190.     As another example, Facebook acquired Giphy for $400 million in May 2020. Although Giphy's primary function is to allow users to share GIFs[147] online and through

---

[147] A "GIF" is a compilation of still images, akin to a flipbook, played in sequence to create a short animated sequence.

messaging apps, the transaction will also give Facebook competitive insights into other messaging apps.  One commenter said, "While you may successfully block trackers like the Facebook ad pixel following you around online, or even delete your Facebook account, the majority of us wouldn't suspect we're being monitored when we're sending funny images to friends."[148]

191.    In addition, Facebook has sometimes acquired companies without the goal of incorporating them into its own business, but rather, simply to eliminate the competitor, a practice referred to as "catch and kill."  For example, Facebook acquired "tbh"—an anonymous social media app—in October 2017.  It then shut the app down less than a year later, having made little effort to maintain the platform.[149]

192.    Facebook's acquisition conduct is part of an ongoing attempt to entrench its market power in the Social Network and Social Media Markets. Facebook's strategy was made possible due to the social data that Facebook obtained as it acquired its monopoly.  And Facebook has used that data in order to copy, acquire, or kill competitors, instead of competing with them by providing enhanced data privacy protections to consumers.

### *Facebook's Use of Onavo Comes to Light.*

193.    Ultimately, the world learned the truth about the extent of commercial surveillance that technology like Onavo's made possible for Facebook.  In August 2018, Apple removed Onavo from its app store following reporting that Facebook was using the app to track users and other apps. Apple ejected Facebook's Onavo app from its marketplace because it violated Apple's rules prohibiting apps from using data in ways far beyond what is required to

---

[148] Owen Williams, *How Facebook Could Use Giphy to Collect Your Data*, ONEZERO, May 15, 2020, available at https://kl.link/34AW951.

[149] *See* Kaya Yurieff, *Facebook Shutters the Teen App it Just Bought*, CNN Business, July 3, 2018, available at https://kl.link/37G6HBH.

run the app and provide advertising.  In other words, because Onavo Protect was leveraging far more data than any VPN could conceivably need, it was clear that the true purpose of the app was to spy on Onavo users, and Apple would not allow it.  An Apple spokesperson said the company intended to make "it explicitly clear that apps should not collect information about which other apps are installed on a user's device for the purposes of analytics or advertising/marketing and must make it clear what user data will be collected and how it will be used."[150]

194.    The amount of commercial surveillance that Onavo's technology enabled was jaw-dropping.  Facebook's Onavo Protect app reported on users' activities whether their screens were on or off; whether they used WiFi or cellular data; and even when the VPN was turned off.  There was simply no rational relationship between the data collected and the purported purpose of the application.  Put simply, a VPN that collected data even when the VPN was off was an obvious subterfuge for spying on user behavior.

195.    Facebook tried to circumvent Apple's ban by repackaging its Onavo spyware as a Facebook Research VPN app.  Facebook sidestepped the App Store by rewarding teenagers and adults when they downloaded the Research app and gave it root—superuser—access to network traffic on their mobile devices.  Facebook has been leveraging its Onavo code in similar ways since at least 2016, administering the program under the codename "Project Atlas"—a name suited to its goal of surveilling app usage on mobile devices in real time.

196.    When the news broke in January 2019 that Facebook's Research apps were repackaged Onavo apps designed to spy on users, Facebook immediately withdrew the programs from the Apple App store. Apple again concluded that Facebook had tried to violate its policies by obtaining a level of administrative privileges on an iPhone or iPad that would have been

---

[150] House Report, *supra*, at 161.

designed for a company's internal IT department. In addition to Onavo's Protect app, Facebook has attempted to deploy its surveillance software as other forms of utility applications that require extensive or privileged access to mobile devices. For example, Facebook released the Onavo Bolt app, which locked apps behind a passcode or fingerprint while it covertly surveilled users— and sent Facebook the results. Facebook also shut that app down the very day that its surveillance functionality was discovered. The Onavo Bolt app had been installed approximately 10 million times.

### Facebook's Anticompetitive Practices Have Harmed and Continue to Harm Competition in the Social Network and Social Media Markets.

197.    Facebook's anticompetitive practices described above have harmed and continue to harm competition the Social Network and Social Media Markets in the United States.

198.    Facebook is dangerously close to obtaining, or has obtained, monopoly power in the Social Network and Social Media Markets in the United States, and it has wielded that power to anticompetitively foreclose competition.

199.    Facebook's deception of consumers has harmed, and continues to harm, competition. In many markets, the advantage of consumer deception quickly dissolves once the deception is uncovered. But the direct and indirect network effects inherent in the Social Network and Social Media Markets create markets with strong network effects and high barriers to entry. Because of unduly high switching costs, users cannot simply switch to a competitor once the dominant player's deception is exposed, even though they wanted to do so, as evidenced by the "#DeleteFacebook" movement after the revelations regarding Cambridge Analytica in 2018.

200.    Facebook's deception about its lack of privacy protections acted as a welcome sign, inducing a ground swell of users to join Facebook because of Facebook's avowed privacy appeal. But once a critical mass of users, continually expanding due to strong network effects

obtained through its deception, joined Facebook at the expense of its competitors, Facebook slammed the door shut. Because of high switching costs—including the possibility of losing contact with friends, family and acquaintances, an inability to access data that Facebook users have spent years or more inputting into Facebook, and the time and opportunity cost of starting over with a competitor—and the lack of viable alternatives as a result of Facebook's deception, consumers are now trapped. As a result, Facebook has cheated its way to the finish line in the race for dominance without being the best competitor. Instead of providing consumers a way out, such as alternatives to Facebook, the Social Network and Social Media Markets help to lock in Facebook's unfair advantage.

201.    Facebook's acquisition conduct also has harmed, and continues to harm, competition. Facebook built and maintained its monopoly over the Social Network and Social Media Markets by exploiting deceptively obtained user data to target competitive threats, which Facebook then proceeded to acquire, copy, or kill. Facebook tracked its users across the internet, often without permission, to identify companies that might threaten its monopoly. Facebook then used a pattern of discriminatory data access to destroy potential competitors or force them to sell at a discount. Facebook used its data advantage not to run faster, but to kneecap the competition. That approach is not surprising given the win-at-all-costs culture at Facebook.

202.    Facebook's two-pronged anticompetitive strategy harmed competition in the Social Network and Social Media Markets. As detailed herein, Facebook's strategies made it nearly impossible for competitors—both nascent and established—to challenge Facebook's monopoly by competing with Facebook on data privacy protections or by building a higher quality social network.

203.    But for Facebook's anticompetitive practices, consumers would have had more options in the Social Network and Social Media Markets for connecting with other users. Those

companies would have created social networks and social media platforms that competed with Facebook on the merits of data privacy protections and social network and platform quality, without being dependent on Facebook for comprehensive social media network data. Because Facebook anticompetitively restrained competition in its efforts to acquire and obtain social media and social network monopolies, competition along the dimensions of user privacy and product quality was foreclosed. Ultimately, consumers suffered, and continue to suffer, as a result of Facebook's wantonly anticompetitive conduct.

### *Facebook's Anticompetitive Conduct Has Damaged Consumers in Direct and Quantifiable Ways.*

204. Facebook's anticompetitive practices described herein have harmed, and continue to harm, consumers in the Social Network and Social Media Markets in the United States.

205. Facebook's anticompetitive foreclosure of competition has harmed consumers in many ways. When agreeing to Facebook's Terms of Service, consumers agree to give up things of material value: personal information and attention. Facebook then sells for money, measurable in quantifiable units, its users' information and attention to third parties, including advertisers. But for Facebook's anticompetitive conduct, which has substantially reduced, if not eliminated competition, consumers would have had more choices in the Social Network and Social Media Markets, instead of the few, if any, they have today. Absent Facebook's anticompetitive conduct, Facebook would have had to provide consumers increased incremental value, that is quantifiable in measurable units, in return for consumers' data. Otherwise, consumers would have given their data and attention to other platforms, which would have provided consumers increased incremental value. Consumers would have received the fair market value for their data and attention. That value was artificially decreased by Facebook's anticompetitive conduct.

206.   Absent Facebook's anticompetitive conduct, which has substantially reduced, if not eliminated, competition, consumers would have benefitted from more robust competition in terms of non-price attributes such as data privacy practices and social media platform quality. Users could have benefitted from Facebook's social media network without having to surrender as much personal data to Facebook and other third parties that use Facebook for app development or targeted advertising.  Similarly, users could have benefitted from competition that would have resulted in Facebook or its alternatives offering higher-quality services, such as interoperability between platforms and portability of users' data.

207.   If Facebook had disclosed the scope of the data it collected and the level of fine-grained targeted marketing that it enabled, consumers would have benefitted from competition in the Social Network and Social Media Markets, resulting in a better Facebook or better alternatives and lower consumer costs in the form of information and attention. Instead, Facebook has artificially stifled innovation, thrusting on consumers a product of reduced-quality and leaving consumers with no meaningful alternative.

208.   If Facebook had not used its social media monopoly to target its competition for destruction, consumers would have benefitted from more competition, and hence more options and lower costs, in the Social Network and Social Media Markets.  Even elected officials have recognized that absent Facebook's anticompetitive acquisition strategy, Facebook would have had to compete on privacy issues, benefiting consumers:[151]

---

[151] United States Representative Ro Khanna, Twitter (Jan. 25, 2019), available at https://twitter.com/RepRoKhanna/status/1088850988218413058.

> **Rep. Ro Khanna** ✔
> @RepRoKhanna
>
> Replying to @RepRoKhanna
>
> 2/2 -- Imagine how different the world would be if Facebook had to compete with Instagram and WhatsApp. That would have encouraged real competition that would have promoted privacy and benefited consumers.
>
> 12:28 PM · Jan 25, 2019 · Twitter Web Client
>
> **27** Retweets   **1** Quote Tweet   **86** Likes

209.    Because Facebook engaged in the anticompetitive practices described above, consumers suffered substantial, cognizable, and quantifiable economic harm. Unless these acts are enjoined, consumers will continue to suffer harm caused by Facebook's anticompetitive practices.

### ACCRUAL OF CLAIM, EQUITABLE TOLLING, FRAUDULENT CONCEALMENT, CONTINUING VIOLATION, AND ASCERTAINMENT OF DAMAGES

210.    Plaintiff did not discover the existence of the anticompetitive acts alleged herein until, at the earliest, March 17, 2018.  As the House Antitrust Subcommittee recently explained, "[t]o the extent that consumers are aware of data collection practices, it is often in the wake of scandals involving large-scale data breaches or privacy incidents such as Cambridge Analytica."[152]  It was not until the media uncovered the details of the Cambridge Analytica scandal on March 17, 2018, that consumers began to discover Facebook's anticompetitive practices that harmed consumers and that would have enabled consumers to raise the claims presented in this action.  Similarly, it was not until the media revealed the details of Apple's ban of Onavo on August 22, 2018, that consumers learned of the additional facts regarding

---

[152] House Report, *supra*, at 54.

Facebook's anticompetitive practices necessary for consumers to raise the claims presented in the action.

211.    Nor could Plaintiff or any class member have discovered, through the exercise of reasonable diligence, the existence of the anticompetitive acts alleged herein until, at the earliest, March 2018.  That is because, as the House Antitrust Subcommittee has recognized, "nuances in privacy terms are relegated to investigative journalists to discover and explain."[153]  The subsequent investigative reporting that brought to light Facebook's systematic deception and commercial surveillance was not made public until, at the earliest, March 17, 2018, following the Cambridge Analytica scandal.  Accordingly, the statute of limitations should be equitably tolled to March 2018.  As such, all of the anticompetitive conduct described in this complaint presents timely claims, including Facebook's deception and acquisition conduct going back to before it achieved its social media monopoly.

212.    Facebook fraudulently concealed its deceptive practices and commercial surveillance efforts, including the extent of its data privacy practices and anticompetitive acquisition strategy.  As a result, Plaintiff and Class members were unaware of Facebook's unlawful conduct alleged herein.  Facebook affirmatively and fraudulently concealed its unlawful conduct by, *inter alia*:

a)    Agreeing to a settlement with the FTC in 2011 which "barred [Facebook] from making misrepresentations about the privacy or security of consumers' personal information[.]"

b)    Publicly misrepresenting, before and after its 2011 settlement with the FTC, that it was protecting users' privacy. Examples of such public statements include:

---

[153] *Id.*

1

    c)     Mark Zuckerberg's May 2010 statement on NPR that "There's this false

2   rumor that's been going around which says that we're sharing private information with

3   applications and it's just not true."

4   

    d)     Mark Zuckerberg's November 2011 statement on his own Facebook page

5   that "everyone needs complete control over who they share with at all times."

6   

    e)     Mark Zuckerberg's November 2011 statement on his own Facebook page

7   regarding the 2011 FTC Settlement that the settlement "means we're making a clear and formal

8   long-term commitment to do the things we've always tried to do and planned to keep doing –

9   

10  giving you tools to control who can see your information and then making sure only those people

11  you intend can see it."

12      f)     Facebook's statement to shareholders in its IPO filing with the Securities

13  and Exchange Commission, indicating that "[w]e also believe that giving people control over what

14  they share is a fundamental principle[.]"

15  

16      g)     Mark Zuckerberg's June 8, 2013 statement, posted on Facebook's

17  Newsroom, regarding Edward Snowden's allegations of government surveillance: "We will

18  continue fighting aggressively to keep your information safe and secure."

19      h)     Mark Zuckerberg's March 2014 statement on his own Facebook page

20  responding to allegations that the National Security Agency posed as Facebook during a

21  controversial surveillance program: "To keep the internet strong, we need to keep it secure. That's

22  why at Facebook we spend a lot of our energy making our services and the whole internet safer

23  and more secure. . . . Together, we can build a space that is greater and a more important part of

24  the world than anything we have today, but is also safe and secure.  I'm committed to seeing this

25  happen, and you can count on Facebook to do our part."

26  

27

28

i)      Facebook's statement in its 2016 10-K filing that while "some of our developers or other partners, such as those that help us measure the effectiveness of ads, may receive or store information provided by us or by our users through mobile or web applications integrated with Facebook[,]" Facebook only "provide[s] *limited information* to such third parties *based on the scope of services* provided to us."

j)      Mark Zuckerberg's March 2016 public statement in response to a statement issued by its subsidiary, *WhatsApp*, assuring that "Facebook stands with many technology companies to protect you and your information."

k)      Mark *Zuckerberg's* March 2018 statement following news outlets' reporting on the Cambridge Analytica scandal that "[w]e have a responsibility to protect your data, and if we can't then we don't deserve to serve you."

213.    Plaintiff and the class members did not discover, nor could they have discovered through reasonable diligence, that Facebook was violating the antitrust and other laws until less than four years before this litigation was initially commenced.  Facebook did not tell Plaintiff or other Class members that it was violating its 2011 Settlement with the FTC, deceiving consumers and selling their data to extract revenue from third parties, or exploiting consumers' trust by surveilling them and using their data to identify competitors to "acquire, copy, or kill."  To the contrary, Mark Zuckerberg—Facebook's founder, Chief Executive Officer, and public face— repeatedly represented otherwise.  Indeed, in announcing its largest-ever $5 billion fine against Facebook following the Cambridge Analytica scandal, the FTC explained that while Facebook "encourages users to share information on its platform" by "promis[ing] users they can control the privacy of their information," Facebook "repeatedly used deceptive disclosures and settings to undermine users' privacy preferences[.]"

214. In addition, Facebook's anticompetitive conduct was, by its very nature, inherently self-concealing because it was performed outside the sight and knowledge of consumers. As a result, Plaintiff and Class members did not discover Facebook's scheme, even with the exercise of reasonable diligence.

215. Since the start of the class periods, Facebook has committed continuing violations of the antitrust laws, resulting in monetary injury to Plaintiff and Class members. As described herein, Facebook has engaged in a pattern of independent misrepresentations to users, designed to acquire, maintain, and prolong Facebook's monopoly position. Similarly, Facebook has weaponized its users' data as a part of its serial acquisition strategy to "acquire, copy, or kill" its competitors. Each of these injurious acts were separate and independent overt acts during the limitations period that were new and independent acts that inflicted new and accumulating injuries on consumers. Each of Facebook's instances of deception as to its data privacy practices and commercial surveillance over time were acts new and independent from its past issues with data privacy and commercial surveillance. Facebook's continued exposure of private information to app developers, advertisers, and other third parties leading up to 2018 and its anticompetitive acquisition practices were additional, independent, and overt acts that harmed competition and inflicted new and accumulating economic injuries on consumers.

216. Moreover, Plaintiff's and Class members' harms were not ascertainable—sufficient to give rise to the claims presented herein—more than four years prior to the date that this action was first commenced. Since the harm that Plaintiff and Class members allege had not crystallized more than four years prior to the date that this action was initiated, the antitrust claims presented herein are timely.

**CLASS ACTION ALLEGATIONS**

217.    Plaintiff re-alleges and incorporates by reference herein all the allegations contained above.

218.    Pursuant to Federal Rule of Civil Procedure 23(b)(3), Plaintiff asserts claims on behalf of the following Classes:

a)    **The Antitrust Consumer Class:** All persons or entities in the United States who maintained a Facebook profile at any point from 2007 up to the date of the filing of this action. Excluded from the Class are Facebook, any entity in which Facebook has an interest, and any of Facebook's corporate parents, affiliates, subsidiaries, officers, directors, legal representatives, successors, and assigns.  Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

b)    **The Unjust Enrichment Consumer Class:** All persons or entities in the United States who maintained a Facebook profile at any point from 2007 up to the date of the filing of this action.  Excluded from the Class are Facebook, any entity in which Facebook has an interest, and any of Facebook's corporate parents, affiliates, subsidiaries, officers, directors, legal representatives, successors, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

219.    Plaintiff reserves the right to amend the Class definitions if discovery and further investigation reveal that the Classes should be expanded, divided into subclasses, or modified in any other way.

220.    This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority

requirements of Rule 23(b)(3).  Plaintiff seeks to represent ascertainable Classes, as determining inclusion in the classes can be done through Facebook's own records.

221.   Although the precise number of Class members is unknown and can only be determined through appropriate discovery, the proposed Classes number at least in the tens of millions and is therefore so numerous that joinder of all members would be impracticable.

222.   Questions of law and fact common to the putative Classes exist that predominate over questions affecting only individual members, including:

a)   Whether Facebook's deception of consumers about its data privacy practices was anticompetitive;

b)   Whether Facebook's acquisition conduct was anticompetitive;

c)   Whether Facebook intentionally engaged in anticompetitive acts in order to obtain or maintain monopoly power;

d)   Whether Facebook is a monopolist in the Social Network Market;

e)   Whether Facebook is a monopolist in the Social Media Market;

f)   Whether Facebook intentionally made material misrepresentations about its data privacy practices and the extent of its commercial surveillance;

g)   Whether Facebook's foreclosure of competition in the Social Network Market caused by its anticompetitive conduct led to cognizable and quantifiable economic harms to consumers;

h)   Whether Facebook's foreclosure of competition in the Social Media Market caused by its anticompetitive conduct led to cognizable and quantifiable economic harms to consumers;

i)      Whether consumers would have had more options and competition amongst social media companies if Facebook would have revealed the full extent of its data privacy practices and commercial surveillance long ago;

j)      Whether Facebook's anticompetitive conduct substantially harmed competition in the Social Network Market in the United States;

k)      Whether Facebook's anticompetitive conduct substantially harmed competition in the Social Media Market in the United States;

l)      Whether Facebook's anticompetitive conduct should be enjoined or whether other appropriate equitable relief, including ordering Facebook to divest assets or submit to more invasive third-party audits of its privacy practices and commercial surveillance.

223.    Plaintiff is a member of the putative Classes.  The claims asserted by Plaintiff in this action are typical of the claims of the members of the putative Classes, as the claims arise from the same course of conduct by the Defendant and the relief sought is common.

224.    Plaintiff will fairly and adequately represent and protect the interests of the members of the putative Classes, as her interests are coincident with, not antagonistic to, the other members of the Classes.

225.    Plaintiff has retained counsel competent and experienced in both antitrust and class action litigation.

226.    Certification of the Classes is appropriate pursuant to Fed. R. C. P. 23(b)(3) because questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims including consistency of adjudications. Absent a class action it would be unlikely that

many members of the Classes would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed the expected recovery.

227.    A class action is a superior method for the adjudication of the controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense, and the burden of the courts that individual actions would create.

228.    In the alternative, the Classes should be certified because:

a)      The prosecution of separate actions by the individual members of the proposed class would create a risk of inconsistent adjudications, which could establish incompatible standards of conduct for Facebook;

b)      The prosecution of individual actions could result in adjudications, which as a practical matter, would be dispositive of the interests of non-party class members or which would substantially impair their ability to protect their interests; and

c)      Facebook has acted or refused to act on grounds generally applicable to the proposed Classes, thereby making appropriate final and injunctive relief with respect to the members of the proposed Classes as a whole.

**INTERSTATE TRADE AND COMMERCE**

229.    Plaintiff re-alleges and incorporates by reference herein all the allegations contained above.

230.    Facebook's anticompetitive conduct has taken place in, and negatively affected the continuous flow of interstate trade and commerce in the United States in that, *inter alia*:

a)      Facebook has provided a social media network and platform and has exchanged consumer information and attention with advertisers and consumers throughout the United States;

b)      Facebook has used instrumentalities of interstate commerce to provide social media services to consumers and advertisers throughout the United States;

c)      In furtherance of the anticompetitive scheme alleged herein, Facebook has traveled between states and exchanged communications through interstate wire communications and via the Unites States mail; and

d)      The anticompetitive scheme alleged herein has affected billions of dollars of commerce.  Facebook has inflicted antitrust injury by artificially raising the cost to consumers of using its platform, in terms of personal information and attention, by providing reduced user privacy protections to consumers in exchange for their personal data, and by artificially reducing consumer choice and competition in the Social Media Market in the United States.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
### MONOPOLIZATION OF SOCIAL NETWORK MARKET
### Sherman Antitrust Act, § 2
### (On behalf of the Class)

231.    Plaintiff re-alleges and incorporates by reference herein all the allegations contained above.

232.    Facebook has willfully acquired and maintained monopoly power in the relevant Social Network Market.  There are no reasonably interchangeable products that would effectively constrain, or have effectively constrained, Facebook from imposing and profitably sustaining during the relevant period a significant artificial decrease in compensation to consumers for their user information and attention paid to advertisements. Facebook also has the power to impose and profitably sustain lower levels of data privacy protections and social media

network quality than would occur in a world where Facebook had not illegally monopolized the Social Network Market.  Facebook has the power to control prices and exclude competition in the Social Network Market.

233.   By multiple measures, Facebook has dominant market share in the Social Network Market.  As discussed more fully below, Facebook's market share in the Social Network Market is higher than its share in the Social Media Market.  And more than 80% of the time that consumers in the United States spend using social media is spent on Facebook and Instagram.

234.   High barriers to entry, high switching costs, and strong direct and indirect network effects make it unlikely, at any time in the foreseeable future, for a competitor to enter or take away substantial market share from Facebook in the Social Network Market in the United States to compete effectively with Facebook.

235.   Facebook has willfully acquired and maintained monopoly power in the Social Network Market by means of predatory, exclusionary, and anticompetitive conduct.  Such conduct includes, but is not limited to: (a) engaging in a scheme to gain market share at the expense of its rivals by inducing consumers to join Facebook through a pattern of deception regarding Facebook's data privacy protections and its commercial surveillance; and (b) weaponizing the data it obtained from consumers by means of deception to destroy competition through its strategy to "acquire, copy, or kill" any and all of its competitors.

236.   By eliminating competition and obtaining and maintaining monopoly power over the Social Network Markets as described above, Facebook was able to, and did, artificially decrease compensation to consumers for their information and attention and provide lower value to consumers than it would have provided in a competitive market.

237.    Facebook's destruction of competition caused antitrust injury to Plaintiff and Class members by decreasing compensation and lowering value for consumers, who received lower compensation and lower value from Facebook than those consumers would have received in the but-for world where Facebook competed on the merits. Plaintiff and the Class were injured and received substantially less compensation and lower value than they would have absent Facebook's unlawful and anticompetitive conduct.

238.    During the relevant period, Plaintiff and the Class members gave Facebook their personal data and attention in exchange for the use of its social media network. As a result of Facebook's illegal conduct, Plaintiff and other Class members received lower compensation and value than they would have absent Facebook's illegal conduct.

239.    There are no legitimate pro-competitive or business justifications for the conduct alleged herein, and even if there were, the anticompetitive effects would far outweigh any possible pro-competitive effects.

240.    Facebook's acts and practices have continued to be anticompetitive in nature and tendency and constitute an unfair method of competition, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

241.    Facebook's conduct has had a substantial effect on interstate commerce.

242.    Plaintiff and Class members have been, and will continue to be, injured in their property as a result of Facebook's conduct.

243.    Plaintiff and Class members have suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: (a) higher costs in terms of time and attention; (b) a reduction in consumer choice; and (c) being forced to accept a service of lesser quality because of reduced competition.

244.     Plaintiff and Class members seek an award of treble damages or, in the
alternative, disgorgement of Facebook's ill-gotten gains. Plaintiff also seeks appropriate
equitable relief to enjoin Facebook from continuing to engage in anticompetitive behavior to the
detriment of consumers and to remedy the harms that Facebook's monopolization of the Social
Network Market has caused, including: (a) divestment of assets that would continue to entrench
its monopoly power; and (b) requiring Facebook to submit to independent monitoring of its user
privacy practices, data surveillance, and acquisition conduct.

**SECOND CLAIM FOR RELIEF:**

**ATTEMPTED MONOPOLIZATION OF SOCIAL NETWORK MARKET**
**Sherman Antitrust Act, § 2**
**(On behalf of the Class)**

245.     Plaintiff re-alleges and incorporates by reference herein all the allegations
contained above.

246.     With respect to the Social Network Market, Facebook has engaged in predatory,
exclusionary, and anticompetitive conduct, including but not limited to; (a) obtaining market
share through a pattern of deceiving consumers; and (b) exploiting the data it obtained from
consumers through deception to systematically destroy competition through its strategy to "copy,
kill, or acquire" any and all of its competitors.

247.     Facebook's conduct has had an anticompetitive effect in the Social Network
Market.

248.     Facebook's conduct has no legitimate business purpose or procompetitive effect,
and even if there were, the anticompetitive effects would far outweigh any possible pro-
competitive effects.

249.     Facebook has engaged in the anticompetitive conduct described herein with the
specific intent of monopolizing the Social Network Market.

CLASS ACTION COMPLAINT
85

250.     Facebook has engaged in the anticompetitive conduct described herein with a dangerous probability of monopolizing the Social Network Market.

251.     Facebook's conduct has had a substantial effect on interstate commerce.

252.     Plaintiff and Class members have been, and will continue to be, injured in their property as a result of Facebook's conduct.

253.     Plaintiff and Class members have suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: (a) lower compensation for their time and attention; (b) a reduction in consumer choice; and (c) being forced to accept a service of lesser quality because of reduced competition.

254.     Plaintiff and Class members seek an award of treble damages or, in the alternative, disgorgement of Facebook's ill-gotten gains. Plaintiff also seek appropriate equitable relief to enjoin Facebook from continuing to engage in anticompetitive behavior to the detriment of consumers and to remedy the harms that Facebook's attempted monopolization of the Social Network Market has caused, including: (a) divestment of assets that would continue to entrench its monopoly power; and (b) requiring Facebook to submit to independent monitoring of its user privacy practices, data surveillance, and acquisition conduct.

**THIRD CLAIM FOR RELIEF:**

**MONOPOLIZATION OF SOCIAL MEDIA MARKET**
**Sherman Antitrust Act, § 2**
**(On behalf of the Class)**

255.     Plaintiff re-alleges and incorporates by reference herein all the allegations contained above.

256.     Facebook has willfully acquired and maintained monopoly power in the relevant Social Media Market.  There are no reasonably interchangeable products that would effectively constrain, or have effectively constrained, Facebook from imposing and profitably sustaining during the relevant period a significant artificial decrease in compensation to consumers for their

user information and attention paid to advertisements. Facebook also has the power to impose and profitably sustain lower levels of data privacy protections and social media quality than would occur in a world where Facebook had not illegally monopolized the Social Media Market. Facebook has the power to control prices and exclude competition in the Social Media Market.

257.     By multiple measures, Facebook has dominant market share in the Social Media Market.  As measured by advertising revenue that is generated by social media platforms in the Social Media Market, Facebook (including Instagram) has market share of at least 85% of the Social Media Market.  By its own measure, and as reflected in Facebook's internal documents, Facebook has estimated that it is "95% of all social media in the US[.]" And more than 80% of the time that consumers in the United States spend using social media is spent on Facebook and Instagram.

258.     High barriers to entry, high switching costs, and strong direct and indirect network effects make it unlikely, at any time in the foreseeable future, for a competitor to enter or take away substantial market share from Facebook in the Social Media Market in the United States to compete effectively with Facebook.

259.     Facebook has willfully acquired and maintained monopoly power in the Social Media Market by means of predatory, exclusionary, and anticompetitive conduct.  Such conduct includes, but is not limited to: (a) engaging in a scheme to gain market share at the expense of its rivals by inducing consumers to join Facebook through a pattern of deception regarding Facebook's data privacy protections and its commercial surveillance; and (b) weaponizing the data it obtained from consumers by means of deception to destroy competition through its strategy to "acquire, copy, or kill" any and all of its competitors.

260.     By eliminating competition and obtaining and maintaining monopoly power over the Social Media Market as described above, Facebook was able to, and did, artificially decrease

1  compensation to consumers for their information and attention and provide lower value to
2  consumers than it would have provided in a competitive market.

3      261.   Facebook's destruction of competition caused antitrust injury to Plaintiff and
4  Class members by decreasing compensation and lowering value for consumers, who received
5  lower compensation and lower value from Facebook than those consumers would have received
6  in the but-for world where Facebook competed on the merits. Plaintiff and the Class were injured
7  and received substantially less compensation and lower value than they would have absent
8  Facebook's unlawful and anticompetitive conduct.
9

10     262.   During the relevant period, Plaintiff and the Class members gave Facebook their
11  personal data and attention in exchange for the use of its social media network. As a result of
12  Facebook's illegal conduct, Plaintiff and other Class members received lower compensation and
13  value than they would have absent Facebook's illegal conduct.
14
15     263.   There are no legitimate pro-competitive or business justifications for the conduct
16  alleged herein, and even if there were, the anticompetitive effects would far outweigh any
17  possible pro-competitive effects.

18     264.   Facebook's acts and practices have continued to be anticompetitive in nature and
19  tendency and constitute an unfair method of competition, in violation of Section 2 of the
20  Sherman Act, 15 U.S.C. § 2.
21
22     265.   Facebook's conduct has had a substantial effect on interstate commerce.

23     266.   Plaintiff and Class members have been, and will continue to be, injured in their
24  property as a result of Facebook's conduct.

25     267.   Plaintiff and Class members have suffered, and will continue to suffer, injury of
26  the type that the antitrust laws were intended to prevent, including but not limited to: (a) higher
27
28

1    costs in terms of time and attention; (b) a reduction in consumer choice; and (c) being forced to

2    accept a service of lesser quality because of reduced competition.

3        268.    Plaintiff and Class members seek an award of treble damages or, in the

4    alternative, disgorgement of Facebook's ill-gotten gains. Plaintiff also seeks appropriate

5    equitable relief to enjoin Facebook from continuing to engage in anticompetitive behavior to the

6    detriment of consumers and to remedy the harms that Facebook's monopolization of the Social

7    Media Market has caused, including: (a) divestment of assets that would continue to entrench its

8    monopoly power; and (b) requiring Facebook to submit to independent monitoring of its user

9    privacy practices, data surveillance, and acquisition conduct.

10

11                        **FOURTH CLAIM FOR RELIEF:**

12              **ATTEMPTED MONOPOLIZATION OF SOCIAL MEDIA MARKET**
                         **Sherman Antitrust Act, § 2**
13                           **(On behalf of the Class)**

14       269.    Plaintiff re-alleges and incorporate by reference herein all the allegations

15   contained above.

16       270.    With respect to the Social Media Market, Facebook has engaged in predatory,

17   exclusionary, and anticompetitive conduct, including but not limited to; (a) obtaining market

18   share through a pattern of deceiving consumers; and (b) exploiting the data it obtained from

19   consumers through deception to systematically destroy competition through its strategy to "copy,

20   kill, or acquire" any and all of its competitors.

21       271.    Facebook's conduct has had an anticompetitive effect in the Social Media Market.

22       272.    Facebook's conduct has no legitimate business purpose or procompetitive effect,

23   and even if there were, the anticompetitive effects would far outweigh any possible pro-

24   competitive effects.

25       273.    Facebook has engaged in the anticompetitive conduct described herein with the

26   specific intent of monopolizing the Social Media Market.

274.    Facebook has engaged in the anticompetitive conduct described herein with a dangerous probability of monopolizing the Social Media Market.

275.    Facebook's conduct has had a substantial effect on interstate commerce.

276.    Plaintiff and Class members have been, and will continue to be, injured in their property as a result of Facebook's conduct.

277.    Plaintiff and Class members have suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: (a) lower compensation for their time and attention; (b) a reduction in consumer choice; and (c) being forced to accept a service of lesser quality because of reduced competition.

278.    Plaintiff and Class members seek an award of treble damages or, in the alternative, disgorgement of Facebook's ill-gotten gains. Plaintiff also seeks appropriate equitable relief to enjoin Facebook from continuing to engage in anticompetitive behavior to the detriment of consumers and to remedy the harms that Facebook's attempted monopolization of the Social Media Market has caused, including: (a) divestment of assets that would continue to entrench its monopoly power; and (b) requiring Facebook to submit to independent monitoring of its user privacy practices, data surveillance, and acquisition conduct.

**FIFTH CLAIM FOR RELIEF:**

**UNJUST ENRICHMENT**
**California Common Law**
**(On behalf of the Class)**

279.    Plaintiff re-alleges and incorporates by reference herein all the allegations contained above.

280.    In the Facebook Terms of Service ("Terms"), each class member and Facebook have agreed "that the laws of the State of California will govern these Terms and any claim [against Facebook], without regard to conflict of law provisions."

281.    Facebook has been unjustly enriched through its misconduct as alleged herein.

282.    Plaintiff and Class members conferred direct benefits on Facebook in the forms of their personal data, time, and attention.

283.    These benefits are quantifiable in measurable units. Facebook sells access to its users' data, time, and attention to third parties—including advertisers and app developers—for discrete money amounts. In 2019, for example, Facebook collected $70.7 billion in revenue, almost entirely from allowing companies to serve ads to its users.

284.    Facebook appreciated and had knowledge of the fact that Plaintiff and Class members conferred these benefits on it. For example, after Facebook's involvement in the Cambridge Analytica scandal came to light in March 2018, Facebook founder Mark Zuckerberg explicitly recognized that Plaintiff and Class members conferred on Facebook the benefit of their data, stating: "We have a responsibility to protect your data, and if we can't then we don't deserve to serve you."  Moreover, in 2018 Facebook earned an average of roughly $110 in ad revenue per American user. This calculation, however, ignores what it costs to collect, analyze, and market user data. According to the balance sheet on file with the SEC, Facebook earned $55.8 billion worldwide in 2018, virtually all of it from targeted advertising. Facebook also reported that relevant costs came to $20.6 billion. That implies that the value of its users' personal information was equivalent to $35.2 billion, or 63 percent of Facebook's earnings..

285.    Facebook acquired these benefits from Plaintiff and Class members through misrepresentations and deception.  Facebook induced Plaintiff and Class members to join Facebook based on the promise of stringent privacy protections. All the while, Facebook concealed the scope of the data it harvested from Plaintiff and Class members and brokered to third parties.  Nor did Facebook reveal the manner in which it weaponized Plaintiff's and Class members' data to "copy, kill, or acquire" Facebook's rivals.

286.    As a result of Facebook's receipt of the direct benefits of Plaintiff's and Class members' data, time, and attention, Facebook was able to destroy competition, enriching itself at the expense of Plaintiff and Class members.  Although Plaintiff and Class member conferred on Facebook the direct benefits of their data, time, and attention, Plaintiff and Class members have been, as a result of Facebook's misconduct: (a) deprived of a marketplace that adequately compensates them for their data, time, and attention with benefits of reciprocal value; (b) forced to accept Facebook's services, which are of inferior quality, with no meaningful alternative.

287.    Facebook has unjustly reaped monstrous financial gain as a result of the misconduct alleged herein.  In 2019, for example, Facebook collected $70.7 billion in revenue, almost entirely from allowing companies to serve ads to its users.  It would be unfair, unscrupulous, unjust, and inequitable to allow Facebook to retain the value it derived from the direct benefits that Plaintiff and Class members conferred upon it.

288.    To the extent that it is required—and solely in the alternative—Plaintiff and Class members have no other adequate remedy at law available.

289.    Plaintiff and Class members in all of the 50 States and the District of Columbia accordingly seek disgorgement of all of Facebook's profits resulting from the wanton misconduct alleged herein.

**SIXTH CLAIM FOR RELIEF**

VIOLATION OF THE UNFAIR COMPETITION ACT
(Cal. Bus. & Prof. Code § § 17200, *et seq.*)

290.    Plaintiff re-alleges and incorporates by reference herein all the allegations contained above.

291.    Plaintiff brings this claim on her own behalf and on behalf of each member of the proposed nationwide California-law class described above.

292.    California's Unfair Competition Law (UCL) defines "unfair competition" to include any "unlawful, unfair, or fraudulent" business act or practice. CAL. BUS. & PROF.

CODE §§ 17200 *et seq.* As these are stated in the disjunctive, the UCL sets up three prongs—the unlawful, unfair, and fraudulent prongs—the violation of any of which constitutes a violation of the UCL.

293.    Facebook has engaged in, and continues to engage in, acts of unfair competition as defined in California's UCL. More specifically, Facebook, based upon the conduct alleged herein, has violated the unlawful and unfair prongs of the UCL.

294.    Not only is there a California choice-of-law provision in Facebook's Terms of Service, but also, at all pertinent times, the conduct complained of took place in, and has emanated from, California.

295.    Facebook users, including the plaintiff, are individuals who lack sophistication and power.  Facebook users are also consumers.

296.    Facebook's acts of unfair competition include its violations of the Sherman Act as alleged herein. Therefore, Facebook has violated the unlawful prong of the UCL.

297.    Facebook's conduct has harmed its users, competition, and the public generally. Plaintiff and the Class Members give up something of material value when agreeing to Facebook's Terms of Service: their personal information and their attention.  User information and attention is then sold in measurable units to advertisers in exchange for money.  Consumers thus give up valuable consideration in using Facebook pursuant to Facebook's Terms of Service. As Facebook's co-founder explained, "[Facebook] is not actually free, and it certainly isn't harmless. . . . We pay for Facebook with our data and our attention, and by either measure it doesn't come cheap.".

298.    Facebook's acts of unfair competition include its violations of the Sherman Act and the policies underlying it, as alleged herein. More specifically:

(a)      The acts or practices alleged in this complaint violate the unfair
prong of the UCL because the injuries complained of herein are substantial: Facebook acquired
substantial benefits from Plaintiff and Class members through creating monopolization of the
social media platforms.  Facebook induced Plaintiff and Class members to join Facebook based
on the promise of stringent privacy protections. All the while, Facebook concealed the scope of
the data it harvested from Plaintiff and Class members and brokered to third parties.

(b)      As a result of Facebook's receipt of the direct benefits of
Plaintiff's and Class members' data, time, and attention, Plaintiff and Class members have been,
as a result of Facebook's misconduct: (a) deprived of a marketplace that adequately compensates
them for their data, time, and attention with benefits of reciprocal value; (b) forced to accept
Facebook's services, which are of inferior quality, with no meaningful alternative.

(c)      Facebook's business practices are also unfair because it offends the
nation's antitrust policies as alleged herein. They are immoral, unethical, oppressive, and
unscrupulous because they are a function of the abuse of Facebook's market power as alleged
herein; and

(d) Facebook's behavior is also unfair because it violates public policy that is
tethered to this country's statutory antitrust regulation, as expressed in part in the Sherman Act. In
sum, for all or any of these reasons, Facebook has violated the unfair prong of the UCL.

299.    Plaintiff and the Class Members are entitled to recover restitution.

300.    Plaintiff is still a current user of Facebook and is also entitled to injunctive relief to
prevent Facebook from persisting in its unlawful, inequitable, and unjustified behavior to her and
the Class Members detriment, with such an injunction requiring: (i) Facebook to halt its continuing
wrongful acts described herein; (ii) Facebook to engage third-party auditors to conduct audits and
evaluations of Facebook's data privacy practices, commercial surveillance, and acquisition

conduct, and ordering them to promptly correct any problems or issues detected by these auditors, and (iii) Facebook to divest assets, such as WhatsApp, Instagram, and its Onavo technology, that tend to substantially entrench Facebook's monopoly power in a timely and complete manner. *See, e.g.*, Cal. Bus. & Prof. Code § 17203.

### SEVENTH CLAIM FOR RELIEF
VIOLATION OF THE CARTWRIGHT ACT
(Cal. Bus & Prof. Code 16700 *et seq.*)

301.    Plaintiff re-alleges and incorporates by reference herein all the allegations contained above.

302.    Throughout the Class Period, Facebook engaged in systematic and continuous conduct with the purpose of (i) unreasonably restricting trade and commerce, and (ii) excluding potential competitors from the Social Network Market.  Facebook achieved these anticompetitive purposes by excluding or acquiring any potential competitors to Facebook's business. Facebook's conduct violated California Business and Professions Code §§ 16700 *et seq*. (the "Cartwright Act").

303.    The Cartwright Act applies to the anticompetitive, price-fixing, trade-restraining conduct of a single firm in certain circumstances where a trader uses coercive tactics to impose restraints on uncooperative businesses.

304.    Facebook's actions alleged herein, individually and collectively, were unlawful combinations within the meaning of the Cartwright Act. The effect of these unlawful combinations was to exclude competitors from the Social Media market, reinforce and grow Facebook's dominance and ability to extract anticompetitive profits (a perpetual cycle that will continue unless Facebook is enjoined), and – fundamental to this action – cause their dominance of the Social Media market.

305.   At all relevant times, Facebook intended to form and formed one or more trusts through a combination or conspiracy to accomplish purposes prohibited by and contrary to the public policy of the State of California.

306.   Facebook's actions constitute prohibited restraints on competition in violation of Business and Professions Code §§ 16720 *et seq.*

307.   Facebook willfully acquired and maintained monopoly power in the relevant Social Network Market, which violates Business and Professions Code § 16727, which makes it unlawful for "any person to lease or make a sale or contract for the sale of . . . commodities . . . or to fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor or competitors of the lessor or seller, where the effect . . . may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State."

308.   As a direct result of Facebook's unlawful conduct, Plaintiffs and the Class members were injured due to Facebook's maintenance of a Social Network Market monopoly.

309.   Plaintiffs and other Class members are "persons" within the meaning of the Cartwright Act as defined in California Business and Professions Code § 16702.

310.   Facebook's conduct violates the Cartwright Act.

311.   These violations are continuing and will continue unless enjoined by the Court.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Banks Kupcho, on behalf of herself and the Classes, seek the following relief:

a)       An order certifying this action as a class action under Fed.  R. Civ. 23, defining the Classes as requested herein, finding that Plaintiff are proper representatives of the Classes requested herein, and appointing Plaintiff's counsel as Class Counsel.

b)       Injunctive and other equitable relief as is necessary to protect the interests of the Classes, including: (i) an order prohibiting Facebook from continuing to engage in the wrongful acts described herein; (ii) requiring Facebook to engage third-party auditors to conduct audits and evaluations of Facebook's data privacy practices, commercial surveillance, and acquisition conduct, and ordering them to promptly correct any problems or issues detected by these auditors, and (iii) requiring Facebook to divest assets, such as WhatsApp, Instagram, and its Onavo technology, that tend to substantially entrench Facebook's monopoly power in a timely and complete manner.

c)       Treble damages or, alternatively, restitution and/or disgorgement of all amounts wrongfully charged to and received from Plaintiff and members of Classes.

d)       Attorneys' fees, statutory costs and other costs of suit herein incurred, for both pre- and post-judgment interest on any amounts awarded, for corrective advertising to ameliorate consumers' mistaken impressions created by Facebook's anticompetitive conduct.

e)       Declaratory relief, including but not limited to a declaration and judgment that Facebook's conduct as alleged herein violates the laws alleged herein.

f)       Such other relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:  December 11, 2020                    HAGENS BERMAN SOBOL SHAPIRO LLP

                                                         *s/  Shana E. Scarlett*
                                                         SHANA E. SCARLETT (SBN 217895)

                                                         715 Hearst Avenue, Suite 202
                                                         Berkeley, CA 94710

CLASS ACTION COMPLAINT
97

1    Telephone: (510) 725-3000
     Facsimile:  (510) 725-3001
2    E-Mail:  shanas@hbsslaw.com

3    Steve W. Berman
     1301 Second Avenue, Suite 2000
4    HAGENS BERMAN SOBOL SHAPIRO LLP
     Seattle, WA 98101
5    Telephone: (206) 623-7292
     Facsimile:  (206) 623-0594
6    E-mail:    steve@hbsslaw.com

7    W. Joseph Bruckner
8    Brian D. Clark
     Robert K. Shelquist
9    Rebecca A. Peterson (241858)
     Arielle S. Wagner
10   Stephanie Chen
     LOCKRIDGE GRINDAL NAUEN P.L.L.P.
11
12   100 Washington Avenue South, Suite 2200
     Minneapolis, MN 55401
13   Telephone: (612) 339-6900
     Facsimile: (612) 339-0981
14   E-mail: wjbruckner@locklaw.com
15           bdclark@locklaw.com
             rkshelquist@locklaw.com
16           rapeterson@locklaw.com
             aswagner@locklaw.com
17           sachen@locklaw.com

18
     ***Counsel for Plaintiff***
19
20
21
22
23
24
25
26
27
28

JS-CAND 44 (Rev. 10/2020)

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Rachel Banks Kupcho | Facebook, Inc. |

| **(b)** County of Residence of First Listed Plaintiff    Hennepin County<br>*(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant    San Mateo County<br>*(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |
| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)*<br>Shana E. Scarlett, Hagens Berman Sobol Shapiro LLP<br>715 Hearst Ave., Suite 202, Berkeley, CA 94501; (510) 725-3000 | Attorneys *(If Known)* |

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 | Federal Question<br>*(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 | Diversity<br>*(Indicate Citizenship of Parties in Item III)* |

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place<br>of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place<br>of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a<br>Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of<br>Overpayment Of<br>Veteran's Benefits<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted<br>Student Loans (Excludes<br>Veterans)<br>☐ 153 Recovery of<br>Overpayment<br>of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers'<br>Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product<br>Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury -Medical<br>Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury – Product<br>Liability<br>☐ 367 Health Care/<br>Pharmaceutical Personal<br>Injury Product Liability<br>☐ 368 Asbestos Personal Injury<br>Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property<br>Damage<br>☐ 385 Property Damage Product<br>Liability | ☐ 625 Drug Related Seizure of<br>Property 21 USC § 881<br>☐ 690 Other<br><br>**LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management<br>Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical<br>Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement<br>Income Security Act | ☐ 422 Appeal 28 USC § 158<br>☐ 423 Withdrawal 28 USC<br>§ 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent—Abbreviated New<br>Drug Application<br>☐ 840 Trademark<br>☐ 880 Defend Trade Secrets<br>Act of 2016 | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC<br>§ 3729(a))<br>☐ 400 State Reapportionment<br>☒ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced &<br>Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 485 Telephone Consumer<br>Protection Act<br>☐ 490 Cable/Sat TV |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/<br>Accommodations<br>☐ 445 Amer. w/Disabilities–<br>Employment<br>☐ 446 Amer. w/Disabilities–Other<br>☐ 448 Education | **PRISONER PETITIONS**<br>**HABEAS CORPUS**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate<br>Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**OTHER**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee–<br>Conditions of<br>Confinement | **IMMIGRATION**<br>☐ 462 Naturalization<br>Application<br>☐ 465 Other Immigration<br>Actions | **SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or<br>Defendant)<br>☐ 871 IRS–Third Party 26 USC<br>§ 7609 | ☐ 850 Securities/Commodities/<br>Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information<br>Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure<br>Act/Review or Appeal of<br>Agency Decision<br>☐ 950 Constitutionality of State<br>Statutes |

## V.  ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original<br>Proceeding | ☐ 2 Removed from<br>State Court | ☐ 3 Remanded from<br>Appellate Court | ☐ 4 Reinstated or<br>Reopened | ☐ 5 Transferred from<br>Another District *(specify)* | ☐ 6 Multidistrict<br>Litigation–Transfer | ☐ 8 Multidistrict<br>Litigation–Direct File |

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. § 2

Brief description of cause:
Monopolization of Social Network and Social Media Markets

## VII.  REQUESTED IN COMPLAINT:

☑ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, Fed. R. Civ. P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII.  RELATED CASE(S), IF ANY *(See instructions):*

JUDGE

DOCKET NUMBER

## IX.  DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

**(Place an "X" in One Box Only)**   ☐ SAN FRANCISCO/OAKLAND   ☒ SAN JOSE   ☐ EUREKA-MCKINLEYVILLE

DATE   12/11/2020   SIGNATURE OF ATTORNEY OF RECORD   s/ Shana E. Scarlett

# EXHIBIT 3

1  **KESSLER TOPAZ MELTZER & CHECK, LLP**
Jennifer L. Joost (Bar No. 296164)
2  One Sansome Street, Suite 1850
San Francisco, CA 94104
3  Tel: (415) 400-3000
Fax: (415) 400-3001
4  jjoost@ktmc.com
5
[*Additional Counsel on Signature Page*]
6
7  *Counsel for Plaintiffs DEBORAH DAMES*
*and TIMOTHY MATHEWS, individually and*
8  *on behalf of all others similarly situated*
9
10               **UNITED STATES DISTRICT COURT**
11        **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
12                    **SAN JOSE DIVISION**
13

| | |
|---|---|
| 14  DEBORAH DAMES and TIMOTHY MATHEWS, individually and on behalf of all others similarly 15  situated, | Case No. 5:20-cv-8817 |
| 16         Plaintiffs, | **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |
| 17         v. | CLASS ACTION |
| 18  FACEBOOK, INC., | |
| 19 | |
| 20         Defendant. | |

21
22
23
24
25
26
27
28

1.     Plaintiffs, by and through their undersigned counsel, hereby bring this action against Defendant Facebook, Inc. ("Facebook" or the "Company"), individually and on behalf of a class of similarly situated persons, and allege as follows:

I.     **PRELIMINARY STATEMENT**

2.     Facebook is the largest social networking platform in the world. Nearly 3 billion people use Facebook regularly to connect with friends and family through direct messages, sharing photos, and updating their statuses. Since its founding in 2004, Facebook has grown to become a social networking empire. But Facebook's market dominance was not achieved and maintained through fair competition and innovation; rather, Facebook obtained its position through anticompetitive behavior, such as buying up companies that threatened to compete with Facebook, like Instagram and WhatsApp, and imposing restrictive conditions on third-party applications to hinder any potential competition.

3.     As alleged below, Facebook holds monopoly power in the Personal Social Networking Market in the United States. In October 2020, Facebook reported having 1.82 billion daily active users and 2.74 billion monthly active users worldwide. No other social networking website is comparable in scale.

4.     Since toppling MySpace and other social networking providers and achieving its monopoly power, Facebook has turned to identifying and acquiring competitive threats. In 2012, Facebook acquired Instagram, a popular social networking app focused on sharing, editing, and commenting on photos, after its mobile photo-sharing features began to outshine those of Facebook. After neutralizing the threat from Instagram, Facebook turned to what it considered the next biggest consumer risk, WhatsApp. And instead of investing and innovating in an effort to out-compete their rivals, Facebook responded to the competitive threats by acquiring them.

5.     In addition to its strategy of acquiring competitive threats in personal social networking, Facebook has announced and enforced several anticompetitive barriers on third-party software applications that want access to Facebook's application programming interfaces ("APIs"). For years, third-party apps could only access Facebook's APIs if they agreed to refrain from providing the same functionality as Facebook, and from connecting with or promoting other social networks. This conduct allowed Facebook to weaken potential threats and maintain its monopoly.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

6.      But Facebook's improper market dominance must come to end. On December 9, 2020, more than 40 state attorneys general and the Federal Trade Commission filed antitrust actions against Facebook, alleging that the social networking empire engaged in unlawful, anticompetitive behavior to acquire or crush its competition and solidify dominance in the Personal Social Networking Market.

7.      This class action is brought on behalf of Facebook users that signed up for Facebook accounts. In exchange for their accounts, these users have allowed Facebook access to their personal data, including their names, pictures, connections, and online activity. From its early days, Facebook assured users that it was committed to "industry-leading privacy practices." But, as described below, Facebook consistently and intentionally deceived consumers about the privacy protections it actually provided to users.

8.      Facebook derives substantial economic benefits from the data it harvests from users. In fact, Facebook touts the economic value of such data. For example, Facebook describes its advertising earnings in terms of average revenue per user ("ARPU") in its public filings. For 2019, Facebook's ARPU was over $41 per user in the United States and Canada. And in that year, Facebook collected $70.7 billion in revenue, almost entirely from allowing companies to serve ads to its users.

9.      Absent Facebook's anticompetitive scheme, fair competition would have required Facebook to provide consumers greater value in return for their valuable data, but Facebook instead took that data without providing adequate compensation to its users. That constitutes antitrust injury. Through its deception anticompetitive conduct, Facebook prevented competition on the merits, and as a result of that reduction in competition, users received less value for their data than they would have received otherwise and were deprived of alternatives for personal social networking.

10.     Facebook has violated the antitrust laws and harmed consumers. This action seeks recovery for consumers' losses and Facebook's unlawful gains, as well as other appropriate equitable relief to prevent Facebook from continuing its anticompetitive conduct.

## II.   PARTIES

11.     Plaintiff Deborah Dames is a citizen of the state of Missouri and resides in Chesterfield, Missouri.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

12. Plaintiff Dames created a Facebook account in 2008. Plaintiff Dames maintains an active account and regularly uses Facebook. Plaintiff Dames also has an active Instagram account, which she created in 2017.

13. Plaintiff Timothy Mathews is a citizen of the state of Delaware and resides in Felton, Delaware.

14. Plaintiff Mathews created a Facebook account in 2006. Plaintiff Mathews maintains an active account and regularly uses Facebook. Plaintiff Mathews also has an active Instagram account, which he created in 2012.

15. Defendant Facebook is a publicly traded, for-profit company, incorporated in Delaware and with its principal place of business at 1601 Willow Road, Menlo Park, CA 94025.

16. The Company's principal businesses are in technologies that facilitate digital interactions and communications, including Facebook, which provides personal social networking; Instagram, which provides personal social networking; Facebook Messenger, which provides mobile messaging services; and WhatsApp, which provides mobile messaging services.

## III. <u>JURISDICTION AND VENUE</u>

17. This action arises under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and Section 4 of the Clayton Act, 15 U.S.C. § 15. The action seeks to recover treble damages or disgorgement of profits, interest, costs of suit, equitable relief, and reasonable attorneys' fees for damages to Plaintiffs and members of the Class resulting in the Company's restraints of trade and monopolization of the Personal Social Networking Market described herein.

18. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332, and 1337(a), and under 15 U.S.C. § 15. The Court also has subject matter jurisdiction over the state-law unjust enrichment claim under 28 U.S.C. § 1367.

19. This Court has personal jurisdiction over Facebook because it is subject to general jurisdiction in the State of California, where it maintains its headquarters and its principal place of business.

20. Venue is appropriate in this District under 15 U.S.C. § 15(a), 15 U.S.C. § 22, and 28 U.S.C. § 1391(b). Facebook transacts business within this District, and it transacts its affairs and carries out interstate trade and commerce, in substantial part, in this District.

21.     Facebook's "Terms of Service" provide that:

> For any claim, cause of action, or dispute you have against us that arises out of or relates to these Terms or the Facebook Products ("claim"), you agree that it will be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County. You also agree to submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claim, and that the laws of the State of California will govern these Terms and any claim, without regard to conflict of law provisions.[1]

## IV.   FACTUAL ALLEGATIONS

### A.   FACEBOOK AND PERSONAL SOCIAL NETWORKING

22.     In the early 2000s, the widespread use of personal computers enabled a new way of connecting and communicating with other people online: social networking with friends and family. Friendster, launched in March 2003, was one of the first personal social networks to gain significant popularity, and MySpace followed soon after. Half a year later, in February 2004, Mark Zuckerberg and his Harvard College classmates launched Facebook (then styled TheFacebook).

23.     In contrast to the limited functionalities of email and messaging, personal social networking gained popularity by providing a distinct and richer way for people to maintain personal connections. Personal social networking enables people to stay up-to-date and share personal content with friends and family, and is an integral part of the daily lives of millions of Americans.

24.     Facebook first launched on college campuses, but within a few years it had expanded to the general public.  Soon after, Facebook surpassed both Friendster and MySpace, presenting itself as a more premium, private, and personal social networking experience.  By 2009, Facebook had established itself as the most popular personal social networking provider in the United States and the world. Facebook has remained the number one provider of personal social networking in the United States and the world ever since.

25.     Historically, personal social networking providers have refrained from charging a monetary price for providing personal social networking to users, relying instead on monetizing user data and engagement through advertising. Personal social networking providers compete for users on a variety of

---

[1] *Facebook Terms of Service*, https://www.facebook.com/terms.php.

factors, including quality of the user experience, functionality, and privacy protection options, among others.

**B.    FACEBOOK'S BUSINESS MODEL**

26.    Facebook has monetized its businesses by selling advertising that is displayed to users based on the personal data that Facebook collects from them.

27.    This has been highly profitable for Facebook.  Advertisers pay billions—nearly $70 billion in 2019—to display their ads to specific "audiences" of Facebook and Instagram users, created by Facebook using proprietary algorithms that analyze the vast quantity of user data the company collects.  This allows advertisers to target different campaigns and messages to different groups of users. Ads displayed by Facebook are interspersed with—and can be similar in appearance to—user-generated content on each personal social network.

28.    Facebook has recognized the unique characteristics of the advertising that a personal social network ("Social Advertising") can offer.  For example, in an earnings call, Facebook Chief Operating Officer ("COO") Sheryl Sandberg described Facebook as the "world's first global platform that lets marketers personalize their messages at unprecedented scale," and called Facebook and Instagram the "two most important mobile advertising platforms" in the world.

29.    Social Advertising is distinct from other forms of advertising, including other forms of display advertising, search advertising, and "offline" advertising. Display advertising refers to the display of advertisements—in the form of images, text, or videos—on websites or apps when a user visits or uses them. Display advertising is distinct from "offline" advertising, such as TV, radio, and print advertising, because it offers the ability to reach consumers during their online activity (including during their use of mobile devices like smartphones and tablets), allows for interactive ads, and permits rich ad targeting to users using personal data generated and collected through their online activity.  Display advertising is also distinct from search advertising, which is a form of digital advertising that is shown to a person when he or she enters a specific search term in an online search engine, like Google or Bing. Advertisers buy search advertising to target consumers who are actively inquiring about a particular type of product or service. By contrast, display advertising reaches consumers who are not actively querying a search engine, including consumers who may be further from making a specific purchase decision.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

30.     Social Advertising is a type of display advertising, but it is distinct in several ways from the non-social display advertising on websites and apps that are not personal social networks. For example, in part because users must log in to a personal social network with unique user credentials, Social Advertising enables advertisers to target users based on personalized data regarding users' personal connections, activities, identity, demographics, interests, and hobbies. Also, in contrast to display advertising on other websites and apps, Social Advertising leverages high engagement and frequent contact with users, as well as the integration of advertisements directly into a user's feed of content generated by personal connections (including ads that resemble "native" content and boosted content). Social Advertising also facilitates forms of engagement with the advertisement that are not available with other forms of display advertising, such as allowing a user to share an advertisement with a personal connection, or to "like" or follow an advertiser's page. Among other things, the foregoing characteristics enable Social Advertising providers to sell advertisers access to personally targeted "audiences" of highly engaged users, and to reach users that need not be actively searching for—or even aware of—the advertised product or service.

31.     As Ms. Sandberg emphasized in a 2012 earnings call: "[O]n the question of where advertisers are, you know as I've said before, we are a third thing. We're not TV, we're not search. We are social advertising." Facebook in particular has a preeminent ability to target users with advertising due to its scale, its high level of user engagement, and its ability to track users both on and off Facebook properties to measure outcomes.

32.     Facebook's Social Advertising business—serving ads to users of its personal social networks reflecting its vast access to data—is extraordinarily profitable. According to its public earnings reports, Facebook earns substantially all of its revenue from selling advertising placements.

**C.     RELEVANT MARKET AND MONOPOLY POWER**

**1.     The Personal Social Networking Market**

33.     Personal social networking services are a relevant product market. Personal social networking services consist of online services that enable and are used by people to maintain personal relationships and share experiences with friends, family, and other personal connections in a shared social space. Personal social networking services are a unique and distinct type of online service. Three key

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

elements distinguish personal social networking services from other forms of online services provided to users.

34.     First, personal social networking services are built on a social graph that maps the connections between users and their friends, family, and other personal connections. The social graph forms the foundation upon which users connect and communicate with their personal connections, and can reflect friendships, online conversations, a desire to see someone's updates, visits to places, and other shared connections to personal interests and activities, including groups, locations, businesses, artists, and hobbies. Personal social networking providers use the social graph as the backbone for the features they offer users, including the two other key elements of personal social networking discussed below.

35.     Second, personal social networking services include features that many users regularly employ to interact with personal connections and share their personal experiences in a shared social space, including in a one-to-many "broadcast" format. In this shared social space, which may include a news feed or other similar feature, users share content—such as personal updates, interests, photos, news, and videos—with their personal connections. Personal social networking providers can use the social graph to inform what content they display to users in the shared social space and when.  This generally applies to all forms of content on the personal social networking service, including user-created content like user news feed posts, publisher-created content like news articles, and advertisements.

36.     Third, personal social networking services include features that allow users to find and connect with other users, to make it easier for each user to build and expand their set of personal connections.  The social graph also supports this feature by informing which connections are suggested or available to users.

37.     Instagram provided personal social networking at the time Facebook acquired it. Instagram provided the defining features of personal social networking, including maintaining a social graph with personal connections, enabling users to interact with their personal connections and share their personal experiences via a shared social space, including in a one-to-many "broadcast" format, and offering features that allow each user to find and connect with other users to build a network of personal connections.

38.     The relevant geographic market is the United States.  The United States is a relevant geographic market for personal social networking due to several factors, including differences in

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

broadband access and social norms that vary at the country level. In addition, network effects between users are generally stronger between users in the same country, because for most users the vast majority of relevant friends, family, and other personal connections reside in the same country as the user. Accordingly, users in the United States predominately share with other users in the United States. For users in the United States, a personal social networking service that is not popular in the United States, even if it is popular in another country, is therefore not reasonably interchangeable with a personal social networking service that is popular in the United States. Facebook and other industry participants recognize these distinctions and track their performance, and that of rivals, separately by country.

39.     While users may engage with other websites and apps, other types of internet services are not adequate substitutes for personal social networking.

40.     Personal social networking is distinct from, and not reasonably interchangeable with, specialized social networking services like those that focus on professional (e.g., LinkedIn) or interest-based (e.g., Strava) connections.  Specialized networks are designed for, and are utilized by users primarily for, sharing a narrow and highly specialized category of content with a narrow and highly specialized set of users for a narrow and distinct set of purposes.

41.     Personal social networking is distinct from, and not reasonably interchangeable with, online video or audio consumption-focused services such as YouTube, Spotify, Netflix, and Hulu. Users employ such services primarily for the passive consumption and posting of specific media content (e.g., videos or music) from and to a wide audience of often unknown users. These services are not used primarily to communicate with friends, family, and other personal connections. Search engines, such as Google, are also not personal social networks because they do not provide for interaction between platform members.

42.     Personal social networking is distinct from, and not reasonably interchangeable with, mobile messaging services. Mobile messaging services do not feature a shared social space in which users can interact, and do not rely upon a social graph that supports users in making connections and sharing experiences with friends and family. Indeed, users of mobile messaging services generally do not and cannot query a mobile messaging service to find contact information they do not already possess, nor can they query the service to find other users connected to the people, places, things, and interests that matter to them. Instead, users of mobile messaging services employ such services primarily to send

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

communications to a small and discrete set of people generally limited to a set of contacts entered by each user. Mr. Zuckerberg described this distinction in a 2019 post, calling personal social networking providers like Facebook "the digital equivalent of a town square," and contrasting the private communication offered by mobile messaging apps like WhatsApp as "the digital equivalent of the living room."[2] As discussed in more detail below, despite being a mobile-messaging app, Facebook acquired WhatsApp for fear that it would enter the personal social networking market and threaten Facebook's monopoly in that market.

## 2.      Facebook's Monopoly Power

43.      The Company provides personal social networking to users via its Facebook and Instagram services.

44.      Facebook has been the dominant personal social networking provider in the United States since at least 2011. Facebook has maintained a dominant share of the Personal Social Networking Market in the United States (in excess of 60%) since that time, until the present day. It is likely to continue to hold monopoly power for the foreseeable future.

45.      From the beginning, Mr. Zuckerberg has described Facebook as being "about real connections to actual friends, so the stories coming in are of interest to the people receiving them, since they are significant to the person creating them."[3]

46.      Indeed, in August 2020, Mr. Zuckerberg testified that "the use cases that we've focused on the most over time are helping you connect . . . with your friends and family." Similarly, Ms. Sandberg testified in September 2020 that the value Facebook provides to its users is "helping you stay in touch with friends and family and helping you know what's going on with them in a very efficient way."

47.      Facebook's dominant position in the Personal Social Networking Market is durable, due to significant entry barriers, including direct network effects and high switching costs.

48.      Direct network effects refer to user-to-user effects that make a personal social network more valuable as more users join the service. Direct network effects are a significant barrier to entry into personal social networking. Specifically, because a core purpose of personal social networking is to connect and

---

[2] https://www.facebook.com/notes/mark-zuckerberg/a-privacy-focused-vision-for-social-networking/10156700570096634/.

[3] https://www.facebook.com/notes/facebook/calm-down-breathe-we-hear-you/2208197130.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1 engage with personal connections, it is very difficult for a new entrant to displace an established personal
2 social network in which users' friends and family already participate.

3       49.    A potential entrant in personal social networking services also would have to overcome
4 users' reluctance to incur high switching costs. Over time, users of a personal social network build more
5 connections and develop a history of posts and shared experiences, which they would lose by switching to
6 another personal social networking provider. Further, these switching costs can increase over time as each
7 user's collection of content and connections, and investment of effort in building each, builds with use of
8 the service.

9       50.    Providers of personal social networking typically sell advertising that they display to their
10 users. Any positive indirect network effects (i.e., increases in the value of one service as a function of usage
11 of another) between a personal social networking provider's services to users and its sale of advertising to
12 advertisers operate in only one direction: users either are indifferent to the amount of advertising that the
13 personal social networking provider displays, or would prefer fewer or no advertisements.

14      **D.    ANTICOMPETITIVE CONDUCT**

15           **1.    Facebook's Efforts to Neutralize Personal Social Networking Competition**

16      51.    Personal social networking is characterized by strong network effects:  a provider's service
17 is generally more valuable to a user when more of the user's friends and family are using that service. Once
18 a personal social network has achieved dominant scale, these effects make competition and entry harder,
19 even for a rival that users perceive as offering a higher quality product.

20      52.    As a result, the most significant competitive threats to Facebook come not from near clones,
21 but from differentiated products that offer users a distinctive way of interacting with friends and family.

22      53.    To that end, Facebook has maintained its monopoly power in personal social networking,
23 not by competing on the merits, but rather through a course of anticompetitive conduct spanning many
24 years, including:

25          a)  the acquisition and continued control of Instagram, which has neutralized a significant
26              independent personal social networking provider;

27          b)  the acquisition and continued control of WhatsApp, which has neutralized a significant
28              competitive threat to Facebook's personal social networking monopoly;

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

c)   the imposition of anticompetitive conditions on access to APIs in order to suppress and deter competitive threats to its personal social networking monopoly; and

d)   its pattern of deception with respect to consumers concerning Facebook's privacy practices.

54.     Facebook's acquisition conduct reflects its philosophy that, as Mr. Zuckerberg put it, "we can likely always just buy any competitive startups."[4] Facebook has also made a point of attempting to detect and evaluate competitive threats early in order to neutralize them before they have a chance to grow fully.

55.     In October 2013, Facebook acquired the user surveillance company, Onavo. Onavo marketed itself to users as providing secure virtual private networking services, but—unknown to many users—it also tracked users' online activity.

56.     By acquiring Onavo, Facebook obtained control of data that it used to track the growth and popularity of other apps, with an eye toward identifying competitive threats for acquisition or for targeting under its anticompetitive Facebook Platform policies. Facebook shut down Onavo in 2019 following public scrutiny; however, it continues to track and evaluate potential competitive threats using other data.

57.     Facebook's monopolization is ongoing, as Facebook holds and operates Instagram and WhatsApp, which neutralizes their direct competitive threats to Facebook, and continues to keep them positioned to maintain its personal social networking monopoly. Specifically, Facebook recognizes that so long as it maintains Instagram and WhatsApp operating at scale, it will be harder for new firms to enter and build scale around their respective mechanics.

58.     Likewise, Facebook's imposition of anticompetitive conditions on APIs punished promising competitors and prevented others from even becoming threats in the first place.

**2.     Facebook Acquires Instagram and WhatsApp**

59.     In 2012, Facebook acquired Instagram, the most significant personal social networking competitor to emerge since Facebook had launched.

60.     Instagram is a mobile-first app that enables users to engage in personal social networking with family and friends through taking, editing, sharing, and commenting on photographs. Instagram

---

[4] https://www.theverge.com/2020/7/29/21345723/facebook-instagram-documents-emails-mark-zuckerberg-kevin-systrom-hearing.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

emerged when users of personal social networking were migrating from desktop computers to smartphones and toward a greater use of photo-based sharing. Smartphones combined high-quality cameras with mobile access to the internet, which gave consumers new ways to share their lives. Instagram satisfied users' demand for photo handling, social networking, and user experience via their smartphones and quickly became a fast-growing provider of personal social networking. As users increasingly demanded and prioritized personal social networking services on their smartphones, and connecting with friends and family through photo-sharing, Instagram threatened Facebook's monopoly on personal social networking.

61.    Facebook initially tried to compete with Instagram by improving its own mobile photo-sharing features, but to no avail. So Facebook fell back on the philosophy that "it is better to buy than compete."

62.    Mr. Zuckerberg recognized that by acquiring and controlling Instagram, Facebook would not only squelch the direct threat that Instagram posed, but also significantly hinder another firm from using photo-sharing on mobile phones to gain popularity as a provider of personal social networking. As Mr. Zuckerberg explained to Chief Financial Officer David Ebersman in a February 2012 email, controlling Instagram would secure Facebook's enduring dominance as a provider of personal social networking services

> [T]here are network effects around social products and a finite number of different social mechanics to invent.  Once someone wins at a specific mechanic, it's difficult for others to supplant them without doing something different. It's possible someone beats Instagram by building something that is better to the point that they get network migration, but this is harder as long as Instagram keeps running as a product. [Integrating Instagram's functions into Facebook] is also a factor but in reality we already know these companies' social dynamics and will integrate them over the next 12-24 months anyway…. [O]ne way of looking at this is that what we're really buying is time. Even if some new competitors spring[] up, buying Instagram, Path, Foursquare, etc now will give us a year or more to integrate their dynamics before anyone can get close to their scale again. Within that time, if we incorporate the social mechanics they were using, those new products won't get much traction since we'll already have their mechanics deployed at scale.

63.    On April 9, 2012, Facebook announced that it was acquiring Instagram. The Instagram acquisition has given Facebook control over its most significant personal social networking competitor, which both neutralizes the direct threat that Instagram posed by itself, and, additionally, makes it more difficult for other firms to use photo-sharing via smartphones to gain traction in personal social networking.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

64.     After neutralizing the threat from Instagram, Facebook identified another competitor that had embraced the importance of mobile technology—the popular and widely used mobile messaging app, WhatsApp. Once again, though, rather than investing and innovating in an effort to compete with WhatsApp, Facebook responded to the competitive threat by acquiring it.

65.     By 2012, WhatsApp had become a unique competitor in mobile messaging and an obvious candidate to enter the personal social networking market.  Not locked into a single mobile operating system like Apple's iMessage, nor heavily localized in parts of Asia like LINE, Kakao, or WeChat, WhatsApp was a leader in mobile messaging. As noted by one industry observer, "Facebook users were complaining dearly about the lack of one-on-one personalized socializing and sharing, which WhatsApp clearly has been successful with[.]"[5]

66.     Facebook's leadership feared that mobile messaging, like WhatsApp would serve as a path for a serious competitive threat to enter the personal social networking market.

67.     So once again, Facebook decided it was better to buy than compete, and Facebook announced its acquisition of WhatsApp in 2014. As noted by an analyst after the acquisition, "We think WhatsApp and Facebook were likely to more closely resemble each other over time, potentially creating noteworthy competition, which can now be avoided."[6]

68.     Just as with Instagram, WhatsApp presented a powerful threat to Facebook's personal social networking monopoly, which Facebook targeted for acquisition rather than competition. Facebook's control of WhatsApp both neutralizes WhatsApp as a direct threat and, separately, makes it harder for future mobile messaging apps to acquire scale and threaten to enter personal social networking.

**3.      The Company Created Anticompetitive Conditions for Its Platform That Deterred Competitors**

69.     Facebook launched "Facebook Platform" in 2007 with the goal of becoming the infrastructure for social interactions on the internet. Facebook Platform encouraged software developers to build an entire ecosystem of apps and tools—ranging from games and page design tools to video-sharing tools and e-marketing apps—that interact with Facebook.

---

[5] https://money.cnn.com/2014/02/20/technology/social/whatsapp-19-billion/.

[6] *Id.*

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

70.     Since its launch, Facebook Platform has undergone a variety of adjustments and added functionalities, such as APIs that allowed third-party apps access to Facebook's user data. In 2010, Facebook provided third-party apps with access to critical APIs, including the Find Friends API and other APIs used to access user content from Facebook. The Find Friends API, in particular, was a valuable growth tool for third-party apps because it enabled users of such apps to find their Facebook friends who also used the third-party app and to invite those friends who did not.

71.     Also in 2010, Facebook added the Open Graph API to Facebook Platform, which enabled third-party apps and websites to add plug-ins, such as the Facebook "Like" button, to their own services. Using the "Like" button, users could like and share their interest in the third-party app, which could attract additional users to the third-party app.

72.     This strategy drove profits for Facebook and helped Facebook grow. And, with the success of Facebook Platform, Facebook became important infrastructure for third-party apps and obtained immense power over their development.

73.     Facebook used this power to deter and suppress competitive threats to its personal social networking monopoly. In particular, to protect its personal social networking monopoly, Facebook adopted conditional dealing policies that limited how third-party apps could use Facebook Platform. Specifically, between 2011 and 2018, Facebook made Facebook Platform, including certain commercially significant APIs, available to developers only on the condition that their apps neither competed with Facebook nor promoted competitors. Facebook punished apps that violated these conditions by cutting off their use of commercially significant APIs.

(a)     The Anticompetitive Conditions on Facebook Platform

74.     From July 2011 until December 2018, Facebook publicly announced and imposed a set of anticompetitive conditions governing access to Facebook Platform.

75.     On July 27, 2011, Facebook introduced a new policy that "Apps on Facebook may not integrate, link to, promote, distribute, or redirect to any app on any other competing social platform." This policy was intended to harm and deter competition in the Personal Social Networking Market.

76.     Following that, Facebook imposed other policies restricting app developers' use of Facebook Platform, including Facebook APIs, to deter and suppress competition. Such restrictions include:

Case No. 5:20-cv-8817

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

- September 2012—"Competing social networks: You [developers] may not use Facebook Platform to export user data into a competing social network without our permission."

- January 2013—Developers "may not use Facebook Platform to promote, or to export user data to, a product or service that replicates a core Facebook product or service without our permission."

77. Driven by anticipated public scrutiny from the release of documents by the U.K. Parliament, Facebook removed its anticompetitive restrictions on Facebook Platform in December 2018.

78. Because access to the relevant APIs is valuable to app developers, Facebook policy conditions changed the incentives of app developers, and deterred them from developing competing functionalities or supporting competing social networks.

(b) Facebook's Enforcement of its Anticompetitive Conditions

79. Facebook enforced these conditions against potential competitors by cutting off API access. These competitors included:

- Path, a personal social networking competitor, which was founded by a former Facebook manager, whose access to Facebook API was terminated in or around 2013;

- Circle, an app that was attempting to build a local social network, which lost access to Facebook API in 2013;

- Vine, a video app launched by Twitter, whose API access was shut down in 2013;

- MessageMe, a messaging app for which Facebook revoked access to its API in 2013; and

- Stackla, a social media sentiment tracking company, which lost access in 2019.

80. Facebook's enforcement of the conditional platform policies hindered the ability of individual businesses, such as those above, to grow and threaten Facebook's personal social networking monopoly. Facebook's enforcement actions also alerted other apps that they would lose access to Facebook's APIs if they likewise threatened Facebook's personal social networking monopoly.

81. Collectively, Facebook's announcement and enforcement of its anticompetitive conditions have served to hinder, suppress, and deter the emergence of competitive threats to its monopoly in the Personal Social Networking Market.

82. Facebook cannot substantiate procompetitive benefits sufficient to justify the anticompetitive conditioning of access to Facebook Platform.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

**4.    Facebook Deceived Consumers about Its Privacy Practices**

83.    From as early as 2006, Facebook promised users that it would disclose its "information and privacy practices" and that it would "not use cookies to collect private information from any user."[7] It further claimed that its "commitment to industry-leading privacy practices."[8]

84.    In 2007, Facebook introduced its "Beacon" product. Beacon allowed participating third-parties to track users' purchases outside Facebook and notify their Facebook friends.[9] In 2010, Facebook launched its "Like" button, which is a web plug-in that appears on a third-party's website. If a user supports or "likes" a particular piece of content on the third-party website a number ticker besides the "Like" button increases by one. The "Like" button enabled Facebook to obtain consumer data by tracking activity across the internet.

85.    Facebook also began sharing its user data with app developers to entice them to access user content and information:

> Facebook's business model is "to monetise data," which evolved into Facebook paying app developers to build apps, using the personal information of Facebook's users.[10]

86.    Facebook similarly struck "data-sharing partnerships with at least 60 device makers—including Apple, Amazon, BlackBerry, Microsoft and Samsung" which "allow[ed] phone and other device makers access to vast amounts of its users' personal information."[11]

---

[7] *See* Dina Srinivasan, *The Antitrust Case Against Facebook: A Monopolist's Journey Towards Pervasive Surveillance In Spite of Consumers' Preference for Privacy*, 16 Berkeley Bus. L. J. 39 (2019).

[8] Facebook Launches Additional Privacy Controls for News Feed and Mini-Feed; Facebook Responds to User Feedback and Reaffirms Privacy as Top Priority, https://www.businesswire.com/news/home/20060908005274/en/Facebook-Launches-Additional-Privacy-Controls-for-News-Feed-and-Mini-Feed-Facebook-Responds-to-User-Feedback-and-Reaffirms-Privacy-as-Top-Priority.

[9] Louise Story, *Facebook Is Marketing Your Brand Preferences (With Your Permission)*, N.Y. Times, Nov. 7, 2007, https://www.nytimes.com/2007/11/07/technology/07adco.html.

[10] U.K. House of Commons, Digital, Culture, Media and Sport Committee, *Disinformation and 'Fake News': Final Report*, 2017-19, HC 1791, (Feb. 14, 2019), at ¶ 103.

[11] Gabriel J.X. Dance, Nicholas Confessore, and Michael LaForgia, *Facebook Gave Device Makers Deep Access to Data on Users and Friends*, N.Y. Times, June 3, 2018, https://www.nytimes.com/interactive/2018/06/03/technology/facebook-device-partners-users-friends-data.html.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

87.     As such, Facebook's offerings and privacy practices led to scrutiny from federal regulators and an eventual settlement, in 2012, with the Federal Trade Commission ("FTC"). In that settlement, the FTC charged that "Facebook deceived consumers by telling them they could keep their information on Facebook private, and then repeatedly allowing it to be shared and made public."[12]

88.     Facebook's settlement with the FTC barred Facebook from making any further deceptive privacy claims, required Facebook to get consumers' approval before it changes the way it shared their data, and required Facebook to obtain periodic assessments of its privacy practices by independent auditors.

89.     In March of 2018, news broke of a scandal which revealed the depth of Facebook's deception with respect to its privacy practices and also demonstrated that Facebook had failed to live up to its obligations under the FTC settlement.

90.     The scandal concerned Cambridge Analytica, a British political consulting firm that combined data harvesting and analytics for use in political advertising, and revealed that Facebook had been giving app developers the ability to harvest Facebook users' private data without the users' consent, and further to use that data for purposes beyond targeted advertising on Facebook.

91.     In particular, it was revealed that a Cambridge Analytica app, called "This Is Your Digital Life," which was used by 270,000 Facebook users, was able to access the personal data of up to 87 million Facebook users, the vast majority of whom had not given permission to Cambridge Analytica to access their data.

92.     Facebook banned the app and claimed that Cambridge Analytica had breached the Company's Terms of Service.[13] Subsequent investigation uncovered, however, that as early as April 2015, Facebook recognized that it was unable to keep track of how app developers were using their user data and

---

[12] Federal Trade Commission, *Facebook Settles FTC Charges That It Deceived Consumers By Failing To Keep Privacy Promises*, Nov. 29, 2011, https://www.ftc.gov/news-events/press-releases/2011/11/facebook-settles-ftc-charges-it-deceived-consumers-failing-keep.

[13] Kurt Wagner, *Here's how Facebook allowed Cambridge Analytica to get data for 50 million users*, Vox, Mar. 17, 2018, https://www.vox.com/2018/3/17/17134072/facebook-cambridge-analytica-trump-explained-user-data.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

that Facebook's data permissions allowed apps to access data not only about an app user, but also the data of the app user's connections.[14]

93.     On July 24, 2019, the FTC and the Department of Justice announced that Facebook would pay a $5 billion penalty in connection with its violation of the 2012 settlement "by deceiving users about their ability to control the privacy of their personal information."

> The $5 billion penalty against Facebook is the largest ever imposed on any company for violating consumers' privacy and almost 20 times greater than the largest privacy or data security penalty ever imposed worldwide.

> "Despite repeated promises to its billions of users worldwide that they could control how their personal information is shared, Facebook undermined consumers' choices," said FTC Chairman Joe Simons.

> More than 185 million people in the United States and Canada use Facebook on a daily basis. Facebook monetizes user information through targeted advertising, which generated most of the company's $55.8 billion in revenues in 2018. To encourage users to share information on its platform, Facebook promises users they can control the privacy of their information through Facebook's privacy settings.

> [Facebook's deceptive privacy disclosures and settings] allowed the company to share users' personal information with third-party apps that were downloaded by the user's Facebook "friends." The FTC alleges that many users were unaware that Facebook was sharing such information, and therefore did not take the steps needed to opt-out of sharing.[15]

## E.   FACEBOOK'S ANTICOMPETITIVE PRACTICES HAVE HARMED COMPETITION

94.     Facebook's anticompetitive practices described herein have harmed and continue to harm competition in the Personal Social Networking Market in the United States. As detailed herein, Facebook's strategies made it nearly impossible for competitors to challenge Facebook's monopoly. As a result, users of personal social networking services in the United States have been deprived of the benefits of additional competition.

---

[14] Deepa Seetharaman and Kirsten Grind, *Facebook's Lax Data Policies Led to Cambridge Analytica Crisis*, The Wall Street Journal, March 20, 2018, https://www.wsj.com/articles/facebooks-lax-data-policies-led-to-cambridge-analytica-crisis-1521590720.

[15] Federal Trade Commission, *FTC Imposes $5 Billion Penalty and Sweeping New Privacy Restrictions on Facebook*,       https://www.ftc.gov/news-events/press-releases/2019/07/ftc-imposes-5-billion-penalty-sweeping-new-privacy-restrictions.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

95.     The benefits to users of additional competition include additional innovation, quality improvements, and consumer choice, which would enable users to select a personal social networking provider that more closely suits their preferences, such as preferences regarding data privacy protections and the amount and nature of advertising.

96.     But for Facebook's anticompetitive practices, consumers would have had more options in the Personal Social Networking Market for connecting with other users.  Those options would have created social networks that competed with Facebook on the merits of data privacy protections and social network and platform quality.

97.     Because Facebook intentionally restrained competition in its efforts to acquire and obtain a monopoly on personal social networking services, competition concerning user privacy and product quality was foreclosed.

98.     As a condition for using Facebook, consumers agree to provide Facebook with access to its data. Facebook in turn sells that data for measurable amounts to third parties, such as advertisers. Absent Facebook's anticompetitive conduct, Facebook would have had to provide consumers increased value in exchange for their data. Otherwise, consumers would have engaged with, and provided their data to, other platforms, which would have provided consumers increased incremental value. The value of consumer data was artificially decreased by Facebook's anticompetitive conduct.

99.     In addition, by monopolizing the Personal Social Networking Market, Facebook also harmed, and continues to harm, competition for the sale of advertising in the United States. In particular, because personal social networking providers typically monetize through the sale of advertising, Facebook's suppression of competing personal social networking providers also has enabled Facebook to avoid close competition in the supply of advertising services.

100.    Competing personal social networking providers would have been close competitors of Facebook in the supply of advertising. This is because they would have been able to offer the distinctive advertising features described above that distinguish social advertising from other forms of display advertising, search advertising, and "offline" advertising. Instagram and WhatsApp, in particular, were each well-situated to develop into meaningful competitive constraints on Facebook in the sale of

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

advertising. Competing social networks may also have explored and developed alternative advertising models that consumers and advertisers preferred.

101.  Facebook's anticompetitive conduct to maintain its monopoly in the Personal Social Networking Market has neutralized, suppressed, and deterred competition for the sale of advertising, and deprived advertisers of the benefits of additional competition.

102.  The benefits to advertisers of additional competition include lower advertising prices, innovation, quality improvements, and choice, allowing advertisers to select a particular personal social networking provider that more closely suits their preferences.

103.  Facebook cannot establish business justifications or procompetitive benefits in any relevant market to justify its unlawful and anticompetitive conduct to maintain its monopoly.

**F.    INTERSTATE TRADE AND COMMERCE**

104.  Facebook's anticompetitive conduct has taken place in, and negatively affected the continuous flow of, interstate trade and commerce in the United States in that:

   a)  Facebook has used instrumentalities of interstate commerce to provide personal social networking services to consumers throughout the United States;

   b)  Facebook has exchanged user data with advertisers throughout the United States;

   c)  In furtherance of the anticompetitive scheme alleged herein, Facebook has traveled between states and exchanged communications through interstate wire communications and via the Unites States mail; and

   d)  The anticompetitive scheme alleged herein has affected billions of dollars of commerce. Facebook has inflicted antitrust injury by artificially raising the cost to consumers of using its product, by providing reduced user privacy protections and by artificially reducing consumer choice and competition in the Personal Social Networking Market in the United States.

**V.    THE ACCRUAL OF CLAIMS AND TOLLING OF THE STATUTE OF LIMITATIONS**

105.  Plaintiffs and class members had no knowledge of Facebook's anticompetitive conduct, or of facts sufficient to place them on inquiry notice of the claims asserted herein, during the class period and continuing thereafter.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

106.     Plaintiffs had no direct contact or interaction with Facebook and no means from which they could have discovered their injuries and the other bases for the harm they suffered.

107.     Plaintiffs allege a continuing course of unlawful conduct by Facebook, including conduct within the applicable limitations periods. That conduct has inflicted continuing and accumulating harm to Plaintiffs and class members within the applicable statutes of limitations.

108.     Additionally, Facebook has fraudulently concealed its data privacy practices and anticompetitive acquisition strategy. As a result, Plaintiffs and Class members were unaware of Facebook's unlawful conduct alleged herein.

109.     Plaintiffs had no knowledge of Facebook's wrongful acquisition and maintenance of monopoly power in the relevant market, or of facts sufficient to place them on inquiry notice of their injuries or the other bases for their causes of action, during the class period and continuing thereafter.

110.     Facebook concealed its anticompetitive conduct, both by failing to disclose its wrongful acquisition and maintenance of a personal social networking monopoly through exclusionary acts in the relevant market, and by affirmatively denying that it was engaged in such conduct. Facebook has repeatedly publicly denied allegations by government regulators that it has abused its power in the social networking market.

111.     In addition, Facebook's anticompetitive conduct was, by its very nature, inherently self-concealing because it was performed outside the sight and knowledge of consumers. As a result, Plaintiffs and Class members did not discover Facebook's scheme, even with the exercise of reasonable diligence.

112.     Accordingly, the statute of limitations should be equitably tolled, and all of the anticompetitive conduct described in this Complaint presents timely claims.

## VI.     CLASS ACTION ALLEGATIONS

113.     Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

114.     Pursuant to Federal Rule of Civil Procedure 23(b)(2) and/or (b)(3), Plaintiffs assert claims on behalf of the following Classes:

> **The Antitrust Class:** All persons or entities in the United States who maintained a Facebook profile at any point from 2007 up to the date of the filing of this action.

> **The Unjust Enrichment Class:** All persons or entities in the United States who maintained a Facebook profile at any point from 2007 up to the date of the filing of this action.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

115.    Excluded from the Classes are Facebook and its parents, subsidiaries, and corporate affiliates. Also excluded from the Classes are any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

116.    Plaintiffs reserve the right to revise the definition of the Classes based upon subsequently discovered information and reserve the right to establish additional subclasses where appropriate.

117.    The Classes are so numerous that joinder of all members is impracticable. Plaintiffs believe that the proposed Classes number at least in the tens of millions throughout the United States.

118.    Common questions of law and fact exist as to all members of the Classes and predominate over any issues solely affecting individual members of the Classes. The common and predominating questions of law and fact include, but are not limited to:

- Whether Facebook's acquisition of competitors was anticompetitive;

- Whether Facebook intentionally engaged in anticompetitive acts in order to obtain or maintain monopoly power;

- Whether the conditions that Facebook imposed with respect to Facebook Platform were anticompetitive;

- Whether Facebook is a monopolist in the Personal Social Networking Market;

- Whether Facebook intentionally made material misrepresentations about its data privacy practices;

- Whether Facebook's deception of consumers about its data privacy practices was anticompetitive;

- Whether Facebook's foreclosure of competition in the Personal Social Networking Market caused by its anticompetitive conduct led to cognizable and quantifiable economic harms to consumers;

- Whether consumers would have had more choices and competition amongst personal social networking companies if Facebook would have revealed the full extent of its data privacy practices earlier;

- Whether Facebook's anticompetitive conduct substantially harmed competition in the Personal Social Networking Market in the United States; and

- Whether Facebook's anticompetitive conduct should be enjoined or whether the Company should be subject to other appropriate equitable relief.

119.    Plaintiffs' claims are typical of the claims of the Classes that Plaintiffs seek to represent, as the claims arise from the same course of conduct by Facebook and the relief sought is common.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

120.     Plaintiffs are willing and prepared to serve the Classes in a representative capacity with all of the obligations and duties material thereto. Plaintiffs will fairly and adequately protect the interests of the Classes and have no interests adverse to or in conflict with the interests of the other members of the Classes.

121.     Plaintiffs' interests are co-extensive with and are not antagonistic to those of absent members within the Classes. Plaintiffs will undertake to represent and protect the interests of absent members within the Classes and will vigorously prosecute this action.

122.     Plaintiffs have engaged the services of the undersigned counsel. Counsel is experienced in complex litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiffs and absent members of the Classes.

123.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

124.     Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

125.     The Classes may also be certified under Rule 23(b)(2) because Facebook has acted on grounds generally applicable to the Classes, thereby making it appropriate to award final injunctive relief or corresponding declaratory relief with respect to the Classes.

## VII.    CLAIMS FOR RELIEF

### COUNT I: MONOPOLIZATION
### Sherman Act, 15 U.S.C § 2

126.     Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

127.     Facebook has willfully acquired and maintained monopoly power in the relevant Personal Social Networking Market. There are no reasonably interchangeable products that would effectively constrain, or have effectively constrained, Facebook from imposing and profitably sustaining during the relevant period a significant artificial decrease in compensation to consumers for their user information.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Facebook also has the power to impose and profitably sustain lower levels of data privacy protections and personal social networking quality than would occur in a world where Facebook had not illegally monopolized the Personal Social Networking Market. Facebook has the power to control prices and exclude competition in the Personal Social Networking Market.

128.    Facebook has dominant market share in the Personal Social Networking Market.

129.    High barriers to entry, high switching costs, and strong direct and indirect network effects make it unlikely, at any time in the foreseeable future, for a competitor to enter or take away substantial market share from Facebook in the Personal Social Networking Market in the United States to compete effectively with Facebook.

130.    Facebook has willfully acquired and maintained monopoly power in the Personal Social Networking Market by means of anticompetitive conduct. Such conduct includes, but is not limited to engaging in a scheme aimed to gain and maintain market share by neutralizing competition through the acquisition of competitors, the creation and enforcement of anticompetitive conditions on Facebook Platform, and by inducing consumers to join Facebook through a pattern of deception regarding Facebook's data privacy protections.

131.    By eliminating competition and obtaining and maintaining monopoly power over the Personal Social Networking Market as described above, Facebook was able to, and did, artificially decrease compensation to consumers for their user information and provide lower value to consumers than it would have provided in a competitive market.

132.    Facebook's destruction of competition caused antitrust injury to Plaintiffs and Class members by decreasing compensation and lowering value for consumers, who received lower compensation and lower value from Facebook than those consumers would have received in the but-for world where Facebook competed on the merits. Plaintiffs and the Classes were injured and received substantially less compensation and lower value than they would have absent Facebook's unlawful and anticompetitive conduct.

133.    During the relevant period, Plaintiffs and Class members provided Facebook with access to their personal data in exchange for the use of Facebook's personal social networking services. As a result of Facebook's illegal conduct, Plaintiffs and Class members received lower compensation and value than

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

they would have absent Facebook's illegal conduct. There are no legitimate pro-competitive or business justifications for the conduct alleged herein, and even if there were, the anticompetitive effects would far outweigh any possible pro-competitive effects.

134.    Facebook's acts and practices have continued to be anticompetitive in nature and tendency and constitute an unfair method of competition, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

135.    Facebook's conduct has had a substantial effect on interstate commerce.

136.    Plaintiffs and Class members have been, and will continue to be, injured in their property as a result of Facebook's conduct.

137.    Plaintiffs and Class members have suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: (a) higher costs in terms of their personal information; (b) a reduction in consumer choice; and (c) being forced to accept a service of lesser quality because of reduced competition.

138.    Plaintiffs and Class members seek an award of treble damages or, in the alternative, disgorgement of Facebook's ill-gotten gains. Plaintiffs also seek appropriate equitable relief to enjoin Facebook from continuing to engage in anticompetitive behavior to the detriment of consumers and to remedy the harms that Facebook's monopolization of the Personal Social Networking Market has caused.

**COUNT II: ATTEMPTED MONOPOLIZATION**
**Sherman Act, 15 U.S.C § 2**

139.    Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

140.    With respect to the Personal Social Networking Market, Facebook has engaged in anticompetitive conduct, including but not limited to engaging in a scheme aimed to gain and maintain market share by neutralizing competition through the acquisition of competitors and the creation and enforcement of anticompetitive conditions on Facebook Platform and by inducing consumers to join Facebook through a pattern of deception regarding Facebook's data privacy protections.

141.    Facebook's conduct has had an anticompetitive effect in the Personal Social Networking Market.

142.    Facebook's conduct has no legitimate business purpose or procompetitive effect, and even if there were, the anticompetitive effects would far outweigh any possible pro- competitive effects.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

143.    Facebook has engaged in the anticompetitive conduct described herein with the specific intent of monopolizing the Personal Social Networking Market.

144.    Facebook has engaged in the anticompetitive conduct described herein with a dangerous probability of monopolizing the Personal Social Networking Market.

145.    Facebook's conduct has had a substantial effect on interstate commerce.

146.    Plaintiffs and Class members have been, and will continue to be, injured in their property as a result of Facebook's conduct.

147.    Plaintiffs and Class members have suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: (a) lower compensation for their personal information; (b) a reduction in consumer choice; and (c) being forced to accept a service of lesser quality because of reduced competition.

148.    Plaintiffs and Class members seek an award of treble damages or, in the alternative, disgorgement of Facebook's ill-gotten gains. Plaintiffs also seek appropriate equitable relief to enjoin Facebook from continuing to engage in anticompetitive behavior to the detriment of consumers and to remedy the harms that Facebook's attempted monopolization of the Personal Social Networking Market has caused.

## COUNT III: UNJUST ENRICHMENT

149.    Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

150.    Facebook has been unjustly enriched through its misconduct as alleged herein.

151.    Plaintiffs and Class members conferred direct benefits on Facebook in the form of their personal data.

152.    These benefits are quantifiable in measurable units. Facebook sells access to its users' data to third parties—including advertisers and app developers—for discrete monetary amounts. In 2019, for example, Facebook collected $70.7 billion in revenue, almost entirely from allowing companies to serve ads to its users.

153.    Facebook appreciated and had knowledge of the fact that Plaintiffs and Class members conferred these benefits on it.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

154. Facebook acquired these benefits from Plaintiffs and Class members through misrepresentations and deception. Facebook induced Plaintiffs and Class members to join Facebook based, in part, on the promise of privacy protections. All the while, Facebook concealed the scope of the data it harvested from Plaintiffs and Class members and made available to third parties.

155. As a result of Facebook's receipt of the direct benefits of Plaintiffs' and Class members' data, Facebook was able to neutralize competition and enrich itself at the expense of Plaintiffs and Class members. Although Plaintiffs and Class members conferred on Facebook the direct benefits of their personal data, Plaintiffs and Class members have been, as a result of Facebook's misconduct: (a) deprived of a marketplace that adequately compensates them; (b) deprived them of alternatives for personal social networking services.

156. Facebook has unjustly reaped monstrous financial gain as a result of the misconduct alleged herein. In 2019, for example, Facebook collected $70.7 billion in revenue, almost entirely from allowing companies to serve ads to its users. It would be unjust and inequitable to allow Facebook to retain the value it derived from the direct benefits that Plaintiffs and Class members conferred upon it.

157. Plaintiffs and the Classes accordingly seek disgorgement of all of Facebook's profits resulting from the misconduct alleged herein.

## VIII. **PRAYER FOR RELIEF**

Plaintiffs, on behalf of themselves and the Classes, seek the following relief:

a) An order certifying this action as a class action under Fed. R. Civ. 23, defining the Classes as requested herein, finding that Plaintiffs are proper representatives of the Classes requested herein, and appointing Plaintiffs' counsel as Class Counsel;

b) Treble damages or, alternatively, restitution and/or disgorgement of all amounts wrongfully obtained;

c) Injunctive and other equitable relief as is necessary to protect the interests of the Classes;

d) Declaratory relief, including but not limited to a declaration that Facebook's conduct as alleged herein violates the laws alleged herein;

e) Attorneys' fees, statutory costs and other costs of suit herein incurred, for both pre- and post-judgment interest on any amounts awarded; and

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1       f)   Such other relief as the Court may deem just and proper.

2 **IX.**      **DEMAND FOR JURY TRIAL**

3        Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all

4 issues in this action so triable of right.

5 DATED: December 11, 2020                   Respectfully submitted,

6                                    /s/ Jennifer L. Joost

7                                   **KESSLER TOPAZ MELTZER & CHECK, LLP**
Jennifer L. Joost (Bar No. 296164)

8                                   One Sansome Street, Suite 1850
San Francisco, CA 94104

9                                   Telephone: (415) 400-3000
Facsimile: (415) 400-3001

10                                   jjoost@ktmc.com

11                                   Joseph H. Meltzer*

12                                   Terence S. Ziegler*
Melissa L. Troutner*

13                                   Lauren McGinley*

14                                   **KESSLER TOPAZ MELTZER & CHECK, LLP**
280 King of Prussia Road

15                                   Radnor, PA 19087
Tel: (610) 667-7706

16                                   Fax: (610) 667-7056
jmeltzer@ktmc.com

17                                   tziegler@ktmc.com

18                                   mtroutner@ktmc.com
lmcginley@ktmc.com

19

20                                   *pro hac vice* forthcoming

21                                   *Counsel for Plaintiffs DEBORAH DAMES and*
*TIMOTHY MATHEWS, individually and on behalf of*

22                                   *all others similarly situated*

23

24

25

26

27

28

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

JS-CAND 44 (Rev. 10/2020)

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

DEBORAH DAMES and TIMOTHY MATHEWS, individually and on behalf of all others similarly situated,

**(b)** County of Residence of First Listed Plaintiff   St. Louis County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Jennifer L. Joost, Kessler Topaz Meltzer & Check, LLP
One Sansome Street, Suite 1850, San Francisco, CA 94104; (415) 400-3000

### DEFENDANTS

FACEBOOK, INC.

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☐ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC § 881 | ☐ 422 Appeal 28 USC § 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury – Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC § 157 | ☐ 376 Qui Tam (31 USC § 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | **LABOR** | ☐ 820 Copyrights | ☒ 410 Antitrust |
| ☐ 150 Recovery of Overpayment Of Veteran's Benefits | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 830 Patent | ☐ 430 Banks and Banking |
| | | | ☐ 720 Labor/Management Relations | ☐ 835 Patent—Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 740 Railway Labor Act | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 751 Family and Medical Leave Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced & Corrupt Organizations |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 790 Other Labor Litigation | | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 791 Employee Retirement Income Security Act | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 362 Personal Injury -Medical Malpractice | | **IMMIGRATION** | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 462 Naturalization Application | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 465 Other Immigration Actions | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | ☐ 440 Other Civil Rights | **HABEAS CORPUS** | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS–Third Party 26 USC § 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 445 Amer. w/Disabilities– Employment | ☐ 535 Death Penalty | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 446 Amer. w/Disabilities–Other | **OTHER** | | | |
| ☐ 290 All Other Real Property | ☐ 448 Education | ☐ 540 Mandamus & Other | | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee– Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation–Transfer    ☐ 8 Multidistrict Litigation–Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. §§ 2, 15

Brief description of cause:
Restraints of trade and monopolization of the Personal Social Networking Market

## VII. REQUESTED IN COMPLAINT:

✓ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ☐ No

## VIII. RELATED CASE(S), IF ANY *(See instructions)*:

JUDGE   Hon. Koh; Hon. Beeler

DOCKET NUMBER   5:20cv8570; 5:20cv8721

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

**(Place an "X" in One Box Only)**   ☐ SAN FRANCISCO/OAKLAND   ☒ SAN JOSE   ☐ EUREKA-MCKINLEYVILLE

DATE   12/11/2020

SIGNATURE OF ATTORNEY OF RECORD   /s/ Jennifer L. Joost

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-CAND 44

**Authority For Civil Cover Sheet.** The JS-CAND 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

- **I. a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

- **b) County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

- **c) Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)."

- **II. Jurisdiction.** The basis of jurisdiction is set forth under Federal Rule of Civil Procedure 8(a), which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

  - (1) <u>United States plaintiff</u>. Jurisdiction based on 28 USC §§ 1345 and 1348. Suits by agencies and officers of the United States are included here.

  - (2) <u>United States defendant</u>. When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

  - (3) <u>Federal question</u>. This refers to suits under 28 USC § 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

  - (4) <u>Diversity of citizenship</u>. This refers to suits under 28 USC § 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

- **III. Residence (citizenship) of Principal Parties.** This section of the JS-CAND 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

- **IV. Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

- **V. Origin.** Place an "X" in one of the six boxes.

  - (1) <u>Original Proceedings</u>. Cases originating in the United States district courts.

  - (2) <u>Removed from State Court</u>. Proceedings initiated in state courts may be removed to the district courts under Title 28 USC § 1441. When the petition for removal is granted, check this box.

  - (3) <u>Remanded from Appellate Court</u>. Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

  - (4) <u>Reinstated or Reopened</u>. Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

  - (5) <u>Transferred from Another District</u>. For cases transferred under Title 28 USC § 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

  - (6) <u>Multidistrict Litigation Transfer</u>. Check this box when a multidistrict case is transferred into the district under authority of Title 28 USC § 1407. When this box is checked, do not check (5) above.

  - (8) <u>Multidistrict Litigation Direct File</u>. Check this box when a multidistrict litigation case is filed in the same district as the Master MDL docket.

    <u>Please note that there is no Origin Code 7</u>. Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

- **VI. Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC § 553. Brief Description: Unauthorized reception of cable service.

- **VII. Requested in Complaint.** <u>Class Action</u>. Place an "X" in this box if you are filing a class action under Federal Rule of Civil Procedure 23.

  <u>Demand</u>. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

  <u>Jury Demand</u>. Check the appropriate box to indicate whether or not a jury is being demanded.

- **VIII. Related Cases.** This section of the JS-CAND 44 is used to identify related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

- **IX. Divisional Assignment.** If the Nature of Suit is under Property Rights or Prisoner Petitions or the matter is a Securities Class Action, leave this section blank. For all other cases, identify the divisional venue according to Civil Local Rule 3-2: "the county in which a substantial part of the events or omissions which give rise to the claim occurred or in which a substantial part of the property that is the subject of the action is situated."

**Date and Attorney Signature.** Date and sign the civil cover sheet.

1  SONAL N. MEHTA (SBN 222086)
    Sonal.Mehta@wilmerhale.com
2  WILMER CUTLER PICKERING
    HALE AND DORR LLP
3  2600 El Camino Real, Suite 400
4  Palo Alto, California 94306
   Telephone: (650) 858-6000
5  Facsimile: (650) 858-6100

6  DAVID Z. GRINGER (*pro hac vice*)
    David.Gringer@wilmerhale.com
7  ARI HOLTZBLATT (*pro hac vice*)
8   Ari.Holtzblatt@wilmerhale.com
   MOLLY M. JENNINGS (*pro hac vice*)
9   Molly.Jennings@wilmerhale.com
10 WILMER CUTLER PICKERING
    HALE AND DORR LLP
11 1875 Pennsylvania Ave NW
   Washington, DC 20006
12 Telephone: (202) 663-6000
   Facsimile: (202) 663-6363
13
14 *Attorneys for Defendant*
   FACEBOOK, INC.
15

16              UNITED STATES DISTRICT COURT

17             NORTHERN DISTRICT OF CALIFORNIA

18                   SAN JOSE DIVISION

19 | REVEAL CHAT HOLDCO, LLC, a Delaware | Case No. 5:20-CV-00363-BLF
   limited liability company, USA TECHNOLOGY
20 AND MANAGEMENT SERVICES, INC. (d/b/a | **DEFENDANT FACEBOOK, INC.'S**
   Lenddo USA), a Delaware corporation, and | **[PROPOSED] ORDER GRANTING**
21 BEEHIVE BIOMETRIC, INC., a dissolved | **FACEBOOK'S MOTION FOR**
   Delaware corporation, | **ADMINISTRATIVE RELIEF TO**
22 | **CONSIDER WHETHER CASES**
   | **SHOULD BE RELATED**
23              Plaintiffs,

24 v.

25 FACEBOOK, INC., a Delaware corporation,

26              Defendant.

27

28

# [PROPOSED] ORDER

IT IS HEREBY ORDERED:  Defendant Facebook, Inc's Motion for Administrative Relief to Consider Whether Cases Should Be Related is GRANTED as follows:

1.  The actions recently filed in this District and captioned *Sherman v. Facebook, Inc.*, No. 3:20-cv-08721-LB; *Kupcho v. Facebook, Inc.*, No. 4:20-cv-08815-JSW; and *Dames v. Facebook, Inc.*, No. 3:20-cv-00817-TSH are hereby related to the instant earlier-filed matter, *Reveal Chat Holdco, LLC v. Facebook, Inc.*, No 5:20-cv-00363-BLF; and

2.  The *Sherman*, *Kupcho*, and *Dames* actions are hereby reassigned to this Court, the Honorable Beth Labson Freeman, accordingly.


DATED: _____          By: _____

Hon. Beth Labson Freeman

United States District Judge



Submitted by:

WILMER CUTLER PICKERING HALE AND DORR LLP

By:      */s/ Sonal N. Mehta*

*Attorney for Facebook, Inc.*