# EXHIBIT 1

SONAL N. MEHTA (SBN 222086)
Sonal.Mehta@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

DAVID Z. GRINGER (*pro hac vice*)
  David.Gringer@wilmerhale.com
ARI HOLTZBLATT (*pro hac vice*)
  Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
Molly.Jennings@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Attorneys for Defendant*
FACEBOOK, INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| REVEAL CHAT HOLDCO, LLC, a Delaware limited liability company, USA TECHNOLOGY AND MANAGEMENT SERVICES, INC. (d/b/a Lenddo USA), a Delaware corporation, and BEEHIVE BIOMETRIC, INC., a dissolved Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC., a Delaware corporation,<br><br>Defendant. | Case No. 5:20-cv-00363-BLF<br><br>**DEFENDANT FACEBOOK, INC.'S MOTION FOR ADMINISTRATIVE RELIEF TO CONSIDER WHETHER CASES SHOULD BE RELATED PURSUANT TO CIVIL L.R. 3-12**<br><br>Judge: Hon. Beth Labson Freeman |

Pursuant to Civil Local Rule 3-12, Defendant Facebook, Inc. respectfully moves the Court to consider whether to relate *Klein et al. v. Facebook, Inc.*, No. 5:20-cv-08570-LHK ("*Klein*") to *Reveal Chat et al. v. Facebook, Inc.*, No. 5:20-cv-00363-BLF ("*Reveal Chat*"). The *Reveal Chat* plaintiffs stipulate to this motion. The *Klein* plaintiffs oppose without explanation. A declaration from David Z. Gringer accompanies this motion.

Under Civil Local Rule 3-12(a), actions are related "when: (1) The actions concern substantially the same parties, property, transaction or event; and (2) It appears likely that there will be an unduly burdensome duplication of labor and expense or conflicting results if the cases are conducted before different Judges." A party that knows or believes that an action may be related to another action that is or was pending in this District "must promptly file in the lowest-numbered case an Administrative Motion to Consider Whether Cases Should be Related, pursuant to Civil L.R. 7-11." Civil L.R. 3-12(b).

The recently filed *Klein* action is a putative antitrust class action brought against Facebook on behalf of Facebook users. Like *Reveal Chat*, it alleges that Facebook unlawfully monopolized or attempted to monopolize markets in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. Both the *Klein* and *Reveal Chat* complaints focus on similar alleged conduct by Facebook as the gravamen of their complaints. As a few examples, the plaintiffs in both actions allege the following as part of their unlawful monopolization theories:

- To eliminate potential competition, Facebook acquired Instagram (*compare Reveal Chat* Am. Compl. ¶¶ 287-299 *with Klein* Compl. ¶¶ 170-177) and WhatsApp (*compare Reveal Chat* Am. Compl. ¶¶ 323-332, *with Klein* Compl. ¶¶ 184-186);

- In 2015, Facebook ended general access to the Friends and News Feed APIs and entered into data-sharing agreements (*compare Reveal Chat* Am. Compl. ¶¶ 247-261, *with Klein* Compl. ¶¶ 164-166, 168);

- Facebook acquired and used Onavo to collect user data and employed that data to identify and target competitive threats (*compare Reveal Chat* Am. Compl. ¶¶ 266-286, *with Klein* Compl. ¶¶ 148-153); and

- Facebook cloned the Snapchat "Stories" feature after acquisition talks failed (*compare Reveal Chat* Am. Compl. ¶¶ 311-312, *with Klein* Compl. ¶¶ 182-183).

In fact, both complaints repeatedly use identical or nearly identical language. For example:

| *Reveal Chat* | *Klein* |
|---|---|
| After the announcement and through the full removal of the APIs in April 2015, Facebook continued to make a series of agreements that forced certain competitors to hand their data over to Facebook. For example, Facebook forced certain third-party developers that it identified as competitive threats with valuable social data to sign Private Extended API agreements—referred to throughout this Complaint as "Whitelist and Data Sharing Agreements" or simply "the Agreements"—in order to obtain access to the Friends and/or News Feed APIs. Am. Compl. ¶ 247. | After the announcement and through the full removal of the APIs in April 2015, Facebook made a series of agreements that forced certain competitors to hand their data over to Facebook. For example, Facebook forced certain third-party developers that it identified as competitive threats with valuable social data to sign Private Extended API agreements—referred to throughout this Complaint as "Whitelist and Data Sharing Agreements" or simply "the Agreements"—in order to obtain access to the Friends and/or News Feed APIs. Compl. ¶ 165. |
| Facebook's Whitelist and Data Sharing Agreements, as of January 2015, included a provision that acknowledged that the APIs they covered are not available to the general public. An exhibit to each Whitelist and Data Sharing Agreement listed the specific Facebook APIs to which a particular developer was being granted access. Am. Compl. ¶ 248. | Facebook's Whitelist and Data Sharing Agreements included a provision that acknowledged that the APIs they covered are not available to the general public. An exhibit to each Whitelist and Data Sharing Agreement listed the specific Facebook APIs to which a particular developer was being granted access. Compl. ¶ 165. |
| These Agreements were only offered in | These Agreements were only offered in |

| | |
|---|---|
| exchange for massive purchases of Facebook's social data through mobile advertising and/or through the provision of the developer's own social data back to Facebook (so-called "reciprocity"). Am. Compl. ¶ 249. | exchange for massive purchases of Facebook's social data through mobile advertising and/or through the provision of the developer's own social data back to Facebook (so-called "reciprocity"). Compl. ¶ 165. |
| To obtain extensive information on a user's usage of mobile applications and of bandwidth, Onavo cloaked its spyware in virtual private networks ("VPNs"), data compression, and even in mobile privacy apps. Am. Compl. ¶ 266. | To obtain extensive information on a user's usage of mobile applications and of bandwidth, Onavo cloaked its spyware in VPNs, data compression, and even in mobile privacy apps. Compl. ¶ 149. |
| Onavo sold the mobile usage data it collected to Facebook, which in turn used the real-time information it received from Onavo to determine which mobile applications posed a threat to Facebook's dominance and to the SDBE protecting Facebook from new entrants and competition. Am. Compl. ¶ 267. | Onavo sold the mobile usage data it collected to Facebook, which in turn used the real-time information it received from Onavo to determine which mobile applications posed a threat to Facebook's dominance and to the substantial barriers to entry protecting Facebook from new entrants and competition. Compl. ¶ 149. |
| Facebook used Onavo data to: (a) identify and target competitors from which Facebook could demand Whitelist and Data Sharing Agreements; (b) identify and target competitors to whom Facebook would completely deny Platform access; and (c) identify and target competitors that Facebook would remove from the competitive landscape | Facebook used Onavo's data to: (a) identify and target competitors from which Facebook could demand concessions; (b) identify and target competitors to whom Facebook would completely deny access to its platform; and (c) identify and target competitors that Facebook would remove from the competitive landscape entirely through acquisition. Compl. ¶ 150. |

| | |
|---|---|
| entirely through acquisition. Am. Compl. ¶ 267. | |
| When an Onavo Protect user opened a mobile app or website, Onavo software secretly redirected the traffic to Facebook's servers, where the action was logged in a massive database. Facebook product teams then analyzed the aggregated Onavo data to determine which apps and features people were using in real time, how frequently they used the apps, and for how long. If the data in an app was not encrypted, this information was as specific as (for example) the number of photos the average user likes or posts in a week in that app. Am. Compl. ¶ 272. | When an Onavo Protect user opened a mobile app or website, Onavo software secretly redirected the traffic to Facebook's servers, where the action was logged in a massive database. Facebook product teams then analyzed the aggregated Onavo data to determine which apps and features people were using in real time, how frequently they used the apps, and for how long. If the data in an app was not encrypted, this information was as specific as (for example) the number of photos the average user likes or posts in a week in that app. Compl. ¶ 152. |

*Compare also Reveal Chat* Am. Compl. ¶ 266 *with Klein* Compl. ¶ 149; *Reveal Chat* Am. Compl. ¶ 292 *with Klein* Compl. ¶ 171; *Reveal Chat* Am. Compl. ¶ 293 *with Klein* Compl. ¶ 171.

To be sure, the *Klein* complaint contains an additional theory of competitive harm regarding Facebook's privacy policy, but the cases still easily exceed the relevant standard for relation. **First**, absent relation, there is a serious risk "of conflicting results." *See* Civil L.R. 3-12(a). Facebook anticipates raising similar defenses to the *Klein* allegations as it has in *Reveal Chat*: including that the claims are untimely and that the plaintiffs have failed to plausibly allege exclusionary conduct. And though the complaints focus primarily on the same conduct and claim similar anticompetitive effects, they allege the existence of different relevant markets with different market participants, further increasing the prospect for inconsistent judgments.

**Second**, *Klein* and *Reveal Chat* "concern substantially the same parties, property, transaction or event." Civil L.R. 3-12(a)(2)(1). Facebook is the sole defendant and there is some

overlap between the putative classes (one focused on app developers, the other Facebook users, which itself almost certainly includes the developers). And as discussed, *Klein* relies on "materially identical allegations of misconduct to those proffered by [Reveal Chat]." *Zakinov v. Ripple Labs, Inc.*, No. 18-CV-06753-PJH, 2020 WL 2768966, at *2 (N.D. Cal. May 28, 2020) (granting motion to relate). Recognizing these similarities, the FTC listed both *Reveal Chat* and *Klein* as related to a case it filed on December 9, 2020 in the United States District Court for the District of Columbia alleging that Facebook violated Section 2 of the Sherman Antitrust Act by, among things, acquiring WhatsApp and Instagram after using Onavo to identify those companies as potential competitive threats.

***Third***, given the substantial factual and legal overlap, it is "likely that there will be an unduly burdensome duplication of labor and expense … if the cases are conducted before different Judges." Civil L.R. 3-12(a)(2). Given the time and effort that the Court has already expended in assessing similar legal claims premised on a shared factual predicate, relating *Reveal Chat* and *Klein* would conserve judicial resources. For example, the *Klein* plaintiffs challenge the acquisitions of Instagram and WhatsApp, which this court has already held to be time-barred, rejecting the continuing violation theory that the *Klein* plaintiffs allege. And should the two cases survive motions to dismiss, relation is particularly important to avoid unnecessary labor and expense during discovery. Simply put, it would be inefficient and unduly burdensome to "hav[e] two different judges govern discovery disputes." *Financial Fusion, Inc. v. Ablaise Ltd.*, 2006 WL 3734292, at *3 (N.D. Cal. Dec. 18, 2006). Finally, discovery in *Reveal Chat* has not yet begun, meaning that it is not far ahead of *Klein*. *Id*. at *4 (noting lack of delay as factor in favor of relation).

Because of the substantial overlap between *Reveal Chat* and *Klein*, and because the Court is already familiar with many of the legal and factual issues implicated in the cases, Facebook respectfully requests that the Court enter an order relating *Reveal Chat* and *Klein*.

| | | |
|---|---|---|
| 1 | Dated: December 10, 2020 | Respectfully submitted, |

By: */s/ Sonal N. Mehta*
SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
david.gringer@wilmerhale.com
ARI HOLTZBLATT (*pro hac vice*)
ari.holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
molly.jennings@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 663-6000

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of December 2020, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System. And I hereby certify that I have served the foregoing document on counsel for the plaintiffs in the action in which relation is sought pursuant to agreement between the parties.

*/s/ Sonal N. Mehta*
Sonal N. Mehta