# EXHIBIT 4

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Jennifer L. Joost (Bar No. 296164)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel: (415) 400-3000
Fax: (415) 400-3001
jjoost@ktmc.com

[*Additional Counsel on Signature Page*]

*Counsel for Plaintiffs DEBORAH DAMES*
*and TIMOTHY MATHEWS, individually and*
*on behalf of all others similarly situated*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| DEBORAH DAMES and TIMOTHY MATHEWS, individually and on behalf of all others similarly situated,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>FACEBOOK, INC.,<br><br>　　　　　Defendant. | Case No. 5:20-cv-8817<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br><u>CLASS ACTION</u> |

1. Plaintiffs, by and through their undersigned counsel, hereby bring this action against Defendant Facebook, Inc. ("Facebook" or the "Company"), individually and on behalf of a class of similarly situated persons, and allege as follows:

## I.   **PRELIMINARY STATEMENT**

2. Facebook is the largest social networking platform in the world. Nearly 3 billion people use Facebook regularly to connect with friends and family through direct messages, sharing photos, and updating their statuses. Since its founding in 2004, Facebook has grown to become a social networking empire. But Facebook's market dominance was not achieved and maintained through fair competition and innovation; rather, Facebook obtained its position through anticompetitive behavior, such as buying up companies that threatened to compete with Facebook, like Instagram and WhatsApp, and imposing restrictive conditions on third-party applications to hinder any potential competition.

3. As alleged below, Facebook holds monopoly power in the Personal Social Networking Market in the United States. In October 2020, Facebook reported having 1.82 billion daily active users and 2.74 billion monthly active users worldwide. No other social networking website is comparable in scale.

4. Since toppling MySpace and other social networking providers and achieving its monopoly power, Facebook has turned to identifying and acquiring competitive threats. In 2012, Facebook acquired Instagram, a popular social networking app focused on sharing, editing, and commenting on photos, after its mobile photo-sharing features began to outshine those of Facebook. After neutralizing the threat from Instagram, Facebook turned to what it considered the next biggest consumer risk, WhatsApp. And instead of investing and innovating in an effort to out-compete their rivals, Facebook responded to the competitive threats by acquiring them.

5. In addition to its strategy of acquiring competitive threats in personal social networking, Facebook has announced and enforced several anticompetitive barriers on third-party software applications that want access to Facebook's application programming interfaces ("APIs"). For years, third-party apps could only access Facebook's APIs if they agreed to refrain from providing the same functionality as Facebook, and from connecting with or promoting other social networks. This conduct allowed Facebook to weaken potential threats and maintain its monopoly.

6. But Facebook's improper market dominance must come to end. On December 9, 2020, more than 40 state attorneys general and the Federal Trade Commission filed antitrust actions against Facebook, alleging that the social networking empire engaged in unlawful, anticompetitive behavior to acquire or crush its competition and solidify dominance in the Personal Social Networking Market.

7. This class action is brought on behalf of Facebook users that signed up for Facebook accounts. In exchange for their accounts, these users have allowed Facebook access to their personal data, including their names, pictures, connections, and online activity. From its early days, Facebook assured users that it was committed to "industry-leading privacy practices." But, as described below, Facebook consistently and intentionally deceived consumers about the privacy protections it actually provided to users.

8. Facebook derives substantial economic benefits from the data it harvests from users. In fact, Facebook touts the economic value of such data. For example, Facebook describes its advertising earnings in terms of average revenue per user ("ARPU") in its public filings. For 2019, Facebook's ARPU was over $41 per user in the United States and Canada. And in that year, Facebook collected $70.7 billion in revenue, almost entirely from allowing companies to serve ads to its users.

9. Absent Facebook's anticompetitive scheme, fair competition would have required Facebook to provide consumers greater value in return for their valuable data, but Facebook instead took that data without providing adequate compensation to its users. That constitutes antitrust injury. Through its deception anticompetitive conduct, Facebook prevented competition on the merits, and as a result of that reduction in competition, users received less value for their data than they would have received otherwise and were deprived of alternatives for personal social networking.

10. Facebook has violated the antitrust laws and harmed consumers. This action seeks recovery for consumers' losses and Facebook's unlawful gains, as well as other appropriate equitable relief to prevent Facebook from continuing its anticompetitive conduct.

## II.   PARTIES

11. Plaintiff Deborah Dames is a citizen of the state of Missouri and resides in Chesterfield, Missouri.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

12. Plaintiff Dames created a Facebook account in 2008. Plaintiff Dames maintains an active account and regularly uses Facebook. Plaintiff Dames also has an active Instagram account, which she created in 2017.

13. Plaintiff Timothy Mathews is a citizen of the state of Delaware and resides in Felton, Delaware.

14. Plaintiff Mathews created a Facebook account in 2006. Plaintiff Mathews maintains an active account and regularly uses Facebook. Plaintiff Mathews also has an active Instagram account, which he created in 2012.

15. Defendant Facebook is a publicly traded, for-profit company, incorporated in Delaware and with its principal place of business at 1601 Willow Road, Menlo Park, CA 94025.

16. The Company's principal businesses are in technologies that facilitate digital interactions and communications, including Facebook, which provides personal social networking; Instagram, which provides personal social networking; Facebook Messenger, which provides mobile messaging services; and WhatsApp, which provides mobile messaging services.

## III. **JURISDICTION AND VENUE**

17. This action arises under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and Section 4 of the Clayton Act, 15 U.S.C. § 15. The action seeks to recover treble damages or disgorgement of profits, interest, costs of suit, equitable relief, and reasonable attorneys' fees for damages to Plaintiffs and members of the Class resulting in the Company's restraints of trade and monopolization of the Personal Social Networking Market described herein.

18. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332, and 1337(a), and under 15 U.S.C. § 15. The Court also has subject matter jurisdiction over the state-law unjust enrichment claim under 28 U.S.C. § 1367.

19. This Court has personal jurisdiction over Facebook because it is subject to general jurisdiction in the State of California, where it maintains its headquarters and its principal place of business.

20. Venue is appropriate in this District under 15 U.S.C. § 15(a), 15 U.S.C. § 22, and 28 U.S.C. § 1391(b). Facebook transacts business within this District, and it transacts its affairs and carries out interstate trade and commerce, in substantial part, in this District.

21.     Facebook's "Terms of Service" provide that:

For any claim, cause of action, or dispute you have against us that arises out of or relates to these Terms or the Facebook Products ("claim"), you agree that it will be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County. You also agree to submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claim, and that the laws of the State of California will govern these Terms and any claim, without regard to conflict of law provisions.[1]

## IV.     FACTUAL ALLEGATIONS

### A.     FACEBOOK AND PERSONAL SOCIAL NETWORKING

22.     In the early 2000s, the widespread use of personal computers enabled a new way of connecting and communicating with other people online: social networking with friends and family. Friendster, launched in March 2003, was one of the first personal social networks to gain significant popularity, and MySpace followed soon after. Half a year later, in February 2004, Mark Zuckerberg and his Harvard College classmates launched Facebook (then styled TheFacebook).

23.     In contrast to the limited functionalities of email and messaging, personal social networking gained popularity by providing a distinct and richer way for people to maintain personal connections. Personal social networking enables people to stay up-to-date and share personal content with friends and family, and is an integral part of the daily lives of millions of Americans.

24.     Facebook first launched on college campuses, but within a few years it had expanded to the general public.  Soon after, Facebook surpassed both Friendster and MySpace, presenting itself as a more premium, private, and personal social networking experience.  By 2009, Facebook had established itself as the most popular personal social networking provider in the United States and the world. Facebook has remained the number one provider of personal social networking in the United States and the world ever since.

25.     Historically, personal social networking providers have refrained from charging a monetary price for providing personal social networking to users, relying instead on monetizing user data and engagement through advertising. Personal social networking providers compete for users on a variety of

---

[1] *Facebook Terms of Service*, https://www.facebook.com/terms.php.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

factors, including quality of the user experience, functionality, and privacy protection options, among others.

**B.      FACEBOOK'S BUSINESS MODEL**

26.      Facebook has monetized its businesses by selling advertising that is displayed to users based on the personal data that Facebook collects from them.

27.      This has been highly profitable for Facebook.  Advertisers pay billions—nearly $70 billion in 2019—to display their ads to specific "audiences" of Facebook and Instagram users, created by Facebook using proprietary algorithms that analyze the vast quantity of user data the company collects.  This allows advertisers to target different campaigns and messages to different groups of users. Ads displayed by Facebook are interspersed with—and can be similar in appearance to—user-generated content on each personal social network.

28.      Facebook has recognized the unique characteristics of the advertising that a personal social network ("Social Advertising") can offer.  For example, in an earnings call, Facebook Chief Operating Officer ("COO") Sheryl Sandberg described Facebook as the "world's first global platform that lets marketers personalize their messages at unprecedented scale," and called Facebook and Instagram the "two most important mobile advertising platforms" in the world.

29.      Social Advertising is distinct from other forms of advertising, including other forms of display advertising, search advertising, and "offline" advertising. Display advertising refers to the display of advertisements—in the form of images, text, or videos—on websites or apps when a user visits or uses them. Display advertising is distinct from "offline" advertising, such as TV, radio, and print advertising, because it offers the ability to reach consumers during their online activity (including during their use of mobile devices like smartphones and tablets), allows for interactive ads, and permits rich ad targeting to users using personal data generated and collected through their online activity.  Display advertising is also distinct from search advertising, which is a form of digital advertising that is shown to a person when he or she enters a specific search term in an online search engine, like Google or Bing. Advertisers buy search advertising to target consumers who are actively inquiring about a particular type of product or service. By contrast, display advertising reaches consumers who are not actively querying a search engine, including consumers who may be further from making a specific purchase decision.

30.     Social Advertising is a type of display advertising, but it is distinct in several ways from the non-social display advertising on websites and apps that are not personal social networks. For example, in part because users must log in to a personal social network with unique user credentials, Social Advertising enables advertisers to target users based on personalized data regarding users' personal connections, activities, identity, demographics, interests, and hobbies. Also, in contrast to display advertising on other websites and apps, Social Advertising leverages high engagement and frequent contact with users, as well as the integration of advertisements directly into a user's feed of content generated by personal connections (including ads that resemble "native" content and boosted content). Social Advertising also facilitates forms of engagement with the advertisement that are not available with other forms of display advertising, such as allowing a user to share an advertisement with a personal connection, or to "like" or follow an advertiser's page. Among other things, the foregoing characteristics enable Social Advertising providers to sell advertisers access to personally targeted "audiences" of highly engaged users, and to reach users that need not be actively searching for—or even aware of—the advertised product or service.

31.     As Ms. Sandberg emphasized in a 2012 earnings call: "[O]n the question of where advertisers are, you know as I've said before, we are a third thing.  We're not TV, we're not search. We are social advertising." Facebook in particular has a preeminent ability to target users with advertising due to its scale, its high level of user engagement, and its ability to track users both on and off Facebook properties to measure outcomes.

32.     Facebook's Social Advertising business—serving ads to users of its personal social networks reflecting its vast access to data—is extraordinarily profitable. According to its public earnings reports, Facebook earns substantially all of its revenue from selling advertising placements.

## C.    RELEVANT MARKET AND MONOPOLY POWER

### 1.    The Personal Social Networking Market

33.     Personal social networking services are a relevant product market. Personal social networking services consist of online services that enable and are used by people to maintain personal relationships and share experiences with friends, family, and other personal connections in a shared social space. Personal social networking services are a unique and distinct type of online service. Three key

elements distinguish personal social networking services from other forms of online services provided to users.

34. First, personal social networking services are built on a social graph that maps the connections between users and their friends, family, and other personal connections. The social graph forms the foundation upon which users connect and communicate with their personal connections, and can reflect friendships, online conversations, a desire to see someone's updates, visits to places, and other shared connections to personal interests and activities, including groups, locations, businesses, artists, and hobbies. Personal social networking providers use the social graph as the backbone for the features they offer users, including the two other key elements of personal social networking discussed below.

35. Second, personal social networking services include features that many users regularly employ to interact with personal connections and share their personal experiences in a shared social space, including in a one-to-many "broadcast" format. In this shared social space, which may include a news feed or other similar feature, users share content—such as personal updates, interests, photos, news, and videos—with their personal connections. Personal social networking providers can use the social graph to inform what content they display to users in the shared social space and when. This generally applies to all forms of content on the personal social networking service, including user-created content like user news feed posts, publisher-created content like news articles, and advertisements.

36. Third, personal social networking services include features that allow users to find and connect with other users, to make it easier for each user to build and expand their set of personal connections. The social graph also supports this feature by informing which connections are suggested or available to users.

37. Instagram provided personal social networking at the time Facebook acquired it. Instagram provided the defining features of personal social networking, including maintaining a social graph with personal connections, enabling users to interact with their personal connections and share their personal experiences via a shared social space, including in a one-to-many "broadcast" format, and offering features that allow each user to find and connect with other users to build a network of personal connections.

38. The relevant geographic market is the United States. The United States is a relevant geographic market for personal social networking due to several factors, including differences in

broadband access and social norms that vary at the country level. In addition, network effects between users are generally stronger between users in the same country, because for most users the vast majority of relevant friends, family, and other personal connections reside in the same country as the user. Accordingly, users in the United States predominately share with other users in the United States. For users in the United States, a personal social networking service that is not popular in the United States, even if it is popular in another country, is therefore not reasonably interchangeable with a personal social networking service that is popular in the United States. Facebook and other industry participants recognize these distinctions and track their performance, and that of rivals, separately by country.

39.   While users may engage with other websites and apps, other types of internet services are not adequate substitutes for personal social networking.

40.   Personal social networking is distinct from, and not reasonably interchangeable with, specialized social networking services like those that focus on professional (e.g., LinkedIn) or interest-based (e.g., Strava) connections.  Specialized networks are designed for, and are utilized by users primarily for, sharing a narrow and highly specialized category of content with a narrow and highly specialized set of users for a narrow and distinct set of purposes.

41.   Personal social networking is distinct from, and not reasonably interchangeable with, online video or audio consumption-focused services such as YouTube, Spotify, Netflix, and Hulu. Users employ such services primarily for the passive consumption and posting of specific media content (e.g., videos or music) from and to a wide audience of often unknown users. These services are not used primarily to communicate with friends, family, and other personal connections. Search engines, such as Google, are also not personal social networks because they do not provide for interaction between platform members.

42.   Personal social networking is distinct from, and not reasonably interchangeable with, mobile messaging services. Mobile messaging services do not feature a shared social space in which users can interact, and do not rely upon a social graph that supports users in making connections and sharing experiences with friends and family. Indeed, users of mobile messaging services generally do not and cannot query a mobile messaging service to find contact information they do not already possess, nor can they query the service to find other users connected to the people, places, things, and interests that matter to them. Instead, users of mobile messaging services employ such services primarily to send

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

communications to a small and discrete set of people generally limited to a set of contacts entered by each user. Mr. Zuckerberg described this distinction in a 2019 post, calling personal social networking providers like Facebook "the digital equivalent of a town square," and contrasting the private communication offered by mobile messaging apps like WhatsApp as "the digital equivalent of the living room."[2] As discussed in more detail below, despite being a mobile-messaging app, Facebook acquired WhatsApp for fear that it would enter the personal social networking market and threaten Facebook's monopoly in that market.

### 2. Facebook's Monopoly Power

43. The Company provides personal social networking to users via its Facebook and Instagram services.

44. Facebook has been the dominant personal social networking provider in the United States since at least 2011. Facebook has maintained a dominant share of the Personal Social Networking Market in the United States (in excess of 60%) since that time, until the present day. It is likely to continue to hold monopoly power for the foreseeable future.

45. From the beginning, Mr. Zuckerberg has described Facebook as being "about real connections to actual friends, so the stories coming in are of interest to the people receiving them, since they are significant to the person creating them."[3]

46. Indeed, in August 2020, Mr. Zuckerberg testified that "the use cases that we've focused on the most over time are helping you connect . . . with your friends and family." Similarly, Ms. Sandberg testified in September 2020 that the value Facebook provides to its users is "helping you stay in touch with friends and family and helping you know what's going on with them in a very efficient way."

47. Facebook's dominant position in the Personal Social Networking Market is durable, due to significant entry barriers, including direct network effects and high switching costs.

48. Direct network effects refer to user-to-user effects that make a personal social network more valuable as more users join the service. Direct network effects are a significant barrier to entry into personal social networking. Specifically, because a core purpose of personal social networking is to connect and

---

[2] https://www.facebook.com/notes/mark-zuckerberg/a-privacy-focused-vision-for-social-networking/10156700570096634/.

[3] https://www.facebook.com/notes/facebook/calm-down-breathe-we-hear-you/2208197130.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

engage with personal connections, it is very difficult for a new entrant to displace an established personal social network in which users' friends and family already participate.

49. A potential entrant in personal social networking services also would have to overcome users' reluctance to incur high switching costs. Over time, users of a personal social network build more connections and develop a history of posts and shared experiences, which they would lose by switching to another personal social networking provider. Further, these switching costs can increase over time as each user's collection of content and connections, and investment of effort in building each, builds with use of the service.

50. Providers of personal social networking typically sell advertising that they display to their users. Any positive indirect network effects (i.e., increases in the value of one service as a function of usage of another) between a personal social networking provider's services to users and its sale of advertising to advertisers operate in only one direction: users either are indifferent to the amount of advertising that the personal social networking provider displays, or would prefer fewer or no advertisements.

**D. ANTICOMPETITIVE CONDUCT**

**1. Facebook's Efforts to Neutralize Personal Social Networking Competition**

51. Personal social networking is characterized by strong network effects: a provider's service is generally more valuable to a user when more of the user's friends and family are using that service. Once a personal social network has achieved dominant scale, these effects make competition and entry harder, even for a rival that users perceive as offering a higher quality product.

52. As a result, the most significant competitive threats to Facebook come not from near clones, but from differentiated products that offer users a distinctive way of interacting with friends and family.

53. To that end, Facebook has maintained its monopoly power in personal social networking, not by competing on the merits, but rather through a course of anticompetitive conduct spanning many years, including:

   a) the acquisition and continued control of Instagram, which has neutralized a significant independent personal social networking provider;

   b) the acquisition and continued control of WhatsApp, which has neutralized a significant competitive threat to Facebook's personal social networking monopoly;

c) the imposition of anticompetitive conditions on access to APIs in order to suppress and deter competitive threats to its personal social networking monopoly; and

d) its pattern of deception with respect to consumers concerning Facebook's privacy practices.

54. Facebook's acquisition conduct reflects its philosophy that, as Mr. Zuckerberg put it, "we can likely always just buy any competitive startups."[4] Facebook has also made a point of attempting to detect and evaluate competitive threats early in order to neutralize them before they have a chance to grow fully.

55. In October 2013, Facebook acquired the user surveillance company, Onavo. Onavo marketed itself to users as providing secure virtual private networking services, but—unknown to many users—it also tracked users' online activity.

56. By acquiring Onavo, Facebook obtained control of data that it used to track the growth and popularity of other apps, with an eye toward identifying competitive threats for acquisition or for targeting under its anticompetitive Facebook Platform policies. Facebook shut down Onavo in 2019 following public scrutiny; however, it continues to track and evaluate potential competitive threats using other data.

57. Facebook's monopolization is ongoing, as Facebook holds and operates Instagram and WhatsApp, which neutralizes their direct competitive threats to Facebook, and continues to keep them positioned to maintain its personal social networking monopoly. Specifically, Facebook recognizes that so long as it maintains Instagram and WhatsApp operating at scale, it will be harder for new firms to enter and build scale around their respective mechanics.

58. Likewise, Facebook's imposition of anticompetitive conditions on APIs punished promising competitors and prevented others from even becoming threats in the first place.

## 2. Facebook Acquires Instagram and WhatsApp

59. In 2012, Facebook acquired Instagram, the most significant personal social networking competitor to emerge since Facebook had launched.

60. Instagram is a mobile-first app that enables users to engage in personal social networking with family and friends through taking, editing, sharing, and commenting on photographs. Instagram

---

[4] https://www.theverge.com/2020/7/29/21345723/facebook-instagram-documents-emails-mark-zuckerberg-kevin-systrom-hearing.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

emerged when users of personal social networking were migrating from desktop computers to smartphones and toward a greater use of photo-based sharing. Smartphones combined high-quality cameras with mobile access to the internet, which gave consumers new ways to share their lives. Instagram satisfied users' demand for photo handling, social networking, and user experience via their smartphones and quickly became a fast-growing provider of personal social networking. As users increasingly demanded and prioritized personal social networking services on their smartphones, and connecting with friends and family through photo-sharing, Instagram threatened Facebook's monopoly on personal social networking.

61.     Facebook initially tried to compete with Instagram by improving its own mobile photo-sharing features, but to no avail. So Facebook fell back on the philosophy that "it is better to buy than compete."

62.     Mr. Zuckerberg recognized that by acquiring and controlling Instagram, Facebook would not only squelch the direct threat that Instagram posed, but also significantly hinder another firm from using photo-sharing on mobile phones to gain popularity as a provider of personal social networking. As Mr. Zuckerberg explained to Chief Financial Officer David Ebersman in a February 2012 email, controlling Instagram would secure Facebook's enduring dominance as a provider of personal social networking services

> [T]here are network effects around social products and a finite number of different social mechanics to invent.  Once someone wins at a specific mechanic, it's difficult for others to supplant them without doing something different. It's possible someone beats Instagram by building something that is better to the point that they get network migration, but this is harder as long as Instagram keeps running as a product. [Integrating Instagram's functions into Facebook] is also a factor but in reality we already know these companies' social dynamics and will integrate them over the next 12-24 months anyway…. [O]ne way of looking at this is that what we're really buying is time. Even if some new competitors spring[] up, buying Instagram, Path, Foursquare, etc now will give us a year or more to integrate their dynamics before anyone can get close to their scale again. Within that time, if we incorporate the social mechanics they were using, those new products won't get much traction since we'll already have their mechanics deployed at scale.

63.     On April 9, 2012, Facebook announced that it was acquiring Instagram. The Instagram acquisition has given Facebook control over its most significant personal social networking competitor, which both neutralizes the direct threat that Instagram posed by itself, and, additionally, makes it more difficult for other firms to use photo-sharing via smartphones to gain traction in personal social networking.

64.     After neutralizing the threat from Instagram, Facebook identified another competitor that had embraced the importance of mobile technology—the popular and widely used mobile messaging app, WhatsApp. Once again, though, rather than investing and innovating in an effort to compete with WhatsApp, Facebook responded to the competitive threat by acquiring it.

65.     By 2012, WhatsApp had become a unique competitor in mobile messaging and an obvious candidate to enter the personal social networking market.  Not locked into a single mobile operating system like Apple's iMessage, nor heavily localized in parts of Asia like LINE, Kakao, or WeChat, WhatsApp was a leader in mobile messaging. As noted by one industry observer, "Facebook users were complaining dearly about the lack of one-on-one personalized socializing and sharing, which WhatsApp clearly has been successful with[.]"[5]

66.     Facebook's leadership feared that mobile messaging, like WhatsApp would serve as a path for a serious competitive threat to enter the personal social networking market.

67.     So once again, Facebook decided it was better to buy than compete, and Facebook announced its acquisition of WhatsApp in 2014. As noted by an analyst after the acquisition, "We think WhatsApp and Facebook were likely to more closely resemble each other over time, potentially creating noteworthy competition, which can now be avoided."[6]

68.     Just as with Instagram, WhatsApp presented a powerful threat to Facebook's personal social networking monopoly, which Facebook targeted for acquisition rather than competition. Facebook's control of WhatsApp both neutralizes WhatsApp as a direct threat and, separately, makes it harder for future mobile messaging apps to acquire scale and threaten to enter personal social networking.

### 3.     The Company Created Anticompetitive Conditions for Its Platform That Deterred Competitors

69.     Facebook launched "Facebook Platform" in 2007 with the goal of becoming the infrastructure for social interactions on the internet. Facebook Platform encouraged software developers to build an entire ecosystem of apps and tools—ranging from games and page design tools to video-sharing tools and e-marketing apps—that interact with Facebook.

---

[5] https://money.cnn.com/2014/02/20/technology/social/whatsapp-19-billion/.

[6] *Id.*

70.     Since its launch, Facebook Platform has undergone a variety of adjustments and added functionalities, such as APIs that allowed third-party apps access to Facebook's user data. In 2010, Facebook provided third-party apps with access to critical APIs, including the Find Friends API and other APIs used to access user content from Facebook. The Find Friends API, in particular, was a valuable growth tool for third-party apps because it enabled users of such apps to find their Facebook friends who also used the third-party app and to invite those friends who did not.

71.     Also in 2010, Facebook added the Open Graph API to Facebook Platform, which enabled third-party apps and websites to add plug-ins, such as the Facebook "Like" button, to their own services. Using the "Like" button, users could like and share their interest in the third-party app, which could attract additional users to the third-party app.

72.     This strategy drove profits for Facebook and helped Facebook grow. And, with the success of Facebook Platform, Facebook became important infrastructure for third-party apps and obtained immense power over their development.

73.     Facebook used this power to deter and suppress competitive threats to its personal social networking monopoly. In particular, to protect its personal social networking monopoly, Facebook adopted conditional dealing policies that limited how third-party apps could use Facebook Platform. Specifically, between 2011 and 2018, Facebook made Facebook Platform, including certain commercially significant APIs, available to developers only on the condition that their apps neither competed with Facebook nor promoted competitors. Facebook punished apps that violated these conditions by cutting off their use of commercially significant APIs.

(a)     The Anticompetitive Conditions on Facebook Platform

74.     From July 2011 until December 2018, Facebook publicly announced and imposed a set of anticompetitive conditions governing access to Facebook Platform.

75.     On July 27, 2011, Facebook introduced a new policy that "Apps on Facebook may not integrate, link to, promote, distribute, or redirect to any app on any other competing social platform." This policy was intended to harm and deter competition in the Personal Social Networking Market.

76.     Following that, Facebook imposed other policies restricting app developers' use of Facebook Platform, including Facebook APIs, to deter and suppress competition. Such restrictions include:

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

- September 2012—"Competing social networks: You [developers] may not use Facebook Platform to export user data into a competing social network without our permission."

- January 2013—Developers "may not use Facebook Platform to promote, or to export user data to, a product or service that replicates a core Facebook product or service without our permission."

77. Driven by anticipated public scrutiny from the release of documents by the U.K. Parliament, Facebook removed its anticompetitive restrictions on Facebook Platform in December 2018.

78. Because access to the relevant APIs is valuable to app developers, Facebook policy conditions changed the incentives of app developers, and deterred them from developing competing functionalities or supporting competing social networks.

(b)    Facebook's Enforcement of its Anticompetitive Conditions

79. Facebook enforced these conditions against potential competitors by cutting off API access. These competitors included:

- Path, a personal social networking competitor, which was founded by a former Facebook manager, whose access to Facebook API was terminated in or around 2013;

- Circle, an app that was attempting to build a local social network, which lost access to Facebook API in 2013;

- Vine, a video app launched by Twitter, whose API access was shut down in 2013;

- MessageMe, a messaging app for which Facebook revoked access to its API in 2013; and

- Stackla, a social media sentiment tracking company, which lost access in 2019.

80. Facebook's enforcement of the conditional platform policies hindered the ability of individual businesses, such as those above, to grow and threaten Facebook's personal social networking monopoly. Facebook's enforcement actions also alerted other apps that they would lose access to Facebook's APIs if they likewise threatened Facebook's personal social networking monopoly.

81. Collectively, Facebook's announcement and enforcement of its anticompetitive conditions have served to hinder, suppress, and deter the emergence of competitive threats to its monopoly in the Personal Social Networking Market.

82. Facebook cannot substantiate procompetitive benefits sufficient to justify the anticompetitive conditioning of access to Facebook Platform.

### 4. Facebook Deceived Consumers about Its Privacy Practices

83. From as early as 2006, Facebook promised users that it would disclose its "information and privacy practices" and that it would "not use cookies to collect private information from any user."[7] It further claimed that its "commitment to industry-leading privacy practices."[8]

84. In 2007, Facebook introduced its "Beacon" product. Beacon allowed participating third-parties to track users' purchases outside Facebook and notify their Facebook friends.[9] In 2010, Facebook launched its "Like" button, which is a web plug-in that appears on a third-party's website. If a user supports or "likes" a particular piece of content on the third-party website a number ticker besides the "Like" button increases by one. The "Like" button enabled Facebook to obtain consumer data by tracking activity across the internet.

85. Facebook also began sharing its user data with app developers to entice them to access user content and information:

> Facebook's business model is "to monetise data," which evolved into Facebook paying app developers to build apps, using the personal information of Facebook's users.[10]

86. Facebook similarly struck "data-sharing partnerships with at least 60 device makers—including Apple, Amazon, BlackBerry, Microsoft and Samsung" which "allow[ed] phone and other device makers access to vast amounts of its users' personal information."[11]

---

[7] *See* Dina Srinivasan, *The Antitrust Case Against Facebook: A Monopolist's Journey Towards Pervasive Surveillance In Spite of Consumers' Preference for Privacy*, 16 Berkeley Bus. L. J. 39 (2019).

[8] Facebook Launches Additional Privacy Controls for News Feed and Mini-Feed; Facebook Responds to User Feedback and Reaffirms Privacy as Top Priority, https://www.businesswire.com/news/home/20060908005274/en/Facebook-Launches-Additional-Privacy-Controls-for-News-Feed-and-Mini-Feed-Facebook-Responds-to-User-Feedback-and-Reaffirms-Privacy-as-Top-Priority.

[9] Louise Story, *Facebook Is Marketing Your Brand Preferences (With Your Permission)*, N.Y. Times, Nov. 7, 2007, https://www.nytimes.com/2007/11/07/technology/07adco.html.

[10] U.K. House of Commons, Digital, Culture, Media and Sport Committee, *Disinformation and 'Fake News': Final Report*, 2017-19, HC 1791, (Feb. 14, 2019), at ¶ 103.

[11] Gabriel J.X. Dance, Nicholas Confessore, and Michael LaForgia, *Facebook Gave Device Makers Deep Access to Data on Users and Friends*, N.Y. Times, June 3, 2018, https://www.nytimes.com/interactive/2018/06/03/technology/facebook-device-partners-users-friends-data.html.

87.     As such, Facebook's offerings and privacy practices led to scrutiny from federal regulators and an eventual settlement, in 2012, with the Federal Trade Commission ("FTC"). In that settlement, the FTC charged that "Facebook deceived consumers by telling them they could keep their information on Facebook private, and then repeatedly allowing it to be shared and made public."[12]

88.     Facebook's settlement with the FTC barred Facebook from making any further deceptive privacy claims, required Facebook to get consumers' approval before it changes the way it shared their data, and required Facebook to obtain periodic assessments of its privacy practices by independent auditors.

89.     In March of 2018, news broke of a scandal which revealed the depth of Facebook's deception with respect to its privacy practices and also demonstrated that Facebook had failed to live up to its obligations under the FTC settlement.

90.     The scandal concerned Cambridge Analytica, a British political consulting firm that combined data harvesting and analytics for use in political advertising, and revealed that Facebook had been giving app developers the ability to harvest Facebook users' private data without the users' consent, and further to use that data for purposes beyond targeted advertising on Facebook.

91.     In particular, it was revealed that a Cambridge Analytica app, called "This Is Your Digital Life," which was used by 270,000 Facebook users, was able to access the personal data of up to 87 million Facebook users, the vast majority of whom had not given permission to Cambridge Analytica to access their data.

92.     Facebook banned the app and claimed that Cambridge Analytica had breached the Company's Terms of Service.[13] Subsequent investigation uncovered, however, that as early as April 2015, Facebook recognized that it was unable to keep track of how app developers were using their user data and

---

[12] Federal Trade Commission, *Facebook Settles FTC Charges That It Deceived Consumers By Failing To Keep Privacy Promises*, Nov. 29, 2011, https://www.ftc.gov/news-events/press-releases/2011/11/facebook-settles-ftc-charges-it-deceived-consumers-failing-keep.

[13] Kurt Wagner, *Here's how Facebook allowed Cambridge Analytica to get data for 50 million users*, Vox, Mar. 17, 2018, https://www.vox.com/2018/3/17/17134072/facebook-cambridge-analytica-trump-explained-user-data.

that Facebook's data permissions allowed apps to access data not only about an app user, but also the data of the app user's connections.[14]

93. On July 24, 2019, the FTC and the Department of Justice announced that Facebook would pay a $5 billion penalty in connection with its violation of the 2012 settlement "by deceiving users about their ability to control the privacy of their personal information."

> The $5 billion penalty against Facebook is the largest ever imposed on any company for violating consumers' privacy and almost 20 times greater than the largest privacy or data security penalty ever imposed worldwide.

> "Despite repeated promises to its billions of users worldwide that they could control how their personal information is shared, Facebook undermined consumers' choices," said FTC Chairman Joe Simons.

> More than 185 million people in the United States and Canada use Facebook on a daily basis. Facebook monetizes user information through targeted advertising, which generated most of the company's $55.8 billion in revenues in 2018. To encourage users to share information on its platform, Facebook promises users they can control the privacy of their information through Facebook's privacy settings.

> [Facebook's deceptive privacy disclosures and settings] allowed the company to share users' personal information with third-party apps that were downloaded by the user's Facebook "friends." The FTC alleges that many users were unaware that Facebook was sharing such information, and therefore did not take the steps needed to opt-out of sharing.[15]

### E. FACEBOOK'S ANTICOMPETITIVE PRACTICES HAVE HARMED COMPETITION

94. Facebook's anticompetitive practices described herein have harmed and continue to harm competition in the Personal Social Networking Market in the United States. As detailed herein, Facebook's strategies made it nearly impossible for competitors to challenge Facebook's monopoly. As a result, users of personal social networking services in the United States have been deprived of the benefits of additional competition.

---

[14] Deepa Seetharaman and Kirsten Grind, *Facebook's Lax Data Policies Led to Cambridge Analytica Crisis*, The Wall Street Journal, March 20, 2018, https://www.wsj.com/articles/facebooks-lax-data-policies-led-to-cambridge-analytica-crisis-1521590720.

[15] Federal Trade Commission, *FTC Imposes $5 Billion Penalty and Sweeping New Privacy Restrictions on Facebook*, https://www.ftc.gov/news-events/press-releases/2019/07/ftc-imposes-5-billion-penalty-sweeping-new-privacy-restrictions.

95.     The benefits to users of additional competition include additional innovation, quality improvements, and consumer choice, which would enable users to select a personal social networking provider that more closely suits their preferences, such as preferences regarding data privacy protections and the amount and nature of advertising.

96.     But for Facebook's anticompetitive practices, consumers would have had more options in the Personal Social Networking Market for connecting with other users.  Those options would have created social networks that competed with Facebook on the merits of data privacy protections and social network and platform quality.

97.     Because Facebook intentionally restrained competition in its efforts to acquire and obtain a monopoly on personal social networking services, competition concerning user privacy and product quality was foreclosed.

98.     As a condition for using Facebook, consumers agree to provide Facebook with access to its data. Facebook in turn sells that data for measurable amounts to third parties, such as advertisers. Absent Facebook's anticompetitive conduct, Facebook would have had to provide consumers increased value in exchange for their data. Otherwise, consumers would have engaged with, and provided their data to, other platforms, which would have provided consumers increased incremental value. The value of consumer data was artificially decreased by Facebook's anticompetitive conduct.

99.     In addition, by monopolizing the Personal Social Networking Market, Facebook also harmed, and continues to harm, competition for the sale of advertising in the United States. In particular, because personal social networking providers typically monetize through the sale of advertising, Facebook's suppression of competing personal social networking providers also has enabled Facebook to avoid close competition in the supply of advertising services.

100.    Competing personal social networking providers would have been close competitors of Facebook in the supply of advertising. This is because they would have been able to offer the distinctive advertising features described above that distinguish social advertising from other forms of display advertising, search advertising, and "offline" advertising. Instagram and WhatsApp, in particular, were each well-situated to develop into meaningful competitive constraints on Facebook in the sale of

advertising. Competing social networks may also have explored and developed alternative advertising models that consumers and advertisers preferred.

101. Facebook's anticompetitive conduct to maintain its monopoly in the Personal Social Networking Market has neutralized, suppressed, and deterred competition for the sale of advertising, and deprived advertisers of the benefits of additional competition.

102. The benefits to advertisers of additional competition include lower advertising prices, innovation, quality improvements, and choice, allowing advertisers to select a particular personal social networking provider that more closely suits their preferences.

103. Facebook cannot establish business justifications or procompetitive benefits in any relevant market to justify its unlawful and anticompetitive conduct to maintain its monopoly.

## F. INTERSTATE TRADE AND COMMERCE

104. Facebook's anticompetitive conduct has taken place in, and negatively affected the continuous flow of, interstate trade and commerce in the United States in that:

    a) Facebook has used instrumentalities of interstate commerce to provide personal social networking services to consumers throughout the United States;

    b) Facebook has exchanged user data with advertisers throughout the United States;

    c) In furtherance of the anticompetitive scheme alleged herein, Facebook has traveled between states and exchanged communications through interstate wire communications and via the Unites States mail; and

    d) The anticompetitive scheme alleged herein has affected billions of dollars of commerce. Facebook has inflicted antitrust injury by artificially raising the cost to consumers of using its product, by providing reduced user privacy protections and by artificially reducing consumer choice and competition in the Personal Social Networking Market in the United States.

## V. THE ACCRUAL OF CLAIMS AND TOLLING OF THE STATUTE OF LIMITATIONS

105. Plaintiffs and class members had no knowledge of Facebook's anticompetitive conduct, or of facts sufficient to place them on inquiry notice of the claims asserted herein, during the class period and continuing thereafter.

106.    Plaintiffs had no direct contact or interaction with Facebook and no means from which they could have discovered their injuries and the other bases for the harm they suffered.

107.    Plaintiffs allege a continuing course of unlawful conduct by Facebook, including conduct within the applicable limitations periods. That conduct has inflicted continuing and accumulating harm to Plaintiffs and class members within the applicable statutes of limitations.

108.    Additionally, Facebook has fraudulently concealed its data privacy practices and anticompetitive acquisition strategy. As a result, Plaintiffs and Class members were unaware of Facebook's unlawful conduct alleged herein.

109.    Plaintiffs had no knowledge of Facebook's wrongful acquisition and maintenance of monopoly power in the relevant market, or of facts sufficient to place them on inquiry notice of their injuries or the other bases for their causes of action, during the class period and continuing thereafter.

110.    Facebook concealed its anticompetitive conduct, both by failing to disclose its wrongful acquisition and maintenance of a personal social networking monopoly through exclusionary acts in the relevant market, and by affirmatively denying that it was engaged in such conduct. Facebook has repeatedly publicly denied allegations by government regulators that it has abused its power in the social networking market.

111.    In addition, Facebook's anticompetitive conduct was, by its very nature, inherently self-concealing because it was performed outside the sight and knowledge of consumers. As a result, Plaintiffs and Class members did not discover Facebook's scheme, even with the exercise of reasonable diligence.

112.    Accordingly, the statute of limitations should be equitably tolled, and all of the anticompetitive conduct described in this Complaint presents timely claims.

## VI.    CLASS ACTION ALLEGATIONS

113.    Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

114.    Pursuant to Federal Rule of Civil Procedure 23(b)(2) and/or (b)(3), Plaintiffs assert claims on behalf of the following Classes:

**The Antitrust Class:** All persons or entities in the United States who maintained a Facebook profile at any point from 2007 up to the date of the filing of this action.

**The Unjust Enrichment Class:** All persons or entities in the United States who maintained a Facebook profile at any point from 2007 up to the date of the filing of this action.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

115.    Excluded from the Classes are Facebook and its parents, subsidiaries, and corporate affiliates. Also excluded from the Classes are any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

116.    Plaintiffs reserve the right to revise the definition of the Classes based upon subsequently discovered information and reserve the right to establish additional subclasses where appropriate.

117.    The Classes are so numerous that joinder of all members is impracticable. Plaintiffs believe that the proposed Classes number at least in the tens of millions throughout the United States.

118.    Common questions of law and fact exist as to all members of the Classes and predominate over any issues solely affecting individual members of the Classes. The common and predominating questions of law and fact include, but are not limited to:

- Whether Facebook's acquisition of competitors was anticompetitive;

- Whether Facebook intentionally engaged in anticompetitive acts in order to obtain or maintain monopoly power;

- Whether the conditions that Facebook imposed with respect to Facebook Platform were anticompetitive;

- Whether Facebook is a monopolist in the Personal Social Networking Market;

- Whether Facebook intentionally made material misrepresentations about its data privacy practices;

- Whether Facebook's deception of consumers about its data privacy practices was anticompetitive;

- Whether Facebook's foreclosure of competition in the Personal Social Networking Market caused by its anticompetitive conduct led to cognizable and quantifiable economic harms to consumers;

- Whether consumers would have had more choices and competition amongst personal social networking companies if Facebook would have revealed the full extent of its data privacy practices earlier;

- Whether Facebook's anticompetitive conduct substantially harmed competition in the Personal Social Networking Market in the United States; and

- Whether Facebook's anticompetitive conduct should be enjoined or whether the Company should be subject to other appropriate equitable relief.

119.    Plaintiffs' claims are typical of the claims of the Classes that Plaintiffs seek to represent, as the claims arise from the same course of conduct by Facebook and the relief sought is common.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

120.    Plaintiffs are willing and prepared to serve the Classes in a representative capacity with all of the obligations and duties material thereto. Plaintiffs will fairly and adequately protect the interests of the Classes and have no interests adverse to or in conflict with the interests of the other members of the Classes.

121.    Plaintiffs' interests are co-extensive with and are not antagonistic to those of absent members within the Classes. Plaintiffs will undertake to represent and protect the interests of absent members within the Classes and will vigorously prosecute this action.

122.    Plaintiffs have engaged the services of the undersigned counsel. Counsel is experienced in complex litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiffs and absent members of the Classes.

123.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

124.    Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

125.    The Classes may also be certified under Rule 23(b)(2) because Facebook has acted on grounds generally applicable to the Classes, thereby making it appropriate to award final injunctive relief or corresponding declaratory relief with respect to the Classes.

## VII.    CLAIMS FOR RELIEF

### COUNT I: MONOPOLIZATION
### Sherman Act, 15 U.S.C § 2

126.    Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

127.    Facebook has willfully acquired and maintained monopoly power in the relevant Personal Social Networking Market. There are no reasonably interchangeable products that would effectively constrain, or have effectively constrained, Facebook from imposing and profitably sustaining during the relevant period a significant artificial decrease in compensation to consumers for their user information.

Facebook also has the power to impose and profitably sustain lower levels of data privacy protections and personal social networking quality than would occur in a world where Facebook had not illegally monopolized the Personal Social Networking Market. Facebook has the power to control prices and exclude competition in the Personal Social Networking Market.

128.    Facebook has dominant market share in the Personal Social Networking Market.

129.    High barriers to entry, high switching costs, and strong direct and indirect network effects make it unlikely, at any time in the foreseeable future, for a competitor to enter or take away substantial market share from Facebook in the Personal Social Networking Market in the United States to compete effectively with Facebook.

130.    Facebook has willfully acquired and maintained monopoly power in the Personal Social Networking Market by means of anticompetitive conduct. Such conduct includes, but is not limited to engaging in a scheme aimed to gain and maintain market share by neutralizing competition through the acquisition of competitors, the creation and enforcement of anticompetitive conditions on Facebook Platform, and by inducing consumers to join Facebook through a pattern of deception regarding Facebook's data privacy protections.

131.    By eliminating competition and obtaining and maintaining monopoly power over the Personal Social Networking Market as described above, Facebook was able to, and did, artificially decrease compensation to consumers for their user information and provide lower value to consumers than it would have provided in a competitive market.

132.    Facebook's destruction of competition caused antitrust injury to Plaintiffs and Class members by decreasing compensation and lowering value for consumers, who received lower compensation and lower value from Facebook than those consumers would have received in the but-for world where Facebook competed on the merits. Plaintiffs and the Classes were injured and received substantially less compensation and lower value than they would have absent Facebook's unlawful and anticompetitive conduct.

133.    During the relevant period, Plaintiffs and Class members provided Facebook with access to their personal data in exchange for the use of Facebook's personal social networking services. As a result of Facebook's illegal conduct, Plaintiffs and Class members received lower compensation and value than

they would have absent Facebook's illegal conduct. There are no legitimate pro-competitive or business justifications for the conduct alleged herein, and even if there were, the anticompetitive effects would far outweigh any possible pro-competitive effects.

134.    Facebook's acts and practices have continued to be anticompetitive in nature and tendency and constitute an unfair method of competition, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

135.    Facebook's conduct has had a substantial effect on interstate commerce.

136.    Plaintiffs and Class members have been, and will continue to be, injured in their property as a result of Facebook's conduct.

137.    Plaintiffs and Class members have suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: (a) higher costs in terms of their personal information; (b) a reduction in consumer choice; and (c) being forced to accept a service of lesser quality because of reduced competition.

138.    Plaintiffs and Class members seek an award of treble damages or, in the alternative, disgorgement of Facebook's ill-gotten gains. Plaintiffs also seek appropriate equitable relief to enjoin Facebook from continuing to engage in anticompetitive behavior to the detriment of consumers and to remedy the harms that Facebook's monopolization of the Personal Social Networking Market has caused.

### COUNT II: ATTEMPTED MONOPOLIZATION
### Sherman Act, 15 U.S.C § 2

139.    Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

140.    With respect to the Personal Social Networking Market, Facebook has engaged in anticompetitive conduct, including but not limited to engaging in a scheme aimed to gain and maintain market share by neutralizing competition through the acquisition of competitors and the creation and enforcement of anticompetitive conditions on Facebook Platform and by inducing consumers to join Facebook through a pattern of deception regarding Facebook's data privacy protections.

141.    Facebook's conduct has had an anticompetitive effect in the Personal Social Networking Market.

142.    Facebook's conduct has no legitimate business purpose or procompetitive effect, and even if there were, the anticompetitive effects would far outweigh any possible pro- competitive effects.

143.    Facebook has engaged in the anticompetitive conduct described herein with the specific intent of monopolizing the Personal Social Networking Market.

144.    Facebook has engaged in the anticompetitive conduct described herein with a dangerous probability of monopolizing the Personal Social Networking Market.

145.    Facebook's conduct has had a substantial effect on interstate commerce.

146.    Plaintiffs and Class members have been, and will continue to be, injured in their property as a result of Facebook's conduct.

147.    Plaintiffs and Class members have suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: (a) lower compensation for their personal information; (b) a reduction in consumer choice; and (c) being forced to accept a service of lesser quality because of reduced competition.

148.    Plaintiffs and Class members seek an award of treble damages or, in the alternative, disgorgement of Facebook's ill-gotten gains. Plaintiffs also seek appropriate equitable relief to enjoin Facebook from continuing to engage in anticompetitive behavior to the detriment of consumers and to remedy the harms that Facebook's attempted monopolization of the Personal Social Networking Market has caused.

## COUNT III: UNJUST ENRICHMENT

149.    Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

150.    Facebook has been unjustly enriched through its misconduct as alleged herein.

151.    Plaintiffs and Class members conferred direct benefits on Facebook in the form of their personal data.

152.    These benefits are quantifiable in measurable units. Facebook sells access to its users' data to third parties—including advertisers and app developers—for discrete monetary amounts. In 2019, for example, Facebook collected $70.7 billion in revenue, almost entirely from allowing companies to serve ads to its users.

153.    Facebook appreciated and had knowledge of the fact that Plaintiffs and Class members conferred these benefits on it.

154.    Facebook acquired these benefits from Plaintiffs and Class members through misrepresentations and deception. Facebook induced Plaintiffs and Class members to join Facebook based, in part, on the promise of privacy protections. All the while, Facebook concealed the scope of the data it harvested from Plaintiffs and Class members and made available to third parties.

155.    As a result of Facebook's receipt of the direct benefits of Plaintiffs' and Class members' data, Facebook was able to neutralize competition and enrich itself at the expense of Plaintiffs and Class members. Although Plaintiffs and Class members conferred on Facebook the direct benefits of their personal data, Plaintiffs and Class members have been, as a result of Facebook's misconduct: (a) deprived of a marketplace that adequately compensates them; (b) deprived them of alternatives for personal social networking services.

156.    Facebook has unjustly reaped monstrous financial gain as a result of the misconduct alleged herein. In 2019, for example, Facebook collected $70.7 billion in revenue, almost entirely from allowing companies to serve ads to its users. It would be unjust and inequitable to allow Facebook to retain the value it derived from the direct benefits that Plaintiffs and Class members conferred upon it.

157.    Plaintiffs and the Classes accordingly seek disgorgement of all of Facebook's profits resulting from the misconduct alleged herein.

## VIII.  PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and the Classes, seek the following relief:

a) An order certifying this action as a class action under Fed. R. Civ. 23, defining the Classes as requested herein, finding that Plaintiffs are proper representatives of the Classes requested herein, and appointing Plaintiffs' counsel as Class Counsel;

b) Treble damages or, alternatively, restitution and/or disgorgement of all amounts wrongfully obtained;

c) Injunctive and other equitable relief as is necessary to protect the interests of the Classes;

d) Declaratory relief, including but not limited to a declaration that Facebook's conduct as alleged herein violates the laws alleged herein;

e) Attorneys' fees, statutory costs and other costs of suit herein incurred, for both pre- and post-judgment interest on any amounts awarded; and

     f)   Such other relief as the Court may deem just and proper.

## IX.    **DEMAND FOR JURY TRIAL**

    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

DATED: December 11, 2020

Respectfully submitted,

/s/ Jennifer L. Joost
**KESSLER TOPAZ MELTZER & CHECK, LLP**
Jennifer L. Joost (Bar No. 296164)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001
jjoost@ktmc.com

Joseph H. Meltzer*
Terence S. Ziegler*
Melissa L. Troutner*
Lauren McGinley*
**KESSLER TOPAZ MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
jmeltzer@ktmc.com
tziegler@ktmc.com
mtroutner@ktmc.com
lmcginley@ktmc.com

*pro hac vice* forthcoming

*Counsel for Plaintiffs DEBORAH DAMES and TIMOTHY MATHEWS, individually and on behalf of all others similarly situated*