1   **QUINN EMANUEL URQUHART & SULLIVAN, LLP**
2   Stephen A. Swedlow (admitted *pro hac vice*)
    stephenswedlow@quinnemanuel.com
3   191 N. Wacker Drive, Suite 2700
    Chicago, IL 60606
4   (312) 705-7400
    **HAGENS BERMAN SOBOL SHAPIRO LLP**
5   Shana E. Scarlett (Bar No. 217895)
    shanas@hbsslaw.com
6   715 Hearst Avenue, Suite 202
    Berkeley, CA 94710
7   (510) 725-3000

8   *Interim Co-Lead Consumer Class Counsel*

9   **BATHAEE DUNNE LLP**
    Yavar Bathaee (Bar No. 282388)
10    yavar@bathaeedunne.com
    445 Park Avenue, 9th Floor
11  New York, NY 10022
    (332) 205-7668
12  **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
    Kristen M. Anderson (Bar No. 246108)
13    kanderson@scott-scott.com
    230 Park Avenue, 17th Floor
14  New York, NY 10169
    (212) 233-6444
15
16  *Interim Co-Lead Advertiser Class Counsel*

SONAL N. MEHTA (SBN 222086)
  Sonal.Mehta@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
950 Page Mill Road
Palo Alto, California 94303
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

DAVID Z. GRINGER (*pro hac vice*)
  David.Gringer@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
1875 Pennsylvania Ave NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Attorneys for Defendant Facebook, Inc.*

17
18
19
20

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN and SARAH GRABERT, individually and on behalf of all other similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC., a Delaware Corporation headquartered in California,<br><br>Defendant. | Case No. 5:20-cv-08570-LHK<br><br>**JOINT CASE MANAGEMENT STATEMENT**<br><br>Hearing Date: April 7, 2021<br>Time: 2:00 pm<br>Judge: Hon. Lucy Koh |

1   Pursuant to Civil Local Rule 16-9, The Standing Order For All Judges Of The Northern

2   District Of California, and the Scheduling Order entered by the Court, ECF No. 47, counsel for

3   the proposed Consumer Class, the proposed Advertiser Class, and defendant Facebook, Inc. have

4   met and conferred on certain issues and respectfully submit this Joint Case Management

5   Statement in advance of the Initial Case Management Conference on April 7, 2021 at 2:00 p.m.

6   **1.     Jurisdiction and Service**

7   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331

8   (federal question jurisdiction), 1332 (class action diversity jurisdiction), and 1337(a) (antitrust);

9   and under 15 U.S.C. §§ 15 and 26 (antitrust), as this action alleges violations of Section 2 of the

10  Sherman Antitrust Act, 15 U.S.C. § 2.  This Court also has subject matter jurisdiction over the

11  state law unjust enrichment claims presented in this action under 28 U.S.C. § 1367 (supplemental

12  jurisdiction).

13  Facebook does not anticipate contesting subject matter jurisdiction, but reserves all

14  objections pending review of the Consolidated Class Action Complaints ("CACs") that plaintiffs

15  intend to file.  In addition, at the March 18 hearing, certain plaintiffs raised the issue of

16  arbitrability of plaintiffs' claims here; Facebook expects that it will assess that issue, and raise it

17  with the Court as appropriate, once the CACs are filed and the scope of the cases is clearer.

18  Plaintiffs would oppose any motion to compel arbitration.

19  Facebook does not contest personal jurisdiction or venue.  Facebook has also been

20  properly served in many of the underlying cases.

21  **2.     Facts**

22  **Plaintiffs' Position:**

23  Facebook has built one of the world's most dominant monopolies through an

24  extraordinary and unprecedented pattern of anticompetitive conduct.  Facebook attempts to brush

25  this case aside by claiming it is a free service that competes with everything from search engines

26  to Netflix.  But that posturing ignores the well-pleaded allegations in the complaints, and

27  common sense.

28

Facebook provides its social networking services to consumers for non-cash consideration. But as Facebook's co-founder has explained, "[Facebook] is not actually free . . . . We pay for Facebook with our data and our attention, and by either measure it doesn't come cheap." Chris Hughes, *It's Time to Break Up Facebook*, NY Times, May 9, 2019, *available at* https://kl.link/3dUTshC. Facebook "spend[s] billions of dollars annually" developing features and content that it offers to consumers in exchange for their data and attention, *infra* at 5-6. And Facebook converts that data and attention into billions in profits by selling a unique form of digital advertising, which Facebook COO Sheryl Sandberg has described as "a third thing. We're not TV, we're not search. We are social advertising." Complaint (Public Redacted Version), *FTC v. Facebook, Inc*., No. 1:20-cv-3590-JEB, ECF No. 51 at ¶ 49 (D.D.C. Jan. 13, 2021). Standard Oil operated drilling platforms to extract crude oil and earned its revenue through the sale of refined petroleum. Facebook operates a digital platform that mines data and consumer attention and earns its revenue through the sale of social advertising. The consideration exchanged by this internet monopolist may be novel, but that does not render one of the world's largest companies immune to fundamental antitrust principles. Facebook acquired and maintains monopoly power by undermining competition, not by building a better mousetrap, and Facebook users and advertisers both receive less value as a result. The Federal Trade Commission, 46 States, and a multi-year congressional investigation have all reached the same conclusion.

Consumer Class Plaintiffs' Statement: Facebook has engaged in a two-part anticompetitive scheme to destroy competition and harm consumers. *First*, Facebook has consistently and intentionally deceived consumers about the data privacy protections it provides. Facebook promised consumers stringent privacy protections, and many consumers chose Facebook over other competing platforms as a result, allowing Facebook to unlawfully gain and maintain a dominant, monopoly position. In reality, Facebook deceived consumers about the amount of data that it harvested from consumers and made available to third parties. *Second*, Facebook surveilled consumers, tracking the websites and apps they visited, to identify upstart competitors that were gaining traction, to target them for acquisition or destruction. Facebook

made clear that it would copy competitors' innovations and discriminatorily block their access to Facebook's platform and valuable consumer data if they did not sell their businesses to Facebook.  Facebook's highly successful "acquire, copy, or kill" scheme has substantially lessened, if not eliminated, competition.

Although Facebook attempts to rewrite plaintiffs' complaints by claiming the only conduct at issue occurred long ago, the Consumer Class Plaintiffs have alleged in detail how Facebook's anticompetitive conduct continued well past 2018, and indeed continues today.  *E.g., Klein* Compl. ¶¶ 128–139 (explaining how Facebook secretly allowed third parties to access user data without consent, in violation of the 2012 FTC consent order, until after the Cambridge Analytica scandal brought its conduct to light in March 2018); *Id.* ¶ 199 (describing Apple's discovery in August 2018 that Facebook was using Onavo to secretly monitor consumers); *Id.* ¶ 188 (describing anticompetitive acquisition of Giphy in 2020).

Facebook's destruction of competition through its two-part scheme has caused consumers to suffer substantial economic injury.  Consumers give up valuable consideration—their personal information and their attention—in using Facebook pursuant to Facebook's Terms of Service. Facebook in turn sells consumer data to advertisers in exchange for money.  Absent Facebook's anticompetitive conduct, competition would have required Facebook to provide consumers greater value in return for their data, which Facebook took without providing adequate compensation.  Through its deception of consumers and the acquisitions enabled by its deception, Facebook prevented competition, and as a result, consumers received less value for their data than they otherwise would have.

Advertiser Class Plaintiffs' Statement:  The Advertiser Class Plaintiffs allege that, among other things, Facebook's false promises of stringent privacy protections allowed it to unlawfully acquire a dominant, monopoly position in the social advertising market and that Facebook maintained and expanded that monopoly by engaging in an anticompetitive scheme to eliminate and prevent competition in the social advertising market, causing substantial economic injury to the proposed advertiser class in the form of inflated prices for Facebook's advertising services.

The Advertiser Class Plaintiffs allege, in detail, that Facebook actively concealed its anticompetitive scheme for years, and it remained concealed until NBC News made internal Facebook documents public in November 2019. *Affilious* Compl. ¶¶ 371-409.

Potential challenges to Facebook's dominance in the social advertising market arose with the prevalence of touch-controlled smart phones. Mobile applications were providing similar functionality to Facebook's desktop application, including messaging and image sharing, and were generating user content and engagement with the mobile applications' platforms. While it was clear that the digital future was moving toward mobile platforms, Facebook was behind the curve with a mobile product and, consequently, was losing traction with users. Facebook understood that reduced engagement on its core product (the Facebook desktop web app) would, in turn, reduce the demand for Facebook's targeted social advertising. That is when, according to internal Facebook documents, Facebook devised a plan to prevent developers from building mobile applications that could become rival social networks and competitors in the social advertising market.

Tens of thousands of applications relied on Facebook's developer platform (called "Platform") to access Facebook's social data through application programming interfaces ("APIs"). Facebook performed a detailed audit of mobile applications to identify current and potential competitors and neutralized those competitive threats by revoking access to core APIs that, among other things, allowed apps to query a user's friends to find other users who might be interested in using the app. For a select group of hand-picked developers, Facebook allowed continuing access to core APIs through data sharing agreements. Meanwhile, apps that did not rely on the Facebook's Platform, including Instagram and WhatsApp, were building their own competing social networks organically. Facebook's withdrawal of its core APIs would have no effect on those competitors. Therefore, Facebook acquired those competitors, including Instagram and WhatsApp, which could potentially rival Facebook as a source of social user data and compete in the social advertising market. Facebook's acquisitions decreased competition and increased Facebook's share of the social advertising market. Contrary to Facebook's

assertions, *infra* at 5, this is not a mere "refusal to deal" case; rather, the Advertiser Class Plaintiffs allege that Facebook's removal of Platform functionality was one part of a larger scheme to exclude rivals and to monopolize the relevant markets, and further, that there was no legitimate business or technical justification for that conduct. *Affilious* Compl. ¶¶ 117-128, 169-187.

The Advertiser Class Plaintiffs allege that Facebook's anticompetitive conduct eliminated and prevented competition in the social advertising market, allowing Facebook, unrestrained by competition, to continually hike its advertising prices during the class period to supracompetitive levels.

**Defendant's Position:**

This is an extraordinary and unprecedented antitrust case.  Antitrust law exists to protect competition, with the express understanding that competition will ensure fair prices and maximize output.  Facebook is free to users and is offered in unlimited supply.  Thus, the users have no compensable theory of antitrust harm.  The users also do not even claim Facebook engaged in any anticompetitive conduct, instead attacking Facebook's "mousetrap" for not living up to their (unspecified) standards.  Perhaps that is why the users in their statement muster a stronger argument for a case against Standard Oil than they do Facebook.  For advertisers, Facebook is just one of many options in the market—social or otherwise—part of a flourishing competitive arena where advertisers have their pick of countless ways to reach consumers.  The advertiser plaintiffs in this case attack Facebook because it is one of the more attractive places to advertise.  That too is not an antitrust claim.  Indeed, the advertisers' theory, advanced by the same counsel for plaintiffs here in a similar case, has already been rejected by Judge Freeman on every conceivable dimension, including its "refusal to deal" theory and on statute of limitations grounds.  *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp.3d 981 (N.D. Cal. 2020).

Since its founding in a college dorm room in 2004, Facebook has offered a higher-quality user experience than its competitors and has continued to improve that experience through constant innovation and investment.  Today, Facebook competes to keep users engaged by

1    constantly innovating and adding new features—spending billions of dollars annually on

2    research and development.  Facebook operates a portfolio of products that helps users engage,

3    connect, share, and consume different content, including personal updates, interests, photos,

4    news, videos, and other content.  Facebook's services are free to its users and offered in

5    unlimited quantity.  Facebook generates substantially all of its revenue by selling advertising.

6         Users and advertisers alike have countless options to which to devote their attention and

7    advertising dollars, respectively—a reality that plaintiffs ignore in their artificially narrow

8    market definitions.  Those options expand by the day, with new entrants like TikTok, Clubhouse,

9    and Disney+ recently emerging, and established competitors like YouTube, Apple's iMessage,

10   Tencent, Google, Snapchat, Twitter, Spotify, Netflix, Hulu, LinkedIn, and Strava all allowing

11   users to engage, connect, share, and consume different content.  As the Federal Trade

12   Commission acknowledges, the "most significant competitive threats" Facebook faces are not

13   "clones of Facebook," but "differentiated products that offer users a distinctive way of

14   interacting."  Compl. ("FTC Compl.") ¶ 69, *FTC v. Facebook, Inc.*, No. 1:20-cv-3590-JEB

15   (hereinafter "FTC Case"), ECF No. 6 (D.D.C. Dec. 9, 2020).  Advertisers have even more

16   options, including traditional and streaming television and movies, and even print.  Every

17   website on the internet is a competitor for advertising dollars.  And as the Court knows, even

18   when one focuses only on digital advertising, Facebook faces a massive competitor:  Google.

19   March 18 Hr'g Tr. at 17:1-3 (The Court:  "Facebook and Google are perhaps the biggest ad

20   revenue competitors in the world.").  Google's presence alone precludes any suggestion that

21   Facebook is a monopolist.

22        Given the broad range of competitors to Facebook's free products, it is little surprise that

23   plaintiffs' complaints fail to articulate any traditional antitrust theory.  Instead, plaintiffs'

24   complaints require reconstructing the now-distant past to identify a hypothetical alternate reality

25   in which the competitive landscape looks different.  In doing so, the complaints ignore

26   Facebook's history of innovation and competition on the merits, trading reality for a contrived

27   and flawed narrative construct.  That narrative—lifted from an article and a complaint dismissed

28

by another court in this district last year—seeks to tie Facebook's success to representations it made about its privacy policy nearly two decades ago.  In this counterfactual world, widely known practices—successes and missteps alike—are alleged to be part of a hidden scheme to drive away competition.  According to plaintiffs, this supposed scheme went unnoticed, despite Facebook being one of the most scrutinized companies in the world for almost two decades, until it was too late.  None of it is true.  The facts are that Facebook is successful due to constant innovation, investment, research, and product and technology improvements.

Indeed, what plaintiffs attack is competition and innovation.  For example, beginning in 2007, Facebook allowed application developers to integrate their products with Facebook by, among other things, providing access to various "Application Programming Interfaces" or "APIs"—expanding the range of services users could access through the Facebook platform.  When Facebook announced changes to that policy, the most recent of which at issue in these cases was announced in 2014, *see, e.g.*, *Affilious* Compl. ¶ 207, it acted pursuant to legitimate business justifications.

Belying any claim of monopoly status, Facebook has continuously sought to add features and services for its users.  To enhance its capabilities in photo-sharing, in 2012 Facebook acquired a then-fledgling start up with 13 employees called Instagram.  And to expand its reach into international markets and provide users with enhanced messaging capabilities, it acquired WhatsApp in 2014.  Both high-profile acquisitions were reported to and reviewed by the FTC, and neither was challenged by the United States Department of Justice, the FTC (which cleared both transactions), the Attorneys General of any of the 50 states or the District of Columbia, or any private plaintiff.  And for good reason.  Neither transaction even arguably lessened competition at the time, and in the years since the acquisitions, Facebook has invested billions of dollars in both apps, helped both services innovate and dramatically expand their user bases, and driven enhanced competition in photo- and video-sharing and online messaging (particularly against SMS products offered by wireless companies), all of which has redounded to the benefit

1    of consumers.  And, again, Facebook has offered all of these services to users *for free* and in

2    *unlimited quantity*.

3           Facebook being free has not deterred the user plaintiffs from pursuing claims for

4    damages.  The user plaintiffs claim that, had Facebook faced *even more* competition, Facebook

5    would have provided them with "compensation" in exchange for their "information and

6    attention" given to the use of Facebook's free services.  *E.g.*, *Klein* Compl. ¶ 234.  In other

7    words, plaintiffs seek to be paid for using Facebook for free over the last 14 years.  By the same

8    token, the advertiser plaintiffs complain that they overpaid for advertising on Facebook, while

9    failing to allege the price they claim that they should have paid, or explaining how Facebook

10   possibly engaged in monopoly pricing for advertising given the incredibly large number of

11   advertising outlets that exist in the market.  Offering consumers an attractive product and

12   charging commensurate with product quality and value is not an antitrust violation.

13          Whatever the merits of plaintiffs' theories, it is beyond dispute that the challenged

14   anticompetitive conduct occurred long ago.  Plaintiffs nowhere explain why they delayed so long

15   to bring their stale claims and plaintiffs' counsel has already told the court that they were waiting

16   until the "time was right."  It is to thwart just that kind of strategic behavior that statutes of

17   limitations exist in the first place.  One complaint meekly claims that the plaintiffs could not

18   have discovered any of Facebook's privacy practices because its publicly disclosed, three-

19   paragraph privacy policy was too complicated to understand until "investigative journalists . . .

20   discover[ed] and explain[ed]" it.  *Klein* Compl. ¶ 209.  But that explanation was published no

21   later than 2008.  Others point to Facebook's generalized statements about its commitment to user

22   privacy.  But the complaints also describe supposed "public outrage and litigation" that ensued

23   following conduct that occurred in 2007.  *Id.* ¶ 110; *Kupcho* Compl. ¶ 111.  The plaintiffs also

24   claim that a publicly disclosed settlement with the FTC addressing much of the conduct

25   challenged in the complaints purportedly engendered widespread consumer reliance *in 2012*.

26   *Klein* Compl. ¶ 139; *Kupcho* Compl. ¶ 140.  Of course, plaintiffs cannot claim that they relied on

27   something while at the same time claiming that it was concealed from them.  In actual fact,

28

Facebook has a long track record of transparency with respect to its use of user data, belying any contention that the challenged practices were concealed—let alone fraudulently so.

At bottom, plaintiffs' claims are premised on theories well beyond the outer boundaries of the antitrust laws:  that a firm's statements about its own products can inhibit competition on the merits; that the acquisition and attempted acquisition of firms with no viable path to, or even plans to, compete in the alleged relevant markets can somehow reduce competition in those markets; that Facebook had a duty to aid a laundry list of tens of thousands of its putative competitors by providing perpetual and unconditioned free access to user data via its Platform APIs; and that plaintiffs can recover monetary damages from their use of a free product.

### 3.   **Legal Issues**

**Plaintiffs' Position:**

Consumer Class Plaintiffs' Statement:

- Whether Facebook has unlawfully acquired and maintained monopoly power in the relevant markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

- Whether Facebook has unlawfully attempted to monopolize the relevant markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

- Whether Facebook has been unjustly enriched by its alleged misconduct; and

- Whether a class should be certified under Federal Rule of Civil Procedure 23.

Advertiser Class Plaintiffs' Statement:

- Whether Facebook has unlawfully acquired and maintained monopoly power in the relevant markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

- Whether Facebook has unlawfully attempted to monopolize the relevant markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; and

- Whether a class should be certified under Federal Rule of Civil Procedure 23.

**Defendant's Position:**

Because consolidated complaints have yet to be filed, Facebook is not yet able to identify all of the principal legal issues raised by plaintiffs.  At the March 18 hearing, the Court ordered a

claim-selection process and suggested that the parties and the Court address the selection of each side's claims at the upcoming Case Management Conference.  Plaintiffs have not advised Facebook what claims they intend to plead in their CACs or what their top five claims will be.

Based on its review of the complaints filed against it to date, Facebook identifies at least the following legal issues that are likely to be in dispute:

1. Whether individuals may recover monetary damages under the antitrust laws for their use of a free product.

2. Whether plaintiffs' allegations are sufficient to state a claim against Facebook under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

3. Whether plaintiffs' claims are timely given the four-year limitations period in 15 U.S.C. § 15b.

4. Whether the doctrine of laches bars plaintiffs' claims for injunctive relief.

5. Whether Facebook caused antitrust injury to the plaintiffs and putative class members and, if so, which plaintiffs and class members.

6. Whether plaintiffs can satisfy the prerequisites of both Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3).

7. Whether members of the putative "user" class relied upon Facebook's privacy representations in deciding to become and/or stay Facebook users.

8. Whether and to what extent members of the putative "user" class place a cognizable monetary value on their personal data, time, and information.

9. Whether alleged deceptive conduct is cognizable under Section 2 of the Sherman Act when the alleged statements are about the defendant's own product.

10. Whether Facebook's acquisitions of companies that were not competitors—or at best only one of several similarly positioned nascent or potential competitors—at the time of the acquisitions is unlawful "exclusionary conduct."

11. Whether Facebook has a duty to deal within the meaning of *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398

(2004) with developers who designed applications that interfaced with Facebook's Platform.

12. Whether vertical agreements to share data that do not foreclose competition can be unlawful "exclusionary conduct."

13. Whether allegedly copying a putative rival's product features is unlawful "exclusionary conduct," or is instead competition on the merits.

14. Whether a relevant antitrust market limited to "social" advertising is plausible.

15. Whether plaintiffs have plausibly defined the contours of their alleged relevant markets.

16. Whether plaintiffs have plausibly alleged that Facebook has monopoly power in a relevant market.

17. Whether plaintiffs can meet their burden of showing that the challenged conduct did not constitute competition on the merits.

18.  Whether plaintiffs can overcome the strong presumption that commercial speech or advertising has a de minimis effect on competition.

19. Whether plaintiffs can meet their burden of proving that Facebook had a specific intent to control prices when it offers a completely free product to consumers.

## 4.    **Motions**

There are no pending motions.

***Motions to Relate***:  Parties have moved to relate the following cases to this action, which the Court has granted—

- *Sherman v. Facebook*, No. 20-CV-08721-JSW (N.D. Cal. filed Dec. 9, 2020)
- *Kupcho v. Facebook, Inc.*, No. 20-CV-08815-JSW (N.D. Cal. filed Dec. 11, 2020)
- *Dames et al. v. Facebook, Inc.*, No. 20-cv-08817-HSG (N.D. Cal. filed Dec. 11, 2020)
- *Steinberg v. Facebook, Inc.*, 20-CV-09130-VC (N.D. Cal. filed Dec. 17, 2020)
- *Affilious, Inc. et al. v. Facebook, Inc.*, No. 20-CV-09217-EMC (N.D. Cal. filed Dec. 18, 2020)

- *Layser v. Facebook, Inc.*, No. 21-CV-00337-VC (N.D. Cal. filed Jan. 13, 2021)
- *Garvin v. Facebook, Inc.*, No. 21-CV-00618-KAW (N.D. Cal. filed Jan. 26, 2021)
- *Rosenman v. Facebook, Inc.*, No. 21-CV-00336-VC (N.D. Cal. filed Feb. 5, 2021)[1]
- *Kovacevich v. Facebook, Inc.*, No. 21-CV-01117-JCS (N.D. Cal. filed Feb. 15, 2021)
- *Mark K. Wasvary, P.C. v. Facebook, Inc.*, No. 21-CV-001518-SK (N.D. Cal. filed March 3, 2021)

Facebook anticipates moving to relate *Ryan v. Facebook, Inc.*, No. 21-cv-2017 (N.D. Cal. filed Mar. 23, 2021), to this case as well.

**Motion for Leave to Appear in Pro Hac Vice**:  Parties have moved for their respective counsel to appear in pro hac vice.  The Court has thus far granted all such motions.

**Motions to Appoint Plaintiff's Counsel**:  The Court has considered applications to serve as interim class counsel and has appointed separate interim class counsel to represent the putative Consumer Class and Advertiser Class.

**Motion(s) to Dismiss**:  Facebook expects that it will move to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  The Court has set the deadline for this motion on May 20, 2021, twenty-eight (28) days following the filing of plaintiffs' CACs.

**Motion to Stay**:  In the event this Court denies Facebook's anticipated motion to dismiss these cases and Judge Boasberg denies in whole or in part Facebook's pending motions to dismiss two lawsuits filed by the FTC and State Attorneys General in the District Court for the District of Columbia, *see* FTC Case, ECF No. 56; *New York v. Facebook, Inc.*, No. 1:20-cv-03589-JEB (D.D.C.) (hereinafter "State AG Case") (together, the "government cases"), ECF No. 114, Facebook will likely move to stay this action in whole or in part pending resolution of the government cases.

Facebook's position is that, given the substantial overlap in allegations, theories of harm, and injunctive relief sought between the cases and the resulting risk of inconsistent judgments,

---

[1] This case was voluntarily dismissed and re-filed in California state court.  Facebook has removed it and anticipates moving to relate the new case.  *See Rosenman v. Facebook, Inc.*, No. 21-CV-2108 (N.D. Cal. removed March 25, 2021).

staying proceedings pending the government lawsuits will enhance efficiency for both parties and the Court and distill which claims, if any, remain for adjudication.[2]

Plaintiffs would oppose any motion to stay this action pending resolution of the government cases.

*Motion to Compel Arbitration*:  At the March 18 hearing, certain plaintiffs raised the issue of arbitrability of plaintiffs' claims here; Facebook expects that it will assess that issue, and raise it with the Court as appropriate, once the CACs are filed and the scope of the cases is clearer.  Plaintiffs would oppose any motion to compel arbitration.

*Motion for Class Certification*:  Plaintiffs anticipate filing motions for class certification. Facebook anticipates opposing class certification.

*Motion for Summary Judgment*:  In the event that this case survives any motion to dismiss and a putative class is certified, Facebook anticipates moving for summary judgment pursuant to Fed. R. Civ. P. 56.

The parties also anticipate that there will be further motions, including motions to exclude expert testimony and motions in limine.

**5.    Amendment of Pleadings**

Pursuant to the Court's March 18, 2021 Case Management Order (ECF No. 74), plaintiffs will file CACs—one for the proposed Consumer Class and one for the proposed Advertiser Class—no later than April 22, 2021.

**6.    Evidence Preservation**

The parties certify that they have reviewed this Court's Guidelines Relating to the Discovery of Electronically Stored Information.  The parties are aware of their obligations, and have taken reasonable steps to, preserve potentially relevant evidence.  The parties will meet and confer concerning ESI.

**7.    Disclosures**

---

[2] Plaintiffs' own counsel, in their filings regarding their motions to appoint interim lead plaintiffs' counsel, recognized that the FTC and State Attorneys General "assert *virtually identical* theories of harm to competition."  *See* ECF No. 62, at 8 n.5 (emphasis added).

The parties have not served initial disclosures.

**Plaintiffs' Statement:**

Plaintiffs propose that the parties serve the information required by Fed. R. Civ. P. 26(a)(1) by May 13, 2021.  Facebook, like virtually every defendant in complex civil litigation, claims it will eliminate or narrow the case against it through a motion to dismiss, and that efficiency would be served by stopping the case in its tracks.  Plaintiffs of course disagree.  That familiar dispute is no basis for failing to set a date for compliance with the modest requirements of Fed. R. Civ. P. 26(a)(1).  Moreover, although Facebook represents that "there remains the need to coordinate with the government cases, where discovery has not yet commenced and is awaiting the outcome of Facebook's motion to dismiss, pursuant to local rule," *infra* at 14, there is nothing to prevent Facebook from pressing forward with the government cases expeditiously during the pendency of its motion to dismiss in those cases.  Plaintiffs understand and will comply with their ongoing duty under Rule 26(e) to supplement their disclosures.

**Defendant's Statement:**

Facebook proposes that the exchange of initial disclosures occur fourteen (14) days after a decision on Facebook's motion to dismiss the CACs, assuming the complaints are not dismissed in their entirety and a stay is not sought pending resolution of the government cases. As described below, it is likely that the scope of this case will be far narrower after the motion to dismiss is decided, if it is not dismissed entirely.  Plaintiffs attempt to cast Facebook's motion to dismiss as standard fare, but the issues with their complaints are anything but ordinary.  While this Court will of course hear and resolve the motions to dismiss itself, Judge Freeman's ruling in *Reveal Chat* confirms that, at a minimum, there are serious questions regarding threshold issues, including timeliness and antitrust merits issues, that will be presented here that will fundamentally shape whatever, if anything, remains of the case.  And there remains the need to coordinate with the government cases, where discovery has not yet commenced and is awaiting the outcome of Facebook's motion to dismiss, pursuant to local rule.  *See* Fed. R. Civ. P. 26(d) (discovery cannot begin until Rule 26(f) conference); D.D.C. LCvR 16.3(b) (no Rule 26(f)

conference in cases where no answer has yet been filed).[3]  It is therefore most efficient for the parties to set a schedule that allows the parties to serve initial disclosures once the scope of contested issues in this case has been resolved at the motion-to-dismiss stage.  Facebook understands and will comply with its ongoing duty under Rule 26(e) to supplement its disclosures after initial disclosures take place.

**8.    Discovery**

The parties have not taken any discovery to date.  The parties will discuss Stipulated Electronically Stored Information (ESI) and Protective [Proposed] Orders and will endeavor to make joint proposals to the Court to be entered in this action.

The parties' respective proposals regarding the timing of discovery are set forth in Section 17 (Proposed Case Schedule) below.

**Plaintiffs' Position On Section 8 - Discovery:**

**A.  Timing of Discovery Commencement**

Consumer and Advertiser Class Plaintiffs' Statement:  Plaintiffs believe discovery should begin immediately with Facebook's production of documents that Facebook previously produced to government entities.  Plaintiffs request that Facebook immediately produce the documents (and associated privilege logs) it provided to, and its correspondence with, any government entity—including the FTC, State Attorneys General, the United States House of Representatives, the United Kingdom's House of Commons, the German Federal Cartel Office (Bundeskartellamt), and the Australian Competition & Consumer Commission—in connection with their investigation and/or litigation of Facebook's conduct at issue in this case.  Such production will be neither burdensome nor costly, as it requires little more than making a copy of the productions previously made.  Producing these documents now will avoid unnecessary delay in conducting discovery and may assist Plaintiffs in tailoring their follow-on discovery efforts.  Plaintiffs request that the documents described above—with the exception of any third-party

---

[3] Facebook timely filed its Motion to Dismiss those cases.  It is unclear what the plaintiffs are referring to when they suggest that Facebook should proceed "expeditiously."

1  documents for which production requires notice to such third parties—be provided to Plaintiffs

2  by Facebook no later than two business days after the entry of the Protective Order.  Any third-

3  party documents covered by Facebook's confidentiality obligations to such third parties should

4  be produced promptly following the completion of the notice and objection process that will be

5  outlined in the Protective Order.[4]

6      Plaintiffs further request that Facebook produce unsealed versions of the sealed filings in

7  the FTC Case and the State AG Case, no later than two business days after the entry of the

8  Protective Order.  Plaintiffs also request that Facebook produce unsealed versions of the sealed

9  filings, as well as Facebook's document productions, discovery responses, deposition transcripts

10  and exhibits, and expert reports, in the following cases, no later than two business days after the

11  entry of the Protective Order:  *Six4Three LLC v. Facebook, Inc.*, No. CIV53328 (San Mateo

12  County Super. Ct.); *Social Ranger LLC v. Facebook, Inc.*, No. 1:14-CV-01525 (D. Del.); *In re*

13  *Facebook, Inc. Consumer Privacy User Profile Litigation*, No. 3:18-MD-02843 (N.D. Cal.);

14  *Williams et al v. Facebook, Inc. et al*, No. 3:18-CV-03676 (N.D. Cal.); *Lane et al v. Facebook,*

15  *Inc. et al*, No. 5:08-CV-03845 (N.D. Cal.); and *In re Facebook Internet Tracking Litigation*, No.

16  5:12-MD-02314 (N.D. Cal.).  To the extent any third-party information in these documents is

17  covered by Facebook's confidentiality obligations to such third-parties, this information should

18

19

20  _____

[4] To the extent Facebook suggests that Judge Chhabria's order in *In re Facebook, Inc. Consumer*
21  *Privacy Litigation* cuts against Plaintiffs' position, that suggestion is inaccurate.  In that case,
Judge Chhabria in fact ordered Facebook to produce materials provided in response to
22  government investigations notwithstanding Facebook's assertions that the materials would be
overbroad; the language quoted by Facebook simply reflects that Judge Chhabria granted
23  Facebook's request for additional time to conduct a further review.  *See* Tr. of Proceedings at
8:12-15, *In re Facebook, Inc. Consumer Privacy Litig* No. 18-md-2843-VC (N.D. Cal. Jan. 8,
24  2020) ("I don't think it is important for you to get the pre-2012 stuff on an expedited stuff [sic].
I also don't see an any reason you shouldn't get the 2012 -- pre-2012 stuff.  I understand there is
25  a lower likelihood that that stuff will be relevant or lead to the -- lead to the discovery of material
that is relevant now, but it's -- there seems like enough of a possibility that it is worth ordering
26  them to provide it, and it is not burdensome enough to be worried about it too much.  So I'm
going to order Facebook to provide the pre-2012 stuff too, but I don't think it needs to be on an
27  expedited basis.").

28

1  be provided promptly following the completion of a notice and objection process that will be

2  outlined in the Protective Order.

3       Plaintiffs propose that a Rule 26(f) conference will be held on April 29, 2021.  However,

4  Plaintiffs believe that production of the documents described above will be helpful in focusing

5  both the Rule 26(f) conference and subsequent discovery efforts.

6       Plaintiffs intend to serve requests for the production of documents prior to the Rule 26(f)

7  conference seeking the documents outlined above in order to make the conference more

8  productive, and will serve other written discovery after the Rule 26(f) conference.  Plaintiffs will

9  agree to forego early discovery under FRCP 34 if Facebook agrees to make a substantial

10 production of documents responsive to Plaintiffs' document requests and serve substantive

11 interrogatory responses on the day its responses to the document requests become due (30 days

12 after the Rule 26(f) conference).

13      In an effort to target discovery, Plaintiffs asked Facebook to provide them with just the

14 document requests issued by governmental entities (and not Facebook's responses).  After

15 reviewing those requests, Plaintiffs would work to further target their initial discovery by seeking

16 responses to the most relevant requests.  However, Facebook has refused to provide even the

17 document requests it received from governmental entities.

18      Facebook has further taken the position that discovery should be stayed entirely because

19 it expects to narrow or eliminate this case through a motion to dismiss.  Facebook acknowledges

20 that this Court does not typically stay discovery pending a motion to dismiss in antitrust cases,

21 *infra* at 23, but claims this cases is exceptional for two reasons.  First, Facebook assures the

22 Court that it is likely to win on its motion to dismiss.  Second, Facebook claims the

23 governmental actions against it should be allowed to reach final judgment before Facebook has

24 to spend time defending against this case.

25      Facebook's lengthy arguments for staying discovery should be made and addressed in a

26 motion to stay discovery.  Plaintiffs will not brief that motion here, but note only briefly that

27 both of Facebook's reasons for delay lack merit.  First, Facebook's claim that it will prevail on a

28

motion to dismiss is neither exceptional nor accurate.  If discovery were stayed every time a

defendant claimed it would eliminate or narrow a complex civil case with a motion to dismiss,

stays of discovery would become the norm rather than the rare exception.  Moreover, Facebook's

arguments rely on grave distortions of Plaintiffs' legal theories.  Second, Facebook's attempt to

parlay the government actions into a stay of discovery falls apart when examined.  If the

government actions overcome a motion to dismiss and are litigated to final judgment, as

Facebook appears to anticipate, *see infra* at 25 (referring to final judgments in the government

actions), Facebook will have to participate in extensive discovery.  It would make no sense to

stay this case, which raises claims for additional relief not sought in the government cases, while

the government cases are litigated at length in an uncoordinated fashion.  Indeed, Facebook has

claimed it prefers that discovery in this case be coordinated with the FTC and State cases.  But

Plaintiffs cannot coordinate discovery with the government cases if discovery is stayed.

Facebook not only wants discovery delayed, but also wants it bifurcated between class

and merits, with merits being further bifurcated between monopoly acquisition and monopoly

maintenance stages.  This request is also not appropriately litigated through a joint CMC

statement.  Therefore, Plaintiffs will simply note that distinguishing class from merits discovery

(or types of merits discovery) in this case would be inefficient, lead to intractable disputes about

scope, and any departure from the default rules of civil litigation should be based on more than a

defendant's disputed claims that it will obtain an early win.

The Court should order Facebook to produce to Plaintiffs documents previously provided

to the government before the Rule 26(f) conference, as explicitly authorized by Rule 26(d)(1)

(allowing for discovery before the parties have conferred as required by Rule 26(f) "when

authorized . . . by stipulation, or by court order.").  It is efficient—not premature—for Facebook

to provide Plaintiffs with readily ascertainable and available documents previously produced to

the government immediately.  Production of such documents will be helpful in focusing both the

Rule 26(f) conference and subsequent discovery efforts.  Early production of documents

provided to the government may also obviate or limit the need for Plaintiffs to later amend their

1   consolidated complaints.  Indeed, the clear trend among district courts, including those in this

2   Circuit, in large complex antitrust cases, is to order the early production of documents produced

3   by defendants to the government even before the consolidated complaint is filed.  *In re Lithium*

4   *Ion Batteries Antitrust Litigation*, No. 13-md-02420, 2013 U.S. Dist. LEXIS 72868, *25-32

5   (N.D. Cal. May 21, 2013) (requiring production of DOJ documents before consolidated amended

6   complaints were filed); *In re Resistors Antitrust Litig.*, No. 5:15-cv-03820 (N.D. Cal. 2016), ECF

7   No. 112, Minute Entry ("All DOJ documents are to be voluntarily produced to Plaintiffs by

8   4/29/2016.  The Consolidated Amended Complaint shall be filed by 5/27/2016"); *In re Toyota*

9   *Motor Corp. Unintended Acceleration Mktg., Sales Practices & Prods. Liab. Litig.*, No. 10-ML-

10  02151 (C.D. Cal. June 1, 2010), ECF No. 180, "Order No. 3", at 2 (ordering production of

11  documents already produced to the government prior to the filing of the consolidated complaint).

12  **B.  Scope of Anticipated Discovery**

13  <u>Consumer Class Plaintiffs' Statement</u>:  The Consumer Class Plaintiffs will seek

14  documents and testimony from Facebook regarding, among other things:  Facebook's

15  representations to consumers regarding Facebook's privacy protections; Facebook's harvesting

16  of consumer data; Facebook's disclosure of consumer data to third parties, including Facebook's

17  sale of consumer data to advertisers; Facebook's intent to deceive consumers regarding

18  Facebook's privacy protections and commercial surveillance; Facebook's surveillance of the

19  websites and apps visited by Facebook's consumers; Facebook's acquisition of competitors and

20  related negotiations; Facebook's copying of competitors; Facebook's policies and practices

21  relating to access to Facebook's Platform and consumer data; the relevant markets; Facebook's

22  market power and expansion in the relevant markets; barriers to entry and network effects in the

23  relevant markets; and the effects of Facebook's policies on competition and consumers.  The

24  Consumer Class Plaintiffs will also seek documents and testimony from non-parties, including

25  Facebook's (former) competitors.

26

27

28

1    The Consumer Class Plaintiffs object to Facebook's proposal that Consumer and

2    Advertiser Class Plaintiffs be required to jointly serve written discovery requests, and that the

3    limits on written discovery "shall be applied on a per-side" basis.

4    <u>Advertiser Class Plaintiffs' Statement</u>:  The Advertiser Class Plaintiffs will seek

5    documents and testimony from Facebook regarding, among other things, Facebook's sales of and

6    policies related to advertising; Facebook's surveillance of the websites and apps visited by

7    Facebook's consumers; Facebook's acquisition of competitors and related negotiations;

8    Facebook's copying of competitors; Facebook's policies and practices relating to access to

9    Facebook's Platform and consumer data; the relevant markets; Facebook's market power and

10   expansion in the relevant markets; barriers to entry and network effects in the relevant markets;

11   and the effects of Facebook's policies on competition and advertisers.  The Advertiser Class

12   Plaintiffs will also seek documents and testimony from non-parties, including Facebook's

13   (former) competitors.

14   The Advertiser Class Plaintiffs object to Facebook's proposal that Consumer and

15   Advertiser Class Plaintiffs be required to jointly serve written discovery requests, and that the

16   limits on written discovery "shall be applied on a per-side" basis.

17   **C.  Protective Order**

18   Plaintiffs propose that the parties provide a stipulated Protective Order to the Court in

19   advance of the Initial Case Management Conference, and no later than April 5, 2021.  As set

20   forth above, Plaintiffs request that Facebook immediately produce the documents identified in

21   Section 8(A) no later than two business days after the entry of the Protective Order.

22   **D.  Proposed Limitations or Modifications to the Discovery Rules**

23   *Depositions.*  Plaintiffs believe that relief from the limitation on the number of

24   depositions set forth in Rule 30(a)(2) is necessary and appropriate and proposes to meet and

25   confer with Facebook and propose to the Court a stipulated deposition protocol to govern

26   depositions in this action.

27

28

*Document Subpoenas to Non-Parties.*  Plaintiffs propose as follows with respect to nonparties producing materials in response to Fed. R. Civ. P. 45 document subpoenas in this action.  The issuing party shall request that non-parties simultaneously produce materials to Plaintiffs and Facebook.  If, notwithstanding such request, the non-party does not produce the materials to both sides, the issuing party shall provide a copy of all materials to the other side within three business days after receipt of the materials from the non-party, subject to any limitations in the Protective Order.  If a party modifies or extends the time to respond to a Fed. R. Civ. P. 45 document subpoena (whether orally or in writing), it shall simultaneously notify the other party of that extension, modification, or explanation, including providing copies of any written agreements regarding modification or extension.

*Authenticity Presumptions.*  Plaintiffs propose that documents produced by non-parties from the non-parties' files shall be presumed to be authentic within the meaning of Fed. R. Evid. 901.  Documents produced by Facebook shall be presumed to be authentic within the meaning of Fed. R. Evid. 901.  If a party serves a specific good-faith written objection to the authenticity of a document that it did not produce from its files, the presumption of authenticity will no longer apply to that document.  Any objection to a document's authenticity must be provided with (or prior to) the exchange of objections to trial exhibits.  The parties will promptly meet and confer to attempt to resolve any objections.  The Court will resolve any objections that are not resolved through this means or through the discovery process.

*Expert Discovery.*  Plaintiffs propose that expert disclosures, including each side's expert reports, shall comply with the requirements of Federal Rule of Civil Procedure 26(a)(2), except as modified herein.  Neither side must preserve or disclose, including in expert deposition testimony, the following documents or materials: (i) any form of communication or work product shared between any of the parties' in-house or outside litigation counsel and such party's expert(s) or consultant(s), or between any of such party's experts or consultants themselves; (ii) any form of communication or work product shared between an expert and persons assisting the expert; (iii) expert's notes, unless they are expressly relied upon and/or cited in support of an

opinion or fact; or (iv) drafts of expert reports, analyses, or other work product. The parties shall disclose the following materials in connection with all expert reports: (a) a list by Bates number of all documents relied upon by the testifying expert(s); (b) copies of any materials relied upon by the expert not previously produced or otherwise generally available; and (c) for any calculations appearing in the report, all data and programs underlying the calculation, including all programs, models, and codes necessary to recreate the calculation from the initial ("raw") data files.

*Service*. Service of any documents not filed via ECF, including pleadings, discovery requests, subpoenas for testimony or documents, expert disclosure, and delivery of all correspondence, whether under seal or otherwise, shall be by email to all attorneys for the receiving party; the parties will provide each with "service lists" that can be used to serve documents. In the event the volume of served materials is too large for email and requires electronic data transfer by file transfer protocol or a similar technology, or overnight delivery, the serving party will telephone or email the other side's principal designee when the materials are sent to provide notice that the materials are being served. For purposes of calculating discovery response times under the Federal Rules of Civil Procedure, electronic delivery shall be treated the same as hand delivery.

*Coordination with the FTC and State AG Cases.* Plaintiffs propose that the parties use their best efforts to coordinate discovery between this action and the FTC and State AG Cases. Plaintiffs propose that the parties will meet and confer with each other, and with direction from the Court, include the FTC and State Attorneys General in those meet-and-confer conferences, concerning the particulars of, and appropriate scope of, coordination and cross-production of discovery between the FTC and State AG Cases and this case. Plaintiffs anticipate that there will be overlapping discovery and efforts to coordinate depositions.

**Defendant's Position On Section 8 - Discovery:**

Facebook intends to file a motion to dismiss that should resolve this entire action, which as the statements of facts above make clear, is not really an antitrust case at all. Facebook's

1  position is that formal discovery should await a ruling on the motion to dismiss, which would

2  allow the Court and the parties to tailor the scope and timing of discovery to match the claims

3  remaining in the case (if any).[5]  While this Court will of course hear and resolve the motions to

4  dismiss itself, Judge Freeman's ruling in *Reveal Chat* confirms that, at a minimum, there are

5  serious questions regarding threshold issues that will be presented here that will fundamentally

6  shape what remains of this case, if anything.  For that reason, Judge Freeman has followed the

7  prudent course of staying discovery until those issues are resolved in the *Reveal Chat* case,

8  which has ensured that if discovery does begin, it will do so in an efficient and thoughtful

9  manner.  *Reveal Chat Holdco, LLC v. Facebook, Inc.*, No. 20-cv-00363-BLF, ECF No. 31 (N.D.

10 Cal. Apr. 10, 2020).  As noted, if plaintiffs in these cases do state a claim, Facebook may move

11 to stay these cases pending resolution of the motions to dismiss the government cases.  But in

12 any case, if plaintiffs here do state a claim and discovery commences, Facebook's position is that

13 discovery should be bifurcated with discovery first limited to issues that relate to class

14 certification, and then if a class is ultimately certified, turn to merits discovery.

15      **A.      Discovery Should Not Be Opened Before This Court Rules on the Motion to**

16              **Dismiss And The Motions To Dismiss The Government Cases Are Resolved**

17          Facebook recognizes that this Court's general past practice in complex antitrust litigation

18 has been to open discovery, at least in part, around the time that an operative complaint is filed.

19 This case is different for two reasons.

20

21

22 ────────────────────

[5] This Court has "broad discretion to stay discovery pending the disposition of a dispositive

23 motion."  *Gibbs v. Carson*, No. C-13-0860, 2014 WL 172187, at *3 (N.D. Cal. Jan. 15, 2014).
   The burdens of discovery in antitrust cases are an important consideration in the Court's exercise

24 of that discretion, which have often led courts to stay discovery pending resolution of a motion to
   dismiss antitrust claims.  *See, e.g.*, *Top Rank, Inc. v. Haymon*, No. CV 15-4961, 2015 WL

25 9952887, at *2 (C.D. Cal. Sept. 17, 2015) (citing *Twombly*'s discussion of the expense of
   antitrust discovery and noting "[s]taying discovery in antitrust cases pending the resolution of a

26 motion to dismiss may be particularly appropriate."); *In re Graphics Processing Units (GPU)
   Antitrust Litig.*, No. C-06-07417, 2007 WL 2127577 (N.D. Cal. July 24, 2007) ("[T]o allow

27 antitrust discovery prior to sustaining a complaint would defeat one of the rationales of *Twombly*,
   at least when the discovery would be burdensome.").

28

1    *First*, the existing complaints suggest that plaintiffs' forthcoming CACs will fail to state a

2    claim under the antitrust laws.  The conduct plaintiffs challenge largely mirrors the facts alleged

3    in *Reveal Chat*, 471 F. Supp. 3d at 1002.  Indeed, the *Klein* complaint quotes many paragraphs

4    verbatim from the *Reveal Chat* complaint.  *See Reveal Chat*, ECF No. 85 at 2-4 (identifying

5    identical and nearly identical language).  There the Court held that challenges to the acquisitions

6    of Instagram and WhatsApp are time-barred, rejecting the same continuing-violation theory that

7    the *Klein* plaintiffs allege here.  The *Reveal Chat* Court also agreed with Facebook that a Section

8    2 claim challenging Facebook's API policy changes failed because there was no cognizable

9    duty-to-deal allegation and because the narrow *Aspen Skiing* exception did not apply.  *See Reveal*

10   *Chat*, 471 F. Supp at 1002-1003.  Judge Freeman appropriately stayed discovery pending the

11   resolution of Facebook's motions to dismiss, *Reveal Chat*, ECF Nos. 31, 66, and that has already

12   ensured that any discovery that may occur will be far narrower than it would have been had it

13   commenced following the first complaint.  There is no reason to believe that plaintiffs' claims

14   here—which, if anything, are even more belated and flawed than those of the *Reveal Chat*

15   plaintiffs—will survive a motion to dismiss.  And even if the Court were not inclined to grant a

16   motion to dismiss in full, plaintiffs' complaints are littered with unprecedented antitrust theories

17   and damage claims tied to their use of free products.  It is likely that the scope of discovery will,

18   if nothing else, be far narrower after the motion to dismiss is decided.

19   *Second*, the need for immediate discovery is lessened by the pendency of two

20   substantially similar pending antitrust cases brought by the FTC, and 46 states, the District of

21   Columbia, and Guam (the "Plaintiff States") on December 9, 2020.  Holding off discovery in this

22   case will permit more efficient coordination with the government cases.  Discovery has not yet

23   commenced pursuant to local rule in the government cases, and is awaiting the outcome of

24   Facebook's motion to dismiss.  *See* Fed. R. Civ. P. 26(d) (discovery cannot begin until Rule

25   26(f) conference); D.D.C. LCvR 16.3(b) (no Rule 26(f) conference in cases where no answer has

26   yet been filed).  Opening discovery now could result in these cases moving ahead of the

27   government cases, which would both be inefficient and inconsistent with congressional intent.

28

1   Discovery should be coordinated across the cases, which cannot meaningfully happen

2   until the scope of all the cases is clearer.  Plaintiffs themselves recognize the importance of

3   coordination with the government cases, and propose above that the parties use their best efforts

4   to coordinate discovery with the government cases.  *See also, e.g.*, ECF No. 55 at 21 (discussing

5   counsel's "strong relationships and open channels of communication with the public entities

6   which are also pursuing antitrust actions against Facebook").

7   Indeed, this Court has experience establishing clear, workable rules for coordination in

8   the early stages of parallel, overlapping litigation.  In the *Qualcomm* cases, this Court entered a

9   coordinated discovery order between the FTC case and cases brought by private litigants, Joint

10   Stipulation and Discovery Coordination Order, *In re Qualcomm Antitrust Litig.*, No. 17-md-

11   2773-LHK, ECF No. 131 (N.D. Cal. Sept. 22, 2017), which it then broadened to cover a case

12   involving overlapping issues in the Southern District of California, *In re Qualcomm*, ECF No.

13   515.  A similar order, accounting for the differences in the posture of the various cases, should be

14   entered in this case before discovery begins.

15   Furthermore, Facebook's discovery proposal recognizes that ensuring the government

16   cases go first will likely narrow the issues before this Court and thereby promote judicial

17   economy.  For example, if the Court enters final judgment for the FTC, that decision may be

18   prima facie evidence against Facebook.  *See* 15 U.S.C. § 16(a).  If Facebook prevails against the

19   States, plaintiffs in this case would be bound by the judgment, because the States are deemed to

20   represent all of their citizens under the doctrine of *parens patriae*.  *See Satsky v. Paramount*

21   *Commc'ns, Inc.*, 7 F.3d 1464, 1470 (10th Cir. 1993) (because "the citizens of [a] state are

22   represented in such litigation by the state," they "are bound by the judgment"); *Menzel v. County*

23   *Utilities Corp.*, 501 F. Supp. 354, 357 (E.D. Va. 1979) ("under the doctrine of *parens patria*, a

24   state is deemed to represent all of its citizens, when the state is a party in a suit involving a

25   matter of sovereign interest," and "[t]here is a presumption that the state [] will represent

26   adequately the position of its citizens"); *see also Alaska Sport Fishing Ass'n v. Exxon Corp.*, 34

27   F.3d 769, 773 (9th Cir. 1994) ("Under the *parens patriae* doctrine, a state that is a party to a suit

28

involving a matter of sovereign interest is presumed to represent the interests of all its citizens.");

*Northern Calif. River Watch v. Humboldt Petroleum, Inc.*, 162 F. App'x 760, 765 (9th Cir. 2006)

(corporation's suit was barred by *res judicata* because its claims were covered by defendant's

consent agreement with the state).

Allowing the government cases to proceed first also reduces the risk of inconsistent

judgments between the government cases and this litigation.  All three lawsuits (the two

government actions and this case) allege that Facebook unlawfully maintained monopoly power

by thwarting competition through, for instance, a strategy of copying, acquiring, or killing

competitors, thus harming both users and advertisers.  *See, e.g.*, FTC Compl. ¶¶ 1-9; Compl.

("State AG Compl.") ¶ 4, State AG Case, ECF No. 4 (D.D.C. Dec. 9, 2020).  If these cases were

to proceed on parallel and uncoordinated tracks, there is a risk of inconsistent judgments on

threshold issues and necessary elements of the antitrust claims, including relevant market

definition(s), proof of monopoly power, and proof of harm to competition.  Again, allowing the

government cases to go first could significantly streamline (or altogether dispose of) issues in

this case.

Facebook anticipates that the parties can efficiently address this issue at the upcoming

Case Management Conference, but if the Court would find briefing on a motion helpful—as

Plaintiffs seem to suggest—Facebook requests that the Court set a briefing schedule so that this

issue can be resolved before any discovery, including Plaintiff's request for unilateral early

discovery, commences.

**B.**      **If And When Discovery Opens, It Should Be Bifurcated**

**1.**      **Class Discovery**

If discovery does commence, it should be bifurcated between class and merits issues.

Other courts within this district have adopted phased or bifurcated discovery schedules in class

actions where dispositive issues are distinct from the merits of the plaintiffs' claims.  *See, e.g.*,

Civil Minute Order, *In re Coca-Cola Prods. Mktg. & Sales Practices Litig.*, No. 4:14-md-2555

(N.D. Cal. July 10, 2015), ECF No. 69 (White, J.) (setting initial phase of discovery in false

advertising suit into whether the named plaintiffs relied on the alleged false advertisements); Order Following Further Case Management Conference at 1-2, *In re Apple iTunes iPod Antitrust Litig.*, No. 4:05-cv-37 (N.D. Cal. Nov. 21, 2006), ECF No. 86 (Rogers, J.) (ordering initial phase of discovery limited to class-certification issues).  There will be no risk of delay or prejudice to the private plaintiffs here because these same issues will be developed by the government plaintiffs, including the States who are acting on the plaintiffs' behalf.  Furthermore, bifurcation is consistent with Facebook's proposal to allow the government plaintiffs to go first to streamline the merits issues in these cases.  Class certification is of course unique to the private cases and will allow discovery to be sensibly coordinated:  the government will go first with merits discovery while the private plaintiffs and Facebook address issues of class certification, and then if a class is certified, the private plaintiffs can "backfill" any additional discovery that they need.

In addition, the class issues in this case are unique and can be readily separated from the merits issues.  These issues include whether the case should be properly tried as a class action at all.  Facebook therefore proposes an initial phase of discovery regarding (i) plaintiffs' method for proving their tolling theories on a class-wide basis, (ii) plaintiffs' method for proving antitrust impact on a class-wide basis, (iii) plaintiffs' reliance, if any, on Facebook's alleged statements regarding its privacy policy; and (iv) plaintiffs' class-wide damages model.  To give an example, plaintiffs must provide a damages model that shows that damages are susceptible to measurement across the entire class.  *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).  But Facebook's product is free, and the user plaintiffs' purported injuries—in the form of supracompetitive levels of "information and attention"—have no connection to any price.  Instead, information and attention are valued differently by different users, if they are valued at all.  Ascribing a monetary value to them will be an unprecedented and highly speculative exercise, which will be further compounded by the need for plaintiffs to show the baseline level of "information and attention" they would have given in a counterfactual, allegedly more competitive market.

With respect to the proposed advertiser class, plaintiffs will need to show not just that they were purportedly overcharged for advertising (and by how much they were overcharged), but also what their volume of ad purchases would have been in the counterfactual market, as well as how Facebook's status as a non-monopolist in that counterfactual market would have affected their overall ad purchase strategies.  Meanwhile, advertiser decisions are *sui generis* and vary by the size of the advertiser and its business strategy.  This is highly individualized and likely requires an assessment of each advertiser's unique business model.  Again, it is difficult to imagine a poorer fit for class treatment.  Facebook intends to focus class discovery on advertisers' choices in the broad relevant market, Facebook's prices during the putative class period, and related materials.

Given the cost and expense associated with antitrust merits discovery, assessing whether plaintiffs can realistically certify a class may obviate the need for more burdensome merits discovery, particularly since class certification issues could be dispositive.

### 2.    Merits Discovery

Facebook proposes that if a class is ultimately certified, the Court schedule a case management conference for 30 days after its class certification ruling for the parties to address the scope and procedure for merits discovery, including the process for additional coordination with the government cases.  Depending on the timing of the government cases, Facebook believes phasing of merits discovery may make sense, with an initial stage of discovery focused on Plaintiffs' theory that nearly fifteen years ago Facebook illegally *acquired* a monopoly (a theory notably *not* alleged by the government plaintiffs) and then a second phase of merits discovery targeted at plaintiffs' monopoly maintenance theory, which overlaps almost completely with the government cases, and is rooted in conduct between six and ten years old.

1

**C.      This Court Should Reject Plaintiffs' Discovery Proposal**

2

      **1.      Plaintiffs' Request for Immediate, Cloned Discovery Is Premature**

3

           **and Overbroad**

4

Plaintiffs ask this Court to order Facebook to immediately and prematurely produce all

5

documents provided to competition regulators across the globe as well as the entire documentary

6

records of a laundry list of other private litigations that span well over a decade.  This request

7

should be denied.

8

Plaintiffs misleadingly suggest that cloned discovery is a "clear trend among district

9

courts."  This is incorrect.  "Asking for all documents produced in another matter is not generally

10

proper," and courts routinely reject requests for cloned discovery as presumptively overbroad or

11

irrelevant "even if the subject matter of [the] cases seem to overlap."  *Ludlow v. Flowers Foods,*

12

*Inc.*, 2019 WL 6252926, at *18 (S.D. Cal. Nov. 22, 2019).  Wholesale cloned discovery like that

13

sought by the plaintiffs is improper where, as here, the responses "would include documents

14

irrelevant to plaintiffs' case."  *Rodriguez v. Google, Inc.*, 2021 U.S. Dist. LEXIS 23824, at *6

15

(N.D. Cal. Feb. 8, 2021) (Tse, J.); *Schneider v. Chipotle Mexican Grill, Inc.*, 2017 WL 1101799,

16

at *4 (N.D. Cal. Mar. 24, 2017) (Westmore, J.) (productions in a matter that "is broader than the

17

instant case" not subject to cloned discovery because they "may involve documents that are not

18

relevant on their face").

19

The documents sought in the FTC and State AG investigations, just two of the many

20

matters from which plaintiffs demand wholesale cloned discovery, include documents related to

21

a number of topics that are far afield of plaintiffs' claims, including merely by way of example:

22

submissions to regulatory authorities in connection with investigations of third parties unrelated

23

to these cases, such as Facebook's response to an FTC subpoena concerning a transaction to

24

which it was not a party; submissions to regulatory authorities in connection with other

25

investigations of Facebook's unrelated to this case, such as Facebook's efforts to develop a

26

digital currency called Libra; policies concerning identity verification and security measures

27

taken to address fake and duplicate accounts; and information about ancillary features on mobile

28

apps such as "stickers," "avatars," "masks," and "voice filters."  Other government investigations have been similarly sweeping and likewise required production of documents wholly unrelated to this case.  For example, the materials sought in the House Judiciary Committee's digital markets investigation include documents and information related to Facebook products and programs that are not at issue in this litigation, including Oculus (a virtual reality platform), Facebook Payments (an in-app payments product), and FbStart (a program designed to help mobile startups succeed).[6]  Documents produced in response to these requests obviously have no bearing on any plaintiff's claims in this case.  No plaintiff has raised a claim related to Facebook's digital currency, payments, or virtual reality products; the deletion of fake Facebook accounts; and certainly not about Facebook's regulatory submissions in investigations of mergers to which Facebook was *not a party*.

Further, the German Federal Cartel Office[7] and the Australian Competition and Consumer Commission[8]—other regulators that plaintiffs have demanded Facebook's submissions to—sought information related to conduct taking place entirely within those countries.  Plaintiffs' request for wholesale reproduction of documents from a laundry list of other litigations fares no better.  Plaintiffs have not sought to relate those cases to this one, and have offered no explanation for why the documents produced in those cases would be relevant here.  As just one example, Plaintiffs seek Facebook's document production from a state court litigation in which a third-party app developer has asserted, over the course of six different complaints, a variety of claims ranging from breach of contract to intentional interference with contract, among others, for changes Facebook made to its APIs that impacted how app developers (not users or advertisers) can access Facebook's platform.

---

[6] *See* https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/facebook%20rfi%20-%20signed.pdf.

[7] *See* https://www.bundeskartellamt.de/SharedDocs/Entscheidung/EN/Fallberichte/Missbrauchsaufsicht/2019/B6-22-16.html.

[8] *See* https://www.accc.gov.au/focus-areas/digital-platforms.

And even with respect to document requests from regulators that do overlap with the issues in this case, it is far from clear that the entire production set would be relevant.  As Judge Chhabria recently remarked with respect to a similar request for cloned discovery propounded on Facebook, "I don't think it would be appropriate for me to order" "Facebook . . . without doing any further review to turn over exactly what it turned over to the government."  Tr. of Proceedings at 8:12-15, *In re Facebook, Inc. Consumer Privacy Litig.*, No. 18-md-2843-VC (N.D. Cal. Jan. 8, 2020).  This is so because, he explained, "when you turn stuff over to the Government, you worry—you do worry less about relevance . . . . You do worry less about turning over something that might not be subject to discovery because it is not relevant at all . . . because you are dealing with the Government and you are trying to—you know, it is a different calculus."  *Id.* at 8:21-9:2.

Moreover, the size of the production that plaintiffs demand belies plaintiffs' proffered justification that cloned discovery would be "efficient."  Facebook produced almost nine million documents—totaling approximately 35 million pages—to the FTC and State AGs alone.  The notion that plaintiffs would somehow be able to ***undertake the time and expense to*** review these documents at all, let alone in the proposed 30 days between their production and plaintiffs' proposed Rule 26(f) conference in order to "focus[]" the discussion at the conference, is not credible.

Thus, while reviewing millions upon millions of documents in a month may enable class counsel to run up substantial legal fees, the wholesale reproduction of millions of documents does nothing to promote reasonable, efficient, and proportional discovery into the issues that may actually be relevant to this case.[9]

Furthermore, Facebook's productions to government regulators generally were provided under a single confidentiality designation.  Facebook expects that the protective order ultimately entered in this case may have multiple tiers of confidentiality, requiring a re-review of the

---

[9] Plaintiffs offer no explanation of why the Federal Rules' and this Court's ediscovery guidelines and checklists requirements that discovery sought be relevant and proportional to the needs of the case should not apply in "large complex antitrust cases."

1    productions for classification into the appropriate confidentiality tier.  That itself eliminates the

2    illusory efficiency rationale that plaintiffs assert for their sweeping request for reproduction of

3    documents from dozens of regulatory inquiries and litigations.

4         In short, plaintiffs' request for any discovery is both improperly overbroad and

5    premature.  A more appropriate pre-Rule 26(f) conference disclosure would be the document

6    requests themselves, rather than what was produced in response to them.  To that end, if the

7    Court believes some early discovery is appropriate, Facebook proposes to produce to plaintiffs

8    the Civil Investigative Demands issued by the FTC, and the subpoenas propounded by the

9    Plaintiff States, in advance of the Rule 26(f) conference.

10        Those materials would enable plaintiffs to begin to assess the subject matter and

11   relevance of the documents actually in the productions that plaintiffs seek, and the parties could

12   meet and confer on what readily-available materials Facebook may be able to produce that would

13   be relevant and proportional to the needs of this case.  As Judge Chhabria explained, the

14   appropriate production for Facebook to make would be "whatever is responsive . . . to the

15   discovery requests in this case."  Tr. of Proceedings at 38:15-18, *In re Facebook, Inc. Consumer*

16   *Privacy Litig.*, No. 18-md-2843-VC (N.D. Cal. Nov. 11, 2019).  Facebook would, of course, be

17   willing to produce responsive materials properly subject to discovery at an appropriate time,

18   notwithstanding the fact that those materials were previously provided to government regulators.

19        Plaintiffs falsely (and bizarrely) state that Facebook has refused to provide those

20   materials.  To the contrary, Facebook's proposal explicitly contemplates that Facebook would

21   provide those materials as part of its discovery proposal.  Plaintiffs have rejected that proposal

22   flat out.

23        Finally, should the Court open discovery early by requiring Facebook to produce

24   materials in advance of the Rule 26(f) conference over Facebook's objection, Facebook should

25   be permitted to serve discovery on plaintiffs.  Plaintiffs offer no explanation of why they should

26   enjoy a period of unilateral discovery, and the Federal Rules contemplate no such thing.

27

28

### 2. Plaintiffs' Proposal To Use "Best Efforts" To Coordinate Discovery With The Government Cases Is Insufficient

All parties agree that discovery will need to be coordinated with the government cases. This Court recognized the same at the hearing to appoint interim class counsel.  Tr. at 28:4-5 ("I would assume there would be some coordination, especially on discovery.").  A plan for coordination between the government cases needs to be put in place before discovery begins in this case.  A promise to use "best efforts" is an empty gesture, not a workable proposal.  Instead, as noted, there should be a uniform coordination order entered before any discovery takes place.

Moreover, plaintiffs' proposal that the parties will submit a protective order in advance of this Case Management Conference—which would be less than two weeks after plaintiffs provided a draft to Facebook—is simply unworkable.  For one, Facebook has already advised Plaintiffs and the Court that there will be significant issues that need to be resolved in the context of the protective order because of the overlap between counsel in these cases and in other antitrust cases with overlapping issues.  For example, some of the same attorneys from Keller Lenkner firm, which serves on the Executive Committee for the user class, are representing the state of Texas in an antitrust case against Google in which Facebook is named a purported "co-conspirator" and in which significant discovery has been sought from Facebook.  Likewise, as Facebook explained and the Court contemplated at the March 18 hearing, there will need to be some coordination of discovery with the FTC and States' cases, which will itself require special protective order provisions.  Facebook also continues to investigate the sufficiency of the screen Keller Lenkner imposed on one of its attorneys who had previously done hundreds of hours of work on behalf of Facebook on the related FTC and state AG antitrust investigations.  The scope and contours of a protective order in this case should be decided only after resolution of the motions to dismiss in the FTC and States' cases pursuant to the local rules and issues remaining in those cases, if any, and then if necessary or appropriate, after entry of a protective order in those matters tailored to those cases.  The parties in those cases have not yet had an opportunity to negotiate the terms of a protective order, or submit such an order to the Judge overseeing those

matters to solicit and receive guidance on the appropriate provisions.  All of this to say, Facebook will of course work with plaintiffs to reach resolution on a reasonable protective order that appropriately addresses the complexities of this case.  But the parties need more than ten days to negotiate a draft protective order given the specific issues involved here.

### 3.     Other Elements of Plaintiffs' Discovery Proposal Are Deficient

While it is premature to address most, if not all, specific procedures governing discovery, plaintiffs make a number of proposals to which Facebook objects.  For example, Facebook does not agree that a blanket presumption of authenticity should attach to all documents produced in discovery, but Facebook is of course willing to confer on possible stipulations as to the authenticity of different categories of documents as the case progresses.  And with respect to plaintiffs' proposal regarding preservation of particular categories of information, the parties should address the scope of preservation when the parties meet and confer concerning ESI at the Rule 26(f) conference or otherwise as appropriate and not piecemeal.  Further, while the scope of the plaintiffs' cases as alleged would likely militate in favor of an additional number of depositions, Facebook believes that after its motion to dismiss is decided, to the extent that any issues remain, they will be far narrower and circumscribed to the statute of limitations period.  In that case, the limit in the Federal Rules may well be sufficient.

If and when discovery opens, Facebook proposes that at least the following rules govern. First, the user and advertiser plaintiffs shall jointly serve requests for production, requests for admission, and interrogatories to the extent that they seek information relevant to both actions. Second, the user and advertiser plaintiffs shall jointly notice and conduct fact-witness depositions and depositions pursuant to Fed. R. Civ. P. 30(b)(6) such that the same witness need not be made available more than once.  Third, the limits on discovery found in Rules 30, 31, and 33, or as otherwise agreed to by the parties or ordered by the Court, shall be applied on a per-side and not per-party basis.

1

### 9.    <u>Class Action</u>

This case is a putative class action.  Counsel for both sides have reviewed the Procedural

Guidance for Class Action Settlements.

Plaintiffs propose that two or more classes be certified pursuant to Federal Rule of Civil

Procedure 23(b)(3) and to file a motion for class certification as set forth in Plaintiffs' proposed

schedule.

Facebook contends that plaintiffs cannot satisfy the class-certification prerequisites or

requirements set forth in Fed. R. Civ. P. 23, and that the parties should proceed with bifurcated

discovery and focus on discovery related to class certification before turning to discovery on the

merits.

### 10.    <u>Related Cases</u>

In addition to the ten related private actions that have been consolidated with this case,[10]

related lawsuits filed by the FTC and State Attorneys General are currently pending in the

District Court for the District of Columbia.  Both the FTC and the States have filed related case

notices for the vast majority if not all of the private actions.  *See* FTC Case, ECF Nos. 4, 10, 28,

31, 44, 45, 52, 53, 54, 55, 57, 58; State AG Case, ECF Nos. 5, 9, 14, 56, 85, 86, 109, 110, 116.

Complaints in both cases contain allegations that overlap with the anticipated allegations

in plaintiffs' forthcoming CACs, including that Facebook allegedly holds monopoly power in the

market for personal social networking services in the United States, FTC Compl. ¶ 2, State AG

---

[10] *Mark K. Wasvary, P.C. v. Facebook, Inc.*, No. 21-CV-001518-SK (N.D. Cal. filed March 3, 2021); *Kovacevich v. Facebook, Inc.*, No. 21-CV-01117-JCS (N.D. Cal. filed Feb. 15, 2021); *Rosenman v. Facebook, Inc.*, No. 21-CV-00336-VC (N.D. Cal. filed Feb. 5, 2021); *Garvin v. Facebook, Inc.*, No. 21-CV-00618-KAW (N.D. Cal. filed Jan. 26, 2021); *Layser v. Facebook, Inc.*, No. 21-CV-00337-VC (N.D. Cal. filed Jan. 13, 2021); *Affilious, Inc. et al. v. Facebook, Inc.*, No. 20-CV-09217-EMC (N.D. Cal. filed Dec. 18, 2020); *Steinberg v. Facebook, Inc.*, 20-CV-09130-VC (N.D. Cal. filed Dec. 17, 2020); *Dames et al. v. Facebook, Inc.*, No. 20-cv-08817-HSG (N.D. Cal. filed Dec. 11, 2020); *Kupcho v. Facebook, Inc.*, No. 20-CV-08815-JSW (N.D. Cal. filed Dec. 11, 2020); *Sherman v. Facebook*, No. 20-CV-08721-JSW (N.D. Cal. filed Dec. 9, 2020).  As noted above, Facebook anticipates moving to relate *Ryan v. Facebook, Inc.*, No. 21-CV-2017 (N.D. Cal. filed Mar. 23, 2021) and the re-filed *Rosenman v. Facebook, Inc.*, No. 21-CV-2108 (N.D. Cal. removed Mar. 25, 2021) to this case as well.

---

Compl. ¶ 4, and that Facebook allegedly engaged in anticompetitive conduct to eliminate threats to its supposed monopoly, including its acquisitions of Instagram and WhatsApp, FTC Compl. ¶ 5, State AG Compl. ¶¶ 12.  According to the FTC and the States, this alleged anticompetitive conduct harmed both "users" and advertisers, FTC Compl. ¶¶ 27-28; State AG Compl. ¶ 4.  In addition, both government complaints request injunctive relief and divestiture of Instagram and WhatsApp, *see* FTC Compl. Prayer for Relief; State AG Compl. ¶ 277, similar to the relief anticipated in plaintiffs' CACs.

The proceedings in the government lawsuits are ahead of those in this action, with Facebook's motions to dismiss in those cases already filed and the government's oppositions due before the deadline for the private plaintiffs to file the CACs.  *See* FTC Case, ECF No. 56; State AG Case, ECF No. 114.

**11.    Relief**

Consumer Class Plaintiffs' Statement:  The Consumer Class Plaintiffs seek damages to the maximum extent authorized by applicable federal and state law, including treble damages, or, alternatively, restitution and/or disgorgement of all amounts wrongfully charged to and received from Plaintiffs.  Plaintiffs also seek injunctive and declaratory relief, as well as attorneys' fees and costs.

Advertiser Class Plaintiffs' Statement:  The Advertiser Class Plaintiffs seek damages to the maximum extent authorized by law, including treble damages, or, alternatively, restitution and/or disgorgement of all amounts wrongfully charged to and received from Plaintiffs. Plaintiffs also seek injunctive and declaratory relief, as well as attorneys' fees and costs.

Facebook Statement:  There is simply no reason to allow the user plaintiffs to proceed with a damages claim.  Facebook is free and the antitrust laws do not permit recovery for the nonpecuniary "injuries" claimed by the plaintiffs.

**12.    Settlement and ADR**

No settlement discussions have taken place.  The parties have discussed ADR and do not believe that ADR would be constructive at this time and likely will not be until the government

1  cases are resolved.  As the case progresses, the parties are of course willing to engage in ADR
2  with a private mediator if it would be productive.  The parties have complied with ADR Local
3  Rule 3-5.
4     **13.    <u>Consent to Magistrate Judge For All Purposes</u>**
5     A number of plaintiffs have declined to consent to proceed before a magistrate judge for
6  all purposes.
7     **14.    <u>Other References</u>**
8     The parties do not believe this case is suitable for reference to a special master or the
9  Judicial Panel on Multidistrict Litigation.
10    **15.    <u>Narrowing of Issues</u>**
11    **Plaintiffs' Position:**
12    Consistent with the Court's direction, ECF No. 74, the Consumer and Advertiser Class
13  Plaintiffs together will not be bringing more than 10 claims collectively in the forthcoming
14  CACs.
15    Plaintiffs will consider issues that can be narrowed by agreement or by motion, as well as
16  potential means to expedite the presentation of evidence at trial.
17    **Defendant's Position:**
18    The FTC and State AG cases currently pending in the U.S. District Court for the District
19  of Columbia both challenge substantially the same conduct that is at issue here.  *See generally*
20  FTC Compl.; State AG Compl.  The most efficient way to narrow the issues in these actions and
21  expedite the presentation of evidence at trial is for this Court to set a schedule ensuring that
22  discovery is bifurcated and that the two government cases reach final judgments before these
23  cases do.
24    Should the FTC obtain a final judgment in its enforcement action, that judgment may be
25  prima facie evidence against Facebook in the instant cases.  *See* 15 U.S.C. § 16(a).  And should
26  Facebook prevail in the State AG case, a *parens patriae* action, that judgment will have
27  preclusive effect and bar the overlapping claims brought by any of the named plaintiffs and
28

putative class members who are citizens of the Plaintiff States.  *See Satsky*, 7 F.3d at 1470

("When a state litigates common public rights" such as competition issues, "the citizens of that

state are represented in such litigation by the state and are bound by the judgment"); *Menzel v.*

*County Utilities Corp.*, 501 F. Supp. 354, 357 (E.D. Va. 1979) ("under the doctrine of *parens*

*patria*, a state is deemed to represent all of its citizens, when the state is a party in a suit

involving a matter of sovereign interest," and "[t]here is a presumption that the state [] will

represent adequately the position of its citizens"); *see also Alaska Sport Fishing Ass'n*, 34 F.3d at

773 (private claims barred by *res judicata* following State's entry into consent decree resolving

claims arising out of the same facts); *Northern Calif. River Watch*, 162 F. App'x at 765 (similar).

Accordingly, allowing the government cases to proceed to final judgment may

substantially narrow the scope of contested issues in these consolidated cases, and will allow the

parties to streamline discovery and their presentations at trial should these cases proceed.

### 16.   <u>Expedited Trial Schedule</u>

The parties do not consent to the Expedited Trial Procedure of General Order No. 64.

### 17.   <u>Scheduling</u>

Facebook filed its motions to dismiss both the FTC and State Attorneys General actions

on March 10, 2021; the oppositions to the motions to dismiss are due April 7, 2021; and

Facebook's replies in support of its motions to dismiss are due April 21, 2021.  No schedule has

otherwise been proposed or entered in those cases.

**Plaintiffs' Position:**

Plaintiffs will use their best efforts to coordinate with the FTC and State AG

Cases.  However, upon review of Facebook's positions herein, it is apparent that Facebook seeks

to leverage the pendency of the FTC and State AG cases to unreasonably delay this case—

seeking, for example, a trial date in mid-2025 *or later*, predicated on Facebook's assumption that

the government cases against Facebook may go to trial in mid-2024 (no schedule has been set in

the government cases).  *Infra* at 41-42.  To avoid such unreasonable delay, Plaintiffs respectfully

request the Court enter a pretrial schedule at this time.  Plaintiffs propose the following schedule.

1

| Event | Date |
|---|---|
| Filing of Joint Case Management Statement | March 31, 2021 (ECF No. 74) |
| Filing of Protective Order | April 5, 2021 |
| Initial Case Management Conference | April 7, 2021 (ECF No. 74) |
| Filing of Consolidated Amended Complaints | April 22, 2021 (ECF No. 74) |
| Rule 26(f) Conference Deadline | April 29, 2021 |
| Facebook's Motion to Dismiss Consolidated Amended Complaints | May 20, 2021 (ECF No. 74) |
| Parties begin production of documents and transactional data on rolling basis | June 1, 2021 |
| Plaintiffs' Oppositions to Motion to Dismiss | June 17, 2021 (ECF No. 74) |
| Facebook's Reply in support of Motion to Dismiss | July 1, 2021 (ECF No. 74) |
| Hearing on Motion to Dismiss | July 15, 2021 at 1:30 p.m. (ECF No. 74) |
| Parties substantially complete production of documents and transactional data | September 1, 2021 |
| Plaintiffs' Opening Expert Reports | March 1, 2022 |
| Plaintiffs' Motion for Class Certification | March 15, 2022 |
| Facebook's Expert Reports | April 5, 2022 |
| Facebook's Opposition to Motion for Class Certification | April 19, 2022 |
| Close of Fact Discovery | April 19, 2022 |
| Plaintiffs' Rebuttal Expert Reports | May 10, 2022 |
| Plaintiffs' Reply in support of Motion for Class Certification | May 17, 2022 |
| Hearing on Motion for Class Certification | May 31, 2022 at 1:30 p.m. |
| Close of Expert Discovery | May 31, 2022 |
| Last Day to File Dispositive Motions and Daubert Motions | June 21, 2022 |
| Summary Judgment and Daubert Oppositions | July 19, 2022 |
| Summary Judgment and Daubert Replies | August 9, 2022 |
| Hearing on Dispositive Motions | August 23, 2022 at 1:30 p.m. |
| Final Pretrial Conference | October 25, 2022 at 1:30 p.m. |
| Trial | November 8, 2022 at 9:00 a.m. |

**Defendant's Position:**

In plaintiffs' first draft of this Case Management Statement they affirmatively proposed that "this case should be coordinated with the FTC and State Attorneys General actions" and proposed that "a pretrial schedule in this case not be set until a schedule is entered in the FTC and State Attorneys General actions." Plaintiffs maintained that position through the exchange of multiple drafts between the parties and a telephonic meet-and-confer about this Case

Management Statement.  Facebook agreed with this proposal.  But at 5:30 p.m. Pacific Time on the day that this submission was due, and with no explanation, plaintiffs withdrew their proposed agreement and now request that this Court set a pretrial schedule immediately and no longer support coordination.

Whatever prompted the unexplained, eleventh-hour about-face, plaintiffs themselves repeatedly acknowledged that it is premature to set a schedule in this case.  And for good reason. Given the nature of this proceeding, including the weaknesses of plaintiffs' claims and the substantial overlap with the government cases, it would be premature to schedule deadlines beyond the hearing on the motion to dismiss at this early date.  That will ensure that these cases can be scheduled in a manner consistent with the government cases, which will maximize the effectiveness of any coordination.  It also allows for all parties to negotiate a protective order that will ensure consistent treatment of both Facebook and nonparty confidential information.

If this case proceeds to discovery, Facebook proposes that it proceed in a bifurcated manner, as described above.  Facebook proposes that the parties confer on an appropriate schedule if any of plaintiffs' claims survive Facebook's motion to dismiss and that a case management conference be scheduled for 30 days after the Court's ruling on the motion to dismiss.  The Court has adopted this step-wise approach in prior proceedings.  *See, e.g.*, CMO, *In re Anthem Data Breach Litig.*, No. 5:15-md-02617-LHK, ECF No. 326 (N.D. Cal. Oct. 25, 2015); CMO, *In re Yahoo! Inc. Customer Data Security Breach Litig.*, No. 5:16-md-02752-LHK, ECF No. 89 (N.D. Cal. May 4, 2017).

In the event that the Court elects to schedule beyond the motion to dismiss hearing, Facebook proposes, again consistent with its proposal for bifurcated discovery, dates through the conclusion of a hearing on class certification.

| Event | Facebook's Proposal |
|---|---|
| Initial Case Management Conference | April 7, 2021 |
| Filing of Consolidated Class Action Complaint ("CAC") | April 22, 2021 |
| Facebook's Motion to Dismiss the Consolidated Complaint | May 20, 2021 |

| Plaintiffs' Opposition to Facebook's Motion to Dismiss the Consolidated Complaint | June 17, 2021 |
|---|---|
| Facebook's Reply in Support of Motion to Dismiss the Consolidated Complaint | July 1, 2021 |
| Hearing on Motion to Dismiss | July 15, 2021 |
| Deadline to Finish Meeting and Conferring Regarding ESI and Confidentiality Orders | July 22, 2021 or 30 days after entry of Protective Order and Case Management Order in FTC and State AG cases, whichever is later |
| Rule 26(f) Conference Deadline | August 15, 2021 or 56 days after entry of Protective Order and Case Management Order in FTC and State AG cases, whichever is later |
| Initiation of Class Discovery | September 7, 2021 |
| Class Discovery Cutoff | April 1, 2022 |
| Plaintiffs' Motion for Class Certification Including Expert Declarations | June 3, 2022 |
| Opposition to Class Certification | July 1, 2022 |
| Reply in Support of Class Certification | July 15, 2022 |
| Hearing on Motion for Class Certification | August 1, 2022 |
| Merits Discovery Case Management Conference | September 6, 2022 |

To the extent the court is inclined to set a schedule beyond class certification, plaintiffs' proposed schedule is unworkable for a number of reasons. To give the Court some context, in the government enforcement action filed by the DOJ late last year against Google in a narrower case than this one, another court in the U.S. District Court for the District of Columbia set a fact discovery period of fifteen months, with trial set for late 2023. A similar schedule for the government enforcement cases against Facebook would likely see fact discovery extend to the Fall of 2022, with trial in mid-2024.

Moreover, as the Court and various counsel for the plaintiffs acknowledged at the March 18, 2021 hearing to appoint interim class counsel, this case is extraordinarily complex. Tr. at 22:20 (the Court describing this as a "big complex case[]"), 61:25-62:1, 69:1-2, 71:11-12, 72:5-6 ("It's hard at this stage to understand just how complex it's going to get."). Plaintiffs' counsel also explained: "Facebook is a huge company. There's multiple areas of discovery which is going to be large." *Id.* at 63:18-19.

1   Nevertheless, plaintiffs propose to conduct class certification proceedings, fact discovery,

2   and expert discovery at the same time.  They would also have expert reports served before the

3   close of fact discovery.  This proposal should be a non-starter.  As an initial matter, plaintiffs'

4   efforts to certify classes here will involve novel and speculative theories.  As explained above, to

5   determine whether this case may properly proceed as a class action, class certification issues

6   should be resolved prior to any further case activities.  Second, and independently, to Facebook's

7   knowledge this Court has never permitted *simultaneous* fact and expert discovery in an antitrust

8   case.[11]  And for good reason.  The experts should have the benefit of the entire factual record

9   before submitting their opening reports.  Proceeding with a highly-speculative class certification

10  exercise, complex fact discovery, and even more complex expert discovery (against an ever-

11  evolving record produced in simultaneous fact discovery) would create unworkable chaos.

12  Against this backdrop, and considering that Facebook intends to file two dispositive

13  motions, it makes little sense to set a schedule, as plaintiffs propose, contemplating a trial fewer

14  than two years from the filing of the first complaint in this case.  Instead, if the Court is inclined

15  to set a trial date now, a more realistic and appropriate date is mid-2025 or 90-120 days after

16  final judgment is entered in the government cases, whichever is later.  This will ensure that the

17  government cases go first (and thus the issues in this case can be narrowed, as Facebook has

18  explained above), and will give the parties adequate time to conduct class certification

19  proceedings, as well as appropriately structured fact and expert discovery.  But again, the

20  uncertainty of the schedule in the government cases now militates against setting a further

21  schedule at this time and instead revisiting this topic once the schedule in the government cases

22  has been set.

23

24  ─────────────

25  [11] *See* CMO at 2, *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 5:20-md-2966-LHK, ECF No.
    44 (N.D. Cal. Jan. 28, 2021); CMO at 2, *In re Qualcomm Antitrust Litig.*, 5:17-md-2773-LHK,
    ECF No. 36 (N.D. Cal. May 25, 2017); CMO at 1, *Ryan v. Microsoft Corp.*, 5:14-cv-4634-LHK,
26  ECF No. 46 (N.D. Cal. Feb. 11, 2015); CMO at 2, *Garrison v. Oracle Corp.*, 5:14-cv-4592-
    LHK, ECF No. 25 (N.D. Cal. Jan. 21, 2015); CMO at 2, *In re Animation Workers Antitrust
27  Litig.*, 5:14-cv-4422-LHK, ECF No. 33 (N.D. Cal. Nov. 6, 2014); CMO at 2, *In re High-Tech
    Employee Antitrust Litig.*, 5:11-cv-2509-LHK, ECF No. 88 (N.D. Cal. Oct. 26, 2011).

28

─────────────

1

**18.**   **Trial**

2

Consumer Class Plaintiffs' Statement:  The Consumer Class Plaintiffs request a jury trial,

3

and currently estimate the trial in this case will take four weeks.

4

Advertiser Class Plaintiffs' Statement:  The Advertiser Class Plaintiffs request a jury

5

trial, and currently estimate the trial in this case will take four weeks.

6

Facebook Statement:  It is premature to estimate the duration of trial at this early date,

7

especially given the significant uncertainty as to the scope of this case and whether classes will

8

be certified.  Facebook anticipates that the plaintiffs' request for damages will not survive

9

dispositive motion practice and therefore a jury trial will be inappropriate.

10

**19.**   **Disclosure of Non-Party Interested Entities or Persons**

11

Consumer Class Plaintiffs' Statement:  Consumer Class Plaintiffs are not aware of any

12

persons or entities with a financial or other interest in the subject matter in controversy other than

13

the named parties and members of the proposed class.

14

Advertiser Class Plaintiffs' Statement:  All Advertiser Plaintiffs named in the *Affilious*

15

Complaint have filed their certifications pursuant to Civil L.R. 3-15; other than the named

16

parties, there are no non-party interested entities or persons to report.  To the extent a plaintiff

17

that has not filed a Civil L.R. 3-15 certification is named in the consolidated complaint on behalf

18

of the advertiser class, such certification will be promptly filed.

19

Facebook's Statement:  Facebook is not aware of any persons or entities with a financial

20

or other interest in the subject matter in controversy other than the named parties and the

21

members of the putative class.

22

**20.**   **Professional Conduct**

23

All attorneys of record for the parties have reviewed the Guidelines for Professional

24

Conduct for the Northern District of California.

25

**21.**   **Other Matters**

26

The parties believe that the following procedures will facilitate the expeditious,

27

economical, and just resolution of this action:

28

1    A complex antitrust class action presents special case management issues, in particular

2    the efficient and timely completion of discovery.  Given the issues likely to arise in the course of

3    litigating this matter, the parties believe that the action would benefit from quarterly status

4    conferences in person or by telephone on dates and at times convenient for the Court.  *See*

5    Manual for Complex Litigation, Fourth §11.22 (2004).  To the extent status conferences are held

6    quarterly or at other intervals, the parties propose jointly filing a Status Conference Report seven

7    days in advance of a scheduled Status Conference setting forth what issues, if any, there are for

8    discussion with or resolution by the Court.

1

DATED:  March 31, 2021                    Respectfully submitted,

2

By /s/ *Shana E. Scarlett*                          By /s/ *Stephen A. Swedlow*

3

**HAGENS BERMAN SOBOL SHAPIRO LLP**          **QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Shana E. Scarlett (Bar No. 217895)          Stephen A. Swedlow (admitted *pro hac vice*)

4

shanas@hbsslaw.com                            stephenswedlow@quinnemanuel.com
715 Hearst Avenue, Suite 202                Michelle Schmit

5

Berkeley, CA 94710                            michelleschmit@quinnemanuel.com
(510) 725-3000                              191 N. Wacker Drive, Suite 2700

6

                                            Chicago, IL 60606-1881
                                            (312) 705-7400

7

Steve W. Berman (admitted *pro hac vice*)
   steve@hbsslaw.com

8

1301 Second Avenue, Suite 2000              Manisha M. Sheth (admitted *pro hac vice*)
Seattle, WA 98101                             manishasheth@quinnemanuel.com

9

(206) 623-7292                              51 Madison Avenue, 22nd Floor
                                            New York, New York 10010

10

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**          (212) 849-7000

11

W. Joseph Bruckner (admitted *pro hac vice*)
   wjbruckner@locklaw.com

12

Robert K. Shelquist (admitted *pro hac vice*)  Kevin Y. Teruya (Bar No. 235916)
   rkshelquist@locklaw.com                       kevinteruya@quinnemanuel.com

13

Brian D. Clark (admitted *pro hac vice*)     Adam B. Wolfson (Bar No. 262125)
   bdclark@locklaw.com                           adamwolfson@quinnemanuel.com

14

Rebecca A. Peterson (Bar No. 241858)         Brantley I. Pepperman (Bar No. 322057)
   rapeterson@locklaw.com                        brantleypepperman@quinnemanuel.com

15

Arielle S. Wagner (admitted *pro hac vice*)  865 South Figueroa Street, 10th Floor
   aswagner@locklaw.com                       Los Angeles, CA 90017-2543

16

Stephanie A. Chen (admitted *pro hac vice*)  (213) 443-3000
   sachen@locklaw.com

17

100 Washington Avenue South, Suite 2200     **KELLER LENKNER LLC**

18

Minneapolis, MN 55401                       Warren Postman (Bar No. 330869)
(612) 339-6900                                wdp@kellerlenkner.com

19

                                            Jason Ethridge (admitted *pro hac vice*)
                                              jason.ethridge@kellerlenkner.com

20

                                            1300 I Street, N.W., Suite 400E
                                            Washington, DC 20005

21

                                            (202) 918-1123

22

                                            Ashley Keller (admitted *pro hac vice*)
                                              ack@kellerlenkner.com

23

                                            Ben Whiting (admitted *pro hac vice*)
                                              ben.whiting@kellerlenkner.com

24

                                            Jason A. Zweig (admitted *pro hac vice* )
                                              jaz@kellerlenkner.com

25

                                            150 N. Riverside Plaza, Suite 4270
                                            Chicago, IL 60606

26

                                            (312) 741-5220

27

                                            *Interim Counsel for the Consumer Class*

28

1

2   By /s/ *Kristen M. Anderson*
    **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
3   Kristen M. Anderson (CA 246108)
    The Helmsley Building
    230 Park Avenue, 17th Floor
4   New York, NY 10169
    Telephone: 212-233-6444
5   Facsimile:  212-233-6334
    kanderson@scott-scott.com
6
    Christopher M. Burke (CA 214799)
7   David H. Goldberger (CA 225869)
    Yifan (Kate) Lv (CA 302704)
8   600 W. Broadway, Suite 3300
    San Diego, CA 92101
9   Telephone: 619-233-4565
    Facsimile:  619-233-0508
10  cburke@scott-scott.com
    dgoldberger@scott-scott.com
11  klv@scott-scott.com

12  Patrick J. McGahan (*pro hac vice*)
    Michael P. Srodoski (*pro hac vice*)
13  156 South Main Street, P.O. Box 192
    Colchester, CT 06415
14  Telephone: 860-537-5537
    Facsimile:  860-537-4432
15  pmcgahan@scott-scott.com
    msrodoski@scott-scott.com
16
    **LEVIN SEDRAN & BERMAN LLP**
17  Keith J. Verrier (*pro hac vice*)
    Austin B. Cohen (*pro hac vice*)
18  510 Walnut Street, Suite 500
    Philadelphia, PA 19106-3997
19  Telephone: 215-592-1500
    Facsimile:  215-592-4663
20  kverrier@lfsblaw.com
    acohen@lfsblaw.com
21

22

23

24

25

26

27

28

By /s/ *Yavar Bathaee*
**BATHAEE DUNNE LLP**
Yavar Bathaee (CA 282388)
Edward M. Grauman (*pro hac vice*)
Andrew C. Wolinsky (*pro hac vice*)
445 Park Avenue, 9th Floor
New York, NY 10022
Telephone: 332-205-7668
yavar@bathaeedunne.com
egrauman@bathaeedunne.com
awolinsky@bathaeedunne.com

Brian J. Dunne (CA 275689)
633 West Fifth Street, 26th Floor
Los Angeles, CA 90071
Telephone: 213-462-2772
bdunne@bathaeedunne.com

**AHDOOT & WOLFSON, PC**
Tina Wolfson (CA 174806)
Robert Ahdoot (CA 172098)
Theodore W. Maya (CA 223242)
Rachel Johnson (CA 331351)
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: 310-474-9111
Facsimile:  310-474-8585
twolfson@ahdootwolfson.com
rahdoot@ahdootwolfson.com
tmaya@ahdootwolfson.com
rjohnson@ahdootwolfson.com

*Interim Counsel for the Advertiser Class*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:  /s/ *Sonal N. Mehta*

Sonal N. Mehta (SBN: 222086)
WILMER CUTLER PICKERING HALE AND
DORR LLP
950 Page Mill Road
Palo Alto, California 94303
Telephone:  (650) 858-6000
Facsimile:  (650) 858-6100
Email:  Sonal.Mehta@wilmerhale.com


David Z. Gringer (*pro hac vice*)
WILMER CUTLER PICKERING HALE AND
DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363
Email:  David.Gringer@wilmerhale.com


Attorneys for Defendant Facebook, Inc.

## <u>SIGNATURE ATTESTATION</u>

I am the ECF User whose identification and password are being used to file the foregoing.  Pursuant to Civil Local Rule 5-1(i), I hereby attest that the other signatories have concurred in this filing.

Dated:  March 31, 2021                                    By:     */s/ Stephen A. Swedlow*
                                                                     Stephen A. Swedlow