SONAL N. MEHTA (CA Bar No. 222086)
Sonal.Mehta@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

DAVID Z. GRINGER (*pro hac vice*)
David.Gringer@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Attorneys for Defendant*
FACEBOOK, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, SARAH GRABERT, AND RACHEL BANKS KUPCHO, on behalf of themselves and all those similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>FACEBOOK, INC.,<br><br>    Defendant. | Case No. 5:20-cv-08570-LHK<br><br>**FACEBOOK'S NOTICE OF MOTION AND MOTION TO DISQUALIFY KELLER LENKNER LLC, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:   September 30, 2021<br>Time:   1:30 p.m.<br>Ctrm:   8<br>Judge:  Hon. Lucy H. Koh |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

    A.    Keller Lenkner Hired A Lawyer Who Previously Represented
        Facebook In A Matter Concerning The Same Legal And Factual Issues
        As This Case. ............................................................................................... 3

    B.    Keller Lenkner Learned Of The Conflict In June 2020 But Did Nothing ............. 4

    C.    Keller Lenkner Has Been Disqualified For Similar Misconduct .......................... 7

    D.    Keller Lenkner Refused To Withdraw Voluntarily ............................................... 8

LEGAL STANDARD ......................................................................................................... 9

ARGUMENT ...................................................................................................................... 10

I.    KELLER LENKNER VIOLATED THE CALIFORNIA RULES OF
    PROFESSIONAL CONDUCT ................................................................................... 11

    A.    Facebook's Former Counsel May Not Represent The Named Plaintiffs
        And Putative Class ............................................................................................... 11

    B.    The Conflict Of Facebook's Former Counsel Is Imputed To His New
        Employer Keller Lenkner And No Exception Applies ......................................... 14

        1.    Facebook's Former Counsel Substantially Participated In A
            Substantially Related Matter ................................................................... 14

        2.    Keller Lenkner Did Not Timely Screen Facebook's Former
            Counsel Or Promptly Notify Facebook Of The Conflict ......................... 17

II.    DISQUALIFICATION IS THE APPROPRIATE REMEDY FOR KELLER
    LENKNER'S VIOLATION OF ITS ETHICAL OBLIGATIONS ................................. 20

III.    DISQUALIFICATION WILL NOT PREJUDICE THE PRIVATE
    PLAINTIFFS ............................................................................................................ 23

CONCLUSION ................................................................................................................... 24

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Acacia Patent Acquisition, LLC v. Superior Ct.*,
 184 Cal. Rptr. 3d 583 (Ct. App. 2015)........................................................ 11, 15

*Advanced Messaging Technologies, Inc. v. EasyLink Services International Corp.*,
 913 F. Supp. 2d 900 (C.D. Cal. 2012) ........................................................ 15, 16

*Beltran v. Avon Products, Inc.*,
 867 F. Supp. 2d 1068 (C.D. Cal. 2012) ................................................ 22, 23, 24

*Bryant v. Donahoe*,
 2012 WL 12884904 (C.D. Cal. Oct. 10, 2012)................................................. 17

*Concat LP v. Unilever, PLC*,
 350 F. Supp. 2d 796 (N.D. Cal. 2004) .............................................................. 10

*Diva Limousine, Ltd. v. Uber Technologies, Inc.*,
 2019 WL 144589 (N.D. Cal. Jan. 9, 2019).................................................*passim*

*Epikhin v. Game Insight North America*,
 2015 WL 2229225 (N.D. Cal. May 12, 2015) .................................................. 20

*Export-Import Bank of Korea v. ASI Corp.*,
 2019 WL 8200603 (C.D. Cal. Jan. 16, 2019) ................................................... 22

*Farhang v. Indian Inst. of Tech.*,
 2009 WL 3459455 (N.D. Cal. Oct. 27, 2009).................................................... 17

*Farris v. Fireman's Fund Insurance Co.*,
 14 Cal. Rptr. 3d 618 (Ct. App. 2004)........................................................... 12, 15

*Flatt v. Superior Court*,
 885 P.2d 950 (Cal. 1994) ........................................................................... 2, 20

*FlatWorld Interactives LLC v. Apple Inc.*,
 2013 WL 4039799 (N.D. Cal. Aug. 7, 2013) ................................................... 23

*Foster Poultry Farms v. Conagra Foods Refrigerated Foods Co.*,
 2005 WL 2319186 (E.D. Cal. Sept. 22, 2005)................................................... 13

*Guifu Li v. A Perfect Day Franchise, Inc.*,
 2011 WL 4635176 (N.D. Cal. Oct. 5, 2011)......................................... 12, 14, 17

*Hitachi, Ltd. v. Tatung Co.*,
 419 F. Supp. 2d 1158 (N.D. Cal. 2006) ....................................................... 21, 22

*In re Complex Asbestos Litigation*,
    283 Cal. Rptr. 732 (Ct. App. 1991) ........................................................... 17, 18

*In re County of Los Angeles*,
    223 F.3d 990 (9th Cir. 2000) .................................................................... 9

*j2 Glob. Communications, Inc. v. EasyLink Services International Corp.*,
    2012 WL 6618609 (C.D. Cal. Dec. 19, 2012) ................................................ 22

*Jessen v. Hartford Casualty Insurance Co.*,
    3 Cal. Rptr. 3d 877 (Ct. App. 2003) .......................................................... 13

*Kirk v. First American Title Insurance Co.*,
    108 Cal. Rptr. 3d 620 (Ct. App. 2010) ................................................ 17, 19, 23

*Lennar Mare Island, LLC v. Steadfast Insurance Co.*,
    105 F. Supp. 3d 1100 (E.D. Cal. 2015) ....................................................... 20

*MD Helicopters, Inc. v. Aerometals, Inc.*,
    2021 WL 1212718 (E.D. Cal. Mar. 31, 2021) ........................................... 20, 21

*Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft LLP*,
    81 Cal. Rptr. 2d 425 (Ct. App. 1999) ......................................................... 11

*National Grange of Order of Patrons of Husbandry v. California Guild*,
    250 Cal. Rptr. 3d 705 (Ct. App. 2019) ................................................... 22, 23

*Oliver v. SD-3C, LLC*,
    2011 WL 13156460 (N.D. Cal. Aug. 4, 2011) ............................................... 12

*People ex rel. Department of Corporations v. SpeeDee Oil Change Systems, Inc.*,
    980 P.2d 371 (1999) ................................................................ 10, 22, 23

*Plumley v. Doug Mockett & Co.*,
    2008 WL 5382269 (C.D. Cal. Dec. 22, 2008) ............................................... 10

*SC Innovations, Inc. v. Uber Technologies, Inc.*,
    2019 WL 1959493 (N.D. Cal. May 2, 2019) ......................................... 13, 20, 23

*Talon Research., LLC v. Toshiba America Electronic Components, Inc.*,
    2012 WL 601811 (N.D. Cal. Feb. 23, 2012) ........................................... 14, 16

*Trone v. Smith*,
    621 F.2d 994 (9th Cir. 1980) ............................................................ 12, 14

*Wausau Business Insurance Co. v. Diamond Contract Services, Inc*,
    2010 WL 11549716 (C.D. Cal. Sept. 23, 2010) ............................................. 16

*WhatsApp Inc. v. NSO Group Technologies Ltd.*,
    2020 WL 7133773 (N.D. Cal. June 16, 2020) .................................................... 10, 13, 20

**DOCKETED CASES**

*FTC v. Facebook, Inc.*,
    No. 1:20-cv-03590-JEB (D.D.C.) ............................................................ 3, 12, 13

*New York v. Facebook, Inc.*,
    No. 1:20-cv-03589-JEB (D.D.C.) ............................................................ 3, 12, 13

**RULES**

Cal. R. Prof. Conduct 1.7 ........................................................................ 9, 18

Cal. R. Prof. Conduct 1.9 ........................................................................ *passim*

Cal. R. Prof. Conduct 1.10 ....................................................................... *passim*

Civ. Local R. 11-4 .................................................................................. 1, 9

**OTHER AUTHORITIES**

STATE BAR OF CALIFORNIA, *Executive Summary: Rule 1.10 Imputation of Conflicts of Interest*, http://www.calbar.ca.gov/Portals/0/documents/rules /Rule_1.10-Exec_Summary-Redline.pdf ........................................................... 10, 14

*Keller Lenkner Joins as Co-Counsel in Antitrust Class-Action Lawsuit Against Live Nation and Ticket Master* (Feb. 10, 2021), https://www.kellerlenkner.com/keller-lenkner-joins-as-co-counsel-in-antitrust-class-action-lawsuit-against-live-nation-and-ticketmaster/ ...................................................................................... 19

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT, on September 30, 2021 at 1:30 p.m., Defendant Facebook, Inc. will and hereby does move this Court pursuant to Civil Local Rule 11-4 and the Court's inherent authority, for an order disqualifying Warren Postman and Keller Lenkner, LLC, counsel to Plaintiffs, from this action due to a conflict of interest that violates the California Rules of Professional Conduct.  This Motion is based upon this Notice of Motion, the Memorandum of Points and Authorities filed herewith, and the Declarations of Aaron Panner and Sonal Mehta filed herewith along with their accompanying exhibits.[1]

## ISSUE PRESENTED

Whether Keller Lenkner is disqualified from representing the named plaintiffs and putative class because it hired and failed to timely screen a lawyer who had spent more than 800 hours over the prior six months directly representing Facebook in government antitrust investigations and preparing for subsequent litigation involving substantially the same legal and factual questions raised by the Consolidated Class Action Complaint ("CAC"), Dkt. 87, and did not promptly notify Facebook of this conflict.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

In June 2020, Keller Lenkner hired a lawyer who had just spent six months and more than 800 hours representing Facebook in government antitrust investigations and in preparation for litigation involving the same course of conduct and many of the same legal theories alleged in this case.  Those investigations resulted in two antitrust actions being filed in the U.S. District Court for the District of Columbia, which present many of the same legal questions and factual allegations as the consolidated complaint now pending before this Court—indeed, Keller Lenkner has acknowledged that the government plaintiffs "assert virtually identical theories of harm to competition" as the private plaintiffs do here.  *Klein* Plaintiffs' Response to Competing

---

[1] Although the hearing on this motion is currently set for September 30, 2021, Facebook respectfully requests that this motion be heard and decided at the earliest time convenient to the Court given the nature of the motion and requested relief.

Application for Appointment as Interim Co-Lead User Class Counsel, Dkt. 62 at 8 n.5 ("Keller Lenkner Resp.").  The lawyer Keller Lenkner brought on was deeply involved in the government cases: he wrote legal memoranda for Facebook, responded to a civil investigative demand, worked with Facebook's experts, and was frequently entrusted with Facebook's confidential and privileged information including through participation in interviews with potential Facebook employee witnesses and meetings with in-house counsel.  Unsurprisingly, then, the lawyer told Warren Postman—the partner leading Keller Lenkner's own antitrust investigation into Facebook—about his extensive work representing the company the day after starting at the firm.

Notwithstanding the obvious conflict of interest created by an attorney switching sides in the middle of these closely related matters, Keller Lenkner did not screen the Facebook lawyer it hired from Keller Lenkner's investigation of Facebook until November 11, 2020—more than four months after learning of the conflict.  And despite being required by the California Rules of Professional Conduct to promptly notify Facebook of that (incurable) conflict, Keller Lenkner failed to do so, acknowledging the conflict for the first time on March 19, 2021.  Further, during the lead counsel selection hearing, Keller Lenkner overstated what it had done to address the conflict, falsely asserting that the firm had "promptly screened this lawyer *upon his arrival at the firm*."  Interim Class Counsel Hearing Tr. 10:4 (March 18, 2021) ("Hr'g Tr.") (emphasis added).

Because of this clear and significant violation of the Rules of Professional Conduct, Facebook asked Keller Lenkner to withdraw from its conflicted representation.  Keller Lenkner refused.  Thus, Facebook has no choice but to seek disqualification.  Under California's Rules, which govern Keller Lenkner's conduct here, disqualification is mandatory in a case like this one, where a lawyer has changed sides in substantially related matters after obtaining a client's confidential and privileged information through substantial work in the first representation.  *See Flatt v. Superior Court*, 885 P.2d 950, 954-55 (Cal. 1994).  Nothing less safeguards the duties of confidentiality and loyalty lawyers owe to their clients, both present and past.  Facebook can never know which of the firm's actions are tainted by that ethical violation, which is precisely the state of ongoing uncertainty the duties attorneys owe their clients are intended to prevent.  These concerns are exacerbated because Mr. Postman and Keller Lenkner have played fast and loose

with this same ethics rule before—having recently been disqualified in another antitrust litigation in this district. As a result of their prior experience, they were or should have been well aware of their ethical obligations. They chose to ignore them. This Court should not.

## BACKGROUND

### A. Keller Lenkner Hired A Lawyer Who Previously Represented Facebook In A Matter Concerning The Same Legal And Factual Issues As This Case.

On December 9, 2020, the Federal Trade Commission and a group of state attorneys general filed complaints in federal court asserting that Facebook violated the Sherman Act. *See FTC v. Facebook, Inc.*, No. 1:20-cv-03590-JEB (D.D.C.) (hereinafter, "FTC Case"); *New York v. Facebook, Inc.*, No. 1:20-cv-03589-JEB (D.D.C.) (hereinafter, "State AG Case"). The government plaintiffs allege that Facebook has unlawfully sought to maintain a monopoly over the "personal social networking" market through its acquisitions of Instagram and WhatsApp, among other companies. *See, e.g.*, FTC Compl. ¶¶ 170-72 (FTC Case, Dkt. 51); State AG Compl. ¶¶ 257-62 (State AG Case, Dkt. 70). The private plaintiffs who are before this Court assert substantially the same theory, alleging that Facebook unlawfully maintained a monopoly in similarly defined social networking and media markets by, among other things, acquiring Instagram and WhatsApp. *Compare, e.g.*, CAC ¶¶ 55-229, *with* FTC Compl. ¶¶ 6-160, *and* State AG Compl. ¶¶ 26-255. As Keller Lenkner previously explained to this Court, the FTC and States "assert virtually identical theories of harm to competition" as the private plaintiffs do here. *See* Keller Lenkner Resp. at 8 n.5. Because of the substantial overlap between the government cases and the private antitrust litigation, the FTC and States have filed related case notices for nearly all of the actions now consolidated before this Court.[2]

Facebook's lead counsel in the government antitrust litigation is Kellogg, Hansen, Todd, Figel & Frederick ("Kellogg Hansen").[3] Kellogg Hansen also represented Facebook during the investigations that preceded the filing of the complaints. One of the Kellogg Hansen attorneys

---

[2] *See* FTC Case, Dkts. 4, 10, 28, 31, 44, 45, 52, 53, 54, 55, 57, 58, 60; State AG Case, Dkts. 5, 9, 14, 56, 85, 86, 109, 110, 116.

[3] Prior to 2017, the firm was named Kellogg, Huber, Hansen, Todd, Evans & Figel.

who worked on those investigations is Albert Pak.  Mr. Pak was an associate at Kellogg Hansen until June 26, 2020.  Panner Decl. ¶ 9.[4]  Beginning in December 2019, he was a core member of the Kellogg Hansen team handling the FTC's and States' antitrust investigations of Facebook and preparing to litigate if, as happened, lawsuits ultimately occurred.  *Id.* ¶¶ 4-8.  Between December 11, 2019 and June 24, 2020, for example, he billed 824.5 hours to these matters.  *Id.* ¶ 8.  That represented approximately three-quarters of the time he billed over this period.  *Id.*  He was involved in many discussions about Facebook's legal strategy, including with Facebook's in-house counsel; interacted directly with Facebook's in-house counsel during those strategy sessions; wrote legal memoranda concerning issues of potential relevance to Facebook's defense; participated in fact gathering for witness interviews of witnesses who were deposed during the government investigations; analyzed and reviewed document productions; helped Facebook respond to one of the FTC's civil investigative demands; and was privy to regular communications about strategy directly from Mark Hansen, lead trial counsel, and other senior in-house and outside counsel lawyers developing Facebook's defense.  *Id.* ¶¶ 5-7.  Notably, Mr. Pak also helped a Kellogg Hansen partner lead the firm's work with consulting and potential testifying experts, through which he became privy to all of the expert teams' pending projects and discussions among counsel and expert teams regarding defense strategy.  *Id.* ¶ 6.  As a result of this significant involvement while at Kellogg Hansen, Mr. Pak learned Facebook's confidential and privileged information, and its strategy in the event of litigation.  *Id.* ¶ 7.  Indeed, a substantial portion of his work consisted of gathering and analyzing that sensitive information so that Facebook could decide how to respond to the government investigators and prepare for subsequent litigation.  *Id.* ¶¶ 4-7.

## B.    Keller Lenkner Learned Of The Conflict In June 2020 But Did Nothing

After working more than 800 hours in six months representing Facebook, Mr. Pak left Kellogg Hansen on June 26, 2020.  Panner Decl. ¶¶ 8-9.  He joined Keller Lenkner just three days later, on June 29, 2020.  Mehta Decl., Ex. C (Email from Warren Postman to Sonal Mehta (Apr. 7, 2021)).  According to Warren Postman, the lead Keller Lenkner partner on the private antitrust

---

[4] Facebook does not intend to waive its privilege in filing this motion.

case, Mr. Pak told Mr. Postman on June 30, 2020 that he had previously represented Facebook and worked on the government antitrust investigations while at Kellogg Hansen. *Id.* On July 1, 2020, Mr. Pak also disclosed his work on the Facebook antitrust investigations to the firm as part of a conflicts check. *Id.* At the time, Keller Lenkner was in the midst of its own antitrust investigation into Facebook—led by Mr. Postman. As Mr. Postman told this Court in March 2021, "[w]e've spent *months and years* thinking not about the high-level fact that an antitrust case could exist against Facebook, but the real nitty gritty. I've spent many late nights working on the complaint, the memos and before the cases." Hr'g Tr. at 48:4-8 (emphasis added); *see also id.* at 47:19-20 ("Keller Lenkner worked to develop this case independently from Quinn Emanuel."); *Klein* Plaintiffs' Application to Appoint Quinn Emanuel Urquhart & Sullivan, LLP and Keller Lenkner LLC as Interim Co-Lead Counsel for the User Class, Dkt. 55 at 4-5, 7 (describing the "extraordinary time and resources" the firm spent "identifying, investigating and developing the antitrust theories central to the User Class's claims" and Keller Lenkner's "substantial pre-filing investigation" that "commenced . . . two years ago").

Keller Lenkner did not notify Facebook that it had hired one of the company's lawyers after it hired Mr. Pak. Instead, the firm kept the existence of the conflict to itself. Facebook was not aware that Keller Lenkner was involved in an antitrust investigation of the company until the firm filed its initial complaint in *Klein* on December 3, 2020. Keller Lenkner then remained silent for months about the conflict and what steps, if any, the firm had taken to address it, even as Keller Lenkner litigated motions to relate later-filed cases, *see, e.g.*, Dkts. 17, 24, 34, filed an application to be appointed lead counsel that touted the firm's extensive investigation of Facebook, Dkt. 55, and filed an opposition to another such application, Dkt. 62. It was only in March 2021 that Keller Lenkner finally acknowledged the ethical problem and revealed the (inadequate) steps the firm had taken to address it, doing so after Facebook raised the conflict of interest at the hearing on appointment of interim class counsel. Hr'g Tr. at 7:25-9:22. In response, Mr. Postman represented to the Court—wrongly—that Keller Lenkner had "promptly screened [Mr. Pak] upon *his arrival* at the firm." *See id.* at 10:1-4 (emphasis added). Mr. Postman also stated that he would be "happy to provide details" of the "robust screens" Keller Lenkner had in place. *Id.* at 10:6-7.

The following day Mr. Postman emailed Facebook's counsel in the private cases with new details regarding Mr. Pak's employment and the conflict of interest.   He described Keller Lenkner's general policies regarding screens and again wrongly asserted that Facebook's former counsel, Mr. Pak, had been "promptly screened."   Mehta Decl., Ex. A (Email from Warren Postman to Sonal Mehta (Mar. 19, 2021)).   Mr. Postman admitted, however, that the screen was not put in place until November 11, 2021.   *Id.*   Mr. Postman also attempted to qualify his prior representations to the Court about the length and scope of Keller Lenkner's investigation of Facebook.   He said that as of November 11, his firm "had not been retained by any client adverse to Facebook; Quinn Emanuel and [Keller Lenkner] had not yet agreed to co-counsel on, or file any case against, Facebook, and no [Keller Lenkner] lawyer had yet worked on any draft of the Klein complaint."   *Id.*   Contradicting what he had told the Court, Mr. Postman offered that it was "[o]nly after the screening procedures were put in place" that Keller Lenkner had "agree[d] to join Quinn Emanuel in pursuing claims against Facebook and begin working on a draft complaint."   *Id.*

Facebook then sought to clarify several of Mr. Postman's representations by sending him a detailed set of follow-up questions.   *See* Mehta Decl., Ex. B (Email from Sonal Mehta to Warren Postman (Mar. 30, 2021)).   Mr. Postman responded on April 7, 2021.   Mehta Decl., Ex. C.   In this second email, Mr. Postman confirmed that Mr. Pak had worked at Keller Lenkner for more than four months prior to the imposition of an ethical screen, despite Mr. Pak having told the firm of the potential conflict immediately after he started work.   *Id.*   Mr. Postman next admitted that the first notice provided to Facebook of the potential conflict was his March 19, 2021 email to the company's counsel.   *Id.*   Mr. Postman's story then shifted again:  he explained that he had in fact led a team "consider[ing] the potential matter against Facebook" prior to the imposition of the ethical screen, including "investigating and analyzing the claims in this case [beginning] in August of 2020," though he averred to having "instructed" those lawyers "not to discuss the potential action or claims with Mr. Pak," and to having "instructed Mr. Pak not to discuss any potential action or claims against Facebook with anyone at the firm."   *Id.*   Mr. Postman did not say how or when the supposed instructions were given, yet insisted that no "attorney or staff member has ever discussed the substance of the claims" against Facebook with its former counsel.   *Id.*   He also noted

that at least three of the then six members of Keller Lenkner's partnership had communicated about the Facebook investigation, but he said those emails were stored only "locally" and were not accessible to Mr. Pak. *Id.* And while an (unspecified) "file relating to this case was saved" on Keller Lenkner's "cloud-based document management system," apparently without any restrictions on who could access it, he asserted that the firm's "records confirm that Mr. Pak never accessed it." *Id.*

Mr. Postman's second email also tried to further walk back his earlier statements to the Court regarding Keller Lenkner's substantial investigatory efforts. He suggested that when he told the Court about "months and years" of work, he was referring "to the combined efforts of Keller Lenkner and Quinn Emanuel, and the fact that Quinn Emanuel began investigating the claims at issue in this case in 2019," whereas Keller Lenkner's independent efforts began in earnest only in August 2020—still three months before the screen of Mr. Pak was put into place. *See id.* (emphasis omitted); *see also id.* (noting that Mr. Postman "speak[s] with" Steve Swedlow, the lead Quinn partner on this matter, "regularly" but that Mr. Postman "first spoke with Quinn Emanuel regarding a potential antitrust case against Facebook and the possibility of partnering on such a case on October 14, 2020"). But even then, Mr. Postman did not attempt to square this revised chronology—which still put discussions with Quinn Emanuel concerning the private antitrust action nearly a month before the imposition of the screen—with his representation to the Court that "Keller Lenkner worked to develop this case independently from Quinn Emanuel" and only "once we had in our minds the theories worked through" did they "reach[] out." Hr'g Tr. at 47:19-23.

### C.     Keller Lenkner Has Been Disqualified For Similar Misconduct

Facebook's concerns regarding the conflict of interest were deepened by virtue of the fact that Mr. Postman and his firm were recently disqualified in another antitrust litigation in this district because of a prior representation. In *Diva Limousine, Ltd. v. Uber Technologies, Inc.*, Mr. Postman and Keller Lenkner sought to represent a putative class against Uber. Mr. Postman was previously counsel at the U.S. Chamber of Commerce Litigation Center. There, he had worked with Uber on litigation involving similar questions and obtained the company's confidential

1    information.  *Diva Limousine*, 2019 WL 144589, at *9-*12 (N.D. Cal. Jan. 9, 2019).  Uber moved

2    to disqualify Keller Lenkner based on that prior representation.  Judge Chen granted the motion.

3    He concluded that Mr. Postman's work on the prior case and the one at bar were "substantially

4    related," "support[ing] a rational conclusion that he obtained confidential information in the course

5    of that [prior] relationship that is material to his current representation of [the putative class] in the

6    instant action against [Uber]."  *Id.* at *12.[5]  That meant that "disqualification of [his] representation

7    of [the plaintiff] is mandatory; indeed, the disqualification extends vicariously to the entire [Keller

8    Lenkner] firm."  *Id.* at *13.[6]

         **D.      Keller Lenkner Refused To Withdraw Voluntarily**

10            After Keller Lenkner confirmed that it currently employs and failed to timely screen one

11   of Facebook's former attorneys, who obtained Facebook's confidential and privileged information

12   during his representation of the company, Facebook asked Keller Lenkner to withdraw from this

13   case.  Mehta Decl., Ex. D (Letter from Sonal Mehta to Warren Postman (May 4, 2021)).  Mr.

14   Postman's response raised—once more—questions about the adequacy of Keller Lenkner's

15   conflicts check and supposed preventive measures.  He acknowledged that Mr. Pak's employment

16   potentially created an ethical conflict that could not be cured through the use of even a timely

17   ethical screen.  Mehta Decl, Ex. E (Letter from Warren Postman to Sonal Mehta (May 5, 2021)).

18   But Mr. Postman stated (by now nearly a year after Mr. Pak started working at Keller Lenkner)

19   that the firm needed to know more about Mr. Pak's involvement in the government antitrust

20   investigations to determine whether Keller Lenkner had in fact violated its ethical obligations.  *Id.*

21   On May 6, 2021, Mr. Postman's partners and Facebook's counsel then met and conferred to discuss

22   Mr. Postman's questions and whether Keller Lenkner would withdraw.  Mehta Decl. ¶ 8.  Keller

---

[5] Except where otherwise noted, internal citations and quotation marks have been omitted.

[6] Despite the mandatory language of the California rules, the Court went on to consider whether it was "appropriate to order disqualification, taking into account, *inter alia*, equitable considerations."  *Diva Limousine, Ltd. v. Uber Techs., Inc*., 2019 WL 144589, at *13 (N.D. Cal. Jan. 9, 2019).  But it found no "basis in equity to deny the disqualification motion," given the "untenable conflict" created by Mr. Postman's past work.  *Id.*

Lenker confirmed that the parties were at an impasse on whether disqualification is warranted, and Facebook filed this motion.

## LEGAL STANDARD

Attorneys practicing in the Northern District of California are bound by "the standards of professional conduct required of members of the State Bar of California."  *See* Local Rule 11-4(a)(1).  Courts in this district thus "apply state law in determining matters of disqualification."  *In re Cty. of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000); *Diva Limousine*, 2019 WL 144589, at *3.  Rule 1.9(a) of the California Rules of Professional Conduct provides that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed written consent."[7]  As relevant here, California Rule of Professional Conduct 1.10(a) provides that "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by [Rule] 1.9."  A limited exception to this rule is set forth in Rule 1.10(a)(2), which provides that there is no bar to representation when:

> [T]he prohibition is based upon rule 1.9(a) . . . and arises out of the prohibited lawyer's association with a prior firm, and
>
> > (i) the prohibited lawyer did not substantially participate in the same or a substantially related matter; and
> >
> > (ii) the prohibited lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom; and
> >
> > (iii) written notice is promptly given to any affected former client to enable the former client to ascertain compliance with the provisions of this rule, which shall include a description of the screening procedures employed; and an agreement by the firm to respond promptly to any written inquiries or objections by the former client about the screening procedures.

---

[7] A matter "includes any judicial or other proceeding, application, request for a ruling or other determination, contract, transaction, claim, controversy, *investigation*, charge, accusation, arrest, or other deliberation, decision, or action that is focused on the interests of specific persons, *or a discrete and identifiable class of persons*."  Rule 1.7(e) (emphasis added).

1    Each of Rule 1.10(a)(2)'s requirements must be met for a law firm to invoke this exception.  *See*

2    *WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, 2020 WL 7133773, at *3 (N.D. Cal. June 16, 2020).[8]

3        Although the analogous Model Rule promulgated by the American Bar association

4    "broadly permits screening," California's Rule 1.10 "significantly differs" in that it "permit[s]

5    screening only in limited circumstances, i.e., if the prohibited lawyer did 'not substantially

6    participate' in the matter at issue."  *See* State Bar of California, *Executive Summary: Rule 1.10

7    Imputation of Conflicts of Interest*, at 1, http://www.calbar.ca.gov/Portals/0/documents/rules

8    /Rule_1.10-Exec_Summary-Redline.pdf.  Rule 1.10's no-substantial-participation requirement

9    thus protects against the "risk that a lawyer who has acquired sensitive confidential information

10   about . . . former clients is now in the opposing party's law firm."  *Id.* at 2.

11       A lawyer's ethical obligations under the Rules of Professional Conduct are unyielding, but

12   "[t]he right to disqualify counsel is a discretionary exercise of the trial court's inherent powers."

13   *Diva Limousine*, 2019 WL 144589, at *3.  When making such a determination, "[t]he paramount

14   concern must be to preserve public trust in the scrupulous administration of justice and the integrity

15   of the bar."  *Id.* (quoting *People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*, 980 P.2d

16   371, 378 (1999)).  So although disqualification is a serious remedy that "should only be imposed

17   when absolutely necessary," *Concat LP v. Unilever*, PLC, 350 F. Supp. 2d 796, 814 (N.D. Cal.

18   2004), "[t]he important right to counsel of one's choice must yield to ethical considerations that

19   affect the fundamental principles of our judicial process," *SpeeDee Oil*, 980 P.2d at 378.

## ARGUMENT

21       Keller Lenkner violated every aspect of the applicable ethical standards and should be

22   disqualified from representing the named plaintiffs and putative class.  The government antitrust

---

[8] The California Rules of Professional Conduct were amended in 2018.  Rule 1.9 was previously known as Rule 3-310.  *See WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, 2020 WL 7133773, at *3 n.3 (N.D. Cal. June 16, 2020).  Rule 3-310 also provided that "[a]n attorney may not, without written consent, accept employment adverse to a former client on a matter substantially related to the prior representation."  *Plumley v. Doug Mockett & Co.*, 2008 WL 5382269, at *1 (C.D. Cal. Dec. 22, 2008).  Rule 1.10 does not have a direct analogue under the prior Rules, but largely adopted the approach of California courts concluding that ethical screens could obviate conflicts in certain extremely limited circumstances.  See Rule 1.10 cmt. 6 (collecting cases).

investigations in which Mr. Pak represented Facebook turn on many of the same legal and factual questions at issue in this case.  During the course of Facebook's former counsel's extensive involvement in those matters, he obtained Facebook's confidential and privileged information. Keller Lenkner then failed to timely screen Mr. Pak from its investigation of Facebook, and it did not promptly notify Facebook of the conflict as required by the rules.  These violations are serious and incurable, warranting disqualification.

## I.   KELLER LENKNER VIOLATED THE CALIFORNIA RULES OF PROFESSIONAL CONDUCT

### A.   Facebook's Former Counsel May Not Represent The Named Plaintiffs And Putative Class

In determining whether Keller Lenkner should be disqualified, the threshold question is whether Facebook's former counsel would himself be permitted under Rule 1.9 to undertake this representation.  That rule states, as noted, that a client's former lawyer "shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed written consent."  Rule 1.9(a).  Facebook has not given its informed written consent, and the interests of the named plaintiffs and putative class in this matter are obviously materially adverse to Facebook.  That leaves whether this matter is "substantially related" to the prior representation of Facebook in the government antitrust investigations.  There is no credible debate that it is, meaning that Facebook's former lawyer could not represent the named plaintiffs and putative class under Rule 1.9.

The "substantial relationship" test looks to whether there is "a substantial risk of a violation" of two duties: the duty not "to do anything that will injuriously affect the former client in any matter in which the lawyer represented the former client" and the duty not to "at any time use against the former client knowledge or information acquired by virtue of the previous relationship."  Rule 1.9 cmts. 1, 3.  In assessing the relationship between two matters, courts look to "the similarities between the two factual situations, the legal questions posed, and the nature and extent of the attorney's involvement with the cases," *Acacia Pat. Acquisition, LLC v. Superior Ct.*, 184 Cal. Rptr. 3d 583, 588 (Ct. App. 2015), along with "the attorney's possible exposure to

formulation of policy or strategy," *Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft*, 81 Cal. Rptr. 2d 425, 432 (Ct. App. 1999).  *See also Trone v. Smith*, 621 F.2d 994, 998 (9th Cir. 1980) ("Substantiality is present if the factual contexts of the two representations are similar or related."); *Guifu Li v. A Perfect Day Franchise, Inc.*, 2011 WL 4635176, at *3 (N.D. Cal. Oct. 5, 2011) ("When the attorney had a direct relationship with the client in the first representation, whether the two representations are substantially related 'centers precisely upon the factual and legal similarities of the two representations.'" (quoting *Farris v. Fireman's Fund Ins. Co.*, 14 Cal. Rptr. 3d 618, 622 (Ct. App. 2004))).  Given the purposes of the Rules, "[c]ourts have counseled against construing the 'substantial relationship' test too narrowly."  *Oliver v. SD-3C, LLC*, 2011 WL 13156460, at *2 (N.D. Cal. Aug. 4, 2011); *see also Trone*, 621 F.2d at 1000 ("The substantial relationship test does not require that the issues in the two representations be identical.").

The government antitrust investigations and the private antitrust action before this Court are substantially related—indeed, the "factual and legal similarities of the two representations" are overwhelming.  *Guifu Li*, 2011 WL 4635176, at *3.  The government investigations and preparation for litigation in which Mr. Pak represented Facebook involved the same course of conduct alleged in the consolidated complaint, and sought to determine whether Facebook violated the same provision of the same statute invoked by that complaint.  *Supra*, at 3.  For example, the government investigators now claim that Facebook has monopolized a social networking market largely defined by the use of "a social graph that maps the connections between users and their friends, family, and other personal connections."  FTC Compl. ¶ 53.  The consolidated complaint similarly alleges Facebook has monopoly power in a social networking market, again defined by the use of "a social graph" that "connects users to wide array of people," including "friends, family members, . . . [and] other acquaintances."  CAC ¶ 57.  The government investigations also sought to uncover information about Facebook's alleged strategy of acquiring, copying, or killing nascent competitors, *see, e.g.*, State AG Compl. ¶¶ 98-231; FTC Compl. ¶¶ 68-128, the very same factual allegations underlying the consolidated complaint in this case, CAC ¶¶ 156-213.  And all of the matters center on whether Facebook violated Section 2 of the Sherman Act.  State AG Compl.

1  ¶¶ 256-262; FTC Compl. ¶¶ 169-174; CAC ¶¶ 260-307.  These common factual allegations and

2  legal issues establish a substantial relationship.[9]

3      *SC Innovations, Inc. v. Uber Techs., Inc.*, 2019 WL 1959493 (N.D. Cal. May 2, 2019), is

4  instructive.  In that case, the court found a substantial relationship between two actions "relat[ing]

5  to the same services provided by" the defendant, even though the matters concerned "different

6  markets," *id.* at *7, just as in the case before this Court the representations concern the same service

7  provided by Facebook, albeit in social networking markets defined slightly differently.  As in *SC*

8  *Innovations*, the government investigations "required at least some degree of discovery into and

9  analysis of the same [Facebook] operations at issue in this case," which further supports a finding

10  of a substantial relationship.  *Id.*  Finally, the information that Facebook's former counsel obtained

11  working on the company's responses to the government investigations is clearly "material" to this

12  representation, *id.* at *5—the cases overlap to such a degree that the States and FTC have filed

13  related case notices and the parties in this case are presently negotiating how to coordinate

14  discovery between the actions, Mehta Decl. ¶ 9.[10]

15      The facts here thus "support a 'rational conclusion that information material to the

16  evaluation, prosecution, settlement or accomplishment of the former representation given its

17  factual and legal issues is also material to the evaluation, prosecution, settlement or

18  accomplishment of the current representation given its factual and legal issues.'"  *WhatsApp*, 2020

19  WL 7133773, at *4 (quoting *Jessen v. Hartford Cas. Ins. Co.*, 3 Cal. Rptr. 3d 877, 887-88 (Ct.

20  App. 2003)).  Because Facebook's former lawyer "acquire[d] information vitally related to the

21  subject matter of the pending litigation" during his prior representation of the company, he could

22

23

24  [9] That Mr. Pak's representation involved an investigation and preparation for litigation, rather than the litigation itself, does not affect the analysis.  *See Foster Poultry Farms v. Conagra Foods*

25  *Refrigerated Foods Co.*, 2005 WL 2319186, at *6 (E.D. Cal. Sept. 22, 2005) ("The distinction between antitrust litigation and preparation for antitrust litigation has no place in this conflict of

26  interest analysis. . . .  For disqualification purposes, it is the representation of a client that matters; the fact that the representation did not involve litigation is immaterial.").

27  [10] *See* FTC Case, Dkt. 4 at 1 (stating that the cases "involve[] common issues of fact" and "grow[]

28  out of the same event or transaction"); State AG Case, Dkt. 5 at 1 (stating that the cases "involve[] common issues of fact").

1    not represent the named plaintiffs and putative class without violating his ethical obligations.

2    *Trone*, 621 F.2d at 1000.

3         **B.    The Conflict Of Facebook's Former Counsel Is Imputed To His New Employer Keller Lenkner And No Exception Applies**

4

5         Because Mr. Pak may not represent the named plaintiffs and putative class, Keller

6    Lenkner's representation is also prohibited.    Rule 1.10(a) states that "[w]hile lawyers are

7    associated in a firm, none of them shall knowingly represent a client when any of them practicing

8    alone would be prohibited from doing so by rule[] 1.9."    Rule 1.10(a)(2) provides a limited

9    exception to this bar, but Keller Lenkner cannot meet any of that provision's three prerequisites,

10   much less all of them.

11        *1.    Facebook's Former Counsel Substantially Participated In A Substantially Related Matter*

12        To invoke Rule 1.10(a)(2), Keller Lenkner must first show that "the prohibited lawyer did

13   not substantially participate in the same or a substantially related matter."    That is because Rule

14   1.10(a)(2) precludes the use of ethical screens outside of "narrowly defined circumstances" in

15   which there is not a "significant risk that a lawyer who has acquired sensitive confidential

16   information" ends up at "the opposing party's law firm."    *Executive Summary: Rule 1.10*

17   *Imputation of Conflicts of Interest*, *supra*, at 1-2.    The situation here does not fall within that narrow

18   category.    For the reasons described above, Mr. Pak represented Facebook in a substantially related

19   matter.    His participation, moreover, was substantial.    Comment One to Rule 1.10 says "a number

20   of factors should be considered" in making this assessment, "such as the lawyer's level of

21   responsibility in the prior matter, the duration of the lawyer's participation, the extent to which the

22   lawyer advised or had personal contact with the former client, and the extent to which the lawyer

23   was exposed to confidential information of the former client likely to be material in the current

24   matter."    *See also Talon Rsch., LLC v. Toshiba Am. Elec. Components, Inc.*, 2012 WL 601811, at

25   *2 (N.D. Cal. Feb. 23, 2012) ("Courts must differentiate between lawyers who become heavily

26   involved in the facts of a particular matter and those who enter briefly on the periphery for a limited

27   and specific purpose related solely to legal questions."); *Guifu Li*, 2011 WL 4635176, at *4 ("The

28

1  Court should consider the time spent by the attorney on the earlier cases, the type of work

2  performed, and the attorney's possible exposure to formulation of policy or strategy.").[11]   Mr.

3  Pak's participation in the government antitrust investigations and associated preparation for

4  litigation was thus substantial within any meaning of the term.

5        Start with the work Mr. Pak performed for Facebook.  He had frequent and direct client

6  contact, taking part in meetings with Facebook's in-house counsel and closely interacting with

7  those lawyers.  Panner Decl. ¶ 7.  As a result of those meetings, his review of legal memoranda

8  and privileged communications discussing Facebook's litigation strategy, and his writing of

9  memoranda concerning issues potentially relevant to Facebook's defense, Mr. Pak was privy to

10  Facebook's strategy for the government investigations and for potential litigation on the same

11  subject matter as this case.  *Id.* ¶¶ 5, 7.  He also spent a substantial portion of his work directly

12  accessing Facebook's confidential and privileged information when working on the company's

13  responses to the government investigations.  *Id.* ¶ 7.  Further, Mr. Pak assisted the Kellogg Hansen

14  partner leading Facebook's work with consulting and potential testifying experts, through which

15  he learned "all of the expert teams' pending projects" and participated in conversations between

16  counsel and expert teams on defense strategy.  *Id.* ¶ 5; *see also Advanced Messaging Techs., Inc.*

17  *v. EasyLink Servs. Int'l Corp.*, 913 F. Supp. 2d 900, 907 (C.D. Cal. 2012) (observing that "[c]ourts

18  emphasize shared communications in determining whether there was a direct relationship" with a

19  prior client).  This was not an insignificant or incidental representation—Mr. Pak spent more than

20  six months and 800 hours working for Facebook on a wide-range of important and sensitive aspects

21

22

---

23  [11] As noted above, Rule 1.10 was adopted in 2018.  But courts interpreting the California Rules of
   Professional Conduct have long considered the degree of an attorney's participation in a prior

24  representation when assessing whether an ethics violation has occurred and disqualification is
   warranted.  *See, e.g., Acacia Pat. Acquisition, LLC v. Superior Ct.*, 184 Cal. Rptr. 3d 583, 588

25  (2015) (assessing the "nature and extent of the attorney's involvement with the cases"); *Farris v.*
   *Fireman's Fund Ins. Co.*, 14 Cal. Rptr. 3d 618, 621-22 (2004) ("[W]hen ruling upon a

26  disqualification motion in a successive representation case, the trial court must first identify where
   the attorney's former representation placed the attorney with respect to the prior client," and "[i]f

27  the court determines that the placement was direct and personal," disqualification is required when
   "there is a connection between the two successive representations").

28

1   of a related matter, stopping only days before he joined Keller Lenkner. *See* Panner Decl. ¶¶ 4-5

2   (describing Mr. Pak's "significant[]" and "heav[y]" involvement in the related matters).

3          Courts have found disqualifying conflicts based on far less. In *Wausau Business Insurance*

4   *Co. v. Diamond Contract Services, Inc.*, for example, the Court concluded that an associate who

5   had lateraled between two firms had a disqualifying conflict because he "did substantial legal

6   work" for a prior client by spending 9.8 hours reviewing documents and preparing a privilege log,

7   2010 WL 11549716, at *4 (C.D. Cal. Sept. 23, 2010) (noting that "[a]n attorney is possibly exposed

8   to strategy or policy along with confidential information when reviewing documents for

9   privilege").[12]  And in *Advanced Messaging Technologies, Inc. v. EasyLink Services International*

10  *Corp.*, the Court found that an associate had a disqualifying conflict based on his prior

11  representation of a client while at a different law firm, for which he had billed "234.7 hours of

12  work," or "about ten percent of his billing" during the time in question, 913 F. Supp. 2d at 903.

13  The associate had worked on motions, reviewed client documents, and sent, received, or was

14  copied on more than 120 emails to the client's in-house counsel. *Id.* at 904.  As a result of this

15  "direct relationship" with the former client, which "touched issues related to the present litigation,"

16  the Court concluded the associate had a disqualifying conflict. *Id.* at 907-909.  Mr. Pak had

17  precisely that kind of direct relationship with Facebook, having spent three-quarters of his time

18  over six months working closely with the company throughout an investigation—and preparing

19  for potential litigation—premised on the same legal theory alleged in the consolidated complaint.

20  *See supra,* at 3, 12-13; *see also Talon Research*, 2012 WL 601811, at *3 (attorney's "participation"

21  in a prior related matter was sufficiently "direct and personal" to support disqualification despite

22  billing only "approximately 150 hours").

23         In another case, this Court found a disqualifying conflict based on exposure to "company

24  documents related to [the subsequent] litigation" along with several client communications in

25

26  _____

27  [12] The associate had also performed a significant amount of additional work on other related matters but the court concluded that the 9.8 hours he billed preparing a privilege log on a case "virtually identical to this action" "alone is sufficient to grant [the] Motion to disqualify." *Wausau*

28  *Bus. Ins. v. Diamond Contract Servs., Inc.*, 2010 WL 11549716 at *4-5 (C.D. Cal. Sept. 23, 2010).

which "confidential information would normally have been imparted." *Guifu Li*, 2011 WL 4635176, at *4. Here the over 800 hours Facebook's former counsel spent representing the company involved accessing thousands of documents "pertinent to the present litigation," not "several," and he "obtained nonpublic information" on numerous occasions. *Id.*; *see also Bryant v. Donahoe*, 2012 WL 12884904, at *2 (C.D. Cal. Oct. 10, 2012) (disqualifying lawyer based on a prior meeting with a potential client "[a]lthough the consultation was brief and [the client] ultimately decided not to retain [the attorney's] services"); *Farhang v. Indian Inst. of Tech.*, 2009 WL 3459455, at *3 (N.D. Cal. Oct. 27, 2009) ("While 19 hours [billed] is not a large amount of time, it is certainly enough time for confidential information to be passed.").[13]

Because the first of Rule 1.10(a)(2)'s requirements is not satisfied, the exception does not apply here. As a result, Mr. Pak's conflict is imputed to Keller Lenkner, and it may not represent the named plaintiffs and putative class regardless of any effort to impose an ethical screen. *See* Rule 1.10(a).

       2.     *Keller Lenkner Did Not Timely Screen Facebook's Former Counsel Or Promptly Notify Facebook Of The Conflict*

Even setting aside Keller Lenkner's inability to meet Rule 1.10(a)(2)'s first requirement, it is independently barred from this representation because it failed to comply with the Rule's two other provisions. As an initial matter, Keller Lenkner's screen of Mr. Pak was untimely. *See* Rule 1.10(a)(2)(ii) (stating the conflicted lawyer must be "timely screened from any participation in the matter"). "Screening is a prophylactic, affirmative measure to avoid both the reality and appearance of impropriety," *In re Complex Asbestos Litig.*, 283 Cal. Rptr. 732, 745 (Ct. App. 1991), so "a firm must impose screening measures when the conflict first arises," *Kirk v. First Am.*

---

[13] Rules 1.11 and 1.12 govern the ethical obligations of former government lawyers and those having served in judicial roles. Both preclude successive representations when a lawyer previously "participated personally and substantially" in a matter. *See* Rule 1.11(a); Rule 1.12(a). The comments to Rules 1.11 and 1.12 define "substantial participation" differently than does Rule 1.10 cmt. 1. The divergent language of the Rules and comments makes clear these standards are not the same—a result of the different policy considerations behind the Rules, and the California courts' preexisting acceptance of screens of former public servants. Of course, Mr. Pak's involvement in the government antitrust litigations would be substantial under any formulation of the standard.

1    *Title Ins. Co.*, 108 Cal. Rptr. 3d 620, 645 (Ct. App. 2010).  Said otherwise, "screening should be

2    implemented before undertaking the challenged representation or hiring the tainted individual."

3    *In re Complex Asbestos Litig.*, 283 Cal. Rptr. at 745.

4           Here, Facebook's former lawyer was not screened until November 11, 2020, despite being

5    hired on June 29 of that year and disclosing the potential conflict the next day.  Although Keller

6    Lenkner asserts that it had no obligation to impose a screen until it actually "decided to initiate a

7    case against Facebook," Mehta Decl., Ex. C, the Rules apply to "matters," not filings.  Rule

8    1.10(a)(2)(ii).  And a "matter" includes an "*investigation* . . . that is focused on the interests of . . .

9    *a discrete and identifiable class of persons*," Rule 1.7(e) (emphasis added).  That broader sweep

10   is necessary because the duty of confidentiality protected by a screen runs not to the clients that

11   Keller Lenkner currently represents but to the client that Mr. Pak previously represented—

12   Facebook.  And the interests of a former client are jeopardized as soon as an adverse representation

13   is contemplated.  Keller Lenkner's apparent interpretation would completely defeat the

14   prophylactic purpose of a screen by allowing a client's former lawyer to provide information up

15   until the moment his new firm formally decides to file a complaint, to say nothing of leaving the

16   firm with absolute discretion over when a screen is implemented through its control over when to

17   make that filing.  And while Keller Lenkner represents that Mr. Pak did not provide any

18   information to Keller Lenkner, Rule 1.10 is clear that that is ultimately irrelevant.  Facebook should

19   not be left to wonder whether the duties that it is owed have been met—especially where the

20   shifting representations to the Court and Facebook highlight concerns that Keller Lenkner has,

21   once again, not acted in compliance with its obligations.

22          In this case, Keller Lenkner has represented to the Court that an investigation focused on

23   the interests of a discrete and identifiable class of Facebook users had begun "months and years"

24   before the first complaint was filed.  Hr'g Tr. at 48.  As Mr. Postman himself explained, those

25   "months and years" were spent "thinking not about the high-level fact that an antitrust case could

26   exist against Facebook, but the real nitty gritty."  *Id.*  So at the absolute latest, the obligation to

27   screen Mr. Pak attached as soon as Mr. Pak told Mr. Postman—the day after Mr. Pak started work,

28   no less—that Mr. Pak had represented Facebook in the government antitrust investigations.  That

obligation became even more pressing in August 2020, when Mr. Postman admits he began "investigating and analyzing the claims *in this case*." Mehta Decl., Ex. C. And it grew stronger still on October 14, 2020, when Mr. Postman began discussing the terms of a potential joint representation with Quinn Emanuel. *Id.* Yet despite Mr. Postman's representations to the Court about having acted "promptly," each of these events came and went without the imposition of an ethical screen.[14]

Making matters worse, Keller Lenkner did not "promptly" give the company the "written notice" required by Rule 1.10(a)(2)(iii). The notice requirement exists to give the former clients whose confidences are threatened the opportunity to "ascertain compliance with the provisions of" Rule 1.10, and to "inquir[e] or object[]" to screening procedures. Rule 1.10(a)(2)(iii). As Keller Lenkner's course of conduct in this case demonstrates, that opportunity is vital to ensuring that firms respect their ethical obligations. Keller Lenkner did not notify Facebook to acknowledge the conflict and describe any screen until March 19, 2021, after making numerous filings in this litigation. *See supra*, at 5. That undermined Facebook's ability to probe whether, when, and to what extent a screen had been put in place, and to take steps to protect its confidential and privileged information during the many months that Keller Lenkner had been impermissibly working on this matter while conflicted. And here, Mr. Postman only belatedly complied with the Rule's notification requirement because Facebook had discovered and raised the conflict on its

---

[14] Keller Lenkner's small size increased the necessity of a timely screen. In a leading case on screening procedures, the court observed that "[i]n some cases, particularly where the attorneys work closely together in a small office, complete isolation" from attorneys working on the conflicted matter "may be necessary to satisfy a court that the presumption of disclosure has been refuted." *Kirk v. First Am. Title Ins. Co.*, 108 Cal. Rptr. 3d 620, 646 n.33 (2010). Given that Keller Lenkner presently employs around 30 lawyers, such a screen was necessary to prevent the risk of inadvertent disclosures, making the delay in imposing *any* screen all the more egregious. Indeed, Mr. Pak is currently co-counsel in another action raising claims under Section 2 of the Sherman Act with Mr. Postman and a Keller Lenkner partner who appeared on the initial *Klein* complaint. *See Keller Lenkner Joins as Co-Counsel in Antitrust Class-Action Lawsuit Against Live Nation and Ticket Master* (Feb. 10, 2021), https://www.kellerlenkner.com/keller-lenkner-joins-as-co-counsel-in-antitrust-class-action-lawsuit-against-live-nation-and-ticketmaster/ (noting that "Warren Postman, Ben Whiting, and Albert Pak of Keller Lenkner LLC and Frederick A. Lorig, Kevin Y. Teruya, and Adam B. Wolfson of Quinn Emanuel Urquhart & Sullivan LLP" represent the putative class). The risk of sharing information in that context, even with a "screen" in place, is obvious.

own.  This violation provides a third, independent reason that Keller Lenkner breached the Rules of Professional Conduct.

## II.  DISQUALIFICATION IS THE APPROPRIATE REMEDY FOR KELLER LENKNER'S VIOLATION OF ITS ETHICAL OBLIGATIONS

Because Keller Lenkner violated its ethical obligations, this Court "must determine whether it is appropriate to order disqualification," taking into consideration the nature of the violation and circumstances of the case.  *Diva Limousine*, 2019 WL 144589, at *13; *see also id.* at *3 ("The right to disqualify counsel is a discretionary exercise of the trial court's inherent powers.").  Here, disqualification is the proper remedy for Keller Lenkner's misconduct both because Mr. Pak substantially participated in a substantially related matter and because Keller Lenkner failed to timely screen Mr. Pak from its work adverse to Facebook.

As an initial matter, disqualification is the presumptive result when a firm takes on an adverse representation in a substantially related matter.  *See id.* at *6 ("Generally, when there is a substantial relationship between the two representations, courts disqualify counsel from representing the second client."); *Epikhin v. Game Insight North America*, 2015 WL 2229225, at *7 (N.D. Cal. May 12, 2015) ("As the Court finds a substantial relationship between [counsel's] prior representation . . . and her representation of Plaintiffs in this action, [she] must be disqualified."); *see also Flatt*, 885 P.2d at 954 (collecting cases).  Indeed, California courts have held that in substantially related representations, disqualification is not just presumed—it "is mandatory" under the Rules.  *Diva Limousine*, 2019 WL 144589, at *13.

Federal courts applying California's Rules of Professional Conduct have repeatedly disqualified firms in such circumstances, regardless of whether a firm attempted to screen the attorneys creating the conflict.  *See SC Innovations*, 2019 WL 1959493, at *10; *WhatsApp*, 2020 WL 7133773, at *3 (interpreting Rules 1.9 and 1.10 and holding that "[o]nce the substantial relationship is established, access to confidential information by the attorney in the course of the first representation is presumed and disqualification of the attorney's representation of the second client is required"); *Lennar Mare Island, LLC v. Steadfast Ins. Co.*, 105 F. Supp. 3d 1100, 1109 (E.D. Cal. 2015).  As the court in *MD Helicopters, Inc. v. Aerometals, Inc.*, 2021 WL 1212718, at

*10 (E.D. Cal. Mar. 31, 2021), explained when disqualifying a firm that had set up an ethical wall that—unlike in this case—was timely and effective, "[a] number of California courts have found vicarious disqualification of a firm to be required where a substantial relationship is proven, even if the firm erects an ethical wall around the attorney who possesses the opponent's confidences."

Courts, moreover, have disqualified firms based on conflicts nearly identical to the one here, even when the firms have taken steps to comply with their ethical obligations beyond those taken by Keller Lenkner.  In *Hitachi, Ltd. v. Tatung Company*, 419 F. Supp. 2d 1158 (N.D. Cal. 2006), for example, the Court disqualified a firm on the basis of a conflict created by the hiring of an associate.  The associate had, while working for a different law firm, represented Hitachi in a patent infringement action, billing 340 hours over a six-month period.  *Id.* at 1159.  He then joined the firm at issue.  *Id.* at 1160.  The new firm sought to represent a defendant in a separate patent case brought by Hitachi, and "immediately" implemented an ethical wall between the associate and the lawyers taking on the new representation.  *Id.* at 1160, 1164.  The Court concluded that the matters were substantially related and disqualified the firm, expressly holding that the new firm's prompt and extensive procedures to screen the associate failed to cure the conflict.[15]  *Id.* at 1164.  The Court based that holding on the extent of the similarities between the cases, the associate's significant involvement in the prior matter, and the small size of the office handling the subsequent representation, *id.* at 1164-65, factors that are all also present in this case.  And unlike in *Hitachi*, here Keller Lenkner failed to "promptly recognize[] and attempt[] to resolve the ethical conflict" by "immediately initiat[ing] an ethical wall."  *Id.* at 1164.  Indeed, the Court in *Hitachi* found that the conflicted firm "could not substantially improve the efficacy of their ethical screening procedures."  *Id.*  Yet "balancing the relative interests of the parties with the need to

---

[15] The Court noted the "the established rule" that "where an attorney is disqualified from representing a client because that attorney had previously represented a party with adverse interests in a substantially related matter that attorney's entire firm must be disqualified as well, regardless of efforts to erect an ethical wall."  *Hitachi*, *Ltd. v. Tatung Co.*, 419 F. Supp. 2d 1158, 1161 (N.D. Cal. 2006).  But it nevertheless held that "[e]ven if California law permitted ethical walls to prevent disqualification where an attorney moves from one private firm to another," the close relationship between the representations and the small size of the office handling the subsequent matter compelled disqualification.  *Id.* at 1164-65.

preserve ethical standards favor[ed] disqualification," because only that remedy sufficed "to adequately protect" the former client's "confidential information and prevent the appearance of impropriety."  *Id.* at 1165; *Beltran v. Avon Prod., Inc.*, 867 F. Supp. 2d 1068, 1083 (C.D. Cal. 2012) (when a firm hires a lawyer that previously represented the opposing party in a substantially related matter, "an ethical wall is insufficient to overcome" disqualification).[16]

Disqualification is even more appropriate in a case, like this one, where the conflicted firm has not taken any of the preventive measures called for by the ethics rules.  Courts "routinely" disqualify firms that fail to implement timely screens.  *See, e.g.*, *Export-Import Bank of Korea v. ASI Corp.*, 2019 WL 8200603, at *11 (C.D. Cal. Jan. 16, 2019) ("Courts routinely disqualify counsel for failing to implement ethical screens *before* representing a prospective client."); *j2 Glob. Commc'ns, Inc. v. EasyLink Servs. Int'l Corp.*, 2012 WL 6618609, at *10 (C.D. Cal. Dec. 19, 2012) (disqualifying firm when screen was untimely).  Indeed, although "[t]he specific elements of an effective screen will vary from case to case," a "necessary" element of every screen is that it "be timely imposed." *Nat'l Grange of Ord. of Patrons of Husbandry v. California Guild*, 250 Cal. Rptr. 3d 705, 714 (Ct. App. 2019).  Keller Lenkner's screen was not imposed for more than four months after the conflict arose.  *Supra*, at 6.  That is untimely under any measure, and does nothing to mitigate the harm caused by the firm's breach of its ethical obligations.

Whether or not Mr. Pak actually or advertently shared information with his colleagues who were investigating Facebook is immaterial.  "The attorney-client privilege is a hallmark of our jurisprudence that furthers the public policy of ensuring the right of every person to freely and fully confer and confide in one having knowledge of the law, and skilled in its practice, in order that the former may have adequate advice and a proper defense." *SpeeDee Oil*, 980 P.2d at 378.

---

[16] Although *Hitachi* and *Beltran* were decided before the 2018 amendments to the Rules of Professional Conduct, both courts considered the same factors relevant under Rule 1.10 in assessing the ethical violation and need for disqualification. *See Hitachi*, 419 F. Supp. 2d at 1164-65 (relying on the degree of overlap between the matters and the "significant amount of time" the conflicted lateral hire had "billed . . . on the earlier matter"); *Beltran v. Avon Prod., Inc.*, 867 F. Supp. 2d 1068, 1083 (C.D. Cal. 2012) (relying on the "over 300 hours" the conflicted lateral hire had billed to the prior matter in "substantive and wide-ranging work" and that the matters involved the same legal claims and overlapping facts).

In order "[t]o protect the confidentiality of the attorney-client relationship," the ethics rules prohibit successive representations in substantially related matters. *Id.* That avoids a situation, like this one, wherein a former client "is left to speculate what information its former attorneys shared with their colleagues." *SC Innovations*, 2019 WL 1959493, at *10. To make Facebook—having relied on its lawyer's confidence to engage in the frank exchanges necessary to obtain legal advice—second guess whether those communications were kept confidential as promised "would undermine the public trust both in the scrupulous administration of justice and in the integrity of the bar." *Id.* Nor can Keller Lenkner excuse its breach by asserting "that confidential information was not conveyed or that the disqualified attorney did not work on the case"; even assuming that an effective and timely screen could obviate the conflict here, the ethics rules require "the imposition of *preventive measures* to guarantee that information will not be conveyed." *Nat'l Grange*, 250 Cal. Rptr. 3d at 714. The need for such preventive measures is heightened at a small firm like Keller Lenkner, given the risk of even inadvertent disclosures among a tightknit group of attorneys. *See Kirk*, 108 Cal. Rptr. 3d at 646 n.33 (noting stricter screening measures may be required when "attorneys work closely together in a small office"). The ineffective and post hoc measures employed by Keller Lenkner, in contrast, were no more than belated reactions—leaving Facebook "to speculate what information its former attorney[] shared with [his] colleagues." *SC Innovations*, 2019 WL 1959493, at *10.

Taken together, disqualification is warranted in light of the circumstances of this case.

## III.   DISQUALIFICATION WILL NOT PREJUDICE THE PRIVATE PLAINTIFFS

When deciding whether to disqualify counsel, courts also consider the prejudice to the party that stands to lose its lawyer. *See SpeeDee Oil*, 980 P.2d at 377-78; *Beltran*, 867 F. Supp. 2d at 1084 ("In a motion to disqualify, it is also proper to consider such factors as whether disqualification would result in prejudice to the nonmoving party."). But disqualifying Keller Lenkner would not cause the kind of "substantial hardship" or "financial burden" that weighs against disqualification. *See FlatWorld Interactives LLC v. Apple Inc.*, 2013 WL 4039799, at *9 (N.D. Cal. Aug. 7, 2013) (finding prejudice because of "the difficulty of finding" counsel sufficiently "sophisticated" to take on the specialized patent litigation at issue and "the delay

disqualification would cause").  The present litigation is at an "early stage," with the operative

complaint only recently filed.  *See Beltran*, 867 F. Supp. 2d at 1084 (minimal prejudice given stage

of litigation).  And "no discovery has been conducted nor any dispositive motions litigated."  *Diva*

*Limousine*, 2019 WL 144589, at *14 (collecting cases finding prejudice when a motion was filed

near discovery deadline or "the brink of class certification").  Further, the named plaintiffs and

putative class will remain represented by numerous other firms regardless of Keller Lenkner's

involvement; indeed, Keller Lenkner is not interim lead counsel.  As a result, disqualification here

would occasion no material prejudice, much less harm significant enough to excuse Keller

Lenkner's clear breach of the standards of professional conduct.

## CONCLUSION

Disqualification is reserved for serious violations of the ethical rules.  Keller Lenkner's

conduct unfortunately meets that bar.  The Court should, accordingly, grant Facebook's motion.

Dated: May 7, 2021

Respectfully submitted,

*/s/ Sonal N. Mehta*

DAVID Z. GRINGER (*pro hac vice*)
david.gringer@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

SONAL N. MEHTA (CA Bar No. 222086)
sonal.mehta@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

*Attorneys for Defendant*
FACEBOOK, INC.*.*