1  SONAL N. MEHTA (SBN 222086)
    Sonal.Mehta@wilmerhale.com
2  WILMER CUTLER PICKERING
    HALE AND DORR LLP
3  950 Page Mill Road
   Palo Alto, California 94303
4  Telephone:  (650) 858-6000
   Facsimile:  (650) 858-6100
5
6  DAVID Z. GRINGER (*pro hac vice*)
    David.Gringer@wilmerhale.com
7  WILMER CUTLER PICKERING
    HALE AND DORR LLP
8  1875 Pennsylvania Ave NW
   Washington, DC 20006
9  Telephone:  (202) 663-6000
   Facsimile:  (202) 663-6363
10
11 *Attorneys for Defendant*
   FACEBOOK, INC.
12
13              UNITED STATES DISTRICT COURT
14            NORTHERN DISTRICT OF CALIFORNIA
15                  SAN JOSE DIVISION
16
17 MAXIMILIAN KLEIN, et al., on behalf of      Case No. 5:20-cv-08570-LHK
18 themselves and all others similarly situated,
                                                **DEFENDANT FACEBOOK, INC.'S**
19                          Plaintiffs,         **NOTICE OF MOTION AND**
                                                **MOTION TO DISMISS THE**
20        v.                                    **CONSOLIDATED CONSUMER**
                                                **CLASS ACTION COMPLAINT AND**
21 FACEBOOK, INC.,                              **CONSOLIDATED ADVERTISER**
                                                **CLASS ACTION COMPLAINT;**
22                          Defendant.          **MEMORANDUM OF POINTS AND**
                                                **AUTHORITIES IN SUPPORT**
23                                              **THEREOF**
24
25                                              Hearing Date: July 15, 2021
                                                Time: 1:30 pm
26                                              Judge: Hon. Lucy H. Koh
27
28

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION TO DISMISS ..................................................1

STATEMENT OF REQUESTED RELIEF ...............................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ..............................................1

INTRODUCTION ........................................................................................................1

BACKGROUND ..........................................................................................................3

    A.    Pre-2010 Competitive Environment ..................................................4

    B.    Post-2010 Competitive Environment .................................................5

ARGUMENT ................................................................................................................6

I.    Plaintiffs' Section 2 Claims Are Time-Barred...........................................6

    A.    The Statute Of Limitations Bars All Plaintiffs' Damages Claims.........6

    B.    Laches Bars All Plaintiffs' Claims For Injunctive Relief .....................8

    C.    No Tolling Theory Applies ..................................................................9

        1.    Fraudulent Concealment Does Not Apply ..................................9

        2.    Users Cannot Invoke The Continuing Violation Doctrine .......12

II.    Plaintiffs Fail To Plausibly Define A Relevant Product Market .......................13

    A.    Advertisers Fail To Plausibly Define A Product Market .....................14

    B.    Users Fail To Plausibly Define Product Markets ................................15

        1.    Users' "Social Network" Market Fails As A Matter Of Law..................16

        2.    Users' "Social Media" Market Fails As A Matter Of Law.......................17

    C.    Users Fail To Plausibly Allege Monopoly Power ...............................18

III.    Plaintiffs Have Not Adequately Alleged Exclusionary Conduct.......................19

    A.    Facebook Did Not Unlawfully Acquire A Monopoly ..........................19

    B.    None of Plaintiffs' Monopoly Maintenance Theories Are Cognizable ................22

        1.    Plaintiffs' Product Improvement Allegations Are Non-Cognizable..........23

        2.    Facebook's Acquisitions Were Not Exclusionary .....................................23

        3.    Facebook Did Not Unlawfully "Kill" Third Party App Developers..........24

IV.    Plaintiffs Lack Antitrust Standing .........................................................27

    A.    Users Have Not Alleged An Antitrust Injury .......................................28

        1.    Lost "Information And Attention" Is Not A Cognizable Injury ...............28

        2.    Users' Alleged Injury From Their Monopoly Acquisition Theory Is Speculative ...................................................................29

        3.    Users' Purported Injuries Were Not Caused By Lost Competition..........30

    B.    No Plaintiffs Were Injured By "Copy, Acquire, Kill"..........................31

C.    Advertisers Have Not Alleged An Antitrust Injury ...............................................31

1.    The Alleged Injuries From Advertisers' Section 2 Claims Are Conclusory .........................................................................................31

2.    Advertisers Lack Antitrust Standing To Pursue Their Section 1 Claim.........................................................................................................32

V.    Users Fail To State A Claim For Unjust Enrichment .........................................................35

CONCLUSION....................................................................................................................................35

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP,*
    592 F.3d 991 (9th Cir. 2010) ............................................................................23

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.,*
    190 F.3d 1051 (9th Cir. 1999) ....................................................................27, 33

*Am. Prof. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal &*
    *Prof. Publ., Inc.,*
    108 F.3d 1147 (9th Cir. 1997) ........................................................................21

*Amarel v. Connell,*
    102 F.2d 1494 (9th Cir. 1996) ....................................................................27, 33

*Apple Inc v. Pepper,*
    139 S. Ct. 1514 (2019) ....................................................................................29

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
    472 U.S. 585 (1985) ........................................................................................25

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
    459 U.S. 519 (1983) ..................................................................................33, 34

*Astiana v. Hain Celestial Grp., Inc.,*
    783 F.3d 753 (9th Cir. 2015) ..........................................................................35

*Atl. Richfield Co. v. USA Petrol. Co.,*
    495 U.S. 328 (1990) ........................................................................................29

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.,*
    166 F. Supp. 3d 988 (N.D. Cal. 2015) ...........................................................16

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ............................................................................22, 24, 26

*Bhan v. NME Hosps., Inc.,*
    669 F. Supp. 998 (E.D. Cal. 1987), *aff'd,* 929 F.2d 1404 (9th Cir. 1991) .........28

*Blue Cross Blue Shield v. Marshfield Clinic,*
    65 F.3d 1406 (7th Cir. 1995) ..........................................................................32

*Brantley v. NBC Universal, Inc.,*
    675 F.3d 1192 (9th Cir. 2012) ........................................................................27

*Complete Entm't Res. LLC v. Live Nation Entm't, Inc.,*
    2016 WL 3457177 (C.D. Cal. May 11, 2016) ................................................13

*Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*,
    858 F.2d 499 (9th Cir. 1988) .......................................................................9, 11

*Danjaq LLC v. Sony Corp.*,
    263 F.3d 942 (9th Cir. 2001) ..................................................................................8

*Dodds v. Cigna Sec., Inc.*,
    841 F. Supp. 89 (W.D.N.Y. 1992) ........................................................................12

*Duarte v. Quality Loan Serv. Corp.*,
    2018 WL 2121800 (C.D. Cal. May 8, 2018) .........................................................12

*DXS, Inc. v. Siemens Med. Sys. Inc.*,
    100 F.3d 462 (6th Cir. 1990) .................................................................................7

*Eagle v. Star-Kist Foods, Inc.*,
    812 F.2d 538 (9th Cir. 1987) ...............................................................................29

*Eichman v. Fotomat*,
    880 F.2d 149 (9th Cir. 1989) ...............................................................................12

*Evans Analytical Grp., Inc. v. Green Plant Farms, LLC*,
    2013 WL 3963822 (N.D. Cal. July 29, 2013).........................................................5

*Feitelson v. Google Inc.*,
    80 F. Supp. 3d 1019 (N.D. Cal. 2015) ............................................................27, 29

*Fine v. Barry & Enright Prods.*,
    731 F.2d 1394 (9th Cir. 1984) ..............................................................................28

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
    703 F.2d 534 (9th Cir. 1983) ................................................................................23

*Fraser v. Major League Soccer, L.L.C.*,
    284 F.3d 47 (1st Cir. 2002)...................................................................................24

*Free FreeHand Corp. v. Adobe Sys. Inc.*,
    852 F. Supp. 2d 1171 (N.D. Cal. 2012) ................................................................13

*FTC v. Qualcomm Inc.*,
    411 F. Supp. 3d 658 (N.D. Cal. 2019) ..................................................................18

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) .........................................................13, 25, 26, 30

*Garrison v. Oracle Corp.*,
    159 F. Supp. 3d 1044 (N.D. Cal. 2016) ........................................................6, 7, 11

*Genus Lifesciences Inc. v. Lannett Co.*,
    378 F. Supp. 3d 823 (N.D. Cal. 2019) ..................................................................21

iv

*Herskowitz v. Apple Inc.*,
    940 F. Supp. 2d 1131 (N.D. Cal. 2013) ..............................................................35

*Hexcel Corp. v. Ineos Polymers, Inc.*,
    681 F.3d 1055 (9th Cir. 2012) ...............................................................2, 9, 11

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ...........................................13, 14, 15, 16, 17

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    485 F. Supp. 3d 1137 (N.D. Cal. 2020) ..............................................................26

*In re Apple iPod iTunes Antitrust Litig.*,
    796 F. Supp. 2d 1137 (N.D. Cal. 2011) ..............................................................23

*In re Google Dig. Advertising Antitrust Litig.*,
    No. 5:20-cv-003556-BLF, Dkt. 143 (N.D. Cal. May 13, 2021) ...........................15, 25, 26

*In re Late Fee Litig.*,
    528 F. Supp. 2d 953 (N.D. Cal. 2007) ..............................................................35

*In re Packaged Seafood Prods. Antitrust Litig.*,
    2017 WL 35571 (S.D. Cal. Jan. 3, 2017)..............................................................10

*In re Super Premium Ice Cream*,
    691 F. Supp. 1262 (N.D. Cal. 1988), *aff'd sub nom.*,
    *Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*,
    895 F.2d 1417 (9th Cir. 1990) ..............................................................18

*Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*,
    518 F.2d 913 (9th Cir. 1975) ..............................................................8

*Intel Corp. v. Fortress Inv. Grp. LLC*,
    --- F. Supp. 3d ----, 2021 WL 51727 (N.D. Cal. Jan. 6, 2021) ...................................31, 32

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
    626 F.3d 1327 (11th Cir. 2010) ..............................................................16

*Kaiser Found. v. Abbott Labs.*,
    2009 WL 3877513 (C.D. Cal. Oct. 8, 2009)..............................................................7

*Kinderstart.com, LLC v. Google, Inc.*,
    2007 WL 831806 (N.D. Cal. Mar. 16, 2007).............................................15, 21

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000) ..............................................................33

*Korea Kumho Petrochemical v. Flexsys Am. LP*,
    2008 WL 686834 (N.D. Cal. Mar. 11, 2008)..............................................................18

*Krottner v. Starbucks Corp.*,
    628 F.3d 1139 (9th Cir. 2010) ...................................................................................12

*Lee v. City of Los Angeles*,
    250 F.3d 668 (9th Cir. 2001) .....................................................................................4

*Letizia v. Facebook, Inc.*,
    267 F. Supp. 3d 1235 (N.D. Cal. 2017) ...................................................................35

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone Inc.*,
    140 F.3d 1228 (9th Cir. 1998) ............................................................................30, 31

*Lucas v. Bechtel Corp.*,
    800 F.2d 839 (9th Cir. 1986) ...................................................................................34

*MetroNet Servs. Corp. v. Qwest Corp.*,
    383 F.3d 1124 (9th Cir. 2004) .............................................................................25, 26

*Midwestern Mach. Co. v. Nw. Airlines, Inc.*,
    392 F.3d 265 (8th Cir. 2004) .....................................................................................8

*Newcal Indus., Inc. v. Ikon Office Sol.*,
    513 F.3d 1038 (9th Cir. 2008) ..................................................................................15

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) ................................................................................25

*NSS Labs, Inc. v. Symantec Corp.*,
    2019 WL 3804679 (N.D. Cal. Aug. 13, 2019) .........................................................17

*O'Connor v. Uber Techs., Inc.*,
    58 F. Supp. 3d 989 (N.D. Cal. 2014) .......................................................................35

*Oliver v. SD-3C LLC*,
    751 F.3d 1081 (9th Cir. 2014) ...................................................................................8

*Oltz v. St. Peter's Cmty. Hosp.*,
    861 F.2d 1440 (9th Cir. 1988) .................................................................................14

*Olympia Equip. Leasing Co. v. Western Union Tel. Co.*,
    797 F.2d 370 (7th Cir. 1986) ...................................................................................27

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009).............................................................................................22, 25

*Pac. Express, Inc. v. United Airlines, Inc.*,
    959 F.2d 814 (9th Cir. 1992) ...................................................................................18

*Pace Indus., Inc. v. Three Phoenix Co.*,
    813 F.2d 234 (9th Cir. 1987) ...................................................................................12

*Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*,
    268 F. Supp. 3d 1071 (C.D. Cal. 2017) ....................................................16

*Pistacchio v. Apple Inc.*,
    2021 WL 949422 (N.D. Cal. Mar. 11, 2021) ..........................................17

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
    507 F.3d 117 (2d Cir. 2007) ....................................................................26

*Rambus Inc. v. FTC*,
    522 F.3d 456 (D.C. Cir. 2008) ..........................................................22, 24

*Rebel Oil Co. v. Atlantic Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ............................................................19, 27

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979) .................................................................................28

*Reveal Chat Holdco LLC v. Facebook, Inc.*,
    2021 WL 1615349 (N.D. Cal. Apr. 26, 2021) ......................................9, 10

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
    471 F. Supp. 3d 981 (N.D. Cal. 2020) ........................................... *passim*

*Reveal Chat Holdco LLC v. Facebook, Inc*,
    No. 5:20-cv-00363-BLF, Dkt. 62 (Aug. 7, 2020) ...................................10

*Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*,
    2013 WL 3242245 (N.D. Cal. June 25, 2013) .........................................18

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*,
    28 F.3d 1379 (5th Cir. 1994) ...................................................................24

*Rutledge v. Boston Woven Hose & Rubber Co.*,
    576 F.2d 248 (9th Cir. 1978) ...................................................................12

*Ryan v. Microsoft*,
    147 F. Supp. 3d 868 (N.D. Cal. 2015) .....................................................11

*Safeway Inc. v. Abbott Labs.*,
    761 F. Supp. 2d 874 (N.D. Cal. 2011) .....................................................32

*Samsung Elecs. Co. v. Panasonic Corp.*,
    747 F.3d 1199 (9th Cir. 2014) ...................................................................6

*Sidibe v. Sutter Health*,
    4 F. Supp. 3d 1160 (N.D. Cal. 2013) .......................................................19

*SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*,
    88 F.3d 780 (9th Cir. 1996) .....................................................................26

*Somers v. Apple, Inc.*,
  729 F.3d 953 (9th Cir. 2013) .................................................................27, 30, 33

*Stackla, Inc. v. Facebook Inc.*,
  2019 WL 4738288 (N.D. Cal. Sept. 27, 2019) ...........................................5, 26

*Stationary Eng'rs Local 39 v. Philip Morris, Inc.*,
  1998 WL 476265 (N.D. Cal. Apr. 30, 1998) .....................................................28

*Tabler v. Panera LLC*,
  2020 WL 3544988 (N.D. Cal. June 30, 2020) .................................................20

*Taleff v. Sw. Airlines Co.*,
  828 F. Supp. 2d 1118 (N.D. Cal. 2011) .............................................................9

*Tate v. Gas & Elec. Co.*,
  230 F. Supp. 2d 1072 (N.D. Cal. 2002) ...........................................................21

*United States v. Aetna Inc.*,
  240 F. Supp. 3d 1 (D.D.C. 2017) .....................................................................24

*United States v. Am. Express Co.*,
  838 F.3d 179 (2d Cir. 2016), *aff'd sub nom.*, *Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018).......................................................................15, 16, 32

*United States v. Marine Bancorp.*,
  418 U.S. 602 (1974).........................................................................................24

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004).........................................................................................25

*Vess v. Ciba-Geigy Corp. USA*,
  317 F.3d 1097 (9th Cir. 2003) ....................................................................19, 20

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
  592 F.3d 954 (9th Cir. 2010) .............................................................................6

*Z Techs. Corp. v. Lubrizol Corp.*,
  753 F.3d 594 (6th Cir. 2014) .......................................................................7, 13

**STATUTES, RULES, AND REGULATIONS**

Fed. R. Civ. P. 9(b) .................................................................................9, 10, 20

Fed. R. Civ. P. 12(b)(6).................................................................................1, 14

Clayton Antitrust Act, 15 U.S.C. §§ 12-27 (1914) .................................6, 13, 24, 28, 35

Sherman Antitrust Act, 15 U.S.C. §§ 1-7 (1890)................................................ *passim*

**OTHER AUTHORITIES**

3B Phillip E. Areeda & Herbert Hovenkamp,
    *Antitrust Law* (4th ed. 2015) .......................................................................................21, 27

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE THAT, on July 15, 2021 at 1:30 pm in Courtroom 8 of the U.S. District Court for the Northern District of California, San Jose Division, at 280 South 1st Street, San Jose, CA, this Motion To Dismiss filed by Defendant Facebook, Inc. will be heard.  Pursuant to Fed. R. Civ. P. 12(b)(6), Facebook moves to dismiss the Consolidated Amended Complaints in the above-captioned action.  Facebook's Motion to Dismiss is based on this Notice of Motion and the supporting Memorandum of Points and Authorities.

## STATEMENT OF REQUESTED RELIEF

Facebook requests that the Court dismiss Plaintiffs' claims under Rule 12(b)(6).

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Over the last two decades, Facebook has succeeded in a fiercely competitive environment. With a seemingly unlimited number of choices about how to spend their time or be entertained or where to advertise, people and businesses use Facebook's products every day, not because they have to, but because they find them valuable.  Ignoring this reality, Plaintiffs offer a series of unfounded and untimely allegations that fail to plausibly allege an antitrust case.

Three individuals who chose to use Facebook's free products and services for over fifteen years (Users) now seek to have Facebook *pay them* for that use.  They make this unprecedented claim despite acknowledging that they have received (and presumably continue to receive) substantial value from using Facebook.  Users also advance an implausible rewrite of history: They contend that Facebook's alleged misrepresentations in its privacy policies, starting in 2007, were *the* reason that Myspace and/or Friendster failed as competitors, thus enabling Facebook to obtain an alleged monopoly in supposed markets for "social networks" and "social media."  No antitrust claim has ever proceeded past a motion to dismiss under such a theory, even if timely brought, which these claims are assuredly not.

Users are joined by a small number of individuals and entities (Advertisers) who claim injury through their purchase of an unspecified amount of advertising despite acknowledging that Facebook offers higher quality ads at far lower rates than what others, including Google, charge.

As with Users, Advertisers' claims are tardy, do not allege cognizable antitrust injury, and fail to plausibly allege anticompetitive conduct.  Each complaint thus fails on multiple grounds.

**Plaintiffs' Section 2 claims are time-barred**.  The "gravamen" of Users' complaint is allegedly deceptive conduct that occurred well over a decade ago.  The statute of limitations and laches bar Users' claims here.  Users' monopoly acquisition theory would require reconstructing the market as it existed in 2007 and then require the factfinder to assess the significance of privacy policies in the decisions Users made to sign up for Facebook instead of Myspace and Friendster at that time.  But, to state the obvious, the relevant privacy policies were disclosed and publicly-available to Users when they signed up for those services and widely-reported thereafter.  So there is no credible argument for tolling.  *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012).  That reality is fatal to Users' and Advertisers' monopoly maintenance theory as well, which is tied to a "scheme" involving publicly-known conduct alleged to have ended in 2015.  These acts were not concealed, let alone fraudulently so.  Judge Freeman recently dismissed virtually identical claims against Facebook *with prejudice* for just this reason.

**Plaintiffs allege gerrymandered and legally implausible markets**.  Advertisers contend there is a so-called submarket for "social" advertising distinct from online (and presumably other forms of) advertising.  But this attempt to ignore the competitive landscape is foreclosed by Ninth Circuit precedent, with Judge Freeman holding just last week that it is implausible to create narrow advertising submarkets that ignore direct competition between Facebook and Google.  Users' alleged "social network" and "social media" markets are also legally deficient.  In addition to being inscrutable, they are not defined using cross-elasticity of demand, and there are no plausible allegations that warrant excluding obvious economic substitutes that also connect people with one another.  User Class Action Complaint ("UC") ¶ 62.  Users also allege no facts to support the theory that Facebook has monopoly power, and, on the contrary, allege many facts—including the presence in the market of scores of large competitors—making clear that it does not.

**Plaintiffs' theories of exclusionary conduct fail to state a claim**.  Users seek to turn alleged misrepresentations about Facebook's privacy policies into a theory of unlawful monopolization, but that rewrite of history is implausible on its face.  Users' claim would fail

2

1    anyway because they have not pled this theory, which sounds in fraud, with particularity, nor have

2    they alleged specific facts that would overcome the Ninth Circuit's presumption that false

3    advertising has a de minimis effect on competition.  Likewise, Plaintiffs' claim that Facebook

4    unlawfully maintained a monopoly, through a so-called "copy, acquire, kill" strategy, fails because

5    none of the alleged conduct violates the antitrust laws:  "Copying" rivals—especially to improve

6    one's products—is not anticompetitive; none of the firms Facebook acquired could plausibly be

7    viewed as a unique competitive threat to Facebook; and Plaintiffs' refusal to deal theory—which

8    Judge Freeman already rejected—is at odds with the Supreme Court's *Trinko* decision and the

9    Ninth Circuit's decision in *Qualcomm.*

10          **Plaintiffs' theories of antitrust injury are barred as a matter of law**.  Users claim that

11   Facebook should have *paid them* for their use of Facebook.  Again, no antitrust case has ever

12   survived a motion to dismiss on such a fanciful theory, and it is directly foreclosed by case law.

13   Advertisers' theory of injury fares no better.  They seek to be "reimbursed" for what they concede

14   were low-cost, high quality ads compared to other online options.  Unsurprisingly, they fail to

15   allege how the prices they—and not advertisers generally—did pay were "supracompetitive," or

16   even how much they paid or what a competitive price would have been.  And Advertisers do not

17   even attempt to link—as they must—the allegedly supracompetitive prices to any of the conduct

18   that they challenge.  Similarly, Advertisers offer no plausible allegations as to how an agreement

19   between Facebook and Google in one alleged market had an anticompetitive effect in what they

20   claim is a separate, unrelated market.  And, as Judge Freeman also recently recognized, all

21   Plaintiffs necessarily indulge in pure speculation when they claim that the smattering of firms

22   Facebook acquired or allegedly "kill[ed]" would have succeeded.

23          The antitrust laws protect competition; they do not punish success.  And they certainly do

24   not rewrite history in so doing.  Both complaints should be dismissed with prejudice.

25                                    **BACKGROUND**[1]

26          In a now-familiar story, Facebook was founded in 2004 by Mark Zuckerberg in his college

27   dorm room.  UC ¶ 5; Advertiser Class Action Complaint ("AC") ¶ 44.  Plaintiffs allege that people

28

---

[1] For purposes of this Motion only, Facebook accepts non-conclusory factual allegations as true.

1    use Facebook to: "Socialize.  Stay in touch.  Be entertained.  [And] kill time."  UC ¶ 62.  There

2    have been and continue to be, of course, countless other apps and websites, and other forms of

3    communication and entertainment, that allow users to do the same.  For example, users "flock" to

4    Snapchat to send one another texts, photos, and videos.  *Id*. ¶ 196.  Videos of varying length can

5    be shared on YouTube or TikTok.  *Id.* ¶ 36.  Hundreds of millions of people use services like

6    Twitter, LinkedIn, Pinterest, and Reddit.  And everyone with a smartphone has an address book

7    with contacts, which are a "ready-made, proto-social network from which" all mobile apps,

8    including services like iMessage and Signal, can draw.  AC ¶ 4.

9         Facebook is free for its users.  UC ¶ 38; AC ¶ 93.  Facebook's revenues come substantially

10   from advertising.  AC ¶ 67.  Facebook competes against other forms of advertising, including

11   banner and internet search-based ads.  *Id.* ¶ 413.  Facebook ads can be targeted to people by

12   location, age, gender, interests, demographics, behavior, and connections.  *Id*. ¶ 425.  Facebook is

13   not the only source for targeted advertisements.  As just one example, Google remains a much

14   larger online "advertising titan[],"  *id.* ¶ 16, with "control over exchange-traded advertising

15   throughout the Internet,"  *id.* ¶ 411.  Plaintiffs allege that Facebook's advertisements are typically

16   less expensive than Google ads.  *Id.* ¶ 438.

17        **A.    Pre-2010 Competitive Environment**

18        When Facebook was founded, it faced intense competition from, among others, Myspace

19   and Friendster, UC ¶ 68, were marked by "lax" privacy policies that permitted anyone to join

20   anonymously, *id*. ¶¶ 44, 104.  Facebook required users to sign up with their real identities, which

21   "became [its] distinguishing feature."  *Id*. ¶ 48.  Among a myriad of technical, management, and

22   product problems that were well-known and public, Myspace and Friendster ultimately folded.[2]

23   Plaintiffs paint an alternate reality:  They claim Myspace and Friendster failed because of alleged

24   misrepresentations in Facebook's privacy policies from 2007 to 2009 "subsequently proven to be

25

26   ────────────────

     [2] In July 2005, News Corp. acquired Myspace for $580 million.  News Corp. sold the majority of
     its stake for $35 million in June 2011.  *See* Gringer Decl., Ex. 1.  Copies of certain materials cited
27   in this brief are attached as Exhibits to the Declaration of David Z. Gringer filed concurrently
     herewith ("Gringer Decl.").  On a motion to dismiss, courts may take judicial notice of matters of
28   public record that are not subject to reasonable dispute.  *See Lee v. City of Los Angeles*, 250 F.3d
     668, 689 (9th Cir. 2001).

1   untrue." *Id.* ¶ 120.  These statements were the subject of "public outcry" soon after they were

2   made, *id.* ¶¶ 114, 121, and many were the subject of a 2012 consent decree with the FTC, *id.* ¶ 127.

3   Each Plaintiff knew of the decree when it issued.  *Id.* ¶ 154.

4          **B.      Post-2010 Competitive Environment**

5          Plaintiffs allege Facebook competes for the "attention" of users, which in turn drives

6   advertising revenue.  UC ¶¶ 60, 203, 225.  Plaintiffs claim that from "2012 through 2015,"

7   Facebook engaged in a "scheme" to thwart competition.  AC ¶ 8.  This alleged "scheme" consisted

8   of the following:  Beginning in 2012, Facebook acquired Instagram, an app for the sharing of

9   photos and videos.  UC ¶ 15.  In 2014, Facebook acquired WhatsApp, a messaging app.  *Id.*

10  According to Plaintiffs, neither Instagram nor WhatsApp had the user base "necessary to compete"

11  with Facebook at the time, *id.* ¶ 99, and both (public) acquisitions were reviewed and cleared by

12  the FTC.  In 2014, Facebook revised its policy to limit access to certain user data available through

13  APIs to third-party developers, AC ¶ 500, which it implemented by 2015, *id.* ¶¶ 214, 225.

14  Facebook manages API access to "decisively police the integrity of its platforms," in which "the

15  public has a strong interest."  *Stackla, Inc. v. Facebook Inc.*, 2019 WL 4738288, at *6 (N.D. Cal.

16  Sept. 27, 2019).  Facebook supposedly also allowed certain app developers access to other APIs

17  at an undefined time, pursuant to agreements labeled as "Data Sharing" agreements.  AC ¶ 217.

18  Neither complaint alleges these agreements were exclusive.  Finally, Facebook allegedly copied

19  product features offered by certain competitors in 2011-12 and 2016 to improve its offerings to

20  Users.  UC ¶¶ 191, 198, 200.  The principal "victim" of this alleged copying, Snapchat, is today

21  the most popular "social app" among teenagers in the United States, with TikTok trailing closely

22  behind.  Gringer Decl., Ex. 2.[3]

23         Advertisers alone also allege that Facebook and Google's September 2018 agreement (the

24  "Google Network Bidding Agreement," or "GNBA")—which has nothing to do with advertising

25  on Facebook—nevertheless enabled Facebook to maintain "supracompetitive prices for social

26

27

28  _____
    [3] On a motion to dismiss, the court may consider documents incorporated by reference in the
    complaint.  *See, e.g.*, *Evans Analytical Grp., Inc. v. Green Plant Farms, LLC*, 2013 WL 3963822,
    at *1 n.1 (N.D. Cal. July 29, 2013).

1    advertising."[4]   AC ¶¶ 22, 400.

2                                        **ARGUMENT**

3    **I.    PLAINTIFFS' SECTION 2 CLAIMS ARE TIME-BARRED**

4          **A.    The Statute Of Limitations Bars <u>All Plaintiffs'</u> Damages Claims**

5          Private lawsuits seeking damages for alleged violations of Section 2 of the Sherman Act

6    are subject to a four-year statute of limitations.  15 U.S.C. § 15(b).  In the Ninth Circuit, the default

7    rule is that claims brought under the Sherman Act accrue "at the time of the alleged anticompetitive

8    conduct."  *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1065 (N.D. Cal. 2016) (citing *Samsung*

9    *Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1203-04 (9th Cir. 2014)).  To be sure, some courts

10   in this district have found that plaintiffs' antitrust claims accrue at the time of injury, but these

11   courts were merely "determining whether to apply a discovery rule of accrual" and "were not

12   presented" with the separate question of "whether accrual began at the time of injury or the time

13   of the alleged anticompetitive conduct."  *Id.* at 1066.  Here, Plaintiffs do not seriously dispute that

14   their claims accrued when the challenged conduct took place: from 2007 to 2015 at the latest.  But

15   even if the Court were to look at the time Plaintiffs were allegedly injured, the claims are still time-

16   barred since all Plaintiffs allege injury before December 2016.  Thus, "the running of the statute

17   is apparent on the face of [both] complaint[s]," and Plaintiffs' claims should be dismissed.  *Von*

18   *Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010).

19        ***Users*:** The UC alleges that Facebook violated the antitrust laws through a "two-part

20   anticompetitive scheme": first, by "consistently and intentionally deceiv[ing] consumers about the

21   data protections it provided to its users" and second, by "identify[ing] nascent competitors and

22   then 'acquir[ing], copy[ing], or kill[ing]'" them.  UC ¶¶ 2-4.  But Facebook's acts that form both

23   parts of the alleged scheme occurred more than four years before—often well before—Users filed

24   their lawsuit.  *See, e.g.*, *id.* ¶¶ 101-40 (representations regarding privacy policies beginning in

25   2007); *id.* ¶¶ 169-203 (changes to Facebook's Platform policy in 2015 and acquisitions in 2012

26

27   _____
     [4] Over twenty lawsuits have been filed against Google and Facebook (or Google alone) in recent
28   months alleging that one or both companies monopolized or suppressed competition in
     advertising-technology related markets, including by entering into the GNBA.  A petition to
     centralize these cases was filed recently before The Judicial Panel on Multidistrict Litigation.

1   and 2014).  Under the default rule in the Ninth Circuit, these claims accrued in 2015 at the absolute

2   latest.  *Garrison*, 159 F. Supp. 3d at 1065; *see also DXS, Inc. v. Siemens Med. Sys. Inc.*, 100 F.3d

3   462, 467 (6th Cir. 1990) (holding that statute of limitations analysis under Sherman Act is focused

4   on "the defendant's overt acts, as opposed to the effects of the overt acts").

5       To the extent the timing of Users' alleged injury is relevant, Users purport to rely on

6   Facebook's failure to pay them for their time spent using Facebook.  *See, e.g.*, UC ¶ 272.  But even

7   assuming without basis that this is an "injury," it too occurred well before the limitations period,

8   *id.* ¶¶ 19, 23, 26 (named Users joined Facebook in 2006-2008).  Users make a half-hearted effort

9   to allege their injury did not "crystallize" until more recently, *id*. ¶ 246—but they provide no

10  explanation of what this means or why it would impact accrual.

11      ***Advertisers:***   Advertisers allege that Facebook violated the antitrust laws through a

12  "scheme" executed from "2012 through 2015."  AC ¶ 8.  By Advertisers' own account, the alleged

13  scheme occurred more than four years before Advertisers filed their lawsuit and their claims

14  accrued well outside the limitations period.  *See, e.g.*, *Garrison*, 159 F. Supp. 3d at 1065.

15      Even under an injury rule, Advertisers' claims are untimely.  Advertisers were allegedly

16  injured when they paid "supracompetitive prices for social advertisements."  AC  ¶ 1.[5]  That

17  Advertisers continued to purchase advertisements into the limitations period does not change the

18  analysis.  *Kaiser Found. v. Abbott Labs.*, 2009 WL 3877513, at *7 (C.D. Cal. Oct. 8, 2009) ("[T]he

19  statute of limitation [for unilateral conduct] runs from the time of commission of the act,

20  notwithstanding that high prices may last indefinitely into the future.").   In unlawful

21  monopolization cases, "profits, sales, and other benefits accrued as the result of an initial wrongful

22  act . . . are uniformly viewed as 'ripples' caused by the initial injury, not as distinct injuries

23  themselves."  *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 600 (6th Cir. 2014).

24

25

26  _____

[5] All but two of the named Advertisers are alleged to have purchased advertisements on Facebook
before December 2016.  *See* AC ¶¶ 24-25, 27, 29-32.  While the other two Advertisers allege that

27  they began purchasing advertisements during the limitations period—*see id.* ¶¶ 26, 28—
Facebook's records show that both Advertisers actually began purchasing advertisements before
December 2016.  *See* Decl. of Kristin Armitage ¶¶ 4, 5.  These purchase records are incorporated

28  by reference in the AC and so can be considered here.  *See supra* n.3.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.   Laches Bars <u>All Plaintiffs</u>' Claims For Injunctive Relief**

All Plaintiffs' requests for injunctive relief are barred by laches.  The Sherman Act's limitations period serves as "a guideline for computation of the laches period" in suits for injunctive relief.  *Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*, 518 F.2d 913, 926 (9th Cir. 1975) ("*ITT*").  And in "applying laches," courts "look to the same legal rules that animate the four-year statute of limitations."  *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014). Laches issues may be decided on a motion to dismiss when apparent on the face of the complaint. *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 990-92 (N.D. Cal. 2020) ("*Reveal Chat I*").  Laches bars relief where "a party has inexcusably delayed pursuing his claim and his adversary has been prejudiced as a result."  *Oliver*, 751 F.3d at 1085 n.4.  That is true here. Plaintiffs waited years to "initiat[e] [this] lawsuit" even though they "knew (or should have known) of the allegedly [unlawful] conduct" the moment it occurred.  *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 952 (9th Cir. 2001).  For example, the Instagram and WhatsApp acquisitions were highly publicized, as were the decisions by competition agencies in the U.S. and elsewhere not to challenge the acquisitions.  *See Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 272 (8th Cir. 2004) ("Mergers occur in the public eye and at a reasonably certain date."); *Reveal Chat I*, 471 F. Supp. 3d at 991-92 (holding that similar allegations were subject to the doctrine of laches). And Facebook's 2012 settlement with the FTC regarding the privacy representations at issue was likewise public.  UC ¶ 145.

Plaintiffs' unreasonable delay also prejudiced Facebook.  "The bare fact of delay creates a rebuttable presumption of prejudice."  *ITT*, 518 F.2d at 926.  Plaintiffs make no plausible allegations to rebut this presumption.  Nor could they.  For example, Facebook invested in and grew Instagram, AC ¶ 289, and the product is now a key component of Facebook's business, *id.* ¶¶ 290-93, 296.  The prejudice from a ruling more than a decade later that the acquisition is unlawful is obvious.  Particularly because "[t]he potential for economic disruption is so great" from a belated suit of this nature, the Court should not permit Plaintiffs to "sleep through" Facebook's alleged "antitrust violations and then sue many years later."  *ITT*, 518 F.2d at 927.  At a minimum, Plaintiffs' request for the "fairly extraordinary remedy" of divestiture (*see, e.g.*, UC

1   ¶¶ 273, 283, 297, 307) is "'barred as a matter of law'" based on "plaintiffs' delay in bringing their

2   suit." *Taleff v. Sw. Airlines Co.*, 828 F. Supp. 2d 1118, 1124-25 (N.D. Cal. 2011), *aff'd*, 554 F.

3   App'x 598 (9th Cir. 2014).

4           **C.**     **No Tolling Theory Applies**

5                   **1.**     **Fraudulent Concealment Does Not Apply**

6         Because Plaintiffs commenced their lawsuits in an untimely manner, their "claims are time

7   barred unless the Sherman Act statute of limitations is properly tolled." *Reveal Chat Holdco LLC*

8   *v. Facebook, Inc.*, 2021 WL 1615349, at *5 (N.D. Cal. Apr. 26, 2021) ("*Reveal Chat II*"). Aware

9   of their protracted delay in bringing suit, Plaintiffs seek to invoke the doctrine of fraudulent

10  concealment. *See* AC ¶¶ 488-526; UC ¶¶ 237-43. That effort fails. To plead fraudulent

11  concealment, Plaintiffs must allege that (1) Facebook engaged in "affirmative acts to mislead

12  them," (2) Plaintiffs lacked "actual or constructive knowledge of the facts giving rise" to the claim,

13  and (3) Plaintiffs acted diligently in trying to uncover the facts giving rise to the claim. *Hexcel*,

14  681 F.3d at 1060. Moreover, both "the circumstances of the concealment and the facts supporting

15  [plaintiffs'] due diligence" must be pled with particularity in accordance with Fed. R. Civ. P. 9(b).

16  *Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499, 502 (9th Cir. 1988); *Reveal Chat II*,

17  2021 WL 1615349, at *4 (fraudulent concealment allegations must allege "an account of the time,

18  place, and specific content of the false representation as well as the identities of the parties to the

19  misrepresentations" and "what is false or misleading about a statement, and why it is false").

20  Plaintiffs' allegations do not (and cannot) meet these requirements.

21                 **a) <u>Advertisers</u> Do Not Plausibly Allege Fraudulent Concealment**

22        Advertisers allege that Facebook fraudulently concealed its alleged misconduct by

23  enforcing a code of silence, preventing disclosure to developers and the public, continuing to

24  promote APIs knowing that they were slated for removal, misleading developers and the public

25  about the reasons for the removal through pretextual explanations, and misleading regulators and

26  the public about acquisitions. *See* AC ¶ 489. Advertisers allege that the "true, non-pretextual"

27  reasons for Facebook's alleged conduct did not come to light until internal documents were

28  released to the public. *Id.* ¶ 490. There are no allegations that any of this misled any of the

1   advertisers, which is alone fatal to the theory.  Also, Judge Freeman recently rejected a fraudulent

2   concealment argument focused on the same conduct because the acts that form the basis of the

3   Plaintiffs' lawsuit were all public and Plaintiffs knew or should have known about them long

4   before the documents were released.  *Compare* Amended Class Action Complaint, *Reveal Chat*

5   *Holdco LLC v. Facebook, Inc* ("*Reveal Chat II* Compl."), No. 5:20-cv-00363-BLF, Dkt. 62, at

6   ¶¶ 446-75 (Aug. 7, 2020), *with* AC ¶¶ 488-516.  Specifically, in *Reveal Chat II*, Judge Freeman

7   found that very similar allegations "failed to plead affirmative conduct on the part of Facebook

8   with the requisite particularity that Rule 9(b) requires."   2021 WL 1615349, at *8.  And,

9   significantly, Judge Freeman held that the *Reveal Chat II* plaintiffs had "failed to plead their

10   diligence in trying to uncover the facts giving rise to its claim with particularity," *id.* at *9, despite

11   the fact that the *Reveal Chat II* plaintiffs had at least *attempted* to plead their diligence, *see Reveal*

12   *Chat II* Compl. ¶ 476.  Here, Advertisers include *no* allegations about diligence.

13                    **b) <u>Users</u> Fail To Allege Fraudulent Concealment**

14          Users' fraudulent concealment theories are also meritless.  ***First***, with respect to Users'

15   privacy-representations theory, *see* UC ¶¶ 237-40, nearly all "affirmative acts" Users rely on to

16   allege fraudulent concealment, *see id.* ¶ 238, are generalized, market-facing statements about

17   Facebook's commitments to user privacy and internet security that are only alleged to be false by

18   a conclusory allegation lumping the statements together, *id.* ¶ 239.  This does not meet the

19   particularity requirements of Rule 9(b).  *In re Packaged Seafood Prods. Antitrust Litig.*, 2017 WL

20   35571, at *16 (S.D. Cal. Jan. 3, 2017) ("generalized statements," including alleged statements to

21   the public, are "insufficient to allege fraudulent concealment with particularity").   And the

22   statements relating to the Cambridge Analytica incident (*e.g.*, UC ¶ 238(o)) are irrelevant to any

23   alleged concealment analysis, as these events occurred after—according to Users—Facebook had

24   already secured its monopoly, *see, e.g.*, *id.* ¶ 154.  Accordingly, these statements could not have

25   prevented Users from uncovering the facts relevant to their monopoly *acquisition* claim.  Users'

26   fraudulent concealment theory with respect to the supposed "acquire, copy, or kill" strategy fails

27

28

1  for the same reason as Advertisers' nearly identical allegations.  *See supra* pp.9-10.[6]

2  **Second**, Users had—at the very least—constructive knowledge of the facts giving rise to

3  their claims.  *Hexcel*, 681 F.3d at 1060 ("The plaintiff is deemed to have had constructive

4  knowledge if it had enough information to warrant an investigation which, if reasonably diligent,

5  would have led to the discovery of the fraud.").  So long as a plaintiff is aware of "any fact that

6  should excite his suspicion," he is deemed to have "actual knowledge of his entire claim."

7  *Conmar*, 858 F.2d at 502.  Many of the facts upon which Users premise their claims were widely

8  reported—sometimes over a decade ago.  *See Reveal Chat I*, 471 F. Supp. at 993-94 (finding

9  constructive knowledge when "the Wall Street Journal reported" on existence of challenged

10 agreements).  For example, Users allege that Facebook's "Beacon" product allowed Facebook to

11 use data "in unauthorized or intrusive ways" as early as 2007.  *See* UC ¶¶ 119-21.  However, a

12 document cited in the UC explains that a report publicized the privacy implications of the Beacon

13 product in December 2007—almost fifteen years ago.  *See* Gringer Decl., Ex. 3.  Further, most

14 statements Users rely on to establish fraudulent concealment and the purportedly false

15 representations that make up the alleged scheme were supposedly made before the FTC order.

16 *See, e.g.*, UC ¶¶ 238(a)-(d).  But the FTC order was public; indeed, the UC alleges that Users

17 "relied on" it "in deciding to continue to give Facebook access to their personal data."  *Id.* ¶ 154.

18 Accordingly, as the UC alleges, any supposed misrepresentations were discussed at length in that

19 very same order and thus cannot support a fraudulent concealment claim.  *See Garrison*, 159 F.

20 Supp. 3d at 1062, 1084 (alleged fraudulent acts before the relevant limitations period are irrelevant

21 to the fraudulent concealment analysis).

22 **Third**, the UC fails to allege diligence.  Instead, it *disclaims* Users' obligation to be diligent

23 because "nuances in privacy terms are relegated to investigative journalists to discover and

24 explain" and firms "*like* Facebook . . . often further obfuscate their data privacy practices."  UC

25 ¶¶ 234-35 (emphasis added).  This allegation—which undermines Users' central argument that

26 Facebook's privacy policies were *the* reason for its success—cannot excuse a lack of diligence.  A

27

28

---

[6] Where plaintiffs do not plead affirmative acts to mislead, "the Court need not address the remaining elements of the fraudulent concealment analysis."  *Ryan v. Microsoft*, 147 F. Supp. 3d 868, 885 (N.D. Cal. 2015).

plaintiff cannot "escape the requirement that she exercise reasonable diligence" by claiming that "she could not understand" the "information necessary for her to make an informed decision." *Dodds v. Cigna Sec., Inc.*, 841 F. Supp. 89, 95 (W.D.N.Y. 1992).  As Users themselves allege, *see, e.g.*, UC ¶¶ 117-22, news stories about Facebook's privacy policies, including by "investigative journalists," date back well over a decade.  These allegations do not constitute sufficient diligence.  *See, e.g.*, *Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 250 (9th Cir. 1978) (diligence must be supported by facts alleged "with particularity").

## 2.   Users Cannot Invoke The Continuing Violation Doctrine[7]

"A continuing violation is one in which the plaintiff's interests are repeatedly invaded." *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987).  To invoke the doctrine, a plaintiff must allege "an overt act during the limitations period that meets two criteria: 1) It must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) it must inflict new and accumulating injury on the plaintiff."  *Reveal Chat I*, 471 F. Supp. 3d at 994.

As a matter of law, Users' allegations that the "continued exposure of private information . . . leading up to 2018" constitutes a continuing violation as to Facebook's data privacy practices, UC ¶ 245, are insufficient.  The exposure of supposedly private information is not an antitrust violation, and "[t]he continuing violation doctrine is inapplicable when, as here, the actions falling within the period of limitations are not themselves violations."  *Duarte v. Quality Loan Serv. Corp.*, 2018 WL 2121800, at *8 (C.D. Cal. May 8, 2018).  Users also allege no specific facts that *their* information was "expos[ed]," nor do they allege facts that they suffered any injury if it was; and therefore by definition they cannot show the new and accumulating injury the law requires.  *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1143 (9th Cir. 2010) (exposure of personal information constitutes injury-in-fact only where plaintiffs face "a credible threat of real and immediate harm").  Finally, Users do not allege any new overt acts of exposure inside the limitations period.  This is independently fatal to this theory because "passive" conduct will not "restart the statute of limitations."  *Eichman v. Fotomat*, 880 F.2d 149, 160 (9th Cir. 1989).

Likewise, the supposed "instances of deception" that occurred post-2010 do not support

---

[7] Advertisers do not allege a continuing violations theory.

Users' monopoly acquisition claim.  By that time, according to the UC, Facebook had obtained a monopoly.  *See, e.g.*, UC ¶¶ 124, 154.  Users' monopoly *maintenance* claim tied to the alleged "copy, acquire, kill" scheme does not include this alleged deception.  But even if it did, Users fail to allege how this supposed deception inflicted a new and accumulating injury *to them*, especially since they were aware of the alleged deception by 2012 but continued to use Facebook.  *Id.* ¶ 154.

Users also incorrectly assert that "*[e]ach*" of Facebook's actions "as a part of its serial acquisition strategy to 'acquire, copy, or kill' its competitors . . . were separate and independent overt acts during the limitations period" and amount to continuing violations.  UC ¶¶ 244-45 (emphasis added).  There are only two alleged acts that occurred after 2017[8]—the "cloning" of Houseparty and the acquisition of tbh, *id.* ¶¶ 204-05, 207.  Neither suffices.  The continuing violation doctrine does not apply to merger challenges and thus cannot save the claims tied to pre-2017 acquisitions.  *See Reveal Chat I*, 471 F. Supp. 3d at 994-95.[9]  The supposed cloning is a product improvement that benefitted the Users by adding functionality to the Facebook app.  Users unsurprisingly do not allege that either act inflicted a new and accumulating injury or any injury at all.  *See id.* at 995.  And there certainly are not allegations to explain how the tbh acquisition lessened competition.

## II.   PLAINTIFFS FAIL TO PLAUSIBLY DEFINE A RELEVANT PRODUCT MARKET

"A threshold step in any antitrust case is to accurately define the relevant market, which refers to the area of effective competition."  *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020).  The relevant market alleged must be supported by plausible factual allegations.  *See Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120-24 (9th Cir. 2018).  A "complaint may be dismissed under

---

[8] Users also challenge the acquisition of Giphy.  *See* UC ¶ 206.  This acquisition was announced in 2020 but has not yet been completed and so cannot have harmed Users.

[9] Facebook recognizes that this Court held that the continuing violation doctrine could be applied to challenges to acquisitions brought under Section 2 of the Sherman Act, even though it does not apply in the context of Section 7 of the Clayton Act.  *See Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1187 (N.D. Cal. 2012).  Of course, there, the acquiring firm shut down the acquired firm—an independent anticompetitive act separate from the initial acquisition.  Not so here.  On these facts, the *Reveal Chat I* court reached a different conclusion, noting that there "is no reason to treat the same conduct differently in sister statutes that are designed to promote the same legislative objective."  471 F. Supp. 3d at 995.  Other recent cases have agreed with the *Reveal Chat* court.  *See, e.g., Z Techs. Corp.*, 753 F.3d at 603; *Complete Entm't Res. LLC v. Live Nation Entm't, Inc.*, 2016 WL 3457177, at *1 (C.D. Cal. May 11, 2016).

1    Rule 12(b)(6)" when its allegations do not satisfy the "legal principles that govern the definition"

2    of a product market.  *Id.* at 1120.  These principles include the requirement that the complaint

3    plausibly excludes alternatives that consumers could substitute for the same purpose ("reasonable

4    interchangeability"), and that it alleges sufficient facts to establish "cross-elasticity of demand,"

5    or consumer switching in response to price increases.  *See Oltz v. St. Peter's Cmty. Hosp.*, 861

6    F.2d 1440, 1446 (9th Cir. 1988).  An alleged market that is "not natural," "artificial," or "contorted

7    to meet [plaintiffs'] litigation needs" compels dismissal.  *Hicks*, 897 F.3d at 1120-23.  Here,

8    Plaintiffs allege inconsistent and implausible relevant markets.  Advertisers allege a "social

9    advertising" submarket.  Users allege "social network" and "social media" markets.  All Plaintiffs

10   allege different markets than the government.  None of these alleged markets is viable.

11        **A.     Advertisers Fail To Plausibly Define A Product Market**

12        Advertisers "social" advertising "submarket" is an obvious and legally flawed attempt to

13   find a monopoly where none exists.  The AC acknowledges that Facebook participates in a vibrant

14   competitive market for advertising dollars against "titan" Google among others.  AC ¶ 16.  In

15   evaluating this same alleged market on a motion to dismiss, Judge Freeman stated that she had

16   "real concerns" and told plaintiffs they had to "clearly define" the market in an amended complaint.

17   *Reveal Chat I*, 471 F. Supp. 3d at 1000.  They never did; nor do Advertisers here.

18        Courts, including those in the Ninth Circuit, are skeptical even at the pleading stage of

19   proposed markets limited to a single form of advertising because advertisers can and do reach

20   consumers through other forms of advertising, particularly when prices increase.  In *Hicks*, for

21   example, the Ninth Circuit specifically rejected an allegation that a specialized form of advertising

22   was plausible because it was more effective at reaching interested customers and had distinct

23   pricing, as Advertisers contend is true about "social advertising."  *See* 897 F.3d at 1121-23; AC

24   ¶¶ 413, 436-38.   Instead, *Hicks* held that advertising on social media was reasonably

25   interchangeable with other forms of advertising.  897 F.3d at 1123.  For this reason, the Ninth

26   Circuit explained "many courts have rejected antitrust claims reliant on proposed advertising

27   markets limited to a single form of advertising."  *Id*.  Advertisers have alleged nothing to support

28   a different result here.

1    Applying *Hicks*, Judge Freeman held just last week that an alleged market that sought to

2    isolate Google and Facebook into different advertising markets could not survive a motion to

3    dismiss.  *In re Google Dig. Advertising Antitrust Litig.*, No. 5:20-cv-003556-BLF, Dkt. 143, at 5-

4    6 (N.D. Cal. May 13, 2021).  At least one other case has already so held.  *Kinderstart.com, LLC v.*

5    *Google, Inc.*, 2007 WL 831806, at *6 (N.D. Cal. Mar. 16, 2007) (holding different forms of online

6    advertising could not be separated into distinct markets).  Here, just as in the *Google* cases,

7    common sense dictates that advertisers can and do shift their spending to and among all sources

8    where consumers spend their time.  *Hicks*, 897 F.3d at 1121 (holding "common sense" required

9    rejecting a facially unsustainable advertising submarket).  And if Google and Facebook are in the

10   same market—not to mention the countless other platforms for advertising—then Facebook

11   necessarily cannot have an advertising monopoly.

12   Further, Advertisers do not include factual allegations sufficient to define the contours of

13   the market—*i.e.*, who participates, and who does not—beyond merely asserting that Twitter and

14   LinkedIn compete.  AC ¶ 448-49.  They acknowledge that advertisers "buy ads on sites across the

15   web," *id.* ¶ 344, but offer no plausible basis for excluding other forms of advertising, including

16   those specifically mentioned in the AC like YouTube.  The failure to define the "boundaries of the

17   market" renders the allegations legally deficient.  *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d

18   1038, 1045 (9th Cir. 2008); *see also Hicks*, 897 F.3d at 1120 ("Including economic substitutes

19   ensures that the relevant product market encompasses the group or groups of sellers or producers

20   who have actual or potential ability to deprive each other of significant levels of business.").

21   **B.    <u>Users</u> Fail To Plausibly Define Product Markets**

22   Virtually ignoring the relentlessly competitive business that provides Facebook with

23   substantially all of its revenues (advertising), Users define instead markets in which the products

24   are free and available in unlimited quantities.  The implausible markets that Users purport to define

25   thus ignore the basic purpose of defining a market—namely, "to identify the market participants

26   and competitive pressures that restrain an individual firm's ability *to raise prices or restrict*

27   *output*."  *United States v. Am. Express Co.*, 838 F.3d 179, 196 (2d Cir. 2016), *aff'd sub nom.*, *Ohio*

28   *v. Am. Express Co.*, 138 S. Ct. 2274 (2018) (emphasis added).  Moreover, the alleged markets

1   suffer from two basic pleading defects:  they do not address reasonable interchangeability or cross-

2   elasticity of demand.

### 1.      Users' "Social Network" Market Fails As A Matter Of Law

4          Users' "social network" market definition is contrived and legally insufficient.  Users

5   contend that social networks "allow users to find, communicate, and interact with friends, family,

6   personal acquaintances, and other people with whom the users have shared interests or

7   connections." UC ¶ 56.  This function-based attempt to define the market departs from the purpose

8   of defining a relevant market.  *Am. Express*, 138 S. Ct. at 2285.  Rather, it appears to be a

9   description of one aspect of Facebook's products; it fails to provide a plausible basis for identifying

10  which firms provide products that consumers consider acceptable substitutes, and which do not.

11  *See Hicks*, 897 F.3d at 1121 (properly alleged market "encompasses the group or groups of sellers

12  or producers who have actual or potential ability to deprive each other of significant levels of

13  business"); *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010) (stating that,

14  even at pleading stage, a plaintiff "still must present enough information in [its] complaint to

15  plausibly suggest the contours of the relevant geographic and product markets").  For example, as

16  Users allege, Facebook is used to "kill time" and to entertain.  UC ¶ 62.  The UC alleges no facts

17  explaining why the countless gaming, news, messaging, and other apps that allow users to do just

18  that are not reasonable substitutes for time spent on Facebook.

19         As a result, Facebook is left in the dark about who is in this alleged market and who is out.

20  *See Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*, 268 F. Supp. 3d 1071, 1084 (C.D. Cal. 2017)

21  (granting motion to dismiss where alleged market definition left "unclear what products this might

22  encompass," because such "ambiguities make Plaintiff's market definition unsustainable on its

23  face"); *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F. Supp. 3d 988, 997 (N.D. Cal.

24  2015) ("Although detailed factual findings at the pleading stage are not required, Plaintiff must

25  provide enough facts [about the relevant market] to enable the opposing party to defend itself

26  effectively.").  To be sure, the UC contains conclusory and implausible allegations that the market

27  does not include Twitter, Snapchat, LinkedIn, and TikTok, because they do not share the *exact*

28  *same* functionality as Facebook.  UC ¶¶ 37, 60.  Likewise, it appears that other apps that entertain

users and "kill time" are not in this market either, notwithstanding the allegations that this is how Facebook is used.  If the alleged market is focused on uses for Facebook, it cannot simply exclude products that facilitate those same functions at the mere say-so of Users, particularly when doing so is at odds with common sense.  Users are required to allege the contours of the market that encompasses all "appropriate economic substitutes."  *Pistacchio v. Apple Inc.*, 2021 WL 949422, at *2 (N.D. Cal. Mar. 11, 2021); *see also Hicks*, 897 F.3d at 1123 (affirming dismissal where product markets failed to include "many reasonably interchangeable products").  Users must—but did not—allege *facts* explaining why these many other websites and apps are not *also* reasonably interchangeable with whatever products are in the alleged market.

Users also fail to make any factual allegations about "cross-elasticity of demand."  *See NSS Labs, Inc. v. Symantec Corp.*, 2019 WL 3804679, at *9 (N.D. Cal. Aug. 13, 2019) (dismissing antitrust claims).  Because Facebook is free and available in unlimited quantities, Users do not and cannot allege any effect a price change would have on demand to establish the boundaries of the market.  Nor have Users alleged an alternative basis to evaluate cross-elasticity of demand.  Absent such allegations, Facebook and this Court are impermissibly left guessing how to determine whether another service is capturing demand in response to changes in Facebook's product. *See id.*

## 2.   Users' "Social Media" Market Fails As A Matter Of Law

According to Users, "social media" includes websites and apps "that allow users of a given application to distribute various forms of media—such as text messages, photos, videos, and music—to other users of the same application."  UC ¶ 72.  In other words, "social media" must include iMessage, YouTube, TikTok, Snapchat, and Spotify, among many others.  *See, e.g.*, *Hicks*, 897 F.3d at 1121 (courts should use "common sense" in evaluating market definition on motion to dismiss).

Users articulate no plausible basis for limiting this market to apps that offer in-app distribution (such as WhatsApp and iMessage) while excluding competitors that allow for the distribution of media outside their own applications (such as SMS messaging).  Likewise, email can do everything Users define as "social media," *i.e.*, distributing media, albeit across platforms.  But the notion that email is outside the alleged market because social media is less functional than

1    email makes no sense.  Lesser functionality just means products are differentiated, not that they

2    are in a wholly different market.  *See In re Super Premium Ice Cream*, 691 F. Supp. 1262, 1268

3    (N.D. Cal. 1988), *aff'd sub nom.*, *Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*,

4    895 F.2d 1417 (9th Cir. 1990).  Users likewise fail to allege any plausible basis for excluding

5    competitors that provide other forms of online entertainment since they, like Facebook, compete

6    for user attention.  UC ¶ 74.  And like the "social networks" market, Users also fail to define the

7    contours of the "social media" market by reference to cross-elasticity of demand.  *See supra* p.17.

8          C.    <u>Users</u> Fail To Plausibly Allege Monopoly Power

9          Monopoly  power  is  the  power  to  "profitably  raise  prices  substantially  above  the

10   competitive level."  *FTC v. Qualcomm Inc.*, 411 F. Supp. 3d 658, 684 (N.D. Cal. 2019).  Even

11   accepting  the  alleged  relevant  markets,  Users  have  not  plausibly  alleged  that  Facebook  has

12   monopoly power in either purported market, a necessary element of a Section 2 claim.  *See, e.g.*,

13   *Pac. Express, Inc. v. United Airlines, Inc.*, 959 F.2d 814, 817 (9th Cir. 1992).

14         In both markets, Users claim without support that Facebook's "share" exceeds 65%, UC

15   ¶ 78, but they make no allegations about what this number consists of.  Merely reciting a

16   percentage without alleging to what it refers—let alone how it was or could be calculated—is

17   conclusory and is not creditable.  And because "[p]laintiffs' only market share allegation does not

18   establish [Facebook's] market share in the actual market[] defined by the Complaint[s]," the UC

19   cannot  support  an  inference  of  monopoly  power  based  on  market  share.  *Rheumatology*

20   *Diagnostics Lab., Inc. v. Aetna, Inc.*, 2013 WL 3242245, at *14 (N.D. Cal. June 25, 2013); *Korea*

21   *Kumho Petrochemical v. Flexsys Am. LP*, 2008 WL 686834, at *9 (N.D. Cal. Mar. 11, 2008)

22   (granting  motion  to  dismiss  because,  "[a]lthough  Plaintiff  need  not  necessarily  quantify

23   [defendant's] market share with precision, Plaintiff must assert some *facts* in support of its

24   assertions of market power that suggest those assertions are plausible").

25         With respect to the alleged social media market in particular, the absence of detail is telling

26   because it is simply implausible that Facebook has monopoly power in a market that includes large

27   rivals like Apple's iMessage, Twitter, YouTube, Snapchat, and TikTok. UC ¶¶ 73-74, 80. Perhaps

28   for  that  reason,  Users'  market  share  allegations  appear  to  exclude  those  entities  without

explanation.  Apparently aware that their share-based allegations in the "social media" market are insufficient, Users claim to offer "direct" evidence of monopoly power based on two presentations, UC ¶ 77, both of which are nearly a decade old, and neither of which even comes close to serving as direct evidence of anything.  *See* Gringer Decl., Exs. 4, 5.  These presentations, on their face, do not track Users' alleged market definition and therefore are irrelevant.  And even if the markets did align, nothing in either document shows what the market share contained therein purports to measure—the very same problem that dooms Users' share allegations.  These "conclusory allegations do not establish direct evidence of [monopoly] power" or anything else.  *Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1180 (N.D. Cal. 2013).

Users do not even try to buttress their inadequate share-based allegations in the social network market.  And while it is completely unclear who might be in or out of this market, the UC alleges no facts to suggest Facebook has monopoly power in this market either.  Likewise, naked assertions about barriers to entry do not suffice.  UC ¶¶ 83, 88, 93-94.  Even assuming *arguendo* that there were adequate allegations about barriers to entry, that says nothing about whether a *single firm* who participates in that market has monopoly power.[10]

## III.  PLAINTIFFS HAVE NOT ADEQUATELY ALLEGED EXCLUSIONARY CONDUCT

### A.   Facebook Did Not Unlawfully Acquire A Monopoly

While Advertisers allege only a monopoly maintenance theory, Users allege that Facebook acquired monopoly power through deception about its privacy policies.  Specifically, Users allege that "Facebook lied about its data privacy practices," UC ¶¶ 21, 25, 28, "in order to entice users to join Facebook," *id.* ¶ 106; that "Facebook's representations to consumers regarding its data policies were instrumental to Facebook gaining and maintaining market share at the expense of its rivals," *id.* ¶ 108; and that if Users "had known the truth about Facebook's privacy practices" they "would not have agreed to give Facebook [] as much personal data," *id.* ¶¶ 21, 25, 28.  Users thus "allege a unified course of fraudulent conduct," *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097,

---

[10] For the same reasons they fail to plausibly allege monopoly power, Users fail to plausibly allege that Facebook had "a dangerous probability of achieving 'monopoly power'" in either alleged relevant market, and their attempted monopolization claims (Counts II & IV) accordingly fail on this basis.  *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1432-33 (9th Cir. 1995).

1103 (9th Cir. 2003), which forms the basis of Users' antitrust claims, *see* Dkt. 16-1 at 3 (describing Facebook's alleged deception as the "gravamen" of Users' Complaint).  Users' claims "'sound in fraud,' and the pleading of th[ose] claim[s] [] must satisfy . . . Rule 9(b)." *Vess*, 317 F.3d at 1103-04.

None of the conduct that supposedly forms the basis of the alleged deception is alleged with sufficient particularity.  Users allege that Facebook "promised users . . . that it would 'not use cookies to collect private information from any user,'" but then subsequently "allowed third parties to track Facebook users across the internet using cookies."  UC ¶¶ 106, 137.  And they claim that "Facebook initially maintained that" its "Beacon" advertising program "only tracked and maintained the activity of users that consented," which was allegedly "untrue."  *Id.* ¶ 120.  But there are no allegations explaining who made "promise[s]" to Facebook's users regarding cookies or how that person did so, just as the UC provides no explanation as to the manner in which, or to whom, Facebook "maintained" its supposedly untruthful description of the 2007 Beacon program. Nor is there any allegation about when either of these "statements" were made or to which named plaintiffs they were communicated, if any.  Accordingly, none of these purported representations satisfies Rule 9(b), which "requires the plaintiff to allege the particular circumstances surrounding [the] representations at issue." *Tabler v. Panera LLC*, 2020 WL 3544988, at *6 (N.D. Cal. June 30, 2020).

The UC's descriptions of other supposedly deceptive acts likewise lack the fundamental elements required under Rule 9(b).  With respect to much of the challenged conduct, Users fail to identify *any* underlying representation to Users, fail to explain how the representation was false, or both.  *See Vess*, 317 F.3d at 1105-06.  Users assert that "Facebook created information dossiers on millions of users and nonusers alike," but never identify any instance in which Facebook made any representations to Users about "dossiers," false or otherwise.  UC ¶ 139.  Similarly, the UC alleges that in 2012 Facebook announced that "future privacy changes would require user approval through voting." *Id.* ¶ 130.  But there are no facts alleged about how this policy change involved, as Users claim, a "promise" or "commitment" that Facebook would retain it permanently, let alone how Facebook's publicly-announced recession of the policy is consistent with a "pattern of

1    deception." *Id.*   The UC also challenges Facebook's failure to "disclose to its users" that it

2    allegedly "provid[ed] to third parties . . . user data marked 'private.'" *Id.* ¶ 118.  But Users offer

3    no allegations regarding how this impacted competition.

4           These pleading deficiencies are exacerbated by the legal rule that antitrust claims based on

5    alleged false advertising should "presumptively be ignored."[11]  *Am. Prof. Testing Serv., Inc. v.*

6    *Harcourt Brace Jovanovich Legal & Prof. Publ., Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997).  This

7    is because the likelihood of deceptive advertising leading to "significant creation of durable market

8    power is so small in most observed instances."   3B Phillip E. Areeda & Herbert Hovenkamp,

9    *Antitrust Law* ¶ 782b at 351 (4th ed. 2015) ("Areeda").  The reasons for this rule are obvious:  even

10   actually deceptive statements, particularly about one's own product, are discoverable and do not

11   obviously impede rivals from competing.  *Id.*  Thus, to overcome this presumption, a plaintiff must

12   plausibly and particularly allege that the alleged misrepresentations were, *inter alia*: "clearly

13   material, clearly likely to induce reasonable reliance, . . . and not readily susceptible of

14   neutralization or other offset by rivals."  *Harcourt*, 108 F.3d at 1152.  A failure to allege plausible

15   facts to meet each element of the test compels dismissal.  *See, e.g.*, *Tate v. Gas & Elec. Co.*, 230

16   F. Supp. 2d 1072, 1079-80 (N.D. Cal. 2002).

17          Here, the alleged misrepresentations are on their face reasonably susceptible to

18   neutralization by rivals in obvious ways.  For example, those firms could have improved their own

19   policies, or called attention to Facebook's supposed misstatements.  *See Genus Lifesciences Inc.*

20   *v. Lannett Co.*, 378 F. Supp. 3d 823, 842 (N.D. Cal. 2019) (dismissing claims under *Harcourt*

21   because plaintiff failed to allege why it was incapable of "pushing back" on false statements);

22   *Kinderstart*, 2007 WL 831806, at *8 (dismissing Section 2 claim because of insufficient

23   allegations that Google deprived competitors of ability to neutralize its statements, or that

24   competitors were unable to do so).  The UC never alleges any factual obstacles to any of this.

25          Users also fail to allege with particularity that (or how) Facebook's representations

26   impeded competition.  The few "[c]ases that recognize deception as exclusionary hinge . . . on

27

28   _____

[11] Facebook does not concede that these statements are "advertising," but it is clear that Users so
allege because otherwise they could not begin to allege a causal link between the statements and
Facebook's alleged monopoly power.

1   whether the conduct impaired rivals in a manner tending to bring about or protect a defendant's

2   monopoly power." *Rambus Inc. v. FTC*, 522 F.3d 456, 464 (D.C. Cir. 2008).  Representations

3   about a company's own product, like those at issue here, have "no particular tendency to exclude

4   rivals and thus to diminish competition." *Id*.  Unsurprisingly, the UC does not allege any facts

5   showing that Facebook's alleged misrepresentations prevented other well-resourced firms—like

6   Google or Snapchat—from competing effectively.  And again, nothing stopped any firm from

7   differentiating their own practices in response to the alleged misrepresentations.

8        These failings are unsurprising because the underlying theory is completely implausible.

9   Users allege that Facebook's representations about its privacy practices led to its success, and that

10  users would have turned to alternatives if Facebook had made different representations about its

11  privacy policies. *See, e.g.*, UC ¶ 3.  Users' theory is not cognizable if they fail to plausibly allege

12  that deception was the but-for cause of Facebook's supposed monopoly. *Rambus*, 522 F.3d at 464.

13  Plaintiffs have not so alleged, nor could they.  Instead, the UC offers competing theories for

14  Facebook's success, all more plausible than deception.  These include Facebook's "realness,"

15  which is alleged to be Facebook's "distinguishing feature," and its unique emphasis on connecting

16  friends, family, and other "verified relationships," which the UC says "fostered an incredible

17  amount of trust" among users.  UC ¶ 48; *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007)

18  (antitrust claims are implausible where there was "an obvious alternative explanation" on the face

19  of the complaint).  Users' allegations of deception are thus not enough to "nudge[] their claims

20  across the line from conceivable to plausible," compelling dismissal. *Id*. at 570.

21       **B.    None of Plaintiffs' Monopoly Maintenance Theories Are Cognizable**

22       All Plaintiffs advance a monopoly maintenance theory tied to the so-called "copy, acquire,

23  kill, strategy."  Plaintiffs allege a "monopoly broth" theory, arguing that nearly every action

24  alleged in the Complaints together amounts to a violation of Section 2.  "Monopoly broth" does

25  not allow a plaintiff to "alchemize" a "new form of antitrust liability" by combining distinct

26  Section 2 claims that fail on their own. *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S.

27  438, 457 (2009) ("Two wrong claims do not make one that is right.").  This requires an evaluation

28  of each allegedly anticompetitive act on its own.  And aggregating the competitive effects of a

1  series of actions, none of which is plausibly anticompetitive, "is of no assistance to [plaintiffs']

2  efforts to state a claim for relief" under Section 2.  *Foremost Pro Color, Inc. v. Eastman Kodak*

3  *Co.*, 703 F.2d 534, 543-44 (9th Cir. 1983).  No component of Plaintiffs' alleged monopoly

4  maintenance scheme is plausibly anticompetitive or otherwise cognizable.

5  **1.     Plaintiffs' Product Improvement Allegations Are Non-Cognizable**

6  Every firm, even an alleged monopolist, can lawfully improve its product offerings absent

7  special circumstances not alleged here.  *See, e.g.*, *In re Apple iPod iTunes Antitrust Litig.*, 796 F.

8  Supp. 2d 1137, 1143 (N.D. Cal. 2011).  Here, Plaintiffs allege that Facebook introduced product

9  features similar to those already offered by its competitors, *e.g.*, UC ¶¶ 200, 205; AC ¶ 14, and

10 that this somehow amounted to exclusionary conduct.  However, courts have consistently

11 recognized that "a design change" (such as adding the "Stories" feature to Instagram) "that

12 improves a product by providing a new benefit to consumers"—as demonstrated by its popularity

13 relative to Snapchat's offering, UC ¶ 200—is not cognizable by itself.  *Allied Orthopedic*

14 *Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998-1000 (9th Cir. 2010).  Neither

15 Complaint alleges any "associated anticompetitive conduct," and so the "proposition that product

16 improvement by itself does not violate Section 2, even if it is performed by a monopolist and harms

17 competitors as a result," holds.  *Id.*

18 **2.     Facebook's Acquisitions Were Not Exclusionary**

19 Plaintiffs belatedly challenge Facebook's acquisitions of three firms:  Instagram,

20 WhatsApp, and "tbh."  UC ¶¶ 186-94, 201-03, 207; AC ¶¶ 268-300, 301-23.[12]  Aside from the

21 conclusory allegation that "tbh"—an app about which Plaintiffs provide no information—was an

22 "anonymous social media app," UC ¶ 207, Plaintiffs do not allege that the acquired firms were

23 competitors in any alleged market.  Instead, Plaintiffs simply speculate that Instagram "*could*"

24 become a competitor, UC ¶ 189; AC ¶ 279 (emphasis added), and Advertisers merely describe

25 WhatsApp as having been a "nascent social platform," AC ¶ 322.[13]

26

27 ─────────────────
   [12] Again, Users also challenge Facebook's proposed acquisition of Giphy but fail to explain how
   this not-yet consummated deal has resulted in any competitive harms.  *See supra* n.8.

28 [13] The UC does not allege that WhatsApp could have, or had any plans to, enter the relevant
   markets alleged in that Complaint.  *See* UC ¶¶ 201-03.

No court has accepted the proposition advanced by Plaintiffs that acquisition of a firm that *could* become a competitor is anticompetitive. *See Twombly*, 550 U.S. at 555 (requiring "[f]actual allegations" that rise "above the speculative level"). "[T]o be condemned as exclusionary, a monopolist's act must have 'anticompetitive effect.'" *Rambus*, 522 F.3d at 463. The mere *potential* for competitive harm is not enough to violate Section 2. *See id.* The Supreme Court has not endorsed anything like Plaintiffs' theory, even under Section 7—the statute that expressly addresses acquisitions and seeks to stop them in their incipiency. *See United States v. Marine Bancorp.*, 418 U.S. 602, 625 (1974); *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 75 (D.D.C. 2017) ("Whether actual potential competition is a viable theory of section 7 liability has not been answered by the Supreme Court."). This is because it is impossible to predict whether or how a firm *not* competing in a particular alleged product market will enter that market, much less identify future successes. *See Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 71 (1st Cir. 2002). Judge Freeman considered similar—and, in many cases, identical—allegations related to the acquisitions of Instagram and WhatsApp and concluded that the allegations of potential harm to competition were "merely conclusory." 471 F. Supp. 3d at 1003 ("Plaintiffs provide no factual support for their allegations that Instagram and WhatsApp were willing to, or could, harvest and monetize social data to compete with Facebook."). The same can be said of the other various "would-be" competitors that Facebook either acquired or allegedly copied or killed. *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1385 (5th Cir. 1994).

### 3.    Facebook Did Not Unlawfully "Kill" Third Party App Developers

Plaintiffs allege that Facebook eliminated upstart competitors by denying third-party app developers access to Facebook's APIs and demanding concessions in contracts for user data shared with consent. UC ¶ 167; AC ¶¶ 216-18. This component of Plaintiffs' theory depends, first, on the contention that Facebook had a duty to deal with third-party app developers, which by Plaintiffs' telling were Facebook's competitors. No such duty exists. The theory also depends on the implausible and entirely unsupported claim that a series of non-exclusive vertical contracts somehow excluded competitors from the relevant markets.

### a) The API Policy Change Is Not Actionable

Under the antitrust laws "there is no duty to aid competitors." *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1131 (9th Cir. 2004) (quoting *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004)). "As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Linkline*, 555 U.S. at 448. "The one, limited exception to this general rule . . . comes under the Supreme Court's decision in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)." *Qualcomm*, 969 F.3d at 993. That exception exists "at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409. It requires a showing that a firm "(1) [] unilateral[ly] terminat[es] . . . a voluntary and profitable course of dealing; (2) the only conceivable rationale or purpose is to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition; and (3) the refusal to deal involves products that the defendant already sells in the existing market to other similarly situated customers." *Qualcomm*, 969 F.3d at 993-94 (citing *MetroNet*, 383 F.3d at 1132-33). The Supreme Court has "warn[ed] . . . that the *Aspen Skiing* exception should be applied"—if at all—"only in rare circumstances," *id.* at 994, and Judge Freeman stated just last week that she was "unlikely to entertain any allegations based solely on" *Aspen Skiing* given the few "existing exceptions from the proposition that there is no duty to aid competitors," *In re Google*, Dkt. 143 at 8.

Whatever is left of the *Aspen Skiing* exception after *Trinko* and the Ninth Circuit's recent decision in *Qualcomm*, it has no application here. **First**, in *Aspen Skiing* and the few other cases recognizing a duty to deal, the plaintiff and defendant cooperated to put forward a joint offering. 472 U.S. at 589-95. Here, there are no plausible allegations to that effect.

**Second**, Plaintiffs do not allege that developers provided Facebook with any value to access the APIs (to the contrary, access was provided for free), and thus changing the terms for access does not permit an inference that Facebook lost any profits. *Trinko*, 504 U.S. at 409. The "discontinuation of this arrangement" does not indicate, as it must, any "willingness to sacrifice short-term profits, let alone in a manner that was irrational but for its tendency to harm competition." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1076 (10th Cir. 2013) (Gorsuch, J.);

1  *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1142, 1151 (N.D. Cal. 2020) (dismissing

2  complaint because allegations that LinkedIn "denied access to the public portion of LinkedIn's

3  website" to "people analytics providers" did not state a claim that "LinkedIn sacrificed a profitable

4  course of dealing in the short term").  Indeed, Advertisers' allegations reflect an entirely rational

5  justification for Facebook's conduct—the protection of user privacy and data security and the

6  prevention of free-riding.  AC ¶¶ 502, 509; *see also SmileCare Dental Grp. v. Delta Dental Plan*

7  *of Cal., Inc.*, 88 F.3d 780, 786 (9th Cir. 1996) (dismissing complaint because the legitimacy of

8  policies to prevent free-riding "is a foregone conclusion requiring no further analysis"); *Stackla*,

9  2019 WL 4738288, at *5-*6 ("the public has a strong interest" in "allowing Facebook to exclude

10  those who act impermissibly on its platform and jeopardize user privacy").  A plaintiff cannot state

11  an antitrust claim by alleging conduct that is equally "consistent with" anticompetitive activity as

12  with a "rational and competitive business strategy."  *Twombly*, 550 U.S. at 554.  To be sure,

13  Plaintiffs say this was not the actual basis for Facebook's actions, but they fail to offer any factual

14  allegations supporting the conclusion—as the law requires—that Facebook's stated rationale was

15  not even "conceivable."  *Qualcomm*, 969 F.3d at 993; *Port Dock & Stone Corp. v. Oldcastle Ne.,*

16  *Inc.*, 507 F.3d 117, 124-25 (2d Cir. 2007) (refusal to deal claim fails if "[t]he facts pleaded"

17  "sugges[t] . . . the purpose of increasing efficiency in some way").

18      ***Third***, Plaintiffs do not allege that Facebook continues to make the API data widely

19  available.  The purpose of this requirement is to capture situations in which a firm deals with

20  "certain customers but merely refuses to sell to its competitors."  *MetroNet*, 383 F.3d at 1133.

21  There is no allegation that this data was ever made available at retail or to anyone other than "third-

22  party app developers"—Facebook's purported competitors.  UC ¶ 175; AC ¶ 126.  The court in

23  *Reveal Chat I* already found that this prong of the *Aspen Skiing* rule is not satisfied by the API

24  withdrawal, 471 F. Supp. 3d at 1002, and Judge Freeman recently reiterated that a firm "has no

25  duty to help its competitors survive or expand" where, as here, it introduces a design change to a

26  competitor-facing product, *In re Google*, Dkt. 143 at 8-9.

27          **b)   The Data-Sharing Agreements Were Not Exclusionary**

28      Plaintiffs' allegations that Facebook's data-sharing agreements with certain third-party

1   developers reduced competition are also implausible.  UC ¶¶ 181-85; AC ¶¶ 216-33.  As a matter

2   of law, vertical contracts like these agreements can only "injure competition" if they "foreclose

3   competitors from entering or competing in a market" or "facilitate[e] horizontal collusion."

4   *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012).  Neither result could have

5   plausibly obtained from these agreements.  Neither complaint alleges that the data-sharing

6   agreements prevented new competitors from organically collecting user data or collecting data

7   from independent sources not controlled by Facebook.  Moreover, Plaintiffs do not allege the

8   agreements were exclusive and thus did not preclude signatories from acquiring data from both

9   Facebook and other sources, including their own websites or apps.  And, as Judge Freeman

10  observed, this entire "scheme," pursuant to which Facebook supposedly "only allowed its

11  successful competitors to stay on the platform" via data-sharing agreements "and cut out the

12  unsuccessful ones [,] . . . doesn't make any sense."  *Reveal Chat* 12/3/2020 MTD Hr'g Tr. at 6.[14]

13  **IV.   PLAINTIFFS LACK ANTITRUST STANDING**

14  "Congress did not intend to provide a private remedy for all injuries that might conceivably

15  be traced to an antitrust violation."  *Amarel v. Connell*, 102 F.2d 1494, 1507 (9th Cir. 1996).

16  Instead, courts inquire into private plaintiffs' "'antitrust standing'" to determine whether they "are

17  the appropriate plaintiffs to enforce the antitrust laws."  *Feitelson v. Google Inc.*, 80 F. Supp. 3d

18  1019, 1026 (N.D. Cal. 2015).  For a private plaintiff to establish antitrust standing, it is necessary

19  but not sufficient to plausibly allege antitrust injury, which includes the following elements:  "(1)

20  unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the

21  conduct unlawful, [] (4) that is of the type the antitrust laws were intended to prevent."  *Somers v.*

22  *Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013).  Courts also evaluate "the directness of the injury,"

23  "the speculative measure of the harm," and "the complexity in apportioning damages" in assessing

24  whether a private plaintiff has antitrust standing.  *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190

25  F.3d 1051, 1054 (9th Cir. 1999).

26

27  [14] All Plaintiffs' failure to allege cognizable exclusionary conduct defeats both their

28  monopolization and attempted monopolization claims because the conduct requirement for both types of claims is the same.  *Rebel Oil*, 51 F.3d at 1432; *Olympia Equip. Leasing Co. v. Western Union Tel. Co.*, 797 F.2d 370, 373 (7th Cir. 1986) (Posner, J.); Areeda ¶ 806a.

1

2

A.     <u>Users</u> **Have Not Alleged An Antitrust Injury**

**1.     Lost "Information And Attention" Is Not A Cognizable Injury**

3

4

5

6

7

The UC presents an entirely novel and unsupported theory of antitrust liability:  that Users are entitled to money damages because they allegedly provided Facebook with more "personal information and attention" than they would have in a more competitive market.  UC ¶ 222.  To the extent this can be characterized as an "injury" at all, it is not one that confers antitrust standing or for which damages are available under the antitrust laws.

8

9

10

11

12

13

14

15

16

Only those plaintiffs injured in their "business or property" have suffered an antitrust injury.  15 U.S.C. § 15.  "[B]usiness" refers to "that which occupies the time, attention, and labor of [a plaintiff] for the purpose of . . . *pecuniary* reward," *Fine v. Barry & Enright Prods.*, 731 F.2d 1394, 1397 (9th Cir. 1984) (emphasis added), and "'property' comprehends anything of material value owned or possessed," *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338 (1979).  Accordingly, the Sherman Act "allow[s] recovery only if a plaintiff can demonstrate a *financial* loss."  *Stationary Eng'rs Local 39 v. Philip Morris, Inc.*, 1998 WL 476265, at *4, *9 (N.D. Cal. Apr. 30, 1998) (emphasis added).  Users have not done so, nor could they.  Facebook provides all its user-facing services for free, and Users allege no facts suggesting that they had a "financial loss."

17

18

19

20

21

22

23

24

25

26

27

Users do not really claim any injury at all.   The quality-adjusted price of a free product is always zero, so Users could not have overpaid for using Facebook.   And their speculative allegations that Facebook "artificially decrease[d] compensation to consumers for their information and attention," *e.g.*, UC ¶ 265, are simply another expression of Users' complaint that the quality-adjusted price of zero was somehow too high.  Users cannot even claim any injury tied to their own data being exposed.  If there were any injury here, and there is not, it would be, at best, a "personal injur[y]" for which there is no antitrust remedy.  *Reiter*, 442 U.S. at 339.  Personal, as distinct from economic, injuries are simply not cognizable under the antitrust laws.  *See, e.g.*, *Bhan v. NME Hosps., Inc.*, 669 F. Supp. 998, 1013 (E.D. Cal. 1987) ("lost . . . friends" and "marred" "reputation . . . are personal injuries that are simply not compensable under the antitrust laws"), *aff'd*, 929 F.2d 1404 (9th Cir. 1991).

28

Deviating from existing precedent and recognizing this kind of speculative injury as

1    cognizable under the Sherman Act would undermine several key purposes of the antitrust standing

2    doctrine, particularly "(1) facilitating more effective enforcement of the antitrust laws; (2) avoiding

3    complicated damages calculations; and (3) eliminating duplicative damages against antitrust

4    defendants." *Apple Inc v. Pepper*, 139 S. Ct. 1514, 1524 (2019).  Apportioning damages between

5    Users would be nearly impossible.  The "compensation" of which the Users were deprived for

6    their non-pecuniary resources cannot be assessed because everyone values those resources

7    differently—if at all—and there is no way to calculate the baseline level of information and

8    attention Users would have provided in a more competitive market.  These "complicated theories"

9    "involving massive evidence," just to "ascertain damages," counsel against finding antitrust

10   standing.  *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 543 (9th Cir. 1987).

11                    **2.       Users' Alleged Injury From Their Monopoly Acquisition Theory Is**

12               **Speculative**

13           "[C]onclusory and speculative" allegations that provide "no facts . . . that would render

14   [the] threatened injuries more concrete than hypothetical" are insufficient to establish antitrust

15   injury.  *Feitelson*, 80 F. Supp. 3d at 1029.

16           The UC alleges that Facebook acquired its purported monopoly power through

17   misrepresentations about its privacy practices to the detriment of its early competitors, like

18   Myspace.  UC ¶¶ 101-40.  But the UC offers no allegations that these competitors would have

19   remained viable but for the challenged conduct.  *Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S.

20   328, 339 n.8 (1990) ("The antitrust injury requirement cannot be met by broad allegations of harm

21   to the 'market' as an abstract entity.").  For instance, it contains no information about these firms'

22   business plans, economics, or strategies.  And, critically, it alleges that these firms' privacy policies

23   were "lax" even in the face of competition from Facebook, leaving to guesswork whether, if any

24   had succeeded, Users would have in fact received the higher "compensation" in the form of privacy

25   protections they claim they would have received in a more competitive market.  UC ¶ 95.  There

26   are also no allegations of plans for privacy improvements.

27           Users then leap to the conclusion that "fair competition" "would have required Facebook"

28   to pay consumers "in return for consumers' data."  UC ¶ 10.  But there are no non-conclusory

allegations to support such counter-intuitive speculation.  Certainly, no Facebook competitor is alleged to have differentiated itself by engaging in the counter-intuitive strategy of paying users to use their free product.  *See Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone Inc.*, 140 F.3d 1228, 1233 (9th Cir. 1998) (no antitrust injury if plaintiff would have suffered "the same injury" absent the challenged conduct).  Given that Plaintiffs allege that Facebook had well over 40,000 competitors, AC ¶ 214; UC ¶ 180, none of whom are alleged to have adopted this strategy, there is no reason to credit this theory, even at the pleading stage.

### 3.   <u>Users</u>' Purported Injuries Were Not Caused By Lost Competition

Antitrust injury requires that a plaintiff's injuries "flow[] from that which makes [the defendant's] conduct unlawful." *Somers*, 729 F.3d at 963.  That is, Users must have been injured by a reduction in competition in the alleged markets caused by Facebook's conduct.  *Qualcomm*, 969 F.3d at 999-1000.  Users do not plausibly tie their supposed harms to any purportedly competition-reducing aspect of Facebook's conduct.

The UC's allegations about how generic "users" were injured are insufficient because they are not tied to any harm to competition.  ***First***, Users assert that they might have "benefitted from" more favorable "data privacy practices."  UC ¶ 226.  However, the UC does not explain why Facebook's competitors in fact did not respond to Facebook's representations about its privacy policies with better policies and practices of their own.  Indeed, the UC alleges that Facebook's early competitors' privacy practices were deficient, *id.* ¶ 104 (describing "Myspace's lax privacy practices"), and did not respond to Facebook's improved policies, rendering it implausible that any purportedly excluded firms would have somehow offered better privacy terms than Facebook. ***Second***, Users claim that they would have benefitted from improved "social media application quality." *Id.* ¶ 226.  But there is no plausible factual allegation that would address how firms with no plans to enter the relevant markets might have competed on quality or provided a better user experience than Facebook or its actual competitors, and the UC contends that even products that were "better" would not have succeeded. *Id.* ¶ 87. *Third*, they assert that they "received substantially less *compensation* . . . than they would have absent Facebook's . . . conduct." *E.g.*,

1   *id.* ¶ 266.  But Facebook is already free and there are no plausible facts alleged to support the

2   argument that Facebook would have paid Users absent the conduct at issue.  *See supra* pp.28-30.

3   **B.    No Plaintiffs Were Injured By "Copy, Acquire, Kill"**

4        Both Complaints allege that Facebook maintained its supposed monopoly power through

5   a strategy built around the withdrawal of APIs and data-sharing contracts designed to neutralize

6   emergent competitors.  UC ¶¶ 169-213; AC ¶¶ 216-33, 245-323.  But neither Complaint alleges

7   facts regarding how any of the purportedly affected firms would have competed more effectively

8   but for the challenged conduct, particularly in light of the allegations that a competitor as well-

9   resourced as Google was unsuccessful because of market forces, UC ¶¶ 131-35; AC ¶¶ 74-82, and

10  Plaintiffs' own insistence that, because of network effects, only one firm was destined to be

11  successful in the alleged relevant markets, UC ¶ 85; AC ¶ 70; *see Lucas Auto.*, 140 F.3d at 1233.

12       The allegations about the firms Facebook acquired, including Instagram and WhatsApp,

13  suffer from the same defects.  There are no facts alleged to allow the Court to conclude that these

14  firms had any unique ability to enter any of the alleged markets.  *Cf. Reveal Chat I*, 471 F. Supp.

15  3d at 1002-03.  Plaintiffs speculate that, "had it continued to add features, Instagram *could* have

16  threatened Facebook[]" in the alleged relevant markets.  UC ¶ 189 (emphasis added).  Likewise,

17  Plaintiffs do not allege any plans on WhatsApp's part to expand beyond messaging services.  *Id.*

18  ¶¶ 201-03.  Without these types of factual allegations, the Court cannot do more than speculate

19  that the challenged conduct caused Plaintiffs antitrust injury.

20  **C.    <u>Advertisers</u> Have Not Alleged An Antitrust Injury**

21       **1.    The Alleged Injuries From Advertisers' Section 2 Claims Are**

22            **Conclusory**

23       Advertisers summarily complain only of "supracompetitive" ad pricing.  *E.g.*, AC ¶ 486.

24  But Advertisers fail to plausibly allege that *they* paid a supracompetitive price for advertising.  *See*

25  *Intel Corp. v. Fortress Inv. Grp. LLC*, --- F. Supp. 3d ----, 2021 WL 51727, at *14 (N.D. Cal. Jan.

26  6, 2021) (allegations of "supracompetitive pricing" "require plausibility").   The only price

27  allegation in the AC contends that Facebook charges far *less* for advertising than "titan" Google.

28  AC ¶ 438.  Meanwhile, Advertisers repeatedly extol the superiority of ads on Facebook and the

1    benefit they derive from the quality of advertising on Facebook.  *E.g.*, *id.* ¶¶ 414, 428-29, 436,

2    440-41.  "Generally you must pay more for higher quality."  *Blue Cross Blue Shield v. Marshfield*

3    *Clinic*, 65 F.3d 1406, 1412 (7th Cir. 1995).  This is not an antitrust violation.

4         Moreover, plaintiffs like Advertisers claiming to be injured from "supracompetitive"

5    purchase prices are required to, at a minimum, identify the competitive price and provide

6    "information about, *e.g.*, what [they] paid" to adequately plead injury.  *Fortress*, 2021 WL 51727,

7    at *15.  The AC contains no such allegations.  And even if there were allegations of higher prices,

8    higher prices by themselves are not an adequate allegation of injury.  As the Supreme Court

9    recently explained: if "output is expanding at the same time prices are increasing, rising prices are

10   equally consistent with growing demand."  *Am. Express*, 138 S. Ct. at 2288; *see also Safeway Inc.*

11   *v. Abbott Labs.*, 761 F. Supp. 2d 874, 887 (N.D. Cal. 2011) ("supracompetitive pricing must be

12   accompanied by restricted output").  Since Plaintiffs allege increases in output, UC ¶ 226, the

13   allegation of "supracompetitive" prices does not state a claim.

14         **2.**    **Advertisers Lack Antitrust Standing To Pursue Their Section 1 Claim**

15         Advertisers also lack standing to pursue their claim that the GNBA violates Section 1 of

16   the Sherman Act.[15]  Similar to their Section 2 claims, Advertisers' Section 1 claim is premised on

17   a theory that they paid "supracompetitive prices."  AC ¶¶ 22, 486.  But as explained above, those

18   allegations are conclusory and lack the specificity required to survive a motion to dismiss.

19         The GNBA concerns advertising that takes place off Facebook on third-party mobile

20   applications.  AC ¶¶ 18, 401.  Advertisers allege that they were injured only as purchasers of ads

21   in the social advertising market on Facebook's platforms, *id.* ¶¶ 22, 412, that the social advertising

22   market is distinct from (and not substitutable with) "programmatic and exchange-based ad

23   markets" consisting of digital advertising on third-party websites and applications, *id.* ¶¶ 18, 412-

24   50, and that the GNBA restrained competition only in the exchange-based ad markets, *id.* ¶¶ 18,

25   401, 411.  Advertisers are thus alleging harm in one alleged market (social advertising) by virtue

26   of an agreement that they say restrained competition in a separate alleged market (programmatic

27   and exchange-based advertising).  This theory of harm is plainly inadequate.

28
_____
[15] Users do not challenge the GNBA.

1    *First*, Advertisers fail to put forth any plausible allegations that the GNBA caused their

2    alleged injury.  *See Somers*, 729 F.3d at 964 (explaining that to have antitrust standing a plaintiff

3    must "suffer[] an injury caused by [] anticompetitive conduct").  The AC does not contain any

4    plausible allegations that the GNBA caused Facebook's ad prices to increase.  Instead, Advertisers

5    allege in conclusory terms that the GNBA somehow "propped up" the allegedly supracompetitive

6    prices that Facebook was already charging for "social advertising."  AC ¶ 406.  But while

7    Advertisers allege in conclusory terms that the GNBA was an agreement to "divide and segment

8    markets," *id.* ¶ 411, they do nothing to allege facts explaining how, absent the GNBA, Google was

9    poised to "poach advertising sales from Facebook" on *Facebook's own platforms* or anywhere in

10   the supposed *social advertising* market.  *See id.* ¶ 410.  This case is therefore distinct from cases

11   in which plaintiffs demonstrated causation via a connection between prices in two allegedly

12   separate markets.  *Cf. Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 989 (9th Cir. 2000);

13   *Amarel*, 102 F.3d at 1508, 1512.  Similarly, Advertisers have not plausibly alleged—as they

14   must—that they are a "consumer . . . or a competitor of the alleged violator in the restrained

15   market."  *Somers*, 729 F.3d at 963.  As explained, Advertisers have put forth no plausible, non-

16   conclusory allegations that the GNBA restrained competition in the alleged *social advertising*

17   market in which they participate.  Thus, Advertisers have not adequately alleged they are

18   consumers "in the restrained market," *id.*, and parties "whose injuries . . . are experienced in

19   another market do not suffer an antitrust injury," *Am. Ad*, 190 F.3d at 1057.

20   *Second*, even if Advertisers adequately alleged some plausible theory under which the

21   GNBA could impact prices in the alleged social advertising market, their theory of harm is far too

22   speculative to support antitrust standing.  *See Assoc. Gen. Contractors of Cal., Inc. v. Cal. State*

23   *Council of Carpenters*, 459 U.S. 519, 541 (1983).  Unable to identify a specific impact the GNBA

24   had on the prices Facebook charges for advertising on its own platforms, Advertisers do nothing

25   more than assert in broad terms that the GNBA must have had some impact on prices that they

26   allege were supracompetitive before the GNBA was executed.  *See* AC ¶ 27 (alleging Plaintiff

27   Joshua Jeon paid supracompetitive prices for Facebook ads purchased in April 2016); *id.* ¶ 400

28   (alleging the GNBA was executed in September 2018).  At the same time, however, Advertisers

1    identify in support of their Section 2 claims a laundry list of other issues that purportedly permitted

2    Facebook to charge and maintain supracompetitive pricing.  *See id.* ¶¶ 44-368.   Those

3    allegations—themselves insufficient to support any antitrust claim—concerning conduct that had

4    nothing to do with, and largely predated, the GNBA underscore the lack of any alleged direct

5    connection between the GNBA and the alleged harm.  *See Assoc. Gen. Contractors*, 459 U.S. at

6    542 (damages speculative when "alleged effects . . . produced by independent factors").

7         ***Third***, even if the Court were to conclude that Advertisers have alleged some form of injury

8    in the alleged social advertising market because of Facebook's alleged conduct in what is alleged

9    to be a separate market, Advertisers are not efficient enforcers of claims arising out of the GNBA.

10   As the Supreme Court held, "[t]he existence of an identifiable class of persons whose self-

11   interest . . . motivate[s] them to vindicate the public interest in antitrust enforcement diminishes

12   the justification for allowing a more remote party . . . to perform the office of a private attorney

13   general." *Assoc. Gen. Contractors*, 459 U.S. at 542.  Here, Advertisers are, at best, a remote

14   plaintiff who allegedly suffered some indirect harm, perpetrated in unspecified ways and allegedly

15   arising from the GNBA.  While Facebook rejects any notion that the GNBA constitutes an

16   anticompetitive agreement, there are nonetheless other potential plaintiffs—specifically,

17   advertisers who actually purchased ads on Google's ad exchanges—whose self-interest would

18   motivate them to pursue Section 1 claims arising out of the GNBA.  And they are doing exactly

19   that.  *See supra* n.4.  Accordingly, even if the Court were to find Advertisers had sufficiently

20   alleged antitrust injury, Advertisers still lack antitrust standing because they are not the most

21   efficient enforcers to bring claims arising from the GNBA.  *See Lucas v. Bechtel Corp.*, 800 F.2d

22   839, 844 (9th Cir. 1986) (no antitrust standing where defendants' "competitors [were] much more

23   immediate victims of the alleged conspiracy, and an action by them would encounter none of the

24   conceptual difficulties that encumber the [plaintiffs'] claim").

25        ***Fourth,*** Advertisers allege the Agreement was executed in September 2018, but five of the

26   named Plaintiffs—Affilious, Jessyca Frederick, Joshua Jeon, 406 Property Services, PLLC, and

27   Mark Young d/b/a Dinkum Hair—did not purchase advertising after that date.  *See AC* ¶¶ 24, 25,

28   27, 28; Decl. of Kristin Armitage ¶ 4.  These five Advertisers necessarily cannot claim causal

antitrust injury.  *See* 15 U.S.C. § 15(a) (plaintiff seeking monetary damages for antitrust violations must prove that he has been "injured in his business or property.").

## V.   UsErs FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT

Users' unjust enrichment claims under California law (*see* UC Fifth Claim for Relief, ¶¶ 308-17) should be dismissed with prejudice for three independent reasons.

*First*, there is no cause of action for unjust enrichment under California law.  *See, e.g.*, *Herskowitz v. Apple Inc.*, 940 F. Supp. 2d 1131, 1148 (N.D. Cal. 2013) (collecting cases).

*Second*, Users offer no basis other than their defective antitrust allegations for concluding that any alleged enrichment of Facebook was unjust.  Where a plaintiff's claim of unjust enrichment "does not allege any distinct purported impropriety, but depends entirely on the allegation that the defendants benefitted from actions that are unlawful under other theories of liability in their complaint," the unjust enrichment claim must be dismissed when those other claims are dismissed.  *In re Late Fee Litig.*, 528 F. Supp. 2d 953, 967 (N.D. Cal. 2007).

*Third*, Users' unjust enrichment claims should be dismissed because there is a contractual relationship between each User and Facebook.  *See, e.g.*, UC ¶ 5 ("When users sign up for a Facebook account, they agree to certain terms.").  Certain federal courts in California have construed unjust enrichment claims under California law as quasi-contract claims seeking restitution.  *See, e.g.*, *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015).  But it is "well settled that an action based on an implied-in-fact or quasi-contract cannot lie where there exists between the parties a valid express contract covering the same subject matter."  *O'Connor v. Uber Techs., Inc.*, 58 F. Supp. 3d 989, 999-1000 (N.D. Cal. 2014).  Here, the terms govern Users' use of Facebook's services and dismissal is appropriate.  *See Letizia v. Facebook, Inc.*, 267 F. Supp. 3d 1235, 1253-54 (N.D. Cal. 2017).

## CONCLUSION

For the reasons discussed, Plaintiffs' claims are untimely and untenable.  This Court should grant Facebook's motion to dismiss with prejudice.

1   Dated:  May 20, 2021                    Respectfully submitted,

2

3                                           By: /s/ Sonal N. Mehta

4                                           Sonal N. Mehta (SBN: 222086)
                                            WILMER CUTLER PICKERING HALE AND
5                                           DORR LLP
                                            950 Page Mill Road
6                                           Palo Alto, California 94303
                                            Telephone:  (650) 858-6000
7                                           Facsimile:  (650) 858-6100
                                            Email:  Sonal.Mehta@wilmerhale.com
8
                                            David Z. Gringer (*pro hac vice*)
9                                           WILMER CUTLER PICKERING HALE AND
                                            DORR LLP
10                                          1875 Pennsylvania Avenue NW
                                            Washington, DC 20006
11                                          Telephone:  (202) 663-6000
                                            Facsimile:  (202) 663-6363
12                                          Email:  David.Gringer@wilmerhale.com

13

14                                          *Attorneys for Defendant Facebook, Inc.*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that on this 20th day of May, 2021, I electronically transmitted the

3   foregoing document to the Clerk's Office using the CM/ECF System.

4

5                                                    */s/ Sonal N. Mehta*

                                                     Sonal N. Mehta
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28