Warren Postman (Bar No. 330869)
  wdp@kellerlenkner.com
Jason Ethridge (admitted *pro hac vice*)
  jason.ethridge@kellerlenkner.com
**KELLER LENKNER LLC**
1300 I Street, N.W., Suite 400E
Washington, DC 20005
(202) 918-1123

Ashley Keller (admitted *pro hac vice*)
  ack@kellerlenkner.com
Benjamin Whiting (admitted *pro hac vice*)
  ben.whiting@kellerlenkner.com
Jason A. Zweig (admitted *pro hac vice*)
  jaz@kellerlenkner.com
**KELLER LENKNER LLC**
150 N. Riverside Plaza, Suite 4270
Chicago, IL 60606
(312) 741-5220

*Interim Counsel for the Consumer Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, SARAH GRABERT, and RACHEL BANKS KUPCHO, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs,*<br><br>vs.<br><br>FACEBOOK, INC.,<br><br>*Defendant.*<br><br>This Document Relates To: All Actions | Consolidated Case No. 5:20-cv-08570-LHK<br><br>**PLAINTIFFS' OPPOSITION TO FACEBOOK'S MOTION TO DISQUALIFY KELLER LENKNER LLC**<br><br>Hon. Lucy H. Koh<br>Date:  September 30, 2021<br>Time: 1:30 p.m.<br>Courtroom: 8 |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................................... 3

LEGAL STANDARDS ................................................................................................................... 8

   I.   Disqualification Requires A Showing That The Challenged Firm Has A Conflict, And That The Conflict Will Have A Material Impact On This Proceeding. ......................................... 8

   II.   California's Rules Of Professional Conduct Explicitly Permit The Use Of Ethical Screens To Prevent The Imputation Of Conflicts................................................................................. 9

ARGUMENT ................................................................................................................................ 11

   I.   Keller Lenkner Has No Imputed Conflict. ........................................................................ 11

     A.   California Rules Allow The Use Of A Screen Here Because Mr. Pak's Participation In The Previous Facebook Case Was Not "Substantial." ....................................................... 11

     B.   The Screen Was Timely. ................................................................................................ 16

     C.   The Notice Was Prompt. ................................................................................................ 20

   II.   Even Assuming A Conflict, No Disqualification Would Be Warranted............................. 21

     A.   Some Adverse Impact On The Proceedings Is Required To Warrant Disqualification In Every Conflicts Case. ...................................................................................................... 21

     B.   A Screen Can Be Used In These Circumstances To Prevent Adverse Impact................. 23

CONCLUSION ............................................................................................................................. 25

# TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE(s)**

*Advanced Messaging Technologies, Inc. v. EasyLink Services International Corp*,
   913 F. Supp. 2d 900 (C.D. Cal. 2012). ........................................................................... 15, 24

*Bryant v. Donahoe*,
   No. 11-CV-10432, 2012 WL 12884904 (C.D. Cal. Oct. 10, 2012) ................................. 16, 24

*In re Cnty. of Los Angeles*,
   223 F.3d 990 (9th Cir. 2000) .................................................................... 3, 22, 23, 24

*People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*,
   980 P.2d 371 (Cal. 1999) ................................................................................................. 24

*Farhang v. Indian Inst. of Tech.*,
   08-CV-2658, 2009 WL 3459455 (N.D. Cal. Oct. 27, 2009) ............................................. 24

*Flatt v. Superior Ct.*,
   885 P.2d 950 (Cal. 1994) ................................................................................................. 24

*Fremont Indem. Co. v. Fremont Gen. Corp.*,
   49 Cal. Rptr. 3d 82 (Cal. Ct. App. 2006) ........................................................................ 13

*Guifu Li v. A Perfect Day Franchise, Inc.*,
   No. 11-CV-01189, 2011 WL 4635176 (N.D. Cal. Oct. 5, 2011) ..................................... 15, 24

*Joseph v. City of San Jose*,
   No. 19-CV-01294, 2020 WL 1031899 (N.D. Cal. Mar. 3, 2020) ..........................................9

*Kane v. Chobani, Inc.*,
   No. 12-CV-02425, 2013 WL 3991107 (N.D. Cal. Aug. 2, 2013) ................................. *passim*

*Kirk v. First Am. Title Ins. Co.*,
   108 Cal. Rptr. 3d 620 (Cal. Ct. App. 2010) ................................................................. *passim*

*In re Marriage of Murchison*,
   199 Cal. Rptr. 3d 800 (Cal. Ct. App. 2016) .......................................................................9

*McElroy v. Pac. Autism Ctr. for Educ.*,
   No. 14-CV-04118, 2015 WL 2251057 (N.D. Cal. May 13, 2015) (Koh, J.) .................. *passim*

*Nat'l Grange of Ord. of Patrons of Husbandry v. Cal. Guild*,
   250 Cal. Rptr. 3d 705 (Cal. Ct. App. 2019) ............................................................. 14, 23, 24

*Neal v. Health Net, Inc.*,
   123 Cal. Rptr. 2d 202 (Cal. Ct. App. 2002) .......................................................................9

*Oaks Mgmt. Corp. v. Superior Ct.*,
   51 Cal. Rptr. 3d 561 (Cal. Ct. App. 2006) ..................................................................... 22

**CASES (cont'd)**                                                                     **PAGE(s)**

*S.E.C. v. King Chuen Tang*,
    831 F. Supp. 2d 1130 (N.D. Cal. 2011) ................................................................. 8

*Sharp v. Next Entm't, Inc.*,
    78 Cal. Rptr. 3d 37 (Cal. Ct. App. 2008) ............................................................. 10

*Silva v. TEKsystems, Inc.*,
    No. 12-CV-05347, 2013 WL 3939500 (N.D. Cal. July 25, 2013) ...................................... 1, 2

*Talon Research., LLC v. Toshiba American Electronic. Components, Inc.*,
    No. 11-CV-04819, 2012 WL 601811 (N.D. Cal. Feb. 23, 2012) ..................................... 15, 24

*Wausau Business Insurance Co. v. Diamond Contract Services, Inc.*,
    No. 10-CV-3192, 2010 WL 11549716 (C.D. Cal. Sept. 23, 2010) ................................... 15, 24

**Other Authorities**

ABA Model Rule 1.6 .......................................................................................... 3

California Rules of Professional Conduct Rule 1.7 .......................................................... 17

California Rules of Professional Conduct Rule 1.9 ........................................................ *passim*

California Rules of Professional Conduct Rule 1.10 ....................................................... *passim*

PLAINTIFFS' OPPOSITION TO FACEBOOK'S MOTION TO DISQUALIFY
Case No. 5:20-cv-08570-LHK

1

## INTRODUCTION

2      Facebook's motion does not demonstrate that Keller Lenkner ("KL") violated California's

3  Rules of Professional Conduct in any way.  Much less does it make the *additional* showing required

4  for disqualification: that "allowing [KL] to remain on the case will affect the outcome of the

5  proceedings before the court." *Kane v. Chobani, Inc*., No. 12-CV-02425, 2013 WL 3991107, at *14

6  (N.D. Cal. Aug. 2, 2013) (Koh, J.).   Instead, the motion (1) backtracks from representations

7  Facebook made to the Court; (2) misleadingly cites cases decided under California's old Rules of

8  Professional Conduct ("Rules"), which were later amended specifically to allow the use of a screen

9  in circumstances such as these; (3) relies on inaccurate, meritless quibbles with the timing and notice

10 of the screening procedures KL employed; and (4) obscures the fact that KL never obtained any

11 confidential information about Facebook and has absolutely no unfair advantage in this case.   This

12 is precisely the sort of "tactical abuse" that has led this Court to warn that attempts

13 "to disqualify counsel are strongly disfavored."  *Silva v. TEKsystems, Inc*., No. 12-CV-05347, 2013

14 WL 3939500, at *2 (N.D. Cal. July 25, 2013) (Koh, J.) (internal quotation marks omitted).

15      *First*, after telling this Court that it was interested merely in ensuring that "some ethical walls

16 [are] put in place," 3/18/21 Hrg. Tr. 8:2-4—a representation upon which this Court no doubt relied

17 when appointing KL to represent the User Class—Facebook has reversed course.  It now insists that

18 KL must be automatically disqualified, "regardless of any effort to impose an ethical screen," Mot.

19 to Disqualify Keller Lenkner LLC, D.E. 93 ("Mot.") at 22, because a single junior associate once

20 had a minor role in representing Facebook for six months on a different matter at his previous firm.

21      *Second*, in urging this result, Facebook fails to engage with the legal standard and instead

22 relies on cases decided before California amended its Rules specifically to allow the use of a screen

23 in this situation.  Under the current Rules, an ethical screen prevents imputation of a conflict to the

24 lawyer's entire firm so long as the lawyer's previous participation in a related matter was not

25 "substantial."  California Rules of Professional Conduct Rule 1.10 (2018).  In defining "substantial

26 participation," the Rules set forth a four-factor balancing test that turns on (1) the relevant lawyer's

27 level of responsibility, (2) time spent on the matter, (3) extent of advice to or personal contact with

28 the client, and (4) the extent of exposure to confidential information.  *See id.* Cmt. 1.  Although

1

Facebook uses vague generalities to try to paint Albert Pak as a central architect of its defense, Mr. Pak in fact played a minor role as a fourth-year associate in a sprawling matter that likely employed more than 100 outside attorneys, spanned at least four law firms, *see* Pak Decl. ¶¶ 7, 10, 11, and rang up untold tens—or even hundreds—of thousands of billable hours.  As one of the most junior lawyers on a large team assessing legal experts, he largely reviewed documents, wrote memos, assisted more senior lawyers in coordinating expert-witness workstreams, and listened (mostly silently) on weekly status calls. *Id.* ¶¶ 12-15.  These tasks were focused on a narrow slice of the matter, and Mr. Pak was therefore entirely uninvolved in a wide range of other aspects of the matter. Mr. Pak's participation was not substantial under the balancing test in Rule 1.10, which means KL's screen prevented imputation of his conflict.

*Third,* Facebook's strained attempts to manufacture a defect with the notice and timing of KL's ethical screen do not withstand scrutiny.  Facebook argues KL should have erected its ethical screen immediately after Mr. Pak joined the firm.  But at that time, there was nothing to screen Mr. Pak from: KL had not even begun evaluating the potential claims underlying this suit, and the Rules do not require a screen until a firm "represent[s]" a client adverse to a lawyer's former client.  Rules 1.9, 1.10.  At every step, KL took appropriate measures to ensure that nobody at KL ever discussed the claims in this case with Mr. Pak, and KL imposed a formal firm-wide screen immediately upon deciding to pursue this case.  Facebook also argues that KL's notice of the screen was too late.  Once again, Facebook's position has changed since it appeared before this Court.  But in any event, the Rules do not specifically define what constitutes prompt notice, and the notice here was prompt in light of the purpose of the Rule: Facebook has had a full opportunity to learn about the screening measures KL put in place before any significant litigation has taken place in this case.  Moreover, Facebook does not even attempt to argue it would have requested additional screening measures if it had received notice earlier.

*Finally*, a conflict alone is not a sufficient basis to justify the "strongly disfavored" remedy of disqualification. *Silva*, 2013 WL 3939500, at *2.  In every conflicts case, the party seeking disqualification must show that allowing the representation to continue would "taint[] the trial." *Kane*, 2013 WL 3991107, at *14.  And in the specific context of imputed conflicts, the case law

makes clear that disqualification is not necessary where, as here, a screen in fact prevents confidential information from being shared. *See Kirk v. First Am. Title Ins. Co.*, 108 Cal. Rptr. 3d 620, 645-46 (Cal. Ct. App. 2010). KL's screening measures ensured that KL never obtained Facebook's confidential information from Mr. Pak. Mr. Pak has not worked, is not working, and will never work on this case. He has never communicated with any KL employee about the substance of this case—or his previous work for Facebook—and he never will. And Facebook has not identified a single way in which it believes the current screen is insufficient to protect its confidential information going forward.

Disqualification in this circumstance would improperly elevate "hypersensitivity to ethical nuances" over practical realities, *Kane*, 2013 WL 3991107, at *8, and allow defendants like Facebook to wield empty formalisms as swords against their adversaries. The ripple effects on the profession would be significant. It would "make firms . . . understandably more reluctant to hire mid-career lawyers, who would find themselves cast adrift as 'Typhoid Marys,'" and diminish clients' "choice of counsel," "particularly in specialized areas of law." *In re Cnty. of Los Angeles*, 223 F.3d 990, 996 (9th Cir. 2000). Facebook's motion should be denied.

## FACTUAL BACKGROUND

While working at Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C. ("Kellogg Hansen"), a fourth-year lawyer named Albert Pak worked for about six months on "investigations that preceded the filing of the complaints" against Facebook by the FTC and various state attorneys general. Mot. at 3. During that time, a far more senior attorney, Mark Hansen—the "Hansen" in Kellogg Hansen—served as "lead trial counsel." Mot. at 4. Mr. Hansen and another senior partner, Aaron Panner—both of whom graduated from college before Mr. Pak was born—supervised a large team of partners and associates, including Mr. Pak. Pak Decl. ¶ 12.[1] More broadly, Facebook was represented by a multitude of lawyers from at least four law firms, a large number of whom were partners, counsel, or senior associates with more responsibility than Mr. Pak. *Id.* ¶¶ 7, 10, 13. On

---

[1] Mr. Pak has discussed his prior representation of Facebook only to the extent necessary "to detect and resolve conflicts of interest arising from the lawyer's change of employment." ABA Model Rule 1.6(b)(7); *see also* Pak Decl. ¶ 2.

the Kellogg Hansen team alone, at least ten lawyers more senior than Mr. Pak were working on the case. *Id.* ¶ 10.  Mr. Pak primarily served as the most junior lawyer on the expert-witness team, which included multiple partners from multiple law firms.  *Id.* ¶ 12-13.  His role was to "assist Mr. Panner, primarily with coordinating various workflows."  *Id.* at 12.  During the weekly expert-team calls, Mr. Pak "took notes" but "did not speak frequently (if at all)."  *Id.* ¶ 13.  Mr. Pak does not ever recall "speaking on a call that involved a potential testifying expert."  *Id.*  And Mr. Pak never directly advised Facebook's in-house lawyers—let alone the officers of the company—something "he likely would not have been permitted to do" "without supervision by a Kellogg Hansen partner."  *Id.* ¶ 16.

Mr. Pak is now at KL, 3/18/21 Hrg. Tr. 7:24–25, where he began working on June 29, 2020. Mot at 4.  At that time, the *Klein* case did not exist yet, and KL had no concrete plans to bring a lawsuit against Facebook.  Postman Decl. ¶ 13.  The House Judiciary Committee hearings, which spurred KL and other firms more seriously to consider an antitrust case against Facebook, would not occur until the end of July.  *Id.* ¶ 5. And KL did not represent any client adverse to Facebook, *id.* ¶ 13, which necessarily meant that the firm could not have a conflict of interest.  *See* Rule 1.9 (forbidding a lawyer to "represent another person" adverse to a former client in a substantially related matter).  As it does for all incoming attorneys, KL asked Mr. Pak about his previous clients and received a written list of them.  Postman Decl. ¶ 13-14.  Mr. Pak informed KL that he had worked for Facebook while at Kellogg Hansen.  *Id.* ¶ 14; Pak Decl. ¶ 19.

In early August, KL began analyzing the potential claims underlying this case—something it does for dozens of *potential* claims each year.  Postman Decl. ¶ 3, 5, 22.  The lawyers involved were Warren Postman, Ashley Keller, and Ben Whiting.  *Id.* ¶ 6.  At that time, there was no indication that California rules would govern any potential representation—because the KL lawyers involved were working in Illinois and Washington, D.C., and KL had not decided to file a case at all, much less to file one in California.  Mr. Postman instructed Mr. Keller and Mr. Whiting not to discuss the potential claims with Mr. Pak, and he instructed Mr. Pak not to discuss any potential claims against Facebook with anyone at the firm.  *Id.* ¶ 15-16; Pak Decl. ¶ 20.  As a result, no KL lawyer ever spoke to Mr. Pak about the claims.  *See* Pak Decl. ¶ 22; Postman Decl. ¶¶ 18, 19; Keller Decl. ¶ 2; Whiting Decl. ¶ 2; Zweig Decl. ¶ 2; Ethridge Decl. ¶ 2; Heinz Decl. ¶ 2; Watson Decl.

4

¶ 2; Dravillas Decl. ¶ 2; Longtin Decl. ¶ 2; Hanna Decl. ¶ 2.  All files related to the investigation were stored on hard drives that Mr. Pak could not and did not access, except for one file stored on the firm's shared cloud-storage drive, which Mr. Pak never accessed.  Pak Decl. ¶ 22; Postman Decl. ¶ 15.

On November 11, 2020, "it seemed likely that KL and [Quinn Emanuel] would reach an agreement to work together to file an antitrust case against Facebook."  Postman Decl. ¶ 17.  Up to this point, KL had not begun drafting a complaint, had not entered into any co-counsel arrangements, and had not been retained by a client adverse to Facebook.  *See id*. ¶¶ 16-17.  That same day, KL put in place a formal ethical screen.  The firm's Managing Partner sent a firm-wide "high priority" email announcing that Mr. Pak had been screened from the potential antitrust case the firm was considering against Facebook.  Postman Decl. ¶ 17; Pak Decl. ¶ 21.  During a quarterly all-firm meeting conducted via Zoom on December 4, 2020, all attorneys and staff were reminded of this (and other) ethical screens in place at the firm.  Postman Decl. ¶ 17.  Since then, the main KL "intranet" page for attorneys and staff has noted this ethical screen, reminding all employees to abide by it.  *Id*.  And as part of their onboarding process, all attorneys and staff who join KL are informed of this and other ethical screens at the firm.  *Id*.

Plaintiffs Maximilian Klein and Sarah Grabert did not retain KL until December 3, 2020, three weeks *after* the formal, firm-wide screen was imposed.  *See* Postman Decl. ¶ 11.  For months, the litigation was almost entirely procedural.  Mr. Postman and colleagues entered appearances near the end of December.  *See* D.E. 20, 28, 29, and 30.  In February, the various cases were consolidated.  *See* D.E. 47, 50.  And on March 5, 2021, various law firms filed motions for appointment as lead counsel.  *See* D.E. 55, 56, 57, 58, 59.

In its response to those motions, Facebook noted KL's "representation of [plaintiffs] in the multi-state antitrust case against Google" and asked the Court to "closely manage information flow and access to confidential and strategic information."  Defendant Facebook, Inc.'s Response to Plaintiffs' Motions to Appoint Interim Lead Counsel, D.E. 60. at 1-2.  At the hearing on March 18, the Court began by asking counsel for Facebook, Ms. Mehta, to "elaborate" on the information-flow issue Facebook had raised.  3/18/21 Hrg. Tr. 7:7-9.  After Ms. Mehta suggested that the Court needed

"to ensure that we don't have inappropriate cross-pollination of information across different cases," the Court asked her: "Would you please be more specific?  What are the conflicts that you see?"  *Id.* 7:18–22.  In response, Ms. Mehta told the Court that "there [are] actually members of the Keller Lenkner firm that used to represent Facebook at . . . Kellogg Hansen."  *Id.* 7:25–8:2.  The Court followed up: "So the former Kellogg Hansen lawyers who are now at [KL], what did they represent Facebook in?  Antitrust cases or something else?"  *Id.* 9:2–4.  Ms. Mehta responded that she "they worked on antitrust related issues."  *Id.* 9:5–7.  Ms. Mehta later clarified—at the request of the Court—that only one KL lawyer (not multiple lawyers) had previously performed work for Facebook.  *Id.* 9:19.

At no point did Facebook state that this purported conflict would be imputed regardless of an ethical screen.  Quite the opposite: Ms. Mehta told the Court that a screen would be sufficient: that "there needs to be some ethical walls put in place, and [that she] believe[d] there has been work that has been done to try to accommodate that."  *Id.* 8:2–4.  And she told the Court that "we're not suggesting that there's any particular conflict that we're aware of."  *Id.* 8:9–10.  Ms. Mehta later reiterated the point, stating that "there is a provision in place that requires there to be an ethical wall and certain certifications provided to Facebook."  *Id.* 9:8–10.  She told the Court that "Facebook has not yet received that certification" and said she "hope[d] that [Facebook] would be receiving it promptly and that all appropriate steps would be taken."  *Id.* 9:11–13.

Turning to Mr. Postman, the Court asked whether Mr. Pak was "working on this case" at KL, and Mr. Postman confirmed that he was not.  *Id.* 9:20–25.  Mr. Postman stated that "the associate in question is I believe a fourth or fifth year lawyer who to our understanding worked on antitrust matters for Facebook for several months, less than a year."  *Id.* 10:1–3.  Mr. Postman again confirmed that Mr. Pak "has never had any involvement in this case," stated that KL had "robust screens in place," and said he would be "happy to provide details of that to Facebook."  *Id.* 10:5–7.

Mr. Postman also said that Mr. Pak had been screened "upon his arrival at the firm," *id.* 10:4, when in fact KL formally screened Mr. Pak when it resolved to pursue this case.  Postman Decl. ¶ 17.  Although Facebook insists there was something nefarious about this slip of the tongue, Mr. Postman simply misspoke.  *Id.* ¶ 19.  When Mr. Pak arrive at the firm, there was no conflicting

6

representation from which to screen Mr. Pak.  *Id.*  And Facebook had not flagged this potential issue in its briefing, so Mr. Postman had not reviewed the exact sequence of events, which occurred months before.  In response, the Court said "All right.  Thank you.  Okay." 3/18/21 Hrg. Tr. 10:8.

The Court appointed Mr. Postman to represent the User Class.  The next day, KL provided Facebook with more details about the nature of the screen.  *See* Mot. Ex. A, D.E. 93-3.  KL specified the precise timing of the screen, as well as the steps it had taken to ensure the screen was effective.  *Id.* at 1.  KL also stated that "[i]f [Facebook] would like to discuss or [has] further questions about these procedures, please let us know and we will respond promptly."  *Id.*

Eleven days later, Facebook responded.  *See* Mot. Ex. B, D.E. 93-4.  Just as at the hearing, Facebook never suggested that a screen could not prevent imputation of the potential conflict or that the information KL provided about the screen was untimely.  Again, quite the opposite: Facebook stated that it "appreciate[d] [KL's] commitment *to honor screening procedures* for the duration of the *Klein* case."  *Id.* at 1 (emphasis added).  And Facebook noted the "*need for a robust screen* that fully complies with all applicable ethical standards."  *Id.* (emphasis added).  Facebook went on to ask a number of detailed questions concerning the "adequacy of the screen," *id.*, which KL promptly answered.  *See* Mot. Ex. C, D.E. 93-5.

In particular, KL told Facebook:

- That "Mr. Pak's first day at Keller Lenkner was June 29, 2020";

- That "Mr. Pak disclosed his representation of Facebook and other former clients to [Mr. Postman] verbally on June 30, 2020," and that "Keller Lenkner obtained a conflicts list from Mr. Pak and performed a conflicts check" the next day;

- That at this time—and prior to November 11, 2020—the firm *had not* (i) "decided to initiate a case against Facebook," (ii) "affiliated with co-counsel," (iii) "beg[u]n drafting a complaint," or been (iv) "retained by a client";

- That when the firm was "consider[ing] the potential matter against Facebook," "[Mr. Postman] instructed the small number of lawyers with whom [he] discussed the matter not to discuss the potential action or claims with Mr. Pak, and . . . instructed Mr. Pak not to discuss any potential action or claims against Facebook with anyone at the firm";

- That during that time period, "materials regarding potential claims were contained in emails between Ashley Keller, Ben Whiting, and [Mr. Postman], and were stored locally on our hard drives, none of which could be accessed by Mr. Pak";

- That records confirmed Mr. Pak had never accessed the "single file relating to this case [that] was saved on [KL's] cloud-based document management system"; and

- That no "attorney or staff member has ever discussed the substance of the claims with Mr. Pak."  Mot. Ex. C, D.E. 93-5 at 2.

KL heard nothing from Facebook for almost a month.  Then, on May 4, 2021, Facebook demanded that KL withdraw from this case within two days.  Mot. Ex. D., D.E. 93-6 at 1.  After previously telling KL and this Court that "there needs to be some ethical walls put in place" and that "there is a provision in place that requires there to be an ethical wall," 3/18/21 Hrg. Tr. 8:2–4, 9:8–9, Facebook insisted for the first time that no ethical screen could prevent imputation of the conflict, because (in Facebook's view) "Mr. Pak 'substantially participate[d]' in [a] related matter."  D.E. 93-6 at 2 (citing Rule 1.10(a)(2)(i)).  Facebook also asserted that KL had not put a screen in place soon enough and had not given proper notice under the Rules.  *Id.*

KL responded the next day.  KL noted that "California specifically amended its Rules of Professional Conduct in 2018 to allow law firms to use an ethical screen to avoid imputation of conflicts by lateral lawyers."  Mot. Ex. E, D.E. 93-7 at 1.  KL was confident that Mr. Pak—a junior associate with a narrow role on a massive team—did not "substantially participate" on the previous matter as that term is used in the amended Rule.  Nonetheless, only Facebook knows exactly how many lawyers worked on the matter, their seniority levels, the tasks performed, and the number of hours billed.  KL therefore asked several basic questions about the investigations, none of which implicated privilege.  *Id.*  KL wanted to give Facebook an opportunity to show that, contrary to KL's understanding, "Mr. Pak's role in the FTC and State Attorneys General investigations was so central and extensive as to preclude the use of [an ethical] screen."  *Id.*  Tellingly, Facebook refused to answer all of KL's questions except one—the number of hours Mr. Pak had billed—citing its view that whether Mr. Pak's "participation was 'substantial[]' . . . has nothing to do with" KL's questions regarding the size of the matter and number of attorneys involved.  *See* Mot. Ex. F, D.E. 93-8 at 1.

## LEGAL STANDARDS

### I.  Disqualification Requires A Showing That The Challenged Firm Has A Conflict, And That The Conflict Will Have A Material Impact On This Proceeding.

"Federal courts in California look to [California] law to decide motions to disqualify." *S.E.C. v. King Chuen Tang*, 831 F. Supp. 2d 1130, 1141 (N.D. Cal. 2011).  Under California law, a

Court must first assess whether an ethics Rule has been violated.  Absent such a violation, there is no basis for disqualifications.  *Neal v. Health Net, Inc*., 123 Cal. Rptr. 2d 202, 217 (Cal. Ct. App. 2002) ("Because there was no violation of [the relevant rule], disqualification . . . was not legally authorized.").  But even a "violation of [the Rules] does not necessarily compel disqualification." *In re Marriage of Murchison*, 199 Cal. Rptr. 3d 800, 804 (Cal. Ct. App. 2016)).  Disqualification is appropriate only if the Court also determines that the violation "will affect the outcome of the proceedings before the court."  *Kirk*, 183 Cal. Rptr. at 650.  Thus, as Facebook concedes, deciding this motion requires a two-step analysis: (1) determining whether a conflict exists and (2) determining whether any conflict would have a material impact on the proceedings.  *See* Mot. at 20 (acknowledging that, in addition to finding a conflict, the Court must "determine whether it is appropriate to order disqualification").

The second step of this analysis is significant because "[d]isqualification of counsel" is a "drastic remedy," *Joseph v. City of San Jose*, No. 19-CV-01294, 2020 WL 1031899, at *7 (N.D. Cal. Mar. 3, 2020) (Koh, J.) (citation omitted)—one that "should not be taken simply out of hypersensitivity to ethical nuances or the appearance of impropriety," *Kane*, 2013 WL 3991107, at *8 (internal quotation marks omitted).  Unless the trial will be "taint[ed]," there is no reason to order disqualification *even if* the court determines that a Rule was violated.  *McElroy v. Pac. Autism Ctr. for Educ.*, No. 14-CV-04118, 2015 WL 2251057, at *3 (N.D. Cal. May 13, 2015) (Koh, J.).

## II.   California's Rules Of Professional Conduct Explicitly Permit The Use Of Ethical Screens To Prevent The Imputation Of Conflicts.

California's Rules of Professional Conduct prohibit an attorney from representing a client where it would produce a conflict of interest with a former client.  *See* Rule 1.9 ("A lawyer who has formerly represented a client in a matter shall not thereafter represent another person [with interests adverse to the former client] in the same or a substantially related matter.").  Independently, Rule 1.6 imposes a strict duty of confidentiality that prohibits an attorney from divulging confidential client information independently of any conflict.  But the Rules go one step further and impose an additional, prophylactic measure to protect client confidences: when lawyers work together in the

PLAINTIFFS' OPPOSITION TO FACEBOOK'S MOTION TO DISQUALIFY
Case No. 5:20-cv-08570-LHK

same firm, "none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by rules 1.7 or 1.9." Rule 1.10(a).

For many years, California's Rules had no provisions allowing the use of an ethical screen to prevent the imputation of a conflict based on work performed by a lateral lawyer at his or her prior firm. *See Sharp v. Next Entm't, Inc.*, 78 Cal. Rptr. 3d 37, 59 n.11 (Cal. Ct. App. 2008) ("[In 2008], in the context of private law firms, there [was] no definitive California authority authorizing ethical walls."); Baldwin Decl. ¶ 17. Rather, the conflicts of a lawyer who joined a new firm were automatically imputed to the new firm regardless of any screen. *See Kirk*, 108 Cal. Rptr. 3d at 637–38. That changed in November 2018. After substantial debate, the Second Commission for the Revision of the Rules of Professional Conduct proposed, and the California Supreme Court enacted, a new rule governing the imputation of conflicts. *See* Executive Summary, New Rule of Professional Conduct 1.10 ("Ex. Summ.") at 1–4 (discussing the history of the Rule change). Under the new rule, one lawyer's conflict is *not* imputed to the entire firm so long as "the prohibited lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom," "written notice is promptly given to any affected former client to enable the former client to ascertain compliance," and the prohibited lawyer did not "substantially participate in the same or a substantially related matter." Rule 1.10(a)(2).

The Comments to the Rules identify four factors that should be considered "[i]n determining whether a prohibited lawyer's previous[] participation was substantial": "[1] the lawyer's level of responsibility in the prior matter, [2] the duration of the lawyer's participation, [3] the extent to which the lawyer advised or had personal contact with the former client, and [4] the extent to which the lawyer was exposed to confidential information of the former client likely to be material in the current matter." *Id.* Cmt. 1. By inviting courts to consider "the extent" to which the factors are true, the comment makes clear that the inquiry is necessarily relative—*i.e.*, the Rules assume that the lawyer might have had *some* responsibility, participated for *some* time, had *some* client contact, and been exposed to *some* confidential information. The question is to what *extent*, and whether it was "substantial," a "material matter of clear and weighty importance." Rule 1.0.1(*l*).

The Executive Summary to the Rules on which Facebook relies, *see* Mot. at iv, 10, 14, underscores the distinction between the "principal lawyer" on a related case (who cannot be screened) and lawyers with a more minor role (who can be).  In enacting this regime, California took an intermediate step between the model ABA rules—which would "permit the *principal* lawyer in the same matter to be screened"—and the prior Rules, which did not contemplate screening. Ex. Summ. at 1, 3 and n.3.  California's middle ground allows for a "limited screen," applicable to a lawyer who was not "'substantially involved,' did not have a 'substantial role,' *did not have 'primary responsibility*,' *etc*., in the former client's matter." *Id.* at 3 and n. 4 (emphasis added).

## ARGUMENT

Facebook's motion fails at both steps of the disqualification analysis.  Facebook cannot show that KL has any imputed conflict.  And Facebook's motion has not shown how such a conflict could have a material impact on this proceeding in light of the precautions KL took—both before and after imposing a formal screen—to protect Facebook's confidential information.

**I.      Keller Lenkner Has No Imputed Conflict.**

**A.      California Rules Allow The Use Of A Screen Here Because Mr. Pak's Participation In The Previous Facebook Case Was Not "Substantial."**

As detailed above, "substantial participation" turns on four factors: level of responsibility, duration of the lawyer's participation, extent of client interaction, and extent of confidential information.  Rule 1.10 Cmt. 1.  Although the inquiry is necessarily relative—because courts must consider "the extent" to which a certain factor is true—it is unclear is whether the factors are to be judged against the matter overall, or rather against other lawyers' involvement on the matter.  Either way, however, the factors produce a clear answer here: the first, third, and fourth factors cut decisively against a finding of substantial participation, and the second factor is neutral.

*1.  Mr. Pak's Participation Was Not Substantial Under The Relevant Factors.*

The first factor—level of responsibility—tips strongly against a finding of substantial participation.  Judged against the matter overall, Mr. Pak had minimal responsibility over just a small sliver of it.  On a matter so large as to require an organizational chart just to keep track of the partners involved, Pak Decl. ¶ 11, Mr. Pak spent most of his time as a young associate on a single *sub*-team responsible for experts.  Even there, he was the most junior lawyer.  *Id.* 12–13.  His role was one of basic "coordinat[ion]," not grand strategy or even substantive tactics.  *Id.* ¶ 12.  Not only did Mr. Pak not have any responsibility over what other teams were doing, but in many instances, he was not even aware of what they were doing.  *Id.* ¶ 11.  The same result holds when level of responsibility is judged against other attorneys working on the case.  Among the army of senior lawyers representing Facebook, Mr. Pak's level of responsibility was obviously minor.  On weekly calls for that sub-team, he spoke rarely, if ever—naturally deferring to the multiple partners, counsels, and senior associates from his and other firms.  *Id.* ¶ 13.  Even among the Kellogg Hansen contingent, he was at least three levels down in the hierarchy—supporting Mr. Panner who in turn supported Mr. Hansen—and there were at least ten more senior lawyers from that firm alone.  *Id.* ¶¶ 10, 12.  Facebook makes no direct attempt to address this factor, implicitly conceding that it cuts against a finding of substantial participation.

The second factor—duration of participation—is neutral.  Mr. Pak worked on the matter in question for 800 hours over six months.  Although that amount of work is not *de minimis*, it is also not extensive relative to the matter overall or to other attorneys working on it.  Mr. Pak began working on the matter long after it began and left long before the end.  *Id.* ¶¶ 7–9.  When measured against the timeline one would expect for a matter of this kind, six months is relatively short.  And Mr. Pak likely spent far less time on the matter than the other associates working on it, billing 800 of his typical 3,000 annual hours to the matter, *id.* ¶¶ 10, 17.  Accordingly, this factor does not cut strongly in either direction.

The third factor—"the extent to which the lawyer advised or had personal contact with the former client"—tilts sharply against Facebook's position.  The most Facebook can come up with is that Mr. Pak "participated" in "meetings" "in which Facebook's in-house counsel participated" and

12

thereby "interacted" with the client.  Panner Decl., D.E. 93-1, ¶ 7.  That is carefully parsed language designed to inflate Mr. Pak's interactions.  In reality, Mr. Pak watched Mr. Panner interview a single Facebook employee and listened in on weekly update calls.  Pak Decl. ¶ 13.  Mr. Pak spoke rarely during these discussions.  *Id.*  He never gave direct advice to the client "and likely would not have been permitted to do so without supervision by a Kellogg Hansen partner."  *Id.* ¶ 16.  Facebook does not suggest that the in-house lawyers on these calls were particularly senior.  And Facebook never suggests that Mr. Pak ever spoke with an officer of the company.  Again, Facebook makes no attempt to argue that Mr. Pak's client interaction was greater than any other lawyers on the matter or constituted some material portion of the enormous amount of client contacts that this matter entailed. This factor cuts strongly against a finding of substantial participation.

The fourth factor—"the extent to which the lawyer was exposed to confidential information"—again tips against a finding of substantial participation.  Rule 1.10 Cmt. 1.  To be sure, Mr. Pak presumably received *some* confidential information in the course of assisting with experts, reviewing documents relevant to experts, listening in on standing calls, and receiving emails, "a large portion of which were administrative, ministerial, or otherwise process-focused." Pak Decl. ¶ 15.  But judged against the matter overall, Mr. Pak was again privy to just a small sliver of it.  As a member of the expert-witness team, he had no visibility into the confidential information obtained by most of the 100+ lawyers working on the case, given that he does not even know what many of them were working on.  Judged against other lawyers, the result is the same: Facebook does not even attempt to argue that Mr. Pak's exposure to confidential information was more extensive than any other lawyers who happened to work on the matter.

Instead of analyzing "the extent to which" Mr. Pak was exposed to confidential information, Facebook attacks a straw man: it rests on the fact that Mr. Pak received some confidential information.  *See, e.g.*, Mot. at 4 ("As a result of this significant involvement while at Kellogg Hansen, Mr. Pak learned Facebook's confidential and privileged information.").  But the test for "substantial participation" does not turn on whether the lawyer in question obtained confidential information.  That question addresses the threshold issue of whether two matters are "substantially related."  *See Fremont Indem. Co. v. Fremont Gen. Corp.*, 49 Cal. Rptr. 3d 82, 93 (Cal. Ct. App.

13

2006) (matters are substantially related "only if the issues are sufficiently similar to support a reasonable inference that the attorney . . . was likely to have obtained confidential information material to the current representation"); *Nat'l Grange of Ord. of Patrons of Husbandry v. Cal. Guild*, 250 Cal. Rptr. 3d 705, 713 (Cal. Ct. App. 2019) (holding that when courts find a substantial relationship, they must "conclusively presume that the attorney possesses confidential information adverse to the former client"). Indeed, the entire point of an ethical screen is to prophylactically protect confidential information. If the lawyer did not have such information, there would be no conflict at all and no need for the screen. And the entire point of the 2018 amendments was to allow a screen to prevent imputation of a conflict *even when* a lawyer possesses confidential information. *See* Baldwin Decl. ¶ 17 ("Prior to the enactment of Rule 1.10, which became effective November 1, 2018, California professional rules did not contain any provisions allowing ethical screens."). If Facebook's approach were correct, then the fourth factor would cut against the availability of a screen in every case and could never make a difference in determining substantial participation.

In sum, three of the factors cut against a finding of substantial participation, one is neutral, and none cuts in favor of such a finding. Although Mr. Pak no doubt "did excellent work on the Facebook matter," he was a junior associate being "supervised" by senior partners. Panner Decl., D.E. 93-1, ¶ 4. Everyone knows he was not the "principal lawyer" with "primary responsibility" on the case. Ex. Summ. at 1, 3. Facebook's initial response to this Court's questioning was consistent with this fact, as was its position 11 days later when it noted "the importance of and need for a robust screen." Mot. Ex. B, D.E. 93-4, at 1. Since then, Facebook has apparently determined there is some tactical advantage to seeking to disqualify KL. But Facebook's platitudinous descriptions of a fourth-year associate's work cannot obscure the straightforward conclusion that Mr. Pak's role does not constitute substantial participation under the four factors above.

### 2. The Cases Facebook Relies Upon Do Not Discuss Substantial Participation.

Facebook's motion recites the above standard but fails to address each factor in any detail, instead relying on case law. Specifically, the motion includes a paragraph describing "the work Mr. Pak performed for Facebook" and claims that California courts "have found disqualifying conflicts based on far less." Mot. at 15-16. Facebook then describes in detail cases in which motions to

14

disqualify counsel were granted, concluding that, "[b]ecause the first of Rule 1.10(a)(2)'s requirements [i.e., that "the prohibited lawyer did not substantially participate" in the prior matter] is not satisfied, the exception [allowing for an ethical screen] does not apply here." Mot. at 16–17.

Facebook's invocation of these cases is stunningly misleading. Each was decided *before* the Rules were amended expressly to allow a screen to prevent the imputation of conflicts. And none addresses whether a lawyer's work amounted to "substantial participation" so as to preclude the use of a screen. In *Wausau Business Insurance Co. v. Diamond Contract Services, Inc.*, No. 10-CV-3192, 2010 WL 11549716, at *6 (C.D. Cal. Sept. 23, 2010), the court disqualified a firm because it had not actually put in place an effective screen.[2]  Rather, the *conflicted attorney himself* "took at least two depositions and prepared and opposed dispositive motions" in a related matter adverse to the former client. *Id.* The court never mentioned or addressed whether the attorney's work on the previous case amounted to "substantial participation." In *Advanced Messaging Technologies, Inc. v. EasyLink Services International Corp*, the court disqualified a firm because it imposed a screen eight months *after* the conflict arose. 913 F. Supp. 2d 900, 911-12 (C.D. Cal. 2012). Again, the court never mentioned "substantial participation." In *Talon Research., LLC v. Toshiba American Electronic. Components, Inc.*, No. 11-CV-04819, 2012 WL 601811 (N.D. Cal. Feb. 23, 2012), the Court addressed only the question of whether two matters were "substantially related." No screen was *ever* put in place, so after the court found the matters to be substantially related, it disqualified counsel without discussing screening, let alone addressing "substantial participation." *See id.* at *7. Facebook's remaining examples of disqualification do not even deal with imputed conflicts at all, much less whether past work constitutes "substantial participation" such that a screen cannot prevent imputation. *See Guifu Li v. A Perfect Day Franchise, Inc.*, No. 11-CV-01189, 2011 WL 4635176, at *4–6 (N.D. Cal. Oct. 5, 2011) (Koh, J.) (disqualifying attorney who counseled an employer about employment issues and then himself represented an employee in a substantially related case against

---

[2] The Court did not address the screen for the purpose of determining whether the Rules had been complied with. (Again, because the Rules did not allow screens.) Rather, the absence of a screen was relevant to the second step of the analysis: *assuming* a conflict, did a screen eliminate the need for *disqualification*. *See Wausau*, 2010 WL 11549716, at *6; *infra* at Section II.B.

the employer); *Bryant v. Donahoe*, No. 11-CV-10432, 2012 WL 12884904, at *2 (C.D. Cal. Oct. 10, 2012) (disqualifying attorney who obtained confidential information in a prior representation that the same attorney used in a later, substantially related representation).

The pre-2018 cases that Facebook cites cannot possibly inform whether Mr. Pak's involvement in the prior matter constituted "substantial participation," as that concept did not exist under the old rules. Facebook's argument is therefore "premised upon a rule which no longer exists." *McElroy*, 2015 WL 2251057, at *4-5 (rejecting invocation of cases applying an outdated Rule of Professional Conduct). Facebook focuses on inapposite case law because a straightforward application of the factors shows that Mr. Pak's work did not constitute "substantial participation."

Admittedly, the California rules do not go as far as the model ABA rules in permitting screening. Unlike in other jurisdictions, KL could not have used a screen to avoid conflict in California if Mr. Hansen had joined the firm after quarterbacking Facebook's defense at Kellogg Hansen. But if the 2018 Amendments did anything, they allowed a screen to be used to prevent the imputation of conflicts based on the work of a junior lawyer with only a supporting role in a case. Facebook was right when it previously told this Court that a screen could avoid any conflict here. Facebook's revised position is incorrect.

**B.    The Screen Was Timely.**

Facebook falls back to arguing that the screen here was "untimely." Mot. at 17. The attorneys participating in KL's initial investigation were instructed not to discuss the potential case with Mr. Pak, and a formal, firmwide screen was imposed on November 11, 2020, as soon as KL thought it was reasonably likely that it would pursue a case. Nonetheless, Facebook says that a firmwide screen should have begun on June 30—the day Mr. Pak disclosed his prior Facebook work, *id.* at 18—even though KL represented no client adverse to Facebook at that time (and was not even considering doing so).

Facebook's position ignores the plain text of the applicable rules. Rule 1.9 provides that "[a] lawyer who has formerly represented a client in a matter shall not thereafter *represent another person* [with interests adverse to the former client] in the same or a substantially related matter." Rule 1.9(a) (emphasis added). And Rule 1.10 provides that no lawyer in a firm may "knowingly

16

represent a client when any one of them practicing alone would be prohibited from doing so by [Rule 1.9]" unless a screen is employed.  Rule 1.10(a).  On June 30—the day KL learned of Mr. Pak's previous involvement with Facebook—KL did not "represent a client" or "person" adverse to Facebook, and there could accordingly be no conflict between clients.  Rule 1.9(a); Rule 1.10(a); *see Kirk*, 108 Cal. Rptr. 3d at 645 (stating that a screen is required when "the conflict first arises"); *McElroy*, 2015 WL 2251057, at *5 ("[O]nly attorney-client relationships may give rise to conflicts of interest under the Rules of Professional Conduct governing attorneys.").

In response, Facebook notes that a "matter" is defined by Rule 1.7(e) to include "an 'investigation . . . that is focused on the interests of . . . a discrete and identifiable class of persons.'" Mot. at 18 (citing Rule 1.7(e)).  But Facebook fails to note that Rule 1.7 applies only when a lawyer "represent[s] a client [and] the representation is directly adverse to another client in the same or a separate matter."  Rule 1.7(a).  Rule 1.7 thus uses the term "matter" to refer to an investigation *for a client.*  On June 30, KL did not "represent" anyone in connection with any matter related to Facebook—"investigation" or otherwise.  Rule 1.9(a); Rule 1.10(a).  The fact that an "investigation" *for a client* is a "matter" that can produce a conflict does nothing to help Facebook, because KL was not "representing" a client adverse to Facebook at the time.

Requiring a screen at the commencement of a representation is also the only approach that would be practically workable.  KL is always considering "dozens of *potential* cases that [it] might pursue."  Mot. Ex. C, D.E. 93-5 at 3; Postman Decl. ¶ 22.  And lawyers at defense-side firms such as WilmerHale regularly consider new clients they might pitch for work on a "potential" matter. What standards would possibly govern a rule requiring a screen prior to taking on a matter adverse to a former client?  Is it enough that an attorney is talking about a potential case?  Thinking about a potential case?  Reading the legal news?  And what sort of *notice* of a screen could be given?  That the firm walled off an attorney because it was *thinking about* suing one of that attorney's former clients from another law firm for some undefined misconduct, even though an actual complaint might never be filed?  These questions have hundreds of permutations with no workable answers.

Facebook's approach would also be unworkable because firms would not know *which jurisdiction's* rules to apply.  Facebook wants to apply California Rules to govern lawyers working

17

in Illinois and Washington, D.C. at a time when they had not decided to take on a case, let alone thought through where it would be litigated.  Because the applicable conflict rules often vary based on where a case is filed, that is obviously unworkable.  For example, many states (and the Model ABA rules) permit the use of a screen to wall off the primary lawyer who worked on a previous related case.  But if California rules apply everywhere, based on the mere possibility that a case might be filed in California, a firm employing such a lawyer could never even consider a potential case even if it ended up filing in another state.  Finally, a rule requiring screens before merely considering a case would render the screens so numerous as to be meaningless—and likely ignored. A firm of WilmerHale's size would have to send a firm-wide screening notices numerous times each day.  That is why the Rules are pegged to "representat[ion]" in a case, Rule 1.10(a)—a bright-line rule that can easily be followed.  *See McElroy*, 2015 WL 2251057, at *3 ("[W]ith regard to the ethical boundaries of an attorney's conduct, a bright line test is essential.").

Facebook attempts to distract from the plain meaning of the Rules by invoking a bogeyman: that following the actual text would "allow[] a client's former lawyer to provide information [to his new firm] up until the moment his new firm formally decides to file a complaint."  Mot. at 18.  That is obviously not true.  A lawyer is *never* entitled to divulge his client's confidential information. Rule 1.6(a) ("A lawyer shall not reveal information protected from disclosure by [the Rules] unless the client gives informed consent, or the disclosure is [necessary to prevent physical harm or a crime].").  And KL and Mr. Pak took measures from the moment he joined the firm to guard against any inadvertent disclosure of confidential information.  *See* Postman Decl. ¶ 14-15; Pak Decl. ¶ 19-20; Keller Decl. ¶ 2; Whiting Decl. ¶ 2.  The relevant question is not when a lawyer may breach his client's confidences—the answer to that question is "never"—but rather when to impose the additional, purely *prophylactic* measure of imputing conflicts to an entire firm.  Commencement of a representation provides an intuitive, bright-line trigger for the obligation to impose a screen. Before that point, the Rules rely on the general prohibition on sharing a client's secrets, a prohibition that is *always* in force, and that Facebook does not even attempt to argue was violated here.

To the extent Facebook asks this Court to ignore the plain requirements of Rule 1.10 and impose a screening requirement before any conflict arises, KL's conduct here was still appropriate.

18

KL imposed targeted measures to protect against any disclosure of confidential information as soon as KL attorneys began their preliminary investigation of the case—the investigating attorneys and Mr. Pak were instructed not to discuss the potential case and relevant files were stored where Mr. Pak could not and did not access them.  Postman Decl. ¶ 15; Pak Decl. ¶ 20.  Those measures were proportionate and reasonable, given that KL had not even decided to pursue a case, let alone taken on a representation that would produce a conflict.  Hence there is no question that the formal screen was "timely" under the Rules, and that KL safeguarded Facebook's confidential information even before the formal screen was put in place.  Rule 1.10(a); *Kirk*, 108 Cal. Rptr. 3d at n.31.

Displeased with the chronology, Facebook accuses KL of misrepresenting it.  Mot. at 6 ("Mr. Postman's story then shifted again"); *id.* at 7 (suggesting Mr. Postman "further walk[ed] back his earlier statements"); *id.* ("revised chronology"); *id.* at 18 ("shifting representations").  In Facebook's view, because Mr. Postman said Mr. Pak was screened "upon *his arrival* at the firm" and said that "[w]e've spent *months and years* thinking" about the "nitty gritty" of the case, the screen was not put in place at the proper time for nefarious reasons.  *Id.* at 5 (quoting the 3/18/21 Hrg. Tr.).

Although Facebook tries to manufacture some impropriety, it can identify nothing but a single, imprecise statement with no material significance.  As explained above, Mr. Postman misspoke when he said that Mr. Pak had been screened upon arrival, when there was nothing to *screen him from*, rather than when the conflict arose.  Postman Decl. ¶ 20.  Imprecise statements occasionally happen, and they are no basis to assert bad faith—particularly when they are promptly corrected, as Mr. Postman did *the next day* in an email to Facebook's attorneys.  Mot. Ex. A, D.E. 93-3 at 1; *cf.* 3/18/21 Tr. 7–9 (Ms. Mehta erroneously stating that multiple KL lawyers had worked for Facebook before clarifying that it was just one).  Mr. Postman's verbal slip-up is understandable given that Facebook did not raise this issue in its pre-motion filings, which meant Mr. Postman had not reviewed the course of events in preparing for the hearing.  Most importantly, there was no tactical advantage to be gained—and no reason to think that the hearing would have gone any differently—if Mr. Postman had stated that Mr. Pak was screened "before KL became adverse to Facebook in this matter."

---

19

1       As for the "months and years" comment, that was 100% accurate.  The snippet quoted by

2   Facebook is part of a statement by Mr. Postman describing the respective work done by KL and

3   Quinn Emanuel.    Mr. Postman noted that "Keller Lenkner worked to develop this case

4   independently from Quinn Emanuel."  3/18/21 Hrg. Tr.  47:19–21.  He then explained that KL

5   "worked with [Quinn Emanuel] very successfully on other matters and reached out and lo and

6   behold they were looking into the same thing and *we*"—*i.e.*, KL and Quinn Emanuel—"melded *our*

7   theories."  *Id.* 47:23–25 (emphasis added).  "The point *we're* trying to make," Mr. Postman said, "is

8   that *we've* spent months and years thinking [about] . . . the real nitty gritty" of a potential case.  *Id.*

9   48:4–7 (emphases added).  The context makes clear what "*we've* spent months and years" means.

10   So do the conventions of ordinary English: If KL and QE had both spent *years* on the matter, there

11   would have been no need to refer to *months* at all.

12       **C.    The Notice Was Prompt.**

13       Facebook's final argument is that disqualification is required because KL "did not

14   'promptly' give" written notice of the screen.  Mot. at 19.  Once again, that is not what Facebook

15   previously told this Court.  During the hearing on March 18, Facebook knew of the potential conflict

16   and knew that it had not yet received notice of any screen.  *See id.* 9:11–12 ("[M]y understanding is

17   that Facebook has not yet received that certification [of a screen].").  Nevertheless, Facebook did

18   not suggest that any future notice would be untimely.  Again, quite the opposite: Facebook's counsel

19   said, "I would hope that we *would be receiving [the notice] promptly* and that all appropriate steps

20   would be taken."  *Id.* 9:11–13 (emphasis added).  KL sent that notice the very next day.  *See* Mot.

21   Ex. A, D.E. 93-3.  By Facebook's own account, this notice was "prompt" under the rules.

22       Facebook's original position was correct. The purpose of the "prompt" notice provision—

23   which imposes no concrete timing requirement—is "to enable the former client to ascertain

24   compliance."  Rule 1.10(a)(2)(iii).  KL has given Facebook ample opportunity to do so, providing

25   "a description of the screening procedures employed," and responding "promptly to [Facebook's]

26

27

28

PLAINTIFFS' OPPOSITION TO FACEBOOK'S MOTION TO DISQUALIFY
Case No. 5:20-cv-08570-LHK

1   written inquires." *Id.*  Facebook does not even argue that it would have done anything different if it

2   had been notified earlier.  Hence the notice served the purposes of the Rule.[3]

3   **II.     Even Assuming A Conflict, No Disqualification Would Be Warranted.**

4             Whether KL has an imputed conflict under the California Rules is just the first step of the

5   disqualification analysis.  To prevail on this motion, Facebook must show a Rule violation (which

6   they have not) *and* demonstrate that disqualification here is "absolutely necessary," which means

7   showing that KL's continued representation would "taint" the trial.  *Kane*, 2013 WL 3991107, at

8   *14.  Facebook barely even tries to make this second, required showing.  Although it acknowledges

9   that this Court must consider whether "disqualification is the appropriate remedy," Mot. at 20,

10  Facebook does not dispute that KL has an effective screen in place and that KL attorneys working

11  on this case never received Facebook's confidential information.  Indeed, in Facebook's view,

12  "[w]hether or not Mr. Pak actually or advertently shared information with his colleagues who were

13  investigating Facebook is immaterial."  Mot. at 22.  That is wrong.  If Mr. Pak did not share

14  information—and if the current screen is effective—there is no reason why disqualification is

15  "absolutely necessary" to avoid a negative effect on "the outcome of the proceedings before the

16  court." *Kane*, 2013 WL. 3991107, at *14.  Facebook's failure to show the sort of material prejudice

17  necessary for disqualification provides an entirely independent reason to deny Facebook's motion.

18        **A.     Some Adverse Impact On The Proceedings Is Required To Warrant**

19              **Disqualification In Every Conflicts Case.**

20            "The purpose of a disqualification order is prophylactic, not punitive."  *Kirk*, 108 Cal. Rptr.

21  3d at 650.  Accordingly, disqualification is not imposed to regulate "the ethics of those that practice

22  before [the Court] unless the behavior taints the trial."  *Kane*, 2013 WL 3991107, at *14.  Instead,

23  in *all* cases involving an alleged conflict, disqualification is not appropriate unless the Court

24

25        [3] Even under pre-2018 California law, notice was "*not* an element required in all cases in order

26  for an ethical wall to rebut the presumption of imputed knowledge and prevent disqualification of
    the law firm." *Kirk*, 108 Cal. Rptr. 3d at 648 n.36; *see also id.* at 648-49 ("Each of these elements

27  need not necessarily be present for an ethical wall to be sufficient.").  If lack of *any* notice does not
    require disqualification, it follows more forcefully that the precise *timing* of the notice need not do

28  so.

determines that the conflict "will affect the outcome of the proceedings before the court." *Kirk*, 183 Cal. Rptr. at 650; *see also Oaks Mgmt. Corp. v. Superior Ct.*, 51 Cal. Rptr. 3d 561, 571 (Cal. Ct. App. 2006) ("Disqualification is inappropriate . . . simply to punish a dereliction that will likely have no substantial continuing effect on future judicial proceedings.").  In evaluating a motion to disqualify, the court must recognize the realities of "today's legal world where lawyers change associations more freely than in the past" and the adverse effects on lateral mobility—especially for "mid-career lawyers"—that disqualification orders can cause.  *Los Angeles*, 223 F.3d at 996.

All of those considerations counsel against disqualification.  There is not a shred of evidence suggesting that Mr. Pak has divulged or ever will divulge any confidential information to anyone at KL.  *See* Pak Decl. ¶ 22; Postman Decl. ¶ 18; Keller Decl. ¶ 2; Whiting Decl. ¶ 2; Zweig Decl. ¶ 2; Ethridge Decl. ¶ 2; Heinz Decl. ¶ 2; Watson Decl. ¶ 2; Dravillas Decl. ¶ 2; Longtin Decl. ¶ 2; Hanna Decl. ¶ 2.  And Facebook does not dispute that KL currently has an effective screen in place.  Hence KL's representation will not "taint [this] trial," *McElroy*, 2015 WL 2251057, at *3, or "affect the outcome of the proceedings," *Kirk*, 183 Cal. Rptr. at 650.  That is the end of the matter.

The best Facebook can muster is that it will need to "second guess whether [its] communications were kept confidential."  Mot. at 23.  But as this Court has recognized, "hypothetical disclosures" are not a reason to order disqualification.  *Kane*, 2013 WL 3991107, at *14–15 (declining to order disqualification because "the Court has not found that confidential information was in fact disclosed").  What is instead required is a showing that "counsel's continued representation would threaten to taint all further proceedings."  *Id*. at *7.  And Facebook provides no reason to think that KL's continued presence, with a rigorous screen in place and without having obtained any confidential information, will taint this case in any way.  As a result, disqualification would be entirely "punitive" rather than "prophylactic"—not a basis for disqualification.  *Id*. at *15.

Requiring punitive disqualification in cases like this—where there is no risk of prejudice to the moving party—would have unfortunate systemic consequences as well.  Law firms will think twice before hiring junior associates like Mr. Pak, worried that opposing counsel might one day try to cast document reviews and marginal participation in team calls as a basis for disqualification, *notwithstanding any screen*.  Those worries will translate into fewer lateral-employment

1   opportunities for younger lawyers.  The problem will be particularly acute for young lawyers who

2   ultimately wish to work on behalf of injured plaintiffs rather than corporate defendants.  Such

3   lawyers often begin their careers at firms that litigate primarily on behalf of large companies, and a

4   rule requiring disqualification here would make it difficult for these lawyers to ever move to a

5   plaintiff-side firm.  In the absence of risk of actual harm, there is no reason for the Court to convert

6   junior associates into "Typhoid Marys" in this way.  *Los Angeles*, 223 F.3d at 996.

7        **B.    A Screen Can Be Used In These Circumstances To Prevent Adverse Impact.**

8        California cases dealing with disqualification in the specific context of imputed conflicts

9   confirm this result.  Those cases lay out a two-tiered presumption framework with the ultimate goal

10  of determining whether the conflict will taint the trial (such that disqualification is necessary despite

11  the consequences) or not (such that disqualification is unnecessary).  When a lawyer switches side

12  in *the same case*, there is an irrebuttable presumption that the lawyer has shared the confidential

13  information with lawyers at the new firm who are working on the case—and thus an irrebuttable

14  presumption that the trial will be tainted.  *Kirk*, 108 Cal. Rptr. 3d at 649.[4]  But that is not the situation

15  here.  The *Klein* case did not exist while Mr. Pak was at Kellogg Hansen, and even Facebook argues

16  only that he worked on a "substantially related" case, not the same case.  Mot. at 14.

17       That distinction is an important one.  Where a firm "employs an attorney who previously

18  represented a party opposing the firm in the case in a 'substantially related' but *different* case,"

19  courts allow a screen to prevent disqualification on a "case-by-case" basis.  *Nat'l Grange*, 2017 WL

20  2021731, at *2 (emphasis added).  That is although there is a presumption that the lawyer shared

21  confidential information with his new colleagues—and thus a presumption of a tainted trial—that

22  presumption is rebuttable.  *Kirk*, 108 Cal. Rptr. 3d at 643.  Specifically, it can be rebutted by

23  evidence of an effective screen, *i.e.*, if the firm "satisf[ies] the trial court that the [tainted attorney]

---

[4] Although the pre-amendment case law says nothing about the definition of "substantial participation"—a concept that did not exist in the prior rules or case law—the Rules specifically invite courts to consider *Kirk* when evaluating the "standards for disqualification." Rule 1.10 Cmt. 6.  Hence it is appropriate for the Court to consider *Kirk*—and cases following it—when determining whether disqualification is an appropriate remedy. *See also* Ex. Summ. at 2 (noting that the rules put in place "an approach to screening that was sanctioned in *Kirk*").

1  has not had and will not have any involvement with the litigation, or any communication with

2  attorneys or employees concerning the litigation, that would support a reasonable inference that the

3  information has been used or disclosed."  *Id.*; *see Los Angeles*, 223 F.3d at 996 ("An ethical wall,

4  when implemented in a timely and effective way, can rebut the presumption that a lawyer has

5  contaminated the entire firm.").[5]

6        That is why, in the cases that Facebook cites in support of its misleading contention that

7  "[c]ourts have found disqualifying conflicts based on far less" involvement than Mr. Pak had, Mot.

8  at 16, there was some concrete reason to think that the confidential information *might have actually*

9  *been shared* with lawyers working on the new case.  In some of those cases, it was because the

10  attorneys with the confidential information had themselves *actually worked* on the new case.  *Guifu*

11  *Li*, 2011 WL 4635176, at *4 (noting that the attorney had "use[d] confidential information he gained

12  . . . to [his client's] advantage in this litigation"); *Talon Research*, 2012 WL 601811, at *1 (noting

13  that three of the attorneys deemed to possess confidential information were actually "named as

14  counsel on [the relevant] complaint"); *Bryant*, 2012 WL 12884904, at *2 (noting that the lawyer

15  with confidential information was actually serving as "Plaintiff's counsel").  In others, it was

16  because the firm had failed to employ an effective screen.  *Wausau*, 2010 WL 11549716, at *6

17  (noting that the conflicted attorney himself "took at least two depositions and prepared and opposed

18  dispositive motions" in a related matter adverse to the former client); *Advanced Messaging*, 913 F.

19  Supp. 2d at 911 (noting that the law firm imposed a screen *eight months after* the conflict arose)

20  And in one, the conflicted attorney affirmatively stated that he *had* shared confidential information

21  with others at the firm.  *Farhang*, 2009 WL 3459455, at *6.  Here, by contrast, KL put in place an

---

23     [5] In support of its argument that a firm is automatically disqualified if one of its attorneys

24  previously participated in a different but "substantially related" case, Facebook relies primarily on

*Flatt v. Superior Ct.*, 885 P.2d 950, 954-55 (Cal. 1994).  But as later California cases have

25  recognized, the relevant portion of that case is "dicta."  *Kirk*, 108 Cal. Rptr. 3d at 634; *Nat'l Grange*,

2017 WL 2021731, at *2 ("*Flatt's* extension of *Henriksen*'s holding, however, was dictum,

26  as *Flatt* did not decide whether a firm should be disqualified.")  And not only was *Flatt* reciting

dicta, but dicta that "the California Supreme Court [later] called into question."  *Nat'l Grange*, 2017

27  WL 2021731, at *2 (discussing *People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*,

28  980 P.2d 371 (Cal. 1999)).  Facebook thus overreaches even in its misguided application of pre-

amendment case law.

effective screen, Baldwin Decl. ¶ 22–23, and every lawyer involved in the new case has sworn under penalty of perjury that no confidential information was passed along.  *See* Pak Decl. ¶ 22; Postman Decl. ¶ 18; Keller Decl. ¶ 2; Whiting Decl. ¶ 2; Zweig Decl. ¶ 2; Ethridge Decl. ¶ 2; Heinz Decl. ¶ 2; Watson Decl. ¶ 2; Dravillas Decl. ¶ 2; Longtin Decl. ¶ 2; Hanna Decl. ¶ 2.  Even assuming arguendo the existence of a conflict, Facebook has simply offered no evidence to suggest that confidential information was shared, or will ever be shared, with the KL attorneys working on this case.  Hence there is no reason to think that any purported conflict "will affect the outcome of the proceedings before the court," *Kirk*, 183 Cal. Rptr. at 650—and no legitimate basis for disqualification.

## **CONCLUSION**

The Court should deny Facebook's Motion to Disqualify Keller Lenkner LLC.


Dated: May 21, 2021                                    Respectfully submitted


                                                      */s/ Warren Postman*
Ashley Keller (admitted *pro hac vice*)                  Warren Postman (Bar No. 330869)
  ack@kellerlenkner.com                                   wdp@kellerlenkner.com
Ben Whiting (admitted *pro hac vice*)                  Jason Ethridge (admitted *pro hac vice*)
  ben.whiting@kellerlenkner.com                           jason.ethridge@kellerlenkner.com
Jason A. Zweig (admitted *pro hac vice*)               **KELLER LENKNER LLC**
  jaz@kellerlenkner.com                                1300 I Street, N.W., Suite 400E
**KELLER LENKNER LLC**                                 Washington, DC 20005
150 N. Riverside Plaza, Suite 4270                     (202) 918-1123
Chicago, IL 60606
(312) 741-5220
                                                      *Interim Counsel for the Consumer Class*

PLAINTIFFS' OPPOSITION TO FACEBOOK'S MOTION TO DISQUALIFY
Case No. 5:20-cv-08570-LHK

1

## <u>CERTIFICATE OF SERVICE</u>

2

3

I hereby certify that on this 21st day of May 2021, I electronically transmitted the

foregoing document to the Clerk's Office using the CM/ECF System.

4

5

<u>*/s/ Warren Postman*</u>
Warren Postman

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO FACEBOOK'S MOTION TO DISQUALIFY
Case No. 5:20-cv-08570-LHK