Warren Postman (Bar No. 330869)
 wdp@kellerlenkner.com
Jason Ethridge (admitted *pro hac vice*)
 jason.ethridge@kellerlenkner.com
**KELLER LENKNER LLC**
1300 I Street, N.W., Suite 400E
Washington, DC 20005
(202) 918-1123

Ashley Keller (admitted *pro hac vice*)
 ack@kellerlenkner.com
Benjamin Whiting (admitted *pro hac vice*)
 ben.whiting@kellerlenkner.com
Jason A. Zweig (admitted *pro hac vice*)
 jaz@kellerlenkner.com
**KELLER LENKNER LLC**
150 N. Riverside Plaza, Suite 4270
Chicago, IL 60606
(312) 741-5220

*Interim Counsel for the Consumer Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, SARAH GRABERT, and RACHEL BANKS KUPCHO, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs,*<br><br>vs.<br><br>FACEBOOK, INC.,<br><br>*Defendant.*<br><br><u>This Document Relates To: All Actions</u> | Consolidated Case No. 5:20-cv-08570-LHK<br><br>**DECLARATION OF WARREN POSTMAN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO FACEBOOK'S MOTION TO DISQUALIFY KELLER LENKNER LLC**<br><br>Hon. Lucy H. Koh<br>Date:  September 30, 2021<br>Time: 1:30 p.m.<br>Courtroom: 8 |

I, Warren Postman, declare as follows:

1. I am a Partner at Keller Lenkner LLC ("KL"). I have personal knowledge of the facts stated herein, and, if called upon as a witness, I could and would competently testify thereto.

**Background on Keller Lenkner**

2. KL represents plaintiffs in complex litigation, with a focus on product liability, consumer protection, employment law, and antitrust claims. At KL, the process of identifying potential cases often begins with KL partners following the news; reading legal publications such as Law360, National Law Journal, and Westlaw Today; and reviewing docket alerts for certain types of case filings. Other law firms also contact us regularly to suggest potential opportunities to work as co-counsel. When those sources elicit an idea for a potential case, we often undertake research on Westlaw or PACER to better understand the issue. If the initial research is encouraging, we discuss the idea with a fellow partner or two. If the idea still seems to have promise, we conduct more thorough research and discuss the idea with additional partners before deciding whether to proceed. This cycle of discussion and research is often iterative. Once the firm decides to pursue a case, we seek out a client—often through online marketing—to retain us to pursue the claims.

3. I typically spend several hours each weekend and several more hours over the course of each work week on the process above. In an average week, I skim hundreds of news stories about potential defendants, perform quick research into a dozen or more potential cases, and discuss several potential case ideas with my partners. KL decides to pursue only a very small number of the cases we explore.

**Keller Lenkner Consideration of Antitrust Claims Against Facebook**

4. Starting in early 2020, I began reading public news reports that made clear the Federal Trade Commission and other regulators were increasingly concerned about antitrust harms caused by "big tech" companies such as Amazon, Google, Apple, and Facebook.

5. In late July, the House Judiciary Committee conducted widely publicized hearings regarding big tech companies and antitrust, which included testimony from the CEOs of Amazon, Google, Apple, and Facebook. On August 4, 2020, Ashley Keller, Travis Lenkner, Adam Gerchen, and I conducted a quarterly planning meeting and discussed the firm's strategic priorities for new

-1-   Case No. 5:20-cv-08570-LHK
WARREN POSTMAN DECLARATION IN SUPPORT OF FACEBOOK'S MOTION TO DISQUALIFY KELLER LENKNER LLC

cases. We noted the growing public recognition that big tech companies cause antitrust harms and agreed to prioritize antitrust matters against those companies. In the following weeks, Mr. Keller and I brainstormed multiple ideas for antitrust cases against each of these companies, including Facebook. With regard to Facebook, we soon included our partner, Ben Whiting, in the discussions.

6. On October 4, 2020, the Subcommittee on Antitrust, Commercial and Administrative Law of the House Judiciary Committee released a report entitled "Investigation of Competition in Digital Markets" that detailed a wide range of anticompetitive conduct and harms committed by Facebook. Mr. Keller, Mr. Whiting, and I thought we had come up with some insights that were not fully captured by the Subcommittee Report and resolved to think through the relevant legal and factual issues more thoroughly. KL also decided that, for a variety of strategic reasons, we would want to partner with another, larger firm before deciding to file a major antitrust case against Facebook.

7. On October 14, 2020, I called Stephen Swedlow at Quinn Emanuel ("QE") to raise the possibility of KL's partnering with QE to bring an antitrust case against Facebook. KL and QE have worked successfully as co-counsel on several other cases in the past.

8. Mr. Swedlow informed me that QE had in fact litigated a related case against Facebook in 2019 and spent a considerable amount of time since then investigating similar antitrust theories to the ones KL had proposed pursuing. We continued to discuss the possibility of a potential case over the following several weeks.

9. KL and QE formally agreed to pursue a case against Facebook together on November 20, 2020.

10. On November 22, 2020, KL began searching for a client interested in retaining KL and QE.

11. Maximillian Klein and Sarah Grabert retained KL and QE on December 3, 2020.

**Screening of Albert Pak**

12. Albert Pak joined KL as an associate in KL's Washington, D.C. office on June 29, 2020.

13.     On June 30, 2020, I asked Mr. Pak to describe for conflict purposes the former clients he had represented at Kellogg, Hansen, Todd, Figel & Frederick P.L.L.C. ("Kellogg Hansen") and, as KL does for all incoming attorneys, I asked Mr. Pak to obtain a full conflicts list from his former firm. Mr. Pak disclosed that he had performed work for Facebook while at Kellogg Hansen. Kellogg Hansen is known for its work in antitrust matters, Facebook was under scrutiny for potential antitrust violations, and KL regularly brings antitrust claims on behalf of plaintiffs. I therefore asked Mr. Pak if the work he performed for Facebook was antitrust-related. When Mr. Pak replied that it was, I made a mental note to avoid involving Mr. Pak in anything related to Facebook and antitrust in the future. At that time, however, KL did not represent any client adverse to Facebook and had no concrete plans to bring any case against Facebook.

14.     Mr. Pak forwarded me a full conflicts list from Kellogg Hansen on July 1, 2020, which I shared with KL's Managing Partner, Travis Lenkner.

15.     In early August, when I first began discussing potential claims against Facebook with Mr. Keller and Mr. Whiting, I immediately instructed them not to discuss the claims with Mr. Pak, because he had previously represented Facebook while at Kellogg Hansen. Mr. Keller, Mr. Whiting, and I analyzed and discussed potential claims by email and primarily stored related files locally on our hard drives, none of which could be accessed by Mr. Pak. Prior to November 11, 2020, a single file relating to this case was stored on our cloud-based document management system, and our access records confirm that Mr. Pak never accessed it.

16.     As we began investigating potential claims against Facebook, I also asked Mr. Pak to describe in further detail, without revealing confidential information, the sort of antitrust matter in which he had represented Facebook and the nature of his role in that matter. I explained that KL was evaluating potential antitrust claims against Facebook on behalf of Facebook users and asked if his work for Facebook was related to those issues. Mr. Pak told me that the matter involved a large antitrust investigation and that it likely was related to such issues. He also explained that he was one of many lawyers at Kellogg Hansen and several other firms who had represented the company in the matter. He said that he played a junior role on a large team of Kellogg Hansen lawyers, which was focused primarily on investigating potential experts, and that he had worked on

the matter for several months (he likely told me a precise number of months, but I do not specifically recall it). At that time, KL still had not decided to pursue an antitrust case against Facebook, or where such a case might be filed. Out of an abundance of caution, however, I instructed Mr. Pak to be careful not to discuss any claims involving Facebook with anyone at KL.

17. By November 11, 2020, it seemed likely that KL and QE would reach an agreement to work together to file an antitrust case against Facebook on behalf of Facebook users. I therefore suggested to Mr. Lenkner that we institute a formal, firmwide ethical screen. Mr. Lenkner imposed the following screening measures:

- That same day, Mr. Lenkner notified all KL attorneys and staff by email, marked "high priority," that Mr. Pak had been screened from—and could not have any involvement in—the potential antitrust case KL was considering pursuing against Facebook.

- All attorneys and staff were further directed not to:
    - Speak to Mr. Pak about the potential case or any related issues;
    - Save any Facebook-related files outside of the Facebook workspace on the document management system; or
    - Leave physical case materials in unlocked or open areas that could be accessed by anyone not working on the matter.

- Also on November 11, 2020, access to all documents related to Facebook was restricted to exclude Mr. Pak.

- During a quarterly all-firm meeting conducted via Zoom on December 4, 2020, all KL attorneys and staff were reminded of this (and other) ethical screens in place at the firm and the attendant restrictions.

- All attorneys and staff who join KL are informed of this (and other) ethical screens in place at the firm and the attendant restrictions.

- The main KL "intranet" page for attorneys and staff lists current ethical screens in place at the firm, including this one.

18. As noted above, I discussed the contours of Mr. Pak's work for Facebook only to the extent necessary to evaluate the potential for a conflict. I have never discussed the substance of Mr. Pak's work with Facebook with Mr. Pak. I have never discussed the claims in this case with Mr. Pak. And Mr. Pak has never discussed the claims in this case with me.

19. Every attorney at KL who has billed time to this case has submitted a declaration in support of KL's opposition to Facebook's motion to disqualify confirming that he or she similarly has never discussed this case, or Mr. Pak's work for Facebook, with Mr. Pak.

20. At the hearing before this Court on March 19, 2021, I stated that Mr. Pak had been screened "upon his arrival at the firm." That was admittedly an imprecise description. As noted, when Mr. Pak arrived at the firm on June 29, 2020, KL did not have any client adverse to Facebook and had no plans to have any matter adverse to Facebook, so there was nothing from which to screen Mr. Pak. What I should have said was that we conducted a conflicts check upon Mr. Pak's arrival at the firm, that we were therefore aware that he had previously represented Facebook, and that as a result, we ensured at every step that Mr. Pak had no involvement in the Facebook case in any way. In other words, from the moment Mr. Pak joined the firm and we performed a standard conflicts check, and we took all appropriate steps to ensure a proper screen.

**Practical Implications of Facebook's Position**

21. Facebook has taken the position that KL should have "screened" Mr. Pak immediately upon his joining KL, or at least when KL first thought about potential claims against Facebook. A requirement to screen lawyers from potential, non-existent, future matters would be entirely unworkable for any law firm..

22. In any given week, lawyers at KL likely discuss more than a dozen potential new case ideas. Many of these ideas give rise to some preliminary research questions. And several each month lead to detailed analyses but ultimately are not pursued. If KL were required to impose a formal, firm-wide screen for every one of every KL lawyer's former clients, regardless of whether KL was even considering pursuing a matter against a lawyer's former clients, it would be impossible to comply because we would not know what to screen the lawyer *from*. Moreover, if KL were required to impose a formal firmwide screen as soon as any lawyer at KL had an idea for a potential

case, KL would be forced to send out hundreds of screens each year. That would make it impossible for attorneys at KL to remember all the screens in place, and to whom they applied, and ultimately would make the screens that *are* required by the rules less effective.

I declare that the foregoing is true and correct under penalty of perjury. Executed May 21, 2021, in Burlington, Vermont.

*/s/ Warren Postman*
Warren Postman