SONAL N. MEHTA (CA Bar No. 222086)
Sonal.Mehta@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

DAVID Z. GRINGER (*pro hac vice*)
David.Gringer@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Attorneys for Defendant*
FACEBOOK, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, SARAH GRABERT, AND RACHEL BANKS KUPCHO, on behalf of themselves and all those similarly situated,<br><br>                Plaintiffs,<br><br>        v.<br><br>FACEBOOK, INC.,<br><br>                Defendant. | Case No. 5:20-cv-08570-LHK<br><br>**REPLY IN SUPPORT OF FACEBOOK'S MOTION TO DISQUALIFY KELLER LENKNER LLC**<br><br>Date:    September 30, 2021<br>Time:    1:30 p.m.<br>Ctrm:    8<br>Judge:   Hon. Lucy H. Koh |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 3

    I.      THE CONFLICTED LAWYER SUBSTANTIALLY PARTICIPATED
           IN THE GOVERNMENT ANTITRUST INVESTIGATIONS ............................ 3

        A.      Keller Lenkner's Interpretation Of "Substantial Participation" Is
              Textually, Historically, And Logically Wrong ........................................... 4

        B.      Mr. Pak's Participation Was Substantial Under Any Definition ............... 7

    II.     KELLER LENKNER DID NOT TIMELY SCREEN MR. PAK .......................... 8

        A.      Keller Lenkner Had An Obligation To Implement A Screen Well
              Before It Was Retained By The Named Plaintiffs On The Day It
              Filed Suit .................................................................................................... 9

        B.      Mr. Pak's Individual Ethics Obligations And Keller Lenkner's
              Scattershot, Informal Measures Were No Substitute For A Screen
              .................................................................................................................. 10

    III.    DISQUALIFICATION IS WARRANTED ........................................................ 12

CONCLUSION .................................................................................................................. 15

1

**<u>TABLE OF AUTHORITIES</u>**

2

**Page(s)**

**CASES**

3

4

*Acacia Patent Acquisition, LLC v. Superior Ct.*,
   184 Cal. Rptr. 3d 583 (Ct. App. 2015).................................................................. 6

5

*Advanced Messaging Technologies, Inc. v. EasyLink Services International Corp.*,
   913 F. Supp. 2d 900 (C.D. Cal. 2012) ............................................................... 6, 7

6

7

*Beltran v. Avon Products, Inc.*,
   867 F. Supp. 2d 1068 (C.D. Cal. 2012) ............................................................... 13

8

*Diva Limousine, Ltd. v. Uber Technologies, Inc.*,
   2019 WL 144589 (N.D. Cal. Jan. 9, 2019) ......................................................... 12

9

10

*Export-Import Bank of Korea v. ASI Corp.*,
   2019 WL 8200603 (C.D. Cal. Jan. 16, 2019) ................................................. 11, 13

11

*Farris v. Fireman's Fund Insurance Co.*,
   14 Cal. Rptr. 3d 618 (Ct. App. 2004)................................................................... 6

12

13

*Guifu Li v. A Perfect Day Franchise, Inc.*,
   2011 WL 4635176 (N.D. Cal. Oct. 5, 2011)........................................................ 15

14

*Hitachi, Ltd. v. Tatung Co.*,
   419 F. Supp. 2d 1158 (N.D. Cal. 2006) ............................................................... 13

15

16

*In re Complex Asbestos Litigation*,
   283 Cal. Rptr. 732 (Ct. App. 1991) ................................................................. 9, 11

17

*In re Vitamin C Antitrust Litigation*,
   279 F.R.D. 90 (E.D.N.Y. 2012) ........................................................................... 9

18

19

*Kane v. Chobani, Inc.*,
   2013 WL 3991107 (N.D. Cal. Aug. 2, 2013) ................................................. 13, 14

20

21

*Kirk v. First American Title Insurance Co.*,
   108 Cal. Rptr. 3d 620 (Ct. App. 2010)........................................................ 11, 12, 14

22

*MD Helicopters, Inc. v. Aerometals, Inc.*,
   2021 WL 1212718 (E.D. Cal. Mar. 31, 2021) ..................................................... 6

23

24

*National Grange of Order of Patrons of Husbandry v. California Guild*,
   250 Cal. Rptr. 3d 705 (Ct. App. 2019).......................................................... 2, 11, 12, 14

25

26

*People ex rel. Department of Corporations v. SpeeDee Oil Change Systems, Inc.*,
   980 P.2d 371 (Cal. 1999) ................................................................................... 12

27

28

*SC Innovations, Inc. v. Uber Technologies, Inc.*,
  2019 WL 1959493 (N.D. Cal. May 2, 2019) ....................................... 12, 14, 15

*Talon Research., LLC v. Toshiba America Electronic Components, Inc.*,
  2012 WL 601811 (N.D. Cal. Feb. 23, 2012) ....................................... 7

*Wausau Business Insurance Co. v. Diamond Contract Services, Inc*,
  2010 WL 11549716 (C.D. Cal. Sept. 23, 2010) ................................ 7

*WhatsApp Inc. v. NSO Group Technologies Ltd.*,
  2020 WL 7133773 (N.D. Cal. June 16, 2020) ................................. 6

**BRIEFS**

*MD Helicopters, Inc. v. Aerometals, Inc*., Mem. P. & A. in Supp. of Mot. to Disqualify
  2019 WL 7594334 (E.D. Cal. Sept. 10, 2019) ................................. 6

**RULES**

Cal. R. Prof. Conduct 1.9 ............................................................. 6

Cal. R. Prof. Conduct 1.10 ..........................................................*passim*

D.C. R. Prof. Conduct 1.9 ............................................................. 10

D.C. R. Prof. Conduct 1.10 .......................................................... 10

Ill. R. Prof. Conduct 1.9 .............................................................. 10

Ill. R. Prof. Conduct 1.10 ............................................................ 10

**OTHER AUTHORITIES**

State Bar of California, *Executive Summary: Rule 1.10 Imputation of Conflicts of
  Interest*, https://tinyurl.com/3xm66ca4 ...................................... 5, 6, 9

Transcript, *Conflicts of Interest: Challenges and Options for Dealing With Conflicts In
  A Complex Environment*, California MCLE Marathon 2019: Current
  Developments in Legal Ethics-Competence Issues-Elimination of Bias, PLI Plus
  (recorded Dec. 12, 2019), https://plus.pli.edu/Details/Details?fq=id:(294253) ...................... 5

2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 309a (4th ed. 2014) ........................ 7

Despite repeatedly running afoul of the California Rules of Professional Conduct, Keller Lenkner makes clear that it still lacks appreciation of their purpose. It dismisses as merely "hypothetical" the very concerns that the Rules guard against. It downplays the role of Facebook's former lawyer in the government antitrust matter, even while his own declaration confirms the significance of the representation and the extent of client confidences to which he was privy. And it fundamentally misconstrues the function of ethical screens, implausibly deriding Facebook's concern that its former lawyer—after spending more than six months and 800 hours working for Facebook in a matter involving the same conduct and legal theories at issue here—could have (even inadvertently) disclosed the company's confidences after joining a small firm where he works closely with the attorneys who are litigating this case.

These concerns are exacerbated because Keller Lenkner has given Facebook every reason to worry that its confidences were and are at risk of disclosure. Keller Lenkner has obfuscated both the timing of its work-up of this case and its compliance with the ethical obligations created by employing Facebook's former counsel. When early and independent work adverse to Facebook favored the firm, Keller Lenkner partner Warren Postman told this Court of the "months and years" it had spent "thinking not about the high-level fact that an antitrust case could exist against Facebook, but the real nitty gritty." Interim Class Counsel Hearing Tr. 48:4-8 (March 18, 2021) ("Hr'g Tr."); *see also id.* 52:15-53:6. And Mr. Postman boasted of the "the many late nights" he had personally endured "working on the complaint, the memos and before the cases." *Id.* at 48:4-8. Yet, after being confronted with the (unmet) ethical obligations triggered by this work, those "late nights" poring over "the real nitty gritty" suddenly became "no concrete plans to bring a lawsuit against Facebook"—indeed, the case Mr. Postman and his colleagues supposedly spent "months and years" preparing, and sought to be rewarded for by being appointed co-lead class counsel, ceased to even "exist" until a little more than two weeks before filing a complaint. Opposition to Motion ("Opp.") at 4. Similarly, with that class counsel appointment on the line, Mr. Postman confidently assured the Court and Facebook that Keller Lenkner had "promptly

screened [Facebook's former] lawyer *upon his arrival at the firm*." Hr'g Tr. 10:4.[1] Forced to admit this was false, that assurance became a mere "slip of the tongue." Opp. 6. Even then, Keller Lenkner does not contest that it imposed no formal ethical screen until long after it started "analyzing the potential claims underlying *this case*," thereby putting Facebook's confidential and privileged information at risk in precisely the way the Rules prohibit. *Id.* at 4.

Behind the shifting stories and misstatements to the Court are undisputed facts that require disqualification. *First*, the firm hired a lawyer who possessed Facebook's confidential and privileged information as a result of 800+ hours of work over just six months on a matter substantially related to this litigation. Even under Keller Lenkner's interpretation of its ethical obligations, this required Keller Lenkner to screen the attorney from the firm's work adverse to Facebook and notify the company of the conflict. Opp. 16, 20. But Keller Lenkner admits that it erected no ethical screen until *months after* Keller Lenkner undertook work adverse to Facebook. And more, the firm did not promptly notify Facebook of the conflict as required by the Rules, choosing to do so only after Facebook pieced together the firm's distortions and raised the issue itself. Opp. 4, 20. These decisions violated the Rules and demand disqualification because a "necessary" element of every screen is that it "be timely imposed." *Nat'l Grange of Ord. of Patrons of Husbandry v. Cal. Guild*, 250 Cal. Rptr. 3d 705, 714 (Ct. App. 2019). None of Keller Lenkner's self-serving arguments against disqualification or carefully worded declarations alters these fundamental facts in any way. *Second*, the former Facebook lawyer's own declaration confirms the extensive and sensitive work he performed for the company, including heavy involvement with Facebook's experts, responding to investigative demands, and frequent, direct contact with in-house counsel. Because such work constitutes substantial participation in a substantially related matter, Keller Lenkner breached its ethical obligations under the Rules and should be disqualified.

To be sure, disqualification is a serious remedy and one that Facebook does not seek lightly. But it is necessary here. Facebook should not be left to wonder which version of the facts surrounding Keller Lenkner's work-up of this case is true. Facebook should not be left to question

---

[1] Except where otherwise noted, internal citations and quotation marks have been omitted and emphasis has been added.

whether a firm that has been so cavalier with its screening and notification obligations in this case—and that was disqualified in another case in this District for failing to live up to its ethical obligations—can be trusted to abide by those obligations here. And Facebook should not be left to worry that its confidences may have been shared or may still be shared, even inadvertently, with its opponent. That is precisely the position that the ethics rules say Facebook should not be forced to endure, and yet it is the position Facebook finds itself in.

## **ARGUMENT**

## I.   THE CONFLICTED LAWYER SUBSTANTIALLY PARTICIPATED IN THE GOVERNMENT ANTITRUST INVESTIGATIONS

From December 2019 to June 2020, Albert Pak spent more than 800 hours representing Facebook in the FTC's and state attorneys general's antitrust investigations and preparing for litigation. Panner Decl. ¶ 8. Serving as Facebook's lawyer was his primary responsibility. *Id.* (noting Mr. Pak billed around three-quarters of his time to Facebook during that period). While on the Facebook team defending against these investigations and preparing for eventual litigation, Mr. Pak had direct and personal contact with Facebook's in-house counsel, learned Facebook's overall defense strategy through communications with the most senior lawyers involved in the investigations and litigation preparation, wrote legal memoranda concerning issues of potential relevance to that defense, participated in fact-gathering for witness interviews, and helped respond to investigative demands. *Id.* ¶ 5; Pak Decl. ¶¶ 12-16. Notably, he was also an important part of Facebook's expert team, through which he "was privy to all of the expert teams' pending projects and discussions among counsel and expert teams regarding defense strategy." Panner Decl. ¶ 6; Pak Decl. ¶¶ 12-13. Mr. Pak's declaration disputes none—and confirms most—of these facts.[2]

Because the government antitrust investigations, associated preparation for litigation, and this case are substantially related within the meaning of the California Rules of Professional

---

[2] Keller Lenkner goes so far as to explicitly *advertise* Mr. Pak's past work at Kellogg Hansen on unspecified "antitrust litigation" in describing his qualifications to do antitrust work at his present firm. *See* Keller Lenkner, *Albert Pak*, https://www.kellerlenkner.com/our-team/albert-pak/.

Conduct, the question here is whether the work described above was "substantial."[3]  If so, no ethical screen could cure the conflict created by Mr. Pak switching sides. *See* Cal. R. Prof. Conduct 1.10(a); Opp. 16. Keller Lenkner argues, without citing a single case, that Mr. Pak's participation did not rise to that level because other, more senior lawyers *also* represented Facebook in the government antitrust work. This interpretation of the Rules would cause a sea change in California ethics practice, allowing all but the most senior partners to be screened from subsequent adverse representations. That has never been the rule in this State, and it is not now.

## A. Keller Lenkner's Interpretation Of "Substantial Participation" Is Textually, Historically, And Logically Wrong

Keller Lenkner starts in the right place, identifying four (expressly nonexhaustive) factors that the Rules' commentary says should be considered in determining whether a lawyer's prior participation was substantial. But the firm then takes a wrong turn, insisting that a lawyer's participation can only be evaluated by comparing it against all of the other attorneys who represented a former client. This interpretation is not supported in either the text of the rule or in logic. The entire basis for this supposedly dispositive qualification is the commentary's use of the phrase "the extent," which precedes two of the four example factors. Opp. 11-13. Keller Lenkner elides that even under its interpretation, this language *at most* applies to the two factors where it can actually be found. Yet more importantly, "the extent to which the lawyer was exposed to confidential information" and "the extent to which a lawyer advised or had personal contact with the former client," Rule 1.10 cmt. 1, are most naturally evaluated by looking at the lawyer's actual work, regardless of what other attorneys did or did not do. Just as "the extent to which" a person is balding could range from "not much" to "substantially" regardless of how much hair other people have, so too can "the extent to which" Mr. Pak obtained confidential information and advised or had personal contact with Facebook be evaluated on its own terms. That is the ordinary

---

[3] Keller Lenkner appears to concede that the matters are substantially related. Opp. 16 (admitting that for at least one Facebook lawyer a screen would not be permissible). Regardless, they clearly are. The government investigations and litigation preparation involved the same course of conduct and legal theories put forward by the private plaintiffs in this case. Mot. 3-4, 12-14. Indeed, the private plaintiffs have told Facebook, and just this week acknowledged to Judge DeMarchi, that they are already coordinating with the FTC and state attorneys general on the parallel litigation.

meaning of the phrase, and nothing in the text of the Rule or its commentary supports, much less requires, Keller Lenkner's contrary interpretation.

The version of substantial participation advanced in the Opposition, moreover, would have far-reaching consequences at odds with the purposes and history of the ethical rules. As Keller Lenkner acknowledges, California long precluded *any* ethical screens in cases where ***any*** lawyer changed sides in substantially related matters. Opp. 10. The 2018 Amendments worked a modest change to that regime, and now "permit the erection of an ethical screen in *narrowly defined* circumstances." State Bar of California, *Executive Summary: Rule 1.10 Imputation of Conflicts of Interest*, at 1, https://tinyurl.com/3xm66ca4 ("*Executive Summary*").[4] Rule 1.10 thus "significantly differs" from the analogous ABA Model Rule by "permit[ting] screening only in limited situations." *Id.*; *see also id.* at 2 (screening is permissible only "under narrowly specified conditions"). That is because the California Rule's central purpose is avoiding situations that "create[e] a significant risk that a lawyer who has acquired sensitive confidential information about the former client[] is now in the opposing party's law firm." *Id.* at 2. The factors listed in the commentary are a proxy for when an attorney would have obtained that "sensitive confidential information," something that indisputably happened here. Keller Lenkner's view of substantial participation, in contrast, would put nearly all but the most senior lawyers who obtained extensive privileged information while representing Facebook within what is supposed to be a "narrow[]" and "limited" exception to a general prohibition on screening. Put another way, under Keller Lenkner's version of Rule 1.10, when a client's need for counsel is significant enough to require multiple lawyers, most of those attorneys would be subject to *looser* ethical standards in subsequent representations.

The modest change effected by the 2018 Amendments also means that Keller Lenkner errs in categorically rejecting the guidance of pre-Amendment caselaw. Opp. 16 (stating the concept

---

[4] Keller Lenkner's own expert has taught that the rule change "allows for an ethical wall *under very limited circumstances*." Transcript, *Conflicts of Interest: Challenges and Options for Dealing With Conflicts In A Complex Environment*, California MCLE Marathon 2019: Current Developments in Legal Ethics-Competence Issues-Elimination of Bias, PLI Plus (recorded Dec. 12, 2019), https://plus.pli.edu/Details/Details?fq=id:(294253) (Statement by Merri A. Baldwin).

1   of "substantial participation . . . did not exist under the old rules"). The Rules themselves
2   acknowledge the significant continuity in the ethics landscape, repeatedly citing pre-2018
3   decisions. *See, e.g.*, Rule 1.9 cmts 1, 5; Rule 1.10 cmt. 6. So did the Rules' drafters in explaining
4   the meaning of the Amendments. *See Executive Summary*, *supra*, at 2 (noting adoption of "a
5   limited screening provision . . . that was sanctioned" in pre-Amendment caselaw). Courts
6   interpreting the amended Rules have too. *MD Helicopters, Inc. v. Aerometals, Inc.*, 2021 WL
7   1212718, at * 5-*6 (E.D. Cal. Mar. 31, 2021) (relying on pre-2018 cases to interpret Rules 1.9 and
8   1.10); *WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, 2020 WL 7133773, at *3-*4 (N.D. Cal. June 16,
9   2020) (same). Even Keller Lenkner's own expert would not cast aside the pre-Amendment
10  decisions, expressly relying on one such decision when helpful to her cause. Baldwin Decl. ¶ 22
11  (citing 2010 decision); *see also* Mem. P. & A. in Supp. of Mot. to Disqualify, *MD Helicopters,*
12  *Inc.*, 2019 WL 7594334, at *7-*11 (E.D. Cal. Sept. 10, 2019) (motion signed by Ms. Baldwin
13  relying on pre-Amendment caselaw to support violation of Rules 1.9 and 1.10 post-Amendment).
14          To be sure, the Rules did not expressly use the term "substantially participate" before 2018.
15  But the concept was hardly new. Mot. 15 n.11. When determining whether a conflict existed and
16  disqualification was warranted, courts assessed not just whether matters are "substantially
17  related"—but also the "nature and extent of the attorney's involvement with the cases." *See Acacia*
18  *Pat. Acquisition, LLC v. Super. Ct.*, 184 Cal. Rptr. 3d 583, 588 (Ct. App. 2015); *Farris v.*
19  *Fireman's Fund Ins. Co.*, 14 Cal. Rptr. 3d 618, 621-22 (Ct. App. 2004) (directing courts to consider
20  *both* whether an attorney's prior involvement "was direct and personal" *and* whether "there is a
21  connection between the two successive representations"). *Advanced Messaging Technologies, Inc.*
22  *v. EasyLink Services International Corp.*, for example, stated that a court assessing a substantial
23  relationship should "analyze whether there was a direct relationship between an attorney and the
24  former client," then turn to "whether that relationship touched issues related to the present
25  litigation" and decide if "the subject of the prior representation put the attorney in a position in
26  which confidences material to the current representation would normally have been imparted to
27  counsel." 913 F. Supp. 2d 900, 906-07 (C.D. Cal. 2012). Cases in which an attorney's involvement
28  in a prior representation was deemed significant enough to create a conflict warranting

1   disqualification are no less instructive now that the Rules have formalized "substantial

2   participation" as a standalone consideration, thereby separating out component parts the caselaw

3   previously analyzed together. Otherwise, the very concept of "substantial participation" would be

4   superfluous, given that California courts expressly considered the very same factors the Rules now

5   group under substantial participation when addressing substantial relation.[5]

6       **B.   Mr. Pak's Participation Was Substantial Under Any Definition**

7           Regardless of how "substantial participation" is defined, Keller Lenkner's attempts to

8   minimize Mr. Pak's involvement in the government antitrust investigations and Facebook's

9   preparation for litigation are unavailing. Keller Lenkner focuses on the first factor, Opp. 12, but

10  there is overwhelming evidence of Mr. Pak's substantial "responsibility in the prior matter," Rule

11  1.10 cmt. 1. Mr. Pak does not dispute that he acquired sensitive confidential information relating

12  to Facebook's trial strategy, nor that he had frequent and direct contact with Facebook's in-house

13  counsel. Panner Decl. ¶¶ 4-7 (describing how "Mr. Pak was heavily involved"); Pak Decl. ¶¶ 13-

14  16. And he acknowledges that he "primarily spent [his] time on the Facebook matter" working "on

15  the expert team," including attending "several weekly calls with [its members]." Pak Decl. ¶¶ 12-

16  13; *see also* Panner Decl. ¶ 6 (noting that "Mr. Pak was privy to all of the expert teams' pending

17  projects and discussions among counsel and expert teams regarding defense strategy"). Expert

18  testimony "is both ubiquitous and essential in antitrust cases." 2 Phillip E. Areeda & Herbert

19  Hovenkamp, *Antitrust Law* ¶ 309a (4th ed. 2014). Keller Lenkner simply ignores this reality.[6]

20          The remaining considerations do no more to help Keller Lenkner's cause. First, "the

---

21  [5] Each of the decisions whose citation Keller Lenkner calls "stunningly misleading," Opp. 15,
22  analyzed the attorney's participation in the prior matter against a rubric similar to that used by the
    Amended Rules. *See Advanced Messaging Techs.*, 913 F. Supp. at 907; *Wausau Bus. Ins. Co. v.*
23  *Diamond Cont. Servs., Inc.*, 2010 WL 11549716, at *4 (C.D. Cal. Sept. 23, 2010); *Talon Rsch.,*
    *LLC v. Toshiba Am. Elec. Components, Inc.*, 2012 WL 601811, at *2-*3 (N.D. Cal. Feb. 23, 2012).

24  [6] Merri Baldwin's conclusory assertion that Mr. Pak did not substantially participate in the
    government antitrust investigations suffers from the same defect. Ms. Baldwin assumes, without
25  support and without apparent antitrust expertise, that Mr. Pak's work on the expert team involved
26  "very narrow issues" related to "certain fact-gathering." Baldwin Decl. ¶ 20. Far from it. Panner
    Decl. ¶¶ 5-7. Further, Ms. Baldwin apparently based this opinion on the mistaken belief that Mr.
27  Pak "did not have direct client contact." *Id.* As Mr. Pak himself acknowledged, he did. Pak Decl.
    ¶ 16; *see also* Panner Decl. ¶ 7 ("[Mr. Pak] participated in many meetings in which Facebook's
28  in-house counsel participated and interacted with those lawyers directly.").

---

duration of [Mr. Pak's] participation" weighs in favor of substantial participation. Rule 1.10 cmt. 1. Keller Lenkner's baseless speculation about how much time Mr. Pak spent representing Facebook as compared to other lawyers aside, Opp. 12, the undisputed facts are that Mr. Pak spent 75% of his time for more than six months working on the government antitrust investigations, Panner Decl. ¶ 8. Second, Mr. Pak "advised or had personal contact with the former client." Rule 1.10 cmt. 1. Mr. Pak contends that he does not "recall" such contact "[o]utside of weekly group calls and the group emails, the one witness interview, and the other tasks described [in his declaration]." Pak Decl. ¶ 16. That is to say, Mr. Pak *does* recall having "personal contact." Nothing in the Rules or commentary restricts such contact to "one-on-one communication[s]." *Id.* Further, the partner with whom Mr. Pak worked most closely reviewed the relevant billing records, and determined that Mr. Pak did indeed participate in meetings with Facebook's in-house counsel and otherwise "interact[] with" Facebook's in-house counsel "directly." Panner Decl. ¶¶ 5, 7. Finally, Mr. Pak "was exposed to confidential information of the former client likely to be material in the current matter." *See* Rule 1.10 cmt. 1. Keller Lenkner does not suggest otherwise. Opp. 13. To the contrary, it attempts to downplay Mr. Pak's role by speculating that he was "privy to just a small sliver of . . . the confidential information obtained by" the others working on the case. *Id.* So what? A lawyer does not need to learn *all* of a client's confidences, or more confidences than some other lawyer on the case, for his or her duties to the client to attach. Mr. Pak was entrusted with knowledge of "all of the expert teams' pending projects" and received "daily" emails from Mr. Hansen "shar[ing] his thinking on legal and trial strategy," including "documents and analysis from [Facebook] and counsel at other firms assisting Facebook on the investigations and potential litigation." Panner Decl. ¶¶ 6-7.

All four factors thus favor substantial participation, and no screen could cure the conflict created by Mr. Pak's representation of Facebook. Disqualification is warranted on this basis alone.

## II.   KELLER LENKNER DID NOT TIMELY SCREEN MR. PAK

In any case, even if Keller Lenkner were correct that an ethical screen could theoretically have cured the conflict here (it is not), the firm did not timely screen Mr. Pak from its antitrust investigation of Facebook. According to its new timeline, despite onboarding Mr. Pak in June

1   2020, beginning to analyze the claims in this particular case in August 2020, discussing a co-

2   counsel arrangement with Quinn Emanuel in October 2020, and representing to the Court that it

3   had conducted a lengthy pre-complaint investigation of Facebook, Keller Lenkner admits it did

4   not impose an ethical screen until November 11, 2020. Mot. 18-19; Opp. 5. The firm defends that

5   belated screen by claiming that (1) it had no obligation to implement a screen before being engaged

6   by the named plaintiffs; and (2) even if it did, the scattered and informal measures Keller Lenkner

7   took—then misrepresented to the Court—sufficed. Neither argument is persuasive.

8       **A.    Keller Lenkner Had An Obligation To Implement A Screen Well Before It Was**

9           **Retained By The Named Plaintiffs On The Day It Filed Suit**

10          Keller Lenkner contends that it could start to work up litigation against Facebook on behalf

11  of a putative class without regard for the ethics rules, as long as it had not formally signed up a

12  plaintiff to affix his or her name to the complaint. Opp. 16-17. That makes no sense. The rules

13  against successive representations in substantially related matters exist to protect the duty of

14  confidentiality owed to *former* clients, not future ones. Mot. 11-12, 17-18; *see also Executive*

15  *Summary*, *supra*, at 1-2. That is why "screening should be implemented *before* undertaking the

16  challenged representation or hiring the tainted individual." *In re Complex Asbestos Litig.*, 283 Cal.

17  Rptr. 732, 745 (Ct. App. 1991). Were the rule otherwise, the preventive effect of screens would be

18  defeated; they are, after all, "prophylactic, affirmative measure[s] to avoid both the reality and

19  appearance of impropriety" created by a firm taking actions that could risk even inadvertent

20  disclosure of privileged and confidential information. *Id.* In the class action context, as this case

21  well demonstrates, those confidences are jeopardized before named plaintiffs are found. *See In re*

22  *Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 107 (E.D.N.Y. 2012) (noting that antitrust class actions

23  are typically "driven by lawyers," rather than named plaintiffs). Months before imposing a screen,

24  Keller Lenkner was—by its own admission—"investigating and analyzing the claims *in this case*."

25  Dkt. 93-5 at 2. These actions were clearly adverse to Facebook, and the firm undertook them

26  knowing it employed a lawyer with the very information most relevant to the planned suit.

27          Indeed, Keller Lenkner's conduct belies its assertion that requiring a screen before signing

28  an engagement letter would not "be practically workable." Opp. 17. Although there may be

1    situations in which the obligation to screen is unclear based on the preliminary nature of an
2    investigation, this is not one. As Mr. Postman has explained, he began instructing attorneys not to
3    speak with Mr. Pak about the firm's antitrust investigation as Keller Lenkner "considered the
4    potential matter against Facebook." Dkt. 93-5 at 2. By that time, the firm was obviously aware that
5    its investigation was sufficiently advanced and adverse to Facebook to raise ethical concerns, and
6    could have imposed a screen then. It *chose* not to. One need look no further than Mr. Postman's
7    declaration to understand the irrationality of Keller Lenkner's position: according to Mr. Postman,
8    the firm had not been engaged by the named plaintiffs *until the day it filed the complaint*. *Compare*
9    Dkt. 1 (Complaint filed Dec. 3, 2020), *with* Postman Decl. ¶ 11 ("Maximillian Klein and Sarah
10   Grabert retained KL and QE on December 3, 2020."). Thus, under the firm's view of when its
11   ethical obligations attached, it was permitted to work up this case for "months and years" and over
12   "many late nights," and go so far as to draft an 80+ page complaint, all without any screen in place,
13   as long as it implemented a screen that day. That cannot be—and is not—the rule.

14        In the end Keller Lenkner pleads ignorance, contending that it ignored its obligations under
15   the California Rules because "there was no indication [they] would govern any potential
16   representation" and the firm could not have known "which jurisdiction's rules to apply." Opp. 4,
17   17 (emphasis omitted). In fact, the firm did know what rules would apply. The December 3
18   complaint signed by Keller Lenkner expressly avers that "Facebook's terms [of service] provide
19   that consumers *must bring these claims in this Court*." Dkt. 1 ¶ 28.  In any case, even the more
20   permissive jurisdictions that Keller Lenkner suggests would have excused its conduct require a
21   timely screen when a lawyer changes sides in substantially related matters. *See* D.C. R. Prof.
22   Conduct 1.9, 1.10; Ill. R. Prof. Conduct 1.9, 1.10. Thus, there was no question that the firm *at least*
23   had the obligation to screen Mr. Pak. Further, Mr. Postman and the firm were doubtless familiar
24   with the particular ethical obligations imposed by the California Rules, given that Mr. Postman is
25   barred in the state and the firm was recently disqualified for violating them. Opp. 1; Mot. 7-8.

26   **B.    Mr. Pak's Individual Ethics Obligations And Keller Lenkner's Scattershot,
27          Informal Measures Were No Substitute For A Screen**

28        Mr. Pak's own obligation not to share Facebook's privileged and confidential information,

and the informal measures Keller Lenkner says it took to try to limit disclosures, does nothing to obviate the firm's failings. Opp. 18. An attorney always has such a duty, but the rules nevertheless require screening rather than a hodgepodge of warnings to individual lawyers. It is the insufficiency of those measures that creates the need for Rule 1.10 and a screen in the first place. "Screening is a prophylactic, affirmative measure to avoid both the reality and appearance of impropriety," *In re Complex Asbestos Litig.*, 283 Cal. Rptr. at 745, and a formal screen ensures that all members of the firm are aware of the conflict and their obligation to be vigilant. The Rules thus demand "the imposition of *preventive* measures to *guarantee* that information will not be conveyed," *Nat'l Grange*, 250 Cal. Rptr. 3d at 714, and courts routinely disqualify law firms that fail to impose timely screens, *see, e.g.*, *Export-Import Bank of Korea v. ASI Corp.*, 2019 WL 8200603, at *11 (C.D. Cal. Jan. 16, 2019), regardless of whether confidential information was actually disclosed or other informal measures were taken.

This very case illustrates why the Rules require firms to turn square corners when complying with screening obligations. Mr. Pak possessed detailed information about Facebook's defense strategy, including privileged and confidential information relating to "all of the expert teams' pending projects." Panner Decl. ¶¶ 5-7. In antitrust litigation, the particular information Mr. Pak possessed is of even greater importance. *Supra*, at 7. Yet just days after leaving Kellogg Hansen, he joined a law firm of approximately 30 attorneys, at least a third of whom are apparently participating in this litigation, and began working on other antitrust suits with them and co-counsel at Quinn Emanuel. *See* Opp. 22 (collecting declarations); Mot. 18-19 & n.14. The risk of even inadvertent disclosures in such a small office is manifest. *See Kirk v. First Am. Title Ins. Co.*, 108 Cal. Rptr. 3d 620, 646 n.33 (Ct. App. 2010) ("In some cases, particularly where the attorneys work closely together in a small office, complete isolation" from attorneys working on the conflicted matter "may be necessary"). And the need for a formal screen that appropriately alerts all involved to the conflict and their own obligations not to cross-pollinate information is particularly acute in that setting, especially where, as here, Mr. Pak is working with the other members of his office (and an overlapping team of lawyers from Quinn Emanuel) on other Section 2 cases day in and day out. For that reason, the carefully parsed (and identical) declarations by Keller Lenkner

11   REPLY IN SUPPORT OF FACEBOOK'S MOTION
TO DISQUALIFY KELLER LENKNER LLC

1   attorneys claiming that they never discussed the "substance" of Mr. Pak's prior work with

2   Facebook (nor this case, without the "substance" caveat) with Mr. Pak are irrelevant.

3       In any event, the Rules preclude the guessing game into which Keller Lenkner has forced

4   Facebook. The duties owed to former clients "protect the confidentiality of the attorney-client

5   relationship," which "ensur[es] the right of every person to freely and fully confer and confide in

6   one having knowledge of the law." *People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys.,*

7   *Inc.*, 980 P.2d 371, 378 (Cal. 1999). That relationship is irreparably compromised when a client

8   "is left to speculate what information its former attorneys shared with their colleagues." *SC*

9   *Innovations, Inc. v. Uber Techs., Inc.*, 2019 WL 1959493, at *10 (N.D. Cal. May 2, 2019). This

10  taint cannot be cured through ex post representations like those offered by Keller Lenkner, which

11  assert after the fact "that confidential information was not conveyed or that the disqualified

12  attorney did not work on the case." *Nat'l Grange*, 250 Cal. Rptr. 3d at 714. The Rules require "the

13  imposition of *preventive* measures to guarantee that information will not be conveyed." *Id.*[7]

14  **III.   DISQUALIFICATION IS WARRANTED**

15      This misconduct warrants disqualification. Keller Lenkner resists that conclusion by

16  misstating the law, falsely characterizing Facebook's motion as "punitive," and asserting that

17  disqualification would remedy no prejudice. Opp. 21-25. But as explained in Facebook's motion,

18  that remedy is appropriate in cases like this one, where a firm has recklessly (and repeatedly)

19  violated its ethical obligations, leaving a former client with no way to assure its confidences were

20  kept. Mot. 20-25.

21      *First*, Facebook need not show Keller Lenkner's breach of its ethical violations will

22  necessarily "taint" a future trial or "affect the outcome of the proceedings before the court." Opp.

---

[7] Keller Lenkner's decision to obtain an ethics opinion *now* is too little, too late. "[U]nilaterally obtained ethics guidance is not a shield that allows counsel to continue a representation where that representation creates an untenable conflict," even when such advice is procured "before" involvement in a matter. *Diva Limousine, Ltd. v. Uber Techs., Inc.*, 2019 WL 144589, at *13 (N.D. Cal. Jan. 9, 2019). Here, of course, the advice was sought in litigation to excuse past misconduct. And although the declaration characterizes as "most important[]" the fact that other attorneys at Keller Lenkner have attested to the effectiveness of the firm's informal measures, Baldwin Decl. ¶ 24, California courts have expressly rejected this approach to evaluating screens, *see, e.g.*, *Kirk*, 108 Cal. Rptr. 3d at 646 ("It is not sufficient to simply produce declarations stating that confidential information was not conveyed or that the disqualified attorney did not work on the case.").

22. In support of this standard, Keller Lenkner relies primarily on *Kane v. Chobani, Inc.*, 2013 WL 3991107 (N.D. Cal. Aug. 2, 2013). To borrow a phrase, this is a stunningly misleading citation. *Kane* involved the question of whether to disqualify "counsel due to contact with an opposing party's expert." *Id.* at *7. The legal standard applicable to such motions is distinct from those involving an attorney's own conflict of interest, and requires proof of actual disclosure of confidential information. *Id.* at *7-*8 (applying this specialized standard, which requires showing that (1) the expert possessed confidential information; (2) the expert disclosed or used that information when dealing with opposing counsel; and, if so, that (3) "opposing counsel's continued representation would threaten to taint all further proceedings").

The standard applicable here, in contrast, is the one stated in Facebook's motion: courts must "balance[e] the relative interests of the parties with the need to preserve ethical standards," ensuring "adequate[] protect[ion]" for a former client's confidential information and avoiding "the appearance of impropriety." Mot. 21-22 (quoting *Hitachi, Ltd. v. Tatung Co.*, 419 F. Supp. 2d 1158, 1165 (N.D. Cal. 2006)). Applied to a nearly identical conflict created through the hiring of an associate in *Hitachi*, that standard warranted disqualification. *Id.* And it did so despite the disqualified firm having "immediately" employed an ethical wall and otherwise scrupulously complying with its ethical obligations. *Id.* at 1164. The same can hardly be said for Keller Lenkner. *Supra*, at 8-9. Indeed, the firm does not even bother trying to distinguish—because it cannot— *Hitachi* or *Beltran v. Avon Prods., Inc.*, 867 F. Supp. 2d 1068 (C.D. Cal. 2012), which also held disqualification appropriate based on a conflict similar to the one here. Nor does the firm contest that "[c]ourts routinely disqualify counsel for failing to [timely] implement ethical screens," as happened in this case. *Export-Import Bank of Korea*, 2019 WL 8200603, at *11; Mot. 22.

*Second*, even under Keller Lenkner's (mis)statement of the law, disqualification would still be warranted because the firm's decision to play fast and loose with its ethics obligation "taints" this proceeding and may well "affect the outcome of the proceedings before the court." Opp. 21-22.[8] Keller Lenkner can offer all the belated self-serving declarations it wants, but no action now

---

[8] That disqualification would not be "punitive" is further evidenced by the firm's status as a repeat offender. Mot. 7-8.

can substitute for "the imposition of *preventive measures* to guarantee that information will not be conveyed." *Nat'l Grange*, 250 Cal. Rptr. 3d at 714. Keller Lenkner was working on this very case before it implemented a screen, nearly a third of the firm's lawyers have participated in this litigation, and Mr. Pak continues to work with numerous lawyers involved in *Klein*. This ongoing, close contact—after the months during which Keller Lenkner worked adversely to Facebook despite failing to construct an ethical screen—creates a real risk of at least inadvertent disclosure of confidential and privileged information material to this matter. Although the firm brushes aside these concerns as "hypothetical," Opp. 22,[9] the entire point of the Rules' prophylactic nature is to avoid precisely this situation, in which a client "is left to speculate what information its former attorneys shared with their colleagues." *SC Innovations*, 2019 WL 1959493, at *10. Only disqualification can resolve that uncertainty—it is the necessary remedy to prevent prejudice to Facebook, not "punitive." And it bears repeating: the injury to a former client caused by a breach of the Rules is not cured through ex post assertions of "no harm, no foul." Opp. 21-25 (claiming as much). That is because "[i]t is not sufficient to simply produce declarations stating that confidential information was not conveyed or that the disqualified attorney did not work on the case." *Kirk*, 108 Cal. Rptr. 3d at 646. Moreover, in contrast to the harm caused by Keller Lenkner's continued involvement in this case, the firm simply defaults on the question of whether disqualification would prejudice the plaintiffs. *See* Mot. 23-24 (noting that the well-represented plaintiffs would suffer no prejudice at all if Keller Lenkner were disqualified at this early stage).

Finally, Keller Lenkner takes sporadic shots at the timing of Facebook's motion, alleging "tactical abuse." Opp. 1, 5-8, 20. Not so. Facebook filed this motion as soon as it discovered disqualification was warranted, a determination delayed by Keller Lenkner's shifting representations about its compliance with the ethics rules. *Supra*, at 1-2; Mot. 5-7. Keller Lenkner's failure to promptly notify Facebook—as the rules required it to do—undermined the

---

[9] Here again Keller Lenkner misleadingly cites *Kane*, relying on inapposite language regarding the standard for disqualifying counsel based on contact with a conflicted expert. *Compare* Opp. 22, *with Kane*, 2013 WL 3991107, at *13-15 (contrasting the "hypothetical disclosures" justifying disqualification of an expert against "the distinct determination of whether the moving party already has transmitted the moving party's confidential information to opposing counsel").

company's ability to investigate the nature of Mr. Pak's prior representation and what, if any, screening procedures could have adequately mitigated the risk to its privileged and confidential information. Instead, Keller Lenkner swept the issue under the rug, only acknowledging a potential conflict after Facebook raised it at the hearing on appointment of interim class counsel. And even then, it took several rounds of correspondence to ascertain Keller Lenkner's (inadequate and untimely) response to the problem.[10] Considering this record, the timing of Facebook's efforts to enforce the duties Mr. Pak and Keller Lenkner owed the company hardly present the kind of "extreme" and "unreasonable delay" that would weigh against disqualification. *See Guifu Li v. A Perfect Day Franchise, Inc.*, 2011 WL 4635176, at *5 (N.D. Cal. Oct. 5, 2011) (describing "a narrow exception to the disqualification doctrine when a former client inexcusably postpones a motion to disqualify"). To find otherwise would be to fault Facebook—and deprive it of the protections it is due under the ethics rules—because of Keller Lenkner's inexcusable delay and because Facebook carefully considered the facts and law before it came to the Court to seek relief.

## CONCLUSION

Keller Lenkner violated the Rules of Professional Conduct and then tried to obscure its ethical failings from Facebook and the Court by opportunistically framing both its participation in this matter and the steps it took to mitigate its breach of the Rules. Facebook "is left to speculate what information its former attorney[] shared with [his] colleagues." *SC Innovations*, 2019 WL 1959493, at *10. That warrants disqualification, and the Court should grant Facebook's motion.

---

[10] Keller Lenkner accuses Facebook of misrepresenting its concerns about the conflict at that hearing. Opp. 6, 19. In fact, Facebook raised Mr. Pak and the Keller Lenkner lawyers litigating the State cases against Google (which also involve Facebook) to flag these issues for the Court and counsel. Hr'g Tr. 7:24-9:13. Any uncertainty about the extent of Keller Lenkner's breach of its duties, and the remedies warranted, resulted only from Keller Lenkner's own failure to timely inform Facebook of the conflict. Facebook can hardly be faulted for its discretion in not leveling serious charges without the relevant facts. In any event, the specific point to which Keller Lenkner takes umbrage—exactly how many former Kellogg Hansen attorneys the firm employs—was clarified at the hearing. Hr'g Tr. 9:10 (Facebook's counsel referring to "the lawyer in question"); 9:14-19 (confirming that there was one lawyer who worked on the government cases at Kellogg Hansen). In fact, Keller Lenkner does employ multiple former Kellogg Hansen lawyers (including one who appears on the original *Klein* complaint), but only one worked on the government cases.

1    Dated: May 28, 2021                    Respectfully submitted,

2                                           */s/ Sonal N. Mehta*
3                                           SONAL N. MEHTA (CA Bar No. 222086)
                                            sonal.mehta@wilmerhale.com
4                                           WILMER CUTLER PICKERING
                                             HALE AND DORR LLP
5                                           2600 El Camino Real, Suite 400
                                            Palo Alto, California 94306
6                                           Telephone: (650) 858-6000
                                            Facsimile: (650) 858-6100
7

8                                           DAVID Z. GRINGER (*pro hac vice*)
                                            david.gringer@wilmerhale.com
9                                           WILMER CUTLER PICKERING
                                             HALE AND DORR LLP
10                                          1875 Pennsylvania Avenue, NW
                                            Washington, D.C. 20006
11                                          Telephone: (202) 663-6000
                                            Facsimile: (202) 663-6363
12

13                                          *Attorneys for Defendant*
                                            FACEBOOK, INC.
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28