**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Stephen A. Swedlow (admitted *pro hac vice*)
  stephenswedlow@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Shana E. Scarlett (Bar No. 217895)
  shanas@hbsslaw.com
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
(510) 725-3000

*Interim Co-Lead Consumer Class Counsel*

[Additional counsel listed on signature page]

**BATHAEE DUNNE LLP**
Yavar Bathaee (Bar No. 282388)
  yavar@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
(332) 205-7668

**SCOTT + SCOTT ATTORNEYS AT LAW LLP**
Kristen M. Anderson (Bar No. 246108)
  kanderson@scott-scott.com
230 Park Avenue, 17th Floor
New York, NY 10169
(212) 223-6444

*Interim Co-Lead Advertiser Class Counsel*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> FACEBOOK, INC., <br><br> Defendant. <br><br> This Document Relates To: All Actions | Consolidated Case No. 5:20-cv-08570-LHK <br><br> **CONSUMER CLASS PLAINTIFFS' AND ADVERTISER CLASS PLAINTIFFS' JOINT OPPOSITION TO FACEBOOK'S MOTION TO DISMISS** <br><br> The Hon. Lucy H. Koh <br><br> Hearing Date:   July 15, 2021 at 1:30 p.m. |

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ................................................................................1

II.   RELEVANT ALLEGATIONS AND BACKGROUND ..........................................3

    A.    *Consumers*: Anticompetitive Conduct in the Social Media and Social
          Network Markets ...............................................................................................3

          1)    Systematic and Repeated Deception of Consumers ...................................3

          2)    Surveillance of Competitive Threats Using Deceptively Obtained
                Data ..........................................................................................................4

          3)    Harm to Competition ...............................................................................4

    B.    *Advertisers*: Anticompetitive Conduct in the Social Advertising Market.................5

          1)    API Access Removal, Data Demands, and Whitelist Agreements .............5

          2)    Use of Onavo to Surveil Competitors and Advertising Targets...................6

          3)    Anticompetitive Back-end Integration of Acquired Businesses ...................7

          4)    Market Allocation Agreement with Google .............................................7

          5)    Harm to Competition ...............................................................................7

II.   LEGAL STANDARDS .........................................................................................7

III.  ARGUMENT ........................................................................................................7

    A.    Plaintiffs' Section 2 Claims Are Timely .................................................................7

          1)    Plaintiffs Allege Actionable Conduct and Injuries Inside the
                Limitations Period ...................................................................................8

                a)    Consumers Detail Continued Conduct and New Injuries .................8

                b)    Advertisers Detail Continued Conduct and New Injuries...............10

          2)    Fraudulent Concealment Tolls Plaintiffs' Section 2 Claims ......................11

                a)    Consumers Adequately Allege Concealment...................................11

                b)    Advertisers Adequately Allege Concealment .................................13

           3)    Laches Does Not Bar Plaintiffs' Requests for Equitable Relief .................14

    B.    Facebook Possesses Monopoly Power in Cognizable Product Markets .................15

          1)    Consumers' Social Network and Social Media Markets............................16

a)    The Markets Are Well-Defined and Recognized and Address Substitutes .......................................................................16

b)    Facebook Has Monopoly Power in Both Markets Alleged by Consumers ......................................................................18

2)    Advertisers' Social Advertising Market Is Well-Defined and Recognized and Addresses Substitutes ........................................19

C.    Facebook Obtained and Maintained Monopoly Power by Anticompetitive Means .................................................................................................21

1)    Facebook's Unrelenting Deception of Consumers Violates Section 2 ........21

2)    Facebook's Anticompetitive Serial Acquisition Conduct ............................24

a)    Consumers' Claims ............................................................24

b)    Advertisers' Claims ...........................................................25

3)    Plaintiffs Do Not Allege "Product Improvement" Claims ........................26

4)    Facebook Mischaracterizes Plaintiffs' Allegations Regarding Developers ............................................................................27

a)    Consumers' Claims Do Not Implicate a "Duty to Deal" ................27

b)    Advertisers' Claims ...........................................................27

D.    Plaintiffs Adequately Allege Antitrust Standing and Injury .....................................28

1)    Consumers Suffered Direct, Quantifiable, Antitrust Injury ........................28

2)    Advertisers Allege Antitrust Standing and Injury ....................................32

E.    Consumers State a Cognizable, Standalone Unjust Enrichment Claim ..................34

IV.    REQUESTS FOR LEAVE TO AMEND ..........................................................................35

V.    CONCLUSION ...............................................................................................................35

1

## **TABLE OF AUTHORITIES**

2
**Page**

3
## Cases

4
*Abuelhawa v. Santa Clara Univ.*,
   No. 5:20-cv-04045-LHK (N.D. Cal. March 29, 2021) ........................................................... 35

5

6
*Allflex USA, Inc. v. Avid Identification Sys., Inc.*,
   2010 WL 11405130 (C.D. Cal. Feb. 16, 2010) .......................................................................... 18

7
*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
   592 F.3d 991 (9th Cir. 2010) ......................................................................................................... 26

8

9
*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*,
   190 F.3d 1051 (9th Cir. 1999) ..................................................................................................... 28

10

11
*Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publications, Inc.*,
   108 F.3d 1147 (9th Cir. 1997) ..................................................................................................... 23

12
*Apple Inc. v. Pepper*,
   139 S. Ct. 1514 (2019) ................................................................................................................. 30

13

14
*Arista Networks, Inc. v. Cisco Sys. Inc.*,
   2018 WL 11230167 (N.D. Cal. May 21, 2018) ......................................................................... 23

15

16
*Aspen Skiing Co v. Aspen Highlands Skiing Corp.*,
   472 U.S. 585 (1985) ..................................................................................................................... 28

17

18
*Backhaut v. Apple Inc.*,
   2015 WL 4776427 (N.D. Cal. Aug. 13, 2015) ......................................................................... 34

19
*Beasley v. Conagra Brands, Inc.*,
   374 F. Supp. 3d 869 (N.D. Cal. 2019) ....................................................................................... 14

20

21
*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................................................ 7

22
*Bercut-Vandervoort & Co. v. Maison Tarride Ledroit & Cie*,
   2006 WL 8442285 (N.D. Cal. June 1, 2006) ............................................................................. 14

23

24
*Bhan v. NME Hosps., Inc.*,
   669 F. Supp. 998 (E.D. Cal. 1987) .............................................................................................. 29

25

26
*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962) ......................................................................................................... 17, 19, 33

27
*Brown v. Google LLC*,
   2021 WL 949372 (N.D. Cal. Mar. 12, 2021) ........................................................... 7, 11, 13, 14

28

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*,
148 F.3d 1080 (D.C. Cir. 1998) ................................................................. 21, 23

*Clayco Petroleum Corp. v. Occidental Petroleum Corp.*,
712 F.2d 404 (9th Cir. 1983) ............................................................................ 7

*Cmty. Publishers, Inc. v. Donrey Corp.*,
892 F. Supp. 1146 (W.D. Ark. 1995) ......................................................... 15, 18

*Cmty. Publishers, Inc. v. DR Partners*,
139 F.3d 1180 (8th Cir. 1998) ......................................................................... 21

*CollegeNet, Inc. v. Common Application, Inc.*,
355 F. Supp. 3d 926 (D. Or. 2018) .................................................................. 18

*Conmar v. Mitsui & Co. (U.S.A.), Inc.*,
858 F.2d 499 (9th Cir. 1988) ........................................................................... 14

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) ........................................................................................ 26

*Danjaq LLC v. Sony Corp.*,
263 F.3d 942 (9th Cir. 2001) ........................................................................... 15

*Datel Holdings Ltd. v. Microsoft Corp.*,
712 F. Supp. 2d 974 (N.D. Cal. 2010) ............................................................ 17

*Dial Corp. v. News Corp.*,
165 F. Supp. 3d 25 (S.D.N.Y. 2016) ................................................................. 9

*Dodds v. Cigna Securities, Inc.*,
841 F. Supp. 89 (W.D.N.Y. 1992) .................................................................... 13

*Doe 1 v. AOL LLC*,
719 F. Supp. 2d 1102 (N.D. Cal. 2010) .......................................................... 22

*Duarte v. Quality Loan Serv. Corp.*,
2018 WL 2121800 (C.D. Cal. May 8, 2018) ..................................................... 8

*E.W. French & Sons, Inc. v. General Portland Inc.*,
885 F.2d 1392 (9th Cir.1989) .......................................................................... 13

*Eagle v. Star-Kist Foods, Inc.*,
812 F.2d 538 (9th Cir. 1987) ........................................................................... 30

*ESG Cap. Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016) ................................................................... 34, 35

*F.T.C. v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) ........................................................................... 28

*Fed. Deposit Ins. Corp. v. Dintino*,
    167 Cal. App. 4th 333 (2008) ................................................................................. 35

*Free FreeHand Corp. v. Adobe Sys. Inc.*,
    852 F. Supp. 2d 1171 (N.D. Cal. 2012) ............................................... 8, 9, 21, 24, 25, 26, 29, 32

*Garrison v. Oracle Corp.*,
    159 F. Supp. 3d 1044 (N.D. Cal. 2016) .................................................................. 12

*Genus Lifesciences Inc. v. Lannett Co., Inc.*,
    378 F. Supp. 3d 823 (N.D. Cal. 2019) .................................................................... 23

*Glen Holly Ent., Inc. v. Tektronix, Inc.*,
    352 F.3d 367 (9th Cir. 2003) ...................................................................... 31, 32, 34

*Goldwasser v. Ameritech Corp.*,
    1998 WL 60878 (N.D. Ill. Feb. 4, 1998) .............................................................. 31

*Greyhound Computer Corp. v. Int'l Bus. Machines Corp.*,
    559 F2d 488 (9th Cir. 1977) ................................................................................... 20

*Hart v. TWC Prod. & Tech. LLC*,
    2021 WL 1032354 (N.D. Cal. Mar. 17, 2021) ................................................. 34, 35

*Hicks v. PGA Tour, Inc.*,
    165 F. Supp. 3d 898 (N.D. Cal. 2016) ............................................................ 20, 21

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) .......................................................................... 16, 17

*Hoai Dang v. Samsung Elecs. Co.*,
    2018 WL 6308738 (N.D. Cal. Dec. 3, 2018) ........................................................ 35

*Hoopes v. Union Oil Co. of Cal.*,
    374 F.2d 480 (9th Cir. 1967) .................................................................................... 9

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) .......................................................................... 18, 21

*In re Aggrenox Antitrust Litig.*,
    94 F. Supp. 3d 224 (D. Conn. 2015) ................................................................ 16, 29

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    2010 WL 10947344 (E.D.N.Y. Sept. 22, 2010) ..................................................... 8

*In re Animation Workers Antitrust Litig.*,
    123 F. Supp. 3d 1175 (N.D. Cal. 2015) .............................................. 11, 12, 13, 14

*In re Apple iPod iTunes Antitrust Litig.*,
    796 F. Supp. 2d 1137 (N.D. Cal. 2011) ................................................................ 27

*In re Cardizem CD Antitrust Litig.*,
   105 F. Supp. 2d 618 (E.D. Mich. 2000) .................................................................. 24

*In re Glumetza Antitrust Litig.*,
   2020 WL 1066934 (N.D. Cal. Mar. 5, 2020) ........................................................... 10

*In re Google Digital Advert. Antitrust Litig.*,
   2021 WL 2021990 (N.D. Cal. May 13, 2021) .......................................................... 21

*In re Google Inc.*,
   2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) ......................................................... 22

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
   383 F. Supp. 3d 187 (S.D.N.Y. 2019) ..................................................................... 21

*In re Lithium Ion Batteries Antitrust Litig.*,
   2014 WL 309192 (N.D. Cal. Jan. 21, 2014) ............................................................ 11

*In re Loc. TV Advert. Antitrust Litig.*,
   2020 WL 6557665 (N.D. Ill. Nov. 6, 2020) ............................................................ 20

*In re Loestrin 24 Fe Antitrust Litig.*,
   814 F.3d 538 (1st Cir. 2016) ................................................................................... 29

*In re Magnesium Oxide Antitrust Litig.*,
   2011 WL 5008090 (D.N.J. Oct. 20, 2011) .......................................................... 32, 33

*In re Packaged Seafood Prods. Antitrust Litig.*,
   2017 WL 35571 (S.D. Cal. Jan. 3, 2017) ................................................................. 11

*In re Super Premium Ice Cream Distribution Antitrust Litig.*,
   691 F. Supp. 1262 (N.D. Cal. 1988) ........................................................................ 17

*In re Webkinz Antitrust Litig.*,
   695 F. Supp. 2d 987 (N.D. Cal. 2010) ..................................................................... 18

*Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*,
   661 F. Supp. 2d 1039 (D. Minn. 2009) .................................................................... 20

*Intel Corp. v. Fortress Inv. Grp. LLC*,
   2021 WL 51727 (N.D. Cal. Jan. 6, 2021) ................................................................ 32

*Jamsports & Ent., LLC v. Paradama Prods., Inc.*,
   2003 WL 1873563 (N.D. Ill. Apr. 15, 2003) ........................................................... 17

*Kaiser Found. v. Abbott Labs*,
   2009 WL 3877513 (C.D. Cal. Oct. 8, 2009) ............................................................ 10

*Kickflip, Inc. v. Facebook, Inc.*,
   999 F. Supp. 2d 677 (D. Del. 2013) ........................................................................ 17

*Kinderstart.com LLC v. Google, Inc.*,
   2007 WL 831806 (N.D. Cal. Mar. 16, 2007) ...................................................... 21, 23

*Klehr v. A.O. Smith Corp.*,
   521 U.S. 179 (1997) ................................................................................................ 8

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
   232 F.3d 979 (9th Cir. 2000) ...................................................................... 7, 28, 30

*Korea Kumho Petrochemical v. Flexsys Am. LP*,
   2008 WL 686834 (N.D. Cal. Mar. 11, 2008) ......................................................... 19

*Lockheed Martin Corp. v. Boeing Co.*,
   390 F. Supp. 2d 1073 (M.D. Fla. 2005) ................................................................. 19

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,
   140 F.3d 1228 (9th Cir. 1998) ............................................................................... 32

*Mayor of Baltimore v. Actelion Pharms. Ltd.*,
   995 F.3d 123 (4th Cir. 2021) ................................................................................. 10

*Moore v. Mars Petcare US, Inc.*,
   966 F.3d 1007 (9th Cir. 2020) ................................................................................. 7

*Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*,
   198 F.3d 823 (11th Cir. 1999) ............................................................................... 12

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
   513 F.3d 1038 (9th Cir. 2008) .......................................................................... 15, 16

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*,
   311 F. Supp. 2d 1048 (D. Colo. 2004) ............................................................. 18, 20

*NSS Labs, Inc. v. Symantec Corp.*,
   2019 WL 3804679 (N.D. Cal. Aug. 13, 2019) ....................................................... 17

*Obertman v. Electrolux Home Care Prod., Inc.*,
   482 F. Supp. 3d 1017 (E.D. Cal. 2020) ................................................................. 35

*Oliver v. SD-3C LLC*,
   751 F.3d 1081 (9th Cir. 2014) .......................................................................... 14, 15

*Omni Outdoor Advert., Inc. v. Columbia Outdoor Advert., Inc.*,
   891 F.2d 1127 (4th Cir. 1989)
   (*rev'd on other grounds*) ...................................................................................... 20

*Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*,
   268 F. Supp. 3d 1071 (C.D. Cal. 2017).................................................................. 17

1
2
*Palmer v. BRG of Ga., Inc.*,
   498 U.S. 46 (1990) ................................................................................. 33

3
*Pfizer Inc. v. Johnson & Johnson*,
   333 F. Supp. 3d 494 (E.D. Pa. 2018) .................................................... 24

4
5
*Pistacchio v. Apple Inc.*,
   2021 WL 949422 (N.D. Cal. Mar. 11, 2021) ........................................ 17

6
7
*Pro. Tax Appeal v. Kennedy-Wilson Holdings, Inc.*,
   29 Cal. App. 5th 230 (2018) ................................................................. 35

8
*Rambus Inc. v. F.T.C.*,
   522 F.3d 456 (D.C. Cir. 2008) ........................................................ 23, 24

9
10
*RealPage, Inc. v. Yardi Sys., Inc.*,
   852 F. Supp. 2d 1215 (C.D. Cal. 2012) ........................................... 20, 21

11
12
*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ................................................................ 18

13
*Reiter v. Sonotone Corp.*,
   442 U.S. 330 (1979) .............................................................................. 29

14
15
*Retrophin, Inc. v. Questcor Pharms., Inc.*,
   41 F. Supp. 3d 906 (C.D. Cal. 2014) .................................................... 19

16
17
*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
   471 F. Supp. 3d 981 (N.D. Cal. 2020) ................................. 11, 12, 14, 15, 20, 25

18
*Rheumatology Diagnostics Lab'y, Inc. v. Aetna, Inc.*,
   2013 WL 3242245 (N.D. Cal. June 25, 2013) ...................................... 19

19
20
*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*,
   28 F.3d 1379 (5th Cir. 1994) ................................................................ 25

21
22
*Safeway Inc. v. Abbott Labs.*,
   761 F. Supp. 2d 874 (N.D. Cal. 2011) .................................................. 33

23
*Samsung Elecs. Co. v. Panasonic Corp.*,
   747 F.3d 1199 (9th Cir. 2014) ........................................................... 9, 10

24
25
*Smith v. eBay Corp.*,
   2012 WL 27718 (N.D. Cal. Jan. 5, 2012) .............................................. 9

26
*Stationary Engineers Loc. 39 Health & Welfare Tr. Fund v. Philip Morris, Inc.*,
   1998 WL 476265 (N.D. Cal. Apr. 30, 1998) ........................................ 28

27
28

CONSUMER AND ADVERTISER PLAINTIFFS' JOINT OPPOSITION TO FACEBOOK'S MOTION TO DISMISS

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
  345 F. Supp. 3d 614 (E.D. Va. 2018)
  *aff'd in part, vacated in part* ............................................................................. 15

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
  988 F.3d 690 (4th Cir. 2021) ................................................................................ 15

*Tabler v. Panera LLC*,
  2020 WL 3544988 (N.D. Cal. June 30, 2020) ...................................................... 22

*Tele Atlas N.V. v. NAVTEQ Corp.*,
  2008 WL 4911230 (N.D. Cal. Nov. 13, 2008) ...................................................... 25

*Ticketmaster L.L.C. v. RMG Techs.*,
  2007 WL 2989504 (C.D. Cal. Oct. 12, 2007) ....................................................... 22

*Times-Picayune Pub. Co. v. United States*,
  345 U.S. 594 (1953) .............................................................................................. 20

*TSI Prod., Inc. v. Armor All/STP Prod. Co.*,
  2019 WL 4600310 (D. Conn. Sept. 23, 2019) ...................................................... 29

*U.S. Wholesale Outlet & Distribution, Inc. v. Living Essentials, LLC*,
  2019 WL 4452966 (C.D. Cal. Aug. 7, 2019) ........................................................ 24

*United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v.
  Teikoku Pharma USA, Inc.*,
  74 F. Supp. 3d 1052 (N.D. Cal. 2014) .................................................................. 29

*United Nat'l Records v. MCA, Inc.*,
  609 F. Supp. 33 (N.D. Ill. 1984) ........................................................................... 12

*United States ex rel. Jones v. Sutter Health*,
  2020 WL 6544412 (N.D. Cal. Nov. 6, 2020) ........................................................ 35

*United States v. Aetna Inc.*,
  240 F. Supp. 3d 1 (D.D.C. 2017) .......................................................................... 25

*United States v. Bazaarvoice, Inc.*,
  2014 WL 203966 (N.D. Cal. Jan. 8, 2014) ........................................................... 16

*United States v. Brown*,
  936 F.2d 1042 (9th Cir. 1992) ............................................................................... 33

*United States v. El Paso Nat. Gas Co.*,
  376 U.S. 651 (1964) .............................................................................................. 26

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966) ......................................................................................... 17, 26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ............................................................ 23, 24

*United States v. Topco Assocs., Inc.*,
   405 U.S. 596 (1972) ......................................................................... 33, 34

*United States v. Tribune Publ'g Co.*,
   2016 WL 2989488 (C.D. Cal. Mar. 18, 2016) ........................................ 21

*United States v. Vill. Voice Media, LLC*,
   2003 WL 21659092 (N.D. Ohio Feb. 12, 2003) ...................................... 16

*Vesta Corp. v. Amdocs Mgmt. Ltd.*,
   129 F. Supp. 3d 1012 (D. Or. 2015) ................................................. 18, 19

*Viamedia, Inc. v. Comcast Corp.*,
   951 F.3d 429 (7th Cir. 2020) ............................................................... 28

*Xechem, Inc. v. Bristol-Myers Squibb Co.*,
   372 F.3d 899 (7th Cir. 2004) ................................................................. 9

*Z Techs. Corp. v. Lubrizol Corp.*,
   753 F.3d 594 (6th Cir. 2014) ............................................................... 10

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   401 U.S. 321 (1971) ........................................................................... 10

1

## I.  PRELIMINARY STATEMENT

2    Facebook's motion to dismiss ("Mot.") attempts to dispute well-pleaded factual allegations,

3    attacks legal theories that Plaintiffs have not asserted, and distorts basic principles of antitrust law.

4    The Consumer Complaint ("CC") describes in detail the operation of two markets—the

5    Social Media Market and the Social Network Market—that have been recognized by numerous

6    commentators, governmental entities, and Facebook itself, and alleges specific methods of

7    estimating that Facebook controls over an 80% share of both markets. Unhappy with these facts,

8    Facebook asks the Court to skip discovery, expert reports, and a trial, and reject these detailed

9    allegations because Facebook claims they are "implausible." But implausibility is only a ground to

10   reject *inferences* beyond the allegations of a complaint; it provides no basis to ignore the CC's

11   specific factual allegations, which establish market power in both relevant markets. In all events,

12   the CC's market definition and market power allegations are highly intuitive, not implausible.

13   The CC also alleges that Facebook has obtained and maintained market power by (1)

14   deceiving the market about a material feature of its products and (2) using its wrongfully obtained

15   data advantage to eliminate competition through a series of acquisitions and attacks on competitors.

16   Facebook's primary response is to attack legal theories Consumer Plaintiffs ("Consumers") have

17   *not* alleged. Consumers are not alleging that Facebook falsely disparaged the product of a

18   competitor, challenging individual acquisitions in isolation, or complaining about Facebook's

19   supposed "product improvement." To the extent Facebook does address Consumers' claims,

20   Facebook's central argument is that Consumers could not have been injured because Facebook is

21   "free." But the CC alleges in detail that Facebook is *not* free, because Consumers pay for it with

22   their data and attention. And Facebook simply misstates the law when it claims the antitrust laws do

23   not protect customers who buy products with in-kind consideration.

24   Facebook's argument that Consumers' claims are time-barred similarly attempts to contest

25   well-pleaded factual allegations. The CC alleges Facebook maintained its monopoly through

26   actionable conduct, which caused discrete injuries, after December 2016 (within the limitations

27   period). The CC further alleges Facebook fraudulently concealed key parts of its market deceptions

28   and the anticompetitive nature of its acquisition strategy until 2018 and beyond. And each of these

1    allegations is supported by specific facts detailing the "who," "what," "when," "where," and "how"

2    of the relevant conduct. Facebook cannot establish that Consumers' claims are time-barred without

3    proving these factual allegations are false. But that is an issue for summary judgment or trial, not a

4    motion to dismiss.

5           The Advertiser Complaint ("AC") alleges a well-defined, intuitive, and concretely bounded

6    product market—the Social Advertising Market. This market has been recognized in other contexts

7    by Facebook itself and its salience is confirmed by Facebook's ability to raise ad prices without

8    competitive pressure from other forms of online advertising. Facebook argues the Advertiser

9    Plaintiffs ("Advertisers") failed to identify competitors in the Social Advertising Market, but the

10   AC does identify those competitors, revealing Facebook's argument to be a dispute about the

11   ***boundaries*** of the relevant market, which is inappropriate for resolution on a motion to dismiss.

12   Facebook further faults Advertisers' noncompliance with a non-existent requirement to plead the

13   competitive price absent Facebook's anticompetitive conduct.

14          Facebook attempts to distract from the theories of the AC by defending its ability to set

15   policies for access to its data, improve its product, or engage in individual acquisitions. But these

16   strawman positions are no defense to Advertisers' claims. As explained in the AC, Facebook

17   engaged in a multi-part scheme that was specifically intended to and did actually harm competition,

18   including deceptively inducing third-party developers to build apps for Facebook's Platform and

19   then manipulating Platform access to, among other things, create artificial demand for its mobile

20   advertising product and extort app developers for their data; weaponizing data to identify potential

21   competitors and then neutralize them; agreeing to a market division with Google; executing a serial

22   acquisition scheme and aggressive backend integration of its acquired products. Facebook's

23   alternative explanations are factual disputes to be decided after discovery, and it cites no authority

24   for the proposition that these allegations, if proven, would not be actionable.

25          Finally, Facebook again ignores well-pleaded allegations when it argues Advertisers' claims

26   are time-barred. The AC plainly alleges conduct—including cloning of Snapchat, continued

27   Platform manipulation to harm rivals, spying on competitors, dividing markets with Google, and

28   integration of Instagram and WhatsApp—that inflicted new injuries within the limitations period.

1    The AC further alleges fraudulent concealment of prior conduct that lasted until November 2019.

2         Consumers and Advertisers have both stated timely claims for relief, and Facebook's motion

3    should be denied.

4         **II.       RELEVANT ALLEGATIONS AND BACKGROUND**

5         Consumers are individuals who use Facebook's social network and social media products

6    (Facebook, Instagram, Messenger, and WhatsApp) and assert claims based on Facebook's

7    anticompetitive conduct in the Social Network and Social Media Markets. CC ¶¶ 19, 23, 26, 55,

8    248. Advertisers are direct purchasers of Facebook's advertising who assert claims based on

9    Facebook's anticompetitive conduct in the Social Advertising Market. AC ¶¶ 24–32, 412, 529, 532.

10   **A.    *Consumers*: Anticompetitive Conduct in the Social Media and Social Network Markets**

11        The Social Media Market consists of social media websites and applications, which allow

12   users to distribute media, such as text messages, photos, videos, and music, to other users of the

13   same application. CC ¶ 72. Social media apps focus on the distribution of media, often of one

14   particular form of media (*e.g.*, text posts, or photos, or videos). *Id.* ¶¶ 36, 60, 65.

15        The Social Network Market is a distinct part of the Social Media Market composed of social

16   networks, which are websites and applications that allow users to "find, communicate, and interact

17   with friends, family, personal acquaintances, and other people with whom the users have shared

18   interests or connections." CC ¶ 56. Unlike social media apps (which are limited to users of a

19   particular form of media), social networks connect users to a wide array of people, and also provide

20   users with a wide array of substantive features such as the abilities to communicate, participate in

21   "groups," curate "events," or play online games with one another. *Id.* ¶¶ 57–58. Social networks

22   combine these features into a "one-stop shop." *Id.* ¶ 59.

23        Providers of social networks and social media apps, unlike providers of other products,

24   generally do not charge users a monetary fee, instead providing their products in return for users'

25   data, which they monetize through ads. CC ¶¶ 38–39.

26        **1)      Systematic and Repeated Deception of Consumers**

27        Facebook has gained and maintained dominance in the Social Network and Social Media

28   Markets by systematically deceiving its users about the scope and magnitude of data they provided

---

CONSUMER AND ADVERTISER PLAINTIFFS' JOINT OPPOSITION TO FACEBOOK'S MOTION TO DISMISS

in exchange for Facebook's products. Despite promising, for example, that it had "built extensive privacy settings" to give users "control over who you share your information with," Facebook harvested users' data, shared it with third parties, and weaponized it to identify nascent competitors. CC ¶¶ 112–18, 136, 139–40, 152, 156–58, 167. Facebook's false assurances regarding its collection, use, and sharing of users' data prevented users from jumping ship to competing social networks and social media apps. *Id.* ¶¶ 101, 108, 111–26, 131, 137, 140, 154, 238.

Contrary to its repeated representations, and in breach of its 2012 FTC settlement, Facebook enabled tens of thousands of apps, such as Cambridge Analytica, to unauthorizedly access millions of Facebook users' data.[1] CC ¶¶ 140–48. In 2019, the DOJ recognized that Facebook's continued deception, including its breach of the FTC settlement, did not begin to come to light until 2018 with the Cambridge Analytica scandal. *Id.* ¶¶ 111, 146. All the while, users continued to use Facebook (over its competitors) based on its misrepresentations. *Id.* ¶ 155.

### 2)   Surveillance of Competitive Threats Using Deceptively Obtained Data

To identify and eliminate competitive threats, Facebook secretly tracked its users' other applications, utilizing, for example, Onavo, an analytics firm that it later acquired. CC ¶¶ 156–68; 186–208. Facebook and Onavo concealed the ultimate use of the data they collected from unsuspecting users. *Id.* ¶¶ 165–66, 232. That data allowed Facebook to target competitors for discriminatory application of its policies, copying, or acquisition. *Id.* ¶ 167.

### 3)   Harm to Competition

Facebook has destroyed competition and harmed Consumers. CC ¶¶ 214–29. Its misrepresentations, amplified by strong network effects and high switching costs, allowed it to crush new, well-situated competitors, including Google's "Google+" social network. *Id.* ¶¶ 68, 131–35. By misrepresenting that it provided "extensive" privacy protections, Facebook stopped users from switching to competitors with similar features, but better privacy practices. *Id.* ¶¶ 114, 135. When new competitors emerged, Facebook was systematically able to identify and then "copy, acquire, or

---

[1]   As part of the settlement, Facebook denied the FTC's allegations, but was "barred from making misrepresentations about the privacy or security of consumers' personal information" and "required to obtain consumers' affirmative express consent before enacting changes that override their privacy preferences[.]" CC ¶¶ 127 n. 102 (incorporating by reference settlement in link), 127–28.

1   kill" them. CC ¶ 218. As a result, no "meaningful alternative to Facebook's social network and

2   social media empire" exists today. *Id.* ¶ 11. Competition would have spawned alternative social

3   networks and social media apps that provided increased value to users for their data, or that exerted

4   competitive pressure on Facebook to provide greater value. *Id*. ¶¶ 11, 220. Such incremental value

5   could include monetary consideration or better-quality features. *Id.* ¶¶ 11, 223–26.

6   **B.**     ***Advertisers*: Anticompetitive Conduct in the Social Advertising Market**

7          The Social Advertising Market is a submarket of the online advertising market. AC ¶¶ 412–

8   50. Social advertising "allows advertisers to granularly target groups of users for ads by their

9   attributes," *e.g.*, a user's age, location, gender, hobbies, interests, and "likes, shares, and comments."

10  *Id.* ¶¶ 412, 416–17. Social advertising providers direct highly targeted ads to "users that fit a

11  particular, predefined profile or set of characteristics." *Id.* ¶ 437.

12         Facebook provides social advertising services, including "Facebook ads," which target

13  people "by location, age, gender, interests, demographics, behavior and connections," as well as

14  more advanced social advertising services, such as its "Lookalike Audience" feature, which allows

15  advertisers to "choose a source audience," after which Facebook "identif[ies] the common qualities

16  of the people in it (for example, demographic information or interests)" and then delivers ads to an

17  audience of people "who are similar to (or 'look like') them." AC ¶¶ 24–32, 42, 412, 425.

18         Facebook has monopoly power in the Social Advertising Market and has consistently raised

19  advertising prices year after year without a competitive check. AC ¶¶ 59, 66–67, 547–49. Its

20  monopoly power is protected by the Data Targeting Barrier to Entry ("DTBE"), a critical mass of

21  social data and machine-learning/AI technology necessary to provide the highly targeted granular

22  advertising services offered in the Social Advertising Market. *Id.* ¶ 451–60. Facebook engaged in

23  an unlawful scheme to maintain monopoly power in the Social Advertising Market using multiple

24  anticompetitive and predatory means.

25         **1)      API Access Removal, Data Demands, and Whitelist Agreements**

26         Facebook operates its "Platform" for developers, which allows third-party app developers to

27  build apps that Facebook users can utilize (and in which ads can be displayed). AC ¶¶ 99–103. In

28  the beginning, developers were enticed to use the Facebook Platform because it gave them access

to Facebook's trove of user data through application programming interfaces ("APIs"), and that data allowed them to grow exponentially. AC ¶¶ 99–103. Allowing third parties to develop apps for its Platform was also profitable and useful for Facebook. *Id.* ¶¶ 109–30. In private, however, Facebook recognized that third-party apps could grow into competitive threats and therefore devised a plan to "attract[] third-party developers to build for Facebook's Platform" and then, once those apps were reliant upon Facebook's APIs, remove their access to APIs that were most central to their applications"—this was at times referred to as the "Switcharoo Plan." *Id.* ¶¶ 105, 107–09, 111, 126, 201, 207–08.

As part of this plan, Facebook approached developers demanding "reciprocity," *i.e.*, requiring them to give up their own data, or Facebook would remove their access to the Platform and blacklist them (it privately developed a plan to seize their data anyway). AC ¶¶ 122, 126–37, 140–45, 149–53. Facebook subsequently formalized this scheme with across-the-board changes to its Platform access policies, including removal of third parties' access to "Friend and News Feed APIs," except for hand-selected developers that acquiesced to Facebook's demands and executed "Whitelist and Data Sharing Agreements." *Id.* ¶¶ 10–12, 211–18, 220. These extortionate demands required third parties to either pay Facebook considerable sums to buy advertising or make their own data available to Facebook to have continued access to its Platform. *Id.* ¶¶ 217–18, 220. The purpose of this endeavor was to ensure that Facebook continued to "control the supply of social data," artificially prop up demand for Facebook's advertising products, and "ensure[] that no . . . competing platform could arise." *Id.* ¶ 229. Internally, Facebook's senior-most Platform engineers recognized that the plan had no legitimate technical or business purpose. *Id.* ¶¶ 173–91.

### 2)   Use of Onavo to Surveil Competitors and Advertising Targets

Facebook used Onavo to identify, surveil, and target potential competitors, including Instagram and WhatsApp. AC ¶¶ 185, 245–59; 268–300, 308–14. Facebook also used Onavo "to identify mobile app developers from which to demand advertising purchases or data sharing agreements." *Id.* ¶ 7. Onavo allowed Facebook to exclude competition either by acquiring them, requiring data reciprocity or requiring extortionate Whitelist and Datasharing Agreements, or "killing" them by deprecating the Friends and News Feed API functionality. *Id.* ¶¶ 475–78, 480.

3)     **Anticompetitive Back-end Integration of Acquired Businesses**

Beginning in January 2020, Facebook aggressively integrated Instagram, WhatsApp, and Facebook, so as to consolidate segmented user bases and to strengthen the DTBE. AC ¶¶ 517–26.

4)     **Market Allocation Agreement with Google**

In September 2018, per an agreement codenamed Jedi Blue (also referred to as the "Google Network Bidding Agreement" or "GNBA"), Facebook and Google explicitly allocated markets, agreeing to stay out of each other's advertising territories. AC ¶¶ 16–20, 369–411, 564–69.

5)     **Harm to Competition**

Facebook's unlawful and anticompetitive scheme destroyed competition in the Social Advertising Market, and as a result, Advertisers have paid higher prices for social advertising than they would have paid in a competitive market. AC ¶¶ 21–22, 33, 67–69, 406–11, 443, 465–70, 483.

## II.     <u>LEGAL STANDARDS</u>

Rule 12(b)(6) "do[es] not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). While courts will not draw inferences in favor of liability that are not "plausible," defendants may not ignore specific factual allegations by labeling them "implausible." *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1016 (9th Cir. 2020). "[D]ismissals for failure to state a claim are disfavored in antitrust actions," *Clayco Petroleum Corp. v. Occidental Petroleum Corp.*, 712 F.2d 404, 406 (9th Cir. 1983), and "must be accompanied by leave to amend unless amendment would be futile," *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 983 (9th Cir. 2000).

## III.     <u>ARGUMENT</u>

### A.     <u>Plaintiffs' Section 2 Claims Are Timely</u>

A claim may ***only*** be dismissed as time-barred if "the running of the statute is apparent on the face of the complaint" and "it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim." *Brown v. Google LLC*, 2021 WL 949372, at *12 (N.D. Cal. Mar. 12, 2021) (Koh, J.).[2] Facebook disputes the timeliness of Plaintiffs' claims. But

---

[2]   Except where otherwise noted, internal citations and quotation marks have been omitted and emphasis has been added.

1  Plaintiffs allege actionable conduct inside the four-year limitations period and also allege facts that

2  establish tolling past that period. Facebook's desire to dispute these facts is not a basis for dismissal.

**1)      Plaintiffs Allege Actionable Conduct and Injuries Inside the Limitations Period**

**a)      <u>Consumers</u> Detail Continued Conduct and New Injuries**

5      Facebook asserts that the acts which form the bases for Consumers' claims "occurred more

6  than four years before" Consumers "filed their lawsuit." Mot. at 6. But Facebook is wrong, as the

7  CC clearly alleges that Facebook engaged in multiple anticompetitive acts after December 2016,

8  within the limitations period, including: (1) deceptively obtaining data from Consumers through

9  Onavo until, at least, January 2019, CC ¶¶ 209–13; (2) acquiring additional competitors, *id.* ¶¶ 206–

10  07; and (3) deceiving Consumers as to Facebook's commitment to their privacy, up to and after the

11  Cambridge Analytica scandal, *id.* ¶¶ 238(n), 238(o). These actions were "separate and independent

12  overt acts during the limitations period" which start "the statutory period running again[.]" *Id.* ¶¶

13  244–45; *Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1187 (N.D. Cal. 2012)

14  (Koh, J.). If it limits anything here, the statute of limitations limits only the damages period; ***not***

15  causes of action. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997); *In re Air Cargo Shipping*

16  *Servs. Antitrust Litig.*, 2010 WL 10947344, at *13–15 (E.D.N.Y. Sept. 22, 2010).

17      Facebook's other challenges as to the "continuing violation" doctrine are premised on

18  misstatements of the law. Facebook cites *Duarte v. Quality Loan Serv. Corp.*, 2018 WL 2121800,

19  at *8 (C.D. Cal. May 8, 2018), for the proposition that the doctrine is "inapplicable" when "the

20  actions falling within the period of limitations are not themselves violations." Mot. at 12. But the

21  court's conclusion in *Duarte* was based on the specific context of Equal Credit Opportunity and Fair

22  Housing Act claims. 2018 WL 2121800, at *8. In the antitrust context, however, "new and overt"

23  acts during the limitations period need only inflict new ***injuries***, not independently amount to

24  antitrust violations. *FreeHand*, 852 F. Supp. 2d 1187 ("overt ***act*** restarts the statute of limitations"

25  if it is "new and independent ***act***" and "inflict[s] new and accumulating ***injury***").

26      Facebook also distorts Consumers' argument when it frames the "new and accumulating

27  injury" as continued "exposure" of Consumers' information. Mot. at 12. The CC alleges Facebook's

28  overt acts during the limitations period—*e.g.*, new misstatements deceiving Consumers up to and

including the Cambridge Analytica scandal—allowed it to *maintain* its monopolies and continue to undercompensate Consumers in new transactions going forward. CC ¶ 238; s*ee Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004) (act, within limitations period, of "improperly prolonging" monopoly by preventing entry of generic through renewed, deceptive use of FDA process was "discrete act with fresh adverse consequences"). Facebook's arguments that Consumers' "monopoly *maintenance* claim . . . does not include" instances of "alleged deception" and that Consumers do not "allege how this supposed deception inflicted a new and accumulating injury *to them*," Mot. at 13, are therefore simply wrong. Even were Facebook correct that particular instances of deception which relate to Facebook's monopoly *acquisition* are outside the limitations period because they are not tolled, those events are nonetheless germane to the CC's monopoly *maintenance* claims. *Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 37–38 (S.D.N.Y. 2016).

Facebook urges that "*each*" of Facebook's acquisitions does not "amount to continuing violations" since the "continuing violation doctrine does not apply to merger challenges[.]" Mot. at 13. Facebook attacks a strawman. In *FreeHand*, this Court concluded that while the doctrine may not apply to Section 7 merger claims, it does apply to Section 2 claims, particularly where the claim is "*not based solely*" on the acquisition itself. 852 F. Supp. 2d at 1187–88. That is the case here.

The CC does *not* independently challenge individual acquisitions. *See* Section III(C)(2)(a). It challenges, as part of a course of conduct also involving deception, Facebook's serial acquisition *strategy*, including buying an upstart competitor, "tbh," during the limitations period and then shutting it down, which "is part of an ongoing attempt to entrench its market power in the Social Network and Social Media Markets." CC ¶¶ 2–4, 207–08, 219; *see Smith v. eBay Corp.*, 2012 WL 27718, at *5 (N.D. Cal. Jan. 5, 2012) (Section 2 claim timely since "not based *solely* on . . . eBay acquir[ing] PayPal" during pre-limitations period but also non-acquisition conduct *and* later acquisition of other firm "in an effort to further extend its leadership in online payments."); *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1203–04 (9th Cir. 2014) (claim timely due to "new and independent act" during limitations period, even where other acts occurred pre-period); *Hoopes v. Union Oil Co. of Cal.*, 374 F.2d 480, 486 (9th Cir. 1967) (Section 2 claim based on "course of conduct" not time-barred even where part of course occurred pre-limitations period).

1

**b)**     <u>Advertisers</u> Detail Continued Conduct and New Injuries

2      Facebook incorrectly states that the AC alleges a scheme only from 2012 through 2015, Mot.

3 at 7, ignoring the AC's allegations that Facebook's scheme spans the period after December 2016,

4 indisputably within the limitations period. For example, Facebook: (a) anticompetitively cloned

5 Snapchat features after Snapchat's CEO turned down acquisition offers, culminating in the cloned

6 release of Instagram's "stories" feature at the end of 2016 (AC ¶¶ 298–99); (b) continued its

7 Platform manipulation scheme well past the first Friends functionality deprecation in April 2015,

8 allowing exemptions at least until April 4, 2018 (*id.* ¶¶ 234–44); (c) spied on users' mobile

9 applications with Onavo spyware until at least August 2018 (*id.* ¶¶ 247–67); (d) divided markets

10 with Google through their "Jedi Blue" agreement in September 2018 (*id.* ¶ 17, 399–411); and (e)

11 continued back-end integration of Instagram and WhatsApp into 2020 (*id.* ¶¶ 517–26).

12      These acts are not mere "affirmation[s] of a previous act;" they are "new and independent"

13 overt acts taken to preserve Facebook's monopoly, which "inflicted new and accumulating injury"

14 on Advertisers for ad purchases at inflated prices after December 18, 2016, restarting the statute of

15 limitations as to each such purchase.[3] *Samsung*, 747 F.3d at 1202; *In re Glumetza Antitrust Litig.*,

16 2020 WL 1066934, at *6 (N.D. Cal. Mar. 5, 2020) ("[E]ach continuing violation (*i.e.*, each new

17 sale) . . . triggered the statute of limitations anew for *that act*."); *Mayor of Baltimore v. Actelion*

18 *Pharms. Ltd.*, 995 F.3d 123, 132 (4th Cir. 2021) ("[E]ach time that Actelion sold Tracleer to the

19 plaintiffs at monopoly prices after the patent's expiration, it engaged in a new injurious overt act

20 that commenced a new limitations period.").[4]

21

22

---

23 [3]   Facebook claims that overcharges based on ad purchases after December 2016 somehow accrued by April 2015. Mot. at 7. But a lawsuit "likely would have been rejected by the trial court" if filed

24 before Advertisers actually made those post-2016 purchases at inflated prices. *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1087 (9th Cir. 2014); *see Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S.

25 321, 338, 341–42 (1971) (claims do not accrue prior to conduct as future injuries are "speculative").

[4]   Facebook contends that the continued purchase of ads past the limitations period "does not change

26 the analysis." Mot. at 7. But its cited cases do not support its claim, since the AC alleges conduct throughout the limitations period that were new and overt acts. *Cf. Kaiser Found. v. Abbott Labs*,

27 2009 WL 3877513, at *6–7 (C.D. Cal. Oct. 8, 2009) (purchases at monopoly prices "had not only accrued but had ended" before limitations period); *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594,

28 600 (6th Cir. 2014) (price increases from pre-limitations period merger and no other "new and independent acts that [were] not merely a reaffirmation of a previous act" during limitations period).

CONSUMER AND ADVERTISER PLAINTIFFS' JOINT OPPOSITION TO FACEBOOK'S MOTION TO DISMISS

1        **2)        Fraudulent Concealment Tolls Plaintiffs' Section 2 Claims**

2        A "statute of limitations may be tolled if the defendant fraudulently concealed the existence

3   of a cause of action in such a way that the plaintiff, acting as a reasonable person, did not know of

4   its existence." *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1194 (N.D. Cal.

5   2015) (Koh, J.). "[T]he plaintiff must allege that: (1) the defendant took affirmative acts to mislead

6   the plaintiff; (2) the plaintiff did not have actual or constructive knowledge of the facts giving rise

7   to its claim; and (3) the plaintiff acted diligently in trying to uncover the facts giving rise to its

8   claim." *Id.* "[I]t is generally inappropriate to resolve the fact-intensive allegations of fraudulent

9   concealment at the motion to dismiss stage[.]" *Id.*

10       **a)        <u>Consumers</u> Adequately Allege Concealment**

11       Facebook's claim that Consumers allege only "generalized, market-facing statements"

12  which lack sufficient particularity, Mot. at 10, ignores the CC's 15 specific examples of Facebook's

13  misstatements that describe the speaker, time period, and location of the misstatement. CC ¶ 238.

14  These statements were affirmatively misleading as to Facebook's data practices, falsely suggesting

15  Facebook gave Consumers control as to "what data [it] could collect, to whom that data would be

16  shared, and how it would be used." *Id.* ¶¶ 3–4, 111, 141, 145–46, 239; *see Brown*, 2021 WL 949372,

17  at *13 ("affirmative acts" element met where "representations . . . presented private browsing" as

18  way "users could maintain their privacy and control what [firm] collects" and "obscured [firm's]

19  intent" to collect information). And, "public" statements regularly form the basis for concealment

20  in antitrust cases. *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 309192, at *16 (N.D. Cal.

21  Jan. 21, 2014).[5] Contrary to Facebook's argument, Mot. at 10, its misstatements during the

22  limitations period are clearly relevant to its illegal monopoly ***maintenance***.[6]

23       Facebook's claim that Consumers had "constructive knowledge" similarly ignores the CC's

24

25  _____
    [5]   *In re Packaged Seafood Prods. Antitrust Litig.*, did not hold that "statements to the public are
26  'insufficient'" as to Rule 9(b). Mot. at 10. It held "general" allegations that did not sufficiently detail
    the misrepresentations' falsity are insufficient. 2017 WL 35571, at *16 (S.D. Cal. Jan. 3, 2017).

27  [6]   *Reveal Chat Holdco LLC v. Facebook, Inc.*, found deficient developers' fraudulent concealment
    allegations relating to third-party access to Facebook's "Platform." Mot. at 10–11 (citing 2021 WL
28  1615349, at *8 (N.D. Cal. Apr. 26, 2021) ("*Reveal Chat II*")). The CC alleges concealment based
    on wholly different misstatements relating to Facebook's commitment to users' privacy. CC ¶ 238.

allegations. Mot. at 11. Whether specific documents, which may have described individual instances of Facebook's deception, provided "constructive knowledge . . . presents a question for the trier of fact." *Animation*, 123 F. Supp. 3d at 1204–05 (collecting cases rejecting argument that reporting by "widely read publications" sufficient to trigger inquiry as a matter of law).[7] And even assuming reporting on (or the FTC's disclosure of) particular examples of Facebook's deception—such as "Beacon"—provided constructive notice of privacy-based claims relating to ***those*** instances of deception,[8] it does not follow that those reports put Consumers on notice as to ***other*** instances of Facebook's deception (such as with Onavo), or Facebook's overall use of deception to destroy competition.[9] *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 834 (11th Cir. 1999) (rejecting, in antitrust case, assertion that "notice of one wrong by a defendant triggers a duty for potential plaintiffs to investigate all other potential wrongs the defendant might be committing").

Even were Facebook correct that any publicization of its deception was sufficient to "excite" Consumers' suspicions in the first place, Mot. at 11, Facebook extinguished those suspicions with false assurances and denials. CC ¶¶ 114, 121, 130, 238(a)(f)(j)(o). Facebook ***denied*** any wrongdoing in its FTC settlement, *Id*. ¶ 127 n. 102, and Mark Zuckerberg downplayed the settlement's significance, remarking "we have a good history of providing transparency and control over who can see your information," and "[e]ven before" the "agreement," Facebook "already proactively addressed many" of the FTC's "concerns*." Id*. ¶ 238(f) n. 204 (incorporated by reference in link provided); *United Nat'l Records v. MCA, Inc.*, 609 F. Supp. 33, 36–38 (N.D. Ill. 1984) ("throwing up a smokescreen" sufficient since maybe "caused plaintiffs to abstain from ***further*** investigation").

---

[7]   *Reveal Chat* did not, as Facebook states, hold that a media outlet's report is sufficient as a matter of law to provide constructive notice. *Reveal Chat Holdco*, *LLC v. Facebook*, *Inc.*, 471 F. Supp. 3d 981, 993–94 (N.D. Cal. 2020) ("*Reveal Chat I*"). The court held those plaintiffs failed to allege any affirmative misrepresentations that would explain why they lacked notice of "Whitelist and Data Sharing Agreements" given the purported reporting of those agreements. The CC, by contrast, details how Facebook denied and obfuscated the wrongdoing that news media outlets and regulators charged it with. In any event, and contrary to Facebook's misstatement, Mot. at 11, Consumers' claims do not turn on the Whitelisting Agreements at issue in *Reveal Chat I. See* Section III(C)(4)(a).

[8]   The CC alleges "[c]onsumers relied on ***Facebook's representations*** before and after" its 2012 FTC settlement, ***not***, as Facebook misstates, Mot. at 11, the settlement itself. CC ¶¶ 154.

[9]   Facebook's reliance on *Garrison v. Oracle Corp.*, Mot. at 11, which held that acts "from 2006 to 2009" did not conceal claims accruing in 2010, is misplaced. 159 F. Supp. 3d 1044, 1062 (N.D. Cal. 2016). The CC alleges concealment until 2018, well into the limitations period. CC ¶ 238.

Facebook's diligence arguments attack a strawman. Mot. at 11. Consumers "were not obligated to investigate their claims *until* [they] had reason to suspect the existence of their claims." *Brown*, 2021 WL 949372, at *13. Since Consumers' notice cannot be decided now, Facebook's diligence argument "puts the cart before the horse[.]" *Id.* Facebook's arguments regarding laypersons' difficulties in understanding Facebook's privacy *policies* misconstrue Consumers' claims. Mot. at 11. The CC challenges Facebook's departures from its public *statements* as to its commitment to users' privacy, *not* merely its departures from its privacy *policies* (as reflected in its terms of service). These departures were secret, and Facebook's argument that Consumers could (or should) have uncovered their antitrust claims simply because "investigative journalists" may have been able to discover snippets of Facebook's deception misstates the law. Mot. at 12. A "reasonable person" standard applies, and Consumers "are not under a duty continually to scout around to uncover claims which they have no reason to suspect they might have." *Animation*, 123 F. Supp. 3d at 1204; *Brown*, 2021 WL 949372, at *13 (consumers need not contact defendant with "questions about [its] privacy practices."). And, in all events, "courts have been hesitant to dismiss an otherwise fraudulently concealed antitrust claim for failure to sufficiently allege due diligence."[10] *Brown*, 2021 WL 949372, at *13 (denying motion to dismiss since "Plaintiffs have alleged that they acted diligently in trying to uncover the facts giving rise to their claim."); *see* CC ¶ 243 (similar).

### b)   <u>Advertisers</u> Adequately Allege Concealment

Facebook argues that the AC's fraudulent concealment allegations lack specificity, Mot. at 9, but the AC specifically alleges false statements designed to conceal the *causes of action* asserted here, which all require anticompetitive purpose and/or effect as necessary elements. *E.W. French & Sons, Inc. v. General Portland Inc.*, 885 F.2d 1392, 1399 (9th Cir. 1989) (tolling if "plaintiff proves the defendant fraudulently concealed *the existence of the cause of action*"). Facebook: (a) had a duty to speak fully and truthfully about its Platform functionality, but internally enforced a code of silence and intentionally made false and misleading public statements (and omissions) about its

---

[10]   Facebook relies on *Dodds v. Cigna Securities, Inc.*, Mot. at 12 (841 F. Supp. 89, 95 (W.D.N.Y. 1992) (fraud claims not tolled since investor possessed, but did not read, prospectuses). Consumers here lacked information supporting their claims, and Facebook misled them. CC ¶¶ 233, 237–43.

1   reasons for the Platform changes (including in a Facebook March 26, 2018 blog post), with the AC

2   identifying the who, what, where, and when of every statement, AC ¶¶ 491–92; (b) misled the public

3   about its data sharing and advertising agreements, including in a Facebook December 5, 2018 blog

4   post that falsely stated that agreements for continued, full-Platform access were "short term" and in

5   false statements made at the widely publicized F8 developers conference, *id.* ¶¶ 10–11, 211–15,

6   500–16; and (c) made false and misleading statements (and omissions) about the Instagram and

7   WhatsApp mergers, including to regulators and the public to prevent discovery of the

8   anticompetitive purpose of those mergers. These intentional, misleading acts, along with others,

9   prevented Advertisers from discovering the anticompetitive scheme until November 2019, when

10  Facebook's internal documents first came to light. *Id.* ¶¶ 517–26.

11      Facebook next argues that Advertisers failed to allege that they were diligent in uncovering

12  the facts giving rise to their claim. Mot. at 10. Facebook misstates the law. Absent "facts publicly

13  available" that are "sufficient to excite [plaintiffs'] inquiry, then no due diligence need be

14  demonstrated." *Conmar v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499, 504–05 (9th Cir. 1988);

15  *Animation*, 123 F. Supp. 3d at 1204; *Brown*, 2021 WL 949372, at *13. Facebook does not identify

16  any facts that could possibly excite Advertisers' inquiry here, and even if it did, whether facts would

17  have excited a reasonable person to inquire is a question of fact. *Conmar*, 858 F.2d at 504–05.[11]

### 3)   Laches Does Not Bar Plaintiffs' Requests for Equitable Relief

18      Facebook's laches arguments fail. Challenging the "appropriateness of specific remedies,"

19  such as divestiture, Mot. at 8–9, is "premature" at the pleading stage. *Beasley v. Conagra Brands,*

20  *Inc.*, 374 F. Supp. 3d 869, 879 n.2 (N.D. Cal. 2019). Moreover, laches is generally not resolvable

21  on a motion to dismiss, *Bercut-Vandervoort & Co. v. Maison Tarride Ledroit & Cie*, 2006 WL

22  8442285, at *5 (N.D. Cal. June 1, 2006), and it does not bar claims within the Clayton Act's four-

23  year limitations period. *Oliver*, 751 F.3d at 1086–87. As described above as to Plaintiffs' damages

---

[11]  *Reveal Chat II* involved developers injured by Facebook's Platform conduct and does not help
Facebook. The court held that plaintiffs there had "actual or constructive knowledge of the facts
giving rise to [their] claim[s]" and distinguished overcharge cases, *i.e.*, those involving
anticompetitive prices resulting from price fixing, on the basis that the concealment obscures the
fact that a plaintiff has been injured at all. 2021 WL 1615349, at *7. Facebook does not explain how
Advertisers here could have known that they paid supracompetitive prices before November 2019.

claims, Plaintiffs' constructive knowledge cannot be decided now, particularly given Facebook's concealment, meaning that any delay for laches purposes similarly cannot be decided now. *Oliver*, 751 F.3d at 1086. Facebook also argues that because its Instagram and WhatsApp acquisitions were "highly publicized" at the time, laches bars any equitable relief addressing those acquisitions. Mot. at 8. But laches does not place "a singular focus on a merger's closing date." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 717 (4th Cir. 2021). While the fact of those acquisitions may have been public, they were enabled by Facebook's collection and use of deceptively obtained data, as part of its larger anticompetitive scheme, none of which began to come to light until within the limitations period.[12] *See*, *e.g.*, CC ¶¶ 157, 209, 211–13; AC ¶¶ 259, 516.

Facebook also complains of "prejudice" that would flow from resolution of Plaintiffs' equitable claims, given its integration of acquired firms like Instagram. Mot. at 8. But laches does not allow a monopolist to destroy competition and then use its expenditure of resources as a shield. *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 345 F. Supp. 3d 614, 681 (E.D. Va. 2018) (laches not bar to unwinding merger despite hardships) (*aff'd in part*, *vacated in part*). And any supposed prejudice (which cannot be interjected here from outside the complaints) must be balanced with the simplicity, administrability, and certainty of particular remedies and their role in antitrust enforcement. *Id.*; *Cmty. Publishers, Inc. v. Donrey Corp.*, 892 F. Supp. 1146, 1176 (W.D. Ark. 1995).

**B.**    **Facebook Possesses Monopoly Power in Cognizable Product Markets**

To state a Section 2 claim, "a plaintiff must allege that the defendant has market power within a 'relevant market,'" consisting of both product and geographic markets. *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1044, 1045 n.4 (9th Cir. 2008).[13] The product market "must encompass the product at issue as well as all economic substitutes for the product." *Id.* at 1045. "There is no requirement that these elements . . . be pled with specificity," and "since the validity of the 'relevant market' is typically a factual element rather than a legal element, alleged markets

---

[12]    *Danjaq LLC v. Sony Corp.*, held, after a bench trial, a delay between 21 and 36 years was unreasonable. 263 F.3d 942 (9th Cir. 2001). Facebook raises acts here that occurred within 8 years. And *Reveal Chat I* did not address the role the Instagram and WhatsApp acquisitions played in Facebook's until-recently-unknown, courses of conduct identified here. 471 F. Supp. 3d at 991–92.

[13]    Facebook does not dispute the alleged geographic markets (the United States). Mot. at 13.

1  may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial."

2  *Newcal*, 513 F.3d at 1045. Dismissal is ***only*** appropriate "if the 'relevant market' definition is

3  facially unsustainable." *Id.*

4         1)    <u>Consumers</u>' Social Network and Social Media Markets

5         a)    The Markets Are Well-Defined and Recognized and Address Substitutes

6        Facebook suggests the CC's Social Network and Social Media Markets are "implausible"

7  and contrary to the "common sense" that "courts should use . . . in evaluating market definition[.]"

8  Mot. at 14, 17. But the CC specifically describes the contours of each market and explains why

9  certain products in each market are economic substitutes and why others are not. CC ¶¶ 55–81.

10 Facebook cannot ignore these well-pleaded facts simply by labeling them "implausible." Mot. at 15.

11 Moreover, common sense suggests that these two markets—each recognized by consumers, the

12 House Antitrust Subcommittee, and industry participants—are highly intuitive, not "implausible."

13 CC ¶¶ 55, 61–67, 73–75; *see United States v. Bazaarvoice, Inc.*, 2014 WL 203966, at *23 (N.D.

14 Cal. Jan. 8, 2014) ("public recognition of the market . . . may determine [its] boundaries").[14]

15       Facebook claims a relevant market cannot include services that are "free." Mot. at 15. But

16 that is not the law. *See United States v. Vill. Voice Media, LLC*, 2003 WL 21659092, at *1 (N.D.

17 Ohio Feb. 12, 2003) (market for newspapers "distributed free of charge"). Facebook's position

18 would absurdly immunize from antitrust liability internet companies that make billions of dollars

19 by exchanging their products for data and attention. In all events, the CC alleges (and the FTC's

20 former Chief Technologist and Facebook's co-founder confirm) Facebook is ***not*** free; users pay

21 with consideration in-kind: their data. CC ¶¶ 5–7, 9, 39, 39 n.9; *see In re Aggrenox Antitrust Litig.*,

22 94 F. Supp. 3d 224, 242 (D. Conn. 2015) ("distinction between transfers of money and transfers of

23 things that are worth money" is "distinction without a difference" for "antitrust scrutiny").

24       Facebook argues that the CC "alleges no facts explaining" why "gaming, news, messaging,

25 and other apps" are "not reasonable substitutes[.]" Mot. at 16–17. But a plaintiff need not "anticipate

26

27 ───────────────────────

[14]   This widespread recognition of these markets distinguishes this case from *Hicks v. PGA Tour,*

28 *Inc.*, upon which Facebook relies. Mot. at 17. *Hicks* involved an obviously artificial market for "in-play advertising during professional golf tournaments." 897 F.3d 1109, 1121 (9th Cir. 2018).

1  and refute in its complaint all possible market substitutes." *Jamsports & Ent., LLC. v. Paradama*

2  *Prods., Inc.*, 2003 WL 1873563, at \*6 (N.D. Ill. Apr. 15, 2003). And, the CC **does** explain why

3  particular online services that offer individual features are **not** substitutes for social networks: social

4  networks provide users a wide array of connections, multiple substantive features, **social** interaction

5  and distribution (*i.e.*, virality), **and** a "one-stop shop."[15] CC ¶¶ 57–67; *see Kickflip*, *Inc. v. Facebook*,

6  *Inc.*, 999 F. Supp. 2d 677, 687 (D. Del. 2013) ("other platforms that offer games" not substitutes for

7  "*social*-game networks" including Facebook); *United States v. Grinnell Corp.*, 384 U.S. 563, 572

8  (1966) ("single market" may include "number of different products" where "combination reflects

9  commercial realities.").[16] The CC does the same for social media apps. CC ¶¶ 73–76.

10        Facebook claims it is "in the dark about who is in" these markets, Mot. at 16, but that could

11  only be true if Facebook ignores the CC's allegations. CC ¶¶ 36–37, 68 (identifying Diaspora, and

12  now-defunct Myspace, Friendster, Flip.com, Bebo, and Google+ as examples of social networks,

13  and YouTube, Twitter, TikTok, Instagram, and Snapchat as examples of social media apps). While

14  Facebook may dispute these characterizations or suggest alternatives firms for inclusion, that is not

15  a basis for dismissal.[17] *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 997 (N.D. Cal.

16  2010). Facebook's quarrels as to the **boundaries** of these markets present improper factual disputes.

17        Contrary to Facebook's arguments regarding "cross-elasticity of demand," Mot. at 17–18, a

18  relevant market may be "determined by the reasonable interchangeability . . . **or** the cross-elasticity

19  of demand[.]" *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). The CC addresses

20  reasonable interchangeability in both the Social Network and Social Media Markets.[18] CC ¶¶ 60–

21

22  ──────────

23  [15]    Given these explanations, Facebook places undue weight on *Hicks*, 897 F.3d at 1123 (unclear why other advertising not substitute for "live-action golf advertising"), and *Pistacchio v. Apple Inc.*, 2021 WL 949422, at \*2 (N.D. Cal. Mar. 11, 2021) (unclear why mobile, computer, and console games with other economic models not substitutes for subscription-based Apple iOS mobile games).

24  [16]    Facebook's reliance on *In re Super Premium Ice Cream Distribution Antitrust Litig.*, which held that "gradations among various qualities of ice cream are not . . . separate relevant markets," is unavailing. Mot. at 18 (citing 691 F. Supp. 1262, 1268 (N.D. Cal. 1988)). Social networks and social media apps are functionally different from, not "gradations" of, other online services. CC ¶¶ 60, 74.

25

26  [17]    Facebook's understanding of the markets' contours sufficient to propose alternative firms betrays its claim that it is "left guessing," and renders inapt *Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*, 268 F. Supp. 3d 1071, 1084 (C.D. Cal. 2017) (market "unclear" where only one example identified).

27

28  [18]    Facebook cites *NSS Labs, Inc. v. Symantec Corp.*, 2019 WL 3804679, (N.D. Cal. Aug. 13, 2019). The complaint in that case addressed neither cross-elasticity **nor** interchangeability. *Id.* at \*9.

67, 73–76. No more is required. *See In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987, 995 (N.D. Cal. 2010) ("On a motion to dismiss, the court need not engage in extensive analyses of reasonable interchangeability and cross elasticity of demand."); *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1082 (D. Colo. 2004) (even beyond pleading stage, "a plaintiff may . . . define a relevant market without economic study of cross-elasticity of demand").

**b)   Facebook Has Monopoly Power in Both Markets Alleged by <u>Consumers</u>**

Monopoly power may be established circumstantially where "the defendant owns a dominant share" of a relevant market and "significant barriers to entry" exist.[19] *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997). Generally, a market share of 65% is sufficient for a monopolization claim, while a "lower quantum" is required for an attempt claim *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) (44% easily sufficient for attempt). Whether "the defendant has monopoly power is complex, nuanced, and fact dependent." *CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926, 956–57 (D. Or. 2018).

Facebook's incantation of the word "plausible," which applies to claims, not facts, does not allow it to ignore the CC's specific factual allegations regarding monopoly power. Mot. at 18. The CC alleges that Facebook "has market share of at least 85% of the Social Media Market" and that its "market share in the Social Network Market is higher"—since the "Social Network Market is a distinct part or sub-part of the Social Media Market"—"and, in any event, exceeds 65%." CC ¶¶ 56, 71, 286. These specific factual allegations regarding market share must be accepted as true at the pleading stage. *Allflex USA, Inc. v. Avid Identification Sys., Inc.*, 2010 WL 11405130, at *9 (C.D. Cal. Feb. 16, 2010); *Vesta Corp. v. Amdocs Mgmt. Ltd.*, 129 F. Supp. 3d 1012, 1028 (D. Or. 2015).

Though not required, the CC also provides bases for calculating Facebook's shares of the relevant markets. It explains that "one of the best available metrics of market share in the Social Media Market is advertising revenue" (of which Facebook has 85%) since the more popular a social media app is with users, the more valuable it is to advertisers. CC ¶¶ 80, 83, 86. And, the CC alleges

---

[19]   Monopoly power may also be shown directly, where a firm raises prices *or* "reduce[s] quality . . . below competitive levels." *Cmty.*, 892 F. Supp. at 1153 n.8. Facebook disputes neither raising prices to consumers (collecting more data), nor providing worse-quality services. CC ¶¶ 70, 259(d).

1   that "more than 80% of the time that consumers . . . spend using social media is spent on Facebook

2   and Instagram." CC ¶ 286. While Facebook may dispute these calculations and methodologies, its

3   competing proposals do not provide a basis for dismissal.[20] *Vesta*, 129 F. Supp. 3d at 1028–29;

4   *Lockheed Martin Corp. v. Boeing Co.*, 390 F. Supp. 2d 1073, 1079 (M.D. Fla. 2005).

5         Facebook urges that "naked assertions about barriers to entry do not suffice." Mot. at 19.

6   But it ignores the CC's detailed allegations of barriers to entry including network effects, switching

7   costs, lack of data portability, high initial investment, and data accumulation. CC ¶¶ 83–94. And,

8   "whether there are in fact significant barriers to entry is not . . . appropriately decided" on a motion

9   to dismiss. *Retrophin, Inc. v. Questcor Pharms., Inc.*, 41 F. Supp. 3d 906, 917 (C.D. Cal. 2014).

10         **2)**     <u>**Advertisers**</u>**' Social Advertising Market Is Well-Defined and Recognized and**

11              **Addresses Substitutes**

12         Advertisers allege that Facebook's anticompetitive conduct occurred in the Social

13   Advertising Market, a submarket of the broader online advertising market. AC ¶¶ 59, 412–50.

14   Advertisers detail how this new market arose; its parameters; why other advertising is not

15   substitutable; industry recognition of it as a separate economic entity; and its distinct characteristics

16   and uses, production facilities, customers, prices, price sensitivity, and specialized vendors. *Id*. ¶¶

17   412–64; *see Brown Shoe*, 370 U.S. at 325 (listing "practical indicia" of economically distinct

18   submarket). Facebook would have the Court believe that Advertisers created this market out of

19   whole cloth for the sole purpose of "find[ing] a monopoly where none exists," Mot. at 14, but it was

20   Facebook that touted the uniqueness of this market when it was in its best interest to do so.

21         Long before this litigation began, Facebook's COO Sheryl Sandberg repeatedly trumpeted

22   that "we are a third thing," "we're not TV, we're not search. ***We are social advertising***." AC ¶ 422.

23   Facebook not only recognizes the Social Advertising Market's uniqueness, it exploits that

24   uniqueness to the tune of billions of dollars in annual revenue. Now that Advertisers echo

25   Facebook's own statements—that social advertising is a separate thing from other online

---

26

27   [20]   Facebook's cited cases are inapt. *Cf. Rheumatology Diagnostics Lab'y, Inc. v. Aetna, Inc.*, 2013

28   WL 3242245, at *14 (N.D. Cal. June 25, 2013) (share in "outpatient testing market" alleged but not in applicable laboratory, pathology, or lipid testing markets); *Korea Kumho Petrochemical v. Flexsys Am. LP*, 2008 WL 686834, at *9 (N.D. Cal. Mar. 11, 2008) (no share number alleged at all).

1   advertising—Facebook pretends no such distinction exists.

2       Facebook also argues that the AC defines the Social Advertising Market too narrowly and

3   fails to account for other sources of competition.[21] Mot. at 15. But the AC details the defining

4   features of the Social Advertising Market and lists specific companies that compete in that market.

5   AC ¶¶ 430, 448–49 (listing Twitter, LinkedIn, and other minor competitors). Facebook's

6   "protestations" as to the market's boundaries "turn on issues of fact inappropriate for resolution at

7   this stage of the litigation." *RealPage, Inc. v. Yardi Sys., Inc.*, 852 F. Supp. 2d 1215, 1225 (C.D.

8   Cal. 2012).[22] Facebook's argument contradicts Advertisers' allegations that it faced limited social

9   advertising competition, including allegations regarding Google, "who met [Facebook] directly in

10  the marketplace" with Google+, and then "bowed out after sustaining heavy losses." *Greyhound*

11  *Computer Corp. v. Int'l Bus. Machines Corp*., 559 F2d 488, 497 (9th Cir. 1977); *see* AC ¶¶ 71–83.

12      Facebook also argues that "common sense dictates that advertisers can and do shift their

13  spending" between advertising on Facebook and Google, "particularly when prices increase." Mot.

14  at 14–15. But Facebook raised its advertising prices over 100% year-on-year, each year, from 2017–

15  19, did not lose market share as a result, and saw its advertising revenues grow. AC ¶¶ 443–46. The

16  Social Advertising Market as a whole is growing, *id.* ¶¶ 446–50, despite the dominant firm raising

17  prices year after year since 2011, *id.* ¶¶ 67–68, 443. These allegations establish that advertisers are

18  not switching between Facebook and Google when Facebook increases its prices.

19      Moreover, there is no *per se* rule against relevant markets limited to a single form of

20  advertising.[23] *See* Mot. at 14. Facebook's reliance on *Hicks*, Mot. at 14–15, is also misplaced. The

---

21   [21]  Facebook does not challenge Advertisers' allegation of monopoly power.

22   [22]  *Reveal Chat I*, Mot. at 14, found on a Rule 12(b)(6) motion, that relevant market "should be
23   resolved on a more developed factual record." 471 F. Supp. 3d at 999.

24   [23]  *See In re Loc. TV Advert. Antitrust Litig.*, 2020 WL 6557665, at *12 (N.D. Ill. Nov. 6, 2020)
     (broadcast television advertising separate from online advertising); *Nobody*, 311 F. Supp. 2d at
25   1088–89 (radio advertising separate from newspapers, magazines, and television); *Omni Outdoor
     Advert., Inc. v. Columbia Outdoor Advert., Inc*., 891 F.2d 1127, 1139–42 (4th Cir. 1989) (billboards
26   advertising separate from television, radio, newspapers, and magazines) (*rev'd on other grounds*);
     *Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*, 661 F. Supp. 2d 1039, 1057–60 (D. Minn. 2009)
27   (in-store advertising separate from out-of-store); *Times-Picayune Pub. Co. v. United States*, 345
     U.S. 594, 611–13 & n.31 (1953) (local newspaper advertising separate from other forms of
28   advertising); *Cmty. Publishers, Inc. v. DR Partners*, 139 F.3d 1180, 1183–84 (8th Cir. 1998) (same);
     *United States v. Tribune Publ'g Co*., 2016 WL 2989488, at *3 (C.D. Cal. Mar. 18, 2016) (same).

1  plaintiffs in *Hicks* did not allege the economic significance of any practical indicia of a separate

2  submarket, or any facts as to reasonable interchangeability or cross-elasticity of demand. *See Hicks*

3  *v. PGA Tour, Inc.*, 165 F. Supp. 3d 898, 910 (N.D. Cal. 2016). Here, the AC "conscientiously

4  considers and rejects multiple interchangeable substitute products with reference to the rule of

5  reasonable interchangeability." *RealPage*, 852 F. Supp. 2d at 1225; AC ¶¶ 413–14, 424, 426, 431.[24]

6  **C.    Facebook Obtained and Maintained Monopoly Power by Anticompetitive Means**

7        Section 2's "conduct element" requires "the use of monopoly power to foreclose

8  competition, to gain a competitive advantage, or to destroy a competitor." *Image Tech.*, 125 F.3d at

9  1208. Conduct is anticompetitive if it "tends to impair the opportunities of rivals and either does not

10 further competition on the merits or does so in an unnecessarily restrictive way." *FreeHand*, 852 F.

11 Supp. 2d at 1180. "The metes and bounds of when such behavior impermissibly crosses the line

12 from competitive to violative" is "a highly contextual analysis" often unsuitable for a motion to

13 dismiss. *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187,

14 239 (S.D.N.Y. 2019). Facebook distorts and disputes Plaintiffs' allegations, and asks the Court to

15 adopt a rigid, categorical approach to anticompetitive conduct that would evaluate each of

16 Facebook's acts in isolation. *But see Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*, 148

17 F.3d 1080, 1087 (D.C. Cir. 1998) ("'Anticompetitive conduct' can come in too many different

18 forms, and is too dependent upon context, for any court or commentator ever to have enumerated

19 all the varieties."); *FreeHand*, 852 F. Supp. 2d at 1180 ("not proper to focus on specific individual

20 acts of an accused monopolist while refusing to consider their overall combined effect.").

21        **1)    Facebook's Unrelenting Deception of <u>Consumers</u> Violates Section 2**

22        Facebook concedes that systematic deception of consumers can be actionable

23 anticompetitive conduct under Section 2. Mot. at 19–22. But it claims the CC does not provide

24 enough detail to satisfy Rule 9(b). Facebook ignores the CC's detailed allegations describing

25 specific times ("when") Facebook and specific employees ("who") made deceptive representations

26

27  _____

[24]  *In re Google Digital Advert. Antitrust Litig.*, 2021 WL 2021990 (N.D. Cal. May 13, 2021) and
28  *Kinderstart.com LLC v. Google, Inc.*, 2007 WL 831806 (N.D. Cal. Mar. 16, 2007) are similarly
distinguishable from the AC's relevant market allegations, which set forth in detail each of the
*Brown Shoe* submarket factors and their economic significance.

1    ("what") to the public ("to whom") on its website and in media statements ("where") which falsely

2    suggested Facebook gave users control as to "what data [it] could collect, to whom that data would

3    be shared, and how it would be used" ("how").[25] CC ¶¶ 106, 109, 114–21, 123, 125–27, 130, 137,

4    139, 145–46, 165–66, 238–39. No more is required. *See Doe 1 v. AOL LLC*, 719 F. Supp. 2d 1102,

5    1112 (N.D. Cal. 2010) (Rule 9(b) met based on false statements as to users' privacy).

6         Facebook cherry-picks specific allegations as insufficient, but ignores the facts that complete

7    the picture. As to Facebook's use of cookies and "Beacon," the CC cites specific pages of an article

8    (which Facebook agrees is incorporated by reference and attaches to its motion) supplying any

9    supposedly missing detail. Dkt. 97-4 at 49 nn. 42–43 (2004 Facebook Privacy Policy regarding use

10   of cookies); 57, 57 n.87 (newspaper's Nov. 29, 2007 interview of named Facebook executive

11   regarding Beacon). Facebook's creation of "dossiers" beginning in April 2013 and provision to third

12   parties of "user data marked 'private'" is deceptive given its repeated representations that, *e.g.*, "it's

13   just not true" that "we're sharing private information with applications[.]" CC ¶¶ 118, 139,

14   238(c)(d); *In re Google Inc.*, 2013 WL 5423918, at *14 (N.D. Cal. Sept. 26, 2013) (Koh, J.) (data

15   use and creation of "user profiles" deceptive). Facebook's promise "that ***future*** privacy changes

16   would require user approval through voting" implies this change's permanency, and its founder

17   explained the change "makes it so that we can't just put in" "new terms . . . without everyone's

18   permission[.]" CC ¶ 130. Rule 9(b) requires that "the complaint identif[y] the circumstances of the

19   alleged fraud so that defendants can prepare an adequate answer," ***not*** allege "all facts supporting

20   each and every instance of fraud over a multi-year period." *Ticketmaster L.L.C. v. RMG Techs.*,

21   2007 WL 2989504, at *2 (C.D. Cal. Oct. 12, 2007). The CC meets these requirements.[26]

22        Facebook's assertion that antitrust claims premised on deception should "presumptively be

23   ignored," Mot. at 21, ignores that this presumption applies in cases involving "disparagement," *i.e.*,

24

25   ─────────────────────────────
     [25]   Facebook ignores that 4 pages of the CC describe 15 specific examples of Facebook's

26   misstatements, which all identify the speaker, time period, and where they were made. CC ¶ 238.
     [26]   Nor does Rule 9(b) require that the CC identify which plaintiffs viewed which

27   misrepresentations. *Tabler v. Panera LLC*, Mot. at 20, involved state-law false advertising claims
     and noted that even as to such claims, Rule 9(b) does not "require a plaintiff to plead reliance on

28   specific advertisements" when they allege "exposure to a long-term" "campaign." 2020 WL
     3544988, at *5–8 (N.D. Cal. June 30, 2020). The CC makes exactly this allegation. CC ¶¶ 238, 243.

"[f]alse statements about rivals[.]" *Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publications, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997). The CC challenges Facebook's misrepresentations about its **own** products, **not** its disparagement of its rivals' products. This distinction is material. Disparagement usually has *de minimis* competitive effects since it is often "readily susceptible of neutralization or other offset by rivals[.]" *Id.* That is not true where (as here) the public and rivals do not and cannot know, in real-time, whether the speaker is lying about its own internal processes. CC ¶ 146 ("full scale of unauthorized collection, use, and disclosure . . . resulting from Facebook's conduct is unknown" by 2019). As such, courts have declined to apply this presumption in cases (like this one) that do not involve disparagement. *Arista Networks, Inc. v. Cisco Sys. Inc.*, 2018 WL 11230167, at *12 (N.D. Cal. May 21, 2018) (Freeman, J.).

Courts have regularly found that a firm's deceptive promotion of its own products or services satisfies Section 2's anticompetitive conduct element. *See, e.g.*, *Caribbean*, 148 F.3d at 1087 (radio service "misrepresented to advertisers that they could reach the 'entire Caribbean'" on its station); *United States v. Microsoft Corp.*, 253 F.3d 34, 76 (D.C. Cir. 2001) (operating system deceived developers that its software tools would allow development of apps cross-compatible with competing operating system).[27] In all events, the CC satisfies even *Harcourt*'s disparagement framework, alleging that Facebook made clear misrepresentations, CC ¶¶ 92, 101, 146–51, 239; clearly material to users' decisions to use Facebook, *id.* ¶¶ 102, 106, 108–10; on which lay persons reasonably relied for years, *id.* ¶¶ 109, 154, 243; and that competitors could not overcome them due to network effects, other barriers, and the secrecy of Facebook's actual data practices, *id.* ¶¶ 92, 145–46, 240–42. *See Harcourt*, 108 F.3d at 1152 (describing elements for disparagement claim).

Facebook selectively excerpts *Rambus Inc. v. F.T.C.*, Mot. at 22, which determined that "**an otherwise lawful** monopolist's use of deception **simply to obtain higher prices** normally" is not, itself, exclusionary. 522 F.3d 456, 464 (D.C. Cir. 2008). But unlike in *Rambus*, the CC alleges that

---

[27] Facebook's cited cases applying *Harcourt* to claims involving a firm's statements as to its own products are inapt. Those parties **agreed** *Harcourt* applied, and the challenged statements were either easily offset, or not clearly false. *Kinderstart*, 2007 WL 831806, at *8 (not "clearly false" search results were "objective"); *Genus Lifesciences Inc. v. Lannett Co., Inc.*, 378 F. Supp. 3d 823, 842 (N.D. Cal. 2019) (easily offset that drug "generic"); *Genus*, No. 3:18-cv-07603, Dkt. 36 at 22.

Facebook's deception as to privacy allowed it to obtain and maintain its monopolies, *i.e.*, that Facebook is *not* an "otherwise lawful" monopolist and that prices were higher because of loss of competition. CC ¶¶ 3, 9, 216–17, 220, 222. Likewise, while Facebook claims that its early "realness" is a "competing theor[y] for [its] success," Mot. at 22, its desire to dispute its monopolies' origins cannot be resolved now. *See Pfizer Inc. v. Johnson & Johnson*, 333 F. Supp. 3d 494, 502 (E.D. Pa. 2018) ("an antitrust plaintiff is not required to disprove all other possible alter[n]ative causes to survive a motion dismiss."); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 649 (E.D. Mich. 2000) (similar); *U.S. Wholesale Outlet & Distribution, Inc. v. Living Essentials, LLC*, 2019 WL 4452966, at *3 (C.D. Cal. Aug. 7, 2019) (antitrust causation "question of fact for the jury").

### 2) Facebook's Anticompetitive Serial Acquisition Conduct

Facebook's assertion that "[n]o court has accepted . . . that acquisition of a firm that *could* become a competitor is anticompetitive," Mot. at 24, is wrong and irrelevant. As a legal matter, "it would be inimical to the purpose of the Sherman Act to allow monopolists free reign to squash nascent . . . competitors at will—particularly in industries marked by rapid technological advance and frequent paradigm shifts." *Microsoft*, 253 F.3d at 79. Moreover, Facebook ignores Plaintiffs' allegations that Instagram and WhatsApp were its "actual competitors" when it acquired them and also misconstrues the role of its serial acquisitions in Plaintiffs' Section 2 claims. Mot. at 23–24.

### a) <u>Consumers' Claims</u>

*First*, Facebook attacks a strawman by arguing that each of its acquisitions, standing alone, was lawful. The CC does not challenge single acquisitions in isolation. Instead, the CC alleges that Facebook's *serial* acquisitions of rivals (sometimes in their incipiency) is part of its multi-part scheme to obtain and maintain market power, along with non-acquisition conduct including deceiving Consumers and then using their data to identify other competitors. CC ¶¶ 2–4, 156–58, 168, 219; *see FreeHand*, 852 F. Supp. 2d at 1180–84 (Section 2 claim stated where firm "acquired monopoly power through its acquisition" of rival and maintained power through other acts that might be "otherwise *legal*" alone, but illegal in "aggregate").

*Second*, assuming *arguendo* Facebook's serial acquisition strategy would have been lawful if undertaken based on public information, it was still anticompetitive because it was guided by data

1  deceptively obtained from Consumers. CC ¶¶ 4, 157–58. Facebook cannot defend its spying on

2  competitors by arguing that the tactics it used to harm competition—which made possible ***even***

3  ***more*** spying once it acquired additional user bases from whom data could be extracted—would have

4  been lawful absent the spying. Facebook's argument that Consumers' challenge is "belated[]," Mot.

5  at 23, is thus unavailing. While Facebook's acquisitions may, themselves, have been public, its use

6  of deception to obtain the data that then informed them was not. CC ¶¶ 157, 209, 211–13.

7          In all events, the acquisitions made possible by Facebook's deception are actionable as part

8  of Facebook's overall anticompetitive scheme. *FreeHand*, 852 F. Supp. 2d at 1183 ("bundling"

9  actionable as part of defendant's overall scheme, even if bundling allegations did not, in isolation,

10  give rise to standalone bundling claim) (citing *Tele Atlas N.V. v. NAVTEQ Corp.*, 2008 WL

11  4911230, at *3 (N.D. Cal. Nov. 13, 2008) (even legal conduct "contemporaneous" to "other alleged

12  conduct" "could reinforce the effect of [monopolist's] other conduct.")).

13          Rather than engage with these allegations, Facebook instead invokes inapt cases and

14  doctrines. Mot. at 24. Urging that its acquisition of horizontal competitors did not harm competition,

15  Facebook cites *Roy B. Taylor Sales, Inc.* v. *Hollymatic Corp.*, which involved no acquisitions at all.

16  28 F.3d 1379, 1384–85 (5th Cir. 1994) (tying). It also argues that the "actual potential competition

17  theory" derived from Section 7 of the Clayton Act somehow bars Consumers' Section 2 Sherman

18  Act claims. Mot. at 24 (collecting Section 7 cases). But even if that doctrine ***could*** apply, Facebook's

19  own authorities recognize that it ***does not*** apply to acquisitions of "actual competitors," who are

20  those even "marginally in the market[.]" *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 76 (D.D.C.

21  2017). Contrary to Facebook's quibbles, the CC alleges that Instagram and WhatsApp were

22  Facebook's "actual competitors" in the Social Media Market when it acquired them, and it

23  recognized them as such. CC ¶¶ 99, 173, 190–93, 202–03; *cf. Reveal Chat I*, 471 F. Supp. 3d at 1003

24  (Facebook, Instagram, and WhatsApp not "actual competitors" in different, "Social Data" market).

25          **b)**          <u>**Advertisers' Claims**</u>

26          Advertisers allege that Facebook's serial acquisition of rivals is one part of its

27  anticompetitive scheme, along with other non-acquisition conduct, including, but not limited to,

28  manipulating access to the Platform and requiring app developers to enter into "Whitelist and Data

Sharing Agreements." AC ¶¶ 6–18, 121–32, 216–33. Engaging in this type of serial acquisition conduct as part of a larger scheme to obtain and/or maintain a monopoly is the type of predatory conduct that will support a claim under Section 2. *See Grinnell*, 384 U.S. at 576 (acquiring competitor to avoid competing actionable under Section 2); *FreeHand*, 852 F. Supp. 2d at 1180–84; *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (in monopolization cases, "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.").

Moreover, Facebook's acquisitions were a method for maintaining its dominance by preventing others from obtaining the same high-quality, granular-level data that Facebook possessed. AC ¶¶ 65–70. Each action taken by Facebook as part of the anticompetitive scheme, including these acquisitions, was intended to enforce the DTBE that protected its dominance in the Social Advertising Market. *Id.* ¶¶ 140, 173, 215, 283–89.[28]

Facebook also argues that Advertisers "do not allege that the acquired firms were competitors in any alleged market." Mot. at 23. Facebook is wrong. The AC includes allegations that Facebook's CEO Mark Zuckerberg considered Instagram and WhatsApp to be current competitors of Facebook at the time they were acquired.[29] AC ¶¶ 280, 318.

### 3) Plaintiffs Do Not Allege "Product Improvement" Claims

Facebook's argument that it "can lawfully improve its product offerings" attacks a strawman. Mot. at 23. Neither Consumers nor Advertisers allege a "product improvement" claim. As noted, Facebook's deception regarding user data allowed it to identify competitors to target, which included sometimes copying their features. CC ¶¶ 162, 165–67, 189–205; AC ¶¶ 7, 14, 166, 268. That is not "product improvement," and Facebook's cited cases are inapt. *Cf. Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998–1001 (9th Cir. 2010) (dominant firm updated products so competitors' ancillary products no longer worked with them); *In re Apple*

---

[28]   The acquisitions were also integral to the anticompetitive scheme and Facebook's manipulation of its Platform because they prevented app developers, who were faced with exclusion from the Facebook Platform, from having an alternative outlet. AC ¶¶ 15, 133–91, 219–20.

[29]   Thus, the acquisitions were of nascent, not (as Facebook wrongly claims) potential, competitors, Mot. at 24, and they are actionable. *See United States v. El Paso Nat. Gas Co.*, 376 U.S. 651, 660 (1964) (acquisition of nascent competitor anticompetitive).

1    *iPod iTunes Antitrust Litig.*, 796 F. Supp. 2d 1137, 1143 (N.D. Cal. 2011) (same).

2              **4)      Facebook Mischaracterizes Plaintiffs' Allegations Regarding Developers**

3              **a)      Consumers' Claims Do Not Implicate a "Duty to Deal"**

4         The CC's claims do ***not*** depend on any "duty to deal" between Facebook and "third-party

5    app developers." Mot. at 24–27. The CC alleges that Facebook engaged in a multi-part scheme to

6    obtain and maintain market power by deceiving Consumers and then using their data to identify

7    other firms to acquire or attack. CC ¶¶ 157–58, 167–69, 172, 178, 181–83. How Facebook then used

8    this data to cut off third-party access to its "Platform" and demand data reciprocity and monetary

9    sums describe a ***consequence*** of this scheme, not the CC's "theory" of anticompetitive conduct.

10             **b)      Advertisers' Claims**

11        Advertisers do not assert claims that impose upon Facebook a duty to deal with competitors.

12   Rather, the AC alleges a multi-part scheme that includes Platform-based conduct designed to

13   eliminate actual or potential sources of social data that threatened Facebook's DTBE, as well as

14   both actual and potential rivals in the Social Advertising Market. This inflated advertising prices.

15   *E.g.*, AC ¶ 482. This conduct was part of the *means* for Facebook's unlawful maintenance of its

16   monopoly and the price overcharge that resulted to Advertisers.

17        In any event, the allegations surrounding Facebook's Platform comfortably constitute an

18   anticompetitive refusal to deal. The AC alleges: (a) the termination of a "voluntary and profitable

19   course of dealing" when Facebook pretended to deprecate essential Platform functionality,

20   destroying apps that added value to Facebook's Platform (*e.g.*, AC ¶ 103 (Vernal: "Platform is a

21   key to our strategy because we believe that there will be a lot of different social applications . . .

22   And we believe we can't develop all of them ourselves."); ¶ 107 (Facebook told its investors that

23   Platform created "value for Facebook" and that "Platform supports our advertising business")); (b)

24   Facebook forwent profits by destroying tens of thousands of apps that added value to Facebook's

25   Platform, including profits from potential Platform access charges and actual app-install-based

26   advertising (*e.g.*, ¶¶ 115 ("The biggest/most efficient market segment for advertising on mobile

27   today is driving app installs"); ¶ 112 (refusal to "allow things which are at all competitive to 'buy'

28   this data from us"); ¶¶ 138–40; 154 (WeChat, Kakao, and Line restricted from purchasing ads));

and (c) Facebook did so discriminatorily by selling access to certain developers it anointed as winners in various app categories (¶¶ 136, 196, 204, 216–44, 482, 493). *See F.T.C. v. Qualcomm Inc.*, 969 F.3d 974, 993–94 (9th Cir. 2020) (setting forth elements). Moreover, the AC alleges that Facebook, as its own senior engineers confirmed internally, had no legitimate business or technical justification for its Platform conduct. AC ¶¶ 173–193 (quoting internal e-mails among senior Platform executives stating Facebook's Platform changes were beyond "parody" and justifications were "pablum" and "false"). *See Aspen Skiing Co v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608–11 (1985) (analyzing lack of legitimate justification for anticompetitive conduct). This is adequate on the pleadings. *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 462 (7th Cir. 2020).

D.    **Plaintiffs Adequately Allege Antitrust Standing and Injury**

Antitrust standing requires courts to "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them, to determine whether a plaintiff is a proper party to bring an antitrust claim." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1054 (9th Cir. 1999). Courts consider "the nature of the plaintiff's injury," "the directness of the injury," "the speculative measure of the harm;" and "the complexity in apportioning damages." *Knevelbaard*, 232 F.3d at 987. A "court need not find in favor of the plaintiff on each factor," and "no single factor is decisive." *Am. Ad*, 190 F.3d at 1055. A plaintiff must also adequately allege "antitrust injury[.]" *Id.* Plaintiffs adequately allege both antitrust standing *and* antitrust injury here.

1)    **Consumers Suffered Direct, Quantifiable, Antitrust Injury**

Facebook asserts that Consumers' claims are not "cognizable" because "the Sherman Act allow[s] recovery only if a plaintiff can demonstrate *financial* loss," which Consumers cannot allege since Facebook is "free." Mot. at 28. Facebook misstates the law, runs from key factual allegations, and ignores economic realities.

***First***, Facebook's claim as to a "financial loss" requirement purportedly imposed by *Stationary Engineers Loc. 39 Health & Welfare Tr. Fund v. Philip Morris, Inc.*, Mot. at 28, is incorrect (citing 1998 WL 476265, at *4, *9 (N.D. Cal. Apr. 30, 1998)). The quoted passage describes the requirements for bringing a civil ***RICO*** claim, *id.* at *4, not, as Facebook represents, a claim under "the Sherman Act." Mot. at 28. Facebook's narrow and unsupported approach to

1   antitrust standing under the Clayton Act would mean that antitrust laws do not apply at all to firms

2   that simply transact in consideration in-kind, rather than cash, a business model increasingly

3   prevalent in the modern, digital economy. But as Facebook's own cited authorities recognize, Mot.

4   at 28, injuries to "property" under the Clayton Act are given a "broad and inclusive" definition that

5   "comprehends ***anything*** of material value." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338 (1979);

6   *Bhan v. NME Hosps., Inc.*, 669 F. Supp. 998, 1013 (E.D. Cal. 1987) (similar). Consumers therefore

7   have standing to sue for a wide range of harms, such as increased costs, reduced choices and

8   innovation, and lower quality products and services. CC ¶¶ 9–11; 219–23, 226–29. *See TSI Prod.,*

9   *Inc. v. Armor All/STP Prod. Co.*, 2019 WL 4600310, at *13 (D. Conn. Sept. 23, 2019) (reduced

10  choice and quality); *FreeHand*, 852 F. Supp. 2d at 1185 (higher prices and "stifl[ed] innovation").

11  ***Second***, Facebook is not in fact "free," and Consumers do not complain of "personal

12  injuries," such as psychological harm arising from Facebook's exposure of their data. Mot. at 28.

13  Consumers pay for Facebook with "material value"—their personal data and attention—which

14  Facebook then monetizes. In return, Consumers are supposed to receive products and services of

15  material value. Facebook's monopoly power allowed it to extract more data from them and provide

16  less compensation to them than it could in a competitive market. CC ¶¶ 9, 16, 38–41, 70, 225–26.

17  Facebook ignore these allegations, common sense (it is a for-profit, publicly traded company, not a

18  charity), and its own admissions as to the value it extracts from users. *Id.* ¶¶ 7, 14, 138.

19  ***Third***, Facebook's suggestion that its conduct is not actionable since it transacts with

20  Consumers in a different form of consideration ignores economic realities. *United Food & Com.*

21  *Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Teikoku Pharma USA, Inc.*,

22  74 F. Supp. 3d 1052, 1070 (N.D. Cal. 2014) ("broader definition of payment . . . align[s] [antitrust]

23  law with modern-day realities."). That approach would render many firms in the modern, digital

24  economy, worth trillions of dollars from similar business models, immune from antitrust law.

25  Antitrust law is not so limited. *Aggrenox*, 94 F. Supp. 3d at 242 (no "distinction between transfers

26  of money" and "things that are worth money" for "antitrust scrutiny"); *In re Loestrin 24 Fe Antitrust*

27  *Litig.*, 814 F.3d 538, 550 (1st Cir. 2016) (competitors' non-cash transaction subject to antitrust law,

28  which "prioritize[s] substance over form," since contrary would give wrongdoers "carte blanche").

1    Facebook also asserts that antitrust standing's "key purposes" require that the Court deny

2   Consumers standing. Mot. at 29. But antitrust standing's key purposes are to assess whether a

3   particular potential plaintiff, among others, is the "proper plaintiff" to bring an antitrust suit. *Apple*

4   *Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019). Antitrust standing does not bar claims where, as here,

5   consumers directly transact with a monopolist who asserts that ***no*** set of plaintiffs can recover. *Id.*

6   While Facebook glosses over this distinction, Mot. at 29, its cited authorities do not. *See Id.* at 1524

7   (rationale for indirect purchaser rule); *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 543 (9th Cir.

8   1987) (difficulties apportioning damages between union, owners, and employees).

9    Facebook brushes aside as "speculative" the CC's allegations that Facebook's

10  anticompetitive acts injured Consumers because greater competition would have forced it to provide

11  them a better product or pay them for their data. Mot. at 29. But the CC's theories of injury are

12  neither difficult to assess uniformly, nor "speculative." Consumers' injuries do not turn on

13  individuals' subjective conceptions of "value," *Id.*, but instead, Facebook's failure "to provide

14  [them] greater value . . . on a ***market-wide basis***[.]" CC ¶ 10. That value could have taken the form

15  of improved product quality, *e.g.*, "superior product features"; requiring Consumers "to surrender

16  [less] personal data"; "lower ad loads, interoperability between applications"; and data portability.

17  *Id.* ¶ 226. It can be approximated by the amount Facebook would have paid users in a competitive

18  market to use it absent those improvements.[30] This measure is hardly "counter-intuitive

19  speculation." Mot. at 30. Facebook itself calculates the value of a user's attention and data "in terms

20  of ***average*** revenue per user . . . in its public filings." CC ¶ 7. Competition also could have required

21  Facebook to monetarily compensate Consumers for their data as other firms, like Microsoft, do. *Id.*

22  ¶ 223. Despite its about-face in its motion, Mot. at 30–31, Facebook itself "discussed a 'Data for $

23  plan'" and then paid some users up to ***$20.00 per month*** for their data. CC ¶¶ 223–24, 225 n.190.

24   Facebook again ignores the CC's allegations when it claims Consumers failed to tie their

25  "harms" to "competition-reducing aspect[s] of Facebook's conduct," Mot. at 30. The CC explains

26

27  _____
    [30]  Facebook urges that Consumers should be denied antitrust standing since "there is no way to
28  calculate" Consumers' injuries. Mot. at 29. That is false, and the ***method for measuring*** antitrust
    injury is a matter for expert discovery, not a basis for dismissal. *Knevelbaard*, 232 F.3d at 991.

how Consumers' harms "flow" from their lack of any "meaningful alternative to Facebook's social network and social media empire," a market distortion that Facebook created and maintained by deceiving Consumers into using it (to its competitors' detriment) and then weaponizing their data "to know precisely which competitors to pick off." CC ¶¶ 11, 168, 217–19; *see Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 374 (9th Cir. 2003) (antitrust injury where conduct "detrimentally changed the market make-up and limited consumers' choice to one source").

Consumers need not, as Facebook claims, also plead "information about [competing] firms' business plans, economics, or strategies" or detail how they "might have competed on quality or provided a better user experience[.]" Mot. at 29–30. That ignores that the CC's theory of injury does not turn on what products *other* companies would have provided Consumers. The CC also alleges the changes *Facebook* would have made to its own products in response to competitive pressure. CC ¶¶ 225–27. Basic economics (and Facebook's own desire to deceive Consumers about its privacy practices) make clear that if Consumers knew of Facebook's true privacy costs, competition would have forced it to compete harder on either quality or price. *Id.* ¶ 134; *Goldwasser v. Ameritech Corp.*, 1998 WL 60878, at *8 (N.D. Ill. Feb. 4, 1998) ("determination that market conditions would be different 'but for' the defendant's conduct is always a difficult issue in antitrust cases," but it follows that "rates will be lower once the . . . industry becomes competitive;" and "if [monopolist] is at fault for this industry not yet being competitive, [its] actions have harmed Plaintiffs.").

Contrary to Facebook's arguments, Mot. at 30, the CC describes how competitors could not adequately respond to Facebook's deception in real-time since it repeatedly denied any wrongdoing, and, even by 2019, the full scale of its deception was unknown. CC ¶¶ 92, 127 n.102, 135, 146. When competitors like Google+ did "offer better privacy terms," Mot. at 30, Facebook temporarily abstained from "further eroding its privacy features," long enough to withstand any competitive pressure. CC ¶¶ 132–35. Nor does the CC allege that even "better" products "would" have failed. While entry barriers opened the door to Facebook's dominance, its anticompetitive conduct "slammed the door shut," and was responsible for its thwarting competitors.[31] *Id.* ¶¶ 11, 106–07.

---

[31]   The CC does not allege "only one firm was destined to be successful" due to entry barriers. Nor does it allege that these barriers were insurmountable. Mot. at 31. Facebook surpassed early rivals,

1      Finally, Facebook's assertion that Consumers received "substantial value from using

2  Facebook" does not provide it a safe harbor. Mot. at 1. The antitrust laws do not give refuge to a

3  monopolist who provides *some* value to consumers, if they would have received *even more* value

4  but for the destruction of competition. *FreeHand*, 852 F. Supp. 2d at 1185 (antitrust reaches "acts

5  that . . . raise the price of goods above their *competitive* level or diminish their quality" below it).

6          **2)      Advertisers Allege Antitrust Standing and Injury**

7      Facebook's restraint of competition in the Social Advertising Market increased prices above

8  competitive levels, forcing Advertisers to pay supracompetitive prices when purchasing directly

9  from Facebook in that restrained market. This is canonical antitrust injury. *See Glen Holly*, 352 F.3d

10  at 374 (consumers in restrained market "are presumptively the proper plaintiffs to allege antitrust

11  injury"); *FreeHand*, 852 F. Supp. 2d at 1185 (anticompetitive conduct causing overcharges is "the

12  type[] of injur[y] that commonly satisfy[ies] the antitrust standing requirement."). Facebook can

13  hardly challenge this analysis and chooses not to do so.

14      Instead, Facebook first claims that Advertisers do not "plausibly allege *they* paid a

15  supracompetitive price for advertising," Mot. at 31, even though the AC contains voluminous

16  allegations that Facebook's anticompetitive conduct resulted in supracompetitive prices to

17  purchasers generally and that Advertisers specifically paid those supracompetitive prices. *See, e.g.*,

18  AC ¶¶ 1–2, 21–22, 24–33, 486–87. Next, Facebook espouses a heightened pleading standard, not

19  previously seen in antitrust law, arguing Advertisers lack standing because they did not plead "the

20  competitive price" they would have paid absent anticompetitive conduct. Mot. at 32. There is no

21  such requirement, and Facebook cites no authority for that position.[32] *Cf. In re Magnesium Oxide*

22  *Antitrust Litig.*, 2011 WL 5008090, at *6 (D.N.J. Oct. 20, 2011) (allegation that plaintiffs "'injured

23  by having paid more for MgO6 than they otherwise would have paid absent defendants' unlawful

24

---

25  including then-dominant Myspace, despite these barriers. CC ¶¶ 106–07, 122; *cf. Lucas Auto. Eng'g,*
   *Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1233 (9th Cir. 1998) (no injury from plaintiffs'
26  loss of *exclusive* contract, since injury same whether monopolist or other competitor won contract).

27  [32]   Facebook misreads *Intel Corp. v. Fortress Inv. Grp. LLC*, 2021 WL 51727 (N.D. Cal. Jan. 6,
   2021). Mot. at 31. There, plaintiffs alleged that patent aggregation allowed royalty inflation, but the
28  allegations were belied by licenses occurring before the alleged anticompetitive conduct, and there
   were no allegations about royalties charged for those licenses. *Intel*, 2021 WL 51727, at *1–2.

conduct' is sufficient to establish antitrust standing.").[33]

Facebook also challenges Advertisers' standing to bring a Section 1 claim based upon its Jedi Blue agreement with Google. By entering into the Jedi Blue agreement, Facebook, in addition to agreeing to spend $500 million per year through Google's advertising program, agreed not to enter the Google-dominated "exchange-based" advertising market; in return, Google agreed not to encroach on Facebook's dominance in the Social Advertising Market and to help Facebook further exclude potential competitors. AC ¶¶ 16–20, 369–411, 564–69. This is a straightforward market allocation agreement that is a "classic *per se* antitrust violation." *United States v. Brown*, 936 F.2d 1042, 1045 (9th Cir. 1992); *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972); *see also Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49–50 (1990) (market allocation "agreements are anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other.").

Facebook argues Advertisers lack antitrust standing to pursue this Section 1 claim, because, according to Facebook, Jedi Blue only affected the exchange-based advertising market. Mot. at 32. However, this is not a case where Advertisers allege that the ripple effects from the anticompetitive conduct in one market caused harm in a second market; this is a case where the anticompetitive conduct (*i.e.*, the agreement among potential horizontal competitors to allocate markets), by definition, impacts both allocated markets directly. *Topco*, 405 U.S. at 610–11 (explaining anticompetitive impact of horizontal market allocation across multiple markets). Once that distinction is understood, Facebook's argument unravels. Because three of Facebook's four arguments regarding antitrust standing—that there was no harm in the Social Advertising Market, that any harm in that market is too speculative, and that Advertisers are not the most efficient

---

[33]  Facebook's additional arguments—that higher prices were the result of higher quality and that Advertisers must allege restricted output—are wide of the mark. Facebook's "higher quality" argument is simply a denial of Advertisers' factual allegations; Facebook can plead this in its Answer. And Facebook's assertion that allegations of "restricted output" must accompany allegations of supracompetitive pricing is legally and factually mistaken. Mot. at 32 (citing *Safeway Inc. v. Abbott Labs.*, 761 F. Supp. 2d 874, 887 (N.D. Cal. 2011). *Safeway* recognized that allegations of pricing power over time are sufficient to allege supracompetitive pricing, even absent allegations of restricted output. 761 F. Supp. 2d at 887 n.3. In any event, the AC plainly alleges that Facebook, over years, sustained higher pricing for, and restricted output of, social advertising. AC ¶¶ 486–87.

1   enforcers of the antitrust laws—rely on this false premise, those arguments must fail.[34]

2          The AC details how and why the Social Advertising Market (dominated by Facebook) and

3   the exchange-based advertising market (dominated by Google) were separate but converging, and

4   how Jedi Blue halted that convergence, protecting both conspirators' respective dominant positions.

5   AC ¶¶ 370–82; 384–410. Most importantly, Jedi Blue allowed Facebook to reserve the Social

6   Advertising Market for itself and Google to reserve the exchange-based advertising market for itself.

7   *Id.* ¶ 411. Both markets were directly restrained by this market allocation. And in agreeing to refrain

8   from targeting Facebook's users for ad sales and to help Facebook target those users for ad sales

9   outside of Facebook-controlled apps, Google helped Facebook strengthen the DTBE protecting

10  Facebook's social advertising dominance. *Id.* ¶¶ 404, 410. This allowed Facebook to continue

11  charging Advertisers a significant price premium for its social advertising. *Id.* ¶¶ 406, 409, 411.

12         Simply put, Advertisers are consumers in a restrained market, since they purchased

13  advertising directly from Facebook, one of the conspirators, in the Social Advertising Market, one

14  of the markets subject to the unlawful market allocation agreement. They thus have standing to bring

15  their Section 1 claim. *See Glen Holly*, 352 F.3d at 372.[35]

16  **E.     Consumers State a Cognizable, Standalone Unjust Enrichment Claim**

17         Facebook raises three faulty challenges to the CC's unjust enrichment claim. Mot. at 35.

18  ***First***, the Ninth Circuit ***has*** determined that, under California law, unjust enrichment is "an

19  independent cause of action[.]"[36] *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir.

20  2016). Courts have since recognized it as a standalone California state-law claim. *See Hart v. TWC*

21  *Prod. & Tech. LLC*, 2021 WL 1032354, at *8 (N.D. Cal. Mar. 17, 2021) (citing *ESG*); *Hoai Dang*

22  *v. Samsung Elecs. Co.*, 2018 WL 6308738, at *11 (N.D. Cal. Dec. 3, 2018) (Koh, J.).[37]

---

23  [34]   Facebook also repeats its argument that the Advertisers do not allege supracompetitive prices
24  with the requisite specificity. Mot. at 32. This is not required. Market allocation agreements are *per
    se* illegal, and their anticompetitive effects are therefore presumed. *Topco*, 405 U.S. at 606.

25  [35]   Facebook's argument that Jedi Blue occurred after five of the named Advertisers purchased
    advertising is immaterial, Mot. at 34, as only one named plaintiff need have made a post-agreement
26  purchase. *See Backhaut v. Apple Inc.*, 2015 WL 4776427, at *5 (N.D. Cal. Aug. 13, 2015) (Koh, J.)
    ("In a class action, standing is satisfied if at least one named plaintiff meets the requirements.").

27  [36]   Facebook cites this Court's *Herskowitz* decision, Mot. at 35, but *Herskowitz* predates *ESG*.

28  [37]   This Court recently decided differently, but it appears the parties did not raise *ESG* to the Court.

1    *Second*, assuming *arguendo* that the CC's unjust enrichment claim turns on its antitrust

2    claims, the CC states cognizable antitrust claims, as discussed *supra*. Even assuming otherwise, "an

3    independent" unjust enrichment claim may lie wherever a "defendant received and unjustly retained

4    a benefit at the plaintiff's expense." *ESG*, 828 F.3d at 1038. The CC alleges that Facebook received

5    benefits from Consumers ("data, time, and attention") and it would be unjust for Facebook to retain

6    its large profits from these benefits given its deception as to its collection and use of the data to

7    destroy competition. CC ¶¶ 310–15; *cf. Hart*, 2021 WL 1032354, at *1, *8 (unjust enrichment claim

8    stated where mobile app deceptively tracked and sold users' geolocation data for advertising).

9    *Third*, Facebook asserts that "[c]ertain federal courts" have reconstrued unjust enrichment

10    claims "as quasi-contract claims," which fail if a contract exists. Mot. at 35. But unjust enrichment

11    "is not narrowly and rigidly limited to quasi-contract principles"; the Ninth Circuit has held that it

12    is "an independent cause of action" *or* a "quasi-contract claim[.]" *Pro. Tax Appeal v. Kennedy-*

13    *Wilson Holdings, Inc.*, 29 Cal. App. 5th 230, 240 (2018); *ESG*, 828 F.3d at 1038. Borrowed quasi-

14    contract principles need not apply to this independent "cause of action," and even if they did,

15    Facebook's terms of service are immaterial, since the claim "is not based on, and does not arise out

16    of" any purported breach of the terms. *Fed. Deposit Ins. Corp. v. Dintino*, 167 Cal. App. 4th 333,

17    347 (2008). The claim turns on the differences between what Facebook represented to users and its

18    actual data practices. *Obertman v. Electrolux Home Care Prod., Inc.*, 482 F. Supp. 3d 1017, 1028

19    (E.D. Cal. 2020) (unjust enrichment claim stated based on false advertising, despite contract).

20                    **IV.    REQUESTS FOR LEAVE TO AMEND**

21    Should the Court dismiss any portion of the CC or AC, Plaintiffs respectfully request leave

22    to amend their respective complaints. *United States ex rel. Jones v. Sutter Health*, 2020 WL

23    6544412, at *4 (N.D. Cal. Nov. 6, 2020) (Koh, J.). Plaintiffs can cure any insufficiencies through

24    amendment, including additional allegations based on Facebook's recent document production.

25                            **V.    CONCLUSION**

26    For these reasons, the Court should deny Facebook's motion to dismiss in its entirety.

27

28
─────────────────────

*Abuelhawa v. Santa Clara Univ.*, No. 5:20-cv-04045-LHK, (N.D. Cal.), Dkts. 32, 33, 35, 49.

1   DATED:  June 17, 2021                    Respectfully submitted,[38]

2
    By:  */s/ Yavar Bathaee*                 By:  */s/ Stephen A. Swedlow*
3   **BATHAEE DUNNE LLP**                    **QUINN EMANUEL URQUHART & SULLIVAN,
    Yavar Bathaee (Bar No. 282388)           LLP**
4     yavar@bathaeedunne.com                 Stephen A. Swedlow (admitted *pro hac vice*)
    Edward M. Grauman (admitted *pro hac*      stephenswedlow@quinnemanuel.com
5   *vice*)                                  Michelle Schmit (admitted *pro hac vice*)
      egrauman@bathaeedunne.com                michelleschmit@quinnemanuel.com
6   Andrew C. Wolinsky (admitted *pro hac*   191 N. Wacker Drive, Suite 2700
    *vice*)                                  Chicago, IL 60606-1881
7     awolinsky@bathaeedunne.com             (312) 705-7400
    445 Park Avenue, 9th Floor
8   New York, NY 10022                       Kevin Y. Teruya (Bar No. 235916)
    (332) 206-7668                             kevinteruya@quinnemanuel.com
9                                            Adam B. Wolfson (Bar No. 262125)
    Brian J. Dunne (Bar No. 275689)            adamwolfson@quinnemanuel.com
10    bdunne@bathaeedunne.com                Brantley I. Pepperman (Bar No. 322057)
    633 West Fifth Street, 26th Floor          brantleypepperman@quinnemanuel.com
11  Los Angeles, CA 90071                    865 South Figueroa Street, 10th Floor
    (213) 462-2772                           Los Angeles, CA 90017-2543
12                                           (213) 443-3000

13  By:  */s/ Kristen M. Anderson*           Manisha M. Sheth (admitted *pro hac vice*)
    **SCOTT + SCOTT ATTORNEYS AT LAW**         manishasheth@quinnemanuel.com
14  **LLP**                                  51 Madison Avenue, 22nd Floor
    Kristen M. Anderson (Bar No. 246108)     New York, New York 10010
15    kanderson@scott-scott.com              (212) 849-7000
    230 Park Avenue, 17th Floor
16  New York, NY 10169
    (212) 223-6444
17                                           By:  */s/ Shana E. Scarlett*
    Christopher M. Burke (Bar No. 214799)    **HAGENS BERMAN SOBOL SHAPIRO LLP**
18    cburke@scott-scott.com                 Shana E. Scarlett (Bar No. 217895)
    David H. Goldberger (Bar No. 225869)       shanas@hbsslaw.com
19    dgoldberger@scott-scott.com            715 Hearst Avenue, Suite 202
    Yifan (Kate) Lv (Bar No. 302704)         Berkeley, CA 94710
20    klv@scott-scott.com                    (510) 725-3000
    600 W. Broadway, Suite 3300
21  San Diego, CA 92101                      Steve W. Berman (admitted *pro hac vice*)
    (619) 233-4565                             steve@hbsslaw.com
22                                           1301 Second Avenue, Suite 2000
    Patrick J. McGahan (admitted *pro hac*   Seattle, WA 98101
23  *vice*)                                  (206) 623-7292
      pmcgahan@scott-scott.com
24  Michael P. Srodoski (admitted *pro hac*
    *vice*)
25    msrodoski@scott-scott.com
    156 South Main Street, P.O. Box 192
26  Colchester, CT 06415
    (860) 537-5537
27
    _____
28  [38]  Each Interim Counsel joins in their respective Class's arguments and allegations, as well as in
    the joint arguments contained herein.

1

By:   */s/ Tina Wolfson*
**AHDOOT & WOLFSON, PC**

2

Tina Wolfson (Bar No. 174806)
  twolfson@ahdootwolfson.com

3

Robert Ahdoot (Bar No. 172098)
  rahdoot@ahdootwolfson.com

4

Theodore W. Maya (Bar No. 223242)
  tmaya@ahdootwolfson.com

5

Rachel Johnson (Bar No. 331351)
  rjohnson@ahdootwolfson.com

6

2600 West Olive Avenue, Suite 500
Burbank, CA 91505

7

(310) 474-9111

8

By:   */s/ Keith J. Verrier*

9

**LEVIN SEDRAN & BERMAN LLP**
Keith J. Verrier (admitted *pro hac vice*)

10

  kverrier@lfsblaw.com
Austin B. Cohen (admitted *pro hac vice*)

11

  acohen@lfsblaw.com
510 Walnut Street, Suite 500

12

Philadelphia, PA 19106-3997
(215) 592-1500

13

14

*Interim Counsel for the Advertiser Class*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:   */s/ Warren Postman*
**KELLER LENKNER LLC**

Warren Postman (Bar No. 330869)
  wdp@kellerlenkner.com
Jason Ethridge (admitted *pro hac vice*)
  jason.ethridge@kellerlenkner.com
1300 I Street, N.W., Suite 400E
Washington, DC 20005
(202) 918-1123

Ashley Keller (admitted *pro hac vice*)
  ack@kellerlenkner.com
Ben Whiting (admitted *pro hac vice*)
  ben.whiting@kellerlenkner.com
Jason A. Zweig (admitted *pro hac vice*)
  jaz@kellerlenkner.com
150 N. Riverside Plaza, Suite 4270
Chicago, IL 60606
(312) 741-5220

By:   */s/ Brian D. Clark*
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**

W. Joseph Bruckner (admitted *pro hac vice*)
  wjbruckner@locklaw.com
Robert K. Shelquist (admitted *pro hac vice*)
  rkshelquist@locklaw.com
Brian D. Clark (admitted *pro hac vice*)
  bdclark@locklaw.com
Rebecca A. Peterson (Bar No. 241858)
  rapeterson@locklaw.com
Arielle S. Wagner (admitted *pro hac vice*)
  aswagner@locklaw.com
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900

*Interim Counsel for the Consumer Class*

1

**ATTESTATION OF STEPHEN A. SWEDLOW**

2

This document is being filed through the Electronic Case Filing (ECF) system by attorney

3 Stephen A. Swedlow.  By his signature, Mr. Swedlow attests that he has obtained concurrence in

4 the filing of this document from each of the attorneys identified on the caption page and in the above

5 signature block.

6

Dated: June 17, 2021                          By    /s/ Stephen A. Swedlow

7                                                                    Stephen A. Swedlow

8

9

10

**CERTIFICATE OF SERVICE**

11

I hereby certify that on this 17th day of June 2021, I electronically transmitted the foregoing

12 document to the Clerk's Office using the CM/ECF System, causing the document to be

13 electronically served on all attorneys of record.

14

By    /s/ Stephen A. Swedlow

15                                                                    Stephen A. Swedlow

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSUMER AND ADVERTISER PLAINTIFFS' JOINT OPPOSITION TO FACEBOOK'S MOTION TO DISMISS