**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Stephen A. Swedlow (admitted *pro hac vice*)
  stephenswedlow@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Shana E. Scarlett (Bar No. 217895)
  shanas@hbsslaw.com
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
(510) 725-3000

*Interim Co-Lead Consumer Class Counsel*

[Additional counsel listed on signature page]

**BATHAEE DUNNE LLP**
Yavar Bathaee (Bar No. 282388)
  yavar@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
(332) 205-7668

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Kristen M. Anderson (Bar No. 246108)
  kanderson@scott-scott.com
230 Park Avenue, 17th Floor
New York, NY 10169
(212) 223-6444

*Interim Co-Lead Advertiser Class Counsel*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> FACEBOOK, INC., <br><br> Defendant. <br><br> This Document Relates To: All Actions | Consolidated Case No. 5:20-cv-08570-LHK <br><br> **CONSUMER CLASS PLAINTIFFS' AND ADVERTISER CLASS PLAINTIFFS' SUPPLEMENTAL BRIEF REGARDING GOVERNMENT ORDERS** <br><br> The Hon. Lucy H. Koh <br><br> Hearing Date:  July 15, 2021 at 1:30 p.m. |

1

# **TABLE OF CONTENTS**

2
**Page**

3   I.      FEDERAL TRADE COMMISSION ORDER ...................................................................1

4           A.      The FTC Order Sustained the FTC's PSN Market Definition ...................................1

5           B.      Determinations Regarding FTC's Monopoly Power Allegations ............................2

6   II.     STATES ORDER.................................................................................................................4

7           A.      Determinations Regarding Facebook's "Platform" Access Policies.........................4

8           B.      Determinations that Injunctive Relief as to Individual Acquisitions Barred by
                    Laches........................................................................................................................4
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Facebook claims that the District Court for the District of Columbia's ("D.D.C.") dismissal of the government antitrust lawsuits against Facebook requires dismissal of these private actions. Dkt. 114 at 5. Both the Consumer Complaint ("CC") and the Advertiser Complaint ("AC"), however, present materially different legal theories and factual allegations that the D.D.C. indisputably did not (and could not) resolve. And those decisions reject some of the same arguments Facebook advances here, further highlighting why its motion, Dkt. 97 ("Mot."), should be denied.

## I.    FEDERAL TRADE COMMISSION ORDER

### A.    The FTC Order Sustained the FTC's PSN Market Definition

**Consumers.** In finding the "Personal Social Networking Services" market plausible, the D.D.C. *rejected* many of the arguments that Facebook repeats here. *Fed. Trade Comm'n v. Facebook, Inc.*, No. 20-cv-03590 (D.D.C. June 28, 2021), Dkt. 73 ("FTC Order") at 23.

Although there are some differences, the FTC's PSN Market definition is highly similar to Consumers' Social Network Market definition. In finding the PSN Market plausible, the D.D.C. necessarily disposed of Facebook's argument that such a market definition fails because the products in it are purportedly "free and available in unlimited quantities." FTC Order at 23; Mot. at 15; Dkt. 109 ("Opp.") at 16. The D.D.C. explicitly rejected Facebook's argument that market definition requires reference to demand cross-elasticity, even where reasonable interchangeability is alleged. FTC Order at 24; Mot. at 17–18; Opp. at 17–18. And the D.D.C. also rejected Facebook's arguments regarding what firms are in the PSN Market and its attempts to inject in "other possible substitutes," all of which Facebook improperly parrots here. FTC Order at 25–26; Mot. at 15–18; Opp. at 16–18.

**Advertisers.** The FTC did not allege, and the D.D.C. did not address, Advertisers' Social Advertising Market. However, the D.D.C. rejected Facebook's factual disputes concerning the FTC's well-pleaded allegations that consumers would not substitute other services. FTC Order at 25. In this case, Facebook "directly takes aim," *id.* at 25, at Advertisers' allegations that search and display ads are not reasonable substitutes. Mot. at 15; *see* AC ¶¶ 413–444. Per the FTC Order, it is improper at this stage "to engage in the sort of 'deeply fact-intensive inquiry'" raised by Facebook regarding market definition. FTC Order at 25. This underscores the flawed premise of Facebook's arguments on this issue here.

**B.**     **Determinations Regarding FTC's Monopoly Power Allegations**

The D.D.C. determined that the FTC's "mere[]" allegations that Facebook has "maintained a dominant share" of the PSN Market "in excess of 60%" and that "no other social network of comparable scale exists in the United States" do "not even provide an estimated figure or range for Facebook's market share at any point over the past ten years[.]" FTC Order at 27, 32.

**Consumers.** The D.D.C. rejected the FTC's "exceeds 60%" allegation as "bare assertions" of the minimum share usually required to establish monopoly power. FTC Order at 19, 28 (recognizing 60–65% usually required, collecting cases involving similar "threadbare recital[s]"). But the CC does not allege merely the minimum share legally required; it alleges Facebook "has market share of at least 85% of the Social Media Market" and that its share in the Social Network Market "is higher" since the latter is a part of the former.[1] CC ¶¶ 56, 71, 286. As explained below, the CC also alleges specific facts of Facebook's share, not threadbare recitals of the legal minimum.

The D.D.C. noted that while the FTC's lone "exceeds 60%" allegation "might sometimes be acceptable" in a "case involving a more traditional goods market," it was not there given the PSN Market definition and the quantum of share alleged. FTC Order at 2, 27–28 (citing Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law § 531 (4th ed. 2014)). The treatise upon which the D.D.C. relied rejects any "sliding scale" but explains that whether a "minimum share" is sufficient "depends" on "confidence" as to market definition, such that a higher share may be needed to bolster allegations of monopoly power in an "idiosyncratically drawn" market. Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law § 532a (5th ed. 2021). The D.D.C. did ***not***, however, state that a factual allegation of a specific market share, such as here (85%), can be disregarded. Nor could it. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (factual allegations "taken as true"); Areeda, Antitrust Law § 532a ("Once a market is defined, no matter how tenuously, courts examine market share on the assumption that all market definitions are alike."). Instead, the D.D.C. faulted the FTC for alleging merely the legal minimum of "exceeds 60%," failing "to allege that Facebook has ever . . . had something like 85% or even 75%" share, and failing to explain "which firms make up the

---

[1]   Consumers also assert standalone attempted monopolization claims (which the FTC did not) for each market. *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) (44% market share "sufficient as a matter of law" to support attempt claim, and even 30% possibly sufficient).

remaining 30–40%[.]" FTC Order at 30–31. Here, the CC alleges that Facebook controls more than 85% of the Social Media and Social Network Markets, past competitors are defunct, and current competitors are "only a very small drop in the ocean[.]" CC ¶¶ 56, 68, 71, 140, 286.

The D.D.C. also explained that the FTC did not "offer <u>any</u> indication of the metric(s) or method(s) it used to calculate Facebook's market share[.]" FTC Order at 2. Consumers provide such support for their specific share estimations including, *e.g.*, Facebook's **own** estimation that it is "95% of all social media in the US."[2] CC ¶ 77. The CC also alleges that "more than 80% of the time that consumers . . . spend using social media is spent on Facebook and Instagram," explaining how ***Facebook*** values and uses "time spent" to measure competitive performance, secretly gathering Consumers' data as to their time spent on other apps. *Id.* ¶¶ 78, 163–65, 211, 286; *accord* Dkt. 97-6 at 8 (internal presentation cited at CC ¶ 77, and attached to Facebook's motion, tracking that "Facebook has ~125x the amount of ***minutes spent*** per user" compared to Google+). The CC cites documents—*e.g.*, the House Report and an article Facebook attached to its motion (Dkt. 97-4 at 87–88)—which use "time spent" to calculate market share.[3] To the extent the D.D.C. suggested this metric—which the FTC "sa[id] nothing about"—may be inapt for the PSN Market because "some of the features offered by a Facebook" are not "part of" its PSN-services offerings," FTC Order at 29–30, the CC does not exclude those features from Consumers' markets. CC ¶¶ 15, 56, 59, 262.

The CC also supports its share estimates using Facebook's high share of ad revenue. CC ¶¶ 80, 286. The D.D.C. suggested that ad revenue itself "cannot be the right metric for measuring market share here," as it is "earned in a separate market . . . the market for advertising." FTC Order at 29. But the CC does not allege that Facebook's ad revenue share ***is*** its share of the Social Network or Social Media Markets; the CC alleges Facebook's ad revenue share is probative of Facebook's Social Media Market share, since the more users a social network or social media app has, the more popular it is with advertisers. CC ¶¶ 80, 83, 86; *cf. Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*

---

[2]   Facebook now disclaims its own internal estimates as "nearly a decade old," "not track[ing] Users' alleged market definition," and "irrelevant." Mot. at 19. Its own estimation that it had near-total power in some market ***it*** defines as "social media" is certainly relevant. *Cf.* FTC Order at 27.

[3]   The "95% of all social media" presentation cited at CC ¶ 77, which Facebook now disclaims but attached to its motion, ***itself*** uses "monthly total minutes of use" to calculate share. Dkt. 97-5 at 3.

*of Univ. of Oklahoma*, 468 U.S. 85, 111 (1984) (that firm "uniquely attractive" to advertisers "support[s] conclusion" that firm "possesses market power" in broadcasting market).

**Advertisers.** The D.D.C. did not address Facebook's monopoly power in the Social Advertising Market. Nor did Facebook challenge Advertisers' allegations here. *See generally* Mot. at 18; Opp. at 20 n.21; AC ¶¶ 61–83, 445–60 (Facebook's monopoly power based on its 86% share of ad revenues, ability to raise prices year after year, and protection by high barriers to entry).

## II.    STATES ORDER

### A.    Determinations Regarding Facebook's "Platform" Access Policies

The D.D.C. found the States' Section 2 claim based on Facebook's third-party "Platform" policies failed under "refusal to deal" and "conditional dealing" principles. *State of New York et al. v. Facebook, Inc.*, No. 20-cv-03589 (D.D.C. June 28, 2021), Dkt. 137 ("States Order") at 22–23.

**Consumers.** Consumers' claims do not implicate Facebook's "Platform" policies. Opp. at 27. Instead, Consumers challenge Facebook's deception of the market and larger course of conduct involving Facebook's serial acquisitions and use of deceptively-obtained data to identify competitors and inform those acquisitions. *Id.* at 24. The D.D.C., by contrast, explicitly noted that "Facebook's data-collection and -use practices . . . are ***not the subject of this action***." *Id.* at 7.

**Advertisers.** The D.D.C.'s refusal to deal analysis does not weigh against Advertisers' Section 2 claims. It in fact supports the AC's refusal allegations, as the D.D.C. stated specific revocations of API access to applications deemed competitive could violate Section 2, but held those potentially unlawful refusals were not recent enough to justify injunctive relief. *See* States Order at 31–35. The AC does not make a "policy" argument like the one rejected in the States Order, *see id.* at 28–30, nor does the AC rely on a conditional dealing theory under *Lorain Journal*, *see id.* at 35–40. Rather, the AC alleges, as to Platform conduct, each of the *Aspen* elements with particularity, as well as anticompetitive agreements for advertising purchases and data sharing that directly inflated social advertising demand and prices and reinforced Facebook's DTBE. Opp. at 5–6, 25–26.

### B.    Determinations that Injunctive Relief as to Individual Acquisitions Barred by Laches

Since the States sought only injunctive relief and divestiture, their Section 2 and Clayton Act Section 7 challenges to the Instagram and WhatsApp acquisitions were barred by laches, as the

1   States did not respond to Facebook's "timeliness arguments" and "rais[e] (or even hint[] at) a factual

2   dispute as to" accrual or provide "a reasonable justification" for delay. States Order at 40, 66.

3        **Consumers.** The D.D.C.'s findings as to the States' equitable, acquisition claims do not

4   address Consumers' standalone claims based on deception (which are timely). Opp. at 8, 21–24.

5        Moreover, the CC does not independently challenge individual acquisitions (such as under

6   Section 7); it challenges Facebook's *serial* acquisitions of rivals as part of a multi-part scheme,

7   along with non-acquisition conduct like deceiving Consumers and using their data to spy on

8   competitors.[4] Opp. at 24–25. Whereas the D.D.C faulted the States since neither the "buy" nor the

9   "bury" portions of their course of conduct theory occurred during the limitations period, States Order

10  at 59–65, the CC details how—in furtherance of the different scheme Consumers allege—Facebook

11  engaged in additional, non-acquisition acts *during the limitations period* (deception and spying).

12  *See* CC ¶¶ 156–58, 168, 209, 212, 238(n)(o); *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086–87 (9th

13  Cir. 2014) (equitable antitrust claims timely if based on acts occurring within limitations period).

14  And while the fact of acquisitions was known, that they were enabled by deceptive conduct, and

15  part of a broader anticompetitive scheme, was not until within the limitations period. Opp. at 15, 25.

16       In all events, the D.D.C. repeatedly noted that it was only adjudicating *equitable* claims.

17  States Order at 2, 34, 40. As such, laches—which considers both delay *and* prejudice—governed

18  those claims. *Id.* at 43. But the CC also asserts claims for *damages*, including for different harms—

19  *e.g.*, Consumers not receiving adequate compensation for their data—which continued into the

20  limitations period. CC ¶¶ 11, 223–26; Opp. at 4–5, 8–9. The D.D.C.'s concerns as to "prejudice to

21  Facebook," States Order at 45–47, are thus no bar to the damages claims here. *See Oliver*, 751 F.3d

22  at 1085–86, 1086 n.4 ("Unlike [antitrust] damages claims" subject to "statute of limitations,"

23  equitable antitrust claims subject to laches, including prejudice element).

24       **Advertisers.** Because Advertisers do not seek injunctive relief based on the Platform or

25  acquisition conduct alleged by the States, the D.D.C.'s laches analysis is irrelevant. Advertisers'

26  damages claims are timely under the continuing violation and fraudulent concealment doctrines.

---

27

28  [4]  As such, even if certain individual acquisitions are not independently actionable, they are germane
to Consumers' claims. Opp. at 25 (course of conduct); *see also Dial Corp. v. News Corp.*, 165 F.
Supp. 3d 25, 37–38 (S.D.N.Y. 2016) (pre-limitations acts "material to" damages period injuries).

1   DATED:  July 5, 2021                          Respectfully submitted,[5]

2

3   By:   /s/ Yavar Bathaee                       By:   /s/ Stephen A. Swedlow
    **BATHAEE DUNNE LLP**                          **QUINN EMANUEL URQUHART & SULLIVAN,**
    Yavar Bathaee (Bar No. 282388)                 **LLP**
4     yavar@bathaeedunne.com                       Stephen A. Swedlow (admitted *pro hac vice*)
    Edward M. Grauman (admitted *pro hac*            stephenswedlow@quinnemanuel.com
5   *vice*)                                        Michelle Schmit (admitted *pro hac vice*)
      egrauman@bathaeedunne.com                      michelleschmit@quinnemanuel.com
6   Andrew C. Wolinsky (admitted *pro hac*         191 N. Wacker Drive, Suite 2700
    *vice*)                                        Chicago, IL 60606-1881
7     awolinsky@bathaeedunne.com                   (312) 705-7400
    445 Park Avenue, 9th Floor
8   New York, NY 10022                             Kevin Y. Teruya (Bar No. 235916)
    (332) 206-7668                                   kevinteruya@quinnemanuel.com
9                                                  Adam B. Wolfson (Bar No. 262125)
    Brian J. Dunne (Bar No. 275689)                  adamwolfson@quinnemanuel.com
10    bdunne@bathaeedunne.com                      Brantley I. Pepperman (Bar No. 322057)
    633 West Fifth Street, 26th Floor                brantleypepperman@quinnemanuel.com
11  Los Angeles, CA 90071                          865 South Figueroa Street, 10th Floor
    (213) 462-2772                                 Los Angeles, CA 90017-2543
12                                                 (213) 443-3000

13  By:   /s/ Kristen M. Anderson                  Manisha M. Sheth (admitted *pro hac vice*)
    **SCOTT+SCOTT ATTORNEYS AT LAW LLP**             manishasheth@quinnemanuel.com
14  Kristen M. Anderson (Bar No. 246108)           51 Madison Avenue, 22nd Floor
      kanderson@scott-scott.com                    New York, New York 10010
15  230 Park Avenue, 17th Floor                    (212) 849-7000
    New York, NY 10169
16  (212) 223-6444

17  Christopher M. Burke (Bar No. 214799)          By:   /s/ Shana E. Scarlett
      cburke@scott-scott.com                       **HAGENS BERMAN SOBOL SHAPIRO LLP**
18  David H. Goldberger (Bar No. 225869)           Shana E. Scarlett (Bar No. 217895)
      dgoldberger@scott-scott.com                    shanas@hbsslaw.com
19  Yifan (Kate) Lv (Bar No. 302704)               715 Hearst Avenue, Suite 202
      klv@scott-scott.com                          Berkeley, CA 94710
20  600 W. Broadway, Suite 3300                    (510) 725-3000
    San Diego, CA 92101
21  (619) 233-4565                                 Steve W. Berman (admitted *pro hac vice*)
                                                     steve@hbsslaw.com
22  Patrick J. McGahan (admitted *pro hac vice*)   1301 Second Avenue, Suite 2000
      pmcgahan@scott-scott.com                     Seattle, WA 98101
23  Michael P. Srodoski (admitted *pro hac*        (206) 623-7292
    *vice*)
24    msrodoski@scott-scott.com
    156 South Main Street, P.O. Box 192
25  Colchester, CT 06415
    (860) 537-5537
26

27
    ─────────────────────
28  [5]  Each Interim Counsel joins in their respective Class's arguments and allegations, as well as in
    the joint arguments contained herein.

| | | |
|---|---|---|
| 1 | By:  */s/ Tina Wolfson* | By:  */s/ Warren Postman* |
| 2 | **AHDOOT & WOLFSON, PC** | **KELLER LENKNER LLC** |
| | Tina Wolfson (Bar No. 174806) | Warren Postman (Bar No. 330869) |
| | twolfson@ahdootwolfson.com | wdp@kellerlenkner.com |
| 3 | Robert Ahdoot (Bar No. 172098) | Jason Ethridge (admitted *pro hac vice*) |
| | rahdoot@ahdootwolfson.com | jason.ethridge@kellerlenkner.com |
| 4 | Theodore W. Maya (Bar No. 223242) | 1300 I Street, N.W., Suite 400E |
| | tmaya@ahdootwolfson.com | Washington, DC 20005 |
| 5 | Rachel Johnson (Bar No. 331351) | (202) 918-1123 |
| | rjohnson@ahdootwolfson.com | |
| 6 | 2600 West Olive Avenue, Suite 500 | Ashley Keller (admitted *pro hac vice*) |
| | Burbank, CA 91505 | ack@kellerlenkner.com |
| 7 | (310) 474-9111 | Ben Whiting (admitted *pro hac vice*) |
| | | ben.whiting@kellerlenkner.com |
| 8 | | Jason A. Zweig (admitted *pro hac vice*) |
| | By:  */s/ Keith J. Verrier* | jaz@kellerlenkner.com |
| 9 | **LEVIN SEDRAN & BERMAN LLP** | 150 N. Riverside Plaza, Suite 4270 |
| | Keith J. Verrier (admitted *pro hac vice*) | Chicago, IL 60606 |
| 10 | kverrier@lfsblaw.com | (312) 741-5220 |
| | Austin B. Cohen (admitted *pro hac vice*) | |
| 11 | acohen@lfsblaw.com | |
| | 510 Walnut Street, Suite 500 | By:  */s/ Brian D. Clark* |
| 12 | Philadelphia, PA 19106-3997 | **LOCKRIDGE GRINDAL NAUEN P.L.L.P.** |
| | (215) 592-1500 | W. Joseph Bruckner (admitted *pro hac vice*) |
| 13 | | wjbruckner@locklaw.com |
| | *Interim Counsel for the Advertiser Class* | Robert K. Shelquist (admitted *pro hac vice*) |
| 14 | | rkshelquist@locklaw.com |
| 15 | | Brian D. Clark (admitted *pro hac vice*) |
| | | bdclark@locklaw.com |
| 16 | | Rebecca A. Peterson (Bar No. 241858) |
| | | rapeterson@locklaw.com |
| 17 | | Arielle S. Wagner (admitted *pro hac vice*) |
| | | aswagner@locklaw.com |
| 18 | | 100 Washington Avenue South, Suite 2200 |
| | | Minneapolis, MN 55401 |
| 19 | | (612) 339-6900 |
| 20 | | *Interim Counsel for the Consumer Class* |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

**ATTESTATION OF STEPHEN A. SWEDLOW**

This document is being filed through the Electronic Case Filing (ECF) system by attorney Stephen A. Swedlow.  By his signature, Mr. Swedlow attests that he has obtained concurrence in the filing of this document from each of the attorneys identified on the caption page and in the above signature block.

Dated: July 5, 2021                          By   _/s/ Stephen A. Swedlow_

Stephen A. Swedlow

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of July 2021, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System, causing the document to be electronically served on all attorneys of record.

By _/s/ Stephen A. Swedlow_

Stephen A. Swedlow