SONAL N. MEHTA (SBN 222086)
  Sonal.Mehta@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California 94303
Telephone:  (650) 858-6000
Facsimile:  (650) 858-6100

DAVID Z. GRINGER (*pro hac vice*)
  David.Gringer@wilmerhale.com
ARI HOLTZBLATT (*pro hac vice*)
  Ari.Holtzblatt@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Ave NW
Washington, DC 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363

*Attorneys for Defendant*
FACEBOOK, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated,<br><br>                              Plaintiffs,<br><br>        v.<br><br>FACEBOOK, INC.,<br><br>                              Defendant. | Case No. 5:20-cv-08570-LHK<br><br>**DEFENDANT FACEBOOK, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS**<br><br>Hearing Date: July 15, 2021<br>Time: 1:30 pm<br>Judge: Hon. Lucy H. Koh |

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

ARGUMENT ..............................................................................................................3

I.      PLAINTIFFS' SECTION 2 CLAIMS ARE TIME-BARRED.................................3

     A.      The Continuing Violation Doctrine Does Not Save Plaintiffs' Claims..................3

          1.      Users Cannot Invoke The Continuing Violation Doctrine .........................4

          2.      Advertisers Cannot Invoke The Continuing Violation Doctrine .................5

     B.      Fraudulent Concealment Does Not Save Plaintiffs' Claims................................6

          1.      Users Do Not Plausibly Allege Fraudulent Concealment...........................6

          2.      Advertisers Do Not Plausibly Allege Fraudulent Concealment .................8

     C.      Laches Bars All Plaintiffs' Claims For Injunctive Relief......................................8

II.     PLAINTIFFS FAIL TO PLAUSIBLY DEFINE A RELEVANT PRODUCT
      MARKET.......................................................................................................9

     A.      Advertisers Cannot Rely On A "Social Advertising" Submarket ........................9

     B.      Users Fail To Plausibly Allege A Relevant Market Or Monopoly Power ............10

          1.      Implausible Relevant Markets ............................................................10

          2.      Users Have Failed To Allege Monopoly Power ......................................12

III.    PLAINTIFFS HAVE NOT ADEQUATELY ALLEGED EXCLUSIONARY
      CONDUCT ...................................................................................................13

     A.      Users' Deception Theory Is Still Not Pleaded With Particularity .......................13

     B.      Users' Deception Theory Fails ....................................................................14

     C.      Plaintiffs' Monopoly Maintenance Theories Are Not Cognizable ......................15

          1.      Facebook's Acquisitions Were Not Exclusionary ...................................15

          2.      Plaintiffs' Product Improvement Claims Are Non-Cognizable.................16

          3.      Allegations That Facebook "Killed" App Developers Are
              Insufficient ......................................................................................17

IV.     PLAINTIFFS LACK ANTITRUST STANDING...........................................18

     A.      Users Have Not Alleged An Antitrust Injury ...............................................18

1.    Lost "Information And Attention" Is Not A Cognizable Injury ...............18

2.    Users' Injuries Are Speculative And Not Caused By Lost Competition.................................................................................................19

B.    Advertisers Have Not Alleged An Antitrust Injury ...............................19

1.    Alleged Injuries From Advertisers' Section 2 Claims Are Conclusory .................................................................................................19

2.    Advertisers Lack Antitrust Standing To Pursue Their Section 1 Claim.........................................................................................................20

V.    USERS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT ...........................20

CONCLUSION...............................................................................................................20

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abuelhawa v. Santa Clara University*,
  2021 WL 1176689 (N.D. Cal. Mar. 39, 2021)...................................................................20

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*,
  592 F.3d 991 (9th Cir. 2010) ..........................................................................................16

*American Professional Testing Service, Inc. v. Harcourt Brace Jovanovich Legal &*
  *Professional Publications, Inc.*,
  108 F.3d 1147 (9th Cir. 1997) ........................................................................................14

*Arista Networks, Inc. v. Cisco Systems Inc.*,
  2018 WL 11230167 (N.D. Cal. May 21, 2018) ...............................................................14

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985)........................................................................................................17

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990)........................................................................................................20

*Bay Area Surgical Management LLC v. Aetna Life Insurance Co.*,
  166 F. Supp. 3d 988 (N.D. Cal. 2015) ..............................................................................5

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................................3, 15, 19

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d. Cir. 1979)..........................................................................................14

*Brown v. Google LLC*,
  2021 WL 949372 (N.D. Cal. Mar. 12, 2021)....................................................................7

*Caribbean Broadcasting System, Ltd. v. Cable & Wireless P.L.C.*,
  148 F.3d 1080 (D.C. Cir. 1998) .....................................................................................14

*City of Anaheim v. Southern California Edison Co.*,
  955 F.2d 1373 (9th Cir. 1992) ........................................................................................15

*Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*,
  858 F.2d 499 (9th Cir. 1988) ............................................................................................7

*Danjaq LLC v. Sony Corp.*,
  263 F.3d 942 (9th Cir. 2001) ............................................................................................8

*F.T.C. v. Facebook, Inc.*,
  2021 WL 2643627 (D.D.C. June 28, 2021) ............................................................. *passim*

*F.T.C. v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ........................................................................17

*Free FreeHand Corp. v. Adobe Systems Inc.*,
  852 F. Supp. 2d 1171 (N.D. Cal. 2012) ...........................................................4

*Garrison v. Oracle Corp.*,
  159 F. Supp. 3d 1044 (N.D. Cal. 2016) ..............................................4, 5, 7, 13

*Genus Lifesciences Inc. v. Lannett Co.*,
  378 F. Supp. 3d 823 (N.D. Cal. 2019) ...........................................................14

*Hicks v. PGA Tour, Inc.*,
  897 F.3d 1109 (9th Cir. 2018) ..............................................................9, 10, 12

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  485 F. Supp. 3d 1137 (2020) ........................................................................17

*Holmes v. Securities Investor Protection Corp.*,
  503 U.S. 258 (1992) .....................................................................................18

*In re Aggrenox Antitrust Litigation*,
  94 F. Supp. 3d 224 (D. Conn. 2015) .............................................................11

*In re Glumetza Antitrust Litigation*,
  2020 WL 1066934 (N.D. Cal. Mar. 5, 2020) ...................................................6

*In re Google Digital Advertising Antitrust Litigation*,
  2021 WL 2021990 (N.D. Cal. May 13, 2021) .............................................9, 10

*In re K-Dur Antitrust Ligitation*,
  338 F. Supp. 2d 517 (D.N.J. 2004) ..................................................................6

*In re Lithium Ion Batteries Antitrust Litigation*,
  2014 WL 4955377 (N.D. Cal. Jan. 21, 2014) ...................................................6

*In re Packaged Seafood Products Antitrust Litigation*,
  2017 WL 35571 (S.D. Cal. Jan. 3, 2017) ..........................................................6

*In re Webkinz Antitrust Litigation*,
  695 F. Supp. 2d 987 (N.D. Cal. 2010) ...........................................................10

*In re WellPoint, Inc. Out-of-Network UCR Rates Litigation*,
  903 F. Supp. 2d 880 (C.D. Cal. 2012) ............................................................19

*Intel Corp. v. Fortress Investment Group LLC*,
  2021 WL 51727 (N.D. Cal. Jan. 6, 2021) .................................................19, 20

*International Telephone & Telegraph Corp. v. General Telephone & Electronics Corp.*,
  518 F.2d 913 (9th Cir. 1975) ........................................................................11

*Jackson v. Eddy's LI RV Center, Inc.*,
    845 F. Supp. 2d 523 (E.D.N.Y. 2012) .............................................................7

*Kaiser Foundation v. Abbott Laboratories*,
    2009 WL 3877513 (C.D. Cal. Oct. 8, 2009) ....................................................5

*Kaplan v. Burroughs Corp.*,
    611 F.2d 286 (9th Cir. 1979) .........................................................................10

*Kinderstart.com LLC v. Google, Inc.*,
    2007 WL 831806 (N.D. Cal. Mar. 16, 2007) ..................................................10

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997).........................................................................................4

*Korea Kumho Petrochemical v. Flexsys America LP*,
    2008 WL 686834 (N.D. Cal. Mar. 11, 2008)...................................................12

*Mayor of Baltimore v. Actelion Pharmaceuticals Ltd.*,
    995 F.3d 123 (4th Cir. 2021) ...........................................................................6

*MetroNet Services Corp. v. Qwest Corp.*,
    383 F.3d 1124 (9th Cir. 2004) ........................................................................17

*National Association of Pharmaceutical Manufacturers, Inc. v. Ayerst Laboratories*,
    850 F.2d 904 (2d Cir. 1988)............................................................................14

*New York v. Facebook, Inc.*,
    2021 WL 2643724 (D.D.C. June 28, 2021)............................................ *passim*

*Nobody in Particular Presents, Inc. v. Clear Channel Communications, Inc.*,
    311 F. Supp. 2d 1048 (D. Colo. 2004).............................................................10

*Norcen Energy Resource Ltd. v. Pacific Gas & Electric Co.*,
    1994 WL 519461 (N.D. Cal. Sept. 19, 1994) ..................................................15

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) ......................................................................17

*NSS Labs, Inc. v. Symantec Corporation*,
    2019 WL 3804679 (N.D. Cal. Aug. 13, 2019) ................................................10

*Oliver v. SD-3C LLC*,
    751 F.3d 1081 (9th Cir. 2014) ....................................................................3, 4

*PBTM LLC v. Football Northwest, LLC*,
    2021 WL 37648 (W.D. Wash. Jan. 5, 2021)......................................................9

*Rambus Inc. v. F.T.C.*,
    522 F.3d 456 (D.C. Cir. 2008) .......................................................................15

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979)........................................................................................18

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
    471 F. Supp. 3d 981 (N.D. Cal. 2020) ................................................4, 5, 8, 17

*Reveal Chat Holdco LLC v. Facebook, Inc.*,
    2021 WL 1615349 (N.D. Cal. Apr. 26, 2021) .......................................7, 8, 14

*Rutherford Holdings, LLC v. Plaza Del Ray*,
    166 Cal. Rptr. 3d 864 (Ct. App. 2014) .........................................................20

*Ryan v. Microsoft Corp.*,
    147 F. Supp. 3d 868 (N.D. Cal. 2015) ...........................................................6

*Stationary Engineers Local 39 Health & Welfare Trust Fund v. Philip Morris, Inc.*,
    1998 WL 476265 (N.D. Cal. Apr. 30, 1998) ................................................18

*Tate v. Pacific Gas & Electric Co.*,
    230 F. Supp. 2d 1072 (N.D. Cal. 2002) .......................................................14

*Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc.*,
    875 F.2d 1369 (9th Cir. 1989) .....................................................................11

*United States v. El Paso Natural Gas Co.*,
    376 U.S. 651 (1964).....................................................................................16

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) .......................................................................14

*United States v. Village Voice Media, LLC*,
    2003 WL 21659092 (N.D. Ohio Feb. 12, 2003) ...........................................11

*Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004).....................................................................................16

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020) .......................................................................17

*Washington v. Franciscan Health System*,
    388 F. Supp. 3d 1296 (W.D. Wash. 2019)....................................................16

*Z Technologies Corp. v. Lubrizol Corp.*,
    753 F.3d 594 (6th Cir. 2014) .........................................................................5

**STATUTES, RULES, AND REGULATIONS**

Fed. R. Civ. P. 9(b) .............................................................................................13

Clayton Antitrust Act, 15 U.S.C. §§ 12-27 (1914) ...............................................1, 4, 18

1

Sherman Antitrust Act, 15 U.S.C. §§ 1-7 (1890)...........................................................................4, 6

2

**OTHER AUTHORITIES**

3

3 Phillip E. Areeda & Herbert Hovenkamp,
        *Antitrust Law* ¶ 336 (4th ed. 2015) ...................................................................................18

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

### INTRODUCTION[1]

2      The core conduct Plaintiffs challenge and core theories they advance have been raised in

3 four other antitrust complaints—and dismissed four times.  No private or government plaintiff has

4 been able to state a viable claim based on this conduct and these Plaintiffs do not either.  The

5 complaints here suffer from the same fundamental and incurable defects that caused Judge

6 Freeman, and just last week, Judge Boasberg, to dismiss many of the same claims without leave

7 to amend.  As in those cases, the allegations in both complaints are untimely.  As in those cases,

8 the allegations of monopoly power in relevant markets are contrived and unsupportable.  And as

9 in those cases, the theories of liability are unprecedented and are not viable.  None of that changes

10 with respect to Users' "deception" claim where the alleged conduct occurred fifteen years ago and

11 is on its face not an antitrust claim at all.

12      **Statute of Limitations.**  Judges Freeman and Boasberg both reached the unremarkable

13 conclusion that complaints challenging high-profile public acts that occurred outside the Clayton

14 Act's four-year limitations period should be dismissed on timeliness grounds—*without leave to*

15 *amend*.  So too here.  ***First***, neither set of Plaintiffs can invoke the "continuing violation" doctrine.

16 Users' argument rests solely on acts that they concede were not violations (hence, no continuing

17 violation), and neither Users nor Advertisers argue that any post-December 2016 acts injured them

18 in a new way, as the law requires.  ***Second***, Judge Freeman has twice correctly rejected nearly

19 identical attempts to argue that fraudulent concealment tolls the statute of limitations where, as

20 here, Plaintiffs challenge public acts that were widely known at or near their occurrence long ago.

21      **Monopoly Power.**  ***First***, as was true for the FTC, Users seek to rest their theory of

22 monopoly power on naked allegations of market share, without any supporting detail or factual

23 allegations.  Judge Boasberg correctly granted Facebook's motion to dismiss the FTC case on this

24 basis, and Users' allegations should receive the same treatment.  ***Second***, and independently, all

25 Plaintiffs fail to point to any facts they have alleged to support their obviously gerrymandered

26 relevant markets.  In an apparent effort to manufacture monopoly power, Plaintiffs seek to define

27

28

---

[1] Unless otherwise stated, emphases were added to quotations and internal punctuation, alterations, and citations were omitted from them.

1   markets that conveniently carve-out competitors, resulting in the "unusual, nonintuitive product

2   market[s]" that undermined the FTC's effort to allege that Facebook is a monopoly.  ***Third,***

3   Advertisers fail to distinguish controlling Ninth Circuit authority in *Hicks*, which renders their

4   "social" advertising submarket deficient as a matter of law— warranting dismissal of the AC.

5         **Exclusionary Conduct.  *First***, Users argue that Facebook deceived its way to a monopoly

6   because it told consumers it was committed to privacy.  But Users' *own allegations*—that

7   Facebook was successful because, unlike Myspace and Friendster, users were not anonymous—

8   and common sense illustrate why the theory does not cross the plausibility threshold, let alone

9   overcome the presumption that allegedly false statements do not violate the antitrust laws.

10  Remarkably, Users also argue that they are not challenging the Instagram and WhatsApp

11  acquisitions because of any anticompetitive effects, but merely because the acquisitions were

12  allegedly undertaken based on internal Facebook data.  But the legality of an acquisition is

13  determined by its effect on competition, not on the information the acquiring party reviewed

14  beforehand.  ***Second***, Users' and Advertisers' challenge to Facebook's platform policy changes

15  depend on a "refusal to deal" theory that plainly fails to satisfy this Circuit's *Qualcomm* decision

16  and has twice been rejected on motions to dismiss by Judges Freeman and Boasberg.  Plaintiffs'

17  attempts to distinguish their case while relying on the same allegations—verbatim—fails.

18        **Antitrust Injury.**  Plaintiffs fail to allege antitrust injury caused by any of the conduct they

19  challenge.  ***First***, Users insist that they "pay" Facebook with attention but allege no facts to support

20  their claim that Facebook would have paid Users with money but for the alleged conduct.  They

21  therefore cannot establish the "economic loss" controlling precedent requires.  ***Second***,

22  Advertisers' invocation of the word "supracompetitive" has no talismanic effect:  Advertisers'

23  own allegations illustrate that Facebook's prices were less than Google's, and they cannot—as

24  they must—point to any plausible allegation *they paid* supracompetitive prices.  Likewise,

25  Advertisers' challenge to the GNBA must fail because there are no factual allegations about why

26  the agreement caused them to pay higher prices in a purportedly unrelated market.

27        The deficiencies in Plaintiffs' complaints cannot be alleviated by further amendment.  Both

28

1    complaints fail to state a claim and should be dismissed with prejudice.[2]

2                                    **ARGUMENT**

3    **I.    PLAINTIFFS' SECTION 2 CLAIMS ARE TIME-BARRED**

4            All Plaintiffs seek extraordinary relief for conduct that occurred outside the limitations

5    period.  This Court should not deviate from the three opinions that have already found similar

6    claims untimely, including the recently-dismissed State AG lawsuit.  *New York v. Facebook, Inc.*,

7    __ F. Supp. 3d __, 2021 WL 2643724, at *28 (D.D.C. June 28, 2021) ("*AGs*").  Any differences

8    among the cases (Supp. 5) work against Plaintiffs as their distinct allegations relate to conduct that

9    occurred even longer ago.  Just like the other cases, "this antitrust action is premised on public,

10   high-profile conduct nearly all of which occurred over six years ago" and the allegations

11   "themselves make clear that [Plaintiffs] could have easily brought suit then, just as they make clear

12   that any equitable relief this Court could or would order now would greatly prejudice Facebook

13   and third parties."  *AGs*, 2021 WL 263724, at *28.  Here, the only question before the Court is

14   whether Plaintiffs have adequately alleged facts to justify tolling the statute of limitations.  They

15   have not.

16       **A.    The Continuing Violation Doctrine Does Not Save Plaintiffs' Claims**

17           As a threshold matter, it is "important to note" what Plaintiffs "do not argue" while

18   asserting continuing violations.  *AGs*, 2021 WL 2643724, at *22.  Plaintiffs do not argue that it

19   was "uncertain or speculative whether Facebook's antitrust violations would injure them at the

20   time of the violation."  *Id.*  Plaintiffs also do not argue that the conduct at issue "did not violate . . .

21   Section 2" until sometime later; on the contrary, Plaintiffs' theory is that Facebook's alleged

22   conduct was "unlawful from the outset."  *Id.*  Finally, Plaintiffs do not "maintain that they had

23   good reason for not suing earlier, such that their lengthy delay . . . was nonetheless reasonable."

24   *Id.*  These failures preclude Plaintiffs from opening untimely conduct "to renewed challenge," *id.*,

25   under both the doctrine of laches and under standard statute of limitations analysis, Supp. 5, which

26   in the antitrust context, is essentially the same.  *See, e.g.*, *Oliver v. SD-3C LLC*, 751 F.3d 1081,

27

28   _____
     [2] In laying out the purported legal standard, Plaintiffs cite a 1983 case for the proposition that
     "dismissals for failure to state a claim are disfavored in antitrust actions."  Opp. 7.  Today, *Bell
     Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), is controlling.

1   1086 (9th Cir. 2014) (in "applying laches" in antitrust cases, courts "look to the same legal rules

2   that animate the four-year statute of limitations").

3       Moreover, the continuing violation doctrine *does not* apply to merger challenges, whether

4   brought under Section 2 of the Sherman Act or Section 7 of the Clayton Act.  *See AGs*, 2021 WL

5   2643724, at *25 (stating "the same [] analysis applies"); *Reveal Chat Holdco, LLC v. Facebook,*

6   *Inc.*, 471 F. Supp. 3d 981, 995 (N.D. Cal. 2020) ("*Reveal Chat I*").  Thus, Plaintiffs cannot invoke

7   the doctrine with respect to their challenges to the acquisitions of Instagram or WhatsApp.  They

8   cannot do so for the balance of their claims either.

9       **1.    <u>Users</u> Cannot Invoke The Continuing Violation Doctrine**

10      Each supposedly "continuing" violation cited by Users is conceded not to be an antitrust

11  violation.  Users argue that this is not required.  Opp. 8.  However, this Court's opinion in *Free*

12  *FreeHand Corp. v. Adobe Systems Inc.*, which Users cite (Opp. 8) to support their argument,

13  provides that the relevant continuing acts must be "part of the antitrust violation."  852 F. Supp.

14  2d 1171, 1187 (N.D. Cal. 2012) (quoting *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997));

15  *see also Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1070 (N.D. Cal. 2016) (same).  Users

16  have not pleaded any continuing ***violation***—relying instead on mere continuing conduct not even

17  alleged to be unlawful.  For that reason, Users are mistaken that Facebook's acquisition of tbh,

18  which Users do not even contend to have ever been anticompetitive, can restart the statute of

19  limitations for an otherwise stale claim, or otherwise distinguishes their case from the State AG

20  opinion.  Opp. 9; Supp. 5.  There is no reason "why one small acquisition . . . (which merited one

21  [paragraph] in [Users'] Complaint) should . . . reopen the window to challenge a series of allegedly

22  much more consequential acquisitions that all took place from 2012 to 2014."  *AGs*, 2021 WL

23  2643724, at *26.   Likewise, Users' "characteriz[ation]" of their claim "as a challenge to

24  Facebook's larger scheme of serial anticompetitive acquisitions," *id.*, is of no moment:  merger

25  challenges must be "timely made, for the benefit of both the public and the merged firms."  *Id.*

26      The other post-2016 conduct Users cite is also irrelevant.  Users do not allege Facebook's

27  supposedly deceptive access to data through Onavo is itself anticompetitive.  Opp. 8.  And while

28  Users argue that Facebook's alleged deceptive statements about its privacy practices were

anticompetitive, *id.*, the identified post-2016 conduct is, as alleged, a "reaffirmation of a previous" strategy, not a "new and independent act" capable of restarting the statute of limitations. *Bay Area Surgical Mgmt., LLC v. Aetna Life Ins. Co.*, 166 F. Supp. 3d 988, 999 (N.D. Cal. 2015).

Regardless, even if the post-December 2016 acts could be sufficient, Users cannot allege— as they must—that the acts inflicted "new and accumulating injury" on them. *See Reveal Chat I*, 471 F. Supp. 3d at 994. Users assert that Facebook is "simply wrong" about the lack of allegations on this prong of the continuing violation test, *see* Opp. 9, but the only allegation they identify, *see id.* (citing UC ¶ 238), is a paragraph about alleged fraudulent concealment via public misrepresentations that has nothing to do with how the Users were supposedly newly injured. Thus, there is no basis to distinguish, Supp. 5, Users' allegations from the State AGs' allegations.

## 2.  <u>Advertisers</u> Cannot Invoke The Continuing Violation Doctrine

Beyond what Users have argued, the only post-December 2016 conduct Advertisers highlight, Opp. 10—that Facebook "cloned" Snapchat features and used Onavo to "spy" on users—fails for the same reason those near-identical allegations failed to resuscitate untimely complaints in *Reveal Chat*.[3]  *Compare, e.g.*, AC ¶¶ 298-99, *with* Amended Class Action Complaint, *Reveal Chat Holdco LLC v. Facebook, Inc.* ("*Reveal Chat II* Compl."), No. 5:20-cv-00363-BLF (N.D. Cal. Aug. 7, 2020), Dkt. 62, at ¶¶ 311-12 (identical allegations) and AC ¶¶ 247-67, *with Reveal Chat II* Compl. ¶¶ 266-86 (nearly identical allegations).

Advertisers' only argument, Opp. 10, not already rejected on multiple occasions is that some named plaintiffs bought ads after December 2016 and that these purchases are a continuing violation—a suggestion with no support in the case law.[4]  In a Section 2 case, "profits, sales, and other benefits accrued as the result of an initial wrongful act . . . are uniformly viewed as 'ripples' caused by the initial injury, not as distinct injuries themselves." *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 600 (6th Cir. 2014); *see also Kaiser Found. v. Abbott Labs.*, 2009 WL 3877513, at

---

[3] Advertisers also challenge Facebook and Google's alleged September 2018 agreement. *See* Opp. 10. But these allegations go primarily to Advertisers' Section 1 claim (*see* Mot. 32-35; AC ¶¶ 564-69) and are unrelated to the rest of the Section 2 conduct.

[4] Advertisers contend that their claims "based on ad purchases after December 2016" are timely because they could not have filed a lawsuit "before Advertisers actually made those post-2016 purchases." Opp. 10 n.3. This is the same argument this Court rejected in *Garrison*. 159 F. Supp. 3d at 1064.

1   *7 (C.D. Cal. Oct. 8, 2009) ("[T]he statute of limitation [for unilateral conduct] runs from the time

2   of commission of the act, notwithstanding that high prices may last indefinitely into the future.");

3   *AGs*, 2021 WL 2643724, at *24 ("Post-acquisition increases in prices . . . are mere inertial

4   consequences that one naturally expects to flow from an anticompetitive merger [and] do not

5   restart the statute of limitations.").[5]   Unsurprisingly then, the case upon which Advertisers

6   primarily rely (*In re Glumetza Antitrust Litigation*, *see* Opp. 10) is a Sherman Act *Section 1* case,

7   which requires an agreement between two or more firms, and in which continuing participation in

8   the conspiracy is unlawful—unlike possession of an alleged monopoly.[6]  *See* 2020 WL 1066934,

9   at *9 (N.D. Cal. Mar. 5, 2020).

10       **B.      Fraudulent Concealment Does Not Save Plaintiffs' Claims**

11           **1.      <u>Users</u> Do Not Plausibly Allege Fraudulent Concealment**

12       Users' arguments that they have adequately alleged, with the requisite particularity, (1)

13   false statements; (2) lack of knowledge; and (3) diligence find no support in the UC's allegations.

14       *First*, Users point to "examples of Facebook's misstatements" as evidence of the requisite

15   "affirmative acts," citing *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 309192 (N.D. Cal.

16   Jan. 21, 2014).  Opp. 11.  But *Lithium Ion* does not support Users' argument that "allegedly

17   misleading public statements" were "sufficient on their own to support an allegation of fraudulent

18   concealment"; rather, only a "combination of those misleading, pretextual statements *and* the

19   affirmative efforts taken to destroy evidence of the conspiracy or otherwise keep the conspiracies

20   secret [] supported the respective plaintiffs' fraudulent concealment allegations."[7]   *Ryan v.*

21   *Microsoft Corp.*, 147 F. Supp. 3d 868, 891 (N.D. Cal. 2015).  The statements challenged here

---

[5] The only way Advertisers attempt to distinguish *Z Techs* and *Kaiser* is to contend that, unlike those cases, "the AC alleges conduct throughout the limitations period that were new and overt acts." Opp. 10 n.4.  Judge Freeman correctly rejected this argument, as should this Court.

[6] Advertisers also cite *Mayor of Baltimore v. Actelion Pharmaceuticals Ltd.*, 995 F.3d 123 (4th Cir. 2021).  Opp. 10.  But that out-of-circuit case analogized its facts to "what has been termed a pay-for-delay scheme."  995 F.3d at 132.  These cases require concerted action among multiple firms "in the context of a conspiracy to violate the antitrust laws."  *See, e.g.*, *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 551 (D.N.J. 2004).

[7] Users mischaracterize Facebook's citation to *In re Packaged Seafood Products Antitrust Litig.* as arguing that "statements to the public are 'insufficient'" under fraudulent concealment.  *See* Opp. 11 n.5.  Facebook's (correct) argument is that "'generalized statements,' are 'insufficient to allege fraudulent concealment with particularity.'"  Mot. 10.

involve Facebook's privacy policies; Plaintiffs do not allege any effect on competition was concealed.  Users also attempt to rely on *Brown v. Google LLC*, 2021 WL 949372 (N.D. Cal. Mar. 12, 2021) (Opp. 11), but in *Brown*, plaintiffs alleged that a series of specific statements were clearly false, related to the underlying legal violation, and could induce reasonable reliance.  2021 WL 949372 at *3-4.  By contrast, the statements Users highlight are, at most, generalized statements.  *See, e.g.*, UC ¶ 238(i) ("We will continue fighting aggressively to keep your information safe and secure."); *id.* ¶ 238(m) ("Facebook stands with many technology companies to protect you and your information.").  These statements are insufficient to support tolling.  *Cf. Garrison*, 159 F. Supp. 3d at 1078 (general statements "alone [do not] suffice to show fraudulent concealment"); *Jackson v. Eddy's LI RV Ctr., Inc.*, 845 F. Supp. 2d 523, 533 (E.D.N.Y. 2012) (statements were "nothing more than puffery" and could not support alleged fraudulent concealment tolling).

     *Second*, Users contend, Opp. 12, that, even though they long ago reviewed specific documents that "described individual instances of Facebook's deception," they were unaware of "Facebook's overall use of deception to destroy competition."  But so long as a plaintiff is aware of "*any fact* that should excite his suspicion," the plaintiff is deemed to have "actual knowledge of his *entire* claim."  *See Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499, 502 (9th Cir. 1988).  Before December 2016, Users knew of the supposedly deceptive conduct by Facebook, and claim to have been negatively affected by it.  *See, e.g.*, UC ¶ 154.  That suffices to establish knowledge foreclosing fraudulent concealment.  *Conmar*, 858 F.2d at 502.  Users also argue that, even if their suspicions would have been "excited," Facebook "extinguished those suspicions with false assurances and denials."  Opp. 12.  But the significance of constructive knowledge cannot be so easily evaded:  once plaintiffs have "knowledge of their claims, it was not reasonable for them to rely on reassuring comments from Defendant."  *See Reveal Chat Holdco LLC v. Facebook, Inc.*, 2021 WL 1615349, at *9 (N.D. Cal. Apr. 26, 2021) ("*Reveal Chat II*").

     *Third*, Users must plead "with particularity" their diligence in trying to uncover the facts.  *Conmar*, 858 F.2d at 502; *Reveal Chat II*, 2021 WL 1615349, at *9.  But neither the UC nor Users' opposition identifies any diligence performed at all; in fact, they disclaim any such obligation.  UC ¶¶ 240-43; Opp. 13.

### 2. <u>Advertisers</u> Do Not Plausibly Allege Fraudulent Concealment

Advertisers' fraudulent concealment theory is based on conduct (*see* Opp. 13-14) that is similar—and often identical—to allegations in the *Reveal Chat* complaints. *Compare, e.g.*, AC ¶¶ 491-92 (alleging that Facebook had "a duty to speak fully and truthfully" about its Platform functionality but made eight supposedly misleading statements), *with Reveal Chat II* Compl. ¶¶ 450-51 (nearly identical allegations pointing to the same eight statements) and AC ¶¶ 211-15, 500-16 (alleging that Facebook misled the public about its data sharing and advertising agreements by stating that the agreements were "short term," as well as in statements at the F8 developers conference), *with Reveal Chat II* Compl. ¶¶ 242-46, 459-75 (nearly identical allegations). Judge Freeman correctly rejected this argument because, as here, fraud was not alleged with particularity, plaintiffs had constructive knowledge of their claims, and plaintiffs had failed to plausibly allege any diligence. *Reveal Chat II*, 2021 WL 1615349, at *6-9; *Reveal Chat I*, 471 F. Supp. 3d at 992-95. This Court should do the same now.[8]

### C. Laches Bars All Plaintiffs' Claims For Injunctive Relief

Two courts have applied laches on motions to dismiss to much of the conduct alleged, including the acquisitions at issue in Plaintiffs' complaints. *See AGs*, 2021 WL 2643724, at *17-28; *Reveal Chat I*, 471 F. Supp. 3d at 991-92. This makes sense because the "presumptive four-year laches period is particularly appropriate for challenges to acquisitions." *AGs*, 2021 WL 2643724, at *18. In both cases, just as here, Plaintiffs styled their cases as challenges to "serial" acquisitions, Supp. 5, and the courts still correctly held laches applied.

Despite these holdings, Plaintiffs seek to punt laches to a later date. Opp. 14-15. Critically, however, Plaintiffs do not dispute that dismissal at the pleadings stage is appropriate when, as here, Mot. 8, "(1) an unreasonable delay appears on the face of the pleading and (2) no sufficient excuse for delay appears or is pleaded." *AGs*, 2021 WL 2643724, at *28; *see also Reveal Chat I*, 471 F. Supp. 3d at 990. The "economic prejudice" to Facebook from delay is also apparent. *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 955-56 (9th Cir. 2001). The complaints "confirm the existence of

---

[8] Advertisers argue that Judge Freeman distinguished cases involving "price fixing" from the Section 2 monopolization claims before her. Opp. 14 n.11. This distinction is unhelpful: Advertisers also bring monopolization claims, not price fixing claims.

1   economic prejudice" against Facebook because they allege that Facebook has "made business

2   decisions and allocated firm resources based on holding Instagram and WhatsApp." *AGs*, 2021

3   WL 2643724, at *19.  On this basis, Judges Freeman and Boasberg correctly granted motions to

4   dismiss on laches grounds and this Court should do the same.  That is particularly true because

5   Plaintiffs seek divestiture as a remedy; Facebook is "aware of no case, and Plaintiffs provide none,

6   where such a long delay in seeking such a consequential remedy has been countenanced in a case

7   brought by a plaintiff other than the federal government." *Id.* at *1.

8   **II.   PLAINTIFFS FAIL TO PLAUSIBLY DEFINE A RELEVANT PRODUCT MARKET**

9          Common sense and real-world experience make clear that Facebook is not a monopolist in

10  any alleged market.   Thus, it is unsurprising that Advertisers cannot defend their "social

11  advertising" market, and that Users' "social network" and "social media" markets are implausibly

12  drawn.  And it is unsurprising that, like the FTC, Plaintiffs fail to plausibly allege monopoly power.

13         **A.   <u>Advertisers</u> Cannot Rely On A "Social Advertising" Submarket**

14         Neither the AC nor the opposition provide any basis for the Court to recognize, even at the

15  pleading stage, a "submarket" for *social* advertising, particularly where the sole basis for that

16  submarket is the supposed uniqueness of social advertising from other forms of advertising,

17  because "courts regularly reject [] arguments that the unique attributes of a product automatically

18  signify that the product independently comprises a market or sub-market." *See, e.g.*, *PBTM LLC*

19  *v. Football Nw., LLC*, __ F. Supp. 3d __, 2021 WL 37648, at *14 (W.D. Wash. Jan. 5, 2021)

20  (dismissing Section 2 claim).  And this is particularly true for markets limited to a single form of

21  advertising.  *See Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1123 (9th Cir. 2018).  Advertisers try

22  distinguishing *Hicks* on the grounds that, there, the plaintiffs "did not allege the economic

23  significance of any practical indicia of a separate submarket, or any facts as to reasonable

24  interchangeability or cross-elasticity of demand."  Opp. 21.  But those plaintiffs relied on the very

25  same "practical indicia"—the advertising's effectiveness and distinct prices—that Advertisers

26  point to here.  *See Hicks*, 897 F.3d at 1120-21.  And just like the *Hicks* plaintiffs, Advertisers fail

27  to allege low cross-elasticity of demand with other forms of advertising.

28         Advertisers also do not distinguish *In re Google Digital Advertising* or *Kinderstart.com*.

Opp. 21 n.24.  Both held—on motions to dismiss—that different forms of online advertising could not be segregated into different relevant markets.  *See In re Google Digit. Advert. Antitrust Litig.*, 2021 WL 2021990, at *3 (N.D. Cal. May 13, 2021) (dismissing because complaint sought to isolate Google and Facebook into different advertising markets); *see also Kinderstart.com, LLC v. Google, Inc.*, 2007 WL 831806, at *6 (N.D. Cal. Mar. 16, 2007) ("no logical basis" for distinguishing search advertising from internet advertising).  Nor does it suffice that Facebook COO Sheryl Sandberg once (seven years ago) used the words "social advertising," Opp. 19, to explain that Facebook is not the same as television or search.  What matters is not whether different types of advertising have different characteristics but whether the alleged market encompasses the "group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business."  *Hicks*, 897 F.3d at 1120.  Advertisers fail to allege facts sufficient to support the claim that the "social advertising market" meets that requirement.

## B.     <u>Users</u> Fail To Plausibly Allege A Relevant Market Or Monopoly Power

### 1.     Implausible Relevant Markets

Users have not, as they must, adequately pleaded a relevant market taking into account what products would experience increased demand if prices were raised ("cross-elasticity of demand") and what products consumers view as interchangeable ("reasonable interchangeability").  *See NSS Labs, Inc. v. Symantec Corp.*, 2019 WL 3804679, at *9 (N.D. Cal. Aug. 13, 2019) (dismissing antitrust claims where plaintiff "fail[ed] to identify the economic substitutes for the product markets" and did not "plead any facts regarding the cross-elasticity of demand").  Cross-elasticity of demand is "[t]he principle most fundamental to product market definition." *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir. 1979).  Indeed, even the cases Users cite in arguing that they can state a claim without alleging cross-elasticity of demand, *see* Opp. 17-18, confirm the opposite is true.  *See In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987, 994 (N.D. Cal. 2010) (products are reasonably interchangeable "where there is cross-elasticity of demand"); *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1080-81 (D. Colo. 2004) ("reasonable interchangeability, [] includes [] cross-elasticity of demand").  And yet, cross-elasticity of demand is addressed nowhere in Users' complaint.  Opp.

1    17.   Nor do Users point to any other way to establish reasonable interchangeability, which

2    distinguishes their market from that alleged by the FTC.  *See FTC v. Facebook, Inc.*, __ F. Supp.

3    3d __, 2021 WL 2643627, at *11 (D.D.C. June 28, 2021) ("*FTC*") (noting that the FTC pleaded

4    interchangeability "albeit in a somewhat lean fashion").

5    Users seek to excuse their failure to plead facts to support this fundamental element by

6    arguing that their purported markets are based on product features.  Opp. 17.  So what?  The fact

7    that a product has distinct features does not address cross-elasticity of demand or

8    interchangeability.  *See supra* pp. 9-10.  Nor does Users' response that a relevant market may

9    include free services.  Opp. 16.  Facebook has not argued otherwise.  What Facebook has argued—

10   and Users have not meaningfully addressed—is that Users may not disregard their obligation to

11   allege cross-elasticity of demand simply because Facebook's service is free.  Users offer no

12   authority to support their contrary claim.  *United States v. Village Voice Media, LLC* (cited Opp.

13   16) does not recognize a market for free newspapers and does not resolve any disputed issue at all

14   because it was a consent decree.  2003 WL 21659092, at *16 (N.D. Ohio Feb. 12, 2003).  *In re*

15   *Aggrenox Antitrust Litig.* (cited Opp. 16) also misses the mark.  94 F. Supp. 3d 224 (D. Conn.

16   2015).  That case involved a "reverse payment" settlement agreement, and the discussion cited is

17   about what constitutes a "payment" under antitrust scrutiny of patent settlements.  *See id.* at 242.

18   Unable to satisfy this pleading requirement, Users defend their market definitions by citing

19   "public recognition" and "common sense."  Opp. 16.  But the fact that some congressional staff

20   may agree with Users' market definitions in a report without the force of law is not the type of

21   "public recognition" the case law contemplates.  *See Thurman Indus., Inc. v. Pay 'N Pak Stores,*

22   *Inc.*, 875 F.2d 1369, 1375 (9th Cir. 1989) ("public recognition" must have "economic

23   significance," e.g., reflect the actual field of competition); *Int'l Tel. & Tel. Corp. v. Gen. Tel. &*

24   *Elec. Corp.*, 518 F.2d 913, 932-33 (9th Cir. 1975) (same).   Nor are Users' theories

25   commonsensical.  For example, the UC alleges that Houseparty—a video-chat app—is a social

26   network, but that TikTok, Twitter, and iMessage are not.  UC ¶¶ 37, 204.  And the features Users

27   cite in support of their "social media" and "social network" market definitions cannot explain this

28   implausible conclusion—in fact, those allegations confirm that Users wish to selectively include

1    and exclude competitors in ways that defy "common sense." *See, e.g.*, *Hicks*, 897 F.3d at 1121.

2    Indeed, while the FTC's different "personal social networking" market definition was not "fatally

3    devoid of meat," its "idiosyncratic" market definition bore on the plausibility of the allegations of

4    monopoly power in that market. *See FTC*, 2021 WL 2643627, at *10-12.

5                    **2.    Users Have Failed To Allege Monopoly Power**

6            Users assert that their conclusory allegation that Facebook has a market share of "at least

7    85%" in the two relevant markets is enough to state a Section 2 claim.[9]  Opp. 18.  However, this

8    conclusory pleading is not enough.  *See FTC*, 2021 WL 2643627, at *1, *12-14 (citing "ample

9    authority" that bare market share allegations are "too speculative and conclusory to go forward").

10   Like the FTC, Users fail to explain what the alleged share refers to, let alone how it could be

11   calculated.  These deficiencies are especially pronounced given the weakness of the relevant

12   market allegations.  *Id.* at *14.  Users argue that their conclusory allegation of a market share

13   *higher* than the FTC alleged distinguishes their complaint from the FTC's.  Supp. 2.  However,

14   dismissal of the FTC complaint did not rest on the fact that the alleged share was too low.  Instead,

15   the court held that there were insufficient allegations to support the proposition that Facebook had

16   monopoly power.  *FTC*, 2021 WL 2643627, at *2, *12-13; *see also Korea Kumho Petrochemical

17   *v. Flexsys Am. LP*, 2008 WL 686834, at *9 (N.D. Cal. Mar. 11, 2008) (plaintiff "must assert some

18   *facts* in support of its assertions of market power that suggest those assertions are plausible").

19   Users' complaint is no better.

20           Further, Users ignore the internal incoherence of their own allegations, which is fatal to

21   their attempt to distinguish their complaint from the FTC complaint.  *See* Supp. 2.  Based on a

22   Powerpoint that says nothing of the sort, and conclusory allegations about "time" spent using social

23   media, Users allege that Facebook has over 85% of the social media market, while simultaneously

24   arguing that it includes, at a minimum, fast-growing-entrants like TikTok, as well as established

25   players like iMessage, Twitter, YouTube, and Snapchat.  *See, e.g.*, UC ¶¶ 73-74, 80; Mot. 5 (citing

26

27   ───────────────────
     [9] Users argue that they alleged monopoly power directly, pointing to their allegations that
     Facebook has raised "prices" by collecting more data and degrading quality.  Opp. 18 n.19.  But

28   Users do not allege what a competitive level of data collection or quality would be.  *See FTC*, 2021
     WL 2643627, at *8 (citing FTC's bare assertion that it could offer direct proof of market power
     and concluding that the agency made "no real direct-proof argument").

───────────────────

1   facts related to the popularity of TikTok and Snapchat incorporated by reference in the AC).  If

2   the market includes these services, it is not plausible that Facebook has close to an 85% share.

3   *FTC*, 2021 WL 2643627, at *13; *see* Opp. 18-19.  As Users concede (Supp. 3), these same errors

4   infect the allegations of monopoly power in the social network market too.  *FTC*, 2021 WL

5   2643627, at *14 (not enough to "simply nod to the conventional wisdom that Facebook is a

6   monopolist").  Last, Users' argument that their allegations can be distinguished from the FTC's

7   because their allegations about ad revenue are indicative of market share in some user-side market,

8   Supp. 3, is directly contrary to Judge Boasberg's determination that allegations about share in one

9   market are *not* probative of power in a different market.  *FTC*, 2021 WL 2643627, at *29.

10  **III.   PLAINTIFFS HAVE NOT ADEQUATELY ALLEGED EXCLUSIONARY CONDUCT**

11         Users implausibly seek to turn alleged misrepresentations about Facebook's privacy

12  policies into a theory of unlawful monopolization, and Users and Advertisers together claim that

13  Facebook unlawfully maintained a monopoly through a so-called "copy, acquire, kill" strategy that

14  (1) challenges acquisitions that Users concede are not anticompetitive, (2) contests what are

15  unquestionably product improvements, and (3) must satisfy the Ninth Circuit's stringent "refusal

16  to deal" case law.  At bottom, there is no viable theory of exclusionary conduct.

17         **A.   <u>Users'</u> Deception Theory Is Still Not Pleaded With Particularity**

18         Accepting that their allegations regarding Facebook's "systematic deception" sound in

19  fraud, Opp. 21-22, Users point to 15 supposed examples of Facebook's alleged misstatements to

20  satisfy Rule 9(b)'s heightened pleading requirements, *id.* at 22 n.25.  But the examples identified

21  by Users—generalized, market-facing statements—fall well short of the particularity required by

22  Rule 9(b).[10]  Users also fail to "set forth what is false or misleading" about any of these statements,

23  or "why [each statement] is false."  *Garrison*, 159 F. Supp. 3d at 1060.  And Users still fail to

24  identify, as they must, which named plaintiffs "read or relied on" each statement.  *Reveal Chat II*,

25

---

26  [10] *See, e.g.*, UC ¶ 238(a) ("So we have been coding nonstop for two days to get you better privacy controls."); *id.* ¶ 238(b) ("I know we can do better."); *id.* ¶ 238(c) ("Facebook does not share

27  personal information with people or services users don't want."); *id.* ¶ 238(d) ("There's this false rumor that's been going around which says that we're sharing private information with

28  applications and it's just not true."); *id.* ¶ 238(e) ("I founded Facebook on the idea that people want to share and connect with people in their lives, but to do this everyone needs complete control over who they share with at all times.").

---

1    2021 WL 1615349, at *8.

2        **B.**    **Users' Deception Theory Fails**

3        Users assert that antitrust claims premised on deception are presumptively insufficient only

4    in cases involving disparagement (i.e., false statements about rivals).  Opp. 23.  But the law makes

5    no such distinction.  Courts have repeatedly recognized that a firm's promotion of its own product

6    in a manner that "emphasizes a product's strengths and minimizes its weaknesses" is not an

7    antitrust violation.  *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 287-88 (2d Cir.

8    1979).  Even when alleged deception concerns defendants' own products, other market participants

9    have every incentive to challenge overstatements and bring competitors' defects to the fore.

10   Therefore, courts presume that misrepresentations have a "de minimis" impact on competition.

11   *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich*, 108 F.3d 1147, 1152 (9th Cir. 1997);

12   *Genus Lifesciences Inc. v. Lannett Co.*, 378 F. Supp. 3d 823, 842 (N.D. Cal. 2019) (granting motion

13   to dismiss).  In fact, the case from which *Harcourt* derived its six-part test, *National Association*

14   *of Pharmaceutical Manufacturers, Inc. v. Ayerst Laboratories*, 850 F.2d 904, 916 (2d Cir. 1988),

15   concerned allegedly false statements about the quality of a firm's own product.

16       The cases that Users cite, Opp. 23, do not rest on alleged deception or are not controlling

17   here.  In *Arista*, the plaintiff conceded that some of the challenged communications were true, and

18   the court logically found that the *Harcourt* test was inapplicable.  *Arista Networks, Inc. v. Cisco*

19   *Sys. Inc.*, 2018 WL 11230167, at *13 (N.D. Cal. May 21, 2018).  *Caribbean Broadcasting System,*

20   *Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1087 (D.C. Cir. 1998), and *United States v.*

21   *Microsoft Corp.*, 253 F.3d 34, 76 (D.C. Cir. 2001), did not focus on deception through false

22   advertising (*Caribbean* mentioned deception only in passing), and therefore did not address

23   *Harcourt* or its presumption.

24       The presumption that deception is not actionable conduct forecloses Users' claim.  *See,*

25   *e.g.*, *Tate v. Pac. Gas & Elec. Co.*, 230 F. Supp. 2d 1072, 1079-80 (N.D. Cal. 2002).  For example,

26   Users merely allege that Facebook made "deceptive representations," Opp. 21, and fail to allege—

27   because they cannot—that any statements were "clearly false," which *Harcourt* requires to

28   overcome the presumption.  Users also fail to allege that Facebook deprived competitors of the

ability to neutralize its statements or that competitors were otherwise unable to do so, not to mention the chorus of critics of Facebook's practices which the UC alleges (and incorporates by reference) were prevalent from the start.  UC ¶¶ 47, 101, 113-21.  Users further argue that the D.C. Circuit's *Rambus* decision can be distinguished (Opp. 23) because it involved a monopoly maintenance theory and not a monopoly acquisition theory.  But the reasoning in *Rambus*—that representations about a company's own product have "no particular tendency to exclude rivals and thus to diminish competition"—did not rest on this distinction.  *See Rambus Inc. v. FTC*, 522 F.3d 456, 464 (D.C. Cir. 2008).

Finally, Users argue (Opp. 24) that they are not required to disprove alternative explanations for Facebook's success.  But courts do consider "an obvious alternative explanation" when analyzing the line between possibility and plausibility.  *See Twombly*, 550 U.S. at 567.  Here, the UC—not Facebook—offers theories for Facebook's success that are *more plausible*, including its claim that Facebook's "realness" was its "distinguishing feature."  UC ¶ 48.

## C.    Plaintiffs' Monopoly Maintenance Theories Are Not Cognizable

 "[T]he various components" of Plaintiffs' alleged monopoly maintenance scheme—acquisitions, supposed copying, and "killing" nascent competitors—are properly analyzed "individually, even though Plaintiff[s] technically frame[] [their] challenge as an attack on Facebook's overall course of anticompetitive conduct."  *FTC*, 2021 WL 2643627, at *14; *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992).  Only the effects of constituent acts in the scheme that are ***both*** plausibly anticompetitive ***and*** cognizably violative of the antitrust laws may be "aggregated" for purposes of evaluating the scheme's effect on competition.  *AGs*, 2021 WL 2643724, at *27; *Norcen Energy Res. Ltd. v. Pac. Gas & Elec.*, 1994 WL 519461, at *13-15 (N.D. Cal. Sept. 19, 1994).  Plaintiffs' "scheme" consists entirely of acts that are either not anticompetitive, could not "themselves [be] independent violations," or both, and fails accordingly.  *FTC*, 2021 WL 2643627, at *17.

### 1.    Facebook's Acquisitions Were Not Exclusionary

Users concede that they do not allege that the acquisitions of Instagram, WhatsApp, or tbh, standing alone, were anticompetitive, Opp. 24, and Advertisers appear to agree, *id.* at 25.  Instead,

1   Plaintiffs challenge a "serial acquisition strategy."  *Id.* at 24.  But a "strategy" cannot be

2   anticompetitive without conduct.  *See, e.g.*, *Verizon Commc'ns, Inc. v. Law Offices of Curtis V.*

3   *Trinko, LLP*, 540 U.S. 398, 407 (2004) ("To safeguard the incentive to innovate, the possession of

4   monopoly power will not be found unlawful unless it is accompanied by an element of

5   anticompetitive *conduct*." (emphasis in original)).  And there are no facts alleged to suggest that

6   any conduct—the acquisitions, individually or together—had an anticompetitive effect.  *See*

7   *Washington v. Franciscan Health Sys.*, 388 F. Supp. 3d 1296, 1301-02 (W.D. Wash. 2019)

8   (improper to aggregate competitive effects of merger not challenged as anticompetitive).  Plaintiffs

9   also provide no support for their unprecedented theory that otherwise lawful acquisitions become

10  antitrust violations because they were purportedly "guided" by non-public data.  Opp. 24-25.

11  Using non-public data to pursue a pro-competitive (or neutral) acquisition is pro-competitive (or

12  neutral), not anti-competitive.   Plaintiffs' only argument is to frame these acquisitions as

13  eliminating nascent competitors, but the case law they rely upon—*United States v. El Paso Natural*

14  *Gas Co.*, 376 U.S. 651 (1964) (Opp. 26 n. 29)—is inapposite.  In that case, the acquiring competitor

15  was shown to be the only firm capable of entering the relevant market and disciplining the acquired

16  firm.   376 U.S. at 658-59.   There are no equivalent allegations here—the complaints allege

17  Facebook has numerous competitors.  *See, e.g.*, AC ¶¶ 430, 448-49; UC ¶ 80, 176.

18          **2.     Plaintiffs' Product Improvement Claims Are Non-Cognizable**

19          Plaintiffs attack Facebook's introduction of features purportedly "copied" from other

20  firms, but this is unquestionably product improvement and therefore beyond the reach of the

21  antitrust laws.  Mot. 23.  Plaintiffs do not contest that for their "copying" claims, Opp. 26-27, to

22  make sense, the features that Facebook allegedly copied must have been ones that its customers

23  found attractive and therefore enhanced Users' experience.  (Otherwise, the copying wouldn't have

24  affected any competitor, let alone competition, at all).   But making products better is pro-

25  competitive.  And neither complaint alleges that the alleged copying did not improve *Facebook*'s

26  service, which is the relevant inquiry.  *See Allied Orthopedic Appliances Inc. v. Tyco Health Care*

27  *Grp. LP*, 592 F.3d 991, 1000 (9th Cir. 2010) (design "constitute[s] an improvement" if it

28  "provide[s] some new benefit to consumers").

3.      **Allegations That Facebook "Killed" App Developers Are Insufficient**

Facebook's withdrawal of access to certain Platform APIs is not cognizable because Facebook had no duty to allow app developers access to those APIs.  Mot. 25-26.  Judges Freeman and Boasberg have both considered challenges to Facebook's API restrictions and found that the claims depended on a duty to deal with rivals that did not exist as a matter of law.  *FTC*, 2021 WL 2643627, at *17; *AGs*, 2021 WL 2643724, at *12; *Reveal Chat I*, 471 F. Supp. 3d at 1002.  Accordingly, they "should be excluded" from any holistic evaluation of Facebook's conduct under a "monopoly broth" theory.  *AGs*, 2021 WL 2643724, at *27.  In response, Plaintiffs do little to distinguish their allegations from those previously rejected—nor could they.  Using verbatim language from the *Reveal Chat* complaint, they all allege that the API deprecation "halted the growth of tens of thousands of third-party applications" that purportedly threatened Facebook.  *E.g.*, UC ¶ 175; AC ¶ 129; *accord Reveal Chat II* Compl. ¶ 160.  Users now have withdrawn this argument, stating their "claims do not implicate Facebook's 'Platform' policies" at all.  Supp. 4.

For their part, in their opposition, Advertisers acknowledge that this is not a "'theory' of anticompetitive conduct" and is thus non-actionable.  Opp. 27.[11]  Yet in their supplemental brief, Advertisers half-heartedly seek to revive their Platform theory.  Supp. 4.  But at no point do they respond to Facebook's arguments that they do not (1) allege the requisite joint product offering, *see Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 589-95 (1985); (2) allege that Facebook's conduct was "irrational but for its tendency to harm competition," *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1076 (10th Cir. 2013) (Gorsuch, J.); or (3) even attempt to cure the persistent defect, that Facebook made API data available ***only*** as a wholesale input and not, as it must have, in a retail market, 471 F. Supp. 3d at 1002; *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1133 (9th Cir. 2004); *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1142, 1151 (N.D. Cal. 2020).[12]  And Advertisers' suggestion that Judge Boasberg's rulings

---

[11] No Plaintiff defends the viability of the allegations concerning the "data-sharing" agreements, apparently conceding that these agreements were not plausibly anticompetitive.  Mot. 26-27.

[12] The *Viamedia* case Advertisers cite, Opp. 28, announces a refusal-to-deal standard inconsistent with the Ninth Circuit's test.  *Compare FTC v. Qualcomm, Inc.*, 969 F.3d 974, 993-94 (9th Cir. 2020), *with Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 462 (7th Cir. 2020).  And *Viamedia* allowed the refusal-to-deal claim to proceed because it was on all fours with *Aspen Skiing*, *see* 951 F.3d at 459-60; as explained in text, Plaintiffs' is not.

1   somehow "support[] the AC's refusal allegations," Supp. 4, is obviously incorrect.   Judge

2   Boasberg held that the API policies the government challenged were ***not*** actionable, and explicitly

3   did "not address th[e] question" of whether application of those policies could be.   *FTC*, 2021 WL

4   2643627, at *17, 19; *AGs*, 2021 WL 2643724, at *12, 15.

5   **IV.   PLAINTIFFS LACK ANTITRUST STANDING**

6     **A.   <u>Users</u> Have Not Alleged An Antitrust Injury**

7       **1.   Lost "Information And Attention" Is Not A Cognizable Injury**

8      As a matter of law, Users may not recover damages for their use of a free product for which

9   they have paid no money.   Mot. 28-29.   Users dispute Facebook's cite to a holding construing 15

10   U.S.C. § 15's "business or property" provision to require a "financial loss" because the specific

11   language quoted refers to the identical business-or-property requirement in the civil RICO statute.

12   Opp. 28 (discussing *Stationary Eng'rs Local 39 Health & Welfare Tr. Fund v. Philip Morris, Inc.*,

13   1998 WL 476265, at *4, 9 (N.D. Cal. Apr. 30, 1998)).   Users ignore the *Stationary Engineers*

14   court's statement that the plaintiffs' federal antitrust claims failed for the same reason: "[a]s

15   *discussed in the context of plaintiffs' RICO claims*, . . . plaintiffs' complaint ultimately seeks

16   recovery for a personal injury."   1998 WL 476265, at *9.   Moreover, because Congress "used the

17   same words" in the relevant provision as it did in 15 U.S.C. § 15, courts "assume it intended them

18   to have the same meaning."   *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992).

19      Otherwise, Users do not dispute that antitrust injury requires "some kind of injury that can

20   properly be characterized as economic."   3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*

21   ¶ 336 (4th ed. 2015); *see also Reiter v. Sonotone Corp.*, 442 U.S. 330, 338 (1979).   Users argue

22   that because they allege information and attention is "consideration," contrary to any logical

23   understanding, the Court must accept that as true.   Opp. 29.   The fact is that all of Facebook's user-

24   facing services cost nothing to use, no User has paid Facebook to use its services, and any

25   allegations to the contrary are inherently implausible.

26      Users' remaining arguments are beside the point.   Facebook does not dispute that the

27   antitrust laws might apply to "in-kind" transactions if the plaintiff alleges an *economic* injury.

28   Opp. 29.   That has not happened here.   Users cannot "pay" for Facebook with their attention, get

1  to use Facebook in return, and then demand monetary compensation years later.  And even if they

2  could, Users do not explain how they spent a supracompetitive amount of information and attention

3  using Facebook, or what that could mean within the framework of the antitrust laws.  Users'

4  argument that "no set of plaintiffs can recover" if Users cannot, Opp. 30, is one better made to

5  policymakers.  The law requires an antitrust plaintiff to allege *economic* injury.

6           **2.       Users' Injuries Are Speculative And Not Caused By Lost Competition**

7  Users cite a handful of situations—like the Nielsen ratings—where consumers receive

8  courtesy payments for participation in surveys (not in return for consuming a product or service).

9  None supports the allegation (Opp. 30) that "Facebook would have paid users in a competitive

10  market to use it absent . . . improvements" that Facebook would have supposedly made in the face

11  of competitive pressure.  There are no facts alleged that any firm purportedly in the relevant

12  markets ever paid its own users—including other social networks or social media firms alleged to

13  lack market power—let alone that the systemic absence of such payments, which is true with a

14  plethora of forms of entertainment that seek attention, is "a market distortion."  *Id.* at 31.  Because

15  there are no facts alleged to plausibly suggest that customers would have been paid to use Facebook

16  absent the challenged conduct, the Court should dismiss.  *In re WellPoint, Inc. Out-of-Network*

17  *UCR Rates Litig.*, 903 F. Supp. 2d 880, 905 (C.D. Cal. 2012) (no injury where plaintiff did not

18  allege increase competition would avoid harm).

19      **B.       Advertisers Have Not Alleged An Antitrust Injury**

20           **1.       Alleged Injuries From Advertisers' Section 2 Claims Are Conclusory**

21  Advertisers' theory that some unspecified price paid on an unspecified date is

22  "supracompetitive" is a conclusory allegation that cannot be credited under *Twombly*.  The prices

23  the named plaintiffs paid for ads on Facebook (and elsewhere) are fully within their control, yet

24  no Advertiser alleges a single ad price that it ever paid or any price they should have paid.  These

25  omissions are fatal to Advertisers' claims.  And while Advertisers criticize Facebook for citing

26  "no authority" for this position, they immediately and unsuccessfully attempt to distinguish the

27  authority that Facebook did, in fact, cite.  Opp. 32 n.32.  In *Intel Corp. v. Fortress Investment*

28  *Group*, plaintiffs failed to include allegations about royalties charged for intellectual property

1    licenses, which were the prices at issue.  2021 WL 51727, at *1-2 (N.D. Cal. Jan. 6, 2021).

2    **2.** **Advertisers** **Lack Antitrust Standing To Pursue Their Section 1 Claim**

3    Advertisers do not respond substantively to the deficiencies that Facebook identified

4    regarding Advertisers' standing to pursue their Section 1 claim.  Instead, Advertisers argue that

5    standing can be presumed because they have alleged a *per se* violation of Section 1.  Opp. 33.  But

6    allegations of a *per se* violation do not eliminate plaintiffs' requirement to plausibly allege and

7    establish antitrust injury.  *See, e.g.*, *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344

8    (1990) ("[P]roof of a per se violation and of antitrust injury [] must be shown independently.").

9    Advertisers have no answer to Facebook's challenge that their alleged injury is speculative

10   and that Advertisers are not efficient enforcers to bring their Section 1 claim.  Advertisers also

11   ignore that their own allegations undermine their assertion that the GNBA caused Facebook to

12   continue charging supracompetitive prices for ads on Facebook in the alleged social advertising

13   market.  For example, Advertisers allege that Google's ad products outside the alleged social

14   advertising market "threatened to superset [sic] the Social Advertising Market itself by allowing

15   user and identity targeting outside of Facebook's social network," AC ¶ 379, but Advertisers do

16   not explain, beyond these conclusory allegations, how Google's ability to target users in the

17   exchange-based ad market would have affected pricing for ads on Facebook, which is purportedly

18   in a different market.

19   **V.**    **USERS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT**

20   Relying on the "repeated holdings of the California Courts of Appeal," this Court has

21   "repeatedly" rejected Users' argument that unjust enrichment is a standalone cause of action under

22   California law.  *Abuelhawa v. Santa Clara Univ.*, __ F. Supp. 3d __, 2021 WL 1176689, at *9-10

23   (N.D. Cal. Mar. 29, 2021) (collecting cases).  Users cannot pivot to a quasi-contract claim (*see*

24   Opp. 35):  There is no action in quasi-contract "where [as here] there exists between the parties a

25   valid express contract covering the same subject matter."  *Rutherford Holdings, LLC v. Plaza Del*

26   *Rey*, 166 Cal. Rptr. 3d 864, 872 (Ct. App. 2014); *see also* UC ¶ 5.

**CONCLUSION**

27

28   This Court should grant Facebook's motion to dismiss with prejudice.

Dated:  July 7, 2021

Respectfully submitted,

By:/s/ Sonal N. Mehta

Sonal N. Mehta (SBN: 222086)
WILMER  CUTLER  PICKERING  HALE  AND
DORR LLP
950 Page Mill Road
Palo Alto, California 94303
Telephone:  (650) 858-6000
Facsimile:  (650) 858-6100
Email:  Sonal.Mehta@wilmerhale.com

David Z. Gringer (*pro hac vice*)
Ari Holtzblatt (*pro hac vice*)
WILMER  CUTLER  PICKERING  HALE  AND
DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363
Email:  David.Gringer@wilmerhale.com

*Attorneys for Defendant Facebook, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of July, 2021, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System.


*/s/ Sonal N. Mehta*
Sonal N. Mehta