# EXHIBIT 1

BRADFORD L. GEYER (*pro hac vice*)
Brad@FormerFedsGroup.com
FORMERFEDSGROUP.COM LLC
2006 Berwick Drive
Cinnaminson, NJ 08077
Telephone:  (856) 607-5708

ROB HENNIG
rob@employmentattorneyla.com
HENNIG KRAMER RUIZ & SINGH, LLP
3600 Wilshire Blvd, Suite 1908
Los Angeles, CA 90010
(213) 310-8301 phone
(213) 310-8302 fax

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| Sally Loveland, a California Resident, Sharon Cheatle, a California Resident, Janine Cortese, a North Carolina Resident <br><br> Plaintiffs, <br><br> v. <br><br> FACEBOOK, INC. <br><br> Defendant | Case No. 3:21-cv-03300-CRB <br><br> Hon. Charles R. Breyer <br><br> 1) **MONOPOLIZATION OF SOCIAL NETWORK MARKET** Violation of the Sherman Act (15 U.S.C. § 2) <br> 2) **ATTEMPTED MONOPOLIZATION OF SOCIAL NETWORK MARKET** Violation of the Sherman Act (15 U.S.C. § 2) <br> 3) **MONOPOLIZATION OF SOCIAL MEDIA MARKET** Violation of the Sherman Act (15 U.S.C. § 2) <br> 4) **ATTEMPTED MONOPOLIZATION  OF** |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SOCIAL MEDIA MARKET**
Violation of the Sherman Act (15 U.S.C. § 2)

Amended Complaint alleging monopoly claims

# CLASS ACTION AMENDED COMPLAINT
## TABLE OF CONTENTS

**PAGE**

INTRODUCTION………………………………………………………… ………2

JURISDICTION AND VENUE…………………………………….……….…...8

PARTIES…………………………..…………………………………….……...9

ALLEGATIONS……………………………………………………….…....10

    A.  Facebook establishes a monopoly on the public
        square………………………………………………………….…....10

    B.  Facebook acquires access to user content through terms of service that are
        made possible by its monopoly and through a scheme of concealing the
        material terms of its financial arrangement with Plaintiffs and users……………………….14

    C.  Facebook uses its monopoly to surveil users and seize total dominion over the
        creation, storage, and access of content on its platform……………………………..17

    D.  Defendant Facebook works to garner favor with its governmental
        overseers………………………………………………………….....20

    E.  Facebook expands "curation" protocols that promote Mandatory
        Vaccine Policy, and the COVID-19 pandemic response became
        a pretext to promote new vaccines, new drugs and to suppress
        free expression regarding alternative COVID-19 Treatments…………………………..21

CLAIMS FOR RELIEF…………………………………………………….24

CLASS ACTION ALLEGATIONS……………………………………….35

PRAYER FOR RELIEF…………………………………………………….39

# I. INTRODUCTION

1.     Sally Loveland, Sharon Cheatle, and Janine Cortese, by and through their attorneys, sue Defendant Facebook Inc. and allege on personal information and on information and belief, as follows:

2.     Plaintiffs were drawn together because of common concerns about the official pandemic response and a shared interest in potential solutions like hydroxychloroquine (HCQ) and Ivermectin (IVM) that might have blunted the COVID-19 pandemic.  Plaintiffs sue Facebook for its deliberate use of suppression, censorship and "known lies" in agency with the U.S. government to acquire, secure and protect its monopoly power in social networking and social media markets. Defendant has irreparably damaged Plaintiffs' sacred obligations to fulfill their duty as Americans to share important health care information with their fellow citizens that could have prevented many deaths. Treatments beginning at the earliest stage of COVID-19 infection were preempted by Facebook's censorship. Its "fact checkers" prevented important life-saving information from getting to Americans including physicians, nurses and health care workers, and their elected representatives.

3.     Facebook has attempted to acquire or protect its monopoly in the social network and social media markets--the modern American public square (hereinafter "public square")--through fraud and artifice, by offering "free" services, that were not free in any sense. All Facebook users were adversely impacted on October 1, 2020, when Facebook claimed total dominion over their users' content and an unfettered right to separate users from and to confiscate their content.

No. 3:21-cv-03300-CRB                                    Amended Complaint alleging monopoly claims



4.      As Defendant Facebook monopolized and attempted to monopolize the public square, it acquired total dominion over users' content.  It surveilled users while they were not using Facebook and imposed speech codes on the public square in a manner that was intended to please legislators that had political control of monopoly enforcement agencies. Facebook monitored, censored, and libelously branded Plaintiffs as purveyors of false, misleading, and dangerous information to curry favor with politicians of all stripes who were positioned to prevent or protect Facebook's monopoly, immunities, anti-competitive position, and content dominion, most notably, its monopoly power and its continued immunity under Section 230 of the Communications Decency Act (hereinafter sometimes referred to interchangeably as "Special Immunities").

5.      Facebook branded Plaintiffs' life-saving informational posts as "false", curating content and reframing differences of reasonable opinions in deceptive ways to benefit "government overseers"  who were positioned to hurt or to help Facebook navigate through a

perilous legislative and monopoly enforcement landscape.[1] In exchange, Facebook hoped to benefit by diverting Americans to their own brand of "government approved" opinions that government overseers sought to promote.[2]  Through moderators, including Factcheck.Org, Poynter Institute, and Lead Stories LLC, Facebook established and maintained an information suppression system that prevented life-saving information from being discussed and shared while it published its own erroneous false information.[3] As the COVID-19 virus is well into its second year, many of Plaintiffs' concerns about the pandemic response have been tragically substantiated, and these Plaintiffs and all Americans have been egregiously impacted by Defendant Facebook. Facebook imposed a government approved version of reality, that in important respects was false, and had devastating consequences for the nation.  Information control by a monopoly or a near monopoly anxious to suppress information to please government overseers resulted in distortion and perversion of objective reality.  While pleasing to its advertisers and government overseers who impacted its continued operations, Facebook

---

[1] "Government overseers" as used throughout includes elected Congressional representatives, the World Health Organization (WHO), the Food and Drug Administration (FDA), the Centers for Disease Control (CDC), the National Institutes of Health (NIH), and their agents and representatives, who adopted positions that prevented Plaintiff's from posting information regarding the use of existing early treatment options like HCQ and IVM  that could have prevented loss of life. Upon information and belief, plaintiffs were placed into a "vaccine hesitancy" class that is reported to comprise 1.5% of Facebook users.  At the time of this amended complaint, Plaintiffs include those who are vaccinated for COVID-19 and those who remain unvaccinated for COVID-19. The main qualification of being deemed "vaccine hesitant" by Facebook is that ultimately members of this group published information that questioned the decisions made by public health officials like Dr. Anthony Fauci and that supported any treatment solution that was seen as conflicting with experimental vaccines as being the final solution. Since prevention and early treatment solutions prevented hospitalizations and deaths— dampening demand for vaccine and threatening Emergency Use Authority (EUA) applications, anyone sharing information in this regard were censored. See Facebook Now Attempting to Censor 'Vaccine Hesitancy' According to Leaked Documents - Viral News (iphone11price.com) (May 22, 2021; checked July 22, 2021)

[2] See for example, https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/15/press-briefing-by-press-secretary-jen-psaki-and-surgeon-general-dr-vivek-h-murthy-july-15-2021/

[3] See attached Attachment  A

purposefully restricted access to useful information and prevented its dissemination. This had tragic consequences for the free market of ideas and to public health.

6.     No attempted monopoly case against Defendant Facebook can be comprehensive and complete without a full accounting of how far Facebook was willing to go to protect to protect its Special Immunities through securing and exercising control over free exchange of ideas on its platform.  Facebook's draconian suppression of users at the behest of the government to protect its monopoly power had devastating effects on a country in crisis when free exchange of information was most urgently needed. It is precisely in these crisis times that the full devastating effects of monopoly power over the public square is evident. Facebook's program to suppress Plaintiffs posts provides ironclad proof of its specific intentions to establish and protect its monopoly power.

7.     Many Americans were surprised when White House Press Secretary Jen Psaki casually admitted on July 15, 2021, that the federal government is censoring American citizens: "We've increased disinformation research and tracking within the Surgeon General's office," Psaki said. "We're flagging problematic posts for Facebook that spread disinformation."[4] Later, when asked about it, President Joseph Biden stated "They're [Facebook's] killing people -- I mean they're really, look, the only pandemic we have is among the unvaccinated."[5]

---

[4] John Cooper on Twitter: "☎️☎️: Jen Psaki says the Biden administration is actively flagging what they deem "disinformation" about the pandemic to Facebook for censoring. What could go wrong?? https://t.co/THz85cqi3R" / Twitter

[5] Biden says platforms like Facebook are 'killing people' with Covid misinformation (July 17, 2021) Biden says platforms like Facebook are "killing people" with Covid misinformation | CNN (checked July 20, 2021)

8.      As shocking as these admissions may be about coordinated censorship, the Facebook program to influence and control discussions in the public square, its collaboration and/or in agency with government overseers and to acquire and protect its growing monopoly, began in 2017   By early 2020, when COVID-19 was gaining steam, Plaintiffs were at the vanguard of Americans who saw clear evidence that public health officials were acting corruptly or incompetently.  They found each other on the Facebook public square and began to share information and concerns.  As Plaintiffs and other Americans posted practical information on their pages and on newsgroup pages like HCQ AND IVM ACCESS NOW (HAN)[6] they experienced growing censorship that peaked in May 2020 when pandemic newgroups experienced Facebook bans. During this time period and thereafter, Facebook gradually increased censorship and eventually forced Plaintiffs' into a formal "vaccine hesitancy" class of users that has been deluged with constant censorship, suspensions, bans and harassment.[7] Facebook exerted this increasing control on Plaintiffs to secure and protect its monopoly under the guise of eliminating "misinformation" and other alleged infractions of social media "rules" that went against government officials who were positioned to protect or destroy Facebook's Special Immunities. After more than 18 months of gradually increasing suppression, we now know that "vaccine hesitancy" was really just a way to isolate and target anyone who expressed skepticism about government positions and responses to the pandemic. The situation has now

---

[6] See Attachment A.

[7] Id. HCQ and IVM ACCESS NOW was originally formed as HCQ Access Now in early May 2020. a public forum created for the purpose of: 1) discussing the value of  HCQ and IVM with Americans as safe and off-patent solutions to prevent unnecessary deaths associated with the pandemic;  2) to discuss the massive effort to develop and impose a mandatory and potentially dangerous vaccines as well as the development and promotion of untested and inefficacious medications and treatment options for COVID-19;  3) determine the source of greatest health care system in the world's inability to properly respond to the pandemic; and 4) promote free expression.

evolved to where Facebook tracks these users and provides intelligence about these users to its government overseers so government and Facebook can better control free thought and free ideas.[8]

9.      There is a long tradition of monopolists working with government overseers to deter monopoly enforcement.  In the most notorious instance of corruption connected to railroad trusts:

> Union Pacific Railroad executives formed a sham construction company, Crédit Mobilier, that submitted bills for nearly double the construction cost of the eastern portion of the Transcontinental Railroad and pocketed the overcharges. To avert any investigation and ensure votes to benefit the company, railroad officials bribed approximately one dozen influential congressmen with Crédit Mobilier shares at below-market prices. Swept up in the Crédit Mobilier scandal was not just Ulysses S. Grant's first vice president, but his second one as well.

> The graft grew even closer to Grant. The Whiskey Ring scandal in which federal agents and whiskey distillers underreported sales to cheat the government out of excise tax revenue and pocket the cash ensnared Grant's personal secretary, Orville Babcock. In an attempt to corner the gold market, Wall Street financier and railroad magnate Jay Gould bribed Abel Rathbone Corbin, who had married Grant's sister, to use his influence to steer the president toward policies that would favor the robber baron's plan. "Grant is not a corrupt man as far as I can tell," White says, "but he combines an incredible lack of attention to detail—astonishing given his army record—and a blind loyalty to friends." [9]

The graft around the Grant White House mirrors the activities of Defendant here except that it spans White Houses over successive administrations regardless of affiliation.  Its scheme operates largely outside the elected representative political paradigm as Defendant has sought to

---

[8] Facebook finds that half of most vaccine-hesitant posts come from just 111 accounts, report says Facebook says it's working to combat posts that contribute to "vaccine hesitancy."(March 16, 2021) https://www.cnet.com/tech/mobile/facebook-finds-half-of-most-anti-vaccine-posts-come-from-just-111-accounts-report-says/ (checked July 22, 2021)

[9] https://www.history.com/news/gilded-age-corruption-corporate-wealth.

ingratiate itself with its government overseers of all stripes or no political affiliation who could influence its continued operations in pursuit of or having achieved monopoly power.

## II.     JURISDICTION AND VENUE

10.     This action arises under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and Section 4 of the Clayton Act, 15 U.S.C. § 15. The action seeks to recover treble damages or disgorgement of profits, interest, costs of suit, equitable relief, and reasonable attorneys' fees for damages to Plaintiffs and members of the Class resulting from Defendant's restraints of trade and monopolization of the Social Network and Social Media Markets described herein.

11.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1332 (class action diversity jurisdiction), and 1337(a) (antitrust); and under 15 U.S.C. § 15 (antitrust). The Court also has subject matter jurisdiction over the state-law unjust enrichment claims presented in this action under 28 U.S.C. 1367 (supplemental jurisdiction).

12.     This Court has personal jurisdiction over Facebook because it is subject to general jurisdiction in the State of California, where it maintains its headquarters and its principal place of business, and Facebook's Terms provide that consumers must bring these claims in this Court. The scheme to monopolize alleged in this Complaint caused injury to persons throughout the United States, including in this District. Moreover, Facebook also conducted substantial business from which the claims in this case arise in California and has agreed to personal jurisdiction in this Court.

13.     Venue is appropriate in this District under 15 U.S.C. § 15(a) (Clayton Act), 15 U.S.C. § 22 (nationwide venue for antitrust matters), and 28 U.S.C. § 1391(b) (general venue

provision). Facebook transacts business within this District, and it transacts its affairs and carries out interstate trade and commerce, in substantial part, in this District.

14.     Facebook's "Terms of Service" provide that "the laws of the State of California," which includes the federal antitrust laws, govern the Terms and "any claim" between Facebook and its users.[10]

## III.     PARTIES

15.     Plaintiff Sally Loveland is an American citizen living in Los Angeles County, California and joined Facebook in or about 2009. Loveland is a member of multiple pandemic and research newsgroups including HAN in May 2020. She has experienced censorship, threats of bans and suspensions on HAN and other newsgroups and on her personal page since she joined Facebook. Intimidation by Facebook initially caused her to refuse to be an administrator for HAN. When Loveland created a Facebook account, she believed Facebook would make money only through selling advertisements and that she would always have access, control, and ownership of her content.

16.     Sharon Cheatle is an American citizen living in Discovery Bay, California, and joined Facebook in or about 2009.  Cheatle joined HAN in July 2020. She has experienced censorship, threats of bans and suspensions on HAN and other newsgroups and on her personal page since she joined Facebook.  When Cheatle created a Facebook account she believed Facebook would make money only through selling advertisements and that she would always have access, control, and ownership of her content.

---

[10] Facebook Terms of Service, https://www.facebook.com/terms.php (last accessed: December 3, 2020).

17.     Janine Cortese is an American citizen living in Hendersonville, NC.  Cortese joined HAN in June 2020. She has experienced censorship, threats of bans and suspensions on HAN and other newsgroups and on her personal page since she joined Facebook. When Cortese created a Facebook account, she believed Facebook would make money only through selling advertisements and that she would always have access, control, and ownership of her content.

18.     Defendant Facebook, Inc. is a Delaware corporation, with its principal place of business at 1 Hacker Way Menlo Park, California 94025.

## IV.     ALLEGATIONS

### A.     Facebook establishes a monopoly on the public square.

19.     Facebook states its mission is to "Give people the power to build community and bring the world closer together." It claims that its products empower more than 3 billion people around the world to share ideas, offer support and make a difference with 100 billion messages shared per day. 180 million+ businesses use its apps to connect with customers and grow.  100 billion+ messages shared everyday help people stay close even when they are far apart. 1 billion+ stories shared everyday help people express themselves and connect. [11]

20.     As observed by New York University Professor Scott Galloway, a "key safeguard for society is diversity of media/viewpoints, checks and balances. . .[and people should be concerned by] the notion that one set of algorithms, controlled by one person who cannot be removed from office" would have a significant influence over the platform through which billions of Facebook users around the world consume information every day.[12]

---

[11] https://about.fb.com/company-info/

[12] https://www.cnbc.com/2019/08/09/scott-galloway-why-mark-zuckerberg-is-dangerous.html

21.     From June 23, 2008, through June 22, 2020, Facebook acquired 84 companies while the public square itself was acquired.[13] This was done as part of a strategy to "copy, kill, or acquire" any and all of its competitors.[14]

22.     With the cumulative popularity of Facebook, WhatsApp, Messenger, and Instagram, Facebook dominates the global social media landscape. All four of those apps have more than 1 billion users each. There are only two other "1 billion user" social media apps on Earth: YouTube, which is owned by Google, and WeChat, which until recently was owned by China. [15]

---

Jerold Nadler, Chairman, of the Majority Staff Report and Recommendations, Subcommittee on Antitrust, Commercial and Administrative Law, Committee of the Judiciary, issued "The Investigation of Digital Markets" (2020) page 422. https://fm.cnbc.com/applications/cnbc.com/resources/editorialfiles/2020/10/06/investigation_of_competition_in_digital_markets_majority_staff_report_and_recommendations.pdf (checked November 11, 2020).

[14] https://www.congress.gov/116/meeting/house/111072/witnesses/HHRG-116-JU05-Wstate-TeachoutZ-20201001.pdf; see also, https://twitter.com/RepJayapal/status/1288605630383763456?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1288605630383763456%7Ctwgr%5E%7Ctwcon%5Es1_c10&ref_url=https%3A%2F%2Fd-42032911072775488850.ampproject.net%2F2107092322000%2Fframe.html (checked July 7, 2021)

[15] https://www.statista.com/statistics/272014/global-social-networks-ranked-by-number-of-users/



23. Even more important for its monopoly power in the social network market is Facebook's influence over developing news stories through Facebook Stories.[16]

*Facebook Stories daily active users vs. other Stories apps*



[16] https://www.businessofapps.com/data/facebook-statistics/#1

Amended Complaint alleging monopoly claims

24. Congress has determined that in the United States geographic market, Facebook has monopoly power in the relevant social networking product market.[17] As alleged, *supra*, Facebook enjoys high barriers to entry and as experienced by Plaintiffs, its platform is virtually impossible to abandon. There are no reasonable substitutes for Facebook.[18]

> *Facebook has monopoly power in the market for social networking. According to internal documents produced by Facebook to the Committee, it has high reach, time-spent, and significantly more users than its rivals in this market. Despite significant changes in the market—such as the advent of mobile devices, applications, and operating systems—Facebook has held an unassailable position in the social network market for nearly a decade, demonstrating its monopoly power. Facebook's monopoly power is firmly entrenched and unlikely to be eroded by competitive pressure from new entrants or existing firms. Documents produced during the investigation by Facebook, including communications among its senior executives on market strategy, as well as a memorandum by a senior data scientist and economist at Facebook, support the conclusion that Facebook's monopoly is insulated from competitive threats. The social network market has high entry barriers—including strong network effects, high switching costs, and Facebook's significant data advantage—that discourage direct competition by other firms to offer new products and services. Facebook has also maintained and expanded its dominance through a series of acquisitions of companies it viewed as competitive threats, and selectively excluded competitors from using its platform to insulate itself from competitive pressure. Together, these factors have tipped the social networking market toward a monopoly.* [19]

25. Plaintiffs and all users unknowingly entered into a long-term service agreement with Facebook to create content and endure around-the-clock surveillance, none will leave

---

[17] See Investigation of Competition in Digital Markets, Majority Staff Report and Recommendations ("House Report"), Subcommittee on Antitrust, Commercial, and Administrative Law of the Committee on the Judiciary, at 18 (emphasis added), October 6, 2020, available at https://kl.link/3jGISfK at page 12, 134. Facebook's monopoly power is set forth on pages 133-174.

[18] House Report, at 91.

[19] House Report, at 133, Networks are websites (and accompanying mobile applications) that: (1) facilitate users of a given network finding, interacting, and networking with other people either whom the users already know or to whom they are connected through others they already know online; and (2) provide users with additional substantive features beyond the ability to communicate with other users and share multimedia.

13

Facebook for the same reasons, and they can now lose their content at any time if they do not comply with Facebook's imposition of government censorship.

**B.      Facebook acquires access to user content through terms of service[20] that are made possible by its monopoly and through a scheme of concealing the material terms of its financial arrangement with Plaintiffs and users**

26.      What is never mentioned in the Facebook user agreements and promotions about free membership, is that content has immense value. Anyone signing up for Facebook could not have known upon entering the Facebook agreement that on October 1, 2020, Facebook would establish new retroactive terms and assert ownership and the right to separate users from their content and to seize their accounts, including family photos, conversations etc.

*~~You can use your privacy settings to limit how your name and profile picture may be associated with commercial, sponsored, or related content (such as a brand you like) served or enhanced by us.~~ You give us permission to use your name, and profile picture, **content, and information** in connection with **commercial, sponsored, or related** ~~that~~ content **(such as a brand you like) served or enhanced by us**, ~~subject to the limits you place~~. **This means, for example, that you permit a business or other entity to pay us to display your name and/or profile picture with your content or information, without any compensation to you. If you have selected a specific audience for your content or information, we will respect your choice when we use it.**[21]*

27.      Notwithstanding Defendant Facebook's change in terms above, Facebook still advertises its services in a way that most users would take to mean that they are getting the services for "free."[22]

---

[20] Facebook Terms of Service, https://www.facebook.com/terms.php (last accessed: December 3, 2020).

[21] https://www.facebook.com/legal/terms. The language that is marked out indicates the old language v. the new language.

[22] https://www.facebook.com/help/186556401394793/9 (checked October 21, 2020).

## Does it cost money to use Facebook?

➤ Share Article

No, we don't charge you to use Facebook. Instead, we charge advertisers to show ads on the Facebook family of apps and technologies. This helps us make Facebook available to everyone without charging people for access to it.

When using Facebook, keep in mind:

- You need Internet access to use Facebook from your computer, mobile phone or tablet, and your Internet provider may charge you for this access. Learn more about data charges and connecting to Facebook on your mobile phone or tablet.

- Using some Facebook features, such as text message notifications, may also lead to charges from your mobile provider.

- If you add your payment information to Facebook, you can do things like make purchases from businesses, send money to friends, support creators on Facebook and purchase ads on Facebook.

  - If you make a purchase on Facebook, we may earn a commission or transaction fee from that activity.

  - You can also make purchases through Facebook for games, apps and other items.

Note: Facebook doesn't sell your information, and we don't share information that personally identifies you (information such as your name or email address that by itself can be used to contact you or identifies who you are) unless you give us permission.

Learn more about your information on Facebook and how we decide what ads to show you.

28.     Facebook falsely promises it does not "charge" users even though all users clearly incur "obligations" that Facebook does not adequately disclose, even now in its newly restated terms. Plaintiffs and all Facebook users were fraudulently and retroactively stripped of an array of rights, some of them crucial Constitutional rights. Facebook claimed to provide consumers greater value in return for consumers' data, but Facebook instead took that data without providing adequate compensation to its users constituting Constitutional and antitrust injury.

29.     Through its deception, Facebook prevented competition on the merits, and as a result of that reduction in competition, users received less value for their data. When agreeing to Facebook's Terms of Service, consumers agree to give up things of material value. Facebook then sold its users' information, and attention to third parties, including advertisers.  But for Facebook's anticompetitive conduct, which has substantially reduced, if not eliminated competition, consumers would have had more choices in the social network market. Absent Facebook's anticompetitive conduct, Facebook would have had to provide consumers increased value, that is quantifiable in measurable units, in return for consumers' data.  Otherwise,

15

consumers would have given their data and attention to other platforms, which would have provided consumers increased value. Consumers would have received the fair market value for their data and attention. That value was artificially decreased by Facebook's anticompetitive conduct.

30. Absent Defendant Facebook's anticompetitive conduct which has eliminated, competition, consumers would have benefitted from more robust competition in terms of non-price attributes such as data privacy practices and social media platform quality. Users could have benefitted from Facebook's social media network without having to surrender as much personal data to Facebook and other third parties that use Facebook for app development or targeted advertising. Similarly, users could have benefitted from competition that would have resulted in Facebook or its alternatives offering higher-quality services, such as interoperability between platforms and portability of users' data.



31. Facebook's stated Community Standards Policy is patently false:

REITERATING OUR COMMITMENT TO VOICE

The goal of our Community Standards has always been to create a place for expression and give people a voice. This has not and will not change. Building community and bringing the world closer together depends on people's ability to share diverse views, experiences, ideas and information. We want people to be able to talk openly about the issues that matter to them, even if some may disagree or find them objectionable. In some cases, we allow content for public awareness which would otherwise go against our Community Standards — if it is newsworthy and in the public interest. We do this only after weighing the public interest value against the risk of harm and we look to international human rights standards to make these judgments.

Contrary to this stated policy, Facebook does not allow customers a place to "talk openly" even if some may disagree, rather it disallows content that its government overseers find objectionable while recording and claiming total dominion over everything.[23]

## C.  Facebook uses its monopoly to surveil users and seize total dominion over the creation, storage, editorial control, and access of content on its platform

32.    Consumers have standing to sue for quality reductions. [24]

33.    Facebook inflated its value by hiding quality reduction information from its users when they signed up for services under false pretenses. A user, by signing up for "free," entered a complex financial and legal arrangement with concealed material terms.  Facebook always intended to do what it did in October 2020 when it claimed total dominion of all content stored on Facebook's platform and claimed the right to separate users from their content to further its "Special Immunities."  Plaintiffs are captives of Facebook's monopoly having now created

---

[23] See for example, https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/15/press-briefing-by-press-secretary-jen-psaki-and-surgeon-general-dr-vivek-h-murthy-july-15-2021/

[24] See AREEDA & HOVENKAMP, ¶¶ 345, 502, note 26 (stating that "clearly a consumer has standing to sue a cartel that reduces quality of the product that the consumer purchased").

extensive content under false pretenses. Plaintiffs cannot leave for a competitor because Facebook has no true competitors and there is no way to port content for transfer. Having learned that their content no longer belongs to them, Plaintiffs are fearful to engage in free expression that might violate Facebook's alleged "community standards" that are confusing and constantly changing. Faced with the possibility of losing contact with each other, Plaintiffs and other Facebook users who would switch to another social media platform or network may choose not to do so because of these high switching costs.[25]

34.     Plaintiffs did not acquiesce to this antitrust harm of diminished value and quality reductions[26] that flow from Defendant's surveillance. Defendant Facebook and its executives engaged in extensive lulling, misrepresentations and outright false statements.[27]  For example, Barry Schnitt, a Facebook spokesman, allayed concerns by falsely claiming that the Facebook "like" button, was not social plug-in data for advertising, and Facebook may use received data to catch bugs in its software and improve service.[28] This was proven to be untrue as Facebook

---

[25] See Dina Srinivasan, *The Antitrust Case Against Facebook: A Monopolist's Journey Towards Pervasive Surveillance In Spite of Consumers' Preference for Privacy*, 16:1 Berkeley Bus. L. J. 39, 87 (2019).

[26] See generally, https://www.justice.gov/opa/speech/assistant-attorney-general-makan-delrahim-delivers-remarks-antitrust-new-frontiers

[27] https://www.computerweekly.com/feature/Facebooks-privacy-U-turn-how-Zuckerberg-backtracked-on-promises-to-protect-personal-data. https://www.ftc.gov/news-events/press-releases/2011/11/facebook-settles-ftc-charges-it-deceived-consumers-failing-keep (prior links checked 11/20/2020).

[28] Declan McCullagh, Facebook 'Like' Button Draws Privacy Scrutiny, CNET.COM (June 2, 2010), https://www.cnet.com/news/facebook-like-button-draws-privacy-scrutiny/ (checked 11/20/2020).

No. 3:21-cv-03300-CRB                                      Amended Complaint alleging monopoly claims

entire system has migrated to a surveillance system even when Facebook users are not using Facebook.[29]

35. In the same month as the last significant competitor's exit (Google Orkut), Facebook regaled in perfection of its monopoly power:

> In June of 2014, Facebook announced it would leverage its code presence on third-party applications to track consumers, enabling it to surveil the specific online behavior of this country's citizens despite widespread preference to the contrary. Facebook would do precisely what it had spent seven years promising it did not and would not do, and finally accomplished what the previous competitive market had restrained it from doing. With a relatively quick software update, Facebook would leverage the code on third-party sites and apps used to deliver other Facebook products—Like buttons, Login buttons, conversion tracking pixels, retargeting pixels, and the Facebook software development kit— for the additional new purpose of tracking users. In a previously competitive market, Facebook was not able to get away with this qualitative degradation. Now Facebook could significantly degrade its quality because consumers no longer had alternative social networks to turn to. But now Facebook changed course and announced that the data derived from tracking consumers would augment Facebook ad targeting, attribution, and measurement. In other words, this deterioration of privacy would be directly related to increased revenue and profits. First, Facebook would use data from this commercial surveillance to enhance its ad targeting algorithms, which meant that Facebook ads could be more targeted and reach a larger relevant advertising base than those of other ad sellers in the market—such as The New York Times or Hearst. Second, data from commercial surveillance would allow Facebook to get paid for more advertising through increased attribution.[30]

36. When Plaintiffs made attempts to limit tracking by deleting cookies (or resetting a mobile device's advertising identifier) Facebook negated these efforts.[31] When Plaintiffs and

---

[29] Arnold Roosendaal, Facebook Tracks and Traces Everyone: Like This! (Tilburg L. Sch. Legal Studs. Res. Paper Ser. No. 03/2011, Nov. 30, 2010), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1717563 (link checked 11/20/2020).

[30] Dina Srinivasan, The Antitrust Case Against Facebook: A Monopolist's Journey Towards Pervasive Surveillance In Spite of Consumers' Preference for Privacy, 16:1 Berkeley Bus. L. J. at 87.

[31] See Chris Jay Hoofnagle, Ashkan Soltani, Nathaniel Good, & Dietrich J. Wambach, Behavioral Advertising: The Offer You Can't Refuse, 6 HARV. L. & POL. REV. 273, 277 (2012).

users downloaded ad-block software, Facebook also developed ad-blocking workarounds.[32]
These are merely two examples in a myriad of deceptive behaviors and invasive encroachments
on Plaintiff's privacy. These actions were accompanied by false rationalizations and comforting
assurances by Facebook to the frogs in the pot, that 1984-esque censorship schemes on behalf of
the government overseers were really to eliminate "misleading information" and promote safety.

### D. Defendant Facebook works to garner favor with its governmental overseers

37.     In the days following the 2016 election, Facebook withstood withering
criticism from opinion leaders and traditional media for its perceived effect on the election
outcome.[33]  This New York Times article followed a PBS Newshour that asked,
"[whether]fake news influence[d] the outcome of Election 2016? How can you be sure
the news you consume is true?"

> *The proliferation of fake news sources on social media has raised questions about the*
> *duty of sites like Facebook and Twitter to screen content and distinguish fact from fiction.*
> *Throughout 2016, false stories about the election were widely circulated by a variety of*
> *websites purporting to be legitimate. An analysis by Buzzfeed News revealed that many of*
> *these stories actually received more engagement — measured by the total number of*
> *comments, reactions and shares an article receives online — than those from real news*
> *sites like The New York Times and The Washington Post.[34]*

38.     Based on information and belief and on the public record, this filtered into a
multitude of threats from Congress from those who felt betrayed by the 2016 election outcome
and Defendant Facebook responded by increasing its censorship to protect its Special

---

[32] Facebook only had to block ads on desktop, because Facebook had already found way to serve
ads in mobile apps that could not be touched by ad blockers. Mike Isaac, Facebook Blocks Ad
Blockers, but It Strives to Make Ads More Relevant, N.Y. TIMES (Aug.
9,2016),https://www.nytimes.com/2016/08/10/technology/facebook-ad-blockers.html (checked
11/18/2020).

[34] https://www.nytimes.com/2016/11/14/technology/facebook-is-said-to-question-its-influence-in-election.html (checked 11/20/2020).

Amended Complaint alleging monopoly claims

Immunities. Defendant Mark Zuckerberg stated, "I regret ridiculing fears over Facebook's effect on election, "describing his change of heart as Facebook provided advertising content to Congress.[35]

39.     In December 2016, Facebook started its third-party fact-checking program,[36] working with "IFCN-certified" fact-checkers around the world to rate and review the accuracy of content on the platform for anyone violating its ad policy or community standards policies.[37] The certification process and constellation of factcheckers is managed by Poynter.[38]

40.     On March 28, 2018, ABC NEWS reported: "Congress turns up heat on Facebook after allegations of data harvesting Congress wants scrutiny of safeguards meant to protect user data."[39] Rumors also swirled about monopoly enforcement.[40]

**E.   Facebook expands "curation" protocols that promote Mandatory Vaccine Policy, and the COVID-19 pandemic response became a pretext to promote new vaccines, new drugs and to suppress free expression regarding alternative COVID-19 Treatments**

---

[35] https://www.theguardian.com/technology/2017/sep/27/mark-zuckerberg-facebook-2016-election-fake-news (checked 11/20/2020).

[36] Facebook partners with fact-checking organizations to begin flagging fake news (Dec. 15, 2016) https://www.theverge.com/2016/12/15/13960062/facebook-fact-check-partnerships-fake-newshttps://www.facebook.com/journalismproject/programs/third-party-fact-checking (checked 11/28/2020).

[37] https://www.facebook.com/communitystandards/.

[38] https://ifcncodeofprinciples.poynter.org/?fbclid=IwAR33zaOQnD2U-n44JdQlk5pW8QYpYZHX-IgKDZi401GgvwSkMl3tL05ap5c.

[39] https://abcnews.go.com/Politics/congress-turns-heat-facebook-allegations-data-harvesting/story?id=53861995 (checked 11/20/2020).

[40] https://www.wsj.com/articles/the-antitrust-case-against-facebook-google-amazon-and-apple-1516121561 (checked 11/20/2020).

41.     In February 2019, government overseer, Democratic Congressman Adam Schiff (D-CA), threatened to introduce legislation to remove Facebook's Section 230 immunity unless it implemented algorithms to "distinguish" and suppress "vaccine misinformation" and advertising. CDC and the WHO then collaborated at length with Facebook to suppress vaccine safety speech with a "warning label" and other notices that appear to flag alleged disinformation. In reality, Facebook censored valid and truthful speech, including speech critical of those agencies and their policies. It was also well known that Facebook had attracted antitrust enforcement scrutiny.[41]

42.     By January 2020, Plaintiffs and other U.S. citizens began making Facebook informational posts about the COVID-19 pandemic.  Facebook, seeking to ingratiate itself with government overseers who had previously threatened its Section 230 status, imposed speech restrictions on U.S. citizens including any discussion regarding the necessity and efficacy of vaccines, the dissemination of alternative COVID-19 treatment therapies, and general criticisms regarding the pandemic response and the impartiality of medical professionals and elected state officials. [42]

43.     In March 2020, it became clear that cheap, available, and safe options, HCQ, IVM and zinc, existed, that if used early could prevent the expansion of the pandemic. By April 2020, many experienced physicians opined that HCQ functioned as a prophylaxis and that IVM[43] was possibly even more efficacious.   By May 2020, Plaintiffs formed and joined HAN and other

---

[41] https://www.wsj.com/articles/ftc-antitrust-probe-of-facebook-scrutinizes-its-acquisitions-11564683965 (checked 11/20/2020).

[42] See Attachment A.

[43] An FDA-approved broad spectrum anti-parasitic agent.
 https://www.sciencedirect.com/science/article/pii/S0166354220302011.

newsgroups to discuss the efficacy of COVID-19 treatments. Since that time, Plaintiffs administering and using HAN and other newsgroups, and also using their personal accounts, have been repeatedly silenced and censored by Facebook in its efforts to monopolize from discussing the efficacy of these COVID-19 off-patent treatments, many of which are generally available. For example, it has been generally known for many years that Vitamin D is remarkably effective at preventing severe reactions to Corona viruses.[44] Plaintiffs discussed this supplement. While promoting this basic vitamin could have saved tens of thousands of lives, Dr. Anthony Fauci, one of the lead members of the Trump administration's White House Coronavirus Task Force addressing the COVID-19 pandemic in the United States, didn't mention Vitamin D until mid-September 2020, when the American death toll had crested above 200,000.[45]

44.     Plaintiffs fall into a certifiable "vaccine hesitancy" sub-class of 1) Antitrust Consumer Class and 2) Unjust Enrichment Consumer Class into which 1.5% of Facebook users who were deemed by Facebook to be hesitant about the vaccine and therefore subject to censorship during the pandemic.[46]  Project Veritas released internal Facebook documents explaining "Vaccine Hesitancy Comment Demotion" which shows the "goal" is to "drastically reduce user exposure to vaccine hesitancy."[47] Another leaked document addressed "Borderline

---

[44] https://c19study.com/d.

[45] https://www.cnbc.com/2020/09/14/supplements-white-house-advisor-fauci-takes-every-day-to-help-keep-his-immune-system-healthy.html (checked November 5, 2020).

[46] Facebook Now Attempting to Censor 'Vaccine Hesitancy' According to Leaked Documents - Viral News (iphone11price.com) (May 22, 2021; checked July 22, 2021)

[47] Facebook whistleblowers leak documents revealing effort to censor 'vaccine hesitancy': report (May 24, 2021) https://www.foxnews.com/media/facebook-whistleblowers-leak-documents-revealing-effort-to-censor-vaccine-hesitancy-report (checked July 22, 2021)

Vaccine (BV) Framework" that delves into how to classify such content with another expressed "goal" to "identify and tier the categories of non-violating content that could discourage vaccination in certain contexts, thereby contributing to vaccine hesitancy or refusal," adding, "We have tiered these by potential harm and how much context is required in order to evaluate harm." [48]

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF:
## MONOPOLIZATION OF SOCIAL NETWORK MARKET
### Sherman Antitrust Act, § 2

46.     Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

47.     Section 2 of the Sherman Act, 15 U.S.C. § 2, provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person . . . to monopolize any part of the trade" is guilty of an offense and subject to penalties. In addition, the Government may seek injunctive relief. 15 U.S.C. § 4. The elements of a private cause of action monopolization claim under the Sherman Act, 15 U.S.C.§ 2, and Clayton Act Section 4 are: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development because of consequence of a superior product, business acumen, or historic accident. *United States v. Grinnell Corp.,* 384 U.S. 563, 570-71 (1966);  *United States v. Dentsply Int'l, Inc.,* 399 F.3d 181 (3d Cir. 2005).

---

[48] Facebook whistleblower fired after leaking 'vaccine hesitancy' censorship documents to Project Veritas (May 24, 2021) Facebook whistleblower fired after leaking 'vaccine hesitancy' censorship documents to Project Veritas | Fox News (checked July 26, 2021)

48.     Facebook has willfully acquired and maintained monopoly power in the relevant Social Network Market. There are no reasonably interchangeable products that would effectively constrain, or have effectively constrained, Facebook from imposing and profitably sustaining during the relevant period a significant artificial decrease in compensation to consumers for their user information and attention paid to advertisements. Facebook also has the power to impose and profitably sustain lower levels of data privacy protections and social media network quality than would occur in a world where Facebook had not illegally monopolized the Social Network Market. Facebook has the power to control prices and exclude competition in the Social Network Market.

49.     By multiple measures, Facebook has dominant market share in the Social Network Market. Facebook's market share in the Social Network Market is higher than its share in the Social Media Market. More than 80% of the time that consumers in the United States spend using social media is spent on Facebook and its products.[49]

50.     High barriers to entry, high switching costs, and strong direct and indirect network effects make it unlikely, at any time in the foreseeable future, for a competitor to enter or take away substantial market share from Facebook in the Social Network Market in the United States to compete effectively with Facebook. Facebook has willfully acquired and maintained monopoly power in the Social Network Market by means of predatory, exclusionary, and anticompetitive conduct. Such conduct includes, but is not limited to: (a) engaging in a scheme

---

[49] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/  With roughly 2.85 billion monthly active users as of the first quarter of 2021, Facebook is the biggest social network worldwide. In the third quarter of 2012, the number of active Facebook users surpassed one billion, making it the first social network ever to do so. Active users are those who have logged into Facebook during the past 30 days. During the first quarter of 2021, the company stated that 3.45 billion people were using at least one of the company's core products (Facebook, WhatsApp, Instagram, or Messenger) each month.

to gain market share at the expense of its rivals by inducing consumers to join Facebook through a pattern of deception regarding Facebook's data privacy protections and its commercial surveillance; and (b) weaponizing the data it obtained from consumers by means of deception to destroy competition through its strategy to "acquire, copy, or kill" any and all of its competitors.

51.     By eliminating competition and obtaining and maintaining monopoly power over the Social Network Markets as described above, Facebook was able to, and did, artificially decrease compensation to consumers for their information and attention and provide lower value to consumers than it would have provided in a competitive market.

52.     Facebook's destruction of competition caused antitrust injury to Plaintiffs and Class members by decreasing compensation and lowering value for consumers, who received lower compensation and lower value from Facebook than those consumers would have received in the but-for world where Facebook competed on the merits. Plaintiff(s) and the class were injured and received substantially less compensation and lower value than they would have absent Facebook's unlawful and anticompetitive conduct.

53.     During the Plaintiff's terms of membership, Plaintiff(s) and the Class members gave Facebook their personal data and attention in exchange for the use of its social media network. As a result of Facebook's illegal conduct, Plaintiffs and other Class members received lower compensation and value than they would have absent Facebook's illegal conduct.

54.     There are no legitimate pro-competitive or business justifications for the conduct alleged herein, and even if there were, the anticompetitive effects would far outweigh any possible pro-competitive effects.

Amended Complaint alleging monopoly claims

55. Facebook's acts and practices have continued to be anticompetitive in nature and tendency and constitute an unfair method of competition, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

56. Facebook's conduct has had a substantial effect on interstate commerce.

57. Plaintiffs and Class members have been, and will continue to be, injured in their property as a result of Facebook's conduct.

58. Plaintiffs and Class members have suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: (a) higher costs in terms of time and attention; (b) a reduction in consumer choice; and (c) being forced to accept a service of lesser quality because of reduced competition.

59. Plaintiffs and Class members seek an award of treble damages or, in the alternative, disgorgement of Facebook's ill-gotten gains. Plaintiffs also seek appropriate equitable relief to enjoin Facebook from continuing to engage in anticompetitive behavior to the detriment of consumers and to remedy the harms that Facebook's monopolization of the Social Network Market has caused, including: (a) divestment of assets that would continue to entrench its monopoly power; and (b) requiring Facebook to submit to independent monitoring of its user privacy practices, data surveillance, and acquisition conduct.

## SECOND CLAIM FOR RELIEF:
### ATTEMPTED MONOPOLIZATION OF SOCIAL NETWORK MARKET
### Sherman Antitrust Act, § 2

60. Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

61.     To state a claim for attempted monopolization under Section 2 of the Sherman Act, the plaintiff must plead facts showing (1) that the defendant engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.  In evaluating allegations of anticompetitive conduct, liability "hinges on whether valid business reasons, as part of the ordinary competitive process, can explain the defendant's actions that resulted in a dangerous probability of achieving monopoly power." [50]

62.     With respect to the Social Network Market, Facebook has engaged in predatory, exclusionary, and anticompetitive conduct, including but not limited to; (a) obtaining market share through a pattern of deceiving consumers; and (b) exploiting the data it obtained from consumers through deception to systematically destroy competition through its strategy to "copy, kill, or acquire" any and all of its competitors.

63.     Facebook's conduct has had an anticompetitive effect in the Social Network Market.

64.     Facebook's conduct has no legitimate business purpose or procompetitive effect, and even if there were, the anticompetitive effects would far outweigh any possible procompetitive effects.

65.     Facebook has engaged in the anticompetitive conduct described herein with the specific intent of monopolizing the Social Network Market.

_____

[50] *Phila. Taxi Ass'n v. Uber Tech., Inc.*, No. 17-1871 (3d Cir. Mar. 27, 2018)

28

66. Facebook has engaged in the anticompetitive conduct described herein with a dangerous probability of monopolizing the Social Network Market.

67. Facebook's conduct has had a substantial effect on interstate commerce.

68. Plaintiffs and Class members have been, and will continue to be, injured in their property as a result of Facebook's conduct.

69. Plaintiffs and Class members have suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: (a) lower compensation for their time and attention; (b) a reduction in consumer choice; and (c) being forced to accept a service of lesser quality because of reduced competition.

70. Plaintiffs and Class members seek an award of treble damages or, in the alternative, disgorgement of Facebook's ill-gotten gains. Plaintiffs also seek appropriate equitable relief to enjoin Facebook from continuing to engage in anticompetitive behavior to the detriment of consumers and to remedy the harms that Facebook's attempted monopolization of the Social Network Market has caused, including: (a) divestment of assets that would continue to entrench its monopoly power; and (b) requiring Facebook to submit to independent monitoring of its user privacy practices, data surveillance, and acquisition conduct.

### THIRD CLAIM FOR RELIEF:
### MONOPOLIZATION OF SOCIAL MEDIA MARKET
### Sherman Antitrust Act, § 2

71. Facebook has willfully acquired and maintained monopoly power in the relevant Social Media Market. There are no reasonably interchangeable products that would effectively constrain, or have effectively constrained, Facebook from imposing and profitably sustaining

Amended Complaint alleging monopoly claims

during the relevant period a significant artificial decrease in compensation to consumers for their user information and attention paid to advertisements. Facebook also has the power to impose and profitably sustain lower levels of data privacy protections and social media quality than would occur in a world where Facebook had not illegally monopolized the Social Media Market. Facebook has the power to control prices and exclude competition in the Social Media Market.

72.     By multiple measures, Facebook has dominant market share in the Social Media Market. As measured by advertising revenue that is generated by social media platforms in the Social Media Market, Facebook (including Instagram) has market share of at least 85% of the Social Media Market. By its own measure, and as reflected in Facebook's internal documents, Facebook has estimated that it is "95% of all social media in the US[.]" [51] And, as noted above, more than 80% of the time that consumers in the United States spend using social media is spent on Facebook and its products. [52]

73.     High barriers to entry, high switching costs, and strong direct and indirect network effects make it unlikely, at any time in the foreseeable future, for a competitor to enter or take away substantial market share from Facebook in the Social Media Market in the United States to compete effectively with Facebook.

74.     Facebook has willfully acquired and maintained monopoly power in the Social Media Market by means of predatory, exclusionary, and anticompetitive conduct. Such conduct includes, but is not limited to: (a) engaging in a scheme to gain market share at the expense of its

---

[51] https://www.businessinsider.com/facebook-2012-95-percent-of-all-social-media-us-2020-7#:~:text=Mark%20Zuckerberg%20told%20Congress%20that,'&text=In%202012%2C%20Facebook%20boasted%20that,social%20media%20in%20the%20US.%22

[52] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/

rivals by inducing consumers to join Facebook through a pattern of deception regarding Facebook's data privacy protections and its commercial surveillance; and (b) weaponizing the data it obtained from consumers by means of deception to destroy competition through its strategy to "acquire, copy, or kill" any and all of its competitors.

75. By eliminating competition and obtaining and maintaining monopoly power over the Social Media Market as described above, Facebook was able to, and did, artificially decrease compensation to consumers for their information and attention and provide lower value to consumers than it would have provided in a competitive market.

76. Facebook's destruction of competition caused antitrust injury to Plaintiffs and Class members by decreasing compensation and lowering value for consumers, who received lower compensation and lower value from Facebook than those consumers would have received in the but-for world where Facebook competed on the merits. Plaintiff(s) and the class were injured and received substantially less compensation and lower value than they would have absent Facebook's unlawful and anticompetitive conduct.

77. During the relevant period, Plaintiff(s) and the Class members gave Facebook their personal data and attention in exchange for the use of its social media network. As a result of Facebook's illegal conduct, Plaintiffs and other Class members received lower compensation and value than they would have absent Facebook's illegal conduct.

78. There are no legitimate pro-competitive or business justifications for the conduct alleged herein, and even if there were, the anticompetitive effects would far outweigh any possible pro-competitive effects.

Amended Complaint alleging monopoly claims

79.     Facebook's acts and practices have continued to be anticompetitive in nature and tendency and constitute an unfair method of competition, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

80.     Facebook's conduct has had a substantial effect on interstate commerce.

81.     Plaintiffs and Class members have been, and will continue to be, injured in their property as a result of Facebook's conduct.

82.     Plaintiffs and Class members have suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: (a) higher costs in terms of time and attention; (b) a reduction in consumer choice; and (c) being forced to accept a service of lesser quality because of reduced competition.

83.     Plaintiffs and Class members seek an award of treble damages or, in the alternative, disgorgement of Facebook's ill-gotten gains. Plaintiffs also seek appropriate equitable relief to enjoin Facebook from continuing to engage in anticompetitive behavior to the detriment of consumers and to remedy the harms that Facebook's monopolization of the Social Media Market has caused, including: (a) divestment of assets that would continue to entrench its monopoly power; and (b) requiring Facebook to submit to independent monitoring of its user privacy practices, data surveillance, and acquisition conduct.

**FOURTH CLAIM FOR RELIEF:**
**ATTEMPTED MONOPOLIZATION OF SOCIAL MEDIA MARKET**
**Sherman Antitrust Act, § 2**

84.     Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

85. With respect to the Social Media Market, Facebook has engaged in predatory, exclusionary, and anticompetitive conduct, including but not limited to; (a) obtaining market share through a pattern of deceiving consumers; and (b) exploiting the data it obtained from consumers through deception to systematically destroy competition through its strategy to "copy, kill, or acquire" any and all of its competitors.

86. Facebook's conduct has had an anticompetitive effect in the Social Media Market.

87. Facebook's conduct has no legitimate business purpose or procompetitive effect, and even if there were, the anticompetitive effects would far outweigh any possible procompetitive effects.

88. Facebook has engaged in the anticompetitive conduct described herein with the specific intent of monopolizing the Social Media Market.

89. Facebook has engaged in the anticompetitive conduct described herein with a dangerous probability of monopolizing the Social Media Market.

90. Facebook's conduct has had a substantial effect on interstate commerce.

91. Plaintiffs and Class members have been, and will continue to be, injured in their property as a result of Facebook's conduct.

92. Plaintiffs and Class members have suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: (a) lower compensation for their time and attention; (b) a reduction in consumer choice; and (c) being forced to accept a service of lesser quality because of reduced competition.

93.     Plaintiffs and Class members seek an award of treble damages or, in the alternative, disgorgement of Facebook's ill-gotten gains. Plaintiffs also seek appropriate equitable relief to enjoin Facebook from continuing to engage in anticompetitive behavior to the detriment of consumers and to remedy the harms that Facebook's attempted monopolization of the Social Media Market has caused, including: (a) divestment of assets that would continue to entrench its monopoly power; and (b) requiring Facebook to submit to independent monitoring of its user privacy practices, data surveillance, and acquisition conduct.

**FIFTH CAUSE OF ACTION:**
**DECLARATORY RELIEF**
**28 U.S.C. § 2201(a)**

94.     Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

95.     The Declaratory Judgment Act, codified in 28 U.S.C. § 2201(a), provides in pertinent part that, "[i]n a case of actual controversy within its jurisdiction [] any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

96.     An actual controversy has arisen and now exists between Plaintiffs and Defendant, concerning their respective rights and duties in that Facebook has published a false and misleading warning labels on Plaintiffs Facebook pages and have fraudulently misrepresented to third-party users of the pages that Plaintiffs have posted and are posting "false [factual] information" in violation of their terms of service.  Facebook has used deceptive means to limit the reach and visibility of HAN's page. Finally, and within the past two months, Facebook has threatened to ban, limit, warn, deboost, block or

censor Plaintiff's content.

97.     Plaintiffs seeks a judicial determination of their rights and remedies and a declaration as to the parties' respective rights and obligations with respect to HAN's Facebook page and, in regard to each newsgroup page and personal page maintained by Plaintiffs in the contained "vaccine hesitancy" sub-class. A judicial declaration is necessary and appropriate at this time so that Plaintiff may ascertain its rights to publish content on those pages without any interference, censorship, warning labels, "shadowbanning," "deboosting," "sandboxing," or other deceptive means and methods employed by Facebook.

## CLASS ACTION ALLEGATIONS

98.     Plaintiffs re-allege  and incorporate by reference herein all the allegations contained above.

99.     Pursuant to Federal Rule of Civil Procedure 23(b)(3), Plaintiffs assert claims on behalf of the following Classes:


a)     **The Antitrust Consumer Class:** All persons or entities in the United States who maintained a Facebook profile at any point from 2007 up to the date of the filing of this action who experienced censorship or lost content related to the pandemic and or that were designated by Facebook as being "Vaccine Hesitant." Excluded from the Class are Facebook, any entity in which Facebook has an interest, and any of Facebook's: corporate parent, affiliate(s), subsidiary(ies), officers, directors, legal representative, successors, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

b)      **The Unjust Enrichment Consumer Class:** All persons or entities in the United States who maintained a Facebook profile at any point from 2007 up to the date of the filing of this action that were designated by Facebook as being "Vaccine Hesitant."  Excluded from the Class are Facebook, any entity in which Facebook has an interest, and any of Facebook's: corporate parent, affiliate(s), subsidiary(ies), officers, directors, legal representatives, successors, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

100.    Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that the Classes should be expanded, divided into subclasses, or modified in any other way.

101.    This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements of Rule 23(b)(3). Plaintiffs seek to represent ascertainable Classes, as determining inclusion in the classes can be done through Facebook's own records.

102.    Although the precise number of Class members is unknown and can only be determined through appropriate discovery, the proposed Classes number where additional injuries were sustained as a result of being given a "vaccine hesitancy" designation by Facebook that applied to an estimated 1.5% of its users is at least in the tens of millions and is therefore so numerous that joinder of all members would be impracticable.

103.    Questions of law and fact common to the putative Classes exist that predominate over questions affecting only individual members, including:

a)    Whether Facebook's deception of consumers about its data privacy practices was anticompetitive;

b)    Whether Facebook's acquisition conduct was anticompetitive;

c)    Whether Facebook intentionally engaged in anticompetitive acts in order to obtain or maintain monopoly power;

d)    Whether Facebook is a monopolist in the Social Network Market;

e)    Whether Facebook is a monopolist in the Social Media Market;

f)    Whether Facebook intentionally made material misrepresentations about its data privacy practices and the extent of its commercial surveillance;

g)    Whether Facebook's foreclosure of competition in the Social Network Market caused by its anticompetitive conduct led to cognizable and quantifiable economic harms to consumers;

h)    Whether Facebook's foreclosure of competition in the Social Media Market caused by its anticompetitive conduct led to cognizable and quantifiable economic harms to consumers;

i)    Whether consumers would have had more options and competition amongst social media companies if Facebook would have revealed the full extent of its data privacy practices and commercial surveillance long ago;

j)    Whether Facebook's anticompetitive conduct substantially harmed competition in the Social Network Market in the United States;

k)    Whether Facebook's anticompetitive conduct substantially harmed competition in the Social Media Market in the United States;

l)    Whether Facebook's anticompetitive conduct should be enjoined or whether other appropriate equitable relief, including ordering Facebook to divest assets or submit to more invasive third-party audits of its privacy practices and commercial surveillance.

m) Whether Facebook attempted to protect its monopoly by acting as agents of government to censor, change, curate and seize content that would have contravened the Constitutional Rights of its users had the government engaged in this activity itself or whether Facebook acted on its own to do this to please its government overseers who were in a position to interfere with its achieving a perfect monopoly or that might threaten its continued operation as a monopoly.

n) Whether this evidence shows overwhelmingly that Facebook specifically intended to monopolize the social media market.

o) Did these actions on behalf of a portion of its key advertisers in the pharmaceutical industry provide it with a permanent anti-competitive advantage in the form of network effects to increase barriers to entry.

p) Whether Facebook ascribed certain users whose continued content generation displeased government overseers received certain designations that identified them for enhanced censorship and content seizures.

104.    Plaintiffs are (a) member(s) of the putative Classes. The claims asserted by the Plaintiffs in this action are typical of the claims of the members of the putative Classes, as the claims arise from the same course of conduct by the Defendant and the relief sought is common.

105.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the putative Classes, as their interests are coincident with, not antagonistic to, the other members of the Classes.

106.     Plaintiffs have retained counsel competent and experienced in both antitrust and class action litigation.

107.     Certification of the Classes is appropriate pursuant to Fed. R. C. P. 23(b)(3) because questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. This predominance makes class certification appropriate.

**DEMAND FOR JURY TRIAL**

108.     Plaintiff demands a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

109.     WHEREFORE, Plaintiffs Sally Loveland, Sharon Cheatle and Janine Cortes, on behalf of themselves and the Classes, seek the following relief:

a) An order certifying this action as a class action under Fed. R. Civ. 23, defining the Classes as requested herein, finding that Plaintiffs are proper representatives of the Classes requested herein, and appointing Plaintiffs' counsel as Class Counsel.

b) Injunctive and other equitable relief as is necessary to protect the interests of the Classes, including: (i) an order prohibiting Facebook from continuing to engage in the wrongful acts described herein; (ii) requiring Facebook to engage third-party auditors to conduct audits and evaluations of Facebook's data privacy practices, commercial surveillance, and acquisition

conduct, and ordering them to promptly correct any problems or issues detected by these auditors, and (iii) requiring Facebook to divest assets, that tend to substantially entrench Facebook's monopoly power in a timely and complete manner.

c) Treble damages or, alternatively, restitution and/or disgorgement of all amounts wrongfully charged to and received from Plaintiffs and members of Classes.

d) Attorneys' fees, statutory costs and other costs of suit herein incurred, for both pre- and post-judgment interest on any amounts awarded, for corrective advertising to ameliorate consumers' mistaken impressions created by Facebook's anticompetitive conduct.

e) Declaratory relief, including but not limited to a declaration and judgment that Facebook's conduct as alleged herein violates the laws alleged herein.

f) Such other relief as the Court may deem just and proper.

Respectfully Submitted,

Dated: July 26, 2021

FORMERFEDSGROUP.COM LLC

By: _/s/ Brad Geyer_____

BRADFORD L. GEYER

HENNIG KRAMER RUIZ & SINGH, LLP

By: _/s/ Rob Hennig_____

ROB HENNIG

_Attorneys for Plaintiffs_

     Amended Complaint alleging monopoly claims

## SIGNATURE ATTESTATION

I am the ECF User whose identification and password are being used to file the foregoing.  Pursuant to Civil Local Rule 5-1(i), I hereby attest that the other signatories have concurred in this filing.

Dated:  July 26, 2021                    By:     */s/ Brad Geyer*                   
                                                  Bradford L. Geyer (pro hac vice)