1            UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3   Before The Honorable Virginia K. DeMarchi, Magistrate Judge

4

5   KLEIN, et al.,                    )
                                      )
6            Plaintiffs,              )
                                      )
7   vs.                               )     No. C 20-08570-LHK
                                      )
8   FACEBOOK, INC.,                   )
                                      )
9            Defendant.               )
    _____   )
10

11                                   San Jose, California
                                     Tuesday, August 31, 2021
12

13          TRANSCRIPT OF THE OFFICIAL ELECTRONIC
      SOUND RECORDING  10:06 - 12:37 = 2 HOURS AND 21 MINUTES
14

15  APPEARANCES:

16  For Plaintiffs:
                                Quinn Emanuel Urquhart &
17                                 Sullivan
                                191 North Wacker Drive
18                              Suite 2700
                                Chicago, Illinois 60606
19                         BY:  STEPHEN A. SWEDLOW, ESQ.
                                MICHELLE R. SCHMIT, ESQ.
20

                                Hagens Berman Sobol Shapiro,
21                                 LLP
                                715 Hearst Avenue
22                              Suite 202
                                Berkeley, California 94710
23                         BY:  SHANA E. SCARLETT, ESQ.

24

25

2

APPEARANCES:   (cont'd.)

For Jarred Johnson:

                Scott and Scott, Attorneys at
                  Law, LLP
                The Helmsley Building
                230 Park Avenue
                Seventeenth Floor
                New York, New York 10169
      BY:   KRISTEN MARIE ANDERSON, ESQ.

For Affilius, Inc.:

                Bathaee Dunne, LLP
                633 West Fifth Street
                Twenty-Sixth Floor
                Los Angeles, California 90071
      BY:   BRIAN JAMES DUNNE, ESQ.

For Defendant:

                Wilmer Cutler Pickering Hale
                and Dorr, LLP
                2600 El Camino Real
                Suite 400
                Palo Alto, California 94306
      BY:   SONAL N. MEHTA, ESQ.

                Wilmer Cutler Pickering Hale
                and Dorr LLP
                1875 Pennsylvania Avenue,
                Northwest
                Washington, DC 20006
      BY:   MOLLY MAUREEN JENNINGS, ESQ.

Transcribed by:          Echo Reporting, Inc.
                Contracted Court Reporter/
                Transcriber
                echoreporting@yahoo.com

3

1  Tuesday, August 31, 2021                    10:06 a.m.

2                    P-R-O-C-E-E-D-I-N-G-S

3                         --oOo--

4          THE CLERK:  So our next matter would be Klein

5  versus Facebook.  Counsel that are going to be speaking on

6  that, if you could raise your hands, please.

7          THE COURT:  All right.  Good morning.  Looks like

8  we have everyone here.

9      Ms. Carmel (phonetic), would you call the case, please.

10         THE CLERK:  On the matter of Klein versus

11 Facebook, Case Number 5:20-cv-08570.

12         THE COURT:  Thank you.

13     May I have appearances, please, starting with counsel

14 for the consumer Plaintiffs.

15         MR. SWEDLOW (Zoom):  Stephen Swedlow of Quinn

16 Emanuel.

17         MS. SCHMIT (Zoom):  Michelle Schmit of Quinn

18 Emanuel.

19         MS. SCARLETT (Zoom):  Shana Scarlett from Hagens

20 Berman.

21         THE COURT:  Okay.  Thank you.

22     And for the advertiser Plaintiffs.

23         MS. ANDERSON (Zoom):  Kristen Anderson from Scott

24 and Scott.

25         MR. DUNNE (Zoom):  Brian Dunne of Bathaee Dunne.

4

1          THE COURT:  All right.  Thank you.

2      And for Defendant Facebook.

3          MS. MEHTA (Zoom):  Good morning, your Honor.

4  Sonal Mehta from Wilmer Hale on behalf of Facebook, and with

5  me today is my colleague, Molly Jennings.

6          THE COURT:  Okay.  Good morning.

7      All right.  So we have four discovery motions.  I'm

8  going to just take them in order.  The first one is Docket

9  132.  This is the motion that concerns depositions of

10  Facebook witnesses and a deposition protocol, generally.

11      Let me start with the first issue that you've raised,

12  which is the number of Facebook depositions, and I think it

13  is really just Facebook depositions.  This is not really, as

14  I understand it, a mutual problem.  Am I mistaken?  All

15  right.

16          MS. JENNINGS:  No, your Honor.

17          THE COURT:  Okay.  Ms. Jennings, you'll be

18  handling this?  Okay.

19      So, as I understand it, the Plaintiffs propose 30

20  depositions, and Facebook proposes 15, at least as a

21  starting point.  It seems to me that the critical question

22  here is, how many Facebook employees have relevant

23  noncumulative information?  The Plaintiffs are focusing on

24  document custodians, and the number of document custodians

25  that have been disclosed or that may be disclosed, and while

5

1  that may be a useful reference point, it seems to me that it

2  doesn't necessarily resolve the question, because I imagine

3  that there could be a large number of document custodians,

4  but only a subset of those folks are going to have relevant

5  noncumulative information from a perspective of testimony.

6      So I'd like to understand, in the first instance, from

7  the Plaintiffs, what is the rationale behind the request for

8  the 30 depositions?

9          MS. ANDERSON:  Good morning, your Honor.  This is

10 Kristen Anderson.  I'll be handling questions on the

11 deposition protocol, and my colleague, Michelle Schmit, will

12 be handling the other protocols this morning.

13         THE COURT:  Okay.

14         MS. ANDERSON:  We think 30 is a reasonable limit,

15 considering the complexity and magnitude of this case.

16 Facebook is a trillion-dollar company, and it has more than

17 63,000 employees, and what's at issue in this case is a

18 primary piece of Facebook's business.

19     There are likely hundreds of employees at Facebook

20 working on advertising and consumer data privacy topics at

21 issue in this case.  We've identified far more than 30

22 employees with information relevant to our claims, and we

23 think 30 is a limit that is reasonable and efficient.

24     The case has already had significant discovery.

25 Facebook has already produced 12,000,000 pages of documents.

6

1  The case also has lengthy class periods dating back over a

2  decade, and in our initial disclosures, the Plaintiffs have

3  identified 65 Facebook employees likely to have discoverable

4  information.

5       So we think these facts show that 15 depositions as an

6  initial limit is unreasonably low, and if we start with 15

7  depositions, we would have to not notice deponents at the

8  beginning of the case, and that's because we already know

9  there are more than 15 we want to depose.  So the parties

10 are likely to be back in front of the Court shortly after

11 depositions commence if we're limited to 15.

12       THE COURT:  But, Ms. Anderson, are you saying that

13 the Plaintiffs have already identified more than 15 Facebook

14 employees who not only may have relevant information in the

15 form of documents, but have relevant information in the form

16 of testimony that is noncumulative as between those

17 particular witnesses?

18       MS. ANDERSON:  Yes, your Honor.  The issues in the

19 two cases, the consumer case and the advertiser case,

20 there's some overlap, but there are relatively distinct

21 cases and issues.  The advertisers and consumers allege

22 different classes, different theories of harm, different

23 relevant markets, and the monopolization conduct allegations

24 are based on different conduct.  So this will necessitate

25 different proof and different witnesses between the two

7

1  groups.

2      So, for example, the advertiser Plaintiffs' claims

3  focus on advertising refusals to deal and market allocation,

4  whereas the consumer Plaintiffs' claims focus on Facebook's

5  false assurances regarding its collection and use of users'

6  data that prevented users from switching to using other

7  social networks and social media apps.

8          THE COURT:  Okay.  So let me hear from Facebook.

9  I mean, in a case like this, my general gut feeling is that

10 15 is too few, but I would like to understand why -- well,

11 what is Facebook's realistic estimate of the number of

12 employees who will have discoverable and nonduplicative

13 testimony to give in the case?

14         MS. JENNINGS:  Yes.  So it's a little hard for me

15 to answer that right off the bat, because we actually don't

16 know who the Plaintiffs have on their list of folks who they

17 think will have both relevant and noncumulative information,

18 and so, if we had their list, we could kind of -- we could

19 sit down and try to figure out who might have the

20 appropriate information here.  Without that, it's a little

21 hard to answer.  I can point you to our initial disclosures,

22 on which we identified nine witnesses that we are likely to

23 call at this point in the case.

24     I would also point out that, at this point, we have

25 agreed to increase the presumption deposition limit by 50

8

1  percent, and so what we're talking about is one of

2  presumptive limit and two of presumptive limit that we've

3  already acknowledged is higher than the general standard

4  limit that applies to all depositions in a given case, and

5  if it becomes the case that that Plaintiffs are able to make

6  the kind of particularized showing that courts in this

7  district usually require for additional depositions, we're

8  of course happy to meet and confer about that, happy to come

9  up with some kind of -- like, tee up any disputes over

10  additional depositions in some kind of omnibus motion for

11  you, so that we're not taking up more of the Court's time

12  than necessary with identifying additional deponents.

13          THE COURT:  So the Plaintiffs stated they have

14  already made that showing, according to the initial

15  disclosures and the identification of unique witnesses for

16  each set of Plaintiffs that they believe, you know, exceed

17  the number that you've said are reasonable.

18      I've asked the question about -- you know, telling me

19  that there's 80 custodians in the FTC case doesn't really

20  tell me anything about who has relevant and nonduplicative

21  testimony, but the initial disclosures maybe get a little

22  closer to the mark.  It's already over 15.  Why haven't they

23  already made the showing that you say is required?

24          MS. JENNINGS:  Yes.  So, in the cases where

25  deposition limits are exceeded, generally, the way parties

9

1  make the showing is they evaluate the testimony they've

2  already gotten from the initial set of depositions they've

3  taken, and then use what they learned during those

4  depositions to determine whether there's real need to exceed

5  the deposition limit, and so we're sitting here today with a

6  list of names and a list of topics in which they expect

7  those individuals to testify, but we don't know what we

8  don't know.  We don't know what depositions are going to

9  show, right?  And we don't know --

10             THE COURT:  I'm sorry, Ms. Jennings, but they're

11  Facebook employees that we're talking about, so Facebook

12  could know, probably does know, based on the people's roles,

13  what their information was.  I'm sure there's been some --

14  I'm sure there's been a lot of investigation already.  I am

15  skeptical that you don't know at all.

16             MS. JENNINGS:  Yes, and we've started with a set

17  of nine current Facebook employees that are identified on

18  our list of initial disclosures, and that's where we are

19  right now, and we've agreed to give them six more over that

20  set of nine.

21             THE COURT:  Okay.  This strikes me as an area

22  where, in light of the other issues, which we'll get to,

23  there can be some compromise, and avoid the need for coming

24  back to me unnecessarily, but I'd like to put a pin in this

25  particular issue, and find out how it relates to some of the

10

1  other things you're disputing about depositions, because I'm

2  not entirely sure how the parties intend to deal with

3  30(b)(6) depositions, and depositions that involve a witness

4  who is both an individual deponent and a 30(b)(6) designee.

5       It seems to me, if I'm interpreting the submissions

6  correctly, that the Plaintiffs are asking for 30

7  depositions, including 30(b)(6) depositions, and then you

8  have this potential formula for how you count 30(b)(6)

9  depositions, which I don't know if that counting is an

10 agreed counting or contingent on resolution of some of these

11 other disputes, but I would like to understand, at least

12 from the Plaintiffs' perspective, how you think this all

13 shakes out in terms of your proposal for 30 depositions.

14 How does it work with 30(b)(6) deponents and people who wear

15 two hats as individual and 30(b)(6) designees?

16          MS. ANDERSON:  The Plaintiffs' position is that we

17 would take 30 depositions collectively between the two

18 Plaintiffs' groups of current Facebook employees.  Each

19 deposition would be seven hours of testimony per employee,

20 unless otherwise agreed or ordered.  There is no cap on the

21 number of hours of testimony from Facebook employees, which

22 is another place our proposals differ, but I would point out

23 that, effectively, the Plaintiffs' proposal does have a cap,

24 because we are agreeing to seven hours of testimony per

25 employee.

1      Then, when it comes to counting 30(b)(6) depositions, I
2  think the drafting could have been a clearer in the
3  submissions, but the way that we're interpreting the
4  protocol is that 30(b)(6) depositions count as one towards
5  the 30 current employee limit, so long as 30(b)(6) testimony
6  does not exceed 21 hours, and if total 30(b)(6) testimony
7  exceeds 21 hours, then each seven additional hours, or a
8  portion of seven hours, will count as one deposition towards
9  the total number of current Facebook employees, and if we
10 have a 30(b)(6) designee also testifying in her individual
11 capacity, that would count as one deposition, so long as it
12 didn't exceed the way 30(b)(6)s are counted under our
13 proposal.

14         THE COURT:  So, if someone testifies for seven
15 hours as an individual, and then another seven hours as a
16 30(b)(6) designee, hypothetically -- I'm not saying that
17 that would be appropriate or whatever, but let's say that
18 happens.  That's one deposition?

19         MS. ANDERSON:  Yes, that would be one deposition
20 under our proposal, but, since it would be exceeding seven
21 hours of testimony, we would either have to get an agreement
22 with Facebook on that or get a court order allowing that 14
23 hours of testimony.

24         THE COURT:  What I'm wondering is, does it make
25 sense to have a different scheme, in the sense that you have

12

1  a presumptive or a guideline number of depositions for

2  individuals only, and then deal with 30(b)(6) depositions

3  entirely separately?  Did the parties consider that?  Does

4  anybody want to consider that?

5           MS. ANDERSON:  The Plaintiffs would consider that.

6           THE COURT:  Okay.  Let me hear from Facebook on

7  the view about what the intersection or interaction is

8  between the proposal for individual depositions and 30(b)(6)

9  depositions.

10          MS. JENNINGS:  Yes.  So our view is that each

11 individual limit would be -- or each individual deposition

12 would be subject to a presumptive seven-hour limit.  The

13 total number of depositions would be subject to a total

14 hours cap that we've calculated by multiplying seven by the

15 total number of depositions, and under our proposal, it's

16 105, which is seven times 15, and that that total hours cap

17 would run -- or both individuals and 30(b)(6) depositions

18 would run against that total hours cap.

19     The intent behind having the 30(b)(6) depositions run

20 against the total hours is to impose some discipline on the

21 use of 30(b)(6) testimony, particularly in the situation

22 that you've identified where the Plaintiffs may wish to --

23 or the Plaintiffs may depose somebody who we think is

24 unnecessary, a corporate representative, may want to take

25 that deposition twice, and to really focus the testimony in

13

1  the 30(b)(6) depositions to the information that is unique

2  to the 30(b)(6) role.

3         THE COURT:  So, in your portion of the submission,

4  Facebook says:

5      "Absent a total hours cap, Facebook foresees that

6      counsel for Plaintiffs may seek to extend every

7      deposition past the seven-hour limit, making the

8      presumptive limit more of a recommendation than a

9      rule."

10     I didn't really understand what you were worried about

11  there.  Why would every deposition somehow be subject to

12  this deviation from the --

13         MS. JENNINGS:  Yes.  Excuse me.  So I think the

14  thinking there is that if you're in a situation where a

15  deposition is close to going over, and there's no overall

16  hours cap, and opposing counsel says, "Can I please just

17  have like another hour with the witness?," maybe you agree

18  to it, and maybe, you know, you have lots of depositions

19  happening simultaneously.

20     There's like 10 depositions scheduled in a week,

21  different people defending every one of those depositions,

22  and then, if each of those depositions goes over a little

23  bit, you end up with a lot more deposition testimony than

24  the parties intended at the outset.  And so the rule there

25  is just kind of to try to help keep some guardrails around

14

1  the deposition process, and to help keep us all efficient in

2  our questioning.

3          THE COURT:  Okay.  So it seems to me the parties

4  have -- well, your goals are not necessarily aligned.  It

5  seems to me that the Plaintiffs are most concerned about

6  being able to talk to the right people, and if there are

7  more than expected right people, the Plaintiffs want to make

8  sure they get the chance to talk to all of them, or enough

9  of them, and the Defendant seems to be most concerned with

10 having some boundaries and controls on discovery, deposition

11 discovery not getting out of hand, because the burden will

12 fall, at least in this dimension fall, most heavily on

13 Facebook.

14      You all do have a number levers to pull in order to

15 accomplish both your goals, and so, you know, nobody needs

16 to be outraged about deposition limits.  Everybody is asking

17 for something that's different from the standard federal

18 rules.  I'm not sure that I'm, like, going to be able to

19 craft the magical, wonderful solution to this, but I will

20 share with you my initial impressions, based on your papers

21 and what you all just told me here, which is 15 is too few,

22 and everybody knows that's too few.  You're going to need

23 more than 15 depositions in this case, but I'm also

24 sensitive things could easily get out of hand, and that

25 discipline is important, and it's not the case that every

15

1  single document custodian should be subject to a deposition.

2      So, you know, like I said, I think that the time limits

3  can be a useful tool.  A cap on the total hours limits

4  requires people to prioritize.  I am not a huge fan of

5  saying, "We'll take depositions first, and then make your

6  showing," because, like I said, I think that this case --

7  it's unrealistic to think that 15 will be sufficient.  So

8  why not do something to address that issue now, by

9  agreement?

10      The 30(b)(6) approach is a little bit more challenging,

11  in the sense that I could imagine a 30(b)(6) deposition

12  notice that is quite extensive and requires many, many

13  people to testify, some of whom may also be deposed as

14  individuals, and there can be an undue burden on an

15  individual witness when that happens, but one thing I

16  thought about is, whatever I conclude about what your

17  starting point is, what may be an appropriate way to deal

18  with the problems that I think Facebook is most concerned

19  about is that if -- well, let me put it this way.

20      If the Plaintiffs waste their depositions, they start

21  taking depositions of people who they don't really need,

22  it's duplicative, all of those kinds of things, and yet they

23  say, "But now we've identified someone for whom we have good

24  cause to depose," maybe there's some cost-shifting that

25  happens at that point, or something else.

1    I believe that injecting discipline into the process is

2  a good thing, but, you know, it also feels to me like this

3  is something that requires a little bit more negotiation

4  amongst the parties, and if we weren't doing this by Zoom, I

5  would maybe send you to my conference room to talk it out

6  some more, but I can just pick a resolution.  I would like

7  get your thoughts on how to sort of cabin things if things

8  get out of hand, but I'm sharing with you my inclinations

9  and my reactions to your briefing and your argument, and if

10 you would like some more time to talk to each other about a

11 resolution that you would all like, as opposed to one I pick

12 for you, I'd like to hear about that as well.

13    So let me start with the Plaintiffs, get a reaction to

14 my observations, and we haven't addressed the remote

15 deposition issue and the counsel in the same room issue yet.

16 I just want to talk about this part of this first.

17      MS. ANDERSON:  As far as the time limits on the

18 total hours cap, you know, we would agree to having a total

19 hours cap calculated the same way that Facebook agreed to

20 calculate its total hours cap in its proposal, which is the

21 number of depositions times seven.  So I think that would be

22 a reasonable total hours cap for the Plaintiffs.

23    As far as 30(b)(6) depositions, and the way that those

24 would count towards the cap, it seems to me that it would

25 make sense to have 30(b)(6) depositions count towards both

17

1 the time limits and the number of depositions, to address

2 your Honor's concern about the burden on individuals if

3 they're being deposed both in a corporate and individual

4 capacity.

5          THE COURT:  So meaning every seven hours or every

6 witness, or both, counts as one, if it's a 30(b)(6)

7 designee?  How are you -- I'm trying to interpret your last

8 remark.

9          MS. ANDERSON:  So, if it's a 30(b)(6) deponent who

10 is also testifying in an individual capacity, that would be

11 one deposition that would count for up to seven hours,

12 depending on how long it lasted.

13          THE COURT:  So, if an individual is deposed, in my

14 hypothetical, for one day as an individual and a second day

15 of seven hours as a designee, that's two?

16          MS. ANDERSON:  Yes.  That would be two.

17          THE COURT:  Okay.  So even if you haven't reached

18 your 21 hours of 30(b)(6) depo time?

19          MS. ANDERSON:  Correct.  Yes.

20          THE COURT:  Okay.  All right.  Let me hear

21 Facebook's reaction.

22          MS. JENNINGS:  Yes, of course, your Honor.  So we

23 have been talking a decent amount with the Plaintiffs.  We

24 haven't made a ton of progress yet, but I think your

25 comments today, and the comments that counsel for Plaintiffs

1 just made, should really help us close that gap.  I think

2 we're happy to sit down and talk it through, and come up

3 with an alternate proposal that incorporates the discussion

4 today.

5            THE COURT:  Okay.  Did Plaintiffs have -- I hope

6 you wouldn't have any objection to discussing this issue

7 further with your colleagues on the defense side?

8            MS. ANDERSON:  No.  That makes a lot of sense to

9 us as well.

10           THE COURT:  Okay.  It's always worrisome when the

11 Court is going to just put some solution for you.

12      Okay.  So let me address the last two matters in this

13 particular discovery brief, and that is the remote

14 deposition versus in-person deposition question, and the

15 related issue of whether the counsel defending the witness

16 can be in the same room as the witness during the

17 deposition, both of which are sort of, you know,

18 pandemic-inspired issues.

19      So, with respect to the remote versus in-person,

20 the parties have framed this issue as really like a

21 burden-shifting problem, and I really feel like there is no

22 default at this time, in the sense that, you know, whose

23 burden is it?  Maybe other judges have reached a different

24 conclusion, but, I mean, we're in the situation that we're

25 in.  As you all, coming out, have observed before, we don't

1    know when it will end and when things will be different.

2    You have a fact discovery deadline, and you need to get your

3    discovery done.

4         My view is, is that, if you really need someone in

5    person for whatever reason -- strategic reasons are

6    super-important -- and you need to be able to have that, you

7    know, that in-person interface with them to be effective,

8    and you can't agree on it, both sides are just going to need

9    to make the case for why the deposition needs to be in

10   person or can't be in person, or can't be delayed, or

11   whatever it is.  I just think it's appropriate to take it on

12   a case-by-case basis, and otherwise you need to do your

13   depositions in a way that complies with, you know, public

14   health requirements and all of those things.

15        So I'm not inclined to sort of say, "The default is

16   this" or "The default is that."  I mean, right now I don't

17   think you all can do in-person depositions safely, but maybe

18   you can.  Maybe there are circumstances in which you can.

19   I'm not going to tell you that you can't.

20        My impression is, is that lawyers have been doing an

21   amazing job with depositions during the pandemic, and video

22   depositions have been really effective, to everyone's

23   surprise.  I would have never thought it could be possible,

24   but I think it is, and for most of your witnesses, probably,

25   it's just fine, but I appreciate that, for some of them, it

1   may not be, and I'm just going to ask you all, if you can't

2   agree on those things, to just bring it to me on a

3   case-by-case basis.

4       As much as I hate to invite more briefing and disputes,

5   I think that's the only way to deal with it, and I'm not

6   going to say, you know, thumb on the scale, "It's this

7   person's burden versus that person's burden," because I

8   think we're just in kind of unusual territory right now.

9       Does anyone want to be heard on that issue?

10  Plaintiffs?

11          MS. ANDERSON:  No, your Honor.

12          THE COURT:  Okay.  The defense?

13          MS. MEHTA:  No, your Honor.

14          THE COURT:  Okay.  So that's my order, we'll say.

15      On the question of whether the counsel defending the

16  witness can be in the same room as the witness during the

17  deposition, I'm not inclined to order that they can't, and

18  my thinking is that you all are very professional, very

19  experienced.  I am not going to assume that anyone is going

20  to behave in an unethical manner.

21      We have a protocol that spells out, you know, how

22  you're going to deal with documents in advance of the

23  deposition.  You know, if I get wind, because someone tells

24  me, that someone is behaving unethically and coaching a

25  witness, and can't be observed, as it would be if you were

1 doing this in person, you know, that will be bad, and I will

2 deal with it.

3     So, you know, I think that Facebook's proposal that the

4 witness' lawyer be on camera, but not recorded, is a

5 helpful -- well, I don't know about the "not recorded" part.

6 I don't quite understand that part.  But Facebook's proposal

7 is, as I understand it, that the witness' lawyer be on

8 camera, so that you can see, if you're the attorney taking

9 the deposition, can see what the behavior is.  That seems

10 like a reasonable precaution.

11     What I don't understand is the "not recording" part,

12 because, if there was some bad behavior going on, and there

13 was no record of it, I'm not sure how you would, you know,

14 share that with me, but maybe you can elaborate.  I don't

15 know if Ms. Jennings is taking that issue, but if you can

16 elaborate on what that meant.

17         MS. JENNINGS:  Yes, of course.  So the idea was

18 just to replicate the same scenario you'd have in an

19 in-person deposition, where the court reporter records

20 the -- or the videographer records the witness, but not the

21 attorneys, and so the video feed would then look just like

22 it would for an in-person deposition, where you'd have just

23 the witness on the screen, and then you heard the attorneys

24 objecting or whatever, but you wouldn't necessarily see them

25 on camera.

22

1          THE COURT:  Okay.  I mean, I have had -- in

2   another matter, I have had parties come to me,

3   mid-deposition, with a concern that, you know, whenever a

4   document was passed to a witness, somehow everybody would

5   turn off their video, and it was the impression of the

6   taking attorney that that lawyer and client were conferring

7   during the deposition about the document.  I'm like, that

8   won't happen, right?  I mean, that's not acceptable in an

9   in-person deposition.  It's not acceptable in a remote

10  deposition.  And I think, if everybody, you know, plays by

11  the normal rules, I'm not really anxious about this being a

12  problem.

13      Having two people in the same room, from a health

14  perspective, is different from having five or six people in

15  the same room for an in-person deposition because, you know,

16  this discussion might then be the question, well, why not

17  just do it in, you know, an in-person deposition, if we're

18  going to allow two people to be in the same room?  I'm not

19  trying to dictate, you know, your public health

20  requirements, but I do think it's important for remote

21  depositions that the witness not be masked.

22      So, you know, that's an important consideration.  I

23  mean, this only works if you can actually see people's

24  faces, and see them speaking, and be able to assess

25  credibility in approximately the same way that you would,

1  you know, in person, and, of course, a videotaped deposition

2  in person is hardly any different from that perspective,

3  from, you know, a fact finder's point of view, than

4  deposition taken by video and also recorded.  So I really --

5  I think, in most situations, nobody is going to be

6  prejudiced by this arrangement.

7          Anybody want to be heard on that particular issue

8  about the lawyer being in the same room?  No.  Okay.

9          MS. ANDERSON:  Yes, your Honor, if I could.

10          THE COURT:  Yes.

11          MS. ANDERSON:  The Plaintiffs' main concern with

12  this provision was that we think it would give Facebook a

13  litigation advantage, and if the default rule is that

14  depositions are going to be remote, then we think they

15  should be remote for all parties, not just the examining

16  party, as Facebook proposes, and then in person for the

17  witness and the defending counsel.

18      We see it as similar to a court hearing.  One party

19  can't show up in person and then force the other party to

20  appear remotely.  There are just advantages to being in

21  person versus being remote, and in our letter brief, on page

22  six, we cite to two cases where the Court held, in the

23  context of the pandemic, that if a party wants their counsel

24  to be present and in person for the depositions, then

25  examining counsel must be allowed to be present and in

24

1 person, too.

2       THE COURT:  Well, I'm not going to order that, and

3 here's why.  I don't think this is really parallel to the

4 situation where you have a court hearing, and some people

5 are remote and some people aren't.  I think it's -- I've had

6 many, many proceedings, including settlement conferences,

7 where I have everybody in a little box on the screen, and

8 others where, you know, the parties are together on their

9 respective sides.  Same thing with hearings.  I've had a

10 client in the room with the lawyer attending, and I've had,

11 you know, people who are in their separate boxes.  I just --

12 I think the prejudice, to the extent there is any, is very,

13 very marginal, and I don't think it's a good parallel.

14     So I disagree, respectfully, with the decisions that

15 have found otherwise.  I don't think there's a litigation

16 advantage.  I think the Plaintiffs can do the same thing, if

17 they wish.  If they wish to be in the same room with

18 their -- Plaintiffs' counsel can be in the same room with

19 Plaintiffs' witness, and it shouldn't be an issue as long as

20 everybody behaves professionally, as they're required to do.

21       I'm sorry, Ms. Anderson, if I cut you off, if

22 there was some other reason.  My apologies, and you can

23 finish your --

24       MS. ANDERSON:  No, your Honor.  I was finished.

25 Thank you.

1          THE COURT:  Okay.  All right.  Did Facebook want

2    to respond on that point at all?

3          MS. MEHTA:  No, your Honor.

4          THE COURT:  Okay.  So I think where we are on this

5    particular dispute is that the parties are going to confer

6    further on number of depositions, length of depositions, and

7    treatment of 30(b)(6) depositions, in light of some

8    observations that I made, and then my order will essentially

9    reflect what I said here about how to resolve the remote

10   versus in person and presence of counsel defending in the

11   same room as the witness.

12       Okay.  Moving on to Docket 132, which is the ESI

13   protocol.  So, on this one, I did have a couple of questions

14   as well.  The first dispute concerns Facebook's request to

15   include text in the ESI order that says:

16             "Responding parties are best situated to

17             evaluate procedures, methodologies, and

18             technologies appropriate to preserving

19             and producing their electronically

20             stored information."

21       I think that proposed text relates to some of other

22   things that are described in the same discovery dispute

23   letter, but, as a general matter, it strikes me as odd that

24   I would be asked to require this text to be in an order,

25   when it -- an ESI order -- when, you know, it's really sort

1 of an either statement of law or statement of operating

2 principle that I wouldn't normally require parties to

3 include in their ESI order.

4     I mean, it's pretty high-level.  It's a pretty, you

5 know, high-level statement of the best practice or something

6 like that.  It just seems like an odd thing, too generic to

7 be useful, but what I understand Facebook to really be

8 saying is "We don't have to agree or cooperate with anybody,

9 or get their approval, before we do a particular thing in

10 terms of preservation, collection, and production of our

11 documents."

12     So that seems to me where this dispute really is, and

13 I'm not inclined to say, "You must include this order" -- or

14 "this text" -- "in the ESI order," but maybe I'm missing the

15 point of this.  If somebody would like to elaborate on that

16 on behalf of Facebook, since this is the piece that you all

17 want?  Ms. Jennings.

18       MS. JENNINGS:  Yes, of course, your Honor.  Molly

19 Jennings.  I will be handling this dispute for Facebook as

20 well.

21     So we think of Sedona Principle 6 as our critical

22 organizing principle here, in light of the way that parties'

23 discussions to date have unfolded.  We've kind of -- as you

24 can see, and as I think you realize, as across the different

25 disputes in the ESI order, there are questions about whether

1 we've provided enough information, or whether the Plaintiffs

2 have provided enough information to us, to allow us to

3 really, like, materially -- or to really advance the ball on

4 our preservation and other obligations here.

5     What we think Sedona Principle 6 really does here is

6 memorializes both the fact that we are best situated to make

7 determinations about how to preserve, collect our own

8 information, because Facebook is a large technology company.

9 We have many document and data sources, many of which aren't

10 going to be relevant here, and the process of educating the

11 Plaintiffs on every single document and data source is just

12 unlikely to be an efficient way to conduct discovery here.

13     What we need is for them to meet us halfway and to

14 cooperate with us, to kind of narrow the universe of what

15 documents and data they're really interested in, so that we

16 can have a meaningful conversation with them about "Okay.

17 So this is the system you care about.  Like, what is a

18 reasonable set of data to preserve from this?  How can we

19 make this work, and how can we preserve or produce in a

20 manner that's proportional to the needs of the case?"

21     Those conversations we just -- we just -- we haven't

22 had a -- we have not had a lot of having as of yet, and

23 that's really what this is getting at, is trying to make

24 sure that we have a framework in which the parties are

25 really kind of doing that, like, "meet in the middle"

1  cooperation.

2       THE COURT:  It just seems to me that the

3  articulation of Sedona Principle 6 is just kind of too

4  generic to be useful, when what you really need is

5  resolution of sort of the nitty-gritty, "How is this going

6  to happen?  How is the preservation going to happen?  What

7  is going to be preserved?," and then, you know, the whole

8  issue that you all briefed about the technology-assisted

9  review and hit reports.

10      So I'm not inclined to say the statement must be

11  included in the ESI order as, you know, an operating

12  principle, because I feel like that would be sort of

13  tantamount to saying, "I'm going to bake into your ESI order

14  a statement of the law that I'm going to apply," or

15  something like that.  It just strikes me as odd.  Maybe

16  other people have done it or people have agreed to it.

17  That's fine, but it seems to me a little bit beside the

18  point.

19      So I think we should discuss the more particular issues

20  that you all have raised, and focus on those, and I would

21  like to understand a little bit more about them, because

22  some of them are briefed at a pretty high level.  You know,

23  you have space limitations, but you have included five

24  issues in one letter, related issues.  I'm not complaining,

25  but, okay.

1      Let's talk about this question of their dispute about

2   the categories of documents and information that should be

3   preserved versus not preserved, in the first instance.  So

4   my first question is for Plaintiff, because -- or, sorry,

5   for Facebook -- because I have a little bit -- I'm not sure

6   I'm understanding Facebook's proposal.  Facebook says:

7                "To the extent that a party identifies

8                relevant information contained in the

9                following sources" -- and this refers to

10               your list, or disputed list -- "in

11               custodial or noncustodial files, the

12               parties will preserve, collect, process,

13               review, and/or produce."

14      So it's the "To the extent that a party identifies."

15   So is Facebook saying they will preserve those listed

16   sources until they review, and then, if Facebook concludes

17   there is nothing relevant or responsive in there, then not

18   preserve thereafter?  The Plaintiffs raise this as an

19   ambiguity in your proposal, and I would like to understand

20   how it's supposed to work.

21               MS. JENNINGS:  Yes, your Honor.  So Facebook's

22   proposal is that we not do a blanket preservation of all of

23   these categories of information at the outset, but that we

24   take a targeted approach to preservation, where we take --

25   where both we and the Plaintiffs, to the extent they have

30

1 thoughts on this, take efforts to identify -- to the extent

2 we identify information that's likely to be relevant falling

3 into any of these categories, we then make sure that it's

4 retained and preserved, and I think that --

5          THE COURT:  I'm sorry.  But at this point, like,

6 where we're starting right now, all of this stuff has been

7 preserved?

8          MS. JENNINGS:  I think most of this preserved

9 pursuant to normal business retention practices.

10          THE COURT:  Okay.  So our starting point is, stuff

11 is preserved right now that falls into Categories One

12 through 16 in -- hold on.  I'm looking at the redline

13 version.  So it's Subsection 4(e).  So right now everybody

14 is preserving all of these things, and the question is "What

15 can we cease preserving?"  And Facebook's proposal is "We

16 shouldn't have to preserve any of this stuff in 4(e)."

17          MS. JENNINGS:  Yes.  So I do want to make one

18 clarifying point, which is that the relevant time period for

19 this case stretches all the way back to 2005, and so it's

20 not the case that we have materials from all the way back to

21 2007 falling into all of these buckets.  So I think that's

22 an important level set here, is that we have the materials

23 that we have, and we're trying to figure out what we need to

24 preserve.

25          THE COURT:  You need to -- okay.  So, then, back

1 to my initial question.  To the extent that a party

2 identifies relevant information, how is that going to

3 happen?  Is that an observation that the party whose

4 documents they are will identify relevant information, or

5 are you saying, "We need the Plaintiffs to tell us what

6 relevant information might be in a backup case"?  Is that

7 what you're suggesting?

8　　　　MS. JENNINGS:  No, your Honor.  So we

9 intentionally used "parties" there to reflect that either

10 party could raise a potential -- raise an idea of

11 information that might be relevant that falls into one of

12 these sources.

13　　So Facebook is doing its own preservation process,

14 speaking with potential document custodians, working

15 through, identifying information within these categories,

16 and then, to the extent Plaintiffs think that particular

17 categories of information are going to be particularly

18 relevant to their claims, we will preserve that.

19　　We preserve information that's relevant to the claims

20 or defenses as alleged in the complaint, and that's the

21 effort that's ongoing at Facebook, and to the extent

22 Plaintiffs want to have some input into that, we're willing

23 to take that into account.  We just don't, at this point,

24 have any kind of sense of what they're seeing in these

25 different categories that is likely to be relevant.

32

1          THE COURT:  So I think that -- I'll let the

2     Plaintiffs address that, but I think they are -- part of

3     their response will be "Where are your documents?"  And we

4     don't have, really, a lot of insight into what there is.  So

5     let me just take backup systems.

6          I mean, backup tapes are -- in my understanding, to the

7     extent they exist, it's extremely expensive for an

8     organization to preserve and not write over them, and,

9     generally, things that are on backup tapes aren't subject to

10    preservation, absent some unusual or particular request,

11    meaning, was this custodian who left the company the only

12    source of information relating to -- that critical person's

13    e-mail communications, documents is on a backup tape, and

14    that must be preserved and extracted or else we will lose

15    for all time this person's critical information, like, that

16    kind of argument.

17         Otherwise, I mean, I'm not sure how the Plaintiffs

18    would necessarily know to present to you, "We need this

19    source of information preserved because it contains X, Y,

20    and Z information."  They're just not going to know that,

21    unless I'm mistaken.  How would they know that?

22          MS. JENNINGS:  So I guess two points there, your

23    Honor.  One is that we taken our own preservation obligation

24    seriously, and so we are -- like, Facebook is taking steps

25    to preserve all of that information here.

1    The second point is that the Plaintiffs at this point

2 have 12,000,000 pages of our internal documents.  This isn't

3 kind of the usual preservation situation you see at the

4 outset of a case.  They have lots and lots of information,

5 and to the extent they're seeing things in that that make

6 them concerns about specific custodians, we are happy to

7 entertain that, but, absent that, we are doing our process.

8 We are making efforts to identify relevant information, and

9 we're preserving it where we find it.

10    It's also exactly right that these backup tapes are

11 extremely burdensome to preserve, and so I think kind of

12 something that's important to understand about the

13 alternative that Plaintiffs have proposed for backup tapes

14 is just straight-up indefinite preservation of them.  We had

15 initially proposed that we would preserve them pursuant to

16 normal business retention.  They weren't willing to agree to

17 that, and that's how we wound up with this kind of

18 "compromise position" language that we're talking about now,

19 which is the idea that we would preserve information from

20 those materials to the extent we identify information,

21 relevant information that might potentially be discoverable.

22          THE COURT:  So back to my original question.  Are

23 you suggesting, then, that Facebook is actually going to

24 review all of these sources of information for potentially

25 responsive material, and preserve if it finds some, and not

34

1  preserve if it doesn't?  Is that how 4(e) would work?

2          MS. JENNINGS:  So I think the reference point is

3  that Facebook's process generally is that they conduct

4  custodial interviews and identify information through that.

5  So it would probably work through custodians, as opposed

6  to -- like, there's no single repository, for example, of,

7  like, every voice-mail that somebody received at the

8  company.  So it's not like someone is going to go through

9  and review every voice-mail, but to the extent a custodian

10 says, "I have voice-mails relevant that issue," then we

11 would look into preserving that information.

12         THE COURT:  But it has to already be preserved in

13 order for you to look for it, right?  Isn't that the problem

14 that we all are having, is that it's going to take you a

15 long time to do that investigation?  In the meantime, what

16 happens to these sources that you all are fighting about?  I

17 mean, anyway, that seems to me to be at least part of the

18 problem.  Let me --

19         MS. JENNINGS:  Yes.

20         THE COURT:  Go ahead.  I'll let you finish your

21 remarks on that, Ms. Jennings.

22         MS. JENNINGS:  Yes, of course.  And the last thing

23 I was going to add is just this wholesale blanket

24 preservation at the outset just simply isn't feasible, given

25 the volume of information we're talking about for some of

1  these categories of information, and the likely relevance of

2  the information contained within these sources, the claims

3  and defenses here, and so it's just -- it's very -- making

4  this kind of wholesale preservation at this point, we just

5  don't know that we have a justification for preserving every

6  single voice-mail in the company right now, is where we are.

7          THE COURT:  All right.  Let me hear from the

8  Plaintiffs.  Who is speaking on this issue?

9          MS. SCHMIT:  Michelle Schmit on behalf of the

10 Plaintiffs, your Honor.

11         THE COURT:  Can I ask you, Ms. Schmit, to just

12 start -- before I lose my train of thought -- start at where

13 we left off with Facebook, which is, it seems to me like not

14 all of these sources are sort of equally burdensome or

15 equally relevant, sort of equally burdensome to preserve or

16 equally relevant to the case, and the briefing that I have

17 from both parties is not really kind of in the -- except on

18 a couple of things, is not really sufficiently specific for

19 me to understand if there are, you know, certain sources

20 here that are really important to the Plaintiffs, if you

21 think there's likely to be material that should be preserved

22 so that discovery can play out and this material can be

23 searched, and others where, you know, the parties could

24 pretty much agree that it's unlikely to be useful

25 information.

36

1       So can you start on that, with that point?

2              MS. SCHMIT:  Sure.  So, with respect to the list,

3   I agree with your Honor that there are certainly things on

4   the list we're more concerned about than others.  So, to

5   highlight the most important things that absolutely would

6   need to be preserved, from Plaintiffs' perspective, that

7   would be text messages, chats, and voice-mails, to the

8   extent relevant.  So that's --

9              THE COURT:  So that's item six and item five?

10             MS. SCHMIT:  Five, six, and nine.

11             THE COURT:  And solely contained on mobile

12  devices?  Whose mobile devices?

13             MS. SCHMIT:  I think it would be a custodian's

14  mobile device, where the custodian has a text -- you know,

15  uses text messages for work, for example, and, therefore,

16  may have responsive text messages.  Something like that

17  could be identified in a custodial interview.

18             THE COURT:  Is there currently a list of such

19  custodians, either by specific name or by, like, position

20  description or something like that?

21             MS. SCHMIT:  So that's a dispute that's raised a

22  little bit later, but what we have from Facebook right now

23  is a list of custodians for the FTC investigation.  We

24  haven't requested from Facebook a list of custodians for

25  this case, because Facebook has indicated to us that the

1  list from the FTC investigation is under-inclusive.

2  Facebook has not agreed to provide that list to us, at least

3  at this juncture.

4      Facebook's position has been that we should look at the

5  list from the FTC, and if they have other custodians that we

6  would like on the list, we should raise them affirmatively.

7  Of course, we don't have the information that Facebook has.

8  We think it makes sense to be starting from a comprehensive

9  list of custodians that Facebook is actually preserving

10  from, and that list should be provided to us.

11      So that's a dispute that comes up later, but, given

12  the, you know, 90-plus custodians that are on the list for

13  the FTC investigation, you know, it seems highly likely that

14  at least certain of those custodians are using their mobile

15  devices to text for work.  This is why we asked the

16  Defendants, you know, we asked Facebook, "Have you done

17  custodial interviews?," not to get into the content of the

18  custodial interviews, but to understand where Facebook's

19  position is coming from.

20      It seems very premature for Facebook to say at the

21  outset of the case that text messages are too burdensome to

22  even need to be preserved, when we have no idea from the

23  Plaintiffs' perspective what Facebook has done to date to

24  identify whether there are, in fact, relevant text messages

25  that should be being preserved.

38

1      So it's not the Plaintiffs' position that Facebook

2  needs to go out and preserve, you know, mobile devices for

3  every employee within Facebook.  That's, of course, not the

4  Plaintiffs' position.  We just don't think it's appropriate

5  to be including things on a list here as not reasonably

6  accessible, such that these items do not need to be

7  preserved, when we don't know at this point whether they

8  include relevant instruction for not, or what Facebook has

9  done to make that determination.

10           THE COURT:  Let me ask the flip side of that

11  question.  Do you have reason to believe that there would be

12  relevant information in people's texts?  I mean, is there

13  any discovery that you've received so far, anything in your

14  own investigation, that suggests that people who may have

15  said or done things that support your claims or relate to

16  your claims used text messages to communicate about those

17  things?

18           MS. SCHMIT:  I can't speak to that at the level of

19  specifics, as to what's been produced to date.  I think

20  Brian would like to speak.

21           MR. DUNNE:  Yes.

22           MS. SCHMIT:  You're welcome.

23           MR. DUNNE:  Yes, your Honor.  Brian Dunne.

24      So yes, there are two -- there are a couple of things

25  that are referenced in the current production.  There's

39

1   many, many references to Facebook messages, and it's our
2   understanding that those can be used on mobile devices.
3   There's also, among other things, public recording that lots
4   of top-level executives, including from Mark Zuckerberg on
5   down, with specific names, communicate regularly via chats
6   or instant messages.

7        Now, if you do an "all" search of the production that
8   we've seen so far for the word "text messages," you see a
9   lot of hits.  Now, a lot of them are, you know, false
10  positives.  They just say, "Text."  But my view, from what
11  we've seen -- and we've looked specifically for it -- is
12  that there's a large degree of business being conducted over
13  mobile devices, including through messages, and that's why
14  we have a significant concern about making sure that those
15  are preserved.

16       Now, look.  We don't have the granularity of having
17  pretty much any natively produced messages from mobile
18  devices.  We have ones that are backed up, the e-mail
19  servers, which is, of course, a slightly separate issue,
20  but, from what I can gather, from having gone through --
21  and, again, it is a large production, but we have
22  specifically looked at this.  There are indeed documents
23  that reference to messages between people.  It's not always
24  clear what they mean by "messages," but they're clearly not
25  referring to e-mails there.

40

1     We also do have archived Facebook chats, which I

2   believe they switched to a different messaging system

3   internally after that, but, you know, these appear to be

4   people that do correspond via mobile devices, including

5   about issues like "Well, can you go talk to this developer?

6   Can you go talk to Cheryl's (phonetic) friend developer?"

7   Right?  And this stuff does not necessarily appear to be

8   conducted via e-mail.  That's important, too, among other

9   things, especially for the advertisers, our Section 2

10  claims, right, and the exclusion, and so that -- we have

11  seen things on, as your Honor noted, six, right, the instant

12  messages, and nine, which would be important.

13     I want to add, for advertisers' perspective, the reason

14  that we referred specifically to sound recordings and video

15  recordings is because -- I'm not sure whether your Honor is

16  aware, but the advertiser Plaintiffs have to prove

17  fraudulent concealment, assuming we make it past the motion

18  to dismiss, on certain aspects of the time limits of our

19  case.  Our allegations of fraudulent concealment pertain,

20  among other things, to public statements, some of which were

21  at conferences that were video-recorded or audio-recorded by

22  Facebook.  We want to make sure that that stuff is

23  preserved.

24          THE COURT:  I see.  Okay.  Voice-mail messages,

25  that seems like a pretty hard category to -- I mean, I'm not

41

1   sure what that -- if it goes back a long time, I'm not sure

2   what the capability of Facebook's voice-mail message system

3   is, but I know, in recent years, it is possible to save

4   audio recordings, somewhat.  But why do you all think the

5   voice-mail messages -- that was one of the categories that

6   Ms. Schmit referenced.  Why are voice-mail messages

7   important to you?

8           MR. DUNNE:  So they're -- I mean, again, we did

9   look for voice-mails.  I don't think we have any

10  voice-mails.  We have references to voice-mails.  I think

11  this is essentially -- you know, as your Honor would be, and

12  I think everyone is aware here, it's a matter of balancing.

13  If the issue is, right, some sort of follow-up, to talk to

14  Facebook about what we've seen as to make a particularized

15  showing on this, you know, that's something I think we could

16  probably do.

17      From the -- we have, you know, it's -- the documents we

18  have are reasonably searchable right now.  I've seen

19  references to voice-mail, like "Hey.  I have a voice-mail

20  from X on this issue."  The real question is, Facebook has

21  basically said -- I mean, it's in their draft that this

22  stuff should be categorically excluded from preservation.

23  So that precludes us from basically going to them and

24  saying, "Well, do you have this?"

25          THE COURT:  And I understand from the redline that

1   the disputed things are in highlighted text.  So the things

2   that are not underlined, for example, are things that you

3   all agree on.  So you all agree, if I understand correctly,

4   that deleted slack fragment or allocated data doesn't need

5   to be preserved.

6        So items, you know, one through four, for example, and

7   items 12 -- well, I think 10 is now disputed, but 12 and 13

8   also don't need to be disputed -- or aren't disputed.  Is

9   that correct, from the Plaintiffs' perspective?  I'm

10  looking, again, at 4(e), Attachment A to your letter.

11           MS. SCHMIT:  That's correct from Plaintiffs' view,

12  yes.

13           THE COURT:  Okay.  All right.  So let me just ask

14  a question, because, you know, Facebook has made, from my

15  view, a particularized showing for why item 10, mobile

16  device and smart device activity logs, ought to be preserved

17  by the Plaintiffs, and yet this is showing up here on this

18  list of things that could be disputed, which I think -- I'm

19  not sure exactly why that is, but the letter suggests that

20  Facebook wants that from you all.  Why shouldn't you all

21  preserve those things?

22           MS. SCHMIT:  So we're not taking the position that

23  we should not preserve this.  The Plaintiffs thought this

24  was agreed to, because it was Facebook that actually

25  proposed that activity logs would not need to be preserved,

43

1  and then we -- from mobile devices, we expanded that to
2  smart devices, and, as you can see in the protocol, this
3  appeared to us to be agreed to.  Once we received Facebook's
4  briefing, in a separate letter from Facebook, it was clear
5  to us that this is not agreed to.
6      From our perspective, this is not reasonably
7  accessible, it's not relevant, it's not proportional, and
8  it's certainly not something that we would agree to produce,
9  but that's a fight for another day.  Because of Facebook's
10 demand that this be preserved, we have been taking efforts,
11 including retaining a vendor to specifically preserve
12 activity logs, to the extent that that's possible.  We're
13 working with a vendor to understand the extent that that's
14 possible.
15     It's not clear to us at all that an individual can even
16 preserve these logs themselves, so that would need, you
17 know, a forensic vendor to do that, and we've been working
18 with a vendor in light of Facebook's demand.  So that's a
19 dispute I think we can -- you know, we are preserving them.
20 We certainly do not agree to produce them, but I think
21 that's a dispute for another day.  But we are taking steps
22 to preserve.
23         THE COURT:  Okay.  So, on that point, the
24 Plaintiffs did raise this idea or this suggestion that there
25 could be some forensic preservation, maybe of this material,

44

1  maybe of other materials.  Have the parties talked about

2  whether the burden associated with some of these issues can

3  be addressed by, you know, having sort of a snapshot

4  preservation of some of these things, particularly things

5  that go back a really long time?

6       I imagine there could be a lot of expense associated

7  with some of these items, but maybe there's a way to sort of

8  take the snapshot, you know, if everybody agreed that it's

9  not going to be sort of a cumulative preservation

10  aggregation.  It's like, "We do it now, and we preserve

11  whatever is there, and then we fight about what's

12  discoverable and producible later."

13       So let me ask the Plaintiffs that question.  Has that

14  been a subject of discussion or investigation in your

15  meet-and-confers?

16            MS. SCHMIT:  From the perspective of the

17  Plaintiffs' obligations, this has not be the subject of a

18  meet-and-confer to date, to my knowledge, but your Honor's

19  suggestion makes a lot of sense.  Otherwise, the Plaintiffs

20  are in a position where we go in and we have a forensic

21  collect now.  Do we need to do that again, you know, in two

22  months from now or two months from now (sic)?  So it

23  wouldn't make sense for us to have a snapshot and to do that

24  now.  We might need to, you know, cumulatively be doing this

25  from the perspective of, you know, Facebook's burden or what

45

1  Facebook needs to preserve.

2      To be completely candid, this list of 16 categories,

3  all of which came from Facebook, came without Facebook

4  describing the burden associated with keeping any of these

5  things.  So the Plaintiffs don't have, you know, the

6  information, any particularized information from Facebook,

7  to know what is the real burden of preserving this

8  information.  So we've been negotiating with Facebook on

9  this kind of in a vacuum, from the Plaintiffs' perspective.

10            THE COURT:  Okay.  Let me turn back to Facebook,

11  and I would like to hear your thoughts about whether, you

12  know, doing sort of a snapshot, sort of forensic

13  preservation of data is, like, a feasible approach for any

14  of these categories that have been disputed, whether you all

15  have investigated that, and I have a related question, which

16  is, you know, given that there are these parallel

17  litigations and investigations going on, you know, are we

18  talking about something that has already been preserved,

19  reviewed?

20      I'm just wondering whether we're debating something

21  that is already taken care of, at least in part, by what

22  you've had to do in connection with your obligations in

23  these others matters.  That may not be a very

24  well-formulated question, but I'm just -- I don't have

25  enough information to resolve this dispute.  It should be

46

1  apparent from my questions.  It's at too high a level, and

2  so I'm trying to curb some of the options here.

3       So who's going to address that on behalf of Facebook?

4            MS. JENNINGS:  I will, your Honor.

5            THE COURT:  Okay.

6            MS. JENNINGS:  And so, your Honor, here, just kind

7  of taking a step back for a minute, these different

8  categories of information are information that,

9  historically, we haven't found have a lot of relevant

10 information for litigation purposes.  We have a list that we

11 often propose in litigation.  We proposed it to the

12 Plaintiffs, and we then had, like, five and a half -- or

13 five or five and a half hours of discussion by phone, and

14 then we exchanged redlines on these issues, all the while

15 trying to narrow the universe of disputes.

16      We understand their position that we haven't provided

17 them specific information about the burden, but we're

18 sitting here trying to figure out how to propose some kind

19 of reasonable alternative to wholesale preservation without

20 understanding exactly what they think is likely to be useful

21 out of these documents.  So, like, all of that -- the

22 majority of what Mr. Dunne told you today, it didn't come

23 out for our meet-and-confers, and so that's really helpful

24 information to us.  That's information that we can take back

25 and use to propose a preservation plan that really works.

47

1     And so I'd say that, and then the other high-level

2  point that you started to get to is that the parties aren't

3  writing on a blank slate here.  The FTC investigation began

4  back in June 2019, and so we are talking about information

5  that's been -- the FTC investigation is also, in some ways,

6  broader than the case here.  The FTC investigated issues

7  that aren't before the Court in the current litigation, and

8  so there's a large preservation effort that took place in

9  connection with that.

10     We gave the Plaintiffs a list of all the custodians for

11  whom we produced documents in that case.  It was 91 people,

12  which is often more than you see in an entire case of this

13  magnitude, and so the idea that there's relevant information

14  being lost, I think, is really being overblown here.  We're

15  really talking about kind of marginal categories of

16  information that we think the Plaintiffs ought to be able to

17  help us identify, with the benefit of the 12,000,000 pages

18  of documents that they've already received.

19          THE COURT:  Okay.  It may take them some time to

20  get through the 12,000,000 pages.  So I'm not sure that's,

21  like, necessarily the right sort of framework to put it in,

22  but what about the idea of doing some kind of forensic grab

23  of data?  Has that already -- you know, effectively, if

24  you've already done a production of any of these sources, or

25  if your production includes any of these sources, maybe you

48

1 can say, "I've already done that."

2     If it hasn't, and let's say, you know, based on the

3 arguments that Ms. Schmit and Mr. Dunne presented, there is,

4 like, a good justification for thinking that some sound and

5 video recordings, or some text messages or chat messages are

6 going to be relevant and responsive, because that's how

7 people communicated in the company, you know, is there a way

8 to preserve those categories, snapshot-wise, you know,

9 without substantial burden, and then sort out, you know,

10 which custodians' text messages or chats, or which time

11 period, or, you know, what are the keyboard searches that

12 you're going to do to figure out if there are, you know,

13 those kind of things?

14         MS. JENNINGS:  Yes.  And so I can't speak to how,

15 exactly, a snapshot would work here, standing here today,

16 but I think that the overall picture is just that we're

17 talking about an extraordinarily -- a long period of time,

18 and a lot of information.  And so the process that we're

19 going through is trying to identify individuals with

20 information, and then identify -- go out from there.

21     So, for example, I think, if you take the information

22 contained solely on mobile devices, as an example, if

23 information is on a person's mobile device, and they're not

24 identified as a custodian, we have no -- we have to go out

25 and get that, to preserve it, right?  There's not like a

1  button we can put (sic) to preserve everything that's

2  contained solely on someone's mobile device that the company

3  doesn't own.

4         THE COURT:  Right.  Yes.

5         MS. JENNINGS:  And so there's a process that we

6  have to go through to identify relevant information and then

7  preserve it.

8         THE COURT:  Okay.  Like I said before, I don't

9  think I have enough information to resolve this dispute.  It

10  also seems like this is another area that you all should

11  talk to each other more, but I think your discussions have

12  to be informed by a couple of considerations.

13      There are some categories on here that just don't make

14  sense as either a blanket "Preserve" or a blanket "Don't

15  preserve."  They're really custodian-specific or

16  role-specific, like, even if you don't know the custodian's

17  name, and maybe you can start with the list of 80, and the

18  initial disclosures, but, you know, some people's mobile

19  phone information may be relevant for a particular reason,

20  and other people's not, and there needs to be some

21  discussion of who falls into that category and who doesn't.

22      I would expect that, for most people who don't need to

23  preserve all information contained solely on their mobile

24  devices, that seems like an extraordinarily unusual

25  obligation, if there are Facebook messages, chats, other

50

1  things that are preserved elsewhere.  For other people, it

2  may be that you can make, as Mr. Dunne did, a case for why

3  their voice-mail messages for a certain period of time

4  that's relevant to the claims should be preserved, because

5  there is information in the existing production that

6  suggests that's how they're communicated.  Same thing for

7  sound recordings or video recordings of people at

8  conferences.

9      You know, you just -- you're going to -- both sides are

10  going to need to articulate their rationale.  The Plaintiffs

11  don't have perfect information about what Facebook's, you

12  know, systems are or who has what, and Facebook needs to

13  share some information about that in order for this to be

14  productive.

15      So, for example, backup systems.  I would be surprised

16  if a backup system needed to be preserved.  You need to have

17  a good reason, you know, but a good reason could be "There's

18  a key witness on your list of 80 custodians.  They're no

19  longer with the company.  We need information about X, and

20  where is that?"  If it's no longer preserved, you know, this

21  backup tape is going to be super-important.  I'm making this

22  up.  I don't know if this even exists.  But you have to have

23  a really good reason to require someone to preserve backup

24  tapes.  I mean, maybe things have changed, but, you know,

25  based on my experience when I used to practice, this is an

1  extraordinary expense for any company, and I don't have any

2  basis in your submissions to know the answer to the question

3  with that.

4      So here's what I'm going to do.  I'm going to require

5  you all to talk further, to share some information, and

6  we're going to get to in a little bit sort of guidance about

7  what information is to be shared, but share information with

8  each other that allows you all to have a conversation about

9  the merits of the disputed categories, and then I want

10  another submission, if you can't agree, that articulates why

11  somebody should or should not preserve this information, and

12  it should include a reference to the burden, if that's the

13  issue, and it should include a reference to what you expect

14  to find in there, in that particular category, because I

15  just can't decide on the basis of the record.  Sorry about

16  that.

17      How much time do you all think you need to accomplish

18  two things, confirm and do another submission?

19          MS. SCHMIT:  I think two weeks would be reasonable

20  for that, give us about a week to confirm, then a week to

21  exchange letter briefs, to the extent that that's necessary.

22  Hopefully, it won't be.

23          THE COURT:  What about Facebook?

24          MS. JENNINGS:  We'd prefer four weeks, your Honor,

25  to the extent we need to do investigation on specific items,

1  I think we want to make sure we have the time to do that

2  correctly.

3          THE COURT:  Can I just ask you another question I

4  should have asked earlier?  Am I correct that nobody has

5  served discovery yet, that there's no -- or have there been

6  document requests served?

7          MS. JENNINGS:  We served document requests on the

8  Plaintiffs last week.

9          THE COURT:  Okay.  And the Plaintiffs, what's your

10  status in terms of serving discovery?

11          MS. SCHMIT:  I anticipate we'll be serving

12  discovery, but have not to date.  We've been reviewing the

13  12,000,000 of documents to date, to identify the discovery

14  that we should -- we plan to serve.

15          THE COURT:  Would it be helpful through

16  discussions -- this is a question for Plaintiffs -- to have

17  kind of gone through the process of articulating what

18  discovery -- what at least your first round of document

19  requests is going to cover?  And then you could say, you

20  know, "According to this, these documents," and "This is

21  what" -- you know, "We've asked for them, and we expect them

22  to be in this category."  Is that going to be useful?  I

23  don't want to delay things unnecessarily, but it might be.

24          MS. SCHMIT:  I'm not sure from our perspective

25  that it's necessary, but we're happy to do that, if that's

53

1  helpful, and we have been drafting discovery, and we're

2  happy to serve discovery, if you think that that will add

3  additional framing to this.  I'm not sure, you know,

4  whether -- I think really the question is, you know, to the

5  80 or 90 or 100 custodians, however many it is, on a

6  custodian-by-custodian basis, who has relevant information

7  in these categories.

8      So, to your point, does this custodian, you know, have

9  text messages relating to this case on their mobile phone, I

10  think that's really a question that Facebook is kind of best

11  positioned to answer through a custodial interview.  We can

12  search the documents that we have have, understanding that,

13  you know, we're not going to have certain things, to try to

14  attempt to make a showing as well, but I think that

15  information is largely within Facebook's possession now, and

16  is something that they could give us now to move us along,

17  but if serving our document requests sooner, rather than

18  later, helps to frame this, we're happy to do that.

19          THE COURT:  Well, given that you have some

20  examples, and Mr. Dunne referred to them, might it be useful

21  to be able to say, "Here's an example of, you know, a

22  custodian who was communicating via text message.  So, you

23  know, this person's role was whatever it was.  We think

24  other people in a similar situation are going to have

25  similar kinds of communications."  And then the question

1  could be "Are these text messages preserved somewhere?  Are

2  they backed up somewhere in some system, or can they only be

3  obtained by examining or taking a forensic, you know,

4  snapshot of that person's phone?"

5      Those are the kinds of technical questions that you all

6  are going to need to have, because, you know, it's, I

7  imagine, quite a bit more burdensome to say, "Are we going

8  to take some forensic snapshot of an individual's phone,

9  with all the stuff that's on there, and preserve that?," as

10 opposed to "We've got a system where all the stuff gets

11 backed up, and we can extract from that system, and we just

12 centrally preserve that system for these people, over this

13 period of time, and go from there"?

14      I mean, those are the technical things that you all

15 should be talking about, but I think the Plaintiffs can do a

16 lot by sharing examples from the production that you already

17 have that inspire your concern that there are categories of

18 sources of information that need to be preserved, or else

19 you're going to lose relevant information.

20      So it's a two-way street here, and I would -- you know,

21 I would encourage you all to -- you all have not been

22 dilatory.  I'm not suggesting that.  You know, discovery

23 needs to get done, but I would like for you to work through

24 this process and not be unduly pressured from some

25 artificial time constraint on my part.

1      So I'm happy to do four weeks, and with that idea that

2  I expect it will take a couple weeks, and maybe some long

3  discussions, and people going back and investigating things

4  in order to get to some kind of resolution where there's

5  partial agreement before you come back to me.  So I'll go

6  with the four-week suggestion that Facebook mentioned for

7  further submission on this point.

8      Okay.  And technology-assisted review.  Okay.

9  Technology-assisted review is usually a good thing.  Often

10  parties reach agreement, but not always.  Here it's not

11  symmetrical.  You know, the Plaintiffs aren't going to be

12  doing any technology-assisted reviews, as far as I

13  understand, and the burden falls solely on Facebook.

14      My general thought about this item of your dispute is

15  that, you know, Facebook should be prepared to answer

16  reasonable questions that will allow the Plaintiffs to

17  assess whether the approach they're taking or whatever

18  they're doing to identify responsive documents is

19  reasonable, but I'm not going to require that there be an

20  agreement or cooperation of the kind that I think the

21  Plaintiffs envision.

22      I don't agree that there is a justification in the case

23  law for requiring that, but, at the same time, you are going

24  to have a lot of disputes if there isn't, you know, sort of

25  a reasonable kind of communication between the parties

1  about, you know, the nature of what is being done.  And I

2  don't mean to be vague about this, but the dispute is at a

3  very high level as well, this one is.

4       So I'm not really sure what the Plaintiffs are going to

5  object to, or would object to if they only knew it was

6  happening, and this kind of bleeds into the hit reports kind

7  of discussion.  So I'll just share my observations on that,

8  and then I'll hear from you all.

9       My sense is, is that the important question when you're

10 assessing hits from key word searches is, how good are your

11 search terms in identifying the relevant and responsive

12 documents, without missing too many things that are

13 responsive and not hit?  You know, you don't want too many

14 false positives, too many false negatives, right?  You want

15 to have to have good search terms, and then you review

16 whatever that's hit for responsiveness.

17      So my general thought about this is that the total

18 hits, or the total hits per custodian, is not really an

19 informative metric.  So it seems to me that Plaintiffs want

20 to know, for a given custodian, how many hits total for that

21 custodian, or maybe how many hits as a percentage of the

22 total collection of documents -- I'm not really sure -- for

23 that particular custodian, and then hope to use that as a

24 way to evaluate the quality of the search, and I don't

25 really understand that.  So I may be misunderstanding what

57

1  Plaintiffs' position is, but that seemed like sort of the

2  wrong focus for the effort here.

3       Who is addressing that on behalf of the Plaintiffs?

4            MS. SCHMIT:  I'll be addressing that as well, your

5  Honor.  I think, from -- I'm more like taking a step back at

6  a high level (sic).  Our concern here is that when we were

7  first discussing technology-assisted review, Facebook's

8  position was that they would not need to inform us whether

9  they were using that.  When we were first discussing search

10 terms, you know, Facebook's position was that they don't

11 need to provide any hit reports.

12      So it may be, for example, that the Plaintiffs want to

13 be -- want a certain term run that is very important to the

14 Plaintiffs, and Facebook is saying that it's too burdensome

15 to run that term, but if Facebook is not going to provide

16 any information about its document review process such that

17 we can evaluate that burden through a hit report, you know,

18 we are very disadvantaged when it comes to information on

19 that point.  So it's not that Plaintiffs want to be managing

20 Facebook's document review.  We completely agree with

21 Facebook that it's Facebook's obligation to meet its own

22 preservation obligations.

23      So that's not really where the dispute here is.  I

24 think the dispute is about the Plaintiffs having even the

25 basic-level information that you would need to assess the

58

1  transparency of the review that's happening, and that

2  typically requires knowing, for example, that TAR is

3  happening, knowing the source of the documents that are

4  subject to TAR versus the documents that are not, so, for

5  example, whether only custodial documents are being reviewed

6  by TAR, as opposed to noncustodial or database documents,

7  knowing how the sample set that was being used to train the

8  TAR algorithm -- how that relevance is being, you know,

9  determined.

10      It's really just sort of the base-level things that

11 Plaintiffs -- we can't -- given, you know, Facebook's sort

12 of initial positions that are tempered a little bit in their

13 final positions, that they really don't have to provide any

14 information on this, and that's Facebook's obligation, that

15 leaves Plaintiffs in this unfortunate position where we're

16 unable to make any headway in a meet-and-confer, because

17 Plaintiffs' position is that it doesn't have to meet and

18 confer, and it doesn't have to cooperate on this point.

19      So, when it comes to search term hit reports, I think

20 the actual content of those reports, you know, can be

21 debated.  I think unique hits is typically the most helpful

22 metric on a search term hit report, you know, the unique

23 hits, whether it's on a custodial basis or not, but we want

24 to be able to have a process where, if we're discussing

25 search terms, you know, Facebook is providing us the

1 information that we need to assess whether our search terms

2 are, in fact, fair, or they are perhaps too burdensome, and

3 if Facebook won't provide any of that information, we see a

4 lot of potential issues in the meet-and-confer process, when

5 we're trying to negotiate a lot of these discovery issues.

6          THE COURT:  So, you know, I took the point that --

7 and I think Facebook has moderated its position, at least

8 as -- it's a more moderate position that's reflected in the

9 letter, which is, they don't have any objection to telling

10 you that they're using technology-assisted review, but

11 when you started speaking about what about the

12 technology-assisted review you want them to share with you,

13 it got more and more granular, and I think that's really

14 where the dispute is, is that Facebook is resisting sharing

15 the details of its technology-assisted review.

16     What I think is most useful here -- and this also

17 relates to the hit reports, because your worry is --

18 Facebook's worry is it's over-inclusive and too burdensome.

19 That's not your worry.  You don't really care, right?  And

20 you have, you know, a set of search terms, and they require

21 Facebook to review too many documents, and it's a burden on

22 Facebook.  If Facebook is willing to do that, fine, as long

23 as it doesn't take too long, but you're really concerned

24 about it being under-inclusive, if I'm not mistaken, that

25 the search terms aren't clear enough, that they're missing

60

1 things.

2      So I think there are different techniques for assessing

3 those problems.  There's this idea of, you know, sort a null

4 set of documents that are sort of randomly selected, and

5 then you probe.  I've seen parties agree to those kinds of

6 things, either as a part of technology-assisted review or

7 totally independent from any kind of, you know, AI features

8 of that.  I mean, there are things that you often do to

9 address concerns about under-inclusivity, just as you can do

10 things about addressing unduly burdensome kinds of concerns.

11      I feel a little bit like what we're talking about here

12 is sort of premature, because nobody has told me what is the

13 volume, how many custodians, how many noncustodians.  You

14 know, I think it's relevant to have a discussion about

15 things at a high level, about is there some standard TAR

16 process that, you know, the vendors use that Facebook is

17 going to employ, and this is just kind of a normal thing?

18 Like, why not share that information?

19      It seems strange that that would be compromising some

20 strategic or privacy or some other interest that Facebook

21 would have, some question of privilege or those kinds of

22 things, and there's a level of information I think you can

23 share that doesn't impose on Facebook sort of an obligation

24 to clear everything it does with the Plaintiffs in the first

25 instance.

1      At the same time, you know, if I'm going to be asked to

2 evaluate the quality of a production, if it's inadequate or

3 not, I mean, the Plaintiffs should have some way of saying,

4 "We think it's missing documents, because," right, "because

5 we've" -- you know, "we've done some looking in the FTC

6 production, and we see that this document is in that

7 production, but not in this other production, and we would

8 expect those same kind of documents to be produced, and

9 they're not be (sic).  So something is missing," you know,

10 some basis for suspecting there's a problem.

11      But, you know, again, this dispute is presented to me

12 at too high a level for me to really help you out here, but

13 I've heard from the Plaintiffs.  Let me hear from Facebook

14 your thoughts both about the TAR issue and the hit reports,

15 and what you can do to sort of share enough information that

16 everybody can be confident that your approach is reasonable.

17           MS. JENNINGS:  Yes.  So, on both situations, we

18 agree with you that the disputes haven't really crystalized

19 to a point where it's useful to talk about exactly what hit

20 reports might be helpful, or exactly what information might

21 be helpful to provide the other side with regard to any

22 potential use of TAR, and that was really the nature of our

23 resistance to some of the language that the Plaintiffs had

24 proposed, was that it envisioned the parties deciding, ab

25 ante, what individual would be helpful to evaluate the use

1  of TAR, to the extent the parties use TAR.

2      And as discovery develops, it may be that there's

3  different levels of information that are helpful, different

4  categories of information that may be useful.  I think I

5  heard both you and Ms. Schmit recommend a few different ways

6  that one could evaluate responsiveness as something that

7  came through in TAR, and so the idea of negotiating a TAR

8  protocol at the outset, and giving the Plaintiffs kind of

9  like full control over that, doesn't make a lot of -- just a

10  lot of sense at this point in the case.

11      And, similarly, the hit reports.  They've proposed kind

12  of like this choreographed exchange of specific hits, and we

13  were resistant to that.  We told them that we would provide

14  hit reports where they would further the parties'

15  discussions, and I think it's also true that, as you

16  mentioned, there's different types of hit reports that may

17  be more or less helpful in a particular situation.

18          THE COURT:  Okay.  So I have a slightly different

19  view of the TAR situation.  I think it does make sense,

20  whether we call it TAR or not -- it doesn't have to be a TAR

21  process.  It can just be a straight-up, you know, ESI search

22  terms -- but some way that the parties discuss in advance

23  how they're going to test the quality of the production,

24  because the Plaintiffs are not necessarily going to be able

25  to know whether the search terms that you all agree on are

63

1  missing things.

2      They should have a good basis for formulating search

3  terms, because they have this existing production, and

4  they've done investigation in their case, and they have

5  witnesses' names.  So there should be a good -- pretty good

6  basis for you all to negotiate such terms, but, you know, in

7  a case of this magnitude, there should be some process that

8  the parties can come to agreement on about a check, and I'm

9  sure you all have done it before.  I suggested a null set

10  process, but I'm sure there are other things that I don't

11  even know about that might be a good way to do it.

12      I think you should talk about that sooner, rather than

13  later, but my overall philosophy is that I'm not going to

14  require Facebook to pre-clear their TAR process with the

15  Plaintiffs, and the rationale given for the hit reports in

16  the briefing is not a persuasive rationale.  It may be that

17  hit reports will be important for things that come up down

18  the road, but I'm not persuaded that it's a good rationale

19  sort of for across-the-board disclosure, for the reasons I

20  explained.

21      So I'm not entirely sure what I'm going to put in my

22  order on this one, but that's my present take on these two

23  items in your dispute, and we have one more.  Does anybody

24  need to be heard on those two items before we move on to the

25  last thing in the second level?

64

1         MS. SCHMIT:  No, your Honor.

2         MS. JENNINGS:  Your Honor, the last thing I'd just

3 add on that is that I think, as with the other discussions

4 we've agreed to have with Plaintiffs today, that it would

5 probably be helpful to discuss these protocols or testing in

6 the context of specific discovery requests.

7         THE COURT:  Okay.  All right.  Let me move to the

8 question of the ESI custodians.  So I'm not inclined to

9 just, as a blanket matter, require Facebook to identify

10 everybody to whom (indiscernible) was sent, because that

11 could be a huge number of folks.  These tend to be

12 over-inclusive, in my experience, but I think there must be

13 some other way of identifying relevant ESI custodians that

14 you all could come up with and not have it be this

15 chicken-and-egg problem, which is "We don't know who the

16 custodian should be, and Facebook is still investigating,

17 and they won't tell us anything."

18     One thing I'm a little mystified about is Facebook's

19 comment about all custodians versus most likely custodians.

20 This is not really developed in the submission, and I

21 wasn't, honestly, sure what Facebook meant about that.  Let

22 me give you the page number where that remark shows up.

23         MS. JENNINGS:  I think it's on page four.

24         THE COURT:  No.  Actually, it's on page seven of

25 Docket 133:

1          "The parties disagree whether, when

2          negotiating search terms, the parties

3          must identify all custodians and/or

4          noncustodial sources that might have

5          responsive information, or simply

6          sources that are most likely to have

7          responsive nonduplicative information."

8     I'm not sure what that means.  I mean, so, again, this

9 is not really developed, and the Plaintiffs don't really

10 respond to that particular point in their section.  So what

11 does Facebook mean by that?

12          MS. JENNINGS:  Yes.  So the language that's at

13 issue is on page four of Exhibit A in the redline, and this

14 is a point where the idea is just who the set of document

15 custodians are that we'd be identifying in response to any

16 particular discovery request as the parties are negotiating

17 over the custodians, over whose documents Facebook would run

18 search terms, and Plaintiffs had originally just proposed

19 reflecting those employees or sources that have information.

20     They moderated their position over the course of the

21 briefing to say, "Most likely to have information and/or

22 documents responsive," and we just think it's important to

23 recognize that the custodians that we would be identifying

24 there wouldn't be, necessarily, every single person who

25 might have a relevant document.  We're talking about a set

1   of people who are nonduplicative and most likely, not just

2   most likely.

3            THE COURT:  How are you going to determine that?

4            MS. JENNINGS:  So a few ways, one of which is,

5   like, as you mentioned, we're not writing on a blank slate

6   here.  There has been prior work on the facts here, and so,

7   when we see a discovery request, we'll have an idea of who

8   we've collected documents for in the past, and what

9   information they may have had that was relevant, and how

10  those documents came out in discovery in (indiscernible) the

11  FTC investigation.

12       And so those folks are probably the "most likelies"

13  that we've identified through that prior investigation, and

14  to the extent there are other folks who we think might --

15  like, for example, if there are two people on the same

16  e-mail that sort of may have received a lot of similar

17  e-mails, we'd want to make sure that we were choosing the

18  person who had kind of the larger set of relevant

19  information, as opposed to the person with the smaller set,

20  who may be just receiving the e-mails, but wasn't otherwise

21  involved in the discussions.

22            THE COURT:  So you've got the list of -- the

23  starting point list of the 91 custodians that was given --

24  that (indiscernible) the FTC investigation, and then there's

25  some additional people that are going to be added, and

67

1   there's some overlap with the custodians identified in the

2   initial discovery.  So we have some -- so, sorry.  So are

3   you proposing to only search for incorrect ESI from some

4   subset of that group of custodians or -- I'm not sure where

5   this dispute really kind of hits -- the rubber hits the road

6   in this dispute.

7           MS. JENNINGS:  Yes, and so --

8           THE COURT:  (Indiscernible) that.

9           MS. JENNINGS:  So one point to begin is that the

10  majority of the parties' dispute about custodians relates to

11  custodians for preservation, and that's that 91 custodians.

12  This is a dispute about, when we're identifying custodians,

13  in response to a particular discovery request, who are most

14  likely to have relevant documents responsive to an

15  individual discovery request.

16          THE COURT:  Okay.  That's helpful.

17          MS. JENNINGS:  So we're talking about, like, a

18  much -- like, we're talking about trying to come up with a

19  list of, I don't know, like, five people who are most likely

20  to have documents responsive to a request, so that we can

21  get Plaintiffs, in an efficient manner, the most responsive

22  documents, rather than dumping a bunch of duplicative stuff

23  on them.

24          THE COURT:  Okay.  But can't you deal with the

25  duplication problem by de-duping stuff, either before you

1 review, if you have, like, very similar custodians, because

2 they were on the same list-serv or whatever, de-duping

3 before you even review, or doing it after you've applied

4 keyboard searches, and before you've produced?

5          MS. JENNINGS:  So I think, to some extent, the

6 answer there is yes.  This is really a matter of trying to

7 trim down the number of custodians we're proposing at the

8 outset, so that we can prioritize custodians and get

9 Plaintiffs the people who are most likely to have the most

10 relevant documents, and so we're not necessarily giving

11 them -- because, like, even if the documents -- like, if

12 we're threading documents for review, there's still, like,

13 an additional person whose documents we have to collect,

14 that you had to load, that you have to, like -- there's a

15 volume and a kind of efficiency loss even with the benefit

16 of the technology that's now available through threading and

17 the like.

18          THE COURT:  Do you all really think this is, like,

19 going to be a big issue?

20          MS. JENNINGS:  So, I mean, we briefed it because

21 it remained disputed in the redlines that we last exchanged

22 with the Plaintiffs.

23          THE COURT:  And is the dispute essentially this

24 word "nonduplicative"?

25          MS. JENNINGS:  Yes, that's my understanding.

1          THE COURT:  Okay.  Let me hear from the Plaintiffs

2  on this one.

3          MS. SCHMIT:  From the Plaintiffs' perspective, you

4  know, I don't even think we included this in our briefing,

5  so I'm not sure if I understand.  I'm not sure I understand

6  what Facebook is proposing here in terms of what this is

7  relevant to.  It's certainly not the Plaintiffs' position

8  that every custodian who could potentially have a relevant

9  document, or every person at Facebook, you know, would be a

10  custodian in the case.  So I think there's clearly a

11  proportionality test that goes into the selection of

12  custodians.

13          So, you know, I'm not sure Plaintiffs feel very

14  strongly, one way or the other, on this word in the

15  protocol.  Our much bigger concern is the identification of

16  the custodians that Facebook has identified to date, and the

17  reason that that's becoming particularly important, even

18  throughout the course of this hearing, is that, if the

19  Plaintiffs are going to go back to Facebook to propose that

20  Facebook needs to be preserving certain items, such as text

21  messages, we need to know who the custodians are, and we

22  still don't know that.

23          We have this list, but Facebook has confirmed to us

24  that they have identified additional custodians.  We're not

25  asking for everyone who has received a lit hold.  We're

70

1  asking for the custodians that Facebook has identified, and

2  it's very difficult for us to go back and say, you know,

3  what should be preserved for each individual person if we

4  don't know who that list is.  I think that's really the

5  bigger dispute when it comes to custodians.  This dispute

6  about proportionality, I mean, a proportional standard

7  applies to the selection of custodians, so I don't think

8  there's a dispute there.

9          THE COURT:  Okay.  Well, here I do think it would

10  be help for Facebook to have your document requests, and

11  then it would be a reasonable position for Plaintiffs to

12  take to say, "Okay.  Now you have our document requests.

13  Now we need to know, who are the custodians who have ESI

14  that's responsive to this request?"  And maybe you have 10

15  people who have, like, identically responsive documents.

16  Facebook will tell you, and then the parties can have a

17  discussion about whether all 10 of those custodians need to

18  have their ESI searched and preserved or whatever.

19      It seems like Facebook is saying part of this dispute

20  is about production, but Plaintiffs' focus is about

21  preservation in the first instance.  It's not impossible to

22  have a conversation about who are relevant custodians, given

23  the status of the case and what's gone before, and, you

24  know, the fact that you've already -- you have complaints in

25  your briefing, and you have, you know, things that -- you

71

1  know what the dispute is about, but, still, having your

2  document requests, and what you're particularly after, is

3  going to help formulate -- or form or frame the parties'

4  discussion about who the relevant custodians are.

5       So, you know, I do think it's not appropriate for me to

6  say whatever steps Facebook has taken, as an internal

7  matter, to order custodians to preserve ESI is the right

8  metric.  I'm not sure I'm persuaded by that reasoning, but I

9  do think that you can -- Facebook -- or, sorry,

10 Plaintiffs -- can formulate these categories of people, even

11 if we don't know their names, are the people for who we

12 would expect ESI would be preserved, and if we do have

13 specific names, because we found them in the 12,000,000

14 pages of production you have already, by all means, share

15 those names, but then the obligation is on Facebook to

16 identify who are the relevant custodians for ESI that's

17 responsive to your document requests, but, if they don't

18 have your document requests, they can't do that.

19      So it seems to me like this one is a little bit

20 premature in terms of me resolving it right here and now,

21 but that's what I'm -- that's how I'm thinking about it.  So

22 I'll think about it more, and I'll write an order that says

23 something, but that is my inclination and (indiscernible).

24 This may end up being a dispute later down the road, but

25 that's my take.

1    Does anybody need to be heard on that --

2         MS. SCHMIT:  No, your Honor.

3         THE COURT:  -- or further on that?

4         MS. JENNINGS:  No, your Honor.

5         THE COURT:  All right.  Let's move on to expert

6 protocol.  This one is easy, relatively speaking.  So this

7 dispute concerns -- this is Docket 134.  This concerns

8 whether and when a privileged clawback obligation should be

9 triggered in connection with documents referenced in an

10 expert report, declaration, or affidavit.

11    So the dispute has crystalized around the words "cited,

12 relied upon, and considered."  I have to confess, in our

13 prior discussion, I thought there were only two categories,

14 documents that an expert expressly relied on, which would be

15 evident from the report or declaration, because they would

16 be specifically referenced in some way, and then documents

17 that were merely listed in the massive appendix as something

18 the expert, like, touched or got or whatever, didn't really

19 inform his or her opinion.

20    So the parties have outdone me and got kind of three

21 categories.  I don't know what the difference is between

22 "cited" and "relied upon," quite honestly.  It seems like,

23 you know, one of you thinks that "cited" and "relied upon"

24 are the same thing, and the other of you thinks that "relied

25 upon" and "considered" are the same thing.

1      You know, what is a document that is relied upon and

2  yet not cited, discussed, talked about by the expert, or

3  indicated as a source of -- you know, you've got a table

4  that does some analysis of some data, and there's some

5  document cited that's the source of that data for the table.

6  Like, what is the difference between "cited" and "relied

7  upon"?  And I think I'll ask Facebook that question.

8           MS. MEHTA:  Certainly, your Honor.  So I think

9  you're right that there's just -- there may just be a

10  language issue here.  Let me explain the scenario that we're

11  worried about, and then we can figure out what language to

12  assign to it.

13           THE COURT:  Okay.

14           MS. MEHTA:  So we talked to your Honor in the

15  context of the 502(d) agreement, about the clawback

16  requirements if something is expressly cited in the expert

17  report, you know, in a footnote, in the text, as a reference

18  to a chart.  That's covered.  Everyone agrees there's a time

19  period for clawback associated with that.

20      The concern we have here is a situation in which

21  someone appends to an expert report a list of hundreds of

22  documents that they say they relied upon, but that aren't

23  actually specifically identified or relied upon anywhere in

24  the report.  I think, in a lot of cases, that might be

25  considered, like, a materials considered list, but we have

74

1 an expert protocol that requires disclosure of information

2 that is relied upon, as opposed to just considered.

3     So we're worried about the scenario in which people are

4 attaching loads of documents to a list that goes with the

5 expert report, and then creating a burden on the producing

6 party to go through and, in a compressed amount of time,

7 review those hundreds of documents, and make judgments as to

8 privilege, and try to claw them back.

9     That doesn't serve the goal that your Honor, I think,

10 articulated at the last hearing, which is balancing the need

11 not to have a "gotcha" of the producing party around

12 privilege, and having them forced to waive privilege by not

13 clawing back things, and also not having uncertainty around

14 the expert reports, and making sure the experts can rely on

15 things that are actually -- you know, they can actually rely

16 on, as opposed to having them clawed back subsequently.

17     I think the way I understood your Honor's comments, and

18 what makes sense to me, is if it's used in the expert

19 report, cited in the text, in a footnote, in a chart, then

20 it's subject to the clawback.  If it's just a list of 100

21 things, or 200 things, or 500 things that the expert says

22 that they relied on, but actually didn't use in their

23 analysis, that shouldn't trigger the clawback requirement,

24 because of the burden associated with the very quick turn on

25 that, and the risk of waiver that would come if there's that

1 long list, and it has to be done in a compressed amount of

2 time.  That's our concern.  What language we put around

3 that, it doesn't matter, as long as we have a meeting of the

4 minds between the parties and your Honor as to what the

5 requirements are.

6          THE COURT:  All right.  Well, I have to say that

7 pretty accurately captures what I thought was the resolution

8 or the guidance I gave last time about how I thought this

9 should work out, so what is the Plaintiffs' concern?

10          MS. SCHMIT:  From the Plaintiffs' perspective,

11 when this was being discussed from the parties, this line

12 that was being drawn was the difference between what's cited

13 in an expert report and what's cited in an appendix, for

14 example, and what's cited in an appendix can often be

15 charts, et cetera, that cite to several other documents that

16 your list of materials relied upon.  So, at this point, I

17 don't know what Facebook believes it needs to review in a

18 timely fashion to claw back and what it doesn't.  So I think

19 what we're having the trouble with is what that line is.

20          THE COURT:  Okay.

21          MS. SCHMIT:  Often -- sorry.  Go ahead.

22          THE COURT:  No, go ahead.

23          MS. SCHMIT:  Often, in an expert report, you're

24 going to have tons of appendices, you know, with charts, for

25 example, that are referring back to documents and the

76

1 documents relied upon, and under -- and so the expert is

2 relying upon those documents as the basis, the inputs for,

3 you know, their charts or their calculations, and if at some

4 point, you know, Facebook says they should have no deadline

5 to claw those documents back, our concern is that it could

6 affect an actual calculation or something along those lines.

7 So that's what the driving concern is here.

8          THE COURT:  Right.  And I totally endorse that

9 point of view, in the sense that we don't want to have a

10 situation where an expert or party has relied on something,

11 the expert has relied on something, only to find, months

12 down the road, that somehow the document is privileged, or

13 there's a claim of privilege, and then, you know, if the

14 expert can't rely on that thing, it throws off the analysis

15 for the party's case.  Like, that can't happen.  That's not

16 a good scenario.

17      And the key here is notice, right?  So, from my

18 perspective, if you've got -- whether you call it an

19 "appendix" or a "table," or "set of tables" at the end of an

20 expert report, or whatever, if you've got something that

21 the -- some expert analysis that references a source, or

22 references, you know, some other document, whether it's in

23 the, quote/unquote, "body" of the report or in an appendix

24 that has charts in it, or diagrams, or calculations, if

25 you've got that material, and it's got a Bates number or a

1   description of some kind, you're on notice of that document

2   being used in that way.

3       If it's in an appendix of a list of documents that were

4   sent to the expert, and that he or she may not have read

5   carefully or not -- it's just the list, and it's not

6   otherwise mentioned anywhere else in the report, not used,

7   not discussed, not referenced as a source -- that is not

8   sufficient notice to trigger a privilege review.  That

9   was my thought.  I think you all are in agreement about

10  this.

11      So I think you should wordsmith this and fix it,

12  because, you know, what I would endorse is that, if the

13  expert has used "relied on," "cited," "expressly referenced"

14  in his or her analysis, whether it's in text or in a table,

15  or something like that, or a chart or analysis at the back

16  of the report, that's the thing that triggers your

17  obligation to review for privilege, and if it's otherwise in

18  a massive list of the documents in an appendix, it doesn't.

19  I think that's a pretty clear line.

20      So can you all fix your language, or do you need me to

21  do that for you?

22          MS. MEHTA:  I would like to believe we can

23  accomplish that, your Honor.  Thank you for clarifying your

24  guidance.  We will make this -- we will put this to bed.

25          THE COURT:  Okay.  Good.  All right.  Moving on to

1  the very last letter, 135, this is the privilege protocol,

2  and this has a couple of different parts.

3        Timing for the report logs.  I suspect that this is

4  another one where the burden is going to fall

5  disproportionately on Facebook, just because of the sheer

6  volume of documents, and let me just give you some thoughts

7  about this, because you both looked at my standing order,

8  and you also cite to, you know, sort of the Burlington case

9  and to what's the default, that kind of thing.  So, you

10  know, your fact discovery closes in September of 2022, so

11  you've got about a year, and the goal here is to not save

12  some massive privilege dispute for the end of the case.

13        So what I'm going to -- what I think would be

14  appropriate is if the parties pick, like, maybe two, one or

15  two interim dates for mutual disclosure of privilege logs,

16  and that should be -- that should reflect your reasonable

17  effort to capture everything based on production so far, as

18  of that point, and do you an exchange, and then you have

19  another, later, interim date, and then you have a final date

20  that is, you know, before the close of fact discovery, so

21  that you have some time, because, if there is going to be a

22  privilege dispute, you know, your absolute last deadline is

23  seven days after the close of discovery to bring something

24  to me, but often these take a lot more effort than the usual

25  discovery dispute.

1    So just think of, like, practically speaking, giving

2  yourselves, like, some interim deadlines to have this mutual

3  exchange, so that you can work through issues sooner, rather

4  than later.  If you do it that way, then, you know, if you

5  don't agree, you can get some guidance from me earlier on,

6  and not save it all for the end.

7    So, you know, I can give you some interim dates, if you

8  want.  I'll just pick them.  But it ought to be tied to kind

9  of, maybe, the waves of production, or when you're going to

10 have other events in the case which I don't know about it,

11 maybe depositions, something like that, so that the

12 privilege log production -- and we're going to get to what

13 does that really entail -- you know, can be a really big

14 effort, and you all might want to organize or time that

15 for -- in a way that it doesn't interfere with other things

16 you have going on in your case.

17    But, if you leave it to me, I'll just arbitrarily pick

18 dates for when you will exchange your privilege logs, and

19 that's how I will resolve this timing issue, because, you

20 know, I think that's the only -- really, it's a practical

21 problem, and, frankly, I'm surprised that you all couldn't

22 figure it out on your own.

23    Anyway, is there something I'm missing?  I mean, it's

24 just -- it's not like "Is it 30 days or not 30 days?"  It's

25 just like you need to have a practical solution to getting

1  through the privilege issues.

2         MS. SCHMIT:  That would resolve it from the

3  Plaintiffs' perspective.  We're not tied to 30 or 60 or

4  interim dates.  It's just the idea of having dates that the

5  parties will need so that we can, you know, tee up an issues

6  we'd have over privilege, especially given the number of,

7  you know, disputes that could potentially arise there.  So

8  interim dates is fine with the Plaintiffs.

9         THE COURT:  Okay.

10         MS. MEHTA:  It's fine with Facebook, your Honor,

11  as well.  The issue we had was, we can't commit to a 30-day

12  deadline when we don't know the volume.  So I think this

13  should resolve it, and we're happy to have your Honor set

14  dates, but I would like to save you the time of that, and it

15  feels like something the parties should be able to work out.

16  So, if the Plaintiffs are amenable and your Honor is

17  amenable, we can go back and put together a schedule for

18  when the exchange would be, in lin with your Honor's

19  guidance.

20         THE COURT:  Okay.  Well, let's get through the

21  rest of this dispute, and maybe there will be some other

22  things you should talk about or at least consider when

23  you're coming up with your dates, but I like the idea of the

24  parties talking about it further.  I'll probably give you a

25  deadline to report back to me on that, like with everything

1  else.  All right.

2      The next issue is exclusions from logging, and, as I

3  understand the dispute, the principal issue is whether

4  Facebook must log privileged documents between the time of

5  the commencement of the FTC investigation and the filing of

6  the complaint.

7      My question is, is this dispute principally about

8  in-house counsel's communications and work product, or is it

9  broader than that?

10          MS. MEHTA:  So, your Honor, from Facebook's

11  perspective, it's broader than that, because what they are

12  saying is any privileged communication during that 18-month

13  period needs to be logged, and, as your Honor might imagine,

14  when you're dealing with a broad-ranging government

15  investigation of the nature that we were dealing with here,

16  Facebook had not only outside counsel, but also in-house

17  counsel involved in that, and the volume of documents that

18  would need to be logged would include both outside counsel

19  communications as well as in-house counsel communications

20  relating to the investigation itself.

21      We're not talking about, you know, in-house counsel

22  that were in some business role or something like that, but

23  what we're talking about is, as you might imagine, a massive

24  number of communications relating to the inquiry that the

25  Plaintiffs themselves have characterized as related to their

82

1  case, and closely coupled with their claims in the case, and

2  that is why we're suggesting that the log cutoff be at the

3  start of that inquiry, as opposed to in December of 2020.

4          THE COURT:  And what was the start date, again,

5  June 2019?

6          MS. MEHTA:  That's correct, your Honor.

7          THE COURT:  Okay.  So let me just ask a question.

8  Was there not a privilege log prepared in connection with

9  the FTC proceeding?

10          MS. MEHTA:  There was.  There was a massive

11  privilege log that was produced to the FTC, and has been

12  produced to the Plaintiffs here.  That log -- my

13  understanding is -- I wasn't directly involved, but my

14  understanding is the FTC did not require Facebook to log

15  communications during that period.

16      So we would -- what Plaintiffs are asking us to do is

17  go back to the period of the FTC investigation and, if it's

18  responsive to their request, log all of the communications

19  with in-house counsel, outside counsel that relate to that

20  investigation that are during the period.  That is not

21  something we've done.  It's not something we did for the

22  FTC, and it would be new work that we would have to do for a

23  potentially massive number of communications.

24          THE COURT:  So what was -- what kinds of things

25  were on the FTC privilege log?

83

1      MS. MEHTA:  The FTC privilege log.  We logged

2 responsive communications to their investigative demands for

3 the time period that was negotiated.  Whatever was withheld

4 on the basis of privilege was logged, but it did not include

5 the communications relating to the investigation itself

6 during that period.

7      THE COURT:  So it would have predated June of

8 2019, in other words.  So you would use the June 2019 date

9 as kind of like the starting point for the FTC for not

10 having to log communications?

11      MS. MEHTA:  Right.  So what we're proposing, your

12 Honor, is that -- essentially, there's an agreement between

13 the parties that, after December 2020, we don't need to log

14 communications.  That's normal.  Your Honor sees that all

15 the time.  We all agree to that all the time.  What we are

16 saying is the actual appropriate date for that is not filing

17 of the complaint in this case, but the initiation of the

18 investigation by the FTC.

19      THE COURT:  I'm sorry.  I think I asked the wrong

20 question, which is, from the FTC's perspective and what

21 happened with respect to that investigation as between

22 Facebook and the FTC, the agreement was, starting with the

23 investigation date, the FTC did not require lodging of

24 communications between outside counsel and inside counsel's

25 communications relating to privileged matters?

1          MS. MEHTA:  Yes, that's my understanding, is that

2    the FTC did not ask for logging of documents during that

3    interim period of 18 months.

4          THE COURT:  Okay.  All right.  Let me hear from

5    the Plaintiffs.  So, from the Plaintiffs' perspective, what

6    are you worried about, you know, being withheld, and, you

7    know, you're not -- that you may not have the opportunity to

8    dispute it?  Because that's the whole point of a privilege

9    log, is being able to assess the privilege claim and

10   challenge it, if necessary.  So what are you worried about,

11   given the explanation of sort of what's happened so far?

12         MS. SCHMIT:  The concern here is that Facebook's

13   language in the actual protocol is that it would not need to

14   log anything with in-house or outside counsel from June 2019

15   forward that relates to the subject matter of this case, and

16   that's really where that issue comes in, what relates to the

17   subject matter of this case, because Facebook could

18   interpret that very broadly.

19       So what I'm talking about, based on Facebook's actual

20   language, is not communications relating to the FTC

21   investigations.  It's any communications a year and a half

22   before we filed, or the FTC filed, with in-house counsel or

23   outside counsel, that would not need to be logged at all, to

24   the extent that Facebook says it relates to the subject

25   matter of this case.

1    From our perspective, that's just way too broad.  The

2  fact that in-house counsel was involved on a communication,

3  you know, a year and a half before the filing doesn't make

4  it privileged.  There could be business advice.  There could

5  be facts underlying.  You know, a document isn't privileged

6  on that basis.

7    So I think a potential compromise position here would

8  be that their documents specifically relating to the FTC

9  investigation that are involving outside counsel -- you

10  know, it would make sense, perhaps, for those not to be

11  logged, but this general idea that Facebook doesn't need to

12  log anything that it deems related to this case for a year

13  and a half before it was filed, from our perspective, is

14  just incredibly over-broad.

15          THE COURT:  All right.  Have you all discussed

16  some kind of, like, compromise language on the scope of what

17  would or would not be logged?  So I just heard a proposal

18  from the Plaintiffs.  What is Facebook's view?

19          MS. MEHTA:  Yes, your Honor.  So I think there's a

20  couple of things built into that.  We've already told them

21  that if it's something that's in a business role, or

22  wouldn't otherwise be subject to privilege, it's not going

23  to go on the log.  It would be produced.

24    So I don't think that issue is really one that needs to

25  be addressed.  I think the question is, with respect to

1  in-house and outside counsel communications during that

2  period, what is the scope of the carve-out?  And we are

3  saying it's the same as the scope of the carve-out post

4  filing of the complaint in December 2020.  So, essentially,

5  whatever would not be logged post-December 2020, we would

6  say, should not be logged after June 2019, except that it

7  would also include in-house counsel, given the role that

8  in-house counsel played in the FTC investigation.

9       THE COURT:  All right.  But I just heard Ms.

10 Schmit say, "Well, what if" -- the way you formulated this

11 is broader than just the FTC investigation.  So it's subject

12 matter, and they're not really sure what that means.

13      MS. MEHTA:  Yes.  So I -- I'm sorry, your Honor.

14      THE COURT:  I guess, let me just say -- let me see

15 if I can formulate what I think the problem is, is that

16 there may have been discussions -- I'm sure there were

17 discussions -- between outside counsel and/or in-house

18 counsel and people in the company that would be privileged,

19 that related to the FTC investigation.

20      Why not just use those words, and have those things be

21 things that are not required to be logged, but going so

22 broad as to say, "The subject matter of this litigation

23 going back to June of 2019 is too broad," so some

24 accommodation there?

25      MS. MEHTA:  Yes, your Honor.  So I can clarify

1 that.  So I think one issue that we could address in the

2 framing of this is, there are also investigations that

3 related to the FTC investigation.  The House Judiciary

4 Committee had a related investigation, and Plaintiffs, for

5 example, have received documents that were produced to the

6 House Judiciary Committee as part of the initial

7 12,000,000-page production.  So what we're trying to capture

8 is that set of regulatory inquiries.

9     We're not suggesting that if they're, you know -- I

10 think, realistically, Plaintiffs' claims really don't cover

11 anything that was going on in 2019 to 2021, but let's say

12 there was a document that relates to the actual merits of

13 their claim.  I'm not suggesting that we wouldn't log that,

14 but for documents that relate to the FTC investigation, the

15 HJC investigation, those government inquiries, that we think

16 the exclusion should be in when those inquiries began, in

17 June of 2019.

18         THE COURT:  Okay.  So that is narrower than what

19 the position statement says.  So, Ms. Schmit, what do you

20 think about that, if it were narrowed as Ms. Mehta just

21 described?

22         MS. SCHMIT:  As long as it's based on the

23 representation of what was and was not logged for the FTC.

24 We had not heard before today, I think, what the agreement

25 was with the FTC on what would or would not be logged.

1      So the compromise that I'm proposing here, I think,

2 makes sense based on the representation that's been made of

3 what's been logged, you know, from the perspective of the

4 FTC, but, to the extent that Facebook is not going to be

5 logging for a year and a half before we even filed the

6 complaint, I definitely think it needs to be narrow, and it

7 needs to be defined, of what is excluded from that, and to

8 us, you know, outside counsel -- communications with outside

9 counsel relating to these two investigations, that seems

10 like a reasonable compromise position.

11      I still think there's going to be concerns with

12 in-house counsel relating to these investigations, to the

13 extent that it's not being logged at all.  It doesn't

14 give -- we don't even know it's there.  It gives us no, you

15 know, possibility to challenge whatsoever, and it could

16 certainly not be privileged, just because in-house counsel

17 is involved.

18           MR. SWEDLOW:  Your Honor, can I be heard on this?

19 I feel like we're moving past --

20           THE COURT:  Mr. Swedlow.  All right.  Go ahead.

21           MR. SWEDLOW:  So Facebook's counsel just said

22 there won't be anything related to this case recently or in

23 that time period, but we have discovery requests which we'll

24 serve that are information we're going to seek in that time

25 period.

1      When Apple changed its privacy policy, and it had a

2  potentially giant impact on Facebook's ability to serve up

3  advertisements, that affects both of our case theories in

4  both of the classes, and we are going to seek information

5  about that, because we think it will demonstrate the value

6  of our claim.  And so to say -- and that is in 2021.

7      So to say that nothing happened recently that we're

8  going to seek discovery about is just false, and we don't

9  have to accept that something that was withheld and never

10  logged was properly withheld.  That's the point of a log.

11  If we don't get a log for those 2021 documents, how do we

12  know that that person, whoever it is, is in-house counsel,

13  or that it wasn't also written by a PR person, and they just

14  copied to counsel, or put "Privileged" in the subject line

15  so they didn't have to share it?  But that's the point of

16  the log.

17      So it isn't the presumption that the recent stuff won't

18  be relevant.  It will be incredibly relevant.  So we need to

19  put that place marker down there, that we're going to look

20  at the recent log that's new work for Facebook very

21  carefully, and we may want to challenge some of those logs.

22          THE COURT:  Right.  I'll let Ms. Mehta address

23  this, but what I thought I understood Facebook saying is

24  that things that the FTC did not require them to log were

25  privileged communications relating to the FTC investigation,

90

1   and then just related to the House Judiciary Committee

2   investigation, that those communications for that

3   production, so to correspond to the production that was

4   made, there was no requirement that Facebook log those

5   things, and they're trying to say, "We should have the same

6   benefit carry over into this litigation," but they are not

7   saying that they don't have to log things during that time

8   period, June 2019 to the present, that relate to your case,

9   and don't relate to the FTC investigation or the House

10  Judiciary investigation in particular.

11       So, if there are lawyers talking to people in-house

12  about things relating to the subject matter of your case,

13  and not specific to the FTC investigation, and not specific

14  to the House Judiciary Committee investigation, those would

15  be loggable.  I don't want to put words in Ms. Mehta's

16  mouth.  Maybe she didn't quite mean that, but it sounds like

17  that might be a possible resolution there.

18            MS. MEHTA:  Yes, your Honor.  So I think you have

19  identified the issue correctly.  What we are proposing is,

20  for the FTC investigation and the related regulatory

21  inquiries, which includes the House Judiciary Committee

22  investigation -- and there may be some other inquiries.  I

23  don't know for sure whether there's international regulators

24  that had some related inquiry.  But we're saying, for the

25  FTC investigation and related regulatory inquiries, we

1  should not log in-house or outside counsel communications

2  relating to those inquiries.  We have not logged them for

3  the FTC, and it would be incredibly burdensome for us to

4  have to go through and identify and log the in-house or

5  outside counsel communications relating to that.

6       That is what we meant by "subject matter."  Maybe that

7  isn't the right way to phrase that, but that's the import of

8  what we are trying to capture with the carve-out.  It's

9  basically to take the December 2020 date and move it to the

10  real date where these related inquiries began, which is June

11  of 2019, and to include in-house counsel, given their role.

12          THE COURT:  The problem from the Plaintiffs'

13  perspective is, if you're just trying to use the date as a

14  cutoff, and any privileged communications that happen to

15  fall after that date, that's what they're having a problem

16  with, because what the question isn't being answered,

17  really, is, how are you going to distinguish the things that

18  you describe as related to the FTC investigation and the

19  regulatory inquiries related to that investigation that you

20  think shouldn't be logged, because they didn't have to be

21  before, and other things that might fall within that time

22  period, and are relevant and responsive to the document

23  request, and would otherwise have to be produced if not

24  privileged?

25          MS. MEHTA:  All right, your Honor.

1        THE COURT:  How is Facebook going to make that

2  call?

3        MS. MEHTA:  Right, your Honor.  I mean, I think

4  the answer is, the same way we make the calls about what's

5  relevant and responsive and what's privileged, which is a

6  good faith examination of the information that's responsive

7  to a discovery request to determine whether it's privileged

8  or not, and what the nature of the information is.

9        There is going to be a huge set of information that I

10  think unquestionably would be make-work to log, which are,

11  like, e-mails between outside counsel and in-house counsel

12  relating to the investigation, to the HJC investigation,

13  what you will get on a privilege lot, and you haven't heard

14  any articulation from them as to what it is -- why they need

15  this.

16        Is "In-house counsel e-mail to outside counsel on this

17  date, subject matter 'Privileged Communication,'" rendering

18  legal advice relating to the FTC investigation?  They gain

19  nothing from that information other than, I guess, putting

20  the burden on Facebook to have to log literally, you know,

21  hundreds, thousands of e-mails and communications where

22  in-house and outside counsel are talking about the

23  regulatory inquiry.  So I can't answer, in the sense that I

24  don't know every e-mail that exists or every document that

25  exists.

1     I don't have their discovery requests yet, so I don't

2  know what's going to be responsive and what the scope of

3  information is that we're going to agree is responsive and

4  producible in this case, but I can tell you that we will

5  look at each request in our documents in a good faith

6  manner, and if something relates to the FTC investigation

7  and the HJC investigation, and it's outside or in-house

8  counsel communications relating to that investigation,

9  making us log it is make-work, and they haven't articulated

10 why it's not make-work, and there has to be some degree of

11 trust that counsel is going to operate in good faith in

12 terms of making a judgment as to whether it's about the

13 investigation or about not the investigation and some, you

14 know, business issue.

15         THE COURT:  I think the Plaintiffs are worried

16 about a couple things.  They're worried about just a date

17 cutoff that you're going to use, and anything that, you

18 know, smacks of privilege, you're just not going to log it,

19 if it's dated June 2019 or later.  So that's one issue.

20     The other issue is what relates to these

21 investigations.  You know, so one way to interpret that is,

22 if it doesn't actually explicitly say, "FTC investigation,"

23 then it doesn't fall in the bucket of things you don't get

24 to log, and then the related thing -- and I'll let Mr. Dunne

25 talk in a moment -- is that they're really worried about

94

1  communications that include in-house counsel, and maybe also

2  outside counsel, and aren't really privileged.  People are

3  just copied for fun, or as a fig leaf, right?  And they want

4  to be able to address that, and if you don't log it -- so

5  they aren't worried about things that are only in-house

6  counsel, only outside counsel.  It's these other people who

7  might be on the e-mail stream, and they can't assess that.

8      Yes.  I'm going to let Mr. Dunne say -- is there

9  anything else that you're worried about?

10          MR. DUNNE:  No.  Your Honor articulated, almost

11  perfectly and completely, what I was slightly fidgety about.

12  One thing that I do want to put in on behalf of the

13  advertising specifically is, right, both the wording of

14  Facebook's proposal, with the word "subject matter," and the

15  argument that was presented, which kind of talked about

16  Plaintiffs, doesn't differentiate between the -- right?

17      There are some differences in, if you will, subject

18  matter between the cases in terms of claims, and, in fact,

19  in terms of distance from the sort of things that the FTC is

20  looking for, and it's just one thing that is a concern

21  for -- right?  When you have a protocol, and you have words,

22  right, that are being used to adjudicate, you know, what is

23  in and what is out of an exclusion, it's a concern for me

24  that, right, the wording of "subject matter," in fact,

25  doesn't take into account the distinction of two classes,

95

1 and, in fact, the distinctions between those classes and the

2 FTC.

3      And then the other issue is one that you articulated

4 perfectly, which is just, at the end of the day, right, to

5 say that the subjects related to even to the subject matter

6 of the investigations or whatever, that needs to be

7 granular, right?  Is it solely related to the FTC

8 investigation?  How are we determining that?  Or is it

9 something that says, "FTC" in the subject?

10      I mean, if it doesn't say, "FTC" in the subject, and it

11 says, you know, "New privacy restrictions," I'm sure that's

12 something that Mr. Swedlow, et al., would be very concerned

13 about overlapping with their case.  If it says something,

14 right, like, you know, "On-line advertising inquiry," that's

15 another issue.

16      And so, right, it's the devils in the details here that

17 are really the concern.  The concern is not that there isn't

18 some limiting principle that we can agree to.  So, you know,

19 maybe there's position to reach an agreement if we talk more

20 on this, but my concern is basically on the specific

21 wording, and I have serious concerns.

22           THE COURT:  All right.

23           MS. MEHTA:  Your Honor, may I just address one

24 point, because I hear what the Plaintiffs are saying, but I

25 have to say it rings a bit hollow to me, because they've

96

1  agreed to the same exclusion for December 2020 forward, at
2  least with respect to outside counsel, so set aside in-house
3  counsel for a moment, and so the question isn't "Do we have
4  to have some amount of trust and good faith in counsel to be
5  making privileged calls in a good faith basis?," right,
6  because we do that all the time.  We have to be able to
7  trust one another to do that.  But here, where they've
8  already agreed that, for December 2020 forward, there
9  doesn't need to be logging, the nature of the instruction
10 that we're seeking to exclude is not different between
11 December 2020 and June 2019.  We are just saying that the
12 dates should be different.
13      It's similar to, if you take an example, where there
14 are six lawsuits filed by a plaintiff, and the parties agree
15 that the date cutoff for the logging should be the filing of
16 the first complaint, not the filing of the sixth complaint.
17 That is the scenario that we are trying to account for, and
18 all of the concerns that you've heard are sort of
19 speculative concerns about whether, at the margins, they
20 might disagree with the privilege call that's made.
21      We're going to have privilege issues in this case, I
22 predict, as we do in every case, and we'll deal with them,
23 but that doesn't, and it should not, open the door to this
24 massive volume of information being required to be logged,
25 where there hasn't really been an articulation as to why,

97

1  when it relates to the FTC investigation and the HJC

2  investigation, it needs to go in a log.

3          THE COURT:  I think the issue is, the word

4  "subject matter" is broader, potentially broader, than what

5  you've just described.  So it's not just a language issue.

6  It's like, are parties being precise about what the

7  understanding is about how this is supposed to work?  And,

8  you know, I think we've made some progress in trying to -- I

9  will note that I think the briefing on this issue omitted

10  Plaintiffs' actual written position.  It was like a -- you

11  probably already noticed that.  It was a typo.

12          MS. SCHMIT:  We did.  I apologize for that.

13          THE COURT:  It's all right.

14          MS. SCHMIT:  When we were combining the briefs, it

15  looks like a position on one issue got included twice, and

16  then some was left out.  I think we have covered what --

17          THE COURT:  I think we've taken care of it, yes.

18  So what I'm thinking is, I don't want to put you all off on

19  this, but I do think "subject matter" is too squishy, and

20  there may be a meeting of minds that can be achieved here

21  that doesn't require Facebook to re-review and log things

22  that the FTC wanted not logged, but also allows -- given

23  that they're not the same, they're not this identical

24  lawsuit, this is not exactly that same scenario, but

25  allows -- I'm attracted by the notion that if it is specific

1 to the investigation, maybe that's a reasonable thing to not

2 log, but if it's just about the subject matter that happens

3 to be part of the investigation, that's not.  That should

4 fall on the other side of the ledger, meaning you should

5 have to log that kind of stuff.

6       And maybe it turns out to be unduly burdensome, and

7 someone will let me know that, and we'll have a specific

8 dispute about that at some point, but we're doing this in a

9 vacuum right now, and it may be that there's very few

10 documents from June of 2019 to December of 2020 that fall

11 into the bucket of communications that are relevant and

12 responsive to a document request, that aren't specifically

13 about these investigations, but maybe there are quite a lot,

14 and we'll see.

15       But that's kind of where I'm inclined to draw the line,

16 is, if it is lawyers communicating about the FTC

17 investigation, how they respond to it, or the related

18 regulatory inquiries, okay, maybe you don't have to log

19 those, because there's just going to be a huge category of

20 them, a huge pile of them.

21       If there's really a dispute about whether those things

22 are privileged -- and I don't really hear that.  I hear a

23 concern more about "We're worried about things that include

24 people other than lawyers" -- maybe that's another

25 dimension, and maybe I can -- you know, if there's a dispute

99

about that, we can do some representative examples, and I
can give you guidance, and that's how this dispute will
shake out, but I'm not inclined to just adopt Facebook's
language for this part of the protocol.

Given that it's 12:15, and I still have, hopefully,
other parties waiting for their case management conference
that we put off, let me see if I can get through the rest of
this.  I start my criminal calendar at 1:00.

So, logging by categories, this is like a general
concept that you all are fighting about, and I'm not sure I
understand the metadata proposal.  So let me just kind of
formulate how I think this dispute is framed here.

There's the federal rule requirement that you have to,
if you're claiming privilege, describe what you're
withholding in a manner that, without revealing the
information you claim is privileged, will enable other
parties to assess the claim of privilege.  This is usually
done on a document-by-document basis.  We all know that.

So what is this metadata proposal?  Is it a proposal
that metadata fields be used on the privilege log in place
of some other description of the document, or in addition?
You have your claim of privilege.  Then you have this
metadata.  Is there something else, or is that it for the
privilege log?  Let me ask Facebook that question.  What's
the proposal?

1          MS. MEHTA:  Yes, your Honor.  So the proposal is,

2   with respect to redacted documents, rather than log the

3   redaction, rely on the metadata to provide the information

4   that would otherwise go on a privilege log.  So, for

5   example, if --

6          THE COURT:  But this isn't just about redactions.

7   You also have this proposal, and it comes up in the first

8   instance, when you argue about you should be able to log by

9   categories, because there will be metadata available.  So

10  just let's take the -- let's forget the redactions for a

11  moment.  Let's just focus on documents as a whole.  Is the

12  proposal of the parties for a log of documents by disclosing

13  metadata, and only metadata only (sic), next to the claim of

14  privilege?

15         MS. MEHTA:  No, your Honor, that's not the

16  proposal.  The proposal is for us to do a categorical log

17  which will identify the basis for the privilege claim based

18  on date range, category description, privilege

19  justification, and number of documents withheld, and then

20  where the metadata comes in, I think, is -- and, hopefully,

21  this is answering your question -- is, if there is a

22  challenge to a categorical log, and we are in the position

23  where Plaintiffs say, "Okay.  Well, we have a question about

24  this categorical log," we are going to move to

25  noncategorical logging in that circumstance, if we agree to

1  do a noncategorical log.

2       Then the noncategorical log would provide more detail,

3  and all we're saying is, if that detail is already provided

4  in the context of the metadata, we can provide it via the

5  metadata, and then provide a log for whatever else is

6  required, but that's where there's a specific particularized

7  question about the categorical log.  So that's what the

8  metadata piece is.  It's sort of how to deal with that

9  question when it comes up.

10          THE COURT:  Okay.  So, follow-up to that is, if

11  Facebook is taking the position now that it's impossible for

12  it to make the showing that the production or the stuff that

13  would need to be logged is so voluminous that it couldn't

14  possibly be done in any kind of reasonable way, and,

15  therefore, there must be some alterative, if you can't make

16  that showing now, then why should I relieve Facebook of the

17  normal obligation to, in the first instance, provide enough

18  information that allows the Plaintiffs to assess a claim of

19  privilege?  Categorical wouldn't seem to cut it.

20          MS. MEHTA:  So, your Honor, I respectfully

21  disagree with that, and here's why.  We are presenting this

22  issue to your Honor now because we have a privilege protocol

23  that was coming to your Honor now, that was going to set the

24  requirements for logging, and what Plaintiffs were proposing

25  was an onerous privilege log process that would require us

102

1  to log, document by document, every document that we're

2  claiming privilege over.

3      I can't tell you the exact number of documents that

4  we're going to have to claim are privileged, because I don't

5  have their requests yet, but I can tell you, based on the

6  FTC investigation, that there were literally thousands and

7  thousands and thousands of entries on the privilege log out

8  of that 12,000,000 pages, and so I wouldn't be surprised if

9  we had a very extensive privilege log here, depending, of

10 course, on what the Plaintiffs request, but I'm using the

11 FTC privilege log as some sort of guidance as to what's

12 likely to happen here, and what we are saying is -- and

13 courts have agreed -- that we can satisfy our preliminary

14 burden with respect to privilege with a categorical log,

15 which would be proportionate to the case, except in cases

16 where they look at the categorical log and they say, "We

17 have a question about this, and we want to talk about it,"

18 and then the parties would have a conversation about it.

19     That's the framework that we are proposing, and that's

20 a framework that other courts have adopted, and it's a

21 framework that we believe will promote getting the parties

22 to actually move forward with discovery in the one year that

23 we have to get the discovery done in this case, and what we

24 haven't really heard from Plaintiffs is why starting with

25 categorical logs, and then, if there are issues, focusing on

1 those issues wouldn't be a workable and efficient resolution

2 for this particular case.

3          THE COURT:  So let me ask the follow-up question

4 to that.  So I assume that Plaintiff -- or, sorry,

5 Facebook -- is going to have to make privilege log

6 determinations on a document-by-document basis, right?

7          MS. MEHTA:  Yes.

8          THE COURT:  So the question is, how do you log

9 those?  If your logging obligation is limited to exporting

10 metadata, which is one of the things I read Plaintiffs to be

11 suggesting, how is it burdensome?

12          MS. MEHTA:  Because we -- I didn't understand them

13 to be suggesting that it's limited just to exporting

14 metadata, but I think even the exporting of metadata

15 requires us to then go and, for each specific document,

16 articulate, "Is it work product?  Is it attorney-client

17 privilege?"  What we're suggesting is, there are going to be

18 broad swathes of categories of documents where there's a

19 range of dates, they relate to a particular subject matter,

20 the claim of privilege is the same, and we would identify

21 them as a category, rather than give them metadata and then

22 have to, for each metadata entry, tag the particular entry

23 as privileged or work product or whatever.

24          THE COURT:  But my suggestion to you is -- you're

25 probably doing this anyway in your document review --

104

1  (indiscernible) a code, "AC," "WP," something else, and why

2  not just, like, export the relevant fields to a privilege

3  log?  And, you know, the Plaintiffs may get way more than

4  they bargained for.  They can have massive output.  But it

5  seems like, as a burden question, not really burdensome.

6          MS. MEHTA:  Because of the description.

7          THE COURT:  No description, just metadata.

8          MS. MEHTA:  So you're suggesting just metadata,

9  and then privilege, attorney-client privilege?

10          THE COURT:  Yes, I mean, your metadata.  And I did

11  read -- and Plaintiffs can tell me if I was wrong about

12  that, but I did read the Plaintiffs' proposal or

13  suggestion -- I'm on page four:

14          "Given the parties' agreement that the

15          privilege log may be populated by

16          agree-upon metadata fields, there is no

17          reason that Facebook cannot individually

18          log documents, which is merely a matter

19          of exporting metadata fields to a

20          populated privilege log."

21          MS. MEHTA:  That is not the position that they've

22  taken, I think, in the meet-and-confer process, and that

23  would not be sufficient under their view, right?  So I think

24  what they're saying is, you can populate a number of the

25  fields in the privilege log with metadata, but they are not

1 saying that you would stop there.  You would still, I think,

2 under their view of the privilege log, have to say for each

3 document what the subject matter of the document is and what

4 the basis for privilege is, which requires work that

5 wouldn't necessarily just be coded in a document review

6 database.

7          THE COURT:  Okay.  Well, let me hear from

8 Plaintiffs, if I have misunderstood your proposal.

9          MS. SCHMIT:  Sure.  No, I think your understanding

10 is largely accurate.  So Plaintiffs take issue with the idea

11 that a categorical log, as Ms. Mehta is proposing here --

12 you know, all that Facebook proposes to offer here is the

13 category number, a date range, a description, a

14 justification, and a number of documents, which means the

15 log could say, "Category one, documents relating to the FTC

16 investigation, June 2019 to the present, attorney-client

17 privileged, X number of documents," and that would be it.

18 There is no way that we can look at a log like that and

19 assess the assertion of privilege.

20      So what we've proposed here, which, in our view, is not

21 more burdensome, is that we have an individual

22 document-by-document log that would largely be the exporting

23 of the metadata.  The additional things that Facebook would

24 need to add are the privilege asserted, but it has to make a

25 document-by-document privilege assertion in connection with

106

1  the category to put it in the category, in any event.

2      So they still are making that document-by-document

3  determination, and then the other thing that we proposed was

4  a description, but we said that that description could be

5  category-based.  So, for example, if they are already going

6  to describe their documents in a categorical log, category

7  by category, they can include that same description in a

8  document-by-document log.

9      So, basically, our point is that the log we're asking

10 for gives us the information that we would, you know, need,

11 really, to be challenging an assertion of privilege, but

12 it's not an additional burden on Facebook to provide that.

13 They have to make a document-by-document call, anyway.

14         THE COURT:  And so what does it give you in

15 addition?  It gives you the addressees and the recipients,

16 the sender and the addressee --

17         MS. SCHMIT:  That's correct.

18         THE COURT:  -- and the specific document date?

19         MS. SCHMIT:  Correct.  Facebook excludes the

20 author, the sender, the recipient, the date.  I mean, this

21 is basic information.  We would have no idea who's even on

22 these e-mails.  If they're all put into a category, we have

23 no idea who's even on them, whereas our, you know, proposal

24 to expert the metadata on a document-by-document basis, that

25 shows, you know, the custodian who wrote -- author of the

107

1 document, the sender, the receiver, so we can immediately

2 see if there's, for example, a third party on the document

3 that could obviate the privilege that's applicable.  Through

4 a categorical log that Facebook proposes, we don't have any

5 of that information.

6         THE COURT:  Okay.  So let me just ask Ms. Mehta a

7 follow-up question.  So, if Facebook would have to come up

8 with a category anyway, if it were going to include an

9 individual document in the larger categorical approach, does

10 what Ms. Schmit is suggesting impose some additional burden?

11         MS. MEHTA:  Well, yes, your Honor, because I think

12 that's not what Ms. Schmit's proposal requires.  So I'm

13 reading from their proposed ESI protocol with the metadata

14 log, and what it requires is objective metadata, and then it

15 says:

16         "The privilege or protection being

17         asserted," and then it says, "A

18         description of the document, including

19         the factual basis sufficient to support

20         the claim that the document is

21         privileged and/or protected."

22         THE COURT:  Right.  So I view her as modifying

23 that position just now by saying, "Category."

24         MS. SCHMIT:  Yes.  Our position may wish to be

25 more clear, but that factual basis, that could be a

*Echo Reporting, Inc.*

1 categorical description.  You know, maybe the devil is in

2 the details on what a categorical description looks like,

3 but we don't need an individualized description, document by

4 document.  You know, often a party is copying and pasting

5 descriptions that apply to multiple documents on a

6 categorical basis.

7          THE COURT:  So let's say it was a high-level

8 description like Ms. Mehta proposed, like, I don't know,

9 "Communication relating to FTC investigation."  There would

10 be, like, lots and lots of documents.  So, if you'd have

11 to -- you'd have to come up with your categories in advance

12 anyway, so there's group things.  So, from Facebook's

13 perspective, you're going to have to do that anyway, and

14 link that category to a particular document, sort of kind of

15 figure out, you know, what you're doing.

16    It sounds like really what the Plaintiffs are after are

17 the metadata, document-specific metadata, that allows them

18 to identify date, addressees, recipients, those kinds of

19 things.  It sounds like, even under Facebook's proposal, the

20 way this would work is you do your category, and they'd ask

21 you immediately for the more detailed, and then you'd fight

22 about, maybe, whether to give it to them or not, but, I

23 mean, it just -- what I'm thinking here is, the right result

24 is, is there's really not a lot of additional burden

25 associated with doing the metadata export, and maybe some of

1 the documents don't have all the metadata fields.

2    Okay.  Fine.  But if there are, you know, the metadata

3 fields, you export the data.  You export what your reviewers

4 have already categorized as the nature of the claim of

5 privilege, and you have a category that you assign, that you

6 would assign to the document anyway, and you just spew that

7 out.  Like I said, Plaintiffs may get way more than they

8 bargained for in terms of a massive log, but what's the -- I

9 don't really see the burden of doing that.

10    MS. MEHTA:  Yes, your Honor.  If they're now

11 willing to agree to the description not being a description

12 of the document, but a description of the category, which is

13 similar to the categorical log, then providing them with the

14 metadata and a field, or some other form in which we say,

15 "These documents" -- I don't know what it will look like,

16 exactly, but providing them with a description of the

17 category level, that addresses our concern.  It's the

18 document-by-document description of the basis of privilege

19 that is incredibly burdensome.

20    THE COURT:  I think that's a good resolution of

21 this issue, and it may be that there is some particular

22 category or group of documents or individual document that

23 needs some more detail, but, hopefully, that will not be the

24 case if you have this metadata and a category description.

25 So that's what I'm inclined to require you to do.

1    If we turn to the redaction issue, I mean, redacted

2  documents do need to be logged, in the sense that you need

3  to identify what the privilege is that supports the

4  redaction, but what I'm not sure about is whether the

5  dispute -- whether the appropriate resolution of the

6  parties' dispute is anything beyond just kind of treating

7  these redacted documents in the same way that you're -- it's

8  like, if you're doing the metadata thing, which I'm pretty

9  going to order you to do, you're doing the metadata thing

10  already.  Then what more do you need about the particular

11  stuff that's been redacted?

12    This is really a question for the Plaintiffs.  What

13  more would a redaction log need to have?

14    MS. SCHMIT:  I think our concern here is really,

15  if we treat redacted documents the same way that we were

16  treating the other documents, as just discussed, we wouldn't

17  have an objection.  Our objection was to Facebook's proposal

18  that all you would need to provide for a redacted document

19  is the sender, recipient, date, and time.  Everything else

20  could be redacted.  Like, the subject matter could be

21  redacted, agreed-upon metadata fields that the parties

22  agreed to for the other documents, but Facebook didn't agree

23  to those same fields for the redacted documents.  So that

24  presents an issue, especially if we have categorical

25  descriptions.  You know, we want to see the subject matter,

111

1  or the e-mail subject, to the extent not privileged.  So the

2  concern was that Facebook is really treating these documents

3  differently by saying they don't need to -- the only things

4  that wouldn't have to be redacted are the sender, recipient,

5  date, and time.

6          THE COURT:  All right.  But if you had the

7  metadata information for a redacted document, you could see

8  what was redacted, literally -- you could literally see what

9  was redacted -- and then you had the privilege claim, and,

10  you know, whatever, you had a category, would the category

11  be at the document level or the redacted information level?

12  Or maybe there's no difference between those things.  I

13  don't know.

14          MS. SCHMIT:  I think there could be a difference,

15  I think.  I think it would be at the level of the redaction,

16  generally, because there could certainly be a document where

17  what's redacted is very much so separate from the rest of

18  the document that you could see.  So I do think it would be

19  supporting the redaction in the document, but, generally,

20  the Plaintiffs would have no problem with treating redacted

21  documents the same way we're treating wholly withheld

22  documents.

23          THE COURT:  Okay.  So let me just ask Facebook

24  that question.  So, if I make you do this metadata thing

25  with the category description, privilege claim for documents

112

1 that are completely withheld, and you just do, essentially,

2 the same thing for your redacted documents, is there really

3 a problem with that approach?

4         MS. MEHTA:  Yes, your Honor, because my

5 understanding is that the metadata will not always

6 capture -- if there's, like, an e-mail string, for example,

7 the metadata isn't going to necessarily capture the portion

8 that is privileged.

9     So what we are suggesting is, you know, if it's an

10 e-mail string, for example, and we're redacting the content

11 of the e-mail, because it's privileged, you will see in the

12 e-mail the "To," the "From," the "CC," and the date, and

13 then, on the face of the redaction, we would include a label

14 that says, "Attorney-client privilege" or "Work product,"

15 which would assert the basis for the privilege, and then

16 give them the information they would otherwise have in a

17 log, and that is going to give them what they need in a way

18 the metadata might not, for a redaction where the e-mail is

19 part of a larger e-mail string.

20         THE COURT:  Okay.  So let me just -- but is it

21 Facebook's position that you shouldn't have to log redacted

22 documents in the first instance?

23         MS. MEHTA:  Right.  Our position is, if they're

24 going to get a document, and it's going to have a portion

25 redacted, there's no need to put the portion that's redacted

113

1  on a log, where you can tell from the face of the document

2  everything that you would know from the log, the "To," the

3  "From," the "CC," the date, and the basis of the privilege,

4  so that we don't have to, like, literally, manually copy

5  that over to a privilege log.

6          THE COURT:  So let's say you --

7          MR. SWEDLOW:  Your Honor --

8          THE COURT:  Just a minute.  Let's say you produce

9  12,000,000 pages of documents again, and, you know, some

10 faction of those have redactions.  If it's not logged, how

11 do Plaintiffs know that you've redacted something from a

12 particular document?  Do they have to search the word

13 "redacted" in the document to find that out?  It seems like

14 a little bit of a practical problem to not log --

15         MS. MEHTA:  I think that they would be able to

16 figure that out from the search of the review database.  I

17 don't know exactly what that looks like, but I think there's

18 a way for them to do that, and I think they included a field

19 that may require us, actually, to say whether there's

20 redactions on the document as part of the metadata.  So

21 there is going to be a way for them to figure out which

22 documents are redacted or not.

23         THE COURT:  Okay.  And now somebody wanted to

24 speak.  I'm not sure who it was.

25         MR. SWEDLOW:  Yes, your Honor.  It's Steve Swedlow

114

1  for the Plaintiffs.

2       I'm not really following this, because, if a document

3  is redacted, that means a portion of it isn't redacted, so

4  the metadata didn't indicate the whole document is

5  privileged or work product.  So a document could be meeting

6  minutes from a meeting where a bunch of people got together,

7  and then seven of the eight topics are produced, and the

8  eighth topic is totally redacted.

9       We're not going to know, literally, anything from the

10 metadata about why that eighth topic is redacted, nothing.

11 If somebody took the human time to block out part of a

12 document that is otherwise responsive and must be produced,

13 that has to be described individually, or we will never be

14 able to challenge the adequacy of that redaction.

15      It might be because -- you know, I've been defense

16 counsel for 25 years, and I know that document reviewers

17 sometimes redact the stuff that seems most damaging to the

18 case, and then let the secondary reviewer decide that it's

19 actually privileged or not.  That's just the way it works.

20      So it may be that it's just a really, really damaging

21 piece of information in an otherwise not privileged

22 document, and we need to be able to challenge that.

23 Metadata is going to give us literally nothing more than

24 would apply to the whole document, and we know the whole

25 document is producible.

1          THE COURT:  Well, so, I mean, it's a reasonable

2   point, but I think it only really is going to apply with

3   certain kinds of documents, and not others.  Others, you're

4   going to be able to see it's an e-mail exchange between a

5   lawyer and, you know, somebody at the client, and it will be

6   privileged for that reason, because the subject line will

7   say whatever it says.  You'll be able to tell from the

8   contents of the document what the basis is.  But I take your

9   point that, for things like meeting minutes, you may have no

10  idea what is being redacted, and maybe your skepticism about

11  the reasonableness and diligence of the document reviewers

12  is appropriate.  I don't know.

13      How many -- has there been -- is there any way that the

14  parties know -- can predict how many documents are going to

15  be subject to redaction, based on the 12,000,000 pages -- or

16  the 12,000,000 documents that have already been produced?

17          MS. MEHTA:  Your Honor, I apologize, but I don't

18  know what portion of the 12,000,000 pages has redactions.  I

19  think it is a significant number, but I couldn't give you

20  the specific number.

21      One suggestion I might offer to address this issue is,

22  if there's a redaction where it's not obvious to them what

23  the basis for the privilege assertion is, for example, the

24  meeting minutes, then they can come to us, and then we can

25  talk about that.

1    I think the vast majority of these documents are going

2  to be, you know, e-mails or messages where the privilege

3  log-level information is going to be discernible from the

4  face of the document, and where it's not, and they have a

5  question about why something is redacted, we're happy to

6  address it.  This is not playing hide-the-ball, but it is

7  about trying to move things forward efficiently.

8            THE COURT:  Yes.  I mean, I think redactions are a

9  slightly different issue, or may pose slightly issues, than

10 withholding something completely, but, I mean, at a minimum,

11 I think they're going to make you do a log of what -- the

12 fact that this document has redactions or not requires

13 Plaintiffs to kind of hunt through a database to figure out

14 whether something has a redaction or not.  I mean, at a

15 minimum, I think they need to be identified.

16            MS. MEHTA:  I'm sorry to interrupt, your Honor.  I

17 did get confirmation that on page 12 of the ESI protocol,

18 there is a field that requires it to be indicated if the

19 document is redacted.

20            THE COURT:  All right.

21            MS. MEHTA:  So they will have that information.

22            THE COURT:  Okay.  I will think this one further,

23 and not belabor it here, about what to do to resolve that

24 particular issue, but I do want to make an observation,

25 because it got raised, and I just want to make sure we're

117

1  all on the same page, that, you know, I am expecting that
2  there will not be redactions for relevance.  I just want to
3  kind of nip that in the bud.
4      The only time that I have ever encountered a legitimate
5  redaction for relevance was in an under-seal case where the
6  claim had to do with national security and law enforcement,
7  and it would have required, like, lots of agency
8  hierarchical review in order for the thing to actually be
9  able to be produced, and maybe I couldn't even see it kind
10 of thing.
11     So that's not this case, I expect, and so I wouldn't
12 expect that we are going to have fights about redactions for
13 relevance.  I don't want to create a dispute where there
14 isn't one, but it was mentioned by the Plaintiffs.  So I
15 think you all are talking about privilege, work product
16 privilege, other kinds of privilege.  So, with that
17 understanding, I will do my best to give you an answer on
18 these issues.
19     I think we're done, at least for this hearing.  Is
20 there anything that anyone needs to address with me right
21 now?  Plaintiffs?
22          MS. SCHMIT:  No, your Honor.  Appreciate your
23 time.
24          THE COURT:  Okay.  Anything for the Defendant?
25          MS. MEHTA:  No, your Honor.  Thank you for your

*Echo Reporting, Inc.*

118

1  time.

2          THE COURT:  Okay.  Thank you all very much.  It

3  was a long hearing.  I will try to get you an order promptly

4  so you can move along, and I will include some guidance

5  about further discussion on some of these topics, so that

6  you know what to do, and the timing for it.

7      Okay.  Thank you very much.  This matter is --

8          MS. MEHTA:  Thank you, your Honor.

9          MS. SCHMIT:  Thank you.

10      (Proceedings adjourned at 12:37 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

119

<u>CERTIFICATE OF TRANSCRIBER</u>

     I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

     I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

               Echo Reporting, Inc., Transcriber

                    Tuesday, September 7, 2021