WILMER CUTLER PICKERING
  HALE AND DORR LLP
SONAL N. MEHTA (SBN 222086)
  Sonal.Mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone:  (650) 858-6000
Facsimile:  (650) 858-6100

DAVID Z. GRINGER (*pro hac vice*)
  David.Gringer@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone:  (212) 230-8800
Facsimile:  (212) 230-8888

ARI HOLTZBLATT (*pro hac vice*)
  Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
  Molly.Jennings@wilmerhale.com
1875 Pennsylvania Ave NW
Washington, DC 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363

*Attorneys for Defendant Facebook, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated,<br><br>                              Plaintiffs,<br><br>        v.<br><br>FACEBOOK, INC., a Delaware Corporation headquartered in California,<br><br>                              Defendant. | Case No. 5:20-cv-08570-LHK<br><br>**DEFENDANT'S OPPOSITION TO PLAINTIFFS' OPENING BRIEF REGARDING AUGUST 20, 2021, CLAWBACK NOTICE**<br><br>Judge: Hon. Lucy H. Koh |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 1

    A.    Facebook Identifies Privileged Materials In Its Production ................................ 1

    B.    The Challenged Excerpts Consist Of Requests For Legal Advice ....................... 2

    C.    The Clawed Back Document Excerpts Were Part Of 12 Million Pages
        Produced To The FTC And Reproduced Here .................................................... 4

ARGUMENT ....................................................................................................................... 5

I.    THE CLAWED-BACK MATERIAL IS PRIVILEGED ................................................. 5

    A.    The Privileged Portions Were Primarily For The Purpose Of Seeking And
        Receiving Legal Advice ..................................................................................... 5

    B.    Hahn Was A Functional Employee Of Facebook ............................................... 8

II.    THERE IS NO VALID WAIVER ARGUMENT BASED ON PRIOR
     PRODUCTION TO THE FTC ...................................................................................... 10

    A.    Plaintiffs Are Barred From Bringing A Challenge Under Rule 502(b) ............... 11

    B.    Facebook Did Not Waive Privilege By Producing Material To The FTC ........... 12

CONCLUSION ................................................................................................................... 15

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*AdTrader, Inc. v. Google LLC*,
  405 F. Supp. 3d 862 (N.D. Cal. 2019) .............................................................13, 14, 15

*Alomari v. Ohio Dep't of Public Safety*,
  626 F. App'x 558 (6th Cir. 2015) ............................................................................ 6, 7

*Arconic v. Novelis Inc.*,
  2019 WL 911417 (W.D. PA. Feb, 26, 2019) ................................................................ 12

*California Institute of Technology v. Broadcom Ltd.*,
  2018 WL 1468371 (C.D. Cal. Mar. 19, 2018) ............................................................. 14

*Church & Dwight Co. v. Mayer Laboratories, Inc.*,
  2011 WL 6119146 (N.D. Cal. Dec. 8, 2011) ............................................................... 15

*Datel Holdings Ltd. v. Microsoft Corp.*,
  2011 WL 866993 (N.D. Cal. Mar. 11, 2011) ............................................................... 13

*FTC. v. GlaxoSmithKline*,
  294 F.3d 141 (D.C. Cir. 2002) ................................................................................... 10

*Great American Assurance Co. v. Liberty Surplus Insurance Corp.*,
  669 F. Supp. 2d 1084 (N.D. Cal. 2009) ...................................................................... 13

*Great-West Life & Annuity Insurance Co. v. American Economy Insurance Co.*,
  2013 WL 5332410 (D. Nev. Sept. 23, 2013) .......................................................... 11, 12

*Holman v. Experian Information Solutions, Inc.*,
  2012 WL 2501085 (N.D. Cal. June 27, 2012) ............................................................ 7, 8

*In re Grand Jury*,
  13 F.4th 710 (9th Cir. 2021) ..................................................................................... 5, 7

*In re High-Tech Employee Antitrust Litigation*,
  2013 WL 772668 (N.D. Cal. Feb. 28, 2013) ............................................................. 9, 10

*In re Kellogg Brown & Root, Inc.*,
  756 F.3d 754 (D.C. Cir. 2014) ........................................................................................ 7

*In re Pacific Pictures Corp.*,
  ,679 F.3d 1121 (9th Cir. 2012) ..................................................................................... 15

*James v. UMG Recordings, Inc.*,
  2014 WL 555179 (N.D. Cal. Feb. 10, 2014) ................................................................... 7

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.*,
    2013 WL 4836752 (E.D. Pa. Sept. 11, 2013) ............................................................. 10

*Luna Gaming-San Diego, LLC v. Dorsey & Whitney, LLP*,
    2010 WL 275083 (S.D. Cal. Jan. 13, 2010) ............................................................. 14

*Medversant Technologies, L.L.C. v. Morrisey Associates*,
    2011 WL 13124128 (C.D. Cal. July 20, 2011) ............................................................. 10

*Memry Corp. v. Kentucky Oil Technology, N.V.*,
    2007 WL 39373 (N.D. Cal. Jan. 4, 2007) ............................................................. 8, 9

*Njenga v. San Mateo County Superintendent of Schools*,
    2010 WL 1261493 (N.D. Cal. Mar. 30, 2010) ............................................................. 13, 14

*Rajala v. McGuire Woods, LLP*,
    2010 WL 2949582 (D. Kan. July 22, 2010) ............................................................. 11

*Schaeffer v. Gregory Village Partners, L.P.*,
    78 F. Supp. 3d 1198 (N.D. Cal. 2015) ............................................................. 9, 10

*Six4Three v. Facebook, Inc.*,
    Fifth Amended Complaint, No. CIV 533328 (San. Mateo Super. Jan. 12, 2018) ......... 3, 4

*United States v. Graf*,
    610 F.3d 1148 (9th Cir. 2010) ............................................................. 10

*United States v. Pacific Gas & Electric Co.*,
    2016 WL 3252779 (N.D. Cal. June 14, 2016) ............................................................. 6

*United States v. Paulus*,
    2021 WL 4494607 (E.D. Ky. Sept. 30, 2021) ............................................................. 15

*Urban Box Office Network, Inc. v. Interfase Managers, L.P.*,
    2006 WL 1004472 (S.D.N.Y. Apr. 18, 2006) ............................................................. 7

**STATUTES, RULES, AND REGULATIONS**

Fed. R. Civ. P. 26 ............................................................. 11

Fed. R. Evid. 502 ............................................................. *passim*

16 C.F.R. § 2.11(d)(1) ............................................................. 12

**OTHER AUTHORITIES**

Matthew Rosenberg, *How Trump Consultants Exploited the Facebook Data of Millions*,
    N.Y. Times (Mar. 17, 2018), https://www.nytimes.com/2018/03/17/us/politics/
    cambridge-analytica-trump-campaign.html ............................................................. 3

Natasha Lomas, *Facebook Hit With Shareholder Lawsuits Over Data Misuse Crisis*, TECHCRUNCH (Mar. 23, 2018, 8:02 AM), https://techcrunch.com/2018/03/23/ facebook-hit-with-shareholder-lawsuits-over-data-misuse-crisis ...................................3

### INTRODUCTION

All three of Plaintiffs' privilege challenges are meritless.  Their first argument—that the clawed back materials are not communications made primarily for the purpose of giving legal advice—would require this Court to hold that inquiries from a corporation's communications professionals to its legal team for advice on how to respond to press inquiries are categorically not privileged.[1]  That is wrong—particularly where, as here, the press inquiries related to an area that was the subject of active and potential litigation.  Second, Plaintiffs are wrong that Facebook's inclusion of Rebecca Hahn, a communications consultant embedded into Facebook's in-house communications team, waived privilege.  Hahn was a "functional employee" under controlling case law, so there is no waiver.  Finally, Plaintiffs' argument that Facebook waived privilege over the documents by producing them—inadvertently—to the FTC in response to a civil investigative demand is also wrong.

The present dispute is indicative of a broader pattern.  Every time Facebook serves a Clawback Notice for documents previously produced to the FTC, Plaintiffs assert that the prior FTC production was a waiver.  Constantly re-litigating this issue is at odds with the purpose of the 502(d) Clawback Order in this case, which was entered into with the full understanding that Plaintiffs were receiving, without Facebook having the opportunity for re-review, more than 12 million pages of previously produced documents.  Plaintiffs agreed then that they would not raise Rule 502(b) arguments in privilege disputes.  Plaintiffs have now broken that commitment in favor of knee-jerk privilege objections without basis that drain the parties'—and, more importantly, the Court's—resources.  The Court should therefore take this opportunity to restore the efficiency and predictability provided by the 502(d) Clawback Order by clarifying that future clawback challenges based solely on Facebook's production to the FTC are inappropriate.

### BACKGROUND

#### A.    Facebook Identifies Privileged Materials In Its Production

On August 18, Facebook received an email from the FTC identifying a document containing potentially privileged information.  Facebook told the FTC that same day the document

---

[1] On October 28, 2021, Facebook changed its name to Meta Platforms, Inc.

-1-                    DEFENDANT'S OPPOSITION RE:
AUGUST 20, 2021 CLAWBACK NOTICE

was privileged and that it would claw it back. The next day, Facebook clawed back eleven related documents (all versions of the same email chain) from the FTC. On August 20, Facebook served a Clawback Notice on Plaintiffs, clawing back the 12 documents clawed back from the FTC. Dunne Decl. Ex A. Facebook provided Plaintiffs with replacement images that redacted the privileged portions.[2] *Id.* Plaintiffs challenged Facebook's August 20 Clawback Notice on September 10.

The August 20 Clawback Notice explained that the documents contained "attorney-client privileged information." Dunne Decl. Ex. A at 1. The notice also included a supplemental privilege log that identified the sender and recipients of each email, including the attorneys involved; quoted each email's subject line; and described the basis for each privilege designation—here, confidential communications "seeking and providing legal advice regarding Facebook's API/platforms policies." Dunne Decl. Ex. B at 1.

**B.      The Challenged Excerpts Consist Of Requests For Legal Advice**

Facebook's need for in-house legal advice related to Facebook's API/platform policies stemmed from a request for comment directed to Facebook's corporate communications manager, ▮▮▮▮▮▮▮ from TechCrunch editor-at-large Josh Constine. Constine asked Facebook to respond to criticism that Facebook's API policy was "anti-competitive" and "hurts users by reducing data portability." Dunne Decl. Ex. C at PALM-002033287-88. Constine focused on the policy that prohibited apps from using "Facebook Platform . . . to export user data … without our permission." *Id.*

Constine's request came amid public, media, and legal scrutiny of that very Facebook API and data access policy. Facebook was already defending a lawsuit that claimed that Facebook's API access policies were used as "a weapon to gain leverage against competitors" by "restricting their access to dozens of APIs containing the most valuable Graph API data, including the full friends list, friends permissions, News Feed APIs, and other data types … upon which

---

[2] Only the 12 documents identified in the August 20 Clawback Notice are at issue. The Court determined that earlier clawback challenges brought by Plaintiffs were untimely. Oct. 26 Hr'g Tr. 26:15-18, 27:6-9.

1   [competitors] depended." Fifth Amended Complaint ¶¶ 3-4, *Six4Three v. Facebook, Inc.*, No. CIV

2   533328 (San. Mateo Super. Jan. 12, 2018).

3         And, about a month before, the *New York Times* broke the Cambridge Analytica story.[3]

4   That story centered on an app that obtained access to information from users with their consent

5   but then improperly shared that information with the firm Cambridge Analytica and other entities.

6   Within a week of the *New York Times*' initial report, various plaintiffs filed four lawsuits

7   challenging Facebook's app access permissions.[4]

8         Amid all this, Constine emailed ███ seeking comment on a question with obvious

9   relevance to the ongoing legal matters:  How does Facebook decide which apps can access data

10  through its APIs (in particular, the "Find Friends" API)?  Following Constine's questions, the

11  Facebook communications team quickly looped in relevant stakeholders, including several in-

12  house lawyers with knowledge of the policy who could provide advice on how to respond

13  consistent with Facebook's legal obligations and in a manner that would address legal risks. Dunne

14  Decl. Ex. C, PALM-002033286-87.  The team also looped in Rebecca Hahn.

15        Hahn had worked closely with Facebook for years.  Kirkland Decl. ¶¶ 4-5.  From June 1,

16  2011, until May 21, 2018, Hahn was an integral member of Facebook's communications team.  *Id.*

17  ¶¶ 5, 10.  When she began working for Facebook, the communications team comprised fewer than

18  approximately 30 employees, so Hahn helped to "fill the gap where full-time Facebook employees

19  were not available."  *Id.* ¶ 4.  Hahn had direct access to Facebook's facilities, including badge

20  access to Facebook's Menlo Park offices, where she routinely spent time over her 7-year tenure.

21  *Id.* ¶ 8.  When at Facebook's offices, Hahn sat with the other members of the communications

22  team.  *Id.*  Hahn also had access to Facebook's communications and record-keeping systems,

23  "housing confidential or sensitive Facebook information."  *Id.* ¶ 7.  Hahn was also subject to a

24  non-disclosure agreement and other confidentiality provisions.  *Id.*

25

26  _____

27  [3] Matthew Rosenberg, *How Trump Consultants Exploited the Facebook Data of Millions*, N.Y. TIMES (Mar. 17, 2018), https://tinyurl.com/pwmctedc.

28  [4] Natasha Lomas, *Facebook Hit With Shareholder Lawsuits Over Data Misuse Crisis*, TECHCRUNCH (Mar. 23, 2018, 8:02 AM), https://tinyurl.com/vsckcy9w.

1  Hahn was functionally no different from a full-time Facebook employee.  At the time of

2  Constine's email, Hahn reported directly to Facebook employee ███████████  *Id.* ¶ 2.  Hahn

3  was routinely entrusted with critical matters for the company, including "sensitive and difficult

4  projects" like Facebook's F8 conference and Oculus connect events.  *Id.* ¶¶ 6-7.  Hahn also

5  interacted directly with the public and third parties on Facebook's behalf, just "like a full-time

6  employee member of the Facebook communications team."  *Id.* ¶ 7.  Hahn's internal work was

7  also indistinguishable from that performed by Facebook's full-time communications employees.

8  So, for example, Hahn was responsible for drafting or commenting on press releases,

9  communications plans, and responses to the press, and would be included on communications with

10  attorneys seeking legal advice before speaking on Facebook's behalf.  *Id.* at ¶ 9.  And, Hahn was

11  trusted to interact with "the business independently [and] without a member of the Facebook

12  communications team present."  *Id.* ¶ 6.

13  **C.**  **The Clawed Back Document Excerpts Were Part Of 12 Million Pages**

14  **Produced To The FTC And Reproduced Here**

15  The emails covered by the August 20 Clawback Notice were among the more than 12

16  million pages of documents that Facebook produced to the FTC in response to a 2019 civil

17  investigative demand.  Facebook undertook reasonable efforts to review responsive materials for

18  privilege and to withhold privileged materials from production.  Those efforts yielded a substantial

19  privilege log, provided to Plaintiffs in this matter, containing more than 300,000 entries.  The log

20  reflects multiple months of work, with entries provided on a rolling basis, with the final

21  consolidated log given to the FTC on September 26, 2020.

22  On April 2, 2021, at Plaintiffs' urging, the Court ordered Facebook to re-produce to

23  Plaintiffs its entire production to the FTC.  Dkt. 11 at 1.  The Court's order provided just 30 days

24  to do so, which gave Facebook no opportunity to systematically re-review the FTC production for

25  responsiveness or privilege before production to Plaintiffs.  To facilitate this quick reproduction

26  and to avoid costly and burdensome disputes, the parties agreed that there would be no disputes

27  about waiver by inadvertence: the parties stipulated that "Federal Rule of Evidence 502(b) does

28  not apply to any disputes regarding Protected Documents."  Dkt. 107, 191.  On May 3, 2021,

1   Facebook re-produced the FTC production to Plaintiffs.  Facebook later provided Plaintiffs the

2   consolidated privilege log that accompanied the FTC production.

3                                    **ARGUMENT**

4          The materials at issue fall squarely within the attorney-client privilege.  The clawed-back

5   material involves a confidential request for legal advice, made among a group of Facebook

6   employees that included functional employee Rebecca Hahn.  Disclosure to Hahn did not waive

7   the attorney-client privilege.  Plaintiffs are foreclosed by their own agreement from arguing waiver

8   under Federal Rule of Evidence 502(b), and even if they could, the inadvertent production of the

9   materials to the FTC did not waive privilege.  Plaintiffs' challenge should be rejected.

10  **I.      THE CLAWED-BACK MATERIAL IS PRIVILEGED**

11         The privilege log description and the unredacted portions of the emails, taken together,

12  establish that each email involved the provision of legal advice related to Facebook's response to

13  a reporter preparing an article on an issue that was the subject of active litigation.  Plaintiffs'

14  arguments to the contrary either ignore the context in which these discussions arose or refuse to

15  acknowledge the disclosed facts that make plain that Rebecca Hahn fell within the umbrella of

16  Facebook's attorney-client privilege.

17         **A.      The Privileged Portions Were Primarily For The Purpose Of Seeking And**

18                   **Receiving Legal Advice**

19         The clawed-back material is protected by the attorney-client privilege because it consists

20  of "confidential communications between attorneys and clients, which are made for the purpose

21  of giving legal advice." *In re Grand Jury*, 13 F. 4th 710, 713 (9th Cir. 2021) (internal citation

22  omitted).  After ██████████ received Constine's original request for comment—which

23  described Facebook's prior actions as "anti-competitive," Dunne Decl. Ex. C, PALM-

24  002033287—she initially contacted a group of non-lawyers.  *Id.* at PALM-002033286-87.  That

25  group, however, quickly realized that they needed legal advice too.  Thus, they solicited legal

26  advice from in-house attorney ████████ because ██████ had "more authority to speak

27  to this policy" and associated legal risks.  *See* Dunne Decl. Ex. E, PALM-002033752-53.

28  ██████ then provided legal guidance.  *Id.* at PALM-002033750-51.  Later in the chain,

1 ██████████ directed a "harder q[uestion]" to ██████ seeking information about "why we

2 have this policy and what criteria we apply," and, again, ██████ responded providing advice

3 on relevant legal risks. *Id.* at PALM-002033748-51. And, in one branch of the communication,

4 in-house attorney ██████ responded to a question seeking comparative analysis of

5 Facebook's policies against Google+ and YouTube's and the legal ramifications of the same.

6 Dunne Decl. Ex. D, at PALM-002033773. In each instance, a Facebook employee directed a

7 question to in-house counsel about a Facebook policy, and the in-house lawyer provided legal

8 guidance.

9      Constine's specific request, and the context in which it arose, make clear the inherently

10 legal nature of the emails at issue. As noted, Constine's questions were animated by criticism that

11 Facebook's actions were "anti-competitive and hurt[] users by reducing data portability." *Id.* at

12 PALM-002033287. Allegations of "anti-competitive" conduct are fundamentally legal. And as

13 discussed, Facebook was already facing several lawsuits concerning its API access policies or

14 adjacent issues. *See supra* pp. 2-3.

15      Thus, Plaintiffs' assertion that the thread at issue is "solely directed toward a press inquiry"

16 misses the point. Br. 9. Corporations regularly coordinate their response to press inquiries with

17 their legal team, and Facebook is no exception. Facebook's public statements are potential

18 admissions in litigation, and therefore must frequently be evaluated for their impact on current and

19 anticipated litigation. Thus, for example, the Sixth Circuit has held that communications with

20 attorneys "seek[ing] legal advice regarding media inquiries" were privileged because "how to

21 respond to [] media inquiries" are "an act with great legal ramifications." *Alomari v. Ohio Dep't*

22 *of Public Safety*, 626 F. App'x 558, 570-571 (6th Cir. 2015). In *Alomari*, the client sought advice

23 from in-house counsel on responding to media inquiries regarding termination of the plaintiff. *Id.*

24 Like here, the attorneys in *Alomari* were brought in to "understand the circumstances surrounding"

25 the issue and their provision of "input on how to draft a media response was essential." *Id.* Courts

26 in this district have reached similar conclusions. *See United States v. Pac. Gas & Elect. Co.*, 2016

27 WL 3252779, at *9 (N.D. Cal. June 14, 2016) (email thread seeking "legal advice [on] how to

28 respond to a media request about an ongoing investigation" protected by attorney-client privilege);

*James v. UMG Recordings, Inc.*, 2014 WL 555179, at *3 (N.D. Cal. Feb. 10, 2014) (documents containing "legal advice [] sought or given with respect to … digital media strategy" are privileged).

Finally, Plaintiffs incorrectly assert that Facebook cannot show that the communications at issue were made for the "primary purpose" of providing legal advice in the context of a press inquiry. *See In re Grand Jury*, 13 F.4th at 714. As explained, attorneys play an "essential" role in calibrating legal risks when companies respond to the press. *Alomari*, 626 F. App'x at 571. The redacted portions of the documents—which are limited to the in-house attorneys' responses to requests from the various stakeholders for legal advice—were therefore undoubtedly made for the primary purpose of providing legal advice. Any other conclusion would leave unprivileged *any* communication to an attorney seeking advice about the legal ramifications of press statements. And it cannot be the case that simply because a request for legal advice is triggered by a press inquiry, it is unprivileged.[5]

Because Plaintiffs cannot show (and have not) that the requests to Facebook's in-house lawyers were made for any primary purpose other than seeking legal advice, they retreat to hyper-technical and narrow readings of the documents. But their nitpicking of certain "phrasing"—"insight," "context," and "rationale"—does not change the result that the requests (when directed to attorneys) were seeking legal advice. *See, e.g.*, *Urban Box Office Network, Inc. v. Interfase Managers, L.P.*, 2006 WL 1004472, at *7 (S.D.N.Y. Apr. 18, 2006) ("legal insight … falls within the attorney-client privilege"); *Holman v. Experian Info. Sol'ns, Inc.*, 2012 WL 2501085, at *6

---

[5] The Ninth Circuit has left open whether the "primary purpose" test requires that "*the* primary purpose" of the communication at issue be a request for legal advice, or whether "*a* primary purpose" suffices. *In re Grand Jury*, 13 F.4th at 716. As explained in text, the primary purpose of the in-house attorneys' communications is the provision of legal advice, so the Court need not determine which standard applies. Should the court nonetheless reach the issue, it should adopt the "*a* primary purpose" test. As the D.C. Circuit has explained, the "*a* primary purpose" formulation is better suited for "dual purpose" documents because "trying to find the one primary purpose for a communication motivated by two sometimes overlapping purposes (one legal and one business, for example) can be an inherently impossible task." *Id.* (citing *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 759 (D.C. Cir. 2014)).

1   (N.D. Cal. June 27, 2012) (privilege not waived over "legal rationale for drafting" talking points

2   related to "policies for compliance with the Fair Credit Reporting Act").[6]

3   **B.     Hahn Was A Functional Employee Of Facebook**

4   The inclusion of Hahn on these emails does not change the outcome. Hahn was a functional

5   employee, and her inclusion on the emails does not constitute waiver. To determine whether a

6   consultant is a functional employee, courts examine the "totality of the relationship" between the

7   consultant and the company, *Memry Corp. v. Ken. Oil Tech., N.V.*, 2007 WL 39373, at *3 (N.D.

8   Cal. Jan. 4, 2007), including (1) when the work was performed; (2) details about the consultant's

9   duties and integration into the corporate structure; (3) how long the consultant worked for the

10  company; (4) how frequently the consultant worked; and (4) whether the consultant acted as an

11  authorized representative of the company.  *Id.* at *2-3.  Each consideration weighs in favor of

12  finding that Hahn was a functional employee:[7]

13  *Hahn's duties and integration into the Facebook corporate structure*: Hahn was an integral

14  member of Facebook's communications team and worked closely with in-house communications

15  professionals to craft public messaging.  Kirkland Decl. ¶¶ 5-6, 9, 11.  In performing this work,

16  Hahn reported directly to a Facebook employee, ███████████  *Id.* ¶ 2.  Hahn had direct access

17  to Facebook's facilities, including badge access to Facebook's Menlo Park campus, where she

18  routinely spent time over her 7-year tenure.  *Id.* ¶ 8.  When on campus, Hahn was integrated with

19  the communications team, and sat with its other members.  *Id.*  Hahn also had access to Facebook's

20  communications and record-keeping systems, "housing confidential or sensitive Facebook

21  information."  *Id.* ¶ 7.  Hahn's work—like the work of Facebook's in-house communications

---

[6] Plaintiffs claim that the direction of requests to non-attorneys ███████ and ███████████
for "insight" and "policy context," respectively, show that the requests to the attorneys were not
requests for legal advice.  Br. 8.  If anything, they show the opposite.  When Facebook wanted
policy and other non-legal insight, it made requests of ███████ and ███████.  When it wanted legal
advice, it asked its attorneys.  The non-legal advice is unredacted and not at issue.

[7] Plaintiffs' suggestion that Facebook failed its meet-and-confer obligations by not providing
"actual evidence" of Hahn's relationship is wrong.  Br. 11.  Evidentiary showings are made to the
Court not opposing counsel.  Oct 26 Hr'g 11:2-5; 25:24-26:2.  In any event, Plaintiffs expressly
acknowledged that the details Facebook provided "will permit concrete briefing on the functional
employee issue." Jennings Decl. Ex. 1.

team—included communications with Facebook's legal team when preparing communications in legally sensitive areas.  In sum, Hahn's "duties … were so intertwined with the subject matter for which [the communications team] sought legal advice that she should be treated as a functional employee." *Schaeffer v. Gregory Vill. Partners, L.P.*, 78 F. Supp. 3d 1198, 1204-1205 (N.D. Cal. 2015).

*How long Hahn worked for Facebook*:  Hahn worked for Facebook for nearly **seven years**. Kirkland Decl. ¶ 5.  A court in this district has found consultants who worked for similar lengths of time to be functional employees.  *See, e.g.*, *Memry Corp.*, 2007 WL 39373, at *3 (consultant who worked for company for eight years considered functional employee).

*How frequently Hahn worked*:  Hahn routinely worked on Facebook's account, including by working from Facebook's Menlo Park campus, where she sat with Facebook's in-house communications team, several times a month.  Kirkland Decl. ¶ 8.  These facts, too, favor a finding that she was a functional employee.  *See Memry Corp.*, 2007 WL 39373, at *3 (considering whether consultant worked from client offices).[8]

*Whether Hahn acted as an authorized representative of Facebook:*  Facebook held Hahn out as its representative.  Hahn regularly interacted with third parties on Facebook's behalf, including by staffing major events for the company as Facebook's communications representative and serving as the point person for interacting with many reporters.  Kirkland Decl. ¶¶ 6-7, 10. This, too, weighs in favor of a finding that Hahn was a functional employee: where "various third parties have dealt with [the employee] as a representative" of the company, it provides further evidence that a consultant functioned as a more traditional employee.  *Memry Corp.*, 2007 WL 39373, at *3.

Where, as here, a consultant is "essentially incorporated into the corporation's staff to perform a corporate function that [is] necessary in the context of … actual and anticipated private litigation, and heavy press scrutiny obtaining at the time," that consultant is considered a functional

---

[8] Plaintiffs are wrong to claim (Br. 12) that Hahn's work for other clients precludes a functional-employee finding.  *See, e.g.*, *In re High-Tech Emp. Antitrust Litig.*, 2013 WL 772668, at *4 (N.D. Cal. Feb. 28, 2013) (consultant a functional Google employee despite roles at Intuit and Apple).

employee of the company. *Schaeffer*, 78 F. Supp. 3d at 1203. Hahn was such a consultant, and her inclusion on otherwise-privileged communications is not a waiver. *See FTC v. GlaxoSmithKline*, 294 F.3d 141, 148 (D.C. Cir. 2002) ("no useful purpose in having a court review the business judgment of each corporate official who deemed it necessary or desirable for a particular employee or contractor to have access to a corporate secret.").

Plaintiffs have no good response. Their narrowing (Br. 12-13) of the functional employee test only to individuals who are functionally part of a company's *legal* team would contradict the functional employee test's purpose: to permit a corporation's attorneys to confer freely with individuals who the corporation needs to act consistently with the advice of its lawyers. *See United States v. Graf*, 610 F.3d 1148, 1158 (9th Cir. 2010). The critical question is therefore whether, based on the consultant's role at the company, "a blanket denial of the attorney-client privilege would undermine ... the ability of the corporation ... to obtain guidance from its counsel"—not whether that consultant is herself a lawyer or hired as part of the legal team. *In re High-Tech Emp. Antitrust Litig.*, 2013 WL 772668, at *4 (N.D. Cal. Feb. 28, 2013). In other words, the test asks whether the consultant is sufficiently aligned with the *client*—not whether the consultant is sufficiently aligned with the client's *lawyers*. Therefore, courts in this Circuit and elsewhere have held that consultants hired initially for non-legal purposes do qualify as "functional employees." *See, e.g., Medversant Techs, LLC v. Morrisey Assocs.*, 2011 WL 13124128, at *4 (C.D. Cal. July 20, 2011) (affirming finding that a consulting firm that "essentially function[ed] as [the company's] public relations department" was a functional employee); *King Drug Co. of Florence Inc. v. Cephalon, Inc.*, 2013 WL 4836752, at *6 (E.D. Pa. Sept. 11, 2013) (rejecting argument that "consultants do not fall within the scope of the privilege because they were hired for business rather than legal purposes").

As explained, the facts make clear that Hahn was a functional employee, and disclosure to her did not waive the attorney-client privilege.

## II. THERE IS NO VALID WAIVER ARGUMENT BASED ON PRIOR PRODUCTION TO THE FTC

The fact that the underlying materials are privileged resolves Plaintiffs' challenge because Plaintiffs have no valid argument that Facebook waived anything by producing the materials to

the FTC, for at least three reasons.  First, the parties agreed not to bring Rule 502(b) challenges.

Second, because the documents at issue were both produced to, and clawed back from, the FTC,

the FTC itself is bound by regulation to treat the documents as privileged, again, precluding a Rule

502(b) challenge.  And third, the privileged document snippets were inadvertently produced to the

FTC, satisfying Rule 502(b), even if it applies.

### A.    Plaintiffs Are Barred From Bringing A Challenge Under Rule 502(b)

In the 502(d) Clawback Order, the parties agreed that Federal Rule of Evidence 502(b)

would not apply to "any disputes regarding Protected Documents."  Dkt. 107 at 2.  That stipulation

"supplant[s] Rule 502(b)"; it reflects the parties' "sensibl[e] agree[ment] to a process whereby a

party that receives information subject to a claim of privilege may challenge the assertion of

privilege" but whether "information is privileged in the first instance is not a question answered

by resort to Rule 502(b)."  *Great-W. Life & Annuity Ins. Co. v. Am. Econ. Ins. Co.*, 2013 WL

5332410, at *12-14 (D. Nev. Sept. 23, 2013).  Plaintiffs' inadvertence arguments concern whether

documents Facebook produced were "privileged in the first instance" under Rule 502(b).  *Id.*  The

parties' agreement in the 502(d) Clawback Order therefore precludes these arguments.[9]  *See Rajala

v. McGuire Woods, LLP*, 2010 WL 2949582, at *2, *7 (D. Kan. July 22, 2010) (Rule 502(b) does

not apply to clawback disputes about documents previously produced to the SEC and DOJ).

Enforcing the 502(d) Clawback Order to eliminate Rule 502(b) arguments accords with the

Clawback Order's plain text.  For one, the text is clear that "[Rule] 502(b) does not apply to *any*"

clawback disputes, which this assuredly is.  Dkt. 191 at 2 (emphasis added).  And, reading the

phrase "Federal Rule of Evidence 502(b) does not apply to any disputes regarding Protected

Documents," *id.*, to apply only to disputes regarding documents produced for the first time in this

litigation, as opposed to documents previously produced to the FTC, would make that phrase

duplicative of the Order's preceding sentence.  The prior sentence ("This Order provides the

---

[9] Facebook is not asking the Court to rule, pursuant to Rule 502(d), that there was no waiver with the production to the FTC.  Facebook is instead asking the Court to enforce Plaintiffs' commitment not to raise Rule 502(b) waiver arguments in this case and with respect to the FTC production in particular.  The Court has authority to enforce that agreement pursuant to Federal Rule of Civil Procedure 26.  *See Rajala*, 2010 WL 2949582, at *5.

maximum protection allowed by Federal Rule of Evidence 502(d) with regard to Protected Documents," *id.*) already forecloses disputes about the circumstances of productions made in *this* litigation.  *See, e.g.*, *Arconic v. Novelis Inc.*, 2019 WL 911417, at *1 (W.D. PA. Feb, 26, 2019) (order providing "maximum protection allowed under [FRE] 502(d)" foreclosed disputes about waiver by inadvertent production).  Such an interpretation would violate the general rule that a clawback order "must be interpreted to give full meaning and effect to all of [its] provisions." *Great-W. Life & Annuity*, 2013 WL 5332410, at *13-14.

In addition, the 502(d) Clawback Order was entered against the backdrop of the imminent deadline for the FTC reproduction, with the express purpose to avoid time-consuming and costly disputes and re-reviews. S*ee* Dkt. 90.  Indeed, the "principal purpose" of this Order is to protect "legitimate claims of privilege without requiring an exhaustive pre- or post-production review of documents disclosed in discovery." Dkt. 105.  That purpose should guide interpretation of the 502(d) Clawback Order and the parties' agreement therein.  Accordingly, the Court should enforce the plain text of the Order by eliminating Rule 502(b) arguments from this case.

## B.    Facebook Did Not Waive Privilege By Producing Material To The FTC

In any event, Facebook did not waive privilege by producing the relevant documents to the FTC, for three reasons.

*First*, by regulation, the status of the clawed back material in the FTC proceeding is privileged.  16 C.F.R. § 2.11(d)(1)(ii) (agency treats clawed back documents as privileged unless and until court orders otherwise).  Since the FTC is bound to treat the material as privileged, there can be no waiver of privilege.  Plaintiffs make no argument to the contrary.

*Second*, even if Plaintiffs could invoke Rule 502(b), disclosure to a regulator does not waive privilege where that disclosure is made inadvertently, and the producing party took reasonable steps to both prevent the disclosure and to rectify the error. Fed. R. Evid. 502(b); 16 C.F.R. § 2.11(d)(1)(i).[10]

---

[10] The Advisory Committee expressly contemplated application of Rule 502(b) to inadvertent disclosures to federal agencies like the FTC acting in the course of their regulatory, investigative, or enforcement authority, noting that the "consequences of waiver, and the concomitant costs of

Plaintiffs have no argument that the snippets of 12 documents that Facebook clawed back on August 20—a tiny fraction of the 12 million pages produced to the FTC—were produced through anything other than inadvertence. Such a large-scale, high-volume production is a textbook case for application of Rule 502(b)'s protection against inadvertent production. *See Datel Holdings Ltd. v. Microsoft Corp.*, 2011 WL 866993, at *4 (N.D. Cal. Mar. 11, 2011) ("Inadvertent production of a relatively low proportion of documents in a large production under a short timetable due to mistake should be and usually is excused."). Indeed, even *Plaintiffs* represented to the Court that "where there's a mass production like Facebook has done here ... we would be very hard pressed to make a case to your Honor that any production in there was intentional as opposed to inadvertent." May 25 Hr'g Tr. 7:9-12; *see also Great Am. Assur. Co. v. Liberty Surplus Ins. Corp.*, 669 F. Supp. 2d 1084, 1091-1092 (N.D. Cal. 2009) (Where "a massive amount of documents [are] swapped during discovery," "inadvertent disclosure is likely."). Plaintiffs offer no explanation for their change in tune.

Facebook also took reasonable steps to prevent disclosure. Before producing documents to the FTC, Facebook conducted an extensive review for responsiveness and privilege, generating a 300,000-entry privilege log that was provided to both the FTC and to Plaintiffs. These efforts constitute the "reasonable steps" to prevent disclosure required by Rule 502(b). *See Njenga v. San Mateo Cty. Superintendent of Sch.*, 2010 WL 1261493, at *17 n.2 (N.D. Cal. Mar. 30, 2010). "[P]erfection or anything close based on the clairvoyance of hindsight cannot be the standard" in large productions, such as the FTC production. *Datel Holdings*, 2011 WL 866993, at *4.

And, Facebook took reasonable steps to rectify its error. Facebook promptly clawed back the material in Clawback Volume 4 once its production came to light, acting the same day the FTC identified a document as potentially privileged. This case is therefore nothing like the situations in which courts find a party to have waived privilege by unduly delaying a clawback. *See AdTrader, Inc. v. Google LLC*, 405 F. Supp. 3d 862, 866-67 (N.D. Cal. 2019) (DeMarchi, Mag.) (waiver where producing party took no action for five months after plaintiffs quoted protected

pre-production privilege review, can be as great with respect to disclosures to offices and agencies as they are in litigation." Fed. R. Evid. 502 Advisory Comm. Note.

material in four filings); *see also Luna Gaming-San Diego, LLC v. Dorsey & Whitney, LLP*, 2010 WL 275083, at \*4-6 (S.D. Cal. Jan. 13, 2010) (waiver where producing party failed to promptly raise privilege claim after documents were used in deposition and summary judgment motions). Plaintiffs suggest that Facebook did not act reasonably because Facebook clawed back documents years after the initial production to the FTC, and only after they came up in this litigation.  Br. 7, 14.  This is a red herring.  Facebook was not obligated to engage in a post-production privilege review following its FTC production, *see* Fed. R. Evid. 502 Advisory Comm. Note, so Facebook had no reason to know that the clawed-back material had been mistakenly produced.  Thus, whether a clawback is prompt turns not on when the documents were produced, but on when the producing party "discovered the inadvertent disclosure." *Njenga*, 2010 WL 1261493, at \*17 n.2; *Cal. Inst. of Tech. v. Broadcom Ltd.*, 2018 WL 1468371, at \*4 (C.D. Cal. Mar. 19, 2018).  Consider this example: Among a set of thousands of documents, a party inadvertently produces a privileged email.  Discovery continues, and the producing party never happens to look at the privileged email until opposing counsel introduces it in a deposition two years later.  When the email is introduced, the party claws it back.  Only then—once a privileged document has gone from "1 in a pile of 12 million" to something that a party is "intentionally relying on," May 25 Hr'g Tr. 12:8, 17-18— must the producing party claw the document back or else risk waiver.

These underlying facts have been repeatedly disclosed to Plaintiffs, despite their protestations otherwise.  Br. 6-7, 4-15.  Plaintiffs know that Facebook conducted an extensive privilege review before producing over 12 million pages of documents to the FTC because Plaintiffs have a copy of Facebook's 300,000-entry privilege log.  And Plaintiffs know that they received Clawback Notices on a rolling basis, as Facebook learned that privileged material was produced to the FTC and re-produced to Plaintiffs.  Plaintiffs have not directly challenged any of these facts.  Instead, they claim that Facebook has made it "impossible" to evaluate inadvertence because Facebook has not provided answers to a laundry list of questions.  Br. 15.  But the necessary facts are already well-known to Plaintiffs and the Court, which has resolved similar disputes without the superfluous information requested by Plaintiffs.  *See, e.g.*, *AdTrader*, 405 F. Supp. 3d at 863 (resolving privilege dispute over inadvertence on joint letter brief, without hearing

or declaration from producing party).  And Plaintiffs offer *no authority* requiring Facebook to provide the specific information they claim necessary.

*Finally*, Plaintiffs are wrong (Br. 14) that a party waives privilege by producing materials to a regulator, no matter the circumstances.  The rule Plaintiffs would have this Court adopt grossly overreads *In re Pacific Pictures Corp.*, 679 F.3d 1121 (9th Cir. 2012).  *Pacific Pictures* involved the distinguishable situation where a producing party "solicited [a] subpoena and chose not to assert the privilege when it was appropriate to do so." 679 F.3d at 1130.   Under those circumstances, the party could not use privilege to shield the documents from production in subsequent civil litigation.  That is a far cry from this case, where Facebook did not solicit the FTC civil investigative demand, mistakenly produced 12 protected documents to the FTC, and clawed those documents back from both the FTC and Plaintiffs soon after discovering the error.  The other cases Plaintiffs cite are entirely unrelated to these circumstances, as they also do not involve Rule 502(b) or any question of inadvertent production.  *See Church & Dwight v. Mayer Labs., Inc.*, 2011 WL 6119146, at *1 (N.D. Cal. Dec. 8, 2011) (discussing the impact of confidentiality agreements on waiver); *United States v. Paulus*, 2021 WL 4494607, at *4, *7 (E.D. Ky. Sept. 30, 2021) (discussing subject matter waiver under Rule 502(a) after a third party "deliberately and voluntarily disclosed information" to the government).

## CONCLUSION

The Court should deny Plaintiffs' motion and make clear that prior production to the FTC is not a valid basis for future clawback challenges.

1    Dated:  November 23, 2021                    Respectfully submitted,

2                                                 By: */s/  David Z. Gringer*

3                                                 SONAL N. MEHTA (SBN 222086)
4                                                   Sonal.Mehta@wilmerhale.com
                                                  WILMER CUTLER PICKERING
5                                                   HALE AND DORR LLP
6                                                 2600 El Camino Real, Suite 400
                                                  Palo Alto, California 94306
7                                                 Telephone: (650) 858-6000
                                                  Facsimile:  (650) 858-6100

8                                                 DAVID Z. GRINGER (*pro hac vice*)
9                                                   David.Gringer@wilmerhale.com
                                                  WILMER CUTLER PICKERING
10                                                  HALE AND DORR LLP
11                                                7 World Trade Center
                                                  250 Greenwich Street
12                                                New York, New York 10007
                                                  Telephone:  (212) 230-8800
13                                                Facsimile:   (212) 230-8888

14                                                ARI HOLTZBLATT (*pro hac vice*)
15                                                  Ari.Holtzblatt@wilmerhale.com
                                                  MOLLY M. JENNINGS (*pro hac vice*)
16                                                  Molly.Jennings@wilmerhale.com
                                                  WILMER CUTLER PICKERING
17                                                  HALE AND DORR LLP
18                                                1875 Pennsylvania Ave NW
                                                  Washington, DC 20006
19                                                Telephone:  (202) 663-6000
                                                  Facsimile:   (202) 663-6363

20

21                                                *Attorneys for Defendant Facebook, Inc.*

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of November, 2021, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System.

Dated:  November 23, 2021                    By:   */s/ David Z. Gringer*
                                                  David Z. Gringer