1

WILMER CUTLER PICKERING
  HALE AND DORR LLP

2

SONAL N. MEHTA (SBN 222086)
  Sonal.Mehta@wilmerhale.com

3

2600 El Camino Real, Suite 400

4

Palo Alto, California 94306
Telephone:  (650) 858-6000

5

Facsimile:   (650) 858-6100

6

DAVID Z. GRINGER (*pro hac vice*)
  David.Gringer@wilmerhale.com

7

7 World Trade Center

8

250 Greenwich Street
New York, New York 10007

9

Telephone:  (212) 230-8800
Facsimile:   (212) 230-8888

10

ARI HOLTZBLATT (*pro hac vice*)
  Ari.Holtzblatt@wilmerhale.com

11

MOLLY M. JENNINGS (*pro hac vice*)
  Molly.Jennings@wilmerhale.com

12

1875 Pennsylvania Ave NW

13

Washington, DC 20006
Telephone:  (202) 663-6000

14

Facsimile:   (202) 663-6363

15

*Attorneys for Defendant Facebook, Inc.*

16

17

**UNITED STATES DISTRICT COURT**

18

**NORTHERN DISTRICT OF CALIFORNIA**

19

**SAN JOSE DIVISION**

20

MAXIMILIAN KLEIN, et al., on behalf of
themselves and all others similarly situated,

21

Plaintiffs,

22

23

v.

24

FACEBOOK, INC., a Delaware Corporation
headquartered in California,

25

Defendant.

26

Case No. 5:20-cv-08570-LHK

**DECLARATION       OF       MICHAEL
KIRKLAND        IN        SUPPORT        OF
FACEBOOK   INC.'S   OPPOSITION   TO
PLAINTIFF'S MOTION TO COMPEL**

Judge: Hon. Lucy H. Koh

27

28

I, Michael Kirkland, declare as follows:

1.      I am currently a Vice President of Technology Communications for Defendant Facebook, Inc.[1]  I have been employed by Facebook since September 2011 and have been in my current position since March 2019.  Over the course of my employment at Facebook, I have acquired personal knowledge of Facebook's reliance on an outside marketing agency specializing in digital, communications, and creative services, The OutCast Agency ("OutCast"), and specifically Rebecca Hahn, to assist with Facebook's communications strategies.

2.      I submit this Declaration in support of Facebook Inc.'s Opposition to the Motion to Compel in the above-captioned case.  It is my understanding that the documents at issue [PALM-002018614-20, PALM-002018621-27; PALM-002018628-34; PALM-002033146-52; PALM-002033279-88; PALM-002033310-6; PALM-002033543-47; PALM-002033748-54; PALM-002033773-81; PALM-002033782-87; PALM-002033788-92; PALM-002033793-98] all include redactions related to communications between Facebook attorneys and employees.  I have been asked to provide this declaration because Rebecca Hahn, who I worked with before and during the relevant time and who was managed by my former colleague, ▮▮▮▮▮▮▮, was included or copied on the communications at issue.

3.      The contents of this declaration are based on my personal knowledge of Facebook's relationship with OutCast and interactions with Rebecca Hahn specifically, as well as materials that were provided to me and reviewed by me, or conversations with other knowledgeable Facebook employees.  During the past ten years as a member of Facebook's communications team, I have worked with OutCast generally, and Rebecca Hahn specifically, on issues concerning Facebook communications relating to Facebook products, technology, or platform matters, among other issues.  If called upon as a witness in this action, I could and would testify competently thereto.

4.      OutCast has been one of Facebook's primary communications firms for over a decade, and has worked jointly during that period.  Notably, a number of OutCast employees have

---

[1] On October 28, 2021, Facebook, Inc. changed its company name to Meta Platforms, Inc. I will refer to the company as Facebook, however, given that was the company name during the relevant time period.

1   subsequently been employed by Facebook as full-time employees, including in leadership

2   positions.  For example, ███████████, the founder of OutCast, served as Facebook's head of

3   communications for over eight years.

4        5.    Ms. Hahn was a partner and Vice President at OutCast.  From June 1, 2011 until

5   May 21, 2018 while employed by OutCast, Ms. Hahn was classified internally at Facebook as a

6   contingent worker. Throughout her time classified as a contingent worker by Facebook, Ms. Hahn

7   was an integral member of Facebook's communications team. At the time Hahn began working

8   for Facebook, its communications team had fewer than approximately 30 members, and some areas

9   of the business lacked any dedicated communications support.  OutCast was retained to fill the

10  gap where full-time Facebook employees were not available. In this way, OutCast functioned

11  similar to a staffing agency.

12       6.    In April 2018, the relevant period of the documents identified above, Ms. Hahn

13  worked on matters related to the Facebook platform.  Also at that time, Ms. Hahn was the Account

14  Manager for the relationship between OutCast and Facebook, and was one of only two partners

15  from OutCast working on Facebook issues. Ms. Hahn was the most experienced member of the

16  OutCast team, both overall and with respect to addressing Facebook matters. Based on that level

17  of experience, Ms. Hahn was routinely entrusted with important matters for the Facebook

18  communications team, and I and my Facebook colleagues relied on her to execute assignments as

19  if she were just like any other Facebook employee, frequently working with the business

20  independently without a member of the Facebook communications team present. With respect to

21  the documents in question here, Ms. Hahn was included because she was assisting in preparing

22  Facebook's response to a press inquiry regarding platform issues—an area of the business she had

23  provided communications support for several years. As part of this role, Ms. Hahn participated in

24  communications with attorneys to understand and facilitate what information to include or exclude,

25  in part based on legal advice provided by those attorneys.

26       7.    In her role as a senior member of OutCast and a contingent worker for Facebook,

27  Ms. Hahn had access to a number of Facebook communications and record-keeping systems,

28  similar to full-time Facebook employees, housing confidential or sensitive Facebook information.

1   Some of her peers at OutCast shared that same access. Ms. Hahn's access to Facebook information

2   was subject to a non-disclosure agreement and was also restricted by confidentiality terms in the

3   Professional Services Agreement between Facebook and OutCast. With respect to Ms. Hahn

4   personally, Facebook trusted her with handling sensitive and difficult projects including relying

5   on her and staffing her on major events for the company as a communications representative,

6   including at Facebook's annual F8 conference for developers and entrepreneurs and Oculus

7   connect events. We also relied on Ms. Hahn to help staff Facebook executives for key media

8   interviews, and she served as the communications point person for interacting with many reporters.

9   Given her experience, the team did not hesitate to allow Ms. Hahn to interact with third-parties on

10  Facebook's behalf like a full-time employee member of the Facebook communications team and

11  shared information with her that the team understood would also be kept confidential pursuant to

12  non-disclosure and confidentiality terms.

13      8.      Ms. Hahn had badge access to Facebook facilities and routinely spent time on-site

14  at Facebook's campus, coming up from her home in Los Angeles several times a month to spend

15  the day working at the Facebook headquarters in Menlo Park. During on-site visits, Ms. Hahn

16  would sit with the other members of the communications team. Given the significance of OutCast

17  to the Facebook communications team, we had dedicated desk space for OutCast employees for

18  several years. Ms. Hahn, and other OutCast team members, were also part of the communications

19  team for extracurricular activities.

20      9.      As part of her responsibilities, Ms. Hahn would often draft or comment on press

21  releases, communications plans, or responses to the press, as well as attend weekly or regular

22  communications team meetings. As part of her responsibilities, Ms. Hahn would be included in

23  communications with attorneys seeking legal advice on such releases or communications plans

24  from Facebook before speaking on behalf of the company.

25      10.     Ms. Hahn, along with other members of the OutCast staff, was functionally

26  integrated into Facebook's communications staff and had responsibility and authority that was

27  indistinguishable from Facebook employees to outside observers. For example, senior OutCast

28  employees, including Ms. Hahn, would routinely interact with members of the press on Facebook's

1    behalf.  In my experience, those members of the press rarely distinguished between a Facebook

2    representative from OutCast or a Facebook employee.  The same was true of some Facebook

3    employees outside the communications department.

4         11.      In short, in my time working with her, Ms. Hahn was an integral member of our

5    communications team, and, despite being employed by OutCast, was integrated, regarded and

6    acted equivalently to a full-time Facebook employee within the communications department.

7

8         I declare that the foregoing is true and correct under penalty of perjury.

9         Executed on this 22nd day of November, 2021, in Walnut Creek, California.

10

11                                    By:   _____

12                                          MICHAEL KIRKLAND

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28