# EXHIBIT A

WILMER CUTLER PICKERING
  HALE AND DORR LLP

SONAL N. MEHTA (SBN 222086)
  Sonal.Mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone:  (650) 858-6000
Facsimile:  (650) 858-6100

DAVID Z. GRINGER (*pro hac vice*)
  David.Gringer@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone:  (212) 230-8800
Facsimile:  (212) 230-8888

ARI HOLTZBLATT (*pro hac vice*)
  Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
  Molly.Jennings@wilmerhale.com
1875 Pennsylvania Ave NW
Washington, DC 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363

*Attorneys for Defendant Facebook, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated,<br><br>                           Plaintiffs,<br><br>    v.<br><br>FACEBOOK, INC., a Delaware Corporation headquartered in California,<br><br>                          Defendant. | Case No. 5:20-cv-08570-LHK<br><br>**FACEBOOK, INC.'S STATEMENT OF RECENT DECISION**<br><br>Judge: Hon. Lucy H. Koh |

1       Pursuant to Civil Local Rule 7-3(d)(2), Defendant Facebook, Inc. respectfully submits this

2   Statement of Recent Decision to bring to this Court's attention the decision of the Ninth Circuit in

3   *City of Oakland v. Oakland Raiders, et al.*, No. 20-16075, 2021 WL 5707683, at *7-13 (9th Cir.

4   Dec. 2, 2021), affirming dismissal of a Sherman Act claim for failure to adequately allege antitrust

5   standing where alleged damages were speculative.   A true and correct copy of that decision is

6   appended hereto.   The decision was filed on December 2, 2021, after briefing was completed on

7   Facebook's Motion to Dismiss the Consolidated Consumer Class Action Complaint and

8   Consolidated Advertiser Class Action Complaint.   The decision is therefore appropriate for

9   consideration by the Court.   *See* Civil L.R. 7-3(d)(2).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: December 7, 2021

Respectfully submitted,

By: */s/ Sonal N. Mehta*

SONAL N. MEHTA (SBN 222086)
   Sonal.Mehta@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

DAVID Z. GRINGER (*pro hac vice*)
   David.Gringer@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

ARI HOLTZBLATT (*pro hac vice*)
   Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
   Molly.Jennings@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
1875 Pennsylvania Ave NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Attorneys for Defendant Facebook, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of December, 2021, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System.

*/s/ Sonal N. Mehta*
Sonal N. Mehta

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CITY OF OAKLAND,
              *Plaintiff-Appellant,*

    v.

OAKLAND RAIDERS, a California
Limited Partnership; ARIZONA
CARDINALS FOOTBALL CLUB, LLC;
ATLANTA FALCONS FOOTBALL CLUB
LLC; BALTIMORE RAVENS, LP;
BUFFALO BILLS, LLC; PANTHERS
FOOTBALL, LLC; CHICAGO BEARS
FOOTBALL CLUB, INC.; CINCINNATI
BENGALS, INC.; CLEVELAND
BROWNS FOOTBALL COMPANY,
LLC; DALLAS COWBOYS FOOTBALL
CLUB, LTD.; PDB SPORTS LTD.;
DETROIT LIONS, INC.; GREEN BAY
PACKERS, INC.; HOUSTON NFL
HOLDINGS, LP; INDIANAPOLIS
COLTS, INC.; JACKSONVILLE
JAGUARS LLC; KANSAS CITY CHIEFS
FOOTBALL CLUB, INC.; CHARGERS
FOOTBALL COMPANY LLC; THE
RAMS FOOTBALL COMPANY, LLC;
MIAMI DOLPHINS, LTD.; MINNESOTA
VIKINGS FOOTBALL LLC; NEW
YORK FOOTBALL GIANTS, INC.; NEW
YORK JETS, LLC; PHILADELPHIA

No. 20-16075

D.C. No.
3:18-cv-07444-
JCS

OPINION

EAGLES LLC; PITTSBURGH
STEELERS LLC; FORTY NINERS
FOOTBALL COMPANY LLC;
FOOTBALL NORTHWEST LLC;
BUCCANEERS TEAM LLC;
TENNESSEE FOOTBALL, INC.; PRO-
FOOTBALL, INC.; NATIONAL
FOOTBALL LEAGUE; NEW ENGLAND
PATRIOTS LLC; NEW ORLEANS
LOUISIANA SAINTS, LLC,
                    *Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of California
Joseph C. Spero, Magistrate Judge, Presiding

Argued and Submitted June 14, 2021
San Francisco, California

Filed December 2. 2021

Before: A. Wallace Tashima and Patrick J. Bumatay,
Circuit Judges, and Douglas L. Rayes,* District Judge.

Opinion by Judge A. Wallace Tashima;
Concurrence by Judge Bumatay

---

* The Honorable Douglas L. Rayes, United States District Judge for
the District of Arizona, sitting by designation.

## SUMMARY[**]

### Antitrust

The panel affirmed the district court's dismissal, for failure to state a claim, of an antitrust action brought by the City of Oakland against the National Football League and its member teams.

The City alleged that defendants created artificial scarcity in their product of NFL teams, and then used that scarcity to demand supra-competitive prices from host cities. The City alleged that when it could not pay those prices, defendants punished it by allowing the Raiders to move to Las Vegas.

The panel held that the City had Article III standing because it plausibly alleged that, but for defendants' conduct, it would have retained the Raiders, and thus made the required showing that its injury was likely caused by defendants.

Affirming the district court's dismissal, the panel held that defendants' conduct did not amount to an unreasonable restraint of trade in violation of § 1 of the Sherman Act. The panel held that the City failed sufficiently to allege a group boycott, which occurs when multiple producers refuse to sell goods or services to a particular customer. Here, the City alleged only that a single producer, the Raiders, refused to deal with it. The panel held that the City also failed sufficiently to allege statutory standing on a theory that

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

4    CITY OF OAKLAND V. OAKLAND RAIDERS

defendants' conduct constituted an unlawful horizontal price-fixing scheme. The panel held that a finding of antitrust standing requires a balancing of the nature of the plaintiff's alleged injury, the directness of the injury, the speculative measure of the harm, the risk of duplicative recovery, and the complexity in apportioning damages. The panel reasoned that here, the City was priced out of the market and therefore was a nonpurchaser. In addition, the City's damages were highly speculative and would be exceedingly difficult to calculate.

Concurring, Judge Bumatay wrote that he would hold that the price-fixing claim was too speculative to satisfy the threshold of constitutional standing. He wrote that the City did not show that its injury was fairly traceable to defendants' challenged conduct, but rather relied on speculation upon speculation to connect its injury of the Raiders leaving for Las Vegas to the NFL's entry rule. Judge Bumatay thus concurred in the court's judgment and joined Parts I, II, and III.B of the majority opinion.

**COUNSEL**

Michael M. Fay (argued), James W. Quinn, Jenny H. Kim, and Emily Burgess, Berg & Androphy, New York, New York; Bruce L. Simon, Pearson Simon & Warshaw, LLP, San Francisco, California; Clifford H. Pearson, Michael H. Pearson and Thomas J. Nolan, Pearson Simon & Warshaw, LLP, Sherman Oaks, California; Barbara Jean Parker, Maria Bee, and Malia McPherson, Office of the City Attorney, Oakland, California, for Plaintiff-Appellant City of Oakland.

Daniel B. Asimow (argued) and Kenneth G. Hausman, Arnold & Porter Kaye Scholer LLP, San Francisco, California; Jonathan I. Gleklen, Arnold & Porter Kaye Scholer LLP, Washington, D.C.; for Defendant-Appellee The Oakland Raiders.

John E. Hall, Gregg H. Levy, Derek Ludwin, and Benjamin J. Razi, Covington & Burling LLP, Washington, D.C., for Defendants-Appellees The National Football League and all NFL Clubs other than The Oakland Raiders.

Makan Delrahim Assistant Attorney General; Michael F. Murray, Deputy Assistant Attorney General; Daniel E. Haar and Jeffrey D. Negrette, Attorneys; Antitrust Division, United States Department of Justice, Washington, D.C.; for Amicus Curiae United States of America.

## OPINION

TASHIMA, Circuit Judge:

Plaintiff City of Oakland (the "City") alleges that the National Football League ("NFL") and its thirty-two member teams (collectively, "Defendants") have "created artificial scarcity in their product (NFL teams), and then used that scarcity . . . to demand supra-competitive prices from host cities." First Am. Compl. ("FAC" or "complaint") FAC ¶ 1.[1] It further alleges that, "[w]hen Oakland could not pay those prices, Defendants punished the city: they voted to allow the Raiders to move to Las Vegas, which left Oakland without an NFL team and caused significant losses to Oakland." FAC ¶ 2. The City contends that Defendants' conduct amounts to an unreasonable restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, on two independent bases: First, because it constitutes an unlawful group boycott, and second, because it constitutes an unlawful horizontal price-fixing scheme. The district court dismissed the City's Sherman Act claim for failure to state a claim upon which relief may be granted. *See City of Oakland v. Oakland Raiders*, 445 F. Supp. 3d 587, 606 (N.D. Cal. 2020); Fed. R. Civ. P. 12(b)(6). We affirm.

We agree with the district court that the City has failed to allege a group boycott. A group boycott occurs when *multiple* producers refuse to sell goods or services to a particular consumer. Although the City alleges collective

---

[1] The NFL is "an association of 'separately owned professional football teams.'" *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1144 (9th Cir. 2019) (quoting *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 187 (2010)).

action (*i.e.*, that the other NFL teams supported the Raiders' boycott), it has not alleged a *group* boycott. The City has alleged only that a single producer—the Raiders—refused to deal with the City.

The City's horizontal price fixing theory fails as well. To plead a Sherman Act claim, a private plaintiff must show that it is a proper party to pursue the claim—a requirement known as antitrust standing. Although buyers who pay collusive overcharges (direct purchasers) ordinarily have antitrust standing to challenge a horizontal price-fixing scheme, buyers, like the City, who are priced out the market—and hence do not purchase the product or pay the overcharge—ordinarily do not. A nonpurchaser's injury is less direct than the injuries of actual purchasers and highly speculative: we cannot know whether, in the absence of Defendants' restrictions on output, the nonpurchaser would have made a purchase and, if so, under what terms. In addition, the City's damages are highly speculative and would be exceedingly difficult to calculate. We therefore agree with the district court that the City has failed to allege antitrust standing on its horizontal price fixing theory of liability.

**I.**[2]

In 1995, the Oakland Raiders professional football team signed an agreement to play in the Oakland-Alameda County Coliseum ("Coliseum"). FAC ¶ 102. Under the terms of the agreement, the Raiders leased the Coliseum for a period of sixteen years, with an annual rent of $50,000; the City offered the Raiders a $31.9 million relocation and operating loan; the City committed up to $10 million toward the construction of a new training facility; the City offered up to $85 million toward stadium modernization efforts; and the Raiders agreed to a $1 surcharge on ticket sales, with the proceeds to benefit Oakland public schools and other public services. FAC ¶ 102. The Raiders extended the lease in 2009 and again in 2014. FAC ¶¶ 107, 112.

In the years that followed, the City negotiated with the Raiders in an unsuccessful attempt to keep the team in Oakland. In 2014, the City proposed donating land to the Raiders for a new stadium. FAC ¶ 113. In 2015, the City proposed a $500 million renovation of the Coliseum, to which the City would have contributed significantly. FAC ¶ 113. In 2016, the City supported a proposal to build a new $1.3 billion stadium in Oakland, financed by $350 million in public funds, $400 million from an investment group led by former NFL players Ronnie Lott and Rodney Peete, and $500

---

[2] Because the district court dismissed the City's Sherman Act claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, we recite the facts as they appear in the City's complaint. *See Padilla v. Yoo*, 678 F.3d 748, 751 n.1 (9th Cir. 2012) ("We emphasize that this factual background is based only on the *allegations* of the plaintiffs' complaint. Whether the plaintiffs' allegations are in fact true has not been decided in this litigation, and nothing we say in this opinion should be understood otherwise.").

million from the Raiders. FAC ¶ 121. The City alleges that the Raiders and the NFL engaged in these negotiations in bad faith. According to the complaint, "[t]he Raiders, the NFL, and ultimately, the vast majority of NFL Clubs, were just stringing Oakland along as part of their collusive scheme to relocate the Raiders." FAC ¶ 23.

In 2017, the Raiders filed an application with the NFL to relocate the team to Las Vegas. FAC ¶ 124. The NFL teams voted thirty-one to one to approve the relocation. FAC ¶ 132. The complaint alleges that the move benefitted the Raiders and the other NFL teams alike. The Raiders moved to a new, $1.9 billion stadium in Las Vegas, financed by $750 million in public funds, FAC ¶¶ 5, 149, and the team's enterprise value more than doubled to $3 billion, FAC ¶¶ 5, 63. The other teams, meanwhile, divided a $378 million relocation fee paid by the Raiders, FAC ¶ 66, and, due to revenue sharing among NFL teams, stand to share in "new television rights in a new geographic territory, new merchandising, new intellectual property and game receipts from an ultra-luxury $1.9 billion stadium," FAC ¶¶ 4, 66.

In 2018, the City commenced this action against the NFL, the Raiders, and the other thirty-one NFL teams, alleging an antitrust violation under § 1 of the Sherman Act, 15 U.S.C. § 1, as well as breach of contract and unjust enrichment claims under California law. FAC ¶¶ 218–42. The complaint seeks declaratory and monetary relief, including treble damages under § 4 of the Clayton Act, 15 U.S.C. § 15(a).

With respect to the Sherman Act claim, which is the focus of this appeal, the complaint alleges that

> [t]he relevant market in this action is the market for hosting NFL teams. The consumers in this market are all Host Cities offering, and all cities and communities that are willing to offer (*i.e.*, potential Host Cities), home stadia and other support to major league professional football teams in the geographic United States. The product in this market is the NFL team, as a hosted entity.

FAC ¶ 189. The City alleges that this market is anticompetitive because the NFL limits both the number of teams and the freedom of teams to relocate: NFL rules permit neither league expansion nor team relocation without the approval of three-fourths of the NFL's teams. FAC ¶ 66. The complaint further alleges that these policies and practices artificially restrict the number of teams, driving up the prices demanded of and paid by host cities. As incumbent and aspiring host cities compete with one another, they are forced to pay supracompetitive prices to retain or acquire teams, usually in the form of publicly financed stadia. The complaint alleges that in a competitive market—with more teams and fewer restrictions on relocation—teams would instead compete for host cities, driving down prices: "Because all viable locations would have a team, team owners would not be able to make threats about leaving their current Host Cities. In fact, the tables would take a dramatic turn: teams actually would compete for financially viable locations." FAC ¶ 47 (quoting R. Fort, *Market Power in Pro Sports: Problems and Solutions*, 13–14, *in The Economics of Sports* (W. Kern ed., 2000)). The complaint maintains that, "[i]n a competitive market, demanding a new stadium would be a risky move for any team owner: the Host City could

reject the demand and seek out a new team willing to play in the existing stadium." FAC ¶ 145.

The City's contention that, in a competitive market, the Raiders would have stayed in Oakland rests on three premises. First, the City alleges that there would be more NFL teams in a competitive market. According to the complaint, Defendants "artificially restrict the supply of its product (NFL teams) even though consumer demand in the market could support greater output (more teams)." FAC ¶ 9. "[F]ocusing on factors of wealth and population," the City contends that "the current NFL could support as many as 42 teams in the United States." FAC ¶ 43. Second, the City asserts that Oakland is a highly attractive market:

> A recent economic analysis conducted by Dr. Daniel Rascher, Professor and Director of Academic Programs for the Sport Management Program at the University of San Francisco, commissioned by Oakland focused on which U.S. cities, currently without an NFL team, best reflect the demographic and financial conditions of existing Host Cities and are the best prospects for new NFL franchises. The winner? *Oakland*. Focusing on total population, real income, percentage of NFL "super fans," and existing stadia support, Oakland was the highest rated city for NFL expansion.

FAC ¶ 138. Third, the City alleges that "without the NFL's cartel structure and rigid control over output (league expansion), the Raiders would have had virtually no relocation 'extortion' threat to exercise." FAC ¶ 92.

The City contends that Defendants' conduct violates the Sherman Act on horizontal price-fixing and group boycott theories. First, the City contends that Defendants have engaged in a group boycott, also known in antitrust law as a concerted refusal to deal. The complaint alleges that "[t]he decision to remove a team from a Host City, combined with the decision to deny that same City a new expansion franchise, constitutes a collective refusal to deal with, or a group boycott of, the City." FAC ¶ 140. Second, the City contends that Defendants, as a cartel, have engaged in a classic horizontal price-fixing scheme. FAC ¶ 146. By "constrain[ing] the supply of NFL teams," the NFL "is driving up the price of hosting an NFL team far beyond the marginal costs of operating an NFL team and far beyond the price that would be found in a competitive marketplace." FAC ¶¶ 145–46.

The complaint asserts that the City lost the Raiders for two reasons. First, the City alleges that it was priced out of the market: "Because it could not pay Defendants' supra-competitive prices, Oakland lost the Raiders and any chance to host an NFL team." FAC ¶ 51. Second, because Defendants believed moving the Raiders to Las Vegas was in their economic interest, they refused to negotiate with the City in good faith.

The complaint alleges that Defendants' conduct—and the loss of the Raiders—has injured the City in several ways: lost investment value arising from the tens of millions of dollars the City borrowed to improve the Coliseum and build a training facility, FAC ¶¶ 201–03; lost income, including the $1 ticket surcharge dedicated to public education and the rental monies the Raiders paid for use of the Coliseum, FAC ¶¶ 204–05; lost tax revenues from ticket sales, concessions,

stadium parking, player compensation, and merchandising associated with Raiders games, FAC ¶¶ 206–10; and devaluation of the Coliseum property, which the City and Alameda County jointly own, FAC ¶¶ 211–17.

The district court dismissed the City's Sherman Act claim with prejudice under Rule 12(b)(6) and declined to exercise supplemental jurisdiction over the state-law claims. The court concluded that the City's alleged injuries were too speculative to confer antitrust standing because the City "had not plausibly alleged that, but for the limited number of teams, Oakland would still have an NFL team." *City of Oakland*, 445 F. Supp. 3d at 601. The court also rejected the City's group boycott theory on the ground that the City had "not alleged that any NFL team besides the Raiders has refused to deal with Oakland, or that the NFL has prohibited any team from dealing with Oakland." *Id.* at 605–06. Following the entry of judgment, the City timely appealed.

## II.

"Dismissal for failure to state a claim is reviewed *de novo*." *Barrett v. Belleque*, 544 F.3d 1060, 1061 (9th Cir. 2008) (per curiam). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Antitrust standing is a question of law reviewed de novo." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054 (9th Cir. 1999).

## III.

### A.  *Article III Standing*

We begin by addressing Defendants' argument that the City lacks Article III standing.[3]  To establish constitutional standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Defendants focus on the second requirement, contending that the City's "purported injury cannot 'fairly . . . be traced' to the NFL's rules requiring existing teams to approve league expansion," because the City relies on "a long and speculative chain of causation."  Specifically, Defendants emphasize that the City does not "allege that any team sought to play in the NFL and was denied admission," "that if there were an additional team, it would have played in Las Vegas thereby foreclosing the Raiders' move there," "that if there were additional teams and one of them might have played in Las Vegas, the Raiders would have stayed in Oakland rather than move to another city with a more attractive stadium or better economics," or "that it made any effort to attract an existing franchise or new expansion team to replace the Raiders in

---

[3] Although Defendants did not challenge the City's constitutional standing in the district court, the issue "may be raised at any time, even for the first time on appeal."  *DBSI/TRI IV Ltd. P'ship v. United States*, 465 F.3d 1031, 1038 (9th Cir. 2006).

Oakland since learning in 2016 of the Raiders' plans to leave."

We agree with Defendants that the City relies on a somewhat speculative chain of causation. As we explain in Part III.C, *infra*, this fact plays a significant role in our analysis of the City's *statutory* standing. To establish constitutional standing, however, the City need not establish to a certainty that, but for Defendants' challenged conduct, it would have retained the Raiders or acquired another team. It need only plausibly allege that, but for that conduct, there is a "substantial probability" that it would have done so. *See Warth v. Seldin*, 422 U.S. 490, 504 (1975); *Nat'l Fam. Farm Coal. v. U.S. Env't Prot. Agency*, 966 F.3d 893, 908 (9th Cir. 2020); *Legal Aid Soc'y of Alameda Cnty. v. Brennan*, 608 F.2d 1319, 1334–35 (9th Cir. 1979). That standard is satisfied here. The City credibly alleges that Oakland is a prime location for an NFL team, that there would be more NFL teams in a market driven by consumer demand, and that—in a competitive market—teams like the Raiders would not be able to use a threat of relocation to demand supracompetitive concessions from host cities. Specifically, Oakland is an incumbent host city. FAC ¶ 1. The City further alleges that in the absence of Defendants' challenged actions (*i.e.*, in a competitive market), there would be more teams in the NFL FAC ¶¶ 1, 9, 39, 43–44, 67, 69, 197, 199; that in the absence of Defendants' challenged actions, Defendants would not be able to threaten relocation, FAC ¶¶ 16, 145, or demand supracompetitive prices from host cities, FAC ¶¶ 5, 10, 14, 47, 49, 57, 149, 198; that Oakland was willing and able to pay competitive prices to retain the Raiders, FAC ¶¶ 4, 65, 121–22, 128–31; that Oakland is a highly desirable host city for an NFL team, FAC ¶¶ 5, 26. 127,138; that NFL relocation policies favor a team's home

territory over relocation, FAC ¶¶ 21, 89–90, 167; that the Raiders were financially successful in Oakland, received significant financial support from the City, and had one of the most loyal fan bases in the NFL, FAC ¶ 22; that Oakland lost the Raiders solely because it was unable to pay supracompetitive prices, FAC ¶¶ 51, 133, 150–51; and that, in a competitive market, the Raiders would have stayed in Oakland or Oakland would have landed another team, FAC ¶¶ 16, 92.

These allegations are sufficiently plausible to allege that there is a "substantial probability" that the Raiders would have stayed in Oakland if not for Defendants' challenged conduct. This is not a case in which the plaintiff's theory of standing is either "counterintuitive" or premised on "a 'highly attenuated chain of possibilities.'" *California v. Texas*, 141 S. Ct. 2104, 2119 (2021) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)).[4]

---

[4] Defendants' reliance on *City of Rohnert Park v. Harris*, 601 F.2d 1040 (9th Cir. 1979), is misplaced. There, the city's assertion that a regional shopping center would have been developed in the city absent the defendants' challenged conduct was "entirely speculative." *Id.* at 1045. That is not the case here.

### B. Group Boycott[5]

As stated above, the complaint alleges a violation of the Sherman Act on two alternative theories—horizontal price fixing and group boycott. The district court rejected the group boycott theory on the ground that the City "has not alleged that any NFL team besides the Raiders has refused to deal with Oakland, or that the NFL has prohibited any team from dealing with Oakland or set any 'agreed terms' that Oakland must meet to attract a new or different team." *City of Oakland*, 445 F. Supp. 3d at 605–06. The City contends that the complaint adequately states a claim on a group boycott theory because it alleges that "it is the NFL owners

---

[5] "The classic 'group boycott' is a concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level"—something that is not alleged here. *Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advert. Ass'n*, 672 F.2d 1280, 1284 (7th Cir. 1982) (quoting *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1178 (D.C. Cir. 1978)); *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶¶ 2003i, 2200a (4th and 5th eds. 2013–2020) ("Areeda & Hovenkamp"). "The term group boycott," however, "is in reality a very broad label for divergent types of concerted activity," *Phil Tolkan Datsun*, 672 F.2d at 1285 (quoting *Mackey v. Nat'l Football League*, 543 F.2d 606, 619 (8th Cir. 1976), *overruled on other grounds as stated in Eller v. Nat'l Football League Players Ass'n*, 731 F.3d 752, 755 (8th Cir. 2013)), and the Supreme Court has recognized group boycotts aimed directly at consumers, *e.g.*, *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 533, 544 ("[T]he Sherman Act makes it an offense for [businessmen] to agree among themselves to stop selling to particular customers." (alteration in original) (quoting *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*, 340 U.S. 211, 214 (1951), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984))). For purposes of our analysis, therefore, we assume that a concerted refusal to deal with a consumer or consumers states a cognizable "group boycott" claim under § 1 of the Sherman Act.

*acting collectively* (not individual teams) who decide whether and where a particular team may relocate and . . . Defendants made a '*collective* decision to move the Raiders to Las Vegas.'" We disagree.

Collective action in support of an individual boycott is not the same as a group boycott. The City's allegations, taken as true, show only that *the Raiders* boycotted the City and that the other Defendants supported the Raiders' boycott. The other teams did not "boycott" the City. The FAC does not allege that they, or any of them, refused to "sell" to the City.

The group boycott cases upon which the City relies involve circumstances in which *multiple* producers refused to sell their goods or services to consumers. In *FTC v. Superior Court Trial Lawyers Ass'n.*, 492 U.S. 414 (1990), the Supreme Court recognized a viable group boycott claim where "*a group of lawyers* agreed not to represent indigent criminal defendants in the District of Columbia Superior Court until the District of Columbia government increased the lawyers' compensation." *Id.* at 422–23 (emphasis added). The Supreme Court explained that these lawyers, as a group, had engaged in "a concerted refusal to serve an important customer in the market for legal services." *Id.* at 423. And in *St. Paul Fire & Marine Insurance Co.*, 438 U.S. at 543–45, the Court recognized a group boycott claim where *three medical malpractice insurers* refused to offer coverage to the policyholders of a fourth insurer in order to force the policyholders into agreeing to coverage by the fourth insurer on the fourth insurer's terms. As these cases reflect, a group boycott occurs when "*two or more competitors* . . . refuse to do business with one firm." *Group boycott*, Black's Law Dictionary (11th ed. 2019) (emphasis added); *see Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1568 (11th Cir.

1991) ("[T]he distinguishing feature of such cases is a plurality of refusals to deal by different parties."); *Constr. Aggregate Transp., Inc. v. Fla. Rock Indus., Inc.*, 710 F.2d 752, 773 (11th Cir. 1983) ("[I]t is important to remember that a concerted refusal to deal essentially is an agreement among two or more parties that each will engage in an individual refusal to deal with a particular customer or customers. In the case before us, however, we have only one business entity refusing to deal with the plaintiff . . . . That [a second business entity] may have instigated [the first entity's] refusal to deal does not create the plurality of 'refusals' necessary for the arrangement to be called a group boycott."). Here, the other NFL teams simply supported the Raiders' refusal to deal with the City, but did not themselves refuse to do business with the City. The City, therefore, although it has alleged an individual boycott, has not alleged a group boycott.[6]

The City alternatively contends that it has alleged a group boycott because the other teams supported the Raiders' relocation threat by agreeing among themselves that they would neither relocate to Oakland nor allow an expansion team to locate there if the City refused to accede to the Raiders' demands for a new stadium. FAC ¶ 140. A law review article upon which the City relies describes this group boycott theory as follows:

> [G]iven the artificial scarcity of teams and the difficulty of new entry, threats to relocate are

---

[6] We do not decide whether the collective action of which the City complains could be actionable under § 1 of the Sherman Act on any other theory. We hold only that the conduct of which the City complains does not allege a group boycott.

> more than the action of an individual
> economic entity; rather, every threat to
> relocate is also an implicit threat of a
> concerted boycott. A group boycott exists
> when individual economic actors agree to
> refrain from dealing with another entity in
> order to gain some competitive advantage, in
> this case the advantage of favorable subsidies
> to build or renovate new stadiums. . . .
> Translation: If Houston does not pay the price
> demanded by the Oilers, no other NFL team
> will deal with the city.

David Haddock, Tonga Jacobi & Matthew Sag, *League Structure & Stadium Rent-Seeking—the Role of Antitrust Revisited*, 65 Fla. L. Rev. 1, 50–51 (2013). This may be a viable theory of group boycott (a question we need not reach), but it fails here because the City has not proffered any specific allegations to suggest that such an agreement in fact existed in this case. As the district court explained, "[c]ertain commentators' view that 'a threat by an individual team to relocate *may* comprise an *implicit* threat of concerted boycott' does not, without more, show that such a boycott in fact occurred." *City of Oakland*, 445 F. Supp. 3d at 606. The City's allegation is therefore too speculative to cross the plausibility threshold.

## C. Horizontal Price Fixing: Antitrust Standing

Because the City's group boycott theory fails to state a claim, the viability of the City's Sherman Act claim turns on its horizontal price-fixing theory. As set forth below, we hold

that the City's price-fixing theory fails as well, for lack of antitrust standing.[7]

Section 1 of the Sherman Act prohibits unreasonable restraints of trade. *In re NFL's Sunday Ticket Antitrust Litig.*, 933 F.3d at 1149.[8]  Actions for damages, like this one, are authorized by § 4 of the Clayton Act.[9]  "Despite the apparent breadth of the phrase 'any person,' the Supreme Court has held that Congress did not intend to afford a remedy to everyone injured by an antitrust violation simply on a showing of causation." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000).  Instead, the plaintiff must have "antitrust standing." *Id*.

We have "identified certain factors for determining whether a plaintiff who has borne an injury has antitrust standing":

---

[7] Because we affirm the dismissal of the City's group boycott theory on other grounds, we need not address whether our analysis of antitrust standing with respect to the City's price-fixing theory applies as well to the City's group boycott theory.

[8] The City does not contend that the challenged practices are per se unlawful.

[9] Section 4(a) provides:

> [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15(a).

(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall;

(2) the directness of the injury;

(3) the speculative measure of the harm;

(4) the risk of duplicative recovery; and

(5) the complexity in apportioning damages.

*Am. Ad Mgmt.*, 190 F.3d at 1054.[10]

---

[10] These five factors are illustrative rather than exhaustive. In *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 146 (9th Cir. 1989) (en banc), for example, we articulated five different factors that, although largely overlapping with those identified in *American Ad Management*, included two factors that we did not specifically mention in *American Ad Management*: "[t]he specific intent of the alleged conspirators" and "[t]he existence of other, more appropriate plaintiffs." We nevertheless rely on the *American Ad Management* factors to frame our analysis. Among other virtues, they adhere closely to the factors identified by Areeda and Hovenkamp in their influential treatise on antitrust law:

Unlike the United States government, which is authorized to sue anyone who violates the antitrust laws, a private antitrust plaintiff must show "standing" to sue. In addition to proving everything that would entitle the government to relief, the private plaintiff must also show (1) that the acts violating the antitrust laws caused—or, in an equity case, threatened to cause—it injury-in-fact to its "business or property;" (2) that this injury is not too remote or duplicative of the recovery of a more directly injured person; (3) that such injury is "antitrust injury," which is defined as the kind of injury that the antitrust laws were intended to

"To conclude that there is antitrust standing, a court need not find in favor of the plaintiff on each factor." *Id.* at 1055. "Instead, we balance the factors," *id.*, recognizing that "[a]ntitrust standing involves a case-by-case analysis," *Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1996) (as amended). "Most cases will find some factors tending in favor of standing (to a greater or lesser degree), and some against (also in varying degrees), and a court may find standing if the balance of factors so instructs." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1363 (9th Cir. 1986). Nevertheless, the first factor—antitrust injury—is mandatory. *See Am. Ad Mgmt.*, 190 F.3d at 1055 ("[T]he Supreme Court has noted that '[a] showing of antitrust injury is necessary, but not always sufficient, to establish standing under § 4.'" (second alteration in original) (quoting *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986))); *see also Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1102 (9th Cir. 1999) ("To have standing to bring an antitrust case, a plaintiff must demonstrate that the harm the plaintiff has suffered or might suffer from the practice is an 'antitrust injury,' that is, an 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" (quoting *Atl. Richfield Co. v. USA Petroleum Co.*,

---

prevent and "flows from that which makes defendants' acts unlawful"; and, in a damage case, (4) that the damages claimed or awarded measure such injury in a reasonably quantifiable way.

Areeda & Hovenkamp ¶ 335 (footnotes omitted). Although *American Ad Management* did not mention the requirement that a plaintiff show injury to its "business or property," that is indisputably an additional requirement for antitrust standing under § 4 of the Clayton Act. *See* 15 U.S.C. § 15(a); *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 260–61 (1972).

495 U.S. 328, 334 (1990))).  Applying these principles here, we conclude that, although the City has alleged antitrust injury, it has not alleged antitrust standing generally.

### 1.  *Antitrust Injury*

We have identified "four requirements for antitrust injury: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent."  *Am. Ad Mgmt.*, 190 F.3d at 1055.

The City has adequately alleged the first requirement—unlawful conduct.  The City alleges that Defendants, operating as a cartel, have restricted the number of NFL teams and demanded supracompetitive prices from host cities.  These allegations are sufficient.  *See, e.g.*, *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 107–08 (1984) ("Restrictions on price and output are the paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit."); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) ("If the plaintiff puts forth evidence of restricted output and supracompetitive prices, that is direct proof of . . . injury to competition . . . .").

The City has adequately alleged the second requirement—injury—as well.  This requirement is satisfied where the plaintiff shows that it "stands to suffer, not gain," from the defendant's unlawful conduct.  *Am. Ad Mgmt.*, 190 F.3d at 1056.  That is the case here.  The City plausibly alleges that, but for Defendants restrictions on output, the Raiders would have stayed in Oakland, or another NFL team would have located there.  The City alleges, moreover, that

the loss of the Raiders has caused the City economic loss, including reduced tax revenues.

Under the third requirement, "[i]t is not enough that the plaintiff's claimed injury flows from the unlawful conduct. An antitrust injury must 'flow[ ] from that which makes defendants' acts unlawful.'" *Id.* (second alteration in original). The complaint again satisfies this requirement here. The City's alleged injuries stem from the loss of the Raiders, and the City plausibly alleges that the Raiders left Oakland because of Defendants' allegedly unlawful restriction on output. The City also credibly asserts that, in a world with more teams, there might have already been a team in Las Vegas, blocking the Raiders' move there, and that, in a competitive market with more teams, the Raiders would not have had the leverage to demand supracompetitive concessions from the City. The City's alleged injuries, therefore, flow from that which allegedly makes Defendants' conduct unlawful: limiting output below levels dictated by consumer demand.

"Finally, the plaintiff's injury must be 'of the type the antitrust laws were intended to prevent.'" *Id.* at 1057. "The Supreme Court has made clear that injuries which result from *increased* competition or lower (but non-predatory) prices are not encompassed by the antitrust laws." *Id.* Thus, "[i]f the injury flows from aspects of a defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's conduct is illegal." *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1003 (9th Cir. 2008). Here, Defendants argue that the complaint fails this test because the City lost the Raiders "through the process of competition . . . . Loss of the Raiders to a city that

made a better offer is not injury arising from a *reduction* in competition."

Defendants' argument stands antitrust law on its head. "[T]he principal objective of antitrust policy is to maximize *consumer* welfare by encouraging *firms* to behave competitively," Areeda & Hovenkamp ¶ 100, not, as Defendants suggest, to maximize producers' welfare by increasing competition among consumers. As the Supreme Court recently reminded us, "[t]he goal [of the Sherman Act] is to distinguish between restraints with anticompetitive effect that are harmful *to the consumer* and restraints stimulating competition that are in *the consumer's* best interest." *NCAA v. Alston*, 141 S. Ct. at 2151 (first alteration in original) (emphasis added) (quoting *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018)). Thus, the fact that the City lost the Raiders as a result of enhanced competition among *consumers* does not negate the City's antitrust injury.

On the contrary, the proper focus is on whether the City's injuries flow from a decrease in competition among *producers*. They do. The City alleges that it was injured because Defendants reduced output and increased prices. These are precisely the kinds of harms to competition that the antitrust laws were intended to prevent. *See Pool Water Prod. v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001) ("Antitrust injury 'means injury from higher prices or lower output, the principal vices proscribed by the antitrust laws.'" (quoting *Nelson v. Monroe Reg'l Med. Ctr.*, 925 F.2d 1555, 1564 (7th Cir. 1991))). Thus, the City has alleged antitrust injury.

### 2. *The Directness of the Injury*

The second factor in the antitrust standing inquiry "looks to whether [the plaintiff's] alleged injury was the direct result of [the defendant's] allegedly anticompetitive conduct." *Am. Ad Mgmt.*, 190 F.3d at 1058. This factor focuses on "the chain of causation between [the plaintiff's] injury and the alleged restraint" of trade. *Id.* "The harm may not be 'derivative and indirect' or 'secondary, consequential, or remote.'" *Theme Promotions*, 546 F.3d at 1004 (first quoting *Amarel*, 102 F.3d at 1511, and then quoting *Kolling v. Dow Jones & Co.*, 187 Cal. Rptr. 797, 808 (Ct. App. 1982)).

This factor cuts against the City's antitrust standing. In a horizontal price-fixing scheme like the one the City alleges here, members of a cartel "collude on price and output in an effort to maximize their profits." Areeda & Hovenkamp ¶ 391b1. Producers restrict output and raise prices, and consumers—direct purchasers from the cartel—pay an overcharge (a supracompetitive price) to purchase the producers' goods or services. These direct purchasers plainly have "standing to recover any collusive overcharges." *Id.* Their injuries are direct and certain. The same cannot be said, however, of consumers, like the City, that "were priced out of the market." *Id.* As Areeda & Hovenkamp explain:

> The difficulty lies in identifying those who are injured by the deadweight welfare loss. Anyone could claim that he or she would have purchased at the competitive price but was priced out of the market as a result of the anticompetitive pricing. Thus, courts are likely to find that the claims of those who

refused to purchase at the cartel price are *speculative*.

*Id.*

The Tenth Circuit confronted this situation in *Montreal Trading Ltd. v. Amax Inc.,* 661 F.2d 864 (10th Cir. 1981). There, the plaintiff alleged that the defendants unlawfully limited potash production to drive up prices. *Id.* at 865. The plaintiff brought an antitrust action against the producers, arguing that as a result of the defendants' actions it was unable to buy potash that it could have resold at a profit. *Id.* at 867. The Tenth Circuit held that the plaintiff lacked antitrust standing. *Id.* at 868. First, the court noted that "[a] price fixing conspiracy is certainly 'aimed' at those who purchase the product at the inflated price; their injury is more direct and more proximately caused than those who are unable to purchase due to product scarcity." *Id.* Second, the plaintiff's injury was too speculative:

> [W]hen, as here, the nonpurchaser has no prior course of dealing with any defendant, we will remain unsure about many things, including: whether the purchase would have been made from one of the conspirators or from one of their competitors; what quantity would have been purchased; what price would have been paid; and at what price resale would have occurred. In the instant case we would also be uncertain whether the potash producers would have inquired about the identity of [the plaintiff's] customers before making the sale; whether, if asked, [the plaintiff] could have truthfully replied that

> part of the purchase was allocated to customers outside North Korea; whether [the plaintiff] would have had the funds needed to make the purchase; and whether an alleged shortage of railroad cars would have aborted the transaction.

*Id.* at 868.[11]

The same concerns exist here too. First, the City's injuries are less direct than those of actual purchasers, such as the cities of Las Vegas and Los Angeles, each of which recently acquired NFL teams, presumably by agreeing to supracompetitive prices. Indeed, the existence of these more direct victims is an additional factor counseling against the City's standing. *See Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 701 (9th Cir. 2001); *R.C. Dick Geothermal Corp.*, 890 F.2d at 146; *Montreal Trading*, 661 F.2d at 868.[12]

Second, the City's contention that, in the absence of Defendants' challenged practices, it would have retained the Raiders (or acquired another team) is too speculative to establish antitrust standing. As the district court explained:

> The Court . . . previously held that Oakland had not plausibly alleged that, but for the

---

[11] The Tenth Circuit did not adopt a bright-line rule precluding nonpurchasers who have been priced out of a market from establishing antitrust standing. *See Montreal Trading*, 661 F.2d at 868. We agree.

[12] The City's injuries would also be less direct than those of NFL expansion teams denied entry into the league.

limited number of teams, Oakland would still have an NFL team.  The Court identified the following "incomplete list of issues that might be relevant" but were not addressed in Oakland's original complaint:

> (1) whether there are additional potential owners willing to establish new teams if the NFL allowed them to do so; (2) whether such potential owners would have based a team in Las Vegas before the Raiders decided to relocate there; (3) whether the Raiders would still have left Oakland for another city if the NFL allowed additional teams; (4) if the Raiders might still have left, whether an additional team would have been established in Oakland to replace the Raiders; or (5) whether Oakland has made any effort to attract an existing team other than the Raiders or to establish a new expansion team to replace the Raiders.

Oakland's first amended complaint alleges none of those things.  Instead, it repeats an allegation from the original complaint that entrepreneur and basketball-team-owner Mark Cuban believes Oakland is a better site for the Raiders than Las Vegas, and adds an allegation that an economic analysis commissioned by Oakland determined that, of U.S. cities without NFL teams, Oakland "best reflect[s] the demographic and financial conditions of existing Host Cities" and has

> "the best prospects for new NFL franchises."
> But Oakland still has not plausibly alleged
> what the playing field would look like if the
> NFL allowed more than thirty-two teams. In
> that hypothetical world, what would prevent
> Las Vegas from offering a more attractive
> deal, as in fact occurred? Would another team
> have already existed in Las Vegas? Would
> the Raiders have gone elsewhere if Las Vegas
> already had a team? If the Raiders left, would
> a different team play in Oakland? The first
> amended complaint answers none of those
> questions.

*City of Oakland*, 445 F. Supp. 3d at 601 (second alteration in original) (citations omitted).

We agree. The City has not alleged—and there is no way of knowing—what would have occurred in a more competitive marketplace. Would new teams have joined the NFL? Would they have found Oakland attractive? Would the Raiders have left Oakland in any event? Would the Raiders have stayed in the Bay Area, but not in Oakland? What price would the City have paid to retain the Raiders or acquire another team? Would the City have been willing and able to pay a competitive price? There are too many speculative links in the chain of causation between Defendants' alleged restrictions on output and the City's alleged injuries. *Cf. Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 540 (1983) ("In this case, the chain of causation between the Union's injury and the alleged restraint in the market for construction subcontracts contains several somewhat vaguely defined links.").

The City complains that it should not be required "to reconstruct the hypothetical marketplace absent a defendant's anticompetitive conduct." (Quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001).)[13] Nonpurchasers who are priced out of the market, however, present a special problem, due to the speculative nature of the harm. We require a reasonable level of certainty before we will confer antitrust standing on such consumers. *See Montreal Trading*, 661 F.2d at 868; Areeda & Hovenkamp ¶ 391b1.

The City alternatively contends that it has standing under *Montreal Trading* because it can show "a regular course of dealing with the conspirators." 661 F.2d at 868. The City's past dealings with the Raiders, however, do not establish a *regular* course of dealing. And, under *Montreal Trading*, a "regular course of dealing" exception makes sense only if that course of dealing occurred in a competitive market. But that is not what the FAC alleges. The City alleges that its course of dealing with the Raiders occurred in an anticompetitive market, which does not resolve the many uncertain links in the chain of causation. Thus, even assuming that *Montreal Trading* is the law of the Circuit, an issue we need not decide, the City would still lack standing.

---

[13] In *Microsoft*, 253 F.3d 34, the plaintiffs were required to prove that Microsoft's anticompetitive practices (*i.e.*, foreclosing Netscape's and Java's distribution channels) caused Microsoft to maintain its monopoly power in the operating system market. In that context, and relying on Areeda & Hovenkamp, the D.C. Circuit reasoned that courts could infer causation from the fact that a defendant has engaged in anticompetitive conduct that reasonably appears capable of making a significant contribution to maintaining monopoly power. *Id.* at 79. The court did not address the question presented here.

In sum, this factor—the directness of the injury—supports the conclusion that the City has not alleged antitrust standing.

### 3.   The Speculative Measure of Harm

So too does the third factor, which considers whether the City's "damages are only speculative." *Am. Ad Mgmt.*, 190 F.3d at 1059. For the reasons just discussed, we do not know whether the City would have retained an NFL team, whether that team would have been the Raiders or another team, where that team would have played, or what price the City would have paid for the privilege of having an NFL team. Because we do not know whether the City would have retained the Raiders, we cannot know whether it would have avoided the harm it alleges.

Furthermore, even if the City could demonstrate that it would have retained the Raiders (or acquired another team), its damages—"lost investment value," "tax revenues associated with Raiders games," and "devaluation of the Coliseum property"—would be exceedingly difficult to calculate. *Cf. id.* at 1060 ("[W]e do not find the calculation of damages in this case to be exceedingly complicated."); Areeda & Hovenkamp ¶ 335c5 ("Once it becomes clear—especially early in the litigation—that damage measurements will be unduly speculative, the courts generally dismiss the damage suit."). In this respect too, this case is far afield from the conventional horizontal price-fixing case in which an actual purchaser seeks to recover collusive overcharges.

In sum, like the second factor, the third factor supports that the City has not adequately alleged antitrust standing.

### 4.  Remaining Factors

The remaining factors do not undermine the City's claim of antitrust standing.  This case does not appear to present a risk of duplicative recoveries.  Nor does it appear that this case would require an apportionment of damages.  Nevertheless, in light of the indirectness of the City's injuries, the existence of more direct victims, the speculative measure of harm, and the difficulty in calculating damages, we are persuaded that the City lacks antitrust standing to pursue its horizontal price-fixing theory.  As the district court observed, the circumstances presented here "render[] this case particularly unsuitable as a novel expansion of antitrust liability to non-purchaser plaintiffs."  *City of Oakland*, 445 F. Supp. 3d at 603.

## IV.

We hold that the district court properly dismissed the City's Sherman Act claim for failure to state a claim upon which relief may be granted.  The City's group boycott theory fails to state a claim because the City has not alleged that more than one team refused to deal with the City.  The City's horizontal price-fixing theory fails because the City has not adequately alleged antitrust standing.  Although the City has alleged antitrust injury, it has not alleged with sufficient certainty that it would have purchased the product (*i.e.*, that the Raiders would have stayed in Oakland), and under what terms, in a hypothetical competitive market.

The judgment of the district court, therefore, is **AFFIRMED**.

BUMATAY, Circuit Judge, concurring:

The City of Oakland brings two theories of antitrust liability against the NFL, the Raiders, and the NFL's other 31 teams. We've called one theory the "group boycott" claim and the other a "price-fixing" claim. As the majority correctly holds, both theories come up short. In their view, Oakland gets to suit up and take the field of Article III standing but can't run the claims into the endzone of antitrust liability. Upon further review, however, I think, the majority fumbles the standing analysis on the price-fixing claim. I would hold that this claim is too speculative to satisfy the threshold of constitutional standing and so must be benched even before kickoff. On the group boycott claim, I fully agree with the majority that Oakland stays on the field but ultimately fails to score on the merits. In short, we should have dismissed Oakland's price-fixing claim on Article III standing grounds and denied the group boycott claim on legal sufficiency grounds. I thus concur in the court's judgment and join Parts I, II and III.B of the majority opinion.

I.

Rigorous enforcement of the Article III standing requirements ensures that federal courts stay in their lanes. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). By disclaiming jurisdiction to resolve certain disputes, we confine ourselves to "a proper[] judicial role." *Id.* (simplified). To meet Article III standing, a party must establish (1) an injury in fact; (2) traceability; and (3) redressability. *Id.* And meeting standing on one claim doesn't mean standing on other claims. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352–53 (2006). Thus, courts must look to see if a party has standing for each claim

brought—regardless of standing on another claim.  *Id.*  The party seeking access to federal court bears the burden of showing standing.  *Spokeo*, 578 U.S. at 338.

Here, Oakland asserts two independent theories of antitrust liability under § 1 of the Sherman Act, 15 U.S.C. § 1.

First, the "price-fixing" claim.  Oakland alleges that the NFL has created a horizontal price-fixing scheme with its entry requirements for new teams.  An NFL rule dictates that ¾ of NFL owners must vote to approve a new football team's entry into the league.  Such a rule, says Oakland, inflates the price of hosting teams for cities by artificially restricting the supply of teams.

Second, we have the "group boycott" claim.  Oakland contends that the NFL and its teams have started an anticompetitive boycott against the City by collectively refusing to deal with it.  In the City's view, the NFL's franchises are punishing Oakland for declining to pay the high costs and benefits to keep the Raiders in the Bay Area.

Oakland fails to meet its burden of establishing Article III standing for the price-fixing claim, while the group boycott claim fails on the merits.

### A.

Oakland's price-fixing claim drops the ball on the second element—traceability.  A party satisfies this element by showing that its injury "is fairly traceable to the challenged conduct of the defendant."  *Spokeo*, 578 U.S. at 338.  Traceability requires "a causal connection between the injury

and the conduct complained of." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). So with traceability, we ask: "Is the line of causation between the illegal conduct and injury too attenuated?" *Allen v. Wright*, 468 U.S. 737, 752 (1984).

Our court has held that "a causal chain does not fail simply because it has several links, provided those links are not hypothetical or tenuous." *Nw. Requirements Utils. v. FERC*, 798 F.3d 796, 806 (9th Cir. 2015) (simplified). Traceability then can't "rely on conjecture about the behavior of other parties." *Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1152 (9th Cir. 2000). And when a standing theory "rests on a highly attenuated chain of possibilities," "far stronger evidence" is required to establish traceability. *California v. Texas*, 141 S. Ct. 2104, 2119 (2021) (simplified).

Oakland's price-fixing claim relies on speculation upon speculation to connect its injury to the NFL's entry rule. Basically, Oakland tries to connect its injury—the Raiders leaving for Las Vegas—to the NFL's ¾ approval rule for new franchises. Specifically, Oakland argues that the entry rule allows NFL teams to demand excessive payments from host cities, causing the Raiders to move to Las Vegas and costing Oakland an NFL home team. As a result, Oakland argues it would not have been injured under more lenient rules for entry into the NFL. Essentially, Oakland's causal chain looks like this:



But Oakland relies on speculation every step of the way. Start with Step One. Under Oakland's theory, in a pro-competitive hypothetical world, the NFL would replace its current ¾ approval rule with a more competitive approach, which would allow for easier admission. We aren't told what this new rule might be or how it might meet the threshold of

improved competition. Instead, we must imagine a hypothetical rule that would somehow accomplish what Oakland seeks.

Step Two—engage in more speculation about hypothetical teams. To get to the next step in the chain of traceability, we need to speculate that this new rule would entice new football franchises to apply to the NFL. Here, it's unclear how potential football franchises would react to this hypothetical new rule. Oakland assumes that more franchises would apply, given a more lenient admission rule. But there is no evidence that these imaginary franchises would have a significant incentive to apply under, say, a ½ owner approval rule rather than the existing ¾ rule. As the NFL accurately notes, Oakland cannot point to a single instance of a team being denied entry into the NFL under the existing rule. And under either regime, a potential franchise would have to convince a significant portion of NFL owners that its admission would not hurt the sport or the quality of competition. In fact, the only evidence Oakland can muster on this point is a 2004 estimate that the NFL could support up to 42 teams in the United States. But such evidence comes well short of showing that more franchises would be likely to apply simply because the NFL could hypothetically support more of them. Article III requires "far stronger evidence" here. *California v. Texas*, 141 S. Ct. at 2119.

Step Three—consider a hypothetical world where the NFL admits new teams from the crop of applicants. The problem at this step is that the composition of sports leagues is inherently difficult to predict. Sports leagues can't have an infinite number of teams. For example, a sports league has to weigh increasing the number of teams in its roster against other factors such as scheduling constraints, the quality of

competition, and existing contracts and commitments with players.  *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 2214(b) (5th ed. 2021) ("Areeda & Hovenkamp") ("[A] sports league requires limits on the number of teams in order that scheduling and ranking can be coordinated.").   Oakland would have us overlook these realities and speculate that the NFL would admit more teams if it had a more permissive entry rule and received more applications.

Step Four—calculate the probabilities that a new imaginary NFL team would play in Las Vegas.  Only if another NFL team played at Allegiant Stadium would the Raiders be blocked from leaving Oakland—the precise injury alleged here.  But as Oakland acknowledges, it can't provide any evidence that Las Vegas would have hosted an NFL team prior to the Raiders under supposedly pro-competitive rules.  As a result, Oakland again asks this court to make another speculative leap—this time that a hypothetical franchise admitted under hypothetical rules would have chosen Las Vegas as its home.   But we generally do not "endorse standing theories that rest on speculation about the decisions of independent actors."  *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 414 (2013); *see also Ecological Rts. Found.*, 230 F.3d at 1152 ("The issue in the causation inquiry is whether the alleged injury can be traced to the defendant's challenged conduct, rather than to that of some other actor not before the court.").

Finally, Step Five—assume there would be enough new franchises admitted by the NFL to prevent other host cities from attracting the Raiders away from Oakland.  At this final step, we must speculate whether another city would have still

attracted the Raiders with a more appealing stadium or better economics. Oakland does put forward evidence from an economic expert stating that Oakland is an attractive location for an NFL franchise. But ultimately, Oakland asks us to conjecture about how hypothetical franchises would have weighed hypothetical proposals from hypothetical host cities. So Oakland's expert can't save the speculative house of cards from tumbling down.

In sum, Oakland's price-fixing theory requires us to make layers of speculative judgments to connect the allegedly unlawful conduct (the NFL's entry rule) to the alleged injury (the Raiders' decision to leave Oakland). But Article III standing requires more than an elaborate string of speculations. It requires the alleged injury to be fairly traceable to the unlawful conduct. *Spokeo*, 578 U.S. at 338. Oakland's loss of the Raiders is too remote and too conjectural to be traceable to the NFL's entry process. I would hold that Oakland failed to establish Article III standing on its price-fixing claim.

The majority looks past these speculations by determining that Oakland has shown a "substantial probability" of standing. Maj. Op. 16. The majority argues that, despite a "somewhat speculative chain of causation," there is a substantial probability that the Raiders would have stayed in Oakland but for the NFL's entry rule. Maj. Op. 15. But our court has made clear that causation cannot "be too speculative, or rely on conjecture about the behavior of other parties." *Ecological Rts. Found.*, 230 F.3d at 1152. That is precisely what Oakland's price-fixing claim does. It speculates about events at every step of the causal chain—relying on inferences about what unknown, independent parties would do under hypothetical

circumstances.  As a result, I would dismiss Oakland's price-fixing claim for failure to establish Article III standing.[1]

### B.

Oakland, however, does establish Article III standing for its group boycott claim.  Oakland satisfies the standing requirements for the group boycott claim because it directly connects the unlawful conduct to the alleged injury.  Unlike the price-fixing claim, the premise of the group boycott claim is that the NFL franchises themselves colluded to keep Oakland from hosting an NFL team.  The football teams sought to punish Oakland, the theory goes, after the City refused to make new payments or improvements to its stadium to keep the Raiders.  Thus, the injury of a lack of an NFL franchise is closely tied to the alleged unlawful conduct of group boycotting.  In other words, there is a direct handoff from the anticompetitive action to the alleged injury.  As a result, Oakland establishes Article III standing on its group boycott claim.

---

[1] In reaching the merits of the price-fixing claim, the majority imports a Tenth Circuit case into our court—*Montreal Trading Ltd. v. Amax Inc.*, 661 F.2d 864 (10th Cir. 1981).  In *Montreal Trading*, the Tenth Circuit denied antitrust standing to non-purchasers on the theory that their injuries were too uncertain.  *Id.* at 868.  I question, however, whether *Montreal Trading* is relevant here.  *Montreal Trading* explained that nonpurchasers should be denied standing to sue "when they lack a past course of dealing with the conspirators."  *Id.*  But Oakland, the Raiders, and the NFL have a long course of dealing, making the applicability of the *Montreal Trading* rule suspect.  Moreover, the majority applies *Montreal Trading* without claiming to adopt it as a "bright-line rule" for our circuit.  Maj. Op. 29 n.11.  But doing so just further complicates an already complicated area of law.  The majority should have punted on this issue.

Looking at the merits, I agree with the majority that Oakland fails to demonstrate an antitrust violation on this claim. In short, Oakland can only show that the Raiders refused to deal with the City—not that the other franchises joined the Oakland boycott. Moreover, since Oakland failed to plead a Sherman Act violation, I do not reach whether Oakland has sufficiently shown antitrust standing. Antitrust standing is distinct from Article III standing. *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983). Unlike Article III standing, courts have discretion to skip antitrust standing and go right to the merits. *See* Areeda & Hovenkamp, ¶ 335f ("When a court concludes that no violation has occurred, it has no occasion to consider [antitrust] standing."). So there's no need to address Oakland's antitrust standing on this claim, but that doesn't mean the City has it. *See* Maj. Op. 21 n.7.

## II.

So, after further review, we must affirm the district court's dismissal of Oakland's suit. While Oakland doesn't need to provide indisputable evidence of traceability to win access to federal courts, the City can't rely on a Hail Mary of speculation to satisfy standing. In my view, we should have blown the whistle on jurisdiction rather than letting that claim play out on the merits.