1                  UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3    Before The Honorable VIRGINIA K. DeMARCHI, Magistrate Judge

4

5    KLEIN, et al.,                 )
                                    )
6              Plaintiffs,          )
                                    )
7    vs.                            )   No. C 20-08570-LHK
                                    )
8    FACEBOOK, INC.,                )
                                    )
9              Defendant.           )
                                    )

10
                                    San Jose, California
11                                  Tuesday, December 14, 2021

12

     TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
13             RECORDING 10:50 - 12:01 = 71 MINUTES

14   APPEARANCES:

15   For Plaintiffs:
                                    Hagens Berman Sobol Shapiro,
16                                    LLP
                                    715 Hearst Avenue, Suite 202
17                                  Berkeley, California 94710
                               BY:  SHANA E. SCARLETT, ESQ.
18

19                                  Quinn Emanuel Urquhart &
                                     Sullivan
20                                  Suite 2700
                                    191 North Wacker Drive
21                                  Suite 2700
                                    Chicago, Illinois 60606
22                             BY:  STEPHEN A. SWEDLOW, ESQ.

23

24

25              (APPEARANCES CONTINUED ON NEXT PAGE)

2

1  APPEARANCES:  (Cont'd.)

2  For Plaintiffs:

3                              Bathaee Dunne, LLP
                               633 West Fifth Street
                               26th Floor
4                              Los Angeles, California 90071
                          BY:  BRIAN J. DUNNE, ESQ.
5
   For Defendant:
6
                               Wilmer, Cutler, Pickering,
7                                Hale & Dorr, LLP
                               2600 El Camino Real
                               Suite 400
8                              Palo Alto, California 94306
                          BY:  SONAL N. MEHTA, ESQ.
9
   Transcribed by:             Echo Reporting, Inc.
10                             Contracted Court Reporter/
                               Transcriber
11                             echoreporting@yahoo.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1   <u>Tuesday, December 14, 2021</u>                    <u>10:50 a.m.</u>

2                       P-R-O-C-E-E-D-I-N-G-S

3                           --oOo--

4            THE CLERK:  Calling the matter of Klein, et al

5   versus Facebook, Incorporated, Case Number 20CV8570.

6            THE COURT:  Thank you.

7        May I have appearances, please, starting with the

8   Plaintiffs.

9            MR. DUNNE (via Zoom):  Good morning, your Honor.

10  Brian Dunne of Bathaee Dunne, LLP, for the advertising

11  Plaintiffs.  And, as Mr. Swedlow stated, I'll be making the

12  argument today on Plaintiffs' behalf.

13           THE COURT:  Okay.  Thank you.

14           MS. SCARLETT (via Zoom):  Good morning, your

15  Honor.  Shana Scarlett from Hagens Berman for the Consumer

16  Plaintiff class.

17           THE COURT:  Okay.  Thank you.  Good morning.

18           MR. SWEDLOW (via Zoom):  Stephen Swedlow, Quinn

19  Emanuel, also for the Consumer Plaintiff class.

20           THE COURT:  Okay.  Thank you.

21       All right.  And for the Defendant?

22           MS. MEHTA (via Zoom):  Yes, your Honor.  Good

23  morning.  Sonal Mehta from Wilmer Hill on behalf of the

24  Defendant.

25           THE COURT:  Okay.  Thank you.

4

1    So, we are here on a dispute about privilege, and I

2    noticed there were lots of redactions in the materials that

3    were submitted to the Court.  I'm hoping we don't need to

4    conduct this proceeding under seal.  I'm also a little

5    skeptical of the volume of redactions, but does any party

6    believe we need to do this under seal?

7              MR. DUNNE:  Not Plaintiffs, your Honor.

8              MS. MEHTA:  No, your Honor.  I think what we have

9    sought to seal is the names of individuals at the company,

10   and I think we can -- we can conduct this hearing without

11   getting into that.

12             THE COURT:  Okay.  That's my -- that's my hope

13   that we can do that as well, and I'll try to be careful

14   about that issue.

15       One housekeeping note before I forget.  So, when

16   briefing is voluminous, I really do appreciate when the

17   parties submit chambers copies.  So, thank you for doing

18   that.  However, I would ask you all to review my standing

19   order on what I would like in chambers copies.

20       So, just as a reminder, they should be double sided and

21   three-hole punched.  And here, the Plaintiffs' chambers

22   copies were not double sided or three-hole punched, single

23   sided and two-hole punched at the top, and Facebook's

24   chambers copies were double side and three-hole punched, but

25   you sent only the public redacted version, which is not

5

1 super helpful, because I need the unredacted version.

2     So, if you all could just advise your teams about those

3 preferences, next time around it would save my law clerk a

4 lot of hassle.

5     Thank you.

6         MS. MEHTA:  We apologize, your Honor.

7         THE COURT:  All right.  All right.  I expect this

8 is not the last dispute that I have.  So I thought I should

9 raise it.

10     Okay.  So, let's -- let's get down to the substance of

11 the dispute, and let me start with some questions for the

12 Plaintiffs.  And I'll just tell the parties that I -- I feel

13 that the critical issue here is the question of whether Ms.

14 Hahn (phonetic), whose name is not confidential, is a

15 functional employee for purposes of this dispute.  I have

16 the benefit of having seen the -- in camera the documents

17 that are at issue, and I know that Plaintiffs have not.

18 And, you know, while there might be some, you know, parsing

19 of what's in those redacted bits that one might engage in, I

20 think overall, I'm satisfied that the nature of the

21 communication is one that is pro -- provision of legal

22 advice and communication in it is getting legal advice from

23 an attorney and not business related.  So, let me just put

24 that out there.

25     I do want to address the question of the waiver issue

6

1   with both parties, but I do feel that the critical issue is

2   this functional employee question, and that's what I'd like

3   to start with with the Plaintiffs.

4        So, from the from the cases that have been presented to

5   me, I'm just going to say the Northern District of Illinois

6   case law seems to be not as helpful because, at least as of

7   the date of those cases, it seemed that the Seventh Circuit

8   had not adopted the functional employee doctrine at all.  So

9   -- but there are other cases that I think kind of go both

10  ways for the parties.

11       And, so, my first question for I guess Mr. Dunne is,

12  you know, the -- you seem to be taking the position that

13  because this -- Ms. Hahn was not only a consultant but a

14  consultant for many other companies, that that really

15  precludes her being cast as a functional employee for

16  purposes of this dispute as a functional employee of

17  Facebook for this matter.  And I just wanted to understand

18  if I was interpreting your argument in a way that you didn't

19  intend, was it maybe not so strongly intended by you.

20           MR. DUNNE:  So -- yes, your Honor.  So, I think

21  preclude is probably slightly strong there, and I do want to

22  -- look, I think this actually ties back into -- you know, I

23  know that we haven't seen much in the redacted

24  communications you have, your Honor.  But one of the points

25  about determining whether something is a confidential -- or,

7

1  sorry, a confidential communication or primarily for purpose
2  of legal advice is, among other things, evaluating the facts
3  that have been set forth by Facebook about the context of
4  that communication, because it's a purpose test, right.
5  It's not a, well, what is it the communication says.  It's
6  why did you make it.
7      Okay.  And, so, our position and one of the reasons we
8  brought up this case law about, all right, when is someone a
9  functional employee, including, right, there are these
10 cases, is, well, this person was part of a legal team, this
11 person was tasked with responding to litigation inquiries --
12 and that goes through lots of cases -- is -- is a matter
13 evaluating, well, what's the purpose of the communication?
14 And, so, rather than saying, well, it's a preclusive legal
15 effect, I think it's something similar to, well, you know,
16 you, your Honor, are going to have to make some findings of
17 fact as to the primary purpose of this communication.  And
18 Ms. Hahn's role, as stated by Facebook, is that she was,
19 according to them, an integral member of their
20 communications team.  I don't think it's something where
21 it's a single box that says this is a member of our legal
22 team, this is a member of our communications team that says,
23 right, if -- you know, however you label them ab initio gets
24 you the -- gives you the purpose of the communication.  But
25 the way that I read those cases -- and, you know, I think

8

even the non-NDL ones are not necessarily collusively clear
on this issue.  I want to be clear about that -- is that the
courts are trying to evaluate, okay, well, given this
person's presence on it, given that this person is not
canonically right, a first-party client, you know, what is
the nature of their presence and the communication.

     And I think even one of the cases that Facebook cited,
which was a Judge Grewal case, it makes clear that once --
once the Court has decided that someone is a functional
employee, for example, does not, in fact -- in fact, the
Court goes out of its way several times to say that doesn't
resolve the issue before me because, among other things, so
-- and this is the In re High-Tech Employee Antitrust
Litigation which Facebook cited on page 10.  All right.  It
says at the risk of repetitiveness but in an abundance of
caution, the Court, again, notes that as an employee,
Campbell may have been eligible for an application of the
attorney-client privilege, but his status as an employee is
itself not enough to warrant application of the privilege.

     And elsewhere in the opinion, Judge Grewal says this
person right -- he's sometimes speaking on behalf of -- of
other companies, and -- all right.  So then he says, we need
to understand here, right, what -- what the communication
was.  And what he says is Google may be able to claim the
attorney-client privilege for communication involving its

9

1   counsel and Campbell who had served as an advisor for

2   Google, but the evidence -- and, again, he's going for the

3   evidence here -- in no way suggests that Google had blanket

4   protection for every communication counsel had with Campbell

5   prior to 2007.

6           THE COURT:  Right.

7           MR. DUNNE:  Yes, your Honor.  I --

8           THE COURT:  Let me just say I -- I think you could

9   approach this from two different -- at least two different

10  angles.  One, I can look at the documents.  I can make a

11  judgment, like, is this clearly legal advice and attorney-

12  client privileged communication in a totally conventional

13  sense, and I can tell that from the face of the document.

14  That would be one thing.

15      And then I ask the question does disclosure of that

16  communication to a third party waive privilege, which, of

17  course, it would but for this functional employee idea here.

18  So, that's one approach.

19      Your approach, as I understand it, is to say, okay,

20  well, just because there's a lawyer saying something, we

21  have to look at the total context of the communication to

22  see if the things the lawyer are saying, while they might be

23  legal in some nature, might actually not be a privileged

24  communication because of the purpose for which this

25  communication is being made.

1        And I understand that argument, but I think they're

2   distinct.  Like, I -- the analysis could be distinct.

3        Do you disagree?

4            MR. DUNNE:  So, well, your Honor, let me -- let me

5   bring back a little bit of law right here, which is that --

6            THE COURT:  I always like some law.

7            MR. DUNNE:  Yeah, but, look, which is that in In

8   re Grand Jury just -- really just this year --

9            THE COURT:  Right.  The primary purpose or a

10  primary purpose.

11           MR. DUNNE:  So, by adopting that, all right,

12  saying, well, look, when you're looking at a mixed purpose

13  communication, right, the primary purpose or a -- I don't --

14  primary purpose of the communication must be for legal

15  advice.  That's actually new to the Ninth Circuit now.  And,

16  if you read that in consenity with, for example, Ruralee

17  (phonetic) and some other published cases from the Ninth

18  Circuit that make clear that every material aspect of the

19  attorney-client privilege inquiry must be proven by its

20  proponent, and that's through evidence, what that means is

21  that, look, right, there's -- there needs to be a factual

22  determination as to the purpose of the communication.  And,

23  in fact, Facebook's own case that they kind of cite as their

24  lead case in the prong one inquiry, which is this

25  unpublished Sixth Circuit case, I mean, Alimari (phonetic),

1  goes through, and it recites evidence that the -- that the

2  District Court used to make a finding of the purpose, and on

3  both of those -- on both of those groups of communications,

4  one, there was deposition testimony about, well, what was

5  the actual context of it, and the other they relied on an

6  affidavit of someone involved in the communication as to its

7  purpose, right.

8      And the way that I view the evidentiary record here is

9  that you have in front of you, right, the context of these

10  communications, their contents themselves, but also an

11  affidavit from Facebook that says, well, Ms. Hahn was an

12  integral part of the communications team, that she was used

13  for PR crisis response, that she helped them with their

14  presentations to developers.  And they go through a whole --

15  a whole host of, well, what's her role at Facebook?

16      And, so, that's evidence in the record to me that says,

17  well, you -- it would be very hard in my view to find that

18  primary purpose of these communications is to render legal

19  advice when all the evidence we have says this is a

20  communications chain, and the final thing --

21          THE COURT:  Well, okay.  So just -- let me just

22  say there I got that argument.  That was very heavily argued

23  in your paper.  I -- I don't think it's impossible or

24  unlikely that crafting a response to a press inquiry would

25  not involve obtaining legal advice.  So, I'm -- I'm not

12

1  rejecting absolutely your premise.  I just think that it's
2  stated too strongly, that just because this was a
3  communications team with this consultant, you know, sort of
4  being an allegedly integral part of this team means that
5  this can't be an attorney-client privileged communication.
6      What I'm looking at the problem from perspective is --
7  and I confess it makes it easier for the Court if I look at
8  it this way -- not that I will, but just posing the question
9  to you, Mr. Dunne -- is let's assume it's like very clearly
10 privileged communication, absolutely privileged, no waiver.
11 We'll get to that.  No waiver by virtue of the fact of its
12 prior production to FTC.  I'm really just drilling down on,
13 so what?  It wasn't waived.  It's absolutely privileged, and
14 yet it's disclosed to Ms. Hahn, who is not anywhere close to
15 an employee.  Like, that's the -- that's the -- the question
16 that I'm trying to put.  It's a -- it's an easy thing for me
17 to say, even assuming it's privileged, even assuming there's
18 no waiver, how is this person possibly a functional
19 employee.  And that's sort of the way I'm framing the
20 question just so I can drill down on this issue, which I
21 find the most challenging given the state of the case law.
22      And, so, I'm creating a hypothetical to focus you on
23 that issue, if I may.
24          MR. DUNNE:  No, I -- I completely agree, your
25 Honor.  And, look, I just -- the -- my -- I guess, all

1  right, the reason that it was framed that way is, look,

2  right, again, if -- right.  Okay.  So, look, there -- Ms.

3  Hahn had a lot of clients apparently, right.  It's not --

4  it's not clear, you know, based on the functional employee

5  test, in our view, that she meets that, which would make her

6  a third party.  But the reason we framed it in the way is,

7  look, even if the Court were to accept the premise that she

8  were not a third party, all right, that would bear on the

9  context of the communication.  But, right, if what your

10  Honor is saying, right, is that, well, based on -- right,

11  based on your assessment of the context of the communication

12  -- and I do think one important thing about the context is

13  that after the communication was made, right, the initiator

14  of the -- of the thread, Ms. Diana, said, all right, oh,

15  okay, here's where we netted out and gave an article.  All

16  right.  If you look at -- if you look at a lot of the case

17  law, on, among other things, right, primary purpose where

18  they talk about, well, was this for legal advice, all right,

19  they talk about, okay, well this was a communications team

20  that was involved in trying to make sure we didn't get sued,

21  right.  This was a communication -- this was a press inquiry

22  about a pending lawsuit.

23     This was a press inquiry about an article that was to

24  be published, and after the article was published, right,

25  the people on the thread, including the lawyers, all got

14

1  this email that says, Here's where we netted out, and we did
2  a good job, right.  I mean, netted out means the end of what
3  they were talking about, and so that's one of the reasons
4  why we -- we had a concern about the -- you know, about the
5  primary purpose looking like it was, you know, for
6  communication purposes as well.  But, look, I --
7          THE COURT:  Yeah.  Okay.
8          MR. DUNNE:  But, so, the -- you know, your initial
9  -- that is, yes, if there's -- if there's a third party
10  who's a stranger to this communication, we absolutely -- I
11  mean, it's not -- it's not actually our position.  It's very
12  -- it's kind of black letter law position that it cannot be
13  a confidential attorney-client communication, which is one
14  of the indispensable -- excuse me -- indispensable features
15  that Facebook bears the burden of proving under the --
16          THE COURT:  Okay.
17          MR. DUNNE:  -- sort of --
18          THE COURT:  Okay.  So, now that we've gotten to
19  that point, I get that that's the law.  That's not the hard
20  part.  The hard part is does this person satisfy the
21  functional employee doctrine, whose -- a doctrine whose
22  boundaries are a little fuzzy, but now that you have the
23  benefit of the briefing that Facebook has put in, what do
24  you think about that?
25          MR. DUNNE:  So -- yes.  So, if I -- I think that,

15

1   among other things, I believe the major NDCAL case that I

2   think both parties cited on this was the -- apologies for

3   trying to find my copy of the case so I can just -- yes.  It

4   is the Schaefer case.

5           THE COURT:  Uh-huh.

6           MR. DUNNE:  So, we've heard -- we've heard a lot

7   about Ms. Hahn's position, right.  I think the two principal

8   -- the two principal sources for the Court's determination

9   of this that I would probably say would be, right, the --

10  the declaration of Michael Kirkland.  That's effectively the

11  factual record on it, although we submitted an exhibit that

12  indicated that she -- that -- and this is Ms. Hahn, served

13  other clients, which wasn't in the declaration.

14      Between that factual record -- and, you know, again,

15  there's not a lot on this.  But in the Schaefer case, for

16  example, right, you had these consultants.  They go through

17  case law, so that -- it's actually pretty good on that where

18  they review other cases.  And, you know, I -- the -- some of

19  the things that they talk about, for example, on 1203 and

20  1204, right, they say, well -- they're talking about and

21  then the Carferty (phonetic) case is -- well, the -- all

22  right.  There's a communication with a consultant who is in

23  an environment dense with regulations who helped them

24  navigate that.  You know, there, the -- the actual

25  functional employee was actually helping with legal issues.

1  You know, then, you know, when they talk about <u>Dieter</u>

2  (phonetic), right, and <u>Graph</u> (phonetic), I mean, again,

3  these were people who were involved in -- I think in <u>Graph</u>,

4  I think it was all aspects of the company's operations.

5  And, you know, effectively, that person was almost an all

6  purpose principal for that company who just had been banned

7  or something from the industry by the State of California,

8  and so it was kept off their website.

9        I mean, those people who are found to be functional

10  employees with respect to the provision of legal advice were

11  not some limited purpose third party consultant who was,

12  among other things, right, a partner at a communications

13  agency with other, you know, arguably even competing

14  clients.  You know, I understand that Facebook says that

15  while Ms. Hahn had badge access and regularly worked with

16  the company on -- well, they said during on-site visits, she

17  would stick with members of the communications team, but I

18  don't think it's in dispute that she worked at an OutCast

19  office in Santa Monica or -- or Venice Beach, not -- not --

20  you know, she didn't sit in Facebook's headquarters, and

21  that is -- that is in concinnity with her role as, you know,

22  working for multiple different clients.

23        THE COURT:  So, here's the thing I find kind of

24  challenging about the cases on this issue is that it seems

25  like one approach is to say, you know, the person who's

17

1    alleged to be a functional employee was in a position of --

2    in a -- his or her role with respect to that client was such

3    that they were essentially functioning as an agent or

4    executive or director of the client.  So, no matter what

5    they were doing with respect to the legal advice, they were

6    the client for all intents and purposes because that's how

7    the entity -- the entity used that person to function.  I'm

8    kind of generalizing here.

9         The other kind of discussion and the one that

10   perhaps is more appropriate to our circumstances is in the

11   particular circumstance, this person was functioning as an

12   employee because their participation in the communication

13   was necessary to that particular communication in some way.

14   It was either necessary to facilitate the advice or they

15   were the person who was going to be with the client

16   implementing the advice.  Like, that kind of more focused,

17   you know, privileged communication specific kind of

18   analysis.

19        So -- so, I think, you know, the Memory case is --

20   perhaps I'm not getting all these cases straight in my head,

21   but the one that Judge Lloyd handled, the situation in that

22   case was more along the lines of -- let me see if that's the

23   right one.  You know, the nature of the person was such that

24   he was essentially an executive functioning in the company,

25   even though he wasn't really an actual employee or director

18

1  or officer of the company.

2      So, you know, so here I am -- I am really interested,

3  and I will be asking Ms. Mehta the question about, you know,

4  what exactly was Ms. Hahn's role with respect to the email

5  thread.  She's only cc'd throughout.  She asked one question

6  about when Facebook did something that appears to be

7  unrelated to the response to this employer's inquiry.  It's

8  sort of like a factual question about some, you know,

9  historical something that happened.

10      And so, you know, I -- I'm not really sure I have an

11  answer to that question, and I'm not sure that that should

12  matter.  That's the -- that's the kind of -- those are the

13  kinds of questions about the functional employee doctrine

14  that I have.

15          MR. DUNNE:  So, if I may, your Honor, I think, all

16  right, the -- the best description that we found in this --

17  or discussion, certainly -- especially from NDCAL cases, is

18  in Schaefer at 1204 to 1205, where, all right, there's a

19  very specific discussion about, well, what about this Calvin

20  Klein case?  What about here?  Right.  So, in the Calvin

21  Klein case, right, they had retained a general public

22  relations person, and that person was held not to be a -- a

23  functional employee, and the -- the Court kind of goes

24  through and says, Well, why is this case not Calvin Klein?

25  Why is this case different.  And they -- and, you know, the

19

1  Court says:

2  　　　　　"Unlike in <u>Calvin Klein</u>, here

3  　　　　　Kreich (phonetic) communicated directly

4  　　　　　with regulatory bodies and neighbors,

5  　　　　　potential legal adversaries, that were

6  　　　　　the source of Gregory Village's legal

7  　　　　　concerns."

8  　　　And I think that's actually really important because,

9  again, we're talking about here not a potential litigant.

10 We're talking about -- right, we're talking about the

11 TechCrunch, which is going to publish an article.  We're not

12 talking -- and, by the way, the -- Ms. -- Ms. Hahn's role, I

13 mean, right -- and, again, perhaps Ms. Mehta will have more

14 here, but, I mean, again, we have to deal with the evidence,

15 not attorney argument on the issue.  But, right, Ms. Hahn's

16 role from the -- from the evidence in the record, which is

17 their declarations, was very specifically on communications

18 issues, not on legal communications either, just

19 straightforward communications.

20 　　　By the way, they have other members of their

21 communications department, and we're not even sure how many

22 OutCast employees that they had or functional employees that

23 they -- they claim, right, just that this one happened to be

24 on -- on all of these communications, and they didn't take

25 her off when they started asking attorneys for legal advice

1  supposedly, which is, you know, again, right, you can -- if

2  you went -- I think this is a perfectly valid framing from

3  your Honor to say, look, right, well, let's not talk about

4  whether that means that this wasn't legal advice.  Let's say

5  it was legal advice.  Why did they leave this third party

6  out?  And I think that's a perfectly valid framing that

7  means that they're not privileged.

8       And, you know, again, in Schaefer, right, they say,

9  well, you know, in -- in contrast to the firm in Calvin

10 Klein, Kreich's duties for Gregory Village were so

11 intertwined with the subject matter for which Gregory

12 Village sought legal advice that she should be treated as a

13 functional employee.

14      All right.  Finally, the Calvin Klein court expressly

15 relied on the fact that the communications at issue were not

16 made for the purpose of legal advice.  Unlike here, the

17 Court did not expressly decide whether the firm's employees

18 should be treated as Calvin Klein's functional employees, so

19 that that actual language is part of why -- and I apologize

20 if this is, you know, a little bit confusing, it's part of

21 why, you know, the -- the line between kind of prongs one

22 and two is not entirely, you know, necessarily

23 disaggregating in the case law, which is why, you know,

24 perhaps that was presented in that manner.

25           THE COURT:  Yeah.  So, no, I'm not criticizing any

21

1  party's presentation of the case.  I'm just trying to find a

2  framework for decisions that make sense to me.

3       But -- but, Mr. Dunne, let me just ask, I mean,

4  Plaintiffs would not be -- assuming there was no waiver

5  issue -- so, again, I'm asking you to put that aside

6  hypothetically.  If you had a privilege log that said these

7  attorneys were on this communication with all of these

8  Facebook employees and there was a claim of attorney-client

9  privilege, we would not be here.  It's because this person

10 is a third party -- again, putting the waiver issue to -- to

11 the side.  That we don't hear.  So, I don't think you'd be

12 making the argument that just because they do

13 communications, it would be inappropriate for a claim of

14 privilege to arise and you would be skeptical of the

15 allegation that there was privileged communications

16 happening if these were all Facebook employees, right?

17            MR. DUNNE:  So, you're asking whether we could --

18 we could possibly -- look, we can't -- as your Honor is

19 aware, we have to use the context we're given to determine

20 whether we believe Facebook has, you know, presented a good-

21 faith basis or to establish that something is attorney-

22 client privilege.

23      We use the envelope information that's available to us,

24 which includes the senders, recipients, cc's, subject line,

25 attorneys, purpose of it, the subject matter.  So, the

22

1  subject line of the email is usually, you know, an important

2  thing to use.

3       Look, I mean, if it says RE TechCrunch article, you

4  know, that might be something, especially if there's a

5  redacted version that we can review, we would look into

6  because, among other things, of the primary purpose test,

7  which is, again, the governing law, right.  It doesn't say

8  -- it doesn't say, well, if there's a legal aspect to it,

9  then we can't challenge it.  But I will tell you, yes, the

10 thing that leapt out here which, you know, again, actually

11 was not on the log we got I don't believe, was -- upon

12 review of the redacted communications was that there was

13 Rebecca at the OutCast agency.  Neither -- which, again, was

14 -- you know, is a -- you can go find it online.  It's very

15 clearly a third party PR firm which, yeah, right, like if --

16 if I find in a privilege log that there's someone from an

17 outside entity or there's someone from the government, for

18 example, which happens all the time in privilege logs, those

19 are the -- those are the low hanging fruit to say, look,

20 that's definitely not privileged or at least, right, among

21 other things, that's something to review, right, because the

22 -- the principal privilege log we got here, by the way, has

23 like three million entries.  And so we have to go through

24 it, you know, but all right, your Honor --

25            THE COURT:  Okay.  I got it.  I see what you're

23

1  saying, that there would be circumstances in which even if
2  there were only employees, there might be a question raised
3  given the context.
4      All right.  Let's just briefly address the waiver
5  issue, because I'm actually having trouble understanding the
6  parties' dispute on this.  So, let me just tell you what I
7  think is what you all agreed to in your stipulation.
8      So, the -- the way I understand the arrangement the
9  parties have is that mass production of documents without
10 review from some other source, like the FTC source, without,
11 you know, re-reviewing the documents for privilege, is not
12 going to resolve in waiver without more.  Okay.
13     That doesn't immunize any prior activity.  So, you
14 know, even if we're not talking about the FTC production, if
15 there was some other production of documents in a litigation
16 in which -- or not even a litigation, just some other
17 disclosure of the documents for whatever purpose, it got
18 used, it got sent to people.  It's out there in the public.
19 The fact that it's now produced to the Plaintiffs in this
20 litigation without privilege review is like neither here nor
21 there.  That act won't necessarily trigger any privilege
22 problem.  But whatever happened before might well be a
23 waiver of privilege.  And, so, that's how I was approaching
24 this situation is, okay, I'll look at the circumstances of
25 production to the FTC and -- and take them at face value.

24

1   But nothing that happened -- the -- the order that you all

2   entered into I don't think, unless I misunderstood it,

3   didn't say anything about that.  It was simply like in this

4   case, production in this case is under 502(d), not 502(b).

5       So, did I -- from -- from the Plaintiff's perspective,

6   am I misunderstanding what you all agreed to?

7               MR. DUNNE:  No.  Your Honor, that's, in fact, our

8   precise argument except I would add one thing here, which is

9   -- or two things, right.  One is that, as your Honor's

10  aware, non-waiver is one of the enumerated prongs of the

11  Ninth Circuit's attorney-client entered --

12              THE COURT:  Yes, I know.

13              MR. DUNNE:  But -- but the -- the main thing here

14  is we're actually not sure based on Facebook's submissions

15  whether they've actually produced this to people other than

16  the FTC.  We've asked them.  They've provided no answer.

17  It's not in their brief.

18      So, right, the circumstances of the past disclosure of

19  this information are -- are of significant concern to us,

20  and it's -- it's Facebook's burden to explain what it is.

21  Now, Facebook's argument about 502(b), all right, that the

22  parties said, quote, right, that -- okay.  So, yeah.  The

23  specific thing that we agreed to is -- it's in their brief,

24  but --

25              THE COURT:  I have the -- the clawback order here.

1  So, it's right -- it's right at the very beginning.

2        MR. DUNNE:  So, let me -- let me find it.  All

3  right.  Okay.  So, the -- according to them, the parties

4  agreed that 502(b) would not apply to "any disputes

5  regarding protected documents."  But 502(b), your Honor, as

6  you're intimately aware, is a -- is a procedure or a set of

7  substantive prongs that a producing party may rely on to

8  show that its past -- its past production of something was

9  inadvertent and may not have waived privilege.

10       When we got the opposition brief -- and, as your

11  Honor's aware, we didn't have a reply -- and saw that their

12  argument was that we waived a 502(b) argument, that's

13  actually one way that they can establish that something out

14  of this proceeding did not, in fact, waive privilege.  But

15  we know that there's been at least one production outside

16  this proceeding.  And, your Honor, we -- we cited cases on

17  page 15 of our brief that have found that producing parties

18  have established that past production was inadvertent in

19  Viamedia and Colexford (phonetic).  And in all those cases,

20  right, what happens is the party says -- the producing party

21  says, Well, I produced this information outside of this

22  proceeding, but here are the circumstances of my production,

23  so that the Court can evaluate whether it falls within

24  502(b) such that that party can claim that their production

25  was inadvertent.

1      This isn't a procedural gambit by us.  It's pointing

2 out to the Court the factors that the Court would look at to

3 say that Facebook's prior production to the FTC and

4 potentially other regulators or other parties, right, was

5 per Facebook's own claim inadvertent enough and then with

6 some other factors too, right, such that it would not

7 establish a wholesale waiver of its privilege claims over

8 the document.

9           THE COURT:  Well, they do address the 502(b)

10 argument on the merits, page 12 of the brief, 12 through 15.

11           MR. DUNNE:  Well, your Honor, so, they -- they

12 talk about 502(b), and they -- right, they cite to

13 regulations.  But they actually offered no evidence.  And,

14 again, right, like that's a bit of a problem.  They don't

15 cite to any declaration by someone in their in-house

16 department saying, Well, we produced all these documents.

17      Now, look, I don't think that they're not telling the

18 truth about the pages of documents they produced to the FTC,

19 but, all right, they don't have anyone who's actually given

20 them competent evidence on that, and it's actually that

21 section doesn't fully respond to many of the questions we

22 have, which is who is everyone that you've produced this to?

23 What were the specific circumstances of all of those

24 productions?  Right.  What did you use to -- to make sure

25 that you didn't -- that you didn't produce inadvertently

27

these.  And then, finally, what did you do for everyone that
you produced this to?  They do say, I think, that they went
to the FTC in subsequent litigation and asked for this back.

          THE COURT:  Uh-huh.

          MR. DUNNE:  Which does address one part of step C,
but the fact that it's not in a -- in a declaration from
someone at Facebook is -- is for me a twin concern because
it also doesn't address how many other times they've
produced it and some other aspects that we've specifically
said are, you know, a mystery to us.

          THE COURT:  Okay.  So, it's principally an
evidentiary issue but also still some -- missing some pieces
that you think are necessary to support a claim of
inadvertence?

          MR. DUNNE:  Yes, your Honor.

          THE COURT:  Okay.  All right.  So, thank you for
that.  I -- I do want to ask Facebook some questions.  Is
there anything else that you'd like to argue to the Court
before I do that?

          MR. DUNNE:  No, your Honor.  I appreciate your
time.  You're obviously careful reading about the --

          THE COURT:  Okay.  All right.  So, Ms. Mehta,
thank you for waiting patiently there.  I would like to
focus on this question of whether Ms. Hahn is a functional
employee.  And, you know, I'll just start with the concern

1  that I said, you know, to Mr. Dunne was one of my principal

2  concerns, which is, you know, I can see what is -- what the

3  exchanges are in this email thread, and I can see what Ms.

4  Hahn says or does not say, and she doesn't say anything.

5  There are no questions directed to her specifically, and she

6  asks only one question towards the end.  So, it's not really

7  clear from the information that's presented why she's on

8  this string in particular as opposed to her more, you know,

9  generic role or, generally speaking, what her role was, not

10  that her role was generic, but that, generally speaking,

11  what her role was on -- you know, with respect to Facebook.

12       So, you know, I think that is an important concern.  At

13  least some of the cases focus very specifically on the

14  person's role in the particular communication at issue or

15  communications at issue, and I don't -- you know, I don't

16  want to belabor the point, which I don't think is right,

17  that this person has to be a legal employee or a legal

18  functional employee.  I don't -- that's not what I mean.  I

19  just mean for the purpose of seeking or obtaining legal

20  advice, what was her role.

21            MS. MEHTA:  Yes, your Honor.  So, I think I want

22  to -- I want to address that question by focusing on the

23  legal framework which, as your Honor's pointed out, isn't --

24  there's not going to be a case that's 100 percent on fours

25  with this one, although I think there are some that are

29

close.   And I want to focus in particular on the <u>Memory</u> case

and the fact that what the Court is to look at here is the

totality of the relationship between the supposed functional

employee and the company to determine what the nature of

that relationship is.

     And I think what I'm -- what I'm a little bit concerned

about with Mr. Dunne's presentation is that there is this

focus on the particular email and this requirement, unstated

but I think implied from the argument that you heard from

Mr. Dunne, that the particular functional employee must be

the person that says, "I want the legal advice" or must be

the person that says, "Here is the legal advice."  That

would so unduly narrow the purpose of the attorney-client

privilege and what the functional employee test is getting

at, but I think it is fundamentally at odds with what the

whole purpose of the totality of the relationship standard

is.

     In this case, what we have is somebody that was

embedded in the Communications Team.  And we have a

declaration that outlines -- and I won't go into all the

details -- what her role was and how integral she was to the

team, on a chain between that team and counsel soliciting

legal advice relating to media inquiries.  And the fact that

she wasn't the person that said "I have a question" doesn't

mean she wasn't receiving the legal advice and implementing

1  that legal advice as part of her role.  There are lots of

2  instances where we might -- one of us might be copied on an

3  email and might be reading the email and processing the

4  question and processing the answer and using that question

5  and that answer to guide the work we do, but we don't have

6  to actively be in the chain, and that's precisely what the

7  declaration and I think the email chain established, which

8  is communications between the Communications Team and legal

9  asking for legal's input on what should be said or shouldn't

10  be said in a particular context to which she was privy and a

11  declaration from Mr. Kirkland establishing that she was an

12  integral member of the team and that her role there was to

13  function as if she were a member of the team with a Facebook

14  employee ID.  And that's really the only difference here.

15      I mean, I think what -- I think -- I didn't get quite a

16  clear answer from Mr. Dunne, but I think what Mr. Dunne has

17  to concede is that if this email chain had somebody with a

18  .fe.com email address instead of a .outcast.com or an at

19  outcast.com email address, we wouldn't be having this

20  argument about waiver.  There might be a separate question,

21  which is the predicate question as to whether this is

22  privileged or not.  I'm happy to get into that.  But the

23  argument that this is a waiver because she has an OutCast

24  email address boils down to the question of whether it

25  matters whether you're an employee or not, and that's what

31

1  the functional employee test and the totality of the

2  relationship is intended to allow the Court to evaluate.

3  And, in this particular case, she was functioning as an

4  employee of the Communications Team, and that team was

5  receiving legal advice on a question that was posed to

6  counsel.

7          THE COURT:  So, I still don't understand two --

8  well, two things.  So, it's hard to distinguish with respect

9  to Ms. Hahn between someone who is serving that role that

10 you described as a member of the Communications Team but

11 doing so in a totally third party consultant capacity.  I

12 mean, it is not hard for me to imagine that any company in

13 -- you know, faced with some sensitive media relation issue

14 would have such a person involved.  That doesn't mean that

15 she's a functional employee for purposes of legal advice.  I

16 can't tell you how many times I regretted when a client

17 copied somebody they shouldn't on an email string, whether

18 privileged or not when I was a practicing lawyer.  You know,

19 that -- so it doesn't answer the question in my mind to

20 simply say, you know, the Communications Team needed to

21 respond to media inquiries that implicated sensitive legal

22 question, needed legal advice, therefore.

23     You know, it seems like the way that you're describing

24 the functional employee doctrine might be too broad.  It

25 might swallow up the traditional limitations on who is and

32

1   is not within the scope of attorney-client privilege, and

2   that's really what I'm trying to understand, and it would be

3   easier to say that she was, as some cases put it, necessary

4   to the communication if she were participating.  But that's

5   not the only way that she could be necessary to the

6   communication.

7          What -- you know, so there's all kinds of people on

8   this email string.  So --

9          MS. MEHTA:  Your Honor, on that I would direct you

10  to paragraph six of Mr. Kirkland's declaration where

11  specifically as to this chain, he says:

12              "With respect to the documents in

13          question here, Ms. Hahn was included

14          because she was assisting in preparing

15          Facebooks's response to a press inquiry

16          regarding platform issues, an area of

17          the business she had provided

18          communication support for several

19          years."

20       So, this is not -- I'm not -- it's not just that she's

21  a member of the Communications Team.  That inquiry goes to

22  her status as a functional employee, and the evidence that

23  we've provided as to the totality of the relationships

24  establishes that she qualifies as a functional employee.

25       If what you're asking for is a nexus between her role

33

1  as a functional employee and the particular communication at

2  issue -- and I'm not suggesting that there would always have

3  to be a nexus as to a particular request for legal advice, I

4  don't know that the case law actually requires that much,

5  but in this case, we have that because we have a sworn

6  declaration from Mr. Kirkland explaining that she was on

7  that chain particularly with respect to an area of expertise

8  on which she was providing communication support.

9        And I think the problem with the Plaintiffs' argument

10  is if in the face of that showing, if you were find that

11  somehow this is not a privileged communication, the

12  practical reality would be every time a team that's an

13  integrated team happens to have someone that has -- that's a

14  consultant as opposed to an employee of the company, they

15  would have to excise that member of the team from particular

16  communications in order to maintain privilege.  But what

17  that would do is destroy the purpose of the functional

18  employee test, right.  We allow for functional employees to

19  be within the role of the privileged communication because

20  we recognize -- the Ninth Circuit recognizes that that is an

21  important protection to extend to a functional employee, and

22  here we've shown that, and we've shown the nexus.

23            THE COURT:  So, the -- the flip side to that

24  argument or maybe the counterpoint to that argument might be

25  that what's to distinguish what you described from any

34

1    situation where any vendor, any mere vendor or consultant of

2    a company can participate in privileged communications

3    without waiver?  I mean, that's not the law.  And here we

4    have a situation where it appears that there is a non-

5    employee of Facebook who is alleged to be a functional

6    employee while servicing multiple entities at the same time

7    in her consulting capacity.  And I haven't seen any cases

8    out there that -- well, maybe you'll tell me I'm wrong and

9    I'm -- I'm not remembering correctly, but are there any

10   cases where the -- someone is found to be a functional

11   employee while -- while basically being a functional

12   employee of multiple entities or a consultant of multiple

13   entities at the same time and yet a functional employee of

14   only one.

15       That's the -- that's what I think are the most

16   challenging facts you have here, unless it's not true and

17   that she was devoted exclusively to Facebook during this

18   time period.

19           MS. MEHTA:  Yes, your Honor.  So, I want to answer

20   first the -- the general question you asked, and then I'll

21   answer the specific question you asked.

22       You asked what's to stop a consultant, any consultant

23   or any vendor from their -- for being subject to the

24   attorney-client privilege.  The answer is the functional

25   employee test.  What stops that from happening is that your

35

1  Honor is going to look at the particular factors that the

2  case law asks you to look at and analyze the totality of

3  circumstances and evaluate on a case-by-case basis whether a

4  vendor or somebody that happens to have credentials -- or

5  happens to be employed by one entity but works with another

6  entity in an integrated way qualifies as a functional

7  employee or as a mere vendor.  And that's why we have the

8  test.  That's why we have the standard that we've outlined

9  and that we addressed in detail in the submission.  So

10 that's one thing.

11     The second thing is your question about whether there's

12 cases that find someone can be a functional employee even if

13 they also happen to have a role in other cases.  So, for

14 that, I would point you to the High-Tech Employee Antitrust

15 Litigation case, which is 2013 Westlaw 772668 at star 4,

16 where a consultant was found to be a functional employee of

17 Google despite also having roles at Intuit and Apple.

18     And that makes sense because if you think about the

19 role that this person's supposed to have, they could be a

20 functional employee and be spending 95 percent of their time

21 at a particular entity and then also be doing five percent

22 of their time doing something else, and that five percent

23 doesn't eliminate the protection that should be afforded to

24 the 95 percent that -- especially where what they're doing

25 is something that meets the requirements of the functional

36

1   employee test.  That's what that test is designed for.

2          THE COURT:  But it's not what we have here where

3   someone is so almost exclusively devoted to one company as

4   opposed to I have a consulting business for PR, and I

5   service many clients, many big clients.

6          MS. MEHTA:  Your Honor, I don't know what the -- I

7   don't know what the percentage breakdown of her time was,

8   but if we look at the Kirkland declaration, which is the --

9   which is the evidence in record, we have factor by factor

10  laid out in sworn declaration that this person was, for all

11  intents and purposes, an in-house member of the

12  Communications Team.

13      I don't know if she was doing anything else on the --

14  at any particular day, but I don't think it matters because

15  what matters was was she in this role.  And, as Mr. Kirkland

16  laid out, she was the account manager for Facebook at the

17  time.  She was actively involved for the company in -- in a

18  role where she wasn't even being supervised or there was no

19  one else that was an employee that was serving in that role.

20  She was on her own as the account manager and as the

21  embedded team person functioning as a Communications Team

22  member.

23          THE COURT:  All right.  I mean, there are some

24  distinctions between the circumstances in In Re High-Tech

25  Employee and this case.  But I do -- I do think that these

37

1  -- there is no case that is precisely exactly like these

2  facts.  I acknowledge that.

3         Let me -- let me ask the question that I was

4  asking about the waiver issue with respect to the FTC

5  situation, because it -- it does appear that Facebook has a

6  different view of what you all did when you did that

7  stipulated order, clawback order, than what I articulated.

8     So, what is the problem that you think this waiver

9  argument raises?

10        MS. MEHTA:  Yes, your Honor.  Can I have your

11  indulgence to just point you to one other case on the --

12        THE COURT:  Sure.

13        MS. MEHTA:  -- last -- on the last point --

14        THE COURT:  Sure.

15        MS. MEHTA:  -- which is the Medversant case that

16  we cited out of the Central District.

17        THE COURT:  Yeah.

18        MS. MEHTA:  And, so, your Honor, while you're

19  looking at that question, I'd encourage you to -- and I know

20  you've already looked at it -- look at the facts of that

21  case.

22        THE COURT:  Okay.

23        MS. MEHTA:  So, then on your question, so, I do

24  think there's a little bit of a difference of a view as to

25  what the text of the 502(d) order in this case requires, and

38

1  what the text of the 502(d) order in this case says is that

2  the parties are not going to challenge production based on

3  502(b) and, instead, are going to use the 502(d) proceeding,

4  and I think that's consistent with what your Honor said at

5  the outset of this discussion, which was the mass production

6  of documents.  The -- the agreement between the parties was

7  that the mass production of documents was not going to be a

8  basis -- that alone was not going to be the basis for a

9  challenge to privilege.

10      Consistent with that, what the 502(d) order says is

11  we're not going to use 502(b) for that sort of mass

12  production.  We're going to use 502(d) and the terms of this

13  order.

14      So, that's our point.  And if we look at the FTC

15  production, it is precisely the type of mass production that

16  the parties are talking about.

17          THE COURT:  You mean Facebook's production to the

18  FTC or Facebook's production of the FTC collection to

19  Plaintiffs?

20          MS. MEHTA:  Well, both of those things are -- I

21  mean, the -- the Facebook production to the FTC in some ways

22  is -- it was a reproduction, and we didn't have an

23  opportunity to have any kind of systematic review of those

24  documents for privilege.  So, it -- it almost -- it's -- it

25  doesn't matter because I think it really collapses into in

39

1   some ways the first production.  It's not like we were

2   making a document-by-document judgment as to what to produce

3   or not produce to the Plaintiffs here from the FTC.  The

4   question in terms of the mass production and the review for

5   responsiveness and the privilege that was done, that was all

6   done in the context of the FTC production.  It was a mass

7   production, and I think we even had a hearing with your

8   Honor where we heard Ms. Schmidt, counsel for the Plaintiff,

9   say that they'd be hard pressed to challenge that kind of

10  mass production.

11        That's what we thought we were doing here, and --

12             THE COURT:  Okay.  But let me -- let me make sure

13  I am straight on the facts here, because in your opposition

14  you do describe the FTC production, meaning the production

15  Facebook made to the FTC in a manner that suggests that

16  there was a review -- before producing documents to the FTC,

17  Facebook conducted an extensive review for responsiveness

18  and privilege.

19             MS. MEHTA:  Right, your Honor.  That's exactly

20  what I'm saying.

21             THE COURT:  Okay.

22             MS. MEHTA:  The review that was done was done

23  before the documents were printed.

24             THE COURT:  Yeah.  I got it.

25             MS. MEHTA:  Not -- not in the 30 days that we had

40

1   where we -- there was no opportunity to --

2        THE COURT:  I understand.  I understand that

3   completely.  But Facebook's production to the FTC was not

4   that kind of mass production where you just relevant to hits

5   -- search terms, got the hits and hit send after doing some,

6   you know, high-level privilege -- that's not what happened

7   there.

8        MS. MEHTA:  That's correct, your Honor.  But I

9   don't think that changes the inquiry here, and the reason

10  for that is --

11       THE COURT:  Well, yeah.  Okay.  Let me just --

12  before I lose my train of thought, let me -- I have the

13  order in front of me, the 502(d) order, the first amended

14  clawback order.

15       MS. MEHTA:  Okay.

16       THE COURT:  And this is docket 191.  So, the first

17  line defines protected documents as the production or

18  disclosure of any documents and accompanying metadata.

19  Okay.  So that -- that I would interpret as the production

20  in this case.  So, those are the protected documents, things

21  that are produced in this case.  And then the rest of that

22  introductory paragraphs talks about, you know, privileges

23  that may apply, attorney-client privilege, regulatory, you

24  know, other immunities, all those kinds of things, and then

25  says that the order provides the maximum protection allowed

41

1   by F.R.E. 502(d) with regard to protected documents, defined

2   term.  502(b) does not apply to disputes regarding protected

3   documents, again, defined term.  And, instead, the

4   stipulated 502(d) order governs all disputes regarding

5   protected documents, defined term, produced in this

6   litigation.

7       So, I interpret that as any production you make in this

8   litigation, including the production Judge Koh ordered you

9   to make of the FTC collection as governed by 502(d).  That's

10  fine, but it doesn't immunize -- if Facebook was handing out

11  the documents that are at issue in this case on a street

12  corner before it produced them to anybody but before it

13  produced them to the Plaintiffs in this case, that would be

14  a waiver, regardless of 502(d) in this case.

15      So, I don't -- I don't understand the argument that

16  says somehow the prior production by Facebook to the FTC

17  falls under the rubric of only 502(d).  That doesn't work

18  under your order.  And why is that not right or do you

19  disagree?

20          MS. MEHTA:  So, your Honor, I think -- I have two

21  responses to that.  One is I think the text of the order I

22  think doesn't necessarily read -- it could be read

23  differently, and I'm looking at it, and I'm reading it a

24  little bit differently than that, which is, the challenges

25  being made to the protective document as it was produced in

42

1   this case, I agree with that.  But it does include an

2   agreement between the parties to use 502(d) instead of

3   502(b), and the reason for that is what you said at the

4   outset, which is, the mass production of documents.  And it

5   wasn't limited to the mass production of documents where

6   there's no re-review, right, because this 502 order applies

7   not only to the performed production but also to the

8   remainder of the productions in this case.

9       So, the point is when we're doing a massive production

10  of the sort that's going to be needed in this case and was

11  needed with the FTC, we're not going to fight over

12  inadvertence under a 502(b) framework, but we're going to

13  use 502(d) instead.  So, that's one response.

14      The second response is I don't think any of this

15  matters because I think we've made a showing under 502(b)

16  that the type of -- the type of production that we had to

17  do, which was a massive production, was done where there was

18  a review that resulted in 300,000 entries on a privilege

19  log, and there hasn't been any articulation from the

20  Plaintiffs that I've heard that would suggest that that's

21  not more than adequate to establish inadvertence under

22  502(b).  And then, of course, even independent from that,

23  there is the FTC regulatory framework which finds that once

24  you claw a document back from the FTC as we have done, that

25  document does not -- there's no waiver of privilege until

43

that privilege issue is resolved, which it has not been.
So, I would say those two independent bases there to find
that the production to the FTC wasn't a waiver.  And I have
to say as a practical matter, the argument that is being
offered by the Plaintiffs would upend the framework of
document productions to regulators.  I mean, if what -- if
Plaintiffs are right that what you have to do is make some
sort of showing -- I don't even know exactly what it is that
they would suggest that we would do beyond what we've
already done to establish them in the context of a mass
production to the regulator, who hasn't waived privilege, it
would completely upend the regulatory framework, and that's
what we were talking about.  I remember being on a Zoom with
you and Ms. Schmidt where we talked about the fact that we
were doing these mass productions.  We shouldn't have to
defend the production framework on a per document basis, and
that was the point of the order.

          THE COURT:  Okay.  So, the order doesn't, in my
view, say precisely that.  And you obviously didn't have a
meeting -- it was a stipulation, and you didn't have a
meeting of the minds, and that's not how I would read it.  I
read -- I read the clawback order in this case as applying
to documents produced in this case.  And whatever happened
before they were produced in this case is subject to
whatever rules are out there, which may very well include

1  and probably do, the regulatory regime in which the Facebook

2  production to the FTC was made.  But also there is

3  information in your opposition brief that talks about all

4  the reasonable steps that you took.

5       Mr. Dunne's problem is that he says, well, that should

6  have been in somebody's declaration.  And, by the way, we're

7  worried that this document was actually produced in other

8  contexts that have not even been disclosed to us, and we

9  don't know about it.  We don't know what the circumstances

10  are.  So, we haven't done a good enough job in documenting

11  how the prior disclosure was an inadvertent disclosure.

12       I mean, I think it's an excellent fact in your favor

13  that the FTC apparently said, "Hey, what about this?  Do you

14  want this back," and you said, "Yes, immediately," and then

15  immediately took steps to claw it back here.  Excellent

16  fact.

17       So, how do you respond to Mr. Dunne's concerns that

18  that's not -- it's not sufficient because there's no

19  evidentiary basis or insufficient evidentiary basis for what

20  you're saying, number one, and, number two, you're

21  incomplete in terms of your showing on this particular email

22  thread?

23          MS. MEHTA:  Yes, your Honor.  So, two things.  One

24  is with respect to the evidentiary basis, with respect to

25  Mr. Dunne, I don't think a declaration is needed to

45

1   establish the two basic factors that are beyond any dispute

2   that would go to the inadvertence.  One is the volume of the

3   production that we made and that we remade to the Plaintiffs

4   in this case, and two is the volume of the privilege log

5   which, from those two facts, I think it is -- there's --

6   it's inexorable that there was a review that was done of the

7   documents in order to screen for privilege and

8   responsiveness.  And I don't think a declaration is

9   necessary to establish that.

10       Two, on the question of whether they were produced to

11  other people, I think we addressed in the briefing where we

12  are aware that the document was produced to other

13  regulators, it was clawed back.  So, when we got notice from

14  the FTC, we clawed it back from private Plaintiffs in this

15  case, and there had been other productions where it had also

16  been produced to regulators and where we were aware of that,

17  and we clawed it back from all of them.

18       So, where we know that the document was produced, it

19  has been clawed back from all of those productions.

20           THE COURT:  And, have there been disputes as to

21  any of those clawbacks?

22           MS. MEHTA:  Not that I'm aware of.

23           THE COURT:  Okay.  So, you mentioned that there

24  was -- it had -- it's privileged until it's been resolved.

25  But right now there are no pending disputes in some other --

46

1  before some other agency or some other court about those

2  issues?

3          MS. MEHTA:  Not that I'm aware of, your Honor.

4  There is -- I should -- I should say for completeness with

5  respect to the FTC, there was one document from this

6  clawback set that the FTC cited in an amended complaint, and

7  with the direction of Judge Boasberg in the District of

8  D.C., the parties agreed to a Rule 502(d) order.  So --

9  stipulation and order, I should say, that was signed by

10 Judge Boasberg, so that that document could -- that portion

11 of that document could be cited without any waiver of

12 privilege.  So, there's a 502(d) nonwaiver agreement as an

13 order from Judge Boasberg as to that particular document.

14 Otherwise, there's been no resolution of the privilege

15 assertion as to those documents as clawed back from the FTC.

16         THE COURT:  And does that order relate to anything

17 in this email thread or was it in a different subject

18 matter?

19         MS. MEHTA:  No, your Honor.  It relates to -- it

20 relates to one of the documents in the email thread.

21         THE COURT:  All right.

22         MS. MEHTA:  One of the documents in the clawbacks

23 I should say for --

24         THE COURT:  Right.  So, let me just ask like a

25 really pointed question.  If something that is in this email

1  thread is in a publically filed complaint, that's gone,

2  right?

3          MS. MEHTA:  It's not public, your Honor.  It was

4  redacted, and it was done pursuant to an order from Judge

5  Boasberg.

6          THE COURT:  Okay.  But is it -- is it the same

7  text that's at issue here?

8          MS. MEHTA:  Yes, your Honor.  So, there is one

9  snippet that is in a document that is not public.  It is

10  under seal, and where Judge Boasberg entered an order saying

11  that they were allowed to cite it in the document and that

12  that would not constitute a waiver of privilege.

13          THE COURT:  Yeah, it wouldn't constitute a waiver

14  of privilege for the subject matter that's in the text, but

15  -- maybe I should see the order.  Maybe somebody should

16  point me to where the order is so I know exactly what he

17  said.

18          MS. MEHTA:  I'm happy to submit it to your Honor,

19  and the order only governs the snippet that's in the

20  complaint, not the underlying document.

21          THE COURT:  I -- I got it.  But, you know, in --

22  what I'm trying to understand is, okay, so that -- that

23  order has been issued.  But, in fairness, what I'm wondering

24  is is that snippet something that at a minimum should be

25  disclosed to the Plaintiffs in this case and, if not, why

48

1  not?  Because, depending on what the order says, if that is

2  -- is disclosed to some other party, even if the waiver

3  extends no further beyond that snippet, should it be

4  withheld here?  And I would like to see the order.

5          MS. MEHTA:  I'm happy to send you the order, your

6  Honor.  I think the -- the answer to that is, no, it

7  shouldn't be because it was done expressly under an

8  agreement that it wouldn't waive privilege, and it was done

9  expressly by a stipulation between those parties and at the

10  suggestion of Judge Boasberg.  We'll send you, your Honor,

11  the order so that you can review Judge Boasberg's order.

12          THE COURT:  Okay.  That would be great.  And you

13  can just file it as like a supplemental thing on the docket.

14          MS. MEHTA:  Will do.

15          THE COURT:  Okay.  So, Ms. Mehta, before I get --

16  Mr. Dunne is anxious to say something here, but I want to

17  give you the opportunity to address any other matters that

18  you think need to be addressed.

19          MS. MEHTA:  No, your Honor.  I think that we've --

20  we've covered it.  The -- the only thing I wanted to make

21  sure, because we hadn't -- we hadn't addressed the sort of

22  separate threshold question was the actual privilege as

23  opposed to the functional employee test, and I think what I

24  want to make -- I want to make clear is from a framework

25  perspective, that I think the way your Honor first started

49

1   out the conversation is the right way doctrinally to look at

2   the question, and I think that's gotten perhaps a little

3   conflated over the course of the briefing and over the

4   course of the argument today from Plaintiffs.

5        Doctrinally, there are three questions before your

6   Honor.  One is whether or not the document was privileged to

7   begin with.  We would suggest and respectfully submit that

8   it is.

9        Two is whether the fact that Ms. Dunne -- I'm sorry --

10  Ms. Hahn was on the document somehow constituted a waiver.

11  No, because she was a functional employee, and pursuant to

12  the Kirkland declaration, she -- there's a nexus between her

13  role as a functional employee and the particular

14  communication chain at issue.

15       And then three is the question of whether production to

16  the FTC was another basis to argue waiver, and we

17  respectfully submit it's not, for the multiple reasons that

18  we outlined in the briefing that I've gone through.  But I

19  think those need to be thought of as distinct questions, and

20  I -- and I'm a little worried that we're starting to, over

21  the course of the briefing and the hearing today, conflate

22  those issues, and I just want to make sure that it's, from

23  our perspective, clear that each of those independently

24  would support the privilege assertion here.

25                THE COURT:  Okay.  Thank you.

50

1       Mr. Dunne, was there something you wanted to address?

2           MR. DUNNE:  I'll be very brief, your Honor.  Just

3   three quick things.

4       So, the -- we've talked about, all right, fact -- well,

5   we talked about evidentiary basis and then Ms. Mehta

6   referred to facts.  And when it comes to the -- the facts

7   regarding the prior production, we found out today that

8   these had been produced to some unnumbered but more than one

9   number of regulators that Facebook sought to claw back from

10  them, which seems to me to be pretty relevant information.

11  And, according to Ms. Mehta, she's not aware of any ongoing

12  disputes except for, well, yes, there is one ongoing dispute

13  that apparently with the FTC, which included portions of

14  this redacted language in one of their complaints.

15      And, so, I would say that that actually raises the

16  issue of whether there is, in fact, some factual disputes

17  which Facebook should have told about as the proponent of

18  the privilege, and the resolution of that, you know, I would

19  leave to your Honor.  But, I mean, there are serious

20  questions now that -- it's not -- it's not us asking for

21  some extremely exacting issue, right.  Part of the issue is

22  what -- I mean, under 502(b)(3), all right, what are their

23  efforts to get this information back, and what are the

24  outcomes of those efforts, and what we heard today is

25  Facebook's counsel is not positive, right.  She was able to

1  say "I'm not aware of any ongoing disputes except for one

2  which is ongoing."

3       And what that also does, right, is it points up that,

4  well, I guess those -- those regulations from the FTC don't

5  really govern here considering there's been multiple

6  productions to unnamed regulators who presumably do not have

7  the same administrative framework as the FTC either.

8       And then the final thing I'll just point out is in

9  regards to Ms. Hahn, right, I mean, there are factual, I

10  guess, disputes too that are unaddressed by Facebook's

11  submission.  And, again, it is the proponent, including what

12  percentage of time did she devote, how many other clients.

13  None of that's actually in there.  And, you know, so that

14  stuff isn't in the declaration.  It's not in the factual

15  record, and there are facts to indicate otherwise that we

16  found simply by looking this stuff up.

17       And the last thing is, on the Medversant case, I --

18  look, there, I just don't -- I don't think that that is

19  particularly strong support, and I would direct the Court to

20  -- to star four of it where they say that the person in

21  question effectively functioned as the entire public

22  relations department for the company in question, and it's

23  undisputed, and I mean it's not seriously in dispute that

24  Facebook has its own giant in-house public relations

25  department, does not need to use outside consultants on

1  sensitive communications with counsel about public relations
2  issues, and that's actually a pretty important point, right,
3  because if they can just include people who don't -- who
4  aren't from Facebook on various communications, right, where
5  is the line?  And the Ninth Circuit is very clear that the
6  attorney-client privilege is, while very important, very
7  narrow because, you know, it can't encompass a company's,
8  you know, conversations -- or a client's -- excuse me --
9  conversations with all these nonclients.  And so I do think
10 that's actually an important point and distinction, not just
11 in Medversant but from others, which is that Facebook has a
12 giant in-house environment.  It's nice that they like to use
13 special consultants every once in a while or apparently, you
14 know, a lot.  But, you know, when it comes to, well, we're
15 bringing legal advisors on for putative legal advice, I
16 would say, yeah, they should be cutting out non-clients or
17 non-Facebook employees from that communication unless they
18 truly are, like truly, in the sense of, hey, that person
19 works for Facebook even though she has an OutCast email
20 address, which I don't think that the -- the facts establish
21 here.
22       And that's all I have, your Honor.
23            THE COURT:  Okay.  You know, Ms. Mehta, it would
24 be helpful for me to understand sort of the sequence of
25 events for this disclosure that was the subject of the order

1 that you referred to.  In other words, did that complaint

2 that -- that had the disclosure in it get filed before the

3 FTC said, "Hey, this might need to be clawed back"?  Do you

4 know?

5          MS. MEHTA:  I -- I believe the answer is that it

6 was after, but I can -- I can try to confirm that, and what

7 I'm happy to do, your Honor, is -- is submit to you the

8 stipulation which will have the date and then the order from

9 Judge Boasberg, and I -- and I think it's already in the

10 record the date of the clawback notice.  So, hopefully, that

11 will give you enough.  But, otherwise, I'm happy to submit

12 something factual to you.

13          THE COURT:  That's fine.  I'd just like -- it may

14 be evident from what you're going to send me by way of the

15 order, but I'd just like to have the timeline straight in my

16 head about what happened when with respect to this

17 particular email thread or some subset of its contents.

18          MS. MEHTA:  Yes, your Honor.  Thank you.

19          THE COURT:  Okay.  Good.  Well, thank you all.  I

20 believe I have what I need to do an order in this matter,

21 and I just wanted to let you all know I have not forgotten

22 about the other dispute that's in my inbox, which I did not

23 have argument with respect to the subpoena.  I've not

24 forgotten about that, but I will get to that as well.

25          MS. MEHTA:  Thank you, your Honor.

54

1          THE COURT:  This matter is concluded.

2      (Proceedings adjourned at 12:01 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

55

## CERTIFICATE OF TRANSCRIBER

     I certify that the foregoing is a true and correct
transcript, to the best of my ability, of the above pages of
the official electronic sound recording provided to me by
the U.S. District Court, Northern District of California, of
the proceedings taken on the date and time previously stated
in the above matter.

     I further certify that I am neither counsel for,
related to, nor employed by any of the parties to the action
in which this hearing was taken; and, further, that I am not
financially nor otherwise interested in the outcome of the
action.


               Echo Reporting, Inc., Transcriber
                 Tuesday, December 21, 2021