1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3             SAN JOSE DIVISION

4

5   MAXIMILIAN KLEIN, ET AL., ON    )  C-20-08570 LHK
    BEHALF OF THEMSELVES AND ALL    )
6   OTHERS SIMILARLY SITUATED,      )  SAN JOSE, CALIFORNIA
                                    )
7              PLAINTIFF,           )  JULY 15, 2021
                                    )
8        VS.                        )  PAGES 1-89
                                    )
9   FACEBOOK, INC.,                 )
                                    )
10             DEFENDANT.           )
    _____ )

11

12

13         TRANSCRIPT OF ZOOM PROCEEDINGS
         BEFORE THE HONORABLE LUCY H. KOH
14         UNITED STATES DISTRICT JUDGE

15

16  A P P E A R A N C E S:

17  FOR THE CONSUMER       QUINN EMANUEL URQUHART & SULLIVAN
    PLAINTIFFS:            BY:  STEPHEN A. SWEDLOW
18                         191 N. WACKER DRIVE, SUITE 2700
                           CHICAGO, ILLINOIS  60606
19
                           BY:  KEVIN TERUYA
20                         865 SOUTH FIGUEROA STREET, 10TH FLOOR
                           LOS ANGELES, CALIFORNIA  90017
21

22

23         APPEARANCES CONTINUED ON THE NEXT PAGE

24  OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595
25

```
 1               PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                    TRANSCRIPT PRODUCED WITH COMPUTER
 2

 3    FOR THE CONSUMER        HAGENS BERMAN SOBOL SHAPIRO
      PLAINTIFFS:             BY:  SHANA E. SCARLETT
 4                            715 HEARST AVENUE, SUITE 202
                              BERKELEY, CALIFORNIA  94710
 5
                              LOCKRIDGE GRINDAL NAUEN
 6                            BY:  BRIAN D. CLARK
                              100 WASHINGTON AVENUE S., SUITE 2200
 7                            MINNEAPOLIS, MINNESOTA  55401

 8

 9    FOR THE ADVERTISER      BATHAEE DUNNE LLP
      PLAINTIFFS:             BY: YAVAR BATHAEE
10                            445 PARK AVENUE, 9TH FLOOR
                              NEW YORK, NEW YORK  10022
11
                              BY:  BRIAN J. DUNNE
12                            633 WEST FIFTH STREET, 26TH FLOOR
                              LOS ANGELES, CALIFORNIA  90071
13

14                            SCOTT & SCOTT
                              BY:  KRISTEN M. ANDERSON
15                            230 PARK AVENUE, 17TH FLOOR
                              NEW YORK, NEW YORK  10169
16

17    FOR THE DEFENDANT:      WILMER CUTLER PICKERING HALE AND DORR
                              BY:  SONAL N. MEHTA
18                            950 PAGE MILL ROAD
                              PALO ALTO, CALIFORNIA  94303
19
                              BY:  DAVID Z. GRINGER
20                                 ARI HOLTZBLATT
                              1875 PENNSYLVANIA AVENUE NW
21                            WASHINGTON, D.C.  20006

22                            KELLOGG, HANSEN, TODD,
                              FIGEL & FREDERICK
23                            BY:  AARON M. PANNER
                              1615 M STREET N.W., SUITE 400
24                            WASHINGTON, D.C.  20036

25    ALSO PRESENT:           ERIC MEIRING
```

```
1     SAN JOSE, CALIFORNIA                    JULY 15, 2021
2                      P R O C E E D I N G S
3         (ZOOM PROCEEDINGS CONVENED AT 1:44 P.M.)
4              THE CLERK:  GOOD AFTERNOON, YOUR HONOR.
5              THE COURT:  GOOD AFTERNOON.  I APOLOGIZE FOR BEING
6     LATE.
7              THE CLERK:  CALLING CASE 20-8570, KLEIN, ET AL,
8     VERSUS FACEBOOK, INCORPORATED.
9          COUNSEL, PLEASE STATE YOUR APPEARANCES FOR THE RECORD,
10    STARTING WITH COUNSEL FOR THE CONSUMER PLAINTIFFS.  THANK YOU.
11             MR. SWEDLOW:  STEPHEN SWEDLOW FROM QUINN, EMANUEL FOR
12    THE CONSUMER PLAINTIFFS.
13             MS. SCARLETT:  SHANA SCARLETT FROM HAGENS BERMAN FOR
14    THE CONSUMER PLAINTIFFS.
15             MR. CLARK:  BRIAN CLARK FROM LOCKRIDGE GRINDAL NAUEN
16    FOR THE CONSUMER PLAINTIFFS.
17             MR. TERUYA:  KEVIN TERUYA FROM QUINN, EMANUEL FOR THE
18    CONSUMER PLAINTIFFS.
19             THE CLERK:  AND FOR THE ADVERTISER PLAINTIFFS?
20             MS. ANDERSON:  KRISTEN ANDERSON, SCOTT & SCOTT, FOR
21    THE ADVERTISER PLAINTIFFS.
22             MR. DUNNE:  BRIAN DUNNE, BATHAEE DUNNE, FOR THE
23    ADVERTISER PLAINTIFFS.
24             MR. BATHAEE:  AND YAVAR BATHAEE FROM BATHAEE DUNNE
25    FOR THE ADVERTISER PLAINTIFFS.
```

```
1              THE CLERK:  AND FOR DEFENDANTS.

2              MS. MEHTA:  GOOD AFTERNOON, YOUR HONOR.

3          SONAL MEHTA FROM WILMER HALE ON BEHALF OF FACEBOOK.  WITH

4      ME ARE AARON PANNER FROM THE KELLOGG HANSEN FIRM, DAVID GRINGER

5      FROM WILMER, HALE, AND ARI HOLTZBLATT FROM WILMER, HALE, AND WE

6      ALSO HAVE ERIC MEIRING, IN-HOUSE COUNSEL FROM FACEBOOK, WHO'S

7      ON THE LINE LISTENING IN.

8              THE COURT:  ALL RIGHT.  GOOD AFTERNOON AND WELCOME TO

9      EVERYONE.  THANK YOU FOR PARTICIPATING.

10         I HAVE A LOT OF QUESTIONS FOR THE PARTIES, SO I APPRECIATE

11     YOUR PATIENCE IN ADVANCE.

12         LET ME FIRST START WITH THE PLAINTIFFS.  I HAVE, AS YOU

13     MIGHT EXPECT, MORE QUESTIONS FOR YOU THAN FOR FACEBOOK TODAY.

14         LET'S JUST START WITH, YOU KNOW, STATUTE OF LIMITATIONS

15     TIMELINESS GROUNDS.  WHY SHOULD THE COURT COME TO A DIFFERENT

16     CONCLUSION THAN JUDGE FREEMAN IN REVEAL CHAT OR JUDGE BOASBERG

17     IN THE NEW YORK AND FTC CASE, OR THE NEW YORK CASE?

18         GO AHEAD, PLEASE.

19             MR. SWEDLOW:  THIS IS STEPHEN SWEDLOW.

20         CAN I TAKE THIS ON BEHALF OF THE CONSUMER PLAINTIFFS?  IS

21     THAT OKAY?

22             THE COURT:  THAT'S FINE.  GO AHEAD, PLEASE.

23             MR. SWEDLOW:  WELL, STARTING WITH I'LL SAY THE

24     GOVERNMENT CASES, THE FTC CASE, THE FUNDAMENTAL CLAIM OF

25     ANTICOMPETITIVE CONDUCT IS DIFFERENT.
```

1        THE CLAIM HERE IS THAT FACEBOOK MISREPRESENTED AND

2   DECEIVED THE USERS OR CONSUMERS ABOUT THE PRIVACY PROTECTION,

3   THE EXTENT AND USE OF THE DATA, THE ACCESS TO THE DATA BY THIRD

4   PARTIES, AND I THINK I'LL GET INTO WHAT THAT WRONGDOING OR

5   ALLEGED WRONGDOING WAS IN A DIFFERENT -- IN ANSWER TO A

6   DIFFERENT QUESTION.

7        BUT THIS ISN'T A MYSTERY, AND IT WAS MADE VERY CLEAR BY

8   THE FTC -- BY THE JUDGE IN THE FTC CASE, TWICE ON PAGE 6 AND 7

9   OF THE OPINION.  THE COURT SAID, QUOTE, "TO BE CLEAR, ALTHOUGH

10  FACEBOOK'S DATA COLLECTION AND USE PRACTICES HAVE BEEN SUBJECT

11  TO INCREASING SCRUTINY, THEY ARE NOT THE SUBJECT OF THIS

12  ACTION."

13       SO THE FUNDAMENTAL ALLEGED ANTICOMPETITIVE BEHAVIOR IN THE

14  FTC AND THE STATE'S CASE WAS DIFFERENT THAN THE FUNDAMENTAL

15  ANTICOMPETITIVE BEHAVIOR HERE, AND WHY -- YOUR FOLLOW-UP

16  QUESTION MIGHT BE, WHY DOES THAT MATTER?  YOU'RE JUST MAKING A

17  POINT.

18       BUT THE POINT IS THAT BECAUSE THAT'S THE ANTICOMPETITIVE

19  CONDUCT HERE, THE DECEPTION, WHAT THE CONSUMERS HAVE THEN PLED,

20  I THINK THE EASIEST PLACE TO FIND THAT WOULD BE IN I THINK IT'S

21  PARAGRAPH 238, IS SPECIFIC AND ACTIVE FRAUDULENT CONCEALMENT OF

22  THAT DECEPTIVE CONDUCT.

23       WHAT THE FTC AND THE STATES WERE CHALLENGING WERE

24  ACQUISITIONS THAT TOOK PLACE, LET'S SAY, EIGHT AND TEN YEARS

25  AGO, AND THOSE ACQUISITIONS, BECAUSE THEY WERE SEEKING

1    EQUITABLE RELIEF, WERE SUBJECT TO THE EQUITABLE DOCTRINE OF

2    LACHES, AND HERE WE'RE SUBJECT TO STATUTE OF LIMITATIONS.

3         THE REASON WHY THE STATUTE OF LIMITATIONS WOULDN'T BAR A

4    CLAIM IS NOT ONLY BECAUSE THERE'S ACTIVE -- OR THERE'S ACTS,

5    ANTICOMPETITIVE ACTS DURING THE STATUTE OF LIMITATIONS PERIOD,

6    BUT IT'S ALSO BECAUSE OF THE ACTIVE FRAUDULENT CONCEALMENT.

7         AND WHAT PLAINTIFFS, THE CONSUMER CLASS, DID WAS LIST, IN

8    PARAGRAPH 238, IF YOU COUNT THEM, 15 AFFIRMATIVE ACTS OF

9    CONCEALMENT.  I WOULD SAY THEY ARE MORE SIGNIFICANT THAN WHAT

10   THIS COURT WAS ASSESSING IN BROWN V. GOOGLE.

11        BUT EVEN THE SIGNIFICANCE OF THE ACT OF CONCEALMENT ISN'T

12   REALLY THE SUBJECT OF REAL DEBATE BECAUSE, JUST TEMPORALLY,

13   WHAT HAPPENED WAS FACEBOOK ENTERED INTO A CONSENT DECREE IN

14   2011, WHICH WAS THEN EXECUTED IN 2012, WITH THE FTC WHERE

15   FACEBOOK DENIED ALL WRONGDOING, BUT AGREED THAT IT WOULD STOP

16   DOING CERTAIN THINGS THAT VIOLATED USERS' CONSUMER DATA PRIVACY

17   RIGHTS.

18        AND THEN THE D.O.J. SUED IN 2019 BECAUSE, UNKNOWN TO THE

19   GOVERNMENT UNTIL THE CAMBRIDGE ANALYTICA SCANDAL WAS REVEALED,

20   SO BY 2019, THE D.O.J. WAS UNAWARE THAT FACEBOOK HAD BEEN DOING

21   THE EXACT DECEPTION THAT IT HAD AGREED TO NOT DO IN THE 2011

22   CONSENT DECREE.

23        SO ONE REASON THAT THE FRAUDULENT CONCEALMENT -- THE FACTS

24   ALLEGED IN THE COMPLAINT SHOULD BE TAKEN AS TRUE, BUT THAT

25   THEY'RE ACTUALLY TRUE IS THAT THE GOVERNMENT WAS UNAWARE THAT

```
 1        FACEBOOK WAS VIOLATING ITS OWN PROMISE TO THE GOVERNMENT TO
 2        STOP ENGAGING IN DECEPTION RELATED TO USER PRIVACY AND DATA FOR
 3        THOSE EIGHT YEARS FROM 2011 TO 2019, AND THE STATUTE OF
 4        LIMITATIONS PERIOD STARTS IN 2015.
 5            I KNOW YOU HAVE A LOT OF QUESTIONS.  I'VE GOT A BUNCH OF
 6        OTHER ANSWERS.  I DON'T KNOW HOW MUCH YOU WANT ME TO GET INTO
 7        THE OTHER ARGUMENTS.
 8                THE COURT:  LET ME ASK YOU JUST A FOLLOW-UP QUESTION.
 9        SO YOU'RE SAYING THE DECEPTION ABOUT DATA PRACTICES WAS NOT AT
10        ALL ALLEGED AS ANTICOMPETITIVE CONDUCT IN THE OTHER CASES.
11            NOW, WHAT ABOUT THE SURVEILLANCE USING ONAVO?  BECAUSE I
12        BELIEVE JUDGE FREEMAN'S ORDER AT LEAST MENTIONS ONAVO.  WAS
13        THAT SORT OF ALLEGATION REGARDING ONAVO NOT BEFORE
14        JUDGE FREEMAN?
15                MR. SWEDLOW:  WELL, THE -- I MEAN, I SHOULD SAY IT
16        THIS WAY:  THE CLAIM WAS NOT BASED UPON THAT AS AN
17        ANTICOMPETITIVE CONDUCT.
18            BUT ONAVO IS A PRETTY EASY ONE TO DEAL WITH FOR STATUTE OF
19        LIMITATIONS, BECAUSE WHAT ONAVO WAS BEING USED FOR WASN'T KNOWN
20        UNTIL WITHIN THE STATUTE OF LIMITATIONS PERIOD.  SO WHILE IT
21        MAY HAVE BEEN, AND OUR ALLEGATION IS, THAT IT WAS USED FOR
22        PURPOSES OF DETERMINING WHICH ACQUISITIONS TO ENTER INTO AND
23        WHICH NOT -- AND THIS ISN'T THAT COMPLICATED A STRUCTURE.  WHAT
24        FACEBOOK WAS DOING WAS USING THE DATA OF ITS USERS TO
25        DETERMINE, WHERE WERE THOSE USERS GOING WHEN THEY WEREN'T ON
```

1     FACEBOOK?

2         SO WE CAN TAKE INSTAGRAM, FOR EXAMPLE.  IF FACEBOOK IS

3     ABLE TO MONITOR IN A DECEPTIVE WAY WHAT USERS DO WHEN THEY'RE

4     NOT ON FACEBOOK AND HOW LONG THEY'VE BEEN USING SOME OTHER APP

5     THAT'S IN SOCIAL MEDIA BUT HASN'T RISEN TO A SOCIAL NETWORK

6     PLATFORM, THEN FACEBOOK COULD USE THAT DATA TO EITHER DECIDE TO

7     ACQUIRE OR NOT ACQUIRE A POTENTIAL COMPETITOR.

8         AND THAT WASN'T KNOWN WHAT ONAVO AND ITS SUCCESSORS WERE

9     BEING USED FOR UNTIL WITHIN THE LIMITATIONS PERIOD.

10        SO IT ISN'T THAT NONE OF THE FACTS THAT WE ALLEGE OVERLAP.

11    IT'S JUST THAT THE ANTICOMPETITIVE CONDUCT DOES NOT.

12        THE COURT:  WELL, WHAT I'M TRYING TO DO IS JUST TO

13    NARROW, WHAT ARE THE BUCKETS OF ANTICOMPETITIVE CONDUCT YOU'RE

14    ALLEGING?  SO THAT WAS THE POINT OF MY QUESTION.

15        MR. SWEDLOW:  OKAY.

16        THE COURT:  IT LOOKS LIKE, FROM THE CONSUMER

17    COMPLAINT, YOU HAVE THREE BUCKETS OF ANTICOMPETITIVE CONDUCT:

18    ONE IS THE DECEPTION ABOUT DATA PRACTICES; ANOTHER SEEMS TO BE

19    THE SURVEILLANCE USING ONAVO; AND THEN THE THIRD ONE SEEMS TO

20    BE USING THE DATA TO IDENTIFY AND ACQUIRE COMPETITIVE THREATS.

21        WOULD YOU THINK THOSE ARE THE BUCKETS OF ANTICOMPETITIVE

22    CONDUCT THAT YOUR CLIENTS ARE ALLEGING?

23        MR. SWEDLOW:  I WOULD -- I WOULD ONLY DISAGREE WITH

24    YOU TO THIS EXTENT:  I THINK IT'S ONE BIG BUCKET, THE DECEPTION

25    RELATING TO DATA PRACTICES AND USE OF DATA, UNAUTHORIZED OR

1    MISAPPROPRIATED USE OF DATA, AND THERE ARE CERTAIN METHODS OF

2    THAT THAT WERE IMPLEMENTED.  SO THE ACQUISITIONS WERE A METHOD

3    WHERE UNAUTHORIZED DATA WAS USED, BUT I WOULDN'T SAY IT'S A

4    SEPARATE BUCKET.

5        THE PRIMARY BUCKET IS THAT USERS WERE DECEIVED ABOUT WHAT

6    DATA WAS GOING TO BE HARVESTED AND HOW THAT DATA WOULD BE USED,

7    WHETHER IT BE SOLD TO THIRD PARTIES, CAMBRIDGE ANALYTICA, USED

8    BY THIRD PARTIES IN A NON-AUTHORIZED WAY, OR USED BY FACEBOOK

9    TO DECIDE WHETHER OR NOT TO ACQUIRE A DIFFERENT SOCIAL MEDIA

10   COMPANY.

11           THE COURT:  ALL RIGHT.

12           MR. SWEDLOW:  GO AHEAD.  SORRY.

13           THE COURT:  SO YOU'RE SAYING YOU'LL HAVE THE FACTS IN

14   YOUR COMPLAINT BECAUSE THEY'RE THE METHODS, AND SO TO THAT

15   EXTENT, THE METHODS MIGHT ALSO BE IN THE COMPLAINTS BEFORE THE

16   OTHER JUDGES.  BUT YOUR OVERALL ALLEGATION OR THEORY IS

17   DIFFERENT.  IS THAT RIGHT?

18           MR. SWEDLOW:  YES.  THE PRIMARY FUNDAMENTAL

19   ANTICOMPETITIVE BEHAVIOR IS THE DECEPTION.  THAT DECEPTION WAS

20   USED TO DECIDE WHETHER OR NOT TO ACQUIRE A POTENTIAL

21   COMPETITOR.

22       THE GOVERNMENT'S COMPLAINTS WERE BASED UPON THE

23   ACQUISITION ACTIVITY, NOT THE DECEPTION.

24           AND LUCKILY -- I MEAN, I GUESS UNLUCKILY FOR THE

25   GOVERNMENT AT THE MOMENT, BUT LUCKILY FOR US, THE JUDGE WAS

1    VERY CLEAR THAT THE, THE DATA USE AND COLLECTION AND PRACTICES

2    ARE NOT THE SUBJECT OF THAT ACTION.

3         SO WHAT I WOULD SAY IS THAT THEY MAY BECOME THE SUBJECT OF

4    THAT ACTION BECAUSE THE FTC WAS GIVEN LEAVE TO AMEND I THINK UP

5    UNTIL JULY 29TH.

6         THE COURT:  UM-HUM.

7         MR. SWEDLOW:  AND THE GOVERNMENT MAY CHOOSE TO AMEND

8    THEIR COMPLAINT AND ADD ALLEGATIONS THAT THE DATA USE AND

9    PRACTICES WERE THE DECEPTIVE ACT THAT CONSTITUTE THE

10    ANTICOMPETITIVE BEHAVIOR.

11         THE COURT:  OKAY.  LET ME GO TO THE ADVERTISER

12    COMPLAINT, BECAUSE IT DOES SEEM LIKE YOUR COMPLAINT IS MORE

13    SIMILAR TO THE CASES BEFORE THE OTHER JUDGES.  CERTAINLY USING

14    THE PLATFORM TO DESTROY COMPETITION, WHICH IS ONE OF YOUR

15    ALLEGATIONS, SEEMS, YOU KNOW, VERY MUCH LIKE WHAT WAS BEFORE

16    OTHER COURTS.

17        YOU -- I MEAN, I DON'T -- IT DOESN'T -- I DON'T BELIEVE

18    THAT THE JEDI BLUE, THE AGREEMENT WITH GOOGLE, WAS BEFORE THE

19    OTHER COURTS.  IS THAT CORRECT?

20        I'M JUST TRYING TO GET A SENSE OF WHERE ARE YOU THE SAME

21    AND WHERE ARE YOU DIFFERENT AS THE PLAINTIFFS IN REVEAL CHAT

22    AND THEN EITHER STATE OF NEW YORK, THE STATE ATTORNEY GENERALS,

23    OR FTC.

24        MR. BATHAEE:  YOUR HONOR, THAT'S CORRECT.  THE

25    JEDI BLUE ALLEGATIONS ARE NOT IN THE REVEAL COMPLAINT.  NEITHER

1    IS THE 2000 TO -- 2016 TO 2018 CONTINUATION OF THE PLATFORM

2    MANIPULATION WHICH WE ALLEGE IN THE COMPLAINT.

3        OTHERWISE THE UNDERLYING ACTS ARE LARGELY THE SAME, BUT

4    FROM A DIFFERENT PERSPECTIVE, FROM THE PERSPECTIVE OF THE

5    ADVERTISERS.

6        AND FOR STATUTE OF LIMITATIONS PURPOSES, YOUR HONOR,

7    THAT'S ACTUALLY QUITE CRITICAL TO JUDGE FREEMAN'S OPINION.

8        BUT OVERALL, YOUR HONOR, I CAN SUMMARIZE THIS POINT, WHICH

9    IS THAT JUDGE FREEMAN'S DECISION FROM THAT SECOND REVEAL

10   OPINION WAS PREMISED ON THIS:  THAT THE DEVELOPERS -- AND THAT

11   CASE INVOLVED DEVELOPERS, IT'S A COMPETITOR SUIT -- WHO WERE

12   DRIVEN OFF THE PLATFORM KNEW THEY WERE INJURED AND, THEREFORE,

13   AS A MATTER OF LAW, IT'S CONSTRUCTIVE KNOWLEDGE OF THEIR CAUSE

14   OF ACTION.

15       NOW, THERE ARE SEVERAL ISSUES WITH THAT, BUT WE DON'T HAVE

16   TO TAKE THEM UP IMMEDIATELY.  I CAN EXPLAIN WHY JUDGE FREEMAN

17   HERSELF DIFFERENTIATED THIS CASE, AND THIS IS AT REVEAL CHAT

18   HOLDCO 202021 WESTLAW 1615349 AT STAR 7.

19       THE COURT AGREED WITH FACEBOOK'S ARGUMENT DISTINGUISHING

20   ANIMATION WORKERS II AND GLUMETZA AND SAYS, "AS FACEBOOK NOTES,

21   THESE CASES INVOLVE ALLEGATIONS OF ILLEGAL PRICE-FIXING, A

22   DIFFERENT ANTITRUST VIOLATION THAN WHAT PLAINTIFFS HAVE ALLEGED

23   HERE.  BOTH CASES ALLEGE A CONSPIRACY, WHICH IS ALSO ABSENT IN

24   THIS CASE.  THESE DIFFERENT FACTUAL SCENARIOS ARE MEANINGFUL IN

25   TERMS OF EVALUATING WHETHER PLAINTIFFS HAVE SUFFICIENTLY PLED

```
 1    FRAUDULENT CONCEALMENT."

 2         AND THEN SHE GOES ON, AND THIS PART IS ACTUALLY QUOTED

 3    FROM FACEBOOK'S BRIEF.  "THE COURT AGREES WITH FACEBOOK THAT

 4    'IN A PRICE-FIXING CASE, CONCEALING THE REASONS A PRICE IS SET

 5    AT A GIVEN LEVEL OBSCURES NOT ONLY THE DEFENDANT'S INTENT BUT

 6    ALSO THE FACT THAT A POTENTIAL PLAINTIFF HAS BEEN INJURED AT

 7    ALL, THAT PRICES ARE THE RESULT OF COLLUSION RATHER THAN MARKET

 8    FORCE.'"

 9         NOW, OF COURSE, THIS ISN'T ENTIRELY AN AGREEMENT-BASED

10    SCHEME.  WE THINK JEDI BLUE IS, OF COURSE.

11         BUT THE SAME CONCEPT APPLIES.  WHEN YOU PAY AN INFLATED

12    ADVERTISING PRICE, YOU DON'T KNOW WHY YOU PAID THAT INFLATED

13    PRICE.  YOU DON'T KNOW THAT IT'S A RESULT OF ANTICOMPETITIVE

14    CONDUCT.  WHEREAS IF YOU ARE A COMPETITOR THAT HAS BEEN THROWN

15    OFF FACEBOOK'S PLATFORM, ARGUABLY YOU IMMEDIATELY KNOW YOU'RE

16    INJURED.

17         NOW, THAT OPINION, YOUR HONOR, IS CURRENTLY BEFORE THE

18    NINTH CIRCUIT.  MY FIRM IS COUNSEL OF RECORD.

19         AND WE TAKE ISSUE WITH THE NOTION THAT INJURY AND CAUSE OF

20    ACTION ARE THE SAME IN REFUSAL TO DEAL CASES, BECAUSE AS CONMAR

21    HAS HELD AND OTHER CASES, INCLUDING THE EXCELLENT E.W. FRENCH,

22    FRAUDULENT CONCEALMENT IS FOCUSSED ON THE CAUSE OF ACTION, NOT

23    THE INJURY.

24         AND AS YOUR HONOR KNOWS, REFUSAL TO DEAL, 99.99 PERCENT OF

25    THEM ARE NOT ACTIONABLE.  YOU HAVE TO PLEAD YOUR WAY THROUGH A
```

1    VERY NARROW NEEDLE, INCLUDING LACK OF BUSINESS JUSTIFICATION,

2    PROFIT SACRIFICE, TERMINATION INVOLUNTARILY -- INVOLUNTARY

3    TERMINATION AND PROFITABLE RELATIONSHIP.

4         SO THE NOTION THAT MERE INJURY WAS TANTAMOUNT TO

5    CONSTRUCTIVE KNOWLEDGE OF A CAUSE OF ACTION, YOU KNOW, WE DON'T

6    THINK IS CORRECT.

7         BUT EVEN IF YOU ACCEPT THAT, THAT'S NOT THE CASE HERE.

8    IT'S ACTUALLY QUITE IMPOSSIBLE FOR AN AD PURCHASER, WHEN HE

9    PAYS AN INFLATED PRICE, TO KNOW, OH, WELL, THAT'S BECAUSE THE

10   DATA TARGETING BARRIER TO ENTRY WAS REENFORCED AND THERE WAS NO

11   COMPETITIVE PRICE CHECK BECAUSE OF ANTICOMPETITIVE CONDUCT.

12        AND THAT'S WHY FRAUDULENT CONCEALMENT I THINK, YOUR HONOR,

13   IS MUCH STRONGER HERE THAN IT WAS EVEN UNDER JUDGE FREEMAN'S

14   OWN OPINION.

15        AND, YOUR HONOR, I DO WANT TO NOTE ON THIS POINT --

16            THE COURT:  WELL, I GUESS I'M -- I GUESS I'M STILL

17   NOT CLEAR.  I MEAN, JUDGE FREEMAN SAID IT DOESN'T MATTER

18   WHETHER YOU KNOW WHAT FACEBOOK'S MOTIVATION WAS FOR ITS, YOU

19   KNOW, PLATFORM POLICY CHANGE.  YOU JUST KNOW THAT THE PLATFORM

20   POLICY DID CHANGE BACK IN 2015.  SO IF THAT WAS TRUE OF APP

21   DEVELOPERS, I'M NOT SURE WHY THAT WOULDN'T BE TRUE FOR

22   ADVERTISERS.

23            MR. BATHAEE:  WELL, YOUR HONOR, SHE SAYS SO HERSELF,

24   BECAUSE WHEN YOU PAY AN INFLATED PRICE, YOU DON'T NECESSARILY

25   KNOW WHY, RIGHT?

1      BUT WHEN YOU'RE THROWN OFF A PLATFORM AND YOU'RE INJURED

2     AND YOU NOW KNOW YOUR BUSINESS CAN'T CONTINUE BECAUSE YOU'VE

3     LOST ACCESS TO KEY FEATURES IN YOUR SOFTWARE, YOU KNOW

4     IMMEDIATELY YOU'RE INJURED.

5          NOW, EVEN SO, YOUR HONOR, WE DON'T THINK THAT'S CONSISTENT

6     WITH CONMAR, HEXCEL, OR E.W. FRENCH, BECAUSE BEING INJURED FROM

7     REFUSAL TO DEAL DOES NOT MEAN YOU HAVE A CAUSE OF ACTION.  YOU

8     CAN'T GO AND PLEAD A REFUSAL TO DEAL CLAIM THE NEXT DAY JUST

9     BECAUSE YOU WERE THROWN OFF FACEBOOK'S PLATFORM.  FOR ALL YOU

10    KNOW, IT'S LEGAL.

11         AND SO WHEN FACEBOOK THEN PUSHES PRETEXT, WHICH WE ALLEGE

12    WITH PARTICULARITY IN OUR COMPLAINT, THE WHO, WHAT, WHERE, AND

13    WHEN, WE ALLEGE THEY PITCHED PRETEXT, THAT IT WAS DONE FOR USER

14    PRIVACY REASONS, AND THAT PRETEXT TURNS OUT TO BE FALSE AND

15    IT'S REVEALED TO BE FALSE IN NOVEMBER 2019 FOR THE FIRST TIME,

16    THAT'S THE FIRST TIME YOU CAN FIGURE OUT, WELL, IF I PAID AN

17    INFLATED PRICE, WELL, IT MUST HAVE BEEN FOR THAT REASON.  YOU

18    CAN ACTUALLY TELL THAT YOU MIGHT HAVE A CLAIM.

19         BUT YOU COULDN'T WALK IN AND PLEAD A CLAIM BASED ON THAT

20    REFUSAL TO DEAL JUST BECAUSE YOU'RE INJURED BY AN INFLATED

21    PRICE.  THERE'S A DISCONNECT THERE.  IT DOESN'T NATURALLY

22    FOLLOW THAT YOUR INFLATED PRICE IS FROM THE PLATFORM CONDUCT.

23         BUT EVEN SO, YOUR HONOR, I COULD NOT FIND A SINGLE CASE,

24    OTHER THAN JUDGE FREEMAN'S DECISION, FINDING AT A MOTION TO

25    DISMISS AS A MATTER OF LAW THAT SOMEONE HAD CONSTRUCTIVE

1    KNOWLEDGE OF A CLAIM FOR FRAUDULENT CONCEALMENT PURPOSES.

2        HEXCEL WAS THE ONLY ONE WHERE WE FOUND FACTS SUFFICIENT TO

3    BAR A CLAIM, AND THAT WAS ON SUMMARY JUDGMENT AFTER A MOTION TO

4    DISMISS HAD BEEN DENIED AND THE PERSON PARTICIPATED IN THE

5    ANTICOMPETITIVE SCHEME.

6        CONMAR AND E.W. FRENCH, POST-TRIAL, SUMMARY JUDGMENT.

7    ALMOST EVERY DISTRICT COURT, INCLUDING SEVERAL OPINIONS FROM

8    YOUR HONOR, WOULD NOT DECIDE CONSTRUCTIVE KNOWLEDGE OF A CLAIM

9    AS A MATTER OF LAW, AND WE THINK IT PROBABLY WAS A MISTAKE IN

10   REVEAL, BUT IT'S DEFINITELY A MISTAKE HERE WHEN ALL YOU'VE DONE

11   IS PAID AN INFLATED PRICE.

12       SO IN ORDER TO FOLLOW JUDGE FREEMAN, YOUR HONOR WOULD HAVE

13   TO FIND CONSTRUCTIVE KNOWLEDGE OF A CLAIM AT THE MOTION TO

14   DISMISS PHASE, WHICH I THINK THE NINTH CIRCUIT HAS ADMONISHED

15   AGAINST IN CONMAR AND YOUR HONOR AGAIN IN HEXCEL ITSELF.

16       BUT HEXCEL IS A VERY SPECIAL CASE AS I MENTIONED.

17       YOUR HONOR, DISTRICT COURTS -- THERE'S, OF COURSE, CAVE

18   CONSULTING IN THE NORTHERN DISTRICT OF CALIFORNIA.  THERE'S THE

19   GARCIA CASE, IN RE: IMMIGRATION WORKERS AND SEVERAL OTHERS, IN

20   RE: PETROLEUM, WHERE THE THEME IS, LOOK, IF THERE'S ANY SHRED

21   OF FACTS THAT COULD GO THE OTHER WAY, YOU CAN'T FIND AS A

22   MATTER OF LAW THAT SOMEONE HAS CONSTRUCTIVE KNOWLEDGE OF THEIR

23   CLAIM.  THAT'S A FACT QUESTION FOR A JURY.

24       AND EVEN -- EVEN I THINK JUDGE TASHIMA IN THE PETROLEUM

25   PRODUCTS CASE SAID, WELL, EVEN WHEN THE FACTS WERE UNDISPUTED,

1      THE INFERENCES WERE FOR THE JURY.

2           SO IT WOULD BE QUITE RADICAL TO SAY, JUST BECAUSE YOU PAID

3      A VERY HIGH PRICE, AND YOU DON'T KNOW WHY, YOU DON'T EVEN KNOW

4      MAYBE THAT YOU PAID A HIGH PRICE OR AN INFLATED PRICE, WELL,

5      YOU'RE AUTOMATICALLY ON NOTICE, ON NOTICE THAT YOU HAVE A CLAIM

6      BASED ON, AMONG OTHER THINGS BECAUSE WE HAVE OTHER THINGS, A

7      REFUSAL TO DEAL.

8           AND SO JUDGE FREEMAN LEFT ROOM FOR THAT.  THERE'S DAYLIGHT

9      IN HER OPINION, EVEN IF YOU ACCEPT THE NOTION THAT THOSE

10     PLAINTIFFS HAD CONSTRUCTIVE KNOWLEDGE OF THE SCHEME.

11          THE COURT:  I'D LIKE YOU TO WRAP UP SO I CAN GO -- I

12     HAVE A LOT OF QUESTIONS, SO I'M GOING TO NEED EVERYONE TO

13     PLEASE KEEP THEIR ANSWERS RELATIVELY SHORT.  I'LL GIVE YOU A

14     SECOND TO WRAP UP.

15          MR. BATHAEE:  THAT'S IT, YOUR HONOR.  I WON'T BELABOR

16     IT.

17          THE COURT:  OKAY.  THANK YOU.

18          ALL RIGHT.  I'D LIKE TO ASK SOME MORE SPECIFIC QUESTIONS

19     ON THE TIME BAR ISSUE.

20          SO LET'S HANDLE CONTINUING VIOLATION FIRST.

21          WHAT ARE EACH PARTY'S BEST CASES ON THE NEW AND

22     INDEPENDENT ACTS ISSUE, WHETHER THEY'VE CAUSED NEW AND

23     ACCUMULATING INJURY TO THE PLAINTIFFS SINCE DECEMBER 2016?

24     HERE I WOULD JUST LIKE A LIST OF CASES.  I CAN CERTAINLY GO

25     BACK AND LOOK AT THEM, SO I DON'T NEED ANY SUMMARY OF WHAT THEY

1    SAY.

2         BUT LET'S START WITH THE CONSUMER PLAINTIFFS.  WHAT ARE

3    YOUR BEST CASES ON CONTINUING VIOLATION?

4         MR. SWEDLOW:  AND THIS IS NOT PANDERING, BUT OUR BEST

5    CASE IS YOUR CASE, FREE FREEHAND FROM 2012; I WOULD SAY THAT

6    THE NINTH CIRCUIT CASE, SAMSUNG ELECTRONICS V. PANASONIC,

7    747 F.3D 1199, THE RELEVANT DISCUSSION IS AT 1203 AND -04; AND

8    A SEVENTH CIRCUIT CASE, XECHEM VERSUS BRISTOL-MYERS SQUIBB,

9    WHICH IS 372 F.3D 899, AND THE RELEVANT DISCUSSION IS AT 902.

10        THE COURT:  ALL RIGHT.  THANK YOU.

11        LET ME ASK THE ADVERTISER PLAINTIFFS, AND THEN WE'LL GO TO

12   FACEBOOK.

13        GO AHEAD, PLEASE.

14        MR. BATHAEE:  WE JOIN IN THOSE CASES.  I'D LIKE TO

15   ADD IN RE: GLUMETZA ANTITRUST LITIGATION AT 2020 WESTLAW

16   1066934 AT STAR 6.

17        THE COURT:  AND I'M SORRY, I COULDN'T HEAR YOU.  IN

18   RE: -- WHAT WAS IT?

19        MR. BATHAEE:  I'M SORRY, YOUR HONOR.  GLUMETZA

20   ANTITRUST LITIGATION, GLUMETZA, G-L-U-M-E-T-Z-A.

21        THE COURT:  OKAY, THANK YOU.

22        ALL RIGHT.  LET ME GO TO FACEBOOK.  WHAT ARE YOUR BEST

23   CASES ON CONTINUING VIOLATION?

24        MS. MEHTA:  THANK YOU, YOUR HONOR.

25        I DON'T THINK IT'LL SURPRISE YOU TO HEAR THE NEW YORK

1    STATE A.G. CASE BY JUDGE BOASBERG; JUDGE FREEMAN'S DECISION IN

2    THE REVEAL CHAT CASE; THE GARRISON CASE THAT YOUR HONOR IS VERY

3    FAMILIAR WITH; PACE FROM THE NINTH CIRCUIT; AND THE BAY AREA

4    SURGICAL CASE THAT'S ALSO CITED IN OUR BRIEFING.

5            THE COURT:  ALL RIGHT.  GARRISON BEING MY CASE WITH

6    ORACLE; CORRECT?

7            MS. MEHTA:  THAT'S CORRECT, YOUR HONOR.

8            THE COURT:  OKAY.  ALL RIGHT.  THANK YOU ALL FOR

9    THAT.

10        LET ME GO TO PLAINTIFFS WITH TWO QUESTIONS AND THEN I'LL

11   GO TO THE DEFENDANTS WITH A QUESTION JUST ON CONTINUING

12   VIOLATION, AND THEN WE'LL GO TO FRAUDULENT CONCEALMENT.

13        SO ON THE NEW AND INDEPENDENT ACTS FOR THE CONTINUING

14   VIOLATION DOCTRINE, IT SEEMS LIKE YOUR ALLEGATIONS ARE

15   BASICALLY CONTINUATIONS OF CONDUCT THAT OCCURRED BEFORE

16   DECEMBER 2016.  SO I GUESS MY QUESTION IS, HOW CAN THESE BE NEW

17   AND INDEPENDENT?

18        AND I WOULD -- AND I GUESS I WOULD PUT IN THOSE BUCKETS OF

19   CONTINUING CONDUCT, I WOULD PUT IN OBTAINING THE, YOU KNOW,

20   USER DATA THROUGH ONAVO, THE ALLEGED DECEPTION REGARDING THE

21   PRIVACY PRACTICES, AND THE PLATFORM MANIPULATION.

22        IF THOSE ARE ALL CONTINUATIONS THAT HAPPENED BEFORE

23   DECEMBER 2016, HOW ARE THEY NEW AND INDEPENDENT AFTER DECEMBER

24   2016?  WHO WANTS TO TAKE THAT?

25            MR. SWEDLOW:  I'LL TAKE PART OF THAT FOR THE

1    CONSUMERS.  THE PLATFORM IS NOT REALLY PART OF OUR CLAIM, SO

2    I'M GOING TO LEAVE THAT FOR THE ADVERTISERS.

3         THE DISTINCTION I WOULD MAKE HERE WHEN WE'RE TALKING ABOUT

4    SECTION 2 VERSUS SECTION 7 -- IT'S NOT A MERGER AND ACQUISITION

5    CLAIM -- THE DISTINCTION IS THAT THERE WAS -- THERE IS, IN

6    FACT, NEW CONDUCT THAT'S CONSISTENT WITH THE SAME

7    ANTICOMPETITIVE COURSE OF CONDUCT OR STRATEGY, AND SO EACH ACT

8    IS AN INDEPENDENT ACT.  IT DOESN'T INDIVIDUALLY HAVE TO GIVE

9    RISE TO ANTITRUST LIABILITY, ALTHOUGH IT COULD.

10        BUT THE ARGUMENT -- AND THE ARGUMENT THAT FACEBOOK IS

11    PRESSING IN THIS CONTEXT FOR SAYING THAT IT'S NOT A CONTINUING

12    VIOLATION IS THAT EVEN THOUGH IT WAS DISCOVERED AND CONTINUES

13    INTO THE LIMITATIONS PERIOD -- IN OTHER WORDS, THE CONSUMER

14    CLASS DID NOT AND COULD NOT KNOW THAT THE CONDUCT HAD CONTINUED

15    INTO THE LIMITATIONS PERIOD -- BECAUSE IT ALSO OCCURRED BEFORE

16    THE LIMITATIONS PERIOD, IT SHOULD BE BARRED BY THE STATUTE OF

17    LIMITATIONS.

18        AND THAT SIMPLY DOESN'T MAKE ANY SENSE.  THE CONDUCT, THE

19    DECEPTIVE CONDUCT FOR HARVESTING AND USE OF DATA ALMOST -- I

20    MEAN, WE'LL TAKE THE ALLEGATIONS AS TRUE, BUT IT IS ACTUALLY

21    TRUE, CONTINUES PAST DECEMBER 2016, AND IT ALSO EXISTED AS A

22    COURSE OF CONDUCT THAT -- I DON'T WANT TO SWITCH TO FRAUDULENT

23    CONCEALMENT -- BUT THAT FACEBOOK CONCEALED AND DIDN'T LET BE

24    KNOWN PRIOR TO THAT DATE.

25        SO THAT WOULD SIMPLY BAR ANY CLAIM THAT STARTED LONG

1    ENOUGH AGO IF YOU COULD SUCCESSFULLY CONCEAL IT SO THAT YOUR

2    ACTS WITHIN THE LIMITATIONS PERIOD LOOK LIKE YOUR ACTS BEFORE

3    THE LIMITATIONS PERIOD EVEN THOUGH NOBODY KNEW THAT YOU WERE

4    DOING IT.

5         SO THAT CAN'T BE THE WAY THAT CONTINUING -- THAT CAN'T BE

6    THE WAY THAT STATUTE OF LIMITATIONS WORKS, WHETHER YOU CALL IT

7    CONTINUING VIOLATION OR FRAUDULENT CONCEALMENT.  YOU CAN'T

8    SIMPLY SUCCEED BY KEEPING YOUR ACTS SECRET, EVEN INTO THE

9    LIMITATIONS PERIOD, AND THEN SAYING, WELL, I WAS ALSO DOING IT

10   BEFORE SO I SHOULD BE ABLE TO GET AWAY WITH IT.

11             THE COURT:  ALL RIGHT.

12        LET ME GO TO THE ADVERTISER COUNSEL.  IS THERE ANYTHING

13   YOU WANT TO ADD?

14             MR. BATHAEE:  YES, YOUR HONOR.

15        SO THE PLATFORM CONDUCT CONTINUES FROM 2016 THROUGH 2018

16   WITH RESPECT TO THE CANVAS AND THE GAMES APPS, AND IT'S THE

17   SAME MODUS OPERANDI, WHICH IS TARGETING AND DEMANDING

18   AGREEMENTS.

19        THE AGREEMENTS THEMSELVES FROM THE 2015 PERIOD WERE

20   SECURED AROUND THEN, AND THEY CONTINUED WELL PAST AND INTO THE

21   LIMITATIONS PERIOD, INCLUDING, FOR EXAMPLE, WITH TINDER.

22        OBVIOUSLY, YOUR HONOR, THERE'S THE BACK-END INTEGRATION,

23   WHICH WAS IN LATE 2019 AND EARLY 2020, AND THE JEDI BLUE

24   AGREEMENT THAT BEGAN IN SEPTEMBER 2018.

25        NOW, ALL OF THESE ARE DISTINCT, OVERT ACTS, BUT THEY'RE

```
1     ALL IN FURTHERANCE OF THE SAME OVERARCHING CONSPIRACY, WHICH IS

2     TO PROTECT THE DATA TARGETING BARRIER TO ENTRY.

3               THE COURT:  I KNOW YOU SAID THAT JEDI BLUE WAS NOT

4     BEFORE EITHER OF THE OTHER JUDGES.  WHAT ABOUT YOUR OTHER, YOU

5     KNOW, PLATFORM CONDUCT THAT YOU'VE ALLEGED BETWEEN 2016 AND

6     2018?  WERE THOSE BEFORE EITHER JUDGE IN --

7               MR. BATHAEE:  NO, YOUR HONOR.  THERE'S A VERY -- I'M

8     SORRY.

9               THE COURT:  GO AHEAD.

10              MR. BATHAEE:  NO, YOUR HONOR.  THAT CONDUCT WOULDN'T

11    HAVE HELPED OUR DEVELOPERS IN REVEAL BECAUSE THEY WERE DRIVEN

12    OUT OF THE MARKET BY APRIL 2015 FOR THE MOST PART.  THERE ARE

13    SOME EXCEPTIONS.  SO THAT CONDUCT REALLY DIDN'T IMPACT THEM.

14        BUT HERE, YOU KNOW, IT WOULD HAVE INFLATED PRICES BECAUSE

15    THE SAME CONDUCT WAS CONTINUING, THERE WAS STILL INFLATED

16    DEMAND ON THE ADVERTISING PLATFORM, THERE WAS SCUTTLING OF THE

17    DEVELOPER PLATFORM.  SO IT HELPS US HERE.

18        IT REALLY WASN'T GERMANE TO THE CASE BEFORE JUDGE FREEMAN.

19              THE OTHER POINT -- THE BACK-END INTEGRATION WAS -- AND THE

20    BACK-END INTEGRATION WAS LARGELY PLED AS PART OF THE SECTION 7

21    CLAIMS, WHICH JUDGE FREEMAN REJECTED ON LACHES GROUNDS AND SO

22    WE DIDN'T REPLEAD THEM IN THE AMENDED COMPLAINT AS PART OF THE

23    SECTION 2 VIOLATION, AND LARGELY BECAUSE IT WAS MUCH LATER AND

24    IT WAS REALLY BEING DONE FOR STATUTE OF LIMITATIONS PURPOSES.

25              BUT HERE WE'RE SAYING THAT THAT ACTUALLY DID HAVE
```

1       ANTICOMPETITIVE EFFECT ON THE RELEVANT MARKET AND THE PRICES.

2              SO THOSE ARE TWO THINGS THAT ARE NOT -- THAT ARE BEFORE

3       YOUR HONOR FOR THE FIRST TIME IN THIS CONTEXT.

4              AND, OF COURSE, JEDI BLUE.

5              THE COURT:  ALL RIGHT.  SO I'M NOT COMPLETELY CLEAR

6       ON WHAT'S DIFFERENT BETWEEN REVEAL CHAT AND HERE OTHER THAN

7       JEDI BLUE, AND YOU'RE SAYING THE BACK-END INTEGRATION WAS

8       THERE, BUT IT'S BEING PLED FOR A DIFFERENT PURPOSE OR ARGUED

9       DIFFERENTLY.

10             MR. BATHAEE:  AND THAT THE ADDITIONAL PLATFORM

11      CONDUCT, YOUR HONOR, FROM 2016 TO '18 THROUGH CANVAS AND THE

12      GATEWAY, THAT'S RIGHT.

13             AND OF COURSE THE AGREEMENTS THEMSELVES.  THEY WOULDN'T

14      HAVE CONCERNED THE DEVELOPERS DRIVEN OUT IN 2015, BUT THE

15      AGREEMENT WITH TINDER THAT SPANNED ALL THE WAY TO 2018, FOR

16      EXAMPLE, WOULD HAVE ANTICOMPETITIVE EFFECTS IN THE RELEVANT

17      MARKET HERE AND THERE WAS NO POINT IN PLEADING THEM THERE, AND

18      THAT'S SORT OF NEW HERE IN THAT RESPECT.

19             THE COURT:  OKAY.  LET ME ASK MY LAST QUESTION FOR

20      PLAINTIFFS ON CONTINUING VIOLATIONS, AND THEN I'D LIKE TO GO TO

21      FACEBOOK AND GIVE THEM AN OPPORTUNITY TO RESPOND.

22             SO JUDGE BOASBERG REJECTED THE STATE'S ARGUMENT ABOUT

23      FACEBOOK'S ACQUISITION OF IGROUP IN 2016 TO RESPOND TO, YOU

24      KNOW, A LACHES DEFENSE BY FACEBOOK.

25             AND IN THIS CASE, THE CONSUMERS -- I GUESS THIS WOULD GO

1    TO MR. SWEDLOW -- ARE SIMILARLY ARGUING ABOUT THE ACQUISITIONS

2    OF TBH AND GIPHY AS CONTINUING VIOLATIONS.

3        SO HOW WOULD YOU RESPOND TO A REJECTION OF THOSE

4    ACQUISITIONS ALONG THE SAME LINES OF WHAT JUDGE BOASBERG

5    SAID --

6            MR. SWEDLOW:  LET ME --

7            THE COURT:  -- ABOUT IGROUP?

8            MR. SWEDLOW:  I THINK THIS IS A GOOD OPPORTUNITY

9    TO -- I WOULD LIKE TO DISTINGUISH OUR CLAIM FROM THAT CLAIM,

10   NOT JUST ON THE BASIS THAT I ALREADY DID.

11       SO THERE ARE ACTS THAT TOOK PLACE UNAVOIDABLY -- OR

12   WITHOUT DISPUTE THAT WE ALLEGE TOOK PLACE WITHIN THE

13   LIMITATIONS PERIOD.

14       LACHES IS DIFFERENT THAN A LIMITATIONS PERIOD AND REQUIRES

15   A DEMONSTRATION OF SOME PREJUDICE AND TIMELY -- AND LACK OF

16   TIMELINESS.

17       BUT SO NOT JUST PARAGRAPH 238, BUT THROUGHOUT THE

18   COMPLAINT, WHAT WE'RE ALLEGING IN HUNDREDS OF PARAGRAPHS IS

19   THAT FACEBOOK REASSURED, IN A DECEPTIVE WAY, OUR ENTIRE CLASS

20   THAT ITS CONDUCT RELATING TO DECEPTIVE ACQUISITION AND USE AND

21   SALE OF THE DATA WAS NOT HAPPENING.

22       AND WHAT THE COURT FOUND IN THE DISTRICT OF D.C. IS THIS,

23   I'M JUST GOING TO READ YOU ONE AND A HALF SENTENCES.  QUOTE ON

24   PAGE 66, "HAD THE STATES RESPONDED TO THE SUBSTANTIAL

25   TIMELINESS ARGUMENT THAT FACEBOOK PUT FORWARD IN ITS MOTION TO

1    DISMISS BY RAISING OR EVEN HINTING AT A FACTUAL DISPUTE AS TO

2    WHEN THEIR CLAIMS ACCRUED OR A REASONABLE JUSTIFICATION FOR

3    THEIR LONG DELAYS IN FILING, THE OUTCOME HERE MIGHT WELL BE

4    DIFFERENT.  THEY DID NOT DO SO."

5        AND SO IN OTHER WORDS -- NOW, LACHES IS DIFFERENT BECAUSE

6    IT REQUIRES PREJUDICE AND IT'S NOT A TIME PERIOD.  BUT WE

7    ALLEGED CONDUCT WITHIN THE TIME PERIOD AND THOSE ACQUISITIONS

8    YOU'RE TALKING ABOUT ARE WITHIN THE TIME PERIOD, SO THEY

9    WOULDN'T BE BARRED BY LACHES BECAUSE WE HAVE A DAMAGES CLAIM

10   HERE.

11       BUT WHAT THE COURT SAID ON PAGE 66 IS THAT THE STATES

12   DIDN'T RESPOND AT ALL, SO IT ISN'T THAT THEIR ARGUMENT ON THE,

13   QUOTE, REASONABLE JUSTIFICATION FOR THEIR LONG DELAYS WERE

14   REJECTED.  THEY DIDN'T MAKE ANY.

15       SO IF THEIR ARGUMENT WAS, WE WAITED TEN YEARS AFTER AN

16   ACQUISITION TO CHALLENGE THE ACQUISITION FOR REASONS OF

17   DECEPTION AND FRAUDULENT CONCEALMENT, THEY MIGHT HAVE WON.

18       BUT WHAT THE COURT SAID IS THE STATES MADE ZERO ARGUMENTS.

19       OUR COMPLAINT ALLEGES WHY WE DIDN'T FILE UNTIL DURING THE

20   LIMITATIONS PERIOD BECAUSE WE COULD NOT HAVE KNOWN ABOUT THE

21   DECEPTIVE CONDUCT.

22           THE COURT:  DO YOU WANT TO ADD ANYTHING ABOUT THE

23    GIPHY AND TBH ACQUISITIONS?  OTHERWISE I'D LIKE TO GO TO THE

24    FACEBOOK DEFENDANT.

25           MR. SWEDLOW:  I'M GOING TO LET YOU GO ON --

```
 1                   THE COURT:  OH, I'M SORRY.  I'M ASKING COUNSEL FOR

 2        THE ADVERTISERS.

 3                   MR. SWEDLOW:  ALL RIGHT.  SORRY.

 4                   MR. BATHAEE:  NO, YOUR HONOR, THEY'RE NOT PART OF OUR

 5        CASE.

 6                   THE COURT:  OKAY.  ALL RIGHT.

 7            THEN LET ME GO TO FACEBOOK.

 8            WHY WOULDN'T THE, YOU KNOW, JEDI BLUE AGREEMENT WITH

 9        GOOGLE IN 2018 OR THE GIPHY AND TBH ACQUISITIONS IN 2017 AND

10        2018 BE NEW AND INDEPENDENT ACTS UNDER THE CONTINUING VIOLATION

11        DOCTRINE?

12                   MS. MEHTA:  THANK YOU, YOUR HONOR, AND I'LL TAKE

13         THOSE SEPARATELY BECAUSE THE ADVERTISERS ONLY ARE RELYING ON

14         JEDI BLUE, AND THE CONSUMERS APPARENTLY ONLY -- AND I'M GLAD

15         FOR THAT CLARIFICATION -- ARE RELYING ON THE TBH AND GIPHY

16         ACQUISITIONS.

17            SO LET ME START WITH JEDI BLUE.  I THINK THERE'S A

18         FUNDAMENTAL PROBLEM WITH WHAT THE PLAINTIFFS ARE ARGUING.  WHAT

19         JUDGE FREEMAN FOUND IS, ON BASICALLY IDENTICAL ALLEGATIONS TO

20         THE ADVERTISERS, THAT THE CLAIMS ARE TIME BARRED.

21            AND THE ONLY QUESTION BEFORE YOUR HONOR IS WHETHER THERE'S

22         SUFFICIENT -- THERE'S SOMETHING SUFFICIENTLY DIFFERENT OR NEW

23         ABOUT THE JEDI BLUE AGREEMENT THAT YOU COULD REACH BACK AND

24         MAKE TIMELY OTHERWISE UNTIMELY CLAIMS.

25            AND THE PROBLEM HERE FOR THE PLAINTIFFS IS THAT THE
```

1     JEDI BLUE AGREEMENT IS FUNDAMENTALLY DIFFERENT FROM THE ALLEGED

2     VIOLATION THAT IS AT THE CORE OF THEIR SECTION 2 CLAIM.  SO I'M

3     GOING TO SET ASIDE THE SECTION 1 CLAIM BECAUSE WE'RE NOT

4     CHALLENGING THAT ON TIMELINESS GROUNDS.

5          BUT WITH RESPECT TO THE SECTION 2 CLAIM WHERE THEIR THEORY

6     IS EXCLUSIONARY CONDUCT BASED ON THIS ALLEGEDLY ANTICOMPETITIVE

7     SCHEME, THAT 2018 AGREEMENT HAS NO NEXUS TO THE ACTUAL

8     ALLEGATIONS OF WHAT THE UNDERLYING VIOLATIONS ARE.

9          SO ESSENTIALLY WHAT'S HAPPENING IS EXACTLY WHAT THE COURT

10    IN KLEHR SAID PLAINTIFFS ARE NOT ALLOWED TO DO.  THEY'RE TRYING

11    TO BOOTSTRAP ACTS THAT HAPPENED AFTER THE VIOLATION -- AFTER

12    THE STATUTE OF LIMITATIONS PERIOD, OR IN THE STATUTE OF

13    LIMITATIONS PERIOD I SHOULD SAY, TO TRY TO REACH BACK AND MAKE

14    TIMELY ACTS THAT DIDN'T.

15         AND I THINK WHAT YOU HEARD FROM THE PLAINTIFFS WAS, WELL,

16    YOU KNOW, IT'S ALL PART OF THE SAME SCHEME.

17         IT'S NOT PART OF THE SAME SCHEME.  THAT'S NOT WHAT'S

18    ALLEGED AT ALL.

19         THE SCHEME THAT IS ALLEGED BY THE ADVERTISERS IS THE COPY

20    ACQUIRES KILL SCHEME.  THAT IS THE CORE OF THEIR SCHEME AND

21    THEIR PLATFORM ALLEGATIONS.

22         THOSE HAVE NO RELATIONSHIP TO THE GOOGLE NETWORK BIDDING

23    AGREEMENT WHICH WAS ENTERED INTO IN 2018 AND IS THE BASIS FOR A

24    SECTION 1 CLAIM.

25         SO THEY'RE TAKING THE SECTION 2 CLAIM THAT IS CONNECTED TO

1    UNILATERAL CONDUCT AND THEY'RE TRYING TO BOOTSTRAP A SECTION 1

2    CLAIM TO TRY TO MAKE THAT TIMELY.

3         AND I THINK THE ALLEGATIONS WITH RESPECT TO THE GOOGLE

4    NETWORK BIDDING AGREEMENT AND WHAT THE FACTS OF THAT AGREEMENT

5    ARE, ARE REALLY CRITICAL HERE.  THAT AGREEMENT IS ALLEGED TO

6    HAVE CONCERTED ACTION BETWEEN FACEBOOK AND GOOGLE WITH RESPECT

7    TO ADS THAT ARE SOLD ON THE GOOGLE AD EXCHANGE.  THEY HAVE

8    NOTHING TO DO WITH THE ADS ON THE FACEBOOK PLATFORM, WHICH IS

9    WHERE THESE ADVERTISERS ARE CLAIMING THAT THEY WERE INJURED BY

10   THE ALLEGED ANTICOMPETITIVE SCHEME.

11        THERE'S JUST NO NEXUS BETWEEN WHAT IT IS THAT WAS THE

12   ACTUAL CORE OF THE ANTITRUST CLAIMS IN SECTION 2 AND THE ACT

13   THAT THEY'RE NOW POINTING TO DURING THE LIMITATIONS PERIOD.

14        AND I WOULD POINT YOUR HONOR HERE TO THE NINTH CIRCUIT'S

15   DECISION IN PACE WHICH PROVIDES THE FRAMEWORK TO ASSESS WHETHER

16   CONDUCT IS ACTUALLY PART OF THE CONTINUING VIOLATION, AND WHAT

17   THE COURT SAYS IS THAT WE LOOK TO SEE WHETHER OR NOT THE

18   ANTITRUST -- OR THE ANTICOMPETITIVE ACT IS A SINGLE OVERT ACT

19   OR IT'S A CONTINUING ANTITRUST VIOLATION.

20        AND IN THE SANDOVAL CASE -- AND I'LL GIVE YOU THE CITATION

21   TO THIS -- SANDOVAL VERSUS SATICOY, S-A-T-I-C-O-Y, LEMON

22   ASSOCIATION AT 747 F.SUPP 1373 AT 1385.

23        THE COURT IN C.D. CAL NOTED THAT YOU'RE GOING TO HAVE A

24   CONTINUING VIOLATION WHERE THERE IS A SUBSTANTIAL NEXUS BETWEEN

25   THE TIME BARRED ACTS AND THE TIME ASSERTED ACTS, AND THAT NEXUS

```
1    IS WHAT'S MISSING BETWEEN THE SECTION 1 CLAIM BASED ON

2    CONCERTED ACTION BETWEEN GOOGLE AND FACEBOOK THAT IS ALLEGED TO

3    IMPACT PEOPLE ON THE GOOGLE AD EXCHANGE, WHICH IS COMPLETELY

4    INDEPENDENT AND DOES NOT HAVE A SUBSTANTIAL NEXUS TO THE

5    SECTION 1 -- SECTION 2 UNILATERAL CONDUCT ACTS THAT ARE ALLEGED

6    AS THE CORE OF THE ANTITRUST VIOLATION BROUGHT IN THE SECTION 2

7    CLAIM BY THE ADVERTISERS.

8         THE COURT:  LET ME GIVE THE ADVERTISER'S COUNSEL AN

9    OPPORTUNITY TO RESPOND.

10        MR. BATHAEE:  WELL, YOUR HONOR, THE CENTRAL PREMISE

11   OF THE SCHEME IS TO STRENGTHEN THAT DATA TARGETING BARRIER TO

12   ENTRY, AND WHAT GOOGLE DID WAS GAVE ITS A.I. OVER TO FACEBOOK

13   TO IDENTIFY 90 PERCENT OF FACEBOOK'S USERS TO TAKE THEM OUT OF

14   THOSE AD EXCHANGES AND ALMOST EXCLUSIVELY INTO THE HANDS OF

15   FACEBOOK.  FACEBOOK GETS TWICE THE AMOUNT OF TIME TO BID ON

16   THEM AND, IN ESSENCE, KEEPS CONTROL OVER ITS OWN USERS, AND

17   THESE TWO MARKETS ARE ABOUT TO CONVERGE AND THEY PAID EACH

18   OTHER OFF TO STAY OUT OF EACH OTHER'S MARKETS.

19        THAT ALLOWED FACEBOOK TO KEEP PRICES INFLATED ON THE

20   SOCIAL ADVERTISING SIDE OF THE MARKET.  SO IT IS RELATED.  IT'S

21   RELATED IN THE SENSE THAT IT MAINTAINED THEIR MONOPOLY,

22   INFLATED PRICES, AND STRENGTHENED THE DATA TARGETING BARRIER TO

23   ENTRY.  IT'S ALL PART OF THE OVERARCHING SCHEME TO STRENGTHEN

24   THAT DATA TARGETING BARRIER TO ENTRY, TO MAINTAIN THAT MARKET

25   AS A SILO SO THERE'S NO COMPETITIVE PRICE CHECK.
```

1        SO THEY'RE VERY -- THEY'RE CONNECTED.

2        IT'S A NEW ACT, IT FALLS UNDER SECTION 2 AND UNDER

3    SECTION 1.  SO, YOUR HONOR, I THINK IT'S JUST A

4    MISCHARACTERIZATION TO SAY, WELL, THAT'S COMPLETELY ON THE

5    GOOGLE SIDE OF THE FENCE, BECAUSE IT'S ALLOWING FACEBOOK TO

6    MAKE SURE NO ONE ON THE GOOGLE SIDE OF THE FENCE CAN PAY AT AN

7    AUCTION TO ADVERTISE TO SOMEONE THEY WOULD OTHERWISE HAVE TO GO

8    THROUGH FACEBOOK TO ADVERTISE TO, AND IT STAVED OFF THE

9    POTENTIAL MERGING OF THESE MARKETS.

10       AND SO, YOU KNOW, IT VERY MUCH MAINTAINED THAT BARRIER TO

11   ENTRY.

12       AND THAT'S ALL I HAVE TO SAY ON THAT SUBJECT.  I DO THINK

13   IT'S ADEQUATELY PLED.  I DISAGREE WITH THE PREMISE.  AND THE

14   ALLEGATIONS ARE IN THE COMPLAINT, OF COURSE.

15            THE COURT:  LET ME GO BACK TO MS. MEHTA.

16       CAN YOU ADDRESS NOW THE GIPHY AND TBH ACQUISITION?

17            MS. MEHTA:  YES, YOUR HONOR, CERTAINLY HAPPY TO DO

18    THAT.

19       SO THIS IS WITH RESPECT TO THE USER CLASS, AND ON THE

20   CONTINUING VIOLATION DOCTRINE, I THINK THE FUNDAMENTAL PROBLEM

21   WITH THE GIPHY AND THE TBH ACQUISITION IS THEY'RE NOT

22   CONTINUING VIOLATIONS BECAUSE THEY'RE NOT INDEPENDENTLY ALLEGED

23   TO BE VIOLATIVE ACTS.

24       THE TBH ACQUISITION IS NOT CHALLENGED AS BEING

25   ANTICOMPETITIVE.  THE GIPHY ACQUISITION IS NOT CHALLENGED AS

1    BEING ANTICOMPETITIVE.  AND WHAT THEY'RE ESSENTIALLY TRYING TO

2    DO IS SAY, WE HAVE THIS ANTITRUST VIOLATION THAT WE CLAIM

3    OCCURRED DURING THIS PERIOD OF TIME AND WE'RE GOING TO NOW SAY

4    THESE OTHER ACQUISITIONS -- WHICH WE DON'T THINK ARE ACTUALLY

5    ANTICOMPETITIVE, WE'RE NOT ALLEGING ARE ANTICOMPETITIVE --

6    SOMEHOW CAN BE ALL THROWN IN TOGETHER AND MAKE THE OVERALL

7    COURSE OF CONDUCT ANTICOMPETITIVE.

8         AND THE RESPONSE I WOULD HAVE TO THAT IS ZERO PLUS ZERO

9    PLUS ZERO IS STILL ZERO, WHICH IS THOSE THINGS ARE NOT

10   INDEPENDENTLY VIOLATIVE AND SO THEY'RE NOT A CONTINUING

11   VIOLATION.  THAT'S ONE POINT.

12        THE SECOND POINT IS IF YOU LOOK AT THEIR -- WELL,

13   ACTUALLY, LET ME STOP THERE BECAUSE I WANT TO SEPARATELY

14   ADDRESS THE PRIVACY RELATED CONTINUING VIOLATION ALLEGATIONS,

15   BUT I'LL WAIT TO LET YOUR HONOR ASK QUESTIONS ABOUT THAT IF YOU

16   HAVE ANY.

17            THE COURT:  DO YOU WANT TO RESPOND TO THAT BRIEFLY,

18   MR. SWEDLOW?

19            MR. SWEDLOW:  YES.  I'M NOT REALLY FOLLOWING, SO I'M

20   GOING TO DISAGREE WITH THE ARGUMENT THAT EACH THING THAT IS

21   PART OF THE COURSE OF CONDUCT OF THE ANTICOMPETITIVE BEHAVIOR

22   WHICH CAUSED THE ANTICOMPETITIVE HARM HAS TO BE A STANDALONE

23   CLAIM.  THAT'S NOT THE WAY IT WORKS.

24        THESE ACQUISITIONS TOOK PLACE DURING THE LIMITATIONS

25   PERIOD AND ARE NOT TIME BARRED.  THE ARGUMENT IS THAT WE DIDN'T

1    SEPARATELY ALLEGE A STANDALONE CLAIM.

2        BUT WE'RE NOT ALLEGING OUR CASE HAS INDIVIDUAL

3    ACQUISITIONS AS STANDALONE CLAIMS.  THE FUNDAMENTAL PROBLEM

4    WITH THE WAY FACEBOOK IS READING OUR COMPLAINT AND WHAT IT

5    ACTUALLY SAYS IS THE ANTICOMPETITIVE CONDUCT IS THE USE OF

6    CONSUMER DATA IN AN ANTICOMPETITIVE WAY, IN A WAY THAT WAS

7    DISHONEST, NOT DISCLOSED, THE SUBJECT OF GOVERNMENT LAWSUITS

8    AND ALLEGATIONS, BUT ALSO USED TO DECIDE WHAT TO ACQUIRE AND

9    WHAT NOT TO ACQUIRE.

10        SO THE ILLEGAL AND ANTICOMPETITIVE USE OF CONSUMER DATA,

11    THROUGH ONAVO, WHICH WASN'T DISCLOSED OR KNOWN UNTIL APPLE

12    KICKED THEM OUT IN 2018/2019, THAT WASN'T KNOWN UNTIL DURING --

13    WITHIN THE LIMITATIONS PERIOD, AND THE ACQUISITIONS WE

14    IDENTIFIED ARE ALSO DURING THAT LIMITATIONS PERIOD.

15        THE ARGUMENT IS THAT YOU DIDN'T PLEAD THAT THAT SINGLE

16    ACQUISITION IS YOUR CLAIM.

17        BUT IT'S NOT OUR CLAIM.  IT'S THAT THAT'S PART OF THE

18    COURSE OF CONDUCT OF THE ANTICOMPETITIVE USE AND DECEPTIVE USE

19    OF DATA.  THAT'S ALL WE'RE SAYING.  WE'RE NOT SAYING THAT THAT

20    PARTICULAR ACQUISITION, STANDING ALONE, IS OUR COMPLAINT

21    BECAUSE IT'S NOT.

22        THE COURT:  ALL RIGHT.

23        MS. MEHTA, WHAT DID YOU WANT TO SAY ABOUT THE ONGOING

24    ALLEGED ACTS OF DECEPTIVE PRACTICES REGARDING CONSUMER DATA?

25        MS. MEHTA:  YES, YOUR HONOR.

1      ACTUALLY, BEFORE I DO THAT, CAN I HAVE JUST A COUPLE OF

2     SECONDS TO RESPOND TO THAT LAST POINT MR. SWEDLOW MADE, BECAUSE

3     I WANT THERE TO BE CLARITY ABOUT WHAT THE ISSUE IS.

4      WE'RE NOT SAYING THEY NEEDED TO HAVE A STANDALONE CLAIM ON

5     THE TBH AND GIPHY ACQUISITIONS.

6      BUT WE ARE SAYING THEY NEEDED TO ALLEGE THAT THOSE WERE

7     ANTICOMPETITIVE, AND THERE IS NO ALLEGATION THAT THOSE ARE

8     ANTICOMPETITIVE.

9      NOR WOULD THE FACT THAT SOMEONE IS ALLEGEDLY USING ONAVO

10    DATA TO DECIDE WHO TO ACQUIRE AND WHO NOT TO ACQUIRE MAKE THEM

11    ANTICOMPETITIVE.

12     AND THIS IS WHERE JUDGE BOASBERG HAD IT EXACTLY RIGHT.

13    THE SUBSEQUENT STANDALONE ACQUISITIONS THAT TOOK PLACE MUCH

14    LATER IN TIME AND ARE NOT INDIVIDUALLY ANTICOMPETITIVE DO NOT

15    CONSTITUTE A CONTINUING VIOLATION.

16     SO I JUST WANT TO MAKE VERY CLEAR WHAT OUR ARGUMENT THERE

17    IS.

18     WITH RESPECT TO CONTINUING VIOLATION ON THE PRIVACY BASED

19    THEORY, THE ALLEGATIONS THAT THEY'RE MAKING ABOUT PRIVACY ARE

20    NO DIFFERENT IN TERMS OF THE POST-STATUTE OF LIMITATIONS PERIOD

21    THAN THE ALLEGATIONS THAT THEY WERE MAKING BEFORE.  THERE IS NO

22    ALLEGATION OF ANY NEW OR INDEPENDENT ACT.  IT'S QUINTESSENTIAL

23    REAFFIRMANCE OF THE PRIOR STRATEGY UNDER THE BAY AREA SURGICAL

24    MANAGEMENT CASE.

25     AND INDEPENDENT OF WHETHER WE'RE TALKING ABOUT THE PRIVACY

1   ALLEGATIONS OR WE'RE TALKING ABOUT THE ACQUISITIONS, FOR ALL OF

2   THE CONTINUING VIOLATION ALLEGATIONS MADE BY THE USERS, THERE

3   IS NO ALLEGATION OF ANY NEW AND ACCUMULATING INJURY, AND WE

4   HAVEN'T HEARD IN THE BRIEFING OR HEARD TODAY ANY ALLEGATION

5   THAT WOULD SUPPORT NEW AND CONTINUING INJURY, WHICH IS AN

6   INDEPENDENT BASIS TO REJECT BOTH OF THE USERS' CONTINUING

7   VIOLATIONS THEORIES.

8        AND THEN I'LL SAVE ANYTHING I HAVE ON THE ADVERTISERS

9   UNTIL YOUR HONOR WANTS TO HEAR ABOUT THAT.

10        THE COURT:  I DON'T WANT TO HEAR ANYTHING MORE ON

11   THIS.  I HAVE A LOT OF QUESTIONS AND I'D LIKE TO MOVE ON TO A

12   NEW TOPIC.  SO THANK YOU TO ALL OF YOU.

13        LET'S GO TO FRAUDULENT CONCEALMENT.  SO I'LL START WITH

14   MR. SWEDLOW FOR THE CONSUMERS.

15        A LOT OF THE CONDUCT THAT YOU RELY ON IN YOUR COMPLAINT IS

16   PUBLIC, IS WIDELY REPORTED.  SO WHY DIDN'T THE CONSUMERS HAVE

17   CONSTRUCTIVE KNOWLEDGE OF THESE CLAIMS?  AND OBVIOUSLY WE CAN

18   GET INTO THE ISSUE THAT MR. BATHAEE RAISED ABOUT WHETHER IT'S

19   EVEN APPROPRIATE TO MAKE A CONSTRUCTIVE KNOWLEDGE DECISION ON A

20   MOTION TO DISMISS.

21        BUT, YOU KNOW, FOR EXAMPLE, THE FTC INVESTIGATIONS, THE

22   PUBLIC SCRUTINY OF FACEBOOK, WHY DIDN'T THAT TRIGGER

23   CONSTRUCTIVE KNOWLEDGE IN YOUR CLIENTS?

24        MR. SWEDLOW:  WELL, I THINK THAT IS THE KEY QUESTION,

25   AND I'LL ACCEPT IT AS CONSTRUCTIVE KNOWLEDGE OR NOT BECAUSE THE

1    REVELATION ABOUT THE EXTENT OF FACEBOOK'S DECEPTION CAME ABOUT,

2    AT THE EARLIEST, IN EARLY 2018 BASED ON THE

3    CAMBRIDGE ANALYTICA, I'LL CALL IT A SCANDAL, BUT BASED ON WHAT

4    HAPPENED WITH CAMBRIDGE ANALYTICA.

5         AND JUST TO BE CLEAR ON HOW SCARY AND DECEPTIVE THAT WAS,

6    IF YOU WERE FRIENDS WITH SOMEBODY WHO HAD SIGNED UP TO USE THAT

7    APP, ONE OF THOUSANDS OF PEOPLE WHO WERE USING THAT APP -- AND

8    THAT COULD HAVE BEEN WHATEVER APP, THAT COULD HAVE BEEN SOME

9    RIGHT WING POLITICAL APP -- YOUR DATA, 87 MILLION PEOPLE'S DATA

10   WHO WERE FRIENDS WITH THE THOUSANDS OF PEOPLE WHO USED THAT

11   APP, THEIR DATA WAS SHARED AND USED BY THAT APP DEVELOPER.

12        THAT'S THE AFFECTED FRIEND THING THAT FACEBOOK SAID AND

13   AGREED IN A CONSENT DECREE IN 2011 AND 2012 TO STOP DOING, BUT

14   THEY DIDN'T STOP DOING.

15        SO WHILE I THINK -- YOU COULD ARGUE, AND WE COULD EVEN

16   ACCEPT THE ARGUMENT, THAT AS OF 2018 AND 2019, AND THEN THE

17   CONGRESSIONAL INVESTIGATION WHICH BECAME PUBLIC, THAT THE CLASS

18   WAS PUT ON CONSTRUCTIVE NOTICE OF ALL OF FACEBOOK'S INCREDIBLY

19   DECEPTIVE CONDUCT WITHIN THE LIMITATIONS PERIOD, AND BECAUSE

20   THERE IS NO PREJUDICE -- THERE'S NO PREJUDICE INQUIRY IN A

21   STATUTE OF LIMITATIONS CONTEXT -- ALL OF THE REVELATIONS TOOK

22   PLACE IN THE LIMITATIONS PERIOD, EXCEPT FOR PRIOR REVELATIONS

23   THAT FACEBOOK AFFIRMATIVELY LIED ABOUT.

24        IN 2011/2012, FACEBOOK ENTERED INTO A CONSENT DECREE.  IN

25   2019, FACEBOOK WAS SUED BY D.O.J. FOR LYING AND DECEIVING ITS

```
1    OWN CONSENT DECREE PROMISE TO THE FTC, AND WHAT THE FTC SAID --

2    THIS IS IN PARAGRAPH 241 OF OUR COMPLAINT -- IS THAT FACEBOOK

3    ENCOURAGES USERS TO SHARE INFORMATION ON ITS PLATFORM BY

4    PROMISING USERS THEY CAN CONTROL THE PRIVACY INFORMATION,

5    PRIVACY OF THEIR INFORMATION.  BUT FACEBOOK REPEATEDLY USED

6    DECEPTIVE DISCLOSURES AND SETTINGS TO UNDERMINE USERS' PRIVACY

7    PREFERENCE.

8              THE COURT:  CAN YOU --

9              MR. SWEDLOW:  THE GOVERNMENT FIGURED THAT OUT IN

10   2019, AND SO TO SAY THAT THE CLASS SHOULD HAVE FIGURED IT OUT

11   BEFORE THE GOVERNMENT SUED FACEBOOK AND SETTLED FOR $5 BILLION

12   DOESN'T MAKE ANY SENSE.

13        FACEBOOK DECEIVED ALL OF THE USERS AND THE GOVERNMENT

14   BASED ON ITS PRIOR CONSENT DECREE.

15             THE COURT:  OKAY.  SO LET ME BACK UP A MINUTE.  CAN

16   YOU GIVE ME -- GIVE ME THEN THE FRAUDULENT CONCEALMENT

17   TIMELINE.  SO YOU'RE SAYING CAMBRIDGE ANALYTICA, THAT'S, WHAT,

18   MARCH 2018?

19             MR. SWEDLOW:  YES, I WOULD SAY THAT FACEBOOK'S

20   FRAUDULENT CONCEALMENT WAS LESS EFFECTIVE AFTER

21   CAMBRIDGE ANALYTICA, AFTER THE D.O.J. LAWSUIT, AFTER THE

22   CONGRESSIONAL INQUIRY.  THERE WERE STILL PUBLIC STATEMENTS,

23   THEY'RE JUST NOT AS EFFECTIVE.

24             THE COURT:  OKAY.  GIVE ME --

25             MR. SWEDLOW:  SO YOU'RE SAYING WHY DID WE WAIT FROM
```

1    2018 TO 2020 WHEN WE ACTUALLY FILED, THAT JUST ISN'T RELEVANT

2    FOR STATUTE OF LIMITATIONS WE WOULD ARGUE BECAUSE IT'S A FINITE

3    TIME PERIOD FOR STATUTE OF LIMITATIONS AND WE WAITED UNTIL WE

4    HAD THE BEST CASE, MEANING UNTIL CONGRESS FINISHED THEIR

5    INQUIRY AND THE DOCUMENTS THAT THE GOVERNMENT GOT FROM FACEBOOK

6    WERE MADE PUBLIC SO WE COULD PLEAD A REALLY DETAILED COMPLAINT.

7    BUT THAT'S THE ONLY PERIOD WHERE WE WAITED.

8        I CAN'T BELIEVE THERE'S A REAL DISPUTE THAT PRIOR TO

9    CAMBRIDGE ANALYTICA, FACEBOOK -- FACEBOOK WAS ENGAGED IN ACTIVE

10   CONCEALMENT OF ITS DECEPTIVE USE OF DATA.

11       THE COURT:  SO WHAT -- I'M SORRY.  CAN YOU BACK UP

12   AND GIVE ME THE TIMELINE OF WHAT PLAINTIFFS KNEW?  THAT WOULD

13   REALLY BE HELPFUL FOR THIS FRAUDULENT CONCEALMENT ANALYSIS.

14       MR. SWEDLOW:  YES.

15       THE COURT:  SO I HAVE ONAVO, AUGUST 2018.  I HAVE

16   CAMBRIDGE ANALYTICA, MARCH 2018.  WHAT DID PLAINTIFFS KNOW WHEN

17   SO THAT I CAN HAVE A TIMELINE IN RULING ON THIS MOTION?

18       MR. SWEDLOW:  OKAY.  SO I'M GOING TO DIRECT YOU IN

19   PART TO OUR MULTI -- OUR VERY LONG PARAGRAPH 238 ONLY BECAUSE

20   IT IS KIND OF A LAYOUT OF A TIMELINE OF THIS FRAUDULENT

21   CONCEALMENT.

22       I DON'T KNOW IF YOU -- I DON'T WANT TO READ ALL OF THE

23   PRIOR --

24       THE COURT:  THAT'S OKAY.  IF YOU GIVE ME ONE

25   MINUTE -- I MEAN, I HAVE ALL THE CASES AND ALL THE COMPLAINTS

1    AND ALL THE BRIEFING IN FRONT OF ME, SO LET ME JUST --

2              MR. SWEDLOW:  OKAY.

3              THE COURT:  IF YOU WOULD GIVE ME A SECOND, I CAN GO

4    TO THAT PARAGRAPH.

5         OKAY.  SO YOU'RE SAYING THIS IS WHERE I SHOULD LOOK?

6              MR. SWEDLOW:  THIS IS WHERE THE, THE -- YEAH, THE

7    FRAUDULENT CONCEALMENT IS LAID OUT AS A TIMELINE, THESE ARE --

8    I WOULD SAY THESE ARE OUR BEST 15 POINTS ON THE TIMELINE.

9         THE ONLY POINT THAT I WANT TO REITERATE, THAT I HOPE I'M

10   MAKING CORRECTLY, IS ONCE WE GET TO DECEMBER 2016, IT DOESN'T

11   LEGALLY MATTER ANYMORE.

12        IN OTHER WORDS, IF WE WERE SLOW BECAUSE THINGS WERE

13   REVEALED IN MARCH OF 2018, IN APRIL OF 2018 AND THEN 2019,

14   WE'RE ALLOWED TO WAIT -- ONCE -- ONCE WE GET INTO THE STATUTE

15   OF LIMITATIONS PERIOD, IF OUR CLAIM IS REVEALED TO US, WE HAVE

16   FOUR YEARS FROM THE POINT THE CLAIM, WE WOULD -- A REASONABLE

17   PERSON WOULD KNOW TO HAVE A CLAIM.

18        SO I'M NOT ATTEMPTING TO JUSTIFY THE DELAY LEGALLY FROM

19   2018 TO 2020, JUST TO BE CLEAR.  SO THAT'S WHERE I'M REALLY

20   MORE TAKING THAT ON AS A LEGAL MATTER, THAT ONCE WE GET WITHIN

21   THE LIMITATIONS PERIOD, WE'RE ALLOWED TO WAIT UP UNTIL FOUR

22   YEARS.  ANYONE IS.  IF I SLIP AND FALL, I KNOW I HAVE A CLAIM,

23   I HAVE A BROKEN ANKLE, BUT I CAN STILL WAIT WHATEVER THE

24   STATUTE OF LIMITATIONS IS TO BRING MY CLAIM.

25             AND IT'S THE REVELATION OF CAMBRIDGE ANALYTICA, THE ONAVO,

1    THE D.O.J. COMPLAINT, THE CONGRESSIONAL INVESTIGATIONS, THE

2    MILLIONS OF DOCUMENTS WE NOW HAVE, THAT'S THE REVELATION THAT

3    WAS WITHIN THE LIMITATIONS PERIOD.

4         THE FRAUDULENT CONCEALMENT TOOK PLACE UP UNTIL 2018, BUT

5    THEN WAS NOT VERY EFFECTIVE AFTER THAT.

6         THE COURT:  HOW DO YOU RESPOND TO, YOU KNOW,

7    FACEBOOK'S ARGUMENT THAT WHAT YOU HAVE IN PARAGRAPH 238 IS JUST

8    TOO GENERAL TO BE AN AFFIRMATIVE ACT?

9         MR. SWEDLOW:  WELL, SO THESE ARE ACTUALLY VERY

10   SPECIFIC.  I THINK THESE ARE EVEN MORE SPECIFIC THAN WHAT YOU

11   FOUND TO BE SUFFICIENT IN I THINK IT'S BROWN V. GOOGLE.  THESE

12   ARE SPECIFIC STATEMENTS.

13        BUT THIS IS -- THE REASON WHY IT'S NOT GENERAL IS BECAUSE

14   THIS IS -- I'M USING THIS IN QUOTES -- THIS IS THE SECRET SAUCE

15   THAT MADE FACEBOOK DOMINANT AND MAINTAINED ITS DOMINANCE.  IF

16   WE GO ALL THE WAY BACK TO PARAGRAPH 109, THERE'S A MEMO

17   ACTUALLY ENTITLED SECRET SAUCE, AN INTERNAL MEMO FROM 2008.

18        THE FACT THAT PEOPLE FEEL SAFE THAT THEIR INFORMATION

19   WON'T GET SHARED OUTSIDE OF THEIR SOCIAL NETWORK AND CAN BE

20   KEPT PRIVATE IS THE REASON THAT FACEBOOK IS A $974 BILLION

21   COMPANY, AND THEIR -- THIS PARAGRAPH HAS TWO, I THINK, RELEVANT

22   DOCUMENTS IN QUOTES.

23        ONE IS THE INTERNAL REPORT CALLED "FACEBOOK SECRET SAUCE"

24   THAT EXPLAINS THAT USERS WILL SHARE MORE INFORMATION IF GIVEN

25   MORE CONTROL OVER WHO THEY ARE SHARING IT WITH AND HOW THEY

1    SHARE.  THAT'S WHAT FACEBOOK WAS DECEIVING USERS ON.  AND

2    THIS -- NOW IT'S TEN YEARS OLD.  THIS STATEMENT -- THIS POST

3    FROM MARK ZUCKERBERG, WHAT HE SAYS HERE IN 109, I'M QUOTING IT

4    NOW, "WHEN I BUILT THE FIRST VERSION OF FACEBOOK, ALMOST NOBODY

5    I KNEW WANTED A PUBLIC PAGE ON THE INTERNET.  THAT SEEMED

6    SCARY.  BUT AS LONG AS THEY COULD MAKE THEIR PAGE PRIVATE, THEY

7    FELT SAFE SHARING WITH THEIR FRIENDS ONLINE.  CONTROL IS KEY.

8    WITH FACEBOOK, FOR THE FIRST TIME, PEOPLE HAD THE TOOLS THEY

9    NEEDED TO DO THIS.  THAT'S HOW FACEBOOK BECAME THE WORLD'S

10   BIGGEST COMMUNITY ONLINE."

11        AND THAT'S OUR FUNDAMENTAL ALLEGATION IS THAT FACEBOOK WAS

12   ACTIVELY DECEIVING AND LYING TO USERS ABOUT WHAT IT WAS DOING

13   WITH THE DATA AND THERE WAS NO WAY FOR USERS TO KNOW THAT.

14        SO WHEN A USER SHARES PHOTOS OF ITS CHILD FOR 15 YEARS ON

15   FACEBOOK THINKING IT'S ONLY GOING TO GET SHARED WITH ITS

16   FRIENDS, BUT IT'S ACTUALLY GETTING SHARED WITH OTHER APPS AND

17   PEOPLE WHO WANT ACCESS TO THE DATA AND INFORMATION, THAT'S OUR

18   ALLEGATION.  THAT WAS DECEPTIVE, AND STEALING THAT FEED STOCK

19   OR VITAL INFORMATION TO MAINTAIN ITS DOMINANCE IN THESE

20   MARKETS, THAT'S THE DECEPTION AND THAT'S WHAT FACEBOOK

21   GENERALLY AND SPECIFICALLY WAS LYING TO USERS ABOUT, BOTH WITH

22   TERMS OF USE AND SERVICE AND PUBLIC STATEMENTS THAT WOULD

23   ENSURE IT HAD THE SECRET SAUCE.

24        THE REASON -- AND THIS WAS OBSERVED IN THE DISTRICT OF

25   D.C. CASE -- IT'S A LOGICAL, UNDERSTANDABLE DISTINCTION.

1    PEOPLE WON'T POST PUBLICLY A VIDEO OF THEIR INFANT CHILD ON

2    YOUTUBE BECAUSE IT'S PUBLIC.  BUT THEY WILL POST THAT IN THEIR

3    SOCIAL NETWORK ON FACEBOOK.  THAT'S THE DISTINCTION.

4         SO TO LIE ABOUT PRIVACY AND DATA PROTECTION ISN'T GENERAL.

5    IT'S THE MOST SPECIFIC, MOST IMPORTANT THING THAT MADE

6    FACEBOOK, FACEBOOK.

7              THE COURT:  LET ME ASK COUNSEL FOR THE ADVERTISERS,

8    IS THERE ANY TIMELINE YOU CAN PROVIDE, OR IF YOU WANT TO ADD

9    ANYTHING TO WHAT'S ALREADY BEEN SAID ABOUT WHAT PLAINTIFFS,

10   WHAT PLAINTIFFS KNEW?

11             MR. BATHAEE:  YES, YOUR HONOR.

12        SO IN APRIL -- ON APRIL 30TH, 2015 WAS THE FIRST BIG

13   PLATFORM MOVE AND THAT'S WHEN 40,000 DEVELOPERS WERE EXPELLED

14   OFF THE PLATFORM.

15        UP UNTIL THAT PERIOD, FACEBOOK KNOWS FOR ABOUT THREE YEARS

16   THAT THIS IS GOING TO HAPPEN AND TELLS PEOPLE TO KEEP

17   DEVELOPING, SO IT'S UNDER A DUTY TO SPEAK UP UNTIL THAT POINT.

18        AND AFTERWARDS, FACEBOOK THEN STARTS TO CONSISTENTLY

19   PEDDLE PRETEXT, AND WE ALLEGE THE PRETEXTUAL STATEMENTS IN 502,

20   503, THAT'S ON THE DAILY ANNOUNCEMENT IN 2015, APRIL 30TH, THE

21   WHO, WHAT, WHERE, AND WHEN; 505, STATEMENTS TO DEVELOPERS RIGHT

22   BEFORE THE ANNOUNCEMENT INCLUDING AIRBIQUITY AND MICROSOFT;

23   508, A BLOG POST APRIL 30TH, 2015 THAT SAYS IT WAS ABOUT GIVING

24   PEOPLE CONTROL OVER THEIR DATA; 509, AN FAQ WHICH THEN GOT

25   POSTED ON STACK OVERFLOW BY SIMON CROSS, AND THAT'S ALL ALLEGED

1    IN PARTICULAR IN THE COMPLAINT; AND THEN ON MARCH 26TH, 2018,

2    THERE'S ANOTHER BLOG POST THAT THEN, RIGHT AROUND THE BIG

3    CHANGES, YOU KNOW, IN AND AROUND THE CANVAS CONDUCT, THEY POINT

4    BACK TO THE ORIGINAL CHANGE IN 2015 AND SAY, OH, THAT WAS TO

5    PREVENT MISUSE OF USER DATA; 514 TO 515, WE SAY -- THERE'S A

6    NOVEMBER 24TH, 2018 BLOG POST THAT SAYS, OH, THOSE AGREEMENTS

7    THAT YOU HEAR ABOUT, THEY WERE MADE ON A SHORT-TERM BASIS AND

8    ONLY TO PREVENT APPS FROM BREAKING IN THE NEAR TERM.  AND OF

9    COURSE THAT WAS FALSE, WE ALLEGE.

10    AND HOW DO WE KNOW THAT THE PRETEXT WAS FALSE, YOUR HONOR?

11    WE HAVE THEIR INTERNAL DOCUMENTS WHICH WERE MADE PUBLIC ON

12    NOVEMBER 6TH, 2019 BY NBC WHERE THEIR SENIOR-MOST API ENGINEER

13    SAYS THE VERY PRETEXT THAT THEY STATED IN THESE STATEMENTS WERE

14    FALSE AND PABLUM, AND THAT'S AT PARAGRAPHS 178 AND 179.

15    SO THERE IS A FACT QUESTION AS TO WHETHER THOSE -- THAT

16    WAS, IN FACT, PRETEXTUAL, AND I THINK WE'VE ALLEGED ENOUGH TO

17    SHOW THAT THOSE STATEMENTS WERE FALSE.

18    AND THAT'S THE TIMELINE.  SO FROM 2015 TO 2000 -- FROM

19    2015 UNTIL NOVEMBER OF 2018, YOU HAVE A SERIES OF FALSE

20    STATEMENTS, AND THEN EVENTUALLY THE ENTIRE TRUTH COMES OUT ON

21    NOVEMBER 6TH, 2019.

22    AND THIS IS ONLY WITH RESPECT TO CONDUCT THAT FALLS, YOU

23    KNOW, PAST THE 2016 DECEMBER PERIOD, BEFORE THAT PERIOD.

24    THERE IS -- THERE ARE SOME ALLEGATIONS WITH RESPECT TO THE

25    MERGERS, YOUR HONOR, THAT THEY WERE FALSE STATEMENTS ABOUT

```
 1      WHETHER THEY WOULD INTEGRATE WHATSAPP AND INSTAGRAM MADE TO

 2      REGULATORS IN 2014.  THAT'S AT PARAGRAPH 518 OF OUR COMPLAINT.

 3            THAT WASN'T REVEALED UNTIL AUGUST 2016, SO THAT'S PROBABLY

 4      WHEN THAT -- SORRY -- UNTIL MAY 2017.  THAT'S WHEN THAT CLOCK

 5      STARTS.

 6            THE COURT:  SO BOTH OF THESE COMPLAINTS ARE VERY LONG

 7      WITH OVER 500 PARAGRAPHS.  YOUR COMPLAINT HAS OVER 500

 8      PARAGRAPHS.  SO YOU'RE SAYING LOOK AT 503, 505, 508, 509, 178,

 9      179, AND 518?

10            MR. BATHAEE:  518, 513, 514, 515.  THERE'S A WHOLE

11      SECTION ON IT, YOUR HONOR.  IT'S GOT A MAJOR HEADING ON

12      FRAUDULENT CONCEALMENT.

13            AND, YOUR HONOR, I DO WANT TO ADD 491 THROUGH -94 ABOUT

14      THE DUTY TO SPEAK AT THE TIME, AND OF COURSE THE HIGHLY -- THE

15      STATEMENT MADE FROM A SENIOR EXECUTIVE AT FACEBOOK IN 2010 THAT

16      IF ILYA SUKHAR TOLD THE TRUTH, THERE WOULD BE, QUOTE, A HIGH

17      LIKELIHOOD OF BREAKING INTO JAIL.

18            SO WE DO ALSO ALLEGE A CODE OF SILENCE IN THE FACE OF A

19      DUTY TO SPEAK.

20            SO ALL OF THAT TOGETHER ARE THE ACTIVE CONDUCT WE ALLEGE

21      FRAUDULENTLY CONCEALED THE ANTICOMPETITIVE CONDUCT.  YOU

22      COULDN'T BRING THIS VERY ANTITRUST SUIT WITHOUT THAT

23      INFORMATION, AND IT WAS DESIGNED TO KEEP THAT INFORMATION OUT

24      OF PEOPLE'S HANDS.

25            THE COURT:  AREN'T YOU SEEKING A PREVENTATIVE
```

1     INJUNCTION REGARDING THE PLATFORM-RELATED CONDUCT, SIMILAR TO

2     WHAT THE STATE SOUGHT?

3              MR. BATHAEE:  NO, YOUR HONOR.

4         WE'RE SEEKING ONLY DAMAGES.  AND TO THE EXTENT WE ASK FOR

5     EQUITABLE RELIEF IN THE -- EQUITABLE RELIEF IN THE COMPLAINT,

6     WE JUST WANT AN INJUNCTION.  SO WE'RE NOT ASKING TO RESTORE OR

7     ANYTHING INJUNCTIVE OR CHANGE ANYTHING WITH RESPECT TO THE

8     PLATFORM.

9              THE COURT:  OKAY.  SO YOU'RE NOW DISCLAIMING THAT?

10    BECAUSE --

11             MR. BATHAEE:  WELL, WE DID SO IN OUR SUPPLEMENTAL

12    BRIEF, YOUR HONOR, ON THE INJUNCTION.  SO WE DON'T RAISE THE

13    LACHES ISSUES.

14        I DO WANT TO NOTE, OF COURSE, THAT IF THERE IS FRAUDULENT

15    CONCEALMENT, THERE IS NO LACHES BECAUSE THERE WOULD BE UNCLEAN

16    HANDS.

17        BUT JUDGE FREEMAN NEVER REACHED THAT ISSUE, EITHER.

18             THE COURT:  OKAY.  SO YOU'RE WITHDRAWING YOUR REQUEST

19    FOR PERMANENT INJUNCTIVE RELIEF.

20        WHAT ABOUT THE CONSUMER PLAINTIFFS?  ARE YOU STILL SEEKING

21    YOUR INJUNCTIVE RELIEF, OR NOT?

22             MR. SWEDLOW:  CAN I ANSWER IT THIS WAY?  THE

23    INJUNCTIVE RELIEF -- THE REQUEST FOR RELIEF, WE MAKE TWO

24    ARGUMENTS.

25        ONE IS THAT IT'S NOT APPROPRIATE FOR THIS MOTION TO

1    DISMISS BECAUSE IT'S NOT A CLAIM, BUT I'M GOING TO JUST FALL ON

2    YOUR MERCY AND YOU'LL DECIDE THAT ONE, WHETHER I'M RIGHT OR

3    WRONG ON THAT.

4        BUT MORE IMPORTANTLY -- I DON'T WANT TO READ THE WHOLE

5    QUOTE AGAIN, BUT IF THE INJUNCTIVE RELIEF IS SUBJECT TO A

6    LACHES DEFENSE --

7            THE COURT:  UM-HUM.

8            MR. SWEDLOW:  -- THE STATE MADE LITERALLY NO ARGUMENT

9    AND DIDN'T PROVIDE, QUOTE, "ANY JUSTIFICATION FOR THEIR LONG

10   DELAY IN FILING."  WE BELIEVE THAT PARAGRAPHS -- THAT

11   PARAGRAPH 238, ALONG WITH A COUPLE OTHER PARAGRAPHS I'D LIKE TO

12   IDENTIFY FOR YOU, I WOULD SAY 152 AND 146, IDENTIFY THE

13   JUSTIFIABLE DELAY IN BRINGING A CLAIM BASED ON DECEPTION.

14       AND SO I WOULD -- I WOULD ASK THE COURT TO CONSIDER THAT

15   IF YOU'RE GOING TO APPLY LACHES TO THE REQUEST FOR INJUNCTIVE

16   RELIEF, THAT YOU LOOK AT ALL OF THE ALLEGATIONS WE MADE ABOUT

17   JUSTIFIABLE DELAY.

18       AND THIS JUSTIFIABLE DELAY IS THAT THE GOVERNMENT, THE

19   U.K. GOVERNMENT, THE UNITED STATES GOVERNMENT, COULD NOT HAVE

20   KNOWN THE DECEPTION THAT FACEBOOK WAS ENGAGING IN UNTIL 2018,

21   2019, AND 2020.  SO THE CONSUMER CLASS COULD ALSO NOT HAVE

22   KNOWN.

23       BUT I RECOGNIZE THAT THE INJUNCTIVE RELIEF IS DIFFERENT

24   THAN THE STATUTE OF LIMITATIONS, WHICH GIVES US AN ABSOLUTE

25   RIGHT FOR FOUR YEARS FROM DISCOVERY OF OUR CLAIM, AND THAT

1      WOULD HAVE BEEN -- THAT'S FROM DECEMBER 2016.

2          LACHES REQUIRES AN ANALYSIS OF BOTH PREJUDICE AND

3      JUSTIFIABLE DELAY.  SO IT'S A DIFFERENT INQUIRY, BUT WE'VE

4      INCLUDED IN OUR COMPLAINT THINGS THAT THE STATE JUST DIDN'T, AT

5      LEAST IN THE FIRST ATTEMPT, DIDN'T INCLUDE.

6          THE COURT:  LET ME ASK FACEBOOK, IF THE STATUTE OF

7      LIMITATIONS IS TOLLED, DOES THAT ADDRESS FACEBOOK'S LACHES

8      ARGUMENT?  OR IS THERE STILL A LACHES ARGUMENT IF THERE'S

9      TOLLING?

10         MS. MEHTA:  NO, YOUR HONOR, I DON'T THINK IT DOES

11     ADDRESS THE TOLLING ARGUMENT BECAUSE THE TYPES OF RELIEF ARE

12     INDEPENDENT.

13         AND INSOFAR AS THEY ARE SEEKING INJUNCTIVE RELIEF, THE

14     ANALYSIS THAT JUDGE BOASBERG AND JUDGE FREEMAN WENT THROUGH IS

15     THAT IT IS LONG PAST TIME FOR THEM TO CHALLENGE THE CONDUCT

16     THAT THEY HAVE ALLEGED THAT IS YEARS AND YEARS AND YEARS OLD,

17     AND THERE IS SIGNIFICANT PREJUDICE TO FACEBOOK FROM HAVING AN

18     INJUNCTION TRYING TO UNWIND CONDUCT THAT IS THAT OLD.

19         THE COURT:  BUT YOU WOULD -- YOU WOULD AGREE THAT

20     CAMBRIDGE ANALYTICA WAS CERTAINLY A REVELATION ABOUT A LOT OF

21     FACEBOOK'S PRACTICES, AND THAT'S MARCH 2018.

22         MS. MEHTA:  THAT'S TRUE, YOUR HONOR.  BUT I DON'T

23     THINK -- AND I HAVEN'T HAD A CHANCE YET TO ADDRESS THE

24     FRAUDULENT CONCEALMENT COMMENTS FROM THE OTHER SIDE, AND WITH

25     YOUR HONOR'S PERMISSION, I'D LIKE TO DO THAT BECAUSE IT DOES

1       NOT HELP THEM IN THIS CASE.

2            THIS IS NOT A PRIVACY CASE.  THIS IS AN ANTITRUST CASE.

3       AND THEY HAVE DONE A LOT OF HAND WAVING AROUND THE DECEPTION

4       THEORY AND THE PRIVACY ALLEGATIONS AND WHY THEY THINK THEY

5       SOMEHOW CAN RECAST PRIVACY ALLEGATIONS IN AN ANTITRUST CASE,

6       WHICH I'LL HAPPILY TALK ABOUT LATER.

7            BUT FOR PURPOSES OF FRAUDULENT CONCEALMENT, THE LAW IS

8       CLEAR:  YOU ARE ON ACTUAL NOTICE -- YOU DON'T HAVE TO FIND

9       CONSTRUCTIVE NOTICE, YOU ARE ON ACTUAL CONSTRUCTIVE -- ACTUAL

10      NOTICE ONCE YOU HAVE NOTICE OF A FACT THAT IS SUFFICIENT TO

11      EXCITE A SUSPICION.  THAT IS THE CONMAR CASE FROM THE NINTH

12      CIRCUIT, 858 F.2D AT 502.  "ANY FACT THAT SHOULD EXCITE

13      SUSPICION IS DEEMED TO GIVE THE PLAINTIFF ACTUAL NOTICE OF

14      THEIR ENTIRE CLAIM."

15           AND LOOKING AT PARAGRAPH 238, WHICH IS THE PARAGRAPH THAT

16      MR. SWEDLOW ASKED YOU TO LOOK AT WHERE THERE ARE 15 ALLEGATIONS

17      THAT THEY CLAIM ARE RELATED TO FRAUDULENT CONCEALMENT, THOSE

18      ALLEGATIONS ON THEIR FACE ESTABLISH THAT THERE WAS ACTUAL

19      NOTICE WELL BEFORE THE STATUTE OF LIMITATIONS PERIOD BECAUSE

20      THERE WAS ACTUAL NOTICE OF FACTS THAT WOULD HAVE BEEN ENOUGH TO

21      EXCITE SUSPICION.

22           JUST THE FTC ORDER -- I'M HAPPY TO WALK THROUGH ALL THE

23      PARAGRAPHS, BUT JUST THE FTC CONSENT DECREE, WHICH THEY SAY

24      THEY WERE AWARE OF AND THEY SAY THEY RELIED UPON, WOULD BE

25      SUFFICIENT TO EXCITE SUSPICION.

1          THERE WERE ALLEGATIONS ABOUT CANVAS AND BEACON, THOSE WERE

2     PUBLICIZED AT THE TIME.  THOSE ARE PUBLIC FACTS THAT

3     JUDGE FREEMAN FOUND IN REVEAL CHAT WOULD BE MORE THAN ENOUGH TO

4     EXCITE SUSPICION AND THEREFORE CREATE KNOWLEDGE.

5          SO WHATEVER HAPPENED WITH RESPECT TO CAMBRIDGE ANALYTICA

6     IN 2018 IS IRRELEVANT AS LONG AS THERE WAS -- AND THIS IS ONE

7     INDEPENDENT BASIS, BY THE WAY, TO DEFEAT FRAUDULENT

8     CONCEALMENT, THERE'S OTHER BASES, TOO -- BUT ONE INDEPENDENT

9     BASIS WOULD BE AS LONG AS THEY HAD ACTUAL NOTICE OF A FACT

10    UNDER CONMAR, WHICH THEY DO ACCORDING TO THEIR OWN ALLEGATIONS,

11    THAT WOULD BE ENOUGH.

12         THE OTHER ISSUES -- AND I'LL BE VERY BRIEF HERE -- THE

13    OTHER ISSUES WITH RESPECT TO THEIR FRAUDULENT CONCEALMENT

14    ALLEGATIONS ARE THE LACK OF SPECIFICITY WITH RESPECT TO THE

15    ALLEGATIONS IN PARAGRAPH 238, AND I WON'T WALK THROUGH THEM,

16    YOUR HONOR CAN LOOK AT THOSE ALLEGATIONS, BUT THEY ARE

17    GENERALIZED STATEMENTS ABOUT PRIVACY AND THERE'S NO SPECIFIC

18    ALLEGATION THAT ANY OF THEM WERE FALSE.

19         PARAGRAPH 239 LUMPS THEM ALL TOGETHER AND THEN

20    CONCLUSORILY ALLEGES THAT THEY WERE FALSE.  BUT THERE'S NO

21    SPECIFIC ALLEGATION THAT THEY WERE FALSE.

22         AND THEN FINALLY, THERE'S NO ALLEGATION -- AND THIS IS

23    CRITICAL -- THAT THERE WAS ANY DILIGENCE AT ALL.

24         AND SO WHATEVER CAMBRIDGE ANALYTICA DOES OR DOES NOT TELL

25    US ABOUT REVELATIONS AS TO PRIVACY, WITH RESPECT TO THE CLAIMS

1    AT ISSUE HERE, THEIR TOLLING THEORY FAILS AT ALL THREE STEPS OF

2    THE WAY ON FRAUDULENT CONCEALMENT.  INDEPENDENTLY, EACH ONE OF

3    THOSE BASES IS CONMAR AND THE FACT THAT THEY HAD ACTUAL NOTICE.

4         THE COURT:  ALL RIGHT.  I'LL GIVE A BRIEF RESPONSE

5    AND THEN I'D LIKE TO MOVE ON TO A NEW TOPIC.

6         MR. SWEDLOW:  SO I'M NOT SURE IF FACEBOOK IS ACTUALLY

7    SAYING THAT WE HAD ACTUAL NOTICE OF THE CLAIM THAT THE D.O.J.

8    FIGURED OUT IN 2019.

9    WHAT HAPPENED WITH THE FTC CONSENT DECREE FROM 2011 AND

10   2012 IS FACEBOOK DENIED ANY WRONGDOING AND WAS CAUGHT ACTUALLY

11   LYING TO EVERYONE ABOUT WHAT THEY WERE DOING WITH THE DATA,

12   WHICH IS WHY THEY SETTLED WITH THE D.O.J. FOR $5 BILLION IN

13   2019.

14   WE DON'T HAVE ANY OBLIGATION TO JUSTIFY DILIGENCE UP UNTIL

15   OR BEYOND DECEMBER OF 2016 BECAUSE THAT'S HOW THE STATUTE OF

16   LIMITATIONS WORK.

17   AND I DON'T WANT TO CONFUSE THE TIME THAT THE PLAINTIFFS'

18   ATTORNEYS TOOK TO DEVELOP THEIR CASE AND STRATEGY AND FILE IT

19   BECAUSE CAMBRIDGE ANALYTICA IS CLEARLY AND COMFORTABLY WITHIN

20   THE STATUTE OF LIMITATIONS PERIOD.

21   IF FACEBOOK IS SAYING THAT OUR CLAIM SHOULD BE BARRED

22   BECAUSE THEY LIED TO THE FTC WHEN THEY GOT CAUGHT FOR SOME

23   PRIVACY AND DECEPTION CONSUMER DATA VIOLATIONS IN 2011, THAT

24   BECAUSE THEY SUCCESSFULLY LIED AND DENIED IT BUT SOMEBODY GOT

25   AN INKLING OF WHAT THEY WERE DOING BACK THEN, THAT CLAIMS

1    SHOULD BE BARRED FOREVER, THEN THAT'S A WAY TO DOMINATE THE

2    MARKET AND DECEIVE CONSUMERS.

3         THAT CAN'T BE THE LAW.  THE LAW CAN'T BE THERE'S A WORD

4    CALLED BEACON AND THAT WAS IN THE CONSENT DECREE, SO THE FACT

5    THAT CAMBRIDGE ANALYTICA AND ALL OF ITS REVELATIONS, YOU SHOULD

6    HAVE KNOWN THAT, CONSUMERS.

7         D.O.J. DIDN'T KNOW IT.  FTC DIDN'T KNOW IT.  THE U.K.

8    HOUSE OF COMMONS DIDN'T KNOW IT.  CONGRESS DIDN'T KNOW IT.  BUT

9    YOUR CLAIM IS BARRED BECAUSE WE GOT CAUGHT FOR THE TIP OF THE

10   ICEBERG IN 2011, LIED ABOUT IT, KEPT DOING EVERYTHING ELSE

11   UNTIL WE ACTUALLY GOT CAUGHT LATER DURING THE LIMITATIONS

12   PERIOD.

13         THAT CANNOT BE THE WAY IT WORKS AND IT'S NOT THE WAY YOU

14   FOUND IT TO WORK IN BROWN V. GOOGLE.

15         THE COURT:  CAN WE GO ON TO THE MARKET ALLEGATIONS,

16   PLEASE.  I HAVE A QUESTION FOR CONSUMERS.

17         WHY ARE TIKTOK AND SNAPCHAT NOT INCLUDED IN THE SOCIAL

18   NETWORK MARKET?

19         MR. SWEDLOW:  WELL, TIKTOK AND SNAPCHAT JUST DON'T

20   SERVE THE SAME FUNCTION OR ROLE AS A SOCIAL NETWORK LIKE

21   FACEBOOK.  YOU CAN'T -- YOU CAN'T -- YOU CAN'T CREATE THE SAME

22   KIND OF SOCIAL NET OR SOCIAL NETWORK THAT YOU CAN WITH

23   FACEBOOK.

24         NOW, TIKTOK AND SNAPCHAT ARE IN THE SOCIAL MEDIA MARKET,

25   WHICH IS -- WE'VE DEFINED TWO MARKETS.  SO IT'S SIMPLY THAT THE

```
1    FUNCTIONALITY AVAILABLE FOR TIKTOK AND SNAPCHAT ARE NOT THE

2    SAME AS FACEBOOK AND A SOCIAL NETWORKING MARKET.  AGAIN, I

3    DON'T THINK THAT'S FACTUALLY CLOSE, BUT THAT'S OUR FACTUAL

4    ALLEGATION OF DEFINING THE MARKET AND I THINK IF WE'RE JUST

5    ADOPTING SOME OF THE REASONING FROM THE DISTRICT OF D.C., EVEN

6    THOUGH IT WAS MORE ODDLY DEFINED, THE PERSONAL SOCIAL NETWORK

7    MARKET THAT WAS ACCEPTED BY THE DISTRICT COURT THERE IS A MORE

8    PARTICULARIZED DEFINITION.

9         OURS IS SIMPLY IDENTIFYING SOCIAL NETWORK AS DIFFERENT

10   FROM SOCIAL MEDIA, BUT WE'RE ALSO ACKNOWLEDGING THE EXISTENCE

11   OF THE SOCIAL MEDIA MARKET.

12            THE COURT:  ALL RIGHT.  BUT YOUR DEFINITION IS PRETTY

13    BROAD.  BUT LET -- YOU KNOW, ALLOWING USERS TO COMMUNICATE AND

14     INTERACT WITH FRIENDS.

15         BUT LET ME MOVE TO MY NEXT TOPIC.

16         DO YOU HAVE ANY CASE THAT SAYS THAT A PERCENTAGE OF

17    ADVERTISING REVENUE IS A GOOD PROXY FOR PERCENTAGE OF SOCIAL

18    MEDIA MARKET?

19            MR. SWEDLOW:  SO, NO.  BUT IF I COULD JUST GIVE A

20    MORE COMPLETE ANSWER THAN JUST NO?

21            THE COURT:  OKAY.

22            MR. SWEDLOW:  WHAT -- I THINK THE INQUIRY HERE IS

23    THAT THE MARKET POWER OR MARKET SHARE THAT WAS CONSIDERED IN

24    THE FTC CASE WAS -- THIS IS ON PAGE 27 OF THE FTC CASE -- ALL

25    THE FTC ALLEGED WAS THAT THEY, QUOTE, MAINTAINED -- THAT
```

1        FACEBOOK MAINTAINED A DOMINANT SHARE OF THE U.S. PERSONAL

2        SOCIAL NETWORKING MARKET, AND THEN IT PARENTHETICALLY SAID, IN

3        EXCESS OF 60 PERCENT, AND NOTHING ELSE.

4            WHAT THE COURT SAID ON THE NEXT PAGE, ON 28, IS "IT IS

5        HARD TO IMAGINE A MARKET SHARE ALLEGATION THAT IS MUCH MORE

6        CONCLUSORY THAN THE FTC HERE."  THAT WAS AT THE TIME THEY

7        ALLEGED IT BECAUSE THEY BELIEVED THAT WAS SUFFICIENT.  THE

8        COURT SAID IT WASN'T.

9            IN CONTRAST, OUR COMPLAINT ALLEGES A BUNCH OF DIFFERENT

10        WAYS THAT YOU COULD MEASURE MARKET SHARE, INCLUDING, BUT NOT

11        LIMITED TO, ADVERTISING REVENUE.

12            AND LET ME JUST BE CLEAR OF HOW IT'S ALLEGED AND WHAT

13        WE'RE ARGUING HERE TODAY.  ADVERTISING REVENUE IS NOT A PROXY

14        OR THE DEFINITION OF THE MARKET SHARE BECAUSE IT'S A DIFFERENT

15        MARKET.  BUT IT'S INFORMATIVE AND FACEBOOK CONSIDERS IT

16        INFORMATIVE OF WHAT THE MARKET SHARE OF THE RELEVANT MARKET IS.

17            IN OTHER WORDS, IF YOU ARE A SOCIAL MEDIA COMPANY LIKE

18        FACEBOOK AND YOU COMPETE WITH OTHER SOCIAL MEDIA COMPANIES LIKE

19        SNAPCHAT AND TWITTER AND LINKEDIN OR WHATEVER IT IS, IF YOU

20        INTERNALLY IDENTIFY THAT YOU GET 85 PERCENT OF THE ADVERTISING

21        REVENUE AND THAT'S HOW YOU ARE APPROXIMATING YOUR MARKET SHARE,

22        THEN IT'S RELEVANT FOR THE INQUIRY.  IT IS NOT THE DEFINITION

23        OF MARKET SHARE, BUT IT'S RELEVANT FOR THE INQUIRY.

24            IT'S SIMILARLY FOR THE TIME SPENT ON SOCIAL MEDIA OR

25        SOCIAL NETWORKS.  FACEBOOK, IN ITS INTERNAL DOCUMENTS, WHICH WE

1        QUOTE, IDENTIFIES TIME SPENT AS A RELEVANT METRIC.

2            WHAT WE DID IN OUR COMPLAINT, WHICH IS WHAT THE FTC ORDER

3        SAYS THE FTC DIDN'T DO, IS WE TOOK SPECIFIC POSITIONS ON MARKET

4        SHARE PERCENTAGES BASED ON SPECIFIC METRICS.  ONE OF THOSE

5        METRICS IS TIME SPENT.  ANOTHER ONE IS ADVERTISING REVENUE.

6            BUT WE'RE NOT SAYING THAT EITHER ARE DEFINITIVE OR

7        IRREBUTTABLE.  WE'RE SAYING, FOR PURPOSES OF OUR PLEADING, WE

8        DID ACTUALLY IDENTIFY FACEBOOK'S MARKET SHARE IN THE TWO

9        RELEVANT MARKETS, AND WE IDENTIFIED WHAT WE BASED THAT ON,

10       WHICH WAS MARKET STUDIES AND FACEBOOK'S OWN MARKET STUDIES.

11           SO IT ISN'T THAT THERE'S A CASE THAT SAYS ADVERTISING

12       REVENUE IS GOOD ENOUGH.  IT'S THAT ADVERTISING REVENUE IS

13       RELEVANT TO THE MARKET SHARE AND WE USED IT AS FACTS RELEVANT

14       TO THE DEFINITION OF THE MARKET SHARE.

15           IN TERMS OF THE TIME SPENT ONE THOUGH, PART OF THE

16       ALLEGATION OF DECEPTION IS THAT FACEBOOK ACQUIRED A COMPANY

17       THAT TRACKS PEOPLE WHO LEFT FACEBOOK AND SPENT TIME IN OTHER

18       APPS, OTHER SOCIAL MEDIA AND POTENTIALLY SOCIAL NETWORK APPS,

19       AND THEY TRACKED THAT TIME TO FIGURE OUT, HOW DOES FACEBOOK'S

20       MARKET SHARE OF SOCIAL MEDIA COMPARE?

21           THAT'S -- OUR ALLEGATION IS THAT FACEBOOK VALUED THAT AS A

22       RELATIVE AND COMPARATIVE METRIC FOR MARKET SHARE, AND SO WE

23       IDENTIFIED IT FROM FACEBOOK'S OWN DOCUMENTS AS DEMONSTRATING

24       DOMINANCE AND MARKET SHARE.

25               THE COURT:  LET ME ASK FACEBOOK, IN REVEAL CHAT,

1     JUDGE FREEMAN SAID THAT THE BOUNDARIES OF THE SOCIAL DATA

2     MARKET SHOULD BE DECIDED ON A MORE CLEARLY DEVELOPED FACTUAL

3     RECORD.

4          DO YOU DISAGREE WITH THAT?  IS IT SOMETHING THAT SHOULD BE

5     DECIDED AT THE MOTION TO DISMISS STAGE?

6          MR. PANNER:  YOUR HONOR, THIS IS AARON PANNER.  I'LL

7     BE ADDRESSING THAT ISSUE FOR FACEBOOK.

8          IN REVEAL CHAT, OF COURSE, JUDGE FREEMAN DIDN'T NEED TO

9     DECIDE THAT ISSUE BECAUSE SHE DISMISSED THAT CASE WITHOUT

10    PREJUDICE IN REVEAL CHAT I AND ULTIMATELY DIDN'T ADDRESS IT IN

11    REVEAL CHAT II.

12         WHAT SHE SAID ABOUT THE SOCIAL DATA MARKET, WHICH IS A

13    DIFFERENT CONSTRUCT FROM WHAT THE CONSUMERS HAVE ALLEGED HERE,

14    IS THAT SHE WAS WILLING TO HEAR MORE ABOUT IT AT A LATER STAGE

15    IF THE CASE PROCEEDED, AND OF COURSE THAT TURNED OUT TO BE

16    DICTA.

17         NOTABLY, WITH REGARD TO THE ADVERTISING MARKET, SHE

18    INDICATED THAT SHE DIDN'T SEE ENOUGH AND WANTED TO MAKE SURE

19    THAT THERE WERE ADEQUATE FACTS PLEADED WITH REGARD TO THE

20    NATURE OF AN ADVERTISING MARKET WHICH, AGAIN, DIDN'T NEED TO BE

21    REACHED IN REVEAL CHAT II.

22         BUT CERTAINLY IN THIS CASE, THE NATURE OF THE MARKETS THAT

23    HAVE BEEN ALLEGED BOTH FROM THE POINT OF VIEW OF MARKET

24    DEFINITION -- SPEAKING NOW TO THE CONSUMER, TO THE USER CASE --

25    BOTH WITH RESPECT TO MARKET DEFINITION AND MARKET POWER ARE

1    INADEQUATE.

2         AND I THINK, IF YOUR HONOR WOULD ALLOW ME, I'LL JUST SPEAK

3    VERY BRIEFLY TO THE COMPARISON TO JUDGE BOASBERG'S DECISION IN

4    THE FTC CASE BECAUSE I THINK IT REVEALS A FUNDAMENTAL PROBLEM

5    WITH WHAT THE USERS HAVE ALLEGED HERE.

6         THE USERS HERE ADMIT THAT FACEBOOK IS COMPETING WITH

7    YOUTUBE AND TIKTOK AND SNAPCHAT AND TWITTER AND IMESSAGE AND

8    ANY NUMBER OF SOCIAL, WHAT THEY CALL SOCIAL MEDIA APPS.

9         THE COMPETITION IS EVEN BROADER BASED ON THE ALLEGATIONS

10   IN THE COMPLAINT BECAUSE WHAT THEY SAY IS FACEBOOK IS USED FOR

11   ENTERTAINMENT AND FOR KILLING TIME, AND OF COURSE THERE'S MANY

12   DIFFERENT APPLICATIONS THAT A USER CAN REACH SIMPLY BY PRESSING

13   AN ICON ON THEIR PHONE IF THEY WANT TO BE ENTERTAINED OR KILL

14   TIME.

15        AND SO THE PROBLEM WITH THE ALLEGATIONS HERE -- SO THE WAY

16   THAT THE FTC TRIED TO GET OUT OF THAT PROBLEM IS IT SAID, WE'RE

17   ACTUALLY GOING TO LIMIT OUR MARKET TO A PARTICULAR

18   FUNCTIONALITY, A PARTICULAR FEATURE OF FACEBOOK, WHICH WE'RE

19   GOING TO DUB PERSONAL SOCIAL NETWORKING, AND ALL OF THE OTHER

20   THINGS THAT PEOPLE DO ON FACEBOOK, THAT'S NOT PART OF OUR

21   MARKET.

22        AND IN DOING THAT, THE COURT SAID, OKAY, I UNDERSTAND WHAT

23   YOU'RE SAYING ABOUT THAT FUNCTIONALITY.  IT'S THIN, BUT I'M

24   GOING TO ALLOW IT.  BUT NOW YOU HAVE NO ABILITY TO ALLEGE

25   MARKET POWER BECAUSE I DON'T KNOW HOW -- YOU KNOW, WHAT YOU'RE

1    MEASURING WHEN YOU TALK ABOUT A SHARE OF A MARKET.

2         NOW, WHAT THE -- WHAT PLAINTIFFS HAVE DONE HERE IS THEY'VE

3    SAID, WELL, ACTUALLY, WE'RE TALKING ABOUT EVERYTHING THAT YOU

4    DO ON FACEBOOK.

5         BUT THEN THEY HAVE NO BASIS TO SAY THAT ALL OF THE OTHER

6    APPS, WHICH THEY CONCEDE PROVIDE COMPETITIVE FEATURES TO

7    PRECISELY WHAT THEY SAY IS WITHIN THE MARKET, THEY HAVE NO

8    BASIS TO SAY THAT'S NOT PART OF THE MARKET.  THEY HAVE NO BASIS

9    FOR SAYING THAT THERE'S, THERE'S A SEPARATE MARKET FOR SOCIAL

10   NETWORK, FOR SOCIAL NETWORKS.

11        THEY ALSO FAIL TO ALLEGE MARKET POWER BECAUSE,

12   NOTWITHSTANDING WHAT MR. SWEDLOW HAS SAID, THEIR ALLEGATIONS

13   ARE EQUALLY CONCLUSORY WITH REGARD TO THE MARKET.  WHAT THEY

14   SAY IS IT'S MORE THAN 65 PERCENT.  THEY DON'T EXPLAIN HOW

15   THEY'VE MEASURED THAT.  THEY DON'T EXPLAIN WHAT'S IN THE

16   DENOMINATOR.

17        AND I THINK WHAT'S, WHAT'S KEY IS, YOU KNOW, THE STATEMENT

18   ABOUT ADVERTISING REVENUE, AS JUDGE BOASBERG INDICATED, IT'S

19   ACTUALLY IRRELEVANT TO THE NATURE OF THE MARKET THAT THEY'VE

20   ALLEGED, WHICH IS A USER SIDE MARKET.  THERE COULD BE A --

21   THERE COULD BE A SERVICE THAT DOESN'T RECEIVE ANY ADVERTISING

22   REVENUE THAT'S A MAJOR COMPETITOR ON THE USER SIDE.  AND SO

23   ADVERTISING REVENUE ACTUALLY DOESN'T TELL YOU ANYTHING ABOUT

24   MARKET SHARE.

25        AND SO THERE'S REALLY A FUNDAMENTAL PROBLEM WITH THE --

```
 1      WITH BOTH THE MARKET DEFINITION AND THE MARKET POWER, MARKET

 2      SHARE ALLEGATIONS IN THE CONSUMER COMPLAINT.

 3              THE COURT:  ALL RIGHT.  THANK YOU.

 4          I'M GOING TO GIVE YOU A VERY QUICK OPPORTUNITY TO RESPOND,

 5      MR. SWEDLOW, AND THEN I'D LIKE TO GO TO THE SOCIAL ADVERTISING

 6      MARKET, PLEASE.

 7              MR. SWEDLOW:  OKAY.

 8          WHAT HAPPENED IN THE FTC CASE IS THAT THE FTC IDENTIFIED

 9      NOTHING, THEY DIDN'T IDENTIFY ANY PERCENTAGE OF ANY REVENUE OR

10      TIME SPENT.  THE JUDGE WAS TRYING TO IDENTIFY WHAT THEY COULD

11      HAVE DONE AND THEY DIDN'T DO.  THEY DIDN'T DO ANY OF IT.  WHAT

12      THE COURT SAID IS THAT THEY DIDN'T EVEN PROVIDE AN ESTIMATED

13      ACTUAL FIGURE OR RANGE FOR FACEBOOK'S MARKET SHARE AT ANY POINT

14      OVER THE PAST TEN YEARS.  THE FTC DIDN'T DO ANYTHING.

15          WHAT WE DID, STARTING WITH PARAGRAPH 286, IS IDENTIFY FROM

16      FACEBOOK'S DOCUMENTS AND FACEBOOK'S DATA WHAT THEY BELIEVE

17      THEIR RELEVANT MARKET SHARE ARE FOR THE TWO MARKETS THAT THE

18      HOUSE REPORT ACTUALLY RECOGNIZED AS MARKETS.  THAT'S THE SOCIAL

19      NETWORK AND THE SOCIAL MEDIA MARKETS.  WE DIDN'T INVENT THESE

20      MARKETS.

21          I'LL ALSO ADD, WE FILED OUR COMPLAINT FIRST, SO IT ISN'T

22      LIKE WE TRIED TO FIX WHAT THE FTC DID IN THEIR COMPLAINT.  WE

23      FILED OUR COMPLAINT.  WE DEFINED OUR MARKET.  WE JUSTIFIED OUR

24      PERCENTAGES.

25              THE FTC DIDN'T BELIEVE THEY NEEDED TO, AND IN THEIR FIRST
```

1    DRAFT OF THEIR FIRST COMPLAINT, THEY DIDN'T.  THEY MAY IN THE

2    NEXT COMPLAINT.  THEY MAY CHOOSE TO CITE PERCENTAGES OVER THE

3    PAST TEN YEARS.

4         WE DID.  WE IDENTIFIED WHY TIME SPENT IS RELEVANT, WHY

5    ADVERTISING REVENUE IS RELEVANT, AND THAT CAN BE DISPUTED LATER

6    IN THE CASE AS A FACTUAL DISPUTE, BUT WE DID WHAT THE JUDGE IN

7    THE FTC CASE SAID THE FTC NEEDS TO DO, WHICH IS SOMETHING

8    BEYOND SAYING SIMPLY THEY HAVE MARKET POWER.

9              THE COURT:  LET'S GO TO THE SOCIAL ADVERTISING

10   MARKET, AND THESE ARE QUESTIONS FOR COUNSEL FOR THE PLAINTIFFS.

11        WHO'S GOING TO ANSWER?  IS THAT YOU, MR. BATHAEE?

12             MS. ANDERSON:  GOOD AFTERNOON, YOUR HONOR.  I'LL BE

13   ADDRESSING THOSE.

14             THE COURT:  OKAY, GREAT.  THANK YOU.

15        SO CAN YOU DISTINGUISH THE NINTH CIRCUIT DECISION IN

16   HICKS V. PGA TOUR, WHICH DECLINED TO RECOGNIZE A MARKET THAT

17   WAS LIMITED TO A SINGLE TYPE OF ADVERTISING?

18             MS. ANDERSON:  YES.  HICKS REJECTED THE PLAINTIFFS'

19   PRODUCT MARKET BECAUSE THE PLAINTIFF ATTEMPTED TO NARROW THE

20   MARKET DEFINITION TO A SUBMARKET OF THE SUBMARKET OF A

21   SUBMARKET, AND THIS WAS ONE OF THOSE MARKET DEFINITIONS THAT

22   JUST WASN'T PLAUSIBLE ON ITS FACE.

23        SO THE MARKET THAT THE HICKS PLAINTIFFS TRIED TO DEFINE

24   WAS SUBDIVIDED IN THREE WAYS FROM GENERAL ADVERTISING.  IT WAS

25   IN PLAY, WHICH IS BETWEEN COMMERCIALS; ADVERTISING ON

1     TELEVISION; AND DIRECTED AT GOLF SPACE.

2          SO THE SUBCLASSES IN HICKS ARE A SUBSTANTIALLY DIFFERENT

3     SCOPE FROM THOSE ALLEGED BY THE ADVERTISERS.  WE PROPOSE A

4     STRAIGHTFORWARD SUBMARKET OF THE OVERALL ADVERTISING SUBMARKET,

5     AND WE ALLEGE FACTS REGARDING REASONABLE INTERCHANGEABILITY AND

6     LOW CROSS-ELASTICITY OF DEMAND, AND OUR ALLEGATIONS ARE

7     SUPPORTED BY ROBUST BROWN SHOE FACTORS SHOWING THE ECONOMIC

8     DISTINCTNESS OF A SOCIAL ADVERTISING MARKET FROM OTHER FORMS OF

9     ADVERTISING.

10         AND MANY COURTS HAVE FOUND MORE GENERALLY DRAWN SUBMARKETS

11    WITHIN THE GENERAL ADVERTISING MARKET TO BE SUFFICIENT MARKET

12    DEFINITIONS, AND WE LAID OUT THOSE CASES IN FOOTNOTE 23 OF OUR

13    BRIEF ON PAGE 20.

14         THE COURT:  SO WHY IS SOCIAL ADVERTISING DIFFERENT

15     FROM SEARCH BASED ADVERTISING?

16         MS. ANDERSON:  SOCIAL ADVERTISING USES DATA FROM

17     SOCIAL NETWORKS TO TARGET USERS FOR ADS BASED ON THE REAL

18     IDENTITIES, THEIR ATTRIBUTES, BEHAVIORS, AND GROUP MEMBERSHIPS.

19         WHAT'S UNIQUE ABOUT SOCIAL ADVERTISING IS THE RICH SOCIAL

20     DATA THAT ALLOWS ADVERTISERS TO TARGET ADS TO INDIVIDUALS BASED

21     ON WHAT THEY SHARE OR VIEW ON A SOCIAL NETWORK, SUCH AS THEIR

22     EDUCATION LEVEL, WHERE THEY LIVE, WHAT THEY BUY, WHO THEIR

23     FRIENDS ARE, WHAT THEIR HOBBIES AND INTERESTS ARE, AND WHAT

24     GROUPS THEY BELONG TO.

25         AND MACHINE LEARNING ALGORITHMS USED IN SOCIAL ADVERTISING

1     ALSO ALLOW ADVERTISERS TO SEEK OTHER USERS WITH SIMILAR

2     BEHAVIOR OR CHARACTERISTICS.  SO THE ABILITY TO TAILOR AN

3     AUDIENCE SPECIFICALLY TO AN AD SETS SOCIAL ADVERTISING APART

4     FROM SEARCH ADVERTISING.

5         A SEARCH ADVERTISEMENT IS DISPLAYED IN RESPONSE TO A

6     SEARCH THAT YOU ENTER INTO A WEB BROWSER, AND SEARCH

7     ADVERTISING LACKS THE TARGETING FEATURES OF SOCIAL ADVERTISING.

8     THE AD IS POSTED JUST BASED ON WHAT THE SEARCH TERMS ARE.  SO

9     THE SEARCH ADVERTISING LACKS THESE TARGETED FEATURES OF A --

10        THE COURT:  OH, I'M GOING TO HAVE TO DISAGREE WITH

11    YOU.  I'VE HAD SO MANY CASES, THE SEARCH ENGINES ARE DOING

12    TARGETED ADVERTISING BASED ON USER PROFILES AND, IF ANYTHING,

13    THEY'RE GETTING EVEN MORE INFORMATION FROM SCANNING E-MAILS AND

14    WHATNOT.  SO I -- I WOULD JUST HAVE TO DISAGREE WITH YOU THERE.

15        YOU'RE SAYING NO SEARCH ADVERTISING IS TARGETED BASED ON

16    USER PROFILES?

17        MS. ANDERSON:  LATER IN THE CLASS PERIOD, I BELIEVE

18    AS WE EXPLAINED IN OUR COMPLAINT, THE TARGETING FEATURES OF

19    DISPLAY AND SEARCH ADVERTISING WERE BECOMING, WERE BECOMING

20    BETTER AND POTENTIALLY CONVERGING WITH THE SOCIAL ADVERTISING

21    MARKET.

22        BUT FOR MOST OF THE CLASS PERIOD, OUR ALLEGATIONS ARE THAT

23    THE TARGETING FEATURES OF SEARCH ADVERTISING JUST DON'T COMPETE

24    WITH THE RICH DATA THAT YOU GET WHEN SOCIAL ADVERTISING.

25        THE COURT:  SO WHEN DO YOU THINK SEARCH ENGINES

```
1     STARTED TARGETED ADVERTISING?

2              MS. ANDERSON:  OUR COMPLAINT ALLEGES THAT THE

3     CONVERGING OF THE MARKETS BEGAN SOMETIME AROUND 2017 TO 2018.

4              THE COURT:  ALL RIGHT.  WELL -- SO YOU'RE SAYING

5     SEARCH BASED ENGINES DID NO TARGETED ADVERTISING BEFORE 2017?

6     THAT'S YOUR ALLEGATION?

7              MS. ANDERSON:  OUR ALLEGATION IS THAT THE SEARCH

8     ADVERTISING, IT LACKS THE RICH FEATURES OF THE SOCIAL

9     ADVERTISING, AND THAT IN 2017/2018, THE MARKETS STARTED TO

10    CONVERGE WITH THE TARGETING, FOR EXAMPLE, THAT GOOGLE HAS FROM

11    ITS PRODUCTS.

12             THE COURT:  SO YOU'RE SAYING GOOGLE DIDN'T DO

13    TARGETED ADVERTISING BEFORE 2017?

14             MS. ANDERSON:  NOT TO THE EXTENT THAT THERE'S

15    TARGETED ADVERTISING IN SOCIAL ADVERTISING WHERE YOU CAN

16    ADVERTISE BASED ON HOW, HOW USERS INTERACT WITHIN NETWORKS,

17    WHAT THEY SHARE, THEIR INTERESTS AND THEIR HOBBIES, THEIR

18    RELATIONSHIP STATUS OR EDUCATION.

19        IT'S A DIFFERENT LEVEL OF SOCIAL -- OF -- IT'S A DIFFERENT

20    LEVEL OF TARGETING.

21             THE COURT:  WHAT'S YOUR POSITION ON THE DISTRICT

22    COURT DECISIONS IN KINDERSTART.COM LLC AND IN RE: GOOGLE

23    ADVERTISING?

24             MS. ANDERSON:  IN KINDERSTART, WE THINK THAT CASE IS

25    FACTUALLY DISTINGUISHABLE.  FIRST OF ALL, IT'S NEARLY 15 YEARS
```

1    OLD.  IT WAS ANALYZING ONLINE ADVERTISING WHEN IT WAS IN ITS

2    INFANCY.  THE IPHONE DID NOT EXIST YET WHEN KINDERSTART WAS

3    DECIDED, AND THERE WEREN'T MOBILE APPS YET WHEN KINDERSTART WAS

4    DECIDED.

5        IN ADDITION, THE OPERATIVE COMPLAINT IN KINDERSTART, IT

6    DIDN'T DISCUSS THE BRANDISHING FACTORS, IT DIDN'T ADDRESS

7    REASONABLE INTERCHANGEABILITY OR CROSS-ELASTICITY OF DEMAND,

8    AND THE PLAINTIFFS IN THAT CASE SIMPLY DID NOT MARSHAL THE KIND

9    OF ROBUST FACTUAL SUPPORT FOR THEIR MARKET DEFINITION THAT

10   ADVERTISER PLAINTIFFS DO HERE WITH OUR BROWN SHOE FACTORS.

11       WITH REGARD TO IN RE: DIGITAL MUSIC, THE ANSWER IS VERY

12   SIMILAR.  THE COMPLAINT THERE DID NOT DISCUSS ANY OF THE

13   BROWN SHOE FACTORS, AND IT DID NOT DISCUSS REASONABLE

14   INTERCHANGEABILITY OR CROSS-ELASTICITY OF DEMAND.  SO WE WOULD

15   DISTINGUISH THAT CASE BASED ON THE FACTUAL SUPPORT WE ALLEGE IN

16   OUR COMPLAINT.

17           THE COURT:  I ASKED ABOUT IN RE: GOOGLE ADVERTISING.

18   IS --

19           MS. ANDERSON:  YEAH, IN RE: GOOGLE DIGITAL

20   ADVERTISING BEFORE JUDGE FREEMAN.

21           THE COURT:  YES.

22           MS. ANDERSON:  IN THAT CASE, THE -- AGAIN, THE

23   OPERATIVE COMPLAINT JUST DOESN'T HAVE THE FACTUAL ALLEGATIONS

24   THAT OURS HAS.

25           AND IN ADDITION, THAT COMPLAINT WAS DISMISSED WITH LEAVE

1    TO AMEND SO THE PLAINTIFFS COULD SHOW -- ALLEGE ADDITIONAL

2    FACTS REGARDING SOCIAL ADVERTISING AND WHY IT MAY NOT BE A

3    SUBSTITUTE.

4              THE COURT:  LET ME GO TO, I GUESS, EITHER -- I

5    PROBABLY SHOULD GO TO THE ADVERTISERS.  I DON'T KNOW WHETHER

6    THE CONSUMERS WILL WANT TO SAY ANYTHING.

7              BUT IN THE FTC CASE IN D.C., THE DISTRICT JUDGE SAID

8    WITHHOLDING API ACCESS FROM COMPETITORS WAS NOT UNLAWFUL, AND

9    SIMILARLY IN REVEAL CHAT, JUDGE FREEMAN SAID THAT THE APP

10   DEVELOPERS HADN'T STATED A CLAIM REGARDING FACEBOOK'S PLATFORM.

11             WOULD YOU LIKE TO RESPOND TO THOSE TWO FINDINGS?  I DON'T

12   KNOW WHO'S GOING TO ANSWER THAT QUESTION.

13             MR. BATHAEE:  YEAH, I'LL ANSWER THAT QUESTION, YOUR

14    HONOR.

15             YOU KNOW, THIS CASE IS EXTREMELY DIFFERENT, AND HERE'S

16   WHY:  WE HAVE DETAILED ALLEGATIONS THAT FIT WITHIN EVERY

17   ELEMENT OF ASPEN, AND IN FACT, YOUR HONOR, I SUBMIT

18   RESPECTFULLY THIS IS THE STRONGEST ASPEN CASE SINCE ASPEN, AND

19   LET ME START WITH THE THREE POINTS THAT WE HAVE TO SHOW.

20             UNILATERAL TERMINATION OF VOLUNTARY AND PROFITABLE COURSE

21   OF DEALING; TWO, THE ONLY CONCEIVABLE RATIONALE OR PURPOSE IS

22   TO SACRIFICE SHORT-TERM BENEFITS OR OBTAIN PROFITS IN THE LONG

23   RUN FROM THE EXCLUSION OF COMPETITION; AND, THREE, THE REFUSAL

24   TO DEAL WITH THE PRODUCTS THE DEFENDANT ALREADY SELLS IN THE

25   EXISTING MARKET TO SIMILARLY SITUATED CUSTOMERS.

1        BUT THERE'S ONE THING THAT'S REALLY IMPORTANT IN EVERY

2    ASPEN CASE, AND THAT'S THAT ELEMENT OF IRRATIONALITY.  AND IN

3    ASPEN, AS YOUR HONOR KNOWS FULL WELL FROM THE QUALCOMM CASES,

4    IN ASPEN ITSELF, THEY WOULDN'T SELL AT FULL PRICE.  WHY?  WHY

5    WOULD THEY DO THAT?  AND THE ANSWER WAS TO GET RID OF A

6    COMPETITOR.

7        AND WE HAVE THAT HERE.  WE HAVE CONDO, WHICH INTERNALLY

8    FACEBOOK'S OWN SENIOR TECHNICAL PEOPLE, AND EXECUTIVES IN

9    CHARGE OF THE PLATFORM, SAY HAD NO TECHNICAL JUSTIFICATION

10   OTHER THAN TO EXCLUDE COMPETITORS, AND I'LL GET TO THAT IN A

11   SECOND.

12       BUT THE VERY FIRST ELEMENT, YOUR HONOR, IS EASILY MET.

13           THE COURT:  I'M SORRY.  LET ME SPEED THIS UP HERE.

14           MR. BATHAEE:  YEAH.

15           THE COURT:  WHAT WAS IT THAT WAS EITHER NOT RAISED

16   BEFORE THE OTHER TWO JUDGES OR THAT -- I MEAN, WHAT'S YOUR

17   POSITION?  DO YOU THINK THOSE TWO JUDGES JUST GOT IT WRONG?  OR

18   DO YOU THINK THAT THERE WERE EITHER ARGUMENTS OR FACTS THAT

19   SHOULD HAVE BEEN BEFORE THOSE JUDGES?  WHAT'S YOUR --

20           MR. BATHAEE:  YOUR HONOR, THEY DIDN'T PLEAD THE FACTS

21   THAT WE PLEAD IN THIS COMPLAINT.  IT WAS A VERY GENERAL

22   ARGUMENT THAT THERE WAS A GENERAL DUTY TO DEAL, AND THEN THERE

23   WAS EVEN AN ARGUMENT ABOUT CONDITIONAL DEALING, WHICH IS A

24   TERM, AS AN ANTITRUST LAWYER, I'D NEVER HEARD OF.  I THINK IT

25   CAME FROM A LAW REVIEW ARTICLE.

 1          AND THE COURT GENERALLY SAID THIS:  IT SAID, LOOK, THERE'S

 2     NO GENERAL DUTY TO DEAL AND YOU REALLY HAVEN'T EXPLAINED HOW

 3     YOU FIT INTO ASPEN.  I DON'T HAVE TO REACH IT BECAUSE LACHES

 4     BARS AN INJUNCTION AND THAT'S WHAT YOU WANT.

 5          AND THE COURT DID SAY, VERY CLEARLY IN D.C., YEAH, THERE

 6     ARE CASES WHERE REFUSAL TO DEAL, YOU KNOW, MAY VIOLATE ASPEN

 7     SKIING.  BUT IT DIDN'T REACH THAT POINT.

 8          AND OF COURSE JUDGE FREEMAN, YOU KNOW, I THINK -- I MEAN,

 9     I DON'T KNOW BECAUSE SHE NEVER REACHED IT IN REVEAL II, BUT I

10     THINK I CONVINCED HER ON THE ARGUMENT ON ASPEN AND HER REAL

11     ISSUE WAS THAT THIRD ELEMENT, WHICH I CAN GET TO.

12          BUT THE FACTS HERE ARE SIMILAR TO REVEAL.  REVEAL DIDN'T

13     REALLY PASS ON THEIR SUFFICIENCY IN THE END.

14          BUT I CAN GET INTO HOW WE MEET EACH ONE OF THESE ELEMENTS.

15     I THINK WE MEET THEM VERY CLEARLY AND WITH SPECIFICITY, WHICH

16     IS SOMETHING VERY HARD TO DO IN AN ASPEN CASE BECAUSE WE

17     ACTUALLY DON'T KNOW WHAT DRIVES THE MONOPOLIST'S CONDUCT

18     USUALLY.  WE DON'T HAVE THAT INSIGHT.

19          WE DO.  WE HAVE THEM -- WE HAVE THEM SEVERING THE

20     VOLUNTARY COURSE, PROFITABLE COURSE OF DEALING, AND HERE'S WHAT

21     THEY SAID IN THEIR OWN IPO DISCLOSURES TO THEIR INVESTORS:

22     "OUR PLATFORM SUPPORTS OUR ADVERTISING BUSINESS BECAUSE APPS ON

23     FACEBOOK CREATE ENGAGEMENT THAT ENABLES US TO SHOW ADS; OUR

24     PLATFORM DEVELOPERS MAY PURCHASE ADVERTISING."

25          THE COURT:  YOU ARE NOT ASKING ME TO -- YOU'RE NOT

```
1    CITING MY RULING IN FTC V. QUALCOMM, ARE YOU, ON THIS ASPEN

2    POINT?  BECAUSE I VERY MUCH GOT SLAPPED DOWN ON THAT BY THE

3    NINTH CIRCUIT.  SO --

4          MR. BATHAEE:  WELL, YOUR HONOR, THE NINTH CIRCUIT'S

5    REASONING WAS, WAS VERY TAILORED TO THE LICENSING SCHEME THERE,

6    AND HERE WE DO ACTUALLY HAVE PRETTY CLEAR EVIDENCE THAT

7    FACEBOOK WAS MAKING MONEY WITH -- FROM THESE DEVELOPERS DURING

8    THE RELEVANT PERIOD AND THEN IT CEASED THE CONDUCT.

9          AND IF -- THE PORTION I WAS READING TO YOUR HONOR IS

10   STRAIGHT FROM -- IS STRAIGHT FROM THEIR OWN INVESTOR

11   DISCLOSURES, THAT THEY MAKE MONEY OFF OF IT.

12         BUT THEIR OWN INTERNAL DOCUMENTS SAY THE SAME THING.

13   PARAGRAPH 107, ZUCKERBERG --

14         THE COURT:  BUT WOULDN'T YOU THINK THAT IN

15   FTC V. QUALCOMM, THE ARGUMENT WOULD EVEN BE STRONGER BECAUSE

16   THOSE ARE STANDARD ESSENTIAL PATENTS, YOU KNOW, THAT QUALCOMM

17   MADE FRAND, FAIR AND NON-DISCRIMINATORY REASONABLE LICENSING

18   OBLIGATIONS AS A MEMBER OF THAT STANDARD SETTING BODY, AND

19   THERE -- IF THE COURT IS NOT GOING TO FIND IT IN THAT INSTANCE,

20   WHY WOULD IT FIND IT HERE?

21         MR. BATHAEE:  WELL, YOUR HONOR --

22         THE COURT:  IF ANYTHING, STANDARD ESSENTIAL PATENTS,

23   FRAND OBLIGATIONS TO A STANDARD SETTING BODY AND INTEGRATED

24   PRODUCTS WHERE EVERYONE IS -- THE WHOLE PURPOSE OF A STANDARD

25   SETTING BODY IS TO CREATE A PRODUCT THAT IS INTERCHANGEABLE AND
```

1        A LOT OF DIFFERENT COMPANIES CAN CONTRIBUTE THEIR PARTS.

2             MR. BATHAEE:  YOUR HONOR, THE COURT PUT EMPHASIS ON

3        THE FACT THAT THERE WAS AN AGREEMENT TO SELL ON -- TO LICENSE

4        ON A FRAND BASIS, BUT NO ACTUAL EVIDENCE OF THOSE SALES

5        HAPPENING UPSTREAM.  AND, AND I THINK THEY SAID, WELL, THE

6        COURT HAD POINTED TO ONLY ONE SPECIFIC PIECE OF EVIDENCE THAT

7        WAS VAGUE AND EARLIER IN TIME.

8        WE HAVE VERY DIFFERENT ALLEGATIONS HERE.  WE ACTUALLY HAVE

9        INTERNAL DOCUMENTS SAYING THEY'RE MAKING $0.70 PER GAME

10       INSTALL, FOR EXAMPLE, FROM THESE APPS THAT THEY END UP KILLING.

11       THAT'S IN PARAGRAPH 115.

12       WE HAVE EVIDENCE, DIRECT EVIDENCE THAT THEY WERE MAKING

13       MONEY FROM ADS FROM THESE DEVELOPERS THAT THEY THEN THREW OFF

14       THEIR PLATFORM.  THEY WERE GETTING ENGAGEMENT FROM THE APPS

15       THAT THEY THREW OFF THEIR PLATFORM.

16       THERE'S ACTUAL, ACTUAL MONEY CHANGING HANDS.  IT'S

17       PROFITABLE FOR THEM.

18       AND THEY SAY, HEY, I DON'T WANT THAT PROFIT BECAUSE I

19       WOULD MUCH RATHER GET RID OF MY COMPETITORS.

20       AND THIS IS MUCH LIKE THE NOVELL V. MICROSOFT CASE.  IN

21       THAT CASE THE TENTH CIRCUIT DID SAY THAT'S, THAT -- THAT THIS

22       SORT OF THING IS ENOUGH.  THEIR API'S WERE REMOVED FROM

23       WINDOWS 95 TO HURT A PARTICULAR COMPETITOR DURING THE BETA

24       PHASE, AND THE COURT SAID, WELL, THE FACT THAT YOU'RE THROWING

25       OFF ONE OF YOUR LEAD DEVELOPERS BEFORE A MAJOR RELEASE OF

1    WINDOWS 95, YEAH, THAT'S THE KIND OF SHOOTING YOURSELF IN THE

2    FOOT THAT WE SEE IN ASPEN.

3         AND WE HAVE THAT HERE.  WE HAVE THEM MAKING CASH FROM

4    THESE DEVELOPERS THROUGH ADVERTISING, THROUGH INSTALL APPS, ON

5    A PER INSTALL BASIS.  THEY WERE EVEN CONSIDERING CHARGING FOR

6    THE API'S THEMSELVES, FOR THE ACCESS TO THE API'S THEMSELVES.

7    THEY PRESENTED IT TO THEIR BOARD OF DIRECTORS, AND THEY DECIDED

8    THEY'RE GOING TO STOP DOING IT AND GET RID OF THAT MONEY AND

9    THAT ENGAGEMENT THEY GOT FROM THE APPS, WHICH WAS INTEGRAL,

10   WHICH WAS INTEGRAL TO THEIR ENTIRE AD BUSINESS AS THEY TOLD

11   INVESTORS IN 2012, AND THAT'S IN PARAGRAPH 107.

12        SO IT'S A LITTLE DIFFERENT THAN HAVING AN AGREEMENT BUT NO

13   ACTUAL MONEY CHANGING HANDS AT THAT LEVEL, AT THAT UPSTREAM

14   LEVEL IN THE FTC V. QUALCOMM.

15        NOW, OF COURSE, YOUR HONOR, I DO HAVE AN OPINION THAT THE

16   NINTH CIRCUIT GOT IT WRONG, BUT OF COURSE WE'RE ALL BOUND BY

17   THAT DECISION.

18        BUT IF I TAKE THAT CASE ON ITS FACE, I THINK IT TURNED

19   ON -- I THINK IT TURNED ON THE ACTUAL EXCHANGE AND WHETHER

20   THERE WAS ACTUAL PURCHASES OR LICENSING GOING ON AT THE

21   APPROPRIATE LEVEL.

22        AND HERE WE DO -- WE ACTUALLY HAVE AN AFFIRMATIVE DECISION

23   NOT TO TAKE MONEY FROM THE -- TO DESTROY DEVELOPERS THAT WERE

24   PROFITABLE TO THEM, INTEGRAL TO THEIR ADVERTISING BUSINESS.

25        AND WHY?  FOR -- IN ORDER TO GET RID OF ANY COMPETITIVE

1    APP THAT MIGHT ERODE THAT DATA TARGETING BARRIER TO ENTRY OR

2    KEEP THEM -- OR BECOME AN INDEPENDENT THREAT WITH THEIR OWN

3    CRITICAL MASS OF SOCIAL DATA.

4        NOW, WE HIT -- THE SECOND ELEMENT IS VERY CLOSE, TOO, AND

5    THAT'S THE PROFIT SACRIFICE ELEMENT.  AND THE DECISION TO

6    DESTROY THOSE 40,000 DEVELOPERS, THEY DID IT AFTER BUCKETING

7    THEM INTO CATEGORIES ONE BY ONE.

8        AND THEN, YOUR HONOR, THEY DECIDED, WELL, IF YOU'RE

9    COMPETITIVE, WE'RE NOT ONLY GOING TO THROW YOU, EVENTUALLY

10    THROW YOU OFF THE PLATFORM, WE'RE NOT EVEN GOING TO LET YOU BUY

11    ADVERTISING AT FULL PRICE.  PARAGRAPH 130, AS VERNAL EXPLAINS

12    TO LESSIN IN AUGUST 2012, WE ARE NOT GOING TO ALLOW THINGS

13    WHICH ARE COMPETITIVE TO BUY THIS DATA FROM US.

14        THE COURT:  ALL RIGHT.  I'M GOING TO ASK YOU TO WRAP

15    UP.

16        MR. BATHAEE:  I'M SORRY, YOUR HONOR.

17        THE COURT:  THANK YOU.

18        MR. BATHAEE:  I DO VERY QUICKLY WANT TO POINT TO

19    PARAGRAPHS 177 THROUGH 180 OF THE COMPLAINT WHERE THE SENIOR

20    EXECUTIVES ACTUALLY DO SAY THERE'S A LACK OF LEGITIMATE

21    BUSINESS AND TECHNICAL JUSTIFICATION.

22        VERY QUICKLY ON THE THIRD ELEMENT, WHETHER IT'S

23    DISCRIMINATORY, WE SAY THAT INHERENTLY THE NATURE OF THE SCHEME

24    WAS DISCRIMINATORY.  IT WAS TO LET SOME WINNERS IN EACH

25    CATEGORY PROCEED, BUT SOME SIMILARLY SITUATED PEOPLE,

1        TERMINATING THEIR ABILITY TO RUN ON THE PLATFORM, OR EVEN

2        ESSENTIALLY ADVERTISE BECAUSE THEY'RE NOT ON THE PLATFORM

3        ANYMORE.

4            SO I'LL POINT YOUR HONOR TO PARAGRAPH 155 WHERE INTERNALLY

5        PEOPLE WERE BALKING AT DISCRIMINATING BASED ON SIMILARLY

6        SITUATED APPS; PARAGRAPH 136 WITH THE CATEGORIZATION OF

7        SIMILARLY SITUATED APPS; AND, OF COURSE, YOUR HONOR,

8        PARAGRAPH 204 AND THE WHITELIST DECISION IN 162 ARE GOOD

9        EXAMPLES OF DISCRIMINATORY CONDUCT.

10           I APOLOGIZE IF I'M A BIT LONG WINDED, YOUR HONOR.  IT'S A

11       VERY COMPLEX ISSUE.  I DIDN'T MEAN TO TAKE TOO MUCH OF THE

12       COURT'S TIME.

13               THE COURT:  NO NEED TO APOLOGIZE.  I APPRECIATE IT.

14           I'M SORRY.  I JUST HAVE MORE QUESTIONS.  I WAS HOPING WE

15       COULD WRAP UP IN TWO HOURS.  I DO NEED TO GIVE A BREAK TO THE

16       COURT REPORTER.

17           LET ME ASK, MS. SHORTRIDGE, WOULD YOU LIKE TO TAKE A BREAK

18       NOW?  I PROBABLY HAVE ABOUT THREE MORE QUESTIONS.

19               THE REPORTER:  WE CAN TAKE A BREAK NOW OR AFTER YOUR

20       NEXT QUESTION.

21               THE COURT:  LET'S GO AHEAD AND TAKE A BREAK NOW

22       BECAUSE WE'VE BEEN GOING ALMOST, WHAT, AN HOUR AND 45 MINUTES,

23       I THINK, ALMOST.

24           ALL RIGHT.  LET'S -- LET'S TAKE A TEN MINUTE BREAK NOW.

25           THANK YOU ALL VERY MUCH.  THANK YOU FOR YOUR PATIENCE.

1    I'M SORRY, I DO HAVE A FEW MORE QUESTIONS, BUT WE WILL BE

2    WRAPPING UP SOON.  THANK YOU.

3            THE CLERK:  WE'RE IN RECESS.

4        (RECESS FROM 3:22 P.M. UNTIL 3:40 P.M.)

5            THE COURT:  OKAY.  OOPS.

6        ALL RIGHT.  OH, LET ME GET MY CAMERA.  OH, OKAY, IS IT

7    WORKING NOW?  OKAY, GOOD.

8        ALL RIGHT.  THANK YOU ALL FOR YOUR PATIENCE.

9        ALL RIGHT.  LET ME GO TO MY REMAINING QUESTIONS.

10       JUST SO YOU KNOW, THIS IS WHAT I PLAN TO DO:  I HAVE THREE

11   MORE QUESTIONS I'D LIKE TO ASK; I WOULD LIKE JUST SOME CLARITY

12   ON EXACTLY WHAT THE PLAINTIFFS ARE ASKING FOR WITH REGARD TO

13   INJUNCTIVE RELIEF, IF ANY; AND THEN I'M GOING TO GIVE EACH

14   PARTY TWO MINUTES, A CLOSING ARGUMENT, TO SAY WHATEVER YOU'D

15   LIKE TO SAY, AND THEN WE'LL END.

16       SO I'M HOPING WE SHOULD BE DONE MAYBE IN THE NEXT 20, 30

17   MINUTES.  SO THANK YOU FOR YOUR PATIENCE.

18       LET'S GO TO WHOEVER WANTS TO ANSWER FOR THE CONSUMERS.

19   YOU SAY THAT YOUR ALLEGATIONS DON'T DEPEND ON A DUTY TO DEAL

20   BETWEEN FACEBOOK AND THIRD PARTY APP DEVELOPERS, AND I JUST

21   WANTED TO KNOW WHY THAT'S THE CASE.

22           MR. SWEDLOW:  THE CONSUMER USER CLASS, IT JUST IS

23   IRRELEVANT FOR OUR CLAIM.  OUR CLAIM IS BASED ENTIRELY -- YOU

24   KNOW, OUR FIRST AND ONLY BUCKET IS THE DECEPTIVE COLLECTION,

25   USE, SALE, AND DISTRIBUTION OF USER DATA, AND SO WHETHER OR NOT

1    FACEBOOK DEALS WITH ANYONE ELSE JUST ISN'T PART OF OUR CLAIM.

2            THE COURT:  THE NEXT TWO QUESTIONS ARE FOR FACEBOOK.

3    I DON'T KNOW WHO WOULD LIKE TO ANSWER IT.

4        BUT JUDGE BOASBERG, WHILE HE DID SAY IT'S NOT UNLAWFUL FOR

5    AN ENTITY TO HAVE A POLICY LIKE THE API POLICY OF FACEBOOK'S,

6    HE DID SAY IT'S POSSIBLE THAT FACEBOOK'S IMPLEMENTATION OF THAT

7    API POLICY AS TO CERTAIN SPECIFIC COMPETITOR APPLICATIONS MAY

8    HAVE VIOLATED SECTION 2.

9        DO YOU HAVE A RESPONSE TO THAT?  I MEAN, OBVIOUSLY WE'LL

10   HAVE TO WAIT AND SEE THE LEAVE TO AMEND AND WHAT -- YOU KNOW,

11   WE'LL HAVE TO WAIT TO SEE ANY AMENDED COMPLAINT AND SEE WHAT

12   THE ALLEGATIONS ARE, BUT --

13            MR. PANNER:  YOUR HONOR, FOR WHAT IT'S WORTH, YOUR

14   HONOR, I DON'T THINK THAT THERE'S LEAVE TO AMEND WITH REGARD TO

15   THAT PART OF THE COMPLAINT.

16            THE COURT:  OKAY.

17            MR. PANNER:  THAT'S BEEN DISMISSED.

18       BUT I -- WHAT I'D LIKE TO STRESS IS THAT THERE'S REALLY NO

19   DAYLIGHT BETWEEN WHAT THE ADVERTISERS ALLEGE WITH REGARD TO A

20   POLICY AND WHAT WAS ALLEGED IN THE FTC AND STATE COMPLAINT.

21       BUT THE KEY POINT IS IF YOU -- IF YOU EVEN LISTEN TO WHAT

22   JUDGE BOASBERG SAID, OR READ WHAT HE SAID, HE EMPHASIZED THAT

23   THERE COULD BE SPECIFIC INSTANCES WHERE A PARTICULAR

24   IMPLEMENTATION WAS, WAS PROBLEMATIC.  HE SAID THAT'S

25   THEORETICALLY POSSIBLE.  HE CERTAINLY DIDN'T REACH IT OR FIND

1      THAT THERE HAD BEEN ANY SUCH.

2           AND WHAT HE SAID WAS WHEN IT COMES TO THE POLICY, IT

3      REALLY DOESN'T MATTER WHAT YOUR MOTIVATION IS.  YOU ARE FREE TO

4      WITHHOLD -- YOU KNOW, GIVE ACCESS TO THE API'S, WITHHOLD ACCESS

5      TO THE API'S, THAT IS -- YOU'RE ENTIRELY FREE TO DO THAT.  YOU

6      HAVE NO DUTY TO DEAL WITH THOSE OTHER APPS.

7           AND ALL THAT'S ALLEGED HERE IS THAT THERE WAS SUPPOSEDLY

8      DEALING WITH SOME LARGE NUMBER OF APPS, AND THEN FACEBOOK'S

9      POLICY CHANGED AND IT SAID WE'RE NOT GOING TO DO THAT.

10          AND SO THERE SIMPLY IS NO ALLEGATION OF SPECIFIC FACTS.

11          AND THEN IF YOU EVEN LOOK AT WHAT'S ALLEGED HERE, IT

12     DOESN'T COME CLOSE TO REACHING THE ELEMENTS THAT THE SUPREME

13     COURT IN TRINCO IDENTIFIED AS NECESSARY AND WHAT THE NINTH

14     CIRCUIT IN QUALCOMM IDENTIFIED AS NECESSARY TO MAKE OUT, YOU

15     KNOW, A VERY NARROW EXCEPTION TO THE NO DUTY TO DEAL RULE.

16          THERE'S NO PROPER ALLEGATION OF PROFIT SACRIFICE, THAT

17     FACEBOOK SOMEHOW SACRIFICED PROFITS BY CHANGING ITS, ITS

18     PLATFORM POLICIES.  AND THE IDEA THAT FACEBOOK WOULD HAVE

19     SOME -- IN SOME, YOU KNOW, HYPOTHETICAL WORLD CHARGED FOR

20     ACCESS TO PLATFORM HARDLY FILLS THAT GAP.  AND FACEBOOK -- SO

21     THERE'S NO, YOU KNOW, WITHDRAWAL FROM ANY VOLUNTARY COURSE OF

22     DEALING THAT WAS PROFITABLE OR ANY PROFIT SACRIFICED.

23          AND THERE'S SIMPLY NO ALLEGATION THAT THIS WAS A PRODUCT

24     THAT WAS MADE AVAILABLE GENERALLY TO RETAIL CUSTOMERS.  IT

25     WASN'T A RETAIL PRODUCT AT ALL, AND SO THERE'S SIMPLY NO BASIS

1    WHATSOEVER FOR ANY KIND OF REFUSAL TO DEAL CLAIM IN THIS CASE.

2         AND, YOU KNOW, WHATEVER -- WHATEVER JUDGE BOASBERG MAY

3    HAVE LEFT OPEN AS A POSSIBILITY FOR SOME OTHER CASE ISN'T

4    REMOTELY PLED HERE.

5              THE COURT:  WHAT ABOUT IN THE NEW YORK CASE -- AND

6    I'M NOT SURE IF YOU'RE GOING TO ANSWER THIS AS WELL,

7    MR. PANNER -- JUDGE BOASBERG FOUND THAT STATES HAVE STANDING TO

8    SUE ON BEHALF OF THEIR RESIDENTS.  SO WHY WOULDN'T CONSUMERS

9    AND ADVERTISERS THEMSELVES HAVE STANDING TO SUE?

10             MR. PANNER:  YOUR HONOR, I THINK THAT MS. MEHTA IS

11   GOING TO ADDRESS THE QUESTION OF ANTITRUST INJURY AND STANDING,

12   SO I'LL TURN THE MIC OVER TO HER.

13             MS. MEHTA:  YES, YOUR HONOR, THANK YOU.

14        SO WITH RESPECT -- LET ME SEPARATE OUT THE USERS AND THE

15   ADVERTISERS FOR PURPOSES OF THAT QUESTION.

16        WITH RESPECT TO THE USERS, THE ANTITRUST INJURY HERE --

17   AND THIS IS NOT A THEORY THAT WAS ARTICULATED BY THE STATE

18   A.G.S -- THE THEORY THAT HAS BEEN ARTICULATED BY THE PLAINTIFFS

19   HERE IS THAT THE USERS ARE SOMEHOW INJURED BECAUSE THEY GAVE

20   TIME AND ATTENTION TO FACEBOOK, AND WHAT THEY HAVE NOT

21   ARTICULATED ANYWHERE IS A SINGLE CASE OR A SINGLE HOLDING IN

22   WHICH A COURT HAS FOUND THAT THAT WOULD SATISFY THE INJURY

23   REQUIREMENT FOR BUSINESS OR PROPERTY, INJURY TO BUSINESS OR

24   PROPERTY UNDER THE ANTITRUST LAWS.

25             THAT IS A DISTINCT ISSUE FROM WHAT JUDGE BOASBERG WAS

1    DEALING WITH IN THE STATE A.G. CASE, WHICH WAS WHETHER THERE'S

2    PARENS PATRIAE STANDING UNDER ARTICLE III.

3         THAT IS DISTINCT FROM THIS QUESTION.  THIS IS AN ANTITRUST

4    INJURY QUESTION, AND THEY HAVE NOT CITED A SINGLE CASE TO

5    SUGGEST THAT THE THEORY THAT THEY ARE ARTICULATING IS

6    PLAUSIBLE, WHICH IS BECAUSE I TAKE A FREE PRODUCT AND I SPEND

7    TIME ON IT, SOMEHOW I'VE SUFFERED AN ECONOMIC INJURY, WHICH IS

8    WHAT IS REQUIRED FOR PURPOSES OF ANTITRUST INJURY, TOTALLY

9    DIFFERENT THAN THE PARENS PATRIAE ARTICLE III STANDING QUESTION

10   THAT JUDGE BOASBERG WAS RESPONDING TO.

11        AND THEN WITH RESPECT TO THE ADVERTISERS, THERE'S A

12   SEPARATE INJURY ISSUE WITH RESPECT TO THE ADVERTISERS, YOUR

13   HONOR, WHICH IS THEY ALLEGE THAT THEY'VE SUFFERED FROM

14   SUPRACOMPETITIVE PRICING, BUT -- I'M SORRY.  LET ME BREAK THIS

15   DOWN.

16        THERE ARE TWO ANTITRUST INJURY ISSUES WITH RESPECT TO

17   ADVERTISERS, ONE ON A SECTION 2 CLAIM AND THEN ONE ON A

18   SECTION 1 CLAIM.

19        WITH RESPECT TO THE SECTION 2 CLAIM, THEY ALLEGE THAT

20   THEIR INJURY IS BASED ON SUPRACOMPETITIVE PRICING.  BUT UNDER

21   JUDGE CHEN'S DECISION IN THE INTEL VERSUS FORTRESS GROUP CASE

22   FROM EARLIER THIS YEAR, THEY HAVE NOT PLED ANY FACTS THAT WOULD

23   MAKE THAT ALLEGATION PLAUSIBLE.  THEY HAVE NOT PLED ANYTHING

24   ABOUT THE PRICES THEY PAID, WHY THOSE PRICES WOULD BE

25   SUPRACOMPETITIVE, AND THAT'S INSUFFICIENT UNDER JUDGE CHEN'S

1    DECISION IN FORTRESS.

2         SEPARATELY, THE ADVERTISERS' SECTION 1 CLAIM SUFFERS FROM

3    AN ANTITRUST INJURY PROBLEM, BUT THAT'S THE SAME PROBLEM, WHICH

4    IS THEY HAVE NOT ARTICULATED WHAT THE INJURY TO THE ADVERTISER

5    CLASS HERE IS FROM THE GOOGLE NETWORK BIDDING AGREEMENT AND THE

6    ALLEGED ANTICOMPETITIVE EFFECTS OF THAT SECTION 1 AGREEMENT

7    BETWEEN GOOGLE AND FACEBOOK, WHICH GOVERNS ANTI -- WHICH

8    GOVERNS AD PURCHASES ON THE GOOGLE EXCHANGE, WHICH IS

9    INDEPENDENT FROM THE AD PURCHASES ON THE FACEBOOK PLATFORM,

10   WHICH IS ALL THAT THEY'RE ALLEGING TO HAVE DONE FOR PURPOSES OF

11   THIS CASE.  AND SO THERE'S A SEPARATE ANTITRUST INJURY CASE

12   ISSUE THERE.

13        THERE'S ALSO ESSENTIAL ENFORCER ISSUES AND OTHER ISSUES

14   WITH RESPECT TO THE GOOGLE NETWORK BIDDING AGREEMENT THAT WE GO

15   THROUGH IN OUR BRIEF, BUT I WON'T BELABOR THOSE UNLESS YOU HAVE

16   QUESTIONS ABOUT THOSE.

17             THE COURT:  ALL RIGHT.  THANK YOU.

18        LET ME ASK, ON THE INJUNCTIVE RELIEF, I'M NOW NOT REALLY

19   CLEAR ON WHAT EACH SET OF PLAINTIFFS IS REQUESTING.  SO IF WE

20   CAN -- LET'S START WITH THE CONSUMER PLAINTIFFS.  SO IF I LOOK

21   AT YOUR PRAYER FOR RELIEF, ARE YOU NOW WITHDRAWING SECTION B ON

22   PAGE 91?  OR YOU'RE NOT?  I'M JUST UNCLEAR.  I GUESS IT SAYS

23   OTHER EQUITABLE RELIEF, ALTHOUGH I DON'T KNOW WHAT YOU

24   ENVISION.

25        DO YOU HAVE ANY GUIDANCE ON THAT?

1          MR. SWEDLOW:  YES.  I'M SORRY, I'M JUST SCROLLING

2     DOWN TO PAGE 91 TO MAKE SURE I'M --

3          THE COURT:  AND I DIDN'T SEE, IN THE SUPPLEMENTAL

4     BRIEF, CONSUMERS ACTUALLY CHANGING WHAT YOU'RE REQUESTING.  SO

5     MAYBE THIS IS REALLY JUST A QUESTION FOR THE ADVERTISERS.

6          MR. SWEDLOW:  I DON'T THINK WE'RE CHANGING OUR

7     INJUNCTIVE RELIEF, INJUNCTIVE AND OTHER EQUITABLE RELIEF

8     REQUEST.

9          THE COURT:  OKAY.

10          MR. SWEDLOW:  I DON'T THINK IT -- I THINK IT'S TOO

11     EARLY IN THE CASE TO SAY WHAT INJUNCTIVE RELIEF WOULD BE

12     APPROPRIATE BECAUSE WE HAVEN'T PROVEN OUR CASE YET.  I WILL

13     CONCEDE THAT TO FACEBOOK.  WE'VE PLED OUR CASE.

14          SO I APOLOGIZE IF THIS IS -- IF IT'S AMORPHOUS RIGHT NOW,

15     BUT WE INCLUDED IT AS A PRAYER FOR RELIEF AND BELIEVE THAT WE

16     ADEQUATELY PLED THAT PRAYER.

17          BUT I DON'T THINK WE'RE ENTITLED TO INJUNCTIVE AND OTHER

18     EQUITABLE RELIEF UNTIL WE PROVE OUR CASE.

19          THE COURT:  OKAY.  THEN I PROBABLY SHOULD HAVE JUST

20     ADDRESSED THIS QUESTION TO THE ADVERTISERS, BECAUSE IN THE

21     SUPPLEMENTAL BRIEF, YOU HAVE ONE SENTENCE ON PAGE 5 THAT SAYS,

22     "BECAUSE ADVERTISERS DO NOT SEEK INJUNCTIVE RELIEF BASED ON THE

23     PLATFORM OR ACQUISITION CONDUCT ALLEGED BY THE STATES, THE

24     D.D.C.'S LACHES ANALYSIS IS IRRELEVANT."

25          SO IS THIS THE STATEMENT THAT, MR. BATHAEE, YOU WERE

1   REFERRING TO EARLIER -- ALTHOUGH I DON'T KNOW WHO'S GOING TO

2   ADDRESS THIS QUESTION, WHETHER IT'S YOU OR MS. ANDERSON -- IS

3   THAT THE STATEMENT THAT YOU WERE REFERRING TO EARLIER, THAT YOU

4   WERE WITHDRAWING SOME PRAYER FOR INJUNCTIVE RELIEF?

5           MR. BATHAEE:  YES, YOUR HONOR, THAT'S THE STATEMENT

6   ON PAGE 5.  WE -- WE ARE ONLY SEEKING TREBLE DAMAGES IN THIS

7   SUIT.

8           THE COURT:  OKAY.  SO IF I LOOK AT YOUR PRAYER FOR

9   RELIEF, WHICH IS ON PAGE 127, ARE YOU THEN WITHDRAWING REQUEST

10  F WHICH SAYS "GRANT PERMANENT INJUNCTIVE RELIEF PURSUANT TO

11  SECTION 16 OF THE CLAYTON ACT TO REMEDY THE ONGOING

12  ANTICOMPETITIVE EFFECTS OF DEFENDANT'S UNLAWFUL CONDUCT"?  ARE

13  YOU WITHDRAWING ALL OF F, OR JUST PART OF F, OR CAN YOU PROVIDE

14  SOME GUIDANCE?

15          MR. BATHAEE:  WE SEEK NO INJUNCTIVE RELIEF IN THIS

16  SUIT.

17          THE COURT:  OKAY.  SO THAT'S NOW GONE?

18          MR. BATHAEE:  YES.

19          THE COURT:  OKAY.  ALL RIGHT.  THANK YOU FOR THE

20  CLARIFICATION.

21      OKAY.  FIRST OF ALL, I WANT TO THANK EVERYBODY FOR A VERY

22  HELPFUL HEARING.  I APPRECIATE YOUR PATIENCE WITH ALL OF MY

23  QUESTIONS.

24      I'M NOW GOING TO GIVE EACH PARTY TWO MINUTES, AND THIS IS

25  GOING TO BE TIMED, AND I PERSONALLY THINK ADDRESSING THE TIME

1    BAR ISSUES WOULD BE PARTICULARLY HELPFUL.

2         BUT I AM GIVING YOU THE FLOOR FOR TWO MINUTES, SO IF YOU

3    WANT TO TALK ABOUT SOMETHING ELSE, YOU'RE WELCOME TO DO THAT.

4         SO LET'S JUST GO DOWN THE LINE.  WHO WANTS TO GO FIRST?

5    TWO MINUTES, AND I'M JUST GOING TO TIME IT.  YOU KNOW, IN TRIAL

6    I DO IT OFF THE REALTIME, BUT I DON'T HAVE THAT REALTIME

7    TRANSCRIPT RIGHT NOW, SO I CAN'T -- I'LL JUST HAVE TO USE THE

8    COMPUTER.

9         WHO WANTS TO GO FIRST?

10        MR. DUNNE:  YOUR HONOR, I'M HAPPY TO GO FOR THE

11   ADVERTISERS.

12        THE COURT:  OKAY.  TIME IS 3:53.  GO AHEAD, PLEASE.

13        MR. DUNNE:  I'D LIKE TO ADDRESS THREE ISSUES VERY

14   QUICKLY.

15        THE FIRST IS ON TIMELINESS.  WE THINK THAT FRAUDULENT

16   CONCEALMENT IS REALLY THE KEY HERE THAT ALLOWS US TO BE TIMELY

17   WITH REGARD TO THE FREEMAN DECISION IN REVEAL CHAT.

18        AS MR. BATHAEE ARGUED, WE BELIEVE THAT THE -- THAT THE

19   CONSTRUCTIVE KNOWLEDGE ANALYSIS IS INCORRECT, BUT ALSO UNDER

20   HER OWN OPINION, THAT THERE'S A DISTINCTION FOR THE TYPE OF

21   INJURY HERE AS AN OVERCHARGE.

22        SECONDLY, ON MARKET DEFINITION, I WANT TO BE CLEAR, OUR

23   MARKET DOES NOT SAY THAT THERE'S NO TARGETING BY OTHER TYPES OF

24   ADVERTISING.  IN FACT, ALL ADVERTISING INHERENTLY TARGETS

25   PEOPLE.

```
 1            THE ISSUE -- THE BASIC POINT IS THAT IT'S NOT REASONABLY

 2   SUBSTITUTABLE THE TYPES OF TARGETING THAT ARE AVAILABLE BETWEEN

 3   SOCIAL ADVERTISING AND DISPLAYING SEARCH ADVERTISING DURING THE

 4   OVERCHARGE PERIOD, AND THAT AS THOSE TYPES OF TARGETING BECAME

 5   POTENTIALLY CROSS SUBSTITUTABLE FOR CONSUMERS, THAT'S WHEN

 6   FACEBOOK AND GOOGLE CUT A DEAL.

 7            AND THE FINAL THING IS THAT IN PARAGRAPH 154 OF THE

 8   COMPLAINT, THERE'S A GOOD -- THERE'S SOME GOOD ALLEGATIONS ON

 9   THE REFUSAL TO DEAL.

10            AND THAT'S ALL FROM ADVERTISERS, YOUR HONOR.  WE

11   APPRECIATE YOUR TIME.

12            THE COURT:  ALL RIGHT.  THANK YOU.

13   YOU ONLY USED A MINUTE.

14            MR. DUNNE:  I THINK WE'RE FINE.

15            THE COURT:  YOU'RE SATISFIED?  ALL RIGHT.  THANK YOU.

16   I APPRECIATE YOU USING LESS THAN THE TIME ALLOCATED.

17       OKAY.  MS. MEHTA, YOU WANT TO GO?

18            MS. MEHTA:  THANK YOU, YOUR HONOR, CERTAINLY.

19            THE COURT:  BRIEFLY.  GO AHEAD, PLEASE.

20            MS. MEHTA:  THANK YOU, YOUR HONOR.

21       I WANT TO START BY TALKING ABOUT SOMETHING WE DIDN'T

22   ACTUALLY HAVE A CHANCE TO TALK ABOUT TODAY BECAUSE I THINK IT

23   FRAMES A LOT OF THE ISSUES, INCLUDING THE STATUTE OF

24   LIMITATIONS ISSUE, AND THAT IS THE CORE THEORY THAT THE USERS

25   ARE PRESENTING, WHICH IS A PRIVACY THEORY AND NOT AN ANTITRUST
```

1    CASE.

2         WHAT MATTERS IN AN ANTITRUST CASE IS THE EFFECT ON

3    COMPETITION.  WHATEVER FACEBOOK IS ALLEGED TO HAVE DONE OR NOT

4    DONE WITH RESPECT TO ITS PRIVACY POLICIES, WHATEVER THE

5    SO-CALLED REVELATIONS ARE THAT MR. SWEDLOW WOULD WANT TO TALK

6    ABOUT, WHICH WE DON'T AGREE WITH THAT, BUT WHATEVER THOSE

7    ALLEGATIONS ARE, NONE OF THAT MAKES PLAUSIBLE THEIR CORE

8    THEORY, WHICH IS THAT COMPETITORS LIKE GOOGLE PLUS, MYSPACE,

9    SNAPCHAT, WHOEVER ELSE THAT WOULD FALL WITHIN THEIR MARKET

10   COULD NOT EFFECTIVELY COMPETE BY OFFERING THEIR OWN PRIVACY

11   PROTECTIVE PRODUCTS.

12        THAT IS THE FUNDAMENTAL THEORY THAT IS OFFERED BY THE

13   USERS AND IT IS THE FUNDAMENTAL PROBLEM WITH THEIR THEORY.

14        THEIR OWN COMPLAINT IDENTIFIES MYRIAD OTHER REASONS FOR

15   FACEBOOK'S SUCCESS AND DOES NOTHING TO EXPLAIN WHY THE SUPPOSED

16   PRIVACY DECEPTION THEORY, STATEMENTS WHICH ARE GENERAL AND FALL

17   FAR SHORT OF THE 9(B) STANDARD, WOULD ACTUALLY GIVE RISE TO AN

18   ANTITRUST CLAIM.

19        RELATED TO THAT, I WANT TO ADDRESS THE FRAUDULENT

20   CONCEALMENT AND THE TIMELINESS OF THOSE CLAIMS.

21        THE USERS' DECEPTION THEORY IS BASED ON EVENTS THAT GO

22   BACK AS FAR AS 2007, AND WHEN WE LOOK AT THE SPECIFIC

23   ALLEGATIONS, THERE'S NOTHING IN THOSE ALLEGATIONS THAT ACTUALLY

24   SAYS THAT WE -- THAT SUGGESTS THAT ANYTHING THAT WE SAID WAS

25   NOT TRUE AS TO THE SPECIFIC COMPLAINTS THEY'RE MAKING.

1          WE WERE UP FRONT ABOUT WHAT WE WERE GOING TO DO, WE'RE

2     GOING TO DO IT, AND THERE'S NOTHING IN THE PRIVACY ALLEGATIONS

3     THAT THEY'VE CLAIMED, OR THE SUPPOSED FRAUDULENT CONCEALMENT

4     ALLEGATIONS, THAT GO TO THE CORE THEORY IN THE CASE.

5          THE FINAL THING IS ANTITRUST INJURY.  I'D ASK YOUR HONOR

6     TO TAKE A REALLY HARD LOOK AT THAT BECAUSE THIS IS A NOVEL

7     THEORY THAT'S NEVER BEEN PRESENTED BY ANYONE BEFORE AND NEVER

8     ACCEPTED BY ANY COURT.

9          AND THEN IN MY LAST FIVE SECONDS, I JUST WANT TO GIVE YOU

10    THREE CITATIONS.  THERE ARE TWO, AT LEAST TWO CASES THAT I WAS

11    ABLE TO FIND JUST IN THE LAST HOUR IN WHICH THE DISTRICT COURT

12    HAS REJECTED FRAUDULENT CONCEALMENT ALLEGATIONS ON THE

13    PLEADINGS.

14          THE COURT:  YOU'RE GOING INTO THREE MINUTES, BUT I'LL

15     LET YOU FINISH.  BUT I WILL GIVE THE OTHER SIDE EQUAL TIME.

16     GO AHEAD, PLEASE.

17          MS. MEHTA:  CERTAINLY.  I JUST WANT TO GIVE YOUR

18     HONOR THE CITATION.

19          THE COURT:  GO AHEAD, PLEASE.

20          MS. MEHTA:  I APOLOGIZE.  THIBODEAUX VERSUS TEAMSTERS

21     LOCAL 853 AT 263 F.SUPP 3D 722, THAT'S A 2017 N.D. CAL CASE;

22     MEDIOSTREAM VERSUS MICROSOFT --

23          THE COURT:  OKAY.  CAN I ASK YOU ONE QUICK QUESTION?

24     I'M SORRY TO INTERRUPT.  ARE THESE CASES THAT ARE ALREADY IN

25     YOUR BRIEFS OR NEW CITES?

1          MS. MEHTA:  NO, THESE ARE NEW CITES THAT RELATE TO

2     THE POINT THAT MR. BATHAEE MADE THAT COURTS DON'T DISMISS

3     CLAIMS ON FRAUDULENT CONCEALMENT AT THE PLEADING STAGE.

4          THE SECOND CITATION IS MEDIOSTREAM VERSUS MICROSOFT,

5     869 F.SUPP 2D AT 1095, THAT'S AN N.D. CAL CASE FROM 2012.

6          THOSE ARE JUST THE TWO I FOUND OVER THE COURSE OF THE

7     HEARING, AND THEN OF COURSE THERE'S JUDGE FREEMAN'S DECISION IN

8     REVEAL CHAT.

9          THE COURT:  ALL RIGHT.  THANK YOU.

10          MS. MEHTA:  THANK YOU, YOUR HONOR.

11          THE COURT:  ALL RIGHT.  3:58.  ACTUALLY, YOU GOT FOUR

12     MINUTES.

13          MS. MEHTA:  WELL, THERE'S TWO OF THEM.

14          THE COURT:  I'M SORRY?

15          MS. MEHTA:  I WAS JUST JOKING, YOUR HONOR.  I WAS

16     JUST SAYING THERE ARE TWO ADVERTISERS.

17          THE COURT:  NO, THAT'S FINE.  THAT'S FINE.

18          LET ME ASK THE ADVERTISERS, YOU ONLY USED A MINUTE, AND

19     NOW IT'S GOING TO GO TO FOUR MINUTES.  DO YOU WANT ANY

20     ADDITIONAL TIME, OR NOT?

21          MR. DUNNE:  I'D LIKE 15 SECONDS, YOUR HONOR.

22          THE COURT:  GO AHEAD, PLEASE.

23          MR. DUNNE:  SO MS. MEHTA APPEARS TO HAVE

24     MISUNDERSTOOD WHAT MR. BATHAEE WAS SAYING, WHICH IS THAT WE

25     FOUND NO CASE OTHER THAN REVEAL CHAT IN WHICH A COURT FOUND A

1    FACTUAL INQUIRY MIGHT LEAD TO CONSTRUCTIVE NOTICE TO HAVE BEEN

2    SATISFIED AT THE PLEADINGS, NOT THAT NO CASE HAS EVER FOUND

3    THAT THERE CAN'T BE FRAUDULENT CONCEALMENT ON THE PLEADINGS,

4    BECAUSE OF COURSE THAT'S CERTAINLY TRUE.

5        SO THAT'S THE INQUIRY THAT WE WERE FRAMING UNDER CONMAR

6    AND OTHER CASES, THAT IT'S THE ACTUAL, RIGHT, IT'S THE ACTUAL

7    CONSTRUCTIVE KNOWLEDGE INQUIRY THAT'S FACT BASED.

8        AND WITH THAT, YOUR HONOR, THAT'S ALL WE HAVE.

9        THE COURT:  OKAY.  3:58 TO 3:59.

10       ALL RIGHT.  MR. SWEDLOW, YOU WANT TO GO FOR THE CONSUMERS?

11       MR. SWEDLOW:  SURE.

12       THE COURT:  ALL RIGHT.  3:59.  GO AHEAD, PLEASE.

13       MR. SWEDLOW:  I'M GOING TO TAKE OUT A CATEGORY

14   AGAINST YOUR SUGGESTION JUST BECAUSE OF THE WAY FACEBOOK

15   PRESENTED THEIR ARGUMENT, AND I'D LIKE TO ADDRESS OR AT LEAST

16   EXPLAIN WHAT OUR ANTITRUST STANDING AND INJURY ARGUMENT

17   ACTUALLY IS.

18       MS. MEHTA SAID THAT WE ARE SEEKING -- WE'RE ALLEGING THAT

19   OUR -- THAT THE TIME AND ATTENTION OF THE USERS IS THE INJURY

20   FOR PURPOSES OF STANDING.

21       BUT WE'RE -- THE KEY WORD WAS DROPPED OUT IN THE 100 PAGES

22   OF OUR COMPLAINT THAT TALK ABOUT DECEPTION RELATING TO USER

23   DATA JUST WASN'T MENTIONED.

24       THE ANTITRUST INJURY AND THE ANTITRUST STANDING ARE BASED

25   UPON THE FACT THAT FACEBOOK DECEIVED, LIED, AND STOLE USER

1    DATA.

2         WITHIN THE MODERN ECONOMY, ENTITIES PAY FOR USER DATA.

3    THE WAY FACEBOOK PAYS FOR USER DATA IS TO PROVIDE A SERVICE AND

4    PRODUCT THAT USERS WANT.

5         THEY ALSO INVEST TIME AND ATTENTION, BUT WHAT WAS DECEIVED

6    AND STOLEN HERE -- WHAT WAS STOLEN THROUGH DECEPTION HERE IS

7    THE DATA AND THE EXTENSIVE USE OF THE DATA.

8         WHAT -- I WOULD DIRECT YOU TO PARAGRAPH 224 WHICH TALKS

9    ABOUT WHAT FACEBOOK RESORTED TO WHEN IT COULD NO LONGER STEAL

10   THE DATA THROUGH THE APP THAT IT GOT CAUGHT USING FOR THAT

11   PURPOSE, AND FACEBOOK STARTED OFFERING $20 A MONTH TO BUY

12   PEOPLE'S DATA.  SO THIS THING THAT FACEBOOK STOLE THROUGH

13   DECEPTION IS VALUABLE.

14        THE SUPREME COURT ESTABLISHED IN 1979 IN REITER VS.

15   SONOTONE, I THINK, 442 U.S. 330, THAT ANTITRUST STANDING OR

16   HARM TO PROPERTY IS BROAD AND INCLUSIVE AND COMPREHENDS

17   ANYTHING OF MATERIAL VALUE OWNED OR POSSESSED.

18        SO WHAT WAS TAKEN HAD VALUE.  USER DATA HAS VALUE.  IT'S

19   ACTUALLY PRECIOUS.  PARAGRAPH 109 IDENTIFIES IT AS THE SECRET

20   SAUCE.  IT'S THE WAY FACEBOOK BECAME FACEBOOK IS THAT IT COULD

21   ACCESS THAT DATA, MONETIZE IT, SELL IT, AND USE IT FOR UNIQUE

22   AND VERY EXTENSIVE ADVERTISING.

23        THAT'S SEPARATE FROM THE OTHER ISSUE, WHICH IS ANTITRUST

24   INJURY.  FACEBOOK HARMED COMPETITION BECAUSE IT WASN'T PAYING

25   FOR THE DATA OR THE RAW MATERIALS THAT IT TOOK FROM USERS.

1          IT ALSO DIDN'T HAVE TO ACTUALLY IMPROVE THE QUALITY OF THE

2     SERVICE THAT IT OFFERED TO KEEP USERS BECAUSE IT WASN'T PAYING

3     FOR THE DATA THAT IT WAS TAKING FROM THOSE USERS WITHOUT

4     COMPENSATION.

5          AND THEN THE THIRD THING, WHICH IS THE LARGER PART OF THE

6     BUCKET, IS THAT FACEBOOK ELIMINATED THE COMPETITION BY UNFAIRLY

7     COMPETING WITH THAT DATA, AND THAT'S SORT OF THE METHOD BY

8     WHICH FACEBOOK PROFITED AND HARMED COMPETITION THROUGH THE

9     DECEPTION.

10         BUT THIS ISN'T SOME UNIQUE THEORY.  THIS IS THE THEORY.

11         TURNING TO, TO THE OTHER PART, WHICH IS THE TIME BAR OR

12    STATUTE OF LIMITATIONS, IF PLAINTIFFS GET TO DECEMBER OF 2016

13    UNDER THE STATUTE OF LIMITATIONS, WE THEN HAVE FOUR YEARS TO

14    FILE OUR CLAIM, WHICH IS WHAT WE DID.

15         FACEBOOK SAID THAT THEY WERE UP FRONT ABOUT EVERYTHING

16    THAT THEY DID.

17         THAT SIMPLY ISN'T BELIEVABLE OR PLAUSIBLE.

18    CAMBRIDGE ANALYTICA WAS A GIANT REVELATION.  IT WASN'T MY

19    REVELATION.  I DIDN'T FIND IT OUT.  D.O.J. DIDN'T SUE FACEBOOK

20    FOR LYING ABOUT ITS PRIOR FTC CONSENT DECREE.  FACEBOOK DIDN'T

21    PAY $5 BILLION BECAUSE IT WAS TOTALLY UP FRONT ABOUT WHAT IT

22    DID.  THE U.K. DIDN'T INVESTIGATE THEM AND DETERMINE NOBODY

23    COULD HAVE KNOWN WHAT FACEBOOK WAS DOING.

24              THE COURT:  CAN I ASK YOU A QUESTION?  WHAT IS YOUR

25     ANSWER THAT THIS IS REALLY A PRIVACY CASE?  I GUESS YOUR ANSWER

1        IS STILL THE SAME AS WHAT YOU'VE ALREADY SAID.

2              MR. SWEDLOW:  IT ISN'T A PRIVACY CASE, BUT THE

3        DECEPTION RELATES TO PRIVACY.

4              WHAT FACEBOOK KNOWS, AND WE -- AND IT'S NOW REVEALED -- IS

5        THAT PEOPLE FEELING SAFE AND SECURE ABOUT THEIR DATA AND USING

6        IT ON FACEBOOK IS THE SECRET SAUCE OF FACEBOOK.

7              WHAT FACEBOOK DID -- IT'S NOT A PRIVACY CASE BECAUSE WHAT

8        FACEBOOK DID WAS HARM COMPETITION BY DECEPTIVELY TAKING

9        PEOPLE'S DATA AND USING IT IN AN ANTICOMPETITIVE WAY.

10             SO FACEBOOK WOULD LIKE TO CALL IT A PRIVACY CASE, BUT IT'S

11       AN ANTITRUST CASE WHERE THE PLAINTIFF CLASS HAS ANTITRUST

12       STANDING, AND WE'VE ADEQUATELY ALLEGED ANTITRUST INJURY.  IT

13       JUST ISN'T A PRIVACY CASE BECAUSE THE DECEPTION RELATES TO

14       PRIVACY.  THEY SIMPLY CAN'T MAKE US PLEAD IT THE WAY THAT THEY

15       WOULD LIKE IT TO BE PLED.

16             THE COURT:  I SEE.  ALL RIGHT.  IT'S 4:03.  THAT WAS

17       FOUR MINUTES.

18             OKAY.  THANK YOU ALL.

19             OH, MS. MEHTA, DID YOU WANT TO SAY SOMETHING?

20             MS. MEHTA:  I WANTED TO TAKE TEN SECONDS, BUT ONLY IF

21       YOUR HONOR WILL GIVE IT TO ME.

22             THE COURT:  GO AHEAD.  GO AHEAD.

23             MS. MEHTA:  THANK YOU.

24             I WANT TO BE REALLY CLEAR ABOUT SOMETHING.  IT'S NOT A

25       PRIVACY -- A PRIVACY CASE DOESN'T BECOME AN ANTITRUST CASE

```
1       BECAUSE MR. SWEDLOW SAID SOMETHING.

2            WHEN I SAID WE WERE UP FRONT ABOUT THINGS, THE CORE THEORY

3       IS THAT SOMEHOW THE USAGE OF USER DATA TO TARGET ADVERTISING IS

4       ANTICOMPETITIVE.

5            THAT IS SOMETHING THAT PEOPLE HAVE KNOWN FOR A LONG TIME.

6       FACEBOOK HAS NOT BEEN ALLEGED HERE, AND THERE'S NOTHING IN

7       THEIR COMPLAINT TO SUGGEST THAT FACEBOOK EVER SAID WE WON'T USE

8       DATA TO TARGET ADVERTISING IN THE SAME WAY THAT SEARCH ENGINES

9       AND OTHER TECHNOLOGY COMPANIES DO.  THAT WAS MY POINT.

10           WHAT MR. SWEDLOW STILL HAS NOT IDENTIFIED IS A SINGLE CASE

11      TO SUPPORT THEIR ANTITRUST INJURY THEORY, OR TO SUPPORT THE

12      DECEPTION THEORY, WHICH EVEN IF YOU TAKE ALL THEIR ALLEGATIONS

13      AT FACE VALUE, TO SOMEHOW MAKE CREDIBLE THE THEORY THAT ALL OF

14      THESE SUPPOSED STATEMENTS ABOUT PRIVACY MEANT THAT COMPANIES

15      LIKE GOOGLE COULDN'T COMPETE IN THE RELEVANT MARKETS, THERE'S A

16      FUNDAMENTAL PROBLEM WITH THAT THEORY.  IT DOESN'T MAKE ANY

17      SENSE.

18               THE COURT:  ALL RIGHT.  I'M GOING TO LET MR. SWEDLOW

19      RESPOND ALSO FOR --

20               MR. SWEDLOW:  I'LL TRY TO GO FOR -- IF THAT WAS TEN

21      SECONDS, I'LL GO FOR THAT SAME TEN SECONDS.

22           FACEBOOK WOULD LIKE OUR ALLEGATIONS TO BE DIFFERENT THAN

23      THEY ARE, FOR EXAMPLE, WE'RE NOT ACTUALLY ALLEGING THE INJURIES

24      RELATED TO TIME AND ATTENTION, AND WE'RE NOT ACTUALLY ALLEGING

25      THAT THE LAWFUL USE OF DATA TO PROVIDE TARGETED ADVERTISING WAS
```

1    DECEPTIVE OR ANTICOMPETITIVE.

2         THAT'S WHAT FACEBOOK SAID IT WAS GOING TO DO.  FACEBOOK

3    DID THAT AND THAT'S LEGAL.

4         WHAT FACEBOOK ALSO DID WITH ITS ILLEGALLY OBTAINED DATA

5    AND DATA THAT WAS NOT DISCLOSED AS BEING COLLECTED AND USED AND

6    SOLD IS UNLAWFULLY COMPETE BY KEEPING USERS AND MAINTAINING

7    MARKET DOMINANCE BY ELIMINATING COMPETITION AND BY NOT HAVING

8    TO PROVIDE A BETTER PRODUCT TO KEEP USERS ENGAGED.

9         IT ISN'T THE LAWFUL USE OF THE DATA THAT WAS THE ACTUAL

10   DEAL WITH USERS.

11        IT'S THE UNLAWFUL COLLECTION AND USE OF THE DATA THAT

12   COULDN'T HAVE BEEN KNOWN UNTIL MARCH OF 2018 WHEN ALL OF THIS

13   CAME TO LIGHT.  THAT'S -- IT'S SIMPLY WE'RE NOT TARGETING THE

14   LEGAL USE OF DATA OR THE DEAL THAT USERS ACTUALLY ENTERED INTO

15   WITH FACEBOOK.  THAT'S FACEBOOK'S LEGAL BUSINESS.

16        IT'S THE ANTICOMPETITIVE PORTION OF THEIR BUSINESS BASED

17   ON DECEPTION.

18             THE COURT:  ALL RIGHT.

19        I WANT TO THANK YOU ALL VERY MUCH.  THIS WAS EXTREMELY

20   HELPFUL, AND THANK YOU FOR YOUR PATIENCE WITH ALL OF MY

21   QUESTIONS.

22        ALL RIGHT.  THANK YOU ALL.  TAKE CARE.

23             MS. MEHTA:  THANK YOU, YOUR HONOR.

24             THE COURT:  THANK YOU.  BYE-BYE.

25             MR. SWEDLOW:  THANK YOU, YOUR HONOR.

1          MR. BATHAEE:  THANK YOU, YOUR HONOR.

2          THE CLERK:  THANK YOU.  COURT IS ADJOURNED.

3       (THE PROCEEDINGS WERE CONCLUDED AT 4:06 P.M.)

1

2

3                    CERTIFICATE OF REPORTER

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF ZOOM PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16   _____

     LEE-ANNE SHORTRIDGE, CSR, CRR
17   CERTIFICATE NUMBER 9595

18         DATED:  JULY 26, 2021

19

20

21

22

23

24

25