UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAXIMILIAN KLEIN, et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>META PLATFORMS, INC.,<br><br>  Defendant. | Case No. 20-cv-08570-JD (VKD)<br><br>**ORDER RE DISPUTE RE DEFENDANT'S AUGUST 20, 2021 CLAWBACK NOTICE**<br><br>**REDACTED VERSION**<br><br>Re: Dkt. No. 188 |

Plaintiffs move to compel defendant Meta Platforms, Inc. (formerly, Facebook, Inc.)[1] to produce in unredacted form several email communications that Meta clawed back from production asserting attorney-client privilege pursuant to the parties' stipulated Federal Rule of Evidence 502(d) Clawback Order (Dkt. No. 107).[2]  The Court heard oral argument on the motion on December 14, 2021.

For the reasons explained below, the Court concludes that Meta may not withhold a portion of disputed communication R5 from production, but rejects plaintiffs' remaining challenges to the August 20, 2021 clawback notice.

## I.  BACKGROUND

This dispute concerns nine emails or portions of emails that are part of an extended email exchange on April 8-9, 2018. *See* Dkt. No. 188, Exs. C-E (redacted).  Meta has labeled the

---

[1] The case caption was amended February 1, 2022 to reflect that Facebook changed its name to "Meta Platforms." For convenience, the Court refers to defendant as "Meta" even as to events occurring before the name change.

[2] This order has been superseded by a First Amended Federal Rule of Evidence 502(d) Clawback Order, filed on November 12, 2021.  Dkt. No. 191.

1   redacted email communications "R1" through "R9," and has provided unredacted versions of

2   these emails to the Court for in camera review.

3         The email exchange begins with an inquiry from Josh Constine, a journalist with the online

4   publication TechCrunch, to ▓▓▓▓, then a Meta corporate communications manager.  Dkt.

5   No. 198 at 2.  The email from Mr. Constine says:

> Hello,
>
> I'm working on a story to be published this evening about Facebook's history of removing Find Friends access from apps that replicate core functionality or don't share content back.
>
> Can you provide a list of apps that have had this happen?  I know of Twitter, Vine, Voxer, MessageMe, Wonder, Phhhoto (cut off by Instagram), and Path (cut off for spamming uploaded phone contacts).
>
> Does Facebook have a statement about why its policy states "You may not use Facebook Platform to promote, or to export user data to, a product or service that replicates a core Facebook product or service without our permission" (now listed as "Don't replicate core functionality that Facebook already provides." in the TOS)?  How does Facebook respond to the criticism that if users want to share their friend list with another app and find their friends there, that Facebook blocking that is both anti-competitive and hurts users by reducing data portability?
>
> What is Facebook's explanation for not allowing the Download Your Information export of friends' email addresses that are visible to a user on those friends' profiles?
>
> Thanks,

Dkt. No. 195-1, Ex. C at ECF 36-37.  According to Meta, the inquiry from Mr. Constine came at a time of intense public scrutiny of Meta's API and data access policies.  Dkt. No. 198 at 2-3.  At that time, Meta also was defending against several lawsuits challenging aspects of these same policies.  *Id.*

▓▓▓▓ forwarded the TechCrunch inquiry to five other Meta communications employees and also copied Rebecca Hahn, a partner at a marketing agency called The OutCast Agency ("OutCast"), with the question: "Who's the right person to handle this?"  Dkt. No. 195-1 at 7.  The email was then forwarded to several members of Meta's in house legal team as well as other Meta employees.  *Id.*  Ms. Hahn was the only person not employed by Meta included in this email

1    exchange.

2          Meta describes each of the redacted email communications, R1-R9, in its privilege log as

3    "Email seeking and providing legal advice regarding Facebook's API/platform policies." Dkt. No.

4    195-1, Ex. B. Each of the redacted communications was authored by and/or expressly directed to

5    at least one of Meta's in house counsel: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6    ▮▮▮▮▮. Ms. Hanh was copied on each redacted communication.

7          Meta produced the April 8-9, 2018 email exchange to plaintiffs on May 3, 2021. Dkt. No.

8    198 at 4-5. These emails were among approximately 12 million pages of documents that Meta

9    previously produced to the FTC in response to a civil investigative demand in 2019, which the

10   presiding district judge ordered Meta to re-produce to plaintiffs in this action. *See* Dkt. No. 82 at

11   1.

12         In August 2021, the FTC alerted Meta that it had identified a communication in the April

13   8-9, 2018 email exchange as potentially privileged. Dkt. No. 198 at 1. Meta advised the FTC that

14   it believed the communication and others in the same email thread were privileged and clawed

15   them back from its production to the FTC. *Id.* at 1-2. Shortly thereafter, Meta sent a clawback

16   notice for the same communications to plaintiffs in this action. *Id.* at 2.

17   **II.  LEGAL STANDARD**

18         As this action is premised on federal question jurisdiction, federal common law governs

19   issues of privilege. Fed. R. Evid. 501; *United States v. Ruehle*, 583 F.3d 600, 608 (9th Cir. 2009).

20         "The attorney-client privilege protects confidential communications between attorneys and

21   clients, which are made for the purpose of giving legal advice." *United States v. Sanmina Corp.*,

22   968 F.3d 1107, 1116 (9th Cir. 2020). The privilege extends to a client's confidential disclosures

23   to an attorney in order to obtain legal advice, as well as an attorney's advice in response to such

24   disclosures. *Ruehle*, 583 F.3d at 607 (citations and quotations omitted). "Because it impedes full

25   and free discovery of the truth, the attorney-client privilege is strictly construed." *Id.* (citations

26   and quotations omitted).

27         In the Ninth Circuit, whether information is protected by the attorney-client privilege is

28   determined using an eight-part test:

United States District Court
Northern District of California

>(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

*Sanmina*, 968 F.3d at 1116. Where a communication has more than one purpose, it may be protected as privileged if the primary purpose of the communication is to give or receive legal advice, as opposed to business or some other non-legal advice. *In re Grand Jury*, 13 F.4th 710, 714 (9th Cir. 2021) (describing and adopting the "primary purpose" test for dual-purpose communications).

The party asserting attorney-client privilege bears the burden of proving that the privilege applies. *Ruehle*, 583 F.3d at 608.

## III.    DISCUSSION

Plaintiffs challenge Meta's clawback of the disputed communications on three grounds. First, plaintiffs argue that the communications are not privileged because they were not made for the purpose of giving legal advice. Second, plaintiffs argue that the communications were not made in confidence between an attorney and client because Ms. Hanh, a non-employee, was a party to each communication. Third, plaintiffs argue that Meta waived any privilege over these communications by producing them in unredacted form to the FTC. The Court considers each argument.

### A.    Purpose of the Redacted Communications

Plaintiffs do not have access to the disputed communications. However, based on the unredacted portions of the April 8-9, 2018 email exchange, plaintiffs argue that the communications were made for the purpose of providing public relations support in response to an inquiry from the press—i.e., for a business purpose, and not for the purpose of giving or receiving legal advice. Dkt. No. 195-1 at ECF 12. They point out that the email exchange begins with an inquiry from a TechCrunch journalist to a Meta communications manager about Meta's data access policies, and is followed shortly thereafter by an email from the communications manager to all others in the email exchange attaching a copy of the published article and stating: "Here's where this netted out thus far . . . ." *Id.* at 7-8. Plaintiffs argue that Meta cannot demonstrate that

4

the disputed communications were made primarily for the purpose of giving or obtaining legal advice.

Meta responds that the press inquiry concerned an issue that was then the subject of active litigation. In particular, Meta's response to criticism that its conduct was "anti-competitive" and "hurts users" would have legal implications for Meta. Dkt. No. 198 at 6. Meta notes that, as a general matter, it coordinates its response to press inquiries with its legal team because the company's public statements may be deemed admissions in litigation, and it says this concern was especially salient for an inquiry about Meta's API and data access policies. *Id.* Meta observes that the email exchange includes communications relating to both business matters and legal advice, and that it has redacted only those portions of the exchange that include communications relating to legal advice. *Id.* at 7, 8 n.6.

The Court has reviewed the disputed communications in camera and in context with the unredacted portions of the email exchange. Based on that review, as well as a careful consideration of the parties' submissions, the Court concludes that the disputed communications were made for the primary purpose of giving or receiving legal advice. As noted above, all of these communications were authored by and/or directed to at least one of Meta's in house counsel. While some of the disputed communications include information that might be considered factual and therefore not privileged, including a description of other companies' policies and references to Meta's prior public statements about its own policies, the disputed communications as a whole concern the giving and receiving of legal advice regarding Meta's response to the press inquiry. *See Upjohn Co. v. United States*, 449 U.S. 383, 395-96 (1981) ("A fact is one thing and a communication concerning that fact is an entirely different thing.") (quotations and citation omitted); *see also In re Bisphenol-A (BPA) Polycarbonate Plastic Prod. Liab. Litig.,* No. 08-1967-MD-W-ODS, 2011 WL 1136440, at *8 (W.D. Mo. Mar. 25, 2011) ("[T]he Court is unwilling to parse out 'privileged parts' of documents from 'unprivileged parts'—at least, as here, where it does not appear that privileged information was included merely to prevent disclosure of non-privileged matters."). Of course, the underlying facts about how Meta handled data access issues are not privileged, even if these communications are. *Upjohn*, 449 U.S. at 395 ("The privilege

5

only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney[.]").

Accordingly, the Court rejects plaintiffs' challenge to Meta's clawback notice on this ground.

### B.     Ms. Hahn's Role

Plaintiffs argue that even if the disputed communications concern legal advice, they are not privileged because they were not made in confidence. Dkt. No. 188 at 10. They note that Ms. Hanh, who was copied on all such communications, was not a Meta employee and is therefore outside the attorney-client relationship. *Id.* Meta acknowledges that Ms. Hanh was not employed by Meta at the time of the email exchange, but it argues that she was a "functional employee" of Meta and that her inclusion in the email exchange does not destroy the privilege. Dkt. No. 198 at 8.

Generally, an attorney-client communication made in the presence of, or shared with, a third party is not confidential and therefore not privileged. *See Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 578 (N.D. Cal. 2007). However, in *United States v. Graf*, the Ninth Circuit held that where a third party is the functional equivalent of a corporate employee, her participation or inclusion in an attorney-client communication does not destroy the corporation's privilege. *Graf*, 610 F.3d 1148, 1158-59 (9th Cir. 2010) (citing *In re Bieter Co.*, 16 F.3d 929 (8th Cir. 1994)).

*Graf* adopted the reasoning of the Eighth Circuit in *In re Bieter Co.* In that case, the Eighth Circuit found that the privilege applied to communications between corporate counsel and an outside consultant who "was in all relevant respects the functional equivalent of an employee" because he was "involved on a daily basis with the principals of Bieter and on Bieter's behalf in the unsuccessful development that serve[d] as the basis for th[e] litigation," and because "his involvement in the subject of the litigation make him precisely the sort of person with whom a lawyer would wish to confer confidentially in order to understand Bieter's reasons for seeking representation." *In re Bieter Co.*, 16 F.3d at 938. The Eighth Circuit observed that, in that case, there was no principled distinction between the consultant's role and an that of an employee, and

6

that it was therefore "inappropriate to distinguish between those on the client's payroll and those who are instead, and for whatever reason, employed as independent contractors." *Id*. at 937.

In *Graf*, the Ninth Circuit affirmed a district court's finding that a criminal defendant who was a consultant to insurance company engaged in a health insurance fraud scheme was an agent of the company, such that his communications with the company's counsel fell within the company's attorney-client privilege. *Graf*, 610 F.3d at 1159. In concluding that the defendant/consultant was a functional employee of the insurance company, the Ninth Circuit noted that he "regularly communicated with insurance brokers and others on behalf of [the company], marketed the company's insurance plans, managed its employees, and was the company's voice in its communications with counsel." *Id.* at 1158. In addition, the Ninth Circuit observed that the defendant likely was a consultant to the company only because he could not legally be employed by an insurance company in the State of California, but that "his actual role" was the functional equivalent of an employee, officer, or director. *Id.* at 1157-59.

Underlying the decisions in *Graf* and *In re Bieter Co.* is the Supreme Court's holding in *Upjohn Co. v. United States* that "a corporation's privilege extends to communications between corporate employees and corporate counsel as long as the communications are made at the direction of corporate superiors in order to secure legal advice." *Graf*, 610 F.3d at 1158 (internal quotations omitted) (citing *Upjohn,* 449 U.S. at 390-94). In rejecting the narrower "control group" test, *Upjohn* held that the scope of the privilege must be assessed based on understanding which employees possess the information needed by the corporation's counsel to enable the giving of legal advice, as well as which employees are responsible for acting on that advice. *Upjohn*, 449 U.S. at 390-392. *Upjohn* left unresolved the question of when communications with a person who is not a corporate employee might fall within the scope of the corporation's attorney-client privilege. In adopting the Eighth Circuit's "functional employee" analysis, the Ninth Circuit concluded that a corporation's privilege properly encompasses communications between corporate counsel and the corporation's non-employee representatives or consultants who have information corporate counsel needs to provide legal advice to the corporation. *See Graf*, 610 F.3d at 1158-

59.[3]

The question here is whether Ms. Hahn operated as a functional employee of Meta with respect to the disputed communications in the April 8-9, 2018 email exchange. Plaintiffs argue that Ms. Hahn was merely an independent public relations consultant whose work for Meta was no different than the work she performed during the same period for other high-profile clients, and she is therefore outside the attorney-client relationship. Meta argues that Ms. Hahn operated as the functional equivalent of a full-time employee on Meta's communications team and with respect to the disputed communications. In support of its position, Meta relies on the declaration of Michael Kirkland, Meta's Vice President of Technology Communications. Dkt. No. 198-3. According to Mr. Kirkland, OutCast "has been one of Facebook's primary communications firms for over a decade," and Ms. Hahn was "an integral member of [Meta's] communications team." *Id.* ¶¶ 4, 5. When Meta first engaged OutCast in June 2011, "OutCast was retained to fill the gap [in Meta's communications team] where full-time [Meta] employees were not available." *Id.* ¶ 5. As of April 2018, Ms. Hahn was the account manager for the relationship between OutCast and Meta, and she was "routinely entrusted with important matters for the [Meta] communications team." *Id.* ¶ 6. Ms. Hahn had access to secure Meta facilities and confidential systems, and she worked on site at Meta several times per month with Meta's communications team. She signed non-disclosure and confidentiality agreements. Moreover, she interacted independently with Meta employees and with the press on Meta's behalf, just as a full-time communications employee would. Dkt. No. 198-3 ¶¶ 7-11. As relevant to the April 8-9, 2018 email exchange, Mr. Kirkland describes Ms. Hanh's role as follows:

> Ms. Hahn was included because she was assisting in preparing [Meta's] response to a press inquiry regarding platform issues—an area of the business she had provided communications support for several years. As part of this role, Ms. Hahn participated in communications with attorneys to understand and facilitate what

---

[3] Nothing in *Upjohn*, *Graf*, or *In re Bieter* supports plaintiffs' thesis that Ms. Hahn cannot be treated as a functional employee for purposes of Meta's attorney-client privilege unless Meta establishes that she was a functional employee of Meta's *legal team*. *See* Dkt. No. 188 at 13. The critical question is whether the employee (functional or otherwise) has information that counsel needs to advise the corporation or is a person with responsibility to act on counsel's advice on the corporation's behalf.

8

>information to include or exclude, in part based on legal advice
>provided by those attorneys.

*Id.* ¶ 6.

The facts presented here are much more challenging for Meta than those in *Graf* or *In re Bieter*. In both of those cases, the consultant had unique responsibilities for the operation of the business, held himself out as a representative of the business, and had either primary or shared responsibility for communications with counsel on behalf of the business. By contrast, Ms. Hahn appears to have been one of many public relations professionals included in communications regarding Meta's efforts to respond to the TechCrunch press inquiry in 2018.[4] Mr. Kirkland's description of Ms. Hanh's role is generic: she was included in the email exchange because she was assisting in preparing Meta's response and participated in communications with counsel to understand and facilitate what information should be in the response. Meta does not assert or suggest that she supplied any information to Meta's counsel or that she relied on counsel's advice in formulating Meta's response to the inquiry. It appears that she merely was copied on the email exchange.

Similarly, the functional employee cases on which Meta principally relies—*Schaeffer, In re High-Tech Employee Antitrust Litigation, Medversant,* and *Memry*—all involve more compelling circumstances. In *Schaeffer v. Gregory Village Partners*, a public relations consultant "communicated directly with the regulatory bodies and neighbors/potential legal adversaries that were the source of Gregory Village's legal concerns. She collected information from neighbors that she transmitted to Gregory Village's attorneys for the purpose of assisting counsel to obtain access agreements and negotiate potential disputes in the shadow of possible litigation." The court in *Schaeffer* concluded that consultant's duties for the business "were so intertwined with the subject matter for which Gregory Village sought legal advice that she should be treated as a functional employee." *Schaeffer*, 78 F. Supp. 3d 1198, 1204-05 (N.D. Cal. 2015).

In *In re High Tech Employee Antitrust Litigation*, the court concluded that an advisor to

---

[4] Although OutCast may have "filled the gap" in Meta's public relations capabilities at the beginning of the engagement in June 2011 (*see* Dkt. No. 198-3 ¶ 5]), Mr. Kirkland does not suggest that OutCast or Ms. Hahn had that same role in April 2018.

1  Google's senior management, who also advised other prominent technology companies while
2  simultaneously serving as Chairman of the Board of Directors for Intuit, Inc., was either an
3  employee or the functional equivalent of an employee of Google.  The advisor's duties included
4  advice on Google's corporate and business strategy, and he was included on confidential and
5  highly sensitive communications regarding Google's compensation practices, policies, and
6  strategies at issue in the litigation.  These communications included communications with
7  Google's executives in which he advised about how to deal with employees leaving the company.
8  The court determined that "a blanket denial of the attorney-client privilege [for communications
9  involving the advisor] would undermine what *Upjohn* and *Graf* emphasize:  the ability of the
10 corporation to both provide information to its counsel and to obtain guidance from its counsel." *In
11 re High-Tech Employee Antitrust Litig.*, No. 11-cv-2509-LHK-PSG, 2013 WL 772668, at *4-5
12 (N.D. Cal. Feb. 28, 2013).

13 In *Medversant Technologies, L.L.C. v. Morrisey Associates, Inc.*, the court found "not
14 clearly erroneous" a magistrate judge's determination that consultants at a public relations firm
15 were functional employees of Medversant.  The public relations firm "essentially function[ed] as
16 Medversant's public relations department," and it was tasked with implementing instructions from
17 Medversant and its attorneys about what to include in the company's press release.  *Medversant*,
18 No. CV 09-05031 MMM (FFMx), 2011 WL 13124128, at *4-5 (C.D. Cal. July 20, 2011).

19 In *Memry Corp. v. Kentucky Oil Technology*, the court concluded that a consultant was the
20 "functional equivalent of an executive, due to his high-level oversight of the company and his
21 interest in the company's financial health."  The company had no regular employees, and the
22 consultant had served as an advisor and agent for the company for several years, including with
23 respect to matters involved in the litigation.  He gathered information to be used in the litigation
24 and had communicated directly with the company counsel as an authorized representative of the
25 company.  On these facts, the court found that treating the consultant as a functional employee was
26 "in line with the policies underlying the attorney-client privilege, including allowing attorneys to
27 discover the information they need to successfully advocate on behalf of their clients."  *Memry*,
28 No. C 04-03843 RMW (HRL), 2007 WL 39373, at *3 (N.D. Cal. Jan. 4, 2007).

By comparison, Ms. Hahn's role with Meta was neither unique nor was her contribution central to the attorney-client communications at issue. If Ms. Hahn supplied no information to counsel and took no action with respect to Meta's response to the press inquiry, a finding that she nevertheless functioned as the equivalent of a Meta employee for purposes of privileged communications seems inconsistent with the rationale underlying *Upjohn* and *Graf*—i.e., in order to give legal advice to a corporate client, counsel needs to be able to confer confidentially with employees and non-employees who possess the information counsel requires and who must implement counsel's advice. In this instance, Ms. Hahn's apparently passive role in the disputed communications did not directly serve the interests the attorney-client privilege protects. At the same time, however, Meta has shown that Ms. Hahn had employee-like duties and responsibilities for Meta over many years, including access to confidential systems and information and to secure facilities, independent interactions with Meta's business executives, and representing Meta at major communications events and in interactions with the press.[5] Ms. Hahn also "provided communications support for several years" on matters concerning the "platform issues" implicated by the TechCrunch press inquiry. Dkt. No. 198-3 ¶¶ 6-10. Considering the context of the disputed communications and Ms. Hahn's role and responsibilities as a consultant to Meta, the Court is persuaded that she could be *expected* to have information counsel would need to provide legal advice to Meta and/or could be *expected* to act on counsel's advice in preparing Meta's response, even if she did not actually do those things. Application of the attorney-client privilege should not depend on the outcome or results of a particular communication. Rather, "[i]f the purpose of the attorney-client privilege is to be served, the attorney and client must be able to predict with some degree of certainty whether particular discussions will be protected." *Upjohn*, 449 U.S. at 393. Meta's expectation that its counsels' communications regarding the press inquiry would be privileged even if those communications included Ms. Hahn was not unreasonable.

The Court concludes that with respect to the April 8-9, 2018 email exchange, Ms. Hahn

---

[5] Plaintiffs offer no contrary evidence, and the mere fact that Ms. Hahn also performed public relations work for other companies does not alter the Court's assessment of her role with respect to Meta.

11

was copied on communications seeking and obtaining legal advice because she, along with others, was expected to have information relevant to the advice or was expected to act on the advice because she functioned as the equivalent of a Meta employee in this context. The Court does not conclude that Ms. Hahn should be considered a functional employee of Meta in all circumstances; Meta's showing regarding her role and responsibilities is too weak to support such a finding.

For this reason, the Court also rejects plaintiffs' challenge to Meta's clawback notice on this ground.

### C.     Unredacted Production to the FTC

Plaintiffs argue that because Meta produced the April 8-9, 2018 email exchange in unredacted form to the FTC in 2019 in response to a civil investigative demand, Meta waived any privilege that otherwise may have protected the disputed communications. Dkt. No. 188, at 14-15. Meta responds that the Clawback Order (Dkt. No. 191) bars plaintiffs' challenge because it permits the clawback of the disputed communications without any consideration of whether a party's production of privileged material was inadvertent or otherwise satisfies the requirements of Federal Rule of Evidence 502(b). Dkt. No. 198 at 11. In addition, Meta argues that its prior production of the disputed communications to the FTC did not waive privilege given the nature of the production and the regulations that govern FTC proceedings. *Id.* at 12-15.

With respect to Meta's first argument, the Clawback Order governs the treatment of "Protected Documents," which is defined to refer to "the production or disclosure of any documents and accompanying metadata, protected from discovery[.]" Dkt. No. 191 at 1. The Clawback Order "governs all disputes regarding Protected Documents produced in this litigation." *Id.* As the Court explained at the hearing, the Clawback Order applies only to documents produced in discovery in this case; it does not specify the conditions for evaluating whether a prior production of documents in another proceeding resulted in a waiver of privilege, even if that prior production is subsequently re-produced to a party in this case.[6]  *See* Dkt. No. 211 at 23:6-23. Accordingly, the Court turns to the merits of plaintiffs' argument that Meta's prior production of

---

[6] Meta does not contend that its prior production in response to the FTC's civil investigative demand was governed by a federal court order under Federal Rule of Evidence 502(d).

12

the April 8-9, 2018 email exchange in unredacted form to the FTC resulted in a waiver of privilege at that time.

Ordinarily, a voluntary disclosure of privileged material to a third party destroys the privilege. *In re Pacific Pictures Corp.*, 679 F.3d 1121, 1126-27 (9th Cir. 2012). However, Federal Rule of Evidence 502(b) provides that if the disclosure is inadvertent, the privilege is not waived if the privilege holder took reasonable steps to prevent disclosure and to correct the error promptly after learning of it. Fed. R. Evid. 502(b). The regulations adopted by the FTC mirror the requirements of Rule 502(b). *See* 16 C.F.R. § 2.11(d)(1)(i).

Here, Meta argues that it disclosed the disputed communications to the FTC in 2019 as part of a 12 million-page production in response to a civil investigative demand. Dkt. No. 198 at 13. These communications were missed during a privilege review that generated a 300,000-entry privilege log. *Id.* at 14. After the FTC alerted Meta to the existence of potentially privileged communications in the April 8-9, 2018 email exchange, Meta immediately clawed back the disputed communications from the FTC and notified plaintiffs that it was clawing back the same communications in this case. *Id*. at 1-2. Plaintiffs have both the FTC production and the privilege log, but they argue that Meta has not shown that it took reasonable steps to review the initial production for privilege and to prevent disclosure of the disputed communications to the FTC. Dkt. No. 188 at 14-15; Dkt. No. 198 at 14. They appear not to dispute that Meta attempted to claw back the disputed communications promptly after receiving notice from the FTC that they contained potentially privileged material. Dkt. No. 188 at 14-15.

The Court infers from the facts that are undisputed—i.e. the scale of the production to the FTC and the extent of the privilege log—that Meta did review documents for privilege before making its production to the FTC. The question is whether the review was reasonable. As plaintiffs correctly observe, Meta relies on representations in its briefing rather than a declaration of counsel or other relevant witness regarding the efforts Meta undertook to prevent disclosure of privileged material to the FTC:

> The emails covered by the August 20 Clawback Notice were among the more than 12 million pages of documents that Facebook produced to the FTC in response to a 2019 civil investigative demand.

13

> Facebook undertook reasonable efforts to review responsive materials for privilege and to withhold privileged materials from production. Those efforts yielded a substantial privilege log, provided to Plaintiffs in this matter, containing more than 300,000 entries. The log reflects multiple months of works, with entries provided on a rolling basis with the final, consolidated log given to the FTC on September 26, 2020.

Dkt. No. 198 at 4. Meta claims that "the necessary facts are already well-known to Plaintiffs and the Court," but the only facts to which it refers are the number of pages in its FTC production, the number of entries in its privilege log, and the time it took to prepare the log. *Id.* at 14. Meta does not explain how it conducted its privilege review, making it difficult for the Court to assess whether its efforts were reasonable. Meta cites no authority suggesting that the sheer volume of its production and the length of its privilege log, without more, shows that it took reasonable steps. Both of the cases on which Meta relies describe the steps a party took to identify and segregate privileged documents from documents for production, and both cite to supporting declarations. *Njenga v. San Mateo County Superintendent of Schools,* No. C-08-04019 EDL, 2010 WL 1261493, at *17 n.2 (N.D. Cal. Mar. 30, 2010) ("Defendants have established through counsel's declaration that the disclosure was inadvertent and the Defendants took reasonable steps to prevent its disclosure in the first place."); *Datel Holdings Ltd. v. Microsoft Corp.*, No. C-09-05535, 2011 WL 866993, at *4 (N.D. Cal. Mar. 11, 2011) (detailing reasonable steps taken, as described in a supporting declaration).

Meta is correct that Rule 502(b) is intended to address the problem of inadvertent production in high volume document productions like the one it made to the FTC. But the Rule does not relieve Meta of its obligation to show it took reasonable steps to prevent disclosure, and Meta has had ample opportunity to make the required showing. Plaintiffs raised the sufficiency of Meta's showing in the parties' original joint submission on October 25, 2021 (Dkt. No. 168), and again in their opening brief (Dkt. No. 188). While Meta is correct that the Court's usual procedures for resolving discovery disputes do not ordinarily require supporting declarations or other evidence, *see* Dkt. No. 198 at 14-15 (citing *AdTrader, Inc. v. Google LLC*, 405 F. Supp. 3d 862, 863 (N.D. Cal. 2019); Standing Order for Civil Cases, sec. 4, https://cand.uscourts.gov/standing-order-for-civil-cases-february-2022/, at the Court suggestion,

14

1   the parties stipulated to a more comprehensive dispute resolution procedure for this particular

2   dispute.[7]  Meta simply has not explained, either in a supporting declaration or in its opposing brief,

3   what it actually did to prevent disclosure of privileged information in the first place.

4         Nevertheless, the Court concludes that despite Meta's poor showing on this point the Court

5   may fairly infer that a disclosure of nine privileged communications from a document production

6   of more than 12 million pages reflects that Meta did, in fact, use reasonable steps to prevent

7   disclosure of privileged material to the FTC.  Accordingly, Court rejects plaintiffs' challenge to

8   Meta's clawback notice on this ground.

9         One other matter requires discussion.  During the December 14, 2021 hearing, Meta

10  disclosed for the first time that in the FTC's action against Meta in the District of Columbia, *FTC*

11  *v. Facebook*, No. 1:20-cv-03590-JEB (D.D.C.), a portion of one of the disputed communications

12  had been included in a complaint filed in that action.  Dkt. No. 211 at 46:4-15.  Meta subsequently

13  filed a notice of supplemental information explaining that the FTC and Meta jointly agreed in

14  September 2021 that the FTC could include a portion of the redacted communication labeled R5 in

15  the FTC's Substituted Amended Complaint.  Dkt. No. 210 at ECF 2 n.2.  The parties further

16  stipulated that the FTC's inclusion of the disputed communication does not waive any otherwise-

17  applicable privilege and that the communication would be redacted from the public version of the

18  Substituted Amended Complaint.  *Id.* at ECF 2-3.  The presiding judge accepted the parties'

19  stipulation, and the FTC filed the Substituted Amended Complaint.  *Id.* at ECF 3.

20        The Court is disappointed that Meta did not share this information with plaintiffs during

21  the parties' discussion and did not disclose it in briefing before this Court, as it is material to the

22  Court's resolution of this dispute.  Meta has allowed a portion of redacted communication R5 to

23  be disclosed to the FTC and to the federal court in the District of Columbia.  The fact that the

24  disclosure is confidential and under seal does not matter.  The Ninth Circuit has rejected the

---

[7] For this dispute, the Court determined that the usual expedited discovery procedures were not sufficient and invited the parties to propose an alternative procedure. Dkt. No. 171; *see also* Dkt. No. 179 at 25:8-29:16; 31:9-32:2; 38:24-39:24.  The parties stipulated to 15-page opening and opposition briefs, without a reply brief, and the Court adopted the stipulation. Dkt. Nos. 178, 180.

United States District Court
Northern District of California

doctrine of "selective waiver" even where the parties to the disclosure have agreed that there will be no waiver with respect to others and have agreed to hold the material in confidence. *In re Pacific Pictures*, 679 F.3d at 1127-29. Meta has agreed to permit the use and disclosure of a communication it contends is privileged. This is a voluntary disclosure. *See id.* at 1130 (choosing not to assert the privilege when it was appropriate to do so renders the disclosure voluntary). Having voluntarily disclosed the communication for one purpose, it may not selectively assert the privilege with respect to the same communication here. *See Potomac Elec. Power Co. v. United States*, 107 Fed. Cl. 725, 730-32 (2012); *XY, LLC v. Trans Ova Genetics, LC*, No. 17-cv-00944-WJM-NYW, 2018 WL 11000694, at *4-6 (D. Colo. May 14, 2018); *Smith v. Best Buy Stores, L.P.*, No. 4:16-cv-00296-BLW, 2017 WL 3484158, at *3-4 (D. Idaho Aug. 14, 2017).

For this reason, the Court finds that Meta may not withhold as privileged the portion of R5 that is included in the FTC's Substituted Amended Complaint.

## IV.   CONCLUSION

Meta must produce to plaintiffs the portion of disputed communication R5 that was disclosed to the FTC and included in the FTC's Substituted Amended Complaint. Plaintiffs' remaining challenges to Meta's August 20, 2021 clawback notice are rejected.

**IT IS SO ORDERED.**

Dated: March 11, 2022

VIRGINIA K. DEMARCHI
United States Magistrate Judge