1

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Stephen A. Swedlow (admitted *pro hac vice*)
  stephenswedlow@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400

**BATHAEE DUNNE LLP**
Yavar Bathaee (Bar No. 282388)
  yavar@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
(332) 322-8835

2

3

4

5

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Shana E. Scarlett (Bar No. 217895)
  shanas@hbsslaw.com
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
(510) 725-3000

**SCOTT + SCOTT ATTORNEYS AT LAW LLP**
Kristen M. Anderson (Bar No. 246108)
  kanderson@scott-scott.com
230 Park Avenue, 17th Floor
New York, NY 10169
(212) 223-6444

6

7

8

9

*Interim Co-Lead Consumer Class Counsel*

10

[Additional counsel listed on signature page]

*Interim Co-Lead Advertiser Class Counsel*

11

12

13

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

14

15

16

17

MAXIMILIAN KLEIN, et al.,

18

        Plaintiffs,

19

        vs.

20

FACEBOOK, INC.,

21

        Defendant.

22

This Document Relates To: All Actions

23

Case No. 5:20-cv-08570-LHK (VKD)

Hon. Virginia K. DiMarchi

**PLAINTIFFS' OPENING BRIEF REGARDING FACEBOOK, INC.'S AUGUST 20, 2021 CLAWBACK NOTICE**

**FILED UNDER SEAL**

24

25

26

27

28

---

**FILED UNDER SEAL**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................1

ARGUMENT ......................................................................................................................5

     I.     Facebook Cannot Establish That The Redacted Communications Were
          Primarily Made For The Purpose Of Giving Legal Advice........................................7

     II.    Each Challenged Communication Was Made To A Third Party Who Was
          Not A Functional Employee With Respect To The Claimed Privilege..................10

     III.   Facebook Previously Produced The Challenged Communications, And Has
          Offered No Facts To Establish Its Past Production Was Inadvertent.....................14

CONCLUSION ..................................................................................................................15

**FILED UNDER SEAL**

<u>**TABLE OF AUTHORITIES**</u>

Cases

*Breuder v. Bd. of Trustees of Cmty. Coll. Dist. No. 502,*
    2021 WL 4283464 (N.D. Ill. Sep. 21, 2021) ...................................................................9

*Calvin Klein Trademark Trust v. Wachner,*
    198 F.R.D. 53 (S.D.N.Y. 2000) .....................................................................................13

*Church & Dwight Co. v. Mayer Lab'ys, Inc.,*
    2011 WL 6119146 (N.D. Cal. Dec. 8, 2011) .................................................................14

*Coles Wexford Hotel, Inc. v. UPMC & Highmark, Inc.,*
    2016 WL 462856 (W.D. Pa. Feb. 8, 2016) ....................................................................15

*Durling v. Papa John's Int'l, Inc.,*
    2018 WL 557915 (S.D.N.Y. Jan. 24, 2018) ..................................................................13

*In re Bieter Co.,*
    16 F.3d 929 (8th Cir. 1994) ...........................................................................................12

*In re Copper Market Antitrust Litig.,*
    200 F.R.D 213 (S.D.N.Y. 2001) ....................................................................................13

*In re Domestic Airline Travel Antitrust Litig.,*
    2020 WL 3496748 (D.D.C. Feb. 25, 2020) ...................................................................10

*In re Grand Jury,*
    13 F.4th 710 (9th Cir. 2021) ......................................................................................6, 10

*In re Pacific Pictures Corp.,*
    679 F.3d 1121 (9th Cir. 2012) .......................................................................................14

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.,*
    352 F. Supp. 3d 207 (E.D.N.Y. 2019) ......................................................................12, 13

*In re Vioxx Prod. Liab. Litig.,*
    501 F. Supp. 2d 789 (E.D. La. 2007) ...............................................................................8

*IP Co., LLC v. Cellnet Tech., Inc.,*
    2008 WL 3876481 (N.D. Cal. Aug. 18, 2008) ................................................................9

*LG Elecs. U.S.A., Inc. v. Whirlpool Corp.,*
    661 F. Supp. 2d 958 (N.D. Ill. 2009) .............................................................................14

*Lynx Sys. Devs., Inc. v. Zebra Enter. Sols. Corp.,*
    2018 WL 1532614 (D. Mass. Mar. 28, 2018) ................................................................13

*Meade v. Gen. Motors, LLC,*
    250 F. Supp. 3d 1387 (N.D. Ga. 2017) ............................................................................9

-ii-

Cases
(*continued*)

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
    2019 WL 1950381 (N.D. Cal. May 1, 2019) ...............................................................14

*Schaeffer v. Gregory Village Partners*,
    78 F. Supp. 3d 1198 (N.D. Cal. 2015) .........................................................11, 12, 13

*SPS Techs., LLC v. Briles Aerospace, Inc.*,
    2020 WL 3050777 (C.D. Cal. Feb. 18, 2020) ................................................................9

*United States ex rel. Baklid-Kunz. v. Halifax Hosp. Med. Ctr.*,
    2012 WL 5415108 (M.D. Fla. Nov. 6, 2012) .................................................................9

*United States v. Chevron Corp.*,
    1996 WL 444597 (N.D. Cal. May 30, 1996) .................................................................8

*United States v. Graf*,
    610 F.3d 1148 (9th Cir. 2010) ...............................................................................11, 12

*United States v. Int'l Bus. Machines Corp.*,
    66 F.R.D. 206 (S.D.N.Y. 1974) .....................................................................................8

*United States v. Paulus*,
    2021 WL 4494607 (E.D. Ky. Sep. 30, 2021) ..............................................................14

*United States v. Ruehle*,
    583 F.3d 600 (9th Cir. 2009) ..............................................................................*passim*

*United States v. Sanmina Corp.*,
    968 F.3d 1107 (9th Cir. 2020) ......................................................................................5

*Universal Standard Inc. v. Target Corp.*,
    331 F.R.D. 80 (S.D.N.Y. 2019) ..................................................................................12

*Viamedia, Inc. v. Comcast Corp.*,
    2017 WL 2834535 (N.D. Ill. Jun. 30, 2017) ...............................................................15

*Wadler v. Bio-Rad Lab'ys, Inc.*,
    212 F. Supp. 3d 829 (N.D. Cal. 2016) ..........................................................................5

Rules

Fed. R. Evid. 502(b) .........................................................................................................15

FILED UNDER SEAL

## INTRODUCTION

Facebook has clawed back nine communications from an April 8-9, 2018 email thread, asserting attorney-client privilege. These communications do not appear, based on their unredacted context, to be attorney-client privileged. First, they do not appear to have been primarily made for the purpose of providing legal advice. Second, they do not appear to have been made confidentially between attorney and client, as a third-party public relations consultant was a recipient of each challenged communication. Finally, Facebook has, despite repeated inquiries, declined to offer specific facts to support its claim of non-waiver over the subject communications—each of which was previously produced in unredacted form outside this litigation, perhaps on several occasions.

Facebook, which bears the burden of proving each aspect of the claimed privilege, has not carried its burden here with respect to any of the communications it seeks to withhold from Plaintiffs. Facebook should be compelled to produce each clawed-back communication in unredacted form.

## BACKGROUND

On August 20, 2021, Facebook sent Plaintiffs a letter (Ex. A) and supplemental privilege log (Ex. B) seeking to claw back twelve documents. The twelve documents Facebook clawed back— all from a single email thread—include nine distinct communications that Facebook has now redacted on the basis of alleged attorney-client privilege. In the three representative documents submitted with this motion as Exhibits C-E, these redactions are labeled by Plaintiffs with "R1" to "R9" in order to ease the Court's understanding and review. Plaintiffs have not seen the actual underlying communications that Facebook has now redacted but have requested that Facebook produce Exhibits C-E, which comprise all nine challenged redactions, to the Court in unredacted form for *in camera* review.

Each communication in question is part of a single (occasionally forked) email thread that occurred on Sunday and Monday, April 8-9, 2018, in response to a press inquiry about Facebook's exclusion of apps from functionality provided through Facebook's developer Platform. *See* Exs. C-E. Specifically, at 11:53 a.m. on April 8, 2018, editor-at-large Josh Constine of the online news outlet TechCrunch emailed ███████████, then a Facebook corporate communications manager:

**FILED UNDER SEAL**

> I'm working on a story to be published this evening about Facebook's history of removing Find Friends access from apps that replicate core functionality or don't share content back.
>
> Can you provide a list of apps that have had this happen? I know of Twitter, Vine, Voxer, MessageMe, Wonder, Phhhoto (cut off by Instagram), and Path (cut off for spamming uploaded phone contacts).
>
> Does Facebook have a statement about why its policy states "You may not use Facebook Platform to promote, or to export user data to, a product or service that replicates a core Facebook product or service without our permission" (now listed as "Don't replicate core functionality that Facebook already provides." in the TOS)? How does Facebook respond to the criticism that if users want to share their friend list with another app and find their friends there, that Facebook blocking that is both anti-competitive and hurts user by reducing data portability?
>
> What is Facebook's explanation for not allowing the Download Your Information export of friends' email addresses that are visible to a user on those friends' profiles?

Ex. C at PALM-002033287-88; *see also* Ex. D at PALM-002033781; Ex. E at PALM-002033754.

Within ten minutes, Ms. ▮▮▮▮—a communications employee—emailed six other people: Facebook communications managers ▮▮▮▮▮ and ▮▮▮▮▮▮▮, Facebook communications directors ▮▮▮▮▮ and ▮▮▮▮▮▮, Facebook communications executive ▮▮▮▮▮, and Rebecca Hahn, a Los Angeles-based partner at The OutCast Agency, "an integrated marketing agency specializing in digital, communications, and branding." Ex. C at PALM-002033287; *see* Ex. F. Ms. ▮▮▮▮'s message to these six communications professionals (five Facebook employees, one at The OutCast Agency; none have law degrees) was, "[w]ho's the right person to handle this?" Ex. C at PALM-002033287. Ms. ▮▮▮▮▮ responded by adding two new Facebook employees: product management director ▮▮▮▮▮▮, and in-house product counsel ▮▮▮▮▮, stating, "I don't know much about this – @▮▮▮▮▮ and @▮▮▮▮▮▮, any insight you can provide here?" *Id.* No privilege label appears on this communication, which is directed toward seven non-lawyers— one called out with a name and @ symbol—and asks for background information in response to a press inquiry. *Id.* at PALM-002033286-87.

**FILED UNDER SEAL**

1       What follows next in the thread is the addition of platform partnership director █████

2   ██████, public policy director ███████, and in-house counsel ████████, all

3   expressly added for their "involve[ment] with this policy" or "policy context"—referring,

4   ultimately, back to TechCrunch's request for public comment on Facebook's allegedly

5   anticompetitive Platform policies and conduct. *See* Ex. C at PALM-002033286. Facebook's first

6   redaction (labeled R1 by Plaintiffs) occurs at this point, and shortly thereafter two more people are

7   added to the email thread—Facebook engineer █████████ and Facebook in-house counsel

8   █████████. *See* Ex. C at PALM-002033283-85 (redactions R2-R5). No privilege label appears

9   on the thread at this point, and all unredacted communications—and indeed the email subject of the

10  thread, "Re: Questions about Find Friends access removed from competitors for article today"—

11  refer to public relations containment, press management, and background questions about a policy

12  that TechCrunch asked for public comment on. *See id.* Indeed, one of the longer redacted

13  communications at this point in the thread (R5 in Plaintiffs' Exhibits C-E) expressly says

14  "███"—both of whom are non-lawyers—"should chime in if I left out any context." Ex. C at

15  PALM-002033283. None of these emails appear to request or provide legal advice.

16      Shortly thereafter, communications employee Ms. ████ places an "A/C Priv" label on her

17  next email—and on the thread as a whole. *See* Ex. C at PALM-002033282. Yet this email (time-

18  stamped 2:49 p.m.) is plainly non-privileged, adding communications executive ████████

19  and product executive █████████ to the thread "for institutional knowledge *of how we've*

20  *externally messaged* the policy Josh/TC asks about below." Ex. C at PALM-002033282 (emphasis

21  added). Facebook does not contend otherwise; it has not claimed privilege over Ms. ████'s "A/C

22  Priv" email. This email further states, in highlighted comments, "WE WON'T COMMENT HERE"

23  and "WHAT REASON AND/OR CRITERIA SHOULD WE CITE FOR HOW/WHY WE APPLY

24  THIS POLICY," respectively, and also identifies "what Justin said in the TC [TechCrunch] article

25  in 2013." *Id.* To this point, the entire thread has centered upon a communications response to a press

26  inquiry, and the personnel on the thread—seven in-house communications employees (████,

27  █████████████████████), an outside public relations consultant

28  (Hahn), three engineering/product employees (████████████████), two partnership/policy

-3-

FILED UNDER SEAL

1   directors (███████████████), and three in-house counsel (████████████

2   ████)—reflect its decidedly non-legal purpose of shaping Facebook's communications

3   strategy in response to a concerning press inquiry. *See* Ex. C at PALM-002033281-88.

4           The next email—R6 in Plaintiffs' Exhibits A-C—adds then-Facebook General Counsel

5   █████████. *See* Ex. C at PALM-002033280-81. Mr. █████ remains on the thread for several

6   additional emails before eventually being removed, yet the unredacted content of the thread's

7   communications remains exclusively focused on a communications response to the TechCrunch

8   inquiry. *See, e.g.*, Ex. C at PALM-002033280 (Ms. █████: "Me again… Josh is pushing on the list

9   of apps against which we enforce our policy. We can not comment – but my q is whether or not he

10  will be able to figure out which ones we do this for? – is there any way this could happen, other than

11  talking to app developers?); *id.* at PALM-002033279 (Ms. █████: "He [TechCrunch's Josh

12  Constine] can't figure this out on his own. He can ask developers but there isn't an independent way

13  for him to find this out."); Ex. D at PALM-002033773 (Ms. █████: "I'm quite sure Google+ and

14  YouTube have similar policies. Looking now."). It is unclear what is redacted in R7-R8 (in Ex. C)

15  and R9 (in Ex. D), but all information available to Plaintiffs indicates that public relations support

16  for Facebook as a business was the primary, and likely sole, purpose for these communications that

17  Facebook now claims are attorney-client privileged. *See* Ex. C at 2033279-80 (R7 and R8); Ex. D.

18  at PALM-002033773 (R9).

19          On September 10, 2021, Plaintiffs wrote a letter to Facebook challenging its clawback of the

20  redacted communications in Exs. C-E, including on the basis of waiver. *See* Ex. G. Facebook

21  responded that the "documents were produced to the FTC inadvertently" and that Facebook had

22  "also clawed back the documents from the FTC." *See* Ex H. On October 6, 2021, the parties met

23  and conferred, and on October 14, they submitted a joint discovery letter brief. *See* Ex. I. On October

24  26, the Court ordered briefing on the parties' privilege dispute regarding Facebook's August 20,

25  2021 clawback. On November 4, 2021, in response to an email from Plaintiffs, Facebook made

26  representations regarding its contention that Rebecca Hahn of The OutCast Agency—a recipient of

27  each clawed-back communication—was a functional employee of Facebook at the time of those

28  communications. *See* Ex. J.

FILED UNDER SEAL

## ARGUMENT

Facebook asserts that nine redacted communications contained in twelve clawed-back documents are attorney-client privileged.[1] "The attorney-client privilege protects confidential communications between attorneys and clients, which are made for the purpose of giving legal advice." *United States v. Sanmina Corp.*, 968 F.3d 1107, 1116 (9th Cir. 2020) (cleaned up). Under Ninth Circuit law, "an eight-part test determines whether information is covered by the attorney-client privilege:"

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived."

*United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009) (cleaned up); *see also Sanmina Corp.*, 968 F.3d at 1116 (reciting same test). "The party asserting the privilege bears the burden of proving each essential element." *Ruehle*, 583 F.3d at 607. Because the attorney-client privilege "contravenes the fundamental principle that the public has a right to every man's evidence, courts construe it narrowly to serve its purposes[.]" *Wadler v. Bio-Rad Lab'ys, Inc.*, 212 F. Supp. 3d 829, 850 (N.D. Cal. 2016) (cleaned up). Here, Facebook has not—as it is required to do—satisfied at least three essential elements necessary to establish that these clawed-back communications are privileged.

*First*, Facebook has not shown—and cannot show—that the communications it now claims are attorney-client privileged were made "for the purpose of giving legal advice." Based on the unredacted portions of the clawed-back documents and the recipients of the allegedly privileged communications, it is apparent that the clawed-back communications pertained to a public relations fiasco. What is *not* apparent—nor even, as far as Plaintiffs can tell, possible—is that the email threads in question primarily involve confidential requests for, and ultimately the confidential provision of, *legal advice* by Facebook attorneys to their corporate client. Under Ninth Circuit law, this means the communications in question, even though they involve Facebook attorneys, are *not*

---

[1] Facebook has not asserted work product protection or any other privilege over the twelve clawed-back documents.

FILED UNDER SEAL

1 attorney-client privileged. *See In re Grand Jury*, 13 F.4th 710, 713-14 (9th Cir. 2021) (adopting

2 "primary purpose" test to evaluate claims of privilege where attorney-client communications "might

3 have more than one purpose").

4      *Second*, Facebook has not shown that the communications it now claims are attorney-client

5 privileged were in fact made solely and confidentially between attorney and client. "[A] party

6 asserting the attorney-client privilege has the burden of establishing the relationship *and* the

7 privileged nature of the communication." *Ruehle*, 583 F.3d at 607 (emphasis in original). But *every*

8 communication that Facebook now claims is attorney-client privileged was made to a third-party

9 public relations consultant, Rebecca Hahn of The OutCast Agency. Although Facebook now claims

10 Ms. Hahn was a functional employee of Facebook at the time of the communications in question,

11 Facebook's statements about Ms. Hahn appear to argue that Ms. Hahn was functionally an "in-house

12 communications" employee of Facebook. *See* Ex. J at 1. But that does not help with the actual

13 privilege claim here. Either the redacted communications were primarily made for the purpose of

14 giving confidential *legal* advice (in which case Ms. Hahn was a third party, as Facebook makes no

15 claim she was functionally part of its legal team), or the redacted communications were made (as

16 seems evident from their unredacted context) principally for non-legal reasons—*i.e.*, a

17 communications crisis engendered by a press inquiry about Facebook's past anticompetitive

18 behavior. Facebook claims that Ms. Hahn would be a functional employee in the latter case, but

19 accepting its claim on that point means that it loses on the privilege issue: Ms. Hahn's presence on

20 every redacted communication lays bare the true nature of what Facebook seeks to claw back.

21      *Third*, Facebook has not established that its past production(s) of the communications it now

22 claims are privileged did not irrevocably waive privilege over these communications. As with every

23 other aspect of the Ninth Circuit test for attorney-client privilege, it is the privilege proponent's

24 burden to establish non-waiver. Facebook has not done so here. It has claimed that its past

25 production(s) of the communications in question was or were "inadvertent," but to this day,

26 Facebook has declined to tell Plaintiffs even *how many times* the clawed-back communications were

27 produced in unredacted form outside of this litigation—let alone when, to whom, and under what

28 circumstances. All Plaintiffs know at this point is that Facebook produced each challenged

**FILED UNDER SEAL**

communication at least one other time, at least two years ago, and outside the context of *any* litigation (let alone this one). And Facebook apparently never sought to claw the information back from *anyone* until mid-2021. To meet its burden to establish non-waiver under Ninth Circuit law, Facebook must explain to whom it previously produced the challenged communications; when; and in what context. Facebook has failed to do so.

I.     **Facebook Cannot Establish That The Redacted Communications Were Primarily Made For The Purpose Of Giving Legal Advice**

Each of the nine clawed-back communications (R1-R9 in Plaintiffs' Exs. C-E) appears in the midst of a lengthy email thread devoted principally—and as far as Plaintiffs can discern from its public portions, entirely—to providing public relations support in response to a troubling press inquiry by TechCrunch. As discussed in the Background section of this brief, the thread in question begins with a question from TechCrunch about Facebook's Platform policies and conduct—and in particular, Facebook's history of excluding applications from functionality such as friends information based on competitive analyses and data reciprocity. *See* Ex. C at PALM-002033287-88. This question was directed toward a Facebook communications employee, who quickly roped in a half-dozen other Facebook communications personnel—and a third-party consultant from The OutCast Agency—for support. *Id.* at PALM-002033286-87. Over the next twenty-four hours, as the recipients list swelled with additional communications employees, product and policy personnel, and eventually three (sometimes four) in-house counsel, every non-redacted communication in the thread was directed toward getting Facebook's story straight for the TechCrunch inquiry, including by bringing in personnel who had previously made public communications about Facebook's Platform to massage and conform the narrative for TechCrunch. *See id.* at PALM-002033279-88; Ex. D at PALM-002033773.

On April 11, 2018—forty minutes after TechCrunch published a story titled "Zuckerberg claims competition from '8 social apps', but Facebook owns 3," Ex. K, ▮▮▮▮▮▮▮ (the Facebook communications employee who initiated the thread in question) replied all to the fourteen recipients on the thread—including all three in-house counsel whose communications Facebook now claims were privileged—pasting TechCrunch's as-published story and stating: "Here's where

-7-

1   this netted out thus far . . . ." Ex. L at PALM-002033644-45).)[2] One recipient, Mr. ███████,

2   emailed Ms. ████ back to say "That came out just fine! Good job!" and Ms. ████ responded:

3   "Thanks for your help." *Id.* at PALM-002033644.

4          Given all the above the purpose of the entire email thread in Exs. C-E—and every

5   communication therein—was plainly to craft Facebook's response to a press inquiry about its

6   Platform conduct and policies. This is not a legal issue, there do not appear (based on the information

7   available to Plaintiffs) to be within Exs. C-E any requests for confidential legal advice—as opposed

8   to business/communications inquiries to lawyers with historical or contextual knowledge about

9   relevant issues. Again, the subject matter (a TechCrunch inquiry), the personnel (almost all non-

10  lawyers, including a third-party PR consultant), and the phrasing of the unredacted communications

11  that reference lawyers ("I don't know much about this – @███████ and @███████, any

12  *insight* you can provide here?";[3] "I'm looping in @████ and @███████, who I believe have

13  been closely involved with this policy";[4] "+████ who has policy *context*";[5] "the only thing I'd

14  add on top of ████'s message is that ███ and ████ have described the *rationale* for this policy"[6])

15  all indicate a non-legal purpose to the communications in Exs. A-C. *See, e.g.*, *In re Vioxx Prod.*

16  *Liab. Litig.*, 501 F. Supp. 2d 789, 809 (E.D. La. 2007) ("primary purpose" of communications

17  "addressed to both lawyers and non-lawyers for review, comment, and approval" was "not to obtain

18  legal assistance"); *United States v. Chevron Corp.*, 1996 WL 444597, at *2 (N.D. Cal. May 30,

19  1996); *United States v. Int'l Bus. Machines Corp.*, 66 F.R.D. 206, 213 (S.D.N.Y. 1974). And the

20  April 11, 2018 follow-up communications in the email thread in question—including an express

21  acknowledgment by Ms. ████ to everyone on the thread, including attorneys, that the "nett[ing]

22  out" of "[our]" communications was the TechCrunch story about Facebook's anticompetitive

23  behavior, Ex. L at PALM-002033644, as well as written exhalations of relief by Ms. ████ and Mr.

24

25

---

[2] Plaintiffs do not challenge the non-overlapping redaction in Ex. K, as the Court has ruled such a

26  challenge untimely.

[3] Ex. C at PALM-002033287 (emphasis added).

27  [4] *Id.* at PALM-002033286.

[5] *Id.* (emphasis added).

28  [6] *Id.* at PALM-002033281 (emphasis added).

FILED UNDER SEAL

1  ███████, *id.*—indicates that the actual thread, lawyer communications and all, was actually

2  about a press inquiry, and not anything else. *See, e.g.*, *Breuder v. Bd. of Trustees of Cmty. Coll. Dist.*

3  *No. 502*, 2021 WL 4283464, at *7 (N.D. Ill. Sep. 21, 2021) (noting that "general public relations

4  work . . . falls outside the scope of the narrowly construed attorney-client privilege" and rejecting

5  privilege claim where party did not establish that public relations consultants were "'necessary' to

6  enable counsel to provide legal advice").

7         Given that every redacted communication appears in an email thread solely directed toward

8  a press inquiry, and not toward any sort of legal proceeding, question, or investigation, it is possible

9  (even likely) that there is no legal purpose *at all* to one or more of the clawed-back communications.

10  The mere inclusion of in-house counsel on these documents does not transform their non-legal

11  nature. *See Meade v. Gen. Motors, LLC*, 250 F. Supp. 3d 1387, 1393 (N.D. Ga. 2017) ("The number

12  of lawyers or non-lawyers to whom a communication was disseminated is not dispositive and a

13  corporation's choices of means and format in the communications between their lawyers and

14  employees cannot limit their adversaries' right of discovery of what otherwise is non-privileged and

15  discoverable." (cleaned up)); *IP Co., LLC v. Cellnet Tech., Inc.*, 2008 WL 3876481, at *3 (N.D. Cal.

16  Aug. 18, 2008). Nor does Facebook's casual use of "A/C Priv," Ex. C at PALM-002033282, as

17  confirmed by Facebook's choice *not* to redact information under this moniker in the very documents

18  at issue. *See, e.g.*, *SPS Techs., LLC v. Briles Aerospace, Inc.*, 2020 WL 3050777, at *5 n.7 (C.D.

19  Cal. Feb. 18, 2020) ("[I]nformation does not become privileged merely by marking it as such.");

20  *United States ex rel. Baklid-Kunz. v. Halifax Hosp. Med. Ctr.*, 2012 WL 5415108, at *6 (M.D. Fla.

21  Nov. 6, 2012). And even for those documents that reflect communications *from* Facebook's in-

22  house counsel, "[i]t is not enough that a document was created by attorneys if the information that

23  it contains was not made for the purpose of facilitating the rendition of legal advice or services,"

24  *i.e.*, "the sort of advice that can be rendered *only* by consulting the legal authorities." *In re Domestic*

25  *Airline Travel Antitrust Litig.*, 2020 WL 3496748, at *6 (D.D.C. Feb. 25, 2020) (emphasis added).

26         Facebook certainly has not met its burden to establish such a purpose from the privilege log

27  it provided (Ex. B), nor from the overall context of the clawed-back documents (Exs. C-E)—and

28  under Ninth Circuit law, it is Facebook's burden to establish that both "the [attorney-client]

**FILED UNDER SEAL**

1  relationship *and* the privileged nature of the communication." *Ruehle*, 583 F.3d at 607 (emphasis in

2  original). Moreover, to the extent Facebook is able to establish *any* connection to an ostensible legal

3  purpose in the redacted communications, the Ninth Circuit demands more: "where an attorney's

4  advice may integrally involve both legal and non-legal analysis," the Ninth Circuit applies the

5  "primary purpose test," in which "courts look at whether the *primary purpose* of the communication

6  is to give or receive legal advice as opposed to business or tax advice." *In re Grand Jury*, 13 F.4th

7  at 713-14. Given the unambiguously non-legal context of the entire thread—from start (email from

8  TechCrunch) to finish ("Here's where this netted out," pasting the as-published TechCrunch

9  article)—Facebook has failed to show that the redacted comments by attorneys throughout were

10  "primarily" made for the purpose of giving legal advice, as required under Ninth Circuit law.[7]

11  **II.**   **Each Challenged Communication Was Made To A Third Party Who Was Not A**

12  **Functional Employee With Respect To The Claimed Privilege**

13       Next, even if one or more of the redacted communications was made primarily for the

14  purpose of providing legal advice (which seems unlikely based on the information available to

15  Plaintiffs), there is a separate problem with Facebook's claims of attorney-client privilege over the

16  redacted communications in Exs. C-E: each clawed-back communication was made to a third-party

17  press consultant, Rebecca Hahn of The OutCast Agency. *See* Ex. C at R1-R8; Ex. D at R9.

18       "The transmission of a communication to a party outside the attorney-client relationship

19  destroys the confidentiality of the communication and therefore the privilege may not be invoked

20  as to that communication." *Schaeffer v. Gregory Village Partners*, 78 F. Supp. 3d 1198, 1202 (N.D.

21  Cal. 2015). Here, each clawed-back communication was sent to Ms. Hahn—a person who was not

22  a Facebook employee in April 2018 (or ever). In order to claim attorney-client privilege over the

23

24  [7] The outcome does not change regardless of whether this Court inquires if "*the* primary purpose"
    or "*a* primary purpose" of each redacted communication was to provide confidential legal advice.
25  *See In re Grand Jury*, 13 F.4th at 716-17 (declining to choose between "the primary purpose" or "a
    primary purpose" because "the universe of documents in which the ['a primary purpose'] test would
26  make a difference is limited . . . [and] would only change the outcome of a privilege analysis in truly
    close cases, like where the legal purpose is just as significant as a non-legal purpose"); *cf. Ruehle*,
27  583 F.3d at 607 ("The fact that a person is a lawyer does not make all communications with that
    person privileged. Because it impedes full and free discovery of the truth, the attorney-client
28  privilege is strictly construed." (cleaned up)).

**FILED UNDER SEAL**

1   communications in question—and wholly aside from its burden to establish these communications'

2   legal purpose—Facebook bears the burden of showing that they were sent only "to the client," *i.e.*,

3   Facebook. *See United States v. Graf*, 610 F.3d 1148, 1156 (9th Cir. 2010). Given that Ms. Hahn did

4   not actually work for Facebook at the time she was sent allegedly privileged communications,

5   Facebook must establish that Ms. Hahn was a "functional employee" of Facebook vis-à-vis the

6   communications in question to claim privilege. *See id.* at 1156-59.

7        On this issue, Plaintiffs have seen no actual evidence from Facebook, but did receive last

8   Thursday, November 4, 2021, a list of assertions that Facebook believes establish that "Ms. Hahn

9   was a functional employee of Facebook at the time the challenged emails were sent":

10  - Facebook classified Hahn as a contingent worker from June 1, 2011 to May 21, 2018.

11  - At the time Hahn began working for Facebook, its communications team was small, and some areas of the business lacked dedicated communications support. Outcast was retained to fill the gap where full-time Facebook employees were not available.

12  

13  

14  - Accordingly, Hahn was integrated into and was an integral member of Facebook's in-house communications team.

15  - Hahn reported to a Facebook employee.

16  - Hahn was routinely entrusted with important matters for the Facebook communications team. For example, she:

17    o Routinely interacted with the business without another member of Facebook's communications team present.

18    o Acted as a communications representative on behalf of the company at major events, including the annual F8 conference for developers and Oculus Connect events.

19  

20    o Staffed executives for major press interviews.

21    o Interacted with press on Facebook's behalf just like a full-time member of Facebook's communications team would.

22  - Hahn was subject to both a non-disclosure agreement and a confidentiality agreement.

23  - Hahn had badge access to Facebook facilities and routinely worked on the Facebook campus with other members of the communications team.

24  

25  Ex. J at 1.

26       Facebook provided Plaintiffs no actual evidence in support of the above allegations, so

27  Plaintiffs are unable to do much but take them at face value at this point—although under Ninth

28  Circuit law, the Court must actually evaluate Facebook's *proof* of its assertions about Ms. Hahn.

-11-

FILED UNDER SEAL

1  *See Graf*, 610 F.3d at 1157-59 (reviewing evidence and findings of fact relating to functional

2  employee determination); *Schaeffer*, 78 F. Supp. 3d at 1200-02, 1203-05 (evaluating evidence

3  relating to functional employee determination). On this score, Plaintiffs note that Ms. Hahn's own

4  public statements about her work in the years immediately preceding 2018 indicate that she worked

5  out of (and indeed founded) The OutCast Agency's Los Angeles office, and "worked with brands

6  across diverse industries including: Andreessen Horowitz, Facebook, Fifth Wall Ventures, Intuit

7  TurboTax, Instagram, Lyft, Mint.com, the NFL, Oculus, and Tanium." Ex. M at 1.

8        Based on Facebook's assertions about Ms. Hahn, and Ms. Hahn's own statements about her

9  work while at The OutCast Agency, Ms. Hahn does not closely resemble the consultants found to

10  be "functional employees" for privilege purposes in *Graf* and in *Schaeffer*. For example, in *Graf*,

11  "[e]vidence at trial . . . showed Graf was heavily involved in all facets of the corporation's

12  operations." 610 F.3d at 1153. Although ostensibly a "consultant," there was evidence that the only

13  reason Graf was not hired formally as a company employee was that the state of California had

14  banned him from insurance work, which was the company's business. *Id.*; *see also Schaeffer*, 78 F.

15  Supp. 3d at 1203 (discussing *Graf*). This stands in contrast to Ms. Hahn, who was apparently a

16  consultant in the truest sense of the word—working at (and out of) a third-party public relations

17  agency on behalf of nearly a dozen major accounts, of which Facebook was one. *See* Ex. M at 1;

18  *Universal Standard Inc. v. Target Corp.*, 331 F.R.D. 80, 90 (S.D.N.Y. 2019) ("functional equivalent

19  exception" inapplicable where third party lacked "independent decision-making authority, primary

20  responsibility, and . . . *had numerous other customers*" (emphasis added and cleaned up)); *In re

21  Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 352 F. Supp. 3d 207, 215 (E.D.N.Y.

22  2019) (consultants not "functional employees" where they "likely served as consultants for other

23  companies"); *Lynx Sys. Devs., Inc. v. Zebra Enter. Sols. Corp.*, 2018 WL 1532614, at *4 (D. Mass.

24  Mar. 28, 2018) (consultants not functional employees where "not obligated to work exclusively for

25  Zebra"); *Durling v. Papa John's Int'l, Inc.*, 2018 WL 557915, at *5 (S.D.N.Y. Jan. 24, 2018).

26        In *Schaeffer*—and in several cases analyzed by the Court in that decision—the consultants

27  found to be functional employees with respect to allegedly privileged communications had specific

28  legal bents to their responsibilities at the corporations in question. For example, in *In re Bieter Co.*,

FILED UNDER SEAL

16 F.3d 929 (8th Cir. 1994), "the consultant was intimately involved in the subject matter of litigation," *Schaeffer*, 78 F. Supp. 3d at 1203; in *In re Copper Market Antitrust Litigation*, 200 F.R.D 213 (S.D.N.Y. 2001), "the court found that the privilege extended to litigation-related communications to and from a public relations firm a corporation hired to respond to actual and anticipated litigation" *Schaeffer*, 78 F. Supp. 3d at 1203; and in *Schaeffer* itself, the consultant in question was hired amidst potential litigation and "acted as the public face of the company and provided information to [the company's] legal staff that was useful and necessary to evaluate legal strategy for the company going forward," *id.* at 1204. As a result, the consultant "acted as [the company's] functional employee *for the purpose of the attorney-client privilege*." *Id.*

On this last score, Ms. Hahn's responsibilities and role stand in contrast to the cases cited and applied in *Schaeffer*, and to *Schaeffer* itself. Specifically, per Facebook's own assertions about Ms. Hahn, Ms. Hahn was specifically and solely a *communications* employee at Facebook. *See* Ex. J. There is not a single assertion in Facebook's bullet list regarding Ms. Hahn's role in Facebook's legal strategy, or on Facebook's legal team. *See id.* Instead, Ms. Hahn's role—*as described by Facebook*—was as an important part of its communications team and strategy, which explains her presence throughout the decidedly non-legal communications in Exs. C-E. This is similar to the *Calvin Klein* case discussed in *Schaeffer* (*see Calvin Klein Trademark Trust v. Wachner*, 198 F.R.D. 53 (S.D.N.Y. 2000)), in which "the communications at issue appeared on their face to be routine suggestions from a public relations firm as to how to put the 'spin' most favorable to Calvin Klein on successive developments in the ongoing litigation." *Schaeffer*, 78 F. Supp. 3d at 1204 (cleaned up). "The [*Calvin Klein*] court found that few, if any of the documents in issue appear to contain or reveal confidential communications from the underlying client made for the purpose of obtaining legal advice." *Id.* (cleaned up).

So too here: even taking Facebook at its word, there is *no* evidence that Ms. Hahn was functionally part of Facebook's *legal* team, and thereby could be privy to confidential attorney-client communications for a *legal* purpose—and this makes perfect sense given the overall context of the challenged communications as non-legal in nature. *See, e.g.*, *Planned Parenthood Fed'n of Am., Inc. v. Ctr. For Med. Progress*, 2019 WL 1950381, at *6 (N.D. Cal. May 1, 2019) ("the

-13-

FILED UNDER SEAL

dispositive question [for the functional employee inquiry] is the consultant's relationship to the company and whether by virtue of that relationship she possesses information about the company that would assist the company's attorneys in *rendering legal advice*" (emphasis added and cleaned up)); *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 958, 964 (N.D. Ill. 2009) (not "functional equivalent" of employees where consultants' work not "necessary to assist counsel in rendering legal advice"). Ms. Hahn was a communications consultant for Facebook, and the challenged communications discuss press strategy; nothing more. Ms. Hahn's—a non-member of the legal team, functional or otherwise—presence on every communication in the email thread at issue simply underscores that Exs. C-D do not contain any confidential attorney-client communications made primarily for the purpose of legal advice.

III.     **Facebook Previously Produced The Challenged Communications, And Has Offered No Facts To Establish Its Past Production Was Inadvertent**

Each of the challenged communications was previously produced in unredacted form at least once, outside the context of this litigation. For example, Facebook admittedly produced each of the challenged communications to the Federal Trade Commission in 2019 as part of a civil investigation. Ordinarily, such a disclosure would waive privilege over the produced information. *See In re Pacific Pictures Corp.*, 679 F.3d 1121 (9th Cir. 2012); *see also Church & Dwight Co. v. Mayer Lab'ys, Inc.*, 2011 WL 6119146, at *1 (N.D. Cal. Dec. 8, 2011) (prior production to FTC waived privilege in subsequent private antitrust litigation); *United States v. Paulus*, 2021 WL 4494607, at *7 (E.D. Ky. Sep. 30, 2021) (determining that production of documents to government in prior investigation "resulted in waiver of both attorney-client and work product privileges" in subsequent litigation, and Rule 502(d) clawback order entered in subsequent litigation did not "retroactively limit the effect of [producing party's] disclosure" of documents in prior investigation because 502(d) order "cannot govern an entirely separate disclosure that occurred in a different proceeding.").

It is Facebook's burden under Ninth Circuit law to *establish* (not just assert) non-waiver. *See, e.g.*, *Ruehle*, 583 F.3d at 607-08 ("unless the protection be waived" is one of the eight essential elements of attorney-client privilege, and "[t]he party asserting the privilege bears the burden of *proving each essential element*" (emphasis added)). However, despite months of requests by

-14-

FILED UNDER SEAL

Plaintiffs, Facebook has declined to offer *any* specific facts regarding its past production(s) of the challenged communications. *See* Ex. J at 1-7; Ex. N; Ex. O. Facebook has refused to even identify to Plaintiffs (i) every entity Facebook previously produced these communications to; (ii) the dates and other circumstances of those production(s); (iii) when and how a clawback communication was made to those other entities; (iv) the circumstances of Facebook's review prior to previously producing the communications in question; or (v) any specific facts at all to support Facebook's claim that its previous production(s) of the information Facebook now claims privilege over was (or were) "inadvertent." *See id.* This has made it impossible for Plaintiffs to actually rebut (or even evaluate) Facebook's claim of inadvertent production in this brief—even though Plaintiffs specifically asked for this information in order to draft this brief, most recently on November 2, 2021. *See* Ex. J at 3. And unless Facebook offers actual evidence on inadvertence—including at minimum the basic facts outlined above—in its submission to the Court, it will have run afoul of its evidentiary burden to establish non-waiver over the contested communications. *See Ruehle*, 583 F.3d at 607-08; *Viamedia, Inc. v. Comcast Corp.*, 2017 WL 2834535, at *3-*7 (N.D. Ill. Jun. 30, 2017) (analyzing evidentiary support for claim of inadvertence); *Coles Wexford Hotel, Inc. v. UPMC and Highmark, Inc.*, 2016 WL 462856, at *1-*3 (W.D. Pa. Feb. 8, 2016) (same); Fed. R. Evid. 502(b).

## CONCLUSION

For the foregoing reasons, the redacted communications in Exs. C-E are not attorney-client privileged, and Facebook should be compelled to produce each of the documents listed in Ex. B to Plaintiffs in fully unredacted form.

FILED UNDER SEAL

DATED:  November 8, 2021

By:  ___/s/ Brian J. Dunne_____
**BATHAEE DUNNE LLP**
Yavar Bathaee (Bar No. 282388)
 yavar@bathaeedunne.com
Edward M. Grauman (admitted *pro hac vice*)
 egrauman@bathaeedunne.com
Andrew C. Wolinsky (admitted *pro hac vice*)
 awolinsky@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
(332) 206-7668

Brian J. Dunne (Bar No. 275689)
 bdunne@bathaeedunne.com
633 West Fifth Street, 26th Floor
Los Angeles, CA 90071
(213) 462-2772

**SCOTT + SCOTT ATTORNEYS AT LAW LLP**
Kristen M. Anderson (Bar No. 246108)
 kanderson@scott-scott.com
230 Park Avenue, 17th Floor
New York, NY 10169
(212) 223-6444

Christopher M. Burke (Bar No. 214799)
 cburke@scott-scott.com
David H. Goldberger (Bar No. 225869)
 dgoldberger@scott-scott.com
Yifan (Kate) Lv (Bar No. 302704)
 klv@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
(619) 233-4565

Patrick J. McGahan (admitted *pro hac vice*)
 pmcgahan@scott-scott.com
Michael P. Srodoski (admitted *pro hac vice*)
 msrodoski@scott-scott.com
156 South Main Street, P.O. Box 192
Colchester, CT 06415
(860) 537-5537

Respectfully submitted,

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Stephen A. Swedlow (admitted *pro hac vice*)
 stephenswedlow@quinnemanuel.com
Michelle Schmit (admitted *pro hac vice*)
 michelleschmit@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606-1881
(312) 705-7400

Kevin Y. Teruya (Bar No. 235916)
 kevinteruya@quinnemanuel.com
Adam B. Wolfson (Bar No. 262125)
 adamwolfson@quinnemanuel.com
Brantley I. Pepperman (Bar No. 322057)
 brantleypepperman@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
(213) 443-3000

Manisha M. Sheth (admitted *pro hac vice*)
 manishasheth@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Shana E. Scarlett (Bar No. 217895)
 shanas@hbsslaw.com
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
(510) 725-3000

Steve W. Berman (admitted *pro hac vice*)
 steve@hbsslaw.com
1301 Second Avenue, Suite 2000
Seattle, WA 98101
(206) 623-7292

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
W. Joseph Bruckner (admitted *pro hac vice*)
 wjbruckner@locklaw.com
Robert K. Shelquist (admitted *pro hac vice*)
 rkshelquist@locklaw.com
Brian D. Clark (admitted *pro hac vice*)
 bdclark@locklaw.com
Rebecca A. Peterson (Bar No. 241858)
 rapeterson@locklaw.com
Arielle S. Wagner (admitted *pro hac vice*)
 aswagner@locklaw.com

FILED UNDER SEAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**AHDOOT & WOLFSON, PC**
Tina Wolfson (Bar No. 174806)
   twolfson@ahdootwolfson.com
Robert Ahdoot (Bar No. 172098)
   rahdoot@ahdootwolfson.com
Theodore W. Maya (Bar No. 223242)
   tmaya@ahdootwolfson.com
Rachel Johnson (Bar No. 331351)
   rjohnson@ahdootwolfson.com
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
(310) 474-9111

100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900

*Interim Counsel for the Consumer Class*

**LEVIN SEDRAN & BERMAN LLP**
Keith J. Verrier (admitted *pro hac vice*)
   kverrier@lfsblaw.com
Austin B. Cohen (admitted *pro hac vice*)
   acohen@lfsblaw.com
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3997
(215) 592-1500

*Interim Counsel for the Advertiser Class*

Plaintiffs' Opening Brief re Facebook, Inc.'s August 20, 2021 Clawback Notice - Case No. 5:20-cv-08570-LHK (VKD)

FILED UNDER SEAL

**<u>ATTESTATION OF BRIAN J. DUNNE</u>**

This document is being filed through the Electronic Case Filing (ECF) system by attorney Brian J. Dunne.  By his signature, Mr. Dunne attests that he has obtained concurrence in the filing of this document from each of the attorneys identified on the caption page and in the above signature block.

Dated: November 8, 2021             By   */s/* Brian J. Dunne
                                                                  Brian J. Dunne

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 8th day of November 2021, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System, causing the document to be electronically served on all attorneys of record.

By   */s/* Brian J. Dunne
                Brian J. Dunne

Plaintiffs' Opening Brief re Facebook, Inc.'s August 20, 2021 Clawback Notice - Case No. 5:20-cv-08570-LHK (VKD)