WILMER CUTLER PICKERING
 HALE AND DORR LLP

SONAL N. MEHTA (SBN 222086)
 Sonal.Mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
 David.Gringer@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800

ARI HOLTZBLATT (*pro hac vice*)
 Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
 Molly.Jennings@wilmerhale.com
1875 Pennsylvania Ave NW
Washington, DC 20006
Telephone: (202) 663-6000

*Attorneys for Defendant Meta Platforms, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated,<br><br>                              Plaintiffs,<br><br>        v.<br><br>META PLATFORMS, INC., a Delaware Corporation headquartered in California,<br><br>                              Defendant. | Case No. 3:20-cv-08570-JD<br><br>**META PLATFORM, INC.'S MOTION TO DISMISS FIRST AMENDED CONSOLIDATED ADVERTISER CLASS ACTION COMPLAINT**<br><br>Hearing Date: May 26, 2022<br>Time: 10:00 am<br>Judge: Hon. James Donato |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION ................................................................................1

STATEMENT OF REQUESTED RELIEF .........................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................1

RELEVANT FACTUAL AND PROCEDURAL BACKGROUND ...................................3

ARGUMENT .......................................................................................................................4

      I.      Plaintiffs' Claims Are Still Time-Barred ................................................................4

             A.      Plaintiffs' "Copy, Acquire, Kill" Claims Remain Untimely .....................5

             B.      The New "Entry and Capture" Theory Is Untimely and Unauthorized ......................................................................................8

      II.     Plaintiffs Still Do Not State Valid Section 2 Claims ............................................9

             A.      None Of The New Conduct Challenged Is Cognizable .........................9

                    1.      The "Entry And Capture" Theory Fails .........................9

                    2.      Improving Meta's Machine Learning Models Is Not Anticompetitive .................................................12

             B.      "Copy, Acquire, Kill" Is Not Cognizable ................................13

      III.    Plaintiffs' Section 1 Claim (Count III) Largely Fails ...........................................14

             A.      An "Entry And Capture" Section 1 Claim Is Not Alleged And Is Meritless ..........................................................................14

             B.      Named Plaintiffs For The Pre-2018 Class Lack Standing For Count III ............................................................................15

CONCLUSION ..................................................................................................................15

1

# TABLE OF AUTHORITIES

2

Page(s)

**CASES**

3

4

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group*,
    592 F.3d 991 (9th Cir. 2010) ....................................................................12

5

*American Ad Management, Inc. v. General Telephone Co. of California*,
    190 F.3d 1051 (9th Cir. 1999) ...................................................................11

6

7

*ASARCO, LLC v. Union Pacific Railroad Co.*,
    765 F.3d 999 (9th Cir. 2014) .......................................................................8

8

9

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...................................................................................12

10

*Aspen Skiing Co. v. Aspen Skiing Highlands Corp.*,
    472 U.S. 585 (1984)...................................................................................13

11

12

*Associated General Contractors of California, Inc. v. California State Council of
    Carpenters*,
    459 U.S. 519 (1983).....................................................................................5

13

14

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)...................................................................................11

15

16

*Bird v. Department of Human Services*,
    935 F.3d 738 (9th Cir. 2019) .......................................................................5

17

18

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012) ..........................................................7, 10, 14

19

*Eastman v. Quest Diagnostics Inc.*,
    108 F. Supp. 3d 827 (N.D. Cal. 2015) .......................................................10

20

21

*Evans Analytical Group, Inc. v. Green Plant Farms, LLC*,
    2013 WL 3963822 (N.D. Cal. July 29, 2013).............................................15

22

23

*Feitelson v. Google, Inc.*,
    80 F. Supp. 3d 1019 (N.D. Cal. 2015) ..................................................11, 14

24

*FTC v. Facebook, Inc.*,
    2021 WL 2643627 (D.D.C. June 28, 2021)................................................13

25

26

*FTC v. Qualcomm Corp.*,
    969 F.3d 974 (9th Cir. 2020) ................................................9, 11, 13, 15

27

28

*Hennegan v. Pacifico Creative Service, Inc.*,
    787 F.2d 1299 (9th Cir. 1986) .....................................................................7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Hirsh v. Martindale-Hubbell, Inc.*,
    674 F.2d 1343 (9th Cir. 1982) ........................................................................12

*Huynh v. Chase Manhattan Bank*,
    465 F.3d 992 (9th Cir. 2006) ............................................................................4

*Jones v. Micron Technology Inc.*,
    400 F. Supp. 3d 897 (N.D. Cal. 2019) ...........................................................15

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997)........................................................................................5, 7

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)..........................................................................................12

*Liveuniverse, Inc. v. Myspace, Inc.*,
    2007 WL 6865852 (C.D. Cal. June 4, 2007), *aff'd*, 304 F. App'x 554 (9th Cir.
    Dec. 22, 2008)....................................................................................................13

*Los Angeles Land Co. v. Brunswick Corp.*,
    6 F.3d 1422 (9th Cir. 1993) ............................................................................10

*MetroNet Services Corp. v. Qwest Corp.*,
    383 F.3d 1124 (9th Cir. 2004) .........................................................................13

*Midwestern Machinery Co., Inc. v. Northwest Airlines, Inc.*,
    392 F.3d 265 (8th Cir. 2004) .............................................................................6

*Nacarino v. Chobani, LLC*,
    2022 WL 344966 (N.D. Cal. Feb. 4, 2022) ......................................................8

*New York v. Facebook, Inc.*,
    549 F. Supp. 3d 6 (D.D.C. 2021).......................................................................3

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) .......................................................................13

*Ohio v. American Express Co.*,
    138 S. Ct. 2274 (2018)......................................................................................10

*Oliver v. SD-3C LLC*,
    751 F.3d 1081 (9th Cir. 2014) ...........................................................................4

*Reveal Chat Holdco LLC v. Facebook, Inc.*,
    2021 WL 1615349 (N.D. Cal. Apr. 26, 2021), *aff'd*, 2022 WL 595696 (9th
    Cir. Feb. 28, 2022) .......................................................................................3, 6

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
    471 F. Supp. 3d 981 (N.D. Cal. 2020) ........................................3, 6, 12, 13, 14

*Samsung Electronics Co. v. Panasonic Corp.*,
    747 F.3d 1199 (9th Cir. 2014) ...................................................................5, 7, 9

*Somers v. Apple Inc.*,
    729 F.3d 953 (9th Cir. 2013) ..........................................................................9, 14

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021)........................................................................................15

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001)..............................................................................12

*United States v. Syufy Enterprises*,
    903 F.2d 659 (9th Cir. 1990) ..............................................................................10

*Verizon Commications, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)............................................................................................13

**STATUTES AND RULES**

Sherman Act, 15 U.S.C. §§ 1-38 ...................................................................*Passim*

Fed. R. Civ. P. 12(b)(6)........................................................................................1

Fed. R. Civ. P. 15(c) ........................................................................................8, 9

**OTHER AUTHORITIES**

Reply Br. for Plaintiffs-Appellants, *Reveal Chat Holdco LLC v. Meta Platforms*
    *Inc.*, No. 21-15863, 2021 WL 6102027 (9th Cir. Dec. 15, 2021), Dkt. 38...............................6

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE THAT, on May 26, 2022 at 10:00 am in Courtroom 11 of the U.S. District Court for the Northern District of California, San Francisco Division, at 450 Golden Gate Avenue, San Francisco, CA, this Motion To Dismiss filed by Defendant Meta Platforms, Inc. will be heard. Pursuant to Fed. R. Civ. P. 12(b)(6), Meta moves to dismiss the First Amended Consolidated Advertiser Class Action Complaint in the above-captioned action. Meta's motion is based on this Notice of Motion and the supporting Memorandum of Points and Authorities.[1]

**STATEMENT OF REQUESTED RELIEF**

Meta requests that the Court dismiss Counts I and II as to all Plaintiffs and Count III as to Plaintiffs Affilious, Inc., Frederick, Jeon, 406 Property Services, and Young under Rule 12(b)(6).

**MEMORANDUM OF POINTS AND AUTHORITIES[2]**

Claims similar to Plaintiffs' "Copy, Acquire, Kill" theory have now been rejected as untimely five times, including by Judge Koh in this case and by the Ninth Circuit. "Copy, Acquire, Kill" is a supposed strategy whereby Meta copied rivals' features, acquired certain apps, and removed third-party access to its Platform. Plaintiffs make only a half-hearted attempt to allege facts that would make those claims timely. Instead, they improperly advance a brand new theory that they call "Entry and Capture," which allegedly involved Meta entering into agreements for "signals" from businesses not alleged to be in the social advertising market. Despite 900 paragraphs of allegations, Plaintiffs' monopolization claims remain too little, too late.

*First*, both Plaintiffs' old and new theories are time-barred. As for the old, Plaintiffs have added a handful of more recent allegations regarding the "Copy, Acquire, Kill" scheme. But they still have not identified any overt act within the limitations period that (a) inflicted a new and accumulating injury on them and (b) was not merely a reaffirmation of an act outside the limitations period. The new "Entry and Capture" allegations likewise cannot resurrect the "Copy,

---

[1] On March 21, 2022, the day of this filing, the Judicial Panel on Multidistrict Litigation issued an order conditionally transferring Advertiser Plaintiffs' action to the *In re Google Digital Advertising Litigation* MDL pending in the Southern District of New York. MDL No. 3010, Dkt. 169 (J.P.M.L. Mar. 21, 2022). As that order is not yet effective, Meta proceeds with filing its Motion before this Court as scheduled.

[2] For purposes of this Motion only, Meta accepts non-conclusory factual allegations as true.

1  Acquire, Kill" theory, because "Entry and Capture" and "Copy, Acquire, Kill" are distinct schemes

2  that do not constitute a single, continuing violation. Evaluated on its own (as it should be), the

3  "Entry and Capture" theory is untimely on its face. The applicable four-year statute of limitations

4  runs from the filing of the new complaint; it does not relate back to the original complaint. The

5  conduct alleged to be a part of "Entry and Capture" began more than four years before the amended

6  complaint was filed, and that scheme's alleged later-in-time components were simply

7  reaffirmations of that untimely conduct that did not inflict a new injury on Plaintiffs. Plaintiffs thus

8  fail to allege a continuing violation and their Section 2 claims remain tardy.

9       *Second*, even if timely, Plaintiffs' Section 2 claims must be dismissed because none of the

10  challenged conduct is exclusionary as a matter of law. Plaintiffs' "Entry and Capture" theory

11  challenges vertical agreements that did not plausibly restrain competition in the social advertising

12  market. There are no allegations that these agreements foreclosed others' access to data, were

13  exclusive, or restrained other companies' ability to enter the market or build competitive products.

14  The closest Plaintiffs come to alleging any competitive effects in the relevant market at all is the

15  allegation that these vertical agreements *improved the quality of the advertising Plaintiffs bought*,

16  making it harder for others to compete. Even a purported monopolist is free to make its products

17  more appealing without running afoul of the antitrust laws. For the same reason, Plaintiffs have

18  failed to offer a cogent, let alone cognizable, theory to explain how Meta's alleged use of an

19  application called Onavo to *improve* its ad targeting is anticompetitive. The remaining conduct

20  alleged—nothing more than the old "Copy, Acquire, Kill" claims—fares no better. "Copy,

21  Acquire, Kill" remains largely premised on a noncognizable theory that Meta refused to deal with

22  app developers. Even beyond that, Plaintiffs never plausibly allege that any of Meta's alleged

23  conduct impeded viable competition in Plaintiffs' purported Social Advertising market.

24       *Finally*, Plaintiffs do not, and cannot, allege that the "Entry and Capture" agreements

25  violate Section 1. Judge Koh did not grant leave to amend that claim, and any Section 1 claim

26  challenging those agreements would fail as a matter of law for the same reason as Plaintiffs'

27  Section 2 claim challenging them. Separately, Plaintiffs' standalone Section 1 claim based solely

28  on the September 2018 Google Network Bidding Agreement (GNBA) must be dismissed for lack

of constitutional and statutory standing as to the Plaintiffs who did not purchase advertising after the agreement was entered into.

For these reasons, Counts I and II should be dismissed again, this time with prejudice. Count III must also be dismissed as to all but two of the named Plaintiffs because they were not—and could not be—injured by the challenged agreement.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

The Plaintiffs here are individuals and entities who purchased advertising from Meta. First Amended Consolidated Advertiser Class Action Complaint ("FAC") ¶ 1. Plaintiffs allege that Meta unlawfully maintained monopoly power in a purported "Social Advertising Market." *Id.* ¶¶ 31, 37. According to the initial complaint, Meta used an app called Onavo to collect information about social media applications. Dkt. 214 at 70. Armed with that data, Meta "enticed … potential competitors to build their products using [Meta's] 'Platform' then removed access to the Platform," allowing only certain apps continued access through "Datasharing Agreements"; "copied … potential competitors' products"; and "acquired numerous potential competitors" (including Instagram and WhatsApp). *Id.* at 70, 76-80, 86.

Judge Koh dismissed the "Copy, Acquire, Kill" claims as untimely. The Court explained that because this scheme allegedly started outside the limitations period, Plaintiffs had to identify "at least one 'overt act' that was part of [Meta's] 'Copy, Acquire, Kill' strategy [that] occurred after December 3, 2016," which Plaintiffs failed to do. *Id.* at 88-94. The same or similar claim has been repeatedly and consistently dismissed as untimely. *See Reveal Chat Holdco LLC v. Facebook, Inc.*, 2021 WL 1615349 (N.D. Cal. Apr. 26, 2021) ("*Reveal Chat II*"), *aff'd* 2022 WL 595696 (9th Cir. Feb. 28, 2022) ("*Reveal Chat III*"); *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981 (N.D. Cal. 2020) ("*Reveal Chat I*"); *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6 (D.D.C. 2021). Judge Koh also held that Plaintiffs did not adequately allege tolling under the fraudulent concealment doctrine. Dkt. 214 at 96. Judge Koh granted Plaintiffs leave to amend their "Copy, Acquire, Kill" claims, but her order required Plaintiffs to obtain leave of Court to allege any new claims. *Id.* at 107.

Plaintiffs have deleted the fraudulent concealment allegations from their FAC. Instead,

they seek to make the theory timely by alleging that three post-2016 acts furthered "Copy, Acquire, Kill." *First*, Plaintiffs allege that Meta continued to enter into datasharing agreements, pursuant to which Meta allegedly obtained non-exclusive licenses for data in exchange for access to its Platform. FAC ¶¶ 302-315 (describing agreements entered into between late 2016 and May 2019). *Second*, Plaintiffs allege that Meta continued using Onavo to collect information about popular social media applications. *Id.* ¶¶ 555-569. *Third*, Plaintiffs allege that, in early 2019, Meta continued to integrate previously acquired Instagram and WhatsApp. *Id.* ¶¶ 706-724, 762-763.

The FAC also alleges an entirely new theory of Section 2 liability. According to Plaintiffs' revised theory of the case, "Copy, Acquire, Kill"—rebranded as the "Platform scheme"—failed, depriving Meta of data. *See, e.g.,* FAC ¶¶ 303, 352. So, Plaintiffs now say, Meta implemented the new "Entry and Capture" strategy between 2016 and 2018 to obtain social data "signals." *Id.* ¶ 415. This scheme allegedly involved Meta "introducing directly competitive products in key sub-verticals, including e-commerce, location-based services, and longform video." *Id.* ¶ 400. Meta then "leveraged" its "entrance" into these "sub-verticals," *id.* ¶ 415, by agreeing not to "compete" in those "sub-verticals" in exchange for non-exclusive access to ad-targeting data, *see id.* ¶¶ 417, 425, 472, 536. And Meta used the data received to improve its advertising products. *See id.* ¶¶ 423, 454, 468, 472, 513. Meanwhile, Meta allegedly collected user data through Onavo to improve advertising quality. *See, e.g., id.* ¶¶ 537, 559-561, 823.

## ARGUMENT

## I. PLAINTIFFS' CLAIMS ARE STILL TIME-BARRED

Judge Koh granted Plaintiffs another opportunity to demonstrate that their "Copy, Acquire, Kill" claims are timely. They have not done so. The running of the four-year statute of limitations is "apparent on the face of the complaint." *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006). The same is true for the new "Entry and Capture" theory.[3] Their claims should be dismissed as time-barred.

---

[3] Plaintiffs have abandoned their claims for injunctive relief. *See* FAC at pp. 204-205. To the extent they continue to seek other forms of equitable relief, *id.*, those claims are barred by laches for the same reasons their damages claims are untimely. *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014) (when "applying laches" in antitrust cases, courts "look to the same legal rules that animate the four-year statute of limitations").

**A.      Plaintiffs' "Copy, Acquire, Kill" Claims Remain Untimely**

Plaintiffs continue to challenge the acquisitions of Instagram in 2012 and WhatsApp in 2014, the use of Onavo starting in 2011, changes to Facebook's Platform policies in 2015, and datasharing agreements that followed the 2015 Platform policy changes—all of which are outside the statute of limitations. Absent tolling, which Plaintiffs do not allege, the only way for such claims to be timely is if they are part of a "continuing violation" with "at least one 'overt act'… after December 3, 2016." Dkt. 214 at 88; *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014).[4] That overt act "must be a new and independent act that is not merely a reaffirmation of a previous act" and "must inflict new and accumulating injury on the plaintiff." *Samsung*, 747 F.3d at 1202. The post-2016 conduct alleged in the FAC does not meet that standard. The alleged integration of Instagram and WhatsApp, continued use of Onavo, and entry into later datasharing agreements either reaffirmed prior acts outside the statute of limitations or did not "inflict new and accumulating injury" on Plaintiffs. *Id.*

*First,* Plaintiffs cannot use the 2019 software integration to bootstrap their untimely challenge to the acquisitions because the integration did not inflict new injury on Plaintiffs and is nothing more than a reaffirmation of the underlying acquisitions. To begin, Plaintiffs nowhere plausibly allege how backend software integration of long-ago acquired assets had any impact on Meta's advertising prices. Both Instagram and WhatsApp ceased to be independent when they were acquired years earlier (outside the limitations period).[5] Thus, there is no new injury.

---

[4] For purposes of this motion, Meta accepts Judge Koh's ruling that plaintiffs could theoretically plead timely claims under the so-called continuing violation doctrine. But Meta reserves the right to argue on appeal that the continuing violation theory is not viable. *Bird v. Department of Human Servs.*, 935 F.3d 738, 746-748 (9th Cir. 2019). At most, the doctrine allows Plaintiffs to recover damages for acts occurring inside the limitations period. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) ("[T]he commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period.").

[5] Plaintiffs make much of the alleged effect of the integration on the ability of other litigants to "break up" Meta. *See, e.g.*, FAC ¶ 662. If Plaintiffs' argument is that they were injured because Meta has made it harder for it to be broken up if the FTC succeeds in its belated challenge to those acquisitions, which will not be scheduled for trial before 2024 at the earliest, that supposed injury is far too speculative to be cognizable (if such a theory could ever be cognizable). *See Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 543 (1983) (rejecting antitrust injury theory based on "nothing but speculation").

1   Moreover, the integration is simply an "unabated intertial consequence[]" of the initial acquisitions

2   of Instagram and WhatsApp, which occurred in 2012 and 2014 and caused no new harm to any

3   advertiser. *Midwestern Machinery Co. v. Northwest Airlines, Inc.*, 392 F.3d 265, 270 (8th Cir.

4   2004). Indeed, the Ninth Circuit recently dismissed Section 2 claims alleging that the exact same

5   conduct "harm[ed] competition in the … Social Advertising market[]." Reply Br. for Plaintiffs-

6   Appellants, *Reveal Chat III*, 2021 WL 6102027, at *16 (9th Cir. Dec. 15, 2021), Dkt. 38; *see*

7   *Reveal Chat III*, 2022 WL 595696. As there, any effect of the integration on Plaintiffs was simply

8   "part and parcel of acquiring a company." *Reveal Chat I*, 471 F. Supp. 3d at 991-992.

9       *Second*, the supposed continued use of Onavo to gather information about "what apps users

10   were spending time on and engaging with," *e.g.*, FAC ¶ 559, is likewise a mere reaffirmation of

11   the pre-limitations conduct that caused no new injury, as part of an overall course of conduct not

12   plausibly alleged to have caused Plaintiffs *any* antitrust injury. Plaintiffs admit as much, alleging

13   that "[s]ince 2011 and through the present," Meta has used Onavo to obtain "real time data about

14   mobile users," *id.* ¶ 234, and claiming that Meta has used "its Onavo code in similar ways since at

15   least 2016," *id.* ¶ 240. As in the previous complaint and prior cases finding these allegations

16   untimely, the alleged mechanism of harm is the same throughout the course of conduct: Onavo

17   supposedly gave Meta information about "potential competitive threats as well as the information

18   and time [Meta's] own users contributed to those threatening apps," allowing Meta to "fortif[y]"

19   barriers to entry in the social advertising market. *See, e.g.*, *id.* ¶¶ 555-569. These conclusory

20   allegations of continued use identify no new and accumulating injury to Plaintiffs, particularly

21   since the FAC does not challenge any acquisitions made based on this data other than those falling

22   outside the limitations period (*e.g.*, WhatsApp in 2014). *See, e.g.*, *Reveal Chat II*, 2021 WL

23   1615349, at *5 (claims based on Meta having "continued to operate … Onavo … as part of its

24   scheme to prevent the advent of a rival social advertising platform" are untimely).

25       *Third*, the additional datasharing agreements Plaintiffs claim Meta entered into to obtain

26   data from other companies after 2016, *see, e.g.*, FAC ¶ 308, cannot amount to a "continuing

27   violation." As alleged, these agreements were a reaffirmation of alleged conduct that began in

28   2015. Plaintiffs never suggest otherwise, characterizing the agreements as an ongoing consequence

of the 2015 Platform deprecation. *See, e.g.*, *id.* ¶ 306 (stating that Meta "would simply keep negotiating whitelist agreements" to obtain data lost through deprecation); ¶ 311 (describing the agreements as part of the "Platform scheme"); ¶ 830 (alleging a single "series" of agreements resulting from Meta "scuttling its Platform"). Thus, they are part of the same allegedly exclusionary "Platform Scheme" already found to be time-barred. Further, Plaintiffs have never plausibly alleged that datasharing agreements like these caused them *any* harm, much less the "new and accumulating" harm that the law requires. Nor could they. As alleged, these agreements improved Meta's ability to target advertisements on behalf of Plaintiffs and other advertisers and are not alleged to have harmed competition in social advertising. *See, e.g.*, *id.* ¶ 311 (agreements "provide[d] Facebook with event-related social data" for its social advertising business). These agreements were "non-exclusive," meaning signatories were free to acquire data from or provide data to other sources. *See id.* ¶ 308 (agreements "granted Facebook 'a non-exclsuive, transferable, sub-licensable, royalty-free worldwide license to use" certain data). That precludes finding any cognizable injury, let alone a new one. *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012) (non-exclusive vertical contracts unlawful if they "foreclose competitors from entering or competing" or "facilitat[e] horizontal collusion").

    *Finally*, the newly alleged "Entry and Capture" scheme does nothing to change the conclusion that Plaintiffs' "Copy, Acquire, Kill" claims are untimely. Within limitations period conduct can revive only claims based on the *same*, ongoing violation of the antitrust laws. *Samsung*, 747 F.3d at 1202; *see also* Dkt. 214 at 88 (Plaintiffs "must allege that at least one 'overt act' that *was part of Facebook's 'Copy, Acquire, Kill' strategy* occurred after December 3, 2016" (emphasis added)). Later acts must be "part of the violation," and "the commission of a separate new overt act generally does not" revive claims premised on earlier conduct. *Klehr*, 521 U.S. at 189 (collecting cases). Here, Plaintiffs themselves allege that "Entry and Capture" was devised after "Copy, Acquire, Kill" proved unsuccessful and "sunsetted." *See, e.g.*, FAC ¶¶ 347, 399, 411. As such, "Entry and Capture" as alleged was a distinct scheme and not an act in furtherance of the alleged "Copy, Acquire, Kill" scheme. *See Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299, 1301 (9th Cir. 1986) (new acts must be "in furtherance of" the overall scheme).

1

**B.**     **The New "Entry and Capture" Theory Is Untimely and Unauthorized**

2       Plaintiffs' challenge to "Entry and Capture" itself is improper and also untimely. Because

3  the prior order granted Advertisers leave to amend *only* their "Copy, Acquire, Kill" claims, Dkt.

4  214 at 107, these new allegations should not be considered by the Court, *see Nacarino v. Chobani,*

5  *LLC*, 2022 WL 344966, at *13 (N.D. Cal. Feb. 4, 2022) ("'[W]here leave to amend is given to

6  cure deficiencies in certain specified claims, courts have held that new claims alleged for the first

7  time in the amended pleading should be dismissed or stricken.'").

8       Even if these claims could be considered, they should be dismissed as untimely. The initial

9  complaint did not challenge the "Entry and Capture" agreements, and, as just explained, the

10  distinct "Copy, Acquire, Kill" scheme that *was* challenged had allegedly "sunsetted" before "Entry

11  and Capture" began. FAC ¶ 347. Thus, claims premised on "Entry and Capture," on their face, do

12  not relate back to the "conduct, transaction, or occurrence set out" in the Advertisers' initial

13  complaint. *See* Fed. R. Civ. P. 15(c). Without that "'common core of operative facts,'" Plaintiffs

14  may not rely on the date of their initial complaint to establish the limitations period. *ASARCO,*

15  *LLC v. Union Pac. R.R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014). Instead, the statute of limitations

16  applicable to these new claims runs from February 28, 2018, four years before the FAC was filed.

17      The claims premised on "Entry and Capture" fall outside this statute of limitations.

18  Plaintiffs allege that the "Entry and Capture" agreements were part of a single, ongoing course of

19  conduct. *See, e.g.*, FAC ¶¶ 414-416. That course of conduct, as alleged, began before February 28,

20  2018. *See, e.g.*, *id.* ¶¶ 463-467 (eBay agreement finalized in March 2017); ¶¶ 510-511 (agreements

21  with Netflix reached in August 2017). Thus, any claims based on the scheme are untimely unless

22  Plaintiffs have plausibly alleged a continuing violation. They have not. The one alleged agreement

23  entered after February 28, 2018 (with Foursquare), *id.* ¶ 423, did not inflict a "new and

24  accumulating" injury on Plaintiffs even as alleged. *See supra* p.7. And even if Plaintiffs attempt to

25  argue, contrary to their allegations, that the "Entry and Capture" agreements are not part of a single

26  scheme, their claims still should be dismissed. Independent claims based on the 2017 eBay and

27  Netflix agreements would be untimely because those agreements are outside the limitations period.

28  And Plaintiffs certainly have not plausibly alleged that the run-of-the-mill Foursquare data

1   licensing agreement, on its own, was anticompetitive or caused them any *new* harm. *See infra* pp.

2   11-12.

3       Meta's supposed use of Onavo to improve ad targeting through machine-learning fares no

4   better. *See, e.g.*, FAC ¶¶ 537, 542, 569. As with the "Entry and Capture" agreements, this alleged

5   new use of Onavo data was not part of the scheme alleged in the initial complaint, so the applicable

6   statute of limitations runs from the filing of the amended one. *See* Fed. R. Civ. P. 15(c); *supra* p.3.

7   And because the use of Onavo for this purpose concededly began outside of the applicable

8   limitations period, FAC ¶¶ 555-556, Plaintiffs must identify new and accumulating injury after

9   February 28, 2018 that derives from something other than a reaffirmation of a prior act, *Samsung*,

10  747 F.3d at 1202. They (once again) cannot. Meta's use of data to improve its advertising did not

11  injure the Plaintiffs.

12  **II.   PLAINTIFFS STILL DO NOT STATE VALID SECTION 2 CLAIMS**

13      "'[T]o be condemned as exclusionary, a monopolist's act must have [an] anticompetitive

14  effect,'" such as "diminished consumer choices and increased prices [that] are the result of a less

15  competitive market due to" the challenged conduct. *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 990

16  (9th Cir. 2020). Monopolization also requires "causal antitrust injury." *Somers v. Apple Inc.*, 729

17  F.3d 953, 963 (9th Cir. 2013). Plaintiffs do not plausibly allege any cognizable anticompetitive

18  effect from the challenged conduct, let alone one that caused them antitrust injury.

19      **A.   None Of The New Conduct Challenged Is Cognizable**

20          **1.   The "Entry And Capture" Theory Fails**

21      Plaintiffs' "Entry and Capture" theory as alleged does not state an antitrust violation. There

22  is no explanation—let alone a plausible allegation—of how Meta's non-exclusive agreements with

23  Netflix, eBay, and Foursquare excluded competition in social advertising. At best, the FAC alleges

24  harm in *other markets*, which is not cognizable here. *Qualcomm*, 969 F.3d at 993, 999-1000.

25      The challenged agreements, as alleged, had no anticompetitive effect in the social

26  advertising market. Under each agreement, Meta allegedly either continued receiving data or

27  acquired new data that it used as inputs for its advertising and other products. FAC ¶¶ 423, 454,

28  468, 472, 513. The contracts are not alleged to be exclusive or to restrict Netflix's, eBay's, or

Foursquare's ability to collect or use their own data or share their data with other entities. That is, Netflix, eBay, and Foursquare were free to share their data with Meta's advertising competitors, or use it themselves. *See id.* ¶¶ 423-424, 463-464, 466, 510 (describing terms). Non-exclusive vertical contracts like these are anticompetitive only if they "foreclose competitors from entering or competing in" the relevant market or "facilitat[e] horizontal collusion." *Brantley*, 675 F.3d at 1198. Given the absence of any restrictions on the contracting parties' ability to use data or offer advertising, Plaintiffs have not alleged that these agreements "foreclosed competition in a substantial share" of the claimed social advertising market. *Eastman v. Quest Diagnostics Inc.*, 108 F. Supp. 3d 827, 836-837 (N.D. Cal. 2015) (dismissing Section 2 claim). Beyond that, the FAC does not even attempt to allege facts supporting an inference that the agreements "reduced output, increased prices, or decreased quality" in the relevant market. *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2284 (2018).

Plaintiffs' apparent theories for why these agreements are anticompetitive are unavailing. *First*, Meta's non-exclusive access to data for ad-targeting is not a barrier to entry. *See* FAC ¶¶ 428, 472, 535 (alleging that agreements "strengthened the DTBE [Data Targeting Barrier to Entry]"). According to Plaintiffs, the alleged barrier to entry is the need to "facilitate social data mining, including through machine learning and artificial intelligence, that would create *even more value* for users, developers, and advertisers." *Id.* ¶ 63 (emphasis added). In other words, the "barrier to entry" is the need to have strong ad targeting products, and these agreements made Meta an even more formidable competitor. Facing "aggressive competition" is not "a structural barrier to entry." *United States v. Syufy Enters.*, 903 F.2d 659, 667-668 (9th Cir. 1990). Barriers to entry are instead "additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants" or "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns." *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1427-1428 (9th Cir. 1993). Because Meta is not alleged to have restricted Netflix, eBay, or Foursquare from doing anything with their data—including sharing that data with competitors—new entrants faced no additional costs. Nor does the FAC allege any plausible facts suggesting that this conduct deterred

1   any firm from competing. Thus, Plaintiffs have not alleged that any entry barrier was increased.[6]

2       *Second*, the only other competitive effects Plaintiffs allege are both implausible and

3   occurred in other markets. The FAC speculates that Meta agreed to "cripple competitive aspects"

4   of non-advertising products (Marketplace and Watch) in exchange for eBay's and Netflix's social

5   advertising data. FAC ¶ 393; *see also id.* ¶¶ 472, 514. Whatever competitive effect this could have

6   had is "outside the 'areas of effective competition'" plaintiffs have alleged. *Qualcomm*, 969 F.3d

7   at 999-1000. Plaintiffs thus cannot challenge these agreements. *See id.* Moreover, the effects of

8   these purported agreements are not plausibly alleged. Meta allegedly agreed ▉▉▉▉▉▉▉▉▉▉

9   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. FAC ¶¶ 464, 510. This is self-

10  evidently not an agreement "not to compete" because, by its terms, it contemplates continued

11  competition. *See, e.g.*, *id.* ¶¶ 472, 515. And while the FAC alleges that Meta "scaled back" parts

12  of Facebook Watch, *id.* ¶ 525; *see also id.* ¶¶ 526-530, 532-534, it only speculates that these

13  product changes were undertaken in connection with the challenged Netflix agreement, alleging

14  that Meta made the product changes sixteen months after its agreement with Netflix (and eight

15  months after the latest amendment to that agreement). *See e.g.*, *id.* ¶¶ 510-511, 526. Allegations,

16  such as these, that are (at best) "merely consistent" with both lawful and unlawful activity cannot

17  survive a motion to dismiss. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

18      Plaintiffs likewise fail to plausibly allege that the Foursquare agreement had any

19  exclusionary effect, let alone in the social advertising market. Meta allegedly licensed Foursquare

20  data to "improve[]" various products. FAC ¶ 423. The agreement did not place any restrictions on

21  Foursquare's use of its own data or its ability to compete. *Id.* ¶ 424. Nevertheless, Plaintiffs assert

22  that Foursquare was a "nascent social network" and, without explanation, that the challenged

23  agreement brought about its "effective exit … from social networking." *Id.* ¶¶ 418, 425. The notion

---

[6] Moreover, Plaintiffs cannot claim causal antitrust injury solely on the basis that conduct allegedly increased entry barriers. Tracing Plaintiffs' purported injury back to "that which makes the conduct unlawful," *American Ad Mgmt., Inc. v. General Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999), would require identifying some new, unspecified, and certainly unalleged competitor whose entry was thwarted by the supposed increase in the barrier to entry. A barrier to entry that is not alleged to have deterred any specific competitor's entry is entirely too speculative to support antitrust injury. *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1029 (N.D. Cal. 2015).

that Foursquare would have agreed to "exit" a purportedly promising line of business in exchange for only $7.6 million in consideration, spread over four years, is implausible on its face. *Id.* ¶ 424. Regardless, the conclusory allegation that Foursquare exited social networking because of the agreement, which did not require it to do so, *id.*, cannot be credited. *Ashcroft v. Iqbal*, 556 U.S. 662, 680-681 (2009). And even if it could, it would not move the needle. Plaintiffs do not plausibly allege that the agreement prevented Foursquare (or any other firm) from competing with Meta in social *advertising*. The FAC offers no allegations, as it must, suggesting that Foursquare (or any other firm) had the means "to build or scale a social advertising business," FAC ¶ 428; *see id.* ¶ 63, that could have exerted competitive pressure on Meta but for Foursquare's exit from the social networking market. *Reveal Chat I*, 471 F. Supp. 3d at 1002-1003; *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001).

If anything, the FAC suggests that each of the challenged agreements—like most vertical agreements—is procompetitive. *See, e.g.*, *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 889-892 (2007). Plaintiffs allege that the agreements enabled Meta to continue receiving or to acquire new data that it used to "improv[e]" its advertising and other products. FAC ¶¶ 423, 454, 468, 472, 513. "A major goal of the antitrust laws is to promote" "practices" like these "employed to increase the efficacy of a firm's product." *Hirsh v. Martindale-Hubbell, Inc.*, 674 F.2d 1343, 1348 (9th Cir. 1982); *cf. Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp.*, 592 F.3d 991, 999 (9th Cir. 2010) ("product improvement by itself does not violate Section 2").

### 2.  Improving Meta's Machine Learning Models Is Not Anticompetitive

Separately, Meta's alleged use of Onavo "data to build machine-learning models that allowed it to make inferences about demographics" and "train machine learning and statistical models with high levels of precision that allowed Facebook to target users by age … location … and other attributes" is not anticompetitive. FAC ¶ 561. Plaintiffs themselves allege that this use "directly strengthened Facebook's ability to target users for content and advertising." FAC ¶ 569. These allegations thus assert *product improvement*, to Plaintiffs' benefit, and thus presumptively foreclose the claim as a matter of law. *Tyco*, 592 F.3d at 998. Aside from the fact that these changes improved Meta's products, the FAC alleges no coercive or otherwise anticompetitive conduct

1    associated with the use of these applications to improve ad targeting.

2           **B.**      **"Copy, Acquire, Kill" Is Not Cognizable**

3           Plaintiffs' "Copy, Acquire, Kill" claims are primarily based on a noncognizable refusal-to-

4    deal theory. According to that theory, almost seven years ago, Meta denied third-party apps access

5    to Facebook APIs, FAC ¶¶ 219-221, and demanded concessions in contracts for user data shared

6    with consent, *id.* ¶¶ 302-315. Multiple courts have already dismissed similar challenges to Meta's

7    Platform policies, both for failure to state a claim and for being untimely. *FTC v. Facebook, Inc.*,

8    2021 WL 2643627, at \*17 (D.D.C. June 28, 2021); *Reveal Chat I*, 471 F. Supp. 3d at 1002. These

9    courts were correct. Generally, "there is no duty to aid competitors." *MetroNet Servs. Corp. v.*

10    *Qwest Corp.*, 383 F.3d 1124, 1131 (9th Cir. 2004). The narrow exception to this rule resides "at

11    or near the outer boundary of § 2 liability." *Verizon Commc'ns, Inc. v. Law Offices of Curtis V.*

12    *Trinko, LLP*, 540 U.S. 398, 409 (2004). It applies only where a firm (1) "unilateral[ly] terminat[es]

13    … a voluntary and profitable course of dealing; (2) the only conceivable rationale or purpose is

14    'to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion

15    of competition'; and (3) the refusal to deal involves products that the defendant already sells in the

16    existing market to other similarly situated customers." *Qualcomm*, 969 F.3d at 993-994.

17           Plaintiffs do not allege facts fitting this narrow exception. API access was granted to

18    developers for free. *See* FAC ¶ 124. Thus, Meta was not refusing to sell a product sold to other

19    customers. *See MetroNet*, 383 F.3d at 1133; *Reveal Chat I*, 471 F. Supp. 3d at 1002. Discontinuing

20    competitors' free access to Meta assets did not indicate, as it must, any "willingness to sacrifice

21    short-term profits, let alone in a manner that was irrational but for its tendency to harm

22    competition." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1076 (10th Cir. 2013); *see also*

23    *Qualcomm*, 969 F.3d at 993; *FTC v. Facebook, Inc.*, 2021 WL 2643627, at \*16-17. There is also

24    no allegation that prior API access was a profitable joint product offering, as was at issue in *Aspen*

25    *Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 589-593 (1984). *See Liveuniverse, Inc.*

26    *v. Myspace, Inc.*, 2007 WL 6865852, at \*13 (C.D. Cal. June 4, 2007), *aff'd*, 304 F. App'x 554, 556

27    (9th Cir. 2008) ("a refusal-to-deal claim … require[s] 'an affirmative decision or agreement to

28    cooperate' between competitors").

1      Moreover, Plaintiffs' allegations—both old and new—concerning datasharing agreements

2 for ongoing Platform access make no attempt to explain how these vertical agreements had the

3 requisite degree of foreclosure to state a valid Sherman Act claim. FAC ¶¶ 302-315. There is no

4 allegation that the agreements are exclusive, *id.* ¶ 308, or that signatories were otherwise prevented

5 from sharing their data with other advertising platforms, *see Brantley*, 675 F.3d at 1198.

6      Plaintiffs' challenge to Meta's integration of Instagram and WhatsApp with its Facebook

7 product is also meritless. Integrating an asset a firm already owns is not exclusionary because it

8 does not remove an independent competitor from the market. Plaintiffs' allegation that the

9 integration degraded Meta's "AI and ML systems" and in so doing somehow "fortified the DTBE,"

10 FAC ¶¶ 761, 763, is nonsensical. It is facially implausible that Meta could strengthen a barrier to

11 entry rooted in product quality by making its product worse. *See supra* pp. 10-11. Making its

12 products worse would make it easier, not harder, for would-be competitors to enter the market.

13 The Court should thus disregard the allegations entirely.

14      For similar reasons, neither the datasharing agreements nor Meta's acquisitions and

15 integration of Instagram and WhatsApp could have caused Plaintiffs antitrust injury. The FAC

16 does not explain how any of the "40,000 third-party apps that relied on the [deprecated] APIs,"

17 FAC ¶ 221, or the firms that entered (non-exclusive) datasharing agreements could have entered

18 the social advertising market and exerted competitive pressure to lower prices. It also does not

19 allege that Instagram and WhatsApp were "willing to, or even could," enter the alleged market.

20 *See Reveal Chat I*, 471 F. Supp. 3d at 1002-1003 (dismissing nearly identical allegations); FAC ¶

21 267 ("Instagram had not at the time of the merger meaningfully monetized its user engagement

22 and social data"), ¶¶ 696-697 (WhatsApp founder "quit in protest" when Meta began monetizing

23 data). This makes it impossible for the Court to "determine whether Plaintiffs' alleged price injury

24 'flows from that which makes [Meta's] conduct unlawful,'" *Feitelson*, 80 F. Supp. 3d at 1028, and

25 is an independent basis for dismissing the "Copy, Acquire, Kill" claims, *Somers*, 729 F.3d at 963.

26 **III.    PLAINTIFFS' SECTION 1 CLAIM (COUNT III) LARGELY FAILS**

27      **A.    An "Entry And Capture" Section 1 Claim Is Not Alleged And Is Meritless**

28      Although Plaintiffs now for the first time challenge vertical agreements as part of their

1   Section 2 claim, they do not challenge those agreements under Section 1 of the Sherman Act.  FAC

2   ¶ 874. Yet, Plaintiffs' class certification allegations suggest Plaintiffs may seek to rely on the new

3   agreements in connection with their Section 1 claim.[7] FAC ¶ 847(h), (i). If Count III includes other

4   agreements, it must be dismissed. Those agreements are lawful, *see supra* pp. 9-12; *Qualcomm*,

5   969 F.3d at 991 (standards under Sections 1 and 2 are generally the same), and Plaintiffs were

6   required to seek leave to add the claims, which they did not do, Dkt. 214 at 107.

7        **B.      Named Plaintiffs For The Pre-2018 Class Lack Standing For Count III**

8             The named Plaintiffs for the putative class of pre-2018 advertisers lack standing to bring

9   Count III. None bought advertising after the GNBA was executed and therefore none could have

10  paid higher prices for advertising on Facebook because of the GNBA.[8] Under Article III, plaintiffs

11  have standing to challenge only conduct that causes them injury. *TransUnion LLC v. Ramirez*, 141

12  S. Ct. 2190, 2204-2205 (2021). The antitrust laws have an even more exacting standard. *Jones v.*

13  *Micron Tech. Inc.*, 400 F. Supp. 3d 897, 907-912 (N.D. Cal. 2019). Here, Plaintiffs Affilious, Inc.,

14  Frederick, Jeon, and 406 Property Services allege that the GNBA injured them through higher

15  prices. *See* FAC ¶¶ 656, 796. But the GNBA was not executed until a year after they last purchased

16  an ad. *See id.* ¶¶ 24-25, 27-28, 646.[9] Thus, there was no injury and these Plaintiffs lack standing.

17                                        **CONCLUSION**

18            For the reasons discussed, this Court should grant Meta's motion to dismiss Counts I and

19  II with prejudice and Count III as to named Plaintiffs for the pre-2018 class and Mark Young.

---

[7] Meta raised this divergence, but Plaintiffs refused to address it other than to assert without explanation that the amendment was "authorized, appropriate, and timely."

[8] Meta raised this argument in its motion to dismiss. *See* Dkt. 97 at 34-35, Dkt. 109 at 34 n.35. Judge Koh's order did not address it. *See* Dkt. 214 at 102-106.

[9] Mark Young is alleged to have purchased advertising "between June 2017 and April 2019," *see* FAC ¶ 26, but he did not buy Meta advertisements after April 2018, Dkt. 97-7 ¶ 4. His purchase records are incorporated by reference, and so may be considered. *See Evans Analytical Grp., Inc. v. Green Plant Farms, LLC*, 2013 WL 3963822, at *1 n.1 (N.D. Cal. July 29, 2013). Meta brought these records to Plaintiffs' attention and Plaintiffs have still articulated no basis for their allegation.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: March 21, 2022

Respectfully submitted,

By: */s/ Sonal N. Mehta*

SONAL N. MEHTA (SBN 222086)
 Sonal.Mehta@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
 David.Gringer@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800

ARI HOLTZBLATT (*pro hac vice*)
 Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
 Molly.Jennings@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
1875 Pennsylvania Ave NW
Washington, DC 20006
Telephone: (202) 663-6000

*Attorneys for Defendant Meta Platforms, Inc.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of March, 2022, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System.

By:   */s/ Sonal N. Mehta*
          Sonal N. Mehta

META'S MOTION TO DISMISS
ADVERTISERS' AMENDED COMPLAINT