## FILED UNDER SEAL

**BATHAEE DUNNE LLP**
Yavar Bathaee (Bar No. 282388)
  yavar@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
(332) 322-8835

**SCOTT + SCOTT ATTORNEYS AT LAW LLP**
Kristen M. Anderson (Bar No. 246108)
  kanderson@scott-scott.com
230 Park Avenue, 17th Floor
New York, NY 10169
(212) 223-6444

*Interim Co-Lead Consumer Class Counsel*

*Interim Co-Lead Advertiser Class Counsel*

[Additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., | Consolidated Case No. 3:20-cv-08570-JD |
| Plaintiffs, | **ADVERTISER PLAINTIFFS' OPPOSITION TO META'S MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED ADVERTISER CLASS ACTION COMPLAINT** |
| vs. | |
| META PLATFORMS, INC., | |
| Defendant. | Hon. James Donato |
| | Hearing Date:  May 26, 2022 |
| | Time:  10:00 a.m. |

**FILED UNDER SEAL**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ...................................................................................................1

ARGUMENT .......................................................................................................3

I.  ADVERTISERS' AMENDED SECTION 2 CLAIMS ARE AUTHORIZED AND TIMELY ......................................................................................................3

    A.  THE FAC'S ALLEGATIONS REGARDING ANTICOMPETITIVE DATA SHARING AGREEMENTS (SECTIONS V AND VII) ARE TIMELY AND AUTHORIZED ...............................................................................3

    B.  THE FAC'S ONAVO ALLEGATIONS ARE AUTHORIZED AND FACIALLY TIMELY ...............................................................................8

    C.  THE FAC'S PRODUCT INTEGRATION ALLEGATIONS ARE TIMELY AND AUTHORIZED ...............................................................................9

II.  THE FAC ADEQUATELY ALLEGES SECTION 2-VIOLATIVE CONDUCT .............11

    A.  THE FAC ALLEGES EXCLUSIONARY CONDUCT AS PART OF A MONOPOLY BROTH, WHICH META CANNOT DISMEMBER .....................11

    B.  THE FACIALLY TIMELY API AND DATA SHARING AGREEMENTS ALLEGED IN FAC SECTIONS V AND VII ARE ANTICOMPETITIVE AND FAIL UNDER THE RULE OF REASON ................................................11

    C.  THE ONAVO CONDUCT IS ANTICOMPETITIVE AND FAILS THE RULE OF REASON .........................................................................................14

    D.  META'S INTEGRATION OF AI / TARGETING SYSTEMS IS ANTICOMPETITIVE ...............................................................................14

    E.  ADVERTISERS DO NOT SEEK DAMAGES FOR—OR ALLEGE MONOPOLIZATION BASED ON—CONDUCT OUTSIDE OF THE LIMITATIONS PERIOD, INCLUDING AS TO THE APRIL 2015 REFUSAL TO DEAL WITH DEVELOPERS ...................................................................15

III.  META'S SECTION 1 ARGUMENTS FAIL ..................................................15

IV.  REQUEST FOR LEAVE TO AMEND ..........................................................15

CONCLUSION ...................................................................................................15

**FILED UNDER SEAL**

**TABLE OF AUTHORITIES**

**Cases**

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp.*,
   592. F.3d 991 (9th Cir. 2010) ................................................................................14

*E.W. French & Sons, Inc. v. Gen. Portland Inc.*,
   885 F.2d 1392 (9th Cir. 1989) ................................................................................5

*Free FreeHand Corp. v. Adobe Systems*, Inc.,
   852 F. Supp. 2d 1171 (N.D. Cal. 2012) ................................................................11

*FTC v. Qualcomm, Inc.*,
   969 F.3d 974 (9th Cir. 2020) ...............................................................11, 13, 15

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) ...............................................................................11

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
   383 F. Supp. 3d 187 (S.D.N.Y. 2019) ..................................................................12

*Reveal Chat Holdco LLC v. Meta Platforms, Inc.*,
   2022 WL 595696 (9th Cir. Feb. 28, 2022) ..........................................................10

*SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*,
   88 F.3d 780 (9th Cir. 1996) ..................................................................................11

*United States ex rel. Jones v. Sutter Health*,
   2020 WL 6544412 (N.D. Cal. Nov. 6, 2020) .......................................................15

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ................................................................................15

*Xechem, Inc. v. Bristol-Myers Squibb Co.*,
   372 F.3d 899 (7th Cir. 2004) ..................................................................................7

**Rules**
FED. R. CIV. P. 15(b) ...............................................................................................5

**FILED UNDER SEAL**

**PRELIMINARY STATEMENT**

On February 28, 2022, Advertisers filed a First Amended Complaint ("FAC," Dkt. 237) against Defendant Meta Platforms, Inc. ("Meta") with leave of the Court. (*See* Dkt. 214.) The new allegations in the FAC allege overt acts exclusively within the Clayton Act's four-year limitations period, including facially timely overt acts—all post-dating December 18, 2016—pertaining to (1) anticompetitive Extended API ("whitelist") data agreements with targeted developers; (2) anticompetitive market division and data sharing agreements with eBay, Netflix, and Foursquare; (3) anticompetitive leveraging of deceptively obtained Onavo data to maintain Meta's Social Advertising dominance; and (4) an anticompetitive integration of Meta's disparate AI and machine-learning systems and sources. The FAC also alleges, in detail, that each of the foregoing overt acts was indeed anticompetitive—*i.e.*, proscribed by Sherman Act § 2 as violating the rule of reason—and injured the Advertiser Plaintiffs, including by contributing to inflated advertising prices in the Social Advertising Market. Given the Court's previous ruling that (i) the Social Advertising Market has been adequately pleaded and (ii) Advertisers adequately pleaded Section 1 and 2 claims based on Meta's anticompetitive agreement with Google, the FAC plausibly asserts viable Section 2 claims against Meta based on five categories of exclusionary conduct—all timely on their face.

In view of the above, there are really no serious timeliness or plausibility questions left in this case. What remains are factual questions—and the parties have indeed proceeded into factual discovery, with expert discovery shortly on the way. Nonetheless, rather than answering, Meta has moved to dismiss portions of the FAC. (Dkt. 262, "Mot.") Meta's motion misstates the Court's previous ruling as to the scope of leave to amend; makes meritless and incoherent timeliness arguments; and ignores and dismembers the FAC's allegations of anticompetitive conduct by Meta in favor of blindered strawmen. The five categories of exclusionary conduct recited in the FAC are all timely; they are all adequately pleaded (and indeed, one category has already been upheld by this Court); and they all pertain to an adequately pleaded market. Meta's motion should be denied.

**BACKGROUND**

Advertisers commenced this action on December 18, 2020. (*See Affilious, Inc. v. Facebook, Inc.*, No. 5:20-cv-09217, Dkt. No. 1). After consolidation with the Consumer cases, which were

**FILED UNDER SEAL**

1  filed beginning December 3, 2020 (Dkt. No. 68), and the appointment of the undersigned as lead

2  and executive committee counsel for the Advertiser classes (Dkt. No. 73), Advertisers filed a

3  Consolidated Amended Complaint on April 22, 2021 (Dkt. No. 86, the "CAC").

4          Meta moved to dismiss the CAC. On January 14, 2022, after briefing and oral argument,

5  then-District Judge Koh sustained Advertisers' Social Advertising Market (Dkt. 214 at 33-38) and

6  Advertisers' Section 1 and 2 claims based on allegations that Meta and Google entered into an

7  unlawful market division agreement in September 2018 (*id.* at 100-06). The Court gave Advertisers

8  leave to amend as to the remaining Section 2 allegations in the CAC, which the Court referred to

9  (collectively with Consumers' similar allegations) as "Copy, Acquire, Kill" claims.[1] (*Id.* at 70-100.)

10         On February 28, 2022, Advertisers timely filed their FAC. In addition to facts supporting

11 the Advertisers' previously sustained Section 1 and 2 claims, the FAC alleges four more categories

12 of exclusionary acts in further support of Advertisers' Section 2 claims: (1) post-December 18, 2016

13 anticompetitive API / whitelisting agreements providing certain developers access to portions of

14 Meta's scuttled developer Platform (FAC ¶¶ 302-315); (2) 2017 and 2018 anticompetitive data

15 sharing agreements with eBay, Netflix, and Foursquare, which were extracted after ████████

16 ███████████████████████████████████████████████████████████████████

17 ███████████████████  (FAC ¶¶ 316-536); (3) post-December 18, 2016 anticompetitive use of

18 deceptively obtained data acquired through Onavo spyware to surveil and target rivals and their

19 users, including by using this deceptively obtained data to train Meta's AI and machine learning

20 targeting systems (FAC ¶¶ 537-569); and (4) the anticompetitive integration—begun in late 2019

21 and lacking legitimate, non-pretextual technical justification—of Meta's disparate AI and machine-

22 learning systems from across its business (FAC ¶¶ 657-764). For the sake of brevity, detailed

23 allegations concerning the above categories of conduct are discussed (as relevant) in the context of

24 the arguments set forth below.

25         On March 21, 2022, Meta moved to dismiss any claims in the FAC to the extent they are

26 based on new factual allegations.

27

28

---

[1] The phrase "copy, acquire, kill" did not appear in the CAC.

**FILED UNDER SEAL**

**ARGUMENT**

**I.    ADVERTISERS' AMENDED SECTION 2 CLAIMS ARE AUTHORIZED AND TIMELY**

In its January 14, 2022 opinion, the Court analyzed the anticompetitive conduct alleged in the CAC, and with respect to allegations other than those concerning Meta's anticompetitive market division agreement with Google (which it sustained under Sections 1 and 2), identified precisely what facts would have to be pleaded on amendment to state a timely claim. (Dkt. 214 at 88-96.) As explained below, the new allegations in the FAC are ***each*** addressed to subjects the Court expressly discussed in its opinion and authorized amendment for. Moreover, the new allegations are all timely on their face: they involve ***only*** overt acts entirely within the limitations period, which acts allowed Meta to unlawfully monopolize the Social Advertising Market, causing an overcharge injury.

**A.    The FAC's Allegations Regarding Anticompetitive Data Sharing Agreements (Sections V and VII) Are Timely and Authorized**

The CAC alleged, among other things, that Meta violated Section 2 of the Sherman Act by entering into anticompetitive data sharing agreements with developers. (Dkt. 214 at 86-88.) Beginning in 2012—executing a plan hatched by Mark Zuckerberg himself—Meta extracted data and other concessions from chosen developers by leveraging artificial competitive pressure, to wit, a pre-planned but secret forthcoming privatization of key Application Programming Interfaces (APIs) offered through Meta's developer Platform. (*Id.* at 83-88.) The CAC alleged that this activity first occurred in 2012-2015, during which time Meta entered into so-called "whitelist and data sharing agreements" with targeted developers while planning to destroy others (*id.*), and continued thereafter with further anticompetitive data agreements between Meta and chosen developers until at least April 2018 (*id.* at 88).

The Court's first MTD opinion analyzed Advertisers' data sharing allegations and held that they were untimely as pleaded because all specifically identified anticompetitive data agreements were made before December 3, 2016 (four years before this consolidated action was commenced). (Dkt. 214 at 93-94.) But the Court expressly gave Advertisers leave to amend their allegations, noting that Advertisers had pleaded that "[Meta] continued this discriminatory practice 'at least until April 4, 2018.'" (*Id.* at 93.) The CAC was, in the Court's view, deficiently pleaded in that it alleged

**FILED UNDER SEAL**

1    that Meta continued entering into anticompetitive data agreements with developers until 2018, but

2    didn't specifically identify or discuss any such agreements after December 3, 2016. (*Id.* at 93-94.)

3    The Court identified numerous pre-2016 agreements identified in the CAC as not facially timely,

4    including a 2015 data-sharing agreement with Netflix. (*Id.* at 93.) "Although Advertisers also

5    alleged that 'dozens of app developers entered into such Agreements with Facebook,'" the Court

6    reasoned, the CAC did not allege the "precise number and identity" of these developers, leaving the

7    allegations "bereft of any dates or details with regards" to agreements with these developers. (*Id.* at

8    94.) The district court, identifying this conduct as part of what it referred to as part of the "Copy,

9    Acquire, Kill" claims (*id.*), accordingly dismissed Advertisers' anticompetitive data agreement

10   allegations, but gave leave to amend them by February 28, 2022 (*id.* at 99-100, 107).

11           The FAC cures the pleading defects identified by the Court with respect to Advertisers'

12   anticompetitive data sharing allegations. Specifically, using documents produced in discovery in

13   this case, the FAC particularly identifies and describes two groups of allegedly anticompetitive data

14   agreements with developers that post-date December 18, 2016.[2] First, in Section V ("Facebook

15   Continues to Enter into Extended API Agreements after the April 2015 Platform Changes"), the

16   FAC specifically identifies ██████ post-December 18, 2016 API whitelist agreements by party and

17   date. (FAC ¶¶ 308-15 (identifying anticompetitive Extended API agreements entered between

18   December 27, 2016, and August 2019).) Second, in Section VII ("Facebook's Entry and Data

19   Capture Conduct"), the FAC identifies and describes facially timely anticompetitive data

20   agreements with developers Foursquare (FAC ¶¶ 418-28 (Foursquare ████████████

21   ████████████), eBay (FAC ¶¶ 429-72 (eBay ███████████████████████)), and Netflix

22   (FAC ¶¶ 473-536 (Netflix ██████████████████████████████

23   ████████████████████)). These data agreements are, without exception, overt acts that fall

24   within the four-year limitations period—they are timely on their face.

25           The FAC also explains the context for these agreements and how they were extracted. It is

26   the same context and story that appeared in the CAC—but bolstered with factual details and

27

28
_____
[2] As noted earlier, the initial Advertiser complaint was filed December 18, 2020.

**FILED UNDER SEAL**

1   particulars that were previously nonpublic and could only have been found from internal Meta

2   documents. For example, after having scuttled its Platform, which was its primary source of third-

3   party social data, Meta continued leveraging API agreements where it could (*see* FAC § V), and at

4   the same time ████████████████████████████████████████████████████████████

5   █████████████████ for its social advertising business (FAC §§ VI-VII.A). Repeating the

6   company's pattern of ████████████████████████████████████—where Meta

7   was a fiercely competitive new entrant, but not yet a monopolist—to benefit its social advertising

8   monopoly, Meta reached anticompetitive data agreements with ████████████ Netflix

9   (whose CEO was on Meta's Board) and eBay in ████████. (*See* FAC § VII.C (eBay); *id.*

10  § VII.D (Netflix).) Specifically, Meta agreed ██████████████████████████████

11  ████████████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████ that

13  allowed Meta to maintain the Data Targeting Barrier to Entry ("DTBE") surrounding its social

14  advertising monopoly as Facebook users increasingly spent their time and attention elsewhere on

15  the Internet and in other apps. (*See* FAC § VI (████████████████████████████

16  ██████████); *id.* at § VII (Meta's monopoly-maintaining response).)

17       Meta next argues that even if authorized, the new agreement allegations are untimely

18  because they supposedly do not relate back to the allegations in the CAC. This argument is baseless.

19  As an initial matter, Meta appears to concede that the FAC's data agreement allegations "are part of

20  the same allegedly exclusionary 'Platform Scheme'" in the CAC. (Mot. at 7.) This is correct: the

21  anticompetitive data agreements alleged in Sections V and VII of the FAC plainly "ar[i]se out of

22  the conduct, transaction, or occurrence set out—or attempted to be set out—in the original

23  pleading." FED. R. CIV. P. 15(b); *see also E.W. French & Sons, Inc. v. Gen. Portland Inc.*, 885 F.2d

24  1392, 1396 (9th Cir. 1989) ("[C]ourts should apply the relation back doctrine of Rule 15(c) liberally

25  and . . . '[t]his liberality is particularly persuasive in antitrust suits where there is ample opportunity

26  for discovery and other pretrial procedures.'" (citation omitted)).

27       Concessions aside, a review of the CAC lays to rest any relation back concerns. The CAC

28  alleges that Meta scuttled its Platform in order to extract data sharing agreements from potential and

**FILED UNDER SEAL**

1   actual competitors that fell into defined app categories. (CAC ¶¶ 136-37, 186, 189.) If these app

2   developers refused to enter into data sharing agreements, they would be cut off from core

3   functionality available on the Facebook Platform. (CAC ¶ 140.) The anticompetitive agreements in

4   the FAC are all anticompetitive data agreements that occurred as a result of, and as an effect of,

5   Meta's scuttling of the Facebook Platform and overall scheme, which left Meta vulnerable if it did

6   not replace the social data (███████████████████████) that it lost when it blindsided

7   developers and ejected tens of thousands of them from its Platform. (FAC ¶¶ 318-22, ¶¶ 395-410.)

8   In other words, because Meta had destroyed its source of social data in April 2015, it now had to

9   collect that social data itself or extract it from a third party.

10       That is what the FAC alleges Meta did—using the lessons it learned from its 2012-2015

11  Platform conduct. With respect to third parties that needed access to Meta's Platform for social data,

12  Meta entered into "whitelisting" agreements in exchange for their users' data within the limitations

13  period. (FAC ¶¶ 302-15.) As to third parties with valuable ████████ (FAC ¶ 330)—namely,

14  Netflix and eBay—████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████████

16  ██████████████████ (FAC ¶¶ 316-393.) ████████████████████████████

17  ████████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████████

20  ████████████████████████, strengthening the DTBE by ensuring that a new entrant would

21  need both Meta's places data *and* the licensed data to effectively enter the Social Advertising

22  market. (FAC ¶¶ 423-428.) These FAC allegations use evidence drawn from discovery in this case

23  to particularly support preexisting allegations of post-2015 data agreements in the CAC—

24  allegations that Judge Koh specifically identified when analyzing Advertisers' CAC and providing

25  leave to amend. (Dkt. 214 at 93-94.) They not only provide, as the Court requested, the identity of

26  each counterparty and the dates of each agreement, but also detailed allegations as to how Meta

27  extracted the agreements from each company—████████████████████████████

28

**FILED UNDER SEAL**

1 ██████████████████████████████████████████████████████

2 ████████████████████████████████████████████████.

3     Meta also argues that the exclusionary agreements with Netflix, eBay, and Foursquare, as

4 well as facially timely Extended API agreements, are somehow untimely because they do not inflict

5 "new and accumulating injury" with respect to pre-limitations period conduct. To the extent this

6 standard—drawn from the "continuing harm" doctrine—is even applicable here, where the overt

7 acts in Sections V and VII of the FAC are all timely on their face, it is unambiguously satisfied.

8 Advertisers specifically and plausibly plead that Meta's post-December 2016 data agreements

9 distinctly strengthened the DTBE protecting Meta's Social Advertising monopoly, distinctly helped

10 Meta illegally maintain that monopoly, and distinctly contributed to the anticompetitive overcharge

11 suffered by the Advertisers plaintiffs and class members. (*See* FAC ¶ 311 (Events API new and

12 accumulating injury); ¶ 417 ("[B]eginning in 2016 (and extending to the present), [Meta] used the

13 ██████████████████████████████████████████████████████

14 ████████████████████████████████████████████ with the

15 intent and effect of fortifying and maintaining [Meta's] DTBE and concomitant Social Advertising

16 monopoly. . . . Plaintiffs and the putative classes paid inflated prices for Facebook advertisements

17 as a result of this anticompetitive conduct."); ¶ 428 (Foursquare); ¶¶ 471-72 (eBay); ¶¶ 514, 535-36

18 (Netflix); ¶¶ 819-22, 824-26, 828, 830-36.) Meta's argument on this issue is both factually

19 counterintuitive (indeed, the class periods in this case do not even ***begin*** until December 2016) and

20 contrary to law—as the Court specifically recognized in its original MTD opinion. (*See* Dkt. 214 at

21 57-58 ("[I]mproperly prolonging a monopoly is as much an offense against the Sherman Act as is

22 wrongfully acquiring market power in the first place." (quoting *Xechem, Inc. v. Bristol-Myers*

23 *Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004) (Easterbrook, J.)).)

24     Meta further argues that Meta's anticompetitive ████████████████

25 ██████████—identified and specifically pleaded based on discovery obtained in this case—

26 are somehow exempt from the Court's MTD Order giving Advertisers leave to amend their Section

27 2 claims to specifically identify "new Whitelist and ***Data Sharing*** Agreements after December 3,

28 2016." (Dkt. 214 at 94 (emphasis added).) This argument is inconsistent with the Court's MTD

ADVERTISER PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

**FILED UNDER SEAL**

1    opinion, with the CAC, and with applicable law. As explained above, the agreements with

2    Foursquare, eBay, and Netflix fit squarely within the conduct, transaction, and occurrence set out in

3    the CAC, and the Court's prior MTD opinion expressly stated that Advertisers could (indeed, must)

4    newly identify and plead anticompetitive data sharing agreements after December 2016. Meta's

5    entire argument is to dismember the ***means*** by which Meta obtained the so-called "Entry and

6    Capture" agreements, then state that this somehow renders them outside of the monopolization

7    scheme previously alleged in the CAC. But the FAC is clear that the ███████████████████

8    ████████████████████████████████████████████████████████████████

9    █████████████████████████████████, and that these agreements were a substantial part

10   of the post-December 2016 monopolization and overcharge in the Social Advertising Market that is

11   at the heart of this case (*id.* §§ VII, XIII; *see also id.* at ¶¶ 839, 842 (class periods)).

12       **B.    The FAC's Onavo Allegations Are Authorized and Facially Timely**

13           The Court's initial MTD opinion expressly authorized Advertisers to amend the Onavo

14   allegations, and sought additional facts regarding (a) "how Facebook used data obtained through

15   Onavo after December 3, 2016"; (b) the "companies which Facebook tracked using Onavo after

16   December 3, 2016"; and (c) whether "users of Facebook's social network services also were users

17   of Onavo Protect." (Dkt. 214 at 89-91.) The FAC, which devotes an entire new section specifically

18   to post-December 2016 Onavo-related anticompetitive conduct (*see* FAC § VIII), includes

19   additional factual allegations on each point—namely that (a) Meta used its Onavo spyware to spy

20   on third-party app users (*id.* ¶ 564-69), then used the deceptively acquired user data to train its

21   machine learning and analytics models during the limitations period, thereby directly connecting

22   Meta's deceptive data acquisition apparatus into an (anti)competitive advantage over Social

23   Advertising rivals and would-be entrants (FAC ¶¶ 537-54, 564-69); (b) Meta used Onavo to surveil

24   rival or potentially competitive mobile apps during the limitations period, including Snapchat,

25   Google Photos, iMessage, Android Messages, and Twitter after December 18, 2016 (FAC ¶¶ 551-

26   63); and (c) Meta matched users of third-party apps that incorporated Onavo's SDK with their

27   Facebook IDs after December 3, 2016 (FAC ¶¶ 564-69). These new allegations, made in response

28   to the Court's direction, were sourced from discovery obtained in the case and concern ***only*** overt

**FILED UNDER SEAL**

acts falling squarely within the limitations period. Moreover, each new allegation relates directly to Onavo allegations in the CAC. (*See, e.g.*, FAC ¶ 236, CAC ¶ 258 (real-time surveillance of users); FAC ¶ 290, CAC ¶ 312 (Onavo used to surveil top apps); FAC ¶ 297, CAC ¶ 319 (used by data scientists to monitor and model WhatsApp growth); FAC ¶¶ 230-31, CAC ¶¶ 252-53 (Onavo used to deceive users within the limitations period with hidden spyware).)

Meta also argues that Advertisers' post-December 2016 Onavo allegations do not "identify new and accumulating injury to plaintiffs," as required under the continuing-harm doctrine (Mot. at 6.) To the extent this standard is applicable to exclusively timely-on-their-face overt acts, it is plainly met here with respect to Onavo. The FAC expressly and specifically alleges post-December 2016 Onavo conduct through which "[Meta] used deception to obtain a competitive edge in ad targeting between 2016 and 2019." (FAC ¶ 540; *see id.* at ¶¶ 537-69.) This conduct "provided [Meta] with a further competitive advantage against would-be entrants to the Social Advertising Market, helping to maintain the DTBE and to seal off any erosion of [Meta's] Social Advertising market power— and concomitant supracompetitive ad prices—between 2016 and 2019." (*Id.* ¶ 542; *see also id.* at ¶ 569 (post-2016 Onavo conduct gave "[Meta] an immense advantage over competitors" and inflicted overcharge on Plaintiffs); *id.* at ¶¶ 819, 821, 823.) Again, the law does not support Meta's "new and continuing injury" argument any more than the facts do: as the Court explained in its MTD opinion, "'improperly prolonging a monopoly is as much an offense against the Sherman Act as is wrongfully acquiring market power in the first place.'" (Dkt. 214 at 58 (quoting *Xechem*, 372 F.3d at 902).)

**C.    The FAC's Product Integration Allegations are Timely and Authorized**

The FAC alleges an anticompetitive integration of Meta's AI and targeting systems beginning in 2019. (FAC at § XI.) In its MTD opinion, the Court expressly analyzed allegations regarding Facebook's publicly-announced 2019 integration of its Facebook, Messenger, Instagram, and WhatsApp as part of its "Copy, Acquire, Kill" analysis (Dkt. 214 at 94-96), and noted that Advertisers must identity an "overt act" within the limitations period (*id.* at 96). The FAC specifically responds to the Court's observation that allegations concerning the 2019 integration were "sparse," *id.*, alleging additional facts obtained in discovery (*see* FAC at 657-764). The FAC

**FILED UNDER SEAL**

1   also makes clear that the complained-of "integration" is (and was) itself an anticompetitive act—

2   effectively, a product- and data architecture-redesign across Meta's entire data targeting business—

3   entirely separate from the company's 2012 and 2014 acquisitions of Instagram and WhatsApp.

4   Indeed, Meta's integration was made possible by its anticompetitive AI and targeting agreement

5   with Google (FAC ¶¶ 20, 657, 686-687), which this Court has already sustained as a violation of

6   Sections 1 and 2 (Dkt. 214 at 100-06). Based on newly acquired discovery concerning the previously

7   pleaded integration of Meta's products and systems, the FAC provides a detailed account of the AI

8   systems that were integrated (FAC ¶¶ 663-689, 729-749); allegations that the company's announced

9   end-to-end encryption—pleaded in the CAC (CAC ¶¶ 517-526)—was a pretextual smokescreen

10   devised by Zuckerberg and his most senior lieutenants (FAC ¶¶ 711-724, 750-764); and detailed

11   allegations that the integration of Meta's AI systems lacked any legitimate technical justification

12   (FAC ¶¶ 662, 709, 732-33, 739-742, 883).

13          In response, Meta again asserts that facially timely conduct—here, conduct entirely from

14   *2019* and thereafter—is somehow time-barred. (Mot. at 6.) Meta's argument appears to rely on a

15   laches argument it previously made with respect to injunctive relief claims: that Meta's 2019

16   systems integration was "part and parcel" of the company's 2012 and 2014 acquisitions of Instagram

17   and WhatsApp, and therefore barred by laches. (*Id.*) There are, however, no injunctive relief claims

18   at issue here, and even if Meta's 2019 integration of data processing systems and products from

19   across its business *were* "part and parcel" of earlier asset acquisitions (it's not), claims for damages

20   from Meta's 2019 systems integration simply cannot be time barred in a FAC filed in early 2022.

21   There is no doctrine—laches or otherwise—that can bar monopolization damages claims falling

22   within the Congressionally created four-year limitations period, and Meta provides no support for

23   such a radical proposition. Meta's citation to *Reveal Chat Holdco LLC v. Meta Platforms, Inc.* (Mot.

24   at 6) is distinguishable on its face, both at the district court level (where ***injunctive relief*** was barred

25   by laches) and at the Ninth Circuit (where the Court expressly refused to reach the injunction/laches

26   issue due to an absence of standing). *See* 2022 WL 595696, at *1 (9th Cir. Feb. 28, 2022).

27

28

<u>**FILED UNDER SEAL**</u>

1   **II.       THE FAC ADEQUATELY ALLEGES SECTION 2-VIOLATIVE CONDUCT**

2              Monopolization under Section 2 of the Sherman Act requires (1) possession of monopoly

3   power in the relevant market, and (2) "the willful acquisition or maintenance of that power,"

4   resulting in antitrust injury. *SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780,

5   783 (9th Cir. 1996). The Court has already ruled that Advertisers have plausibly pleaded the alleged

6   Social Advertising Market, as well as Meta's market power in that market. (Dkt. 214 at 33-38.)

7   Accordingly, the sole question before the Court on this motion is whether the FAC plausibly alleges

8   anticompetitive, exclusionary conduct—in addition to the Google agreement already sustained by

9   the Court—that allowed Meta to maintain its Social Advertising monopoly during the two Class

10  Periods. This "conduct element" requires "the use of monopoly power to foreclose competition, to

11  gain a competitive advantage, or to destroy a competitor." *Image Tech. Servs., Inc. v. Eastman*

12  *Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997).

13         **A.       The FAC Alleges Exclusionary Conduct as Part of a Monopoly Broth, which**
                      **Meta Cannot Dismember**
14

15             Advertisers allege a "monopoly broth," a doctrine previously recognized by this Court. (Dkt.

16  214 at 70-71.) The conduct, which must be "analyzed [for its] aggregate anticompetitive effect" (*id.*

17  at 71), includes (a) unlawful data and market division agreements with Netflix, eBay, and

18  Foursquare; (b) API whitelisting and data agreements; (c) an unlawful market division and AI /

19  targeting agreement with Google (already sustained as an adequately pleaded Section 1 and 2

20  violation); (d) using deceptively obtained Onavo data to surveil and target competition and users in

21  a manner unavailable to Meta's actual and potential competitors; and (e) an anticompetitive

22  integration of Meta's disparate AI and machine-learning systems. (FAC ¶¶ 819-820.) Meta's

23  attempt to dismember this conduct is inappropriate, and any subset of this conduct can violate

24  Section 2, "even if some of the activities would be lawful if viewed in isolation." *Id.* at *42 (quoting

25  *Free FreeHand Corp. v. Adobe Systems*, Inc., 852 F. Supp. 2d 1171, 1180 (N.D. Cal. 2012)).

26         **B.       The Facially Timely API and Data Sharing Agreements Alleged in FAC**
                      **Sections V and VII Are Anticompetitive and Fail under the Rule of Reason**
27

28             The rule of reason standard under Section 2 is the same as under Section 1, *FTC* v.

    *Qualcomm, Inc.*, 969 F.3d 974, 991 (9th Cir. 2020), which requires the application of a fact-laden

**FILED UNDER SEAL**

1  burden-shifting inquiry into anticompetitive and pro-competitive effects, *id.* at 992. The rule of

2  reason is a highly factual inquiry, inappropriate for resolution as a matter of law on a motion to

3  dismiss. *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187,

4  239 (S.D.N.Y. 2019). The FAC plausibly alleges that each of the allegedly exclusionary agreements

5  pleaded in Section V (extended API / whitelist agreements) and Section VII (███████████

6  ████████████████████████████) is anticompetitive and helped Meta maintain its

7  monopoly in the Social Advertising Market, harming Advertiser plaintiffs and class members. (*See*

8  FAC ¶ 311 (Events API); ¶ 417 (Foursquare, eBay, and Netflix); ¶ 428 (Foursquare); ¶¶ 471-72

9  (eBay); ¶¶ 514, 535-36 (Netflix); ¶¶ 819-22, 824-26, 828, 830-36 (all of the foregoing, tied to their

10 particular harms); *see generally* FAC ¶¶ 132-80 and 302-15 (description of API / "whitelist"

11 agreements); ¶¶ 418-28 (description of ████████████████████); ¶¶ 429-72

12 (description of ████████████████); ¶¶ 473-536 (description of ████████

13 ████████████).) Meta does not really meet any of these allegedly anticompetitive

14 agreements on their terms, but instead argues without any serious attempt at factual context that the

15 data agreements, such as those with eBay and Netflix, "improved" Meta's advertising product and

16 are therefore as a matter of law procompetitive and non-exclusionary. (Mot. at 12.) This argument

17 is contrary to the well-pleaded facts and the unambiguous law.

18      For example, as to Netflix and eBay, the FAC alleges ████████████████████

19 ██████████████████████ (FAC ¶¶ 429-536)—████████████████████

20 ██████████████████████████ (*see, e.g., id.* ¶ 487, 832-33). In

21 short, Meta forwent ████████████████████████████████████

22 ████████████████████████████████████████████████

23 ████████████████████████████████████████████████

24 ██████████████. (*See* FAC ¶¶ 341, 358, 376-377, 384, 401-403, 405-406, 409-410, 468-72.)

25 It may certainly be true that the █████████████████████ helped Meta target

26 advertisements better than in a world ████████████, but it is not necessarily the case that

27 Meta's ad products were unambiguously improved by an agreement that ████████████████

28 ████████████████████████████████████████████████

**FILED UNDER SEAL**

1 ██████████████████. Moreover, by entrenching Meta's monopoly in Social Advertising,

2 consumers like the Advertiser plaintiffs paid supracompetitively for any incremental improvement

3 in targeting—and indeed the FAC alleges the price of Facebook advertising soared between 2017

4 and 2019 (FAC ¶ 796) (but more on that, among other specifically-pleaded anticompetitive effects,

5 later). No matter how sliced, Meta's ████████████ with Netflix and eBay were hardly as-

6 a-matter-of-law "product improvements" hailed by ad purchasers.

7      So, too, with the other agreements identified in Sections V and VII of the FAC. The

8 Foursquare agreement captured a valuable source of social data from a direct, ***horizontal***

9 competitor—Foursquare, a rival social network—that could have facilitated entry into the Social

10 Advertising Market (FAC ¶ 425), providing Meta with a superset of the location and places-based

11 social data available in that market (FAC ¶ 428). A new entrant could never have Meta's

12 combination of Meta's data ***plus*** the Foursquare data even if it licensed the latter, fortifying the

13 DTBE and preventing effective entry at scale in the Social Advertising Market (which in turn

14 allowed Meta to maintain pricing and market power). (*See id.*; *see also id.* ¶ 824.) As for Meta's

15 discriminatory Extended API / whitelist agreements tied to Platform APIs—including the facially

16 timely API agreements set forth in FAC § V—these had obvious anticompetitive effects that

17 included preventing social data covered by the agreements from being shared with or used by a

18 competitive or nascent Social Advertising platform, thereby strengthening the DTBE and

19 contributing to the monopoly price premium paid by the Advertiser plaintiffs and class members.

20 (*See* FAC ¶ 311, 819, 821-22.)

21      Most importantly, even if anticompetitively obtained targeting data indeed improved Meta's

22 advertising product, this would be—at best—a procompetitive effect of Meta's agreements ██

23 ████████████████, and other developers that must be weighed against their respective

24 anticompetitive effects, which are substantial and specifically and carefully alleged in the FAC.

25 (*See, e.g.,* FAC ¶¶ 311, 417, 428, 471-72, 514, 535-36, 819-22, 824-26, 828, 830-36, 860, 866.)

26 Whether any alleged procompetitive improvement in Meta's ad-targeting from the agreements set

27 forth in FAC §§ V and VII outweighs their serious, specifically-pleaded anticompetitive effects is a

28 fact question inappropriately resolved on a motion to dismiss. *Qualcomm, Inc.*, 969 F.3d at 992.

**FILED UNDER SEAL**

1   And in fact, the FAC plausibly alleges—with significant factual support—that the anticompetitive

2   effects resulting from the agreements set forth in FAC §§ V and VII substantially outweigh any

3   procompetitive effects that may have also flowed from them. There is no basis to dismiss the Section

4   2 claims based on the allegedly anticompetitive agreements in Sections V and VII of the FAC.

5   **C.      The Onavo Conduct Is Anticompetitive and Fails the Rule of Reason**

6           Meta argues that the use of Onavo to train its machine-learning and AI models is not

7   anticompetitive because such conduct would have "improved" Facebook's advertising targeting

8   systems. (Mot. at 12-13.) Meta misses the point. Meta used Onavo to ***deceptively steal data*** from

9   other apps and their users, to surveil the competition, and to train machine-learning and AI models

10  using that stolen data. (FAC ¶ 538, 541-542.) These are advantages over the competition that were

11  obtained through overtly deceptive conduct—advantages that neither the existing competition, nor

12  would-be potential entrants, could fairly obtain. (FAC ¶ 569.) This strengthened the DTBE and

13  impeded entry of competitor(s) that could have served as a check on inflated Social Advertising

14  prices. (FAC ¶ 569.) Meta's citation to *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp.*,

15  592. F.3d 991 (9th Cir. 2010), in which the plaintiff contended that a product improvement by itself

16  was anticompetitive, *id.* at 999, 1002, is simply not applicable here.

17  **D.      Meta's Integration of AI / Targeting Systems Is Anticompetitive**

18          The FAC alleges that Meta integrated its backend AI and machine learning systems to

19  strengthen the DTBE, including by inextricably intertwining its AI and data and impairing any effort

20  to regulate or break up Meta's business or AI and targeting systems. (FAC ¶¶ 657-764). The FAC's

21  factual allegations show that this was not a product improvement but an ***impairment*** (FAC ¶ 748),

22  and that Meta propagated a pretextual reason for this move (FAC ¶¶ 711-724, 750-754). Meta argues

23  that the fact that complained-of integration is alleged to have made its AI and machine learning

24  systems less effective means it could not possibly have strengthened the DTBE, and therefore could

25  not be anticompetitive. (Mot. at 14.) This misses the point. The conduct is ***irrational but for its***

26  ***anticompetitive effect***—forever intertwining and centralizing Meta's data and AI infrastructure,

27  which makes entry at scale more difficult and regulatory intervention (including divestiture)

28  virtually impossible. The integration may have hurt Meta's targeting systems, but it strengthened its

**FILED UNDER SEAL**

1   Social Advertising monopoly. This is precisely the sort of product integration that was held to be

2   anticompetitive in the seminal *United States v. Microsoft Corp.* under Section 2 of the Sherman

3   Act—for failing the rule of reason. *See* 253 F.3d 34, 65-57 (D.C. Cir. 2001).

4        **E.     Advertisers Do Not Seek Damages for—or Allege Monopolization Based On—**

5        **Conduct Outside of the Limitations Period, Including as to the April 2015**
         **Refusal to Deal with Developers**

6        Meta devotes several pages of its brief to arguing that Meta's April 30, 2015, refusal to deal

7   with Facebook Platform developers is not actionable under Section 2. While this refusal to deal and

8   related conduct provides relevant factual context for the exclusionary conduct alleged within the

9   limitations period in the FAC, Advertisers do not seek damages for Meta's refusal-to-deal conduct—

10  or any pre-limitations period conduct—nor do they base their Section 2 claims on such conduct.

11  (*See* FAC ¶¶ 860, 866.) Meta's refusal-to-deal arguments are simply immaterial.

12  **III.   META'S SECTION 1 ARGUMENTS FAIL**

13       Meta also directs arguments toward Advertisers' Section 1 claim, which is directed solely to

14  Meta's 2018 market division agreement with Google; was sustained by this Court in January; and

15  has not been amended since. (Mot. at 14-15.) It is not clear why, or what relief Meta could possibly

16  seek with respect to a claim that it already moved to dismiss, which has not been changed. *See* Fed.

17  R. Civ. P. 12(g)(2). Meta's grievances about class definition and recitation common issues are not

18  arguments in support of dismissal—of anything.[3]

19  **IV.   REQUEST FOR LEAVE TO AMEND**

20       Should the Court dismiss any portion of the FAC, Advertisers respectfully request leave to

21  amend. Any deficiencies can be cured, including based on facts from Meta's document production.

22  *United States ex rel. Jones v. Sutter Health*, 2020 WL 6544412, at *4 (N.D. Cal. Nov. 6, 2020).

                                    **CONCLUSION**

23       For these reasons, the Court should deny Meta's motion to dismiss in its entirety.

24

25

26  ────────────────
    [3] Meta incorrectly cites the "common issues" section of the FAC to argue that Plaintiffs are asserting

27  additional Section 1 claims. (Mot. at 14 (citing FAC ¶ 847(h), (i).) This is not the case. As Meta
    itself concedes (Mot. at 15 (citing *Qualcomm*, 969 F.3d at 991)), if an agreement in the FAC violates

28  Section 1 under the rule of reason, this would indisputably be exclusionary under Section 2, hence
    presenting a common issue for classwide adjudication of the Section 2 claim.

<u>**FILED UNDER SEAL**</u>

1 DATED: April 11, 2022                    Respectfully submitted,

2

By: */s/ Kristen M. Anderson*            By: */s/ Yavar Bathaee*
3 **SCOTT + SCOTT ATTORNEYS AT LAW**      **BATHAEE DUNNE LLP**
**LLP**                                  Yavar Bathaee (Bar No. 282388)
4 Kristen M. Anderson (Bar No. 246108)      yavar@bathaeedunne.com
   kanderson@scott-scott.com             Andrew C. Wolinsky (*pro hac vice*)
5 230 Park Avenue, 17th Floor              awolinsky@bathaeedunne.com
New York, NY 10169                       445 Park Avenue, 9th Floor
6 (212) 223-6444                          New York, NY 10022
                                         (332) 322-8835
7 Christopher M. Burke (Bar No. 214799)
   cburke@scott-scott.com                Brian J. Dunne (Bar No. 275689)
8 David H. Goldberger (Bar No. 225869)      bdunne@bathaeedunne.com
   dgoldberger@scott-scott.com           633 West Fifth Street, 26th Floor
9 Hal D. Cunningham (Bar No. 243048)      Los Angeles, CA 90071
   hcunningham@scott-scott.com           (213) 462-2772
10 Daniel J. Brockwell (Bar No. 335983)
   dbrockwell@scott-scott.com            Edward M. Grauman (*pro hac vice*)
11 Yifan (Kate) Lv (Bar No. 302704)         egrauman@bathaeedunne.com
   klv@scott-scott.com                   7000 North MoPac Expressway, Suite 200
12 600 W. Broadway, Suite 3300            Austin, TX 78731
San Diego, CA 92101                      (512) 575-8848
13 (619) 233-4565
                                         *Interim Co-Lead Counsel for the Advertiser*
14 Patrick J. McGahan (*pro hac vice*)    *Classes*
   pmcgahan@scott-scott.com
15 Michael P. Srodoski (*pro hac vice*)   **LEVIN SEDRAN & BERMAN LLP**
   msrodoski@scott-scott.com             Keith J. Verrier (admitted *pro hac vice*)
16 156 South Main Street, P.O. Box 192      kverrier@lfsblaw.com
Colchester, CT 06415                     Austin B. Cohen (admitted *pro hac vice*)
17 (860) 537-5537                           acohen@lfsblaw.com
                                         510 Walnut Street, Suite 500
18 *Interim Co-Lead Counsel for the*      Philadelphia, PA 19106-3997
*Advertiser Classes*                     (215) 592-1500
19
                                         *Executive Committee Counsel for the*
20 **AHDOOT & WOLFSON, PC**                *Advertiser Classes*
Tina Wolfson (Bar No. 174806)
21    twolfson@ahdootwolfson.com
Robert Ahdoot (Bar No. 172098)
22    rahdoot@ahdootwolfson.com
Theodore W. Maya (Bar No. 223242)
23    tmaya@ahdootwolfson.com
Henry Kelston (*pro hac vice*)
24    hkelston@ahdootwolfson.com
2600 West Olive Avenue, Suite 500
25 Burbank, CA 91505
(310) 474-9111
26
*Executive Committee Counsel for the*
27 *Advertiser Classes*

28

**FILED UNDER SEAL**

**ATTESTATION OF YAVAR BATHAEE**

This document is being filed through the Electronic Case Filing (ECF) system by attorney Brian Dunne.  By his signature, Mr. Dunne attests that he has obtained concurrence in the filing of this document from each of the attorneys identified on the caption page and in the above signature block.

Dated: April 11, 2022                    By   */s/ Brian J. Dunne*
                                                 Brian J. Dunne

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of April, 2022, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System, causing the document to be electronically served on all attorneys of record.

By   */s/ Brian J. Dunne*
       Brian J. Dunne

ADVERTISER PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT