**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION | MDL No. 3010 |
| *Klein v. Meta Platforms, Inc.*, N.D. Cal., C.A. No. 3:20-08570 | |

<u>***KLEIN* ADVERTISERS' BRIEF IN SUPPORT OF THE MOTION TO VACATE
CONDITIONAL TRANSFER ORDER NO. 7**</u>

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ........................................................................................1

II.    RELEVANT BACKGROUND AND PROCEDURAL HISTORY ....................................2

    A.    The Social Advertising Market...........................................................................2

    B.    Facebook's Anticompetitive Conduct .................................................................3

    C.    The *Klein* Proceedings.........................................................................................5

III.    ARGUMENT.....................................................................................................................8

    A.    The Google MDL and *Klein* Share No "Common Factual Core" ...........................9

    B.    Transfer Inconveniences the Parties and Witnesses .............................................12

    C.    Transfer Would Be Unjust and Inefficient ...........................................................13

        1.    Severing the Advertiser claims from the Consumer claims in
*Klein* would duplicate discovery ............................................................14

        2.    Transfer would substantially complicate and expand the MDL Court
proceedings without generating any meaningful efficiencies ..................17

            a)    Transferring Advertisers' more advanced claims in the
midst of discovery needlessly complicates the Google MDL .......17

            b)    Conflicts preclude efficiencies from formal consolidation and
coordination ...................................................................................18

    D.    Alternatively, the Panel should sever Count III of Advertisers' FAC...................20

IV.    CONCLUSION ...............................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alien Child. Ed. Litig.*,
    482 F. Supp. 326 (J.P.M.L. 1979) ........................................................................20

*In re Am. Bd. of Med. Specialties Maint. of Certification Antitrust Litig.*,
    382 F. Supp. 3d 1353 (J.P.M.L. 2019) ..................................................................9

*In re: Best Buy Co., Inc., California Song-Beverly Credit Card Act Litig.*,
    804 F. Supp. 2d 1376 (J.P.M.L. 2011) ..................................................................8

*In re: Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
    No. CA 1:11-06212, 2011 WL 11761004 (J.P.M.L. Dec. 21, 2011) ....................20

*In re CVS Caremark Corp. Wage and Hour Emp't Practices Litig.*,
    684 F. Supp. 2d 1377 (J.P.M.L. 2010) ..................................................................8

*In re Eli Lilly & Co. (Cephalexin Monohydrate) Patent Litig.*,
    446 F. Supp. 242 (J.P.M.L. 1978) ........................................................................19

*In re First Am. Fin. Corp. Customer Data Sec. Breach Litig.*,
    396 F. Supp. 3d 1372 (J.P.M.L. 2019) ..................................................................19

*In re Fresh Dairy Prod. Antitrust Litig. (No. III)*,
    190 F. Supp. 3d 1353 (J.P.M.L. 2016) ..................................................................16

*In re Google Antitrust Litig.*,
    521 F. Supp. 3d 1358 (J.P.M.L. 2021) ..................................................................11

*In re: Google Play Store Simulated Casino-Style Games Litig.*,
    544 F. Supp. 3d 1364 (J.P.M.L. 2021) ..............................................................8, 12

*In re: Grain Shipments*,
    319 F. Supp. 533 (J.P.M.L. 1970) ........................................................................9

*In re IBM*,
    316 F. Supp. 976 (J.P.M.L. 1970) ........................................................................9

*In re Proton-Pump Inhibitor Prod. Liab. Litig.*,
    273 F. Supp. 3d 1360 (J.P.M.L. 2017) ..............................................................7, 13

*In re Qualcomm Antitrust Litig.*,
    273 F. Supp. 3d 1373 (J.P.M.L. 2017) ..................................................................12

*In re Rail Freight Fuel Surcharge Antitrust Litig. (No. II)*,
    437 F. Supp. 3d 1365 (J.P.M.L. 2020) ..................................................................16

*In re Signal Int'l LLC Hum. Trafficking Litig.*,
    38 F. Supp. 3d 1390 (J.P.M.L. 2014) ....................................................................9

*Klein v. Facebook, Inc.*,
    No. 20-CV-08570-LHK, 2022 WL 141561 (N.D. Cal. Jan. 14, 2022) ...........................*passim*

## Statutes, Rules & Regulations

28 U.S.C. §1407(a) ...........................................................................................9, 12, 20

Rules of Procedure of the U.S. Judicial Panel on Multidistrict Litigation
    Rule 6.1(b)(iv) ...................................................................................................5
    Rule 6.2(d) .......................................................................................................13
    Rule 7.1(a) ...................................................................................................7, 13
    Rule 7.1(f) ..........................................................................................................1

## Other Authorities

Federal Judicial Center, *Manual for Complex Litigation*, §20.131 (4th ed. 2004) ......................13

The New Facebook Login and Graph API 2.0, META FOR DEVELOPERS, April 30,
    2014, *available at* https://developers.facebook.com/blog/post/2014/04/30/the-
    new-facebook-login/ ...........................................................................................14

Plaintiffs Affilious, Inc., Jessyca Frederick, Mark Young, Joshua Jeon, 406 Property Services, PLLC, Mark Berney, and Katherine Looper ("Advertisers") submit this brief in support of their motion, pursuant to Rule 7.1(f) of the Rules of Procedure for the Judicial Panel on Multidistrict Litigation, to vacate Conditional Transfer Order No. 7 ("CTO-7"), transferring this matter to *In re: Google Digital Advertising Antitrust Litigation* ("Google MDL") in the United States District Court for the Southern District of New York ("MDL Court").[1]

## I.     PRELIMINARY STATEMENT

For approximately a year, Meta Platforms, Inc.[2] ("Facebook") knew about the *Klein* Advertisers' allegations and claims concerning Facebook's "Jedi Blue" agreement with Google,[3] which make up part of the Social Advertising Market monopolization at issue in the consolidated *Klein* antitrust action.[4] Facebook did nothing until it lost a motion to dismiss on the issue and Judge Lucy H. Koh – who had presided over the consolidated case and discovery – was elevated to the Ninth Circuit and the case was re-assigned to Judge James Donato. Perhaps unhappy with its new judge, Facebook then for the first time tagged the *Klein* case as related to the Google MDL – even though none of the claims or markets being litigated by the *Klein* Advertisers were (or are) being litigated in the Google MDL; the pleadings have not closed there; and discovery is stayed. Facebook's request to transfer misuses the Panel and its transfer authority to shop forums and judges: its request has nothing to do with the just and efficient conduct of the litigation (in

---

[1]     Advertisers refer to the Panel's docket (MDL No. 3010) as "Panel Dkt." and the MDL Court's docket (1:21-md-03010 (S.D.N.Y.)) as "Google MDL Dkt."

[2]     Defendant Facebook, Inc. changed its name to Meta Platforms, Inc. on October 28, 2021.

[3]     As used here, "Google" includes Google LLC, Alphabet Inc., and YouTube, LLC.

[4]     *Klein v. Meta Platforms, Inc.*, 3:20-cv-08750 (N.D. Cal.) ("*Klein*"). A copy of Advertisers' first amended complaint has been filed with the Panel under seal at Panel Dkt. No. 166 ("FAC"). *See also Klein* Dkt. No. 236-3.

either forum); the convenience of the parties or witnesses; or even parity of legal and factual issues among the cases. Instead, Facebook's proposed transfer would significantly expand the scope of the MDL, hinder progress in *Klein*, and cause unnecessary procedural and conflict problems in the Google MDL. What's more, if Facebook's procedural ruse here succeeds, it will be an invitation to savvy defendants across the United States to fence-sit through dispositive motion practice; lose; and then abuse the Panel's transfer authority to seek a mulligan.

The Panel should vacate CTO-7, as there is no serious case to be made for transfer of the *Klein* Advertisers' FAC given the actual facts on the ground – in San Francisco and in New York. In the alternative, the Panel should at most sever Count III of Advertisers' FAC (the Section 1 claim pertaining to Jedi Blue) and transfer only that claim.

## II.    RELEVANT BACKGROUND AND PROCEDURAL HISTORY

### A.    The Social Advertising Market

The Social Advertising Market at issue in *Klein* is a well-defined submarket of general online advertising. Social Advertising is offered by social media companies in the United States, such as Facebook, Twitter, and LinkedIn, and is not at issue in ***any*** of the cases pending before the MDL Court. Unlike other forms of advertising (including ads offered by Google), Social Advertising allows advertisers to granularly target users based on particularized data derived from a platform's user-base. Through Social Advertising, advertisers can reach social media users who may be interested in, but possibly unaware of, the advertisers' offerings.

In *Klein*, Judge Koh already concluded that Advertisers have adequately alleged the existence of a distinct Social Advertising Market that is not reasonably interchangeable with other forms of advertising (including those relevant to the Google MDL), a fact long

acknowledged by top Facebook executives.[5] *Klein v. Facebook, Inc.*, No. 20-CV-08570-LHK, 2022 WL 141561, at *21-23 (N.D. Cal. Jan. 14, 2022). Other forms of online advertising, including search-based ads and banner ads, do not compete with Social Advertising because they do not appeal to businesses looking to find new customers. *Id.* at *22.[6] Moreover, unlike other forms of online advertising, Social Advertising does not require advertisers to bid against each other; rather, the price of a social advertisement is proportional to the specificity of the audience it is targeting, allowing businesses of all sizes to reach minutely defined audiences. *Id.*

In the Social Advertising Market, Facebook is a monopolist. *See id.,* at *20 ("Facebook does not dispute that, if Advertisers have adequately alleged the Social Advertising Market, Facebook has monopoly power."). And powerful network effects and switching costs (the "Data Targeting Barrier to Entry") prevent entry by competitors. FAC ¶¶ 59-68, 804-13.

### B. Facebook's Anticompetitive Conduct

As illustrated in Advertisers' FAC, over the past several years Facebook has engaged in an anticompetitive campaign to maintain its monopoly in the Social Advertising Market, a campaign and relevant market that is not raised in ***any*** of the Google MDL actions. Facebook:

- used coercive Whitelist and Data Sharing Agreements to neutralize competitors on pain of denial of access to Facebook's Platform and APIs (FAC ¶¶ 119-222, 302-15);

---

[5]     For example, Facebook's COO Sheryl Sandberg stated on an October 2012 earnings call: "We're not TV, we're not search. We are social advertising."  FAC ¶ 775.

[6]     Search-based ads are shown to individuals who enter certain terms into search engines like Google – thereby only targeting potential customers already looking for the advertiser or its products and services. *Id.* at *21. Similarly, banner ads are placed on specific websites, rendering them useful only to advertisers who already know the kinds of websites their customers visit.  *Id.*

- anticompetitively integrated artificial intelligence and machine learning ("AI / ML") models and features from across distinct products and data sources to reinforce the Data Targeting Barrier to Entry and insulate Facebook's monopoly from regulators (*id.* ¶¶ 657-764);

- used deceptively-obtained consumer data from Onavo spyware to identify, surveil, and eliminate competition and to train Facebook's AI / ML models (*id.* ¶¶ 223-301, 537-69); and

- fortified the Data Targeting Barrier to Entry and Facebook's Social Advertising monopoly by entering anticompetitive agreements with eBay, Foursquare, and Netflix under threat of ruinous competition in the markets those companies operate (e-commerce, location-based services, and video streaming) (*id.* ¶¶ 394-536). *See also id.* ¶ 819.

Continuing this campaign, Facebook also entered an anticompetitive agreement with Google in September 2018 known as "Jedi Blue" or the Google Network Bidding Agreement ("GNBA"). *Id.* ¶¶ 645, 819. As part of the GNBA, Facebook retracted its support for header bidding, an emerging practice threatening Google in the separate market for exchange-based advertising. *Id.* ¶ 646. Like eBay and Netflix, in exchange for Facebook's promise not to compete with Google's primary business, Google provided Facebook with concessions solidifying the Data Targeting Barrier to Entry and Facebook's continued monopoly in Social Advertising. *Id.* ¶¶ 647-55. In essence, through the GNBA, Google and Facebook agreed to divide their markets to the detriment of competition in the Social Advertising Market. *Id.* ¶ 656.

As a result of Facebook's campaign, Advertisers bought Facebook advertisements at supracompetitive prices, an antitrust harm not alleged in ***any*** MDL Court cases. *Id.* ¶¶ 834-35.

C.      The *Klein* Proceedings

In December 2020 – before Facebook was named in any of the cases pending in the Google MDL – Advertisers filed their initial complaint in the United States District Court for the Northern District of California. *See* Complaint, *Affilious, Inc. v. Facebook, Inc.*, 3:20-cv-09217 (N.D. Cal. Dec. 18, 2020), Dkt. No. 1. On February 9, 2021, Judge Koh consolidated *Affilious* with other antitrust cases filed against Facebook. *Klein* Dkt. No. 47. On March 18, 2021, the Court appointed Yavar Bathaee of Bathaee Dunne LLP and Kristen M. Anderson of Scott+Scott Attorneys at Law LLP as interim class counsel for the Advertisers.[7] *Klein* Dkt. No. 73. The Court also appointed separate interim class counsel for the *Klein* consumer plaintiffs, who use Facebook's services in the relevant markets for Social Networking and Social Media ("Consumers"). *Id*. On March 31, 2021, the parties submitted a Joint Case Management Statement noting they "do not believe this case is suitable for reference to . . . the Judicial Panel on Multidistrict Litigation." *Klein* Dkt. No. 78 at 37.

On April 22, 2021, Advertisers and Consumers filed separate consolidated complaints. Importantly, Google is not a defendant in either. The Advertiser Complaint asserted three claims against Facebook: (i) monopolization and attempted monopolization of the Social Advertising Market under Section 2 of the Sherman Act (Counts I & II), and (ii) restraint of trade in violation of Section 1 of the Sherman Act based on the GNBA (Count III). *Klein* Dkt. No. 86. The Consumer Complaint asserted five claims against Facebook: (i) monopolization and attempted

---

[7]     In support of centralization, Facebook erroneously asserts that "Tina Wolfson of Ahdoot & Wolfson, PC is interim co-lead counsel for [] the advertiser plaintiffs in *Klein*…" Panel Dkt. No. 164, at 3 n.6. The *Klein* court appointed Ms. Wolfson to serve on Plaintiffs' Executive Committee for the advertiser class, not as interim co-lead counsel. *Klein* Dkt. No. 43. Ms. Wolfson is, however, (along with Dena C. Sharp of Girard Sharp LLP) interim co-lead counsel for the advertiser plaintiffs in the Google MDL, who oppose CTO-7. *See* Panel Dkt. No. 176.

monopolization of the Social Networking and Social Media Markets under Section 2 of the Sherman Act (Counts 1-4), and (ii) unjust enrichment (Count 5). *Klein* Dkt. No. 87 ("CAC").[8]

Facebook moved to dismiss both complaints on May 20, 2021. *Klein* Dkt. No. 97. While that motion was pending, the Court granted a separate motion to disqualify Keller Lenkner LLC, which had previously been appointed to Plaintiffs' Executive Committee for the Consumer class. *Klein* Dkt. Nos. 93, 127. The basis for Keller Lenkner's disqualification was its employment of an attorney who had formerly represented Facebook at his previous employer, Kellogg, Hansen, Todd, Figel & Frederick PLLC ("Kellogg Hansen"). *Id.* As discussed *infra*, Kellogg Hansen currently represents plaintiffs Associated Newspapers Ltd. and Mail Media, Inc. (the "Daily Mail Plaintiffs") in the Google MDL as well as Facebook in *Klein* (*Klein* Dkt. Nos. 121, 122) and *FTC v. Facebook, Inc.*, No. 20-CV-3590 (D.D.C.) (Google MDL Dkt. No. 138). If *Klein* is transferred, Kellogg Hansen would represent plaintiffs and a defendant in the same MDL.

On January 14, 2022, Judge Koh granted in part and denied in part Facebook's motion to dismiss with leave to amend. *Klein* Dkt. No. 214. On January 27, 2022 – over a year after *Klein* began and over six months after the Google MDL began – Facebook filed a notice of potential tag-along action, which the Panel denied with leave to re-submit after Advertisers filed their FAC. Panel Dkt. Nos. 149, 150. The FAC was filed on February 28, again asserting two claims under Section 2 of the Sherman Act and one claim under Section 1. *Klein* Dkt. No. 236-3.

Advertisers' FAC proposes two classes. The Pre-2018 Nationwide Advertiser Class:

All persons, entities, and/or corporations in the United States who purchased advertising from Facebook between December 1, 2016, and April 3, 2018, but not

---

[8]     The Consumer class comprises "[a]ll persons in the United States who maintained a Facebook profile at any point from 2007 up to the date of the filing of this action." CAC ¶ 248. In accordance with Panel Rule 6.1(b)(iv), Advertisers have filed a copy of the CAC herewith.

after April 3, 2018, and were thereby injured by anticompetitive price inflation in the Social Advertising Market (the "Pre-2018 Class Period").

The Post-2018 Nationwide Advertiser Class:

All persons, entities, and/or corporations in the United States who purchased advertising from Facebook between April 4, 2018, and the present, and were thereby injured by anticompetitive price inflation in the Social Advertising Market (the "Post-2018 Class Period").

FAC ¶¶ 839, 842. Because the GNBA was executed in September 2018, no member of the Pre-2018 Advertiser Nationwide Class asserts claims against Facebook based on the GNBA (Count III). *Id.* ¶ 645. Rather, that Class's claims solely concern Facebook's monopolization of Social Advertising, a topic rife with complex factual and legal issues irrelevant to the Google MDL.

On March 21, 2022, Facebook moved for partial dismissal of the FAC. *Klein* Dkt. No. 262. Facebook's motion to dismiss will be fully briefed and argued by the time the Panel hears this motion. Advertisers filed their opposition on April 11, 2022. *Klein* Dkt. No. 271. Facebook's reply is due April 25, 2022, and oral argument is scheduled for May 26, 2022. *Klein* Dkt. Nos. 262, 268. During the motion's pendency—and through the pendency of Facebook's previous motion to dismiss in *Klein*—the parties have engaged in substantial discovery, highly coordinated between Advertiser and Consumer counsel. The parties established a protective order, negotiated ESI and deposition protocols, served and responded to document requests and interrogatories, engaged in discovery-related motion practice, attended dozens of meet and confers, and Facebook produced over 12 million pages of documents.

On March 9, 2022, Facebook filed another tag-along notice for *Klein*. Panel Dkt. No. 164. On March 21, 2022, the Panel Clerk issued CTO-7, which severed the Advertiser action from the Consumer action and conditionally transferred the Advertiser action to the Google MDL. Panel Dkt. No. 169. Advertisers timely filed a Notice of Opposition. Panel Dkt. No. 171.

## III.    ARGUMENT

The Panel's Rules of Procedure impose an obligation on "[a]ny party or counsel in actions previously transferred under Section 1407" to "**promptly** notify the Clerk of the Panel of any potential tag-along actions in which that party is also named[.]" Panel Rule 7.1(a) (emphasis added); *see also In re Proton-Pump Inhibitor Prod. Liab. Litig.*, 273 F. Supp. 3d 1360, 1362 n.7 (J.P.M.L. 2017) (quoting Panel Rule 6.2(d)). Despite this obligation and Facebook's active participation in this MDL,[9] it refrained from filing its tag-along notice until nearly a year after Google first sought centralization and over six months after the Panel initiated the MDL, opting instead to test its luck in the Northern District of California by moving to dismiss Advertisers' Section 1 claim based on the GNBA. *Klein* Dkt. No. 97. During that time, however, the *Klein* case swiftly progressed, including through significant advancement of closely coordinated discovery, and Judge Koh denied Facebook's motion to dismiss with respect to Advertisers' claims arising from the GNBA. *Klein*, 2022 WL 141561, at *59-62.

Unhappy with this ruling, Facebook belatedly attempts to escape the *Klein* proceedings by seeking to lump Advertisers' case onto the Google MDL's docket, where general discovery is stayed pending the Court's resolution of Google's motion to dismiss a complaint – *The State of Texas v. Google LLC* – in which Facebook is not even a defendant. Google MDL Dkt. No. 129. In seeking to add Advertisers' claims to the mix, Facebook's actions threaten to drastically expand the scope of the Google MDL, a position this Panel assesses skeptically. *See In re Google Play Store Simulated Casino-Style Games Litig.*, 544 F. Supp. 3d 1364, 1366 (J.P.M.L. 2021) ("we do not change the scope of an MDL lightly"); *In re CVS Caremark Corp. Wage and*

---

[9]    *See* Defendant Facebook, Inc.'s Response to Google Defendants' Motion for Transfer and Centralization, Panel Dkt. No. 75.

*Hour Emp't Practices Litig.*, 684 F. Supp. 2d 1377, 1379 (J.P.M.L. 2010) ("where a Section 1407 motion appears intended to further the interests of particular counsel more than those of the statute, we would certainly find less favor with it").

Facebook's stratagem is inconsistent with the standards and purpose governing centralization under Section 1407. "[C]entralization under Section 1407 should be the last solution after considered review of all other options." *In re: Best Buy Co., Inc., California Song-Beverly Credit Card Act Litig.*, 804 F. Supp. 2d 1376, 1378 (J.P.M.L. 2011). It is appropriate only where: (1) "common questions of fact" exist among the actions; (2) transfer "will be for the convenience of parties and witnesses"; and (3) transfer will "promote [] just and efficient conduct." 28 U.S.C. §1407(a). CTO-7 is an administrative act of the Panel Clerk that "can and will be vacated upon the showing of good cause by any party." *In re: Grain Shipments*, 319 F. Supp. 533, 534 (J.P.M.L. 1970).[10] Accordingly, good cause to vacate exists where, as here, any of the Section 1407 factors are not satisfied. *See, e.g.*, *In re IBM*, 316 F. Supp. 976, 977 (J.P.M.L. 1970) (vacating CTO where "the just and efficient conduct of the actions will not be promoted by transfer" despite "a few common fact questions resulting from the common defendant"). The guiding interests of judicial economy and the just and efficient resolution of litigation are ill-served by transferring *Klein*; rather, it would significantly and needlessly hinder both *Klein* and the Google MDL proceedings. The Panel should vacate CTO-7.

### A. The Google MDL and *Klein* Share No "Common Factual Core"

The Google MDL and *Klein* share no "common factual core" warranting centralization. Transfer Order, Panel Dkt. No. 126 at 4. Facts are "common" for purposes of Section 1407 if they are material to the resolution of each lawsuit; however, where "individualized facts very

---

[10]     Unless otherwise indicated, citations are omitted and emphasis is added.

well may predominate over the common factual issues alleged by plaintiffs," centralization is inappropriate. *In re Signal Int'l LLC Hum. Trafficking Litig.*, 38 F. Supp. 3d 1390, 1391 (J.P.M.L. 2014); *In re Am. Bd. of Med. Specialties Maint. of Certification Antitrust Litig.*, 382 F. Supp. 3d 1353, 1354 (J.P.M.L. 2019) (denying centralization where "individualized discovery and legal issues (such as with respect to the antitrust market at issue in each action) are likely to be numerous and substantial").

When the Panel created the Google MDL in August, it observed:

> All actions present common factual questions concerning the allegation that Google has monopolized or suppressed competition in online display advertising services [*i.e.*, the marketplace for the placement of digital display ads on third-party websites and mobile apps] in violation of federal antitrust law, whether that market is described singly as all display advertising services, or as some larger spectrum of digital advertising.

Transfer Order, Panel Dkt. No. 126 at 2-3. This characteristic is absent from *Klein*. As Facebook concedes, "the bulk of the allegations in the majority of these [MDL] cases concern conduct allegedly undertaken by Google that has nothing to do with Facebook." Panel Dkt. No. 75 at 6. Thus, unlike in *Klein* (where Google will never be a defendant), no case before the MDL Court asserts Section 2 monopolization claims against Facebook in any market, let alone the Social Advertising Market. *See* Defendant Google's Statement of Position, Panel Dkt. No. 168 at 2 (noting "the majority of the factual allegations underlying [Advertisers' Section 2 claims] relate only to [Facebook's] conduct and differ from the allegations at issue in the MDL").

Notwithstanding this fundamental difference, Facebook now seeks centralization based on Advertisers' Section 1 allegations regarding the GNBA, which span only 8 pages of Advertisers' 206-page complaint. Panel Dkt. No. 164; FAC, ¶¶614-56. However, even in the MDL cases that do assert Section 1 claims based on the GNBA, the Panel observed they "all arise from a common factual core – Google's alleged suppression of competition in display

advertising services." Transfer Order, Panel Dkt. No. 126 at 4.[11] But Advertisers are not concerned with Google's conduct in the market for ad placement on third-party websites; they seek redress for the supracompetitive prices they paid to Facebook for Social Advertising on its social media platform. FAC, ¶¶834-45. *Klein* involves different markets, different competitors, and different competitive harm.[12] *See In re Google Antitrust Litig.*, 521 F. Supp. 3d 1358 (J.P.M.L. 2021) (denying centralization where the actions "plainly involve different relevant markets and [] alleged anticompetitive conduct differs substantially").

Thus, the Advertisers' proposed classes differ significantly from those in the Google MDL. The Advertisers' classes consist of those who purchased advertising from Facebook and were subjected to inflated prices in the Social Advertising Market since December 2016. FAC, ¶¶839, 842. By contrast, the *Surefreight* plaintiffs assert a class of advertisers and publishers who "**used Google's advertising services**." Complaint ¶ 87, *In re Google Digital Advertising Antitrust Litig.*, 21-cv-07001-PKC (S.D.N.Y. May 27, 2020), Dkt. 1. *Cliffy Care* defines a class of "persons who purchased digital display advertising through **Google Ads, Amazon DSP, or other non-Facebook demand-side platform**." Complaint ¶ 18, *Cliffy Care*, 21-cv-6910. And while the *SPX* plaintiffs propose a class of individuals who "purchased advertising on or over Facebook," their Class Period only covers the time beginning on September 1, 2018; Facebook is not a

---

[11]     *See, e.g.*, Complaint ¶ 119, *SPX Total Body Fitness LLC v. Google LLC*, 1:21-cv-06870-PKC (S.D.N.Y. Aug. 16, 2021), Dkt. No. 1 (as a result of "the Facebook Agreement," "Google has charged supra-competitive fees and degraded quality in the ad exchange market"); Complaint ¶ 49, *Cliffy Care Landscaping LLC v. Facebook Inc.*, 1:21-cv-06910-PKC (S.D.N.Y. Feb. 9, 2021), Dkt. No. 1; Complaint ¶ 17, *Coastal Point LLC v. Google LLC*, 1:21-cv-06824-PKC (S.D.N.Y. Apr. 19, 2021), Dkt. No.1.

[12]     The irrelevance of Advertisers' claims to those in the MDL is punctuated by the fact that neither Google nor the plaintiff States cite Judge Koh's analysis denying Facebook's motion to dismiss Advertisers' Section 1 claim in their briefing on Google's motion to dismiss the States' Section 1 claim. *See* Google MDL Dkt. No. 218 at 30-40; Google MDL Dkt. No. 264 at 23-33.

defendant; and they only allege harm in the ad-exchange market dominated by Google. Complaint ¶¶ 119, 126, 130-31, *SPX Total Body Fitness LLC,* 1:21-cv-06870-PKC. Because the GNBA occurred in September 2018, there is no overlap between these classes and Advertisers' Pre-2018 Nationwide Advertiser Class. *See Google Antitrust Litig.*, 521 F. Supp. 3d at 1359 (refusing to centralize actions where "the putative class in the advertising action presents no overlap at all with any of the Google Play Store actions"). And whatever factual overlap may exist in the Post-2018 Nationwide Advertiser Class is outweighed by the divergent factual inquiries Advertisers' monopolization claims raise. *See Google Play Store Simulated Casino-Style Games*, 544 F. Supp. 3d at 1365 (declining to expand Apple MDL to include Google even though both actions involved "largely the same" casino-type games); *In re Qualcomm Antitrust Litig.*, 273 F. Supp. 3d 1373, 1375-76 (J.P.M.L. 2017) (declining to include plaintiff Apple in MDL despite similar antitrust claims because Apple asserted other unique claims).[13]

### B. Transfer Inconveniences the Parties and Witnesses

Transfer independently fails because it would not "be for the convenience of the parties and witnesses." 28 U.S.C. §1407(a). A plurality of the named Advertiser plaintiffs are located in California.[14] Facebook acknowledges its headquarters is in the Northern District of California, along with a majority of the potential witnesses. FAC ¶ 32; *see also* Panel Dkt. No. 75 at 10.

Indeed, Facebook has served 32 expansive subpoenas on businesses and individuals in *Klein*. Sixteen of these subpoenas were directed to non-parties with residences or headquarters in

---

[13]    There may not be ***any*** overlap between the Advertisers and the Google advertiser classes. The MDL Court tasked interim co-lead counsel for the Google advertisers with harmonizing the three Google classes. Google MDL Dkt. No. 263, at 3-4. If they exclude Facebook advertisers from their forthcoming consolidated pleading, it would eliminate any potential overlap.

[14]    Three are in California, one is in New York, one is in Texas, and two are in Montana. FAC ¶¶ 24-30.

the Northern District of California, including Netflix, Inc., which Advertisers allege entered into an anticompetitive data-acquisition agreement under threat of Facebook's entry into the video-streaming "subvertical." *See* FAC, ¶¶473-536. Additionally, Facebook subpoenaed its competitors in the Social Advertising Market, Twitter, Inc. and LinkedIn Corporation, both headquartered in the Northern District of California.[15] Two foreign subpoena recipients, Tencent Holdings Ltd. and Samsung Electronics Co., Ltd., maintain their U.S. headquarters in the Northern District of California. And eight additional subpoena recipients maintain residences or U.S. headquarters in California.[16] By contrast, only two subpoena recipients, Spotify Technology S.A. and Foursquare Labs Inc., have headquarters in New York.

### C.     Transfer Would Be Unjust and Inefficient

Advertisers filed their initial complaint against Facebook in December 2020, well before this Panel centralized the MDL and before any other plaintiff in the MDL asserted claims against Facebook. Facebook has repeatedly hinted in its filings of the ***possibility*** that *Klein* may present a potential tag-along action. *See Klein* Dkt. Nos. 139, 157, 201, 212; Panel Dkt. No. 75 at 6 n.5. Yet it did not file its tag-along notice until after it received an unfavorable ruling on its motion to dismiss from the *Klein* Court. The Panel's Rules do not sanction such blatant judge shopping. Rather, Facebook was required to "promptly" notify the Panel Clerk of any potential tag along so the Panel may make a compendious determination of the appropriate scope of the Google MDL at the outset. *See* Panel Rules 6.2(d) & 7.1(a); *Proton-Pump Inhibitor*, 273 F. Supp. 3d at 1362

---

[15]     The remaining 13 subpoena recipients in the Northern District of California are: Alpha Exploration Co., Discord Inc., Iannis Hanen, Jonathan Abrams, Nextdoor Holdings, Inc., PageBites, Inc., Pinterest, Inc., Quora, Inc., Shopify Inc., Signal Messenger LLC, Smugmug, Inc., Yelp, Inc., and Zoom Video Communications, Inc.

[16]     These non-parties are: Viant Technology, Inc., Chris DeWolfe, NAVER BAND Inc., Razer USA Ltd., Sgroupes Inc., Snap Inc., TikTok, Inc., and Kakao Games Corp.

n.7.[17] Facebook deprived the Panel of that opportunity, and now seeks to shoehorn Advertisers' claims to the detriment of the careful balance struck by the MDL Court, after the "optimal time to structure the litigation to maximize efficiencies" has passed. Transfer Order, Panel Dkt. 126 at 3. The just and efficient conduct of both proceedings would suffer from transfer.

### 1. Severing the Advertiser claims from the Consumer claims in *Klein* would duplicate discovery

The Advertiser and Consumer cases contain considerable factual overlap, requiring common discovery even after the Court's decision on Facebook's motion to dismiss and Advertisers' subsequent amendment. The cases overlap as to: (1) the effects of Facebook's clandestine data harvesting on barriers to entry in both the Social Networking/Media and Social Advertising markets; (2) Facebook's use of privacy as a pretext for taking anticompetitive actions aimed at maintaining its monopolies in those markets; (3) Facebook's evaluation of competition, including how changes to its practices as to harvesting and processing data from its users would affect its ability to generate advertising revenue; and (4) Facebook's use of Onavo to accomplish this data harvesting.

***Barriers to Entry:*** Significant facts overlap regarding the nature of Facebook's barriers to entry in Social Networking/Media and Social Advertising Markets. Facebook's business model is to extract data from its users and use that data to sell targeted advertising to advertisers. The barriers to entry in both markets are the same. *Compare Klein*, 2022 WL 141561, at *18 (explaining Consumers' allegations of "two classic barriers to entry" for Social Network Market,

---

[17]     *See also* Federal Judicial Center, *Manual for Complex Litigation*, §20.131 (4th ed. 2004) (The Panel Rules "impose an affirmative obligation on parties in cases in which a motion to transfer is pending, or that previously have been transferred by the Panel, to promptly notify the Panel of any potential tag-along action in which the party is also named.").

"(1) network effects and (2) switching costs"); *with* FAC ¶¶ 59-68 (describing network effects and switching costs as primary components of the Data Targeting Barrier to Entry).

   ***Facebook's Use of Pretext:*** Consumers and Advertisers also allege that Facebook engaged in a pattern of behavior whereby it made materially false statements about user privacy as a pretext for anticompetitive actions designed to maintain its monopolies in the Social Networking/Media and Social Advertising Markets, respectively. *Compare Klein*, 2022 WL 141561, at *32 (finding Consumers' allegations related to Facebook's false statements about user privacy sufficient); *with* The New Facebook Login and Graph API 2.0, META FOR DEVELOPERS, April 30, 2014, *available at* https://developers.facebook.com/blog/post/2014/04/30/the-new-facebook-login/ ("Today at f8, we introduced a new Facebook Login experience that gives people more control over the information they share with apps.") (referenced at FAC ¶¶ 181-222 as the pretextual cover for a years-long plan to anticompetitively cripple the Facebook Platform); *and* FAC ¶¶ 659-61, 706-24 (discussing Facebook's use of user privacy as pretext for anticompetitive back-end integration of Instagram and WhatsApp).

   ***Facebook's Evaluation of Competition:*** How Facebook evaluated competition in both markets likewise has significant factual overlap – Facebook's model is to sell advertising targeting users on its social network, so a potential competitor would need to attract a significant number of users ***and*** target advertising to those users to compete with Facebook, almost certainly requiring entry into both markets. *Compare Klein*, 2022 WL 141561, at *15 (crediting Consumers' use of Facebook's advertising revenue as a proxy for its market share in the Social Networking Market), *with* FAC ¶¶ 798-803 (using Facebook's advertising revenue as a proxy for its market share in the Social Advertising Market); *compare* CAC ¶¶ 131-35 (describing

Google+'s failed entry to Social Networking Market); *with* FAC ¶¶ 69-81 (describing Google+'s failed entry to Social Advertising Market).

**Onavo:** Both Consumers' and Advertisers' allegations overlap as to Facebook's use of Onavo to spy on users and Facebook's anticompetitive use of the information gained from Onavo. *See* CAC ¶¶ 209-213 (Consumers' allegations related to Onavo, including whether Facebook integrated Onavo into future Facebook products); FAC ¶¶ 537-569 (Advertisers' allegations related to Onavo, including whether Facebook integrated Onavo into its machine learning and artificial intelligence apparatus).

As a result of this extensive overlap, Consumers and Advertisers require common discovery, as evidenced by discovery issued to date and the parties' negotiations on Facebook's document custodians. As to the former, Consumers and Advertisers issued a joint set of 25 Requests for Production covering the common factual ground. As to the latter, Facebook has agreed on 15 document custodians that are likely to possess relevant, discoverable information related to the claims in both cases, and the parties continue to negotiate additional common custodians, many of which Facebook disputes only on grounds of burden or duplicativeness (not relevance). Indeed, for the 43 Requests for Production (issued by Consumers, Advertisers, or jointly) that will require Facebook to perform custodial searches, Facebook has identified at least one joint custodian as likely to possess responsive documents for ***every single one***.

Facebook agrees that the Consumer claims do not belong in the Google MDL. Panel Dkt. No. 164 at 2 n.4. Nonetheless, severing of Advertisers' and Consumers' claims would either result in duplicative discovery among Advertisers and Consumers or require the parties to maintain their extensive coordination with the added difficulty of litigating in separate forums, a particularly daunting endeavor since general discovery is stayed in the MDL Court but not in the

Northern District California. The sensible solution, therefore, is to keep these cases together and proceeding apace under the experienced hand of Judge Donato.

### 2. Transfer would substantially complicate and expand the MDL Court proceedings without generating any meaningful efficiencies

"[T]he panel must always consider the impact that transfer of [an] action could have on the cases already in the MDL." *In re Rail Freight Fuel Surcharge Antitrust Litig. (No. II)*, 437 F. Supp. 3d 1365, 1366 (J.P.M.L. 2020); *In re Fresh Dairy Prod. Antitrust Litig. (No. III)*, 190 F. Supp. 3d 1353, 1354-55 (J.P.M.L. 2016) (although "the subject actions share certain factual issues as to whether defendants engaged in coordinated efforts to . . . inflate the price of dairy products," transfer "at this juncture would complicate and delay" the litigation "while providing no substantial offsetting benefit").

### a) Transferring Advertisers' more advanced claims in the midst of discovery needlessly complicates the Google MDL

Transfer of Advertisers' claims to the Google MDL undermines the MDL Court's case management order, which was formulated on the assumption that all such cases feature Google as a common defendant. Google MDL Dkt. No. 129. In that order, the Court stayed general discovery, as well as defendants' obligation to answer all but one complaint – *The State of Texas v. Google LLC*. *Id.*, ¶¶2-3. As the MDL Court explained in September: "The idea is to get the strongest and best pleading in front of the Court so Google can make its motions and so that we don't have this tennis match of rulings on motions followed by amendments followed by further motions and further rulings, etc." Tr. of Hr'g at 11:5-9, Google MDL Dkt. No. 142 (Sept. 24, 2021). The MDL Court further remarked: "If I find that one or more of the claims in the complaint states a claim for relief, the antitrust claims, I will likely allow discovery to commence. I will not wait for briefing on the various motions to dismiss." *Id.* at 12:25-13:3.

In *Klein*, there is no question that Advertisers have stated claims for relief and that the case will proceed through discovery and class certification. To subject Advertisers to the stay of general discovery is illogical. Similarly, awaiting a decision on Google's motion to dismiss does not narrow the issues between Advertisers and Facebook. Indeed, Google moved to dismiss the plaintiff States' Section 1 claim, notwithstanding Judge Koh's decision denying dismissal in *Klein*. Google MDL Dkt. No. 217. Likewise, Facebook noted its intent to move separately to dismiss the private plaintiffs' claims, whatever the outcome of Google's motion, and already moved for partial dismissal of Advertisers' FAC. Google MDL Dkt. No. 54; *Klein* Dkt. No. 262. Adding Advertisers' claims, at their more advanced posture, would present precisely the "tennis match of rulings" the MDL Court admonished, requiring that Court to choose between reformulating its case management plan, placing *Klein* on an independent track, or scrapping the progress the parties made in *Klein* to align with MDL cases frozen in their initial stages.[18]

### b) Conflicts preclude efficiencies from formal consolidation and coordination

Post-transfer conflicts among the various plaintiffs would seriously limit Advertisers' ability to coordinate discovery and motion practice with other private plaintiffs. As noted above, Kellogg Hansen, whose specter as counsel for Facebook in the FTC case was sufficient to disqualify Keller Lenkner in *Klein*, also represents the Daily Mail Plaintiffs in the Google MDL. The MDL Court identified the issue at the September conference (Google MDL Dkt. No. 142 at 36:3-40:1), and given the predominance of Google-specific issues in the case, the parties claim

---

[18]     In requesting centralization, Facebook transparently seeks the third option. Indeed, on April 6, 2022, Facebook wrote to Advertisers that "any and all agreements with respect to discovery will need to be reevaluated if and when the transfer to the MDL is memorialized to account for the MDL structure, case management orders, schedule, discovery limits, etc." Ex. 1, Letter of David Gringer, dated 4/6/2022.

they "walled off" Kellogg Hansen from any ancillary matters involving Facebook. Google MDL Dkt. No. 138. These ad hoc measures may have worked when Facebook constituted a small portion of the overall case against Google, but they make no sense as applied to Advertisers' claims brought **only** against Facebook **and** where Kellogg Hansen **has appeared in Klein on Facebook's behalf**. Advertisers' claims would drastically expand Facebook's involvement in the MDL. The presence of Facebook's outside counsel on the plaintiffs' side in the Google matters all but guarantees that, at best, Advertisers would be required to prosecute their claims separately with minimal formal coordination with the MDL plaintiffs.

Additionally, Keller Lenkner, disqualified from *Klein*, currently represents the States in the Google MDL. Notice of Appearance, *The State of Texas v. Google, LLC*, 1:21-cv-06841-PKC (S.D.N.Y. Dec. 22, 2020), Dkt. No. 8. As Facebook is well aware, it has sought to prohibit Advertisers from communicating at all with Keller Lenkner regarding the subject matter of *Klein*. Ex. 2, Letter of Sonal N. Mehta, dated 8/2/2021. And Advertisers confirmed in writing they (and their counsel or experts) "will not have further communications or exchanges of information with Keller Lenkner related to the subject matter of this litigation." Ex. 3, Letter of Kristen Anderson, dated 8/6/2021. It is hard to imagine what efficiencies Facebook envisions in seeking centralization given its demands that Advertisers refrain from coordinating with lead counsel of the MDL's lead case. As a result, informal cooperation, rather than centralization, between the Google MDL and *Klein* provides a preferable mechanism to eliminate duplicative discovery. *In re First Am. Fin. Corp. Customer Data Sec. Breach Litig.*, 396 F. Supp. 3d 1372, 1373 (J.P.M.L. 2019); *In re Eli Lilly & Co. (Cephalexin Monohydrate) Patent Litig.*, 446 F. Supp. 242, 244 (J.P.M.L. 1978). As illustrated above, regardless of the Panel's decision, informal coordination will be required: either between *Klein* and the Google MDL or between the

Advertisers, if transferred, and the severed Consumers. Denying transfer here ensures the actions minimize inefficiencies arising from conflicts.

      **D.**      **Alternatively, the Panel should sever Count III of Advertisers' FAC**

Given the factual differences between *Klein* and the Google MDL, the location of the parties and relevant witnesses, the need to coordinate discovery with Consumers, *Klein*'s advanced proceedings, and the procedural and conflict quagmire involving multiple law firms and cases that would ensue were *Klein* transferred, Advertisers believe no form of their case is appropriate for centralization in the Google MDL. If the Panel concludes otherwise, however, it should, pursuant to Section 1407(a), sever only Advertisers' Section 1 claim based on the GNBA (Count III) for transfer and remand the remaining counts for Facebook's monopolization (Counts I & II) to the Northern District of California. *See In re: Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, No. CA 1:11-06212, 2011 WL 11761004, at *1 (J.P.M.L. Dec. 21, 2011) (severing unique claims initially transferred by CTO).

As discussed above, the GNBA is only one event in the course of Facebook's much larger campaign to monopolize the Social Advertising Market that forms the core of Advertisers' Section 2 claims. Moreover, one of Advertisers' proposed classes only asserts claims for Facebook's acts preceding the formation of the GNBA in September 2018 and thus could not possibly overlap with the claims asserted here. *See, e.g.*, *In re Alien Child. Ed. Litig.*, 482 F. Supp. 326, 328 (J.P.M.L. 1979) (severing claims involving "minimal, if any, common questions of fact" whose "inclusion in the coordinated or consolidated pretrial proceedings herein ordered would not accomplish the goals of Section 1407").

## IV.    CONCLUSION

For the foregoing reasons, Advertisers' respectfully request that the Panel vacate CTO-7.

Dated:  April 12, 2022

Respectfully submitted,
**BATHAEE DUNNE LLP**

 s/ Brian J. Dunne
Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
633 West Fifth Street, 26th Floor
Los Angeles, CA 90071
Telephone: (213) 462-2772

Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Edward M. Grauman (*pro hac vice*)
egrauman@bathaeedunne.com
Andrew C. Wolinsky
awolinsky@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
Telephone: (332) 322-8835

*Interim Co-Lead Counsel for Plaintiffs Affilious, Inc., Jessyca Frederick, Mark Young, Joshua Jeon, 406 Property Services, PLLC, Mark Berney, and Katherine Looper*

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Kristen M. Anderson (CA 246108)
kanderson@scott-scott.com
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334

Christopher M. Burke (CA 214799)
cburke@scott-scott.com
David H. Goldberger (CA 225869)
dgoldberger@scott-scott.com
Kate Lv (CA 302704)
klv@scott-scott.com
Hal D. Cunningham (CA 243048)
hcunningham@scott-scott.com
Daniel J. Brockwell (CA 335983)
dbrockwell@scott-scott.com
600 W. Broadway, Suite 3300

San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508

Patrick J. McGahan (*pro hac vice*)
pmcgahan@scott-scott.com
Michael P. Srodoski (*pro hac vice*)
msrodoski@scott-scott.com
156 South Main Street, P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
Facsimile: (860) 537-4432

*Interim Co-Lead Counsel for Plaintiffs Affilious, Inc., Jessyca Frederick, Mark Young, Joshua Jeon, 406 Property Services, PLLC, Mark Berney, and Katherine Looper*

**LEVIN SEDRAN & BERMAN LLP**

Keith J. Verrier (*pro hac vice*)
Austin B. Cohen (*pro hac vice*)
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3997
Telephone: (215) 592-1500
Facsimile: (215) 592-4663
kverrier@lfsblaw.com
acohen@lfsblaw.com

*Plaintiffs' Executive Committee Counsel and Counsel for Plaintiffs Affilious, Inc., Jessyca Frederick, Mark Young, Joshua Jeon, 406 Property Services, PLLC, Mark Berney, and Katherine Looper*

**AHDOOT & WOLFSON, PC**

Tina Wolfson (CA 174806)
Robert Ahdoot (CA 172098)
Theodore W. Maya (CA 223242)
Henry J. Kelson (*pro hac vice*)
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
Facsimile: (310) 474-8585
twolfson@ahdootwolfson.com
rahdoot@ahdootwolfson.com

tmaya@ahdootwolfson.com

Andrew William Ferich
Ahdoot & Wolfson PC
201 King of Prussia Rd.
Suite 650
Radnor, PA 19087
Tel.: (310) 474-9111
Fax: (310) 474-8585
Email: aferich@ahdootwolfson.com

*Plaintiffs' Executive Committee Counsel and
Counsel for Plaintiffs Affilious, Inc., Jessyca
Frederick, Mark Young, Joshua Jeon, 406 Property
Services, PLLC, Mark Berney, and Katherine
Looper*

# EXHIBIT 1

WILMERHALE

April 6, 2022

**David Gringer**

+1 212 230 8864 (t)
+1 212 230 8888 (f)
david.gringer@wilmerhale.com

**By E-mail**

Michael P. Srodoski
Scott+Scott Attorneys at Law LLP
156 S. Main St.
Colchester, CT 06415
msrodoski@scott-scott.com

> Re:  Advertisers' First Set of Document Requests in *Klein v. Meta Platforms*, Case No.
> 5:20-cv-08570-JD

Michael:

I write in response to your March 11, 2022 letter to confirm Meta's position on several matters concerning Advertiser Plaintiffs' First Set of Requests for Production.

As you are aware, the JPML has issued a conditional transfer order consolidating the Advertiser action with the pending MDL.  Advertisers have objected to that Order and the dispute is pending before the JPML.  We provide these responses to continue the parties' dialogue while we await a ruling from the JPML, but note that any and all agreements with respect to discovery will need to be reevaluated if and when the transfer to the MDL is memorialized to account for the MDL structure, case management orders, schedule, discovery limits, etc.

**Definition of "Competitive Conditions"**

Your February 18, 2022 email defined "Competitive Conditions" as follows:  "Competitive Conditions means online advertising costs, as well as pricing, production/output, capacity, sales, demand, supply, effectiveness, and/or market shares in any market Facebook participated in and from which Facebook gathered data that was subsequently used to sell, target, or price Facebook advertising."

Meta disputes that these "Competitive Conditions" are relevant, reasonable, or proportionate to the needs of this case.  However, in an effort to compromise, Meta will apply the definition of "Competitive Conditions" quoted above in searching for documents in response to requests that implicate this definition, subject to further negotiations concerning custodians and search terms.

**Request No. 1**

Meta agreed, as an initial step, to identify subpoenas, civil investigative demands, and other requests for written discovery issued to it by the eight authorities and across the five topic areas identified by the Request.  Meta is currently working to identify those materials as agreed.

Michael P. Srodoski
By E-mail
Page 2

## Request Nos. 3, 4, 5

As stated during the parties' February 18 meet-and-confer call, Meta will produce documents from between January 1, 2012 and October 25, 2021 in accordance with the production proposals for each Request outlined in Meta's January 14, 2022 letter to Advertisers:

- For Request Nos. 3 and 4, Meta will produce non-privileged, non-work-product-protected documents sufficient to show the operation of Meta's advertising auction between January 1, 2012 and October 25, 2021, including actual or contemplated changes to the auction, pricing, or terms and conditions pursuant to which Meta sold advertising, as well as documents sufficient to show Meta's analysis of its own online advertising services dated between January 1, 2012 and October 25, 2021, to the extent such documents exist in Meta's possession, custody, or control and can be located after a reasonable search.

- For Request No. 5, Meta will produce non-privileged, non-work-product-protected documents sufficient to show Meta's analysis of other online advertising services, to the extent such documents, dated between January 1, 2012 and October 25, 2021, exist in Meta's possession, custody, or control and can be located after a reasonable search.

## Request Nos. 7, 14, 15

As stated during the parties' February 18 meet-and-confer call, Meta will produce documents from between January 1, 2012 and October 25, 2021 in accordance with the production proposals for these Requests outlined in Meta's January 14, 2022 letter to Advertisers:

- Meta will produce non-privileged, non-work-product-protected templates of its contracts with advertising customers concerning its advertising services in effect between January 1, 2012, and October 25, 2021 to the extent such documents exist in Meta's possession, custody, or control and can be located after a reasonable search.

- Meta will also produce final, executed copies of bespoke agreements with advertisers dated between January 1, 2012, and October 25, 2021, to the extent such documents exist in Meta's possession, custody, or control and can be located after a reasonable search.

## Request No. 10

In response to Request No. 10, Meta offered during the parties' February 18 meet-and-confer call to conduct a reasonable search for non-privileged, non-work-product protected regular reports dated between January 1, 2012 and October 25, 2021 regarding Meta's monthly revenue, costs, or margins for advertising services, to the extent such documents exist in Meta's possession, custody, or control.

**WILMERHALE**

Michael P. Srodoski
By E-mail
Page 3

Advertisers now request that Meta further adjust the start date for these productions, to search for responsive documents dating back to January 1, 2010. In the spirit of compromise, Meta is willing to expand its search for documents responsive to Request No. 10 to January 1, 2010.

**Request No. 12**

As stated during the parties' February 18 meet-and-confer call, Meta will produce documents responsive to this request dated between January 1, 2012 and October 25, 2021. As conveyed in Meta's February 18 custodian proposal, after conducting a careful review of each request, it is Meta's position that custodians should be identified on an RFP-by-RFP basis, with a subset of custodians' files searched for each RFP; Meta accordingly appreciates Advertisers' offer to consider identifying the relevant subset of custodians whose files it should search for documents responsive to Request No. 12, and expects that Advertisers will be amenable to similar compromises on other Requests.

**Request No. 16**

As stated during the parties' February 18 meet-and-confer call, Meta will produce documents responsive to this request dated between January 1, 2010 and October 25, 2021.

Meta expects that Advertisers will be prepared to discuss the relevance of each of the 64 custodians Advertisers have proposed, and whether Advertisers expect that each of those custodians will have non-duplicative documents responsive to this request given your review of Meta's substantial productions to date, during the parties' upcoming meet-and-confer concerning document custodians.

**Request Nos. 21 and 22**

Request Nos. 21 and 22 concern communications with non-parties Google (Request No. 21) and LinkedIn, Twitter, TikTok, and/or any other social advertising business (Request No. 22) about either Meta's online advertising business or the other entity's online advertising business. In response to Meta's request that you narrow this request, you proposed excluding communications with these non-parties that concern "any one specific sale or purchase of online advertising."

Even with Advertisers' proposed narrowing, this request is overbroad. But rather than dispute the breadth of this request in the abstract, Meta proposes that the parties address the proper scope of collection and review in response to this request in the context of the parties' ongoing discussions concerning custodians and search terms.

WILMERHALE

Michael P. Srodoski
By E-mail
Page 4

## Request No. 26

Meta rejects Advertisers' proposal. Even as limited to document custodians, advertisers have yet to give any reason why the telephone records sought in Request No. 26 are relevant to your claims as currently pleaded. You have not identified any legitimate basis to seek this discovery.

## Request Nos. 2, 6, 9

Meta is working on a response to Advertisers' February 3, 2021 letter and will respond as soon as it has completed its analysis of the fields described in that letter.

Best regards,

*/s/ David Gringer*


David Gringer

# EXHIBIT 2

WILMERHALE

August 2, 2021

**Sonal N. Mehta**

+1 650 600 5051 (t)
+1 650 858 6100 (f)
sonal.mehta@wilmerhale.com

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Stephen A. Swedlow
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400

**BATHAEE DUNNE LLP**
Yavar Bathaee
445 Park Avenue, 9th Floor
New York, NY 10022
(332) 205-7668

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Shana E. Scarlett
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
(510) 725-3000

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Kristen M. Anderson
230 Park Avenue, 17th Floor
New York, NY 10169
(212) 233-6444

Re:     Disqualification of Keller Lenkner LLC in *Klein v. Facebook*, No. 5:20-cv-08570-LHK
        (N.D. Cal.)

Dear Counsel,

        In light of the Court's July 13 and July 20, 2021 Orders disqualifying Keller Lenkner
LLC in the above-captioned action, we write to confirm that Plaintiffs and their counsel are
taking appropriate steps to ensure that Keller Lenkner's breach of its ethical duties does not
further prejudice Facebook. *See Beltran v. Avon Prod., Inc.*, 867 F. Supp. 2d 1068, 1084 (C.D.
Cal. 2012) (noting ethical obligations attach to attorneys who have "collaborated with" the
conflicted firm prior to its disqualification); *Canatella v. Krieg, Keller, Sloan, Reilley & Roman
LLP*, 2012 WL 847493, at *2 (N.D. Cal. Mar. 13, 2012) (observing that conflicts may be
imputed between firms when they "work[ed] together very closely"); *In re Airport Car Rental
Antitrust Litig.*, 470 F. Supp. 495, 503-07 (N.D. Cal. 1979) (same).

        *First*, we ask that lead counsel at each firm confirm in writing that Plaintiffs, their
counsel, and their experts (1) have not had any communication, directly or indirectly, with Mr.
Pak regarding the subject matter of this litigation; (2) have not received any information from
Keller Lenkner that came from Mr. Pak; (3) will destroy any documents or work product from
Keller Lenkner related to the subject matter of this litigation that contain information or work
product from Mr. Pak; and (4) will refrain from all further communications or exchanges of

WILMERHALE

August 2, 2021
Page 2

information with Keller Lenkner related to the subject matter of this litigation, except as is necessary to finalize the firm's withdrawal.

*Second,* please confirm that Plaintiffs and their counsel will expressly advise any named plaintiffs, class members, fact witnesses, consultants, or experts involved in this matter on behalf of Plaintiffs that they shall not communicate with Keller Lenkner regarding the subject matter of this case. *See j2 Glob. Commc'ns Inc. v. Captaris Inc.*, 2012 WL 6618272, at *11 (C.D. Cal. Dec. 19, 2012) (restricting communications with disqualified firm to those necessary for an orderly withdrawal).

These steps are necessary to ensure that Keller Lenkner's ethical violations do not further infect these proceedings. They are particularly important given Keller Lenkner's many months of impermissible involvement in this matter, during which time it worked closely with the lawyers that continue to represent Plaintiffs. Please confirm your agreement by **12 pm PST on August 6, 2021**.

Best Regards,

Sonal N. Mehta

# EXHIBIT 3



KRISTEN+ANDERSON

+ Via E-Mail +

August 6, 2021

Sonal N. Mehta
Wilmer Cutler Pickering Hale and Dorr LLP
2600 El Camino Real
Suite 400
Palo Alto, CA 94306

     Re:    *Klein v. Facebook*
             No. 5:20-cv-08570-LHK (N.D. Cal.)

Ms. Mehta:

    This letter responds to your August 2, 2021 letter on behalf of advertiser plaintiffs. As you are aware, Keller Lenkner LLC ("Keller Lenkner") was retained and appointed to represent consumer plaintiffs and the consumer class; they were not retained or appointed to represent advertiser plaintiffs or the advertiser class in this case. While the case law you cite does not support your requests, advertiser plaintiffs nevertheless respond as follows:

    With respect to your first block of requests:

1. Advertiser plaintiffs' counsel and experts have not had any communication, directly or indirectly, with Mr. Pak regarding the subject matter of this litigation.

2. Although it is highly unlikely any advertiser plaintiffs have had any communication, directly or indirectly, with Mr. Pak regarding the subject matter of this litigation, we are in the process of confirming that this is the case for each advertiser plaintiff. We expect to provide final confirmation of this for all advertiser plaintiffs next week.

3. Advertiser plaintiffs' counsel understand that Mr. Pak has not provided information or work product to the attorneys from Keller Lenkner that worked on this case and thus are not aware of receiving any work product that came from Mr. Pak.

4. Accordingly, there are no documents or work product to destroy.

5. Advertiser plaintiffs, counsel, and experts will not have further communications or exchanges of information with Keller Lenkner related to the subject matter of this litigation.

    With respect to your second block of requests:

    Advertiser plaintiffs' counsel have taken and will continue to take appropriate steps, in accordance with our ethical obligations, to advise advertiser plaintiffs' counsel, advertiser plaintiffs, and any consultants or experts retained by advertiser plaintiffs' counsel not to communicate with Keller Lenkner regarding the

Sonal N. Mehta, Wilmer Hale
August 6, 2021
Page 2

subject matter of this litigation. However, we have neither the obligation nor ability to advise absent class members and fact witnesses.

Sincerely,

SCOTT+SCOTT ATTORNEYS AT LAW LLP

Kristen Anderson / by HC

Kristen Anderson

BATHAEE DUNNE LLP

Yavar Bathaee

*Lead Counsel for Advertiser Plaintiffs*