LATHAM & WATKINS LLP
Elizabeth L. Deeley (CA Bar No. 230798)
  *elizabeth.deeley@lw.com*
Melanie M. Blunschi (CA Bar No. 234264)
  *melanie.blunschi@lw.com*
Nicole C. Valco (CA Bar No. 258506)
  *nicole.valco@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, CA  94111-6538
Telephone:  +1.415.391.0600

Andrew B. Clubok (*pro hac vice*)
  *andrew.clubok@lw.com*
Susan E. Engel (*pro hac vice*)
  *susan.engel@lw.com*
555 Eleventh Street, N.W., Suite 1000
Washington, D.C.  20004-1304
Telephone:  +1.202.637.2200

*Attorneys for Defendant Meta Platforms, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| DZ RESERVE and CAIN MAXWELL (d/b/a MAX MARTIALIS), individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | Case No. 3:18-cv-04978 JD<br><br>**META PLATFORMS, INC.'S REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE THE EXPERT REPORTS AND TESTIMONY OF DR. GREG M. ALLENBY AND PORTIONS OF THE EXPERT REPORTS AND TESTIMONY OF DR. TIMOTHY ROUGHGARDEN AND DR. ARMANDO LEVY**<br><br>Date:   June 23, 2022<br>Time:   10:00 a.m.<br>Court:  Courtroom 11, 19th Floor<br>Hon.    James Donato |

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

META'S REPLY ISO MOT. TO EXCLUDE
G. ALLENBY, T. ROUGHGARDEN, AND A. LEVY
CASE NO. 3:18-CV-04978 JD

1

2

<u>**TABLE OF CONTENTS**</u>

**Page**

3  I.   INTRODUCTION ................................................................................................. 1

4  II.  ARGUMENT ....................................................................................................... 3

5  A.  Allenby's Testimony Is Not Relevant Or Helpful Because He Does
6      Not Address Plaintiffs' Only Viable Theory Of Harm And
       Damages.................................................................................................... 3

7  B.  Allenby's First-of-its-Kind Invented Analysis Is Not An Accepted
8      Or Reliable Application Of A Linear Regression................................. 4

9  C.  Allenby's Rationale for Rejecting His Original Analysis Is Directly
       Contradicted by His Survey Design and Pre-Test Survey
10     Respondents ............................................................................................ 7

11 D.  Allenby's Invented Analysis Is Based on an Incomplete,
       Unrepresentative Subset of Data That Was Even Further Cherry-
12     Picked to Drive the Results.................................................................... 8

13 E.  The Flaws In Allenby's Invented Analysis Go to Admissibility,
       Not Weight............................................................................................... 9

14 F.  Allenby's Flaws Cause Portions of Plaintiffs' Other Experts'
15     Analyses to Fail..................................................................................... 10

16 III. CONCLUSION.................................................................................................. 10

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

i

META'S REPLY ISO MOT. TO EXCLUDE
G. ALLENBY, T. ROUGHGARDEN, AND A. LEVY
CASE NO. 3:18-CV-04978 JD

1

2

## <u>TABLE OF AUTHORITIES</u>

3
**Page(s)**

4
*Adkins v. Facebook, Inc.,*
424 F. Supp. 3d 686 (N.D. Cal. 2019) ..................................................................5

5

6
*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
No. 07-cv-5944, 2017 WL 10434367 (N.D. Cal. Jan. 23, 2017)...........................10

7
*Clicks Billiards, Inc. v. Sixshooters, Inc.,*
251 F.3d 1252 (9th Cir. 2001) ..............................................................................9

8

9
*Daubert v. Merrell Dow Pharm., Inc.,*
509 U.S. 579 (1993)..........................................................................................1, 5

10

11
*In re Incretin-Based Therapies Prod. Liab. Litig.,*
524 F. Supp. 3d 1007 (S.D. Cal. 2021),
*aff'd,* No. 21-55342, 2022 WL 898595 (9th Cir. Mar. 28, 2022) ............................5

12

13
*Lipitor (Atorvastatin Calcium) Mktg. v. Pfizer, Inc.,*
892 F.3d 624 (4th Cir. 2018) ................................................................................7

14

15
*Primiano v. Cook,*
598 F.3d 558 (9th Cir. 2010) ................................................................................4

16
*Pulaski & Middleman v. Google,*
802 F.3d 979 (9th Cir. 2015) ................................................................................3

17

18
*Samuels v. Holland Am. Line-USA Inc.,*
656 F.3d 948 (9th Cir. 2011) ................................................................................5

19
*Stilwell v. Smith & Nephew, Inc.,*
482 F.3d 1187 (9th Cir. 2007) ..............................................................................4

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii

META'S REPLY ISO MOT. TO EXCLUDE
G. ALLENBY, T. ROUGHGARDEN, AND A. LEVY
CASE NO. 3:18-CV-04978 JD

## I.    INTRODUCTION

Meta filed the instant Motion seeking to exclude the expert testimony of Greg Allenby at any stage of this case, not only class certification.  After Meta filed its Motion, the Court entered an order on class certification ("Order"), which denied Meta's prior motion to exclude Allenby at the class certification stage, while leaving the door open for decertification if "evidence emerges at trial that substantially impeaches Dr. Allenby's methods and conclusions."  Dkt. 388 at 14.  Meta respectfully submits this reply brief to preserve its challenges to Allenby's testimony at trial and on appeal.

Allenby's report and testimony should be excluded under Rule 702 and *Daubert v. Merrell Dow. Pharm., Inc.*, 509 U.S. 579 (1993).  As a threshold matter, this Court's Order granting Plaintiffs' motion for class certification makes clear there is a mismatch between Allenby's report and testimony and Plaintiffs' theory of liability.  In its Order, the Court held that Plaintiffs had proffered evidence supporting their theory that Meta misleadingly described Potential Reach as an estimate of "people" even though the numerical value of each Potential Reach estimate supposedly reflected a (higher) number of "accounts."  Dkt. 388 at 10.  Allenby is not relevant to proving that theory because he **admitted** that he found no statistically significant impact from changing the description of Potential Reach from "people" to "accounts."

Even apart from this mismatch, Plaintiffs also cannot rely on Allenby's Invented Analysis.[1] Allenby may have used a "linear regression" in his Invented Analysis, but that does not and cannot justify his decision to abandon his standard methodology after receiving the results, and then analyze only the favorable portion of his survey data.  Plaintiffs' argument is akin to claiming that an expert's damages calculation is reliable anytime she uses an "equation," regardless of whether her equation makes sense, has complete inputs, or has been manipulated in order to drive a particular result.  That Allenby used a "linear regression" is not the issue:  Meta does not contest that linear regressions can be used to analyze survey data.  *See* Mot. at 6 n.7; Dkt. 388 at 13.  But Allenby's use of a linear regression in the Invented Analysis is flawed and unreliable because he used less than half of the comparative data from his survey, and he did so **only after** his Original

---

[1] Defined terms herein are used consistently as defined in Meta's opening brief.  Dkt. 374 ("Mot.").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

META'S REPLY ISO MOT. TO EXCLUDE
G. ALLENBY, T. ROUGHGARDEN, AND A. LEVY
CASE NO. 3:18-CV-04978 JD

Analysis (which used the complete set of data) **disproved** Plaintiffs' theory.  Plaintiffs claim that Meta distorts Allenby's testimony, but that testimony speaks for itself.  Allenby explained that he has never previously used, taught, published, seen in a peer-reviewed journal, or seen any other experts in this field perform **a linear regression of less than half of the survey data** as he did.  Pls.' Allenby Daubert Ex. 1 (Dkt. 393-2) ("Allenby Dep.") at 137:15-139:6, 141:16-144:18, 330:11-331:7.[2]

In an attempt to shore up Allenby's results-driven opinions (Dkt. 393 ("Opp.") at 11), Plaintiffs emphasize that Allenby rejected his Original Analysis based on his post-hoc conclusion that there was "a poor model fit" because "Facebook and Google are not close substitutes" (Dkt. 377-19 ("Allenby Rep.") at 21).  However, this argument falls apart under minimal scrutiny.  *See* Mot. at 5-6.  It was only after Allenby saw the results of his Original Analysis—which disproved Plaintiffs' theory of harm—that he concluded it was a "poor fit" **based on those results alone** (Allenby Rep. at 21; Allenby Dep. 160:15-162:23), and he did no further market research to see whether, in reality, Facebook and Google are close substitutes (Allenby Dep. at 244:12-25, 255:20-256:21).  In fact, Allenby admitted in his deposition that he "anticipated the logit model"[3] used in his Original Analysis would "fit" **before** he got the results.  *Id*. at 136:21-137:14.

The flaws in Allenby's opinions go to admissibility, not merely weight.[4]  Meta is not nitpicking inputs to an otherwise reliable method.  Rather, it seeks to exclude Allenby's faulty Invented Analysis because he applied a linear regression in a fundamentally unreliable way, by using less than half of the survey data, after stripping the data out of its original, necessary comparative context: the survey measured budget allocations *when considering the comparison between Facebook, Google, and Elsewhere*, but Allenby treated that data as if it measured budget

---

[2] All "Ex." references are to exhibits filed with Meta's opening brief, Plaintiffs' opposition brief, and the concurrently filed Declaration of Melanie M. Blunschi in Support of Meta's Reply in Support of its Motion for Summary Judgment and Motions to Exclude.  Previously filed exhibits are also referenced by docket number.

[3] The "logit model" or choice/allocation-based analysis both describe Allenby's Original Analysis, Plaintiffs concede (Opp. at 5), and that is the methodology that Allenby used in Table 4 of his report (Allenby Rep. at 21).

[4] Meta reserves the right to raise arguments that go to the weight of Allenby's survey design and methodology at the appropriate time.  Mot. at 13 n.12.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

META'S REPLY ISO MOT. TO EXCLUDE
G. ALLENBY, T. ROUGHGARDEN, AND A. LEVY
CASE NO. 3:18-CV-04978 JD

1   allocations to Meta in a vacuum.  Plaintiffs have no response to this, other than falling back to the

2   unsupportable position that Allenby did a "linear regression" (Opp. at 7-13), with no defense of

3   Allenby's use of an inappropriately cherry-picked portion of his survey data to do so.

4   **II.     ARGUMENT**

5           **A.     Allenby's Testimony Is Not Relevant Or Helpful Because He Does Not Address**
            **Plaintiffs' Only Viable Theory Of Harm And Damages**

6

7           Plaintiffs' theory in this case is that Meta described Potential Reach as an estimate of

8   "people" when it supposedly displayed estimates of a higher number of "accounts" instead.  Dkt.

9   388 at 10.  In other words, Plaintiffs claim that, while Potential Reach may have been an accurate

10  estimate of the number of "accounts," it was an "inaccurate" estimate of the number of "people"

11  because "the number of unique accounts and unique people were different." *Id.*  To prevail at trial,

12  Plaintiffs must show: (1) the difference between describing Potential Reach as an estimate of

13  "people" as opposed to "accounts" was material to advertisers; and (2) advertisers increased their

14  budgets in response to that change, resulting in injury and damages.  *See Pulaski & Middleman v.*

15  *Google*, 802 F.3d 979, 987-88 (9th Cir. 2015) (plaintiffs must "show that their damages stemmed

16  from actions that created the legal liability").

17          Allenby does not (and cannot) support this theory of liability.  Plaintiffs proffered Allenby

18  to show that advertisers increased their budgets when the numerical value of the Potential Reach

19  estimates was higher, *see, e.g.*, Opp. at 3 (stating that "Allenby designed and conducted a conjoint

20  survey that measures the effect of Facebook's inflated Potential Reach numbers on advertiser

21  demand"), but Allenby **admitted** that he **also** found that changing the description of Potential

22  Reach from "people" to "accounts" had *no effect* on advertisers' purchasing decisions.  *See*

23  Allenby Dep. at 159:2-12, 200:24-201:18 (admitting that he did not "find evidence that [accounts

24  versus people] matters" in either his original or additional analysis); *see also* Allenby Rep. at 21

25  (Table 4); Dkt. 382-1 ("Reibstein Rep.") ¶ 119 (explaining that Allenby "finds no statistical

26  support" for view that advertisers would change budget allocations if audience size was described

27  as "accounts" not "people").  As this Court already recognized, the alleged misrepresentation in

28  this case to which "all class members were exposed" is the allegedly improper use of "people" to

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

META'S REPLY ISO MOT. TO EXCLUDE
G. ALLENBY, T. ROUGHGARDEN, AND A. LEVY
CASE NO. 3:18-CV-04978 JD

describe the numerical values, Order at 10, so Plaintiffs must show damages flowing from that alleged misrepresentation.  Allenby does *not* do that, and in fact, given his finding that advertisers do not care about "people" instead of "accounts," he fatally undercuts Plaintiffs' theory of liability. Because Allenby's opinion does not match Plaintiffs' theory of liability, his opinions lack "a valid connection" to the remaining issues in the case, and he should be excluded.  *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010); *see also Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007) (in assessing "helpfulness," courts "must determine whether there is 'a link between the expert's testimony and the matter to be proved'" (citation omitted)).

### B.  Allenby's First-of-its-Kind Invented Analysis Is Not An Accepted Or Reliable Application Of A Linear Regression

During his deposition, Allenby went to great lengths to describe his experience with, and teaching of, conjoint analysis and linear regressions *generally*.  But this misses the point:  while courts have accepted conjoint analysis as a means to calculate price premiums, as the Court noted (Dkt. 388 at 13), an expert must still conduct a conjoint analysis using a methodology that meets the basic standards of *Daubert*.  In this case, Allenby abandoned the accepted methodology for conducting a conjoint analysis, and instead simply applied a linear regression to some of the data he collected in a first-of-its-kind way, that he concedes he had never previously performed.  *See, e.g.*, Allenby Dep. at 113:16-115:7 (comparing his Invented Analysis to a prior conjoint, conceding: "The methodology for the design was identical.  The methodology for [this] analysis was different.").  Allenby's Invented Analysis is not a typical conjoint analysis, *i.e.*, the logit model that he teaches, has published, and that is used by other experts (*id.* at 160:15-161:7; Reibstein Rep. ¶¶ 5, 89-90), which utilizes linear regression as part of analyzing the complete survey data comparing the various features across the tested products, and which is how he performed his Original Analysis.  Reibstein Rep. ¶¶ 89-90 (discussing Allenby's "not standard" methodology and noting three of Allenby's prior publications where he "analyzed all respondents' data for all brands collected from the survey and did not only analyze data related to one particular brand").  Simply put, while the use of conjoint analysis has been found to be a sufficiently reliable method for calculating price premiums (Dkt. 388 at 13), the methodology Allenby utilized was not.  Rather,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

META'S REPLY ISO MOT. TO EXCLUDE
G. ALLENBY, T. ROUGHGARDEN, AND A. LEVY
CASE NO. 3:18-CV-04978 JD

1   for his Invented Analysis, Allenby did a linear regression on less than half of his survey's data in

2   a way that stripped that portion of data out of its proper comparative context.  **That** methodology

3   has never been taught, published or used by any other expert before, as Allenby testified (Allenby

4   Dep. at 137:15-139:6, 141:16-144:18, 330:11-331:7), and is not a reliable scientific method.[5]

5           Rule 702 requires an expert's testimony to be the "product of reliable principles and

6   methods."  Fed. R. Evid. 702.  Expert testimony is inadmissible when the underlying methodology

7   is invalid.  *See Samuels v. Holland Am. Line-USA Inc.*, 656 F.3d 948, 952 (9th Cir. 2011).  Where

8   an expert "develop[s] [his] opinions expressly for the purposes of testifying," courts have excluded

9   the testimony, concluding "that [the] analysis was unduly results-driven."  *In re Incretin-Based*

10  *Therapies Prod. Liab. Litig.*, 524 F. Supp. 3d 1007, 1039 (S.D. Cal. 2021), *aff'd*, No. 21-55342,

11  2022 WL 898595 (9th Cir. Mar. 28, 2022); *Daubert*, 43 F.3d at 1319.[6]  Allenby's analysis should

12  be excluded on these grounds.

13          Plaintiffs assert three arguments in response, but none can salvage Allenby's improper and

14  results-driven methodology.  First, Plaintiffs claim that Meta misleads the Court about Allenby's

15  testimony.  But Allenby's testimony speaks for itself, and Plaintiffs do not address Allenby's clear

16  admissions that invalidate his Invented Analysis:

17          (1) He has never published his Invented Analysis.  Allenby Dep. at 138:22-139:6

18  (objections omitted) (emphasis added):

19                  Q. And have you ever in any of your academic writings
                    described the step that you took in this case after receiving
20                  the results that are reflected in table 4 [Original Analysis]
                    that let [*sic*] you to the results that are reflected in table 3
21                  [Invented Analysis]?
                    A. **In my writings I have not articulated that**. I want to
22                  emphasize that I'm just following the data.

23          (2) He has never seen the Invented Analysis methodology used or published by any expert

24

25  ---

26  [5] Plaintiffs go to great lengths to defend Allenby's qualifications, but "even a good expert can do
    a bad job."  *Adkins v. Facebook, Inc.*, 424 F. Supp. 3d 686, 694 (N.D. Cal. 2019).

27  [6] Plaintiffs' attempt to distinguish Allenby's analysis from that in *In re Incretin* is misplaced.  The
    portion Plaintiffs cite (Opp. at 8-9), appears to exclude a *different* expert and has no bearing on the
    finding that the expert's analysis, like Allenby's ,"consists of a cherry-picked selection of
28  favorable data" and is "unduly results-driven, not good science, and therefore inadmissible."  *In
    re Incretin*, 524 F. Supp. 3d at 1039.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

META'S REPLY ISO MOT. TO EXCLUDE
G. ALLENBY, T. ROUGHGARDEN, AND A. LEVY
CASE NO. 3:18-CV-04978 JD

in the conjoint field. *Id.* at 141:16-142:1 (objections omitted) (emphasis added):

> Q: Oh, okay. Are you -- so you've identified all those other experts. Have any of those experts that you identified, as far as you know, ever in writing described the use of the step that you took in this case after you got the results that are reflected in table 4 [Original Analysis] that let you to the results that are reflected in table 3 [Invented Analysis] of your report?
> A. **Not to my knowledge, no**.

(3) He has never seen the Invented Analysis methodology published in a peer-reviewed journal. *Id.* at 144:10-18 (objections omitted) (emphasis added):

> Q. Can you identify anyone in a peer-reviewed journal who has ever written an article that describes the step that you took after receiving results that are depicted in table 4 [Original Analysis] that led you to get the results that are depicted in table 3 [Invented Analysis]? Yes or no.
> A. **No.**

(4) Allenby teaches students to undertake "rigorous" conjoint analysis (like his Original Analysis), which **does not** include instructions to abandon the traditional methodology in favor of a novel analysis using less than half of the relevant data. *See* Ex. 70 (Dkt. 278-5) at 18. There is **no evidence** that Allenby has ever taught the Invented Analysis. Allenby Dep. at 136: 21-137:14 (testifying that he does not have a written presentation describing the steps of the Invented Analysis).

Second, Plaintiffs attempt to mask what Allenby has done as a standard "regression" analysis of survey data. The portion of Allenby's deposition that Plaintiffs repeatedly cite is Allenby's answer that he has taught students to use a regression analysis **generally**, as applied in his Original Analysis (not his Invented Analysis). *Id.* at 134:20-135:22. But that is not the same as teaching a regression analysis using the specific methodology of his Invented Analysis (Table 3 of Allenby's Report). Reibstein Rep. ¶ 89. And as Meta explained in its Motion, "Meta does not take issue with the use of a linear regression to analyze survey data in general" (Mot. at 6 n.7), but instead of conducting a traditional conjoint analysis, Allenby created a brand new methodology. Allenby's Invented Analysis occurred as part of a four-step process: (1) he designed and fielded a survey where respondents made hypothetical ad spending decisions based on comparisons between features of Facebook, Google, and Elsewhere; (2) he analyzed the full set of

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

6

META'S REPLY ISO MOT. TO EXCLUDE
G. ALLENBY, T. ROUGHGARDEN, AND A. LEVY
CASE NO. 3:18-CV-04978 JD

data from that survey using an allocation-based conjoint analysis, or "logit model" (the Original Analysis); (3) he rejected the outcome of that analysis; and (4) only **then** did he decide to use a portion of the comparative survey data (ignoring the data on allocations to Google or Elsewhere) as the input into his novel linear regression methodology, which just so happened to fit Plaintiffs' theory of harm (the Invented Analysis).  Suggesting that adding step (4) is merely conducting a standard linear regression runs directly contrary to Allenby's own testimony.  Allenby Dep. at 113:11-115:7 (conceding that his "methodology for [this] analysis was different").

Finally, Allenby's opinions cannot escape scrutiny under *Daubert* merely because they were disclosed in his report.  In *Lipitor*, the court found the expert's "result-driven" and "cherry-pick[ed]" analysis did "not reflect scientific knowledge, [was] not derived by the scientific method, and not 'good science.'"  *Lipitor (Atorvastatin Calcium) Mktg. v. Pfizer, Inc.*, 892 F.3d 624, 634 (4th Cir. 2018) (citation omitted).  As such, the proposed expert's results were excluded.  Plaintiffs try to distinguish *Lipitor* on the basis that Allenby included his Original Analysis in his report.  That is not enough; *Lipitor* is not merely about disclosure of faulty methodologies.  *Id.*  That Allenby disclosed his Original Analysis does not save him from scrutiny under *Daubert* where he performed a novel, cherry-picked, and results-driven Invented Analysis.

## C.    Allenby's Rationale for Rejecting His Original Analysis Is Directly Contradicted by His Survey Design and Pre-Test Survey Respondents

Plaintiffs' assertion that Allenby rejected the Original Analysis because of a "poor fit" of the model strains credulity.  Allenby admitted in his deposition that he performed market research in designing his survey, and based on that research, his survey compared the features of advertising on Facebook, Google, and Elsewhere.  Allenby Dep. at 245:8-24, 262:16-263:4.  Prior to fielding his survey, Allenby ran twelve pre-test interviews that he claims were designed to identify any issues with the survey design and ensure the respondents understood the questions.  Allenby Rep. at 12.  **Eleven of the twelve** pre-test respondents to his survey described that they advertise on **both** Facebook and Google.  *Compare* Ex. 130 at 2; Ex. 131 at 1; Ex. 132 at 1; Ex. 133 at 1, Ex. 134 at 2; Ex. 135 at 2; Ex. 136 at 2; Ex. 137 at 1; Ex. 138 at 1; Ex. 139 at 1; Ex. 140 at 1, *with* Ex. 141 at 1 (Certified Transcripts of Allenby's Pre-Test Interviews); *see also* Reibstein Rep. ¶¶ 79-

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

META'S REPLY ISO MOT. TO EXCLUDE
G. ALLENBY, T. ROUGHGARDEN, AND A. LEVY
CASE NO. 3:18-CV-04978 JD

86.  Indeed, both named Plaintiffs also testified that they advertised on both Facebook and Google. Ex. 114 (Dkt. 395-33) (Maxwell Dep.) at 57:23-58:8; Ex. 118 (Dkt. 395-35) (DZ Reserve Dep.) at 32:16-33:1.  Based on that research and the results of his pre-test, Allenby went forward with his survey of 1,100 advertisers comparing the features of advertising on Facebook, Google, and Elsewhere, and then performed his "logit model" or choice/allocation-based analysis (Original Analysis).  It was only **after** he got the results of his Original Analysis, showing that advertisers as a class did not make budget allocations based on the challenged Potential Reach Statements, that he determined his model had a "poor fit."  He admitted this timing in his deposition.  Allenby Dep. at 283:11-285:21.  And he did no market research after he got the results of the Original Analysis to assess whether Facebook and Google are in fact competitors (*id.* at 244:12-25, 255:20-256:21).  His conclusion that Facebook and Google are not close advertising substitutes directly contradicts the design of his survey, which is premised on the assumption that they are direct substitutes.  *Id.* at 316:15-18.  His opinion that Facebook and Google are not substitutes is also at odds with the data he obtained from the respondents in his survey: 99% of his 1,100 survey respondents chose to allocate their budget to **both** Facebook and Google in at least one survey choice, and 94% of respondents allocated their budget to **both** Facebook and Google in **all** of their survey choices, Reibstein Rep. ¶ 81.  Allenby's post-hoc explanation that Facebook and Google are not close substitutes is not plausible.  *Id.* ¶¶ 80-81; Dkt. 384-1 (Tucker Rep.) ¶ 115.

> **D.**   **Allenby's Invented Analysis Is Based on an Incomplete, Unrepresentative Subset of Data That Was Even Further Cherry-Picked to Drive the Results**

The fact that Allenby only used a portion of the comparative survey data in performing his regression—contrary to the standard methodology in the field, Reibstein Rep. ¶¶ 89-90—renders his analyses unreliable and inadmissible.  But even beyond that, Allenby further cherry-picked the data in an attempt to support Plaintiffs' claims—although he still did not find that advertisers as a class spent more on Facebook advertising as a result of the difference between "people" and "accounts."  Allenby Dep. at 159:2-12.

After discarding his Original Analysis, Allenby came up with an Invented Analysis that used less than half the data from the conjoint survey.  This is problematic because his survey was

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

META'S REPLY ISO MOT. TO EXCLUDE
G. ALLENBY, T. ROUGHGARDEN, AND A. LEVY
CASE NO. 3:18-CV-04978 JD

designed only to measure advertisers' budget allocations *based on the comparison* between features of advertising on Facebook/Instagram, Google/YouTube, and Elsewhere.  Reibstein Rep. ¶¶ 96-97.    It also ignores that the respondents' decisions between the options (Facebook/Google/Elsewhere) would not necessarily be the same as they would be if they had only been provided one option (*e.g.*, Facebook).  *Id.* ¶¶ 96-101.  Given that, any analysis of Allenby's survey data must take into account **all** of the products tested in the conjoint survey (not just one), and must consider that the allocation decisions made by the respondents were based on the features of all the products that were in the survey.  *Id*.  That Allenby switched the order that the Google/Facebook/Elsewhere allocations appeared during the survey does not, as Plaintiffs claim (Opp. at 14), justify his extraction of **only** the Facebook budget allocation data for his Invented Analysis, and it surely does not undo the reality that respondents made budget allocation decisions considering all **three** of those options, and all of the features of those options.  *See* Ex. 71 (Dkt. 378-6).

Allenby then further cherry-picked the data in his Invented Analysis by using arbitrary and highly subjective cut offs even for the portion of his survey data that he included in his Invented Analysis.  The inclusion or exclusion of these outliers entirely changes the outcome of his analysis. Mot. at 7-8.  Plaintiffs claim that the exclusion of speeders is "standard practice" (Opp. at 15), but the manner in which Allenby excluded speeders led to highly subjective results and is not common. *See* Reibstein Rep. ¶¶ 103-105.  So too with Allenby's exclusion of respondents that he considered to be "straight-liners" or whose responses he could not make sense of; these exclusions were anything but standard.  *Id.* ¶¶ 104-107, 111.

**E.** **The Flaws In Allenby's Invented Analysis Go to Admissibility, Not Weight**

The flaws in Allenby's methodology go to admissibility, not the weight of his opinions. The Ninth Circuit has explained that while critiques of a survey design or methodology may go to weight over admissibility, there remains a threshold question of whether the survey is "relevant and conducted according to accepted principles."  *Clicks Billiards, Inc. v. Sixshooters, Inc*., 251 F.3d 1252, 1263 (9th Cir. 2001) ("Treatment of surveys is a two-step process.  First, is the survey admissible?  That is, is there a proper foundation for admissibility, and is it relevant and conducted

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9

META'S REPLY ISO MOT. TO EXCLUDE
G. ALLENBY, T. ROUGHGARDEN, AND A. LEVY
CASE NO. 3:18-CV-04978 JD

1   according to accepted principles?  This threshold question may be determined by the judge.").

2   Allenby's methodology fails this threshold question of admissibility because it is not relevant (*see*

3   *supra* Section II.A), and it was not conducted according to accepted principles (Mot. at 10-11;

4   Reibstein Report ¶ 111).

5       **F.      Allenby's Flaws Cause Portions of Plaintiffs' Other Experts' Analyses to Fail**

6           Plaintiffs concede that their other experts, Armando Levy and Timothy Roughgarden rely

7   entirely on the output of Allenby's Invented Analysis as essential inputs to their analyses, and

8   Plaintiffs make no attempt to argue that if Allenby is excluded, Roughgarden and Levy's opinions

9   may remain.  *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-cv-5944, 2017 WL

10  10434367, at *2 (N.D. Cal. Jan. 23, 2017) (excluding expert's opinion because it relied on opinion

11  of another expert that the court had found to be unreliable).  If Allenby's opinions are excluded,

12  including at a later stage, so too must the opinions of Levy and Roughgarden that rely on Allenby

13  be excluded.

14  **III.    CONCLUSION**

15          For the foregoing reasons, the Court should exclude the opinions of Greg Allenby and the

16  portions of Timothy Roughgarden's and Armando Levy's opinions that rely on Allenby's analysis.

17  Dated:  April 29, 2022                    LATHAM & WATKINS LLP

18                                            By:  */s/ Elizabeth L. Deeley*
                                                 Elizabeth L. Deeley (CA Bar No. 230798)
19                                               Melanie M. Blunschi (CA Bar No. 234264)
                                                 Nicole C. Valco (CA Bar No. 258506)
20                                               505 Montgomery Street, Suite 2000
                                                 San Francisco, CA  94111-6538
21                                               Telephone:  +1.415.391.0600
                                                 *elizabeth.deeley@lw.com*
22                                               *melanie.blunschi@lw.com*
                                                 *nicole.valco@lw.com*
23

24                                               Andrew B. Clubok (*pro hac vice*)
                                                 Susan E. Engel (*pro hac vice*)
25                                               555 Eleventh Street, N.W., Suite 1000
                                                 Washington, D.C. 20004-1304
26                                               Telephone:  +1.202.637.2200
                                                 *andrew.clubok@lw.com*
27                                               *susan.engel@lw.com*

28                                               *Attorneys for Defendant Meta Platforms, Inc.*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10      META'S REPLY ISO MOT. TO EXCLUDE
        G. ALLENBY, T. ROUGHGARDEN, AND A. LEVY
        CASE NO. 3:18-CV-04978 JD