# EXHIBIT C

WILMER CUTLER PICKERING
  HALE AND DORR LLP

SONAL N. MEHTA （州律师协会编号：222086）
  Sonal.Mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, California 94306
电话：(650) 858-6000

DAVID Z. GRINGER （仅限于本案）
  David.Gringer@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
电话：(212) 230-8800

ARI HOLTZBLATT （仅限于本案）
  Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS （仅限于本案）
  Molly.Jennings@wilmerhale.com
1875 Pennsylvania Avenue, NW
Washington, District of Columbia 20006
电话：(202) 663-6000

被告 Meta Platforms, Inc. 律师

美国地区法院

加州北区

旧金山分院

| | |
|---|---|
| MAXIMILIAN KLEIN 等，代表自身以及所有其他类似情况者，<br><br>　　　　　　　　　原告，<br><br>　　诉<br><br>META PLATFORMS, INC. 一家特拉华州公司，总部设在加州，<br><br>　　　　　　　　　被告。 | 案件编号：3:20-cv-08570-JD<br><br>**根据 1970 年 3 月 18 日《关于从国外调取民事和商事证据海牙公约》要求提供国际司法协助的请求书**<br><br>法官：James Donato 阁下 |

美国加州北区地区法院向中华人民共和国司法部致以敬意，请求协助获取本院民事诉讼所需的证据。

该请求是根据 1970 年 3 月 18 日《关于从国外调取民事和商事证据海牙公约》（"海牙证据公约"）第一和第二章提出的，并且符合其规定，美国和中华人民共和国均为《海牙证据公约》的缔约国。

具体而言，地区法院要求提供协助，向非当事人腾讯控股有限公司    （"腾讯"）（设在中华人民共和国深圳市的中国实体）获取证据。

**第 I 部分**

**1. 发送人：**

James Donato 阁下
加州北区美国地区法院
450 Golden Gate Avenue
San Francisco, CA 94102
United States of America

**2. 被请求国中央机关：**

司法协助交流中心 (ILCC)
中华人民共和国司法部
平安里西大街 33 号
西城区
北京，100035
中华人民共和国
电话：+86 (10) 5560 4537
传真：+86 (10) 5560 4538

**3. 签字版请求书接收人：**

James Donato 阁下
加州北区美国地区法院
450 Golden Gate Avenue
San Francisco, CA 94102
United States of America

*另寄一份副本至双方法定代理人：*
Stephen A. Swedlow
昆鹰律师事务所 (Quinn Emanuel Urquhart & Sullivan, LLP)
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606

电话：(312) 705-7400
电子邮箱：stephenswedlow@quinnemanuel.com

Shana E. Scarlett
哈根斯•伯曼•索波•夏皮罗律师事务所 (Hagens Berman Sobol Shapiro LLP)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
电话：(510) 725-3000
电子邮箱：shanas@hbsslaw.com

Yavar Bathaee
Bathaee Dunne LLP
445 Park Avenue, 9th Floor
New York, NY 10022
电话：(332) 322-8835
电子邮箱：yavar@bathaeedunne.com

Kristen M. Anderson
Scott+Scott Attorneys at Law LLP
230 Park Avenue, 17th Floor
New York, NY 10169
电话：(212) 223-6444
电子邮箱：kanderson@scott-scott.com

Sonal N. Mehta
Wilmer Cutler Pickering Hale and Dorr LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
电话：(650) 858-6000
电子邮箱：sonal.mehta@wilmerhale.com

David Z. Gringer
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
电话：(212) 230-8800
电子邮箱：david.gringer@wilmerhale.com

**4. 请求机关要求收到请求书答复的日期：**

请求机关希望尽快对协助请求作出答复，以确保及时收到文件，用于下文所述的民事诉讼。

<u>第 II 部分</u>

根据《公约》第 **3** 条的规定，以下签字申请人谨就本请求提交以下信息：

**5. (a)** 请求司法机关（第 **3(a)** 条）：

James Donato 阁下
加州北区美国地区法院
450 Golden Gate Avenue
San Francisco, CA 94102
United States of America

**(b)** 主管机关（第 **3(a)** 条）：

中华人民共和国

**(c)** 案件名称及识别号：

*Klein* 等诉 *Meta Platforms, Inc.* 案，编号：3:20-cv-08570-JD，加州北区美国地区法院，美国加州旧金山。

**6.** 当事方及其代理人的姓名和地址（第 **3(b)** 条）：

**(a)** 原告：

Maximilian Klein

Sarah Grabert

Rachel Banks Kupcho

Affilious, Inc.

Jessyca Frederick

Mark Young

406 Property Services, PLLC

Mark Berney

Katherine Looper

代理人：

Stephen A. Swedlow
昆鹰律师事务所 (Quinn Emanuel Urquhart & Sullivan, LLP)

191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
电话：(312) 705-7400
电子邮箱：stephenswedlow@quinnemanuel.com

Shana E. Scarlett
哈根斯•伯曼•索波•夏皮罗律师事务所 (Hagens Berman Sobol Shapiro LLP)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
电话：(510) 725-3000
电子邮箱：shanas@hbsslaw.com

Yavar Bathaee
Bathaee Dunne LLP
445 Park Avenue, 9th Floor
New York, NY 10022
电话：(332) 322-8835
电子邮箱：yavar@bathaeedunne.com

Kristen M. Anderson
Scott+Scott Attorneys at Law LLP
230 Park Avenue, 17th Floor
New York, NY 10169
电话：(212) 223-6444
电子邮箱：kanderson@scott-scott.com

**(b)** 被告：

Meta Platforms, Inc.
1601 Willow Road
Menlo Park, CA 94025

代理人：
Sonal Mehta
Wilmer Cutler Pickering Hale and Dorr LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
电话：(650) 858-6000
电子邮箱：sonal.mehta@wilmerhale.com

David Z. Gringer
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
电话：(212) 230-8800
电子邮箱：david.gringer@wilmerhale.com

**7. 诉讼性质和目的以及事实概要（第 3(c) 条）：**

**(a)   诉讼性质：**

该诉讼的性质是代表两个推定集体提起的合并民事诉讼：(1)   推定消费者集体（由使用 Meta 社交网络和社交媒体服务的个人组成）；以及 (2)   推定广告商集体（由购买 Meta 广告服务的个人和实体组成）。消费者原告根据《谢尔曼法》第 2 条提出索赔，声称 Meta 通过关于其数据收集和使用行为的被控虚假的陈述，在所称的社交网络和社交媒体市场获得并保持垄断势力。广告商原告根据《谢尔曼法》第 1 条和第 2 条提出索赔，指控 Meta 对所称的社交广告市场实施垄断和企图垄断，包括所 Meta 与谷歌之间所谓的市场划分协议。这些索赔是基于消费者原告的集体诉讼合并起诉书 （第 87 号案卷）和广告商原告的集体诉讼合并起诉书第一次修订本 （第 237 号案卷）提出的。

**(b)   起诉书概要：**

消费者原告：消费者原告称，Meta 在向其服务用户提供的数据隐私保护方面存在欺骗性行为。消费者原告声称，Meta 虚假地表示其将为用户提供某些隐私保护，并且在其收集并提供给第三方的用户数据量方面欺骗用户。消费者原告称，许多用户因 Meta 的失实陈述而使用 Meta 的服务而不是其他竞争平台，使得 Meta 在"社交网络"和"社交媒体"市场上获得并保持了垄断地位。消费者原告的集体诉讼合并起诉书的副本见附件 A。

广告商原告：广告商原告同样指称，Meta 在数据隐私保护方面存在欺骗性行为，使 Meta 在"社交广告"市场上获得了垄断地位。广告商原告进一步指称，Meta 实施反竞争行为，以消除和防止进一步的竞争。具体而言，广告商原告声称，Meta 阻止开发者建立原本可能会成为社交网络竞争对手和社交广告市场竞争对手的移动应用程序。广告商原告还称，Meta 和谷歌在 2018 年 9 月达成了一项反竞争协议，分割网络广告市场，并帮助 Meta 维持其在社交广告市场的地位。广告商原告的集体诉讼合并起诉书第一次修订本的副本见附件 B。

**(c)   辩护概要：**

由于多个原因，Meta 否认消费者和广告商原告起诉书中的指控。本请求书旨在获得与下列辩护具体相关的信息（并非列出 Meta 在本诉讼中的全部辩护）：消费者和广告商原告所界定的市场并不可信；行业和公众不认可所称的"社交网络"、"社交媒体"或"社

交广告"市场；Meta 在所称的市场中没有必需的市场份额；竞争和消费者不会因所称的垄断一个免费向所有用户发放产品的市场而受到损害；Meta 的数据隐私政策和实践并不是获得对其他竞争对手的竞争优势的手段；Meta 在任何适当界定的市场中一直面临竞争。

**第 III 部分**

**8. 需要取得的证据或需要履行的其他司法行为（第 3(d) 条）：**

**(a)    需要取得的证据：**

要求中华人民共和国提供的援助包括获得腾讯控股有限公司持有的文件的副本。

**(b)    寻求证据的目的：**

本请求书中所寻求的证据与上述指控和辩护有关，并且仅用于关于上述事项的法律诉讼。证据受附件 C 规定的严格保护令的约束。保护令确保本案中产生的文件不会被 Meta 用于诉讼之外的任何其他目的。保护令规定，腾讯控股有限公司等出示方可以将其文件标记为机密或高度机密；如果做了此类标记，那么除了两名（高度机密材料）至四名（机密材料）内部律师之外，Meta 的任何人都不可查看这些文件，并且这些律师在收到文件后两年内不得参与 Meta 的竞争性决策。

本请求中所寻求的信息对于 Meta 就消费者和广告商原告的指控进行公平辩护是必要的。特别是，腾讯控股有限公司是其标记为"社交平台"的微信和 QQ 的所有者。[1]向腾讯寻求的关于其运营市场、市场份额以及与 Meta 在用户时间和精力方面的竞争的证据涉及到 Meta 的辩护，因为腾讯等其他数字平台公司的存在表明 Meta 在任何市场均缺乏垄断势力。

Meta 要求腾讯进行证据开示，证明腾讯的产品与 Meta 的产品存在竞争。Meta 要求提供关于腾讯如何看待其产品和 Meta 之间的竞争的文件（第 1 项文件请求），以及关于微信或 QQ 的服务为用户提供的功能是否与 Meta 提供的功能基本相似的文件（第 2 项文件请求）。Meta 还询问腾讯是否考虑对其用户进行数据补偿，以测试原告的损害赔偿论断（第 3 项文件请求）。为了解决原告的关于市场势力的指控，Meta 要求提供关于腾讯是否认为其隐私政策和实践致使其产品有别于其竞争对手的产品或是否影响用户满意度或参与度的文件（第 4 和 5 项文件请求）。Meta 还要求提供关于腾讯收购与 Meta 相竞争的

---

[1]腾讯，业务，https://www.tencent.com/en-us/business.html （2022 年 3 月 26 日访问）。

某些美国公司的文件（第 6 项文件请求） 最后，Meta 还有两个有限数据请求，即原告的、关于在微信和 QQ 上花费的时间和每日活跃用户数量的市场份额和市场界定指控（第7 和第 8 项文件请求）。Meta 认为，该信息有助于反驳原告关于 Meta 在任何可确认市场中具有垄断势力的指控。Meta 将这些请求限于"市场份额"的公认"适当指标"上，即花费的时间、活跃用户和每日活跃用户。*参见 Fed. Trade Comm'n 诉 Facebook, Inc.* 案，编号：2022 WL 103308，第 7 页 (D.D.C. 2022 年 1 月 11 日)。第 7 项请求寻求的是 Meta 产品出现故障时的特定时间段的数据以及离开 Meta 产品而转用其他产品的信息。在第 8 项请求中，Meta 要求提供 2011-2014 年和 2021 年的数据，以帮助回应原告关于 Meta 具有任何类型的持久垄断势力的指控。

**9.** **需要检查的文件或其他财产（第 3(g) 条）：**

附件 D 是拟向腾讯控股有限公司获取的文件的清单。

**10. 应遵循的特殊方法或程序（第 3(i) 和第 9 条）：**

在中国适用法律允许的范围内，诚请中国相关司法机关要求对所请求的文件作适当标识、以电子和/或纸质形式提供并添加该标识，以提交给：

David Z. Gringer
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
电话：(212) 230-8800
电子邮箱：david.gringer@wilmerhale.com

另外还请求，在中国法律允许的情况下，提交的文件应附有腾讯授权代理人的宣誓声明，证明其中包括本请求书所述的全部文件，或以其他方式说明其中不含哪些文件及其原因，并证明这些文件是本请求书所述文件的真实和准确副本。

**11. 关于请求书签署时间和地点以及被通知人身份和地址的通知请求（第 7 条）**

要求将本请求书的签署通知提供给上文第 6 款所列的双方代理人。

**12. 关于请求机关司法人员出席或参与请求书签署事宜的请求（第 8 条）：**

无。

**13. 任命专员的主管机关，待司法部批准：**

加州北区美国地区法院。

**14. 根据发起管辖区法律拒绝给予的特权或义务的说明（第 11(b) 条）：**

除了中国法律项下适用的特权外，腾讯控股有限公司不需要披露构成其与律师之间关于寻求或提供法律意见的保密通信的文件和电子记录。但是，如果该通信已被披露给第三方，则可能会放弃该特权。

**15. 根据《公约》第 14 条第 2 款或第 26 条规定应予偿还的费用：**

本《海牙证据公约》程序费用，包括专员费用，将由 Meta Platforms, Inc. 承担，由其上述律师转交。各方将负责承担其各自的律师因本《海牙证据公约》程序而产生的与任何诉讼有关费用和支出（如有）。

<u>**第 IV 部分**</u>

本地区法院对中华人民共和国主管机关根据《海牙公约》条款提供的协助和惠允表示感谢。

请求机关签字和盖章：

日期：

_____

JAMES DONATO
美国地区

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>附件 A</u>

1

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Stephen A. Swedlow （获准担任*法律顾问*）

2

stephenswedlow@quinnemanuel.com
191 N. Wacker Drive, Suite 2700

3

Chicago, IL 60606
(312) 705-7400

4

5

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Shana E. Scarlett（律师号：217895）

6

shanas@hbsslaw.com
715 Hearst Avenue, Suite 202

7

Berkeley, CA 94710
(510) 725-3000

8

*临时消费者群体联合首席法律顾问*

9

【签名页上列出的其他律师】

10

美国加利福尼亚北区

11

联邦地区法院

12

圣何塞分院

13

| | |
|---|---|
| 马克西米利安·克莱因 (MAXIMILIAN KLEIN)、萨拉·格拉伯特 (SARAH GRABERT) 和雷切尔·班克斯·库普乔 (RACHEL BANKS KUPCHO) 代表他们自己和所有其他处境相似的人，<br><br>　　　　　原告<br><br>　　　诉<br><br>FACEBOOK, INC.<br><br>　　　　　被告。<br><br>本文档涉及：所有诉讼 | 合并案件编号：5:20-cv-08570-LHK<br><br>尊敬的 露西·H·高 (Lucy H. Koh) 阁下<br><br>**消费者合并集体诉讼起诉书**<br><br><u>**要求陪审团审判**</u> |

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# 目录

页码

一、 初步声明 ....................................................................................................................1

二、 当事人 ........................................................................................................................4

    A. 被告 ..........................................................................................................4

    B. 原告 ..........................................................................................................5

三、 管辖权、地点、区内分配 和法律的选择 ..............................................................7

四、 事实指控 ....................................................................................................................8

    A. 社交媒体行业的一般背景 ....................................................................8

    B. Facebook 的一般背景 .........................................................................10

    C. Facebook 在社交网络和社交媒体相关市场占据主导地位。.........13

        1） 社交网络市场 ....................................................................14

        2） 社交媒体市场 ....................................................................20

        3） 相关地域市场 ....................................................................22

        4） 社交网络和社交媒体市场的进入壁垒很高 ....................22

    D. Facebook 试图通过在隐私保护方面欺骗消费者来获得市场力量（并成功地获得了市场力量）。 ..........................................................28

    E. Cambridge Analytica 丑闻部分揭示出 Facebook 欺骗的程度。 ....................39

    F. Facebook 使用反竞争收购和威胁来破坏社交网络和社交媒体市场的竞争。 ..............................................................................................43

        1） Facebook 对消费者的跟踪推动了其"复刻、收购或扼杀"策略。 ....................................................................................43

        2） Facebook 以歧视性做法威胁竞争对手，帮助推动其反竞争收购策略。 ............................................................................47

            Instagram ................................................................................52

            Snapchat .................................................................................54

            WhatsApp ...............................................................................56

            Facebook "复刻、收购、扼杀"策略的其他例子 ..........57

    G. Facebook 使用 Onavo 的行为暴露。 ..............................................58

1

H.      Facebook 的反竞争行为已经并将继续损害社交网络和社交媒体市场中
        的竞争。 ............................................................................60

2

3       I.      Facebook 的反竞争行为直接且严重地损害了消费者。 ................................61

4  五、   诉讼时效 ..................................................................................................................65

5       A.      应计索偿 ............................................................................................65

6       B.      公平收费 ............................................................................................66

7       C.      欺诈性隐瞒 ........................................................................................67

8       D.      持续的侵权行为和损害赔偿的确定 ................................................72

9  VI.    集体诉讼指控 ........................................................................................................72

10 VII.   州际贸易和商业 ....................................................................................................74

11 VIII.  救济索赔 ................................................................................................................75

12 IX.    救济请求 ................................................................................................................82

13 十、   要求陪审团审判 ....................................................................................................83

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

案件编号：5:20-cv-08570-LHK
消费者合并集体诉讼起诉书

1.　　原告通过其在下面签名的律师以个人名义并代表处境相似的群体，特此对被告 Facebook, Inc.（简称"Facebook"）提起本诉讼：

## 一、　　初步声明

2.　　Facebook 最初是一个让大学生在校园里与朋友联系的网站，后来其呈指数级增长，如今已成为世界上最大的社交网络和社交媒体公司。例如，Facebook 报告称，在 2020 年 7月，仅其 Facebook 社交网络就有 17.8 亿日活跃用户和 27 亿月活跃用户。通过 Facebook 的*所有*主要产品，*例如，*Facebook、Instagram、Facebook Messenger、WhatsApp 和 Oculus，Facebook 拥有 24.7 亿日活跃用户和 31.4 亿月活跃用户。但 Facebook 并没有像公众所认为的那样，凭借创新和公平竞争获得市场主导地位。相反，Facebook 将其巨无霸地位用作武器，清除所有威胁其夺取市场份额的竞争对手。Facebook 通过一项由两部分组成的反竞争计划做到了这一点，该计划起源于多年前，但一直持续到今天，其最终效果是破坏竞争并损害消费者的利益。

3.　　首先，Facebook 一心想要彻底称霸，一贯故意在其向用户提供的数据保护方面欺骗消费者，以减少竞争，并在以强大的网络效应和高准入门槛为特征的市场中获得主导地位。在社交网络的早期，Facebook 就认识到，向用户承诺严格的隐私保护是其赢得市场竞争的必要条件。因此，由于 Facebook 对用户隐私的承诺，许多用户选择了 Facebook 而不是其他竞争网络。然而，事实上，Facebook 隐瞒了它从消费者那里收集到的数据的范围，以及它利用这些数据压制竞争的方式。当 Facebook 的欺骗行为在 2018 年开始遭到曝光的时候，已经为时已晚——Facebook 已经通过欺骗获得了市场主导地位。Facebook 因其欺骗行为而获利，然后，多年来，非法维持了对社交网络和社交媒体市场（下文将进一步定义和讨论）的垄断地位。高准入门槛，包括强大的网络效应和高昂的转换成本，都有助于 Facebook 阻止实际竞争对手和潜在竞争对手挑战其垄断地位。

4.　　其次，Facebook 利用它从用户那里通过欺骗手段提取的大量数据识别新兴竞争对手，然后"收购、复制或消灭"这些公司。Facebook 不是靠实力竞争，而是利用它所收集的宝贵的消费者数据来识别最有可能获得有意义的市场份额增长的新兴竞争对手。掌

握了宝贵的用户数据后，Facebook 为了让消费者相信它没有收集用户数据也不会以这种方式使用这些数据，它瞄准了用户首选的替代公司，将其销毁。Facebook 明确表示，如果新兴竞争对手不首先将其业务出售给 Facebook，它将复制这些新兴竞争对手的创新成功，并歧视性地切断这些公司获取 Facebook 宝贵用户数据的渠道。Facebook 向其竞争对手传达的信息很明确：以低价出售，否则 Facebook 将进入"毁灭模式"。所有这些都是 Facebook 的欺骗行为促成的。

　　5.　　虽然自马克·扎克伯格 (Mark Zuckerberg) 2004 年创立公司以来，因欺骗和一系列的收购计划，Facebook 得以不断发展，但 Facebook 与其用户之间的基本经济关系却没有发展。当用户注册 Facebook 账户时，他们就同意了某些条款。这些条款阐述了 Facebook 与其用户之间的经济交换。消费者允许 Facebook 访问和使用他们特定类型和数量的个人数据；而Facebooke 允许用户访问其社交网络和社交媒体产品，并承诺保护用户隐私。Facebook 目前的服务条款规定：

> *您无需付费使用 Facebook 和我们提供的其他产品和服务*，使用这些条款所涵盖的 Facebook 产品，即表示*您同意我们向您展示企业和组织付费让我们在 Facebook 公司产品内外推广的广告。我们使用您的个人数据，例如有关您的活动和兴趣的信息，向您展示与您相关的广告。*[1]

值得注意的是，Facebook 向用户表明（即使到今天），它利用用户数据的程度是有限的，并且数据收集的范围仅限于 Facebook 的服务本身。

　　6.　　服务条款进一步规定，"要使用 Facebook 的服务，作为交换，我们需要您做出某些承诺。"这些"承诺"包括"允许使用您的姓名、头像以及有关您在广告和赞助内容中的行为的信息。"条款还规定，保护用户"隐私是 Facebook 设计其广告系统的核心"。换言之，消费者放弃个人信息，并同意接收 Facebook 上的定向广告，以换取访问 Facebook 社交网络的权限。消费者不同意任何超出此等范围的事情。

　　7.　　Facebook 从其收集的消费者数据中获得了巨大的经济价值。事实上，Facebook 本身也在吹嘘它收集的消费者数据的经济价值。Facebook 根据其收集的用户个人数据，向用户定向推广广告。而且，Facebook 在其公开文件中以每位用户平均收入

---

[1] *Facebook 服务条款*，https://www.facebook.com/terms.php （最后访问时间：2021 年 4 月 15 日）（后加的强调）。

（"ARPU"）的形式具体描述了其巨额广告收入。2019 年，Facebook 报告称，其在美国和加拿大的 ARPU 超过每用户 41.00 美元。[2] 在美国有 2 亿多用户，这相当于 Facebook 一年的收入超过 82 亿美元。

8.　　Facebook 对用户数据的武器化及其"收购、复制或消灭"竞争对手的策略取得了巨大的成功，但却牺牲了消费者的利益。Facebook 的反竞争计划即使没有消除竞争，却也减少了竞争，并损害了消费者利益。

9.　　Facebook 对竞争的破坏，给消费者造成了巨大的经济损失。消费者在同意使用 Facebook 的产品时会放弃一些有物质价值的东西：他们的个人数据和他们的关注点。正如 Facebook 的联合创始人所解释的那样，"Facebook 实际上并不是免费的，当然也不是无害的…… 我们用自己的数据和关注点为 Facebook 付费，无论以哪种方式衡量，它都不便宜。"[3] 然后，用户数据和注意力被以可衡量的单位出售给广告商，以换取金钱。

10.　　如果没有 Facebook 的反竞争计划，公平竞争会要求 Facebook 为整个市场范围内的消费者提供更大的价值，以换取消费者数据，但 Facebook 却没有充分考虑其用户，*即*本诉讼中假定群体的成员。这就构成了反垄断损害。Facebook 通过其欺骗和通过其欺骗促成的收购，阻止了竞争，由于竞争的减少，用户从其数据中获得价值就低于其在竞争未减少情况下获得的价值。

11.　　Facebook 的收购和维持垄断权力的行为持续损害消费者的利益。在 Facebook 整合社交网络和社交媒体市场之前，许多公司通过提供质量等非价格属性上不同的竞争产品进行有力竞争，以赢得消费者。例如，早期的社交网络和社交媒体公司，包括 Facebook，通过向消费者提供突出特定隐私功能的竞争产品来争夺市场份额。如果没有 Facebook 的反竞争计划，使 Facebook 将消费者置于其垄断控制之下，则来自 Facebook 竞争对手的竞

---

[2] *Facebook 2019 年第 4 季度业绩*，第 4 页，载于 https://kl.link/36yIY5J （最后访问时间：2021 年 4 月 15 日）。

[3] Chris Hughes，《*是时候解散 Facebook 了*》，《纽约时报》（2019 年 5 月 9 日），载于 https: //kl.link/3dutshc（最后访问时间：2021 年 4 月 15 日）。

争将要求 Facebook 通过货币对价或更高质量的产品为消费者提供更大的价值，以换取他们使用 Facebook. 相反，因为 Facebook 的反竞争行为，Facebook 人为地扼杀了创新，并剥夺了消费者对 Facebook 社交网络和社交媒体帝国替代品的任何有意义的选择。因此，消费者面临着"要么接受，要么放弃"的选择：要么接受价值和质量较低的 Facebook，要么放弃使用大多数消费者的朋友和家人使用的唯一一社交网络和社交媒体产品。

12. Facebook 的垄断行为违反了反垄断法，损害了消费者的利益。事实上，美国众议院反垄断小组委员会、联邦贸易委员会（"FTC"）和各州总检察长都承认 Facebook 开展了反竞争行动。众议院反垄断小组委员会近期发布的一份多数派工作人员报告详细介绍了 Facebook 的反竞争行为模式。*见《数字市场竞争调查》，《多数派工作人员报告和建议》*（"美众议院报告"），司法委员会反垄断、商业和行政法小组委员会（2020 年 10 月 6 日），载于 https://kl.link/3jGISfK。此外，FTC 和 48 个州的总检察长已经开始对 Facebook 提起民事反垄断诉讼。*见纽约州等诉 Facebook, Inc.* 案，案件编号：1:20-cv-03589-JEB (D.D.C.)；*联邦贸易委员会诉 Facebook, Inc.* 案，案件编号：1:20-cv-03590-JEB (D.D.C.)。

13. Facebook 在社交网络市场和社交媒体市场中占据着主导地位，为了垄断这些市场，它开展掠夺性和排斥性行动，导致原告和消费者群体成员遭受重大经济损失。本诉讼旨在追回消费者的损失和 Facebook 的非法所得，并寻求适当的公平救济措施，以防止 Facebook 继续破坏竞争和损害消费者利益。

## 二、 当事人

**A. 被告**

14. 被告 Facebook, Inc. 由马克·扎克伯格于 2004 年创立，是特拉华州的一家公司，其主要营业地点位于加利福尼亚州门洛帕克市。

15. Facebook 是一家社交媒体公司，为超过 31.4 亿用户提供在线服务。Facebook 拥有并经营多个业务部门，例如：

- Facebook。根据 Facebook 提交给股东的文件，Facebook 的核心社交网络应

用程序（以公司名称命名）旨在使"人们在移动设备和个人电脑上能相互联系、分享、发现和交流"。Facebook 的核心产品之一是"动态消息"，其显示一系列经过算法排序的内容，包括各种媒体和有关用户社交活动的更新内容。动态消息还包括针对每个人的个性化广告。

- Instagram。Instagram 是一个社交媒体照片共享应用程序，可让用户在移动设备上共享照片、视频和消息。Facebook 在 2014 年 4 月宣布收购 Instagram，并与当年晚些时候完成了收购。

- Messenger。Facebook 的 Messenger 应用程序是一款多媒体消息传送应用程序，可通过应用程序和设备在人与人之间发送包括照片和视频在内的消息。

- WhatsApp。WhatsApp 是个人和企业使用的消息传送应用程序。WhatsApp 的主要卖点之一是其声称比短信或其他消息传送应用程序更私密、更安全。Facebook 于 2014 年收购了 WhatsApp。

16.  作为提供服务的交换条件，Facebook 收集用户数据，使广告商能够利用这些数据向 Facebook 用户投放定向广告。Facebook 的主要收入来自其向广告商提供投放定向广告的权限。2019 年，Facebook 获得了 707 亿美元的收入，几乎全部是 Facebook 允许公司向 Facebook 用户投放广告所得。

17.  Facebook 在全球拥有超过 50000 多名员工和办事处。

**B.  原告**

18.  原告马克西米利安·克莱因是佛蒙特州的自然人、公民，是奇腾登县的居民。

19.  马克西米利安·克莱因在 2006 年创建了一个 Facebook 账户，保持着活跃状态，并且经常使用 Facebook。原告克莱因有一个活跃的 Instagram 账户，并自 2016 年以来一直维护该账户。原告克莱因使用 Facebook 的 Messenger 功能，并积极使用 WhatsApp 账户。

20.  原告克莱因关心自己的网络隐私，并且相信 Facebook 会保护他的隐私。但自

从 2018 年剑桥分析公司的丑闻爆发，暴露了 Facebook 缺乏隐私保护和低质量的数据隐私做法以来，他现在不相信 Facebook 会保护他的网络隐私。原告克莱因现在不喜欢 Facebook 及其产品的侵扰。尽管如此，原告克莱因仍继续使用 Facebook 及其产品，因为几乎他认识的每个人都在使用它们，而且没有其他合适的替代品可与他的朋友和家人联系。

21.　　Facebook 在其数据隐私做法及其收集并提供给第三方的数据范围方面撒了谎。如果原告克莱恩几年前就知道 Facebook 隐私做法的真相，那他就不会同意让 Facebook 访问那么多他的个人数据了。

22.　　原告莎拉·格拉伯特是伊利诺伊州的自然人、公民，是库克县的居民。

23.　　原告格拉伯特在 2007 年之前创建了一个 Facebook 账户，保持着活跃状态，并且经常使用 Facebook。原告格拉伯特有一个活跃的 Instagram 账户，并至少自 2010 年以来一直保留该账户。原告格拉伯特使用 Facebook 的 Messenger 功能，并曾使用 WhatsApp 功能。

24.　　原告格拉伯特关心她的网络隐私，并相信 Facebook 会保护她的隐私。但自从 2018 年剑桥分析公司丑闻爆发并暴露了 Facebook 缺乏隐私保护和低质量的数据隐私做法后，她现在不相信 Facebook 会保护她的网络隐私。原告格拉伯特现在不喜欢 Facebook 及其产品的侵扰。尽管如此，原告格拉伯特仍继续使用 Facebook 及其产品，因为几乎她认识的每个人都在使用它们，而且没有其他合适的替代品可与她的朋友和家人联系。

25.　　Facebook 在其数据隐私做法及其收集并提供给第三方的数据范围方面撒了谎。如果原告格拉伯特几年前就知道 Facebook 隐私做法的真相，那她就不会同意让 Facebook 访问那么多她的个人数据了。

26.　　原告雷切尔·班克斯·库普乔是明尼苏达州的自然人、公民，并且是享内平县的居民。原告雷切尔·班克斯·库普乔在 2008 年创建了一个 Facebook 账户，保持着活跃状态，并且经常使用 Facebook。原告雷切尔·班克斯·库普乔积极使用她的 Instagram 账户、Facebook 的 Messenger 功能和她的 WhatsApp 账户。

27.　　原告班克斯·库普乔关心她的网络隐私，并相信 Facebook 会保护她的隐私。但自从 2018 年剑桥分析公司丑闻爆发并暴露了 Facebook 缺乏隐私保护和低质量的数据隐私做法后，她现在不相信 Facebook 会保护她的网络隐私。原告班克斯·库普乔现在不喜欢 Facebook 及其产品的侵扰。尽管如此，原告班克斯·库普乔仍继续使用 Facebook 及其产品，因为几乎她认识的每个人都在使用它们，而且没有其他合适的替代品可与她的朋友和家人联系。

28.　　Facebook 在其数据隐私做法及其收集并提供给第三方的数据范围方面撒了谎。如果原告班克斯·库普乔几年前就知道 Facebook 隐私做法的真相，那她就不会同意让 Facebook 访问那么多她的个人数据了。

### 三、　管辖权、地点、区内分配
#### 和法律的选择

29.　　本诉讼根据《谢尔曼反垄断法》第 2 节（《美国法典》第 15 卷第 2 节）和《克莱顿法》第 4 节（《美国法典》第 15 卷第 15 节）提出。本诉讼旨在对原告和消费者群体成员因 Facebook 的限制贸易和垄断本文所述的社交网络和社交媒体市场而遭受的损失进行三倍赔偿或没收其利润、利息、诉讼费用、平等救济和合理的律师费。

30.　　根据《美国法典》第 28 卷第 1331 节（联邦问题管辖权）、第 28 卷第 1332 节（集体诉讼多样化管辖权）、第 28 卷第 1337 节 a 条（反垄断）和第 15 卷第 15 节（反垄断）。根据《美国法典》第 28 卷第 1367 节（补充管辖权），本法院还对本诉讼中提出的州法不当得利索赔也拥有标的物管辖权。

31.　　本法院对 Facebook 拥有属人管辖权，因为 Facebook 受加利福尼亚州一般管辖权管辖，其总部和主要营业地点位于加利福尼亚州，并且 Facebook 的条款规定，消费者必须在本法院提出这些索赔。本起诉书中指称的垄断计划对美国各地的人，包括本地区的人，造成了伤害。此外， Facebook 还在加利福尼亚州开展了大量的业务，本案中的索赔就由此产生， Facebook 已同意本法院的属人管辖权。

32.　　根据《美国法典》第 15 卷第 15 节 a 条（《克莱顿法》）、第 15 卷第 22 节（全国范围内反垄断案件的审判地点）和第 28 卷第 1391 节 b 条（一般审判地点规定），

将该地区作为审判地点是适当的。Facebook 在该地区开展业务，它在该地区处理其事务，并很大程度上开展洲际贸易和商业活动。

33.　　根据《地方民事规则》第 3-2(c) 条，本诉讼被适当地分配到该地区的圣何塞分院，因为反垄断集体诉讼可以在全区范围内分配。

34.　　就可选择的法律而言，Facebook 的"服务条款"规定，"加利福尼亚州法律"管辖 Facebook 与其用户之间"因'Facebook 产品'引起的与之相关的任何索赔"。[4]

## 四、　　事实指控

### A.　　社交媒体行业的一般背景

35.　　概括地讲，社交媒体行业的各个参与者包括：社交媒体应用程序、社交网络、消费者、广告商和内容提供商（可以是前述任何类型的市场参与者，也可以是第三方）。

36.　　社交媒体应用程序提供对用户生成内容（如，文字帖子或评论、数字照片或视频以及通过在线互动生成的数据）的有限访问。事实上，社交媒体应用程序通常（至少在最初）专注于特定的媒体形式。[5]例如，Twitter 是作为一种广播用户短文本消息（最初限制在 140 个字符，现在最多允许 280 个字符）的应用程序开发的。YouTube 为不同时间长度视频的分享提供便利，而 TikTok 可允许分享时间长度有限的短视频。Instagram 的与众不同之处在于，它是一款分享照片的应用程序，在较小程度上也可以分享视频。

37.　　另一方面，社交*网络*与社交媒体应用程序不同。虽然社交媒体应用程序通常对分享不同形式的内容提供了便利，*即*照片 (Instagram)、短文本消息 (Twitter)、阅后即焚 (Snapchat) 或短视频 (TikTok)，但 Facebook 以及之前的 Myspace、Friendster、Orkut、Flip.com、Bebo 和 Google+ 等社交网络将这些功能和其他个别功能结合起来，让他们的用户可以将其作为一个多功能产品的一部分使用这些功能。此外，社交媒体网络通常允许用

---

[4] *Facebook 服务条款*，https://www.facebook.com/terms.php （最后访问日期：2021 年 4 月 15 日）。

[5] 《美众议院报告》，*同上*，第 89-90 页（"社交媒体公司也可能专注于吸引特定类型或群体的消费者，使自己与大公司区别开来……。鉴于 Facebook 的主导地位，新进入者竞争的主要方式是吸引一个子群体或利基市场。"）。

案件编号：5:20-cv-08570-LHK

消费者合并集体诉讼起诉书

户在其网络上与用户的所有社会关系（包括用户已经认识的人）进行联络和互动，参与将具有特定背景或共同兴趣的用户联系在一起的"群组"，并通过线性提要显示内容。[6]Facebook 的社交网络可让用户与他人互动、加入并参与群组，并以线性方式显示各种内容，如下图所示：[7]



38. 社交网络和社交媒体应用程序通常以非现金形式向消费者提供服务。[8]社交网络和社交媒体应用程序从其用户处获取宝贵的个人数据，作为对提供服务的酬报。从用户处获得的信息的范围因社交网络和社交媒体应用程序而异，对获得的数据及其随后的用途的披露也是如此。

39. 社交网络和社交媒体应用程序通过向第三方出售数据访问权限，将其从用户那里获得的数据货币化。正如联邦贸易委员会前首席技术专家特别针对 Facebook 所解释

---

[6] 《美众议院报告》，*同上*，第 88 页。

[7] *参见* Kessica Guynn，《*Facebook 正在对您的动态消息作出重大改变*》，《今日美国》（2018 年 1 月 11 日），载于 https://www.usatoday.com/story/tech/2018/01/11/facebook-newsfeed-big-change/1023331001/（最后访问时间：2021 年 4 月 15 日）。

[8] 《美众议院报告》，*同上*，第 88 页。

的那样，"个人信息……被提供给平台，进行挖掘，然后转售给第三方开发者或由第三方开发者重复使用来开发应用程序，或转售给广告商来用于做广告。[9] 举例来说，广告商、产品制造商和服务提供商经常向社交网络和社交媒体应用程序付费，以便将策划好的广告专门针对特定的用户群体投放。

**B.    Facebook 的一般背景**

40.    Facebook 为消费者提供的核心服务是其社交网络的访问权限，其社交网络涵盖有美国 2 亿多用户和全球数十亿用户的个性化资料，并整合了 Facebook 的各种社交媒体服务。Facebook 是唯一一个允许消费者与大多数家人、朋友和熟人在线联系的社交网络，作为交换，Facebook 要求用户提供个人数据并接收定向广告。

41.    Facebook 利用从其庞大的用户群中获得的数据，创造其最大的收入来源：向其用户出售定向广告。事实上，Facebook 公开承认"我们几乎所有的收入都来自广告。"[10] 2019年，Facebook 获得了 707 亿美元的收入，几乎全部来自允许公司向 Facebook 用户提供定向广告。

42.    Facebook 的机器学习算法为广告商挖掘数据中的模式，这使得广告商能够精准地接触到合适的受众，从而转化为销售、用户注册或产生销售线索。为了保护其对用户数据的控制，Facebook 已对复制公开可用的用户数据并在 Facebook 之外提供这些数据的行为者提起了法律诉讼，这表明 Facebook 承认这些数据的价值。[11]

---

[9] 英国下议院，数字、文化、媒体和体育委员会，*虚假信息和"假新闻"：《最终报告》*，2017-2019 年，HC 1791，（"DCMS 报告"）（2019 年 2 月 14 日），第 128 页，载于https://kl.link/37MnyDf（最后访问时间：2021 年 4 月 15 日）。事实上，正如英国下议院的数字、文化、媒体和体育委员会所认识到的，"Facebook 将自己描绘成一家免费服务公司，但这只是故事的一半。" *出处同上。*

[10] 《证券交易委员会提交给 Facebook, Inc. 的 10-K 表格》，载于https://www.sec.gov/Archives/edgar/data/1326801/000132680119000009/fb-12312018x10k.htm，第 42 页（最后访问时间：2021 年 4 月 18 日）（后加的着重部分）。

[11] Facebook 最近在 2020 年 11 月 19 日提起了一起这样的诉讼。*参见* Jessica Romero，《打击克隆网站》，Facebook 新闻编辑室（2020 年 11 月 19 日），载于https://about.fb.com/news/2020/11/combating-clone-sites/（最后访问时间：2021 年 4 月 15 日）。

43.　这些数据还通过商业化访问来实现货币化，例如，通过向应用程序开发人员、内容生成者和广告商提供直接访问 Facebook 网络中嵌入的信息（如用户之间的相互联系、用户属性和用户行为）的权限。然后，这些第三方就可以使用这些数据。

44.　从一开始，Facebook 就试图基于其所谓的维护用户数据隐私的承诺来吸引消费者。早期的竞争社交网络允许任何有兴趣的人都可以匿名或使用未经验证的用户名加入，与之不同的是，Facebook 要求有兴趣加入的人使用其真实身份加入。

45.　这种质的区别对隐私有明显的影响。具有讽刺意味的是，早期允许用户匿名或使用假名注册的应用程序给用户带来了更多的隐私问题，因为获取和/或使用其他用户个人信息的不法行为分子可能隐藏在他们的网络（匿名或未经验证的）的身份后面。

46.　相比之下，Facebook 声称，它建立了一定程度的问责制，因为用户表面上知道谁在屏幕的另一边，并在现实生活中以某种方式与他们有联系。事实上，Facebook 的网站"是用户使用真实姓名表明自己身份的首批社交网络之一。"[12] 通过让用户"感觉真实"，Facebook 声称（用户通过用脚投票表示同意），他们的网上的社交互动得到了更好的保护，也更有意义。但所有这些都要求 Facebook 承诺保护隐私，以诱使用户提供他们的真实身份和数据。

47.　马克·扎克伯格很早就知道了隐私对消费者的重要性。在扎克伯格还是哈佛大学读书时，他创建了"Facemash"，"将两个随机的哈佛本科生的照片放在一起，让用户判断他们的外表吸引力。"[13] Facemash 未经学生许可使用了他们的照片，"引起了学生和管理人员的愤怒"。[14] 在宣传 Facebook 的前身"thefacebook.com"时，扎克伯格发誓，

---

[12] 参见 John Gallaugher，《从信息系统中获取最大利益》第 8.3 节，载于 https://kl.link/3dX3BKN（最后访问时间：2021 年 4 月 15 日）。

[13] 参见 Alan J. Tabak，《数百人注册新 Facebook 网站》，《哈弗克里姆森报》（2004 年 2 月 9 日），载于 https://www.thecrimson.com/article/2004/2/9/hundreds-register-for-new-facebook-website/（最后访问时间：2021 年 4 月 15 日）。

[14] 出处同上。

案件编号：5:20-cv-08570-LHK
消费者合并集体诉讼起诉书

他已经从 Facemash 的经验中吸取了教训，并将在"thefacebook.com"中加入"密集的隐私选项"，"他希望这能帮助他恢复声誉"。[15] 事实上，thefacebook.com 以及后来的 Facebook 关于隐私的陈述是一个精心策划的计划的一部分，旨在确保和延长 Facebook 的垄断地位。

48.　起初，Facebook 只对那些能够验证自己真实身份的用户开放，比如通过大学或公司等机构发出的电子邮件地址来验证自己身份是否合法:[16]

> 正是这种"真实性"成为了 Facebook 的显著特征--它带来了一种可感知的安全和舒适度，也依赖于这种安全和舒适度，这使得 Facebook 成为了一个真正的社交工具，并构建了一个由经过验证的关系组成的可靠社交图。由于"加好友"（社交图中节点之间的链接）要求双方用户都认可这种关系，因此该网络培养出了令人难以置信的信任度。今天，许多 Facebook 用户会发布他们的手机号码和生日，提供个人照片，或者分享他们在朋友圈之外从未做过的事情。

49.　自那时以来，Facebook 收集的数据的价值很大程度上来自于其通过真实身份识别 Facebook 用户的能力。其他应用程序，如 Twitter，只是松散地执行身份规则，从未要求用户披露关于自己的详细信息。

50.　Facebook 将每个用户披露自己的身份描述为增加所有用户体验的价值，据称所有用户都能够通过与其现实世界中的联系人联系并关注他们的活动，而从他人的披露中受益。[17]信息披露也增加了 Facebook 从其用户那里获得的数据的市场价值。了解"Yankeesfan123"的互联网习惯不如了解特定个人的浏览习惯更有价值，因为这个人对 Yankees 的热爱可以与他的购物习惯、收入、家庭、朋友、旅行、用餐、约会和无数其他数据点联系起来。

---

[15] 出处同上。

[16] Gallaugher，同上，第 8.3 节。

[17]对于 Facebook 等社交网络和社交媒体应用程序鼓励披露个人信息只是为了给其他用户创造更丰富的"个性化体验"，Apple 公司全球隐私高级主管近日对其表示怀疑。参见《Apple 公司隐私政策》，2020 年 11 月 19 日，载于 https://kl.link/33bhK2Y（最后访问时间：2021 年 4 月 15 日）（一些公司所谓的'个性化体验'通常是试图收集尽可能多的个人数据，建立广泛的用户资料，然后将这些资料货币化。"）。

案件编号：5:20-cv-08570-LHK
消费者合并集体诉讼起诉书

51.　自成立以来的几年里，Facebook 通过其强大的数据结构，即"社交图"，跟踪着数万亿个消费者数据点。社交图"指的是 Facebook 收集、表达和利用网站用户之间联系的能力，或者像有些人描述的那样，'每个人的全球社交图以及他们之间的关系"。[18]Facebook 上的所有数据都可以被视为连接到 Facebook 其他数据的"节点"或"端点"：

> 您与其他用户（你的朋友）联系，关于您的照片会被标记，您发布的评论带有您的名字，您是群组的成员，您与您安装的应用程序连接等等，Facebook 将它们全部都链接起来。[19]

52.　鉴于 Facebook 的规模和影响力及其秘密的数据收集范围，社交图是一个独特和特别有价值的数据集，即使在科技界的巨头中也是如此。这一价值很大程度上源于这样一个事实，即公众或搜索引擎无法查看 Facebook 的大多数社交图，其中包含了用户无意中向 Facebook 提供的关于他们最细微日常习惯的大量数据。

53.　Facebook 是一个所谓的"围墙花园"----一个由单一运营商运营的封闭生态系统。广告商必须通过 Facebook 才能接触到 Facebook 用户。Facebook 可以决定让广告商和应用程序开发商（包括竞争对手）访问 Facebook 的多少社交图。

54.　Facebook 用户的个人数据有多种形式，包括用户在个人资料页面上分享的信息、用户查看的照片和个人资料、用户与他人分享的信息，甚至是用户向其他用户发送的消息。这些精细的数据使得定向广告达到了前所未有的规模。Facebook 的产品可让广告商通过 Facebook 用户的属性和行为来定位用户群。第三方广告商已经能够使用 Facebook 的产品在整个互联网上跟踪和定位消费者，即使 Facebook 用户已经"注销"了 Facebook。

**C.　Facebook 在社交网络和社交媒体相关市场占据主导地位。**

55.　有两个相关市场适用于本争议。它们是：（1）社交网络市场；（2）社交媒体市场。众议院反垄断小组委员会认可社交网络市场和社交媒体市场都是相关市场。[20]Facebook 在这两个市场都非法获得并保持垄断权。

---

[18] Gallaugher，*同上*，（引自 Alex Iskold 的《社交图：概念与问题》，读写网，2007 年 9 月 12 日）。

[19] *出处同上*（引自 Alan Zeichick，《Facebook 如何运作》，《技术评论》，2008 年 7 月/8 月）。

[20] 《美众议院报告》，*同上*，第 90-91 页。

**1)    社交网络市场**

56.    社交网络市场是由社交网络组成的产品市场，社交网络是使用户能够找到朋友、家人、熟人以及与之有共同兴趣或联系的其他人、与之交流和互动的网站和应用程序。社交网络的示例包括 Facebook--MySpace、Friendster、Orkut、Flip.com、Bebo 和 Google+。社交网络不同于社交媒体应用程序，尽管社交媒体应用程序可能只提供社交网络广泛功能和连接的有限部分。从这个意义上来说，社交网络市场是社交媒体市场的一个独特部分或子部分（详情如下文）。

57.    社交网络有几个关键要素，使其有别于社交媒体应用程序等其他服务。首先，社交网络在社交图的基础上为用户提供"丰富的社交体验"。[21]社交图将用户与广泛的人群联系起来，其数量之多，范围之广，反映了用户在现实世界中的各种联系。这个广泛的范围包括用户在现实生活中已经认识的人（例如朋友、家人、邻居、社区成员和其他熟人），以及用户还不认识但与用户在现实世界中的其他熟人（例如朋友的朋友）有关联的人，或者与用户都有某些特征（例如兴趣或背景）的人。许多社交网络鼓励其用户推荐可以联系到的新朋友来扩展其网络。

58.    其次，社交网络为用户提供了实质性的功能，这些功能促成用户社交图中大量人群之间的广泛互动，反映了用户在现实世界中的全方位互动。例如，社交网络允许用户在他们的联系中分享包括文本帖子、照片、视频等在内的内容。举例来说，如果 Sarah 与她在社交网络上的所有联系人（包括 Tom 和 Jerry）分享了一张照片，那么社交网络可能允许 Tom 和 Jerry 通过他们与 Sarah 的共享关系来彼此互动，即使 Tom 和 Jerry 还不认识对方。社交网络还提供额外的实质性功能，有助于用户找到彼此并与彼此互动，比如能够创建和参与群组，这些群组将有共同背景（如某所学校的毕业生）、共同兴趣（如在某一美食或某一电影系列）和共同爱好（如修复老爷车）的个人聚集在一起。再如，社交网络还可以让用户在构成用户社交图的广泛人群中组织活动，包括让用户能够创建带有活动

---

[21] 出处同上，第 91 页。

信息的页面、策划邀请名单以及发送和监控邀请名单。一些社交网络甚至允许用户与他们的联系人玩在线游戏。

59. 第三，社交网络为用户提供"一站式服务"的便利。社交网络将多个实质性特征和功能组合到一个产品中，而那些可能提供一种单独功能的公司则无法做到。Facebook 的创始人马克·扎克伯格认为 Facebook 的多功能性是一个独特而重要的特征，他解释说："…… 你可以做很多不同的事情。…… 几乎任何你想和许多人一起做的事情，你都可以在城市广场的数字世界里完成。" [22]

60. 社交网络没有合理的替代品。其他应用程序要么不提供与人际网络的社交，要么仅提供社交网络的广泛功能和连接中的单个或有限的部分。Google、Yahoo 或 Bing 等搜索引擎不是"社交网络"，因为它们不提供应用程序用户之间的互动。同样，像 Apple 的"iMessage"这样的应用程序只允许分享消息传递媒介，例如电子邮件或短信，并不是社交网络，因为尽管它们提供互动，但它们只是以设备到设备的方式，在特定操作系统上，在有限数量的用户联系人（如用户通讯录中的联系人）之间进行互动，只专注于传递信息，而非专注于促进更广泛的在线社交体验。[23]

61. 还有其他类型的在线网络，如 LinkedIn，它并不是本起诉书中定义的"社交网络"，因为它们的使用目的不同，这种网络是社交网络的平行网络，不能替代社交网络。虽然 LinkedIn 通常被认为是世界上占主导地位的职业在线网络，但它不能取代 Facebook 等社交网络。这是因为 LinkedIn 主要用于职业社交和求职目的，其使用范围狭窄，而 Facebook 等则主要用于非职业和个人目的。[24]

---

[22] 对 Facebook 首席执行官马克·扎克伯格的采访，美国广播公司新闻网（2019 年 4 月 4 日），载于 https://abcnews.go.com/Business/interview-facebook-ceo-mark-zuckerberg-transcript/story?id=62152829（最后访问时间：2019 年 4 月 19 日）。

[23] Facebook 也注意到了这一区别，在提供给众议院反垄断小组委员会的文件中解释说，尽管 Apple 的 iMessage 的增长"受到 iPhones 普及的限制，…… Facebook 的产品可以跨设备使用。"出处同上，第 136 页第 752 段。

[24] Facebook 本身在其提供给众议院反垄断小组委员会的文件中也承认了这一区别。

案件编号：5:20-cv-08570-LHK

消费者合并集体诉讼起诉书

62.　　各政府实体都已认识到，LinkedIn 不能取代包括 Facebook 在内的社交网络。[25]在对 Microsoft/LinkedIn 合并案的审查中，欧盟委员会解释说："使用（职业服务网络）的原因与使用个人社交网络的原因不同。前者是用来'*1. 保持职业身份，2. 建立有用的联系，3. 寻找机会，4. 保持联系*'，而后者是用来'*1. 社交，2. 保持联系，3. 娱乐，4. 消磨时间*'。"[26] 因此，用户会*同时*拥有 LinkedIn 和 Facebook 账户，而不是非此即彼，并且这种其他类型的网络也不被视为社交网络的替代品。[27]

63.　　LinkedIn 本身已经认识到社交网络是一种独特的产品。[28]例如，它解释了"个人社交网络"（*如*Facebook）和"职业社交网络"（*如* LinkedIn）之间的区别：[29]



---

*出处同上*，第 133-134 页 第 733 段。（LinkedIn……在美国 Facebook 同时使用，有类似的用户群，但其之间存在正交图：Facebook 连接朋友和家人，而 LinkedIn 连接同事。"）。

[25]除了承认 Facebook 独特的社交目的之外，众议院反垄断小组委员会最近的报告还根据 LinkedIn 的经济模型将 LinkedIn 与 Facebook 等社交网络区分开来。*纽约州等诉 Facebook, Inc.* 案，案件编号：1:20-cv-03589-JEB (D.D.C.), Dkt. 70, 第 34 段；*联邦贸易委员会诉 Facebook, Inc.* 案，案件编号：1:20-cv-03590-JEB (D.D.C.), Dkt. 51, 第 58 段。

[26]欧盟委员会，*案件 M.8124 – Microsoft/LinkedIn*（2016 年 6 月 12 日），第 106 段，载于 https://ec.europa.eu/competition/mergers/cases/decisions/m8124_1349_5.pdf（最后访问时间：2021 年 4 月 15 日）（原文中的着重部分）。

[27]除了认可 LinkedIn 独特的职业社交目的之外，众议院反垄断小组委员会的近期报告还根据 LinkedIn 的经济模式将其与 Facebook 等社交网络区分开来。尽管用户用他们的数据、时间和关注度为 Facebook 等社交网络付费，但 LinkedIn 的一些功能，如"LinkedIn Premium"，则需要用户支付费用。*见《美众议院报告》，同上*，第 88 页。

[28]*参见* LinkedIn，*《思维模式的差异》*（2012 年 9 月），载于 https://business.linkedin.com/content/dam/business/marketing-solutions/global/en_US/site/pdf/wp/linkedin-marketing-solutions-mindset-divide.pdf（最后访问时间：2021 年 4 月 15 日）。

[29]*出处同上*，第 4 页。

64. 同样，LinkedIn 已经认识到社交网络用户在访问某个社交网络时期望看到的独特内容：[30]



用户最期待的 3 类内容

65. YouTube 和 TikTok 等社交媒体应用程序同样不是社交网络的合理替代品。事实上，众院反垄断小组委员会、德国联邦卡特尔办公室和英国竞争和市场管理局都认识到社交网络市场和社交媒体市场之间的区别，并认识到"对社交网络的具体需求与对其他社交媒体的需求有着根本的不同。"[31] 这是因为用户使用这两种工具的目的不同：社交网络"方便用户找到其他人、并与之互动和建立联系"，而社交媒体应用程序"主要促进与发帖者有广泛关系的用户（包括陌生人）"之间的"内容分发和消费"。[32]因此，虽然用户可能会使用 YouTube 访问和观看完全陌生的视频（如烹饪食谱），但这个用户会使用 Facebook，而不是 YouTube，与朋友、家人和现实世界的联系人分享*该*视频。[33]同样，用户在 YouTube 上发现名人（或其他陌生人）的有趣视频后，可能会选择在 Facebook 上分享该视频，鼓励他们的朋友和家人观看，并附上说明:[34]

---

[30] *出处同上*，第 6 页。

[31] 《美众议院报告》，*同上*，第 91 页。

[32] *出处同上*，第 91 页。

[33] *参见*《行政诉讼》，卡特尔局，B6-22/16（"德国联邦卡特尔办公室报告"）第 312段（2019 年 2 月 6 日），载于 https://kl.link/39AxErE（最后访问时间：2021 年 4 月 15 日）（"YouTube 几乎从未用*诸如*与朋友联系、发消息、寻找用户认识的人、分享内容等其他目的"）。

[34] Meira Gebel，《*如何使用 YouTube 的"分享"功能以不同的方式在 Facebook 上发布 YouTube 视频*》，《商业内幕》（2019 年 8 月 23 日），载于 https://www.businessinsider.com/how-to-post-a-youtube-video-on-facebook（最后访问时间：2021 年 4 月 15 日）。

案件编号：5:20-cv-08570-LHK
消费者合并集体诉讼起诉书



66.　其他因素表明，社交媒体应用程序可与社交网络同时使用，不能取代社交网络。首先，许多消费者同时使用 YouTube 和 Facebook，而不是非此即彼。[35]社交媒体应用程序使用户可以轻松地使用其社交网络帐户分享其在社交媒体应用程序上找到的内容。例如，通过点击出现在 YouTube 视频下方的"分享"按钮，YouTube 就会预先填充该视频的超链接，然后用户就可以轻松地将其复制并粘贴到 Facebook 上：[36]



67.　此外，Facebook 等社交网络向用户提供特定产品功能，而社交媒体应用程序一般根本不提供这些功能，更不用说"一站式服务"了。[37]YouTube 和 TikTok 等社交媒体

---

[35]《联邦卡特尔局报告》，*同上*，第 318 段（注意"同时使用 Facebook.com 和 YouTube 的行为越来越多"，并且"大量[用户]未经注册就使用 YouTube，仅用于看视频。"）。

[36] Gebel, *同上*。

[37]《美众议院报告》，*同上*，第 91、139 页（注意 YouTube"主要用于在线消费视频

应用程序不提供或促进类似的使用，而是仅提供有限的社交互动机会，或提供完全不同类型的互动，补充而非替代社交网络体验。

68. 从 Facebook 最初进入市场开始，就与 Myspace 和 Friendster 等早期社交网络公司竞争，自那时起，Facebook 就占据了主导地位。Myspace 目前已经停止运营社交网络，宣布它"将不再尝试在社交网络方面与 Facebook 竞争"，而是希望建立一个"社交娱乐"网站，而 Friendster 则完全不复存在了。[38]相比之下，Facebook 在全球拥有超过 27 *亿*用户，占全球人口（不包括中国）的 42%，其中美国用户超过 2 亿。正如近期的一篇文章所描述的那样，"Facebook 一直是并且仍然是社交网络市场无可争议的王者，"而其他社交网络，如 Diaspora，"与 Facebook 相比只是沧海一粟。"[39]

69. 有直接和间接证据表明 Facebook 在社交网络市场的市场力量。Facebook 进行的一项内部研究得出的结论是："对于当今数亿想要与朋友和家人联系的人来说，Facebook 是第一选择，更重要的是，它是*唯一的*选择。"[40]

70. 正如众议院反垄断小组委员会近期认可的，"平台在没有引起市场反应的情况下侵蚀消费者隐私的程度"是"平台市场力量的证据。"[41]事实上，社交网络"在损害用户隐私的同时维持强大网络的能力可以被合理地视为等同于垄断者提高价格或降低产品质量的决定。"[42]因此，"一家公司的支配地位可以使其在不失去客户的情况下滥用消费

---

内容。它不提供 Facebook 的核心功能……比如，个人网络内的页面、市场或有限的共享。"）。

[38] Whitney Kimball，《*为什么这些社交网络如此失败*》，小发明网站（2019 年 8 月 19 日），载于 https://gizmodo.com/why-these-social-networks-failed-so-badly-1836996164（最后访问日期：2021 年 4 月 19 日）。

[39] 《*Facebook 的最佳替代品是什么？*》，IONOS 数字指南（2021年1月14日），载于 https://www.ionos.com/digitalguide/online-marketing/social-media/the-best-facebook-alternatives/（最后访问日期：2021 年 4 月 19 日）。

[40]纽约州 *等诉Facebook, Inc. 案*，案件编号：1:20-cv-03589-JEB (D.D.C.), Dkt. 70，第 242 段（后加的着重部分）。

[41]《美众议院报告》，*同上*，第 51 页。

[42]*出处同上*，第 52 页。

者的隐私。"[43] 很明显，Facebook 的创始人兼首席执行官马克·扎克伯格在美国国会就 Facebook 的数据隐私漏洞宣誓作证时，一再挣扎也难以说出消费者可以转向的 Facebook 直接竞争对手。[44]

71.　　如下文所述，Facebook 在社交网络市场的份额高于其在社交媒体市场的份额，而且无论如何都超过了 65%。除了这一明显的高市场份额外，Facebook 多年来一直占据着这一主导地位，但新进入这个市场的门槛很高（下文将进一步讨论）。一部关于 Facebook 的电影被命名为《*社交*网络》是有原因的；Facebook 无疑是这个市场的主导者。

**2）　社交媒体市场**

72.　　社交媒体市场是由社交媒体应用程序和工具组成的产品市场，即允许特定应用程序的用户向同一应用程序的其他用户分发各种形式的媒体（如短信、照片、视频和音乐）的是网站和移动应用程序。

73.　　Google、Yahoo 或 Bing 等搜索引擎不是社交媒体应用程序。[45]这是因为用户主要利用搜索引擎查找存在于搜索引擎之外的信息。用户可能会使用微软的 Bing 搜索"纽约时报"，以找到《纽约时报》的 URL 网址："www.nytimes.com"。相比之下，用户会利用社交媒体应用程序，如 YouTube，找到托管在该社交媒体应用程序上的视频。

74.　　其他形式的在线娱乐不是社交媒体应用程序的合理替代品，因为社交媒体应用程序具有独特的特点。例如，TikTok 允许"用户通过与更广泛的社区分享短视频来表达他们的想法。"[46] 相比之下，包括 Pokerstars 等在线牌室在内的其他服务提供的是在线娱

---

[43] *出处同上。*

[44] Sarah Jeong，*《扎克伯格难以说出一个竞争对手》*，前沿网（2018 年 4 月 10 日），载 于 https://www.theverge.com/2018/4/10/17220934/facebook-cmonopoly-competitor-mark-zuckerberg-senate-hearing-lindsey-graham（最后访视时间：2021 年 4 月 19 日）。

[45]与此相关的是，美国司法部 ("DOJ") 最近在针对谷歌的反垄断诉讼中认可了搜索引擎并非"社交媒体"。参加美国等诉 Google LLC 案，1:20-cv-03010 (D.D.C.), Dkt. 1，第 90 段（"平台……不是一般搜索服务的合理替代品。"）。

[46]《美众议院报告》，*同上*，第 91 页。

案件编号：5:20-cv-08570-LHK
消费者合并集体诉讼起诉书

乐，但提供的方式不是促进各种形式的媒体传播，如短信、照片、视频或音乐。

75. 用户行为也证实了社交媒体应用程序是其他类型在线服务和娱乐的补充。事实上，用户在使用社交媒体应用程序的同时，还使用其他在线服务和娱乐。例如，用户可以在 Hulu 上观看 Hulu 制作的节目，但可以使用 YouTube 分享该 Hulu 节目的业余视频评论。

76. 此外，社交媒体应用程序提供的经济模式有别于其他形式的在线服务和娱乐的其他提供商所采用的经济模式，因为这种经济模式允许选择不向用户收取费用。事实上，许多社交媒体应用程序可能不会向用户收取访问其应用程序的费用，而是让用户接受广告（广告商为此向公司提供货币补偿）或要求用户放弃某种形式的有限数据。相比之下，其他在线服务和娱乐提供商可能会向用户收取每次使用的货币费用或定期（每月或每年）费用，但因此可能不会向他们提供广告，也不可能收集他们的数据。

77. 有大量直接证据表明 Facebook 在社交媒体市场具有垄断权。例如，在为 Facebook 首席运营官谢丽尔·桑德伯格 (Sheryl Sandberg) 准备的一份内部报告中，Facebook 坚持认为，"随着行业的成熟，它会进行整合"，"Facebook 现在占美国所有社交媒体的 95%。"[47]在另一份内部报告中，Facebook 指出，"在我们提供服务的每个国家，我们都保持了市场渗透率"，并对其他公司能否与 Facebook 竞争表示怀疑。[48]

78. 除了直接证据外，还有无可辩驳的间接证据表明 Facebook 在社交媒体市场中的力量。Facebook 是迄今为止最大的社交媒体公司，其市场份额超过 65%。在美国，以月活跃人数、覆盖范围以及日活跃人数和月活跃人数的百分比来衡量，Facebook 的产品涵盖七个最受欢迎的移动应用中的三个。[49]事实上，众议院反垄断小组委员会近期的报告显示，"根据 Facebook 的内部市场数据，其用户花在其产品系列上的时间明显比花费在 Facebook

---

[47]《美众议院报告》，*同上*，第 138 页。
[48]*出处同上*，第 139 页。
[49]*出处同上*，第 136 页。

案件编号：5:20-cv-08570-LHK
消费者合并集体诉讼起诉书

1  竞争对手的时间要多得多。"[50]

2  79. 社交媒体市场上的公司几乎都以广告收入的形式为股东创造价值。社交媒体

3

4  应用程序允许广告商使用应用程序用户的有关数据，以便向消费者发送定向广告。

5  80. Facebook、Twitter、Snapchat 和其他社交媒体公司都在争夺用户的关注度和

6  数据，然后通过销售广告将其转化为收入。因此，衡量社交媒体市场市场份额的最佳指标

7  之一是广告收入。其广告收入反映出，Faceook（包括Instagram）拥有超过 85% 的美国市

8  场，而第二大竞争对手 Twitter 的市场份额*不到 3.5%*。

9  81. 值得注意的是，Facebook 的一项或多项 服务被认为是大多数用户的"必备"，

10

11  而其他社交媒体应用程序则不是。[51]这意味着大多数社交媒体用户，即竞争性社交媒体应

12  用程序的用户，仍有一个 Facebook 服务帐户（即便不是全部），这进一步意味着

13  Facebook 的广告收入是对其已经明显占主导地位的市场份额的保守估计。

14  **3） 相关地域市场**

15  82. 美国是社交媒体市场和社交网络市场的相关地域范围。每个社交媒体应用程

16  序都为美国各地的消费者提供服务，这些服务并不因在美国境内的地理区域而不同。例如，

17  Facebook 和与之竞争的社交媒体应用程序，如 YouTube，都不限制向加利福尼亚州圣何塞

18  的居民提供服务，而不向阿肯色州小石城的居民提供服务。另一方面，由于多种因素，包

19  括宽带互联网接入、转换成本和消费者偏好，其他国家的社交媒体应用程序无法与社交媒

20  体市场的应用程序合理互换。Facebook 在美国的社交网络市场上有竞争对手，在地域市场

21  上也有竞争对手。

22  **4） 社交网络和社交媒体市场的进入壁垒很高**

23  83. Facebook 的垄断是持久的，因为它所处的行业具有强大的网络效应和高准入

24

25

26  ────────────

[50] *出处同上*，第 137-138 页。

27  [51] Salvador Rodriguez，《*TikTok 超过 Instagram 成为第二大受美国青少年喜欢的社交应用程序*》，美国全国广播公司财经频道（2020 年 10 月 6 日），载于

28  https://www.cnbc.com/2020/10/06/tiktok-passes-instagram-as-second-most-popular-social-app-for-us-teens.html ）（最后访问时间：2021 年 4 月 15 日）。

门槛。[52]网络效应是一种现象，即，用户从商品或服务中获得的价值或效用取决于同一商品或服务的用户数量。网络效应可以是直接的，也可以是间接的。当更多的用户使用一种产品或服务时，该产品或服务对用户来说变得更有价值，就会产生直接的网络效应。当一种产品或服务的广泛使用激励了不同客户群中的第三方也参与该产品或服务时，就会产生间接网络效应。

84.　YouTube 等社交媒体应用程序是直接网络效应的一个例子。即使应用程序有最好的功能，但如果很少有其他用户使用它上传和查看内容，那么该产品对用户的价值也相对较低。消费者使用像 YouTube 这样的视频应用程序来查找和传播内容：参与其中的用户越多，它对每个人的价值就越大。因此，社交媒体市场表现出清晰明显的直接网络效应。而社会网络市场的直接网络效应甚至更强。由于用户加入社交网络是为了与他们的很多熟人互动，社交网络不能仅通过提供内容访问来生存。事实上，只有当一个社交网络将用户与他们的大量社交熟人联系起来时，用户才会使用它，因为"没有人愿意使用没有其他用户的社交网络"。[53]

85.　因为社交网络和社交媒体市场固有的强大的直接网络效应，早期阶段的竞争是*针对*该领域展开的，而不是*在*该领域内竞争。[54]众议院反垄断小组委员会在近期的报告中认可了这一点，因为这与 Facebook 有关，解释称 Facebook 的网络效应"非常强"，而且"社交网络市场存在强烈的引爆点，*为市场创造竞争*，而不是在市场内竞争。"[55] 此后，类似的现场社交媒体市场上也很明显，例如，即使用户可能更喜欢将非 Facebook 选项作为他们的*最爱*（*例如*，TikTok 或 Snap），但他们仍然最常使用 Facebook 的社交媒体产品（*例如*，Instagram），因为它是占主导地位的"必备"社交媒体应用程序。[56]

---

[52] *见*《美众议院报告》第 37-45 页。

[53] *出处同上*，第 41 页。

[54] *出处同上*。

[55] *出处同上*（后加的着重部分）。

[56] Salvador Rodriguez，《*TikTok 超过 Instagram 成为第二大受美国青少年喜欢的社交应用程序*》，美国全国广播公司财经频道（2020 年 10 月 6 日），载于 https://www.cnbc.com/2020/10/06/tiktok-passes-instagram-as-second-most-popular-social-app-

86. Facebook 用户群产生的内容也产生了强大的间接网络效应，反过来又增加了 Facebook 网络对第三方（包括开发商和广告商）以及 Facebook 本身的价值。Facebook 用户的每一张照片、每一个关系状态、每一次签到或每一条帖子都使 Facebook 不仅对用户更有价值，而且对第三方（包括根据个人数据来定位内容的广告商和应用程序开发人员）也更有价值。这一反馈循环使 Facebook 能够利用其反竞争策略（欺骗消费者和垄断性合并行为）来实现规模——由吸引到 Facebook 的广告商和应用程序开发商等第三方的收入的支撑——这在很大程度上阻碍了社交网络和社交媒体市场的竞争。

87. 表现出强大网络效应的市场往往具有"粘性"，或者伴随着高昂的转换成本。一旦大量用户采用了一种产品，他们将不愿意切换到甚至是更优秀的、更具竞争力的替代品，因为除非许多其他用户同时切换，否则新的产品将无法带来同样多的价值。因为网络效应市场的这一特点，早期竞争非常激烈，但在此之后，单一的主导者往往会变得根深蒂固。Facebook 本身在一份内部备忘录中表示，关于社交网络，"要么每个人都使用它们，要么没有人使用它们。"[57] 因此，在早期竞争的初始阶段，公平、公正的竞争环境对于最大限度地提高消费者福利至关重要，如果出现可能取代旧的应用程序的新型社交媒体应用程序，那么公平的竞争环境也是举足轻重的。

88. 转换成本是进入市场的障碍。在一个转换成本高的市场上，为了诱使用户采用一种新产品，竞争对手不仅要承担制造优质产品的费用，而且支付额外的补偿以支付用户转换成本。现有企业则不会产生这种额外的成本，它保持的成本优势至少与竞争对手必须吸收的转换成本相当。在转换成本高的地方，现有企业的竞争优势也很高。

89. 社交网络和社交媒体市场的高转换成本让 Facebook 得以延长其垄断地位。Facebook 的用户只能通过 Facebook 的网络相互联系，这使得 Facebook 成为用户保持联系的唯一方法。面对彼此失去联系的可能性，倾向于使用另一社交媒体应用程序或社交网络

---

for-us-teens.html（最后访问时间：2021 年 4 月 15 日）。
  [57]《美美众议院报告》，*同上*，第 141 页。

的 Facebook 用户在很大程度上无法做到转换，因为转换成本很高。[58]

90. 同样，Facebook 用户数据缺乏可移植性也增加了转换成本。举例来说，"用户可以向 Facebook 上传各种数据，包括照片和个人信息，但（根据 Facebook 的设计）可能无法轻松下载数据并将其移动到另一个社交媒体网站；相反，要使用新平台，用户必须从头开始，重新上传她的照片，并将她的个人信息重新输入到新平台。"[59]

91. Facebook 对其他应用程序和服务的触手般的控制同样给消费者带来了另一种转换成本。例如，流行的 Spotify 音乐流媒体服务的用户经常使用他们的 Facebook 账户注册 Spotify。[60]但是使用 Facebook 账户注册 Spotify 的用户"不能断开他/她的 Facebook 账户"，即不能离开 Facebook 后使用 Spotify，用户通常必须在 Spotify 上建立新账户。[61]但这样他们就无法访问以前的播放列表、收听历史记录、与 Spotify 上其他用户的联系以及其他数据。[62]这会阻止潜在的叛逃者离开 Facebook。

92. 试图欺骗消费者和破坏竞争的垄断者往往会受到市场力量的约束。例如，一个在电池寿命上撒谎的电池制造商，可能会在一段时间内收取不合理的溢价。但一旦该制造商的欺骗行为被揭穿，消费者就会迅速转而选择价格更合理的品牌。然而，一旦 Facebook 以反竞争方式确保其主导地位，社交网络和社交媒体市场中存在的强大网络效应就会阻碍市场力量战胜 Facebook 的市场力量。那些在 2018 年发现 Facebook 实际上没有像承诺的那样保护他们隐私的消费者无法轻易转而使用其他产品，因为他们的朋友和联系人都在 Facebook 上。

93. 社交网络和社交媒体市场还有其他高准入门槛，包括大量的初始投资。一旦

---

[58] Srinivasan, *同上*，第 89 页。
[59] 《美美众议院报告》，*同上*，第 42 页。
[60] *出处同上*，第 146 页。
[61] *出处同上*。
[62] *出处同上*。

像 Facebook 这样的社交网络和社交媒体应用程序获得了主导市场份额，将需要巨大的资本投资数额才能挑战 Facebook 的垄断地位。潜在的竞争对手不仅要建立自己的庞大网络，提供 Facebook 无法提供的功能，而且还必须为用户支付大规模的转换成本。

94.　　数据的积累是进入社交网络和社交媒体市场的另一个重要壁垒。数据有三个定义属性：体积、速度和多样性，这些属性巩固了积累数据的公司的地位。[63]从用户那里收集大量数据的社交网络和社交媒体应用程序能够分析数据，而那些不收集大量（或任何）数据的应用程序则无法做到。同样，数据的速度--数据收集和处理之间的反馈循环--使社交网络和社交媒体应用程序能够快速识别和利用其用户的偏好、兴趣、活动和联系人。而且，社交网络和社交媒体应用程序能够收集的各种数据，包括（除其他外）用户的位置、年龄、联系信息、工作经历、教育水平、计算机类型和关系状态，产生了潜在竞争对手难以克服的显著优势。

95.　　再加上社交网络和社交媒体市场的网络效应和高准入门槛，Facebook 的反竞争行为使其能够以个人数据和关注度的形式从用户那里榨取极具竞争力的租金，并提供最低的、次优的隐私保护和整体质量。如果没有这些影响，用户就会转向与之竞争的、能为用户提供更多的数据隐私，为用户投放更少的广告，或为用户提供更丰富的内容、功能或金钱补偿的社交网络。然而，由于这些障碍，Facebook 能够从其反竞争行为中获得极具竞争力的利润，而无需面对来自现有竞争对手或新进入者的典型竞争压力。而且，Facebook 已经能够控制和增加它所需要的消费者信息和关注度。

96.　　内部文件显示，Facebook 已经敏锐地意识到这些市场特征。Facebook 的一位高级数据科学家和经济学家在2018 年 10 月准备的一份内部备忘录中承认，Facebook 及其

---

[63]Ed Dumbill，《体积、速度和多样性：您需要了解的大数据》，福布斯（2019 年 1 月 1 日），载于 https://www.forbes.com/sites/oreillymedia/2012/01/19/volume-velocity-variety-what-you-need-to-know-about-big-data/?sh=50797c4d1b6d（最后访问时间：2021 年 4 月 15 日）。

产品的网络效应"非常强"。[64]在另一份演示文稿中，Facebook 将其网络效应描述为"飞轮"，称"网络效应使别人很难与我们竞争"，其网络效应"每天都在增强"。[65]同样，Facebook 的创始人马克·扎克伯格也明确表示，Facebook 认识到"这是围绕社交产品的网络效应"；"可以放慢的不同社交机制有限"和"首先是你如何建立一个品牌和网络效应。"[66]

97.　Facebook 自己的文件显示，它意识到，由于强大的网络效应和市场倾斜，Facebook 更关心的是*自己的 Facebook* 产品系列（Facebook、Instagram、Messenger 和 WhatsApp），而不是市场上其他社交应用（如 Snapchat 或 Twitter 的竞争。[67]就即时通讯应用程序而言，Facebook 的文件显示，网络效应可能更加极端。由于 Facebook 无法与其他社交网络互操作，其用户切换到其他网络的成本很高，从而将他们锁定在 Facebook 的网络中。

98.　Facebook 意识到社交网络和社交媒体市场的这些特点，形成了其竞争策略。例如，该公司的一名高管将其收购策略描述为"抢占地盘"，而扎克伯格则夸口说，Facebook "可能永远可以收购任何有竞争力的初创公司"。[68]文件显示，脸书将 Facebook 将 Instagram 和 WhatsApp 视为特立独行的竞争对手，收购它们是为了保护和加强 Facebook 垄断地位持久性。[69]

99.　新兴的社交媒体应用程序不仅在社交媒体市场上对 Facebook 构成竞争威胁，而且还可能进入社交网络市场。事实上，Instagram 和 WhatsApp 等社交媒体应用最初缺乏作为社交网络竞争所必需的用户基础。因此，他们专注于社交媒体市场中相对狭窄的利基

---

[64] 《美众议院》，*同上*，第 13 页第 13 n.14 段。
[65] *出处同上。*
[66] *出处同上，*第 143 页。
[67] *出处同上，*第 384 页。
[68] *出处同上，*第 12-13 页。
[69] *出处同上，*第 149、160 页。

市场，以获得立足点。然而，随着 Instagram 和 WhatsApp 用户和功能的增加，它们开始建立其用户群和功能的组合，可以帮助它们进入社交网络市场并在该市场上与 Facebook 竞争。

100. Facebook 的反竞争行为（详见下文），加上强大的网络效应和较高的准入门槛，使其能够获得并保持对美国社交网络和社交媒体市场的垄断。正如众议院反垄断小组委员会所认识到的那样："Facebook的垄断力量根深蒂固，不太可能受到新进入者或现有公司的竞争压力的侵蚀。"[70]

**D. Facebook 试图通过在隐私保护方面欺骗消费者来获得市场力量（并成功地获得了市场力量）。**

101. 多年来，Facebook 一直在欺骗它所获得的数据量，以及其应用程序长期以来支持第三方收集和使用数据的程度。它的欺骗行为直到最近才开始曝光。

102. 在社交网络和社交媒体市场的早期，隐私保护是一种至关重要的竞争形式。Myspace 在 2003 年成立后，迅速占领了社交网络和社交媒体市场。到 2006 年，Myspace 取代谷歌成为美国访问量最大的网站。

103. Myspace 提供了一个"开放"的社交网络，允许*所有*感兴趣的用户加入 Myspace。此外，Myspace 用户可以使用未经验证的用户名和假用户名注册 Myspace。

104. 到2007年，铺天盖地的负面头条新闻开始引起人们对 MySpace 松懈的隐私保护措施的关注。特别是，用户、父母和批评者都将性侵犯、自杀和谋杀归咎于 Myspace，他们猜测 Myspace 的开放网络以相对匿名的方式掩盖了不法分子，这是一种额外的隐蔽保护，从而引发了这些事件。

105. 此时，MySpace 的竞争对手，包括 Friendster、Orkut、Flip.com、Bebo 和 Facebook，已经开始出现。

106. 鉴于 Myspace 的突出地位，Facebook 试图将自己与 Myspace 区分开来，以吸引用户加入 Facebook。Facebook 最初因其严格的隐私设置（包括其封闭的网络方式）而脱

---

[70] *出处同上*，第 13 页。

颖而出。重要的是，Facebook 向用户承诺，它将披露其"信息和隐私措施"，并承诺"不会使用 cookie 从任何用户那里收集私人信息。"[71]

107. 2006 年，全世界约有 2.5 亿人使用社交网络：1 亿人使用 Myspace，1200 万人使用 Facebook，其余人使用其他一些竞争对手的产品。[72]2007 年，Myspace 的用户增长开始停止，到 2007 年年中，Facebook 已经开始取代 Myspace 成为美国访问量最大的社交网络。[73]

108. Facebook 就其数据政策向消费者作出的陈述有助于 Facebook 以牺牲包括 MySpace 在内的竞争对手的利益为代价获得和维持市场份额。2004年的一项消费者调查显示，大多数美国人表示隐私是一个"他们经常关心的非常重要的问题"。[74]另一项研究关注早期 Facebook 用户对隐私的态度，发现他们更关心隐私政策，而不是恐怖主义。[75]学术界人士比较了 Facebook 用户对 Facebook 隐私设置的满意度和 Myspace 用户对 Myspace 隐私设置的满意度，得出的结论是，用户通常更喜欢 Facebook 的设置，而不是 Myspace的设置。[76]

109. Facebook 本身也认识到其所谓的严格隐私保护对于使 Facebook 迅速积累主导地位的重要性。在其 2008年 题为"Facebook 秘诀"的内部报告中，Facebook 认识到了其早期成功与其在隐私方面的表现之间的联系，并解释说，"如果用户对于他们与谁分享以

---

[71] Srinivasan，*同上*，第 39 页。cookie 是指网站可以安装在用户计算机上的小文本文件，使其能够记住并记录用户的信息。*出处同上*，第 49 页。

[72] *出处同上*，第 54 页。

[73] *出处同上*。

[74] *出处同上*，第 52 页（原文括号）（内部引文省略）。

[75] *出处同上*。（内部引文省略）。

[76] *出处同上*。

及如何分享有更多的控制权，那他们就会分享更多的信息。"[77] 同样，扎克伯格在 2011 年 11 月在 Facebook 上发表的一篇文章中回忆道：

> 当我建立第一个版本的 Facebook 时，我认识的人中几乎没有想在互联网上建立公共页面的。因为这似乎很可怕。但只要他们能设置自己页面的隐私，他们就会觉得在网上和朋友分享是安全的。控制是关键。有了 Facebook，人们第一次拥有了做这件事所需的工具。*这就是 Facebook 成为世界上最大的在线社区的原因。*[78]

110. 时至今日，消费者仍然非常关心隐私问题。这就是为什么许多公司将他们对隐私的承诺作为其产品和服务的卖点。例如，Apple 公司告诉公众，"Apple 公司认为隐私是一项基本人权"，"我们与您一样，认为客户应对其数据拥有控制权。"[79]

111. 尽管 Facebook 陈述了其卓越的数据隐私措施，但在接下来的十五年里，Facebook 一直在欺骗消费者，称其为用户提供数据隐私保护，以换取对其数据的访问。2018 年，在"剑桥分析"丑闻的新闻报道后，Facebook 的商业监控范围以及对用户数据的收集和使用首次开始披露出来时，Facebook 已经在社交网络和社交媒体市场实现了垄断。

112. 在公开场合，Facebook 试图通过提供卓越的隐私保护来使自己与众不同。但在幕后，在以强大的网络效应、高昂的转换成本和其他强大准入壁垒等形式为 Facebook 的垄断提供额外保护的市场中，Facebook 建立了一个商业监控基础设施，使其能够支配竞争对手。如果 Facebook 没有在数据隐私和商业监控方面欺骗消费者，这是不可能实现的。

113. 2006年，Facebook 推出了"动态消息"。精选的推送旨在作为一个中心目的

---

[77] *纽约州等诉 Facebook, Inc.* 公司案，案件编号：1:20-cv-03589-JEB (D.D.C.), Dkt. 70，第 76 段。

[78] Anita Balakrishnan、Matt Hunter、Sara Salinas，*马克·扎克伯格 15 年来一直在谈论隐私问题——这里有他说过的几乎所有话*，CNBC 新闻（2018 年 4 月 9 日），载于 https://www.cnbc.com/2018/03/21/facebook-ceo-mark-zuckerbergs-statements-on-privacy-2003-2018.html（最后访问时间：2021 年 4 月 15 日）（后加的着重部分）。

[79] 《Apple 公司隐私政策》，*同上*。

地，这样用户就不必浏览朋友的个人资料来了解最新情况。大约 100万 用户加入了一个 "Facebook 动态消息抗议小组"，认为该功能太具侵入性。[80]

114.  Facebook 最初对这些批评置之不理，但在持续的抗议之后，马克·扎克伯格发表了公开道歉，表示 "我两年前创造了脸书…… 我想创造一种环境，让人们可以分享任何他们想要分享的信息，但也可以控制他们与谁分享这些信息，"并敦促 Facebook 建立广泛的隐私设置，让你更好地控制与谁分享你的信息"。[81] 重要的是，扎克伯格向 Facebook 用户保证："这是我们的一个大错误，我对此深表歉意。但仅仅道歉是不够的。我希望确保我们对此有所行动，而且要快。我们两天来一直在不停地编写代码，以便推出更好的隐私控制措施。"[82]

115.  Facebook 随后制定了它声称的强化版隐私设置，据称可以用户更好地保持其活动的私密性。[83]例如，Facebook 坚称，它将让用户选择不在其他用户的 "动态消失" 中显示某些信息，例如当用户删除个人资料信息、在 Facebook 墙上发帖、对照片发表评论、添加好友、删除关系状态或离开群组。[84]在宣布这些更新时，Facebook 公开向用户保证 "行业领先的隐私限制…… 使 Facebook 成为一个值得信赖的信息共享网站。"[85]

116.  然而，尽管 Facebook 声称为用户提供了更好的隐私保护，但它越来越多地向广告商提供用户数据，而不向用户披露。Facebook 对其用户的无情欺骗使 Facebook 能够继续在社交网络和社交媒体市场上积累市场份额。

---

[80] Alyssa Newcomb， 《你还记得在 Facebook 的"动态消息"之前你是如何应对的吗？》，美国国家广播公司新闻，2016 年 9 月 26 日，载于 https://kl.link/2G1XF6Q （最后访问时间：2021 年 4 月 15 日）。

[81] 马克·扎克伯格 (Mark Zuckerberg)，《马克·扎克伯格公开信》，Facebook（2006 年 9 月 8 日），载于 https://www.facebook.com/notes/facebook/an-open-letter-from-mark-zuckerberg/2208562130/（最后访问时间：2021 年 4 月 18 日）（后加的着重部分）。

[82] 出处同上。

[83] 参见 Facebook，《Facebook 为"动态消息"和"迷你消息"推出了额外的隐私控制》（2006 年 9 月 8 日），载于 https://kl.link/3oq7BrY （最后访问时间：2021 年 4 月 15 日）。

[84] 出处同上。

[85] 出处同上。

117. 2007 年开始，Facebook 向应用程序开发人员提供用户内容和信息的访问权限，包括标记为私人的内容。[86]Facebook 意图"成为全球的统治性社交媒体服务，它签订协议，允许手机和其他设备制造商访问其大量用户的个人信息。"[87]

118. Facebook 没有向用户披露 Facebook 早期开始向第三方提供的内容和数据的范围，包括标记为"私人"的用户数据。但 Facebook 在 2007 年 5 月向第三方应用程序开发人员解释说，Facebook 的核心价值理念和商业模式是"提供对一种新类型数据——社交数据的访问权限，使您能够构建与用户相关的应用程序。" 关于此类数据，Facebook 告诉开发人员："你们和我们处在一个公平的赛场上。你们可以搭建强大的应用程序，不仅仅是小插件。完美集成到 Facebook 网站上。"

119. 同样在 2007 年，Facebook 以"社交广告"为幌子，推出了"Beacon"产品。Beacon 允许参与的第三方跟踪用户在Facebook 之外的购物情况，并通知他们的 Facebook 好友。[88]举例说明，当 Facebook 用户从 Blockbuster 租电影时，用户将立即收到 Blockbuster 的"弹出"通知，请求允许与 Facebook 共享有关用户租赁电影的详细信息。[89]除非用户通过选择"否，谢谢"选项明确拒绝许可，否则 Facebook 将收到有关用户租赁活动的信息（例如租借的电影名称），并将该信息发布在用户的 Facebook 页面上。[90]下图显示了在第三方网站上向 Facebook 用户显示的 Beacon 弹出请求的示例：[91]

---

[86] DCMS Report，如前所述，¶ 103。

[87] Gabriel J.X. Dance、Nicholas Confessore 和 Michael LaForgia，*Facebook Gave Device Makers Deep Access to Data on Users and Friends*，《纽约时报》（2018 年 6 月 3 日），可在 https://kl.link/2HwXIYP 查看（最后访问时间 2021 年 4 月 15 日）。

[88] Louise Story，*Facebook Is Marketing Your Brand Preferences (With Your Permission)*，《纽约时报》（2007 年 11 月 7 日），可在 https://kl.link/34tuzXy 查看（最后访问时间 2021 年 4 月 15 日）。

[89] Srinivasan，如前所述，第 56 页。

[90] *同上。*

[91] *同上。*

120. Facebook 关于其 Beacon 程序的许多陈述后来被证明不实。Facebook 最初坚持称，Beacon 只跟踪和维护在弹出窗口寻求许可时获得同意的用户活动。[92]而实际上，即使用户点击了"不，谢谢"提示，Beacon 仍允许 Facebook 跟踪用户活动。[93]

121. FTC 对 Facebook 的 Beacon 程序表示担忧，公众的愤怒和诉讼也接踵而至。[94]扎克伯格最终道歉，让用户选择退出，并称 Beacon 是一个错误，安慰 Facebook 用户说："我们处理这种情况的方式有所欠缺，我知道我们可以做得更好。"[95]扎克伯格的声明表示，Facebook 已经吸取了教训，它不会再以未经授权或侵入的方式使用他们的数据。

122. 截至 2008 年第三季度，Facebook 在全球拥有约 1 亿月活跃用户。[96]这使得它仅次于月活跃用户数超 1.1 亿的 Myspace。[97]2009 年，Facebook 在美国的月活跃用户方面超过了 Myspace。此后，虽然 Myspace 作为竞争对手继续存在到 2014 年，但它再未如此接近过 Facebook。

123. 在 2009 年 11 月左右，Facebook 开始为用户提供"中央隐私页面"，其中包

---

[92] 同上，第 57 页。

[93] 同上，第 58 页。

[94] *见上文*，第 57–59 页。

[95] Betsy Schiffman，*Facebook CEO Apologizes, Lets Users Turn Off Beacon*，《Wired》（2007 年 12 月 5 日），可在https://www.wired.com/2007/12/facebook-ceo-apologizes-lets-users-turn-off-beacon/ 查看（最后访问时间 2021 年 4 月 20 日）。

[96] *Number of monthly active Facebook users worldwide as of 4th quarter 2020*，《Statista》，可在 https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/ 查看（最后访问时间 2021 年 4 月 15 日）。

[97] *Jeremiah Owyang，Social Network Stats:* Facebook, MySpace, Reunion (Jan, 2008)，https://web-strategist.com/blog/2008/01/09/social-network-stats-facebook-myspace-reunion-jan-2008/ （最后访问时间 2021 年 4 月 15 日）。

案件编号：5:20-cv-08570-LHK
消费者合并集体诉讼起诉书

含"个人资料"链接，且有随附文本表示用户可以"控制哪些人可以看到您的个人资料和个人信息"。[98]下图是 Facebook"中央隐私页面"的一个示例：



124. 到 2010 年，在徒有其表的隐私保护承诺的支持下，Facebook 已成为世界上最大的社交网络。然而，几乎所有用户都不知道，Facebook 已经将业务转变为出售数据访问权限，具体表现为向开发人员出售访问权限以及销售针对 Facebook 参与和活跃用户网络的广告。2010 年 3 月，据报道称，Facebook 在 2009 年的收入高达 7 亿美元，2010 年有望达到 11 亿美元，几乎全部来自向用户投放的广告。至此，Facebook 的收入每年大约都翻了一倍——2007 年为 1.5 亿美元；2008 年为近 3 亿美元；2009 年为 7 亿美元。

125. 2010 年初，Facebook 推出了"喜欢"按钮，也被称为"社交插件"。"喜欢"按钮是显示在第三方网站上的网页插件。如果用户支持或"喜欢"第三方网站上的特定内容（例如特定的新闻文章），"喜欢"按钮旁边的计数会加一。Facebook 用户在第三方网站上"喜欢"的内容，可能会在用户的 News Feed 中向用户在 Facebook 上的关注者显示预览，这可能会吸引其他浏览者在查看用户 News Feed 中的预览内容后访问第三方网站。第三方网站上显示的 Facebook"喜欢"按钮版本如下图所示：[99]



---

[98] DCMS Report，*如前所述*，¶ 65。

[99] Ray C. He, *Introducing new Like and Share buttons*, Facebook for Developers News（2013 年 11 月 6 日），可在 https://developers.facebook.com/blog/post/2013/11/06/introducing-new-like-and-share-buttons/ 查看（最后访问时间 2021 年 4 月 15 日）。

126.  "喜欢"按钮被营销为分享意见的一种方式，实际上使 Facebook 能够通过跟踪互联网上的活动来获取消费者数据。在 Facebook 推出"喜欢"按钮时，Facebook 的"常见问题"页面表示，"当您在外部网站上查看社交插件时，不会共享有关您的数据。"[100] 然而，独立研究者后来确认，第三方网站上存在"喜欢"按钮，会导致 Facebook 能够在用户访问这些第三方网站时监控用户并随时获取其数据，即使用户*没有*点击"喜欢"按钮。[101]

127.  调查人员很快揭破了这一骗局，Facebook 与 FTC 达成和解决该机构的指控，即"Facebook 欺骗消费者，告诉他们会对他们在 Facebook 上的信息保密，然而却一再共享和公开。"[102] 根据 Facebook 与 FTC 的和解，Facebook 不得再做出任何进一步的欺骗性隐私声明，要求 Facebook 在变更其共享数据的方式之前获得消费者的批准，并要求 Facebook 在未来 20 年内获得独立第三方审计师对其隐私做法的定期评估。

128.  特别是，根据和解协议，Facebook 具体需要：

**a)**  不得对消费者个人信息的隐私性或安全性进行虚假陈述；

**b)**  在实施覆盖消费者隐私偏好的变更之前，需要获得消费者的肯定明确同意；

**c)**  在用户删除其帐户 30 天后，阻止任何人访问用户的材料；

**d)**  建立并维护一个全面的隐私计划，旨在解决与开发和管理新旧产品和服务相关的隐私风险，并保护消费者信息的隐私性和保密性；和

**e)**  在 180 天内以及此后在接下来的 20 年中每两年一次，获得独立第三方

---

[100] Declan McCullagh, *Facebook 'Like' button draws privacy scrutiny*，CNET（2010年6月2日），可在 https://www.cnet.com/news/facebook-like-button-draws-privacy-scrutiny/ 查看（最后访问时间 2021 年 4 月 15 日）。

[101] Srinivasan，*如前所述*，第 65–67 页。

[102] 联邦贸易委员会新闻公告，Facebook Settles FTC Charges That It Deceived Consumers By Failing To Keep Privacy Promises （2011 年 11 月 29 日），可在 https://kl.link/3mqWAEX 查看（最后访问时间 2021 年 4 月 15 日）。

案件编号：5:20-cv-08570-LHK
消费者合并集体诉讼起诉书

审计，证明其已制定符合或超过 FTC 命令要求的隐私计划，并确保消费者信息的隐私性受到保护。[103]

129. 然而，Facebook 最终没有遵守对 FTC 的承诺。

130. 为了回应这些争议，Facebook 在 2012 年宣布，未来的隐私变更将需要用户通过投票批准，这是 Facebook 做出隐私保护承诺，但后面却没有兑现的又一个例子。[104]在一次"隐私新闻发布会"上，Facebook 创始人马克·扎克伯格解释说，Facebook 是"网络上为数不多供人们分享个人和亲密信息的服务之一"；要求用户批准隐私变更，"会导致在没有获得所有人同意的情况下，我们无法提出新的服务条款"；而且"我们认为这些变化将为增加用户对服务的联系和信任。"[105] 但是，Facebook 沿袭与其一贯的欺骗模式，最终没有遵守这一承诺，选择结束要求用户批准才能进行未来更改的过程。[106]

131. Facebook 对隐私的持续承诺对潜在的竞争对手——甚至是那些背靠全球最大公司的竞争对手——产生了负面影响，导致他们无法再获取可观的市场份额。2010 年，Google 推出了一个新的社交网络 Google+。Google+ 是 Google 建立"社交图谱"一次尝试，社交图谱将在 Google 产品（包括 YouTube 和 Gmail）上使用一个通用的用户身份。

132. 通过 Google+，Google 试图超越 Facebook 的基本产品特性和功能。Google+ 的计划功能包括一款名为"stream"的连续滚动产品；一个名为"sparks"的配套功能，它将"stream"与用户的个人兴趣相关联；以及一款名为"Circles"的分享应用程序，用以与朋友、家人、联系人和广大公众分享信息。

---

[103] *同上*

[104] Eyder Peralta，*Facebook Will Allow Users to Vote On Privacy Changes*，NPR（2012 年 6 月 1 日），可在 https://www.npr.org/sections/thetwo-way/2012/06/01/154162976/facebook-will-allow-users-to-vote-on-privacy-changes 查看（最后访问时间 2021 年 4 月 15 日）。

[105] Srinivasan，*如前所述*，第 61–62 页。

[106] Dave Lee，*Facebook criticised over decision to stop public privacy votes*，BBC News（2012 年 11 月 22 日），可在 https://www.bbc.com/news/technology-20444678 查看（最后访问时间 2021 年 4 月 15 日）。

133. Google+ 代表着巨大的资源投入，将一个完整、全面的社交网络推向市场。Google 几乎征用了公司的所有产品来帮助搭建 Google+。在高峰时期，Google+ 调用了全国各地多个分部的 1,000 名员工。Google 甚至要求员工使用 Google+Hangouts 视频聊天功能，以此帮助推动它在科技行业及其他行业的采用。

134. Facebook 知道，如果用户觉得 Facebook 提供的隐私保护不足，他们会转投 Google+。因而，Google+ 的竞争威胁（在它持续期间）暂时阻止了 Facebook 进一步侵蚀其隐私特性。例如，在 2011 年，Facebook 允许用户从照片中"取消标记"他们自己，即使其他用户首先"标记"了他们。[107]Facebook 曾计划去除这种允许用户"取消标记"自己的功能，但担心这一变化会迎来争议，因为 Facebook 计划的更改将会降低用户的隐私性。Facebook 的一位高管解释说："如果有避免争议的时期，那肯定发生在别人拿我们的产品与 G＋进行比较的时候。"[108] 这位高管后来建议 Facebook 推迟对其隐私政策的任何更改，"一直等到直接竞争比较开始平息。"[109]

135. 然而，Google 最终在与 Facebook 的竞争中落败。尽管 Google+ 一直到 2018 年都还是 Facebook 的竞争对手，但它没能推翻 Facebook 或从 Facebook 手中夺走可观的市场份额，与此同时，Facebook 继续误导用户，以阻止他们转换到提供类似功能但实际隐私实践更优越的网络。

136. Facebook 有关其数据隐私实践的欺骗和一连串的反竞争收购推动了 Facebook 日渐庞大的用户群快速增长，并提高了 Facebook 社交图谱的价值。正如 Facebook 产品管理副总裁在 2012 年 10 月的一封电子邮件中对马克·扎克伯格的解释，Facebook 收集的数据使 Facebook 在收集和变现消费者数据方面日臻完善："人们在我们的平台上看的东西越多，我们就能更多地了解人们想要看到的内容… 使用系统的人越多，我们就能掌握越多关于如何让更多人使用该系统的信息。"

---

[107] *纽约州等诉Facebook, Inc.*，案件编号 1:20-cv-03589-JEB (D.D.C.), 档案 70,¶ 95.
[108] *同上*
[109] *同上*

137. Facebook 于 2012年上市。为了追求收入，Facebook 开始使用"查看标记"，它允许广告商使用cookie 在互联网上跟踪 Facebook 用户。[110]Facebook 还让广告商能够进行更细化的广告竞价，并专门针对"自定义受众"（即，广告商提供的特定用户列表）投放广告。Facebook 没有透露其用户数据实践允许第三方使用 cookie 在互联网上跟踪 Facebook 用户。

138. Facebook 在 2012 年首次公开募股（"IPO"）时，向美国证券交易委员会（"SEC"）提交的文件显示，该公司有 8.45 亿的月活跃用户，网站每天收到 27 亿次喜欢和评论。[111]

139. Facebook 后来将用户内容与其他第三方数据相结合，从而对第三方数据进行去匿名化处理。例如，在 2013 年 4 月，Facebook 为数百万用户和非用户创建了信息档案。档案甚至包含姓名、健康信息、友邻信息和爱好。Facebook 没有向用户披露此类档案（甚至没有向用户披露此类档案存在的事实），而是利用它们方便广告商更精确地定位用户。[112]用户并不知道 Facebook 商业监控的范围，直到 Cambridge Analytica 丑闻爆发后才开始意识到——2018 年 3 月，绝大多数 Facebook 用户都错误地认为 Facebook 只在用户登录时收集数据。[113]

140. Facebook 实施这种持续的欺骗模式，其具体意图是垄断社交网络和社交媒体市场，并最终维持和利用其垄断地位。Facebook 成功地欺骗了消费者，持续时间之久，足

---

[110] *Rebecca Greenfield*，*2012: The Year Facebook Finally Tried to Make Some Money*，The Atlantic （2012 年 12 月 14 日），可在https://kl.link/34qhxdd 查看（最后访问时间 2021 年 4 月 15 日）。

[111] Facebook 根据 《1933 年证券法》 作出的 S-1 表格注册声明，https://kl.link/2L9TgRD （最后访问时间 2021 年 4 月 15 日）。

[112] Tim Peterson，*Facebook Will Remove Advertisers' Other Third-Party Data Option, But Loopholes, Questions Remain*, DigiDay（2018 年 4 月 6 日），可在https://kl.link/37Mprjj 查看（最后访问时间 2021 年 4 月 15 日）。

[113] Paul Hitlin & Lee Rainie，*Facebook Algorithms and Personal Data*，皮尤研究中心（2019 年 1 月 16 日），可在 https://kl.link/37EsidN 查看（最后访问时间 2021 年 4 月 15 日）。

以巩固它在社交网络和社交媒体市场的市场力量。到 Facebook 关于其数据隐私实践欠佳的骗局在 2018 年被揭露时——即 Google+ 因无力增长离开市场的那一年，它已经取得了不可撼动的主导支配地位。

**E.    Cambridge Analytica 丑闻部分揭示出 Facebook 欺骗的程度。**

141.  直到 2018 年 Cambridge Analytica 丑闻爆出，消费者才逐渐发现 Facebook 松散的数据隐私实践的范围和影响。特别是，丑闻揭露出 Facebook 一直在让应用程序开发人员收集 Facebook 用户的私人数据，没有经过用户的同意，并且将这些数据用于 Facebook 上定向广告以外的其他目的。

142.  Cambridge Analytica（"CA"）是一家英国政治咨询公司，将数据收集和分析相结合，用于政治广告。一款名为"This Is Your Digital Life"的 CA 应用程序向用户提出一系列问题，用以建立用户的心理档案。这款应用程序不仅从其用户自有的应用程序收集数据，还从用户的 Facebook 好友那里收集数据。

143.  CA 的做法在 2018 年 3 月被人揭破，据当时透露，凭借使用 CA 应用程序的 270,000 名 Facebook 用户，CA 能够访问多达 8700 万 Facebook 用户的个人数据。这些用户中的绝大多数都没有授予 CA 访问其数据的权限。

144.  丑闻爆出后，Facebook 封禁了该应用程序，并声称 CA 违反了 Facebook 的服务条款。[114]然而，一项调查显示，早在 2015 年 4 月，Facebook 就意识到它无法跟踪有多少应用程序开发人员正在使用以前下载的数据。[115]Facebook 的数据权限允许应用程序访问的数据，不仅有关于应用程序用户的数据，还有应用程序用户所有好友的数据。

---

[114] Kurt Wagner，*Here's how Facebook allowed Cambridge Analytica to get data for 50 million users*，Vox（2018 年 3 月 17 日），可在 https://kl.link/2ToOFLZ 查看（最后访问时间 2021 年 4 月 15 日）。

[115] Deepa Seetharaman 和 Kirsten Grind，*Facebook's Lax Data Policies Led to Cambridge Analytica Crisis*，《华尔街日报》（2018 年 3 月 20 日），可在 https://kl.link/3jt8o86 查看（最后访问时间 2021 年 4 月 15 日）。

145. 至少早在 2010 年，Facebook 就欺骗性地允许第三方访问 Facebook 用户好友的数据，这一政策构成了 FTC 2011 年起诉书的部分依据。然而，在 2012 年，FTC 在与 Facebook 的和解安排中命令Facebook "不得在任何事项上明示或暗示地歪曲事实，[Facebook]维护涵盖信息的隐私性或安全性，包括…… [Facebook 收集、使用或披露任何涵盖的信息[。]" 2015 年，Facebook 进一步向用户表明，它将结束允许第三方访问用户好友数据的做法。然而事实与 Facebook 的言论相反，大多数第三方都可以继续访问这些数据，违反了 Facebook 2012 年与 FTC 达成的和解协议。这些第三方从 Facebook 获得的数据量之多，令一名 Facebook 员工感叹道："我必须承认，我们竟然无缘无故地给出了这么多，这令我非常震惊。" [116]

146. 至少在 2018 年之前，Facebook 仍然允许一些第三方访问用户好友的数据。美国司法部在 2019 年因 Facebook 违反 2012 年与 FTC 的和解协议对 Facebook 的起诉书中，明确指出了 Facebook 关于共享其用户数据的虚假行为。[117]直到 Cambridge Analytica 丑闻爆出后，Facebook 在分享用户好友数据方面的持续欺骗才开始暴露出来。在 2019 年对 Facebook 的起诉书中，司法部告诫说，"Facebook 的行为导致未经授权收集、使用和披露消费者信息的全部范围尚不清楚，至少有一部分原因是该公司的记录保存不全。[118]

147. 然而，到 2018 年的这个时候，Facebook 的社交网络和社交媒体垄断地位已经完全稳固，在美国拥有超过 2.17 亿用户。那一年，Facebook 的收入超过 550 亿美元，几乎完全来自销售定向广告，由于缺乏有效的数据隐私保护，定向广告对 Facebook 和第三方来说更有价值了。

148. 2019 年 9 月，Facebook 称它暂停了数以万计的应用程序，原因是不当获取用

---

[116] *美国诉 Facebook, Inc.*，案件编号1:19-cv-02184 (D.D.C.)，档案 1，¶ 84。
[117] *同上*，¶¶ 5–9。
[118] *同上*，¶ 126。

户的个人数据和其他违规行为，"默认其数据隐私问题的规模远超其此前承认的规模。" [119] Facebook 最终透露，它已经暂停了69,000 个应用程序，其中 10,000 个应用程序被标记为可能盗用了 Facebook 用户的个人数据。[120] Facebook 数据隐私问题的规模和范围清楚地表明，形同虚设的数据隐私保护是 Facebook 社交网络的一个特征，而不是缺陷。

149. 2019 年 7 月 24 日，联邦贸易委员会和司法部宣布，Facebook 将支付 50 亿美元的罚款，并接受新的限制和修改后的公司结构，针对该公司"欺骗用户称他们有能力控制其个人信息隐私性"的指控达成和解。[121]

150. 在此之前，联邦贸易委员会判处的最大额罚款为 2.75 亿美元。联邦贸易委员会解释说："Facebook 通过定向广告将用户信息变现，占该公司 2018 年 558 亿美元收入的大部分。为了鼓励用户在其平台上分享信息，Facebook 向用户承诺，他们可以通过 Facebook 的隐私设置来控制其信息的隐私性。" [122]

151. 联邦贸易委员会进一步解释，虽然Facebook 这么说，但"Facebook 一再使用欺骗性披露和设置破坏用户的隐私偏好"，确定"这些策略允许该公司与用户的 Facebook "好友"下载的第三方应用程序共享用户的个人信息，并进一步发现"Facebook 没有采取足够的措施来处理它知道违反了其平台政策的应用程序。" [123]

152. 联邦贸易委员会 2019 年的指控清楚地表明，Facebook 一再使用欺骗性披露和设置来破坏用户的隐私偏好，严重违反了联邦贸易委员会 2012 年的命令。在英国下议院

---

[119] Kate Kogner、Gabriel J.X. Dance 和 Mike Isaac，*Facebook's Suspension of 'Tens of Thousands' of Apps Reveals Wider Privacy Issues*，《纽约时报》（2019 年 9 月 20 日），可在 https://kl.link/31JmImH 查看（最后访问时间 2021 年 4 月 15 日）。

[120] *参见* Facebook，*An Update on Our App Developer Investigation*（2019 年 9 月 20 日），可在 https://kl.link/31FSVeP 查看（最后访问时间 2021 年 4 月 15 日）。

[121] 联邦贸易委员会，*FTC Imposes $5 Billion Penalty and Sweeping New Privacy Restrictions on Facebook*，可在 https://kl.link/34snVR0 查看（最后访问时间 2021 年 4 月 15 日）。

[122] *同上*

[123] *同上*

作证时，联邦贸易委员会的前首席技术专家 Ashkan Soltani 承认，"Facebook 一次又一次地允许开发人员访问用户及其好友的个人信息，这与他们的隐私设置和政策声明相悖。"[124]

153. 2012 年与联邦贸易委员会达成和解后，Facebook 承诺，在消费者隐私设置中明确列举的实体以外分享信息之前，它将会向消费者发出"清晰而显眼"的通知，征得他们的同意。[125]例如，如果 Facebook 用户的隐私设置指定特定内容（如照片）仅对用户的"好友"可见，Facebook 表示（并且 2012 年 FTC 和解要求），Facebook 将获得用户的"肯定明确同意"，然后再在用户"好友"以外分享此类内容。[126]

154. 消费者依靠 Facebook 在 2012 年与 FTC 达成和解之前和之后的声明，决定继续使用 Facebook（而不是其竞争对手），并允许 Facebook 访问他们的个人数据，作为使用 Facebook 的交换。但是，到消费者得知 Facebook 违反了这一和解协议时，他们已经无法合理地转换到同类社交网络或社交媒体应用程序。Facebook 已经在社交网络和社交媒体市场获得了垄断权，网络效应、高进入壁垒和高昂的转换成本使得 Facebook 的垄断地位更有可能得以维持。虽然市场力量有时会遏制欺骗用户的公司，但社交网络和社交媒体市场的唯一特性使得市场更难以处罚违反对消费者承诺的 Facebook。

155. 虽然 Cambridge Analytica 丑闻爆出民众群情激愤，但绝大多数 Facebook 用户仍在继续使用 Facebook 及其产品系列。其原因显而易见。正如 Facebook 敏锐地意识到的那样，社交网络只有在用户的朋友也都使用时，才真正有价值。一旦社交网络达到临界量，

---

[124] DCMS Report，*如前所述*，¶ 89。

[125] Frederic Lardinois，*Facebook And FTC Settle Privacy Charges—No Fine, But 20 Years Of Privacy Audits*，TechCrunch（2012 年 8 月 10 日），可在 https://techcrunch.com/2012/08/10/facebook-ftc-settlement-12/ 查看（最后访问时间 2021 年 4 月 1 日）。

[126] Somini Sengupta，*F.T.C. Settles Privacy Issue at Facebook*，《纽约时报》（2011 年 11 月 29 日），可在 https://www.nytimes.com/2011/11/30/technology/facebook-agrees-to-ftc-settlement-on-privacy.html 查看（最后访问时间 2021 年 4 月 1 日）。

它就会在市场上站稳脚跟, 用户通常不会再有可行的社交图谱替代品, "因为如果没有可联系的人, 用户没有理由开始使用这种社交网络。" [127] 因此, 尽管 Cambridge Analytica 丑闻爆出后群情激愤, 但很少有 Facebook 用户停止使用 Facebook, 因为不再有其他可行的网络可供使用。

**F.  Facebook 使用反竞争收购和威胁来破坏社交网络和社交媒体市场的竞争。**

156.  Facebook 还试图通过定期摧毁和收购竞争威胁来保护并扩大其垄断地位, 并利用其市场力量和数据优势, 以反竞争方式实现其垄断目标。

157.  自 2004 年成立以来, Facebook 已经收购了至少 63 家公司。[128]虽然这些收购是公开的, 但公众直到最近才发现, Facebook 在很大程度上利用它从用户那里骗来的数据来识别新生的竞争对手, 并锁定他们进行收购或摧毁。这些新信息表明, Facebook 的反竞争性收购是由 Facebook 欺骗性隐私实践促成的, 也是 Facebook 欺骗性隐私实践的结果。

**1)  Facebook 对消费者的跟踪推动了其"复刻、收购或扼杀"策略。**

158.  Facebook 使用从用户那里获得的数据跟踪用户访问的网站和应用程序——通常没有完全披露, 以此找出哪些新生的竞争对手势头上涨, 进而锁定他们进行收购或摧毁。Facebook "持续地监视竞争对手幼苗, 使 Facebook 从中受益… 采取措施滥用数据、伤害竞争对手并为 Facebook 屏蔽竞争。[129]事实上, Facebook 有意发展其监视用户的能力, 以辅助其收购策略, 这项策略从它最初成为最大社交网络时起一直延续至今。

159.  从历史上看, Facebook 使用自己的内部数据和来自数据分析与测量公司 Comscore 的数据来跟踪竞争威胁的增长情况。[130]但 Facebook 所做的努力只等同于底层数据。因此, Facebook 决定通过加强监控从用户那里获取更强大的数据, 以便清除社交网络

---

[127] House Report, *如前所述*, 第 89 页。
[128] *同上*, 第 149 页。
[129] *同上*, 第 166 页。
[130] *同上*, 第 160–66 页。

和社交媒体棋盘中的未来竞争对手。

160. 2012 年 4 月，Facebook 增长总监 Javier Olivan 给扎克伯格和 Facebook 首席产品官 Chris Cox 发了电子邮件，讨论如何改进 Facebook 的"竞争性研究"。Olivan 表示，"让我们的数据处于最佳状态需要付出努力"，Facebook 建立自己的识别竞争威胁的系统将会"使我们能够更好地理解"对 Facebook 在移动设备上支配地位的竞争威胁。[131]Olivan 解释说：

> *Facebook's Secret Phot o Sharing App*，TechCrunch（2015 年 6 月 15 日），可在 https://techcrunch.com/2011/06/15/facebook-photo-sharing-app/?_ga=2.23833 1010.340941203.1606233329-687565188.1605321310 查看（最后访问时间 2021 年 4 月 5 日）。我认为拥有关于其用户[原文]参与度的、他们从[Facebook]获得的价值… 确切数据，将帮助我们在认定他们是朋友还是敌人时做出更大胆的决策。回到你关于"复刻"与"创新"的话题，我们也可以使用这些信息来启发我们的后续行动。[132]

161. 扎克伯格回复说："对，我们就这么做吧。" 扎克伯格强调了利用用户数据识别竞争威胁对 Facebook 的重要性，他承诺"在我每周回顾时定期找一些时间研究这些东西。"[133]

162. 2013 年，Olivan 向扎克伯格阐述了Facebook 收购 Onavo 的前景，Onavo 是一家运营虚拟专用网络（"VPN"）的以色列移动网络分析公司。VPN 为用户提供安全性和加密，创建一个"数据隧道"，当通过用户的互联网连接发送数据时，该隧道会掩护数据，扰乱用户的在线活动以防止被第三方检测到。[134]

---

[131] *同上*，第 161 页。
[132] *同上*
[133] *同上*
[134] Steve Symanovich, *What is a VPN?*，NortonLifeLock（2021 年 1 月 14 日），可在 https://us.norton.com/internetsecurity-privacy-what-is-a-vpn.html 查看（最后访问时间 2021 年 4 月 19 日）。

163. 当时，Olivan 敦促扎克伯格称，Onavo 可以为 Facebook 提供强大的"竞争洞察"，"极有利于识别收购目标"。[135]据 Olivan 所说，"Onavo 在战略上是有意义的，它解决移动市场数据问题的效果比任何其他替代方案要好 10 倍，而且你知道，每当我们有参与度或竞争问题时，这些数据有多么重要[。]"[136]

164. Facebook 于 2013 年 10 月以 1.15 亿美元收购了 Onavo。在收购 Onavo 之前，Facebook 多年来一直依赖 Onavo 对 Facebook 竞争对手的监视，例如在收购 Instagram 的过程中，Facebook 最终收购并使用 Onavo 的资产，通过关于其用户参与度、使用情况以及在其他应用程序上所用时间的非公开内部实时数据来跟踪潜在的竞争对手。[137]值得注意的是，在收购 Onavo 时，Facebook 并不打算将 Onavo 的员工安置在 Facebook 的数据分析团队中。相反，在收购 Onavo 时，Facebook 计划将 Onavo 的员工——包括其联合创始人 Guy Rosen 安置到 Facebook 的增长团队，由 Javier Olivan 负责。[138]

165. 通过声明这些应用程序提供数据安全功能，Onavo 允许 Facebook 秘密地从使用 Onavo 移动应用程序的消费者那里收集信息。Facebook 通过 Onavo 收集的信息类型包括"用户访问过的每个应用程序"；"用户每天在应用中花费的秒数"；"用户在特定应用中花费的时间占其手机使用总时间的百分比"；"用户在每个应用程序中执行的操作"；以及个人信息，例如用户的原籍国、年龄和性别（等等）。[139]Facebook 将它通过 Onavo 获

---

[135] *参见纽约州等诉 Facebook, Inc.*，案件编号 1:20-cv-03589-JEB (D.D.C.)，档案 70，¶ 141。

[136] *同上*

[137] *Betsy Morris 和 Deepa Seetharaman，The New Copycats: How Facebook Squashes Competition From Startups*，《华尔街日报》（2017 年 8 月 9 日），可在 https://kl.link/3e6nMpW 查看（最后访问时间 2021 年 4 月 15 日）。

[138] House Report，*如前所述*，第 161 页。

[139] *澳大利亚竞争与消费者委员会诉 Facebook, Inc. 等*，澳大利亚联邦法院（2020 年 12 月 16 日），¶11，可在 https://www.accc.gov.au/system/files/ACCC%20v%20Facebook%20Inc%20%26%20Ors_%20Concise%20Statement_0.pdf 查看（最后访问时间 2021 年 3 月 29 日）（"ACCC 起诉书"）。

得的近乎即时的信息化为武器，用以识别竞争对手，然后"复刻、收购或扼杀"。

166. Facebook 立即开始将 Onavo 的应用程序整合到其业务运营和收购策略中。例如，Facebook 开始分析从 Onavo 的Protect 软件秘密收集的数据，该软件是一个伪装成 VPN 软件的大规模监控和数据收集计划。讽刺的是，Onavo Protect 是作为"保障您和您的数据安全"，"保存、衡量并保护您的移动数据"，"帮助您掌握如何使用移动数据并保护您的个人信息"，"为您的所有移动数据流量额外增加一层保护，提供更高的安全性"，以及提供"浏览时的安心感"（等等）的方式推销给消费者，它实际上监控了用户移动设备上的所有网络和移动应用程序流量，并最终将这些信息重定向到Facebook，由 Facebook 的产品团队对其进行记录和分析。[140]截至 2018 年 2 月，Onavo 应用程序在 iOS 和 Android 上的下载量已达到 3300 万次。

167. Facebook 利用对用户的广泛监控来识别和锁定新生的竞争威胁。然后利用从 Onavo 和其他来源获得的数据，Facebook 通过要求在协议中做出让步、拒绝访问 Facebook 网络上的重要数据和信息来源，或通过收购方式，消除新生的竞争对手。正如民选官员所认识到的那样，Facebook 从 Onavo 和其他数据代理商那里获得的技术使 Facebook 能够保护并进一步提升其市场支配地位：[141]



Congresswoman Pramila Jayapal ✔
July 29, 2020 · 

Facebook is a case study in monopoly power: It harvests and monetizes our data, then uses it to spy on competitors—to copy, acquire, and kill rivals.
This destructive model makes it impossible for new companies to flourish—harming our democracy, small businesses, and consumers.

168. Facebook 利用它从 Onavo 或其他来源获得的用户数据为 Facebook 反竞争的"复刻、收购、扼杀"策略提供信息，其部分方式详述如下。就像一支橄榄球队窃取其他球队的比赛暗语一样，Facebook 利用其对用户的欺骗性监视来准确了解需要踢走哪些竞争对手。然而，值得注意的是，Facebook 使用不当获取的用户数据实施这些策略的程度，直

---

[140] 同上，附件 A1–A4。

[141] 美国代表 Pramila Jayapal，Facebook（2020 年 7 月 29 日），可在 https://www.facebook.com/RepJayapal/videos/questioning-mark-zuckerberg/319712279065223/ 查看（最后访问时间 2021 年 4 月 19 日）。

到最近才为人所知。

**2) Facebook 以歧视性做法威胁竞争对手，帮助推动其反竞争收购策略。**

169. 除了 Facebook 通过 Onavo 进行的监视之外，Facebook 的"复刻、收购、扼杀"策略还建立在该公司使用骗来的用户数据锁定关键竞争对手，以歧视性做法拒绝他们访问"Facebook 平台"的意愿之上。

170. "Facebook 平台"允许第三方开发搭配 Facebook 运行的产品。扎克伯格将"Facebook 平台"的目的描述为"将 Facebook 打造成某种操作系统，让用户可以运行全部的应用程序[。]"为了访问该"操作系统"，开发人员和第三方必须使用其应用程序编程接口（"API"）向 Facebook 发送数据并从中接收数据。[142]

171. 在将其具有支配地位的"平台"开放给第三方时，Facebook 认识到这种访问对 Facebook 来说是有利可图的。然而，Facebook 选择性地放弃了这些利益，利用对其社交图谱的歧视性访问，并借口执行其"平台"政策，以防止可能的竞争对手出现，继续事事损害消费者。扎克伯格在谈到已确定的竞争威胁时说："我认为正确的解决办法是更严格地执行我们的政策，并确定作为我们竞争对手的公司。[143]

172. Facebook 确实是这样做的，以可能违反其政策为借口，截断已经炙手可热的社交应用程序，如 Vine、Stackla、Ark 和 MessageMe。Facebook 切断这些社交应用程序对 Facebook 用户数据的访问，是因为担心继续访问会让这些应用程序推出自己的竞争服务，给 Facebook 不断扩大的产品库中的任何一款产品构成挑战。[144]举例来说，Facebook 因第三方应用程序 Ark（Facebook 用户可以搭配 Facebook 使用）访问 Facebook 上数据的方式，对 Ark 实施了处罚。[145]Facebook 的一名前员工在 2012 年年中解释说："领导层对 Ark 施加较为严厉的惩罚，明显是因为扎克伯格认为 Ark 与 Facebook 构成了竞争，在 Ark 因违

---

[142] David Kirkpatrick，*Facebook's plan to hook up the world*，CNN Money（2007 年 5 月 29 日），可在 https://kl.link/3qrmFGT 查看（最后访问时间 2021 年 4 月 15 日）。

[143]House Report，*如前所述*，第 167 页。

[144] *同上*，第 166 页。

[145] *同上*，第 169 页。

反政策而受到调查的同时，Facebook 也在积极探索收购 Ark 的办法。"[146]

173.　到 2011 年底和 2012 年初，Facebook 高管们商讨出一项计划，以阻止第三方开发人员自行构建不依赖 Facebook 的网络也能产生参与度和数据的竞争性社交网络。Line、微信和Instagram 等社交媒体应用程序都在建立自己的独立用户群，并添加各种功能，使它们成为新崛起的竞争威胁。

174.　Facebook 解决这些潜在竞争对手的办法是破坏这些应用程序的增长，首先吸引第三方应用程序开发人员为 Facebook 的"平台"构建应用程序，然后最终删除他们对 API 的访问权限，从而消除这些开发人员对 Facebook 社交网络功能的访问权限以及有关 Facebook 用户的好友和拓展网络的信息、用户之间的互动以及用户的动态发文。这种 API 访问是 Facebook "平台"的核心价值理念。如果开发人员构建的应用程序能够增强 Facebook 社交网络的价值，他们将因而获得访问 Facebook 社交网络功能的福利，以及 Facebook 用户之间的互连和互动——Facebook 的社交图谱。

175.　Facebook 关闭 API 访问权限，导致应用程序开发人员无法访问其应用程序最核心的 API，例如 Facebook的"Friends"和"Timeline"的 API，以及其他重要的 API，包括与消息传递相关的 API。Facebook 识别竞争威胁并删除对这些API 的访问权限，成功中断了数以万计的第三方应用程序的增长，这些应用程序依赖于这些基础 API，在 Facebook 看来，它们正在侵蚀保护 Facebook 业务的重要进入壁垒，给 Facebook 的垄断地位造成了威胁。Facebook 的计划阻止竞争性第三方应用程序通过其 API 或通过其广告网络从 Facebook 购买消费者数据。正如 Facebook 的一位高管在 2012 年所解释，Facebook "不允许哪怕有一丝一毫竞争力的东西从我们这里'购买'这些数据。"

176.　2012 年 5 月，扎克伯格决定利用切断潜在竞争对手对 Facebook "平台"的访问的威胁，方便 Facebook 提取更多数据。他指示高管们要求与使用 Facebook "平台"的主要竞争对手达成"互惠"协议。然后，Facebook 开始阻止竞争对手使用其平台并以此获得 Facebook 关于消费者的数据。Twitter、Instagram、Pinterest 和Foursquare 等竞争对手被

---

[146] 同上

要求将他们最有价值的资产——社交数据——交给竞争对手 Facebook，以保留对 Facebook API 和广告网络的访问权限。

177. Facebook 计划阻止竞争对手使用其"平台"，从而防止他们侵蚀保护 Facebook 市场力量的实质性进入壁垒和网络效应。对于拥有 Facebook 需要进一步扩大其支配地位的社交数据的公司，Facebook 将强迫他们签订与 Facebook 共享他们最有价值的社交数据的协议。如果他们拒绝，Facebook 会把他们列入黑名单，然后使用爬虫软件刮取他们面向公众的网站以获取信息，拿走数据。从竞争对手那里攫取社交数据的最初谈判策略，成为了 Facebook 的"平台"策略基础。对于那些在自建竞争网络方面威胁足够大的竞争对手，Facebook 会要求他们交出他们唯一的筹码——他们从用户参与中获得的社交数据。

178. Facebook 愿意通过歧视性地访问其社交图谱的方式来抄袭和惩罚竞争对手，这也使得 Facebook 更容易以较低的价格收购竞争对手。例如，在扎克伯格和 Instagram 首席执行官 Kevin Systrom 关于收购 Instagram 的谈判中，扎克伯格将 Instagram 继续访问 Facebook "平台"和 Facebook 的社交图谱与Instagram 对 Facebook 收购要约的回应进行挂钩：

> 很快，你就会明白你其实非常想与我们合作。这可能是一次收购，通过与 Open Graph 的密切关系，通过使用我们的传统 API 进行公平交易的关系，或者可能根本不是… 当然，与此同时，我们正在制定自己的照片策略，因此我们现在如何参与，将决定我们是合作伙伴还是竞争对手——我希望我们慎重考虑后决定。[147]

179. 同样，在 Systrom 和 Instagram 投资人兼 Facebook 前高级顾问 Matt Cohler 之间的早期对话中，Systrom 和 Cohler 讨论了 Instagram 对Facebook 收购意图的回应是否可能影响 Instagram 对 Facebook "平台"的访问。[148]在讨论如何就 Facebook 的步步紧逼与与扎

---

[147] *同上*，第 164 页。

[148] Production of Facebook to H. Comm. on the Judiciary（2012 年 2 月 13 日）， FB-HJC-ACAL-00101440可在 https://judiciary.house.gov/uploadedfiles/0010143800101441.pdf 查看（最后访问时间 2021 年 4 月 15 日）。

克伯格进行接触时，Cohler 警告说："我们需要尽量让 fb 难以破坏我们在平台上进行分发的能力。[149]

180. 2015 年，Facebook 切断了所有公众对 Friends 和 News Feed API 的访问。在宣布并最终删除 API 之前，Facebook 已经从数十家竞争对手那里提取了有价值的社交网络数据。这一举动使它能够胁迫初期的竞争威胁拱手交出他们的社交网络数据。Facebook 拒绝向数千个潜在竞争对手给予 API 访问权限，并在此过程中确保其"平台"是搭载第三方社交媒体应用程序的唯一可行"平台"。

181. 尽管 Facebook 已经消除了对 Friends 和 News Feed API 的公开访问，但它通过名为"白名单和数据共享协议"的协议，迫使某些竞争对手继续将其数据交给 Facebook。[150]Facebook 要求被认定为竞争威胁的第三方开发人员执行标准格式协议，Facebook 称之为"私有扩展 API 附录"。[151]这些协议"使开发人员能够检索与 Facebook 相关的数据或功能，这些数据或功能在平台下不可获取，其中可能包括持续身份验证、照片上传、视频上传、消息传递和电话簿连接。"[152] 重要的是，第三方开发人员"在 Facebook 上投入大量资金"，是通过白名单和数据共享协议"保持个人数据优先访问权限的条件"。[153]

182. 作为该计划的一部分，Facebook 还要求这些第三方开发人员提供"互惠条件"，"要求使用 Facebook 数据的应用程序… 共享… 他们的数据返回到 Facebook（几乎不考虑用户的隐私）。[154]事实上，Facebook 的互惠政策成倍地扩大了其在隐私方面欺骗用户的影响："例如，登录 Tinder 等应用程序时，用户不会意识到他们正在泄露 Facebook

---

[149] 同上

Facebook 为约会类应用程序 Tinder 和 Hinge 提供了白名单和数据共享协议。[150]为了进一步巩固其社交图谱并获得更多的数据访问权限，它还与其他第三方（包括 Netflix、Nissan 和 Lyft）秘密签署了白名单和数据共享协议。总共有数十家第三方与 Facebook 签订了此类协议。

[151] DCMS Report，*如前所述*，¶ 85。

[152] 同上

[153] 同上，¶ 96。

[154] 同上，¶ 106。

案件编号：5:20-cv-08570-LHK
消费者合并集体诉讼起诉书

1    上的所有信息。 ” [155]

2

3    183. Facebook 的 Simon Cross 延续了 Facebook 通过在隐私实践方面欺骗消费者，

4    维持其对社交网络和社交媒体市场的垄断力的策略，将其第三方访问政策的变化作为用户

5    数据安全性增强的成就进行宣传。Facebook 公布了一个新的口号，“‘以人为先’，因为

6    ‘如果人们使用 Facebook 会觉得不舒服，特别是在登录 Facebook 和在应用程序中使用

7    Facebook 时，我们就没有平台，没有开发人员。’”然而，Facebook 实际将这些变化及其

8    对这些变化的营销描述为“Switcheroo 计划”： [156] “Facebook 将切断第三方访问用户数据

9    的决定与其他不相关的隐私更新捆绑在一起，并根据新的口号‘以人为先’进行了解释。”

10   “只要这些公司给 Facebook 足够的资金并且没有构成竞争威胁，一些第三方仍然可以被使

11   用用户数据，这一事实被顺便省略了。” [157][158]

12

13   184. 如果没有这些协议和 Facebook 消除新生竞争对手的整体计划，其他公司本可

14   以创建自己的社交网络和社交媒体应用程序。随着大量的用户数据在这些其他网络和应用

15   程序上生成并变现，社交网络和社交媒体市场的巨大进入壁垒将受到侵蚀。但是，由于

16   Facebook 可以强制要求交出在竞争“平台”上生成的所有数据，白名单和数据共享协议确

17   保了竞争威胁无法挑战 Facebook 对其利用在社交网络和社交媒体市场的垄断地位获得的

18   数据的控制力。

19

20   185. 在围绕潜在收购展开的所有行为中，Facebook 会有意地监视、复刻、收购并

21   扼杀竞争对手，摧毁竞争对手既是其具体意图，也是其结果。Facebook 获得并维持其在社

22

23   _____

     [155] *同上*

24   [156] Josh Constine, *Facebook Is Shutting Down Its API For Giving Your Friends' Data to

25   Apps*，TechCrunch（2015 年 4 月 28 日），可在 https://techcrunch.com/2015/04/28/facebook-
     api-shut-down/ 查看（最后访问时间 2021 年 4 月 15 日）。

26   [157] Elena Botella, *Facebook Earns $132.80 From Your Data per Year*，Slate（2019 年

27   11 月 15 日），可在 https://slate.com/technology/2019/11/facebook-six4three-pikinis-lawsuit-
     emails-data.html 查看（最后访问时间 2021 年 4 月 15 日）。

28   [158] *同上*

交网络市场和社交媒体市场的垄断地位，是它在一系列收购过程中的掠夺性和反竞争行为带来的结果，它的具体意图是垄断（并且一开始就具有危险的可能性）并最终成功获得和维持其市场力量。

### Instagram

186.　Facebook 利用对其用户的未公开监视，将 Instagram 确定为威胁并最终收购了该公司。Instagram 是由 Kevin Systrom 创立的照片分享类移动应用程序，用户可签到、发布计划和分享照片。照片分享功能立即成为该应用程序最受欢迎的功能。

187.　2010 年，Instagram 在 Apple 的移动设备操作系统上推出，很快成为了 App Store 上排名第一的免费照片分享类应用程序。Instagram 第一天的下载量就达到了 25,000 次。到 2010 年 12 月，Instagram 推出仅几个月后，下载数已达到 100 万次。

188.　截至 2012 年 3 月，Instagram 拥有 2700 万用户。一个月后，即 2012 年 4 月，Instagram 在 Android 设备上线。Android 推出仅 10 天后，Instagram 的总用户群就涨了 1000 万，超过了 4000 万。[159]因此，Instagram 准备在估值 5 亿美元的基础上获得更多的融资。

189.　Facebook 意识到 Instagram 对 Facebook 的支配地位构成了威胁。Instagram 卓越的照片分享功能为 Instagram 提供了一个吸引大量用户群的吊钩。如果它的用户群继续增长，如果它继续增加功能，Instagram 可能会威胁到 Facebook 的统治力，不仅是在社交媒体市场，还有在社交网络市场上。因此，Facebook 执着地追踪 Instagram 的崛起情况，包括从监视 Facebook 用户行为中获得的情报以及从 Onavo 获得的情报。[160]

---

[159] Andrew Webster，*Instagram surpasses 40 million users ten days after Android launch*，The Verge（2012 年 4 月 13 日），可在 https://www.theverge.com/2012/4/13/2946602/instagram-40-million-users 查看（最后访问时间 2021 年 4 月 9 日）。

[160] Mike Swift，*Facebook's history with Onavo resonates for privacy experts worried about Giphy purchase*，mlex Market Insight（2020 年 6 月 23 日），可在 https://mlexmarketinsight.com/insights-center/editors-picks/area-of-expertise/data-privacy-and-security/facebooks-history-with-onavo-resonates-for-privacy-experts-worried-about-giphy-purchase 查看（最后访问时间 2021 年 4 月 15 日）。

190. Facebook 的一线员工和高层管理人员都认为 Instagram 是一个竞争威胁。在 Facebook 的一条内部消息中，一位工程师打趣说："Instagram 正在吃掉我们的午餐。这个领域本该归我们所有，但我们已经丢失了大半。"[161] 在与 Facebook 员工的一次内部会议上，扎克伯格直言说："坏消息是，[Instagram 的]增长速度非常快，他们有很大的后劲，而且很难赶走他们。"[162]

191. 与其"复刻"潜在竞争对手的策略一致，Facebook 最初试图自己创建能够与 Instagram 竞争的产品。到 2011 年 6 月，Facebook 开始开发自己的照片分享类应用程序。[163]一位 Facebook 员工将 Facebook 预期的照片分享类应用程序称为"Instagram 复刻版"。[164]Facebook 后来发布了 Facebook Camera，这是一款独立的应用程序，用户可从他们的移动设备拍摄、过滤和分享照片。[165]

192. 除了"复刻"Instagram 之外，Facebook 确定了另一种方法对冲其赌注、保护其垄断地位并消除 Instagram 的竞争威胁：直接收购 Instagram。因此，在与马克·扎克伯格直接谈话后，Facebook 在 2012 年 4 月提出以 10 亿美元收购 Instagram。

193. 除了 10 亿美元的价格标签之外，Instagram 对 Facebook 收购要约的评估还有另一个考虑因素：Facebook 的攻击性和反竞争性威胁，而由于其垄断者地位，Facebook 即使做出这些威胁仍然可以安然无恙。在 Facebook 和 Instagram 的谈判中，扎克伯格警告

---

[161] House Report，*如前所述*，第 163 页。

[162] *同上*

[163] *MG Siegler，Behold:* Facebook's Secret Photo Sharing App，TechCrunch（2015 年 6 月 15 日），可在 https://techcrunch.com/2011/06/15/facebook-photo-sharing-app/?_ga=2.238331010.340941203.1606233329-687565188.1605321310 查看（最后访问时间 2021 年 4 月 5 日）。

[164] House Report，*如前所述*，第 163 页。

[165] Josh Constine，*FB Launches Facebook Camera – An Instagram-Style Photo Filtering, Sharing, Viewing iOS App*，TechCrunch（2012 年 5 月 24 日），可在 https://techcrunch.com/2012/05/24/facebook-camera/ 查看（最后访问时间 2021 年 4 月 15 日）。

Instagram 首席执行官 Kevin Systrom，"很快，你就会明白你其实非常想与我们合作···现在参与，将决定我们是合作伙伴还是竞争对手——我希望我们慎重考虑后决定。"[166] 在与 Instagram 投资者、Facebook 前产品管理副总裁 Matt Cohler 的另一次沟通中，Systrom 询问"如果我拒绝"，扎克伯格是否会转而采用摧毁模式。[167]Cohler 回复说，扎克伯格"很可能会"采用"摧毁模式"，并"认为击溃 Instagram 是最好的办法[。]"Cohler进一步感叹道，"我觉得我们永远逃不脱扎克伯格的愤怒"。[168][169]

194.  Instagram 显然屈服了，惧怕 Facebook 的"愤怒"，于是接受了Facebook 的收购要求。Facebook 在 IPO 前完成了这笔交易。

**Snapchat**

195.  收购 Instagram 之后，Facebook 将提供照片和视频分享功能的第三方应用程序驱逐出 Facebook 的"平台"。如果图片分享或视频应用程序包含重要功能，Facebook 就进行复刻，从而为将竞争对手驱逐出其"平台"铺平道路，同时抢夺竞争对手的用户份额。而且，Facebook 的高级管理人员都非常清楚这一策略。[170]

196.  例如，到 2012 年，照片分享应用程序 Snapchat 在消费者中越来越受欢迎。Snapchat 由 Evan Spiegel 创立，允许该应用程序上的用户相互发送通信，包括文本、照片和视频，这些内容仅显示固定的一段时间，然后消失。[171]在 Snapchat 隐私呼吁的吸引下，用户开始涌向 Snapchat。

---

[166] House Report，*如前所述*，第 163–64 页。

[167] Production of Facebook to H. Comm. on the Judiciary（2012 年 2 月 13 日），FB-HJC-ACAL-00101438，可在 https://judiciary.house.gov/uploadedfiles/0010143800101441.pdf 查看（最后访问时间 2021 年 4 月 15 日）。

[168] *同上*，FB-HJC-ACAL-00101438–39。

[169]*同上*，FB-HJC-ACAL-00101440。

扎克伯格、Sheryl Sandberg（Facebook 首席运营官）和 Sam Lessin（Facebook *产品管理总监*）等高管明确表示支持"复刻"其他竞争应用程序的热门功能。*参见* House Report，*如前所述*，第 163 页。

[171]Srinivasan，*如前所述*，第 53 页。

197.　面对来自 Snapchat 的竞争威胁，Facebook 采取了其惯用的"复刻、收购、扼杀"策略，试图消灭 Snapchat。制定这一策略时，Facebook 依靠从 Onavo 获得的数据。[172]

198.　2012 年 12 月，Facebook 推出了一款独立应用程序"Poke"，用户可使用该应用程序相互发送照片、视频或 Facebook 消息，几秒钟后过期。[173]但对 Facebook 来说，凭真本事与 Snapchat 竞争不能为 Facebook 的垄断地位稳固提供充分保障。因此，就在 Facebook 推出 Poke 的几天前，扎克伯格在洛杉矶会见了 Snapchat 的创始人 Spiegel。[174]在会议期间，扎克伯格向 Spiegel 描述了 Facebook 即将发布的 Poke 应用程序。Spiegel 对扎克伯格会议期间的言论描述如下："基本上就是说，'我们要打垮你。'"[175]

199.　在那次会议以及 Facebook 推出 Poke 之后，Facebook 向 Snapchat 提出了额外的提议，以图巩固其龙头地位。[176]Facebook 最终提出以 30 亿美元收购 Snapchat。Facebook 的 30 亿美元报价清楚地表明，Facebook 愿意为 Snapchat 当时的市场价值支付溢价，为消除 Facebook 市场支配地位面临的可能威胁增加安全性。

200.　Snapchat 拒绝了 Facebook 的要约，Facebook 的回应是复刻*更多*受消费者欢迎的 Snapchat 功能。例如，Snapchat 的"Stories"功能允许 Snapchat 用户以快速字符串发布

---

[172] Karissa Bell，*"Highly confidential" documents reveal Facebook used VPN app to track competitors*，Mashable（2018 年 12 月 5 日），可在 https://mashable.com/article/facebook-used-onavo-vpn-data-to-watch-snapchat-and-whatsapp/ 查看（最后访问时间 2021 年 4 月 15 日）。

[173] Josh Constine，*Facebook Launches Snapchat Competitor 'Poke', An iOS App for Sending Expiring Text, Photos, And Videos*，TechCrunch（2012 年 12 月 21 日），可在：https://techcrunch.com/2012/12/21/facebook-poke-app/ 查看（最后访问时间 2021 年 4 月 15 日）。

[174] *J.J. Colao*，*The Inside Story Of Snapchat:* The World's Hottest App Or A $3 Billion Disappearing Act?，《福布斯》（2014 年 1 月 20 日），可在：https://www.forbes.com/sites/jjcolao/2014/01/06/the-inside-story-of-snapchat-the-worlds-hottest-app-or-a-3-billion-disappearing-act/?utm_campaign=forbestwittersf&utm_medium%0b=social&utm_source=twitter&sh=3e058aae67d2 查看（最后访问时间 2021 年 4 月 15 日）。

[175] *同上*

[176] *同上*

图像和视频集合，其他 Snapchat 用户在 24 小时内可以查看。2016 年，Facebook（通过 Instagram）推出了它自己的功能，也称为"Stories"，与 Snapchat 的版本"几乎一模一样"。[177]到 2017 年 4 月，Facebook 在 Instagram 上的"Stories"功能比 Snapchat 的版本更受欢迎，成功打击了 Facebook 最大的竞争对手之一。[178]

### WhatsApp

201. Facebook 对 WhatsApp 的收购也沿用了类似的模式。WhatsApp 最初是一款移动应用程序，可在智能手机上的地址簿中显示用户状态。然而，当 Apple 为 iPhone 引入"推送通知"，即使用户没有使用该应用程序，仍允许开发人员向应用程序用户发送消息后，WhatsApp 的热门程度暴涨。此功能成为即时消息的一种形式，用户能够将消息广播到用户社交网络中的联系人——该社交网络是从其手机的联系人列表构建的。由于 WhatsApp 使用手机的互联网连接，而不是通过手机的蜂窝连接发送短信，因此该应用程序可以让用户完全避免产生短信费用。WhatsApp 能够向任何使用连网手机的用户发送消息，这是它最受欢迎的功能。

202. 随着 WhatsApp 的热度在 2010 年代初开始上升，Facebook 从 Facebook 的间谍软件 Onavo 中收集用户参与度数据，严密跟踪 WhatsApp。数据显示，WhatsApp 可与 Facebook 自己的 Messenger 产品相匹敌，截至 2013 年 4 月，在美国 iPhone 移动消息类应用程序中按用户覆盖面排名第三。Facebook 使用 Onavo 的数据跟踪通过 WhatsApp 发送的消息，使 Facebook 自有移动产品上的消息增加了一倍多。同样的 Onavo 数据显示了 WhatsApp 用户的极高参与度，排在第五位，前面是 Facebook 的自有核心产品，Facebook 新收购的 Instagram、Twitter、Foursquare 和 Snapchat。WhatsApp 威胁到了 Facebook 的业

---

[177] Casey Newton，*Instagram's new stories are a near-perfect copy of Snapchat stories*，The Verge（2016 年 8 月 2 日），可在 https://www.theverge.com/2016/8/2/12348354/instagram-stories-announced-snapchat-kevin-systrom-interview 查看（最后访问时间 2021 年 4 月 15 日）。

[178] Kaya Yurieff，*Instagram's Snapchat clone is more popular than Snapchat*，CNN Business（2017 年 4 月 13 日），可在 https://money.cnn.com/2017/04/13/technology/instagram-stories-snapchat/index.html 查看（最后访问时间 2021 年 4 月 15 日）。

务, 包括保护 Facebook 支配地位的进入壁垒和网络效应, 并且因为 Onavo, Facebook 知道 WhatsApp 是对 Facebook 垄断力的直接威胁。

203. Facebook 随后试图消除竞争对手 WhatsApp, 以确保 Facebook 在社交网络和社交媒体市场保持其垄断力。Facebook 利用它从 Onavo 数据监控技术中获得的洞察力, 在 2014 年以近 220 亿美元的价格收购了 WhatsApp, 远高于其最初的 160 亿美元出价。除了消除社交媒体和社交网络市场中的竞争以及保护 Facebook 的垄断力之外, 这笔交易对 Facebook 没有任何经济意义。WhatsApp 在 2013 年的收入仅为 1020 万美元。该公司 2014 年上半年的六个月收入总计 1590 万美元, 同期净亏损 2.32 亿美元。Facebook 支付了 200 亿美元——是 WhatsApp 收入的数千倍——来收购一家亏损的公司, 这家公司创造的软件功能在 Facebook 的自身产品中也有, 并且只需要收购成本的一小部分就可以从零构建。

**Facebook "复刻、收购、扼杀" 策略的其他例子**

204. 除了本文件中描述的例子之外, Facebook 还对其他的潜在竞争对手采用了 "复刻、收购、扼杀" 策略, 而且它基于欺骗获得的用户数据实施这种策略的程度, 直到最近才被人知晓。例如, 据报道, Facebook 从 Onavo 收集的数据将 "Houseparty" (一个自称为 "互联网客厅" 的社交网络) 推入了 Facebook 的瞄准范围中。[179]

205. Houseparty 拒绝 Facebook 的收购要约后, Facebook 宣布其 Messenger 应用程序将成为 "虚拟客厅"。Houseparty 的活跃用户群在 2017 年至 2018 年间下降了一半。

206. 另一个例子是, Facebook 在 2020 年 5 月以 4 亿美元收购了 Giphy。虽然 Giphy 的主要功能是让用户在线和通过消息类应用程序分享 GIF, 但这项交易会给 Facebook 提供对其他消息类应用程序竞争情况的洞察。[180] 一位评论者说: "你或许会成功阻止像

---

[179] Rachel Sandler, *People are furious about Onavo, a Facebook-owned VPN app that sends your app usage habits back to Facebook*, Business Insider (2018 年 2 月 14 日), 可在 https://www.businessinsider.com/what-is-facebooks-onavo-protect-virtual-private-network-app-2018-2?r=US&IR=T 查看 (最后访问时间 2021 年 3 月 29 日)。

[180] "GIF" 是静止图像的汇编, 类似于翻页书, 按顺序播放以创建简短的动画序列。

Facebook ad pixel 这样的跟踪器，甚至可以删除你的 Facebook 帐户，但我们大多数人都不会怀疑我们在向朋友发送有趣的图片时也会受到监视。[181]

207. 此外，Facebook 收购公司，有时其目的不是把它们纳入自己的业务，只是为了消除竞争对手，这种做法被称为"捕杀"。例如，Facebook 在 2017 年 10 月收购了匿名社交媒体应用程序"tbh"。然后，它在不到一年后关闭了该应用程序，几乎没有投入精力维护该应用程序。[182]

208. Facebook 的收购行为是在不断努力巩固它在社交网络和社交媒体市场中的市场力量。Facebook 的策略之所以有效，是因为 Facebook 在实现其垄断地位过程中获得的社交数据。而且，Facebook 使用这些数据来复刻、收购或扼杀竞争对手，而不是向消费者提供增强的数据隐私保护，与竞争对手堂堂正正地进行竞争。

**G. Facebook 使用 Onavo 的行为暴露**。

209. Facebook 使用诸如 Onavo 之类的技术实施商业监控的真相，最终暴露在世人面前。2018 年 8 月，Apple 从其应用商店中移除了 Onavo，此前有报道称 Facebook 使用该应用程序跟踪用户和其他应用程序。Apple 从其市场中将 Facebook 的 Onavo 应用程序下架，是因为它违反了 Apple 禁止应用程序以远超出运行应用程序和提供广告所需的方式使用数据的规定。换句话说，Onavo Protect 利用的数据远远超过任何 VPN 可能需要的数据，因此，该应用程序的真正目的显然是监视 Onavo 用户，Apple 不允许此类行为。Apple 发言人表示，该公司打算"明确表明，应用程序不得收集有关用户设备上安装的其他应用程序的信息用于分析或广告/营销目的，并且必须明确说明将收集哪些用户数据以及如何使

---

[181] Owen Williams，*How Facebook Could Use Giphy to Collect Your Data*，ONEZERO，2020 年 5 月 15 日，可在 https://kl.link/34AW951 查看（最后访问时间 2021 年 4 月 15 日）。

[182] 参见 Kaya Yurieff，*Facebook Shutters the Teen App it Just Bought*，CNN Business（2018 年 7 月 3 日），可在 https://kl.link/37G6HBH 查看（最后访问时间 2021 年 4 月 15 日）。

案件编号：5:20-cv-08570-LHK

消费者合并集体诉讼起诉书

用。"[183]

210.  Onavo 的技术能够实现的商业监控数量令人瞠目。不论用户的屏幕是打开还是关闭，不论他们是使用 WiFi 还是蜂窝数据，甚至是在 VPN 关闭的时候，Facebook 的 Onavo Protect 应用程序都会报告用户的活动。应用程序收集的数据与其声称的目的之间根本没有合理的关系。简而言之，即使关闭也能收集数据的 VPN，显然是监视用户和用户行为的伪装。

211.  Facebook 试图通过将其 Onavo 间谍软件重新包装为 Facebook Research VPN 应用程序，以此规避 Apple 的禁令。在青少年和成年人下载 Research 应用程序，并给予其访问移动设备上网络流量的 root（超级用户）权限时，Facebook 会奖励他们，从而绕开了 App Store。至少自 2016 年以来，Facebook 一直在以类似的方式利用其 Onavo 代码，以"Project Atlas"为代号管理该程序——这个名称非常适合其实时监控移动设备上应用程序使用情况的目标。

212.  2019 年 1 月有消息称 Facebook 的 Research 应用程序被重新包装为旨在监视用户的 Onavo 应用程序时，Facebook 立即从 Apple App Store 中撤回了这些程序。Apple 再次得出结论，Facebook 试图通过在 iPhone 或 iPad 上获得原本应由设备用户雇主的内部 IT 部门掌握的管理权限，违反 Apple 政策。

213.  除了 Onavo 的 Protect 应用程序外，Facebook 还试图将其监控软件部署为其他形式的实用应用程序，这些应用程序需要对移动设备的广泛或特权访问。例如，Facebook 发布了 Onavo Bolt 应用程序，Facebook 表示该应用程序将允许用户阻止未经授权访问用户手机上的特定应用程序，除非提供特定的密码、指纹或其他信息。实际上，Onavo Bolt 却在秘密监视用户并向 Facebook 发送结果。Facebook 还在其监控功能被发现的那天关闭了

---

[183] Ari Levy, *Apple removes Facebook's Onavo security app from the App Store*, CNBC（2018 年 8 月 22 日），可在 https://www.cnbc.com/2018/08/22/apple-removes-facebook-onavo-app-from-app-store.html 查看（最后访问时间 2021 年 4 月 22 日）。

1　该应用程序。Onavo Bolt 应用程序已经安装了大约 1000 万次。

**H.　Facebook 的反竞争行为已经并将继续损害社交网络和社交媒体市场中的竞争。**

214.　Facebook 的上述反竞争行为已经并将继续损害美国社交网络和社交媒体市场中的竞争。[184]

215.　Facebook 即将获得或已经获得美国社交网络和社交媒体市场中的垄断力，并且它已经在利用这种力量以反竞争的方式消灭竞争。

216.　Facebook 对消费者的欺骗已经并将继续破坏竞争。在许多市场中，一旦欺骗被发现，消费者欺骗的优势就会迅速消失。但是，社交网络和社交媒体市场固有的直接和间接网络效应创造了具有强大网络效应和高进入壁垒的市场。由于转换成本过高，一旦占支配地位的参与者的欺骗行为被曝光，用户就不能简单地转换到竞争对手处，即使他们想这样做也不行，2018 年关于 Cambridge Analytica 的真相曝光后，"#删除Facebook"运动也证明了这一点。

217.　Facebook 关于其缺乏隐私保护的欺骗如同一个欢迎信号，吸引了大量用户因 Facebook 的公开隐私呼吁加入 Facebook。但是，由于通过欺骗获得强大网络效应而不断扩大的用户，以牺牲竞争对手为代价加入 Facebook 的人数一旦达到临界数量，Facebook 就关上了大门。由于高昂的转换成本——包括可能会失去与朋友、家人和熟人失去联系，无法访问 Facebook 用户花费数年或更多时间输入 Facebook 的数据，以及与竞争对手重新开

---

[184] 正如司法部反托拉斯司前助理检察长的解释，"现在已经很好地解决了…竞争有价格和非价格维度。" Makan Delrahim，美国司法部反托拉斯司助理检察长，反托拉斯新领域会议上的讲话（2019 年 6 月 11 日），可在 https://www.justice.gov/opa/speech/assistant-attorney-general-makan-delrahim-delivers-remarks-antitrust-new-frontiers 查看。同样，当被问及"在…进行科技行业的竞争分析时，应该考虑非价格因素，"Facebook 首席执行官马克·扎克伯格在美国众议院能源与商业委员会（United States House of Representatives Committee on Energy & Commerce）面前作证时表示，"除了价格之外，法律已经包括产品质量。" *Social Media's Role in Promoting Extremism and Misinformation*，第 117 届国会（ 2021 年 3 月 25 日 ） 视 频 可 在 https://energycommerce.house.gov/committee-activity/hearings/hearing-on-disinformation-nation-social-medias-role-in-promoting 观 看 （ 从 4:31:40 开始）。

始的时间和机会成本——以及由于 Facebook 的欺骗导致没有可行的替代方案，消费者现在被困住了。结果，Facebook 在争夺支配地位的竞赛中靠着欺骗到达了终点线，但却不是最出众的竞争对手。社交网络和社交媒体市场非但没有为消费者提供出路，比如 Facebook 的替代品，而且还帮助锁定了 Facebook 的不公平优势。

218. Facebook 的收购行为也损害了竞争，并将继续损害竞争。Facebook 利用骗来的用户数据锁定竞争威胁，然后进行收购、复刻或扼杀，从而建立并维持了其对社交网络和社交媒体市场的垄断地位。Facebook 经常在未经许可的情况下跟踪互联网上的用户，以确定可能威胁其垄断地位的公司。然后，Facebook 使用歧视性数据访问模式摧毁潜在的竞争对手，或迫使他们以低价出售。如果 Facebook 宣布这些公司存在竞争威胁，Facebook 就会关闭这些公司对Facebook 用户数据的访问，阻挠竞争性社交网络和社交媒体应用程序的出现。简而言之，Facebook 利用其数据优势不是为了跑得更快，而是为了遏制竞争。考虑到 Facebook 不惜一切代价追求胜利的文化，这种手段不足为奇。

219. Facebook 双管齐下的反竞争策略破坏了社交网络和社交媒体市场的竞争。正如本文件中所详述，Facebook 的策略使得竞争对手（无论是新创公司还是老牌公司）几乎不可能通过在数据隐私保护方面与 Facebook 竞争，或通过建立更高质量的社交网络来挑战 Facebook 的垄断地位。

220. 如果不是 Facebook 的反竞争行为，消费者在社交网络和社交媒体市场中原本会有更多的选择来访问内容和与其他用户联系。这些公司原本会创建社交网络和社交媒体应用程序，在数据隐私保护以及社交网络和社交媒体应用程序质量方面与 Facebook 竞争，无需依赖 Facebook 获得全面的数据。因为 Facebook 以反竞争的方式将其竞争限制为收购并获得社交媒体和社交网络垄断权，因此，在用户隐私和产品质量方面的竞争被消除了。最终，由于 Facebook 肆无忌惮的反竞争行为，消费者现在及以后将继续深受其苦。

**I.  Facebook 的反竞争行为直接且严重地损害了消费者。**

221. 本文件中描述的 Facebook 的反竞争行为已经并将继续损害美国社交网络和社

1　交媒体市场中的消费者。

2

3　　　222. Facebook 以反竞争的方式消除竞争，在很多方面伤害了消费者。在使用

4　Facebook 的产品时，消费者同意放弃具有重要价值的事物：个人信息和注意力。然后，

5　Facebook 以可量化的单位将用户信息和对第三方（包括广告商）的关注出售变现。如果不

6　是 Facebook 的反竞争行为——即使没有彻底消除竞争，也大大减少了竞争，消费者在社

7　交网络和社交媒体市场中原本会有更多的选择，而不是像如今这样寥寥无几（如果还有的

8

9　话）。

10

11　　　223. 激烈的竞争原本有利于消费者，会要求社交网络和社交媒体应用程序采用最

12　能吸引和保留用户的商业模式。例如，当消费者同意使用微软的"必应"搜索引擎并允许

13　微软收集他们的数据时，微软会用具有金钱价值的物品来补偿消费者。[185]同样地，同意向

14　尼尔森公司的计算机和移动小组提供其网络浏览历史记录的用户每年可以收到 50.00 美元。

15　[186]Honeygain 是一项允许用户共享其互联网访问数据的服务，每月最高会补偿用户 19.00

16　美元。[187]

17

18　　　224. 在 2016 年至 2019 年期间，根据其秘密的"Project Atlas"，Facebook 向年龄

19　在 13 至 35 岁之间的用户支付了每月最高 20.00 美元的费用，以换取对这些用户的电子邮

20　件、社交媒体应用程序中的私人消息、照片和视频、网页浏览和搜索活动、甚至位置信息

21

22

---

23　　　[185] Lisa Marie Segarra, *Microsoft Will Pay You to Use Bing Instead of Google*，《财富》

24　（2017 年 6 月 3 日），可在 https://fortune.com/2017/06/03/microsoft-pay-use-bing-google/ 查
　　看（最后访问时间 2021 年 3 月 29 日）。

25　　　[186] Nielsen Computer & Mobile Panel，*常 见 问 题*，可 在

26　https://computermobilepanel.nielsen.com/ui/US/en/faqen.html 查看（最后访问时间 2021 年 3
　　月 29 日）。

27　　　[187] *Honeygain，How Our PayPal Payouts Are Done?* Step by Step Instructions （2019 年

28　12 月 17 日），可 在 https://www.blog.honeygain.com/post/paypal-payouts-step-by-step-
　　instructions 查看（最后访问时间 2021 年 3 月 29 日）。

的访问权限。[188]Facebook 将应用程序命名为"Research"，并通过没有 Facebook 名号的服务（包括 BetaBound、uTest 和 Applause）进行广告宣传，以此掩盖它的参与。[189]这些广告以显眼的方式告知参与者将获得其数据的金钱补偿：



225. 如果没有 Facebook 的反竞争行为，Facebook 原本需要为消费者提供更多的增量价值，以换取消费者的数据。否则，消费者会把他们的数据和注意力放到会为消费者提供更多增量价值的其他社交网络和社交媒体应用程序上。消费者原本会因其数据和注意力而获得公平的市场价值。[190]但这种价值却被 Facebook 的反竞争行为人为地削减了。

226. Facebook 的反竞争行为即使没有彻底消除竞争，也大大减少了竞争，如果没

---

[188] Josh Constine，*Facebook pays teens to install VPN that spies on them*，TechCrunch（2019 年 1 月 29 日），可在 https://techcrunch.com/2019/01/29/facebook-project-atlas/ 查看（最后访问时间 2021 年 4 月 1 日）。

[189] *同上*

[190]Facebook 毫无疑问认识到其用户的数据具有金钱价值。例如，除了根据"Project Atlas"向 那些在 Facebook、Instagram 和 WhatsApp 之外共享信息的用户秘密付款，Facebook 还在 2019 年吹嘘其 ARPU 在美国和加拿大超过了每个用户 41.00 美元。在 IPO 之后，Facebook 高管公开讨论一项"美元换美元"计划，解释说"我们希望在数据上投入一

有 Facebook 的反竞争行为，消费者原本会从非价格属性（例如，数据隐私实践以及社交网络和社交媒体应用程序质量）方面更激烈的竞争中受益。事实上，更激烈的竞争原本有利于消费者，因为创新会增加（包括开发卓越的产品功能），消费者选择会增多（包括能够选择社交网络或社交媒体应用程序，这些社交网络或社交媒体应用程序为消费者提供更符合消费者偏好的服务，例如在显示的内容、广告的数量和质量方面，以及有关数据收集和使用实践的选择）。消费者本可以从 Facebook 的社交网络和社交媒体产品中受益，而不必向 Facebook 和其他使用 Facebook 进行应用程序开发或定向广告的第三方提供尽可能多的个人数据。[191]同样，消费者原本也可以从竞争中受益，竞争会推动 Facebook 或其替代品提供更高质量的服务，例如更低的广告负载、应用程序之间的互操作性以及用户数据的可移植性。因为缺少这种竞争，许多消费者被困在 Facebook 的社交网络和社交媒体产品中，减少了对这些产品的使用。

227. 如果 Facebook 披露了其收集的数据范围以及它能实现的细分定向营销水平，消费者原本可以从社交网络和社交媒体市场的竞争中受益，从而打造出更好的 Facebook 或更好的替代品，以信息和关注度的形式降低消费者成本。而 Facebook 却人为地扼杀了创新，硬塞给消费者一款质量低劣的产品，没给消费者留下任何有意义的替代品。

228. 如果 Facebook 没有利用其社交网络和社交媒体垄断地位锁定并摧毁其竞争，消费者原本可以从社交网络和社交媒体市场更多的竞争中受益，从而获得更多的选择和更低的成本。正如民选官员认识到的那样，如果没有 Facebook 的反竞争收购策略，Facebook

---

美元，在分配上投入一美元。" 参见 Goodwin，*如前所述*

[191] FTC 专员 Rohit Chopra 在众议院反托拉斯小组委员会（House Antitrust Subcommittee）面前作证时解释说，特别是对于 Facebook，"对服务条款的更改隐藏在微不可见之处，他们可以据此收集越来越多的数据并单方面强加这些条款，实际上就是提价。我们是在用我们的数据、无比宝贵的数据付费[。]" *Online Platforms and Market Power, Part 3: The Role of Data and Privacy in Competition*，第 116 届国会（2020 年 10 月 18 日），转录文本可在 https://www.congress.gov/116/chrg/CHRG-116hhrg39840/CHRG-116hhrg39840.pdf 查看（第 115 页）。

将不得不在隐私问题上进行竞争，从而使消费者受益：[192]



229.　由于 Facebook 参与了上述反竞争行为，消费者遭受了大量可识别和量化的经济损失。除非这些行为被禁止，否则消费者将继续遭受 Facebook 的反竞争行为带来的伤害。

## 五、　诉讼时效

**A.　应计索偿**

230.　原告最早在 2018 年 3 月 17 日才发现本诉讼所指控的反竞争行为的存在。正如众议院反垄断小组委员会最近解释的那样，"就消费者对数据收集做法的了解程度而言，往往是在涉及大规模数据泄露或隐私事件（如 Cambridge Analytica 公司）的丑闻之后。"[193]

231.　直到 2018 年 3 月 17 日媒体揭露了 Cambridge Analytica 丑闻的细节，消费者才开始发现 Facebook 损害消费者的反竞争行为，这使得消费者能够提出本诉讼中的索赔。事实上，英国下议院数字、文化、媒体和体育委员会已经明确承认，至少在 2018 年 3 月之前，"Facebook 用户*不知道*他们的数据能够被他们不知道的开发者访问，尽管他们已经

---

[192]　美国众议员 Ro Khanna，Twitter（2019 年 1 月 25 日），可访问 https://twitter.com/reprokhanna/status/1088850988218413058?lang=en （最后一次访问是在 2021 年 4 月 15 日）。

[193]　众议院报告，*见上文*，第 54 页。

案件编号：5:20-cv-08570-LHK
消费者合并集体诉讼起诉书

设置了隐私设置, 专门禁止这种做法。" [194]

232. 同样, 直到媒体在 2018 年 8 月 22 日披露了苹果公司禁止 Onavo 的细节, 消费者才了解到关于 Facebook 反竞争行为的其他事实, 这是消费者提出本诉讼中的索赔所必需的。重要的是, 澳大利亚竞争和消费者委员会——已针对 Facebook 因欺骗性地使用 Onavo 而发起了自己的诉讼——声称, 一般来说, "在 Onavo Protect 网站、苹果应用商店、谷歌商店或 Onavo Protect 的广告中, Facebook 或 Onavo 都未向消费者披露…… Onavo Protect 不会保护和保密用户的个人活动数据, 或者 Facebook 或 Onavo 会为了 Facebook 或 Onavo 的商业利益使用从用户那里收集的个人活动数据。" [195]

**B. 公平收费**

233. 原告也不可能通过合理的努力, 最早在 2018 年 3 月之前发现本诉讼所指控的反竞争行为的存在。Facebook 没有充分披露其欺骗行为, 其隐私政策本身也没有向消费者明确说明其收集数据的范围、可以访问这些数据的第三方, 以及这些数据如何被使用。Facebook 的隐私政策密集而不透明。[196]值得注意的是, Facebook 当时的政策解决方案副总裁 Richard Allan 在向英国下议院数字、文化、媒体和体育委员会作证时承认, "人们对 [Facebook 的隐私]控制措施有多了解, 以及这些措施是否太过复杂, 这些都是非常合理的问题。" [197]

234. 像 Facebook 这样从消费者那里收集大量数据的公司, 往往会进一步混淆其数据隐私政策, 让消费者更难理解。事实上, "这些政策几乎没有告诉你这些网站掌握的关于你的数据。这就是问题的关键…… 他们知道, 如果他们告诉人们他们收集和使用信息的每一种方式, 那么大多数用户会减少分享信息, 这意味着他们的收入会减少。" [198]

---

[194] DCMS 报告, *见上文*, ¶第 75 页 (着重是后加的)。
[195] ACCC 起诉书, *见上文*, ¶第 8 页。
[196] 众议院报告, *见上文*, 第 54 页。
[197] DCMS 报告, *见上文*, ¶第 82 页 (着重是后加的)。
[198] Marcus Moretti 和 Michael Naughton, 《为什么隐私政策如此难以理解》, 《大

235. 因此，正如众议院反垄断小组委员会所承认的那样，"隐私条款的细微差别由调查记者发现和解释。"[199] 随后的调查报道揭露了 Facebook 的系统性欺骗和商业监控，最早直到 2018 年 3 月 17 日，在 Cambridge Analytica 丑闻发生后才公之于众。

236. 因此，诉讼时效应公平地延至至少 2018 年 3 月。因此，本起诉书中描述的所有反竞争行为都及时提出了指控，包括 Facebook 在实现其社交网络和社交媒体垄断之前的欺骗和收购行为。

**C. 欺诈性隐瞒**

237. Facebook 欺诈性地隐瞒了其欺骗性做法和商业监控措施，包括其数据隐私做法和反竞争收购战略的范围。因此，原告和集体成员并不知道 Facebook 在此指控的非法行为。

238. Facebook 肯定欺诈性地掩盖了其非法行为，*特别是*在 2011 年与美国联邦贸易委员会达成和解之前和之后，公开歪曲"禁止 [Facebook] 对消费者个人信息隐私或安全作出错误陈述"，声称其在保护用户隐私。这些公开声明的例子包括：

    **a)**    Mark Zuckerberg 2006 年 9 月 8 日在 Facebook 上发表的声明，代表"**我们已经创建了大量隐私设置——方便加强对信息分享对象的管控**"；道歉称 Facebook 关于其动态消息推送 (News Feed) 功能的隐私事故"**是我们的一个重大错误，我对此感到抱歉**"；并解释说"道歉是不够的。我希望确保我们对此有所行动，而且要快。**我们两天来一直在不停地编写代码，以便推出更好的隐私控制措施。**"[200]

    **b)**    2007 年 12 月 6 日，马克·扎克伯格在 Facebook 新闻编辑室发表声明，解释称 Facebook 的信标功能旨在"为人们提供一种简单而可控的方式，与他们的朋友分

---

西洋月刊》（2014 年 9 月 5 日），可在 https://www.theatlantic.com/technology/archive/2014/09/why-privacy-policies-are-so-inscrutable/379615/ 找到（上次访问时间为 2021 年 4 月 1 日）。

    [199] 众议院报告，*见上文*，第 54 页。

    [200] 马克·扎克伯格 (Mark Zuckerberg)，《马克·扎克伯格公开信》，Facebook（2006 年 9 月 8 日），可在 https://www.facebook.com/notes/facebook/an-open-letter-from-mark-zuckerberg/2208562130/ 找到（最后一次访问是在 2021 年 4 月 18 日）（着重是后加的）。

享更多……信息"；承认"在人们开始联系我们之后，我们花了太长时间来改变产品……而不是迅速采取行动，我们花了太长时间来决定正确的解决方案"；并安慰说，虽然"我对我们处理这种情况的方式感到不光彩"，**"我知道我们可以做得更好。"** [201]

    **c)**     Facebook 于 2010 年 5 月 26 日在其新闻编辑室发表声明称，Facebook "将授权 Facebook 的 4 亿多用户，**让他们能够准确控制谁可以看**他们分享的信息和内容"；"用户可以控制信息分享方式"；**"Facebook 不会与用户不想与之分享的人或服务分享个人信息"**；"Facebook 不允许广告商获取用户个人信息"；**"Facebook 不会向任何人出售用户信息。"** [202]

    **d)**     2010 年 5 月 27 日，马克·扎克伯格在美国国家公共广播电台发表声明称："有谣言说**我们在与应用程序共享私人信息，这不是真的。**" [203]

    **e)**     2011 年 11 月 29 日，马克·扎克伯格在 Facebook 新闻编辑室发表声明称，"我创立 Facebook 的理念是，人们希望在生活中与他人分享和联系，但要做到这一点，**每个人都需要随时完全控制自己与之分享的对象范围。**" [204]

    **f)**     2011 年 11 月 29 日，马克·扎克伯格在 Facebook 新闻编辑室发表声明称，Facebook 与美国联邦贸易委员会的和解"意味着我们做出了正式的明确长期**承诺**，完成我们一直试图完成并计划继续进行的工作——**提供工具来控制谁可以看你的信息，确保**

---

[201] 马克·扎克伯格，*公布：Facebook 用户现在可以选择退出信标功能*，Facebook 新闻编辑室（2007 年 12 月 6 日），可在 https://about.fb.com/news/2007/12/announcement-facebook-users-can-now-opt-out-of-beacon-feature/ 找到（最后一次访问是在 2021 年 4 月 20 日）（着重是后加的）。

[202] Facebook，*《Facebook 重新设计隐私》*，Facebook 新闻编辑室（2010 年 5 月 26 日），可在 https://about.fb.com/news/2010/05/facebook-redesigns-privacy/ 找到（最后一次访问是在 2021 年 4 月 1 日）（着重是后加的）。

[203] Mark Memmott, *Facebook 扎克伯格反对将"隐私"作为"默认设置"*，SCPR（2010 年 5 月 27 日），见：https://www.scpr.org/news/2010/05/27/15527/facebooks-zuckerberg-argues-against-making-privacy/（最后一次访问是在 2021 年 4 月 1 日）（着重是后加的）。

[204] 马克·扎克伯格，*《我们对 Facebook 社区的承诺》*，Facebook 新闻编辑室（2011 年 11 月 29 日），见 https://about.fb.com/news/2011/11/our-commitment-to-the-facebook-community/（最后一次访问是在 2021 年 4 月 1 日）（着重是后加的）。

1　只有那些你想要他们看到的人可以看到这些信息。**"** [205]

2　　　　　**g)**　　2012 年 2 月 1 日，马克·扎克伯格在就 Facebook IPO 申请向潜在股东

3　发表的声明中指出，"在 Facebook，我们开发工具，帮助用户与他们希望的人联系，**并分**

4　**享他们想要分享的内容**[。]…… 我们还认为，**让用户控制他们所分享的内容是一项基本原**

5　**则**[。]**"** [206]

6

7　　　　　**h)**　　2012 年 9 月 30 日，Facebook 在其新闻编辑室发布的声明中指出，

8　"我们…… 认识到，**用户信任我们会保护他们在 Facebook 上分享的信息**。在我们继续发

9　展的过程中，**维护这种信任是重中之重**。**"** [207]

10　　　　　**i)**　　2013 年 6 月 8 日，马克·扎克伯格在 Facebook 新闻编辑室发布了关于

11　爱德华·斯诺登 (Edward Snowden) 指控政府监控的声明。"我们将继续积极努力，确保用

12　户信息安全保密。**"** [208]

13

14　　　　　**j)**　　2014 年 3 月 13 日，马克·扎克伯格在自己的 Facebook 页面上发表声

15　明，对美国国家安全局在一项有争议的监控计划中把自己伪装成 Facebook 的服务器的指

16　控作出回应："为了维护互联网强大的功能，我们需要确保它的安全。这就是为什么在

17　Facebook，**我们花费大量精力提升我们的服务和整个互联网的安全性和可靠性**…… 我们

18　可以一起建立一个比我们今天拥有的任何事物都要更加伟大、重要的空间，而且还安全、

19

20

21

---

22　　　[205] *同上。*（着重是后加的）。

23　　　[206] 路透社工作人员，《*扎克伯格致投资者的信*》，路透社（2012 年 2 月 1 日），

24　见　　　　　https://www.reuters.com/article/us-facebook-letter/zuckerbergs-letter-to-investors-idUSTRE8102MT20120201（最后一次访问是在 2021 年 4 月 1 日）（着重是后加的）。

25　　　[207] Facebook，《*保护隐私的相关广告*》，Facebook 新闻编辑室（2012 年 9 月 30

26　日），见 https://about.fb.com/news/2012/09/relevant-ads-that-protect-your-privacy/（最后一次访问是在 2021 年 4 月 1 日）（着重是后加的）。

27　　　[208] 马克·扎克伯格，《*马克·扎克伯格关于棱镜门事件的个人回应*》，Facebook 新闻

28　编辑室（2013 年 6 月 8 日），见 https://about.fb.com/news/2013/06/personal-response-from-mark-zuckerberg-about-prism/（最后一次访问是在 2021 年 4 月 1 日）。

可靠。**我致力于见证这一切的发生，你可以指望 Facebook 尽我们的一份力。**" [209]

  **k)**  2015 年 7 月 30 日，Facebook 产品经理 Melissa Luu-Van 在 Facebook 新闻编辑室发表的声明指出："我们希望每个人都能在 Facebook 上获得安全的体验。这就是为什么我们设有专门的团队和智能安全系统夜以继日地工作，帮助确保您的账户安全。" [210]

  **l)**  Facebook 在其 2016 年 10-K 文件中声明，虽然"我们的一些开发者或其他合作伙伴，例如帮助我们衡量广告效果的合作伙伴，可能会接收或存储我们或我们的用户通过与 Facebook 集成的移动或网络应用程序提供的信息[，]"。Facebook 只"根据向我们提供的服务范围，**向此类第三方提供有限的信息。**" [211]

  **m)**  马克·扎克伯格在 2016 年 3 月的公开声明中回应了其子公司 WhatsApp 发布的一份声明，保证"Facebook 与许多技术公司一道致力于保护用户及用户信息。" [212]

  **n)**  2017 年 3 月 12 日，马克·扎克伯格在他的 Facebook 主页上发表了一份公开声明，"保护全球社区的安全是我们使命的一个重要部分——也是我们衡量未来进展的重要方式之一"，并保证"保护我们的社区安全不需要牺牲隐私。" [213]

---

[209] 尼古拉斯·卡尔森 (Nicholas Carlson)，*扎克伯格：《我刚刚给奥巴马打电话说我对美国国家安全局有多生气》*，雅虎新闻（2014 年 3 月 13 日），见 https://www.yahoo.com/news/zuckerberg-obama-nsa-damaging-future-192935379.html （最后一次访问是在 2021 年 4 月 1 日）（着重是后加的）。

[210] Melissa Luu-Van，*《通过快速检查加强安全》*，Facebook 新闻编辑室（2015 年 7 月 30 日），见 https://about.fb.com/news/2015/07/enhancing-security-with-a-quick-checkup/ （最后访问时间：2021 年 4 月 1 日）。

[211] Facebook, Inc. 的 10-K 表格文件，美国证券交易委员会，见 https://www.sec.gov/Archives/edgar/data/1326801/000132680117000007/fb-12312016x_10k.htm （最后访问时间：2021 年 4 月 1 日）（着重是后加的）。

[212] Anita Balakrishnan、Sara Salinas、和 Matt Hunter，马克·扎克伯格 15 年来一直在谈论隐私问题——这里有他说过的几乎所有话，CNBC（2018 年 4 月 9 日），见 https://www.cnbc.com/2018/03/21/facebook-ceo-mark-zuckerbergs-statements-on-privacy-2003-2018.html （最后访问时间：2021 年 4 月 1 日）。

[213] 马克·扎克伯格，*《构建全球社区》*，Facebook（2017 年 3 月 12 日），见

消费者合并集体诉讼起诉书

**o)** 马克·扎克伯格在新闻媒体报道 Cambridge Analytica 公司丑闻后，于 2018 年 3 月 21 日发表声明说："我们有责任保护用户数据，如果我们做不到，那么我们就不配为用户服务。" [214]

239. Facebook 关于其对用户隐私承诺的声明，以及关于其收集和分享用户数据的陈述是虚假的，或者至少遗漏了使这些声明不具有误导性所需的重要事实。这些陈述给人留下了错误的印象，即 Facebook 允许用户选择 Facebook 具体可以收集哪些数据，这些数据将会分享给谁，以及如何使用这些数据。

240. 原告和集体成员未发现，也不可能通过合理的努力发现 Facebook 在欺骗他们，且违反了反垄断法和其他法律，直到本诉讼开始前不到四年。Facebook 没有告诉原告或其他集体成员，它违反了 2011 年与美国联邦贸易委员会达成的和解协议，欺骗消费者并出售他们的数据以从第三方获取收入，或者通过监视消费者并利用他们的数据来确定竞争对手，以"收购、复制或消灭"他们，从而利用消费者的信任。

241. 相反，Facebook 创始人、首席执行官和公众形象马克·扎克伯格一再表示并非如此。事实上，在 Cambridge Analytica 公司丑闻发生后，美国联邦贸易委员会在宣布对 Facebook 开出 50 亿美元的有史以来最大罚单时解释说，Facebook "承诺用户可以控制他们的信息隐私"，以此来"鼓励用户在其平台上分享信息"，但 Facebook "一再使用欺骗性的披露和设置来破坏用户的隐私偏好[。]"

242. 此外，Facebook 的反竞争行为，究其性质而言，本质上是自我掩盖，因为它是在消费者的视线和了解之外进行的。因此，原告和集体成员没有，也无法发现 Facebook 的阴谋，即使经过合理的努力。

---

https://www.facebook.com/notes/mark-zuckerberg/building-global-community/10154544292806634?qid=339663931&%3Bmf_story_key=10103508221158471（最后访问时间：2021 年 4 月 1 日）。

[214] *Facebook 扎克伯格就 Cambridge Analytica 公司的"泄露"丑闻发表讲话*，BBC 新闻（2018 年 3 月 22 日），见 https://www.bbc.com/news/world-us-canada-43494337（最后访问时间：2021 年 4 月 1 日）。

243.  原告和集体成员试图在维护数据安全性、可靠性和隐私方面做出合理努力。这就是为什么基于 Facebook 对其用户隐私的公开承诺，原告和集体成员使用 Facebook 及其各种产品。但原告和集体成员并没有发现，也不可能通过合理的努力查明他们的索赔案，直到提起本诉讼前不久咨询了律师，并且在任何情况下不早于 2018 年 3 月。

**D. 持续的侵权行为和损害赔偿的确定**

244.  自集体诉讼期开始以来，Facebook 不断违反反垄断法，给原告和集体成员造成了经济上的损失。正如本诉讼所述，Facebook 对用户采取了独立的虚假陈述，旨在获得、维持和延长 Facebook 的垄断地位。同样，Facebook 将其用户数据作为武器，作为其系列收购战略的一部分，以"收购、复制或消灭"竞争对手。

245.  这些损害行为中的每一种都是在诉讼时效期间单独和独立的公开行为，是新的独立行为，对消费者造成了新的累积损害。Facebook 在其数据隐私做法和商业监控方面的每一次欺骗行为，都是新的独立于其过往数据隐私和商业监控问题的行为。在 2018 年之前，Facebook 持续向应用程序开发人员、广告商和其他第三方披露私人信息的行为，以及其反竞争收购行为，都是额外的独立和公开行为，有损竞争，并对消费者造成了新的累积经济损害。

246.  此外，原告和集体成员所遭受的损害在本诉讼首次提起诉讼的四年多以前还无法确定，不足以引起在此提出的索赔案。由于原告和集体成员声称的损害在此诉讼发起之日的四年多以前还没有明确，因此本诉讼提出的反垄断索赔是及时的。

## VI.  集体诉讼指控

247.  原告在此诉讼中重新陈述并通过引用来纳入上述所有指控。

248.  根据《联邦法律民事诉讼规则》第 23(b)(3) 条，原告代表**消费者集体提出索赔**：美国所有在 2007 年至本诉讼提起之日的任何时间保留 Facebook 个人资料的用户。Facebook、Facebook 拥有权益的任何实体，以及 Facebook 的任何公司母公司、附属公司、子公司、管理人员、董事、法律代表、继承人和受让人不在该集体之列。此外，主持这一事件的任何审判员、法官或司法官员及其直系亲属和司法工作人员也被排除在集体之外。

249. 本诉讼已被提起，并可作为集体诉讼适当维持，因其满足了规则第 23(b)(3) 条的数量、共性、典型性、充分性、主导性和优越性要求。原告试图代表一个可以确定的集体，因为通过 Facebook 自己的记录就可以确定是否被纳入集体。

250. 虽然集体成员的确切人数不详，只能通过适当的证据开示来确定，但拟议的集体人数至少有数千万，因此人数众多，将所有成员合并在一起是不切实际的。

251. 诉讼集体存在共同的法律和事实问题，这些问题比仅影响个别成员的问题更为重要，其中包括：

      **a)**    Facebook 在数据隐私方面欺骗消费者的做法是否不利于竞争；

      **b)**    Facebook 的收购行为是否不利于竞争；

      **c)**    Facebook 是否故意从事反竞争行为，以获得或维持垄断权力；

      **d)**    Facebook 是否是社交网络市场的垄断者；

      **e)**    Facebook 是否是社交媒体市场的垄断者；

      **f)**    Facebook 是否故意对其数据隐私做法和商业监控的范围做出重大虚假陈述；

      **g)**    Facebook 的反竞争行为是否妨碍社交网络市场竞争，从而导致了对消费者的可确认和量化的经济损害；

      **h)**    Facebook 的反竞争行为是否妨碍社交媒体市场竞争，从而导致了对消费者的可确认和量化的经济损害；

      **i)**    如果 Facebook 很早就全面披露其数据隐私做法和商业监控，消费者是否会在社交网络和社交媒体公司之间拥有更多选择和竞争；

      **j)**    Facebook 的反竞争行为是否严重损害了美国社交网络市场的竞争；

      **k)**    Facebook 的反竞争行为是否严重损害了美国社交媒体市场的竞争；以及

      **l)**    是否应禁止 Facebook 的反竞争行为，或其他适当的衡平法救济是否公正和适当，包括命令 Facebook 剥离资产或对其隐私做法和商业监控进行更具侵入性的第三方审计。

252. 原告是推定的消费者集体成员。原告在本诉讼中提出的索赔是典型的推定消费者集体成员索赔，因为这些索赔是由被告的同一行为过程引起的，所寻求的救济是共同的。

253. 原告将公平、充分地代表和保护推定消费者集体成员的利益，因为他们的利益与消费者集体的其他成员是一致的，而不是对立的。

254. 原告已经聘请了在反垄断和集体诉讼方面都有能力和经验的律师。

255. 根据《美国联邦民事诉讼规则》第 23(b)(3) 条的规定，对消费者集体的认证是适当的，因为对集体各成员来说，共同的法律或事实问题比只影响个别成员的法律或事实问题更为重要。这种优势使得集体诉讼优于任何其他可用于公平和有效裁决这些索赔的方法，包括裁决的一致性。如果没有集体诉讼，消费者集体的许多成员不太可能保护自己的利益，因为通过个人诉讼的诉讼成本可能会超过预期的赔偿。

256. 集体诉讼是裁决争议的一种优越方法，因为它允许在一个法庭同时有效地解决大量索赔，并且没有因起诉大量个人诉讼而造成的不必要的困难，以及个人诉讼所带来的重复证据开示、工作、费用和法院负担。

257. 另外，消费者集体应该得到认证，因为：

**a)** 由拟议中的集体成员单独提起诉讼会造成判决不一致的风险，这可能为 Facebook 建立不相容的行为标准。

**b)** 对个别诉讼的起诉可能会导致裁决，而这些裁决实际上会对非当事人的集体成员利益产生决定性影响，或者会严重损害他们保护自己利益的能力；以及

**c)** Facebook 根据普遍适用于拟议的消费者集体的理由采取行动或拒绝采取行动，从而使拟议的消费者集体成员作为一个整体获得适当的最终禁令救济。

## VII. 州际贸易和商业

258. 原告在本诉讼中重新陈述并通过引用来纳入上述所有指控。

259. Facebook 的反竞争行为发生在美国，并对美国州际贸易和商业的持续流动产生了负面影响，*特别包括：*

**a)** Facebook 提供了社交网络和社交媒体应用程序，并与美国各地的广告商和消费者交换了消费者信息和关注；

案件编号：5:20-cv-08570-LHK
消费者合并集体诉讼起诉书

**b)** Facebook 利用州际商业工具向美国各地的消费者和广告商提供社交网络和社交媒体服务。

**c)** 为了推进本诉讼所指控的反竞争计划，Facebook 往返于各州之间，并通过州际有线通信和美国邮件进行通信交流；以及

**d)** 本诉讼所指控的反竞争计划已经影响到数十亿美元的商业活动。Facebook 通过人为提高消费者使用其产品的个人信息和关注成本，降低用户隐私保护来换取消费者的个人数据，以及人为减少消费者在美国社交网络和社交媒体市场上的选择和竞争，造成了反垄断损害。

## VIII.　救济索赔

### 第一项救济索赔：垄断社交网络市场

### 《谢尔曼反托拉斯法》，第 2 节

### （代表消费者集体）

260.　原告在本诉讼中重新陈述并通过引用将本纳入上述所有指控。

261.　Facebook 有意在相关社交网络市场中获得并保持垄断地位。没有任何合理的可互换产品能够有效限制，或已经有效限制 Facebook 在相关期间强制并在获利情况下持续大幅人为减少对消费者用户信息及其对广告的关注的补偿。Facebook 还有能力强制并在获利情况下维持较低水平的数据隐私保护和社交网络质量，而不是在 Facebook 没有非法垄断社交网络市场的情况下发生的状况。Facebook 有能力控制价格并排除社交网络市场的竞争。

262.　通过多种措施，Facebook 在社交网络市场上拥有主导性的市场份额。如下文所述，Facebook 在社交网络市场的份额高于其在社交媒体市场的份额。而且美国消费者使用社交媒体的时间有 80% 以上都花在了 Facebook 和 Instagram 上。

263.　高准入门槛、高转换成本以及强大的直接和间接网络效应，使得在可预见的未来任何时候，都不太可能有竞争对手进入美国社交网络市场或从 Facebook 手中夺走大量市场份额，从而与 Facebook 展开有效竞争。

264.　Facebook 通过掠夺性、排他性和反竞争行为，在社交网络市场中肆意获取并维持垄断地位。该等行为包括但不限于：(a) 通过在 Facebook 的数据隐私保护和商业监控

方面的欺骗模式，诱导消费者加入 Facebook，从而参与到以牺牲竞争对手的利益为代价获取市场份额的计划中；以及 (b) 通过欺骗手段将其从消费者那里获得的数据作为武器，通过其"收购、复制或消灭"任何及所有竞争对手的策略来破坏竞争。

265. 通过消除竞争并获得和维持上述对社交网络市场的垄断地位，Facebook 能够并且确实人为减少了对消费者就其信息和关注的补偿，并为消费者提供了比在竞争性市场上更低的价值。

266. Facebook 对竞争的破坏对原告和消费者集体成员造成了反垄断损害，因为他们从 Facebook 获得的补偿和价值低于在 Facebook 老老实实竞争的情况下这些消费者本会获得的补偿和价值。原告和消费者集体受到了损害，得到的补偿和价值大大低于他们在没有 Facebook 的非法和反竞争行为的情况下所能得到的。

267. 在相关时期，原告和消费者集体成员将他们的个人数据和关注交给 Facebook，以换取使用其社交网络。由于 Facebook 的非法行为，原告和其他消费者集体成员获得的补偿和价值低于他们在没有 Facebook 非法行为的情况下得到的。

268. 本诉讼所指控的行为没有任何合法的有利于竞争或商业的理由，即使有，反竞争的影响也会远远超过任何可能的有利于竞争的影响。

269. Facebook 的行为和做法一直具有反竞争的性质和倾向，构成了不公平的竞争方式，违反了《谢尔曼法》第 2 条和《美国法典》第 15 卷第 2 节的规定。

270. Facebook 的行为对州际商业产生了重大影响。

271. 由于 Facebook 的行为，原告和消费者集体成员的财产已经并将继续受到损害。

272. 原告和消费者集体成员已经并将继续遭受反垄断法旨在防止的那种损害，包括但不限于：(a) 对他们的使用时间和关注的补偿减少；(b) 消费者的选择减少；以及 (c) 由于竞争减少而被迫接受质量较差的服务。

273. 原告和消费者集体成员要求获得三倍的损害赔偿金，或者是没收 Facebook 的非法所得。原告还寻求适当的公平救济，以禁止 Facebook 继续从事损害消费者利益的

反竞争行为，并对 Facebook 垄断社交网络市场所造成的损害进行补救，包括：(a) 剥离会继续巩固其垄断地位的资产；以及 (b) 要求 Facebook 接受对其用户隐私做法、数据监控和收购行为的独立监督。

**第二项救济索赔：企图垄断社交网络市场**

**《谢尔曼反托拉斯法》，第 2 节**

**（代表消费者集体）**

274. 原告在本诉讼中重新陈述并通过引用纳入上述所有指控。

275. 在社交网络市场方面，Facebook 从事了掠夺性、排他性和反竞争行为，包括但不限于：(a) 通过欺骗消费者的方式获得市场份额；(b) 利用其通过欺骗获得的消费者数据，通过其"复制、消灭或收购"任何及所有竞争对手的策略，系统地破坏竞争。

276. Facebook 的行为在社交网络市场上产生了反竞争影响。

277. Facebook 的行为没有合法的商业目的或有利于竞争的影响，即使有，其反竞争影响也会远远超过任何可能有利于竞争的影响。

278. Facebook 从事了本诉讼所述的反竞争行为，其具体意图是垄断社交网络市场。

279. Facebook 从事了本诉讼所述的反竞争行为，具有可能垄断社交网络市场的危险。

280. Facebook 的行为对州际商业产生了重大影响。

281. 由于 Facebook 的行为，原告和消费者集体成员的财产已经并将继续受到损害。

282. 原告和消费者集体成员已经并将继续遭受反垄断法旨在防止的那种损害，包括但不限于：(a) 对他们的使用时间和关注的补偿减少；(b) 消费者的选择减少；以及 (c) 由于竞争减少而被迫接受质量较差的服务。

283. 原告和消费者集体成员要求获得三倍的损害赔偿金，或者是没收 Facebook 的非法所得。原告还寻求适当的公平救济，以禁止 Facebook 继续从事损害消费者利益的反竞争行为，并对 Facebook 企图垄断社交网络市场所造成的损害进行补救，包括：(a) 剥

离会继续巩固其垄断地位的资产；以及 (b) 要求 Facebook 接受对其用户隐私做法、数据监控和收购行为的独立监督。

### 第三项救济索赔：垄断社交媒体市场

### 《谢尔曼反托拉斯法》，第 2 节

### （代表消费者集体）

284. 原告在本诉讼中重新陈述并通过引用来纳入上述所有指控。

285. Facebook 有意在相关社交媒体市场中获得并保持垄断地位。没有任何合理的可互换产品能够有效限制，或已经有效限制 Facebook 在相关期间强制并在获利情况下持续大幅人为减少对消费者用户信息及其对广告的关注的补偿。Facebook 还有能力强制并在获利情况下维持较低水平的数据隐私保护和社交媒体质量，而不是在 Facebook 没有非法垄断社交媒体市场的情况下发生的状况。Facebook 有能力控制价格并排除社交媒体市场的竞争。

286. 通过多种措施，Facebook 在社交媒体市场上拥有主导性的市场份额。按照社交媒体市场中社交媒体应用产生的广告收入来衡量，Facebook（包括 Instagram）在社交媒体市场中的市场份额至少为 85%。按照它自己的衡量标准，以及 Facebook 的内部文件所反映的情况，Facebook 估计自己占据了"美国所有社交媒体 95% 的份额[。]"而且美国消费者使用社交媒体的时间有 80% 以上都是花在 Facebook 和 Instagram 上。

287. 高准入门槛、高转换成本以及强大的直接和间接网络效应，使得在可预见的未来任何时候，都不太可能有竞争对手进入美国社交媒体市场或从 Facebook 手中夺走大量市场份额，从而与 Facebook 展开有效竞争。

288. Facebook 通过掠夺性、排他性和反竞争行为，在社交媒体市场中肆意获取并维持垄断地位。该等行为包括但不限于：(a) 通过在 Facebook 的数据隐私保护和商业监控方面的欺骗模式，诱导消费者加入 Facebook，从而参与到以牺牲竞争对手的利益为代价获取市场份额的计划中；以及 (b) 通过欺骗手段将其从消费者那里获得的数据作为武器，通过其"收购、复制或消灭"任何及所有竞争对手的策略来破坏竞争。

289. 通过消除竞争并获得和维持上述对社交媒体市场的垄断地位，Facebook 能够并且确实人为减少了对消费者就其信息和关注的补偿，并为消费者提供了比在竞争性市场上更低的价值。

290. Facebook 对竞争的破坏对原告和消费者集体成员造成了反垄断损害，因为他们从 Facebook 获得的补偿和价值低于在 Facebook 老老实实竞争的情况下这些消费者本会获得的补偿和价值。原告和反垄断消费者集体成员受到了损害，得到的补偿和价值大大低于他们在没有 Facebook 的非法和反竞争行为的情况下所能得到的。

291. 在相关时期，原告和消费者集体成员将他们的个人数据和关注交给 Facebook，以换取使用其社交媒体产品。由于 Facebook 的非法行为，原告和其他消费者集体成员获得的补偿和价值低于他们在没有 Facebook 非法行为的情况下得到的。

292. 本诉讼所指控的行为没有任何合法的有利于竞争或商业的理由，即使有，反竞争的影响也会远远超过任何可能的有利于竞争的影响。

293. Facebook 的行为和做法一直具有反竞争的性质和倾向，构成了不公平的竞争方式，违反了《谢尔曼法》第 2 条和《美国法典》第 15 卷第 2 节的规定。

294. Facebook 的行为对州际商业产生了重大影响。

295. 由于 Facebook 的行为，原告和消费者集体成员的财产已经并将继续受到损害。

296. 原告和消费者集体成员已经并将继续遭受反垄断法旨在防止的那种损害，包括但不限于：(a) 对他们的使用时间和关注的补偿减少；(b) 消费者的选择减少；以及 (c) 由于竞争减少而被迫接受质量较差的服务。

297. 原告和消费者集体成员要求获得三倍的损害赔偿金，或者是没收 Facebook 的非法所得。原告还寻求适当的公平救济，以禁止 Facebook 继续从事损害消费者利益的

反竞争行为，并对 Facebook 垄断社交媒体市场所造成的损害进行补救，包括：(a) 剥离会继续巩固其垄断地位的资产；以及 (b) 要求 Facebook 接受对其用户隐私做法、数据监控和收购行为的独立监督。

**第四项救济索赔：企图垄断社交媒体市场**

**《谢尔曼反托拉斯法》，第 2 节**

**（代表消费者集体）**

298.   原告在本诉讼中重新陈述并通过引用来纳入上述所有指控。

299.   在社交媒体市场方面，Facebook 从事了掠夺性、排他性和反竞争行为，包括但不限于：(a) 通过欺骗消费者的方式获得市场份额；(b) 利用其通过欺骗获得的消费者数据，通过其"复制、消灭或收购"任何及所有竞争对手的策略，系统地破坏竞争。

300.   Facebook 的行为在社交媒体市场上产生了反竞争影响。

301.   Facebook 的行为没有合法的商业目的或有利于竞争的影响，即使有，其反竞争影响也会远远超过任何可能有利于竞争的影响。

302.   Facebook 从事了本诉讼所述的反竞争行为，其具体意图是垄断社交媒体市场。

303.   Facebook 从事了本诉讼所述的反竞争行为，具有可能垄断媒体网络市场的危险。

304.   Facebook 的行为对州际商业产生了重大影响。

305.   由于 Facebook 的行为，原告和消费者集体成员的财产已经并将继续受到损害。

306.   原告和消费者集体成员已经并将继续遭受反垄断法旨在防止的那种损害，包括但不限于：(a) 对他们的使用时间和关注的补偿减少；(b) 消费者的选择减少；以及 (c) 由于竞争减少而被迫接受质量较差的服务。

307.   原告和消费者集体成员要求获得三倍的损害赔偿金，或者是没收 Facebook

的非法所得。原告还寻求适当的公平救济，以禁止 Facebook 继续从事损害消费者利益的反竞争行为，并对 Facebook 企图垄断社交媒体市场所造成的损害进行补救，包括：(a) 剥离会继续巩固其垄断地位的资产；以及 (b) 要求 Facebook 接受对其用户隐私做法、数据监控和收购行为的独立监督。

### 第五项救济索赔：不当得利

### 加利福尼亚州普通法

### （代表消费者集体）

308.　原告在本诉讼中重新陈述并通过引用来纳入上述所有指控。

309.　Facebook 通过本诉讼中所指控的不当行为获得了不正当收益。

310.　原告和消费者集体成员以其个人数据、使用时间和关注的形式为 Facebook 带来了直接利益。

311.　这些利益可以用可衡量的单位来量化。Facebook 将用户数据、使用时间和关注的访问权限出售给第三方——包括广告商和应用程序开发商——以换取不等金额。例如，在 2019 年，Facebook 获得了 707 亿美元的收入，几乎全部来自允许各个公司向其用户推送广告。那一年，Facebook 报告称其在美国和加拿大的每用户平均收入超过了 41.00 美元。

312.　Facebook 赞赏并清楚原告和消费者集体成员为其带来这些利益的事实。例如，在 2018 年 3 月 Facebook 卷入 Cambridge Analytica 公司丑闻曝光后，Facebook 创始人马克·扎克伯格明确承认，原告和消费者集体成员的数据为 Facebook 带来利益，称："我们有责任保护用户的数据，如果我们做不到，那么我们就不配为用户服务。" Facebook 在内部跟踪用户在 Facebook（及其产品系列）上花费的时间，并将这些数据与他们在其他竞争服务上花费的时间进行比较，这进一步表明 Facebook 承认原告和消费者集体成员的使用时间和关注为其带来了利益。

313.　Facebook 通过其及其高管公开发布的虚假陈述和欺骗行为，从原告和消费者集体成员那里获得了这些利益。Facebook 基于严格保护隐私的承诺，诱使原告和消费者群

体成员加入 Facebook。与此同时，Facebook 隐瞒了它从原告和消费者集体成员那里收集的数据的范围，并将其卖给第三方。Facebook 也没有透露它是如何将原告和消费者集体成员的数据作为武器，来"复制、消灭或收购"Facebook 的竞争对手的。

314. 由于 Facebook 获得了原告和消费者集体成员的数据、使用时间和关注带来的直接利益，Facebook 能够破坏竞争，在牺牲原告和消费者集体成员利益的情况下从中获利。尽管原告和消费者集体成员的数据、使用时间和关注为 Facebook 带来了直接利益，但由于 Facebook 的不当行为，原告和消费者集体成员：(a) 被剥夺了用互惠价值利益对他们的数据、使用时间和关注予以充分补偿的市场；(b) 被迫接受 Facebook 提供的质量较差的服务，没有任何有意义的选择。

315. 由于本诉讼指控的不当行为，Facebook 不公正地获得了巨大的经济利益。例如，在 2019 年，Facebook 获得了 707 亿美元的收入，几乎全部来自允许各个公司向其用户推送广告。如果允许 Facebook 保留其从原告和消费者集体成员带给它的直接利益中获得的价值，那将是不公平、不道德、非正义和不公允的。

316. 在需要这样做的情况下——而且仅仅是在另一种情况下——原告和消费者集体成员在法律上没有其它适当的普通法救济。

317. 因此，所有 50 个州和哥伦比亚特区的原告和消费者集体成员要求没收 Facebook 因本诉讼指控的肆意不当行为而获得的所有利润。

## IX. 救济请求

318. 为此，原告 Maximilian Klein、Sarah Grabert 和 Rachel Banks Kupcho 代表他们自己和消费者群体，寻求以下救济：

**a)** 根据《联邦民事诉讼规则》第 23 条规定，法院颁布命令以证明本诉讼为集体诉讼，按本诉讼要求界定消费者集体，认定原告是本诉讼要求的消费者集体的适当代表，并指派原告律师为消费者集体律师。

**b)** 禁令和其他为保护消费者集体利益所必需的衡平法救济包括：(i) 下令禁止 Facebook 继续从事本诉讼中所述的不法行为；(ii) 要求 Facebook 聘请第三方审计师对

Facebook 的数据隐私做法、商业监视和收购行为进行审计和评估，并责令他们及时纠正这些审计师发现的任何问题或事项。

       **c)**     三倍损害赔偿，或者归还和/或退还向原告和消费者集体成员错误收取的所有金额。

       **d)**     在本诉讼中产生的律师费、法定费用和其他诉讼费用，包括判决前和判决后赔偿金额的利息，用于纠正广告以改善消费者因 Facebook 的反竞争行为而产生的错误印象。

       **e)**     确认式救济，包括但不限于声明和判决，即本诉讼中指控的 Facebook 的行为违反了法律。

       **f)**     法院认为公正和适当的其他救济，如剥离巩固 Facebook 垄断地位的资产。

## 十、 要求陪审团审判

根据《联邦民事诉讼规则》第 38 条规定，原告特此要求本诉讼陪审团审判所有陪审团能够审判的议题。

日期：2021 年 4 月 22 日　　　　　　特此提交

提交人：/s/ *Shana E. Scarlett*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Shana E. Scarlett（律师号：217895）
　shanas@hbsslaw.com
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
(510) 725-3000

Steve W. Berman（获准担任*法律顾问*）
　steve@hbsslaw.com
1301 Second Avenue, Suite 2000
Seattle, WA 98101
(206) 623-7292

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
W. Joseph Bruckner（获准担任*法律顾问*）
　wjbruckner@locklaw.com
Robert K. Shelquist（获准担任*法律顾问*）
　rkshelquist@locklaw.com
Brian D. Clark（获准担任*法律顾问*）
　bdclark@locklaw.com
Rebecca A. Peterson（律师号：241858）
　rapeterson@locklaw.com
Arielle S. Wagner（获准担任*法律顾问*）
　aswagner@locklaw.com
Stephanie A. Chen（获准担任*法律顾问*）
　sachen@locklaw.com
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900

提交人：/s/ *Stephen A. Swedlow*

**昆鹰律师事务所 (QUINN EMANUEL URQUHART & SULLIVAN, LLP)**
Stephen A. Swedlow（获准担任*法律顾问*）
　stephenswedlow@quinnemanuel.com
Michelle Schmit（获准担任*法律顾问*）
　michelleschmit@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606-1881
(312) 705-7400

Kevin Y. Teruya（律师号：235916）
　kevinteruya@quinnemanuel.com
Adam B. Wolfson（律师号：262125）
　adamwolfson@quinnemanuel.com
Brantley I. Pepperman（律师号：322057）
　brantleypepperman@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
(213) 443-3000

Manisha M. Sheth（获准担任*法律顾问*）
　manishasheth@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

**KELLER LENKNER LLC**
Warren Postman（律师号：330869）
　wdp@kellerlenkner.com
Jason Ethridge（获准担任*法律顾问*）
　jason.ethridge@kellerlenkner.com
1300 I Street, N.W., Suite 400E
Washington, DC 20005
(202) 918-1123

Ashley Keller（获准担任*法律顾问*）
　ack@kellerlenkner.com
Ben Whiting（获准担任*法律顾问*）
　ben.whiting@kellerlenkner.com
Jason A. Zweig（获准担任*法律顾问*）
　jaz@kellerlenkner.com
150 N. Riverside Plaza, Suite 4270
Chicago, IL 60606
(312) 741-5220

*消费者集体的临时律师*

## **STEPHEN A. SWEDLOW 的证言**

  本文件由 Stephen A. Swedlow 律师通过电子立案系统 (ECF) 提交。Swedlow 先生签字为证，他提交本文件获得了标题页和上述签名栏中所标明的每一位律师的同意。

  日期：2021 年 4 月 22 日    提交人：  /s/ Stephen A. Swedlow
                        Stephen A. Swedlow

### **送达回证**

  本人特此证明，在 2021 年 4 月 22 日这一天，本人使用 CM/ECF 系统将上述文件以电子方式传送到书记官办公室，使该文件以电子方式送达所有记录在案的律师。

               提交人：  /s/ Stephen A. Swedlow
                          Stephen A. Swedlow



# CERTIFICATION

TransPerfect is globally certified under the standards ISO 9001:2015, ISO 17100:2015, and ISO 18587:2017. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

MAXIMILIAN KLEIN, SARAH GRABERT, and RACHEL BANKS KUPCHO, on behalf of themselves and all others similarly situated, Plaintiffs, vs. FACEBOOK, INC., Defendant.

File Name(s):            CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT DEMAND FOR JURY TRIAL

Consolidated Case No. 5:20-cv-08570-LHK

Source Language(s):            English (United States)

Target Language(s):            Simplified Chinese

Authorized Signature:

Signature, Notary Public:

Name:     Jacqueline Yorke

Title:     Project Manager

Date:     July 14, 2022

WENDY POON
STATE OF NEW YORK
NOTARY PUBLIC
Qualified in
Queens County
.01PO6356754
MY COMMISSION EXPIRES 04-03-2025

Stamp: Notary Public

Reason for signature: I approve the accuracy of this document content as written

1

<u>附件 **B**</u>

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

盖章后提交

**BATHAEE DUNNE LLP**
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Edward M. Grauman （仅限此次）
egrauman@bathaeedunne.com
Andrew C. Wolinsky
awolinsky@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
电话：(332) 322-8835

Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
633 West Fifth Street, 26th Floor
Los Angeles, CA 90071
电话：(213) 462-2772

*广告商集体的临时联合首席律师*

**SCOTT + SCOTT ATTORNEYS AT LAW LLP**
Kristen M. Anderson (CA 246108)
kanderson@scott-scott.com
230 Park Avenue, 17th Floor
New York, NY 10169
电话：(212) 223-6444

Christopher M. Burke (CA 214799)
cburke@scott-scott.com
David H. Goldberger (CA 225869)
dgoldberger@scott-scott.com
Kate Lv (CA 302704)
klv@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
电话：(619) 233-4565

Patrick J. McGahan （仅限此次）
pmcgahan@scott-scott.com
Michael P. Srodoski （仅限此次）
msrodoski@scott-scott.com
156 South Main Street, P.O. Box 192
Colchester, CT 06415
电话：(860) 537-5537

（其他律师见签名页）

美国地区法院

加利福尼亚北区

旧金山分部

| | |
|---|---|
| MAXIMILIAN KLEIN 等，代表自身及处境相似的所有其他人<br><br>　　　　原告<br><br>　　诉<br><br>META PLATFORMS, INC.,<br><br>　　　　被告 | 案件编号 20-cv-08570-JD<br><br>主审法官 James Donato<br><br>**第一次修正后合并广告商集体诉讼起诉书**<br><br>**要求陪审团审理**<br><br>**集体诉讼** |

盖章后提交

## 目录

简述 ................................................................................................................ 1

当事方 .......................................................................................................... 5

I.  原告 ..................................................................................................... 5

II.  被告 ..................................................................................................... 6

司法管辖权和管辖地 ............................................................................... 8

地区内移交 ............................................................................................... 8

事实陈述 ................................................................................................... 9

I.  FACEBOOK 崛起为占据支配地位的社交网络 ................................. 9

    A.  最后的社交网络 ......................................................................... 9

    B.  自己创造的新市场 ................................................................... 11

    C.  数据定向进入壁垒 ................................................................... 13

    D.  Google 进入社交广告市场失败 ............................................. 15

II.  对 FACEBOOK 垄断地位的威胁：智能手机和移动应用程序的兴起 ..... 18

    A.  移动应用程序革命 ................................................................... 18

    B.  Facebook 意识到移动应用程序带来的紧迫威胁 ................. 21

    C.  Facebook 平台 ......................................................................... 22

    D.  盈利的 Open Graph 平台和移动安装业务 ........................... 25

III.  Facebook 将其平台武器化以摧毁竞争 ........................................... 27

    A.  Facebook 计划移除重要的平台功能，并拒绝将社交数据出售给与其竞争的应用程序开发者 ........................................................................... 27

    B.  Facebook 的社交数据盗窃 ..................................................... 29

    C.  Facebook 针对竞争对手的互惠或拒绝 API 访问权限 ......... 33

    E.  关于取消开发者访问好友、动态消息、事件和其他关键 API 的决定缺乏任何正当理由 ....................................................................................... 39

    F.  Facebook 准备宣布移除 API ................................................. 43

    G.  F8 公告 ..................................................................................... 46

IV.  监视和获取竞争威胁 ....................................................................... 48

    A.  Facebook 依赖 Onavo 对其竞争对手进行监视，并收购和使用 Onavo 的资产 ........ 48

i

**盖章后提交**

| | | | |
|---|---|---|---|
| | B. | Facebook 将 Instagram 视为威胁并收购了该公司 | 52 |
| | C. | Facebook 收购 WhatsApp | 60 |
| IX. | | 威胁超越了 Facebook 的封闭花园 | 133 |
| | A. | Facebook 受众网络 | 133 |
| | B. | Facebook 收购 Atlas | 135 |
| | C. | Facebook 通过整合 Atlas、受众网络和其他技术来对抗谷歌 | 139 |
| | D. | 影子档案和识别 Facebook 应用程序之外的用户 | 140 |
| X. | | Facebook 和谷歌同意不竞争，加强 Facebook 主导的社交广告市场 | 141 |
| | A. | 谷歌对广告交易平台和广告服务器的主导地位以及 Facebook 突然带来的威胁 | 142 |
| | B. | 谷歌的 AI 主导地位 | 144 |
| | C. | Header Bidding 的兴起，Facebook 威胁与谷歌竞争 | 145 |
| | D. | 谷歌同意帮助 Facebook 识别其封闭花园之外的自己的用户，Facebook 退出程序性和交易所交易广告 | 147 |
| XI. | | Facebook 以反竞争的方式整合了 Instagram、WhatsApp、Messenger 及其核心 Facebook 产品的后端 | 149 |
| XII. | | 相关市场 | 174 |
| | A. | 社交广告市场 | 174 |
| | B. | 进入壁垒 | 180 |
| | C. | 相关地域市场 | 182 |
| XIII. | | 损害竞争和反垄断损害 | 182 |
| 集体诉讼指控 | | | 187 |
| 救济主张 | | | 192 |
| 救济请求 | | | 195 |
| 陪审团需求 | | | 196 |

盖章后提交

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

盖章后提交

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**盖章后提交**

## 简述

1.　　本起诉书为代表曾向被告 Meta Platforms, Inc.（"Facebook"）购买过广告的人士和公司——包括各指名原告——提起。[1]在过去十年间，Facebook 设计、执行了一套非法垄断社交广告市场的计谋，从中收割了丰厚的利益。由此造成的直接结果是，Facebook 能够（并且确实）按超竞争性价格向数以千计的人士和企业收取社交广告费用，其中包括原告 Affilious, Inc.、Jessyca Frederick、Mark Young、Joshua Jeon、406 Property Services, PLLC、Mark Berney 和 Katherine Looper。

2.　　Facebook 通过下面所述的反竞争计谋获得了提价的力量，并且逐年提价，毫无任何竞争性遏制。

　　　　　　　　　　*　　　　*　　　　*

3.　　截至 2010 年底，Facebook 在社交网络领域一家独大，开始通过定向广告将其产品变现。Facebook 以一种与众不同的网络广告形式获得了垄断——社交广告。这种形式的广告依赖特定形式的数据，即社交数据，以驱动广告和内容定向所使用的机器学习和 AI 模型。

4.　　Facebook 已经获取了达到临界量的社交数据和定向基础设施，形成了一个数据定向进入壁垒（"DTBE"）——一种网络驱动的进入壁垒，保护 Facebook 在社交广告市场的垄断份额。

5.　　Facebook 的支配地位在 2012 年受到了威胁，为了击退这种威胁，Facebook 的 CEO 马克·扎克伯格及其高级副手在 2012 到 2015 年间计划并实施了一套计谋，利用 Facebook 的开发者平台从第三方应用程序攫取社交数据和广告收入，其中有些应用程序已经给 Facebook 造成了竞争威胁。在此期间，Facebook 公然摧毁其实际和潜在的竞争对手，并收购了两家对其业务有威胁苗头的初创企业——Instagram 和 WhatsApp。

6.　　到 2015 年 4 月，Facebook 以各种方式驱逐了其平台上的第三方应用程序，包括计

---

[1]被告原用名称为 Facebook, Inc.，在本案审理期间更名为 Meta Platforms, Inc.。

<u>盖章后提交</u>

划弃用核心功能，例如浏览用户的 Facebook 好友、新闻推送或事件功能。在该举措之前，Facebook 已经能从其平台上搭建的应用程序获取社交数据。然而，Facebook 后来仍遭遇了社交数据真空。Facebook 签订了一系列的数据共享和白名单协议，以获取重要数据和广告收入，[Redacted]

7.　但 Facebook 仍然需要[Redacted]

8.　为了从这些公司获取数据，从 2016 年到 2018 年，Facebook 进入定向垂直子领域，引发毁灭性竞争威胁，然后[redacted]

[redacted]

<u>盖章后提交</u>

1

2  [redacted]

3

4

5

6

7

8

9

10

11

12

13

14

15　　　　15.　　　随着 2010 年代渐近尾声，标题竞价方面的技术发展以及 Google 为其不断发展壮大

16  的数据收集生态系统收购并部署强大的机器学习工具，对 Facebook 基于身份的定向优势构成了

17  侵蚀威胁，甚至可能形成社交广告市场的超集。为了应对该威胁，Facebook 收购并扩展了强大的

18  跨站点和跨设备跟踪工具，在其"围墙花园"外面部署了自己的机器学习工具，并为进入程序化

19  广告和其他谷歌主导的网络广告市场打下基础。到 2018 年，这两家各有其长期支配领域的网络

20  广告巨头似乎将正面相撞。

21

22　　　　16.　　　然而，Facebook 和 Google 非但没有竞争，反而达成了一项反竞争协议。这项协议

23  由 Facebook 和 Google 在 2018 年 9 月签订，代号"Jedi Blue"，两家公司根据该协议分割了市场，

24  这不仅巩固更增强了 Facebook 在社交广告市场的支配地位。

25　　　　17.　　　根据 Jedi Blue 协议，Facebook 放弃对标题竞价的支持，实际是将程序化广告和基

26  于交易的广告市场让给 Google。同时，Google 同意向 Facebook 提供强大的工具，以便其在网络

27

28

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

<u>盖章后提交</u>

上和第三方移动应用程序上对 Facebook 的自有用户进行识别、定向和变现，然后就 90% 面向这些用户的广告给予 Facebook 优先权，在面向这些用户的广告竞价中给予 Facebook 两倍的时间。

18.　　最终的结果是，Facebook 仍然是面向其社交网络用户群的细化定向广告的主导来源，也是唯一的来源。作为交换，Facebook 退出 Google 的广告交易业务，包括放弃采用"标题竞价"。

19.　　由于上述所列的行为，Facebook 成为了能够精准定向社交网络用户的高价值广告的主导来源（在许多方面也是唯一来源），并维持了近十年。从开始其计谋时起，Facebook 每年都会利用这种市场支配力屡次抬高广告价格。

[Redacted]

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

22. 近十年间，Facebook 在社交广告价格方面没有遇到任何有意义的竞争牵制，在这段时期内，它从诸如原告的其他广告商那里攫取了超竞争收入。

23. 原告是 Facebook 广告平台上的广告商，深受社交广告超竞争性价格的损害。如果 Facebook 没有非法垄断社交广告市场、没有采取不法行为（包括与 Google 达成的明确反竞争协议）维持垄断地位，他们支付的价格原本可以低一些，因为原本应存在的竞争力量会牵制 Facebook 的市场支配力和垄断地位，并对社交广告价格形成约束。

## 当事方

### I. 原告

24. 原告 Affilious, Inc. （"Affilious"）是一家加利福尼亚州公司，主要营业地址位于加利福尼亚拉昆塔。Affilious 是一家互联网出版公司，运营有多个网站，其中包括 WineClubReviews.net。在 2016 年末和 2017 年 8 月，Affilious 在 Facebook 的自助广告平台上购买广告推广 WineClubReviews.net。一直到 2019 年 11 月 6 日之前，Affilious 都不知晓（并且无法合理获知）Facebook 反竞争行为的真相，包括其实施反竞争行为的目的和意图，也不知道它因为支付超竞争性广告价格遭受的损害。

25. 原告 Jessyca Frederick 是加利福尼亚州的居民。Frederick 是促销网站 ClubsAndGifts.com 的独资经营者，也是 Affilious 的创始人和 CEO。从 2009 年 4 月 4 日到 2017 年 8 月，Frederick 多次在 Facebook 的自助广告平台上购买广告推广其业务。

26. 原告 Mark Young 是纽约州的居民。Young 是位于纽约布坎南的美发沙龙 Dinkum Hair 的独资经营者。在 2017 年 6 月到 2019 年 4 月，Young（经营名称 Dinkum Hair）在 Facebook 的自助广告平台上购买了广告推广业务。

27. 原告 Joshua Jeon 是得克萨斯州的居民。他是得克萨斯州奥斯丁 Dwell 教堂的牧师。2016 年 4 月，Jeon 在 Facebook 的自助广告平台上购买了广告宣传 Dwell 教堂。Jeon 没有从 Dwell 教堂收到购买广告的补偿。

28. 原告 406 Property Services, PLLC （"406 Property Services"）是一家蒙大拿州专业

盖章后提交

有限责任公司，主要营业地址位于蒙大拿州怀特菲什 (Whitefish)。406 Property Services 是一家房地产物业服务公司。从 2017 年 6 月 8 日左右，直到 2017 年 10 月 20 日左右，406 Property Services 在 Facebook 的自助广告平台上购买了广告推广其业务。

29.　　原告 Mark Berney 是蒙大拿州的居民。从大约 2016 年到 2018 年 12 月间，Berney 在 Facebook 的自助广告平台上购买了广告宣传其个人音乐作品。

30.　　原告 Katherine Looper 是加利福尼亚州的居民。从大约 2013 年到 2020 年 3 月间，Looper 在 Facebook 的自助广告平台上购买了广告宣传在 Cadillac Hotel 举办的免费音乐会。Cadillac Hotel 是 Looper 的非营利组织 Reality House West 在旧金山经营的一家面向低收入人群的长住型旅馆。

31.　　各原告支付的广告价格，都比假使没有 Facebook 的反竞争行为以及非法获取和/或维持垄断的情况下要高。Facebook 利用其通过本起诉书中描述的反竞争计谋获得和/或维持的市场支配力，迫使原告为广告支付了超竞争性价格。

**II.　　被告**

32.　　被告 Meta Platforms, Inc. 是一家在特拉华州组建成立的上市公司。Meta Platforms, Inc. 原名为 Facebook, Inc.，2021 年 10 月 28 日更名为 Meta Platforms, Inc.。Facebook 的主要营业地和总部位于 1601 Willow Road in Menlo Park, California。

33.　　Facebook 由马克·扎克伯格在 2004 年创立，是一家为全世界数十亿用户提供网络服务的社交媒体公司。作为提供服务的交换，Facebook 会收集用户数据，用以创建和销售定向广告服务。Facebook 的主要收入来自它作为数据代理商向广告商提供的定向社交媒体广告。

34.　　Facebook 还是一个第三方应用程序和硬件平台，拥有并经营若干业务分部：

- *Facebook*。Facebook 的核心应用程序，承载着公司的名称，根据 Facebook 向股东提交的文件，其宗旨是促使"人们在移动设备和个人计算机上相互关联、分享、发现和沟通。" Facebook 核心产品包含"新闻推送"，针对每个人个性化显示按算法排序的一系列报告和广告。

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

<u>盖章后提交</u>

- *Instagram*。 Instagram 是一款照片分享应用程序，供用户在移动设备上分享照片、视频和消息。Instagram 在 2012 年 4 月被收购，目前，Facebook 将 Instagram 作为一款单独的应用程序，与其核心 Facebook 产品分开经营。

- *Messenger*。Facebook 的 Messenger 应用程序是一款多媒体消息传递应用程序，可跨平台和设备在人与人之间发送包含照片和视频的消息。

- *WhatsApp*。 WhatsApp 是一款安全的消息传递应用程序，供个人和企业使用。WhatsApp 在 2014 年被 Facebook 以 218 亿美元收购，当时在全球拥有约 4.5 亿用户。

- *Oculus*。Oculus 是 Facebook 的虚拟现实硬件业务线，在 2014 年 3 月被 Facebook 以大约 20 亿美元的价格收购。

35.　　Facebook 截至 2019 年年末的收入达到了 707.0 亿美元（比上一年增长 27%），其中经营净收入达到 239.9 亿美元。该收入几乎全部来自于广告，尤其是移动广告。截至 2019 年年末，Facebook 持有 548.6 亿美元的现金和现金等价证券。在 2019 年底，Facebook 的全球员工人数为 44,942 人（比上一年增长了 26%）。Facebook 截至 2020 年年末的收入为 859.7 亿美元（比上一年增长 22%），经营净收入为 326.7 亿美元。同样地，该收入几乎全部来自于移动广告。截至 2020 年年末，Facebook 持有 619.5 亿美元的现金和现金等价证券。在 2020 年底，Facebook 的全球员工人数为 58,604 人（比上一年增长了 30%）。2021 年，Facebook / Meta 营收所得为 1179.3 亿美元，其中 1149.3 亿美元来自于广告。公司的 2021 年经营总收入为 467.53 亿美元。不考虑 Facebook / Meta 的 Reality Labs 业务（经营发生重大亏损），Facebook / Meta 在 2021 年的经营总收入为 569.5 亿美元。Facebook / Meta 在 2021 年的经营净收入（包括 Reality Labs）为 393.7 亿美元

36.　　对于 2019 财年，Facebook 向投资者汇报称，Facebook 和 Messenger 的平均日活跃用户（"DAU"）为 16.6 亿人（比上一年增长 9%），平均月活跃用户（"MAU"）为 25.0 亿人（比上一年增长 8%）。Facebook 还报告称，使用任何Facebook产品的日活跃人数（"DAP"）

**盖章后提交**

平均为 22.6 亿（比上一年增长 11%），月活跃人数（"MAP"）平均为 28.9 亿（比上一年增长 9%）。对于 2020 财年，Facebook 向投资者汇报称，其 DAU 平均为 18.4 亿（比上一年增长 11%），MAU 平均为 28.0 亿（比上一年增长 12%）。Facebook 还报告称，使用任何 Facebook 产品的 DAP 平均为 26.0 亿（比上一年增长 15%）。对于 2021 财年，Facebook / Meta 向投资者汇报称，其产品家族的 DAU 平均为 19.1 亿，MAU 平均为 28.9 亿，DAP 平均为 27.8 亿，MAP 平均为 35.3 亿，四个类别均比 2020 年有所增长。

### 司法管辖权和管辖地

37.    本诉讼依据《谢尔曼反托拉斯法》（《美国法典》第 15 篇第 1、2 条） 第 1 条和第 2 条以及《克莱顿法》（《美国法典》第 15 篇第 15、26 条）第 4 条和第 16 条提起。诉讼针对被告的社交广告市场贸易限制和垄断给原告及集体成员造成的损害，寻求获得三倍损害赔偿、利息、诉讼费用、衡平救济以及合理的律师费。

38.    依据《美国法典》第 28 篇第 1331 条（联邦问题）、第 1332 条（集体诉讼多种管辖权）和第 1337 条（反托拉斯）以及《美国法典》第 15 篇第 15 条（反托拉斯），本法院拥有对事管辖权。

39.    根据《美国法典》第 15 篇第 15(a) 条（克莱顿法）、《美国法典》第 15 篇第 22 条（反托拉斯事宜的全国管辖地）以及《美国法典》第 28 篇第 1391(b) 条（一般管辖地规定），以该地区为管辖地是适宜的。Facebook 在该地区内办理业务，其处理事务、开展州际贸易和商业很大程度上在该地区进行。

40.    法院对 Facebook 拥有属人管辖权，因为 Facebook 的总部和主要营业地都设在加利福尼亚州，在加利尼亚州受到一般管辖权的约束。本起诉书中所指的计谋、串通和垄断均以全美国的人为目标，给美国（包括本地区）的民众造成了损害。

### 地区内移交

41.    本诉讼已移交给该司法地区旧金山分部的 James Donato 法官审理。

盖章后提交

事实陈述

**I.**     **FACEBOOK 崛起为占据支配地位的社交网络**

    **A.**     **最后的社交网络**

42.     Facebook 自 2004 年成立以来的飞速崛起，是有据可查的。该公司诞生于其 CEO 马克·扎克伯格的宿舍里，后从多家社交网络的激烈竞争中脱颖而出。Facebook 最初是专门面向全美精英大学的服务，后扩大了其网络，容纳全美以及全世界各地的用户作为其一般受众。

43.     在 2004 到 2010 年间，Facebook 消灭了多个对家，崛起为美国具有支配地位的社交网络。

44.     Facebook 的第一个主要竞争对手是 MySpace。MySpace 成立于 2003 年（比 Facebook 早一年），以相同的受众为目标，提供大体相同的服务，并且迅速吸引了一大批用户。到 2005 年，MySpace 拥有 2500 万活跃用户，被 NewsCorp 以 5.80 亿美元的价格收购。2006 年，MySpace 的注册用户达到 1 亿人，超过 Google 成为美国访问人数最多的网站。

45.     然而在接下来的三年里，MySpace 稳步螺旋转下，与之对抗的 Facebook 则快速增长。2008 年，Facebook 的全球活跃用户数量超过 MySpace 并持续增长，到 2009 年 4 月时全球的活跃用户达到了 3.07 亿。2009 年 5 月，Facebook 以 7028 万对 7026 万的月活跃用户数量，在美国超过了 MySpace。

46.     此后，MySpace 再也没有如此接近过 Facebook。到 2010 年，MySpace 几乎退出了市场，彻底脱离了社交媒体业务。MySpace 的 CEO 在 2010 年 11 月表示屈服："MySpace 不再是社交网络。它现在是一个社交娱乐目的地。"2010 年 9 月，MySpace 报告称它已亏损 1.26 亿美元，2011 年 6 月，NewsCorp 以 3500 万美元的价格卖出了这家公司——比它六年前支付的价格足足少了 5.45 亿美元。那时，它的用户群体已经缩减到了每月 300 万访客。

47.     同一时期，其他几家社交网络也迎来了灭亡，包括 Google 的 Orkut、AOL 的 Bebo 以及 Friendster，它们没有迅速地发展壮大，不足以与 MySpace 和 Facebook 相抗衡。

48.     到 2009 年且直到 2010 年，Facebook 成为唯一一个大规模存在的点对点社交媒体网

<u>盖章后提交</u>

络，没有其他网络或公司可以与 Facebook 的庞大用户群相匹敌。2010 年 3 月 2 日，*Adweek* 报告称，Facebook 在 2009 年的收入高达 7 亿美元，2010 年的收入有望达到 11 亿美元，这些收入几乎全部来自于面向其新增用户的广告。至此，Facebook 的收入每年大约都翻了一倍——2007 年为 1.50 亿美元，2008 年为 2.80 亿至 3.00 亿美元，2009 年为 7.00 亿美元。

盖章后提交

49.    《时代》杂志将扎克伯格评为 2010 年年度人物。



50.    《时代》的封面故事阐述了其中的利害关系——新组的社交网络范围前所未见，令人惊叹：

> 究竟发生了什么？ 在不到七年的时间里，扎克伯格把十二分之一的人口汇集到一个网络中，由此创建了一个人数几乎为美国人口两倍的社交实体。假如 Facebook 是一个国家，那么它将会是仅次于中国和印度的第三大人口国。它最初只是一种玩乐、一项消遣，后来却变得真实，在全物种范围上切实改变了人类相互关联的方式。我们现在通过一个营利性网络经营我们的社交生活，这个网络（至少在理论上）已经让扎克伯格六次成为亿万富翁。

51.    到 2010 年，Facebook 已经没有敌手并占据了支配地位，如同后个人电脑历史时期的微软一样。它通过驾驭强大的网络效应潮流做到了这一点。

**B.    自己创造的新市场**

52.    到千禧年的第二个十年开始时，Facebook 是一个全新市场上无可争议的王者——不是构建在硬件或操作系统支配地位上的市场，而是构建在人际网络上的市场，它的力量和价值直接衍生自人与该网络的接触。用户通过彼此通信和互动、发布照片、发表内容，向 Facebook

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

<u>盖章后提交</u>

中输入的数据越多，Facebook 网络对第三方就越有价值，第三方可以使用用户提供给 Facebook 网络的信息锁定用户，从而向 Facebook 用户发布广告。

53. 有关用户在其个人页面上共享哪些信息；他们浏览的照片和个人资料；他们与他人的关联；他们与他人分享的内容；甚至他们向其他用户发送的消息中包含什么的数据，都可用来以前所未有的规模投放定向广告。与搜索广告不同，Facebook 的广告平台可以让广告商按特征和行为锁定 Facebook 的用户群体，而不是在搜索栏中输入查询。更重要的是，与搜索不同，用户身份不仅是可发现的，而且是由用户自愿提供的，这些用户最亲密的朋友和家人的身份同样如此。这些身份可以在整个互联网进行跟踪和锁定。

54. Facebook 参与用户网络创建的这些社交数据可以通过多种方式变现。这些数据可以转售用于定向广告和机器学习；Facebook 的机器学习算法为广告商挖掘数据中的模式，使广告商能够精准地接触到合适的受众，转化为销售、用户注册或产生销售线索。这些数据也可以通过商业化访问来出售，例如，为应用程序开发人员、内容生成者和广告商提供对 Facebook 网络中嵌入的信息的直接访问权限，例如用户之间的相互关联、用户属性和用户行为。然后，这些数据也可以由第三方进行挖掘。

55. 所有将社交数据变现的方法都是基于出售这些数据，但视接收所售数据的应用程序不同，可以将这些数据进行打包、结构化或以不同的方式挖掘。对于广告商来说，Facebook 的网络给广告商和 Facebook 本身呈现了全新的社交信号，比如人际关系、事件、朋友关系和粒度兴趣。电影、音乐和图书是用户个人资料的固有部分。Facebook 网络中可以作为社交数据挖掘的信息量是前所未有的，Facebook 每天从美国和全球数百万用户那里接收这些数据。

56. Facebook 收集的数据是独特的社交数据，来自于 Facebook 用户的互动和强身份。Twitter 是面向公众的社交网络，松散增强用户身份，并且从不要求用户披露自己的详细信息。Facebook 在这方面自成一派，其产品明确凸显个人及其与他人的关联。2010 年，Google、Yahoo 和其他主要网络广告来源在一个全然不同的市场上相互竞争——一个基于搜索数据的市场。而

**盖章后提交**

Facebook 掌握的数据却不是搜索数据可以替代的——它是关于个人用户的可操作数据，并且用户身份完全可以确定。

57.    到 2010 年，Facebook 在新崛起的社交广告市场中一枝独秀，成为社交广告市场的主导者——在这个市场中，Facebook 的自有用户为 Facebook 提供源源不断的价值独特信息，Facebook 又通过广告销售将其变现。广告商从其他公司找不到替代品，就会为 Facebook 强大的定向和可操作数据支付高价，有些广告商甚至会或有意或无意地将有关他们自身、他们的产品以及他们的定向目标效率的关键数据反馈给 Facebook 的网络。

58.    正如 Facebook 自己在 2007 年 5 月向第三方开发者解释的那样，Facebook 的核心价值主张和商业模式是 (a)"提供对一种新类型数据——社交数据的访问权限，使您能够构建与用户相关的应用程序。" 关于此类数据，Facebook 告诉开发者："你们和我们处在一个公平的赛场上。你们可以搭建强大的应用程序，不仅仅是小插件。完美集成到 Facebook 网站上。" 到 2010 年，Facebook 的整个业务明显都在销售这种新形式的"社交数据"（以及基于此类数据的机器学习驱动型用户定向），并且它将为此向开发人员销售访问权限以及销售针对 Facebook 参与和活跃用户网络的广告。

**C.    数据定向进入壁垒**

59.    随着 Facebook 在 2010 年占据主导地位，强大的网络效应和反馈环稳定并巩固了这一地位。用户提供的数据以及基于这些数据的用户定向，使 Facebook 的网络更具价值，从而吸引更多的用户加入网络。有一个典型的使用案例是，一个 Facebook 用户邀请他最亲密的朋友和家人，然后他们再邀请网络上的其他朋友和家人并与之互动。由此形成一个熟悉的反馈环——一个良性循环，迅速扩大 Facebook 的用户群。

60.    这个用户群生成的内容反过来又增加了 Facebook 网络的价值。Facebook 用户每发布一张照片、一条关系状态、一次签到或发文，作为与直接关联的熟人进行通信的途径，以及了解更多远程关联的熟人的途径，Facebook 网络就更有价值。

61.    正如时任 Facebook 产品管理副总裁的 Samuel Lessin 在 2012 年 10 月 26 日的一封内

**盖章后提交**

部电子邮件中对马克·扎克伯格的解释，Facebook 收集的数据使 Facebook 越来越擅于收集和变现数据：

> 目前可以让我们立于不败之地的事物之一是，我们一直以来使用 Facebook 在人与人之间建立的关系，以及我们拥有使 Facebook 成为更优秀产品所需的信息。这是对协同因素之类的事情的基本见解。**人们在我们的平台上看的东西越多，我们就能更多地了解人们想要看到的内容。** *在这方面，虽然也有其他方法可以接近，但直觉上感觉有 ROS 动态在其中发挥作用才是正确的，* **使用系统的人越多，我们就能掌握越多关于如何让更多人使用该系统的信息。**

（着重强调）。

62.　从这个反馈环中出现了一个进入壁垒。为了与 Facebook 竞争，新进入者必须迅速复制 Facebook 网络的广度和价值——仅仅克隆该网络是无法完成这项任务的。事实上，为了与 Facebook 竞争，竞争对手不仅必须建立自己的庞大网络，而且还必须大规模地吸引活跃的社交参与——这可能需要吸引大量的 Facebook 用户离开该平台。

63.　转换的成本将极其高昂：新进入的竞争对手必须向用户展现一整套价值理念，这种价值理念不仅要赢过 Facebook 根深蒂固的网络，而且要赢得毫不费力。此外，为了与 Facebook 的良性循环竞争，新进入的竞争对手平台提供的价值必须促进社交数据挖掘，包括通过机器学习和人工智能进行挖掘，这甚至会为用户、开发者和广告商创造更多的价值。这种进入壁垒在本起诉书中称为数据定向进入壁垒（"DTBE"）。

64.　DTBE保护 Facebook 在社交广告市场控制和提高价格的能力，而不受来自现有竞争



**图1: 零售 Facebook CPM，2012 年第 4 季度 – 2013 年第 4 季度**

对手或新进入者的价格竞争压力。由于其在社交广告市场中的垄断地位和 DTBE，Facebook 能不断地提高社交广告收费价格。这正是 Facebook 自 2010 年获得支配地位以来所做的事情。

65.     例如，从 2011 年到 2012 年，Facebook 大幅提高了其广告收费价格，这是其社交数据的主要销售渠道之一。那一年，Facebook 上的每千次展示费用（CPM）增加了 41%，仅在 2011 年最后一个季度就增长了 15%。每次点击费用（CPC）是衡量按点击量支付广告费用的指标，同年上涨了 23%。Facebook 提高了社交广告的价格，同时也增加了在其网站上展示的广告数量，这表明了它在社交广告市场的垄断力量。

66.     Facebook 在 2013 年一直保持着这种对价格的垄断力，CPM 同比增长了 2.9 倍。随着这一增长而来的是总体广告收入的再次增长——该年比去年增长了惊人的 83%。

67.     如果没有 DTBE，就不可能实现这些提价。如果存在一个竞争网络，可以通过广告销售同类社交数据，Facebook 的提价将会导致客户转投同类竞争对手。但 Facebook 没有这样的竞争对手，即使在通过广告迅速增加其销售数据供应期间，其提高价格的能力也不受约束。

68.     Facebook 在社交广告市场占据支配地位后，它的地位只会升高，并且愈加根深蒂固。Facebook 销售的广告越多，Facebook 收集和打包出售的社交数据越多，Facebook 在销售广告、定向用户以及将用户社交数据的直接访问权限商业化（例如，通过 API）方面就越有效。这反过来又会导致新的竞争对手进入市场无望，或者成本高得令人望而却步，从而使 Facebook 能够提价并进行额外投资，加深围绕其业务的 DTBE 沟壑。

**D.     Google 进入社交广告市场失败**

69.     2010 年，Google 迫切想要进入社交广告市场。它此前曾做过多次尝试，但每次进军都以失败告终。Google 的社交网络 Orkut 比 Facebook 早几天推出，然而很快就被碾压。Google 的社交通信平台 Wave 在用户中没有激起任何水花。Google 的社交网络 Buzz——背靠其大获成功的 Gmail 产品搭建——在 2010 年初迅速崩溃。

70.     Google 下一次进入市场的尝试正面迎击 Facebook 的功能，试图穿透保护 Facebook

盖章后提交

业务的强大 DTBE。Google 做出了一笔前所未有的大规模资源投资，以构建一款具有足够价值的产品，吸引用户离开 Facebook 范围广、参与度高的社交网络。

71.　　2010 年，Google 的 Vic Gundotra 成为该公司的首席架构师。Gundotra 向 Google 联合创始人 Larry Page 推荐了一个新的社交网络，后者于 2011 年重返公司担任 CEO。Gundotra 多次说起一句不祥的话，"Facebook 会杀了我们。Facebook 会杀了我们，"惊惧不已的 Page 采取了行动。

72.　　Page 为一款新产品 Google+ 大开绿灯。最初，Google+ 旨在利用 Google 的YouTube产品来建立其社交网络，需要有 Google+ 帐户才能访问 YouTube 的某些关键功能。面对严重的用户阻力，Google 放弃了这一要求。尽管如此，Google 仍试图通过 Google+ 建立一个"社交图"，在 Google 产品（包括 YouTube 和 Gmail）上使用一个通用的用户身份。

73.　　2011 年初，Google 开始了推出 Google+ 之前的"100 天冲刺"（内部人士的叫法）。公平来说，Google 计划交付的产品在产品特性和功能方面都与 Facebook 提供的产品惊人地相似。到 2011 年夏，Google+ 的计划功能包括一款名为"stream"的连续滚动产品（复刻 Facebook 的"feed"产品）；一个名为"sparks"的配套功能，它将"stream"与用户的个人兴趣相关联；以及一款名为"Circles"的分享应用程序，据称改进了与朋友、家人、联系人和广大公众分享信息的方式。

74.　　Google+ 与 Google 过去的产品不同，它的设计初衷并不是为了稳步成长和从零发展。从一开始，Google 就投入了大量资源，将一个完整、全面的社交网络推向市场。Google 称该项目为"Emerald Sea"，几乎征用了公司的所有产品来帮助搭建 Google+。数百名工程师参与了这项工作，它还是近期重新担任 Google CEO 一职的 Page 的一个代表项目。借用 Google 的 Gundotra 的话来解释，即将成为 Google+ 的产品是 Google 自身的转型之作："我们正在将 Google 本身转变为一个社交目的地，其水平和规模是我们从未尝试过的——就人员而言，投资比以前的任何项目都要高出几个数量级。"

75.　　Google 动用的资源量与其之前渗透社交广告市场的尝试形成鲜明对比。对于其之

<u>盖章后提交</u>

前失败的社交网络产品 Buzz，Google 只投入了十几名工作人员。在高峰时期，Google+ 调用了全国各地多个分部的 1000 名员工。例如，Google 撤掉了其精心制作的内部视频会议系统，强迫员工使用 Google+Hangouts 视频聊天功能，一名内部员工将其描述为"janky"。员工奖金与 Google+ 的成功挂钩。整个项目的保密程度在 Google 也是前所未见。

76.     Google+ 于 2011 年 6 月 28 日发布。产品包括"stream"、"Circles"应用程序、"Hangout"视频聊天和消息传递产品以及一款照片分享产品。它与 Facebook 惊人地相似。正如一位 Google 内部员工所说："这看起来跟 Facebook 一模一样。那有什么关系？它就是一个社交网络。"另一位 Google 员工说："大张旗鼓搞了这么久，最后开发出的东西却这么普通。"有一件事是无可争议的：随着 Google+ 的发布，Google 通过有效复刻 Facebook 的产品直面迎战 Facebook。

77.     由于 Google 的用户群庞大，Google+ 产品在发布后很快就吸引了数百万用户。然而，尽管这些用户注册了 Google+，但 Google 很快发现他们并没有使用该产品。正如一位 Google 前员工解释的那样：

> 如果你看一下每位用户指标，会明显发现没人发帖、没人回来，也没人真正使用产品。六个月过后，开始有人觉得收效不如人意。

78.     Google+ 的问题在于，强大的网络效应增强了保护 Facebook 的 DTBE。Google 对 Facebook 的复刻并没有带来足够的新价值，不能克服高昂的网络转换成本——Facebook 用户从其多年来活跃投入社交数据的现有网络产品转离的成本。

79.     在被问及 Google+ 失败的原因时，Google+ 前用户体验团队成员 Paul Adams 简要总结道：

> 人们对 Facebook 和网络效应的了解不足… 好比你有一家乌糟脏乱的夜总会，大家都玩得很开心，然后你在隔壁又建了一家锃亮崭新的店，从某些方面来说技术上更胜一筹，但谁会想要离开？人们不需要另一个版本的 Facebook。

80.     到 2014 年，Google+ 宣布失败，其创始人 Gundotra 最终离开了 Google。纵有其资

**盖章后提交**

源、开发人员和现有用户群为倚仗，Google 仍然在短短几年内彻底失败了，没能攻克保护 Facebook 的 DTBE。只要 Facebook 仍然控制着源自参与且活跃用户群的数据，它就能继续保持该用户群活跃和参与度。

81.　要破坏这种良性循环，唯一的方法是用一款竞争产品提供远超 Facebook 的价值或截然不同的价值，并通过强大的网络效应推动该产品扩大规模。

**II.　对 FACEBOOK 垄断地位的威胁：智能手机和移动应用程序的兴起**

**A.　移动应用程序革命**

82.　在 2009 年和 2010 年，随着 Facebook 成为社交媒体大战无可争议的胜利者，另一个新市场日渐成形。2007 年推出的 Apple iPhone 创造了一个新型手机市场：手机有用户界面，能够实现稳定的互联网连接以及发消息。iPhone 不再受限于用数字小键盘发短信或连接到手机的笨重永久字母数字键盘（例如 Treo 或 Sidekick 手机），可以动态显示多点触控键盘，并配备了功能齐全的网页浏览器，可以呈现完整的网页。

83.　到 2008 年夏，Apple 的最新款 iPhone——iPhone 3G 发布，搭载了 GPS 和其他升级硬件。随新款 iPhone 发布的还有包含将在 iPhone 上本机运行的第三方应用程序的全新商店：Apple App Store，于 2008 年 7 月 10 日投入运营，即 iPhone 3G 发布的前一天。

84.　通过 App Store 发布第三方应用程序的开发人员获得了丰厚的回报。在 App Store 最初推出时，大约有 500 个应用程序可供使用。使用 iPhone 加速器的游戏迅速成功，有些游戏以几美元的价格出售下载包，迅速赚取了数十万美元。利用 iPhone 中的新 GPS 功能的应用程序也迅速成为热门。到 2008 年 9 月，Apple App Store 的下载量达到了 1 亿次，到 2009 年，达到了 10 亿次。iPhone 应用程序已成为向无数用户提供扩展价值的新途径。Google 在 2008 年也推出了后来的 Play Store（最初称为 Android Market）。它很快在总销量上超过了 Apple 的 App Store，增长 82%。移动应用革命已经开始。

85.　移动应用程序迅速激增，并有巨大机遇实现进一步增长——因为到 2010 年，大部

<u>盖章后提交</u>

分的手机活动已经不再是打电话。例如，2010 年皮尤研究中心的一项调查显示，拍照和发短信已成为成年人中最常见的手机用途，超过三分之一的成年手机用户通过手机上网、玩游戏、发电子邮件、录视频或播放音乐。与此同时，29% 的成年手机用户使用过下载的应用程序。

86. 尼尔森 2010 年的一项调查显示，游戏、新闻/天气、地图和导航以及社交网络是手机上最热门的应用程序。

87. 值得注意的是，移动应用程序与近期采用社交媒体，并一窝蜂向 Facebook 提供数据的人群高度吻合。

*在手机上执行以下各项操作的成年手机用户百分比…*

| | |
|---|---|
| 拍照 | 76% |
| 发送或接收短信 | 72 |
| 上网 | 38 |
| 玩游戏 | 34 |
| 发送或接收电子邮件 | 34 |
| 录视频 | 34 |
| 播放音乐 | 33 |
| 发送或接收即时消息 | 30 |
| 使用应用程序 | 29 |

来源：皮尤研究中心的互联网与美国生活项目，2010 年 4 月 29 日 - 5 月 30 日跟踪调查。N=1,917 个成年手机用户。

盖章后提交



来源：2005-2019 年开展的调查。

皮尤研究中心



**来源：** Nielsen App Playbook，2009 年 12 月。N=3,962 个成年人在调查
前的 30 天内下载过应用程序。

在手机持有者中，应用程序用户相对更加年轻，2010 年 44% 的应用程序用户年龄在 20 岁以下，41% 在 30 到 49 岁之间。这与迅速在生活中采用社交媒体，为 Facebook 提供社交数据，建立并维护保护其业务的 DTBE 的人群一致。

88. 许多迅速吸引用户的移动应用程序之所以这样做，是因为它们提出了自己的专门价值理念。这些应用程序必须是专用的，因为手机屏幕较小，特别是在 2010 年，移动流量是由专业软件驱动的，通常专为单一目的的设计。用户使用其电子邮件地址和个人信息注册这些应用程序，并直接与应用程序进行交互。

89. 正如《Wired》杂志在 2010 年所描述的那样，用户通常从一个应用程序移动到另一个应用程序，每个应用程序都有某种专门用途：

> 你睡醒后，在床边的 iPad 上查看电子邮件，这就是一个应用程序。吃
> 早餐时，你浏览 Facebook、Twitter 和《纽约时报》——另外三个应用
> 程序。在上班路上，你在智能手机上收听播客。又一个应用程序。上
> 班期间，你在阅读器中滚动浏览 RSS 推送，并进行 Skype 和 IM 对话。
> 更多应用程序。一天结束，你回到家，一边听 Pandora 一边做晚餐，

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

**盖章后提交**

在 Xbox Live 上玩游戏，在 Netflix 的流媒体服务上看电影。

90.    2010 年，摩根士丹利预测，使用移动设备上网的用户数量在五年内将超过使用电脑上网的用户数量。互联网正处于一个转折点——万维网不再是获取信息的主要方式。用户从专门的围墙花园中获取信息，而 Facebook 自己的围墙花园距离被取代只差一个应用程序。

91.    在直到 2010 年的几年里，流媒体应用程序（如 Netflix 和 Pandora）以及电子书阅读器（如 Kindle 和 iBooks）快速兴起。Apple 2010 年最卖座的 iPhone 应用程序名单包括《愤怒的小鸟》、《涂鸦跳跃》、《Skee-Ball》、《宝石迷阵 2 + 闪电战》、《水果忍者》、《割绳子》、《All-in-1 GameBox》、《蠢蛋测试》、《植物大战僵尸》和《口袋上帝》等手机游戏。Facebook 的移动应用程序在 App Store 的免费下载列表中名列前茅，此外还有 Words with Friends、Skype 和 Weather Channel App。

**B.    Facebook 意识到移动应用程序带来的紧迫威胁**

92.    到 2011 年，Facebook 意识到它落后了。Facebook 刚刚推出了新的"Timeline"产品，这是对 Facebook 推送的有争议修改，Facebook 推送为每个用户生成动态内容，而不是用户可见的一系列静态帖子。在过去的八个月里，Facebook 一直在优化其桌面体验和新的 Timeline 产品。但在此期间，移动应用程序仍继续迅速崛起。

93.    Facebook 自己的移动应用程序搭建在一种名为 HTML5 的技术之上，该技术当时很适合构建网页，但不适合用于构建 iOS 和 Android 智能手机原生的移动应用程序。因此，Facebook 的移动应用程序有缺陷，容易崩溃，而且速度很慢。扎克伯格在多年后对于 HTML5 叹惜道，"我们押错了注。"

94.    扎克伯格在 2018 年反思说，Facebook 在移动应用程序出现时就已经落后了：

> 到目前为止，我对公司运营的一大遗憾是，我觉得我们没有全力塑造移动平台发展的路径，它们早期是与 Facebook 同时开发的。我的意思是，iOS 和 Android 在 2007 年左右问世，当时我们是一家非常小的公司，所以那不是我们努力的事情。

95.    随着移动应用的兴起，Facebook 的桌面产品以较慢的速度获取用户。所有这一切

盖章后提交

都发生在 Facebook 计划其首次公开募股期间。Facebook 知道它的地位正在下降，如果移动增长继续下去，它的 IPO 首次亮相将发生在其业务遭遇重大变化期间，这将破坏 Facebook 对公众投资者的财务和质量披露。

96.　　但这个问题是无法回避的。Facebook 在 2012 年 5 月 18 日进行 IPO。到 Facebook 发布第一份年度报告时，这一趋势确定无疑——从桌面网络应用程序向移动设备的过渡给 Facebook 的业务构成了存亡威胁。在 2012 年的 10-K 表格中，Facebook 向股东披露了这种风险，指出这是影响其底线的因素之一：

> ***通过我们的移动产品使用 Facebook 替代在*** *个人电脑使用的数量增长，可能会对我们的收入和财务业绩产生负面影响。*
>
> 2012 年 12 月，我们有 6.8 亿移动 MAU。虽然我们的大多数移动用户也会通过个人电脑访问 Facebook，但我们预计，在可预见的未来，移动使用量的增长速度将超过通过个人电脑使用的增长速度，并且在某些市场中，通过个人电脑的使用量可能会下降或持续下降，部分原因是我们专注于开发移动产品，鼓励 Facebook 的移动使用。例如，在 2012 年第四季度，使用个人电脑的日活跃用户（DAU）数量与 2012 年第三季度相比略有下降，包括美国等主要市场的下降，而移动 DAU 则继续增加。虽然我们于 2012 年初开始在用户的移动新闻推送中展示广告，但迄今为止，我们从 Facebook 移动产品使用中只获得了一小部分收入。此外，我们目前不向移动设备上的应用程序提供支付基础设施。如果用户越来越多地使用 Facebook 移动产品来代替通过个人电脑访问，如果我们无法继续增加移动收入，或者如果我们在这项工作中产生了过多的费用，我们的财务业绩和增加收入的能力将受到不利影响。

**C.　　Facebook 平台**

97.　　尽管 Facebook 面临着来自移动应用程序的紧迫威胁，但它保留着一个重要的影响力来源：它的社交数据。Facebook 掌握着（并继续接收）有关其庞大用户群的海量信息，包括每个用户如何与他人关联。这些信息对新的和现有的移动应用程序都很有价值，它们可以利用 Facebook 的社交数据来获得新用户，以及构建新颖的社交特性、功能和应用程序。

98.　　Facebook 将其网络称为"图谱"，仿照对各个节点之间的连接进行建模的数学构

**盖章后提交**

造。Facebook 图谱包含用户"节点"，"边缘"的节点之间进行连接并交换信息。Facebook 创造了"开放图谱"一词，用于描述开发人员可以用来穿越 Facebook 用户网络的一组工具，包括用户参与产生的社交数据。

99.　　重要的是，开放图谱包含一组应用程序编程接口（"API"），可供自行创建社交应用程序的开发者查询 Facebook 网络获取信息。Facebook 在其 2012 年的 10-K 表格中解释称：

> ***Open Graph***。我们的底层平台是一套 API，开发者可以使用它们来创建应用程序和网站，使用户能够在 Facebook 上与好友分享他们的活动。随着 Open Graph 连接的应用程序和网站成为用户表达自己的重要组成部分，人们正在阅读的书籍、想看的电影和听的歌曲等活动在 Facebook 的 Timeline 和 News Feed 中会更加显著地显示出来。这使开发者的应用程序和网站成为 Facebook 用户体验的关键部分，并且可以提高开发者的增长和参与度。

100.　　Open Graph 以及其他 Facebook 产品（如 NEKO 广告和支付产品）都是 Facebook 平台的组成部分。该平台对 Facebook 的业务至关重要，因为它确保了用户在 Facebook 上的持续参与。如果没有这个平台，Facebook 将被要求开发能够增加其网络自身价值的应用程序——这意味着 Facebook 将不得不尝试预测用户想要什么应用程序；设计、编写代码，并在其用户群和网络中扩展这些应用程序；并承担猜测错误和犯错的风险和资源消耗。

101.　　Facebook 没有这样做的资源，所以它决定允许第三方为平台开发应用程序。正如马克·扎克伯格在 2008 年 2 月写给 Facebook 平台工程副总裁 Michael Vernal（他是扎克伯格的高级副手，曾部分负责开发 Open Graph）的一封电子邮件中所说的那样：

> 平台是我们战略的关键，因为我们相信会有很多不同的社交应用程序……我们相信我们不可能自己开发全部此类应用程序。因此……对我们来说，专注于这个平台非常重要，因为定义这个社交平台的公司将处于最佳位置，能为人们提供最好的沟通方式，并取得长期成功。

102.　　简言之，Facebook 可以自己开发新的社交应用程序，也可以为其他人提供平台来这样做。多年来，Facebook 一直选择提供一个平台，直到它能够开发自己的社交应用程序。

103.　　但 Facebook 也意识到，其平台上的开发者可能构成潜在的竞争威胁。在其 2012 年

盖章后提交

年报中，Facebook 披露了其运营面临的以下重大风险因素：

> 此外，平台合作伙伴可能会使用我们的用户通过 Facebook 平台共享的信息来开发与我们竞争的产品或功能…… 因此，我们的竞争对手可能会以牺牲我们用户群的增长或参与度为代价来获取和吸引用户，这可能会对我们的业务和财务业绩产生负面影响。

104.    因此，Facebook 已经知道竞争可能来自它自己的第三方应用程序开发者。尽管如此，Facebook 还是积极寻求开发者在其平台上开发应用程序，因为 Facebook 可能从这些开发者开发的应用程序以及他们所吸引的用户有中获利。

105.    正如 Facebook 在 2012 年向其投资者解释的那样，维持一个可以让开发者用来开发应用程序的平台，意味着 Facebook 拥有更多用户互动，从而获得更多广告收入：

> 与我们平台开发者的应用和网站的互动可以以多种方式为 Facebook 创造价值：我们的平台支持我们的广告业务，因为 Facebook 上的应用创造了用户互动，让我们能够展示广告；我们平台的开发者可能会在 Facebook 上购买广告以增加他们的应用程序和网站的流量；平台开发者使用我们的支付基础设施来促进与用户在个人电脑上的交易；平台应用程序与 Facebook 分享内容，使我们的产品更具吸引力；与平台应用程序和网站的互动有助于我们了解人们的兴趣和偏好，提高我们制作个性化内容的能力。我们继续投资于工具和 API，以增强平台开发者的能力，提供更社会化和个性化的产品，并让人们更好地在 Facebook、移动设备和整个网络上的互动。

106.    Facebook 的平台在几个重要方面对 Facebook 很有价值。

107.    首先，平台意味着新的应用程序将在 Facebook 的网络上构建，因此，随着应用程序变得更受欢迎，增加了 Facebook 网络的价值。这些新应用增加了与 Facebook 的互动，这转化为更有针对性的内容和更高的广告收入。

108.    其次，Facebook 将不需要花费大量资源来开发新的应用程序或测试新的商业模式——第三方将做这些工作。Facebook 可能只是等待一款获得广泛采用的为其平台开发的应用程序，然后要么开发一款与之竞争的应用程序，要么被动地从该受欢迎的应用程序的用户互动中获取好处，包括为 Facebook 及其网络提供有价值的新社交数据。

盖章后提交

109. 第三，对 Facebook 网络的访问权限本身对第三方开发者很有价值，所以 Facebook 可以向开发者收取费用——最显著的是，通过访问 API 和购买广告——来访问 Facebook 的平台，并访问从 Facebook 的大量用户中收集的社交数据。

**D.** **盈利的 Open Graph 平台和移动安装业务**

110. Facebook 继续努力追赶移动应用程序的新攻势，但它意识到，新应用程序需要积极的用户增长才能盈利。此外，Facebook 的 API 使移动应用程序开发者能够查询一个人的好友的好友，这使移动应用程序能够找到其他可能有兴趣使用他们的应用程序的用户。

111. 移动应用程序也可以使用 Facebook 在整个 Facebook 网络中与用户的好友或其他与用户没有直接联系的人进行交流。例如，一款移动支付应用程序可以让两个陌生人相互支付，即使他们在 Facebook 上没有直接联系，只要他们都存在于 Facebook 平台的某个地方就可以实现。一款约会应用程序（比如 Tinder）的用户可以使用 Facebook 的 API 来在个人扩展的好友网络中，也可以在 Facebook 平台的任何地方寻找一个合适的约会对象。

112. Facebook 很快意识到，它可以通过第三方手机应用程序将其网络的价值变现，并积极采取行动，首先是开发在 Facebook 平台上运行的游戏。这些游戏中有许多是社交游戏，允许用户与他人一起玩或对抗，他们首先寻求的是新用户来增加他们的游戏使用率。Facebook 的 Vernal 试图通过这些应用程序获得一个桥头堡，从而把通过使用 Facebook 平台或 Facebook 的广告产品"NEKO"获得的额外游戏安装量变现。

113. 例如，Facebook 将广告作为用户时间轴上的"故事"，显示用户是否认识正在玩某款特定游戏的其他用户。当游戏从中获得新用户时，Facebook 便会把这些广告变现。正如 Vernal 在 2012 年 5 月的一封电子邮件中解释的那样：

> 如今，移动广告最大/最有效的细分市场便是推动应用程序安装量。这至少部分是因为它是最可测量的——如果你知道你从每售出一款游戏中获得 0.7 美元，那么理论上你可以为每次安装支付最高 0.69 美元。这种可测量性允许带来最大出价。

**盖章后提交**

所以，我们想要做的是通过专注于一种特定类型的故事（即体验型故事）和一个细分市场（即游戏）而在手机平台上启动我们的赞助故事业务，并将其发挥作用，然后在此基础上进行扩展。

114. 因此，Facebook 利用其最有价值的资产（即关于其用户、他们的兴趣，以及最重要的，他们的好友的信息）从移动游戏的激增中赚钱。

115. 《Farmville》是一款允许玩家创建自己的模拟农场的手机应用程序，得益于 Facebook 平台，这类游戏迅速走红。Facebook 逐渐意识到，它可以通过游戏本身获得用户互动。

116. Facebook 通过允许开发者向其用户群投放广告，并通过 Facebook API 来访问 Facebook 的社交网络，从而推动应用程序安装量。Facebook 对其网络带来的每次应用程序安装收取一笔费用。Vernal 详细介绍了该计划：

大体来说，该计划：

1/ 创造新的 iOS + Android SDK，因为当前的 SDK 都很糟糕。Ship Thunderhill，让我们的游戏得到更广泛的采用。

2/ 将它们连接起来，确保我们知道你何时在玩游戏（这样我们就可以生成我们可以在画布上呈现的相同类型的体验型故事）。

3/ 通过我们现有的渠道（信息流、桌面＋移动平台上的网络自我）为这些游戏创造大量有效且有机的分销。发送到手机平台，这让我们能够利用桌面用户去推动手机应用流量。

4/ 创造比原生应用商店（即我们的应用程序中心）更好的应用商店，并对它大做文章，这样开发者就会知道他们应该考虑我们来为他们的移动应用程序增加流量。

5/ 引入一种付费产品，可能是基于安装成本 (CPI)，即你可以付费让我们安装你的移动应用程序。这种付费分销的主要渠道是信息流和应用中心（桌面+手机）以及桌面 RHC。

117. 他们的战略很明确，不仅针对游戏，也针对移动应用程序。Facebook 将通过允许应用开发者利用其用户群来赚钱。Facebook 通过获取其用户的社交数据（包括他们何时玩游戏以及他们的哪些好友玩过游戏）向其用户推送社交游戏广告，作为交换，Facebook 将从每次安装中获得一笔费用，也就是应用程序开发者的每次安装成本 (CPI)。同样的计划通常也适用于移动应

**盖章后提交**

用程序。

118. 在 2011 年底和 2012 年初,Facebook 开始讨论其平台(包括 Open Graph API)的其他变现方式。一种方法是根据使用情况出售 API 访问权限。扎克伯格和 Facebook 的高管们广泛讨论了出售 API 访问权限的一种分层方法。Facebook 考虑了 API 访问权限的一种定价模式,并决定可以将 API 访问权限出售给第三方开发者。Facebook 还决定将 API 访问权限与在 Facebook 上发布广告的能力捆绑在一起。然而,如下所述,Facebook 放弃了它可以从 API 访问权限中获取的利润,以获得完全主导社交广告市场的机会,从而排除竞争对手(包括实际的和潜在的竞争对手),并利用网络效应来实现和维持垄断权力。

**III. Facebook 将其平台武器化以摧毁竞争**

**A. Facebook 计划移除重要的平台功能,并拒绝将社交数据出售给与其竞争的应用程序开发者**

119. 虽然 Facebook 通过 API 和 NEKO 广告系统出售社交数据获取权获得了大量收入和利润,并计划扩大这一业务,但它选择不这么做,牺牲了这些可观的利润。

120. 2011 年底至 2012 年初,扎克伯格与 Facebook 的增长副总裁 Javier Olivan、产品管理副总裁 Samuel Lessin 和 Michael Vernal 就一项计划进行了内部讨论,该计划旨在阻止第三方开发者建立自己的与 Facebook 竞争的社交网络,这些社交网络能够独立于 Facebook 平台产生用户互动和社交数据。

121. 像 Line、微信和 Instagram 这样的新兴移动应用程序正在创造自己庞大的用户群,并且它们的身份识别和登录功能与 Facebook 平台截然不同。它们的日益普及对 Facebook 的核心业务构成了生存威胁,因为该业务严重依赖于用户群的互动。这些应用程序提供了典型的社交应用程序,例如图片分享、消息传递和支付——这直接威胁到 Facebook 自己的应用程序,包括 Facebook 自己刚推出的 Messenger 应用程序。

122. 移动应用程序正在迅速蚕食 Facebook 的主导地位,因为这种地位严重依赖其基于网络的桌面产品。扎克伯格曾公开承认其桌面应用程序不是未来,原生手机应用程序将主导未来

**盖章后提交**

的移动网络。

123.    因此，扎克伯格试图将核心应用程序整合到它的集中式 Facebook 应用程序中，他在 2012 年 3 月与员工的问答中指出，Facebook 正在"朝着社交版 Facebook 发展，到时你可以使用个人应用或 Facebook 版本。" 也就是说，用户可以"用这些 Facebook 应用程序取代手机的整个部分，并且[它们] 将成为人们的完整套餐。"

124.    从 2011 年秋天开始，一直到 2012 年，马克 扎克伯格和他的主要副手 Lessin 和 Vernal 计划解决日益迫近的移动应用程序威胁。他们的解决方案是制定一个方案，通过吸引第三方开发者为 Facebook 平台开发应用程序，然后取消他们对应用程序最核心的 API 的访问权限，从而破坏移动应用程序的大规模增长。他们将利用 Facebook 的"好友"和"时间轴"API，以及其他重要的 API（包括那些与消息传递相关的 API）来实现这一点。

125.    "好友"API 允许第三方开发者浏览 Facebook Graph，搜索用户的好友及其好友的好友。扎克伯格和他的高管们提议修改 API，以阻止第三方开发者访问用户好友（以及他们好友的好友）的信息，除非该开发者的应用程序一开始就已经被用户的好友安装。这确保了新的应用程序不能获取新用户或使用 Facebook 的社交数据来增加其应用程序的价值。

126.    Facebook 还禁止开发者继续从用户的时间轴或信息流中提取有关用户好友的信息。因此，第三方应用程序如果依赖于用户动态消息产生的信息流，比如关于用户的好友订婚或分享一篇新闻文章的帖子，则这些第三方应用程序将突然失去它们正常运行所需的社交数据。

[Redacted]

128.    删除这些 API 的访问权限使得成千上万依赖于这些重要 API 的第三方应用程序停止了增长，因为在 Facebook 看来，这些应用程序侵蚀了保护 Facebook 业务的 DTBE，威胁了 Facebook 的统治地位。

129.    Facebook 的计划阻止了任何有竞争力的第三方应用程序从 Facebook 购买社交数据，

<u>盖章后提交</u>

无论是通过其平台 API 还是通过其广告平台。正如 Vernal 在 2012 年 8 月向 Lessin 解释的那样，Facebook 将 "不允许任何有竞争力的东西从我们这里 '购买' 这些数据。"

130. 因此，Facebook 拒绝将其社交数据出售给任何有竞争力的第三方开发者，从而以牺牲大量短期利润来换取在社交广告市场中的竞争优势。如果不是为了将这些竞争对手赶出 Facebook 所竞争的市场，拒绝将社交数据出售给第三方开发者的决定在经济、技术或业务方面都毫无意义。

131. 拥有成功应用程序的第三方开发者通过增加用户互动以及生成 Facebook 通过定向广告渠道出售（包括向开发者出售）的社交数据，从而提升了 Facebook 整体网络的价值。正如扎克伯格多年前所观察到的，Facebook 自身无法广泛开发新的第三方应用程序，也无法预测哪些应用程序会成功，所以它依赖第三方来做这些工作。拒绝向第三方提供 API 和社交数据意味着他们无法开发对 Facebook 的增长、参与度和广告收入至关重要的应用程序。Facebook 决定故意牺牲其第三方开发者提供的价值，以确保其在社交广告市场的主导地位。

**B. Facebook 的社交数据盗窃**

132. 2012 年 5 月，扎克伯格决定利用将竞争对手列入其平台黑名单的威胁，从 Facebook 的一些竞争对手那里获取宝贵的社交数据。他指示高管们悄悄向使用 Facebook 平台的主要竞争对手索要 "互惠"。扎克伯格要求的互惠是这些竞争对手的业务命脉——即从他们与 Facebook 竞争的网络上的用户互动中获得的社交数据。

133. 到2012年中期，Facebook 开始阻止一些竞争对手使用其平台，从而阻止获取 Facebook 的社交数据。Facebook 已经禁止谷歌（包括与 Facebook 竞争的社交网络 Google+）访问 Facebook 的 API 和广告平台。对于 Twitter、Instagram、Pinterest 和 Foursquare, Facebook 会要求 "互惠"，否则将它们列入黑名单。当然，互惠意味着这些与 Facebook 竞争的社交网络将不得不把他们最有价值的资产（即社交数据）交给他们的竞争对手 Facebook。

134. 如果竞争对手不遵守 扎克伯格的要求，将他们的社交数据交给 Facebook, Facebook 就会直接拿走这些数据。2012 年 5 月，Vernal 指示他的下属——平台工程总监 Douglas Purdy 和

盖章后提交

全球运营副总裁 Justin Osofsky——建立"我们自己的黑客抓取器"和一堆"抓取器",抓取 Twitter 和 Instagram 等竞争对手的网站,收集他们的社交数据,不管是否得到它们的同意。如果 Twitter 或 Instagram 拒绝接受扎克伯格的"互惠"提议,Facebook 就会转而使用抓取器来获取数据。

135.   2012 年 8 月,Facebook 考虑扩大其公司名单,以搜刮社交数据——或者在 Facebook 平台上完全屏蔽这些公司。就在那个月,Facebook 当时的业务和营销合作副总裁 David Fischer 确定了其他潜在的产品类别,以及每个类别中需要屏蔽的竞争公司:

> 我认为我们网络的很大一部分市场将会来自现有的和潜在的竞争对手。以下是 Jud 列出的一份清单,其中列出了如果我们采用广义的"竞争对手"禁令,我们可能会禁止哪些公司:
>
> - 社交网络应用程序(Google+、Twitter、Path 等)
> - 照片分享应用程序(Picasa、Flickr、LiveShare、Shutterfly 等)
> - 消息应用程序(WhatsApp、Viber、Imo、KakaoTalk 等)
> - 本地应用程序(Google+ Local、Google Offers、Yelp、yp 等)
> - 社交搜索应用程序(HeyStaks、Wajam 等)
> - 平台(Google Play、Amazon 等)

136.   因此,Facebook 确定了它在社交数据方面的直接、横向竞争对手,包括那些拥有或可能创建与 Facebook 竞争的社交广告平台的竞争对手。这些与 Facebook 竞争的应用程序类别(尤其是在移动平台上)威胁到了 Facebook 的业务,因为它们创建了独立于 Facebook 的社交网络,而且每个网络都能够生成自己的有价值的社交数据。如果 Facebook 失去了对这些公司的控制,它将失去对这些公司生成的社交数据的访问权限,这意味着 Facebook 自己的产品无法推动用户互动和销售广告。这是因为 Facebook 的机器学习算法(用于确定目标来投放广告和内容,包括通过细分的人口统计数据)需要社交数据才能发挥作用。

137.   2012 年 8 月,Facebook 向董事会发表了一份报告,其中包括各种用于进行平台变现的收入模式,包括 API。董事会明白,Facebook 可以通过向每家公司、每款应用程序、每个用户或每次 API 调用收费来进行平台变现。

<u>盖章后提交</u>

138.　但 Facebook 没有选择做其中任何事情。取而代之的是，它决定在短期内牺牲这些利润来获得对不断增长的移动应用程序和广告市场的完全控制，从而维持并进一步巩固其在社交数据和社交广告市场的主导地位。

139.　Facebook 的计划是阻止竞争对手使用其平台，从而防止他们侵蚀能保护 Facebook 业务的 DTBE。然而，对于少数几个拥有 Facebook 维持和发展自己的业务所需的社交数据的公司，Facebook 会强迫它们达成协议，与 Facebook 分享最有价值的社交数据。如果它们拒绝，Facebook 将把它们列入黑名单，用自己的抓取软件从它们面向公众的网站上抓取信息。

140.　2012 年 9 月，扎克伯格正式下令关闭 "好友" 和 "动态消息" / "时间轴" API，并迫使竞争对手向 Facebook 提供有价值的数据，否则它们将被列入黑名单。2012 年 10 月 30 日，Vernal 将扎克伯格的决定通知了下属：

> 我们将大幅减少通过 Read API 公开的数据…… 我们将修改 friends.get，使其只能返回同样使用应用程序的好友…… 因为 friends.get 将只返回其他 TOSed 用户的数据 [即来自同意应用服务条款的用户的数据]，这意味着我们不再需要 friends_* 权限。我们将删除/白名单流 API 访问权限[动态消息 API]。我们将在没有正式协议的情况下限制竞争网络使用我们的平台的能力…… 我们将要求所有平台合作伙伴同意数据互惠。

141.　这一决定意味着以下几点：(1) 当第三方应用程序调用 "好友" API 时，它无法获取关于用户的其他好友的信息，除非这些好友已经安装了应用程序；(2) "动态消息" API 将不再提供关于用户联系人的信息；(3) 那些获得并同意数据互惠的第三方开发者将被列入 API 访问权限 "白名单"；(4) 对 API 的任何访问都需要互惠。

142.　2012 年 11 月，时任 Facebook 平台负责人 Osofsky 总结了这一决定所需的政策变化：

> 政策变化：定义与 Facebook 竞争的网络 + 要求他们与我们达成协议，无论规模大小。为所有其他开发者维护基于规模的阈值，以强迫进行业务交易。要求用户扩展信息的数据互惠，以确保我们有最丰富的身份。

143.　Facebook 知道，这些变化将消除 "23% 的 Facebook 应用程序使用的增长渠道"，并且在前 1,000 名 iPhone 应用程序中有 89% 依赖于完整的好友列表 API，而前 1,000 名 iPhone 应用程序中有 75% 依赖于好友许可 API。Facebook 认为，该决定将导致其平台上拥有数百万用户的

**盖章后提交**

热门应用程序崩溃，包括 FarmVille、ChefVille、CityVille、Skype、Spotify、Xobni、Texas Holdem、雅虎、Trip Advisor、微软的生日提醒、三星客户端、Glassdoor 等数十款应用程序。

144. 2012 年 11 月 19 日，扎克伯格大范围宣布了他的决定，以屏蔽竞争对手，或者要求完整的数据互惠，以继续访问。Facebook 首席运营官 Sheryl Sandberg 立即批准了这一决定，并补充说："我们正试图最大化 Facebook 上的分享，而不仅仅是全世界的分享"，并指出，这一区别是一个"关键区别"，也是"原因所在"。

145. Facebook 开始准备 2013 年的移动广告业务计划，其中包括推出新版本的平台 3.0。根据 Facebook 的说法，平台 3.0 将促进 Facebook 从桌面广告业务向移动广告业务的过渡。过渡计划的一个核心元素是执行 扎克伯格关于删除"好友"和"动态消息"API 的决定。

146. 2012 年 11 月，Vernal 向 Facebook 的其他员工解释了 扎克伯格的决定，指出，他认为 Facebook 要求竞争对手提供的数据量是"疯狂的"：

> [一家公司必须分享]该用户可能被其他用户看到的每一条内容。马克的意思是，他希望某些（我认为不是所有）合作伙伴代表他们的用户为我们提供动态消息，这种做法有点疯狂。

147. Facebook 继续将正式化其计划，要求其有权抓取器竞争对手的网站，以此作为访问其平台的条件。2012 年 11 月，Facebook 的集团产品经理 Rose Yao 解释了这一计划：

> 我们也保留抓取合作伙伴网站的用户数据的权利。合作伙伴不能将 Facebook 列入黑名单或阻止其抓取你的网站或使用 API。如果它们这样做了，Facebook 保留权利阻止合作伙伴使用我们的 API…… Action Importers 背后的理论是我们需要平衡杠杆。只要我们可以调用你的 API（如果你有）或抓取你的网站（如果没有）并访问你的数据，你就可以调用我们的 API 并访问我们的数据。你可以拖延，但如果是我们做的话，我们就会迫使你做出决定，要么允许我们访问你的数据，要么你阻止我们。如果你屏蔽了我们，那么我们就很容易/直接决定屏蔽你。有什么改变？*当我们第一次开始讨论这个问题时，我们说的是只针对顶级合作伙伴。我想很多人把这解读为只是一种谈判策略——就如果他们不合作，我们就威胁要这么做。从那时到现在的变化是，这显然不是一种谈判策略——这实际上是用于读取端平台的策略。*

（着重强调）。

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

<u>盖章后提交</u>

148.　因此，最初作为一种从竞争对手那里获取社交数据的谈判策略成为了 Facebook 平台战略的基础。对于那些足以构成威胁来创建自己的竞争网络的竞争对手，Facebook 要求他们交出它们拥有的唯一一筹码——它们从用户互动中获得的社交数据。

149.　对于一些直接与 Facebook 竞争的竞争对手来说，再多的数据量也不足以证明它们访问 Facebook 平台的正当性，而对于那些依赖 Facebook 平台、没有任何有用数据可提取的新生威胁，Facebook 的决定是直接切断它们对"好友"和"动态消息"API 的访问权限，而这几乎立即扼杀了它们的业务。

150.　2012 年 11 月，Vernal 向扎克伯格表达了对该战略的担忧，指出他对 Pinterest 等竞争对手会允许 Facebook 获取他们的社交数据表示怀疑。如果他们和其他公司一样这样做，Facebook 将成为竞争对手之间收集的数据的中心交换平台。也就是说，竞争对手将数据共享给 Facebook，然后 Facebook 将这些数据共享给参与该方案的竞争对手。***Facebook 将成为一个数据传递机制。***

151.　2012 年 12 月，尽管认识到 API 访问权限（特别是当与 Facebook 的 NEKO 广告平台捆绑在一起时）是有利可图的，但 Facebook 决定不对 API 访问权限收费，并开始全面实施 扎克伯格的决定。

152.　虽然 Facebook 曾计划在一篇公开的博客文章中宣布了其关于不允许通过好友和动态消息 API 访问好友数据的决定，但扎克伯格在 2012 年 12 月否决了这一决定。相反，扎克伯格在仔细分析了 Facebook 的竞争对手后，决定有选择地、秘密地执行这一决定。一些竞争对手将完全被屏蔽在 API 之外，而一些精选的少数公司只有在不向 Facebook 提供它们自己的社交数据时才会被屏蔽。

**C.　Facebook 针对竞争对手的互惠或拒绝 API 访问权限**

153.　从 2013 年 1 月开始，Facebook 开始对所有依赖其平台的应用程序进行内部审计。它立即发现竞争对手，完全屏蔽其访问 Facebook 的 API 或广告平台。具体来说，扎克伯格下令限制微信、Kakao 和 Line 使用好友和动态消息 API，甚至禁止它们在 Facebook 的 NEKO 和其他

**盖章后提交**

平台上做广告。

154.　Facebook 的 David Fischer 对这一决定表示反对，他指出，即便是在广告平台上屏蔽竞争对手，也是不合理的，并且是行不通的：

> 我仍然认为我们应该允许来自竞争对手的广告，原因如下：我们应该在我们的产品质量上有足够的安全，使它们能够在开放的市场上有效地竞争……这样的防御姿态会看起来软弱无力。在执行时将面临挑战。我们有很多竞争对手，这个名单迟早会增加。随着我们 Gifts 的发展，我们将如何判断零售商和电子商务网站，因为它们也可以说是竞争对手。

155.　Fischer 是正确的。这个决定在经济上和商业上都不合理。拒绝作为 Facebook 平台的一部分或通过广告出售社交数据的唯一目的是排除竞争，让 Facebook 主导社交广告市场。除了反竞争的目的之外，Facebook 拒绝以全价出售社交数据或广告的决定是如此不理智，以至于那些可能并不完全了解这项反竞争计划的 Facebook 自己的员工对这一决定的不合理些提出了抗议。

156.　同月，Facebook 的 Osofsky 请求 Vernal 发表一份声明，向开发者发出一个明确的信号，但 Vernal 回应说，扎克伯格已经拒绝了这种做法。正如 Vernal 所解释的那样，告知开发者这一决定意味着要承担"改变规则"的"真实成本"，包括背叛 Facebook 为构建其 API 和平台而引诱的开发者的"公关成本"。

157.　同月，Facebook 继续执行 扎克伯格的决定，将竞争对手列入黑名单。他命令 Facebook 的竞争对手 Vine 从 Facebook 的 API 和平台上"关闭"，包括关闭广告。由于 Vine 使用了 Facebook 的平台，Facebook 再次牺牲了其可能通过增加用户互动和广告收入而获得的利润，以换取将 Vine 排除在竞争版图之外。

158.　事实上，Facebook 的移动广告平台正在迅速增长，而阻止大公司使用它，除了实现 扎克伯格的计划，以防止对手与 Facebook 竞争之外，没有任何经济意义。在 2013 年 1 月 20 日的一封电子邮件中，Facebook 时任产品管理和平台货币化团队总监 Deborah Liu 写道："本周 Neko 又涨了 50%！周五达到 72.5 万美元的高点（费用见下文）。我们现在占广告总收入的 5%，移动广告收入的 21%。"

**盖章后提交**

159.　Lessin 回应道："neko 的增长非常惊人。完全超出我的预期，这是可能的重新增加付费产品。"

160.　然而，Liu 很清楚，尽管之前的支出大户（如微信）被列入了黑名单，但收入还是增加了："根据该政策，微信和其他竞争网络不再在 Neko 上做广告。"

161.　2013 年 2 月，Facebook 关闭了 Yahoo! 对关键 KPI 的访问权限，这导致了 Yahoo! 的 Marissa Mayer 和 Facebook 的 Sheryl Sandberg 之间的直接谈判，以恢复 Yahoo! 对 Facebook 平台的访问权限。

162.　2013 年 3 月，Facebook 的关键平台员工开始表示担心，认为 Facebook 采取的关闭访问权限，然后强迫"数据互惠"的做法是有问题的。相反，他们鼓励提前宣布 API 将不可用，然后就访问 Facebook 平台的协议进行谈判。当月，在 Purdy 发给 Facebook 其他员工和高管的一封电子邮件中，他写道：

> 我一直在思考关于互惠和竞争性执行的挑战（friends.get 等）和事实，*这都是事实*。我们现在的结构是，你在 FB 上开发一款应用程序，然后发布，然后我们可能会关闭它，这伤害了用户和开发者。我想知道，我们是否应该尽快采取一种产品模式，在这种模式下，在未经批准的情况下，你从平台上得到的只是登录（基本信息）和分享。所有其他 API 都可用于开发，但在应用程序向真正的用户发布之前必须得到批准（基本上所有使用 friends.get 的应用程序都必须获准拥有这个能力）。我们大致上正在把它作为统一审查的一部分来交付，但不包括像 friends.get 这样更细粒度的审批。我喜欢这一点的另一个原因是，我们可以通过让每个功能都得到批准，从而使我们的白名单更加清晰。Marie：我认为这使你的"弃用"更容易。想法?

163.　尽管 Facebook 已经开始完全弃用这些 API（除了那些有白名单协议的 API），但它仍在悄悄地关闭竞争对手对这些 API 的访问，然后要求他们做一个互惠交易。事实上，Facebook 随后很快关闭了三款与 Facebook 竞争的 Amazon 应用程序，这导致 Amazon 抗议该决定"将破坏我们的 3 个实时集成"。

164.　2013 年 3 月，Facebook 以 API 和平台访问权限作为杠杆，收购竞争对手 Refresh.io。Facebook 内部决定，可以用拒绝访问 API 来威胁 Refresh.io，除非它把业务卖给 Facebook。同样

<u>盖章后提交</u>

的杠杆形式也会被用来收购其他竞争对手——要么他们卖给 Facebook，要么他们看到自己的业务被 Facebook 平台驱逐。

165. 2013 年，Facebook 还开始使用移动间谍软件公司 Onavo，秘密跟踪客户手机上应用程序的使用情况。Onavo 通过欺骗性的服务条款，实时跟踪应用程序的使用情况，而 Facebook 则利用这些数据锁定特定的竞争对手。到 2013 年 4 月，Olivan 使用 Onavo 跟踪 Snapchat、Pinterest、WhatsApp、Tumblr、Foursquare、谷歌、Path、vine、Kik、Voxer、MessageMe、Viber、GroupMe、Skype、Line 和 Tango。一份内部 Olivan 演示文稿包含了这些应用程序从 2012 年 8 月到 2013 年 3 月的详细使用数据。

166. 到 2013 年 7 月，Onavo 数据已经向 Facebook 提供了关于 3000 万 Onavo 用户的详细情报。数据显示，在所有这些应用中，WhatsApp 迅速崛起，它是 Facebook 自己的新兴产品 Messenger 的直接竞争对手。

167. 有了关于 Facebook 平台内外竞争对手的详细情报，Facebook 下令对 Facebook 依赖好友和动态消息 API 的应用程序进行详细审计。

168. Facebook 的开发者平台和项目总监 Konstantinos Papamiltiadis 表示，有 40,000 款使用 API 的应用程序将受到限制，其中 7% 是照片或视频分享应用程序。

169. 随后，Facebook 开始将这些第三方应用程序分为三个大类：(1) 如果它们对 API 的访问权限被关闭，"可能会造成负面影响"的开发者；(2) 能"提供战略价值"的应用程序；(3) 具有"竞争性"或"对 FB 没有用处"的应用程序。由于 API 访问限制而导致"重大业务中断/终止"的应用程序开发者会收到一个"PR 标志"。

170. 为了应对这种分类，Lessin 立即命令他的下属"关闭生活方式应用程序上与好友的联系…… 因为*我们最终要与所有这些程序竞争。*"（着重强调）。

171. 随着 Facebook 对依赖好友和动态消息 API 的应用程序的持续分析，很明显，Facebook 的计划将导致"大多数 API 表面"的弃用——也就是，作为 Facebook 平台最重要部分的 API。

盖章后提交

[Redacted]

盖章后提交

1

2    [Redacted]

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>盖章后提交</u>

**E.    关于取消开发者访问好友、动态消息、事件和其他关键 API 的决定缺乏任何正当理由**

181.    负责实现 扎克伯格限制 API 访问权限决定的工程师们感到困惑。这个决定在技术方面毫无意义。事实上，除了压制那些威胁 Facebook 和 DTBE 主导地位的竞争对手之外，它没有任何理由这么做。

182.    正如 Facebook 工程师 David Poll 在 2011 年早些时候写给所有平台工程师的信中所说的那样，这一决定意味着 Facebook 平台上一些最重要的移动应用所使用和需要的功能将被删除：

> 当我今晚使用我的 Android 手机时，我正在考虑平台 3.0 的好友列表的变化，并意识到两个对我的日常移动体验影响最大的应用程序将被这个变化彻底地、不可逆转地破坏…… 在这两种情况下，应用程序都为我的体验增加了真正的价值，而且在这两种情况下，我都不指望我的好友会使用这款应用程序。我对这种改变的根本问题是，我的好友列表就是我的信息——它是我的一部分，Facebook 关闭这个访问权限主要给我的感觉是，Facebook 入侵并关闭了我对自己信息的访问权限。

183.    Poll 得出的结论是：“无论你如何看待它，这一变化都将对我的日常智能手机体验产生重大的负面影响。”

184.    Poll 是正确的。这一变化意味着破坏了那些曾为 Facebook 网络带来重大价值，并增加 Facebook 核心产品用户互动的应用程序。故意破坏这些应用程序的决定只有一个看似合理的目的——加强 DTBE，并确保竞争对手无法创建与 Facebook 竞争的社交网络。

185.    这一主张对负责 Facebook 平台的人员来说是显而易见的。在 2013 年 8 月的一封电子邮件中，平台高级工程师 Bryan Klimt 致信 Facebook 开发者产品主管兼 API 高级工程师 Ilya Sukhar 以及 Facebook 平台的其他工作人员，称 Facebook 决定屏蔽好友和动态消息 API 的原因是为了排除竞争对手，其他所有原因都是虚假的和托词。首先，Klimt 明确表示，删除 API 是“荒谬的”，因为它们对 Facebook 平台来说是如此重要：

> 我正试图写一篇文章，内容涉及删除让你从 Facebook 平台获得用户好友列表的 API 将是一个多么糟糕的想法。为了说明我的观点，我想讽

**盖章后提交**

刺地建议删除一些对开发者体验至关重要的 API，并且说明删除这些 API 从表面上看是很荒谬的。例如，删除允许你创建新窗口的窗口 API 方法。或者删除让你发送文本消息的 Twilio API 方法。这两个建议都是完全疯狂的。问题是，对 Facebook 平台来说，删除获取好友列表的方法从字面上看就已经很荒谬了。我想不出比这更可笑的例子了。

186.   Klimt 随后否认了 API 被移除是因为技术或功能原因的说法：

在我们更详细地讨论之前，我想澄清一些关于弃用的误解。我听到一些关于我们为什么要这么做的谣言。但其中许多谣言显然是随意编造的，目的是让工程师们认为这个决定有坚实的技术理由。但它没有。1/ 这个 API 可能被滥用，所以我们可以删除它。这是假的。是不合逻辑的。很多 API 都可能会被滥用。我们的整个产品都可能被滥用。这就是为什么我们拥有行业中最优秀的团队之一来检测和遏制滥用。这个团队，再加上"统一审查"，已经足够处理来自这个 API 的任何理论上的滥用。即使这是真的，谁愿意在一个全班都因为少数人的过失而受到惩罚的教室里？

187.   Klimt 还明确表示，删除 API 并不是为了支持提供相同功能的新 API 或不同的 API：

2/ 可以删除，因为我们已经为共同用途提供了替代方案。这是假的。如果你认为这是真的，那么我认为你并没有意识到开发者平台存在的原因。如果我们想要将 Facebook 限制在我们已经想象过的用例集合中，那么我们可以自己做，甚至不需要平台。平台的目的是让人们在它上面构建新事物。它是要让世界上任何人都能想到的所有想法都成为可能。开发者会有各种疯狂的想法。我们希望他们在 Facebook 的基础上构建那些疯狂的想法。你知道为什么 Facebook 最初是为 WWW 而建的，而不是作为 CompuServe 或 AOL 的专有网络的一部分吗？ 这是因为网络是一个开放和可扩展的平台。它让开发者将他们最疯狂的想法变成现实。

188.   Klimt 随后解释说，真正的原因是要伤害 Facebook 的竞争对手，阻止他们与 Facebook 竞争：

所以，如果这些原因都不能解释我们为什么要这么做，那么是什么在驱动它呢？ 我所听到的唯一一个合理的理由是，我们担心有人"窃取图谱"，*我们这样做是为了确保其他人都无法通过我们的社交图谱来创建一个与我们竞争的社交网络。*好吧，让我们假设这个社交图谱属于我们，而不是我们的用户。让我们假设这是一个真实的问题，尽管，我不相信它是。我的意思是，关于其他公司会窃取我们的好友图谱的担忧可能只是妄想。但为了便于讨论，我们就当它不是妄想。然后呢？

盖章后提交

> ***我们正在移除开发者平台中的核心 API。因为担心有人会窃取我们的社交网络产品。***这向开发者传达了一个明确的信息：Facebook 平台仅次于社交网络产品 Facebook。这一直是对我们平台的一种批评。当你阅读那些批评我们平台的博客文章时，它们都提到了这一点。当我们的 API 受制于其他产品的突发奇想时，它们就不可能是稳定的。而一个不稳定的平台并不是真正的平台。那么就剩下两个大问题了。1/ 你如何说服外部开发者在一个最基本的核心 API 随时可能被移除的平台上进行开发？ 我的意思是，我们现在提供的最大价值便是分销和曝光，这将鼓励开发者只与 Facebook 进行最表面的整合。基本上，他们只会做能够使用 Neko 广告的事情。2/ 你如何说服内部开发者在平台上工作，因为他们知道平台在公司的其他部门面前只会充当次要角色？ 我的意思是，为什么我们中的任何一个人要去开发一款随时可能被破坏的会让另一个团队受益的产品呢？ 如果我在平台上工作，如果这个 API 被弃用，我会认真地重新考虑我的选项。

（着重强调）。

189.    Klimt 说得很清楚——除了防止竞争对手创建一个与 Facebook 竞争的，侵蚀能保护 Facebook 业务的 DTBE 的社交网络，删除 API 的决定缺乏任何技术或商业上的理由。在 Facebook，任何人提出的任何相反的理由都完全是托词。

190.    此外，关于移除 API 的决定永久性地摧毁了 Facebook 平台的价值。如果开发者不相信 Facebook 会将 API 作为其平台的稳定部分来维护，他们就不会在未来冒险为该平台编写应用。这一决定意味着摧毁 Facebook 宝贵的平台，以阻止竞争对手占领社交网络。

191.    Sukhar 回应了 Klimt，指出他同意这种说法，而且他"在每次会议上都会提到这一点"。他请求 Vernal、Purdy 和 扎克伯格改变他们的决定，但没有人理睬他。这个决定已经做出，Klimt 和 Sukhar 必须执行它。

192.    Facebook 继续对依赖 API 的应用程序进行审计。大多数应用程序对 Facebook 生态系统都很重要。事实上，Facebook 承认它们"不是垃圾邮件或垃圾，但应用程序用户喜欢很多。"尽管如此，Facebook 的 Papamiltiadis 得出的结论是，Sunrise、Yahoo、IFTT、Friendcaster、MyLife、Sync.me、YouTube、Contacts+ 和 Bitly 等应用程序"与 Facebook 的产品重叠"，"可能会影响我们在这些领域的成功"。

<u>盖章后提交</u>

193.    Facebook 对与其竞争的应用程序的仔细监控一直持续到 2013 年，鉴于其严重依赖 Onavo 秘密收集的数据，Facebook 于 2013 年 10 月 14 日收购了 Onavo。Facebook 使用这些数据来确定哪些应用程序与其社交网络竞争，从而对 DTBE 构成威胁。然后，它针对这些公司撤回 API 访问权限，并强迫其达成数据互惠协议。

194.    2013 年 10 月，Facebook 的 Purdy 报告称，Facebook 将应用程序分为"三个部分：现有的竞争对手、潜在的未来竞争对手，以及与我们的商业模式一致的开发者"。Facebook 的 Eddie O'Neil 认为，"这些类别之间的划分并不清晰"，而且重叠存在问题。正如 O'Neil 所观察到的，"应用程序可以从一致转向竞争，最终会让我们感到难过，因为我们在它们与我们一致时向其泄露了一堆数据。"

195.    Sukhar 反对整个做法，指出他已经与许多开发者交谈过，"他们会被这事搞得一团糟，甚至连理由都不对。" Sukhar 解释说，他的"工程师们认为**这个计划是疯狂的**，我不会支持召开全体会议来说服他们。"（着重强调）。

196.    正如 Sukhar 所指出的，关于从平台上撤回好友、动态消息和事件 API 的决定在技术上毫无意义，而 Sukhar 也不会让自己把这件事告诉他的工程师们——因为他们已经识破了这个诡计。很明显，Facebook 试图压制潜在的竞争——即通过阻止与其竞争的应用程序的用户增长和用户互动。就像一位 Facebook 工程师评论移除 API 计划的明显目的一样："我明白我们想让开发者很难开发出一款新的应用程序。"

197.    对应用程序的审查继续进行，针对某些高度敏感的竞争对手的具体决定被上报给马克·扎克伯格。正如 Facebook 内部一封电子邮件所解释的那样：

> 我们维护了一份很短的战略竞争对手名单，马克已经亲自审查过它。名单上的公司生产的应用程序受到如下列出的一些限制。在未获得马克级别签字的情况下，不允许超出指定范围的任何使用。

198.    2013 年 12 月，Klimt 向 Sukhar 抱怨审计和分类过程：

> 我们真的要根据我们对应用程序的恐惧程度将它们分组并给它们不同的 API 吗？ 我们怎么可能想要记录这些信息呢？ 在页面顶部放一个

<u>盖章后提交</u>

链接，上面写着"要开发一个即时通讯应用程序吗？ 点击这里过滤掉我们不让你使用的 API！"

如果一个应用程序添加了一个功能，将它们从 2 移到 1，这该怎么办。只是休息？ 消息应用程序不能使用 Facebook 登录？ 所以我信息是，"如果你要与我们竞争，那么请确保你不与我们整合。" 我简直惊呆了。

199.    Poll 在回应 Klimt 的投诉时承认，Facebook平台的变化"不仅复杂，而且有点不道德"。Klimt 同意这一评估，并指出移除 API"感觉不道德……这让我觉得自己是个坏人。"

**F.    Facebook 准备宣布移除 API**

200.    扎克伯格决定在代号为 PS12N 的 Facebook 平台重大变化的掩护下宣布移除 API，该变化将在下一次 Facebook F8 开发者大会上宣布。因此，Facebook 的工程师们在 2013 年 9 月接到指示，将 API 的更改隐藏起来，并在大会上宣布更改时悄悄宣布。

201.    在宣布撤回 API 之前，Facebook 继续对其平台上使用 API 的应用程序进行审计。在此过程中，Facebook 继续把包括 LinkedIn 和 AirBnB 在内的潜在竞争对手归类为将被拒绝访问的公司，没有白名单例外。

202.    尽管 Facebook 知道 API 将在下一次 F8 大会上被移除，但它仍然告诉开发者要依赖它们。正如 Facebook 平台的一位技术传道者所指出的，在一份经常与开发者分享的文件中，"这里关于好友权限的语言与我们即将进行的平台简化工作是背道而驰的"，"感觉这有违我们前进的精神"。

203.    然而，这正是 Facebook 想要的——继续吸引开发者在使他们对 Facebook 产生依赖的 API 上构建他们的软件和业务。API 的使用意味着竞争对手可能会突然被市场拒之门外，有用的应用程序可能会被勒索以获取有价值的社交数据，而其余的应用程序可能会被摧毁。

204.    到 2013 年 10 月，Facebook 要求它选择的白名单中的某些应用程序开发者签署私人扩展 API 协议，该协议要求他们购买大量广告或向 Facebook 提供自己有价值的社交数据，以换

**盖章后提交**

取继续访问。例如,在那个月,Facebook 将 Royal Bank of Canada 的应用程序列入白名单,以换取通过 Facebook 的 NEKO 广告平台购买社交数据。[Redacted]

205. Facebook 在其平台上对可能抱怨这一决定的开发者进行了分类和跟踪,这制造了负面新闻。负责起草公关信息的 Facebook 内部员工在 2013 年 12 月的一封电子邮件中解释了这一计划:

> 为了准备实现平台简化,我们整理了一份我们认为可能会在媒体上对我们所做的改变发声和表达负面看法的开发者名单:首先,我们认为这将是过去政策执行中常见的嫌疑人的名单。我们很乐意从你的历史知识中找到答案。你是否想把任何人加入下面的名单? 我们将围绕如何管理以及与其中每个开发者沟通来制定计划。我们还计划与那些拥有很高的广告支出并且是 马克/Sheryl 好友的开发者合作。”

206. Facebook 计划谨慎地管理它的信息,因为它的决定可能会疏远那些通过广告从 Facebook 大量购买社交数据,并且/或者是 Facebook 两位最高高管 扎克伯格和 Sandberg 的好友的开发者。我们确定了这些开发者的身份,并精心设计了将传达给他们的信息,以避免公关灾难。然而,对于大多数应用程序开发者来说,这个决定将导致他们的应用程序完全被排除在 Facebook 的生态系统之外——这对他们的业务来说可能是致命的。

207. Facebook 针对的可能是“发声”或“表达负面看法”的开发者,包括但不限于以下应用程序和开发者:iLike、Rock You、Zynga、Path、Flipboard、Slide、Social、Fixer、SocialCam、Viddy、BranchOut、Vince、Voxer、Message Me、Lulu、Anil Dash、Super Cell、Kabam、Washington Post、Guardian、the Wall Street Journal、Jason Calacanis、cirl .cl、Bang with Friends、Tinder、Social Roulette、App Wonder、Ark、Vintage Camera 和 Girls Around Me。

208. Facebook 还利用由 Android 用户秘密收集的通话记录数据来锁定要关闭的开发者和应用程序。

209. 整个过程让 Facebook 的工程师 George Lee 悲叹道:

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

**盖章后提交**

我们在2年前向开发者兜售了一份关于 OG [Open Graph] 的商品清单，并告诉他们最好的方法之一便是进行 a/b/测试并优化内容和创意。现在我们成功了…… 我们说的是把它拿走…… [开发者]投入了大量时间在我们的系统上建立流量…… 我越思考这个问题，我就越担心今年我们的开发者所面临的一堆问题。PS12N 将要求他们改变对待 API 的方式（并且将获得有限的价值）。

210. 因此，当 Facebook 继续准备它的 API 退出公告时，Facebook 自己的高管意识到平台开发者已经被欺骗去依赖 Facebook 的 API。Facebook 很清楚它打算移除 API，但它允许并鼓励开发者在这些 API 的基础上或围绕它们建立完整的业务。正如 Lee 所说，它们被当作"商品清单"出售。

211. 到 2014 年，很明显，除了少数应用程序和开发者，大多数应用程序将完全无法访问好友、动态消息和事件 API。

212. 2014 年 1 月，扎克伯格就拒绝 API 访问交友应用程序进行了辩论。Facebook 决定将 Tinder 和其他指定的约会应用程序列入白名单，并关闭其他应用，从而为被选中的应用主导约会市场扫清道路。扎克伯格的理由是，虽然 Facebook 最终会创建自己的约会应用程序，但在 Facebook 的竞争应用准备好之前，它会让 Tinder 和选定的少数几个其他应用程序生存下去：

我一直在思考 Tinder 和其他用户推荐应用程序，因为现在许多国家约有 10% 的人在使用 Tinder。用户推荐似乎是我们的强项，但目前我们还不太擅长。Tinder 的增长尤其让我担忧，因为他们的产品完全建立在 Facebook 的数据上，而且它比我们使用相同的语料库构建的任何推荐都要好得多…… 我认为这是一个巨大而重要的空间，我们应该有一个团队来做这件事——也许现在可以开发用户推荐 Hunch 的部分。

213. 扎克伯格越来越多地参与评估当 API 被移除时，单个应用程序是否会被列入白名单。Facebook 的高层管理人员为此准备了建议供他考虑。例如，在 2014 年 1 月的一场名为"马克的幻灯片"的演讲中，Facebook 员工总结了正在进行的应用程序审计的结果。演示文稿指出，如果没有与 Facebook 达成白名单协议，就"不可能"开发出一款应用程序。该演示文稿特别推荐了通过 Facebook NEKO 平台购买大量社交数据的应用程序，或其开发者是 扎克伯格或 Sandberg 的

<u>盖章后提交</u>

好友的应用程序。然而，依赖好友、动态消息或事件 API 的 41,191 个应用程序中的大部分将被关闭，从而被完全销毁。

214.    虽然对这些应用程序的影响很明显，但 Facebook 继续向开发者宣传 API。2014 年 1 月，Facebook 的 George Lee 向 Purdy 和 Vernal 发出警告，但对方故意充耳不闻：

> 合作伙伴经理仍然在销售我们要求他们销售的产品，所以当涉及到 feed 整合时，我们仍然告诉人们使用 [Open Graph]。上一款 f8 是关于隐式 [Open Graph]，所以虽然我们可能已经做出决定，如果没有替代方案，未来将不再是这样，但我们没有任何东西可以告诉当前的[开发者]（因此合作伙伴继续告诉他们使用 [Open Graph]，他们继续集成它）。

215.    这个关于悄悄取消 API，转而支持一个新的受损的开发者平台的计划被 Facebook 的工程师们称为 "交换机计划"。很明显，在即将到来的 F8 大会上宣布对平台的改变是为了掩盖 Facebook 计划对其平台做出的根本性改变——即，移除好友、动态消息和事件 API。

216.    2014 年 3 月，Facebook 的工程师和员工一直对即将到来的决定感到困惑。一位员工指出：

> 我们阻止其他开发者在我们的平台上做我们自己可以做的事情，这似乎有点奇怪。我们认为自己可以豁免吗？ 这似乎有点不公平，尤其是我们对某些政策的立场是，它们是为了确保信任和良好的体验。我关于平台是一个公平的竞争环境的思维模式可能是错误的。

217.    这一决定对 Facebook 自己的员工来说毫无意义，尤其是因为 Facebook 本身需要 API 来开发他们自己的竞争应用程序，包括 Facebook 的 Messenger 应用程序。Facebook 的高管们忽视了他们员工（包括 API 工程师）提出的所有疑虑，并在 F8 大会上继续推动关于移除 API 的声明。

218.    移除 API 的真正原因被严格保密。2014 年 4 月，就在宣布移除 API 之前，Vernal 警告 Sukhar，如果提到任何关于移除 API 的竞争原因（如 Sukhar 所希望的)，将会有 "很高的闯入监狱的可能性"。

**G.    F8 公告**

盖章后提交

219.  2014 年 4 月 30 日，Facebook 在其网站上宣布了"The New Facebook Login and Graph API 2.0"。Facebook 在好几个页面上都预告了其新登录系统的变化。在公告中隐藏着一个关于平台最重要的 API——好友、动态消息和事件 API——的秘密声明："除了上述变化，我们正在删除几个很少使用的 API 端点；详情请访问我们的更新日志。"

220.  这些 API 并不*少用*。成千上万的第三方应用程序都在积极使用这些 API 并在它们基础上构建。Facebook 内部的工程师把它们比作微软 Windows 系统中必不可少的 API，并对删除这些 API 感到愤怒。在 2012 年 12 月的调查中，十大 Facebook 应用程序中有五款严重依赖于这些 API。该公告完全是虚假的，并被故意隐藏在其他 API 公告之下，以避免引起人们对该决定的削弱竞争效应的关注。事实上，今天，在 Facebook 的页面上已经无法访问公告中提到的更新日志，而多年前的其他变更日志仍可访问。

221.  当马克扎克伯格在 F8 大会上发表主题演讲时，他并没有提到被删除的 API。相反，就在 Facebook 悄悄地删除了 Facebook 平台中一些被最严重依赖和必要 的 API 的同时，扎克伯格强调了 Facebook 移动平台的"稳定性"。



222.  在公告之前的 20 个开发者会议上，没有一个人提到 API 被移除，也没有人提到即将到来的变化会破坏几乎所有依赖于 API 的超过 40,000 款第三方应用程序。

## IV. 监视和获取竞争威胁

223. 为了确保其用于维持和扩大其市场支配力量的计划能够奏效，Facebook 必须控制一个重要的竞争来源：独立的社交网络和社交数据的生产者。尽管 Facebook 可以通过拒绝访问必要的 API 来摧毁任何依赖其平台的竞争对手，但这并不能阻止一个完全独立于 Facebook 而发展其用户网络的竞争对手。

224. 为了在这种威胁变得过于强大之前发现它们，Facebook 找到了一种方法，暗中监视数百万移动用户，以确定他们在使用什么应用程序，以及如何使用。移动应用程序对 Facebook 来说尤为重要，因为桌面互动正在减少，而移动应用程序却在迅速激增。到 2012 年，扎克伯格和 Facebook 都清楚地认识到，任何对其主导地位的威胁都将来自一款移动应用。正如本节所解释的那样，Facebook 以一种前所未有的规模使用移动间谍软件来监视、识别那些独立地威胁到 Facebook 的主导地位和/或保护其垄断地位、市场力量和业务的 DTBE 的竞争对手，并最终通过收购将其从市场中清除出去。

### A. Facebook 依赖 Onavo 对其竞争对手进行监视，并收购和使用 Onavo 的资产

225. Onavo 是一家以色列移动网络分析公司，由 Roi Tiger 和 Guy Rosen 在 2010 年创立。该公司设计了一款间谍软件，用于在用户使用移动设备时监视他们。为了获取关于用户使用移动应用程序和带宽的广泛信息，Onavo 将其间谍软件隐藏在虚拟专用网 (vpn)、数据压缩、甚至移动隐私应用程序中。

226. Onavo 将收集到的移动使用数据卖给了 Facebook，后者反过来利用 Onavo 获得的实时信息来确定哪些移动应用程序对 Facebook 的主导地位和用于保护 Facebook 免受新进入者和竞争的 DTBE 构成威胁。Facebook 使用 Onavo 数据：(a) 识别并锁定竞争对手，以便 Facebook 要求签订白名单和数据共享协议；(b) 识别并锁定 Facebook 将完全拒绝其平台访问权限的竞争对手；(c) 识别并锁定那些 Facebook 将通过收购方式完全从竞争格局中移除的竞争对手。

227. Facebook 实时接收到 Onavo 的信息，其中包括竞争对手移动应用程序的两个最重要的指标——它们的覆盖范围和互动。"覆盖范围"衡量的是应用程序用户群的规模，"互动"衡量的是用户积极与应用程序互动的程度。一款拥有高覆盖范围和低互动率的应用程序无法产生

Facebook 所需的社交数据，从而为其广告平台提供可操作的目标用户数据。相反，一款拥有高互动率和低覆盖范围的应用程序无法从足够多的人群中产生社交数据，从而吸引广泛的广告商。对 Facebook 业务最大的威胁将来自一款显示出强大的覆盖范围和强大互动率的应用程序，尤其是一款在这两个指标上都显示出快速增长的应用程序，因为这表明网络效应的发展。

228.　随着移动应用程序对 Facebook 市场主导地位的潜在威胁持续增长，Facebook 试图获得对 Onavo 监控数据的独家控制，以及对其移动间谍软件代码和安装基数的控制。2013 年 10 月 13 日，Facebook 收购 Onavo。

229.　Onavo 的首席执行官 Guy Rosen 和 CTO Roi Tiger 在其博客上宣布，Onavo 将继续作为一个独立品牌运营：“交易完成后，我们计划继续作为一个独立品牌来运行 Onavo 移动应用程序。我们将一如既往地保护我们应用程序用户的隐私，这一承诺不会改变。”

230.　然而，Facebook 有其他计划。该公司立即开始将 Onavo 的应用程序整合到其业务运营和收购战略中。例如，Facebook 开始分析由 Onavo 的 Protect 软件秘密收集的数据，这款软件是一个伪装成 VPN 软件的大规模监视和数据收集方案。Onavo Protect 被标榜为一种“保护你和你的数据安全”的方法，实际上它可以监控用户移动设备上的所有网络和移动应用程序流量。

231.　当 Onavo Protect 的用户打开一个移动应用程序或网站时，Onavo 软件会秘密地将流量重定向到 Facebook 的服务器上，在该服务器上，行为被记录在一个庞大的数据库中。随后，Facebook 的产品团队分析了汇总的 Onavo 数据，以确定人们在实时使用哪些应用程序和功能、他们使用这些应用程序的频率和时长。如果一款应用程序中的数据未被加密，那么这些信息就会像诸如用户在该应用程序中一周内平均点赞或发布的照片数量一样具体。

232.　根据 2017 年的一项估计，Onavo 的移动应用程序被下载了大约 2400 万次，而 Facebook 收集、编译并利用了收集到的所有数据。截至 2018 年 2 月，Onavo 应用程序在 iOS 和 Android 平台上的下载量已达 3300 万次。

233.　正如联邦贸易委员会的前首席技术专家对媒体所说的那样，Onavo 正被用来违反用户利益，从而扼杀有竞争力的创新：

　　　　他们不是为了发布广告而转换数据，而是将其转换为竞争情报…… 从

盖章后提交

本质上讲，这种方法以直接损害消费者利益的方式使用消费者产生的数据——例如，阻碍竞争创新。

234.  自 2011 年至今，Onavo 产品为 Facebook 提供了移动用户的实时数据，其广度和规模是其他任何服务或应用都无法提供的。通过使用 Onavo 数据，Facebook 能够确定哪些潜在竞争对手可以作为其白名单和数据共享协议的目标；它可以通过拒绝访问关键 API 来摧毁哪些竞争对手；需要通过收购将哪些竞争者赶出市场以保持其垄断地位和 DTBE。

235.  此外，通过监控潜在的威胁，Facebook 确保它没有盲点——任何对其主导地位构成威胁的应用程序都将通过反竞争和非法的白名单和数据共享协议来处理，通过拒绝访问 Facebook 平台上的关键 API 来销毁，或通过收购来处理。

236.  通过收购 Onavo, Facebook 获得了唯一的实时和高质量的大规模移动应用程序用户指标来源。由于收购了 Onavo, Facebook 通过确保任何威胁到其社交广告市场的主导地位的威胁都能在尽可能早的阶段得到解决，加强了 DTBE。事实上，通过 Onavo, Facebook 能够（而且的确是）从发布之初就追踪移动应用程序的使用情况和趋势。如果一个潜在 Facebook 杀手正在崛起，Facebook 有一个独特的工具可以在其他人之前识别它——并且 Facebook 使用了这种工具。

237.  在收购 Onavo 之后的几年里，Facebook 继续积极利用该公司的代码库，开发出一些带有欺骗性标签的应用程序，帮助最大限度地对移动用户进行监控和数据收集。例如，Facebook 将 Onavo 间谍软件放置在那些需要特权（在某些情况下，超级用户特权）来访问用户移动设备的应用程序中，从而让 Facebook 能够收集关于用户移动设备使用情况的几乎所有方面的数据。

盖章后提交

238.　Facebook 的滥用是如此的明目张胆，以至于苹果于 2018 年 8 月 22 日在其应用商店中封杀了 Facebook 的 Onavo 应用程序。苹果将 Facebook 的应用程序逐出了其市场，因为它违反了苹果的规定，即禁止应用程序以远远超出运行应用程序和提供广告所需的方式使用数据。换言之，因为 Onavo Protect 所利用的数据远远超过任何 VPN 所需要的数量，因此很明显，该应用程序的真正目的是监视 Onavo 用户，而苹果不会允许这样做。

239.　事实上，监控的数量令人瞠目结舌。Facebook 的 Onavo Protect 应用程序会报告用户的活动，不管他们的屏幕是开着还是关着；他们使用的是 WiFi 还是蜂窝数据；甚至在 VPN 关闭的情况下也会这样做。收集的数据和应用程序的目的之间没有合理的关系。简单来说，一个即使在 VPN 关闭的情况下也能收集数据的 VPN 是一个明显的用来暗中监视用户行为的托词。

240.　Facebook 并未气馁，将其 Onavo 间谍软件重新包装为 Facebook Research 的 VPN 应用程序。通过在青少年和成年人下载研究应用时给予奖励，并赋予其访问移动设备网络流量的 root（即超级用户）权限，Facebook 避开了应用商店。至少从 2016 年开始，Facebook 就以类似的方式利用 Onavo 代码，以代号"Project Atlas"管理该项目——这个名字很适合其实时监控移动设备上应用程序使用情况的目标。

241.　2019 年 1 月有消息称，Facebook 的 Research 应用程序是被重新包装的 Onavo 应用程序，旨在监视用户，当时，Facebook 立即从苹果应用商店撤回了这些程序。

242.　苹果再次认定 Facebook 试图违反其政策。通过苹果的企业开发者计划（该计划允许用户安装证书或政策，以提供对 iPhone 或 iPad 的 root 访问权限），Facebook 获得了专为公司内部 IT 部门设计的管理权限。因此，通过使用一个允许组织管理内部移动设备的系统，Facebook 为其间谍软件超级用户提供了访问普通用户的 iPhone 和 iPad 的权限。苹果阻止了这种滥用。一名苹果公司发言人表示：

> 我们的企业开发者计划是专为企业内部应用发布而设计的。Facebook 一直利用其会员资格向客户分发一款用于数据收集的应用程序，这显然违反了他们与苹果的协议。任何使用企业证书向消费者分发应用程

**盖章后提交**

序的开发者，其证书都将被吊销，这就是我们在这个案例中所做的，
目的是保护我们的用户和他们的数据。

243.    美国参议员 Mark Warner 立即呼吁制定新的立法，以防止 Facebook 所从事的这种滥用行为。美国参议员 Richard Blumenthal 发表了一份激烈的声明，谴责 Facebook 将 Onavo 间谍软件重新包装为"研究"："窃听青少年不是研究，这种行为永远不应该被允许。"

244.    除了 Onavo 的 Protect 应用程序，Facebook 还试图将其监控软件部署为其他形式的实用应用程序，而这些应用程序需要广泛权限或特权来访问移动设备。例如，Facebook 发布了 Onavo Bolt 应用程序，该程序在秘密监视用户并将结果发送给 Facebook 时，会用密码或指纹锁定应用程序。Facebook 也在其监控功能被发现的当天关闭了该应用程序。Onavo Bolt 应用程序已经被安装了大约 1000 万次。

245.    Facebook 继续拥有 Onavo 的代码库，而且很可能会像以前一样，将其监控软件重新打包成另一款应用程序。Facebook 还可以轻松地将监控代码整合到其任何拥有大量安装基数和覆盖范围的移动应用程序中，包括 Instagram 和 WhatsApp。如果未被阻止，Facebook 可能会继续利用其收购 Onavo 时获得的监控软件、基础设施和分析。

**B.    Facebook 将 Instagram 视为威胁并收购了该公司**

246.    Onavo 的数据显示，一款名为 Instagram 的照片共享移动应用程序可能会在 2011 年（当然也会在 2012 年）出现。这款应用程序起源于当时 27 岁的创始人 Kevin Systrom 在晚上和周末学习编程。Systrom 开发了一款名为 Burbn 的应用程序，它允许用户登录、发布计划和分享照片。照片分享功能立即成为该应用程序最受欢迎的功能。

247.    在与 Baseline Ventures 和 Andreesen Horowitz 等风投公司会面后，Systrom 获得了 50 万美元的投资。不久之后，Systrom 遇到了当时 25 岁的联合创始人 Mike krieger，后者专注于应用程序的用户体验。

248.    看到 Burbn 应用程序在照片分享方面的积极反响，Krieger 和 Systrom 决定将他们的业务重点放在这一功能上。他们研究了这一领域的竞争对手，包括一款名为 Hipstamatic 的应用

盖章后提交

程序，该应用程序具有照片编辑功能，包括为照片添加滤镜的功能。然而，Hipstamatic 没有社交功能。

249.   为了弥合 Hipstamatic 照片功能和 Facebook 元素之间的差距，Systrom 和 Krieger 将 Burbn 精简为照片、评论和点赞功能。然后他们将这款应用程序改名为 Instagram，加入了"即时"和"电报"两个词。

250.   Systrom 和 Krieger 孜孜不倦地改进他们的新应用程序的用户体验，设计 Instagram 以简化在移动设备上拍照并上传到社交平台的过程。该应用程序有一个极简的重点，要求尽可能少的用户操作。经过 8 周的微调，这款应用进入了 beta 测试阶段，创始人准备在 iOS 平台上发布。

251.   2010 年 10 月 6 日，Instagram 登陆 iOS 平台。就在那一天，它成为苹果应用商店上排名第一的免费照片分享应用程序，下载量达到 2.5 万次。Instagram 的创始人被人们的反应惊呆了。正如 Systrom 在程序发布后指出的："首先，我们必须说，我们从未想到会有如此强烈的反响。我们在几个小时内就从拥有为数不多的用户变成了排名第一的免费摄影应用程序。"

252.   到第一周结束时，Instagram 已经被下载了 10 万次，到 2010 年 12 月中旬，它的总下载量已经达到 100 万次。这款应用程序的发布时间点是无可挑剔的，因为配备了改进摄像头的 iPhone 4 在 2010 年 6 月才发布几个月。

253.   随着 Instagram 的崛起，投资者争相入股。2011 年 2 月，Instagram 获得了 700 万美元的 A 轮融资，投资者包括 Benchmark CAPItal，该公司认为 Instagram 的估值约为 2500 万美元。2011 年 3 月，Twitter 首席执行官 Jack Dorsey 萌生了收购 Instagram 的想法，并且 Twitter 向该公司提出了约 5 亿美元的收购要约。Systrom 拒绝了。

254.   到 2012 年 3 月，这款应用程序的用户数量已经膨胀到 2700 万。当年 4 月，Instagram 安卓版发布，在不到一天的时间里下载量就超过 100 万次。当时，该公司还在洽谈另一轮 5 亿美元的融资。

盖章后提交

255.　在内部，Facebook 仔细跟踪了 Instagram 的迅速崛起，包括通过 Onavo 数据收集功能获得的情报。Instagram 显然对 Facebook 的主导地位构成了竞争威胁，包括在快速扩张的移动社交应用程序市场。

256.　与 Instagram 精简的照片分享方式不同，Facebook 的照片分享非常繁琐。正如 Facebook 内部认识到的那样，移动设备正在改变用户上传和分享照片的方式，这给 Facebook 的业务带来了严重的问题。正如 Facebook 的一场内部演示所解释的那样：

> 在手机出现之前，人们会在特殊活动、度假等场合会带上数码相机。然后，他们会把一堆照片上传到电脑上，然后马上发布出来。有了手机，人们可以更频繁地拍照和分享更多照片。他们分别分享照片（而不是等着一次上传一堆）。

257.　这导致 Facebook 核心社交网络产品上的批量照片上传大幅下降——从 2012 年到 2014 年下降了 29%。Facebook 还观察到，由于"转向使用带摄像头的手机"，文本贴文"下降了"26%。数据很清楚——Facebook 不得不阻断这款新照片分享应用程序突然带来的威胁。如果 Facebook 什么都不做，以目前的增长速度，Instagram 的用户基数将很快超过 Facebook，从而侵蚀甚至摧毁 Facebook 的 DTBE。作为一款不依赖于 Facebook 的独立应用，Instagram 不仅可能成为一款与 Facebook 竞争的移动社交应用，还可能成为一款社交网络，在可能产生和变现的用户互动和社交数据方面与 Facebook 竞争。

258.　2012 年 2 月，扎克伯格与 Facebook 首席财务官 David Ebersman 讨论了收购 Instagram 的可能性。扎克伯格解释说，他"一直在考虑…… 为了收购 Instagram 这样的移动应用程序公司，[Facebook] 应该愿意支付多少钱…… 他们正在建立与我们自己的网络竞争的网络。"扎克伯格先生告诉 Ebersman 先生，这些"业务还处于萌芽阶段，但网络已经建立，品牌已经有了意义，如果它们发展到很大规模，它们可能会对我们造成很大的破坏。"

259.　作为回应，Ebersman 问 扎克伯格，收购的目标是否包括：(1) 消除潜在竞争对手；（2）获取人才；或 (3) 将 Instagram 的产品与 Facebook 的产品整合，以提高其服务。扎克伯格回答说，这笔交易的目的是为了中和 Instagram，并表示这笔交易的目标是"(1) 和 (3) 的结合"。他

**盖章后提交**

解释说：

> 让第 (1) 点更合理的一个原因是，社交产品会产生网络效应，可以发明的社交机制数量是有限的。一旦有人在某一特定机制中获胜，其他人便很难在不采取不同做法的情况下取代他们。有可能有人通过开发更好的东西来打败 Instagram，从而获得网络迁移，但只要 Instagram 作为一款产品持续运行，这就会变得更难。

260.  扎克伯格很快意识到，Instagram 的迅速崛起对 Facebook 的整个业务构成了威胁。有了现成的用户网络，Instagram 主导一个推动 Facebook 互动的"机制"意味着破坏了保护 Facebook 的 DTBE。如果 Instagram 夺走了 Facebook 的用户互动，Facebook 将失去一些针对用户的内容和向他们投放广告的能力，这反过来意味着互动减少。这种良性循环将会自我逆转。

261.   就像扎克伯格自己说的：

> 通过结合 (1) 和 (3)，看待这个问题的一种方式是，我们真正收购的是时间。即使出现了新的竞争对手，再有人接近它们的规模之前，收购 Instagram、Path、Foursquare 等公司也能给我们一年或更长的时间来整合它们的动态。在这段时间内，如果我们整合他们使用的社交机制，这些新产品将不会获得太大吸引力，因为我们已经大规模部署了他们的机制。

262.   扎克伯格很清楚，他"真正买到的是时间"，因为最终会出现一个竞争对手，威胁到 Facebook 的 DTBE 和对其封闭花园的主导地位。

扎克伯格一直讨论到 2012 年 3 月，他告诉 Facebook 的首席技术官 Mike Schroepfer，收购 Instagram 将为 Facebook 的主要产品提供"保障"。Schroepfer 对此表示同意，并回应说："不失去照片领域中的战略地位是值得的。" 他补充说，"最大的风险"是 Facebook 未通过"投资" Instagram 来"杀死"该公司，从而为新进入者打开窗口。"

263.   2012 年 4 月 5 日，扎克伯格在发给另一名 Facebook 员工的电子邮件中表示，"Instagram 可以在不成为一家巨型公司的情况下，对我们造成有意义的伤害。" 相比之下，他并不认为 Pinterest 和 Foursquare 等其他小公司是迫在眉睫的危险竞争威胁。正如他所指出的，如果这些公司"发展壮大，我们只会后悔没有这么做…… 或者我们可以在那时购买它们，或者在路上构建它们。" 在第二天的全体会议上，扎克伯格在回答有关 Instagram 快速增长的问题时说，

<u>盖章后提交</u>

"我们需要把自己从困境中解救出来。" 他还告诉该公司的员工，Instagram"发展得非常快"，"很难把他们赶出去"。

264.　在与马克 扎克伯格直接谈判后，Facebook 于 2012 年 4 月向 Instagram 发出了 10 亿美元的收购要约，并明确承诺该公司将保持独立管理。Facebook 在其 IPO 之前完成了这笔交易。

盖章后提交

265.  Facebook 自己的 Onavo 数据（由 Buzzfeed 获得并发布）表明，Instagram 对 Facebook 的生存构成了威胁。到 2013 年 2 月，Instagram 在所有社交应用中所占的用户数量已增至 34%。

### 美国移动应用程序 (iPhone)



来源 Onavo

266.  通过收购 Instagram，Facebook 的手机照片分享应用程序的用户份额大幅增长，因为 Facebook 将 Instagram 的 34% 用户覆盖率添加到 Facebook 自己的 72% 的用户覆盖率中。

267.  虽然 Instagram 在合并时还没有将其用户参与度和社交数据进行有意义的货币化，但 Facebook 很快做到了。从 2013 年底开始，Facebook 开始在 Instagram 上展示广告。从那以后，Instagram 在 Facebook 的广告收入中所占的比例越来越高，在 Facebook 的用户增长中所占的份额也越来越大。

<u>盖章后提交</u>

268.    2017 年，Instagram 创收 20 亿美元，约占 Facebook 130 亿美元广告收入的 15%。

Instagram 在 Facebook 广告收入和增长中的估计份额



269.    截至 2018 年底，Instagram 拥有 10 亿用户，预计 2018 年将为 Facebook 带来 80 亿至 90 亿美元的收入。

270.    自收购以来，Instagram 也是 Facebook 新收入的主要来源。

Facebook 和 Instagram 的估计季度广告收入



第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

**盖章后提交**

271.　当 Facebook 的桌面和核心移动应用开始停滞不前时，Instagram 让 Facebook 得以发展其社交网络。Facebook 和 Instagram 共同捕获了两款应用程序产生的社交数据，并将其变现。

272.　Instagram 的收购确保了 Instagram 不会成为一个可以产生足够的社交数据来侵蚀 DTBE 的社交网络竞争对手，从而保护了 Facebook 的业务。它还确保了 Instagram 无法建立和发展自己的开发者平台，因为通过拒绝或利用依赖社交数据的应用程序访问基本功能，这将威胁到 Facebook 主导社交广告市场的计划。因此，这次收购也确保了被要求加入白名单和数据共享协议的 Facebook 竞争对手没有其他平台的选择——因此，除了把它们的社交数据给 Facebook，它们别无选择。最后，这次收购确保了 Instagram 无法在社交广告市场上销售高度定向的广告，否则将意味着 Facebook 的提价能力将受到实质性的考验。

273.　2012 年 IPO 时，Facebook 难以发展其移动产品，更不用说把它通过广告收集的社交数据进行有意义的变现了。到 2019 年，Facebook 凭借其 Instagram 移动应用程序和 Facebook 移动和桌面应用程序在社交广告市场中占据了 83% 的份额。在市场份额方面，没有其他公司能与之相比。

274.　Instagram 对 Facebook 在社交广告市场的爆炸性增长起到了重要作用。从 2010 年第四季度到 2011 年第一季度，Facebook 的收入基本持平。从 2011 年的假期周期到 2012 年开年的三个月（就在 IPO 之前），Facebook 的业绩实际上一直在*缩水*。随后，Facebook 在收购 Instagram 后经历了突然的逆转，因为移动收入开始占营收的很大一部分，并且 Instagram 让 Facebook 随着移动应用程序的兴起而增长。

275.　值得注意的是，Facebook 对 Instagram 的收购也使 Facebook 能够在其平台上排除那些提供照片和视频共享功能的第三方应用程序。如果一个图片分享或视频应用程序包含一个重要功能，Facebook 就会克隆它，从而为将竞争对手排除在其平台之外铺平道路，同时夺走该竞争对手的用户份额。

276.　例如，当应用程序 SnapChat 的制造商 Snap 拒绝了扎克伯格和 Facebook 以 30 亿美

**盖章后提交**

元收购该公司及其产品的提议后,Facebook 公然复制了 Snap 的关键功能,并将其嵌入到自己的 Instagram 产品中。因此,当 SnapChat 的"故事"功能(允许用户发布一系列相连的图片和视频)迅速流行起来时,Instagram 只是直接克隆了它。到 2016 年底,Instagram 推出了一款产品,它提出了 Snapchat 最受欢迎的功能之一。

277.    Facebook 自己的笨重移动应用程序克隆了"故事"功能,这并没有获得相同的用户吸引力。正是 Instagram 为 Facebook 提供了一个平台,使其与社交照片和视频分享应用程序就日益逼近的威胁展开正面竞争。如果没有 Instagram,Facebook 将面临直接的竞争。相反,它利用 Instagram 获得并维持了自己在社交移动应用程序,以及这些应用程序产生的利润丰厚的社交数据中的主导地位。

278.    简言之,收购 Instagram 大大提高了 Facebook 在社交广告市场的份额,加强了能保护 Facebook 业务的 DTBE。

**C.    Facebook 收购 WhatsApp**

279.    2009 年 2 月,Jan Koum 和 Brian Acton 离开雅虎,成立了一家名为 WhatsApp 的新公司。Koum 有一个想法,要开发一款移动应用程序,可以在智能手机的地址簿中显示用户状态,比如显示用户是否在打电话、电量不足或在健身。两人在俄罗斯开发者 Igor Solomennikov 的帮助下开发了这款应用程序。Koum 花了几天时间为该应用编写后端代码,使其能够与世界上任何一个电话号码同步。

280.    虽然这款名为 WhatsApp 的应用程序最初并不成功,但 2009 年 6 月的一次开发改变了一切。当月,苹果在 iPhone 上推出了"推送通知"功能,允许开发者在用户不使用应用程序时通知他们。Koum 立即更新了 WhatsApp,当用户的状态发生变化时,可以更新用户的整个好友圈。

281.    这个功能最终成为了一种即时消息的形式。因为通过 WhatsApp 发送的消息会即时通知其他用户,即使手机没有在前台运行该应用程序,它成为向用户的社交网络内的联系人广播信息的理想工具,而该功能正是建立在用户手机的联系人列表上。

282.    当时,WhatsApp 在这类即时通讯业务上唯一的重要竞争对手是黑莓的 BBM——它

<u>盖章后提交</u>

专门用于黑莓的专用硬件平台。另一方面，WhatsApp 利用了已经出现的庞大的、支持应用程序的消费者智能手机网络，尤其是苹果的 iPhone。

283.   WhatsApp 继续创新，包括引入了一个双勾，它会在消息被其他用户阅读时显示。WhatsApp 希望从短信服务（包括蜂窝网络使用的有限的彩信协议）中获得更多好处，因此打算建立一个多媒体消息传递系统，通过社交网络向移动设备实时发送消息。

284.   由于 WhatsApp 的消息传递使用的是手机的互联网连接，而不是短信，因此该应用程序使用户能够完全避免短信费用。在一些国家，通过手机运营商发送的短信是计量的。WhatsApp 最受欢迎的功能是可以向任何使用互联网的手机用户发送消息。

285.   2009 年 12 月，WhatsApp 更新了其 iPhone 版应用程序，使其可以发送照片。即便是在 WhatsApp 向用户收取服务费的情况下，其用户增长速度也大幅上升。在创造了一个独特的图像和通讯应用程序的组合，成为一款社交驱动的应用程序后，WhatsApp 决定保持付费服务，并在创造收入的同时实现增长。

286.   到 2011 年初，WhatsApp 已跻身苹果的美国应用商店前 20 名付费应用程序之列。该公司引起了风险投资公司 Sequoia 的注意，WhatsApp 同意在最初 25 万美元的种子基金之外再获得 800 万美元的融资。

287.   两年后，也就是 2013 年 2 月，WhatsApp 的活跃用户激增至 2 亿。当月，WhatsApp 又筹集了 5,000 万美元，估值达到 15 亿美元。

盖章后提交

288.　在公司内部，Facebook 一直密切关注着 WhatsApp 的迅速崛起。Facebook 的 Onavo 间谍软件获得的用户互动数据显示，WhatsApp 正在与 Facebook 自己的 Messenger 产品竞争，截至 2013 年 4 月，在美国 iPhone 手机的移动消息应用程序中，WhatsApp 的用户覆盖范围排名第三。



289.　更广泛的情况对 Facebook 的威胁更大。据 Buzzfeed 报道，Onavo 追踪了通过 WhatsApp 发送的信息，这个数字让 Fakebook 自己的移动产品相形见绌，因为前者是后者的两倍多。



第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

<u>盖章后提交</u>

290. Buzzfeed 报道的同一份 Onavo 数据显示，WhatsApp 用户的互动量很高，排名第六，落后于 Facebook 自己的核心产品；Facebook 新收购的 Instagram；Twitter；Foursquare；和 Snapchat。

美国移动应用程序（仅适用于 iPone）



291. WhatsApp 虽然没有 Facebook 那样的市场覆盖范围，但同样受到了有限的关注量。鉴于 Facebook 刚刚推出的 Messenger 应用程序，WhatsApp 暴露了 Facebook 商业模式中的一个巨大漏洞。WhatsApp 建立在一个直接从智能手机用户的联系人列表衍生出来的社交网络上。它不需要 Facebook 的图谱网络来实现增长，因此不能通过撤销对 Facebook API 的访问权限来关闭它。Facebook 也不能要求 WhatsApp 加入白名单和数据共享协议。

292. WhatsApp 对 Facebook 的业务构成了直接威胁，包括用于保护其主导地位的 DTBE。WhatsApp 支持状态、图片分享和收发短信——这些都是 Facebook 核心产品的主要功能。到 2013 年，WhatsApp 的网络规模和用户互动使其成为对 Facebook 市场主导地位的最直接威胁——因为有 Onavo，所以 Facebook 知道这一点。

293. 为了确保它维护 DTBE，进而维护其在社交广告市场的主导地位，Facebook 试图将 WhatsApp 从竞争对手的位置上移除。据《华尔街日报》报道，Facebook 的 Vernal 曾在 2013 年内部评论道："Whats App 发布一个与我们竞争的平台绝对是我非常担心的事情。" Vernal 明白，

<u>盖章后提交</u>

如果 WhatsApp 创建了一个与 Facebook 竞争的平台，Facebook 利用自己的平台来排除竞争对手的计划将会失败——开发者将会迁移到 WhatsApp 提供的与 Facebook 竞争的平台。

294.　Facebook 的管理团队在内部对 WhatsApp 的威胁进行了紧急讨论。Facebook 的增长主管 Javier Olivan 在一封内部邮件中写道，在 WhatsApp 已经渗透的国家，WhatsApp 的覆盖范围和使用率都高于 Facebook。例如，根据 Facebook 的内部数据，WhatsApp 已经覆盖了西班牙 99.9% 的智能手机用户，或者用 Olivan 先生的话来说，"简直是所有人"。Olivan 表示，通过收购 WhatsApp，他们可以让新用户接触到 Facebook，从而"进一步发展 Facebook"。此外，通过将免费服务与 WhatsApp 和 Facebook 的其他服务捆绑在一起，这笔交易可能成为 Facebook 在 WhatsApp 用户中扩大影响力的另一种机制。扎克伯格回答说："我非常同意这个分析。"

295.　在给 Facebook 首席财务官 David Ebersman 的一封电子邮件中，Olivan 写道："WhatsApp 在智能手机用户中的覆盖范围实际上超过我们的覆盖范围⋯⋯ 我们的重叠度接近 100%，我们的用户群只是他们的子集。" 他解释说："在他们做得好的市场，他们几乎覆盖了 100% 的智能手机用户——这是很大一部分的人口。"

296.　2013 年 12 月 13 日，扎克伯格就公司面临的竞争问题写信给他的管理层。WhatsApp 就是其中一个竞争：

> 我想指出我们近期面临的两个竞争问题。首先是 WhatsApp 为公众人物添加了一个类似的功能⋯⋯ 如果该领域打算朝这个方向发展，那么成为领导者并建立品牌和网络效应就非常重要。仅这一点就应该鼓励我们很快考虑这个问题⋯⋯ 当世界发生这样的变化时，成为第一就是你建立品牌和网络的方式。我们有机会大规模地这样做，但这个机会不会永远持续下去。我怀疑，在 WhatsApp 开始朝着这个方向发展之前，我们是否还有一年的时间。

297.　利用 Onavo 提供的数据，Facebook 的数据科学家模拟了 WhatsApp 的增长，尤其是它的互动和覆盖范围，以确定它是否正在"杀死 Facebook messenger"，以及与 Snapchat 相比它的使用趋势如何。

<u>盖章后提交</u>

1

2   298.   由于了解 WhatsApp 的规模、用户互动，以及它在侵蚀用于保护 Facebook 市场主导

3   地位的 DTBE 方面的独特潜力，Facebook 采取了积极行动，从竞争格局中消除了这一存在的威胁。

4   2013 年底，Facebook 首次出价 160 亿美元购买 WhatsApp 的股票。在 2014 年初的谈判中，

5   Facebook 将收购价格提高到 196 亿美元，这比原来的价格增加了 36 亿美元，作为对 WhatsApp 员

6   工留在 Facebook 的补偿。最终，Facebook 以近 220 亿美元的价格收购了 WhatsApp。

7   299.   但对于遏制和阻止与 Facebook 竞争的 WhatsApp 社交网络和平台的增长而言，这笔

8   交易对 Facebook 来说没有任何经济意义。WhatsApp 在 2013 年的收入只有区区 1,020 万美元。

9   2014 年上半年，该公司六个月的营收总计为 1590 万美元，而同期该公司净亏损高达 2.32 亿美元。

10  Facebook 花了 200 亿美元——是 WhatsApp 收入的数千倍——收购了一家亏损的公司，这家公司

11  开发的软件功能是 Facebook 本身已经作为其产品一部分的功能，而且如果它愿意，可以很容易

12  地从零开始，只需花收购成本的一小部分。

13

14  300.   在收购 WhatsApp 时，Facebook 的用户覆盖范围、用户群和互动已经非常大了——

15  任何竞争对手都无法与之匹敌——但 WhatsApp 用户群的加入进一步巩固了 Facebook 在社交广告

16  市场的主导地位。然而，更重要的是，Facebook 消除了对其 DTBE 的一个严重威胁。如果

17  WhatsApp 和它新生的社交平台被允许参与竞争，那么 Facebook 将无法利用它的平台来继续主导

18  社交广告市场，包括使用 API 访问权限来关闭与 Facebook 竞争的第三方应用程序，并要求访问

19  其他应用程序的最有价值的社交数据作为其存在的条件。

20  301.   此外，由于 WhatsApp 的覆盖范围和用户互动产生了重要的社交数据，Facebook 可

21  能（而且可以）通过其移动广告渠道利用这些数据来盈利，收购 WhatsApp 后，Facebook 的

22  DTBE 得到了加强，强化了 Facebook 在社交广告市场的无可匹敌的主导地位，并加强了 Facebook

23  的能力，使其能够排除潜在的进入这个市场的人，让他们无法在竞争对手的即时通讯或照片分享

24  应用程序上立足。

25  [Redacted]

26

27

28

盖章后提交

[Redacted]

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

<u>盖章后提交</u>

[Redacted]

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

盖章后提交

[Redacted]

**A.** **平台变更和应用程序真空的后果。**

316.　扎克伯格在 2014 年 4 月的 F8 大会上宣布了这一消息之后，Facebook 继续允许访问动态消息和好友 API 一年。然而，到 2015 年 4 月底，Facebook 最终取消了对 API 的通用访问权限，这摧毁了其平台上成千上万的第三方应用程序。

317.　Facebook 静悄悄地将某些开发者排除在其决定之外，精心挑选那些 Facebook 可以从中获得特别有价值的目标数据的开发者；大量购买广告的开发者，特别是在 Facebook 的新移动广告平台 NEKO 上；以及同时满足这两个标准的开发者。

318.　尽管有这些豁免，Facebook 的第三方应用生态系统还是遭到了重创。数千款应用程序以前曾在 Facebook 的平台上执行各种功能，这让 Facebook 能够从一个广泛的第三方应用程序生态系统中获取数据，用于其广告定位，但这些应用程序现在已经消失了——这些应用程序产生的广告收入和用户互动也消失了。

319.　Facebook 本身现在是其社交网络用户数据的主要来源（对于许多类型的用户数据，它是唯一的来源）——这些数据来自 Facebook 的封闭花园。多数情况下，外部开发者将不再通过 Facebook 平台查询 Facebook 最有价值的 Graph 社交数据。相反，Graph 数据只对 Facebook 和它精心挑选的用户开放。

320.　在互动量较高的应用程序中，Facebook 购买了两款用户群增长最快、最成功的应用程序：WhatsApp 和 Instagram。Fakebook 的核心产品还包括 Facebook 的即时通讯应用程序 Messenger。Facebook 对这些属性的控制为它提供了来自重要的社交网络垂直产品和邻近功能（即移动通讯和照片共享）的社交数据。

321.　随着其平台遭到破坏，Facebook 将不得不从自己的产品中获取用户互动和社交数据，但 Facebook 在主要类别中缺乏产品，例如旅游、电子商务、流媒体视频和基于位置的服务。Facebook 再也不能依靠第三方应用程序从这些领域的用户互动中获取社交数据。

322.　到 2015 年 4 月，Facebook 的优先事项也随之发生了变化。它需要自己的直接渠道

**盖章后提交**

从封闭花园中收集用户数据。

[Redacted]

<u>盖章后提交</u>

[Redacted]

<u>盖章后提交</u>

[Redacted]

盖章后提交

[Redacted]

<u>盖章后提交</u>

[Redacted]

<u>盖章后提交</u>

[Redacted]

<u>盖章后提交</u>

[Redacted]

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

<u>盖章后提交</u>

[Redacted]

354.　　Facebook 于 2016 年 10 月 3 日推出了 Marketplace，主要关注客户对客户的交易。最初的产品是为了与 Craigslist 这样的网站竞争，但 Facebook 希望将其产品扩展到囊括来自企业的销售。TechCrunch 在 Marketplace 发布的当天就报道了它的新功能：

> Facebook 的 Marketplace 让你可以浏览一个按相关度排序的信息流，从
> 附近的人那里购买物品，并快速列出你自己的待售物品。与 Facebook
> Messenger 的集成让你可以讨价还价或安排见面，而且得益于
> Facebook 上的个人资料，你能够比在 Craigslist 这样的匿名网站上更了
> 解你在和谁打交道。

355. Facebook 的 Marketplace 于 2016 年作为其移动产品的核心功能推出。事实上，

Facebook 在其移动应用程序导航栏的中心位置放置了一个 Marketplace 图标。



356. TechCrunch 注意到了这项新功能的重要性。对这家新闻机构来说，很明显，

Facebook 在 Marketplace 上下了很大赌注：

> Facebook 将赌注押在 Marketplace 上，因为 Facebook 考虑到它将取代
> Facebook iOS 版的 Messenger 快捷方式，占据导航标签栏的主要位置。
> 这个黄金位置可能会让 Marketplace 成为收银台冲动购物的数字版本。

[Redacted]


[Redacted]

**盖章后提交**

<u>盖章后提交</u>

[Redacted]

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

<u>盖章后提交</u>

1

2          [Redacted]

3

4

5

6

7

8

9

10

11

12

13      **D.      Facebook 进军基于地理位置的服务**

14          365.    到 2015 年底，Facebook 面临着一个新兴的基于地理位置的社交网络 Foursquare 的

15  竞争。Foursquare 将社交网络的概念扩展到了现实世界，允许用户在不同的地点"签到"，把他

16  们的行踪通知好友。

17          366.    2014 年 7 月，Foursquare 将自己分拆为两款应用程序——Swarm 和 Foursquare。

18  Swarm 将专注于基于位置的消息传递，而 Foursquare 应用程序将专注于基于用户位置的本地推荐。

19  这两款应用程序都很可能通过地理定位服务的创新来侵蚀 Facebook 的社交网络业务。

20

21          367.    Foursquare 艰难地开发了其基于位置的社交网络所需的数据，包括关于景点、餐厅、

22  商店和用户经常光顾的其他地方的信息。Foursquare 通过 Foursquare API 将这些信息提供给第三

23  方集成商和应用程序。TechCrunch 在 2015 年 5 月 5 日的一篇文章中描述了 Foursquare 的数据、

24  API 和集成商网络：

25                  与此同时，Places by Foursquare 是该公司的地点数据库，该数据库包
26                  含了大约 6,500 万个兴趣点，该公司称，这些兴趣点可以用作端到端
27                  定位解决方案。这个数据库不仅是通过使用 Foursquare API 的开发者

28

---

盖章后提交

网络建立起来的——其中包括 Citymaps、微软和 Garmin 等公司——还通过 Foursquare 自己的应用程序建立起来的。

368.　Foursquare 的地点数据库让它在快速发展的基于位置服务的次垂直领域与 Facebook 竞争，并且该公司利用这一优势积极地建立了一个与 Facebook 竞争的社交网络。2015 年 12 月，基于其收集到的数据具有独特价值的前提，Foursquare 又获得了一轮融资。

369.　但对 Facebook 来说，比 Foursquare 的新兴社交网络更糟糕的是，该公司拥有丰富的实时社交位置数据。这些数据——在正确的人手中有可能被用来有力地定位社交广告——通过 Foursquare 的 API 立即获得许可，这对 Facebook 的社交广告垄断构成了巨大的潜在威胁。如果 Foursquare 的实时位置数据储存库和管道被提供给社交广告领域的潜在竞争者，或者 Foursquare 利用有价值的基于位置的数据资源来发展其社交广告产品，而 Facebook 本身仍在准备有意义地进入基于地理位置的服务，那么这可能会显著侵蚀 DTBE，因为基于位置的目标定位以及与位置相关的推断和信号即将成为社交广告最有价值的目标信号。

不幸的是，Foursquare [Redacted]

<u>盖章后提交</u>

[Redacted]

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

## 盖章后提交

[Redacted]

[Redacted]

**E.    流媒体视频和 Facebook Watch**

379.    用户社交数据的另一个潜在来源是流媒体视频，它可以被挖掘出来作为广告导向的定位信息。在 2016 年之前，Facebook 已经在其移动产品中加入了视频标签，但长视频和片段视频在市场上占据了一席之地，并形成了一个特别丰富的潜在社交数据来源。

380.    2017 年，Netflix 是一家专注于长篇电视和电影内容的卓越流媒体服务公司。Netflix 的流媒体服务收入大幅增长，从 2016 年的约 88 亿美元增长到 2017 年的 116 亿美元。

381.    Netflix 也是一个强大的用户数据来源。用户观看和互动的电影、电视节目、短片、运动和剧集视频揭示了他们的兴趣，以及他们可能的购买决定。

382.    Netflix 服务的核心是它的推荐算法。Netflix 的推荐算法会针对特定用户定制内容。正如《华尔街日报》在 2018 年 11 月 10 日的一篇文章中解释的那样："分析深深嵌入了 Netflix 的 DNA。该公司会挖掘关于订阅者喜好的大量数据，以帮助决定押注哪些节目，以及如何推广这些节目。" 此外，Netflix 使用强大的 AI 和 ML 模型来决定为哪些节目和电影发放执照，以及创作哪些原创节目。

[Redacted]

[Redacted]

**盖章后提交**

[Redacted]

388.   Watch 允许为个人用户量身定制视频，包括基于他们的好友网络和他们的习惯。Facebook 还根据其网络上其他人正在观看的内容，为用户策划视频。正如 TechCrunch 在 Watch 发布当天的一篇文章中解释的那样：

> Watch 的功能是个性化推荐可观看的直播和录制节目，以及"最热门话题"、"什么让人们发笑"和"你的好友正在看的节目"等类别。发行商还可以在动态消息中分享他们的节目，帮助人们发现它们。观看列表功能可以让你订阅你最喜欢的节目的最新剧集。通过一个链接到"群组"的新功能，粉丝们可以互相联系，也可以与创作者联系。

[Redacted]

<u>盖章后提交</u>

[Redacted]

盖章后提交

**VII.  FACEBOOK 的输入和数据捕获行为**

[Redacted]

394.    长期以来，Facebook 的业务一直依赖于销售那些以与 Instagram、WhatsApp、Messenger 及其核心 Facebook 产品互动的用户为目标的广告。当用户真正与这些产品互动时——*例如*，用户浏览 Instagram；通过 WhatsApp 或 Messenger 聊天；或浏览 Facebook 网站或移动应用程序——他们的身份很容易被 Facebook 确定。这些用户登录到 Facebook，他们的一举一动都会被跟踪、记录，并转化为结构化的社交数据，供 Facebook 的 ML 和 AI 系统挖掘。

[Redacted]到 2015 年，Facebook 的用户开始使用智能手机和网络应用程序进行耗费时间和注意力的活动，而 Facebook 还没有将这些活动纳入其自有和控制的产品中。更糟糕的是，在 Facebook 的开放平台于 2015 年初夭折后，[Redacted]

[Redacted]

<u>盖章后提交</u>

[Redacted]

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

<u>盖章后提交</u>

[Redacted]

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

<u>盖章后提交</u>

[Redacted]

<u>盖章后提交</u>

[Redacted]

## 盖章后提交

[Redacted]

418.    从 2015 年到 2016 年，Facebook 与新兴社交网络 Foursquare 的竞争日益激烈。Foursquare 的竞争优势——[Redacted]——是它辛苦创建的数据库和位置数据流，包括它用户的实时位置社交数据。

419.    2015 年 1 月 29 日，Facebook 直接杀进 Foursquare 的基于位置的社交网络领域，宣布了自己的"地点提示"产品，直接与 Foursquare 的位置推荐引擎竞争。

420.    Facebook 在 2016 年和 2017 年进一步扩张到 Foursquare 的地盘，这给 Foursquare 带来了进一步的压力，而后者当时正在迅速筹集资金与 Facebook 展开竞争。

[Redacted]

<u>盖章后提交</u>

[Redacted]

盖章后提交

[Redacted]

<u>盖章后提交</u>

[Redacted]

<u>盖章后提交</u>

[Redacted]

Case 3:20-cv-08570-JD   Document 374-5   Filed 10/28/22   Page 203 of 333
案件 3：20-cv-08570-JD 文件 374-5，陆续于 2022 年 02 月 28 日，第 203 页，共 203 页

盖章后提交

[Redacted]

<u>盖章后提交</u>

[Redacted]

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

<u>盖章后提交</u>

[Redacted]

<u>盖章后提交</u>

[Redacted]

<u>盖章后提交</u>

[Redacted]

盖章后提交

Stephanie，我觉得你应该把这份提议的条款清单分发给 Dan
[Redacted]

102

<u>**盖章后提交**</u>

[Redacted]

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

<u>盖章后提交</u>

[Redacted]

<u>盖章后提交</u>

[Redacted]

<u>盖章后提交</u>

[Redacted]

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

<u>盖章后提交</u>

[Redacted]

盖章后提交

[Redacted]

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

<u>盖章后提交</u>

[Redacted]

**盖章后提交**

[Redacted]

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

<u>盖章后提交</u>

[Redacted]

<u>盖章后提交</u>

[Redacted]

<u>盖章后提交</u>

[Redacted]

<u>盖章后提交</u>

[Redacted]

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

Case 3:20-cv-08570-JD   Document 374-5   Filed 10/28/22   Page 221 of 383
案件 3：20-cv-08570-JD 文件 374-5，共计 383 页，提交于 2022 年 02 月 28 日，第 120 项，共 203 页

盖章后提交

[Redacted]

<u>盖章后提交</u>

[Redacted]

<u>盖章后提交</u>

[Redacted]

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

<u>盖章后提交</u>

[Redacted]

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

盖章后提交

[Redacted]

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

<u>盖章后提交</u>

[Redacted]

Case 3:20-cv-08570-JD   Document 374-5   Filed 10/28/22   Page 227 of 333
案件 3：20-cv-08570-JD 文件 237，陆由档于 5 2022 年 02 月 28 日，第 126 页，共 203 页

盖章后提交

[Redacted]

<u>盖章后提交</u>

[Redacted]

**盖章后提交**

[Redacted]

526. 2018 年 12 月，Facebook 削减了其用于 watch 上的节目的资金。2019 年 2 月，Facebook 宣布将不再更新其大多数新闻节目。据 *Digiday* 2019 年 2 月 26 日报道：

> 去年 6 月，Facebook 推出了其首批每日和每周新闻节目，这些节目来自 ABC News、CNN、Business Insider 和 NowThis 等发行商。总的来说，Facebook 已经在 Watch 上推出了 21 档新闻节目，包括 CNN 的《Anderson Cooper Full Circle》、BuzzFeed 的《Profile》和 Univision 的《real America with Jorge Ramos》。

> 据与 Facebook 见过面的消息人士透露，最近几个月，Facebook 一直在告诉新闻发行商，它将只续订约三分之一已为 Facebook Watch 出资制作的现有新闻。

527. Facebook 也开始削减其原创内容，尤其是脚本剧集。2020 年 1 月 16 日，Facebook 砍掉了 Elizabeth Olsen 主演的热门电视剧《*Sorry for Your Loss*》和 Jessica Biel 主演的《*Limetown*》。

528. 到 2020 年初，Facebook 公开取消了其平台上的几乎所有电视剧，包括《*SKAM Austin*》、《*Five Points*》、《*Sacred Lies*》、《*Turnt*》、《*The Birch*》和《*Steroscope*》。Facebook 还砍掉了喜剧《*Strangers*》和《*Queen America*》。Facebook 砍掉了系列纪录片，包括《*Humans of New York: The Series*》、Bill Murray 和 Brian Doyle-Murray 的《*Extra Innings*》、

盖章后提交

《*Tom* vs. *Time*》、《*Fly Guys*》、《*Behind the Wall: Bubba Wallace*》和《*Inside the Madness: Kentucky Basketball*》。

529.   Facebook 取消了游戏节目《*Confetti*》和《*Outside Your Bubble*》。Facebook 还砍掉了其动画系列《*Human Kind of*》、《*Liverspots and Astronots*》和《*Human Discoveries*》。Facebook 几乎砍掉了所有真人秀节目，包括《*No Script with Marshawn Lynch*》、《*Relationshipped*》、《*Backourt: Wade*》、《*The Tattoo Shop*》、《*Bear Grylls: Face of the Wild*》、《*Help Us Get Married*》、《*Huda Boss*》、《*Sneaker Hustle*》、《*Troy the Magician*》、《*You Kiddin＇Me*》、《*Big Chicken Shaq*》、《*Double Take*》和 Will Smith 的《*Bucket List*》。

[Redacted]

<u>盖章后提交</u>

[Redacted]

536.    2019 年 4 月 12 日—[Redacted]—Facebook 宣布 Reed Hastings 将离开 Facebook 董事会。

[Redacted]     FACEBOOK 以违反竞争的方式利用 ONAVO 数据建立了一个庞大的监控系统，并暗中监视 FACEBOOK 用户。

[Redacted]

<u>盖章后提交</u>

[Redacted]

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

<u>**盖章后提交**</u>

[Redacted]

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

<u>盖章后提交</u>

[Redacted]

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

<u>盖章后提交</u>

[Redacted]

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

盖章后提交

[Redacted]

<u>**盖章后提交**</u>

[Redacted]

<u>盖章后提交</u>

1
2   [Redacted]

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

569.　这为 Facebook 提供了相对于竞争对手的巨大优势。与 Facebook 竞争的应用程序必

24   须从它们自己的应用程序中获取用户数据，而 Facebook 除了自己的应用程序之外，还可以从第

25   三方应用程序中获取用户数据。这直接加强了 Facebook 针对用户投放内容和广告的能力，并让

26   Facebook 实时了解潜在的竞争威胁，以及 Facebook 自己的用户为这些有威胁的应用程序提供的

27   信息和时间。这有助于巩固 DTBE，帮助维持 Facebook 的社交广告垄断地位，并损害原告和提议

28

**盖章后提交**

的集体。

## IX. 威胁超越了 Facebook 的封闭花园

570. 为了维持其在社交广告领域的主导地位，Facebook 必须确保它能够精确定位 Facebook 用户。但因为这些用户在 Facebook 之外花费了大量时间，包括在移动应用程序和网页应用程序上，因此 Facebook 需要有效地从他们身上获取社交数据，即使他们当不在 Facebook 上时。此外，为了保持从 DTBE 中获得的竞争优势，Facebook 必须将其能力扩展到封闭花园之外的目标用户。

### A. Facebook 受众网络

571. Facebook 在 2014 年 4 月的 F8 大会上宣布了一个新的广告系统，被称为 Facebook 受众网络（"FAN"）。FAN 允许开发者利用 Facebook 的大量个人数据，瞄准标准横幅广告和定制广告单元。广告商可以通过 FAN 在移动应用中购买广告空间，而开发者也可以通过他们的应用程序盈利。

572. 正如 TechCrunch 在 F8 公告之前所报道的那样，FAN 将允许广告商使用 Facebook 的颗粒定位系统在移动应用中做广告：

> Facebook 还将带来广告定位的力量，这使广告商能够根据个人履历和兴趣数据来接触受众，以及可能的基于 cookie 的重新定位。大多数其他广告网络都有有限数量的关于用户身份的数据，而这些数据通常是推断出来的，所以并不总是准确的。这使得显示相关广告变得更加困难，这些广告可以得到结果，并为发行商带来很高的收益。*[原文如此]*

> 但 Facebook 的社交网络已经说服人们自愿提供大量深入的个人信息，例如工作经历、教育背景和最喜欢的电影，此外，它还可以看到他们使用什么应用程序，以及他们在哪里。由于人们一直登录到 Facebook，因此 FAN 可以准确地识别查看者是谁，并向他们展示与他们的个人资料相匹配的广告。

573. Facebook 把一部分重点放在了开发者身上，因为他们是 Facebook 最大的移动广告客户，因为他们通过应用安装来寻找新用户。FAN 将提供新的广告形式，包括早期的"重新定位"广告形式——在广告曝光或其他事件后重新与用户接触。TechCrunch 解释说：

---

133

**盖章后提交**

广告本身可以推广一系列产品。作为 Facebook 目前的摇钱树，肯定会有很多应用程序安装广告，因为开发者迫切需要安装量，并愿意为此付费。移动应用程序再互动广告也可能受到欢迎。你可能已经安装了 Hotel Tonight，但已经忘记了它。如果 Facebook 发现你喜欢旅行，并且刚刚登记入住洛杉矶的一家餐厅，那么 Facebook 可能会在另一款应用程序中显示通过 FAN 发送的广告，该应用程序将 HotelTonight 重新开放给该市的一间 99 美元的酒店房间。大品牌和当地企业也可能参与进来，因为 Facebook 的线下测量工具可以证明，它的广告推动了面对面的销售。

574. Facebook 开启了一系列全新的功能——那些功能依赖于跨设备和应用程序跟踪用户。

575. FAN 于 2014 年 10 月上线，而且发布的内容比 Facebook 在 F8 上宣布的内容要广泛得多。FAN 并不是作为一个单独的广告流发布。相反，它是作为 Facebook 现有广告系统的一种延伸而实施的。这意味着一个使用 Facebook 的细粒度定位系统的 Facebook 广告可以被用来定位 Facebook 属性之外的广告——直接在第三方移动应用程序中。

576. TechCrunch 报道了这项新功能，并解释了它的重要性：

到目前为止，Facebook 每赚 1 美元就意味着更多的广告惹恼自己的用户。这就给 Facebook 的营收设置了一个自然的上限，除非它想用过多广告惹恼我们，导致我们停止访问 Facebook。现在它可以坐下来利用收集到的所有目标数据来赚钱。

577. Facebook 创建了经过精细调整的机器学习系统，用于通过在用户与其他 Facebook 用户互动时收集的个人信息和基于兴趣的信息来定位用户。现在，这些机器学习算法将被释放到 Facebook 的封闭花园之外，使它们能够精确地定位和跟踪 Facebook 的用户，即使他们正在使用其他人的移动应用程序。

578. 这项新功能的价值不仅在于能够在 Facebook 无法控制的移动应用程序上显示广告，它还为 Facebook 提供了更关键的用户数据，尤其是社交数据，因为这是其机器学习算法所需的燃料。Facebook 将能够更多地了解其用户，包括他们如何与 Facebook、Instagram 或 WhatsApp 之

**盖章后提交**

外的其他用户和内容互动。这使 Facebook 能够在 Facebook 控制的应用程序上更好地向用户提供内容和广告，从而强化了 DTBE。

579. 最初，Facebook 在 2014 年 F8 大会上推广的登录产品是 Facebook 能够追踪不同应用程序用户的方法之一。用户通过 Facebook 登录到第三方应用程序后，Facebook 会在他们使用这些应用程序期间跟踪他们。

580. 然而，在 2016 年 5 月，Facebook 进一步扩展了 FAN 功能，用于追踪那些甚至没有登录 Facebook 的 Facebook 用户。正如 Facebook 在一篇博客文章中解释的那样：

> 在接下来几个月，我们将扩大在受众网络上的 Facebook 广告的覆盖范围，用于囊括那些没有账号的用户。为了确保人们在受众网络的应用程序和网站中看到的广告高度相关，我们将使用我们从使用 Facebook 技术的第三方网站和应用程序收到的信息。

581. 2016 年 5 月 27 日，《华尔街日报》报道称，这一改变使 Facebook 可以追踪互联网上的用户，让 Facebook 与谷歌展开正面竞争：

> 为此，这家社交网络和在线广告公司周四表示，它现在将帮助营销人员向在其受众网络广告网络中访问网站和应用程序的所有用户展示广告。此前，Facebook 只在其社交网络的用户访问这些第三方网站时才会向他们展示广告。

> 这是一个微妙的变化，但它可能意味着 Facebook 很快将帮助销售和放置出现在互联网上的更大比例的视频和显示广告。这一变化还将加剧与 Alphabet Inc. 子公司谷歌的竞争。谷歌主导着全球数字广告市场，以及众多其他在线广告专业公司。

582. Facebook 现在计划利用其封闭花园之外的目标定位系统。它将监控那些根本没有登录 Facebook 的用户，这让 FAN 能够将 Facebook 的优势扩展到社交广告市场之外，因为它凭借保护其业务的 DTBE 而占据主导地位。

**B. Facebook 收购 Atlas**

583. 2012 年 12 月 6 日，有消息称 Facebook 正考虑从微软收购一家名为 Atlas 的公司。Atlas 是一家既提供广告服务又跟踪广告转换的软件公司。

---

135

<u>盖章后提交</u>

584. 例如，Atlas 技术会在用户查看提供给他们的广告时进行记录，然后如果他们后来购买了一个产品（即"转换"的广告），Atlas 技术将允许把销售归属于广告。

585. 谷歌在 2007 年为它自己的广告服务产品 DoubleClick 支付了 30 亿美元。尽管 Atlas 缺乏 DoubleClick 的成熟度——尤其是在谷歌开发并集成了 DoubleClick 软件之后——但收购 Atlas 将使 Facebook 能够增长并扩展其能力，从而通过投放远远超出 Facebook 自有资产的广告来精确定位用户。

586. 然而，在 Facebook 手中，Atlas 及其技术将更有价值。正如《Business Insider》在 2012 年 12 月解释的那样：

> 基于 Facebook 的/由 Atlas 支持的广告网络的价值将是巨大的。
>
> 这就是原因。
>
> Facebook 是世界上唯一一家拥有 10 亿个电子邮箱地址、家庭地址和电话号码的公司。
>
> 这个资产让 Facebook 可以做一些其他网站做不到的事情。
>
> Facebook 可以告诉营销人员，Facebook 用户在去商店购买产品之前，是否在 Facebook.com 上看到了产品广告。
>
> 这是有可能的，因为零售商的记录中通常有顾客的电话号码、家庭住址或电子邮箱地址。（他们从数据收集公司购买这些数据。）
>
> 短期内，Facebook 将利用这个流程告诉营销人员，他们在 Facebook.com 上的广告增加了具体多少销售额。

587. 购买能够在 Facebook 封闭花园之外追踪 Facebook 广告转换的软件，是 Facebook 目标定位机制的有力延伸。它关闭了发生在 Facebook 视野之外的事件的反馈循环。

588. 然而，这种能力的意义远不止于此。Facebook 的 DTBE 既来自于它从用户那里获取的数据，也来自于它的机器学习模型的能力。机器学习模型会消耗这些数据。随着用户在 Facebook 之外花费的时间越来越多，这些机器学习模型可用于训练的内容就越来越少，从而降低了 Facebook 进行目标定向的有效性。这反过来又降低了 Facebook 内部的互动率，从而降低了其

盖章后提交

定向广告的价值。2010 年代初，随着移动应用程序的兴起，Facebook 意识到了这一威胁。这就是为什么当用户不使用 Facebook 的核心产品 Instagram 或 WhatsApp 时，Facebook 能够跟踪用户是至关重要的。

589.　收购 Atlas 时，它已经具备了必要的功能，允许广告商策划活动，在整个网站上购买广告，并衡量其影响力。它处理富媒体和流媒体视频，显示广告，并提供用于编程控制的 API。

590.　在 Facebook 内部，Atlas 被视为一种大规模提高 Facebook 定位能力的手段。正如 Facebook 公司发展副总裁 Amin Zoufonoun 在 Facebook 考虑收购时向 Sheryl Sandberg 描述的那样，这向 Facebook 提供了"立即重新定向的规模，提供优质的洞察力，建立相似的模型，证明和衡量 [Facebook] 作为一种营销媒介的有效性，[并]增加客户受众和相关收入。"

591.　最重要的是，它让 Facebook 能够通过Facebook Identity（Facebook 在所有浏览器和设备上为 Facebook 用户提供的唯一标识符）使用基于身份的定向来提供高度定向的广告。事实上，Facebook 曾将 Facebook Identity 的价值描述为"跨浏览器和设备来对准用户"的能力，以及"激活离线数据以丰富在线定向"等功能。

592.　2013 年 2 月 28 日，Facebook 以约 1 亿美元的价格收购了 Atlas。在该交易时的总结中，Facebook 指出，这笔交易是一个机会，它将使 Facebook 成为"媒体策划人员每天首先启动的买方桌面工具"，并获得"一个深度安装的像素基础，我们可以立即打开它来对各种产品进行转换跟踪和归因。"

593.　后者最为重要。对于像素，Facebook 指的是当用户访问非 Facebook 网站时，会自动从 Facebook 服务器提取信息的嵌入式网络资源。有时，这可以通过从集中式服务器下载的不可见的单像素图像来实现这一点。当用户下载了出现在第三方网站上的单像素图像时，Facebook 会立即知道并获得用户的浏览器信息、IP 地址和设备信息。

594.　2014 年 9 月 29 日，Facebook 通过 Atlas 的总经理 Erik Johnson 的博客文章宣布，Facebook 已经"从头开始"重建 Atlas，这意味着它已经将 Atlas 与 Facebook 的广告系统整合在一起。Facebook 在纽约市广告周之前宣布了这一消息。

**盖章后提交**

595. 虽然 Facebook 从其网站上删除了这篇博客文章和公告，但《*Wired*》杂志同时讲述了公告的重点：与谷歌不同，Facebook 不需要 cookie 来识别用户身份；它有自己的数据和目标定位系统，而且它用自己的网站与用户互动训练和磨练了这些系统：

> 约翰逊写道，作为广告商传统上用来跟踪消费者的方法，cookie 是有缺陷的，因为消费者不再一直使用一台设备——这样说明显是在挖苦谷歌。"cookie 无法在移动设备上运行，在人口定位方面越来越不准确，也无法轻松或准确地衡量不同浏览器和设备或线下世界的客户购买漏斗，" Johnson 写道。他提出了"以人为本的营销"（即基于 Facebook 数据的营销）作为解决方案。它不仅可以追踪不同设备之间的用户，还可以将在线活动与线下销售联系起来，以确定特定活动的实际效果。

596. 2014 年 11 月 4 日，Johnson 在 2014 年网络峰会的第一天发表了讲话（如下图所示）。



597. Johnson 在网络峰会上的谈话重点是利用 Facebook 的用户定位技术来识别不同设备和互联网上的用户：

> 如果该电子邮箱地址与你在 Facebook 上使用的电子邮箱地址相对应，我们现在可以将你在互联网上任何地方看到的广告与你在商店进行的购物相结合。Facebook 拥有这一功能已经有一段时间了，但有了 Atlas，我们能够将 Facebook 拥有的跨设备、以人为本和从线下到线上的故事转移到互联网的其他地方。

598. Atlas 为 Facebook 提供了利用和扩展其 DTBE 的能力。Facebook 不仅可以在用户与

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

Facebook 控制的应用程序互动时对准目标用户，还可以在用户与其他应用程序和网站互动时对准目标用户。这强化了 Facebook 自身在各个产品中的定位能力。

**C.    Facebook 通过整合 Atlas、受众网络和其他技术来对抗谷歌**

599.    到 2014 年 12 月 10 日，Facebook 已经收购了几个关键系统，这些系统使其能够将其目标定位优势扩展到 Facebook 产品之外。除了 Facebook Atlas 和 FAN，Facebook 还以大约 4-5 亿美元的价格收购了 LiveRail。

600.    LiveRail 将营销人员与网络和移动平台上的发行商联系起来，每月向访问者投放 70 亿次视频广告。它提供了实时竞价，这意味着它能动态匹配广告库存和营销人员的出价，以优化广告的收入和效果。

601.    Facebook 从 LiveRail 和 Atlas 获得的技术，加上 FAN，共同使 Facebook 能够在其封闭花园（Facebook 的三个主要产品——Facebook 本身、Instagram 和 WhatsApp）之外获得主导地位。Facebook 的广告可以覆盖这些应用程序之外的领域，追踪移动设备和网站上的用户，并利用从追踪中收集的信息来改进 Facebook 在自己产品中的目标定位算法。

602.    媒体将合并后的资产比作 "AdTech Voltron"，这是一个卡通机器人，用更小的部件组装成一个强大的机器人：

　　　　以下是这些部件是如何组合在一起的。

　　　　Facebook 带来了 13.5 亿用户，并在其展示广告的动态消息上拥有大量互动。由于其庞大的用户群是通过网络和移动设备登录的，因此它对人们的身份有一个统一的理解，这是大多数平台所不具备的。Facebook 丰富的个人数据意味着它可以更准确地投放广告。例如，该公司表示，与在线广告行业 50% 的平均准确率相比，其针对性别的广告准确率达到了 90%。

603.    这些特性的结合巩固了 Facebook 在社交广告市场的主要杠杆形式——也就是它以比其他竞争产品更精确的方式精确定位用户的能力。通过跟踪 Facebook 封闭花园内部和外部的用户，Facebook 的目标定位系统有望跨越互联网、移动应用程序和 Facebook 的社交应用程序，

**盖章后提交**

包括 Instagram 和 WhatsApp。

604.　通过这些资产的组合，Facebook 能够创建"Lookalike Audiences"，这是一款于 2013 年 3 月发布的新产品，它使 Facebook 能够使用合并的跟踪信息来训练其机器学习算法，以提供更有可能"转换"或以其他方式产生预期反馈的广告。Facebook 可以在第三方网站上使用跟踪像素，在它自己的应用程序中找到足够相似的用户，在同一个网站上进行同样的转换。

605.　Facebook 在其网站上提供了一个例子：

> 假设你是一个在线花商，想要联系那些与在你的网站上购物的人相似的用户。现在你可以使用来自你的 Facebook 像素（Facebook Conversion Pixel 或网站像素的自定义受众）的数据，以联系那些与以前在你的网站上购物的人最相似的消费者。

606.　Facebook 宣称，电子商务公司 Shopify "在使用其网站访问者的相似者时，每个销售线索的成本降低了两倍。"

607.　新的广告目标定位方法意味着 Facebook 的机器学习变得更加强大——能够自我调整广告活动，使其效果最大化。在 Facebook 的广告运行一段时间后，它们将变得更加有效，无需手动用户输入。Facebook 的机器学习算法不仅会优化广告，还会优化 Facebook 的收入。与此同时，Facebook 的算法将从其跟踪的用户中获取更多信息，使其能够进一步训练其机器学习模型。这创造了一个良性循环，扩大了 Facebook 的目标定位方法和社交数据库。最终的结果是 DTBE 的进一步加强。

**D.　影子档案和识别 Facebook 应用程序之外的用户**

608.　Facebook 的新战略关键在于识别 Facebook 应用程序之外的用户。通过追踪 Facebook 封闭花园之外的用户，Facebook 在锁定内部用户方面做得更好。

609.　也就是说，通过更好地根据用户的网页浏览或移动应用使用情况向他们提供内容，Facebook 可以将用户锁定在自己的应用中，从而减少用户在上网时离开 Facebook 应用的需求，这反过来使 Facebook 为自己用户提供的广告比其他形式的广告更有效。

610.　Facebook 需要一种方法来跟踪用户在移动应用程序、其自身的应用程序以及整个

**盖章后提交**

网络上的活动。它通过维护用户的"影子档案"做到了这一点。

611. 2018 年 4 月 16 日，在经过国会的严格审查后，Facebook 披露了其收集的影子档案数据的来源：

> **Facebook 什么时候获得关于其他网站和应用程序的用户的数据？**
>
> 许多网站和应用程序使用 Facebook 服务来使其内容和广告更具吸引力和相关性。这些服务包括：
>
> - 社交插件，例如我们的点赞和分享按钮，使其他网站更具社交性，并帮助你在 Facebook 上分享内容；
>
> - Facebook 登录，允许你使用你的 Facebook 账户登录到另一个网站或应用程序；
>
> - Facebook Analytics，它能帮助网站和应用程序更好地了解用户如何使用它们的服务；以及
>
> - Facebook 广告和测量工具，它们使网站和应用程序能够显示来自 Facebook 广告商的广告，在 Facebook 或其他地方运行自己的广告，并了解他们的广告的有效性。
>
> 当你访问那些使用我们服务的网站或应用程序时，即使你已经注销或没有 Facebook 帐户，我们也会收到信息。这是因为其他应用程序和网站并不知道谁在使用 Facebook。

612. 2018 年 6 月 11 日，Facebook 在给美国参议院的书面答复中证实了其收集信息的行为，承认 Facebook 在用户未登录 Facebook 账户的情况下也会收集大量数据。

613. 所有这一切都意味着，Facebook 拥有独一无二的条件来扩大并利用其在社交广告市场中的地位，以直接挑战谷歌在在线搜索和展示广告领域的地位，而长期以来，谷歌在这两个领域一直占据主导地位。正如下一节所解释的，Facebook 从未这么做过。相反，它与谷歌达成了一份限制竞争协议，以维护社交广告市场——以及 Facebook 在其中的主导地位。

**X. Facebook 和谷歌同意不竞争，加强 Facebook 主导的社交广告市场**

614. 尽管 Facebook 准备将其广告和目标定位业务扩展到社交网络应用之外，但它从未真正这么做过。相反，正如下文解释的那样，它与谷歌达成了一项协议，该协议将帮助 Facebook

<u>盖章后提交</u>

改进其机器学习算法，这样它就能保持对自己用户进行目标定位的卓越能力。作为交换，Facebook 从未在社交广告市场之外挑战谷歌的统治地位。

**A.    谷歌对广告交易平台和广告服务器的主导地位以及 Facebook 突然带来的威胁**

615.    当 Facebook 走出封闭花园的第一步时，谷歌已经在一种广告形式上取得了长期的主导地位，这种广告形式允许网站和应用程序上的展示广告库存与寻求针对特定人群的营销人员进行动态匹配。

616.    发行商将他们的广告库存提供给谷歌的广告经理（"GAM"），然后该经理将广告库存与直接进行广告交易的购买者进行匹配，或者将可用的库存提供给广告交易所，在那里营销人员将实时竞标库存。

617.    例如，一份在线报纸可能在其网站上有一个用来刊登广告的空间。它会将这些信息传递给广告服务器，后者会为该空间寻找买家。在某些情况下，广告服务器会将可用的广告空间发送给广告交易所，后者将广告空间出售给出价最高的投标者。

618.    到 2010 年代中期，谷歌的广告服务器已经变得无处不在。《USA Today》、ESPN、CBS、《Time》、沃尔玛和 Weather.com 等发行商曾经（现在仍然）使用 GAM。如今，GAM 控制着发行商 90% 的广告库存。

619.    因为大多数发行商使用 GAM 来出售他们的广告库存，所以谷歌充当了所有广告交易所的中间人，在这些交易所中，营销人员的出价与可用的广告库存实时匹配。

620.    除了控制占统治地位的广告服务器，谷歌还运行自己的广告交易所，称为谷歌广告交易所或"AdX"。谷歌对匹配购买者和广告库存收取一笔交易所费，其中大部分来自谷歌的主流 GAM。

621.    谷歌独特的优势使它不仅能够控制提供给交易所的库存，而且能够打败其他广告交易所赢得投标。

622.    也就是说，谷歌通过其分析产品来跟踪网站使用情况。它跟踪其 Gmail 产品上的用户。当用户使用谷歌新闻时，它会跟踪这些用户。它甚至提供免费的 DNS 服务器，负责为互联

网上的用户解析 IP 地址和 web 地址。谷歌还因其移动操作系统 Android 而拥有独特的优势。

623.　近年来，谷歌独特的工具和属性使它越来越适合做其他广告交易所不能做的事情：识别访问发行商网站的人实际上是谁，*也就是*他们真实、独特的身份。谷歌的广告服务器和交易所提供了访问发行商网站的人的基本信息，例如 IP 地址、设备标识信息或浏览器信息。谷歌的其他工具和属性越来越多地使其能够根据这些数据进行细粒度的身份确定。

624.　简言之，到 2010 年代中期，在 Facebook 整个广告业务的基础领域，谷歌的广告生态系统变得越来越好，但却无法跳出自己的属性——也就是确定身份。（当然，谷歌过去不能，现在也无法在其产品上向 Facebook 用户提供广告。）到 2016 年年底，随着新技术以及像 Android 这样精心定位的信息收集产品的崛起，谷歌的广告产品有可能蚕食 Facebook 的以身份为中心的广告产品，并且通过允许在 Facebook 的社交网络之外进行用户和身份目标定位，谷歌的广告产品确实有可能超越社交广告市场本身。

625.　随着谷歌功能的增强，有望出现一种新的、高度定向的广告形式——它可以在社交广告市场上与购买广告的有效性相匹敌，而在社交广告市场上，Facebook 占据主导地位，并且拥有无与伦比的用户信息。

626.　与此同时，在 2010 年代中期，Facebook 在识别用户身份和人口统计信息方面变得越来越出色，即使是在自己的应用程序之外。通过 Facebook 的一系列收购，它能够利用先进的机器学习技术对准用户，即使用户没有登录 Facebook。

627.　到 2018 年，Facebook 利用其技术进入谷歌的领地，包括在移动应用程序和网页上实时销售广告，这对谷歌构成了威胁。谷歌快速增长的识别身份的能力对 Facebook 的 DTBE 的生存构成了威胁。

628.　这两家公司达成了一项限制竞争的协议，代号为"Jedi Blue"（本起诉书稍后将解释它）。然而，要正确理解广告巨头之间一度迫在眉睫的冲突的真正利害关系和背景，关键是要理解人工智能和机器学习工具在在线广告中的作用，以及谷歌和 Facebook 在 2018 年达成分割市场协议之前如何以不同方式使用这些工具。

**盖章后提交**

### B. 谷歌的 AI 主导地位

629. 与 Facebook 不同，谷歌用 2010 年代的时间成为机器学习和人工智能领域的翘楚。例如，谷歌在 2014 年 1 月以超过 5 亿美元的价格收购了位于英国的 DeepMind 公司，获得了突破性的人工智能技术。从那时起，谷歌就在其整个生态系统中利用了这一技术和其他尖端机器学习技术。

630. 谷歌的机器学习主导地位使它能够以越来越强大的方式在互联网和移动应用程序中利用其庞大的用户数据。例如，谷歌在 2016 年 12 月 14 日宣布，它已经使用 DeepMind 技术在其 Google Play Store（谷歌针对安卓设备的移动应用商店）上进行推荐。谷歌在其人工智能博客上解释了这个问题及其基于人工智能的解决方案：

> 为 Google Play Apps Store 的访问者提供有用和相关的应用程序推荐是我们应用程序探索团队的一个关键目标。然而，理解与应用程序相关的主题只是创建一个最好地为用户服务的系统的一部分。为了创造更好的整体体验，还必须考虑到用户的品味，并提供个性化的建议。如果不这样做，那么"你可能也喜欢"的推荐对每个人来说都是一样的。

> 要发现这些细微差别，不仅需要了解应用程序的功能，还需要了解用户使用应用程序的背景。例如，对于狂热的科幻游戏玩家来说，他们可能会对类似的游戏推荐感兴趣，但如果用户安装了一款健身应用程序，那么推荐一个健康食谱应用可能比推荐 5 个以上的健身应用程序更有意义。由于用户可能更有兴趣下载与他们已经安装的应用程序或游戏互补的应用程序或游，因此，除了提供基于与应用程序相关的主题（"相似的应用程序"）的推荐，我们还提供基于应用程序之间的相关性（"你可能也喜欢"）的推荐。

> 基于之前的安装和搜索查询点击，一个特别强的背景信号是应用相关性。举例来说，如果用户搜索并玩了大量图像密集型游戏，那么他们可能更喜欢图像密集型的应用程序，而不是拥有更简单图像的应用程序。所以，当该用户安装赛车游戏时，"你可能也喜欢"的建议中包含与"种子"应用程序相关的应用程序（因为它们是图像密集型赛车游戏），而不是拥有更简单图像的赛车应用程序。这样就可以实现更精细的个性化，使应用程序的特征与用户的偏好相匹配。

631. 因此，谷歌解决了 Facebook 以社交方式（使用实际的社交数据）解决的一个问题，

**盖章后提交**

但采用了不同的方式——使用复杂的机器学习，不需要社交信号来进行社交评估和推荐。谷歌并没有收集实际的好友推荐和活动，而是使用机器学习——*即*深度神经网络模型——来研究用户的决定和偏好，然后确定该用户可能感兴趣的其他应用程序。

632. 另一方面，通过使用其社交目标定位系统来贯穿其网络，并诱导其他用户使用社交关系来安装应用程序，Facebook 多年来已经将应用安装变现——这是 Facebook 的"摇钱树"。Facebook 利用社交数据（即用户在其社交网络中的互动数据）来设计和训练机器学习算法，从而预测谁会对安装应用程序感兴趣。

633. 在 Facebook 2010 年代早期的 API 计划中，扎克伯格对 Tinder 的担忧正是基于这种"推荐引擎"技术。事实上，在 2014 年 1 月，扎克伯格担心"推荐看起来是我们应该有的强项"，但"却是我们不太擅长的事情"。他发现 Tinder 的增长"令人担忧"，因为它的推荐引擎"完全建立在 Facebook 数据上"，而且它"比我们使用相同语料库构建的任何推荐都要好得多"。

634. 但当 Facebook 试图将其机器学习能力扩展到封闭花园之外时，它面对的是一个在人工智能和机器学习领域远远领先于它的谷歌。这意味着谷歌在识别用户方面做得更好，如果不进行约束，它将在包括移动应用程序在内的整个互联网上更好地锁定 Facebook 自己的用户。

**C. Header Bidding 的兴起，Facebook 威胁与谷歌竞争**

635. 到 2016 年，Facebook 和谷歌之间的竞争冲突似乎迫在眉睫。Facebook 已经充分具备了进军广告交易所业务的条件，而谷歌已经准备好打破 Facebook 在基于身份的广告目标定位领域的主导地位，包括在 Facebook、Instagram 和 WhatsApp 等长期封闭的社交网络中。

636. 2015 年和 2016 年，发行商开始采用一种名为"报头竞价"的做法，竞争的威胁开始加剧。用户每次访问网页时，报头竞价会把广告存货转发给多个中立的交易所，以返回对该存货的最高出价。

637. 也就是说，发行商可以向几个交易所发送一个标准化的报头，其中包括关于广告位和访问用户的信息，而交易所中的竞标者可以在几毫秒内对该广告位进行投标。

638.　　新的报头竞价技术威胁要把谷歌踢出局。报头竞价不仅破坏了谷歌的广告服务器（该服务器将广告转发给交易所），还削弱了谷歌通过让自己的广告交易所获得信息优势，从而领先于第三方广告交易所的能力。

639.　　谷歌创建了自己的报头竞价替代方案，称为开放式竞价，这让谷歌比其他交易所更有优势，包括当广告在非谷歌交易所出售时收取罚款。

640.　　谷歌积极地试图平息报头竞价带来的威胁，但当 Facebook 威胁采用报头竞价时，这种威胁变得切实存在。2017 年 3 月，Facebook 公开宣布将支持报头竞价，包括与 FAN 相关的竞价。当时，当竞标谷歌的广告服务器时，Facebook 的 FAN 等网络必须在交易所中竞标，并支付交易所费用。通过采用报头竞价，Facebook 将让网页发行商、移动应用程序发行商和广告商完全避免谷歌的交易所费用。他们可以直接向交易所出价，包括通过 Facebook 有重要价值的 FAN。

641.　　这被认为是对谷歌霸权的直接攻击。《Ad Age》在 2017 年 3 月 22 日报道称：

> Facebook 刚刚对竞争对手谷歌及其 DoubleClick 帝国发动了一场数字广告政变。

> 这家社交媒体巨头周三表示，它将把受众网络的广告需求带到使用报头竞价的移动网络发行商那里。

> 到目前为止，移动发行商只要不使用报头竞价技术（一种允许他们同时接受多个买家出价的系统），就可以利用来自 Facebook 受众网络的需求。但是如果他们想要利用报头竞价，他们就必须放弃 FAN 中的任何需求。

> 那些过去曾使用报头竞价并希望利用来自 FAN 的广告商的发行商现在可以通过 Facebook 的技术合作伙伴 Index Exchange、Sonobi、Amazon Publisher Services、AppNexus、Media.net 和 Sortable 来实现这一点。该公司表示，用户还可以通过开源解决方案 PreBid 和 PubFood 访问 FAN。

642.　　根据《Ad Age》的观察，这一举动意味着 Facebook 卓越的、基于身份的目标定位系统现在可以在整个互联网上使用：

> 《华盛顿邮报》、《每日邮报》和《福布斯》等发行商一直在悄悄地

1

与 Facebook 合作引入这项服务，这将让它们能够插入 FAN，接收通过 Facebook 复杂的数据和目标定位技术购买的广告。

643.　Facebook 此举是引诱谷歌的长期战略的一部分。Facebook 的策略奏效了，谷歌与 Facebook 达成了交易。

**D.　谷歌同意帮助 Facebook 识别其封闭花园之外的自己的用户，Facebook 退出程序性和交易所交易广告**

644.　在 Facebook 官方发布报头竞价公告几个月后，谷歌和 Facebook 开始了正式谈判。到 2018 年 8 月，两家公司展开了激烈的谈判，每家公司都在内部评估当无法达成协议时的应急措施和战略。

645.　2018 年 9 月，两家公司最终达成了一项限制竞争的协议。协议代号为 Jedi Blue。

646.　Facebook 同意放弃对报头竞价的支持，从而保留谷歌在基于交易所的广告领域的主导地位。

647.　作为交换，谷歌同意向 Facebook 提供它所需要的东西———一种用于在 Facebook 控制的应用程序之外跟踪 Facebook 用户的手段。

648.　作为协议的一部分，Facebook 将向谷歌支付 5% - 10% 的交易费用，并将被锁定每年在谷歌基于交易所的系统上花费 5 亿美元。

649.　作为回报，Facebook 将继续控制社交广告市场。事实上，正是因为这项协议，Facebook 才能够确保谷歌的目标定位技术不会对准 Facebook 的用户，从而巩固了 Facebook 在其社交网络上针对用户的广告优势。简言之，Facebook 与谷歌的协议在其封闭花园中巩固了 DTBE，而当时 Facebook 主导的差异化社交广告市场正受到程序化广告和跟踪技术的威胁。

650.　据《华尔街日报》报道，作为 Jedi Blue 项目的一部分，谷歌向 Facebook 做出了一系列让步，以确保实现这一点。例如：

- 在用户使用网站和第三方应用程序的过程中，谷歌将帮助 Facebook 识别移动和网络用户，特别是 Facebook 自己的用户。

**盖章后提交**

- Facebook 将获得向 90% 它认为是自己用户的用户展示广告的权利。

- Facebook 将获得 300 毫秒的"超时时间"来识别用户并出价。其他参与者则会获得一个更短的 160 毫秒的超时时间。

651. Facebook 在谷歌的地盘上利用其目标定位系统的威胁以协议方式被平息了。作为交换，谷歌支撑了社交广告市场。因为 Facebook 可以在自己的应用程序之外识别自己的用户，所以 Facebook 在向这些用户出售广告时可以保持溢价。Facebook 也获得了针对这些用户优先权，这意味着其他交易所的竞标者只能获得剩余 10% 的存货，即使这样，这些竞标者也只有 Facebook 一半的时间来竞标这些广告存货。

652. 谷歌向 Facebook 移交了对 Facebook 用户和 Facebook 控制的其他应用程序的用户的广告定位的控制权。这意味着 Facebook 成为覆盖这些用户的最有价值的方式，包括在使用第三方应用程序或网站的过程中。

653. 如果不达成协议，谷歌的机器学习和人工智能优势将使它能够识别用户，包括 Facebook 自己的用户，并最终基于细粒度标准来定位他们。这将削弱用于保护 Facebook 社交广告市场的 DTBE，并降低 Facebook 为覆盖其用户而可能收取（并且过去的确收取的）的溢价。

654. 因为 Jedi Blue 协议，Facebook 的用户仍然是只能由 Facebook 投放广告的用户。因此，广告商不得不（按照溢价）向 Facebook 支付广告费用，从而通过精细目标定位（包括基于人口统计学的目标定位）向这些用户投放广告。由于 Jedi Blue 协议，没有出现可以与 Facebook 针对其封闭花园用户的广告产品相匹敌的定向广告产品。

655. 该协议还消除了（或至少大大推迟了）由谷歌带来的人工智能和机器学习威胁。虽然谷歌能够根据发行商提供的信息和它自己在互联网上收集的数据来确定用户的身份，但它不会利用这些数据从 Facebook 那里窃取广告销售额。相反，Facebook 将获得对其已识别用户的广告优先权，并将获得谷歌的帮助来识别这些用户的身份。谷歌并没有利用自己的技术来对抗 Facebook，而是利用它来巩固 Facebook 在社交广告市场中的主导地位。

656. 简言之，谷歌和 Facebook 同意划分市场，这让 Facebook 能够继续为其在社交广告

**盖章后提交**

市场中销售的定向广告收取更高的价格溢价。该协议还避免了威胁谷歌对整个互联网中的交易所交易广告控制权的竞争。两个竞争对手都从中获益。但对竞争不利。

## XI. Facebook 以反竞争的方式整合了Instagram、WhatsApp、Messenger 及其核心 Facebook 产品的后端

657. Facebook 与谷歌签订了一项协议，目的是当 Facebook 用户在 Facebook 封闭花园之外的网站和应用程序上互动时，将识别 Facebook 用户的身份。随着资源的释放，Facebook 转向内部，并最终封锁了社交广告市场中的任何竞争，从而显著且不可逆转地加强了 DTBE。

658. 多年来，Facebook 一直将 WhatsApp 和 Instagram 应用程序作为独立业务来运营。事实上，Facebook 曾向监管机构承诺，将把两家公司及其庞大的数据存储区分开。[Redacted]

[Redacted] 这次整合的目的不是（合法的）技术上的；相反，整个计划是在试图不可逆转地混合 Facebook 的各种数据来源、产品和模式，这样，在全球对 Facebook 的数据做法和市场影响力的担忧日益加剧一年后，监管机构就无法最终拆分、剥离或以其他方式明确禁止或监控该公司。

659. [Redacted] 2019 年 3 月- [Redacted] - 许多美国参议员（包括总统候选人 Elizabeth Warren）曾明确并公开呼吁拆分该公司。

<u>盖章后提交</u>

[Redacted] 扎克伯格和 Facebook [Redacted]

662. Facebook 的后端整合缺乏任何合法的技术理由，而只是一种手段，以防止监管部门拆分 Facebook、Instagram 和 WhatsApp，并巩固 Facebook 在社交广告市场中的主导地位。

[Redacted]

<u>盖章后提交</u>

[Redacted]

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

<u>**盖章后提交**</u>

[Redacted]

<u>盖章后提交</u>

[Redacted]

盖章后提交

[Redacted]

<u>盖章后提交</u>

[Redacted]

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

<u>盖章后提交</u>

[Redacted]

<u>盖章后提交</u>

[Redacted]

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

Case 3:20-cv-08570-JD   Document 374-5   Filed 10/28/22   Page 264 of 333
案件 3：20-cv-08570-JD 文件 237，归档日于 2022 年 02 月 28 日，第 163 页，共 203 页

盖章后提交

[Redacted]

**盖章后提交**

[Redacted]

690. 在收购 Instagram 和 WhatsApp 时，Facebook 曾向监管机构承诺，它将把 Instagram 和 WhatsApp 作为独立于其核心应用程序 Facebook 和 Messenger 的业务来运营。

691. 例如，Facebook 曾向欧盟委员会的竞争监管机构表示，它无法匹配 WhatsApp 和 Instagram 的用户资料。作为其 2014 年并购审查流程的一部分，欧盟监管机构曾依赖这些声明。

692. 2017 年 5 月 17 日，欧盟监管机构对 Facebook 罚款 1.1 亿欧元，并在以下新闻稿中解释了罚款的原因：

> 由于 Facebook 在 2014 年收购 WhatsApp 的调查中提供了不正确或误导性的信息，因此根据欧盟并购条例，欧盟委员会对 Facebook 罚款 1.1 亿欧元⋯⋯

> 当 Facebook 在 2014 年发布关于收购 WhatsApp 的通知时，它曾告知欧盟委员会，它无法在 Facebook 用户的账户和 WhatsApp 用户的账户之间建立可靠的自动匹配。它在通知表格和回复委员会的信息请求时都说明了这一点。然而，在 2016 年 8 月，WhatsApp 宣布更新其服务条款和隐私政策，包括可能将 WhatsApp 用户的电话号码与 Facebook 用户的身份进行关联。

> 2016 年 12 月，欧盟委员会发表了一份反对 Facebook 的声明，其中详细阐述了其担忧。

> 该委员会发现，与 Facebook 在 2014 年合并审查过程中的声明相反，自动匹配 Facebook 和 WhatsApp 用户身份的技术可能性在 2014 年就已经存在，而且 Facebook 的工作人员当时也知道这种可能性。

[Redacted]

**盖章后提交**

[Redacted] 2018 年 3 月，WhatsApp 创始人 Brian Acton 辞职以示抗议，他在 Twitter 上表示：“现在是时候了。 #deletefacebook。”



**Brian Acton** @brianacton • 2018 年 3 月 20 日
现在是时候了。 #deletefacebook

♡ 1.8K    ⇄ 13K    ♥ 34K

697.　扎克伯格违背了他关于限制 WhatsApp 五年内变现的承诺，并几乎立即开始通过将 WhatsApp 的庞大用户群与 Facebook 现有的用户资料进行匹配来进行变现，从而定向投放广告和收集社交数据。

698.　Acton 在辞职抗议时留下了 8.5 亿美元的股票。

699.　WhatsApp 的另一位联合创始人 Jan Koum 于 2018 年 4 月离职。同样，Instagram 的创始人 Kevin Systrom 和 Mike Krieger 也在不久后效仿，于 2018 年秋天从 Facebook 辞职。

[Redacted]

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

盖章后提交

### D. 关于拆分 Facebook、WhatsApp 和 Instagram 的呼吁

701. 2018 年 3 月 20 日，《华盛顿邮报》报道，在 Facebook 臭名昭著的 Cambridge Analytica 丑闻之后，美国联邦贸易委员会启动了调查。在 2016 年美国总统大选的准备阶段，Facebook 允许 Cambridge Analytica 公司通过 Facebook 的 API 获取大量用户信息，这影响了数千万 Facebook 用户。这一丑闻令人惊讶，因为 Facebook 一直在告诉开发者和公众，它不再允许第三方应用程序访问用户的好友和动态信息。联邦贸易委员会立即开始调查 Facebook 是否违反了 2011 年与该机构达成的认罪协议。

702. 2018 年 4 月 10 日，马克·扎克伯格被传唤到美国参议院作证。参议员们的问题尖锐地转向了 Facebook 的垄断地位，尤其是在来自南卡罗来纳州的参议员 Lindsey Graham 的提问期间。Graham 多次向扎克伯格询问 Facebook 的竞争对手，并直接问他该公司是否是垄断企业。

703. 到 2018 年底，包括华盛顿特区民众在内的公众普遍认为，Facebook 已经成为一家反竞争的垄断企业。几名美国参议员提出了降低 Facebook 市场支配力量的措施，包括提议修改《通信规范法案》下的法律条款，这些条款被解释为向 Facebook 提供了许多其他公司过去和现在都没有享受到的广泛的法律豁免权。2018 年 9 月 5 日，《The Verge》杂志的一篇文章称：

> 在某些方面，Facebook 是最紧迫的案例。它不可避免，不透明，对我们社会的基本功能有着巨大的影响力。与其他科技巨头相比，Facebook 的影响力更像是一种迫在眉睫的威胁，也是国会采取行动最合理的首要目标。弗吉尼亚州民主党参议员 Mark Warner 已经提出了 20 项不同的措施，旨在约束 Facebook 和其他科技巨头，包括从 GDPR 风格的数据可迁移性要求，到根据 230 条款进行更多分拆。

> 但是，虽然 Warner 的措施集中在推动 Facebook 采取更负责任的行为，但越来越多的批评者认为问题出在 Facebook 本身。可能是一个拥有 20 多亿用户的社交网络太大了，无法负责任地进行管理，而且再多的审核员或监管机构也无法有效地约束这家公司。对这些批评者来说，社交网络是一种天然的垄断，再多的数据可携带性要求也不会产生一个对 Facebook 有意义的竞争对手，或者对其权力进行有意义的约束。

> 如果这是真的，*那么经典的反垄断拆分（就像一些人建议的那样）似乎是唯一的选择。*

**盖章后提交**

（着重强调）。

704. 想要拆分 Facebook 的呼声越来越普遍。以"网络中立性"而闻名的 Tim Wu 教授（事实上，他创造了"网络中立性"这个词）一直在呼吁拆分 Facebook。他的重点是 Instagram 和 WhatsApp。2018 年 9 月，《The Verge》杂志的一篇文章解释了 Wu 教授的立场：

> 我认为，如果你仔细研究一下 WhatsApp 和 Instagram 的收购，那么关于这些收购的影响是反竞争的说法就很容易被证明，理由有很多，Wu 说。他说，拆分这家公司并不难。

705. 2019 年 3 月 8 日，当时正在竞选美国总统的参议员 Elizabeth Warren 直接呼吁拆分 Facebook。Warren 的重点是 Instagram 和 WhatsApp 的收购。正如 Warren 在一篇博客文章中所说的那样，她认为几起大型科技公司的合并应该被推翻，包括 Facebook 对 WhatsApp 和 Instagram 的收购：

> 目前的反垄断法授权联邦监管机构拆分那些减少竞争的合并。我将任命致力于利用现有工具来推翻那些反竞争的合并的监管机构，包括：
>
> - Amazon：Whole Foods；Zappos
> - Facebook：WhatsApp；Instagram
> - Google：Waze；Nest；DoubleClick
>
> 推翻这些合并将促进市场的良性竞争——这将给大型科技公司带来压力，迫使它们更积极地回应用户的担忧，包括隐私方面的担忧。

> [Redacted]

<u>盖章后提交</u>

1
2      [Redacted]
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20     [Redacted] Warren 的公开声明是为了让公众（或许还有监管部门）关注 扎克伯格最初的整
21   合计划。 [Redacted]
22
23
24
25
26
27
28

<u>盖章后提交</u>

[Redacted]

 

 

 

 

 

[Redacted] 这是一个已经解决了的问题，即使在 Facebook：《纽约时报》在 2016 年 4 月 5 日的报道，引用 WhatsApp 自己的公司博客 -

> 旧金山 - 周二，Facebook 旗下的即时通讯应用 WhatsApp 为其服务引入了完全加密技术，以确保只有发送方和接收方

盖章后提交

才可以读取使用该应用程序发送的消息。

它被称为"端到端加密"，将应用于世界各地的人们用 50 多种语言发送的照片、视频和群发短信……

715. 简而言之，Facebook 早就拥有了技术、诀窍、资源以及商业经验，能够把将端到端加密应用于其任何其他通讯服务，以及其各种产品的照片、视频和群组文本功能。事实上，**_Facebook 在 2016 年已经在 WhatsApp 上这样做了。_**

716. 此外，简单地说，加密是与集成完全不同的技术问题。加密通信不会"整合"任何东西（事实上，Facebook 在 2016 年选择了对 WhatsApp 进行端到端加密，而不是选择其他任何东西）；集成多个产品不会突然加密任何东西。毫无疑问，这两个技术概念是完全不同的 [Redacted]

717. 然而，在任何情况下使用"端到端加密"这个词总是会带来一个可预见的结果：它立即偏离并压倒了对话中的任何其他技术问题，因为执法部门和公民自由主义者只要一提到 E2EE，整个房间立刻充满了对电子隐私的不同看法。2016 年 4 月，《纽约时报》的一篇宣布 WhatsApp 的新端到端加密的文章就是一个很好的例子：

> 此举使 WhatsApp 进一步陷入科技公司和执法官员在数字数据访问权限问题上的对峙，这将硅谷的公民自由意志主义理念与联邦政府对国家安全的担忧对立起来。加强加密将使当局更难（如果不是不可能的话）拦截 WhatsApp 的通信以进行调查……

> 考虑到 WhatsApp 拥有庞大的用户群和庞大的国际业务，联邦调查局对 WhatsApp 的端到端加密尤为关注。随着消息服务之间发送的通信越来越多，加密的文本、视频、照片等对执法来说可能比锁定的设备更成问题。WhatsApp 的加密功能将默认开启，因此用户无需自行开启该功能。

[Redacted]因此，当 Facebook 的后端整合（一个完全不同的技术概念，将不可逆转地混合四种不同的 Facebook 产品的数据和架构，以防止拆分）即将在 2019 年 3 月被 Elizabeth Warren 推到聚光灯下时，[Redacted]

[Redacted]

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

**盖章后提交**

721.　几乎每一家新闻媒体都只报道了端到端加密技术的合理性和背景，以及它对 Facebook 产品的意义。

722.　国会和美国司法部也几乎只关注 Facebook 关于端到端加密的声明。正如《Engadget》在 2019 年 10 月 3 日报道的那样：

> 美国司法部将要求 Facebook 暂停其对所有消息服务进行端到端加密的计划。它将敦促该公司不要在"未确保用户安全不会下降"的情况下继续推进。
>
> 司法部长 William Ban 将于周五在一封给脸书首席执行官马克·扎克伯格的公开信中提出这一要求。代理国土安全部长 Kevin McAleenan、英国内政大臣 Priti Patel 和澳大利亚内政部长 Peter Dutton 也在信函草稿上签字……

[Redacted]

<u>盖章后提交</u>

[Redacted]

<u>盖章后提交</u>

[Redacted]

<u>盖章后提交</u>

[Redacted]

<u>盖章后提交</u>

[Redacted]

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

[Redacted]

[Redacted] 当然，集成和端到端加密之间并没有什么特别的关系。Facebook 可以轻松整合其消息系统并从中获取数据。

[Redacted]

## 盖章后提交

1

2

3

4　　[Redacted] 同样，端到端加密也可以在应用程序层面实现，而无需集成消息传递系统的后

5　端。[Redacted]

6　　755.　事实上，WhatsApp 已经在其消息平台中加入了端到端加密功能。正如 WhatsApp 网

7　站在 2016 年 4 月所言：

8　　默认的安全

9

10　　　　当你和你通信的人使用我们的应用程序的最新版本时，WhatsApp 将提
　　　　供端到端加密功能。许多通讯应用程序只对你和它们之间的信息进行

11　　　　加密，但 WhatsApp 的端到端加密确保只有你和你在交流的人可以读
　　　　取发送的内容，其他任何人都不可以读取，甚至 WhatsApp 也不行。

12　　　　这是因为你的消息将用一把锁提供保护，只有收件人和你拥有解锁和
　　　　读取消息所需的特殊密钥。为了增加保护，你发送的每条消息都有自

13　　　　己独特的锁和钥匙。所有这些都是自动发生的：不需要打开设置或设

14　　　　置特殊的秘密聊天来保护你的消息。

15　　756.　WhatsApp 再次在公司博客上发布了关于这方面的贴文。《纽约时报》为此写了一

16　篇文章。Facebook 知道如何在其产品中实施端到端加密——而且它早在几年前就已经这么做了。

17　　757.　事实上，WhatsApp 在 2016 年就已经实现了端到端加密，而且这项功能不需要与

18　Instagram 或 Facebook Messenger 进行任何形式的集成。2019 年声称添加的"端到端加密"并不

19　像 Facebook 所说的那样是后端集成的一部分。相反，这与它毫无关系。

20　　[Redacted]

21

22

23

24

25

26

27

28

盖章后提交

[Redacted]

762. 与此同时，这些在 2019 年初发生并持续到今天的 Facebook 产品变化（原告根据有限的证据开示可以看出这一点）毫无疑问加强和巩固了 DTBE，并帮助维持了 Facebook 在社交广告市场中的主导地位，使 Facebook 不可逆转地汇集了大量社交数据 [Redacted]。

763. Facebook 与整合相关的产品变化在社交广告市场上产生了反竞争的影响，因为，除了其他事情外，这些产品 [Redacted] (i) 通过创建世界上已知的最大的社交目标定位数据聚合，以及 (ii) 通过阻止或实质上限制剥离或拆分（包括根据监管法令法院下令的剥离——联邦贸易委员会目前正在寻求这样做）来自 WhatsApp、Instagram 和 Facebook / Messenger 的离散社交数据。

764. 但以上是一个预期的功能，而不是 bug。如前几节所述，Facebook 从 2019 年开始对这些反竞争的产品进行了修改。

[Redacted] 此外，如前几节所述，这些反竞争产品变更缺乏合法的技术（或非反竞争的）理由。

**盖章后提交**

**XII.   相关市场**

765.   原告是本案中相关市场（即社交广告市场）中的消费者和购买者。原告是 Facebook 广告产品的直接购买者，并且作为社交广告市场的参与者受到了反竞争的损害。

**A.   社交广告市场**

766.   社交广告市场是在线广告的一个子市场，后者包括条幅广告、基于搜索的广告和社交网络上的广告。然而，社交广告与其他形式的在线广告是不可替代或互换的。事实上，社交广告使广告商能够根据用户的属性（包括其网络的属性）对目标用户进行细分。

767.   因此，由于在 Facebook 这样的社交媒体网站上，定位用户投放广告的能力非常强大，搜索和横幅广告不是合理的替代品。

768.   一些相关因素表明，社交广告市场是一个不同于在线广告和更一般的广告市场的子市场：

769.   *行业或公众认可该次级市场是一个独立的经济实体。* 市场和行业参与者普遍认为社交广告不同于其他形式的广告。例如，广告公司 Outbrain 在其博客上这样描述社交广告之间的区别：

> 付费社交广告是通过算法来提供的，而算法会根据用户的社交账户过去的活动来定义用户可能对什么感兴趣，比如点赞、分享和评论。与专注于目标导向的搜索活动不同，在社交网站上浏览要轻松得多。想想社交网站上的猫表情包、度假照片和有趣的小测验。尽管如此，社交平台已经积累了关于每个特定用户的大量数据，而这些数据可以被用来瞄准特定的受众，投放他们可能感兴趣的广告。

770.   Outbrain 解释说，社交广告被认为有独特的用途：

> 社交广告最适合针对那些可能对你的产品或服务感兴趣的受众群体，基于一系列的目标定位标准——位置、年龄组、性别、爱好和兴趣。Facebook 等社交网络有先进的目标定位功能，这意味着你可以微调你的定位标准，以覆盖一个非常具体的、高质量的受众。

**盖章后提交**

771. Outbrain 解释说，搜索广告是不同的，因为"在客户已经在找你时（*例如*，他们搜索你的公司名称或产品），或者他们在搜索你可以提供的特定产品、服务或信息时，搜索广告对定位客户很有帮助。" Outbrain 还将社交广告与其他形式的在线广告（如发现广告）区分开来。

772. 此外，statista.com 等商业统计的提供商也提供关于社交媒体广告的信息，这是在线广告和普通广告的一个独特的子市场。

773. 另一个例子是，2015 年 3 月，领先的广告刊物《AdAge》将 Facebook 的定制受众定位（这是社交广告所独有的）称为"潜在的不同和更特殊功能，因为它们拥有更丰富的数据层次"。

774. 同样，行业出版物《Marketing Land》在 2019 年 10 月 14 日的一篇文章中报道称，Publicis Media 旗下的媒体机构 Zenith 预测，与搜索和电视广告不同，社交媒体广告领域将出现增长，其中社交媒体广告将排在电视和付费搜索广告之后，位列第三。

775. 在 2012 年 10 月 23 日的财报电话会议上，Facebook 首席运营官 Sheryl Sandberg 表示："关于广告商在哪里的问题，我之前说过，我们处于第三位。我们不是电视，也不是搜索。我们是社交广告，我想说的是，我们的客户处于接受曲线的不同部分。" 后来，在 2013 年 5 月 1 日的财报电话会议上，Sandberg 解释道："就像我之前说的，品牌广告商的问题在于，他们非常习惯于电视广告，然后他们非常习惯于搜索，而我们处于第三位。"

776. 即使是学术文章（包括发表在《Journal of Advertising》上的学术文章）也将社交媒体广告作为一个独特的具有明确的互动特征的细分市场进行了分析。

777. *产品的特点和用途。*社交广告与其他形式的广告有一个截然不同的目的。社交广告与其他形式的在线广告有着不同的应用。也就是说，社交广告允许基于用户属性、用户兴趣和组属性进行精细的目标定位。此外，由于当用户在社交媒体平台上互动时，可以收集到关于用户的详细数量的信息，因此社交广告可以找出具有类似行为特征的其他用户。

778. 例如，Facebook 将它自己的目标定位能力描述为：

**盖章后提交**

Facebook 可以根据位置、年龄、性别、兴趣、人口统计、行为和关系来定向投放广告。你还可以使用更高级的目标定位工具（例如 Lookalike Audiences），它可以让你定位与已经与你的业务互动的人类似的人，或者你可以把目标定位选项进行分层，以选择更特定的受众。

779. Facebook 允许广告商创造类似的受众。因此，与搜索或其他形式的广告不同（在这些广告中，广告的创建和放置是为了覆盖已经存在的受众），Facebook 能够通过算法来合并其用户子集，从而投放广告。这种功能是社交广告所独有的。

780. 正如 Facebook 在其网站上解释的那样：

当你创建一个 Lookalike Audience 时，你需要选择一个源受众（使用从像素、移动应用程序或页面粉丝中提取的信息创建的定制受众）。我们在其中确定人们的共同品质（例如，人口统计信息或兴趣）。然后我们将你的广告发送给与他们相似（或"看起来像"）的受众。

781. 由于 Facebook 从用户那里收集的颗粒数据水平，它可以提供其他广告媒体无法比拟的目标定位灵活性。Facebook 解释道：

你可以在创建过程中选择 Lookalike Audience 的规模。较少的受众会更接近匹配你的源受众。创建更大规模的受众会增加你的潜在覆盖范围，但会降低 Lookalike Audience 和源受众之间的相似程度。我们通常推荐 1,000 到 50,000 人规模的源用户。来源质量也很重要。例如，如果一个源受众是由你最好的客户而不是所有客户组成的，那么这可能会带来更好的结果。

782. 社交广告的另一个特点是，当用户与广告互动时，它能够通过算法来优化广告目标定位。例如，Facebook 允许用户在他们的网站上放置一个像素，当该网站被访问时，该像素就会从 Facebook 的服务器上脱离。因此，一旦用户转向广告商自己的网站，Facebook 就能够确定在 Facebook 上运行的广告的有效性。随着时间推移，Facebook 的广告在特定的广告目标（比如潜在客户生成或在线购买）方面变得更有针对性和更有效。

783. Twitter 等其他社交网络也提供类似的目标定位功能。例如，Twitter 允许基于位置、语言、设备、年龄和性别进行目标定位，但也允许针对受众类型进行目标定位，包括以算法方式量身定制的受众。

**盖章后提交**

784.　在社交广告平台上可以使用的这些目标定位功能在其他形式的在线广告（如展示和横幅广告或搜索广告）中是不可比拟的。

785.　***独特的生产设施。***社交广告需要从社交应用程序的用户那里收集数据。例如，用户的搜索历史将不会提供足够的数据来创建高度定向的广告功能，比如 Facebook 的 Lookalike Audiences。同样地，被动广告（如条幅广告，甚至是普通杂志或出版物广告）提供了小颗粒的数据，然后这些数据可以用来进一步细化广告的目标定位。

786.　社交广告的提供者需要专门的制作手段，因为他们必须依赖于从用户网络之间的互动中获取的数据，以促进高度定向的广告。因此，能够发布社交广告的平台必须提供图像和视频共享、消息传递、配对、内容共享和其他固有的社交功能，以便获得所需的数据，实现颗粒化用户和用户网络目标定位。

787.　因为社交广告允许对目标受众进行迭代优化，社交广告提供商必须使用机器学习或人工智能算法，而这些算法是通过用户与内容和广告进行互动和参与时收集的数据来进行训练。Facebook 应用机器学习团队负责人 Joaquin Quiñonero Candela 告诉《*Wired*》杂志（原文强调）：

> ***今天的 Facebook 离不开人工智能。***每次你使用 Facebook、Instagram 或 Messenger 时，你可能没有意识到，你的体验是由人工智能驱动的。

（着重强调）。

788.　其他形式的广告通常不需要复杂的机器学习或人工智能。在现代机器学习技术出现之前的几年里，雅虎和谷歌等搜索引擎使用远不那么复杂的算法来匹配用户搜索与建议的网站，进而匹配广告。传统广告（比如杂志或电视广告）根本不需要算法，更不用说人工智能了。

789.　***不同的客户。***社交广告客户不同于搜索广告商和被动展示广告商。此外，社交广告通常更有效地进行有针对性的广告投放，而不是覆盖大量人群。

790.　在搜索引擎上投放广告的客户通常会在根据特定的关键字返回的搜索结果中寻找优先级。在社交媒体平台上投放广告的客户正在寻找符合特定的、预定义的个人资料或一组特征的用户。虽然小型企业通常没有足够的预算来竞标令人垂涎的搜索结果，但它们却能够在 Facebook

**盖章后提交**

这样的社交媒体平台上竞标精细定义的受众。

791. ***明显不同的价格和对价格变化的敏感性。*** 社交广告的价格不同于其他形式的广告。在基于搜索的广告投放中，某些搜索关键字被许多广告商抬高价格，因为它们希望让它们的广告显示在搜索结果中。这意味着，某些类别的价格（例如法律或家装）在基于搜索的平台将明显高于社交广告平台（如 Facebook）。例如，法律广告在 Facebook 上的平均点击成本为 1.32 美元，而在谷歌广告平台上的平均点击成本为 6.75 美元。同样，在 Facebook 平台上，消费者服务广告的平均点击成本为 3.08 美元，而谷歌广告的平均点击成本为 6.4 美元。

792. 由于谷歌广告和其他基于搜索的广告的竞价是零和的（这意味着只有一定数量的广告可以与一组特定的搜索关键字相配对），因此定价对需求的变化更为敏感。

793. 然而，社交广告允许细分目标定位，从而避免了其他广告投标形式的大部分零和本质。此外，像 Facebook 这样的社交广告商可以定制受众，从而减少广告商在任何特定时间点竞争相同展示机会的可能性。

794. 其他一般的广告形式（例如电视和印刷品）甚至是零和的，因为在报纸或杂志上只有有限的时段或可用的页面。因此，在这些形式的广告中，定价对需求更为敏感。

795. 因此，社交广告是完全不同的。由于能够定位受众来投放广告，所以定价与目标定位的普遍性成正比，而不是简单地与有限的搜索词、关键字或期刊放置的一般需求成正比。

796. 此外，Facebook 几乎每年在销售广告时都能持续提价，而不会面临竞争对手的价格压力。根据 2019 年底的一份报告，以每英里成本 (CPM) 或每千次广告印象成本为基础，Facebook 的广告价格同比增长了 90%。2018 年，Vox 报告称，Facebook 上的 CPM 价格同比增长了 122%。2017 年，Facebook 的 CPM 增长了 171%。Facebook 此前几年也曾提价。

797. ***专业供应商。*** 社交广告市场拥有自己独特的专业供应商，即广告代理公司，如 Lyfe、Thrive、Volume Nine、Sociallyin 和 Firebelly Marketing，所有这些公司都拥有社交媒体广告的专长，并提供专门的社交媒体管理产品。有许多这样的专业广告公司专门负责创建社交媒体

**盖章后提交**

广告活动。此外，也存在专业的社交媒体分析供应商，比如 Socialbakers，负责提供跨社交媒体平台的聚合分析。有一个由专门从事社交广告的供应商组成的完整的生态系统——这表明社交广告市场是它自己独特的在线广告子市场，需要它自己独特的工具和专业知识。

798.    Facebook 在社交广告市场的营收份额约为 80%。自 2015 年以来，其份额一直高于 70%。直到今天，它仍然高于这个门槛。



799.    Facebook 在美国和全球的广告收入都在稳步增长。截至 2019 年第三季度，Facebook 的广告收入总计 173.83 亿美元。其中约 83 亿美元的广告收入来自美国。

**盖章后提交**



800.　从 2014 年到 2016 年，Facebook 的广告收入从 29 亿美元增长到 64.36 亿美元。在此期间，甚至在此之前，Facebook 是为数不多的通过销售广告将其网络显著变现的社交网络之一。其他竞争对手并没有接近 Facebook，Facebook 在社交广告市场建立了无可匹敌的主导地位，并一直保持到今天。

801.　Twitter 是 Facebook 竞争对手中唯一一个在社交广告市场上销售大量社交广告的公司，其广告收入从未超过 8 亿美元。2012 年第一季度营收约为 4500 万美元，2014 年第四季度增长至 4.32 亿美元，2019 年第三季度为 7.02 亿美元。

802.　另一家销售社交广告的竞争对手 LinkedIn 到 2018 年底的总收入约为 20 亿美元，其中一部分来自广告。

803.　考虑到 LinkedIn 和 Twitter 产生的收入，Facebook 的广告收入约占社交广告市场三大竞争公司总收入的 86%。除去那些将其社交网络变现的小型竞争对手，社交广告市场的 HHI 约为 7,685 家，远远超出了司法部所认为的高度集中的市场。

**B.　进入壁垒**

**盖章后提交**

804. 社交广告市场受到数据目标定位进入壁垒的保护，它阻止 Facebook 的竞争对手进入该市场。如果没有大量的社交数据和机器学习/ AI 技术，社交广告市场的参与者就无法产生收入。

805. 此外，如果没有足够的社交数据以及与社交网络的互动，那么市场参与者就无法向用户展示能够产生足够价值的内容，从而产生互动和额外的社交数据。

806. 同样，如果没有大量社交数据，广告目标定位就不可能实现，或者广告效果会大幅下降，从而减少社交广告市场中的广告销售收入。

807. 因此，一个公司在这个市场上的市场支配力量依赖于获得大量的社交数据以及挖掘这些数据的技术。由于网络效应，用户不会使用一个缺乏足够社交数据来提供有针对性的内容或向其他用户提供有价值的联系的社交网络。但是，一旦市场参与者获得一定数量的社交数据，由于网络效应，可能会形成一个反馈回路，从而进一步增加社交网络产生的社交数据量。

808. 因此，一个新进入者必须在资本、技术和劳动力方面投入大量资金，以创建一个足够大的网络，从而产生必要的网络效应，与市场上的主导企业竞争。

809. 由于成功进入社交广告市场需要大量资本和社交数据，因此 DTBE 有效地排除了一个新竞争对手的进入，即使这个竞争对手拥有充足的资金。事实上，DTBE 阻止了谷歌凭借 Google+ 社交网络产品成功进入社交数据市场和社交广告市场。

810. 虽然 Google+ 成功地复制了 Facebook 的核心功能，甚至在其软件中添加了额外的功能，但它失败了，因为它缺乏临界量的社交数据来扭转为 Facebook 提供保护的网络效应。没有这个临界量，用户就不会承担从 Facebook 的社交网络转换到新进入者的社交网络的成本。也就是说，一个新进入者将无法提供一个有价值的参与用户网络来证明 Facebook 用户改变社交网络是合理的。

811. 这正是发生在谷歌身上的情况。尽管它拥有庞大的用户群，但缺乏互动，这意味着它无法提供足够的社交数据，无法用于为用户提供针对性的内容和广告。这反过来又降低了新进

**盖章后提交**

入的社交网络的价值，从而降低了从 Facebook 转向谷歌社交网络的吸引力。

812. DTBE 将继续巩固 Facebook 的主导地位。事实上，通过本起诉书中描述的反竞争计划，Facebook 排除了竞争对手和潜在的竞争社交网络，从而加强了 DTBE，为其提供了更大的社交数据份额，并通过社交广告提供了更强大的变现渠道。额外的社交数据量增加了其网络的价值，而来自社交广告的收入增加了新竞争对手的进入成本。

813. 社交广告市场的其他进入壁垒还包括但不限于高开发成本、数据管理、人才获取和保留、服务器基础设施、开发基础设施、软件技术、软件库以及足以吸引用户的品牌和营销存在。

**C.  相关地域市场**

814. 相关地域市场是美国社交广告市场。

815. 对于推动社交广告产品的社交数据，社交数据必须与购买该数据的客户兼容。因此，国外市场的社交数据对美国的广告商来说可能没什么用处。数据可能以不同的语言收集，可能涉及与特定地理区域更相关的兴趣（*例如*，美式足球与橄榄球），而且可能包含具有共同文化或仅仅是接近的用户的人口统计数据。

816. 社交广告市场也是如此。寻求销售专为美国消费而设计的产品的广告商可能对平台在美国以外的广告定位功能没有任何用处。在美国，Facebook 在社交广告市场的份额高于其在全球的份额（这一份额已经非常高了，如上文第 VI.A 小节所述）。简言之，Facebook 在美国社交广告市场的份额要高于它在全球的份额。

817. 在美国，Facebook 用户产生的社交数据所占的市场份额甚至超过了其全球市场份额。像微信这样的服务面向的是亚洲市场，尤其是中国，它们在美国市场通常不会与 Facebook 的 Messenger、Instagram 和核心社交网络产品竞争。因此，Facebook 在美国的市场份额甚至高于在第 VI.A 节中所提到的全球市场份额，后者已经是社交广告市场的主导份额。

**XIII.  损害竞争和反垄断损害**

<u>盖章后提交</u>

818. Facebook 的反竞争计划具有垄断美国社交广告市场的目的和效果。Facebook 的行为使其得以维持其在 2010 年之前在社交广告市场上获得的垄断和市场力量，并且/或者 Facebook 打算并试图通过其反竞争计划获得这种垄断。

819. 具体而言，Facebook 参与了一系列促进其计划的行为，包括但不限于：

- 定位竞争对手来推行强制白名单和数据共享协议，代价是拒绝访问 Facebook 的平台和 api，包括 Facebook 的事件 API；

- [Redacted]

- 与谷歌签订反竞争协议，以巩固和强化 Facebook 在社交广告市场的主导地位；以及

- [Redacted]

820. 这种行为，无论是单独的，还是伙同他人，都至少在以下方面损害了竞争：

821. *首先*，Facebook 的行为导致实际和潜在的竞争对手被排除在社交广告市场之外。通过签订一系列反竞争白名单和数据共享协议，在退出平台后，Facebook 获得了由第三方应用收集的社交数据的超集。Facebook 利用启用决定，[Redacted]从第三方获取社交数据和信号。

**盖章后提交**

[Redacted]。Facebook 通过与谷歌签订反竞争协议，把威胁抵御在其封闭花园之外。Facebook 使用欺骗手段通过 Onavo 间谍软件获取普通竞争对手无法获取的用户信息-[Redacted]。这种行为共同确保了竞争对手社交广告平台无法进入市场，监管机构也无法拆分 Facebook 或以其他方式监管其行为。

822.　*其次*，Facebook 的行为减少了消费者的选择/福利。Facebook 的行为确保了在非价格的基础上不会有竞争对手的社交广告平台，例如，增加隐私、更多功能、更高质量的功能、新的功能、更有价值的社交联系、减少推送给用户的广告，或新的使用案例。该计划还阻止竞争对手或潜在竞争对手采用新的或替代的商业模式。

823.　此外，Facebook 的 Onavo 监控系统从用户设备中窃取了个人和敏感数据 [Redacted]。

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

<u>盖章后提交</u>

此外，这些被窃取的 Onavo 数据对社交广告市场的竞争对手或潜在进入者来说是不可获取的，这就确保了不存在能与 Facebook 的独占社交广告价格相抗衡的价格。

824.  同样，用户数据也被纳入了 Facebook 的广告定位系统 [Redacted]。最终的结果是加强了 Facebook 在社交广告市场中的地位，降低了其他公司进入该市场的能力，尤其是在无法访问 Facebook 通过威胁与这些公司竞争而获得的 [Redacted] 的情况下，从这些公司获取数据。

825.  Facebook 还减少了广告消费者的选择。因为 Facebook 的行为。Facebook 的目标定位能力大大增强，潜在竞争对手访问专门存储的独特社交数据的能力被封锁，从而阻止其他社交广告公司进入社交广告市场。这导致广告商的社交广告选择减少，社交广告市场上只有 Facebook 的垄断租金。

826.  *第三，*Facebook 的行为允许它提高价格。Facebook 的反竞争计划允许其在该计划执行期间和 Facebook 的开展业务过程中提高社交广告的价格，包括在两个集体诉讼期内。在美国和世界大部分地区，Facebook 仍然是仅有的定向社交广告来源之一。作为其在社交广告市场中的市场支配力量的证据，Facebook 已经在不牺牲任何需求的情况下提高了价格。

827.  例如。Facebook 要求开发者购买广告，以此作为维持平台访问权限的条件，这人为地创造了对 Facebook 广告产品的需求，尤其是对其移动广告产品的需求。这种做法有直接抬高广告价格的目的和效果。

828.  同样，[Redacted]，并最终允许 Facebook 在社交广告市场上保持和提高价格，而在数月或数年内几乎没有竞争对手。

**盖章后提交**

829.    此外，Facebook 与谷歌签订的反竞争协议允许 Facebook 在这些应用程序之外跟踪 Facebook、Instagram 和 WhatsApp 的用户，并在向这些用户投放广告时给予 Facebook 优先权。因为这个协议。在程序化和基于展示的广告产品市场和子市场中，Facebook 并没有与谷歌展开有意义的竞争，谷歌也没有利用其识别和定位 Facebook 用户的能力，而这种做法会削弱 Facebook 在社交网络上针对这些用户的定向广告的主导地位。因为谷歌支持和加强了 Facebook 在社交广告市场的主导地位和市场支配力量，所以 Facebook 能够在几乎没有竞争对手的情况下维持和提高价格。

830.    其次，通过加强 DTBE、消除竞争和防止竞争者进入，并通过本起诉书中所述的行为从各种来源获取用户社交数据，包括在其平台被破坏后与目标开发者签订一系列反竞争白名单协议 [Redacted]；Facebook 可以在没有任何有意义的约束的情况下收取独占价格。

[Redacted] *第四*，Facebook 的行为强化了 DTBE，从而为 Facebook 的垄断地位筑起了一道护城河。Facebook 的行为加强和扩大了 Facebook 的访问权限 [Redacted]

**盖章后提交**

[Redacted]

832.    Facebook 的每一个排外行为都缺乏任何促进竞争的利益/理由，更不用说任何可能超过该行为的反竞争影响的理由。[Redacted]

833.    [Redacted] 的反竞争影响（包括加强 Facebook 的 DTBE）远远超过任何促进竞争的效应（而本起诉书中声称的事实表明没有）。同样，Facebook 的扩展 API 协议和其他平台行为、[Redacted] 行为的反竞争效应也不大于促进竞争的效应。Facebook 的后端整合也没有合法的、非托词的技术理由。

834.    Facebook 的反竞争行为的最终结果是抬高了广告价格，包括原告和集体支付的价格。另一方面，本起诉书中描述的 Facebook 行为的目的和效果是实现在美国社交广告市场的一种危险的垄断可能性。

835.    所有这些都导致了 Facebook 广告价格的持续上涨，并且价格越来越具有独占性。每一个原告（以及提议的集体中的个人、实体和公司）都按照被 Facebook 反竞争计划抬高的独占价格购买了 Facebook 的广告。

836.    因此，原告的业务和财产受到了损害：由于 Facebook 非法、反竞争的行为，他们被收取了过高的广告费用。

**集体诉讼指控**

837.    集体的主张都直接源自 Facebook 的一项行为。Facebook 对集体采取了统一和标准化的行为。Facebook 针对集体成员采取的行动或不行动没有实质性区别。关于这些主题的客观事实对所有集体成员都是一样的。在集体主张的每一项救济请求中，都适用相同的法律标准。据此，根据《联邦民事诉讼规则》第 23(a) 和 (b)(3) 和/或 (b)(2) 和/或 (c)(4)，原告代表自己和由于相似的

1

2 处境而被提议为集体成员的所有其他人提起本诉讼。本诉讼满足了这些条款的数量、共性、典型

3 性、充分性、优势性和优越性要求。

4 **2018 年之前全国广告商集体**

5 838. 在 2012 年 10 月 1 日至 2018 年 4 月 3 日期间，Facebook 广告商（包括原告附属公

6 司、jessica Frederick、Joshua Jeon 和 406 Property Services）在实质上受共同服务条款的约束，这

7 些条款在此期间一般适用于商业和非商业 Facebook 账户。

8 839. 原告联属方 Jessyca Frederick、Joshua Jeon 和 406 Property Services 提起此诉讼，并

9 寻求根据《联邦民事诉讼规则》的规则 23(a)；(b)(2)；和/或 (b)(3)；和/或 (c)(4) 代表其本身和如

10 下定义的 2018 年之前全国广告商集体，寻求证明并维持本诉讼为集体诉讼：

11

12 　　　　在 2016 年 12 月 1 日至 2018 年 4 月 3 日期间，但未在 2018 年 4 月 3

13 　　　　日之后从 Facebook 购买广告，并因此在社交广告市场中受到反竞争价
格上涨伤害的所有美国个人、实体和/或公司（"2018 年之前集体诉讼

14 　　　　期"）。

15 840. 2018 年之前全国广告商集体不包括 2018 年之后全国广告商集体、Facebook、其员

16 工、管理人员、董事、法律代表、继承人、继任者以及全资或部分拥有的子公司或关联公司；以

17 及司法官员和他们的直系亲属和相关的法庭工作人员。

18 **2018 年之后全国广告商集体**

19 841. 从 2018 年 4 月 4 日至今，包括原告 Mark Berney、Mark Young 和 Katherine Looper

20 在内的 Facebook 广告商，一直受在此期间专门适用于"商业"Facebook 账户的大致相同的服务

21 条款的管辖。

22

23 842. 原告联属方 Mark Berney、Mark Young 和 Katherine Looper 提起此诉讼，并寻求根

24 据《联邦民事诉讼规则》的规则 23(a)；(b)(2)；和/或 (b)(3)；和/或 (c)(4) 代表其本身和如下定义

25 的 2018 年之后全国广告商集体，寻求证明并维持本诉讼为集体诉讼：

26

27 　　　　2018 年 4 月 4 日至今从 Facebook 购买广告，并因此在社交广告市场中

28

---

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

受到反竞争价格上涨伤害的所有美国个人、实体和/或公司（"2018 年之后集体诉讼期"）。

843. 2018 年之后全国广告商集体不包括 2018 年之前全国广告商集体、Facebook、其员工、管理人员、董事、法律代表、继承人、继任者以及全资或部分拥有的子公司或关联公司；以及司法官员和他们的直系亲属和相关的法庭工作人员。

## 大量和可确定性

844. 本诉讼中的每个集体都满足 Fed. R. Civ. P. 23(a)(1) 的要求 在 2018 年之前和 2018 年之后集体诉讼期的每个时期内，全国都有数以千计的个人、实体和/或公司从 Facebook 购买广告。所有集体成员的单独联合诉讼是不现实的。

845. 这些集体是可确定的，因为它们的成员可以通过 Facebook 账户、Facebook 广告注册以及 Facebook 或第三方在其控制范围内的正常业务过程中保存的其他记录和信息来轻松识别。原告希望向认证的集体提供适当的通知，以符合 Fed. R. Civ. P. 23(c)(1)(2)(A) 和/或 (B)，该通知将在集体认证后由法院批准，或根据法院命令，以符合 Fed. R. Civ. P. 23(d)。

## 共同问题的主导性

846. 本诉讼满足 Fed. R. Civ. P. 23(a)(2) 和 23(b)(3) 的要求，因为对每个集体都有相同的共同答案的法律和事实问题压倒性地超过了只影响个别集体成员的问题。

847. 常见问题包括但不限于以下 2018 年之前和 2018 年之后全国广告商集体的法律和事实问题：

    a. 被告是否垄断了社交广告市场。

    b. 被告、其员工或关联公司是否有意垄断社交广告市场。

    c. 被告是否企图垄断社交广告市场。

    d. 被告是否在社交广告市场中拥有垄断或市场支配力量。

    e. 第三方获取的用户数据和数据是否造成了数据目标定位进入壁垒，从而保护了 Facebook 的市场地位和/或垄断地位，减少了社交广告市场的竞争或进入，以及/

**盖章后提交**

或提高了该市场中产品的价格，包括但不限于出售给提议的集体成员的广告。

f.　被告与被列入白名单的开发者的协议是否违反《谢尔曼法案》第 2 条，包括该协议是否限制贸易或加强了数据目标定位进入壁垒。

g.　如本起诉书所述和指控的，[Redacted]是否违反《谢尔曼法案》第 2 条；

h.　被告的 [Redacted] 是否违反《谢尔曼法案》第 1 条；

i.　被告的 [Redacted] 是否违反《谢尔曼法案》第 1 条；

j.　被告与谷歌达成的旨在加强和巩固 Facebook 在社交广告市场主导地位的协议是否违反了《谢尔曼法案》第 1 条和第 2 条。

k.　被告的后端整合是否反竞争并违反《谢尔曼法案》第 2 条；

l.　被告的行为是否损害了社交广告市场的竞争。

m.　被告的行为是否导致社交广告市场中的价格上涨或消费者或开发者选择的减少。

n.　被告的违法行为是否构成对集体成员伤害的重要促成因素。

**典型性**

848.　本诉讼满足 Fed. R. Civ. P. 23(a)(3) 的要求，因为对于每一个提议的集体，所确定的原告的主张都是其他集体成员的典型主张，并且产生于被告的同一行为过程。每个集体的指定原告寻求的救济都是为缺席集体成员寻求的典型救济。

**充分代表性**

849.　原告将公平、充分地代表和保护集体的利益。原告聘请了在反垄断和消费者集体诉讼方面有丰富经验的律师。

850.　原告和他们的律师承诺代表集体积极提起诉讼，并有足够的财务资源这样做。原告和他们的律师都没有与这些集体的利益相抵触的利益。

**优越性**

851.　本诉讼满足 Fed. R. Civ. P. 23(b)(2) 的要求，因为被告已采取或拒绝采取一般适用于

---

190

**盖章后提交**

集体的理由，从而对整个集体作出适当的最终禁令和/或相应的声明性救济。

852. 本诉讼满足 Fed. R. Civ. P. 23(b)(3) 的要求，因为集体诉讼在公平和有效地裁决这一争议方面优于其他可用的方法。对于每个提议的集体，与被告行为和责任相关的共同法律和事实问题，应优先于仅影响单个集体成员的任何问题。

853. 由于每一位集体成员所遭受的损害可能比诉讼费用相对较小，因此，个人诉讼的费用和负担将使集体成员个人很难或不可能纠正对他们每个人所做的错误行为，因此，大多数或所有集体成员在单独控制对特定诉讼的起诉方面没有合理的经济利益，即使是该集体中的一小部分，个人诉讼给司法系统带来的负担也将是巨大的，因此对提议的每个集体来说，集体审判都成为优先的替代选项，符合 Fed. R. Civ. P. 23(b)(3)(A)。

854. 对于每一个提议的集体，将这一诉讼作为集体诉讼来进行，管理上的困难要少得多，能更好地节省司法资源和各方的资源，也能比零星诉讼更有效地保护每一个集体成员的权利。与个别诉讼的费用、负担、矛盾、经济上的不可行性和效率低下相比，在贵法院进行集体诉讼对当事人、法院和公众的合法利益带来的好处，大大超过了将这一诉讼作为集体诉讼来管理的挑战，这使得集体裁决优于其他选择，符合 Fed. R. Civ. P. 23(b)(3)(D)。

855. 原告不知道在管理这一诉讼中可能会遇到将排除其作为集体诉讼来维持的任何障碍。规则 23 赋予法院权力和灵活性，能够使集体机制的效率和利益最大化，并减少管理挑战。法院可以根据原告的动议或它自己的决定，对拥有共同法律问题的诉讼主张进行全国范围、州范围和/或多州类别的证明；利用规则 23(c)(4) 的规定，证明任何特定的主张、问题或共同的事实或法律问题，以做出整个集体的裁决；对集体主张进行证明和裁定风向；并利用规则 23(c)(5) 将任何集体划分为子集体。

**通过引用进行再授权和合并**

856. 原告通过引用方式重新指控和纳入本起诉书中所有之前的段落和指控，就好像已在代表各集体提出的每一项救济主张中作了充分规定。

**盖章后提交**

**救济主张**

**1**
**《谢尔曼法案》第 2 条：**
**垄断**

857. 被告故意取得并维持在社交广告相关市场中的垄断权力。

858. Facebook 在相关的社交广告市场拥有垄断力量。Facebook 有力量控制相关市场的价格或排除竞争。

859. Facebook 在社交广告市场的营收份额约为 80%；自 2015 年以来，其份额一直高于 70%。

860. 被告故意取得并维持 Facebook 在社交广告相关市场中的垄断权力。如本起诉书所指控，被告通过掠夺性、排他性和反竞争的行为实现了这个目标，包括但不限于：

- 定位竞争对手来推行强制白名单和数据共享协议，代价是拒绝访问 Facebook 的平台和 api，包括 Facebook 的事件 API；

  [Redacted]

- 与谷歌签订反竞争协议，以巩固和强化 Facebook 在社交广告市场的主导地位；以及

- [Redacted]

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

盖章后提交

861.　此处指控的被告行为在相关的社交广告市场具有反竞争效应。

862.　此处指控的被告行为没有合法的商业目的或促进竞争的效应。

863.　此处指控的被告行为对州际商业产生了重大影响。

864.　由于本起诉书中指控的被告行为，原告和各集体已经并将在其业务或财产方面受到伤害。

865.　由于被告的行为，原告和各集体已经并将会遭受反垄断法意图防止的那种伤害。由于被告的行为，原告和各集体已经并将因为竞争被破坏而受到伤害。

**II**
**《谢尔曼法案》第 2 条：**
**企图垄断**

866.　如本起诉书所指控，被告掠夺性、排他性和反竞争的行为，包括但不限于：

- 定位竞争对手来推行强制白名单和数据共享协议，代价是拒绝访问 Facebook 的平台和 api，包括 Facebook 的事件 API；

- [Redacted]

**盖章后提交**

[Redacted]

- 与谷歌签订反竞争协议，以巩固和强化 Facebook 在社交广告市场的主导地位；以及

- [Redacted]

867. 此处指控的被告行为在相关的社交广告市场具有反竞争效应。

868. 此处指控的被告行为没有合法的商业目的或促进竞争的效应。

869. 被告从事该行为的具体意图是垄断社交广告的相关市场。

870. 被告从事该行为时具有垄断相关社交广告市场的危险可能性。

871. 此处指控的被告行为对州际商业产生了重大影响。

872. 由于本起诉书中指控的被告行为，原告和各集体已经并将在其业务或财产方面受到伤害。

873. 由于被告的行为，原告和各集体已经并将会遭受反垄断法意图防止的那种伤害。由于被告的行为，原告和各集体已经并将因为竞争被破坏而受到伤害。

**III**
**《谢尔曼法案》第 1 条：**
**限制贸易**

874. 如本起诉书所指控，Facebook 在知情的情况下故意签订了一项限制交易的协议，以维护 DTBE 并保护 Facebook 对社交广告的控制。通过巩固和加强 Facebook 在社交广告市场的市场支配力量和主导地位，该协议的目的和效果是维持市场划分和/或细分，使 Facebook 能够继续

**盖章后提交**

1
2  为其在社交广告市场中销售的定向广告收取显著的溢价。因为这项协议，将无法出现能够与

3  Facebook 的广告产品相匹敌的定向广告。

4      875.    上面指控的被告行为本身就违反了《谢尔曼法案》第 1 条 (15 U.S.C. § 1)。因此，

5  原告不需要对相关市场提出指控。如果必须要指控一个市场，那么 Facebook 对交易的限制在美

6  国的相关社交广告市场产生了反竞争效应。

7      876.    此处指控的被告行为没有合法的商业目的或促进竞争的效应。

8      877.    被告行为对州际商业产生了重大影响。

9      878.    由于此处指控的被告行为，原告和各集体已经并将在其业务或财产方面受到伤害。

10
11     879.    由于被告的行为，原告和各集体已经并将会遭受反垄断法意图防止的那种伤害。由

12 于被告的行为，原告和各集体已经并将因为竞争被破坏而受到伤害。

13                   **救济请求**

14     因此，原告请求对被告作出判决，并请求法院批准下列事项：

15     A.    裁定本诉讼可根据《联邦民事诉讼规则》第 23(a)、(b)(2)、(b)(3) 和/或 (c)(4)条维持

16               为集体诉讼，并指示向各集体发出第 23(c)(2) 条规定的合理通知，并宣布原告为各

17               集体的代表；

18     B.    对被告作出有利于原告和集体的判决；

19     C.    裁定向各集体提供赔偿（即三倍于其损害赔偿），金额由审判决定；

20     D.    裁定实际的、补偿性的、法定的和相应的损害赔偿；

21     E.    裁定衡平法上的金钱救济，包括返还和追缴所有不义之财，对被告的不义之财实施

22               法定信托，或以其他方式限制其收益，以确保有效的救济；

23     F.    按法律允许的最高利率裁定判决前和判决后的利息；

24     G.    裁定支付原告和集体的诉讼费用，包括法律规定的合理律师费；以及

25     H.    根据案件需要来裁定进一步的和额外的，法院在这种情况下可能认为是公正和适当

26               的救济。

27
28

---

第一次修正后合并广告商集体诉讼起诉书 – 案件编号 20-CV-08570-JD

**盖章后提交**

## 陪审团需求

原告要求对所有可作为权利问题审理的主张进行陪审团审判。

**盖章后提交**

日期：2022 年 2 月 28 日

特此提交

**SCOTT + SCOTT ATTORNEYS AT LAW LLP**

/s/ Kristen M. Anderson
Kristen M. Anderson (CA 246108)
kanderson@scott-scott.com
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
电话：(212) 223-6444
传真：(212) 223-6334

Christopher M. Burke (CA 214799)
cburke@scott-scott.com
David H. Goldberger (CA 225869)
dgoldberger@scott-scott.com
Kate Lv (CA 302704)
klv@scott-scott.com
Hal D. Cunningham (CA 243048)
hcunningham@scott-scott.com
Daniel J. Brockwell (CA 335983)
dbrockwell@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
电话：(619) 233-4565
传真：(619) 233-0508

Patrick J. McGahan（法律顾问）
pmcgahan@scott-scott.com
Michael P. Srodoski（法律顾问）
msrodoski@scott-scott.com
156 South Main Street, P.O. Box 192
Colchester, CT 06415
电话：(860) 537-5537
传真：(860) 537-4432

*广告商集体临时联合首席律师和执行委员会*

**BATHAEE DUNNE LLP**

/s/ Yavar Bathaee
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Edward M. Grauman（法律顾问）
egrauman@bathaeedunne.com
Andrew C. Wolinsky
awolinsky@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
电话：(332) 322-8835

Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
633 West Fifth Street, 26th Floor
Los Angeles, CA 90071
电话：(213) 462-2772

**LEVIN SEDRAN & BERMAN LLP**
Keith J. Verrier（法律顾问）
Austin B. Cohen（法律顾问）
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3997
电话：(215) 592-1500
传真：(215) 592-4663
kverrier@lfsblaw.com
acohen@lfsblaw.com

**AHDOOT & WOLFSON, PC**
Tina Wolfson (CA 174806)
Robert Ahdoot (CA 172098)
Theodore W. Maya (CA 223242)
Henry J. Kelson（法律顾问）
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
电话：(310) 474-9111
传真：(310) 474-8585
twolfson@ahdootwolfson.com
rahdoot@ahdootwolfson.com
tmaya@ahdootwolfson.com

<u>盖章后提交</u>

**YAVAR BATHAEE 誓词**

本文件由 Yavar Bathaee 通过电子案件归档 (ECF) 系统归档，并且 Yavar Bathaee 证明他已获得在标题页和签名栏中标识的每一位律师对归档本文件的同意。

日期：2022 年 2 月 28 日　　　　　　　　　　/s/ Yavar Bathaee
　　　　　　　　　　　　　　　　　　　　　Yavar Bathaee

 TRANSPERFECT

# CERTIFICATION

TransPerfect is globally certified under the standards ISO 9001:2015, ISO 17100:2015, and ISO 18587:2017. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated, Plaintiffs, v. META PLATFORMS, INC., Defendant.

File Name(s):          CONSOLIDATED ADVERTISER CLASS ACTION COMPLAINT
                       DEMAND FOR JURY TRIAL

                       Consolidated Case No. 20-cv-08570-JD

Source Language(s):    English (United States)

Target Language(s):    Simplified Chinese

Authorized Signature:                          Signature, Notary Public:

Name:    Jacqueline Yorke

Title:    Project Manager

Date:    July 14, 2022



Stamp: Notary Public

Reason for signature: I approve the accuracy of this document content as written

1

<u>附件 **C**</u>

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

哈根斯•伯曼•索波•夏皮罗律师事务所 (HAGENS BERMAN SOBOL SHAPIRO LLP)
Shana E. Scarlett （州律师协会编号：217895）
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
电话：(510) 725-3000
传真：(510) 725-3001
shanas@hbsslaw.com

BATHAEE DUNNE LLP
Yavar Bathaee (Bar No. 282388)
  yavar@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
电话：(332) 322-8835

昆鹰律师事务所 (QUINN EMANUEL URQUHART & SULLIVAN, LLP)
Stephen A. Swedlow （仅限于本案）
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
电话：(312) 705-7400
stephenswedlow@quinnemanuel.com

SCOTT + SCOTT ATTORNEYS AT LAW LLP
Kristen M. Anderson （律师协会编号：246108）
  kanderson@scott-scott.com
230 Park Avenue, 17th Floor
New York, NY 10169
电话：(212) 223-6444

*消费者集体诉讼临时联合首席律师*
*[签名栏列明的新增律师]*

*广告主集体诉讼临时联合首席律师*

美国地区法院

加州北区

旧金山分院

| | |
|---|---|
| MAXIMILLIAN KLEIN, 等人<br><br>　　　　　　　　　　　原告，<br><br>　诉<br><br>META PLATFORMS, INC.,<br><br>　　　　　　　　　　　被告。 | 案件编号：3:20-cv-08570-JD<br><br>**约定保护令**<br><br>法官：James Donato 阁下 |

**1.    目的和限制**

本诉讼中的披露和证据开示活动可能会涉及到出示机密、专有或私人信息，对于这些信息，可能需要提供特殊保护，以避免公开披露，并避免用于提起本诉讼以外的任何其他目的。因此，双方特此约定并请求法院发布以下约定保护令。双方确认，该保护令并非对所有披露或证据开示答复给予全面保护，所提供的不公开披露和禁止使用保护仅适用于适用法律原则规定的有资格获得保密处理的有限信息或物品。双方进一步确认，如下文第11.4条所述，本约定保护令并不赋予其密封提交机密信息的权利；《地方民事规则》第79-5条规定了一方向法院寻求提交密封材料之许可时必须遵循的程序和适用标准。

**2.    定义**

2.1    异议方：对本保护令项下指定的信息或物品提出异议的当事方。

2.2    竞争性决策：涉及到竞争对手、潜在竞争对手、客户或分销伙伴的决策，包括有关合同、营销、定价、产品或服务开发或设计、产品或服务的提供、研发、并购或许可、收购或知识产权之执行的决策。

2.3    "机密"信息或物品：指《联邦民事诉讼程序》第26(c)(1)(G)条所述的任何商业秘密或其他机密的研发或商业信息，或任何包含此类信息的尚未公布或以违反本保护令之方式予以公开的文件、笔录或其他材料。此外，指定方还可根据下文第3.2条，将违反法院保密令而公开的、指定方认为应得到保密处理的任何信息或物品指定为机密信息。机密信息包括：(i) 从机密信息中复制或摘录、汇总或汇编的信息，以及 (ii) 双方或其律师可能披露机密信息的证词、谈话或陈述。

2.4    律师（无限定词）：外部律师和内部律师（及其辅助人员）。

2.5    指定内部律师：指由被告指定的、有权根据第7.2(b)条访问机密信息或根据第7.3(b)条访问高度机密信息的内部律师。

2.6    指定方：指将其在披露或证据开示答复中提供的信息或物品指定为"机密"或"高度机密"的当事方或非当事方。

2.7    披露或开示材料：在本诉讼的披露或证据开示答复中产生或生成的所有物品或

约定保护令 - 1
案件编号：3:20-CV-08570-JD

信息，<u>不考虑</u>其产生、存储或保存媒介或方式（包括但不限于证词、笔录和有形物品）。

2.8　　<u>专家</u>：在与诉讼有关的问题上具备专业知识或经验的人，包括与专家有关的律所的雇员或当事方或其律师聘请的、作为本诉讼中的专家证人或顾问负责在本诉讼中协助专家工作的独立承包商。

2.9　　<u>"高度机密"信息或物品</u>：向另一当事方或非当事方披露后，可能会造成重大实质性损害的"机密信息或物品"。包括：(i) 从高度机密信息中复制或摘录、汇总或汇编的信息，以及 (ii) 受保护人士或其律师可能披露高度机密信息的证词、谈话或陈述。

2.10　　<u>内部律师</u>：属于本诉讼当事方的雇员的任何律师，以及一方雇用的律师助理、秘书、文职和行政人员。内部律师不包括外部律师。

2.11　　<u>非当事方</u>：任何自然人、合伙企业、法团、联合体或未被指定为本诉讼当事方的其他法律实体。

2.12　　<u>外部律师</u>：外部律所雇佣的在本诉讼中代表当事方的律师以及律师辅助人员。

2.13　　<u>当事方</u>：本诉讼中指定的任何一方，包括其所有高管、董事、雇员、顾问、聘请的专家和外部律师（及其辅助人员）。

2.14　　<u>出示方</u>：在本诉讼中出示披露或证据开示材料的当事方或非当事方。

2.15　　<u>专业供应商</u>：提供诉讼支持服务（例如复印、录像、翻译、准备证据或论证以及以任何形式或媒介整理、存储或检索数据）的人或实体及其雇员和分包商。

2.16　　<u>受保护材料</u>：被指定为"机密"或"高度机密"的任何披露或证据开示材料。

2.17　　<u>受保护人士</u>：任何自愿或根据强制程序提供或已经提供受保护材料的人士（包括当事方或非当事方）。

2.18　　<u>接收方</u>：接收出示方所提供的披露或证据开示材料的一方。

**3.　　范围**

3.1　　本约定和保护令所赋予的保护不仅涵盖受保护材料（如上定义），还包括：(1) 从受保护材料中复制或摘录的任何信息；(2) 受保护材料的所有副本、摘录、汇总或汇编；以及 (3) 双方或其律师可能披露受保护材料的任何证词、谈话或陈述。但是，本约定和保护令

所赋予的保护不包括以下信息：(a) 在向接收方披露之时已公开的任何信息，或在向接收方披露之后公开的任何信息，无论是 (1) 在不违反本保护令情况下公布的（包括通过审理或其他方式而成为公共记录一部分的信息），还是 (2) 在不违反其他法院的信息保密令的情况下公布的，但均须以下文第 3.2 条为前提；以及 (b) 接收方在披露之前已知的任何信息，或接收方在披露之后从依法获得信息并对指定方无保密义务的来源获取的信息。如果在审理中或任何证据听证会上披露任何被指定为高度机密信息或机密信息的文件、证词或其他材料，须遵守单独的法院命令。如果预计将在审理中或在任何证据听证会上使用非当事方的高度机密信息或机密信息，那么在提交关于在审理中或在证据听证会上披露高度机密信息或机密信息的拟议命令之前，应将该命令通知非当事方。

   3.2  任何当事方或非当事方可将其认为应得到保密处理的任何信息或物品指定为机密信息。如果出示方之外的某人违反其他法院的命令公开了出示方的保密材料，且出示方知道该公开事宜，则应及时通知接收方，继续要求在本诉讼中对该材料进行保密处理。如果接收方不同意继续将该材料视为机密，可根据本保护令第 6.1-6.3 条对该指定提出异议。如果一当事方从非当事方处收到的材料有明显的迹象表明是一方的机密信息，则收到该材料的当事方在选择将其作为公开信息进行处理之前，应适当询问该材料是否为保密材料，包括询问该材料的归属方。关于此类材料是否应继续视为机密的任何争议，可按照本保护令第 6.1-6.3 条中的程序进行解决。

**4.  期限**

   即使在本诉讼最终结案后，本保护令规定的保密义务仍继续有效，直到指定方另有书面同意或法院命令另有指示。视为在以下两者中的较晚时间最终结案：(1) 本诉讼中的所有索赔和抗辩均予以驳回，无论是否可以再诉；(2) 在本诉讼的所有上诉、重审、发回重审、审判或复审均已完成或结束后，作出最终判决，包括根据适用法律提出任何动议或延期申请的时限结束之后。

**5.    指定受保护材料**

5.1    在指定需要保护的材料时力行克制和谨慎。各当事方或非当事方在指定本保护令项下需要保护的信息或物品时，必须注意任何此类指定仅限于符合适当标准的特定材料。

禁止任何一方进行批量、不加区分的或例行化的指定。如果任何一方的指定明显不合理，或具有不正当的目的（例如，不必要地阻碍或延缓案件进展或给其他各方造成不必要的费用和负担），则指定方将面临处罚。

如果指定方发现其指定保护的信息或物品不符合保护条件，该指定方必须立即通知所有其他当事方，撤回错误指定。

5.2    指定方式和时间。除非本保护令另有规定（例如，见下文第 5.2(a) 条第二款），或另有约定或命令，否则符合本保护令项下之保护资格的披露或证据开示材料必须在其披露或出示之前明确指定为受保护的材料。

符合本保护令的指定：

(a)    对于文件形式的信息（例如，纸质或电子文件，但不包括作证程序或其他审理前或审理程序的记录），出示方在文件的每一页注明"机密"或"高度机密"字样。

根据本保护令，如文件含有受保护材料，可全部指定为机密或高度机密。

被告作为当事方，在指定材料时，不需要重新审查其向联邦贸易委员会和众议院司法委员会提供的材料，并且可以将这些材料作为高度机密重新提供给原告。但是，如果 Facebook 在*纽约州等诉 Facebook, Inc. 案*（案件编号：1:20-cv-03589- JEB）（美国哥伦比亚特区联邦地区法院（D.D.C.））（"州检察长案"）或*联邦贸易委员会诉 Facebook, Inc. 案*（案件编号：1:20-cv-03590-JEB）（D.D.C.）（"FTC 案"）中出示的任何文件的指定保密级别较低（即"机密"或未指定），则在本案中 Facebook 应及时重新提供此类文件，以反映州检察长案或 FTC 案中的较低保密级指定或无指定情况。此外，根据本保护令第 6 条，原告可以对 Facebook 向联邦贸易委员会和众议院司法委员会提供的且在本案中重新提供的任何文件的机密或高度机密指定提出异议，但同意不以其指定是批量化、不加区分或例行化的指定为由，

对此等文件的整体指定提出质疑。

(b) 对于在作证或其他审理前或审理程序中提供的证词，受保护人士应在提供完整的终版笔录副本后的 30 天内，确定要求保护的具体证词部分，并说明所要求的保护级别。在收到最终笔录后的五

(5) 个工作日内，发出宣誓作证通知的一方应向宣誓证人提供最终笔录。本约定保护令的条款仅适用于在 30 天内适当指定的需要保护的证词部分。另外，如果无法单独确定有权获得保护的每部分证词，并且可能大部分证词都符合保护资格，指定方可以指明，将笔录整体视为"机密"或"高度机密"。一方有权就指定为"机密"或"高度机密"的文件或信息向宣誓证人提出质疑时，提出该质疑的一方也应将笔录中与该机密或高度机密文件或信息有关的部分标记为"机密"或"高度机密"。

如果当事方有理由认为作证、听证或其他程序预计会包含受保护材料，该当事方应通知其他方，以便其他方能够确保只有签署了"受约束确认和同意书"（附件 A）的授权人士参加受保护材料的讨论。如果在作证时以文件为证据，则不得以任何方式影响其"机密"或"高度机密"指定。

含有受保护材料的笔录应在标题页添加明显的文字说明，指明该笔录包含受保护材料，标题页后附上被指定为受保护材料的所有页面（适当注明行号）以及指定方所要求的保护级别的清单。指定方应将这些要求告知法庭记录员。在 30 天的指定期结束之前准备的任何笔录，在该期间应被视为已被指定为"高度机密"。在该期限届满之后，应按实际的指定处理该笔录。

(c) 对于以文件以外的某种形式提供的信息和任何其他有形物品，出示方应在存放该信息或物品的一个或多个容器的外部明显位置贴上"机密"或"高度机密"字样。

5.3 因疏忽而未指定。因疏忽而未能指定合格信息或物品的，如果进行了及时纠正，则指定方不会仅仅因此而丧失为此类材料获得本保护令项下之保护的权利。在及时纠正指定后，接收方必须尽合理努力，确保根据本保护令处理相关材料。

**6. 对保密性指定提出异议**

6.1    提出异议的时间。任何一方均可在开庭前提前 30 天，对保密性指定提出异议。除非对指定方的保密性指定及时提出异议对于避免可预见的、实质性的不公平、不必要的经济负担、或对诉讼的重大干扰或延误是必需的，否则当事方不因选择不在披露原指定之后及时提出异议而丧失对保密性指定提出异议的权利。

6.2    会面和协商。异议方应就其提出异议的每项指定提供书面通知，并具体说明每项异议的依据，以启动争议解决程序。为了明确是否确已提出异议，书面通知必须指出，保密性异议是根据保护令的本具体条款提出的。异议方和指定方应尽力本着诚意解决每项异议，并且必须在通知送达之日后的 14 天内，以直接协商（采用语音对话；其他沟通形式是不够的）方式开始这一流程。协商期间，异议方必须解释其认为保密性指定不适当的依据，并且必须给予指定方机会，供其审查指定材料、重新考虑具体情况，如指定方未提出更改指定，还须解释所选指定的依据。异议方必须首先参与该会面和协商程序，或及时确定指定方不愿意参与会面和协商程序，然后才能进入异议程序的下一阶段。

6.3    司法干预。如果双方无法在没有法庭干预的情况下解决异议，则应遵循《Donato 法官民事证据开示常规命令》中概述的证据开示争议解决程序。如双方未能在《民事案件常规命令》规定的期限内寻求法院干预，并不自动解除存有异议的每项指定的保密性指定。此外，如有充分理由，异议方还可以随时寻求保密性指定相关的救济，包括对证词记录或其他任何部分的指定提出异议。在根据本规定提供的任何此类证据开示函中，各方应证明其已遵守前款规定的会面和协商要求。

在任何此类异议程序中，指定方应承担举证责任。如异议方提出无意义的以及出于不正当目的的异议（例如，骚扰或给其他方造成不必要的费用和负担），可能会受到处罚。在法院对异议作出裁决之前，各方应继续以出示方的指定所对应的保护水平保护相关材料。

如果法院认定对高度机密信息或机密信息的指定不适当，则应考虑撤销存有异议的指定，但是，对于高度机密信息，法院可以（或在法院没有作出相反裁决的情况下，异议方和指定方以协议形式）决定将该材料适当指定为机密。

**7.    受保护材料的访问和使用**

7.1    <u>基本原则</u>。接收方只能将另一当事方或非当事方披露或提供的与本案相关的受保护材料用于提起、抗辩或尝试和解本诉讼。此等受保护材料只能在本保护令所述条件下披露给本保护令所述类别的人员。诉讼终止后，接收方必须履行下文第 12 条（最终结案）的规定。

接收方必须妥善存放受保护材料，存放地点和方式应确保只有本保护令授权人员可以访问。

7.2    <u>"机密"信息或物品的披露</u>。除非法院另有命令或指定方书面允许，否则接收方只能向以下人员披露被指定为"机密"的信息或物品：

(a)    接收方的外部律师，以及签署了本保护令附件 A "受约束确认和同意书"的律师辅助人员；

(b)    接收方的四名负责本案诉讼的指定内部律师，这些律师目前以及在最后一次向该内部律师披露机密信息后的两 (2) 年内，(a) 不得参与被告的竞争性决策或就此提供咨询，无论该内部律师仍受雇于被告还是受雇于其他雇主，(b) 如果在本诉讼期间在任何雇主处访问了受保护人士的机密信息，则不得参与涉及该等受保护人士的竞争性决策或就此提供咨询，或 (c) 如果受保护人士是真正的对方当事人（即不仅仅是名义上的利益相对，例如，对受保护方的传票作出回应），并且指定内部律师在本诉讼过程中访问了该受保护人士的机密信息，则不得代表被告或任何其他雇主参与诉讼或其他法律行动（因本诉讼起诉状中的指控而引起的或与之相关的诉讼除外）或就此提供咨询；如需获得本子部分规定的访问资格，内部诉讼律师应首先按照本保护令附件 B 的格式签署一份内部律师保密协议（该协议的签署版本应由相关被告的外部律师保管，并在法院、任何当事方或任何非当事方受保护人士要求时，供其查看），并且只能在被告的备案外部律师办公室亲自查看机密信息，或使用安全的电子数据库或以个人登录名和密码登录文件查阅平台进行访问。被告应及时向法院、原告和任何相关非当

事方受保护人士报告任何擅自使用或披露机密信息的可疑或已确认行为。如果任何受本款约束的律师从被告离职，然后进入与竞争性决策相关决定无关的行业工作，则在原告或任何相关受保护人士未证明此人参与了竞争性决策的情况下，应被推定为不受本款的离职后限制之约束。

(c)   因本诉讼而必须接受披露并且已签署"受约束确认和同意书"（附件 A）的、被指定为原告或集体代表的个人，条件是该人士并不拥有这些信息，并且未曾参与 Facebook 竞争对手的决策；

(d)   因本诉讼而必须接受披露并且已签署"受约束确认和同意书"（附件 A）的接收方专家（定义见本保护令）；

(e)   法院和其工作人员；

(f)   法庭记录员及其工作人员、专业陪审团或审判顾问，以及因本诉讼而必须接受披露并且已签署"受约束确认和同意书"（附件 A）的专业供应商；

(g)   在作证期间，当事方或非当事方的、机密信息或物品表明或接收方善意地认为属于文件的撰写人、收件人、接收人、保管人或来源的本案证人，条件是其之前可以合法访问已披露或将披露的文件；接收方善意地认为之前曾接收或访问文件的任何证人，除非指定方律师或证人指出其之前并未访问过文件；必须接受披露并且已签署"受约束确认和同意书"（附件 A）的任何证人。除非指定方另外同意或法院另有命令，否则这些限制均适用；和

(h)   双方在此诉讼中聘请的或法院指定的、已签署"受约束确认和同意书"（附件 A）的任何调解员或仲裁员。

7.3   "高度机密"信息或物品的披露。除非法院另有命令或指定方书面允许，否则接收方只能向以下人员披露被指定为"高度机密"的信息或物品：

(a)   接收方的外部律师，以及因本诉讼而必须接受所披露的信息并签署了本保护令附件 A"受约束确认和同意书"的律师辅助人员；

(b)   被告的两名负责本案诉讼的指定内部律师，这些律师在签署本保护令附件 B 中

约定保护令 - 8
案件编号：3:20-CV-08570-JD

的指定内部律师保密协议之时以及在最后一次向该内部律师披露高度机密信息后的两 (2) 年内，(a) 不得参与被告的竞争性决策或就此提供咨询，无论该内部律师仍受雇于被告还是受雇于其他雇主，(b) 如果在本诉讼期间在任何雇主处访问了受保护人士的高度机密信息，则不得参与涉及该等受保护人士的竞争性决策或就此提供咨询，或 (c) 如果受保护人士是真正的对方当事人（即不仅仅是名义上的利益相对，例如，对受保护方的传票作出回应），并且指定内部律师在本诉讼过程中访问了该受保护人士的高度机密信息，则不得代表被告或任何其他雇主参与诉讼或其他法律行动（因本诉讼起诉状中的指控而引起的或与之相关的诉讼除外）或就此提供咨询；如需获得本子部分规定的访问资格，内部诉讼律师应首先按照本保护令附件 B 的格式签署一份指定内部律师保密协议（该协议的签署版本应由相关被告的外部律师保管，并在法院、任何当事方或任何非当事方受保护人士要求时，供其查看），并且只能在被告的备案外部律师办公室亲自查看高度机密信息，或使用安全的电子数据库或以个人登录名和密码登录文件查阅平台进行访问。被告应及时向法院、原告和任何相关非当事方受保护人士报告任何擅自使用或披露高度机密信息的可疑或已确认行为。如果任何受本款约束的律师从被告离职，然后进入与被告的竞争性决策相关决定无关的行业工作，则在原告或任何相关受保护人士未证明此人参与了竞争性决策的情况下，应被推定为不受本条款的离职后限制之约束。

(c)     因本诉讼而必须接受披露并且已签署"受约束确认和同意书"（附件 A）的接收方专家（定义见本保护令）；

(d)     法院和其工作人员；

(e)     法庭记录员及其工作人员、专业陪审团或审判顾问，以及因本诉讼而必须接受披露并且已签署"受约束确认和同意书"（附件 A）的专业供应商；

(f)     在作证期间，当事方或非当事方的、机密信息或物品表明或接收方善意地认为属于文件的撰写人、收件人、接收人、保管人或来源的本案证人，条件是其之

前可以合法访问已披露或将披露的文件；接收方善意地认为之前曾接收或访问文件的任何证人，除非指定方律师或证人指出其之前并未访问过文件，或指定方另有约定或法院另有命令；和

(g)   双方在此诉讼中聘请的或法院指定的、已签署"受约束确认和同意书"（附件 A）的任何调解员或仲裁员。

7.4   提供建议：本保护令不禁止或以其他方式阻止律师向各自的委托人提供关于本诉讼的建议，并且在以符合第 7.2(b) 和 7.3(b) 条"指定内部律师"条款的方式提供此类建议的过程中，不禁止或阻止律师依赖其对高度机密或机密信息的审查或了解。批准或反对向指定内部律师披露"高度机密"或"机密"信息或物品的程序。

7.5   除非法院另有命令或受保护人士书面同意，否则在向被告指定内部律师披露任何被指定为高度机密信息或机密信息的信息前七 (7) 天，被告必须以书面形式向原告和受保护人士提交一份书面声明，(i) 载明指定内部律师的全名及其居住的州和城市，(ii) 充分详细地描述内部律师过去、现在以及可合理预见的未来的主要工作职责和责任，以确定内部律师是否参与或是否会参与任何竞争性决策；以及 (iii) 列出内部律师代表被告或任何其他雇主参与的或提供咨询的诉讼或其他法律行动。

7.6   除非法院另有命令或受保护人士书面同意，否则被告在审理之前的任何时候确定可接收高度机密或机密信息或物品的指定内部律师。如需获得本子部分规定的访问资格，指定内部诉讼律师应首先按照本保护令附件 B 的格式签署一份指定内部律师保密协议（该协议的签署版本应由被告的外部律师保管，并在法院、任何当事人或任何非当事方受保护人士要求时，供其查看）。

7.7   提出请求并提供前述各款规定的信息的当事方，可向确定的指定内部律师披露高度机密或机密信息，除非该方在交付附件 B 的副本后的 14 天内，收到受保护人士的异议书。任何此类异议书必须详细列出其依据。

7.8   收到及时异议书的当事方必须与受保护人士会面和协商（通过直接语音对话），尽力在收到异议书后的 7 天内以协议方式解决该问题。如未达成协议，双方应遵守《Donato

法官民事证据开示常规命令》中概述的证据开示争议解决程序。根据本条款提交的任何证据开示函必须具体描述相关情况，详细说明必须向指定内部律师披露信息的合理原因，评估该披露会带来的损害风险，并提出可用于降低该风险的任何其他方式。此外，任何此类信函必须描述各方为了以协议方式解决相关问题而作出的努力（即会面讨论的范围和内容），并载明受保护人士提出的拒绝批准披露的理由。被告在争议解决前不得向其内部律师披露任何高度机密或机密信息。如果法院认为指定内部律师符合第 7.2(b) 条或第 7.3(b) 条规定的资格，则被告可以根据第 7.2(b) 条或第 7.3(b) 条的规定，酌情向其指定内部律师披露高度机密信息或机密信息。

在任何此类程序中，反对向指定内部律师披露的当事方应承担举证责任，证明披露所带来的损害风险（在建议保障措施下）高于接收方向其指定内部律师披露受保护材料的必要性。

7.9    被告可在本诉讼审理前的任何时候，经作出机密指定（"指定方"）或向法院提出动议的受保护人士同意，要求向其他内部律师披露高度机密或机密信息。被告应向指定方和本诉讼的所有当事方提供书面通知，说明披露的依据。被告和指定方必须在书面通知发出后的七天内进行会面和协商，尽力以协议方式解决相关问题。如未达成协议，双方应遵守《Donato 法官民事证据开示常规命令》中概述的证据开示争议解决程序。被告在争议解决前不得向其他内部律师披露任何高度机密或机密信息。如果法院认定内部律师访问高度机密或机密信息的具体需要高于对指定方或公共利益的损害风险，则被告可向其指定内部律师披露高度机密或机密信息。

**8.    其他诉讼中呈交或要求的受保护材料**

在没有有效传票或法院命令的情况下，各方不得在其他诉讼中披露高度机密或机密信息。如果一当事方收到其他诉讼的传票或法院命令，强制要求披露本诉讼中指定为"机密"或"高度机密"的任何信息或物品，该方必须：

8.1    立即以书面形式通知指定方。该通知应含有传票或法院命令的一份副本；

8.2    立即以书面形式通知在其他诉讼中要求发出传票或命令的一方：该传票或命令

所涉及的部分或全部材料受本保护令约束。该通知应含有本约定保护令的一份副本；并在受

保护材料的相应指定方所寻求的各种合理程序中提供配合。

　　如果指定方及时寻求保护令，在发布传票或命令的法院作出裁决之前，收到传票或法

院命令的一方不得出示本诉讼中指定为"机密"或"高度机密"的任何信息，除非该方已获得指

定方的许可。指定方应负责就其受保护材料而向该法院寻求保护并承担相关费用——这些规定

不得被解释为授权或怂恿本诉讼中的接收方违背其他法院的合法指令。

**9.　诉讼中要求出示的非当事方受保护材料**

(a)　本保护令的条款适用于非当事方在本诉讼中出示的被指定为"机密"或"高度机密"

　　　的信息。非当事方提供的与本诉讼有关的此类信息受本保护令规定的救济的保

　　　护。这些规定不得被解释为禁止非当事方寻求额外的保护。

(b)　如果有效的传票、法院命令或证据开示请求要求当事方出示其持有的非当事方

　　　机密信息，而该方又与非当事方达成了不出示非当事方机密信息的协议，那么

　　　该方应：

　　　1.　及时以书面形式通知请求方和非当事方：所请求的部分或全部信息受与

　　　　　非当事方之间的保密协议约束；

　　　2.　及时向非当事方提供本诉讼中的约定保护令副本、相关证据开示请求以

　　　　　及所请求信息的合理详细的描述；以及

(c)　提供所请求的信息供非当事方检查。本规定不解除当事方对寻求当事方持有的

　　　非当事方机密信息的任何证据开示请求或传票提出异议的权利。

9.2　　　如第 9(b) 条所述，非当事方必须在收到通知和所附信息后的 14 天内提出异议或寻求保护令。如果非当事方未能及时提出异议或向本法院寻求保护令，则接收方可以根据证据开示请求提供非当事方的机密信息，但如果被要求进行证据开示的当事方具有给予非当事方更长通知期的合同义务，则该方应告知请求证据开示的一方，而出示方在合同通知期届满之前没有义务出示非当事方的材料。如果非当事方及时寻求保护令，在法院作出裁决之前，接收方不得出示其拥有或控制的、受与非当事方达成的保密协议约束的任何信息。[1]如果没有相反的法院命令，非当事方应负责就其受保护材料向本法院寻求保护并承担相关费用。

**10.　受保护材料的非授权披露**

如果接收方得知，其因疏忽或其他原因而向未经本约定保护令授权的任何人或在本约定保护令未授权的任何情况下披露了受保护材料，接收方必须立即 (a) 以书面形式通知受保护人士该未经授权的披露行为，(b) 尽最大努力追回受保护材料的所有非授权副本，(c) 将本保护令的所有条款告知未经授权的披露对象，以及 (d) 要求这些披露对象签署本保护令附件 A "受约束确认和同意书"。

**11.　其他规定**

11.1　获得进一步救济的权利。本保护令中的任何内容均不削减任何人在未来向法院申请修改本命令的权利。

11.2　提出其他异议的权利。双方约定出具本保护令，并不表示双方放弃以本保护令中未阐述的任何理由反对披露或出示任何信息或物品的权利。同样，任何当事方均不放弃以任何理由反对将本保护令所涉及的任何材料用作证据的权利。

11.3　保护令副本。在本保护令生效后，如果在本诉讼中要求非当事方进行证据开示，证据开示请求必须附本保护令的副本。

11.4　提交受保护材料。未经指定书面许可，或未在适当通知所有相关人员后获得法院命令，当事方不得将任何受保护材料交存于本诉讼的公共记录。要求密封提交任何受保

---

[1]本条款的目的是提醒有关各方注意非当事方具有保密权，并给予非当事方在本法院保护其保密权益的机会。

护材料的当事方必须遵守《地方民事规则》第 79-5 条。受保护材料只能在法院命令批准对具体的相关受保护材料进行密封时，才可密封盖印提交。根据《地方民事规则》第 79-5 条，只有在确定相关受保护材料具有保密性、可作为商业秘密进行保护或在其他方面享有法律保护的情况下，才会发布密封令。如果接收方根据《地方民事规则》第 79-5(e) 条提出的密封提交受保护材料的请求被法院拒绝，那么接收方可以根据《地方民事规则》第 79-5(e)(2) 条将受保护材料作为公共记录提交，除非法院另有指示。

11.5    出口管制。受保护材料的披露应遵守与此类受保护材料所含技术数据的出口有关的所有适用法律和法规，包括向美国或其他地方的外国人员或国民发布此类技术数据。出示方应负责识别任何此类受控技术数据，而接收方应采取必要的措施以确保合规。

**12.    最终结案**

在本诉讼最终结案（定义见第 4 款）后的 60 天内，各接收方必须将所有受保护材料归还出示方或销毁此类材料。在本款中，"所有受保护材料"包括所有副本、摘要、汇编、汇总以及复制或捕获任何受保护材料的任何其他格式。无论是归还还是销毁受保护材料，接收方均须在 60 天内向出示方（如与指定方不是同一个人或实体，向指定方）提交一份书面证明，(1) 按类别适当确定已归还或销毁的所有受保护材料，(2) 确认接收方未保留任何复制或捕获任何受保护材料的副本、摘要、汇编、汇总或任何其他格式。尽管有此规定，但经本保护令授权而接收受保护材料的律师有权保留所有诉状、动议文件、审理、证词和听证会记录、法律备忘录、通函、证词和审理证据、专家报告、律师工作成果以及顾问和专家工作成果的存档副本，即使这些材料含有受保护材料，但源代码的纸质副本除外。含有或构成受保护材料的任何此类存档副本仍须根据第 4 条（期限）的规定，受本保护令约束。

特此根据约定发布本保护令。

1　日期：_____

2

3

4

5　　　　　　　　　　　　　　　　　　　_____

5　　　　　　　　　　　　　　　　　　　James Donato 阁下

6　　　　　　　　　　　　　　　　　　　美国地区法官

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## 附件 **A**

### 受约束确认和同意书

本人＿＿＿＿＿＿＿＿＿＿，＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿[打印或输入全名]，[打印或输入完整地址]，依据伪证罪惩罚条款声明，我已阅读并理解加州北区美国地区法院于 [日期] 在 *Klein 诉 Meta Platforms, Inc.* 案（案件编号：3：20-cv-08570-JD）中发布的约定保护令。本人同意遵守该约定保护令的所有条款并受其约束，本人理解并承认，如不遵守，我可能会受到藐视法庭性质的处罚和惩罚。本人郑重承诺，本人不会以任何方式向任何个人或实体披露受本约定保护令约束的任何信息或物品，除非是严格根据本保护令进行且本保护令具有明确规定的披露。

本人还同意，在执行本约定保护令的条款时，服从加州北区美国地区法院的管辖，即便该执行程序是在本诉讼终止后实施的。本人放弃我可能享有的以其他方式对上述法院的管辖权提出异议的任何权利。

本人特此指定＿＿＿＿＿＿＿＿＿＿＿[ 打 印 或 输 入 完 整 地 址 和 电 话 号 码 ]＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿的 [打印或输入全名] 作为本人在本诉讼或本约定保护令的任何执行程序中的加州送达代收人。

日期：＿＿＿＿＿＿＿＿＿＿＿＿＿＿

宣誓和签字所在州及城市：＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

印刷体姓名：＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
　　　　　　　　　　[印刷体姓名]

签名：＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
　　　　　　　　　[签名]

1

2

**附件 B**

**内部律师保密协议**

3

4

本人，_____[打印或输入完整地址]_____[ 打 印 或 输

入全名]，受聘于_____，担任_____。

5

6

7

本人依据伪证罪惩罚条款声明，我已阅读并理解加州北区美国地区法院于 [日期] 在

Klein 诉 Meta Platforms, Inc. 案（案件编号：3：20-cv-08570-JD）中发布的约定保护令。

8

9

10

11

本人同意遵守该约定保护令的所有条款并受其约束，本人理解并承认，如不遵守，我

可能会受到藐视法庭性质的处罚和惩罚。本人郑重承诺，本人不会以任何方式向任何个人或

实体披露受本约定保护令约束的任何信息或物品，除非是严格根据本保护令进行且本保护令

具有明确规定的披露。

12

13

14

15

本人还同意，在执行本约定保护令的条款时，服从加州北区美国地区法院的管辖，即

便该执行程序是在本诉讼终止后实施的。本人放弃我可能享有的以其他方式对上述法院的管

辖权提出异议的任何权利。

16

17

18

本人特此指定_____[ 打 印 或 输 入 完 整 地 址 和 电 话 号 码 ]

_____的 [打印或输入全名] 作为本人在本诉讼或本约

定保护令的任何执行程序中的加州送达代收人。

19

日期：_____

20

宣誓和签字所在州及城市：_____

21

22

23

印刷体姓名：_____
　　　　　　　[印刷体姓名]

24

25

26

签名：_____
　　　　　[签名]

27

28

1   日期：2022 年 7 月 5 日                                            敬呈，

2   哈根斯•伯曼•索波•夏皮罗律师事务所                         昆鹰律师事务所 (QUINN EMANUEL
3   (HAGENS BERMAN SOBOL SHAPIRO LLP)           URQUHART & SULLIVAN, LLP)

4
    签字人：                                                        签字人：
5   _*Shana E. Scarlett*_                                        _*Stephen A. Swedlow*_
6   _____（电子签名）                                         _____（电子签名）
    SHANA E. SCARLETT                                            STEPHEN A. SWEDLOW
7
8   Shana E. Scarlett （州律师协会编号：217895）    Stephen A. Swedlow *（仅限于本案）*
    715 Hearst Avenue, Suite 202                              Michelle Schmit *（仅限于本案）*
9   Berkeley, CA 94710                                          191 N. Wacker Drive, Suite 2700
    电话：(510) 725-3000                                        Chicago, IL 60606-1881
10  传真：(510) 725-3001                                        电话：(312) 705-7400
11  shanas@hbsslaw.com                                         stephenswedlow@quinnemanuel.com
                                                                michelleschmit@quinnemanuel.com
12
13  Steve W. Berman *（仅限于本案）*                    Kevin Y. Teruya （律师协会编号：235916）
    哈根斯•伯曼•索波•夏皮罗律师事务所                  Adam B. Wolfson （律师协会编号：262125）
14  (HAGENS BERMAN SOBOL SHAPIRO LLP)           Brantley I. Pepperman （律师协会编号：
    1301 Second Avenue, Suite 2000                          322057）
15  Seattle, WA 98101                                          昆鹰律师事务所 (QUINN EMANUEL
16  电话：(206) 623-7292                                        URQUHART & SULLIVAN, LLP)
    传真：(206) 623-0594                                        865 South Figueroa Street, 10th Floor
17  steve@hbsslaw.com                                          Los Angeles, CA 90017-2543
                                                                电话：(213) 443-3000
18                                                              kevinteruya@quinnemanuel.com
                                                                adamwolfson@quinnemanuel.com
19                                                              brantleypepperman@quinnemanuel.com
                                                                Manisha M. Sheth *（仅限于本案）*
20                                                              昆鹰律师事务所 (QUINN EMANUEL
21                                                              URQUHART & SULLIVAN, LLP)
                                                                51 Madison Avenue, 22nd Floor
22                                                              New York, NY 10010
                                                                电话：(212) 849-7000
23                                                              manishasheth@quinnemanuel.com
24
                                                                *消费者集体诉讼临时联合首席律师*
25

26

27

28

W. Joseph Bruckner （*仅限于本案*）
Robert K. Shelquist （*仅限于本案*）
Brian D. Clark （*仅限于本案*）
Rebecca A. Peterson （州律师协会编号：241858）
Arielle S. Wagner （*仅限于本案*）
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
电话：(612) 339-6900
传真：(612) 339-0981
wjbruckner@locklaw.com
rkshelquist@locklaw.com
bdclark@locklaw.com
rapeterson@locklaw.com
aswagner@locklaw.com

*消费者集体诉讼执行委员会*

**SCOTT + SCOTT ATTORNEYS AT LAW LLP**

签字人：*Kristen M. Anderson* （电子签名）

Kristen M. Anderson （律师协会编号：246108）
　kanderson@scott-scott.com
230 Park Avenue, 17th Floor
New York, NY 10169
(212) 223-6444

Christopher M. Burke （律师协会编号：214799）
　cburke@scott-scott.com
David H. Goldberger （律师协会编号：225869）
　dgoldberger@scott-scott.com
Hal D. Cunningham （律师协会编号：243048）
　hcunningham@scott-scott.com
Daniel J. Brockwell （律师协会编号：335983）
　dbrockwell@scott-scott.com
Yifan (Kate) Lv （律师协会编号：302704）
　klv@scott-scott.com

**BATHAEE DUNNE LLP**

电签字人：*Yavar Bathaee* （电子签名）

Yavar Bathaee (Bar No. 282388)
　yavar@bathaeedunne.com
Andrew C. Wolinsky （*仅限于本案*）
　awolinsky@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
(332) 322-8835

Brian J. Dunne （律师协会编号：275689）
　bdunne@bathaeedunne.com
633 West Fifth Street, 26th Floor
Los Angeles, CA 90071
(213) 462-2772

Edward M. Grauman （*仅限于本案*）
　egrauman@bathaeedunne.com
7000 North MoPac Expressway, Suite 200
Austin, TX 78731
(512) 575-8848

约定保护令 - 19
案件编号：3:20-CV-08570-JD

600 W. Broadway, Suite 3300
San Diego, CA 92101
(619) 233-4565

*广告主集体诉讼临时联合首席律师*

Patrick J. McGahan  *（仅限于本案）*
  pmcgahan@scott-scott.com
Michael P. Srodoski  *（仅限于本案）*
  msrodoski@scott-scott.com
156 South Main Street, P.O. Box 192
Colchester, CT 06415
(860) 537-5537

*广告主集体诉讼临时联合首席律师*

**AHDOOT & WOLFSON, PC**
Tina Wolfson  （律师协会编号：174806）
  twolfson@ahdootwolfson.com
Robert Ahdoot  （律师协会编号：172098）
  rahdoot@ahdootwolfson.com
Theodore W. Maya  （律师协会编号：223242）
  tmaya@ahdootwolfson.com
Henry Kelston  *（仅限于本案）*
  hkelston@ahdootwolfson.com
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
(310) 474-9111

*广告主集体诉讼执行委员会律师*

**LEVIN SEDRAN & BERMAN LLP**
Keith J. Verrier  *（仅限于本案）*
  kverrier@lfsblaw.com
Austin B. Cohen  *（仅限于本案）*
  acohen@lfsblaw.com
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3997
(215) 592-1500

*广告主集体诉讼执行委员会律师*

签字人：*Sonal N. Mehta*               （电子签名）

**WILMER CUTLER PICKERING HALE AND DORR LLP**
SONAL N. MEHTA  （律师协会编号：222086）
  Sonal.Mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, California 94306
电话：(650) 858-6000

DAVID Z. GRINGER  *（仅限于本案）*
  David.Gringer@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
电话：(212) 230-8800

ARI HOLTZBLATT  *（仅限于本案）*
  Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS  *（仅限于本案）*
  Molly.Jennings@wilmerhale.com
1875 Pennsylvania Ave NW
Washington, DC 20006
电话：(202) 663-6000

*被告 Meta Platforms, Inc. 律师*

## 送达回证

本人特此证明，上述文件已于 2022 年 7 月 5 日通过 CM/ECF 系统传送至书记员办公室，该文件将以电子方式送达所有记录在案的律师。

日期：2022 年 7 月 5 日                   签字人：*Shana E. Scarlett*   （电子签名）
                                        Shana E. Scarlett

 TRANSPERFECT

# CERTIFICATION

TransPerfect is globally certified under the standards ISO 9001:2015, ISO 17100:2015, and ISO 18587:2017. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

MAXIMILLIAN KLEIN, et al., Plaintiffs, v. META PLATFORMS, INC., Defendant.

File Name(s):

STIPULATED PROTECTIVE ORDER

Case No. 3:20-cv-08570-JD

Source Language(s):          English (United States)

Target Language(s):          Simplified Chinese

Authorized Signature:                    Signature, Notary Public:

Name:     Jacqueline Yorke

Title:      Project Manager

Date:      July 18, 2022

Stamp: Notary Public

Reason for signature: I approve the accuracy of this document content as written

**附件 D**

**定义和说明**

1.　　在答复每项请求时，您需要提供您拥有、保管或控制的以任何方式持有或获取的所有文件—包括但不限于您的高级职员、董事、雇员、承包商、律师、审计师、保险公司、调查员、顾问、代理人或其他代表为您或代您合法（法律上）、实际（事实上）、推定和切实持有、保管或控制的，或在您的记录中的文件，包括但不限于在本诉讼或任何其他诉讼的证据开示中获取的文件。为免生疑问，您不会被要求提供您设在美国的任何子公司所拥有或保管的文件。

2.　　"每日活跃用户"是指每日保持活跃账户或每日至少使用一次产品的用户。

3.　　"高管"是指您的首席执行官、首席财务官、首席运营官、首席产品官、首席技术官或首席营销官。

4.　　"QQ" 是指由腾讯公司运营、于 1999 年首次发布、公开名称为 "QQ" 或 "腾讯 QQ," 的应用程序。

5.　　"腾讯"、"公司"或"您"或"您的"是指腾讯控股有限公司（一家公众交易公司）、其全部或部分拥有的子公司、母公司、非法人部门、合资企业、合伙企业、化名经营业务、前身、关联方、投资工具，以及所有董事、高级职员、合伙人、雇员、代理人、律师、顾问和任何其他在本传票所涉期间的任何时候为上述任何一方工作或代表其工作的个人或实体。

6.　　"微信"是指由腾讯公司运营、于 2011 年 1 月 21 日首次发布、公开名称为"微信"的应用程序。

1

<u>**要求提供的文件**</u>

2 <u>**提供请求：1：**</u>

3    2011 年 1 月 1 日至 2014 年 12 月 31 日，以及 2021 年 1 月 1 日至 2021 年 12 月 31

4 日，提交给董事会或高管的、讨论或分析微信或 QQ 与 Facebook、Instagram 或 WhatsApp

5 之间的竞争的报告或备忘录。

6 <u>**提供请求：2：**</u>

7    2011 年 1 月 1 日至 2014 年 12 月 31 日，以及 2021 年 1 月 1 日至 2021 年 12 月 31

8 日，提交给高管或董事会的、说明微信或 QQ 是否被用于维持人际关系以及与朋友、家人

9 和其他相关人员分享经历或其范围的报告或备忘录。

10 <u>**提供请求：3：**</u>

11    2011 年 1 月 1 日至 2014 年 12 月 31 日，以及 2021 年 1 月 1 日至 2021 年 12 月 31

12 日，提交给高管或董事会的、讨论对微信或 QQ 用户使用微信或 QQ 进行补偿的报告或备

13 忘录。如果没有答复文件，请提供相关说明。

14 <u>**提供请求：4：**</u>

15    2011 年 1 月 1 日至 2014 年 12 月 31 日，以及 2021 年 1 月 1 日至 2021 年 12 月 31

16 日，提交给高管或董事会的有关腾讯使用其隐私政策或隐私实践作为产品差异化手段或获

17 得对任何其他公司产品（包括 Meta 的产品）的竞争优势的报告或备忘录。如果没有答复

18 文件，请提供相关说明。

19 <u>**提供请求：5：**</u>

20    2011 年 1 月 1 日至 2014 年 12 月 31 日，以及 2021 年 1 月 1 日至 2021 年 12 月 31

21 日，提交给高管或董事会的、讨论或分析隐私政策或隐私实践对用户满意度或参与度的影

22 响的报告或备忘录。

23 <u>**提供请求：6：**</u>

24    提交给高管或董事会的讨论腾讯对以下美国公司的投资决策的报告或备忘录：

25 Reddit Inc.、Universal Music Group、Riot Games、Epic Games、Activision Blizzard Inc.、

26 Discord 和 Skydance Media。

27 <u>**提供请求：7：**</u>

28

2021 年 9 月 27 日至 2021 年 10 月 18 日，以小时和日为单位，记录在提供微信或 QQ 的每个国家的活跃用户数量、花费的总时间以及每个用户在微信或 QQ 上花费的平均时间的文件或数据。

**提供请求：8:**

2011 年 1 月 1 日至 2014 年 12 月 31 日，以及 2021 年 1 月 1 日至 2021 年 12 月 31 日，在提供微信或 QQ 的每个国家，每周、每月和每年生成或获得的、记录微信或 QQ 的日活跃用户数以及每个日活跃用户在微信或 QQ 上花费的平均时间的文件或数据。



**TRANSPERFECT**

# CERTIFICATION

TransPerfect is globally certified under the standards ISO 9001:2015 and ISO 17100:2015. This Translation Certificate confirms the included documents have been completed in conformance with the Quality Management System documented in its ISO process maps and are, to the best knowledge and belief of all TransPerfect employees engaged on the project, full and accurate translations of the source material.

File Name(s):          2022.07.22 Tencent Letter of Request (Klein draft)(195747681.3)_ZH-CN

Source Language(s)     English (United States)

Target Language(s)     Chinese (China)

*Authorized Signature:*                          *Signature, Notary Public:*

*Name:*     *Jacqueline Yorke*

*Title:*    *Project Manager*

*Date:*     *July 28, 2022*

*Stamp: Notary Public*

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS