**FILED UNDER SEAL**

**BATHAEE DUNNE LLP**
Yavar Bathaee (Bar No. 282388)
  yavar@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
(332) 322-8835

*Interim Co-Lead Consumer Class Counsel*

**SCOTT + SCOTT ATTORNEYS AT LAW LLP**
Kristen M. Anderson (Bar No. 246108)
  kanderson@scott-scott.com
230 Park Avenue, 17th Floor
New York, NY 10169
(212) 223-6444

*Interim Co-Lead Advertiser Class Counsel*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, et al.,<br><br>  Plaintiffs,<br><br>vs.<br><br>META PLATFORMS, INC.,<br><br>  Defendant. | Consolidated Case No. 3:20-cv-08570-JD<br><br>**ADVERTISER PLAINTIFFS' OPPOSITION TO META'S MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED ADVERTISER CLASS ACTION COMPLAINT**<br><br>Hon. James Donato<br>Hearing Date: May 26, 2022<br>Time: 10:00 a.m. |

**FILED UNDER SEAL**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ..............................................................................................................................1

ARGUMENT ....................................................................................................................................3

I. ADVERTISERS' AMENDED SECTION 2 CLAIMS ARE AUTHORIZED AND TIMELY ...............................................................................................................................3

    A. THE FAC'S ALLEGATIONS REGARDING ANTICOMPETITIVE DATA SHARING AGREEMENTS (SECTIONS V AND VII) ARE TIMELY AND AUTHORIZED ............................................................................................................3

    B. THE FAC'S ONAVO ALLEGATIONS ARE AUTHORIZED AND FACIALLY TIMELY .................................................................................................8

    C. THE FAC'S PRODUCT INTEGRATION ALLEGATIONS ARE TIMELY AND AUTHORIZED ......................................................................................................9

II. THE FAC ADEQUATELY ALLEGES SECTION 2-VIOLATIVE CONDUCT .............11

    A. THE FAC ALLEGES EXCLUSIONARY CONDUCT AS PART OF A MONOPOLY BROTH, WHICH META CANNOT DISMEMBER ......................11

    B. THE FACIALLY TIMELY API AND DATA SHARING AGREEMENTS ALLEGED IN FAC SECTIONS V AND VII ARE ANTICOMPETITIVE AND FAIL UNDER THE RULE OF REASON ............................................................11

    C. THE ONAVO CONDUCT IS ANTICOMPETITIVE AND FAILS THE RULE OF REASON ..................................................................................................................14

    D. META'S INTEGRATION OF AI / TARGETING SYSTEMS IS ANTICOMPETITIVE ...............................................................................................14

    E. ADVERTISERS DO NOT SEEK DAMAGES FOR—OR ALLEGE MONOPOLIZATION BASED ON—CONDUCT OUTSIDE OF THE LIMITATIONS PERIOD, INCLUDING AS TO THE APRIL 2015 REFUSAL TO DEAL WITH DEVELOPERS ...................................................................................15

III. META'S SECTION 1 ARGUMENTS FAIL ....................................................................15

IV. REQUEST FOR LEAVE TO AMEND .............................................................................15

CONCLUSION ................................................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp.*,
  592. F.3d 991 (9th Cir. 2010) ............................................................................................. 14

*E.W. French & Sons, Inc. v. Gen. Portland Inc.*,
  885 F.2d 1392 (9th Cir. 1989) ............................................................................................. 5

*Free FreeHand Corp. v. Adobe Systems, Inc.*,
  852 F. Supp. 2d 1171 (N.D. Cal. 2012) ............................................................................. 11

*FTC v. Qualcomm, Inc.*,
  969 F.3d 974 (9th Cir. 2020) .................................................................................. 11, 13, 15

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) ............................................................................................ 11

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
  383 F. Supp. 3d 187 (S.D.N.Y. 2019) ................................................................................ 12

*Reveal Chat Holdco LLC v. Meta Platforms, Inc.*,
  2022 WL 595696 (9th Cir. Feb. 28, 2022) ......................................................................... 10

*SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*,
  88 F.3d 780 (9th Cir. 1996) ................................................................................................ 11

*United States ex rel. Jones v. Sutter Health*,
  2020 WL 6544412 (N.D. Cal. Nov. 6, 2020) ..................................................................... 15

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ............................................................................................. 15

*Xechem, Inc. v. Bristol-Myers Squibb Co.*,
  372 F.3d 899 (7th Cir. 2004) ............................................................................................... 7

**Rules**

FED. R. CIV. P. 15(b) .................................................................................................................. 5

**FILED UNDER SEAL**

**PRELIMINARY STATEMENT**

On February 28, 2022, Advertisers filed a First Amended Complaint ("FAC," Dkt. 237) against Defendant Meta Platforms, Inc. ("Meta") with leave of the Court. (*See* Dkt. 214.) The new allegations in the FAC allege overt acts exclusively within the Clayton Act's four-year limitations period, including facially timely overt acts—all post-dating December 18, 2016—pertaining to (1) anticompetitive Extended API ("whitelist") data agreements with targeted developers; (2) anticompetitive market division and data sharing agreements with eBay, Netflix, and Foursquare; (3) anticompetitive leveraging of deceptively obtained Onavo data to maintain Meta's Social Advertising dominance; and (4) an anticompetitive integration of Meta's disparate AI and machine-learning systems and sources. The FAC also alleges, in detail, that each of the foregoing overt acts was indeed anticompetitive—*i.e.*, proscribed by Sherman Act § 2 as violating the rule of reason—and injured the Advertiser Plaintiffs, including by contributing to inflated advertising prices in the Social Advertising Market. Given the Court's previous ruling that (i) the Social Advertising Market has been adequately pleaded and (ii) Advertisers adequately pleaded Section 1 and 2 claims based on Meta's anticompetitive agreement with Google, the FAC plausibly asserts viable Section 2 claims against Meta based on five categories of exclusionary conduct—all timely on their face.

In view of the above, there are really no serious timeliness or plausibility questions left in this case. What remains are factual questions—and the parties have indeed proceeded into factual discovery, with expert discovery shortly on the way. Nonetheless, rather than answering, Meta has moved to dismiss portions of the FAC. (Dkt. 262, "Mot.") Meta's motion misstates the Court's previous ruling as to the scope of leave to amend; makes meritless and incoherent timeliness arguments; and ignores and dismembers the FAC's allegations of anticompetitive conduct by Meta in favor of blindered strawmen. The five categories of exclusionary conduct recited in the FAC are all timely; they are all adequately pleaded (and indeed, one category has already been upheld by this Court); and they all pertain to an adequately pleaded market. Meta's motion should be denied.

**BACKGROUND**

Advertisers commenced this action on December 18, 2020. (*See Affilious, Inc. v. Facebook, Inc.*, No. 5:20-cv-09217, Dkt. No. 1). After consolidation with the Consumer cases, which were

**FILED UNDER SEAL**

filed beginning December 3, 2020 (Dkt. No. 68), and the appointment of the undersigned as lead and executive committee counsel for the Advertiser classes (Dkt. No. 73), Advertisers filed a Consolidated Amended Complaint on April 22, 2021 (Dkt. No. 86, the "CAC").

Meta moved to dismiss the CAC. On January 14, 2022, after briefing and oral argument, then-District Judge Koh sustained Advertisers' Social Advertising Market (Dkt. 214 at 33-38) and Advertisers' Section 1 and 2 claims based on allegations that Meta and Google entered into an unlawful market division agreement in September 2018 (*id.* at 100-06). The Court gave Advertisers leave to amend as to the remaining Section 2 allegations in the CAC, which the Court referred to (collectively with Consumers' similar allegations) as "Copy, Acquire, Kill" claims.[1] (*Id.* at 70-100.)

On February 28, 2022, Advertisers timely filed their FAC. In addition to facts supporting the Advertisers' previously sustained Section 1 and 2 claims, the FAC alleges four more categories of exclusionary acts in further support of Advertisers' Section 2 claims: (1) post-December 18, 2016 anticompetitive API / whitelisting agreements providing certain developers access to portions of Meta's scuttled developer Platform (FAC ¶¶ 302-315); (2) 2017 and 2018 anticompetitive data sharing agreements with eBay, Netflix, and Foursquare, which were extracted after Meta entered each counterparty's core business, threatening ruinous competition, and then withdrew in exchange for social data "signals" (FAC ¶¶ 316-536); (3) post-December 18, 2016 anticompetitive use of deceptively obtained data acquired through Onavo spyware to surveil and target rivals and their users, including by using this deceptively obtained data to train Meta's AI and machine learning targeting systems (FAC ¶¶ 537-569); and (4) the anticompetitive integration—begun in late 2019 and lacking legitimate, non-pretextual technical justification—of Meta's disparate AI and machine-learning systems from across its business (FAC ¶¶ 657-764). For the sake of brevity, detailed allegations concerning the above categories of conduct are discussed (as relevant) in the context of the arguments set forth below.

On March 21, 2022, Meta moved to dismiss any claims in the FAC to the extent they are based on new factual allegations.

---

[1] The phrase "copy, acquire, kill" did not appear in the CAC.

**FILED UNDER SEAL**

## ARGUMENT

### I. ADVERTISERS' AMENDED SECTION 2 CLAIMS ARE AUTHORIZED AND TIMELY

In its January 14, 2022 opinion, the Court analyzed the anticompetitive conduct alleged in the CAC, and with respect to allegations other than those concerning Meta's anticompetitive market division agreement with Google (which it sustained under Sections 1 and 2), identified precisely what facts would have to be pleaded on amendment to state a timely claim. (Dkt. 214 at 88-96.) As explained below, the new allegations in the FAC are *each* addressed to subjects the Court expressly discussed in its opinion and authorized amendment for. Moreover, the new allegations are all timely on their face: they involve *only* overt acts entirely within the limitations period, which acts allowed Meta to unlawfully monopolize the Social Advertising Market, causing an overcharge injury.

#### A. The FAC's Allegations Regarding Anticompetitive Data Sharing Agreements (Sections V and VII) Are Timely and Authorized

The CAC alleged, among other things, that Meta violated Section 2 of the Sherman Act by entering into anticompetitive data sharing agreements with developers. (Dkt. 214 at 86-88.) Beginning in 2012—executing a plan hatched by Mark Zuckerberg himself—Meta extracted data and other concessions from chosen developers by leveraging artificial competitive pressure, to wit, a pre-planned but secret forthcoming privatization of key Application Programming Interfaces (APIs) offered through Meta's developer Platform. (*Id.* at 83-88.) The CAC alleged that this activity first occurred in 2012-2015, during which time Meta entered into so-called "whitelist and data sharing agreements" with targeted developers while planning to destroy others (*id.*), and continued thereafter with further anticompetitive data agreements between Meta and chosen developers until at least April 2018 (*id.* at 88).

The Court's first MTD opinion analyzed Advertisers' data sharing allegations and held that they were untimely as pleaded because all specifically identified anticompetitive data agreements were made before December 3, 2016 (four years before this consolidated action was commenced). (Dkt. 214 at 93-94.) But the Court expressly gave Advertisers leave to amend their allegations, noting that Advertisers had pleaded that "[Meta] continued this discriminatory practice 'at least until April 4, 2018.'" (*Id.* at 93.) The CAC was, in the Court's view, deficiently pleaded in that it alleged

that Meta continued entering into anticompetitive data agreements with developers until 2018, but didn't specifically identify or discuss any such agreements after December 3, 2016. (*Id.* at 93-94.) The Court identified numerous pre-2016 agreements identified in the CAC as not facially timely, including a 2015 data-sharing agreement with Netflix. (*Id.* at 93.) "Although Advertisers also alleged that 'dozens of app developers entered into such Agreements with Facebook,'" the Court reasoned, the CAC did not allege the "precise number and identity" of these developers, leaving the allegations "bereft of any dates or details with regards" to agreements with these developers. (*Id.* at 94.) The district court, identifying this conduct as part of what it referred to as part of the "Copy, Acquire, Kill" claims (*id.*), accordingly dismissed Advertisers' anticompetitive data agreement allegations, but gave leave to amend them by February 28, 2022 (*id.* at 99-100, 107).

The FAC cures the pleading defects identified by the Court with respect to Advertisers' anticompetitive data sharing allegations. Specifically, using documents produced in discovery in this case, the FAC particularly identifies and describes two groups of allegedly anticompetitive data agreements with developers that post-date December 18, 2016.[2] First, in Section V ("Facebook Continues to Enter into Extended API Agreements after the April 2015 Platform Changes"), the FAC specifically identifies nineteen post-December 18, 2016 API whitelist agreements by party and date. (FAC ¶¶ 308-15 (identifying anticompetitive Extended API agreements entered between December 27, 2016, and August 2019).) Second, in Section VII ("Facebook's Entry and Data Capture Conduct"), the FAC identifies and describes facially timely anticompetitive data agreements with developers Foursquare (FAC ¶¶ 418-28 (Foursquare data agreement, beginning Jul. 3, 2018), eBay (FAC ¶¶ 429-72 (eBay data agreement, beginning Mar. 3, 2017)), and Netflix (FAC ¶¶ 473-536 (Netflix data agreements, beginning Q3 and Q4 2017, including Aug. 15, 2017, Aug. 21, 2017, and Apr. 1, 2018)). These data agreements are, without exception, overt acts that fall within the four-year limitations period—they are timely on their face.

The FAC also explains the context for these agreements and how they were extracted. It is the same context and story that appeared in the CAC—but bolstered with factual details and

---

[2] As noted earlier, the initial Advertiser complaint was filed December 18, 2020.

**FILED UNDER SEAL**

particulars that were previously nonpublic and could only have been found from internal Meta documents. For example, after having scuttled its Platform, which was its primary source of third-party social data, Meta continued leveraging API agreements where it could (*see* FAC § V), and at the same time made costly entries into the streaming video and e-commerce markets in 2017 and 2018 to obtain social data for its social advertising business (FAC §§ VI-VII.A). Repeating the company's pattern of trading off competitive benefit in other markets and submarkets—where Meta was a fiercely competitive new entrant, but not yet a monopolist—to benefit its social advertising monopoly, Meta reached anticompetitive data agreements with would-be competitors Netflix (whose CEO was on Meta's Board) and eBay in 2017 and 2018. (*See* FAC § VII.C (eBay); *id.* § VII.D (Netflix).) Specifically, Meta agreed to cripple Meta's streaming video and e-commerce products (Facebook Watch and Facebook Marketplace, respectively) to obtain from Netflix and eBay critically important (and competitively scarce) social data "signals" from those companies that allowed Meta to maintain the Data Targeting Barrier to Entry ("DTBE") surrounding its social advertising monopoly as Facebook users increasingly spent their time and attention elsewhere on the Internet and in other apps. (*See* FAC § VI (the need for signals and Meta's entry into subverticals); *id.* at § VII (Meta's monopoly-maintaining response).)

Meta next argues that even if authorized, the new agreement allegations are untimely because they supposedly do not relate back to the allegations in the CAC. This argument is baseless. As an initial matter, Meta appears to concede that the FAC's data agreement allegations "are part of the same allegedly exclusionary 'Platform Scheme'" in the CAC. (Mot. at 7.) This is correct: the anticompetitive data agreements alleged in Sections V and VII of the FAC plainly "ar[i]se out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." FED. R. CIV. P. 15(b); *see also E.W. French & Sons, Inc. v. Gen. Portland Inc.*, 885 F.2d 1392, 1396 (9th Cir. 1989) ("[C]ourts should apply the relation back doctrine of Rule 15(c) liberally and . . . '[t]his liberality is particularly persuasive in antitrust suits where there is ample opportunity for discovery and other pretrial procedures.'" (citation omitted)).

Concessions aside, a review of the CAC lays to rest any relation back concerns. The CAC alleges that Meta scuttled its Platform in order to extract data sharing agreements from potential and

**FILED UNDER SEAL**

actual competitors that fell into defined app categories. (CAC ¶¶ 136-37, 186, 189.) If these app developers refused to enter into data sharing agreements, they would be cut off from core functionality available on the Facebook Platform. (CAC ¶ 140.) The anticompetitive agreements in the FAC are all anticompetitive data agreements that occurred as a result of, and as an effect of, Meta's scuttling of the Facebook Platform and overall scheme, which left Meta vulnerable if it did not replace the social data (internally referred to as "signals") that it lost when it blindsided developers and ejected tens of thousands of them from its Platform. (FAC ¶¶ 318-22, ¶¶ 395-410.) In other words, because Meta had destroyed its source of social data in April 2015, it now had to collect that social data itself or extract it from a third party.

That is what the FAC alleges Meta did—using the lessons it learned from its 2012-2015 Platform conduct. With respect to third parties that needed access to Meta's Platform for social data, Meta entered into "whitelisting" agreements in exchange for their users' data within the limitations period. (FAC ¶¶ 302-15.) As to third parties with valuable "intent" data (FAC ¶ 330)—namely, Netflix and eBay—Meta created rival products to compete with them (*i.e.*, Facebook Marketplace, and Facebook Watch) for the purpose of extracting social data signals it needed to maintain its social advertising monopoly. (FAC ¶¶ 316-393.) Then, after reaching an agreement for Netflix and eBay data to be used as part of Meta's advertising product, Meta crippled its Marketplace product to avoid eBay's core business (¶ 472) and destroyed its own streaming video product entirely (FAC ¶¶ 515-536). With respect to Foursquare, Meta entered into an agreement to obtain the location-based social networking company's "places" data, strengthening the DTBE by ensuring that a new entrant would need both Meta's places data *and* the licensed data to effectively enter the Social Advertising market. (FAC ¶¶ 423-428.) These FAC allegations use evidence drawn from discovery in this case to particularly support preexisting allegations of post-2015 data agreements in the CAC— allegations that Judge Koh specifically identified when analyzing Advertisers' CAC and providing leave to amend. (Dkt. 214 at 93-94.) They not only provide, as the Court requested, the identity of each counterparty and the dates of each agreement, but also detailed allegations as to how Meta extracted the agreements from each company—by entering markets; threatening well-situated

**FILED UNDER SEAL**

incumbents with ruinously expensive competition; extracting valuable signals data from those incumbents to bolster Meta's social advertising monopoly; then withdrawing from competition.

Meta also argues that the exclusionary agreements with Netflix, eBay, and Foursquare, as well as facially timely Extended API agreements, are somehow untimely because they do not inflict "new and accumulating injury" with respect to pre-limitations period conduct. To the extent this standard—drawn from the "continuing harm" doctrine—is even applicable here, where the overt acts in Sections V and VII of the FAC are all timely on their face, it is unambiguously satisfied. Advertisers specifically and plausibly plead that Meta's post-December 2016 data agreements distinctly strengthened the DTBE protecting Meta's Social Advertising monopoly, distinctly helped Meta illegally maintain that monopoly, and distinctly contributed to the anticompetitive overcharge suffered by the Advertisers plaintiffs and class members. (*See* FAC ¶ 311 (Events API new and accumulating injury); ¶ 417 ("[B]eginning in 2016 (and extending to the present), [Meta] used the leverage it obtained from entry into key sub-verticals . . . to extract anticompetitive agreements from third parties (including, as presently known to Plaintiffs, Foursquare, eBay, and Netflix), with the intent and effect of fortifying and maintaining [Meta's] DTBE and concomitant Social Advertising monopoly. . . . Plaintiffs and the putative classes paid inflated prices for Facebook advertisements as a result of this anticompetitive conduct."); ¶ 428 (Foursquare); ¶¶ 471-72 (eBay); ¶¶ 514, 535-36 (Netflix); ¶¶ 819-22, 824-26, 828, 830-36.) Meta's argument on this issue is both factually counterintuitive (indeed, the class periods in this case do not even ***begin*** until December 2016) and contrary to law—as the Court specifically recognized in its original MTD opinion. (*See* Dkt. 214 at 57-58 ("[I]mproperly prolonging a monopoly is as much an offense against the Sherman Act as is wrongfully acquiring market power in the first place." (quoting *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004) (Easterbrook, J.)).)

Meta further argues that Meta's anticompetitive data sharing agreements with Foursquare, eBay, and Netflix—identified and specifically pleaded based on discovery obtained in this case— are somehow exempt from the Court's MTD Order giving Advertisers leave to amend their Section 2 claims to specifically identify "new Whitelist and ***Data Sharing*** Agreements after December 3, 2016." (Dkt. 214 at 94 (emphasis added).) This argument is inconsistent with the Court's MTD

**FILED UNDER SEAL**

opinion, with the CAC, and with applicable law. As explained above, the agreements with Foursquare, eBay, and Netflix fit squarely within the conduct, transaction, and occurrence set out in the CAC, and the Court's prior MTD opinion expressly stated that Advertisers could (indeed, must) newly identify and plead anticompetitive data sharing agreements after December 2016. Meta's entire argument is to dismember the ***means*** by which Meta obtained the so-called "Entry and Capture" agreements, then state that this somehow renders them outside of the monopolization scheme previously alleged in the CAC. But the FAC is clear that the 2017-18 agreements with eBay, Netflix, and Foursquare were all made precisely because Meta had scuttled its Platform and lost important sources of social "signals" (FAC § VI), and that these agreements were a substantial part of the post-December 2016 monopolization and overcharge in the Social Advertising Market that is at the heart of this case (*id.* §§ VII, XIII; *see also id.* at ¶¶ 839, 842 (class periods)).

### B. The FAC's Onavo Allegations Are Authorized and Facially Timely

The Court's initial MTD opinion expressly authorized Advertisers to amend the Onavo allegations, and sought additional facts regarding (a) "how Facebook used data obtained through Onavo after December 3, 2016"; (b) the "companies which Facebook tracked using Onavo after December 3, 2016"; and (c) whether "users of Facebook's social network services also were users of Onavo Protect." (Dkt. 214 at 89-91.) The FAC, which devotes an entire new section specifically to post-December 2016 Onavo-related anticompetitive conduct (*see* FAC § VIII), includes additional factual allegations on each point—namely that (a) Meta used its Onavo spyware to spy on third-party app users (*id.* ¶ 564-69), then used the deceptively acquired user data to train its machine learning and analytics models during the limitations period, thereby directly connecting Meta's deceptive data acquisition apparatus into an (anti)competitive advantage over Social Advertising rivals and would-be entrants (FAC ¶¶ 537-54, 564-69); (b) Meta used Onavo to surveil rival or potentially competitive mobile apps during the limitations period, including Snapchat, Google Photos, iMessage, Android Messages, and Twitter after December 18, 2016 (FAC ¶¶ 551-63); and (c) Meta matched users of third-party apps that incorporated Onavo's SDK with their Facebook IDs after December 3, 2016 (FAC ¶¶ 564-69). These new allegations, made in response to the Court's direction, were sourced from discovery obtained in the case and concern ***only*** overt

acts falling squarely within the limitations period. Moreover, each new allegation relates directly to Onavo allegations in the CAC. (*See, e.g.*, FAC ¶ 236, CAC ¶ 258 (real-time surveillance of users); FAC ¶ 290, CAC ¶ 312 (Onavo used to surveil top apps); FAC ¶ 297, CAC ¶ 319 (used by data scientists to monitor and model WhatsApp growth); FAC ¶¶ 230-31, CAC ¶¶ 252-53 (Onavo used to deceive users within the limitations period with hidden spyware).)

Meta also argues that Advertisers' post-December 2016 Onavo allegations do not "identify new and accumulating injury to plaintiffs," as required under the continuing-harm doctrine (Mot. at 6.) To the extent this standard is applicable to exclusively timely-on-their-face overt acts, it is plainly met here with respect to Onavo. The FAC expressly and specifically alleges post-December 2016 Onavo conduct through which "[Meta] used deception to obtain a competitive edge in ad targeting between 2016 and 2019." (FAC ¶ 540; *see id.* at ¶¶ 537-69.) This conduct "provided [Meta] with a further competitive advantage against would-be entrants to the Social Advertising Market, helping to maintain the DTBE and to seal off any erosion of [Meta's] Social Advertising market power— and concomitant supracompetitive ad prices—between 2016 and 2019." (*Id.* ¶ 542; *see also id.* at ¶ 569 (post-2016 Onavo conduct gave "[Meta] an immense advantage over competitors" and inflicted overcharge on Plaintiffs); *id.* at ¶¶ 819, 821, 823.) Again, the law does not support Meta's "new and continuing injury" argument any more than the facts do: as the Court explained in its MTD opinion, "'improperly prolonging a monopoly is as much an offense against the Sherman Act as is wrongfully acquiring market power in the first place.'" (Dkt. 214 at 58 (quoting *Xechem*, 372 F.3d at 902).)

C.   **The FAC's Product Integration Allegations are Timely and Authorized**

The FAC alleges an anticompetitive integration of Meta's AI and targeting systems beginning in 2019. (FAC at § XI.) In its MTD opinion, the Court expressly analyzed allegations regarding Facebook's publicly-announced 2019 integration of its Facebook, Messenger, Instagram, and WhatsApp as part of its "Copy, Acquire, Kill" analysis (Dkt. 214 at 94-96), and noted that Advertisers must identity an "overt act" within the limitations period (*id.* at 96). The FAC specifically responds to the Court's observation that allegations concerning the 2019 integration were "sparse," *id.*, alleging additional facts obtained in discovery (*see* FAC at 657-764). The FAC

**FILED UNDER SEAL**

also makes clear that the complained-of "integration" is (and was) itself an anticompetitive act—effectively, a product- and data architecture-redesign across Meta's entire data targeting business—entirely separate from the company's 2012 and 2014 acquisitions of Instagram and WhatsApp. Indeed, Meta's integration was made possible by its anticompetitive AI and targeting agreement with Google (FAC ¶¶ 20, 657, 686-687), which this Court has already sustained as a violation of Sections 1 and 2 (Dkt. 214 at 100-06). Based on newly acquired discovery concerning the previously pleaded integration of Meta's products and systems, the FAC provides a detailed account of the AI systems that were integrated (FAC ¶¶ 663-689, 729-749); allegations that the company's announced end-to-end encryption—pleaded in the CAC (CAC ¶¶ 517-526)—was a pretextual smokescreen devised by Zuckerberg and his most senior lieutenants (FAC ¶¶ 711-724, 750-764); and detailed allegations that the integration of Meta's AI systems lacked any legitimate technical justification (FAC ¶¶ 662, 709, 732-33, 739-742, 883).

In response, Meta again asserts that facially timely conduct—here, conduct entirely from *2019* and thereafter—is somehow time-barred. (Mot. at 6.) Meta's argument appears to rely on a laches argument it previously made with respect to injunctive relief claims: that Meta's 2019 systems integration was "part and parcel" of the company's 2012 and 2014 acquisitions of Instagram and WhatsApp, and therefore barred by laches. (*Id.*) There are, however, no injunctive relief claims at issue here, and even if Meta's 2019 integration of data processing systems and products from across its business *were* "part and parcel" of earlier asset acquisitions (it's not), claims for damages from Meta's 2019 systems integration simply cannot be time barred in a FAC filed in early 2022. There is no doctrine—laches or otherwise—that can bar monopolization damages claims falling within the Congressionally created four-year limitations period, and Meta provides no support for such a radical proposition. Meta's citation to *Reveal Chat Holdco LLC v. Meta Platforms, Inc.* (Mot. at 6) is distinguishable on its face, both at the district court level (where *injunctive relief* was barred by laches) and at the Ninth Circuit (where the Court expressly refused to reach the injunction/laches issue due to an absence of standing). *See* 2022 WL 595696, at *1 (9th Cir. Feb. 28, 2022).

**FILED UNDER SEAL**

## II. THE FAC ADEQUATELY ALLEGES SECTION 2-VIOLATIVE CONDUCT

Monopolization under Section 2 of the Sherman Act requires (1) possession of monopoly power in the relevant market, and (2) "the willful acquisition or maintenance of that power," resulting in antitrust injury. *SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 783 (9th Cir. 1996). The Court has already ruled that Advertisers have plausibly pleaded the alleged Social Advertising Market, as well as Meta's market power in that market. (Dkt. 214 at 33-38.) Accordingly, the sole question before the Court on this motion is whether the FAC plausibly alleges anticompetitive, exclusionary conduct—in addition to the Google agreement already sustained by the Court—that allowed Meta to maintain its Social Advertising monopoly during the two Class Periods. This "conduct element" requires "the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997).

### A. The FAC Alleges Exclusionary Conduct as Part of a Monopoly Broth, which Meta Cannot Dismember

Advertisers allege a "monopoly broth," a doctrine previously recognized by this Court. (Dkt. 214 at 70-71.) The conduct, which must be "analyzed [for its] aggregate anticompetitive effect" (*id.* at 71), includes (a) unlawful data and market division agreements with Netflix, eBay, and Foursquare; (b) API whitelisting and data agreements; (c) an unlawful market division and AI / targeting agreement with Google (already sustained as an adequately pleaded Section 1 and 2 violation); (d) using deceptively obtained Onavo data to surveil and target competition and users in a manner unavailable to Meta's actual and potential competitors; and (e) an anticompetitive integration of Meta's disparate AI and machine-learning systems. (FAC ¶¶ 819-820.) Meta's attempt to dismember this conduct is inappropriate, and any subset of this conduct can violate Section 2, "even if some of the activities would be lawful if viewed in isolation." *Id.* at *42 (quoting *Free FreeHand Corp. v. Adobe Systems*, Inc., 852 F. Supp. 2d 1171, 1180 (N.D. Cal. 2012)).

### B. The Facially Timely API and Data Sharing Agreements Alleged in FAC Sections V and VII Are Anticompetitive and Fail under the Rule of Reason

The rule of reason standard under Section 2 is the same as under Section 1, *FTC* v. *Qualcomm, Inc.*, 969 F.3d 974, 991 (9th Cir. 2020), which requires the application of a fact-laden

**FILED UNDER SEAL**

burden-shifting inquiry into anticompetitive and pro-competitive effects, *id.* at 992. The rule of reason is a highly factual inquiry, inappropriate for resolution as a matter of law on a motion to dismiss. *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 239 (S.D.N.Y. 2019). The FAC plausibly alleges that each of the allegedly exclusionary agreements pleaded in Section V (extended API / whitelist agreements) and Section VII (data sharing agreements with Foursquare, eBay, and Netflix) is anticompetitive and helped Meta maintain its monopoly in the Social Advertising Market, harming Advertiser plaintiffs and class members. (*See* FAC ¶ 311 (Events API); ¶ 417 (Foursquare, eBay, and Netflix); ¶ 428 (Foursquare); ¶¶ 471-72 (eBay); ¶¶ 514, 535-36 (Netflix); ¶¶ 819-22, 824-26, 828, 830-36 (all of the foregoing, tied to their particular harms); *see generally* FAC ¶¶ 132-80 and 302-15 (description of API / "whitelist" agreements); ¶¶ 418-28 (description of data sharing agreement with Foursquare); ¶¶ 429-72 (description of data sharing agreement with eBay); ¶¶ 473-536 (description of data sharing agreement with Netflix).) Meta does not really meet any of these allegedly anticompetitive agreements on their terms, but instead argues without any serious attempt at factual context that the data agreements, such as those with eBay and Netflix, "improved" Meta's advertising product and are therefore as a matter of law procompetitive and non-exclusionary. (Mot. at 12.) This argument is contrary to the well-pleaded facts and the unambiguous law.

For example, as to Netflix and eBay, the FAC alleges that Meta stopped competing for signals with these companies in exchange for their data (FAC ¶¶ 429-536)—dividing markets with them by withdrawing from subverticals Meta had entered at scale (*see, e.g., id.* ¶ 487, 832-33). In short, Meta forwent competing for first-party "intent" signals that could have been potentially more valuable than the (admittedly rich, and contrary to Meta's unsupported assertion, very much not-generally-available) signals Meta instead obtained from Netflix and eBay after taking a knee in video and e-commerce. (*See* FAC ¶¶ 341, 358, 376-377, 384, 401-403, 405-406, 409-410, 468-72.) It may certainly be true that the data Meta obtained from Netflix and eBay helped Meta target advertisements better than in a world without these signals, but it is not necessarily the case that Meta's ad products were unambiguously improved by an agreement that crippled Meta's own Watch and Marketplace products as opposed to a but-for world in which Meta vigorously competed for

signals using its own products. Moreover, by entrenching Meta's monopoly in Social Advertising, consumers like the Advertiser plaintiffs paid supracompetitively for any incremental improvement in targeting—and indeed the FAC alleges the price of Facebook advertising soared between 2017 and 2019 (FAC ¶ 796) (but more on that, among other specifically-pleaded anticompetitive effects, later). No matter how sliced, Meta's data sharing agreements with Netflix and eBay were hardly as-a-matter-of-law "product improvements" hailed by ad purchasers.

So, too, with the other agreements identified in Sections V and VII of the FAC. The Foursquare agreement captured a valuable source of social data from a direct, ***horizontal*** competitor—Foursquare, a rival social network—that could have facilitated entry into the Social Advertising Market (FAC ¶ 425), providing Meta with a superset of the location and places-based social data available in that market (FAC ¶ 428). A new entrant could never have Meta's combination of Meta's data ***plus*** the Foursquare data even if it licensed the latter, fortifying the DTBE and preventing effective entry at scale in the Social Advertising Market (which in turn allowed Meta to maintain pricing and market power). (*See id.*; *see also id.* ¶ 824.) As for Meta's discriminatory Extended API / whitelist agreements tied to Platform APIs—including the facially timely API agreements set forth in FAC § V—these had obvious anticompetitive effects that included preventing social data covered by the agreements from being shared with or used by a competitive or nascent Social Advertising platform, thereby strengthening the DTBE and contributing to the monopoly price premium paid by the Advertiser plaintiffs and class members. (*See* FAC ¶ 311, 819, 821-22.)

Most importantly, even if anticompetitively obtained targeting data indeed improved Meta's advertising product, this would be—at best—a procompetitive effect of Meta's agreements with Netflix, eBay, Foursquare, and other developers that must be weighed against their respective anticompetitive effects, which are substantial and specifically and carefully alleged in the FAC. (*See, e.g.,* FAC ¶¶ 311, 417, 428, 471-72, 514, 535-36, 819-22, 824-26, 828, 830-36, 860, 866.) Whether any alleged procompetitive improvement in Meta's ad-targeting from the agreements set forth in FAC §§ V and VII outweighs their serious, specifically-pleaded anticompetitive effects is a fact question inappropriately resolved on a motion to dismiss. *Qualcomm, Inc.*, 969 F.3d at 992.

And in fact, the FAC plausibly alleges—with significant factual support—that the anticompetitive effects resulting from the agreements set forth in FAC §§ V and VII substantially outweigh any procompetitive effects that may have also flowed from them. There is no basis to dismiss the Section 2 claims based on the allegedly anticompetitive agreements in Sections V and VII of the FAC.

### C.  The Onavo Conduct Is Anticompetitive and Fails the Rule of Reason

Meta argues that the use of Onavo to train its machine-learning and AI models is not anticompetitive because such conduct would have "improved" Facebook's advertising targeting systems. (Mot. at 12-13.) Meta misses the point. Meta used Onavo to **deceptively steal data** from other apps and their users, to surveil the competition, and to train machine-learning and AI models using that stolen data. (FAC ¶ 538, 541-542.) These are advantages over the competition that were obtained through overtly deceptive conduct—advantages that neither the existing competition, nor would-be potential entrants, could fairly obtain. (FAC ¶ 569.) This strengthened the DTBE and impeded entry of competitor(s) that could have served as a check on inflated Social Advertising prices. (FAC ¶ 569.) Meta's citation to *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp.*, 592. F.3d 991 (9th Cir. 2010), in which the plaintiff contended that a product improvement by itself was anticompetitive, *id.* at 999, 1002, is simply not applicable here.

### D.  Meta's Integration of AI / Targeting Systems Is Anticompetitive

The FAC alleges that Meta integrated its backend AI and machine learning systems to strengthen the DTBE, including by inextricably intertwining its AI and data and impairing any effort to regulate or break up Meta's business or AI and targeting systems. (FAC ¶¶ 657-764). The FAC's factual allegations show that this was not a product improvement but an **impairment** (FAC ¶ 748), and that Meta propagated a pretextual reason for this move (FAC ¶¶ 711-724, 750-754). Meta argues that the fact that complained-of integration is alleged to have made its AI and machine learning systems less effective means it could not possibly have strengthened the DTBE, and therefore could not be anticompetitive. (Mot. at 14.) This misses the point. The conduct is **irrational but for its anticompetitive effect**—forever intertwining and centralizing Meta's data and AI infrastructure, which makes entry at scale more difficult and regulatory intervention (including divestiture) virtually impossible. The integration may have hurt Meta's targeting systems, but it strengthened its

**FILED UNDER SEAL**

Social Advertising monopoly. This is precisely the sort of product integration that was held to be anticompetitive in the seminal *United States v. Microsoft Corp.* under Section 2 of the Sherman Act—for failing the rule of reason. *See* 253 F.3d 34, 65-57 (D.C. Cir. 2001).

    **E.**    **Advertisers Do Not Seek Damages for—or Allege Monopolization Based On—Conduct Outside of the Limitations Period, Including as to the April 2015 Refusal to Deal with Developers**

Meta devotes several pages of its brief to arguing that Meta's April 30, 2015, refusal to deal with Facebook Platform developers is not actionable under Section 2. While this refusal to deal and related conduct provides relevant factual context for the exclusionary conduct alleged within the limitations period in the FAC, Advertisers do not seek damages for Meta's refusal-to-deal conduct—or any pre-limitations period conduct—nor do they base their Section 2 claims on such conduct. (*See* FAC ¶¶ 860, 866.) Meta's refusal-to-deal arguments are simply immaterial.

## III.  META'S SECTION 1 ARGUMENTS FAIL

Meta also directs arguments toward Advertisers' Section 1 claim, which is directed solely to Meta's 2018 market division agreement with Google; was sustained by this Court in January; and has not been amended since. (Mot. at 14-15.) It is not clear why, or what relief Meta could possibly seek with respect to a claim that it already moved to dismiss, which has not been changed. *See* Fed. R. Civ. P. 12(g)(2). Meta's grievances about class definition and recitation common issues are not arguments in support of dismissal—of anything.[3]

## IV.  REQUEST FOR LEAVE TO AMEND

Should the Court dismiss any portion of the FAC, Advertisers respectfully request leave to amend. Any deficiencies can be cured, including based on facts from Meta's document production. *United States ex rel. Jones v. Sutter Health*, 2020 WL 6544412, at *4 (N.D. Cal. Nov. 6, 2020).

### CONCLUSION

For these reasons, the Court should deny Meta's motion to dismiss in its entirety.

---

[3] Meta incorrectly cites the "common issues" section of the FAC to argue that Plaintiffs are asserting additional Section 1 claims. (Mot. at 14 (citing FAC ¶ 847(h), (i).) This is not the case. As Meta itself concedes (Mot. at 15 (citing *Qualcomm*, 969 F.3d at 991)), if an agreement in the FAC violates Section 1 under the rule of reason, this would indisputably be exclusionary under Section 2, hence presenting a common issue for classwide adjudication of the Section 2 claim.

**FILED UNDER SEAL**

DATED: April 11, 2022

By: */s/ Kristen M. Anderson*
**SCOTT + SCOTT ATTORNEYS AT LAW LLP**
Kristen M. Anderson (Bar No. 246108)
　kanderson@scott-scott.com
230 Park Avenue, 17th Floor
New York, NY 10169
(212) 223-6444

Christopher M. Burke (Bar No. 214799)
　cburke@scott-scott.com
David H. Goldberger (Bar No. 225869)
　dgoldberger@scott-scott.com
Hal D. Cunningham (Bar No. 243048)
　hcunningham@scott-scott.com
Daniel J. Brockwell (Bar No. 335983)
　dbrockwell@scott-scott.com
Yifan (Kate) Lv (Bar No. 302704)
　klv@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
(619) 233-4565

Patrick J. McGahan (*pro hac vice*)
　pmcgahan@scott-scott.com
Michael P. Srodoski (*pro hac vice*)
　msrodoski@scott-scott.com
156 South Main Street, P.O. Box 192
Colchester, CT 06415
(860) 537-5537

*Interim Co-Lead Counsel for the Advertiser Classes*

**AHDOOT & WOLFSON, PC**
Tina Wolfson (Bar No. 174806)
　twolfson@ahdootwolfson.com
Robert Ahdoot (Bar No. 172098)
　rahdoot@ahdootwolfson.com
Theodore W. Maya (Bar No. 223242)
　tmaya@ahdootwolfson.com
Henry Kelston (*pro hac vice*)
　hkelston@ahdootwolfson.com
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
(310) 474-9111

*Executive Committee Counsel for the Advertiser Classes*

Respectfully submitted,

By: */s/ Yavar Bathaee*
**BATHAEE DUNNE LLP**
Yavar Bathaee (Bar No. 282388)
　yavar@bathaeedunne.com
Andrew C. Wolinsky (*pro hac vice*)
　awolinsky@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
(332) 322-8835

Brian J. Dunne (Bar No. 275689)
　bdunne@bathaeedunne.com
633 West Fifth Street, 26th Floor
Los Angeles, CA 90071
(213) 462-2772

Edward M. Grauman (*pro hac vice*)
　egrauman@bathaeedunne.com
7000 North MoPac Expressway, Suite 200
Austin, TX 78731
(512) 575-8848

*Interim Co-Lead Counsel for the Advertiser Classes*

**LEVIN SEDRAN & BERMAN LLP**
Keith J. Verrier (admitted *pro hac vice*)
　kverrier@lfsblaw.com
Austin B. Cohen (admitted *pro hac vice*)
　acohen@lfsblaw.com
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3997
(215) 592-1500

*Executive Committee Counsel for the Advertiser Classes*

**FILED UNDER SEAL**

**ATTESTATION OF YAVAR BATHAEE**

This document is being filed through the Electronic Case Filing (ECF) system by attorney Brian Dunne. By his signature, Mr. Dunne attests that he has obtained concurrence in the filing of this document from each of the attorneys identified on the caption page and in the above signature block.

Dated: April 11, 2022            By   */s/ Brian J. Dunne*
                                                Brian J. Dunne

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of April, 2022, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System, causing the document to be electronically served on all attorneys of record.

By   */s/ Brian J. Dunne*
        Brian J. Dunne