**BATHAEE DUNNE LLP**
Yavar Bathaee (Bar No. 282388)
  yavar@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
Telephone: (332) 322-8835

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Amanda F. Lawrence (*pro hac vice*)
  alawrence@scott-scott.com
156 South Main Street, P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537

*Interim Co-Lead Advertiser Class Counsel*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MAXIMILIAN KLEIN, et al.,<br><br>                            Plaintiffs,<br><br>    v.<br><br>META PLATFORMS, INC.,<br><br>                            Defendant. | Case No. 3:20-cv-08570-JD<br><br>**OVERVIEW OF THE U.S. SOCIAL ADVERTISING MARKET FOR FEBRUARY 28, 2023 TUTORIAL**<br><br>Judge: Hon. James Donato |

**Overview of the U.S. Social Advertising Market from 2016-2020**

This submission is made on behalf of advertisers who purchased social advertisements from Facebook.  The difference between social advertising and other types of digital advertising is discussed below.

*What Is Advertising and Who Are Advertisers?*

Advertisements are communications that promote a product, brand, or service to attract interest and sales, develop awareness, or trigger other actions.  Advertisers are individuals or entities that purchase the right to place an advertisement through a particular advertising channel.  Here, advertisers who purchased Facebook, Instagram, and/or Messenger advertisements through Meta's closed advertisement channel,[1] Facebook Ads Manager (now Meta Ads Manager), are the proposed class members in the putative advertising classes.

*What Different Objectives Do Advertisers Have and Why Does that Matter?*

Advertisers want to place the right kind of ad in front of the right person at the right time, without wasting money showing ad impressions[2] to the wrong audience.  This is called ad targeting.

To formulate their campaign objectives, advertisers must determine where their target audiences are in the "marketing funnel" or "purchase funnel."  At the top of the funnel, an advertiser seeks to improve brand awareness with consumers who are not currently aware of its product or service.  At the bottom of the funnel, the advertiser seeks to consummate a defined action (usually a purchase) by those customers who have already expressed some preference for the advertiser's product or service but have not yet bought or repurchased.  In between the top and the bottom of the

---

[1]  A "closed channel," also known as an owned-and-operated channel, is an advertising channel in which a publisher (*e.g.*, Meta Platforms, Inc. ("Meta")) sells its ad inventory directly to advertisers using the publisher's own systems.  This is the preferred method through which internet platforms, including Meta, Twitter, Amazon, and YouTube, sell their ad inventory.  By contrast, an "open web channel" facilitates multiple website and app publishers selling their ad inventory to multiple advertisers.  The most common example of such a channel is open web display advertising, where publishers (*e.g.*, the *New York Times*, *Politico*, ESPN.com, or the *Washington Post*) use ad tech services to auction their ad inventory to advertisers.

[2]  An "ad impression" represents a single ad displayed ("served") to an individual user on a website or app.

1  funnel – stages commonly referred to as the "consideration phases" – an advertiser seeks to
2  encourage consumers to engage with its product or service and prompt a positive brand response.



13        The key insight of the marketing/purchase funnel is that distinct advertisements should be
14  used to influence consumer behavior at each successive stage of a consumer's purchasing path.
15  Consequently, advertisers regularly pursue multiple objectives simultaneously, using distinct ads to
16  target consumers at successive levels of the marketing funnel.  To do so, advertisers select
17  advertising types – commonly referred to as advertising channels – that most effectively meet each
18  of their objectives.  Because no single advertising channel is optimal for multiple, distinct objectives,
19  advertisers regularly use a range of different techniques and advertising channels to reach their target
20  audience and achieve their marketing goals.
21        Advertisers consequently view advertising channels as complementary tools and attempt to
22  select the tool(s) best suited to the job at hand.  They do not view distinct advertising channels as
23  ready substitutes.

*What Is Social Advertising?*

Social advertisements are display ads,[3] composed of images, text, and/or videos, shown to social media users as they scroll through a social media platform's web or mobile phone application. Social advertisements are particularly effective at targeting consumers at the upper- to mid-level of the purchase funnel,[4] and as such, can be used to drive awareness.

But social advertising also can be used for certain types of lower-funnel targeting (mobile app-install ads are one prominent example). Social advertising differs from other online advertising (discussed below) because of its ability to prompt consumer engagement with a brand or product (*e.g.*, likes, shares, or click-throughs) and to uniquely target specific categories of consumers who would likely consider purchasing a particular advertiser's product or service.[5] The unique targeting ability of social advertising is driven by the nature of social media itself: users not only tell the platform *who* they are (*e.g.*, name, contact, age, location), but also what and whom they like, dislike, or are indifferent to, both explicitly and through their engagement with other users in their network and the content they generate. Other online advertising channels do not offer the same ability to customize audience targeting by reference to consumers' demographics, interests, personal information, or inferences from their or their friends' behavior.[6]

To the extent it could be said Meta had competitors in the U.S. Social Advertising Market during the relevant period of late 2016 to the present, those were: Twitter, LinkedIn, Snapchat,

---

[3] The term "display ads" is used generically to refer to text, image, and video ads appearing in defined portions of web pages or mobile apps. Display ads are different from search ads, which only appear where the consumer actively makes a search. Display ads appear where a consumer happens to be online.

[4] It is important to distinguish between distinct advertising channels (*e.g.*, search vs. social advertising) and ad formats. Ads take different formats, including as video (including in-stream video, out-stream video, and stories), banner ads, and native and sponsored content (ads that match the format and function of the surrounding content). The same or similar ad format, such as banner ads, may be used across different advertising channels.

[5] Meta permits advertisers to target a "Lookalike Audience" – users similar to other users that Meta's systems determine have engaged favorably with the advertiser's business. Other social advertisers offer similar features.

[6] Meta's Facebook Audience Network ("FAN") permits Facebook's advertisers to purchase certain types of open web display ads shown outside Facebook's own applications.

Pinterest, Foursquare, and Google+ (which exited the market in 2019). TikTok first offered advertising in the United States in 2020.

*What Other Types of Digital Advertising Channels Are There?*

From 2016 through 2020, the period most relevant to the Advertisers' operative complaint, the following constituted the key digital advertising channels besides social advertising: search advertising, open web display advertising, and video platform advertising.[7] Each channel performs a different job for online advertisers:

- *Search Advertisements*: These are ads shown when a consumer performs a search on general search engines (such as Google or Bing), or on specialized search engines (such as Amazon or Yelp). The selection and targeting of these advertisements are based primarily on keywords entered by the user, and not the specific characteristics of the user. In contrast to social advertisers, search ads are useful for capturing lower-funnel explicit intent, as they are respond to a consumer's real-time stated desire to seek a product or service (*e.g.*, a Google search for "suit shop in my area" discloses that this consumer is likely interested in purchasing a suit in his or her local geographic area). Because a user needs to know what he or she is looking for to trigger an advertiser's search ad, search ads are not useful for building brand awareness or for targeting advertisements based on social factors – *e.g.*, who a consumer is and what he or she likes, distinct from what he or she is actively searching for at any given time.

- *Open Web Display Advertisements ("OWDAs")*: These are display ads shown on the open web and sold by website publishers through ad-tech intermediaries such as Google or through direct negotiations with the advertiser. OWDAs permit advertisers to purchase "banner ads"' (images and animations shown at the top, bottom, and side of web pages) and certain video ads (typically out-of-stream video that appears outside of a video selected by the user, like a pop-up or video within an online article).[8] OWDAs are effective top-of-funnel advertisements directed at developing brand awareness or for retargeting consumers who have already shown an interest in the brand so as to increase the favorability of the brand or product. OWDAs leverage a publisher's ability to place an ad in the path of the potential consumer as he or she browses the web. However, as consumers typically only passively observe the websites on which these ads are shown, and these sites are largely bereft of the type and volume of social data that powers social advertisement targeting, OWDAs cannot drive mid-to-lower funnel engagement like social advertisements. Instead, OWDAs are mainly used for promoting general brand or product awareness to a broader audience.

---

[7] Classified advertisements – ads shown on general classified websites (*e.g.*, Boattrader.com) – are not addressed given their comparatively low volume.

[8] This long-term shift from traditional media (*e.g.*, print, radio, and TV) to digital advertising was driven by growing use of online channels by consumers, not substitutability.

- ***Video Platform Advertisements***:  These are typically longer-form video ads sold by video-streaming platforms such as YouTube and Vevo.  They are typically designed to be shown with the sound on before, during, and after the video content selected by or recommended to the consumer.  Advertisers use these ads to build an initial brand image early in the purchase journey without expecting an immediate response.  Indeed, video platforms permit limited user engagement with the ad content shown in-stream.  Users typically will not leave comments about the in-stream ads shown to them in the static comment section below the video they selected, in part because viewers of the same video may be shown different in-stream ads.  Nor can video platform users share or discuss these ads with their contacts within the video platform itself.[9]  By contrast, social video ads are typically short, sound-off ads placed within the users' feed, designed to capture a user's attention and drive an immediate action (*e.g.*, "likes," "shares," and "click-throughs").[10]  Unlike social advertising, video platform advertising can also perform a function analogous to search advertisements to the extent ads can be shown in response to a consumers' real-time queries (*e.g.*, a YouTube search for "broken Ryobi lawnmower" may prompt an in-stream video ad for lawncare during a "DIY" video uploaded by another YouTube user).

***What Are Some Characteristics of the Social Advertising Market?***

Scale drives market power in the social advertising market.  The volume of users on a social media platform and the amount of time spent traversing and interacting with that platform (a) generates that platform's supply of, and demand for, ad inventory; (b) sets the potential "reach" of an advertising campaign; and (c) generates the social data that powers the unique targeting capabilities of these platforms.[11]  The more a user interacts with a platform and the more pages he or she opens and scrolls through, the more advertising demand he or she creates for that platform.  That user's engagement with the platform also drives the volume and quality of data collected by the platform, thus increasing the value of advertising space on the platform.

In addition to scale, a social advertising platform's access and control of (a) first-party data gathered from the users of its apps; and (b) third-party data about the users of third-party sites, apps, and services, as well as its ability to accurately combine and analyze that data, constitutes other key

---

[9]   Consequently, video platforms do not collect the same types of social data about their users that permits targeted social advertising. Further, they have more limited "identity" data, as users are not required to log in to an account with the video platform in order to view the videos.

[10]   The different purpose of these two types of video advertisements is reflected in their different pricing models.  Video platforms often only charge advertisers when the consumers watch 30 seconds or more of the ad, whereas social advertisers generally charge the advertisers if three seconds of the ad are watched.

[11]   "Reach" is how much of the target demographic an advertiser can reach on a particular advertising channel.

drivers of market power. Such first-party and third-party data are used to make inferences about a user's identity, interests, and desires, facilitating extremely targeted advertising, and permitting valuable attribution services (*i.e.*, tracking whether the users exposed to the ad performed the desired action (*e.g.*, clicked through)).[12]

The data and reach advantage afforded by scale results in more advertising revenue. This revenue funds investments in more on-platform products for users to interact with and better artificial-intelligence and machine-learning systems ("AI/ML") to leverage user data. As more and better data is fed to the social media platform, ad targeting and attribution improves, which in turn starts the "revenue flywheel" – a powerful network effect. Money made from ads drives further investments to generate more data and better AI/ML, and so on. Without scale, social advertising competitors cannot obtain sufficient data or offer their advertising customers sufficient reach to place a competitive constraint on a scaled incumbent. Consequently, new entrants face significant barriers to entry.

*What Are the Geographic Limits of Competition?*

As social advertising depends on the collection and analysis of user data to identify like-minded consumers, it is constrained by the social, cultural, and language barriers of different countries (*e.g.*, social data of a French teenager may not inform the likes of an American teenager). Moreover, while global companies may pursue global "brand" strategies, to comply with national regulations, as well as societal, cultural, and language differences, advertising campaigns are generally executed at the national or regional level. As such, the relevant geographic market is the United States.

> *Advertiser Plaintiffs' Presenter*

Dr. David S. Sibley, John Michael Stuart Professor of Economics at the Department of Economics at the University of Texas at Austin, will present on behalf of the advertiser classes at the upcoming market tutorial.

---

[12] Data that indicates or can be used to infer a user's commercial intent is commonly referred to as a "signal."

Dated: February 17, 2023

By: */s/ Amanda F. Lawrence*
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Amanda F. Lawrence (*pro hac vice*)
  alawrence@scott-scott.com
Patrick J. McGahan (*pro hac vice*)
  pmcgahan@scott-scott.com
Michael P. Srodoski (*pro hac vice*)
  msrodoski@scott-scott.com
156 South Main Street, P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537

Patrick J. Rodriguez (*pro hac vice*)
  prodriguez@scott-scott.com
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444

Patrick J. Coughlin (Bar No. 111070)
  pcoughlin@scott-scott.com
Hal D. Cunningham (Bar No. 243048)
  hcunningham@scott-scott.com
Carmen A. Medici (Bar No. 248417)
  cmedici@scott-scott.com
Daniel J. Brockwell (Bar No. 335983)
  dbrockwell@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565

**LEVIN SEDRAN & BERMAN LLP**
Keith J. Verrier (*pro hac vice*)
  kverrier@lfsblaw.com
Austin B. Cohen (*pro hac vice*)
  acohen@lfsblaw.com
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3997
Telephone: (215) 592-1500

Respectfully submitted,

By: */s/ Yavar Bathaee*
**BATHAEE DUNNE LLP**
Yavar Bathaee (Bar No. 282388)
  yavar@bathaeedunne.com
Andrew C. Wolinsky (Bar No. 345965)
  awolinsky@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
Telephone: (332) 322-8835

Brian J. Dunne (Bar No. 275689)
  bdunne@bathaeedunne.com
Edward M. Grauman (*pro hac vice*)
  egrauman@bathaeedunne.com
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
Telephone: (213) 462-2772

**AHDOOT & WOLFSON, PC**
Tina Wolfson (Bar No. 174806)
  twolfson@ahdootwolfson.com
Robert Ahdoot (Bar No. 172098)
  rahdoot@ahdootwolfson.com
Theodore W. Maya (Bar No. 223242)
  tmaya@ahdootwolfson.com
Henry Kelston (pro hac vice)
  hkelston@ahdootwolfson.com
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111

*Interim Counsel for the Advertiser Class*

**ATTESTATION OF AMANDA F. LAWRENCE**

This document is being filed through the Electronic Case Filing (ECF) system by attorney Amanda F. Lawrence. By her signature, Ms. Lawrence attests that she has obtained concurrence in the filing of this document from each of the attorneys identified in the above signature block.

Dated:  February 17, 2023               By:     */s/ Amanda F. Lawrence*
                                                        Amanda F. Lawrence

**CERTIFICATE OF SERVICE**

I hereby certify that on February 17, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system to send notification of such filing to all counsel of record.

           *s/ Amanda F. Lawrence*
           Amanda F. Lawrence

*Counsel for the Advertiser Class*