Pages 1 - 46

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

MAXIMILLIAN KLEIN, et al.,    )
                            )
        Plaintiffs,     )
                            )
  VS.                      )    **NO. C 20-08570 JD**
                            )
META PLATFORMS, INC.,      )
                            )
        Defendant.      )
_____)

San Francisco, California
Thursday, April 27, 2023

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

        QUINN, EMANUEL, URQUHART & SULLIVAN LLP
        865 South Figueroa Street - 10th Floor
        Los Angeles, California  90017
  BY:  **KEVIN Y. TERUYA, ATTORNEY AT LAW**
        **BRANTLEY I. PEPPERMAN, ATTORNEY AT LAW**

        SCOTT + SCOTT ATTORNEY AT LAW, LLP
        156 South Main Street - PO Box 192
        Colchester, Connecticut  06415
  BY:  **AMANDA LAWRENCE, ATTORNEY AT LAW**

        HAGENS BERMAN SOBOL SHAPIRO LLP
        715 Hearst Avenue - Suite 300
        Berkeley, California  94710
  BY:  **SHANA SCARLETT, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
        United States District Court - Official Reporter

**APPEARANCES:**   (cont'd)

For Plaintiffs:

                            BATHAEE DUNNE LLP
                            901 South MoPac Expressway
                            Barton Oaks Plaza I - Suite 300
                            Austin, Texas  78746
              **BY:**   **BRIAN J. DUNNE, ATTORNEY AT LAW**

                            BATHAEE DUNNE LLP
                            445 Park Avenue - 9th Floor
                            New York, New York  10022
                            **YAVAR BATHAEE, ATTORNEY AT LAW**

For Defendant:

                            WILMER, CUTLER, PICKERING, HALE
                            & DORR LLP
                            2600 El Camino Real - Suite 400
                            Palo Alto, California  94306
              **BY:**   **SONAL N. MEHTA, ATTORNEY AT LAW**

                            WILMER, CUTLER, PICKERING, HALE
                            & DORR LLP
                            1875 Pennsylvania Avenue NW
                            Washington, D.C.  20006
              **BY:**   **MOLLY M. JENNINGS, ATTORNEY AT LAW**

For Netflix:

                            WILSON SONSINI GOODRICH & ROSATI, P.C.
                            One Market Plaza, Spear Tower
                            Suite 3300
                            San Francisco, California  94105
              **BY:**   **JUSTINA K. SESSIONS, ATTORNEY AT LAW**

| | |
|---|---|
| 1 | **Thursday - April 27, 2023**                                    **10:52 a.m.** |
| 2 | P R O C E E D I N G S |
| 3 | ---oOo--- |
| 4 | **THE CLERK:**  Calling civil 20-8570, Klein versus Meta |
| 5 | Platforms. |
| 6 | (Pause in proceedings.) |
| 7 | **THE CLERK:**  Counsel. |
| 8 | **MR. TERUYA:**  Kevin Teruya from Quinn Emanuel for |
| 9 | consumer Plaintiffs. |
| 10 | **MR. PEPPERMAN:**  Brantley Pepperman from Quinn Emanuel |
| 11 | for consumer Plaintiffs. |
| 12 | **MS. SCARLETT:**  Shana Scarlett from Hagens Berman for |
| 13 | the consumer class. |
| 14 | **MR. BATHAEE:**  Yavar Bathaee, Your Honor, co-lead |
| 15 | counsel for advertiser Plaintiffs. |
| 16 | **MS. LAWRENCE:**  Amanda Lawrence, Scott + Scott, lead |
| 17 | counsel for advertiser Plaintiffs. |
| 18 | **MR. DUNNE:**  Brian Dunne for advertiser Plaintiffs. |
| 19 | **MS. MEHTA:**  Good morning, Your Honor, Sonal Mehta from |
| 20 | Wilmer Hale on behalf of the Defendant Meta Platforms, Inc. |
| 21 | With me is my partner Molly Jennings and with us today is |
| 22 | Associate General Counsel of litigation at Meta Platforms, Eric |
| 23 | Meiring. |
| 24 | **THE COURT:**  What about Netflix? |
| 25 | **MS. SESSIONS:**  Good morning, Your Honor, Justina |

1  Sessions from Wilson Sonsini for Netflix and Mr. Hastings.

2      I'm also joined today by a representative from Netflix,

3  Asa Wynn-Grant.

4          **THE COURT:**  Okay, it's Justina with an A at the end?

5          **MS. SESSIONS:**  Correct.

6          **THE COURT:**  Let's just march through your seven

7  issues.

8          **MR. TERUYA:**  Your Honor, before the Court turns to the

9  discovery disputes and the letter briefs, Ms. Scarlett and I

10 wanted to quickly address a couple of case management issues.

11         **THE COURT:**  Okay.

12         **MR. TERUYA:**  One issue relates to the structured data

13 issues discussed at pages 4 through 5 of the joint case

14 management statement.

15         **THE COURT:**  Yes.

16         **MR. TERUYA:**  Happy to report that consumer Plaintiffs

17 and Meta have reached an agreement regarding the present

18 disputes.  This is over the FTC data, the Mint portal data, and

19 the structured data requests, the fifth set of document

20 requests.  We have reached an agreement over the present

21 disputes.  And if there's any future dispute, we will promptly

22 meet and confer and if necessary, bring it to the Court's

23 attention.

24         **THE COURT:**  You can cross that one off.  All right.

25 Structure data is out.  All right.  Good, okay.

1      **MS. SCARLETT:**  The second issue we would just like to

2  discuss briefly is the production of documents and keeping this

3  case on schedule.  We have less than 60 days to go until the

4  close of fact discovery --

5      **THE COURT:**  How about this, that probably relates to

6  some of these discovery issues.

7      **MS. SCARLETT:**  There's a separate ask from us, the

8  consumer Plaintiffs, that are separate and aside from the

9  discovery briefs; and that's that Meta certify next week that

10  its finished with its productions or tell us how many documents

11  remain, what custodians they are impacting, and when they think

12  they are going to finish production.

13      We have been undertaking depositions of high-level

14  executives; and after those depositions have finished, we have

15  been getting documents numbering in the hundreds that relate to

16  those depositions.

17      There's one very clear example that happened this week,

18  Your Honor.  I deposed Mr. Schultz, who stood here before you

19  at the market tutorial, and only on Tuesday night was a

20  document produced from his file that is so squarely related to

21  market definition issues.

22      There's a -- sort of an overlying Meta document that has

23  50 underlying research documents and studies by Facebook about

24  correlations in the market, natural experiments of power

25  outages, where users went, what they did.  We didn't have any

1    of these documents when we deposed Mr. Schultz weeks ago.

2          Your Honor, at this time what we are asking you to do is

3    to make sure that we know by next week that these productions

4    are complete, and I'm just putting a marker down.

5          We are kind of on our heels looking at these hundreds of

6    documents that have been floating in every day.  We might come

7    back and ask for some of these high-level depositions to be

8    reopened with documents that were late produced that we this

9    think are critical to our case.

10         **THE COURT:**  All right.  There is nothing for me to do.

11         **MS. SCARLETT:**  There is.  We would like Meta to either

12   certify next week their productions are complete or tell us how

13   many documents are remaining and what components they relate

14   to.

15         **THE COURT:**  Is next week the deadline?

16         **MS. SCARLETT:**  We have less than 60 days left.  We

17   just need to have some finality here in terms of the document

18   production.  I have never seen anything like this.

19         Every day we get a new production letter with additional

20   documents with no explanation of what they are, and we have our

21   reviewers not only preparing for these depositions that are

22   happening every day but then for closed depositions, we need to

23   send them back to go look and see what else was produced for

24   Mr. Schultz's files that I didn't have at the time I deposed

25   him.

1          **MS. MEHTA:**  Your Honor, may I address that?  There's a

2    few different things going on here.  I want to first address

3    the example that Ms. Scarlett just gave because I think it is

4    actually indicative of the overall problem of the requests they

5    are making.

6          Those documents that were produced this week were produced

7    in response to a specific request for them for hyperlinks where

8    we had addressed with you in an earlier status conference that

9    when they had hyperlinked documents that they wanted to

10   receive, they would send us the hyperlink.  We would collect

11   the documents, and we would produce them.

12         If they asked for a hyperlink, we will turn the documents

13   over.  That's exactly what we did.  If they wait to ask for the

14   hyperlink until recently, then we can only produce the

15   documents after they make the request.

16         The overall problem here is that they have been continuing

17   to ask for things.  They have been continuing to follow up on

18   requests.  We are working around the clock to respond to their

19   various requests, and the things that they are contending are

20   late produced are things like privilege downgrades from the FTC

21   litigation.

22         **THE COURT:**  Okay.  I don't -- I really -- you know,

23   you all -- I'm -- it's 11:00 p.m. at the party and I just

24   walked in.  I don't -- I can't.  There's nothing I can -- if

25   you have a concrete dispute, you can send it to me.  I can't do

1    anything sort of on the fly.

2        Okay.  Let's get into the disputes.  I'm just going to do

3    it in my order.  There's some disagreement about the start time

4    for Nick Clegg.

5            **MS. MEHTA:**  Your Honor, there's no joint dispute here.

6    I honestly I don't think we needed to have in the statement a

7    back-and-forth about deposition start times.

8            **THE COURT:**  Is this one done?  I don't have to do it?

9            **MS. MEHTA:**  They cancelled the deposition two days

10   before.

11           **THE COURT:**  It's over?  No Nick Clegg?

12           **MS. SCARLETT:**  Remove it from your list, Your Honor.

13           **THE COURT:**  What's that?

14           **MS. LAWRENCE:**  I'm not saying that we are not going to

15   request his deposition.  For right now, Your Honor, there's

16   nothing for you to decide.

17           **THE COURT:**  Okay, I will consider that terminated.

18   That takes care of, it looks like, docket number 174.  Docket

19   number 553 with respect to structured data is resolved.

20       Let's see.  I'm just going to go down my list here.  It

21   looks like you had some stipulations at docket number 540 and

22   541 about various business records exceptions.  Okay.  I mean,

23   I'm -- if you want them that's fine with me.

24           **MS. MEHTA:**  Thank you, Your Honor.

25           **THE COURT:**  Consider those done.  All right.  Let's

see.  Okay.  Meta's request -- this is docket number 485 --
Meta's request for relief.  These are your words (as read:)
"Meta's request for relief from advertisers, violations of the
protective order."  All right.  Ms. Mehta.

     **MS. MEHTA:**  Yes, Your Honor, thank you.  So the
protective order is very clear.  What it says is you can show a
deponent a document if they are the author, the addressee, the
recipient, the custodian, the source of the document or you had
a good-faith basis to believe that they were one of those
things or otherwise previously had access to the document.

     That is not an unusual provision in the Court's model
order for highly confidential material and trade secret.  In
patent cases we have a very similar provision.  In fact, in
that one it just says you can only show highly confidential
material to an author or recipient of the document.  You don't
even have that good-faith penumbra that we added to the
protective order in this case.

     The problem that we are having is consistently, deposition
after deposition after deposition -- and every time we have
asked them, they refuse to even promise they won't do it going
forward -- they are showing protected, confidential and highly
confidential documents to people that never had the document,
never would have had access to the document.

     And they have -- when we have asked what their good-faith
basis is to show that material to the person, they have refused

1   to answer and they have said that even though the protective

2   order says that, they have no obligation to articulate a

3   good-faith basis.  And the problem with this is --

4          **THE COURT:**  We can pause right there.  Okay.  You

5   agreed not to do that, so why are you doing that?

6          **MS. LAWRENCE:**  I don't think that's a fair

7   representation of what's actually going on.

8          **THE COURT:**  Well, I'm reading the provision in the

9   protective order.  It says that you agree -- you, with Meta --

10  agree that the document will be shown, confidential or highly

11  confidential, will be shown to a witness only where the party

12  has a good-faith basis to believe that the deponent was the

13  author, addressee, recipient custodian or source of the

14  document or otherwise may have seen the document in some other

15  context.

16         So, that's your deal.  You are going to have to live with

17  it.  You can't just -- listen, I'm not -- this is easy.  You

18  can't show -- if Mark Zuckerberg -- Zuckerberg, right?  -- it's

19  Mark Zuckerberg.  Mark Zuckerberg writes a confidential memo

20  to -- highly-confidential memo -- Mark Zuckerberg writes a memo

21  to the party, one recipient and it's marked "highly

22  confidential," only Zuckerberg and the one recipient get to see

23  it.  That's what you agreed to unless you have a good-faith

24  basis that you can suggest that the witness you want to show it

25  to, who is not on the face of the document and otherwise has no

1  connection to it on any obvious way, somehow may have seen it.

2  Okay.  So that's the rule.  All right.  Let's go to --

3          MS. LAWRENCE:  Your Honor, if I may just say --

4          THE COURT:  That is the rule.  I'm not taking any

5  argument on it.  This is your deal.  I'm going to enforce it.

6      Okay.  Docket number 486, which is the unsealed of 487-3,

7  Plaintiffs request for relief from Meta's -- is this what we

8  just heard about, incomplete document production?  No?  No?

9  Okay.  Different one?  Okay.

10     This is Meta -- Plaintiff's believe Meta has withheld

11  several hundred thousand documents -- oh, privilege review.

12  Okay, go ahead.

13         MR. DUNNE:  Yes, Your Honor.  So this dispute arises

14  out of the -- one of the first things that happened in this

15  case back in, I believe, May 2021 or thereabouts was that -- it

16  was Facebook at the time -- they were ordered to produce to

17  Plaintiffs in this case all documents produced or -- in the FTC

18  investigation into Facebook antitrust.

19         THE COURT:  In the House of Representatives?

20         MR. DUNNE:  Yes, correct.  And what we received at

21  that point or within the couple of months after that was a --

22  approximately 4 million documents -- 3 million probably -- from

23  Facebook and a million entry privilege log.

24         THE COURT:  Right.

25         MR. DUNNE:  Now, in the intervening year, year and a

```
 1   half, in which discovery has proceeded in this case, we have
 2   negotiated --
 3            THE COURT:  Two years.
 4            MR. DUNNE:  Well --
 5            THE COURT:  May 2023.
 6            MR. DUNNE:  I agree, Your Honor, but this is -- so I'm
 7   going through a little bit of a time process here.
 8            THE COURT:  Oh, I see.
 9            MR. DUNNE:  We spent about a year and a half
10   negotiating custodians, negotiating search terms, negotiating
11   the scope of the responses to our document requests in this
12   case.  And in every one of those steps -- every one -- the
13   first position from Facebook was "We are not going to rereview
14   anything that came up in this FTC investigation."
15            THE COURT:  You mean on the privilege logs?  We are
16   not reviewing any privilege log entries?
17            MR. DUNNE:  No, no, no.  Their position was if it was
18   part -- if it was a custodian from there --
19            THE COURT:  Oh, I see.
20            MR. DUNNE:  -- if it was a subject from there, if it
21   was a custodial subject.  So, for example, if it was a vice
22   president of partnerships and he had been produced documents in
23   the FTC regarding, say, some sort of agreement, right, or API
24   agreements or whatever, right, they would say, "We are going to
25   remove that from the custodians and search terms that we are
```

1    going to do in this case for efficiency reasons."

2         So, for two years -- now two and a half years -- the scope

3    of discovery has had approximately a million documents that

4    have just been nevers.  We don't go there.  We won't look at

5    them.  We won't review them.

6         Now, we found out at the end of 2022, early 2023, that, in

7    fact, that privilege log that had withheld one million

8    documents from our entire case, from reviewing in this case

9    things that would have been responsive to our RFPs, things that

10   would have been responsive for custodial searches and for

11   choosing custodians, that those -- that that privilege log was

12   by Meta's own admission in federal court 60 percent wrong.  And

13   so now --

14            THE COURT:  They admitted that here?

15            MR. DUNNE:  They admitted that in the District of

16   Columbia, which we found out by me going out to the docket

17   because I was looking for something else and I read a status

18   report.  No one ever told us in this litigation.

19            THE COURT:  Meta told a district judge in D.C. that

20   60 percent of their privilege log was wrong?

21            MR. DUNNE:  Yes, this privilege log.  And so that's

22   why --

23            THE COURT:  How can that be?

24            MS. MEHTA:  Your Honor, can I correct a few things

25   that I think were said there?

1     **THE COURT:**  Let's just focus on the -- I want to hear

2  the rest of the argument -- just on this one 60 percent issue.

3     **MS. MEHTA:**  I don't think that's a fair

4  characterization of what happened.  So, there were 330,000

5  entries on the logs and over the course -- and that was from

6  the investigation.  That's not from the litigation.  That's

7  from the pre-suit investigation in the FTC matter, which was

8  sweeping.

9     And over the course of the litigation between the FTC and

10 Meta, there have been a tremendous number of discussions

11 between the FTC and Meta about the privilege log, different

12 questions, different follow-up items.

13     Through that the parties in that litigation came up with a

14 sampling process to look at the overall log and sample

15 subsections of it including subsections that were identified

16 specifically by the FTC.

17     In some of those samples there was a relatively high

18 rereview rate of 60 percent, but that was also because of the

19 way those samples were chosen.

20     Overall in that litigation, based on a privilege log that

21 was done in an investigation years ago, there has already been

22 a rereview of one-third of the 330,000 documents, over

23 one-third of the 330,000 --

24     **THE COURT:**  When you say there was a rereview rate of

25 60 percent, you're saying that --

```
 1            MS. MEHTA:  I'm saying there was either a downgrade or
 2    a change to a redaction.
 3            THE COURT:  You took them off the privilege log, in
 4    other words?
 5            MS. MEHTA:  Or we changed the redaction.  So not
 6    always would you actually downgrade it from a privilege log.
 7    You might adjust a redaction but only as to particular samples,
 8    not as to the whole log.  And, of course, that gets into the
 9    sampling methodology and all of that.
10            THE COURT:  Is it Mr. Dunne?
11            MR. DUNNE:  Yes, Your Honor.
12            THE COURT:  So, you want them to do the same thing for
13    the one million entry?
14            MR. DUNNE:  Whatever is left, Your Honor, because it
15    has been taken out from our entire scope of discovery, and we
16    now know that there's -- by the way, we put in our letter
17    brief --
18            THE COURT:  There's smoke.  You want to see if there
19    is fire.
20            MR. DUNNE:  And on page 1, Your Honor, we cite to the
21    entry from that District of Columbia litigation where in a
22    joint filing they say it's a 50 percent downgrade rate.
23            THE COURT:  Let's do this:  Let's take a sample, how
24    about that?
25            MR. DUNNE:  Okay.
```

1          **THE COURT:**  Do the same test, okay.  I like that.  I

2    always like representative samples.  So there are a million

3    entries.

4          **MS. MEHTA:**  It's not a million, Your Honor.  It's not

5    a million.  It's 330,000.  And of that over 150,000 have

6    already been rereviewed and they already have all of the

7    results of that rereview.

8       I mean, that's what I'm trying to get at if I can just

9    have one minute, this is a process that's already almost

10   complete in the District of D.C., rather, because it relates to

11   the investigation in that litigation.

12      There were 300,000 --

13         **THE COURT:**  It's a different log, though, isn't it?

14         **MS. MEHTA:**  No.  It's the same log because this is

15   just the reproduction.

16         **THE COURT:**  Is it the same log?

17         **MS. MEHTA:**  They have had these logs since July of

18   2021.

19         **THE COURT:**  Is it the same log?

20         **MR. DUNNE:**  Yes, Your Honor.

21         **MS. MEHTA:**  And they have had the logs since July of

22   2021, and they never said anything.  Then while our parallel

23   case is happening in D.C. -- there has been a rereview -- all

24   of the results from that rereview, we have already given to

25   them.

1          So they have already gone through a process of the 330,

2     the sampling, everything that Judge Boasberg and Meta and the

3     FTC have gone through, they have the results from and more than

4     a third, 150 out of 330 have already been rereviewed and given

5     to them.  So the idea that we are now --

6          **THE COURT:**  What about the remainder?  What about the

7     other roughly 160?

8          **MS. MEHTA:**  The other roughly 160 have not been

9     subject to the rereview even though there has been extensive

10    litigation about sampling and all of that, there's no rereview

11    for that other 160 because there hasn't been a reason to do

12    that rereview between the FTC, Meta or Judge Boasberg.  So what

13    they are asking for now --

14         **THE COURT:**  Hold on.  So is that what you want, the

15    160?

16         **MR. DUNNE:**  Yes, Your Honor.

17         **THE COURT:**  Just the 160?

18         **MR. DUNNE:**  We would like a reasonable sample.  They

19    have to determine a downgrade rate.  Because that's just

20    160,000 documents, we don't know what's in there.  We do know

21    definitely, statistically, that it is very likely there are ten

22    thousands --

23         **THE COURT:**  What is 10 percent of 160,000?

24         **MR. DUNNE:**  Which percent?

25         **THE COURT:**  What is 10 percent of 160,000?

1           **MR. DUNNE:**  16,000.

2           **THE COURT:**  Seems like a lot.

3           **MS. MEHTA:**  Your Honor, I just want to put one piece

4    of context around this because they are asking for this with

5    respect to the 160 where the FTC has already gone through and

6    asked for sampling and all of that.

7           **THE COURT:**  I understand.  But they are not the FTC.

8    They have got their case and I am -- the FTC is not their agent

9    for --

10          **MS. MEHTA:**  Understood, Your Honor, but this wasn't

11   their production either.  This is not documents that were

12   requested by the Plaintiffs.  This is just a flip of the

13   production from the FTC investigation.  On top of that --

14          **THE COURT:**  Okay.

15          **MS. MEHTA:**  -- there have been 78 custodians.

16          **THE COURT:**  Yes, thank you.  All right.  16,000 seems

17   like a lot.  What do you consider -- how about a random sample

18   of 5,000?

19          **MR. DUNNE:**  That works.

20          **THE COURT:**  That would be like 9,000; right?  8,000?

21          **MR. DUNNE:**  That works for Plaintiffs, Your Honor.

22          **THE COURT:**  Now, when you do this rereview, what do

23   you do?

24          **MS. MEHTA:**  Yes, Your Honor.  So, first of all, I

25   would ask that we do a random sample of a thousand to start

1   because we need to see -- we have a lot of work to do.  We have

2   to close discovery, and given the amount of rereview --

3           **THE COURT:**  A thousand is less than 1 percent.  That's

4   just not enough.

5           **MS. MEHTA:**  But they have already done more than

6   30 percent of the log.

7           **THE COURT:**  Ms. Mehta, we are pass that now.  Now we

8   are on the "fix it" portion.

9           **MS. MEHTA:**  Okay.

10          **THE COURT:**  So one percent is not enough.

11          **MS. MEHTA:**  Can we do 2,000 documents and then what we

12  are going to do is -- I'm worried about speed, Your Honor.

13  That's what it is.  It's time.

14          **THE COURT:**  I'm not an auctioneer, okay.

15      I just want to -- maybe that's too many.  Okay.  Let's

16  answer my question.  Everyone stop talking except for direct

17  answers to my question.  When you do the rereview, what happens

18  in the rereview?

19          **MS. MEHTA:**  So we would want to negotiate with them

20  over a random sample.  Then we would have --

21          **THE COURT:**  No, no.  Someone is sitting down and

22  saying -- I have some poor associate who has been tasked with

23  re-reviewing.  What is that person going to do?

24          **MS. MEHTA:**  They are going to look at the document

25  that was already looked at by an attorney, but they will look

1    at it again; determine whether there's any reason to change the

2    privilege designation; either downgrade it because it is not

3    privileged or change a redaction if there is a redaction.

4         **THE COURT:**  How are they going to make that decision?

5         **MS. MEHTA:**  In the same way that any reviewer makes a

6    decision as to privilege which is we look at the document to

7    determine whether it either is soliciting or giving legal

8    advice, it is confidential, the same way we look at every

9    document.

10        **THE COURT:**  And to or from an attorney on the

11   transmission line?

12        **MS. MEHTA:**  Either to or from an attorney on the

13   transmission line or otherwise transmitting attorney advice.

14        **THE COURT:**  All right.  So, it is going to be a

15   substantive review.  I don't want to make it too much.  So how

16   about -- how about 2,500 to start?

17        **MR. DUNNE:**  Yes, Your Honor.

18        **THE COURT:**  Are these like e-mails or something?

19        **MS. MEHTA:**  A lot of them are e-mails or messages.

20        **THE COURT:**  Okay.  So most of them are not going to be

21   that hard.  In my day we used to do bankers boxes.  You-all

22   don't even know what that is.  It a box that contains 6,000

23   printed pages.  So this is a third of a banker's box.

24        If you were not capable of knocking out a banker's box per

25   day as an associate, you did not get a bonus.  So, I'm

1  confident that -- I know.  It's a different world now but --

2  this is not a Paul Hastings moment.  This is just the way life

3  was in 1990s for associates.  Things have changed in a

4  beneficial way, I'm sure.  Somebody can do this.  2,500

5  documents shouldn't take more than two days.  So burden seems

6  reasonable.  Now --

7              MS. MEHTA:  Your Honor --

8         THE COURT:  Now, you will do that.  Get a hit rate.

9  Get a hit rate.  See what the hit rate looks like, and then you

10  two can talk from there.

11        MS. MEHTA:  Your Honor, we are happy to do the 2,500

12  if that's your order.  It is not going to be possible to do it

13  in two days because --

14         THE COURT:  No.  I'm not saying do it by Tuesday.  I'm

15  saying as a practical matter, it's not going to take more than

16  two days of some associate's time to do that, most

17  realistically.

18      Looking at an e-mail and deciding whether this is legal

19  advice, to and from clients and lawyers, is not that hard.  I

20  have done a lot of it.

21      So anyway, that's a figurative way of my saying, "This is

22  not going to be a $12 million project."  That's all I'm talking

23  about.  When you actually finish it, let's talk about that.

24  How much do you want?  Two weeks, what do you want to do?

25             MS. MEHTA:  Your Honor, the first thing I would like

1  to do is meet and confer with them on how we identify the

2  sample.

3          **THE COURT:**  You do it.  You have a list; right.  It's

4  numbed.  It's a privileged log.  So every log has a unique

5  identifying number.

6          **MS. MEHTA:**  We will need a random sample.  That's

7  right.

8          **THE COURT:**  Just do a random -- here is what you do:

9  Take 1 to 160.  Do one of those random number generators.

10  Figure out -- just have it generate random samples; okay.  All

11  right.  And then you will do that, and then you will share the

12  results with Mr. Dunne; and you can decide whether you are okay

13  with or whatever you want to do after that.

14          **MR. DUNNE:**  Yes, Your Honor.

15          **THE COURT:**  How long do you want, two weeks?

16          **MS. MEHTA:**  If we can have three weeks, if we can do

17  it less than that, we will.  There is a lot of processing time

18  that goes into pulling the documents, to the platform,

19  reviewing them, reproducing them, and the technology --

20          **THE COURT:**  It is all electronic; right?  It is in a

21  database.  You just review them the way -- what's the holdup on

22  that?

23          **MS. MEHTA:**  It's not in our database because this was

24  from a production in an investigation from years ago.  It's not

25  from this case.  That's the problem.

 1              THE COURT:  Meta has full custody, possession --

 2         MS. MEHTA:  I'm not --

 3              THE COURT:  Don't talk over me, please.

 4         MS. MEHTA:  Sorry.

 5              THE COURT:  Meta has full custody, control and

 6    possession of this evidence.  Get it done.  You have two weeks.

 7    All right.  Two weeks from Monday.  Okay.  That takes care of

 8    that.

 9         Let's go on to docket number -- oh, we just did that one.

10    All right.

11                        (Pause in proceedings.)

12              THE COURT:  Oh, now we get to Netflix.  All right.

13    Come on up.  The deposition of Reed Hastings; is that right?

14         MS. SESSIONS:  Yes, Your Honor.

15              THE COURT:  What's the -- what's the issue?

16         MS. SESSIONS:  Yes.  So there are three --

17    unfortunately, three Netflix related issues before Your Honor

18    today.  The first of which is advertisers -- advertiser

19    Plaintiffs demand to take Mr. Hastings deposition.

20         Mr. Hastings is the Chairman of the Board at Netflix and

21    recently -- until recently was Netflix's CEO.  He is an apex

22    witness, and they have made absolutely no showing of a need to

23    take Mr. Hastings --

24              THE COURT:  They are doing Nick Clegg, Mark

25    Zuckerberg.  Who else are you guys doing?

1          **MR. DUNNE:**  Sheryl Sandberg.

2          **THE COURT:**  They are doing all the hits.  Why not

3    Mr. Hastings?

4          **MS. SESSIONS:**  Because Netflix is not a party to this

5    lawsuit, Your Honor, and the -- the information that the

6    advertiser Plaintiffs claim to need from Mr. Hastings is all

7    evidence that they can and should obtain from Meta.

8          **THE COURT:**  Well, you know, these are big antitrust

9    competition issues and historical situations where sometimes

10   it's the top people who have these conversation.  I'm not

11   saying anything like that happened here.  How much time would

12   you need from Mr. Hastings?

13         **MR. DUNNE:**  Two hours.

14         **MS. SESSIONS:**  Your Honor, competition issues are not

15   why advertiser Plaintiffs claim to want to take Mr. Hastings --

16         **THE COURT:**  Advertisers say that Meta and Netflix made

17   anticompetitive agreements during Hastings' tenure on Meta's

18   board of directors.  So he straddled both companies.  And so

19   two hours it is.

20         **MS. SESSIONS:**  Your Honor, they can and should obtain

21   evidence regarding those alleged agreements from Meta.

22         **THE COURT:**  Ms. Sessions, he will sit for a two-hour

23   deposition.  Now, he can do it remotely or how do you want to

24   do that?

25         **MR. DUNNE:**  We would do it remotely if he wishes.

```
 1              THE COURT:  Remotely it will be.  Two hours it is, two
 2     hours max.
 3              MR. DUNNE:  Yes, Your Honor.
 4              THE COURT:  Okay.  What's the other Netflix issue?
 5              MR. DUNNE:  There are --
 6              MS. SESSIONS:  The other issues are their document
 7     demands to Netflix and to Mr. Hastings and --
 8              THE COURT:  Okay.  So advertisers say that -- what's
 9     the issue, Mr.  Dunne?
10              MR. DUNNE:  Sure.  So there are two discrete but
11     related issues.  One is that we served document requests on
12     Mr. Hastings and the reason was because both -- there's a --
13     three entities that are all pointing to one another.  Netflix
14     said -- Netflix didn't produce any Reed Hastings' documents.
15              THE COURT:  What did you ask from him personally?
16              MR. DUNNE:  Well, so he has documents in, among other
17     things, a personal e-mail account that he used when he was on
18     the board of directors at Facebook.
19              THE COURT:  Oh.
20              MR. DUNNE:  He also -- it looks to us that he
21     communicated personally with executives potentially on his
22     electronic devices, and we just want them to make a reasonable
23     search.
24              THE COURT:  All from personal accounts?
25              MR. DUNNE:  Yes, correct.
```

```
 1              THE COURT:  I see.
 2              MR. DUNNE:  And then the other thing is the Netflix --
 3              THE COURT:  Just --
 4              MR. DUNNE:  Sure.
 5              THE COURT:  I imagine these are very narrowly tailored
 6    requests?
 7              MR. DUNNE:  Yes.  They just refuse to substantively
 8    even discuss them.
 9              THE COURT:  I'm asking about you.  They are narrowly
10    tailored requests?
11              MR. DUNNE:  Yes.
12              THE COURT:  All right.  Can you give me an example?
13              MR. DUNNE:  Sure.
14                        (Pause in proceedings.)
15              MR. DUNNE:  It would be -- I should have the requests
16    here --
17              THE COURT:  It doesn't have to be exact.
18              MR. DUNNE:  Right.  No.  Yeah.  So, documents,
19    communications with Facebook regarding Facebook watch and
20    competition issues in connection with Netflix during the
21    relevant period.
22              THE COURT:  Really, you just want to know, does he
23    have any personal stock not --
24              MR. DUNNE:  Correct.
25              THE COURT:  -- not on the Meta or Netflix servers?
```

1          **MR. DUNNE:**  Yes.  I won't talk over you, Your Honor.

2          **THE COURT:**  That's it; right?

3          **MR. DUNNE:**  Yes, that's the starting point of this.

4     The starting point of this is --

5          **THE COURT:**  Isn't that the end point?

6          **MR. DUNNE:**  -- Netflix doesn't have it if Facebook

7     doesn't have it.  That's what we are --

8          **THE COURT:**  You are just checking to see if he has a

9     third avenue of communication?

10         **MR. DUNNE:**  Yes.  Some of the requests are very, very

11    bespoke such as communications with Mark Zuckerberg or Sheryl

12    Sandberg regarding Facebook watch, things that are alleged in

13    our complaint.

14         **THE COURT:**  Seems okay.  What's wrong with that?

15         **MS. SESSIONS:**  Well, Your Honor, they have the other

16    half of those communications.  They are asking for Mr. Hastings

17    communications with Netflix.  They can and should obtain that

18    information from Meta, who is a party to this case.

19         And in their motion they cited what they claim to be

20    communications between Mr. Hastings and Meta employees that

21    they obtained in discovery from Meta in this case.

22         So there's simply no reason to burden a third party with

23    going out and looking for communications that they can obtain

24    from a party to this case because communications with Meta

25    necessarily occurred with Meta, and that's discovery that they

1    can and should get from them.

2          THE COURT:  Well, you know, they are allowed to

3    check -- look, I -- I and many of my colleagues embrace the

4    proposition that typically the starting point for third parties

5    is they don't owe the time of day to anybody.  That's the

6    starting point.  But this case has enough in it that a

7    deposition is warranted and just check his personal e-mail for

8    whatever was served that's responsive for the things.  Okay.

9    That takes care of that one.

10         Now, next one is --

11         MR. DUNNE:  Your Honor, if we may, there's one more

12   Netflix --

13         THE COURT:  Oh, one more Netflix?

14         MR. DUNNE:  Yes.  That's our motion to compel

15   documents, and this I will answer based on what you just asked.

16         THE COURT:  From who?

17         MR. DUNNE:  We move to compel documents from Netflix

18   or letter brief because we served a subpoena on them in May,

19   I believe, of 2021.  The document requests, we recite them in

20   our letter to Your Honor, and we -- every single one, every

21   single one, has a carve-out that not what was -- not what Meta

22   would have in its custodial records, right, communications

23   with -- communications internally about your communications

24   with Netflix, documents not -- right, that Meta would not have.

25         And in response to that, over really two years later now,

```
1   we have gotten a grand total in this entire case between us and

2   Meta, 72 documents from Netflix, Netflix who is alleged to be a

3   coconspirator here.  I will tell you --

4        THE COURT:  Maybe you are wrong.

5        MR. DUNNE:  I know, absolutely; right.  But we

6   can't --

7        THE COURT:  It's not that they are hiding.  They are

8   only 72 documents.  Why am I -- that number doesn't say

9   anything to me.

10       MR. DUNNE:  Well, one of the requests is for Reed

11  Hastings' communications about their competition with Facebook

12  watch.  We don't have a single document on that.

13       We don't -- we actually -- the 72 documents I just wanted

14  to use as basically an example of how small it is, but you are

15  absolutely right.  The thing that really matters is the

16  substance.

17       We haven't gotten a single document that's responsive to

18  our actual requests.  We have gotten privacy policies.  We have

19  gotten an overview of their content distribution network, but

20  we haven't had anything that says, "Look, how is our

21  competition with Facebook doing?  What's the deal with our CEO

22  being on the board of one of our new nascent largest

23  competitors?"

24       I find that very, very, very difficult to believe that

25  there are zero documents at Netflix --
```

1          **THE COURT:**  Really?  You think a Netflix employee is

2  going to e-mail another -- e-mail another one at Netflix and

3  say, "Hey, why is our boss" -- I don't think they are going to

4  say that.

5          **MR. DUNNE:**  I'm hopeful.  I honestly don't think that

6  this --

7          **THE COURT:**  Did you look?

8          **MS. SESSIONS:**  Your Honor --

9          **THE COURT:**  You looked?

10         **MS. SESSIONS:**  I will tell you --

11         **THE COURT:**  You need to answer just my questions.  We

12  are going on 11:30, and I feel like I'm supervising recess

13  right now; okay.

14      Did you look?  If you didn't look, you are going to look.

15  Did you take the searches, look through Netflix documents, and

16  determine that you had nothing responsive or did you not even

17  look?

18         **MS. SESSIONS:**  We searched for -- we did a custodial

19  search of the documents for Netflix's director of competitive

20  intelligence, and we also surveyed the team responsible for

21  analyzing competition.

22      And so the custodial search that we did involved a word

23  search for words like Meta or Facebook or Instagram and other

24  things and competition.  And --

25         **THE COURT:**  All right.  So, you did a search.  And so

1    that's all they came up with.

2         **MS. SESSIONS:**  Your Honor, and this -- this sort of

3    side issue of internal discussions at Netflix I think is so far

4    afield from the relevance, if at all, of Netflix.

5         **THE COURT:**  All right.  Let's just pause there.  They

6    did a search and you got what they got.  So what's the issue?

7         **MR. DUNNE:**  So well, one of our things asks

8    specifically for Reed Hastings' Netflix documents on these

9    issues.  Sounds to me like they didn't search for his Netflix

10   documents.

11        **THE COURT:**  You know, you two chat about this more.  I

12   can't help you.  You two work that one out, and I'm going to

13   send it back to you.

14        **MS. SESSIONS:**  Your Honor, may I -- I understand

15   Your Honor's ruling on the deposition; but I would just say

16   since Your Honor has ordered us to go and do additional

17   searches in Mr. Hastings' e-mail, I would submit that we should

18   do that before any deposition is ordered, before any -- before

19   we impose on his time as he is an apex witness and the

20   Plaintiffs --

21        **THE COURT:**  I'm sure you would like the documents

22   before you talk to him?

23        **MR. DUNNE:**  Yes, Your Honor, I think that would be the

24   correct sequence.

25        **THE COURT:**  I just assumed that would happen.  Is

1  there any issue with that?  Is there an issue with that?  Why

2  are we talking about this?  Is there an issue with that?

3       **MS. SESSIONS:**  I'm just asking for the opportunity to

4  do that search and then continue to meet and confer with the

5  Plaintiffs before Mr. Hastings is ordered to sit for any

6  deposition because there may be nothing there.

7       **THE COURT:**  It is up to Mr. Dunn.  If he wants to take

8  the deposition based on just what he has and whatever you

9  produce from Reed Hastings' personal e-mail, it's up to him.

10  If he wants to wait until you get all this other stuff worked

11  out, then you two -- this is not for me; okay.  You two work it

12  out.

13       Okay.  Yikes, we are only on number 5.  Advertisers'

14  request for relief from Meta's 30(b)(6) -- okay, this is docket

15  number 510 unsealed, 511-3, and advertisers think that somebody

16  with respect to a machine wasn't adequately prepared.  Is that

17  the issue?

18       **MR. BATHAEE:**  That's right, Your Honor.  The key issue

19  here is the changes made to Facebook's Deep Neural Network

20  systems, before and after the agreements with Netflix and the

21  agreements with Ebay.

22       We need to show that there were changes made that were

23  economically irrational but for their anticompetitive effect.

24  We need to prove those changes at trial.

25       Now, we can do that by deposing five engineers.  We

1   thought it made more sense to ask for a 30(b)(6); get a sense

2   of what systems are involved, how they changed, how to find

3   them, how to identify them, so we can at least have a

4   conversation or serve ROGs.

5       We got to the deposition -- and I can't go into the detail

6   of the testimony because it's all sealed.  We got to the

7   deposition.  The witness couldn't tell us anything about the

8   period before he showed up to work.  I was showing him

9   documents --

10       **THE COURT:**  What period did you ask for for the

11   30(b)(6)?

12       **MR. BATHAEE:**  From '16 to '20.

13       **THE COURT:**  2016 to 2020.

14       **MR. BATHAEE:**  That's right, Your Honor.

15       **THE COURT:**  The witness said he was prepared -- is it

16   a he or she?

17       **MR. BATHAEE:**  He.

18       **THE COURT:**  For what period?

19       **MR. BATHAEE:**  The first quarter of 2019 is when he

20   started.  And he could tell you only about his small little

21   group on ad ranking after the period he started.  The period

22   before he said he talked to some people but then could give us

23   no details about anything.

24       **THE COURT:**  A 30(b)(6) just has to be reasonably

25   prepared.  If he say, "Hey, I didn't get here until 2019.  Let

1    me talk with my older -- my more established, longer term

2    colleagues," what's wrong with that?

3         **MR. BATHAEE:**  There is nothing wrong with that except

4    this guy wasn't even close.  He had absolutely no details.  At

5    one point I asked him about the data that went into their Deep

6    Neural Network systems, and he told me it's some combination of

7    first and third party data.  And, Your Honor, there is no

8    second party data.  He is just saying "We trained with data."

9         I mean, that's not useful I can get that off the internet

10   with a Google search.  I was not even able to identify what the

11   models were.  How do I tell what features were in the Facebook

12   feature framework, which is the center of our integration

13   exclusionary act.

14        I got literally nothing to use in that deposition.  And,

15   in fact, when we started taking fact depositions -- and we had

16   to burn lots of fact deposition time to get the information,

17   some of it at least that we needed -- we found out half the

18   stuff he told me wasn't even correct including from senior

19   people like Chris Cox.  He told me he couldn't get certain

20   information and we have senior executives telling us readily

21   available to them.

22        **THE COURT:**  What do you want me to do?

23        **MR. BATHAEE:**  I would like the hours back, Your Honor,

24   and I would like another -- a prepared witness to sit at least

25   for some number of hours in addition.

1          **THE COURT:**  Was it a seven-hour deposition?

2          **MR. BATHAEE:**  It was a six hours -- six hours and a

3    few minutes.

4          **THE COURT:**  Okay.

5          **MR. BATHAEE:**  And if I can have the six hours back

6    because we blew quite a few hours in 30(b)(1)s because of this,

7    I would like the six hours back and hopefully a prepared

8    witness that can talk to us on those topics.

9          **THE COURT:**  Ms. Mehta?

10          **MS. MEHTA:**  May I respond, Your Honor?  Thank you.

11          So, first thing is the person that we put up is a senior

12    engineer that leads the team that's responsible for machine

13    learning and ad ranking.  He then spoke to at least four

14    different people at the company including people that had been

15    responsible for those systems dating back to April of 2015.  He

16    looked at documents.  He talked to all of those people.  He

17    came.  He was prepared to testify.

18          The real problem here is the breadth of the topic that

19    they requested.  The topic was (as read:) "artificial

20    intelligence machine learning algorithms, software and systems

21    used in connection with Meta's ad and content targeting during

22    the relevant period including the data sources."

23          That's an incredibly broad topic for a company like Meta.

24    Three weeks before the deposition we wrote them and we said we

25    are going to --

1      **THE COURT:**  I just -- I'm drowning in details I have

2  no hope of understanding.  So here is what you are going to do:

3  You two meet and confer -- you two personally -- see what you

4  can work out.  If they need another hour or two to close the

5  chapter on this, let's do it.  I'm not going to do anything

6  else until you work something out, all right?

7      Major compromises on both sides.  Just get it done.  There

8  is no way for any district judge or magistrate judge, for that

9  matter, to ever say this witness was adequately prepared or

10 not.  There just isn't.  So that complaint, I can't help you

11 with.

12     **MR. BATHAEE:**  Well, Your Honor, respectfully --

13     **THE COURT:**  I'm turning this to you two.  You two take

14 it and see what you can do.

15     **MR. BATHAEE:**  I asked him and he said he wasn't

16 prepared.  I put quotes in there.  The guy said he wasn't

17 prepared, literally on things within scope.  There's one point

18 he says, "It is within scope but not in my preparation."  So I

19 don't know --

20     **THE COURT:**  That's for your discussion.  Why don't you

21 make a list for those, and I'm sure Ms. Mehta will be quite

22 reasonable saying yes, that's fair.  It's fair; right?

23     **MS. MEHTA:**  I will be reasonable and I will do my best

24 to work it out.

25     **THE COURT:**  All right.  Good.  This is the last one --

oh, no, second to last.  Oh, this one is -- okay, this is with

respect to Mark Young, Plaintiff Mark Young.

**MS. MEHTA:**  Yes, Your Honor.  So this one I really --

I'm sorry to say that we had to bring this to the Court.  There

was -- there's a named Plaintiff who testified in his

deposition that he was advertising books that he was selling

for other business -- he has a number of associated

businesses -- he is advertising those.  We asked him if he had

produced documents relating to the advertising of those books

on channels other than Meta, which he did for some of his

businesses, not for others.

Afterwards, we met and conferred with them and we said,

"Look, did you search for those documents?  Do they exist?  If

they exist, will you produce them?"  And we just can't get a

straight answer as to whether they searched for the documents,

if they exist or they don't exist.

**THE COURT:**  Okay.  So, the contents of the books are

not at issue?

**MS. MEHTA:**  No, just the advertising purchases.

**THE COURT:**  All right.  What's the answer?

**MS. LAWRENCE:**  We searched for the documents.  They

don't exist, Your Honor.

**THE COURT:**  They don't exist?

**MS. LAWRENCE:**  They don't exist.

**MS. MEHTA:**  I wish we had heard that the multiple

1    times we asked them before but we will --

2           THE COURT:  All right.  That resolves 525, okay.  Last

3    one, another privilege issue, overbroad, this is dockets number

4    529, unsealed, and 528-3, sealed.

5        Plaintiffs request -- Meta's overbroad assertions of

6    privilege assertions according to Plaintiffs with the

7    entertaining example of an attorney telling someone if you --

8    don't -- okay.  All right -- don't use my name and say that I'm

9    on it just for privilege.  Just add me in the to line.  Okay.

10   Not great advice.  Anyway, what's the issue?

11          MS. LAWRENCE:  The issue is twofold, Your Honor, the

12   first is the quality of the privilege log and --

13          THE COURT:  Isn't that the same thing we just did?

14          MS. LAWRENCE:  I was just about to say that --

15          THE COURT:  Which one is this?

16          MS. LAWRENCE:  This is the log produced in the Klein

17   matter.

18          THE COURT:  Oh, in Klein.

19          MS. LAWRENCE:  To date it is roughly 99,000 entries

20   completely separate from the FTC.

21       I'm going to try to be as direct as I can.  The first is

22   the quality of the entries, they do not comply with

23   Your Honor's standing order.  They don't give the subject of

24   the communications.  They give general categories.

25          THE COURT:  Okay.

1                **MS. LAWRENCE:**  The second issue --

2           **THE COURT:**  Why is this just now coming in?  Haven't

3      you had the privilege log forever?

4           **MS. LAWRENCE:**  That's what Meta says.  If you look at

5      it, 99 percent of the entries on the privilege log we received

6      in the last four months.  Indeed, 66 percent of the entries we

7      received on February 17th, 2023.

8           So after February 17th, we quickly wrote them; we met and

9      conferred on March 30th and reached an impasse and filed with

10     this Court in early April.  So if you use the February date as

11     the operative date, we have been expeditious at this.

12          **THE COURT:**  Well, let's just start with that.  You

13     think the descriptive category is too cursory; is that correct?

14          **MS. LAWRENCE:**  That's correct, Your Honor.

15          **MS. MEHTA:**  Your Honor, we have a highly, heavily

16     negotiated privilege protocol for this case where the parties

17     reached an agreement on exactly what our logs should say, and

18     our logs meet those requirements and give them details.

19          Every time they've asked a follow-up question, we've

20     followed up on it.  We have tried to be responsive and answer

21     their questions about the log.  The idea that we should --

22          **THE COURT:**  What did you agree that you would say in

23     the descriptor?

24          **MS. MEHTA:**  We would agree to provide -- let me pull

25     up the actual language of the -- my colleague may have it, the

actual language of the protocol.

          **MS. LAWRENCE:**  I have it.  It is general categories.

          **MS. MEHTA:**  Yes, it requires general categories, and we provide categories.  We have provided information about the Bates number, Meta data, custodians, privilege asserted, and the description of the reason for privilege for every document on the log in compliance with that negotiated --

          **THE COURT:**  Are you just saying legal advice?  Is that the --

          **MS. MEHTA:**  I'm sorry?

          **THE COURT:**  Are you saying legal advice in that last one?

          **MS. MEHTA:**  We are saying legal advice -- actually my colleague may be able to talk about the specific language.

          **THE COURT:**  All right.  Come on up.

          **MS. LAWRENCE:**  I have it here.  (As read:) "providing legal advice and/or prepared in anticipation of litigation," and that's repeated on and on and on without any more description of the subject of the communication.

          **THE COURT:**  That's typically how it goes.  You don't say "legal advice re X because you are revealing the subject matter that's privileged."  So what do you want me to do?  You typically just say this is work product, this is legal advice.  You don't -- you know --

          **MS. LAWRENCE:**  I will move to then to why we --

1          **THE COURT:**  That one is denied.

2          **MS. LAWRENCE:**  No, no, no, Your Honor, it is not.

3    There's a second part to it.  And that's that the categories

4    are masking the real issue, which is there are documents --

5          **THE COURT:**  Please stop.  That first question is

6    resolved and it's denied.  There is no "no" to that.  Now we

7    are moving to the second one.

8          **MS. LAWRENCE:**  Understood, Your Honor.

9          **THE COURT:**  All right.  What is the second one?

10         **MS. LAWRENCE:**  So the second one is documents on the

11   privilege log that don't belong on the privilege log, and this

12   is somewhat related but on a different log to the --

13         **THE COURT:**  Another one?  Rereview, another rereview?

14         **MS. LAWRENCE:**  There is another rereview needed.  And

15   if I use an example here, the night before -- just before the

16   deposition of an individual, we asked for a rereview of 92 of

17   her documents, 56 of them were downgraded.  That's just over

18   60 percent.  So that's the only sample we have had so far, but

19   we have reason to believe that there are documents on the

20   privilege log that don't belong on that privilege log, and that

21   it's also to the tune of the 60 percent.

22        We met and conferred and asked for a 5,000 document sample

23   and Meta refused it, so we had to bring this motion.

24         **THE COURT:**  All right.  Well --

25         **MS. MEHTA:**  Your Honor, may I respond to that briefly?

1          **THE COURT:**  Sure.

2          **MS. MEHTA:**  Your Honor, first of all, the suggestion

3     that we should have to rereview broadly is -- I think needs a

4     little bit of context, which is the documents on this log are

5     all being reviewed by two licensed attorneys before they are

6     produced -- so before they are on a log or they are redacted.

7     So we are already doing an extensive privilege review for these

8     documents.

9          **THE COURT:**  We have had pretty good evidence that a

10    lot of things aren't working out well.

11         **MS. MEHTA:**  I wanted to address that, Your Honor.  So

12    this is, of course, very different from the review from the FTC

13    investigation.  This is in this case different review team, all

14    of that is different, different privilege protocol.

15         With respect to the one example she provided of that

16    particular witness, it was less than 1 percent of all of the

17    documents for that witness on which we made any change at all

18    based on the rereview.  And that's not surprising because they

19    picked the particular documents they were interested in.

20         And just as the privilege protocol suggests, we went back

21    and looked; and the vast majority of the changes we made were

22    not to downgrade privilege.  They were to adjust redactions.

23    If we could redact a little bit less, a few fewer words, we did

24    that to give them more information.

25         **THE COURT:**  When you say "downgrade," you mean

declared not privilege?

**MS. MEHTA:**  Right.  The majority of that was changing the redactions, not actually determining that a document was not privileged.  And, of course, the set they sent us was the set that they were particularly interested in.  So it's not surprising there was a slightly higher rate for that; but overall it was less than 1 percent of that custodian's documents.

So the process is working, they have actually done it for multiple custodians.  Every time they come to us and they say, "Here are the documents we are concerned about on the log, will you look at them again," we look at them again.  If there's anything to change, we change it and we give it to them before the deposition.

That's the process the privilege protocol the parties agreed on establishes.  That's what we have been doing.  It's working.  We do not have the time nor does it make sense to go through an extensive rereview that they are now asking of this on top of the other one.

**THE COURT:**  We would probably just do a sampling thing.  Okay.  Why don't you do it on a case-by-case -- that seems reasonable.  When you need it, they will do it.

**MS. LAWRENCE:**  The issue with that, Your Honor, when we have been doing it on a case-by-case basis, we are getting the documents either the night before the deposition or often

1  times many days after the deposition.

2        **THE COURT:**  Oh, well, that's fixable.

3        **MS. MEHTA:**  That's because of the requests,

4  Your Honor.  That's because they send a request two days before

5  the deposition or a week before the deposition.

6        **THE COURT:**  Okay, everybody.  Let's just take a

7  30-second healing centering break.  It's getting --

8                    (Pause in proceedings.)

9        **THE COURT:**  All right.  I had to do this repeatedly in

10  a trial I just did.  I found it to be effective.  Just take a

11  breath.  Everybody relaxes.  Do you have that watch thing?  You

12  can do a meditation second.

13                    (Pause in proceedings.)

14        **THE COURT:**  Just ask earlier.  How about that?

15        **MS. LAWRENCE:**  The problem with that --

16        **THE COURT:**  Then you know the deponent is coming up.

17  You don't need to know anything about what you are asking.  You

18  can just say -- I mean, for example, you had -- one deponent

19  had 92 entries and you said please rereview them and they did.

20     So, that seems reasonable.

21        **MS. LAWRENCE:**  In the instance of another deposition

22  we asked several days prior, and we got just over 500 documents

23  the night before his deposition.

24        **THE COURT:**  Those were privileged -- rereviewed

25  privilege?

1          **MS. LAWRENCE:**  A part of them were rereview privilege.

2     Actually, some of them were first time productions as well.

3          **THE COURT:**  Let's just do this:  You have to make the

4     request and the request has to be responded to -- how long does

5     it take to do this?

6          **MS. MEHTA:**  It depends on how many they send us.  If

7     they send us a list of a hundred, it is going to take us about

8     a week, maybe less, just for processing time to get it out to

9     them.

10         **THE COURT:**  A week to look at a hundred --

11         **MS. MEHTA:**  It is not the looking.  It is the

12    processing that takes a little bit of time.  I would say this:

13    If they can get us the list --

14         **THE COURT:**  What does that mean?  What is the

15    processing?

16         **MS. MEHTA:**  We have to pull the documents from a

17    database, review them -- they have to reimage the documents

18    with the new redactions.  They have to create new load files,

19    and then they have to be sent over to us.

20         **THE COURT:**  That can't possibly take a week.  I'm

21    sorry.  I'm not going to buy that.  That cannot possibly take a

22    week.

23         **MS. MEHTA:**  That's what my people tell me.

24         **THE COURT:**  Here is what we are going to do:  Minimum

25    of 14 calendar days before the deposition, you will make your

1   last rereview update, whatever it is, all right.  And a minimum

2   of seven calendar days before the deposition, you will produce,

3   Meta, everything that you have.  All right.  That's the deal.

4   Okay.

5          MS. LAWRENCE:  Thank you, Your Honor.

6          THE COURT:  In the odd case that you get somebody with

7   tens of thousands of documents, which I would imagine won't

8   happen, work out something else; but that's the timeline.  All

9   right.  Okay.  I think we have zeroed everything out.  Anything

10  else, Plaintiffs?

11         MS. LAWRENCE:  The June 15th -- we put a June 15th CMC

12  on the schedule.  We wanted to ensure that works for

13  Your Honor.

14         THE COURT:  You want to cancel it?

15         MS. LAWRENCE:  No.  I think we need it.  We didn't get

16  confirmation that it worked for Your Honor.

17         THE COURT:  I have a slew of trials starting May 8th,

18  so we will just have to see when we get a little bit closer.

19  That's it for that.  Anything else from Meta, the Defendant?

20         MS. MEHTA:  No, Your Honor.  Thank you.

21         THE COURT:  Thanks a lot.  Thank you.

22             (Proceedings adjourned at 11:42 a.m.)

23                       ---oOo---

24

25

<u>**CERTIFICATE OF REPORTER**</u>

          I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.


DATE:    Friday, April 28, 2023





_____

          Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
          United States District Court - Official Reporter