WILMERHALE

June 15, 2023

Sonal N. Mehta

+1 650 600 5051 (t)
+1 650 858 6100 (f)
sonal.mehta@wilmerhale.com

**VIA ECF**

The Honorable James Donato
U.S. District Judge for the Northern District of California
450 Golden Gate Avenue, Courtroom 11, 19th Floor
San Francisco, CA 94102

Dear Judge Donato:

Advertisers' accusation that Meta intentionally omitted information responsive to Advertisers' fourth interrogatory is meritless. The interrogatory asks about information from "Onavo, Onavo apps (*e.g.*, Onavo Protect), or Meta's Onavo team." Dkt. 575-1. Meta objected to the interrogatory, including expressly to the language Advertisers rely on in their motion, and responded by providing—in both its initial (last August) and supplemental (last December) responses—detailed information regarding data collected through the Onavo apps (i.e., Onavo Protect). *See* Dkts. 576-4, 576-5. After doing nothing for over six months—not once claiming that Meta's supplemental response was deficient—Advertisers now, with less than a month left in fact discovery, inexplicably move for an "evidentiary sanction." Dkt. 575 at 3.

Advertisers' motion is premised on the contention that Meta should have described data collected through an entirely ***different*** app, a limited market research program called the Facebook Research App ("FBR app")—what Advertisers call the "Onavo IAAP Program." *Id.* Advertisers appear to take this position because their interrogatory asked for all data collected by an "Onavo team"—a term that Advertisers chose not to define—and some of the same people at Meta who worked on Onavo also worked on the FBR app, Meta's response should have been broader. But Meta made clear from the start that it was not agreeing to Advertisers' overbroad demand for all information and data collected or derived from an undefined "Onavo team," and that it was limiting its response to data collected through the Onavo apps.

If Advertisers felt that limitation was inappropriate, then they were obliged to say so in the nine months since Meta served its initial response. They were certainly able—***Advertisers knew about the FBR app at least by the time they filed their original complaint***, Dkt. 86, ¶¶ 262-63, and referenced it again in their amended complaint, Dkt. 237 ¶¶ 240-41 (alleging that "Onavo spyware" was "repackaged" as "a Facebook Research VPN app" that gave "root … access" to participants' phones and "leverag[ed] Onavo code."). If they had wanted information on the FBR app, they could have, and should have, said so. But they never did. Instead, Advertisers now try to excuse this failure by claiming that it took them "untold hours of needle-in-a-haystack" discovery to learn that people who supported Onavo also supported the FBR app. Dkt. 575 at 3. But the fact that there were employees who worked on both apps has been ***publicly available—in the same sources they cited in their original complaint—since 2019***. Advertisers' argument that Meta made them hunt around for information it deliberately withheld is thus nonsensical: Advertisers knew the information when they filed their complaint.

## I.    Factual Background

Advertisers' Interrogatory 4 asked Meta to identify "all information and data" that Facebook

"obtained through, or derived from, Onavo, Onavo apps (*e.g.*, Onavo Protect), or Meta's Onavo team." Dkt. 575-1. In response, Meta noted that Advertisers did nothing to define the phrases "obtained through," "derived from," "Onavo," or "Meta's Onavo team," objected to those terms as vague and ambiguous, and further objected on relevance grounds, stating that "it is unclear how an identification and description of 'all information and data ' 'obtained through, or derived from, Onavo' is relevant to support Advertisers' claims or how the scope of the information sought in this Interrogatory is relevant or proportional to those claims." Dkt. 576-4 at 3-4. Meta did, however, provide detailed information about metrics calculated using data derived from Onavo Protect. *Id.* at 4-5. After Advertisers stated in an email that they were entitled to further information on data collected through Onavo apps, Meta supplemented its response in December 2022, again clearly limiting the response to data collected through Onavo apps. *See* Dkt. 576-5 at 3-8.

Despite knowing about the FBR app since filing the complaint, Dkt. 86, ¶¶ 262-63, Advertisers have not, until now, suggested that Meta unreasonably limited its responses to data collected from the Onavo apps and should instead have provided all data derived from the undefined "Onavo team." Dkt. 575 at 1-2. Instead, when Meta first responded to Interrogatory 4, Advertisers objected to Meta providing a "non-exhaustive list" of metrics calculated in Onavo Protect. *See* Aug. 30, 2022 Email from B. Dunne. During the parties' September 2022 meet and confer, Advertisers similarly took issue with Meta's description of the data and metrics associated with Onavo. Notably, after the meet and confer, Advertisers did ***not*** include Meta's response to Interrogatory 4 when they proceeded to file a procedurally improper and baseless motion to compel further discovery. Dkt. 385. And then, after Meta supplemented its response to Interrogatory 4 in December 2022 with further information on data collected through Onavo Protect, Advertisers made no further objection to Meta's responses until filing the instant motion.

## II.   Argument

Advertisers' eleventh-hour request for an "evidentiary sanction" is meritless. As an initial matter, Advertisers' brief is affirmatively misleading. Advertisers refer to an "Onavo IAAP program" and repeatedly assert that Meta used Onavo to intercept encrypted traffic and "deploy an 'SSL man-in-the-middle' attack." *See* Dkt. 575 at 2-3. Their complaint likewise alleges that Onavo used an "SSL bump" to collect data on competitors. Dkt. 237 ¶ 551. However, as Advertisers well know from discovery in this case, Onavo was never used for that purpose and there is no "Onavo IAAP program."[1] Instead, Advertisers' (meritless) allegations concerning the unlawful interception of encrypted traffic deliberately conflate Onavo with a different app, the FBR app.[2]

Meta's objections and limitations on its response were clear and well-founded. Indeed, a demand that Meta describe with particularity all information derived from an undefined "Onavo team"—

---

[1] Naveh Tr. 284:3-11 ("[W]hen I talk about Onavo, I talk about the apps Onavo Protect on iOS and Android. Those apps never used … SSL bump or were not part of the in-app action panel or Facebook Research app, which is a very different app and very different panel of users").

[2] As Advertisers know well, "the Facebook Research VPN" and "Facebook's Onavo Protect app" "were different apps." Jhaveri Tr. 128:2-14, 195:22-196:18. Moreover, the Facebook Research App employed industry standard market research practices, Baser Rough Tr. 242:1-17, not "man-in-the-middle" attacks "because Facebook was disclosing to the user that they were signing up to have their data shared. So it's hard to call that a man-in-the-middle attack, if it's open and disclosed," *id.* at 233:24-235:7.

even where that work was on a different app—is both overbroad and irrelevant. Employees who worked on Onavo worked on several endeavors at the company over time.[3] If Advertisers wanted to know about all the projects that certain individuals worked on over time or information on data collected through the FBR app (as they now claim), then it was Advertisers' responsibility to ask for it. For example, they could have listed the FBR app in their interrogatory or at least included defined terms making clear which apps were in view. They could have mentioned the FBR app at a meet and confer or in correspondence sometime over the last nine months. Advertisers did none of those things, but instead attempt to manufacture a basis to seek sanctions now that they have failed to substantiate their exclusionary conduct theories through fact discovery.

Finally, the notion that Advertisers had to spend "untold hours" to "lock in on the reality of the IAAP program," Dkt. 575 at 3, is disingenuous. Indeed, a 2019 TechCrunch article about the FBR app specifically described how the FBR app used "root access" technology, and stated (incorrectly) that it was "to protect [Facebook's] dominance."[4] Advertisers referenced the article in their complaint to support their allegation that FBR app "leverag[ed] … Onavo code." Dkt. 86, ¶¶ 261-63; Dkt. 237, ¶¶ 239-41. And, Advertisers have been questioning witnesses about Meta's collection of in-app action panel data since their first deposition in this case on February 2, 2023. Patel Tr. 249:12-251:11 (discussing PX-0026, PALM-011683732). Thus, the idea that Advertisers did not know enough to specifically ask for information on the FBR app or even raise this dispute as soon as Meta's initial responses were served in August 2022 is not credible.

Undeterred, Advertisers now ask the Court to sanction Meta for an incomplete response. This is improper and unwarranted. Meta has made no efforts to obstruct discovery—or even come close to adopting the type of "vexatious, wanton, or … oppressive" conduct sanctionable in this jurisdiction. *Ray v. Leal*, 2015 WL 1501056, at *9 (N.D. Cal. Mar. 31, 2015) (citing *Fair Housing of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002), *aff'd*, 633 Fed. Appx. 401 (9th Cir. 2016), for the proposition that "Rule 37 sanctions are appropriate only where the discovery violation is due to willfulness, bad faith, or fault of the party"). Instead, for over nine months, Meta has stood on its objections and clearly explained that it was providing responses for the Onavo apps, not for the undefined "Onavo team."

\*       \*       \*

Meta has been clear from the start that its responses to Interrogatory 4 provide information about data collected through the Onavo apps. At any time over the past nine months (since Meta's served its initial response), Advertisers could have argued that this was an inappropriate limitation but did not until now, with less than one month left in fact discovery. That Advertisers waited until now to raise the issue—and jumped straight to an improper request for sanctions—reveals their motion for what it is: a transparent gambit to leverage frivolous allegations to expand the already extraordinary discovery limits in this case (which permit plaintiffs 260 hours of testimony from up to 50 current and former Meta employees, in addition to nonparty discovery) because Advertisers still have not found evidence to support their claims. Meta thus asks that the Court deny Advertisers' baseless request for sanctions.

---

[3] Naveh Tr. 18:13-19:4, 170:13.

[4] CONSUMER-FB-0000001932 at 2, 4; Jhaveri Dep. Ex. PX-1506, at 1, 3 (same article).

3

Respectfully submitted,


By: */s/ Sonal N. Mehta*

WILMER CUTLER PICKERING HALE AND
DORR LLP
*Attorneys for Defendant Meta Platforms, Inc.*