Pages 1 - 34

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

```
MAXIMILIAN KLEIN and SARAH      )
GRABERT, individually and on    )
behalf of all others similarly  )
situated,                       )
                                )
          Plaintiffs,           )
                                )
   VS.                          )   NO. C 20-08570 JD
                                )
META PLATFORMS, INC.,           )
                                )
          Defendant.            )
_____)
```

San Francisco, California
Thursday, June 22, 2023

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Consumer Class Plaintiffs:
    QUINN, EMANUEL, URQUHART & SULLIVAN LLP
    865 South Figueroa Street, 10th Floor
    Los Angeles, California 90017
    BY:  **KEVIN Y. TERUYA, ATTORNEY AT LAW**
         **BRANTLEY I. PEPPERMAN, ATTORNEY AT LAW**


For Consumer Class Plaintiffs:
    HAGENS BERMAN SOBOL SHAPIRO LLP
    715 Hearst Avenue, Suite 300
    Berkeley, California 94710
    BY:  **SHANA E. SCARLETT, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
         CSR No. 7445, Official U.S. Reporter

**APPEARANCES**:   (CONTINUED)

For Advertiser Class Plaintiffs:
                        BATHAEE DUNNE LLP
                        3420 Bristol Street, Suite 600
                        Costa Mesa, California 92626
                   BY:  **BRIAN J. DUNNE, ATTORNEY AT LAW**

                        BATHAEE DUNNE LLP
                        445 Park Avenue, Ninth Floor
                        New York, New York 10022
                   BY:  **YAVAR BATHAEE, ATTORNEY AT LAW**


                        SCOTT & SCOTT ATTORNEYS AT LAW LLP
                        156 South Main Street
                        Post Office Box 192
                        Colchester, Connecticut 06415
                   BY:  **PATRICK COUGHLIN, ATTORNEY AT LAW**

For Defendant:
                        WILMER CUTLER PICKERING HALE & DORR LLP
                        2600 El Camino Real, Suite 400
                        Palo Alto, California 94306
                   BY:  **SONAL M. MEHTA, ATTORNEY AT LAW**

                        WILMER CUTLER PICKERING HALE & DORR LLP
                        7 World Trade Center
                        New York, New York 10007
                   BY:  **DAVID Z. GRINGER, ATTORNEY AT LAW**


                        WILMER CUTLER PICKERING HALE & DORR LLP
                        1875 Pennsylvania Avenue, NW
                        Washington, D.C. 20006
                   BY:  **MOLLY JENNINGS, ATTORNEY AT LAW**


For Non-Party Netflix:
                        FRESHFIELDS BRUCKHAUS DERINGER
                        855 Main Street
                        Redwood City, California 94063
                   BY:  **JUSTINA K. SESSIONS, ATTORNEY AT LAW**


Also Present:           **Stacy Chen, In-House Counsel**
                        **Meta Platforms, Inc.**

**Thursday - June 22, 2023**                                        **10:26 a.m.**

                    **P R O C E E D I N G S**

                          ---o0o---

     **THE CLERK:**  Calling Civil 20-8570, Klein vs.

Meta Platforms.

    Counsel?

          **MS. SCARLETT:**  Would you like appearances, Your Honor?

          **THE COURT:**  What's that?

          **MS. SCARLETT:**  Would you like appearances?

          **THE COURT:**  Well, of course, yes.

     **MS. SCARLETT:**  Okay.  Shana Scarlet from Hagens Berman

for the consumer plaintiffs.

     **MR. TERUYA:**  Kevin Teruya from Quinn Emanuel for

consumer plaintiffs.

     **MR. BATHAEE:**  Good morning, Your Honor.  Yavar

Bathaee, from Bathaee Dunne LLP, for the advertiser plaintiffs.

          **MR. DUNNE:**  Brian Dunne for advertiser plaintiffs.

     **MR. PEPPERMAN:**  Good morning, Your Honor.  Brantley

Pepperman from Quinn Emanuel for the consumer plaintiffs.

     **MR. COUGHLIN:**  Good morning, Your Honor.  Patrick

Coughlin from Scott & Scott, advertiser plaintiffs.

     **MS. MEHTA:**  Good morning, Your Honor.  Sonal Mehta

from WilmerHale on behalf of the defendant.  With me are my

colleagues David Gringer and Molly Jennings.  And we have

in-house counsel from Meta Platforms, Inc., Stacy Chen here as

1    well.

2         **MS. SESSIONS:**  Good morning, Your Honor.  Justina

3    Sessions of Freshfields Bruckhaus Deringer for non-party

4    Netflix.

5         **THE COURT:**  Sessions.  Ms. Sessions.

6         **MS. SESSIONS:**  Yes, Your Honor.

7         **THE COURT:**  From Netflix.

8    Okay.  12 discovery letters.  Breaking every record in the

9    wrong way.

10   I'm not going to accept any more discovery letters from

11   anyone.  You can ask, you can make a proffer, but you'd be wise

12   not to.  We have spent far too much time on these disputes.

13   You're out of time anyway tomorrow; right?

14        **MS. MEHTA:**  That's right, Your Honor.

15        **THE COURT:**  Okay.  I'm not extending anything.  No

16   dates are being extended under any circumstances.  So any

17   request for continuances or extensions are denied.

18   Let's just plow through these things.

19   Okay.  Let's start with Docket Numbers 558-3 and 563.

20   Mr. Zuckerberg again.  Oh, wait.  No.  This is -- this is the

21   prior issue we had about whether people can see protective

22   order documents that they appear on.

23   So, all right.  What's the problem?

24        **MS. MEHTA:**  Yes, Your Honor.  I'm happy to address

25   this.  I think I can make this short.

1    We're almost done with depositions.  We have depositions

2  tomorrow.

3           THE COURT:  This letter is from the plaintiffs.

4           MS. MEHTA:  I believe 559 is from us and 563 is from

5  them.  It's cross-motions on the same issue.

6           THE COURT:  Let's start with the plaintiffs.  They

7  sent the first one in.

8           MS. MEHTA:  Fair enough.

9           MR. COUGHLIN:  Your Honor, that's correct.  This was

10  filed a month and a half ago.  We've taken about 30 depositions

11  in between that time.  So I think this issue has died away.

12    But the issue is whether somebody like Ms. --

13           THE COURT:  If it's died away, let's just stop.  I've

14  got 12 of these things.

15           MR. COUGHLIN:  Got it.

16           THE COURT:  It's done?  Okay.  By the parties

17  agreement, it's terminated.

18    Okay.  The next one is Docket Number 564, 596-3.  This is

19  back to Mark Zuckerberg.

20    All right.  Plaintiffs, what's the issue?

21    Oh.  Defendants, you sent that one in.  Okay.  Go ahead.

22           MS. MEHTA:  Yes, Your Honor.  Sorry.  We went first on

23  this one, seeking --

24           THE COURT:  Yeah.

25           MS. MEHTA:  -- a protective order to just enforce your

1    prior ruling that Mr. Zuckerberg's deposition would be limited

2    to three hours.

3         They took three hours with him.  Advertisers had an hour

4    and a half to ask him questions about all sorts of things.

5    They chose to spend their time asking him about things that he

6    told them repeatedly he didn't know about.  And now they're

7    arguing that they want more time with him, our CEO, to cover

8    other things that they elected not to ask him about.

9         They have not come close to showing that he has unique,

10   non-repetitive knowledge under the apex standard.  Every

11   document they say they want to ask him about, lots of other

12   people are on.  They've had north of 40 depositions of current

13   and former employees, including on the exact same issues that

14   they are trying to talk to Mr. Zuckerberg about.

15        They've had their chance.  Discovery is done.  It makes no

16   sense to bring him back, waste his time asking him more about

17   things he doesn't know about.  They had their chance.

18        **THE COURT:**  Okay.  Plaintiff?

19        **MR. DUNNE:**  Brian Dunne for the advertisers.

20   I guess what you had previously ruled was that you would

21   grant their motion for three hours and that if we had things

22   that we needed to ask that were unique and non-repetitive, to

23   make an application, which is what we did.

24        **THE COURT:**  No.  I said if there was good cause, I

25   might consider it.  I didn't say if you have more, just bring

 1    it in.

 2        So what's the good cause?  What is it that you were

 3    prevented -- "good cause" means something that is relevant and

 4    material and you were not able to ask it for some reason out of

 5    your control.  So what is that?

 6            **MR. DUNNE:**  The reason that we weren't able to ask him

 7    things was simply the 87 minutes that we had --

 8            **THE COURT:**  I gave you three hours.  So, I mean, use

 9    it as you wish.  But the fact that you ran out of time, that's

10    not good cause.

11            **MR. DUNNE:**  Okay.

12            **THE COURT:**  Is that it?

13        Okay.  That motion is denied.

14        All right.  Let's go to 565 and 606-2.  Oh, 56- -- sorry,

15    sorry, sorry.  563 -- 556-3 and 606-2.  Something about -- oh,

16    no.  I'm taking this one -- forget about that one.  This is the

17    wiretapping thing.  I'm going to deal with that separately.  So

18    forget that.  False start.

19        Okay.  Next one will be 569-3 and 603-2.  This is from the

20    plaintiffs.  First one is from the plaintiffs.  IA -- IAPP?

21    IAAP.  IAAP program.

22        Okay.  Go ahead.

23            **MR. DUNNE:**  This is -- so you said you didn't want to

24    deal with the privileged one; right?  This is the one about the

25    interrogatory with Onavo?

1            **THE COURT:**  Well, it's your letter.

2        **MR. DUNNE:**  Yes.  Yes.

3            **THE COURT:**  You tell me.

4        **MR. DUNNE:**  No.  I --

5            **THE COURT:**  All right.  Go ahead.

6        **MR. DUNNE:**  Because this was filed under seal, it

7  doesn't have the docket number on it.

8            **THE COURT:**  Yeah.  It's 569-3.  That's the sealed

9  version.

10        **MR. DUNNE:**  So, Your Honor, more than -- well, I guess

11  about exactly one year ago, we served an interrogatory on Meta,

12  asking them for everything done by their Onavo team, collected

13  by Onavo and the Onavo apps.  That was to help us understand

14  the information that was being collected by this particular

15  team within Facebook that was designed for competitive

16  intelligence.

17     We found out during discovery -- and I'll hew closely to

18  the letter so that we don't intrude into anything that hasn't

19  been unsealed.

20            **THE COURT:**  How about this?  Just tell me what you

21  want.  Okay?  What is it you think you're missing, and why do

22  you think you're entitled to it?

23        **MR. DUNNE:**  So, well, we -- at this point, I just --

24  we spent a lot of extra deposition time on getting these

25  things.  And so I guess, given Your Honor's ruling that you

1    don't -- you're not going to allow us to take any more

2    depositions to fix that up, I think we're --

3          **THE COURT:**  That's not a good way of phrasing it.

4    You've had more than a country mile to do whatever you wanted,

5    and you directed your discovery in a way that was totally up to

6    you.  So this is not a matter of my denying you anything.  This

7    is a matter of you coming up on a deadline that I'm not

8    extending.  So please --

9          **MR. DUNNE:**  No.  I --

10         **THE COURT:**  -- don't -- don't try to suggest to

11   yourself or to anybody else that this is a matter of your being

12   shortchanged.

13         You've gotten far more than you probably should have, had

14   I been looking at this more carefully.  So you're not in a

15   position to complain.  Okay?

16         So this is withdrawn?

17         **MR. DUNNE:**  Yeah.  For us, we know this, Your Honor.

18         **THE COURT:**  It's withdrawn, terminated.

19         Okay.  Docket Number 576-3 and 602.  Let's see.

20   Plaintiffs, again, sent the first letter.  Looks like another

21   Onavo issue.

22         Same result?  Withdrawn?

23         **MR. DUNNE:**  So I thought that the last one was the

24   Onavo rogs.

25         If you were referring last time to the IAAP issue, that

 1   would be the crime fraud.

 2          **THE COURT:**  No.  This is Docket Number 576-3, and it

 3   mentions Onavo again.

 4          **MR. DUNNE:**  Oh.  I believe that's just a motion to

 5   seal.

 6          **THE COURT:**  I can't hear you.

 7          **MR. DUNNE:**  Oh.  Yeah, that's the interrogatory that

 8   we -- that we had discussed.  That is the interrogatory brief.

 9          **THE COURT:**  Well, how is that different from 569-3,

10   which we were just talking about?

11      Oh, wait.  I see.  Okay.  So that's the one we were just

12   talking about; right?

13          **MR. DUNNE:**  Yes.

14          **THE COURT:**  Okay.  Good.  That one's terminated by

15   agreement.

16      All right.  Just one second.  I'm giving my clerks a break

17   by not being out here, so I've got to write all this down.

18                     (Pause in proceedings.)

19          **THE COURT:**  Okay.  Now, the 576-3 and 602.  Is that

20   the one we just talked about for Onavo?  No.  It's a different

21   one.

22      Okay.  Plaintiffs, what's happening here?

23          **MR. DUNNE:**  576 was --

24          **THE COURT:**  -3.

25          **MR. DUNNE:**  Yeah.  That's the letter brief on the

1    interrogatory.

2              **THE COURT:**  Okay.  That's terminated by agreement.

3         All right.  583 and 601.

4              **MR. DUNNE:**  Yes, Your Honor.  This is in reference to

5    the FTC privilege log.

6              **THE COURT:**  Yeah.

7              **MR. DUNNE:**  As you'll recall at the last hearing, you

8    ordered Meta to re-review a sample of 2500 --

9              **THE COURT:**  Yes.

10             **MR. DUNNE:**  -- entries we received.

11             **THE COURT:**  Turned out a lot of them were

12   reclassified; right?

13             **MR. DUNNE:**  Yes.

14             **THE COURT:**  So what would you like to do?

15             **MR. DUNNE:**  We would like a re-review of the rest of

16   their log.

17             **THE COURT:**  Okay.  That was the point.  And you did

18   have a very high re-call rate.  So --

19             **MS. MEHTA:**  Yes, Your Honor.

20             **THE COURT:**  -- this is a sample.

21        It's a living experiment, and I think the experiment says

22   you've got to finish the job.

23             **MS. MEHTA:**  So, Your Honor, just one note on that.

24        We -- in recognition of the fact that I expected that

25   might be your reaction, we voluntarily agreed to re-review

 1   90,000 additional documents.  So every document that touches

 2   any deponent in this case has been re-reviewed already.  That's

 3   200,000 of the 330,000 documents from that log.

 4        What they're now asking for is the remaining portion of

 5   that log, which are for witnesses or custodians that have no

 6   bearing on this case.  They're not deponents on this case.

 7   That investigation, as they've admitted, included lots of

 8   different issues that don't come into play here.

 9        So what we're asking for --

10        **THE COURT:**  Let me just jump in.

11        If you put them on the privilege log, you're going to have

12   to do it.  So just do the balance.  Okay?  Just finish that --

13   I mean, the whole point of this was to test it.  You had a very

14   high -- on the sample test, you had a very high downgrade rate.

15   I was expecting, like, 10 percent.  You're over 50.

16        So, okay.  Just finish those all.  That's the disposition.

17   So everything else in the privilege log will be reviewed in the

18   same manner.  Okay?  But only the privilege log.  That's it.

19   That's all we're talking about.

20        **MS. MEHTA:**  Yes, Your Honor, from the FTC

21   investigation.  Understood.

22        **THE COURT:**  Yeah.  Okay.

23        Okay.  Now, Docket Number 586 and 613.  This one started

24   with defendant.  Depo topics.

25        **MR. GRINGER:**  Yes, Your Honor.  David Gringer from

Meta.

Fundamentally, we have agreed to do a lot.  The topics at issue are incredibly broad.  There is no realistic way to prepare someone.  We've suggested a number of alternatives that we think are reasonable and fair, including backdating some of the 60 depositions.  We've made people available on a number of these topics.

But Your Honor has rules that make sense for a reason, I'm sure, based on your own experience.  We simply cannot prepare people on topics as broad as "Facebook's data use since 2007." Not practical.  Not realistic.

**THE COURT:**  Okay.  Let's see.  Let's just take Topic 2 here.  So what is Topic 2?  Topic 2 is what?

**MR. GRINGER:**  More data collection and use practices. This topic includes, but is not limited to, and then there are 11 different subparts, which I would be happy to read but I'm not sure that's the best use of the Court's --

**THE COURT:**  No.  I have them here.

I mean, Meta lives to collect data.  So you're basically asking everything Meta did for multiple -- I don't quite understand -- a 15-year period.  15 years.

**MR. TERUYA:**  No, Your Honor.  There's very specific parts of this topic that are at issue now.  Some of the parts of it, they've already agreed to give testimony on.

What is still at issue is 2(a).  There's 30 specific

1   statements that they asked us about.  They said:  What are the

2   misrepresentations or admissions?  We listed them.  They're in

3   Attachment C.  So we want to ask about that.

4        THE COURT:  All right.  So this is the subtopic with

5   respect to 30 statements or omissions between 2006 and 2021

6   which the plaintiffs believe are misleading or deceptive.

7   They're specific statements?

8        MR. TERUYA:  Yes.  They're Attachment C.  They're

9   listed in an interrogatory response.

10       THE COURT:  All right.  Well, Defendant?

11       MR. GRINGER:  Well, you know, this is the first I'm

12   hearing that he's only asking about that one.  We tried to

13   negotiate something reasonable.  There are, as Your Honor just

14   noted, 11 --

15       THE COURT:  All right.  That's granted.  I'll do that

16   one.  That's fine.

17     Okay.  What's the next subsection of Topic 2?

18       MR. TERUYA:  The only other part of 2 that's left is

19   2(c), which --

20       THE COURT:  I have Roman numerals.  So this would be

21   (iii) in mine?  A, B, C?

22       MR. TERUYA:  Yes, in C.

23       THE COURT:  Meta's app developer investigation?

24       MR. TERUYA:  No.  It's the domestic regulators'

25   investigation of Meta's data collection and use practices.

 1   It's just asking for a list of what investigations there are,

 2   when they started, when they ended, and what the result was.

 3        We even said, like, if you want to give us --

 4             **THE COURT:**  What is it again?  Meta's what?

 5             **MR. TERUYA:**  Domestic regulators' investigations of

 6   Meta's data collection and use practices.

 7             **THE COURT:**  Well, let's see.  I actually have several

 8   on that.  I have, one topic is the identity of any regulator;

 9   another topic is the subject matter of any regulatory; the

10   third is the dates of any regulatory.  So we're not matching.

11        What specifically --

12             **MR. TERUYA:**  Yeah.

13             **THE COURT:**  What specifically is it?

14             **MR. TERUYA:**  Those go together.  They broke them out

15   into pieces.  But -- so number -- going by their letter, little

16   Roman (viii), (ix), (x), and (xi) go together.

17        But it's basically a list of what are the investigations,

18   when did they start, when did they end, what's the result, and

19   what's the subject matter.

20             **THE COURT:**  You can do that in an interrogatory.

21             **MR. GRINGER:**  That was exactly our position,

22   Your Honor.

23             **MR. TERUYA:**  We proposed a meet and confer.  If they

24   want to give us a written response, written deposition

25   response, interrogatory response, whatever you want to call it.

1    **THE COURT:**  Why don't you just does it as an

2  interrogatory.  Okay?

3    **MR. TERUYA:**  Okay.

4    **THE COURT:**  I'm looking at Docket Number 586.  Meta

5  will answer (ii), (viii), (ix) and (x) and (xi).  Right?

6    **MR. TERUYA:**  Yes.

7    **THE COURT:**  Okay.  You can do that in an

8  interrogatory.  Okay?

9    All right.  Great.  That takes care of that one.

10   What about Topic 3?

11   **MR. GRINGER:**  Your Honor, this is one -- it

12  essentially is:  How did Facebook decide -- everywhere it

13  displays content to Facebook users, how did it decide to do

14  that, and what did it decide?

15   That is hopelessly overbroad and even -- I'm also not at

16  all sure why it's relevant.

17   **THE COURT:**  Determine what content.  Okay.  Well?

18   **MR. GRINGER:**  There are also time constraints

19  remaining.  They only have 11 hours for all of these topics

20  left.  There are topic limits.

21   I mean, this is -- and I think we proposed a reasonable

22  resolution.  There was an FTC deposition on a higher level

23  which we offered to provide them the transcript of.

24   **THE COURT:**  Okay.  All right.  What can you narrow

25  down here, Plaintiff?

1      **MR. TERUYA:**  Yeah.  So this one is very narrow.  This

2    is asking about surfaces, which you heard about, like, in the

3    expert market tutorial presentation from Meta.  This is just

4    newsfeed, stories, reels, et cetera.  There's different,

5    quote/unquote, surfaces that they have.

6      And we're just asking for each -- what are those; and for

7    each of those, are they -- what determines what you see?  Is it

8    the social graph, or is it something else or some combination?

9      **THE COURT:**  Well, but it goes back to 2007.  I mean,

10   that's awfully far back.

11      **MR. TERUYA:**  Right.  Yes.  But presumably, that hasn't

12   changed very often over time.  And some of these surfaces

13   didn't even exist back then.

14      **THE COURT:**  I don't know that.  Do you know that?

15   Maybe it changes every month.  I have no idea.

16      **MR. TERUYA:**  Or they could say that it changes every

17   month and that would be the answer.  That's what we're looking

18   for, is -- and this goes to market definition.  Are these

19   things tied to the social graph or not?

20      And somebody could say it changes every day; it's based on

21   this algorithm.  You know, they could give an answer.

22      **THE COURT:**  How does surface work?  How do you program

23   the surface playlist?

24      **MR. GRINGER:**  It really depends on the surface.  I

25   mean, Mr. Teruya just gave a list of several surfaces and then

1    said "et cetera," made it sound like it's some small thing.

2    He's basically saying:  How do you show people content on

3    Facebook and each way you show them content over 16 years.  We

4    can't get someone prepared on such a broad topic.

5              **THE COURT:**  Just remind me.  What's contained in the

6    surface display?

7              **MR. GRINGER:**  That's each element.  So if you log on

8    to Facebook, you might see the newsfeed.  That's one surface.

9    You might go to groups.  That's a different surface.  You might

10   watch a video.  That's a different surface.

11        That means each activity, how do you -- what content do

12   you see and why are you seeing it.

13             **THE COURT:**  Well, do the users pick their surfaces?

14             **MR. GRINGER:**  They did not.  And the truth is, it's a

15   very -- even on one surface, it's extraordinarily broad.

16             **THE COURT:**  They're randomly played by Meta?

17             **MR. GRINGER:**  I'm not sure I follow you entirely.

18             **THE COURT:**  Well, you're not having any answers that

19   help me narrow this for you, so I'm inclined to just let it go

20   forward.

21             **MS. MEHTA:**  Your Honor, maybe I can help answer that

22   question.

23        I think what you're asking is, on the Facebook page, when

24   a user interacts with all of the different surfaces, do they

25   choose what surfaces they interact with, if I understand the

1    question.

2         THE COURT:  Well, that's part of it.  And the answer

3    is "no"; right?

4         MS. MEHTA:  The answer is there's lots of different

5    surfaces, and users may click into one, click into another.

6         The Facebook page, as you might imagine, has evolved a

7    tremendous amount since 2007.  Mr. Schultz testified about all

8    the new surfaces and features that are continually added, like

9    stories, and then stories with stickers, and all of that that

10   he talked about.  So the idea that we have to have someone to

11   come and talk about every change that's made to a software

12   platform --

13        THE COURT:  I'm trying to find a -- look, it's

14   perfectly fine -- there must be someone who can say, at a high

15   level, "This is how we program surface content."  Somebody must

16   be able to say that.

17        MS. MEHTA:  I think one thing that --

18        THE COURT:  Somebody is programming surface content at

19   Facebook.  Now, maybe it's a different person for each genre.

20   I don't know.  But there should be someone who could say, "For

21   every surface, as a general practice, here's sort of the

22   parameters of what we think about when we stock the surface

23   experience for users."

24        MS. MEHTA:  I think it's going to be very different

25   across different surfaces.

1      So one question is:  Can they pick two or three surfaces?

2  And then we can try to make someone available on those.

3          **THE COURT:**  All right.  That's fair.

4      Pick three.  What three would you like?

5          **MR. TERUYA:**  Well, Your Honor, they're the ones

6  bringing up these other surfaces, saying that, oh, this shows

7  that Meta competes in this or that, like it's the presentation

8  you received from Mr. Schultz at the expert market definition

9  tutorial.  But, you know --

10          **THE COURT:**  Okay.

11          **MR. TERUYA:**  So we can --

12          **THE COURT:**  Pick three.

13          **MR. TERUYA:**  -- pick some if they're not going to --

14          **THE COURT:**  What three surfaces would you like?  This

15  is your chance.  So do you want --

16          **MR. TERUYA:**  Could I have one second?

17          **THE COURT:**  Sure.

18              (Co-counsel confer off the record.)

19          **MR. TERUYA:**  We'll pick newsfeed, reels, and stories.

20          **THE COURT:**  Reels.  Okay.  Reels, stories, and

21  newsfeed.  All right.  Done.  Okay.  So that will be Topic 3:

22  reels, news feeds, and stories.

23      Okay.  Topic 4.

24          **MR. GRINGER:**  This is another extraordinarily broad

25  one, Your Honor.  It's any discussion of any form of

1  compensation, whether it's monetary or not, to every Facebook

2  user for their data, for their time, or for their attention.  I

3  don't understand how we could possibly identify every

4  discussion on any subject.

5      What we've said is, if there are particular programs that

6  we have considered over time -- and there certainly have been

7  questions about that -- if they identify specific programs that

8  they're interested in asking about, then we might be able to

9  reasonably prepare someone.  But we can't search the company

10  for every discussion over 16 years on such a broad topic.  It's

11  not possible.

12      **MR. TERUYA:**  Your Honor, to help here, we already

13  offered to narrow to any review, evaluation, et cetera, that

14  was sufficiently serious that it was either presented to

15  high-level employees at Facebook or actually executed on.

16  We're not looking for every scrap of paper, metaphorically

17  speaking, on this topic.

18      **THE COURT:**  All right.  Well, I think programs that

19  actually paid users, that's fine.  That should be easy.  Okay?

20      And then I think any program presented to senior

21  management as a proposal, if they didn't do it, what difference

22  does it make?

23      **MR. TERUYA:**  Just the fact that they considered it and

24  looked at it and it's not pie in the sky if it was presented to

25  Mark Zuckerberg or other high-level management, then it was

 1  sufficiently serious that it's not --

 2        **THE COURT:**  I don't think just because it went to the

 3  C-suite people means it's in any way realistic.

 4        And, first of all, what are you going to do with that at

 5  trial?  Are you going to stand up and tell the jury, "Here's a

 6  program.  They never did it, but they thought about it."

 7  That's not going to get you anywhere.

 8        **MR. TERUYA:**  Well, they --

 9        **THE COURT:**  I'll let you do any actual programs.

10  Okay?

11        **MR. TERUYA:**  Thank you.

12        **THE COURT:**  But that will be limited to any actual

13  payments.

14        Okay.  Topic 5, last one.

15        **MR. GRINGER:**  So this one is one where there has been

16  a tremendous amount of fact witness deposition testimony.

17  We've offered to back designate.  This is everything that we've

18  ever considered about the App Tracking Transparency issues,

19  including our analysis of projected impact.  We think there's

20  enough testimony that we'd simply like to back designate.

21        And this one really goes to the issue, Your Honor, that we

22  asked repeatedly when -- before depositions started and as they

23  were getting scheduled, "Please serve us a 30(b)(6) notice so

24  when our relevant personnel are being deposed in their

25  individual capacity, we can put them forward as our corporate

representative."

     And in this case, on this topic, now we're going to have
to bring one or more people back, when this was well-known to
the plaintiffs, they easily could have served a notice, and we
could have avoided having a double deposition of the same
person.

          **THE COURT:**  Okay.  Plaintiff?

          **MR. TERUYA:**  So, Your Honor, this is about the
App Tracking Transparency feature of Apple, which you've heard
about.  It's an important issue in the case.

     We deposed the two specific people that they listed that
they say they would want to backdate testimony from.

     We asked them about not just, "Hey, what was the projected
effect of this feature?" but "What happened after that?  What's
the actual effect?"  And they both said they didn't know.
Like, what did Facebook do to respond to that?  What was the
actual impact?  And they didn't know.

     And so we are following up now.  And I think this is a
classic use of 30(b)(6) to just follow up on it with a --

          **THE COURT:**  What specifically is the topic, then?

          **MR. TERUYA:**  We want to know about the actual or
projected impact or effect of the App Tracking Transparency
feature.

          **THE COURT:**  Okay.

          **MR. GRINGER:**  This is one we could easily do by an

1   interrogatory if they're really just --

2           **THE COURT:**  That's fine.  You can get a deponent on

3   that.  Okay.  So that's granted, but just for that one topic,

4   actual or projected impact or effect of App Tracking

5   Transparency.

6       Okay.  I think that's it for the depos.  All right.

7           **MR. GRINGER:**  Thank you, Your Honor.

8           **MR. TERUYA:**  Thank you, Your Honor.

9           **THE COURT:**  Okay.  Now, next set.

10      Okay.  Docket 587 and -- oh, this is to extend expert

11  deadlines.  That's denied for the reasons I stated earlier.

12      Okay.  Next set is 588 -- sorry -- 589-3 and -- oh, it's

13  Netflix.  Okay.  589-3 and 615.

14      Okay.  Plaintiffs started that one.

15          **MR. DUNNE:**  So, Your Honor, last CMC in April, we

16  moved to compel the production of documents from Netflix; and

17  their response was, "We already did a search."

18      And you ordered us to meet and confer about the scope of

19  that search.  And when we corresponded and met and conferred,

20  we found that for 14 of our 16 RFPs, no search was conducted at

21  all and that, for RFPs 1 and 2, a search was conducted of a

22  single custodian who didn't join Netflix until after our

23  allegedly anticompetitive agreement between them and Facebook.

24          **THE COURT:**  Okay.

25          **MR. DUNNE:**  And so we're back.

```
 1              THE COURT:  All right.  Netflix?

 2         MS. SESSIONS:  Your Honor, I think both the scope of

 3    the searches that Netflix did and the -- we would disagree both

 4    with the scope of the searches that we did and with the state

 5    of the meet-and-confer record.

 6         So we've been consistent throughout our discussions with

 7    the plaintiffs about the scope of the searches that Netflix

 8    did.  So it's no surprise to them that we did a custodial

 9    search of the --

10              THE COURT:  Okay.  Let me just jump in.

11         I don't know.  I have no idea.  What do you want me to do?

12              MS. SESSIONS:  So, well --

13              THE COURT:  I have no idea what either of you did.  I

14    have no visibility whatsoever on what you asked for or what

15    Netflix gave you.  So what do you want me to do?

16              MS. SESSIONS:  Your Honor, if I may --

17              THE COURT:  I'm asking the plaintiff.

18         What do you want me to do?

19              MR. DUNNE:  We ask that they be compelled to do a

20    search for just --

21              THE COURT:  Why?

22              MR. DUNNE:  -- 12 through 15.

23              THE COURT:  I don't know if they did it or not.

24    You're asking me to order them to do something, I have no idea

25    whether it happened or not.  So what do you want me --
```

1          **MR. DUNNE:**  So to be clear, I think the record is

2   clear that they didn't do a search for interrogatory --

3          **THE COURT:**  It's not clear.  I wouldn't be asking you.

4   It's plain as mud to me.  I have no idea what you all have been

5   doing, flopping around with these documents.  I have no idea.

6      And I'm not taking your word for it that it's all great.

7   I'm sorry.  I'm not taking either one's word because that's not

8   evidence.  It's just your saying it.

9      So I don't know what to do.

10         **MS. SESSIONS:**  Understood, Your Honor.  And here's

11  where I think the -- here's where I think the real problem is.

12     So as I understand it, the requests on which they have

13  moved to compel -- with the exception of 1 and 2, which I had

14  understood they were not going to move to compel on based on an

15  e-mail that they had sent us -- their RFPs 12 through 15

16  concern this alleged agreement that they believe was struck

17  between Mr. Hastings, when he was on the board --

18         **THE COURT:**  I'm sorry.

19         **MS. SESSIONS:**  -- of directors of Facebook.

20     And we searched -- and, Your Honor, we searched --

21         **THE COURT:**  Please don't speak over --

22         **MS. SESSIONS:**  -- his e-mail.

23         **THE COURT:**  -- me.

24     When I start, you need to stop.  Okay, Counsel?

25         **MS. SESSIONS:**  Yes, Your Honor.

 1          **THE COURT:**  Yelling does not advance you.  In fact, it
 2   puts you behind the ball.  So, please, I've got 12 of these
 3   things, and we all have far better things to do.
 4          So you're going to have a -- somebody at Netflix is going
 5   to swear out a declaration, attesting to the searches that they
 6   did, custodian, whatever.  It's under penalty of perjury.  File
 7   it within one week, and give it to --
 8          You can look at it then and tell me if there's any issue.
 9   All right?
10          **MS. SESSIONS:**  We can do that, Your Honor.
11          **THE COURT:**  Now, if it turns out that they weren't
12   adequately searched, there are going to be consequences.
13          **MS. SESSIONS:**  Yes, Your Honor.
14          **THE COURT:**  I want to be clear about that.  Okay?
15          All right.  And that declaration should detail who did the
16   searches, who searched, what dates, what was found, what was
17   not found.  Okay?
18          "We didn't find anything, and I'm representing that there
19   is nothing."
20          There have to be affirmative -- I'm not going to accept --
21   let me just be clear.  It's going to be a custodian who did the
22   actual searches who's going to identify who he or she searched,
23   what files were searched by name, date ranges, what was found.
24   And if nothing was found, that person is going to certify there
25   were no responsive documents found.  This will all be under

1   penalty of perjury.

2            **MS. SESSIONS:**  Understood, Your Honor.

3            **THE COURT:**  All right.

4       Okay.  Let's see.  592 -- 591-2 and 614.  This is

5   Ms. Frederick.  Okay.  Plaintiffs -- sorry.  Defendants started

6   this one.

7            **MR. GRINGER:**  Yes, Your Honor.  We have a fundamental

8   issue here, which is, the named plaintiffs on the advertiser

9   side have not read the complaint and they're not familiar with

10  the allegations.  And what that means is we can't challenge

11  them in depositions about whether they were injured by the

12  conduct they're suing on.

13      And in this case, the plaintiff was an entity.  We served

14  a 30(b)(6) notice.  Their designee testified she hadn't read

15  the complaint, was completely unfamiliar with the allegations.

16      All she said is, "Facebook has a monopoly on advertising

17  to Facebook customers while they're on Facebook."

18           **THE COURT:**  Let me just pause there for a moment.

19      Okay.  You have cross-examination gold.  What are you

20  complaining about?  You've got a plaintiff who doesn't know

21  anything about the case.  Go nuts at trial.

22      What do you want me to do?  I've said this before.  I

23  cannot force people to say things that they can't answer.  I

24  can't do it.  I can't go shake a stick at Ms. Frederick and

25  say, "Now, come on, just say something."  That's not good.

1    All right?  So don't ask.

2         MR. GRINGER:  In this case --

3         THE COURT:  What is it you want me to do?  I'm not

4    going to subject her to another deposition where you just say,

5    "Are you sure you don't know anything?"  That's not going to

6    happen.

7         MR. GRINGER:  I understand, Your Honor.  She was a

8    corporate designee --

9         THE COURT:  This is a very good example about how this

10   letter system has been abused.  There is nothing meaningful

11   that I can do for you.  Okay?  You have a witness; and if that

12   witness gets up and says, "I don't know nothing about nothing,"

13   what do you want me to do?  I cannot create a witness for you.

14   Don't ask.  All right?

15      This is denied.

16        MR. GRINGER:  Thank you, Your Honor.

17        THE COURT:  Please learn from this for your next judge

18   and for your next case and for the next poor client that you're

19   billing for these things.  Don't waste time on letters like

20   this.  It's a complete waste of your client's money and scarce

21   judicial resources.  Don't ask to squeeze blood from a turnip.

22      All right.  Oh, 609.  All right.  Go ahead, Meta.

23        MS. MEHTA:  Yes, Your Honor.  I think this one is

24   hopefully relatively straightforward, which is, we received a

25   supplemental interrogatory response last week from the

advertisers including in their contentions reliance on

agreements that are outside the statute of limitations period.

     Your Honor will remember that in the motion to dismiss

phase, they disavowed reliance on anything that took place

outside the statute of limitations period, and you said in your

order they would be held to that, and now they are trying to

rely on precisely the type of material they disavowed reliance

on.

     So we're simply asking for that to be struck so that

there's no question those agreements are out.

       **THE COURT:**  Well, that was for a claim, not --

relevance is a little bit broader.

     **MS. MEHTA:**  Yes, Your Honor, but this is a contention

as to what they're relying on.  They're specifically relying on

these agreements --

       **THE COURT:**  Oh, this is -- I see.

     **MS. MEHTA:**  -- as exclusionary conduct, which is a

direct affront to what they said and what you said you would

hold them to.

     **MR. DUNNE:**  Your Honor, may I respond?

       **THE COURT:**  I mean, why are we doing this now?  You

can just bring a motion in limine.

     **MS. MEHTA:**  We debated that --

       **THE COURT:**  Why is it --

     **MS. MEHTA:**  -- Your Honor, and that's fine.

1        **THE COURT:**  Why is it a discovery letter issue?

2        **MS. MEHTA:**  We were doing it in the procedural posture

3   of a motion to strike the interrogatory response; but if you'd

4   prefer we do it as an in limine motion, we're happy to do that

5   as well.

6        **THE COURT:**  If I said you can't bring anything before

7   a certain date as evidence and they try to bring it in, bring a

8   motion saying:  Can't do it.

9        **MS. MEHTA:**  Will do.  Thank you.

10        **THE COURT:**  This is discovery, Ms. Mehta.  You

11   understand the difference between getting ready for trial and

12   sending in a dozen discovery letters.  I know you're not

13   responsible for our dozen, but please --

14        **MS. MEHTA:**  I do, Your Honor.  I understand.

15        **THE COURT:**  -- use some discretion.  Okay?

16        **MS. MEHTA:**  I do.  And on this one, Your Honor, I will

17   say, we debated that.  And my concern was that if we didn't

18   move now to strike the interrogatory response, that they would

19   use it at the in limine stage.  But I hear what you're saying.

20        **THE COURT:**  No, you're not going to waive anything.

21        **MS. MEHTA:**  And we will --

22        **THE COURT:**  That's what motions in limine are for.

23   "This evidence is not admissible because."  That's the only --

24        **MS. MEHTA:**  Understood, Your Honor.

25        **THE COURT:**  Now, not because they don't have a claim.

1    It's not a summary judgment substitute.  It's because it

2    violates the Court's prior order or whatever.

3          Okay.  All right.  That resolved that.  That's preserved

4    for a later date.

5               **MS. MEHTA:**  Thank you.

6               **THE COURT:**  Now, this has been going on and on and on.

7    Discovery is over.

8          What's happening with your ADR process?

9               **MS. MEHTA:**  Yes, Your Honor.  So we have -- both sides

10   have agreed on a private mediator, Greg Lindstrom.  And I don't

11   want to get into any conversations, obviously, but I --

12              **THE COURT:**  As well you shouldn't.  But you have

13   somebody in place.  Have you started to see this person?

14              **MS. MEHTA:**  Both sides have been having preliminary

15   conversations with Mr. Lindstrom, yes.

16              **THE COURT:**  Separately?

17              **MS. MEHTA:**  Yes, so far, separately.

18              **THE COURT:**  When is the big meeting?

19              **MS. MEHTA:**  I don't think we have one scheduled yet.

20   He is working with us -- again, I'm not going to get into any

21   substance.  He's working to help us figure out what the right

22   timing and process will be, given that there's two different

23   classes, and what the --

24              **THE COURT:**  Oh, okay.

25              **MS. MEHTA:**  -- kind of schedule is.

1              **THE COURT:**  Well, let's put some heat on it.

2              **MS. MEHTA:**  Okay, Your Honor.

3              **THE COURT:**  Let's not let this dangle.  You know what

4    I mean?

5              **MS. MEHTA:**  Understood, Your Honor.

6              **THE COURT:**  Plaintiffs, what do you think about that?

7              **MS. SCARLETT:**  We've available, Your Honor.  We've

8    been having discussions with Greg Lindstrom separately.

9              **THE COURT:**  Okay.  I will respect his process.  It's

10   his deal, so that's perfectly fine.  But don't let it languish

11   is --

12             **MS. SCARLETT:**  Understood.

13             **THE COURT:**  -- is my message.

14        Okay.  Now, if you can remind me.  Did I set a trial date?

15             **MS. MEHTA:**  Yes, Your Honor.  We have a trial date at

16   the end of 2024.

17             **THE COURT:**  End of 2024.  Okay.

18        All right.  A lot of expense is coming up.  You have an

19   enormous -- actually, probably more expense -- at least as much

20   as you spent so far, and maybe even more.  So this is a good

21   time to think about how you're going to turn off the tap in a

22   way that makes everybody at least semihappy.  At settlement,

23   you're only semihappy.  Nobody is thrilled.  You're only

24   semihappy, each side.  That's a good settlement, okay, when

25   you're both semihappy.  So let's put some heat on it.

```
 1        Okay.  I am reluctant to ask:  Anything else for today?
 2            MS. MEHTA:  No, Your Honor.
 3            THE COURT:  Excellent answer.
 4        Plaintiffs?
 5            MS. SCARLETT:  No, Your Honor.
 6            THE COURT:  Great.  Okay.  That's it for discovery.
 7    Whew, we made it.
 8            MS. MEHTA:  Thank you, Your Honor.
 9            THE COURT:  Done.  All right.  Thanks.
10            THE CLERK:  All rise.  Court's in recess.
11                (Proceedings adjourned at 11:05 a.m.)
12                            ---o0o---
13
14                    CERTIFICATE OF REPORTER
15        I certify that the foregoing is a correct transcript
16    from the record of proceedings in the above-entitled matter.
17
18    DATE:  Sunday, July 2, 2023
19
20
21                    Ana Dub
22    _____
23            Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter
24
25
```