## FILED UNDER SEAL

**BATHAEE DUNNE LLP**
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Andrew C. Wolinsky (CA 345965)
awolinsky@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
Tel.: (332) 322-8835

Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (*pro hac vice*)
egrauman@bathaeedunne.com
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
Tel.: (213) 462-2772

*Interim Co-Lead Counsel for the
Advertiser Classes*

[Additional counsel on signature page]

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Amanda F. Lawrence (*pro hac vice*)
alawrence@scott-scott.com
Patrick J. McGahan (*pro hac vice*)
pmcgahan@scott-scott.com
Michael P. Srodoski (*pro hac vice*)
msrodoski@scott-scott.com
156 South Main Street, P.O. Box 192
Colchester, CT 06415
Tel.: (860) 537-5537

Patrick J. Coughlin (CA 111070)
pcoughlin@scott-scott.com
Carmen A. Medici (CA 248417)
cmedici@scott-scott.com
Hal D. Cunningham (CA 243048)
hcunningham@scott-scott.com
Daniel J. Brockwell (CA 335983)
dbrockwell@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: (619) 233-4565

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on Behalf of Themselves and All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> META PLATFORMS, INC., <br><br> Defendant. | Case No. 3:20-cv-08570-JD <br><br> Hon. James Donato <br><br> **ADVERTISER PLAINTIFFS' NOTICE OF MOTION, MOTION FOR CLASS CERTIFICATION, AND MEMORANDUM IN SUPPORT** <br><br><br> Hearing Date: December 14, 2023 <br> Hearing Time: 10:00 a.m. <br> Courtroom 11, 19th Floor |

**FILED UNDER SEAL**

## TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................1

STATEMENT OF COMMON FACTS.................................................................................3

    I.      THE PROPOSED CLASS ..................................................................3

    II.     COMMON CLASSWIDE EVIDENCE OF THE RELEVANT MARKET ..........4

    III.    COMMON CLASSWIDE EVIDENCE OF META'S UNLAWFUL CONDUCT ..............................................................5

    IV.    COMMON EVIDENCE OF CLASSWIDE ANTITRUST IMPACT.................11

        A.    Common Evidence Shows that Meta Had Monopoly Power in the Social Advertising Market ..............................................................11

        B.    Common Evidence Shows that All or Virtually All Class Members Were Injured by Meta's Conduct.......................................13

        C.    Aggregate Damages Can Be Calculated on a Classwide Basis .................14

ARGUMENT ......................................................................................................14

    V.     THE REQUIREMENTS OF RULE 23(A) ARE SATISFIED.............................15

        A.    Rule 23(a)(1)'s Numerosity Requirement Is Met .....................................15

        B.    Rule 23(a)(2)'s Commonality Requirement Is Met ..................................15

        C.    Rule 23(a)(3)'s Typicality Requirement Is Met........................................16

        D.    Rule 23(a)(4) and 23(g) Adequacy Requirements Are Met......................17

    VI.    THE REQUIREMENTS OF RULE 23(B)(3) ARE SATISFIED .........................18

        A.    The Predominance Requirement Is Met ....................................................18

            1.    Common Questions Predominate as to Meta's Antitrust Violations...............................................................19

            2.    Common Questions Predominate as to Antitrust Impact and Damages.................................................................21

        B.    The Superiority Requirement Is Met .........................................................25

CONCLUSION....................................................................................................25

i

**FILED UNDER SEAL**

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)...........................................................................................................2, 19

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013).............................................................................................................18

*Bias v. Wells Fargo & Co.*,
    312 F.R.D. 528 (N.D. Cal. 2015)..........................................................................................16

*Cancino Castellar v. Mayorkas*,
    No. 17-cv-00491, 2021 WL 4081559 (S.D. Cal. Sept. 8, 2021)............................................4

*City of Anaheim v. S. Cal. Edison Co.*,
    955 F.2d 1373 (9th Cir. 1992) .............................................................................................23

*DZ Rsrv. v. Meta Platforms, Inc.*,
    No. 3:18-cv-04978-JD, 2022 WL 912890 (N.D. Cal. Mar. 29, 2022) (Donato, J.) ........ *passim*

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023) ................................................................................................19

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011)..............................................................................................................18

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ...............................................................................................20

*Giuliano v. Sandisk Corp.*,
    No. C 10-02787-SBA, 2015 WL 10890654 (N.D. Cal. May 14, 2015) ................................24

*Hill v. Xerox Bus. Servs., LLC*,
    59 F.4th 457 (9th Cir. 2023) .............................................................................................4, 16

*In re Capacitors Antitrust Litig. (No. III)*,
    No. 14-CV-03264-JD, 2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) (Donato, J.)..............25

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
    No. 02-1486-PJH, 2006 WL 1530166 (N.D. Cal. June 5, 2006)...........................................21

*In re Glumetza Antitrust Litig.*,
    336 F.R.D. 468 (N.D. Cal. 2020).............................................................................19, 20, 21

**FILED UNDER SEAL**

*In re Google Play Store Antitrust Litig.*,
   No. 21-md-02981-JD, 2022 WL 17252587 (N.D. Cal. Nov. 28, 2022)
   (Donato, J.).............................................................................................................18

*In re High-Tech Emp. Antitrust Litig.*,
   985 F. Supp. 2d 1167 (N.D. Cal. 2013) ...............................................................15

*In re Hyundai & Kia Fuel Econ. Litig.*,
   926 F.3d 539 (9th Cir. 2019) (*en banc*) .............................................................18

*In re Live Concert Antitrust Litig.*,
   247 F.R.D. 98 (C.D. Cal. 2007) ......................................................................20, 21

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ..............................................................................20

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
   No. C 09-1967 CW, 2013 WL 5979327 (N.D. Cal. Nov. 8, 2013) ........................16

*In re Packaged Seafood Prods. Antitrust Litig.*,
   332 F.R.D. 308 (S.D. Cal. 2019), *aff'd sub nom. Olean*, 31 F.4th .........................21

*In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*,
   967 F.3d 264 (3d Cir. 2020)............................................................................22, 23

*In re TFT-LCD*,
   267 F.R.D...............................................................................................................25

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   267 F.R.D 583 (N.D. Cal. 2010)..............................................................................4

*Johnson v. City of Grants Pass*,
   72 F.4th 868 (9th Cir. 2023) .................................................................................15

*Krehl v. Baskin-Robbins Ice Cream Co.*,
   78 F.R.D. 108 (C.D. Cal. 1978) ............................................................................20

*Kumar v. Salov N. Am. Corp.*,
   No, 14-cv-2411-YGR, 2016 WL 3844334 (N.D. Cal. July 15, 2016)...................17

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) (*en banc*) .......................................................... *passim*

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   993 F.3d 774 (9th Cir. 2021), *vacated on other grounds*, 31 F.4th 651 (9th Cir.
   2022) .....................................................................................................................21

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
   20 F.4th 466 (9th Cir. 2021)..................................................................................19

**FILED UNDER SEAL**

*Roman v. Jan-Pro Franchising Int'l, Inc.*,
   342 F.R.D. 274 (N.D. Cal. 2022) .......................................................................4, 16

*Ruiz Torres v. Mercer Canyons Inc.*,
   835 F.3d 1125 (9th Cir. 2016) ........................................................................16, 21

*Senne v. Kan. City Royals Baseball Corp.*,
   934 F.3d 918 (9th Cir. 2019) ................................................................................14

*Staton v. Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003) ................................................................................17

*Tawfilis v. Allergan, Inc.*,
   No. 8:15-cv-00307-JLS-JCG, 2017 WL 3084275 (C.D. Cal. June 26, 2017)...................21, 25

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016)..............................................................................................18

*United States v. Topco Assocs., Inc.*,
   405 U.S. 596 (1972)..............................................................................................20

*Vaquero v. Ashley Furniture Indus., Inc.*,
   824 F.3d 1150 (9th Cir. 2016) ..............................................................................22

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011).......................................................................................15, 16

*Wolin v. Jaguar Land Rover N. Am., LLC*,
   617 F.3d 1168 (9th Cir. 2010) ..............................................................................25

**Statutes, Rules, and Regulations**

15 U.S.C.
   §1............................................................................................................19, 20
   §2....................................................................................................19, 20, 21
   §15.........................................................................................................................19

Federal Rules of Civil Procedure
   Rule 23 .........................................................................................4, 15, 16, 21
   Rule 23(a)...............................................................................14, 15, 17, 18
   Rule 23(a)(1)....................................................................................................15
   Rule 23(a)(2)....................................................................................................15
   Rule 23(a)(3)....................................................................................................16
   Rule 23(a)(4)....................................................................................................17
   Rule 23(b)........................................................................................................14
   Rule 23(b)(3)............................................................................2, 15, 18, 25
   Rule 23(g) .......................................................................................................17
   Rule 23(g)(4)...................................................................................................17

**FILED UNDER SEAL**

**Other Authorities**

6 *Newberg and Rubenstein on Class Actions* (6th ed. 2022)
§12:2 ................................................................................................................22
§20:24 ..............................................................................................................20
§20:28 ..............................................................................................................20

**FILED UNDER SEAL**

**NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION**

PLEASE TAKE NOTICE that on December 14, 2023, at 10:00 a.m., before the Honorable James Donato, of the United States District Court for the Northern District of California, San Francisco Division, 450 Golden Gate Avenue, San Francisco, California, Courtroom 11, 19th Floor, Advertiser Plaintiffs Affilious, Inc., Jessyca Frederick, Mark Berney, 406 Property Services, PLLC, Mark Young, and Katherine Looper, on behalf of themselves and all others similarly situated, will and now do move the Court for an order granting Advertiser Plaintiffs' Motion for Class Certification pursuant to Federal Rule of Civil Procedure 23.

Advertiser Plaintiffs seek entry of an order (1) certifying a proposed Rule 23(b)(3) class; (2) appointing Advertiser Plaintiffs Affilious, Inc., Jessyca Frederick, Mark Berney, 406 Property Services, PLLC, Mark Young, and Katherine Looper as representatives of the Class; and (3) appointing Yavar Bathaee of Bathaee Dunne LLP and Amanda F. Lawrence of Scott+Scott Attorneys at Law LLP as Co-Lead Class Counsel for the Class.  Advertiser Plaintiffs propose that the Class for their Sherman Act claims be defined as follows:

**THE ADVERTISER CLASS**

> All persons, including entities and/or corporations, in the United States who purchased advertising from Meta Platforms, Inc. (f/k/a Facebook, Inc.) between December 1, 2016, and December 31, 2020 (the "Class Period").

Excluded from the Advertiser Class are Meta Platforms, Inc. (f/k/a Facebook, Inc.) ("Meta") and its officers, directors, employees, and successors; any person or entity who has (or had during the Class Period) a controlling interest in Meta; any affiliate, legal representative, heir, or assign of Meta; any judicial officer presiding over this action and their immediate family members and judicial staffs; and any juror assigned to this action.

This motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, all filed supporting declarations and exhibits, the expert reports and reply expert reports of Dr. Michael Williams, Prof. Joshua Gans, Kevin Kreitzman, and Scott Fasser, the records from this action, and any argument that may be presented at or before the hearing on this Motion.

**FILED UNDER SEAL**

1                          **MEMORANDUM OF POINTS AND AUTHORITIES**

2        In 2016, Meta Platforms, Inc. ("Meta"), then called Facebook, faced an existential threat to

3 its dominance over a unique type of advertising – social advertising.  Facebook had recently scuttled

4 its developer platform to eliminate competition from third-party applications, but was left vulnerable

5 by the resulting paucity of "signals" it used to target advertising and content to its users.  At the same

6 time, a technological sea change was occurring in how advertising could be targeted.  A new form of

7 artificial intelligence was rising – based not on hardcoded instructions by computer programs, but on

8 deep layers of neural networks, which could make decisions based directly on observed data.  This

9 exacerbated Facebook's dilemma from its recent destruction of thousands of third-party apps running

10 on its social network, which might have otherwise provided Facebook the engagement and user data

11 it needed to transition to cutting-edge targeting technologies.  For the first time, the powerful barrier

12 to entry that protected Facebook's business, the Data Targeting Barrier to Entry (the "DTBE"), was

13 threatened, leaving Facebook's social advertising monopoly potentially vulnerable to competition

14 from new entrants.  And indeed, a new entrant had arrived – an app called Snapchat, which was

15 rapidly overtaking Facebook's popularity among younger users.

16        By late 2016, Facebook was in bet-the-company mode to protect its powerful market position

17 – a position that had afforded it substantial, and growing, pricing power over social advertisers.  Under

18 the direct supervision of its founder Mark Zuckerberg, the company began an aggressive campaign

19 to maintain and strengthen its monopoly.  From 2016 through 2020, Facebook wiretapped its

20 competitors, ▮▮▮▮▮▮▮▮▮▮ to neutralize competition; it bought off would-be competitors like

21 ▮▮▮▮▮▮▮▮▮▮▮▮ with competition-restricting API deals; cut a deal with Netflix (whose

22 CEO sat on Facebook's board) to cripple Facebook's premium video product; and agreed to a brazen

23 market division with Google.  All the while, Facebook raced to integrate ▮▮▮▮▮▮▮▮▮

24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and when the FTC

25 investigated Facebook's integration, the company misled it to avoid divestiture.  This multi-pronged

26 campaign worked.  Facebook was able to back off the financial precipice it was on the edge of in late

27 2016, successfully extending its social advertising monopoly into the next decade, allowing it to

28

**FILED UNDER SEAL**

1  repeatedly and substantially raise social advertising prices into 2020 without losing market share –

2  all while product quality stagnated, ███████████████████

3       The named Advertiser Plaintiffs – proposed as Class representatives here – are people and

4  companies that bought social advertising at prices inflated by Meta's unlawfully maintained

5  monopoly.  Advertiser Plaintiffs seek to certify a single class of Meta advertising purchasers from

6  December 1, 2016, to December 31, 2020.  As explained below, their claims are precisely the sort

7  suitable for classwide treatment.  Every element required for a Rule 23(b)(3) class is met here.

8       *First*, there is no question that Advertiser Plaintiffs' claims present issues common to all Class

9  members, including as to Meta's liability under the antitrust laws.  Questions such as market

10  definition, market power, and exclusionary conduct will be proven exclusively through common

11  evidence from Meta and third parties.  These questions are about ***Meta's*** conduct and are not answered

12  differently for any of the Advertiser Plaintiffs or Class members.  Moreover, injury and damages

13  issues also present common questions under the methodology proposed by Advertiser Plaintiffs'

14  experts.  Meta's exclusionary conduct maintained its monopoly – unlawfully – during the entire Class

15  Period and wreaked a consistent overcharge on each member of the proposed Class.

16       *Second*, these common questions plainly predominate the issues to be tried.  In antitrust cases,

17  liability issues are a canonically predominant common question.  *See Amchem Prods., Inc. v. Windsor*,

18  521 U.S. 591, 625 (1997).  As to damages, the methodology proposed by Advertiser Plaintiffs' expert,

19  Dr. Michael Williams, arrives at readily calculable overcharge damages for every member of the

20  Class based on a well-established yardstick damages methodology.  Facebook's purported expert,

21  Dr. Catherine Tucker, presents several predominance arguments, but none of them are availing.

22  Dr. Tucker, for example, argues that Dr. Williams' damages methodology fails to consider the

23  benefits to each individual Class member arising from Facebook's anticompetitive conduct, but as

24  Dr. Tucker herself explains, she does not provide evidence of such benefits – unsurprising, given that

25  Dr. Williams found no improvement to Facebook's social advertising products, ███████████

26  ████████████████████████ during the Class Period.  Dr. Tucker also makes

27  arguments about the effects from particular Meta actions, but ***not*** from the monopoly those actions

28  unlawfully maintained – an economically unsound analysis, given that (as two different experts

2

**FILED UNDER SEAL**

explain) it was Meta's unlawful monopoly that caused the overcharge injury to Advertiser Plaintiffs and the proposed Class. Dr. Tucker also falls back to the unfounded refrain that various ads are priced differently, but neglects the documented workings of Meta's advertising auctions in doing so. Not one of Dr. Tucker's criticisms show that common issues would not predominate a trial in this action – not even close. Should Meta rely on those criticisms, they cannot defeat class certification here.

*Finally*, the elements of typicality and adequacy are met. Advertiser Plaintiffs purchased ads during the Class Period and are typical of the antitrust claims to be asserted by every member of the Class, particularly given Facebook's conduct in this litigation waiving any post-May 2018 arbitration. As to adequacy, the named Advertiser Plaintiffs have invested significant time and effort in this case, including being deposed and making extensive document productions. Advertiser Plaintiffs' counsel have also vigorously litigated the case, including by taking depositions, litigating discovery issues, and overcoming two motions to dismiss by Meta. Put simply, every element for class certification is met here – based on extensive evidence. The Court should certify the proposed Advertiser Class, and this case should be tried on a classwide basis.

## STATEMENT OF COMMON FACTS[1]

### I.  THE PROPOSED CLASS

Advertiser Plaintiffs propose a single class for certification, consisting of everyone who bought advertising from Meta between December 1, 2016, and December 31, 2020. While this differs in two respects from the classes proposed in the AFAC, those differences are logical and merited in light of case developments since the filing of the AFAC.[2] *First*, the class period is narrower in this motion (here, it ends on December 31, 2020) than in the AFAC (there, it continued to "the present"), reflecting the time period of Meta's exclusionary conduct and classwide overcharge identified in fact and expert discovery. *Second*, the AFAC proposed two classes split in time based on an arbitration clause introduced into Meta's Commercial Terms on April 4, 2018. However, Meta's actions in this

---

[1]     The Statement of Common Facts is cited herein as "SOCF."

[2]     Advertiser Plaintiffs' First Amended Complaint ("AFAC") defines two classes: (i) all people who bought advertising from Meta between December 1, 2016, and April 3, 2018, but not after April 3, 2018; and (ii) all people who bought advertising from Meta between April 4, 2018, and the present. ECF No. 237 (AFAC), ¶¶839, 842.

**FILED UNDER SEAL**

1  litigation – including vigorously litigating, on the merits, market definition, monopoly power,

2  damages, and anticompetitive conduct issues extending from 2016 through late 2020 – have

3  unambiguously waived any right to arbitrate the claims of proposed Class members.[3]

4       Advertiser Plaintiffs' proposed class definition is thus narrower than that proposed in the

5  AFAC, and the changes are minor and non-prejudicial to Meta.  The Court can and should consider

6  the class as proposed in this motion.[4]  However, if the Court declines to adopt Advertiser Plaintiffs'

7  proposed updated class definition, or if Meta argues that it has not waived arbitration and the Court

8  agrees, the Rule 23 arguments set forth here, and the analysis conducted by Advertiser Plaintiffs'

9  class certification experts, would support certifying two classes, one for advertisements purchased

10 prior to May 25, 2018, and a second for advertisements purchased on or after May 25, 2018.  *See*

11 *Cancino Castellar*, 2021 WL 4081559, at *10 (exercising Court's "broad authority to redefine classes

12 as appropriate" to analyze class different from that brought in certification motion); Williams Rpt.,

13 ¶6 (analysis applies to split classes from AFAC).[5]

14 **II.    COMMON CLASSWIDE EVIDENCE OF THE RELEVANT MARKET**

15      The relevant antitrust market in this action – the United States Social Advertising Market –

16 will be defined through common, classwide evidence.  As explained by Dr. Michael Williams in his

17 expert report, social advertising is advertising that can be targeted based on social data contained in

18 a "social graph."  Williams Rpt., ¶¶10, 16-29.  Similarly, Prof. Joshua Gans reinforces in his expert

19 report that social advertising is advertising that uses data "to predict the purchase intents of particular

20 users" that is obtained primarily from "a user's social graph."  Gans Rpt., ¶¶23-24.  The effectiveness

---

21 [3]     *See Hill v. Xerox Bus. Servs., LLC*, 59 F.4th 457, 469-70 & n.15 (9th Cir. 2023); *DZ Rsrv. v.*
22 *Meta Platforms, Inc.*, No. 3:18-cv-04978-JD, 2022 WL 912890, at *4 (N.D. Cal. Mar. 29, 2022)
   (Donato, J.); *Roman v. Jan-Pro Franchising Int'l, Inc.*, 342 F.R.D. 274, 290-94 (N.D. Cal. 2022).

23 [4]     *See Cancino Castellar v. Mayorkas*, No. 17-cv-00491, 2021 WL 4081559, at *8 (S.D. Cal.
24 Sept. 8, 2021) ("The definition of the class at the class certification stage may diverge from that set
   forth in the Complaint, as long as the new class definition is narrower than the original . . . or the
25 proposed change is minor and non-prejudicial to the defendant."); *In re TFT-LCD (Flat Panel)*
   *Antitrust Litig.*, 267 F.R.D. 583, 590-91 (N.D. Cal. 2010) (modified class definitions permitted where
26 they were "minor, required no additional discovery, and caused no prejudice to defendants").  Unless
   otherwise noted, emphasis is added and citations are omitted throughout.

27 [5]     The expert reports and reply expert reports of Advertiser Plaintiffs' experts Dr. Michael
28 Williams, Prof. Joshua Gans, Kevin Kreitzman, and Scott Fasser are submitted as exhibits to each
   expert's declaration filed herewith.  For example, the Williams Report ("Rpt.") and Williams Reply
   Report ("Reply") are Exhibits A and B to the Williams Declaration.

**FILED UNDER SEAL**

1   of social advertising depends on both the quality and quantity of social data used to train the offeror's

2   artificial intelligence/machine learning ("AI/ML") models and the possession of better AI/ML

3   modeling systems, and a nascent Social Advertising Market competitor must reach a critical mass of

4   both social data and AI/ML to meaningfully challenge incumbent firms.  Williams Rpt., ¶¶22-29.

5   Facebook and Instagram sold social advertising during the Class Period, as did Twitter, LinkedIn,

6   and Snap, among others.  *Id.*, ¶¶30-68.  All of Meta's ad products sold during the Class Period across

7   Facebook and Instagram were social advertising products.  Williams Reply, ¶¶46-52.  Meta had a

8   dominant position in the United States Social Advertising Market throughout the Class Period,

9   including the ability to raise prices to supracompetitive levels – which it did.  Williams Rpt., ¶¶216-

10  322.  At trial, Advertiser Plaintiffs will prove that the United States Social Advertising Market is a

11  relevant antitrust market through common, classwide evidence (*id.*, ¶¶127-143), including through

12  *Brown Shoe* evidence drawn from common sources and well-established economic theories, including

13  Meta's own documents and testimony; the documents and testimony of relevant third parties

14  including advertising purchasers and sellers, regulators, and industry analysts; and Dr. Williams'

15  classwide economic analysis, including a SSNIP test.  *Id.*, ¶¶144-215.

16  **III.   COMMON CLASSWIDE EVIDENCE OF META'S UNLAWFUL CONDUCT**

17          Trial in this case will focus principally on common, classwide evidence of Meta's

18  anticompetitive conduct.  Specifically, Advertiser Plaintiffs will prove that Meta maintained its

19  monopoly between December 2016 and December 2020 through an anticompetitive course of conduct

20  comprising five principal categories of exclusionary acts: (1) Meta's use of Onavo technology,

21  including Meta's ████████████████████████ to monitor and preempt competitive threats,

22  including from Facebook's horizontal Social Advertising competitor Snapchat; (2) Meta's

23  agreements with hand-picked potential entrants, including ████████████████████████

24  ████████████████████████████████████ for access to private

25  Application Programming Interfaces ("APIs"), which provided these third parties with private Meta

26  user data ████████████████████████████████████ (3)

27  Meta's agreement with Netflix to obtain large advertising expenditures from Netflix that inflated the

28  demand for (and price of) Facebook's social advertising and ensured that the signals generated from

**FILED UNDER SEAL**

Netflix ads would go to Meta and not an actual or potential social advertising rival, in exchange for Meta's agreement to scuttle certain aspects of its Facebook Watch product, which threatened competition against Netflix in its core video streaming market; (4) Meta's agreement with Google to stave off potential competition from Google's open web display advertising product in return for Meta's abandonment of entry into Google's core market and for billions of dollars in guaranteed advertising spending on Google's advertising exchange; and (5) Meta's deception of the U.S. Federal Trade Commission ("FTC") to forestall divestiture or regulatory scrutiny as Meta integrated signals from across its business through a one-stop "buffet" for AI/ML training.  These exclusionary acts will be the unambiguous centerpiece of a trial, and, as shown below, each category will be proved through common, classwide evidence – principally evidence from Meta's own documents and witnesses.

*First*, during the Class Period, Meta used Onavo technology to wiretap its competitors, including ██████████████████████████████████  In this program, Meta paid people (some of whom were teenagers) to ██████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ Ex. 1 at 799-802, Ex. 2 at 831.[6]  The technical details and competitive impact of this program, including its exclusionary impact on ██████ and other actual or potential Social Advertising rivals during the Class Period, will be proved through common, classwide evidence.  For example, ██████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████ *See* Ex. 3 at 836. ████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████ Ex. 4 at 275 ████████████████████████████████████

---

[6]     Citations to numbered exhibits refer to the exhibits to the accompanying Declaration of Amanda F. Lawrence.  Pin citations are cited by the final three digits of the Bates-stamp.

**FILED UNDER SEAL**

1 ████████████████████████████████████████████████████████████████

2 ███████████████████████████████████████████████████ Ex. 5, Ex. 6, Ex. 7 at

3 975-981.   Common, classwide evidence – both from Meta and from ████████ executives – will

4 likewise show that this conduct was intended to, and successfully did, fortify Meta's Social

5 Advertising dominance.  *Compare* Ex. 8 at 331 ████████████████████████████

6 ████████████████████████████████████ *with* Ex. 9 at 966 ████████████████

7 ████████████████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████████████████

9 ██████████ *see* Ex. 4 at 275 ████████████████████████████████████

10 ████████████████████████████████████████████ Ex. 6 (same), Ex. 10 at 236 ██

11 ████████████████████████████████████████████████████████████████

12 ███████████████████████████████████████ This included by, ████████████████

13 ████████████████████████████████████████████████████████████████

14 ██████████████████████████████████ Ex. 11 at 50:12-22.

15        *Second*, during and leading up to the Class Period, Meta secretly entered into private extended

16 API agreements with selected companies with large user bases and data troves that made those

17 companies particularly well-suited to build or equip a potential Social Advertising rival.  For example,

18 Meta entered into such agreements with ████████████████████████ – companies that

19 threatened Meta's DTBE through social elements of their products (*e.g.*, ████████████████

20 ██████████████████████████████ that could potentially be leveraged to create a

21 rival Social Advertising platform or product.   These private extended API agreements included

22 ████████████████████████████████████████ which helped prevent or restrict

23 entry into the Social Advertising Market by Meta's private API counterparties.  The restrictions were

24 in force, and counterparties like ████████████████████████████████████████

25 ████████████████████████████████████████████████████████████████

26 All the foregoing will be shown through common, classwide evidence.  For example:

27        • ████████████████████████████████████████████████████████

28          ████████████████████████████████████████████████████████

1  ██████████████████████████████████████████████████████████████

2  ████████████████████████████ (Ex. 12 at 387-88);

3  •  ██████████████████████████████████████████████████████████

4  ██████████████████ (Ex. 13, Ex. 14 at 709, Ex. 15 at 288);

5  •  ██████████████████████████████████████████████████████████

6  ████████████████████████ (Ex. 16 at 678);

7  •  ██████████████████████████████████████████████████████████

8  ██████████████████████████████████████████████████████████

9  ████████████████████████ (Ex. 17 at 557);

10  •  ██████████████████████████████████████████████████████████

11  ██████████████████████████████████████████████████████████

12  ████████████ and others during the Class Period (Ex. 18);

13  •  ██████████████████████████████████████████████████████████

14  ██████████████████████████████ (Ex. 19 at 859-61); and

15  •  the agreements themselves, ████████████████████████████████████

16  ████████████████████████████ (*e.g.*, Ex. 20 at 263-64, 267; *see also* Ex. 21, Ex.

17  22 at 248:2-250:25).

18    *Third,* during the Class Period, Meta entered into an agreement with Netflix that reduced direct

19  competition between the two companies in exchange for kickbacks benefiting Meta's Social

20  Advertising business.  Everything about this agreement will be proven through common, classwide

21  evidence at trial – specifically, through documents and testimony from Meta witnesses and from Reed

22  Hastings, Netflix's founder and former CEO.  For example, Meta-produced documents will show that

23  from the start of the Class Period through early 2019, Hastings was a member of Meta's Board (Ex.

24  23); ██████████████████████████████████████████████████████████

25  ████████████████████████████████████ (Ex. 24 at 050 ████████████

26  ████████████████████████████████████████████ Ex. 25, Ex. 26, Ex. 27, Ex.

27  28); and that by mid-2017, Meta and Netflix were moving into direct competition with one another

28  in video streaming – ████████████████████████████████ Ex. 29  at 590 ██████████

**FILED UNDER SEAL**

1　████████████████████████████████████████████████

2　██████████████████ Ex. 30; *cf.* Ex. 31 at 587 ████████████

3　████████████████████████████████████████████████

4　█████████████████ Meta-produced documents and related testimony will also show that

5　████████████████████████████████████████████████

6　████████████████████████████████████████████████

7　████████████████████████████████████████████████

8　████████████████████████████ (Ex. 32, Ex. 33 at 836-37), ████████

9　██████████████████████████████████ (Ex. 34 at 272), ████████

10　████████████████████████████████████████████████

11　Ex. 35.  Meta-produced evidence will likewise show that ████████████

12　████████████████████████████████████████████████

13　█████████████  Ex. 36 at 031.  And common, classwide evidence will show that after the

14　agreement was struck, █████████████████████████████████

15　███████████████████████████████ (Ex. 37 at 140), and that in

16　████████████████████████████████████████████████

17　████████████████████████████████████████████████

18　████████████████████████████████████████████████

19　Ex. 38 at 983.  Finally, common evidence will show that ████████████████

20　████████████████████████████████████████████████

21　████████████████████████████████████████████████

22　████████████████████ Ex. 39 at 295, Ex. 40.

23　　　　*Fourth*, in late September 2018, Meta entered into a market division agreement with Google

24　– that is, an agreement not to compete or enter adjacent markets.  This agreement will be proven

25　exclusively through common, classwide evidence, including ████████████████████

26　███████████████████ (Ex. 41), ████████████████████

27　███████████████████ (Ex. 42) – as well as Meta-produced and

28　Google-produced internal documents and testimony regarding the negotiations, context, and

**FILED UNDER SEAL**

1    aftereffects of the companies' market division.   Thus, for example, ██████████████

2    █████████████████████████████████████████████████████████████████████████

3    █████████████████████████████████████████████████████████████████████████

4    █████████████████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████  *See, e.g.*,

6    Ex. 43.

7          When header-bidding technology threatened Google's open-web display advertising business

8    model and Meta publicly threatened to adopt it in 2017 in connection with its display network, FAN,

9    each company posed an imminent competitive threat to an online advertising submarket previously

10   dominated by the other.  *Id.*, Ex. 44, Ex. 45, Ex. 46, Ex. 47, Ex. 48 at 237:10-238:14, Ex. 49 at 156:11-

11   157:1, 169:12-15, 209:25-210:12.  In response to the threat from header bidding, Google developed

12   a new open-web display product, Exchange Bidding Dynamic Allocation ("EBDA" or "Open

13   Bidding"), ███████████████████████████████  Ex. 50; *see also* Ex. 51, Ex.

14   52, Ex. 53, Ex. 49 at 223:4-224:24, 228:5-11, 230:1-8.

15         This mutual competitive pressure was deflated by the companies agreeing to divide markets,

16   █████████████████████████████████████████████████████████████████  Ex.

17   54, Ex. 55, Ex. 56, Ex. 57, Ex. 58, Ex. 59.  ████████████████████████

18   █████████████████████████████████████████████████████████████████████████

19   █████████████████████████████████████████████████████████████████████████

20   ████████████████████████████████████  Ex. 41 at 359-60, Ex. 60, Ex. 61, Ex. 62, Ex.

21   48 at 219-28, Ex. 63 at 148:3-15.  ███████████████████████████████

22   ███████████████████████  (Ex. 41 at 361-66), ███████████████████████████

23   ███████████  Ex. 64 at 415, Ex. 65, Ex. 66 at 188, 199, 201, 207, Ex. 63 at 205:22-207:19.  All of

24   this evidence at trial will be common and classwide, principally from the documents and testimony

25   of Meta and Google themselves.

26         *Fifth*, Meta deceived the FTC and the public during the Class Period regarding the viability

27   of divestiture and segregation of Meta's business units and data from its Facebook Blue, Instagram,

28   WhatsApp, and Messenger lines of business, while at the same time racing to implement a

10

**FILED UNDER SEAL**

1 ████████████████████████████████████████████████████

2 ██████ This conduct, which prevented any divestiture (or segregation-related competitive price

3 check) from occurring during the Class Period ███████████████████████████

4 ████████████████████████████████████████████████████

5 ██████ will be proven entirely through common, classwide evidence.  For example, common

6 evidence will show that ████████████████████████████████

7 ████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████

9 ███████████████████████████████████████ *See, e.g.*, Ex.

10 67, Ex. 68. ████████████████████████████████████████

11 ████████████████████████████████████████████████████

12 ████████████████████████████████████████ Ex. 69, Ex. 70 at

13 151:10-13; Ex. 71 at 2-5 ███████████████████████████

14 ████████████████████████████████████████████████████

15 ████████████████████████████████████████████ Ex.

16 69 at 779.  These omissions to the FTC are not only based on common evidence; they are undisputed.

## IV.   COMMON EVIDENCE OF CLASSWIDE ANTITRUST IMPACT

Advertiser Plaintiffs rely on widely accepted economic models and other common, classwide economic evidence in evaluating the effects of Meta's conduct on advertisers.  For example, Dr. Michael Williams' analysis shows that but for Meta's unlawfully maintained monopoly, Advertiser Plaintiffs and the proposed Class would have paid lower prices and benefited from improvements to quality, choice, and output in purchasing social advertisements during the Class Period.

### A.   Common Evidence Shows that Meta Had Monopoly Power in the Social Advertising Market

Advertiser Plaintiffs will prove through common, classwide evidence that Meta had monopoly power – that is, the ability to enhance its profits by raising prices substantially above marginal costs for a substantial volume of sales – in the United States Social Advertising Market during the Class

Period.  *See* Williams Rpt., ¶¶216-322.  This will be shown through both direct and indirect evidence, on a common, classwide basis, as Dr. Williams explains in his expert report.

As direct evidence of Meta's monopoly power in the U.S. Social Advertising Market, Dr. Williams used Meta's economic profit rate ("EPR"), return on capital employed ("ROCE"), and operating margin (calculated by Advertiser Plaintiffs' expert Kevin Kreitzman and the UK's principal antitrust regulator, CMA) to conclude that Meta had monopoly power during the Class Period.  *See* Williams Rpt. at 97-98 ███████████████████████████████████████████████████ ████████████████████████████ *id.* at 99 ██████████████████████████████████████ ███████████████████████████████████████████ *id.* at 99-100 ████████████████ ███████████████████████████████████████████████████████████████████████ ██████  These direct measures of market power indicate, through widely accepted economic methods using common evidence, that Meta was able to enhance its profits by raising prices substantially above marginal costs for a large volume of sales over a sustained period of time.  *Id.*  Additionally, Meta's own documents produced in this case are common evidence that Meta had pricing power, which it exercised by consistently raising prices during the Class Period without sacrificing market share.  *Id.* at 100-01.  Further, competition authorities, industry analysts, and market participants have concluded that Meta had monopoly power in the Social Advertising Market during the Class Period (*id.* at 101-13), and Meta- and third-party-produced documents and testimony show that Meta could and did exclude competition from the Social Advertising Market both leading up to and during the Class Period.  *Id.* at 113-28.  All of the above is common evidence, based on widely accepted economic methodology, which will be used to show on a classwide basis that Meta had monopoly power in the Social Advertising Market during the Class Period.

Advertiser Plaintiffs will also show through indirect evidence that Meta had monopoly power in the U.S. Social Advertising Market during the Class Period.  *See* Williams Rpt., ¶¶285-322.  Meta's market share in the U.S. Social Advertising Market increased from 18.4% in 2008 to 82.7% in 2020, and ranged from 82.7% to 84.0% during the Class Period.  *Id.*, ¶¶285-290; *see also id.*, ¶¶291-295 ██████████████████████████████████████████████████████████████████  Common evidence, including reports and analyses by competition authorities and academic experts (*id.*, ¶¶296-

**FILED UNDER SEAL**

311), and Meta's own documents (*id.*, ¶¶312-322), will show that there are substantial barriers to entry into the Social Advertising Market – further indirect evidence of Meta's monopoly power given its dominant market position.

> **B.    Common Evidence Shows that All or Virtually All Class Members Were Injured by Meta's Conduct**

Dr. Williams uses well-accepted economic methods and common evidence to show that all, or virtually all, members of the proposed Class were injured due to a classwide price inflation in Meta's social advertising prices during the Class Period.  Williams Rpt., ¶¶324-354.  For example, Dr. Williams analyzes the social advertising prices that would have existed in a but-for world in the absence of the alleged conduct that maintained Meta's monopoly during the Class Period, employing a damages methodology that uses firms' EPRs based on a "yardstick" model.  *Id.*, ¶¶324-326.  These are well-accepted economic methods for evaluating anticompetitive price inflation.  *Id.*    In collaboration with Mr. Kreitzman, Dr. Williams analyzes classwide economic injury by estimating Meta's but-for advertising revenues based on the EPRs of comparable companies (*id.*, ¶¶327-350), and concludes that but for Meta's monopoly-preserving anticompetitive conduct, Meta's advertising revenues would have been ▌▌▌▌▌ during the Class Period.  *Id.*, ¶¶351-354.  Put another way, its actual advertising revenues were ▌▌▌▌▌ than they would have been in the but-for world, meaning advertisers were overcharged by ▌▌▌ as a percentage of but-for values.  *Id.*

Dr. Williams also draws on the evidentiary record and the advertising industry expertise of Scott Fasser to conclude that Meta did not routinely offer discounts to individual advertisers, and that even advertisers who received discounts would have been injured as against the but-for world given the price inflation due to Meta's monopoly-maintaining anticompetitive conduct.  *Id.*, Williams Reply, ¶¶95-96; *see also* Ex. 72 at 13:23-16:24, 26:2-27:4 ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ Ex. 73 at 274:25-275:3 ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ Ex. 74 at 42:4-15, 45:25-46:5 ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

1    ███████████████████████████ Ex. 75 (*About ad auctions*, Meta Platforms, Inc.,

2    https://www.facebook.com/business/help/430291176997542?id=561906377587030)  ("Each time

3    there's an opportunity to show an ad to someone, an auction takes place to determine which ad to

4    show to that person.").  In view of the above, Dr. Williams concludes that social advertising prices

5    for Meta ads during the Class Period were higher for all or almost all members of the proposed Class

6    than the social advertising in a but-for world without Meta's monopoly-maintaining anticompetitive

7    conduct.  Williams Rpt., ¶354, Williams Reply, ¶96.

8    **C.    Aggregate Damages Can Be Calculated on a Classwide Basis**

9    Having determined the extent of the overcharge, on a classwide percentage difference basis,

10   between Meta's actual advertising revenues for the proposed Class and its but-for advertising

11   revenues, Dr. Williams multiplies this percentage overcharge by the relevant volume of commerce to

12   calculate aggregate damages on a classwide basis.  Williams Rpt., ¶354.  Specifically, using ████

13   ████ as the volume of commerce for U.S. Meta advertising during the Class Period (as calculated

14   by Mr. Kreitzman), Dr. Williams uses the EPR damages methodology based on a yardstick model

15   that he previously determined resulted in a classwide overcharge of ████ (as a percentage of actual

16   values) to calculate classwide damages for the proposed Class, across the Class Period, of ████

17   ████  *Id.*, ¶¶355-357.  Like classwide injury, classwide damages can and will be calculated using

18   well-accepted economic methods, using common evidence.  *Id.*; *see id.*, ¶¶324-354 (classwide

19   overcharge determination).  And though not required at this stage, Dr. Williams also explains how

20   individual damages can be calculated using a common formulaic method – multiplying the dollar

21   value of a given Class member's advertising purchases by the common classwide overcharge (as a

22   percentage of actual values).  Williams Reply, ¶64.

23   **ARGUMENT**

24   A plaintiff seeking class certification "must satisfy the four requirements of Rule 23(a):

25   (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation."  *Senne v. Kan.*

26   *City Royals Baseball Corp.*, 934 F.3d 918, 927 (9th Cir. 2019).  The plaintiff also "must show that

27   the class fits into one of three categories" set forth in Rule 23(b).  *Olean Wholesale Grocery Coop.,*

28   *Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022) (*en banc*).  Here, Advertiser

**FILED UNDER SEAL**

Plaintiffs propose a class under Rule 23(b)(3), under which a class may be certified if two additional requirements are met – predominance and superiority.  *See* Fed. R. Civ. P. 23(b)(3) (requiring a finding that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy").  Advertiser Plaintiffs' proposed Class meets these requirements and should be certified.

## V.   THE REQUIREMENTS OF RULE 23(A) ARE SATISFIED

### A.   Rule 23(a)(1)'s Numerosity Requirement Is Met

There can be no dispute that the proposed Class is so numerous such that joinder of all members would be "impracticable."[7]  Fed. R. Civ. P. 23(a)(1).  By July 2017, there were ███████ active U.S. advertisers across Meta platforms (Ex. 76), and in 2020 there were ██████████████ ██████████████████████████████████████  Ex. 77 at 862.  The proposed Class easily satisfies the numerosity requirement.  *See Johnson v. City of Grants Pass*, 72 F.4th 868, 886 (9th Cir. 2023) (holding that "classes of more than sixty [members] are sufficiently large" to satisfy numerosity requirement); *DZ Rsrv.*, 2022 WL 912890, at *3.

### B.   Rule 23(a)(2)'s Commonality Requirement Is Met

Rule 23(a) also requires one or more questions of law or fact common to the class.  Fed. R. Civ. P. 23(a)(2).  Rule 23 does not require that all questions of law and fact be common to every class member; rather, Advertiser Plaintiffs' claims "must depend upon a common contention . . . of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

"Antitrust liability alone constitutes a common question that 'will resolve an issue that is central to the validity' of each class member's claim 'in one stroke.'"  *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013).  Indeed, this case presents several common questions of law and fact that satisfy Rule 23's commonality requirement because they will "generate

---

[7]      Numerosity remains even if the class is divided into pre- and post-May 25, 2018 classes, as both classes would include millions of members.

1   common **answers** apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (emphasis

2   in original).  Further, each of these common questions is amenable to classwide resolution because

3   each "focuses on the actions of Defendant[] and does not vary by class member." *Bias v. Wells Fargo*

4   *& Co.*, 312 F.R.D. 528, 537 (N.D. Cal. 2015).  These common questions include whether, during the

5   Class Period: (1) there existed a relevant antitrust market consisting of social advertising in the United

6   States; (2) Meta possessed monopoly power in that market; (3) Meta willfully maintained its

7   monopoly in or attempted to monopolize that market; (4) Meta entered into an agreement with Google

8   in unreasonable restraint of trade; and (5) all (or nearly all) members of the Class suffered damage as

9   a result of Meta's anticompetitive conduct.  Commonality is readily satisfied.

10        **C.        Rule 23(a)(3)'s Typicality Requirement Is Met**

11              Rule 23's typicality requirement is "a 'permissive' standard" that is satisfied when the "claims

12   or defenses of the representative parties are typical of the claims or defenses of the class." *Bias*, 312

13   F.R.D. at 537.  "This requirement is usually satisfied if the named plaintiffs have suffered the same

14   or similar injuries as the unnamed class members, the action is based on conduct which is not unique

15   to the named plaintiffs, and other class members were injured by the same course of conduct."  *In re*

16   *NCAA Student-Athlete Name & Likeness Licensing Litig.*, No. C 09-1967 CW, 2013 WL 5979327, at

17   *4 (N.D. Cal. Nov. 8, 2013).  The representative claims need only be "'reasonably coextensive with

18   those of absent class members; they need not be substantially identical.'"  *Ruiz Torres v. Mercer*

19   *Canyons Inc.*, 835 F.3d 1125, 1141 (9th Cir. 2016).  Even when Class members "differ in advertising

20   budgets and scope of purchases," these differences do not defeat typicality because the advertising

21   "products, pricing, and programs accessed by class members" are sufficiently similar across Meta's

22   platforms.  *DZ Rsrv.*, 2022 WL 912890, at *4; *see* Williams Reply, ¶¶48-60; *supra*, SOCF, §IV.B.

23              Nor does Meta's May 2018 arbitration provision pose a challenge to typicality.  Not only has

24   Meta waived any right to arbitrate the claims of absent Class members by "vigorously litigat[ing] this

25   lawsuit in federal court as if arbitration were not an option," *DZ Rsrv.*, 2022 WL 912890 at *4; *see*

26   *also Hill*, 59 F.4th at 469-70 & n.15; *Roman*, 342 F.R.D. at 290-94, but even if arbitration were

27   relevant, it would not defeat typicality (or, for that matter, adequacy).  The arbitration provision in

28   Meta's Commercial Terms took effect May 25, 2018.  Ex. 78.  As in *DZ Reserve v. Meta Platforms,*

**FILED UNDER SEAL**

*Inc.*, Advertiser Plaintiffs "purchased ads both before and after May 2018,"[8] making their claims typical of (and making them adequate representatives for) "advertisers who purchased ads before and after May [25], 2018."  2022 WL 912890, at *4.

Advertiser Plaintiffs' claims are the same as the proposed Class members' and based on the same conduct by Meta, and damages can be shown by a common classwide methodology.  *See supra*, SOCF §§III, IV.  Accordingly, typicality is satisfied.

### D.    Rule 23(a)(4) and 23(g) Adequacy Requirements Are Met

Rule 23(a) requires representative plaintiffs to "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Likewise, Rule 23(g) requires class counsel to "fairly and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(4).  The related inquiries consider "'(1) [whether] the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) [whether] the plaintiffs and their counsel prosecute the action vigorously on behalf of the class.'"  *Kumar v. Salov N. Am. Corp.*, No, 14-cv-2411-YGR, 2016 WL 3844334, at *2 (N.D. Cal. July 15, 2016) (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003)).  Advertiser Plaintiffs and their counsel readily meet these requirements.

*First*, no conflicts exist between Advertiser Plaintiffs and their counsel and the Class as a whole: their interests are aligned in challenging Meta's anticompetitive conduct.  Advertiser Plaintiffs all state that they have "no conflicts of interest with any class member that would prevent [them] from fairly and adequately representing the best interests of the class."[9]  And the relief Advertiser Plaintiffs and their counsel seek is the same for the named plaintiffs and the Class: recovery for inflated sums paid to Meta for social advertising.

*Second*, since March 18, 2021, when Advertiser Plaintiffs' counsel were initially appointed as interim lead counsel (ECF No. 73), counsel have vigorously litigated the case on behalf of the proposed Class.  Advertiser Plaintiffs' counsel have engaged in 26 months of extensive discovery including: taking 49 depositions of Meta fact witnesses; issuing 30 third-party document subpoenas and participating in 29 third-party depositions; participating in countless meet-and-confers on

---

[8]    Berney Decl., ¶¶8-20; Frederick Decl., ¶¶9-15; Looper Decl., ¶¶7-40; Young Decl., ¶¶8-13.

[9]    Berney Decl., ¶24; Frederick Decl., ¶19; Looper Decl., ¶44; Young Decl., ¶17.

**FILED UNDER SEAL**

discovery issues, and bringing those issues to Court where required; and reviewing millions of documents produced by Meta and third parties.  Advertiser Plaintiffs' counsel have engaged experts that, over the course of two years, have developed opinions on technical issues, market definition, monopoly power, antitrust impact, and damages.

Each Advertiser Plaintiff has actively participated in the case by reviewing filings, producing documents, answering interrogatories, and sitting for a deposition, and all state that they understand their duties as Class representatives and are willing to serve in that role.[10]  In sum, Advertiser Plaintiffs and their counsel have and will continue to adequately represent the proposed Class.

## VI.    THE REQUIREMENTS OF RULE 23(b)(3) ARE SATISFIED

### A.    The Predominance Requirement Is Met

The predominance requirement is also met here.  "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (cleaned up).  Plaintiffs need not "prove that each element of their claim is susceptible to classwide proof," *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013) (cleaned up), and "'more important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class.'"  *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 557 (9th Cir. 2019) (*en banc*).  Thus, "even if just one common question predominates," (*id.*), a class may be certified under Rule 23(b)(3) "'even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Tyson Foods*, 577 U.S. at 453.[11]

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) (quoting Fed. R. Civ. P. 23(b)(3)).  For private antitrust

---

[10]    Berney Decl., ¶¶21-23; Frederick Decl., ¶¶16-18; Looper Decl., ¶¶41-43; Young Decl., ¶¶14-16.

[11]    The predominance requirement overlaps with Rule 23(a)'s commonality requirement, *see Olean*, 31 F.4th at 664, and they may be assessed "in tandem."  *In re Google Play Store Antitrust Litig.*, No. 21-md-02981-JD, 2022 WL 17252587, at *8 (N.D. Cal. Nov. 28, 2022) (Donato, J.).

**FILED UNDER SEAL**

1    actions like this one brought under 15 U.S.C. §15, the elements of a claim are "(i) the existence of an

2    antitrust violation; (ii) 'antitrust injury' or 'impact' flowing from that violation;" and "(iii) measurable

3    damages." *Olean*, 31 F.4th at 665-66.  Predominance thus requires that "'essential elements of the

4    cause of action,' such as the existence of an antitrust violation or antitrust impact, are capable of being

5    established through a common body of evidence, applicable to the whole class." *Id.* at 666.

6         As in most antitrust class actions, the questions of whether Meta violated the antitrust laws

7    and whether each Class member suffered an impact (in the form of higher ad prices) flowing from

8    those violations will be answered at trial based on common, classwide evidence. *See Amchem*, 521

9    U.S. at 625 ("Predominance is a test readily met in certain cases alleging . . . violations of the antitrust

10    laws.").  Aggregate damages can also be calculated here on a classwide basis.

11                **1.**        **Common Questions Predominate as to Meta's Antitrust Violations**

12         Advertiser Plaintiffs allege that Meta has engaged in three types of antitrust violations under

13    the Sherman Act: (1) monopolization under Section 2, 15 U.S.C. §2; (2) attempted monopolization

14    under Section 2; and (3) restraint of trade under Section 1, 15 U.S.C. §1.  These violations can and

15    will be established through common evidence, including with respect to market definition (*supra*,

16    SOCF §II), Meta's anticompetitive acts (*id.*, §III), and antitrust impact (*id.*, §IV.A), as each of them

17    "turns on [**Meta's**] conduct and intent along with the effect on the market, **not** on individual class

18    members." *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 475 (N.D. Cal. 2020).  Moreover, this

19    common evidence will unquestionably drive the resolution of any trial in this matter.

20         A Section 2 monopolization claim has two elements: "'(1) the possession of monopoly power

21    in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished

22    from growth or development as a consequence of a superior product, business acumen, or historic

23    accident.'" *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023).  Attempted

24    monopolization requires: "'(1) specific intent to monopolize a relevant market; (2) predatory or

25    anticompetitive conduct; and (3) a dangerous probability of success.'" *Optronic Techs., Inc. v.*

26    *Ningbo Sunny Elec. Co.*, 20 F.4th 466, 481-82 (9th Cir. 2021).  "[C]ourts have routinely certified

27    classes alleging that a monopolist's conduct caused a direct and uniform overcharge, as overcharge

28    cases often rely on facts common across the class such as the existence of a relevant market, the

**FILED UNDER SEAL**

1  defendant's monopoly power, and the existence of the illegal course of conduct."  6 *Newberg and*

2  *Rubenstein on Class Actions* §20:28 (6th ed. 2022) (hereinafter *Newberg*) (collecting cases); *see also*

3  *Glumetza*, 336 F.R.D. at 475 ("Section 2 monopolization claims readily lend themselves to common

4  evidence.").   Here, Advertiser Plaintiffs allege that Meta unlawfully maintained its monopoly,

5  resulting in a classwide overcharge in the form of higher ad prices.

6         Advertiser Plaintiffs' Section 1 claim similarly can be established through common evidence.

7  Section 1 requires a plaintiff to prove "(1) the existence of an agreement, and (2) that the agreement

8  was in unreasonable restraint of trade."  *FTC v. Qualcomm Inc.*, 969 F.3d 974, 988-89 (9th Cir. 2020)

9  (cleaned up).  The particular restraint of trade alleged here – a horizontal market-division agreement

10  between Meta and Google – is a *per se* violation of Section 1.  *In re Musical Instruments & Equip.*

11  *Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015) (citing *United States v. Topco Assocs., Inc.*, 405

12  U.S. 596, 608 (1972)).   "Market-division cases . . . are generally well-suited for class action

13  adjudication," both because the violation is established *per se* and because (like monopolization

14  cases) "predominance concerns are eased by a focus on the defendants' conduct."  6 *Newberg* §20:24

15  (citing, *inter alia*, *Krehl v. Baskin-Robbins Ice Cream Co.*, 78 F.R.D. 108, 123 (C.D. Cal. 1978)).

16         Moreover, alleged antitrust violations here will be established through common evidence,

17  which will predominate at trial.  *First*, the five categories of exclusionary conduct by Meta (one of

18  which, Meta's market division with Google, also underlies the Section 1 claim) will be established

19  entirely through common, classwide evidence – principally from Meta itself – and will be the

20  centerpiece of trial on Advertiser Plaintiffs' claims.  *See supra*, SOCF §III; *see also* Gans Rpt., ¶¶49-

21  109 (Meta's exclusionary conduct susceptible to common, classwide proof).  *Second*, for the Section

22  2 claims, the existence of the U.S. Social Advertising Market and Meta's power in that market will

23  be established by common evidence that will not vary from plaintiff to plaintiff.  *See supra*, SOCF

24  §§II (market definition), IV.A (monopoly power); Williams Rpt. at 8-95 (market definition), 96-155

25  (monopoly power); *see, e.g.*, *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 131 (C.D. Cal. 2007)

26  (market definition and monopoly power to be established through "the same data, the same experts,

27  the same industry analyses, and the same application of the same economic tests").  In sum, common

28  questions predominate as to the antitrust violation element of Advertiser Plaintiffs' claims.  *See, e.g.*,

1   *Glumetza*, 336 F.R.D. at 475-76 (common questions predominated as to §2 and §1 violations); *Live*

2   *Concert*, 247 F.R.D. at 122-32 (same, for §2 monopolization and attempted monopolization).

3      **2.**  **Common Questions Predominate as to Antitrust Impact and Damages**

4      Common questions also predominate as to antitrust impact and damages.  To show antitrust

5   impact at the class-certification stage, plaintiffs "'must establish, predominantly with generalized

6   evidence, that all (or nearly all) members of the class suffered damage as a result of [the defendant's]

7   alleged anti-competitive conduct.'"  *In re Packaged Seafood Prods. Antitrust Litig.*, 332 F.R.D. 308,

8   320 (S.D. Cal. 2019), *aff'd sub nom. Olean*, 31 F.4th at 651.  As discussed above, Advertiser

9   Plaintiffs' expert, Dr. Williams, uses well-accepted economic methods and common evidence to show

10  that all (or nearly all) members of the proposed class paid inflated prices for Meta ads as a result of

11  Meta's unlawful monopoly.  *See, e.g., Olean*, 31 F.4th at 670 (affirming holding that plaintiffs'

12  evidence was capable of establishing antitrust impact, "in the form of higher prices paid by each

13  member of the class," on a classwide basis).  He does this by using the EPRs of comparable firms to

14  estimate Meta's social advertising revenues in a but-for world in the absence of Meta's

15  anticompetitive conduct, then comparing them with Meta's actual supracompetitive social advertising

16  revenues during the Class Period.  *See supra*, SOCF §IV.B.  Having determined the extent of the

17  overcharge, on a classwide percentage difference basis, and multiplying that by the volume of

18  commerce for Meta advertising during the Class Period, Dr. Williams is also able to calculate

19  aggregate damages.  *See supra*, SOCF §IV.C.  This "yardstick" approach to isolate the "but-for" effect

20  of Meta's anticompetitive conduct is a well-established method of proving classwide impact and

21  damages in antitrust cases.  *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 993

22  F.3d 774, 788-89 (9th Cir. 2021), *vacated on other grounds*, 31 F.4th 651 (9th Cir. 2022); *Tawfilis v.*

23  *Allergan, Inc.*, No. 8:15-cv-00307-JLS-JCG, 2017 WL 3084275, at *6 (C.D. Cal. June 26, 2017); *In*

24  *re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. 02-1486-PJH, 2006 WL 1530166,

25  at *9-10 (N.D. Cal. June 5, 2006).

26     Providing a model for estimating aggregate damages is sufficient to establish predominance.

27  *See Ruiz Torres*, 835 F.3d at 1140 ("'[T]here is no absolute requirement in Rule 23 that aggregate

28  damages be calculable, but where they are, they may be all that plaintiffs need to prove.'" (quoting

**FILED UNDER SEAL**

*Newberg* §12:2)); *see also In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264, 271 (3d Cir. 2020) ("Antitrust plaintiffs may satisfy the predominance requirement by using a model that estimates the damages attributable to the antitrust injury, even if more individualized determinations are needed later to allocate damages among class members."). But while "the need for individual damages calculations does not, alone, defeat class certification," *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016), Dr. Williams also provides a method for calculating individual damages using a common formulaic method – multiplying the dollar value of a given Class member's advertising purchases by the percentage overcharge.  Williams Reply, ¶64; *see also, e.g.*, *Suboxone*, 967 F.3d at 272 n.13.

None of Meta's apparent counterarguments (drawn from Meta's disclosed expert reports) change what information and evidence will predominate at trial regarding antitrust impact and damages.  Meta's expert Dr. Tucker claims that "under Plaintiffs' theories, each form of alleged conduct offered distinct benefits to many advertisers, and these benefits varied across advertisers," apparently to set up an argument that individualized antitrust impact and damages issues might predominate at trial.  Tucker Rpt., ¶104.  But Dr. Tucker's opinions in this regard are deeply flawed for numerous reasons, as both Dr. Williams and Prof. Gans show in their Reply Reports.

To start, as Dr. Williams explains, Dr. Tucker's assertion that Meta's alleged anticompetitive conduct led to significant innovation and quality improvement for Meta contradicts both economic theory and ▮▮▮▮▮▮▮▮▮  Williams Reply, ¶67.  It ignores that any innovation and product-quality improvement from social data obtained from Meta's alleged conduct is limited due to diminishing returns to data size (*id.*, ¶¶68-71), and it also ignores that competition, rather than monopolization, leads to more innovation and product improvement.  *Id.*, ¶¶72-79.  That is, with more competition in a but-for world in the absence of the alleged conduct, there would be more – rather than less – innovation and quality improvement.  *Id.*; *see also* Gans Reply, ¶25 ("[L]ower prices are associated with improved ad-targeting when there is sufficient competition for advertisers.").  Additionally, Dr. Tucker's claim about alleged innovation and product-quality improvements by Meta during the Class Period is asserted without any evidence – ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Williams Reply, ¶¶80-83 (showing

1  ████████████████████████████████  Dr. Tucker's claims regarding product

2  improvement are flawed not just for antitrust impact (*id.*, ¶¶66-83), but in regard to Plaintiffs'

3  damages model as well.  *Id.*, ¶¶89-92.

4      Next, Dr. Tucker's claims that Advertiser Plaintiffs failed to separate the effect in their

5  damages model of "each aspect of the alleged conduct" simply ignore Dr. Williams' actual analysis,

6  which proposes using a well-established economic methodology to calculate damages "from [Meta's]

7  monopoly maintenance – rather than any individual exclusionary act."  Williams Reply, ¶84 (quoting

8  Williams Rpt., ¶328); *see* Williams Reply, ¶¶84-88; *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d

9  1373, 1376 (9th Cir. 1992) ("[I]t would not be proper to focus on specific individual acts of an accused

10  monopolist while refusing to consider their overall combined effect."); *Suboxone*, 967 F.3d at 270-

11  71 & n.11 (rejecting challenge to damages model examining combined effects of monopolistic acts

12  where there was "one theory of liability proven by a variety of acts resulting in one antitrust injury").

13      Finally, Dr. Tucker makes a series of claims regarding Meta's auction pricing, in connection

14  with both antitrust impact and classwide damages.  None of these claims defeats predominance:

15      • Dr. Tucker argues that due to the nature of the ad auction, ████████████

16      ████████ (Tucker Rpt., ¶123), and that as a result, further inquiry would be

17      required to demonstrate common injury, including inquiry into ████████████

18      ████████████████████ (*id.*, ¶122), ████████████████

19      (*id.*), ████████████████████████  *Id.*, ¶125. Dr. Williams' Reply Report

20      shows that each of these alleged issues is either irrelevant, *de minimis*, or simply factually

21      and economically wrong;

22      • Dr. Tucker's claim that the ████████████████████ is inconsistent

23      with basic economics and with the actual facts (Williams Reply, ¶¶100-111), including

24      ████████████ *Id.*, ¶¶106-107;

25      • Dr. Tucker's set of "further inquiries" that she asserts Advertiser Plaintiffs should have

26      performed are unnecessary based on ████████████ and basic economics

27      (*id.*, ¶¶112-114, 120, 122), and it is in any event infeasible, requiring data that Meta

28      refused to produce despite Advertiser Plaintiffs requesting it. *Id.*, ¶¶114-119, 121-122;

**FILED UNDER SEAL**

- Dr. Tucker's claim ████████████████████████████████████████ both basic monopoly economics and the actual analysis conducted by Advertiser Plaintiffs' experts, who analyzed (and will analyze, at trial) antitrust impact and damages from a market-wide price inflation due to monopoly maintenance – not some sort of entrant-by-entrant or action-by-action method of proof. *Id.*, ¶¶123-125; and

- Dr. Tucker's claims about ███████ (Tucker Rpt., ¶¶129-131), and about ████████ ████████████████████████████████████ (*id.*, ¶133), are also off base. As Dr. Williams explains, increased competition is associated with ████████ ██████████████████ such that it makes no sense to argue that some proposed Class members are uninjured as against the but-for world ████████████████████ during the period of Meta's monopoly. Williams Reply, ¶¶126-127. Additionally, ████ ████████████████████████████████████████████████████ ████████████████████████████ *Id.*, ¶128.[12]

Again, none of the alleged individualized pricing issues posited by Dr. Tucker – even if they could be shown to exist at all – defeats predominance given the common facts of this case. As the *en banc* Ninth Circuit has explained, "[i]t is not implausible to conclude that a conspiracy could have a class-wide impact, 'even where the market involves diversity in products, marketing, and prices,' especially 'where . . . there is evidence that the conspiracy artificially inflated the baseline for price negotiations.'" *Olean*, 31 F.4th at 677-78; *see also id.* at 678 ("it is both logical and plausible that the conspiracy could have raised the baseline prices for all members of the class by roughly ten percent"). "Courts have held that even if there is considerable individual variety in pricing because of individual price negotiations, plaintiffs may succeed in proving class-wide impact by showing the minimum baseline for beginning negotiations, or the range of prices which resulted from the negotiation, was artificially raised by anti-competitive actions of the defendant." *Giuliano v. Sandisk*

---

[12] ████████████████████████████████████████████████████████ (Williams Reply, ¶¶130-133), ████████████████████████████ (Tucker Rpt., ¶132), ████████████████████ Williams Reply, ¶130 ████████████████████████████████████████████ ████████████████████████████████████████████

**FILED UNDER SEAL**

1    *Corp.*, No. C 10-02787-SBA, 2015 WL 10890654, at *18 (N.D. Cal. May 14, 2015).  This principle

2    applies not just to Plaintiffs' antitrust impact analysis, but also to their classwide damages

3    methodology.  *See Tawfilis*, 2017 WL 3084275, at *14 (approving use of yardstick approach to model

4    classwide damages where "[a]pplication of the same percentage decrease to Botox list price in the

5    United States during the class period would have a common impact on all class members, regardless

6    of whether they received a rebate"); *see also In re Capacitors Antitrust Litig. (No. III)*, No. 14-CV-

7    03264-JD, 2018 WL 5980139, at *9 (N.D. Cal. Nov. 14, 2018) (Donato, J.) (relevant product

8    "customization," "different end uses and demands, and differences among class members with regard

9    to bargaining power and pricing . . . pose no barrier to certification because . . . these kinds of

10   individualized damages variations do not defeat predominance").

11       **B.    The Superiority Requirement Is Met**

12       Rule 23(b)(3) requires a finding that "a class action is superior to other available methods for

13   fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  "The purpose of the

14   superiority requirement is to assure that the class action is the most efficient and effective means of

15   resolving the controversy.  Where recovery on an individual basis would be dwarfed by the cost of

16   litigating on an individual basis, this factor weighs in favor of class certification."  *Wolin v. Jaguar*

17   *Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (cleaned up).  This requirement is met

18   here, as the Class comprises millions of advertisers – many, like Advertiser Plaintiffs, individuals or

19   small businesses who made relatively small ad purchases.  *See DZ Rsrv.*, 2022 WL 912890, at *9

20   (superiority requirement met where Meta advertisers paid relatively small price premium); *supra*,

21   SOCF §IV; Williams Rpt., ¶¶351-357.  Indeed, "[n]o reasonable person is likely to pursue these

22   claims on his or her own, especially given the cost and other resources required to litigate against a

23   company like Meta."  *DZ Rsrv.*, 2022 WL 912890, at *9; *see also In re TFT-LCD*, 267 F.R.D. at 314-

24   15 (noting that, in antitrust cases, individual damages "'are likely to be too small to justify litigation,

25   but a class action would offer those with small claims the opportunity for meaningful redress'").

26       **CONCLUSION**

27       For the foregoing reasons, the Court should grant Advertiser Plaintiffs' motion and certify a

28   Class as set forth above.

**FILED UNDER SEAL**

1 | Dated: September 15, 2023

2 | **BATHAEE DUNNE LLP**

**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**

3

4 | By: */s/ Yavar Bathaee*
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com

By: */s/ Amanda F. Lawrence*
Amanda F. Lawrence (*pro hac vice*)
alawrence@scott-scott.com

5 | Andrew C. Wolinsky (CA 345965)
awolinsky@bathaeedunne.com

Patrick J. McGahan (*pro hac vice*)
pmcgahan@scott-scott.com

6 | Andrew M. Williamson (CA 344695)
awilliamson@bathaeedunne.com

Michael P. Srodoski (*pro hac vice*)
msrodoski@scott-scott.com

7 | Adam Ernette (*pro hac vice*)
aernette@bathaeedunne.com

156 South Main Street, P.O. Box 192
Colchester, CT 06415

8 | 445 Park Avenue, 9th Floor
New York, NY 10022

Tel.: (860) 537-5537

9 | Tel.: (332) 322-8835

Patrick J. Coughlin (CA 111070)
pcoughlin@scott-scott.com

10 | Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com

Carmen A. Medici (CA 248417)
cmedici@scott-scott.com

11 | Edward M. Grauman (*pro hac vice*)
egrauman@bathaeedunne.com

Hal D. Cunningham (CA 243048)
hcunningham@scott-scott.com

12 | 901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300

Daniel J. Brockwell (CA 335983)
dbrockwell@scott-scott.com

13 | Austin, TX 78746
Tel.: (213) 462-2772

600 W. Broadway, Suite 3300
San Diego, CA 92101

14 |

Tel.: (619) 233-4565

15 | Allison Watson Cross (CA 328596)
across@bathaeedunne.com

Patrick J. Rodriguez (*pro hac vice*)
prodriguez@scott-scott.com

16 | 3420 Bristol St, Ste 600
Costa Mesa, CA 92626-7133

230 Park Avenue, 17th Floor
New York, NY 10169

17 | *Interim Co-Lead Counsel for the Advertiser Classes*

Tel.: (212) 223-6444

18

19 | **LEVIN SEDRAN & BERMAN LLP**

**AHDOOT & WOLFSON, PC**

20 | Keith J. Verrier (*pro hac vice*)
kverrier@lfsblaw.com

Tina Wolfson (CA 174806)
twolfson@ahdootwolfson.com

21 | Austin B. Cohen (*pro hac vice*)
acohen@lfsblaw.com

Robert Ahdoot (CA 172098)
rahdoot@ahdootwolfson.com

22 | 510 Walnut Street, Suite 500
Philadelphia, PA 19106-3997

Theodore W. Maya (CA 223242)
tmaya@ahdootwolfson.com

23 | Tel.: (215) 592-1500

Henry J. Kelson (*pro hac vice*)
hkelston@ahdootwolfson.com

24 | *Members of Executive Committee for the Advertiser Classes*

2600 West Olive Avenue, Suite 500
Burbank, CA 91505
Tel.: (310) 474-9111

25

26

27

28

26

**FILED UNDER SEAL**

1

## **FILER ATTESTATION**

2          I am the ECF user who is filing this document.  Pursuant to Civil L.R. 5-1(h)(3), I hereby

3   attest that each of the other signatories have concurred in the filing of the document.

4

5   Dated: September 15, 2023                  By:   */s/Amanda F. Lawrence*
                                                      Amanda F. Lawrence
6

7

## **CERTIFICATE OF SERVICE**

8          I hereby certify that on September 15, 2023, I caused a true and correct copy of the foregoing

9   document to be served by electronic mail on all counsel of record.

10

11

12  Dated: September 15, 2023                  By:   */s/Amanda F. Lawrence*
                                                      Amanda F. Lawrence

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28