1  **QUINN EMANUEL URQUHART & SULLIVAN, LLP**
    Kevin Teruya (Bar No. 235916)
2    kevinteruya@quinnemanuel.com
    865 South Figueroa Street, 10th Floor
3   Los Angeles, CA 90017
    (213) 443-3000
4

5  **HAGENS BERMAN SOBOL SHAPIRO LLP**
    Shana E. Scarlett (Bar No. 217895)
    shanas@hbsslaw.com
6   715 Hearst Avenue, Suite 202
    Berkeley, CA 94710
7   (510) 725-3000

8  *Interim Co-Lead Consumer Class Counsel*

9  [Additional counsel listed on signature page]

10

11                **UNITED STATES DISTRICT COURT**

12              **NORTHERN DISTRICT OF CALIFORNIA**

                  **SAN FRANCISCO DIVISION**
13

| | |
|---|---|
14 | MAXIMILIAN KLEIN, et al., | Consolidated Case No. 3:20-cv-08570-JD |
| | |
15 | Plaintiffs, | **CONSUMER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS** |
| | **CERTIFICATION AND APPOINTMENT** |
16 | vs. | **OF CLASS COUNSEL** |
| | |
17 | META PLATFORMS, INC., | The Hon. James Donato |
| | |
18 | Defendant. | Hearing Date: Dec. 14, 2023 at 10:00 a.m. |
| | |
19 | This Document Relates To: All Consumer | **REDACTED       VERSION       FILED** |
20 | Actions | **PUBLICLY** |

21

22

23

24

25

26

27

28

# NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on December 14, 2023, at 10:00 a.m., before the Honorable James Donato, of the United States District Court of the Northern District of California, San Francisco Division, 450 Golden Gate Avenue, San Francisco, California, Courtroom 11, 19th Floor, Plaintiffs Maximillian Klein, Sarah Grabert, and Rachel Banks Kupcho ("Consumers"), on behalf of themselves and all others similarly situated, hereby move the Court for an order granting their Motion for Class Certification pursuant to Federal Rule of Civil Procedure 23.

Consumers seek entry of an order: (1) certifying a proposed Rule 23(b)(3) class ("Consumer Class"); (2) appointing Consumers Dr. Klein, Ms. Grabert, and Ms. Banks Kupcho as representatives of the Consumer Class; and (3) appointing Kevin Y. Teruya, of Quinn Emanuel Urquhart & Sullivan, LLP, and Shana E. Scarlett, of Hagens Berman Sobol Shapiro LLP, as Co-Lead Consumer Class Counsel.

Consumers propose that the Court certify the following Consumer Class:

> All persons in the United States who maintained and used a Facebook profile at any point from December 3, 2016 to December 3, 2020. Excluded from the Class are: (1) Defendant Meta Platforms, Inc. ("Meta"), any entity in which Meta has an interest, any of Meta's corporate parents, affiliates, subsidiaries, officers, directors, legal representatives, successors and assigns; (2) any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff; and (3) any juror assigned to this action.

This motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, all filed supportive declarations and exhibits, the records, pleadings, and other documents on file in this consolidated action, and any argument that may be presented to the Court.

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ..................................................................................................1

II.  THE PROPOSED CONSUMER CLASS ..............................................................3

III.  PROFFER OF FACTS COMMON TO THE CONSUMER CLASS .....................3

    A.  Common Evidence on Facebook's Monopoly Power in the Relevant Market ..........4

    B.  Common Evidence of Facebook's Anticompetitive Conduct ...................................5

        1.  Facebook has continuously misrepresented and failed to disclose its data practices to the Class. ..........................................................................5

        2.  Data practices are clearly material to the average consumer and to competition in the PSN Market. ..........................................................6

        3.  Facebook's statements and omissions regarding its data practices were false and misleading. ..................................................................8

        4.  Facebook's statements on data and privacy practices were clearly likely to induce reliance. ..................................................................12

        5.  Facebook intentionally caused and benefitted from the market's lack of understanding regarding Facebook's actual data practices. ...................13

        6.  Facebook's statements to users and the market were not readily offset or overcome by rivals. ..................................................................14

    C.  Evidence of Impact and Damages Is Common to All Consumer Class Members ...................................................................................................15

        1.  Facebook's Deception Harmed All Consumer Class Members .................15

        2.  Consumers' Damages Model Calculates Both Class-Wide and Individual Damages Using Real-World, Common Data ...........................16

IV.  LEGAL STANDARDS .........................................................................................17

V.  THE CONSUMER CLASS SATISFIES RULE 23(A) ........................................17

VI.  COMMON QUESTIONS PREDOMINATE UNDER RULE 23(B)(3) ............................19

    A.  Facebook's Monopoly Power in the Personal Social Network Market Is an Undisputed Common Question ...........................................................20

    B.  Common Proof Demonstrates Facebook's Anticompetitive Deception Regarding Its Data Practices ...........................................................20

    C.  Common Proof Demonstrates Class-Wide Impact and Damages ...........................23

VII.  SUPERIORITY IS SATISFIED .........................................................................24

VIII.   THE COURT SHOULD APPOINT CO-LEAD INTERIM CONSUMER CLASS COUNSEL AS CO-LEAD CONSUMER CLASS COUNSEL............................................25

IX.    CONCLUSION ...................................................................................................................25

1

# TABLE OF AUTHORITIES

2
**Page**

3

## Cases

4

*American Prof'l Testing Service, Inc. v. Harcourt Brace Jovanovich Legal & Prof'l*
5      *Pubs., Inc.,*
       108 F.3d 1147 (9th Cir. 1997) ................................................................................. 5
6

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds,*
7      568 U.S. 455 (2013) ................................................................................ 17, 20, 22

8
*Basic Inc. v. Levinson,*
9      485 U.S. 224 (1988) ................................................................................................ 22

10  *Bateman v. Am. Multi-Cinema, Inc.,*
       623 F.3d 708 (9th Cir. 2010) ................................................................................. 24
11

12  *Beltran v. Avon Prod., Inc.,*
       2012 WL 12303423 (C.D. Cal. Sept. 20, 2012) ................................................... 22

13  *Brickman v. Fitbit, Inc.,*
14     2017 WL 5569827 (N.D. Cal. Nov. 20, 2017) ..................................................... 19

15  *Dial Corp. v. News Corp.,*
       314 F.R.D. 108 (S.D.N.Y. 2015) ........................................................................... 24
16

17  *Fed. Trade Comm'n v. Qualcomm Inc.,*
       969 F.3d 974 (9th Cir. 2020) ............................................................................. 3, 20
18

19  *Giuliano v. Sandisk Corp.,*
       2015 WL 10890654 (N.D. Cal. May 14, 2015) ............................................... 19, 21
20

21  *Hawaii v. Standard Oil Co. of Cal.,*
       405 U.S. 251 (1972) ................................................................................................ 17
22
*Image Tech. Servs., Inc. v. Eastman Kodak Co.,*
       125 F.3d 1195 (9th Cir. 1997) ............................................................................... 24
23

24  *In re Capacitors Antitrust Litig.,*
       2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) ..................................................... 17
25

26  *In re ConAgra Foods, Inc.,*
       90 F. Supp. 3d 919 (C.D. Cal. 2015) ..................................................................... 22

27  *In re Facebook Biometric Info. Priv. Litig.,*
       326 F.R.D. 535 (N.D. Cal. 2018) ........................................................................... 25

28

*In re Glumetza Antitrust Litig.*,
    336 F.R.D. 468 (N.D. Cal. 2020) ........................................................................... 21

*In re High-Tech Emp. Antitrust Litig.*,
    985 F. Supp. 2d 1167 (N.D. Cal. 2013) ................................................................. 18

*In re Live Concert Antitrust Litig.*,
    247 F.R.D. 98 (C.D. Cal. 2007) ....................................................................... 18, 19

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
    2023 WL 1813530 (C.D. Cal. Feb. 7, 2023) ......................................................... 24

*In re Neurontin Antitrust Litig.*,
    2011 WL 286118 (D.N.J. Jan. 25, 2011) ................................................................ 5

*In re Nw. Airlines Corp. Antitrust Litig.*,
    197 F. Supp. 2d 908 (E.D. Mich. 2002) ............................................................... 24

*In re Optical Disk Drive Antitrust Litig.*,
    2016 WL 467444 (N.D. Cal. Feb. 8, 2016) ........................................................... 23

*In re Static Random Access memory (SRAM) Antitrust Litig.*,
    264 F.R.D. 603 (N.D. Cal. 2009) ........................................................................... 20

*In re Tableware Antitrust Litig.*,
    241 F.R.D. 644 (N.D. Cal. 2007) ........................................................................... 18

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    267 F.R.D. 583 (N.D. Cal. 2010) ........................................................................... 19

*In re Wholesale Grocery Prod. Antitrust Litig.*,
    2012 WL 3031085 (D. Minn. July 25, 2012) ....................................................... 23

*Jabbari v. Farmer*,
    965 F.3d 1001 (9th Cir. 2020) ............................................................................... 21

*Jimenez v. Allstate Ins. Co.*,
    765 F.3d 1161 (9th Cir. 2014) ............................................................................... 18

*Just Film, Inc. v. Buono*,
    847 F.3d 1108 (9th Cir. 2017) ............................................................................... 18

*Ochoa v. McDonald's Corp.*,
    2016 WL 3648550 (N.D. Cal. July 7, 2016) ......................................................... 18

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir.) (2022) ............................................................................... 17

*Ruiz Torres v. Mercer Canyons Inc.*,
    835 F.3d 1125 (9th Cir. 2016) ............................................................................... 20

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ................................................................... 19

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
    373 F.3d 57 (1st Cir. 2004) ...................................................................... 22

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ..................................................................... 5

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ................................................................................ 18

*Zinser v. Accufix Rsch. Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001) ................................................................. 25

### Rules and Regulations

Fed. R. Civ. P. 23 ............................................................................................ 17

Fed. R. Civ. P. 23(a) ............................................................................. 2, 17, 18

Fed. R. Civ. P. 23(a)(2) .................................................................................. 18

Fed. R. Civ. P. 23(a)(3) .................................................................................. 18

Fed. R. Civ. P. 23(a)(4) .................................................................................. 19

Fed. R. Civ. P. 23(b) ...................................................................................... 17

Fed. R. Civ. P. 23(b)(3) ............................................................................ 19, 24

Fed. R. Civ. P. 23(b)(3)(B) ............................................................................ 25

Fed. R. Civ. P. 23(b)(3)(C) ............................................................................ 25

Fed. R. Civ. P. 23(b)(3)(D) ............................................................................ 25

Fed. R. Civ. P. 23(g) ............................................................................. 3, 19, 25

### Additional Authorities

6 Newberg and Rubenstein on Class Actions § 20:28 (6th ed.) ................... 20

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law,* § 782b ................. 5

1

**TABLE OF ABBREVIATIONS**

| <u>Abbreviation</u> | <u>Referenced Document</u> |
|---|---|
| **Ex. __** | All exhibit references are to the Declaration of Kevin Y. Teruya in Support of Consumer Plaintiffs' Motion for Class Certification and Motion to Exclude Portions of the Expert Report and Testimony of Dr. Catherine Tucker, concurrently filed herewith. |
| **Economides ¶ __** | Expert Class Certification Report of Dr. Nicholas Economides, concurrently filed herewith. |
| **Economides Reply ¶ __** | Reply Expert Class Certification Report of Dr. Nicholas Economides, concurrently filed herewith. |
| **Farrell ¶ __** | Expert Class Certification Report of Dr. Joseph Farrell, concurrently filed herewith. |
| **B. Klein ¶ __** | Expert Class Certification Report of Robert L. Klein, concurrently filed herewith |
| **B. Klein Reply ¶ __** | Reply Expert Class Certification Report of Robert L. Klein, concurrently filed herewith. |
| **Lamdan Decl. ¶ __** | Expert Class Certification Report of Professor Sarah Lamdan, concurrently filed herewith. |
| **Lamdan Reply ¶ __** | Reply Expert Class Certification Report of Professor Sarah Lamdan, concurrently filed herewith. |
| **Scarlett Decl.** | Declaration of Shana E. Scarlett in Support of Consumer Plaintiffs' Motion for Class Certification, filed concurrently herewith. |
| **Teruya Decl.** | Declaration of Kevin Y. Teruya in Support of Consumer Plaintiffs' Motion for Class Certification, filed concurrently herewith. |
| **Tucker ¶ __** | Expert Class Certification User Rebuttal Report of Facebook Expert Dr. Catherine Tucker, concurrently filed herewith. |
| **Fair ¶ __** | Expert Class Certification Report of Facebook Expert Rebecca Kirk Fair, concurrently filed herewith. |
| **M. Klein ¶ __** | Declaration of Named Consumer Plaintiff Maximilian Klein in Support of Consumer Plaintiffs' Motion for Class Certification, concurrently filed herewith. |
| **Grabert ¶ __** | Declaration of Named Consumer Plaintiff Sarah Grabert in Support of Consumer Plaintiffs' Motion for Class Certification, concurrently filed herewith. |
| **Banks Kupcho ¶ __** | Declaration of Named Consumer Plaintiff Rachel Banks Kupcho in Support of Consumer Plaintiffs' Motion for Class Certification, concurrently filed herewith. |

**STATEMENT OF ISSUES TO BE DECIDED**

The issues to be decided with respect to Consumers' Motion are:

1.   Should this Court certify this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, given the predominance of common questions of fact and law, including:

    a.   A personal social network market definition Facebook concedes can be proven by common evidence, including internal Facebook documents, executive testimony, and the testimony of two experts on behalf of the Consumer Class;

    b.   Monopoly power Facebook concedes can be proven by common evidence, including indirect and direct evidence and the testimony of an expert economist;

    c.   Antitrust impact, demonstrated by evidence common to the Common Class of a continuous course of deceptive conduct by Facebook regarding data collection, use, privacy, and security (which Facebook concedes can be proven by common evidence), and the ensuing consumer harm; and

    d.   A damages model informed by 12 separate, real-world yardsticks that support a damages methodology to calculate both class-wide and individual damages?

2.   Should this Court appoint Consumer Class representatives Maximilian Klein, Sarah Grabert, and Rachel Banks Kupcho as Representatives of the proposed Consumer Class, where they have served ably for the past three years of this litigation, have produced thousands of pages of documents, been deposed, and spent countless hours cooperating with Class Counsel regarding the prosecution of this litigation?

3.   Should this Court make permanent the appointment of Kevin Y. Teruya and Shana E. Scarlett as Co-Lead Consumer Class Counsel, pursuant to Rule 23(g) of the Federal Rules of Civil Procedure?

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.      INTRODUCTION

Named Consumer Plaintiffs Maximilian Klein, Sarah Grabert, and Rachel Banks Kupcho seek certification of the proposed Consumer Class, a Rule 23(b)(3) damages class consisting of all individuals in the United States that maintained and used a Facebook profile between December 3, 2016 and December 3, 2020 (the four-year period before the filing of the first complaint).

Every issue here will be resolved class-wide. The liability inquiry turns exclusively on Facebook's uniform actions across the Consumer Class and the market, and on evidence common to the Class. Facebook did not take any individualized action against any individual class member in creating its monopoly of the Personal Social Network ("PSN") Market—the relevant market in this case. No other competitor even comes close to Facebook.

Facebook gained its monopoly by promising users the best data collection, use, security, and privacy practices. Facebook made these promises intentionally, ███████████████████████ ████████████████████████████████████████████████████ Ex. 19 (PALM-002469803 at Slide 14). As Facebook knows and ██████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████ Ex. 41 (PALM-012991911 at -914) (████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████).

What users did not know during or after Facebook's meteoric rise to market dominance, was Facebook's uniform and prolonged deception regarding its data collection and use practices. This systemic set of deceptions and omissions enabled Facebook to obtain and maintain monopoly power. And, while Facebook materially misled the public and the market, internally it knew these public portrayals of its data practices were hugely problematic and contrary to the truth.

Mr. Zuckerberg, for example, has spent years publicly promising that Facebook users have complete control over their data. But, ██████████████████████████████████████████ ████████████████████████████████████████████████████

1  ███████████████████████████████████████████████████████

2  ████████████████████████████████████████████ Ex. 42 (PALM-013003886)

3  (emphasis in original). A former economist at Facebook ███████████████

4  ███████████████████████████████████████████████████████

5  ████████████████████████████████████ *See* Ex. 63 at 115:3–119:10

6  (Cunningham Tr.); Ex. 29 (PALM-009048148). Facebook entered into a consent decree with the FTC

7  in 2011 for misrepresenting its data practices, and then in 2019 paid a ***$5 billion fine*** and entered into

8  a new one after surreptitiously violating the first one. The FTC is investigating whether Facebook is

9  now violating the 2019 consent decree too. ███ Facebook's now COO—Javier Olivan— ████

10 ███████████████████████████████████████████████████████

11 █████████████████████ Ex. 47 (PALM-016517685 at -691).

Facebook itself conceded in expert discovery that proof of the relevant market, monopoly power, and Facebook's deception all depend on common evidence. Common evidence also shows that Facebook's market distortions deprived every class member of compensation for their data, thus harming every single one. This common evidence further shows real-world examples where Facebook and other companies compensated users for the exact sort of data at issue here, providing real world valuations ***by Facebook*** of the user data it anticompetitively obtained. This provides Consumers a straightforward damages model that calculates both aggregate and individual damages, because they can use those yardsticks (as well as other real-world yardsticks) to calculate the amount Facebook would have compensated them in the but-for world. In short, predominance here is clear-cut and overwhelming—the exact sort of record appropriate for class treatment.

All this common evidence shows that Consumers' claims proceed on central, common questions that are capable of class-wide resolution. In the end, Consumers meet each Rule 23(a) requirement for class certification. ***First***, numerosity exists because there are millions of Consumer Class members. ***Second***, Consumers' claims present many clearly common legal and factual questions. ***Third***, Consumers' claims are typical of the claims of all class members—they bring the same legal claims, against the same defendant, based on the same conduct and legal theories, resulting in the same type of injury. ***Fourth***, the named Consumers are adequate class representatives: their

1 interests and those of the Consumer Class are fully aligned; they have doggedly pursued this case for

2 several years against Facebook; and they are represented by well-qualified counsel who satisfy Rule

3 23(g). ***Finally,*** both predominance and superiority are satisfied by the uniform evidence and answers

4 on Facebook's liability and class-wide harm and the economic and complex legal hurdles in bringing

5 any individual case here.

6 **II.     THE PROPOSED CONSUMER CLASS**

7      The proposed Consumer Class definition is: **All persons in the United States who**

8 **maintained and used a Facebook profile at any point from December 3, 2016 to December 3,**

9 **2020**. Excluded from the Class are: (1) Defendant Meta Platforms, Inc. ("Meta"), any entity in which

10 Meta has an interest, any of Meta's corporate parents, affiliates, subsidiaries, officers, directors, legal

11 representatives, successors and assigns; (2) any judge, justice, or judicial officer presiding over this

12 matter and the members of their immediate families and judicial staff; and (3) any juror.

13      Consumers seek to certify the claims alleged in Counts I–II of the operative complaint

14 (Section 2 claims for monopolization and attempted monopolization of the PSN Market). Dkt. 87.

15 The proposed class definition differs slightly from the one in the complaint. ***First***, to conform to the

16 portion of the motion to dismiss order addressing the damages period, Consumers seek to certify a

17 Consumer Class that begins on December 3, 2016 (*i.e.*, four years before the original complaint),

18 although the relevant conduct period of Facebook's continuing violation goes back to January 1, 2007.

19 Dkt. 214 at 55–58. ***Second***, the putative Consumer Class is limited to those Facebook users in the

20 United States who "maintained and used" a Facebook profile during the damages period.

21 **III.    PROFFER OF FACTS COMMON TO THE CONSUMER CLASS**

22      Evidence common to the Consumer Class, establishes each element of Consumers' claims,

23 including (1) the possession of monopoly power in the relevant market, (2) the willful maintenance

24 of that power by anticompetitive means, and (3) antitrust injury. *See Fed. Trade Comm'n v.*

25 *Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020). Consumers will prove their claims with common

26 documents, data, testimony, and other evidence from Facebook and non-parties. They also support

27 their claims with four expert opinions of: **Dr. Nicholas Economides** (relevant market definition,

28 monopoly power, anticompetitive conduct, antitrust injury, and damages); **Dr. Joseph Farrell**

(relevant market definition); **Robert Klein** (survey evidence regarding the materiality of Facebook's deception to consumers); and **Prof. Sarah Lamdan** (academic and industry research shows consumers care about collection, use, sharing, and privacy of their data).[1]

###### A.      Common Evidence on Facebook's Monopoly Power in the Relevant Market

Facebook does not truly dispute that the question of market definition and monopoly power are questions common to the Class. Consumers have offered two separate antitrust economists to testify to the existence of the market and Facebook's monopoly power (Drs. Economides and Farrell). Neither of Facebook's expert contest these showings. Tucker ¶ 25; Fair ¶ 1 n.2.

*First*, Dr. Economides performed several widely accepted qualitative and quantitative analyses demonstrating the existence of the PSN Market. These include a small but significant non-transitory increase in price ("SSNIP") test, and a small but significant non-transitory decrease in quality ("SSNDQ") test. Economides ¶¶ 20–25, 35–211. Dr. Farrell offers similar testimony about the relevant market, using similarly well-accepted methods, such as a critical loss analysis based on available aggregate diversion ratio and profit margin data. Farrell ¶¶ 16–20, 50, 90–107. These formal economic tests are supported by reams of record evidence indicating that industry participants and Facebook executives alike considered personal social networks to be the critical relevant market. *E.g.*, Economides ¶¶ 72–206 (describing common record evidence).

*Second*, evidence common to the Class confirms Facebook holds monopoly power in the PSN Market. Monopoly power is typically assessed in two ways: (1) through direct evidence, such as a firm's ability to sustain supra-competitive profits or degrade product quality; and (2) circumstantially, by calculating the firm's market share within the relevant market and evaluating barriers to entry. Economides ¶¶ 32–34. The common record, and the analyses Dr. Economides conducted based on the common record, show that both types of evidence demonstrate Facebook's monopoly power in the PSN Market. *Id.* ¶¶ 212–252. Facebook accepts Dr. Economides' opinions regarding monopoly

---

[1]   Facebook was in gross violation of the discovery deadlines in this case, producing the bulk of data only two months before the close of fact discovery, and 95,702 documents (over 747,000 pages) after the cut-off. Scarlett Decl., Exs. 2–3. Given these extraordinarily late productions, Consumers' experts may incorporate additional data and information into their merits reports. However, their class certification reports handily demonstrate the basis for certification, as discussed below.

power for purposes of class certification. Tucker ¶ 25.

## B. Common Evidence of Facebook's Anticompetitive Conduct

In a monopolization case, the evidence of wrongdoing centers entirely on the defendant. *In re Neurontin Antitrust Litig.*, 2011 WL 286118, at *6 (D.N.J. Jan. 25, 2011). This is certainly true here: Facebook engaged in a decade-long campaign to dupe the market regarding its data practices.

At the motion to dismiss stage, Judge Koh applied the Ninth Circuit's test in *American Prof'l Testing Service, Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Pubs., Inc.*, 108 F.3d 1147 (9th Cir. 1997), which held that under certain circumstances, a company's "false and misleading advertising" may "constitute[] exclusionary conduct" for purposes of the Sherman Act. *Id.* at 1152. Other courts have looked to whether the alleged deception has harmed competition. *E.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 77 (D.C. Cir. 2001) (deception was anticompetitive where "Microsoft offers no procompetitive explanation for its campaign to deceive developers"). Consumers contest whether the elements of *Harcourt Brace*'s framework constitute the proper legal test to apply, but note that even this legal question itself is common to the Class. Regardless, even the *Harcourt Brace* line of cases demonstrates how common evidence supports Consumers' claims in this case. Specifically, "false and misleading advertising" can establish a Sherman Act claim if the defendant monopolist made representations about its own products or its rivals' products that: (1) continued for prolonged periods; (2) were clearly material; (3) were clearly false; (4) were clearly likely to induce reasonable reliance, (5) were made to buyers without knowledge of the subject matter, and (6) were not readily susceptible of neutralization or other offset by rivals. *Harcourt*, 108 F.3d at 1152; Ex. 8, Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, § 782b (explaining that a "monopolist's misrepresentations encouraging the purchase of its product can fit our general test for an exclusionary practice when the impact on rivals is significant") (citing this case). Proof of these elements, even if the correct ones to apply, clearly relies on evidence common to the Class.

### 1. Facebook has continuously misrepresented and failed to disclose its data practices to the Class.

The breadth and ubiquity of Facebook's uniform public statements and omissions regarding its data practices makes this a quintessential common question. Since its inception, Facebook has embarked on a public campaign of promising users control, safety, and security of their data. Ex. 17

is a chart of illustrative statements and omissions Facebook has made since 2006 regarding its data practices. But even these do not present the full picture. ███████████████████████████ ███████████████████████████████████████████████████ Ex. 39 (PALM-012846445 at -447); Ex. 36 (PALM-012003899 at Slide 4).

To support this constant campaign of (mis)representations, Facebook maintained a large marketing and communications department that constantly evaluated Facebook's messaging regarding data collection and use issues. That team ███████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████. Ex. 24 at Slides 2, 10–11 (PALM-004235531).[2] Its former Director—███████████—urged that ███████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████ Ex. 30 (PALM-009278820). Facebook has blanketed the market with statements and omissions regarding its data practices to the public since its inception, all common to the Class.

### 2. Data practices are clearly material to the average consumer and to competition in the PSN Market.

Facebook tethered its public statements to a message of data control, safety, and security and did not disclose its substantial shortcomings for a reason—██████████████████████████ ███████████████████████████████████████████████████ Ex. 35 (PALM-011140935). Facebook readily acknowledges this consumer preference. Mr. Zuckerberg has stated that: "[t]he **No. 1 thing that people care about is privacy and the handling of their data.**" Ex. 11 at 5. Facebook's website today emphasizes that "[w]e have dedicated teams and processes to help us do privacy well **because it's important to people and our business**" and "[p]rotecting users' data and privacy is **essential to our business.**" Ex. 9.

During their depositions in this case, Facebook executives acknowledged time and again t██ ███████████████████████████████████████████ Michel Protti—Facebook's Chief Privacy Offer for Product—████████████████████████████████████████████████████████

---

[2] All emphasis is added, unless otherwise indicated.

1   ███████ Ex. 67 at 120:2–8 (Protti Tr.). Dave Wehner—Facebook's former CFO and current Chief

2   Strategy Officer—explained ████████████████████████████████████████████████

3   ███████ Ex. 70 at 72:7–73:7 (Wehner Tr.). Guy Rosen—Facebook's Chief Information Security

4   Officer—likewise testified that ███████████████████████████████████████████████

5   ██████████████████████████████████ Ex. 68 at 210:13–18 (Rosen Tr.). Facebook

6   further recognized that when its users were given the choice on Apple devices to not have Facebook

7   track them, **nearly** ████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████████████████████

9   ██. Ex. 54 (PALM-017069195 at -197). Facebook's Marketing & Insights team likewise concluded

10  ████████████████████████████████████████████████████████████████████████████

11  ███████████████████████████████████. Ex. 18 (PALM-002447238).

12      Consumers offer testimony from two experts to confirm what is evident in Facebook's

13  documents, that consumers consider privacy and data issues material. Consumers' expert, Robert

14  Klein, designed, conducted, and analyzed a survey to measure the degree of importance U.S.-based

15  Facebook users place on knowing how Facebook may collect or use their data. B. Klein ¶ 10. His

16  survey asked a representative sample of respondents to rank "[h]ow important or unimportant is it for

17  you to know the following in deciding whether or not to use a social network" for a series of data

18  practices by an unnamed social network, which are at issue in this case. *Id.* ¶¶ 15–21, 24, 37, 38. Mr.

19  Klein's survey showed **between 71 to 89 percent** of respondents found it "very important" or

20  "somewhat important" to know about the types of data practices Facebook deceived about:

| Importance that Facebook users place on knowing how a social network may collect or use their personal data when deciding whether or not to use a social network: | |
|---|---|
| The social network could: | Users considered important |
| Allow other companies to read your private messages within the social network app. | 89.0% |
| Allow advertisers to use your phone number to send you targeted advertisements. | 84.9% |
| Collect your personal data from your mobile device even while you were using other websites and apps. | 88.2% |
| Collect your contact list stored on your mobile device. | 87.8% |
| Let other companies see your profile information and activity even if you did not use their apps. | 85.1% |
| Let other companies use your personal data to send targeted political advertisements, even if you did not use their apps. | 84.2% |
| Use your online shopping and web browsing history from other apps and websites | 74.7% |

| | |
|---|---|
| to sell targeted advertising. | |
| Use your activity within the social network service to target and sell advertisements. | 70.7% |

B. Klein ¶¶ 42, 46, Summary Table 2A, Table 2B. These results (common to the Class) show that "Facebook users place a high degree of importance on knowing how a social network may collect or use their personal data when deciding whether or not to use a social network." B. Klein ¶ 47.

Next, Consumers offer the opinions of Professor Sarah Lamdan, whose "specialties include data privacy with a focus on the implications of the use of personal data to target consumers and to assess consumer risk." Lamdan ¶ 2. She has also worked with various privacy advocacy organizations to assess the privacy risks posed by various online platforms' collection and use of consumers' data and testified to Congress. *Id.* ¶ 4. Based on her work, Prof. Lamdan explains the vast body of research and academic work underlying her opinions that online privacy and control over data are material to consumers, and which Facebook's own documents confirm. Lamdan ¶¶ 13–46, 70–82; Lamdan Reply ¶¶ 6–9, 15–17, 25–33, 43–52. All of this evidence—Facebook's internal documents, employee testimony, and expert opinion—is common to the Class.

It bears noting that not every consumer needs to value data in the exact same way for this anticompetitive result to take hold. All that matters is a sufficient number of consumers *do* highly value their data, such that data practices act as a competitive driver between PSNs. Economides ¶ 401; Economides Reply ¶¶ 110–18. As the common proof shows, this is exactly the case—a huge number of PSN users value their data enough to make data practices a key competitive driver in the PSN Market. Ex. 45 (PALM-014362572 at -573) (███████████████████████████████████████████████████████████████████████████████████████. By deceiving the market as to its own data practices, Facebook deprived its competitors of the ability to cut into its monopoly power in any meaningful way.

### 3. Facebook's statements and omissions regarding its data practices were false and misleading.

The determination of the falsity of Facebook's data-related statements and omissions will be answered class-wide with common evidence. This issue is a quintessential question of liability and would not require individualized inquires as to any class member. Although Consumers do not need *prove* their falsity for class certification, below are illustrative examples of Facebook's long history

of deceptive and misleading commitments and the common proof Consumers will use at trial.

**Beacon.** In November 2007, Facebook introduced its "Beacon" feature, which allowed Facebook to obtain data from users regarding their purchases off Facebook and provided a pop-up allowing users to opt in to sharing this information. Facebook's then-Vice President of User Growth—Chamath Palihapitiya— Facebook would "[a]bsolutely not" receive data about the user's purchase if they did not opt in. Ex. 4 (CONSUMER-FB-0000044206 at -207). Internally, ███████ ████████████████████████████████████████████████████████████████ Ex. 28 (PALM-008881801); *see also* Ex. 22 (PALM-003823269) ██████████████████ ████████████████████████████████████).

**Social Plug-Ins and Cookies.** In April 2010, Facebook introduced "social plug-ins," such as the "Like button," on third-party websites that allowed that activity to be shared to the user's Facebook page. Facebook stated that ███████████████████████████████████████ ██████████████████████████████████ Ex. 49 (PALM-016881862). ██ Erin Egan (Facebook's Chief Privacy Officer for Policy) advised then-COO Sheryl Sandberg and other executives that: ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████ *Id.*; Ex. 64 at 114:1–116:5 (Egan Tr.) (████████████████ ████████████████████████████████████).

Between May and September 2011, various Facebook employees—including Facebook's then-CTO Bret Taylor—also promised that Facebook does not use "cookies" for tracking or advertising. Ex. 5 (CONSUMER-FB-0000044208 at -209); Ex. 6 (CONSUMER-FB-0000044213 at -214). ██ Facebook's PR team ████████████████████████████████████████████ ████████████████████████████████████████████████████. Ex. 56 (PALM-FTC-00001385 at -387). Moreover, Facebook months earlier ████████████████████████ ██████████████████████████████████████████████████████████

1    ***Two-Factor Authentication.*** In 2011, Facebook introduced two-factor authentication, which

2    allowed users to input their phone numbers to receive a one-time password or key code to make

3    logging in more secure. Facebook represented its 2FA measure was "a new feature to help prevent

4    unauthorized access to your account" and is "additional security" which "helps confirm that it's really

5    you trying to log in." Ex. 15. Facebook did not █████████████████████████████████

6    ██████████████████████████████████. Ex. 78 at 253:16–24 (Parikh Tr.). Facebook

7    recognized █████████████████████████████████████████████████████

8    ████████████████████ Ex. 50 (PALM-016904790 at -798).

9    ***Sharing Data with Third Parties.*** Facebook has maintained various application programming

10   interfaces that allow third parties like software developers and hardware device makers to access

11   users' data. Historically, third parties had been able to access the data not only of a Facebook user,

12   but also of the user's ***friends***, even if they themselves never used the third party's product. In April

13   2014, Mr. Zuckerberg publicly announced Facebook would end third parties' access to "friends data"

14   because "this is a really important step for giving people power and control over how they share their

15   data with the apps." Ex. 7 (CONSUMER-FB-0000044232 at -233).

16   Mr. Zuckerberg chose to not mention that Facebook would ████████████████████

17   ██████████████████████████████████████████████ Ex. 61 at 79:5–

18   22 (Chang Tr.). Facebook did exactly that, entering into more than 60 partnerships that allowed

19   certain device makers and software developers continued access to "friends data" until at least 2018.

20   Ex. 2 (CONSUMER-FB-0000001857). After ██████████ Facebook ██████████████

21   ███████████████████████████████████████████ *See* Ex. 23 (PALM-

22   003961720 at -720) (████████████████████████████████████████

23   ███████████████████████████████████████████████████████

24   ████████████████████████████████████████████████).

25   ***Cambridge Analytica.*** In late 2015, ████████████████████████████

26   ███████████████████████████████████████████████████████

27   ██████████████████████. Ex. 44 (PALM-013086782). In 2018, after news reports that

28   Cambridge Analytica had ultimately accessed Facebook users' data in connection with the 2016 U.S.

1   Presidential Election, Facebook announced that "the Facebook information of up to 87 million people

2   – mostly in the US – may have been improperly shared with Cambridge Analytica." Ex. 14. That

3   same month, ███████████████████████████████████████████████████████████

4   ██████████████████████████████████████████████████████████. Ex. 33

5   (PALM-010595431). In the scandal's aftermath, Facebook's then-Director of Marketing Insights

6   urged the then-Chief Marketing Officer that ████████████████████████████████

7   ██████████████████████████████████████████████████████████████████████

8   ████████████████████. Ex. 21 (PALM-003543014). During his deposition, Mr. Zuckerberg

9   ██████████████████████████████████████████████████████████████████████

10  ██████████████████████████████████████████████████████████████████████

11  ████████████. Ex. 73 at 39:12–24, 41:22–42:2 (Zuckerberg Tr.).

12      ***App Developer Investigation.*** Following the Cambridge Analytica scandal, Facebook ███

13  ██████████████████████████████████████████████████████████████████████.

14  Ex. 55 (PALM-ADI-0000653883 at -884); Ex. 62 at 24:12–25:12 (Chen Tr.). █████████████

15  ██████████████████████████████. Ex. 62 at 92:21–23, 95:6–

16  14. ███████████████████

17  ████████████████████[3] *Id.* at 92:24–93:2, 100:1–18, 103:24–104:8. ██████████

18  ██████████████████████████████████████████████████████████████████████

19  ██████████████████████████████████████████████████████████████████████

20  *Id.* at 59:4–70:21; Ex. 12 at 12–13 (Facebook presentation); Ex. 13 (Senate letter).

21      ***Commitment Review.*** In 2020, Facebook launched its "Commitment Review" effort, which

22  seeks to: ██████████████████████████████████████████████████████████████

23  ██████████████████████████████████████████████████████████████████████

24  ██████████████████████████████████████████████████████████████████████

25  Ex. 39 (PALM-012846445 at -447); Ex. 69 at 13:19–15:12, 27:7–29:22 (Stefancik Tr.).

26      Facebook's corporate designee ████████████████████████████████

27

28  [3] Mr. Olivan (Facebook's now-COO) called Facebook Platform ███████████████████████

    ██████████████████████. Ex. 25 (PALM-004257464 at -465–66).

CONSUMER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION [REDACTED]

1   ██████████████████████████████████████████████████ Stefancik Tr. at

2   22:13–24, 59:2–60:5, 91:2–17. ████████████████████████████████████

3   ████████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████████

6   ██████████████████████████████████. Ex. 51 (PALM-017036460 at -464–65, -486).

7   ███ Mr. Zuckerberg publicly made the exact latter commitment in April 2018.[4] Ex. 16 (Wired

8   Article). ████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████████████

10  ████████. Ex. 69 at 73:2–74:11 (Stefancik Tr.) & Ex. 53 (PALM-017042708 at -719) ████

11  ██████████████████████████); Ex. 52 (PALM-017042298 at -299) █████████

12  ████████████████████████████████

### 4.   Facebook's statements on data and privacy practices were clearly likely to induce reliance.

Facebook knew it needed consumers' trust to establish and maintain its dominance. As Prof. Lamdan explained (citing internal documents), "Facebook recognized that concepts of control and privacy are directly related to how much consumers trust Facebook" and thus their use of Facebook. Lamdan ¶ 17. The company recognized ████████████████████████████████ ███████████████████████████████████. Ex. 43 (PALM-013008413 at -415). Externally, Facebook likewise stated that ████████████████████████████████ ██████████████████████████████ Ex. 40 (PALM-012965558). The common evidence here shows that to maintain this trust, and its monopoly power, Facebook carefully crafted its messaging regarding its data practices to induce its users' reliance.

The company recognized the magnitude of ████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ Ex. 38 (PALM-

---

[4] Contrary to Mr. Zuckerberg's statement, ██████████████████████████████ ██████████████████████████████ Ex. 48 (PALM-016555802).

1   012841182 at -185). That is why, ████████████████████████████

2   ████████████████████████████████████████████████████████████

3   ████████████████████████████. Ex. 72 at 69:4–70:15 (Weinstein Tr.).  Internally,

4   Facebook  recognized  that  ████████████████████████████████████

5   ████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████. Ex.

7   46 (PALM-015654588) (emphasis in original). Elsewhere,  the  company  acknowledged  ██████████

8   ████████████████████████████████████████████████████████████

9   ████████████████████████. Ex. 47 (PALM-016517685 at -686). Industry analysts

10  likewise ███████████████████████████████████████████████████

11  ██████████████████████████████. Ex. 26 (PALM-005598229).

        **5.      Facebook intentionally caused and benefitted from the market's lack of
                  understanding regarding Facebook's actual data practices.**

        Facebook's campaign of deception regarding its claimed data practices was made all the more

successful by the market's (and consumers') lack of understanding of Facebook's true practices,

which Facebook knew. Document  after  document  from  Facebook  demonstrates  that  ████████

████████████████████████████████████████████████████████████

███████████████. For example, ████████████████████████

████████████████████████████████████████████████████████████

███████████████████████. Ex. 34 (PALM-010644865).

        Prof. Lamdan likewise reviews a slew of executive testimony and materials from Facebook

insiders that ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████. *See* Lamdan Reply ¶¶ 57–82 ██████████████████████████████

At his deposition, former Facebook employee and WhatsApp co-founder Brian Acton recognized

██████████████████████████████████████████████████████████. Ex. 59. at

152:16–22 (Acton Tr.). Mr. Acton likewise explained that ███████████████████████

█████████. *Id.* at 167:23–168:13. Mr. Acton's testimony is consistent with other common proof that

makes clear ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇   *E.g.,* Ex. 37 (PALM-012266626 at -627) ▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇); Ex. 31 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Consumers, then, cannot know the full extent of

Facebook's practices. Mr. Zuckerberg and his team recognized in 2018 that users ▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Ex. 27 (PALM-

006273517 at -519). As Prof. Lamdan explains, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

### 6. Facebook's statements to users and the market were not readily offset or overcome by rivals.

Facebook's statements and omissions to the market on its data practices were not readily neutralized, and they in fact actively undermined rivals. Common evidence here shows that Facebook gained market share in the early 2000s precisely because of its supposed focus on privacy and data security, which competitively differentiated it from other then-existing personal social networks. Economides ¶ 317 n.452 (collecting deposition testimony). A 2008 internal memo entitled "▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇ Ex. 20 (PALM-003182426). Facebook then maintained this public façade, even though

its CEO, Mark Zuckerberg, derogatorily referred to Facebook users as "dumb [expletives]" for

willingly sharing their data with Facebook. Ex. 1; *see also* Ex. 74 (PALM-006006351) ▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Evidence, common to the Class, further shows that even after the initial defeat of MySpace, Facebook continued to undermine rivals through its constant campaign of deception. *See* Economides ¶¶ 322–34 (defeat of Myspace), 335–48 (defeat of Google+), 349–57 (defeat of MeWe); Economides Reply ¶¶ 72–80 (defeat of Snapchat). Snapchat testified that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Ex. 65 at 85:21–

96:10, 97:2–15 (Levenson Tr.). Facebook was worried about users switching to Google+ and ▇▇▇▇

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████████████████████ Economides ¶¶ 346–47. Another PSN, MeWe, tried to differentiate

4 itself from Facebook in terms of its data practices by collecting no data and showing no ads. MeWe's

5 founder, Mark Weinstein, explained that ████████████████████████████████

6 ████████████████████████████████████████████████

7 ████████████████████████████████████████ Ex. 71 at

8 284:22–289:3 (Weinstein Tr.); Ex. 72 at 41:15–43:8, 61:17–64:13, 68:17–70:15, 74:14–75:10,

9 77:20–78:14 (Weinstein Tr.). Facebook's COO explained ██████████████████

10 ████████████████████████████████████████████████

11 ████████████████████ Ex. 66 (Olivan Tr.) at 56:21–57:3. They never had the

12 chance, due to Facebook's deception.

13    **C.**    **Evidence of Impact and Damages Is Common to All Consumer Class Members**

14       **1.**    **Facebook's Deception Harmed All Consumer Class Members**

15 Substantial common evidence also demonstrates the Consumer Class's harm flowing from

16 Facebook's anticompetitive conduct. Although Facebook does not charge users a monetary price, it

17 is not "free." "Zero price" markets are a common concept in economics, and product sales in such

18 markets still involve an exchange of consideration; just one that is slightly different than a

19 "traditional" sale. Farrell ¶¶ 54-58. In Facebook's case, its "effective price" is users providing their

20 data in exchange for use of its PSN. Economides ¶¶ 61, 64, 370; Economides Reply ¶¶ 178, 180.

21 Facebook's co-founder, Chris Hughes, confirmed it "is not actually free," "[w]e pay . . . with our data

22 and our attention," and "it doesn't come cheap." Ex. 3 (CONSUMER-FB-0000002291 at -298).

23 Economic logic and theory show that when consumers have competitive alternatives, sellers

24 are forced to lower their prices to maintain market share, and that if they do not, they will lose

25 customers. Economides ¶ 370. And when the beginning price is "zero," economic theory predicts that

26 additional competition should drive the price negative, meaning the user receives compensation for

27 their data or use of the service. *Id.*; Economides Reply ¶ 180.

28 Facebook provides its users a uniform pricing structure in the actual world: its monopoly

-15-    Case No. 3:20-cv-08570-JD

power allows it to offer users of its personal social network no monetary compensation for their data. That price is ***not*** subject to individual negotiation or other complexities—the compensation for ***all*** Consumer Class members is zero. Economides Reply ¶ 180. Because the but-for world absent Facebook's anticompetitive conduct would have included compensation to all Consumers (regardless of their personal views on data), ***all*** Consumer Class members have been harmed by Facebook's anticompetitive conduct. Economides ¶¶ 396–401; Economides Reply ¶¶ 177–80.

In the but-for world, this compensation would have been "flat" and "market-wide." Economides ¶ 409. That is consistent with the actual world, where Facebook offers the same terms—including price—to Class members across the board, ***including*** when it and other companies pay users for their data. Economides ¶¶ 399–400 452–55; Ex. 60 at 12:6–13:10, 15:25–16:9, 19:4–11 (Ben-Zedeff 30(b)(6) Tr.); Ex. 75 at 281:25–282:15 (Tucker Tr.) ███████████████████ ████████████████████████████████████

### 2.   Consumers' Damages Model Calculates Both Class-Wide and Individual Damages Using Real-World, Common Data

Using these fundamental pieces of economic logic, Dr. Economides uses the commonly-accepted "yardstick" methodology to calculate damages. Looking at Facebook's own programs, as well as ten other separate yardsticks, where users are compensated for data, Dr. Economides calculates a monthly price for the cost of data in the but-for world. Dr. Economides first considers programs where Facebook itself paid users for their data. Economides ¶¶ 375–83, 409–14. Facebook's "Research App" paid users ████████████████ and Facebook's "Study" service ████████ ████████████████████████████. *See* Exs. 58 (describing compensation), 57, 10. Those instances were more limited than competition would have required in the but-for world, but they demonstrate the exact defendant engaging in the exact behavior Consumers allege would have occurred in the but-for world, *i.e.*, ascribing a definitive value to data from users and compensating them for it. In addition, Dr. Economides considers yardsticks from other major companies that pay users for their data. These ten other real-world yardsticks include companies like Google, Nielsen, Comscore, and Amazon. Economides ¶¶ 411–53, Table D1. Dr. Economides explains why these twelve total programs are appropriate yardsticks, including because of the comparability of the data Facebook collects from its users (and pays a monopoly price of $0 for) and the data the yardsticks

1   collect and pay users for. *E.g.*, Economides ¶¶ 408–11; Economides Reply ¶¶ 141–53, 173.

2           Given Facebook's demonstrated preference for flat pricing in the actual world, Dr.

3   Economides then utilizes these real-world yardsticks and the well-accepted yardstick methodology to

4   calculate a $5.00 per month market price of user data. Economides § XII. To be conservative, he also

5   calculated 25th and 75th percentile market prices of $3.50 and $7.00 per month, based on the range

6   of real-world yardsticks identified in discovery here. *Id.* ¶¶ 450–51. Once he had a monthly price for

7   user data, it was a simple question for Dr. Economides to calculate the Class's aggregate damages.

8   Economides § XII(C). He did so by adding up the numbers of monthly active users Facebook reported

9   for each month of each year of the Consumer Class Period, and then multiplied that number by the

10  market price he calculated. Economides ¶¶ 461–63. Although not yet required, Dr. Economides also

11  showed how individual damages could be calculated with this common method. *Id.* ¶ 464.

## IV.    LEGAL STANDARDS

13          The Supreme Court has long recognized that class actions play a vital role in private

14  enforcement of the antitrust laws. *See Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 266 (1972).

15  Class certification requires plaintiffs to demonstrate that Rule 23(a) is met, namely, that there are

16  "questions of law or fact common to the class," and the requirements of "numerosity, typicality and

17  adequacy of representation" are also met. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods*

18  *LLC*, 31 F.4th 651, 663 (9th Cir.) (2022) (en banc). Plaintiffs must next, by a "preponderance of

19  evidence" show the class fits into one of three categories of Rule 23(b). *Id.* at 665. And while the

20  Court's "class certification analysis must be 'rigorous' and may entail some overlap with the merits

21  of the plaintiff's underlying claim, . . . [m]erits questions may be considered to the extent—but only

22  to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class

23  certification are satisfied." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66

24  (2013). As this Court has explained, "[t]he class certification procedure is decidedly not an alternative

25  form of summary judgment or an occasion to hold a mini-trial on the merits." *In re Capacitors*

26  *Antitrust Litig.*, 2018 WL 5980139, at *10 (N.D. Cal. Nov. 14, 2018) (Donato, J.).

## V.     THE CONSUMER CLASS SATISFIES RULE 23(A)

28          ***The Class is Sufficiently Numerous.*** The Consumer Class here, in the millions, easily satisfies

the first Rule 23(a) factor, numerosity. Economides ¶ 461; *Ochoa v. McDonald's Corp.*, 2016 WL 3648550, at *4 (N.D. Cal. July 7, 2016) (Donato, J.) ("40 or more members" sufficient).

*Common Questions of Law and Fact Exist.* Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality exists where the claims at issue "depend upon a common contention" whose "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores*, *Inc. v. Dukes*, 564 U.S. 338, 350 (2011). For commonality, not "every question in the case, or even a preponderance of questions" need be "capable of classwide resolution." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014). Instead, "even a single common question will do." *Id.* at 1052.

Facebook acknowledges that Consumers' antitrust claims raise ***numerous*** questions common to all class members. Specifically, Facebook's experts have conceded that all of the following questions are common to the Class: (1) market definition; (2) monopoly power; (3) the existence of barriers to entry; and (4) the failed attempts by Facebook's rivals to enter the market. Tucker ¶ 25. As in other antitrust class actions, these issues are all common to the Class. *See In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 117 (C.D. Cal. 2007) (commonality met due to existence of "common issues such as market definition, monopoly power, anticompetitive conduct, and ca[u]sal antitrust injury"); *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013) (similar, because "[a]ntitrust liability alone constitutes a common question").

*The Named Plaintiffs' Claims are Typical of the Class.* Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The requirement is permissive, such that representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Just Film*, *Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017) (cleaned up). Typicality is "established by plaintiffs and all class members alleging the same antitrust violation by the defendants." *In re Tableware Antitrust Litig.*, 241 F.R.D. 644, 649 (N.D. Cal. 2007). Here, the named Consumers have used Facebook since December 3, 2016, just like the remainder of the proposed Consumer Class. *See* Klein Decl. ¶ 3; Grabert Decl. ¶ 3; Banks Kupcho Decl. ¶ 3. They and the rest of the proposed Class bring the same antitrust claims, against the same defendant, based on the same

conduct and legal theories, resulting in the same type of injury. This renders the named Consumers' claims typical of the Class they seek to represent. *See, e.g.*, *Live Concert*, 247 F.R.D. at 117; *Giuliano v. Sandisk Corp.*, 2015 WL 10890654, at *14 (N.D. Cal. May 14, 2015).

**Named Plaintiffs Will Adequately Represent the Class.** Rule 23(a)(4) requires that "the representative parties . . . fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).[5] Courts in the Ninth Circuit examine whether the representative plaintiffs have any conflicts of interest with class members and will prosecute the action vigorously on behalf of the class. *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). Each named Consumer satisfies these requirements. There are no speculative, let alone actual, conflicts between them and the Class. *See* Klein Decl. ¶ 7; Grabert Decl. ¶ 7; Banks Kupcho Decl. ¶ 7; *cf. Brickman v. Fitbit, Inc.*, 2017 WL 5569827, at *3 n.2 (N.D. Cal. Nov. 20, 2017) (Donato, J.) (Class certification "should not be denied on the basis of speculative conflicts."). Instead, all interests are aligned. Each named Consumer has each vigorously prosecuted this case, investing significant time in, and resources to, advancing the Consumer Class's claims. Each has also responded to Facebook's voluminous discovery requests, produced thousands of documents from their files, sat for deposition (including, in one named Consumer's case, shortly before giving birth), and actively participated in the litigation by reviewing pleadings and discovery and consulting with counsel. *See* Klein Decl. ¶¶ 8–10; Grabert Decl. ¶¶ 8–10; Banks Kupcho Decl. ¶¶ 8–10. That commitment amply demonstrates their adequacy. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 595 (N.D. Cal. 2010).

## VI.   COMMON QUESTIONS PREDOMINATE UNDER RULE 23(B)(3)

Certifying a damages class pursuant to Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Predominance is ***not*** a "matter of nose-counting," and certification under Rule 23(b)(3) may be proper "even though other important matters will have to be tried separately." *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016); *Tyson*, 577 U.S. at 453. Consumers must show that ***questions*** common to the Consumer Class predominate, "not that those questions will be answered, on the merits, in favor of the Class." *Amgen*, 568 U.S. at 459.

---

[5] Adequacy of counsel is now examined under amended Rule 23(g). *See* Section VIII, *infra.*

Consumers have detailed the evidence, common to the Class, supporting the elements of their Section 2 claim above in their proffer of evidence. *See* Section III, *supra*. Consumers briefly review the elements of their monopolization claim here, including (1) Facebook's monopoly power; (2) Facebook's willful acquisition or maintenance of that power; and (3) causal antitrust injury. *Qualcomm*, 969 F.3d at 990. Courts "routinely certif[y] classes alleging that a monopolist's conduct caused a direct and uniform overcharge, as overcharge cases often rely on facts common across the class such as the existence of a relevant market, the defendant's monopoly power, and the existence of the illegal course of conduct." 6 Newberg and Rubenstein on Class Actions § 20:28 (6th ed.).

### A.  Facebook's Monopoly Power in the Personal Social Network Market Is an Undisputed Common Question

Facebook concedes both that market definition and monopoly power, the first element of Consumers' monopolization claim, may be proven through evidence common to the Class. Consumers put forth two esteemed economists—Drs. Economides and Farrell—who both, independently, offer opinions supporting the PSN Market. *See* Section III(A), *supra*. Facebook has accepted these analyses for the purposes of class certification, offering no expert evidence in response. Tucker ¶ 25. Moreover, reams of common proof, including documents, data, and testimony of Facebook, non-parties, and their current and former employees support this definition. *See* Economides ¶¶ ¶¶ 72–206; Section III(A), *supra*. It is, thus, undisputed that common questions regarding market definition and monopoly power predominate.

### B.  Common Proof Demonstrates Facebook's Anticompetitive Deception Regarding Its Data Practices

A large focus of any trial will be Facebook's anticompetitive, market-wide deception regarding its data practices. The underlying facts regarding Facebook's deception, the application of the law to those facts, and the ultimate determination whether Facebook's deception violates the Sherman Act are all common questions that are the same for all members of the Consumer Class. *See In re Static Random Access memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 611 (N.D. Cal. 2009) ("Common liability issues such as . . . monopolization have, almost invariably, been held to predominate over individualized issues"). They will all be resolved using common evidence. *See In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 475 (N.D. Cal. 2020) (noting that "Section 2

monopolization claims readily lend themselves to common evidence").

**First**, common evidence will prove that Facebook has made a series of representations and omissions regarding its data practices that were deceptive and meant to induce reliance. The same documents—*e.g.*, press releases, blog posts, transcripts, and Facebook's own documents and testimony—will be used to prove what Facebook said (or did not say) to the market regarding its data practices, whether they were accurate or misleading, and why Facebook made them. *See* Exhibit Ex. 17 (summary of misrepresentations and omissions made by Facebook during the conduct period); Section III(B), *supra*; Economides ¶¶ 27–29, 285–316; *cf. Giuliano*, 2015 WL 10890654, at *17 (common questions regarding defendant's deception predominated for fraud-based Section 2 claim since "[p]laintiffs will rely on common evidence . . . to show that the Disputed Patents were fraudulently procured"); *Jabbari v. Farmer*, 965 F.3d 1001, 1007 (9th Cir. 2020) ("common questions, such as 'whether the fuel economy statements were in fact accurate' and 'whether defendants knew that their . . . statements were false or misleading'" predominate) (cleaned up).

**Second**, common questions predominate regarding whether Facebook's deceptive statements and omissions harmed competition. The key economic questions are (a) whether *enough* users care about a personal social network's data practices to a sufficient degree to make them a competitive driver, and (b) whether Facebook's deception about its own practices therefore harmed competition. *E.g.*, Economides ¶ 400–01; Tucker ¶ 31. Common evidence demonstrates this is clearly the case in the relevant market here—indeed, Facebook was petrified about even small numbers of its users expressing concerns regarding its data practices. For example, ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

Ex. 76 (PALM-016440640 at -644, -647); Ex. 77 (PALM-016440707 at -708); *see also* Ex. 31 at -779 ███████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████, Facebook's expert, Dr. Tucker, stated

████████████████████. Ex. 75 at 263:13–265:2 (Tucker Tr.). That is consistent with the

1   percentage of the market that need be affected in other antitrust contexts, like exclusive dealing. *Stop*

2   *& Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004) (30 or

3   40 percent foreclosure level could "be of concern"). And, here, it makes perfect sense why the rates

4   need only be so relatively low: losing just 20–30% of users to a competitor is massively problematic

5   for a company that relies heavily on direct network effects.

6        In other non-antitrust contexts, where the standard is different because the relevant legal

7   question is whether an entire audience, rather than a sufficient sub-set, is likely to find an item to be

8   material—such as in securities, Lanham Act, and consumer protection cases—the case law

9   demonstrates not only that materiality is an objective inquiry,[6] but evidence that less than the entire

10  population (such as between 50 and 60%, or even 20%) finding something material is sufficient.[7]

11  Even assuming these non-antitrust standards apply, Consumers more than meet them. For example,

12  Facebook's own surveys have shown 84% of users "are concerned about the information they share

13  on Facebook," and an average of 80% of consumers reported in Mr. Klein's survey agreed that

14  knowing data practices at issue in this case are important to their use of a social network. *See* Section

15  III(B)(2), *supra*. Prof. Lamdan noted that extensive record evidence and academic research all show

16  that consumers deeply care about privacy, prefer less data collection and use over more, and that

17  Facebook was aware of these preferences. Lamdan ¶¶ 13–82; Lamdan Reply ¶¶ 25–33. Moreover,

18  Facebook users demonstrated the importance of data and privacy to them when, in Apple's real-world

19  "ATT" experiment, nearly ▇ of U.S. users decided to prevent Facebook from tracking them when

20  given the choice. Ex. 54 (PALM-017069195 at -197). Mr. Zuckerberg also recognized "[t]he **No. 1**

21  **thing that people care about is privacy and handling of their data**." Ex. 11 at 5.

22       And ***finally***, Facebook's continuous course of anticompetitive conduct had a clear impact on

23

---

24  [6] Materiality is an objective inquiry. *See Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988)

25  (explaining fraud-on-the-market theory); *Amgen*, 568 U.S. at 460, 67 (materiality is objective inquiry for which common questions predominate since "the class . . . will prevail or fail in unison").

26  [7] *E.g.*, *Beltran v. Avon Prod., Inc.*, 2012 WL 12303423, at *7 (C.D. Cal. Sept. 20, 2012) (surveys showing 72% and 61% of respondents supported plaintiffs' claims satisfied materiality in consumer

27  protection case); *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1018 (C.D. Cal. 2015) (common questions of materiality predominated based on survey results of 59% and 65%, and suggesting

28  survey showing "only 24% of consumers would behave differently" could raise triable issue).

1   rivals. The testimony in this case is clear, and Dr. Economides explains how Facebook's privacy and

2   data (false) promises were critical to the defeat of competitors such as Myspace, Google+ and MeWe.

3   Economides ¶¶ 322–57; Economides Reply ¶¶ 62–80; *see also* Section III(B)(6), *supra*.

4           **C.      Common Proof Demonstrates Class-Wide Impact and Damages**

5           Common evidence and analysis will also be used to prove that Facebook's anticompetitive

6   deception has harmed all Consumer Class members and to calculate both aggregate and individual

7   damages. Facebook's uniform pricing to all class members simplifies the antitrust impact analysis.

8           Dr. Economides shows Facebook's pricing in the actual world ($0) is flat across all Facebook

9   users and there is no individual negotiation. Economides Reply ¶¶ 178–80. In the real-world situations

10  where Facebook *has* compensated users for their data, it similarly did so in a flat manner; *i.e.*, paying

11  all users the same amount. *Id.* ¶ 115; Ex. 60 at 15:25–16:9, 19:4–11 (Ben-Zedeff 30(b)(6) Tr.). The

12  common evidence further shows that other companies similarly prefer a flat model when

13  compensating users for data, which makes intuitive sense given it simplifies execution and

14  explainability, avoids fairness issues associated with price discrimination, and minimizes

15  administrative costs. Economides ¶¶ 399, 409–10, 452–54; Economides Reply ¶¶ 112–24.

16          Increased competition in the but-for world would have required Facebook to compensate all

17  its users for their data, regardless of their individual preferences on data collection and use.

18  Economides ¶ 401 & Economides Reply ¶¶ 178–80. All Class members pay an effective overcharge

19  by receiving Facebook's monopoly price of $0. In this way, all Class members are harmed by the lack

20  of market-wide compensation for their data that Facebook was able to deprive them of, no matter

21  their individual views. *Cf. In re Optical Disk Drive Antitrust Litig.*, 2016 WL 467444, at *9 (N.D.

22  Cal. Feb. 8, 2016) (where claimed damages in antitrust case are for overcharge, "focus on the

23  subjective desires of individual consumers is misplaced" because "[t]he harm lies in paying more than

24  the product is objectively worth, and does not turn on the individual user's desire or lack of desire for

25  a specific feature."). Proving antitrust impact in this case is therefore "straightforward" and common

26  questions predominate. *In re Wholesale Grocery Prod. Antitrust Litig.*, 2012 WL 3031085, at *9 (D.

27  Minn. July 25, 2012) (explaining "gas stations typically charge a single price for diesel fuel" and "the

28  price does not vary among customers" such that "if a gas station were able to monopolize the diesel

1   market and elevate the price of diesel above its competitive level, proving common impact would"

2   merely require "showing the price of diesel but for the gas station's monopoly would have been

3   lower" and that customer "purchased diesel at the elevated price").

4          Classwide damages are similarly clear-cut. In the but-for world, the common record shows

5   Facebook would have implemented a flat pricing model to compensate users on a monthly basis.

6   Economides ¶¶ 409, 452–54; Economides Reply ¶¶ 112–89. Based on real world yardsticks

7   (including what Facebook has paid users for their data), Dr. Economides estimated the monthly price

8   Facebook would have paid its users and then multiplied that price by the amount of monthly users

9   and the time of the Consumer Class period. Economides ¶¶ 456–63. This straightforward model relies

10  on no complicated econometric analyses, convoluted theories, or internally-implausible

11  assumptions—it is an application of direct evidence from Facebook itself about a payment model

12  Facebook (and multiple others) employed, and which comports fully with Consumers' core antitrust

13  liability theory and proof. This is the essence of a classwide damages model the Consumer Class can

14  use at trial, thus further underscoring predominance under Rule 23(b)(3). *E.g.*, *In re Nat'l Football*

15  *League's Sunday Ticket Antitrust Litig.*, 2023 WL 1813530, at *8, *12 (C.D. Cal. Feb. 7, 2023)

16  (noting yardstick damages method "is an accepted methodology in antitrust cases" and suffices to

17  establish common damages questions predominate for Rule 23(b)(3) purposes).[8]

18  **VII.   SUPERIORITY IS SATISFIED**

19         Rule 23(b)(3) also requires that a class action be "superior to other available methods for fairly

20  and efficiently adjudicating the controversy." In making this determination, courts consider "a non-

21  exhaustive list of factors relevant to the superiority inquiry." *Bateman v. Am. Multi-Cinema, Inc.*, 623

22  F.3d 708, 713 (9th Cir. 2010). Each favors certifying the Consumer Class.

23         ***First***, where each putative class member suffers relatively small damages, this factor weighs

24  in favor of class treatment. *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001).

25  ─────────────────

26  [8] *See also In re Nw. Airlines Corp. Antitrust Litig.*, 197 F. Supp. 2d 908, 928 (E.D. Mich. 2002)
    (yardsticks "need not be wholly identical," just "somewhat comparable"); *Dial Corp. v. News Corp.*,
27  314 F.R.D. 108, 118–19 (S.D.N.Y. 2015) ("selection of perfectly comparable" yardsticks
    "impossible" as defendant's "alleged monopoly prevents comparable firms from operating within
28  its market"); *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1221 (9th Cir. 1997)
    (whether proposed yardstick "properly compares to the relevant market presents" jury question).

That is the case here, where individual Consumer Class members' damages likely range from $5 to $240 each. Economides ¶ 464. The costs of litigating this complex antitrust case and doing so against Facebook—with its endless monetary and attorney resources—also make class treatment superior. *In re Facebook Biometric Info. Priv. Litig.*, 326 F.R.D. 535, 548 (N.D. Cal. 2018) (Donato, J.).

**Second**, "the extent and nature of any litigation concerning the controversy already begun by or against class members" likewise favors certifying the Consumer Class. *See* Fed. R. Civ. P. 23(b)(3)(B). Consumers are not aware of any other litigation by or against Consumer Class members concerning Facebook's monopolization of the PSN Market via anticompetitive deception.

**Third**, continuing to concentrate these claims before this Court in the Northern District of California would promote judicial efficiency and fairness. Fed. R. Civ. P. 23(b)(3)(C). Facebook is headquartered in this District and maintains a forum selection clause requiring litigation in this District. The Court has also presided over this case for nearly three years.

**Finally**, no inherent difficulties undermine maintaining Consumers' case as a class action. Fed. R. Civ. P. 23(b)(3)(D). To the contrary, **not** certifying the Consumer Class and requiring each class member to proceed individually would compound manageability difficulties for the parties and the Court by creating potentially millions of duplicative individual lawsuits.

## VIII.   THE COURT SHOULD APPOINT CO-LEAD INTERIM CONSUMER CLASS COUNSEL AS CO-LEAD CONSUMER CLASS COUNSEL

Consumers respectfully request that, pursuant to Rule 23(g), the Court appoint Mr. Teruya of Quinn Emanuel and Ms. Scarlett of Hagens Berman as Co-Lead Consumer Class Counsel. Mr. Teruya, Ms. Scarlett, and their respective firms have significant expertise and experience in complex class actions and antitrust litigation, and they all have worked cooperatively and extensively in vigorously advancing the Class's interests. Teruya Decl. ¶¶ 14–40, Scarlett Decl. ¶ 1–9. If appointed as Co-Lead Counsel, Mr. Teruya and Ms. Scarlett will continue to zealously litigate this case.

## IX.   CONCLUSION

Accordingly, Consumers respectfully request that the Court certify the proposed Consumer Class, appoint the named Consumers as class representatives, and appoint Co-Lead Class Counsel.

DATED: September 15, 2023

By: */s/ Shana E. Scarlett*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Shana E. Scarlett (Bar No. 217895)
 shanas@hbsslaw.com
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
(510) 725-3000

Steve W. Berman (admitted *pro hac vice*)
 steve@hbsslaw.com
1301 Second Avenue, Suite 2000
Seattle, WA 98101
(206) 623-7292

*Interim Co-Lead Consumer Class Counsel*


**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
W. Joseph Bruckner (admitted *pro hac vice*)
 wjbruckner@locklaw.com
Robert K. Shelquist (admitted *pro hac vice*)
 rkshelquist@locklaw.com
Brian D. Clark (admitted *pro hac vice*)
 bdclark@locklaw.com
Rebecca A. Peterson (Bar No. 241858)
 rapeterson@locklaw.com
Kyle Pozan (admitted *pro hac vice*)
 kjpozan@locklaw.com
Laura M. Matson (admitted *pro hac vice*)
 lmmatson@locklaw.com
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900

*Interim Counsel for the Consumer Class*

By: */s/ Kevin Y. Teruya*

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Kevin Y. Teruya (Bar No. 235916)
 kevinteruya@quinnemanuel.com
Adam B. Wolfson (Bar No. 262125)
 adamwolfson@quinnemanuel.com
Scott L. Watson (Bar No. 219147)
 scottwatson@quinnemanuel.com
Claire D. Hausman (Bar No. 282091)
 clairehausman@quinnemanuel.com
Brantley I. Pepperman (Bar No. 322057)
 brantleypepperman@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
(213) 443-3000

Michelle Schmit (admitted *pro hac vice*)
 michelleschmit@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606-1881
(312) 705-7400

Manisha M. Sheth (admitted *pro hac vice*)
 manishasheth@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Interim Co-Lead Consumer Class Counsel*

**ATTESTATION OF KEVIN Y. TERUYA**

This document is being filed through the Electronic Case Filing (ECF) system by attorney Kevin Y. Teruya. By his signature, Mr. Teruya attests that he has obtained concurrence in the filing of this document from each of the attorneys identified on the caption page and in the above signature block.

Dated: September 15, 2023          By   /s/ Kevin Y. Teruya
                                                    Kevin Y. Teruya


**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of September 2023, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System, causing it to be electronically served on all attorneys of record.

By   /s/ Kevin Y. Teruya
        Kevin Y. Teruya