**HAGENS BERMAN SOBOL SHAPIRO LLP**
Shana E. Scarlett (Bar No. 217895)
shanas@hbsslaw.com
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Kevin Y. Teruya (Bar No. 235916)
kevinteruya@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
Telephone: (213) 443-3000

*Interim Co-Lead Consumer Class Counsel*

[Additional Counsel Listed in Signature Block]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

MAXIMILIAN KLEIN, *et al.*,

Plaintiffs,

vs.

META PLATFORMS, INC.,

Defendant.

This Document Relates To: *All Consumer Actions*

Consolidated Case No. 3:20-cv-08570-JD

**CONSUMER PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE PORTIONS OF THE EXPERT REPORT AND TESTIMONY OF DR. CATHERINE TUCKER**

**REDACTED**

The Hon. James Donato

Hearing Date: Dec. 14, 2023
Hearing Time: 10:00 a.m.

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on December 14, 2023, at 10:00 a.m., before the Honorable James Donato of the United States District Court for the Northern District of California, San Francisco Division, 450 Golden Gate Avenue, San Francisco, California, Courtroom 11, 19th Floor, Plaintiffs Maximillian Klein, Sarah Grabert, and Rachel Banks Kupcho ("Consumer Plaintiffs"), on behalf of themselves and all others similarly situated, hereby move the Court for an order excluding portions of the expert report and testimony of Dr. Catherine Tucker.

This motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, all filed supportive declarations and exhibits, the records, pleadings, and other documents on file in this consolidated action, and any argument that may be presented to the Court.

## TABLE OF ABBREVIATIONS

| Abbreviation | Referenced Document |
|---|---|
| **Ex. __** | All exhibit references are to the Declaration of Kevin Y. Teruya in Support of Consumer Plaintiffs' Motion for Class Certification and Appointment of Class Counsel; and Motion to Exclude Portions of the Expert Report and Testimony of Dr. Catherine Tucker, concurrently filed herewith. |
| **Mot. Class Cert.** | Consumer Plaintiffs' Motion for Class Certification and Appointment of Class Counsel. |
| **Economides ¶ __** | Expert Class Certification Report of Dr. Nicholas Economides, concurrently filed herewith. |
| **Economides Reply ¶ __** | Reply Expert Class Certification Report of Dr. Nicholas Economides, concurrently filed herewith. |
| **Farrell ¶ __** | Expert Class Certification Report of Dr. Joseph Farrell, concurrently filed herewith. |
| **Tucker ¶ __** | Expert Class Certification User Rebuttal Report of Facebook Expert Dr. Catherine Tucker, concurrently filed herewith. |

**STATEMENT OF ISSUES TO BE DECIDED**

Whether Facebook's expert, Dr. Catherine Tucker, provides a legally impermissible and economically unsupported opinion by opining that the yardstick methodology proffered by Consumer Plaintiffs is purportedly flawed because the twelve separate yardsticks examined by Dr. Nicholas Economides are not within the *same* relevant product market (personal social networks) as Facebook?

# I. INTRODUCTION

Consumer Plaintiffs do not bring this motion lightly. Most criticisms of experts go to the weight of an expert's opinion and should be dealt with through cross-examination. But, at times, an expert's errors are so egregious, they cannot be left unaddressed.

Consumer Plaintiffs' expert, Dr. Nicholas Economides—a Professor of Economics at the Stern School of Business of New York University—offers a number of opinions in this litigation, one of which is that there is a clear methodology to calculate class wide *and* individual damages from the *but-for* world where Facebook would need to make complete disclosures about its data collection and use practices and compensate class members in return. To offer this opinion, Dr. Economides draws on twelve, real world yardstick programs (including from Facebook itself) that identify the market price users receive when paid for their data.

Facebook's expert, Dr. Catherine Tucker, makes a number of criticisms of these yardstick programs, but one criticism must be excluded from the record because it is essentially junk science. Specifically, Dr. Tucker makes the misguided criticism that these yardsticks are flawed because they are not in the same relevant product market as Facebook itself (namely, the personal social network market).

This criticism is undeniably wrong from a legal, economic, and factual perspective and was in fact retracted by Dr. Tucker at deposition. Given its utter lack of foundation in academics, legal literature, or apparently now her own testimony, these paragraphs of her report (paragraphs 189–197) must be excluded from the record and she should be precluded from providing such opinions moving forward.

# II. ARGUMENT

## A. Legal Standard and Background

Expert opinion evidence is admissible under Federal Rule of Evidence 702 unless "the proponent demonstrates that the expert is qualified and (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles

and methods to the facts of the case."[1] The proponent of the opinion bears the burden of establishing each element.[2] The Court, accordingly, may "exclude junk science."[3]

**B. Background on Dr. Tucker and Her Opinions**

Dr. Tucker is not an econometrician. [REDACTED][4] She is not an expert in the intersection of antitrust and economics, as is Dr. Joseph Farrell, Consumer Plaintiffs' expert, who served as the Director of the Bureau of Economics at the FTC and as Deputy Assistant Attorney General for Economic Analysis for the Antitrust Division of the DOJ.[5] She does not have an extensive background in industrial organization and antitrust economics like Consumer Plaintiffs' expert, Dr. Nicholas Economides, who has published dozens (if not hundreds) of papers and teaches classes in industrial organization, microeconomics, and network industries and platforms.[6]

Instead, Dr. Tucker describes herself as [REDACTED] Privacy economics, however, is a part of information economics, and itself is not a single field, but "an amalgam of many related subfields."[8] At deposition, Dr. Tucker

---

[1] *Stiner v. Brookdale Senior Living, Inc.*, No. 17-cv-03962-HSG, 2023 WL 2722294, at *5 (N.D. Cal. Mar. 30, 2023).

[2] *Cabrera v. Google LLC*, No. 5:11-cv-01263-EJD, 2022 WL 4468266, at *2 (N.D. Cal. Sept. 26, 2022).

[3] *Day v. GEICO Cas. Co.*, No. 21-cv-02103-BLF, 2022 WL 16556802, at *2 (N.D. Cal. Oct. 31, 2022); *see also Kitsch LLC v. Deejayzoo, LLC*, No. SA CV19-02556 JAK (RAOX), 2023 WL 4291445, at *8 (C.D. Cal. May 8, 2023) (excluding expert opinion as contrary to law).

[4] Ex. 75, Tucker Dep. 297:23–298:6.

[5] Farrell ¶¶ 2–3.

[6] Economides ¶ 4.

[7] Ex. 75, Tucker Dep. 8:3–16.

[8] Alessandro Acquisti, Curtis Taylor, and Liad Wagman, *The Economics of Privacy*, 54 Journal of Economic Literature 442–492 at 443 (June 2016); *see also id.* at 442–443 ("The value and regulation of information assets have been among the most interesting areas of economic research since Friedrich Hayek's 1945 treatise on the use of knowledge in society. Contributions to what has become known as the field of information economics have been among the most influential, insightful, and intriguing in the profession."); American Economic Association, JEL Classification System / EconLit Subject Descriptors (Sept. 1, 2022), https://www.aeaweb.org/econlit/jelCodes.php?view=jel (official classification of the *Journal of Economic Literature*, and a standard method of classifying scholarly literature in the field of economics – no "economics of privacy" delineated).



asserted: [redacted][9]

Dr. Tucker has a long-standing relationship with Facebook. [redacted][10] [redacted][11] [redacted][13]

Dr. Tucker, despite testifying as an economist, is notable for what she does not say. [redacted][4] [redacted][15] [redacted].[16] Dr. Tucker was not familiar with a critical loss analysis or aggregate diversion ratio (analyses

---

[9] Ex. 75, Tucker Dep. 8:18–9:9.

[10] Ex. 75, Tucker Dep. 17:23–18:7.

[11] Ex. 75, Tucker Dep. 13:13–17; *see also* Tucker, App. B at B-1-2 (citing prior testimony in: (1) *dotStrategy, Co., Individually and On Behalf of All Other Similarly Situated, v. Facebook, Inc*., Case No. 20-cv-00170-WHA, United States District Court for the Northern District of California (2021); (2) *Deborah Louise Douez, v. Facebook, Inc*., Case No. VLC-S-S-122316, Supreme Court of British Columbia, Vancouver Registry (2021); (3) *DZ Reserve, and Cain Maxwell (d/b/a Max Martialis) individually and on behalf of others similarly situated v. Facebook, Inc*., Case No. 3:18-cv-04978, United States District Court, Northern District of California (2021); (4) *Integritymessageboard.com. LLC, v. Facebook, Inc*., Case No. 4:18-cv-05286-PJH, United States District Court, Northern District of California (2021); (5) *Stephen Adkins, et al., v. Facebook, Inc*., Case No. 18-CV-05982-WHA, United States District Court, Northern District of California (2019). Dr. Tucker identified two additional matters where she testified on behalf of Facebook at her deposition.

[12] Ex. 75, Tucker Dep. 13:18–14:1.

[13] *Id.* at 19:23–20:13.

[14] *Id.* at 45:4–7.

[15] *Id.* at 45:8–47:18.

[16] *Id.* at 47:20–49:5.

undertaken by Dr. Farrell here to help identify the relevant market) and would need to [REDACTED] Dr. Tucker has [REDACTED][18]

**C. There is no basis to opine that yardsticks must come from the same market (versus a reasonably comparable market).**

The only affirmative opinion Dr. Tucker actually offers is an attack on Dr. Economides' yardstick-based class wide damages methodology. Dr. Economides proceeded by analyzing twelve, real world yardstick programs that applied a market value for user data—including from Facebook itself. He then used those real-world yardsticks to calculate the market price Facebook would have applied to its users' data in the but-for world and then showed how one could take that market price and apply it on both a classwide and individual basis in this case.[19] Dr. Tucker criticizes Dr. Economides' methodology on the basis that eleven of these twelve yardsticks supposedly do not come from the same relevant product market as the one in which Facebook operates (personal social networks). This criticism finds no basis in the law or economic literature.

As an initial matter, it cannot be seriously contested that "'the yardstick approach is a well-established methodology' in antitrust actions," and certainly Tucker cannot "complain that the methodology itself is unreliable."[20] Certainly, the court in *Realtors* found such methodologies acceptable, when upholding a yardstick damages by Dr. Economides only a few months ago.[21]

After surveying reams of record evidence, including multiple examples where Facebook itself paid for the exact same type of user data at issue in this case, Dr. Economides identified twelve examples where companies paid users in exchange for their data. Dr. Economides

---

[17] *Id.* at 49:7–22.

[18] *Id.* at 50:11–21.

[19] *See* Mot. Class Cert. at 15–17.

[20] *Moehrl v. The Nat'l Assoc. of Realtors*, No. 1:19-cv-01610, 2023 WL 2683199, at *8 (N.D. Ill. Mar. 29, 2023) (citing *In re Dealer Mgmt. Sys.*, 581 F. Supp. 3d 1029, 1073 (N.D. Ill. 2022). *See also Fishman v. Est. of Wirtz*, 807 F.2d 520, 551 (7th Cir. 1986) ("The concept of a 'yardstick' measure of damages, that is, linking the plaintiff's experience in a hypothetical free market to the experience of a comparable firm in an actual free market, is . . . well accepted.").

[21] *Moehrl*, 2023 WL 2683199, at *18.

exhaustively detailed the types of data collected by Facebook and compared that against the data collected by each of the twelve yardsticks.[22] After satisfying himself that these data collection programs were reasonably comparable to Facebook's collection of data, he provided the following chart outlining the amounts paid to consumers for data, and by which companies:[23]

**Table D1: Yardstick Data Prices[702]**

| Company | Program or App | Pay Range (per Month) | Midpoint of Range |
|---|---|---|---|
| Facebook | Facebook Research | \$10 - \$20 | \$15 |
| Facebook | Facebook Study | \$5 - \$20 | \$12.50 |
| Google | Screenwise | \$3-\$16 | \$9.50 |
| Nielsen | Computer and Mobile Panel | \$5 | \$5 |
| Verto Analytics | Smart Panel | \$6.25 | \$6.25 |
| SmartPhoneMate | SmartPhoneMate App | \$3 | \$3 |
| Strategy Analytics | AppOptix | \$3.60 | \$3.60 |
| Embee Mobile Insights Solutions | Mobile Performance Meter | \$3.50 | \$3.50 |
| Placed | Placed Panel App | \$1 - \$3 | \$2 |
| Comscore | MobileXpression | \$5.50 | \$5.50 |
| Luth Research | SavvyConnect | \$5 – \$15 | \$10 |
| Amazon | Shopper Panel | \$2 – \$12 | \$7 |
| | | Average (All): | \$6.90 |
| | | Average (Non-FB): | \$5.54 |

[22] *Compare* Economides ¶ 243 (describing Facebook data collection) *with* ¶¶ 377–79, ¶ 377 n.579 (Facebook Research App collected "internet browsing and app usage activity and data"), ¶ 382 (Study from Facebook collected app usage data and "country, device," and "network type"), ¶ 419 (Google Screenwise Panel collected "web pages you've visited" and "device information"), ¶ 423 (Nielsen Computer and Mobile Panel collected "the URL (address) you went to," "How long you were on the URL," and "General computer and/or mobile device activity"), ¶ 424 (Verto analytics Smart Panel collected how users "interact with their online services and apps" and offering customers "a second-by-second account of crossdevice consumer activity"), ¶ 427 (SmartPhoneMate App collected data that allowed firm "to understand and study how people use their phones"), ¶ 429 (Strategy Analytics AppOptix Panel collected app usage, device, and location data), ¶ 431 (Embee Mobile Performance Meter collected "web and app usage information"), ¶ 432 (Placed.com collected "location data" and "information on apps installed and usage"), ¶ 433 (Comscore MobileXpression collected web browser, location, transaction, and biographical data), ¶ 435 (SavvyConnect collected "Visitation and Time Spent on Sites and Apps"), ¶¶ 438–39 (Amazon Shopper Panel collected off-Amazon purchase history via receipt upload, as well as data regarding engagement with ads via "Ad Verification" program); *see also* Economides Reply ¶¶ 149–150.

[23] Economides ¶ 441 (Table D1).

From these yardsticks, Dr. Economides identified what, in his expert opinion, would have been the market price Facebook applied to its users' data: $5 per month. This was the lowest amount Facebook actually paid in the real world as part of its yardstick data collection program, but was also far lower than the majority of similar data collection programs. However, Dr. Economides also estimated a lower market price ($3.50/month) and a higher price ($7/month), and showed how utilizing any market price for data can be translated into classwide *and* individual damages.[24]

Dr. Tucker criticizes this yardstick methodology, in part, because it supposedly [redacted][25] [redacted][26] Said another way, Dr. Tucker criticizes the dozen yardsticks Dr. Economides identified and used for his analysis ***because they themselves are not in the same relevant market as*** Facebook. Dr. Tucker's mistake is somewhat shocking for an economist because it fundamentally misunderstands the purposes of a yardstick program. [redacted][27]

To put it plainly, Dr. Tucker has confused yardsticks with "before-and-after" benchmarks. As explained by Drs. Rubinfeld and McCrary in *Measuring Benchmark Damages in Antitrust Litigation*—an article that Dr. Tucker herself cites in her report—in the yardstick method, [redacted]

---

[24] *See* Mot. Class Cert. at 17.

[25] Tucker VII.A.2.

[26] Tucker ¶ 192 [redacted]

[27] Ex. 75, Tucker Dep. 297:23–298:6.

[REDACTED] [8] This is different from a benchmark approach, which "refers to comparisons to the same market but in a time period free from the conduct, and yardstick refers to comparisons to other markets in the same time period."[29] Because Facebook has dominated the personal social network market for so long, a "pre-conduct" benchmark was not feasible here—a point Dr. Tucker does not contest.[30] Instead, Dr. Economides turned to the series of twelve yardsticks where multiple different companies (including Facebook itself) compensated users for the same sort of data at issue in this case.[31]

Dr. Tucker's testimony that Dr. Economides' yardstick analysis is subject to criticism because the programs are not in the same antitrust market is simply junk science. When questioned on this topic at her deposition, Dr. Tucker backpedaled on her opinion and agreed that yardsticks absolutely may come from a different relevant market; they just need to be "informative":

Q.
A.



[28] Tucker ¶ 195 fn.436; *see also* Justin McCrary and Daniel L. Rubinfeld, *Measuring Benchmark Damages in Antitrust Litigation*, 3 Journal of Econometric Methods 63–74 (2014); *In re Nw. Airlines Corp. Antitrust Litig.*, 197 F. Supp. 2d 908, 928 (E.D. Mich. 2002) (benchmarks "need not be wholly identical," just "somewhat comparable"); *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 118–19 (S.D.N.Y. 2015) ("selection of perfectly comparable benchmark[s]" "impossible" as defendant's "alleged monopoly prevents comparable firms from operating within its market").

[29] Economides Reply ¶ 142.

[30] Economides Reply ¶ 142.

[31] Economides Reply ¶ 143. To the extent that defendant Facebook might now be heard to complain that the yardsticks (all twelve) were simply not comparable, that is an issue for the jury. *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1221 (9th Cir. 1997) ("Whether that 'unaffected' business properly compares to the relevant market presents a question of fact for the jury."); *Syufy Enterprises v. Am. Multicinema, Inc.*, 793 F.2d 990, 1003 (9th Cir. 1986) (holding "Comparability is a question of fact" for the jury when examining yardstick damages in an antitrust action).

[redacted].

There is no removing this fatal concession at deposition. Yardsticks are an appropriate measurement of damages in an antitrust case.[33] They typically must come from a relevant market that is different from the tainted product itself,[34] and doing so is not only permitted, but completely justified under the economic literature that Dr. Tucker herself cites. Given that case law supports the existence of the yardstick methodology for estimating damages, Dr. Tucker's apparent retraction of her criticism, and the indisputable case law that if Facebook is challenging the comparability of the yardsticks, and that this is a question of fact for the jury,[35] Consumer Plaintiffs request that the Court exclude Dr. Tucker's Opinion Four (*i.e.*, "The Economides Report's damages methodology is incorrect and unreliable because it lacks a necessary connection to the 'Personal Social Network Market'"); Paragraph 6(a); Paragraphs 189-197, and her overarching stated opinion that Dr. Economides' yardstick damages methodology is unreliable because it [redacted][36]

## III. CONCLUSION

For all the reasons stated above, Consumer Plaintiffs request that Dr. Tucker's paragraphs 189–197, and any testimony that Dr. Economides' yardstick methodologies are flawed for not themselves being in the personal social network market, be excluded from the record and that she be precluded from offering such opinions moving forward.

---

[32] Ex. 75, Tucker Dep. 296:16–297:4.

[33] *Moehrl*, 2023 WL 2683199, at *18.

[34] Justin McCrary and Daniel L. Rubinfeld, *Measuring Benchmark Damages in Antitrust Litigation*, 3 Journal of Econometric Methods 63–74 (2014).

[35] *Image Tech. Servs.*, 125 F.3d at 1221; *Syufy*, 793 F.2d at 1003.

[36] Tucker ¶ 148.

DATED: September 15, 2023

Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By: */s/ Shana E. Scarlett*
Shana E. Scarlett (Bar No. 217895)
shanas@hbsslaw.com
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000

Steve W. Berman (admitted *pro hac vice*)
steve@hbsslaw.com
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
W. Joseph Bruckner (admitted *pro hac vice*)
wjbruckner@locklaw.com
Robert K. Shelquist (admitted *pro hac vice*)
rkshelquist@locklaw.com
Brian D. Clark (admitted *pro hac vice*)
bdclark@locklaw.com
Rebecca A. Peterson (Bar No. 241858)
rapeterson@locklaw.com
Arielle S. Wagner (admitted *pro hac vice*)
aswagner@locklaw.com
Kyle Pozan (admitted *pro hac vice*)
kjpozan@locklaw.com
Laura M. Matson (admitted *pro hac vice*)
lmmatson@locklaw.com
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By: */s/ Kevin Y. Teruya*
Kevin Y. Teruya (Bar No. 235916)
kevinteruya@quinnemanuel.com
Adam B. Wolfson (Bar No. 262125)
adamwolfson@quinnemanuel.com
Claire D. Hausman (Bar No. 282091)
clairehausman@quinnemanuel.com
Brantley I. Pepperman (Bar No. 322057)
brantleypepperman@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
Telephone: (213) 443-3000

Michelle Schmit
michelleschmit@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400

Manisha M. Sheth (admitted *pro hac vice*)
manishasheth@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000

*Interim Co-Lead Counsel for the Consumer Class*

**ATTESTATION OF KEVIN Y. TERUYA**

This document is being filed through the Electronic Case Filing (ECF) system by attorney Kevin Y. Teruya. By his signature, Mr. Teruya attests that he has obtained concurrence in the filing of this document from each of the attorneys identified on the caption page and in the above signature block.

Dated: September 15, 2023

*/s/ Kevin Y. Teruya*
Kevin Y. Teruya

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of September, 2023, the foregoing document was served on all attorneys of record by electronic mail.

Dated: September 15, 2023

*/s/ Kevin Y. Teruya*
Kevin Y. Teruya