**PUBLIC REDACTED VERSION**

WILMER CUTLER PICKERING
 HALE AND DORR LLP
SONAL N. MEHTA (SBN 222086)
 Sonal.Mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
 David.Gringer@wilmerhale.com
ROSS E. FIRSENBAUM (*pro hac vice*)
 Ross.Firsenbaum@wilmerhale.com
RYAN CHABOT (*pro hac vice*)
 Ryan.Chabot@wilmerhale.com
PAUL VANDERSLICE (*pro hac vice*)
 Paul.Vanderslice@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800

*Attorneys for Defendant Meta Platforms, Inc.*

ARI HOLTZBLATT (*pro hac vice*)
 Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
 Molly.Jennings@wilmerhale.com
2100 Pennsylvania Ave NW
Washington, DC 20037
Telephone: (202) 663-6000

MICHAELA P. SEWALL (*pro hac vice*)
 Michaela.Sewall@wilmerhale.com
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated,<br><br>                              Plaintiffs,<br><br>    v.<br><br>META PLATFORMS, INC., a Delaware Corporation,<br><br>                              Defendant. | Case No. 3:20-cv-08570-JD<br><br>**META PLATFORMS, INC.'S MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF NICHOLAS ECONOMIDES**<br><br>Judge: Hon. James Donato<br><br>Hearing Date: December 14, 2023<br>Time: 10:00 a.m. |

**PUBLIC REDACTED VERSION**

## TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ...................................................................................1

STATEMENT OF REQUESTED RELIEF ..............................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES .........................................................1

INTRODUCTION ....................................................................................................................1

BACKGROUND ......................................................................................................................2

LEGAL STANDARD ..............................................................................................................4

ARGUMENT ...........................................................................................................................4

I.  ECONOMIDES'S PREDICTION THAT META WOULD HAVE EVER COMPENSATED ITS USERS FOR THEIR DATA IS JUNK SCIENCE —NOT THE PRODUCT OF RELIABLE PRINCIPLES AND METHODS ..................................................................................4

      A.  ECONOMIDES OFFERS NO EMPIRICAL SUPPORT FOR HIS FINDING OF INJURY ..................................................................................5

      B.  ECONOMIDES'S CONCLUSION RELIES ON INAPPOSITE FACTS ............6

II.  ECONOMIDES'S CALCULATION THAT META WOULD ███████████ ███████████████████ IS JUNK SCIENCE AND DOES NOT REFLECT RELIABLE PRINCIPLES AND METHODS ..................................................................................9

III.  ECONOMIDES' OPINION THAT FACEBOOK'S PRIVACY SETTINGS ARE CONFUSING SHOULD BE EXCLUDED AS NOT OFFERING HIS OWN "SPECIALIZED KNOWLEDGE" ...........13

CONCLUSION .......................................................................................................................15

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**CASES**

*Carnegie Mellon Univ. v. Hoffman-LaRoche, Inc.*,
  55 F. Supp. 2d 1024 (N.D. Cal. 1999) ......................................................................6

*Donnelly v. Rhode Island Board of Governors for Higher Education*,
  929 F. Supp. 583, 591 (D.R.I. 1996)........................................................................13

*DZ Reserve v. Meta Platforms, Inc.*,
  2022 WL 912890 (N.D. Cal. Mar. 29, 2022)................................................4, 14, 15

*Farmington Dowel Prods. Co. v. Forster Mfg. Co.*,
  421 F.2d 61 (1st Cir. 1969) ......................................................................................13

*Flintkote Co. v. Lysfjord*,
  246 F.2d 368 (9th Cir. 1957) ..............................................................................10, 13

*General Electric v. Joiner*,
  522 U.S. 136 (1997)................................................................................................4, 8

*Huawei Techs., Co. v. Samsung Elecs. Co.*,
  340 F. Supp. 3d 934 (N.D. Cal. 2018) .....................................................................14

*In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*,
  524 F. Supp. 2d 1166 (N.D. Cal. 2007) .....................................................................4

*In re Blood Reagents Antitrust Litig.*,
  2015 WL 6123211 (E.D. Pa. Oct. 19, 2015)............................................................13

*In re Google Play Antitrust Litig.*,
  2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) ...........................................................8

*In re Live Concert Antitrust Litig.*,
  863 F. Supp. 2d 966 (C.D. Cal. 2012) ................................................................10, 13

*Loeffel Steel Prods. v. Delta Brands, Inc.*,
  387 F. Supp. 2d 794 (N.D. Ill. 2005) *amended by* 2015 WL 8178971 (N.D. Ill.
  Sept. 8, 2005) ...........................................................................................................13

*Miller v. Pfizer, Inc.*,
  196 F. Supp. 2d 1062 (D. Kan. 2002) *aff'd*, 356 F.3d 1326 (10th Cir. 2004) ...........6

*Moehrl v. National Association of Realtors*,
  1:19-cv-01610 (N.D. Ill.), Dkt. No. 324-5 (June 8, 2022)......................................10

*Muffett v. City of Yakima*,
  2012 WL 12827492 (E.D. Wash. July 20, 2012)...........................................10, 11, 13

**PUBLIC REDACTED VERSION**

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) (en banc) ...................................................................4

*Siqueiros v. GM LLC*,
  2022 WL 74182 (N.D. Cal. Jan. 7, 2022) .............................................................13

**STATUTES, RULES, AND REGULATIONS**

Fed. R. Evid. 702 .......................................................................................................1, 15

**Other Authorities**

*Computer & Mobile Panel: Technical FAQs*, Nielsen,
  https://computermobilepanel.nielsen.com/ui/US/en/techfaqen.html ......................11

Dante D'Orazio, *Google Screenwise Pays Opt-in Users for Expanded Web
  Tracking*, The Verge (Feb. 8, 2012), https://www.theverge.com/2012/2/8
  /2785751/google-screenwise-panel-webmonitoring-knowledge-networks ...........12

David S. Evans, *Attention Platforms, the Value of Content, and Public Policy*, 54
  R. Indus. Org. 775 (2019) ..................................................................................5, 8

Herbert Hovenkamp, *A Primer on Antitrust Damages*, Faculty Scholarship at
  Penn Carey Law (2011) .........................................................................................10

*Join the Amazon Shopper Panel and Earn Monthly Rewards!*, Amazon,
  https://panel.amazon.com ........................................................................................12

Nicholas Economides & Ioannis Lianos, *Giving Away Our Data for Free Is a
  Market Failure*, Promarket (Feb. 1, 2021), https://www.promarket.org/2021
  /02/01/free-data-market-failure-digital-platforms/ ...................................................3

Phillip A. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
  Principles and Their Application* (2023) .................................................................9

*Strategic Analytics Introduces New Wall Street Services Analyzing Mobile*,
  BusinessWire (Sept. 11, 2018), https://www.businesswire.com/news/home
  /20180911005702/en/ .............................................................................................12

**PUBLIC REDACTED VERSION**

### NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT, on December 14, 2023, at 10:00 a.m. in Courtroom 19 of the U.S. District Court for the Northern District of California, San Francisco Division, at 450 Golden Gate Avenue, San Francisco, CA, this Motion to Exclude Testimony of Nicholas Economides filed by Defendant Meta Platforms, Inc. will be heard. Pursuant to Federal Rule of Evidence 702, Meta moves to exclude testimony of Dr. Nicholas Economides. Meta's motion is based on this Notice of Motion and the supporting Memorandum of Points and Authorities.

### STATEMENT OF REQUESTED RELIEF

Meta requests that the Court exclude Parts X-XII of the Declaration of Dr. Nicholas Economides in Support of Consumer Plaintiffs' Motion for Class Certification Errata ("Economides Report"), as well as Section IV(C) and Parts VI-VII of the Reply Declaration of Dr. Nicholas Economides in Support of Consumer Plaintiffs' Motion for Class Certification ("Economides Reply Report").  *See* Declaration of David Gringer in Support of Motion to Exclude ("Gringer Decl.") Exs. 1-3.

### MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

No service that competes for user time and attention with its content has ever paid users for consuming or engaging with content. No platform that is advertising-supported (newspaper, television, radio, magazine, or website) has paid users for accessing the platform and receiving ads as part of that experience. No participant in the supposed "Personal Social Network Market" has paid users for signing up or consuming or engaging with content, whatever competition it faces. Nor do TikTok, YouTube, or the many other firms that Meta actually competes with that Plaintiffs exclude from their contrived market. The user side of the value exchange is the opportunity to engage with interesting content and be entertained. Despite these real-world facts, Users' putative expert Nicholas Economides opines that ███████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████ In total, according to Economides, ████████ ████████████████████████████████████████████████████

**PUBLIC REDACTED VERSION**

1 [REDACTED]

2 Economides asks the Court to accept that such payments would have occurred but for the

3 challenged conduct because . . . he says so. He offers no regression analysis, no mathematical

4 formula, and no reliable economic methodology to support his opinion. Nothing that is the stuff of

5 real economics or expert opinion. Instead, the only bases for Economides's opinion are proposals

6 for compensating users that Meta considered *and rejected* over the years and Meta's payment of

7 limited participants in certain *market-research programs* that offer no independent value to the

8 participant. According to Economides, these programs and other market research programs by

9 companies like Nielsen, which are nothing like Facebook and countless other attention platforms

10 like it, [REDACTED]

11 [REDACTED], even though *no competitor* in Users' contrived market or in the real-world has

12 *ever* paid users a single cent for accessing content on an ad-supported platform and doing so makes

13 no sense. Economides offers no analysis or explanation for how to reconcile his opinions with the

14 economic realities of the market and the contrary facts. Instead, his *ipse dixit* is implausible junk

15 science and this Court should exclude it as such.

16 **BACKGROUND**

17 User Plaintiffs have retained Economides to opine on, as relevant here, [REDACTED]

18 [REDACTED]

19 [REDACTED]. *See* Gringer Decl.

20 Ex. 1, Declaration of Dr. Nicholas Economides in Support of Consumer Plaintiffs' Motion for

21 Class Certification ("Economides Report") ¶ 9. Economides offers Plaintiffs' sole theory of injury

22 and damages.

23 Economides claims to identify a relevant antitrust market for "Personal Social Networks"

24 defined by [REDACTED]

25 [REDACTED]

26 [REDACTED]. *Id*. ¶ 12. He opines that [REDACTED]

27 [REDACTED]. *Id*. ¶ 14(d).

28 Meta's monopolization of this market, he claims, allowed Meta to collect and use more user

**PUBLIC REDACTED VERSION**

1 "data"—information users provided to Meta directly or indirectly through their use of its platforms

2 or activity on third-party sites—without adequately compensating users in return.

3     Economides speculates that ███████████████████████████████

4 ███████████████████████████████████████████████████████████

5 ███████████████████████████████████████████████████████████

6 ███████████████████████████████████████████████████████████

7 ███████████████████████████" *Id.* ¶¶ 373, 395.

8     Economides then opines that ████████████████████████████

9 ████████████████████████████.[1] *Id.* ¶ 409. He arrives at this figure as his ████████

10 ███████████████████████████████████████████████████████████

11 ███████████████████████████████████████████████████████████

12 ███████████████████████████████████████████████████████████

13 ███████████████████████████████████████████████████████████

14 ████████████████████████████████. *Id.* ¶¶ 409-39. These programs have

15 users measured in the thousands. Economides opines that ████████████████████

16 ███████████████████████████████████. *Id.* ¶ 399.

17     The opinion that ████████████████████████████ directly contradicts

18 Economides's own scholarship. Outside of this litigation, Economides argues that Facebook

19 already compensates users, but via the quality of its services rather than monetary compensation.

20 *See* Gringer Decl. Ex. 4, Nicholas Economides & Ioannis Lianos, *Giving Away Our Data for Free*

21 *is a Market Failure*, Promarket (Feb. 1, 2021), https://www.promarket.org/2021/02/01/free-data-

22 market-failure-digital-platforms/ [hereinafter Economides, *Giving Away*] ("[T]he platform does

23 not pay for personal data *except by a payment in kind with a service*.") ("Personal information is

24 collected without compensation to the user, *other than* providing . . . free social networking

25

---

26 [1] Economides suggests that ████████████████████████████████████████████

                                            Gringer Decl. Ex. 3, Economides Dep. Tr. 177:25-178:14.

27 Assuming Meta ███████████████████, that would amount to over 10.4 *billion* Visa gift

28 cards sent to users over the class period. To put that in context, there are fewer than 3 billion debit cards in circulation worldwide.

**PUBLIC REDACTED VERSION**

services by Facebook.") (emphasis added). Economides has also specifically opined that if platforms like Facebook did pay users for data, not everyone would warrant or demand payment and not in the same amount. *Id.* He has explained, "Compensation would depend on the value of the information of a particular user to the platform" and that "[u]sers vary widely on the value they place on privacy and in the value of their personal information to the platforms." *Id.* Thus, he has written that only "some of the users participating in the market at zero price would be compensated at a positive price under competition." *Id.* "Transaction prices for the sale of personal information would . . . vary and likely be individually negotiated between the platform and the user," Economides concludes. *Id.*

## LEGAL STANDARD

Most relevant to this motion, "the question for the Court at this stage is to decide whether [an expert] will use a generally accepted method . . . or whether his approach is 'junk science' akin to predicting criminality by feeling the bumps on a person's head." *DZ Reserve v. Meta Platforms, Inc.*, 2022 WL 912890, at *3 (N.D. Cal. Mar. 29, 2022). Courts therefore may exclude an expert's "opinion evidence . . . [that] is connected to existing data only by the *ipse dixit* of the expert," *Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997), or that "cherry-pick[s]" the data to which it is connected. *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007). When assessing a class-certification expert's damages model, courts assess "factors that may undercut the model's reliability (such as unsupported assumptions, erroneous inputs, or nonsensical outputs such as false positives)." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 683 (9th Cir. 2022) (en banc). The party offering expert testimony bears the burden of proving that it is admissible. *Id.* at 665.

## ARGUMENT

### I.   ECONOMIDES'S PREDICTION THAT META WOULD HAVE EVER COMPENSATED ITS USERS FOR THEIR DATA IS JUNK SCIENCE—NOT THE PRODUCT OF RELIABLE PRINCIPLES AND METHODS

Economides's prediction that Meta would have paid users of its platforms for their data but for the alleged conduct—the entire premise for his subsequent "damages" calculation—is not

**PUBLIC REDACTED VERSION**

1   serious science and has no business being admitted in federal court. Economides's unfounded

2   declaration that ██████████████████████████ is based on no empirical or other analysis,

3   just his say-so. Indeed, his only comparative bases at all are market-research programs that are

4   nothing like the Facebook platform and plans that Meta explored *and rejected* for reasons that had

5   nothing to do with an alleged lack of competition. The Court should exclude this opinion because

6   it has no basis whatsoever.

7       **A.**    **ECONOMIDES OFFERS NO EMPIRICAL SUPPORT FOR HIS FINDING OF INJURY**

8          First, and fatally, Economides's speculation about the but-for world ignores the reality that

9   Facebook attracts users' time and attention with engaging content (providing them substantial

10   value) and makes money by selling advertisements. Attention platforms, like Facebook and

11   Instagram, date back to ad-supported newspapers in the mid-17[th] century and serve to provide

12   content that induces individuals to spend time on the platform. David S. Evans, *Attention*

13   *Platforms, the Value of Content, and Public Policy*, 54 Rev. of Indus. Org. 775, 777 (2019).

14   Economides identifies no example of an attention platform, or any company that generates content,

15   paying users of that service delivered free of charge (except select content creators like public

16   figures or influencers). *See* Gringer Decl. Ex. 3, Economides Dep. Tr. 115:10-17. There is none.

17   Many firms generate content and collect user data on ad conversions, including Amazon, Effectv,

18   Google, Hulu, LinkedIn, NBCUniversal, Pinterest, Reddit, Roku, Quora, Snapchat, TikTok,

19   Twitter, and VerizonMedia Group. None of these firms pays users for what Economides refers to

20   as "██████████████." Nor do Snapchat or MeWe—which Economides says *are* Meta's

21   current competitors in the putative Personal Social Network market—or Meta's previous

22   competitors in that putative market, Google+ or MySpace. And Meta, of course, has never

23   responded to competition from any firm in the real world, including more recently TikTok, by

24   paying users. Why not? Economides never explains. He just asserts that it would happen. And he

25   does so with zero consideration of other reasons why Meta would not pay users. *See, e.g.*, Baser

26   Dep. Tr. 270:4-271:19 (describing a user compensation program as "██████" because the

27   proposal would have left Facebook as "████████████████████" and "

28   ████████████").

1    This *ipse dixit* opinion divorced from real-world facts is precisely what the *Daubert*

2  standard is designed to weed out. *See, e.g., Carnegie Mellon Univ. v. Hoffman-LaRoche, Inc.*, 55

3  F. Supp. 2d 1024, 1034-35 (N.D. Cal. 1999) (excluding testimony of expert who "depart[ed] from

4  scientific standards" by "examining only subsets of the controls (the ones that do not disprove his

5  theory)," "failing to address and exclude alternative explanations for the data on which he basis

6  his findings," and "selectively examining only portions of the data from a number of studies");

7  *Miller v. Pfizer, Inc.*, 196 F. Supp. 2d 1062, 1086-87 (D. Kan. 2002) ("exclusion of evidence is

8  not generally accepted practice . . . . [O]btaining information from sources that support, refute or

9  are neutral regarding the hypothesis is appropriate to minimize the likelihood of a false

10  conclusion.") (quotation marks omitted) *aff'd*, 356 F.3d 1326 (10th Cir. 2004). The Economides

11  Report is unscientifically avoiding essential facts and should be excluded on this basis.

12  **B.    ECONOMIDES'S CONCLUSION RELIES ON INAPPOSITE FACTS**

13    While ignoring germane data points is alone sufficient to exclude an expert's conclusion,

14  Economides's opinions must be excluded for the independent reason that they do not fit the facts

15  of the case and are, indeed, contradicted by them.

16    First, Economides considers and relies upon internal Meta proposals about compensating

17  users that the company considered—and rejected. *See* Gringer Decl. Ex. 1, Economides Report

18  ¶¶ 385-393 (describing ███████████████████████████████████████

19  ████████████████████). As this Court has observed, "just because" Meta considered a

20  proposal does not "mean[] it's in any way realistic." June 22, 2023 Hr'g Tr. 22:2-6. As the Court

21  said, it does not "get you anywhere" to "stand up and tell the jury, 'Here's a program. They never

22  did it, but they thought about it.'" *Id.*

23    The evidence in this case makes it clear that ████████████████████████████

24  ███████ is not a viable option for Facebook, even under the different competitive conditions that

25  Economides imagines would exist in his but-for world. The record is clear tha ████████████

26  ████████████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████ Zuckerberg Dep. Tr. 52:9-23.

**PUBLIC REDACTED VERSION**

1   Executives within Meta considered it ▮▮▮▮▮ and ▮▮▮▮▮▮ to pursue user compensation

2   because it would have left the company as ▮▮▮▮▮▮▮▮▮▮▮ and unable to ▮▮

3   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Baser Dep. Tr. 270:4-271:19..

4   From this evidence that Meta rejected ideas to pay users as nonsensical, Economides concludes

5   nonsensically that Meta would have paid users. This gets him nowhere, as the Court forewarned.

6          The other basis for Economides's opinion that ▮▮▮▮▮▮▮▮▮▮▮

7   ▮▮▮▮▮▮▮▮▮▮▮ is three market-research programs that Meta

8   implemented over the years (outside Facebook and Instagram). To be sure, these programs *do* offer

9   compensation to entice participants to participate in market research that obtained "incremental"

10  data that Meta did not otherwise have access to. To wit, Economides admitted that the data

11  Facebook collects from Study ▮▮▮▮▮▮▮▮▮▮▮ to allow Facebook

12  to collect information about ▮▮▮▮▮▮▮▮▮▮▮

13  ▮▮▮▮▮▮▮▮▮▮▮ Gringer Decl. Ex. 3.,

14  Economides Dep. Tr. 159:1-11.   And Facebook Research collected similar incremental

15  information. *Id.* at 159:22-160:5. It makes sense then—even to Economides—that Meta paid

16  participants to provide this data, because ▮▮▮▮▮▮▮▮▮▮▮

17  ▮▮▮▮▮▮▮▮▮▮ *Id.* at 160:15-23. That Meta has launched market research

18  programs because it is interested in additional detailed information (from a small number of

19  participants) says nothing about Meta's willingness to compensate *all* users of Meta's apps, who

20  do not provide comparable information to Meta.

21         Importantly, these market research programs (internal or external to Meta) do not pay

22  people to use a service—or offer them a service at all—or provide independent value such as

23  entertainment or communication. Each app compensates people in exchange for participating in

24  studies related to market research (like Nielsen). Gringer Decl. Ex. 1, Economides Report ¶¶ 411-

25  440. None of them are ad-supported businesses. And these programs also sought only select,

26  limited, and representative panels of participants, and so were available to users by invitation only.

27  *See* Gringer Decl. Ex. 5, Ben-Zedeff, *Introducing Study From* Facebook, Meta (June 11, 2019),

28  Ex. 6, Naveh, *Introducing Facebook Viewpoints* (Nov. 25, 2019). ▮▮▮▮▮▮▮▮▮

**PUBLIC REDACTED VERSION**

████████████████████████████████████████████████████████. Gringer Decl. Ex. 7,

Background for Sagee Ben-Zedeff 30(b)(6) Deposition, PX-2961. Economides acknowledged at

his deposition that ████████████████████████████████████████████████

████████ Gringer Decl. Ex. 3, Economides Dep. Tr. 169:19-170:3.

Facebook, of course, has hundreds of millions of users in the United States, none of whom

are paid, because Facebook offers a valuable service that users enjoy. *See* Evans, *Attention

Platforms* at 775 ("[A]ttention platforms generate valuable content. Even though people often

don't pay for content, we know from revealed preference that content is valuable because people

spend a considerable amount of time—which has an opportunity cost—consuming it."). Indeed,

the three Named Plaintiffs themselves say ████████████████████████████████

███████████████████████████████████. *See* M. Klein Dep. Tr.

294:23-295:5 Grabert Dep. Tr. 325:5-327:6; Kupcho Dep. Tr. 53:13-21, 54:4-9, 109:20-110:3.

████████████████████████. Gringer Decl. Ex. 3, Economides Dep. Tr. 71:9-12. Because

of the value that Users get from Facebook, it is no surprise that they do not require payment to

continue to use it. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████. *Id*. at 133:14-144:19. That Meta paid limited, select participants in market-research

programs says nothing about whether Meta would ever pay any user of the Facebook app, let alone

that it would have paid *every* active Facebook user a fixed amount per month over many years.

Altogether, Economides's foundational proposition that Meta would have paid every active

Facebook user is classic junk science: a conclusion with no basis in the record or reality. His

"wholly speculative assumptions . . . make his opinions *ipse dixit* unsuitable for admission at trial"

because "there is simply too great an analytical gap between the data and the opinion offered." *In

re Google Play Antitrust Litig.*, 2023 WL 5532128, *9-10 (N.D. Cal. Aug. 28, 2023) (excluding

expert testimony) (quoting *Gen. Elec.*, 522 U.S. at 146).

**PUBLIC REDACTED VERSION**

1   **II.**   **ECONOMIDES'S CALCULATION THAT META WOULD HAVE** ███████████

2   ██████████████████████████ **IS JUNK SCIENCE AND DOES NOT REFLECT**

3   **RELIABLE PRINCIPLES AND METHODS**

4   Relying on rejected proposals and research apps to opine that ███████████

5   ████████████████████████████████████████████████████████

6   ██████████████████. Gringer Decl. Ex. 1, Economides Report ¶ 444.

7   One need look no further than Economides's own scholarship to know that this opinion is

8   driven by Plaintiffs' desired outcome and not science. Basic economics dictates that, even if it

9   were plausible for Meta to pay users who simply consume content, it would not compensate

10   negative-value users (users whose value to Meta, net of the cost of providing them services, is

11   negative) or users who would reject a hypothetical "privacy focused" competitor even in a world

12   where Meta did not offer any compensation. Indeed, while Economides cites ███████████

13   ████████████████████████████████████████████████████████

14   ████████████████████████████. Gringer Decl. Ex. 1, Economides Report

15   ¶¶ 386-393. Gringer Decl. Ex. 3, Economides Dep. Tr. 110:16-110:9 ████████████

16   ████████████████████████████████████████████████████████

17   ██████████████████████. Since this truth is fatal to Users' efforts to certify a class,

18   however, Economides disregards his earlier scholarship to opine ███████████████

19   █████████████████████████

20   He does this through speculation masquerading as "yardstick" analysis that in fact

21   considers only unrelated programs. Gringer Decl. Ex. 1, Economides Report ¶¶ 408-446. Actual

22   yardstick analysis involves comparing prices charged in "yardstick" markets or businesses with

23   the relevant market or business in the litigation. A yardstick must be "as comparable as possible

24   in all respects" to the firm at issue—in "degree of competition, tax structure, regulatory

25   requirements, population density, and so on." 3G Phillip A. Areeda & Herbert Hovenkamp,

26   *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 395b3 (2023). Thus,

27   "the reliability of the yardstick approach is based on the comparability of that yardstick to the

28   business (or proposed business) involved in the litigation." *Muffett v. City of Yakima*¸ 2012 WL

**PUBLIC REDACTED VERSION**

12827492, at *3 (E.D. Wash. July 20, 2012) (citing *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 393 (9th Cir. 1957). A yardstick method is therefore acceptable science "only in limited situations" where "the markets of the two firms are identical" and the compared firms "stand in the same relative position in those markets, offer the same product mix, have comparable managements and are comparable in other respects." Herbert Hovenkamp, *A Primer on Antitrust Damages*, Faculty Scholarship Penn Carey Law, at 46 (2011). Antitrust scholar Herbert Hovenkamp warns that if "either the markets or firms being compared are dissimilar, the yardstick theory will not produce a trustworthy estimate," *id.* at 46, and "[i]f there is an important difference that is beyond adjustment, this approach will have to be abandoned." Areeda & Hovenkamp ¶ 395b3. Despite citing Hovenkamp's article as supportive of his approach, when confronted with this language, Economides decided that ███████████████ Gringer Decl. Ex. 3, Economides Dep. Tr. 187:19-188:7. He did not dispute, however, that ███████████. *Id.* at 185:20-186:5.

Without a valid comparator, one cannot conclude that the difference in price in the at-issue market and in the yardstick market—here, ██████████████ (per Economides) and $0— is attributable to anticompetitive conduct *at all*, let alone conclude that the entire difference is attributable to it. *See, e.g.*, *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 975 (C.D. Cal. 2012) (rejecting yardstick analysis that "does not account for *any* other possible explanation(s) for this disparity" between the yardstick and at-issue market price). Thus, "[w]here no basis for comparison was shown such evidence has been rejected." *Flintkote Co.*, 246 F.2d at 393. For example, in another recent case in which Economides employed a yardstick analysis, he devoted an entire section of his report to comparability. *See* Expert Class Certification Report of Dr. Nicholas Economides, *Moehrl v. Nat'l Ass'n of Realtors*, No. 1:19-cv-01610 (N.D. Ill. June 8, 2022), Dkt. 324-5. Economides testified that ██████████████████ Gringer Decl. Ex. 3, Economides Dep. Tr. 189:6-190:15. He was right.

To determine the "market price of data" in the Personal Social Network market he identifies, then, one would expect Economides to turn to comparator firms in his candidate market—███████████████████████. He does not—because if he did, the price would be zero or in the broadest lens possible would at least

**PUBLIC REDACTED VERSION**

not be to *all* Facebook users. Nor does he use as yardsticks any of the firms mentioned above that have tools like Meta's to collect data on ad conversions, such as Amazon, Effectv, Google, Hulu, LinkedIn, NBCUniversal, Pinterest, Reddit, Roku, Quora, Snapchat, TikTok, Twitter, or Verizon Media Group. Again, the reason that Economides avoids these more natural comparators is clear: these firms do not and never did pay users for user-related "data" either, just as Meta does not. This fact shows—and should have shown Economides—that the "market price for data" in his supposed Personal Social Network market is zero. So even though "the reliability of the yardstick approach is based on the comparability of that yardstick to the business (or proposed business) involved in the litigation," *Muffett¸* 2012 WL 12827492, at *3, Economides ignores the most comparable businesses—because they do not show what he wants them to show.

Economides's selection of yardsticks is not sound economics, but classic cherrypicking designed to reach an outcome favorable to Plaintiffs. Instead of seeking to identify businesses that are true yardsticks, Economides testified that he asked ███████████████████████ ████████████████████████████████████████████████████████████ ████████████████████ Gringer Decl. Ex. 3, Economides Dep. Tr. 166:17-22. In other words, Economides looked out at a crowd and picked out his friends. So instructed, his staff settled on programs that bear no resemblance to Facebook, either in the nature of the value they provide or the data they collect. They generally incentivize a relatively small panel of participants via monetary compensation or redeemable points to install a router extension or mobile app that collects user data passively on a particular device. *See* Gringer Decl. Ex. 1, Economides Report ¶¶ 412-440. These programs then use this data to prepare market research reports for businesses, rather than for personalizing an experience on a platform. *See, e.g.*, *Computer & Mobile Panel: Technical FAQs*, Nielsen, https://computermobilepanel.nielsen.com/ui/US/en/techfaqen.html (last visited Sept. 15, 2023) ("We combine the information that comes from our panelists with data and research tools from other sources. We use this information to perform research and to prepare reports and analyses concerning Internet audience demographics, behavior and use."). These programs do not offer free services with independent value such as for entertainment, communication, education, or anything comparable. Indeed, they offer no user experience or other

**PUBLIC REDACTED VERSION**

1  use at all. Common sense dictates that users require less (or no) compensation to use a platform

2  that offers them engaging, compelling content that they enjoy than platforms that offer them none.

3        Further, these research programs operate on much a smaller scale than Facebook. By

4  design, they are available only to limited, select participants—often by invitation only—and then

5  are often closed once they reach certain quotas, since further participants' information would

6  provide diminishing returns. *See, e.g.*, *Join the Amazon Shopper Panel and Earn Monthly*

7  *Rewards!*, Amazon, https://panel.amazon.com (last visited Sept. 15, 2023) ("The Amazon Shopper

8  Panel is an opt-in, invitation-only program . . . Space is limited and you may only be eligible to

9  participate in certain parts of the program."). They have at most thousands of participants, not the

10  hundreds of millions of users Facebook has (in just the United States). *See, e.g.*, D'Orazio, *Google*

11  *Screenwise Pays Opt-In Users for Expanded Web Tracking*, The Verge (Feb. 8, 2012 8:33 PM),

12  https://www.theverge.com/2012/2/8/2785751/google-screenwise-panel-webmonitoring-

13  knowledge-networks ("According to screenshots sent by an anonymous tipster to the site, the so-

14  called ScreenwisePanel will consist of 2,500 participants[.]"); *Strategy Analytics Introduces New*

15  *Wall Street Service Analyzing Mobile Companies*, BusinessWire (Sept. 11, 2018),

16  https://www.businesswire.com/news/home/20180911005702/en/ ("AppOptix U.S. observes

17  approximately 4,000 devices annually."). The information they collect, often about how people

18  spend time on their devices across all apps, is much broader than the information Meta can collect

19  and use about users' information and activities on and off Facebook. These programs thus need to,

20  and can afford to, pay their smaller-size number of participants. It is the exact opposite of how

21  Economides describes firms in his Personal Social Network market, for which he contends █

22  ███████████████████████. *See* Gringer Decl. Ex. 1, Economides Report ¶ 23(e)(ii) ████

23  ████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████

25  ████████████████; *see also* Gringer Decl. Ex. 3, Economides Dep. Tr. 170:14-17

26  (agreeing that ████████████████████████████████████). The price

27  that market-research programs must, and can afford, to pay a deliberately limited number of panel

28  participants therefore says nothing about a price that Meta would ever pay the hundreds of millions

of active Facebook users in the United States. Economides's yardsticks are 100 yards away from Facebook.

Economides makes no effort to account for these differences. Indeed, he "failed to perform any substantive analysis of those factors most relevant to comparability." *In re Blood Reagents Antitrust Litig.*, 2015 WL 6123211, at *22 (E.D. Pa. Oct. 19, 2015). With "no basis for comparison" between Facebook and these market-research programs, his opinion based on this comparison should be excluded. *Flintkote Co.*, 246 F.2d at 393; *see also, e.g.*, *Farmington Dowel Prods. Co. v. Forster Mfg. Co.*, 421 F.2d 61, 82 & n.48 (1st Cir. 1969) (affirming exclusion of expert opinion based on supposed yardstick methodology given the "reasons why the two businesses were not sufficiently comparable"); *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d at 975 (excluding expert testimony comparing prices charged at rock concerts promoted by various promoters that failed to account for differences in artist quality and popularity); *Muffett*, 2012 WL 12827492, at *3 (excluding expert testimony comparing expected profits of cabarets in different geographies without accounting for the differences between these markets); *Loeffel Steel Prods. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 812-13 (N.D. Ill. 2005) (excluding expert's opinion for making an "apples and oranges" comparison between "steel service centers" without accounting for differences in products, services, or customers (quoting *Donnelly v. Rhode Island Bd. of Govs. for Higher Ed.*, 929 F. Supp. 583, 591 (D.R.I. 1996))), *amended by* 2015 WL 8178971 (N.D. Ill. Sept. 8, 2005).

### III.   ECONOMIDES' OPINION THAT FACEBOOK'S PRIVACY SETTINGS ARE CONFUSING SHOULD BE EXCLUDED AS NOT OFFERING HIS OWN "SPECIALIZED KNOWLEDGE"

In his Reply Report, Economides offers an additional opinion that should be excluded: that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Gringer Decl. Ex. 2, Economides Reply Report ¶¶ 35-52. Economides is opining on issues far afield from his economic training and offers no competent testimony.

Courts in this district routinely recognize that experts "may not restate or summarize record evidence and then state a conclusion without applying a methodology that is reliable and which evinces his/her expertise." *Siqueiros v. GM LLC*, 2022 WL 74182, at *9 (N.D. Cal. Jan. 7, 2022)

**PUBLIC REDACTED VERSION**

(citing *Huawei Techs., Co. v. Samsung Elecs. Co.*, 340 F. Supp. 3d 934, 992 (N.D. Cal. 2018). This Court has excluded expert testimony where the "report does not offer any specialized or scientific expertise, or anything beyond the typical knowledge and experience of a jury." *DZ Reserve* 2022 WL 912890 at *9 (excluding testimony of expert for offering "nothing more than his personal interpretation of documents and evidence").

      Restating and summarizing record evidence, and then stating a conclusion without using any expertise, is precisely what Economides does in Section IV(C) of his Reply Report. Paragraphs 36 through 50 consist of restatements and summaries of documents and deposition testimony relating to Facebook's privacy settings. *See, e.g.¸* Gringer Decl. Ex. 2, Economides Reply Report ¶ 43 ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. In Paragraph 51, Economides then offers three conclusions, including that █████████████████████████████████████████████████████████████████████████ and ██████████████████████████████████ He adds that █████████████████████████████████████████████████████████████████ *Id.* ¶ 51.

      These conclusions apply none of Economides's expertise and fall far outside the scope of his own assignment. In his own words, Economides ██████████████████████████████████████████ Gringer Decl. Ex. 1, Economides Report ¶ 4. His assignment is ████████████████████████████████████████████. *Id.* ¶ 9. Despite his role being clearly limited to issues suitable for an economist, Economides decides in this section of his report to instead offer his "personal interpretation of documents and evidence" relating to privacy settings. *DZ Reserve¸* 2022 WL 912890 at *9. Economides confirmed this at his deposition. When asked if his opinion that

**PUBLIC REDACTED VERSION**

1    Facebook's privacy policy was complex was an economic opinion, he answered that ███

2    ████████████████████████████████████████████████████████████████

3    ██████████████████████████ Gringer Decl. Ex. 3, Economides Dep. Tr.

4    47:24-48:6. This commentary is admittedly nothing "beyond the typical knowledge and experience

5    of a jury." *DZ Reserve*, 2022 WL 912890 at *9. And even if Economides *were* leveraging his

6    economics training here, it's not clear his opinion would be at all helpful to the jury. As a cross-

7    section of the community, the jury is in a far better position to assess whether privacy settings are

8    "confusing" to ordinary users than a single economics professor.

9        Because Economides is not offering his own "specialized knowledge," with respect to

10   Facebook's privacy settings, Fed. R. Evid. 702(a), this opinion should be excluded.

11   **CONCLUSION**

12       The Court should exclude Economides's opinions that Meta would have paid all active

13   users of Facebook a uniform amount and his attempt to quantify the amount of such a uniform

14   payment, as well as his opinion on Facebook's privacy settings.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PUBLIC REDACTED VERSION**

Dated: September 15, 2023

Respectfully submitted,

By: */s/ Sonal N. Mehta*

SONAL N. MEHTA (SBN 222086)
 Sonal.Mehta@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (pro hac vice)
 David.Gringer@wilmerhale.com
ROSS E. FIRSENBAUM (pro hac vice)
 Ross.Firsenbaum@wilmerhale.com
RYAN CHABOT (pro hac vice)
 Ryan.Chabot@wilmerhale.com
PAUL VANDERSLICE (pro hac vice)
 Paul.Vanderslice@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800

ARI HOLTZBLATT (pro hac vice)
 Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (pro hac vice)
 Molly.Jennings@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000

MICHAELA P. SEWALL (pro hac vice)
 Michaela.Sewall@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

*Attorneys for Defendant Meta Platforms, Inc.*

**PUBLIC REDACTED VERSION**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of September, 2023, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System.

By:    */s/ Sonal N. Mehta*
Sonal N. Mehta

DEFENDANT'S MOTION TO EXCLUDE
TESTIMONY OF NICHOLAS ECONOMIDES