# EXHIBIT 3

THE SEDONA CONFERENCE COMMENTARY ON THE..., 7 Sedona Conf. J. 69

Case 3:20-cv-08570-JD   Document 658-4   Filed 10/06/23   Page 2 of 13

**7 Sedona Conf. J. 69**

**Sedona Conference Journal**
Fall, 2006

Article
The Sedona Conference Working Group on the Role of Economics in Antitrust Law
Sedona, AZ
Daniel R. Shulman, Esq.

Copyright © 2006 by The Sedona Conference; The Sedona Conference Working Group on the Role of Economics in Antitrust Law, Daniel R. Shulman, Esq.

# THE SEDONA CONFERENCE COMMENTARY ON THE ROLE OF ECONOMICS IN ANTITRUST LAW

Editor's Note: The 2005 public comment draft of this document was included in Vol, 6 of this journal. This is the 2006 post-public comment version. This is the work product of the working group as a whole, and does not necessarily represent the views of any of the individual participants, members or observers or their employers, clients, or any other organizations to which any belong, nor does it necessarily represent official positions of The Sedona Conference.®

**TABLE OF CONTENTS**

| | |
|---|---:|
| **Introduction** | 74 |
| **CHAPTER I: Best Practices in Applying Federal Rule of Evidence 702 to Expert Economic Testimony in Antitrust Cases** | 83 |
| **Principle I-1:** The qualifications of an economic expert must be evaluated in the light of the specialized nature of the analysis that may be performed in antitrust cases | 83 |
| **Principle I-2:** The qualifications of an economic expert should be evaluated on the basis of training and experience with the particular issues addressed and methods employed, as well as familiarity with relevant scholarly literature | 84 |
| **Principle I-3:** To be admissible, testimony from a witness qualified as an expert in aspects of economics must be based on the tools of economics | 84 |
| **Principle I-4:** For testimony to be admissible, an expert economist must articulate "good grounds" in economics for the expert's opinions | 85 |
| **Principle I-5:** Expert economic testimony is not rendered unreliable because it runs contrary to case law precedent, nor is it rendered reliable because it is based on precedent. | 86 |
| **Principle I-6:** To be admissible, expert economic testimony must be based on sufficient facts or data | 87 |
| **Principle I-7:** To be admissible, expert economic testimony must fit the facts of the case | 88 |
| **Principle I-8:** The critical test for the fit of a theoretical economic model is not whether it accurately reflects institutional details, but whether it explains the aspects of industry performance it is being used to predict | 88 |
| **Principle I-9:** The critical test for fit for an empirical economic model is whether it is capable of aiding the trier of fact by reliably explaining or accounting for a relevant factual issue | 89 |
| **Principle I-10:** Case management orders should address motions to exclude expert economic testimony based on Rule 702, responses to such motions, and, if appropriate, hearings on such motions | 89 |
| **Principle I-11:** Motions to exclude expert economic testimony made under Rule 702 are appropriate in class certification proceedings | 90 |
| **Principle I-12:** Motions to exclude expert economic testimony made under Rule 702 are appropriate in bench trials as well as jury trials | 90 |

THE SEDONA CONFERENCE COMMENTARY ON THE..., 7 Sedona Conf. J. 69

Case 3:20-cv-08570-JD   Document 658-4   Filed 10/06/23   Page 3 of 13

| | |
|---|---|
| **CHAPTER II: Applying Rules 12, 16, 26 to the Use of Economic Evidence in Antitrust Cases** | 91 |
| **Principle II-1:** The proper consideration of economic analysis should be tailored to the procedural posture of the case, while avoiding unnecessary repetition over the course of the litigation | 91 |
| **Principle II-2:** An antitrust complaint should rarely be dismissed solely on economic theory | 91 |
| **Principle II-3:** The central economic issues in antitrust litigation should be described in the initial and other early status conferences | 92 |
| **Principle II-4:** An economic expert's opinion, including the factual and experiential basis on which that opinion is based, should be fully disclosed | 92 |
| **Principle II-5:** The process by which an economic opinion is reached can and should be shielded from discovery | 93 |
| **CHAPTER III: Best practices in Using Ecomomics for Class Certification Motions Under Rule 23 of the Federal Rules of Civil Procedure** | 95 |
| **Principle III-1:** On motions for class certification, economic evidence should not be subjected to a higher standard of scrutiny than other types of evidence bearing on class issues | 97 |
| **Principle III-2:** Economic evidence submitted in class certification proceedings should be strictly limited to class issues under Rule 23, such as commonality of proof of violation, impact, or damages | 97 |
| **Principle III-3:** In horizontal price-fixing cases, economic evidence may be helpful in showing whether class-wide proof is or is not feasible with regard to impact or damages | 98 |
| **Principle III-4:** In cases involving vertical restraints, including vertical price-fixing, economic evidence may be helpful to show common impact | 99 |
| **Principle III-5:** In other types of cases, such as tying, market allocation, or monopolization cases, economic evidence may be helpful in showing whether or not causation or fact of injury can be proved on a class-wide basis | 99 |
| **Principle III-6:** In cases where the plaintiffs are pursuing multiple theories on liability or damages, economic testimony may be helpful in showing whether or not class members' interests conflict | 100 |
| **Principle III-7:** In most antitrust cases, economic testimony should be helpful to show whether or not the case is manageable as a class action because a common method exists to prove individual damages | 100 |
| **Principle III-8:** In class certification proceedings, *Daubert* rules should be limited to considering whether proffered economic evidence is sufficiently reliable to be considered in those proceedings, and should not be used to consider trial admissibility | 101 |
| **CHAPTER IV: Summary Judgment** | 102 |
| **Principle IV-1:** Expert economic opinion evidence should be considered in deciding a motion for summary judgment only if the evidence meets the standards for admissibility at trial | 104 |
| **Principle IV-2:** If reasonably possible, questions of the admissibility of expert economic evidence should be raised and decided prior to the parties' submission of their substantive memoranda in the summary judgment proceeding | 105 |
| **Principle IV-3:** Questions as to the admissibility of expert testimony must be decided in accordance with Rule 702 and with sufficient opportunity for the proponent of theevidence to be heard | 106 |
| **Principle IV-4:** Where reasonable and without prejudice to the opposing party, the court should allow the proponent of expert testimony the opportunity to cure any deficiency preventing the testimony's admission into evidence | 108 |
| **Principle IV-5:** For expert opinion testimony to create a genuine issue of material fact warranting denial of a motion for summary judgment, the testimony must sufficiently disclose the basis for the conclusion | 109 |
| **Principle IV-6:** When an expert's opinion is not supported by sufficient facts; depends on an assumption clearly contradicted by the record or an assumption unsupported by fact or accepted economic theory; or utilizes an economically untenable inference, the opinion cannot support a judicial finding of fact and hence cannot be a basis for deciding summary judgment | 110 |
| **Principle IV-7:** The rule that courts cannot assess the credibility or weight to be accorded admitted evidence applies as equally to expert testimony as it does to normal fact testimony | 111 |
| **Principle IV-8:** Expert testimony is admissible when it satisfies the requirements of Rule 702 even if it conflicts with other admissible expert testimony. Conflicts in admissible expert testimony, like conflicts in evidence generally, must be resolved by the trier of fact and not on summary judgment | 111 |
| **Principle IV-9:** Expert testimony, while typically useful as a means for efficiently organizing and persuasively advancing the evidence, is rarely if ever strictly necessary to establishing a prima facie case or creating a material issue of fact | 111 |
| **Principle IV-10:** A trial court's determination of the admissibility of expert testimony under Rule 403 or 702 into the summary judgment record is reviewed under the abuse of discretion standard | 112 |

**Principle IV-11:** The same standard of review applies regardless of whether the trial court has allowed or disallowed the proffered expert testimony or whether the ruling is determinative of the outcome of the summary judgment motion … 112

**CHAPTER V: Economic Evidence and Testimony in Motions *in Limine* and at Trial** … 113

**Principle V-1:** Case management orders should generally include a time for the parties to confer with the court regarding the issues for which economic testimony will be necessary at trial … 113

**Principle V-2:** Timely *Daubert* motions should generally render unnecessary motions in limine directed at the same expert testimony, but do not preclude objections and motions to strike as the evidence is presented at trial … 114

**Principle V-3:** Courts analyzing challenges to expert economic testimony through motions in limine or during trial should take care not to usurp the jury's function as fact finder and should require parties challenging economic evidence to present more than contrary conclusions or speculation … 114

**Principle V-4:** Although court-appointed experts may in some cases offer the fact-finder a more neutral and more reliable perspective on issues at trial, they present a multitude of problems and are not necessary or advisable in the vast majority of cases, and a court should carefully balance the pros and cons of using court-appointed experts before exercising its discretion to do so … 115

**CHAPTER VI: Economics and Proof of Concerted Action** … 118

**Principle VI-1:** Economic evidence on the existence *vel non* of agreement should have a foundation in sound economic theory … 123

**Principle VI-2:** Evidence of market structure may, in appropriate circumstances, shed light on whether a claim of conspiracy is plausible or implausible, but must be examined carefully … 124

**Principle VI-3:** Economic evidence offered on the issue of concerted action vel non must respect and acknowledge the legal principle that conscious parallelism alone does not constitute agreement … 124

**Principle VI-4:** Economic evidence offered on the issue of concerted action vel non must respect and acknowledge the legal definition of agreement guiding the court in the case at issue … 125

**Principle VI-5:** Economic evidence offered on the issue of concerted action vel non in an oligopoly setting should particularly describe the economic principles and theory underlying the analysis and justify its applicability to the evidence of record … 125

**Principle VI-6:** Economic evidence offered on the issue of whether conduct is or is not contrary to independent self-interest in the absence of agreement should be consistent with the teachings of sound economic scholarship and theory … 126

**Principle VI-7:** Evidence of market performance may, in appropriate circumstances, be relevant in showing whether or not conduct is the result of agreement, but must be examined carefully … 126

**Principle VI-8:** Economic evidence on the issue of agreement vel non must be stated in appropriate non-conclusory language that is grounded in economic theory and does not usurp the function of the finder of fact … 127

**Principle VI-9:** Courts should receive economic evidence on the issue of agreement vel non only after ensuring that an adequate foundation exists … 127

**CHAPTER VII: Harm to Competition** … 128

**Principle VII-1:** Harm to competitors from competition itself is not harm to competition … 129

**Principle VII-2:** Cartels harm competition … 129

**Principle VII-3:** Conduct that interferes with the competitive process and harms consumer welfare is conduct that harms competition … 130

**Principle VII-4:** Higher prices and lower output are consumer welfare harms. Coerced choice may qualify. Also, net loss to innovation and attendant loss of choice in highly concentrated markets may qualify … 131

**Principle VII-5:** There may be anticompetitive conduct and resulting antitrust harm that is not, or is not directly, consumer harm; e.g., exploitation of producers or middlemen through buying cartels or monopsonistic joint ventures … 132

**Principle VII-6:** Unreasonable, unjustified foreclosure may be harm to competition; but courts must take care that they are protecting the market and not competitors … 133

**Principle VII-7:** Whether a plaintiff must prove actual or potential harm to competition depends on the nature of the plaintiff's cause of action … 133

**Principle VII-8:** As noted, the most common theory of harm to competition is price rise or output limitation. In some cases, burden-shifting presumptions of a price rise or output limitation are economically or legally appropriate. This is the case in the event of a monopolist's imposition of serious and apparently unjustified exclusionary practices … 134

**Principle VII-9:** In cases of mergers of significant competitors in concentrated markets leading to significant increases in concentration, the Philadelphia National Bank presumption shifts the burden of going forward to defendants; the burden of persuasion stays with plaintiffs. The presumption is not necessarily reflective of a … 135

THE SEDONA CONFERENCE COMMENTARY ON THE..., 7 Sedona Conf. J. 69

Case 3:20-cv-08570-JD   Document 658-4   Filed 10/06/23   Page 5 of 13

logical inference, and courts using the presumption should be receptive to evidence that the merger does not harm competition

**Principle VII-10:** In tying cases applying the qualified *per se* rule, defendants may defend by showing a good business justification — 136

**Principle VII-11:** In *per se* cases, although the government need not prove competitive harm, private plaintiffs must show standing and antitrust injury, which generally require a showing that the plaintiffs' injuries are the result of injury or harm to competition — 137

**CHAPTER VIII: Market Definition** — **138**

**Principle VIII-1:** Market definition should undertake to identify the products that constrain the exercise of market power by the firm or firms whose conduct is being examined — 138

**Principle VIII-2:** Properly identifying constraints on market power depends on whether the concern about market power is prospective or retrospective, which determines what prices should be employed in defining and analyzing effects in the relevant market — 139

**Principle VIII-3:** Courts should be receptive to evidence of supply constraints as well as to evidence of demand constraints — 139

**Principle VIII-4:** If anticompetitive effects can be proven or predicted with sufficient certainty, it should not be necessary in an antitrust (merger or conduct) case to prove a product and geographic market, or market share in a relevant market. It is nonetheless ordinarily important to identify the area of competition affected by the merger or conduct, so that the competitive constraints by all relevant products and firms can be identified and analyzed — 140

**APPENDICES**

Appendix A: Working Group Participants & Observers — 141

Appendix B: The Sedona Conference® Working Group Series — 143

**\*74 INTRODUCTION**

**A. The Working Group on the Role of Economics in Antitrust**

The Working Group on the Role of Economics in Antitrust (WG3) was created by The Sedona Conference®, a nonprofit research and education institute dedicated to the advanced study of law and policy in the areas of antitrust, complex litigation, and intellectual property. This Working Group is one of several working groups that have operated under the auspices of The Sedona Conference®. Other Working Groups have been (or are) concerned with electronic document retention and production; protective orders, confidentiality and public access; the intersection of the patent and antitrust laws; and claim construction in patent litigation. The purpose of the this Working Group is to define those areas of antitrust where economic analysis and economic evidence can make important contributions and to specify the nature and types of economic analysis and evidence that will be most helpful to courts in reaching decisions that will further the reasoned development of the law. The Working Group is also concerned with those areas of antitrust where economics may assume an inappropriate role that could be counterproductive in furthering the objectives of either the antitrust laws or of the Federal Rules of Civil Procedure.

In the mid-twentieth century, economic efficiency began to emerge as one of the principal goals of antitrust law. Some believe that efficiency should be the only goal, while others believe that antitrust law does (and should) embody other goals, such as protecting consumers, and perhaps that it should embrace noneconomic goals as well. In any event, the use of economic evidence and argument in antitrust cases has increased dramatically during the last several decades. As the brief history below of the use of economics in antitrust law suggests, economic issues gradually have overtaken noneconomic concerns so that, in the twenty-first century, economics has come to pervade virtually all aspects of antitrust cases, finding its way into every procedural step and numerous substantive issues.

In the spring of 2004, The Sedona Conference® Working Group on the Role of Economics in Antitrust was formed. The Working Group is composed of judges, attorneys, and academics experienced in antitrust issues. Initially, these participants focused their attention on a range of issues: best practices under Federal Rule of Civil Procedure 26 and Federal Rule of Evidence 702; best practices under Federal Rule of Civil Procedure 56; best practices for the use of economic evidence and testimony at trial; inappropriate use of economic evidence and testimony; the appropriate use of economic evidence and testimony in proof of concerted action; competitive harm and the appropriate means of proving it; and the use of economic evidence and testimony in analyzing and classifying commercial arrangements. Subgroups were formed to report on all of these matters.

The entire Working Group met for two days in mid-May 2004 to discuss the reports of the subgroups and to narrow the issues on which the Working Group would ultimately make recommendations. During that meeting, participants reviewed and discussed

Case 3:20-cv-08570-JD   Document 658-4   Filed 10/06/23   Page 6 of 13

THE SEDONA CONFERENCE COMMENTARY ON THE..., 7 Sedona Conf. J. 69

by the Justice Department and the Federal Trade Commission, U.S. Dep't of Justice & FTC, 1992 Merger Guidelines, 4 Trade Reg. Rep. (CCH) Paragraph 13, 104 (as amended 1997), have established criteria for the types of evidence to be used in the evaluation of mergers. These guidelines make a range of economic evidence relevant. Such evidence includes evidence about market, cross-elasticity of demand, concentration, and potential entry.

Among the critical economic issues affecting mergers is the applicability of an efficiencies defense, including the applicability of the so-called Williamson tradeoff.[5] The courts have verbally endorsed an efficiencies defense, but the courts of appeal have not yet clearly applied such a defense. Many courts (both district courts and courts of appeals) have insisted upon some "passing on" of the benefits of efficiencies to consumers as a condition of recognizing an efficiencies defense. *FTC v. Cardinal Health, Inc.*, 12 F.Supp.2d 34, 62 (D.D.C. 1998); *FTC v. University Health, Inc.*, 938 F.2d 1206, 1223 (11th Cir. 1991); *FTC v. Butterworth Health Corp.*, 946 F.Supp. 1285 (W.D. Mich. 1996), *aff'd*, 121 F.3d 708 (6th Cir 1997); *FTC v. Swedish Match*, 131 F.Supp.2d 151, 172 (D.D.C. 2000); *United States v. United Tote, Inc.*, 768 F. Supp. 1064, 1084-85 (D. Del. 1991); *California v. American Stores*, 697 F. Supp. 1125, 1133-34 (C.D. Cal. 1988), *aff'd in part and rev'd in part*, 872 F.2d 837 (9th Cir. 1989), *rev'd*, 495 U.S. 271 (1990). This "passing on" language seems to be an endorsement of a consumer-surplus maximization standard of evaluation and thus a rejection of the Williamson tradeoff (which is a total surplus maximization standard). Indeed, it might be beneficial were the courts to drop the passing-on language and instead forthrightly adopt a consumer-surplus maximization standard, as the latter term is less prone to misunderstanding. *See* Paul L. Yde & Michael G. Vita, *Merger Efficiencies: Reconsidering the "Passing On" Requirement*, 64 Antitrust L.J. 735, 742 (1996).

In at least one hospital merger case, a court was persuaded by purportedly economic evidence that there was a correlation between increased concentration and lower prices to consumers. *FTC v. Butterworth Health Corp.*, 946 F. Supp. 1285 (W.D. Mich. 1996), *aff'd*, 121 F.3d 708 (6th Cir. 1997). If the courts' embrace of a passing-on requirement is in fact an adoption of a consumer-surplus standard, then the Robert Lande position that the prevention of wealth transfers from consumers to producers constitutes the primary purpose of Section 7 appears to be correct. Both the courts and the merger guidelines appear to embrace an approach to an efficiencies defense that requires evidence of greater efficiencies to offset greater anticompetitive effects likely to result from a *82 proposed merger. The strongest such case may have been the recent proposed Heinz/Beech-Nut merger where evidence of substantial efficiencies was deemed inadequate because of the high-levels of concentration.[6]

**Summary**

In summary, the history of the antitrust laws shows a continuing struggle over the scope for economic evidence and economic argumentation. Throughout the earlier history of those laws, economics had to vie with other, largely populist concerns for recognition in decision making. *Per se* rules limit the role for economic input (both evidence and argument). Today, *per se* rules have narrowed. The result is that most behavior is presumed to be lawful. Economic argument can be useful in working out the boundaries of *per se* rules. It would be potentially available for arguments (on both sides) on whether to retain *per se* rules whose value has been questioned (such as those involving tying and those involving vertical price-fixing agreements).

The chapters hereafter will review both the proper procedural constraints to be applied to the use of economic evidence in antitrust cases, as well as those areas of substantive law where the Working Group believes economic evidence can make a valuable contribution.

*83 CHAPTER I. BEST PRACTICES IN APPLYING FEDERAL RULE OF EVIDENCE 702 TO EXPERT ECONOMIC TESTIMONY IN ANTITRUST CASES

**INTRODUCTION**

The admissibility of economic testimony, like all other expert testimony, is governed by Federal Rule of Evidence 702. As amended in 2000 in the wake of the landmark decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Rule 702 provides:

THE SEDONA CONFERENCE COMMENTARY ON THE..., 7 Sedona Conf. J. 69

Case 3:20-cv-08570-JD   Document 658-4   Filed 10/06/23   Page 7 of 13

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702 has been said to impose "a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). *See also Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 362 F.3d 775, 780 (11th Cir. 2004) ("Expert testimony is admissible if (1) the expert is qualified to testify on the topic at issue, (2) the methodology used by the expert is sufficiently reliable, and (3) the testimony will assist the trier of fact."). As elaborated below, economic testimony is inadmissible in an antitrust case unless:

> (1) the witness is an expert in the relevant aspects of economics,

> (2) the testimony is well grounded in relevant aspects of economics, and

> (3) the testimony applies the tools of economics to the facts of the case.

**Qualifications**

**PRINCIPLE I-1: The qualifications of an economic expert must be evaluated in the light of the specialized nature of the analysis that may be performed in antitrust cases.**

**COMMENT**

Rule 702 requires "specialized expertise," *Schneider*, 320 F.3d at 404, and the "*Daubert* test must be applied with due regard for the specialization of modern science." *Dura Automotive Systems of Indiana, Inc., v. CTC Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) (Posner, C.J.). Economics is highly specialized, as are many of the particular applications of economics in antitrust cases. A witness with a Ph.D. in economics, and even a Nobel Prize, nevertheless may be unqualified to testify about a particular issue or to apply a particular method. Indeed, antitrust law raises issues, such as the definition of the relevant market, not commonly or widely addressed by many fields of study in economics, and only expertise on market definition can qualify a witness to testify on the relevant market. *Cf. Nelson v. Monroe Regional Medical Center*, 925 F.2d 1555, 1572 (7th Cir. 1991) (concurring opinion) (A respected Ph.D. economist with "no background in antitrust markets" and not "a member of any associations or industrial organization groups which form the bulwark of economists specializing in antitrust law and economics" was not qualified to testify on the relevant market.). Moreover, a witness lacking a Ph.D. in economics but experienced in particular methods used in antitrust may be well qualified to testify using such methods.

**\*84  PRINCIPLE I-2: The qualifications of an economic expert should be evaluated on the basis of training and experience with the particular issues addressed and methods employed, as well as familiarity with relevant scholarly literature.**

**COMMENT**

Neither advanced training in economics nor extensive testimonial experience necessarily qualifies a witness as an expert on any particular issue or analytic method. Rather, a witness must have training and experience on the issues addressed and methods

THE SEDONA CONFERENCE COMMENTARY ON THE..., 7 Sedona Conf. J. 69

Case 3:20-cv-08570-JD   Document 658-4   Filed 10/06/23   Page 8 of 13

applied. See *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994) (A court should examine "not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.").

The required training and experience depend on the degree of specialization of the issues addressed and methods applied. For example, expert economic testimony in antitrust cases may entail the use of multiple regression or other econometric techniques. *See generally* Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 181 (Federal Judicial Center, 2d ed. 2000). General training in economics at the Ph.D. level normally qualifies a witness as an expert on basic applications of basic econometric methods. On more subtle and complex issues, only a witness specializing in econometrics may be qualified. On those rare occasions when economic evidence in a case involves fine points of certain highly specialized techniques, only econometricians with even more specialized knowledge of those particular techniques may be qualified. See *Dura Automotive Sys. v. CTC*, 285 F.3d at 613-14. Of course, a well-trained econometrician is qualified to apply or assess methods never before encountered when they are modest extensions of familiar principles. Nor is this Principle intended to prevent economists from employing their expertise to apply or assess methods not previously encountered where their expertise qualifies them to make use of such methods.

A witness with little or no formal training in economics almost certainly is not qualified to offer testimony with a purported basis in economics. See *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 214 F. Supp. 2d 530, 537 (D. Md. 2002) (excluding testimony on the relevant market by a witness lacking "specific education, training, or experience in economics or antitrust analysis");

*Virginia Vermiculite Ltd. v. W.R. Grace & Co.-Connecticut*, 98 F. Supp. 2d 729, 733 (W.D. Va. 2000) (excluding testimony on the relevant market by a witness lacking the "skill and training of a professional economist necessary to define a relevant market for antitrust purposes"). Similarly, a witness with formal training in economics but totally out of touch with developments in economics over several decades is unqualified to testify about many issues to which such developments are pertinent.

A witness who has published widely on a particular issue or analysis is almost certainly qualified to testify on that issue. The only exception might be a witness with views so far outside the mainstream as to be considered wholly irrational and unsupported. And a witness who has confronted an issue or applied a method many times in professional work most likely has acquired the requisite expertise.

**Reliability**

**PRINCIPLE I-3: To be admissible, testimony from a witness qualified as an expert in aspects of economics must be based on the tools of economics.**

**COMMENT**

As stated by the Advisory Committee Notes to the 2000 amendments of Rule 702, an "expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." Thus, the testimony of a witness qualified as an expert in economics is admissible only to the extent that the opinions expressed derive from the application of the tools of economics, i.e., only to the extent that they are **\*85** supported by economic reasoning or predicated on formal economic models or empirical methods used in economics. Cf. *Worldwide Basketball and Sports Tours, Inc. v. NCAA,* 273 F. Supp. 2d 933, 944 (S.D. Ohio 2003) (excluding purely "conclusory" testimony on submarket).

As the Supreme Court held in *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997), "nothing requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *See also R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc.*, 2004-2 Trade Cas. (CCH) Paragraph 74,491, at 99,779 (N.D. Ill. 2004) ("If the applicable data and the proffered opinion are separated by an analytical chasm, it cannot be bridged solely by the expert's say-so ...."). Nor can the gap between the data and the opinion be bridged through the mere utterance of economic jargon, such as vague references to econometric methods like "multiple regression" or theoretical constructs like "oligopoly theory." A witness purporting to rely on econometric methods or economic models must describe the methods or models in sufficient detail to communicate the particular methods or models on which the witness purports to rely. A witness also must provide the economic reasoning that explains why the methods or models are relevant and how they support the conclusion reached.

THE SEDONA CONFERENCE COMMENTARY ON THE..., 7 Sedona Conf. J. 69

Case 3:20-cv-08570-JD   Document 658-4   Filed 10/06/23   Page 9 of 13

Economic experts may be called upon to draw inferences from statements by market participants or to interpret documents, and the lens of economics certainly may bring such evidence into sharper focus. But testimony from a witness qualified as an expert in aspects of economics must be excluded if the principles of economics are not being applied. For example, the application of the tools of economics can never support a conclusion that documentary evidence itself demonstrates that a conspiracy existed, or that it did not. *Cf. City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 565 (11th Cir. 1998) (affirming exclusion of statistician's "characterizations of documentary evidence as reflective of collusion"). In contrast, the tools of economics, properly applied, can support testimony that certain conduct was, or was not, consistent with the pursuit of unilateral self-interest.

Of course, an economist may have relevant expertise not strictly within the field of economics and may be qualified as an expert not just in aspects of economics. For example, an economist may be an expert in aspects of statistics or in specialized methods developed for antitrust such as the hypothetical monopolist test of the *Horizontal Merger Guidelines* promulgated by the U.S. Department and Federal Trade Commission. *See generally* Gregory J. Werden, *The 1982 Merger Guidelines and the Ascent of the Hypothetical Monopolist Paradigm*, 71 ANTITRUST L.J. 253 (2003).

**PRINCIPLE 1-4: For testimony to be admissible, an expert economist must articulate "good grounds" in economics for the expert's opinions.**

**COMMENT**

The proponent of expert testimony has the burden of establishing its admissibility. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000); *Lust v. Merrell Dow Pharmaceuticals, Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). And an "expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 742 (3d Cir. 1994) (quoting *Daubert*, 509 U.S. at 590). The testimony of a witness qualified as an expert in aspects of economics, therefore, is inadmissible unless it sets out grounds in economics for the opinions offered that are sufficient to make out a prima facie case for admissibility of the testimony. To make out a prima facie case for admissibility, expert economic testimony must identify the specific economic reasoning, and models or methods of economics (if any) supporting each opinion expressed, the rationale for applying those models and methods, and the economic logic that connects them to the opinion.

Precisely what is required of a witness "depends upon the particular circumstances of the particular case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those *86 facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).

Judge Posner has held that, under Rule 702, an expert "is not permitted to offer evidence that he has not generated by the methods he would use in his normal academic or professional work, which is to say in work undertaken without reference to or expectation of possible use in litigation." *Khan v. State Oil Co.*, 93 F.3d 1358, 1365 (7th Cir. 1996) (Posner, C.J.), vacated, 522 U.S. 3 (1997). While this articulation of Rule 702 could preclude any economic testimony based on methods especially developed for use in antitrust, Justice Breyer has explained that all Rule 702 requires is that an expert "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). *See also Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1025 (10th Cir. 2002) (affirming exclusion of testimony not employing "the same level of intellectual rigor that characterizes an expert in the field of economics and industrial organization").

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. "A minor flaw in an expert's

reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible. 'The judge should only exclude the evidence if the flaw is large enough that the expert lacks "good grounds" for his or her conclusions.'" *Amorgianos,* 303 F.3d at 267 (quoting *In re Paoli,* 35 F.3d at 746). But expert economic testimony lacks good grounds to the extent it relies on reasoning, models or methods, or ways of applying them, deemed clearly erroneous by professional consensus. See *State Oil,* 93 F.3d at 1365 (Posner, C.J.) (The testimony of a witness who "failed to conduct a study that satisfied professional norms," is inadmissible even if the witness is "a Ph.D. in economics from a reputable university and an experienced consultant in antitrust economics, and hence qualified to offer expert economic evidence."), *vacated,* 522 U.S. 3 (1997).

Economics may offer several alternative lines of reasoning, models, or methods that may be useful in analyzing a particular issue in an antitrust case, so two differing analyses leading to conflicting conclusions both may have good grounds in economics. *Cf.* *ID Security Systems Canada, Inc. v. Checkpoint Systems, Inc.,* 198 F. Supp. 2d 598, 603-09 (E.D. Pa. 2003) (admitting both sides' expert economic testimony over objections). "*Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance. It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." *United States. v. Mitchell,* 365 F.3d 215, 244 (3d Cir. 2004).

**PRINCIPLE I-5: Expert economic testimony is not rendered unreliable because it runs contrary to case law precedent, nor is it rendered reliable because it is based on precedent.**

**COMMENT**

Antitrust law has embraced economic learning to a significant extent, but there may remain significant tensions between the two. Expert economic testimony departing from legal precedent is properly excluded when it does not "assist the trier of fact to understand the evidence or to determine a fact in issue," *Williamson Oil Co., Inc. v. Philip Morris USA,* 346 F.3d 1287, 1322-23 (11th Cir. 2003); but departing from legal precedent is not a basis for questioning the reliability of economic testimony. A few courts may have held to the contrary. See *City of Tuscaloosa,* 158 F.3d at 567 n.27 (noting that an economist's testimony should have been excluded for a variety of reasons, including that his market definition was "contrary to law"); *Bailey v. Allgas, Inc.,* 148 F. Supp. 2d 1222, 1242-45 (N.D. Ala. 2000) (excluding relevant market testimony in part because it "runs contrary to well-established law").

In addition, the fact that expert economic testimony is firmly grounded in legal precedent is not a basis for finding that it is reliable. There must be good grounds in economics for the **\*87** testimony no matter how consistent it is with precedent. For example, the testimony of an economic expert on market delineation is inadmissible if the only grounds for the opinion are the "practical indicia" set out in *Brown Shoe Co. v. United States,* 370 U.S. 294, 325 (1962). The "practical indicia" are not economics at all, much less intellectually rigorous economics. Of course, testimony by an economic expert may be admissible if it merely addresses the presence or absence of Brown Shoe indicia or issues implicated by the indicia.

**PRINCIPLE I-6: To be admissible, expert economic testimony must be based on sufficient facts or data.**

**COMMENT**

Rule 702 requires that expert testimony be "based upon sufficient facts or data," and expert economic testimony normally must be well grounded in the facts of the industry and the case. *Accord* *El Aguila Food Products, Inc. v. Gruma Corp.*, 301 F. Supp. 2d 612, 620-24 (S.D. Tex. 2003) (excluding testimony "based on wholly insufficient data" while ignoring "the facts of the case"). A court should be highly suspect of an expert knowing little, and caring little, about the facts. In a notorious case, the district court excluded most of the testimony of a Nobel Prize winning economist because he had inadequate knowledge of the industry. *In re Brand Name Prescription Drugs Antitrust Litig.*, 1999-1 Trade Cas. (CCH) Paragraph 72,446, at 84,126-28 (N.D. Ill. 1999).

Case 3:20-cv-08570-JD Document 658-4 Filed 10/06/23 Page 11 of 13

THE SEDONA CONFERENCE COMMENTARY ON THE..., 7 Sedona Conf. J. 69

The extent of the grounding in fact required for expert economic testimony, however, necessarily depends on the subject matter of the testimony. In the notorious case just mentioned, the court of appeals held that "the district judge erred in excluding [the] testimony *on the grounds that he did*," because the point of the testimony was something "[e]veryone knows" without studying the industry. Hence, extensive factual knowledge was unnecessary. *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 786 (7th Cir. 1999) (Posner, C.J.) (emphasis added). Even purely theoretical economic testimony may thus be admissible in some cases, for example to rebut testimony on a proposition of economic theory from another expert.

Opposing economic experts may legitimately perceive facts differently or take different views of which facts are critical. As noted by the Advisory Committee Notes to the 2000 amendments of Rule 702: "When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other."

While the word "data" in Rule 702 encompasses more than that term's meaning in statistics or economics, it certainly encompasses that narrower meaning as well. Any data, in the statistical sense, on which a testifying expert relies must be shown to be reasonably suited to the task. *See SMS Systems Maintenance Services, Inc. v. Digital Equipment Corp.*, 188 F.3d 11, 25 (1st Cir. 1999) ("an expert must vouchsafe the reliability of the data on which he relies and explain how the cumulation of that data was consistent with standards of the expert's profession"); *U.S. Information Systems, Inc. v. International Brotherhood of Electrical Workers Local Union No. 3*, 313 F. Supp. 2d 213, 233-35 (S.D.N.Y. 2004) ("As the proponents of the expert, it is the plaintiffs' burden to demonstrate the reliability of his data. Here, the plaintiffs have not met that burden, and [the expert's] data sample therefore cannot provide the basis for his testimony."). Although the economic expert's testimony must be based on sufficient, reliable facts, the expert's role is not necessarily to establish the reliability of the evidence and facts relied upon, the reliability of which may be established elsewhere in the evidentiary record.

**\*88 Fit**

**PRINCIPLE I-7: To be admissible, expert economic testimony must fit the facts of the case.**

**COMMENT**

In *Daubert*, the Supreme Court held that expert testimony is admissible only if it "is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute," i.e., only if there is a good "fit" between the testimony and the pertinent inquiry. 509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)). In the most significant application of this Principle in an antitrust case, the Eighth Circuit noted that "a theory that might meet certain *Daubert* factors ... should not be admitted if it does not apply to the specific facts of the case," and the court excluded expert economic testimony on which a jury verdict rested, because the oligopoly model used by the plaintiffs' expert economist was "not grounded in the economic reality of the" industry. *Concord Boat v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000).

In other antitrust cases, courts have similarly excluded expert economic testimony not adequately grounded in the facts. *See Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 760-61 (8th Cir. 2003) (plaintiffs' expert testimony, although "thorough, sophisticated, and often well-grounded in the relevant scientific literature," excluded because of "excessive speculation"); *Heary Bros. Lightning Protection Co., Inc. v. Lightning Protection Institute*, 287 F. Supp. 2d 1038, 1065-68 (D. Ariz. 2003) (economic expert testimony excluded because the expert had "*no* evidence *at all* supporting [an important] assumption" and because the expert's "Cournot model does not fit the economic reality" of the industry); *American Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1041 (N.D. Cal. 2001) (expert's model excluded for purposes of proving damage causation, and summary judgment on damage claims granted, because it contained "too many assumptions and simplifications that are not supported by real-world evidence"). A formal economic model or method, however, does not necessarily need to fit every or even most facts of a case in order to be admissible. The theoretical and empirical modeling tools of economics invariably incorporate assumptions that may not perfectly comport with any particular factual setting, and they may nevertheless appropriately form a basis for an economic opinion. For example, an expert may illustrate an economic principle with a formal model that does not fit all facts in a case, and may explain separately why that principle applies given the particular facts of the case. The applicability of the principle to the facts of the case would then be an issue

THE SEDONA CONFERENCE COMMENTARY ON THE..., 7 Sedona Conf. J. 69

Case 3:20-cv-08570-JD   Document 658-4   Filed 10/06/23   Page 12 of 13

for the trier of fact that would rarely prevent admissibility. Similarly, a method of data analysis may be admissible even if it incorporates assumptions or simplifications that do not fit all the facts of the case. Under such circumstances, questions involving the robustness of the conclusions under alternative assumptions would be issues for the trier of fact that would rarely prevent admissibility.

**PRINCIPLE I-8: The critical test for the fit of a theoretical economic model is not whether it accurately reflects institutional details, but whether it explains the aspects of industry performance it is being used to predict.**

**COMMENT**

A theoretical economic model used to make predictions must fit the facts of the industry to which it is applied. A closer fit to the facts of an industry is required for a theoretical model used to make predictions than for a theoretical model used only to illustrate an economic principle. The same oligopoly model was rejected in both *Concord Boat* and *Heary Bros*. because it was judged to fit both industries poorly. However, a model need not reflect every institutional detail of an industry; indeed, economic models are meant to be abstractions and are useful because they abstract from real-world minutiae. Testimony based on a particular model should not be excluded merely because the stylized actions of economic agents in the model do not comport with the details of actual behavior of agents the industry. The critical test of a model is whether it explains reasonably well those aspects of industry performance that the model is being used to predict. For example, if a model is being used to predict prices for the years following a proposed merger, it should also be able to **\*89** explain pricing for the years before the merger. *See generally* Gregory J. Werden, Luke M. Froeb & David T. Scheffman, A Daubert *Discipline for Merger Simulation*, ANTITRUST, Summer 2004, at 89. The model also must be calibrated to match important quantitative aspects of an industry, e.g., market shares and prices.

**PRINCIPLE I-9: The critical test for fit for an empirical economic model is whether it is capable of aiding the trier of fact by reliably explaining or accounting for a relevant factual issue.**

**COMMENT**

An empirical model used to make predictions or disentangle effects must be tailored to the facts of the case. A necessary predicate to the application of an empirical model is a demonstration, applying economic reasoning to the facts, of the potential for the available data reliably to explain or account for a relevant factual issue. Models used to make predictions or disentangle effects are properly excluded if they fail to account for important causal factors and therefore fail to isolate the cause of interest. *See* *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 776-77 (8th Cir. 2004) (damages testimony held inadmissible because it "did not determine whether other factors, including the emergence of two direct competitors, may have affected" the plaintiffs' growth rate); *Blue Dane Simmental Corp. v. American Simmental Ass'n*, 178 F.3d 1035, 1039-41 (8th Cir. 1999) (affirming exclusion of damage estimate because it inferred "causation without considering all independent variables that could affect the conclusion"); *In re Aluminum Phosphide Antitrust Litigation*, 893 F. Supp. 1497, 1504-05 (D. Kan. 1995) (rejecting as unreliable a damage estimate that failed to account for several important factors).

**Procedures**

**PRINCIPLE I-10: Case management orders should address motions to exclude expert economic testimony based on Rule 702, responses to such motions, and, if appropriate, hearings on such motions.**

**COMMENT**

Motions to exclude may be permitted at any time after the filing of an expert report. *See* *Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 362 F.3d 775, 780 (11th Cir. 2004) ("A Daubert objection not raised before trial may be rejected as untimely .... But a trial court has broad discretion in determining how to perform its gatekeeper function, and nothing prohibits it from hearing a *Daubert* motion during trial.") (citation omitted). It clearly is best, however, that such motions be made well in advance of trial. Thus, case management orders generally should make specific provision for motions to exclude expert testimony based on Rule 702. Such motions should be filed sufficiently in advance of trial to permit responses and rulings on the motions prior to trial. If expert reports are filed at least ninety day before trial, as provided by Fed. R. Civ. P. 26(a)(2)(C), motions to exclude

Case 3:20-cv-08570-JD   Document 658-4   Filed 10/06/23   Page 13 of 13

THE SEDONA CONFERENCE COMMENTARY ON THE..., 7 Sedona Conf. J. 69

should be required within thirty days after the filing of the corresponding expert report, with responses within thirty days of service of the motion. In expedited proceedings, motions to exclude could be required as little as a week after the filing of the corresponding report, with responses accelerated in a parallel fashion.

Trial courts should not exclude expert economic testimony without careful consideration of the specific admissibility issues raised, but courts have considerable "latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability." *Kumho Tire,* 526 U.S. at 152. In assessing the reliability and fit of expert economic testimony, courts may benefit from declarations from trial or non-trial witnesses, and they may make use of special masters, court appointed experts, or technical advisors. Courts may find an evidentiary hearing useful, although none is required, and a lengthy hearing is most unlikely to be a good use of judicial resources.

*See also* Chapters II and V, *infra*.

**\*90  PRINCIPLE I-11: Motions to exclude expert economic testimony made under Rule 702 are appropriate in class certification proceedings.**

**COMMENT**

Rule 702 applies to expert economic testimony in class action certification proceedings; however, in that context, the issue is not "whether a jury at trial should be permitted to rely on" the testimony, but rather whether the court may "utilize it in deciding whether the requisites of Rule 23 have been met." *In re Visa Check/MasterMoney Antitrust Litigation,* 192 F.R.D. 68, 76-77 (E.D.N.Y. 2000), *aff'd,* 280 F.3d 124 (2d Cir. 2001). In particular, a Rule 702 challenge may be made to reliability and fit of the proposed method for the common proof of damages. *E.g., Corley v. Entergy Corp.,* 220 F.R.D. 478, 485 (E.D. Tex. 2004). Vague references to the use of a method such as "multiple regression" cannot satisfy the burden to establish either the admissibility of the testimony under Rule 702 or the requisites of Rule 23.

*See also* Chapter III, *infra*.

**PRINCIPLE I-12: Motions to exclude expert economic testimony made under Rule 702 are appropriate in bench trials as well as jury trials.**

**COMMENT**

In *Daubert* the Supreme Court held that a trial judge must serve in "a gatekeeping role" pursuant to Federal Rule of Evidence 104(a) by making a "preliminary assessment" of the reliability and fit of proffered expert testimony. 509 U.S. at 592-93, 597. Although judges obviously do not serve in the same gatekeeping role in bench trials as in jury trials, Rule 702 applies to both. There is no risk of a jury being unduly influenced by unreliable evidence when there is no jury, but judicial resources may be conserved by ruling on motions to exclude before commencement of a bench trial. Moreover, all motions to exclude based on Rule 702 eventually should be granted, denied, or dismissed as moot so that the record for possible appeal is clear.

**\*91  CHAPTER II. APPLYING RULES 12 16, AND 26 TO THE USE OF ECONOMIC EVIDENCE IN ANTITRUST CASES**

**INTRODUCTION**

As illustrated in the introduction and throughout this report, economic issues are generally and increasingly intertwined with legal issues in antitrust litigation. An antitrust lawsuit can turn on economic issues in the context of class certification or summary judgment motions, disputes about competitive effect or relevant market, or evidentiary rulings during trial. The pervasiveness of economic issues can extend throughout all stages, including the pretrial stages, of antitrust litigation.

These seconomic issues merit management focus because economic issues play out in different ways in different types of antitrust cases. In a battle of experts, for example, economic issues may have characteristics of the ultimate question of fact. In considering