**PUBLIC REDACTED VERSION**

WILMER CUTLER PICKERING
 HALE AND DORR LLP
SONAL N. MEHTA (SBN 222086)
 Sonal.Mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
 David.Gringer@wilmerhale.com
ROSS E. FIRSENBAUM (*pro hac vice*)
 Ross.Firsenbaum@wilmerhale.com
RYAN CHABOT (*pro hac vice*)
 Ryan.Chabot@wilmerhale.com
PAUL VANDERSLICE (*pro hac vice*)
 Paul.Vanderslice@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800

ARI HOLTZBLATT (*pro hac vice*)
 Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
 Molly.Jennings@wilmerhale.com
2100 Pennsylvania Ave NW
Washington, DC 20037
Telephone: (202) 663-6000

MICHAELA P. SEWALL (*pro hac vice*)
 Michaela.Sewall@wilmerhale.com
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

*Attorneys for Defendant Meta Platforms, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated,<br><br>                         Plaintiffs,<br><br>        v.<br><br>META PLATFORMS, INC., a Delaware Corporation,<br><br>                         Defendant. | Case No. 3:20-cv-08570-JD<br><br>**META PLATFORMS, INC.'S MOTION TO EXCLUDE TESTIMONY OF KEVIN KREITZMAN AND MICHAEL A. WILLIAMS**<br><br>Hearing Date: December 14, 2023<br>Time: 10:00 a.m.<br>Judge: Hon. James Donato |

**PUBLIC REDACTED VERSION**

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION .........................................................................................1

STATEMENT OF REQUESTED RELIEF ...................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................1

BACKGROUND ..........................................................................................................................3

LEGAL STANDARD ...................................................................................................................4

ARGUMENT ...............................................................................................................................5

I.  KREITZMAN AND WILLIAMS ASSUME, WITHOUT ANY BASIS, THAT META'S PROFITS ARE DUE TO ANTICOMPETITIVE CONDUCT..........................................................5

    A.  The Experts Fail To Control For Lawful Factors Affecting Profits .......................5

    B.  The Experts Fail To Distinguish Between Profits From Social Advertising And Profits From Non-Social Advertising .............................................................8

II.  KREITZMAN'S "YARDSTICK FIRMS" ARE THE PRODUCT OF ARBITRARY JUNK SCIENCE ...................................................................................................................9

    A.  The Selection Criteria Are Junk Science ...............................................................9

    B.  The Final Set Of Yardsticks Is The Clear Product Of Junk Science ...................14

CONCLUSION...........................................................................................................................15

**PUBLIC REDACTED VERSION**

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Amorgianos v. National Railroad. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)................................................................................................. 15

*Bazemore v. Friday*,
    478 U.S. 385 (1986)....................................................................................................... 2, 7

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
    152 F.3d 588 (7th Cir. 1998) ................................................................................ 2, 5, 6, 7, 9

*DZ Reserve v. Meta Platforms, Inc.*,
    2022 WL 912890 (N.D. Cal. Mar. 29, 2022)..................................................................... 1

*Eleven Line, Inc. v. North Texas State Soccer Ass'n*,
    213 F.3d 198 (5th Cir. 2000) ........................................................................................ 5, 9, 15

*In re Google Play Store Antitrust Litig.*,
    2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) ............................................................. 8, 11

*In re Live Concert Antitrust Litig.*,
    863 F. Supp. 2d 966 (C.D. Cal. 2012) .................................................................... 2, 5, 7, 8

*Kentucky v. Marathon Petroleum Co. LP*,
    464 F. Supp. 3d 880 (W.D. Ky. 2020) ............................................................................... 6

*LD v. United Behavioral Health*,
    2023 WL 2806323 (N.D. Cal. Mar. 31, 2023)................................................................... 4

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) (en banc) .............................................................................. 4

*Persian Gulf v. BP West Coast Products*,
    632 F. Supp. 3d 1108 (S.D. Cal. Sept. 30, 2022)............................................................ 15

*Shannon v. Crowley*,
    538 F. Supp. 476 (N.D. Cal. 1981) ............................................................................... 5, 9

### STATUTES, RULES, AND REGULATIONS

Fed. R. Evid. 702 ................................................................................................................. 1

### OTHER AUTHORITIES

ABA Antitrust Law Section, *Proving Antitrust Damages: Legal and Economic Issues* (3d
    ed. 2017) ......................................................................................................................... 15

**PUBLIC REDACTED VERSION**

Phillip A. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (2023) ...................................................................... 5, 9

5 David L. Faigman et al., *Modern Scientific Evidence: The Law and Science of Expert Testimony* (2022-2023 ed.) ................................................................................. 6

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on December 14, 2023, at 10:00 a.m., this Motion to Exclude Testimony of Kevin Kreitzman and Michael A. Williams filed by Defendant Meta Platforms, Inc. will be heard. Pursuant to Federal Rule of Evidence 702, Meta moves to exclude the testimony of Kevin Kreitzman and Michael A. Williams. Meta's motion is based on this Notice of Motion and the supporting Memorandum of Points and Authorities.

**STATEMENT OF REQUESTED RELIEF**

Meta requests that the Court exclude the Kreitzman-Williams "yardstick" study and accordingly (1) exclude the testimony of Kevin Kreitzman in full; (2) exclude the testimony described in Sections IV and V of Michael A. Williams's Report (Ex. 1) and Sections III and IV of Williams's Reply Report (Ex. 2);[1] and (3) exclude the testimony described in Sections II.E.i. and III.A.i. of Williams's Report that relies on the results of the "yardstick" study.[2]

**MEMORANDUM OF POINTS AND AUTHORITIES**

To certify their proposed class of all advertisers who bought so-called social advertising on Meta, Advertisers were required to come forward with a common method of proving that all or nearly all advertisers on Meta were charged supracompetitive prices during the class period and that those supracompetitive prices were because of the challenged conduct. They have instead come forward with a model that tells us nothing about the important issues for class certification.

Advertisers' putative experts, Kevin Kreitzman and Michael A. Williams, seek to compare Meta's *profits*—not its prices—with a cherry-picked group of just three "yardstick" companies. One of the "yardsticks" is a small Polish company, ▮▮▮▮▮▮▮▮▮, that sells online advertising along with tourist packages, architectural plans, and cars. Another is a microblogging site, ▮▮▮, that primarily operates in China. The third is ▮▮▮. Ex. 4, Kreitzman Report ¶¶ 9, 30, 53-54. That's it. Using the profits of these three supposed comparators as a benchmark, Kreitzman and

---

[1] "Ex." citations reference exhibits to the Jennings Declaration filed herewith.

[2] Williams relies on the results of the Kreitzman-Williams study to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Williams Report § II.E.i, and in support of his conclusion that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, *id.* § III.A.i. These analyses, identified by paragraph number in Meta's proposed order, should also be excluded for the reasons set forth in this motion. *See DZ Reserve v. Meta Platforms, Inc.*, 2022 WL 912890, at *9 (N.D. Cal. Mar. 29, 2022).

**PUBLIC REDACTED VERSION**

Williams calculate Meta's supposed excess profits and then attribute the entirety of those excess profits to supracompetitive pricing (even as they admit that ███████████████████ ███████ ) which in turn they attribute entirely to the challenged conduct (even as they admit ████ ███████████████████████ ). The Kreitzman-Williams study contains no controls for any other causes of Meta's profitability and makes no attempt to tie the profits Meta earns to the challenged conduct. Although their methodology is riddled with problems, this motion focuses on two that are so significant as to render it manifestly unreliable when used as a tool to calculate an overcharge in advertising prices on a class-wide basis (or at all).

*First*, the Kreitzman-Williams study cannot show that prices are at supracompetitive levels market-wide or that the pricing of any Meta advertisement (let alone all advertisements) is attributable to anticompetitive conduct. That is because, as both Kreitzman and Williams expressly acknowledge, ████████████████████████████████ ████████████████████████████████ *See* Ex. 3, Williams Tr. 229:23-230:3 (████ ████████████████████████████████ ), 70:12-72:5 (████████████████████ ████████████████████████████████ ); Ex. 6, Kreitzman Tr. 36:15-19 (████ ████████████████████████████ ). And yet neither Kreitzman nor Williams makes any effort to account for these factors. Kreitzman Tr. at 42:20-43:5 (████████████████ ████████████████████████████████ ), 45:4-10, 44:7-17, 46:12-47:1; Williams Tr. 185:7-21, 186:8-187:13 (████████ ████████████████████████████████ ). This itself renders a yardstick methodology "worthless" and "irrelevant." *Blue Cross & Blue Shield United of Wis. V. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) (Posner, J.) ("*BCBS*"); *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 973, 975-976 (C.D. Cal. 2012) (quoting *Bazemore v. Friday*, 478 U.S. 385, 400

**PUBLIC REDACTED VERSION**

n.10 (1986) (Brennan, J., partial concurrence joined by the entire Court)).

*Second*, Kreitzman and Williams's selection of supposed "yardstick" firms is based on a set of criteria that is the expert witness equivalent of throwing darts at a wall. The criteria omit nearly all the features usually relied on to assess firms' comparability. As for the criteria that were used, Kreitzman concedes that several of them were chosen not to identify genuinely comparable firms, but instead for the sake of convenience. One was set without any understanding as to what firms were being included or excluded by the filter (including, remarkably, whether the filter was filtering out firms that were *more* comparable than those it was allowing to pass), and one required Kreitzman to make judgment calls in areas in which he admits ███████████████████ ████████████████████. Ultimately, all six criteria used to filter down to the supposed "yardstick" firms are ones that Kreitzman or Williams (or both) admitted either say nothing about comparability, or are, at best, based on their *ipse dixit*. Unsurprisingly, this lack of rigor produces unreliable results, filtering out firms that common sense tells us (and that Kreitzman and Williams admit) are at least as, if not more comparable to Meta than a Polish travel company, or ████ in China. And this conveniently results in an excess profits calculation nearly identical to the damages estimate Advertisers' counsel made at the start of the case (and years before Kreitzman and Williams did their work). This is a post-hoc justification for an astronomical damages figure developed by plaintiffs' counsel and it should be rejected.

## BACKGROUND

Advertisers submitted Kreitzman's and Williams's reports to prove a common method of showing injury and to identify the damages attributable to the higher prices they claim that the conduct at issue in this litigation permitted Meta to charge. To do so, Kreitzman compares the economic profit rate (EPR) for Meta's advertising business against the weighted average EPRs for what he claims are the three "yardstick" firms—████████████████████. Kreitzman Report ¶¶ 30-49.[3] Kreitzman lists six criteria that he used to select his three yardstick firms. *Id.* ¶ 30. The criteria are that the company (1) ████████████; (2) █████████████████

---

[3] Meta is not aware of any court or scholar approving a yardstick study that infers supracompetitive *prices* solely from a firm's *profits*.

**PUBLIC REDACTED VERSION**

1   █████████████████████████████████████████████████ ; (3) ████████████████

2   █████████████████████████████████████████ ; (4) ████████████████████████

3   █████████████████████████████████████████ ; (5) ████████████████████████

4   ████████████████████████████████ ; and (6) ██████████████████████████████

5   ██████████████████████████████ *Id*. After the filters were applied, only the three

6   "yardstick" firms remained.

7          Next, Kreitzman proposes a hypothetical reduction in advertising revenue that would have

8   lowered Meta's profit rate to match the yardstick average. *Id.* ¶¶ 6, 50-54. The reduction he offers

9   is a ████ decrease in Meta's advertising revenue—or █████████ . *Id.* ¶¶ 9, 53. And that is where

10  Kreitzman's opinion stops. He does not analyze what revenues Meta would have earned in a but-

11  for world without the challenged conduct. He does not analyze whether, in a world where Meta

12  *did* earn lower profits, that reduction would have flowed from a revenue decrease or some other

13  cause (like cost increases). He does not analyze why Meta's alleged EPR is higher than the

14  yardstick firms' or isolate how much (if any) of that profitability may be due to the challenged

15  conduct versus other factors.

16         Neither does Williams. Instead, he treats Kreitzman's report as having ████████████████

17  ████████████████████████████████████████████████████████████████████████████

18  ██████████████████████████████████████████ Williams Report ¶ 351. Premised on

19  this understanding, Williams relied on Kreitzman's calculations to ██████████████████████

20  ████████████████████████████████████████████████████████████████████████████

21  ██████████████████████████████████████ *Id.* ¶ 357.

**LEGAL STANDARD**

23         Even at the class certification stage, the party offering expert testimony bears the burden

24  of proving that it is admissible. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,

25  31 F.4th 651, 683 (9th Cir. 2022) (en banc). The Court must "scrutinize[] the reliability of the

26  expert testimony in light of the criteria for class certification and the current state of the evidence."

27  *LD v. United Behav. Health*, 2023 WL 2806323, at *2 (N.D. Cal. Mar. 31, 2023). As relevant to

28  this motion, a "yardstick" study is admissible only if it "account[s] for … other possible

**PUBLIC REDACTED VERSION**

1   explanation(s) for the disparity" observed between firms before attributing the difference to

2   anticompetitive conduct. *Live Concert*, 863 F. Supp. 2d at 975. This is a "vital" requirement. *BCBS*,

3   152 F.3d at 593. Moreover, a reliable yardstick study must compare the defendant to businesses

4   that are "nearly as identical as possible." *Shannon v. Crowley*, 538 F. Supp. 476, 481 (N.D. Cal.

5   1981). Plaintiffs bear the burden of "demonstrat[ing] the reasonable similarity" of the defendant's

6   business to the proposed comparators in the yardstick study. *Eleven Line, Inc. v. North Tex. State*

7   *Soccer Ass'n*, 213 F.3d 198, 208 (5th Cir. 2000).

8                                              **ARGUMENT**

9              Despite calling their approach a "yardstick" model, the Kreitzman-Williams study is

10  anything but. Rather, it only superficially resembles actual yardstick studies approved by courts

11  and scholars. Kreitzman and Williams's approach suffers from two independently fatal flaws that

12  courts have found render yardstick analyses unreliable and inadmissible. First, the study assumes

13  that the difference between Meta's EPR and the yardstick firms' is wholly attributable to the

14  challenged conduct, without accounting for salient variables that both experts acknowledge affect

15  Meta's profitability. Second, the study employs entirely arbitrary criteria to select the yardsticks,

16  yielding a facially inappropriate result. The study is junk science, and its results confirm that.

17  **I.    KREITZMAN AND WILLIAMS ASSUME, WITHOUT ANY BASIS, THAT META'S PROFITS**

18  **ARE DUE TO ANTICOMPETITIVE CONDUCT**

19             The Kreitzman-Williams study assumes that all of Meta's profits over and above the

20  yardstick firms' are due to anticompetitive conduct in the alleged market for social advertising.

21  There are two fundamental problems with that assumption. First, neither expert controls for lawful

22  conduct that can explain Meta's profits (and thus, at least according to these experts, its prices).

23  And second, neither expert scoped the excess profits methodology to the asserted market. Each of

24  these errors renders their opinions inadmissible.

25        **A.    The Experts Fail To Control For Lawful Factors Affecting Profits**

26             The "most important[]" requirement for a "yardstick methodology" is "to control for any

27  factors that might have influenced [a firm's] profit performance that are competitively neutral or

28  even procompetitive." 3G Phillip A. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis*

**PUBLIC REDACTED VERSION**

1  *of Antitrust Principles and Their Application* ¶ 397 (2023); Faigman et al., 5 Mod. Sci. Evid.

2  § 43:35 (2022-2023 ed.) (When a "yardstick benchmark is employed, effects on the prices paid by

3  plaintiffs … caused by factors other than the alleged wrongdoing must be taken into account."). If

4  a study fails to do so, it cannot possibly show that any difference is "attributable to the defendant's

5  misconduct" and is therefore inadmissible. *BCBS*, 152 F.3d at 592-593; *Kentucky v. Marathon*

6  *Petrol. Co.*, 464 F. Supp. 3d 880, 894 (W.D. Ky. 2020) (same).

7       Disregarding these basic tenets of reliable yardstick studies, Williams testified that he

8  ████████████████████████████████████████████████████████████████████

9  █████████████ *Williams* Tr. 73:7-17. From this alone, Williams concluded that ████████████

10 ████████████████████████████████████ *Id.* He also concluded that, ████████████

11 ████████████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████████████████

14 *Id.* at 229:3-9, 229:18-22.

15      The Kreitzman-Williams study fails as a threshold matter because it does not control for

16 any of the litany of other factors besides the challenged conduct that Williams and Kreitzman both

17 acknowledge ████████████████████████████████████████. Both

18 Kreitzman and Williams agreed in their depositions that ████████████████████████

19 ████████████████████████████████ *Williams* Tr. 229:23-230:3;

20 Kreitzman Tr. 36:15-19 (████████████████████████████████████████████

21 ████████████████████████████). These reasons include at least ████████████

22 ████████████████████████████████. Kreitzman Tr. 37:18-

23 23, 38:6-15, 39:24-42:19; *see also* Williams Tr. 70:12-72:5 (████████████████

24 ████████████████████████████████████████████████████████).

25      Yet by their own admission, their yardstick study does not account or control for any of

26 these factors. Kreitzman explained that ████████████████████████████████

27 ████████████████████████████████████████████. Kreitzman Tr.

28 44:7-17 (████████████████████████████████████); *id.* at 46:12-47:1 (████████

**PUBLIC REDACTED VERSION**

1    ████████████████████████████████████████████████████). Williams also did

2    not do anything to account for these factors. Williams Tr. 185:7-21, 186:8-187:13.

3         This omission, on its own, renders the study unreliable and inadmissible. A yardstick study

4    is "worthless" if it "attribute[s] the entire difference between the prices of" an antitrust defendant

5    and the comparator firms to anticompetitive conduct without "correct[ing] for salient factors, not

6    attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff

7    is complaining." *BCBS*, 152 F.3d at 593. "[S]imply assum[ing]—without further examination—

8    that the difference in" prices between firms "is due entirely to [the defendant's] allegedly

9    anticompetitive conduct" without "account[ing] for *any* other possible explanation(s) for this

10   disparity" is "'so incomplete as to be inadmissible as irrelevant.'" *Live Concert*, 863 F. Supp. 2d

11   at 975 (quoting *Bazemore*, 478 U.S. at 400 n.10).

12        Williams appears to have recognized his error: he testified that the yardstick study

13   ██████████████████████████████████████████████████████████████████████

14   ██████████████████████████████████████████████████████████████████████

15   ████████████████████ Williams Tr. 231:23-234:2. But Kreitzman testified that Williams is

16   wrong—and that his opinion ████████████████████████████████████████████

17   ██████████████████████████████████████████████████████████████████████

18   ██████████████████████████████ Kreitzman Tr. 47:16-48:12 (emphasis added).

19   Kreitzman also offered no opinion ███████████████████████████████████████

20   ███████ *id.* at 27:7-10, leaving Williams's conclusions that ████████████████████

21   ██████████████████████████████████████████████████████████████████████

22   ██████████████████████ unexplained and unsupported. Indeed, Williams's conclusion defies not

23   only common sense but also Kreitzman's concession that ██████████████████████

24   ██████████████████████████. *Id.* at 68:19-69:4 (████████████████████████████

25   ██████████████████████████████████████████████████████████████████████

26   ██████████████████████████████████████████████████████████████████████

27   ██████████████████████████); *id.* at 69:16-20 (████████████████████████████

28   ██████████████████████████████████████████████████████████████████████

**PUBLIC REDACTED VERSION**

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

2    Williams then makes yet another fatal error. His opinions from the study reflect the

3 improper assumption that the difference between Meta and the yardsticks is due entirely to Meta's

4 allegedly anticompetitive conduct. Williams Tr. 73:7-17. But he did not account for any other

5 salient factors, which renders his opinion unreliable. *Live Concert Antitrust Litig.*, 863 F. Supp. 2d

6 at 975. Williams's multiple logical leaps are "based on assumptions … that are not supported by

7 the evidence," and are inadmissible. *In re Google Play Store Antitrust Litig.*, 2023 WL 5532128,

8 at *9 (N.D. Cal. Aug. 28, 2023).

9    **B.    The Experts Fail To Distinguish Between Profits From Social Advertising And**

10    **Profits From Non-Social Advertising**

11    Advertisers' class certification motion asserts that the relevant market is the market for

12 "social advertising." Dkt. 643 at 4. Social ads, they say, are those "that use[] data 'to predict the

13 purchase intents of particular users' that is obtained primarily from 'a user's social graph.'" *Id.*

14 (quoting Ex. 7, Gans Report ¶¶ 23-24); *see also* Williams Tr. 244:18-24 (▮▮▮▮▮▮▮▮

15 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16 ▮▮▮▮▮▮▮▮▮▮), 247:14-25. Those are the only ads Meta is claimed to monopolize.

17 *See id.* at 282:6-15 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). So, they are the only ads affected by the challenged

22 conduct, and the only ads for which the class may recover.

23    Advertisers' experts admit that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, meaning

24 that not all of Meta's advertising *profits* are from the allegedly monopolized market. *See,* Ex. 9,

25 Fasser Tr. 97:8-12 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27 ▮▮▮▮▮▮▮▮▮▮▮▮▮); *id.* at 82:15-83:1 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1   █████████████); Ex. 8, Gans Tr. 94:6-11 (████████████████

2   ████████████████████████████████). But neither

3   Williams nor Kreitzman separates the revenues and profits attributable to *social* advertisements

4   from those attributable to *other* advertisements Meta sells that are not social. *See* Kreitzman Tr.

5   248:22-24 (█████████████████████████████████);

6   Williams Tr. 282:16-21 (█████████████████████████████

7   ████████). That—just like their failure to account for ███████████████

8   ██████████████, or just about anything else—requires the Court to exercise its role

9   as a gatekeeper and exclude their opinions. *BCBS*, 152 F.3d at 593 (failure to "correct for salient

10  factors, not attributable to the defendant's [alleged] misconduct," requires exclusion of study).

11  **II.   THE "YARDSTICK FIRMS" ARE NOT THE PRODUCT OF A RELIABLE METHODOLOGY**

12  **A.   The Selection Criteria Are Junk Science**

13  "[T]he yardstick method requires a comparison of the" firm at issue "with one nearly as

14  identical as possible." *Shannon*, 538 F. Supp. at 481; Areeda & Hovenkamp, *Antitrust Law* ¶ 392f

15  ("[O]ne must identify a firm that is truly comparable in order for the inferences drawn to be reliable

16  rather than speculative."). That involves considering whether the firms are comparable with

17  respect to real-world factors like, for example, "geographical location," the "attractiveness of"

18  their product offerings, the size and type of the markets they serve, and their "relative costs of

19  operation." *Eleven Line*, 213 F.3d at 208.

20  The Kreitzman-Williams selection criteria ignore those real-world criteria in favor of

21  convenience (both methodological and in the results). And that oversight shows in the list of firms

22  the criteria produce: one of the firms is a relatively tiny Polish company that makes its money

23  selling not only advertising but also tourist packages, architectural plans, and cars, and two of the

24  three firms operate primarily in dissimilar international markets (China and Poland). Indeed, other

25  than █████, the list lacks a single company that anyone has ever mentioned in the same breath as

26  Meta—no Twitter, no LinkedIn, no TikTok, no Snapchat, no Apple, no Amazon, no Reddit—and

27  Kreitzman admits that ████████████████████████████████

28  ████████████████████████████. *See* Kreitzman Tr. 239:7-241:17.

**PUBLIC REDACTED VERSION**

1    The factors Kreitzman *does* rely on to produce his yardsticks do not ensure comparability.

2    Consider each filter in turn.

3    *First*, Kreitzman limits the yardsticks to ███████████. He does so not because

4    ███████ are any more comparable to Meta than ██████, but instead for convenience—

5    ███████████████████████████████████████████████████████

6    ██████ Ex. 5, Kreitzman Reply ¶ 24; *accord* Kreitzman Tr. 70:10-15. But as Kreitzman

7    acknowledged, that says nothing about their comparability: ████████████████████

8    ███████████████████████████████████████████████████████

9    ███████████████████████████████████████████████████████

10   ██████████████████████████████████████████████ Kreitzman Tr.

11   at 71:8-14. As a result, both Kreitzman and Williams agree that █████████████████

12   ███████████████████████████████████████████████████████

13   ██████████████████████ *Id.* at 76:23-77:7; *accord* Williams Tr. 193:24-194:3. Filter

14   number one concededly does no work to produce a comparable set of firms—and it excludes

15   potentially superior comparators to the chosen yardsticks to boot.[4]

16   *Second*, Kreitzman limits the yardsticks to those that ████████████████████

17   ██████████████████ That filter brings the set of comparable firms from 52,538 to just

18   347—eliminating 99% of possible comparators—and excludes brands with massive online

19   advertising businesses (like Amazon, Microsoft, or Verizon). Despite the filter's dramatic effect

20   on his study results, Kreitzman admitted that ██████████████████████████████

21   ███████████████████████████████████████████████████████

22   ███████████████████████████ Kreitzman Tr. 81:19-23, 87:16-20. Williams

23   said the same, and observed that ██████████████████████████. *See* Williams

24   Tr. 214:16-215:5. Both experts, when pressed to nonetheless justify the filter, testified that ███

25   ███████████████████████████████████████████████████████

26   ████████████████████████████████████. *Id.* at 209:11-210:1;

---

[4] Advertisers served dozens of non-party subpoenas in this case and had every opportunity to seek relevant financial information from appropriate potential comparators, which they either did not do or, if they did, did not like what they found.

1    Kreitzman Tr. 80:9-12 (█████████████████████████████████). Exactly.

2    Application of this filter excluded firms that *are* comparable while leaving those that are not.

3    Moreover, despite the conceded unreliability of ████████████████, Kreitzman relied

4    on those very descriptions to exclude every single other ████████████████████

5    ████████████, without actually ████████████████████████ to assess their

6    comparability to Meta. Kreitzman Tr. at 88:7-15. As a result—and as Kreitzman admitted—█

7    ████████████████████████████████████████████████████████████████

8    ████████████████ *Id.* at 85:19-86:3, 89:18-90:5. He did, at least, know that this filter ██████

9    ████████████████████████████████████████████████████████████████

10    ████████████████████████████████████████████████████████████████

11    ████████████████ *See id.* at 94:6-13, 96:25-97:4, 98:10-22, 99:16-19, 100:2-7. In an

12    emerging pattern, then, filter number two does nothing to produce a comparable set of firms, and

13    excludes potentially superior comparators to the yardsticks.

14         *Third*, Kreitzman limited the yardsticks to firms with ████████████████████

15    ████████████████████. His express goal was not to identify comparable firms, but

16    instead do the opposite and ████████████████████████████████████

17    ████ Kreitzman Tr. at 120:25-121:10. With a justification so unmoored from comparability, it

18    is no wonder that the filter rests on two completely arbitrary choices: its numerical threshold, and

19    its decision to look at only a single year of data. With respect to the ██████ threshold, Kreitzman

20    testified that had he selected a marginally higher cutoff, ██████████—the lowest-EPR firm

21    in the set—would not have made the cut, dramatically altering the results. *Id.* at 128:5-12. Yet

22    when challenged to justify the number he chose, Kreitzman offered only ████████████████

23    ████████████ Kreitzman Reply ¶ 31. That is code for "ipse dixit" and is insufficient to

24    demonstrate that he identified a "reasonable facsimile" or "benchmark" firm. *See Play Store*, 2023

25    WL 5532128, at *9. Meanwhile Kreitzman's decision to look at revenues for only ████ (an

26    anomalous year for many companies' finances due to ████████████),[5] flatly contradicts his

---

[5] Kreitzman agreed that ████████████████████████████████████████████████
████████████ Kreitzman Tr. 150:3-12. But he did not try to measure it. *Id.* at 150:16-22 (█
████████████████████████████████).

**PUBLIC REDACTED VERSION**

1  testimony that the " ███████████████████████████████████████████

2  ███████████████████████████████████████ " Kreitzman Tr. 155:23-156:2.

3  Kreitzman cannot possibly explain why it was appropriate to focus on ████ alone notwithstanding

4  the effects of ██████████ , because he did not " █████████████████████████████████

5  ████████████████ " *Id.* at 150:23-151:6. This filter, then, once again failed to reliably select for

6  comparable firms—and certainly not firms that were comparable over the class period.

7       *Fourth*, Kreitzman applied a similar filter with respect to ██████████████████ : any

8  firm that had a ████████████████████████████████ in that one year was rejected by

9  this filter and thus necessarily deemed non-comparable by Kreitzman and Williams. That filter is

10  arbitrary in the same respects as the ████████ filter—neither its numerical threshold nor its

11  restriction to a single year finds any support beyond Kreitzman's *ipse dixit*. Indeed, the

12  arbitrariness is especially dramatic here: had the cutoff been even ██████████████ would

13  have been excluded. *See* Kreitzman Report ¶ 30 & fig.12. This filter's purpose was also to ████████

14  ██████████ again resulting in ████████████ just barely scraping through. *See* Kreitzman

15  Tr. 131:9-14 ( █████████████████████████████████████████████████████████

16  ████████████████████████████████████ ). But the ████████ filter also has an

17  *additional* deficiency, above and beyond those it shares with the ████████ filter. Kreitzman

18  calculated its cutoff by guesstimating that ██████████████████████████████████████

19  ██████████ But remarkably, Kreitzman did not ████████████████████████████████

20  ████ to arrive at that figure; it was a ████████████████████ *Id.* at 135:9-17. Left fatally

21  unexplained—again—is how or why Kreitzman exercised his judgment in this fashion.

22       *Fifth*, Kreitzman eliminated any firm that had ████████████████████████████

23  ████████████ . This filter is likewise an outcome-oriented choice justifiable only by *ipse dixit*.

24  Kreitzman's reply report just asserts that a company ████████████████████████████████████

25  ██████████████████ Kreitzman Reply ¶ 33; Kreitzman Tr. 153:3-154:2. Perhaps recognizing

26  the infirmity of that explanation, he adds that the filter really ██████████████████████ by

27  ████████████████████████████████████████ Kreitzman Reply ¶ 34. But

28  his own testimony reveals that he was wrong: as he agreed, ████████████████████████████████

**PUBLIC REDACTED VERSION**

1    ███████████████████████████████ meaning there is no necessary connection between ██

2    ███████████████████████████████ Kreitzman Tr. 157:12-15. And

3    in any event, it hardly excuses a significant flaw in one's analysis to say, "no harm, no foul."

4    Especially where the application of the filter confirms that it did in fact harm—or at least call into

5    question—the reliability of the methodology. This screening criteria was the one that *filtered out*

6    ███████ as a comparator to Meta.

7        *Sixth*, Kreitzman limits the yardsticks to ██████████████████████████████

8    ███████████ The primary purpose of this filter was, by Kreitzman's own admission, not to

9    identify comparable firms, but rather to ███████████████████████████████

10   ██████████████████████ Kreitzman Reply ¶ 36; Kreitzman Tr. 173:10-14 (██

11   ███████████████████████ ). But Kreitzman did not even consider whether ████████

12   ███████████████████████████████████████. *See,*

13   *e.g.*, Kreitzman Tr. at 97:5-11, 98:17-22, 100:2-5. The result is that Kreitzman has no idea whether

14   his sixth filter filtered out ████████████████████████████████

15   ████████████, because he did not even look:

16-19   ███████████████████████████████████████

20   *Id.* at 176:1-12.

21       What's more, this filter turns almost entirely on a judgment call that Kreitzman is

22   unqualified to make. As Kreitzman acknowledged, applying this filter required him ███████

23   ███████████████████████████████ Kreitzman Tr.

24   at 176:17-23. Yet segments that ████████████████ were excluded if he believed ██

25   ███████████████████████████ *Id.* at 192:8-13. Even though

26   Kreitzman admits ████████████████████████████████

27   ███████████████████████████████████████

28   ███████████████████████ *Id.* at 196:12-19

1   (emphasis added).

2        In sum, Kreitzman's own testimony amply establishes that several of his selection criteria

3   do not even attempt to identify comparable firms, and that the others cannot possibly do so in a

4   remotely reliable fashion. In the end, Kreitzman's selection criteria did *nothing* to select for

5   comparable firms—they instead excluded scores of comparable firms. Kreitzman's opinions, and

6   Williams's opinions relying thereon, should therefore be excluded.

7        **B.     The Final Set Of Yardsticks Is The Clear Product Of Junk Science**

8        Stepping back from the specific selection criteria applied, the final trio of yardstick firms—

9   ███████████████████████—confirm the unreliability of the selection process.

10       Turning first to ████████████, neither Williams nor Kreitzman was aware of ████

11  ████████████████████████████████████████████████████████████████████████

12  Williams Tr. 228:14-229:2; Kreitzman Tr. 236:22-237:4. The company is a tiny fraction of Meta's

13  size and its businesses include tourist packages, architectural designs, TV ads, and car sales.

14  Indeed, revenue data from ████████████ strongly suggests that it does not even clear

15  Kreitzman's flawed criteria. It began breaking out the size of its advertising segment in *2021*, and

16  its advertising revenues that year—when *combined* with revenues from subscription services—

17  constituted only 63% of ████████████ revenue, with the rest attributable to such diverse

18  offerings as the sale of tourist packages and consumer financial products. ████████████

19  ██████████████████████████ In the next year, the ads-and-subscriptions

20  combination constituted only 58% of revenue. *Id.* There is no basis to infer that the share

21  attributable to advertising was some ████████████████████████████████████

22  ████████████████████████ Indeed, Kreitzman asserted that ████████

23  ████████████████████████████ but, when confronted, admitted he was

24  wrong. Kreitzman Tr. 222:6-223:11. He could not reconcile those contradictory facts, nor offer

25  any basis for concluding that ████████████████████████████

26  ████████████████████████████████████████

27  ████████████████████████████████████████

28  ██████████████████████████

**PUBLIC REDACTED VERSION**

*Id.* at 231:1-13. That alone reveals that his set of comparator firms is so unreliable as to warrant exclusion. *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 268 (2d Cir. 2002) (excluding expert opinion for "fail[ing] to apply his own methodology reliably").

Next, consider ███. As Williams acknowledges, a yardstick study must compare ███████████████████████████████████████████████████████████████████ Williams Report ¶ 326 (quoting ABA Antitrust L. Sec., *Proving Antitrust Damages: Legal and Economic Issues* Ch. 4, § C (3d ed. 2017)) (emphasis added); *see also* Williams Tr. 198:10-25. But ███ is not merely affected by the alleged anticompetitive conduct in this case; it is (allegedly) ████████████. *See* Am. Compl., Dkt. 391 ¶¶ ████ (challenging Meta's alleged ██████████████████). ████ too, ought to have been excluded under Kreitzman's and Williams's own description of their approach. Strikingly, this is not the first time Williams has committed this same error. *See Persian Gulf v. BP W. Coast Prods.*, 632 F. Supp. 3d 1108, 1166 (S.D. Cal. Sept. 30, 2022) ("Williams' methodology disregarded the basic econometric principle of selecting a benchmark … that is reasonably free of misconduct.").

That leaves only ███. ███ is, again, a Chinese microblogging site that Advertisers' experts have failed to establish has any relevant similarities to Meta. *See Eleven Line*, 213 F.3d at 208. And in any event, ██████████████████—it offers no proof Meta obtained an anticompetitive profit. Kreitzman Report ¶ 51 fig.23. That means that, in reality, the yardstick study can show neither damages nor antitrust impact—and that the experts' opinions to the contrary should be excluded.

## CONCLUSION

The Court should exclude the unreliable Kreitzman-Williams "yardstick" study by excluding the testimony of Kreitzman in full and excluding the testimony described in Sections II.E.i, III.A.i, IV, and V of the Williams Report and Sections III and IV of the Williams Reply.

**PUBLIC REDACTED VERSION**

Dated: October 6, 2023

Respectfully submitted,

By: */s/ Sonal N. Mehta*

SONAL N. MEHTA (SBN 222086)
 Sonal.Mehta@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (pro hac vice)
 David.Gringer@wilmerhale.com
ROSS E. FIRSENBAUM (pro hac vice)
 Ross.Firsenbaum@wilmerhale.com
RYAN CHABOT (pro hac vice)
 Ryan.Chabot@wilmerhale.com
PAUL VANDERSLICE (pro hac vice)
 Paul.Vanderslice@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800

ARI HOLTZBLATT (pro hac vice)
 Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (pro hac vice)
 Molly.Jennings@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000

MICHAELA P. SEWALL (pro hac vice)
 Michaela.Sewall@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

*Attorneys for Defendant Meta Platforms, Inc.*

**PUBLIC REDACTED VERSION**

# CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of October, 2023, I electronically transmitted the public redacted version of the foregoing document to the Clerk's Office using the CM/ECF System and caused the version of the foregoing document filed under seal to be transmitted to counsel of record by email.

By:     */s/ Sonal N. Mehta*
       Sonal N. Mehta

MOTION TO EXCLUDE TESTIMONY OF
KEVIN KREITZMAN AND MICHAEL A. WILLIAMS