**PUBLIC REDACTED VERSION**

WILMER CUTLER PICKERING
 HALE AND DORR LLP
SONAL N. MEHTA (SBN 222086)
 Sonal.Mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
 David.Gringer@wilmerhale.com
ROSS E. FIRSENBAUM (*pro hac vice*)
 Ross.Firsenbaum@wilmerhale.com
RYAN CHABOT (*pro hac vice*)
 Ryan.Chabot@wilmerhale.com
PAUL VANDERSLICE (*pro hac vice*)
 Paul.Vanderslice@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800

ARI HOLTZBLATT (*pro hac vice*)
 Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
 Molly.Jennings@wilmerhale.com
2100 Pennsylvania Ave NW
Washington, DC 20037
Telephone: (202) 663-6000

MICHAELA P. SEWALL (*pro hac vice*)
 Michaela.Sewall@wilmerhale.com
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

*Attorneys for Defendant Meta Platforms, Inc.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated, | Case No. 3:20-cv-08570-JD |
| Plaintiffs, | **META PLATFORM, INC.'S OPPOSITION TO USERS' MOTION FOR CLASS CERTIFICATION** |
| v. | Hearing Date: Dec. 14, 2023 |
| META PLATFORMS, INC., a Delaware Corporation headquartered in California, | Time: 10:00 a.m. Judge: Hon. James Donato |
| Defendant. | |

**PUBLIC REDACTED VERSION**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

BACKGROUND .........................................................................................................................2

I. META ATTRACTS AND RETAINS USERS BY PROVIDING VALUABLE SERVICES....................2

II. USERS SEEK TO CERTIFY A CLASS OF FACEBOOK USERS THAT MAINTAINED AND USED A PROFILE BETWEEN DECEMBER 3, 2016 AND DECEMBER 3, 2020, WHO THEY CLAIM WERE INJURED BY NOT BEING PAID FOR USING META'S FREE SERVICES ......................................................................................................................3

LEGAL STANDARD ...................................................................................................................5

ARGUMENT ..............................................................................................................................5

I. ANTITRUST INJURY CANNOT BE ESTABLISHED THROUGH CLASSWIDE PROOF ....................6

   A. Individualized Issues Predominate Because Users' Classwide Injury Model Is Speculative And Contrary To The Record ........................................................... 6

   B. Even If Meta Would Have Paid Some Facebook Users Absent The Allegedly Anticompetitive Conduct, Whether Any Particular User Would Have Been Injured Through Lack Of Compensation Requires An Individualized Inquiry .......... 10

      1. Who, if anyone, is paid in the but-for world is individualized .......................10

      2. Whether users would be better off or harmed in the but-for world is individualized.............................................................................................12

   C. Users Offer No Common Proof That Meta's Actions Were Actionably Anticompetitive........................................................................................... 14

      1. Users provide no common means to determine whether putative class members were influenced by the alleged misrepresentations.........................14

      2. Users offer no common proof of who uses the functions of Facebook that compete in their "PSN" market, nor a reliable means for defining that market ....................................................................................................16

II. USERS HAVE NOT PRESENTED A VALID DAMAGES MODEL ............................................18

III. THE NAMED PLAINTIFFS ARE NOT TYPICAL AND ADEQUATE REPRESENTATIVES OF THE PUTATIVE CLASS .........................................................................................................20

   A. The Named Plaintiffs Cannot Serve As Class Representatives Because They Testified That Their Theory Of Liability Is Wrong .................................................. 21

   B. The Named Plaintiffs' Relationships With The Counsel That Brought This Case Further Undermine Their Adequacy As Class Representatives ................................ 24

CONCLUSION..........................................................................................................................25

**PUBLIC REDACTED VERSION**

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
190 F.3d 1051 (9th Cir. 1999) ...............................................................13

*Am. Exp. Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013)................................................................................5

*In re Apple iPhone Antitrust Litig.*,
2022 WL 1284104 (N.D. Cal. Mar. 29, 2022).....................................6, 10

*In re Arris Cable Modem Consumer Litig.*,
327 F.R.D. 334 (N.D. Cal. 2018)...........................................................21

*Bohn v. Pharmavite, LLC*,
2013 WL 4517895 (C.D. Cal. Aug. 7, 2013)..........................................25

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017) .................................................................9

*Carrera v. Bayer Corp.*,
727 F.3d 300 (3d Cir. 2013).....................................................................9

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)................................................................5, 18, 19, 20

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) .................................................................21

*EQT Prod. Co. v. Adair*,
764 F.3d 347 (4th Cir. 2014) ...................................................................9

*In re Facebook, Inc., PPC Advert. Litig.*,
282 F.R.D. 446 (N.D. Cal. 2012)...........................................................23

*In re Google Play Store Antitrust Litig.*,
2023 WL 5602143 (N.D. Cal. Aug. 28, 2023) ........................................5

*California v. Infineon Techs. AG*,
2008 WL 4155665 (N.D. Cal. Sept. 5, 2008) ........................................16

*Kottaras v. Whole Foods Market, Inc.*,
281 F.R.D. 16 (D.D.C. 2012)................................................................14

*Lerwill v. Inflight Motion Pictures, Inc.*,
582 F.2d 507 (9th Cir. 1978) .................................................................23

**PUBLIC REDACTED VERSION**

*London v. Wal-Mart Stores, Inc.*,
   340 F.3d 1246 (11th Cir. 2003) ........................................................................25

*Major v. Ocean Spray Cranberries, Inc.*,
   2013 WL 2558125 (N.D. Cal. June 10, 2013) .....................................................21

*May v. Gladstone*,
   562 F. Supp. 3d 709 (C.D. Cal. 2021) ...............................................................24

*McArdle v. AT&T Mobility LLC*,
   2018 WL 6803743 (N.D. Cal. Aug. 13, 2018) ...................................................24

*Milan v. Clif Bar & Co.*,
   340 F.R.D. 591 (N.D. Cal. 2021) ......................................................................18

*Mowry v. JP Morgan Chase Bank, N.A.*,
   2007 WL 1772142 (N.D. Ill. June 19, 2007) .....................................................25

*Mueller v. Puritan's Pride, Inc.*,
   2021 WL 5494254 (N.D. Cal. Nov. 23, 2021) ...................................................18

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
   522 F.3d 6 (1st Cir. 2008) ...............................................................................6, 9

*In re Nexium Antitrust Litig.*,
   777 F.3d 9 (1st Cir. 2015) ....................................................................................9

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) ...........................................................................5, 10

*Probe v. State Teachers' Ret. Sys.*,
   780 F.2d 776 (9th Cir. 1986) ................................................................................9

*In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*,
   725 F.3d 244 (D.C. Cir. 2013) .............................................................................5

*Sheppard, Mullin, Richter & Hampton, LLP v. J-M Mfg. Co.*,
   6 Cal. 5th 59 (2018) ..........................................................................................25

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016) .............................................................................................5

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) .............................................................................................5

*Ward v. Apple Inc.*,
   2018 WL 934544 (N.D. Cal. Feb. 16, 2018) ...................................................7, 10

**STATUTES, RULES, AND REGULATIONS**

Fed. R. Civ. P. 23 ........................................................................................ *passim*

**PUBLIC REDACTED VERSION**

1

**DOCKETED CASES**

2

*FTC v. Meta Platforms*,
    No. 1:20-cv-03590-JEB (D.D.C.) .................................................................................4

3

**OTHER AUTHORITIES**

4

Economides & Lianos, *Restrictions on Privacy and Exploitation in the Digital
    Economy*, J. Competition L. & Econ. (2021) ...................................................12, 20

Economides & Lianos, *Giving Away Our Data for Free is a Market Failure*,
    ProMarket (Feb. 1, 2021) ...........................................................................11, 12

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PUBLIC REDACTED VERSION**

## INTRODUCTION

Users' attempt to prove classwide antitrust injury and damages relies on the fantasy that in a "but-for world" Meta would have made monthly payments to everyone who "maintained and used" a Facebook profile.  There is no support for this speculation in the law or the facts, and it is refuted by basic economics and common sense.  Even the named plaintiffs have testified that the foundations of this theory are false, which together with their longstanding personal connections to the lawyers bringing this case render them atypical and inadequate class representatives. Because Users cannot satisfy their burden under Rule 23, the Court should deny the motion for class certification.

Users' proposed methods for proving common antitrust injury and damages fail at every step.  Ignoring that companies have attracted audiences through free content to make money by selling advertising for hundreds of years, Users claim that in a world where Facebook had made different statements about its privacy policies and practices, competition would have forced Meta to invent an entirely new business model: paying each of its millions of users five dollars a month in perpetuity to consume content on Facebook.  No court has ever recognized the failure to pay a negative price as a viable antitrust injury.  No platform has ever operated this way, and the record shows Meta never would.  Regardless, Users and Meta agree that Meta values every user differently based on their engagement with its services.  And all agree that every user values Meta's services differently.  Those undisputed facts mean that individualized assessments are required to determine whether any particular person would be better off in Users' but-for world and the rationality of paying for their continued use.  They also mean that tens of millions of users (or more) do not provide sufficient value to warrant payment at all, and thus suffer no injury from the lack of compensation.  Users, moreover, make no attempt to account for the numerous members of the putative class who would be harmed by Facebook conditioning payment on activity, which the evidence shows destroys the authentic engagement that attracts people to platforms like Facebook in the first place.  Without any reliable evidence that Meta would pay users at all, much less each one, Users are left with *ipse dixit* that cannot survive the rigorous assessment of the evidence that this Court must conduct before certification.

**PUBLIC REDACTED VERSION**

These are only some of the defects in Users' class certification bid.  Users have also offered no means of determining whether any of the tens of thousands of alleged misrepresentations contributed to the competitive conditions they credit for Meta's success, nor any common proof of which putative class members participated in the market in which that success occurred.  Users' damages model fares no better, and relies entirely on a price set in an undefined, dissimilar market for data that Meta is not alleged to have monopolized.  And even if *someone* could represent a class pursuing the unprecedented theory that Meta must retroactively pay users to maintain accounts they long benefited from for free, that person is not among the named plaintiffs recruited by their lawyer friends.  Before being approached by her "███████████," Jennings Decl. Ex. 1, Kupcho Dep. 60:7-8, "██████████████████████," Jennings Decl. Ex. 2, Grabert Dep. 358:3-4, and ████████████, Jennings Decl. Ex. 3, Klein Dep. 306:2-3, the named plaintiffs benefitted from Meta's free service.  They used Facebook because they enjoy it, and found personalized value in it that Users never account for.  They do not use Facebook because of alleged misrepresentations they cannot name and admit they never heard or saw, that concerned practices they concede were irrelevant to their decisions to join and use Facebook.  So if the named plaintiffs now wish to use Facebook and be paid for it, despite having testified that the foundations of the class's theory are wrong and involving themselves in this litigation only to help the attorneys behind it, Rule 23 requires they do so alone.

## BACKGROUND

### I.    META ATTRACTS AND RETAINS USERS BY PROVIDING VALUABLE SERVICES

To compete against the numerous online platforms that offer the same services, Facebook provides a variety of valued features to its hundreds of millions of users.  Jennings Decl. Ex. 5, Expert Rebuttal Report of Catherine Tucker ("Tucker") 106-10.[1]  Like Snapchat and iMessage, for example, Facebook allows users to send messages, photos, and videos.  Videos of varying lengths (including short-form videos called "reels," *id.* at 107-08) can be posted and shared on Facebook, just as they can be shared on YouTube, Snapchat, and TikTok.  Facebook also offers

---

[1]    The Executive Summary of Tucker's report, which summarizes her core opinions in a few pages, is separately attached as Jennings Decl. Ex. 4.

**PUBLIC REDACTED VERSION**

Groups and Events functionality, lets users create customizable profiles, provides a newsfeed that displays posts and updates from other users, and has fundraising tools.  Klein Dep. 140:2-3, 161:4-6, 172:2-22.  Through these and other aspects of the Facebook platform, users can view content from, and share content with, friends, family, people with similar interests, public figures, and organizations.  *See, e.g.*, Kupcho Dep. 138:19-138:24.

Meta provides these services for free because its business model turns largely on selling advertising.  That requires attracting and retaining a broad user base with high quality features and content, then serving useful advertisements without disrupting the user experience.  This model is hardly new; it began with ad-supported newspapers nearly four hundred years ago and continues to be used by news services, television stations, magazines, and a variety of online platforms (*e.g.*, Snapchat, TikTok, and YouTube).  Tucker 80.  Users are attracted to a platform like Facebook by the content it provides, then choose to spend their time there because of the value they receive from that content.  *Id.*  Advertisers, in turn, pay platforms to reach users attracted by such content. *Id.* at 81.

**II.    USERS SEEK TO CERTIFY A CLASS OF FACEBOOK USERS THAT MAINTAINED AND USED A PROFILE BETWEEN DECEMBER 3, 2016 AND DECEMBER 3, 2020, WHO THEY CLAIM WERE INJURED BY NOT BEING PAID FOR USING META'S FREE SERVICES**

Users claim that Meta made misrepresentations about its "data collection, use, security, and privacy practices" that induced users to create and maintain Facebook accounts.  Mot. 1, 5-6; Jennings Decl. Ex. 6, Report of Nicholas Economides ("Economides") 10.  According to the plaintiffs, people make decisions about which online platforms to use based on representations about these practices.  Mot. 6-8, 12-13; Economides 85.  Having allegedly been deceived about Facebook's "data collection and use," users purportedly signed up for and stayed on Facebook at the expense of other platforms in a "Personal Social Network" (PSN) market, ultimately allowing Meta to acquire and maintain market power.  Mot. 1, 5, 8; Economides 85.  Users do not define this purported market in their motion, but their putative expert Nicholas Economides speculates that ███████████████████████████████████████████████████████████████████████ ███████.  Economides 22-39.  Users rely on the struggles or failures of ████████████████ ████ to substantiate the anticompetitive effect of the alleged misrepresentations.  Mot. 14-15;

**PUBLIC REDACTED VERSION**

1    Economides 99-110.

2           According to Users, Meta's success inflicted a common antitrust injury on Facebook users

3    because they were denied compensation that they would have received in a competitive "PSN"

4    market.  They claim that, in this hypothetical world, "█████████████████████████████

5    ██████████████████████████████████████████████████████████████████████████████

6    ████████████████████████████."  Economides 117; Mot. 15-16.  Faced

7    with that competition, they assert that Meta's "████████████████████████████████

8    ██████████████████████████████████████████████████████████████████████████████

9    ██████████████████████."  Economides 117; Mot. 23.  Every member of the putative class

10   would supposedly "████████████████████████████," Economides Dep. 178:9-10, and "all

11   Class members are harmed by the lack of market-wide compensation for their data," Mot. 23.

12          Users further argue that their expert has presented a reliable model for assessing the amount

13   of damages (*i.e.*, the value of the data collected and corresponding compensation) suffered by

14   Facebook users who "'maintained and used' a Facebook profile" from December 3, 2016 to

15   December 31, 2020.  Mot. 3, 24.  As they note, this class definition "differs" from that raised in

16   the complaint by restricting itself to those persons who "used" an account, though Users never

17   explain what that means in their motion.  *Compare* Mot. 3, *with* Compl. ¶ 248 (class of persons

18   "who maintained a Facebook profile at any point from 2007 up to the date of the filing of this

19   action").  Largely relying on payments made by market research programs that monitor all device

20   activity and rewards programs that require the completion of particular tasks (*e.g.*, surveys), Users

21   then conclude that Meta would have paid "████████████████████████████."  Mot. 17;

22   Economides 145-46.  They estimate total damages at ███████.  Economides 148.[2]

---

[2]     Users briefly and vaguely assert that Meta produced materials in violation of discovery
deadlines, but complain primarily of productions "before the close of fact discovery."  Mot. 4 n.1.
In any event, the data productions they appear to reference constitute approximately 1% of what
was provided by Meta, and the document productions were made *pursuant to agreements* with
Users or a privilege re-review of documents from *FTC v. Meta Platforms*, No. 1:20-cv-03590-JEB
(D.D.C.) the Court ordered on June 22, 2023, a day before the close of fact discovery.  *See* Scarlett
Decl. Exs. 2-3.

**PUBLIC REDACTED VERSION**

## LEGAL STANDARD

Rule 23 "imposes stringent requirements for certification that in practice exclude most claims." *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013). Users must prove that whether class members suffered an antitrust injury with measurable damages can be resolved "in one stroke," and that this common question predominates over any individualized inquiry into whether a user was injured. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 670 (9th Cir. 2022). Without such common evidence, the "need to present evidence that varies from member to member" to establish antitrust injury will make individual questions "more prevalent or important" than common ones. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). Users must also "establish[] that damages are capable of measurement on a classwide basis," *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013), and that the named plaintiffs "'possess the same interest and suffer the same injury' as the class members," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-49 (2011).

## ARGUMENT

Users' motion first fails because they rely on the inadmissible expert report of Nicholas Economides to prove that all Facebook users suffered an antitrust injury and damages. Mot. 15-17. For the reasons in Meta's pending *Daubert* motion, Economides' opinions on these matters are junk science. *See* Dkt. 651-4. If properly excluded, Users necessarily fail to meet the requirements of Rule 23. *See Olean*, 31 F.4th at 665 (plaintiffs bear the burden of proof at class certification); *In re Google Play Store Antitrust Litig.*, 2023 WL 5602143, at *1 (N.D. Cal. Aug. 28, 2023); *see also In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 252-53 (D.C. Cir. 2013) ("No damages model, no predominance, no class certification.").

But even if Meta's *Daubert* motion is denied, Users cannot satisfy Rule 23's commonality, predominance, typicality, and adequacy requirements. "Courts have frequently found that expert evidence, while otherwise admissible under *Daubert*, was inadequate to satisfy the prerequisites of Rule 23." *Olean*, 31 F.4th at 666 n.9. As explained in detail below, that is just the case here. *See, e.g.*, *id.* (theory of classwide impact and damages that "contained unsupported assumptions" insufficient at class certification). The recruited named plaintiffs, moreover, cannot meet Rule

**PUBLIC REDACTED VERSION**

23(a)'s typicality and adequacy requirements, given their close personal relationships with counsel and their testimony directly contradicting Users' theory of liability.

## I.   ANTITRUST INJURY CANNOT BE ESTABLISHED THROUGH CLASSWIDE PROOF

Users' speculative and unsupportable theory that Facebook users suffered a common harm when Meta failed to pay them cannot reliably prove the existence of a classwide injury.  And even setting that dispositive defect aside, questions predicate to the existence of Users' asserted injury—who would be paid even if Meta were to pay some users, whether members of the putative class would benefit or be harmed by the changes to the platform that would necessarily occur if Facebook paid for use, who (if anyone) was influenced by Meta's supposedly anticompetitive misrepresentations, and even which members of the proposed class used the aspects of Facebook alleged to compete in the "PSN" market—have no common answers, making individual suits the only way to adjudicate Users' claims.  Because "[c]lass certification is precluded where plaintiffs have not shown that the antitrust injury element can be proven for all class members with common evidence," Users' motion must be denied.  *In re Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at *15 (N.D. Cal. Mar. 29, 2022).

### A.   Individualized Issues Predominate Because Users' Classwide Injury Model Is Speculative And Contrary To The Record

Users cannot meet their burden under Rule 23 because their classwide injury theory's foundational assumption—that "[i]ncreased competition in the but-for world would have required Facebook to compensate all its users for their data," Mot. 23—proceeds from rank speculation.  This failure to offer any "realistic means of proof" regarding "*how* the pivotal evidence behind plaintiff's theory can be established" precludes certification even when, as here, the putative class claims to offer a means for assessing injury across the class.  *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 29 (1st Cir. 2008).

Facebook is an attention platform.  ███████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████████ Tucker 79. ███████████████████████████████ ████████████████████████████████████ Tucker 80.  As noted, this business model has been employed since ad-supported newspapers first began appearing hundreds of years ago

**PUBLIC REDACTED VERSION**

1   and continues to be employed by online platforms that compete with Facebook.  *See id.* at 80 &

2   n.214, 83-84.

3       If it were in fact likely that Meta would abandon this well-established approach—as is a

4   necessary first step for Users to prove common injury—there would be evidence that Meta or its

5   competitors had made such payments in the past.  There would be some evidence (*any evidence*)

6   that Users' common injury model was based on the real-world economics that govern the

7   competition Meta allegedly subverted.  But there is none.  For example, competitors like Google+

8   and Snapchat entered Users' overly narrow "PSN" market without compensating users.  Indeed,

9   no online platform bearing even a passing resemblance to Facebook has adopted the business

10  model underlying Users' theory of common injury.  Jennings Decl. Ex. 7, Economides Dep.

11  115:13-21 ("███████████████████████████████████████████████████████████████

12  ███████████████████████████████████████").  None of the firms that

13  Users identify as competing in the supposed PSN market, for example, pay or have ever paid users

14  for maintaining accounts.  Economides Dep. 84:11-16 ("███████████████████████████

15  █████████████").  In fact, Users have not identified *any* ad-supported platform that pays users

16  for consuming content.

17      Users instead rely on wildly dissimilar services, Mot. 15-16, 23, that do not constitute the

18  kind of "properly analyzed, reliable evidence" they must provide for class certification, *Ward v.*

19  *Apple Inc.*, 2018 WL 934544, at *3 (N.D. Cal. Feb. 16, 2018), *aff'd*, 784 F. App'x 539 (9th Cir.

20  2019).  These paying services ███████████████████████████.  Economides Dep.

21  160:15-161:11.  And they *must* incentivize use because—unlike, for example, Facebook,

22  Snapchat, TikTok or YouTube—they provide no value to the user.  Take Facebook Research.  ████

23  ███████████████████████████████████████████████████████████████████████████

24  ████████████████████████   Tucker 103 & n.290.  And like other market research

25  programs, it did not provide "██████████████████████."  Jennings Decl. Ex. 8, Email

26  Thread Regarding the Facebook Research App, 2019, PALM-013777098-123 at 102.  Users

27  instead received compensation ██████████████████████████████   Jennings Decl.

28  Ex.  9,  Centercode,  "████████████████████████████,"  September  1,  2017,

**PUBLIC REDACTED VERSION**

Centercode_00000851; Jennings Decl. Ex. 10, Sancho Dep. 114:19-22.  So too for Facebook Study, which "█████████████████" and "█████████████████████████████████████."  Jennings Decl. Ex. 11, Ben-Zedeff Dep. 46:2-7.  Economides agrees. Economides Dep. 162:8-11 (users received no ██████████████████████████████ ████████████████████████████████████" provided).

There are good reasons that Users' model is based on speculation rather than any real-world parallel: widespread payments would be economically infeasible, encourage adverse selection, and wrought with moral hazard, degrading the quality of any platform to offer them. Offering compensation for maintaining and using an account ████████████████████████ ████████████████████████████████████████. Tucker 90.  Similarly, ██████████████████ ████████████. *Id.*  The distorted incentives created by payments "████████████████ ███████████████████████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████████████████████ ██████" *Id.*  These concerns are well-documented, *see id.* at 91-96 (collecting academic literature), and part of the reason Meta ████████████████████████████████████████

The other paid applications identified by Users are more of the same, Tucker 104-05, or else required users to complete tasks to earn payments, Tucker 111-12.  █████████████ ███████████████████████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████████████████████ ███████       Economides   138.   ███████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████████████████████ █████████████████████████████████ *Id.* at 132-38.  At best, these supposed comparators "█████████████████████████████████████████████████████████████████████████████████████████████ ████████," rather than demonstrating that any platforms remotely analogous to Facebook paid users.  Tucker 105.  Evidence with such a tenuous connection to Facebook does not offer reliable proof that an injury caused by Meta can be assessed on a classwide basis.

████████, Jennings Decl. Ex. 12, Meta, "████████████████████████," September 15, 2020, PALM-013818575-630 at 615 ("█████████████████████████████████████ ███████████████████████").

Users respond by doubling down on their assertion that compensation in their but-for world would be uniform, Jennings Decl. Ex. 13, Economides Reply 70-71, but still concede that people who will never "████████████████████████████████████████ ████████████████." Economides Dep. 253:14-17.  Worse, the but-for world presupposes compensation only for those who "maintained and *used* a Facebook profile."  *E.g.*, Mot. 3 (emphasis added).  The motion never says what that means.  Is merely logging on enough, or do you need to interact with content, and if so, how much?  What about running the app in the background on your phone and seeing notifications but never opening them, or using your Facebook credentials to access a third-party service?  Such indeterminacy would be problematic in a class of hundreds; in a putative class of hundreds of millions it is dispositive.  *See Probe v. State Teachers' Ret. Sys.*, 780 F.2d 776, 780 (9th Cir. 1986) (class must be "sufficiently definite to conform to Rule 23").  And however vaguely defined, conditioning payment on any kind of on-platform conduct leads to the adverse consequences Tucker identified.  *See* Tucker 90-102 (describing consequences of even uniform compensation).[3]

Users' classwide injury model thus relies on an "implausible" central assumption, without which "the theory collapses."  *In re New Motor Vehicles Can. Export Anti. Litig.*, 522 F.3d at 27 (rejecting class certification when plaintiffs' "novel and complex" theory of antitrust injury lacked sufficient evidentiary support).  This "failure to provide 'properly analyzed, reliable *evidence* that a common method of proof exists to prove impact on a class-wide basis' is fatal."  *Ward*, 2018 WL 934544, at *3.

---

[3]  Despite recognizing that "a class must not be vaguely defined and must be sufficiently definite to conform to Rule 23," the Ninth Circuit has held that Rule 23 imposes no separate ascertainability requirement.  *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1125 & n.4 (9th Cir. 2017).  Though this Court is bound by that incorrect approach, Meta maintains and preserves for appeal the argument that Users' failure to provide an objective means of currently and readily ascertaining the class contravenes Rule 23.  *See In re Nexium Antitrust Litig.*, 777 F.3d 9, 19 (1st Cir. 2015); *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014); *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013).

**PUBLIC REDACTED VERSION**

**B. Even If Meta Would Have Paid Some Facebook Users Absent The Allegedly Anticompetitive Conduct, Whether Any Particular User Would Have Been Injured Through Lack Of Compensation Requires An Individualized Inquiry**

Users' classwide injury model also fails to comply with Rule 23 because it proceeds from the economically irrational premise that *all* Facebook users who maintained and used a Facebook profile would receive compensation (and equal compensation at that) in a but-for world in which Meta paid users. Mot. 15-16. Even if *some* putative class members were harmed through lack of compensation under Users' theory, numerous users would have never received payment or would be worse off in the but-for world, meaning that whether any particular user would suffer an antitrust (or even an Article III) injury is an individualized question. Because Users thus "rely on an unsound methodology, which cannot reliably demonstrate which members, and how many, were injured, as common proof of class wide impact" they "cannot meet their predominance burden." *In re Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at *16; *see also Olean*, 31 F.4th at 669 n.14 ("When 'a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification.'" (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824 (7th Cir. 2012))); *Olean*, 31 F. 4th at 682 & n.32 (not reaching whether "the possible presence of a large number of uninjured class members raises an Article III issue").

**1. Who, if anyone, is paid in the but-for world is individualized**

Users' model presumes that Facebook would have been willing to pay for users for maintaining and using a Facebook profile because of "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.'' Economides 124; *see also id.* at 19; Mot. 1 ████████████████████████████████████████████████████████████ As such, the value of any individual user's Facebook account turns on ████████████████████████████████████████████████████████████████████████████████ Economides 74. That means ████████████████████████████████████████ *Id.* at 142; Mot. 15-16.

**PUBLIC REDACTED VERSION**

Who would be compensated in Users' but-for world is necessarily individualized because not all members of the putative class provide Meta with the same value, or even any value at all. Tucker 118-31.  As Economides put it, "█████████████████████████████."  Economides Dep. 56:20-21.  ██████████████████████████████████████████████████████ ████████████████████████████████  Tucker 118.  ████████████████████████ █████████████████████████  *Id.*  ███████████████████████████████████ █████████████████████████  *Id.*  █████████████████████ ███████████████████████████  *Id.*  █████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████  *See id.* at 119, 123 (discussing analysis of sampled users); *see also id.* at 126 (noting that "████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████").  All of these factors affect the value of a given Facebook account to Meta, and make it impossible to determine through common proof whether it would be economically rational to compensate any individual user (and thus whether that person would be harmed by the lack thereof) even in Users' but-for world.

Users' own expert confirms that not everyone would be compensated even in the but-for world.  As an initial matter, the "yardsticks" Economides relies on did not involve anything like the widespread, uniform compensation proposed here; they were largely available to users by invitation only, and sought select, limited, and representative panels of participants.  *See supra*, at 7-8; Jennings Decl. Ex. 14, Ben-Zedeff, Introducing Study From Facebook, Meta (June 11, 2019); Jennings Decl. Ex. 15, Naveh, Introducing Facebook Viewpoints (Nov. 25, 2019); Economides 129-40.  These narrow programs provide no support for a but-for world with payments to hundreds of millions of users.  *See* Tucker 131-34.  Economides has further argued that in a more competitive market for data, "[c]ompensation would depend on the value of the information of a particular user to the platform," which "var[ies] widely."  Jennings Decl. Ex. 16, Economides & Lianos, *Giving Away Our Data for Free is a Market Failure*, ProMarket (Feb. 1, 2021) (hereinafter, "*Giving*

*Away*"); *see also* Economides Dep. 257:24-258:1 (when users "█████████████████████

███████████████████████████"), 270:6-7 (comparing users who "████████████████

███████" with others "████████████████"). As a result, "[t]ransaction prices for the sale

of personal information would also vary and likely be individually negotiated between the platform

and the user," *Giving Away*, and "the allocation of the benefits between the advertisers, the

intermediary and consumers vary and require a case-by-case assessment," Jennings Decl. Ex. 17,

Economides & Lianos, *Restrictions on Privacy and Exploitation in the Digital Economy*, Journal

of Competition Law and Economics (2021) at 46 (hereinafter, "*Restrictions*"). The average ad

revenue Meta earned on the named plaintiffs' accounts during the weeks Tucker sampled bears

out the individualized nature of this inquiry, ███████████████████████████.

Tucker 123.[4]

### 2. Whether users would be better off or harmed in the but-for world is individualized

Because reinventing Facebook as a pay-for-use platform would necessarily change its

functionality, *supra* at 8-9, the benefit of the but-for world (regardless of compensation) further

depends on the value users personally assign to the services received from Facebook. That

determination is highly individualized.

Begin with the numerous benefits users currently receive from Facebook. Users find value

in consuming content on Facebook; watching and sharing videos or photos; advertising or finding

local businesses; and being introduced to new content or groups aligned with their interests, to

name just a few. Tucker 59, 80, 105; Economides Dep. 71:9-12 ("████████████████████

█████████████"). Studies demonstrate that the monetary value users assign to these

benefits vary wildly. *See* Tucker 105-06 (collecting studies showing ████████████████

██████████████████████████████████████). The named plaintiffs

---

[4]      Economides did not dispute the conclusions of his earlier scholarship at his deposition, nor
offer any meaningful reason to ignore them. Dep. 243:2-247:2. And although he questioned the
administrability of the non-uniform payments that he had previously said would occur in a
competitive market, his new proposal raises its own such concerns. *See, e.g., id.* 179:8-16 (████

█████████████████████████████████████████████████).

**PUBLIC REDACTED VERSION**

are no different, and value different benefits from Facebook in different ways.  *See, e.g.*, Klein Dep. 136:17-23, 161:4-6, 140:2-3, 219:1-4 (█████████████████████████████ ██████ ); Grabert Dep. 324:13-326:10, 326:11-327:7 (███████████████████████ █████████████████████████████████████████████████████ ████████████████ ).  But Users never address these benefits, how they could change in the but-for world, or dispute that determining the value of Facebook to any particular user is an individualized question.

    Individualizing the question of injury even more, a significant portion of users would be *harmed* in Users' but-for world because they value aspects of the Facebook experience that would likely be lost in a world with widespread compensation for use.  As noted, no platform has ever adopted such a business model because of the potential negative effects on user engagement and experience.  To obviate those problems, "████████████████████████████████ ███████████████████████████████," such as "████████████ ████████████████████████████████████████████████████." Tucker 137.  █████████████████████████ *Id.*  If Meta, for example, "████████████ ████████████████████████████████████," it "████████████████████████████████████████████ █████████████████████████████████." *Id.* at 137-38.  ████████████ █████████████████████████████ *Compare* Economides Dep. 179:8-16 (█████████████ ████████████████████████████████), *with* Jennings Decl. Ex. 18, Lamdan Dep. 93:3-7 ("████████████████████████████████████████████████████ ██████").  Users do not even acknowledge the potential harms to users, much less suggest a way to account for them on a classwide basis.  Together with the failure to consider the value to users of Facebook's current services, that means Users' injury model cannot determine whether putative class members "stand[] to gain from the alleged unlawful conduct" because they would value Facebook's services less in the but-for world. *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190

F.3d 1051, 1056 (9th Cir. 1999).  And in such circumstances, "[t]here can be no antitrust injury." *Id.*

Having failed to account for these individualized inquiries in their injury model, Users resort to tautologies.  They claim that because compensation will be paid to everyone in the but-for world, all putative class members "have been harmed by Facebook's anticompetitive conduct." Mot. 16.  But that a broken damages model (*infra*, at 18-20) necessarily results in payment says nothing about whether the net gain to any individual user in the but-for world is positive.  And for putative class members that would suffer from the changes in Facebook's services occasioned by a pay-for-use model, it is not.  *Kottaras v. Whole Foods Market, Inc.*, 281 F.R.D. 16, 25 (D.D.C. 2012) (declining to certify class when some members benefited from allegedly anticompetitive behavior because calculating "net harm" required individualized inquiry); *id.* ("Since benefits must be offset against losses, it is clear that widespread injury to the class simply cannot be proven through common evidence.").

### C.  Users Offer No Common Proof That Meta's Actions Were Actionably Anticompetitive

#### 1.  Users provide no common means to determine whether putative class members were influenced by the alleged misrepresentations

As Users acknowledge, Meta's conduct could only have caused an antitrust injury if they can demonstrate "clearly false" representations that "were clearly material" and "clearly likely to induce reasonable reliance." Mot. 5.  But after three years of litigation, they do not offer any common method for identifying which users heard or read any of tens of thousands of statements, assessing the meaning of those statements to users, showing that the statements were false, or determining whether users could have reasonably relied on those statements.  Mot. 6-13; *see also* Mot. 8 (refusing to identify particular alleged misrepresentations beyond "illustrative examples"). To the contrary—the expert they rely on for "her opinions that online privacy and control over data are material to consumers" and likely to induce reliance, Mot. 8, 12, ███████████████ ██████████████████████, Lamdan Dep. 98:16-99:2 ("██████████████████ ████████████████████████████████████████████████████████ █████████     █████████     ████████████████████████████

**PUBLIC REDACTED VERSION**

1 ██████████████████████████████████████████████████

2 ████████████████████████████ ").   Their survey expert also did not assess the

3 importance of the alleged misrepresentations.   Jennings Decl. Ex. 19, R. Klein Dep. 17:4-10 ("█

4 ██████████████████████████████████████████████████

5 ████████████████████████████████████████████ ").   For

6 the  general  privacy  practices  he  did  ask  about,  he  admitted  ██████████████████

7 ███████████ .   *See, e.g.*, *id.* 148:5-15 ("████████████████████████

8 ██████████████████████████████████████████████████

9 ██████████████████████████████████████████████████

10 ██████████████████████████████████████████████████

11 ██████████████████████████████████████████████████

12 ██████████████████ .").

13      Much of the evidence they have presented thus far, in contrast, shows that these statements

14 had nothing to do with Meta's success or users' decisions whether to join and stay on Facebook.

15 The named plaintiffs have never heard, much less relied on, the purported misrepresentations.   *See*

16 *infra*, at 21-23.   Economides ████████████████████████ .   Economides Dep.

17 45:25-46:4   ("████████████████████████████████████████

18 ██████████████████████████████████████████████████

19 ██████████████████████ ").   And Users' own survey expert, retained to show that privacy

20 statements affect users' decisionmaking when signing up for services, testified that ████████

21 ██████████████████████████████████████████████████

22 ██████████████████████████████████████████████████

23 ██████████████████████████████████ .   *See*  R.  Klein

24 Dep. 209:2-8, 294:7-300:6, 299:16-21 (████████████████████████

25 ██████████████████████████████ ).

26      The  only  "evidence"  on  materiality  and  reliance  that  Users  provide  is  generalized

27 statements about valuing privacy untethered from both the alleged deceptions and the competitive

28 mechanisms necessary to their theory of liability.   Mot. 6-8, 12-13.   Whether Meta is "in a good

**PUBLIC REDACTED VERSION**

spot when it comes to trust," Mot. 12, and users profess to "care deeply about their data," Mot. 6, is not the relevant question.  Ultimately, Users speak only "in general and broad terms, without providing a sufficiently detailed explanation as to how [they] actually propose[] to apply any particular methodology to specific facts or data in this case."  *California v. Infineon Techs. AG*, 2008 WL 4155665, at *9 (N.D. Cal. Sept. 5, 2008).  A valid model, in contrast, has to account for what users and Meta actually did, not just what they said they desired.  Without one, individualized questions regarding whether users "considered Facebook's representations about its data privacy practices important *in determining whether to use* Facebook," and whether those statements were clearly likely to induce users' reasonable reliance, necessarily predominate.  *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 801 (N.D. Cal. 2022) (emphasis added).

> **2.  Users offer no common proof of who uses the functions of Facebook that compete in their "PSN" market, nor a reliable means for defining that market**

The tenuous connection between Users' injuries and Meta's conduct is compounded by the lack of any common proof of whether members of the putative class use the aspects of Meta's services that compete in the supposedly monopolized market.  As Economides acknowledged, ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████." Economides 68.  Indeed, he opined that ███████████████████████████████ ████████████████████████████████████████████████████████████████████ *Id.* Economides then ████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████.  *See, e.g.*, Economides Dep. 231:19-233:13 (he ██████████████████ ████████████████████████████████████████████████████████████████████████ ███████).  That matters, because without that analytical step, it is impossible to know which users have actually been affected by conduct in the market Meta allegedly monopolized.  *Garnica v. HomeTeam Pest Def.*, Inc., 230 F. Supp. 3d 1155, 1157 (N.D. Cal. 2017) (rejecting certification when plaintiffs "have not met their burden to show that key questions about monopoly power in the [relevant] markets ... are subject to 'common answers'").  Consider a user that logs on to

**PUBLIC REDACTED VERSION**

1   Facebook to send messages, shop on marketplace, or view videos— ██████████████

2   ████████████████ . Under his theory, none of those individuals are affected by Facebook's

3   purported monopoly.

4          This inability to offer common evidence of participation in the "PSN" market stems from

5   defects in the means Users propose to define that market.[5] Users' putative market definition expert

6   (Joseph Farrell) candidly admitted that ██████████████████████████████

7   ████████████████████████████████████████████████████ .

8   Jennings Decl. Ex. 20, Farrell Dep. 94:19-21; *id.* 27:16-24, 303:8-10 (explaining that ██████

9   ████████████████████████████████████████████████████████

10   ███████████████ ). Instead, he opines only that ████████████████████

11   ████████████████ . *Id.* 14:22. But even then, he admitted ████████████

12   ████████████████████████████ , *id.* 208:11-14 (████████████████████

13   ████████████████████████████████ ). No TikTok. *Id.* 200:6-9 ("█

14   ████████████████████████████████████████████████████████

15   ████████████████ ). No Snapchat. *Id.* 204:4-6 ("████████████████

16   ████████████████████████████████████████████████ "). He has

17   not even attempted to translate the stale information he *did* use into a meaningful analysis of the

18   class period. *Id.* 201:5-6 ████████████████████████████████

19   ██ , 204:20-205:3 ████████████████████████████

20   ████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████

22   ████████████████ ). So by his own admission, Farrell's preliminary assessment addresses

23   only the plausibility of a market years before the class period and fails to consider the effect of any

24   subsequent events.

25          Economides also offers an opinion on market definition, but also relies on conduct outside

26   the class period, conducting his "small but significant and non-transitory increase in price"

27

28   [5]    Users bizarrely assert that Facebook "concedes" market definition can be proven through common evidence. *See, e.g.*, Mot. 20. That is obviously not true. *See* Section I.C.2.

**PUBLIC REDACTED VERSION**

1  (SSNIP) test "████████████████████████████████████████

2  ███████"  Economides 18.  The only means Users have offered for defining the market that

3  relies on evidence from the class period is a supposed "small but significant non-transitory

4  decrease in quality" (SSNDQ) qualitative method that neither of Users' experts ███████████

5  █████████████  (Farrell Dep. 112:24-113:10; Economides Dep. 212:19-21), ███████████

6  ████████████████  (Economides Dep. 212:24), and consists entirely of Economides divining

7  "███████████████████████."  Economides 16.  His process: "████████████████

8  ████████████████████████████████"  Economides Dep. 201:18-19.  As

9  noted, that "robust" methodology did not even involve examining how people spend time on

10  Facebook.  Economides Dep. 231:19-233:13 (████████████████).  Users have thus not

11  offered common proof of how Meta's conduct would have affected competition or users within

12  the "PSN" market, much less a reliable method of defining that market.

## II.   USERS HAVE NOT PRESENTED A VALID DAMAGES MODEL

14        Defects in Users' damages model preclude class certification for two reasons.

15        *First*, even if Economides' opinions on damages are admissible, *see supra*, at 5*,* they are

16  premised on widespread, uniform payments calculated by reference to amounts paid by market

17  research programs entirely unlike Facebook, with no attempt to account for the differences or

18  support the comparison.  Mot. 16-17.  So, for the same reasons Users' have failed to meet the

19  requirements of Rule 23 with respect to their injury model, their "[f]ailure to identify a feasible

20  method for calculating class damages is fatal to class certification."  *Mueller v. Puritan's Pride,*

21  *Inc.*, 2021 WL 5494254, at *6 (N.D. Cal. Nov. 23, 2021) (Donato, J.); *see also Comcast*, 569 U.S.

22  at 35-36 (whether a damages methodology is "a just and reasonable inference or speculative" must

23  be considered to avoid "arbitrary" models that "would reduce Rule 23(b)(3)'s predominance

24  requirement to a nullity"); *Milan v. Clif Bar & Co.*, 340 F.R.D. 591, 600 (N.D. Cal. 2021) (Donato,

25  J.) ("[T]he damages model must reasonably reflect the ... evidence in the case.").

26        *Second*, Users do not even attempt to model damages in the market where Meta's allegedly

27  anticompetitive conduct and the resulting antitrust injury purportedly occurred.  Because Users'

28  model therefore "fail[s] to measure damages resulting from the particular antitrust injury on which

**PUBLIC REDACTED VERSION**

1  [Meta's] liability in this action is premised," "[q]uestions of individual damage calculations will

2  inevitably overwhelm questions common to the class," and certification must be denied.  *Comcast*,

3  569 U.S. at 34, 36.

4       Start with Users' theory of liability.  They say Meta achieved and maintained monopoly

5  power in the purported PSN market by misrepresenting "its data collection and use practices,"

6  which led people to use Facebook rather than other apps.  Mot. 1; Economides 6-7.  The resulting

7  reduction in competition in Users' asserted PSN market is what allegedly injured members of the

8  putative class, because ████████████████████████████████████████████

9  █████████████████████████████  Economides 117.  Given that the allegedly anticompetitive

10  behavior and its consequences occurred in the purported PSN market, "[i]f [Users] prevail on their

11  claims, they would be entitled only to damages resulting from reduced [PSN] competition, since

12  that is the only theory of antitrust impact" they have advanced.  *Comcast*, 569 U.S. at 35.  "It

13  follows that a model purporting to serve as evidence of damages in this class action must measure

14  only those damages attributable to that theory," and "[i]f the model does not even attempt to do

15  that, it cannot possibly establish that damages are susceptible of measurement across the entire

16  class." *Id.*

17       Users, however, offer no model for assessing damages attributable to conduct or harm in

18  their proffered PSN market.  Economides instead opines ████████████████████████

19  ████████████████████████████████████████████████████████████████

20  ████████████████████████████  Economides 126, 128; Mot. 17.  But Meta is not

21  alleged to have committed anticompetitive acts in a market for ████████████████████

22  ████████████████  much less monopolized it.  And while Users never bother to delineate that

23  amorphous market, the few examples that they give of transactions within it ████████████

24  ████████████████████████████████████████████████████████████████

25  ████████████████  Economides 129-41.  By Economides' own definition, these programs do not

26  participate in (nor resemble participants in) their PSN market.  *Supra*, at 7-8, 11-12; Dkt. 651-4 at

27  9-13; Tucker 150-51.  ████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████████

**PUBLIC REDACTED VERSION**

1   Economides 8.  Economides never addresses ███████████████████████████

2   ████████████████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████████████████

4   ████████████████████████   Tucker 152-53.  Without such an effort, his opinions do not even

5   attempt to "measure only those damages attributable to" the alleged anticompetitive conduct and

6   injury.  *Comcast*, 569 U.S. at 35.

7           Economides recognized these fatal deficiencies before joining this case.  As he explained,

8   "[i]n a competitive world, the authors would expect to see the existence of *two different markets*....

9   One for Facebook's social network service, and one for the acquisition of personal data by

10  Facebook."  *Restrictions* at 10 (emphasis added); *accord id.* ("[F]or Facebook, there would be two

11  separate markets.").    These markets—again, according to Economides—*both* need to be

12  considered to model the degree of harm to Facebook users, because "the total charges in the two

13  markets" must be "combin[ed]" to determine whether a user "would end up paying a positive

14  price," "be paid a positive price," or "break even" for using Facebook.  *Id.*  Yet in this case,

15  Economides' calculations ignore the market "for Facebook's social network service" entirely.

16          Users resort to this sleight of hand because a damages model based on the "PSN" market

17  cannot be constructed.  Economides does not (and cannot) contend that any participants in the

18  alleged PSN market paid users for maintaining accounts.  *See* Economides 128; *supra*, at 6-7.  So,

19  if he had sought to present a model reliably "measur[ing] only those damages attributable to that

20  theory" of liability, the result would have been zero damages.  *Comcast*, 569 U.S. at 35.  This

21  disconnect between Users' model for damages in the market for "███████████████████████

22  ████████████" and the claim that Meta acted anticompetitively in the supposed PSN market

23  cannot be bridged; "[t]he first step in a damages study is the translation of the *legal theory of the*

24  *harmful event* into an analysis of the economic impact of that event," *Comcast*, 569 U.S. at 38

25  (internal quotation marks omitted and emphasis original).  But Users "ignored that first step

26  entirely." *Id.*

27  **III.    THE NAMED PLAINTIFFS ARE NOT TYPICAL AND ADEQUATE REPRESENTATIVES OF THE PUTATIVE CLASS**

28          Each of the named plaintiffs testified that the factual foundations of their theory of antitrust

**PUBLIC REDACTED VERSION**

liability are false. That discrepancy might be surprising if this case were premised on real grievances with Meta. But because the named plaintiffs are (by their own admission) atypical of the Facebook users allegedly harmed by Meta's conduct and became involved in this litigation only through their close personal relationships with counsel, they lack the "same or similar injury" as other members of the putative class and cannot "fairly and adequately protect the[ir] interests." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984-85 (9th Cir. 2011).

### A. The Named Plaintiffs Cannot Serve As Class Representatives Because They Testified That Their Theory Of Liability Is Wrong

If named as representatives of the putative class, the plaintiffs must prove that (1) in a world without Meta's allegedly anticompetitive conduct, competitors that differentiated their "data privacy practices" would have attracted away so many members of the putative class that Meta would have been forced to pay people to stay; and (2) Meta's alleged misrepresentations about its privacy practices were both "clearly material" and "clearly likely to induce reasonable reliance" among putative class members. Mot. 5, 21; Economides 85-87.[6] The named plaintiffs, however, have already testified that privacy practices did not cause them to join or use apps like Facebook, and that they were not aware of—much less relied on—the supposed misrepresentations at the center of their case. Because the plaintiffs' "testimony about [these] issues[s] conflicts with" what they assert the putative class will show at trial, they are not typical or adequate representatives. *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 359 (N.D. Cal. 2018) (finding plaintiff atypical and inadequate when testimony conflicted with one of two theories of liability); *cf. Major v. Ocean Spray Cranberries, Inc.*, 2013 WL 2558125, at *3 (N.D. Cal. June 10, 2013) ("The typicality requirement has been found to not be satisfied where the evidence needed to prove at least one of the named plaintiff's claims is not probative of the other class members' claims").

Consider first that the named plaintiffs testified that representations about privacy did not affect which online platforms they used, the exact opposite of how Users' theory of liability

---

[6]     Economides purports to dispute that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Economides Reply 24, but repeatedly asserts that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *id.* at 41; *see also, e.g.*, *id.* at 56 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); *id.* at 64 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). So his semantic distinction is irrelevant.

**PUBLIC REDACTED VERSION**

requires a typical Facebook user to behave.  Grabert said that she ███████████████████

███████████████████████████████████████████████

█████████████  Grabert Dep. 204:14-205:13.  Nor did she ████████████████████

██████████████████████████████████████████████ *Id.*  Since

joining Facebook—█████████████████—Grabert has never ████████████████

██████████████████████████████████████████████████

█████████████████████████████████████ *Id.*  And with respect to TikTok

and Snapchat, she stated that her ███████████████████████████

*Id.* 208:14-20, 210:16-211:7.  Klein signed up for Facebook despite ████████  ████████

██████████████████████████████████████████████

████████████████████████████████████ Klein Dep. 60:25-61:3; *see also,*

*e.g.*, *id.* 201:1-14 (███████████████████████████████████████████),

210:2-211:17 (███████████████).  So too for Kupcho, who could not ███████

██████████████████████████████████████████████

█████████████████  Kupcho Dep. 37:2-16.  █████████████████████

██████████████████████████████████████████████

*Id.* 93:21-24 (███████████████████████████████████████████

████████████████████); *id.* 155:6-21 (testifying to ████████████

█████████████████).  Such testimony stands in stark contrast to how Users define

typical Facebook users, who they claim were deceived into joining or remaining on Facebook

because of representations about privacy.  Mot. 21; Economides 110-11.

Any class certified here would also have to prove that Meta's alleged misrepresentations

were "clearly material" and "clearly likely to induce reasonable reliance," but the named plaintiffs

testified the alleged misstatements were nothing of the sort.  Klein said that he ████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

**PUBLIC REDACTED VERSION**

1    ██████████████████████████████████████    Klein Dep. 277:6-13, 280:3-281:1, 283:6-

2    12.  The only alleged misrepresentation Grabert ████████████████████████████████

3    ██████████████████████████████████████████████████████████

4    ████████████████████████    Grabert Dep. 378:19-379:5, 383:14-20.  As to everything else

5    the putative class claims it can show, she ████████████████████████████████████

6    ██████████████████████████    *Id.* 383:21-384:4.  Kupcho did not ████████████

7    ██████████████████████████████████████████████████████████

8    ██████████████████████████████████████    Kupcho

9    Dep. 77:8-10, 243:21-244:7. ████████████████████████████████████

10   ████████████████████    *Id.* 243:21-244:7.  Each of the named plaintiffs further agreed that

11   they could not "████████████████████████████████" underlying their theory

12   of liability "████████████████████████████████████████"

13   with Meta's purported competitors.  Jennings Decl. Ex. 21, Consumer Plaintiffs' Supplemental

14   Responses and Objections to Interrogatory Nos. 15 and 16 at 6; Klein Dep. 282:12-283:23.

15        All of this testimony conflicts with the claims being advanced by plaintiffs' counsel, and

16   evinces the kind of "interests antagonistic to the remainder of the class" that preclude being a class

17   representative.  *In re Facebook, Inc., PPC Advert. Litig.*, 282 F.R.D. 446, 454 (N.D. Cal. 2012);

18   *accord Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978).  According to

19   Users' theory of liability, platforms compete through representations about privacy because users

20   find such statements clearly material and respond to them when making choices about which

21   online services to join or use.  Klein, Grabert, and Kupcho do not, and have not.  With respect to

22   the misstatements alleged in this case, moreover, the named plaintiffs had never seen or heard

23   them.  And for those claimed misstatements that Klein, Grabert, and Kupcho were even vaguely

24   familiar with, they could not say whether the statements were wrong, and (regardless) never relied

25   on them.  The named plaintiffs are thus not typical of putative class members according to

26   plaintiffs' theory of liability, and cannot adequately represent the putative class in proving a theory

27   their testimony contradicts.

28

**PUBLIC REDACTED VERSION**

### B. The Named Plaintiffs' Relationships With The Counsel That Brought This Case Further Undermine Their Adequacy As Class Representatives

That the named plaintiffs know little about this case and testified their theory of liability is wrong follows from the origins of this litigation.  The named plaintiffs are before the court only because they were recruited by their close friends, who are lawyers at the firms that brought this case.  This "relationship between counsel and the representative plaintiff is a factor for consideration by the district court" in determining whether a named plaintiff will provide adequate representation, *May v. Gladstone*, 562 F. Supp. 3d 709, 714 (C.D. Cal. 2021), because of the risk that the named plaintiffs will prosecute the case so as to benefit their lawyers, rather than the absent class members they represent.  "A close relationship between the named plaintiff and his counsel can create a conflict but it does not have to," and "[t]he question is one of degree." *McArdle v. AT&T Mobility LLC*, 2018 WL 6803743, at *8 (N.D. Cal. Aug. 13, 2018).  Here, the relationships are both intensely personal and "highlight[] [the] other, more serious weaknesses in the plaintiffs' cases" discussed above, further supporting that Klein, Kupcho, and Grabert are inadequate representatives. *Id.*

The testimony of the named plaintiffs demonstrates the risk they would litigate in their counsels' interest rather than that of the class.  Kupcho "████████████████████████" by a ███████████████████████████████████████████████████████████████.  Kupcho Dep. 59:17, 60:7-8. ████████████████████████████

████████████████████████████████████████████████

████████████████████████████ *Id.* 61:18-21, 62:20-21.  Grabert signed onto this suit because ███████████████████████ Grabert Dep. 357:4, even though she had ████████████ █████████████████, *id.* 362:24. ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ *Id.* 358:3-4, 360:17-18. He had also previously ███████████████████████████████████████████████

████████████████████ *Id.* 357:2-3.  Klein ████████████████████

████████████████████████████████████████████████████████

1

2 Klein Dep. 305:3-4, 306:1-3, 308:8; *id.* 43:7-11

3

4

5       These kinds of "close relationship[s] create[] the possibility that the class representative

6 may ... become more concerned with maximizing the return to his counsel." *Mowry v. JP Morgan*

7 *Chase Bank, N.A.*, 2007 WL 1772142, at *3 (N.D. Ill. June 19, 2007) (internal quotation marks

8 omitted). Considered together with the named plaintiffs' testimony contradicting Users' theory of

9 liability, they "suggest that Plaintiff[s] may have, at best, unduly relied on [their] close friend[s],

10 or, at worst, have no real interest in prosecuting this action other than to assist [their] close friend[s]

11 in recovering a sizeable fee award." *Bohn v. Pharmavite*, LLC, 2013 WL 4517895, at *3 (C.D.

12 Cal. Aug. 7, 2013). That precludes appointing the named plaintiffs as class representatives. *See*

13 *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1255 (11th Cir. 2003) (reversing grant of class

14 certification because "the long-standing personal friendship of [the named plaintiff] and [his

15 counsel] casts doubt on [the named plaintiff's] ability to place the interests of the class above that

16 of class counsel" and "creates a present conflict of interest").[7]

17                              **CONCLUSION**

18       The Court should deny Users' motion for class certification with prejudice.

19

20

21

22

23

24

---

25 [7]     Although Grabert and Klein are close friends with lawyers at since-disqualified Keller Lenkner,

26                                      Jennings Decl. Ex. 22, Grabert Engagement Letter, CONSUMER-FB-0000002313; Jennings Decl. Ex. 23, Klein Engagement

27 Letter, CONSUMER-FB-0000002332. Moreover, the governing California law does not preclude recovery of fees by disqualified firms. *See Sheppard, Mullin, Richter & Hampton, LLP v. J-M*

28 *Mfg. Co.*, 6 Cal. 5th 59, 89 (2018). And in any event, Kupcho's relationship is with a lawyer who continues to be actively involved in this matter.

**PUBLIC REDACTED VERSION**

1  Dated: October 13, 2023                    Respectfully submitted,

2                                             By: */s/ Sonal N. Mehta*

3                                             SONAL N. MEHTA (SBN 222086)
4                                              Sonal.Mehta@wilmerhale.com
                                              WILMER CUTLER PICKERING HALE AND
5                                             DORR LLP
                                              2600 El Camino Real, Suite 400
6                                             Palo Alto, California 94306
                                              Telephone: (650) 858-6000
7

8                                             DAVID Z. GRINGER (*pro hac vice*)
                                               David.Gringer@wilmerhale.com
9                                             ROSS E. FIRSENBAUM (*pro hac vice*)
                                               Ross.Firsenbaum@wilmerhale.com
10                                            RYAN CHABOT (*pro hac vice*)
                                               Ryan.Chabot@wilmerhale.com
11                                            PAUL VANDERSLICE
                                               Paul.Vanderslice@wilmerhale.com (*pro hac vice*)
12                                            WILMER CUTLER PICKERING HALE AND
                                              DORR LLP
13                                            7 World Trade Center
14                                            250 Greenwich Street
                                              New York, New York 10007
15                                            Telephone: (212) 230-8800

16
                                              ARI HOLTZBLATT (*pro hac vice*)
17                                             Ari.Holtzblatt@wilmerhale.com
                                              MOLLY M. JENNINGS (*pro hac vice*)
18                                             Molly.Jennings@wilmerhale.com
                                              WILMER CUTLER PICKERING HALE AND
19                                            DORR LLP
                                              2100 Pennsylvania Ave NW
20                                            Washington, DC 20037
                                              Telephone: (202) 663-6000
21

22                                            MICHAELA P. SEWALL (*pro hac vice*)
                                               Michaela.Sewall@wilmerhale.com
23                                            60 State Street
24                                            Boston, Massachusetts 02109
                                              Telephone: (617) 526-6000
25
                                              *Attorneys for Defendant Meta Platforms, Inc.*
26

27

28

**PUBLIC REDACTED VERSION**

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on this 13th day of October, 2023, I electronically transmitted the

3   public redacted version of the foregoing document to the Clerk's Office using the CM/ECF System

4   and caused the version of the foregoing document filed under seal to be transmitted to counsel of

5   record by email.

6

7                          By:    */s/ Sonal N. Mehta*
                                   SONAL N. MEHTA
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

META'S OPPOSITION TO USERS' MOTION FOR
                                                              CLASS CERTIFICATION