**PUBLIC REDACTED VERSION**

WILMER CUTLER PICKERING
 HALE AND DORR LLP
SONAL N. MEHTA (SBN 222086)
 Sonal.Mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
 David.Gringer@wilmerhale.com
ROSS E. FIRSENBAUM (*pro hac vice*)
 Ross.Firsenbaum@wilmerhale.com
RYAN CHABOT (*pro hac vice*)
 Ryan.Chabot@wilmerhale.com
PAUL VANDERSLICE (*pro hac vice*)
 Paul.Vanderslice@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800

ARI HOLTZBLATT (*pro hac vice*)
 Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
 Molly.Jennings@wilmerhale.com
2100 Pennsylvania Ave NW
Washington, DC 20037
Telephone: (202) 663-6000

MICHAELA P. SEWALL (*pro hac vice*)
 Michaela.Sewall@wilmerhale.com
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

*Attorneys for Defendant Meta Platforms, Inc.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated,<br><br>                                    Plaintiffs,<br><br>        v.<br><br>META PLATFORMS, INC., a Delaware Corporation,<br><br>                                    Defendant. | Case No. 3:20-cv-08570-JD<br><br>**DEFENDANT META PLATFORMS, INC.'S OPPOSITION TO ADVERTISER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date: December 14, 2023<br>Time: 10:00 a.m.<br>Judge: Hon. James Donato |

**PUBLIC REDACTED VERSION**

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

BACKGROUND .................................................................................................................2

LEGAL STANDARD..........................................................................................................4

ARGUMENT ......................................................................................................................4

I.      Individualized Issues Of Antitrust Injury Predominate Over Common Ones ....................4

        A.      Impact Through Ad "Overpayment" Is Individualized ..........................................5

              1.      Advertisers Offer No Common Way To Prove Class-Wide Overcharge ..............................................................................................5

              2.      Advertisers Cannot Account For Offsetting Benefits With Common Proof..................................................................................................9

        B.      Whether Class Members Participated In The Purported Market For "Social Advertising" Is An Individualized Question..........................................................13

        C.      Whether Class Members Are Barred From Recovery As Indirect Purchasers Is An Individualized Issue ...................................................................16

II.     Plaintiffs' Damages Model Fails *Comcast* ......................................................................17

        A.      Advertisers Lack A Damages Model Entirely Because Critical Portions Of Their Experts' Reports Are Inadmissible Under *Daubert* .....................................17

        B.      Advertisers' Damages Model Fails To Identify Damages Traceable To Meta's Alleged Anticompetitive Conduct ..............................................................17

        C.      Advertisers Improperly Tie Damages To Monopoly Maintenance Instead Of The Challenged Acts...................................................................................19

III.    The Named Plaintiffs Are Atypical And Inadequate Class Representatives....................22

CONCLUSION..................................................................................................................25

**PUBLIC REDACTED VERSION**

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Allegheny Pepsi-Cola Bottling Co. v. Mid-Atlantic Coca-Cola Bottling Co.*,
690 F.2d 411 (4th Cir. 1982) ........................................................................................... 21

*American Ad Management, Inc. v. General Telephone Co.*,
190 F.3d 1051 (9th Cir. 1999) ........................................................................................... 9

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979).................................................................................... 20, 21

*Blue Cross Blue Shield United of Wisconsin v. Marshfield Clinic*,
152 F.3d. 588 (7th Cir. 1995) ......................................................................................... 19

*Bowerman v. Field Asset Services*,
60 F.4th 459 (9th Cir. 2023) ............................................................................................. 5

*Brazil v. Dole Packaged Foods, LLC*,
2014 WL 2466559 (N.D. Cal. May 30, 2014) ................................................................. 18

*Burkhalter Travel Agency v. MacFarms International, Inc.*,
141 F.R.D. 144 (N.D. Cal. 1991)..................................................................................... 25

*Cabrera v. Google LLC*,
2023 WL 5279463 (N.D. Cal. Aug. 15, 2023) .................................................................. 9

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)............................................................................... 1, 2, 4, 17, 20, 21

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)......................................................................................................... 17

*Dreamstime.com, LLC v. Google LLC*,
54 F.4th 1130 (9th Cir. 2022) ......................................................................................... 20

*Fido's Fences, Inc. v. Radio Systems Corp.*,
999 F. Supp. 2d 442 (E.D.N.Y. 2014) ............................................................................ 14

*FTC v. Cardinal Health, Inc.*,
12 F. Supp. 2d 34 (D.D.C. 1998).......................................................................................6

*Grasshopper House, LLC v. Clean & Sober Media LLC*,
2019 WL 12074086 (C.D. Cal. July 1, 2019).................................................................. 18

*Image Technical Services, Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) ......................................................................................... 20

*In re Aluminum Warehousing Antitrust Litigation*,
    336 F.R.D. 5 (S.D.N.Y. 2020) ...................................................................... 9

*In re Apple iPhone Antitrust Litigation*,
    846 F.3d 313 (9th Cir. 2017) ...................................................................... 16

*In re Arris Cable Modem Consumer Litigation*,
    327 F.R.D. 334 (N.D. Cal. 2018) ............................................................... 17

*In re Clorox Consumer Litigation*,
    301 F.R.D. 436 (N.D. Cal. 2014) ............................................................... 16

*In re Facebook, Inc., PPC Advertising Litigation*,
    282 F.R.D. 446 (N.D. Cal. 2012) ............................................................... 24

*In re New Motor Vehicles Canadian Export Antitrust Litigation*,
    522 F.3d 6 (1st Cir. 2008) ............................................................................ 8

*In re Optical Disk Drive Antitrust Litigation*,
    303 F.R.D. 311 (N.D. Cal. 2014) ................................................................. 8

*In re Rail Freight Fuel Surcharge Antitrust Litigation*,
    725 F.3d 244 (D.C. Cir. 2013) .................................................................... 17

*IntegrityMessageBoards.com v. Facebook, Inc.*,
    2021 WL 3771785 (N.D. Cal. Aug. 24, 2021) ............................................ 22

*Kottaras v. Whole Foods Market, Inc.*,
    281 F.R.D. 16 (D.D.C. 2012) .......................................................... 9, 10, 13

*LD v. United Behavioral Health*,
    2023 WL 2806323 (N.D. Cal. Mar. 31, 2023) .............................................. 4

*Leyva v. Medline Industries Inc.*,
    716 F.3d 510 (9th Cir. 2013) ................................................................ 17, 18

*Los Angeles Memorial Coliseum Comm'n v. National Football League*,
    791 F.2d 1356 (9th Cir. 1986) ............................................................... 9, 21

*Mueller v. Puritan's Pride, Inc.*,
    2021 WL 5494254 (N.D. Cal. Nov. 23, 2021) ............................................ 17

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    259 F.3d 154 (3d Cir. 2001) ......................................................................... 8

*Ohio v. Richter Concrete Corp.*,
    69 F.R.D. 604 (S.D. Ohio 1975) ........................................................... 16, 17

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) ........................................................................ 4

*Postpichal v. Cricket Wireless, LLC*,
    2023 WL 3294852 (N.D. Cal. May 4, 2023) ................................................. 18

*Schneider v. YouTube, LLC*,
    --- F. Supp. 3d --- , 2023 WL 3605981 (N.D. Cal. 2023) ................................... 4

*Singh v. Google LLC*,
    2022 WL 94985 (N.D. Cal. Jan. 10, 2022) ...................................................... 24

*Somers v. Apple*,
    729 F.3d 953 (9th Cir. 2013) .......................................................................... 14

*Stromberg v. Qualcomm Inc.*,
    14 F.4th 1059 (9th Cir. 2021) ........................................................................ 13

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*,
    350 F.3d 1181 (11th Cir. 2003) ..................................................................... 25

*Ward v. Apple Inc.*,
    784 F. App'x 539 (9th Cir. 2019) ..................................................................... 8

**STATUTES, RULES, AND REGULATIONS**

Fed. R. Civ. P. 23(a) ............................................................................................ 4

Fed. R. Civ. P. 23(b) ............................................................................................ 4

Fed. R. Evid. 702 ............................................................................................... 17

**OTHER AUTHORITIES**

*About Custom Audiences*, Meta Business Help Center, https://www.facebook.com/
    business/help/744354708981227 (last visited Oct. 12, 2023) ......................... 15

*Create a Customer List Custom Audience*, Meta Business Help Center,
    https://www.facebook.com/business/help/170456843145568?id=
    2469097953376494 (last visited Oct. 12, 2023) ............................................ 15

*Instagram Stories Ads – Now Available for All Businesses Globally*, Instagram Business
    Blog (Mar. 1, 2017), https://business.instagram.com/blog/instagram-stories-
    available-globally (last visited Oct. 13, 2023) ................................................ 11

Philip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles
    and Their Application* (2023) ....................................................................... 21

Susan Athey & Joshua Gans, *The Impact of Targeting Technology on Advertising
    Markets and Media Competition*, 100 Am. Econ. R. 608 (2010) ..................... 12

**PUBLIC REDACTED VERSION**

## INTRODUCTION

Advertisers bring an overcharge case with no common proof of who was overcharged, how they were overcharged, or by how much they were overcharged.

First, Advertisers have failed to show class-wide injury. In an attempt to show a uniform overcharge, Advertisers rely largely on the (supposed) fact that Meta's profits exceed three alleged comparators'. But Meta's *profits* say nothing about whether its conduct had a class-wide impact on the *prices* class members paid for advertisements. As Advertiser expert Scott Fasser conceded, ███████████████████████████████████████████████████████████ ████████████████████████ Ex. 1, Fasser Tr. 148:24-149:3.[1]

Second, Advertisers fail to focus their model on the market they assert. Advertisers have proposed a submarket for "social advertising." Meta is alleged to have a monopoly only in that submarket and not the alleged broader market for online advertising. As a result, only purchasers of social advertising were ostensibly subject to a monopoly overcharge. But Advertisers' experts admit ████████████████████████████████ and the logic of Advertisers' arguments compels the same conclusion. And yet, Advertisers have provided no methodology to commonly determine which class members bought a *social* advertisement—meaning they have provided no way to determine which class members were supposedly injured by Meta's alleged monopoly.

Third, Advertisers' approach to injury ignores the fact that their claims turn on the premise that Meta *improved its offerings* through the challenged conduct. Those improvements make it highly likely that—even if Advertisers' claims are credited—many class members obtained a net benefit from the challenged conduct via lower quality-adjusted prices. Thus, an individualized, advertiser-by-advertiser inquiry must be undertaken to assess injury.

Even if Advertisers could show that the challenged conduct resulted in class-wide overcharges for social advertising, their damages model (assuming it is admissible at all) fails to measure damages attributable to their theory of liability, as required under *Comcast Corp. v.*

---

[1] "Ex." citations reference exhibits to the Jennings Declaration submitted herewith.

**PUBLIC REDACTED VERSION**

1  *Behrend*, 569 U.S. 27, 34 (2013). Advertisers just calculate the difference between Meta's profits

2  and those of the above-mentioned comparators, and then assert that every dollar of difference

3  reflects supracompetitive pricing attributable to the anticompetitive conduct they challenge.

4  However, Advertisers' experts acknowledged what is obvious: ████████████████████

5  ████████████████████████████████████████████████████

6  ████████████████ . Yet Advertisers' model does not consider or control for ████████

7  ████ . Instead, Advertisers tie their damages to Meta's alleged monopoly maintenance, and assert

8  an entitlement to all the damages that stemmed from that alleged monopoly during the class period.

9  Under well-settled law, Advertisers are entitled to no such thing. Among other problems, allowing

10  Advertisers to recover that vast sum would permit them to recover damages stemming from time-

11  barred conduct that Advertisers believe enabled Meta to establish the monopoly they (allege) it

12  unlawfully maintained.

13  Ultimately, Advertisers' approach is so unmoored from reason and evidence that, out of

14  the tens of millions of advertisers that advertise on Meta's services, they could not find a

15  representative advertiser as a named plaintiff. Instead, the named plaintiffs are idiosyncratic

16  advertisers who spent very little on Meta ads and know next to nothing about this case. They do

17  not represent the interests of the many class members who understand and value precisely the sort

18  of advertising improvements that Advertisers take aim at in this litigation.

19  **BACKGROUND**

20  Advertisers' class certification motion picks five actions they claim enabled Meta to

21  maintain a monopoly in the submarket for "social advertising." Those actions are: (1) using Onavo

22  and the ████████████████ to "██████████████████" and "████████████

23  ████████████████████████" Ex. 2, Advertiser Plaintiffs' Corrected First

24  Supplemental Response and Objections to Meta Platforms, Inc.'s Interrogatory No. 11

25  ("Interrogatory 11 Resp."), at 87; (2) imposing privacy-protective restrictions on other companies'

26  use of Meta users' data; (3) supposedly secretly agreeing to scuttle one of its many video features

27  to secure a slight increase in Netflix advertising spend and gain "████████████████████

28  ████████████████████" *id*. at 149; (4) joining Google's advertising exchange so that

**PUBLIC REDACTED VERSION**

1    Meta's advertisers would, among other things, "███████████" and receive "███████████

2    ███████████████████", *id.* at 172; and (5) trying to deceive the FTC to prevent a

3    lawsuit seeking the divestiture of Instagram (a lawsuit the FTC ultimately brought). Dkt. 643

4    ("Mot.") 5-6. They now seek to litigate those claims as a class action encompassing everyone "in

5    the United States who purchased advertising from Meta Platforms, Inc. … between December 1,

6    2016 and December 31, 2020." *Id.* at vi.

7            In support of their motion, Advertisers offer a "yardstick" study (the subject of a *Daubert*

8    motion, Dkt. 662) that they claim establishes the existence of a class-wide overcharge for

9    advertising—showing both class-wide antitrust impact and damages. That study does not consider

10   the price Meta charged for any ad, but instead focuses on Meta's profit rate. It compares that profit

11   rate to those of three so-called "yardstick" firms: █████, █████ (a Chinese microblogging

12   company), and ███████████ (a small Polish firm that sells online advertising along with tourist

13   services, architectural plans, and cars). *See* Ex. 3, Kreitzman Report ¶¶ 30-49. It then computes

14   the gap between Meta's profit rate and those firms' rates during the class period and asserts that

15   the entire gap reflects Meta's monopoly profits. *See id.* ¶¶ 6, 9, 50-54; Ex. 4, Williams Report

16   ¶ 357. The study makes no attempt to link injury or damages to the categories of anticompetitive

17   conduct described above, but instead claims to calculate the entire overcharge stemming from

18   Meta's alleged monopoly. *See* Williams Report ¶ 328; *infra* II.B-C.

19           Because Advertisers' damages study says nothing about whether all or most class members

20   were impacted by (or faced higher prices due to) the challenged conduct, they offer two other

21   experts' testimony to try to fill that gap. Scott Fasser is a self-described industry expert. He opined

22   that ████████████████████████████████████ Ex. 5, Fasser

23   Report ¶ 8. Advertisers' damages expert, Michael Williams, relied solely on that supposed fact to

24   conclude that ████████████████████████████████████

25   ████████████████████████████████████████

26   ██████████████ Williams Report ¶¶ 352, 354; Ex. 6, Williams Reply ¶¶ 94, 96.

27   Advertisers, in turn, rely on Williams's opinion to contend that classwide injury can be shown

28   through common evidence. Mot. 13-14. Fasser, however, has since admitted ███████████

**PUBLIC REDACTED VERSION**

1   ██████████████████████████████████████. Fasser Tr. 134:17-135:3 (

2   ████████████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████████████

4   ███████). And while Advertisers also offered a report from economist Joshua Gans—who

5   asserted that, ███████████████████████████████████████████████████████

6   █████████████████████, Ex. 7, Gans Report ¶¶ 50, 71, 73, 86, 88, 95, 107, 110—he

7   admitted in his deposition that ████████████████████████████████████████

8   █████████████████ Ex. 8, Gans Tr. 99:11-24, 148:3-8. Meta has also moved to exclude Gans's

9   and Fasser's reports and testimony. Dkt. 644.

## LEGAL STANDARD

11   To certify a class, "Plaintiffs bear the burden of proving by a preponderance of the evidence

12   that the proposed class[] satisf[ies] all four requirements of Rule 23(a) and at least one of the

13   subsections of Rule 23(b)." *Schneider v. YouTube, LLC*, --- F. Supp. 3d --- , 2023 WL 3605981,

14   at *5 (N.D. Cal. May 22, 2023) (Donato, J.). In an antitrust case, Rule 23 requires Advertisers to

15   prove, *inter alia*, that the question whether class members suffered an antitrust injury can be

16   resolved "'in one stroke,'" and that this common question predominates over any individualized

17   inquiry into whether an advertiser was injured. *Olean Wholesale Grocery Coop., Inc. v. Bumble*

18   *Bee Foods LLC*, 31 F.4th 651, 670 (9th Cir. 2022) (en banc). Advertisers must also "establish[]

19   that damages are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 34. Any

20   damages model proffered to satisfy that requirement must also be "'scrutinize[d] [for] reliability …

21   in light of the criteria for class certification and the current state of the evidence.'" *LD v. United*

22   *Behav. Health*, 2023 WL 2806323, at *2 (N.D. Cal. Mar. 31, 2023).

## ARGUMENT

24   **I.   INDIVIDUALIZED ISSUES OF ANTITRUST INJURY PREDOMINATE OVER COMMON ONES**

25   Plaintiffs have failed to show classwide proof of impact. Instead, their own experts have

26   confirmed that assessing impact requires an individualized inquiry into (A) whether any advertiser

27   paid supracompetitive prices for "social" ads and (B) whether advertisers participated in the

28   purported submarket for "social advertising" at all. Each is fatal to class certification.

A.      **Impact Through Ad "Overpayment" Is Individualized**

1.      **Advertisers Offer No Common Way To Prove Class-Wide Overcharge**

Advertisers' attempt to infer a class-wide overcharge from Meta's profits leaves them unequipped to show that antitrust impact can be established with common proof. That is fatal to their motion, as "class certification is inappropriate when … individualized injury … assessments" overwhelm common issues. *Bowerman v. Field Asset Servs.*, 60 F.4th 459, 469 (9th Cir. 2023). The premise underlying Advertisers' theory of class-wide impact is that all ad buyers had their prices set via the ad auction. The premise is wrong and, even if it were right, it is irrelevant.

In their motion, Advertisers rely on Williams for their supposed proof of class-wide impact. Mot. 21. But Williams never even *purports* to show that the challenged conduct produced a common overcharge throughout the class. Indeed, he looks at no evidence whatsoever about what *anyone* ever paid for ads. This despite the fact that Williams himself admitted, ███████████ ██████████████████████████████████████████████████ Ex. 9, Williams Tr. 128:12-14. Instead, Williams relies on only one input to show that ███████████ rather than some unknown subset, paid higher prices: the supposed fact (recounted in Fasser's report) ██████ ████████████████████████████████████████████████ Williams Report ¶ 352.

But Fasser has since ███████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████████████
██████████████████████████████
███████████████████████████
Fasser Tr. 134:17-135:3. And Fasser ████████████████████████
████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████
███████████

**PUBLIC REDACTED VERSION**

1   ███████

2   *Id.* at 148:24-149:3; *see also id.* at 146:16-25; 148:6-15.[2]

3       Even Williams ultimately acknowledged that ████████████████

4   ████████████████████████████████████████ Williams

5   Tr. 88:1-6. In the real world, some class members would have purchased "Reach and Frequency"

6   ads, whose prices are set ahead of time, not via auction. *See* Ex. 10, Advertiser Class Rebuttal

7   Report of Catherine Tucker[3] ("Tucker") ¶ 133; Williams Tr. 162:2-8 (███████████

8   ████████████████████████████████████████

9   █████████████). Others used the ad auction price only as a jumping-off

10   point before individualized discounts, credits, and other incentives modified the auction price. *See*

11   Tucker ¶¶ 129-131, 134. And still other advertisers—usually large "power" buyers—negotiated

12   bespoke pricing agreements with Meta for custom prices or discounts. *See id.* ¶ 134; *see also FTC*

13   *v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 59 (D.D.C. 1998) ("the existence of large power buyers

14   mitigate[s] against the ability … to raise prices").

15       But the problems with Advertisers' theory run even deeper. Even entertaining the idea that

16   an ad auction could in *theory* supply class-wide proof of an overcharge (despite not being used as

17   a class-wide pricing mechanism), there are multiple reasons it did not do so in practice. For these

18   same reasons, even a class limited to advertisers who purchased ads only via auction would still

19   present individual questions of injury that predominated over common issues.

20       *First*, the manner in which prices are set does not say anything about whether prices are

21   inflated at all, let alone whether they are inflated for *everyone*. Competitive prices are set by

22   auction in countless industries. The mere fact of an auction does not mean prices are

---

23   [2] Gans's report also asserted that, ██████████████████████████████

24   ████████████████████████████████ Gans Report ¶¶ 49-51, 110.

25   But neither Williams's report nor Advertisers' motion relies on Gans's report for proof of class-wide impact, presumably because he admittedly ██████████████

26   ████████████████████████████. Gans Tr.

27   95:11-96:15. No one else did.

28   [3] The Executive Summary of Tucker's report, which summarizes her core opinions in a few pages, is separately attached as Ex. 11.

**PUBLIC REDACTED VERSION**

supracompetitive.

*Second*, the auction's structure makes it far more likely that prices will be individualized based on auction dynamics—especially as compared with ordinary retail goods, where uniform prices are set in advance for all customers. *See* Tucker ¶ 123. That is because ███████████ ██████████████████████████████████████████████████████████████████████████ ███████████████████████████████████ *Id.* ¶ 124; *see also* Williams Tr. 116:9-17 (confirming the same). That individualization means that a consistent, class-wide overcharge cannot be inferred from the mere existence of an ad auction—certainly not when Advertisers have failed to provide any support for that inference. Indeed, the individualized structure of the ad auction suggests that the challenged conduct may have *reduced* costs for some advertisers. *See infra* I.A.2.

*Third*, the changes to the competitive landscape Advertisers envision in their but-for world would not impact all Meta ad auctions similarly. Advertisers contend that, but for Meta's allegedly anticompetitive conduct, new advertising platforms would have entered the social advertising market and drawn advertisers away from Meta, lowering prices. Interrogatory 11 Resp. at 180-181. Whether that would affect demand for a category of advertising, or the composition of any ad auction—and thus the price charged—depends on *which* advertisers would have migrated to other platforms and for what ads. *See* Tucker ¶¶ 125-126. Yet despite the diversity of the class (which includes every single person or company who purchased ads from Meta during the class period), Advertisers provide no common method for determining which of its members would have switched to supposed "social advertisers" like ████████ or obtained lower auction prices under their theory. *See* Williams Tr. 156:6-12 (██████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ████████). It is implausible that it would have been all or nearly all such advertisers.

All this leaves Advertisers with only one expert who could possibly supply common proof that Meta's conduct had a class-wide impact: Gans. But Gans acknowledges that ██████████ ████. He testified that he ████████████████████████████████████████████████████ ██████████████████████████████████ *See* Gans Tr. 99:10-23. He ████████████████

**PUBLIC REDACTED VERSION**

1 ████████████████████████████████████████████████████████████

2 ██████████ *Id.* at 100:19-101:4; *see also id.* at 307:2-4 ("████████████████

3 ██████████████████████████ "). And he could not say ████████████████

4 ████████████████████████████████████████. *See id.* at

5 101:20-102:3. The most he could suggest was that ████████████████████████

6 ████████████████████████████. *Id.* at 95:11-96:15. The fatal problem for

7 Advertisers is that none of their experts has done so. Their "expert[s] did not provide a workable

8 method for classwide determination of the impact of the alleged antitrust violation," but instead

9 "asserted that" they could "develop a model at some point in the future." *Ward v. Apple Inc.*, 784

10 F. App'x 539, 540 (9th Cir. 2019) (mem.). "[T]hat is not enough." *Id.*

11      At bottom, it appears that Advertisers are hoping to establish class-wide injury based on a

12 general sense that profits and therefore prices were increasing during the class period. This is

13 insufficient. Antitrust plaintiffs claiming an overcharge must provide a model of antitrust impact

14 that can "establish, without need for individual determinations for the many … potential class

15 members, which consumers were impacted by the alleged antitrust violation and which were not."

16 *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 28 (1st Cir. 2008). "'The

17 ability to calculate the aggregate amount of damages,'" moreover, "'does not absolve plaintiffs

18 from the duty to prove each [class member] was harmed by the defendants' practice.'" *Id.* (quoting

19 *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 188 (3d Cir. 2001)). As a

20 result, plaintiffs seeking class certification may not simply "rely on an inference that any upward

21 pressure on … pricing would necessarily raise the prices actually paid by individual consumers."

22 *In re New Motor Vehicles*, 522 F.3d at 29. Nor may they rest on an expert's "assert[ion] that each

23 class member may calculate his or her damages merely by 'applying [an] overcharge percentage

24 estimated on a class-wide basis to [the member's] individual purchases.'" *In re Optical Disk Drive

25 Antitrust Litig.*, 303 F.R.D. 311, 321 (N.D. Cal. 2014). Rather, they must provide a method capable

26 of "show[ing] that all or nearly all purchasers were overcharged in that amount." *Id.* Advertisers'

27 model, which "makes no attempt to establish, but instead simply assumes, class-wide impact,"

28 falls short of that requirement. *Id.*

**PUBLIC REDACTED VERSION**

Since Advertisers have failed to "offer[] any systematic method for identifying which" if any advertisements should have been priced lower, "the Court cannot be confident that common questions predominate," and class certification must be denied. *Cabrera v. Google LLC*, 2023 WL 5279463, at *25 (N.D. Cal. Aug. 15, 2023).

## 2. Advertisers Cannot Account For Offsetting Benefits With Common Proof

"There can be no antitrust injury if the plaintiff stands to gain from the alleged unlawful conduct." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1056 (9th Cir. 1999). Accordingly, the Sherman Act requires that a court "take into account any benefits which would not have been received by plaintiff 'but for' the defendant's anticompetitive conduct, or amounts a plaintiff would have expended in the absence of the violation." *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1367 (9th Cir. 1986). Where the benefits exceed the harms, there is no injury for which to recover. And where such benefits vary by class member, and thus "require[] an analysis of each putative class member's purchases" to determine which members "suffered net harm," they render antitrust injury an individualized issue that makes class certification inappropriate. *Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16, 25 (D.D.C. 2012); *see also In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 59 (S.D.N.Y. 2020) ("common proof of antitrust injury" could not exist where the challenged "price increase" for aluminum delivery "was offset—and, at least for some … purchases, wholly offset—by the downward impact" of the alleged conduct on the price of aluminum itself, "thereby eliminating any injury").

Advertisers ignore the substantial, individualized benefits that the challenged conduct (if true) would have delivered to class members. As a result, there is no methodology—let alone a common one—for determining which members suffered a net injury once those benefits are accounted for. Specifically (and as explained further below), Advertisers' claims hinge on the idea that Meta's conduct impeded would-be competitors by (1) improving Meta's ad targeting abilities, and (2) leading to new features and improvements that advertisers valued. Those are advertising improvements that substantially benefit many of Meta's advertisers. Yet Advertisers have no

**PUBLIC REDACTED VERSION**

common method of figuring out which class members benefited from those improvements or how much they benefited—and most importantly, how those benefits impacted the quality-adjusted price the advertiser paid for ads during the class period. Without such a method, there is no common way of determining which class members were actually injured—that is, which actually lost more from purported supracompetitive pricing than they gained from the advertising improvements on which Advertisers' claims turn. "Since benefits must be offset against losses, it is clear that widespread injury to the class simply cannot be proven through common evidence." *Kottaras*, 281 F.R.D. at 25.

> i.   *Advertisers' claims turn on advertising improvements.*

The central premise of Advertisers' claims is that Meta's conduct increased barriers to entry for new firms by helping Meta acquire data that enabled it ███████████████████ ███████████████████ Gans Report ¶ 13.b; Gans Tr. 93:1-7 (testifying that ████████ ████████████████████████████████████████████████████████████████ ████████████); First Am. Compl., Dkt. 391 ¶ 825 ("Because of Facebook's conduct, Facebook's targeting ability vastly increased[.]"); Interrogatory 11 Resp. at 109-110 ("████████████████ ██████████████████████████████████"). And each of Advertisers' claims identifies specific mechanisms by which Meta improved its advertising offerings. The Netflix allegations, for example, turn on ████████████████████████████████ ████████. Interrogatory 11 Resp. at 88; *see also* Tucker ¶ 64. And the Onavo, ████████, Backend Integration, GNBA, and API allegations all likewise turn on the use of data to train machine learning models for targeting purposes or to otherwise improve Meta's ad targeting systems. *See* Interrogatory 11 Resp. at 87-89 (████████████████████████ ████████████████████████████████████████); *id.* at 164 (████████████████ ████████████████████████████████████████); *id.* at 110, 154 ("████████████ ████████████████████████████████████████████████"). Notwithstanding all these claims—which have always been at the center of Advertisers' case—

**PUBLIC REDACTED VERSION**

Williams asserts that ██████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ Williams Reply ¶ 67. For purposes of class certification, Advertisers cannot have it both ways—the central premise of this alleged exclusionary conduct case is that Meta acquired more data in order to achieve an insurmountable data targeting advantage. If the data Meta obtained was of minimal value, its acquisition cannot possibly have contributed materially to Meta's alleged monopoly, especially where, as here, the various agreements challenged were non-exclusive.

In addition, some of Advertisers' allegations turn on improvements to Meta's offerings that provided further, highly individualized benefits for some class members. Advertisers argue, for example, that Onavo and ████████████████ data led to ████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████ *See* Tucker ¶¶ 74-78; Ex. 12, Gans Dep. Ex. 23 at SNAP – FTC – No. 191-0134 – 0000051024 (████████████████████████████████████████████████████████ ████████████████████████); Ex. 13, *Instagram Stories Ads – Now Available for All Businesses Globally*, Instagram Business Blog (Mar. 1, 2017), https://business.instagram.com/ blog/instagram-stories-available-globally ("With its stories campaign, [Airbnb] saw a double digit point increase in ad recall."); Interrogatory 11 Resp. at 97 (██████████████████████ ████████████████████████████████████████████████████████████████ ████████). And the Google Network Bidding Agreement, by which Meta advertisers gained access to ad placements via Open Bidding, provided many advertisers with additional inventory and better user matches. *See* Tucker ¶¶ 83-94. As Meta's Senior Director of Product Management testified, ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████ Ex. 14, Crum Tr. 283:24-284:16.

       *ii.*    *These improvements would have lowered prices for some class members.*

The advertising improvements on which Advertisers' claims turn—improved advertising

**PUBLIC REDACTED VERSION**

performance, targeting, and measurement, along with the introduction of valuable new advertising formats—likely lowered the ultimate price paid by some advertisers in two ways.

*First*, for some advertisers, ad improvements may well have brought down the *nominal* price of advertising—that is, the price paid to secure an impression via an ad auction. As Advertisers' own expert Gans has explained, improved targeting can increase the effective supply of advertising, "'push[ing] prices downwards'" for ads. Ex. 15, Susan Athey & Joshua Gans, *The Impact of Targeting Technology on Advertising Markets and Media Competition*, 100 Am. Econ. R. 608, 608 (2010). "[T]argeting allows general outlets to more efficiently allocate scarce advertising space, resulting in an increase in the number of advertisers who can be accommodated," thus "push[ing] prices down." *Id.*; *see also* Gans Tr. 77:7-78:4 (███████████ ███████████████████████████████████████████████████████████ ██████████ ). Beyond that, by allowing the creation of multiple distinct types of ads distinguished by the characteristics of the targeted user base, improved targeting can thin demand for some inventory and thus lower prices. *See* Tucker ¶ 68. Assessing these impacts would require individualized inquiry into the particular forms of targeting each advertiser used and the degree of competition for impressions in that advertising space. No wonder, then, that Gans himself testified that ███████████████████████████████████████████████████████ ██████████████████████████████████████ Gans Tr. 33:16-21.

The *second* way the challenged conduct benefited many advertisers is by lowering the *effective* price of advertising—that is, the price advertisers paid to achieve their advertising objectives. That quality-adjusted price is ████████████████████ Gans Tr. 298:15-20. And that quality-adjusted price is influenced by multiple factors—the nominal price of an impression, to be sure, but also the quality of that impression. For example: An advertiser who pays $1 per impression but reaches its desired audience only 10% of the time is paying more for advertising than an advertiser who pays $2 per impression but reaches its desired audience 50% of the time. *See* Tucker ¶ 58. Here, the targeting and measurement improvements that Advertisers claim Meta anticompetitively obtained would have improved the quality of matches for many Advertisers, bringing down their effective price—all depending on their individualized objective, how the

PUBLIC REDACTED VERSION

advertising improvements affected that objective, and how those improvements compared to any alleged increase in nominal prices. As Fasser admits, ███████████████████████████

███████████████

██████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████████████

███████████████

Fasser Tr. 32:11-18.[4] "[W]here each customer's transaction must be evaluated to show injury, 'the level of individualized inquiry required … is cancerous to a finding of commonality; there is no common method for resolving to whom Defendant is liable.'" *Kottaras*, 281 F.R.D. at 25.[5]

**B.** **Whether Class Members Participated In The Purported Market For "Social Advertising" Is An Individualized Question**

Advertisers assert a submarket for "social advertising." That alleged submarket is the only market asserted to have been impacted by Meta's alleged anticompetitive conduct. Advertisers define what that market includes: advertising "that uses data 'to predict the purchase intents of particular users' that is obtained primarily from 'a user's social graph.'" Mot. 4 (quoting Gans Report ¶¶ 23-24); *see also* Williams Tr. 244:18-24 ("██████████████████████████

██████████████████████████████████").

The class, however, includes "[a]ll persons … who purchased advertising" of *any type* from Meta during the class period. Mot. vi. For class certification to be appropriate, Advertisers needed

---

[4] Gans briefly speculates that ████████████████████

███████████████████████████████ *See* Ex. 16, Gans Reply ¶¶ 18-21. But it is the plaintiffs' burden to show that common proof can establish class-wide injury, not Meta's to affirmatively show otherwise. *See Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1066 (9th Cir. 2021).

[5] To be sure, Williams opines that ████████████████████

██████████████████████ Williams Reply ¶¶ 72-79. That leaves Advertisers in the same situation: There are, on Advertisers' own theory, both substantial benefits and downsides resulting from Meta's alleged conduct, and there is no classwide mechanism for determining which class members obtained a net benefit, or suffered a net harm, from that conduct.

1    to provide common proof that those class members all purchased *social* ads in particular—without

2    such proof, they cannot show that antitrust injury is susceptible to class-wide resolution. An

3    advertiser who purchased only non-social ads from Meta—advertisements outside the market

4    allegedly impacted by Meta's actions—cannot have been injured by the conduct alleged. *See, e.g.*,

5    *Fido's Fences, Inc. v. Radio Sys. Corp.*, 999 F. Supp. 2d 442, 449-450 (E.D.N.Y. 2014) (seller of

6    batteries for containment fences challenging anticompetitive conduct in the "submarket for

7    replacement batteries" had no "concrete, actual, or imminent injury" in the "broader market for

8    electronic pet containment systems"); *see also Somers v. Apple*, 729 F.3d 953, 963 (9th Cir. 2013).

9          Advertisers offer no class-wide means of determining which class members purchased

10   "social" ads under their own definition—even though their experts admit, and the record

11   establishes, that many class members have *never* done so.

12          Consider first Advertisers' own experts. Fasser testified ████████████████

13   ████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████

15   Fasser Tr. 97:8-12. And second, ██████████████████████████████

16   ████████████████████████████████████████████████████

17   ████████████████████ *Id*. at 82:15-83:1. Gans further testified that ████

18   ████████████████████████████████████████████████████

19   ████ Gans Tr. 94:6-11.[6]

20          The evidence confirms that many ads sold on Meta properties do not rely on social data.

21   As Dr. Tucker explained, ██████████████████████████████████

22   ████████████████████████████████████████████. *See* Tucker

23   ¶ 46. That data does not turn on users' social connections or friends, or on a "social graph"—and

24   ads relying on that data are thus not "social" ads. Another extremely popular offering is "Custom

25   ────────────────────────────────

    [6] Williams's reply, by contrast, ██████████████████████████

26   ████████████████ Williams Reply ¶ 60. In addition to contradicting

    Advertisers' other experts, that claim appears to be based on ██████████████

27   ████████████████████████ *See id*. ¶ 48. But that says little about the

    individual products a firm sells. By way of analogy, IKEA might be in the "flat-pack furniture"

28   business, but that hardly makes a Swedish meatball a futon.

Audiences." Ads using Custom Audiences define a target audience using the advertiser's own sources of information, "like customer lists, website or app traffic, or engagement" with the advertiser's content. Ex. 17, *About Custom Audiences*, Meta Business Help Center, https://www.facebook.com/business/help/744354708981227 (last visited Oct. 12, 2023); *see also* Tucker ¶ 45. A business may, for instance, advertise to its customers via a Custom Audience that matches its customers' email addresses to Meta users' email addresses, without relying on any of Meta's data about users' social connections. *See* Ex. 18, *Create a Customer List Custom Audience*, Meta Business Help Center, https://www.facebook.com/business/help/170456843145568?id=2469097953376494 (last visited Oct. 12, 2023); Tucker ¶ 45. These ads definitionally do not rely on any of the purportedly "social" data Meta possesses, and purchases of these ads are not purchases of "social advertising" under Advertisers' (or any) conception of that term. Custom Audience targeting ███████████████████████████████████████████████. Tucker ¶ 45.

By contrast, the record confirms that targeting features Advertisers apparently believe to meet their contrived definition of "social advertising" were used infrequently. For instance: "Friends of Connections" targeting, which permits advertisers to target users based on who they were "friends" with, ████████████████████████████████████████████████████████████████████████████████████. Tucker ¶ 35. "Direct Connections" targeting, which targets users based on their interactions with advertisers' pages, ████████████████████████████████████████████████. *Id.* ¶ 38. And "Lookalike Audiences" (██████████████████████ *see* Williams Reply ¶ 54) ██████████████████████████████████. Tucker ¶ 40.

Given this significant variation in targeting options and ad purchases, determining which advertisers purchased "social advertisements"—and thus may have been injured under Advertisers' theory—will require a highly individualized inquiry. It will require identifying which targeting options were used for each ad an advertiser purchased to assess whether those ads might use "social" data. For ads placed through the Facebook Audience Network, ████████████████ ████████████████████████████████████████████ Fasser Tr. 82:22-83:1. And even for ad

**PUBLIC REDACTED VERSION**

purchases that used "social" targeting features, if those options were combined with non-social targeting, still further inquiry will be required to assess if "social" data had any ultimate effect on who was shown the ad, because Advertisers' definition of "social advertising" requires that the relevant data be obtained "primarily" from a social graph. Mot. 4. If this inquiry reveals that an advertiser never purchased a "social" ad whose price could have been affected by the challenged conduct, then that advertiser cannot have been injured. But Advertisers have identified no class-wide means of answering such questions with common proof. While it is easily discernible that a substantial number of Meta's ads are not social, there is no common way of discerning which ads *are* social under Advertisers' contrived definition. The need to resolve individualized questions to determine which class members were injured means that individualized issues predominate, and that class certification is therefore inappropriate.[7]

### C.   Whether Class Members Are Barred From Recovery As Indirect Purchasers Is An Individualized Issue

By Advertisers' own admission, ███████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ █████  *See* Williams Report ¶¶ 206-211. Indirect purchasers of a product, however, generally cannot recover antitrust damages. *See In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 320-322 (9th Cir. 2017). Were the rule otherwise, courts would be faced with the "insurmountable" task of "tracing the effects of an overcharge at each stage of a distribution chain." *Id.* at 321. The trouble is that Advertisers' class definition is so imprecise as to potentially encompass any purchaser of advertising from Meta, whether direct or indirect. Assessing which class members purchased directly—or are subject to one of the narrow exceptions permitting antitrust recovery for indirect purchasers—and are thus entitled to pursue an antitrust claim at all presents yet another highly individualized inquiry barring class certification. *See, e.g.*, *Ohio v. Richter Concrete Corp.*, 69 F.R.D. 604, 605 (S.D. Ohio 1975) ("[T]he presence of both direct and indirect purchasers within

---

[7] This would pose a problem even for a more narrowly defined class. *See, e.g.*, *In re Clorox Consumer Litig.*, 301 F.R.D. 436, 441 (N.D. Cal. 2014) (denying certification where plaintiffs did "not propose any method for" determining "exactly who purchased [the affected product] during the class period").

**PUBLIC REDACTED VERSION**

a single class gives rise to individual questions of impact which predominate over any common questions of law or fact.").

II.   **PLAINTIFFS' DAMAGES MODEL FAILS *COMCAST***

   A.   **Advertisers Lack A Damages Model Entirely Because Critical Portions Of Their Experts' Reports Are Inadmissible Under *Daubert***

Advertisers' Kreitzman-Williams damages study calculating Meta's profit rate, comparing it to so-called yardstick firms, and inferring a class-wide overcharge from the difference in profit rates, is inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See* Dkt. 662. When that method is excluded, class certification must be denied. *See In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 370 (N.D. Cal. 2018) ("class could not be certified" where expert's "opinion testimony" was "found to be inadmissible" and plaintiffs consequently "lack[ed] a damages model"); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252-253 (D.C. Cir. 2013) ("No damages model, no predominance, no class certification.").

   B.   **Advertisers' Damages Model Fails To Identify Damages Traceable To Meta's Alleged Anticompetitive Conduct**

Even if Advertisers' damages model were admissible under *Daubert*, it would still fail its core task: calculating the damages attributable to the conduct challenged in this case. "Failure to identify a feasible method for calculating class damages is fatal to class certification." *Mueller v. Puritan's Pride, Inc.*, 2021 WL 5494254, at *6 (N.D. Cal. Nov. 23, 2021) (Donato, J.). To provide such a method, a "damages model 'must measure only those damages attributable to' the plaintiff's theory of liability." *Id.* (quoting *Comcast*, 569 U.S. at 35). Put differently, "plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability," and not from some other cause. *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013). Thus, their model must "bridge the differences between supracompetitive prices in general and supracompetitive prices attributable to the" specific anticompetitive conduct on which their claims turn because "'[t]he first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*.'" *Comcast*, 569 U.S. at 38. In

**PUBLIC REDACTED VERSION**

overcharge cases, the damages model may not just "assume[] that the entire price difference of any comparison product or price point was attributable" to the alleged wrongful conduct, given the wide array of lawful reasons that price differences may exist even between generally comparable products. *Postpichal v. Cricket Wireless, LLC*, 2023 WL 3294852, at *2 (N.D. Cal. May 4, 2023); *see also Brazil v. Dole Packaged Foods, LLC*, 2014 WL 2466559, at *16 (N.D. Cal. May 30, 2014) (excluding model making this assumption).

Advertisers' method of calculating the overcharge supposedly flowing from Meta's alleged anticompetitive conduct fails this requirement because it makes no effort to separate the profits—and assumed corresponding price increases—attributable to Meta's allegedly wrongful conduct from those attributable to other causes. Instead, Advertisers simply assume that every dollar by which Meta's profits exceeded the average of its (supposedly) peer firms must be attributable to the specific anticompetitive conduct challenged in this case. *See* Williams Tr. 73:7-17 (███████
████████████████████████████████████████████████████████████
█████████████████████████████████████████████████). But *Comcast* forbids Advertisers from simply assuming, without proof, that their damages stem from the challenged conduct. *See Leyva*, 716 F.3d at 514 ("[P]laintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability."). Williams knows this. *See Grasshopper House, LLC v. Clean & Sober Media LLC*, 2019 WL 12074086, at *12 (C.D. Cal. July 1, 2019) ("Dr. Williams' methodology is also deficient for failing to consider … other factors" affecting profitability other than the alleged misconduct.). And yet, he repeats his error here.

As Williams and Kreitzman both acknowledged, "████████████████████████████
███████████████████████████" Williams Tr. 229:23-230:3; Ex. 19, Kreitzman Tr. 36:15-19 (████████████████████████████████████████████████
███████████████████████████████████). And both Kreitzman and Williams acknowledged ████████████████████████████████████████████
█████████████████████████████████████████████████. *See* Dkt. 662 at 6 (citing Williams Tr. 229:23-230:3, 70:12-72:5; Kreitzman Tr. 37:18-23, 38:6-15, 39:24-42:19). By nonetheless

**PUBLIC REDACTED VERSION**

1   tying damages to relative profits, without *any* consideration of these possible alternative causes,

2   Advertisers have calculated a damages figure that bears no relation to their theory of liability. *See*

3   *Blue Cross Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d. 588, 593 (7th Cir. 1995)

4   (yardstick study "worthless" when it "attribute[s] the entire difference between the prices" of firms

5   to anticompetitive conduct without "correct[ing] for salient factors, not attributable to the

6   defendant's misconduct").

7          That problem does not go away just because Advertisers have conducted (so they claim) a

8   yardstick study. Williams takes the position that ███████████████████████████████████

9   ████████████████████████████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████████████████████████████

12  ████████████████. Williams Tr. 73:5-17; 231:23-234:2. But he has offered no explanation for

13  how that exclusion was accomplished. And because not one of the selection criteria Williams and

14  Kreitzman used to pick comparable firms has anything to do with those attributes, it is

15  inconceivable that their model could have accounted for them. *See* Kreitzman Tr. 44:15-17, 42:20-

16  43:5 (███████████████████████████████████████████████████████████████████████████████

17  ████████████████████████████████████). Indeed, the model barely attempts to account for

18  *any* potentially confounding variable (for instance, with an accompanying regression analysis).

19  *See* Dkt. 662 at 5-8. And as explained in Meta's *Daubert* motion, that is far from the only fatal

20  problem with the yardstick model. *See id.* at 8-15 (explaining, among other things, that the model

21  identifies inapposite comparators and relies on inappropriate selection criteria).

22          As in *Comcast*, Advertisers have failed their burden to provide a damages model that

23  "measure[s] damages resulting from the particular antitrust injury on which [their] liability in this

24  action is premised." *Comcast*, 569 U.S. at 36. Accordingly, their motion for class certification

25  must be denied.

26      **C.    Advertisers Improperly Tie Damages To Monopoly Maintenance Instead Of**

27             **The Challenged Acts**

28          Advertisers repeatedly attempt to paper over their damages model's weaknesses by

**PUBLIC REDACTED VERSION**

1   asserting that ███████████████████████████████████████████████

2   ███████████████████████████ Williams Report ¶ 328. They fall back on that assertion

3   constantly. When Advertisers moved to exclude Hochberg's opinions, they accused her of

4   ████████████████████████████████████████████████████████████████████████

5   ███████████████████████████████████████████████████████ Dkt. 658 at

6   13 n.14. When they moved to exclude Tucker's opinions, they made clear that what Williams

7   addressed was "whether prices for Facebook's ads were inflated due to *Facebook's monopoly*"—

8   not due to the challenged conduct in particular. Dkt. 660 at 8 (emphasis added). And Williams

9   himself claims that ██████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████████████████

11  ███████████████ *See* Williams Report ¶ 328. He concededly ████████████████████████

12  ████████████████████████████████████████████████████████████████████████

13  ██████████████████████████████████████ Williams Tr. 60:7-14.

14      Advertisers presumably chose to tie their damages to the alleged monopoly itself because

15  doing so inflates their potential recovery and avoids the more rigorous economic analysis required

16  to calculate damages, if any. But there is (at least) one critical flaw in this approach: The law

17  prohibits Advertisers from calculating the price difference attributable to Meta's alleged monopoly

18  rather than to the specific challenged conduct at issue in this suit.

19      "'The mere possession of monopoly power, and the concomitant charging of monopoly

20  prices, is not only not unlawful; it is an important element of the free-market system.'"

21  *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137 (9th Cir. 2022). As a result, antitrust

22  plaintiffs are entitled solely to the "damages attributable to [the] monopolizing conduct" they

23  challenge, not to any and all damages stemming from the monopoly itself. *Image Tech. Servs., Inc.

24  v. Eastman Kodak Co.*, 125 F.3d 1195, 1224 (9th Cir. 1997). That is black-letter antitrust law,

25  reinforced by *Comcast*'s requirement that a plaintiff's damages model "must measure only those

26  damages attributable to" the plaintiffs' theory of liability. *Comcast*, 569 U.S. at 35. Therefore, "the

27  true measure of damages" in a monopoly maintenance case "is the price increment caused by the

28  anticompetitive conduct that … augmented the monopolist's control over the market"—not the

**PUBLIC REDACTED VERSION**

price increment stemming from the monopoly itself. *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 297 (2d Cir. 1979); *see also Los Angeles Memorial Coliseum*, 791 F.2d at 1370 (discussing *Berkey* rule approvingly). "[A] purchaser may recover only for the price increment that 'flows from' the distortion of the market caused by the monopolist's anticompetitive conduct"— that is, Advertisers may *not* recover "the entire excess of [Meta's] price over" a non-monopoly price just because (allegedly) Meta's "power has merely been supplemented by improper conduct." *Berkey*, 603 F.2d at 297-298.

But that is precisely what Advertisers seek to do—they claim an entitlement to all the damages resulting from Meta's alleged monopoly, just because the challenged conduct ███ ███████████████████████████ Williams Report ¶ 328 (emphasis added). "[E]ven assuming," as Williams does, that Meta's supposed price increases were "to some extent caused by" the challenged conduct, he concededly "made no attempt to show what *part* of the increase was caused by" that conduct. *Allegheny Pepsi-Cola Bottling Co. v. Mid-Atl. Coca-Cola Bottling Co.*, 690 F.2d 411, 415 (4th Cir. 1982) (emphasis added). That is, he made no attempt to calculate—as *Comcast* requires—the damages for which Advertisers are even arguably entitled to recover. *See Comcast*, 569 U.S. at 35. The problem with tying damages to a monopoly, rather than to the conduct challenged, is especially acute in a monopoly maintenance case like this one. That is because a monopoly maintenance case *presumes* that the monopoly predated the challenged conduct— meaning that the profits gained from the monopoly cannot possibly be attributed to the challenged conduct alone. *Cf.* 6C Philip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 657 (2023) ("[T]he consumer's injury results only from the *increment* in price that results from the unlawful monopolization[.]").

Advertisers' monopoly-based (rather than conduct-based) approach to damages would permit them to recover for theories of liability this Court has already held are time-barred and thus unavailable to the class—in other words, to do *exactly* what *Comcast* prohibits. Namely, Advertisers previously alleged claims based on Meta's acquisition of Instagram and WhatsApp (First Am. Compl., Dkt. 391 ¶¶ 246-301) and based on Meta's 2015 changes to its Platform policies and data sharing practices (*id.* ¶¶ 119-221). The parties ultimately agreed those claims

**PUBLIC REDACTED VERSION**

were time-barred, and the Court held that Advertisers could not "seek damages for" any of that conduct. Dkt. 396 at 2.

But Advertisers have never retreated from the position that those actions contributed to Meta's alleged monopoly—indeed, their class certification motion *opens* with a discussion of how Meta's pre-2016 Platform policies allowed it "to eliminate competition." Mot. 1. And when Advertisers recounted Meta's supposedly anticompetitive ███████████ in their interrogatory responses just a few months ago, they ████████████████████████████████████ ███████████████████████ *See* Interrogatory 11 Resp. at 89-91. And they further ███████ ████████████████████████████████████████████████████████████ ████████████████████ *Id.* at 77. As Advertisers see it, that conduct—for which Advertisers concededly have *no* right to recover—played a critical role in cementing Meta's alleged monopoly. And because Advertisers' damages figure calculates the entire amount of damages stemming from Meta's alleged monopoly, it seeks damages stemming from this pre-limitations conduct for which Advertisers cannot recover—that is, it measures damages that are unmoored from Advertisers' remaining theories of liability.

This Court has already warned Advertisers that they "will be held to" their promise not to seek damages for actions outside the limitations period. Dkt. 396 at 2 ("[T]he advertisers stated that they will not seek damages for … 'any pre-limitations period conduct.' Facebook has no substantive concerns about this representation, and the advertisers will be held to it." (citations omitted)). *Comcast* does not permit Advertisers to now circumvent that order by hitching their damages case to Meta's alleged monopoly instead of to the actual conduct they challenge.

## III. THE NAMED PLAINTIFFS ARE ATYPICAL AND INADEQUATE CLASS REPRESENTATIVES

A "material difference between the sophistication of a class representative and that of absent class members supports denying certification." *IntegrityMessageBoards.com v. Facebook, Inc.*, 2021 WL 3771785, at *8 (N.D. Cal. Aug. 24, 2021) (noting that the class representatives lacked the "degree of preexisting marketing experience" that "many" of the proposed class of Facebook advertisers did). That is precisely the situation here.

The named plaintiffs—who include the owner of a small-town barbershop who doubles as

**PUBLIC REDACTED VERSION**

a self-publishing joke book author (Mark Young), a resident advertising free concerts in her neighborhood (Kathy Looper), a Montana real estate agent and musician (Mark Berney, and his LLC "406 Property Services"), and a wine review website (Affilious, plaintiff Jessyca Frederick's business)—are not experienced advertising professionals. And, to their credit, they freely admit they do not understand the range of options available to advertisers. Mark Young acknowledged that ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 20, Young Tr. 34:18-23. He ████████████████████████████████████████████████████████████████████ ████████████████████████████████ *Id.* at 34:24-35:11. This is not surprising given that ████████████████████████████████████████████████████ *See* Ex. 21, Advertisers' Second Am. Init. Disc. at 35. When asked ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 22, Berney Tr. 169:19-25. Because of this inexperience, he █████████████████████████████████████████████████████████████████████████████████████████████. Advertisers' Second Am. Init. Disc. at 35. Jessyca Frederick's business Affilious, Inc. spent ██████████████████████████████████████. Ex. 23, Frederick Tr. 157:25-158:5. Frederick ██████████████████████████████████████████████████████████████. *Id.* at 78:8-79:15. Kathy Looper ████████████████████████████████████████████████. Ex. 24, Looper Dep. Ex. 10 at PALM-012939295. She ███████████████████████████████████, Ex. 25, Looper Tr. 80:6-16, and ██████████████████████████████████. *Id.* at 78:4-7 ("████████████████████████████████████████████████████████"). She

1   also admitted ██████████████████████████████████████████████████████

2   *Id.* at 58:24-59:1.

3        These idiosyncratic purchasers cannot claim to represent tens of millions of diverse

4   advertisers who differ greatly in terms of marketing experience, marketing objectives, and

5   marketing interests. Even more so because they cannot show that they (or others) lacked

6   alternatives to Meta, because they have no concept of what those alternatives may be. That

7   contrasts sharply with more sophisticated buyers who were aware of—and took advantage of—

8   ample alternative options to Meta for purchasing advertising. Indeed, such buyers not only had

9   alternatives to Meta's offerings, but were able to negotiate bespoke pricing agreements from

10  Meta—something the named plaintiffs presumably would not have even contemplated. *See* Tucker

11  ¶ 134 & n.258 (████████████████████████████████████████████████████████

12  ████████████████). The named plaintiffs are simply too dissimilar in size and sophistication

13  from huge swathes of the class to make them appropriate class representatives. *See Singh v. Google*

14  *LLC*, 2022 WL 94985, at *9 (N.D. Cal. Jan. 10, 2022) (noting that "the large disparity in size and

15  sophistication of [the proposed named plaintiff] and the members of the proposed class represents

16  an adequacy problem" and finding named plaintiff inadequate because he sought "to represent …

17  advertisers who spend amounts of money that are orders of magnitude higher *per month* than he

18  spends *per year*"); *see also In re Facebook, Inc., PPC Advert. Litig.*, 282 F.R.D. 446, 454 (N.D.

19  Cal. 2012) (finding that the "interests of [the proposed named plaintiffs] are different than those

20  of other class members" which included a "diverse group" of "large sophisticated corporations, as

21  well as individuals and small businesses"). That difference is especially salient given the facts of

22  this case—it is implausible to presume that a named plaintiff who did not shop around, plan his or

23  her campaign in a sophisticated way, or track the effectiveness of his or her advertising ultimately

24  paid a similar overcharge compared to a firm that carefully considered and monitored its approach

25  to advertising. And it is equally implausible for the named plaintiffs to seek to represent firms of

26  that sort.

27        The named plaintiffs' idiosyncrasies do not end there. Each named plaintiff had a specific,

28  limited objective for their Meta advertisements, none of which adequately reflect the variety of

**PUBLIC REDACTED VERSION**

purposes that advertisers must consider when deciding where to place their ad spend. Mark Young ██████████████████████████████████████████ Young Tr. 205:14-15, t██ ██████████ *id.* at 208:2. Looper ████████████████████████████████████████ ██████████████████████████████████████, Looper Tr. 187:23-188:2, and ████████ ████████████████████████████████████████████████████ *id.* at 13:13-15. Frederick was also ██████████████████████████████████████ and ██████████████████████████████████████—a consideration that would be more important to other advertisers interested in a more diverse geo-targeted campaign. Frederick Tr. 189:3-6.

The extraordinary gulf between the knowledge, objectives, and interests of the named plaintiffs and the class they seek to represent renders them inadequate as class representatives. Permitting them to proceed with this case as a class action thus risks a serious "denial of due process to the absent class members." *Burkhalter Travel Agency v. MacFarms Int'l, Inc.*, 141 F.R.D. 144, 154 (N.D. Cal. 1991). That danger is especially pronounced because those absent class members include advertisers who know, value, and derive great benefit from precisely the sort of advertising improvements challenged in this case. *See supra* I.A.2. Where named plaintiffs "claim to have been harmed by the same conduct that benefitted other members of the class[,] … the named representatives cannot 'vigorously prosecute the interests of the class.'" *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003). Many absent class members almost certainly have little interest in seeing valuable Meta features threatened or punished to enrich plaintiffs with whom they have nothing in common, let alone those plaintiffs' lawyers.

## CONCLUSION

The Court should deny Advertisers' motion for class certification with prejudice.

Dated: October 13, 2023                    Respectfully submitted,

                                           By: */s/ Sonal N. Mehta*

                                           SONAL N. MEHTA (SBN 222086)
                                            Sonal.Mehta@wilmerhale.com
                                           WILMER CUTLER PICKERING HALE
                                           AND DORR LLP
                                           2600 El Camino Real, Suite 400
                                           Palo Alto, California 94306
                                           Telephone: (650) 858-6000

                                           DAVID Z. GRINGER (pro hac vice)
                                            David.Gringer@wilmerhale.com
                                           ROSS E. FIRSENBAUM (pro hac vice)
                                            Ross.Firsenbaum@wilmerhale.com
                                           RYAN CHABOT (pro hac vice)
                                            Ryan.Chabot@wilmerhale.com
                                           PAUL VANDERSLICE (pro hac vice)
                                            Paul.Vanderslice@wilmerhale.com
                                           WILMER CUTLER PICKERING HALE
                                           AND DORR LLP
                                           7 World Trade Center
                                           250 Greenwich Street
                                           New York, New York 10007
                                           Telephone: (212) 230-8800

                                           ARI HOLTZBLATT (pro hac vice)
                                            Ari.Holtzblatt@wilmerhale.com
                                           MOLLY M. JENNINGS (pro hac vice)
                                            Molly.Jennings@wilmerhale.com
                                           WILMER CUTLER PICKERING HALE
                                           AND DORR LLP
                                           2100 Pennsylvania Avenue NW
                                           Washington, DC 20037
                                           Telephone: (202) 663-6000

                                           MICHAELA P. SEWALL (pro hac vice)
                                            Michaela.Sewall@wilmerhale.com
                                           WILMER CUTLER PICKERING HALE
                                           AND DORR LLP
                                           60 State Street
                                           Boston, Massachusetts 02109
                                           Telephone: (617) 526-6000

                                           *Attorneys for Defendant Meta Platforms, Inc.*

**PUBLIC REDACTED VERSION**

### CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of October, 2023, I electronically transmitted the public redacted version of the foregoing document to the Clerk's Office using the CM/ECF System and caused the version of the foregoing document filed under seal to be transmitted to counsel of record by email.

By:    */s/ Sonal N. Mehta*

Sonal N. Mehta