1  **QUINN EMANUEL URQUHART & SULLIVAN, LLP**
    Kevin Y. Teruya (Bar No. 235916)
2    kevinteruya@quinnemanuel.com
   865 South Figueroa Street, 10th Floor
3  Los Angeles, CA 90017
   (213) 443-3000
4

5  **HAGENS BERMAN SOBOL SHAPIRO LLP**
    Shana E. Scarlett (Bar No. 217895)
    shanas@hbsslaw.com
6  715 Hearst Avenue, Suite 202
   Berkeley, CA 94710
7  (510) 725-3000

8  *Interim Co-Lead Consumer Class Counsel*

9  [Additional counsel listed on signature page]

10

11                    **UNITED STATES DISTRICT COURT**

12                   **NORTHERN DISTRICT OF CALIFORNIA**

                     **SAN FRANCISCO DIVISION**
13

14  MAXIMILIAN KLEIN, et al.,               Consolidated Case No. 3:20-cv-08570-JD

15              Plaintiffs,                 **CONSUMER PLAINTIFFS' OPPOSITION
                                            TO      FACEBOOK'S     MOTION    TO
16         vs.                              EXCLUDE TESTIMONY OF NICHOLAS
                                            ECONOMIDES**
17  META PLATFORMS, INC.,
                                            The Hon. James Donato
18              Defendant.
                                            Hearing Date: Dec. 14, 2023 at 10:00 a.m.
19  This Document Relates To: All Consumer
    Actions                                 **REDACTED         VERSION      FILED
20                                          PUBLICLY**

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     LEGAL STANDARDS ...........................................................................................1

III.    DR. ECONOMIDES' IMPACT AND DAMAGES OPINIONS.............................2

IV.    ARGUMENT .........................................................................................................5

     A.     Dr. Economides' Impact Opinions Are Based On Real-World Examples, Extensive Record Evidence, and Accepted Economic Theory and Literature...........5

          1.     Facebook's core exclusion arguments simply ignore or actively misrepresent the extensive bases for Dr. Economides' impact opinions ...................................................................................................5

          2.     Dr. Economides' antitrust impact opinions fit this case................................7

     B.     Dr. Economides Bases His Damages Model On Extensive Real-World Evidence, Utilizing Well-Accepted Methods Rooted in Equally-Accepted Theory ........................................................................................................10

          1.     Dr. Economides' opinions are consistent with his prior research ...............11

          2.     Dr. Economides reliably uses the yardstick method, which is widely accepted for calculating damages in antitrust cases ....................................11

     C.     Dr. Economides' Opinions Regarding Data Practices and Settings Are Proper ........................................................................................................14

V.     CONCLUSION ....................................................................................................15

1

## <u>TABLE OF AUTHORITIES</u>

**Page**

2
<u>Cases</u>

3
*Bigelow v. RKO Radio Pictures,*

4
    327 U.S. 251 (1946) ......................................................................................................... 14

5
*Brown v. Google, LLC,*
    2022 WL 17961497 (N.D. Cal. Dec. 12, 2022) ........................................................... 14

6

7
*Dial Corp. v. News Corp.,*
    314 F.R.D. 108 (S.D.N.Y. 2015).................................................................................... 14

8
*Droplets, Inc. v. Yahoo! Inc.,*

9
    2021 WL 9038355 (N.D. Cal. Aug. 9, 2021) ................................................................. 7

10
*Elosu v. Middlefork Ranch Inc.,*
    26 F.4th 1017 (9th Cir. 2022)......................................................................................... 2

11

12
*Farmington Dowel Prod. Co. v. Forster Mfg. Co.,*
    421 F.2d 61 (1st Cir. 1969) ........................................................................................... 13

13
*Flintkote Co. v. Lysfjord,*

14
    246 F.2d 368 (9th Cir. 1957).......................................................................................... 13

15
*Huawei Techs., Co, Ltd v. Samsung Elecs. Co-., Ltd.,*
    340 F. Supp. 3d 934 (N.D. Cal. 2018) ......................................................................... 15

16

17
*IGT v. All. Gaming Corp.,*
    2008 WL 7084605 (D. Nev. Oct. 21, 2008)................................................................... 9

18
*Image Tech. Servs., Inc. v. Eastman Kodak Co.,*

19
    125 F.3d 1195 (9th Cir. 1997) ...................................................................................... 14

20
*In re Allstate Corp. Sec. Litig.,*
    2022 WL 842737 (N.D. Ill. Jan. 10, 2022) .................................................................. 11

21

22
*In re Androgel Antitrust Litig. (No. II),*
    2018 WL 2984873 (N.D. Ga. June 14, 2018) ............................................................... 8

23
*In re Capacitors Antitrust Litig.,*

24
    2020 WL 870927 (N.D. Cal. Feb. 21, 2020)........................................................... 9, 14

25
*In re Dealer Mgmt. Sys. Antitrust Litig.,*
    581 F. Supp. 3d 1029 (N.D. Ill. 2022) ......................................................................... 10

26
*In re Elec. Books Antitrust Litig.,*

27
    2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ............................................................... 8

28

*In re EpiPen (Epinephrine Injection, USP) Mktg.*, *Sales Pracs. & Antitrust Litig.*,
   2021 WL 2577490 (D. Kan. June 23, 2021) ................................................................. 8

*In re Facebook, Inc. Internet Tracking Litig.*,
   956 F.3d 589 (9th Cir. 2020) ...................................................................................... 13

*In re Glumetza Antitrust Litig.*,
   2021 WL 1817092 (N.D. Cal. May 6, 2021) ................................................................ 8

*In re Glumetza Antitrust Litig.*,
   2021 WL 3773621 (N.D. Cal. Aug. 25, 2021) ........................................................... 15

*In re Google Play Store Antitrust Litig.*,
   2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) ........................................................... 10

*In re Juul Labs, Inc. Mktg., Sales Pracs. & Prod. Liab. Litig.*,
   2022 WL 1814440 (N.D. Cal. June 2, 2022) ................................................................ 7

*In re Live Concert Antitrust Litig.*,
   863 F. Supp. 2d 966 (C.D. Cal. 2012) ....................................................................... 13

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
   169 F.R.D. 493 (S.D.N.Y. 1996) ................................................................................ 12

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
   2023 WL 1813530 (C.D. Cal. Feb. 7, 2023) .............................................................. 10

*In re Twitter, Inc. Securities Litig.*,
   2020 WL 9073168 (N.D. Cal. Apr. 20, 2020) ...................................................... 10, 11

*In re Visa Check/Mastermoney Antitrust Litig.*,
   192 F.R.D. 68 (E.D.N.Y. 2000) .................................................................................... 6

*In re Xyrem (Sodium Oxybate) Antitrust Litig.*,
   2023 WL 3440399 (N.D. Cal. May 12, 2023) ................................................. 10, 12, 14

*In re Zetia (Ezetimibe) Antitrust Litig.*,
   2021 WL 6690351 (E.D. Va. Aug. 17, 2021) ............................................................... 8

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
   451 U.S. 557 (1981) ..................................................................................................... 8

*Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*,
   387 F. Supp. 2d 794 (N.D. Ill. 2005) ......................................................................... 13

*Messick v. Novartis Pharms. Corp.*,
   747 F.3d 1193 (9th Cir. 2014) .................................................................................. 2, 8

*Milan v. Clif Bar & Co.*,
   340 F.R.D. 591 (N.D. Cal. 2021) ................................................................................. 2

*Moehrl v. Nat'l Ass'n of Realtors*,
   2023 WL 2683199 (N.D. Ill. Mar. 29, 2023) ................................................................. 10, 13

*Moore v. James H. Matthews & Co.*,
   682 F.2d 830 (9th Cir. 1982) ............................................................................................ 14

*Muffett v. City of Yakima*,
   2012 WL 12827492 (E.D. Wash. July 20, 2012) ............................................................. 13

*Murray v. S. Route Mar. SA*,
   870 F.3d 915 (9th Cir. 2017) ............................................................................................... 1

*Primiano v. Cook*,
   598 F.3d 558 (9th Cir. 2010) ............................................................................................... 2

*Rearden LLC v. Walt Disney Co.*,
   2021 WL 6882227 (N.D. Cal. July 12, 2021) .................................................................... 2

*Syufy Enterprises v. Am. Multicinema, Inc.*,
   793 F.2d 990 (9th Cir. 1986) ............................................................................................. 12

*United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare
   Fund v. Teikoku Pharma USA*,
   296 F. Supp. 3d 1142 (N.D. Cal. 2017) .............................................................................. 8

*US Airways, Inc. v. Sabre Holdings Corp.*,
   2022 WL 1042273 (S.D.N.Y. Apr. 5, 2022) ...................................................................... 6

*Wendell v. GlaxoSmithKline LLC*,
   858 F.3d 1227 (9th Cir. 2017) ............................................................................................. 2

## **Other Authorities**

Federal Rule of Evidence 702 ............................................................................................ 1, 2, 14

CONSUMERS' OPPOSITION TO FACEBOOK'S MOTION TO EXCLUDE ECONOMIDES [REDACTED]

**TABLE OF ABBREVIATIONS**

| Abbreviation | Referenced Document |
|---|---|
| **Ex. __** | All exhibit references are to the Declaration of Kevin Y. Teruya in Support of Consumer Plaintiffs' Opposition to Facebook's Motion to Exclude Testimony of Nicholas Economides, concurrently filed herewith. |
| **Economides ¶ __** | Expert Class Certification Report of Dr. Nicholas Economides, filed at Dkt. 645-5. |
| **Economides Reply ¶ __** | Reply Expert Class Certification Report of Dr. Nicholas Economides, filed at Dkt. 645-6. |
| **Mot.** | Facebook's Memorandum in Support of Motion to Exclude Testimony of Nicholas Economides, filed at Dkt. 651-3. |
| **Tucker ¶ __** | Expert Class Certification User Rebuttal Report of Facebook Expert Dr. Catherine Tucker, filed at Dkt. 645-19. |
| **Fair ¶ __** | Expert Class Certification Report of Facebook Expert Rebecca Kirk Fair, filed at Dkt. 645-20. |

**COUNTER STATEMENT OF ISSUES TO BE DECIDED**

The issues to be decided with respect to Facebook's Motion are:

Whether the Court should deny Facebook's Motion on the grounds that Facebook identifies no basis to exclude any portion of Dr. Economides' opinions in this case and instead raises arguments that, at best, go to the weight of his opinions, not their admissibility.

## I. <u>INTRODUCTION</u>

Consumer Plaintiffs ("Consumers") allege, and common evidence overwhelmingly shows, that Facebook monopolized the Personal Social Network Market ("PSN Market") by deceiving the market regarding its data practices. To define the relevant market, measure Facebook's monopoly power, assess the common impact of Facebook's anticompetitive deception on the Consumer Class, and calculate resulting damages, Consumers offered, *inter alia*, the opinions and testimony of Dr. Nicholas Economides, an internationally-renowned economist. Facebook does not challenge Dr. Economides' credentials, nor his extensive opinions and analyses regarding market definition, monopoly power, and anticompetitive conduct. Instead, it seeks to exclude portions of his opening and rebuttal opinions regarding: (a) antitrust impact; (b) damages; and (c) the economic ramifications of the complexity of Facebook's data practices and inefficacy of its supposed privacy settings.

In truth, Facebook's quibbles go to the weight of Dr. Economides' opinions, not their admissibility. Its critiques attack strawmen, mischaracterize the record and Dr. Economides' opinions, and ignore well-accepted economic theory and law. Dr. Economides relied on ███████ ███████ and extensive economic literature and real-world evidence to determine that competition unburdened by Facebook's anticompetitive market deception would have created a "negative price" market in which Facebook compensated its users for their data (whether through cash payments or some other type of compensation). And he used twelve, real-world yardsticks that applied a market price for such data, including several ██████████████████ ███████████████. With this market price established, he calculated class wide damages in the but-for world utilizing a flat rate pricing model that ████████████ ██████████. And his opinions on the ramifications of Facebook's data practices (given as an economist) rebut corresponding opinions from Facebook's own economic expert. Either she could not give such opinions in the first place, or Dr. Economides' rebuttals are just as proper as hers.

Facebook identifies no basis to exclude any of these opinions. The motion should be denied.

## II. <u>LEGAL STANDARDS</u>

Federal Rule of Evidence 702 and the Supreme Court's *Daubert* decision impose a "a flexible test examining the 'reliability' and 'fit' of the offered expert testimony." *Murray v. S. Route Mar. SA*,

1   870 F.3d 915, 922 (9th Cir. 2017). The Court's duty in assessing reliability is simply "to decide

2   whether" the expert "will use a generally accepted method … or whether his approach is 'junk

3   science' akin to predicting criminality by feeling the bump's on a person's head." *Milan v. Clif Bar*

4   *& Co.*, 340 F.R.D. 591, 601 (N.D. Cal. 2021) (Donato, J.). "The 'fit' question is one of relevance."

5   *Rearden LLC v. Walt Disney Co.*, 2021 WL 6882227, at *5 (N.D. Cal. July 12, 2021). The "relevancy

6   bar is low, demanding only that the evidence logically advances a material aspect of the proposing

7   party's case." *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014).

8        In exercising its gatekeeping role, the Court is "not a fact finder" and "is not tasked with

9   deciding whether the expert is right or wrong, just whether his testimony has substance such that it

10  would be helpful to a jury." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022)

11  (cleaned up). Even "[s]haky but admissible evidence is to be attacked by cross examination, contrary

12  evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564

13  (9th Cir. 2010). Ultimately, Rule 702 and *Daubert* "should be applied with a 'liberal thrust' favoring

14  admission." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017).

## III.   DR. ECONOMIDES' IMPACT AND DAMAGES OPINIONS

16       Dr. Economides explains that in the actual world, Facebook is a monopolist as a result of its

17  anticompetitive conduct, which ███████████████████████. The logical construction

18  of the *but-for* world without Facebook's anticompetitive conduct is well supported by accepted theory

19  and evidence. Dr. Economides explains that while Facebook does not charge users a monetary price,

20  Facebook is not "free." This is because "price" is "a thing of value" that "the user must give up in

21  order to use" a product. Economides ¶ 61. In some cases, that consideration is money, but, in the case

22  of personal social networks like Facebook, the in-kind consideration users provide is their data. *E.g.*,

23  *Id.* ¶¶ 61–63, 367, 367 n.560, 370. Well-accepted economic logic and theory indicate that when

24  consumers have competitive alternatives, sellers are forced to lower their prices to maintain market

25  share, else risk losing customers. *Id.* ¶ 370. Where, as here, the starting money price is "zero,"

26  additional competition should drive the money price to be "negative," such that users receive

27  compensation. *Id.*; Economides Reply ¶¶ 178–80.

28       This "negative price market" concept is well-recognized. ████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████ *E.g.*, Economides Reply ¶ 172 n.303 (citing PALM-010720853). Other documents are in accord. *E.g.*, Ex. 1 (CONSUMER-FB-0000002291 at -298) (Facebook co-founder explaining it "is not actually free," and "[w]e pay . . . with our data and our attention"); Ex. 8 (PALM-003556066 at -069) (█████████████████████████ ██████████████████████████); Ex. 17 (PALM-FTC-00024133) (██████). Other examples of record evidence confirm ████████████████████████████████████ █████████████████████████████████████████████████████████████████

- ████████████████████████████████████████████ ██████████████████ Economides ¶¶ 387–90 & 390 n.614 (citing Ex. 9 (PALM-013785714)).

- ████████████████████████████████████████████ ██████████████████████████████████████ Economides ¶¶ 391–92 (citing Ex. 10 (PALM-013788535)).

- ████████████████████████████████ Economides ¶ 390 (citing Ex. 11 (PALM-013553009)). ██████████████████████████████████████████████ *Id.* at -011.

- ████████████████████████████████████████████ ██████████████████████████████████████ Economides ¶ 386 (citing Ex. 12 (PALM-013818575)).

In addition to these multiple record examples, Dr. Economides also noted that competition, governmental, and economic authorities similarly recognize this well-accepted concept. Economides ¶ 370 n. 570 (citing, *inter alia*, a March 2019 report by the U.K. government that states "[f]or services funded through advertising, consumers will pay through provision of their data, " and the zero money price "may in fact be too high, as consumers could be extracting greater value in return for their data" and "could even be paid for the use of their data, and so effectively receive a negative price").[1] Another example was the Stigler Report, prepared by Dr. Fiona Scott Morton and others (cited in Economides Reply ¶ 108 n. 187), which explains, *inter alia*, that user data "has a market price that can be analyzed" and "[i]t is possible that a digital market has an equilibrium price that is ***negative***;

---

[1]  Dr. Economides also cites similar findings from the U.S. House Antitrust Subcommittee and the U.K. Competition & Markets Authority. Economides ¶ 370 n. 570.

1    … [*i.e.*,] **the consumer's data is so valuable that the platform would pay for it**." Ex. 2 at 9, 30. All

2    of this is consistent with Dr. Economides' opinions. Economides Reply ¶¶ 179–80.

3         On the bases of this and similar evidence cited throughout his reports, *see, e.g.*, Economides

4    ¶¶ 358–407; Economides Reply ¶¶ 81–137, 178–80, Dr. Economides concludes that Facebook

5    harmed all Consumer Class members through its anticompetitive conduct, because it allowed

6    Facebook to provide users less compensation for their data than it would have needed to provide with

7    meaningful competition. Contrary to Facebook's attempts to recast those opinions, Dr. Economides

8    explains compensation in the but-for world would have been either "direct monetary payment" **or**

9    non-cash compensation, like points of equivalent value. Economides ¶ 373; Economides Reply ¶ 84.[2]

10        With these impact opinions established, Dr. Economides next turned to class wide damages.

11   To do so, he first worked to identify a market price for the data Facebook collected from its users. He

12   identified twelve different, real-world examples where companies applied exactly such a price for the

13   same general type of data at issue in this case. These included programs from **Facebook**, Google,

14   Amazon, Nielsen, Comscore, Verto, SmartPhoneMate, Strategy Analytics, Embee, Placed.com, and

15   Luth Research.   Economides ¶¶ 373–453, Table D1; Economides Reply ¶¶ 145–50. Notably,

16   ████████████████████████████████████████████████████████████████████████

17   ████████████████████████████ Economides Reply ¶¶ 149–50. Dr. Economides also explained

18   in his reports why he selected these examples as yardsticks for the market price of data:

19   •    Although these yardsticks are "smaller scale" than the Facebook personal social network

20   ████████████████████████████████████████████████████████████████████. Economides ¶¶ 445–46;

21       Economides Reply ¶¶ 175–76.

22   •    He intentionally selected yardsticks that "do not offer free services with independent value,"
         *see* Mot. at 11, because he wanted to isolate the market price of ██████████████

23       ██████. This allows him to identify "the specific element of price (data compensation) that
         I am trying to measure in the but-for world." Economides Reply ¶¶ 152–53, 153 n.257.

24   •    Any differences in what the yardsticks collected vis-à-vis what Facebook collected in the
         real world rendered the yardsticks' implied market price **conservative**, because Facebook

25   _____

     [2] Contrary to Facebook's quote, Mot. at 3 n.1, Dr. Economides █████████████

26   ██████████ Ex. 14 (Economides Tr.) at 177:25–179:12. Dr. Economides also opined that

27   Facebook could provide electronic payments in money-backed points (which is a common way that
     companies ██████████████████████████████████ have used to pay users), and is consistent

28   with ██████████████████. *E.g.*, Economides ¶ 373; Economides Reply ¶ 84.

1  ████████████████████████████████████████████████████████████████

2  ████████████████████████████████. Users would demand
   more compensation for the former. Economides ¶ 446; Economides Reply ¶ 174.

3  • The yardsticks ███████████████████████████████████that a flat rate
   across all users is the most economically likely model ████████████████

4  regardless of how "valuable" any one user's data actually is. Economides ¶¶ 452–55;
   Economides Reply ¶¶ 87–94, 116–24, 175.

5     With numerous yardsticks regarding market price for user data established, Dr. Economides

6  next reviewed the range of payments these companies provided and identified $5 per month as the

7  most likely for Facebook's own payments in the but-for world. He reached this conclusion by looking

8  at ████████████████████████████████████. Economides ¶¶ 444–

9  449. As noted, he then concluded a flat rate was the most likely model, as demonstrated ████████

10  ████████████████. *Id.* ¶¶ 452–55. He then multiplied the $5 monthly payment by monthly

11  active users across the full time of the class period, arriving at a class wide damages calculation that

12  is equally capable of breaking out individual class members' damages. *Id.* ¶¶ 456–63. And he tested

13  his analysis with a rigorous robustness check. *Id.* ¶¶ 445–49. To be conservative, Dr. Economides

14  also estimated a lower market price ($3.50/month) and a higher price ($7/month), and showed how

15  utilizing any market price for data can be translated into classwide and individual damages. *Id.* ¶¶

16  450–51, 456–64. This is a straightforward, easy-to-understand, well-grounded damages model.

17  **IV.   <u>ARGUMENT</u>**

18     **A.   <u>Dr. Economides' Impact Opinions Are Based On Real-World Examples,
            Extensive Record Evidence, and Accepted Economic Theory and Literature</u>**

19

20     As noted, Dr. Economides opines that, in the but-for (*i.e.*, competitive) world, Facebook

21  would have had to compensate its users for their data. Dr. Economides concluded that, by not doing

22  so, Facebook anticompetitively impacted every single class member, because they received less in

23  compensation than they would have otherwise. In attacking these impact opinions, Facebook contends

24  they: (1) are not based on empirical or other analysis; and (2) rely on inapposite facts. Mot. at 5–6.

25  But this ignores the actual record, literature, and real-world examples underlying these opinions.

26     **1.   Facebook's core exclusion arguments simply ignore or actively
              misrepresent the extensive bases for Dr. Economides' impact opinions**

27     Faced with unquestioned record, public, and academic evidence making clear that a negative

28  price PSN Market is not only expected under basic economic theory, but also something that ███

1    ██████████████████████████, Facebook resorts to a number of arguments against Dr.

2    Economides' opinions that do not square with the facts or law, and certainly do not warrant exclusion.

3    **First**, Facebook suggests that the testimony must be excluded because, in the actual world, no

4    advertising-supported platform currently pays users. Mot. at 1. This is factually incorrect. Numerous

5    companies, including **Facebook itself**, have done so. In 2011, in return for viewing video ads on its

6    site, Facebook offered users "Facebook Credits." *See* Ex. 3. Facebook has also compensated users for

7    their data through its Study and Research programs, and companies like Google, Nielsen, Comscore,

8    and Amazon have paid users for their data as well. Economides ¶¶ 411–41. Facebook's own economic

9    expert, Dr. Tucker, conceded earlier this year in a published academic article that "[t]here are plenty

10   of firms who have sought to set up businesses which would allow individuals to own their data and

11   trade it for monetary value." Ex. 4 at 11; *see also* Ex. 13 (Tucker Tr.) at 234:10–20.

12   **Second**, Facebook argues that Dr. Economides' supposed absence of "empirical support"

13   renders his opinions unreliable and/or *ipse dixit*. This is facially absurd, given the extensive evidence

14   Dr. Economides cites, but it is also wrong under the law because, even if an antitrust economist's

15   expert report "is based principally on economic theory, not exhaustive empirical or quantitative

16   analysis," that itself "is no bar to its admission." *In re Visa Check/Mastermoney Antitrust Litig.*, 192

17   F.R.D. 68, 78 (E.D.N.Y. 2000); *see also US Airways, Inc. v. Sabre Holdings Corp.*, 2022 WL

18   1042273, at *1 (S.D.N.Y. Apr. 5, 2022) (denying *Daubert* motion where economics expert did not

19   create economic model, but instead based their opinions "on reliable economic principles"). Dr.

20   Economides unquestionably relies on, *inter alia*, accepted economic theory and record evidence for

21   his opinions, rendering this argument from Facebook both unsupported and legally incorrect.

22   Facebook's cited cases, *see* Mot. at 6, do not help it. In *Carnegie Mellon Univ. v. Hoffmann-*

23   *LaRoche, Inc.*, the expert—a scientist analyzing experiments and data concerning DNA polymerase—

24   was excluded where he had a financial interest in the litigation, "examin[ed] only subsets of the

25   controls" (*i.e.*, "the ones that do not disprove his theory"), and "rel[ied] on sentences from scientific

26   literature taken out of context." 55 F. Supp. 2d 1024, 1034–35 (N.D. Cal. 1999). In *Miller v. Pfizer*,

27   *Inc.*, the court excluded a psychiatrist's opinions that a pharmaceutical caused the decedent's suicide

28   because the expert relied only "on pre-selected evidence from interested parties" and did not look at

1  *any* other evidence about potential causes, such as facts indicating the decedent had suicidal thoughts

2  before he began using the pharmaceutical. 196 F. Supp. 2d 1062, 1086–87 (D. Kan. 2002).

3  These cases bear no resemblance to the facts here. Dr. Economides reviewed a wide body of

4  evidence, including the documents and testimony ███████████████████████████

5  ███████████████. Economides, Appendix C. His compensation is in no way contingent on his

6  opinions or the outcome of this litigation. *Id.* ¶ 5. Facebook's own counsel acknowledged that ████

7  ████████████████████. Ex. 14 (Economides Tr.) at 61:4–7. He asked his ████████████████

8  █████████████████████████. *Id.* at 55:17–19, 63:13–21 (emphasis added). And,

9  perhaps most importantly, many of the documents supporting his opinions come from ██████████

10  ███████. This is not the stuff of "junk science," and Facebook offers no case suggesting as much.

11  While Facebook may disagree with Dr. Economides' analysis, that is not a basis to exclude

12  his opinions. *See, e.g.*, *Droplets, Inc. v. Yahoo! Inc.*, 2021 WL 9038355, at *11 (N.D. Cal. Aug. 9,

13  2021) (denying *Daubert* on this basis, and noting that while defendant "may disagree with" expert's

14  "analysis, ... it is not *ipse dixit*" because it "relies on several studies"); *In re Juul Labs*, *Inc. Mktg.*,

15  *Sales Pracs. & Prod. Liab. Litig.*, 2022 WL 1814440, at *4 n. 5 (N.D. Cal. June 2, 2022) (similar,

16  and noting such arguments "go to the weight … and do not justify wholesale exclusion").

17  ***Third***, Facebook asserts that it is not a personal social network, but is instead an "attention

18  platform" that "competes for user time and attention." *E.g.*, Mot. at 1, 5–6. This supposedly means

19  Dr. Economides "is unscientifically avoiding essential facts." *Id.* at 6. But Facebook has already

20  ████████████████████████████████████████████████. Tucker ¶ 25; Fair ¶ 1

21  n.2. Excluding Dr. Economides' impact opinions because Facebook disagrees as a factual matter with

22  his market definition is improper under *Daubert* and Facebook's self-limitation.

### 2.    Dr. Economides' antitrust impact opinions fit this case

24  Facebook next challenges Dr. Economides' opinions on the grounds that they do not fit the

25  case. Mot. at 6. This is impossible to square with his actual opinions and the bases for them.

26  As an initial matter, Facebook simply misapplies the law on "fit." Its argument is apparently

27  that, in developing his opinions about the but-for world, Dr. Economides cannot rely on real-world

28  evidence of situations where Facebook considered and "rejected" proposals to compensate users *en*

1  *masse* for their data, or evidence of where it actually paid users for their data (in its "Research" and

2  "Study" programs). Mot. at 6–7. But, such evidence is clearly relevant to economic opinions

3  regarding the but-for world in this antitrust case, as "fit" under *Daubert* "depends on the particular

4  law at issue because expert opinion testimony is relevant if the knowledge underlying it has a valid

5  connection to the pertinent inquiry." *Messick*, 747 F.3d at 1196–97 (cleaned up).

6    To this point, it is axiomatic that "the but-for world does not exist." *In re Elec. Books Antitrust*

7  *Litig.*, 2014 WL 1282293, at \*27 (S.D.N.Y. Mar. 28, 2014). That is because "[t]he vagaries of the

8  marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the

9  absence of the defendant's antitrust violation." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451

10  U.S. 557, 566 (1981). An antitrust plaintiff therefore "need not show that the [defendant] of our world

11  actually contemplated a given scenario within the but-for world." *In re Glumetza Antitrust Litig.*,

12  2021 WL 1817092, at \*13 (N.D. Cal. May 6, 2021). To insist otherwise "rests upon the befuddling

13  notion that our actors must have contemplated what they would have done in a but-for world which,

14  due to defendants' antitrust violation, *never happened*." *Id.* at \*16 (emphasis in original).

15    For these reasons, courts regularly reject *Daubert* arguments from antitrust defendants seeking

16  exclusion on the notion that an expert's opinion regarding the defendant's expected conduct in the

17  but-for world is unsupported by any evidence that the defendant behaved that exact way in the actual

18  world. *See, e.g.*, *United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare*

19  *Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1190 (N.D. Cal. 2017); *In re Androgel Antitrust*

20  *Litig. (No. II)*, 2018 WL 2984873, at \*17 (N.D. Ga. June 14, 2018); *In re Zetia (Ezetimibe) Antitrust*

21  *Litig.*, 2021 WL 6690351, at \*6 (E.D. Va. Aug. 17, 2021). But, here, there *is* evidence ████████

22  ████████████████████████████████████████████████████████████████████████████████████████

23  ████████. That renders his opinions even stronger than the ones upheld in the above-cited cases. *See*

24  *In re EpiPen (Epinephrine Injection, USP) Mktg.*, *Sales Pracs. & Antitrust Litig.*, 2021 WL 2577490,

25  at \*16 (D. Kan. June 23, 2021) (evidence that antitrust defendants in actual world "considered" course

26  of action expert predicted would have occurred in the but-for world would corroborate the analysis).

27    Given its lack of legal support, Facebook turns to factual disputes. But each simply shows

28  why Facebook's attacks go to weight, not admissibility. For example, Facebook asserts—with no real

1  citation—that paying "████████████████████████████" Mot. at

2  6–7. In contrast, using record evidence, Dr. Economides showed that ████████████

3  ███████████████████████████████████████. *E.g.*, Economides

4  ¶¶ 386, 389, 392 (███████████████████████████████████████████

5  ███████████████████████████████████████████████

6  ███████████████████████████████). Moreover, Facebook tracks its

7  monetization in terms of "average revenue per user" (ARPU), and Dr. Economides ██████

8  ███████████████████████████████████████████████

9  ███████████████████████████████████████████████

10 ███████████████████████████. Economides ¶ 445–47.

11     Facebook's selective citation to two depositions is unavailing.[3] Mot. at 6–7. It merely disputes

12 evidence, and the inferences to be drawn therefrom. But "*Daubert* does not allow a court to resolve a

13 factual dispute underlying the expert's analysis." *IGT v. All. Gaming Corp.*, 2008 WL 7084605, at *8

14 (D. Nev. Oct. 21, 2008). "Learned professionals can have strong disagreements about their analyses

15 of facts, and the strength of their disagreement does not mean" either "must be dismissed as a quack."

16 *In re Capacitors Antitrust Litig.*, 2020 WL 870927, at *2 (N.D. Cal. Feb. 21, 2020) (Donato, J.).

17     Facebook next suggests that its market research programs, where it provides actual payments

18 for user data, do not support Dr. Economides because of differences in those programs. This misses

19 the point. Dr. Economides explains Facebook's "offer[ing] compensation to users in exchange for the

20 collection and use of additional user data" in the actual world is "economically significant evidence

21 of Facebook's economic incentives, its revealed preferences, and the operation of a market by which

22 consumers receive monetary payments for their data." Economides ¶ 375. Facebook's quarrel with

23 the ultimate significance of this evidence does not rely on any supposed methodological flaw and is

24

25 [3] Mr. Baser testified ████████████████████████████████████████

26 ████████████████████████████████████████████████

27 ████████████████████ Ex. 16 (Baser Tr.) at 288:19–294:23. Mr. Zuckerberg testified ██████

28 ████████████████████████████████████████████████

                                              Ex. 15 (Zuckerberg Tr.) at 52:13–53:8, 60:14–61:15.



thus a jury argument. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1070 (N.D. Ill. 2022) (denying *Daubert* and explaining "it is up to the factfinder to decide which expert's 'but for' world is the more convincing one"); *Moehrl v. Nat'l Ass'n of Realtors*, 2023 WL 2683199, at *6–7 (N.D. Ill. Mar. 29, 2023) (antitrust defendants' competing "interpretation of facts" they "believe undermine" expert's but-for world opinions not grounds for exclusion" and "for the jury to decide").

Finally, Facebook's passing reference to this Court's *Google Play* decision is baffling. Mot. at 8. In *Google Play*, the Court excluded the plaintiff expert's "pass-through" and "consumer subsidy" opinions at the merits stage, explaining the former was based on a "logit" model that was predicated on an "unproven assumption" that "cannot be squared with the economic literature" and was not factually supported because it led to absurd conclusions. *In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *7–10 (N.D. Cal. Aug. 28, 2023). The Court further explained there was "no visible factual support" and "no real analysis or data" regarding the "subsidy model." *Id.* at *9–10. That is not the case here, where the opinions Dr. Economides provides directly square with  economic theory and literature, competition authorities' analyses, and Facebook's own materials and conduct.

### B.       Dr. Economides Bases His Damages Model On Extensive Real-World Evidence, Utilizing Well-Accepted Methods Rooted in Equally-Accepted Theory

Facebook's attacks on Dr. Economides' damages model boil down to assertions that: (1) in prior scholarship, Dr. Economides supposedly rejected the type of payment model he opines Facebook would have employed in the but-for world; and (2) he relied on "improper" yardsticks. These arguments each fail because they are not only wrong; they (once again) at best go to weight.

The "yardstick" method Dr. Economides used to identify a market price for Facebook's data "is an accepted methodology in antitrust cases." *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 2023 WL 1813530, at *8 (C.D. Cal. Feb. 7, 2023); Economides ¶ 411; Economides Reply ¶¶ 143–45. Facebook's factual criticisms with his yardstick selections are fodder for cross-examination and not a basis to exclude. *See In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 2023 WL 3440399, at *13 (N.D. Cal. May 12, 2023) (denying *Daubert* and explaining that defendants' argument that there were "more appropriate yardsticks" is matter for cross-examination). So, too, are its arguments about supposed "contradictions" with his prior scholarship. *See*, *e.g.*, *In re Twitter, Inc. Securities Litig.*,

2020 WL 9073168, at *5 (N.D. Cal. Apr. 20, 2020) (expert's "prior work contradict[ing] his opinions" is "not a ground for exclusion"; it "can be addressed through cross-examination."); *In re Allstate Corp. Sec. Litig.*, 2022 WL 842737, at *13 (N.D. Ill. Jan. 10, 2022) (same, as to academic work).

### 1. Dr. Economides' opinions are consistent with his prior research

Facebook first asserts that Dr. Economides "███████████████████████████████ ████████████████████████████████████████" because it claims one of his articles says Facebook already adequately compensates users. Mot. at 3–4, 9. This is flatly incorrect, and deeply disingenuous—as the article's title itself makes clear: "Giving Away Our Data for Free is a ***Market Failure***." In any event, Dr. Economides' previous scholarship is fully consistent with his opinions in this case. What he actually said is that forcing users "to provide personal data at zero price is a direct result of" Facebook's "market dominance," which allows it to "avoid[] monetary payments that would be the norm in the but for world." Ex. 5. Notably, he also did so at a time when he did not have access to the confidential materials Facebook provided (and to which it testified) in this case.

Facebook also cherry-picks language from Dr. Economides' article that the compensation would fluctuate depending on the value of the user or individual negotiation. Mot. at 3–4, 9. As Dr. Economides explained here, however, that prior article "explored the ***theoretical possibility*** of personalized price discrimination in the compensation offered to users" and did not—could not— reflect confidential evidence ████████████████████████████████████████ ███████████████████████████████████████████████████████████████is the most economically rational, and thus likely approach for the but-for world, based on multiple factors Facebooks does not question in its motion (████████████████████████████████████ ██████████████████████). Economides ¶¶ 399, 409–10, 452–54; Economides Reply ¶¶ 81–130; Ex. 14 (Economides Tr.) at 242:11–243:1, 245:17–247:2.

Finally, as noted above, even if Facebook were correct there is any "contradiction" here, that is not an exclusion argument. *Twitter*, 2020 WL 9073168, at *5; *Allstate*, 2022 WL 842737, at *13.

### 2. Dr. Economides reliably uses the yardstick method, which is widely accepted for calculating damages in antitrust cases

Facebook's next tack is to argue that Dr. Economides relied on improper yardsticks for his

1    damages model. These arguments contradict the facts and do not demonstrate a basis for exclusion.

2         First, Facebook's insistence that yardsticks need be "identical" to the product or from the same

3    relevant market at issue grossly misstates the applicable standard. Mot. at 9–10. Yardsticks need only

4    be reasonably "comparable" to the product at issue. *Syufy Enterprises v. Am. Multicinema, Inc.*, 793

5    F.2d 990, 1003 (9th Cir. 1986). Facebook finally conceded this point shortly before Consumers

6    submitted this opposition brief. Dkt. 663-1 at 5. A yardstick need only be reasonably "comparable"

7    because the yardstick method necessarily compares "prices paid by the plaintiff with the

8    corresponding data for a firm or **in a market unaffected by the violation**." *In re NASDAQ Mkt.-

9    Makers Antitrust Litig.*, 169 F.R.D. 493, 521 (S.D.N.Y. 1996) (emphasis added).

10        The weight of the literature is similarly clear. For example, *Measuring Benchmark Damages

11   in Antitrust Litigation*—which Facebook's economic expert (Dr. Tucker) cites on these issues, *see*

12   Tucker ¶ 195 n. 436—states that "[i]n a typical yardstick approach, one compares prices during the

13   period … to prices in **other markets**" that are "reasonably comparable." Ex. 6 at 63. While Facebook

14   tries to imply Prof. Hovenkamp's treatises vaguely suggest something to the contrary, *see* Mot. at 9–

15   10, it mixes and matches quotes from sections on lost profits damages and cartel cases to paint an

16   incorrect picture of the actual standard. In his "*Primer on Antitrust Damages*"—which both Facebook

17   and Dr. Tucker cite—Prof. Hovenkamp explains that "in **exclusionary practice cases**" (like this one),

18   experts "might also select a different product market rather than a different geographic market as a

19   'yardstick.'" Ex. 7 at 31 (emphasis added). And Dr. Tucker ███████████████████████

20   ████████████████████████████████████████████████████████████████████████████

21   ██████████████████████████████ Ex. 13 (Tucker Tr.) at 296:16–297:4.

22        Facebook's factual arguments about those yardsticks also fail. Facebook suggests that Dr.

23   Economides should have used different firms in his yardstick analysis. Mot. at 11. But Dr.

24   Economides explained the myriad reasons why he did not use those firms as yardsticks. Economides

25   Reply ¶¶ 171–73. Facebook's disagreement with his reasons for rejecting them is fodder for cross-

26   examination, not exclusion. *See Xyrem*, 2023 WL 3440399, at *13.

27        Similarly, Facebook's contention that market-research payments say nothing about a price

28   that Meta would pay users, *see* Mot. at 9–13, is again an inherently factual dispute. As discussed, Dr.

Economides explained at length why each of Facebook's critiques are meritless and ignore the many, well-founded reasons he selected his data market price yardsticks. *See supra* at 4–5.

But, even if this were not alone enough to refute Facebook's factual arguments, as Dr. Economides noted, when ███████████████████████████████████████████████

███████████████████████████████████████████████████████████. *E.g.*, Economides Reply ¶¶ 149–50 (████████████████████████████████████); Ex. 11. This demonstrates that ███████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████—just as Dr. Economides did. *Moehrl*, 2023 WL 2683199, at *9 (evidence that defendants themselves used some of Dr. Economides' "potential yardsticks" as "comparators" demonstrated reliability of his yardstick damages opinions); *cf. In re Facebook, Inc. Internet Tracking Litig.,* 956 F.3d 589, 600 (9th Cir. 2020) ("research panels that pay participants for access to their browsing histories" indicative of "financial value" of Facebook users' data).

Facebook's cited cases are either inapposite, or *support* admitting Dr. Economides' damages opinions. For example, in *Muffett v. City of Yakima*, 2012 WL 12827492, at *3 (E.D. Wash. July 20, 2012); *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 976 (C.D. Cal. 2012); and *Loeffel Steel Prod.*, *Inc. v. Delta Brands*, *Inc.*, 387 F. Supp. 2d 794, 806 n. 9, 812–15 (N.D. Ill. 2005), the experts all either performed no discernible comparability analysis for their yardsticks, or committed fundamental errors in identifying the prices used in the yardsticks they selected. That fact pattern obviously has no application to Dr. Economides, who consulted extensive documents and data in support of his comparability analysis and accurately quoted the prices from his yardsticks. *See* Economides ¶¶ 408–449; Economides Reply ¶¶ 138–76.

Others of Facebook's citations are inapposite because they address unsupported **lost profit** analyses, which need to reflect the plaintiff's lost profits but, in those cases, did not. *See Farmington Dowel Prod. Co. v. Forster Mfg. Co.*, 421 F.2d 61, 82 & n.48 (1st Cir. 1969) (calculating plaintiff's lost profits based on the defendant's profits); *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 393 (9th Cir. 1957) (similar, but based solely on plaintiffs' personal expectations from their prior employer, rather than "evidence of what any other similar business did during any period"). This is not a lost profits

case, rendering these two cases completely irrelevant to Dr. Economides' damages opinions. And in *In re Blood Reagents Antitrust Litig.*, the court **denied** a *Daubert* as to the expert's yardstick analysis, because exclusion is appropriate only where "the expert testimony is so deficient that the yardsticks cannot logically advance a material aspect of the proposing party's case," and the expert "examined the discovery produced in this case, including underlying documents and relevant depositions" and data. 2015 WL 6123211, at \*22–23 (E.D. Pa. Oct. 19, 2015). For the reasons discussed above, Dr. Economides supported his yardstick selection through careful, well-grounded analyses.

At bottom, what all of this confirms is that any quibbles Facebook may have with Dr. Economides' yardsticks "may be grist for a good cross-examination at trial, but they do not play a material role in deciding whether" his "work should be admitted under Rule 702." *Capacitors*, 2020 WL 870927, at \*2; *see also, e.g.*, *Xyrem*, 2023 WL 3440399, at \*13 (denying *Daubert* because "it is often very difficult to select a yardstick" that "perfectly tracks" and "differences" do not "fatally undermine" expert's choice); *Brown v. Google, LLC*, 2022 WL 17961497, at \*5 (N.D. Cal. Dec. 12, 2022) (denying *Daubert*, as price Google paid users of its Screenwise panel—one of Dr. Economides' yardsticks—was "logical and reliable" estimate of value of user data, even though "the full scope of the data collected in the Screenwise studies differs in some respect from the at-issue data"). Moreover, the Ninth Circuit is clear that whether yardsticks "properly compare[] to the relevant market presents a question of fact for the jury." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1221 (9th Cir. 1997). Facebook, as the antitrust wrongdoer, cannot insist on an impossible level of proof of damages—*e.g.*, perfectly identical yardsticks—as "[a]ny other rule would enable [it] to profit by [its] wrongdoing at the expense of" the Consumer Class. *Moore v. James H. Matthews & Co.*, 682 F.2d 830, 836 (9th Cir. 1982); *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946); *see also Dial Corp. v. News Corp.*, 314 F.R.D. 108, 119 (S.D.N.Y. 2015) (denying *Daubert* because "the selection of perfectly comparable benchmarks is impossible" given defendant's "alleged monopoly").

### C.    Dr. Economides' Opinions Regarding Data Practices and Settings Are Proper

Facebook contends that Dr. Economides should be precluded from providing rebuttal opinions that "███████████████████████████████████████" because such opinions are supposedly outside his "economic training." *See* Mot. at 13. This is incorrect for multiple reasons.

These opinions *rebut* opinions to the exact contrary from Facebook's economic expert, Dr. Tucker. Specifically, she ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████. Tucker ¶ 59; Economides Reply ¶ 35. Dr. Economides rebuts that the literature—including on the "economics of privacy," Dr. Tucker's supposed area of expertise—and record contradict such views and show ███████████████████████ ████████████████████████████████████████████. Economides Reply ¶¶ 23–52.

An expert is entitled to respond to critiques from the other party's expert. In doing so, the expert can properly "provide factual context" that "is necessary context to the challenged conclusions." *Huawei Techs., Co, Ltd v. Samsung Elecs. Co*., *Ltd.*, 340 F. Supp. 3d 934, 992–93 (N.D. Cal. 2018). Section IV(C)—the specific section of Dr. Economides' reply report that Facebook seeks to exclude—provides factual support for Dr. Economides' opinions in preceding sections that Facebook does not seek to exclude. *In re Glumetza Antitrust Litig.*, 2021 WL 3773621, at *20 (N.D. Cal. Aug. 25, 2021) (rejecting *Daubert* argument that antitrust economist acted as "human highlighter" because expert must "summarize the facts and data considered in their report.").

Moreover, Dr. Economides' academic work has involved issues regarding privacy in the digital economy, information asymmetry and its competitive implications, and usability, security, and privacy of information technology. Ex. 14 (Economides Tr.) at 11:25–13:17; Economides Appendix C. If he as an economist cannot offer this response to Dr. Tucker's opinions, then Dr. Tucker—Facebook's economist, who ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████, *e.g.*, Ex. 13 (Tucker Tr.) at 164:1–15, 171:5–22—also has no expert basis for her opinions. Consumers suspect Facebook will maintain that Dr. Tucker *can* offer such opinions, so, based on his credentials and experience, Dr. Economides is qualified and should be permitted to offer his own.

## V.   **CONCLUSION**

For these reasons, Consumers respectfully request that the Court deny Facebook's motion.

DATED: October 13, 2023

By: */s/ Shana E. Scarlett*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Shana E. Scarlett (Bar No. 217895)
    shanas@hbsslaw.com
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
(510) 725-3000

Steve W. Berman (admitted *pro hac vice*)
    steve@hbsslaw.com
1301 Second Avenue, Suite 2000
Seattle, WA 98101
(206) 623-7292

*Interim Co-Lead Consumer Class Counsel*

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
W. Joseph Bruckner (admitted *pro hac vice*)
    wjbruckner@locklaw.com
Robert K. Shelquist (admitted *pro hac vice*)
    rkshelquist@locklaw.com
Brian D. Clark (admitted *pro hac vice*)
    bdclark@locklaw.com
Rebecca A. Peterson (Bar No. 241858)
    rapeterson@locklaw.com
Kyle Pozan (admitted *pro hac vice*)
    kjpozan@locklaw.com
Laura M. Matson (admitted *pro hac vice*)
    lmmatson@locklaw.com
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900

*Interim Counsel for the Consumer Class*

By: */s/ Kevin Y. Teruya*

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Kevin Y. Teruya (Bar No. 235916)
    kevinteruya@quinnemanuel.com
Adam B. Wolfson (Bar No. 262125)
    adamwolfson@quinnemanuel.com
Scott L. Watson (Bar No. 219147)
    scottwatson@quinnemanuel.com
Claire D. Hausman (Bar No. 282091)
    clairehausman@quinnemanuel.com
Brantley I. Pepperman (Bar No. 322057)
    brantleypepperman@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
(213) 443-3000

Michelle Schmit (admitted *pro hac vice*)
    michelleschmit@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606-1881
(312) 705-7400

Manisha M. Sheth (admitted *pro hac vice*)
    manishasheth@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Interim Co-Lead Consumer Class Counsel*

CONSUMERS' OPPOSITION TO FACEBOOK'S MOTION TO EXCLUDE ECONOMIDES [REDACTED]

**ATTESTATION OF KEVIN Y. TERUYA**

This document is being filed through the Electronic Case Filing (ECF) system by attorney Kevin Y. Teruya. By his signature, Mr. Teruya attests that he has obtained concurrence in the filing of this document from each of the attorneys identified on the caption page and in the above signature block.

Dated: October 13, 2023          By   /s/ Kevin Y. Teruya
                                        Kevin Y. Teruya


**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of October 2023, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System, causing it to be electronically served on all attorneys of record.

By   /s/ Kevin Y. Teruya
     Kevin Y. Teruya

CONSUMERS' OPPOSITION TO FACEBOOK'S MOTION TO EXCLUDE ECONOMIDES [REDACTED]