<u>**PUBLIC REDACTED VERSION**</u>

| | |
|---|---|
| WILMER CUTLER PICKERING HALE AND DORR LLP | ARI HOLTZBLATT (*pro hac vice*)<br>  Ari.Holtzblatt@wilmerhale.com |
| SONAL N. MEHTA (SBN 222086)<br>  Sonal.Mehta@wilmerhale.com<br>2600 El Camino Real, Suite 400<br>Palo Alto, California 94306<br>Telephone: (650) 858-6000 | MOLLY M. JENNINGS (*pro hac vice*)<br>  Molly.Jennings@wilmerhale.com<br>1875 Pennsylvania Ave NW<br>Washington, DC 20006<br>Telephone: (202) 663-6000 |
| DAVID Z. GRINGER (*pro hac vice*)<br>  David.Gringer@wilmerhale.com<br>ROSS E. FIRSENBAUM (*pro hac vice*)<br>  Ross.Firsenbaum@wilmerhale.com<br>RYAN CHABOT (*pro hac vice*)<br>  Ryan.Chabot@wilmerhale.com<br>PAUL VANDERSLICE (*pro hac vice*)<br>  Paul.Vanderslice@wilmerhale.com<br>7 World Trade Center<br>250 Greenwich Street<br>New York, New York 10007<br>Telephone: (212) 230-8800 | MICHAELA P. SEWALL (*pro hac vice*)<br>  Michaela.Sewall@wilmerhale.com<br>60 State Street<br>Boston, Massachusetts 02109<br>Telephone: (617) 526-6000 |

*Attorneys for Defendant Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated,<br><br>                              Plaintiffs,<br><br>    v.<br><br>META PLATFORMS, INC., a Delaware Corporation headquartered in California,<br><br>                              Defendant. | Case No. 3:20-cv-08570-JD<br><br>**META PLATFORMS, INC.'S OPPOSITION TO ADVERTISER PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF DR. CATHERINE TUCKER**<br><br>Hearing Date: December 14, 2023<br>Time: 10:00 a.m.<br>Judge: Hon. James Donato |

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

BACKGROUND ....................................................................................................................2

LEGAL STANDARD .............................................................................................................4

ARGUMENT ..........................................................................................................................4

    I.    Tucker Reliably And Correctly Opined That Not All Ads Meta Sold During The Class Period Were "Social" ....................................................................................4

    II.   Tucker Reliably And Correctly Opined That Advertisers' Injury And Damages Model Is Untethered To the Conduct They Challenge ............................................9

    III.  Tucker Reliably And Correctly Opined That Many Class Members Benefited From the Challenged Conduct .................................................................................11

CONCLUSION .......................................................................................................................14

**PUBLIC REDACTED VERSION**

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*In re Aluminum Warehousing Antitrust Litig.*,
  336 F.R.D. 5 (S.D.N.Y. 2020) ..................................................................................................11

*Berkey Photo, Inc v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979) ....................................................................................................10

*Blades v. Monsanto Co.*,
  400 F.3d 562 (8th Cir. 2005) .................................................................................................5, 6

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ..................................................................................................................10

*Fido's Fences, Inc. v. Radio Sys. Corp.*,
  999 F. Supp. 2d 442 (E.D.N.Y. 2014) ......................................................................................5

*Heerwagen v. Clear Channel Commc'ns*,
  435 F.3d 219 (2d Cir. 2006) ......................................................................................................5

*Huawei Techs., Co. v. Samsung Elecs. Co.*,
  340 F. Supp. 3d 934 (N.D. Cal. 2018) ......................................................................................4

*IGT v. Alliance Gaming Corp.*,
  2008 WL 7084605 (D. Nev, Oct. 21, 2008) .............................................................................8

*Kotteras v. Whole Foods Mkt., Inc.*,
  281 F.R.D. 16 (D.D.C. 2012) ..................................................................................................11

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
  791 F.2d 1356 (9th Cir. 1986) ...........................................................................................10, 11

*Somers v. Apple Inc.*,
  729 F.3d 953 (9th Cir. 2013) ....................................................................................................5

*Stromberg v. Qualcomm Inc.*,
  14 F.4th 1059 (9th Cir. 2021) .................................................................................................14

*Sumotext Corp. v. Zoove, Inc.*,
  2020 WL 264701 (N.D. Cal. Jan. 17, 2020) ................................................................4, 7, 14

*TCL Commc'ns Tech. Holdings Ltd. v. Telefonaktenbologet LM Ericsson*,
  2016 WL 7042085 (C.D. Cal. Aug. 17, 2016) ....................................................................4, 10

*US Airways, Inc v. Sabre Holdings Corp.*,
  2022 WL 1042273 (S.D.N.Y. Apr. 5, 2022) ...........................................................................13

**PUBLIC REDACTED VERSION**

*Williams v. Illinois*,
    567 U.S. 50 (2012)................................................................................................4, 12, 13

**PUBLIC REDACTED VERSION**

## INTRODUCTION

Advertisers' motion to exclude Catherine Tucker's testimony is meritless. Tucker is not only well-qualified to offer the opinions rendered, but Advertisers' own experts ▬▬▬▬. Each of Advertisers' criticisms of her opinions fails.

Tucker opines that not all ads sold by Meta during the class period fit Advertisers' definition of a "social" ad, and her analysis shows that it is likely that a majority of the proposed class never purchased a social ad at all. Unable to disprove this, Advertisers instead seek to prevent Tucker from testifying about it, claiming that her analysis was based on a made-up, "private" definition of social advertising. Dkt. 660 ("Mot") 7. It was not. Most ads on Meta are not targeted based on the very criteria that Advertisers' own experts used to define social advertising: users' social connections, the "social data contained in a 'social graph'" that advertisers claim distinguish "social" ads from "nonsocial" online ads. Dkt. 643 at 4. It is of little surprise then that two of Advertiser's putative experts, Scott Fasser and Joshua Gans, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬.

Tucker next opines that Advertisers' classwide antitrust injury and damages theory, based on the Kreitzman-Williams "yardstick" study, fails to show that the conduct advertisers challenge caused the harm for which they seek redress. On this issue, again, ▬▬▬▬▬▬. Indeed, Williams acknowledges that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. Yet Advertisers move to exclude Tucker's testimony about this essentially undisputed fact on the grounds that she should have instead analyzed whether or not advertisers were harmed by the mere fact that Meta allegedly possessed monopoly power. But that is wrong on the law, and, as Tucker explained, economically incoherent.

Finally, Tucker opines that a significant (non de minimis) number of advertisers in the proposed class benefited from the challenged conduct and that those benefits must be considered when determining whether any individual advertiser was injured. Advertisers' experts, again, ▬▬▬▬. Gans ▬▬▬▬▬▬▬▬▬▬▬

**PUBLIC REDACTED VERSION**

███████████████████████████████ Ex. 1, Gans Tr. 93,[1] and Advertisers themselves contend that the conduct "██████████████████," Ex. 2, Advertiser Plaintiffs' Corrected First Supplemental Response and Objections to Meta Platforms, Inc.'s Interrogatory No. 11 ("Interrogatory 11 Resp.") at 109-110. Advertisers seek to exclude Tucker's economic opinion that these improvements redounded to advertisers' benefit because she did not independently prove that Meta's ad offerings, in fact, improved. But Advertisers have already admitted that ███████ ████████████████████████████, and, as Tucker notes, their classwide injury theory contains no mechanism to account for the corresponding benefits and the extent to which these benefits offset any alleged harms.

Advertisers' motion identifies no legitimate basis for exclusion of Tucker's opinions and should be denied in its entirety.

## BACKGROUND

Meta's rebuttal expert Catherine Tucker is a professor of management science and marketing at MIT. Ex. 3, Advertiser Class Rebuttal Report of Catherine Tucker ¶ 4. She holds a Ph.D. in economics from Stanford University. *Id.* ¶ 5. She specializes in digital economics and studies how the use of digital technologies has transformed advertising. *Id.* Tucker leads the Digital Economics and Artificial Intelligence initiatives at the National Bureau of Economic Research, has testified before Congress and presented to a litany of federal agencies on topics concerning digital advertising, and has published multiple academic papers on the subject. *Id.* ¶¶ 6-7. Her qualifications to testify on the topics on which she opines are beyond dispute, and Advertisers do not seriously challenge them.

Tucker's Report offers three principal opinions. *First*, she opines that not all advertisements sold by Meta during the class period were "social advertisements," based on Advertisers' description of that term. Tucker § III. This opinion is based on a study of Meta's various ad offerings and the extent of their usage during the class period based on data Meta produced in this case.

---

[1] "Ex." citations reference exhibits to the Jennings Declaration submitted herewith.

**PUBLIC REDACTED VERSION**

Tucker identified ads meeting Advertisers' description of "social" advertising, which they claim is "advertising that can be targeted based on social data contained in a 'social graph.'" Dkt. 643 at 4. Tucker identified two forms of Meta advertising "based around explicit targeting of social connections": "friends of connections" ads—through which "Meta allowed advertisers to target, or exclude, friends of individuals that are connected to their Facebook page, apps, or events"—and "direct connections" ads—which allowed advertisers to "target or exclude individuals connected to their Facebook page, apps, or events" directly. Tucker ¶¶ 34-39. Together, these advertising formats comprised just ▓% of the total ad spend on Meta during the class period, and were used by ▓% of Meta advertisers. *Id.* ¶ 39. In response to Williams's suggestion that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, Ex. 4, Williams Report ¶ 42, Tucker studied these ads and determined that Lookalike Audience ads comprised just ▓% of the ad spend on Meta, Tucker ¶ 40. Altogether, Tucker found that the ads fitting Advertisers' experts' descriptions of "social" advertising comprised, at most, roughly ▓% of the total ad spend on Meta during the class period. *Id.* ¶¶ 34-44.

Tucker also identified ads that Meta sells that *do not* fit Advertisers' description: (1) ads targeted based on demographic information like age and location; and (2) Custom Audience ads, which allow an advertiser to target users based on the advertiser's own list of previous customers or website visitors. Tucker ¶¶ 45-46. Tucker found that Custom Audience ads comprised over ▓% of the ad spend on Meta during the class period. *Id.* As a result, she concluded it is likely that a majority of the advertisers in the proposed class did not purchase the allegedly monopolized offering and were necessarily uninjured. Ex. 5, Tucker Tr. 66-67 (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓).

*Second*, Tucker opines that, because Advertisers challenge improvements to Meta's ad offerings, the challenged conduct benefited some advertisers in the proposed class and as a result, whether any advertisers were harmed is an individualized question. Tucker § IV. She explains that the improvements in ad targeting that Advertisers allege resulted from the challenged conduct could have lowered either quality-adjusted or nominal prices for a significant number of Meta advertisers. *Id.* ¶¶ 64-72. Tucker also identifies other benefits to advertisers from the conduct,

**PUBLIC REDACTED VERSION**

including efficiency and the expansion of available inventory. *Id.* ¶¶ 73-93. She concludes that assessment of these benefits would require an advertiser-by-advertiser evaluation to assess impact, which Advertisers have not done or otherwise accounted for. *Id.* ¶ 94. Accordingly, Advertisers cannot show with common proof that all advertisers in the proposed class were harmed by the challenged conduct.

*Third*, Tucker criticizes Advertisers' experts' injury and damages methodology, embodied in the Kreitzman-Williams "yardstick" study. Tucker § V. She explains— ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮—that the study is untethered to the challenged conduct and contains no mechanism to account for any offsetting benefits from the conduct or the separate impact on advertisers from each challenged act. *Id.* ¶¶ 95-120. She also opines that, contrary to Advertisers' contention, Meta's ad auction mechanism does not ensure that all advertisers in the class suffered a common injury. *Id.* ¶¶ 121-35.

## LEGAL STANDARD

"The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party." *Huawei Techs., Co. v. Samsung Elecs. Co.*, 340 F. Supp. 3d 934, 996 (N.D. Cal. 2018). Rebuttal experts are entitled to opine that the opposing party's "expert's methodology was conducted improperly." *TCL Commc'ns Tech. Holdings Ltd. v. Telefonaktenbologet LM Ericsson*, 2016 WL 7042085, at *5 (C.D. Cal. Aug. 17, 2016). The mere fact that one expert disagrees with another expert is not a basis to exclude testimony. *Sumotext Corp. v. Zoove, Inc.*, 2020 WL 264701, at *5 (N.D. Cal. Jan. 17, 2020). "[A]n expert may express an opinion that is based on facts that the expert assumes" and that a party intends to prove at trial. *Williams v. Illinois*, 567 U.S. 50, 57 (2012).

## ARGUMENT

**I.  TUCKER RELIABLY AND CORRECTLY OPINED THAT NOT ALL ADS META SOLD DURING THE CLASS PERIOD WERE "SOCIAL"**

Advertisers contend that Meta unlawfully maintained an alleged monopoly in a submarket for "social advertising." None of Advertisers' experts undertook an assessment of whether, in fact, all ads Meta sells fit the Advertisers' description of what is a "social" advertisement. Dkt. 662 at

**PUBLIC REDACTED VERSION**

8-9. Tucker did. In Section III of her Report, she found that advertisements that fit the definition proposed by Advertisers comprised just a fraction of the ads Meta sold during the class period. As a result, Advertisers' proposed class of everyone "in the United States who purchased advertising from Meta … between December 1, 2016 and December 31, 2020," Dkt. 643 at vi, contains a significant number of advertisers who did not participate in the allegedly monopolized market or purchase "social" ads and therefore have no cognizable injury. *Somers v. Apple Inc.*, 729 F.3d 953, 963 (9th Cir. 2013); *Blades v. Monsanto Co.*, 400 F.3d 562, 572-74 (8th Cir. 2005) (affirming denial of class certification where only "some (but not all)" class members purchased product affected by challenged conduct); *see Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 228-29 (2d Cir. 2006) (affirming denial of class certification because class members participated in different relevant markets); *Fido's Fences, Inc. v. Radio Sys. Corp.*, 999 F. Supp. 2d 442, 449-50 (E.D.N.Y. 2014); Dkt. 672 at 13-16.

*First*, Tucker's analysis was properly based on Advertisers' own experts' description of "social advertising." Williams stated that ████████████████████████████████████████ and that ████████████████████████████████████████ Williams Report ¶ 19; *see also id.* ¶ 21 ("████████████████████████████████████████"); Ex. 6, Williams Tr. 244-45 ("████████████████████████████████████████"); Dkt. 643 at 4. He also referred to ████████████████████████████. *E.g.*, Williams Report ¶ 17 (████████████████████████████); *id.* ¶ 159 (████████). Similarly, Gans offered ████████████████████████████████████████ Ex. 7, Gans Report ¶ 7; Gans Tr. 20 ("████████

1  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

2  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇"). Because she

3  was rebutting these opinions, Tucker followed the defining principles of "social advertising" that

4  Advertisers' experts asserted, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, and based on which Advertisers

5  moved to certify a class. Using their framework, Tucker analyzed forms of advertising available

6  on Meta that allow advertisers to target their ads based on users' social connections—the

7  information contained in Meta's "social graph." These included friends of connections ads and

8  direct connections ads. Tucker ¶¶ 34-39. And, based on Williams's belief that ▇▇▇▇▇▇▇▇

9  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, Tucker analyzed those ads as well. *Id.* ¶¶ 40-44.[2]

10       Altogether, Section III of the Tucker Report demonstrates that, at most, roughly ▇% of

11  the ad spend on Meta during the class period was associated with ads fitting Advertisers'

12  description of "social" advertising. Tucker ¶¶ 35, 38-40 & exs. 3-5. It also shows that over ▇% of

13  the ad spend was not. *Id.* ¶ 45. Advertisers do not dispute the accuracy or reliability of any of these

14  calculations—which their motion does not even mention.[3] These calculations establish that

15  Advertisers have failed to show that all, or even most, advertisers in the class purchased "social"

16  ads, and have therefore not met their burden of showing with common proof that all class members

17  suffered an antitrust injury. *Blades*, 400 F.3d at 572-74.

---

[2] Williams's basis for claiming that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.
Williams Report ¶ 42. Lookalike Audience ads are shown to "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇" Tucker ¶ 41. As Tucker explained, those users are typically identified based on their "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇" and ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇." *Id.* ¶ 41 & n.64. That is, some Lookalike Audience ads may not be "social" at all.

[3] Advertisers' motion (at 7) criticizes Tucker in passing for noting that Meta discontinued its "Sponsored Story" ad format prior to the class period, but fails to mention that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Williams ¶ 17 (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇). Even assuming that these ads qualify as "social" under Advertisers' definition, no member of the putative class bought them during the class period. Tucker ¶ 32.

Perhaps recognizing that Tucker's opinions create an insurmountable hurdle to class certification, Advertisers argue that she supposedly "ignored" Advertisers' experts' description of the ads sold in the social advertising market and invented a "private definition of Social Advertising." Mot. 5-7. But Advertisers' other experts ███. Gans testified that ███. Gans Tr. 94 ("███"). And Scott Fasser, whom Advertisers put forth as an industry expert, testified that ███. Ex. 8, Fasser Tr. 97. Fasser also stated that ███. *Id*. at 82. And he agreed that ███ *Id*. at 82-83 ("███").

Among Advertisers' experts, only Williams even offered the opinion that ███. To the extent Advertisers are challenging Tucker's testimony to the contrary simply because Williams disagrees with her, that is not a basis for exclusion of her opinions. *Sumotext*, 2020 WL 264701, at *5. That is particularly true where, as here, Tucker applied Williams's description of "social" advertising to Meta's ad offerings and determined which ads fit that description—an analysis that Williams did not and has never done. Instead, Williams based his conclusion that ███ entirely on ███ Ex. 9, Williams Reply ¶ 48 & tbl. 1, that uniformly say nothing about the relevant question: whether all Meta ads are "targeted based on social data contained in a 'social graph.'" Dkt. 643 at 4.

***Second***, Advertisers take issue with Tucker's testimony on which Meta ads are social because she purportedly "lack[s] basic knowledge about the very ad systems and formats" she

**PUBLIC REDACTED VERSION**

1  discusses. Mot. 7-8. The only example Advertisers provide in support of this criticism is the fact
2  that Tucker had not ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ for
3  a single format of Meta advertising, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Mot. 7. Advertisers provide no
4  explanation of why Tucker would have been required to study this specific piece of technical
5  information concerning a single ad format in order to opine, as she did, that ***other types*** of Meta
6  ads do not fit Advertisers' description of "social" advertisements. As Advertisers acknowledge (at
7  7), Tucker did not discuss ▇▇▇▇▇▇▇▇ in her Report at all. Advertisers have no explanation
8  for why this supposed omission warrants exclusion, or mention. Instead, it appears to be an attempt
9  to distract from the testimony of their expert, Fasser, that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
10 ▇▇▇. Fasser Tr. 97.
11       Advertisers' apparent belief that both Tucker and ▇▇▇▇▇▇▇▇▇▇▇▇ are "wrong"
12 about whether ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (Mot. 8) is irrelevant for purposes of this motion.
13 "*Daubert* does not allow a court to resolve a factual dispute underlying the expert's analysis." *IGT*
14 *v. Alliance Gaming Corp.*, 2008 WL 7084605, at *8 (D. Nev, Oct. 21, 2008). If Advertisers come
15 forward with evidence that all advertisements sold by Meta during the class period were targeted
16 based on social data contained in a social graph, they are certainly welcome to cross-examine
17 Tucker on that topic. So far they have presented none. All their motion offers is a snippet of
18 deposition testimony from Meta's Alex Schultz, which Advertisers incorrectly claim shows ▇▇▇
19 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
20 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Mot. 8. Schultz said no such thing. Instead,
21 Schultz explained that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
22 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
23 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Ex. 10, Schultz Tr. 154-55.
24 Importantly, the testimony concerned ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
25 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. The testimony therefore has nothing
26 to do with whether all ads on Meta are targeted using social data contained in a social graph.
27
28

**PUBLIC REDACTED VERSION**

## II. TUCKER RELIABLY AND CORRECTLY OPINED THAT ADVERTISERS' INJURY AND DAMAGES MODEL IS UNTETHERED TO THE CONDUCT THEY CHALLENGE

Advertisers' classwide antitrust injury and damages theory is based entirely on a purported "yardstick" study conducted by Kreitzman and Williams. The Kreitzman-Williams study is junk science that assumes every dollar of difference between what they describe as the economic profit rates of Meta and three cherry-picked "yardsticks" is attributable to Meta charging supracompetitive prices. This study is subject of a separate *Daubert* challenge by Meta. Dkt. 662. Among other defects, Kreitzman and Williams make no secret of the fact that their study has no relationship whatsoever to the challenged conduct. Williams testified in his deposition that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Williams Tr. 60. Indeed, Advertisers' motion reiterates that Williams "addressed whether prices for Facebook's ads were inflated due to ***Facebook's monopoly***"—not the challenged conduct. Mot. 8 (emphasis added).

In Section V of her Report, Tucker analyzes these defects in the Kreitzman-Williams study, opining that the analysis assumes without showing that advertisers were overcharged, Tucker ¶¶ 95-103—which Williams ▮▮▮▮▮▮▮▮▮▮, Williams Tr. 60—and that the study's failure to attribute damages to any of the conduct yields absurd results. For example, Tucker notes that the study "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Tucker ¶ 110.

Advertisers do not dispute any of Tucker's opinions concerning the Kreitzman-Williams study, but seek to exclude her testimony on the study because she supposedly did not "analyze the presence or absence of monopoly." Mot. 8.[4] At no point in Advertisers' motion do they explain

---

[4] Advertisers assert this is a "distinct basis" to exclude both Sections IV and V of Tucker's Report, and later repeat this as a basis to exclude just Section IV. Mot. 10-11. Their arguments on this issue with respect to Section IV of the Report are discussed *infra* in Section III of this opposition.

**PUBLIC REDACTED VERSION**

what this means, what about its "presence or absence" Tucker should have considered but didn't, or why she was required to do so to form reliable opinions. As Tucker explained in her deposition, in a portion selectively excerpted in Advertisers' motion (Mot. 9 n.58) but reproduced in full here:

[REDACTED]

Tucker Tr. 317-18 (emphases added). As Tucker explained in Section V of her Report and reiterated at her deposition, the Kreitzman-Williams study is economically incoherent and fails to show that any of the ***challenged conduct*** caused the injury and damages that Advertisers allege.

What Advertisers seem to be suggesting is that, rather than commenting on whether their study shows that advertisers were harmed by the conduct, Tucker should have opined on whether it shows that advertisers were harmed simply by the ***existence*** of Meta's alleged monopoly. *See* Mot. 8-9. Not so. *Comcast Corp. v. Behrend* requires Advertisers "measure only those damages attributable to [their] theory" of liability. 569 U.S. 27, 35 (2013). Yet Advertisers improperly seek damages to which they are not entitled under black-letter antitrust law: recovery for the entirety of the purported overcharge caused by Meta's alleged monopoly, rather than "the price increment caused by the anticompetitive conduct that … augmented [Meta's alleged] control over the market." *Berkey Photo, Inc v. Eastman Kodak Co.*, 603 F.2d 263, 297 (2d Cir. 1979); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1370 (9th Cir. 1986); *see* Dkt. 672 at 17-22. They cannot excuse that failure by somehow suggesting that Tucker should have joined their experts in evaluating the wrong question. Tucker's opinion that Advertisers' model improperly fails to link the challenged conduct to the alleged harm was proper rebuttal expert testimony focused on the proper legal inquiry. *TCL Commc'ns*, 2016 WL 7042085, at *5 (rebuttal

**PUBLIC REDACTED VERSION**

1  expert may testify "that … the plaintiff's expert's methodology was conducted improperly").[5]

### III. TUCKER RELIABLY AND CORRECTLY OPINED THAT MANY CLASS MEMBERS BENEFITED FROM THE CHALLENGED CONDUCT

Advertisers' claims are based on improvements Meta made to its advertising offerings. The central premise of Advertisers' theory of injury and anticompetitive effects is that Meta's alleged conduct helped Meta acquire additional data in order ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Gans Report ¶ 13.b. In Section IV of her Report, Tucker opines that—assuming Advertisers' theories are correct—these improvements to Meta's ad offerings would have benefited some Advertisers in varying ways by, among other things, reducing the nominal price or the quality-adjusted price of advertising on Meta. Tucker ¶¶ 58, 68. She also opines that Advertisers' coterie of putative experts provide no mechanism to account for the effect of these improvements to advertisers. *Id.* ¶¶ 104-106. As a result, Advertisers have no common proof of whether and to what extent all advertisers in the proposed class suffered a net harm or a net benefit, and therefore cannot show that all advertisers suffered an antitrust injury on a classwide basis. *LA Mem'l Coliseum*, 791 F.2d at 1367; *Kotteras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16, 25 (D.D.C. 2012); *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 59 (S.D.N.Y. 2020); Dkt. 672 at 9-13.

*First*, Advertisers assert that Tucker's opinions are "factually baseless" because Tucker purportedly does not identify any improvements to Meta's ad offerings herself and is not sufficiently familiar with various technical elements of "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" to do so. Mot. 11-13. This criticism fails because it both misses the point and misunderstands Tucker's testimony.

Tucker's testimony properly considered the economic implications of the improvements that **Advertisers and their experts** allege took place. The evidence of improvements that she relies on come directly from Advertisers' own contentions and expert testimony. For each of the

---

[5] Advertisers also criticize Tucker for not ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Mot. 9-10. But Meta's other expert, Hochberg, addresses this issue at length in her report, and Advertisers do not explain why Tucker should have offered duplicative testimony.

**PUBLIC REDACTED VERSION**

1  challenged acts, Advertisers have alleged an improvement to Meta's advertising offerings. The
2  receipt of Onavo data, they contend, "███████████████████████" Interrogatory 11
3  Resp. at 87-89. Meta's integration of Instagram and WhatsApp also allegedly ███████
4  ███████████████████████████████. *Id.* (███████████████
5  ███████████████████████████████████████████). And they have
6  made the same contentions about the Google, Netflix, and API agreements they challenge—██
7  ███████████████████████████████████████████████████
8  ███████████████████████████. *See id.* at 110, 154, 164. As Advertisers put it: "██████
9  ███████████████████████████████████████████" *Id.* at 109-110.
10 Advertisers' expert Gans similarly identified ██████████████████████
11 ███████████████████████, *e.g.*, Gans Report ¶¶ 58, 74, 87, and testified that, ██████
12 ███████████████████████████████. Gans Tr. 93 ("██████████████
13 ███████████████████████████████████████████████████
14 ███████████████████████████████").

15     Advertisers have elsewhere recognized that it is appropriate for an expert to, as Tucker did
16 here, assume that their contentions were true and offer an opinion on their economic consequences
17 for advertisers in the proposed class. Dkt. 666 at 5 ("assum[ing] the facts to be as Advertisers assert
18 them for purposes of [] economic analysis of class certification issues" is "a 'settled' expert
19 function according to no less than the Supreme Court" (citing *Williams*, 567 U.S. at 57)); Tucker
20 Tr. 129-30 ("███████████████████████████████████████
21 ███████████████████████████████████████████████████
22 ███████"). Tucker was not required to examine, for example, whether Meta used "██████
23 ██████" Mot. at 13, or "███████████████████" in its ad systems, *id.* at 12, or otherwise
24 affirmatively study ███████████████████ to prove that its offerings in fact improved. As
25 she explained, ███████████████████████████████ Tucker Tr. 108, and offers
26 *economic* testimony, not engineering testimony.

27     Tucker's economic testimony on the effect of the alleged improvements to Meta's ad
28 offerings drew on a wide variety of reliable economic and empirical research. She analyzes a study

**PUBLIC REDACTED VERSION**

Gans conducted with Susan Athey, which concluded that "improved targeting can increase the effective supply of advertising, 'push[ing] prices downwards' for ads." Tucker ¶ 67. Tucker also discusses the report of Stanford economists Jonathan Levin and Paul Milgrom, which noted that improved targeting can reduce competition between advertisers for ad space, and therefore lead to lower prices. *Id.* at ¶ 68. And she includes the work of Yale and Stanford economists Dirk Bergemann and Alessandro Bonatti, which indicates that improved targeting increases the value of advertising, and also decreases the prices paid by some advertisers. *Id.* She also relies on her own research which established empirically that if improved technology allows advertisers to identify the most profitable target users, they may pay lower prices. *Id.* at ¶ 69.

Advertisers do not take issue with any of this economic analysis in their motion. Instead, they backpedal from their own contentions and assert that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Mot. 13. That novel contention—announced for the first time in Williams' Reply Report—has no bearing on the admissibility of Tucker's analysis in Section IV of her Report.[6] Tucker's analysis of the economic consequences of Meta's alleged conduct and the corresponding improvements to Meta's advertising offerings is based on indisputably "reliable economic principles." *US Airways, Inc v. Sabre Holdings Corp.*, 2022 WL 1042273, at *1 (S.D.N.Y. Apr. 5, 2022). Whether or not Tucker herself determined that Advertisers' contentions were correct and that Meta's offerings improved—which she was not required to do—is no bar to the admissibility of her testimony on the economic consequences of those improvements. *See Williams*, 567 U.S. at 57.

**Second**, Advertisers criticize Tucker for not "analyz[ing] monopoly power in the actual world, or the absence of that monopoly in the but-for world." Mot. 11. Advertisers again provide no explanation of what this means or what about Meta's alleged monopoly power Tucker should

---

[6] The contention that Meta's ad offerings ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ contradicts Advertisers' entire theory of competitive harm, the premise of which is that Meta's improved data targeting capabilities created an insurmountable barrier to entry for other firms. *See* Dkt. 672 at 11. Moreover, the fact that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ in the actual world says nothing about the impact of the challenged conduct on Meta's ad quality, because Advertisers do not compare it to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ in a but-for world without the conduct that, until very recently, they repeatedly contended "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓." *E.g.*, Interrogatory 11 Resp. at 109-110.

**PUBLIC REDACTED VERSION**

1  have considered. Instead, they gesture without elaboration towards two assertions in Williams's
2  and Gans's Reply Reports, both of which are inapposite. *Id.* 11 n.67. In Williams's Reply Report,
3  he speculates that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
4  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Williams Reply ¶ 72. That
5  speculation obviously has no bearing on the question Tucker addresses, which is whether
6  advertisers in the class benefited from the real-world improvements to Meta's ad offerings
7  Advertisers allege.
8    In Gans's Reply Report, he muses that Meta may have ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
9  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Ex. 11,
10 Gans Reply ¶ 18. This is a highly speculative assertion because, as Gans recognizes, ▇▇▇▇▇
11 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
12 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *Id.* ¶ 19 n.19—none of which Gans has analyzed. Moreover, as
13 Gans recognizes, this consideration would only become relevant if ▇▇▇▇▇▇▇▇▇▇▇. *Id.*
14 ¶ 19 ("▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
15 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇"
16 (second emphasis added)). Neither Gans nor Advertisers contend that ▇▇▇▇▇▇▇▇▇▇▇.
17 Gans Tr. 108 ("▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
18 ▇▇▇▇"). In any event, it is Advertisers' burden to establish that the class members were injured
19 by the conduct they challenge, not Meta's burden to affirmatively show otherwise. *See Stromberg*
20 *v. Qualcomm Inc.*, 14 F.4th 1059, 1066 (9th Cir. 2021). Advertisers have failed to account for a
21 significant effect on advertisers of the improvements they challenge. If Advertisers' experts
22 disagree with Tucker on the extent to which advertisers realized benefits from these improvements,
23 those conflicting views are for the factfinder to weigh, not a basis to exclude Tucker's testimony.
24 *Sumotext*, 2020 WL 264701, at *5.

## CONCLUSION

26   The Court should deny Advertisers' motion to exclude Tucker.

**PUBLIC REDACTED VERSION**

| | |
|---|---|
| DATED: October 20, 2023 | Respectfully submitted, |
| | By: *Sonal N. Mehta* |
| | SONAL N. MEHTA (Bar No. 222086) |
| | Sonal.Mehta@wilmerhale.com |
| | WILMER CUTLER PICKERING HALE AND DORR LLP |
| | 2600 El Camino Real, Suite 400 |
| | Palo Alto, California 94306 |
| | Telephone: (650) 858-6000 |
| | |
| | DAVID Z. GRINGER (*pro hac vice*) |
| | David.Gringer@wilmerhale.com |
| | ROSS E. FIRSENBAUM (*pro hac vice*) |
| | Ross.Firsenbaum@wilmerhale.com |
| | RYAN CHABOT (*pro hac vice*) |
| | Ryan.Chabot@wilmerhale.com |
| | PAUL VANDERSLICE (*pro hac vice*) |
| | Paul.Vanderslice@wilmerhale.com |
| | WILMER CUTLER PICKERING HALE AND DORR LLP |
| | 7 World Trade Center |
| | 250 Greenwich Street |
| | New York, New York 10007 |
| | Telephone: (212) 230-8800 |
| | |
| | ARI HOLTZBLATT (*pro hac vice*) |
| | Ari.Holtzblatt@wilmerhale.com |
| | MOLLY M. JENNINGS (*pro hac vice*) |
| | Molly.Jennings@wilmerhale.com |
| | WILMER CUTLER PICKERING HALE AND DORR LLP |
| | 2100 Pennsylvania Avenue NW |
| | Washington, DC 20037 |
| | Telephone: (202) 663-6000 |
| | |
| | MICHAELA P. SEWALL (*pro hac vice*) |
| | Michaela.Sewall@wilmerhale.com |
| | WILMER CUTLER PICKERING HALE AND DORR LLP |
| | 60 State Street |
| | Boston, MA 02109 |
| | Telephone: (617) 526-6000 |
| | |
| | *Attorneys for Defendant Meta Platforms, Inc.* |

No. 3:20-cv-08570-JD                    15                    META'S OPPOSITION TO ADVERTISERS'
                                                              MOT. TO EXCLUDE TUCKER

**PUBLIC REDACTED VERSION**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of October, 2023, I electronically transmitted the public redacted version of the foregoing document to the Clerk's Office using the CM/ECF System and caused the version of the foregoing document filed under seal to be transmitted to counsel of record by email.

By:  *Sonal N. Mehta*
     Sonal N. Mehta