# EXHIBIT 2

Case 3:20-cv-08570-JD   Document 680-3   Filed 10/20/23   Page 2 of 39

**American Economic Association**

----

The Cost of Capital, Corporation Finance and the Theory of Investment
Author(s): Franco Modigliani and Merton H. Miller
Source: *The American Economic Review*, Vol. 48, No. 3 (Jun., 1958), pp. 261-297
Published by: American Economic Association
Stable URL: http://www.jstor.org/stable/1809766
Accessed: 10/09/2009 09:51

----

Your use of the JSTOR archive indicates your acceptance of JSTOR's Terms and Conditions of Use, available at
http://www.jstor.org/page/info/about/policies/terms.jsp. JSTOR's Terms and Conditions of Use provides, in part, that unless
you have obtained prior permission, you may not download an entire issue of a journal or multiple copies of articles, and you
may use content in the JSTOR archive only for your personal, non-commercial use.

Please contact the publisher regarding any further use of this work. Publisher contact information may be obtained at
http://www.jstor.org/action/showPublisher?publisherCode=aea.

Each copy of any part of a JSTOR transmission must contain the same copyright notice that appears on the screen or printed
page of such transmission.

JSTOR is a not-for-profit organization founded in 1995 to build trusted digital archives for scholarship. We work with the
scholarly community to preserve their work and the materials they rely upon, and to build a common research platform that
promotes the discovery and use of these resources. For more information about JSTOR, please contact support@jstor.org.



*American Economic Association* is collaborating with JSTOR to digitize, preserve and extend access to *The American Economic Review.*

http://www.jstor.org

# The American Economic Review

VOLUME XLVIII          JUNE 1958          NUMBER THREE

## THE COST OF CAPITAL, CORPORATION FINANCE AND THE THEORY OF INVESTMENT

*By* Franco Modigliani and Merton H. Miller[*]

What is the "cost of capital" to a firm in a world in which funds are used to acquire assets whose yields are uncertain; and in which capital can be obtained by many different media, ranging from pure debt instruments, representing money-fixed claims, to pure equity issues, giving holders only the right to a pro-rata share in the uncertain venture? This question has vexed at least three classes of economists: (1) the corporation finance specialist concerned with the techniques of financing firms so as to ensure their survival and growth; (2) the managerial economist concerned with capital budgeting; and (3) the economic theorist concerned with explaining investment behavior at both the micro and macro levels.[1]

In much of his formal analysis, the economic theorist at least has tended to side-step the essence of this cost-of-capital problem by proceeding as though physical assets—like bonds—could be regarded as yielding known, sure streams. Given this assumption, the theorist has concluded that the cost of capital to the owners of a firm is simply the rate of interest on bonds; and has derived the familiar proposition that the firm, acting rationally, will tend to push investment to the point

* The authors are, respectively, professor and associate professor of economics in the Graduate School of Industrial Administration, Carnegie Institute of Technology. This article is a revised version of a paper delivered at the annual meeting of the Econometric Society, December 1956. The authors express thanks for the comments and suggestions made at that time by the discussants of the paper, Evsey Domar, Robert Eisner and John Lintner, and subsequently by James Duesenberry. They are also greatly indebted to many of their present and former colleagues and students at Carnegie Tech who served so often and with such remarkable patience as a critical forum for the ideas here presented.

[1] The literature bearing on the cost-of-capital problem is far too extensive for listing here. Numerous references to it will be found throughout the paper though we make no claim to completeness. One phase of the problem which we do not consider explicitly, but which has a considerable literature of its own is the relation between the cost of capital and public utility rates. For a recent summary of the "cost-of-capital theory" of rate regulation and a brief discussion of some of its implications, the reader may refer to H. M. Somers [20].

where the marginal yield on physical assets is equal to the market rate of interest.[2] This proposition can be shown to follow from either of two criteria of rational decision-making which are equivalent under certainty, namely (1) the maximization of profits and (2) the maximization of market value.

According to the first criterion, a physical asset is worth acquiring if it will increase the net profit of the owners of the firm. But net profit will increase only if the expected rate of return, or yield, of the asset exceeds the rate of interest. According to the second criterion, an asset is worth acquiring if it increases the value of the owners' equity, *i.e.*, if it adds more to the market value of the firm than the costs of acquisition. But what the asset adds is given by capitalizing the stream it generates at the market rate of interest, and this capitalized value will exceed its cost if and only if the yield of the asset exceeds the rate of interest. Note that, under either formulation, the cost of capital is equal to the rate of interest on bonds, regardless of whether the funds are acquired through debt instruments or through new issues of common stock. Indeed, in a world of sure returns, the distinction between debt and equity funds reduces largely to one of terminology.

It must be acknowledged that some attempt is usually made in this type of analysis to allow for the existence of uncertainty. This attempt typically takes the form of superimposing on the results of the certainty analysis the notion of a "risk discount" to be subtracted from the expected yield (or a "risk premium" to be added to the market rate of interest). Investment decisions are then supposed to be based on a comparison of this "risk adjusted" or "certainty equivalent" yield with the market rate of interest.[3] No satisfactory explanation has yet been provided, however, as to what determines the size of the risk discount and how it varies in response to changes in other variables.

Considered as a convenient approximation, the model of the firm constructed via this certainty—or certainty-equivalent—approach has admittedly been useful in dealing with some of the grosser aspects of the processes of capital accumulation and economic fluctuations. Such a model underlies, for example, the familiar Keynesian aggregate investment function in which aggregate investment is written as a function of the rate of interest—the same riskless rate of interest which appears later in the system in the liquidity-preference equation. Yet few would maintain that this approximation is adequate. At the macroeconomic level there are ample grounds for doubting that the rate of interest has

[2] Or, more accurately, to the marginal cost of borrowed funds since it is customary, at least in advanced analysis, to draw the supply curve of borrowed funds to the firm as a rising one. For an advanced treatment of the certainty case, see F. and V. Lutz [13].

[3] The classic examples of the certainty-equivalent approach are found in J. R. Hicks [8] and O. Lange [11].

as large and as direct an influence on the rate of investment as this analysis would lead us to believe. At the microeconomic level the certainty model has little descriptive value and provides no real guidance to the finance specialist or managerial economist whose main problems cannot be treated in a framework which deals so cavalierly with uncertainty and ignores all forms of financing other than debt issues.[4]

Only recently have economists begun to face up seriously to the problem of the cost of capital *cum* risk. In the process they have found their interests and endeavors merging with those of the finance specialist and the managerial economist who have lived with the problem longer and more intimately. In this joint search to establish the principles which govern rational investment and financial policy in a world of uncertainty two main lines of attack can be discerned. These lines represent, in effect, attempts to extrapolate to the world of uncertainty each of the two criteria—profit maximization and market value maximization—which were seen to have equivalent implications in the special case of certainty. With the recognition of uncertainty this equivalence vanishes. In fact, the profit maximization criterion is no longer even well defined. Under uncertainty there corresponds to each decision of the firm not a unique profit outcome, but a plurality of mutually exclusive outcomes which can at best be described by a subjective probability distribution. The profit outcome, in short, has become a random variable and as such its maximization no longer has an operational meaning. Nor can this difficulty generally be disposed of by using the mathematical expectation of profits as the variable to be maximized. For decisions which affect the expected value will also tend to affect the dispersion and other characteristics of the distribution of outcomes. In particular, the use of debt rather than equity funds to finance a given venture may well increase the expected return to the owners, but only at the cost of increased dispersion of the outcomes.

Under these conditions the profit outcomes of alternative investment and financing decisions can be compared and ranked only in terms of a *subjective* "utility function" of the owners which weighs the expected yield against other characteristics of the distribution. Accordingly, the extrapolation of the profit maximization criterion of the certainty model has tended to evolve into utility maximization, sometimes explicitly, more frequently in a qualitative and heuristic form.[5]

The utility approach undoubtedly represents an advance over the certainty or certainty-equivalent approach. It does at least permit us

[4] Those who have taken a "case-method" course in finance in recent years will recall in this connection the famous Liquigas case of Hunt and Williams, [9, pp. 193–96] a case which is often used to introduce the student to the cost-of-capital problem and to poke a bit of fun at the economist's certainty-model.

[5] For an attempt at a rigorous explicit development of this line of attack, see F. Modigliani and M. Zeman [14].

to explore (within limits) some of the implications of different financing arrangements, and it does give some meaning to the "cost" of different types of funds. However, because the cost of capital has become an essentially subjective concept, the utility approach has serious drawbacks for normative as well as analytical purposes. How, for example, is management to ascertain the risk preferences of its stockholders and to compromise among their tastes? And how can the economist build a meaningful investment function in the face of the fact that any given investment opportunity might or might not be worth exploiting depending on precisely who happen to be the owners of the firm at the moment?

Fortunately, these questions do not have to be answered; for the alternative approach, based on market value maximization, can provide the basis for an operational definition of the cost of capital and a workable theory of investment. Under this approach any investment project and its concomitant financing plan must pass only the following test: Will the project, as financed, raise the market value of the firm's shares? If so, it is worth undertaking; if not, its return is less than the marginal cost of capital to the firm. Note that such a test is entirely independent of the tastes of the current owners, since market prices will reflect not only their preferences but those of all potential owners as well. If any current stockholder disagrees with management and the market over the valuation of the project, he is free to sell out and reinvest elsewhere, but will still benefit from the capital appreciation resulting from management's decision.

The potential advantages of the market-value approach have long been appreciated; yet analytical results have been meager. What appears to be keeping this line of development from achieving its promise is largely the lack of an adequate theory of the effect of financial structure on market valuations, and of how these effects can be inferred from objective market data. It is with the development of such a theory and of its implications for the cost-of-capital problem that we shall be concerned in this paper.

Our procedure will be to develop in Section I the basic theory itself and to give some brief account of its empirical relevance. In Section II, we show how the theory can be used to answer the cost-of-capital question and how it permits us to develop a theory of investment of the firm under conditions of uncertainty. Throughout these sections the approach is essentially a partial-equilibrium one focusing on the firm and "industry." Accordingly, the "prices" of certain income streams will be treated as constant and given from outside the model, just as in the standard Marshallian analysis of the firm and industry the prices of all inputs and of all other products are taken as given. We have chosen to focus at this level rather than on the economy as a whole because it

is at the level of the firm and the industry that the interests of the various specialists concerned with the cost-of-capital problem come most closely together. Although the emphasis has thus been placed on partial-equilibrium analysis, the results obtained also provide the essential building blocks for a general equilibrium model which shows how those prices which are here taken as given, are themselves determined. For reasons of space, however, and because the material is of interest in its own right, the presentation of the general equilibrium model which rounds out the analysis must be deferred to a subsequent paper.

### I. *The Valuation of Securities, Leverage, and the Cost of Capital*

#### A. *The Capitalization Rate for Uncertain Streams*

As a starting point, consider an economy in which all physical assets are owned by corporations. For the moment, assume that these corporations can finance their assets by issuing common stock only; the introduction of bond issues, or their equivalent, as a source of corporate funds is postponed until the next part of this section.

The physical assets held by each firm will yield to the owners of the firm—its stockholders—a stream of "profits" over time; but the elements of this series need not be constant and in any event are uncertain. This stream of income, and hence the stream accruing to any share of common stock, will be regarded as extending indefinitely into the future. We assume, however, that the mean value of the stream over time, or average profit per unit of time, is finite and represents a random variable subject to a (subjective) probability distribution. We shall refer to the average value over time of the stream accruing to a given share as the return of that share; and to the mathematical expectation of this average as the expected return of the share.[6] Although individual investors may have different views as to the shape of the probability distri-

---

[6] These propositions can be restated analytically as follows: The assets of the $i$th firm generate a stream:

$$X_i(1), X_i(2) \cdots X_i(T)$$

whose elements are random variables subject to the joint probability distribution:

$$\chi_i[X_i(1), X_i(2) \cdots X_i(t)].$$

The return to the $i$th firm is defined as:

$$X_i = \lim_{T \to \infty} \frac{1}{T} \sum_{t=1}^{T} X_i(t).$$

$X_i$ is itself a random variable with a probability distribution $\Phi_i(X_i)$ whose form is determined uniquely by $\chi_i$. The expected return $\overline{X}_i$ is defined as $\overline{X}_i = E(X_i) = \int_{X_i} X_i \Phi_i(X_i) dX_i$. If $N_i$ is the number of shares outstanding, the return of the $i$th share is $x_i = (1/N)X_i$ with probability distribution $\phi_i(x_i)dx_i = \Phi_i(Nx_i)d(Nx_i)$ and expected value $\bar{x}_i = (1/N)\overline{X}_i$.

THE AMERICAN ECONOMIC REVIEW

bution of the return of any share, we shall assume for simplicity that they are at least in agreement as to the expected return.[7]

This way of characterizing uncertain streams merits brief comment. Notice first that the stream is a stream of profits, not dividends. As will become clear later, as long as management is presumed to be acting in the best interests of the stockholders, retained earnings can be regarded as equivalent to a fully subscribed, pre-emptive issue of common stock. Hence, for present purposes, the division of the stream between cash dividends and retained earnings in any period is a mere detail. Notice also that the uncertainty attaches to the mean value over time of the stream of profits and should not be confused with variability over time of the successive elements of the stream. That variability and uncertainty are two totally different concepts should be clear from the fact that the elements of a stream can be variable even though known with certainty. It can be shown, furthermore, that whether the elements of a stream are sure or uncertain, the effect of variability per se on the valuation of the stream is at best a second-order one which can safely be neglected for our purposes (and indeed most others too).[8]

The next assumption plays a strategic role in the rest of the analysis. We shall assume that firms can be divided into "equivalent return" classes such that the return on the shares issued by any firm in any given class is proportional to (and hence perfectly correlated with) the return on the shares issued by any other firm in the same class. This assumption implies that the various shares within the same class differ, at most, by a "scale factor." Accordingly, if we adjust for the difference in scale, by taking the *ratio* of the return to the expected return, the probability distribution of that ratio is identical for all shares in the class. It follows that all relevant properties of a share are uniquely characterized by specifying (1) the class to which it belongs and (2) its expected return.

The significance of this assumption is that it permits us to classify firms into groups within which the shares of different firms are "homogeneous," that is, perfect substitutes for one another. We have, thus, an analogue to the familiar concept of the industry in which it is the commodity produced by the firms that is taken as homogeneous. To complete this analogy with Marshallian price theory, we shall assume in the

[7] To deal adequately with refinements such as differences among investors in estimates of expected returns would require extensive discussion of the theory of portfolio selection. Brief references to these and related topics will be made in the succeeding article on the general equilibrium model.

[8] The reader may convince himself of this by asking how much he would be willing to rebate to his employer for the privilege of receiving his annual salary in equal monthly installments rather than in irregular amounts over the year. See also J. M. Keynes [10, esp. pp. 53–54].

analysis to follow that the shares concerned are traded in perfect markets under conditions of atomistic competition.[9]

From our definition of homogeneous classes of stock it follows that in equilibrium in a perfect capital market the price per dollar's worth of expected return must be the same for all shares of any given class. Or, equivalently, in any given class the price of every share must be proportional to its expected return. Let us denote this factor of proportionality for any class, say the $k$th class, by $1/\rho_k$. Then if $p_j$ denotes the price and $\bar{x}_j$ is the expected return per share of the $j$th firm in class $k$, we must have:

$$(1) \qquad\qquad p_j = \frac{1}{\rho_k}\, \bar{x}_j;$$

or, equivalently,

$$(2) \qquad\qquad \frac{\bar{x}_j}{p_j} = \rho_k \text{ a constant for all firms } j \text{ in class } k.$$

The constants $\rho_k$ (one for each of the $k$ classes) can be given several economic interpretations: (a) From (2) we see that each $\rho_k$ is the expected rate of return of any share in class $k$. (b) From (1) $1/\rho_k$ is the price which an investor has to pay for a dollar's worth of expected return in the class $k$. (c) Again from (1), by analogy with the terminology for perpetual bonds, $\rho_k$ can be regarded as the market rate of capitalization for the expected value of the uncertain streams of the kind generated by the $k$th class of firms.[10]

## B. *Debt Financing and Its Effects on Security Prices*

Having developed an apparatus for dealing with uncertain streams we can now approach the heart of the cost-of-capital problem by dropping the assumption that firms cannot issue bonds. The introduction of debt-financing changes the market for shares in a very fundamental way. Because firms may have different proportions of debt in their capi-

---

[9] Just what our classes of stocks contain and how the different classes can be identified by outside observers are empirical questions to which we shall return later. For the present, it is sufficient to observe: (1) Our concept of a class, while not identical to that of the industry is at least closely related to it. Certainly the basic characteristics of the probability distributions of the returns on assets will depend to a significant extent on the product sold and the technology used. (2) What are the appropriate class boundaries will depend on the particular problem being studied. An economist concerned with general tendencies in the market, for example, might well be prepared to work with far wider classes than would be appropriate for an investor planning his portfolio, or a firm planning its financial strategy.

[10] We cannot, on the basis of the assumptions so far, make any statements about the relationship or spread between the various $\rho$'s or capitalization rates. Before we could do so we would have to make further specific assumptions about the way investors believe the probability distributions vary from class to class, as well as assumptions about investors' preferences as between the characteristics of different distributions.

tal structure, shares of different companies, even in the same class, can give rise to different probability distributions of returns. In the language of finance, the shares will be subject to different degrees of financial risk or "leverage" and hence they will no longer be perfect substitutes for one another.

To exhibit the mechanism determining the relative prices of shares under these conditions, we make the following two assumptions about the nature of bonds and the bond market, though they are actually stronger than is necessary and will be relaxed later: (1) All bonds (including any debts issued by households for the purpose of carrying shares) are assumed to yield a constant income per unit of time, and this income is regarded as certain by all traders regardless of the issuer. (2) Bonds, like stocks, are traded in a perfect market, where the term perfect is to be taken in its usual sense as implying that any two commodities which are perfect substitutes for each other must sell, in equilibrium, at the same price. It follows from assumption (1) that all bonds are in fact perfect substitutes up to a scale factor. It follows from assumption (2) that they must all sell at the same price per dollar's worth of return, or what amounts to the same thing must yield the same rate of return. This rate of return will be denoted by $r$ and referred to as the rate of interest or, equivalently, as the capitalization rate for sure streams. We now can derive the following two basic propositions with respect to the valuation of securities in companies with different capital structures:

*Proposition I*. Consider any company $j$ and let $\overline{X}_j$ stand as before for the expected return on the assets owned by the company (that is, its expected profit before deduction of interest). Denote by $D_j$ the market value of the debts of the company; by $S_j$ the market value of its common shares; and by $V_j \equiv S_j + D_j$ the market value of all its securities or, as we shall say, the market value of the firm. Then, our Proposition I asserts that we must have in equilibrium:

$$(3) \qquad V_j \equiv (S_j + D_j) = \overline{X}_j / \rho_k, \text{ for any firm } j \text{ in class } k.$$

That is, the *market value of any firm is independent of its capital structure and is given by capitalizing its expected return at the rate $\rho_k$ appropriate to its class.*

This proposition can be stated in an equivalent way in terms of the firm's "average cost of capital," $\overline{X}_j / V_j$, which is the ratio of its expected return to the market value of all its securities. Our proposition then is:

$$(4) \qquad \frac{\overline{X}_j}{(S_j + D_j)} \equiv \frac{\overline{X}_j}{V_j} = \rho_k, \text{ for any firm } j, \text{ in class } k.$$

That is, *the average cost of capital to any firm is completely independent of*

*its capital structure and is equal to the capitalization rate of a pure equity stream of its class.*

To establish Proposition I we will show that as long as the relations (3) or (4) do not hold between any pair of firms in a class, arbitrage will take place and restore the stated equalities. We use the term arbitrage advisedly. For if Proposition I did not hold, an investor could buy and sell stocks and bonds in such a way as to exchange one income stream for another stream, identical in all relevant respects but selling at a lower price. The exchange would therefore be advantageous to the investor quite independently of his attitudes toward risk.[11] As investors exploit these arbitrage opportunities, the value of the overpriced shares will fall and that of the underpriced shares will rise, thereby tending to eliminate the discrepancy between the market values of the firms.

By way of proof, consider two firms in the same class and assume for simplicity only, that the expected return, $X$, is the same for both firms. Let company 1 be financed entirely with common stock while company 2 has some debt in its capital structure. Suppose first the value of the levered firm, $V_2$, to be larger than that of the unlevered one, $V_1$. Consider an investor holding $s_2$ dollars' worth of the shares of company 2, representing a fraction $\alpha$ of the total outstanding stock, $S_2$. The return from this portfolio, denoted by $Y_2$, will be a fraction $\alpha$ of the income available for the stockholders of company 2, which is equal to the total return $X_2$ less the interest charge, $rD_2$. Since under our assumption of homogeneity, the anticipated total return of company 2, $X_2$, is, under all circumstances, the same as the anticipated total return to company 1, $X_1$, we can hereafter replace $X_2$ and $X_1$ by a common symbol $X$. Hence, the return from the initial portfolio can be written as:

$$(5) \qquad\qquad Y_2 = \alpha(X - rD_2).$$

Now suppose the investor sold his $\alpha S_2$ worth of company 2 shares and acquired instead an amount $s_1 = \alpha(S_2 + D_2)$ of the shares of company 1. He could do so by utilizing the amount $\alpha S_2$ realized from the sale of his initial holding and borrowing an additional amount $\alpha D_2$ on his own credit, pledging his new holdings in company 1 as a collateral. He would thus secure for himself a fraction $s_1/S_1 = \alpha(S_2 + D_2)/S_1$ of the shares and earnings of company 1. Making proper allowance for the interest payments on his personal debt $\alpha D_2$, the return from the new portfolio, $Y_1$, is given by:

[11] In the language of the theory of choice, the exchanges are movements from inefficient points in the interior to efficient points on the boundary of the investor's opportunity set; and not movements between efficient points along the boundary. Hence for this part of the analysis nothing is involved in the way of specific assumptions about investor attitudes or behavior other than that investors behave consistently and prefer more income to less income, *ceteris paribus.*

$$(6) \qquad Y_1 = \frac{\alpha(S_2 + D_2)}{S_1} X - r\alpha D_2 = \alpha \frac{V_2}{V_1} X - r\alpha D_2.$$

Comparing (5) with (6) we see that as long as $V_2 > V_1$ we must have $Y_1 > Y_2$, so that it pays owners of company 2's shares to sell their holdings, thereby depressing $S_2$ and hence $V_2$; and to acquire shares of company 1, thereby raising $S_1$ and thus $V_1$. We conclude therefore that levered companies cannot command a premium over unlevered companies because investors have the opportunity of putting the equivalent leverage into their portfolio directly by borrowing on personal account.

Consider now the other possibility, namely that the market value of the levered company $V_2$ is less than $V_1$. Suppose an investor holds initially an amount $s_1$ of shares of company 1, representing a fraction $\alpha$ of the total outstanding stock, $S_1$. His return from this holding is:

$$Y_1 = \frac{s_1}{S_1} X = \alpha X.$$

Suppose he were to exchange this initial holding for another portfolio, also worth $s_1$, but consisting of $s_2$ dollars of stock of company 2 and of $d$ dollars of bonds, where $s_2$ and $d$ are given by:

$$(7) \qquad s_2 = \frac{S_2}{V_2} s_1, \qquad d = \frac{D_2}{V_2} s_1.$$

In other words the new portfolio is to consist of stock of company 2 and of bonds in the proportions $S_2/V_2$ and $D_2/V_2$, respectively. The return from the stock in the new portfolio will be a fraction $s_2/S_2$ of the total return to stockholders of company 2, which is $(X - rD_2)$, and the return from the bonds will be $rd$. Making use of (7), the total return from the portfolio, $Y_2$, can be expressed as follows:

$$Y_2 = \frac{s_2}{S_2} (X - rD_2) + rd = \frac{s_1}{V_2} (X - rD_2) + r \frac{D_2}{V_2} s_1 = \frac{s_1}{V_2} X = \alpha \frac{S_1}{V_2} X$$

(since $s_1 = \alpha S_1$). Comparing $Y_2$ with $Y_1$ we see that, if $V_2 < S_1 \equiv V_1$, then $Y_2$ will exceed $Y_1$. Hence it pays the holders of company 1's shares to sell these holdings and replace them with a mixed portfolio containing an appropriate fraction of the shares of company 2.

The acquisition of a mixed portfolio of stock of a levered company $j$ and of bonds in the proportion $S_j/V_j$ and $D_j/V_j$ respectively, may be regarded as an operation which "undoes" the leverage, giving access to an appropriate fraction of the unlevered return $X_j$. It is this possibility of undoing leverage which prevents the value of levered firms from being consistently less than those of unlevered firms, or more generally prevents the average cost of capital $\overline{X}_j/V_j$ from being systematically higher for levered than for nonlevered companies in the same class.

Since we have already shown that arbitrage will also prevent $V_2$ from being larger than $V_1$, we can conclude that in equilibrium we must have $V_2 = V_1$, as stated in Proposition I.

*Proposition II*. From Proposition I we can derive the following proposition concerning the rate of return on common stock in companies whose capital structure includes some debt: the expected rate of return or yield, $i$, on the stock of any company $j$ belonging to the $k$th class is a linear function of leverage as follows:

$$(8) \qquad i_j = \rho_k + (\rho_k - r) D_j / S_j.$$

That is, *the expected yield of a share of stock is equal to the appropriate capitalization rate $\rho_k$ for a pure equity stream in the class, plus a premium related to financial risk equal to the debt-to-equity ratio times the spread between $\rho_k$ and $r$*. Or equivalently, the market price of any share of stock is given by capitalizing its expected return at the continuously variable rate $i_j$ of (8).[12]

A number of writers have stated close equivalents of our Proposition I although by appealing to intuition rather than by attempting a proof and only to insist immediately that the results were not applicable to the actual capital markets.[13] Proposition II, however, so far as we have been able to discover is new.[14] To establish it we first note that, by definition, the expected rate of return, $i$, is given by:

$$(9) \qquad i_j \equiv \frac{\overline{X}_j - r D_j}{S_j}.$$

From Proposition I, equation (3), we know that:

$$\overline{X}_j = \rho_k (S_j + D_j).$$

Substituting in (9) and simplifying, we obtain equation (8).

---

[12] To illustrate, suppose $\bar{X} = 1000$, $D = 4000$, $r = 5$ per cent and $\rho_k = 10$ per cent. These values imply that $V = 10{,}000$ and $S = 6000$ by virtue of Proposition I. The expected yield or rate of return per share is then:

$$i = \frac{1000 - 200}{6000} = .1 + (.1 - .05)\frac{4000}{6000} = 13\tfrac{1}{3} \text{ per cent.}$$

[13] See, for example, J. B. Williams [21, esp. pp. 72–73]; David Durand [3]; and W. A. Morton [15]. None of these writers describe in any detail the mechanism which is supposed to keep the average cost of capital constant under changes in capital structure. They seem, however, to be visualizing the equilibrating mechanism in terms of switches by investors between stocks and bonds as the yields of each get out of line with their "riskiness." This is an argument quite different from the pure arbitrage mechanism underlying our proof, and the difference is crucial. Regarding Proposition I as resting on investors' attitudes toward risk leads inevitably to a misunderstanding of many factors influencing relative yields such as, for example, limitations on the portfolio composition of financial institutions. See below, esp. Section I.D.

[14] Morton does make reference to a linear yield function but only " . . . for the sake of simplicity and because the particular function used makes no essential difference in my conclusions" [15, p. 443, note 2].

## C. *Some Qualifications and Extensions of the Basic Propositions*

The methods and results developed so far can be extended in a number of useful directions, of which we shall consider here only three: (1) allowing for a corporate profits tax under which interest payments are deductible; (2) recognizing the existence of a multiplicity of bonds and interest rates; and (3) acknowledging the presence of market imperfections which might interfere with the process of arbitrage. The first two will be examined briefly in this section with some further attention given to the tax problem in Section II. Market imperfections will be discussed in Part D of this section in the course of a comparison of our results with those of received doctrines in the field of finance.

*Effects of the Present Method of Taxing Corporations.* The deduction of interest in computing taxable corporate profits will prevent the arbitrage process from making the value of all firms in a given class proportional to the expected returns generated by their physical assets. Instead, it can be shown (by the same type of proof used for the original version of Proposition I) that the market values of firms in each class must be proportional in equilibrium to their expected return net of taxes (that is, to the sum of the interest paid and expected net stockholder income). This means we must replace each $\overline{X}_j$ in the original versions of Propositions I and II with a new variable $\overline{X}_j^{\tau}$ representing the total income net of taxes generated by the firm:

$$(10) \qquad \overline{X}_j^{\tau} \equiv (\overline{X}_j - rD_j)(1-\tau) + rD_j \equiv \bar{\pi}_j^{\tau} + rD_j,$$

where $\bar{\pi}_j^{\tau}$ represents the expected net income accruing to the common stockholders and $\tau$ stands for the average rate of corporate income tax.[15]

After making these substitutions, the propositions, when adjusted for taxes, continue to have the same form as their originals. That is, Proposition I becomes:

$$(11) \qquad \frac{\overline{X}_j^{\tau}}{V_j} = \rho_k^{\tau}, \text{ for any firm in class } k,$$

and Proposition II becomes

$$(12) \qquad i_j \equiv \frac{\bar{\pi}_j^{\tau}}{S_j} = \rho_j^{\tau} + (\rho_k^{\tau} - r)D_j/S_j$$

where $\rho_k^{\tau}$ is the capitalization rate for income net of taxes in class $k$.

Although the form of the propositions is unaffected, certain interpretations must be changed. In particular, the after-tax capitalization rate

---

[15] For simplicity, we shall ignore throughout the tiny element of progression in our present corporate tax and treat $\tau$ as a constant independent of $(X_j - rD_j)$.

$\rho_k{}^\tau$ can no longer be identified with the "average cost of capital" which is $\rho_k = \overline{X}_j / V_j$. The difference between $\rho_k{}^\tau$ and the "true" average cost of capital, as we shall see, is a matter of some relevance in connection with investment planning within the firm (Section II). For the description of market behavior, however, which is our immediate concern here, the distinction is not essential. To simplify presentation, therefore, and to preserve continuity with the terminology in the standard literature we shall continue in this section to refer to $\rho_k{}^\tau$ as the average cost of capital, though strictly speaking this identification is correct only in the absence of taxes.

*Effects of a Plurality of Bonds and Interest Rates.* In existing capital markets we find not one, but a whole family of interest rates varying with maturity, with the technical provisions of the loan and, what is most relevant for present purposes, with the financial condition of the borrower.[16] Economic theory and market experience both suggest that the yields demanded by lenders tend to increase with the debt-equity ratio of the borrowing firm (or individual). If so, and if we can assume as a first approximation that this yield curve, $r = r \ (D/S)$, whatever its precise form, is the same for all borrowers, then we can readily extend our propositions to the case of a rising supply curve for borrowed funds.[17]

Proposition I is actually unaffected in form and interpretation by the fact that the rate of interest may rise with leverage; while the average cost of *borrowed* funds will tend to increase as debt rises, the average cost of funds from *all* sources will still be independent of leverage (apart from the tax effect). This conclusion follows directly from the ability of those who engage in arbitrage to undo the leverage in any financial structure by acquiring an appropriately mixed portfolio of bonds and stocks. Because of this ability, the ratio of earnings (*before* interest charges) to market value—*i.e.*, the average cost of capital from all

---

[16] We shall not consider here the extension of the analysis to encompass the time structure of interest rates. Although some of the problems posed by the time structure can be handled within in our comparative statics framework, an adequate discussion would require a separate paper.

[17] We can also develop a theory of bond valuation along lines essentially parallel to those followed for the case of shares. We conjecture that the curve of bond yields as a function of leverage will turn out to be a nonlinear one in contrast to the linear function of leverage developed for common shares. However, we would also expect that the rate of increase in the yield on new issues would not be substantial in practice. This relatively slow rise would reflect the fact that interest rate increases by themselves can never be completely satisfactory to creditors as compensation for their increased risk. Such increases may simply serve to raise $r$ so high relative to $\rho$ that they become self-defeating by giving rise to a situation in which even normal fluctuations in earnings may force the company into bankruptcy. The difficulty of borrowing more, therefore, tends to show up in the usual case not so much in higher rates as in the form of increasingly stringent restrictions imposed on the company's management and finances by the creditors; and ultimately in a complete inability to obtain new borrowed funds, at least from the institutional investors who normally set the standards in the market for bonds.

sources—must be the same for all firms in a given class.[18] In other words, the increased cost of borrowed funds as leverage increases will tend to be offset by a corresponding reduction in the yield of common stock. This seemingly paradoxical result will be examined more closely below in connection with Proposition II.

A significant modification of Proposition I would be required only if the yield curve $r = r(D/S)$ were different for different borrowers, as might happen if creditors had marked preferences for the securities of a particular class of debtors. If, for example, corporations as a class were able to borrow at lower rates than individuals having equivalent personal leverage, then the average cost of capital to corporations might fall slightly, as leverage increased over some range, in reflection of this differential. In evaluating this possibility, however, remember that the relevant interest rate for our arbitrage operators is the rate on brokers' loans and, historically, that rate has not been noticeably higher than representative corporate rates.[19] The operations of holding companies and investment trusts which can borrow on terms comparable to operating companies represent still another force which could be expected to wipe out any marked or prolonged advantages from holding levered stocks.[20]

Although Proposition I remains unaffected as long as the yield curve is the same for all borrowers, the relation between common stock yields and leverage will no longer be the strictly linear one given by the original Proposition II. If $r$ increases with leverage, the yield $i$ will still tend to

[18] One normally minor qualification might be noted. Once we relax the assumption that all bonds have certain yields, our arbitrage operator faces the danger of something comparable to "gambler's ruin." That is, there is always the possibility that an otherwise sound concern— one whose long-run expected income is greater than its interest liability—might be forced into liquidation as a result of a run of temporary losses. Since reorganization generally involves costs, and because the operation of the firm may be hampered during the period of reorganization with lasting unfavorable effects on earnings prospects, we might perhaps expect heavily levered companies to sell at a slight discount relative to less heavily indebted companies of the same class.

[19] Under normal conditions, moreover, a substantial part of the arbitrage process could be expected to take the form, not of having the arbitrage operators go into debt on personal account to put the required leverage into their portfolios, but simply of having them reduce the amount of corporate bonds they already hold when they acquire underpriced unlevered stock. Margin requirements are also somewhat less of an obstacle to maintaining any desired degree of leverage in a portfolio than might be thought at first glance. Leverage could be largely restored in the face of higher margin requirements by switching to stocks having more leverage at the corporate level.

[20] An extreme form of inequality between borrowing and lending rates occurs, of course, in the case of preferred stocks, which can not be directly issued by individuals on personal account. Here again, however, we would expect that the operations of investment corporations plus the ability of arbitrage operators to sell off their holdings of preferred stocks would act to prevent the emergence of any substantial premiums (for this reason) on capital structures containing preferred stocks. Nor are preferred stocks so far removed from bonds as to make it impossible for arbitrage operators to approximate closely the risk and leverage of a corporate preferred stock by incurring a somewhat smaller debt on personal account.

MODIGLIANI AND MILLER: THEORY OF INVESTMENT     275

rise as $D/S$ increases, but at a decreasing rather than a constant rate. Beyond some high level of leverage, depending on the exact form of the interest function, the yield may even start to fall.[21] The relation between $i$ and $D/S$ could conceivably take the form indicated by the curve $MD$



FIGURE 1

FIGURE 2

in Figure 2, although in practice the curvature would be much less pronounced. By contrast, with a constant rate of interest, the relation would be linear throughout as shown by line $MM'$, Figure 2.

The downward sloping part of the curve $MD$ perhaps requires some

[21] Since new lenders are unlikely to permit this much leverage (*cf.* note 17), this range of the curve is likely to be occupied by companies whose earnings prospects have fallen substantially since the time when their debts were issued.

comment since it may be hard to imagine why investors, other than those who like lotteries, would purchase stocks in this range. Remember, however, that the yield curve of Proposition II is a consequence of the more fundamental Proposition I. Should the demand by the risk-lovers prove insufficient to keep the market to the peculiar yield-curve $MD$, this demand would be reinforced by the action of arbitrage operators. The latter would find it profitable to own a pro-rata share of the firm as a whole by holding its stock *and* bonds, the lower yield of the shares being thus offset by the higher return on bonds.

### D. *The Relation of Propositions I and II to Current Doctrines*

The propositions we have developed with respect to the valuation of firms and shares appear to be substantially at variance with current doctrines in the field of finance. The main differences between our view and the current view are summarized graphically in Figures 1 and 2. Our Proposition I [equation (4)] asserts that the average cost of capital, $\overline{X}_j^\tau/V_j$, is a constant for all firms $j$ in class $k$, independently of their financial structure. This implies that, if we were to take a sample of firms in a given class, and if for each firm we were to plot the ratio of expected return to market value against some measure of leverage or financial structure, the points would tend to fall on a horizontal straight line with intercept $\rho_k^\tau$, like the solid line $mm'$ in Figure 1.[22] From Proposition I we derived Proposition II [equation (8)] which, taking the simplest version with $r$ constant, asserts that, for all firms in a class, the relation between the yield on common stock and financial structure, measured by $D_j/S_j$, will approximate a straight line with slope $(\rho_k^\tau - r)$ and intercept $\rho_k^\tau$. This relationship is shown as the solid line $MM'$ in Figure 2, to which reference has been made earlier.[23]

By contrast, the conventional view among finance specialists appears to start from the proposition that, other things equal, the earnings-price ratio (or its reciprocal, the times-earnings multiplier) of a firm's common stock will normally be only slightly affected by "moderate" amounts of debt in the firm's capital structure.[24] Translated into our no-

---

[22] In Figure 1 the measure of leverage used is $D_j/V_j$ (the ratio of debt to market value) rather than $D_j/S_j$ (the ratio of debt to equity), the concept used in the analytical development. The $D_j/V_j$ measure is introduced at this point because it simplifies comparison and contrast of our view with the traditional position.

[23] The line $MM'$ in Figure 2 has been drawn with a positive slope on the assumption that $\rho_k^\tau > r$, a condition which will normally obtain. Our Proposition II as given in equation (8) would continue to be valid, of course, even in the unlikely event that $\rho_k^\tau < r$, but the slope of $MM'$ would be negative.

[24] See, *e.g.*, Graham and Dodd [6, pp. 464–66]. Without doing violence to this position, we can bring out its implications more sharply by ignoring the qualification and treating the yield as a virtual constant over the relevant range. See in this connection the discussion in Durand [3, esp. pp. 225–37] of what he calls the "net income method" of valuation.

MODIGLIANI AND MILLER: THEORY OF INVESTMENT   277

tation, it asserts that for any firm $j$ in the class $k$,

(13)    $$\frac{\overline{X}_j{}^\tau - rD_j}{S_j} \equiv \frac{\bar{\pi}_j{}^\tau}{S_j} = i_k^*, \text{ a constant for } \frac{D_j}{S_j} \leq L_k$$

or, equivalently,

(14)    $$S_j = \bar{\pi}_j{}^\tau / i_k^*.$$

Here $i_k^*$ represents the capitalization rate or earnings-price ratio on the common stock and $L_k$ denotes some amount of leverage regarded as the maximum "reasonable" amount for firms of the class $k$. This assumed relationship between yield and leverage is the horizontal solid line $ML'$ of Figure 2. Beyond $L'$, the yield will presumably rise sharply as the market discounts "excessive" trading on the equity. This possibility of a rising range for high leverages is indicated by the broken-line segment $L'G$ in the figure.[25]

If the value of shares were really given by (14) then the over-all market value of the firm must be:

(16)    $$V_j \equiv S_j + D_j = \frac{\overline{X}_j{}^\tau - rD_j}{i_k^*} + D_j = \frac{\overline{X}_j{}^\tau}{i_k^*} + \frac{(i_k^* - r)D_j}{i_k^*} .$$

That is, for any given level of expected total returns after taxes ($\overline{X}_j{}^\tau$) and assuming, as seems natural, that $i_k^* > r$, the value of the firm must tend to *rise* with debt;[26] whereas our Proposition I asserts that the value of the firm is completely independent of the capital structure. Another way of contrasting our position with the traditional one is in terms of the cost of capital. Solving (16) for $\overline{X}_j{}^\tau / V_j$ yields:

(17)    $$\overline{X}_j{}^\tau / V_j = i_k^* - (i_k^* - r)D_j / V_j.$$

According to this equation, the average cost of capital is not independent of capital structure as we have argued, but should tend to *fall* with increasing leverage, at least within the relevant range of moderate debt ratios, as shown by the line $ms$ in Figure 1. Or to put it in more familiar terms, debt-financing should be "cheaper" than equity-financing if not carried too far.

When we also allow for the possibility of a rising range of stock yields for large values of leverage, we obtain a U-shaped curve like $mst$ in

[25] To make it easier to see some of the implications of this hypothesis as well as to prepare the ground for later statistical testing, it will be helpful to assume that the notion of a critical limit on leverage beyond which yields rise rapidly, can be epitomized by a quadratic relation of the form:

(15)    $$\bar{\pi}_j{}^\tau / S_j = i_k^* + \beta(D_j / S_j) + \alpha(D_j / S_j)^2, \qquad \alpha > 0.$$

[26] For a typical discussion of how a promoter can, supposedly, increase the market value of a firm by recourse to debt issues, see W. J. Eiteman [4, esp. pp. 11–13].

Figure 1.[27] That a yield-curve for stocks of the form $ML'G$ in Figure 2 implies a U-shaped cost-of-capital curve has, of course, been recognized by many writers. A natural further step has been to suggest that the capital structure corresponding to the trough of the U is an "optimal capital structure" towards which management ought to strive in the best interests of the stockholders.[28] According to our model, by contrast, no such optimal structure exists—all structures being equivalent from the point of view of the cost of capital.

Although the falling, or at least U-shaped, cost-of-capital function is in one form or another the dominant view in the literature, the ultimate rationale of that view is by no means clear. The crucial element in the position—that the expected earnings-price ratio of the stock is largely unaffected by leverage up to some conventional limit—is rarely even regarded as something which requires explanation. It is usually simply taken for granted or it is merely asserted that this is the way the market behaves.[29] To the extent that the constant earnings-price ratio has a rationale at all we suspect that it reflects in most cases the feeling that moderate amounts of debt in "sound" corporations do not really add very much to the "riskiness" of the stock. Since the extra risk is slight, it seems natural to suppose that firms will not have to pay noticeably higher yields in order to induce investors to hold the stock.[30]

A more sophisticated line of argument has been advanced by David Durand [3, pp. 231–33]. He suggests that because insurance companies and certain other important institutional investors are restricted to debt securities, nonfinancial corporations are able to borrow from them at interest rates which are lower than would be required to compensate

[27] The U-shaped nature of the cost-of-capital curve can be exhibited explicitly if the yield curve for shares as a function of leverage can be approximated by equation (15) of footnote 25. From that equation, multiplying both sides by $S_i$ we obtain: $\bar{\pi}_i{}^\tau = \bar{X}_i{}^\tau - rD_i = i_k{}^*S_i + \beta D_i + \alpha D_i{}^2/S_i$ or, adding and subtracting $i_k{}^*D_k$ from the right-hand side and collecting terms,

$$(18) \qquad \bar{X}_i{}^\tau = i_k{}^*(S_i + D_i) + (\beta + r - i_k{}^*)D_i + \alpha D^2{}_i/S_i.$$

Dividing (18) by $V_i$ gives an expression for the cost of capital:

$$(19) \quad \bar{X}_i{}^\tau/V_i = i_k{}^* - (i_k{}^* - r - \beta)D_i/V_i + \alpha D_i{}^2/S_iV_i = i_k{}^* - (i_k{}^* - r - \beta)D_i/V_i + \alpha (D_i/V_i)^2/(1 - D_i/V_i)$$

which is clearly U-shaped since $\alpha$ is supposed to be positive.

[28] For a typical statement see S. M. Robbins [16, p. 307]. See also Graham and Dodd [6, pp. 468–74].

[29] See e.g., Graham and Dodd [6, p. 466].

[30] A typical statement is the following by Guthmann and Dougall [7, p. 245]: "Theoretically it might be argued that the increased hazard from using bonds and preferred stocks would counterbalance this additional income and so prevent the common stock from being more attractive than when it had a lower return but fewer prior obligations. In practice, the extra earnings from 'trading on the equity' are often regarded by investors as more than sufficient to serve as a 'premium for risk' when the proportions of the several securities are judiciously mixed."

creditors in a free market. Thus, while he would presumably agree with our conclusions that stockholders could not gain from leverage in an unconstrained market, he concludes that they can gain under present institutional arrangements. This gain would arise by virtue of the "safety superpremium" which lenders are willing to pay corporations for the privilege of lending.[31]

The defective link in both the traditional and the Durand version of the argument lies in the confusion between investors' subjective risk preferences and their objective market opportunities. Our Propositions I and II, as noted earlier, do not depend for their validity on any assumption about individual risk preferences. Nor do they involve any assertion as to what is an adequate compensation to investors for assuming a given degree of risk. They rely merely on the fact that a given commodity cannot consistently sell at more than one price in the market; or more precisely that the price of a commodity representing a "bundle" of two other commodities cannot be consistently different from the weighted average of the prices of the two components (the weights being equal to the proportion of the two commodities in the bundle).

An analogy may he helpful at this point. The relations between $1/\rho_k$, the price per dollar of an unlevered stream in class $k$; $1/r$, the price per dollar of a sure stream, and $1/i_j$, the price per dollar of a levered stream $j$, in the $k$th class, are essentially the same as those between, respectively, the price of whole milk, the price of butter fat, and the price of milk which has been thinned out by skimming off some of the butter fat. Our Proposition I states that a firm cannot reduce the cost of capital—i.e., increase the market value of the stream it generates—by securing part of its capital through the sale of bonds, even though debt money appears to be cheaper. This assertion is equivalent to the proposition that, under perfect markets, a dairy farmer cannot in general earn more for the milk he produces by skimming some of the butter fat and selling it separately, even though butter fat per unit weight, sells for more than whole milk. The advantage from skimming the milk rather than selling whole milk would be purely illusory; for what would be gained from selling the high-priced butter fat would be lost in selling the low-priced residue of thinned milk. Similarly our Proposition II—that the price per dollar of a levered stream falls as leverage increases—is an ex-

[31] Like Durand, Morton [15] contends "that the actual market deviates from [Proposition I] by giving a changing over-all cost of money at different points of the [leverage] scale" (p. 443, note 2, inserts ours), but the basis for this contention is nowhere clearly stated. Judging by the great emphasis given to the lack of mobility of investment funds between stocks and bonds and to the psychological and institutional pressures toward debt portfolios (see pp. 444–51 and especially his discussion of the optimal capital structure on p. 453) he would seem to be taking a position very similar to that of Durand above.

act analogue of the statement that the price per gallon of thinned milk falls continuously as more butter fat is skimmed off.[32]

It is clear that this last assertion is true as long as butter fat is worth more per unit weight than whole milk, and it holds even if, for many consumers, taking a little cream out of the milk (adding a little leverage to the stock) does not detract noticeably from the taste (does not add noticeably to the risk). Furthermore the argument remains valid even in the face of instituional limitations of the type envisaged by Durand. For suppose that a large fraction of the population habitually dines in restaurants which are required by law to serve only cream in lieu of milk (entrust their savings to institutional investors who can only buy bonds). To be sure the price of butter fat will then tend to be higher in relation to that of skimmed milk than in the absence such restrictions (the rate of interest will tend to be lower), and this will benefit people who eat at home and who like skim milk (who manage their own portfolio and are able and willing to take risk). But it will still be the case that a farmer cannot gain by skimming some of the butter fat and selling it separately (firm cannot reduce the cost of capital by recourse to borrowed funds).[33]

Our propositions can be regarded as the extension of the classical theory of markets to the particular case of the capital markets. Those who hold the current view—whether they realize it or not—must as-

---

[32] Let $M$ denote the quantity of whole milk, $B/M$ the proportion of butter fat in the whole milk, and let $p_M$, $p_B$ and $p_\alpha$ denote, respectively, the price per unit weight of whole milk, butter fat and thinned milk from which a fraction $\alpha$ of the butter fat has been skimmed off. We then have the fundamental perfect market relation:

(a) $$p_\alpha(M - \alpha B) + p_B \alpha B = p_M M, \qquad 0 \le \alpha \le 1,$$

stating that total receipts will be the same amount $p_M M$, independently of the amount $\alpha B$ of butter fat that may have been sold separately. Since $p_M$ corresponds to $1/\rho$, $p_B$ to $1/r$, $p_\alpha$ to $1/i$, $M$ to $\overline{X}$ and $\alpha B$ to $rD$, (a) is equivalent to Proposition I, $S+D=\overline{X}/\rho$. From (a) we derive:

(b) $$p_\alpha = p_M \frac{M}{M - \alpha B} - p_B \frac{\alpha B}{M - \alpha B}$$

which gives the price of thinned milk as an explicit function of the proportion of butter fat skimmed off; the function decreasing as long as $p_B > p_M$. From (a) also follows:

(c) $$1/p_\alpha = 1/p_M + (1/p_M - 1/p_B) \frac{p_B \alpha B}{p_\alpha(M - \alpha B)}$$

which is the exact analogue of Proposition II, as given by (8).

[33] The reader who likes parables will find that the analogy with interrelated commodity markets can be pushed a good deal farther than we have done in the text. For instance, the effect of changes in the market rate of interest on the over-all cost of capital is the same as the effect of a change in the price of butter on the price of whole milk. Similarly, just as the relation between the prices of skim milk and butter fat influences the kind of cows that will be reared, so the relation between $i$ and $r$ influences the kind of ventures that will be undertaken. If people like butter we shall have Guernseys; if they are willing to pay a high price for safety, this will encourage ventures which promise smaller but less uncertain streams per dollar of physical assets.

sume not merely that there are lags and frictions in the equilibrating process—a feeling we certainly share,[34] claiming for our propositions only that they describe the central tendency around which observations will scatter—but also that there are large and *systematic* imperfections in the market which permanently bias the outcome. This is an assumption that economists, at any rate, will instinctively eye with some skepticism.

In any event, whether such prolonged, systematic departures from equilibrium really exist or whether our propositions are better descriptions of long-run market behavior can be settled only by empirical research. Before going on to the theory of investment it may be helpful, therefore, to look at the evidence.

E. *Some Preliminary Evidence on the Basic Propositions*

Unfortunately the evidence which has been assembled so far is amazingly skimpy. Indeed, we have been able to locate only two recent studies—and these of rather limited scope—which were designed to throw light on the issue. Pending the results of more comprehensive tests which we hope will soon be available, we shall review briefly such evidence as is provided by the two studies in question: (1) an analysis of the relation between security yields and financial structure for some 43 large electric utilities by F. B. Allen [1], and (2) a parallel (unpublished) study by Robert Smith [19], for 42 oil companies designed to test whether Allen's rather striking results would be found in an industry with very different characteristics.[35] The Allen study is based on average figures for the years 1947 and 1948, while the Smith study relates to the single year 1953.

*The Effect of Leverage on the Cost of Capital.* According to the received view, as shown in equation (17) the average cost of capital, $\overline{X}^\tau/V$, should decline linearly with leverage as measured by the ratio $D/V$, at least through most of the relevant range.[36] According to Proposition I, the average cost of capital within a given class $k$ should tend to have the same value $\rho_k^\tau$ independently of the degree of leverage. A simple test

[34] Several specific examples of the failure of the arbitrage mechanism can be found in Graham and Dodd [6, *e.g.*, pp. 646–48]. The price discrepancy described on pp. 646–47 is particularly curious since it persists even today despite the fact that a whole generation of security analysts has been brought up on this book!

[35] We wish to express our thanks to both writers for making available to us some of their original worksheets. In addition to these recent studies there is a frequently cited (but apparently seldom read) study by the Federal Communications Commission in 1938 [22] which purports to show the existence of an optimal capital structure or range of structures (in the sense defined above) for public utilities in the 1930's. By current standards for statistical investigations, however, this study cannot be regarded as having any real evidential value for the problem at hand.

[36] We shall simplify our notation in this section by dropping the subscript $j$ used to denote a particular firm wherever this will not lead to confusion.

of the merits of the two alternative hypotheses can thus be carried out by correlating $\overline{X}^\tau/V$ with $D/V$. If the traditional view is correct, the correlation should be significantly negative; if our view represents a better approximation to reality, then the correlation should not be significantly different from zero.

Both studies provide information about the average value of $D$—the market value of bonds and preferred stock—and of $V$—the market value of all securities.[37] From these data we can readily compute the ratio $D/V$ and this ratio (expressed as a percentage) is represented by the symbol $d$ in the regression equations below. The measurement of the variable $\overline{X}^\tau/V$, however, presents serious difficulties. Strictly speaking, the numerator should measure the expected returns net of taxes, but this is a variable on which no direct information is available. As an approximation, we have followed both authors and used (1) the average value of actual net returns in 1947 and 1948 for Allen's utilities; and (2) actual net returns in 1953 for Smith's oil companies. Net return is defined in both cases as the sum of interest, preferred dividends and stockholders' income net of corporate income taxes. Although this approximation to expected returns is undoubtedly very crude, there is no reason to believe that it will systematically bias the test in so far as the sign of the regression coefficient is concerned. The roughness of the approximation, however, will tend to make for a wide scatter. Also contributing to the scatter is the crudeness of the industrial classification, since especially within the sample of oil companies, the assumption that all the firms belong to the same class in our sense, is at best only approximately valid.

Denoting by $x$ our approximation to $\overline{X}^\tau/V$ (expressed, like $d$, as a percentage), the results of the tests are as follows:

$$\text{Electric Utilities} \quad x = 5.3 + .006d \quad r = .12$$
$$(\pm .008)$$

$$\text{Oil Companies} \quad x = 8.5 + .006d \quad r = .04.$$
$$(\pm .024)$$

The data underlying these equations are also shown in scatter diagram form in Figures 3 and 4.

The results of these tests are clearly favorable to our hypothesis.

[37] Note that for purposes of this test preferred stocks, since they represent an *expected* fixed obligation, are properly classified with bonds even though the tax status of preferred dividends is different from that of interest payments and even though preferred dividends are really fixed only as to their maximum in any year. Some difficulty of classification does arise in the case of convertible preferred stocks (and convertible bonds) selling at a substantial premium, but fortunately very few such issues were involved for the companies included in the two studies. Smith included bank loans and certain other short-term obligations (at book values) in his data on oil company debts and this treatment is perhaps open to some question. However, the amounts involved were relatively small and check computations showed that their elimination would lead to only minor differences in the test results.



FIGURE 3. COST OF CAPITAL IN RELATION TO FINANCIAL STRUCTURE
FOR 43 ELECTRIC UTILITIES, 1947–48



FIGURE 4. COST OF CAPITAL IN RELATION TO FINANCIAL STRUCTURE
FOR 42 OIL COMPANIES, 1953

Both correlation coefficients are very close to zero and not statistically significant. Furthermore, the implications of the traditional view fail to be supported even with respect to the sign of the correlation. The data in short provide no evidence of any tendency for the cost of capital to fall as the debt ratio increases.[38]

It should also be apparent from the scatter diagrams that there is no hint of a curvilinear, U-shaped, relation of the kind which is widely believed to hold between the cost of capital and leverage. This graphical impression was confirmed by statistical tests which showed that for both industries the curvature was not significantly different from zero, its sign actually being opposite to that hypothesized.[39]

Note also that according to our model, the constant terms of the regression equations are measures of $\rho_k^\tau$, the capitalization rates for unlevered streams and hence the average cost of capital in the classes in question. The estimates of 8.5 per cent for the oil companies as against 5.3 per cent for electric utilities appear to accord well with a priori expectations, both in absolute value and relative spread.

*The Effect of Leverage on Common Stock Yields.* According to our Proposition II—see equation 12 and Figure 2—the expected yield on common stock, $\bar{\pi}^\tau/S$, in any given class, should tend to increase with leverage as measured by the ratio $D/S$. The relation should tend to be linear and with positive slope through most of the relevant range (as in the curve $MM'$ of Figure 2), though it might tend to flatten out if we move

---

[38] It may be argued that a test of the kind used is biased against the traditional view. The fact that both sides of the regression equation are divided by the variable $V$ which may be subject to random variation might tend to impart a positive bias to the correlation. As a check on the results presented in the text, we have, therefore, carried out a supplementary test based on equation (16). This equation shows that, if the traditional view is correct, the market value of a company should, for given $\bar{X}^\tau$, increase with debt through most of the relevant range; according to our model the market value should be uncorrelated with $D$, given $\bar{X}^\tau$. Because of wide variations in the size of the firms included in our samples, all variables must be divided by a suitable scale factor in order to avoid spurious results in carrying out a test of equation (16). The factor we have used is the book value of the firm denoted by $A$. The hypothesis tested thus takes the specific form:

$$V/A = a + b(\bar{X}^\tau/A) + c(D/A)$$

and the numerator of the ratio $X^\tau/A$ is again approximated by actual net returns. The partial correlation between $V/A$ and $D/A$ should now be positive according to the traditional view and zero according to our model. Although division by $A$ should, if anything, bias the results in favor of the traditional hypothesis, the partial correlation turns out to be only .03 for the oil companies and —.28 for the electric utilities. Neither of these coefficients is significantly different from zero and the larger one even has the wrong sign.

[39] The tests consisted of fitting to the data the equation (19) of footnote 27. As shown there, it follows from the U-shaped hypothesis that the coefficient $\alpha$ of the variable $(D/V)^2 /(1-D/V)$, denoted hereafter by $d^*$, should be significant and positive. The following regression equations and partials were obtained:

Electric Utilities $x = 5.0 + .017d - .003d^*$; $r_{xd^* \cdot d} = -.15$

Oil Companies $\quad x = 8.0 + .05d - .03d^*$; $r_{xd^* \cdot d} = -.14$.

MODIGLIANI AND MILLER: THEORY OF INVESTMENT      285

far enough to the right (as in the curve $MD'$), to the extent that high leverage tends to drive up the cost of senior capital. According to the conventional view, the yield curve as a function of leverage should be a horizontal straight line (like $ML'$) through most of the relevant range; far enough to the right, the yield may tend to rise at an increasing rate. Here again, a straight-forward correlation—in this case between $\bar{\pi}^\tau/S$ and $D/S$—can provide a test of the two positions. If our view is correct, the correlation should be significantly positive; if the traditional view is correct, the correlation should be negligible.

Subject to the same qualifications noted above in connection with $\overline{X}^\tau$, we can approximate $\bar{\pi}^\tau$ by actual stockholder net income.[40] Letting $z$ denote in each case the approximation to $\bar{\pi}^\tau/S$ (expressed as a percentage) and letting $h$ denote the ratio $D/S$ (also in percentage terms) the following results are obtained:

$$\text{Electric Utilities} \quad z = 6.6 + .017h \qquad r = .53$$
$$(+ .004)$$

$$\text{Oil Companies} \quad z = 8.9 + .051h \qquad r = .53.$$
$$(\pm .012)$$

These results are shown in scatter diagram form in Figures 5 and 6.

Here again the implications of our analysis seem to be borne out by the data. Both correlation coefficients are positive and highly significant when account is taken of the substantial sample size. Furthermore, the estimates of the coefficients of the equations seem to accord reasonably well with our hypothesis. According to equation (12) the constant term should be the value of $\rho_k^\tau$ for the given class while the slope should be $(\rho_k^\tau - r)$. From the test of Proposition I we have seen that for the oil companies the mean value of $\rho_k^\tau$ could be estimated at around 8.7. Since the average yield of senior capital during the period covered was in the order of $3\frac{1}{2}$ per cent, we should expect a constant term of about 8.7 per cent and a slope of just over 5 per cent. These values closely approximate the regression estimates of 8.9 per cent and 5.1 per cent respectively. For the electric utilities, the yield of senior capital was also on the order of $3\frac{1}{2}$ per cent during the test years, but since the estimate of the mean value of $\rho_k^\tau$ from the test of Proposition I was 5.6 per cent,

[40] As indicated earlier, Smith's data were for the single year 1953. Since the use of a single year's profits as a measure of expected profits might be open to objection we collected profit data for 1952 for the same companies and based the computation of $\bar{\pi}^\tau/S$ on the average of the two years. The value of $\bar{\pi}^\tau/S$ was obtained from the formula:

$$\left(\text{net earnings in 1952} \cdot \frac{\text{assets in '53}}{\text{assets in '52}} + \text{net earnings in '1953}\right) \frac{1}{2}$$

$$\div \text{ (average market value of common stock in '53)}.$$

The asset adjustment was introduced as rough allowance for the effects of possible growth in the size of the firm. It might be added that the correlation computed with $\bar{\pi}^\tau/S$ based on net profits in 1953 alone was found to be only slightly smaller, namely .50.



FIGURE 5. YIELD ON COMMON STOCK IN RELATION TO LEVERAGE FOR
43 ELECTRIC UTILITIES, 1947–48



FIGURE 6. YIELD ON COMMON STOCK IN RELATION TO LEVERAGE FOR
42 OIL COMPANIES, 1952–53

the slope should be just above 2 per cent. The actual regression estimate for the slope of 1.7 per cent is thus somewhat low, but still within one standard error of its theoretical value. Because of this underestimate of the slope and because of the large mean value of leverage ($\bar{h} = 160$ per cent) the regression estimate of the constant term, 6.6 per cent, is somewhat high, although not significantly different from the value of 5.6 per cent obtained in the test of Proposition I.

When we add a square term to the above equations to test for the presence and direction of curvature we obtain the following estimates:

$$\text{Electric Utilities} \quad z = 4.6 + .004h - .007h^2$$

$$\text{Oil Companies} \quad z = 8.5 + .072h - .016h^2.$$

For both cases the curvature is negative. In fact, for the electric utilities, where the observations cover a wider range of leverage ratios, the negative coefficient of the square term is actually significant at the 5 per cent level. Negative curvature, as we have seen, runs directly counter to the traditional hypothesis, whereas it can be readily accounted for by our model in terms of rising cost of borrowed funds.[41]

In summary, the empirical evidence we have reviewed seems to be broadly consistent with our model and largely inconsistent with traditional views. Needless to say much more extensive testing will be required before we can firmly conclude that our theory describes market behavior. Caution is indicated especially with regard to our test of Proposition II, partly because of possible statistical pitfalls[42] and partly because not all the factors that might have a systematic effect on stock yields have been considered. In particular, no attempt was made to test the possible influence of the dividend pay-out ratio whose role has tended to receive a great deal of attention in current research and thinking. There are two reasons for this omission. First, our main objective has been to assess the prima facie tenability of *our* model, and in this model, based as it is on rational behavior by investors, dividends per se play no role. Second, in a world in which the policy of dividend stabilization is widespread, there is no simple way of disentangling the true effect of dividend payments on stock prices from their apparent effect,

---

[41] That the yield of senior capital tended to rise for utilities as leverage increased is clearly shown in several of the scatter diagrams presented in the published version of Allen's study. This significant negative curvature between stock yields and leverage for utilities may be partly responsible for the fact, previously noted, that the constant in the linear regression is somewhat higher and the slope somewhat lower than implied by equation (12). Note also in connection with the estimate of $\rho_k{}^{\tau}$ that the introduction of the quadratic term reduces the constant considerably, pushing it in fact below the a priori expectation of 5.6, though the difference is again not statistically significant.

[42] In our test, *e.g.*, the two variables $z$ and $h$ are both ratios with $S$ appearing in the denominator, which may tend to impart a positive bias to the correlation (*cf.* note 38). Attempts were made to develop alternative tests, but although various possibilities were explored, we have so far been unable to find satisfactory alternatives.

the latter reflecting only the role of dividends as a proxy measure of long-term earning anticipations.[43] The difficulties just mentioned are further compounded by possible interrelations between dividend policy and leverage.[44]

## II. *Implications of the Analysis for the Theory of Investment*

### A. *Capital Structure and Investment Policy*

On the basis of our propositions with respect to cost of capital and financial structure (and for the moment neglecting taxes), we can derive the following simple rule for optimal investment policy by the firm:

*Proposition III.* If a firm in class $k$ is acting in the best interest of the stockholders at the time of the decision, it will exploit an investment opportunity if and only if the rate of return on the investment, say $\rho^*$, is as large as or larger than $\rho_k$. That is, *the cut-off point for investment in the firm will in all cases be $\rho_k$ and will be completely unaffected by the type of security used to finance the investment.* Equivalently, we may say that regardless of the financing used, the marginal cost of capital to a firm is equal to the average cost of capital, which is in turn equal to the capitalization rate for an unlevered stream in the class to which the firm belongs.[45]

To establish this result we will consider the three major financing alternatives open to the firm—bonds, retained earnings, and common stock issues—and show that in each case an investment is worth undertaking if, and only if, $\rho^* \geqq \rho_k$.[46]

Consider first the case of an investment financed by the sale of bonds. We know from Proposition I that the market value of the firm before the investment was undertaken was:[47]

$$(20) \qquad\qquad V_0 = \overline{X}_0 / \rho_k$$

[43] We suggest that failure to appreciate this difficulty is responsible for many fallacious, or at least unwarranted, conclusions about the role of dividends.

[44] In the sample of electric utilities, there is a substantial negative correlation between yields and pay-out ratios, but also between pay-out ratios and leverage, suggesting that either the association of yields and leverage or of yields and pay-out ratios may be (at least partly) spurious. These difficulties however do not arise in the case of the oil industry sample. A preliminary analysis indicates that there is here no significant relation between leverage and pay-out ratios and also no significant correlation (either gross or partial) between yields and pay-out ratios.

[45] The analysis developed in this paper is essentially a comparative-statics, not a dynamic analysis. This note of caution applies with special force to Proposition III. Such problems as those posed by expected changes in $r$ and in $\rho_k$ over time will not be treated here. Although they are in principle amenable to analysis within the general framework we have laid out, such an undertaking is sufficiently complex to deserve separate treatment. *Cf.* note 17.

[46] The extension of the proof to other types of financing, such as the sale of preferred stock or the issuance of stock rights is straightforward.

[47] Since no confusion is likely to arise, we have again, for simplicity, eliminated the subscripts identifying the firm in the equations to follow. Except for $\rho_k$, the subscripts now refer to time periods.

MODIGLIANI AND MILLER: THEORY OF INVESTMENT     289

and that the value of the common stock was:

$$(21) \qquad\qquad S_0 = V_0 - D_0.$$

If now the firm borrows $I$ dollars to finance an investment yielding $\rho^*$ its market value will become:

$$(22) \qquad\qquad V_1 = \frac{\overline{X}_0 + \rho^* I}{\rho_k} = V_0 + \frac{\rho^* I}{\rho_k}$$

and the value of its common stock will be:

$$(23) \qquad S_1 = V_1 - (D_0 + I) = V_0 + \frac{\rho^* I}{\rho_k} - D_0 - I$$

or using equation 21,

$$(24) \qquad\qquad S_1 = S_0 + \frac{\rho^* I}{\rho_k} - I.$$

Hence $S_1 \gtreqless S_0$ as $\rho^* \gtreqless \rho_k$.[48]

To illustrate, suppose the capitalization rate for uncertain streams in the $k$th class is 10 per cent and the rate of interest is 4 per cent. Then if a given company had an expected income of 1,000 and if it were financed entirely by common stock we know from Proposition I that the market value of its stock would be 10,000. Assume now that the managers of the firm discover an investment opportunity which will require an outlay of 100 and which is expected to yield 8 per cent. At first sight this might appear to be a profitable opportunity since the expected return is double the interest cost. If, however, the management borrows the necessary 100 at 4 per cent, the total expected income of the company rises to 1,008 and the market value of the firm to 10,080. But the firm now will have 100 of bonds in its capital structure so that, paradoxically, the market value of the stock must actually be reduced from 10,000 to 9,980 as a consequence of this apparently profitable investment. Or, to put it another way, the gains from being able to tap cheap, borrowed funds are more than offset for the stockholders by the market's discounting of the stock for the added leverage assumed.

Consider next the case of retained earnings. Suppose that in the course of its operations the firm acquired $I$ dollars of cash (without impairing

[48] In the case of bond-financing the rate of interest on bonds does not enter explicitly into the decision (assuming the firm borrows at the market rate of interest). This is true, moreover, given the conditions outlined in Section I.C, even though interest rates may be an increasing function of debt outstanding. To the extent that the firm borrowed at a rate other than the market rate the two $I$'s in equation (24) would no longer be identical and an additional gain or loss, as the case might be, would accrue to the shareholders. It might also be noted in passing that permitting the two $I$'s in (24) to take on different values provides a simple method for introducing underwriting expenses into the analysis.

the earning power of its assets). If the cash is distributed as a dividend to the stockholders their wealth $W_0$, after the distribution will be:

$$(25) \qquad W_0 = S_0 + I = \frac{\overline{X}_0}{\rho_k} - D_0 + I$$

where $\overline{X}_0$ represents the expected return from the assets exclusive of the amount $I$ in question. If however the funds are retained by the company and used to finance new assets whose expected rate of return is $\rho^*$, then the stockholders' wealth would become:

$$(26) \qquad W_1 = S_1 = \frac{\overline{X}_0 + \rho^* I}{\rho_k} - D_0 = S_0 + \frac{\rho^* I}{\rho_k} \, .$$

Clearly $W_1 \gtreqless W_0$ as $\rho^* \gtreqless \rho_k$ so that an investment financed by retained earnings raises the net worth of the owners if and only if $\rho^* > \rho_k$.[49]

Consider finally, the case of common-stock financing. Let $P_0$ denote the current market price per share of stock and assume, for simplicity, that this price reflects currently expected earnings only, that is, it does not reflect any future increase in earnings as a result of the investment under consideration.[50] Then if $N$ is the original number of shares, the price per share is:

$$(27) \qquad P_0 = S_0/N$$

and the number of new shares, $M$, needed to finance an investment of $I$ dollars is given by:

$$(28) \qquad M = \frac{I}{P_0} \, .$$

As a result of the investment the market value of the stock becomes:

$$S_1 = \frac{\overline{X}_0 + \rho^* I}{\rho_k} - D_0 = S_0 + \frac{\rho^* I}{\rho_k} = N P_0 + \frac{\rho^* I}{\rho_k}$$

and the price per share:

$$(29) \qquad P_1 = \frac{S_1}{N + M} = \frac{1}{N + M} \left[ N P_0 + \frac{\rho^* I}{\rho_k} \right].$$

[49] The conclusion that $\rho_k$ is the cut-off point for investments financed from internal funds applies not only to undistributed net profits, but to depreciation allowances (and even to the funds represented by the current sale value of any asset or collection of assets). Since the owners can earn $\rho_k$ by investing funds elsewhere in the class, partial or total liquidating distributions should be made whenever the firm cannot achieve a marginal internal rate of return equal to $\rho_k$.

[50] If we assumed that the market price of the stock did reflect the expected higher future earnings (as would be the case if our original set of assumptions above were strictly followed) the analysis would differ slightly in detail, but not in essentials. The cut-off point for new investment would still be $\rho_k$, but where $\rho^* > \rho_k$ the gain to the original owners would be larger than if the stock price were based on the pre-investment expectations only.

Since by equation (28), $I = MP_0$, we can add $MP_0$ and subtract $I$ from the quantity in bracket, obtaining:

(30)
$$P_1 = \frac{1}{N+M}\left[(N+M)P_0 + \frac{\rho^* - \rho_k}{\rho_k}I\right]$$

$$= P_0 + \frac{1}{N+M}\frac{\rho^* - \rho_k}{\rho_k}I > P_0 \text{ if,}$$

and only if, $\rho^* > \rho_k$.

Thus an investment financed by common stock is advantageous to the current stockholders if and only if its yield exceeds the capitalization rate $\rho_k$.

Once again a numerical example may help to illustrate the result and make it clear why the relevant cut-off rate is $\rho_k$ and not the current yield on common stock, $i$. Suppose that $\rho_k$ is 10 per cent, $r$ is 4 per cent, that the original expected income of our company is 1,000 and that management has the opportunity of investing 100 having an expected yield of 12 per cent. If the original capital structure is 50 per cent debt and 50 per cent equity, and 1,000 shares of stock are initially outstanding, then, by Proposition I, the market value of the common stock must be 5,000 or 5 per share. Furthermore, since the interest bill is $.04 \times 5,000 = 200$, the yield on common stock is $800/5,000 = 16$ per cent. It may then appear that financing the additional investment of 100 by issuing 20 shares to outsiders at 5 per share would dilute the equity of the original owners since the 100 promises to yield 12 per cent whereas the common stock is currently yielding 16 per cent. Actually, however, the income of the company would rise to 1,012; the value of the firm to 10,120; and the value of the common stock to 5,120. Since there are now 1,020 shares, each would be worth 5.02 and the wealth of the original stockholders would thus have been increased. What has happened is that the dilution in expected earnings per share (from .80 to .796) has been more than offset, in its effect upon the market price of the shares, by the decrease in leverage.

Our conclusion is, once again, at variance with conventional views,[51] so much so as to be easily misinterpreted. Read hastily, Proposition III seems to imply that the capital structure of a firm is a matter of indifference; and that, consequently, one of the core problems of corporate finance—the problem of the optimal capital structure for a firm—is no problem at all. It may be helpful, therefore, to clear up such possible misundertandings.

[51] In the matter of investment policy under uncertainty there is no single position which represents "accepted" doctrine. For a sample of current formulations, all very different from ours, see Joel Dean [2, esp. Ch. 3], M. Gordon and E. Shapiro [5], and Harry Roberts [17].

B. *Proposition III and Financial Planning by Firms*

Misinterpretation of the scope of Proposition III can be avoided by remembering that this Proposition tells us only that the type of instrument used to finance an investment is irrelevant to the question of whether or not the investment is worth while. This does not mean that the owners (or the managers) have no grounds whatever for preferring one financing plan to another; or that there are no other policy or technical issues in finance at the level of the firm.

That grounds for preferring one type of financial structure to another will still exist within the framework of our model can readily be seen for the case of common-stock financing. In general, except for something like a widely publicized oil-strike, we would expect the market to place very heavy weight on current and recent past earnings in forming expectations as to future returns. Hence, if the owners of a firm discovered a major investment opportunity which they felt would yield much more than $\rho_k$, they might well prefer not to finance it via common stock at the then ruling price, because this price may fail to capitalize the new venture. A better course would be a pre-emptive issue of stock (and in this connection it should be remembered that stockholders are free to borrow and buy). Another possibility would be to finance the project initially with debt. Once the project had reflected itself in increased actual earnings, the debt could be retired either with an equity issue at much better prices or through retained earnings. Still another possibility along the same lines might be to combine the two steps by means of a convertible debenture or preferred stock, perhaps with a progressively declining conversion rate. Even such a double-stage financing plan may possibly be regarded as yielding too large a share to outsiders since the new stockholders are, in effect, being given an interest in any similar opportunities the firm may discover in the future. If there is a reasonable prospect that even larger opportunities may arise in the near future and if there is some danger that borrowing now would preclude more borrowing later, the owners might find their interests best protected by splitting off the current opportunity into a separate subsidiary with independent financing. Clearly the problems involved in making the crucial estimates and in planning the optimal financial strategy are by no means trivial, even though they should have no bearing on the basic decision to invest (as long as $\rho^* \geqq \rho_k$).[52]

Another reason why the alternatives in financial plans may not be a matter of indifference arises from the fact that managers are concerned

[52] Nor can we rule out the possibility that the existing owners, if unable to use a financing plan which protects their interest, may actually prefer to pass up an otherwise profitable venture rather than give outsiders an "excessive" share of the business. It is presumably in situations of this kind that we could justifiably speak of a shortage of "equity capital," though this kind of market imperfection is likely to be of significance only for small or new firms.

with more than simply furthering the interest of the owners. Such other objectives of the management—which need not be necessarily in conflict with those of the owners—are much more likely to be served by some types of financing arrangements than others. In many forms of borrowing agreements, for example, creditors are able to stipulate terms which the current management may regard as infringing on its prerogatives or restricting its freedom to maneuver. The creditors might even be able to insist on having a direct voice in the formation of policy.[53] To the extent, therefore, that financial policies have these implications for the management of the firm, something like the utility approach described in the introductory section becomes relevant to financial (as opposed to investment) decision-making. It is, however, the utility functions of the managers per se and not of the owners that are now involved.[54]

In summary, many of the specific considerations which bulk so large in traditional discussions of corporate finance can readily be superimposed on our simple framework without forcing any drastic (and certainly no systematic) alteration of the conclusion which is our principal concern, namely that for investment decisions, the marginal cost of capital is $\rho_k$.

## C. The Effect of the Corporate Income Tax on Investment Decisions

In Section I it was shown that when an unintegrated corporate income tax is introduced, the original version of our Proposition I,

$$\overline{X}/V = \rho_k = \text{a constant}$$

must be rewritten as:

$$(11) \qquad \frac{(\overline{X} - rD)(1 - \tau) + rD}{V} \equiv \frac{\overline{X}^\tau}{V} = \rho_k{}^\tau = \text{a constant.}$$

Throughout Section I we found it convenient to refer to $\overline{X}^\tau/V$ as the cost of capital. The appropriate measure of the cost of capital relevant

---

[53] Similar considerations are involved in the matter of dividend policy. Even though the stockholders may be indifferent as to payout policy as long as investment policy is optimal, the management need not be so. Retained earnings involve far fewer threats to control than any of the alternative sources of funds and, of course, involve no underwriting expense or risk. But against these advantages management must balance the fact that sharp changes in dividend rates, which heavy reliance on retained earnings might imply, may give the impression that a firm's finances are being poorly managed, with consequent threats to the control and professional standing of the management.

[54] In principle, at least, this introduction of management's risk preferences with respect to financing methods would do much to reconcile the apparent conflict between Proposition III and such empirical findings as those of Modigliani and Zeman [14] on the close relation between interest rates and the ratio of new debt to new equity issues; or of John Lintner [12] on the considerable stability in target and actual dividend-payout ratios.

to investment decisions, however, is the ratio of the expected return *before* taxes to the market value, *i.e.*, $\overline{X}/V$. From (11) above we find:

$$(31) \qquad \frac{\overline{X}}{V} = \frac{\rho_k{}^\tau - \tau_r(D/V)}{1 - \tau} = \frac{\rho_k{}^\tau}{1 - \tau}\left[1 - \frac{\tau r D}{\rho_k{}^\tau V}\right],$$

which shows that the cost of capital now depends on the debt ratio, decreasing, as $D/V$ rises, at the constant rate $\tau r/(1-\tau)$.[55] Thus, with a corporate income tax under which interest is a deductible expense, gains can accrue to stockholders from having debt in the capital structure, even when capital markets are perfect. The gains however are small, as can be seen from (31), and as will be shown more explicitly below.

From (31) we can develop the tax-adjusted counterpart of Proposition III by interpreting the term $D/V$ in that equation as the proportion of debt used in any additional financing of $V$ dollars. For example, in the case where the financing is entirely by new common stock, $D=0$ and the required rate of return $\rho_k{}^S$ on a venture so financed becomes:

$$(32) \qquad \rho_k{}^S = \frac{\rho_k{}^\tau}{1 - \tau}.$$

For the other extreme of pure debt financing $D=V$ and the required rate of return, $\rho_k{}^D$, becomes:

$$(33) \qquad \rho_k{}^D = \frac{\rho_k{}^\tau}{1 - \tau}\left[1 - \tau\,\frac{r}{\rho_k{}^\tau}\right] = \rho_k{}^S\left[1 - \tau\,\frac{r}{\rho_k{}^\tau}\right] = \rho_k{}^S - \frac{\tau}{1 - \tau}\,r.[56]$$

For investments financed out of retained earnings, the problem of defining the required rate of return is more difficult since it involves a comparison of the tax consequences to the individual stockholder of receiving a dividend versus having a capital gain. Depending on the time of realization, a capital gain produced by retained earnings may be taxed either at ordinary income tax rates, 50 per cent of these rates, 25 per

[55] Equation (31) is amenable, in principle, to statistical tests similar to those described in Section I.E. However we have not made any systematic attempt to carry out such tests so far, because neither the Allen nor the Smith study provides the required information. Actually, Smith's data included a very crude estimate of tax liability, and, using this estimate, we did in fact obtain a negative relation between $\overline{X}/V$ and $D/V$. However, the correlation ($-.28$) turned out to be significant only at about the 10 per cent level. While this result is not conclusive, it should be remembered that, according to our theory, the slope of the regression equation should be in any event quite small. In fact, with a value of $\tau$ in the order of .5, and values of $\rho_k{}^\tau$ and $r$ in the order of 8.5 and 3.5 per cent respectively (*cf.* Section I.E) an increase in $D/V$ from 0 to 60 per cent (which is, approximately, the range of variation of this variable in the sample) should tend to reduce the average cost of capital only from about 17 to about 15 per cent.

[56] This conclusion does not extend to preferred stocks even though they have been classed with debt issues previously. Since preferred dividends except for a portion of those of public utilities are not in general deductible from the corporate tax, the cut-off point for new financing via preferred stock is exactly the same as that for common stock.

cent, or zero, if held till death. The rate on any dividends received in the event of a distribution will also be a variable depending on the amount of other income received by the stockholder, and with the added complications introduced by the current dividend-credit provisions. If we assume that the managers proceed on the basis of reasonable estimates as to the average values of the relevant tax rates for the owners, then the required return for retained earnings $\rho_k{}^R$ can be shown to be:

$$(34) \qquad \rho_k{}^R = \rho_k{}^\tau \frac{1}{1-\tau}\frac{1-\tau_d}{1-\tau_g} = \frac{1-\tau_d}{1-\tau_g}\rho_k{}^s$$

where $\tau_d$ is the assumed rate of personal income tax on dividends and $\tau_g$ is the assumed rate of tax on capital gains.

A numerical illustration may perhaps be helpful in clarifying the relationship between these required rates of return. If we take the following round numbers as representative order-of-magnitude values under present conditions: an after-tax capitalization rate $\rho_k{}^\tau$ of 10 per cent, a rate of interest on bonds of 4 per cent, a corporate tax rate of 50 per cent, a marginal personal income tax rate on dividends of 40 per cent (corresponding to an income of about $25,000 on a joint return), and a capital gains rate of 20 per cent (one-half the marginal rate on dividends), then the required rates of return would be: (1) 20 per cent for investments financed entirely by issuance of new common shares; (2) 16 per cent for investments financed entirely by new debt; and (3) 15 per cent for investments financed wholly from internal funds.

These results would seem to have considerable significance for current discussions of the effect of the corporate income tax on financial policy and on investment. Although we cannot explore the implications of the results in any detail here, we should at least like to call attention to the remarkably small difference between the "cost" of equity funds and debt funds. With the numerical values assumed, equity money turned out to be only 25 per cent more expensive than debt money, rather than something on the order of 5 times as expensive as is commonly supposed to be the case.[57] The reason for the wide difference is that the traditional

[57] See e.g., D. T. Smith [18]. It should also be pointed out that our tax system acts in other ways to reduce the gains from debt financing. Heavy reliance on debt in the capital structure, for example, commits a company to paying out a substantial proportion of its income in the form of interest payments taxable to the owners under the personal income tax. A debt-free company, by contrast, can reinvest in the business all of its (smaller) net income and to this extent subject the owners only to the low capital gains rate (or possibly no tax at all by virtue of the loophole at death). Thus, we should expect a high degree of leverage to be of value to the owners, even in the case of closely held corporations, primarily in cases where their firm was not expected to have much need for additional funds to expand assets and earnings in the future. To the extent that opportunities for growth were available, as they presumably would be for most successful corporations, the interest of the stockholders would tend to be better served by a structure which permitted maximum use of retained earnings.

view starts from the position that debt funds are several times cheaper than equity funds even in the absence of taxes, with taxes serving simply to magnify the cost ratio in proportion to the corporate rate. By contrast, in our model in which the repercussions of debt financing on the value of shares are taken into account, the *only* difference in cost is that due to the tax effect, and its magnitude is simply the tax on the "grossed up" interest payment. Not only is this magnitude likely to be small but our analysis yields the further paradoxical implication that the stockholders' gain from, and hence incentive to use, debt financing is actually smaller the lower the rate of interest. In the extreme case where the firm could borrow for practically nothing, the advantage of debt financing would also be practically nothing.

### III. *Conclusion*

With the development of Proposition III the main objectives we outlined in our introductory discussion have been reached. We have in our Propositions I and II at least the foundations of a theory of the valuation of firms and shares in a world of uncertainty. We have shown, moreover, how this theory can lead to an operational definition of the cost of capital and how that concept can be used in turn as a basis for rational investment decision-making within the firm. Needless to say, however, much remains to be done before the cost of capital can be put away on the shelf among the solved problems. Our approach has been that of static, partial equilibrium analysis. It has assumed among other things a state of atomistic competition in the capital markets and an ease of access to those markets which only a relatively small (though important) group of firms even come close to possessing. These and other drastic simplifications have been necessary in order to come to grips with the problem at all. Having served their purpose they can now be relaxed in the direction of greater realism and relevance, a task in which we hope others interested in this area will wish to share.

REFERENCES

1. F. B. ALLEN, "Does Going into Debt Lower the 'Cost of Capital'?," *Analysts Jour.*, Aug. 1954, *10*, 57–61.
2. J. DEAN, *Capital Budgeting*. New York 1951.
3. D. DURAND, "Costs of Debt and Equity Funds for Business: Trends and Problems of Measurement" in Nat. Bur. Econ. Research, *Conference on Research in Business Finance*. New York 1952, pp. 215–47.
4. W. J. EITEMAN, "Financial Aspects of Promotion," in *Essays on Business Finance* by M. W. Waterford and W. J. Eiteman. Ann Arbor, Mich. 1952, pp. 1–17.
5. M. J. GORDON and E. SHAPIRO, "Capital Equipment Analysis: The Required Rate of Profit," *Manag. Sci.*, Oct. 1956, *3*, 102–10.

6. B. GRAHAM and L. DODD, *Security Analysis*, 3rd ed. New York 1951.
7. G. GUTHMANN and H. E. DOUGALL, *Corporate Financial Policy*, 3rd ed. New York 1955.
8. J. R. HICKS, *Value and Capital*, 2nd ed. Oxford 1946.
9. P. HUNT and M. WILLIAMS, *Case Problems in Finance*, rev. ed. Homewood, Ill. 1954.
10. J. M. KEYNES, *The General Theory of Employment, Interest and Money*. New York 1936.
11. O. LANGE, *Price Flexibility and Employment*. Bloomington, Ind. 1944.
12. J. LINTNER, "Distribution of Incomes of Corporations among Dividends, Retained Earnings and Taxes," *Am. Econ. Rev.*, May 1956, *46*, 97–113.
13. F. LUTZ and V. LUTZ, *The Theory of Investment of the Firm*. Princeton 1951.
14. F. MODIGLIANI and M. ZEMAN, "The Effect of the Availability of Funds, and the Terms Thereof, on Business Investment" in Nat. Bur. Econ. Research, *Conference on Research in Business Finance*. New York 1952, pp. 263–309.
15. W. A. MORTON, "The Structure of the Capital Market and the Price of Money," *Am. Econ. Rev.*, May 1954, *44*, 440–54.
16. S. M. ROBBINS, *Managing Securities*. Boston 1954.
17. H. V. ROBERTS, "Current Problems in the Economics of Capital Budgeting," *Jour. Bus.*, 1957, *30* (1), 12–16.
18. D. T. SMITH, *Effects of Taxation on Corporate Financial Policy*. Boston 1952.
19. R. SMITH, "Cost of Capital in the Oil Industry," (hectograph). Pittsburgh: Carnegie Inst. Tech. 1955.
20. H. M. SOMERS, " 'Cost of Money' as the Determinant of Public Utility Rates," *Buffalo Law Rev.*, Spring 1955, *4*, 1–28.
21. J. B. WILLIAMS, *The Theory of Investment Value*. Cambridge, Mass. 1938.
22. U. S. Federal Communications Commission, *The Problem of the "Rate of Return" in Public Utility Regulation*. Washington 1938.