# EXHIBIT 8

# Proving Antitrust Damages

## Legal and Economic Issues

### Third Edition





# Proving Antitrust Damages

## Legal and Economic Issues

### Third Edition



SECTION OF
ANTITRUST
LAW

Promoting Competition
Protecting Consumers

AMERICAN BAR ASSOCIATION
Defending Liberty
Pursuing Justice

Cover design by ABA Design.

The materials contained herein represent the opinions of the authors and/or the editors, and should not be construed to be the views or opinions of the law firms or companies with whom such persons are in partnership with, associated with, or employed by, nor of the American Bar Association or the Section of Antitrust Law unless adopted pursuant to the bylaws of the Association

Nothing contained in this book is to be considered as the rendering of legal advice for specific cases, and readers are responsible for obtaining such advice from their own legal counsel. This book is intended for educational and informational purposes only.

© 2017 American Bar Association. All rights reserved.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher. For permission contact the ABA Copyrights & Contracts Department, copyright@americanbar.org, or complete the online form at http://www.americanbar.org/utility/reprint.html.

Printed in the United States of America.

21 20 19 18 17        5 4 3 2 1

ISBN: 978-1-63425-975-0

e-ISBN: 978-1-63425-976-7

Discounts are available for books ordered in bulk. Special consideration is given to state bars, CLE programs, and other bar-related organizations. Inquire at Book Publishing, ABA Publishing, American Bar Association, 321 N. Clark Street, Chicago, Illinois 60654-7598.

www.shopABA.org

# CONTENTS

*Foreword*

*Preface*


**PART I**


**Chapter 1: Impact: Injury and Causation**
 A. Injury
 B. Material Cause
 C. The Standard of Proof
 D. Proof of the Fact of Damage

**Chapter 2: Antitrust Injury and Standing**
 A. Antitrust Injury
     1. Supreme Court Precedent
     2. AGC's Consumer-or-Competitor Antitrust Injury Factor
 B. Antitrust Standing and the Directness of Injury Factor
     1. Limiting Scope of the Indirect Purchaser Doctrine
     2. Exceptions to the Indirect Purchaser Doctrine
 C. Duplicative Recovery, Complex Apportionment, and Better-Situated Plaintiffs
 D. Class-Wide Injury Issues in Antitrust Actions

**Chapter 3: Statute of Limitations**
 A. Accrual of an Antitrust Cause of Action
     1. Speculative Damages
     2. Continuing Violations
 B. Tolling of the Limitations Period

      1. Fraudulent Concealment

      2. Government Suits

      3. Equitable Tolling

  C. Damage Calculations

      1. Period of Recovery

      2. Conduct Prior to the Limitations Period


# PART II


## Chapter 4: Quantifying Damages

 A. The Standard of Proof for Proving Antitrust Damages

 B. The "But-For" Premise

 C. Methods for Quantifying Damages

 D. Mitigation

## Chapter 5: Economic and Financial Concepts

 A. Damages in Antitrust Litigation

 B. Factors to Consider in Developing a Damages Model

    1. Determining the Period of Injury

    2. Historical Performance

    3. Mitigation

    4. Lost Opportunities

    5. Competitive Responses

    6. Effects of Taxes

    7. Use of Hindsight

 C. Potential Sources of Data

    1. Accounting and Economic Costs and Profits

    2. Financial Statements

    3. Internal Company Data

 D. Types of Costs

 E. Discounting and Interest Rates

1. Prejudgment and Post-judgment Interest

2. Discounting and the Time Value of Money

3. Choosing a Discount Rate

4. Date of Discounting

F. Valuation Approaches to Calculating Lost Profits

1. Earnings-Based Measures: Discounted Cash Flow

2. Earnings-Based Methods: Capitalized Earnings

3. Market-Based Methods

**Chapter 6: Econometrics and Regression Analysis**

A. Legal Requirements

B. Causation and Quantification

C. Classic Regression Analysis and Hypothesis Testing

1. Basic Structure of a Regression Model

2. Multiple Regression

3. Estimation Methodology

4. Evaluating the Reasonableness of Estimation Results

5. Statistical Inference: Hypothesis Testing and Confidence Intervals

a. Confidence Intervals

b. T-statistics

c. P-values

D. Necessary Decisions and Common Areas of Expert Debate

1. Choice of Explanatory Variables

a. Too Many or Too Few Variables?

b. Multicollinearity

2. Functional Form

3. Structural Models versus Non-Structural Models

4. Estimation of Parameters Using Instrumental Variables

5. Estimation of the Standard Errors

6. Misspecification Bias and Specification Tests

E. Additional Considerations for Specific Forms of Data

1. Estimation with Large Datasets

2. Estimation with Panel Data

3. Estimation with Time Series Data

   a. Tests for Stationarity

   b. Modeling Market Dynamics with Stationary Time Series

   c. Modeling Dynamics in Nonstationary Time Series

   d. Considerations in Building a Forecasting Model

F. Before-During and Related Approaches to Damages

   1. "Dummy Variable" Models Versus "Prediction" Models

   2. Before-During-After Models

   3. Identifying Beginning and End Points of the Damages Period

G. Benchmark and Difference-in-Differences Approaches to Damages

H. Summary of Key Points in Creating and Evaluating Econometric Models of Damages

I. Case Study—The Application of the Before-During and Benchmark Approaches

   1. Background

   2. Economic Model, Data and Choice of Explanatory Variables

   3. Assumption of Liability and Causation

   4. Stationarity of the Time Series

   5. The Before-During Approach with the Dummy Variable Model

   6. The Before-During Approach with the Prediction Model

   7. Benchmark Approach

J. Additional Example: An Application of Structural Modeling

**Chapter 7: Evaluating the Scientific Validity of a Damages Model**

A. Rules Governing Expert Witness Testimony

B. Application of *Daubert* to Damages Experts in Antitrust

   1. Qualifications

   2. Reliability

   3. Fit

C. Expert Testimony on Antitrust Damages in the Context of
Class Certification
D. Best Practices for Antitrust Damages Experts

# PART III

## Chapter 8: Overcharges
A. Construction of the Economic Model
B. Estimation of the Overcharge
C. Horizontal Price Fixing
    1. Before-During-After Model
    2. Benchmark Method
    3. Difference-in-Differences Method
    4. Cost-based Method
    5. Implementation of a Damages Model
    6. Some Caveats for Overcharge Calculations in General
D. Bid-Rigging Cases
E. Other Causes of Action
    1. Single Firm Monopoly Pricing
    2. Overcharge Incident to Exclusion
    3. Umbrella Effects
    4. Vertical Price Fixing (Resale Price Maintenance)
    5. Tying Arrangements
F. Special Circumstances
    1. Non-price Collusion
    2. Regulated Prices
G. Suit by Indirect Purchasers
    1. Indirect Purchaser Standing Under Federal Law
    2. Indirect Purchaser Standing Under State Law
    3. Possibility of Duplicative Recovery
    4. Calculating Damages to Indirect Purchasers

H. Deadweight Loss

**Chapter 9: Damages in Exclusionary Conduct Cases**
A. Exclusionary Practices Can Harm Both Competitors and Customers
B. The Appropriate Damages Methodology
   1. Before-During-After Method
   2. Yardstick or Benchmark Method
   3. Structural Models Involving Simulation Methods
   4. Structural Models Based on Business Projections
C. Establishing Competitor Damages from Exclusionary Conduct
   1. Legal Issues
      a. Tension in Guidance
      b. Disaggregation of Antitrust Damages
      c. Mitigation of Damages
      d. Future Lost Profits
   2. Economic Issues
      a. Quantification
      b. Distinctions Between Going Out of Business versus Failure to Enter
D. Establishing Customers' Damages from Exclusionary Conduct
   1. Consistency with Liability Theory
   2. Tying and Bundling Damages
E. Cases Involving Competitor Exclusion
   1. Masimo Corp v. Tyco Health Group
   2. ZF Meritor LLC v. Eaton Corp.
   3. Weyerhaeuser
   4. McKenzie-Willamette
   5. LePage's

**Chapter 10: Proof of Robinson-Patman Act Damages**
A. Flexible Standards of Proof
B. Types of Harm

1. Primary Line Damages

2. Secondary Line Damages

    a. Damages from Sales Diversion: Basic Principles Resulting from Proving the Amount of Damages in Secondary Line Cases

    b. Damages May Be Measured by Lost Profits from Reduced Prices, Increased Costs, or Other Factors

C. Establishing the Amount of the Plaintiff's Damages

    1. The Plaintiff Is Not Required to Prove Damages with Certainty

    2. Damages Models Must Account for Other Factors that Impacted the Plaintiff's Profits

## Chapter 11: Proving Antitrust Damages in Jurisdictions Outside the United States

A. European Union

    1. The Types of Legal Proceedings in which Damages May Need to Be Proven

    2. Jurisdictional Issues

    3. The Nature of Available Damages

        a. Compensatory Damages

        b. Exemplary Damages

        c. Restitutionary Damages

    4. How Damages Are Proven

B. Canada

    1. Right of Action for Damages under the Competition Act

    2. Jurisdictional Issues

    3. The Nature of Available Damages

    4. How Damages Are Proven

## Table of Cases

# CHAPTER 4

# **QUANTIFYING DAMAGES**

Once a private antitrust plaintiff has shown that it has sustained antitrust injury, the law tends to be less demanding with respect to the damages methodology a plaintiff uses to quantify its damages. In practice, courts have applied a "reasonableness" standard which accommodates the reality that the quantification of damages is necessarily subject to greater uncertainty than simply proving the fact of injury. This chapter will discuss the standard of proof for antitrust damages, the but-for premise that underlies antitrust damage analysis, quantification methodologies, and mitigation.

# A. The Standard of Proof for Proving Antitrust Damages

Before being entitled to damages, the private antitrust plaintiff must establish that a violation of the antitrust laws occurred, that the plaintiff sustained antitrust injury, and that the plaintiff has "standing" under the antitrust laws to seek monetary damages.[1] Throughout this chapter, and the remainder of this handbook, the discussion will assume that these bars have been met and will refer to "violations" rather than "alleged violations." Damages experts likewise assume liability for the purpose of analysis, often before liability is in fact established. The damages analysis will come into play if and only if liability is established. While proving the existence of antitrust injury may be an exacting task, "a lesser level of proof is needed to support the amount of damages[.]"[2]

The "level of proof" needed to prove the quantum of antitrust damages suffered by a plaintiff was set in a trio of cases decided by the Supreme Court in the first half of the twentieth century: *Eastman Kodak Co. v. Southern Photo*

*Materials Co.*,[3] *Story Parchment Co. v. Paterson Parchment Paper Co.*,[4] and *Bigelow v. RKO Radio Pictures*.[5] They remain the leading cases on this point.[6] In *Eastman Kodak*, the Court was unmoved by defense contentions that "plaintiff's damages were purely speculative" and "not of an amount susceptible of expression in figures[.]"[7] The Court reasoned that "a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible."[8] The Court held that "[d]amages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate."[9]

The Court echoed its *Eastman Kodak* holding in *Story Parchment*, observing that "it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts."[10] Thus, while "damages may not be determined by mere speculation or guess, it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate."[11]

In *Bigelow*, the Court added: "[a]ny other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim."[12] To avoid the injustice of allowing the defendant to improperly retain its illicit profits, a jury is allowed to make a "just and reasonable" estimate of damages based on either direct or inferential proof.[13]

Given these circumstances, damages may be awarded despite imperfect proof. Judges must "observe the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries[.]"[14] A damages analysis based on assuming away the defendant's violation is inherently uncertain because "the vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation."[15] Nevertheless, courts will continue to apply a low threshold because "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."[16]

# B. The "But-For" Premise

A fundamental step in computing antitrust damages is to envision the manner in which a particular market would have developed, assuming that the antitrust violation did not occur and holding every other feature of the actual world constant. The purpose of this analysis is to isolate the effects of the challenged conduct so as to ascertain what would have happened "but for" the defendant's unlawful activities.[17] Then, antitrust damages can be quantified by comparing the plaintiff's actual profits (in a lost profits case), purchase prices (in an overcharge case), or the like, against what the plaintiff would have enjoyed absent the illegal conduct.[18]

Applying the "but-for" analysis can take a variety of forms, depending on the plaintiff bringing the claim and type of relief sought. For instance, a plaintiff who is a direct purchaser of products whose prices are artificially inflated due to anticompetitive conduct would typically seek overcharge damages, which are measured as the difference between the price the plaintiff actually paid and the price that would have prevailed in the absence of the antitrust violation (the "but-for" price), multiplied by the quantity of the product that was actually purchased.[19] This difference between the price that actually prevailed and the price that would have prevailed in the but-for world is called the "overcharge."[20] In contrast, for competitors prevented from fully competing in the marketplace by anticompetitive conduct, applying the but-for premise may require comparing the competitor-plaintiff's actual profits versus the profits the plaintiff would have earned in a world free of the market restraint—as was the case in *Eastman Kodak*, *Story Parchment*, and *Bigelow*. In addition, to the extent that an impaired competitor seeking lost profits enjoyed profits or benefits in the actual world that it would not have received but for the violation, some courts have required an offset.[21] A potentially different analysis may be required to establish the amount of overcharge paid by a plaintiff suing under state law as an *indirect purchaser* of the good in question (that is, who is suing as a purchaser of a product from an entity or person other than the claimed antitrust violator or entity in league with the antitrust violator). In such a case, the damages computation, depending upon the data available and the market or markets at issue, may involve, in part, an assessment of how much of the overcharge was "passed on" to the indirect purchaser.

The but-for premise requires some conceptualization of the actions in which the defendant might have engaged in the but-for world, instead of committing the violation. For certain types of violations, such as unlawful terminations by suppliers, the usual assumption is that the termination did not occur, leaving the supply relationship intact.[22] For other types of violations, such as overcharges caused by exclusionary conduct or cartel behavior, it is necessary to construct a but-for price that the evidence shows likely would have prevailed absent the violation.[23] Importantly, it is not relevant that the defendant or defendants could theoretically have caused the same harms through lawful means; what matters is what they did and likely would have done.[24] For instance, if the violation is cartel behavior and the claimed harm artificially inflated prices, it is not relevant that a member of the cartel could theoretically have raised prices acting alone absent the cartel, unless it could be shown that such a cartelist would have done so regardless.   "regardless" -- has to happen in both the actual and but-for worlds

# C. Methods for Quantifying Damages

Plaintiffs may rely on one or more of a number of methodologies to quantify the damages arising from anticompetitive conduct. In every case, however, courts require that the economic model used must isolate the effect of the anticompetitive conduct.[25] The process of separating out effects of the challenged conduct from other unrelated factors is typically accomplished by comparing the experience in the actual world and the experience the plaintiff likely would have had in a but-for world free of the challenged anticompetitive conduct, holding all other factors the same.

A variety of models can be used to re-construct the but-for world, including "Before-During-After" models, "Yardstick" models, Projection-based models, and Cournot or Bertrand simulation models. These are described in more detail in later chapters, but an overview is provided here.

*Before-During-After Models.* These models seek to isolate harm flowing from the challenged anticompetitive conduct by comparing the plaintiff's experience in the same market before, or after, the misconduct with its experience during the time the conduct was ongoing, which is sometimes referred to as the "damages period." The "Before-During" model acknowledges the likelihood that for a plaintiff who participated in the *same* market before or after the damages period, its actual experience in the time

period before the violation may serve as a proxy for the plaintiff's but-for experience during the damages period.[26] A similar logic applies to the "During-After" model, where, the plaintiff's actual experience after the damages period may serve as a proxy.[27]

*Yardstick Models.* These models seek to isolate harm flowing from the challenged anticompetitive conduct by comparing the experience of the plaintiff in a market subject to anticompetitive conduct to the experience of the plaintiff, or another firm, in a comparable market unaffected by the defendant's violation.[28] The yardstick employed must be comparable to the industry and firm in question.[29] The yardstick method is particularly useful where the before-during-after approach is inappropriate, for example where the plaintiff is a start-up that never began operations in the affected market,[30] or where data for the market free of the antitrust violation are not available. The yardstick approach often requires data about the proxy market participant's sales and profits, or prices paid. These data serve as a proxy to reflect what the plaintiff's experience would have been but for the illegal conduct and, as such, when compared to the plaintiff's actual experience can provide a means to measure the damages suffered.

In either the before-during-after approach or the yardstick approach issues of comparability may arise. In the former, changes in market conditions during the damages period may raise doubts about the direct comparability of the damages period prices or profits to prices and profits before or after. With respect to a yardstick approach, differences in the yardstick and the market subject to anticompetitive conduct may raise questions about their comparability. However, a perfect comparator is not required, and adjustments may be used to account for differences.[31] Thus, while in some cases the proxy may be so lacking in comparability that the court will reject it,[32] whether the proxy is reasonably comparable is usually a question for the trier of fact.[33] This is because only a reasonable approximation is necessary for damages, so a proxy can be applied even if it does not fully correspond to the plaintiffs' situation.[34]

Because the before-during-after approach looks outside the damages period in the same market, and the yardstick approach looks to a different market, one may need to examine changes in economic conditions over time or across markets, the plaintiff's circumstances, or other variables which could affect prices, sales, and profits. One tool widely used by economists to account for

such changes in economic conditions is a statistical technique known as multiple regression analysis.[35] In the context of antitrust damages, multiple regression analysis is useful because it allows an expert to control for variables *other* than the anticompetitive conduct that may change between the damages period, or the market in question, and the benchmark or yardstick used to model the but-for world. Regression analyses are discussed in greater detail in Chapter 6.

*Projection-Based Models.* Courts have also accepted internal business projections by market actors of expected prices, sales, or profits for the damages period, formulated before the violation was known or anticipated, as the basis for but-for predictions.[36] As one court has noted:

> [I]nternal projections for future growth often serve as legitimate bases for expert opinions. Businesses are generally well-informed about the industries in which they operate, and have incentives to develop accurate projections. As such, experts frequently use a plaintiff's business plan to estimate the plaintiff's expected profits in the absence of the defendant's misconduct.[37]

However, if a defendant shows that actual events and conditions during the damages period (unrelated to the violation) departed substantially from the assumptions underlying the projections, an inference that the plaintiff failed to achieve its projected performance solely because of the violation may be undermined or weakened.[38]

*Cournot and Bertrand Models.* Cournot and Bertrand models provide another means to predict the prices that would have prevailed in the but-for market, and hence damages in private antitrust actions. They can be particularly useful in cases where before-during-after models and yardsticks may be unavailable or difficult to derive. The Cournot and Bertrand models are structure-based models with assumptions made regarding non-cooperative strategic interaction among the firms absent conspiratorial behavior. The Cournot model assumes that interaction among firms sets quantities and their customers pay the prices determined by the total output.[39] The Bertrand model assumes that interaction among firms sets prices and their customers choose quantities at the prices set.[40] In the Bertrand and Cournot approaches to quantifying damages, but-for prices are simulated based on the theoretical

relationship between price and factors such as market-concentration, demand elasticity, and marginal cost.[41]

The Department of Justice and the Federal Trade Commission use Cournot and Bertrand models routinely in evaluating prospective mergers to predict what prices would exist if two firms merged.[42] These agencies rely on these techniques because, as the agencies are attempting to forecast the implications of merger that has not been consummated and whose price effects are as yet unknown, data are not available to construct a before-during-after model. Bertrand and Cournot models can similarly be used to predict but-for prices in private antitrust actions where before-during-after methods are not available.[43] As with other types of predictive constructs, Bertrand and Cournot models must be rooted in the facts of the case.[44] Indeed, because Bertrand and Cournot models are frequently based on data which is specific to the market which is subject to the misconduct, they may have an advantage over yardstick models that rely on entirely different markets.[45]

\* \* \*

The use of any of the above models is not required, and the plaintiff may instead build its but-for world based on other relevant data and economic theory.[46] In that case, however, it may be challenging for the plaintiff to establish that the difference between the custom-built but-for plaintiff and the plaintiff's actual experience is attributable to the violation.[47] A simpler approach might be to estimate the profits the plaintiff would have made on sales to specific customers lost because of the violation.

Several courts have further held that a plaintiff must disaggregate the effects of the violation from other, lawful causes of plaintiffs' harm. If the model on its face indistinguishably includes effects of lawful and unlawful conduct, and it is impossible to distinguish the effect of each on prices and profits, then it may be vulnerable to attack.[48] Also, a defendant may attempt to show that independent causal factors other than the violation explain at least some substantial part of the difference between the but-for plaintiff's experience and that of the actual plaintiff.[49] However, the antitrust plaintiff need not prove the violation was the only cause of its damages; proof that the violation was a material cause of its damages is sufficient, as discussed in prior chapters.[50] Thus, a plaintiff is entitled to recover damages caused jointly by lawful and unlawful means. In addition, where two or more wrongdoers cause a harm to the plaintiff that is

incapable of division, then damages should not be apportioned, and each wrongdoer is liable for the entirety of the harm done.[51]

While the focus is often on whether the plaintiff's damages model has adequately isolated the effects of the violation, occasionally the plaintiff's but-for world is rejected on its face as not credible. For example, the posited but-for competitor plaintiff may be unrealistically successful, indicating that the calculated damages are inflated. Astronomical rates of return claimed by a plaintiff seeking lost profits, for example, will likely cast doubt on the reasonableness of the plaintiff's quantification, regardless of how it was derived.[52] Another potential failing of a plaintiff's damages theory may arise if, when applied in a context in which there is no misconduct, it nonetheless yields positive damages.[53]

Similarly, the quantification will be weakened if the defendant can show that it conflicts with basic economic forces. For example, an impaired competitor plaintiff may claim that absent the illegal conduct, it could have charged higher prices—prices higher than any of its competitors. Absent an explanation of how it could have maintained such high prices for a sustained period without inviting price competition, expansion, or new entry, such a damages model may defy economic theory. Moreover, an assumption that the but-for plaintiff would charge higher prices than those the plaintiff actually charged, while maintaining or increasing sales volume, would require further examination as to whether and how such a claim can conform to basic economic theory.[54]

# D. Mitigation

After an antitrust plaintiff has demonstrated the impact of the violation, some courts have held that it must take reasonable measures to minimize its damages.[55] Failure to take reasonable steps to mitigate damages may be a reason to reduce, or even eliminate altogether, damages claimed by the plaintiff.

The defendant has the burden to prove that the plaintiff did not mitigate its antitrust damages, and that the plaintiff's conduct in failing to take steps to mitigate was unreasonable and aggravated the harm.[56] The plaintiff does not have an absolute obligation to pursue an alternative course of conduct.[57] Hindsight should not be used to gauge whether the plaintiff should have

adopted an alternative that, as it turns out, would have been beneficial.[58] The test is whether it was unreasonable under the circumstances for the plaintiff to forgo the mitigation opportunity, not simply whether the opportunity was the next best alternative available.[59]

The plaintiff must be shown to have failed to take reasonable steps to avoid its damages.[60] For instance, in the case of a terminated distributor pursuing a refusal to deal theory, the plaintiff may not recover for the loss of its business if it "bypasse[d] an obviously adequate alternative supplier[.]"[61] However, in cases where the affected product was not available from another source (as is often the case for a purchaser of a product subject to a price-fixing conspiracy), the purchaser plaintiff may be relieved of a duty to mitigate.[62] Moreover, where the violators concealed their wrongdoing, the plaintiff cannot be expected to mitigate or otherwise offset damages that the plaintiff does not know it is incurring.[63]

Actual mitigation efforts by the plaintiff may affect its recoverable damages in a number of ways. Whether or not the efforts are successful, reasonable expenditures pursuing them are recoverable.[64] Even if the mitigation proves successful, the disruption suffered while the plaintiff pursued mitigation also may support a recovery of damages.[65] On the other hand, a plaintiff seeking redress for lost profits may find its damage claims barred if mitigation frees up resources that produce greater returns than would have been earned in the absence of the violation.[66]

Quantifying the effect of a failure to mitigate may produce a role reversal for the plaintiff and the defendant. To implement a failure to mitigate defense, the defendant will need to construct a new hypothetical world, one in which the plaintiff pursues the reasonable mitigation opportunity that it did not pursue in the real world.[67] The recoverable damages would be the difference between the plaintiff's hypothetical experience absent the violation and the plaintiff's hypothetical experience if it had mitigated.[68]

---

1. Associated Gen. Contractors v. Cal. State Council of Carpenters (*AGC*), 459 U.S. 519, 536 (1983) (only certain "part[ies] injured by an antitrust violation may recover treble damages"). For a fuller discussion of antitrust injury and which plaintiffs may recover damages, see AMERICAN ANTITRUST INSTITUTE, PRIVATE ENFORCEMENT OF ANTITRUST LAW IN THE

UNITED STATES 64-94 (2012).

[2]. Los Angeles Mem'l Coliseum Comm'n v. NFL, 791 F.2d 1356, 1360 (9th Cir. 1986). *See also In re* Scrap Metal Antitrust Litig., 527 F.3d 517, 533 (6th Cir. 2008) ("Once liability is established . . . a plaintiff's proof of damages is evaluated under a more lenient standard.").

[3]. 273 U.S. 359 (1927).

[4]. 282 U.S. 555 (1931).

[5]. 327 U.S. 251 (1946).

[6]. The Supreme Court has recently reaffirmed this line of precedent, observing in the antitrust context that damages "calculations need not be exact." Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1433 (2013) (citing *Story Parchment*, 282 U.S. at 563).

[7]. *Eastman Kodak*, 273 U.S. at 378.

[8]. *Id.* at 379.

[9]. *Id.* (internal quotes omitted).

[10]. *Story Parchment*, 282 U.S. at 563.

[11]. *Id.*

[12]. *Bigelow*, 327 U.S. 251, 264 (1946).

[13]. *Id.*

[14]. Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 123 (1969).

[15]. J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 566 (1981).

[16]. *Bigelow*, 327 U.S. at 265. *See also Story Parchment*, 282 U.S. at 563-65 (holding that where violation "preclude[s] the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts"); Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 379 (1927) ("a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible").

[17]. *See, e.g.*, *Bigelow*, 327 U.S. at 259, 263 (referring to proof of competitor plaintiff's profits "in the absence of" the restraints, or "if the restraints had not been imposed"); LePage's Inc. v. 3M, 324 F.3d 141, 165 (3d Cir. 2003) (damage model should "measur[e] what, hypothetically, would have happened 'but for' the defendant's unlawful activities").

18. *See, e.g.*, *LePage's*, 324 F.3d at 165; Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d 91, 107 (2d Cir. 2007) (damages could be measured as "the difference between the but-for fee and the actual fee paid"); New York v. Julius Nasso Concrete Corp., 202 F.3d 82, 88 (2d Cir. 2000) (holding, in a price-fixing case, the measure of damages is "the difference between the price actually paid by the [plaintiff] on the contracts and the price it would have paid absent the conspiracy").

19. *See* Howard Hess Dental Labs v. Dentsply Int'l, 424 F.3d 363, 374 (3d Cir. 2005) ("the standard method of measuring damages in price enhancement cases is overcharge, . . . [that is] 'the difference between the actual price and the presumed competitive price multiplied by the quantity purchased'"); PHILLIP E. AREEDA, ET AL., ANTITRUST LAW ¶ 392a (2013) (an overcharge "is the difference between the illegal price that was actually charged and the price that would have been charged 'but for' the violation multiplied by the number of units purchased"). The plaintiffs' overcharge injury is deemed complete at the time it paid the overcharge on its actual purchases. Illinois Brick Co. v. Illinois, 431 U.S. 720, 724 (1977) ("a direct purchaser suing for treble damages under § 4 of the Clayton Act is injured within the meaning of § 4 by the full amount of the overcharge paid by it"); Meijer, Inc. v. Warner Chilcott Holdings Co. III, 246 F.R.D. 293, 303 (D.D.C. 2007) ("[a]ntitrust injury is considered complete when the direct purchaser pays an illegal overcharge"). Thus, overcharges are computed on products a direct purchaser actually bought at the allegedly artificially inflated price, even if the plaintiff might have made fewer purchases in the but-for world. *See In re* Niaspan Antitrust Litig., No. 13-MD-2460, 2015 WL 4197590, at *1 (E.D. Pa. July 9, 2015) (rejecting argument that damages must be offset "by the amount of any purchases . . . that would not have been made in a 'but for' world"); *In re* Prograf Antitrust Litig., No. 11-2242, 2014 WL 7641156, at *4 (D. Mass. Dec. 23, 2014); *In re* Skelaxin (Metaxalone) Antitrust Litig., No. 12-MD-2343, 2014 WL 2002887, at *5 (E.D. Tenn. May 15, 2014); Teva Pharm. USA, Inc. v. Abbott Labs., 252 F.R.D. 213, 230-31 (D. Del. 2008) ("[d]efendants . . . enmesh the idea of a 'but for' world with a 'but for' price . . . plaintiffs only are required to show that they, in fact, did purchase TRICOR® at a higher price once an antitrust violation and causal relationship are established"); *In re* Relafen Antitrust Litig., 346 F. Supp. 2d 349, 368-69 (D. Mass. 2004).

20. *Illinois Brick*, 431 U.S. at 724-725; Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 489 (1968).

21. *See*, *e.g.*, *Los Angeles Mem'l Coliseum Comm'n,* 791 F.2d at 1367.

22. *See, e.g.*, DeLong Equip. Co. v. Wash. Mills Elec. Minerals Corp., 990 F.2d 1186, 1203 (11th Cir. 1993), *amended per curiam*, 997 F.2d 1340 (11th Cir. 1993). The amount of damages suffered will depend on how long the wrongfully terminated relationship would otherwise have continued. *See, e.g.*, Coastal Fuels of P.R. v. Caribbean Petrol. Corp., 175 F.3d 18 (1st Cir. 1999).

23. *See, e.g.*, *Cordes*, 502 F.3d at 107 (where conspiracy allegedly led to enhanced prices, overcharge damages could be measured as "difference between the but-for fee and the actual fee paid"); Berkey Photo v. Eastman Kodak Co., 603 F.2d 263, 297-98 (2d Cir. 1979) (monopolization overcharge damages are "the price increment caused by the anticompetitive conduct that originated or augmented the monopolist's control over the market").

24. *See, e.g.*, Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555 (1931). In *Story Parchment*, the plaintiff was permitted to seek damages based on the entire difference between prevailing prices before and after the alleged predation, despite defendants' claim that they could have lowered prices anyway by independent (and hence lawful) means. *See id.* at 561-62. So long as "the old prices were reasonable, and that they would not have changed by reason of any economic condition, but would have been maintained except for the unlawful acts" of the defendants, the jury might base damages on the difference between the old price and the new one. *Id. See also* H.J., Inc. v. ITT Corp., 867 F.2d 1531, 1550 (8th Cir. 1989) (defendant may not challenge damage model's assumption of prices at levels before defendant's predatory price cutting by asserting that defendant could have competed with lower but non-predatory prices).

25. *See*, *e.g.*, Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1433 (2013); *see also infra* n.45 ("a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible").

26. *See, e.g.*, Bigelow v. RKO Radio Pictures, 327 U.S. 251, 259-64 (1946) (comparison of plaintiff's profits before the conspiracy to its profits

during the conspiracy); *Story Parchment*, 282 U.S. at 561-62 (comparison of plaintiff's prices before a predatory pricing conspiracy to prices during the conspiracy); Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 376-79 (1927) (comparison of plaintiff's profits before its unlawful termination to profits after the termination); *In re* Mushroom Direct Purchaser Antitrust Litig., No. 06-0620, 2015 WL 5767415, at *7 (E.D. Pa. July 29, 2015) ("The purpose of separating conduct free periods and conduct periods is to create a benchmark conduct free period as an evidentiary foundation for inferring what the prices would have been in the [conduct] period[s] but for the [alleged] illegal activity.") (internal quotes omitted).

27. *See, e.g.*, Independence Tube Corp. v. Copperweld Corp., 691 F.2d 310, 330-31 (7th Cir. 1982), *rev'd on other grounds*, 467 U.S. 752 (1984).

28. *See, e.g.*, *Bigelow*, 327 U.S. at 251-52 (comparison of plaintiff's profits during the conspiracy to those of a comparable competitor not affected by the conspiracy). *See also LePage's*, 324 F.3d at 165 ("an expert may construct a reasonable offense-free world as a yardstick for measuring what, hypothetically, would have happened 'but for' the defendant's unlawful activities."); Conwood Co. v. U.S. Tobacco Co., 290 F.3d 768, 793 (6th Cir. 2002) (yardstick is among "generally accepted methods for proving antitrust damages").

29. Eleven Line v. N. Tex. State Soccer Ass'n., 213 F.3d 198, 208 (5th Cir. 2000) ("An antitrust plaintiff who uses a yardstick method of determining lost profit bears the burden to demonstrate the reasonable similarity of the business whose earning experience he would borrow.").

30. *See, e.g.*, Lehrman v. Gulf Oil Corp., 500 F.2d 659, 667 (5th Cir. 1974) (yardstick method available to plaintiff "who is driven out of business before he is able to compile an earnings record").

31. *See, e.g.*, Blue Cross & Blue Shield United v. Marshfield Clinic, 152 F.3d 588, 592-94 (7th Cir. 1998). A lack of comparability may cut either way: the proxy may understate the success the plaintiff would have achieved but for the violation, making the damages estimate conservative, or may overstate the plaintiff's but-for success, inflating the damages. Defendants will naturally focus on the latter possibility to the exclusion of the former. Because a proxy methodology is a necessarily imprecise way to isolate the effects of an antitrust violation, its sufficiency, at least as an initial matter, should rest on a standard of overall reasonableness, subject to

more detailed rebuttal. *See, e.g.*, National Farmers' Org. v. Assoc. Milk Producers, 850 F.2d 1286, 1294-97 (8th Cir. 1988), *amended*, 878 F.2d 1118 (8th Cir. 1989).

32. *See, e.g.*, Eleven Line v. N. Tex. State Soccer Ass'n, 213 F.3d 198, 206-09 (5th Cir. 2000) (average of plaintiff's experience in other markets not shown to be comparable is insufficient).

33. *See, e.g.*, Image Tech. Servs. v. Eastman Kodak Co., 125 F.3d 1195, 1221 (9th Cir. 1997); *In re* Prograf Antitrust Litig., No. 11-2242, 2014 WL 7641156, at *3 (D. Mass. Dec. 23, 2014) ("[i]t was for the jury to consider [plaintiff's] arguments about the [differences between the yardstick and the but-for world] on the validity of comparison and to adjust its damage award accordingly") (internal quotes and citation omitted; alterations in original).

34. *See, e.g.*, *National Farmers' Org.,* 850 F.2d at 1295 (affirming use of yardsticks despite "many defects" and although they may not be "perfect").

35. *See, e.g.,* Conwood Co. v. U.S. Tobacco Co., 290 F.3d at 768, 793-95 (6th Cir. 2002); City of Tuscaloosa v. Harcros Chems., Inc*.,* 158 F.3d 548, 566 (11th Cir. 1998) (regression analysis is among "well-established and reliable methodologies" for proving antitrust damages); *In re* High Pressure Laminates Antitrust Litig., No. 00 MDL 1368 (CLB), 2006 WL 931692, at *1 (S.D.N.Y. Apr. 7, 2006) (refusing to exclude regression damages model).

36. *See, e.g.*, H.J., Inc. v. ITT Corp., 867 F.2d 1531, 1549-50 (8th Cir. 1989); MCI Commc'ns Corp. v. AT&T, 708 F.2d 1081, 1099, 1160-66 (7th Cir. 1983); Autowest, Inc. v. Peugeot, Inc., 434 F.2d 556, 563-67 (2d Cir. 1970).

37. ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 292 (3d Cir. 2012) (internal quotes and citations omitted). *See also* LePage's Inc. v. 3M, 324 F.3d 141, 165 (3d Cir. 2003) (affirming damage award that used, inter alia, projections as basis for computing extent of injuries); *Autowest,* 434 F.2d 566 (holding that damages testimony was admissible because the financial projections on which the testimony was based "were the product of deliberation by experienced businessmen charting their future course"). *Cf. In re* Nifedipine Antitrust Litig., 246 F.R.D. 365, 371 (D.D.C. 2007) (defendants' projections that prices would have been lower for purchasers in but for world were among "powerful and compelling"

proof of plaintiffs' injuries).

38. *See, e.g.*, ILC Peripherals Leasing Corp. v. IBM, 458 F. Supp. 423, 434-36 (N.D. Cal. 1978) (failure to "adjust these forecasts to reflect the results of actual experience" rendered damages evidence speculative), *aff'd per curiam sub nom.* Memorex Corp. v. IBM, 636 F.2d 1188 (9th Cir. 1980). *See also ZF Meritor*, 696 F.3d at 292 (affirming exclusion of damage model based on projection due to lack of information of circumstances under which projection was created and the assumptions it relied upon).

39. *See* Dennis W. Carlton and Jeffrey M. Perloff, Modern Industrial Organization 161-70 (4th ed. 2005).

40. *Id.* at 171-76.

41. *See* James A. Brander and Thomas W. Ross, *Estimating Damages from Price-Fixing*, in LITIGATING CONSPIRACY 349-351 (Stephen Pitel, ed. 2006).

42. See Andrew R. Dick, Merger Policy Twenty-Five Years Later: Unilateral Effects Move to the Forefront, ANTITRUST 25 (Fall 2012), at 26-27.

43. *See, e.g.*, Castro v. Sanofi Pasteur Inc., No. 11-7178, 2015 WL 5770381, at *11 (D.N.J. Sept. 30, 2015) (allowing use of Bertrand model in computing damages); Ticketmaster Corp. v. Tickets.com, Inc., No. 99-7654, 2003 WL 25781900, *3 (C.D. Cal. Jan. 27, 2003) (refusing to exclude Cournot model of private antitrust damages).

44. *See, e.g.*, Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039 (8th Cir. 2000). In *Concord Boat*, the district court had upheld "the soundness of the Cournot model as a fundamental, time-tested economic tool that has been widely accepted for years by reputable economists," and noted that "the Cournot model provides the theoretical underpinnings for the Department of Justice's Horizontal Merger Guidelines and the widely used Herfindahl-Hirschman Index (the 'HHI')." Concord Boat Corp. v. Brunswick Corp. 21 F. Supp.2d 923, 934 (E.D. Ark. 1998). The Court of Appeals did not take issue with the acceptability of Cournot models generally, but found that the specific model offered by the plaintiffs was "not grounded in the economic reality" of the market because it assumed competitors were identical and would have each have 50 percent share in hypothetical market, but ignored that competitors were not symmetric and that defendant's share exceeded 50 percent even before it began engaging in the alleged anticompetitive conduct. *Concord Boat*, 207 F.3d at 1056-57.

45. *See, e.g., Castro*, 2015 WL 5770381, at *12 (discussing ways in which Bertrand model may be superior to other damage models).

46. As the Fifth Circuit held in *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 668 (5th Cir. 1974), the plaintiff's method of proving damages may be "specially tailored" to fit its case. For examples of such damages models, see DeLong Equip. Co. v. Wash. Mills Elec. Minerals Corp., 990 F.2d 1186, 1203-06 (11th Cir.), *amended per curiam*, 997 F.2d 1340 (11th Cir. 1993); Dolphin Tours v. Pacifico Creative Serv., 773 F.2d 1506 (9th Cir. 1985) (estimated but-for market share based on survey of customers); Park v. El Paso Bd. of Realtors, 764 F.2d 1053, 1066-68 (5th Cir. 1985); Southern Pac. Commc'ns Co. v. AT&T, 556 F. Supp. 825, 1073-90 (D.D.C. 1983), *aff'd*, 740 F.2d 980 (D.C. Cir. 1984).

47. *See, e.g., Southern Pac. Commc'ns*, 556 F. Supp. at 1092-93 (stating that difference between financial performance of but-for and actual plaintiff "due at least in substantial part to a number of factors wholly unrelated to any conduct (lawful or unlawful) of defendants"); *In re* IBM Peripheral EDP Devices Antitrust Litig., 481 F. Supp. 965, 1019-21 (N.D. Cal. 1979) (holding that "arbitrary" adjustments to account for "other causative factors" were insufficient), *aff'd sub nom.* Transamerica Computer Co. v. IBM, 698 F.2d 1377 (9th Cir. 1983). A custom-built model survived similar attacks in *Litton Systems v. AT&T*, 700 F.2d 785, 822-25 (2d Cir. 1983).

48. *See, e.g.*, Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1433 (2013) (holding plaintiffs failed to present viable classwide damages approach where the damage model was tied to multiple theories of liability, but only one theory was triable); MCI Commc'ns Corp. v. AT&T, 708 F.2d 1081, 1161-64 (7th Cir. 1983). *But see* LePage's Inc. v. 3M, 324 F.3d 141, 165-66 (3d Cir. 2003) (stating that given that 3M's conduct taken as a whole violated Section 2, disaggregation was "unnecessary, if not impossible."); National Farmers' Org. v. Assoc. Milk Producers, 850 F.2d 1286, 1307 (8th Cir. 1988) (the fact that defendants' actions were "composed of lawful and unlawful conduct so tightly intertwined as to make it difficult to determine which portion of the damages claimed were caused by the unlawful conduct should not diminish the recovery" and that "the harmful consequences of certain unlawful conduct may have been exacerbated by otherwise lawful conduct," and that in that case "the fact that lawful conduct contributed to additional injury should not prohibit

recovery for that injury"); Spray-Rite Serv. Corp. v. Monsanto, 684 F.2d 1226, 1242-43 (7th Cir. 1982) (defendant had not demonstrated that disaggregation was possible or necessary, and that "[w]e will not deprive Spray-Rite of this recovery merely because the jury may have found that Monsanto combined lawful conduct with unlawful conduct making it impossible to determine which portion of the total damages was caused by the unlawful conduct."), *aff'd*, 465 U.S. 752 (1983).

49. *See, e.g.*, *Southern Pac. Commc'ns*, 556 F. Supp. at 1090-91.

50. *See* Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 114 n.9 (1969). *See also* Chapter 1, Section B for a discussion of the material cause standard.

51. Discover Fin. Servs. v. Visa USA, Inc., 598 F. Supp. 2d 394, 410-12 (S.D.N.Y. 2008).

52. *See* Olympia Equip. Leasing Co. v. W. Union Tel. Co., 797 F.2d 370, 381-83 (7th Cir. 1986).

53. *See, e.g.*, *In re* Rail Freight Fuel Surcharge Antitrust Litig., 725 F.3d 244 (D.C. Cir. 2013). In *Rail Freight*, the court held that the presence of such "false positives" left the damages methodology subject to criticism. *See id.* at 253-55.

54. *See, e.g.*, Gray v. Shell Oil Co., 469 F.2d 742, 749-50 (9th Cir. 1972).

55. *See, e.g.*, Malcolm v. Marathon Oil Co., 642 F.2d 845, 863 (5th Cir. 1981) (observing that under contract law, injured party need only pursue "reasonable" efforts to mitigate damages).

56. *See, e.g.*, *Malcolm*, 642 F.2d at 863. *See also* Litton Sys., Inc. v. AT&T Co., 700 F.2d 785, 820 n.47 (2d Cir. 1983) (mitigation is an affirmative defense which defendant must plead and prove).

57. *Cf.* RESTATEMENT (SECOND) OF CONTRACTS § 350 (1981).

58. *See, e.g.*, Veranda Beach Club v. W. Surety Co., 936 F.2d 1364, 1386 (1st Cir. 1991).

59. *See* Fishman v. Estate of Wirtz, 807 F.2d 520, 556-60 & n.34 (7th Cir. 1986) (holding that mitigation doctrine does not necessarily require plaintiff to undertake the risks of the next best alternative to an unlawfully foreclosed investment).

60. *Malcolm*, 642 F.2d at 863.

61. *Id.*

62. *See In re* TFT-LCD (Flat Panel) Antitrust Litig., No. M 07-1827 SI, 2012

WL 6000154, at *3 (N.D. Cal. Nov. 30, 2012) ("the Court declines to hold that defendants may assert mitigation as a defense to Dell's horizontal price-fixing claim"); *In re* Airline Ticket Comm'n Antitrust Litig., 918 F. Supp. 283, 286 (D. Minn. 1996) ("[i]n a horizontal price-fixing case, . . . mitigation and offset generally do not affect the ultimate measure of damages."); Westman Comm'n Co. v. Hobart Corp., 541 F. Supp. 307, 314-15 (D. Colo. 1982) (refusal-to-deal case; the "argument that [plaintiff] failed to mitigate its damages . . . is ridiculous. This argument implicitly assumes that [defendant] was guilty of a continuing violation of the antitrust laws, yet attempts to place the onus of stopping that violation on [plaintiff] . . . . [A] defendant [cannot] claim immunity from damages caused by its illegal actions because a plaintiff could have stopped them . . . .").

63. *See, e.g.,* Home Indem. Co. v. Lane Powell Moss & Miller, 43 F.3d 1322, 1329 (9th Cir. 1995) ("[T]he duty to mitigate damages does not arise until the party upon whom the duty is impressed is aware of facts making the duty to mitigate necessary." (citation omitted)); Ford Motor Credit Co. v. Hairston, No. 4:06CV00004, 2006 WL 2850615, at *4 (W.D. Va. 2006) ("[I]t would be an absurd misapplication of the rule for mitigation of damages to expect the Plaintiff to minimize injury before the discovery of the breach.").

64. *See* Cont'l Airlines, Inc. v. United Airlines, Inc., 277 F.3d 499, 508 (4th Cir. 2002) (costs of finding alternatives to mitigate damages qualify as antitrust injury); Lee-Moore Oil Co. v. Union Oil Co., 599 F.2d 1299, 1306 (9th Cir. 1979).

65. *See* Pierce v. Ramsey Winch Co., 753 F.2d 416, 436-37 (5th Cir. 1985).

66. *See id* . at 436.

67. *See* Roger D. Blair & William H. Page, *"Speculative" Antitrust Damages*, 70 Wash. L. Rev. 423, 456-57 (1995) (explaining that to account for a failure to mitigate, "the plaintiff's actual condition must be adjusted for rational mitigation efforts before it is compared with the but-for condition").

68. *See* Malcolm v. Marathon Oil Co., 642 F.2d 845, 863 (5th Cir. 1981).