# EXHIBIT 14

# *Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) 392*

*Antitrust Law: An Analysis of Antitrust Principles and Their Application (Areeda and Hovenkamp) > Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and Hovenkamp > CHAPTER 3 The Antitrust System of Remedies (300-399) > 3G The Economics of Impact, Antitrust Injury, and Antitrust Damages (390-399)*

## 392. Evidentiary Standards

**Last Updated: 8/2022**

**Evidentiary Standards** [1]

Section 4 of the Clayton Act provides a private right of action for damages to anyone who has been injured by an antitrust violation. [2] In abbreviated form, a successful private plaintiff must prove three things: (1) that the defendant violated the antitrust laws; (2) that the plaintiff was injured by the antitrust violation; [3] and (3) the monetary value of the injury suffered. With respect to the fact of injury, the plaintiff must meet the usual common law standard of "reasonable certainty." That is, in proving the fact of injury, the plaintiff must prove with reasonable certainty that the defendant's antitrust violation caused the harm suffered by the plaintiff. [4] For example, in a case involving an unlawful conspiracy, the Supreme Court ruled that "proving the *fact* of damage under §4 of the Clayton Act is satisfied by ... proof of some damage flowing from the unlawful conspiracy." [5] When it comes to the *amount* of the damage, however, the burden of proof is somewhat relaxed.

**392a.**

**"Just and reasonable" estimates.**

---

[1] This Paragraph depends in part on Roger D. Blair & William H. Page, *"Speculative" Antitrust Damages* , *70 Wash. L. Rev. 423 (1995)*.

[2] **15 U.S.C. §15a**. Ordinarily, antitrust standing rules limit the "anyone" to those who have been injured directly. *See Illinois Brick Co. v. Illinois* , *431 U.S. 720 (1977)*.

[3] The antitrust injury doctrine requires that the injury flow from the anticompetitive consequences of the antitrust violation. *Brunswick Corp. v. Pueblo Bowl-O-Mat* , *429 U.S. 477 (1977)*. For an expanded discussion of antitrust injury and standing, see William H. Page, *The Scope of Liability for Antitrust Violations* , *37 Stan. L. Rev. 1445 (1985)*; and Roger D. Blair & Jeffrey L. Harrison, *Rethinking Antitrust Injury* , *42 Vand. L. Rev. 1539 (1988)*.

[4] In *Story Parchment Co. v. Paterson Parchment Paper Co.* , *282 U.S. 555, 562 (1931)*, the Court refers to "[t]he rule which precludes the recovery of uncertain damages ...."

[5] *Zenith Radio Corp. v. Hazeltine Research* , *395 U.S. 100, 114 n.9, 123-24 (1969)* (emphasis added).

Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) 392

Private damage claims can be classified generally into overcharge cases, underpayment cases, and foreclosure cases. In an overcharge case, the defendant has illegally imposed noncompetitive prices through some sort of collusive scheme or through monopolizing activities. Similarly, in an underpayment case, the defendant has paid noncompetitive prices through some collusive scheme or monopsonistic conduct. In either event, the usual measure of damage is the difference between the illegal price that was actually charged and the price that would have been charged "but for" the violation multiplied by the number of units purchased. Ordinary business records will typically provide the necessary data on the actual price paid and the actual quantity purchased. Problems arise in determining the "but for" price which must be estimated. In a foreclosure case, the plaintiff is prevented from participating in a market, and therefore the measure of damages is the difference between the profits that the plaintiff actually earned and those that would have been earned but for the violation. Again, ordinary business records provide data on what actually transpired, but the profit that would have been earned but for the violation must be estimated. Because antitrust damage calculations necessarily require a determination of what would have been in a "but for" world, there is an inescapable element of uncertainty in those calculations. The courts have long recognized that antitrust damages cannot be measured with absolute precision. In *Story Parchment*, for example, the Supreme Court pointed out nearly 90 years ago that "the rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount."[6] The Court went on to explain that "it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference."[7] But there is a difference between inference, which is permitted, and *speculation*, which is not permitted. What is required is that the plaintiff "make a just and reasonable estimate of the damage based on relevant data."[8]

This, of course, seems fair. Since the defendant created the need for damage estimation in the first place by violating the antitrust laws, it should bear the burden of uncertainty in proving the consequent damages. This does not mean, however, that the damage estimate can be a stab in the dark. Damage evidence will be deemed insufficient as a matter of law if it permits no more than "pure speculation and guesswork."[9] Thus, in the world of antitrust damages, "speculative" is an epithet that is used to characterize insufficient damage proof and dooms the damage calculation. Juries cannot be asked to speculate. As a general proposition, it is difficult to identify a bright line that separates a "just and reasonable inference" from "speculation." A better understanding of this concept should develop as the issue is addressed in more concrete terms in subsequent paragraphs.

**392b.**

**Measure of damages.**

---

[6] *Story Parchment*, *282 U.S. at 562*.

[7] *Id.* at 563.

[8] *Bigelow v. RKO Radio Pictures*, *327 U.S. 251, 264 (1946)*.

[9] *Home Placement Serv. v. Providence Journal Co.*, *819 F.2d 1199, 1205 (1st Cir. 1987)*.

There are various ways of measuring the damages: lost profits, overcharges, underpayments, reduction in going-concern value, among others. The guiding principle is that the antitrust victim should recover the difference between its actual economic condition and its "but for" condition. [10] In *Bigelow*, the Supreme Court provided a clean expression of this principle: Antitrust damages are found "by comparison of profits, prices and values as affected by the [antitrust violation], with what they would have been in its absence under freely competitive conditions." [11] Using profit as a measure, the actual condition is the profit earned given that the antitrust violation occurred. In contrast, the "but for" condition is the profit that would have been earned had the violation not occurred, but all other economic conditions remained the same. The Eighth Circuit put it succinctly: "... an antitrust plaintiff's damages should reflect the difference between its performance in a hypothetical market free of all antitrust violations and its actual performance in the market infected by the anticompetitive conduct." [12] In other words, the antitrust damage calculation must isolate the effect of the antitrust violation. It should not include any other effects-good or bad-that influence the financial condition of the plaintiff. As we shall see below, this may make damage estimation extremely difficult.

**392c.**

**Net harm.**

It must be emphasized that the antitrust plaintiff is entitled to recover only its *net* harm. As the Ninth Circuit put it, "[a]n antitrust plaintiff may recover only to the 'net' extent of its injury; if benefits accrued to it because of an antitrust violation, those benefits must be deducted from the gross damages caused by the illegal conduct." [13] This requirement reduces the chances of overcompensation.

The implications of confining recoveries to net harm are fairly obvious in some-but not all-instances. For example, to the extent that a plaintiff has been foreclosed from some particular market, it would have lost sales and therefore would experience lower revenues than it would have had absent the foreclosure. If the plaintiff made sales elsewhere and thereby replaced-either fully or partially-those lost sales, then the *net* loss in sales must be determined. Furthermore, to the extent that the firm has made fewer sales, it has avoided the costs of making those sales. Those costs that are avoided must be deducted from the lost revenues in order to calculate the actual harm to the plaintiff's business. In some sense, the plaintiff's gross injury is captured by the lost sales, but it has benefitted by avoiding the costs that it would have had to incur in order to make those sales. As a result, the actual harm is

---

[10] In *Bigelow*, 327 U.S. at 264, the Court explained that antitrust damages are measured "by comparison of profits, prices and values as affected by the conspiracy, with what they would have been in its absence under freely competitive conditions."

[11] *Bigelow v. RKO Radio Pictures*, 327 U.S. 251 (1946) at 265.

[12] *National Farmer's Org. v. Associated Milk Producers*, 850 F.2d 1286, 1306 (8th Cir. 1988), *cert. denied*, **489 U.S. 1081 (1989)**.

[13] *Los Angeles Mem'l Coliseum Comm'n v. National Football League*, 791 F.2d 1356, 1367 (9th Cir. 1986), *cert. denied*, **484 U.S. 826 (1987)**.

the net harm-that is, the lost net profits. If the avoided costs were not deducted from the lost sales revenue, the plaintiff's recovery would exceed its actual injury. In that event, the plaintiff would be overcompensated.

The requirement of calculating net harm can be somewhat more difficult in other situations. As an example, consider the case of tying arrangements. [14] In a tying arrangement, a seller agrees to sell product *A* only on the condition that the buyer also purchase product *B*. Presumably, the seller has some market power in the product *A* market and, as a result, can use product *A* as a tying good. At the same time, the seller faces competition in the product *B* market and has no market power in that market. Ordinarily, the buyer's complaint is that it suffered injury because it was overcharged on the tied product. To see the problem associated with the requirement of calculating net harm, start with the situation where the monopolist over product *A* sets a profit-maximizing price on product *A* and allows its customers to purchase product *B* at competitive prices. If the seller begins to impose a tying requirement that involves an overcharge on the tied good, then it will have to reduce the price of the tying good below the profit-maximizing level. [15] In that case, the net harm to the buyer is equal to the overcharge less the price reduction on the tying good. Calculating this net harm can be a daunting task. Consider the case of *Siegel v. Chicken Delight*, [16] in which the franchisor tied supplies and cooking equipment to its franchise license. Chicken Delight did not charge its franchisees an explicit license fee. Instead, it charged an indirect fee through its pricing of the supplies and equipment. In order to calculate the net harm to the franchisees, it was necessary to deduct the value of the franchise license from the overcharge (if any) on the supplies and equipment. The value of a franchise license is equal to the discounted present value of the profits that the franchise location generates when the supplies and equipment are sold at market prices. Estimating the value of the franchise license is no easy task, but it must be done if overcompensation is to be avoided. [17]

**392d.**

**Basic damage methodologies.**

There are two fundamental approaches to measuring damages: (1) the before-and-after approach and (2) the "yardstick" approach. [18] In using the before-and-after methodology, the period *during* which the antitrust violation allegedly had an adverse effect on economic performance is called the damage period. The actual performance *before* and *after* the

---

[14] Tying arrangements are examined in great detail in WK-CHAP17. On damages in tying cases, see 394e.

[15] Aaron Director & Edward H. Levi, *Law and the Future: Trade Regulation*, 51 Nw. U. L. Rev. 281 (1956); Roger D. Blair & David L. Kaserman, *Vertical Integration, Tying, and Antitrust Policy*, 68 Am. Econ. Rev. 397 (1978).

[16] *Siegel v. Chicken Delight*, 448 F.2d 43 (9th Cir. 1971), *cert. denied*, **405 U.S. 955 (1972)**.

[17] In tying cases, there may not be any net harm even if there is an overcharge on the tied good(s). In *Chicken Delight*, for example, the overcharge on the supplies and equipment could not exceed the value of the franchise license. If it did, the franchisees would have rejected the opportunity to become franchisees.

[18] For a compact survey, see Richard C. Hoyt et al., *Comprehensive Models for Assessing Lost Profits to Antitrust Plaintiffs*, 60 Minn. L. Rev. 1233 (1976). *See also* Herbert Hovenkamp, Federal Antitrust Policy: The Law of Competition and Its Practice §17.5 (6th ed. 2020). These methodologies can be applied to overcharges or lost profits or any other measure of damages.

damage period is then used to draw an inference regarding the performance during the damage period "but for" the antitrust violation. In a "yardstick" model of damages, the plaintiff's performance is compared to that of another business that is substantially similar. This second firm is the benchmark or yardstick for purposes of comparison. In effect, one uses the performance of the yardstick after the antitrust violation has occurred to draw inferences regarding the "but for" performance of the plaintiff.

In  *Bigelow* , [19] the Supreme Court reviewed the plaintiffs' evidence of damage estimates, which used both the before-and-after approach and yardstick approach. The plaintiffs were independent movie exhibitors who claimed that rival exhibitors received films before the plaintiffs did as a result of an illegal conspiracy with the defendants. Because of the repeated delays in distribution, the plaintiffs allegedly were at a competitive disadvantage and therefore lost profits. The plaintiffs introduced two damage estimates at trial. The first estimate used a comparison of the plaintiffs' operations with those of another competitor during the conspiracy period. The competitor, which obtained movie releases in advance of the plaintiffs, was comparable in size to the plaintiffs. The competitor's equipment and location made it somewhat less attractive to movie theater patrons. Despite the differences, the yardstick estimate showed that the plaintiffs lost business presumably as a result of the alleged anticompetitive conduct. The second estimate compared the performance of the plaintiffs' business before and after the violation. This before-and-after approach also demonstrated that the plaintiffs' business had declined during the conspiracy period.

On the issue of damages, the Court addressed the defendants' argument that both measures were invalid, rejected it, and upheld the lower court's damage award. The Court carefully affirmed on the basis of the before-and-after evidence alone, leaving open the question of whether the yardstick evidence would have provided sufficient support for the verdict. Since the Court did not reject the yardstick estimates, one may infer from  *Bigelow*  that the yardstick approach is also a viable technique.

**392e.**

**Before-and-after models and evidentiary problems.**

The antitrust plaintiff must measure its antitrust damages by comparing its actual economic condition to what its condition would have been "but for" the unlawful behavior of the defendant(s). In the before-and-after model of damages, the plaintiff uses its experience prior to and after the antitrust violation to infer what its experience would have been but for the antitrust violation. In an overcharge case, for example, the plaintiff uses the prices that it paid (or received) prior to and after the monopolization or price-fixing activity as a basis for inferring what the prices would have been during the damage period but for the unlawful overcharges. [20] In a foreclosure (or exclusion) case, the plaintiff uses its own experience prior to the violation to infer what its profits would have been but for the anticompetitive

---

[19]  *Bigelow v. RKO Radio Picture.*  , 327 U.S. 251 (1946).

[20] Damages in overcharge cases are examined more fully in  P394.

foreclosure. [21] Evidentiary problems flow from the nature of the before-and-after approach to inferring the "but for" world. [22]

First, the plaintiff must establish that its experience before the antitrust violation is a reliable predictor of its future experience. In a foreclosure case, the plaintiff uses its own economic performance before the foreclosure to infer the profits that it would have earned but for the foreclosure. But how reliable is the plaintiff's prior experience as a foundation for such inferences? The answer depends in part on the length and stability of the firm's past performance. In cases where the plaintiff's past performance was dismal, it is not intuitively plausible that the firm would have suddenly become quite successful (i.e., profitable) absent the antitrust violation. For example, suppose the plaintiff had been largely unsuccessful but had a brief period of profitability prior to the antitrust violation. The plaintiff will have to provide a convincing argument that the burst of profitability was more than an aberration. For example, in *Hawaiian Oke*, [23] the court rejected the plaintiff's projection of profits based on an abnormally profitable six-month period. Similarly, in *Pennsy Supply*, [24] the damage estimates were rejected because the plaintiff tried to use the most profitable portions of two different years to support its damage estimates. When the plaintiff's experience in the before period provides an inadequate foundation for inferences in the after period, the damage estimates are apt to be rejected as speculative.

Second, a related problem arises when the plaintiff's actual experience in the after period is influenced by causal factors other than the unlawful conduct of the defendant. In general, the subsequent performance of the plaintiff can be caused by its own failings (i.e., managerial mishaps), the lawful behavior of the defendant, and changed market conditions. The plaintiff must control for these other causal factors in its damage calculations. Suppose, for example, that a firm held a market share of 20 percent in the base period and a 5 percent share during the damage period. It is inherently unreasonable to claim a loss in market share of 15 percent due to some action of the defendant if there has also been substantial entry into the plaintiff's industry. What is necessary is an estimate of the effect of the unlawful conduct net of the impact of entry. Failing to control for the effect of entry leads to speculative damage estimates.

**392f.**

**Yardstick models and evidentiary problems.**

**1.**

*1. Generally.*

---

[21] Damages in foreclosure cases are examined more fully in *P396*.

[22] In *Isaksen v. Vermont Castings*, *825 F.2d 1158, 1165 (7th Cir. 1987)*, the court criticized simple before-and-after models that fail to account for other causal factors. The court condemned *post hoc ergo propter hoc* reasoning as a damage methodology.

[23] *Joseph E. Seagram & Sons v. Hawaiian Oke & Liquors*, *416 F.2d 71 (9th Cir. 1969)*, *cert. denied*, **396 U.S. 1062 (1970)**.

[24] *R.S.E. v. Pennsy Supply, Inc.*, *523 F. Supp. 954, 966-68 (M.D. Pa. 1981)*.

Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) 392

The major difficulty encountered in the use of a yardstick is finding a suitable one. The central idea behind the yardstick approach is to find a firm that is comparable in all important respects to the plaintiff. The economic performance of the yardstick firm is then used as an estimate of the performance that the plaintiff would have experienced "but for" the antitrust violation. The ideal yardstick is a clone or an identical twin of the plaintiff. Short of this, one must identify a firm that is truly comparable in order for the inferences drawn to be reliable rather than speculative. One may describe the yardstick method as follows: "Under the yardstick approach the plaintiff attempts to identify a market or firm similar to the plaintiff in all respects but for the impact of the antitrust violation." [25]  But the yardstick approach is demanding. If the markets of the two firms are identical, and   *if*  the plaintiff's firm and the firm used for comparison stand in the same relative position in those markets, offer the same product mix, have comparable managements and are comparable in all other respects, then the fact finder may infer that the two would have had comparable revenues or profits "but for" the violation. [26]  As one or more of these points of comparison become more distant, the yardstick is accordingly a poorer measure. Nevertheless, a perfect yardstick never exists, so the question of yardstick quality is necessarily one of degree.

For the yardstick approach to be viable, it is essential that the plaintiff and the yardstick operate in the same product market but in distinct geographic markets. In both  *Farmington Dowel* [27] and  *Admiral Theatre* , [28]  the court explained that it was inappropriate to use a firm in the plaintiff's geographic market as a yardstick. The economic reason is plain: the financial performance of the yardstick is apt to be enhanced by the injury to the plaintiff. As a result, the damage estimate will be biased upward if the yardstick is in the plaintiff's market.

**392f2.**

 *Unestablished business.*

In a case where the plaintiff's fortunes were nipped in the bud by an antitrust violation, the plaintiff will have no real track record on which to rely for a before-and-after measure of damages. Absent prior history, the plaintiff will have to link its "experience in a hypothetical free market to the experience of a comparable firm in an actual free market." [29]  That is, it must resort to a yardstick approach. Before doing so, however, the plaintiff must provide

---

[25] Herbert Hovenkamp, Federal Antitrust Policy: The Law of Competition and Its Practice §17.6b2 (6th ed. 2020).

[26]  *Id.*  (emphasis in original). In  *Farmington Dowel Products v. Forster Manufacturing Co.* ,  **421 F.2d 61 (1st Cir. 1970)**, the plaintiff's yardstick damage evidence was rejected because (1) the plaintiff sold a single product, whereas the yardstick's offerings were more diversified; (2) the plaintiff's sales organization paled in comparison to that of the yardstick; and (3) the yardstick was more amply capitalized than the plaintiff. The plaintiff and the purported yardstick were simply not sufficiently similar to support the inferred damages.

[27]  *Farmington Dowel Prods. v. Forster Mfg. Co.* ,  **421 F.2d 61 (1st Cir. 1970)**.

[28]  *Admiral Theatre Corp. v. Douglas Theatre Co* .,  437 F. Supp. 1268 (D. Neb. 1977).

[29]  *Fishman v. Estate of Wirtz* ,  807 F.2d 520, 551 (7th Cir. 1986). On the unestablished business and problems of proof, see Roger D. Blair & William H. Page,   *The Role of Economics in Defining Antitrust Injury and Standing* , 17 Managerial & Decision Econ. 127 (1996). For problems of standing, see Herbert Hovenkamp, Federal Antitrust Policy: The Law of Competition and Its Practice §16.6 (6th ed. 2020).

Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) 392

some evidence that it would have been a viable entrant but for the exclusionary practices. The plaintiff can shoulder that burden by demonstrating that it was prepared to enter. It should show evidence of adequate capitalization, background and experience, and some actual steps taken toward entry such as obtaining the necessary facilities and equipment. [30] For firms that have already entered, their claims may involve foreclosure from expanding into new markets. In that case, the evidentiary burden of proving preparedness is apt to be somewhat lighter. In *Heatransfer*, [31] for example, the Court articulated such a reduced burden:

> The Court does not believe that a going concern, which is the victim of an anticompetitive practice, must forgo damages for sales it would have made as a result of the natural expansion of its business simply because it was victimized early in its existence before its attempts to expand could ripen into evidence of preparedness and intent to increase its output. [32]

On the other hand, some potential plaintiffs will fail to clear the preparedness hurdle. For example, if a plaintiff has no experience in a new line of business, has taken no affirmative steps to enter, and has not demonstrated an ability to raise the capital that entry would require, its damage claim may be characterized as "pie in the sky." [33]

There is no doubt that the preparedness hurdle will prevent some legitimate plaintiffs from recovering. But it also precludes opportunists from filing antitrust damage claims when they actually had no prior intention of entering the market in question. [34]

Once the plaintiff has convinced the court that it was adequately prepared to enter the market, the hard part begins. The putative yardstick must be comparable to the plaintiff in all important respects: product(s) offered, structure of the firm, management, geographic market, and so on. [35] Some courts have specifically rejected the use of industry averages. [36] The rejection of industry averages is understandable because an industry average necessarily involves a potentially wide range of firm characteristics regarding location, product quality (both level and consistency), managerial acumen, service, marketing and promotion, financial stability, and the like. There is no way to determine how closely the plaintiff matches the average profile, and therefore, one cannot be confident that the plaintiff would have performed as did the industry on average.

---

[30] *Hecht v. Pro-Football*, *570 F.2d 982 (D.C. Cir. 1977)*, *cert. denied*, **436 U.S. 956 (1978)**.

[31] *Heatransfer Corp. v. Volkswagenwerk, A.G*., *553 F.2d 964 (5th Cir. 1977)*.

[32] *Id.* at 986 n.20.

[33] *Dual-Deck Video Cassette Recorder Antitrust Litig*, *11 F.3d 1460, 1464-66 (9th Cir. 1993)*.

[34] Minimal efforts may not suffice even though they are not zero. For example, in *Amerinet v. Xerox Corp.*, *972 F.2d 1483, 1498 (8th Cir. 1992)*, the plaintiff had made two test sales of the product but had not demonstrated any prior experience in selling that or a similar product. Its damage estimates were rejected.

[35] In *Home Placement Service v. Providence Journal Co.*, *819 F.2d 1199, 1206 (1st Cir. 1987)*, the Court required the plaintiff to prove "product, firm, and market comparability."

[36] *William Inglis & Sons Baking Co. v. Continental Baking Co.*, *942 F.2d 1332 (9th Cir. 1991)*.

In *Home Placement*, the plaintiff alleged that its rental referral business was impaired by the local newspaper's refusal to carry its advertising. Since the plaintiff was part of a chain, it tried to use one of its other locations as a yardstick. The product-rental referral services-was the same at both locations. As for the comparability of the two geographic markets, the Court found that the yardstick market was not sufficiently comparable to the plaintiff's market in terms of population, number of rental units, and the vacancy rate. [37] In addition, the plaintiff failed to control for differences in unemployment, rental patterns, summer rentals, and colleges. It also failed to prove that the degree of competition was similar in the two markets. With respect to the similarity of the two firms, the plaintiff failed to prove that they were comparably organized and managed. [38]

There is no doubt that a plaintiff's use of the yardstick approach encounters major obstacles in practice, but there are circumstances in which the yardstick model can be usefully employed. For example, if the plaintiff is the victim of a local price conspiracy, it may compare the cartel prices to those in another market that is untainted by the conspiracy. To be sure, the proposed yardstick market must be reasonably comparable to the plaintiff's market. [39] This will require making adjustments for differences (if any) between the two markets in labor costs, transportation costs, taxes, and the like. For example, in *Greenhaw*, [40] the defendants were retail liquor dealers in Lubbock County, Texas, who were fixing prices. The plaintiff compared the conspiratorial prices in Lubbock to presumably competitive prices in Dallas. In order to use the Dallas prices as a competitive benchmark for inferring the "but for" prices in Lubbock, however, cost differences had to be recognized. The plaintiff's expert adjusted for cost differences between Dallas and Lubbock and estimated the overcharge that the cartel had imposed in Lubbock during the conspiracy period.

### 392g.

### Disaggregation of antitrust damages.

Suppose that an antitrust defendant has engaged in multiple activities that have imposed some injury on the plaintiff. If some of the defendant's conduct is lawful while some is unlawful, the damage claim will have to be disaggregated. [41] The reason for this is clear: under the common law, a plaintiff may recover a damage award that will return it to the financial position it would have enjoyed but for the unlawful conduct. The antitrust law generally adheres to this common law rule. Consequently, any part of the plaintiff's loss that is due to the lawful business practices of the defendant should not be part of the damages award. In addition, some of the defendant's conduct may be unlawful but not anticompetitive.

---

[37] *819 F.2d at 1206 n.9*.

[38] *Id.* at 1206.

[39] *See, e.g.*, *Metrix Warehouse, Inc. v. Daimler-Benz Aktiengesellschaft*, *828 F.2d 1033, 1044 (4th Cir. 1987)*, *cert. denied*, **486 U.S. 1017 (1988)**.

[40] *Greenhaw v. Lubbock Cnty. Beverage Ass'n*, *721 F.2d 1019 (5th Cir. 1983)*, *reh'g denied*, **726 F.2d 752 (5th Cir. 1984)**.

[41] On disaggregation of damages, see P338 (generally); 657b (monopolization cases). *And see* M. Sean Royall, *Disaggregation of Antitrust Damages*, *65 Antitrust L.J. 311 (1997)*.

Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) 392

[42] The damages attributable to unlawful, albeit competitively neutral, conduct must be isolated because those damages would not flow from an antitrust violation and therefore should not be trebled.

The importance of disaggregation was a central issue in the *Comcast* decision. [43] In the Philadelphia market, Comcast and a rival cable operator had subscribers in adjacent areas. Comcast swapped a service area in another market for the subscribers in the adjacent area in Philadelphia. In this case, a class of cable television subscribers alleged that these swaps violated §§1 and 2 of the Sherman Act. Comcast was alleged to have created a monopoly or to have attempted to create a monopoly, reducing competitive pressure and increasing price. [44] The class offered four theories of antitrust injury and damages. First, the swapping placed Comcast in a position to withhold local sports programming from satellite competitors. Second, it reduced competition from adjacent cable companies, or "overbuilders" who might infiltrate Comcast's service area. Third, it reduced "benchmark" competition on which cable customers rely in comparing prices. Fourth, it increased Comcast's bargaining power over content providers. [45] The trial court rejected all of the theories except the overbuilder theory. Although the trial court and Third Circuit certified the class under Rule 23(b)(3), the Supreme Court rejected the damage estimates due to a failure to disaggregate. The expert's model provided an aggregated estimate of the antitrust damages attributable to all four theories offered by the class. The expert acknowledged that the model could not isolate damages derived from the overbuilder theory, that is, the model did not provide estimates on a disaggregated basis. Consequently, the damage estimate could not be adjusted for the removal of the three theories that the trial court rejected and therefore the jury would have no basis for awarding antitrust damages solely due to the overbuilder theory.

The disaggregation requirement is distinct from the requirement that the plaintiff's damage calculations must control for exogenous factors that also have an adverse impact on the plaintiff's economic condition. Unfortunately, some of the cases encourage this confusion. For example, in *ILC Peripherals*, [46] the court criticized Memorex's damage calculation because it did not control for the plaintiff's own mismanagement, a recessionary economy, competition from other rivals, and other things unrelated to any antitrust violation. [47]

---

[42] In *Brooke Group v. Brown & Williamson Tobacco Corp.*, [509 U.S. 209, 225 (1993)](), the Supreme Court pointed out that "an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws." Such malice, however, may offend other statutes or common law rules.

[43] *Comcast Corp. v. Behrend*, [569 U.S. 27, 29 (2013)](). *See also ZF Meritor, LLC v. Eaton Corp*., [696 F.3d 254 (3d Cir. 2012)](), *cert. denied*, **569 U.S. 958 (2013)** (approving damages model against defendant's objections that it treated the injuries of two competitors as cumulative of anticipated overall business, rather than as individualized injuries of each). *See also Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc*., [221 F. Supp. 3d 1033 (N.D. Ind. 2016)]() (rejecting damages study that failed to disaggregate damages resulting from lawful competitive injury from those resulting from other practices that may have been unreasonably exclusionary).

[44] See P331 for more details on *Comcast*.

[45] *Comcast*, [569 U.S. at 31]().

[46] *ILC Peripherals Leasing Corp. v. IBM Corp.*, [458 F. Supp. 423 (N.D. Cal. 1978)](), *aff'd sub nom*. *Memorex Corp. v. IBM Corp.*, [636 F.2d 1188 (9th Cir. 1980)]() (per curiam), *cert. denied*, **452 U.S. 972 (1981)**.

Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) 392

Similarly, in *Transamerica*, [48] the court criticized the damage proof because it would not permit the jury to separate the effects of causes other than the unlawful conduct of IBM. [49] In *Southern Pacific Communications*, [50] the court pointed out that the plaintiff's aggregated damage estimate did not filter out the effects of the plaintiff's own inefficiencies. [51] In these cases, the concerns expressed really deal with a more fundamental problem: speculation due to a failure to control for factors that are extraneous to the antitrust dispute. This is a failure to satisfactorily estimate the plaintiff's "but for" condition rather than a failure to disaggregate.

It is more useful to view the disaggregation requirement as flowing from the fact that the defendant engaged in multidimensional conduct that adversely affected the plaintiff's fortunes, but that some of that conduct was lawful. *MCI* provides an excellent example of the problem. [52] MCI alleged that AT&T had engaged in a variety of business practices and conduct that violated the Sherman Act. As required by the trial court's pre-trial schedule, MCI's damage expert filed his expert report well in advance of the trial. The damage estimate, which was not disaggregated, compared MCI's actual profit performance to what it would have been but for all of AT&T's conduct. Some of MCI's allegations were dismissed on a motion for summary judgment that generated the dismissed allegations. AT&T's underlying conduct may have hurt MCI, but the court ruled that these practices were not offensive under the Sherman Act. Furthermore, some of MCI's remaining allegations did not stand up on appeal. For example, MCI had alleged that AT&T had illegally refused to deal with MCI and that AT&T had engaged in predatory pricing. The jury found in favor of MCI on the unlawful refusal to deal, which was affirmed by the Seventh Circuit. The jury's verdict in favor of MCI on the predatory pricing claim, however, was overturned by the Seventh Circuit. MCI had presented an aggregated estimate of lost profits that was the difference between MCI's profits but for AT&T's conduct and MCI's actual profits during the damage period. Since AT&T's aggressive competitive pricing must have had a substantial- albeit legal-impact on MCI's actual profits, the aggregated damage estimate overstated MCI's antitrust damages. Because MCI had not disaggregated its damage claim, the court was unable to determine the loss suffered due to the unlawful conduct.

In *MCI*, the plaintiff would have recovered the estimated damages if it had prevailed on all of its claims. In other words, disaggregation is not necessary if all of the defendant's conduct is unlawful. [53] It would be risky not to disaggregate, however, because that creates an all-

---

[47] *Id.* at 435.

[48] *Transamerica Computer Co. v. IBM Corp* ., *481 F. Supp. 965 (N.D. Cal. 1979)*, *aff'd* , *698 F.2d 1377 (9th Cir.)*, *cert. denied* , **464 U.S. 955 (1983)**.

[49] *Id.* at 1013.

[50] *Southern Pac. Commc'ns Co. v. AT&T Co.* , **556 F. Supp. 825 (D.D.C. 1983)**.

[51] *Id.* at 1090.

[52] *MCI Commc'ns Corp. v. AT&T Co.* , *708 F.2d 1081 (7th Cir.)*, *cert. denied* , **464 U.S. 891 (1983)**.

[53] *Continental Ore Co. v. Union Carbide & Carbon Corp.* , *370 U.S. 690, 698-99 (1962)*; *MCI* , *708 F.2d at 1161*.

or-none situation with respect to recovering damages. The need to disaggregate obviously imposes a high standard of economic proof on the plaintiffs. [54] Plaintiffs that cannot meet that burden may simply be out of luck. Although this may not seem just, recall the *MCI* situation. Arguably, MCI suffered from an illegal refusal to deal for which it should have recovered. But the aggregated damages included recovery for the losses due to extremely competitive pricing by AT&T, which was highly beneficial to consumers. If antitrust policy permitted recovery for injuries resulting from efficiency and competition on the merits, incentives would be distorted. [55] This would clearly work to the detriment of society and reduce consumer welfare.

In most cases, there are multiple counts, which raises a related issue of disaggregation. If an aggregated damage estimate is provided, there is no way for the jury to associate a portion of the overall damage estimate with each count. If some counts were dismissed on summary judgment, there would be no way to eliminate the damages allegedly flowing from those counts from a global damage calculation. Even if the plaintiff were to prevail on the balance of the counts, the jury would be forced to speculate as to the damages attributable to those counts. A similar problem would arise if the jury were to find in the plaintiff's favor on some counts but not on others. Again, the jury would be unable to identify some portion of a global damage estimate that could be attributable to those counts on which the plaintiff prevailed. In most cases, some of the counts do not invoke the antitrust laws. Those counts may not yield treble damages whereas the antitrust counts do. Consequently, it is imperative to attribute damages to each count even if the plaintiff were to prevail on all counts.

Antitrust Law: An Analysis of Antitrust Principles and Their Application
Copyright © 2023 by Wolters Kluwer. All Rights Reserved.

---

**End of Document**

---

[54] *See* Comment, *Segregation of Antitrust Damages: An Excessive Burden on Private Plaintiffs* , _72 Cal. L. Rev. 403 (1984)._

[55] *See* Herbert Hovenkamp, Federal Antitrust Policy: The Law of Competition and Its Practice §17.6c (6th ed. 2020).