**PUBLIC REDACTED VERSION**

WILMER CUTLER PICKERING
HALE AND DORR LLP

SONAL N. MEHTA (SBN 222086)
 Sonal.Mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
 David.Gringer@wilmerhale.com
ROSS E. FIRSENBAUM (*pro hac vice*)
 Ross.Firsenbaum@wilmerhale.com
RYAN CHABOT (*pro hac vice*)
 Ryan.Chabot@wilmerhale.com
PAUL VANDERSLICE (*pro hac vice*)
 Paul.Vanderslice@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800

ARI HOLTZBLATT (*pro hac vice*)
 Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
 Molly.Jennings@wilmerhale.com
2100 Pennsylvania Ave NW
Washington, DC 20037
Telephone: (202) 663-6000

MICHAELA P. SEWALL (*pro hac vice*)
 Michaela.Sewall@wilmerhale.com
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

Attorneys for Defendant Meta Platforms, Inc.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC., a Delaware Corporation headquartered in California,<br><br>Defendant. | Case No. 3:20-cv-08570-JD<br><br>**META PLATFORMS, INC.'S REPLY IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF KEVIN KREITZMAN AND MICHAEL A. WILLIAMS**<br><br>Hearing Date: December 14, 2023<br>Time: 10:00 a.m.<br>Judge: Hon. James Donato |

**PUBLIC REDACTED VERSION**

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................................1

ARGUMENT ...................................................................................................................................1

I. THE STUDY ASSUMES META'S PROFITS ARE DUE TO ANTICOMPETITIVE CONDUCT............1

    A. The Study Does Not Control For Lawful Factors......................................................1

    B. The Study Does Not Distinguish "Social" And Non-Social Advertising Profits ......................................................................................................................3

    C. The Study Baselessly Assumes Supracompetitive Prices From Meta's Profits ......................................................................................................................5

II. THE "YARDSTICK FIRMS" ARE NOT THE PRODUCT OF A RELIABLE METHODOLOGY ..........6

    A. The Selection Criteria Are Junk Science ..................................................................6

    B. The Final Set Of Yardsticks Is The Clear Product Of Junk Science .....................10

CONCLUSION..............................................................................................................................10

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Amerinet, Inc. v. Xerox Corp.*,
 972 F.3d 1483 (8th Cir. 1992) ............................................................................................... 3

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
 152 F.3d 588 (7th Cir. 1998) ............................................................................................ 1, 3

*Eleven Line, Inc. v. North Tex. State Soccer Ass'n*,
 213 F.3d 198 (5th Cir. 2000) ............................................................................................. 10

*Guidroz-Brault v. Missouri Pac. R.R. Co.*,
 254 F.3d 825 (9th Cir. 2001) ............................................................................................... 4

*In re Google Play Store Antitrust Litig.*,
 2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) ................................................................. 6, 8

*In re High-Tech Emp. Antitrust Litig.*,
 2014 WL 1351040 (N.D. Cal. Apr. 4, 2014) ....................................................................... 2

*In re Live Concert Antitrust Litig.*,
 863 F. Supp. 2d 966 (C.D. Cal. 2012) ................................................................................. 3

*Muffett v. City of Yakima*,
 2012 WL 12827492 (E.D. Wash. July 20, 2012) .............................................................. 10

*Shannon v. Crowley*,
 538 F. Supp. 476 (N.D. Cal. 1981) .................................................................................... 10

*US Airways v. Sabre Holdings Corp.*,
 938 F.3d 43 (2d Cir. 2019) .................................................................................................. 5

**STATUTES, RULES, AND REGULATIONS**

Federal Rule of Civil Procedure 26(a) ........................................................................................... 2

**OTHER AUTHORITIES**

Aswath Damodaran, *Damodaran on Valuation: Security Analysis For Investment And
 Corporate Finance* (2006) ............................................................................................. 6, 10

Phillip A. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
 Principles and Their Application* (2023) ............................................................................ 2

Tim Koller et al., *Valuation: Measuring and Managing the Value of Companies* (7th ed.
 2020) ........................................................................................................................... 2, 3, 6

**PUBLIC REDACTED VERSION**

## INTRODUCTION

Advertisers' opposition fails to establish that the Kreitzman-Williams "yardstick" study is admissible. *First*, and critically, Advertisers do not dispute that for a yardstick study to be admissible it must control for the effect of lawful factors unrelated to the challenged conduct. In response to Meta's showing that the Kreitzman-Williams methodology failed to do so, Advertisers contend that the study's use of economic profit rates—***by itself***—already controls for those lawful factors. But neither Kreitzman nor Williams opined that this was true, because ▬▬▬▬▬ ▬▬▬, perfectly lawful business practices like product quality and innovation are direct drivers of EPR. So a yardstick study comparing EPRs among firms must, like every other form of yardstick study, control for the influence of those factors to isolate the effect of the challenged conduct. The Kreitzman-Williams study does not do so and thus is inadmissible.

*Second*, Advertisers' defense of their experts' yardstick selection criteria fails to establish that they have employed a reliable methodology for selecting comparators. They principally defend these criteria by referring to two sentences from a book on asset valuation, criticizing Meta for not having come up with any better criteria, and inviting the Court to look at the end product to assess the criteria "jointly." This results-oriented approach is the epitome of junk science. But even if looking at the outcome to justify the methodology were appropriate, that would not help. Kreitzman and Williams's selection criteria excludes numerous firms that would be far more comparable to Meta while including only ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. The way these firms were selected, a series of largely arbitrary and often misapplied filters selected for convenience and not comparability, has no business being presented in a federal court.

## ARGUMENT

I. **THE STUDY ASSUMES META'S PROFITS ARE DUE TO ANTICOMPETITIVE CONDUCT**

   A. **The Study Does Not Control For Lawful Factors**

Advertisers do not—because they cannot—dispute that a yardstick study is "worthless" and inadmissible if it does not "correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining." *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) ("*BCBS*"); 3G

**PUBLIC REDACTED VERSION**

Phillip A. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 397 (2023) (the "most important[]" requirement for a "yardstick methodology" is "to control for any factors that might have influenced [a firm's] profit performance that are competitively neutral or even procompetitive"). And they do not dispute that lawful factors—▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Opp. 4 n.4; *see also* Ex. 6, Kreitzman Tr. 37:18-23, 38:6-15; 39:24-42:19; Ex. 3, Williams Tr. 70:12-72:12.[1] The ***only*** way Advertisers claim the study controls for these factors is through its use of so-called EPRs. Opp. 3-4.

Advertisers have no support for this assertion, not even the testimony of their own experts sponsoring the EPR study: neither Kreitzman nor Williams opined that the use of EPRs in a yardstick study controls for the effect of lawful factors.[2] Instead, Advertisers refer without explanation (at 3) to two articles and a single-page excerpt from a book as somehow excusing the study's failure to control for lawful conduct. Not one cited source even mentions the use of EPRs in a yardstick study. Instead, as Williams recognized in his report, each concerns ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮—not whether their use in a yardstick study obviates the need to control for other factors. Ex. 1, Williams Report ¶ 333.

Indeed, a closer inspection of the book on which Advertisers rely refutes their contention that EPRs already control for confounding factors. As Koller et al. explain, entirely lawful factors like offering innovative and high-quality products can drive return on invested capital, which in turn can drive economic profits. Ex. 11 at 40-41, 129, 131. And even Williams made "abundantly clear" at his deposition (Opp. 4) that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 3, Williams Tr. 229:23-230:3; *see also* Ex. 6, Kreitzman Tr. 36:15-19. For this reason, an EPR provides no information about whether a firm has unlawful monopoly power, let alone whether members of the class would have been injured by the challenged acts that supposedly maintained Meta's alleged monopoly. *See* Dkt. 678 at 7-10. Advertisers' error here is compounded by the fact that Kreitzman has not, in fact, calculated an

---

[1] Unless otherwise noted, emphasis is added and "Ex." citations reference exhibits 1-10 to the Jennings Decl., Dkt. 662-1, or exhibits 11-15 to the Jennings Reply Decl. submitted herewith.

[2] Advertisers' reliance on this theory thus violates Rule 26(a)(2), and it should disregarded entirely. *In re High-Tech Emp. Antitrust Litig.*, 2014 WL 1351040, at *11-12 (N.D. Cal. Apr. 4, 2014).

**PUBLIC REDACTED VERSION**

1. EPR, but rather an accounting measure of profits. *Id.* at 3.

2. Thus, Advertisers' claim that EPRs somehow normalize the degree of innovation, product quality, and other lawful factors across firms so that there is no need to control for them in a yardstick study is incorrect. The very literature Advertisers rely on establishes instead that those lawful factors directly contribute to firms' EPRs. This means that, unless the chosen yardsticks have the same degree of innovation, product quality, and the like, Meta's excess EPR over the yardsticks' is at least as likely due to these lawful factors as it is to the challenged conduct. The mere fact that the study used EPRs does not exempt Advertisers from the requirement that a reliable yardstick study must control for "other possible explanation(s) for [the] disparity" between Meta and the yardsticks. *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 975 (C.D. Cal. 2012); *cf. Amerinet, Inc. v. Xerox Corp.*, 972 F.3d 1483, 1494 (8th Cir. 1992) (plaintiff may not "attribute[] all losses to a defendant's [allegedly] illegal acts, despite the presence of significant other factors"). The study did not control for these factors, so must be excluded on that basis alone.[3]

**B. The Study Does Not Distinguish "Social" And Non-Social Advertising Profits**

Advertisers next argue (at 5-6) that Kreitzman and Williams were not required to limit their study to Meta's profits from the sale of "social" advertisements because Meta supposedly "cannot demonstrate that any advertising was 'non-social.'" If Advertisers take the position that all Meta ads are "social," it is their burden to demonstrate that. But their own experts, Fasser and Gans, ███████████████████████████ Ex. 9, Fasser Tr. 97:8-12 (███████); *id.* at 82:15-83:1 (███████████); Ex. 8, Gans Tr. 94:6-11 ("███████████████████████ █"). And Meta's expert Tucker has shown, using Advertisers' experts' definition of "social advertising," that the vast majority of ads Meta sold during the class period were not "social." Dkt. 676 at 2-3 ("social" ads █% of ad spend). In view of that expert testimony, Kreitzman and Williams were required to—but did not—control for the contribution of non-social ads to Meta's profitability as a "salient factor[] not attributable to [alleged] misconduct." *BCBS*, 152 F.3d at 593.

---

[3] "Controlling for" the effect of lawful conduct means isolating how much of Meta's economic profits are attributable to the challenged conduct. Ex. 15, ¶ 146 (Williams describing technique "to isolate the price effects, if any, of the alleged conspiracy" by "controlling for other factors that affect prices"). Advertisers (at 3-5) confuse this with "accounting for" lawful conduct, which EPRs do only in the colloquial sense that such conduct affects EPR. Ex. 11 at 40-41, 129, 131.

**PUBLIC REDACTED VERSION**

1    Advertisers try to explain away this defect in their study principally by pointing to
2 Williams's naked assertion that ████████████████████████████████████████████
3 Opp. 5. But saying it is so does not make it so. The alleged social advertising market consists of
4 ads "targeted based on social data contained in a 'social graph.'" Dkt. 643 at 4; Ex. 1, Williams
5 Report ¶ 19 ("████████████████████████████████████████████████████████████████
6 ████████████████"); Ex. 3, Williams Tr. 244:18-245:4 ("████████████████████████████
7 ████████████████████████████████"). Critically, none of Advertisers' experts
8 assessed whether all Meta ads sold during the class period meet that description. Williams instead
9 asserted ████████████████████ based on ████████████████████████████████████
10 ████████████████████████—none of which said anything about whether all Meta ads are
11 targeted using social data contained in a social graph. Ex. 2, Williams Reply ¶ 48 & tbl. 1. At best,
12 then, Williams has simply assumed, without support, that ████████████████████ This is not
13 permissible, especially from a putative market definition expert, and cannot excuse his failure to
14 control for non-social profits. *Guidroz-Brault v. Missouri Pac. R.R. Co.*, 254 F.3d 825, 830 (9th
15 Cir. 2001) (expert opinion may not be based on "assumption" with "no support … in the record").
16    Advertisers then seek to rebut their own experts' testimony. They claim Fasser's testimony
17 that ████████████████████████████████████████████████████████████████████ is
18 "████████" because Fasser is "not an economist" and was not ████████████████████████
19 ████████████████████████████████████████. Opp. 6. But Williams ████████████████
20 ████████████████ Ex. 12, Williams Tr. 12:22-13:4. Indeed, Advertisers put forward Fasser as
21 "an industry insider" "with 27 years of experience as a ***social*** and digital ***advertising consultant***,"
22 Dkt. 668 at 1, 3—████████████████████████████████████████████████████████████
23 ████████████████████████████████████████████, Ex. 2, Williams Reply ¶¶ 47-48 & tbl. 1.
24 Advertisers notably do not say ████████████████████████████████████████████████████
25 ████████████████████████████████████████. And that still would not undermine Fasser's
26 testimony that ████████████████████████████████████████ Ex. 9, Fasser Tr. 97:8-12, which
27 even Williams agrees ████████████ Ex. 1, Williams Report § II.D.i ("████████████████████
28 ████████████████").

**PUBLIC REDACTED VERSION**

1  Advertisers also claim that Gans's admission that ▬▬▬
2  ▬▬▬ is "irrelevant" because ▬▬▬
3  ▬▬▬. Opp. 6. That
4  mischaracterizes Advertisers' own contentions and Williams's testimony. According to Williams,
5  ▬▬▬
6  ▬▬▬ Ex. 1, Williams Report ¶ 19; *id.* ¶ 21 ("▬▬▬
7  ▬▬▬
8  ▬▬▬"). Thus, the "social data contained in a 'social graph'" that distinguishes
9  "social" ads from "nonsocial" ads, Dkt. 643 at 4, ***is*** data on social connections between users. And
10  again, according to Williams, ▬▬▬ Ex.
11  3, Williams Tr. 244:18-245:4. Gans testified that ▬▬▬.
12  Finally, Advertisers assert that Meta's expert Tucker "fail[ed] to show that some of Meta's
13  ads are non-social," referring to ▬▬▬
14  ▬▬▬. Opp. 5-6. But Tucker did not discuss ▬▬▬ in her report—again,
15  ***Fasser*** testified that ▬▬▬. And Advertisers do not explain why Tucker would
16  need information about that ad format to opine, as she did, that ***other types*** of Meta advertising do
17  not meet Advertisers' definition of "social" ads.[4]

C.   **The Study Baselessly Assumes Supracompetitive Prices From Meta's Profits**

19  Advertisers incorrectly assert (at 1 n.1) that courts have approved of studies that, like theirs,
20  infer supracompetitive prices solely from a firm's profits. The damages study in *US Airways v.*
21  *Sabre Holdings Corp.* compared actual ***prices*** to but-for prices calculated from ***costs*** in a
22  "hypothetical competitive market, plus a reasonable return on investment." 938 F.3d 43, 61 (2d
23  Cir. 2019). It did not calculate an overcharge based on ***profits*** relative to a yardstick. *Id.* Here,
24  Williams has assumed that ▬▬▬
25  ▬▬▬. Ex. 3, Williams Tr. 229:3-9, 229:18-22. This
26  assumption finds no support in the record. Kreitzman ▬▬▬

---

28  [4] Advertisers' claims about so-called "▬▬▬" (at 5-6) are unsupported and irrelevant, *see* Dkt. 676 at 7-8, particularly so here, where Kreitzman and Williams did not rely on Meta's "▬▬▬" in wrongly attributing all of Meta's profits to its sale of "social" ads.

**PUBLIC REDACTED VERSION**

1  ▇▇▇▇ and, contrary to Advertisers' assertion (at 5 n.5), agreed that ▇▇▇▇▇▇▇▇
2  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Ex. 6, Kreitzman Tr. 27:7-10, 68:19-69:4, 69:16-20; *see also*
3  Ex. 11, Koller et al. at 131 (cost efficiencies are a "competitive advantage" driving EPR).
4  Williams's conclusion that Meta's EPR in excess of the yardsticks' shows ▇▇▇▇▇▇▇▇
5  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ is "based on assumptions … that are not supported by the
6  evidence," and an independent reason the study is inadmissible. *In re Google Play Store Antitrust*
7  *Litig.*, 2023 WL 5532128, at *9 (N.D. Cal. Aug. 28, 2023).

**II.   THE "YARDSTICK FIRMS" ARE NOT THE PRODUCT OF A RELIABLE METHODOLOGY**

   **A.   The Selection Criteria Are Junk Science**

Advertisers' defense of their experts' yardstick selection approach draws attention away from the selection criteria themselves and instead focuses on whether, "considered jointly," they "follow the relevant literature" and were "likely" to result in comparable firms. Opp. 6-7. The only "literature" Advertisers point to (at 7) are two sentences from a book on asset valuation—not yardstick studies—that states the obvious proposition that firms in the same "business" and "of similar size" may be comparable for valuation purposes. Dkt. 680-13 at 247. Advertisers omit the actual definition of "What is a comparable firm?" that source provides: "A comparable firm is one with cash flows, growth potential, and risk similar to the firm being valued." *Id.* None of the Kreitzman-Williams selection criteria address these factors.

And as Meta's motion explained (at 9-15), whether considered jointly or one-by-one, the selection criteria ignore real-world comparability factors in favor of both methodological and results-driven convenience. That shows in the outcome. Advertisers defend their criteria's exclusion (at 12) of a litany of firms that are in the advertising business, of a similar size, and with similar cash flows, growth potentials, and risks—the criteria Advertisers' "literature" says matter—on grounds that have nothing to do with comparability. LinkedIn, TikTok, and Reddit were excluded because, Advertisers say, they lacked available data—a convenience factor, not a comparability factor.[5] An asserted absence of data cannot excuse Kreitzman and Williams from *Daubert*'s requirement that they run a reliable study. Twitter and Snap were excluded based on a

---

[5] Advertisers argue that these firms should have been excluded because the challenged conduct might have affected their EPRs. But that is not why Kreitzman and Williams excluded them.

1  filter that Kreitzman asserted in his report was ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
2  ▬▬▬▬▬▬▬▬▬▬ Ex. 5, Kreitzman Reply ¶ 33, but which he later admitted ▬▬▬
3  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Ex. 13,
4  Kreitzman Tr. 67:2-5. And Apple and Amazon were excluded because they "did not derive most
5  of their revenue from online advertising"—which is meaningless for purposes of assessing the
6  comparability *of their advertising businesses*. Indeed, their exclusion was driven by ▬▬▬
7  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. Ex. 5, Kreitzman
8  Reply ¶ 36.[6] That it would have been difficult to do the work is not an excuse for not doing it.
9       A close look reveals how untethered each criteria is to a real comparability assessment:
10 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Advertisers defend this filter by speculating that ▬▬▬
11 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
12 ▬▬▬ Opp. 8. But Kreitzman admitted that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
13 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Ex. 6, Kreitzman Tr.
14 70:16-71:7. This filter thus summarily excluded potentially superior comparators solely for
15 convenience. *Id.* at 76:23-77:7; Ex. 3, Williams Tr. 193:24-194:6.
16 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Advertisers invent a new justification for
17 this filter that neither Kreitzman nor Williams ever offered, claiming that ▬▬▬▬▬▬▬
18 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Opp. 8. The court should
19 evaluate the reliability of this filter based on the reasons given by Kreitzman and Williams, *see*
20 Mot. 10-11, not counsel's post hoc rationalization—not least because Kreitzman and Williams
21 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Ex. 6,
22 Kreitzman Tr. 80:25-81:14 ("▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
23 ▬"); Ex. 3, Williams Tr. 211:11-22 ("▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
24 ▬"). Both agreed ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬, stating that ▬▬▬▬▬▬
25 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. *See* Ex. 6, Kreitzman Tr. 79:24-80:12,

---

27 [6] Advertisers misleadingly describe this omission as "▬▬▬▬▬" because ▬▬▬▬▬
28 ▬▬▬▬▬▬▬▬▬▬▬. Opp. 12 n.12. But Kreitzman did not

**PUBLIC REDACTED VERSION**

1  87:16-20. ▮▮▮▮ Ex. 3, Williams Tr. 214:16-215:16 ("▮▮▮▮
2  ▮▮▮▮").
3  ▮▮▮▮ Advertisers lean in to the
4  arbitrariness of these two filters, throwing up their hands and arguing ▮▮▮▮
5  ▮▮▮▮ Opp. 8. They also insist that ▮▮▮▮
6  ▮▮▮▮. *Id.* at 8-10. In particular, they claim that ▮▮▮▮
7  ▮▮▮▮
8  ▮▮▮▮
9  ▮▮▮▮ *Id.* But that claim wholly contradicts their primary argument that the criteria are
10 reliable **because** they supposedly result in the "most appropriate yardsticks." *Id.* at 6. It also proves
11 just how arbitrary these criteria are, as they concededly do no work to identify comparable firms.
12 And it strongly suggests the criteria are something of a farce—smoke and mirrors designed to
13 reverse engineer a damages estimate closely matching what Advertisers provided two years ago.
14     Nothing about these criteria was the product of any reasoned analysis designed to ensure
15 comparability. Kreitzman effectively admitted that ▮▮▮▮
16 ▮▮▮▮. Ex. 6, Kreitzman Tr.
17 121:11-16 ("▮▮▮▮
18 ▮▮▮▮
19 ▮▮▮▮"). And Advertisers do not dispute that
20 Kreitzman's stated goal of ▮▮▮▮
21 ▮▮▮▮, *id.* at 120:25-121:10, 131:9-14, runs exactly contrary to the
22 ultimate purpose of this exercise: to identify comparable firms. *See* Mot. 11-12. Expert opinion
23 must be based on "real analysis." *Play Store*, 2023 WL 5532128, at *10. These criteria are not.
24     The same is true of Kreitzman's ▮▮▮▮
25 ▮▮▮▮ Ex. 6, Kreitzman Tr. 135:9-17. Advertisers half-
26 heartedly assert that Kreitzman "explains this estimate … in his report." Opp. 9. Here is that
27 explanation: "▮▮▮▮
28 ▮▮▮▮

**PUBLIC REDACTED VERSION**

1 ███████████████████████████████████████" Ex. 4, Kreitzman Report ¶ 30 n.34. Their suggestion
2 that ███████████████████████████████████████████████████████████████████████████
3 ███████████████████████████████████ fares no better. Opp. 9. Kreitzman never claimed
4 that ██████████████████████████████—instead, he just said that ████████████
5 ████████████ Ex. 13, Kreitzman Tr. 136:19-137:3; Ex. 5, Kreitzman Reply ¶ 36.
6 On limiting the filters to ████, Advertisers assert that ██████████████████
7 █████████████████████████████████████████ Opp. 9. This is, again, a
8 post hoc rationalization by counsel. Kreitzman gave no thought at all to ██████████████,
9 and certainly did not ████████████████████████████████████████████████
10 ██████████████████████. Ex. 6, Kreitzman Tr. 150:23-151:6 ("██████████████
11 █████████████████████████████████"); *id.* at 150:9-12 (████████
12 ██████████████████████████████████████████████████████████████████).
13 ██████████████████ Advertisers defend this filter with the conclusory assertion that
14 ████████████████████████████████████████████████████████████████ Opp.
15 10. They entirely ignore Kreitzman's concession that this assertion makes little sense given that
16 █████████████████████████████████████████████████████████ and that he █
17 ████████████████████████████████████████████████████████████
18 ███████████████████ Ex. 6, Kreitzman Tr. 156:19-25, 157:12-15. Advertisers' suggestion (at
19 10) that the experts were somehow required "by case law and guiding literature" to filter ████
20 ████████ out as comparators is wrong. If there is such authority, Advertisers never point to it.
21 ███████████████ Advertisers claim (at 10) that the purpose of this filter was to
22 █████████████████████████ which again ignores Kreitzman's stated rationale of ████
23 ████████████████████████████████████████████████████████████, Ex. 5,
24 Kreitzman Reply ¶ 36. Regardless, Advertisers never explain why █████████████████
25 █████████████████████████████████████████████████████████████████████
26 is not comparable to Meta's ad business. Kreitzman himself acknowledged ███████████. Ex.
27 6, Kreitzman Tr. 176:1-9 ("█████████████████████████████████████████████
28 ██████████████████████"). They also defend Kreitzman's total lack of qualification to

**PUBLIC REDACTED VERSION**

1    ███████████████████████████████████████████████████████████████, *id.*
2    at 176:17-23, by saying that ████████████████████████. That is, obviously, no answer.

### B. The Final Set Of Yardsticks Is The Clear Product Of Junk Science

The final yardsticks are ████████████████████████████. This absurd result confirms that the selection criteria are junk science, as do Advertisers' meager defenses of each comparator.

Advertisers first accuse Meta of ████████████████████████████—a tiny Polish company operating in the tourism, architecture, financial services, and automotive industries in addition to selling advertising—████████████████████████ Opp. 11. But Advertisers, not Meta, have the burden of demonstrating comparability. *Muffett v. City of Yakima*, 2012 WL 12827492, at *3 (E.D. Wash. July 20, 2012). All they have offered is the fact that ██████████████████████████████████████████ Opp. 11. That is not enough, nor is the fact that the firm (barely) made it through Kreitzman and Williams's flawed filters. "[T]he yardstick method requires a comparison of the" firm at issue "with one nearly as identical as possible" based on real-world comparability factors. *Shannon v. Crowley*, 538 F. Supp. 476, 481 (N.D. Cal. 1981); *Eleven Line, Inc. v. North Tex. State Soccer Ass'n*, 213 F.3d 198, 208 (5th Cir. 2000). Advertisers have made no showing even approaching that standard.[7]

Advertisers' defenses of ████████ are no better. Advertisers justify ████████ inclusion only as "████████" and due to "data limitations." Opp. 11. But the fact that Kreitzman and Williams ████████████████ and failed to screen out a comparator that was not only "affected" by the challenged conduct but allegedly ████████████, *see* Mot. 15, further demonstrates the unreliability of their method. For ████, they refer only to unspecified ████████ ██████████████████████████████ Opp. 12. Whoever these ████████ are, they are irrelevant, as they say nothing about whether ████ has similar cash flows, growth potential, and risks as Meta, which are the relevant factors for comparability. Dkt. 680-13 at 247.

### CONCLUSION

The Court should exclude the Kreitzman-Williams "yardstick" study.

---

[7] Advertisers also appear (at 11) to misunderstand ████████████'s financial disclosures from the class period, which state that the company had "businesses different than the sale of advertisement" earning revenues reported separately. ████████

**PUBLIC REDACTED VERSION**

DATED: November 3, 2023

Respectfully submitted,

By: */s/ Sonal N. Mehta*

SONAL N. MEHTA (Bar No. 222086)
  Sonal.Mehta@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
  David.Gringer@wilmerhale.com
ROSS E. FIRSENBAUM (*pro hac vice*)
  Ross.Firsenbaum@wilmerhale.com
RYAN CHABOT (*pro hac vice*)
  Ryan.Chabot@wilmerhale.com
PAUL VANDERSLICE (*pro hac vice*)
  Paul.Vanderslice@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800

ARI HOLTZBLATT (*pro hac vice*)
  Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
  Molly.Jennings@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000

MICHAELA P. SEWALL (*pro hac vice*)
  Michaela.Sewall@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

*Attorneys for Defendant Meta Platforms, Inc.*

**PUBLIC REDACTED VERSION**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of November, 2023, I electronically transmitted the public redacted version of the foregoing document to the Clerk's Office using the CM/ECF System and caused the version of the foregoing document filed under seal to be transmitted to counsel of record by email.

By:   */s/ Sonal N. Mehta*
      Sonal N. Mehta