# EXHIBIT 1

## *Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) 657*

*Antitrust Law: An Analysis of Antitrust Principles and Their Application (Areeda and Hovenkamp) > Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and Hovenkamp > CHAPTER 6 Monopolization (600-658) > 6C The Nature and Definition of "Monopolizing" Conduct: Relationship to Remedies (650-658)*

## 657. Causation and Injury in §2 Cases: "Disaggregation" of Damages

**Last Updated: 8/2022**

**Causation and Injury in §2 Cases: "Disaggregation" of Damages**

**657a.**

**Introduction.**

**1.**

 ***Causation in private versus government actions.***

The previous Paragraph showed that antitrust's mandatory treble damages provision often awards damages that are "excessive," in that the punitive two-thirds is assessed even to actions that are not criminal in character, or where the defendant had made a reasonable but mistaken judgment that it was doing nothing unlawful. Section 2 claims are susceptible to such excesses, for unilateral acts do not fall within the class of violations that we ordinarily think of as criminal, and the line between aggressive competitiveness and a §2 violation is indistinct, making judicial judgments and particularly juries prone to error.

Further, the probability of detection of most §2 violations is typically very high, which means that a damages multiplier does not serve to offset a reduced probability of detection, as it does for price-fixing cases. To be sure, not every §2 violation fits into this category. For example, predatory pricing depends on the defendant's costs, which may not be known to an outside observer. [1] And in so-called *Walker Process* cases involving the unwarranted creation of monopoly by fraud or intentional misrepresentation upon the USPTO, the fraud is typically surreptitious. [2] On the other hand, practices such as refusals to deal, tying, or exclusive dealing are usually knowable as they are occurring.

The resulting potential for excess makes it important that treble damages remedies be limited to those aspects of a plaintiff's injury that were in fact caused by an unlawful exploitation of market power or an unlawful quest for such power in attempt cases. When damages are awarded for injuries not caused by such an exercise, the error applies not only

---

[1] See Ch. 7C.

[2] See Ch. 7B.

to the punitive single portion, but also to the two-thirds punitive portion. See  657b. At the same time, however, this requirement of "disaggregation" can become unreasonably burdensome when the effects of multiple anticompetitive acts cannot be singled out.

This disaggregation problem is less severe in both private and government equity actions, and in particular where the requested relief is an injunction. First, an inference of potential consumer harm must always be at the back end of any monopolization claim. But this does not distinguish the government enforcement action in an antitrust case from government enforcement actions generally. The government is entitled to penalize drunk drivers, speeders, and those who unlawfully carry concealed weapons because harm is threatened, even if no actual harm has yet occurred. In contrast, private plaintiffs operate under tort or tort-like rules that require proof of causation and actual injury if damages are sought, or of proof of threatened injury before an injunction is proper.

Second, the statutory structure of the antitrust laws is precisely the same as the general tort structure in this respect. The substantive provision prohibits "monopolization" and attempts, and the government enforcement provisions authorize the government to "prevent and restrain" such violations. [3]  The only time an injury requirement appears in the statutory scheme is with reference to private actions. The private plaintiff seeking damages must show "injury" to its business or property, [4]  and equity relief can be given only for "threatened loss or damage" to the plaintiff itself. [5]  The one exception occurs when the government itself is suing for damages for its own injuries. In that case it may also obtain treble damages, but only for proven harm. [6]

Thus it is well established that the damage plaintiff must demonstrate not only that the defendant has violated the antitrust laws, but also that the plaintiff's business or property in fact suffered compensable injury as the result of that violation and that this injury is also injury to competition and "antitrust injury." [7]  Proper adherence to that principle would moderate the treble damages consequences of finding "exclusionary" conduct. Thus conduct enjoined or abandoned before consummation provides no basis for damages. For example, no injury results from a threat by a monopolist to bring a baseless infringement suit against a competitor and its customers that the competitor ignores and that is abandoned before the customers ever hear of it. And of course even consummated exclusionary conduct may not cause damage. For example, we might consider it exclusionary for a monopolist to acquire more than a nonexclusive license of an improvement patent, even though no one else could practice that patent without infringing the monopolist's basic patent. [8]  Yet no competitor or customer could be damaged by the monopolist's acquisition of an improvement patent until the basic patent expires, because no one else could use the improvement patent until then.

---

[3] *15 U.S.C. §§4*, *25*.

[4] *15 U.S.C. §15*.

[5] *15 U.S.C. §26*.  *See*  Herbert Hovenkamp,  *Antitrust Harm and Causation*  , 99 Wash. U. L. Rev. 787 (2021).

[6] *15 U.S.C. §15a*.

[7] Greater latitude for uncertainty as to the  *amount*  of damage is allowed once the fact of damage and causation are established. See  P340,  391a.

[8] See  P707.

Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) 657

The following corollary propositions generally apply. First, unduly speculative damages should not be awarded where causation is doubtful. For example, to preserve all reasonable possibilities of new competition, it might be held exclusionary for a monopolist to acquire one of several potential competitors. But the prospect that the acquired firm would have entered the market or that its acquisition would in fact have reduced the number of actual new entrants is ordinarily too speculative to support an award to private parties claiming damages for monopoly pricing. [9]

More general causation principles apply as well. For example, the plaintiff may not recover for injuries that were not clearly attributable to the defendant's acts [10] or that were self-inflicted or the result of the plaintiffs' own mismanagement. [11]

Without ruling them out altogether, we would be particularly cautious about awarding treble damages to competitors who have maintained their profit levels or even have grown during and following the pendency of the alleged exclusionary practice. The basis of such claims is that the plaintiff would have been even more profitable, or would have grown even faster, in the absence of the exclusionary practice; but the fact of actual continued profits and growth is highly suggestive of aggressive competition rather than monopolization. [12]

**657a2.**

### "Strict" proof versus reasonable inference.

Notwithstanding the compelling arguments for requiring a clear showing of causation, the required proof is not "strict," as in the classical tort sense. In early twentieth century tort cases plaintiffs were denied recovery because they could not provide clear evidence of what would have happened had the defendant not acted improperly. [13] Many exclusionary

---

[9] A competitor of the monopolist may well have no case even on a showing that the acquired firm would otherwise have entered the market; the added competition would in almost all circumstances hurt it even more than the acquisition. *See generally* Herbert Hovenkamp, *Merger Actions for Damages*, 35 Hastings L.J. 937 (1984).

[10] *E.g., Comcast Corp. v. Behrend*, 569 U.S. 27, 30 (2013), where the plaintiff's expert was unable to produce classwide proof of injury by actions capable of being disaggregated from other conduct. See 331d2. See also P338. Among the many §2 cases are *Concord Boat Corp. v. Brunswick Corp* ., 207 F.3d 1039, 1056 (8th Cir.), *cert. denied*, **531 U.S. 979 (2000)** (plaintiff ignored "inconvenient" evidence indicating that other factors caused its injuries); *Blue Dane Simmental Corp. v. American Simmental Ass'n*, 178 F.3d 1035, 1041 (8th Cir. 1999) (rejecting plaintiff's study that failed to consider alternative explanations for its injuries); *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp* ., 175 F.3d 18, 24 n.3 (1st Cir.), *cert. denied*, **528 U.S. 931 (1999)** (plaintiff must offer proof that tends to show that its injury was caused by the defendant's unlawful conduct, not by other factors); *Virginia Panel Corp. v. MAC Panel Co* ., 133 F.3d 860, 872-73 (Fed. Cir. 1997), *cert. denied*, **525 U.S. 815 (1998)** (rejecting expert study that failed to consider obvious alternative causes of antitrust plaintiff's injuries); and *Catlin v. Washington Energy Co* ., 791 F.2d 1343 (9th Cir. 1986) (similar). *Contra Conwood Co., L.P. v. United States Tobacco Co.* , 290 F.3d 768 (6th Cir. 2002), *cert. denied*, **537 U.S. 1148 (2003)** (permitting damage award based on expert's model that did not disaggregate lawful from unlawful conduct) (to the extent it is relevant, H.H. was consulted by the defendant after trial).

[11] See 338d ; *and see Amerinet, Inc. v. Xerox Corp* ., 972 F.2d 1483, 1495 (8th Cir. 1992), *cert. denied*, **506 U.S. 1080 (1993)** (§2 claim; injuries resulted from plaintiff's own mismanagement).

[12] *See Western Parcel Express v. UPS* , 190 F.3d 974, 976 (9th Cir. 1999) (rejecting monopolization claim where market expanded during claimed violation period); *Omega Envtl. v. Gilbarco* , 127 F.3d 1157, 1162-64 (9th Cir. 1997), *cert. denied*, **525 U.S. 812 (1998)** (jury cannot "reasonably infer probable injury to competition even in this highly concentrated market where the undisputed evidence shows increasing output, decreasing prices, and significantly fluctuating market shares"). *Contra Conwood* , 290 F.3d 768 (permitting large damage award even though plaintiff was growing and had high margins).

practices, just like many negligence torts, are one-of-a-kind situations in which it is impossible to prove that an outcome would have been different absent the violation. For example, in most cases a plaintiff cannot prove that without the defendant's anticompetitive destruction of its rival the market would have become more competitive. Once the challenged events have occurred, the alternative reality can never be re-created.

For this reason the government suitor need not show that competition is in fact less than it would be in some alternative universe in which the challenged conduct had not occurred. It is enough to show that anticompetitive consequences are a naturally-to-be-expected outcome of the challenged conduct. The private plaintiff needs to show somewhat more, but if it shows a violation and harm of a type that is highly likely to be the result of such a violation, then the ordinary tort rule would shift the burden of proof to the defendant to show that the harm had a different source. [14] As in most cases, assignment of proof burdens depends on the trial judge's assessment of relative fault, the reason that certain types of evidence are difficult to obtain or unavailable, and the plausibility of the underlying claim. Of course, expert testimony will be helpful in most cases, but it will not necessarily be dispositive. [15]

**657b.**

**"Disaggregation" where some conduct subsequently found lawful or previous price was noncompetitive.**

**1.**

*Competitors and consumers distinguished* .

Damages (before trebling) should be limited to that part of the injury reasonably attributable to the exclusionary conduct found unlawful. But here a distinction might be made between competitor and consumer plaintiffs, with a somewhat relaxed standard for consumers, as we outline below. We believe the relaxed standard is justified because consumer lawsuits

---

[13] *E.g., New York Cent. R.R. v. Grimstad* , [264 F. 334 (2d Cir. 1920)](although defendant barge operator may have been negligent in not having life preserver available, plaintiff's case failed because she was unable to show that she would have been able successfully to rescue her drowning husband if it had been).

[14] *E.g., Haft v. Lone Palm Hotel* , [478 P.2d 465 (Cal. 1970)](defendant negligent per se for violating statute requiring pool operators either to have a lifeguard or post a warning sign that none was on duty; unexplained drownings with no witnesses justified shift of proof burden to defendant to show that violation of the statute did not cause the deaths); the court spoke in terms that are equally relevant for antitrust:  To require plaintiffs to establish "proximate causation" to a greater certainty than they have in the instant case, would permit defendants to gain the advantage of the lack of proof inherent in the lifeguardless situation which they have created. Under these circumstances the burden of proof on the issue of causation should be shifted to defendants to absolve themselves if they can.  *Id* . at 475.  *See also First Commercial Tr. Co. v. Rank* , [323 Ark. 390, 915 S.W.2d 262 (1996)](government agency negligently failed to report suspected child abuse; jury entitled to infer that abuse would have ceased or been remedied had it been reported). In products liability, see  *Coffman v. Keene Corp.* , [133 N.J. 581, 628 A.2d 710 (1993)](plaintiff entitled to rebuttable presumption that had defendant given warning about presence of asbestos plaintiff would have heeded it);  *Montgomery v. Opelousas Gen. Hosp.* , [540 So. 2d 312, 319-20 (La. 1989)](type of injury that would not have occurred in absence of negligence).  *Cf* .  *Skinner v. Square D Co.* , **445 Mich. 153, 516 N.W.2d 475 (1994)** (submitted causation theory cannot be merely equally plausible with alternative theories; rather, "the plaintiff must present substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred.").

[15] See  P309.

against monopolists are less common and not prone to the abuses that attend many competitor suits. For example, the rival is injured both by efficiency and by inefficient anticompetitive practices, and the courts often do a poor job of identifying the division between the two. Consumers, by contrast, are injured by anticompetitive practices, but they generally benefit from aggressive competition and increased efficiency.

Suppose the monopolist commits three exclusionary practices in order to create its monopoly. First, it brings unwarranted patent infringement actions against potential rivals. [16] Second, it prices predatorily. [17] Third, it unlawfully bundles or ties complementary products to its primary product. [18] This monopolist is now sued by (1) a rival who was the target of one of the wrongfully brought infringement actions; and by (2) a consumer forced to pay monopoly prices for the monopolist's product.

In the case of the rival, damages are correctly limited to the costs related to the improper infringement action-including the costs of the suit and of possible market exclusion that resulted from the action; however, it would be improper for this rival to obtain damages for predatory pricing or bundling unless it could also prove injury resulting from those offenses. Further, if a competitor plaintiff alleged three unlawful exclusionary practices and only one was subsequently found unlawful, damages could be awarded only for the latter. [19] If the plaintiff's expert's damages study cannot segregate lawful from unlawful practices, then no damages may be awarded on the basis of that study. [20] Of course, some damages might be

---

[16] See P706.

[17] See Ch. 7C.

[18] See P777 ; WK-CHAP17.

[19]  See ACT, Inc. v. Sylvan Learning Sys., Inc.  , 296 F.3d 657 (8th Cir. 2002) (precluding damage study that included damages for harm caused by lawful conduct);  Concord Boat Corp. v. Brunswick Corp.  , 207 F.3d 1039, 1057 (8th Cir.) ,  cert. denied , **531 U.S. 979 (2000)** (rejecting damages study that "did not separate lawful from unlawful conduct");  Blue Dane Simmental Corp. v. American Simmental Ass'n , 178 F.3d 1035 (8th Cir. 1999) (similar);  Amerinet, Inc. v. Xerox Corp. , 972 F.2d 1483, 1494 (8th Cir.) ,  cert. denied , **506 U.S. 1080 (1993)** ("if a plaintiff has suffered financial loss from the lawful activities of a competitor, then no damages may be recovered under the antitrust laws");  City of Vernon v. Southern Cal. Edison Co. , 955 F.2d 1361, 1371-72 (9th Cir.) ,  cert. denied , **506 U.S. 908 (1992)** (although plaintiff need not disaggregate damages among acts found to be unlawful, it must separate out damages for acts subsequently found to be lawful);  McGlinchy v. Shell Chem. Co.  , 845 F.2d 802, 806 (9th Cir. 1988) (rejecting damages study because it "did not relate the loss to specific acts" of the defendant);  Metrix Warehouse, Inc. v. Daimler-Benz Aktiengesellschaft , 828 F.2d 1033, 1044 (4th Cir. 1987) ,  cert. denied , **486 U.S. 1017 (1988)** (rejecting damages verdict where jury had based award in part on lawful conduct);  Farley Transp. Co. v. Santa Fe Trail Transp. Co.  , **786 F.2d 1342, 1350-52 (9th Cir. 1985)** ("utter failure to make any segregation between damages attributable to lawful competition and that attributable to the unlawful scheme");  Multiflex, Inc. v. Samuel Moore & Co.  , 709 F.2d 980, 997 (5th Cir. 1983) ,  cert. denied , **465 U.S. 1100 (1984)** (damages study that failed to separate §1 and §2 damages flawed when court subsequently reversed §1 liability finding but not §2 finding);  MCI Commc'ns Corp. v. AT&T , 708 F.2d 1081, 1160-63 (7th Cir.) ,  cert. denied , **464 U.S. 891 (1983)** (damages study fatally flawed where it did "not establish any variation in the outcome depending on which acts of AT&T were held to be legal and which illegal");  Coleman Motor Co. v. Chrysler Corp.  , 525 F.2d 1338, 1352 (3d Cir. 1975) (rejecting damages study that failed to disaggregate injury from lawful and unlawful acts).  See also U.S. Football League v. NFL , 842 F.2d 1335, 1378-79 (2d Cir. 1988) (same).

[20] In addition to the cases in the previous note, see  ILC Peripherals Leasing Corp. v. IBM Corp.  , 458 F. Supp. 423, 434 (N.D. Cal. 1978) ,  aff'd per curiam sub nom .  Memorex Corp. v. IBM Corp.  , 636 F.2d 1188 (9th Cir. 1980) ,  cert. denied , **452 U.S. 972 (1981)** ; and  Litton Systems, Inc. v. Honeywell, Inc.  , 1996 WL 634213, 1996-2 Trade Cas. P71,559 (C.D. Cal. July 24, 1996) , rejecting damages study aggregating damages from eight alleged §2 violations after six of them were thrown out: The [damages] study bore no direct relationship to any specific acts or conduct but rather was based on judgments about the market share Litton would presumably have achieved in a "but-for" world in which all of Honeywell's challenged conduct, whether

capable of being segregated even though the plaintiff's expert's study fails to do so. For example, suppose the plaintiff claims injury from an unlawful patent infringement suit and predatory pricing but only the first is found unlawful. If the damages study measures lost profits without attributing them to one practice or the other, no lost profits could be awarded on the basis of the study. However, the costs of litigating the infringement suit would be recoverable as a separate element of damages completely unique to the unlawful infringement action. [21]

The consumer is in a position somewhat different from the competitor's. First, the consumer's injury results only from the *increment* in price that results from the unlawful monopolization; awarding damages based on the entire monopoly price treats the monopolist as if it had charged the perfectly competitive price before the unlawful activity was undertaken. But this can hardly be presumed. Nearly all markets susceptible to monopolization will have been at least somewhat oligopolistic before the unlawful acts occurred.

Second, unlike the competitor, perhaps the consumer need not ask as a general matter how much of the monopolist's overcharge is attributable to the wrongful infringement action, how much to the predation, and how much to the tying. If all three actions are unlawful, only the net overcharge is important. However, this "disaggregation" query becomes important if the infringement actions were later found by the court to be unlawful, while the predation and tying were not. In that case, part of the monopolist's price may be the result of lawful acts.

In *Berkey Photo* the Second Circuit addressed the issue by considering how much of the monopoly overcharge was attributable to one of the unlawful exclusionary practices and how much was attributable to lawful monopoly that the firm may already have had or that it lawfully acquired even as it was engaged in these practices. [22] For example, even as the monopolist was bringing the improper infringement suits, it may also have been developing superior products that naturally gave it some power.

Any obligation on plaintiffs to separate out the contribution of each individual act to the defendant's monopoly price, and then to collect damages only for that portion of the overcharge attributed to unlawful conduct, either invites extreme speculation or else becomes an effective rule of nonrecovery.

Once any exclusionary practice has been found unlawful and shown to be a significant contributor to the monopolist's monopoly price, then the court must indulge a presumption about the size of the contribution. Here, the sensible presumption is that in the absence of

---

unlawfully exclusionary or not, was presumed not to have occurred.  1996 WL 634213, at *3. The two theories permitted were exclusive dealing with original equipment manufacturers and long-term supply contracts. The court excluded allegations of unlawful bundling, predatory pricing, and unlawful merger, among others. On technical problems of disaggregation in damages studies, see  392g.The damages study in  *Conwood Co., L.P. v. United States Tobacco Co.* , *290 F.3d 768 (6th Cir. 2002)*, looked at nothing but the market-share growth of the plaintiff and two other rivals and compared these to a different market in which the defendant did not participate. It then attributed the entire growth difference in the two markets to unlawful conduct notwithstanding that most of the defendant's conduct was lawful. See  P340.

[21] See  P706 ;  *and see Premier Elec. Constr. Co. v. National Elec. Contractors Ass'n* , *814 F.2d 358, 371-72 (7th Cir. 1987)* (awarding litigation costs as antitrust damages in case finding improper patent infringement suit).

[22] *Berkey Photo, Inc. v. Eastman Kodak Co.* , *603 F.2d 263, 297 (2d Cir. 1979)*, *cert. denied* , **444 U.S. 1093 (1980)**. For a fuller discussion of the facts, see  P776.

the unlawful exclusionary practice, the monopolist would have charged the competitive price, so damages should be based on the difference between the monopoly price and the competitive price. That, incidentally, is the rule that is ordinarily applied in cartel cases-the difference between the cartel price and the presumed competitive price-even though most markets susceptible to collusion were already behaving oligopolistically before any unlawful activity existed, so the "but for" price would probably have been higher than the competitive price. [23]

Against this rule is the observation-usually factually correct-that an exclusionary practice ordinarily does not take a firm from the perfectly competitive price to the monopoly price. Markets in which perfect competition obtains are not generally readily susceptible to monopoly at all, and one can assume that, in at least most of them, a certain amount of market power or oligopoly coordination obtained before the challenged exclusionary practices were undertaken. Indeed, many exclusionary practices may not have a significant impact on the monopolist's short-run *price* at all; they may have been designed merely to lengthen the monopolist's period of dominance, perhaps by excluding a new entrant.

For example, suppose a lawful monopolist charges a monopoly price of $4 for a widget that costs $2 to produce. When a potentially dangerous but small rival appears on the scene, the monopolist responds not with a price cut, but with a barrage of wrongful patent infringement actions that exhaust the rival's resources and remove it as a threat. The impact of this successful strategy is that the monopolist continues to charge $4, while competition might have forced the price downward. In this case damages computed under the *Berkey Photo* rule would be zero, at least for those purchases made at the time of the wrongful infringement action-the monopolist's price both before and after the wrongful act was $4, so there is no "overcharge" to be attributed to the act itself. [24]  To the extent the monopolization offense applies to a firm already a monopolist before the unlawful exclusionary act is committed but who unlawfully "maintained" its monopoly, the actual price increase caused by the act itself will be zero or quite small.

But this very example illustrates that the strict causation rule goes too far when applied to consumers and involves the court in unreasonable speculation about how much a particular exclusionary practice may have contributed to a monopolist's price.

**657b2.**

*Disaggregation problem not solved by jury instruction.*

---

[23] *See, e.g., Reiter v. Sonotone Corp.* , *442 U.S. 330, 340 (1979)*;  *Chattanooga Foundry & Pipe Works v. Atlanta* , *203 U.S. 390, 396 (1906).* For a more detailed explanation, see Herbert Hovenkamp, Federal Antitrust Policy: The Law of Competition and Its Practice §17.5 (6th ed. 2020). Actually, on this issue the "before-and-after" method and the "yardstick" method of computing damages can yield quite different results. The "before-and-after" method looks at the cartelized market both before and after the cartel's existence and awards damages based on the price difference during cartel and noncartel periods. To the extent the noncartelized market was already subject to oligopoly pricing, the damages award is therefore smaller. By contrast, the "yardstick" method looks at a different market that is thought to resemble the defendants' market but that is operating competitively. To the extent it really is operating competitively, the damages tend to be larger. See  P395 (overcharge injuries), and  P397 (exclusionary practices).

[24] With respect to later purchases, perhaps the plaintiff could show without undue speculation that but for the exclusionary practice the price would have dropped below $4.

In *Conwood* the Sixth Circuit disagreed with other circuits addressing the issue by concluding that proof of disaggregation was unnecessary, provided that the jury was instructed that it should find damages only for unlawful conduct. [25] However, disaggregation requires not only an instruction of that type, but also a basis for making the disaggregation. In the *Conwood* case the plaintiff was growing and was highly profitable during the damage period, but the expert produced two models predicting that its market share would have grown even faster but for the defendant's exclusionary acts. One model predicted a share growth of 8.1 points and the other 5.7 points. Then the expert offered a damages figure for both. The jury selected a number between the two extremes. Most of the conduct that the Sixth Circuit described in its statement of facts was lawful under the antitrust laws, [26] and many other factors, such as the aggressive growth of a third rival, appeared to have a considerable effect on the plaintiff's share growth.

To illustrate the Sixth Circuit's error, suppose that a plaintiff's injury could have resulted from the defendant's (a) tying, or (b) its predatory pricing, or (c) the aggressive growth of a third party. The plaintiff then makes two different growth progressions that both fail to differentiate between tying and predatory pricing and also fail to account for the third party's growth. The projections simply make two different generalized assumptions about the defendant's "but-for" growth rate. One growth projection yields damages of $10 million and the other yields damages of $20 million. If the jury was instructed to attach damages only to unlawful conduct and then came in with a $15 million award, that could not be a basis for concluding that the jury found specific conduct unlawful and assessed damages to that conduct.

"Disaggregation" does not mean simply that the expert must produce a range of numbers and the jury can pick something in the middle of the range depending on its view of the severity of the conduct. In this case no one-neither the expert, nor the judge, nor anyone else-could assign a particular quantum of damages to any particular unlawful practice or to other effects. The expert who says that the plaintiff would have been injured by $10 million or $20 million depending on what its growth rate would have been has not provided any basis at all for assigning damages to anticompetitive as opposed to procompetitive acts or to other market factors beyond the defendant's control. An acceptable damages study must be capable of showing how much the defendant lost "by reason of" the antitrust violation. The *Conwood* expert had admitted in testimony that his methodology could not assign any specific element of damages to any specific act or class of acts.

When the disaggregation question is left to a jury, the jury must be provided with an evidentiary basis for performing the disaggregation function. That requires a damages study that links a particular quantum of damages to allegedly unlawful acts.

The Ninth Circuit's *Kodak* decision more properly rejected the premise that the jury could be trusted to perform the disaggregation function itself on the basis of undifferentiated evidence of effects:

---

[25] *Conwood* , *290 F.3d 768*.  Contrast *R.J. Reynolds Tobacco Co. v. Philip Morris, Inc.* , *199 F. Supp. 2d 362 (M.D.N.C. 2002)*, aff'd , *67 Fed. Appx. 810 (4th Cir. 2003)* (defendant's contracts pertaining to display allocations did not violate either §1 or §2).

[26] See *782a*.

The ISOs [plaintiffs] must segregate damages attributable to lawful competition from damages attributable to Kodak's monopolizing conduct. A failure to do so contravenes the command of the Clayton Act. Although the district court instructed the jury to award only those damages arising from Kodak's monopolization of the service market, the ISOs point to no basis in the record for quantifying lost sales of used equipment caused by Kodak's service monopoly. [27]

## 657c.

### Injuries not caused by unlawful "exercise" of market power.

Treble damages are clearly inappropriate when the plaintiff's injuries are unrelated to the unlawful "exercise" of market power. Two situations merit development: the monopoly overcharge caused by the innocent monopolist (657c1) and the injury to competitors that would have resulted from any firm's behavior, whether or not it was a monopolist (657c2).

## 657c1.

### Innocent monopolist's overcharge.

Provided it does not engage in any unlawful exclusionary practice, a monopolist is entitled to charge whatever price the market will bear. [28] It therefore follows that the customer of such a monopolist has no "overcharge" damages action for the excessive price.

## 657c2.

### Injuries unrelated to "exercise" of monopoly power.

Not every injurious act by a monopolist is an exercise of monopoly power. Suppose that the §2 defendant is a dominant, vertically integrated firm that manufactures vacuum cleaners, which require frequent replacement of a specially designed paper dust bag. The plaintiff is a smaller firm that makes duplicate dust bags that it sells at a lower price than the defendant charges for its "original equipment" dust bags. The defendant then redesigns its vacuum cleaner, and the new design uses a completely different dust bag that is harder to make and, in any event, cannot be made with the existing equipment in which the plaintiff has made a considerable investment. [29]

We can presume that the plaintiff in this case has been injured, and clearly its injury was "caused" by the defendant's redesign of its vacuum cleaner. Nevertheless, the plaintiff's injury is not caused by an unlawful "exercise" of monopoly power unless the defendant's redesign of its vacuum cleaner and the resulting change in dust bag requirements were an

---

[27] *Image Technical Servs., Inc. v. Eastman Kodak Co.* , 125 F.3d 1195, 1224 (9th Cir. 1997), *cert. denied* , **523 U.S. 1094 (1998)** (to the extent it is relevant, H.H. was consulted by the defendant after trial); *accord Amerinet, Inc. v. Xerox Corp.* , 972 F.2d 1483, 1494 (8th Cir. 1992), *cert. denied* , **506 U.S. 1080 (1993)** (when a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damages).

[28] See P720.

[29] *Cf* . *C.R. Bard, Inc. v. M3 Sys.* , 157 F.3d 1340 (Fed. Cir. 1998), *cert. denied* , **526 U.S. 1131 (1999)**, which involved similar facts in a different market. See P776 - P777.

unlawful exercise of monopoly power. For example, if a nondominant producer of vacuum cleaners in a competitive market should redesign its machine so as to make a rival's dust bag incompatible, that might cause injury-in-fact to a rival dust bag maker, but it would not be an injury resulting from unlawful monopolization.

The plaintiff's injury was in fact caused by (a) loss of investment in technology for making the original dust bag and (b) loss of sales during the interval before it could market the redesigned bag. Both of these injuries would have been the same whether or not the defendant had any market power whatsoever. For example, many firms might manufacture replacement engine blocks for automobiles, and if Chrysler, a nonmonopolist, changes its engine block design, such a firm might lose (a) previous investment in technology for making the older design; and (b) sales pending its ability to market the new design. But these injuries result from the fact that the engine block is a nonstandardized product and that the smaller rival has cast its fortune with the older design.

In   *Berkey Photo*   the Second Circuit reached this result with respect to a charge that Kodak's new film, in which it had monopoly power, unlawfully gave it a competitive advantage in photo processing, where it had no monopoly. [30]  The court observed that the injury did not depend on the presence of monopoly power in film, but merely on the fact that the older photo-processing methods used by other firms were dedicated to the older film:

> ... [O]nly the wielding of power will support recovery in this context; advantages inuring to Kodak's photofinishing and equipment arms by virtue of membership in an integrated firm will not. As we suggested earlier, a use of monopoly power is an action that a firm would have found substantially less effective, or even counterproductive, if it lacked market control. Thus, the classic example of such a use is a refusal to deal in goods or services needed by a competitor in a second market. [31]  But, a firm without control of the market that attempts this will simply drive the purchaser to take its patronage elsewhere.

> Similarly, suppose that Kodak was aware that most consumers would prefer Kodacolor X but nevertheless decided to replace it by Kodacolor II, hoping thereby to place competing photofinishers at a disadvantage. A small film manufacturer attempting this tactic would find it ineffective and self-destructive. The slack in [the older] films would be filled by other firms, and consumers would have no reason to buy a film they did not like. Kodak, by contrast, would face a far different calculus: consumers desiring film would have little choice but to buy [the new] Kodacolor II and would thereby ineluctably strengthen [Kodak's] hand in photofinishing.

> It is not clear, however, whether in bringing forth the 110 system Kodak did anything that a smaller firm with integrated capabilities but no market control might not have done. [32]

Many claims of vertical integration, particularly those involving refusals to deal, are similar. For example, a firm selling a durable good requiring frequent repairs, such as a computer, might integrate into repairing itself and refuse to supply diagnostic equipment or replacement parts to rival organizations. [33]  The firm might find it profitable to do this quite aside from any

---

[30] On claims of monopoly "leveraging" into a market where the defendant lacks monopoly power, see  P652.

[31] Citing  *Eastman Kodak Co. v. Southern Photo Materials Co.*  , 273 U.S. 359 (1927).

[32]  *Berkey Photo, Inc. v. Eastman Kodak Co.*  , 603 F.2d 263, 291 (2d Cir. 1979).

market power that it may have. For example, nonmonopolist Chrysler may decide that only Chrysler dealers can do warranty work on its automobiles or that it will sell diagnostic equipment only to "authorized" service technicians. In that case, mechanics who are not appropriately authorized will suffer loss of business, but their loss does not result from any exercise of monopoly power. If Chrysler were a monopolist making the same decision for the same reason, their loss would likewise not be from any "exercise" of monopoly power; it would result simply from the profitable action of a vertically integrated firm.

Antitrust Law: An Analysis of Antitrust Principles and Their Application
Copyright © 2023 by Wolters Kluwer. All Rights Reserved.

---

**End of Document**

---

[33] On the law of such practices, see P762.