# EXHIBIT 2

## *Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) 320*

*Antitrust Law: An Analysis of Antitrust Principles and Their Application (Areeda and Hovenkamp) > Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and Hovenkamp > CHAPTER 3 The Antitrust System of Remedies (300-399) > 3C Repose in Antitrust Litigation (315-321)*

## 320. The Antitrust Statute of Limitation

Last Updated: 5/2023

The Antitrust Statute of Limitation

*Blenheim Capital Holdings Ltd. v. Lockheed Martin Corp* ., *53 F.4th 286 (4th Cir. 2022)* (statute began to run when defendant sent plaintiff a formal notice of immediate termination); *Perrigo Co. v. AbbVie Inc* ., *2022 WL 2870152 (3d Cir. July 21, 2022)* (Under Hatch-Waxman Act, once patentee files infringement action based on generic's filing, entry is delayed for 30 months or until the lawsuit is resolved; during that time damages could not have accrued because entry could not have occurred; that delay was sufficient injury to start the statute of limitation); *Hawthorne Hangar Operations, L.P. v. Hawthorne Airport, LLC* , *2022 WL 3102452 (9th Cir. Aug. 4, 2022)* (where alleged antitrust violation was predicated on two discrete events-defendant's installation of a fence that interfered with the plaintiff's business and its filing of state court tort claims-continuing-violation doctrine did not apply); *Vasquez v. Indiana Univ. Health , Inc* ., *40 F.4th 582 (7th Cir. 2022)* (after defendant's merger it allegedly inaugurated scheme to ruin plaintiffs' business; in that case the date of the merger did not determine that statute of limitation); *Mayor of Balt. v. Actelion Pharms.* , *995 F.3d 123, 129-33 (4th Cir. 2021)* (with respect to complaint that defendant monopolized by failing to make samples of its drug available for copying after the patent had expired, the cause of action accrued when the plaintiff consumers were injured by resulting higher prices, and the statute was restarted each time a consumer made a higher-priced purchase; prior to patent expiration there was no antitrust violation and thus the statute could not relate back to that period); *Academy of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.* , *998 F.3d 190, 196 (5th Cir. 2021)* (at pleading stage, alleged meeting between allergy tester and its competitors' employees was sufficient to restart statute of limitation); *CSX Transp., Inc. v. Norfolk S. Ry. Co* ., 2023 WL 25344 (E.D. Va. Jan. 3, 2023) (declining to restart statute of limitation for each recurrence of a refusal to deal, citing PP320a, c, 338b); *US Airways, Inc. v. Sabre Holdings Corp* ., 2022 WL 1125956 (S.D.N.Y. Apr 15, 2022) (principle that each payment on an unlawful agreement fails to restart statute of limitation applies to both sections of the Sherman Act); *Humana, Inc. v. Celgene Corp* ., *2022 WL 1237883 (D.N.J. Apr. 27, 2022)* (mere persistence of higher prices after a price-fixing agreement insufficient to toll statute of limitation, but ongoing actions of enforcement could delay it; in this case the defendant refused to sell samples of drugs to generic producers and subsequently and frivolously sued some for patent infringement); *Snow v. Align Tech., Inc.* , *586 F. Supp. 3d*

972 (N.D. Cal. 2022) (in consumer action, each sale of price-fixed product restarts the statute of limitation); *Nastasi & Assocs., Inc. v. Bloomberg, L.P* ., 2022 WL 4448621 (S.D.N.Y. Sept. 23, 2022) (for purposes of a motion to dismiss, accepting plaintiff's assertion that the claims of price fixing and market division were self-concealing); *Reveal Chat Holdco LLC v. Facebook, Inc* ., 2021 WL 1615349, at *5 (N.D. Cal. Apr. 26, 2021), *aff'd in part, appeal dismissed in part sub nom. Reveal Chat HoldCo LLC v. Meta Platforms, Inc.* , 2022 WL 595696, at *2 (9th Cir. Feb. 28, 2022) (statute of limitation barred antitrust challenge for Facebook's withdrawal of API that harmed plaintiff; while plaintiff had immediate knowledge of the withdrawal, it alleged that it did not know about its anticompetitive purpose); *Namenda Indirect Purchaser Antitrust Litig* ., 2021 WL 2403727, at *40-*41 (S.D.N.Y. June 11, 2021) (running of statute of limitation might result in exclusion of earlier reimbursement claims but not later ones falling within the four-year period).

 *See also Trendsettah USA, Inc. v. Swisher, Int'l, Inc.* , 31 F.4th 1124 (9th Cir. 2022) (antitrust case applying one-year limitation period in Federal Rule of Civil Procedure 60 for relief from judgment: may be tolled in case of newly discovered evidence and fraud).

**320a.**

**Introduction.**

Limitation serves the same functions in antitrust as elsewhere in the law: to put old liabilities to rest, to relieve courts and parties from "stale" claims where the best evidence may no longer be available, and to create incentives for those who believe themselves wronged to investigate and bring their claims promptly, particularly when they are known or can be determined. Repose is especially valuable in antitrust, where tests of legality are often rather vague, where many business practices can be simultaneously efficient and beneficial to consumers but also challengeable as antitrust violations, where liability doctrines change and expand, where damages are punitively trebled, and where duplicate treble damages for the same offense may be threatened. In addition, relevant evidence may disappear over time. Antitrust liability depends not only on the parties' acts but also on many surrounding circumstances, including the behavior of rival firms and general market conditions-matters that may be hard to reconstruct long afterwards. Moreover, the old evidence that survives may be admitted even though incomplete. [1]

Further, as the Supreme Court observed in its *Rotella* decision interpreting the antitrust statute of limitation, [2] one purpose of the Clayton Act statute of limitation is to take into account that the private plaintiff is not merely seeking recompense but is also acting as a "private attorney general." While this goal is furthered by the award of treble damages, society expects to benefit by having the violation suppressed. As a result, it would be

_____

[1] *See Kansas City Star Co. v. United States* , 240 F.2d 643, 651 (8th Cir.), *cert. denied* , **354 U.S. 923 (1957)** (admitting old evidence as tending to show defendant's state of mind).

[2] *Rotella v. Wood* , 528 U.S. 549 (2000). The action was under the Racketeer Influenced and Corrupt Organizations (RICO) statute, not antitrust, but that statute uses the same Clayton Act statute of limitation, and judicial interpretation generally applies to both. See the discussion of *Klehr v. A.O. Smith Corp.* , 521 U.S. 179 (1997), in  320c7.

strange to provide an unusually long basic limitations period that could only have the effect of postponing whatever public benefit [private enforcement] might realize. The Clayton Act avoids any such policy conflict by its accrual rule that "[g]enerally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business ...." [3]

This policy is particularly strong in the case of "public" acts challenged as antitrust violations, such as publicly announced joint ventures or mergers, dealer terminations, or exclusionary practices that are known by those at whom they are directed. Such practices are generally public, and injured parties are able to feel and perhaps to assess their injuries almost immediately. But assessing antitrust consequences is often difficult, and reasonable minds might differ on that question. In such cases it is especially important that antitrust challenges be timely made, thus minimizing the social costs of any antitrust violation but giving the parties repose for conduct that is lawful.

The cases are inconsistent and often hypertechnical, which makes analysis of the general problem difficult. Here, as in the law of standing, [4] there is a tendency to bend the law to take into account the judge's view of the underlying merits. For example, a court that believes that the antitrust claim is unfounded may avoid the substantive issue by concluding that the statute of limitation has precluded the action. But such bending is not conducive to clarity on either substantive antitrust doctrine or the statute of limitation. As in the case of standing, the best way to analyze the limitation issue is to assume that the antitrust laws have been violated and then consider when the antitrust cause of action has accrued and whether other factors may serve to delay the running of the statute. Throughout this Paragraph we assume that the defendant has committed an antitrust violation and withhold our own opinion about whether the challenged practice merits condemnation.

One does see a tendency toward increased strictness against plaintiffs who knew or should have known of a violation but delayed bringing their suit. Supreme Court decisions from the 1960s and earlier were almost casual about plaintiffs who sat on their rights. [5] In those years of rapidly expanding antitrust liability, the Court seemed concerned that plaintiffs be entitled to challenge practices that had not been recognized as antitrust violations when first initiated, but had been condemned far later. [6] In today's world, a more constant scope of liability has led to an increasing concern that known violations be challenged promptly.

Criminal prosecutions are governed by the general provisions of the criminal code, which forbids prosecutions not instituted within five years after commission of the offense. [7] Equitable actions are subject to no statute of limitation, although doctrines of laches limit

---

[3] *Rotella*, *528 U.S. at 558*, citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, *401 U.S. 321, 338 (1971)*.

[4] See  P335.

[5] *E.g., Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, *392 U.S. 481, 502 n.15 (1968)* (plaintiff could sue to challenge defendant's lease-only policy even though it had been subjected to the policy since 1912).

[6] While the lease-only practices at issue in *Hanover* had been initiated in 1912, the judgment condemning them did not occur until the 1950s. *United States v. United Shoe Mach. Co.*, *110 F. Supp. 295, 340-41 (D. Mass. 1953)*, *aff'd per curiam*, *347 U.S. 521 (1954)*.

[7] *18 U.S.C. §3282*.

injunctive suits brought by private parties. [8] Until 1955, treble damages actions were governed by state statutes of limitation, although the antitrust courts decided some issues-such as determining the point at which a cause of action accrued or the test of fraudulent concealment-as a matter of uniform federal common law. [9] In that year, amendments to the Clayton Act added §4B, [10] which provides for a uniform limitation period of four years for damage actions and applies to all of the antitrust laws. The running of the limitation period is tolled either by the pendency of a government suit [11] or by the defendant's fraudulent concealment, as discussed below in 320e. We first look to the question of when the limitation period begins running.

### 320b.

### Accrual of a cause of action.

To apply any limitation period, one must first pinpoint the time at which the cause of action arose. As a beginning proposition, "a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." [12] The point at which

---

[8] See 320g.

[9] *E.g., Moviecolor Ltd. v. Eastman Kodak Co.* , 288 F.2d 80 (2d Cir.), *cert. denied* , **368 U.S. 821 (1961)**.

[10] 69 Stat. 283 (1955), codified at 15 U.S.C. §15b.

[11] See P321.

[12] *Zenith Radio Corp. v. Hazeltine Research, Inc.* , 401 U.S. 321, 338 (1971). Most of the voluminous decisions do not require separate treatment, but the more important ones are listed here, together with a relevant parenthetical: *Paramount Media Grp., Inc. v. Village of Bellwood* , 929 F.3d 914 (7th Cir. 2019) (statute of limitation for antitrust challenge to village ordinance banning new billboards began to run when ordinance was passed); *SD3 II LLC v. Black & Decker (U.S.), Inc* ., 888 F.3d 98 (4th Cir. 2018) (limitation period on claim by designer of disapproved table saw safety device began when each manufacturer ceased negotiating with the plaintiff as well as on public notice of Justice Department inquiry into defendants' joint venture; as a result, the plaintiff was aware, outside of the limitation period, of the alleged antitrust violation); *Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc* ., 902 F.3d 735 (7th Cir. 2018) (for purposes of tolling statute of limitation, filing of amended complaint relates back to filing of original complaint only if the original complaint gave adequate notice of the claim on which the statute allegedly ran); *Pre-Filled Propane Tank Antitrust Litig.* , 860 F.3d 1059 (8th Cir. 2017), *cert. denied* , **138 S. Ct. 647 (2018)** (each sale to a plaintiff at the fixed price restarts statute of limitation; citing 320c ; rejecting argument that Supreme Court's most explicit statement of this proposition came in a RICO case and did not cover antitrust cases, referencing *Klehr v. A.O. Smith Corp.* , 521 U.S. 179, 189 (1997)); *Z Tech. Corp. v. Lubrizol Corp* ., 753 F.3d 594 (6th Cir. 2014) (statute of limitation on merger runs from acquisition date and is not extended by post-merger price increases attributable to the merger; acknowledging in principle that broader application of a noncompete agreement ancillary to the merger might restart statute, but not finding factual support in this case; also distinguishing cases involving new conduct that did not "stem ... from the merger or was included in the agreement creating the merger."); *DPWN Holdings, Inc. v. United Air Lines, Inc.* , 747 F.3d 145 (2d Cir. 2014), *on remand* , No. 11-CV-564 , JG), 2014 WL 5394950 (E.D.N.Y. Sept. 16, 2014) (plaintiff's allegations that it could not have discovered antitrust violations belied by other allegations in its complaint; remanding on this issue); *Levy v. BASF Metals Ltd* ., No. 1:15-cv-7317-GHW, 2017 WL 2533501 (S.D.N.Y. June 9, 2017), *aff'd* , 917 F.3d 106 (2d Cir. 2019) (plaintiff's claims of conspiracy to manipulate futures contracts on New York Mercantile Exchange untimely); *RX.com v. Medco Health Sols., Inc.* , 322 Fed. Appx. 394, 2009 WL 1067954, 2009-1 Trade Cas. P76,582 (5th Cir. Apr. 22, 2009) (unpublished), *cert. denied* , **558 U.S. 992 (2009)** (Internet pharmacist claims against pharmacy benefits managers for being excluded from their networks barred when the exclusion had clearly occurred more than four years prior to filing and plaintiff had actually complained to the FTC about that time); *World Wrestling Entm't, Inc. v. Jakks Pac., Inc.* , 328 Fed. Appx. 695, 2009 WL 1391807, 2009-1 Trade Cas. P76,617 (2d Cir. May 19, 2009) (unpublished) (antitrust action challenging exclusive agreement between licensor of wrestling IP and a toy marketer and video game marketer was time-barred; the contract had been made more than seven years prior to filing of antitrust action, and it was open and notorious at the time it was made, leading a reasonable person to investigate and bring suit promptly); *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.* , 530 F.3d 204 (3d Cir. 2008) (in determining whether acts in

injury first occurs is often, but not always, fairly clear. For example, a home buyer alleging an

furtherance of a conspiracy were committed during the limitation period the plaintiff was entitled to rely on all available evidence that the conspiracy existed, including acts outside the limitation period; damages, of course, would be limited to the limitation period; as a result, "Toledo was not required to prove an illegal conspiracy with evidence restricted to the limitations period. Its burden was, rather, to present evidence sufficient to allow a rational jury to conclude that Mack and its dealers committed during the limitations period overt acts in furtherance of an illegal conspiracy or conspiracies, even if the conspiracies began before the limitations period." *Id.* at 218.); *Go Computer, Inc. v. Microsoft Corp* ., *508 F.3d 170 (4th Cir. 2007)* (company allegedly driven from business by actions some 11 to 15 years prior to filing and there were already numerous "red flags" even at that time, statute of limitation had run); *Hamilton Cnty. Bd. of Comm'rs v. NFL* , *491 F.3d 310 (6th Cir. 2007)* (statute of limitation barred county's antitrust suit claiming that NFL acted monopolistically in negotiating a stadium lease in 1997 by making "take it or leave it" offers to municipality and threatening to move the team unless a new stadium was provided; all the relevant facts concerning the defendant's power and its strong-arm tactics were known and widely reported as of the time the lease was negotiated; as well as other antitrust suits brought against NFL teams alleging similar violations); *Lower Lake Erie Iron Ore Antitrust Litig.* , *998 F.2d 1144, 1171 (3d Cir. 1993)*, *cert. denied* , **510 U.S. 1091 (1994)** (statute of limitation did not run on continuing conspiracy despite fact that plaintiff knew about it for 20 years); *Flintkote Co. v. United States* , *7 F.3d 870 (9th Cir. 1993)* (tolling statute when defendant pled nolo to criminal conspiracy, thus admitting a continuing conspiracy); *P & M Servs., Inc. v. Gubb* , *2008 WL 4185903, 2008-2 Trade Cas. P76,451 (E.D. Mich. Sept. 8, 2008)*, *aff'd* , **372 Fed. Appx. 613, 2010 WL 1404451, 2010-1 Trade Cas. P76,966 (6th Cir. Apr. 9, 2010)** (unpublished) (statute barred permissive antitrust counterclaim filed after failed patent infringement suit; relevant date was date allegedly improper suit was filed, more than five years prior to filing of antitrust complaint). *See also Glumetza Antitrust Litig* ., *___ F. Supp. 3d ___, 2020 WL 1066934 (N.D. Cal. Mar. 5, 2020)* (pay-for-delay settlement: each sale made during the pendency of the agreement restarted the statute of limitation. Further, in at least some states doctrine of fraudulent concealment operated to continue limitation period on agreement that was not publicly disclosed); *Nuance Commc'ns, Inc. v. Omilia Nat. Language Sols., Ltd* ., *2020 WL 2198362 (D. Mass. May 6, 2020)* (cause of action may have accrued more than four years subsequent to a merger if the injury ripened later; citing 320b); *Farag v. Health Care Serv. Corp* ., *No. 17 C 2547, 2017 WL 2868999 (N.D. Ill. July 5, 2017)* (mere act of continuing to charge more for a branded drug than generic versions did not restart limitation period at the time of each sale); *TFT-LCD (Flat Panel) Antitrust Litig.* , *2012 WL 273761, 2012-1 Trade Cas. P77,785 (N.D. Cal. Jan. 30, 2012)* (announcement of government investigation was sufficient to start statute of limitation even though the announcement did not name the particular firms that were identified here as defendants); *Evergreen Helicopters, Inc. v. Erickson Air-Crane, Inc.* , *2011 WL 285201, 2011-1 Trade Cas. P77,327 (D. Or. Jan. 26, 2011)* (refusal to deal under 14-year contract not barred even though initial refusals occurred more than four years prior to the complaint, where damages may have accrued later and questions of fact existed whether refusal was final and irrevocable); *Rite Aid Corp. v. American Express Travel Related Servs. Co.* , *708 F. Supp. 2d 257 (E.D.N.Y. 2010)* (consumer challenge to "anti-steering" rules that prevented merchants from redirecting customers toward less expensive credit tools; statute ran anew with each overcharge, thus entitling consumers to maintain the action but limiting commencement of damages to four years prior to suit); *Sulfuric Acid Antitrust Litig.* , *743 F. Supp. 2d 827 (N.D. Ill. 2010)* (statute of limitation did not bar price-fixing claim when record did not show any evidence that would have put the plaintiffs on inquiry notice). *And see Samsung Elecs. v. Panasonic Corp* ., *747 F.3d 1199 (9th Cir. 2014)*, *cert. denied* , **574 U.S. 1121 (2015)** (in challenge to allegedly anticompetitive provisions in license agreement, adoption of a new license with expanded provisions served to extend the statute of limitation; court appears to limit this renewal to situations where the renewed agreement was more expansive than the previous one; rejecting licensor's argument that the new license was a mere extension because it called for the same royalty rate; also holding that even if the two licenses were the same, licensor's subsequent insistence that the new license be applied to an additional product that the licensee added to its line served to restart the statute; finally, court cites speculative damages exception); *Wholesale Grocery Prods. Antitrust Litig* ., *752 F.3d 728 (8th Cir. 2014)*, *cert. denied* , **576 U.S. 1004 (2015)** (statute of limitation on surreptitious agreement coinciding with publicly disclosed asset swap did not necessarily run from the date of the asset swap, which would be the ordinary limitation date for a merger) (to the extent it is relevant, H.H. was consulted by the plaintiff); *Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist* ., *326 F. Supp. 3d 602 (N.D. Ill. 2018)*, *aff'd* , *929 F.3d 865 (7th Cir. 2019)* (renewal of exclusive contract restarted statute of limitation); *Garrison v. Oracle Corp* ., *159 F. Supp. 3d 1044 (N.D. Cal. 2016)* (statute of limitation barred claims of former employees that defendants conspired to fix and suppress salaries; fact that the agreements rolled forward, covering new employees as well as existing ones, was not sufficient to toll statute; merely continuing to carry out the conspiracy with each new hire was insufficient to apply continuing conspiracy doctrine; finally, allegations of fraudulent concealment were not sufficiently specific); *Lamictal Indirect Purchaser & Antitrust Consumer Litig* ., *172 F. Supp. 3d 724 (D.N.J. 2016)* (aggregation of state law indirect purchaser challenges to pay-for-delay pharmaceutical settlement; granting motions to dismiss for some states but not others on statute of limitation grounds); *Evanston Nw. Healthcare Corp. Antitrust Litig* ., *No. 07 C 04446, 2016 WL 4720014 (N.D. Ill. Sept. 9, 2016)* (rejecting most parts of statute of limitation challenge to hospital merger and also alleged acts of monopolization; permitting at least some merger claims to go forward although filed more than four years subsequent to the acquisition, on the ground that prices did not increase immediately; noting that the merging parties had announced that the merger would benefit

illegal agreement between banks and law firms imposing certain title search fees on buyers may sue within four years after the purchase and closing. [13] Though the illegal agreement may have been entered earlier and the title search completed earlier, this particular plaintiff was not injured until she paid those fees at the closing. As a result, she could not have maintained an action until that time. The same thing is true of "pay for delay" pharmaceutical settlements in which a generic drug stays out of the market pursuant to an unlawful patent settlement agreement. [14] The injury would start to accrue on the date that the generic firm would have entered the market but for the unlawful settlement. [15]

Two problems of application recur with some frequency: What acts are to be attributed to the violation; and does each repetition of an act, such as a repeatedly stated refusal to deal, give rise to a new cause of action? In the case of a continuing conspiracy or violation, it is said that each independent predicate act that is part of the violation and that injures the plaintiff

---

consumers).  *See also Duty Free Ams., Inc. v. Esteé Lauder Co.*  , *797 F.3d 1248 (11th Cir. 2015)* (cosmetics manufacturer's restrictions on display space and use of tying and full-line forcing all commenced outside the four-year limitation period); *Animation Workers Antitrust Litig* ., *87 F. Supp. 3d 1195 (N.D. Cal. 2015)* (claim that employers agreed with each other to make and enforce noncompetition agreements that limited employees' ability to seek competitive jobs accrued when the contracts were made and did not restart each time an employee requested to be released; a later decision, however, concluded that plaintiffs actually stated fraudulent concealment.  *Animation Workers Antitrust Litig* ., *123 F. Supp. 3d 1175 (N.D. Cal. 2015)*;  *Ryan v. Microsoft Corp* ., No. 14-CV-04634-*LHK, 2015 WL 1738352 (N.D. Cal. Apr. 10, 2015)* (question whether statute has not run pertains not to plaintiffs' awareness of existence of injuries but rather to awareness of the extent of the injuries). *And see Neurontin Antitrust Litig.* , *2009 WL 2751029, 2009-2 Trade Cas. P76,723 (D.N.J. Aug. 28, 2009)* (new allegations in amended complaint related back to date that original complaint was filed, nearly six years earlier; during the intervening period the action had been stayed, and statute did not run during that time);  *and see Processed Egg Prods. Antitrust Litig.* , *2012 WL 6645533, 2012-2 Trade Cas. P78,193 (E.D. Pa. Dec. 20, 2012)* (while statute of limitation defenses cannot frequently be resolved on a Rule 12(b)(6) motion, in this case the complaint itself made clear that the cause of action accrued more than four years prior to filing);  *Bailey Lumber & Supply Co. v. Georgia-Pacific Corp.* , *2010 WL 1141133, 2010-1 Trade Cas. P76,986 (S.D. Miss. Mar. 19, 2010)* (where plaintiff had opted out of class action but then added claim to its own suit, tolling applied to the original opt-out claim, but statute ran on the additional claim);  *Cotton Yarn Antitrust Litig.* , *2009 WL 618252, 2009-1 Trade Cas. P76,536 (M.D.N.C. Mar. 6, 2009)* (one-year statute of limitation contained in arbitration agreement was tolled by fraudulent concealment; did not run until a purchaser discovered the fraud; note: court assumes that arbitration provision limiting statute to one year is permissible; effect of court's order is to compel arbitration but also to permit arbitration to go forward on the merits);  *Aspartame Antitrust Litig.* , *2008 WL 4724094 (E.D. Pa. Aug. 11, 2008)*, *aff'd* , *416 Fed. Appx. 208, 2011 WL 263647, 2011-1 Trade Cas. P77,324 (3d Cir. Jan. 28, 2011)* (unpublished) (doctrine of fraudulent concealment did not serve to toll statute of limitation where plaintiffs should have been aware of alleged cartel based on pricing behavior and took no steps to investigate during the limitation period);  *United States v. Swiss Valley Farms Co.* , *912 F. Supp. 401 (C.D. Ill. 1995)* (if defendant had resumed making bids competitively rather than collusively, that would have constituted a withdrawal from the conspiracy, thus starting the statute; but if defendant continued to receive payments under the bid-rigging scheme, then there is no withdrawal, and the statute would not begin to run).

13  *Amey, Inc. v. Gulf Abstract & Title, Inc.* , *758 F.2d 1486 (11th Cir. 1985)*, *cert. denied* , **475 U.S. 1107 (1986)**.  *See also Meetinghouse Assocs. v. Warwick Twp.* , *1984 WL 2957, 1984-1 Trade Cas. P66,045 (E.D. Pa. Jan. 19, 1984)* (plaintiff land developer alleging conspiracy between municipality and competing developer to deny sewage facility access could sue within four years after the date developer purchased the property, which was a year after the conspiracy was formed).  *See also Stolow v. Greg Manning Auctions, Inc.* , *80 Fed. Appx. 722, 2003 WL 22717684, 2003-2 Trade Cas. P74,210 (2d Cir. Nov. 17, 2003)* (unpublished) (statute ran against plaintiff who was driven out of business more than four years prior to filing);  *Corporate Auto Res. Specialists v. Melton Motors, Inc.* , *2005 WL 1028225, 2005-1 Trade Cas. P74,821 (E.D. Mich. Apr. 19, 2005)* (where plaintiff was allegedly injured by exclusive contract given to rival dealer, allegedly as part of price discrimination conspiracy, statute of limitation required dismissal where contract was executed more than four years prior to the filing of the lawsuit).

14 See  P2046.

15  *Nexium (Esomeprazole) Antitrust Litig* ., *2013 WL 6224342 (D. Mass. Nov. 27, 2013)*.

starts the statutory period running again, [16] often regardless of the plaintiff's knowledge of the alleged illegality at much earlier times. [17]

**320c.**

**Continuing conspiracies and violations.**

**1.**

*Introduction: "independent" predicate act or mere "reaffirmation" of previous act* .

At a sufficient level of abstraction the concept of a "continuing" conspiracy or violation is simple enough: the violator's actions consist not only of some definitive act in violation of the antitrust laws, but also of a series of subsequent acts that cause further injury to the plaintiff. The question then is whether the subsequent acts serve to keep the cause of action alive, and the answer depends heavily on the particular facts as well as the type of violation, whether cartel (320c2), vertical agreement or refusal to deal (320c3), monopolization (320c4), or merger (320c5). Even when a continuing violation is found, damages are ordinarily limited to the four years prior to the filing of the complaint (320c6). Finally, the Supreme Court's *Klehr* decision limited the notion of continuing violations when no further injury flows from the subsequent acts (320c7).

The continuing violation issue arises only when (a) the initial act violating the antitrust laws has not been improperly concealed *and* (b) causes sufficient injury early on. If the violation is not known to likely plaintiffs, then the fraudulent concealment rule may toll the statute in any event. [18] If injury does not materialize immediately after the act or is excessively speculative in the early years, then the plaintiff might qualify for the *Zenith* exception, which toll the statute for as long as damages are uncertain. [19] The idea of the continuing conspiracy or violation is then that the defendant continues to commit acts in furtherance of the violation and each of these additional acts causes additional injury. The statute is said to be tolled as long as such qualifying acts continue to be committed.

The effect of such a tolling rule can be very broad or very narrow, depending on what counts as a "continuing" act. To illustrate, consider the firm that creates a monopoly by the single unlawful act of filing an improper patent infringement suit and then charges a monopoly price for the indefinite future. If the mere charging of a monopoly price constitutes a "continuing violation" tolling the statute, then we have indefinitely lengthened the statute of limitation on claims of successful monopolization. Of course, if the infringement suit had been

---

[16] *Amey* , _758 F.2d 1486_; *Steiner v. 20th Century-Fox Film Corp.* , _232 F.2d 190, 195 (9th Cir. 1956)_ ("In a continuing conspiracy causing continuing damage without further overt acts, the statute of limitations runs ... from the time the blow which caused the damage was struck. Any further internal injury affects the problem of how much should be claimed in damages, not the problem of when the statute of limitations commences to run."); *Crummer Co. v. DuPont* , _223 F.2d 238, 247-48 (5th Cir.)_, *cert. denied* , **350 U.S. 848 (1955)**.

[17] *See Hanover Shoe, Inc. v. United Shoe Mach. Corp.* , _392 U.S. 481, 502 n.15 (1968)_.

[18] See 320e.

[19] See 320d.

unsuccessful in creating a monopoly or had created a monopoly of only short duration, then the period might be accordingly shorter. Nevertheless, the infringement suit itself causes immediate injury and is clearly known to the most likely plaintiff, the infringement defendant who is presumably ousted from the market. At the same time, we might want to distinguish an antitrust lawsuit brought by a *consumer*, and challenging the same wrongfully brought infringement suit. The filing of the lawsuit very likely causes the consumer no injury at all. Rather, the consumer injury occurs when the improper infringement action succeeds in strengthening or lengthening the antitrust defendant's monopoly, thus forcing the consumer to pay more.

Or consider the case of a monopolist who allegedly preserves its monopoly position with an ongoing policy of leasing but refusing to sell its machinery. [20] In this case the creation of the monopoly and the cause of its durability is not identified with a single act in time, but rather with an ongoing policy of refusing to sell. Nevertheless, the user of the machine knows of the lease-only policy from the day that it is imposed.

Alternatively, consider the firm that enters into a 25-year exclusive dealing contract and then makes shipments and receives payments under the contract. Does each new shipment or payment keep the statute of limitation going on the contract? Contrast this situation with the defendant who enters short-term exclusive dealing contracts and continually renews or reasserts them, continuously refusing to deal except on an exclusive basis.

---

[20] *Hanover Shoe*, *392 U.S. at 502 n.15* (ongoing policy of insisting on leasing shoe-making machines was a continuing violation). *See also US Airways, Inc. v. Sabre Holdings Corp* ., *938 F.3d 43 (2d Cir. 2019)* (given that each subsequent anticompetitive price was pursuant to the original contracts, the continuing violation doctrine did not apply); *Bray v. Bank of Am. Corp.* , *784 Fed. Appx. 738 (11th Cir. 2019)* (payments did not serve to extend statute of limitation on old loan agreement); *Meijer, Inc. v. 3M* , *2005 WL 1660188, 2005-2 Trade Cas. P74,882 (E.D. Pa. July 13, 2005)* (3M's package discount practices were a continuing violation, so statute did not run from the date they were first initiated); *Marcus Corp. v. American Express Co.* , *2005 WL 1560484, 2005-2 Trade Cas. P74,851 (S.D.N.Y. July 5, 2005)* (statute of limitation on defendant's "all cards" policy challenged as an unlawful tying arrangement started anew with each transaction pursuant to the agreement, not simply when the plaintiffs signed their initial agreement under the policy). *Cf. Love v. National Med. Enters.* , *230 F.3d 765 (5th Cir. 2000)* (RICO challenge to alleged scheme of insurance fraud involving ongoing submission of fraudulent insurance claims; latter could be a "continuing violation" tolling the statute as to claims within four years prior to filing even if the plaintiff knew or should have known of the fraudulent scheme).In the context of pay-for-delay pharmaceutical settlements, see *Nexium (Esomeprazole) Antitrust Litigation* , *984 F. Supp. 2d 6 (D. Mass. 2013)* (cause of action in pay-for-delay pharmaceutical case accrued on "but for" date of generic entry, which was the first day that purchaser plaintiffs would have suffered an injury, thus starting statute of limitation); *Fond Du Lac Bumper Exchange, Inc. v. Jui Li Enterprise Co.* , *85 F. Supp. 3d 1007 (E.D. Wis. 2015)* (complaint sufficiently alleged continuing price-fixing violation); and *Aggrenox Antitrust Litigation* , No. 3:14-md-*2516 SRU, 2015 WL 4459607 (D. Conn. July 21, 2015)* (noting difference of opinion among courts and the *Antitrust Law* treatise on question of when a monopolist's ongoing unilateral conduct is a continuing violation while damages remain speculative). *See also XY, LLC v. Trans Ova Genetics, L.C.* , *890 F.3d 1282 (Fed. Cir. 2018)* (continuing conspiracy exception did not apply because there was no accumulating injury after plaintiff's license agreement was terminated). *See also Niaspan Antitrust Litig.* , *42 F. Supp. 3d 735 (E.D. Pa. 2014)* (each allegedly unlawful sale of drug whose prices were too high as a result of a pay-for-delay settlement restarted the statute of limitation, stating: Every court to have considered this issue in the pay-for-delay context has held that a new cause of action accrues to purchasers upon each overpriced sale of the drug. *See, e.g., K-Dur Antitrust Litig.* , *338 F. Supp. 2d 517, 549 (D.N.J. 2004)* ("Plaintiffs' claims are not barred by the statute of limitations to the extent that they bought and overpaid for K-Dur within the applicable time limitations."); *Buspirone Patent Litig.* , *185 F. Supp. 2d 363, 378 (S.D.N.Y. 2002)* ("[I]f a party commits an initial unlawful act that allows it to maintain market control and overcharge purchasers for a period longer than four years, purchasers maintain a right of action for any overcharges paid within the four years prior to their filings."); *Skelaxin (Metaxalone) Antitrust Litig.* , No. 12-md-2343, *2013 WL 2181185 (E.D. Tenn. May 20, 2013)* (holding that the plaintiffs' claims were timely because they were "overcharged for metaxalone well into the limitations period"). *Id.* at 746-47.).

Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) 320

The courts have distinguished between "independent predicate acts" that are sufficient to keep the claim alive [21] from actions that are merely "reaffirmations" of the initial act, which are not sufficient. [22] While these terms may seem helpful, they are hardly decisive in close cases. *Pace Industries* found a "mere reaffirmation" in the antitrust defendant's subsequent prosecution of a lawsuit and set the statute of limitation running from the date the lawsuit was filed. [23]

The Fifth Circuit has articulated the distinction with somewhat awkward but nevertheless helpful language. Before a subsequent act can be said to preserve an antitrust claim, that act "must be based on some injurious act actually occurring during the limitations period, *not merely the abatable but unabated inertial consequences of some pre-limitations action* ." [24] For example, it would seem that high prices following an anticompetitive merger or the creation of a monopoly are mere "inertial consequences" that one naturally expects to flow from such acts. An automatic and thus "inertial" consequence of a merger is the making of subsequent sales. By contrast, a series of ongoing meetings to correct a cartel and adjust its prices is hardly "inertial" but manifests a commitment to renewing the competitive act. Most of the decisions are consistent with these observations.

In considering whether ongoing actions are "independent" or merely "reaffirmations," the more recent decisions have paid increased attention to what the plaintiff knew or should have known when the initial act constituting the violation occurred. This is usually the best explanation for the differing treatment between naked and hidden price fixing, where courts are quick to extend the statute for ongoing payments or meetings, and vertical arrangements involving refusal to deal, tying, or exclusive dealing, where the courts show much more reluctance. In the typical cartel case, the buyer does not know about the cartel or only

---

[21] *E.g., Hugh Chalmers Motors, Inc. v. Toyota Motor Sales USA, Inc.* , 184 F.3d 761, 762-63 (8th Cir. 1999), *cert. denied* , **528 U.S. 1156 (2000)** (unspecified acts by distributor may have been a "continuing violation," under definition requiring "new and independent acts inflicting new and accumulating injury on antitrust plaintiff").

[22] *E.g., Grand Rapids Plastics, Inc. v. Lakian* , 188 F.3d 401, 406 (6th Cir. 1999), *cert. denied* , **529 U.S. 1037 (2000)**.

[23] *Pace Indus., Inc. v. Three Phoenix Co.* , 813 F.2d 234, 237 (9th Cir. 1987) ("even when a plaintiff alleges a continuing violation, an overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act"; here, last overt act was allegedly anticompetitive filing of state court action on restrictive covenant, not subsequent prosecution of suit). *See also DXS* , 100 F.3d at 467 & n.3 (distinguishing "new and independent" acts that constitute continuing violations from acts that merely "reaffirm the initial act" and are thus not continuing violations; defendant initially notified customers that it would require a safety check of equipment serviced by third parties; then it neglected to enforce the policy for a time; then it enforced it; court: had the defendant issued the notification and immediately followed through, the subsequent insistence would have been part of a continuing course of action beginning with the notification; however, because the defendant did not follow through immediately, the subsequent refusals restarted the statute); *Kaw Valley Elec. Coop. Co. v. Kansas Elec. Power Coop., Inc.* , 872 F.2d 931, 933 (10th Cir. 1989) (a ratified decision not to provide power to a rival was final, and subsequent acts of refusal merely affirmed it; statute ran from initial act); *Iron Workers Local v. Philip Morris, Inc.* , 29 F. Supp. 2d 801, 805 (N.D. Ohio 1998) (ongoing, repeated denials that cigarettes were unsafe were a continuing violation, particularly since there was evidence that the plaintiffs knew of the falsity already in the 1960s).

[24] *Al George, Inc. v. Envirotech Corp.* , 939 F.2d 1271, 1274 (5th Cir. 1991) (facts similar to those of *Pace* , 813 F.2d at 237); *Poster Exch., Inc. v. National Screen Serv. Corp.* , 456 F.2d 662, 666 (5th Cir. 1972) (statute did not run on refusal to deal where defendant repeatedly refused); *United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.* , **892 F. Supp. 890, 912 (W.D. Tex. 1995)**, *aff'd* , 89 F.3d 233 (5th Cir. 1996), *cert. denied* , **519 U.S. 1116 (1997)** (defendant conditioned sale of electronic database for real estate agents on purchase of computer; but condition had been announced more than four years prior to filing and defendant had pursued this policy continuously; statute ran from first announcement of the policy).

suspects it. By contrast, in the typical refusal to deal, tying, or exclusive dealing case, the injured party and likely plaintiff has virtually immediate knowledge of the unlawful act. The extent of a plaintiff's earlier knowledge is said to be irrelevant to the tolling question in the case of continuing violations. [25] But in fact the most reliable way to predict outcomes is to separate situations where an injured plaintiff had actual knowledge of a violating act and had suffered sufficient injury (statute not tolled) from those where the plaintiff had no knowledge or its knowledge was incomplete or imperfect (statute tolled).

**320c2.**

 *Cartel behavior* .

Consider the easy case of the price-fixing conspirators who meet once a year to adjust the cartel price or output quotas to be imposed on each cartel member. In such a case each new meeting serves to keep the cause of action alive for those injuries that occur within four years prior to the filing of an antitrust complaint. Such a case is easy because each new meeting of the cartel is independently unlawful without regard to any meeting that may have occurred previously. For example, suppose the cartel forms at a meeting on July 31, 1990, and then meets each July 31 for seven years through 1997. The purpose of the meeting is to adjust the cartel price, which may have become too high or too low in the intervening year, and to re-allocate the cartel's output allocations. [26] The plaintiff files suit late in 1999, and may take advantage of the 1997 and 1996 meetings to bring its cause of action within the limitation period. But the plaintiff would have that suit even if no meetings had occurred prior to 1997, because each new meeting of a cartel to adjust its price or output is independently illegal whether or not there were prior meetings. Indeed, in this case it can be said that the cartel members' meeting each year sets the cartel price, and thus the plaintiff's damages, for that year. Thus, for example, each new joint resolution passed by dentists not to participate in the plaintiff health insurer's prepaid dental plan started anew the four-year statute of limitation. [27]

But suppose the cartel forms in 1990 and never requires another communication among members? It keeps selling at agreed-upon prices until 1996, when a consumer files suit. Some courts conclude that each sale itself is an independent act sufficient to toll the statute. [28] Indeed, some courts do not start the statute's final run until bid-rigging conspirators have

---

[25] *See, e.g., Klehr v. A.O. Smith Corp.* , 521 U.S. 179, 189 (1997) (continuing violation "starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times," quoting an earlier version of this Paragraph).

[26] On the need for the cartel to set and subsequently control each member's output, see 2002b. *See Exhaust Unlimited, Inc. v. Cintas Corp.* , 326 F. Supp. 2d 928 (S.D. Ill. 2004) (for claim alleging that auto repair shops conspired to assess environmental charges, cause of action accrued each time the defendants imposed the charges).

[27] *Pennsylvania Dental Ass'n v. Medical Serv. Ass'n of Pa.* , 815 F.2d 270 (3d Cir.), *cert. denied* , **484 U.S. 851 (1987)**. *See also Carbon Black Antitrust Litig.* , 2005 WL 102966, 2005-1 Trade Cas. P74,695 (D. Mass. Jan. 18, 2005) (statute of limitation did not run on alleged price-fixing conspiracy when defendants committed acts in furtherance of the conspiracy well into the limitation period).

[28] *E.g., Columbia Steel Casting Co. v. Portland Gen. Elec. Co.* , 103 F.3d 1446 (9th Cir.), *amended on reh'g* , 111 F.3d 1427 (9th Cir. 1996), *cert. denied* , **523 U.S. 1112 (1998)** (where a utility agreed with another utility to stop competing in the plaintiff's

Case 3:20-cv-08570-JD   Document 689-3   Filed 11/03/23   Page 12 of 45
Page 11 of 44
Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) 320

received the last payment on their successful but illegal bid, reasoning that the "scope and purpose of the conspiracy included the receipt of payments on the contracts awarded pursuant to collusive, non-competitive bids," [29] or that receiving payment "reflected the inflated and anticompetitive price for the work" and was thus "necessary to the successful consummation of the bid-rigging agreement." [30] That the bid payments were received by an individual co-conspirator rather than by the group did not disturb either court, [31] for the conspiracy lasts until its objectives "succeed or are abandoned," and receiving payments clearly indicates the former. [32]

Even here, however, the courts tend to start the statute of limitation once the cartel becomes publicly known-for example, when one of its members is caught or convicted. [33] That is consistent with the observation made previously that courts interpret the statute of limitation much less favorably to the plaintiff with actual or objective knowledge of the offense.

In *Therm-All* the Fifth Circuit concluded that in order to obtain a criminal conviction for price fixing the government was required to show overt acts during the criminal limitation period sufficient to prove that the conspiracy existed during that period. [34] It was not enough to show merely that prices remained at the cartel level within the limitation period. A dissenter objected that in addition to continuing high prices the government had also shown that the defendants continued to exchange price information during the limitation period, a fact not mentioned by the majority. If proven, however, a continuing exchange of pricing information subsequent to the formation of a cartel could be an overt act, for it would be the means by which cartel members monitor one another's compliance with the cartel price levels.

Whether continuing high prices alone should be sufficient to toll the statute is a closer question, and the outcome could vary with the facts. First, one must be certain that the continuing higher prices were a consequence of the price-fixing agreement, not merely of higher costs. Second, some cartel administrations are more "structural" than others and may have longer-lasting price effects, making subsequent enforcement unnecessary. For

---

market in 1972, but then refused the plaintiff's request for service in 1990, the statute of limitation began to run with the 1990 refusal, not with the 1972 agreement; even assuming that the 1972 agreement was the unlawful territorial division being challenged, the 1990 refusal was an "overt act" restarting the statute).

[29] *United States v. Northern Improvement Co.* , 814 F.2d 540, 542-43 (8th Cir.), cert. denied , **484 U.S. 846 (1987)**.

[30] *United States v. A-A-A Elec. Co.* , 788 F.2d 242, 245 (4th Cir. 1986).

[31] *Id.* at 245; *Northern Improvement* , 814 F.2d at 543. Accord United States v. District of Columbia , 788 F.2d 239 (4th Cir. 1986); *United States v. Girard* , 744 F.2d 1170, 1173-74 (5th Cir. 1984).

[32] *United States v. Dynalectric Co.* , **859 F.2d 1559, 1563 (11th Cir. 1988)**, cert. denied , **490 U.S. 1006 (1989)**; *United States v. Evans & Assocs. Constr. Co.* , 839 F.2d 656 (10th Cir.), aff'd on reh'g , 857 F.2d 720 (10th Cir. 1988) (last payment within limitation period though bid-rigged contract awarded seven years before suit); *United States v. Inryco, Inc.* , 642 F.2d 290 (9th Cir. 1981).

[33] *See, e.g., Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.* , 198 F.3d 823 (11th Cir. 1999), cert. denied , **529 U.S. 1130 (2000)** (fact question as to whether plaintiffs had notice of existence of a conspiracy).

[34] *United States v. Therm-All, Inc.* , 352 F.3d 924 (5th Cir. 2003).

example, if two firms decide to divide the paint market, with one making latex water-based paint and the other oil-based paint, carrying out the agreement could require significant commitments to certain technologies, and these firms might not enter each other's markets for many years after they stop "enforcing" their market division. On the other hand, if a cartel in a competitively structured market caused overnight increases in short-term prices, one would expect prices to move back to the cartel level very quickly after cartel enforcement ceased. In the latter case but not the former, it would thus be reasonable to infer continuing acts from continuing higher prices. The cartel in *Therm-All*, which involved garden-variety price fixing of thermal insulation, seems more like the latter type. [35]

**320c3.**

**Vertical agreements and refusals to deal; Robinson-Patman violations.**

When the objective of the agreement is something less than a naked cartel, the courts become more divided. A few decisions permit mere payments to keep the claim alive. [36] But other courts have seen such tolling as unjustified. They have held that the mere receipt of franchise or lease payments under an agreement alleged to contain unlawful tying did not restart the limitations period without proof that the defendant had continuing power to force acceptance of the tie. One decision distinguished the "active enforcement of an illegal tying contract" from "the passive receipt of profits." Only the former is a sufficiently "overt act" to re-start the statute, because lease payments alone did not show that the defendant had the "ability to enforce the tie absent voluntary cooperation" by the plaintiff-that is, that the defendant had the market power that would make the alleged tie illegal. [37] Of course, if monopoly power continues, an illegal lease-only policy created a cause of action every time the monopolist re-leased and impliedly refused to sell. [38] Once again, however, each new refusal to lease when accompanied by monopoly power would have to be counted as a new violation, whether or not the defendant had previously refused. Another distinguishing feature

---

[35] In any event, the court subsequently found that the evidence that price fixing was ongoing was sufficient to toll the statute. This evidence included repeated setting of prices. *United States v. Therm-All, Inc.*, 373 F.3d 625 (5th Cir.), cert. denied, **543 U.S. 1004 (2004)**. See also United States v. Anderson, 326 F.3d 1319 (11th Cir.), cert. denied, **540 U.S. 825 (2003)** (bid rigging on three construction contracts over an eight-year period part of a single overarching conspiracy, thus bringing all within the criminal statute of limitation; here, the initial agreement expressed a willingness to cooperate on future agreements as well; while the parties were not identical in every instance, the agreements worked in the same manner).

[36] *See, e.g., Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299 (9th Cir.), cert. denied, **479 U.S. 886 (1986)** (limitation period begins anew each time defendant souvenir vendors competing with the plaintiff made payments to defendant tour operators, implementing alleged conspiracy to deny trade to the plaintiff); *National Souvenir Ctr. v. Historic Figures, Inc.*, 728 F.2d 503 (D.C. Cir.), cert. denied, **469 U.S. 825 (1984)** (statute's final run does not start until expiration of long-term lease requiring plaintiff museum operator to pay for defendant's wax figures, whether used or not, thus discouraging use of rival products and thereby allegedly implementing the defendant's attempt to monopolize the market for such figures).

[37] *Eichman v. Fotomat Corp.*, 880 F.2d 149, 160 (9th Cir. 1989). Apparently *contra: Imperial Point Colonnades Condo., Inc. v. Mangurian*, 549 F.2d 1029 (5th Cir.), cert. denied, **434 U.S. 859 (1977)** (cause of action accrues each time defendant collected rent for facilities leased to condominium on alleged tie that firmly bound plaintiffs from the day they purchased their condos). *See also Varner v. Peterson Farms*, 371 F.3d 1011, 1020 (8th Cir. 2004) (where original contract claimed to contain tying provision had not been modified, subsequent sales under the contract did not toll the statute of limitation).

[38] *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968).

between the cartel and the unlawful tie or exclusive dealing is that the likely plaintiff has almost immediate knowledge of its existence.

The best solution to the problem of long-term contracts that are unlawful, if at all, from the beginning but also known to the plaintiff, is to use the statute of limitation to bar the tardy damage action but to give flexibility in equity to permit the injunction against continued enforcement. To illustrate, suppose that the defendant imposes a 20-year requirements contract on the plaintiff that was challengeable as exclusive dealing from its inception. The purchaser who suffers injury but delays its damage action for six years has lost its opportunity to collect damages; but the public as well as the purchaser still profit from the termination of an anticompetitive arrangement. The court should permit an action declaring the contract unlawful and unenforceable. [39] This approach may be precluded if the court woodenly adopts the principle that the period for determining whether laches bars an injunction is the same as that for the statute of limitation. [40]

The cases involving refusals to deal often make "finality" decisive. Suppose, for example, that a dealer is terminated in 1990 because the manufacturer has designated a different dealer as its sole outlet in that city. [41] In 1993 the dealer requests reinstatement but is summarily denied, the manufacturer citing the exclusive outlet arrangement. Is the dealer's 1995 antitrust suit challenging the exclusive contract time-barred, or was it revitalized by the 1993 refusal?

In some cases, of course, a single refusal is all that ever occurs, and the statute runs from that instant. But in many cases the refusal is ongoing, represented either by repeated refusals to deal with the plaintiff or repeated assertions of a company policy.

An illegal unilateral refusal to deal following a termination of prior dealings or otherwise creates a cause of action when it occurs [42] or becomes final. [43] Plaintiffs are generally not allowed perpetually to restart the limitation period merely by repeated requests that the defendant refuses. Thus the limitation period continues running notwithstanding a terminated

---

[39] We would do the same thing in a case like *Weber v. Consumer's Digest, Inc.*, *440 F.2d 729 (7th Cir. 1971)*, which permitted the antitrust claimant to challenge an old restrictive covenant as unlawful when the promisee brought suit on the covenant. If the limitation period had expired before the suit was brought, the appropriate resolution would be to permit the restraint of trade issue as a defense to enforcement but not as a basis for damages.

[40] See 320g.

[41] On sole outlets, see P1650 - P1655.

[42] *E.g., Garelick v. Goerlich's, Inc.*, *323 F.2d 854 (6th Cir. 1963)* (manufacturer sent letter terminating distributor; later refused to return distributor's calls and refused reinstatement; statute ran from sending of initial letter); *Saunders v. NBA*, *348 F. Supp. 649 (N.D. Ill. 1972)* (NBA initially refused to draft plaintiff eight years prior to filing and consistently refused to draft him thereafter; statute ran from initial letter); *Norman Tobacco & Candy Co. v. Gillette Safety Razor Co.*, *197 F. Supp. 333 (N.D. Ala. 1960)*, *aff'd*, *295 F.2d 362 (5th Cir. 1961)* (first refusal to sell to wholesaler starts statute).

[43] On finality, see *Adelman v. Mercy Catholic Medical Center*, *1996 WL 635661, 1996-2 Trade Cas. P71,628 (E.D. Pa. Oct. 31, 1996)* (statute of limitation on physician's denial of staff privileges began to run when the hospital's board of directors affirmed the medical board's recommendation, thus making the decision final within the institution). *See also Creative Copier Servs. v. Xerox Corp.*, *2005 WL 2175138, 2005-2 Trade Cas. P74,929 (D. Conn. Sept. 2, 2005)* (denying motion for summary judgment on *Kodak*-style refusal to deal claim; there were sufficient facts from which fact finder could discern that Xerox's initial refusal to sell parts-see P709 -was soft and subject to exceptions, while the refusal hardened up within the limitation period).

Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) 320

dealer's new request for supplies. [44] Most courts see no continuing violation when the initial refusal to deal is "irrevocable, immutable, permanent and final." [45] They emphasize that the plaintiff's injury resulted from the initial refusal. [46] Hence, general inquiries by third-party brokers in behalf of the plaintiff, with whom the defendant had earlier refused to deal, do not restart the limitation period. [47]

An occasional court rejects the general rule, [48] but most courts restarting the statute after a new refusal to deal point to special circumstances, [49] such as a "genuine" subsequent request by one having "reason to believe the original [refusal to deal] decision ... did not still stand." [50] We dispute decisions restarting the statute any time the plaintiff remains in the

---

[44] *David Orgell, Inc. v. Geary's Stores, Inc.* , *640 F.2d 936 (9th Cir.)*, cert. denied , **454 U.S. 816 (1981)**, citing an earlier edition of this Paragraph.

[45] *Multidistrict Vehicle Air Pollution v. General Motors Corp.* , *591 F.2d 68, 72 (9th Cir.)*, cert. denied , **444 U.S. 900 (1979)**. See also *Kaw Valley Elec. Coop. v. Kansas Elec. Power Coop.* , *872 F.2d 931, 934 (10th Cir. 1989)* (refusal to share electric power confirmed in formal resolution by defendant's board of trustees was final). But see *DXS, Inc. v. Siemens Med. Sys., Inc.* , *100 F.3d 462, 467 (6th Cir. 1996)* (defendant's representations to service customers that their warranties would be voided if they used ISO's repair services represented part of a continuing, *Kodak* -style antitrust violation, thus delaying the accrual of the cause of action). *Contra Bonollo Rubbish Removal, Inc. v. Town of Franklin* , *886 F. Supp. 955 (D. Mass. 1995)* (dicta; in challenge to allegedly anticompetitive municipal trash-hauling ordinance, statute of limitation began to run not when the allegedly anticompetitive ordinance was passed, but on the last date that the plaintiff had been forced to patronize undesired facilities under the force of the statute; but by this reasoning there would be no statute of limitation on a challenge to a statute, which is obviously known to the injured plaintiff).

[46] In *Barnosky Oils, Inc. v. Union Oil Co.* , *665 F.2d 74 (6th Cir. 1981)*, defendant allegedly forced plaintiff distributor to agree not to sell to price-cutting retailer and continued to insist on compliance with that agreement although plaintiff made no requests within last four years. In *SJ Advanced Technology & Manufacturing Corp. v. Junkunc* , *627 F. Supp. 572 (N.D. Ill. 1986)*, defendant's continued refusal to deal with those who deal with plaintiff was insufficient to restart the statute.

[47] *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods* , *824 F.2d 582, 586-87 (8th Cir. 1987)*, cert. denied , **484 U.S. 1010 (1988)**.

[48] *Poster Exch., Inc. v. National Screen Serv. Corp.* , *456 F.2d 662, 666 (5th Cir. 1972)*, subsequent disposition , *517 F.2d 129 (5th Cir. 1975)*; *Bell v. Dow Chem. Co.* , *847 F.2d 1179, 1187 (5th Cir. 1988)* (a new "specific act or word of refusal" restarts limitation period). Believing the general rule inapplicable to monopolization cases, *Poster Exchange* asked the lower court to determine whether any "specific act or word" of refusal occurred within four years before suit. However, the policy of repose behind the rule seems equally applicable to all offenses. See also *Travel Agent Comm'n Antitrust Litig.* , *583 F.3d 896 (6th Cir. 2009)*, cert. denied , **562 U.S. 1134 (2011)** (allegedly collusive decision not to pay travel agent commissions did not restart the statute each time defendant acted; rather, it was reaffirmation of a previous act, thus likening the zero commission case more to refusal to deal rather than price fixing).

[49] E.g., *Braun v. Berenson* , *432 F.2d 538, 543 (5th Cir. 1970)* (defendant lessor's repeated refusal to lease new or additional space to plaintiff store owner creates new cause of action because store space is available not continuously but "only periodically and under uniquely different circumstances"); *Century Hardware Corp. v. Powernail Co.* , *282 F. Supp. 223 (E.D. Wis. 1968)*.

[50] *Midwestern Waffles, Inc. v. Waffle House, Inc.* , *734 F.2d 705, 715 (11th Cir. 1984)* (request known to be futile would not create new injury. The court's emphasis on new injury implies, contrary to other language in the opinion, that the suit would be based on the new refusal, not the original refusal. See also *LaSalvia v. United Dairymen of Ariz.* , *804 F.2d 1113 (9th Cir. 1986)*, cert. denied , **482 U.S. 928 (1987)** (subsequent refusal to deal starts statute of limitation anew if it causes additional injury); *Vincent v. Reynolds Mem'l Hosp., Inc.* , **881 F.2d 1070, 1989 WL 87633, 1989-2 Trade Cas. P68,681 (4th Cir. July 25, 1989)** (unpublished) (hospital's repeated denials of staff privileges to plaintiff physician constituted a continuing violation); *Red Lion Med. Safety, Inc. v. Ohmeda, Inc.* , *63 F. Supp. 2d 1218 (E.D. Cal. 1999)* (even though defendant's policy of refusing to sell parts was in place for some ten years prior to the filing of suit, it was a continuing violation; suggesting that a refusal to

business and tolling it only for plaintiffs completely excluded from the market by the refusal. [51] More than almost any other plaintiff, the victim of a direct refusal to deal knows immediately that it has occurred. Particularly when the legal status of the conduct is ambiguous, as it is in nearly all cases involving unilateral refusals to deal, such plaintiffs should have every incentive to bring their suit in a timely fashion, thus minimizing the social damage of any antitrust violation that is subsequently found.

Several courts have held that where the refusal to deal with the plaintiff implements an illegal contract granting exclusive privileges to the plaintiff's rivals, each refusal implementing the illegal contract restarts the limitation period. [52] Courts restarting the statute emphasize the defendant's continuing operation under an illegal contract as creating a continuing cause of action. [53] But restarting the statute seems unwise in the case of the long-term contract whose existence was known to the plaintiff from its inception. For example, most exclusive dealing arrangements are efficient, and long-term arrangements are conducive to stability in business relationships. In that case a person who both knows of the contract and feels the injury should bring its damages action within four years of the contract's formation. In any event, one must distinguish between terminated dealers and newcomers. Suppose that a supplier requires tying of its products and refuses to sell to a dealer unwilling to accept the tied product. Under many of the decisions that second dealer would have only four years to bring its suit after the termination became final. However, a newcomer wishing to be a dealer in the manufacturer's good would have no occasion for asserting an antitrust claim until a request was made to distribute the tying good but not the tied good.

The cause of action from an unlawful termination of relationships usually accrues at the time that a cancellation notice destroys or significantly reduces the value of a franchise contract. [54] However, some courts have reasoned that a mere notice of cancellation lacks legal significance until the would-be buyer places an order that the supplier refuses. [55] Although no categorical rule can properly govern every case, the key date is that on which the

---

deal becomes a final act only when it "completely and permanently" excludes the plaintiff); *Telecomm Technical Servs., Inc. v. Siemens Rolm Commc'ns, Inc.* , *66 F. Supp.2d 1306 (N.D. Ga. 1998)* (manufacturer's refusal to sell replacement parts to ISOs not time-barred even though more than four years prior to filing, where manufacturer had led ISOs to believe that it would reconsider its position and might change its mind); *Western Shoe Gallery, Inc. v. Duty Free Shoppers, Ltd.* , *593 F. Supp. 348 (N.D. Cal. 1984)* (recurring boycotts restart statute).

[51] *See, e.g., Red Lion* , *63 F. Supp.2d 1218*; *Telecomm Technical* , *66 F. Supp.2d 1306*.

[52] *Driscoll v. City of New York* , *650 F. Supp. 1522 (S.D.N.Y. 1987)* (denial of pier privileges in 1982 pursuant to a 1965 exclusive lease starts limitation period); *KFC Corp. v. Marion-Kay Co.* , *620 F. Supp. 1160 (S.D. Ind. 1985)* (action on long-term exclusive dealing contract not time-barred when contract remains in force; repeated refusals amount to continuing violation); *Woolen v. Surtran Taxicabs, Inc.* , *461 F. Supp. 1025 (N.D. Tex. 1978)* (statute restarts every time rival taxicabs denied passengers because of municipality's illegal award of taxicab monopoly).

[53] *E.g., Twin City Sportservice, Inc. v. Charles O. Finley & Co.* , *512 F.2d 1264 (9th Cir. 1975)*, *appeal after remand* , *676 F.2d 1291 (9th Cir.),* *cert. denied* , *459 U.S. 1009 (1982)*; *Baker v. F & F Inv.* , *420 F.2d 1191 (7th Cir.),* *cert. denied* , *400 U.S. 821 (1970)*; *Material Handling Indus., Inc. v. Eaton Corp.* , *391 F. Supp. 977 (E.D. Va. 1975)*.

[54] *E.g., Emich Motors Corp. v. GM* , *229 F.2d 714 (7th Cir. 1956)* (contract between automobile manufacturer and dealer provided that dealer's right to receive new cars would terminate on receipt of first notice of intention to cancel).

[55] *Pioneer Co. v. Talon, Inc.* , *462 F.2d 1106 (8th Cir. 1972)* (plaintiff had no formal contract with manufacturer or his distributor, but merely placed orders on an individual basis); *2361 State Corp. v. Sealy, Inc.* , *402 F.2d 370 (7th Cir. 1968)*.

defendant's act causes sufficiently measurable injury. Thus, once the plaintiff has been injured by an illegal act, the limitation period begins running, even though the defendant continues in its refusal to deal. [56] Although a destroyed plaintiff might subsequently have reentered the business in the absence of the continuing violation, its damages would then be based not on its destruction more than four years earlier but on the profits that reentry would have generated. [57]

Finally, many of the cases distinguish between the injuries that result from the mere imposition of an unlawful arrangement and the injuries that result from discipline for violating the arrangement. For example, suppose a franchisor unlawfully requires franchisees to take a tied product as a condition of obtaining its franchise. One franchise continues under this arrangement for many years, then stops taking the franchisor's tied product and is terminated as a result. The statute of limitation on the termination ordinarily begins to run when the termination occurs, notwithstanding that the unlawful rule leading up to the termination was in place for many years before. [58]

While the cases are not consistent, they are significantly more likely to restart the statute when the action complained of is conspiratorial rather than unilateral. For example, if a group of physicians act anticompetitively by repeatedly denying the plaintiff staff privileges at their hospital, [59] each new meeting is an unlawful act whether or not prior meetings were also unlawful.

In *Champagne Metals* the Seventh Circuit held that the statute had not run on the plaintiff's claim that the plaintiff's rivals had pressured aluminum mills, who were third parties, not to supply aluminum to the plaintiff. [60] The court observed that by its nature coercive pressure placed on a third party to facilitate a boycott was not a one-time occurrence but rather required ongoing communication. [61]

--------

[56] *Hennegan v. Pacifico Creative Serv., Inc.* , 787 F.2d 1299, 1300-01 (9th Cir.), cert. denied , **479 U.S. 886 (1986)** (subsequent operation of illegal conspiracy restarts statute only if plaintiff remains in business and continues to be injured). *See also Yeager v. Waste Mgmt., Inc.* , 1994 WL 761961, 1995-1 Trade Cas. P70,881 (N.D. Ohio Aug. 19, 1994) (when alleged conspiracy of rivals to exclude plaintiff from market eventually forced sale of plaintiff's business, the sale itself could be the last event starting limitation period, even though the last act of any defendant had been earlier; a subsequent decision found the action barred, however, because even the sale had occurred more than four years prior to filing date. *Yeager v. Waste Mgmt., Inc.* , 1994 WL 761959, 1995-1 Trade Cas. P70,882 (N.D. Ohio Sept. 30, 1994)).

[57] *Fitzgerald v. General Dairies, Inc.* , 590 F.2d 874, 875 (10th Cir. 1979). Such a plaintiff must prove, of course, sufficient preparation for reentry. See P349.

[58] *E.g., B. Sanfield, Inc. v. Finlay Fine Jewelry* , 857 F. Supp. 1241, 1994-2 Trade Cas. P70,775 (July 12, 1994) (dealer could challenge its recent termination flowing from unlawful tying arrangement created beyond limitation period).

[59] *E.g., Vincent v. Reynolds Mem'l Hosp., Inc.* , **881 F.2d 1070, 1989 WL 87633, 1989-2 Trade Cas. P68,681 (4th Cir. July 25, 1989)** (unpublished).

[60] *Champagne Metals v. Ken-Mac Metals, Inc.* , 458 F.3d 1073 (10th Cir. 2006).

[61] *See id.* at 1089: [H]ere, the agreeing parties' initial decision *did* require further action. The subsequent actions (contacting and pressuring the mills when those mills were considering recognizing Champagne) were both "distinct from the act[ ] outside the limitations period" (the agreement to effect a boycott) and a "continu[ation] [of] the same conspiracy." The Established Distributors did not simply sit back and watch as the "unabated inertial consequences" of their (alleged) anticompetitive agreement harmed Champagne; rather, their actions within the limitations period "manifest[ed] a commitment to renewing" and

Because the Robinson-Patman Act requires actual sales, [62] cases generally start the statute of limitation from the date of the last discriminatory transaction. [63] Both high-and the low-priced sales are necessary to create a price "discrimination" under the statute, so there is no violation until the last sale has occurred. One qualification is that for long-term contracts that set the discriminatory prices, the contract date rather than the sale date governs. [64] Suppose that a manufacturer enters ten-year contracts to sell widgets to *A* at a 10 percent discount from the list price and to competing dealer *B* at a 20 percent discount from list. Sales pursuant to these contracts create an ongoing discrimination, but in each case the discrimination "relates back" to the date the contracts were formed when the decision to discriminate was implemented. On roughly analogous facts the *Grand Rapids Plastics* court barred an action filed more than four years after the contracts were formed. [65] The subsequent sales under the contracts were not "new and independent" acts; they were merely "a reaffirmation of a previous act"-namely the formation of the discriminatory contracts.

### 320c4.

*Monopolization; single versus ongoing exclusionary practices* .

By contrast to the above situations, consider discrete or ongoing exclusionary practices said to constitute unlawful monopolization or attempt to monopolize. If monopolization is successful, the resulting higher prices could last for many years, although in other cases the monopolization may be of short duration. In the typical attempt case, the monopoly never materializes or is short-lived. Once the monopoly has been attained, the monopolist's setting of its own prices is a unilateral act, and even the monopolist is free to set its own prices. [66] In both monopolization and attempt cases the exclusionary practices could consist of a single act, such as the monopoly created by a wrongful patent infringement suit [67] or a finite

---

enforcing that agreement .... (Citing an earlier version of this Paragraph; citations to record omitted.) The court followed the reasoning in the Ninth Circuit's *Hennegan* decision, 787 F.2d 1299. *Champagne Metals* , 458 F.3d at 1091: As in *Hennegan* , the initial alleged decision to boycott Champagne did not-and could not-"immediately and permanently destroy" Champagne's business. Champagne did not seek aluminum from the Established Distributors but rather from the mills. The Established Distributors' initial boycott decision simply could not "completely and permanently exclude[ ]" Champagne from the market. Rather, the Established Distributors allegedly attempted to further their conspiracy by engaging in subsequent overt acts- *i.e.* , threatening and pressuring those mills that were considering recognizing Champagne. Therefore, the continuing conspiracy exception applies-the Established Distributors allegedly engaged in "new and independent act[s]" by threatening and pressuring the mills and these acts "inflict[ed] new and accumulating injury" on Champagne by causing it to be denied access to needed inputs.

[62] See P2312.

[63] *See, e.g., National Distillers & Chem. Corp. v. Brad's Mach. Prods., Inc.* , 666 F.2d 492 (11th Cir. 1982); *Hoover Color Corp. v. Bayer Corp.* , 24 F. Supp. 2d 571, 573 & n.3 (W.D. Va. 1998), *rev'd* , 199 F.3d 160 (4th Cir. 1999), *cert. denied* , **530 U.S. 1204 (2000)** (limiting damages to sales within four years prior to filing). *See also Olympia Co. v. Celotex Corp.* , 597 F. Supp. 285, 295 (E.D. La. 1984), *aff'd* , 771 F.2d 888 (5th Cir. 1985), *cert. denied* , **493 U.S. 818 (1989)** (dicta); *Chatham Brass Co. v. Honeywell, Inc.* , 512 F. Supp. 108 (S.D.N.Y. 1981).

[64] The contracting date also generally governs the determination whether two sales are sufficiently contemporaneous for purposes of the Act. See P2313.

[65] *Grand Rapids Plastics, Inc. v. Lakian* , 188 F.3d 401, 405-06 (6th Cir. 1999), *cert. denied* , **529 U.S. 1037 (2000)**.

[66] See P720.

Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) 320

period of predatory pricing. [68] Or the practice could be something that is ongoing, such as the continuous or repeated refusal to sell aftermarket parts to rivals [69] or the repeated insistence on renting but not selling one's equipment. [70]

The courts consistently hold that if the monopoly is created by a single identifiable act and is not perpetuated by an ongoing policy, the statute of limitation runs from the time of commission of that act, notwithstanding that high prices may last indefinitely into the future. Thus, for example, the limitation period for monopolization by a wrongfully filed lawsuit runs from either the date the suit is filed or the date that the suit's defendant receives the process. That date is not continued by subsequent pleadings, motions, trial, and the like. [71] The "initiation of a lawsuit is the final, immutable act of enforcement of an allegedly illegal contract. ... All subsequent acts are controlled by the exigencies of litigation, not enforcement of the contract." [72] The court demanded "a new and independent act that is not merely a

---

[67] See P709.

[68] See 7C.

[69] *Eastman Kodak Co. v. Image Technical Servs., Inc.* , 504 U.S. 451 (1992). *See Creative Copier Servs. v. Xerox Corp.* , 2005 WL 2175138, 2005-2 Trade Cas. P74,929 (D. Conn. Sept. 2, 2005) (denying summary judgment to defendant claiming that statute of limitation had run on *Kodak* -style refusal to deal).

[70] *E.g., Hanover Shoe, Inc. v. United Shoe Mach. Corp.* , 392 U.S. 481, 502 n.15 (1968); *United States v. United Shoe Mach. Co* ., 110 F. Supp. 295, 340-41 (D. Mass. 1953), *aff'd per curiam* , 347 U.S. 521 (1954).

[71] *Pace Indus., Inc. v. Three Phoenix Co.* , 813 F.2d 234, 237 (9th Cir. 1987). *See also Al George, Inc. v. Envirotech Corp.* , 939 F.2d 1271 (5th Cir. 1991) (last overt act on allegedly wrongful patent infringement suit was the filing of the suit itself); *Chest Hill Co. v. Guttman* , 1981 WL 2160, 1981-2 Trade Cas. P64,417 (S.D. Ohio May 29, 1981) (same). *See also B.V. OptischeIndustrie de Oude Delft v. Hologic, Inc.* , 909 F. Supp. 162 (S.D.N.Y. 1995) (limitation period on allegedly improperly brought patent infringement suit began to run when process was served and the duty to defend thus arose, not when the complaint itself was filed); *Northern Tr. Co. v. Ralston Purina Co.* , 1994 WL 605743, 1995-1 Trade Cas. P70,874 (N.D. Ill. Nov. 3, 1994) (statute of limitation on claim of fraudulently brought patent infringement suit began to run when the infringement suit was settled, more than four years before current claim was brought). *See also Relafen Antitrust Litig.* , 286 F. Supp. 2d 56 (D. Mass. 2003) (statute of limitation on claim that patent infringement suit was a "sham" and antitrust violation began to run on date the infringement suit was filed; however, insofar as some damages resulting from the suit may have been speculative, the statute would be tolled: [W]hen Smithkline filed suit it was entirely speculative whether *any* damages would flow because no generic-producing competitor had yet received FDA approval. In other words, whether purchasers might some day be injured because the FDA's thirty-month stay would prevent generic competitors from entering the relevant market depends on whether the FDA itself would even approve such competitors, which was unknown at the time the suit was filed. It would have been entirely speculative in early 1998 to determine how a less competitive market would lead to injuries to purchasers because it would require one to speculate as to whether there would be any competitors. *Id.* at 63. Clearly, for example, if an infringement defendant lacked standing to sue an infringement plaintiff for an antitrust violation, then the statute of limitation could not have been running during the time standing was lacking.). *Contrast Molecular Diagnostics Labs. v. Hoffmann-La Roche Inc.* , 402 F. Supp. 2d 276 (D.D.C. 2005) (criticizing and distinguishing *Relafen* , in cases where the plaintiffs are purchasers rather than competitors; in a competitor case the lawsuit itself is the injury; but in a consumer case it is the subsequent period of higher prices: Although the business of a monopolist's rival may be injured at the time the anticompetitive conduct occurs, a purchaser, by contrast, is not harmed until the monopolist actually exercises its illicit power to extract an excessive price ....So long as a monopolist continues to use the power it has gained illicitly to overcharge its customers, it has no claim on the repose that a statute of limitations is intended to provide. Thus, in this setting, as in "the context of a continuing conspiracy to violate the antitrust laws ... each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act ....As to those damages, the statute of limitations runs from the commission of the act." *Id.* at 286, quoting *Berkey Photo Inc. v. Eastman Kodak Co.* , 603 F.2d 263, 295 (2d Cir. 1979), *cert. denied* , **444 U.S. 1093**, which was in turn quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.* , 401 U.S. 321 (1971).). *Cf. Weber v. Consumer's Digest, Inc.* , 440 F.2d 729 (7th Cir. 1971) (suit to enforce allegedly unlawful noncompetition agreement is overt act starting statute).

reaffirmation of a previous act" and that inflicts "new and accumulating injury on the plaintiff." [73]

One complicating factor is the Supreme Court's *Professional Real Estate (PRE)* decision, which declared that a successful suit cannot be a "sham," and thus cannot be the basis of an antitrust violation. [74]  At least one lower court has interpreted this to mean that the existence of an antitrust violation cannot be determined until after the litigation plaintiff (subsequently, the antitrust defendant) loses the suit on the merits. [75]  However, the *PRE* court did not say that the *ex post* determination that a suit is unfounded is necessary to establish the sham, but only that an ex post determination that a suit is meritorious defeats a sham. Many nonmeritorious lawsuits intended to burden weak rivals probably never result in any finding on the merits at all; they result only the infringement defendant's abandonment of its marketing or entry plans. Further, a sham requires not merely that the plaintiff lose its lawsuit but that the lawsuit be so bad that a reasonable plaintiff would not have pursued it. [76]

Reasoning roughly similar to that applied in the infringement suits also dated a claim that the defendant monopolized by obtaining a patent fraudulently from the last overt act in the patent application process rather than from subsequent use of the patent or failure to notify officials of the invalidity. [77]  Of course, a rival cannot reasonably be expected to know of every patent that exists but has not been claimed against it, and it certainly cannot be expected to know the details about any infirmities in the patent application process. In *Wolf* the claim of fraud before the patent office was based on the patentee's failure to disclose prior art to the examiner. However, the prior art issue had been publicized in previous litigation involving the same patent although not the same plaintiff, and the court found this sufficient to start the statute of limitation. [78]

Further, infringement suits are sometimes lost because the court finds that the patent was obtained fraudulently or by inequitable conduct. In such a case a ruling that the last act establishing a violation is the fraudulent conduct seems inconsistent with a ruling

---

[72] *Pace*, *813 F.2d at 238*. The court rejected the contention that antitrust damages would be based on the costs of defending the earlier suit, which would not be known until that suit was concluded. The court also doubted the merits of the plaintiff's claim and was disturbed by the plaintiff's failure to attack the original suit directly via a counterclaim.

[73] *Ibid*.

[74] *Professional Real Estate Investors v. Columbia Pictures Indus.*, *508 U.S. 49 (1993)* ( *PRE* ); and see 205b.

[75] *Chemi SpA v. GlaxoSmithKline*, *356 F. Supp. 2d 495 (E.D. Pa. 2005)* (statute did not run on claim that antitrust defendant brought fraudulent patent infringement suit even though the suit had been brought nearly seven years before antitrust claim was filed; statute began to run when the patent was declared invalid and unenforceable; citing *PRE*, *508 U.S. 49*, for proposition that no antitrust violation exists unless the IP right has been declared invalid; "an antitrust claim based on baseless litigation requires proof that the litigation was unsuccessful, which can only be determined upon the termination of the initial action." *ChemiSpA*, *356 F. Supp. 2d at 500*, citing Herbert Hovenkamp, Mark D. Janis, & Mark A. Lemley, IP and Antitrust §11.1 (2001 & Supp. 2006).

[76] See 205b, 205d.

[77] *Wolf v. Wagner Spray Tech Corp.*, *715 F. Supp. 504 (S.D.N.Y. 1989)*.

[78] *Id.* at 507.

commencing the statute of limitation when the infringement action is filed. Finally, and perhaps most important, fraud before the patent office does not injure any private party in the antitrust sense until the patent is asserted or at least threatened against that person or firm.

In *Hanover Shoe* [79] the act of monopolization was the defendant's refusal to sell its shoe-manufacturing machinery and insistence on leasing it. The court treated this as an ongoing act of maintaining an improper monopoly and held that each refusal to sell started the statute of limitation anew. [80]

In the Second Circuit's important *Berkey Photo* decision, the plaintiff had brought one portion of its suit as a purchaser of Kodak's film and color paper. [81] The conduct that had allegedly created monopolies in the products had occurred more than four years prior to the lawsuit, but high prices did not result until long thereafter. First, the court rejected the district court's conclusion that the statute of limitation began to run from the occurrence of the exclusionary practices alleged to create the monopoly. [82] The court then noted this difference between competitor and purchaser lawsuits challenging a monopoly:

> Although the business of a monopolist's rival may be injured at the time the anticompetitive conduct occurs, a purchaser, by contrast, is not harmed until the monopolist actually exercises its illicit power to extract an excessive price. The case of predatory pricing illustrates the point clearly. As soon as the dominant firm commences such a policy, other producers, who may be driven out of the market, are injured. But, clearly, purchasers are not, for they receive the temporary boon of artificially low prices. It is only when the monopolist, having devoured its smaller rivals, enjoys the spoils of its conquest by boosting its price to excessive levels that a purchaser "feels the adverse impact" of the violation. And if the monopolist never consummates its scheme by taking this final step, the purchaser has no cause of action. [83]

But the court also added the following:

> So long as a monopolist continues to use the power it has gained illicitly to overcharge its customers, it has no claim on the repose that a statute of limitations is intended to provide. Thus, in this setting, as in "the context of a continuing conspiracy to violate the antitrust laws ... each time a plaintiff is injured by an act of the defendants a cause of

---

[79] *Hanover Shoe, Inc. v. United Shoe Mach. Corp.* , 392 U.S. 481, 502 n.15 (1968).

[80] *See also Xechem, Inc. v. Bristol-Myers Squibb Co.* , 372 F.3d 899, 902 (7th Cir. 2004) (plaintiff alleged that defendant's repeated re-filings of "orange book" extensions of its pharmaceutical patent, thus delaying plaintiff's generic entry, violated antitrust laws; assuming that each re-filing caused new injury, each one started the statute of limitation anew; "[T]hat it may be too late to complain in 2003 about what Bristol-Myers did in 1997 does not imply that it is too late to complain about what it did in 2000 or 2002; improperly prolonging a monopoly is as much an offense against the Sherman Act as is wrongfully acquiring market power in the first place"); *Meijer, Inc. v. 3M* , 2005 WL 1660188, 2005-2 Trade Cas. P74,882 (E.D. Pa. July 13, 2005) (repeated use of unlawful package discounts started limitation period anew). *Cf. Mir v. Little Co. of Mary Hosp.* , 844 F.2d 646 (9th Cir. 1988) (antitrust defendant's prior defense of plaintiff's state court complaint against denial of hospital staff privileges was not itself part of the alleged violation and thus did not restart the limitation period).

[81] *Berkey Photo, Inc. v. Eastman Kodak Co.* , 603 F.2d 263 (2d Cir. 1979), *cert. denied* , **444 U.S. 1093 (1980)**.

[82] *Id.* at 295.

[83] *Ibid.*

action accrues to him to recover the damages caused by that act ....[A]s to those damages, the statute of limitations runs from the commission of the act." [84]

That language appears to conflict with numerous decisions of other circuits holding that a "continuing violation" tolls the statute of limitation only if the acts that are alleged to continue the violation are sufficiently independent of the initial unlawful act. The monopolist's simple charging of its profit-maximizing price is a naturally expected consequence of monopoly and can hardly be said to be independent. But the court also added this limiting language:

Plainly, at the time a monopolist commits anticompetitive conduct it is entirely speculative how much damage that action will cause its purchasers in the future. Indeed, some of the buyers who will later feel the brunt of the violation may not even be in existence at the time. Not until the monopolist actually sets an inflated price and its customers determine the amount of their purchases can a reasonable estimate be made. The purchaser's cause of action, therefore, accrues only on the date damages are "suffered".... [85]

In sum, then,

(1) When the monopolist creates its monopoly by a single discrete act injuring rivals, the statute runs against the injured rivals from the time the act is committed.

(2) When the monopolist creates its monopoly by a series of repeated or reasserted acts designed to maintain its monopoly, the statute of limitation is restarted provided that the subsequent acts fall within the definition of "independent" predicate acts, as given above. An example might be the defendant who repeatedly leases and re-leases its equipment, continually refusing to sell it; [86] or the firm that engages in repeated bouts of predatory pricing in order to discipline a rival.

(3) Customers of the monopolist are not injured until after the monopolist causes them injury through higher prices, which may occur later than the exclusionary practices creating the monopoly. For example, competitors are injured immediately by predatory pricing, but customers would not be injured until much later, when the predation has done its work and the monopolist raises its price. Once customers have reason to know of the violation and their damages are sufficiently ascertainable to justify an antitrust action, the statute begins to run against them. When a §2 action is filed in a timely fashion, the customer will be able to collect damages for the four years prior to filing and will be able to rely on pre-limitation conduct in order to establish the exclusionary practices portion of a monopolization claim.

**320c5.**

---

[84] *Ibid.* , quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.* , *401 U.S. 321, 338 (1971)*.

[85] *Ibid.* The court later added: [A] purchaser suing a monopolist for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period. It should not be inferred that this ruling grants antitrust plaintiffs a license to embark on a search for Ichthyosauria-that is, on a time-warped fishing expedition. A trial court in its discretion may always "set a reasonable cut-off date, evidence before which point is to be considered too remote to have sufficient probative value to justify burdening the record with it."... Moreover, the trial court might not be without flexibility to limit the proof where delay in bringing suit may have caused injustice to the defendants. *Id.* at 296, citing P628 in a previous edition.

[86] *E.g., Hanover Shoe, Inc. v. United Shoe Mach. Corp.* , *392 U.S. 481, 502 n.15 (1968)*.

*Mergers* .

The limitation rule governing damage actions for unlawful mergers would be quite straightforward were it not for some dicta in a Supreme Court decision.   *First* , §7 of the Clayton Act makes it unlawful to "acquire," and says nothing about the independent lawfulness of post-merger prices, even if they are monopolistic. Thus the merger is unlawful under §7 only if the acquisition itself is unlawful, and the acquisition is generally public and occurs on a reasonably certain date.   *Second* , any "continuing violation" rule to the effect that each sale by the post-merger firm restarts the statute would leave mergers open to perpetual challenge. Clearly, Congress did not intend to exempt mergers from the antitrust statute of limitation. Antitrust policy generally regards mergers as efficient and thus condemns only a few, and the lines separating legal and illegal mergers are often indistinct. [87] These policy reasons militate in favor of running the statute of limitation from the date that two firms come under the degree of control necessary to cause the competitive injury in question. [88] Offsetting this is that the statute of limitation accrues only when the plaintiff has a cause of action, which requires an injury. In that case the statute of limitation cannot run until the injury occurs.

*Third* , if there is one clear case where a subsequent act is a mere "reaffirmation" rather than an "independent" predicate act, it is the ongoing sales of the post-merger firm. Every merger contemplates that the post-merger firm will continue to sell the product. To regard each sale as an independent predicate act thus deprives the notion of "independence" of all meaning. Indeed, subsequent sales are much more inherent in the merger than subsequent prosecution of a vexatious lawsuit. As noted before, the courts have rather consistently held that the statute runs from the filing of an improper lawsuit, notwithstanding that the plaintiff in that suit filed further pleadings, discovery requests, motions, and the like. [89] But many harassment suits end with the filing of an initial complaint, and each improper paper filed in an improper suit is independently sanctionable. [90] By contrast, it is hard to conceive of a merger that is not followed by subsequent sales.

Limiting merger challenges to four years following acquisition would thus seem to be a foregone conclusion were it not for a few dicta in the Supreme Court's *ITT* decision. [91] The issue was not the statute of limitation but rather the measurement of penalties for violation of a consent decree.   *ITT* had violated a previously entered antitrust consent

---

[87] See generally  WK-CHAP9.

[88] *See Midwestern Mach., Inc. v. Northwest Airlines, Inc.*  , 167 F.3d 439, 442 n.3 (8th Cir. 1999) ( *Midwest Mach. I* ) (dicta; statute of limitation will apply to damages action challenging merger of two airlines);   *accord Concord Boat Corp. v. Brunswick Corp.*  , 207 F.3d 1039 (8th Cir.),   *cert. denied* , *531 U.S. 979 (2000)* (to the extent it is relevant, H.H. was consulted by the defendant);   *Z Tech. Corp. v. Lubrizol Corp* ., 2013 WL 440109 (E.D. Mich. Feb. 5, 2013) (limitation period on merger begins to run from date of acquisition; rejecting argument that subsequent price increases reflected a way in which the defendant used the acquired assets, restarting statute).

[89]  *E.g., Pace Indus., Inc. v. Three Phoenix Co.*  , 813 F.2d 234, 237 (9th Cir. 1987).

[90] See  307e.

[91]  *United States v. ITT Cont'l Baking Co.*  , 420 U.S. 223 (1975).   *See also United States v. Beatrice Foods Co.*  , 493 F.2d 1259 (8th Cir. 1974),   *cert. denied* , *420 U.S. 961 (1975)*.

decree preventing it from acquiring further wholesale bakeries during a specified time period. The relevant enforcement provisions [92] permitted a fine of up to $5,000 for each violation of a decree. The defendant insisted that the maximum fine for a merger in violation of the decree was $5,000, while the government believed that the maximum fine should be $5,000 for each day that the acquired assets were improperly held. In siding with the government, a divided (5-4) Court relied mainly on the very sensible policy rationale that a $5,000 fine for each acquisition would be regarded by the defendant as nothing more than an "acceptable cost of violation, rather than as a deterrence to violation." [93] But the Court then added this rationale:

> We need not go beyond the Clayton Act itself to conclude that "acquisition" as used in §7 of the Act means holding as well as obtaining assets. The Act provides that the FTC, if it finds a violation of §7, can require a party to "divest itself of the stock, or other share capital, or assets, held ... contrary to the provisions of §7." *15 U.S.C. §21(b)*. Thus, the framers of the Act did not regard the terms "acquire" and "acquisition" as unambiguously banning only the initial transaction or acquisition; rather, they read the ban against "acquisition" to include a ban against holding certain assets. [94]

The language can be read to indicate that the merging firm violates §7 as long as it "holds" the unlawfully acquired assets-thus keeping the statute of limitation open until four years after these assets are divested. But the Court was not speaking of the statute of limitation question, and its logic is not persuasive on that issue. The meaning of the statutory phrase that *ITT* quoted is that *if* the plaintiff makes a timely challenge to an unlawful merger within a reasonable period, then one available remedy is divestiture. Since divestiture is an equitable remedy, the statute of limitation would not apply in any event. [95] Further, the statutory provision that the *ITT* decision quoted authorizes only the FTC and a few other federal agencies to obtain the described relief. [96] Even if it served to extend the statute of limitation as to those agencies, it would not do so for a subsequent action by a private party.

---

[92] *15 U.S.C. §§21*( *l* ) (applying to government actions generally), 45( *l* ) (applying to FTC).

[93] *ITT* , *420 U.S. at 231*.

[94] *Id.* at 240-41. The Court found support in its earlier decision in the *DuPont (GM)* case, which had permitted a government challenge many years after an acquisition occurred. *See United States v. E.I. DuPont de Nemours & Co.* , *353 U.S. 586, 597 (1957)*, which concluded that the government might bring an action any time "the acquisition threatens to ripen into a prohibited effect." But the facts in that case were that GM was a relatively small player in the automobile market at the time of the acquisition but had become a dominant firm in the intervening years. As a result, the merger was very likely lawful if analyzed as of the time it had occurred, but unlawful later. The situation would thus be analogous to one in which the post-merger firm did not exact a price increase immediately following a merger, but rather ten years afterward. In that case, a plaintiff purchaser would not be able to bring an action during the first ten years because it would have no injury. The statute would begin to run when the post-merger price increase occurred. *See ITT* , *420 U.S. at 241-42*.

[95] See 320g.

[96] The included agencies are the Surface Transportation Board (formerly Interstate Commerce Commission), Federal Communications Commission, Secretary of Transportation, Federal Reserve System, and the Federal Trade Commission. *See* *15 U.S.C. §21(a)*.

The common law doctrine of adverse possession provides a good analogy to the "acquisition" versus "holding" problem. As in the *ITT* case, the person who enters and occupies property wrongfully is guilty of a trespass not merely on the day that he enters, but also each day thereafter that he wrongfully occupies the property. Further, if a trespass or quiet title action is brought within the limitation period, the intruder can be ousted. But once the intruder has occupied the property for the statutory period, the true owner's cause of action is lost. [97] The fact that each day of occupancy constitutes a trespass, and thus a violation, does not operate so as to toll the statute of limitation forever.

A policy of restarting the limitation period each time the post-merger firm makes a sale would expose merged firms to an unlimited period of vulnerability to litigation. For example, one might challenge a 20-year-old merger on the theory that it continued to produce higher prices. The court would then have to consider not merely the merger's legality, but also the unmanageable question of whether any price above the competitive level 20 years later was caused by the merger or resulted from other factors. [98] These difficulties are precisely the reason that the statute of limitation exists.

This result is confirmed by the Supreme Court's *Rotella* decision, which applied the Clayton Act statute of limitation in a RICO case. [99] The Supreme Court held that the statute of limitation ran on the plaintiff's RICO claim from the time he discovered his injury, even though a "pattern" of corrupt practices existed that stretched far into the future. The Court observed:

> A pattern discovery rule would allow proof of a defendant's acts even more remote from time of trial and, hence, litigation even more at odds with the basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities. [100]

In *Concord Boat* the Eighth Circuit held that the statute of limitation on a merger presumably began to run at the time the merger occurred. [101] However, two things might serve to delay the running of the statute. First, as developed below, [102] if the merger caused the plaintiffs no immediate injury, then the statute would not run until quantifiable injury began. Second, while the ongoing holding or use of an unlawfully acquired asset might be a "continuing violation," [103] mere sales by the post-merger firm were insufficient to qualify as

---

[97] *See, e.g., Jarvis v. Gillespie*, 155 Vt. 633, 587 A.2d 981 (1991).

[98] *See Midwestern Mach., Inc. v. Northwest Airlines, Inc.*, 167 F.3d 439, 442 n.3 (8th Cir. 1999) (*Midwest Mach. I*) (noting problem of proving causation from a stale merger).

[99] *See Rotella v. Wood*, 528 U.S. 549 (2000). *See also Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239 (3d Cir. 2001) (applying antitrust analogies in determining that RICO statute of limitation had run).

[100] *Rotella*, 528 U.S. at 555. *See also Forbes v. Eagleson*, 228 F.3d 471 (3d Cir. 2000), *cert. denied*, 533 U.S. 929 (2001) (applying Clayton Act statute of limitation in RICO case: adopting "injury discovery" rule under which statute of limitation begins to run when the plaintiffs "knew or should have known of their injury").

[101] *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir.), *cert. denied*, 531 U.S. 979 (2000). The merger was characterized by the court as "noted throughout the boating industry" at the time it occurred. *Id.* at 1045, 1051.

[102] See 320d.

Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) 320

an anticompetitive holding. Making post-merger purchases or sales the basis for a "continuing violation" exception would effectively abolish the statute of limitation for merger. Virtually every firm contemplates that its merger will result in ongoing sales. Rather, a continuing violation occurs when the defendant uses the merger in a way that is not inherent in the acquisition itself. For example, suppose that a merger gave a firm the structural power to engage in predatory pricing. [104] A damages action challenging such a merger would fail as long as predation were merely possible or even likely. [105] As a result, the statute of limitation would not run on such a damage claim. However, once unlawful predation began and the plaintiff could show that the merger facilitated the predation, then the statute of limitation would not bar a challenge to the merger itself, in addition to the predatory pricing suit. In the present case, however, the defendant became the provider of motors to the acquired firms from the date of the merger, and this foreclosure was the basis of the claimed injury, so there was no occasion to extend the statute.

In *Midwestern Machinery II* the Eighth Circuit both restated and refined its earlier holdings. [106] In this case the plaintiff had filed suit some seven years after the acquisition but maintained that the statute should be tolled for several reasons. The first was that the defendant's merger had given it a dominant position in the Milwaukee-St. Paul airport hub, and that it used this dominance to engage in exclusionary practices. Each of these practices, it asserted, was a "continuing violation" that served to restart the statute. [107] The court noted that, while continuing violations can serve to prolong the statute, the theory had never been applied to a Clayton §7 claim. Rather, it was generally applied to Sherman §1 conspiracy claims, where new actions are needed to keep the conspiracy going. But where subsequent actions are merely the "unabated inertial" consequences of the original act, the statute of limitation continues to run. [108] The court found a well-established distinction in the case law between

"new and independent act[s] that ... inflict new and accumulating injury on the plaintiff" (which restart the statute of limitations), and unabated inertial consequences of previous

---

[103] *Concord Boat*, [207 F.3d at 1052](#).

[104] See 7C-2.

[105] See 348b ; *and see Cargill, Inc. v. Monfort of Colo., Inc.*, [479 U.S. 104 (1986)](#) (to the extent it is relevant, P.A. was consulted by the defendant).

[106] *Midwestern Mach. Co., Inc. v. Northwest Airlines, Inc.*, [392 F.3d 265 (8th Cir. 2004)](#) ( *Midwest Mach. II* ).

[107] *Id.* at 269. On continuing violations, see 320b.

[108] *Midwestern Mach. II*, [392 F.3d at 270](#), quoting *Concord Boat*, [207 F.3d at 1052](#), which was in turn quoting *DXS, Inc. v. Siemens Med. Sys., Inc.*, [100 F.3d 462, 467-68 (6th Cir. 1996)](#); and citing 320c4. As the court later explained: Even if the merger itself was unlawful, the continued existence of the merged entity is not a continuing violation: It is simply the natural unabated inertial consequence of the merger. Conducting business is presupposed by the merger itself. Selling goods and services and responding to potential competition by lowering prices (aside from predatory pricing practices that may violate §2 of the Sherman Act) or increasing product to quality are the very things that competitive firms, merged or not, are encouraged to do to provide consumers with high quality products at the lowest prices. *Midwestern Mach. II*, [392 F.3d at 271](#).

acts (which do not) allow[ ] the statute of limitations to have effect and discourage[ ] private parties from sleeping on their rights. [109]

Applying this rationale to Clayton §7, the court concluded:

> If the initial violation was the merger itself, none of the "continuing violations" Midwestern alleges can justify restarting the statute of limitations because these acts were not undertaken to further an illegal policy of merger or to maintain the merger. Otherwise, every business decision could qualify as a continuing violation to restart the statute of limitations as long as the firm continued to desire to be merged. Once the merger is completed, the plan to merge is completed and no overt acts can be undertaken to further that plan. [110]

That reasoning appears to be that a merger might create a dominant position and permit a firm to engage in exclusionary practices. But these practices would then be independent violations of §2 of the Sherman Act, not "continuing violations" of the law against mergers, which prohibits only acquisitions. "Unlike a conspiracy or the maintaining of a monopoly, a merger is a discrete act, not an ongoing scheme." [111] As the court noted, applying the plaintiff's rationale could make a firm answerable for mergers almost indefinitely, if it subsequently engaged in a practice that could somehow be tied to the merger as a structural predicate. As the court explained:

> Admittedly, a pro-competitive merger and an anti-competitive one are hard to discern from each other, but exposing a firm to perpetual liability under the Clayton Act simply because its business history includes a merger would chill pro-competitive business combinations. Finding that a continuing violation theory does not apply to §7 does not give a "green light" to monopolists, as Midwestern claims, because merged firms, like all firms, are still subject to the Sherman Act's prohibitions on monopolization or attempts to monopolize. [112]

Nevertheless, in such a case it is the acquisition that facilitates the exclusionary practice, and spinning off the acquired asset may be an appropriate remedy. Perhaps this problem is best addressed by considering the exclusionary practice independently under §2, and then the spinoff as part of the remedy, in which case the statute of limitation on the §7 claim would not be relevant. Even then, there could be cases in which the exclusionary practice is not independently actionable under §2 but the competitive harm results from the exclusion. In that case the statute should run from the date of the exclusionary act facilitated by the merger. In any event, while causation is usually difficult to establish for a price increase occurring many years after a merger, the same thing is not necessarily true of an exclusionary practice that involves use of the acquired asset.

The plaintiff also alleged that the statute of limitation on the merger was tolled under a "holding and use" theory that the Supreme Court had appeared to endorse in the previously

---

[109] *Midwestern Mach. II* , *392 F.3d at 271*, quoting  *Pace Indus., Inc. v. Three Phoenix Co.* , *813 F.2d 234, 238 (9th Cir. 1987)*.

[110] *Ibid.*

[111] *Id.*  at 271.

[112] *Id.*  at 272.

discussed *ITT* decision. [113] Under this theory the holding and subsequent anticompetitive use of an acquired asset could restart the statute of limitation on the merger itself. The court also distinguished the *DuPont* case, which had permitted the government to challenge a merger several decades after it had occurred. However, in that case GM had only a negligible market share at the time of the acquisition and did not become a dominant player in the automobile market until many years later. [114] In the present case, by contrast, any anticompetitive threat from the Northwest-Republic airline merger would have been apparent immediately. [115]

The Eighth Circuit's resolution of this issue creates the superficially unsatisfactory situation that a merger whose competitive threat is reasonably predictable at the time of the acquisition is subject to a strict four-year limitation period from the date of the acquisition. By contrast, a merger that seems completely harmless at the date of the acquisition could be made subject to indefinite challenge if the firm should thereafter acquire a market position enabling exclusionary or other anticompetitive practices. In a case such as *Steves*, which raised the issue mainly under the doctrine of laches, [116] the harm was caused by a refusal to deal that occurred subsequent to the merger. [117] It bears repeating that a plaintiff does not have a cause of action, and as a result the statute does not run, until it has suffered actionable injury. Thus while the rule tying the statute of limitation in merger cases to the date of the merger is strong, it must nevertheless be regarded as presumptive.

*Steves* aside, in most cases causation or injury caused by the merger would be impossible to establish after a long period of time had elapsed. But it is hard to justify a policy making plainly beneficial mergers subject to challenge for a longer time than mergers that plausibly threaten competition at the time they occur.

Perhaps for this reason the *Midwestern Machinery* court added the requirement that someone seeking to toll the statute under a "holding and use" theory must also show that the acquired assets were being used in a different way at the time of the challenge than was initially contemplated at the time of the merger, and that this new use was the one that injured the plaintiff. [118] This theory also seems implicit in existing nonmerger case law. The plaintiff who has not suffered any injury has no cause of action, and thus the statute does not

---

[113] *Id.* at 272-73, citing *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 240 (1975); and *United States v. DuPont de Nemours & Co.*, 353 U.S. 586 (1957).

[114] As the court noted, the issue in *DuPont* was not the running of the statute of limitation, which does not run in an equity action, but rather whether substantive illegality under §7 could be based on post-merger changes in market position. See P1205.

[115] See the dissent, *Midwestern Mach. II*, 392 F.3d at 278-79.

[116] See 320g.

[117] *Steves & Son, Inc. v. JELD-WEN, Inc*., 988 F.3d 690 (4th Cir. 2021).

[118] *Midwestern Mach. II*, 392 F.3d at 273: [T]he statute of limitations must begin to run at some point in order for the time bar to have any effect and to give repose to merged firms. If assets are used in a different manner from the way that they were used when the initial acquisition occurred, and that new use injures the plaintiff, he or she has four years from the time that the injury occurs to sue.

run. [119]  A cause of action accrues, and thus the statute of limitation begins to run only when the plaintiff suffers an injury recognized by §4 of the Clayton Act. [120]

Finally, the court rejected the plaintiff's argument that the statute of limitation should be tolled because the plaintiff's damages were only speculative at the time of the merger but had become sufficiently certain only in later years. [121]  In brief, the plaintiff did not claim that it did not suffer any damages at the time of the merger. Rather, it believed that it subsequently suffered damages that were not foreseeable at the time the merger occurred. As the court noted, however, if the plaintiff had filed a timely suit and obtained equitable relief, these future damages would not have occurred at all:

> Injuries caused by a merger, of course, might not materialize until after the four-year limitation period has expired. In that case, the plaintiff has not been injured yet, and the statute of limitations does not begin to run until the plaintiff suffers injury. But where the plaintiff's injury is immediate (as Midwestern's was according to the class representatives), the statute of limitations begins to run at that time. The limitations period begins when "present or future damages become definite enough to support a recovery." The total extent of the alleged damages, including future damages, was unknown at that time, but damages that could be claimed existed. Midwestern, had it filed suit during the four years following the merger, would have been able to recover the damages it had already suffered if the court found that Northwest's merger with Republic violated the Clayton Act. [122]

In brief, under the Eighth Circuit ruling, the statute of limitation ordinarily runs on a merger from the date of acquisition. It might not run if the merger is not anticompetitive *at all* at the time of the acquisition, thus producing no cause of action, but the post-merger firm subsequently acquires the ability to engage in anticompetitive practices, *and* this ability can be causally linked to the merger. Second, the statute might not be tolled if the merger caused the plaintiff no injury at the time it occurred, but subsequently the acquired assets were used in an anticompetitive way not contemplated at the time of the acquisition and caused the plaintiff injury. Once again, this subsequent and new use must be causally linked to the merger.

### 320c6.

### *Limitation on damages rather than cause of action* .

Even in the case of the continuing conspiracy or violation, where the defendants violate the law repeatedly by continuing in a bid-rigging or similar scheme, plaintiffs are ordinarily limited

---

[119] See  320b.

[120] The court also rejected the plaintiff's argument that "market power" acquired by a merger could be an "asset" within the meaning of §7 of the Clayton Act.  *Midwestern Mach. II* , *392 F.3d at 273*. In any event, the plaintiff did not show that Northwest's market power was used any differently in subsequent years than had been contemplated at the time of the merger.

[121] *Id.*  at 274-75. On speculative damages tolling the statute, see  320d.

[122] *Midwestern Mach. II* , *392 F.2d at 276*, citing Concord Boat  *Corp. v. Brunswick Corp.* , *207 F.3d 1039, 1051 (8th Cir.)*, *cert. denied* , **531 U.S. 979 (2000)**, and quoting  320d.

to damages for the four years immediately preceding the filing of their lawsuit. [123] The Supreme Court's *Klehr* decision discussed in 320c7 makes this clear. By the same token, where it is difficult to pinpoint which recent acts implementing an unlawful conspiracy caused which damages, the plaintiff has been allowed to recover all damages occurring during the four years preceding suit. [124] Of course, if the damages all occurred more than four years earlier, the plaintiff is time-barred notwithstanding continuation of the defendant's violation. [125]

## 320c7.

### *Continuing actions but no additional injury;* **Klehr** *decision* .

In *Klehr* the Supreme Court considered the application of the Clayton Act's statute of limitation to allegedly continuing violations. [126] While the substantive claim was under the Racketeer Influenced and Corrupt Organization Act (RICO), [127] the Supreme Court had previously held that this statute incorporated the federal antitrust limitation provision for damage actions. [128] In this case the basis of the substantive claim was alleged misrepresentation of a defective product. The defendant had sold the plaintiffs a silo advertised to limit the contact of silage with oxygen, thus reducing mold. That sale was in 1974, but the defective product claim was not filed until 1993, nearly 20 years later. However, the plaintiffs alleged that misrepresentations about the silo had been made not only at the time it was sold, but on an ongoing basis many times thereafter, when they had been assured by the seller that the silo was operating as intended. Further, the parts of the silo where the growing mold could be observed bore a warning "Danger: Not Enough Oxygen to Support Life." [129] As a result, the Klehrs were warned away from inspecting those parts of the silo that might have revealed an abundance of mold contaminating the feed and injuring the plaintiffs' cattle. This, the plaintiffs alleged, amounted to fraudulent

---

[123] *See Johnson v. Nyack Hosp.* , *891 F. Supp. 155, 162 & n.5 (S.D.N.Y. 1995)*, *aff'd* , *86 F.3d 8 (2d Cir. 1996)* (contrasting limitation provisions of antitrust and civil rights statutes; under latter, the existence of a continuous practice and policy of discrimination delays the commencement of the statutory period-for example, if one continuously refused to deal on the account of race; by contrast, in antitrust, each refusal or act in furtherance of the wrongful scheme "begins a new limitations period but does not reach back to render timely claims based on acts outside the statutory limitation period").

[124] *Hoopes v. Union Oil Co.* , *374 F.2d 480, 486 (9th Cir. 1967)* (that operative force of restrictive "lease-leaseback" agreements terminated prior to statutory period did not bar claim based on wider course of conduct, including acts that continued beyond filing of complaint, designed to preclude plaintiff from selling or leasing retail station free of exclusive dealing condition); *Delta Theaters, Inc. v. Paramount Pictures, Inc.* , *158 F. Supp. 644 (E.D. La.)*, *appeal dismissed* , **259 F.2d 563 (5th Cir. 1958)** (conspiracy limiting availability of quality films to plaintiff).

[125] *E.g., Baldwin v. Loew's, Inc.* , *312 F.2d 387 (7th Cir. 1963)* (limitation period ran from unfavorable lease executed as a result of defendant's conspiracy, not from later renewal under that lease).

[126] *Klehr v. A.O. Smith Corp.* , *521 U.S. 179 (1997)*.

[127] *18 U.S.C. §§1961*-*1968*.

[128] *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.* , *483 U.S. 143, 156 (1987)*.

[129] *Klehr* , *521 U.S. at 184*.

concealment. The Circuit Court rejected those theories and found that the plaintiffs' claim had accrued some time in the 1970s. [130]

The accrual rule the plaintiffs wanted the Supreme Court to adopt was the Third Circuit's "last predicate act" rule, which stated that

> [if] as a part of the same pattern of racketeering activity, there is further injury to the plaintiff or further predicate acts occur ... the accrual period shall run from the time when the plaintiff knew or should have known of the last injury or the last predicate act which is part of the same pattern of racketeering activity. *The last predicate act need not have resulted in injury to the plaintiff* but must be part of the same "pattern." [131]

As the Supreme Court described the impact of this rule before rejecting it,

> as long as Harvestore [the defendant] committed one predicate act within the limitations period (i.e., the four years preceding suit), the Klehrs can recover, not just for any added harm caused them by that late-committed act, but for all the harm caused them by all the acts that make up the total "pattern." [132]

The Supreme Court's first criticism of the "last predicate act" rule was that it effectively created a significantly longer limitation period than Congress intended:

> Because a series of predicate acts (including acts occurring at up to 10-year intervals) can continue indefinitely, such an interpretation, in principle, lengthens the limitations period dramatically. It thereby conflicts with a basic objective-repose-that underlies limitations periods ....Indeed, the rule would permit plaintiffs who know of the defendant's pattern of activity simply to wait, "sleeping on their rights,"... as the pattern continues and treble damages accumulate, perhaps bringing suit only long after the "memories of witnesses have faded or evidence is lost." [133]

Second, the Court found the "last predicate act" rule to be

> inconsistent with the ordinary Clayton Act rule, applicable in private antitrust treble damage actions, under which "a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." [134]

However, the Court hastened to add:

> We do not say that a pure injury accrual rule always applies without modification in the civil RICO setting in the same way that it applies in traditional antitrust cases. For example, civil RICO requires not just a single act, but rather a "pattern" of acts. [135]

---

[130] *Id.* at 185-86. *See Klehr v. A.O. Smith Corp.*, *87 F.3d 231 (8th Cir. 1996)*.

[131] *Keystone Ins. Co. v. Houghton*, *863 F.2d 1125, 1130 (3d Cir. 1988)* (emphasis added).

[132] *Klehr*, *521 U.S. at 186-87*.

[133] *Id.* at 187, citing and quoting numerous decisions.

[134] *Id.* at 188, quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, *401 U.S. 321, 338 (1971)*; and citing this Paragraph in the previous edition and 1 Calvin W. Corman, Limitation of Actions §6.5.5.1, at 449 (1991).

[135] *Id.* at 188. However, the Supreme Court's subsequent decision in *Rotella*, *528 U.S. 549 (2000)*, largely eliminated the plaintiff's ability to rely on subsequent acts constituting a "pattern" once its injury was known.

The court then noted:

> The Clayton Act helps here because it makes clear precisely where, and how, the Third Circuit's rule goes too far. Antitrust law provides that, in the case of a "continuing violation," say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, "each overt act that is part of the violation and that injures the plaintiff," e.g., each sale to the plaintiff, "starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times."... [136]  But the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period. [137]

Thus, for example, suppose the defendants formed a price-fixing conspiracy and made their first sale to the plaintiff in 1985. The plaintiff later purchased from the same cartel in 1987, 1989, and 1990. In 1992 it discovered the cartel and filed suit. The two propositions that *Zenith* makes clear are that (1) the statute of limitation does not run on the cartel and all its subsequent activities simply because the cartel was first formed in 1985, seven years before suit; however, (2) the plaintiff's damage claim will be limited to those acts of the cartel that both damaged the plaintiff and occurred within the four years prior to the suit. Thus the plaintiff will be able to recover for injury caused by the 1989 and 1990 sales, but not by the 1985 and 1987 sales. Theoretically, at least, a "last predicate act" interpretation would place within the damage claim all sales dating back to 1985, for in this case the 1990 cartel sale is a predicate act of the 1985 cartel. But "the plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." [138]

The distinguishing feature of the case at bar was that while the defendants may have continued to make misrepresentations and publish misleading brochures about their allegedly defective silo, these subsequent misrepresentations differed from the ongoing cartel case in one important respect: they did not cause the plaintiffs any additional injury. They did not deal further with the defendant after purchasing their silo, and all of the defects causing the alleged injury were inherent in the silo as initially sold to them. [139]

**320d.**

**Damages speculative or not immediate;   *Zenith* .**

The Clayton Act §4 damage action ordinarily accrues on the occurrence of conduct violating the antitrust laws and injuring the plaintiff. At that point, however, the plaintiff's damages might be too speculative to support any actual damage award. [140]  Thus, a four-year period

---

[136] Citing this Paragraph in an earlier edition;   *Zenith* , *401 U.S. at 338*;   *Hanover Shoe, Inc. v. United Shoe Mach. Corp.* , *392 U.S. 481, 502 n.15 (1968)*; and lower court decisions.

[137] *Klehr* , *521 U.S. at 189-90*, citing   *Zenith* , *401 U.S. at 338*.

[138] *Id.*  at 190.

[139] *Ibid.* : "as the Court of Appeals pointed out, [the plaintiffs] have not shown how any new act could have caused them harm over and above the harm that the earlier acts caused," citing *87 F.3d 231, 239 (8th Cir. 1996)*.

beginning at the ordinary point might be partly or wholly exhausted before the plaintiff's damages became definite enough for any recovery. Starting the statute at a later time, however, requires the tribunal to speculate about when the damages became non-speculative.

Without attending to that difficulty, the Supreme Court declared in *Zenith*,

> In antitrust and treble-damage actions, refusal to award future profits as too speculative is equivalent to holding that no cause of action has yet accrued for any but those damages already suffered. In these instances, the cause of action for future damages, if they ever occur, will accrue only on the date they are suffered; thereafter the plaintiff may sue to recover them at any time within four years from the date they were inflicted. [141]

The *Zenith* language is somewhat obscure. It might start the limitation period running when (1) an illegal act inflicts damage (at least when the damage period has not entirely run out); or (2) provable damage occurs (perhaps long after future damages become adequately provable); or (3) present or future damages became definite enough to support a recovery. [142] The first reading produces unacceptably arbitrary results where the damages occur or become provable very near the end of the four-year period. The second reading [143] extends the limitation period longer than necessary to accommodate the *Zenith* Court's rationale and concern.

The third reading thus seems to be the correct interpretation and has been adopted by nearly all decisions. The courts thus distinguish the uncertainty that prevents any recovery and shows that no cause of action has yet arisen from the mere uncertainty in damage measurement:

> The former denotes failure to establish an injury, while the latter denotes imprecision with regard to the scope or extent of the injury. The question of whether there is a right to recovery is not to be confused with the difficulty in ascertaining the scope or extent of the injury. [144]

Thus the alleged manipulation of a public market generated a cause of action on the day the market collapsed and the fact of injury appeared, even though the exact amount of damages was not yet known. [145] Similarly, the statute began to run when the defendant undertook predatory pricing and refused access to certain services many years ago, because damages

---

[140] See P340.

[141] *Zenith*, 401 U.S. at 339-40.

[142] *See* Malcolm E. Wheeler & Robert J. Jones, *The Statute of Limitations for Antitrust Damage Actions: Four Years or Forty?*, 41 U. Chi. L. Rev. 72 (1973).

[143] *See Ansul Co. v. Uniroyal, Inc.*, **448 F.2d 872 (2d Cir. 1971)**, *cert. denied*, **404 U.S. 1018 (1972)** (where plaintiff was terminated by defendant in 1963 for failure to adhere to illegal retail price maintenance program and suit was brought in 1968, plaintiff could recover damages falling within the four-year limitation period that could not have been proved with reasonable certainty in 1963).

[144] *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 240 (9th Cir. 1987). *See also Poster Exch., Inc. v. National Screen Serv. Corp.*, 456 F.2d 662, 666 (5th Cir. 1972); *cf. Railing v. United Mine Workers*, 445 F.2d 353 (4th Cir. 1971).

[145] *Camotex, S.R.L. v. Hunt*, 741 F. Supp. 1086 (S.D.N.Y. 1990).

were sufficiently capable of estimation at that time, even though lost profits continued much later. [146] By contrast, those entitled to royalties from coal production were allowed to sue more than four years after an alleged conspiracy to fix coal prices, on the ground that royalties could not be determined until the coal was actually produced. [147]

One must wonder about the practical ability of the courts to apply the *Zenith* exception. In suits occurring more than four years after the defendant's acts injuring the plaintiff, the present judge must determine the point at which a hypothetical earlier judge would have held the plaintiff's claim to be too speculative. [148] But, of course, there is no earlier record. The present determination must then be made on a hypothetical set of proofs that are themselves speculative. That degree of refinement in fact finding is seldom possible. Accordingly, the simplicity of the ordinary accrual rule may be preferable, at least in close cases.

An important corollary of the *Zenith* rule is that when the defendant commits an antitrust violation at time T1 but the plaintiff suffers no injury at all until time T2, the statute runs only from the latter time. For example, suppose that the defendant begins a predatory pricing campaign in 1997 and drives its last rival out of business at the end of 1998. The defendant then raises prices to monopoly levels in 1999. For rivals driven out of business, the statute runs from the inception of the predation campaign, for their injury results from the defendant's predatorily low prices. By contrast, consumers are not injured until 1999, when the defendant's predation has succeeded and it raises its prices to monopoly levels. For those consumers the statute of limitation runs from the later date. [149]

In *Concord Boat* [150] the Eighth Circuit recognized this possibility in a merger suit. In some cases the injury caused by a merger might not occur until many years after the transaction was completed. However, the basis of the merger challenge in this case was foreclosure-that after the merger the defendant supplied its newly acquired subsidiaries exclusively, denying rivals the opportunity to do so. [151] Damage from the alleged foreclosure was immediate, and the plaintiffs had presented a damages study that quantified their damages for each year since the merger occurred. As a result, the statute began to run from the date of the merger and would not be tolled under the *Zenith* exception. [152]

**320e.**

---

[146] *North Carolina Elec. Membership Corp. v. CP&L Co.* , 780 F. Supp. 322 (M.D.N.C. 1991).

[147] *Texas Utils. Co. v. Santa Fe Indus., Inc.* , 627 F. Supp. 44 (D.N.M. 1985).

[148] *Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp.* , 546 F.2d 570 (4th Cir. 1976) (time-barred claim); *Monona Shores, Inc. v. U.S. Steel Corp.* , 374 F. Supp. 930 (D. Minn. 1973) (same).

[149] See the discussion of *Berkey Photo, Inc. v. Eastman Kodak Co.* , 603 F.2d 263, 295 (2d Cir. 1979), *cert. denied* , **444 U.S. 1093 (1980)**.

[150] *See Concord Boat Corp. v. Brunswick Corp.* , 207 F.3d 1039 (8th Cir.), *cert. denied* , **531 U.S. 979 (2000)**.

[151] On this basis for challenging vertical mergers, see P1004.

[152] *Concord Boat* , 207 F.3d at 1050-52. The court gave the benefit of the doubt to some firms whose injuries may not have begun until four years after the merger; however, their suit was still filed outside the limitation period.

## Fraudulent concealment.

The general doctrine that the statute of limitation does not run while the defendant's offense is "fraudulently concealed" [153] has been adopted in antitrust litigation. [154] The root idea is simply that concealment should neither reward the wrongdoing defendant nor deprive the unknowing plaintiff of its compensation. Because of its exceptional character, the plaintiff has the burden of establishing the requisite elements of the doctrine [155] -namely, concealment that was fraudulent. [156]

The concealment requirement is satisfied only if the plaintiff shows that it neither knew nor, in the exercise of due diligence, could reasonably have known of the offense. When a plaintiff has actual knowledge or reason to know of the violation, he or she can no longer claim fraudulent concealment, and the statute runs. [157] A few decisions have seemed willing to toll the statute unless the plaintiff knows or should know sufficient facts to plead a cause of action. [158] Other courts deny the exception when the plaintiff knew enough to excite reasonable suspicions and hence to induce further inquiry. [159] But if reasonable further

---

[153] *E.g., Holmberg v. Armbrecht* , *327 U.S. 392 (1946)*; *Exploration Co. v. United States* , *247 U.S. 435 (1918)*; *Bailey v. Glover* , *88 U.S. 342 (1874)*.

[154] *E.g., GE v. San Antonio* , *334 F.2d 480 (5th Cir. 1964)*; *Westinghouse Elec. Corp. v. Burlington* , *326 F.2d 691 (D.C. Cir. 1964)*; *Westinghouse Elec. Corp. v. Pacific Gas & Elec. Co.* , *326 F.2d 575 (9th Cir. 1964)*; *Atlantic City Elec. Co. v. GE* , *312 F.2d 236 (2d Cir. 1962)*, *cert. denied* , *373 U.S. 909 (1963)*.On fraudulent concealment under the five-year limitation provision for criminal antitrust violations, see *United States v. Hayter Oil Co.* , *51 F.3d 1265, 1270-71 (6th Cir. 1995)* (government "is only required to prove that the agreement existed during the statute of limitations period and that the defendant knowingly entered into that agreement." Further, "[p]roof of an overt act taken in furtherance of the conspiracy within the statute of limitations period would clearly demonstrate the continued existence of the conspiracy. ... [O]nce a conspiracy has been established, it is presumed to continue until there is an affirmative showing that it has been abandoned." However, in finding that the statute had not run, the court also noted telephone calls about allegedly cartelized gas prices that occurred during the limitation period.).

[155] *E.g., Akron Presform Mold Co. v. McNeil Corp.* , *496 F.2d 230 (6th Cir.)*, *cert. denied* , **419 U.S. 997 (1974)**; *Detroit v. Grinnell Corp.* , *495 F.2d 448 (2d Cir. 1974)*; *Dayco Corp. v. Firestone Tire & Rubber Co.* , *386 F. Supp. 546 (N.D. Ohio 1974)*, *aff'd* , *523 F.2d 389 (6th Cir. 1975)*.

[156] *See, e.g., Hamilton Cnty. Bd. of Cnty. Comm'rs v. NFL* , *445 F. Supp. 2d 835 (S.D. Ohio 2006)*, *aff'd* , *491 F.3d 310 (6th Cir. 2007)* (antitrust claims arising from NFL and member team's negotiation of stadium lease were barred by statute of limitation where no acts of fraudulent concealment were shown). *Cf. Copper Antitrust Litig.* , *436 F.3d 782 (7th Cir. 2006)* (fraudulent concealment could be inferred from facts that defendant provided false information to authorities indicating that certain trades were authorized when in fact they were not; offered "innocent alternative explanations" to explain away events that might have created suspicions of price fixing; affirmatively instructed other alleged co-conspirators not to provide evidence concerning the conspiracy; and, in violation of its own record retention policy, destroyed certain documents having to do with its representations to the press; denying summary judgment on this issue).

[157] *Stolow v. Greg Manning Auctions, Inc.* , *258 F. Supp. 2d 236 (S.D.N.Y. 2003)*, *aff'd* , *80 Fed. Appx. 722, 2003 WL 22717684, 2003-2 Trade Cas. P74,210 (2d Cir. Nov. 17, 2003)* (unpublished) (fraudulent concealment did not toll statute when plaintiff admitted he had actual knowledge of the conspiracy during statutory period).

[158] *Forbes v. Greater Minneapolis Area Bd. of Realtors* , *61 F.R.D. 416 (D. Minn. 1973)*.

[159] *See Wood v. Carpenter* , *101 U.S. 135, 141, 143 (1879)*; *Alba v. Marietta Mem'l Hosp.* , **202 F.3d 267, 2000 WL 32031, 2000-1 Trade Cas. P72,774 (6th Cir. Jan. 6, 2000)** (unpublished) (physician whose attorney suspected that there was an anticompetitive motive to hospital board's restrictions on plaintiff's privileges, but who failed to act promptly, did not exercise due diligence; rejecting claim that earlier suit would have been futile because peer review documents were thought at the time not to

Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) 320

inquiry would not have revealed the offense, the plaintiff is not time-barred. [160]  Of course, the plaintiff will be time-barred where his or her own prior complaints to public officials demonstrated awareness of adequate facts about the alleged offense [161] or where sufficient data about the offense were available in public records. [162]  Once the plaintiff begins to suspect a violation that could have been detected with due diligence, the statute of limitation ordinarily begins to run. [163]

In its *Klehr* decision the Supreme Court considered whether

affirmative continuing acts of fraud ... coupled with active coverup of the fraud, act to equitably toll the statute of limitations... *whether or not* Petitioners have exercised reasonable diligence to discover their claim. [164]

---

be subject to discovery);  *Southwire Co. v. J.P. Morgan Chase & Co.* , *307 F. Supp. 2d 1046, 1062 (W.D. Wis. 2004)*, *aff'd in part, rev'd in part* , *436 F.3d 782 (7th Cir. 2006)* (statute of limitation began to run on conspiracy claim when new reports were published that Commodities Futures Trading Commission was launching investigation, not three years later, when a different party filed a lawsuit);  *Insulate SB, Inc. v. Advanced Finishing Sys* ., 2014 WL 943224 (D. Minn. Mar. 11, 2014) (fraudulent concealment did not toll statute when plaintiffs could not show that they had exercised due diligence and an FTC action put them on notice of their antitrust claim);  *Copper Mkt. Antitrust Litig.* , *2003 WL 22495750, 2003-2 Trade Cas. P74,165 (W.D. Wis. Aug. 20, 2003)* (plaintiffs were put on notice of conspiracy when articles revealing it were published in the  *New York Times* );  *Monosodium Glutamate Antitrust Litig.* , *2003 WL 297287, 2003-1 Trade Cas. P73,963 (D. Minn. Feb. 6, 2003)* (fraudulent concealment tolled statute of limitation on defendants' alleged price-fixing conspiracy; the purchasers' due diligence was not undermined by publication a few years earlier of an article that spoke of a government investigation into lysine price fixing even though the article mentioned that the investigation might spill over into other unnamed products);  *Vitamins Antitrust Litig.* , *2000 WL 1475705, 2000-1 Trade Cas. P72,914 (D.D.C. May 9, 2000)* (affirmative acts of fraudulent concealment by one co-conspirator could be attributed to all, thus tolling the statute as to all).  *See also Johnson Controls v. Exide Corp.* , *129 F. Supp. 2d 1137 (N.D. Ill. 2001)* (limitation barred Robinson-Patman Act claim; rejecting fraudulent concealment claim on 12(b)(6) motion where statute had run and complaint made clear that plaintiff filed its action at least seven months after the alleged acts of fraudulent concealment were known to it);  *National Music Ctrs. of Am., Inc. v. Kimball Int'l, Inc.* , *1990 WL 157374, 1990-2 Trade Cas. P69,207 (M.D. Pa. Aug. 29, 1990)* (inquiry necessary once one learns facts calculated to excite inquiry).  *See also Processed Egg Products Antitrust Litig* ., *931 F. Supp. 2d 654 (E.D. Pa. 2013)* (plaintiffs pleading fraudulent concealment and asserting discovery rule under several states' discovery rules must allege a specific date from which statute was tolled).

[160]  *See Glazer Steel Corp. v. Toyomenka, Inc.* , *392 F. Supp. 500 (S.D.N.Y. 1974)*.

[161]  *Starview Outdoor Theatre, Inc. v. Paramount Film Distrib. Corp.* , *254 F. Supp. 855, 857 (N.D. Ill. 1966)*.

[162]  *Dayco Corp. v. Firestone Tire & Rubber Co.* , *386 F. Supp. 546 (N.D. Ohio 1974)*, *aff'd* , *523 F.2d 389 (6th Cir. 1975)* (congressional hearings and FTC proceedings);  *Willmar Poultry Co. v. Morton-Norwich Prods., Inc.* , *520 F.2d 289 (8th Cir. 1975)*, *cert. denied* , *424 U.S. 915 (1976)* (U.S. Tariff Commission report);  *Gaetzi v. Carling Brewing Co.* , *205 F. Supp. 615 (E.D. Mich. 1962)* (Canadian government report).  *See also Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.* , *198 F.3d 823, 834-35 (11th Cir. 1999)*, *cert. denied* , *529 U.S. 1130 (2000)* (newspaper articles stating that defendants had been indicted for bid rigging in milk sales to schools did not put a different class of customers-ordinary retailers-on notice of price fixing by the same defendants; doctrine of fraudulent concealment does not require that "notice of one wrong by a defendant triggers a duty for potential plaintiffs to investigate all other potential wrongs the defendant might be committing").

[163]  *Pinney Dock & Transp. Co. v. Penn Cent. Corp.* , *838 F.2d 1445, 1480 (6th Cir.)*, *cert. denied* , *488 U.S. 880 (1988)*.  *See also Re/Max Int'l Inc. v. Realty One, Inc.* , *173 F.3d 995, 1021 (6th Cir. 1999)*, *appeal after remand* , *271 F.3d 633 (6th Cir. 2001)*, *cert. denied* , *535 U.S. 987 (2002)* (while agreement among defendants to impose adverse commission splits on the plaintiffs may have been fraudulently concealed, limitation period began when the defendants received knowledge that the splits were being imposed).  *And see Copper Antitrust Litig.* , *436 F.3d 782 (7th Cir. 2006)* (until a different firm unsealed its complaint possibly implicating the defendant, plaintiffs may not have had sufficient information to place them on inquiry notice commencing statute of limitation; denying summary judgment on this issue).

[164]  *Klehr v. A.O. Smith Corp* , *521 U.S. 179, 194 (1997)*.

The circuits differed with respect to plaintiffs who were merely in the position of having "constructive" knowledge-that is, plaintiffs for whom the exercise of due diligence would have revealed the claim and thus "should have known" about it. The Court held that a plaintiff who has not exercised due diligence may not benefit from alleging fraudulent concealment. [165] However, while stating that its holding was limited to the context of civil RICO claims, [166] the main basis for the Court's conclusion was that the antitrust cases had adopted that view without significant dissent. [167]

In any event, while the issues that *Klehr* considered as well as those it refused to consider had led to wide differences of opinion among the circuits in RICO cases, [168] they are relatively more settled in antitrust cases.

An additional complication arises in class actions. A class member with actual knowledge must be denied damages, although one court held that certification of an antitrust class action does not require evidence that *no* class member had actual knowledge of an alleged conspiracy formulated outside the limitation period. [169]

Once concealment is found, it must still be fraudulent to toll the statute. Unless the parties stand in a fiduciary relationship requiring disclosure to the plaintiff, mere silence or failure to volunteer information about one's activities does not generally constitute fraudulent concealment sufficient to toll the statute. [170] Nor does a denial when there is no duty to speak [171] or a failure to reveal one's intentions. [172]

---

[165] *Ibid. See also Aluminum Phosphide Antitrust Litig.* , **905 F. Supp. 1457 (D. Kan. 1995)** (where buyer had knowledge of irregularities in bidding in 1989 but did not pursue inquiry and antitrust action until 1993, after the government had obtained a criminal indictment, the buyers did not exercise due diligence to toll the statute of limitation).

[166] *Klehr* , *521 U.S. at 194*.

[167] *Id.* at 195, citing this Paragraph in an earlier edition.

[168] *See* Douglas E. Abrams, *Crime Legislation and the Public Interest: Lessons from Civil RICO* , *50 SMU L. Rev. 33, 70 (1996)*.

[169] *Greenhaw v. Lubbock Cnty. Beverage Ass'n* , *721 F.2d 1019, 1024 (5th Cir. 1983)*, *overruled on other grounds sub nom. International Woodworkers of Am. v. Champion Int'l Corp.* , *790 F.2d 1174 (5th Cir. 1986)*, *aff'd sub nom. Crawford Fitting Co. v. J.T. Gibbons, Inc.* , *482 U.S. 437 (1987)*, *on remand* , *826 F.2d 309 (5th Cir. 1987)*.

[170] *See Texas v. Allan Constr. Co.* , *851 F.2d 1526, 1532 (5th Cir. 1988)*; *Pinney Dock & Transp. Co. v. Penn Cent. Corp.* , *838 F.2d 1445, 1470 (6th Cir.)*, *cert. denied* , **488 U.S. 880 (1988)** (dicta); *Conmar Corp. v. Mitsui & Co. (U.S.A.)* , *858 F.2d 499 (9th Cir. 1988)*, *cert. denied* , **488 U.S. 1010 (1989)** (passive concealment of information does not toll statute of limitation in absence of fiduciary duty to disclose information to plaintiff); *National Music Ctrs. of Am., Inc. v. Kimball Int'l, Inc.* , *1990 WL 157374, 1990-2 Trade Cas. P69,207 (M.D. Pa. Aug. 29, 1990)* (mere denial of wrongdoing or "silence or passive conduct" insufficient in absence of fiduciary relationship); Dayco *Corp. v. Firestone Tire & Rubber Co.* , *386 F. Supp. 546 (N.D. Ohio 1974)*, *aff'd* , *523 F.2d 389 (6th Cir. 1975)*; *Gaetzi v. Carling Brewing Co.* , *205 F. Supp. 615 (E.D. Mich. 1962)*.

[171] *E.g., Suckow Borax Mines Consol. v. Borax Consol., Ltd.* , *185 F.2d 196 (9th Cir. 1950)*, *cert. denied* , **340 U.S. 943 (1951)**; *Hall v. E.I. DuPont de Nemours & Co.* , *312 F. Supp. 358, 362 (E.D.N.Y. 1970)*. *Contra Philco Corp. v. RCA* , *186 F. Supp. 155, 163 (E.D. Pa. 1960)*.

[172] *See Dayco* , *386 F. Supp. at 548-49* (attempted monopolization).

Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) 320

Nevertheless, courts often toll the limitation period in the case of secret conspiracies. [173] Because most clear-cut price-fixing agreements are created and maintained outside of the public eye and abandoned once disclosed, some courts have reasoned that such a conspiracy is "self-concealing"-tolling the statute automatically, regardless of affirmative efforts to conceal it. Merely pretending that a collusive bid was competitive made the conspiracy self-concealing in the Second Circuit, tolling the statute. [174] Of course, regarding every secret conspiracy as sufficiently self-concealing to toll the statute would often force the courts to deal with stale, if not ancient, evidence. To reduce that potential, the Fifth Circuit refused to regard all secret conspiracies as self-concealing, although it conceded that some "efforts aimed at keeping the price-fixing activities secret, even if undertaken at the time of the conspiracy" itself, could toll the statute. [175] Other courts have distinguished acts

---

[173] *Public Serv. Co. v. GE* , 315 F.2d 306 (10th Cir.), cert. denied , **374 U.S. 809 (1963)**; *Ohio Valley Elec. Corp. v. GE* , 244 F. Supp. 914 (S.D.N.Y. 1965); *Illinois v. Sperry Rand Corp.* , 237 F. Supp. 520 (N.D. Ill. 1965).

[174] *New York v. Hendrickson Bros., Inc.* , 840 F.2d 1065, 1084-85 (2d Cir.), cert. denied , **488 U.S. 848 (1988)**. The court also found affirmative acts of concealment: swearing that they had not engaged in collusion, destroying incriminating documents, and agreeing that one of them would testify falsely if summoned before a grand jury. In *Nine West Antitrust Litigation* , 80 F. Supp. 2d 181, 192-93 (S.D.N.Y. 2000), the district court followed *Hendrickson* for purposes of refusing to grant a motion to dismiss and applied it to an alleged resale price maintenance conspiracy, as well as an alleged conspiracy involving a shoe manufacturer and department stores to impose RPM on other shoe dealers. *See also Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.* , 71 F.3d 119, 122-24 (4th Cir. 1995) (rejecting both the notion that tolling of statute requires "affirmative acts" that are "separate and apart" from the challenged conspiracy and the idea that the conspiracy itself is "self-concealing" and tolls the statute; rather, adopting an "intermediate" standard that looked for "affirmative acts" of concealment that are designed to "deflect" litigation); *United States v. Evans & Assocs. Constr. Co.* , 839 F.2d 656 (10th Cir.), aff'd on reh'g , 857 F.2d 720 (10th Cir. 1988); *Sonterra Capital Master Fund, Ltd. v. Barclays Bank, PLC* , 366 F. Supp. 3d 516 (S.D.N.Y. 2018) (per se unlawful conspiracy to set interest rates was inherently self-concealing); *Issuer Plaintiff Initial Pub. Offering Antitrust Litig.* , 2004 WL 487222, 2004-1 Trade Cas. P74,348 (S.D.N.Y. Mar. 12, 2004) (because price-fixing conspiracies are inherently self-concealing, plaintiffs could have statute of limitation tolled simply by showing that they had no knowledge of the underlying facts and could not reasonably have discovered them; they did not need to show affirmative steps taken to conceal the conspiracy); *Commercial Explosives Litig.* , 1996 WL 795270, 1997-1 Trade Cas. P71,723 (D. Utah Dec. 20, 1996) (for purposes of motion on pleadings, allegations that manufacturer and other alleged price fixers conducted their conspiratorial meetings in secret and took care to keep documents from getting out was sufficient to allege fraudulent concealment); *Michigan ex rel. Kelley v. McDonald Dairy Co.* , 905 F. Supp. 447 (W.D. Mich. 1995) (affirmative acts of fraudulent concealment included preparing prearranged losing bids, providing false information to law enforcers, destroying evidence, and concealing public records); *Catfish Antitrust Litig.* , 908 F. Supp. 400 (N.D. Miss. 1995) (furtive telephone calls and secret meetings plus using cash in order to avoid making a record could amount to fraudulent concealment); *Ohio ex rel. Montgomery v. Louis Trauth Dairy, Inc.* , 1996 WL 343440, 1996-1 Trade Cas. P71,396 (S.D. Ohio Apr. 25, 1996) (practice of submitting "complementary" bids on school milk contracts could constitute an affirmative act of fraudulent concealment; under the scheme the co-conspirators would select the winning bidder, the others would then bid "high but near enough to each other" to keep from drawing attention; following *Pinney Dock & Transp. Co. v. Penn Cent. Co.* , 838 F.2d 1445, 1480 (6th Cir.), cert. denied , **488 U.S. 880 (1988)**, on definition of "affirmative acts of fraudulent concealment"; further, a newspaper article concerning evidence that one of the defendants had been engaged in bid rigging in other states was insufficient to put plaintiffs on inquiry notice so as to state limitation period running; while a "major Ohio newspaper" reported a conviction of antitrust violations in Florida, the "story provided no hint of illegal activity in Ohio"); *Carbon Dioxide Antitrust Litig.* , 1993 WL 559779, 1993-2 Trade Cas. P70,436 (M.D. Fla. Nov. 17, 1993) (mere, apparently unilateral, refusal of alleged co-conspirators to bid competitively was not enough to put purchasers on inquiry notice and state statute of limitation running-indeed, if it were, rational cartel members would not do it); *Commonwealth of Pa. v. Milk Indus. Mgmt. Corp* ., 812 F. Supp. 500 (E.D. Pa. 1992) (price-fixing conspiracy may have been self-concealing); *Bethlehem Steel Corp. v. Fischbach & Moore, Inc.* , 641 F. Supp. 271, 274 (E.D. Pa. 1986). *And see Philip Morris, Inc. v. Heinrich* , 1997 WL 781907, 1998-1 Trade Cas. P72,061 (S.D.N.Y. Dec. 18, 1997) (single cartel member's actions of fraudulent concealment tolled the statute as to all of them).

necessary to perfect the conspiracy (such as secret meetings) from the affirmative acts of concealment that would toll the statute. [176] This is to deny that a clandestine conspiracy is inherently self-concealing and thus to require "affirmative acts" of concealment to toll the statute of limitation. [177]

If the efforts to disguise illegal activity are elaborate, fraudulent concealment is readily found. The Ninth Circuit saw sufficient evidence of fraudulent concealment when the conspirators responded to an inquiry by stating that prices were uniform because the market was very competitive and communicated prices to each other in "plain white envelopes." [178] Another court suggested that misrepresenting the reasons for one's refusal to deal and implying that one was ready to deal if certain business difficulties were resolved might constitute fraudulent concealment. [179] It thus appears that the line between active and passive concealment is very fine indeed. [180]

**320f.**

**Prior administrative or judicial proceedings.**

---

[175] *Texas v. Allan Constr. Co.* , 851 F.2d 1526, 1532 (5th Cir. 1988) (secrecy is part of the "wrong itself" and does not toll the statute); but the acts of concealment need not be wholly separate from the illegal conspiracy itself.

[176] *Colorado v. Western Paving Constr. Co.* , 630 F. Supp. 206 (D. Colo. 1986), *aff'd by an equally divided en banc court* , 841 F.2d 1025 (10th Cir.), *cert. denied* , **488 U.S. 870 (1988)**.

[177] *Pinney Dock* , 838 F.2d at 1472; *Berkson v. Del Monte Corp.* , 743 F.2d 53 (1st Cir. 1984), *cert. denied* , **470 U.S. 1056 (1985)**.

[178] *E.W. French & Sons, Inc. v. General Portland* , 885 F.2d 1392 (9th Cir. 1989).

[179] *Pinney Dock* , 838 F.2d at 1472-77.

[180] *See Carrier Corp. v. Outokumpu Oyj* , 673 F.3d 430 (6th Cir. 2012) (at least at pleading stage, complaint alleged sufficiently specific acts by defendants to hide their conspiracy); *Hexcel Corp. v. Ineos Polymers, Inc.* , 681 F.3d 1055 (9th Cir. 2012) (buyer had constructive knowledge, precluding claim of fraudulent concealment, given that it had sufficient information to warrant an investigation); *Aspartame Antitrust Litig.* , 416 Fed. Appx. 208, 2011 WL 263647, 2011-1 Trade Cas. P77,324 (3d Cir. Jan. 28, 2011) (unpublished) (allegations of worldwide price fixing and market allocation conspiracy of generic sweetener; even if defendants fraudulently concealed their actions, there was no evidence that plaintiffs exercised due diligence in discovering the conspiracy; here, the district court had identified "storm warnings" that purchasers ignored-namely, very high prices, the initiation of several price-fixing cases in foreign countries, and the publication of an academic study and suggested collusion; unclear why refusal to sell parts under a contract was an antitrust violation rather than simple breach of a contract); *Schenker AG v. Societe Air Fr.* , 102 F. Supp. 3d 418 (E.D.N.Y. 2015) (plaintiff sufficiently pled fraudulent concealment in defendants' arrangements to keep their meetings and communications secret); *Refrigerant Compressors Antitrust Litig* ., 92 F. Supp. 3d 652 (E.D. Mich. 2015) (plaintiffs sufficiently pled fraudulent concealment where defendants did such things as put false email subject lines as code for conspiracy-related communications); *Magnesium Oxide Antitrust Litig.* , 2012 WL 1150123, 2012-1 Trade Cas. P77,879 (D.N.J. Apr. 5, 2012) (unpublished) (plaintiffs adequately alleged fraudulent concealment); *Kearse v. Kaplan, Inc.* , 692 F. Supp. 2d 398 (S.D.N.Y. 2010) (statute of limitation barred antitrust claim of market allocation against seller of test preparation course when purchase was made some six years prior to filing and complaint made only conclusory allegations of fraudulent concealment; claim was publicized by class action filing 3 years and 364 days prior to plaintiff's filing; court concluded this created a presumption that due diligence would have uncovered evidence of the conspiracy); *Cotton Yarn Antitrust Litig.* , 2009 WL 618252, 2009-1 Trade Cas. P76,536 (M.D.N.C. Mar. 6, 2009) (one-year statute of limitation contained in arbitration agreement was tolled by fraudulent concealment; did not run until a purchaser discovered the fraud; note: court assumes that arbitration provision limiting statute to one year is permissible; effect of court's order is to compel arbitration but also to permit arbitration to go forward on the merits).

Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) 320

The Ninth Circuit held that the antitrust statute of limitation was tolled during the pendency of the plaintiff's prior proceeding before the Interstate Commerce Commission, which had primary jurisdiction over the issue raised in the antitrust suit. [181] If the plaintiff had initiated its antitrust suit first, the court would have dismissed or stayed the suit. [182] As a result, the antitrust suit would not be heard until after the conclusion of the administrative proceedings in any event. Therefore, requiring an earlier suit would be wasteful if the administrators actually dispose entirely of the controversy.

The Seventh Circuit disagreed, emphasizing that the plaintiff can satisfy the statute by filing its antitrust suit, which would then be held in abeyance during any administrative proceedings. [183] To be sure, if administrative proceedings are a jurisdictional pre-requisite to the initiation of the antitrust suit, then no antitrust claim accrues until the prerequisite is met. Thus, if exhaustion of administrative remedies is required before suit, then the statute does not begin running until that occurs, for in that case the judicial cause of action has not yet accrued. [184] But the limitation period continues to run during the pendency of an administrative investigation that was in no sense a jurisdictional prerequisite to the filing of a Sherman Act complaint, although it might determine the extent of any antitrust immunity or defense. [185]

Of course, a timely filing in court satisfies the statute of limitation even if the "defendant asks that the suit be stayed because a potentially controlling question is within an agency's exclusive jurisdiction." [186] However, allowing "the statute of limitations to be tolled on the basis of a defense that might be raised if the suit were filed on time" seemed improper. [187]

---

[181] *Mount Hood Stages, Inc. v. Greyhound Corp.* , 616 F.2d 394, 399-400 (9th Cir.), *cert. denied* , *449 U.S. 831 (1980)*. To illustrate the tolling: the plaintiff would have one year to sue after the conclusion of administrative proceedings that began three years after the antitrust cause of action arose. The ICC has been dissolved and replaced by the Surface Transportation Board. On "primary" jurisdiction, see ¶244d.

[182] At the time the administrative complaint was filed, the law of the circuit would have required dismissal of a contemporaneous antitrust suit. *Mount Hood* , 616 F.2d at 399. *See Carnation Co. v. Pacific Westbound Conference* , **336 F.2d 650, 667 n.32 (9th Cir. 1964)**, *rev'd* , 383 U.S. 213 (1966). In *Johnson v. Nyack Hospital* , 86 F.2d 8, 11 (2d Cir. 1996), the Second Circuit concluded that the antitrust statute of limitation is "not a concern" when a court deferring to a regulatory agency's "primary jurisdiction" issues a stay. However, like here, when the antitrust action was dismissed without prejudice, the courts have developed the concept of "equitable tolling," which permits the plaintiff to exercise due diligence in filing after obtaining the administrative ruling. But in the present case the plaintiff had waited 15 months after the antitrust dismissal to pursue his action with the New York State Public Health Council and did not return to the federal court until 29 months after the case had been dismissed without prejudice. That was too long for this court.

[183] *Brunswick Corp. v. Riegel Textile Corp.* , 752 F.2d 261, 269 (7th Cir. 1984), *cert. denied* , **472 U.S. 1018 (1985)**.

[184] *Id.* at 269 (statute would be tolled); *Huron Valley Hosp., Inc. v. City of Pontiac* , 612 F. Supp. 654 (E.D. Mich. 1985), *aff'd in part* , 792 F.2d 563 (6th Cir.), *cert. denied* , **479 U.S. 885 (1986)** (statute did not run during period when antitrust suit was not yet ripe for adjudication because state agency had not yet issued final denial of certificate of need). On exhaustion requirements, see ¶244d4 (federal remedies), ¶P245 (state and nongovernmental remedies).

[185] *Higgins v. New York Stock Exch., Inc.* , 942 F.2d 829 (2d Cir. 1991).

[186] *Brunswick* , 752 F.2d at 269.

[187] *Ibid.*

Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) 320

Prior suit in a state court under state antitrust law by the same plaintiff does not toll the federal statute of limitation. [188] Nor does a prior federal suit by other plaintiffs, [189] although a class action does toll the statute for all putative class members until class certification is denied. [190]

Class action lawsuits raise a special problem because individual class members are no more than passive participants in the lawsuit, with no power to control the litigation. In *American Pipe* the Supreme Court held that a statute of limitation was tolled during the pendency of a class action until such time as a member decided to opt out. [191] However, in *Copper* a Seventh Circuit panel majority refused to extend this rule to a situation in which the initial suit was a state court class action under state antitrust law and the subsequent suit was federal. [192] A dissenter claimed that this holding violated the principle established by the Supreme Court in *Marrese* that state tribunals must be able to control the effect of their own judgments. [193] In particular, in a case where the state antitrust law is substantively very similar to federal law, tolling seems to be the preferred course:

> The degree of weight any particular state court action must be given in a later federal case will vary, of course, depending on how related it is factually and legally to the federal litigation-there will be a potential range spanning from no weight at all, for wholly unrelated suits, to full-blown claim preclusion, under the principles articulated in *Marrese.* In the present case, the close identity between the facts and legal principles governing the state and federal cases are enough to require tolling the statute of limitations for the persons who were unnamed class members in the California suit. An examination of the pleadings in the *Heliotrope* [i.e., the alternative] litigation reveals that it covers exactly the same matters that the present suit involves. As unnamed members of the *Heliotrope* class, the plaintiffs here had no ability to control the course

---

[188] *Drumm v. Sizeler Realty Co.*, *817 F.2d 1195 (5th Cir. 1987)* (earlier suit itself untimely under state's one-year statute of limitation).

[189] *Shimazaki Commc'ns, Inc. v. AT&T*, *647 F. Supp. 10 (S.D.N.Y. 1986)* (present plaintiff wholesaler not within prior class action by retailers).

[190] *Crown, Cork & Seal Co. v. Parker*, *462 U.S. 345, 353 (1983)*.

[191] *American Pipe & Constr. Co. v. Utah*, *414 U.S. 538 (1974)*. The issue was whether class members could still intervene in an antitrust suit after the limitations period had run, when their class action had been deemed unsuitable for class status. The Court said: A contrary rule allowing participation only by those potential members of the class who had earlier filed motions to intervene in the suit would deprive Rule 23 class actions of the efficiency and economy of litigation which is a principal purpose of the procedure. Potential class members would be induced to file protective motions to intervene or to join in the event that a class was later found unsuitable. In cases such as this one, where the determination to disallow the class action was made upon considerations that may vary with such subtle factors as experience with prior similar litigation or the current status of a court's docket, a rule requiring successful anticipation of the determination of the viability of the class would breed needless duplication of motions. We are convinced that the rule most consistent with federal class action procedure must be that the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action. *Id.* at 553-54.

[192] *Copper Antitrust Litig.*, *436 F.3d 782 (7th Cir. 2006)*.

[193] *Marrese v. American Acad. of Orthopaedic Surgeons*, *470 U.S. 373 (1985)*. See 317f3.

of that litigation. Moreover, had plaintiffs stayed in the *Heliotrope* litigation and the court had finally resolved such critical questions as relevant market and effect on competition, they would probably have faced issue preclusion in any subsequent effort to invoke the federal antitrust laws. Under those circumstances, I would find that the *American Pipe* tolling rule applies and I would thus conclude that the plaintiffs' claims against Morgan are entitled to go forward without further fact-finding. [194]

## 320g.

## Laches.

The §4B limitation period applies only to damage actions. Equity actions, private or governmental, are not restricted by the statute of limitation. But the doctrine of laches can bar an equity action where the plaintiff's unjustifiable delay in suing prejudices the defendant. Laches can also bar damages actions, [195] and it can be applied both to lengthen and to shorten the statute of limitation. [196] As a general proposition, however, judicial uses of laches to deviate from a statute of limitation particular to a substantive provision, such as the antitrust laws, is and should be fairly rare-limited, for example, to situations where a plaintiff knew of its cause of action but sat on its rights to the defendant's prejudice. [197] For that reason, some appellate decisions presume that using laches to shorten a statute of limitation is improper. [198] The statute provides prospective plaintiffs with a "date certain" (subject to numerous qualifications) for collecting evidence of a violation and assembling their complaint with care. The more frequently judges deviate from the statute by applying laches, the less certainty plaintiffs will have.

---

[194] *Copper*, *436 F.3d at 798* (Judge Wood, dissenting on this issue).

[195] *Hot Wax, Inc. v. Turtle Wax, Inc.*, *191 F.3d 813, 822 (7th Cir. 1999)*; *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, *960 F.2d 1020, 1029-30 (Fed. Cir. 1992)* (en banc).

[196] *See Teamsters & Emp'rs Welfare Trust of Ill. v. Gorman Bros. Ready Mix*, *283 F.3d 877 (7th Cir. 2002)*. *See also Hutchinson v. Spanierman*, *190 F.3d 815, 823 (7th Cir.1999)* (laches can be used to shorten as well as lengthen statute of limitation); *Maksym v. Loesch*, *937 F.2d 1237, 1248 (7th Cir. 1991)* (same).

[197] *E.g., Hutchinson*, *190 F.3d 815*. When the statute of limitation is "borrowed," as it is in some civil rights cases, then the rationales for judicial shortening may be more compelling. *See Teamsters*, *283 F.3d at 881*, criticizing the Second Circuit's decision in *Ivani Contracting Corp. v. City of New York*, *103 F.3d 257 (2d Cir. 1997)*, for creating a conclusive presumption against using laches to shorten a statute of limitation on separation of powers grounds, even though in that case the substantive action was under a federal statute, *42 U.S.C. §§1981*, *1983*, and the relevant limitation provision was borrowed from state law. *See also Oliver v. SD-3C LLC*, *751 F.3d 1081 (9th Cir. 2014)*, *cert. denied*, **575 U.S. 950 (2015)** (where consumer plaintiffs sought only equitable relief, their claim was governed by laches, not statute of limitation; here, court concludes that laches does not bar the claim because, if the claim had been for damages, the continuing violation exception would have applied); *Duty Free Ams., Inc. v. Estée Lauder Co.*, No. 12-60741-Civ, 2014 WL 1329359 (S.D. Fla. Mar. 31, 2014), *aff'd*, *797 F.3d 1248 (11th Cir. 2015)* (rejecting injunction as not warranted but stating in dicta that laches on injunction claim would presumptively be governed by four-year limitation period). *See also American Express Anti-Steering Rules Antitrust Litig* ., *2016 WL 748089 (E.D.N.Y. Jan. 7, 2016)* (following recommendation in P320 that laches be applied sparingly where plaintiff is seeking only to enjoin certain conduct because "the right to engage in ongoing anticompetitive conduct should not ordinarily be acquired by prescription.").

[198] *E.g., Herman Miller, Inc. v. Palazzetti Imps. & Exps., Inc.*, *270 F.3d 298, 321 (6th Cir. 2001)*; *United States v. Rodriguez Aquirre*, *264 F.3d 1195, 1208 (10th Cir. 2001)*.

Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) 320

Delay is, of course, justifiable when the plaintiff concealed the offense or the defendant was unable reasonably to discover it. Delay is also justifiable, especially on the government's part, when it serves antitrust policy. For example, there may be good reason not to sue unlawful monopolies until they prove resistant to self-correcting natural market forces. [199]

What constitutes undue delay cannot be stated precisely. Although laches can apply before the statute of limitation has run at law, [200] an equity court may be reluctant to cut off the antitrust plaintiff within the statutory period. Thus, some have suggested the four-year statutory limitation period for damage actions as determinative of the equity result as well. [201]

In any event, the reasons for invoking laches should define excessive delay. Extending the period during which a plaintiff may seek an injunction beyond the four-year statute of limitation is occasionally justified. A stricter limitation is especially appropriate and should be absolute where the equity relief is retroactive in character, such as divestiture of illegally acquired assets. It is less true where the requested equity relief is merely prospective. For example, as we noted previously, an injunction against future enforcement of a long-term anticompetitive contract might be appropriate even after the limitation period for damages has run. [202] Quite aside from the issue of awarding damages, the right to engage in ongoing anticompetitive conduct should not ordinarily be acquired by prescription.

Stale or lost evidence is one important concern and applies more or less equally to damage and equity actions. [203] In antitrust litigation, reconstruction not only of the parties' behavior but especially of surrounding market circumstances becomes increasingly difficult with the passage of time. [204] But evidentiary problems are hardly the only concern. Mergers, for example, normally lead to progressive integration of the assets and operations of the merged firms, and to investment and other business decisions that are contingent on the new situation. There is much to be said, therefore, for insisting that private parties, at least, bring suit with reasonable promptness if they have grounds for believing that the merger will

---

[199] See WK-CHAP6.

[200] *E.g., Goodwin v. First Baptist Church* , 169 S.E.2d 334 (Ga. 1969) (suit six months after event barred by laches).

[201] *IT&T, Inc. v. General Tel. & Elec. Corp.* , 518 F.2d 913, 928 (9th Cir. 1975) ("The proper approach is to use §4B's four-year limitation on §4 actions as a guideline in computing the laches period under §16."); *Maricopa Cnty. v. American Pipe & Constr. Co.* , 303 F. Supp. 77 (D. Ariz. 1969), *aff'd* , 431 F.2d 1145 (9th Cir. 1970), *cert. denied* , **401 U.S. 937 (1971)** (inappropriate to cut short the statutory period, even as extended by tolling under Clayton Act §5(i); also, defendant not prejudiced); *Farbenfabriken Bayer, A.G. v. Sterling Drug Co.* , 197 F. Supp. 627 (D.N.J. 1961), *aff'd on other grounds* , 307 F.2d 210 (3d Cir. 1962), *cert. denied* , **372 U.S. 929 (1963)** (1955 suit for conspiracy ending in 1941 barred). *See also Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.* , 677 F.2d 1045 (5th Cir. 1982), *cert. denied* , **459 U.S. 1105 (1983)** (applying statute of limitation to damage claim and laches to equity claim, relying on same facts).

[202] See 320c3.

[203] *Dempster v. Rosehill Cemetery Co.* , 68 N.E. 1070, 1074 (Ill. 1903): Time impairs and destroys evidence of the true facts, and makes it practically impossible to meet positive testimony of the complainants, whether the same be true or untrue. A court of equity, therefore, finding itself unable to render substantial justice between the parties, asserts the principle of laches on the grounds of public policy and for the repose of property rights.

[204] *E.g., Argus, Inc. v. Eastman Kodak Co.* , 552 F. Supp. 589 (S.D.N.Y. 1982) (laches appropriate if plaintiff's delay was prejudicial to the defendant).

damage them. In such cases the laches period should certainly be no longer than the limitation period for damages and could justifiably be made much shorter.

Concern for the defendant's position must, of course, be balanced against the public interest in vindicating the antitrust laws, notwithstanding the passage of time or the possible negligence or unwise priorities of public officials in failing to sue earlier. These reasons account for the usual proposition that laches does not run against the government. [205] Yet the considerations underlying the laches doctrine might well be applied against the government in appropriate cases-possibly by adjustment in certain burdens of proof or the remedy. [206]

There is another reason why the courts hesitate to bar the governmental equity action: although every successful antitrust plaintiff is vindicating antitrust purposes, one might believe that the delayed government suit is more likely to be addressed to significant public harms than the private and more selfishly motivated suit. Thus we can distinguish between the public and private plaintiff in balancing the interests of plaintiff, defendant, and the public in deciding whether an equity suit long after the event should be time-barred.

Most equity suits seek an injunction against current conduct. In such a suit, a defense based on the plaintiff's delay in suing, whether or not phrased in terms of laches, is more likely to rest on a claimed estoppel arising from express or implied approval. But the estoppel claim is usually unsound, both in fact and in principle. First, failure to sue seldom, if ever, implies approval. [207] Second, even express approval cannot excuse continued illegality. Aside from estoppel arguments, therefore, the laches issue arises in antitrust cases where a claim for present equitable relief is based partly or entirely on conduct that occurred some time ago. There are two illustrative situations: complaints against a prior merger or against a monopolist that once engaged in an exclusionary practice but is doing so no longer. In the *Pullman* case, [208] the court found more recent exclusionary practices and thus avoided reliance on acquisitions of competitors 40 years before suit.

In *Steves* the Fourth Circuit held that laches did not bar the plaintiff's request for divestiture of an unlawful merger, in a challenge brought nearly four years subsequent to the acquisition. [209] The claimed injury was a refusal to deal caused by the merger, and the

---

[205] *United States v. Kirkpatrick*, 22 U.S. 720, 735 (1824); *United States v. Firestone Tire & Rubber Co.*, 374 F. Supp. 431 (N.D. Ohio 1974); *United States v. Pennsall Chems. Corp.*, 262 F. Supp. 101 (E.D. Pa. 1967). *Cf. United States v. New Orleans Chapter, Associated Gen. Contractors*, **382 U.S. 17 (1965)** (per curiam reversal of lower court decision holding the government estopped to indict defendants for practices openly conducted for many years following a government investigation that did not lead to any complaint). *See Guaranty Tr. Co. v. United States*, 304 U.S. 126, 132 (1938); *United States v. RCA*, 358 U.S. 334, 321 (1959). *Cf. United States v. E.I. DuPont de Nemours & Co.*, 353 U.S. 586, 622-24 (1957) (Burton, J., dissenting; acknowledging that laches does not run against the government by objecting to government's challenge to 35-year-old merger on the basis of competitive harm thought to exist when the suit was filed, but not earlier, when the merger had been consummated).

[206] *See United States v. Pullman Co.*, 50 F. Supp. 123, 127 (E.D. Pa. 1943), *aff'd*, **330 U.S. 807 (1947)** ("While the doctrine of laches does not apply against the United States, we should approach the question of equitable relief with great hesitancy in a case where the last operative fact was nearly half a century old.").

[207] *E.g.,* *New Orleans*, **382 U.S. 17**.

[208] *Pullman*, 50 F. Supp. 123.

Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) 320

plaintiff had spent the intervening time diligently seeking alternative trading partners. The defendant had also negotiated a series of agreements with the plaintiff reflecting their desire to find a satisfactory resolution to the dispute. [210] Finally, the court concluded that during the intervening time the plaintiff's injury was compensable by damages, and thus it could not have established that its remedy at law was inadequate during that time period, although the inadequacy of a damages remedy did emerge later. [211]

By contrast, in *Ginsburg* the Eighth Circuit gave laches as a reason for rejecting a request for divestiture of a completed merger at the behest of a class of indirect purchasers. [212]

> In this case, Plaintiffs waited nearly two months after A-B and InBev announced their agreement to merge before filing this lawsuit. Defendants advised that the transaction could close as early as November 12, yet Plaintiffs did not file a motion for preliminary injunction until November 3, and then only because the court imposed this deadline. When dealing with transactions of this nature, these were inexcusable delays .... [213]

Given *Twombly* pleading standards, which would require relatively specific allegations concerning market definition, market position, and probable anticompetitive effects, two months does not seem to be very long. In order to draft a responsible complaint, the plaintiffs would almost certainly have had to consult an expert and depose at least a few witnesses. In fact, the court seems to have been impelled by a particularly weak substantive case, in which the merger was brought under a virtually defunct potential competition theory and the government had thoroughly vetted the merger and approved it.

*New York v. Facebook, Inc* ., *549 F. Supp. 3d 6, 35-36 (D.D.C. 2021)*, *appeal filed* , No. 21-7078 (D.C. Cir. July 29, 2021) (laches precluded state AG's challenges to Facebook's acquisitions of Instagram (in 2012) and WhatsApp (in 2014)).

Antitrust Law: An Analysis of Antitrust Principles and Their Application
Copyright © 2023 by Wolters Kluwer. All Rights Reserved.

---

End of Document

---

[209] *Steves & Son, Inc. v. JELD-WEN, Inc* ., *988 F.3d 690 (4th Cir. 2021)*.

[210] *Id.* at 701-02.

[211] *Ibid.*

[212] *Ginsburg v. InBev NV/SA* , *623 F.3d 1229 (8th Cir. 2010)*.

[213] *Id.* at 1235.