PUBLIC REDACTED VERSION

| | |
|---|---|
| WILMER CUTLER PICKERING<br> HALE AND DORR LLP<br><br>SONAL N. MEHTA (SBN 222086)<br> Sonal.Mehta@wilmerhale.com<br>2600 El Camino Real, Suite 400<br>Palo Alto, California 94306<br>Telephone: (650) 858-6000<br><br>DAVID Z. GRINGER (*pro hac vice*)<br> David.Gringer@wilmerhale.com<br>ROSS E. FIRSENBAUM (*pro hac vice*)<br> Ross.Firsenbaum@wilmerhale.com<br>RYAN CHABOT (*pro hac vice*)<br> Ryan.Chabot@wilmerhale.com<br>PAUL VANDERSLICE (*pro hac vice*)<br> Paul.Vanderslice@wilmerhale.com<br>7 World Trade Center<br>250 Greenwich Street<br>New York, New York 10007<br>Telephone: (212) 230-8800 | ARI HOLTZBLATT (*pro hac vice*)<br> Ari.Holtzblatt@wilmerhale.com<br>MOLLY M. JENNINGS (*pro hac vice*)<br> Molly.Jennings@wilmerhale.com<br>2100 Pennsylvania Ave NW<br>Washington, DC 20037<br>Telephone: (202) 663-6000<br><br>MICHAELA P. SEWALL (*pro hac vice*)<br> Michaela.Sewall@wilmerhale.com<br>60 State Street<br>Boston, Massachusetts 02109<br>Telephone: (617) 526-6000 |

*Attorneys for Defendant Meta Platforms, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>META PLATFORMS, INC., a Delaware Corporation,<br><br>    Defendant. | Case No. 3:20-cv-08570-JD<br><br>**META PLATFORMS, INC.'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF NICHOLAS ECONOMIDES**<br><br>Judge: Hon. James Donato<br><br>Hearing Date: December 14, 2023<br>Time: 10:00 a.m. |

**PUBLIC REDACTED VERSION**

# TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................................1

ARGUMENT .................................................................................................................................2

    I.    Economides's *Ipse Dixit* Opinion That Meta Would Have Responded To More Competition By Paying Its Users Should Be Excluded ................................2

    II.    Economides Failed To Account And Adjust For Major Differences Between His Putative Yardsticks And Facebook ......................................................6

    III.    Before Being Retained, Economides Thought Payment Would Go To Only *Some* Users, And To Those Few In Individualized, Unequal Amounts .........................................................................................................................9

    IV.    Economides Cannot Opine That Privacy Polices Are "Confusing" .......................9

CONCLUSION ............................................................................................................................10

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Bowerman v. Field Asset Servs., Inc.*,
　　60 F.4th 459 (9th Cir. 2023) ...................................................................................................9

*Flintkote Co. v. Lysfjord*,
　　246 F.2d 368 (9th Cir. 1957) ...................................................................................................7

*Gen. Elec. Co. v. Joiner*,
　　522 U.S. 136 (1997)..................................................................................................................2

*Home Placement Serv., Inc. v. Providence J. Co.*,
　　819 F.2d 1199 (1st Cir. 1987) ..................................................................................................6

*Huawei Techs., Co, Ltd v. Samsung Elecs. Co, Ltd.*,
　　340 F. Supp. 3d 934 (N.D. Cal. 2018) ...................................................................................10

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
　　125 F.3d 1195 (9th Cir. 1997) .................................................................................................6

*In re Glumetza Antitrust Litig.*,
　　2021 WL 3773621 (N.D. Cal. Aug. 25, 2021) ......................................................................10

*In re Glumetza Antitrust Litig.*,
　　2021 WL 1817092 (N.D. Cal. May 6, 2021) ..........................................................................4

*In re Live Concert Antitrust Litig.*,
　　863 F. Supp. 2d 966 (C.D. Cal. 2012) ................................................................................6, 8

*Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*,
　　387 F. Supp. 2d 794 (N.D. Ill. 2005), *amended*, 2005 WL 8178971
　　(N.D. Ill. Sept. 8, 2005) ............................................................................................................7

*McGlinchy v. Shell Chem. Co.*,
　　845 F.2d 802 (9th Cir. 1988) ...............................................................................................2, 3

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
　　31 F.4th 651 (9th Cir. 2022) ....................................................................................................9

*Persian Gulf Inc. v. BP W. Coast Prods. LLC*,
　　632 F. Supp. 3d 1108 (S.D. Cal. 2022)....................................................................................2

*Shannon v. Crowley*,
　　538 F. Supp. 476 (N.D. Cal. 1981) .........................................................................................6

*Siqueiros v. Gen. Motors LLC*,
　　2022 WL 74182 (N.D. Cal. Jan. 7, 2022) .............................................................................10

PUBLIC REDACTED VERSION

**STATUTES, RULES, AND REGULATIONS**

Fed. R. Civ. P. 26(a)(2)(B)(i)..................................................................................................4

Fed. R. Evid. 702 ...................................................................................................................2, 10

**OTHER AUTHORITIES**

Bloomberg, "One Corner of U.S. Oil Market Has Already Seen Negative Prices"
(March 27, 2020), https://www.bloomberg.com/news/articles/2020-03-
27/one-corner-of-u-s-oil-market-has-already-seen-negative-prices. ................................3

STIGLER COMM. ON DIGIT. PLATFORMS, MARKET STRUCTURE AND ANTITRUST
SUBCOMMITTEE REPORT (July 2019), https://www.chicagobooth.edu/-
/media/research/stigler/pdfs/digital-platforms---committee-report---stigler-
center.pdf ........................................................................................................................3

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
Principles and Their Application* (4th & 3d eds., 2023 Cum. Supp. 2018-
2023) ................................................................................................................................6

**PUBLIC REDACTED VERSION**

## INTRODUCTION

Users' opposition only confirms that the opinions of putative expert Nicholas Economides should be excluded as inadmissible junk science.

First, Users claim that "Real-World Examples, Extensive Record Evidence, and Accepted Economic Theory and Literature" support Economides's opinion that in his but-for world, Meta would have paid its users. Not so. No economic theory or literature supports the speculation that Meta would have responded to competition by paying users (which no one has ever done) rather than by innovating and creating more engaging content (as Meta and all its competitors have always done in the real world). Users do not cite any "real world examples" of a platform paying users just to use it, whatever competition it faced. Instead, their record evidence shows that Meta already offers users a valuable service, supported through ads, and that Meta would never upend this established business model for another, never-before-seen one. That is why Meta rejected every instance Users identify of someone hypothesizing paying users—and even then, Users never point to anyone ever considering *all* users getting *uniform* payments. An expert cannot simply proclaim that *he thinks* some unspecified increment of additional competition would transform an attention platform that provides content that users value and enjoy into a market research firm that must pay its participants. Users' opposition shows that Economides's guess is all he has.

Second, Users claim Economides reliably used a yardstick method. A reliable yardstick study, however, must adjust for the indisputable differences between Facebook and Economides's market research program "yardsticks." But Economides made no adjustments to the price those programs pay and the price he claims Meta would have paid Facebook users. Skipping that critical step makes his opinion unreliable and inadmissible.

Third, Users argue that Economides can offer his personal, lay opinion that Facebook's data practices and user settings were "confusing" in rebuttal to Meta's expert Catherine Tucker and because Economides's academic studies have included privacy. This opinion is neither rebuttal nor within Economides's academic purview. And even if it were, Economides still could not offer what he concedes is ▮▮▮▮ that he came to simply ▮▮▮▮ Ex. 3,

Economides Tr. 47:24-48:6.[1] Expert testimony must be grounded in "the expert's scientific, technical, or other specialized knowledge" in a way that "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Economides's idiosyncratic experiences and subjective conclusions about whether Facebook's disclosures are "confusing" (a view that courts have disagreed with as a matter of law) does not fit the bill.

## ARGUMENT

### I.   ECONOMIDES'S *IPSE DIXIT* OPINION THAT META WOULD HAVE RESPONDED TO MORE COMPETITION BY PAYING ITS USERS SHOULD BE EXCLUDED

Opining on the but-for world is not license to dream up a fantasy world. An expert cannot say the sky is green—or that it *would be* green in his but-for world—based just on his say so. Courts thus exclude opinions where "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807 (9th Cir. 1988) (affirming exclusion of opinion that "rests on unsupported assumptions" and "has scant basis in the record"); *Persian Gulf Inc. v. BP W. Coast Prods. LLC*, 632 F. Supp. 3d 1108, 1168 (S.D. Cal. 2022) (excluding opinion lacking "some logical relationship to the evidence in the case"). That is the case here.

Economides's central opinion is that "in the but-for (*i.e.*, competitive) world, Facebook would have had to compensate its users for their data." Opp. 5. This is a bold claim that ignores entry and market participation in his own alleged market. Facebook competes for user time and attention, as Economides concedes. *See* Ex. 1, Economides Rep. ¶ 225.[2] So when Snapchat began capturing attention with fleeting pictures and videos in a feed, Meta did not respond by ███████ ███████████████████████████████████████████. It did the obvious—it created Stories with new and engaging features. When Tik Tok emerged, Meta didn't ████████

---

[1] Unless otherwise noted, emphasis is added and "Ex." citations reference exhibits 1-7 to the Gringer Declaration, Dkt 650-1, exhibits 8-12 to the Supplemental Gringer Declaration, Dkt. 653, or exhibits 13-19 to the Gringer Reply Declaration submitted herewith.

[2] The parties dispute how to define the market in which Facebook competes, *see* Meta's Opp. to Users' Motion for Class Certification, Section I.C.2, contrary to Users' assertion (made before Meta filed its class certification opposition) that "Facebook has already ████████████████████████████████████████████████████" Opp. 7. But whether Facebook competes in Economides's "Personal Social Network Market," it indisputably competes with numerous other firms for user time and attention—which creates the incentives that Economides ignores.

**PUBLIC REDACTED VERSION**

1  ▮▮▮▮▮▮▮▮▮▮. It created Reels (and Snap created Spotlights and YouTube created Shorts).
2  Snap and Tik Tok themselves, of course, did not compete *with Meta* by offering to pay users of
3  their platforms. Like Meta, they competed by innovating. As Economides admits, no attention
4  platform has ever responded to competition by paying all its users. ▮▮▮▮▮▮▮▮
5  ▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 13, Economides Tr. 84:11-16. Courts exclude expert opinions
6  that lack a basis in reality, *see, e.g.*, *McGlinchy*, 845 F.2d at 807, and the Court should do so here.
7      Users' efforts to find the best "Real-World Examples," "Record Evidence," and "Economic
8  Theory and Literature" for Economides's wild claim, Opp. 5-10, fail to save him from exclusion.
9      As an initial matter, no economic theory supports Economides's opinion that Meta would
10 have competed by paying users rather than improving quality, such as with new features. Users
11 argue that "Where, as here, the starting money price is 'zero,' additional competition should drive
12 the money price to be 'negative,' such that users receive compensation." Opp. 2. Economides
13 testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
14 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15 ▮▮▮▮▮▮▮▮ Ex. 13, Economides Tr. 102:16-19. But no economic theory bridges the gap
16 between how Meta actually competes (on quality) and how Economides speculates it would.
17 Users' sources instead recognize that "markets where goods are free will be dominated by the best
18 quality firm and others may compete only in so far as they can differentiate their offers and target
19 different customers." STIGLER COMM. ON DIGIT. PLATFORMS, MARKET STRUCTURE AND
20 ANTITRUST SUBCOMMITTEE REPORT 55 (July 2019). Users' putative expert Joseph Farrell agrees:
21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 14, Farrell Rep. ¶ 57. The fact that
25 "negative prices" exist in *some* unique situations, like certain markets for hard-to-store
26 commodities such as electricity or oil,[3] does not show that *this* market for time and attention would
27 have converted to that unusual model with an undefined amount of additional competition.

28
---
[3] *See, e.g.*, Bloomberg, "One Corner of U.S. Oil Market Has Already Seen Negative Prices" (March 27, 2020).

1  Users' alleged "real world examples" are nothing of the sort. None of Facebook's "Study and Research programs" or "companies like Google, Nielsen, Comscore, and Amazon" pays people just for using an attention platform. Opp. 6. Ideas that Meta *rejected* are not "real world" examples of anything. The case Users rely on, *In re Glumetza Antitrust Litigation*, 2021 WL 1817092 (N.D. Cal. May 6, 2021), supports this Court's view that it does not "get you anywhere" to "stand up and tell the jury, 'Here's a program. They never did it, but they thought about it.'" June 22, 2023 Hr'g Tr. 22:2-6. In *Glumetza*, Judge Alsup held that it was irrelevant whether defendants "contemplated any of plaintiffs' but-for scenarios." 2021 WL 1817092, at *13. Rather, he denied defendants summary judgment because "plaintiffs offer cogent evidence"—"direct evidence," "competent evidence," "adequate evidence" that he described over several pages—to support a but-for world that "requires no speculation." *Id.* at *13-*14. He explained, "We construct the but-for world not out of whole cloth, but as a matter of reasoned deviation from the actual world based upon our changed assumption of defendants' lawful conduct." *Id.* at *15. Economides's but-for world has no such real-world grounding and is underpinned solely by speculation. It is "construct[ed] . . . out of whole cloth." *Id*. When asked, [REDACTED] Economides could not give a single one. Ex. 3, Economides Tr. 115:13-17.

Recognizing this glaring deficiency, in their opposition Users for the first time point to Meta offering Facebook Credits for viewing video ads in 2011 as supposed proof of real-world payment to users. If this program was a "basis or reason[]" for Economides's opinion, then Users failed to disclose it as required because he never cites or references it in his reports. Fed. R. Civ. P. 26(a)(2)(B)(i). In any event, a program offering Facebook Credits "in return for viewing video ads" (Opp. 6) that was [REDACTED] offers no support that Meta would have ever offered a uniform payment to all users just for using the platform. Ex. 15, PALM-008405132; Ex. 16, PALM-011944933.

Users then cite a draft book chapter by Tucker that they claim "conceded" that "'[t]here are plenty of firms who have sought to set up businesses which would allow individuals to own

1. their data and trade it for monetary value.'" Opp. 6. But as Tucker explains there, the obscure firms she references (which are not social sites) *failed* to set up thriving businesses. Opp. Ex. 4 at 11-12. Tucker identifies some likely reasons why, and they are the exact reasons why she has opined that Economides's uniform payment theory is nonviable: because "issues of adverse selection and moral hazard," as well as the "ubiquity of data and non-rivalry of data," "might intuitively plague attempts to create such markets." *Id*. So Users remain where they started: without a single "real world example" of universal, uniform payment to use an attention platform.

Nor do Users identify any "record evidence" suggesting Meta would pay users in the manner Economides speculates. Documents that Users argue show Meta ▮▮▮▮ ▮▮▮▮ (Opp. 3) do not prove that Meta would ever completely *upend* that value exchange by offering monetary payment instead of engaging features. And the documents Users cite to claim that ▮▮▮▮ ▮▮▮▮ (Opp. 3) are again rejected proposals, and none to pay all Facebook users just to use it. *See* Opp. Ex. 9, PALM-013785714 (brainstorming ▮▮▮▮ ▮▮▮▮); Opp. Ex. 10, PALM-013788535 ▮▮▮▮ ▮▮▮▮; Opp. Ex. 11, PALM-013553009 (email from team that was ▮▮▮▮ ▮▮▮▮); Opp. Ex. 12, PALM-013818575 at -013818628 (discussing an ultimately rejected idea to ▮▮▮▮ ▮▮▮▮). Economides acknowledged this fact, stating, ▮▮▮▮ ▮▮▮▮ and ▮▮▮▮ Ex. 3, Economides Tr. 110:1-3, 110:5-6. As for Users' reference to "average revenue per

1  user," that Meta calculates its average revenue per user says nothing about Meta *paying* a flat
2  amount to every user—as the term suggests, it is simply an average, with some users providing
3  higher revenue to Meta and others providing ▮▮▮▮▮▮ Ex. 17, Baser Tr. 273:14-275:17; *see*
4  *also* Ex. 18, J. Eide Tr. 273:20-274:5 (noting ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

5  **II.  ECONOMIDES FAILED TO ACCOUNT AND ADJUST FOR MAJOR DIFFERENCES BETWEEN**
6  **HIS PUTATIVE YARDSTICKS AND FACEBOOK**

7  Courts exclude purported "yardstick" analysis that fails to account for major differences
8  between the supposed yardsticks and the market or firm at issue. Yardsticks must be comparable
9  to the market or firm at issue to be reliable. Mot. 9-13; *see also, e.g.*, *Image Tech. Servs., Inc. v.*
10 *Eastman Kodak Co.*, 125 F.3d 1195, 1222 (9th Cir. 1997) (there must be "meaningful economic
11 similarity between [defendants] and the firms used for comparison"); *Home Placement Serv., Inc.*
12 *v. Providence J. Co.*, 819 F.2d 1199, 1206 (1st Cir. 1987) ("Central to this so-called 'yardstick'
13 approach to proving antitrust damages is the requirement the plaintiff identify a sufficiently
14 comparable firm (the 'yardstick') against which it can measure its quantum of damages.");
15 *Shannon v. Crowley*, 538 F. Supp. 476, 481 (N.D. Cal. 1981) ("The yardstick method requires a
16 comparison of the plaintiff's own business with one nearly as identical as possible."); Phillip E.
17 Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their*
18 *Application* ¶ 392 (4th & 3d eds., 2023 Cum. Supp. 2018-2023) ("The major difficulty encountered
19 in the use of a yardstick is finding a suitable one. The central idea behind the yardstick approach
20 is to find a firm that is comparable in all important respects to the plaintiff.").

21 There is no dispute how this methodology ought to work, despite Users' efforts to drum
22 one up. Yardsticks need not be "perfectly identical." Opp. 14. Nor must they come from the same
23 product market. *See* Dkt. 663-1 at 5 (Meta's Opp. to Users' Mot. to Exclude Tucker). They must
24 be "comparable" and "[i]f there is an important difference *that is beyond adjustment*, this approach
25 will have to be abandoned." Mot. 10 (quoting Areeda & Hovenkamp ¶ 395b3).

26 For that reason, failing to adjust for material differences is not "fodder for cross-
27 examination" or a "factual criticism." Opp. 10. It is a methodological fatal flaw that renders the
28 analysis unreliable and inadmissible. *See, e.g.*, *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d

966, 973 (C.D. Cal. 2012) (excluding opinion for failure to "account[] for the major factors" in yardstick comparability); *Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 812 (N.D. Ill. 2005), *amended*, 2005 WL 8178971 (N.D. Ill. Sept. 8, 2005) (finding a damages model that lacked "the requisite showing of comparability" to be "impermissibly speculative and conjectural"); *see also Flintkote Co. v. Lysfjord*, 246 F.2d 368, 393 (9th Cir. 1957) ("Where no basis for comparison was shown, such [yardstick] evidence has been rejected.").

The differences between Economides's so-called yardsticks and Facebook are material. The market research programs he examines meet none of the five criteria of "social networks" that he made up, they collect different kinds of data than he claims Meta would pay for, they have a miniscule number of participants compared to Facebook's user base, and they offer nothing in return *besides* monetary payment. There is simply no "factual dispute" over whether they differ. Opp. 9. Take the differences in data collected. Users have claimed that Economides's supposed yardsticks are examples "where Facebook and other companies compensated users for *the exact sort of data at issue here*." Dkt. 648 (Users Class Cert. Mot.) at 2; *see also* Dkt. 649 (Users' Mot. to Exclude Tucker) at 4 (citing allegedly "multiple examples where Facebook itself paid for *the exact same type of user data at issue in this case*"). They recognize that this data comparability is critical, and so they argued repeatedly the data was "the exact same."

Economides, however, admitted that it is not. He testified that ▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Ex. 13, Economides Tr. 196:24-197:1.[4] As for the non-Facebook programs, Economides testified that ▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *Id.* at 197:16-19; *see also id.* at 198:2-4 ▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇.[5] The question, then, is what Economides did to adjust for those differences.

---

[4] He said so repeatedly: ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *id.* at 155:18-23; ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *id.* at 160:20-23; ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *id.* at 161:3-5.

[5] Users claim Meta ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (Opp. 13), but the documents cited were

1   The answer: nothing. He looks at market research programs and derives from them ▮
2   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ And that is the amount he says Meta would pay people
3   to use Facebook. He did not adjust it for the admittedly different types of "data" those programs
4   and Facebook collect. Nor did he adjust ▮▮▮ for the exponentially higher number of Facebook
5   users. Or to account for the value Facebook users already get from using the service. He did not
6   make any adjustments to account for these major differences at all. That is grounds for exclusion.
7   *See, e.g., In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d at 974.
8      Users' excuses for Economides skipping this step lack merit. They claim that he didn't
9   have to adjust for the exponentially different scale of these programs and Facebook ▮▮▮▮
10  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Opp. 4. This
11  explanation does not justify leaving unadjusted the amount of payment to a few thousand people
12  when applying it to hundreds of millions. *See* Mot. 12. Users also claim that Economides
13  *intentionally* selected yardsticks that offer no independent value ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
14  ▮▮▮. Opp. 4. But that does not explain why Economides did not *adjust* that supposedly
15  isolated price, at all, for a service like Facebook that *does* provide very valuable independent
16  services—which, as a matter of economics and logic, people would require less payment to use (in
17  actuality, no payment at all—for hundreds of millions of real-world users). Last, after quietly
18  walking back their insistence that Facebook and the putative yardsticks collect the "exact same"
19  data—now it is "the same *general type of* data at issue in this case," Opp. 4—Users proclaim that
20  Economides's failure to adjust made his calculation conservative because Facebook ▮▮▮▮
21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Opp. 4-5. They do not identify the differences in
22  the data or explain what makes one more intrusive. Little wonder, since until now they have
23  insisted the data was the "exact same." All they say is that the so-called yardsticks use their data
24  differently ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. But
25  different *uses* say nothing about—to quote Economides—the fact that ▮▮▮▮▮▮▮▮▮
26  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 13, Economides Tr. 198:2-4. Having
27  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬
28  brainstorming ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 2, Economides Reply Rep. ¶¶ 149-150,
    ▮▮—and those brainstormed ideas were then rejected not implemented.

explained nothing about this ▇▇▇▇ Economides cannot claim his failure to perform a necessary step in yardstick analysis was uniformly "conservative"—he hasn't done the work.

### III. BEFORE BEING RETAINED, ECONOMIDES THOUGHT PAYMENT WOULD GO TO ONLY *SOME* USERS, AND TO THOSE FEW IN INDIVIDUALIZED, UNEQUAL AMOUNTS

Economides's scholarship about hypothetical payment by attention platforms is fatal to Users' class certification bid. Meta pointed this out (Mot. 9) but did not offer it as an independent basis to exclude his opinions. Users nevertheless build a strawman exclusion argument. Meta won't say much about this supposed debate over what Economides did or didn't write—his short article on the subject is attached for the Court's reference. *See* Ex. 19. Here is the key part:

> In the competitive world, users by default would opt-out from the market for sale of personal information. If a user wanted to enter this market, she would opt-in, sell her personal information and get compensated by the digital platform. Compensation would depend on the value of the information of a particular user to the platform. A user would accept the offer and participate in market B [the market for sale of personal information] if the monetary compensation exceeds her value of the loss of privacy implied by the transaction.
>
> Users vary widely on the value they place on privacy and in the value of their personal information to the platform. Therefore, in a competitive market for personal information, some users would participate, and others would not. Transaction prices for the sale of personal information would also vary and likely be individually negotiated between the platform and the user.

Ex. 19, Economides & Lianos, *Giving Away*.

It is clear why Users are worried about this prior scholarship. It establishes "the possible presence of uninjured class members," which "means that the class definition is fatally overbroad." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 (9th Cir. 2022) (en banc). It also shows "the complexity of the individualized questions" of "individualized injury and damages assessments" in this case, which make class certification "improper." *Bowerman v. Field Asset Servs., Inc.*, 60 F.4th 459, 469, 471 (9th Cir. 2023). In short, it shows that, if the views of Economides the scholar are accepted, the Court cannot certify the Users' class.

### IV. ECONOMIDES CANNOT OPINE THAT PRIVACY POLICES ARE "CONFUSING"

Economides's opinion in Section IV(C) of his reply report that "Facebook's Data Practices and User Settings Were Confusing" has no basis but his personal interpretation of documents in the record, as a layperson. Economides agreed: his opinion that Facebook's privacy policy is

1  complex is ▮▮▮▮▮ that he came to not as an economist but ▮▮▮▮▮ Ex. 3,
2  Economides Tr. 47:24-48:6. This opinion should be excluded.

3  Users respond that Economides can offer these opinions (1) to rebut Meta's expert
4  Catherine Tucker, or at least to offer background for his rebuttal, or (2) because Economides's
5  "academic work has involved issues regarding privacy." Opp. 15. Both responses are off base.

6  First, Economides's restatement and interpretation of record evidence in Section IV(C) is
7  not a rebuttal to Tucker. The one paragraph of Tucker's report cited in Section IV(C)—or in Users'
8  opposition—is Paragraph 59, which states in full: ▮▮▮▮▮
9  ▮▮▮▮▮
10 ▮▮▮▮▮ Economides's Section IV(C)
11 neither analyzes nor even cites this academic literature or Named Plaintiffs' behavior. The record
12 evidence that it restates, and the opinion that it offers that Facebook's practices and settings were
13 "confusing," say nothing about whether survey responses reliably reveal users' preferences about
14 privacy or data collection and use. In any event, Users cite no case holding that experts may offer
15 unspecialized, lay opinion just so long as it is in rebuttal, and that is obviously wrong.

16 Nor does this section of Economides's report merely "provide factual context," *Huawei
17 Techs., Co, Ltd v. Samsung Elecs. Co., Ltd.*, 340 F. Supp. 3d 934, 992-993 (N.D. Cal. 2018), or
18 "summarize the facts and data considered," *In re Glumetza Antitrust Litig.*, 2021 WL 3773621, at
19 *20 (N.D. Cal. Aug. 25, 2021). It just "restate[s] or summarize[s] record evidence and then state[s]
20 a conclusion"—that Facebook's data practices and user settings were confusing—"without
21 applying a methodology that is reliable and which evinces [any] expertise." *Siqueiros v. Gen.
22 Motors LLC*, 2022 WL 74182, at *9 (N.D. Cal. Jan. 7, 2022). That compels exclusion.

23 Second, it is irrelevant whether Economides's academic work has involved privacy. At
24 issue is the opinion Economides offered *in this case*. That opinion was not based on any "scientific,
25 technical, or other specialized knowledge" at all, Fed R. Evid. 702(a), so it should be excluded.

26 **CONCLUSION**

27 The Court should exclude Economides's testimony drawn from Parts X-XII of his opening
28 report and Section IV(C) and Parts VI-VII of his reply report.

| | |
|---|---|
| Dated: November 3, 2023 | Respectfully submitted, |
| | By: */s/ Sonal N. Mehta* |
| | |
| | SONAL N. MEHTA (SBN 222086) |
| | Sonal.Mehta@wilmerhale.com |
| | WILMER CUTLER PICKERING HALE AND DORR LLP |
| | 2600 El Camino Real, Suite 400 |
| | Palo Alto, California 94306 |
| | Telephone: (650) 858-6000 |
| | |
| | DAVID Z. GRINGER (pro hac vice) |
| | David.Gringer@wilmerhale.com |
| | ROSS E. FIRSENBAUM (pro hac vice) |
| | Ross.Firsenbaum@wilmerhale.com |
| | RYAN CHABOT (pro hac vice) |
| | Ryan.Chabot@wilmerhale.com |
| | PAUL VANDERSLICE (pro hac vice) |
| | Paul.Vanderslice@wilmerhale.com |
| | WILMER CUTLER PICKERING HALE AND DORR LLP |
| | 7 World Trade Center |
| | 250 Greenwich Street |
| | New York, New York 10007 |
| | Telephone: (212) 230-8800 |
| | |
| | ARI HOLTZBLATT (pro hac vice) |
| | Ari.Holtzblatt@wilmerhale.com |
| | MOLLY M. JENNINGS (pro hac vice) |
| | Molly.Jennings@wilmerhale.com |
| | WILMER CUTLER PICKERING HALE AND DORR LLP |
| | 2100 Pennsylvania Avenue NW |
| | Washington, DC 20037 |
| | Telephone: (202) 663-6000 |
| | |
| | MICHAELA P. SEWALL (pro hac vice) |
| | Michaela.Sewall@wilmerhale.com |
| | WILMER CUTLER PICKERING HALE AND DORR LLP |
| | 60 State Street |
| | Boston, Massachusetts 02109 |
| | Telephone: (617) 526-6000 |
| | |
| | *Attorneys for Defendant Meta Platforms, Inc.* |

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of November, 2023, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System.

By:    */s/ Sonal N. Mehta*
          Sonal N. Mehta