1  **QUINN EMANUEL URQUHART & SULLIVAN, LLP**
     Kevin Y. Teruya (Bar No. 235916)
2      kevinteruya@quinnemanuel.com
   865 South Figueroa Street, 10ᵗʰ Floor
3  Los Angeles, CA 90017
   (213) 443-3000
4
   **HAGENS BERMAN SOBOL SHAPIRO LLP**
5    Shana E. Scarlett (Bar No. 217895)
       shanas@hbsslaw.com
6  715 Hearst Avenue, Suite 202
   Berkeley, CA 94710
7  (510) 725-3000

8  *Interim Co-Lead Consumer Class Counsel*

9  [Additional counsel listed on signature page]

10

11                     **UNITED STATES DISTRICT COURT**

12                     **NORTHERN DISTRICT OF CALIFORNIA**

13                        **SAN FRANCISCO DIVISION**

|  |  |
|---|---|
| MAXIMILIAN KLEIN, et al., | Consolidated Case No. 3:20-cv-08570-JD |
| Plaintiffs, | **CONSUMER PLAINTIFFS' REPLY IN FURTHER SUPPORT OF MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL** |
| vs. | |
| META PLATFORMS, INC., | The Hon. James Donato |
| Defendant. | Hearing Date: Dec. 14, 2023 at 10:00 a.m. |
| This Document Relates To: All Consumer Actions | **REDACTED VERSION FILED PUBLICLY** |

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ..................................................................................................1

II.     FACEBOOK'S ANTITRUST INJURY ARGUMENTS DO NOT PROVIDE A
        BASIS TO DENY CLASS CERTIFICATION ....................................................2

        A.      Consumers Establish Antitrust Impact Based on Extensive Record Evidence
                and Accepted Economic Theory, Which Facebook Ignores ......................2

        B.      Facebook's Attempt to Rewrite Consumers' Antitrust Impact Theory as
                "Individualized" Ignores the Theory's Inherently Common Nature and the
                Law ...........................................................................................................4

        C.      Facebook's Self-Serving Arguments that Class Members Are "Worse Off" in
                the But-For World Are Merits Disputes and Unsupported *Ipse Dixit*.......................5

III.    FACEBOOK'S LIABILITY ARGUMENTS CONTRADICT THE RECORD AND
        LAW, HIGHLIGHTING WHY CERTIFICATION IS APPROPRIATE ............................6

        A.      Binding Case Law and Common Evidence Refute Facebook's Arguments
                Regarding "Individualized" Inquiries Into Its Anticompetitive Deception ..............6

        B.      Relevant Market Definition Is an Inherently Class-Wide Issue, Which
                Facebook Concedes Is a Merits Matter That It Has Not Substantively
                Challenged ..................................................................................................9

IV.     FACEBOOK'S DAMAGES CHALLENGES REPEAT ITS FLAWED *DAUBERT*
        ARGUMENTS AND, AT BEST, RAISE MERITS DISPUTES ........................11

V.      FACEBOOK'S ATTACKS ON THE NAMED CONSUMERS ARE MERITLESS ........13

        A.      The Three Named Consumers Are Typical and Adequate Representatives ...........13

        B.      No Relationships Bar the Named Consumers From Serving as
                Representatives ..........................................................................................14

VI.     CONCLUSION ..................................................................................................15

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Cases</u>

*Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publications, Inc.*,
108 F.3d 1147 (9th Cir. 1997) ................................................................................................. 7

*Brickman v. Fitbit, Inc.*,
2017 WL 5569827 (N.D. Cal. Nov. 20, 2017) (Donato, J.) ................................................. 14

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ............................................................................................................. 11

*City of Anaheim v. S. California Edison Co.*,
955 F.2d 1373 (9th Cir. 1992) ............................................................................................... 8

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ............................................................................................................... 12

*DeNicolo v. Hertz Corp.*,
2021 WL 1176534 (N.D. Cal. Mar. 29, 2021) ..................................................................... 15

*Garnica v. HomeTeam Pest Def., Inc.*,
230 F. Supp. 3d 1155 (N.D. Cal. 2017) ............................................................................... 10

*Hadley v. Kellogg Sales Co.*,
324 F. Supp. 3d 1084 (N.D. Cal. 2018) ................................................................................. 7

*Holt v. Noble House Hotels & Resort, LTD*,
2018 WL 5004996 (S.D. Cal. Oct. 16, 2018) ....................................................................... 14

*Image Tech. Serv., Inc. v. Eastman Kodak Co.*,
136 F.3d 1354 (9th Cir. 1998) ............................................................................................. 15

*In re Aftermarket Auto. Lighting Prod. Antitrust Litig.*,
276 F.R.D. 364 (C.D. Cal. 2011) ........................................................................................... 3

*In re Arris Cable Modem Consumer Litig.*,
327 F.R.D. 334 (N.D. Cal. 2018) ......................................................................................... 14

*In re Capacitors Antitrust Litig.*,
2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) ................................................................ 2, 14

*In re Facebook, Inc., PPC Advert. Litig.*,
282 F.R.D. 446 (N.D. Cal. 2012) ......................................................................................... 14

*In re Glumetza Antitrust Litig.*,
336 F.R.D. 468 (N.D. Cal. 2020) ........................................................................................... 2

*In re Google Play Store Antitrust Litig.*,
  2022 WL 17252587 (N.D. Cal. Nov. 28, 2022) ........................................................ 5

*In re Live Concert Antitrust Litig.*,
  247 F.R.D. 98 (C.D. Cal. 2007) ............................................................................. 5

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
  2023 WL 1813530 (C.D. Cal. Feb. 7, 2023) ...................................................... 5, 11

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
  522 F.3d 6 (1st Cir. 2008) ..................................................................................... 3

*In re Online DVD Rental Antitrust Litig.*,
  2010 WL 5396064 (N.D. Cal. Dec. 23, 2010) ......................................................... 3

*In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*,
  421 F. Supp. 3d 12 ............................................................................................... 7

*In re Toys R Us FACTA Litig.*,
  300 F.R.D. 347 (C.D. Cal. 2013) ......................................................................... 15

*Lerwill v. Inflight Motion Pictures, Inc.*,
  582 F.2d 507 (9th Cir. 1978) ............................................................................... 14

*Major v. Ocean Spray Cranberries, Inc.*,
  2013 WL 2558125 (N.D. Cal. June 10, 2013) ....................................................... 14

*Moehrl v. Nat'l Ass'n of Realtors*,
  2023 WL 2683199 (N.D. Ill. Mar. 29, 2023) ....................................................... 12

*Moore v. Int'l Cosms. & Perfumes, Inc.*,
  2016 WL 7644849 (C.D. Cal. Mar. 17, 2016) ...................................................... 14

*Nat'l ATM Council, Inc. v. Visa Inc.*,
  2023 WL 4743013 (D.C. Cir. July 25, 2023) ........................................................ 12

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) .................................................................................. 5

*Poulos v. Caesars World, Inc.*,
  2002 WL 1991180 .............................................................................................. 15

*Sheppard, Mullin, Richter & Hampton, LLP v. J-M Mfg. Co.*,
  6 Cal. 5th 59 (2018) ........................................................................................... 15

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) ............................................................................................. 2

*Ward v. Apple Inc.*,
  2018 WL 934544 (N.D. Cal. Feb. 16, 2018) .......................................................... 4

**TABLE OF ABBREVIATIONS**

| Abbreviation | Referenced Document |
|---|---|
| **Ex. __** | All exhibit references are to the Declaration of Kevin Y. Teruya in Support of Consumer Plaintiffs' Reply in Further Support of Motion for Class Certification and Appointment of Class Counsel, concurrently filed herewith. |
| **Mot. at __** | Consumer Plaintiffs' Motion for Class Certification and Appointment of Class Counsel, filed at Dkt. 645-1. |
| **Opp. at __** | Facebook's Opposition to Users' Motion for Class Certification, filed at Dkt. 669-1. |
| **Economides Opp. at __** | Consumer Plaintiffs' Opposition to Facebook's Motion to Exclude Testimony of Nicholas Economides, filed at Dkt. 673-1. |
| **Economides ¶ __** | Expert Class Certification Report of Dr. Nicholas Economides, filed at Dkt. 645-5. |
| **Economides Reply ¶ __** | Reply Expert Class Certification Report of Dr. Nicholas Economides, filed at Dkt. 645-6. |
| **Farrell ¶ __** | Expert Class Certification Report of Dr. Joseph Farrell, filed at Dkt. 645-7. |
| **B. Klein Reply ¶ __** | Reply Expert Class Certification Report of Robert L. Klein, filed at Dkt. 645-9. |
| **Lamdan ¶ __** | Expert Class Certification Report of Professor Sarah Lamdan, filed at Dkt. 645-10. |
| **Lamdan Reply ¶ __** | Reply Expert Class Certification Report of Professor Sarah Lamdan, filed at Dkt. 645-11. |
| **Tucker ¶ __** | Expert Class Certification User Rebuttal Report of Facebook Expert Dr. Catherine Tucker, filed at Dkt. 645-19. |
| **Fair ¶ __** | Expert Class Certification Report of Facebook Expert Rebecca Kirk Fair, filed at Dkt. 645-20. |
| **Hochberg ¶ __** | Expert Class Certification Report (Errata) of Facebook Expert Dr. Yael Hochberg, filed at Dkt. 657-3. |
| **M. Klein ¶ __** | Declaration of Named Consumer Plaintiff Maximilian Klein in Support of Consumer Plaintiffs' Motion for Class Certification, filed at Dkt. 645-16. |
| **Grabert ¶ __** | Declaration of Named Consumer Plaintiff Sarah Grabert in Support of Consumer Plaintiffs' Motion for Class Certification, filed at Dkt. 645-17. |
| **Banks Kupcho ¶ __** | Declaration of Named Consumer Plaintiff Rachel Banks Kupcho in Support of Consumer Plaintiffs' Motion for Class Certification, filed at Dkt. 645-18. |

I. **<u>INTRODUCTION</u>**

Class certification is proper here, and nothing in Facebook's opposition shows otherwise. Unlike many cases, where nearly every issue stands in dispute at class certification, the field of contested topics before the Court is very narrow. Facebook does not seriously dispute numerosity or that there are questions of law or fact common to the Class; *e.g.*, Facebook's monopoly power and anticompetitive conduct under the Ninth Circuit's *Harcourt Brace* framework. Although Facebook makes a small effort to contest market definition now, it utterly failed to put forward any expert opinion on that issue, and its experts disclaimed any analysis of these topics whatsoever. And Facebook does not dispute that the class action device is the superior means to adjudicate these claims.

Instead, Facebook's narrow attack focuses on whether common evidence can establish two elements of Consumers' claims (antitrust impact and damages), and whether Consumers have met Rule 23(a)'s typicality and adequacy requirements. These attacks do not withstand any scrutiny.

Consumers show common antitrust impact using extensive record evidence and accepted economic theory. Facebook suggests this analysis ultimately fails, but that is a quintessential merits issue for the jury. So, too, is Facebook's suggestion there is insufficient proof that it would have paid all users in the but-for world. Consumers have offered evidence of a but-for world where Facebook would have compensated all users ***equally***—a contention once again based on facts and common evidence from Facebook's real world actions and preferences. If Facebook would like to argue a different model of impact and damages to the jury, it is welcome; but all of the evidence in support of either but-for world is common to the Class. Finally, to challenge Consumers' showing of anticompetitive conduct, Facebook invents a legal standard that is nowhere found in the law, and does not grapple with Consumers' showing under *Harcourt Brace*. This argument, too, must fail.

Facebook then contests the validity of Consumers' damages model. But even within its own filings, Facebook never truly grapples with the fact that the comparability of yardsticks is heavily fact intensive, and Dr. Economides has surveyed a number of both internal and external data valuation services to put forward his damages model. And nowhere does Facebook reckon with the well-established Ninth Circuit law that the comparability of a yardstick approach is a question of the jury.

Finally, as to adequacy and typicality, Facebook defaults to innuendo about the named

representatives and their friendships with two former counsel (from a firm that was disqualified two years ago) and one current counsel (that has no role in leadership). These attacks badly misstate the named Consumers' sworn testimony and exemplary record serving as class representatives. Facebook also ignores its own cited authorities, which make clear "mere friendships" between class representatives and current class counsel do not even present an issue, let alone those with former counsel or counsel with no strategy or settlement authority.

This Court has made clear "[t]he class certification procedure is decidedly not an alternative form of summary judgment or an occasion to hold a mini-trial on the merits." *In re Capacitors Antitrust Litig.*, 2018 WL 5980139, at *10 (N.D. Cal. Nov. 14, 2018). Facebook's opposition raises various mischaracterizations of Consumers' theories, proof, and expert analyses. At absolute best, they are merits disputes only a jury can resolve. The Consumer Class should be certified.

## II.   FACEBOOK'S ANTITRUST INJURY ARGUMENTS DO NOT PROVIDE A BASIS TO DENY CLASS CERTIFICATION

### A.   Consumers Establish Antitrust Impact Based on Extensive Record Evidence and Accepted Economic Theory, Which Facebook Ignores

Consumers have offered an analysis of the but-for world, where Facebook is required to be transparent about its data collection and use practices, and in exchange, the competitive market requires payment to users. Facebook attacks this model as "speculative." Opp. at 1, 6. But this opposition is a critical admission regarding class certification. Facebook takes issue ***not*** with whether Consumers' actual model of impact leaves some Class members uninjured, but instead says that the model itself will lose. And that concession is critical, as whether the but-for world is plausible is a question for the jury and irrelevant at this stage. *Tyson Foods*, *Inc. v. Bouaphakeo*, 577 U.S. 442, 457 (2016) ("alleged failure of proof as to an element of the plaintiffs' cause of action" is "a matter of summary judgment, not class certification"); *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 477–78 (N.D. Cal. 2020) (supposed "failure of proof" as to but-for world irrelevant to predominance).

Facebook attacks the comparability of the twelve yardsticks employed by Consumers' expert, Dr. Economides. But common evidence supports the use of these yardsticks. All of this is addressed extensively in opposition to Facebook's Economides *Daubert* motion and Consumers do not repeat it here. Economides Opp. at 2–13. Regardless of which side is ultimately correct, one thing is clear—

1   the significance and comparability of yardsticks do not implicate any individual issues.[1]

2         Facebook's arguments as to the supposed economic infeasibility of paying users likewise do

3   not defeat certification. Opp. at 8–9. Facebook does not address Dr. Economides' showing that paying

4   each Class member $5 per month is a fraction of Facebook's North American "Average Revenue Per

5   User" and therefore economically feasible. Economides ¶¶ 445–47. And ████████████████████

6   ████████████████████████████████████████████████████████████████████████

7   ████████ Hochberg ¶¶ 67–68; Economides Reply ¶ 10. Facebook's █████████████████

8   assertions rely on Dr. Tucker's opinions, but she conceded she did not ████████████████████

9   ████████████████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████—points Dr.

11  Economides refuted, along with Facebook's ███████████████████████ claims. Ex. 6

12  (Tucker Tr.) at 258:21–259:10, 261:23–262:2, 263:22–24; Economides Reply ¶¶ 57, 81–109. And

13  ███████████ on Facebook are nothing new. Tucker admits ██████████████████████

14  ████████████████ Tucker ¶ 121. Facebook is well familiar with, and capable of, addressing ████████.

15        Facebook's assertions are, at best, merits arguments about what it would have done (or not

16  done) in the but-for world and why (or why not), based on its own expert's opinions. None of these

17  arguments differ by class member. *In re Online DVD Rental Antitrust Litig.*, 2010 WL 5396064, at

18  *10–11 (N.D. Cal. Dec. 23, 2010) (class certified as antitrust impact challenges were "themselves"

19  based on "generalized proof applicable to the class" and merits disputes). In reality, they raise

20  "opposing expert analyses" of "what the 'but for' world would like," which is not a matter for class

21  certification. *In re Aftermarket Auto. Lighting Prod. Antitrust Litig.*, 276 F.R.D. 364, 373–75 (C.D.

22  Cal. 2011).[2] Facebook's cited cases (Opp. at 6–7, 9) are inapt. *See In re New Motor Vehicles Canadian*

23  *Exp. Antitrust Litig.*, 522 F.3d 6, 26–29 (1st Cir. 2008) (expert submitted class certification report

---

[1] Facebook erroneously states Consumers rely on dissimilar services that compensate users "for the completion of particular tasks" like "surveys," in addition to services that compensate users for "passive" data collection. Opp. at 4, 8. Dr. Economides explained these critiques are misplaced and rest on factual mistakes as to the actual yardsticks he used. Economides Reply ¶¶ 154–63.

[2] Facebook concedes its "ascertainability" arguments are contrary to Ninth Circuit law. Opp. at 9 n.3. They are also baseless. The Consumer Class is all U.S. Facebook users that "maintained and used a Facebook profile"—*i.e.*, were "active"—at any point during the class period, which is how Facebook tracks its users. Mot. at 3; Economides ¶ 464 n. 730; Ex. 1 at 32. Class members are identifiable through Facebook's own records. If they somehow are not, they can be by notice and a claim form.

before close of discovery and stated he **could** fashion model but needed data "in defendants' hands"); *Ward v. Apple Inc.*, 2018 WL 934544, at *1–3 (N.D. Cal. Feb. 16, 2018) (11-page expert report only described methods expected to be applied in future, was "devoid of analysis," and consisted only of "preliminary review of certain data and techniques" by different expert in "separate litigation").

**B.** **Facebook's Attempt to Rewrite Consumers' Antitrust Impact Theory as "Individualized" Ignores the Theory's Inherently Common Nature and the Law**

Given that the contours of the but-for world are both based in fact and common to the Class, Facebook pivots to misstating Consumers' theory of impact and the relevant law.

**First**, Facebook suggests there is no common impact because some users in the but-for world would have received payment for their data and others would not. Opp. at 10–11. But Consumers' theory is that Facebook would have compensated **all users** in the but-for world at a **flat rate** because doing so is: the economically rational response to more competition; simple to implement and easy to explain; consistent with how Facebook provides the same terms to all users with no individual negotiation in the real-world; the most common model among services that compensate users for their data; reduces gamesmanship; minimizes moral hazard and adverse selection; and addresses political and fairness concerns. Economides ¶¶ 399, 409–10, 452–55; Economides Reply ¶¶ 81–137, 188–93.

Facebook tries to refute these explanations by selectively citing Dr. Economides' prior academic work and his deposition. Opp. at 4, 11–12, 12 n.3, 13. Consumers addressed these mischaracterizations in opposition to Facebook's *Daubert* motion. Economides Opp. at 4 n.2, 11. And, it is economically rational for Facebook to ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Economides Reply ¶¶ 87, 116, 131–33. Moreover, the cited portion of Dr. Economides' article, "*Restrictions on Privacy and Exploitation in the Digital Economy*," concerns whether, under E.U. law, a given platform's extraction of data is "excessive" (not compensation owed to the user), and the referenced "case-by-case assessment" is between platforms (*e.g.*, Google and Netflix), **not** between one platform and its own users. Ex. 2 at 43–46.

**Second**, Facebook's focus on "uninjured class members" is legally and factually misplaced.

As Consumers explain—and Facebook ignores—Facebook injured **all** Class members by not compensating them, regardless of their individual preferences as to privacy issues or their individual value to Facebook. Mot. at 15–16, 23–24; Economides Reply ¶¶ 110, 116–17, 177–80. (It is also clear that virtually all Consumers care about privacy, at least to a sufficient degree. Mot. at 6–8). Even if this were not the case, the Ninth Circuit has made clear a class's potential inclusion of "more than a de minimis number of injured class members" is **no bar**. *Olean Wholesale Grocery Coop.*, *Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 (9th Cir. 2022). Facebook's other cited case—*In re Apple iPhone Antitrust Litig.*, Opp. at 10—is inapt because it pre-dates *Olean*, relies on out-of-circuit law *Olean* distinguished, and turned on an expert's concession that 14.6% of the proposed class—**30 million** accounts—were uninjured. 2022 WL 1284104, at *15–16 (N.D. Cal. Mar. 29, 2022).

None of the above identifies an inability to show common impact; it demonstrates Facebook's view of the but-for world is different from Consumers'. But experts' competing views as to the but-for world are no basis to deny certification; they highlight that common proof will decide the question.

**C.**   **Facebook's Self-Serving Arguments that Class Members Are "Worse Off" in the But-For World Are Merits Disputes and Unsupported *Ipse Dixit***

Unable to challenge the plausibility of Consumers' but-for world, Facebook suggests some users would be "worse off" in it. Opp. at 12–14. But this Court has recognized that arguments "class members may be worse off in the plaintiff's but-for world" are "far too speculative and conditional to be a serious barrier to certification." *In re Google Play Store Antitrust Litig.*, 2022 WL 17252587, at *13 (N.D. Cal. Nov. 28, 2022) (Donato, J.) (vacated on other grounds). They are merits disputes for "trial" and "do[] not erode plaintiffs' showing of common evidence to prove antitrust impact." *Id.*; *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 142–43 (C.D. Cal. 2007) (similar, as "worse off" claims "relate to the merits"); *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 2023 WL 1813530, at *12–13 (C.D. Cal. Feb. 7, 2023) (similar). Nevertheless, Facebook's arguments fail.

***First***, Facebook would have employed the same data collection and use in the but-for world, but with openness and compensation. The but-for world is therefore one in which Facebook provided the exact same "value" to Consumers, but with adequate compensation. Ex. 4 (Economides Tr.) at 71:13–72:19. Facebook's suggestion that its ████████████████████████████ allows

it to provide value in the real world that it would not have been able to provide in the but-for world is simply misplaced. Opp. at 13–14. All Consumer Class members would benefit in the but-for world.[3]

**Second**, Facebook suggests that it provides value to certain users. Opp. at 13. But the claimed "benefits" that Facebook purports to offer Consumers are ███████████████████████. Facebook users have rejected those "benefits." Mot. at 6:8–9, 7:5–9; Economides Reply ¶¶ 23, 184–86; Lamdan Reply ¶¶ 44–51. But even if this were not the case, individual users' subjective preferences are irrelevant to whether Facebook under-compensated them for their data, since it would pay a market value in a flat manner across all users. Economides Reply ¶¶ 177–80 (all Class members economically injured by under-compensation for data, just as laborer whose market wages suppressed by collusion is injured, notwithstanding laborer "enjoys their job" and would maybe work "for free").

**Third**, Facebook's various "what-ifs" about the but-for world once again, at best, raise merits disputes. Opp. at 12–13. To the extent Facebook suggests ████████████████████████████ ████████████████████████████████████ that is a self-serving "ends justify the means" argument that would allow any monopolist to escape liability. It is also a red herring, as Facebook in the but-for world could still collect and use up to the same amount of data as in the actual world— just with honesty and adequate compensation. Economides ¶¶ 373, 396–403. Facebook's assertions about ███████████████████████████████████ are speculative—i██████████████ ████████████████████ *E.g.*, Ex. 6 (Tucker Tr.) at 290:19–291:8; Economides Reply ¶¶ 90–96.

## III.   FACEBOOK'S LIABILITY ARGUMENTS CONTRADICT THE RECORD AND LAW, HIGHLIGHTING WHY CERTIFICATION IS APPROPRIATE

### A.   Binding Case Law and Common Evidence Refute Facebook's Arguments Regarding "Individualized" Inquiries Into Its Anticompetitive Deception

The Ninth Circuit held in *Harcourt Brace* that market-wide deception can be anticompetitive. Consumers address this legal framework and offer common proof, which supports each prong. Mot.

---

[3] Facebook's cited cases, Opp. at 13–14, do not say differently. *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California* is irrelevant to the but-for world of a monopolization claim. There, the Ninth Circuit found the plaintiff suffered antitrust injury and noted competitors are "often unable to show injury" from a rival's price-fixing. 190 F.3d 1051, 1056 (9th Cir. 1999). In *Kottaras v. Whole Foods Mkt., Inc.*, class members could not by common proof establish any particular one was "net" injured by merger price increases, as doing so required analyzing each's "purchases" and "the amount by which the price of each product changed," as some may have increased and others decreased. 281 F.R.D. 16, 24–25 (D.D.C. 2012). This is not a merger case, and only one product—Facebook—is at issue.

at 5–15, 20–23. Facebook does not mention *Harcourt Brace* once, and its "individualized" deception arguments thus miss this fundamental point and urge an incorrect application of the law.

***First***, Facebook's suggestion (at 14) that Consumers need to identify "which users heard or read any tens of thousands of statements," those individuals' interpretations, and whether they "were influenced by" Facebook's deception ignores that this antitrust case turns on deception of ***the market***.[4] The question is whether Facebook deceived ***enough*** users, such that it was able to harm competition as a result. Mot. at 8, 21–24; *see also Am. Pro. Testing Serv.*, *Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publications*, *Inc.*, 108 F.3d 1147, 1150–52 (9th Cir. 1997) (inquiry is whether deception had a "significant and enduring adverse impact on competition itself in the relevant market[]"). Facebook elsewhere recognizes this is the correct standard. Tucker ¶ 1 (█████████████████████████ █████████████████████████████); Opp. at 21 (███████████████████████████).

Facebook tellingly cites no cases saying otherwise. And the common record (which Facebook does not try to refute) confirms its deception caused market-wide harm. *E.g.*, Mot. at 14–15.

***Second***, to the extent Facebook frames its attack as one of impact, Opp. at 6, 14, all Consumer Class members were harmed because (knowingly or not, and regardless of their preferences) they all paid an overcharge by receiving nothing from Facebook rather than the competitive compensation they would have received for their data in the but-for world. Mot. at 23–24; *In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, 421 F. Supp. 3d 12, 60–61 & 61 n.21 (E.D. Pa. 2019) (class certified for deception-based antitrust claims and rejecting argument claims required proof of "individual reliance" on deception, as irrelevant to injury by paying overcharge).

***Third***, Facebook's contentions (Opp. at 15–16) regarding a supposed absence of methods to prove its anticompetitive deception ignore that proving Facebook's "statements were false," *id.* at 14, is a simple matter of comparing what Facebook said (or did not say) to the market against what it actually did. Facebook's focus on its affirmative misrepresentations also entirely ignores its ***omissions***, which are also at issue and harmed competition. Consumers detailed all this in their motion

---

[4] Even in other types of cases—like consumer protection actions where individual class members allegedly purchased a product ***because of*** mislabeling—"deception and materiality" are "objective inquiries" "ideal for class certification" and for which a supposed "failure of proof" is irrelevant as to predominance. *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1115–16 (N.D. Cal. 2018).

1   and in an accompanying summary chart, which Facebook just ignores. Mot. at 8–12, 20–21.

2         **Fourth**, Facebook's gripes about purported "generalized" evidence, Opp. at 15–16, ignore the

3   mountains of common proof that ███████████████████████████████████████████

4   ██████████████████████ As to materiality, Facebook does not dispute, *e.g.*, its own CEO Mr.

5   Zuckerberg explained "[t]he No. 1 thing that people care about is privacy and handling of their data,"

6   or the reams of other similar common proof from its own executives and files. Mot. at 6–7, 22. Nor

7   does Facebook engage with similar common proof that shows ███████████████████████

8   ████████████████████████████████████████████████████████████████████████

9   █████████████████████████████████████████ *E.g.*, Mot. at 1, 12–13.

10        To be clear, Facebook cites no authority requiring a statement-by-statement or omission-by-

11   omission approach, nor is that the standard applied here at the motion to dismiss stage, which analyzed

12   whether the statements and omissions overall had an effect on the market. *E.g.*, Dkt. 214 at 61–65

13   (considering whether consumers holistically find data and privacy issues important). Facebook's

14   proposed approach is also inconsistent with the law, which makes clear "it would not be proper to

15   focus on specific individual acts of an accused monopolist while refusing to consider their overall

16   combined effect." *City of Anaheim v. S. California Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992).

17        **Fifth**, Facebook mischaracterizes the named Consumers' and their experts' testimony. Opp.

18   at 14–15. As discussed *infra*, the named Consumers explained they (incorrectly) understood Facebook

19   allowed them to control their data. Facebook's emphasis on its "misrepresentations" also ignores its

20   omissions. Dr. Economides testified it would be hard for users to understand and "rely on" Facebook's

21   ***privacy policy*** because of its length and complexity—he was not testifying about Facebook's

22   external-facing public (mis)statements. Ex. 4 (Economides Tr.) at 44:12–46:13. Prof. Lamdan—who

23   Facebook did not seek to exclude—opines "consumers care about their online privacy," and Facebook

24   through PR sought to create the perception it "was a trustworthy steward of user data." *E.g.*, Lamdan

25   ¶¶ 10, 78–81, 84, 100–01; Lamdan Reply ¶¶ 25–33. That she testified she was not opining Facebook's

26   "representations and omissions" were "***clearly material***" or "***clearly likely to induce reasonable***

27   ***reliance***" is unsurprising—those are legal elements and she provides opinions that would allow the

28   jury to make such ultimate conclusions when viewed in light of her testimony and other evidence.

Facebook's attacks regarding Consumers' survey expert—Mr. Klein, who Facebook also did not seek to exclude—are also misguided. Contrary to Facebook's assertion and deposition "gotcha" question, Mr. Klein's survey **does** test the importance to Facebook users of knowing eight specific data practices which Facebook deceived the market about, are at issue in this case, and were identified to him by counsel, all of which he clarified in his reply report. B. Klein Reply ¶¶ 15, 31. Facebook also omits that its critiques that Mr. Klein's survey does not test whether users "prefer[]" certain data practices Facebook misrepresented or omitted or whether users "would have signed up anyway," Opp. at 15, are arguments he already addressed and explained are irrelevant to whether it would be material for a user to know about those practices in the first place (the proper question). B. Klein Reply ¶¶ 5, 17–18, 29–30; Dkt. 214 at 62 (order setting forth standard). Moreover, what Mr. Klein did or did not find "important" when using other "platforms" in his personal life is irrelevant as to his expert opinions in this case, which are based on surveying a representative sample of Facebook users.

**B.**   **Relevant Market Definition Is an Inherently Class-Wide Issue, Which Facebook Concedes Is a Merits Matter That It Has Not Substantively Challenged**

The contours of the relevant market are also a question common to the Class. Consumers have offered two experts, Drs. Economides and Farrell, who deploy a multitude of standardized tests to measure the relevant market. Economides §§ II–VI; Farrell §§ III–IV. Facebook offered no expert evidence in response. And while Facebook now claims it contests whether market definition can be demonstrated with common evidence (Opp. at 17 n.5), its own counsel conceded "market definition" is a "squarely merits . . . not class certification" issue. Ex. 3. At bottom, Facebook offers no expert opinion on the relevant market, its experts do not challenge the PSN Market, and they were instructed by Facebook's counsel **not** to engage with the relevant market because doing so ███████████ ████████ Tucker ¶ 25; Fair ¶ 1 n.2; Ex. 6. (Tucker Tr.) at 44:10–46:17. There is no serious question that defining a relevant market is a question common to the Class.

Even were the Court to entertain Facebook's arguments, they each fail. Facebook asserts (at 16–17) that because the Facebook app offers both PSN features (*e.g.*, engaging with family) and features that resemble those of non-PSN services (*e.g.*, watching a stranger's videos), it is "impossible to know which users have actually been affected" by Facebook's conduct. But the Consumer Class

consists of individuals that maintained and used a Facebook account; they thus necessarily used Facebook's PSN services (*e.g.*, created a profile, could see posts from friends and family and respond, were shown curated content based on the same). And, as Dr. Economides explains, Facebook would have paid all these users—even low-engagement users, who are more important to compensate—such that its not doing so injured all Class members. Economides Reply ¶¶ 110–18, 120, 177–80.

In any case, Facebook's selective citation to Dr. Economides' report (at 16–17) **has nothing to do** with whether Facebook users are in or out of the PSN Market. Dr. Economides explains how Facebook's monstrous profits are not attributable to "superior features" (since it copied them) and are thus direct evidence of its monopoly power. Economides § V(A). Contrary to Facebook's mischaracterizations, he explains why it would be improper to draw a distinction between Facebook's PSN and non-PSN features. *Id.* ¶¶ 78–86. Moreover, he also explains why even applying "haircuts" to Facebook's market share to credit its argument still results in sufficiently high market share in the PSN Market. *Id.* ¶¶ 251–58. *Compare Garnica v. HomeTeam Pest Def.*, *Inc.,* 230 F. Supp. 3d 1155, 1157–58 (N.D. Cal. 2017) (Facebook's cited case, denying certification where no proof of market share in each of "32 **geographic** markets"). Facebook fatally ignores these opinions.

Facebook's claim that Consumers offer no "reliable method" of defining the relevant market is also wrong. Opp. at 17–18. Consumers rely on Dr. Farrell's and Dr. Economides' relevant market opinions, whose reliability Facebook conceded when it did not seek to exclude them, much less even challenge them via its own expert. With no expert analysis of its own, Facebook instead resorts to unsupported attacks that misstate Dr. Farrell's and Dr. Economides' opinions. Opp. at 17–19.

In reality, Dr. Farrell explained his class certification opinions are not "tentative": he set forth **methods** that rely on common proof and can be used for market definition at the merits stage, which he explains show the Court that defining the relevant market—one way or the other—is a class-wide issue. Ex. 5 (Farrell Tr.) at 12:6–13:4, 93:12–95:1, 96:20–98:22. While he did (and need) not formally define the market now, he nonetheless showed how his common methods could be applied at the merits stage, and even applying them now shows the PSN Market is a plausible market, an opinion he expects to finalize at the merits stage. *Id.*; *Id.* at 99:5–99, 281:23–282:10; Farrell ¶¶ 44, 74, 86.

Facebook's references to pre-2014 evidence, Snapchat, and TikTok, Opp. at 17, also take Dr.

Farrell's opinions out of context. He outlined three separate methods for defining the market: (1) critical loss analysis ("CLA"); (2) analyzing other firms ██████████████████████ ████████████████████████████; and (3) evaluating Facebook's discussion of ████████ ████████. Farrell § IV(B). Facebook's selective references focus on Dr. Farrell's ████████ opinions, which necessarily rely on earlier temporal evidence because ████████ failed by 2015. Facebook nowhere even mentions Dr. Farrell's CLA and ████████████████ analyses, which quantitatively and qualitatively confirm the PSN Market definition, including based on post-2014 evidence and regarding Snapchat and TikTok. Farrell ¶¶ 104–131; Ex. 5 (Farrell Tr.) at 282:11–285:7.

Facebook's critiques of Dr. Economides (at 17–18) are also misguided. While Facebook notes ████████████change occurred in 2021, it nowhere explains why market conditions in 2021 are uninformative as to the slightly earlier class period. And Facebook itself relies on supposed proof of competition outside the class period. *E.g.*, Dkt. 227 at 1; Tucker ¶ 98. Facebook also ignores Dr. Economides' extensive analyses based on documents and testimony as to competitive conditions during the class period. *E.g.*, Economides §§ III(E)–(F). Its arguments against the "SSNDQ" test are also misleading, as it is a well-accepted (and regularly-used) alternative to a "SSNIP" test, and is viewed as the equivalent of the accepted "quality effects of competition" analysis. Farrell ¶¶ 57–60; Economides ¶¶ 47–51, 51 n.30, 57; Ex. 5 (Farrell Tr.) at 111:8–114:17. Dr. Economides' use of his economic expertise to identify characteristics of personal social networks that distinguish them from other services is also well-accepted. Economides ¶¶ 53 & 53 n.30; *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) ("product's peculiar characteristics and uses" bear on market definition).

## IV. FACEBOOK'S DAMAGES CHALLENGES REPEAT ITS FLAWED *DAUBERT* ARGUMENTS AND, AT BEST, RAISE MERITS DISPUTES

Facebook advances two challenges to Consumers' class-wide damages model. Each fail.

**First**, Facebook repeats its impact and *Daubert* arguments that Consumers' damages model is supposedly based on improper yardsticks for the market value of Facebook users' data. Opp. at 18–19. That is a merits dispute that raises no individual issues. *See In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 2023 WL 1813530, at *13 (C.D. Cal. Feb. 7, 2023) (defendant "can argue to a jury that Plaintiff's models are unpersuasive and do not *in fact* prove . . . damages," but that is no

basis to deny certification). Facebook's claim is also baseless, as Dr. Economides explains why his data value yardsticks are comparable and appropriate. *E.g.*, Economides Reply § VII; Economides Opp. at 4–5, 11–14. Tellingly, Facebook ignores the Ninth Circuit law (which Consumers cited) making clear yardstick comparability is a jury question. Mot. at 24 n.8; Dkt. 649 at 7 n.31.

*Second*, Facebook's invocation of *Comcast* fails. Opp. at 18–20. *Comcast* instructs that where a class advances ***multiple*** substantive antitrust theories, some of which are rejected, a damages model fails Rule 23(b)(3) where it does not "isolate damages resulting from any one theory." *Comcast Corp. v. Behrend*, 569 U.S. 27, 31–37 (2013). Consumers assert ***one*** liability and impact theory, and their method for calculating damages is consistent with that theory. *E.g.*, Mot. at 1–2, 15–17; Economides ¶¶ 358–60, 373, 397, 408; *see also Moehrl v. Nat'l Ass'n of Realtors*, 2023 WL 2683199, at *20–21 (N.D. Ill. Mar. 29, 2023) (certifying class based on Dr. Economides' yardstick analysis and explaining "[n]o *Comcast* problem arises where the plaintiff asserts only ***one*** theory of liability") (cleaned up).

Facebook's real contention is that Dr. Economides supposedly does not calculate damages in the PSN Market but instead does so in a "market for 'data from users' online and device activities.'" Opp. at 19–20. This is astoundingly incorrect. Consumers do not claim damages based on Facebook's anticompetitive acts in an "online and device activities" market; they seek damages for Facebook's monopolization of the PSN Market and calculate those but-for world damages using yardsticks that identify the market rate for comparable data in the real-world.[5] Economides Reply ¶¶ 143–51.

This underscores why Facebook's complaint that Consumers use yardstick prices outside the PSN Market (Opp. at 20) entirely misses the point. The purpose of the "generally accepted" yardstick method is to compare prices in the relevant market with those "in a comparable market ***unaffected by the antitrust violation***." *Nat'l ATM Council, Inc. v. Visa Inc.*, 2023 WL 4743013, at *7 (D.C. Cir. July 25, 2023). Indeed, Facebook knows this well because, ***in this case***, it has recognized that ██████

████████████████████████████████████████████████████████████

███████████████████████████████████████. Dkt. 661-1 at 15; Dkt. 663-1 at 3.

---

[5] Facebook further attempts to confuse by cherry-picking Dr. Economides' prior article regarding "two different markets" for social networking and the acquisition of data. Opp. at 20. However, that article ***assumed*** the existence of separate markets as a response to hypothetical regulation. Ex. 2 at 9–10. In any case, an expert's prior academic work is a matter for cross. Economides Opp. at 11.

1   This concession is crucial, and it undermines any objection to Dr. Economides' yardstick analysis.

2   **V.    FACEBOOK'S ATTACKS ON THE NAMED CONSUMERS ARE MERITLESS**

3       **A.    The Three Named Consumers Are Typical and Adequate Representatives**

4         Both typicality and adequacy are satisfied here. There is no serious dispute that the named

5   Consumers and members of the proposed Consumer Class allege the same antitrust violations

6   (Section 2), based on the same conduct and theories (anticompetitive deception), resulting in the same

7   type of injury (under-compensation for data). Mot. at 18–19; Opp. at 20–23. Nor can it be contested

8   that the named Consumers have actively participated in the case for years by responding to discovery,

9   sitting for deposition, and reviewing filings. They have swore under oath as to the truth of this.[6] No

10  more is required. Mot. at 18–19 (collecting cases, which Facebook nowhere addresses).

11        Unable to show the named Consumers are actually unsuitable, Facebook resorts to cherry-

12  picking deposition testimony. But even that fails. Even if the named Consumers "were not aware of"

13  or did not individually rely on Facebook's data-related statements or omissions (both of which are

14  untrue), that in no way undermines their typicality or adequacy as class representatives. Opp. at 21–

15  23. As discussed *supra* in Section III(A), class members' individual reliance and exposure are ***not***

16  elements of Consumers' antitrust claims—and Facebook cites zero cases suggesting otherwise.

17        Facebook's assertions regarding the named Consumers' testimony (Opp. at 23) also rest on

18  mischaracterizations. Each testified privacy and data issues matter to them and affected their use of

19  Facebook. *E.g.*, Ex. 8 (Grabert Tr.) at 17:20–25, 127:20–128:3; Ex. 7 (Klein Tr.) at 232:17–24, 280:3–

20  19; Ex. 9 (Banks Kupcho Tr.) at 40:13–21, 50:1–3, 155:21–156:6. To the extent Facebook claims the

21  manner in which the named Consumers' privacy settings on Facebook and other services are toggled

22  somehow indicate they do not care about their data or privacy, each named Consumer testified settings

23  say little of their views. *E.g.*, Ex. 8 at 218:21–219:19; Ex. 7 at 59:1–17, 254:22; Ex. 9 at 73:8–75:4.

24  Indeed, users do not understand, know of, or adjust settings for many reasons, and Prof. Lamdan and

25  Dr. Economides each explain why a user's privacy settings say little about their preferences. Lamdan

26  ¶¶ 47, 53–55, 61–63; Lamdan Reply ¶¶ 53–103; Economides Reply ¶¶ 35–55.

27

---

28  [6] *E.g.*, Ex. 7 (Klein Tr.) at 22:1–7; 105:6–8, 327:21–329:3; Ex. 8 (Grabert Tr) at 17:20–18:9, 119:13–120:5, 126:4–16; Ex. 9 (Banks Kupcho Tr.) at 20:11–15, 33:25–34:5, 249:13–16; M. Klein Decl. ¶¶ 3–6, 9–10; Grabert Decl. ¶¶ 3–6, 9–10; Banks Kupcho Decl. ¶¶ 3–6, 9–10.

Facebook's suggestion the named Consumers are uninformed about the case strains credulity. Opp. at 23–24. For one, **Facebook** insisted on and obtained a protective order preventing the sharing of its highly confidential information (even summaries or characterizations) with the named Consumers. Dkt. 95 at 7; Dkt. 108 at 7. Moreover, the named Consumers are well-educated and engaged in the facts of this case. Facebook's criticisms are factually wrong and legally unsupported. *Capacitors*, 2018 WL 5980139, at *10 (Donato, J.) (rejecting "alleged ignorance" challenges as "disfavored" and noting representative can rely on counsel); *Moore v. Int'l Cosms. & Perfumes, Inc.*, 2016 WL 7644849, at *18 (C.D. Cal. Mar. 17, 2016) (alleged inconsistencies between theories and representatives' testimony "fodder for cross-examination at trial" and do not defeat certification).[7]

**B.      No Relationships Bar the Named Consumers From Serving as Representatives**

The named Consumers can properly serve as class representatives. Facebook launches personal attacks on the relationships between Plaintiff Banks Kupcho and the Lockridge Grindal Nauen ("LGN") firm, as well as between Plaintiffs Klein and Grabert and the Keller Postman ("KP") firm. Opp. at 24–25. This Court has explained "certification should not be denied on the basis of speculative conflicts." *Brickman v. Fitbit, Inc.*, 2017 WL 5569827, at *3 n.2 (N.D. Cal. Nov. 20, 2017) (Donato, J.). Facebook's innuendo about a small subset of attorneys raises zero actual conflict.

Plaintiff Banks Kupcho is a friend of one LGN attorney who also served as her witness "for a name change." Opp. at 24. No real adequacy concerns lie where there is no relationship between a "class representative and class counsel . . . beyond friendship," like "a financial or familial tie." *Holt v. Noble House Hotels & Resort, LTD*, 2018 WL 5004996, at *7 (S.D. Cal. Oct. 16, 2018). Banks Kupcho and the attorney are friends, with no financial or familial tie. The attorney is not Interim Class Counsel and does not seek to be appointed Class Counsel. She has no authority in final strategy or settlement discussions. *Holt*, 2018 WL 5004996, at *7 (no conflict where representative friends with

---

[7] Facebook's cited cases (Opp. at 21, 23) are inapt. *See In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 358–59 (N.D. Cal. 2018) (representative did not even "subscribe" to allegedly deceptive service that was basis for theory); *Major v. Ocean Spray Cranberries, Inc.*, 2013 WL 2558125, at *3–4 (N.D. Cal. June 10, 2013) (classes included products that representative "did not purchase"); *In re Facebook, Inc., PPC Advert. Litig.*, 282 F.R.D. 446, 454 (N.D. Cal. 2012) (representatives subject to arbitration clauses, showed no "concrete injury," sought to represent both "persons or entities", and conceded "knows essentially nothing about the case"); *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978) (**rejecting** challenge to representatives).

attorney "who will ***not be*** class counsel"); *cf. DeNicolo v. Hertz Corp.*, 2021 WL 1176534, at *6 (N.D. Cal. Mar. 29, 2021) (similar, where attorney was "one of several" "from two different firms").

Plaintiffs Klein's and Grabert's relationships with KP consist of one (since departed) attorney that is Klein's close friend and another that is the friend of Grabert's husband, who also previously reviewed some unrelated contracts. Opp. at 24–25. Mere friendship between a class representative and ***current*** counsel do not render the representative unsuitable on grounds she will seek to curry favor to secure a "windfall" for her counsel. *In re Toys R Us FACTA Litig.*, 300 F.R.D. 347, 373–75 (C.D. Cal. 2013). This is even more true where, as here, the representative's relationship is with ***prior*** counsel. *Poulos v. Caesars World, Inc.*, 2002 WL 1991180, at *6 & *6 n.9 (D. Nev. June 25, 2002). KP was disqualified from this case ***nearly 2.5 years ago***. Dkt. 123. Facebook's speculation KP ***might*** "share" in any fees based ███████████████ is mistaken. *Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 136 F.3d 1354, 1355–59 (9th Cir. 1998). To the extent Facebook hypothesizes KP ***might*** seek *quantum meruit*, its cited case makes clear *quantum meruit* is purely a matter for the Court's discretion. *Sheppard, Mullin, Richter & Hampton, LLP v. J-M Mfg. Co.*, 6 Cal. 5th 59, 88–91 (2018).

Facebook's cited cases (Opp. at 24–25) do not establish a class representative's mere friendship with counsel presents a suitability concern. Each involved representatives that had ***other*** significant problems with their suitability, such as no standing or due diligence (*Bohn*), familial or financial relationships (*Mowry*; *London*), employer influence (*May*), or an admission they were there solely to represent counsel (*Mowry*). And, at least one ***rejected*** a suitability challenge (*McArdle*).

Each named Consumer here swore that they are pursuing this case due to a genuine desire to hold Facebook accountable, know of zero conflicts with absent Class members, take seriously their obligations to the Class, and will continue to safeguard its interests. Ex. 7 (Klein Tr.) at 26:8–20, 308:18–25, 324:22–328:2; Ex. 8 (Grabert Tr.) at 17:20–18:3, 126:20–128:3, 352:18–23; Ex. 9 (Banks Kupcho Tr.) at 77:8–10, 247:16–249:24, M. Klein Decl. ¶¶ 7–10; Grabert Decl. ¶¶ 7–10; Banks Kupcho Decl. ¶¶ 7–10. That suffices. *In re Toys R Us*, 300 F.R.D. at 373–75 (rejecting attack based on counsel relationships as representatives swore to "protect the interests of absent class members").

## VI. CONCLUSION

For the foregoing reasons, Consumers respectfully request that the Court grant their Motion.

DATED: November 3, 2023

By: */s/ Shana E. Scarlett*
**HAGENS BERMAN SOBOL SHAPIRO LLP**
Shana E. Scarlett (Bar No. 217895)
  shanas@hbsslaw.com
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
(510) 725-3000

Steve W. Berman (admitted *pro hac vice*)
  steve@hbsslaw.com
1301 Second Avenue, Suite 2000
Seattle, WA 98101
(206) 623-7292

*Interim Co-Lead Consumer Class Counsel*

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
W. Joseph Bruckner (admitted *pro hac vice*)
  wjbruckner@locklaw.com
Robert K. Shelquist (admitted *pro hac vice*)
  rkshelquist@locklaw.com
Brian D. Clark (admitted *pro hac vice*)
  bdclark@locklaw.com
Rebecca A. Peterson (Bar No. 241858)
  rapeterson@locklaw.com
Kyle Pozan (admitted *pro hac vice*)
  kjpozan@locklaw.com
Laura M. Matson (admitted *pro hac vice*)
  lmmatson@locklaw.com
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900

*Interim Counsel for the Consumer Class*

By: */s/ Kevin Y. Teruya*
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Kevin Y. Teruya (Bar No. 235916)
  kevinteruya@quinnemanuel.com
Adam B. Wolfson (Bar No. 262125)
  adamwolfson@quinnemanuel.com
Scott L. Watson (Bar No. 219147)
  scottwatson@quinnemanuel.com
Claire D. Hausman (Bar No. 282091)
  clairehausman@quinnemanuel.com
Brantley I. Pepperman (Bar No. 322057)
  brantleypepperman@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
(213) 443-3000

Michelle Schmit (admitted *pro hac vice*)
  michelleschmit@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606-1881
(312) 705-7400

Manisha M. Sheth (admitted *pro hac vice*)
  manishasheth@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Interim Co-Lead Consumer Class Counsel*

**ATTESTATION OF KEVIN Y. TERUYA**

This document is being filed through the Electronic Case Filing (ECF) system by attorney Kevin Y. Teruya. By his signature, Mr. Teruya attests that he has obtained concurrence in the filing of this document from each of the attorneys identified on the caption page and in the above signature block.

Dated: November 3, 2023          By   /s/Kevin Y. Teruya
                                          Kevin Y. Teruya


**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of November 2023, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System, causing it to be electronically served on all attorneys of record.

By   /s/ Kevin Y. Teruya
          Kevin Y. Teruya