# EXHIBIT 1

**Exhibit 1: Topics for User Plaintiffs–Meta Concurrent Proceeding**

The following are the respective positions of Consumer Plaintiffs' experts (Prof. Economides, Prof. Farrell, Prof. Lamdan, and Mr. Klein) and Meta Platforms, Inc.'s experts (Prof. Tucker and Ms. Kirk Fair) on the agreed upon areas of disagreement for the concurrent proceeding to be held on December 5, 2023, to the extent an expert has analyzed those topics.

1. **The experts disagree about what Facebook and rivals would have done to obtain and retain users if there had been more personal social network services competition in the but-for world.**

**CONSUMER PLAINTIFF EXPERTS' POSITION**

Consumer Plaintiffs' experts opine that the Personal Social Network Market ("PSN Market") is the relevant market, which Facebook's experts do not contest at this stage. In a but-for world featuring more competition to Facebook from rivals in the PSN Market, the fact that Facebook earns high profits per user would give it an economic incentive to offer significantly better terms to its users to avoid losing them to those rivals. The evidence in this case indicates that, in the actual world, Facebook's rivals offered better terms on data collection and use, and that Facebook's misrepresentations and omissions about its own such terms made it difficult (if not impossible) for users to understand these differences in Facebook's actual data practices. In the but-for world in which Facebook's deception did not occur, Facebook's actual data collection and use practices would have been transparent to users, and Facebook would accordingly have had to offer significant incremental value to users in order to keep them from leaving for other personal social networks. Because Facebook's data collection and use was highly profitable, it would have made overwhelming economic sense for Facebook to continue collecting and using data from its users and then pay users for that data, rather than restricting its own data collection and use. Indeed, Facebook considered paying all users for their data *in the actual world*, where it faced very limited competition. Dr. Tucker claims—based on her vaguely defined term "attention platform," and zero analysis as to the competitive equilibria in the examples she offers—that Facebook and its PSN Market rivals would only compete based on content, not on price. But Dr. Tucker elides that the services she mentions ***absolutely do*** compete on price, and competition on that dimension does not deter users or advertisers. Newspapers, magazines, cable television, and streaming apps charge fees (along with displaying ads), and at the same time they regularly offer in-kind compensation (discounts, promotional items, and other special offers) to offset those fees. The but-for world Dr. Economides constructs is no different: Facebook would offset its collection and use of its users' data with monetary compensation. It is also supported by the record, economic logic, and literature, all of which Dr. Tucker does not grapple with. As discussed below, even in the less likely event Facebook compensated users in the but-for world with non-pecuniary benefits, such benefits would have needed to have an equal or greater value than compensation in the form of cash or cash equivalents.

**TUCKER'S POSITION**

In a but-for world in which there had been more competition for the attention of Facebook users, Facebook and its rivals would have responded the way that attention platforms respond to competition in the real world: by improving the quality of their content and features to engage

user attention. That is how they offer more incremental value to users than their competitors. What we would not see—and have never seen in the real world—are widespread payments to users to keep them on the platform. Facebook certainly never made such payments in the real world. Attention platforms compete by providing engaging content through innovative features to attract and engage users' attention. In turn, they subsidize the content and features they offer to users by connecting advertisers to users or making users pay for access to content, or both. For example, when Fox was introduced as the fourth broadcast network, the other three broadcast networks did not respond by paying users to watch them. Investopedia.com did not start paying users to read its content and see its ads, even as additional competing investment websites sprung up. And Facebook and YouTube have not responded to the emergence of TikTok by paying users to stay on Facebook or YouTube instead of migrating to TikTok. Instead, they responded the way attention platforms do when faced with increased competition: by enhancing their product offering to include short-form videos—Facebook Reels and YouTube Shorts. Attention platforms do not pay users as a competitive response because doing so makes little economic sense. Users go to attention platforms to be entertained and informed. They are not looking to be paid. Plaintiffs ignore all the real-world evidence that explains why Meta rejected schemes that would involve paying for data which reflects these economic and behavioral realities. An attention platform that paid its users would not be perceived as entertaining and would also risk attracting users who do not meaningfully engage with the content and features. This combination would make the platform less appealing for authentic users and advertisers alike. There is no basis in economic logic to argue that increased competition in a but-for world would result in Facebook paying users.

2. **The experts disagree about whether market research firms and the internal market research programs at Facebook are informative about the but-for world as proposed yardsticks including the payments these firms make, the value that is generated for users by these firms, and how these firms compete.**

**CONSUMER PLAINTIFF EXPERTS' POSITION**

The compensation of users by market research firms and Facebook's own internal market research programs (Research App and Study) is an appropriate yardstick to reliably and reasonably measure the competitive level of compensation Facebook would have needed to provide to users for their data in the but-for world. While Dr. Tucker makes much of the fact that market research firms offer no "value" or functionality to users (beyond compensation for data), that is the point: such programs properly allow for isolation of the monetary price consumers require for fully-disclosed collection and use of their data. There is thus no need—as Dr. Tucker claims—to "adjust" this price to account for the functionality Facebook provides. This is because in the but-for world, users would have been choosing between Facebook and rival personal social networks with comparable services, but with better data practices. Facebook would have needed to offer *additional* value in order to attract and keep users in the face of this competition. Dr. Tucker ignores these alternatives available to users in the but-for world, and her claims regarding Facebook paying users for consuming content in the but-for world miss the point that the compensation at issue is compensation to users *for their data*. Moreover, the data that the yardsticks and Facebook respectively obtain from their users need not be identical; they need only be *reasonably* comparable. They are: Facebook and the yardsticks obtain from their respective users comparable types of data, *e.g.*, web browser history and location, device, and

2

app usage data. Dr. Tucker's proposed yardsticks (TikTok, Snapchat, YouTube, and Twitter) do not isolate the price of user data in those scenarios (and are thus not really "yardsticks" akin to the user data market valuation examples Dr. Economides analyzes). Moreover, Dr. Tucker has not done any analysis of the competitive situation in the relevant markets those services compete in, let alone any analysis of what data they collect or the value provided to their users supposedly offsetting that data collection. Snapchat, moreover, is in the PSN Market and its pricing and other behavior is tainted by Facebook's anticompetitive conduct in that market. Dr. Tucker's claims that research programs impose "costs" on users is also overstated. Dr. Tucker's only example is installation costs, which typically consist of a one-time app installation (no different than Facebook). And the fact that the programs identified in Dr. Economides' analysis have a different "business model" to Facebook is not material to the comparability of their data valuations. It is also unlikely that Facebook would have offered some non-pecuniary "benefit" (*i.e.*, feature) to users in the but-for world (rather than monetary compensation). Such benefits would likely have been expensive (otherwise Facebook would have implemented them in the actual world) and it would have been very difficult to ensure the benefits appealed to all users and thus provided adequate compensation to offset Facebook's collection and use of their data. Even if Facebook did offer such an alternative benefit, however, it would have had to have been at least as valuable to users as the compensation provided by the yardsticks, and so the yardsticks remain an appropriate comparison for the value that would have been received by users.

**TUCKER'S POSITION**

Market research firms and internal market research programs are not informative about the but-for world. These proposed yardstick programs are uninformative because they do not offer value to users, but instead require users to bear burdens solely so that the program can monitor their digital behavior. That is why they need to make payments. Just as Nielsen, a market research firm that does not produce content, had to pay people to install a box to monitor what they watch on TV, without compensation no one would voluntarily download an app that monitors what they are doing online without providing any benefit. By contrast, Facebook is an attention platform that attracts users by providing a venue for engaging content that users naturally enjoy. To justify his choice of yardsticks, Economides assumes that Facebook's competitors in his but-for world would offer users the same value as Facebook but better data collection and use.[1] However, Economides has contradicted this assumption by agreeing that it is possible that all potential competitors in his but-for world would have been less privacy-focused than Facebook.[2] And given tradeoffs between data collection and use and personalization, it is not clear how Facebook's competitors could offer better value anyway. Economides also agrees that the types of data collected by his proposed yardstick programs are not similar to types of data collected by

---

[1] Reply Declaration of Professor Nicholas Economides in Support of Consumer Plaintiffs' Motion for Class Certification, Maximilian Klein, et al. v. Meta Platforms, Inc., No. 3:20-cv-08570-JD, September 1, 2023, ¶ 152 ("Thus, the actual tradeoff users would evaluate in the but-for world is to compare the value derived from Facebook plus $5, versus the value derived from a rival personal social network plus better data collection and use practices. In other words, after considering that with both options, users receive personal social network services which they would value, the primary difference between the options is a tradeoff between a $5 payment versus the ability to better control how one's data is being collected and used—the same choice offered by the yardstick programs.").
[2] Deposition of Nicholas Economides, *Maximilian Klein, et al. v Meta Platforms, Inc.*, No. 3:20-cv-08570-JD, September 14, 2023, p. 120:13-19 ("Q. In your but-for world, the competitors who participate may have all been less privacy focused than Facebook; correct? A. We -- it is conceivable, but that's not something I assume, that different competitors have different importance to privacy focus. So that's allowed, and that's -- that's possible.").

Facebook.[3] Therefore, without adjusting for these fundamental differences, these proposed yardsticks are not informative about the question of what payments there would have been to users in the Economides but-for world. In contrast, there are many closer analogues to Facebook's data collection and use that Economides fails to consider; firms both in and out of his candidate market like YouTube, Snapchat, TikTok, and Twitter that do not pay their users for consuming content. Tellingly, were these firms used as yardsticks, Economides would have concluded that Meta would not pay users for consuming content.

3. **The experts disagree about the validity of the classwide harm to consumers in the actual world in the absence of payments from Facebook, that is, whether Facebook users would be better off in the Economides but-for world.**

**CONSUMER PLAINTIFF EXPERTS' POSITION**

In the but-for world absent Facebook's deception as to its data collection and use, Facebook would have faced substantially greater competition. As a result of this greater competition, Facebook would have been constrained in its ability to collect and use users' data without losing users to rival personal social networks with better data collection and use practices. In order to capture the tremendous economic opportunity offered by users' data, in the but-for world Facebook would have charged a lower effective price for the Facebook service; that is, it would have offset the data collected and used from users with additional consideration, namely a monetary payment to all users (in cash or equivalent). Given Facebook does not and cannot individually negotiate with its hundreds of millions of users, the price Facebook charged in the actual world and would have charged in the but-for world was and would have been the same across all users. This case is therefore effectively a straightforward overpayment case: users overpaid for Facebook by having their data collected and used without additional compensation beyond the use of the Facebook app, a rate that would not have been sustainable had there been rival personal social networks for users to turn to. And just like any other overpayment case, all users were harmed by overpaying (*i.e.*, not receiving the additional compensation) regardless of their subjective views, including whether they preferred Facebook or a rival in the but-for world. Dr. Tucker attempts to rebut this harm by claiming payments would "downgrade" the user experience. But Dr. Tucker's specific claims are unlikely and unsupported. There is no reason to think, given a user's existing network of friends and family, that the addition of a few additional friends or family who are not particularly active would make a user's experience feel less "authentic." Dr. Tucker's claim is also contrary to economic logic (discussed below in Issue No. 4) and Facebook's own documents (which demonstrate the benefits of retaining and re-activating such low-engagement users). As to the supposed need for additional verification and fraud prevention measures to accompany paying users, Facebook already has such tools and

---

[3] Deposition of Nicholas Economides, *Maximilian Klein, et al. v Meta Platforms, Inc.*, No. 3:20-cv-08570-JD, September 14, 2023, pp. 196:20–197:19 ("Q. Are you offering an opinion regarding the comparability of the data that's collected by your yardsticks on the one hand and the Facebook app on the other? A. Well, the Facebook programs, Research and Study, get some extra data that Facebook doesn't get normally. […] Q. Did you compare the data collected by your non-Facebook affiliated yardsticks with the data collected by the Facebook app? A. Well, all these apps are collecting different data from different industries. So they're not going to be the same. They are not going to be the same types of data.").

4

successfully deploys them. Dr. Tucker likewise admitted in deposition that her assertion that users would have to provide official government ID was just a "hypothetical."[4]

**TUCKER'S POSITION**

Economides wrongly suggests that all proposed class members would have been better off in his but-for world because of the existence of payments to all Facebook users. As described in points 1, 2 and 4, it is not credible that in the Economides but-for world any user would have received a payment, let alone that **all** users would have received payments or that all users would have received **the same** payment. This is not a "straightforward overpayment case" because Facebook users do not pay Facebook at all, but rather spend time and attention on its engaging content and services. However, even supposing that Facebook set up a system whereby hundreds of millions of users were paid $5 a month each month for being on the platform, in the Economides but-for world, some users would be worse off. Users do not benefit merely from the presence of other users on Facebook that are doing the bare minimum possible to receive payments. Instead, the value of Facebook stems from the ability of its users to authentically engage with each other and with content. This means that some users in the Economides but-for world are worse off because they are experiencing a degraded product where there is less authentic engagement from others on Facebook. In addition, if as is likely in the Economides but-for world, users had to verify their identity through a cumbersome process in order to use Facebook, as a fraud prevention measure, then some users would be worse off in the Economides but-for world. The extent to which these changes would degrade user experience would vary across individual users. Payments from Facebook might not offset any downgrade in user experience for individual users who value Facebook in its current form and such users would be worse off in the Economides but-for world. Economides does nothing to account for these dynamics.

4. **The experts disagree about whether, if Facebook did pay users, it would have paid all users and who it would pay.**

**CONSUMER PLAINTIFF EXPERTS' POSITION**

In the but-for world, Facebook would have paid all users. Facebook had an enormous financial incentive to offer payment to users to keep them on its personal social network in the face of competition. Given Facebook's immense size, it would have had to offer a common program of payment to users. Facebook would not have been able to individually negotiate whether to pay (and how much) with hundreds of millions of users. Indeed, Facebook in the actual world offers the same pricing ($0) and terms to all users and does not individually negotiate with any of them. The evidence in this case, as well as economic logic, indicate that Facebook would most likely have paid all users the same flat payment per month (conservatively $5). Although Facebook may earn more revenue from showing advertisements to some users than others, user data indicates that those high-revenue users are also the users who spend the most time on Facebook, indicating that they are likely the users that get the most value from Facebook, and thus are not in need of more compensation to remain on Facebook than other users. Dr. Tucker ignores this data in her claims below. In fact, because of network effects (the value that users provide to each

---

[4] Deposition of Catherine Tucker, *Maximilian Klein, et al. v Meta Platforms, Inc.*, No. 3:20-cv-08570-JD, September 7, 2023, pp. 190:19-291:8 ("Q. Okay. The possibility of a official – an official government-issued identification document is just a hypothetical possibility? A. . . . So yes, it's a hypothetical.")

5

other while on a social network) Facebook's incentives are to compensate all users, including lower-engagement users who are more likely to leave the platform but are in the friend networks of higher-engagement users (and thus create value for Facebook and advertisers by the possibility they might engage with ads in the future and by attracting other users who may do so). Additionally, any program offering different payments to different users would have faced problems with implementation, including fairness concerns and conceptual and technical difficulties including how to measure contributions to Facebook's revenue or users' value from Facebook. Any payments based on individual user activity would also be subject to gamesmanship, making enforcement more complex. Dr. Tucker dismisses all these concerns about varying payments to users as "ease of administration"—but Facebook's own employees questioned the possibility that a scheme of varying payments to users (*i.e.*, the model Dr. Tucker proposes)—would even be possible, also stating such a scheme would expose Facebook to a lot of unwanted scrutiny about its internal practices.[5] Moreover, Dr. Tucker's differential pricing proposal begets the very gamesmanship concerns she claims would lead to the unravelling of Facebook's platform (which she admittedly nowhere actually modeled). For these reasons, a simple program with a flat payment per month to all users would have been consistent with Facebook's incentives and the most feasible option. Regarding Dr. Tucker's claims that the yardsticks are not comparable in various respects, Dr. Economides addresses those claims in connection with Issue No. 5.

**TUCKER'S POSITION**

Economic theory tells us that if Facebook had faced more competitive pressure and if it chose to respond by paying users, as opposed to competing through ensuring it offered more engaging content as would be typical, it would have focused these payments on the users who were both likely to switch to an alternative platform and who generated meaningful value for Facebook. As a result, there would not be classwide harm. Economides instead suggests that Facebook would have paid **all** users, rather than the subset of users who were valuable to Facebook and likely to switch, because it would be easier for Facebook to administer a payments program that paid all Facebook users. However, the cumbersomeness of administering payments and preventing fraud—the arguments Economides makes for a flat payment scheme—is an argument against Facebook choosing to make any payments, instead of offering more engaging content and innovative features, rather than an argument for a particular payment scheme. It is also not credible that the ease of administration would have led to billions of incremental dollars being spent by Facebook that not only did not need to be spent but also could have undermined engagement with the platform. In fact, Economides has not presented any evidence that it would be easier to give payments to everyone to justify the idea that payments would be made to all users rather than being targeted at users who were both at risk of switching to Facebook's competitors and who were valuable to Facebook. In contrast to his opinions in this case, Economides has acknowledged in his scholarship that payments to users, if any, would vary across users depending on their relationship with the platform.

---

[5] *See, e.g.*, Economides Reply Report at ¶113 (citing deposition).

5. **The experts disagree on whether there are relevant precedents in paying for data, and whether this is a common issue to the class.**

**CONSUMER PLAINTIFF EXPERTS' POSITION**

Paying consumers for data is well established in a variety of settings. Market research firms like Nielsen and Comscore, as well as market research programs at a number of more general internet retailers (*e.g.*, Amazon) and technology firms (*e.g.*, Google, Facebook) are all examples of services that have monetarily compensated users for data regarding their online activities, purchases, devices, and so forth. From these real-world services that compensate users for their data, Dr. Economides identifies twelve yardsticks, which he then uses to estimate damages. Facebook recognized the comparability of Facebook, on the one hand, and market research programs, on the other, as it specifically looked to them as models when evaluating paying users *en masse*. Dr. Tucker is correct, below, to identify "share their data" as a burden to users—this is precisely what users prefer ***not*** to do without compensation, and what makes these yardsticks appropriate. And, as Dr. Economides detailed in his reply report, contrary to Dr. Tucker's claim, none of his yardsticks are based on paying for taking surveys, and so the yardsticks are relevant and comparable to the but-for world in that aspect as well. Dr. Tucker also raises the issue that Facebook's and other companies' market research programs do not pay millions of users—but that just highlights the conservatism of the yardsticks, as the participants in market research programs are likely less sensitive to the collection and use of their data than many Facebook users. Moreover, Facebook has a greater incentive than the smaller-scale yardsticks to compensate users, because in the but-for world Facebook would have been required to be honest about its data practices, thus risking its behemoth advertising business and users switching to PSN rivals. While Facebook may have used the data collected by its research programs for some different purposes than it used the data collected from its PSN users, the types of data collected are qualitatively similar (and even more so in the perception of users, to whom the precise, granular details of the incremental units of data collected are not clear).

**TUCKER'S POSITION**

The key word in this topic is *relevant* precedents. I agree that there are isolated examples of market research firms offering incentives for a small group of users to have their digital behavior monitored or take surveys since these are burdensome programs and users have to be incentivized to participate in these programs because they receive no other value for participating. The question is whether payments by these market research firms are at all relevant. They are not. Market research firms do not offer their users engaging content. Instead, they have to pay users to complete tasks or be constantly monitored because there is no independent reward to these users from market research programs. They also do not pay hundreds of millions of users nor anything close to it. In addition, the fact that Facebook itself was in the "actual world" paying a limited number of individuals for engaging with its market research program—never hundreds of millions of users just to use Facebook—contradicts the idea that the market research firms discussed by Economides are relevant precedents for understanding the Economides but-for world. The fact that Facebook had to pay limited users in the real world to collect the types of data that the Facebook market research programs collect, suggests that (i) this is a separate and distinct value proposition from regular Facebook usage and (ii) any data collected by Facebook's market research programs is different than the data

Facebook collects through regular Facebook usage. Therefore, far from supporting his theories, the yardsticks that Economides considers undermine them.

   6. **The experts disagree about the extent to which FB users are concerned about privacy in practice, including the privacy paradox, and whether this is a common issue to the class.**

**CONSUMER PLAINTIFF EXPERTS' POSITION**

Consumer Plaintiffs' and Facebook's experts agree that all class members care about privacy. However, Plaintiffs' experts disagree that the class values privacy less than Facebook's personalized features, or that this is even the relevant question. Far from being an "abstract concept", as shown by survey results, including in those areas where Facebook is alleged in this case to have made misleading statements *and* omissions, consumers overwhelmingly find it important to know what data is collected from them and how it will be used when deciding to use a social network. The so-called "privacy paradox"—*i.e.*, the notion that the manner in which users' privacy settings are toggled or their continued use of a service notwithstanding its data practices somehow reveals their actual contrary preferences—has been debunked by privacy experts. Facebook users' privacy settings may be misaligned with their professed (and actual) privacy concerns for a multitude of reasons, including lack of understanding or even awareness as to the settings, interfaces that are by design confusing, or futility (including the vast amount of time required to calibrate them, to the extent they are even effective). Moreover, users continue to use Facebook notwithstanding its poor data practices because they face a Hobson's choice, not because they are opting into the "creepy" personalization or ad targeting Facebook performs. Rather, they must provide data to Facebook (even if they do not wish to), or else be locked out of the world's most ubiquitous social network. As one real-world example that confirms users do not value these supposed benefits, and even in the face of Facebook's attempts to persuade users of the supposed benefits of ad targeting and personalization made possible by collection and use of their data, Facebook users overwhelmingly opted-out of Facebook's data collection and use through Apple's App Tracking Transparency program. Moreover, for the purposes of showing common impact and damages in this case, it is not necessary for all users to care the same amount about data collection and use. The harm in this case flows from Facebook's market-wide under-compensation of users for collecting and using their data; all users were harmed relative to the but-for world where Facebook would have compensated them by $5 per month. Overwhelming evidence, common to the class, more than shows from an economic perspective that a substantial enough number of users cared about data collection and use (the relevant question) to make Facebook face substantial additional competition in the but-for world absent Facebook's deception, and ultimately to make Facebook compensate users as a result. This evidence includes, among other things, extensive documents and statements from Facebook and its executives that data collection and use matter both to users and to Facebook's ability to compete with rivals. Facebook's CEO, Mr. Zuckerberg, himself acknowledged that being seen as giving control to users was "key" to Facebook's success and that the perception of being "clean" was among the reasons why Facebook defeated Myspace. As well, the evidence shows not only the important role Facebook's data-related misrepresentations and omissions had in its competition with MySpace, but also the role its continuing deception had in impairing later attempted entrants such as Google+, MeWe, and Snapchat (as confirmed by Facebook and non-party executives). Dr. Tucker ignores this evidence.

**META EXPERTS' POSITION (Tucker and Kirk Fair)**

Privacy as an abstract concept is important. That is not in debate. This is not a case, however, about whether privacy, in the abstract, is important. Instead, it is my understanding that Plaintiffs have challenged a series of representations Facebook made and whether ***those statements*** were responsible for Facebook's success by causing users to join or remain on Facebook ***instead of*** other online platforms. Plaintiffs have not presented any evidence in their expert reports, common to the class, that the challenged statements were at all responsible for Facebook's success and the failure of potential competitors, much less by causing users to stay with Facebook rather than shifting to potential competitors—the theory on which their injury and damages model is predicated. Plaintiffs allude to unspecified "surveys," but their survey expert Robert Klein did not even consider—let alone test—the actual statements at issue when preparing his survey questions, and the Klein survey did not present any of these statements to survey respondents when attempting to examine their preferences.[6] When users of Facebook contemplate privacy, they do not do so in a vacuum but instead have to think about the extent to which they value the personalization and convenience that data collection and use offers them. The literature on the privacy paradox emphasizes a documented divergence between people saying they care about privacy and their actions. There are many reasons for the divergence, including that users receive benefits from sharing data through, for example, a more personalized product or an improved user experience. The Klein survey does not distinguish between users who consider a particular data practice "important" because they think it is beneficial and those who consider the same practice "important" because they find it concerning.

---

[6] Deposition of Robert Klein, *Maximilian Klein, et al. v Meta Platforms, Inc.*, No. 3:20-cv-08570-JD, July 27, 2023, pp. 17:4-18:24 ("Q. The questions that you asked in your survey don't actually address any specific statement or omission by Facebook; correct? […] [A.] I don't know whether they do or don't. I don't have the complete background on each one of those. […] Q. Okay. So did you do anything yourself as the expert to understand what relationship there is between the practices that you asked about in your survey questions and the specific misrepresentations and omissions at issues in this case? […] [A.] No, I did not do anything myself to draw the connection between these omissions or these practices that are identified in the survey with specific actions or omissions by Facebook."). Expert Report of Robert L. Klein, *Maximilian Klein, et al., v. Meta Platforms, Inc.*, Case No. 3:20-cv-08570-JD, July 7, 2023, ¶ 37.