# Bathaee :: Dunne :: LLP

April 14, 2023                                                                                                                               **Via CM/ECF**

Re:    *Klein v. Meta Platforms, Inc.*, No. 3:20-cv-08570-JD (N.D. Cal.)

Dear Judge Donato:

      Advertiser Plaintiffs ("Advertisers") in the *Klein* litigation respectfully request that the Court compel Reed Hastings, the founder and ex-CEO of Netflix and a longtime member of Defendant Meta Platforms, Inc.'s ("Facebook") board of directors, to produce documents in response to a subpoena served upon him several months ago. Hastings has refused to produce any documents in response to Advertisers' subpoena, even though Advertisers' requests are plainly relevant and proportional, given the factual and procedural context. Advertisers and Hastings's counsel have exchanged multiple letters, have met and conferred, and are at impasse.

* * *

      For nearly a decade, Netflix and Facebook enjoyed a special relationship. Netflix bought hundreds of millions of dollars in Facebook ads; entered into a series of agreements sharing data with Facebook; received bespoke access to private Facebook APIs; and agreed to custom partnerships and integrations that helped supercharge Facebook's ad targeting and ranking models. It is no great mystery how this close partnership developed, and who was its steward: from 2011-2019, Netflix's then-CEO Hastings sat on Facebook's board and personally directed the companies' relationship, from advertising spend, to data-sharing agreements, to communications about and negotiations to end competition in streaming video. Hastings directly communicated with Facebook executives, principally Mark Zuckerberg and Sheryl Sandberg, to do so.

      In June 2011, Hastings joined Facebook's board of directors. PALM-009329663. Facebook was, at the time, a private company led by Zuckerberg, founder and CEO, and Sandberg, COO. *Id.* Within a month, Netflix had announced a Facebook integration to share Netflix user data internationally, and began lobbying Congress to allow this sort of data-sharing in the United States. PALM-014525328 (Hastings email to Facebook executive Elliot Schrage). By 2013, Netflix had begun entering into a series of "Facebook Extended API" agreements, including a so-called "Inbox API" agreement that allowed Netflix programmatic access to Facebook's user's private message inboxes, in exchange for which Netflix would "provide to FB a written report every two weeks that shows daily counts of recommendation sends and recipient clicks by interface, initiation surface, and/or implementation variant (*e.g.*, Facebook vs. non-Facebook recommendation recipients)." PALM-010305928 (agreement); PALM-010305927 (email). In August 2013, Facebook provided Netflix with access to its so-called "Titan API," a private API that allowed a whitelisted partner to access, among other things, Facebook user's "messaging app and non-app friends." PALM-008242886. Once again, this access required that data be shared back to Facebook—and every Extended API agreement was to be kept confidential, including "the existence and content of the Extended APIs." PALM-010305928.

      In January 2014, when an issue about the two companies' data-sharing API agreements came to a head, Hastings personally emailed Zuckerberg, "writing as Netflix CEO, not FB board member," asking him to "look into" Facebook's use of Netflix data shared through APIs. PALM-006289050. After several 1-on-1 emails between Zuckerberg and Hastings, Facebook executive Mike Vernal described to Zuckerberg the depth of the companies' historical partnership, including Facebook's building a custom API for Netflix "after a meeting between you and Reed":

**FILED UNDER SEAL**

> We have historically gone out of our way to give Netflix the very best level of service and access—they are one of two partners . . . we allowed to build a custom GDP experience. We've given them access to our messaging APIs . . . . We've given them a special version of the Coefficient API after a meeting between you + Reed. We gave thousands of dollars in free ad impressions to support their UK roll out . . . . We lobbied for them in DC to get the VPPA act updated. . . . [W]e've tried to prioritize things . . . important to them.

PALM-006289050. By February 2015, Netflix was spending $40 million per year on Facebook advertising, and had entered into an agreement allowing Netflix user data to be used for "targeting/optimization" in Facebook's ads systems. PALM-006162373. However, Netflix wanted a custom deal—one offered to no other advertiser—restricting the ways in which Facebook could use its data for targeting. PALM-016986654. To implement this deal, Hastings reached out directly to Facebook CTO Andrew Bosworth, cc'ing Facebook's then-Chief Revenue Officer David Fischer, with another "Netflix (not FB board member) question" email. PALM-009797163. A week later, Hastings had dinner with Sandberg, where he "asked me what # advertiser they are on FB and if they spent $100M in a few years, what # would they be[?]" PALM-016986654.

By late 2015, Facebook had other concerns in its ads business. The demise of its public developer Platform had left a companywide dearth of "signals"—data used as inputs to targeting and ranking models—needed to train Facebook's ML/AI systems that personalize ads and other content for users. FAC ¶¶ 316-33. This led to a slowdown in ad pricing growth by Q4 2015/Q1 2016, PALM-016960475, and a companywide reckoning about how to maintain Facebook's ad market dominance, PALM-014640328; PALM-004974882. Against this backdrop, Facebook began entering distinct "verticals" to obtain signals for the AI/ML systems powering its ad business. FAC ¶¶ 316-393. One of these new verticals was streaming video, with a product called Facebook Watch. *Id.* ¶¶ 379-93. Over the course of 2016 and 2017, Facebook spent more than a billion dollars on its new Watch product, eventually signing deals for original, premium video content starring Elizabeth Olsen, Bill Murray, and Catherine Zeta-Jones. FAC ¶¶ 488-98. By mid-2017, Facebook and Netflix were approaching potentially ruinous competition in streaming video. Employees, industry observers, and the press all took notice. At a May 2017 Recode conference, Hastings was asked about competition between Facebook and Netflix and publicly downplayed the situation, saying, "[t]here's not a big conflict yet. . . . We're not bidding on the same shows." However, privately, Hastings promptly emailed Zuckerberg, Sandberg, and Schrage, stating, "[l]et me know if you think there was a better way to handle. In hindsight, I wish I added a materiality qualifier like 'not generally bidding on the same content.'" PALM-013469126. In January 2018, Sandberg went to Netflix for a "Fireside Chat" in front of "500 senior [Netflix] people" (with "Strict no recording") in which she and Hastings carefully deflected, using scripted banter, the companies' "direct video competition" and "FB professional video strategy." PALM-003207836.

In Facebook's Watch division itself, business continued as usual. In March 2018, Watch content executives discussed licensing "library" content—specifically, the 1990s teen drama Dawson's Creek—in competition with Netflix, and Watch's head executive Fidji Simo responded, "I wouldn't limit yourself on budget – I can convince Zuck to give us more for this." PALM-007912956. But behind the scenes, an agreement was being struck. After numerous documented Hastings-Sandberg and Hastings-Zuckerberg touch points in late 2017 and early 2018, *see* PALM-0016919272 (Sandberg, Feb. 13, 2018: "I spent the day on Wednesday shadowing Reed Hastings

at Netflix"), Zuckerberg blindsided Simo with an email personally cutting nearly $1 billion from Watch's budget for originals and sports for the coming year. PALM-013499085 (Zuckerberg, May 25, 2018: "Knowing what I know today about our strategy and financial outlook, I would invest . . . much less in originals and sports. Specifically, when modeling this out with [now-CFO] Susan [Li], we suggested considering cutting $750M from originals + sports for next year"). Despite Simo's protestations, Zuckerberg's abrupt new Watch strategy became policy—Facebook began dismantling the multi-billion dollar original content business it had built over the past two years, suddenly withdrawing from direct competition with Netflix in video streaming. FAC ¶¶ 525-35.

Amidst the sudden pivot in Facebook's video strategy, the data partnership between Netflix and Facebook reached new heights. Facebook and Netflix entered into a series of new data-sharing agreements between August 2017 and April 2018, FAC ¶¶ 509-512, and another in July 2018, *id.* ¶¶ 515-22. Netflix also further increased its Facebook ad spend, agreeing to a guaranteed 2017 ad spend of $150 million. These new agreements provided Facebook's ad targeting systems with rich signals from Netflix, including "cross-device intent signals," while expressly unhooking Watch from the benefits of this bounty. *Id.* ¶¶ 515-24. Hastings appears to have been personally involved in these new data-sharing efforts; in January 2019, Facebook's Bosworth reported:

> I was at Sundance over the weekend and happened to grab lunch with Reed Hastings. He was wondering what he could do with us to make subscription ads more successful. His sense is that they are doing the data sharing now that we asked them to do . . . .

PALM-009949950. In April 2019, Hastings left Facebook's board. Nonetheless, in October 2019, when Hastings and Sandberg were about to fly on the same jet, Hastings emailed Sandberg to tell her that Netflix's "Greg Peters who spends about $200m with you" would be on board, allowing Sandberg to make a written plan to sell more ads to Hastings's own company. PALM-012193982.

Despite the above indications that Hastings personally directed Facebook/Netflix relations, including through seemingly near-constant communications with Facebook executives like Zuckerberg, Sandberg, Schrage, and Bosworth, Facebook has in fact produced comparatively few communications involving Hastings, at one point telling Advertisers (who requested him as a Facebook custodian) that Hastings had too few Facebook-custodial documents to merit such a designation. Similarly, when Advertisers subpoenaed Netflix specifically requesting Hastings's custodial communications with and about Facebook, Netflix produced essentially nothing. Advertisers know from circumstantial evidence that Hastings spoke, including in writing, regularly with Zuckerberg, Sandberg, Schrage, and Bosworth—often from his personal email and likely using his personal mobile devices—yet no production of any such documents has been made by either of Hastings's companies. Left with no other alternative, Advertisers subpoenaed Hastings directly for documents (Ex. A), and were met with a flat refusal to produce ***anything*** (Ex. B).[1] In view of the facts set forth above, and the uncontroversial Rule 45 document production standard, *see, e.g., Erickson v. Builder Advisor Grp. LLC*, 2022 WL 1265823, at *1-2 (N.D. Cal. Apr. 28, 2022), Advertisers respectfully submit that Hastings should be compelled to produce documents responsive to their subpoena to him.

---

[1] Advertisers have also sought Hastings's deposition. He has moved to quash it. Dkt. 505.

**FILED UNDER SEAL**

Respectfully submitted,

By: */s/ Brian J. Dunne*
*On Behalf of Interim Co-Lead Counsel for the Advertiser Classes*

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*/s/ Amanda F. Lawrence*
Amanda F. Lawrence (*pro hac vice*)
alawrence@scott-scott.com
Patrick J. McGahan (*pro hac vice*)
pmcgahan@scott-scott.com
Michael P. Srodoski (*pro hac vice*)
msrodoski@scott-scott.com
156 South Main Street, P.O. Box 192
Colchester, CT 06415
Tel.: (860) 537-5537

Patrick J. Coughlin (CA 111070)
pcoughlin@scott-scott.com
Carmen A. Medici (CA 248417)
cmedici@scott-scott.com
Hal D. Cunningham (CA 243048)
hcunningham@scott-scott.com
Daniel J. Brockwell (CA 335983)
dbrockwell@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: (619) 233-4565

Patrick J. Rodriguez (*pro hac vice*)
prodriguez@scott-scott.com
230 Park Avenue, 17th Floor
New York, NY 10169
Tel.: (212) 223-6444

**BATHAEE DUNNE LLP**

*/s/ Yavar Bathaee*
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Andrew C. Wolinsky (CA 345965)
awolinsky@bathaeedunne.com
Adam Ernette (*pro hac vice*)
aernette@bathaeedunne.com
Priscilla Ghita (*pro hac vice*)
pghita@bathaeedunne.com
Chang Hahn (*pro hac vice*)
chahn@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
(332) 322-8835

Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (*pro hac vice*)
egrauman@bathaeedunne.com
Andrew M. Williamson (CA 344695)
awilliamson@bathaeedunne.com
901 S. MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
(213) 462-2772

Allison Watson Cross (CA 328596)
across@bathaeedunne.com
3420 Bristol St., Ste 600
Costa Mesa, CA 92626-7133

*Interim Co-Lead Counsel for the Advertiser Classes*

5                                                                                       **FILED UNDER SEAL**

## **FILER ATTESTATION**

    I am the ECF user who is filing this document. Pursuant to Civil L.R. 5-1(h)(3), I hereby attest that each of the other signatories have concurred in the filing of the document.

Dated: April 14, 2023                          By:   */s/ Brian J. Dunne*
                                                                   Brian J. Dunne