# Bathaee :: Dunne :: LLP

May 31, 2023                                                                **Via CM/ECF**

Re:    *Klein v. Meta Platforms, Inc.*, No. 3:20-cv-08570-JD (N.D. Cal.)

Dear Judge Donato:

Advertiser Plaintiffs ("Advertisers") respectfully request a reasonable evidentiary sanction for a knowingly incomplete interrogatory response by Meta that caused Advertisers to expend hours of deposition time finding out the answer to a highly material question Advertisers had already asked directly in an interrogatory served in July 2022: what was ***all*** the information and data Meta obtained through or derived from its Onavo team, program, apps, or technology? The parties met and conferred on May 31, 2023, and are at impasse.

This is a monopoly maintenance case centering upon Meta's dominance of the United States market for social advertising, an economically distinct submarket of online advertising. Since 2016, Meta has engaged in an aggressive campaign of anticompetitive conduct to retain its monopoly power—and the supracompetitive prices it has been able to charge as a result—in this market. As Advertisers' operative complaint, Dkt. 391 ("Ad FAC"), explains, one important piece of Meta's monopoly maintenance apparatus between 2016 and 2019 was Onavo, an in-house team and associated technology dedicated to gathering analytics and competitive intelligence. *See* Ad FAC ¶¶ 12-14, 165-66, 193, 225-45, 537-69.

During acquisition talks in 2012, Onavo's then-CEO Guy Rosen (now Chief Information Security Officer at Meta), a former signals intelligence officer, "described [his company's] core skill set as 'reverse-engineering.'" PX 68 (PALM-008674349) (Dec. 20, 2012 email to c-suite executives including S. Sandberg, J. Olivan, C. Cox, M. Schroepfer, and Colin Stretch). And over the next several years, Meta would deploy the Onavo team's unique talents to a variety of competitive intelligence tasks, with incredibly impactful results. *See, e.g.,* PX 69 (PALM-005154871) (Mar. 17, 2017 chat: "Sheryl (unprompted) at biz ops on Onavo 'let's take a moment to remember what a great acquisition this was. It's the gift that keeps on giving.'"); A. Schultz Tr. 198:14-15 ("I found Onavo valuable, and I wanted it to continue to exist."); J. Olivan Tr. 177:20-25 ("I believed we were really good at market research. And some of the capabilities we had, thanks to the Onavo data set, were pretty unique and pretty good. And that's not something I would want competitors to know and imitate . . . ."). Advertisers' complaint alleges that Meta used Onavo in a way that wasn't just valuable, but anticompetitive. However, Meta has frequently been less than forthcoming about what its Onavo team was and what Meta used Onavo technology for, going up to the company's highest levels. *See, e.g.,* PX 409 (PALM-016900228) (Apr. 2016 email from then-GC Stretch to J. Olivan: "[In-house counsel] highlighted that you've been hesitant to discuss Onavo publicly." Olivan's reply: "We certainly should not be proactively bragging about it.").

Given Onavo's relevance to Advertisers' case and the deliberately occlusive, even obfuscatory, atmosphere surrounding the team and its technology at Meta, one of the first interrogatories Advertisers served in this case—served on Meta on July 25, 2022—stated as follows (Ex. A):

> NO. 4: Identify and describe, with specificity, all information and data—including but not limited to call logs, video logs, text message content, app usage information, and battery or power consumption logs—that Facebook obtained through, or derived from, Onavo, Onavo apps (*e.g.,* Onavo Protect), or Meta's Onavo team.

Meta responded twice—first, on August 24, 2022 (Ex. B) and then, after substantial letter-writing by Advertisers pointing out the importance of getting a complete answer to Interrogatory No. 4 and a meet-and-confer ahead of potential motion practice, with a December 16, 2022, supplemental response (Ex. C) served after the Court's December 6, 2022 order denying Meta's motion to dismiss. Dkt. 396. These responses by Meta—and in particular Meta's December 2022 supplemental response—did not contain a single reference to or identification of the fact that Meta used Onavo between June 2016 and early 2019 (during the Advertiser Class Period) to wiretap selected competitors, including Snapchat, for strategic gain. *See generally* Ex. C at 3-8.

Fact depositions began shortly after Meta served its supplemental response to Interrogatory No. 4 (Advertisers took their first Meta employee deposition on February 2, 2023), and Meta's sworn response to Advertisers' Onavo interrogatory helped frame Advertisers' deposition strategy—an important consideration given sharply limited deposition time due to split classes and a hard cap on deponents insisted upon by Meta. However, as fact depositions proceeded, it became clear that Meta used its Onavo team for a breathtakingly anticompetitive—and indeed, criminal—course of conduct targeting its principal Social Advertising rival, Snapchat during the heart of the Advertiser class period. As Advertisers now know, beginning with a June 9, 2016, email from Mark Zuckerberg, Meta used its Onavo team and technology to deploy an "SSL man-in-the-middle" attack on encrypted traffic addressed to Snapchat's analytics server. Meta solicited and paid Snapchat users to install "root" digital certificates on their mobile devices, created fake digital certificates on its servers that would present these Meta-controlled servers as "sc-analytics.appspot.com" to the Snapchat application, and then intercepted, decrypted, and analyzed Snapchat's competitively valuable[1] analytics to redesign Meta's products and outflank Snapchat's advertising business. *See, e.g.,* PX 2256 (PALM-012863799), at 1, 2-3.



This program of competitive intelligence, which Meta called its "In-App Action Panel" (IAAP) program, was ultimately extended to YouTube and Amazon—and perhaps Twitter—during the Advertiser class period. *See id.* at 2-3; PALM-004982075 (Jan. 2018 email describing Twitter "SSL bump"). The intelligence Meta gleaned from this project was described both internally and externally as devastating to Snapchat's ads business, PX 20 (PALM-016175119) (internal analysis), Levenson Dep. 50:12-22 (Snap executive testimony), allowing Meta to hike North American ad prices companywide 60% between 2016 and 2018, *see* PALM-014094553 (2018 Q4 Key Quarterly Metrics showing a Meta-wide 60% price increase on a CPM basis, and 59% price increase on a CPC basis, in North America over this time period).

---

[1] *See* Andreou Tr. 15:4-17:7 (Snap executive testifying that "the internal analytics [Snap] generates about in-app behavior of its users" are "confidential" and "competitively valuable").

FILED UNDER SEAL

And the entire IAAP program, from its inception in June 2016 to its apparent shuttering in early 2019, was designed and deployed by Onavo—by the Onavo team, using Onavo application code, using Onavo servers, and using Onavo technology to intercept encrypted traffic from Meta's rivals. *See, e.g.,* PX 2255 (PALM-016564834) at 2 (Jun. 9, 2016 J. Olivan email, forwarding Zuckerberg email on Snapchat encrypted analytics, to Onavo's Nimrod Priell and making him "point for this"); *id.* (email from Onavo's Calvin Chin suggesting Meta "white-label an Onavo SSL-enabled iOS and Android app to get in-app actions"); *id.* (email from Onavo founder Guy Rosen saying "[t]his is an opportunity for the team to shine"); PALM-011630850 (Jun. 2016 presentation by Priell titled "Onavo Research Taskforce project kickoff"); PX 414 (PALM-010629831) ("Onavo Research Taskforce Status Update" discussing how to "mask" Onavo in the new IAAP program) at 1-2, 6-10; PX 26 (PALM-011683732) at 4 ("Today we are using Onavo vpn proxy stack to deploy squid with ssl bump the stack runs in edge on our own hosts (onavopp and onavolb).").



*PX-414 at 10*



*PX 26 at 4*

Moreover, there is no question that Meta—and its lawyers—knew about the Onavo IAAP program when Meta provided its misleadingly incomplete interrogatory response. A January 30, 2019 "IAAP Technical Analysis" document (PX 2256), which sets forth in painstaking detail the history, purpose, and details of the IAAP program, was created by the Onavo team, Meta's then-CTO, Meta's then-head of security engineering, ***and more than forty one-different attorneys,*** *see* PX 2256 at 4, including fourteen in-house counsel (at least one of whom has appeared at depositions in this case) and ***twenty-five lawyers from WilmerHale—the law firm that prepared and signed Meta's responses to Interrogatory No. 4***. *See* Ex. C. In view of the evidence, there is no other reasonable conclusion than that Meta's lawyers knowingly omitted the IAAP program from Meta's response to Interrogatory No. 4 to make discovery more difficult for Advertisers.

And that is exactly what happened. It took Advertisers weeks of fact depositions, and untold hours of needle-in-a-haystack document review, to lock in on the reality of the IAAP program—that Meta used Onavo to wiretap its competitors, including Snapchat, during the class period, for competitive gain. This despite the fact that ***Advertisers served an interrogatory asking for this exact information ten months ago, before a single deposition had been taken (or even scheduled)***. Advertisers respectfully seek an evidentiary sanction to help cure the prejudice from Meta's knowingly incomplete response to Advertisers' Interrogatory No. 4: an additional three depositions of Meta employees, and an additional 15 hours on Advertisers' deposition cap. This will help to place Advertisers back in the place they would be, as far as deposition time and witness limits, had it not been for Meta's discovery misconduct.

FILED UNDER SEAL

Respectfully submitted,

By: _Brian J. Dunne_
*On Behalf of Interim Co-Lead Counsel*
*for the Advertiser Classes*

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

_/s/ Amanda F. Lawrence_
Amanda F. Lawrence (*pro hac vice*)
alawrence@scott-scott.com
Patrick J. McGahan (*pro hac vice*)
pmcgahan@scott-scott.com
Michael P. Srodoski (*pro hac vice*)
msrodoski@scott-scott.com
156 South Main Street, P.O. Box 192
Colchester, CT 06415
Tel.: (860) 537-5537

Patrick J. Coughlin (CA 111070)
pcoughlin@scott-scott.com
Carmen A. Medici (CA 248417)
cmedici@scott-scott.com
Hal D. Cunningham (CA 243048)
hcunningham@scott-scott.com
Daniel J. Brockwell (CA 335983)
dbrockwell@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA  92101
Tel.: (619) 233-4565

Patrick J. Rodriguez (*pro hac vice*)
prodriguez@scott-scott.com
230 Park Avenue, 17th Floor
New York, NY 10169
Tel.: (212) 223-6444

**BATHAEE DUNNE LLP**

_/s/ Yavar Bathaee_
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Andrew C. Wolinsky (CA 345965)
awolinsky@bathaeedunne.com
Adam Ernette (*pro hac vice*)
aernette@bathaeedunne.com
Priscilla Ghita (*pro hac vice*)
pghita@bathaeedunne.com
Chang Hahn (*pro hac vice*)
chahn@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
(332) 322-8835

Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (*pro hac vice*)
egrauman@bathaeedunne.com
Andrew M. Williamson (CA 344695)
awilliamson@bathaeedunne.com
901 S. MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
(213) 462-2772

Allison Watson Cross (CA 328596)
across@bathaeedunne.com
3420 Bristol St., Ste 600
Costa Mesa, CA 92626-7133

*Interim Co-Lead Counsel for the Advertiser Classes*

**FILED UNDER SEAL**

**FILER ATTESTATION**

I am the ECF user who is filing this document. Pursuant to Civil L.R. 5-1(h)(3), I hereby attest that each of the other signatories have concurred in the filing of the document.

Dated: May 31, 2023                    By:   */s/ Brian J. Dunne*
                                              Brian J. Dunne