# Bathaee :: Dunne :: LLP

June 15, 2023                                                        Via CM/ECF

Re:     _Klein v. Meta Platforms, Inc._, No. 3:20-cv-08570-JD (N.D. Cal.)

Dear Judge Donato:

Three months ago, Defendant Meta Platforms, Inc. ("Facebook") moved for and was granted time limitations on the depositions of several senior executives. Dkt. 476, 477. One of these executives was Mark Zuckerberg, Facebook's founder, Chief Executive Officer, and controlling shareholder. After Facebook told the Court that "Plaintiffs have not identified a single issue that Mr. Zuckerberg . . . is uniquely knowledgeable about," Dkt. 476 at 2, the Court granted the company's request to limit Zuckerberg's deposition to three hours between the two groups of plaintiffs in this consolidated case, and stated that "[i]f, after the depositions have concluded, plaintiffs have a good-faith basis for seeking additional time, they may advise the Court." Dkt. 477.

On May 19, 2023, after deposing Mark Zuckerberg for 87 minutes three days prior, Advertiser Plaintiffs ("Advertisers") informed Facebook that they would do just that, explaining why in a seven-page letter filled with evidentiary analysis and citations to Zuckerberg's (short) transcript. The parties met and conferred on Advertisers' motion for more deposition time with Zuckerberg on May 31, and the result was that Facebook told Advertisers to file their request with the Court. But instead of actually waiting for that, Facebook filed its own motion for a protective order eleven minutes after the parties met and conferred—a motion Facebook never told Advertisers it was contemplating filing, over the course of multiple written communications and a meet-and-confer. Facebook's motion was yet another work of fiction from the company's lawyers in this case.

The central premise of Facebook's motion is two-fold: first, that Zuckerberg has no unique and personal knowledge of any sort that is material to Advertisers' case, and second, that the principal subject that Advertisers need more time to depose Zuckerberg about—Facebook's three-year program to intercept its competitors' encrypted analytics for use in competitive decisionmaking—had nothing to do with Zuckerberg and represents "an entirely new allegation about conduct that appears nowhere in [Advertisers'] nearly 1000-paragraph complaint." Dkt. 564 at 2. Both these contentions are demonstrably wrong.

Advertisers will start with the latter: Facebook's argument that its so-called "In-App Action Panel" (IAAP) Program is not something that Zuckerberg needs to be deposed about in this case. This is the central thrust of Facebook's motion, and it is incorrect backward and forward. First, Facebook's IAAP Program is obviously material to Advertisers' antitrust case: in this program, Facebook paid contractors to install kits that would allow its Onavo servers to intercept and decrypt secure analytics traffic from Snapchat—Facebook's primary would-be price check in the United States Social Advertising Market in 2016-2018—in order to use Snapchat's proprietary data for competitive product redesign. This isn't surmise—a document prepared for Mark Zuckerberg by Facebook's Onavo team and reviewed for accuracy by no less than Facebook's then-CTO, its then-Chief of Security, and forty-one lawyers said as much. _See_ PX 2256 (PALM-012863799) at 1-4.

**FILED UNDER SEAL**



*PX 2256 at 2-3 (excerpted by Advertisers)*

Facebook's IAAP Program used nation-state-level hacking technology developed by the company's Onavo team, in which Facebook paid contractors (including teens) to designate Facebook a trusted "root" Certificate Authority on their mobile devices, then generated fake digital certificates to redirect secure Snapchat analytics traffic (and later, analytics from YouTube and Amazon) from Snapchat's servers to Onavo's; decrypted these analytics and used them for competitive gain, including to inform Facebook's product strategy; reencrypted them; and sent them up to Snapchat's servers as though it came straight from Snapchat's app, with Facebook's Social Advertising competitor none the wiser. *See* PALM-011683680 ("we install a root CA on the device and MITM all SSL traffic"). The company's highest-level engineering executives thought the IAAP Program was a legal, technical, and security nightmare. *See* PALM-017114236 ("Jay [Parikh, then-head of infrastructure engineering] flagged long ago that we should not do man in the middle."); PALM-016606121 (Pedro Canahuati, then-head of security engineering: "I can't think of a good argument for why this is okay. No security person is ever comfortable with this, no matter what consent we get from the general public. The general public just doesn't know how this stuff works."); PALM-016895614 (Mike Schroepfer, then-CTO: "If we ever found out that someone had figured out a way to break encryption on [WhatsApp] we would be really upset.").

But Facebook deployed the program, expanded it, and kept it running for almost three years ***because Mark Zuckerberg personally asked for it, and the program worked—it helped to maintain Facebook's Social Advertising dominance against Snapchat and other potential entrants***. Again, this comes from the mouths of Facebook's own executives (and from Snapchat's executives too). *See* PALM-016564836 (Zuckerberg, June 2016, to Facebook's now-COO Javier Olivan: "Whenever someone asks a question about Snapchat, the answer is usually that because their traffic is encrypted we have no analytics about them. Given how quickly they're growing, it seems important to figure out a new way to get reliable analytics about them. Perhaps we need to do panels or write custom software. You should figure out how to do this."); PALM-017114236 (Olivan: "Unfortunately this was the only way to see in-app behavior (which we really wanted to understand back in the day for certain apps)."); Levenson Dep. 50:12-22 (Snap executive: Facebook's Onavo-informed product redesign "cause[d] advertisers to not have a clear narrative differentiating Snapchat from Facebook and Instagram").

Much of this was already in Advertisers' own motion for more deposition time, Dkt. 569: the IAAP Program's relevance to Advertisers' monopoly maintenance case; the program's documented origin from Zuckerberg himself; Zuckerberg's January 2019 request for a detailed technical

analysis of the program; and his subsequent, in-writing personal decision to pause, but not halt it. In the face of overwhelming written evidence to the contrary, Facebook's assertions in its motion that "Advertisers have not, and cannot, show that Mr. Zuckerberg has unique and personal knowledge" to justify more than 87 minutes of deposition time, Dkt. 564 at 2, ring hollow.

Just as hollow is Facebook's assertion that its IAAP Program is "an entirely new allegation about conduct that appears nowhere in their nearly 1000-paragraph complaint or in any of their discovery responses." *Id.* This argument is a head-scratcher, even by Facebook's standards: the Advertiser FAC contains detailed allegations about Onavo, *see* Dkt. 237 ("Ad FAC") ¶¶ 12-14, 165-66, 193, 225-45, 537-69, including an entire screenshot on page 134 about the use of Onavo to "SSL bump" Snapchat, YouTube, and Twitter in 2018, *see id.* ¶ 551. And an April contention interrogatory response by Advertisers provides chapter and verse (based on what Advertisers knew at that point, midway through fact depositions) about the IAAP Program and its impacts on the United States Social Advertising Market, including its origins ("a June 2016 email thread from Mark Zuckerberg asked for 'what data or research we have on the relative participation rates and usage in Snapchat for sending individual snaps vs sharing your story,' and in response, now-COO Javier Olivan . . . promised to expand Facebook's existing Onavo acquisition capabilities to get '[i]n-app actions for apps that use SSL . . . .'") and its impact on Snapchat ("As a member of Keval Patel's Market Strategy team put it in an Excel summary, the team's Onavo-driven analysis of Snapchat for Facebook's C-suite executives appeared to have directly contributed to Snapchat's competitive decline leading into 2017."). *See* Advs. First Supp. Resp. to Interrogatory No. 11, at p. 92-100.

To the extent that Facebook's actual "New Allegations" complaint is that Advertisers learned key details about the IAAP Program—including its apparent criminality; the specific information (competitors' encrypted analytics) that Facebook intercepted through the program; and the depth of Zuckerberg's personal involvement in the program's origin, expansion, and use—through fact depositions in this action, this doesn't exactly help Facebook's case. As an initial matter, this is what fact depositions are for, and the fact that Facebook did everything in its power to try to roadblock the usefulness of fact depositions in this action does not mean that they were not allowed, in practice, to be useful. Second, Advertisers were forced to learn things about what information Onavo actually collected and used—including that Onavo intercepted and decrypted competing apps' secure analytics using potentially criminal cyberattack methods—through depositions and witness-specific document review *because Facebook hid this information through other discovery methods, including an interrogatory specifically and directly asking Facebook to identify all information collected by Onavo and the Onavo team*. *See* Dkt. 575.

In any event, back to Mark Zuckerberg: there can really be no doubt, on an objective record, that Zuckerberg has substantial, indeed irreplaceable, unique and personal knowledge on issues material to Advertiser Plaintiffs' case—from Facebook's anticompetitive IAAP program, to its C-suite-level deal with Netflix regarding Watch, to its API scheme, to its companywide centralization of machine learning models and data that it hid from the FTC. The default under the Federal Rules is seven hours for a knowledgeable witness, and given the record here, Zuckerberg probably should be sitting for a full seven hours (his personal knowledge merits it). But Advertisers ask only for an additional three hours, beyond the 87 minutes they already spent with Zuckerberg under oath. It is Facebook's burden to justify a departure from the default deposition limits, and it hasn't come close to doing so here.

**FILED UNDER SEAL**

Respectfully submitted,

By: *Brian J. Dunne*
*On Behalf of Interim Co-Lead Counsel for the Advertiser Classes*

| **SCOTT+SCOTT ATTORNEYS AT LAW LLP** | **BATHAEE DUNNE LLP** |
|---|---|
| */s/ Amanda F. Lawrence* | */s/ Yavar Bathaee* |
| Amanda F. Lawrence (*pro hac vice*) | Yavar Bathaee (CA 282388) |
| alawrence@scott-scott.com | yavar@bathaeedunne.com |
| Patrick J. McGahan (*pro hac vice*) | Andrew C. Wolinsky (CA 345965) |
| pmcgahan@scott-scott.com | awolinsky@bathaeedunne.com |
| Michael P. Srodoski (*pro hac vice*) | Adam Ernette (*pro hac vice*) |
| msrodoski@scott-scott.com | aernette@bathaeedunne.com |
| 156 South Main Street, P.O. Box 192 | Priscilla Ghita (*pro hac vice*) |
| Colchester, CT 06415 | pghita@bathaeedunne.com |
| Tel.: (860) 537-5537 | Chang Hahn (*pro hac vice*) |
| | chahn@bathaeedunne.com |
| Patrick J. Coughlin (CA 111070) | 445 Park Avenue, 9th Floor |
| pcoughlin@scott-scott.com | New York, NY 10022 |
| Carmen A. Medici (CA 248417) | (332) 322-8835 |
| cmedici@scott-scott.com | |
| Hal D. Cunningham (CA 243048) | Brian J. Dunne (CA 275689) |
| hcunningham@scott-scott.com | bdunne@bathaeedunne.com |
| Daniel J. Brockwell (CA 335983) | Edward M. Grauman (*pro hac vice*) |
| dbrockwell@scott-scott.com | egrauman@bathaeedunne.com |
| 600 W. Broadway, Suite 3300 | Andrew M. Williamson (CA 344695) |
| San Diego, CA 92101 | awilliamson@bathaeedunne.com |
| Tel.: (619) 233-4565 | 901 S. MoPac Expressway |
| | Barton Oaks Plaza I, Suite 300 |
| Patrick J. Rodriguez (*pro hac vice*) | Austin, TX 78746 |
| prodriguez@scott-scott.com | (213) 462-2772 |
| 230 Park Avenue, 17th Floor | |
| New York, NY 10169 | Allison Watson Cross (CA 328596) |
| Tel.: (212) 223-6444 | across@bathaeedunne.com |
| | 3420 Bristol St., Ste 600 |
| | Costa Mesa, CA 92626-7133 |
| | |
| | *Interim Co-Lead Counsel for the Advertiser Classes* |

**FILED UNDER SEAL**

**FILER ATTESTATION**

  I am the ECF user who is filing this document. Pursuant to Civil L.R. 5-1(h)(3), I hereby attest that each of the other signatories have concurred in the filing of the document.

Dated: June 15, 2023      By:   */s/ Brian J. Dunne*
                  Brian J. Dunne