**PUBLIC REDACTED VERSION**

WILMER CUTLER PICKERING
HALE AND DORR LLP
SONAL N. MEHTA (SBN 222086)
 Sonal.Mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
 David.Gringer@wilmerhale.com
ROSS E. FIRSENBAUM (*pro hac vice*)
 Ross.Firsenbaum@wilmerhale.com
RYAN CHABOT (*pro hac vice*)
 Ryan.Chabot@wilmerhale.com
PAUL VANDERSLICE (*pro hac vice*)
 Paul.Vanderslice@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800

ARI HOLTZBLATT (*pro hac vice*)
 Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
 Molly.Jennings@wilmerhale.com
2100 Pennsylvania Ave NW
Washington, DC 20037
Telephone: (202) 663-6000

MICHAELA P. SEWALL (*pro hac vice*)
 Michaela.Sewall@wilmerhale.com
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

*Attorneys for Defendant Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br> v.<br><br>META PLATFORMS, INC., a Delaware Corporation,<br><br>      Defendant. | Case No. 3:20-cv-08570-JD<br><br>**DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT REGARDING FIRST AMENDED CONSOLIDATED ADVERTISER CLASS ACTION COMPLAINT (Dkt. 237)**<br><br>Hearing Date: June 20, 2024<br>Time: 10:00 a.m.<br>Judge: Hon. James Donato |

**PUBLIC REDACTED VERSION**

**TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION .................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................1

INTRODUCTION ................................................................................................................1

BACKGROUND ..................................................................................................................3

ARGUMENT .......................................................................................................................5

I.     PROOF OF HIGH PROFITS ALONE CANNOT ESTABLISH CAUSAL ANTITRUST INJURY ...........5

       A.     High Profits Cannot Establish Antitrust Injury................................................5

       B.     High Profits Cannot Establish Injury Traceable To The Challenged
              Conduct ...........................................................................................................7

II.    ADVERTISERS CANNOT ESTABLISH MONOPOLY POWER IN ANY COGNIZABLE
       RELEVANT MARKET AS A MATTER OF LAW.....................................................................9

III.   THE CHALLENGED CONDUCT IS NOT EXCLUSIONARY AS A MATTER OF LAW .................13

       A.     Meta's Alleged Misrepresentations To Regulators Cannot Be
              Exclusionary As A Matter Of Law ...............................................................13

       B.     The Challenged Vertical Agreements Cannot Be Exclusionary.....................15

              1.     The Network Bidding Agreement Was Not Exclusionary .......................15

              2.     The Alleged Netflix Agreement Was Not Exclusionary ..........................17

              3.     The API Agreements Were Not Exclusionary...........................................18

       C.     Summary Judgment Is Warranted On Advertisers' Claim Based On
              Meta's Alleged Misappropriation Of Snap's Supposed Trade Secrets .........19

              1.     Rule 37 Bars Advertisers' Untimely Disclosed Claim .............................20

              2.     Meta's Alleged Copying Of Snapchat Stories Cannot Be
                     Exclusionary .............................................................................................21

IV.    ADVERTISERS' ATTEMPTED MONOPOLIZATION AND SECTION 1 CLAIMS FAIL..................24

V.     IF ANY CONDUCT THEORY FAILS, ADVERTISERS ARE NOT ENTITLED TO DAMAGES.........25

CONCLUSION....................................................................................................................25

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Aerotec Int'l v. Honeywell Int'l, Inc.*,
    836 F.3d 1171 (9th Cir. 2016) ........................................................................................ 19

*America Online, Inc. v. GreatDeals.Net*,
    49 F. Supp. 2d 851 (E.D. Va. 1999) ............................................................................. 10

*American Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Pubs.,
Inc.*, 108 F.3d 1147 (9th Cir. 1997) ............................................................................... 16

*Apple, Inc. v. Samsung Elecs. Co.*,
    2012 WL 3155574 (N.D. Cal. Aug. 2, 2012) ................................................................ 20

*Aspen Title & Escrow, Inc. v. Jeld-Wen, Inc.*,
    677 F. Supp. 1477 (D. Or. 1987) .................................................................................. 16

*Augusta News Co. v. Hudson News Co.*,
    269 F.3d 41 (1st Cir. 2001) ............................................................................................ 24

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
    9 F.4th 1102 (9th Cir. 2021) .................................................................................... 24, 25

*Bailey v. Allgas, Inc.*,
    284 F.3d 1237 (11th Cir. 2002) ...................................................................................... 8

*Berkey Photo v. Eastman Kodak Co.*,
    603 F.2d 263 (2d Cir. 1979) ............................................................................................ 6

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
    152 F.3d 588 (7th Cir. 1998) ...................................................................................... 8, 9

*Boone v. Redevelopment Agency of San Jose*,
    841 F.2d 886 (9th Cir. 1988) ........................................................................................ 15

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012) ................................................................................ 15, 18

*City of Oakland v. Wells Fargo & Co.*,
    14 F.4th 1030 (9th Cir. 2021) ........................................................................................ 8

*City of Vernon v. Southern Calif. Edison Co.*,
    955 F.2d 1361 (9th Cir. 1992) ...................................................................................... 25

*Eagle v. Star-Kist Foods, Inc.*,
    812 F.2d 538 (9th Cir. 1987) .......................................................................................... 8

*Eastman v. Quest Diagnostics Inc.*,
   108 F. Supp. 3d 827 (N.D. Cal. 2015) ............................................................................. 18

*FTC v. Qualcomm*,
   969 F.3d 974 (9th Cir. 2020) ................................................................................. 18, 19

*Gerlinger v. Amazon.com Inc.*,
   526 F.3d 1253 (9th Cir. 2008) ........................................................................................ 7

*Golden Grain Macaroni Co. v. FTC*,
   472 F.2d 882 (9th Cir. 1972) ....................................................................................... 14

*Grasshopper House, LLC v. Clean & Sober Media LLC*,
   2019 WL 12074086 (C.D. Cal. July 1, 2019) ................................................................ 9

*Hicks v. PGA Tour, Inc.*,
   897 F.3d 1109 (9th Cir. 2018) ............................................................... 10, 11, 12, 13

*Holmes v. Securities Investor Protection Corp.*,
   503 U.S. 258 (1992) ........................................................................................................ 8

*Huron Valley Publ'g Co. v. Booth Newspapers, Inc.*,
   336 F. Supp. 659 (E.D. Mich. 1972) ..................................................................... 10, 11

*IDX Sys. Corp. v. Epic Sys. Corp.*,
   285 F.3d 581 (7th Cir. 2002) ....................................................................................... 21

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) ..................................................................................... 25

*Imax Corp. v. Cinema Techs., Inc.*,
   152 F.3d 1161 (9th Cir. 1998) ..................................................................................... 21

*In re Ebay Seller Antitrust Litig.*,
   2010 WL 760433 (N.D. Cal. Mar. 4, 2020), *aff'd, In re eBay Seller Antitrust
   Litig.*, 433 F. App'x 504 (9th Cir. 2011) ....................................................................... 7

*In re Google Digital Advertising Antitrust Litig.*,
   2021 WL 2021990 (N.D. Cal. May 13, 2021) .............................................................. 10

*In re Google Digital Advertising Antitrust Litig.*,
   627 F. Supp. 3d 346 (S.D.N.Y. 2022) .............................................................. 16, 17, 24

*In re Google Digital Advertising Antitrust Litig.*,
   --- F. Supp. 3d ---, 2024 WL 895155 (S.D.N.Y. Mar. 1, 2024) ........................ 16, 17, 24

*In re IBM Peripheral EDP Devices Antitrust Litig.*,
   481 F. Supp. 965 (N.D. Cal. 1979) ............................................................................... 6

*In re Live Concert Antitrust Litig.*,
   863 F. Supp. 2d 966 (C.D. Cal. 2012) ................................................................... 12, 13

*In re Online DVD Rental Antitrust Litig.*,
      2011 WL 5883772 (N.D. Cal. Nov. 23, 2011) ................................................................. 7

*Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*,
      518 F.2d 913 (9th Cir. 1975) .......................................................................................... 12

*Intel Corp. v. Fortress Inv. Grp. LLC*,
      511 F. Supp. 3d 1006 (N.D. Cal. 2021), *aff'd*, 2022 WL 16756365 (9th Cir. Nov.
      8, 2022) ......................................................................................................................... 5, 6

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*,
      978 F.3d 653 (9th Cir. 2020) .......................................................................................... 21

*Kinderstart.com LLC v. Google, Inc.*,
      2007 WL 831806 (N.D. Cal. Mar. 16, 2007) .................................................................. 10

*Litton Sys., Inc. v. Honeywell, Inc.*,
      1996 WL 634213 (C.D. Cal. July 24, 1996) ................................................................... 25

*Magnus Petrol. Co., Inc. v. Skelly Oil Co.*,
      599 F.2d 196 (7th Cir. 1979) .......................................................................................... 16

*Manistee Town Ctr. v. City of Glendale*,
      227 F.3d 1090 (9th Cir. 2000) ........................................................................................ 15

*Masimo Corp. v. Tyco Health Care Grp., L.P.*,
      2004 WL 5907538 (C.D. Cal. June 10, 2004) ................................................................ 22

*McSherry v. City of Long Beach*,
      584 F.3d 1129 (9th Cir. 2009) ........................................................................................ 14

*Monahan's Marine, Inc. v. Boston Whaler, Inc.*,
      866 F.2d 525 (1st Cir. 1989) ........................................................................................... 16

*Morton v. Rank Am., Inc.*,
      812 F. Supp. 1062 (C.D. Cal. 1993) ............................................................................... 22

*Nelson v. Pima Community College*,
      83 F.3d 1075 (9th Cir. 1996) .......................................................................................... 14

*Polaris Innovations Ltd. v. Kingston Tech. Co., Inc.*,
      2017 WL 2806897 (C.D. Cal. Mar. 30, 2017) ................................................................ 22

*Procaps S.A. v. Patheon Inc.*,
      141 F. Supp. 3d 1246 (S.D. Fla. 2015) ............................................................................. 7

*Rambus, Inc. v. FTC*,
      522 F.3d 456, (D.C. Cir. 2008) ....................................................................................... 19

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
      842 F.3d 883 (5th Cir. 2016) .......................................................................................... 22

*Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*,
    2013 WL 5694452 (N.D. Cal. Oct. 18, 2013)..................................................... 18

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2013) ....................................................................... 5, 9

*Stephens v. Union Pacific R.R. Co.*,
    935 F.3d 852 (9th Cir. 2019) ......................................................................... 15

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961).................................................................................... 16

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
    875 F.2d 1369 (9th Cir. 1989) ....................................................................... 24

*Truck-Rail Handling, Inc. v. Burlington N. & Santa Fe Ry. Co.*,
    244 F. App'x 130 (9th Cir. 2007) ................................................................... 24

*United Mine Workers v. Pennington*,
    381 U.S. 657 (1965).................................................................................... 15

*United States v. Columbia Steel Co.*,
    334 U.S. 495 (1948).................................................................................... 16

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966).................................................................................... 10

*United States v. Papercraft Corp.*,
    540 F.2d 131 (3d Cir. 1976).......................................................................... 14

*Western Parcel Express v. United Parcel Serv. of Am.*,
    190 F.3d 974 (9th Cir. 1999) ......................................................................... 18

*Zoslaw v. MCA Distributing Corp.*,
    693 F.2d 870 (9th Cir. 1982) ......................................................................... 16

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C. § 45(b) ............................................................................................ 14

16 C.F.R. Part 3............................................................................................... 14

Fed. R. Civ. P. 37(c) ........................................................................................ 20

Fed. R. Civ. P. 56............................................................................................ 1

Standing Order for Civil Cases Before Judge Donato (2017),
    https://www.cand.uscourts.gov/wp-content/uploads/judges/donato-
    jd/JD_Standing-Order-For-Civil-Cases-Before-Judge-Donato.pdf............................... 20

**PUBLIC REDACTED VERSION**

**OTHER AUTHORITIES**

Phillip A. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (2023) ........................................................... 9, 18, 22, 23

**PUBLIC REDACTED VERSION**

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE THAT, on June 20, 2024, at 10:00 a.m., Defendant Meta Platforms, Inc. will move for summary judgment on all claims raised in the First Amended Consolidated Advertiser Class Action Complaint (Dkt. 237).

Pursuant to Federal Rule of Civil Procedure 56, Meta requests that the Court grant summary judgment in Meta's favor on all of Advertisers' claims.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

This Court acknowledged serious questions with Advertisers' case even after an amended complaint, but said it would not "turn off the spigot" on their revised claims before discovery. Dkt. 339 at 22:23-24. In the intervening 19 months, Advertisers have engaged in extensive discovery such that the Court observed they had "gotten far more than [they] probably should have." Dkt. 630 at 9:13-14. Yet despite every opportunity to develop their case, it is now clear Advertisers cannot present a viable antitrust claim because Meta faces vigorous competition in the sale of online ads and owes its success to competition on the merits, not anticompetitive conduct.

Advertisers claim that Meta overcharged for ads without *any* evidence of what Meta charged for ads in the real world or what Meta would have charged in any but-for world. They claim that Meta monopolized the "social advertising" market, but have not coherently defined that market and, importantly, concede that advertisers substitute between "social" advertising and other ad venues. And they challenge actions that as a matter of law cannot be anticompetitive. The Court should grant Meta's summary judgment motion because Advertisers fail to satisfy the basic legal requirements for bringing an antitrust claim to trial. So much so that Meta's motion is based *entirely* on the admissions and opinions of Advertisers' expert witnesses and Advertisers' own contention interrogatory responses, excerpts of which are attached hereto and are the sole evidence filed in support of this motion; the Court need not weigh any other documents or testimony or facts, or even the opinions of Meta's own experts, to grant this motion.

*First*, Advertisers' claim that Meta exercised monopoly power by overcharging for ads fails because they present no evidence that Meta charged supracompetitive prices for ads. Instead,

**PUBLIC REDACTED VERSION**

Advertisers rely on a theory that Meta's *profits* have been elevated above a supposed benchmark. Of course, high profits need not reflect supracompetitive prices; instead, they may reflect a firm's lower costs, superior efficiency, or higher output. Yet Advertisers rely solely on Meta's profits to establish antitrust injury, without even attempting to rule out these other possibilities. And even if a firm earning higher profits than some benchmark could prove that it also charged higher prices, a firm's profits would not reveal whether those prices stem from anticompetitive conduct (as the law requires), as opposed to competition on the merits.

*Second*, Advertisers' claims depend on the existence of a legally relevant submarket for "social advertising." The Ninth Circuit has rejected the idea that mere differences between various types of advertising can create viable antitrust submarkets. And courts routinely dismiss claims, like Advertisers', premised on platform-specific advertising submarkets. Advertisers' own expert recognizes that advertisers choose among advertising platforms based on direct comparisons of return on investment—"bang for the buck"—which defeats Advertisers' market definition contention.

*Third*, none of Advertisers' theories of exclusionary conduct is actionable as a matter of law. Advertisers' claim that the FTC would have ordered the divestiture of Instagram and WhatsApp had Meta told the FTC about an improvement of Meta's machine learning systems is based on pure speculation about how the FTC and other decision makers would have acted, and about how quickly they could have acted, in Advertisers' but-for world. Not only is that speculation legally insufficient and inconsistent with the record, but it is offered with no evidence (from the factual or expert record) of the competitive effect on advertisers even if this speculation were taken as true. Those defects alone doom the claim, but it must also be rejected since it seeks antitrust liability for Meta's representations to the government, contrary to *Noerr-Pennington*.

Advertisers' claims directed at various agreements between Meta and other firms (or in one case, an alleged agreement of which there is no proof) fail as a matter of law. The agreements are vertical and none caused any cognizable anticompetitive effect in the alleged relevant market.

Advertisers' untimely disclosed claim that Meta allegedly stole Snap's trade secrets to copy Snapchat Stories (a public feature of the Snapchat app) fails for several reasons. First, Advertisers

**PUBLIC REDACTED VERSION**

admit that Meta's development of Stories occurred before it acquired any data about Snapchat and they do not identify any feature of Meta's Stories that was developed using a trade secret. Further, they have failed to identify any alleged Snap trade secret with any particularity or explain how Meta misappropriated it at all, let alone in a manner harming competition. Indeed, this sort of alleged intellectual property infringement is not anticompetitive as a matter of law.

*Fourth*, Advertisers' remaining causes of action fail for similar reasons. Their attempted monopolization claim rises and falls with their monopolization claim. And Advertisers' restraint of trade claim based on one of the challenged agreements (Meta's "Network Bidding Agreement" with Google) fails—like all their challenges to Meta's vertical agreements—because the agreement had no legally cognizable anticompetitive effect.

*Finally*, Advertisers' damages model makes no attempt to apportion the damages stemming from each of the five independent acts they challenge. Accordingly, if the Court grants summary judgment as to any of Advertisers' exclusionary conduct theories, there is no basis for a damages award on their claims as a matter of law.

## BACKGROUND

Meta sells ads online. So do many other firms like Google, Amazon, Apple, Microsoft, TikTok, Pinterest, and Twitter. Those companies and Meta have routinely identified one another as close competitors in the sale of advertising. To succeed in this competitive environment, Meta's advertising services have been designed and continually refined to help Meta's advertising customers place engaging and relevant ads. Meta succeeds because its services reach target audiences effectively using what is widely regarded as one of the most user-friendly advertising management systems available.

Advertisers claim that they continued to turn to Meta not because of its excellent, effective, and easy-to-use product and engaged user base, but instead because they have no choice—because Meta supposedly monopolized a purported market for "social advertising" from December 1, 2016, to December 31, 2020 (the Class Period). The merits report of Advertisers' principal expert (Michael Williams) defines "social advertising" as "██████████████"—but apparently need not be—"███████████████████████████████." Ex. 1, Williams Merits Rep.

¶21.[1] In his class-certification deposition, Williams ▮▮▮▮▮▮▮▮▮▮▮. Ex. 2, Williams CC Tr. 244:13-245:4. But he waffled in his more recent merits-stage deposition, testifying that he does not "have an opinion on" whether "there could be ads that use social data contained in the social graph but that do not constitute social advertising" and agreeing it is "possible" for an ad to "constitute social advertising even if it does not use social data contained in a social graph." Ex. 3, Williams Merits Tr. 21:12-23, 23:2-19. Thus, the sole attribute offered to define Advertisers' purported market—targeting based on social data in a social graph—is apparently neither necessary nor sufficient to render an ad "social."

Whatever the definition of "social advertising," Advertisers allege that five unrelated categories of conduct "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮" and that, as a result, advertisers paid too much for ads sold by Meta. Ex. 1, Williams Merits Rep. ¶24. But Advertisers do not analyze Meta's prices. Instead, as their sole proof of injury and damages, they offer a study that applies certain adjustments to some of Meta's accounting *profits* (producing a so-called "economic profit rate" or "EPR" for Meta's ad business) and compares the result to the weighted average of the similarly calculated profit figures for three supposed yardstick firms (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). *Id.* ¶¶326-63. Williams maintains that because Meta's figure exceeded this average (though not ▮▮▮▮ EPR) during the Class Period, Meta must have overcharged class members for social advertising, and the gap between Meta's EPR and the other firms' average EPR stems entirely from these overcharges.

Advertisers claim that any of the five alleged categories of conduct individually, all together, or any subset thereof, would result in the same overcharge and damages. In their view, so long as Meta's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ even if "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." *Id.* ¶332. Williams even testified that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." Ex. 2, Williams CC Tr. 55:5-56:9; Ex. 3, Williams Merits Tr. 313:7-22. Advertisers have not independently

---

[1] Unless otherwise noted, "Ex." citations reference exhibits to the Gringer Declaration submitted herewith, emphasis is added, and objections are omitted for deposition citations.

**PUBLIC REDACTED VERSION**

evaluated the impact of any of these individual acts on Meta's prices, or the relative contribution of each act to Meta's alleged monopoly power. Indeed, Advertisers press their overcharge theory without any analysis of Meta's prices (actual or in the but-for world) at all.

**ARGUMENT**

## I. PROOF OF HIGH PROFITS ALONE CANNOT ESTABLISH CAUSAL ANTITRUST INJURY

### A. High Profits Cannot Establish Antitrust Injury

Advertisers' claimed antitrust injury is being charged supracompetitive prices. But Advertisers present no evidence of Meta's prices, and their own experts did not evaluate whether prices were in fact above competitive levels. Advertisers instead claim that Meta's *profits* are higher than the weighted average of three other firms'. But having high profits cannot, standing alone, establish that prices are supracompetitive and thus Advertisers cannot show that they were injured. That is because high profits can—and often do—exist for many reasons other than supracompetitive prices, including lower costs or higher output. Advertisers have made no effort to show that Meta's profits are attributable to supracompetitive prices as opposed to these other factors, and accordingly their sole proof of antitrust injury fails as a matter of law.

Establishing antitrust injury in an overcharge case requires proof that the plaintiff paid higher prices than it would have in a but-for world without the challenged conduct. *Somers v. Apple, Inc.*, 729 F.3d 953, 965 (9th Cir. 2013) (overcharge plaintiff must show defendant "charge[d] inflated prices"). Advertisers admittedly have proffered no evidence that Meta's prices exceeded any relevant benchmark, nor have they compared what Meta charged for ads in the real world to what Meta would have charged in a but-for world without the challenged conduct. Ex. 3, Williams Merits Tr. 299:9-16 ("[Q.] My question was you did not do a calculation of what Meta's quality-adjusted prices would have been in a but-for world; isn't that right? A. I don't believe my reports have a specific study talking about quality-adjusted prices."); Ex. 4, Kreitzman Merits Tr. 13:5-9 (███████████████████████████████████████████████████████ ███████████████████████████). This failure of proof is dispositive—antitrust claims are dismissed *at the pleading stage* if the plaintiffs do not specifically allege that they actually "paid supracompetitive prices." *Intel Corp. v. Fortress Inv. Grp. LLC*, 511 F. Supp. 3d 1006, 1027 (N.D.

1   Cal. 2021), *aff'd*, 2022 WL 16756365, at *2 (9th Cir. Nov. 8, 2022) (affirming for failure to "allege

2   any instance in which [plaintiff] has in fact paid" more due to conduct).

3       Instead, Advertisers' entire legal theory of injury relies on Meta's supposedly elevated

4   profits. This fails on multiple levels. As an initial matter, the Kreitzman-Williams "yardstick"

5   study forming the basis for this overcharge theory is, for the reasons explained in Meta's class

6   certification *Daubert* motion, *see* Dkt. 662, and concurrently-filed merits *Daubert* motions, junk

7   science that cannot be admitted to show an overcharge or for any other purpose. If the Court so

8   rules, the Advertisers' case is over. But even if it were admissible, the Kreitzman-Williams study

9   would fail as a matter of law to establish antitrust injury. It is black-letter antitrust law that earning

10  high profits, and even "earning monopoly profits," is itself "in no way anticompetitive." *In re IBM*

11  *Peripheral EDP Devices Antitrust Litig.*, 481 F. Supp. 965, 990 (N.D. Cal. 1979). There can be no

12  antitrust injury "until the monopolist actually exercises its illicit power to extract an excessive

13  price," that is, prices higher than those that would have prevailed absent some anticompetitive

14  conduct. *Berkey Photo v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d Cir. 1979). And a "purchaser

15  has no cause of action" against a firm earning monopoly profits unless that firm has "boost[ed] its

16  price to excessive levels." *Id.*

17      Permitting an inference of supracompetitive prices from higher profits would eviscerate

18  this rule, which exists for good reason as a matter of both economics and common sense. Profits

19  are a function of revenue and costs, and revenue is itself a function of both price and volume. ▓

20  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ there are thus at least three levers that influence a firm's

21  profitability: price, output, and costs. *See* Ex. 4, Kreitzman Merits Tr. 109:6-15 (▓▓▓▓▓▓▓▓▓

22  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

23  ▓▓▓▓▓▓▓▓▓▓▓▓); Ex. 3, Williams Merits Tr. 277:12-278:7 (agreeing firms "could

24  maximize their profits … through a reduction of costs while prices remain steady"); Ex. 4,

25  Kreitzman Merits Tr. 91:17-92:1 ▓▓▓▓; *id.* 113:16-114:3 (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

26  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓).

27      Meta's profits thus cannot, as a matter of law, show that Meta overcharged customers for

28  ads without, at a bare minimum, ruling out the possibility that Meta's profits derive from superior

**PUBLIC REDACTED VERSION**

efficiency (e.g., a better product or lower costs). If Meta's profits resulted from superior efficiency, Advertisers would, of course, be unable to show an anticompetitive overcharge. Advertisers' model for injury and damages assumes, however, without analysis or justification, that Meta's (supposedly) excess profits must have derived from an overcharge, rather than from any of the assorted other factors that could explain Meta's business success. *See, e.g.*, Ex. 3, Williams Merits Tr. 284:22-285:8 (testifying he has not "done an analysis of whether in the but-for world Meta's economic profits could be reduced to the economic profits of the yardstick firms through a reduction in output that does not correspond to a reduction in advertising costs"). Williams's findings are thus *entirely consistent* with Meta not having charged supracompetitive prices at all, and Advertisers have no evidence or opinion that would allow the jury to conclude that the class was subject to overcharges.

This is not a fact question or judgment call for the jury. Advertisers may not proceed to trial under a theory that they were overcharged as a result of the challenged conduct based solely on Meta's profits. *See, e.g.*, *In re Ebay Seller Antitrust Litig.*, 2010 WL 760433, at *11 (N.D. Cal. Mar. 4, 2020) (proffered proof of antitrust injury based on overcharge "proxy" affected by multiple non-price factors insufficient to "permit a reasonable jury to find that [plaintiffs] have suffered injury"), *aff'd*, *In re eBay Seller Antitrust Litig.*, 433 F. App'x 504, 506 (9th Cir. 2011) (unpublished); *see also Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253, 1265 (9th Cir. 2008); *In re Online DVD Rental Antitrust Litig.*, 2011 WL 5883772, at *13-16 (N.D. Cal. Nov. 23, 2011); *Procaps S.A. v. Patheon Inc.*, 141 F. Supp. 3d 1246, 1268-69 (S.D. Fla. 2015) (granting summary judgment where defendant "offered no evidence that … any customer's price in fact increased and, if it did, how much it increased," and instead "base[d] its case … on what economic theory predicts should happen, not what actually *did happen*," due to challenged conduct). Advertisers' blinkered focus on profits cannot show Meta overcharged anyone for ads.

**B.    High Profits Cannot Establish Injury Traceable To The Challenged Conduct**

Even if Advertisers could establish that Meta's prices were higher through an examination of its profits alone, as a matter of law, that evidence would not establish that their injury was proximately caused by anticompetitive conduct. Summary judgment is thus warranted. An antitrust

**PUBLIC REDACTED VERSION**

1    plaintiff's "right to sue … require[s] a showing that the defendant's violation … was the proximate

2    cause" of the plaintiff's injury. *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). This

3    requires showing that the injury was not "produced by independent factors" unrelated to the

4    challenged conduct, which Advertisers have made no attempt to—and cannot—do. *Eagle v. Star-*

5    *Kist Foods, Inc.*, 812 F.2d 538, 542 (9th Cir. 1987).

6       *First*, Kreitzman and Williams concede that ███████████████████

7    ████████████████████████████████████████████████

8    ████████████████████████████████████████████████

9    ██████████████████████████. Ex. 2, Williams CC Tr. 229:23-230:3 ████████

10    ████████████████████████████████████████████████

11    ████████████████; *id.* at 70:12-72:17 ████████████████

12    ████████████████████████████████████████████████

13    ████████████████████████; Ex. 5, Kreitzman CC Tr. 36:11-19; *see also Bailey v.*

14    *Allgas, Inc.*, 284 F.3d 1237, 1252 (11th Cir. 2002) ("profits could just as easily be obtained as a

15    result of good management, superior efficiency, or differences in accounting"). Yet despite these

16    concessions, neither putative expert does anything to account for these factors in their yardstick

17    study. Ex. 5, Kreitzman CC Tr. at 42:20-43:5 (these attributes "were not part of [his] six selection

18    criteria" and "there were no adjustments to make for any of those factors in [his] calculations"),

19    44:7-17, 45:4-10, 46:12-47:1; Ex. 2, Williams CC Tr. 184:17-187:13 ████████████

20    ████████████████████████████████████████████████

21    ████████████████████████████.

22       Those admissions are a concession that Advertisers have no "ability to distinguish the

23    'damages attributable to the violation, as distinct from other, independent, factors,'" and thus

24    cannot establish proximate cause. *City of Oakland v. Wells Fargo & Co.*, 14 F.4th 1030, 1039 (9th

25    Cir. 2021) (quoting *Holmes*, 503 U.S. at 269). Instead of doing anything "to correct for salient

26    factors" that could affect Meta's profits, they "attribute the entire difference between" Meta's

27    performance and the yardsticks' to the challenged conduct. *Blue Cross & Blue Shield United of*

28    *Wis. v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998). That is plainly insufficient, and

"do[es] not provide a rational basis for a judgment." *Id.* This is a principle with which Williams is familiar. *See Grasshopper House, LLC v. Clean & Sober Media LLC*, 2019 WL 12074086, at *12 (C.D. Cal. July 1, 2019) ("Dr. Williams' methodology is also deficient for failing to consider … other factors" affecting profitability other than the alleged misconduct.).

        *Second*, in a monopoly maintenance case like this one, particular care is required to connect any supposedly excess profits (or prices) to conduct that actually occurred during the Class Period, rather than to the defendant's (allegedly) pre-existing monopoly power. *See* Areeda & Hovenkamp, *Antitrust Law* ¶657b1 (2023) (a plaintiff may not "treat[] the monopolist as if it had charged the perfectly competitive price before the unlawful activity was undertaken"). Advertisers assert that Meta had monopoly power at the start of the Class Period. Ex. 3, Williams Merits Tr. 287:14-289:6. Yet their yardstick study purporting to show injury attributes Meta's profits, from the very first day of the Class Period onward, to the specific conduct challenged in this case. Indeed, Advertisers admitted in their class certification briefing that the Kreitzman-Williams study "assumes … that Meta would not have a monopoly or market power in a but-for world." Dkt. 699-1 at 4. And that is clear from its operation. As explained, the study does not change no matter whether all, some, or just one of Advertisers' theories of exclusionary conduct is viable. *See supra* pp.4-5. This demonstrates that the study is not meant to, and does not, identify the effects of the challenged conduct, but rather only the effects of the *existence* of Meta's alleged monopoly power. As a result, their yardstick study cannot show that any overcharge (assuming there was one at all) was caused by the challenged conduct—which it must be for Advertisers to have suffered a cognizable injury—as opposed to monopoly power that Advertisers contend existed before the conduct and the Class Period. Advertisers must show that their claimed injury was "caused by [the defendant's] anticompetitive conduct," and they have offered no basis on which to conclude that it was. *Somers*, 729 F.3d at 963-64 & n.5.

## II.   ADVERTISERS CANNOT ESTABLISH MONOPOLY POWER IN ANY COGNIZABLE RELEVANT MARKET AS A MATTER OF LAW

        Advertisers allege that Meta has monopoly power in an ambiguously defined "social advertising" market. But their putative "social advertising" market is not a valid relevant market

**PUBLIC REDACTED VERSION**

1    as a matter of law. Summary judgment is therefore warranted on all of their claims.

2         A well-established line of decisions confirms that a "single market" may contain "different

3    products," and that "commercial realities"—not the mere existence of different products—define

4    the contours of a relevant market. *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966).

5    Courts across the country have reliably taken this approach and rejected market allegations that,

6    like Advertisers' here, divide up the advertising market into technological siloes untethered from

7    the economic realities of the industry. In *Hicks v. PGA Tour, Inc.*, the Ninth Circuit endorsed an

8    extensive set of cases that "rejected antitrust claims reliant on proposed advertising markets limited

9    to a single form of advertising." 897 F.3d 1109, 1123 (9th Cir. 2018) (collecting cases). *Hicks*

10   itself involved a proposed market for advertising during professional golf tournaments not shown

11   during commercial breaks. The court rejected that market on a motion to dismiss because it

12   "omit[ted] many economic substitutes." *Id.* at 1121. As the court explained, companies aiming to

13   target their desired audience (there, golf fans) can "do so by airing commercials during golf-related

14   television programs, radio broadcasts, or podcasts," or by "advertis[ing] on golf-related websites

15   or social media pages" or "through a search engine or social media platform." *Id.*

16        *Hicks* is consistent with similar decisions stretching back decades. *See, e.g.*, *In re Google*

17   *Digit. Advert. Antitrust Litig.*, 2021 WL 2021990, at *3 (N.D. Cal. May 13, 2021) ("alleged market

18   for 'online display advertising services' on the 'open web' … improperly exclude[d] other ways

19   for advertisers to reach" their audience, including "social-media display advertising");

20   *Kinderstart.com LLC v. Google, Inc.*, 2007 WL 831806, at *6 (N.D. Cal. Mar. 16, 2007) ("there

21   is no logical basis for distinguishing the Search Ad Market from the larger market for Internet

22   advertising" because an advertiser "may choose to advertise via search-based advertising or by

23   posting advertisements independently of any search"—that is, "search-based advertising is

24   reasonably interchangeable with other forms of Internet advertising"); *Am. Online, Inc. v.*

25   *GreatDeals.Net*, 49 F. Supp. 2d 851, 858 (E.D. Va. 1999) (dismissing monopolization claim that

26   "restrict[ed] the market to e-mail advertising" when "[t]here are numerous substitutes for e-mail

27   advertising, some of which are less expensive, including use of the World Wide Web, direct mail,

28   billboards, television, newspapers, radio, and leaflets, to name a few"); *Huron Valley Publ'g Co.*

**PUBLIC REDACTED VERSION**

1  *v. Booth Newspapers, Inc.*, 336 F. Supp. 659, 662 (E.D. Mich. 1972) (denying preliminary

2  injunction on monopolization claims in part because "the relevant market includes all modes of

3  retail advertising," not "newspaper advertising alone").

4      As these decisions recognize, the commercial reality of the advertising industry is that

5  advertisers readily substitute across products and platforms. Both this Court and Advertisers' own

6  market definition expert have made similar observations. This Court noted that "everybody [in]

7  the online industry has been using targeted ads from day one," and that advertisers substitute

8  among "all of those entities to reach the[ir] audience" depending on where their dollar gets the

9  biggest return. Dkt. 339 at 7:22-9:24. Evidence that "social" and non-"social" platforms target ads

10  "in slightly different ways" says nothing about whether social advertising is "a market in the

11  antitrust sense." *Id.* Likewise, Williams agreed that "an advertiser might choose to advertise in one

12  venue versus another based on the audience they can reach, irrespective of whether or not those

13  venues have social data or a social graph." Ex. 3, Williams Merits Tr. 110:4-9. And he confirmed

14  that "some advertisers might not know whether or not an advertising venue or platform has social

15  data or a social graph." *Id.* at 110:10-17. Rather, "one of the things that an advertiser considers, if

16  not the primary thing an advertiser considers, when they're deciding where to place an ad is their

17  ROI." *Id.* at 115:7-16. And "advertisers can make assessments about relative ROI of placing an ad

18  on one venue versus another without having an understanding of what type of social data or data

19  is being used to target or place the ad." *Id.* at 115:24-116:22. As he put it, when deciding where to

20  buy ads, "advertisers want to get the most … bang for their buck." *Id.* at 115:7-16.

21      Williams's admissions are fatal to Advertisers' "social advertising" submarket. Market

22  definition depends on whether consumers consider products to be "reasonably interchangeable."

23  *Hicks*, 897 F.3d at 1116. That is because if two products are reasonably interchangeable, a

24  consumer can choose between them based on price and quality. So, Williams's concession that

25  advertisers choose among various digital ad venues based on measurable returns on investment

26  forecloses the claim that "social" advertising is a separate submarket. To say that advertisers

27  choose among ad venues based on price and quality—the "bang for the buck"—is to say that those

28  venues compete with one another and are not in separate antitrust markets.

**PUBLIC REDACTED VERSION**

Advertisers' attempt to overcome the well-settled legal principle that advertising products with differentiated features do not amount to economically distinct antitrust markets fails for two *independent* reasons. First, their market definition expert's analysis is inadmissible junk science for the reasons explained in Meta's concurrently filed *Daubert* motion to exclude Williams's opinions. As explained therein, Williams's self-styled SSNIP test depends on his flawed yardstick study, and also ignores the requirement that a SSNIP test analyze customer substitution in response to price changes. And he purports to "define" the social advertising market while variously ignoring or jettisoning his own definition of what that market encompasses. If the *Daubert* motion is granted, judgment for Meta follows—because Advertisers have nothing to support the significance of their artificially narrow social advertising submarket.

Second, even if the Court does not exclude Williams's opinions, Advertisers' market definition analysis still fails as a matter of law because it focuses solely on whether social advertising is different from non-social advertising, without considering whether those differences are "economically significant," *Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*, 518 F.2d 913, 932 (9th Cir. 1975)—that is, whether alternative ad venues are "reasonably interchangeable" substitutes with Meta's offerings because of those purported differences, *Hicks*, 897 F.3d at 1116; *see also In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 1000 (C.D. Cal. 2012). To the extent Advertisers have defined a market at all, it is seemingly characterized by the ability to use social data in a social graph. Advertisers' view is that ads exist in different markets depending on the data they have access to or whether they are sold by a "social" firm. This produces absurd consequences, as Advertisers' other putative expert, Tilman Klumpp, made clear in his deposition. He explained that, under Advertisers' view of the relevant market, ████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████ Ex. 6, Klumpp Tr. 219:7-220:8. ███████ ████████████████████████████████████████████ That is not a market definition reflecting economic realities or economic substitution.

Courts around the country, including this Court—and even Williams himself—have made

**PUBLIC REDACTED VERSION**

1   clear that advertising customers' purchasing decisions are undisputedly driven by which

2   advertising format delivers the best results, not by data inputs or platform. Differing product

3   features rarely give rise to economically significant submarkets in advertising—and do not do so

4   here—because those features do not impact whether customers view various advertising products

5   as "economic substitutes" for one another. *Hicks*, 897 F.3d at 1120-21. Advertisers' focus on

6   arguable technical differences, rather than the economic significance of those differences, renders

7   their proposed market inadequate as a matter of law. Their flawed argument "boils down to: plenty

8   of people (including consumers and industry participants) recognize" that social advertising is a

9   type of advertising, "therefore, the relevant market in this case is comprised of" social advertising.

10  *In re Live Concert*, 863 F. Supp. 2d at 993. But that theory is missing "[a] key ingredient," namely,

11  "an evaluation of the *economic significance*" of such observations. *Id.*

12  **III.    THE CHALLENGED CONDUCT IS NOT EXCLUSIONARY AS A MATTER OF LAW**

13  All of Advertisers' theories of exclusionary conduct depend on the opinions of their expert

14  Klumpp. As explained in Meta's concurrently-filed *Daubert* motion, those opinions are

15  inadmissible because the only effect of the challenged conduct they identify is monopoly

16  maintenance—which is not an anticompetitive effect—and, beyond that, they lack foundation in

17  reliable economic principles with respect to any of the challenged conduct. If the Court excludes

18  Klumpp's testimony, Advertisers lack any grounds on which to establish that any of the challenged

19  conduct was anticompetitive. But even if the Court does not exclude Klumpp's opinions,

20  Advertisers' claims fail because none of the challenged conduct is exclusionary as a matter of law.

21  **A.    Meta's Alleged Misrepresentations To Regulators Cannot Be Exclusionary
        As A Matter Of Law**

22

23  Advertisers' claim that Meta avoided adverse regulatory action by making supposed

24  misrepresentations to regulators fails both because it is hopelessly speculative and because efforts

     to influence regulatory action through advocacy are immune from antitrust scrutiny.

25

26  According to Advertisers, in February 2020, Meta supposedly "██████████████████

27  ████████████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████████████

**PUBLIC REDACTED VERSION**

1   ███████████████" which Advertisers describe as ███████████████

2   ███████████████" Ex. 7, Klumpp Rep. ¶179. Advertisers contend that, ███████████

3   ████████████████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████████████" *Id.*

6   ¶182. And, Advertisers say, ███████████████████████████████████████████████

7   ████████████████████████████████████████████ *Id.*

8          Advertisers' theory is legally defective because it is predicated on baseless speculation that

9   the FTC would have ordered a divestiture in the but-for world. "Mere allegation and speculation

10  do not create a factual dispute for purposes of summary judgment." *Nelson v. Pima Cmty. Coll.*,

11  83 F.3d 1075, 1081-82 (9th Cir. 1996). "Summary judgment requires facts, not … rank

12  speculation." *McSherry v. City of Long Beach*, 584 F.3d 1129, 1138 (9th Cir. 2009).

13         Here, Advertisers' theory has no factual basis at all. First, the claim assumes the FTC can

14  unilaterally order divestiture or an injunction. It cannot. *See* 15 U.S.C. §45(b) (procedures for entry

15  of FTC orders); 16 C.F.R. Part 3 (corresponding rules). Second, their claim wrongly assumes the

16  FTC could effect a divestiture near-instantaneously. It cannot. *See, e.g.*, *Golden Grain Macaroni

17  Co. v. FTC*, 472 F.2d 882, 884 (9th Cir. 1972) (discussing FTC "[d]ivestiture proceedings …

18  instituted by a complaint," followed by "lengthy litigation," then a "final order compel[ling]

19  divestiture," and then appeal to the Ninth Circuit); *United States v. Papercraft Corp.*, 540 F.2d

20  131, 140 n.17 (3d Cir. 1976) ("divestiture cannot be accomplished overnight"). The FTC has, in

21  fact, sought divestiture as a remedy in a suit that it filed against Meta in December 2020; more

22  than three years later, that case remains in litigation and no divestiture order nor even a more

23  limited injunction has issued. *See FTC v. Meta Platforms, Inc.*, No. 20-cv-03590 (D.D.C.). Third,

24  Advertisers' claim assumes without any evidence that, had a divestiture order issued—or even a

25  far narrower order, like an injunction against implementing F3—it would have somehow resulted

26  in increased competitive pressure sufficient to lower Meta's prices. Fourth, Advertisers have no

27  evidence that proves—or even suggests—that the FTC would or could have ordered a divestiture

28  but for Meta's supposedly inaccurate representations. As Klumpp himself testified: "██████████

1 ███████████████" Ex. 6, Klumpp Tr. 209:15. Nor can a jury, which is precisely why

2 Advertisers' speculation is an inadequate basis for their claim to proceed to trial. *See Stephens v.*

3 *Union Pac. R.R. Co.*, 935 F.3d 852, 856-857 (9th Cir. 2019) ("A party's own speculation is

4 insufficient to create a genuine issue of material fact, and a party cannot make it sufficient simply

5 by finding an expert who is willing to assume its correctness." (citation omitted)).

6       Regardless, Advertisers' theory is barred by *Noerr-Pennington*. Under *Noerr-Pennington*,

7 those "'who petition government for redress are generally immune from antitrust liability.'"

8 *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1093 (9th Cir. 2000). "The doctrine

9 immunizes petitions directed at any branch of government, including … administrative agencies"

10 like the FTC. *Id.* Such "efforts to influence public officials do not violate the antitrust laws even

11 though intended to eliminate competition." *United Mine Workers v. Pennington*, 381 U.S. 657,

12 670 (1965). That is true even if those efforts involve "'misrepresentations'" or "'false'" statements.

13 *Boone v. Redevelopment Agency of San Jose*, 841 F.2d 886, 894 (9th Cir. 1988). Advertisers'

14 challenges actions at the heartland of *Noerr-Pennington*'s protection: responses and presentations

15 made to agency officials that (according to Advertisers) aimed to persuade officials to follow a

16 particular course of action. Ex. 7, Klumpp Rep. ¶¶178-80.

17     **B.**   **The Challenged Vertical Agreements Cannot Be Exclusionary**

18       Advertisers' challenges to various agreements Meta allegedly entered with third parties fail

19 as a matter of law. The agreements are all vertical, so Advertisers must show that they "foreclose[d]

20 competitors" or "facilitate[d] horizontal collusion" among market participants. *Brantley v. NBC*

21 *Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012). Advertisers do not allege any horizontal

22 collusion in the market, nor do they contend the agreements caused any cognizable foreclosure.

23     **1.**   **The Network Bidding Agreement Was Not Exclusionary**

24       Advertisers challenge an agreement Meta entered with Google in September 2018—the

25 "Network Bidding Agreement" or "NBA"—permitting Meta to use Google's "Open Bidding"

26 auction system to bid for ad slots on third party apps. The premise of Advertisers' claim is that

27 Google "████████████████████████████████████████" in its auctions, which

28 "████████████████████████████████████████████████

**PUBLIC REDACTED VERSION**

1   ███████████████████████████████████████" Ex. 7, Klumpp Rep. ¶99. There is "nothing

2   anticompetitive in the simple fact that a seller"—Google—"offers … favorable terms[] to some of

3   its [customers]"—Meta—"even though such discrimination harms the non-favored [customers]."

4   *Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 866 F.2d 525, 529 (1st Cir. 1989); *Zoslaw v. MCA*

5   *Distrib. Corp.*, 693 F.2d 870, 887 (9th Cir. 1982) ("price discrimination that results where buyers

6   seek competitive advantages from sellers encourages the aims of the Sherman Act"). Accordingly,

7   the district court overseeing multi-district litigation involving the same agreement has twice

8   dismissed claims challenging it as unlawful. *In re Google Digit. Advert. Antitrust Litig.* ("*Google*

9   *I*"), 627 F. Supp. 3d 346, 370-77 (S.D.N.Y. 2022); *In re Google Digit, Advert. Antitrust Litig.*

10  ("*Google II*"), 2024 WL 895155, at *9-10 (S.D.N.Y. Mar. 1, 2024).

11          Any market impact of the NBA was so negligible as to be non-actionable as a matter of

12  law. The NBA is "a vertical arrangement between Google in its role as auctioneer and Facebook

13  as auction participant." *Google II*, 2024 WL 895155, at *10. Because the agreement is admittedly

14  ████████████████████ Ex. 6, Klumpp Tr. 274:8-17, it is "properly scrutinized under the

15  rule of reason," *Google I*, 627 F. Supp. 3d at 374-75. The NBA concerns a small segment of Meta's

16  ad business that Advertisers claim accounted for just ████ of Meta's Class Period ad revenue and

17  thus implicated—at most—less than one percent of market-wide revenue. Ex. 1, Williams Merits

18  Rep. ¶¶61, 288 & tbl. 1; *see also* Dkts. 679-1 at 6, 699-1 at 8 n.6. A vertical agreement's foreclosure

19  of a de minimis share of the relevant market is "not sufficient to injure any competitor" and the

20  agreement is thus reasonable as a matter of law. *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S.

21  320, 328 (1961); *United States v. Columbia Steel Co.*, 334 U.S. 495, 520 (1948) (3% foreclosure);

22  *Magnus Petrol. Co., Inc. v. Skelly Oil Co.*, 599 F.2d 196, 204 (7th Cir. 1979) ("less than 1%");

23  *Aspen Title & Escrow, Inc. v. Jeld-Wen, Inc.*, 677 F. Supp. 1477, 1487-88 (D. Or. 1987) ("less

24  than 2.0%" was "de minimis" and "inadequate as a matter of law"); *see Am. Prof'l Testing Serv.,*

25  *Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Pubs., Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997)

26  (monopolization plaintiff showing only "de minimis" effect "fails to prove its claim").

27          Moreover, Advertisers "have not pointed to data or actual instances of harm indicating that

28  competing in-app networks or bidders were placed at anticompetitive disadvantage due to

**PUBLIC REDACTED VERSION**

implementation of the NBA." *Google II*, 2024 WL 895155, at *10. That is, there is no showing of foreclosure at all. Rather, the NBA "promote[d] competition with Google's in-app network by bringing in a new competing bidder," benefiting advertisers. *Google I*, 627 F. Supp. 3d at 376. Likewise, Google "███████████████████████████████████," Ex. 7, Klumpp Rep. ¶99, "benefited consumers and competition by facilitating better outcomes for Facebook's advertisers," *Google II*, 2024 WL 895155, at *10.

## 2. The Alleged Netflix Agreement Was Not Exclusionary

Advertisers' claim challenging Meta's alleged agreement with Netflix fails because there is no evidence that the agreement exists. But even if it did, it would raise no antitrust concerns.

Advertisers claim that in 2018 Meta entered a secret, unwritten agreement with Netflix "█ ████████████████████████████████████████████████████████████ █████████████████████████████████████████████. Ex. 7, Klumpp Rep. ¶125. After voluminous discovery, Advertisers have produced no evidence that any such agreement exists. There is no documentary evidence supporting it, and every witness from Meta and ████████████████████ deny its existence. Even Advertisers' own expert is unwilling to say this agreement exists. Klumpp explicitly states he is "██████████████████████ ███████████████" and instead only "███████████████████████████████ ████████████████████████████████" *Id.* ¶125. He opines on this supposed agreement's effects despite having never seen it and admitting that ██████████ ████████████. Ex. 6, Klumpp Tr. 276:2-22. This analysis is thus purely hypothetical, and the only evidence supporting Advertisers' claim. That cannot possibly withstand summary judgment.

In any event, this alleged agreement could not have been exclusionary as a matter of law. Advertisers' theory of harm is that "█████████████████████████████████████ █████████████████████████████████████████████████████████████ ███████████████████████████████" and that the claimed agreement ensured "█████ ██████████████████████████████████████████████████████████████" Ex. 7, Klumpp Rep. ¶¶126, 132. But this spend never belonged to a rival to "lose." Meta is allowed to sell ads to whomever it wants and the challenged "agreement" did not make it harder for anyone

else to compete for Netflix's business. "[C]ontracts [that] do not preclude consumers from using other … services" "are legal under antitrust law." *W. Parcel Express v. United Parcel Serv. of Am.*, 190 F.3d 974, 976 (9th Cir. 1999). Nothing about the alleged agreement "'prevent[ed] [Netflix] from purchasing [social advertising] from any other vendor'" in addition to Meta, and there was thus no foreclosure. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 1003 (9th Cir. 2020).

Beyond that, Advertisers' experts' data shows that the ████████ supposedly at issue in this alleged agreement involved less than one percent of market-wide sales. Ex. 8, Kreitzman Merits Rep. ¶27 & fig. 5; Ex. 1, Williams Merits Rep. ¶288 & tbl. 1, ¶362. This again does not come anywhere close to the threshold the law requires for actionable foreclosure, *see supra* p.16— let alone the "substantial share" required to support an exclusive dealing or quasi-exclusive dealing claim, *Eastman v. Quest Diagnostics Inc.*, 108 F. Supp. 3d 827, 836-37 (N.D. Cal. 2015); *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, 2013 WL 5694452, at *12, *14 (N.D. Cal. Oct. 18, 2013) (9% insufficient); *see* Areeda ¶768b3 ("agreements to purchase a specific quantity" can be a form of "'quasi'-exclusive dealing"). Meta's rivals were undisputedly free to compete for advertising spend and associated "signals" from the remaining 99% of the purported market.

### 3.   The API Agreements Were Not Exclusionary

Advertisers' claim that Meta entered agreements with certain "Integration Partners" providing access to Meta's application programming interfaces ("APIs") fails as a matter of law because these agreements could not have had any exclusionary effect. Meta offers third-party developers access to its APIs, which allow developers' apps to interact with Meta's systems in limited ways. During the Class Period, Meta required some developers using its APIs to agree not to use certain of Meta's data to develop their own competing products, Ex. 7, Klumpp Rep. ¶¶152-60, but did not restrict them from creating such products using other data, like their own. Advertisers concede these agreements ████████████████████████████████████████ ████████████ Ex. 6, Klumpp Tr. 169:25-170:6. Advertisers do not even allege the agreements foreclosed competition, and thus the claim fails as a matter of law. *See Brantley*, 675 F.3d at 1198.

Instead, Advertisers contend the API Agreements created a ████████████████████ ████████████████████████████████████████████████████████

**PUBLIC REDACTED VERSION**

1    ██████████████████ "—even when they had not in fact done so—and thus "████████

2    ████████████████████████████ " Ex. 7, Klumpp Rep. ¶¶164-67.

3    That is, while the agreements do not bar such investment, and while Advertisers concede "████

4    ██████████████████████████████████

5    ████████████████████ " Advertisers' claim is premised on the

6    specter of ████████████████████████████

7    ████████████████████ *Id.* ¶162. Section 2, however, requires evidence of

8    *actual* harm to competition, not just possibilities. *Qualcomm*, 969 F.3d at 990; *Rambus, Inc. v.*

9    *FTC*, 522 F.3d 456, 438 (D.C. Cir. 2008). And, notably, the only "██████ " Advertisers offer

10    is the prospect that ████████████████████████

11    ████████████████ , Ex. 7, Klumpp Rep. ¶163 & n.357—a suggestion belied

12    by the fact that ████████████ during the Class Period, yet Meta never threatened it

13    with API litigation and Advertisers do not contend its operation of ██████ was impacted in any

14    way. *See* Ex. 6, Klumpp Tr. 188:12-189:5. No court has ever held that a supposed chilling effect

15    like this—one which (supposedly) stems from the unsubstantiated fear that a defendant could

16    maliciously misinterpret an otherwise valid agreement—suffices to make a vertical agreement

17    anticompetitive. Advertisers received discovery from several of Meta's API partners and found no

18    evidence that these agreements deterred them from starting a social service. Advertisers "needed

19    concrete documentation that [Meta's API] agreements prevented [developers] from" competing,

20    and they have none. *Aerotec Int'l v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1182 (9th Cir. 2016).

21      **C.**    **Summary Judgment Is Warranted On Advertisers' Claim Based On Meta's Alleged Misappropriation Of Snap's Supposed Trade Secrets**

22

23       Advertisers' claim that Meta's alleged use of data acquired with consent from panelists

24    who signed up for the Facebook Research ("FBR") App was anticompetitive fails because it is not

25    properly before the Court and, in all events, cannot be exclusionary as a matter of law.

26       The FBR App (which Advertisers call the "In-App Action Panel" or "IAAP") was a paid

27    market research tool through which panelists who signed up to participate agreed to install the

28    FBR App and send Meta data about how they used other apps on their phones, including Snapchat,

YouTube, and Amazon. Ex. 9, Jakobsson Rep. ¶¶30-37. Advertisers contend that unspecified data collected through the app was Snap's trade secret and that Meta misappropriated that information to copy Snapchat Stories, a public feature of Snapchat that launched in 2013 and that had gone viral. Ex. 7, Klumpp Rep. ¶¶58-64. In particular, Advertisers assert that Meta somehow used this information to develop "Stories"—Meta's short-form, ephemeral content feature that launched *before* the FBR App did, Ex. 10, Jakobsson Tr. 221:9-25, 223:7-14—and for other unspecified "███████████," Ex. 7, Klumpp Rep. ¶¶44-47. Advertisers assert that this alleged misappropriation "█████████████████████████████████████████████████ ██████████████████████████████████████████" *Id.* ¶64.

### 1.    Rule 37 Bars Advertisers' Untimely Disclosed Claim

As paragraph 24 of this Court's Standing Order for Civil Cases makes clear, "[u]nder FRCP 37(c), materials that are undisclosed or disclosed late will likely be excluded from use at trial or summary judgment unless permitted otherwise by the Court." This is for good reason: where a plaintiff does not "disclose … the bases of its … theories until after the close of discovery," the defendant loses "the opportunity to conduct additional fact discovery regarding [those] new theories." *Apple, Inc. v. Samsung Elecs. Co.*, 2012 WL 3155574, at *5 (N.D. Cal. Aug. 2, 2012).

Advertisers' novel trade-secret theory was first disclosed **six months after** fact discovery ended. *See* Dkt. 379 (setting June 23, 2023 for close of fact discovery). Until January of this year, Advertisers' claim, as explained in their answers to Meta's contention interrogatories, was that the FBR App was anticompetitive because ████████████████████████████████████████ ███████████████████████████████████████ Ex. 11 at 509. But this January, Advertisers' merits expert reports reinvented this claim. Advertisers' new explanation for why the FBR App was anticompetitive turns on a brand-new contention: that Meta supposedly misappropriated Snap's trade secrets and thereby produced a ████████████████████████ ████████████████ Ex. 7, Klumpp Rep. ¶¶58-64.

Advertisers' untimely disclosure put directly at issue at least (1) whether the data purportedly transmitted from a small panel of users' phones to Snap's servers (which Meta accessed with the users' consent) was somehow Snap's "trade secret," and (2) how the FBR App

affected industry-wide innovation if at all. Because Advertisers never disclosed this theory to Meta during discovery, Meta had no opportunity to develop a record on these points. By waiting until expert discovery to disclose that Snap's data was supposedly a trade secret, Advertisers attempt to side-step these legal requirements and stymie Meta's defense. That is precisely what this Court's Standing Order warns will not be permitted.

> **2.      Meta's Alleged Copying Of Snapchat Stories Cannot Be Exclusionary**

Even if the Court permitted Advertisers' tardy trade-secret theory, Meta's alleged copying of Snapchat Stories cannot be exclusionary as a matter of law.

***First,*** any claim based on trade secret misappropriation cannot survive summary judgment unless the party asserting it identifies the trade secret with "sufficient particularity." *Imax Corp. v. Cinema Techs.*, Inc., 152 F.3d 1161, 1164-65 (9th Cir. 1998). A plaintiff "must *clearly refer* to tangible trade secret material," and may not simply rely upon "catchall phrase[s]" or identify general categories of trade secrets. *Id.* at 1167. Yet Advertisers' sole description of the supposed trade secret here is that it consists of ███████████████████████████████████████ ███████████████████████████████████████ Ex. 7, Klumpp Rep. ¶58. That dooms Advertisers' claim: a general description of electronic information that "does not separate the trade secrets from the other information that goes into" the larger package of information at issue fails to satisfy trade secret law's particularity requirement. *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002); *see also InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 659 (9th Cir. 2020) (Ninth Circuit's particularity requirement is "consistent with" *IDX*). Indeed, the most Klumpp could offer to explain the specific trade secret at issue was a tautology:



Ex. 6, Klumpp Tr. 124:5-125:5. Advertisers' technical expert, Jakobsson, gave no further clarity:

Ex. 10, Jakobsson Tr. 240:10-241:7; *see also id.* at 65:11-23

; *id.* at 237:8-21.

    That this case involves an antitrust claim based on supposed misappropriation of a trade secret—rather than a claim under the law governing trade secrets—makes the need for specificity more pressing, not less. The (legally flawed) premise of Advertisers' claim necessarily depends on proving that Meta improperly used *someone else's* supposed trade secret. With no evidence to identify what that trade secret is, Advertisers have no basis to contend that any information that Meta obtained—from Snapchat's users, not from Snap—was not fair game. In essence, what Advertisers have done is invite this Court to conduct a trial-within-a-trial of a trade secret claim they think Snap might have had against Meta, but forgo the most basic requirements for such a claim. Proceeding to trial in such circumstances would be improper.

    ***Second,*** "expropriat[ing] trade secrets … cannot be classified as anticompetitive." *Morton v. Rank Am., Inc.*, 812 F. Supp. 1062, 1067-68 (C.D. Cal. 1993). Using another firm's intellectual property, even if contrary to intellectual property law, "increase[s] competition" and is thus "not anticompetitive conduct" under the Sherman Act. *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 888 (5th Cir. 2016); *see also Masimo Corp. v. Tyco Health Care Grp., L.P.*, 2004 WL 5907538, at *12-13 (C.D. Cal. June 10, 2004) ("[T]his Court has not found any case where patent infringement has been considered anticompetitive conduct."). Leading antitrust scholars have described that principle as "[c]learly … correct." Areeda ¶782a. Alleged misappropriation of trade secrets is an especially poor fit for the antitrust laws. "In a vacuum, the release of absolutely any bit of information might hurt a company"—however, "transparency is a core value protected by antitrust law[.]" *Polaris Innovations Ltd. v. Kingston Tech. Co., Inc.*, 2017 WL 2806897, at *8 (C.D. Cal. Mar. 30, 2017). Accordingly, antitrust law's presumption is that

**PUBLIC REDACTED VERSION**

1    corporate secrets—not the piercing of those secrets—is the threat to competition. *See* Areeda

2    ¶711c ("trade secret law sometimes gives … excessive and anticompetitive" protection).

3        ***Third***, Advertisers concede that █████████████████████████████

4    ████████████████████████████████████████████████████████████████████████

5    █████████████████████████████████████████████████████ Ex. 12, Klumpp

6    Rebuttal ¶161. There is no dispute that Meta did, in fact, develop its Stories feature without relying

7    on the at-issue FBR data. Meta launched Stories on Instagram in August 2016, when the FBR App

8    "████████████████████████████" and had not yet launched. Ex. 10, Jakobsson Tr. 221:16-25

9    ("████████████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████████████████

11   █████████████████████████████████████"). So, the supposed trade

12   secrets collected via the FBR App cannot possibly have been used to launch Stories because Stories

13   launched before Meta got any data from the FBR App. *Id.* at 223:7-14 ("████████████████

14   ████████████████████████████████████████████████████████████████████████

15   █████████████████████████████████"). As a result, by Klumpp's

16   own logic, there is no dispute that "████████████████████████████████████████

17   ███████████" or "███████████████████████████," rather than using data from the FBR App, and

18   thus no dispute that the launch of Stories was "████████████." Ex. 12, Klumpp Rebuttal ¶161;

19   *see also* Ex. 6, Klumpp Tr. 90:9-91:2 ("████████████████████████████████████████

20   ████████████████████████████████████████████████████████████████████████

21   ███████████████████████████████████████████████████████████").

22       To the extent Advertisers contend Meta further refined Stories based on data it collected

23   via the FBR App, Advertisers have not and cannot identify a single feature that Meta copied or

24   improved using this information. As Klumpp testified, █████████████████████████

25   ████████████████████████████████████████████████████████████████████████

26   ████████ Ex. 6, Klumpp Tr. 89:6-13. Jakobsson has not identified any such feature either:

27   ████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████

**PUBLIC REDACTED VERSION**

Ex. 10, Jakobsson Tr. 141:10-21. Advertisers have thus not identified any competitive harm.

## IV.   ADVERTISERS' ATTEMPTED MONOPOLIZATION AND SECTION 1 CLAIMS FAIL

Advertisers' attempted monopolization claim (Count II) is predicated on the same alleged relevant market and same conduct as their monopolization claim, and fails for the same reasons. *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1378 (9th Cir. 1989) (attempted monopolization requires "anticompetitive conduct directed at accomplishing the unlawful objective"); *Truck-Rail Handling, Inc. v. Burlington N. & Santa Fe Ry. Co.*, 244 F. App'x 130, 131 (9th Cir. 2007) (affirming summary judgment on "attempted monopolization claims because [plaintiff] failed properly to define the relevant product markets").

Advertisers' restraint of trade claim based on the NBA (Count III) likewise fails as a matter of law. As discussed above, the NBA is a vertical agreement and therefore subject to the rule of reason. *Google I*, 627 F. Supp. 3d at 374-75; *Google II*, 2024 WL 895155, at *10. And for the reasons discussed above, the NBA is not anticompetitive under the rule of reason. *See supra* pp.15-17.

In all events, even assuming that the NBA were horizontal—a characterization which ███████████████████████, Ex. 6, Klumpp Tr. 274:11-17—it would still not warrant *per se* condemnation. "[H]orizontal restraints" are "'exempt from the per se rule'" where they are "'subordinate and collateral to a separate legitimate transaction,'" and "'reasonably necessary' to achieving that transaction's pro-competitive purpose." *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1109 (9th Cir. 2021). Where a purported "market-sharing" agreement contains no "promis[e] not to compete," but instead involves "potential rivals … combin[ing] to provide offerings … that none could as easily provide by itself," a *per se* claim fails as a matter of law. *Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 48 (1st Cir. 2001).

That is how Advertisers understand the NBA. They do not assert that the NBA contains a promise not to compete. Ex. 7, Klumpp Rep. ¶96. Advertisers instead claim the NBA's

anticompetitive effect derives from, as in *Augusta*, the superior offering Meta and Google's combined efforts purportedly created: Google gave a █████████████████████████ that ████████████████████████████████████████████████████████████ *Id.* ¶99. So, as a matter of law, the NBA is not the kind of "naked" market division agreement subject to *per se* treatment. And Advertisers proffer no evidence that the NBA is anticompetitive. *Supra* pp.15-17. Summary judgment is thus warranted. *Aya Healthcare*, 9 F.4th at 1113-14.

V.     IF ANY CONDUCT THEORY FAILS, ADVERTISERS ARE NOT ENTITLED TO DAMAGES

       If the Court grants summary judgment for Meta on any of Advertisers' exclusionary conduct theories, it should also grant summary judgment for Meta on Advertisers' claim for damages. Advertisers concede that their damages model, the Kreitzman-Williams study, does not provide "a disaggregated measure of damages for each exclusionary act." Dkt. 699-1 at 4. This model is the only evidence of their entitlement to damages that Advertisers have proffered. When a "monopolization claim has been dismissed or adjudicated against a plaintiff, damages attributable to that claim must be disaggregated." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1224 (9th Cir. 1997). Where a plaintiff cannot satisfy that requirement because its "only damage study" assumes "that all of [the challenged] acts contributed to the damage figure, but the district court" finds that some "of those acts were proper," the plaintiff has "no proper proof of damages" and "summary judgment" as to damages is appropriate. *City of Vernon v. S. Calif. Edison Co.*, 955 F.2d 1361, 1371-73 (9th Cir. 1992); *see also Litton Sys., Inc. v. Honeywell, Inc.*, 1996 WL 634213, at *3 (C.D. Cal. July 24, 1996) (if "damage model d[oes] not attribute an amount of damages to particular … conduct, but rather attribute[s] a single estimate of damages to all of the challenged conduct taken together—even conduct that [has been] excluded from consideration by the jury—the jury ha[s] no rational basis to determine an appropriate damages award"). Accordingly, if the Court dismisses a subset of Advertisers' conduct theories, there is no rational basis in the record for the jury to determine a damages award for any of the remaining conduct, and Advertisers are thus not entitled to damages as a matter of law.

**CONCLUSION**

       The Court should grant summary judgment in Meta's favor on all of Advertisers' claims.

1    Dated: April 5, 2024                    Respectfully submitted,

2                                            By: */s/ Sonal N. Mehta*

3                                            SONAL N. MEHTA (SBN 222086)
4                                             Sonal.Mehta@wilmerhale.com
                                             WILMER CUTLER PICKERING HALE
5                                            AND DORR LLP
                                             2600 El Camino Real, Suite 400
6                                            Palo Alto, California 94306
                                             Telephone: (650) 858-6000
7
8                                            DAVID Z. GRINGER (pro hac vice)
                                              David.Gringer@wilmerhale.com
9                                            ROSS E. FIRSENBAUM (pro hac vice)
                                              Ross.Firsenbaum@wilmerhale.com
10                                           RYAN CHABOT (pro hac vice)
                                              Ryan.Chabot@wilmerhale.com
11                                           PAUL VANDERSLICE (pro hac vice)
                                              Paul.Vanderslice@wilmerhale.com
12                                           WILMER CUTLER PICKERING HALE
                                             AND DORR LLP
13                                           7 World Trade Center
14                                           250 Greenwich Street
                                             New York, New York 10007
15                                           Telephone: (212) 230-8800

16
                                             ARI HOLTZBLATT (pro hac vice)
17                                            Ari.Holtzblatt@wilmerhale.com
                                             MOLLY M. JENNINGS (pro hac vice)
18                                            Molly.Jennings@wilmerhale.com
                                             WILMER CUTLER PICKERING HALE
19                                           AND DORR LLP
                                             2100 Pennsylvania Avenue NW
20                                           Washington, DC 20037
                                             Telephone: (202) 663-6000
21
22                                           MICHAELA P. SEWALL (pro hac vice)
                                              Michaela.Sewall@wilmerhale.com
23                                           WILMER CUTLER PICKERING HALE
                                             AND DORR LLP
24                                           60 State Street
25                                           Boston, Massachusetts 02109
                                             Telephone: (617) 526-6000
26
                                             *Attorneys for Defendant Meta Platforms, Inc.*
27
28

**PUBLIC REDACTED VERSION**

### CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of April, 2024, I electronically transmitted the public redacted version of the foregoing document to the Clerk's Office using the CM/ECF System and caused the version of the foregoing document filed under seal to be transmitted to counsel of record by email.

By:   */s/ Sonal N. Mehta*
Sonal N. Mehta