# EXHIBIT 5

Transcript of Kevin Kreitzman
Conducted on October 2, 2023

1 (1 to 4)

**Page 1**

```
             UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
                SAN FRANCISCO DIVISION
-----------------------------x
MAXIMILIAN KLEIN, et al., on    :
behalf of themselves and all    :
others similarly situated,      :   Case No.
           Plaintiffs,          :   3:20-cv-08570-JD
     v.                         :
META PLATFORMS, INC., a         :
Delaware corporation            :
headquartered in California,    :
           Defendant.           :
-----------------------------x

         Videotaped Virtual Deposition of
                  KEVIN KREITZMAN
              Monday, October 2, 2023
                  9:08 a.m. CST


Job No.:  509154
Pages:  1 - 255
Reported Stenographically by:
Tiffany M. Pietrzyk, CSR RPR CRR
```

**Page 2**

Videotaped virtual deposition of KEVIN KREITZMAN, pursuant to notice, before Tiffany M. Pietrzyk, a Certified Shorthand Reporter in the States of Illinois, Texas, and California, Registered Professional Reporter, Certified Realtime Reporter, and a Notary Public in and for the State of Illinois.

**Page 3**

A P P E A R A N C E S

ON BEHALF OF THE ADVERTISER PLAINTIFFS and PUTATIVE CLASS:
   AMANDA LAWRENCE, ESQUIRE
   BRIAN DUNNE, ESQUIRE
   SCOTT SCOTT
   156 South Main Street
   P.O. Box 192
   Colchester, Connecticut 06415
   860.531.2645

ON BEHALF OF THE DEFENDANT:
   SONAL MEHTA, ESQUIRE
   ANDREW WAKS, ESQUIRE
   WILMER CUTLER PICKERING HALE & DORR, LLP
   2600 El Camino Real
   Suite 400
   Palo Alto, California 94306
   650.858.6000

ALSO PRESENT:
   Wei Zhao
   Ilona Mostipan
   Michelle Mejia, Planet Depos Remote Tech
   Micah Hardin, Planet Depos Videographer

**Page 4**

C O N T E N T S

| EXAMINATION OF KEVIN KREITZMAN | PAGE |
|---|---|
| By Ms. Mehta | 6 |

E X H I B I T S
(Attached to transcript.)

| DEPOSITION EXHIBITS | | PAGE |
|---|---|---|
| Exhibit 33 | Expert Report of Kevin Kreitzman, dated 7/7/23 | 68 |
| Exhibit 34 | Expert Reply Report of Kevin Kreitzman, dated 9/15/23 | 68 |
| Exhibit 35 | Yardstick Index Selection Excel sheet | 105 |
| Exhibit 36 | Exhibit 9 to Report | 183 |
| Exhibit 37 | Autohome Inc. 20-F for the fiscal year ended 12/31/20 | 187 |
| Exhibit 38 | Wirtualna 2020 Annual Report | 214 |

---

**33**

company earning a high economic profit over a long period of time, you know, to me, is an indication that this company has market power in order to do that.

Q. Okay.

A. That's just, again, a definition.

Q. Right. But what I'm getting at is you've said you haven't formed that opinion and then you keep telling me that, in general, that's how it works. Let's talk first about your opinions in this case and then we'll talk about that in general.

With respect to your opinions in this case, you have not offered an opinion that Meta has market power or monopoly power; correct?

A. Correct. My opinion was simply here is the amount of economic profits of Meta. Here is the amount of economic profits of the yardstick. And here is the difference.

Q. Okay. Now let's talk about the general principles. As I understand your testimony, you're saying, as a matter of Economics 101, if a firm consistently has or in the long run has economic profits, then that is an indication that they have market power or monopoly power; is that right?

A. Yeah, again, in the -- you know, the term

---

**34**

"monopoly power," again, to the extent that's used as a synonym to "market power," used as a synonym to the ability to earn economic profits, then if I say one, then I'm saying all three. It's got economic profits.

Q. Now, if the judge and the jury in this case wanted to know how many years a firm has to have economic profit in order to have that market power, do you have an answer for them?

MS. LAWRENCE: Object to form.

A. No, I've never -- I've never done that. I've never come to any conclusion that there is some finite period of time that is a threshold for that determination.

Q. Now, you also said that a firm has to have an earn economic profit over that consistent period of time.

Is there a numerical threshold for how much economic profit a firm has to have for whatever that consistent period of time is, or is it just anything above zero?

MS. LAWRENCE: Object to form.

A. Again, I'm just -- I'm just going with a standard definition I've seen in economics as to what market power is. The definition that I've seen

---

**35**

is that earning economic profit over a nontransient period of time.

Q. Right. But what I'm getting at is, is that economic profit just anything that's net positive, or is there some numerical threshold above zero?

A. Again, I haven't seen any definitions that, you know, quantify, you know, more than 2 percent or 3 percent or -- no, I've never seen that.

Q. With respect to your understanding of it, is it your understanding then in that case where you're talking about an economic profit over a nontransient period of time, that that simply means a positive profit, meaning something above zero?

A. Yes. I mean, practically, if it's a tiny little bit, if it's a tenth a percent above zero, there's probably not going to be a rush to enter that into -- (audio distortion.)

Although someone might, you know, still expand their business a little bit. So no, again, I don't have a particular number. I've never looked at it that way.

Q. So -- okay. So I just want to again make sure that we're clear about this for the record. So then if the judge and the jury in this case wanted to know what the numerical threshold is for there to

---

**36**

be a positive economic profit or an economic profit for a nontransient period of time, do you have a numerical threshold to offer to them?

MS. LAWRENCE: Object to form.

A. You know, again, I'm just -- I just did the calculations of what the economic profit is.

Q. So I take it the answer to that question was no?

A. No, I don't have a -- not -- not giving any guidelines as to what the cutoff point would be.

Q. Let's talk about some of the economic -- some of the foundational economic principles and make sure that you and I are on the same page about them before we dig into your EPR analysis.

Would you agree with me that as a matter of economics, high profits or net positive profits can exist even for years for reasons unrelated to anticompetitive conduct?

A. Yes.

Q. Would you agree with me that Meta could have had higher profits than the yardstick firms because they offered a superior product?

MS. LAWRENCE: Object to form.

A. Again, there's a lot -- a lot of reasons why companies have persistent market power.

---

**37**

1  Q. Right. And this particular case, you'd
2  agree with me that Meta could have had higher
3  profits than the yardstick firms because it offered
4  a superior product to those -- than those firms;
5  right?
6      MS. LAWRENCE: Object to form.
7  A. Okay. So let me kind of back up a little
8  bit. And what I did was I calculated the amount of
9  economic profits earned by Meta. I didn't -- I
10 didn't go in and evaluate whether this was a result
11 of legal or illegal content. I have no opinion on
12 that.
13 Q. Okay. So fair. So you're saying you have
14 no opinion as to what the cause was for Meta's --
15 the higher profit that you calculated that Meta had;
16 is that fair?
17 A. That's fair.
18 Q. Now, stepping back, you'd agree with me that
19 it is possible that one of the reasons that Meta had
20 higher profits than the yardstick firms, is they had
21 a superior product; right?
22     MS. LAWRENCE: Object to form.
23 A. You know, anything is possible.
24 Q. And you haven't analyzed that and ruled that
25 out; right?

**38**

1      MS. LAWRENCE: Object to form.
2  A. Again, I haven't -- I haven't analyzed and
3  tried to assign the reasons for economic profits. I
4  looked and measured and calculated the economic
5  profits.
6  Q. You have not -- you would agree with me that
7  it's possible that Meta could have had its higher
8  economic profits as a result of superior management
9  quality; right?
10     MS. LAWRENCE: Object to form.
11 A. Again, I have not -- I have not done any
12 analysis of the source of the economic profits. And
13 when you say something is possible, I think you can
14 say, you know, anything is possible. I haven't
15 seen -- seen or analyzed any evidence of this.
16 Q. Correct. So --
17     (Indiscernible crosstalk.)
18 A. -- theoretical, you know, if -- you know,
19 what -- almost anything you can say, you can say
20 well, that's possible.
21 Q. Well, let's -- but let's be real here. I
22 mean, you are -- you are saying that you are an
23 expert in financial analysis, and you've obviously
24 had a lot of experience analyzing economic profits
25 across different firms and different industries.

**39**

1  And so I'm not asking you for, is anything
2  possible like you know --
3  A. Yeah.
4  Q. -- some like crazy outlier possibility.
5      I'm asking you about real-world economic
6  dynamics that you are an expert in, or you're
7  holding yourself out to be an expert in. So let's
8  be reasonable about what the bounds are of
9  possibility. That's what I'm asking you to do.
10 A. Yeah.
11 Q. You understand that in different industries,
12 that a company can have higher economic profits than
13 the yardstick firms because it has a superior
14 product; right? You've seen that? You know
15 that's --
16     (Indiscernible crosstalk.)
17     MS. LAWRENCE: Object to form.
18 A. You know, again, I don't -- I have not
19 analyzed the reasons for economic profits being
20 higher than something else or greater than zero.
21 Q. So you can't tell the judge and the jury in
22 this case that Meta's -- well, let me put it this
23 way.
24     You have no opinion with respect to whether
25 or not Meta's higher profits in this case resulted

**40**

1  from superior product quality; right?
2  A. No, I have no opinion on that.
3  Q. And so you can't suggest to the judge and
4  jury that Meta's higher profits aren't caused by
5  higher product quality, can you?
6      MS. LAWRENCE: Object to form.
7  A. Again, I have not tried to isolate sources
8  of economic profits. I calculated what they were.
9  Q. And is that also true for superior
10 management quality? You have not analyzed whether
11 or not Meta's higher economic profits are a result
12 of superior management quality; correct?
13 A. Again, I have not done that analysis.
14 Q. So you can't say that that's not the cause
15 for the higher profits; right?
16     MS. LAWRENCE: Object to form.
17 A. I've -- I have not done that analysis, so
18 I'm not -- I'm not going to give opinions on things
19 I haven't done, no.
20 Q. Okay. It's also true then that you haven't
21 analyzed whether or not Meta's higher economic
22 profits are a result of superior human capital;
23 correct?
24 A. Really the same answer. I haven't -- I have
25 not tried to assign sources and causes of the

**Page 41**

1  economic profits.
2  Q. So that's true for superior human capital as
3  well; right?
4  A. Yes.
5  Q. And that's also true for -- well, let me ask
6  the question more completely.
7     You have not analyzed whether or not Meta's
8  higher profits could be attributable to or caused by
9  effective product differentiation; correct?
10 A. Okay. So kind of the same answer again. I
11 did not -- I did not go through and try to assign
12 sources of economic profits to the risk factors.
13 Q. Right. And that's true for product
14 differentiation as a potential cause for higher
15 profits; right?
16 A. Yes, I have not -- I have not done that
17 analysis.
18 Q. And you have not analyzed whether or not
19 Meta's higher profits result from wise investment
20 and product innovation; right?
21 A. I haven't done that analysis.
22 Q. And you have not analyzed whether or not
23 Meta's higher profits might result from alleged
24 anticompetitive conduct unrelated to the advertiser
25 plaintiffs' claims; right?

**Page 42**

1  A. I have not done that analysis.
2  Q. Now, you also have not analyzed whether or
3  not Meta's ad revenues could be -- so I'm setting
4  aside profits for a moment.
5  A. Yeah.
6  Q. I'm talking about ad revenues.
7     You have not analyzed whether or not Meta's
8  ad revenues are attributable to factors like
9  superior product, superior management quality,
10 superior human capital, product differentiation, or
11 innovation; correct?
12 A. Yes. Once again, I did not -- I did not
13 look for sources of economic profits. I calculated
14 what they were.
15 Q. Right. But I'm talking about ad revenues
16 right now. You have not analyzed whether or not or
17 the extent to which Meta's ad revenues are driven by
18 those factors; correct?
19 A. Again, I did not look at that, yes.
20 Q. And is it also fair to say that in your
21 economic profit analysis, you did not adjust your
22 calculations to account for those factors: Superior
23 product, superior management quality, superior human
24 capital, product differentiation, or product
25 innovation?

**Page 43**

1  A. There was nothing to adjust. The economic
2  profits are based on the cash flows. The cash flows
3  in, the modern capital, these other factors, so
4  there were no adjustments to make for any of those
5  factors in my calculations.
6  Q. And then with respect to your selection
7  criteria, did you specifically adjust for or design
8  for your selection criteria to select firms that
9  were comparable to Meta on those dimensions that I
10 just mentioned: Superior product, superior
11 management quality, superior human capital, product
12 differentiation, or product innovation?
13 A. No, and I guess we're assuming that all
14 these things were superior. I didn't look at them
15 at all, so I didn't say that -- again, I did not
16 look at the source. I calculated the economic
17 profits.
18 Q. Okay. But what I'm asking is, those five
19 criteria that I just mentioned: Product quality,
20 management quality, human capital, product
21 differentiation, and innovation, those are not
22 criteria that you adjusted for in your selection
23 criteria in order to select firms that were
24 comparable to Meta on those five dimensions;
25 correct?

**Page 44**

1  A. No, those were not in the -- we had -- I
2  think we were very clear on what the six criteria
3  were. So if it wasn't one of those, then it's -- it
4  wasn't one of the selection criteria.
5  Q. Right. And what I guess I want to be very
6  clear about so that there's no confusion down the
7  road is, the five criteria I just mentioned, product
8  quality, management quality, human capital, product
9  innovation, and product differentiation, those are
10 not in the six criteria that you selected for;
11 correct?
12 A. Well, I mean, in order to have criteria,
13 they need to be things that you can measure and can
14 get information on.
15 Q. Right. And so they were not part of your
16 six selection criteria?
17 A. No.
18 Q. Is that right?
19 A. Well, no, there would be no practical way to
20 say management quality.
21 Q. Okay. So --
22 A. Yeah. To me, it's an odd question because
23 I'm not using criteria that couldn't be used.
24 Q. Yeah, because of the way the question was
25 asked -- this is on me -- the transcript might be a

---

Page 45

1  little muddy. So I want this to be clear. I'm
2  gonna try to ask it in a way where you can answer it
3  and it will be very clear what the answer is.
4       So the five criteria that I just mentioned,
5  product quality, management quality, human capital,
6  product differentiation, and product innovation,
7  those are not criteria that you used to select the
8  comparable firms; is that correct?
9       A. Yeah. Those are not criteria that could be
10 used.
11      Q. And the reason you're saying that is because
12 those are qualitative and not quantitative criteria;
13 is that your testimony?
14      A. Let me think if that is -- you can put it
15 that simply. Well, they're not things that could
16 be -- there would be no basis for reasonably
17 estimating them.
18      Q. Okay. Now, apart from the selection
19 criteria, so I know your selection criteria did not
20 factor those five things in. Apart from that, did
21 your economic profits analysis factor in or adjust
22 for the five criteria that I just mentioned,
23 superior product or product quality, management
24 quality, human capital, product differentiation, or
25 product innovation, in any way?

Page 46

1       MS. LAWRENCE: Object to form.
2       A. Again, it's a calculation. And it's a
3  calculation of the profits earned by Meta or
4  whatever company compared to its cost to capital.
5  Those are the things that are used for calculating
6  economic profit. There's no adjustments to make
7  anywhere. The economic profit is what it is
8  regardless of the source.
9       Q. Okay. Maybe I can ask the question a little
10 bit differently. I think I understand what you're
11 saying.
12      In your identification of the yardstick
13 firms, did you make any adjustments or otherwise
14 consider product quality, management quality, human
15 capital, product differentiation, or product
16 innovation in selecting those comparable firms?
17      MS. LAWRENCE: Object to form.
18      A. Well, those would have been -- wouldn't
19 necessarily have been a very subjective set of
20 criteria. So no, it's not the type of thing that
21 would work as a criteria. Or an adjustment to a
22 criteria.
23      Q. So the answer to my question is no, that's
24 not something that you considered or adjusted for;
25 correct?

Page 47

1       A. Correct.
2       Q. Now, is it also fair, then, that nothing in
3  your opinion excludes the possibility that those
4  factors, product quality, management quality, human
5  capital, product differentiation, and product
6  innovation, are the cause for Meta's profits?
7       MS. LAWRENCE: Object to form.
8       A. Okay. So, again, the calculation, it's --
9  I'm gonna give the same answer no matter what the
10 cause was. It's --
11      Q. Right. My --
12      A. Yeah, so it's -- it's the profits compared
13 to the weighted average cost of capital. So those
14 things wouldn't be included in a calculation -- in
15 the estimation of economic profits.
16      Q. Right. But let's go back to my question.
17 Given what you just said, nothing in your opinion
18 would exclude the possibility that those other
19 factors, product quality, management quality, human
20 capital, product differentiation, and product
21 innovation, are the cause for Meta's profits; right?
22      MS. LAWRENCE: Object to form.
23      A. Again, I didn't just find anything as to the
24 cause of the economic profits. I measured what they
25 were. So --

Page 48

1       Q. Right. So your opinion doesn't exclude the
2  possibility that those would be the causes; right?
3       A. No, my opinion is just what the economic
4  profits are.
5       Q. And is it also true that your opinion does
6  not exclude the possibility that the excess economic
7  profits, or the higher economic profits that you
8  calculate relative to the yardsticks are caused by
9  those other five factors?
10      A. Kind of the same answer again. I didn't --
11 I did not do any analysis as to what was the cause
12 of economic profits or excess economic profits.
13      Q. Now, going, again, back to sort of your
14 understanding of the foundational economic
15 principles, you would agree with me that it is
16 possible for firms in competitive industries to have
17 positive economic profit; right?
18      A. Are we talking -- I mean, in a -- in a
19 theoretically perfectly competitive industry and
20 equilibrium, I suppose there could still be some
21 that have a slight advantage over others. So there
22 can be -- there can be some economic profits in --
23 in kind of in the real world where there's
24 competition but not perfect competition.
25      Q. Okay. And you would agree with me -- well,

253

Q. And we've obviously covered a lot of ground in the deposition today.
   Is there anything in your testimony that you'd like to amend or correct or clarify, or do you stand by the testimony that you gave here today?
A. Nothing I can think of right now. Just sometimes when you reread what you actually said, it's not what you thought it was what you said, but nothing comes to mind right now.
Q. Okay.
MS. MEHTA: Well, I thank you very much for your time, and I pass the witness.
MS. LAWRENCE: I have no questions for redirect. I just think it's important that we thank Mr. Kreitzman for his time. As you know, he had a rough health spell, and this couldn't have been easy.
MS. MEHTA: Yes. I wanted to do that. And to thank you very much for sitting through this. Notwithstanding, I know it's been a rough few weeks for you, Mr. Kreitzman. Thank you so much for taking the time to be here today.
THE WITNESS: My pleasure.
MS. MEHTA: Let's go off the record.
THE VIDEOGRAPHER: Stand by. We are -- this

254

marks the end of the video deposition of Kevin Kreitzman. The time on the video monitor is 5:00 p.m.
   (Off the record at 5:00 p.m.)

255

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

   I, Tiffany M. Pietrzyk, CSR RPR CRR, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

   IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 3rd of October, 2023.

   *[signature]*

My commission expires:
   February 28th, 2024