**PUBLIC REDACTED VERSION**

| | |
|---|---|
| WILMER CUTLER PICKERING<br> HALE AND DORR LLP | ARI HOLTZBLATT (*pro hac vice*)<br> Ari.Holtzblatt@wilmerhale.com |
| SONAL N. MEHTA (SBN 222086)<br> Sonal.Mehta@wilmerhale.com<br>2600 El Camino Real, Suite 400<br>Palo Alto, California 94306<br>Telephone: (650) 858-6000 | MOLLY M. JENNINGS (*pro hac vice*)<br> Molly.Jennings@wilmerhale.com<br>2100 Pennsylvania Ave NW<br>Washington, DC 20037<br>Telephone: (202) 663-6000 |
| DAVID Z. GRINGER (*pro hac vice*)<br> David.Gringer@wilmerhale.com<br>ROSS E. FIRSENBAUM (*pro hac vice*)<br> Ross.Firsenbaum@wilmerhale.com<br>RYAN CHABOT (*pro hac vice*)<br> Ryan.Chabot@wilmerhale.com<br>PAUL VANDERSLICE (*pro hac vice*)<br> Paul.Vanderslice@wilmerhale.com<br>7 World Trade Center<br>250 Greenwich Street<br>New York, New York 10007<br>Telephone: (212) 230-8800 | MICHAELA P. SEWALL (*pro hac vice*)<br> Michaela.Sewall@wilmerhale.com<br>60 State Street<br>Boston, Massachusetts 02109<br>Telephone: (617) 526-6000 |

*Attorneys for Defendant Meta Platforms, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC., a Delaware Corporation,<br><br>Defendant. | Case No. 3:20-cv-08570-JD<br><br>**DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY AND OPINIONS OF MICHAEL WILLIAMS**<br><br>Hearing Date: June 20, 2024<br>Time: 10:00 a.m.<br>Judge: Hon. James Donato |

**PUBLIC REDACTED VERSION**

**TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION ........................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ...............................................................1

INTRODUCTION ........................................................................................................................1

ARGUMENT ................................................................................................................................3

I.    THE KREITZMAN-WILLIAMS YARDSTICK STUDY REMAINS JUNK SCIENCE ..........................3

    A.    Williams Failed To Correct Problems With The Yardstick Study .........................4

    B.    Merits Expert Discovery Has Reinforced That The Yardstick Study Is Junk Science ...............................................................................................................6

II.    WILLIAMS'S HYPOTHETICAL MONOPOLIST AND SSNIP TEST IS JUNK SCIENCE ..................7

    A.    Williams's Supposed HMT/SSNIP Test Is Not Such A Test .................................7

    B.    Williams's HMT/SSNIP Relies On His Unsound Damages Study ........................9

III.    WILLIAMS HAS FAILED TO COHERENTLY DEFINE A PRODUCT MARKET .............................9

CONCLUSION ............................................................................................................................11

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) .................................................................................................... 1

*Diviero v. Uniroyal Goodrich Tire Co.*,
    114 F.3d 851 (9th Cir. 1997) ....................................................................................... 7

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023) ........................................................................................ 7

*Grasshopper House, LLC v. Clean & Sober Media LLC*,
    2019 WL 12074086 (C.D. Cal. July 1, 2019) ............................................................. 5

*In re Google Play Store Antitrust Litig.*,
    2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) .......................................................... 11

*In re Live Concert Antitrust Litigation*,
    863 F. Supp. 2d 966 (C.D. Cal. 2012) ................................................................. 10, 11

*Kentucky Speedway, LLC v. National Ass'n of Stock Car Auto Racing, Inc.*,
    588 F.3d 908 (6th Cir. 2009) ................................................................................... 8, 9

*Sumotext Corp. v. Zoove, Inc.*,
    2020 WL 533006 (N.D. Cal. Feb. 3, 2020) ................................................................ 7

*Sumotext Corp. v. Zoove, Inc.*,
    2020 WL 6544410 (N.D. Cal. Nov. 6, 2020), *aff'd*, 2021 WL 488024 (9th Cir. Oct. 27, 2021), *cert. denied*, 142 S. Ct. 2836 (2022) ......................................................... 8

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
    546 F.3d 991 (9th Cir. 2008) ....................................................................................... 7

**STATUTES, RULES, AND REGULATIONS**

Fed. R. Evid. 702 .................................................................................................................. 1

**OTHER AUTHORITIES**

Phillip A. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (2023) ............................................................. 4

U.S. Dep't of Just. & FTC, *Horizontal Merger Guidelines* (2010) ................................. 7

**PUBLIC REDACTED VERSION**

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on June 20, 2024, at 10:00 a.m., Defendant Meta Platforms, Inc. will move the Court for an order granting Meta's Motion to Exclude the Expert Testimony and Opinions of Advertiser Plaintiffs' putative expert Michael Williams. Meta's motion is based on this Notice of Motion, the supporting Memorandum of Points and Authorities, and the Declaration of David Gringer filed herewith, along with the accompanying exhibits.

Pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny, Meta requests that the Court exclude the Kreitzman-Williams "yardstick" study and the purported hypothetical monopolist test and damages model that are drawn completely from the study. Meta further requests that the Court exclude Williams's opinion regarding the relevant product market and his opinions about Meta's alleged monopoly power in that market, which depend completely on that purported market's existence. Accordingly, Meta requests that the Court exclude the entirety of the Expert Merits Report of Michael Williams (Ex. 1)[1], and the Expert Merits Rebuttal Report of Michael Williams (Ex. 2), and any testimony drawn from these reports.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Advertisers rely on Williams to establish a submarket of "social advertising," to show that Meta charged class members supracompetitive prices for that "social advertising," and to establish the amount of damages owed. Remarkably, Williams contends that he can do all three of those things through a "yardstick" study solely by comparing Meta's profits—not its prices—to three firms that might as well have been selected at random, and none of which (according to Williams) participate in the candidate market. No reliable study could accomplish all Williams seeks to do, and Williams's *unreliable* study does not do *anything* it seeks to do. It should be excluded.

As a threshold matter, the yardstick study errs by analyzing profits, rather than prices, while baselessly attempting to equate the two. That defect alone dooms the study and all of the other

---

[1] Unless otherwise noted, 'Ex.' citations reference exhibits to the Gringer Declaration filed herewith, emphasis is added, and objections are omitted for deposition citations.

opinions that rest on it. But the study also suffers from other deep methodological failures, which Meta identified in its prior *Daubert* motion (Dkt. 662) and renews here and in the concurrently filed motion to exclude Kreitzman's merits opinions.

*First*, the study does not *attempt* to control for the many factors unrelated to anticompetitive conduct that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ High profits can—and usually do—exist for reasons other than supracompetitive prices. Kreitzman never controls for any of these reasons (or anything). And even if high prices are an explanation for high profits, a comparison of profits alone cannot tell us anything about whether the profits are because of anticompetitive conduct, as opposed to market power earned through competition on the merits. The failure to even try to account for such factors renders completely unreliable Williams's assertion that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *Second*, the selection process used to pick the yardstick firms is completely arbitrary, leading to absurd results. The facially deficient supposed "yardstick firms" include: a small Polish company (▓▓▓▓▓▓▓▓) that sells (among other things) cars and travel packages, a company (▓▓▓▓) directly involved in the challenged conduct, and a Chinese company (▓▓▓▓) with *higher* profits than Meta. *Third*, the profits the study examines are not even the correct ones, as it fails to distinguish between Meta's out-of-market profits and its profits from "social advertising" in particular.

Williams's market definition analysis fares no better. He relies on the yardstick study as a purported SSNIP test, but that test is a SSNIP test in name only. It ignores the entire purpose of a SSNIP test, which is to analyze how consumers substitute among products in response to price increases. Instead of analyzing customer substitution, Williams just points to the fact that Meta's profits exceed his self-selected yardsticks, and then asserts that these supposed excess profits prove social advertising must be the relevant market.

Finally, even if Williams's study could possibly support a relevant market of something, it cannot support his "social advertising" market. To "define" a relevant market, the alleged market must have a clear definition, which Williams fails to provide. Although Williams's merits report offers a definition of "social advertising," as "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

1  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ his report almost completely ignores that definition when it comes
2  time to place firms inside or outside the market. And in his deposition, Williams jettisoned his
3  earlier (and itself nonsensical) definition of "social advertising," testifying both that social
4  advertising need not use social data contained in a social graph, and that he has no opinion whether
5  there are non-social ads that use such data. Williams's inability to land on a clear definition of
6  "social advertising"—indeed, his inability to stick to any definition at all—makes it impossible for
7  anyone to determine which firms and products are inside or outside Williams's purported market.
8  And it renders his effort to define the market and populate it with participants completely
9  unreliable.

10                                             **ARGUMENT**

11  **I.   THE KREITZMAN-WILLIAMS YARDSTICK STUDY REMAINS JUNK SCIENCE**

12       Williams's merits and class certification reports present the same yardstick study—they
13  rely on the same criteria, the same yardstick firms, and the same computation of their economic
14  profit rates. *See* Ex. 3, Williams Merits Tr. 307:9-15 (agreeing that the "criteria that [he] used for
15  the benchmark firms that [he] had in [his] class certification report … did not change for purposes
16  of the yardstick methodology and [his] selection of yardsticks in [his] merits report"); Ex. 5,
17  Kreitzman Merits Tr. 17:17-24 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); *id.* at 15:9-17 (▮▮▮▮▮▮▮▮
20  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). It thus is the same junk that it was at the
21  class certification stage and should be excluded for those same reasons. Meta accordingly renews
22  its *Daubert* challenges to the yardstick method here and in the concurrently filed motion to exclude
23  Kreitzman's merits opinions. If the Court has already granted Meta's class certification *Daubert*
24  challenge to the Kreitzman-Williams yardstick study when it reaches this motion, it may wish to
25  skip subsection I.A below and proceed to Section I.B which raises a new challenge to Williams's
26  opinions at the merits stage; if the Court has not reached or has denied Meta's challenge to the
27  study at the class certification stage, Meta presents additional information.
28

**PUBLIC REDACTED VERSION**

|   |   |
|---|---|
| 1 | **A.  Williams Failed To Correct Problems With The Yardstick Study** |
| 2 | Meta has already explained the gaping methodological flaws with the Kreitzman-Williams |
| 3 | study, but summarizes those problems here for the Court's convenience. The first problem involves |
| 4 | the basic premise of Williams's study. As Meta's class certification opposition (Dkt. 671) |
| 5 | explained, the study looks only at Meta's profits, rather than its prices. *See* Ex. 3, Williams Merits |
| 6 | Tr. 299:9-16 ("Q. Right. My question was you did not do a calculation of what Meta's quality- |
| 7 | adjusted prices would have been in a but-for world; isn't that right? … A. I don't believe my |
| 8 | reports have a specific study talking about quality-adjusted prices."); Ex. 5, Kreitzman Merits Tr. |
| 9 | 13:5-9 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ |
| 10 | ▉▉▉▉▉▉▉▉▉▉▉▉▉▉ But this is an overcharge case—meaning the question is whether |
| 11 | Meta overcharged for ads. Meta's profits say nothing about whether Meta's advertising prices were |
| 12 | too high or, even if they were, whether those prices were attributable to the challenged conduct. |
| 13 | Williams's study should be excluded for baselessly assuming otherwise. |
| 14 | In addition to that overarching conceptual problem, the Kreitzman-Williams study also |
| 15 | suffers from three fundamental methodological flaws. *See* Dkt. 662. First, the study flunks the |
| 16 | "most important[]" requirement for a "yardstick methodology," which is "to control for any factors |
| 17 | that might have influenced [a firm's] profit performance that are competitively neutral or even |
| 18 | procompetitive." Areeda & Hovenkamp, *Antitrust Law* ¶397 (2023); *see* Dkt. 662 at 5-8. |
| 19 | Kreitzman and Williams have no controls. This renders their methodology wholly unreliable |
| 20 | because, as Kreitzman and Williams concede, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ |
| 21 | ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ |
| 22 | ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ |
| 23 | ▉ *See* Ex. 3, Williams Merits Tr. 277:14-278:7 (agreeing a monopolist "could maximize their |
| 24 | profits … through a reduction of costs while prices remain steady"); Ex. 5, Kreitzman Merits Tr. |
| 25 | 90:15-25 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ |
| 26 | ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ *id.* at 113:16-24 (▉▉▉▉▉▉▉▉▉▉▉▉▉▉ |
| 27 | ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Neither expert makes any effort to |
| 28 | control for or account for these factors. *See, e.g.*, Ex. 3, Williams Merits Tr. 284:22-285:8 |

1  (testifying he has not "done an analysis of whether, in the but-for world, Meta's economic profits
2  could be reduced to the economic profits of the yardstick firms through a reduction in output that
3  does not correspond to a reduction in advertising costs"); Ex. 5, Kreitzman Merits Tr. 85:12-18
4  (█████████████████████████████████████████████████████████ And
5  even if high profits do stem from a firm's prices, ███████████████████████████████
6  ██████████████████████████████████████████████████████████████████████████
7  ████████████████████████████ See Ex. 4, Williams CC Tr. 229:23-230:3 (███████
8  ██████████████████████████████████████████████████████████████████████████
9  ████████████████████); id. at 70:12-72:5 ████████████████████████████████
10 ██████████████████████████████████████████████████████████████████████████
11 ██████████████████████████████████ Ex. 6, Kreitzman CC Tr. 36:15-19
12 (agreeing that "high profits … can exist even for years for reasons unrelated to anticompetitive
13 conduct"). Again, neither Williams nor Kreitzman accounts for these factors in their yardstick
14 study. *See id.* at 42:20-43:5 (these attributes "were not part of [his] six selection criteria" and "there
15 were no adjustments to make for any of those factors in [his] calculations"), 45:4-10, 44:7-17,
16 46:12-47:1; Ex. 4, Williams CC Tr. 185:7-21, 186:8-187:13 ███████████████████
17 ██████████████████████████████████████████████████████████████████████████
18 ████████████████████████████████████████████████████████ Thus, the
19 Kreitzman-Williams study cannot even speak to the reasons for Meta's profits. This is a principle
20 with which Williams is familiar. *See Grasshopper House, LLC v. Clean & Sober Media LLC*, 2019
21 WL 12074086, at *12 (C.D. Cal. July 1, 2019) ("Dr. Williams' methodology is also deficient for
22 failing to consider … other factors" affecting profitability other than the alleged misconduct.).
23      Second, the yardstick firms forming the foundation for the Kreitzman-Williams study are
24 not the product of a reliable methodology. *See* Dkt. 662 at 9-15. ███████████████ their
25 model may have excluded, for the sake of "convenience," firms "that are at least as comparable or
26 more comparable to Meta than the yardstick firms." Ex. 6, Kreitzman CC Tr. 76:23-77:7; █████
27 ██████████████████████████. And the bizarre final set of firms—a tiny Polish firm
28 (██████████), a firm directly involved in the challenged conduct (██████), and a firm with a

1  *higher* profit rate than Meta (█████)—simply confirms the unreliability of the selection process.

2  Third, the Kreitzman-Williams study fails to distinguish between in-market profits and out-of-market profits. The "study" examined all of Meta's profits from all the ads that it sells. *See* Ex. 6, Kreitzman CC Tr. 248:22-24 (agreeing he "did not distinguish between social and nonsocial advertising" profits); Ex. 4, Williams CC Tr. 282:16-21 (█████████████████████████████████████████) Advertisers allege that Meta monopolizes a submarket of the broader online advertising market that Advertisers call "social" advertising. The broader online advertising market is highly competitive, and necessarily (and concededly) not all ads Meta sells are social ads. *See* Dkt. 662 at 8-9; Ex. 7, Fasser CC Tr. 97:8-12 (Advertisers' industry expert testifying that ads "placed on Facebook Marketplace that a user would encounter based on their entering of a search term … constitute search advertising"); *id.* at 82:15-83:1 (testifying that ads purchased through the Facebook Audience Network were only "social advertisements" if "placed on other social media networks"); Ex. 8, Gans CC Tr. 94:6-11 (agreeing that "ads that target purely on age and location" are not "ads that use data on social connections between users").

Just as before, these fundamental methodological failures require exclusion of the Kreitzman-Williams study. *See* Dkt. 662; *see also* concurrently filed merits *Daubert* motion of Kreitzman's opinions.

**B.  Merits Expert Discovery Has Reinforced That The Yardstick Study Is Junk Science**

In fact, since Meta's prior *Daubert* motion, the unreliability of the yardstick study has come into even starker relief. Williams has now all but conceded that his model does not actually "█████████████████████████████████." Ex. 2, Williams Merits Rebuttal ¶178 (emphasis added). Williams testified that his damages model proceeds on the belief that "in the but-for world" without the disputed conduct, "Meta's economic profit rate would have been equal to that of the yardstick firms," and "that that would begin *on the first day of the class period*." Ex. 3, Williams Merits Tr. 258:20-25 (emphasis added). Yet he also admits that, in his opinion, Meta already possessed monopoly power prior to the start of the Class Period. *Id.* at 287:14-289:6 ("I think that certainly by December 2016, I think Meta had monopoly power"). He has no

1  explanation—none—for his speculative belief that Meta's supposed monopoly power would have
2  instantaneously evaporated in December 2016 but for the challenged conduct, the vast majority of
3  which occurred long after December 2016. Williams's decision to nonetheless proceed based on
4  pure speculation that Meta's profit rate (and thus, in Williams's view, its degree of market power)
5  would have, without the challenged conduct, somehow instantly come to match the yardsticks' on
6  day one of the Class Period reinforces the fatal flaws in his opinions. An expert, of course, may
7  not base a damages model on "unsubstantiated speculation" just because doing so redounds to the
8  plaintiffs' advantage, and Williams's opinions should therefore be excluded. *See Diviero v.*
9  *Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997).

10  **II.   WILLIAMS'S HYPOTHETICAL MONOPOLIST AND SSNIP TEST IS JUNK SCIENCE**

11      **A.   Williams's Supposed HMT/SSNIP Test Is Not Such A Test**

12  Williams's Report asserts that his market of "social" advertising is supported by what he
13  describes as an application of the Horizontal Merger Guidelines' hypothetical monopolist test. The
14  test, properly applied, aims to determine whether a "hypothetical profit-maximizing firm … that
15  was the only present and future seller of" a product "likely would impose at least a small but
16  significant and non-transitory increase in price ('SSNIP') on at least one product in the market[.]"
17  U.S. Dep't of Just. & FTC, *Horizontal Merger Guidelines* § 4.1.1 (2010). The purpose of a SSNIP
18  test is to "establish[] (or disprove[e]) the substitutability of two or more products." *Sumotext Corp.*
19  *v. Zoove, Inc.*, 2020 WL 533006, at *11 (N.D. Cal. Feb. 3, 2020). To that end, a properly conducted
20  SSNIP test proceeds by evaluating whether "a significant number of customers would respond to
21  a SSNIP *by purchasing substitute products*" outside the proposed market. *Theme Promotions, Inc.*
22  *v. News Am. Mktg. FSI*, 546 F.3d 991, 1002 (9th Cir. 2008) (emphasis added). SSNIP tests
23  normally examine evidence that bears on consumer substitution, like "past consumer-demand data
24  and/or consumer-survey responses." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 975 (9th Cir.
25  2023). To Meta's knowledge, no court has ever accepted a comparison of firms' profits as a SSNIP.

26  Williams's novel attempt to perform what he characterizes as a SSNIP test consists of the
27  following: He observes that the same fatally flawed yardstick analysis he relies on for injury and
28  damages shows that Meta " ███████████████████

1    ███████████ which he interprets as proof that a "████████████████
2    ████████████████████████████████████████████████ Ex. 1, Williams Merits Rep. ¶¶143-
3    144. As a result, he "████████████████████████████████████████
4    ████████████████████████████████████" *Id.* ¶146.

    Williams's so-called SSNIP test should be excluded because it is not in fact a SSNIP test, failing to assess customer substitution as a SSNIP test must. Williams never analyzes whether, in response to a price increase by a monopolist of social advertising, customers would substitute with purchases from other firms. He never analyzes which firms they would substitute to. And he never analyzes whether those substitutions would render a SSNIP unprofitable. Instead, he simply points to the fact that Meta's profits exceed three firms' (mainly ██████), and asserts that "social advertising" is therefore the relevant market. As he agreed, he "did not analyze or quantify the percent decrease in the quantity purchased of ads, either from Meta, in a Meta-only candidate market, or from all the firms in [his] candidate social advertising market as a result of a price increase." Ex. 3, Williams Merits Tr. 179:14-24. That is a long way of saying that he did not conduct a SSNIP test.

    Courts routinely exclude self-styled SSNIP tests like Williams's where they replace the established process for conducting such a test with brand-new, made-for-litigation alternatives that lack a foundation in economics or case law. In *Sumotext Corp. v. Zoove, Inc.*, for example, the court excluded an expert's supposed "natural SSNIP test." 2020 WL 6544410, at *7-9 (N.D. Cal. Nov. 6, 2020), *aff'd*, 2021 WL 488024 (9th Cir. Oct. 27, 2021), *cert. denied*, 142 S. Ct. 2836 (2022). Much like here, the expert did not analyze customer substitution in response to price increases. Instead, he based his self-styled SSNIP test on "comparing, over time, prices of" the defendant's product to prices for three expert-selected comparator products. *Id.* at *7. Because that was not "grounded in any accepted methodology for conducting a market analysis," the court properly excluded it. *Id.* at *9. Likewise, in *Kentucky Speedway, LLC v. National Ass'n of Stock Car Auto Racing, Inc.*, the Sixth Circuit held that the district court properly excluded an expert's so-called SSNIP test because it did not analyze "whether a price increase at a particular point in time would result in consumer substitution of an alternative product" but instead consisted of the

1  expert's "own version of the SSNIP test," which "was produced solely for th[e] litigation." 588
2  F.3d 908, 918-19 (6th Cir. 2009) (internal quotation marks omitted). Williams's analysis is of a
3  piece with these junk SSNIP tests and so should likewise be excluded.

  **B. Williams's HMT/SSNIP Relies On His Unsound Damages Study**

5    As the foregoing description makes clear, Williams's SSNIP test begins and ends with the
6  Kreitzman-Williams yardstick study. Ex. 1, Williams Merits Rep. ¶144 (
7  
8  
9  . Williams's so-called SSNIP test should be excluded for that reason alone.
10   In addition, the pervasive methodological flaws with the yardstick study permeate its use
11 on market definition. As Williams agreed, his damages model was "the only basis for [the]
12 competitive price that [he] employed in the SSNIP test." Ex. 3, Williams Merits Tr. 154:23-155:6.
13 Accordingly, Williams concedes that
14 Ex. 2, Williams Merits Rebuttal ¶46. And if the Kreitzman-
15 Williams yardstick study is excluded, the SSNIP test lacks any basis. So, if this Court finds that
16 Kreitzman-Williams yardstick study unreliable and orders the corresponding opinions excluded
17 (as it should), then it must also exclude Williams's opinions regarding his SSNIP Test.

18 **III. WILLIAMS HAS FAILED TO COHERENTLY DEFINE A PRODUCT MARKET**

19   Williams's merits expert report asserts that "social advertising" is the relevant antitrust
20 market in this case. Ex. 1, Williams Merits Rep. ¶18. The problem is that he cannot seem to decide
21 what that means. Williams first defined "social advertising" as "
22 " *Id.* ¶¶12, 21, 365.[2] He subsequently testified
23 that it is "possible" for an ad to "constitute social advertising even if it does not use social data
24 contained in a social graph." Ex. 3, Williams Merits Tr. 21:12-23. And inversely, he testified that
25 he does not "have an opinion on" whether "there could be ads that use social data contained in the

---

[2] Williams in turn

Ex. 1, Williams Merits Rep. ¶29.

social graph but that do not constitute social advertising." *Id.* at 23:2-12. In other words, an ad targeted based on social data within a social graph is not necessarily social advertising—and selling social advertising does not necessarily mean an advertising provider has or uses a social graph.

An expert's market definition opinions should be excluded when they "appl[y] an unreliable methodology" for determining which products "should be included in the relevant product market" as defined. *In re Live Concert Antitrust Litigation*, 863 F. Supp. 2d 966, 996 (C.D. Cal. 2012). Williams has not identified any criteria that would allow the factfinder to determine what is social advertising and what is not social advertising. And if it is not possible to reliably determine what is social advertising or not, then it is not possible to determine what is in or outside of the market. It is no surprise, then, that when Williams's report analyzes which firms fall within or outside his market, his definition of the "social advertising" product virtually disappears. The term "social data" *never* appears in Section II.D of his report ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). And the term "social graph" appears only once, when he ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 1, Williams Merits Rep. ¶112. Notably, Williams does not analyze ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See id.*

Williams's definition of a "social graph," at least on its face, encompasses all sorts of firms outside of his purported market—Amazon, Google (including YouTube), and Apple obviously have ▮▮▮▮▮▮▮▮▮ And they have "social data," because, as Williams explained, he understood "social data" to include *any* information on a user that is contained in a social graph. *See* Ex. 3, Williams Merits Tr. 28:7-13 ("Q. Is it fair to say that in all the work that you've done in this case, you have not identified any data that would be organized in a social graph that would not constitute social data, under your definition of the term as you applied it? A. I can't think of any right now."). Amazon, Google, and Apple therefore have social graphs, as Williams has defined that term, all sell ads,

1  and all would thus belong in the purported market, as Williams has defined its bounds; yet they
2  are excluded based on Williams's *ipse dixit*.

3  Williams's you-know-it-when-you-see-it approach to populating the "social advertising"
4  market is not a valid method for an expert market definition analysis. *See In re Google Play Store*
5  *Antitrust Litig.*, 2023 WL 5532128, at *10 (N.D. Cal. Aug. 28, 2023) (Donato, J.) ("[N]othing in
6  either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence
7  that is connected to existing data only by the ipse dixit of the expert."). The decision from *In re*
8  *Live Concert Antitrust Litigation* is instructive. There, the plaintiffs' expert defined the market as
9  "live rock music concerts," and had to determine "which concerts qualify as 'rock' concerts, such
10 that they should be included in the market as defined." 863 F. Supp. 2d at 994. To do so, he "relied
11 on his own subjective opinion in order to determine which performers qualify as 'rock' artists"
12 and thus belonged in the market." *Id*. The court excluded his market definition opinions because
13 he "applied an unreliable methodology in determining whether every concert at issue in this
14 litigation qualified as a 'rock' concert, which should be included in the relevant product market."
15 *Id.* at 996.

16 Likewise, Williams in this case has "applied an unreliable methodology" in determining
17 whether every advertising provider and ad product they offer qualifies as "social advertising,"
18 which should be included in the relevant product market—indeed, Williams appears to have
19 followed no methodology at all. As with *In re Live Concert Antitrust Litigation*, that "fatally
20 undermines [his] definition of the relevant product market in its entirety." *Id.* at 996-97.

21 **CONCLUSION**
22 For the foregoing reasons, the Court should exclude the testimony of Williams in full.

**PUBLIC REDACTED VERSION**

| | | |
|---|---|---|
| 1 | Dated: April 5, 2024 | Respectfully submitted, |
| 2 | | By: /s/ Sonal N. Mehta |
| 3 | | SONAL N. MEHTA (SBN 222086) |
| 4 | | Sonal.Mehta@wilmerhale.com |
| | | WILMER CUTLER PICKERING HALE |
| 5 | | AND DORR LLP |
| | | 2600 El Camino Real, Suite 400 |
| 6 | | Palo Alto, California 94306 |
| 7 | | Telephone: (650) 858-6000 |
| 8 | | DAVID Z. GRINGER (*pro hac vice*) |
| | | David.Gringer@wilmerhale.com |
| 9 | | ROSS E. FIRSENBAUM (*pro hac vice*) |
| | | Ross.Firsenbaum@wilmerhale.com |
| 10 | | RYAN CHABOT (*pro hac vice*) |
| | | Ryan.Chabot@wilmerhale.com |
| 11 | | PAUL VANDERSLICE (*pro hac vice*) |
| | | Paul.Vanderslice@wilmerhale.com |
| 12 | | WILMER CUTLER PICKERING HALE |
| | | AND DORR LLP |
| 13 | | 7 World Trade Center |
| 14 | | 250 Greenwich Street |
| | | New York, New York 10007 |
| 15 | | Telephone: (212) 230-8800 |
| 16 | | ARI HOLTZBLATT (*pro hac vice*) |
| | | Ari.Holtzblatt@wilmerhale.com |
| 17 | | MOLLY M. JENNINGS (*pro hac vice*) |
| | | Molly.Jennings@wilmerhale.com |
| 18 | | WILMER CUTLER PICKERING HALE |
| 19 | | AND DORR LLP |
| | | 2100 Pennsylvania Avenue NW |
| 20 | | Washington, DC 20037 |
| | | Telephone: (202) 663-6000 |
| 21 | | |
| 22 | | MICHAELA P. SEWALL (*pro hac vice*) |
| | | Michaela.Sewall@wilmerhale.com |
| 23 | | WILMER CUTLER PICKERING HALE |
| | | AND DORR LLP |
| 24 | | 60 State Street |
| | | Boston, MA 02109 |
| 25 | | Telephone: (617) 526-6000 |
| 26 | | |
| 27 | | *Attorneys for Defendant Meta Platforms, Inc.* |
| 28 | | |

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of April, 2024, I electronically transmitted the public redacted version of the foregoing document to the Clerk's Office using the CM/ECF System and caused the version of the foregoing document filed under seal to be transmitted to counsel of record by email.

By:    */s/ Sonal N. Mehta*
        Sonal N. Mehta