**PUBLIC REDACTED VERSION**

WILMER CUTLER PICKERING
HALE AND DORR LLP
SONAL N. MEHTA (SBN 222086)
Sonal.Mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
David.Gringer@wilmerhale.com
ROSS E. FIRSENBAUM (*pro hac vice*)
Ross.Firsenbaum@wilmerhale.com
RYAN CHABOT (*pro hac vice*)
Ryan.Chabot@wilmerhale.com
PAUL VANDERSLICE (*pro hac vice*)
Paul.Vanderslice@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800

ARI HOLTZBLATT (*pro hac vice*)
Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
Molly.Jennings@wilmerhale.com
2100 Pennsylvania Ave NW
Washington, DC 20037
Telephone: (202) 663-6000

MICHAELA P. SEWALL (*pro hac vice*)
Michaela.Sewall@wilmerhale.com
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

*Attorneys for Defendant Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

META PLATFORMS, INC., a Delaware Corporation,

Defendant.

Case No. 3:20-cv-08570-JD

**DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY AND OPINIONS OF KEVIN KREITZMAN**

Hearing Date: June 20, 2024
Time: 10:00 a.m.
Judge: Hon. James Donato

**PUBLIC REDACTED VERSION**

## TABLE OF CONTENTS


NOTICE OF MOTION AND MOTION ....................1

MEMORANDUM OF POINTS AND AUTHORITIES ....................1

INTRODUCTION ....................1

BACKGROUND ....................3

ARGUMENT ....................4

I. KREITZMAN ASSUMES, WITHOUT ANY BASIS, THAT META'S PROFITS ARE DUE TO ANTICOMPETITIVE CONDUCT ....................4

  A. The Experts Fail To Control For Non-Price And Lawful Factors Affecting Profits ....................4

  B. The Experts Fail To Distinguish Between Profits From Social Advertising And Profits From Non-Social Advertising ....................7

II. THE "YARDSTICK FIRMS" ARE NOT THE PRODUCT OF A RELIABLE METHODOLOGY ....................8

  A. The Selection Criteria Are Junk Science ....................8

  B. The Final Set Of Yardsticks Is The Clear Product Of Junk Science ....................13

CONCLUSION ....................15

**PUBLIC REDACTED VERSION**

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) ... 14

*Bazemore v. Friday*, 478 U.S. 385 (1986) ... 7

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588 (7th Cir. 1998) ... 5, 7, 8

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ... 1

*Eleven Line, Inc. v. North Tex. State Soccer Ass'n*, 213 F.3d 198 (5th Cir. 2000) ... 8, 14

*In re Google Play Store Antitrust Litig.*, 2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) ... 11

*In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 973 (C.D. Cal. 2012) ... 7

*Kentucky v. Marathon Petrol. Co.*, 464 F. Supp. 3d 880 (W.D. Ky. 2020) ... 5

*Persian Gulf v. BP W. Coast Prods.*, 632 F. Supp. 3d 1108 (S.D. Cal. 2022) ... 14

*Shannon v. Crowley*, 538 F. Supp. 476 (N.D. Cal. 1981) ... 8

**STATUTES, RULES, AND REGULATIONS**

Fed. R. Evid. 702 ... 1

**OTHER AUTHORITIES**

ABA Antitrust L. Sec., *Proving Antitrust Damages: Legal and Economic Issues* (3d ed. 2017) ... 14

Faigman et al., 5 Mod. Sci. Evid. § 43:35 (2022-2023 ed.) ... 4

Phillip A. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (2023) ... 4, 8

**PUBLIC REDACTED VERSION**

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on June 20, 2024, at 10:00 a.m., Defendant Meta Platforms, Inc. will move the Court for an order granting Meta's Motion to Exclude the Expert Testimony and Opinions of Advertiser Plaintiffs' putative expert Kevin Kreitzman. Meta's motion is based on this Notice of Motion, the supporting Memorandum of Points and Authorities, and the Declaration of David Gringer filed herewith, along with the accompanying exhibits.

Pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny, Meta respectfully requests that the Court exclude the testimony of Kevin Kreitzman in full.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Advertisers' overcharge case hinges on the idea that Meta's customers paid more for social advertising than they would have without the conduct challenged in this litigation. Kevin Kreitzman's opinions serve as the lynchpin of that theory. But rather than analyzing the prices Meta charged for ads, Kreitzman compares Meta's *profits* with a cherry-picked group of just three "yardstick" companies. That approach is junk science for at least three reasons. First, the approach could only conceivably be informative with a rigorous and sound approach to identify the yardsticks. Kreitzman's arbitrary and random process is the opposite. Second, relatively high profits can—and often do—exist for reasons other than supracompetitive prices. Kreitzman never controls for any of these reasons. Third, even if high prices were an explanation for high profits, Kreitzman's comparison of profits alone cannot tell us anything about whether the profits are because of anticompetitive conduct, as opposed to market power earned through competition on the merits.

Kreitzman's approach is virtually unchanged since the class certification stage, where Meta also challenged the methodology and opinions based on it. *See* Dkt. 662 (Meta's prior *Daubert* motion directed at the yardstick study). The instant motion raises arguments that are largely identical to those raised in Meta's prior *Daubert* motion. If the Court has already granted Meta's class certification *Daubert* challenge to the Kreitzman-Williams yardstick study when it reaches

**PUBLIC REDACTED VERSION**

this motion, it need not consider this independently. If the Court has not reached or has denied Meta's challenge to the study at the class certification stage, Meta presents additional evidence below.

Critically, the yardstick firms and selection criteria remain the same at the merits stage as they did at class certification. One of the "yardsticks" is a small Polish company, [REDACTED] that sells online advertising along with tourist packages, architectural plans, and cars. Another is a microblogging site, [REDACTED] that primarily operates in China. The third is [REDACTED] Ex. 1, Kreitzman Merits Rep. ¶¶35-55.[1] Using the weighted average of the profit rates of these three supposed comparators as a benchmark, Kreitzman calculates Meta's supposed excess profits and Advertisers' other expert, Michael Williams, then attributes those excess profits to supracompetitive pricing, which he in turn attributes entirely to the challenged conduct—even as both experts admit numerous other factors could explain excess profits. Kreitzman includes no controls for any other causes of Meta's profitability and makes no attempt to tie the profits Meta earns to the challenged conduct. Although this methodology is riddled with problems, this motion focuses on two that are so significant as to render the methodology manifestly unreliable when used as a tool to calculate an overcharge in advertising prices.

*First*, the Kreitzman-Williams study cannot show that the pricing of any Meta advertisement (let alone all advertisements) is attributable to anticompetitive conduct because, [REDACTED], there are many factors, unrelated to pricing or anticompetitive conduct, that can cause a firm to maintain high profits. Those include non-price factors such as costs and output. But even where high profits stem from prices, those prices can also reflect factors unrelated to anticompetitive conduct, like product quality, management quality, and human capital, among others. Neither expert makes any effort to account for such factors.

*Second*, Kreitzman and Williams's selection of supposed "yardstick" firms is based on a set of criteria that is the expert-witness equivalent of throwing darts at a wall. The criteria omit nearly all the features usually relied on to assess firms' comparability. As for the criteria that were

[1] Unless otherwise noted, 'Ex.' citations reference exhibits to the Gringer Declaration filed herewith, emphasis is added, and objections are omitted for deposition citations.

used, Kreitzman concedes that several of them were chosen not to identify genuinely comparable firms, but instead for the sake of convenience. Ultimately, all six criteria are ones that Kreitzman or Williams (or both) admitted either say nothing about comparability, or are, at best, based on their *ipse dixit*. Unsurprisingly, this lack of rigor produces unreliable results, and it should be rejected.

## BACKGROUND

Advertisers submitted Kreitzman's report to establish common injury and identify the damages attributable to the higher prices they claim that the conduct at issue in this litigation permitted Meta to charge. Kreitzman acknowledged in his merits-stage deposition that [REDACTED]. *See* Ex. 2, Kreitzman Merits Tr. 17:17-24 ([REDACTED]); *id.* at 15:9-17 ([REDACTED]). Meta has previously described that method, *see* Dkt. 662, and summarizes it again here for the Court's convenience.

Attempting to provide the groundwork for establishing injury and damages, Kreitzman compares what he claims is the economic profit rate (EPR) for Meta's advertising business against his calculation of the weighted average EPR for what he claims is a set of three "yardstick" firms—[REDACTED]. Ex. 1, Kreitzman Merits Rep. ¶¶35-55. Kreitzman lists six criteria that he used to select his three yardstick firms. *Id.* ¶35. The criteria are that the company (1) [REDACTED] (2) [REDACTED] (3) [REDACTED] (4) [REDACTED] (5) [REDACTED] and (6) [REDACTED] *Id*. Thus, companies like Amazon and Microsoft that vigorously compete against Meta to sell advertisements were not selected as benchmarks.

Next, Kreitzman proposes a hypothetical reduction in advertising revenue that would have

**PUBLIC REDACTED VERSION**

lowered Meta's profit rate to match the yardstick average. *Id.* ¶¶11-12, 61-62. The reduction he offers is a [REDACTED] decrease in Meta's advertising revenue—or [REDACTED]. *Id.* Kreitzman does not analyze what revenue Meta would have earned in a but-for world without the challenged conduct. He does not analyze whether, in a world where Meta *did* earn lower profits, that reduction would have flowed from a revenue decrease or some other cause (like cost increases). He does not analyze why Meta's alleged EPR is higher than the yardstick firms' or isolate how much (if any) of that profitability may be due to the challenged conduct versus other factors.

Neither does Williams. Instead, Williams treats Kreitzman's calculations as "[REDACTED]." Ex. 3, Williams Merits Rep. ¶355. Premised on this understanding, Williams relied on Kreitzman's calculations to [REDACTED]" *Id.* ¶363.

## ARGUMENT

Despite calling their approach a "yardstick" model, the Kreitzman-Williams study is anything but. Kreitzman and Williams' approach suffers from two independently fatal flaws that courts have found render yardstick analyses unreliable and inadmissible. First, the study assumes that the difference between Meta's EPR and the weighted average EPR of the yardstick firms is wholly attributable to price increases caused by the challenged conduct, without accounting for salient variables that both experts acknowledge affected Meta's profitability. Second, the study employs arbitrary criteria to select the yardsticks, yielding a facially inappropriate result. The study is junk science, and its results confirm that.

### I. KREITZMAN ASSUMES, WITHOUT ANY BASIS, THAT META'S PROFITS ARE DUE TO ANTICOMPETITIVE CONDUCT

#### A. The Experts Fail To Control For Non-Price And Lawful Factors Affecting Profits

The "most important[]" requirement for a "yardstick methodology" is "to control for any factors that might have influenced [a firm's] profit performance that are competitively neutral or even procompetitive." Areeda & Hovenkamp, *Antitrust Law* ¶397 (2023); Faigman et al., 5 Mod.

**PUBLIC REDACTED VERSION**

Sci. Evid. § 43:35 (2022-2023 ed.) (when a "yardstick benchmark is employed, effects on the prices paid by plaintiffs … caused by factors other than the alleged wrongdoing must be taken into account"). If a study fails to do so, it cannot possibly show that any difference is "attributable to the defendant's misconduct" and is therefore inadmissible. *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 592-93 (7th Cir. 1998) (Posner, J.) ("*BCBS*"); *Kentucky v. Marathon Petrol. Co.*, 464 F. Supp. 3d 880, 894 (W.D. Ky. 2020) (same).

Disregarding these basic tenets of reliable yardstick studies, Kreitzman simply observes that "[REDACTED]," and then calculates [REDACTED] Ex. 1, Kreitzman Merits Rep. ¶¶61-62. He concededly [REDACTED] Ex. 2, Kreitzman Merits Tr. 13:12-14. And even though his analysis assumes that Meta's profits would be brought in line with the yardsticks entirely via a reduction in revenue, Kreitzman acknowledged [REDACTED] *Id.* at 85:12-18. Yet notwithstanding these oversights, Williams then asserts that [REDACTED] Ex. 3, Williams Merits Rep. ¶142. Williams, like Kreitzman, offers no further analysis tying Meta's profits to its advertising revenue or to the challenged conduct in particular. Instead, he too simply attributes "all of [Meta's] reduction in economics profits to a … [p]rice decrease." Ex. 4, Williams Merits Tr. 280:10-20.

The Kreitzman-Williams study fails as a threshold matter because it does not control for any of the litany of factors besides the challenged conduct that both experts acknowledge could have caused Meta's EPRs to exceed those of the yardstick firms. For one thing, Kreitzman admitted (as he must) that [REDACTED] *See* Ex. 2, Kreitzman Merits Tr. 87:13-89:21 ([REDACTED] regardless of whether high profits are caused by prices, costs, or output, those "high profits or net positive profits

**PUBLIC REDACTED VERSION**

can exist even for years for reasons unrelated to anticompetitive conduct." Ex. 5, Kreitzman CC Tr. 36:15-19; [REDACTED] These reasons include at least product quality, product innovation, the quality of a firm's management, and human capital. Ex. 5, Kreitzman CC Tr. 37:18-23, 38:6-15, 39:24-42:19; *see also* Ex. 6, Williams CC Tr. 70:12-72:5.

Yet by Kreitzman's own admission, his yardstick study does not account or control for any of those factors. Kreitzman explained that he [REDACTED] Ex. 2, Kreitzman Merits Tr. 152:1-5. Consistent with that, Kreitzman admitted that his study identifies no reason Meta's profit rate could not come to match the yardsticks' through an increase in costs, instead of a reduction in prices. *See* Ex. 5, Kreitzman CC Tr. 68:19-69:4 ("Q. [I]n evaluating the difference between the profits that you calculated for Meta and for your yardstick firms, is it your opinion that revenue reduction is the only way that Meta's profits could be brought in line with the yardstick firms? A. No, I don't believe that I've offered that opinion."); *id.* at 69:16-20 ("Q. So the answer to my question is yes, Meta's costs could be increased to get to the level of profitability of the yardstick firms; right? A. Yes. Again, profits are an interaction of these different things, yes."). And he likewise admitted that none of his yardstick selection criteria had anything to do with product quality, product innovation, management quality, or human capital. *Id.* at 44:15-17 (these factors "were not part of [his] six selection criteria"); *id.* at 46:12-47:1 (these factors were "not something that [he] considered or adjusted for" in selecting his yardstick firms).

Kreitzman also agreed that [REDACTED] Ex. 2, Kreitzman Merits Tr. 71:10-72:4. That reflects a fundamental misunderstanding of the scope of Williams's opinions. Williams testified that [REDACTED]

**PUBLIC REDACTED VERSION**

[REDACTED] Ex. 6, Williams CC Tr. 186:8-187:13. Rather, he agreed that "[t]he reason [he] would expect Meta's prices to look like the prices of the yardstick firms in the but-for world is because [he] viewe[d] them as comparable, except for the fact that Meta maintained its monopoly via the challenged conduct." Ex. 4, Williams Merits Tr. 163:19-165:1. That is, Williams assumed that Kreitzman built into the yardstick selection process a way of controlling for differences in product quality, innovation, human capital, and management quality—while Kreitzman assumed that Williams was handling those controls. Each assumed that another expert would pick up the slack of controlling for these other factors, but no one did.

The resulting failure to so much as *attempt* to control for factors other than anticompetitive conduct affecting Meta's profits renders the Kreitzman-Williams study unreliable and inadmissible. A yardstick study is "worthless" if it "attribute[s] the entire difference between the prices of" an antitrust defendant and the comparator firms to anticompetitive conduct without "correct[ing] for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining." *BCBS*, 152 F.3d at 593. "[S]imply assum[ing]—without further examination—that the difference in" prices (or profits, in this case) between firms "is due entirely to [the defendant's] allegedly anticompetitive conduct" without "account[ing] for *any* other possible explanation(s) for this disparity" is "'so incomplete as to be inadmissible as irrelevant.'" *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 973, 975 (C.D. Cal. 2012) (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 n.10 (1986)).

**B. The Experts Fail To Distinguish Between Profits From Social Advertising And Profits From Non-Social Advertising**

Advertisers assert that the relevant market is the market for "social advertising." Dkt. 643 at 4; *see also* Ex. 3, Williams Merits Rep. ¶365. Social ads, they say, are those that "can be targeted based on social data contained in a social graph.'" Dkt. 643 at 4; Ex. 3, Williams Merits Rep. ¶365; *see also* Ex. 6, Williams CC Tr. 244:18-24 [REDACTED] [REDACTED] Those are the only ads Meta is claimed to monopolize. *See* Ex. 4, Williams Merits Tr. 176:9-14 (agreeing he has "not offered an opinion in this case in [his] reports that Facebook has monopoly power in any market other than the social advertising market"). So, they are the only ads affected by the

**PUBLIC REDACTED VERSION**

challenged conduct, and the only ads for which the class may recover.

Advertisers' experts admit that not every advertisement sold on Meta was social, meaning that not all of Meta's advertising *profits* are from the allegedly monopolized market. *See*, Ex. 7, Fasser Tr. 97:8-12 (Advertisers' industry expert testifying that ads "placed on Facebook Marketplace that a user would encounter based on their entering of a search term … constitute search advertising"); *id.* at 82:15-83:1 (testifying that ads purchased from Meta through the Facebook Audience Network were not "social advertisements" unless they were "placed on other social media networks"); Ex. 8, Gans Tr. 94:6-11 (agreeing that "ads that target purely on age and location" are not "ads that use data on social connections between users"). But neither Kreitzman nor Williams separates the revenue and profit attributable to *social* advertisements from that attributable to *other* advertisements Meta sells that are outside the alleged market. *See* Ex. 5, Kreitzman CC Tr. 248:22-24 (agreeing he "did not distinguish between social and nonsocial advertising" profits); Ex. 6, Williams CC Tr. 282:16-21 [REDACTED] [REDACTED]. That—just like their failure to account for product quality, management quality, employee quality, innovation, or just about anything else—requires the Court to exercise its role as a gatekeeper and exclude their opinions. *BCBS*, 152 F.3d at 593 (failure to "correct for salient factors, not attributable to the defendant's [alleged] misconduct," requires exclusion of study).

## II. THE "YARDSTICK FIRMS" ARE NOT THE PRODUCT OF A RELIABLE METHODOLOGY

### A. The Selection Criteria Are Junk Science

"[T]he yardstick method requires a comparison of the" firm at issue "with one nearly as identical as possible." *Shannon v. Crowley*, 538 F. Supp. 476, 481 (N.D. Cal. 1981); Areeda ¶ 392f ("[O]ne must identify a firm that is truly comparable in order for the inferences drawn to be reliable rather than speculative."). Plaintiffs bear the burden of "demonstrat[ing] the reasonable similarity" of the defendant's business to the proposed comparators in the yardstick study. *Eleven Line, Inc. v. N. Tex. State Soccer Ass'n*, 213 F.3d 198, 208 (5th Cir. 2000). That involves considering whether the firms are comparable with respect to real-world factors like, for example, "geographical location," the "attractiveness of" their product offerings, the size and type of the markets they

**PUBLIC REDACTED VERSION**

serve, and their "relative costs of operation." *Id.*

The Kreitzman-Williams selection criteria ignore those real-world criteria. And that oversight shows in the list of firms the criteria produce: one of the firms is a relatively tiny Polish company that makes its money selling not only advertising but also tourist packages, architectural plans, and cars, and two of the firms operate primarily in dissimilar international markets (China and Poland). Indeed, other than [REDACTED] the list lacks a single company that anyone has ever mentioned in the same breath as Meta—no Twitter, no Microsoft, no TikTok, no Snapchat, no Apple, no Amazon, no Reddit—and Kreitzman admits that he and Williams did not even consider comparability of those firms (or any others) once one of their screening criteria filtered them out. *See* Ex. 5, Kreitzman CC Tr. 239:7-241:17.

The factors Kreitzman *does* rely on to produce his yardsticks do not ensure comparability. Consider each filter in turn.

*First*, Kreitzman limits the yardsticks to [REDACTED] He does so not because [REDACTED] are any more comparable to Meta than [REDACTED], but instead for convenience—because [REDACTED] [REDACTED] Ex. 1, Kreitzman Merits Rep. ¶35 n.1; *accord* Ex. 5, Kreitzman CC Tr. 70:10-15. But as Kreitzman acknowledged, that says nothing about comparability: "Q. Now, the ability to access the information, in other words, whether or not that information is reliably available because it's a [REDACTED] or not reliably available because it's a [REDACTED] that itself doesn't say anything about the comparability of the firm to Meta; correct? A. That's true, yes." Ex. 5, Kreitzman CC Tr. 71:8-14. As a result, [REDACTED] [REDACTED] "it's possible that there are privately held firms that are at least as comparable or more comparable to Meta than the yardstick firms that [Kreitzman] identified." *Id.* at 76:23-77:7; [REDACTED]. The fact that Kreitzman chose this filter to ensure he had adequate information to perform his calculations does not itself require exclusion of the yardstick study. But it does make clear that this first filter, at least, does no work to help the yardstick study comply with the law's requirement that a yardstick study select a comparable set of firms—if anything, the filter excludes potentially superior comparators to the chosen yardsticks.

**PUBLIC REDACTED VERSION**

Since this filter does nothing to ensure comparability, one of the others must do so for the study to be reliable—but not one actually does so.

*Second*, Kreitzman limits the yardsticks to those that [REDACTED] places in the category [REDACTED] That filter brings the set of comparable firms from 52,538 to just 347—eliminating 99% of possible comparators—and excludes brands with massive online advertising businesses (like Amazon, Microsoft, or Verizon). Despite the filter's dramatic effect on his study results, Kreitzman admitted that he does not "actually know what criteria [REDACTED] used to decide who goes into that category," and that "some of the firms in the category don't meet at least one part of the definition [REDACTED] provided." Ex. 5, Kreitzman CC Tr. 81:19-23, 87:16-20. Remarkably, Williams acknowledged that [REDACTED], and yet he and Kreitzman used it as the first filter for comparable firms. *See* Ex. 6, Williams CC Tr. 214:16-215:5. Both experts, when pressed to nonetheless justify the filter, testified that [REDACTED] *Id.* at 209:11-210:24; Ex. 5, Kreitzman CC Tr. 80:9-12 ("I would focus on what's included in the industry category"). Exactly. Application of this filter excluded firms that *are* comparable while leaving those that are not. Moreover, despite the conceded unreliability of [REDACTED], Kreitzman relied on those very descriptions to exclude every single other industry segment (other than [REDACTED] without actually "look[ing] at the companies in other segments" to assess their comparability to Meta. Ex. 5, Kreitzman CC Tr. 88:7-15. As a result—and as Kreitzman admitted—he does not know whether other segments contained equally or more comparable firms than the yardsticks he picked. *Id.* at 85:19-86:3, 89:18-90:5. He did, at least, know that this filter excluded well-known advertising businesses within Microsoft (LinkedIn), Verizon (Yahoo), and Amazon.[2] In an emerging pattern, then, filter number two does nothing to

---

[2] Kreitzman claims that [REDACTED] Ex. 1, Kreitzman Merits Rep. ¶17. That, of course, says nothing about companies like Microsoft and Verizon. But in any event, [REDACTED]

**PUBLIC REDACTED VERSION**

produce a comparable set of firms, and excludes potentially superior comparators to the yardsticks.

*Third*, Kreitzman limited the yardsticks to firms [REDACTED] [REDACTED]. His goal was not to identify comparable firms, but instead do the opposite and "cast a very, very wide net to pick up … the highest possible number" of firms. *Id*. at 120:25-121:10. With a justification so unmoored from comparability, it is no wonder that the filter rests on an arbitrary numerical threshold. Kreitzman testified that had he selected a marginally higher cutoff than [REDACTED]—the lowest-EPR firm in the set—would not have made the cut. *Id.* at 128:5-12. Yet when challenged to justify the cutoff he chose, Kreitzman said only that it was [REDACTED] Ex. 9, Kreitzman CC Rebuttal ¶31. That is code for "ipse dixit" and is insufficient to demonstrate that he identified a "reasonable facsimile" or "benchmark" firm. *See In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *9 (N.D. Cal. Aug. 28, 2023) (Donato, J.). This filter, then, once again failed to reliably select for comparable firms.

*Fourth*, Kreitzman applied a similar filter with respect to [REDACTED]: any firm that [REDACTED] was rejected by this filter and thus necessarily deemed non-comparable by Kreitzman and Williams. That filter is arbitrary just like the [REDACTED] filter as its numerical threshold finds no support beyond Kreitzman's *ipse dixit*. Tellingly, had the cutoff been even [REDACTED] would have been excluded. *See* Ex. 1, Kreitzman Merits Rep. ¶35 & fig.12. This filter's purpose was also to "cast a very wide net," as evidenced by [REDACTED] barely scraping through. *See* Ex. 5, Kreitzman CC Tr. 131:9-14 (if the "cutoff for market cap had been almost anything other than one one-thousandth, [REDACTED] would have fallen out"). But the [REDACTED] filter also has an *additional* deficiency, beyond those it shares with the [REDACTED] filter. Kreitzman calculated its cutoff by guesstimating that [REDACTED] But remarkably, Kreitzman did not "do any calculation based on Meta's financial data" to arrive at that figure; it was a "judgment-based assumption." *Id.* at 135:9-17. Left fatally unexplained—again—is how or

---

[REDACTED] He says nothing at all about what a comparison between Meta's and Amazon's *advertising* businesses would show about Meta's advertising profits.

**PUBLIC REDACTED VERSION**

why Kreitzman exercised his judgment in this fashion.

*Fifth*, Kreitzman eliminated any firm that [REDACTED] [REDACTED]. This filter is likewise an outcome-oriented choice justifiable only by *ipse dixit*. Kreitzman's report just asserts that companies [REDACTED] [REDACTED] Ex. 1, Kreitzman Merits Rep. ¶35 n.47. Perhaps recognizing the infirmity of that explanation, he adds that the filter really "[REDACTED]" by "[REDACTED]." Ex. 10, Kreitzman Merits Rebuttal ¶15. But his own testimony reveals that he was wrong: as he agreed, "companies can have negative income before delivering very significant profits," meaning there is no necessary connection between [REDACTED] and a low profit rate over the class period. Ex. 5, Kreitzman CC Tr. 157:12-15. And in any event, it hardly excuses a significant flaw in one's analysis to say, "no harm, no foul." Especially where the application of the filter confirms that it, at a minimum, calls into question—if not in fact harms—the reliability of the methodology. This screening criteria was the one that filtered out *Twitter* as a comparator to Meta.

*Sixth*, Kreitzman limits the yardsticks to companies [REDACTED] [REDACTED]. The primary purpose of this filter was, by Kreitzman's own admission, not to identify comparable firms, but rather to [REDACTED] [REDACTED] Ex. 9, Kreitzman CC Rebuttal ¶36; Ex. 5, Kreitzman CC Tr. 173:10-14 (purpose was to "have adequate data"). But Kreitzman did not even consider whether any particular firm's ad revenue could be broken out from its non-ads business, as he did for Meta and [REDACTED] *See, e.g.*, Ex. 5, Kreitzman CC Tr. 97:5-11, 98:17-22, 100:2-5. The result is that Kreitzman has no idea whether his sixth filter filtered out firms with ads businesses that were at least—or more—comparable than the three "yardstick" firms, because he did not even look:

> Q. So it's possible that there were firms that had ads businesses that were at least, if not more comparable than your yardstick firms that were screened out as a result of criteria number 6; right?
> A. Yeah. Again, it could've -- it's possible that this segment by itself would have been a comparable and comparable to Meta's business.
> Q. And that's not something that you evaluated as part of your analysis; correct?
> A. That's correct.

*Id.* at 176:1-12.

**PUBLIC REDACTED VERSION**

What's more, this filter turns almost entirely on a judgment call Kreitzman is unqualified to make. As Kreitzman acknowledged, applying this filter required him "to figure out what segments" of each firm "should be counted as advertising revenue and not." *Id*. at 176:17-23. Yet segments that included advertising revenue were excluded if he believed their ads were "very different" from the "targeted ads" Meta offers. *Id.* at 192:8-13. Even though Kreitzman admits he is not an expert in advertising—he has never worked in the industry and knows little of Meta's advertising products—he "ma[de] that judgment [him]self" without "consult[ing] with *anyone* that has expertise in the advertising industry." *Id.* at 196:12-19.

In sum, Kreitzman's testimony amply establishes that several of his selection criteria do not even attempt to identify comparable firms, and that the others cannot possibly do so in a reliable fashion. In the end, Kreitzman's selection criteria did *nothing* to select for comparable firms—they instead excluded scores of comparable firms. Kreitzman's opinions should therefore be excluded.

**B. The Final Set Of Yardsticks Is The Clear Product Of Junk Science**

Stepping back from the specific selection criteria applied, the final trio of yardstick firms— [REDACTED] —confirm the unreliability of the selection process.

Turning first to [REDACTED], neither [REDACTED] nor Kreitzman was aware of anyone— any document or person—who has ever described [REDACTED] as comparable to Meta. [REDACTED] [REDACTED] Ex. 5, Kreitzman CC Tr. 236:22-237:4. The company is a tiny fraction of Meta's size and its businesses include tourist packages, architectural designs, TV ads, and car sales. Indeed, revenue data from [REDACTED] strongly suggests that it does not even clear Kreitzman's flawed criteria. It began breaking out the size of its advertising segment in *2021*, and its advertising revenue that year—when *combined* with revenue from subscription services— constituted only 63% of its total revenue, with the rest attributable to such diverse offerings as the sale of tourist packages and consumer financial products. [REDACTED] [REDACTED] In the next year, the ads-and-subscriptions combination constituted only 58% of revenue. *Id.* There is no basis to infer that the share attributable to advertising was some 20 points higher ([REDACTED] [REDACTED]) for 2016-2020. Indeed, Kreitzman's class-stage report asserted that [REDACTED]

**PUBLIC REDACTED VERSION**

but, when confronted, he admitted he was wrong. Ex. 5, Kreitzman CC Tr. 222:6-223:11. He could not reconcile those contradictory facts, nor offer any basis for concluding that :

> Q. I'm asking you to confirm that you don't know whether or not had during the class period, because you don't know how much these other sources contributed to its revenue; isn't that right?
> A. Again, I don't know—there was no quantification associated with them, so I cannot say, you know, what they were or if they were material or not.

Yet, incredibly, his merits report doubled down—without support—on the debunked claim that . Ex. 1, Kreitzman Merits Rep. ¶49 n.73.[3] This alone reveals that Kreitzman's set of comparator firms is so unreliable as to warrant exclusion. *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 268 (2d Cir. 2002) (excluding expert opinion for "fail[ing] to apply his own methodology reliably").

Next, consider As Williams acknowledges, a yardstick study must compare Ex. 3, Williams Merits Rep. ¶329 (quoting ABA Antitrust L. Sec., *Proving Antitrust Damages: Legal and Economic Issues* Ch. 4, § C (3d ed. 2017)); *see also* Ex. 6, Williams CC Tr. 198:10-25. But is not merely affected by the alleged anticompetitive conduct in this case; it is allegedly a . *See* Am. Compl., Dkt. 391 ¶¶ (challenging Meta's alleged too, ought to have been excluded under Kreitzman's and Williams's own description of their approach. *See Persian Gulf v. BP W. Coast Prods.*, 632 F. Supp. 3d 1108, 1166 (S.D. Cal. 2022) ("Williams' methodology disregarded the basic econometric principle of selecting a benchmark … that is reasonably free of misconduct.").

That leaves only is, again, a Chinese microblogging site that Advertisers' experts have failed to establish has any relevant similarities to Meta. *See Eleven Line*, 213 F.3d at 208. And in any event, average EPR is *higher* than Meta's—it offers no proof Meta

---

[3] Like his class report, Kreitzman's merits report cites as support for this figure. But the cited pages say nothing of the sort.

obtained an anticompetitive profit. Ex. 1, Kreitzman Merits Rep. ¶59 fig.24. That means that, in reality, the yardstick study can reliably show neither damages nor antitrust impact, and it should therefore be excluded.

**CONCLUSION**

The Court should exclude the unreliable Kreitzman-Williams "yardstick" study by excluding the testimony of Kreitzman in full.

**PUBLIC REDACTED VERSION**

Dated: April 5, 2024

Respectfully submitted,

By: /s/ *Sonal N. Mehta*

SONAL N. MEHTA (SBN 222086)
Sonal.Mehta@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (pro hac vice)
David.Gringer@wilmerhale.com
ROSS E. FIRSENBAUM (pro hac vice)
Ross.Firsenbaum@wilmerhale.com
RYAN CHABOT (pro hac vice)
Ryan.Chabot@wilmerhale.com
PAUL VANDERSLICE (pro hac vice)
Paul.Vanderslice@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800

ARI HOLTZBLATT (pro hac vice)
Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (pro hac vice)
Molly.Jennings@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000

MICHAELA P. SEWALL (pro hac vice)
Michaela.Sewall@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

*Attorneys for Defendant Meta Platforms, Inc.*

**PUBLIC REDACTED VERSION**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of April, 2024, I electronically transmitted the public redacted version of the foregoing document to the Clerk's Office using the CM/ECF System and caused the version of the foregoing document filed under seal to be transmitted to counsel of record by email.

By: *<u>/s/ Sonal N. Mehta</u>*
Sonal N. Mehta