**PUBLIC REDACTED VERSION**

WILMER CUTLER PICKERING
HALE AND DORR LLP
SONAL N. MEHTA (SBN 222086)
 Sonal.Mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
 David.Gringer@wilmerhale.com
ROSS E. FIRSENBAUM (*pro hac vice*)
 Ross.Firsenbaum@wilmerhale.com
RYAN CHABOT (*pro hac vice*)
 Ryan.Chabot@wilmerhale.com
PAUL VANDERSLICE (*pro hac vice*)
 Paul.Vanderslice@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800

ARI HOLTZBLATT (*pro hac vice*)
 Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
 Molly.Jennings@wilmerhale.com
2100 Pennsylvania Ave NW
Washington, DC 20037
Telephone: (202) 663-6000

MICHAELA P. SEWALL (*pro hac vice*)
 Michaela.Sewall@wilmerhale.com
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

*Attorneys for Defendant Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated,<br><br>                              Plaintiffs,<br><br>     v.<br><br>META PLATFORMS, INC., a Delaware Corporation,<br><br>                              Defendant. | Case No. 3:20-cv-08570-JD<br><br>**DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT REGARDING CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT**<br><br>Hearing Date: June 20, 2024<br>Time: 10:00 a.m.<br>Judge: Hon. James Donato |

**TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION .................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................1

INTRODUCTION .................................................................................................................1

BACKGROUND ...................................................................................................................3

ARGUMENT ........................................................................................................................5

I.      USERS' CLAIMS ARE TIME BARRED...................................................................5

        A.      Users' Claims Accrued Outside The Limitations Period...........................5

        B.      Users Cannot Establish A Continuing Violation As A Matter Of Law ..................6

II.     USERS' OWN ALLEGATIONS AND THEIR EXPERTS' ADMISSIONS
        ESTABLISH THAT THE ALLEGED DECEPTION DID NOT HARM
        COMPETITION ........................................................................................................11

III.    USERS HAVE NOT ADEQUATELY DEFINED A MARKET AS A MATTER
        OF LAW ...................................................................................................................15

IV.     USERS CANNOT DEMONSTRATE ANTITRUST STANDING ................................21

V.      USERS' ATTEMPTED MONOPOLIZATION CLAIM AND ABANDONED
        REQUEST FOR INJUNCTIVE RELIEF FAIL FOR THE SAME REASONS .............25

CONCLUSION....................................................................................................................25

**PUBLIC REDACTED VERSION**

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Airweld, Inc. v. Airco, Inc.*,
  742 F.2d 1184 (9th Cir. 1984) ..................................................................................8

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
  190 F.3d 1051 (9th Cir. 1999) ................................................................................23

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
  19 F.4th 127 (2d Cir. 2021) ..............................................................................21, 24

*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l
  Publ'ns, Inc.*, 108 F.3d 1147 (9th Cir. 1997) .............................................2, 11, 12

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983) ................................................................................................21

*Bay Area Surgical Mgmt., LLC v. Aetna Life Ins. Co.*,
  166 F. Supp. 3d 988 (N.D. Cal. 2015) ....................................................................10

*Chang v. Farmers Ins. Co., Inc.*,
  2023 WL 5163288 (C.D. Cal. July 12, 2023) .........................................................11

*City of Oakland v. Oakland Raiders*,
  20 F.4th 441 (9th Cir. 2021) ......................................................................22, 23, 24

*City of Pittsburgh v. West Penn Power Co.*,
  147 F.3d 256 (3d Cir. 1998) ...................................................................................21

*Complete Entm't Res. LLC v. Live Nation Entm't, Inc.*,
  2016 WL 3457177 (C.D. Cal. May 11, 2016) ..........................................................7

*Coronavirus Rep. v. Apple Inc.*,
  2021 WL 5936910 (N.D. Cal. Nov. 30, 2021) .................................................16, 17

*Coronavirus Rep. v. Apple, Inc.*,
  85 F.4th 948 (9th Cir. 2023) .............................................................................15, 16

*Crowder v. LinkedIn Corp.*,
  2023 WL 2405335 (N.D. Cal. Mar. 8, 2023)............................................................8

*Duarte v. Quality Loan Serv. Corp.*,
  2018 WL 2121800 (C.D. Cal. May 8, 2018) .............................................................9

*Electroglas, Inc. v. Dynatex Corp.*,
  497 F. Supp. 97 (N.D. Cal. 1980) ........................................................................5, 8

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ...................................................................13, 16

*Garrison v. Oracle Corp.*,
   159 F. Supp. 3d 1044 (N.D. Cal. 2016) .......................................................5, 6

*Golan v. Pingel Enter., Inc.*,
   310 F.3d 1360 (Fed. Cir. 2002)......................................................................20

*Hawthorne Hangar Operations, L.P. v. Hawthorne Airport, LLC*,
   2022 WL 3102452 (9th Cir. Aug. 4, 2022)......................................................6

*Holmes v. SIPC*,
   503 U.S. 258 (1992)........................................................................................21

*Klehr v. A.O. Smith Corp.*,
   521 U.S. 179 (1997)..........................................................................................7

*Lloyd's Material Supply Co. v. Regal Beloit Corp.*,
   2017 WL 5172206 (C.D. Cal. June 27, 2017) ...............................................25

*McCarthy v. Intercontinental Exch., Inc.*,
   2022 WL 4227247 (N.D. Cal. Sept. 13, 2022) ..............................................21

*Midwestern Mach. Co. v. Nw. Airlines, Inc.*,
   392 F.3d 265 (8th Cir. 2004) ...........................................................................7

*New York v. Meta Platforms, Inc.*,
   66 F.4th 288 (D.C. Cir. 2023)...........................................................................6

*Oliver v. SD-3C LLC*,
   751 F.3d 1081 (9th Cir. 2014) .......................................................................25

*In re Online DVD Rental Antitrust Litig.*,
   2011 WL 1629663 (N.D. Cal. Apr. 29, 2011) ...............................................21

*Pace Indus., Inc. v. Three Phoenix Co.*,
   813 F.2d 234 (9th Cir. 1987) ..........................................................1, 5, 6, 7, 8, 9

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997)............................................................................21

*Rambus Inc. v. FTC*,
   522 F.3d 456 (D.C. Cir. 2008)........................................................................15

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ....................................................................16, 25

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
   842 F.3d 883 (5th Cir. 2016) .........................................................................11

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
   471 F. Supp. 3d 981 (N.D. Cal. 2020) ..............................................................6, 7, 25

*S. Pac. Co. v. Darnell-Taenzer*,
   245 U.S. 531 (1918)..............................................................................................24

*Samsung Elecs. Co. v. Panasonic Corp.*,
   747 F.3d 1199 (9th Cir. 2014) ...........................................................................5, 6, 9

*SaurikIT, LLC v. Apple Inc.*,
   2022 WL 1768845 (N.D. Cal. May 26, 2022) ...................................................7, 11

*Schachar v. Am. Acad. of Ophthalmology, Inc.*,
   870 F.2d 397 (7th Cir. 1989) ...............................................................................11

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
   2010 WL 3521979 (E.D. Cal. Sept. 3, 2010)....................................................8, 25

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
   875 F.2d 1369 (9th Cir. 1989) ..........................................................................19, 20

*Truck-Rail Handling Inc. v. BNSF Ry. Co.*,
   2005 WL 8178364 (N.D. Cal. Mar. 8, 2005).......................................................16

*TYR Sport, Inc. v. Warnaco Swimwear, Inc.*,
   709 F. Supp. 2d 821 (C.D. Cal. 2010) ............................................................11, 12

*United States v. Microsoft*,
   253 F.3d 34 (D.C. Cir. 2001)......................................................................15, 16, 20

*United States v. Oracle Corp.*,
   331 F. Supp. 2d 1098 (N.D. Cal. 2004) ...............................................................21

*Universal Avionics Sys. Corp. v. Rockwell Int'l Corp.*,
   52 F. App'x 897 (9th Cir. 2002) ...........................................................................19

*Yellow Pages Cost Consultants, Inc. v. GTE Directories Corp.*,
   951 F.2d 1158 (9th Cir. 1991) ..............................................................................22

*Z Techs. Corp. v. Lubrizol Corp.*,
   753 F.3d 594 (6th Cir. 2014) .................................................................................7

**STATUTES AND RULES**

15 U.S.C. § 15(b) ............................................................................................................5

Fed. R. Civ. P. 56 ...........................................................................................................1

**PUBLIC REDACTED VERSION**

**OTHER AUTHORITIES**

Phillip A. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
 Principles and Their Application* (2023) .......................................................................12, 23

EJ Dickson, *Inside MeWe, Where Anti-Vaxxers and Conspiracy Theorists Thrive*,
 Rolling Stone (May 23, 2019),
 https://www.rollingstone.com/culture/culture-features/mewe-anti-
 vaxxersconspiracy-theorists-822746.........................................................................14

PUBLIC REDACTED VERSION

1            **NOTICE OF MOTION AND MOTION**

2       PLEASE TAKE NOTICE THAT, on June 20, 2024, at 10:00 a.m., Defendant Meta

3 Platforms, Inc. will move for summary judgment on all claims raised in the Consolidated Class

4 Action Complaint (Dkt. 87, "User Compl."). Meta's motion is based on the supporting

5 Memorandum of Points and Authorities below.

6       Pursuant to Federal Rule of Civil Procedure 56, Meta requests that the Court grant Meta

7 summary judgment on all claims.

8           **MEMORANDUM OF POINTS AND AUTHORITIES**

9                **INTRODUCTION**

10       This case barely resembles the one Users initially brought. Originally, it was a tag-along

11 to the FTC's belated challenge to the acquisitions of Instagram and WhatsApp. But Judge Koh

12 granted Meta's motion to dismiss that claim on timeliness grounds and Users did not even attempt

13 to replead it. That left the backup theory that Meta allegedly deceived its way to a monopoly fifteen

14 years ago and then defeated a flawed Google+ by 2015 based on alleged "privacy" deceptions,

15 which include undelivered talking points and statements that people at Meta rejected making. More

16 implausibly, Users' theory espouses that absent the alleged deception, Meta would have paid users

17 per month in perpetuity. But no firm like Meta, in any market, has paid all its users as a competitive

18 response—ever. This case, in any of its forms, is legally infirm. The Court should grant summary

19 judgment for the following reasons.

20       ***First***, Users' submissions since the motion to dismiss have made clear that the "systemic,"

21 "uniform," and "decade-long campaign" of deception alleged to be anticompetitive began in 2006,

22 and supposedly resulted in Meta acquiring a monopoly by 2011. This suit was filed in December

23 2020. That is well outside the four-year statute of limitations of the antitrust laws. Users have

24 previously invoked the continuing violation doctrine, but that requires proving the deception

25 within the limitations period was more than a "reaffirmation" of earlier conduct and inflicted some

26 "new and accumulating injury." *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th

27 Cir. 1987). Here, Users and their experts claim the opposite—they say the alleged deception was

28 part of a single campaign that started in 2006, and offer no theory of "new and accumulating

**PUBLIC REDACTED VERSION**

injury" to users or competition after December 2016. Thus, accepting for purposes of summary judgment their own theory of the case, Users' claims are time-barred as a matter of law.

*Second*, Users' theory fails as a matter of law because deception "must have a significant and enduring adverse impact on competition itself in the relevant markets to rise to the level of an antitrust violation." *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997). But Users do not connect *any* of the statements or omissions they actually say were deceptive to *any* of the competitors they assert were harmed, and their putative privacy expert concedes that ███████████████████████████████ █████████████████ Ex. 1, Lamdan Tr. 77:21-78:7. Tellingly, while the entire premise of Users' case has been that Meta obtained monopoly power *by* defeating early competitors like Myspace *through* misrepresentations about data use and collection, Users' primary expert admits that "████████████████████████" and that ████████████████████████ ███████████████████████████████████" Ex. 2, Economides Merits Tr. 229:22-231:21; 240:3-10. Users have no explanation or evidence for why Facebook's success over Myspace was ███████████████ but that said competition somehow transformed itself later, after Facebook was already successful, into exclusionary conduct. Instead, Users' experts argue that Meta obtained a commanding position in the market and then, as a result, could not be overcome by its rivals. That theory is legally untenable by its own terms, because it means that Meta has not engaged in any anticompetitive conduct to obtain or maintain monopoly power.

*Third*, the undisputed record makes clear that Users cannot meet their burden of defining a relevant market. Facebook offers users all manner of entertainment without charge, from posting text updates to buying and selling goods to watching videos created by celebrities. As to each of these activities and experiences, Facebook faces intense competition for users' time and attention from services ranging from TikTok to X (Twitter) to YouTube to numerous messaging apps. Against this fundamental truth, Users rely on an expert witness on market definition who ████████ ███████████████████████████████████████████ Unusually, Users offer a *second* market definition expert who admits ████████████████████████████ ███████████████████████ yet says ████████████████████████████

**PUBLIC REDACTED VERSION**

1    ████████████████████████████████████████  Based on the opinions of

2    those experts, Users gerrymander a market around a subset of activities and experiences that

3    they—and only they—term "personal social networking services." But what constitutes "personal

4    social networking services" has never been clear, and Users' own experts cannot agree on what

5    features, activities, and experiences are in and out of the market. That is a fatal defect. Absent the

6    ability to discern what is or is not PSNS, Users cannot identify the relevant competition, much less

7    determine whether that competition effectively constrains Meta's conduct.

8        ***Finally***, Users lack antitrust standing as a matter of law because they cannot show that the

9    claimed failure to pay every user five dollars a month (the only claimed injury) was proximately

10   caused by the alleged deception (the challenged conduct). Their theory of injury relies on a long,

11   speculative chain of causation that starts with the baseless assumption that people choose online

12   platforms based on representations about data collection and use, reimagines vague statements

13   about "privacy" as critical to Facebook's popularity, and ends with the (again, baseless)

14   assumption that if Meta had faced stronger competition from some unknown firm, it would have

15   been forced to pay people five dollars a month to keep them on Facebook. The antitrust laws do

16   not recognize standing to assert injuries premised on such wildly attenuated causal relationships.

17   And they certainly do not do so when the "injury" and damages are the loss of imagined payments

18   for enjoying a free service.

19                                    **BACKGROUND**

20       Facebook's business model requires attracting both users and advertisers. On the user side,

21   Facebook accomplishes that goal by providing a variety of free features to its hundreds of millions

22   of users in the United States. The most popular platforms offer overlapping features that serve

23   similar "██████." Ex. 3, Farrell Rep. ¶¶25-30 & n.12. For example, videos from a variety of

24   sources are shared, posted, and viewed on Facebook, just as they can be (and are) shared, posted,

25   and viewed on X, YouTube, Snapchat, and TikTok. *Id.* So too for sharing with family and friends,

26   live streaming, disappearing content, and numerous other features. *Id.* Facebook must thus

27   constantly innovate and seek to offer a better user experience. Ex. 4, Farrell Tr. 115:19-25.

28   Facebook provides these services for free by selling advertising, which requires obtaining and

1    retaining advertisers in addition to attracting and retaining an engaged user base. *Id.* And

2    advertisers, like users, have numerous alternatives to Facebook.

3         Users assert that Meta misrepresented its data collection and use practices to monopolize a

4    market for "Personal Social Networks." Dkt. 745 ("Class Cert. Mot.") at 5-6. They define that

5    market to include aspects of Facebook, Instagram, Google+, Snapchat, and MeWe from 2016 to

6    2020, and to have previously included Myspace, Friendster, Bebo, and Orkut. Ex. 5, Economides

7    Merits Rep. ¶¶15, 69-83. Users exclude competitors like TikTok and YouTube from the market

8    by reference to a varying number of "█████████████" *id.* ¶28, and whether platforms

9    ███████████████████████████████████████████████" Ex. 3, Farrell

10   Rep. ¶138. Even Users' experts disagree about what activities users engage in on Facebook that

11   are PSNS, and have variously claimed that Facebook's most popular features (or certain uses of

12   those features) are inside or outside of the alleged market. Market definition expert Nicholas

13   Economides, for example, has claimed that ████████████████████ (Ex. 2,

14   Economides Merits Tr. 84:8-22) ██████ (Ex. 6, Economides CC Rep. ¶80) of the market, while

15   Users' other market definition expert Joseph Farrell claims ███████████████████

16   █████████████████████████ (Ex. 4, Farrell Tr. 15:2-3, 79:21-80:5).

17        Users and their experts know of no firm that pays its users for consuming content online.

18   Ex. 7, Economides CC Tr. 115:18-116:2 (Q. "[Y]ou can't think of any examples in the real world

19   where users are paid to consume content? A. I cannot think of an example right now."); Ex. 2,

20   Economides Merits Tr. 255:11-23 (████████████████████████████████████

21   ███████████████████████████████████████████████████████████

22   ███████████████████████████████████████████████████████████

23   ███████████████████████████████████████████████████████████

24   ███████████ ).[1] Users nevertheless assert that they suffered an antitrust injury because, absent the

25   claimed deception, Meta would pay every active user five dollars a month. Ex. 5, Economides

26   Merits Rep. ¶276.

27   _____

28   [1] Unless otherwise noted, "Ex." citations reference exhibits to the Gringer Declaration submitted
     herewith, emphasis is added, internal citations are omitted, and objections are omitted throughout.

**PUBLIC REDACTED VERSION**

## ARGUMENT

### I.   USERS' CLAIMS ARE TIME BARRED

Private lawsuits seeking damages under Section 2 of the Sherman Act are subject to a four-year statute of limitations. 15 U.S.C. § 15(b). The default rule is that such claims accrue "at the time of the alleged anticompetitive conduct." *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1065 (N.D. Cal. 2016) (citing *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1203-04 (9th Cir. 2014)). Users filed their complaint on December 3, 2020, challenging an "anticompetitive scheme" of deception "that originated many years ago," and supposedly resulted in Meta acquiring monopoly power no later than 2011. User Compl. ¶2; Ex. 6, Economides CC Rep. ¶30; Ex. 5, Economides Merits Rep. ¶73. Such claims straightforwardly fall outside the statute of limitations.

Although Users have previously asserted that the continuing violation doctrine tolls the limitations period, that cannot salvage their belated claims. Users must show a timely "overt act"—something new and distinct within the limitations period that caused a "new and accumulating injury." *Samsung*, 747 F.3d at 1202 (quoting *Pace Indus.*, 813 F.2d at 238). Users do nothing of the sort; instead *they argue* that the claimed harm and alleged scheme started before December 3, 2016 and was no different after that date. Beyond that, a continuing violation—as the name suggests—requires "a continuing injury to competition" during the limitations period. *Electroglas, Inc. v. Dynatex Corp.*, 497 F. Supp. 97, 105 (N.D. Cal. 1980). But Users have disclaimed offering evidence of "████████████████" or analysis in their expert reports of any "████ ██████████████████████████████" within the limitations period, and instead "████████ ████████ without regard to when the alleged deception occurred. Ex. 2, Economides Merits Tr. 181:11-16. A claim based on conduct that Users themselves argue started before the limitations period, continued without change during it, and caused them no new harm after December 2016 is untimely as a matter of law.

#### A.   Users' Claims Accrued Outside The Limitations Period

Users' monopoly acquisition theory turns on conduct occurring long before December 3, 2016. They argue that ████████████████████████████████████████ ██████████████████████████████" Ex. 6, Economides CC Rep. ¶323; Ex. 5,

**PUBLIC REDACTED VERSION**

Economides Merits Rep. ¶73 ███████████████████████████████████

████████████████████████████████████). Any anticompetitive conduct giving rise to the alleged acquisition of monopoly power in 2011 necessarily occurred before the limitations period began in 2016.

Users' monopoly maintenance theory also relies on conduct before December 2016. They assert that Meta engaged in a "uniform and prolonged deception regarding its data collection and use practices" that began in 2006. Class Cert. Mot. at 1; *id.* at 5-6 (describing "a public" and "constant campaign" "[s]ince [Facebook's] inception"); Ex. 5, Economides Merits Rep., App'x C ████████████████████████████████████████████████; *see also id.* ¶9 ("████████████████ ████████).

So, as in other cases involving untimely claims based on Facebook's early success, Users "acknowledge that the initial events giving rise to these claims occurred more than four years" before the filing of the complaint. *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 991 (N.D. Cal. 2020) (dismissing claims premised on anticompetitive conduct beginning before 2015 as untimely); *see also New York v. Meta Platforms, Inc.*, 66 F.4th 288, 295 (D.C. Cir. 2023) (affirming dismissal under analogous laches standard of "old" claims premised on acquisition of monopoly power between 2012 and 2014). That necessarily renders their claims untimely under the default rule. *Garrison*, 159 F. Supp. 3d at 1065.

**B.     Users Cannot Establish A Continuing Violation As A Matter Of Law**

Because Users' claims accrued more than four years before the filing of their complaint, Users attempt to invoke the continuing violation doctrine to toll the statute of limitations. Class Cert. Mot. at 3. That requires Users to show that Meta "completed an overt act during the limitations period that meets two criteria: '1) It must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) it must inflict new and accumulating injury on the plaintiff.'" *Samsung*, 747 F.3d at 1202 (quoting *Pace Indus.*, 813 F.2d at 238). "The party seeking relief under the doctrine bears the burden of satisfying these elements." *Hawthorne Hangar Operations, L.P. v. Hawthorne Airport, LLC*, 2022 WL 3102452, at *2 (9th Cir. Aug. 4, 2022).

1  Users cannot do so.

2      *First*, as a legal matter, the continuing violation doctrine has no application to monopoly

3  acquisition when the conduct giving rise to the acquisition occurred entirely before the limitations

4  period. Users must at a minimum identify an "overt act that is part of the violation" after December

5  3, 2016. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997). Here, Users do not identify an overt

6  act relating to the alleged *acquisition* of monopoly power after that date. Indeed, the predicate

7  conduct necessarily occurred no later than 2011. *Supra*, at 5-6. These circumstances are no

8  different from an antitrust suit challenging a merger. In such cases, the continuing violation

9  doctrine is inapposite because a "company has already obtained the monopoly" before the

10  limitations period starts. *See Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 599 (6th Cir. 2014);

11  *Reveal Chat*, 471 F. Supp. 3d at 994 ("The continuing violation doctrine does not make sense in

12  the context of anticompetitive mergers."). "Once [monopoly acquisition] is completed, the plan to

13  [acquire monopoly power] is completed, and no overt acts can be undertaken to further that plan."

14  *Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 271 (8th Cir. 2004). Any other rule

15  would leave the statute of limitations "written out of the law" and allow the acquisition of a

16  monopoly "to be challenged indefinitely" so long as the firm possessing monopoly power took

17  some further action. *Complete Entm't Res. LLC v. Live Nation Entm't, Inc.*, 2016 WL 3457177, at

18  *1 (C.D. Cal. May 11, 2016).

19      *Second*, the continuing violation doctrine cannot resuscitate a monopoly maintenance

20  theory premised on a supposedly "uniform and prolonged deception" that Users assert began in

21  2006. Class Cert. Mot at 1. Even if Users were ultimately able to show that Meta took every alleged

22  action, the law requires Users to show "a new and independent act that is not merely a reaffirmation

23  of a previous act" and that this post-2016 act caused a "new and accumulating injury." *Pace Indus.*,

24  813 F.2d at 238. The asserted overt act must "differ from what [Meta] is alleged to have done

25  starting in [2006]," *SaurikIT, LLC v. Apple Inc.*, 2022 WL 1768845, at *2 (N.D. Cal. May 26,

26  2022), personally harm Users, and itself be actionably anticompetitive, *Pace Indus.*, 813 F.2d at

27  238-39. Because Users identify *no* new harm to themselves or competition within the limitations

28  period, assert that the in-period conduct *is* a reaffirmation of prior acts, and argue that it *does not*

**PUBLIC REDACTED VERSION**

differ from what occurred before 2016, the Court should grant summary judgment on their monopoly maintenance theory.

Users first fail to identify any new personal injury during the limitations period. Their *only* claimed harm in this case is Meta's failure to pay all users five dollars a month starting on December 3, 2016. Ex. 5, Economides Merits Rep. ¶356. But Users have identified nothing about December 2016, much less December 3 specifically, that would have suddenly led Meta to begin making payments in their but-for world. There is not any claimed misrepresentation ███████ ██████████, *id.* App'x C, or any exit of a would-be competitor tied to the supposed onset of payments. And if the payments actually began before December 2016, as Economides has also suggested, their continuation could not constitute a "new" injury. *See id.* ¶210 ████████ ██████████████████████; Ex. 7, Economides CC Tr. 119:13-20 ("Q. [W]hen would Facebook have begun paying all its users $5 per month per year? A. Well, in the beginning of the—of the but-for world, whenever that was. Q. And—but you don't know when that was? A. Well, I have already testified that it was definitely before 2016."). Thus, at best, the "injury" suffered by Users during the limitations period would have been the same injury suffered before the limitations period, precluding invocation of the continuing violation doctrine.

Moreover, Users cannot show an overt act within the limitations period that itself "violate[s] antitrust laws." *Pace Indus.*, 813 F.2d at 239. An overt act must cause "continuing antitrust harm, i.e., a continuing injury *to competition*, not merely a continuing pecuniary injury to a plaintiff." *Electroglas, Inc.*, 497 F. Supp. at 105; *Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184, 1190 (9th Cir. 1984) ("[F]or the cause of action to reaccrue Airweld was required to show Airco committed acts which not only caused it injury but also caused antitrust injury during the limitations period."). Users have not alleged, however, that the failure to pay them itself injured competition. Nor could they, given that "the mere charging of monopoly prices is not unlawful" and cannot constitute an overt act. *Crowder v. LinkedIn Corp.*, 2023 WL 2405335, at *2-3 (N.D. Cal. Mar. 8, 2023) (collecting cases); *accord Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 2010 WL 3521979, at *16 (E.D. Cal. Sept. 3, 2010) ("The acts of purchasing the defendants' products over 22 years is not a 'continuing act' for purposes of restarting the statute of limitations"

because it is "'merely an affirmation of defendants' prior conduct and does not inflict a 'new and accumulating injury' on plaintiff").

Users must instead rely on the claim that the alleged deception harmed competition after December 2016. But they have failed to connect any of the claimed misrepresentations or omissions to the fortunes of Meta's competitors at any time, to say nothing of the failures of rivals occurring within the limitations period. Economides testified that he " ███████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████ " Ex. 2, Economides Merits Tr. 254:7-17; *id.* (" ████████ ████████████████████████████████████████████ "); *see also infra*, at 13. But proof of some distinct in-period harm is required to show a continuing violation, and Economides's concession that he ████████████ renders Users' claims untimely. *Duarte v. Quality Loan Serv. Corp.*, 2018 WL 2121800, at *8 (C.D. Cal. May 8, 2018) ("The continuing violation doctrine is inapplicable when, as here, the actions falling within the period of limitations are not themselves violations."). And even if Users *had* shown some actionable and timely harm to competition (they have not), it would still not save their claims because they have not and cannot identify any connection between the alleged deception and Meta's failure to pay all of its users five dollars. *Infra*, at 21-23; *see also Samsung*, 747 F.3d at 1202 (overt act "must inflict new and accumulating injury *on the plaintiff*"(quoting *Pace Indus.*, 813 F.2d at 238)).

Users have also affirmatively disclaimed the kind of new or different conduct that could constitute a distinct overt act, instead asserting that "[s]ince its inception," Meta engaged in a "uniform," "prolonged," and "systemic set of deceptions" as part of "a public campaign of promising users control, safety, and security of their data." Class Cert. Mot. at 1, 5. According to users, that "campaign" was "constant," and all of the alleged deception was "tethered" to a "common" "message of data control, safety, and security." *Id.* at 6. Indeed, Users have objected to any attempt to separate out the component parts of the allegedly anticompetitive scheme, stating that liability cannot be " ███████████████████████ " Ex. 8, Second Supp. Resps. & Objs. to Meta's Interrogatories Nos. 6, 7, and 8 (Jan. 18, 2023); Ex. 9, Resps. & Objs. to Meta's Fourth Set of Interrogatories (Mar. 24, 2023) (describing the deception as consisting of "substantially similar

1  practices" and refusing "to identify every permutation or every instance of [them]"). Consistent

2  with this, Economides offered only an opinion " ███████████████████████████████

3  ███████████████████████████████████████████████ " testifying that ███████████████

4  ████ " Ex. 2, Economides Merits Tr. 181:4-16.

5        Even when Users have made some attempt at identifying specific statements after

6  December 2016, they only confirm the unified nature of the alleged deception. Users claim, for

7  example, that ███████████████████████████████████████████████████████████████

8  █████████████████████████████████████████████████████████████████████████████

9  █████████████████████████████████████████████████████████████████████████████

10  ██████████████ Ex. 5, Economides Merits Rep. App'x C. The actual statement quoted and

11  alleged to be anticompetitively deceptive is that ███████████████████████████████

12  ████████████████████████████████████████ do not constitute antitrust violations under

13  any circumstances, but even if they could, such statements are exactly what Users claim have been

14  deceptive since 2006. *Id.* ███████████████████████████

15  ███████████████████████████████████████████ Other alleged misrepresentations

16  are likewise mere echoes of earlier statements. *Compare id.* ( ████████████████████

17  █████████████████████████████████████████████████████████████████████████████

18  █████████████████████████████████████████████████████████████████████████████

19  █████████████████████████████████████████████████████████████████████ ), *with id.*

20  ( █████████████████████████████████████████████████████████████████████████████

21  ████████████████████████████████████████ ). Whether such statements are true

22  or false, they indisputably concern the same subject—as even Users admit. *Id.* ( ████████

23  █████████████████████████████████████████████████████████████████████████████

24  ████████████████████ ).

25        Because Users allege that Meta made additional statements about data use and collection

26  after 2016 that *continued* a uniform campaign, the challenged acts only "reaffirm[]" those earlier

27  acts under Users' own theory. *Bay Area Surgical Mgmt., LLC v. Aetna Life Ins. Co.*, 166 F. Supp.

28  3d 988, 999 (N.D. Cal. 2015) (engaging in a "continu[ing] stream of communications" does not

represent "new or independent action" as required to demonstrate a continuing violation); *see also Chang v. Farmers Ins. Co., Inc.*, 2023 WL 5163288, at *3 (C.D. Cal. July 12, 2023) (misrepresentations about past conduct were "mere reaffirmations" of the original deceptions insufficient to show continuing violation of RICO statute). Accordingly, even taking their deception theory at face value, Users necessarily fail to establish how Meta's conduct has changed after December 2016, *SaurikIT*, 2022 WL 1768845, at *3, and summary judgment is required.

## II. USERS' OWN ALLEGATIONS AND THEIR EXPERTS' ADMISSIONS ESTABLISH THAT THE ALLEGED DECEPTION DID NOT HARM COMPETITION

Users' theory of harm to competition turns on the notion that beginning in 2006, Facebook's alleged misrepresentations and omissions about its "data practices" convinced "*enough* users" to join and remain active on Facebook rather than its competitors. Class Cert. Mot. at 21 (emphasis in original). Attributing an anticompetitive effect to deception, however, is strongly disfavored. *See, e.g.*, *Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 400 (7th Cir. 1989) (when statements are "false or misleading or incomplete or just plain mistaken, the remedy is not antitrust litigation but more speech—the marketplace of ideas"); *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 895 (5th Cir. 2016) (collecting cases and observing that "false advertising alone hardly ever operates in practice to threaten competition"). So the Ninth Circuit permits such suits only in rare circumstances, and presumes that the effect of misrepresentations or omissions on competition is "de minimis." *Am. Pro. Testing Serv.*, 108 F.3d at 1152; *id.* (observing that deception claims "should presumptively be ignored"). Here, Users have presented nothing to overcome that presumption. Users do not even attempt to demonstrate that "enough users" responded to specific misrepresentations and omissions by remaining active on Facebook—Users cannot even show that ███████████████ *See, e.g.*, Ex. 10, Grabert Tr. 108:6-108:14 (██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████); Ex. 11, Klein Tr. 83:21-84:25 (████).

In any event, "a plaintiff that has discharged the de minimis presumption is not automatically entitled to its own presumption of significant market effect." *TYR Sport, Inc. v.*

**PUBLIC REDACTED VERSION**

1   *Warnaco Swimwear, Inc.*, 709 F. Supp. 2d 821, 833 (C.D. Cal. 2010). Users must *still* prove that

2   the claimed deception had "a significant and enduring adverse impact on competition itself in the

3   relevant markets to rise to the level of an antitrust violation." *Id.* at 832 (quoting *Am. Pro. Testing*

4   *Serv.*, 108 F.3d at 1152); Areeda & Hovenkamp, *Antitrust Law* ¶651h (2023) (plaintiff must

5   demonstrate deception had "the effect of significantly impairing the ability of rivals to compete").

6   They cannot. As to the acquisition of monopoly power, Economides now concedes that ▮▮▮▮▮▮▮

7   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 2, Economides Merits Tr. 231:4-21. As to

8   the maintenance of monopoly power, neither he nor Users' "privacy" expert can explain how

9   Facebook's continued success had anything to do with the alleged deception, and both now admit

10  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*; Ex. 1, Lamdan Tr. 79:3-14. Thus, whatever Users

12  will be able to prove regarding the alleged deception, there is no evidence of a cognizable effect

13  on competition, and there can be none, because Users' experts have disclaimed its existence. That

14  defect requires summary judgment. *See TYR Sport, Inc.*, 709 F. Supp. 2d at 838 (granting summary

15  judgment when plaintiff "ha[d] not provided evidence from which a reasonable jury could infer a

16  'significant and enduring adverse impact on competition'").

17       Starting with monopoly acquisition, Users' theory is that Facebook's privacy and data

18  promises were critical to the defeat of early competitors like Myspace. Class Cert. Mot. 14. But

19  their conduct expert, Economides, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20-26 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27  Ex. 2, Economides Merits Tr. 240:3-15; *see also* Ex. 7, Economides CC Tr. 96:10-18 ("I would

28  say that at the early stage, the privacy settings of Facebook, despite their problems, were better

**PUBLIC REDACTED VERSION**

than the alternative, the alternative being Myspace."). He then admitted ███████████████

████████████████████████████████████████████████████████████████████ Ex.

2, Economides Merits Tr. 229:22-231:3 (█████████████████████████████████████

███████████████). So despite this entire lawsuit being premised on Facebook having "gained

its monopoly by promising users the best data collection, use, security, and privacy practices,"

Class Cert. Mot. at 1, Users' own expert now admits none of that is true. █████████████████

████████████████████████████████ Ex. 2, Economides Merits Tr. 231:4-21. Success

on the merits is not anticompetitive and is not a violation of Section 2. *FTC v. Qualcomm Inc.*, 969

F.3d 974, 990 (9th Cir. 2020) ("To safeguard the incentive to innovate, the possession of monopoly

power will not be found unlawful [under § 2] unless it is accompanied by an element of

anticompetitive conduct." (alteration in original)).

Users' monopoly maintenance theory fares no better. They claim that Meta maintained

monopoly power by engaging in a "uniform and prolonged deception" to attract users that began

in 2006 and cannot be "█████████████████████████" Class Cert. Mot. at 1; Ex. 8, Second

Supp. Resps. & Objs. To Rogs 6, 7, 8; *supra*, at 9-10. But Users offer nothing tying the alleged

maintenance of monopoly power to *any* misrepresentations, much less evidence or analysis to

explain how deception had a "significant and enduring adverse impact on competition."

Economides, notably, has not "████████████████████████████████████████████████

██████ as would be necessary to show that any particular deception affected any particular

competitor. Ex. 2, Economides Merits Tr. 254:7-17; *id.* ("████████████████████████████

██████████████████████). His approach to Google+ is illustrative—he could not █████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████ *Id.*

244:5-19; *id.* 246:12-247:5. Instead, he testified that ██████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████ *Id.* 244:5-19. And asked whether ██████████████████████████████

████████████████████████████████████████████████████████████████████████████████

**PUBLIC REDACTED VERSION**

1    ██████████████████ Economides admitted "I████████████████████████████████████

2    ██████████████████" *Id.* 249:3-10. The same defects infect Economides's analysis of the only

3    other later "competitor" Users identify, MeWe. He again concedes that ████████████████

4    ████████████████████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████████████████████

6    ██████" *Id.* 233:3-234:2; 235:15-236:3; *see also* EJ Dickson, *Inside MeWe, Where Anti-Vaxxers*

7    *and Conspiracy Theorists Thrive*, ROLLING STONE (May 23, 2019). There is no basis to conclude

8    that MeWe's lack of success had anything to do with Facebook's statements about privacy, as

9    opposed to the countless other reasons that can explain its lack of success; ranging from product

10   quality, to lack of name recognition, to its charging of a monthly fee in a market where the

11   competition was free.

12         Unable to connect the alleged deception to any harm to competition, Economides instead

13   argues that "██████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████████████████" Ex.

15   2, Economides Merits Tr. 250:3-25. Even setting aside the unexplained inconsistency of this

16   theory—admitting that ██████████████████████████████████████████████ then

17   claiming without evidence that the deception nevertheless contributed to a monopoly—this would

18   not save Users' claim. Economides asserts that "████████████████████████████████████

19   ████████████████████████████████████████████████████████████████████████████

20   ██████████████████████████████" *Id.* 248:16-249:1. But, again, according to Economides

21   himself, ████████████████████████████████████████████████████████████████████

22   ████████████████████████████████████ *Supra*, at 12. So to the extent he now claims ████████████

23   ████████████████████████████████████████████████████ it would not violate

24   the antitrust laws.

25         Users' putative "privacy" expert Sarah Lamdan confirmed that ████████████████████

26   ████████████████████████████████████████████ Lamdan testified ████████████████

27   ████████████████████████████████████████████████████████████████████████████

28   ████████████████" Ex. 1, Lamdan Tr. 77:21-78:7. When asked whether ████████████████

**PUBLIC REDACTED VERSION**

1  ██████████████████████████████████████████████████████ she

2  admitted that ███████████████████████████████

3  ████████████████████████████████████████████

4  ████████████████████████████████████████████

5  ████████████████████████████████████████████

6  ████████████████████████████████████████████

7  ██████████████████

8  *Id.* 78:9-79:1. She then went further, and asserted that ███████████████

9  ██████████████████████████████ Questioned whether ██████████

10  ██████████████████████████████████

11  ████████████████████████████████████████████

12  ████████████████████████████████████████████

13  ██████████████████

14  *Id.* 79:3-14.

The failure to connect the alleged deception to any harm to competition or anticompetitive effect decides this case. Users bear the burden of presenting evidence that deception "harm[ed] consumers" for that conduct "to be condemned as exclusionary." *United States v. Microsoft*, 253 F.3d 34, 58-59 (D.C. Cir. 2001); *id.* ("[T]he plaintiff, on whom the burden of proof of course rests, must demonstrate that the monopolist's conduct indeed has the requisite anticompetitive effect."); *accord Rambus Inc. v. FTC*, 522 F.3d 456, 463 (D.C. Cir. 2008) ("It is settled law that the mere existence of a monopoly does not violate the Sherman Act."). They cannot. None of Users' experts even attempts to argue that users stayed on Facebook because of any deceptive statement, and there is nothing in the record that would support such a conclusion. In fact, as noted, one testified that ███████████████████████████ Ex. 1, Lamdan Tr. 79:3-14.

## III.   USERS HAVE NOT ADEQUATELY DEFINED A MARKET AS A MATTER OF LAW

Users' claims separately fail because they have not defined a legally cognizable market. A Section 2 plaintiff bears the burden of proving "the defendant has monopoly power in the relevant market." *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 954 (9th Cir. 2023). Although

**PUBLIC REDACTED VERSION**

defining a market often involves questions of fact—and a number of other factual issues would be raised at any trial—"[a] threshold step in any antitrust case is to *accurately* define the relevant market." *Qualcomm Inc.*, 969 F.3d at 992. This inquiry requires an assessment of reasonable interchangeability, and "*all* products reasonably interchangeable by consumers" must be included in the candidate market. *See Microsoft*, 253 F.3d at 52. When "[o]ne cannot discern what is included and what is not," the market thus fails as a matter of law. *Coronavirus Rep. v. Apple Inc.*, 2021 WL 5936910, at *8 (N.D. Cal. Nov. 30, 2021) (granting motion to dismiss); *accord Truck-Rail Handling Inc. v. BNSF Ry. Co.*, 2005 WL 8178364, at *6 (N.D. Cal. Mar. 8, 2005) (when "Plaintiffs' evidence 'cannot sustain a jury verdict on the issue of market definition,'" the Ninth Circuit has held that "'summary judgment is appropriate.'" (quoting *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995))). That is precisely the case here and summary judgment is warranted.

To begin, Users' proposed market relies entirely on the inadmissible testimony of their purported experts. Meta's *Daubert* motions demonstrate that Economides and Farrell rejected any reliable measure of how people actually choose and use online platforms in favor of impermissible, subjective, and contradictory assessments of "███████████████████" Ex. 5, Economides Merits Rep. ¶28; Ex. 3, Farrell Rep. ¶138; *see also* Economides Daubert Mot. at 10-14; Farrell Daubert Mot. at 6-12. If the Court grants those motions, as it should, then Users have offered no evidence of a relevant market and their claims necessarily fail. *Coronavirus Rep.*, 85 F.4th at 957 ("Failing to define a relevant market alone is fatal to an antitrust claim.").

But even if Economides's and Farrell's opinions were admitted, summary judgment remains appropriate. Users assert that the relevant market includes different uses of certain features on Facebook, Instagram, Google+, Snapchat, and MeWe—for example, looking at certain posts in a feed that are from your friends about their personal lives—and previously included at least aspects of several platforms that were largely defunct by 2016 (Myspace, Friendster, Bebo, and Orkut). Ex. 5, Economides Merits Rep. ¶¶15, 69-83. At the same time, Users exclude from their market numerous other firms that compete for user time and attention and offer similar experiences and features, like TikTok, YouTube, Pinterest, X, and Reddit. *Id.* ¶¶101-23. Users cannot offer

**PUBLIC REDACTED VERSION**

1   any coherent explanation for this results-driven inconsistency because Users have offered no

2   discernable means to identify what constitutes "personal social networking services" and what

3   does not.

4        Indeed, "what is included and what is not" in the PSNS market has never been clear.

5   *Coronavirus Rep.*, 2021 WL 5936910, at *8. The operative complaint does not even claim Meta

6   monopolized that market, instead pleading two "distinct" markets for "Social Network" and

7   "Social Media" services. User Compl. ¶¶37, 260-73, 298-307. The defining feature of a "social

8   network" was allowing users to access a variety of features "as part of one, multi-function

9   product," as compared to social media applications, which "often facilitate the sharing of a distinct

10  form of content." *Id.* ¶37. Facebook was both, while Instagram was only the latter. *Id.* Users then

11  abandoned "Social Media" and revamped their "Social Network" market, contending in June 2023

12  that it included platforms like "Diaspora," "Flip.com," "Hi5," "SixDegrees," "Xanga," and, now,

13  Instagram. Ex. 12, Third Supp. Resps. & Objs. to Meta's Interrogatory No. 1 (June 23, 2023). By

14  class certification, "social networks" had become "personal social networks," defined by "▮▮▮▮

15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 6, Economides CC Rep. ¶23.

16  Users' experts explained that under this new rubric, Facebook offers both PSNS and non-PSNS

17  services, and that whether any individual feature is PSNS depends on how it is being used. For

18  example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶80. That distinction was both "▮▮▮▮▮

21  ▮▮▮" and absolutely essential to Users' market definition, because "▮▮▮▮▮▮▮▮▮▮▮

22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" *Id.* ¶¶82, 86.

25        Since class certification, the proposed market has become even more convoluted. Notably,

26  Users' own experts cannot even agree on what uses of Facebook or Instagram are PSNS.

27  Economides now appears to claim ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1 ████████████████████████████████████████

2 ████████████████████████████████████████

3 ████████████████████████████████████████

4 ████████████████████████████████████████

5 ████████████████████████████████████████

6

7 Ex. 2, Economides Merits Tr. 84:8-22. Farrell continues to ██████████████

8 ████████████████████████████████████████████████████████

9 ███████████████████████████████████████████████████████ " Ex. 4,

10 Farrell Tr. 28:5-29:6, 102:2-14; *id.* 23:9-22 ("█████████████████████████████

11 ████████████████████████████████████████████████████████

12 ████████████████). But he admits that ██████████████████████████████

13 ███████████████████████████ " *Id.* 30:16-31:16. And although he maintains

14 that "█████████████████████████ " *id.*, such differences are hard to parse:

15 ████████████████████████████████████████

16 ████████████████████████████████████████

17 ████████████████████████████████████████

18 ████████████████████████████████████████

19 ████████████████████████████████████████

20 ████████████████████████████████████████

21 ████████████████████████████

22 *Id.* 29:19-30:10. Based on Farrell's position, Facebook would not even be able to exercise any

23 monopoly power in a PSNS market because Facebook itself would have no way of knowing

24 whether a user was engaging in the use in which it had a monopoly, rather than some other use in

25 which it faced robust competition.

26     The net of this is that Users have "posited a number of different, and inconsistent, theories

27 as to the relevant market for antitrust analysis purposes" and that summary judgment must follow.

28

*Universal Avionics Sys. Corp. v. Rockwell Int'l Corp.*, 52 F. App'x 897, 899 (9th Cir. 2002) (affirming grant of summary judgment "for failure to adequately define a relevant market" on that ground). Without any consistent means of defining what is or is not PSNS, Users cannot demonstrate what is reasonably interchangeable with a PSNS use, much less who Meta's relevant competitors are. They thus cannot identify the required "field of competition: the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business." *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989). And that leaves no way of determining whether Meta has monopoly power in any relevant market. Ex. 6, Economides CC Rep. ¶82 ("███████████████████████████████████ ███████████████████████████████████████████████████). Summary judgment is appropriate on that basis alone.

But even considering Economides's and Farrell's competing definitions on their own terms leads to the same result. As to Farrell, a PSNS market that ████████████████████████ ██████████████████████████████████████████████████████ Ex. 4, Farrell Tr. 29:19-30:10. Using his definition, ██████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████ Such a definition is impossible to apply *within* a given service, much less across them, and provides no means for determining what users view as reasonable substitutes.

Economides's new "████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ Ex. 2, Economides Merits Tr. 84:8-22; *id.* 84:23-85:13 ████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████. But Users have no evidence that any person perceives or uses online services in this way, and Economides offers no explanation for why a "████████████████" determines why someone would use Facebook and not TikTok or YouTube to view the exact same

1  content. Indeed, despite apparently relying on █████████████████████

2  █████████████████████ Economides admits that █████████████████████

3  ████████████████████████████████████████████████████████████

4  ██████████████ *Id.* at 95:25-96:11 ("█████████████████████████

5  ████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████

7  █████████████████████████ "); *id.* 70:2-11 ("██████████████████

8  ████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████

11 ████████████████).

12       But even assuming Economides were right that ███████████████████

13 █████████████—and he is wrong, *see, e.g.*, Ex. 13, GOOG-META-01305868 at -80████

14 ████████████████████████████████)—he has identified at most a

15 competitive advantage that Facebook has over these platforms. And mere differentiation of

16 products does not mean that they reside in different markets. *Thurman Indus.*, 875 F.2d at 1376

17 (affirming summary judgment, stating evidence that different stores are "perceived as

18 distinguishable ... form[s] an inadequate basis for concluding that home centers and other retailers

19 lack the ability to attract substantial amounts of business away from each other"). Instead,

20 Economides must determine whether TikTok, YouTube, and Facebook are "reasonably

21 interchangeable by consumers" and thus acceptable substitutes. *Microsoft*, 253 F.3d at 52. He has

22 not, relying instead on his personal, layperson impressions of ████████████. Ex. 2,

23 Economides Merits Tr. 93:24-94:12; *see also Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1369

24 (Fed. Cir. 2002) (affirming summary judgment, rejecting "conclusory allegations" about market

25 definition made "without further supporting evidence").

26       Users must choose what market definition they wish to advance. But whether they seek to

27 rely on Farrell or Economides or both, it is not enough to claim, as both do, that there are vague

28 differences between services; "[m]ore is required" than "the mere notion that there is 'something

1  different' about the [in-market] products and all others." *United States v. Oracle Corp.*, 331 F.

2  Supp. 2d 1098, 1159 (N.D. Cal. 2004) (rejecting a candidate market that lacked any "quantitative

3  metric" to "determine the distinction" between what is in and out). The question is whether

4  consumers consider them acceptable substitutes notwithstanding such differences. *See, e.g.*, *Queen*

5  *City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997) (market defined by

6  willingness of consumers to substitute even if "there may be some degree of preference for the one

7  [product] over the other"). On that point, Users have offered nothing more than the conflicting

8  say-so of Economides and Farrell, and taken together or separately, no reliable way to assess

9  substitution and thus what is in the relevant market. This is not a factual dispute that a jury can or

10  should decide—it is a fundamental failure of Users' theory that leaves them without any viable

11  market definition and requires judgment as a matter of law.

12  **IV.   USERS CANNOT DEMONSTRATE ANTITRUST STANDING**

13  Users must demonstrate that their injury—Meta's supposed failure to pay all users of

14  Facebook five dollars per month—was proximately caused by the alleged deception. *Associated*

15  *Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535-37 (1983);

16  *see also Holmes v. SIPC*, 503 U.S. 258, 268 (1992) (antitrust plaintiff's "right to sue . . . require[s]

17  a showing that the defendant's violation not only was a 'but for' cause of his injury but was the

18  proximate cause as well"). While courts may analyze questions of antitrust standing by looking at

19  a series of "factors," the antitrust standing inquiry "remains, fundamentally, one into proximate

20  cause." *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 143 (2d Cir. 2021).

21  And when, as here, a theory of injury depends on speculation and "vaguely defined links" between

22  the harm asserted and the conduct alleged, courts dismiss the claim or grant summary judgment.

23  *See, e.g.*, *McCarthy v. Intercontinental Exch., Inc.*, 2022 WL 4227247, at *4 (N.D. Cal. Sept. 13,

24  2022) (Donato, J.) (granting motion to dismiss for lack of antitrust standing where "directness of

25  the injury" was "questionable"); *In re Online DVD Rental Antitrust Litig.*, 2011 WL 1629663, at

26  *9 (N.D. Cal. Apr. 29, 2011) (granting summary judgment when plaintiff failed "to satisfy the

27  most 'critical' of antitrust standing requirements here—directness of the injury"); *see also City of*

28  *Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 268 (3d Cir. 1998) (requiring a "direct link"

between conduct and injury).

Users' standing theory fails the proximate cause requirement. First, they cannot show that there is a "direct link" between the challenged statements and Meta not paying people to use the Facebook app. The directness of injury factor examines "the chain of causation" between plaintiffs' asserted harms and any anticompetitive conduct. *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 458 (9th Cir. 2021). The connection must be "close." *Yellow Pages Cost Consultants, Inc. v. GTE Directories Corp.*, 951 F.2d 1158, 1162 (9th Cir. 1991). The connection here is far too attenuated. Users' theory, even if credited in full, requires numerous additional inferences, including that Meta would have faced stronger competition had it not made the challenged statements, that stronger competition would have been in the form of a firm whose product was more appealing to consumers than Facebook absent payment, and if Meta had faced stronger competition, it would have responded by fundamentally changing its business model (and that of all firms like it) through paying all of its users five dollars a month to keep them using Facebook. Even if Users could prove all of these logical leaps—and they have provided evidence establishing none of them, *see supra*, at 8-15; *see also* Economides Daubert Mot. at 4-9—there are plainly too many steps to warrant recognizing their claim.

Notably, Users cannot say that the alleged deception caused enough people to remain active on Facebook that, in the absence of the deception, Meta would have had to start making payments to retain users. For such a theory to be remotely viable, Users would have to first show that absent the deception, there would have been better competitive alternatives in the alleged PSNS market—without such alternatives, Meta would have no need to pay to keep users. But there is no evidence in the record of competitors offering products that Users would have preferred to Facebook absent the alleged deception. *See, e.g.*, Ex. 2, Economides Merits Tr. 239:1-16 ("████████████ ████████████████████"). There is not even evidence that any competitors were competitively impacted by the alleged statements, whether or not they stood to gain absent the alleged deception. To the contrary, the firms Users identify as failed competitors or unsuccessful entrants themselves attribute their lack of success to ████████████████████ *See, e.g.*, Ex. 14, DeWolfe Tr. 87:10-15 ("████████████

1 [REDACTED]

2 [REDACTED]

3 [REDACTED] ; Ex. 15, Horowitz Tr. 129:7-17 [REDACTED]

4 [REDACTED]

5 [REDACTED] . And

6 Users have no evidence—or even argument—that it was Meta's representations about privacy,

7 rather than these other considerations, that prevented the competition they claim would have

8 caused Facebook to pay them five dollars.

9      Users also cannot explain why, even if the allegedly deceptive statements (many of which

10 are obscure or even internal) had an impact on competition, it would have led to Facebook paying

11 users. The record is clear how firms like Meta, and Meta itself, react to competition: by innovating

12 and introducing new features that users value. Ex. 4, Farrell Tr. 127:7-13 (" [REDACTED]

13 [REDACTED]

14 [REDACTED]

15 [REDACTED] "). The same is true in adjacent

16 industries—when NBC ran Seinfeld and ER on Thursday nights for example, CBS and ABC did

17 not pay people to watch their shows instead. Thus, Users offer nothing but speculation about

18 whether they would be injured at all. And "[o]nce it becomes clear…that damage measurement

19 will be unduly speculative, the courts generally dismiss the damage suit." Areeda ¶335c5; *see also*

20 *City of Oakland*, 20 F.4th at 450-51 (rejecting injuries "too speculative to confer antitrust

21 standing").

22      In addition to the indirectness of the injury and speculative nature of the damages, that the

23 alleged harm "may have been produced by independent factors" other than the alleged deception

24 weighs against Users' standing. *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1059

25 (9th Cir. 1999). As Users' experts themselves admit, [REDACTED]

26 [REDACTED] Ex. 2,

27 Economides Merits Tr. 255:11-23. For example, [REDACTED]

28 [REDACTED]

1 ███████████████████████ Ex. 4, Farrell Tr. 272:20-273:8 ("██████████████

2 ████████████████████████████████████████████████████████████████████

3 ██████") ; Ex. 3, Farrell Rep. ¶112 n.322 ("████████████████████████████

4 ████████████████████████████████████████████████████████") ; Ex. 5,

5 Economides Merits Rep. ¶303 ("███████████████████████████████████████

6 ████████████████████████████████████████████████████████████████████

7 █████████████████████████"). It is thus for good reason that no court has ever

8 allowed an antitrust plaintiff to proceed to trial under a theory that they were entitled to a negative

9 price. And this case is a particularly poor candidate to be first, given that Users offer no means to

10 discern the degree to which they were harmed by the use of a free platform.

11        Regardless, Users cannot show the requisite impact on competition. For one, Users' own

12 expert Lamdan argues that █████████████████████████████████████████████████

13 █████████████████████████ Ex. 1, Lamdan Tr. 77:21-79:1. Without showing that

14 users were likely to rely on the statements made by Facebook that are at issue, Users cannot show

15 that there would be any impact on competition. And without showing that the challenged

16 statements were the proximate cause of any loss of competition, Users necessarily cannot show

17 that the challenged statements are what caused their injury. *See In re Am. Express*, 19 F.4th at 139

18 n.7 ("the law 'does not attribute remote consequences to a defendant,' even if those consequences

19 are foreseeable" (quoting *S. Pac. Co. v. Darnell-Taenzer*, 245 U.S. 531, 533 (1918))).

20        At bottom, the Ninth Circuit's decision to affirm the grant of a motion to dismiss on

21 antitrust standing grounds in *City of Oakland* is on all fours and controlling. There, the court held

22 the plaintiff's theory of injury—harms suffered because of the Raiders' move from Oakland to Las

23 Vegas—relied on "too many speculative links in the chain of causation between Defendants'

24 alleged restrictions on output and the City's alleged injuries." *City of Oakland*, 20 F.4th at 459-60.

25 Oakland alleged that but for the NFL's conduct, which supposedly priced Oakland out of the

26 market for NFL teams, it would have kept the Raiders "or acquired another team." *Id.* The court

27 rejected that theory of injury as leaving too many causal questions unanswered, including "Would

28 new teams have joined the NFL?" "Would they have found Oakland attractive?" and "Would the

**PUBLIC REDACTED VERSION**

Raiders have left Oakland in any event?" *Id.* As discussed, substantial causal questions exist here too, Users do even less to provide answers, and are at a later stage of the case to boot. Thus, under Supreme Court and Ninth Circuit precedent, Users have failed to establish antitrust standing as a matter of law.

## V.   USERS' ATTEMPTED MONOPOLIZATION CLAIM AND ABANDONED REQUEST FOR INJUNCTIVE RELIEF FAIL FOR THE SAME REASONS

In addition to their acquisition and maintenance theories seeking monthly payments, Users argue that Meta attempted to monopolize the Personal Social Network market, and previously sought injunctive relief. Class Cert. Mot. 3; User Compl. Prayer for Relief. Their attempted monopolization claim is subject to the same statute of limitations, and also requires proof of harm to competition, a relevant market, and antitrust standing. *See Lloyd's Material Supply Co. v. Regal Beloit Corp.*, 2017 WL 5172206, at *4 (C.D. Cal. June 27, 2017) ("[C]laims for attempted monopolization ... are subject to a four-year statute of limitations"); *Rebel Oil Co.*, 51 F.3d at 1432-33 ("To establish a Sherman Act § 2 violation for attempted monopolization, a private plaintiff seeking damages must demonstrate ... anticompetitive conduct"); *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 2010 WL 3521979, at *29 n.14 (E.D. Cal. Sept. 3, 2010) ("In a monopolization claim or an attempted monopolization claim, relevant market is a necessary element."); *Reveal Chat*, 471 F. Supp. 3d at 996-98 (dismissing attempted monopolization claims for lack of antitrust standing). As to relief, Users have only sought to certify a damages class. Class Cert. Mot. at 1. Regardless, injunctive relief is barred by both laches and the substantive defects discussed above. *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014) (when "applying laches," courts "look to the same legal rules that animate the four-year statute of limitations"). Summary judgment is thus appropriate for the same reasons as on Users' primary theories.

## CONCLUSION

For these reasons, the court should grant summary judgment on all claims.

**PUBLIC REDACTED VERSION**

1

Dated: April 5, 2024

Respectfully submitted,

2

By: */s/ Sonal N. Mehta*

3

SONAL N. MEHTA (Bar No. 222086)
 Sonal.Mehta@wilmerhale.com

4

WILMER CUTLER PICKERING HALE AND
DORR LLP

5

2600 El Camino Real, Suite 400

6

Palo Alto, California 94306
Telephone: (650) 858-6000

7

8

DAVID Z. GRINGER (*pro hac vice*)
 David.Gringer@wilmerhale.com

9

ROSS E. FIRSENBAUM (*pro hac vice*)
 Ross.Firsenbaum@wilmerhale.com

10

RYAN CHABOT (*pro hac vice*)
 Ryan.Chabot@wilmerhale.com

11

PAUL VANDERSLICE (*pro hac vice*)
 Paul.Vanderslice@wilmerhale.com

12

WILMER CUTLER PICKERING HALE AND
DORR LLP

13

7 World Trade Center

14

250 Greenwich Street
New York, New York 10007

15

Telephone: (212) 230-8800

16

ARI HOLTZBLATT (*pro hac vice*)
 Ari.Holtzblatt@wilmerhale.com

17

MOLLY M. JENNINGS (*pro hac vice*)
 Molly.Jennings@wilmerhale.com

18

WILMER CUTLER PICKERING HALE AND
DORR LLP

19

2100 Pennsylvania Avenue NW

20

Washington, DC 20037
Telephone: (202) 663-6000

21

22

MICHAELA P. SEWALL (*pro hac vice*)
 Michaela.Sewall@wilmerhale.com

23

WILMER CUTLER PICKERING HALE AND
DORR LLP

24

60 State Street
Boston, MA 02109

25

Telephone: (617) 526-6000

26

27

*Attorneys for Defendant Meta Platforms, Inc.*

28

-26-    META'S MOTION FOR SUMMARY JUDGMENT
RE USERS' COMPLAINT

**PUBLIC REDACTED VERSION**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of April, 2024, I electronically transmitted the public redacted version of the foregoing document to the Clerk's Office using the CM/ECF System and caused the version of the foregoing document filed under seal to be transmitted to counsel of record by email.

By:  */s/ Sonal N. Mehta*
Sonal N. Mehta