**PUBLIC REDACTED VERSION**

WILMER CUTLER PICKERING
HALE AND DORR LLP
SONAL N. MEHTA (SBN 222086)
 Sonal.Mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
 David.Gringer@wilmerhale.com
ROSS E. FIRSENBAUM (*pro hac vice*)
 Ross.Firsenbaum@wilmerhale.com
RYAN CHABOT (*pro hac vice*)
 Ryan.Chabot@wilmerhale.com
PAUL VANDERSLICE (*pro hac vice*)
 Paul.Vanderslice@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800

ARI HOLTZBLATT (*pro hac vice*)
 Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
 Molly.Jennings@wilmerhale.com
2100 Pennsylvania Ave NW
Washington, DC 20037
Telephone: (202) 663-6000

MICHAELA P. SEWALL (*pro hac vice*)
 Michaela.Sewall@wilmerhale.com
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

*Attorneys for Defendant Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated, | Case No. 3:20-cv-08570-JD |
| Plaintiffs, | **DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY AND OPINIONS OF NICHOLAS ECONOMIDES** |
| v. | |
| META PLATFORMS, INC., a Delaware Corporation, | |
| Defendant. | Hearing Date: June 20, 2024 Time: 10:00 a.m. Judge: Hon. James Donato |

**PUBLIC REDACTED VERSION**

## TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ............................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ...............................................................1

INTRODUCTION ........................................................................................................................1

BACKGROUND ..........................................................................................................................2

ARGUMENT ................................................................................................................................4

I.     ECONOMIDES'S OPINIONS ON INJURY AND DAMAGES ARE INADMISSIBLE JUNK SCIENCE ..........4

     A.     Economides's Prediction That Meta Would Compensate Users For Their Data Is Junk Science – Not The Product of Reliable Principles And Methods ..................4

     B.     Economides's Calculation That Meta Would Have Paid Its Active Users $5 Per Month Is Junk Science And Does Not Reflect Reliable Principles And Methods .........................................................................................................................8

II.     ECONOMIDES'S ATTEMPT TO DEFINE A PSNS MARKET SHOULD BE EXCLUDED ...............9

     A.     Economides Uses No Accepted Method To Define His PSNS Market....................10

     B.     Economides's So-Called "Reverse" SSNIP/SSNDQ Test Is Unsound ...................12

III.     ECONOMIDES'S COMPETITIVE EFFECTS OPINION IS NOT RELIABLE ................................14

IV.     ECONOMIDES'S RECITATIONS OF RECORD EVIDENCE SHOULD BE EXCLUDED .................15

CONCLUSION ...........................................................................................................................15

**PUBLIC REDACTED VERSION**

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Adams v. A/S (In re Incretin-Based Therapies Prods. Liab. Litig.)*,
  2022 WL 898595 (9th Cir. Mar. 28, 2022)................................................................11

*Avila v. Willits Env't Remediation Tr.*,
  633 F.3d 828 (9th Cir. 2011) ......................................................................................10

*Carnegie Mellon Univ. v. Hoffman-LaRoche, Inc.*,
  55 F. Supp. 2d 1024 (N.D. Cal. 1999).........................................................................7

*Claar v. Burlington N. R.R. Co.*,
  29 F.3d 499 (9th Cir. 1994) ........................................................................................11

*Craftsmen Limousine Inc., v. Ford Motor Co.*,
  2005 WL 3263288 (W.D. Mo. Dec. 1, 2005)..............................................................15

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)...............................................................................................1, 14

*Domingo v. T.K.*,
  289 F.3d 600 (9th Cir. 2002) ......................................................................................12

*Epic Games, Inc. v. Apple Inc.*,
  559 F. Supp. 3d 898 (N.D. Cal. 2021), *rev'd on other grounds*, 67 F.4th 946
  (9th Cir. 2023)..............................................................................................................13

*Falcon v. State Farm Lloyds*,
  2014 WL 2711849 (W.D. Tex. June 16, 2014) ...........................................................10

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)...................................................................................................4, 7

*In re Google Play Antitrust Litig.*,
  2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) ..............................................................8

*Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
  588 F.3d 908 (6th Cir. 2009) ......................................................................................14

*In re Live Concert Antitrust Litig.*,
  863 F. Supp. 2d 966 (C.D. Cal. 2012) .....................................................................9, 12

*McGlinchy v. Shell Chem. Co.*,
  845 F.2d 802 (9th Cir. 1988) ........................................................................................5

*Muffett v. City of Yakima*,
  2012 WL 12827492 (E.D. Wash. July 20, 2012)..........................................................8

**PUBLIC REDACTED VERSION**

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
   20 F.4th 466 (9th Cir. 2021) ..................................................................................12, 13

*Persian Gulf Inc. v. BP W. Coast Prods. LLC*,
   632 F. Supp. 3d 1108 (S.D. Cal. 2022)................................................................................5

*Rodriguez v. Google LLC*,
   2024 WL 38302 (N.D. Cal. Jan. 3, 2024) ..........................................................................13

*Siqueiros v. Gen. Motors LLC*,
   2022 WL 74182 (N.D. Cal. Jan. 7, 2022) ...........................................................................15

*Sonneveldt v. Mazda Motor of Am., Inc.*,
   2023 WL 2292600 (C.D. Cal. Feb. 23, 2023)................................................................12, 14

*Sumotext Corp. v. Zoove, Inc.*,
   2020 WL 6544410 (N.D. Cal. Nov. 6, 2020) ......................................................................14

*Teradata Corp. v. SAP SE*,
   570 F. Supp. 3d 810 (N.D. Cal. 2021) ................................................................................14

*Tyr Sport, Inc. v. Warnaco Swimwear, Inc.*,
   709 F. Supp. 2d 821 (C.D. Cal. 2010) ................................................................................15

*UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*,
   949 F.3d 825 (3d Cir. 2020)...............................................................................................15

*United States v. Adams*,
   444 F. Supp. 3d 1248 (D. Or. 2020) ...................................................................................10

*United States v. Fuentes-Cariaga*,
   209 F.3d 1140 (9th Cir. 2000) ............................................................................................15

*Waymo LLC v. Uber Techs., Inc.*,
   2017 WL 5148390 (N.D. Cal. Nov. 6, 2017) ......................................................................15

**STATUTES, RULES, AND REGULATIONS**

Areeda & Hovenkamp, *Antitrust Law* (2023)...........................................................................8, 13

Fed. R. Evid. 702 ......................................................................................................................1

**PUBLIC REDACTED VERSION**

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on June 20, 2024, at 10:00 a.m., Defendant Meta Platforms, Inc. will move to exclude opinions of Dr. Nicholas Economides.

Pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), Meta requests that the Court exclude the Expert Report of Dr. Nicholas Economides in its entirety; Sections II.A-C, II.D.1-2, II.E, II.G, III.A.1-2.b, and III.B and Parts IV-VII of the Expert Rebuttal Report of Dr. Nicholas Economides; and any testimony drawn from those sections.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

No service that competes for user time and attention with its content has ever paid users for consuming or engaging with that content. No platform that is advertising-supported (newspaper, television, radio, magazine, or website) has paid users for accessing the platform and receiving ads. Despite these real-world facts, Users' putative expert, Nicholas Economides, opines that Meta would have paid all users of Facebook a flat fixed amount of $5 per month (for a total of $52.8 billion before trebling) but for securing an alleged monopoly through scattered statements over a twelve-year period about its data practices. Exs. 1-2.[1] Economides's opinions are textbook junk science and should be excluded.

Economides's central opinion is that users of the Facebook app would have been compensated "▮▮▮▮▮▮▮▮" in a but-for world where Meta faced more ▮▮▮▮ competition. After submitting hundreds of pages of reports in this case, Economides offers no support for this opinion. No regression analysis, no mathematical formula, and no reliable economic methodology. Instead, the only bases for Economides's opinion are ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and Meta's payment of participants in certain *market-research programs* that offer no independent value to their (few thousand) participants. He admits that these market-research programs are different in kind from Facebook, even in his but-for world, and that he can

---

[1] Unless otherwise noted, "Ex." citations reference exhibits to the Gringer Declaration filed herewith, emphasis is added, and objections are omitted for deposition citations.

1    identify no service that has ever paid users for consuming or engaging with content as he speculates

2    would happen in that but-for world.

3       Compounding these errors, Economides offers an opinion that Meta is a monopolist in a

4    contrived "Personal Social Network Market" based on his subjective (and shifting) "███████

5    ████████████████" He supports this supposed market with an unrecognizable hypothetical

6    monopolist test with no reliable evidence of a change in usage and no price increase at all. He then

7    attributes revenue earned in a separate *advertising* market he did not analyze to the *user* market on

8    which he opines. This opinion too must be excluded.

9       Economides's competitive effects opinions should also be excluded. Economides says that

10    Meta monopolized PSNS through an alleged campaign of misrepresentations for which he offers

11    no evidence of their effects. In addition to these unreliable opinions, Economides has professed

12    his intent to do what an expert plainly cannot: merely recite evidence into the record. These

13    opinions are unreliable *ipse dixit* and should be excluded.

14                           **BACKGROUND**

15       Nicholas Economides is not an expert in ad-supported platforms that compete for user

16    attention with engaging content, such as Facebook, Instagram, YouTube, TikTok, Snapchat,

17    Reddit, or Twitter/X. His unfamiliarity with these apps shows. He testified, "I use Facebook, but

18    I don't recall all the different features it has." Ex. 3 at 199:2-5. He "do[es] not use TikTok", *id.* at

19    200:4-7, but speculates that its "███████████████████████████████████████████████

20    ████████████████████████████████████████████████████████████████████" Ex. 4 at 47:6-

21    48:2. On YouTube, he speculates that "████████████████████████████" *Id.* at 47:6-48:2.

22    When asked about ████████████████████████████████████████████████████████████

23    ████████████████████████████████████████████████████████████████████████████

24    ████████████████████████████████████████████████ *Id.* at 41:6-18.

25       Perhaps recognizing his own lack of familiarity with the services at the heart of the alleged

26    market, Economides asserted, "I don't believe that I need to use all the services that are available

27    in Facebook and Instagram to be able to opine on the market." Ex. 3 at 199:6-19. That might be

28    true if Economides had employed an objective methodology to define the market, but that is not

**PUBLIC REDACTED VERSION**

1   what he did. Instead, he ███████████████████████████████████████████

2   ████████████████████████████████" Ex. 1, ¶28. At class certification, Economides

3   opined that there were five key PSNS characteristics. Ex. 3 at 202:24-205:10. Four months later,

4   in his merits report, he pivots to only ████ two of which appear to be new. Ex. 1, ¶28. When asked

5   about this change, Economides testified, "████████████████████████████." Ex. 4 at

6   58:16-59:1. When asked "████████████████████████████████████████████

7   he admitted he ████████████████████████████ *Id.* at 62:6-22. With no such record,

8   we are left with only Economides's conclusion that if you accept his say-so on the so-called "███

9   ██████████" during the class period, this PSNS market includes only Facebook, Instagram,

10  Snapchat, Google+, and MeWe. Ex. 1, ¶46.

11      Economides has never coherently explained which features of Meta's apps are in his PSNS

12  market. At times, he has stated that some of the activities on Facebook are not PSNS. *See, e.g.*, Ex.

13  3 at 231:11-18 ("[Facebook] does face competition ... from some other companies, but outside the

14  personal social network market."). At other times, he says that ████████████████████████

15  █████████████   That includes, for example, ████████████████████████████████

16  ████████████████████████████████████ *See* Ex. 4 at 76:14-77:9. Yet under

17  this theory, *every* feature of the firms he excluded, like TikTok and YouTube, is outside PSNS,

18  even if the same feature is PSNS on Facebook: for instance, if someone posts the same short-form

19  fishing video on Facebook, Instagram, TikTok, and YouTube, and then another person watches

20  that same video on all four platforms, "████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████████████

22  ███████████████████████████" *Id.* at 86:25-87:16. Put differently, it's PSNS when Facebook

23  does it and something else when another platform does.[2]

24  ────────────────

25  [2] For Users' other economic expert Joseph Farrell, some uses of Facebook are clearly outside the
    alleged PSNS market. Ex. 5 at 45:25-46:13 ███████████████████████████████████

26  ████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████).

**PUBLIC REDACTED VERSION**

To support his qualitative position, Economides purports to conduct a hypothetical monopolist test by way of a "reverse" SSNIP test, also characterized as a "small but significant decrease in quality" or SSNDQ. Ex. 1, ¶¶132-33, 156. He uses, not changes in the dollar price charged by firms in the PSNS market (they are all free), but ███████████████████████ █████████████████████████████████████████ He offers no economic analysis showing that users *responded* to this supposed change in price or quality.

Economides opines that Meta maintained a monopoly of this PSNS market due to allegedly deceptive statements and omissions, but he did not analyze the actual effect of any of them. Ex. 4 at 181:11-16 ("████████████████████████████████████████████ ███████████████████████████████████████████████████ █████████████████████████████████████"). He claims that ██████████████ ███████████████████████████████████████ and—rather than compete on content and features as in the real world when faced with real competition from TikTok and others—would have transformed its business model in a never-before-seen way and *paid* each of its ████████████████ $5 per month. Ex. 1, ¶292.

## ARGUMENT

## I.   ECONOMIDES'S OPINIONS ON INJURY AND DAMAGES ARE INADMISSIBLE JUNK SCIENCE

Economides's opinion that the putative class was injured to the tune of over $50 billion because Meta did not pay hundreds of millions of Facebook users each $5 per month to use its free service, and his methodology to get there, are largely identical to those offered in the class certification stage—and inadmissible for the same reasons. *See* Dkt. 651.

### A.   Economides's Prediction That Meta Would Compensate Users For Their Data Is Junk Science – Not The Product of Reliable Principles And Methods

Economides opines that "████████████████████████████████████████████ █████████████████████████████████████████████████████ █████████████████████" Ex. 1, §V.D. But opining on the but-for world is not a license to dream up a fantasy world. Courts thus exclude opinions where "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136,

**PUBLIC REDACTED VERSION**

146 (1997); *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807 (9th Cir. 1988) (affirming exclusion of opinion that "rests on unsupported assumptions" and "has scant basis in the record"); *Persian Gulf Inc. v. BP W. Coast Prods. LLC*, 632 F. Supp. 3d 1108, 1168 (S.D. Cal. 2022) (excluding opinion lacking "some logical relationship to the evidence in the case"). That is the case here.

Economides opines that "████████████████████████████████████████████████ ████████████" Ex. 1, ¶210. This claim ignores entry and market participation in his own alleged market. Facebook competes for user time and attention, as Economides concedes. Ex. 4 at 20:16-21:2 ("███████████████████████████████████████████████████████████ ██████████"). Facebook and similar platforms do this by providing services that users value, a fact that ██████████████████ and Economides recognize. *See* Ex. 6 at 294:23-295:5; Ex. 7 at 325:5-327:6; Ex. 8 at 53:13-21, 54:4-10, 109:20-110:3; Ex. 3 at 71:9-12. So when Snapchat began capturing attention with a Stories feature, Meta did not respond by offering users $5 per month to stick with Facebook or Instagram. It instead created its own version of Stories with new and engaging features. When TikTok emerged, Meta did not offer all users $5 per month to keep using Facebook. It created Reels (and Snap created Spotlights and YouTube created Shorts) to offer their users short-form video. And Snap and TikTok themselves did not compete *with Meta* by offering to pay users of their platforms. Like Meta, they competed by innovating. As Economides admits, ██████████████████████████████████████████████████████ Ex. 4, at 255:12-23 ("████████████████████████████████"). Many firms generate content and collect user data on ad conversions. None, including those in the putative PSNS market, pays users for so-called "████████████████████" Courts exclude opinions that lack a basis in reality, *see, e.g.*, *McGlinchy*, 845 F.2d at 807, and the Court should do so here.

With no real-world support for his conclusions, Economides falls back on evidence that he admits is not a fit. First, Economides relies on inapposite market research programs, including two that Meta has implemented: Study and Research. Unlike the Facebook and Instagram apps, these market research programs do not offer engaging content or provide functionality to allow users to communicate. Instead, they offer compensation to attract (quite limited) participation in market research that obtains "incremental" data that Meta did not otherwise access through the Facebook

**PUBLIC REDACTED VERSION**

or Instagram apps. Ex. 9, §X(D)(1). Economides admits that the data Meta collects from Study "is about the use of other apps, not Facebook apps," including what "other apps that users may have, what features they use, how much time they spend on them, the type of device they're using and so on." Ex. 3 at 159:1-11. Research collected similar incremental information. *Id.* at 159:22-160:5. It makes sense then—even to Economides—that Meta paid participants to provide this data, because Meta "by creating these programs, was trying to find extra data that might be useful to it" i.e., data it cannot obtain through Facebook or Instagram and in the research programs. Meta was not providing users with content that they value through market research programs. *Id.* at 160:15-23.

These programs, which do not provide value to users and have relatively few participants, say nothing about whether Meta would compensate *all* Facebook users. Each app Economides considered compensates people to participate in studies related to market research (▮▮▮▮▮▮▮). Ex. 1, ¶¶307-327. None of them are ad-supported businesses. None pay people to use a service—or offer them a service at all—or provide independent value such as entertainment or communication. Simply put, none are anything like Facebook, Instagram, or Snapchat. Moreover, these programs sought only select, limited, and representative panels of participants, and so were available to users by invitation only. *See* Exs. 10-11. Economides has acknowledged that he does "not believe these kind[s] of apps need a very large number of participants." Ex. 3 at 169:19-170:3. So even the market research programs he relies upon are fundamentally different from Economides's proposed but-for world in ways that preclude their use as reliable benchmarks.

Second, Economides considers and relies upon internal Meta proposals about compensating users that the company considered—and *rejected*. Ex. 1, §V(D)(2). As this Court has observed, "just because" Meta considered a proposal does not "mean[] it's in any way realistic." June 22, 2023 Hr'g Tr. 22:2-6. Further, the record is clear that whenever ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Ex. 12 at 52:9-23, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Ex. 13 at 270:4-272:11. Economides offers

nothing to explain why these proposals would suddenly make sense in the but-for-world. And even if Meta had adopted one of these "███████" proposals, Economides points to no record evidence showing that Meta would have paid *all* users a flat monthly rate. *See* Ex. 1, ¶¶237-245. For example, ████████████████████████████████████████████████████ ████████████████████████████████████████ *Id.* ¶238.

At this point, any sound economic analysis would conclude that Meta would not pay all its users in any realistic world. Economides, however, "███████████" that Meta would have done so. Ex. 3 at 102:14-20. Users' other main expert, Joseph Farrell, explains why Economides's theory makes little sense: paying a "negative price" would lead to people joining Facebook for the cash, not authentic engagement. *See* Ex. 14 at 679 ("At a negative price, people could take [products] at a negative price and use them for landfill."); Ex. 5 at 272:10-273:8 ("████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████"). Economides himself, before he started working on this case, wrote that "[u]sers vary widely on the value they place on privacy and in the value of their personal information to the platform. Therefore, in a competitive market for personal information, some users would participate, and others would not. Transaction prices would also vary and likely be individually negotiated between the platform and the user." Ex. 15 at 2. Between the cited record evidence and his opinion of universal flat payments lies an "analytical gap" that only grows wider under Users' experts' own words. *Joiner*, 522 U.S. at 146.

Altogether, Economides's foundational proposition that Meta would have paid every active Facebook user is classic junk science: a conclusion with no basis in the record or reality. This *ipse dixit* opinion divorced from real-world facts is precisely what the *Daubert* standard is designed to weed out. *See Carnegie Mellon Univ. v. Hoffman-LaRoche, Inc.*, 55 F. Supp. 2d 1024, 1034-35 (N.D. Cal. 1999) (excluding testimony of expert for "failing to address and exclude alternative explanations for the data," and "selectively examining only portions of the data"). His "wholly speculative assumptions ... make his opinions *ipse dixit* unsuitable for admission at trial" because

"there is simply too great an analytical gap between the data and the opinion offered." *In re Google Play Antitrust Litig.*, 2023 WL 5532128, *9-10 (N.D. Cal. Aug. 28, 2023).

**B.**    **Economides's Calculation That Meta Would Have Paid Its Active Users $5 Per Month Is Junk Science And Does Not Reflect Reliable Principles And Methods**

Economides arrives at the amount users would be paid—$5 per month, for every active user—in an equally unreliable way. This time, Economides uses what he calls a "yardstick" study. It is hornbook law that the "reliability of the yardstick approach is based on the comparability of that yardstick to the business (or proposed business) involved in the litigation," *Muffett v. City of Yakima*, 2012 WL 12827492, at *3 (E.D. Wash. July 20, 2012). If "important differences" are "beyond adjustment," then the yardstick approach "will have to be abandoned." Areeda & Hovenkamp, *Antitrust Law* ¶395b3 (2023). Economides fails this test too. To select yardsticks for the "market price of data" in the PSNS market, one would expect him to use comparator firms in his candidate market—Snapchat, Google+, MeWe, or others like TikTok or YouTube. He does not—because if he did, the price would be zero payment to all or most Facebook users.

Instead, Economides asked his staff "to look around for payment for data and find information, present it to me, and then myself, together with them, decided on these particular yardsticks." Ex. 3 at 166:17-22. Unsurprisingly, the external market research programs, just like Facebook Research and Study, that Economides's staff turned up bear no resemblance to Facebook, either in the nature of the value they provide to users or the data they collect. *See supra* §I.A; Ex. 1, ¶¶306-27. All are available only to limited, select participants—often by invitation only—and many then close once they reach certain quotas, since further participants' information would provide diminishing returns. *See, e.g.*, Ex. 16 ("The Amazon Shopper Panel is an opt-in, invitation-only program ... Space is limited."). They have at most thousands, not hundreds of millions, of participants. *See, e.g.*, Ex. 17 ("Screenwise Panel will consist of 2,500 participants[.]"); Ex. 18 ("AppOptix U.S. observes approximately 4,000 devices annually."). The information they collect, often about how people spend time on their devices across all apps, is much broader than the information Meta can collect on or off its apps. *See, e.g.*, Ex. 4 at 275:7-15

**PUBLIC REDACTED VERSION**

1 ("█████████████████████████████████████████████

2 ████████████████████████████████████"). These

3 programs offer no user experience or other use at all. They thus need to, and can afford to, pay

4 select participants.

5       In his merits report, Economides attempts to rehabilitate his methodological failings in two

6 ways: (1) █████████████████████████████████ and

7 (2) by naming, after the fact, putative "████████████████" Ex. 1, ¶¶299-305; 330.

8 Both only highlight his method's infirmities. Economides concedes ████████████████

9 █████████████████ Ex. 4 at 273:2-15, making it irrelevant and unhelpful to the jury. And

10 his retrofitted "████████████" do not demonstrate reliable scientific methods. The first is

11 "████████████████████," that is firms *not* comparable to Facebook, which of

12 course does offer engaging content and services to users. Ex. 1, ¶300. The subtext, of course, is

13 that those who do provide "████████████" do not need to—and do not—pay their users.

14       Having picked yardsticks using a comparability assessment designed to pick dissimilar

15 firms, Economides did nothing to adjust for those differences. He looks at market research

16 programs and derives from them ████████████████████ That is what he

17 says Meta would pay people to use Facebook, even though the yardsticks provide *no* ████████

18 ████████ and Facebook does. He did not adjust it for the admittedly different "███" those

19 programs and Facebook collect. Nor did he adjust it for the exponentially more Facebook users.

20 Or for the value Facebook users get from using the service. He did not make any adjustments to

21 account for these major differences at all. With "no basis for comparison" between Facebook and

22 these market-research programs, and without accounting for the "major factors" that could account

23 for the differences in price, his yardstick analysis is "so incomplete as to be inadmissible as

24 irrelevant." *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 974-76 (C.D. Cal. 2012).

25 **II.   ECONOMIDES'S ATTEMPT TO DEFINE A PSNS MARKET SHOULD BE EXCLUDED**

26       Neither of the means Economides uses to define his artificially narrow PSNS market

27 reflects a recognized or even remotely reliable methodology. He invented "████████████

28 ████████" of PSNS, but his entirely subjective methodology forecloses the possibility that

**PUBLIC REDACTED VERSION**

"someone else not associated with the case could duplicate it and get the same results." *United States v. Adams*, 444 F. Supp. 3d 1248, 1260 (D. Or. 2020). And Economides—who has limited familiarity with the candidate market participants—is not qualified to give this opinion. He then purported to perform a "reverse" SSNIP/SSNDQ test, but his method of deeming "███████ ███████" a proxy for price and quality is untested, unaccepted, and unreliable; he compounds this error by misapplying the methodology entirely, measuring changes in the market for *ad revenue*, not in his candidate market for PSNS users.

### A.    Economides Uses No Accepted Method To Define His PSNS Market

Economides's first method for defining his PSNS is subjective and shifting, untested and untestable. At the outset, Economides is not qualified to identify "███████████████████████" Whatever his economics expertise, he has no technical or other expertise in mobile apps. Indeed, Economides testified he could not recall all the different features of Facebook, had not used Snapchat extensively and not in months, had not used TikTok at all, and could not identify which app had which features. Ex. 3 at 198:13-200:7. Economides baselessly testified these platforms "███████████████████████████████████████████████████ ███████████████████████████████████" Ex. 4 at 45:11-46:4, 47:11-48:2, 49:14-50:5. And shockingly, he testified ███████████████████████████████████████ *Id.* at 39:12-24. His uninformed, inexpert opinions about "███████" app features should be excluded. *See Avila v. Willits Env't Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011) (excluding opinion "outside the areas of [expert's] expertise").

His inexperience shows in the unreliable and unreproducible method he used to arrive at these characteristics. When asked how someone would replicate his method, he testified, "You would look at the candidate social networks. You would look at the common features they have. And then you would expand the set and see, well, here is TikTok. Is it—what features does it have? And should we put it in the personal social networks or not? This is kind of simple. We're not talking about rocket science here." Ex. 3 at 205:11-23. This "eyeballing" of candidate apps, with "no documentation of his methods," "preclude[s] any assessment of the accuracy of his conclusions." *Falcon v. State Farm Lloyds*, 2014 WL 2711849, at *67 (W.D. Tex. June 16, 2014).

**PUBLIC REDACTED VERSION**

This unreliable process unsurprisingly yielded inconsistent, unreliable results. Economides opined at class certification that PSNS had five key characteristics—of which "[t]here is no doubt—and we can ask practically any employee of Facebook—that they would say these are key features of Facebook." Ex. 3 at 202:24-203:12. He cited no record evidence in support. Just four months later, in his merits report, ██████████████ have changed, and now ████████ ████ When asked how this change came about, Economides testified, "████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████" Ex. 4 at 58:16-59:1. This fails "*Daubert's* testability factor," which requires "that someone else using the same data and methods ... be able to replicate the results.'" *Adams v. A/S (In re Incretin-Based Therapies Prods. Liab. Litig.)*, 2022 WL 898595 (9th Cir. Mar. 28, 2022). The Court thus has no way to ensure Economides's "conclusions were not mere subjective beliefs or unsupported speculation." *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994).

Economides then failed to reliably apply his self-defined criteria to candidate firms. Take ████████████████████████████████████████████ He testified this was a ████████ ████████████████████████████████████████████████████████. Ex. 4 at 91:13-24. But he nowhere identifies the ████████████████████████ under his own standard. *Id.* at 88:19-91:24. And did he analyze whether, say, TikTok had a ████████████ ██████████████ He did not—he ████████████████████████ █████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ *Id.* at 95:25-96:11.

His other ██████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████ But he did not ████████████████████████████████. He did not ████████████████████████████████████████████████████████████████████ ████████████████████ *See id.* at 51:18-53:9; 70:2-23. Neither did he ████████████████

1     █████ *See id.* at 53:10-54:13; 68:22-69:25. Yet Facebook and Instagram went into the market,

2 YouTube and TikTok went out. Thus, Economides "impermissibly predetermined" the results by

3 putting firms in the market until he liked what he saw. *In re Live Concert Antitrust Litig.*, 863 F.

4 Supp. 2d at 988. His market definition based on these supposed "█████████" therefore "is

5 hypothetical and without confirmation through either testing or real-world data," and it therefore

6 "lacks the basis in 'objective, verifiable evidence' it needs to rise above inadmissible speculation."

7 *Sonneveldt v. Mazda Motor of Am., Inc.*, 2023 WL 2292600, at *12 (C.D. Cal. Feb. 23, 2023)

8 (*citing Domingo v. T.K.*, 289 F.3d 600 (9th Cir. 2002)).

9     **B.**     **Economides's So-Called "Reverse" SSNIP/SSNDQ Test Is Unsound**

10        Economides seeks to support his unreliable qualitative market definition with an equally

11 unreliable and unintelligible application of the Hypothetical Monopolist Test, based on what

12 Economides deems a "reverse" SSNIP/SSNDQ test. To start, Economides claims that the █████

13 ████████████████████████████████████████████████████████████

14 ███████████████████████████████████████ Ex. 1, at ¶136. But

15 Economides does not and cannot show that this supposed decrease in effective price led to either

16 higher usage *or* lower revenue in his purported market, rendering his purported test manifestly

17 unreliable.

18        First, Economides presents no reliable basis to conclude that ███████████

19 █████████ A reliable HMT assumes that consumers can "*respond* to a SSNIP" through their

20 consumption habits. *See Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 482 n.1

21 (9th Cir. 2021). ███████████████████ as Economides says, then as this

22 "price" decreases, users should respond by using Facebook more. *See* Ex. 4 at 98:12-19. His

23 hypothesis appears to be that ████████████████████ Ex. 1, ¶136. To confirm

24 this, it would be relevant to measure whether ██████████████████████████

25 ████████████████████████████ Ex. 4, at 98:20-99:3. Instead, he

26 ████████████████████████████ Ex. 1, ¶179. But ███████

27 ████████████████████████████ Economides also does

28 nothing to show this █████████████████ is statistically significant, different from prior

**PUBLIC REDACTED VERSION**

years, or even whether it was due to the introduction of popular new features, e.g., Reels. *See* Ex. 1, ¶179. Failing to show that usage changed ▮▮▮▮▮▮▮ leaves his "SSNIP" without reliable evidence of how consumers responded—the fundamental thing the HMT is designed to test. Areeda ¶538 ("The profitability of a hypothetical increase in the price of a hypothetical monopolist of product *A* depends, of course, on the reactions of customers," evidenced by "historical shifts in prices and trading patterns," "costs … shifting," or "testimony by customers or alternative suppliers").

Second, Economides provides no reliable basis to conclude that ▮▮▮ shows Meta can profitably raise prices or decrease quality in his putative PSNS market because he admittedly did not analyze the advertising market. The *Epic Games* court found an expert's opinion unreliable for comparable methodological shortcomings: failing to test all sides of a multi-sided market and focusing the SSNIP analysis on prices outside the alleged relevant market. *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 964 (N.D. Cal. 2021), *rev'd on other grounds*, 67 F.4th 946 (9th Cir. 2023). Economides relies on ARPU, or average revenue per user, and then declares that ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 2, ¶103. But he offers no reliable way to measure whether there is a linear relationship between ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 4 at 114:15-24. He accounts for no confounding factors that would reduce ad revenues, such as changes in ad quality, ad budgets, or increased competition from TikTok. *Id.* at 112:12-120:22. Without analyzing the advertiser market, he cannot reliably opine that Meta could profitably raise prices or reduce quality in the *user* market, making his SSNIP test "wholly unpersuasive of substitution." *Epic Games*, 559 F. Supp. 3d at 965; *see also Optronic Techs., Inc.*, 20 F.4th at 482 n.1 (relevant consideration is whether "consumers would respond to a SSNIP by making purchases outside the proposed product market definition, *thereby* rendering the SSNIP unprofitable").

Economides's use of ▮▮▮ to show an unprofitable decrease in price or improvement in quality is not "accepted in a relevant scientific community"—or ever recognized by a court—nor tested, peer reviewed and published, or with an accepted error rate. *Rodriguez v. Google LLC*, 2024 WL 38302, at *2 (N.D. Cal. Jan. 3, 2024). Courts exclude unreliable supposed applications

**PUBLIC REDACTED VERSION**

1   of the HMT that rely on gerrymandered, distorted applications of the SSNIP test. *See Sumotext*

2   *Corp. v. Zoove, Inc.*, 2020 WL 6544410, at *7-9 (N.D. Cal. Nov. 6, 2020) (supposed "natural

3   SSNIP test" was not "grounded in any accepted methodology for conducting a market analysis");

4   *Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 918-19 (6th

5   Cir. 2009) (affirming exclusion of expert's "own version of the SSNIP test," "produced solely for

6   this litigation"). The Court should do so here.

7   **III.   ECONOMIDES'S COMPETITIVE EFFECTS OPINION IS NOT RELIABLE**

8   Economides opines that Meta's "campaign" of supposedly deceptive statements and

9   omissions harmed competition—but does so without analyzing the effect of any individual

10  statement or omission, any subset, or all of them. He merely asserts without support that these

11  alleged misrepresentations "▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

12  ▬▬▬▬▬▬▬▬" Ex. 4 at 250:4-25. Every single allegedly deceptive statement or omission has the

13  "▬▬▬▬▬▬▬▬▬▬▬▬▬ *id.* at 183:19-184:21, regardless of when it was made, where it was

14  made, who made it, the topic it addressed, or its specificity. This includes statements of obvious

15  puffery like "▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

16  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

17  ▬▬▬▬▬▬▬▬" Ex. 1, Appendix C at 5, 9. All he offers in terms of support are summaries

18  of documents speaking generally about privacy issues and never about any specific deceptive acts.

19  This absence of analysis is a problem even under Economides's own views. In his

20  scholarship, he has acknowledged that "[b]ecause inequality is natural in the market structure of

21  network industries, there should be no presumption that anti-competitive actions are responsible

22  for the creation of market share inequality or very high profitability of a top firm." Ex. 19 at 15.

23  Economides now betrays his prior work: he presumes that alleged misrepresentations he did not

24  assess excluded Facebook's competitors and offers zero evidence in support of that conclusion.

25  These "untested hypotheses" are inadmissible "unsupported speculation." *Sonneveldt*,

26  2023 WL 2292600, at *52; *Daubert*, 509 U.S. at 599; *see also Teradata Corp. v. SAP SE*, 570 F.

27  Supp. 3d 810, 843 (N.D. Cal. 2021). Courts have excluded opinions for not "mak[ing] a reliable

28  analysis as to market impact" of alleged deception because it did not "consider[] any data on the

**PUBLIC REDACTED VERSION**

pricing, sales volume, or market share" of more than two competitors. *Tyr Sport, Inc. v. Warnaco Swimwear, Inc.*, 709 F. Supp. 2d 821, 834 (C.D. Cal. 2010). Economides does even less here. He "never analyzes the alleged restraints ... to determine if they were anticompetitive" and offered opinions "based only on his speculation that the restraints at issue were 'anticompetitive.'" *Craftsmen Limousine Inc., v. Ford Motor Co.*, 2005 WL 3263288, at *7 (W.D. Mo. Dec. 1, 2005) (excluding opinion). Without such evidence, the alleged conduct and harm "meet only by assumption." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 834 (3d Cir. 2020) (testimony inadmissible where the expert "presented no quantifiable data to explain or clarify his assumptions" and "no data supporting the application"). Economides's blanket assumption of equal competitive harm by all alleged misrepresentations, accounting for no alternative factors at all, reflects an absence of analysis that the Court should exclude.

## IV.  ECONOMIDES'S RECITATIONS OF RECORD EVIDENCE SHOULD BE EXCLUDED

Finally, an expert may not merely "restate or summarize record evidence and then state a conclusion without applying a methodology that is reliable and which evinces his/her expertise." *Siqueiros v. Gen. Motors LLC*, 2022 WL 74182, at *9 (N.D. Cal. Jan. 7, 2022); *see also United States v. Fuentes-Cariaga*, 209 F.3d 1140, 1142 (9th Cir. 2000) ("Where an expert offers general testimony about an issue within the ken of the jury's knowledge, it is not an abuse of discretion to exclude such testimony under Rule 702."). That is all Economides does in significant portions of his reports. *See, e.g.*, Ex. 1, ¶¶13, 26-123, 166, 168-170, 187, 200-209, 212-224, 227-245, 270, 272, 277-290. That is what he plans to do at trial. On these topics, "███████████████████████ ████████████████████████████████████████████." Ex. 4 at 170:20-171:8. Such testimony is "little more than a mouthpiece for presenting the argument of counsel based on uncomplicated evidence already in the case." *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 5148390, at *6 (N.D. Cal. Nov. 6, 2017).

## CONCLUSION

For these reasons, the Court should exclude Economides's opinions identified above.

**PUBLIC REDACTED VERSION**

1    Dated: April 5, 2024                    Respectfully submitted,

2                                            By: /s/ Sonal N. Mehta

3                                            SONAL N. MEHTA (SBN 222086)
                                              Sonal.Mehta@wilmerhale.com
4                                            WILMER CUTLER PICKERING
                                             HALE AND DORR LLP
5                                            2600 El Camino Real, Suite 400
                                             Palo Alto, California 94306
6                                            Telephone: (650) 858-6000

7

8                                            DAVID Z. GRINGER (*pro hac vice*)
                                              David.Gringer@wilmerhale.com
9                                            ROSS E. FIRSENBAUM (*pro hac vice*)
                                              Ross.Firsenbaum@wilmerhale.com
10                                           RYAN CHABOT (*pro hac vice*)
                                              Ryan.Chabot@wilmerhale.com
11                                           PAUL VANDERSLICE (*pro hac vice*)
                                              Paul.Vanderslice@wilmerhale.com
12                                           WILMER CUTLER PICKERING
                                              HALE AND DORR LLP
13                                           7 World Trade Center
                                             250 Greenwich Street
14                                           New York, New York 10007
                                             Telephone: (212) 230-8800
15

16                                           ARI HOLTZBLATT (*pro hac vice*)
                                              Ari.Holtzblatt@wilmerhale.com
17                                           MOLLY M. JENNINGS (*pro hac vice*)
                                              Molly.Jennings@wilmerhale.com
18                                           WILMER CUTLER PICKERING
                                              HALE AND DORR LLP
19                                           2100 Pennsylvania Avenue NW
20                                           Washington, DC 20037
                                             Telephone: (202) 663-6000
21

22                                           MICHAELA P. SEWALL (*pro hac vice*)
                                              Michaela.Sewall@wilmerhale.com
23                                           WILMER CUTLER PICKERING
                                              HALE AND DORR LLP
24                                           60 State Street
                                             Boston, MA 02109
25                                           Telephone: (617) 526-6000

26
                                             *Attorneys for Defendant Meta Platforms, Inc.*
27

28

**PUBLIC REDACTED VERSION**

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of April, 2024, I electronically transmitted the public redacted version of the foregoing document to the Clerk's Office using the CM/ECF System and caused the version of the foregoing document filed under seal to be transmitted to counsel of record by email.

By:   */s/ Sonal N. Mehta*
Sonal N. Mehta