**PUBLIC REDACTED VERSION**

WILMER CUTLER PICKERING
  HALE AND DORR LLP

SONAL N. MEHTA (SBN 222086)
  Sonal.Mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
  David.Gringer@wilmerhale.com
ROSS E. FIRSENBAUM (*pro hac vice*)
  Ross.Firsenbaum@wilmerhale.com
RYAN CHABOT (*pro hac vice*)
  Ryan.Chabot@wilmerhale.com
PAUL VANDERSLICE (*pro hac vice*)
  Paul.Vanderslice@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800

ARI HOLTZBLATT (*pro hac vice*)
  Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
  Molly.Jennings@wilmerhale.com
2100 Pennsylvania Ave NW
Washington, DC 20037
Telephone: (202) 663-6000

MICHAELA P. SEWALL (*pro hac vice*)
  Michaela.Sewall@wilmerhale.com
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

*Attorneys for Defendant Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated,<br><br>               Plaintiffs,<br><br>   v.<br><br>META PLATFORMS, INC., a Delaware Corporation,<br><br>               Defendant. | Case No. 3:20-cv-08570-JD<br><br>**DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY AND OPINIONS OF JOSEPH FARRELL**<br><br>Hearing Date: June 20, 2024<br>Time: 10:00 a.m.<br>Judge: Hon. James Donato |

**PUBLIC REDACTED VERSION**

## TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ...................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ..........................................................1

INTRODUCTION ....................................................................................................................1

BACKGROUND ......................................................................................................................3

ARGUMENT ............................................................................................................................6

I.      FARRELL'S MARKET DEFINITION AND COMPETITION OPINIONS ARE BASED ON
        UNRELIABLE METHODS OR NO METHOD AT ALL (§§III, IV, V, VI.A OF OPENING
        REPORT; §§II, III.A.2, III.A.3, III.C OF REBUTTAL REPORT) ...............................................6

        A.      Farrell's Subjective Analysis Of Meta's Response ███████ And
                Meta's ████████████████████ Is Not The Product Of Any
                Expert Methodology ....................................................................................6

        B.      Farrell's "Critical Loss" And "Upward Pricing Pressure" Analyses
                Disregard Basic Economics And His Own Standards .............................9

                1.      Farrell's CLA And UPP Improperly Rely On Advertising Revenue
                        Rather Than Any Proxy For A Price Paid By Users...................................9

                2.      Farrell Concedes ████████████████████████
                        ████ .....................................................................................11

II.     FARRELL'S MARKET SHARE CALCULATIONS ARE BASED ON UNSUPPORTED
        ASSUMPTIONS CONTRADICTED BY THE RECORD AND MUST BE EXCLUDED (§VI.B
        OF OPENING REPORT; §III.D OF REBUTTAL REPORT) ........................................................12

CONCLUSION........................................................................................................................15

**PUBLIC REDACTED VERSION**

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Bakst v. Cmty. Mem'l Health Sys., Inc.*,
  2011 WL 13214315 (C.D. Cal. Mar. 7, 2011) ................................................................. 15

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) ........................................................................................................ 9

*Clear-View Techs., Inc. v. Rasnick*,
  2015 WL 3505003 (N.D. Cal. June 2, 2015) ................................................................. 12

*Coronavirus Rep. v. Apple Inc.*,
  2021 WL 5936910 (N.D. Cal. Nov. 30, 2021) ......................................................... 9, 10

*Daubert v. Merrell Dow Pharmaceuticals*, Inc.,
  509 U.S. 579 (1993) ........................................................................................................ 1

*DZ Rsrv. v. Meta Platforms, Inc.*,
  2022 WL 912890 (N.D. Cal. Mar. 29, 2022) ................................................................. 3

*In re German Auto. Mfrs. Antitrust Litig.*,
  497 F. Supp. 3d 745 (N.D. Cal. 2020) ........................................................................... 5

*In re Google Play Store Antitrust Litig.*,
  2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) ............................................................. 11

*In re Live Concert Antitrust Litig.*,
  863 F. Supp. 2d 966 (C.D. Cal. 2012) ...................................................................... 6, 12

*In re Seagate Tech. LLC*,
  326 F.R.D. 223 (N.D. Cal. 2018) ................................................................................... 8

*Philips v. Ford Motor Co.*,
  2016 WL 7428810 (N.D. Cal. Dec. 22, 2016) ......................................................... 10, 11

*Samuels v. Holland Am. Line-USA Inc.*,
  656 F.3d 948 (9th Cir. 2011) .......................................................................................... 9

*Siqueiros v. GM LLC*,
  2022 WL 74182 (N.D. Cal. Jan. 7, 2022) ...................................................................... 9

*Sugar Ass'n, Inc. v. McNeil-PPC, Inc.*,
  2007 WL 5674021 (C.D. Cal. Dec. 10, 2007) .............................................................. 13

*Teradata Corp. v. SAP SE*,
  570 F. Supp. 3d 810 (N.D. Cal. 2021) .................................................................. 6, 7, 10

**PUBLIC REDACTED VERSION**

*United States v. Fuentes-Cariaga,*
   209 F.3d 1140 (9th Cir. 2000) ............................................................. 9

*Williams v. UMG Recordings, Inc.,*
   2006 WL 1307922 (9th Cir. May 12, 2006) ....................................... 14

*Waymo LLC v. Uber Techs., Inc.,*
   2017 WL 5148390 (N.D. Cal. Nov. 6, 2017) ...................................... 9

**STATUTES, RULES, AND REGULATIONS**

Fed. R. Evid. 702 ..................................................................................... 1, 10

**OTHER AUTHORITIES**

U.S. Dep't of Just. & FTC, *Horizontal Merger Guidelines* (2010) ................................................. 5

**PUBLIC REDACTED VERSION**

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE THAT, on June 20, 2024, at 10:00 a.m., this Motion to Exclude Joseph Farrell filed by Defendant Meta Platforms, Inc., will be heard. Meta's motion is based on this Notice of Motion and the supporting Memorandum of Points and Authorities.

Pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny, Meta requests that the Court exclude the opinions of Joseph Farrell concerning market definition, competition in the proposed market, and market share in §§III, IV, V, and VI of his Opening Merits Report and §§II, III.A.2, III.A.3, III.C, and III.D of his Rebuttal Merits Report, as well as any testimony drawn from those sections.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Joseph Farrell is an economist whose assignment was to confirm Users' contrived "PSNS" zero-price market and then find that Meta has monopoly power in that market. To do so, Farrell relies on what ███████████████████████████████████ Two of the three are not the province of economics at all, and Farrell, ██████████████████████████ is particularly poorly situated to assess them. The third has no utility in zero-price markets involving two-sided platforms, in particular when the market is defined to include only certain activities users engage in on those platforms. The result is an unreliable hodgepodge that provides no way to determine what is in the market, would deeply confuse the jury, and cannot withstand even minimal scrutiny. Farrell then offers an opinion on market share that relies on unfounded and unsupported assumptions about how people use Facebook and Instagram, and reaches an unreliable result he conceded was contradicted by the documents underlying his calculation. The Court should exclude these opinions in full.

Farrell provides no coherent definition of what is in or out of the candidate market. He has ████████████████████████████████████████████████████████ ██████████████████████████████ Ex. 1,[1] Farrell Tr. 86:11-18; *id.* 168:3-5. He nevertheless

---

[1] Unless otherwise noted, "Ex." citations reference exhibits to the Gringer Declaration filed herewith, emphasis is added, and objections are omitted for deposition citations.

**PUBLIC REDACTED VERSION**

1   purports to define a market for "personal social network services" based on ███████

2   ████████████████████████████████████████████████████████████████

3   ██████████████ The result, he admits, ████████████████████████████

4   ████████████████████████████████████████████████████████████████

5   ██████████████████████████ *Id.* 252:20-25. █████████████████████

6   ████████████████████████████████████████████████████████████████

7   ██████████████████████████████████████████████." *Id.* 79:21-80:5.

8   Farrell provides no reliable method for determining that threshold fact. *Id.* 36:14-37:1 ████

9   ████████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████████

11  ███████████ .

12      The inability to determine which aspects of Facebook and other platforms are PSNS

13  precludes any reliable market definition, but is only the start of the problem. Facebook is offered

14  to users for free and makes nearly all of its money from advertising. Farrell thus admits ███

15  ███████████████████████████████████████████████████████████ The

16  accommodation he offers is using advertising profits as a proxy for a "price" paid by users. Ex. 2,

17  Farrell Rep. ¶¶199-200. That makes no sense because changes in Meta's advertising profits do not

18  affect the user's experience on the app, and Farrell ignores entirely competition on the advertising

19  side of Facebook's business, which is where those profits are actually determined. He then

20  concedes that ████████████████████████████

21  ███████████████████ but relies on the gross margins from *all* of Facebook's offerings to conduct

22  his analysis, including those he admits ██████████████████ The wrong profits from the

23  wrong side of a free platform say nothing about what users view as substitutes for Facebook or

24  how changes in the platform would affect user demand.

25      That leaves only Farrell's qualitative analysis, which turns on his personal impressions of

26  ████████████████████████████████████████████████████████████████

27  ███████████████████████████████████████ He says, for example, that

28  ████████████████████████████████████████████████████████████████

**PUBLIC REDACTED VERSION**

1   ████████████████████████████████████████████████████

2   ████████████████████████████████████████████████████

3   ████████████████████ Ex. 1, Farrell Tr. 121:9-123:3.███████████████

4   ████ *Id.* 129:12-20. As to ███████████████████████████

5   ██████ he opines (again from nothing more than his review of Meta documents) that Meta's

6   ████████████████████████████████████████████████████

7   ██████████████████████████████████████████ " *Id.* 201:1-

8   202:6. But in actually selecting what to include in the market, Farrell picks and chooses from the

9   apps ████████████████████████████████ with no consistent

10  basis for the distinctions. *Id.* at 203:15-208:1 (████████████████████

11  ████████████████████████. Reading and guessing is not expert analysis, and Farrell's

12  inconsistent view of what actions are meaningful is not sufficiently reliable to assist the jury. *See*

13  *DZ Rsrv. v. Meta Platforms, Inc.*, 2022 WL 912890, at *9 (N.D. Cal. Mar. 29, 2022) (expert

14  testimony that does "not offer any specialized or scientific expertise, or anything beyond the

15  typical knowledge and experience of a jury" is inadmissible).

16      Farrell also offers an opinion on Meta's share of the PSNS market. There he must again

17  confront his incoherent definition of what uses and experiences constitute personal social

18  networking, because the first step in his share calculation is determining the portion of activity on

19  Facebook and Instagram in the candidate market. To do so, he relies entirely on a series of

20  unsupported assumptions about two documents (which themselves contradict the assumptions).

21  As with his market definition, guesses based on misreading documents do not represent reliable

22  expert analysis.

### BACKGROUND

24      Facebook is free for users and makes substantially all of its revenue from advertising. Ex.

25  2, Farrell Rep. ¶¶17, 200. Operating a multi-sided platform where one of the sides is free ██████

26  ████████████████████████████████████████████████████

27  ██████████ Ex. 1, Farrell Tr. 105:20-23. That is because ████████████████████

28  ████████████████████████████████████████████████████

**PUBLIC REDACTED VERSION**

1    ███████████████████████████████████" *Id.* 115:19-25. If Facebook did not sell

2    advertising, ██████████████     *Id.* 106:15-24. Taken together, "█████████████

3    ██████████████" when assessing the relevant market. *Id.* 103:22-25.

4         Farrell proposes a market for "personal social networking services (PSNS)" on the user

5    side of Facebook. Ex. 2, Farrell Rep. ¶138. The candidate market includes certain activities by

6    users on Facebook, Instagram, Snapchat, Google+, and MeWe. *Id.* ¶250. He gets to that set of

7    participants by defining PSNS as those ███████████████████████████████

8    █████████████████████████████ *Id.* ¶138. PSNS apps offer a

9    ███████████████████████████ *Id.* ¶¶27, 138. Apps with these features

10   also have other "██████" unrelated to PSNS, however, and Farrell attempts to exclude those

11   aspects of the services from his market. ████████████████████

12   ██████████████████ Ex. 1, Farrell Tr. 70:23-71:14.█████████████

13   ████████████████████████████████████

14   ███████████████████ *Id.* 79:21-80:5. "███████████

15   ████████████████████████████." *Id.* 79:21-80:5.

16   And if "████████████████████████████████

17   ████████████████████ *Id.* 79:14-20.█████████

18   █████████████████████████████ *Id.* 80:6-16.

19   ████████████████████████████████████

20   █████████████ *Id.* 45:25-46:13. The result: "███████████████ *Id.*

21   252:20-25.

22        For PSNS to be a relevant market for antitrust purposes, Farrell says ████████

23   █████████████ Ex. 2, Farrell Rep. ¶86. Farrell applies qualitative and quantitative

24   analyses that he characterizes as versions of an HMT.

25        His qualitative analysis primarily relies on his interpretation of ██████████

26   ████████████████ *See id*. §IV.B.1. In Farrell's view, █████████

27   ████████████████████████████████████

28   ████████████████ *Id.* ¶154; Ex. 1, Farrell Tr. 125:10-17. He claims that

**PUBLIC REDACTED VERSION**

1 ███████████████████████████████████████████████████

2 ███████████████████████████████████████████████████

3 ███████████ Ex. 1, Farrell Tr. 121:9-125:17. Farrell concludes that ████████████

4 ████████████████████████████████████████ Ex. 2, Farrell

5 Rep. ¶¶154-55. However, he acknowledges that ████████████████████

6 █████████████████████████████ *See, e.g.*, Ex. 1, Farrell Tr. 23:9-20 ("█████

7 ███████████████████████████████████████████████████

8 ███████████████████████████████████████████████████

9 ███████████████████████████████████████ ); *id.* 140:5-8 ███

10 ███████████████████████████████████████████████████

11 ██████████████████ "). And yet, Google+ was in his market and TikTok was not.

Farrell's quantitative method employs two closely related tools: critical loss analysis ("CLA") and upward pricing pressure analysis ("UPP"). Ex. 2, Farrell Rep. ¶¶190-219. These tools are not traditional HMTs, which seek to measure reasonable interchangeability or the cross-elasticity of demand by assessing consumers' response to an increase in price ("SSNIP"). *Id.* ¶87. Instead, CLA and UPP test whether a hypothetical monopolist has an *incentive* to implement a hypothetical SSNIP in the proposed market, *id.* ¶¶95-101; Ex. 1, Farrell Tr. 188:18-189:8, and therefore are most commonly used to corroborate the existence of a relevant market already produced by a SSNIP test, *see In re German Auto. Mfrs. Antitrust Litig.*, 497 F. Supp. 3d 745, 758-59 (N.D. Cal. 2020) (citing U.S. Dep't of Just. & FTC, *Horizontal Merger Guidelines* §4.1.3 (2010)). CLA and UPP require two inputs: (i) the gross margin for the products included *in the market where monopoly power is alleged*; and (ii) diversion ratios, which reflect sales volume lost due to a price increase that would be diverted to other firms inside that same market. Ex. 2, Farrell Rep. ¶197.

CLA and UPP are designed to analyze ██████████████████████

26 ███████████████████ *Id.* ¶17. For CLA and UPP to remain reliable in ██████

27 ██████████████████████████ Farrell explains that ██████

28 █████████████████ *Id.*; *see also id.* ¶199 ("███████████████

**PUBLIC REDACTED VERSION**

1   ████████████████████████████████████████████████████).

2   To that end, Farrell tries to account for the lack of a monetary price charged to users by relying on

3   gross margins from the advertising side of Facebook, which is not part of the candidate PSNS

4   market. *Compare id*. ¶210 (████████████████), *with* ¶¶105, 110 (███████████████

5   ███████████████████████). In making that switch, Farrell uses gross advertising

6   margins that include revenues drawn from all of Facebook, not just from those parts in his PSNS

7   market; █████████████████████████████████████ Ex. 1, Farrell Tr.

8   189:9-11.

9       Finally, Farrell opines on market shares for the five participants in his PSNS market—

10  Facebook, Instagram, Google+, Snapchat, and MeWe—in order to ████████████████" of

11  Meta's market power. Ex. 2, Farrell Rep. §VI.B. Farrell bases his market share calculations on his

12  estimates of the shares of ████████████████████ on each of the five PSNS

13  market participants during the December 2016 to December 2020 class period. *Id*. ¶¶252-54.

**ARGUMENT**

**I.   FARRELL'S MARKET DEFINITION AND COMPETITION OPINIONS ARE BASED ON UNRELIABLE METHODS OR NO METHOD AT ALL (§§III, IV, V, VI.A OF OPENING REPORT; §§II, III.A.2, III.A.3, III.C OF REBUTTAL REPORT)**

**A.   Farrell's Subjective Analysis Of Meta's Response ██████ And Meta's ███ ████████████████████████ Is Not The Product Of Any Expert Methodology**

19  Farrell's qualitative analysis does not purport to apply an economic methodology,

20  specialized knowledge, or contain anything more than his subjective interpretation of documents

21  and witness testimony. Courts routinely exclude expert testimony seeking to define a market

22  through similarly cherry-picked evidence and vague descriptions of the record, rather than reliable

23  measures of substitution and demand. *See, e.g.*, *Teradata Corp. v. SAP SE*, 570 F. Supp. 3d 810,

24  841 (N.D. Cal. 2021); *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 996 (C.D. Cal.

25  2012). This Court should do the same.

26      Start with Farrell's discussion ████████ Farrell speculates ████████████

27  ████████████████████████████████████████████████████

28  Ex. 2, Farrell Rep. ¶145; Ex. 1, Farrell Tr. 122:24-25 █████████████████████

**PUBLIC REDACTED VERSION**

1    ███████████████ ).  Farrell  provides  no  benchmark  or  any  reliable  methodology  for

2    distinguishing  between  ████████████████████████████████████████

3    ██████████████████████████████ Ex. 1, Farrell Tr. 128:21-129:10

4    ████████████████████████████████████████████████████████

5    ██████████████████████████████████████ .  These

6    kinds of subjective comparisons are not the stuff of reliable expert testimony. *Teradata*, 570 F.

7    Supp. 3d at 837 (excluding a market definition opinion that relied on descriptors like "core" and

8    "large" to explain away potential competitors).

9         Farrell then assumes that ████████████████████████████████████

10   ████████████████████████████████████████████████████████

11   ███████████████ Ex. 1, Farrell Tr. 131:14-17 ("███████████████████

12   ████████████████████████████████████████████████████████

13   ████████████████ ").  But he never assesses whether those preliminary impressions proved to

14   be accurate or were reflected in actual actions. He concedes, ████████████████████

15   ████████████████████████████████████████████████████████

16   ██████████████████████████████████ . *Id*. 128:21-129:10 ████████

17   ████████████████████████████████████████████████████████

18   ████████████████████████████████████████████ ; *id*.

19   129:12-20 ("████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████

22   ████████████████████████████████ "); *id*. 127:7-13 ████████

23   ████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████

25   ████████████████████████████████████ ").

26        This leaves Farrell with nothing more than a handful of news articles, Facebook documents,

27   and  long-ago  statements  from  Facebook  executives, Ex. 2, Farrell Rep. ¶¶144-53,  which  he

28   ████████████████████████████████████████████████████████ ,

1   ████████████████████████████ Ex. 1, Farrell Tr. 38:13-21 (████████████

2   ████████████████████████████████████████████████████);

3   *id.* 121:9-123:3 (████████████████████████████████

4   ████████████); *id.* 151:3-13 (████████████████

5   ████████████████████████████████████████████████

6   ████"). Expert opinions that simply summarize documents are not admissible. *See In re Seagate*

7   *Tech. LLC*, 326 F.R.D. 223, 243 (N.D. Cal. 2018) (excluding "large portions of [expert's]

8   declarations [that] merely summarize [defendant's] documents and advertisements").

9        The same is true of Farrell's analysis of ████████████████. He claims

10   that "████████████████████████████████████████

11   ████████████████████████" Ex. 2, Farrell Rep. §IV.B.2.a, and that "████

12   ████████████████████████████████████████████████

13   ████████████████" *Id*. §IV.B.2.b. But his approach is based on no coherent methodology

14   and produces contradictory results. Farrell says, for example, ████████████

15   ████████████████████████████ *Id*. ¶171. He then ████████████

16   ████████████████████████████████████████████████

17   ████████. Indeed, *none* of the firms that ultimately constitute his candidate market is actually

18   ████████████████████████████████████████" *See id*., fig.4. Similarly,

19   Farrell says that ████████████████████████████████

20   ████████ *Id*. ¶¶176-77 & fig.7. ████████████████

21   ████████████████████████████████████████████ *Id*.

22   fig.7. When confronted with these inconsistencies, his explanations evince no method; at best, he

23   has offered his conflicting personal impressions of documents, which is particularly dangerous

24   given his conceded ████████████████████ *See, e.g.*, Ex. 1, Farrell Tr. 211:6-13

25   ████████████████████████████████████████████████

26   ████████████████████████████████████████████"); *id.*

27   222:6-12 (████████████████████████████████

28   ████████"); *id.* 222:23-223:9 (████████████████████,

1  ████████████████; *id.* 214:15-16 (████████████████████████

2  ███████████████████████████████████████████████.

3       This subjective approach of reviewing and summarizing documents does nothing to assist

4  the factfinder, is based on no established methodology, and should thus be excluded. *Samuels v.*

5  *Holland Am. Line-USA Inc.*, 656 F.3d 948, 952 (9th Cir. 2011) (explaining that an expert opinion

6  must entail "more than subjective belief or unsupported speculation"). If Users wish to present

7  evidence that ███████████████████ indicate which companies compete with

8  Facebook and Instagram, they may do so, but not under a "misleading façade of expertise." *Waymo*

9  *LLC v. Uber Techs., Inc.*, 2017 WL 5148390, at *5 (N.D. Cal. Nov. 6, 2017); *United States v.*

10  *Fuentes-Cariaga*, 209 F.3d 1140, 1142 (9th Cir. 2000) ("Where an expert offers general testimony

11  about an issue within the ken of the jury's knowledge, it is not an abuse of discretion to exclude

12  such testimony under Rule 702."); *Siqueiros v. GM LLC*, 2022 WL 74182, at *9 (N.D. Cal. Jan. 7,

13  2022) (experts "may not restate or summarize record evidence and then state a conclusion without

14  applying a methodology that is reliable and which evinces his/her expertise").

15       **B.    Farrell's "Critical Loss" And "Upward Pricing Pressure" Analyses Disregard**
16       **Basic Economics And His Own Standards**

17       Farrell acknowledges that his CLA and UPP analyses must be ███████ to reliably assess

18  markets (like the zero-price PSNS market) that differ from ███████ ones. Ex. 2, Farrell Rep.

19  ¶17. Yet Farrell does not appropriately modify his models. First, he relies on revenues from the

20  advertiser side of the platform, rather than any "price" that is actually paid by users. Second, he

21  uses gross margins for all of Facebook, rather than the portion he says ███████████████

22  ███████ Each of these flaws renders Farrell's quantitative analyses inadmissible.

23       **1.    Farrell's CLA And UPP Improperly Rely On Advertising Revenue**
       **Rather Than Any Proxy For A Price Paid By Users**

24       A relevant market must be "determined by the reasonable interchangeability of use or the

25  cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v.*

26  *United States*, 370 U.S. 294, 325 (1962); *Coronavirus Rep. v. Apple Inc.*, 2021 WL 5936910, at

27  *11 (N.D. Cal. Nov. 30, 2021) ("'Authorities far too numerous to cite or discuss in detail have

28  established' that '[t]he principle most fundamental to product market definition is 'cross-elasticity

**PUBLIC REDACTED VERSION**

1   of demand.'"). For CLA and UPP to reliably support an inference of reasonable interchangeability

2   of use or cross-elasticity of demand, they must account for "the price ultimately paid by the

3   customer." *Teradata*, 570 F. Supp. 3d at 840. In *Teradata*, for example, the court considered an

4   expert who defended his relevant market through "[a]ggregate diversion analysis" ("ADR"). *Id.* at

5   839 n.6. As employed by that expert, ADR closely resembles Farrell's approach, because it

6   depended on "the threshold where a hypothetical monopolist imposing a [SSNIP] would lose

7   enough sales ('actual loss') compared to the 'critical loss' such that the SSNIP would be

8   unprofitable for the hypothetical monopolist." *Id.* The court rejected the ADR model as unreliable,

9   however, because the expert had used data that did "not measure customer responses to changes

10   in price," and thus could not "measure the most fundamental principle in defining a market: cross-

11   elasticity of demand." *Id.* at 840.

12        Farrell's use of advertising profits suffers from the same defects, and he does not offer the

13   analysis he claims ████████████████████████████████████ For example,

14   Farrell opines that ████████████████████████████████████████████

15   ████████████████████████████████████████████████████" Ex. 2, Farrell

16   Rep. ¶¶200-01. Similarly, Farrell claims that ████████████████████████████

17   ████████████████████████████████████████████ *Id.* ¶95. But Farrell

18   never actually analyzes ██████████████████████████ instead, he reverts to advertising

19   margins. Ex. 1, Farrell Tr. 119:10-13 ("████████████████████████████████████

20   ████████████████████████████████████████"); *id.* 91:15-23 ("██

21   ████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████

23   ████████████████████"),

24        Expert testimony must both be "the product of reliable principles and methods" and

25   "reflect[] a reliable application of the principles and methods to the facts of the case." Fed. R. Evid.

26   702(c)-(d). So when an expert fails to apply standards he acknowledges are required for reliability,

27   the testimony is inadmissible. *See Philips v. Ford Motor Co.*, 2016 WL 7428810, at *20-26 (N.D.

28   Cal. Dec. 22, 2016) (excluding an expert's damages methodology as unreliable when it was not

**PUBLIC REDACTED VERSION**

applied according to the expert's standards). Here, Farrell fails by his own standards. Despite

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

████████████████████████—he treats advertising profits as though they can stand in for a price

paid by users (they cannot). So as in *Philips*, Farrell's testimony must be excluded for ignoring the

economic standards and literature he cites about how to apply CLA and UPP to Meta. 2016 WL

7428810, at *26; *see also In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *9 (N.D.

Cal. Aug. 28, 2023) (excluding the merits opinion of a damages expert whose model fell outside

accepted economics and was based on faulty assumptions).

       **2.**     **Farrell Concedes** ████████████████████████████████████
████████

      Even accepting that a CLA and UPP based on advertising profits could properly be applied

to Facebook, Farrell's analyses are unreliable because they use gross margins he ████████████

██████████ Farrell has consistently stated ████████████████████████████████████████

████████████████" Ex. 2, Farrell Rep. ¶96. Here, according to Farrell, that means

████████████████████████████ Ex. 1, Farrell Tr. 189:2-8 ("████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

████████████). As Farrell admitted at his deposition, however, he ████████████████████

██████████████████████████████. *Id*. 189:9-11 ("████████████

██████████████████████████████████"); *id.* 189:12-19 ("████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

████████████████████"). Farrell sought to excuse this failing as "████████" *Id*. 189:12-

190:10. But his failing is not just ████████████ it is self-inflicted due to his inability to reliably

define what constitutes a PSNS use on the Facebook platform.

      Farrell's use of the gross margin from non-PSNS use cases fundamentally alters his data

**PUBLIC REDACTED VERSION**

and renders it unreliable for defining a PSNS market. Meta's advertising margins include revenue from features, surfaces, and activities over which Meta is not alleged to have monopoly power, and have nothing to do with whether Meta could profit from changes to its PSNS offerings. For example, the content shown on Feed is a mix of video, posts from interest-based groups, posts from friends and family, and other content. Advertisements are mixed throughout Feed—they are not solely associated with the friends-and-family content available on Feed. There are also multiple tabs with little or no friends-and-family content, like Reels and Video, that include advertisements. The advertising margins Farrell uses reflect all of this activity, despite his own testimony that ███ ████████████ *Supra*, at 11. Because Farrell does not even attempt to control for any of those non-PSNS margins, his CLA and UPP analyses should be excluded. *See In re Live Concert,* 863 F. Supp. 2d at 981 (excluding expert testimony that failed to "account for major factors" and performed analysis "as if they did not exist").

## II. FARRELL'S MARKET SHARE CALCULATIONS ARE BASED ON UNSUPPORTED ASSUMPTIONS CONTRADICTED BY THE RECORD AND MUST BE EXCLUDED (§VI.B OF OPENING REPORT; §III.D OF REBUTTAL REPORT)

Farrell's market share calculations for Facebook and Instagram rely on no fewer than five unsupported assumptions, most of which are expressly contradicted by the record. Because courts routinely exclude expert testimony that "rests on faulty assumptions," these opinions are inadmissible. *See Clear-View Techs., Inc. v. Rasnick*, 2015 WL 3505003, at *2 (N.D. Cal. June 2, 2015) (collecting cases).

To calculate market shares for the five participants in his alleged PSNS market—Facebook, Instagram, Google+, Snapchat, and MeWe—Farrell says he ████████████████████ ████████████████████. Ex. 2, Farrell Rep. ¶253. He begins with actual ████████████████ ████ during the class period, what he calls ██████████████████████████ ████████████████████. *Id*. However, because Farrell acknowledges ████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████" *id*. ¶256, he applies ████████████████████████████

**PUBLIC REDACTED VERSION**

1  ██████████████████████████████████████████" Ex. 3, Farrell Rebuttal ¶88. There is nothing

2  scientific or reliable about these ████████ Instead, Farrell relies on several assumptions "without

3  any supporting evidence" and a series of extrapolations that render his back-of-the-envelope

4  calculations nothing more than junk science. *See Sugar Ass'n, Inc. v. McNeil-PPC, Inc.*, 2007 WL

5  5674021, at *2 (C.D. Cal. Dec. 10, 2007) (excluding expert's damages calculation when

6  assumptions were "not based on an appropriate methodology").

7      Farrell first mistakenly claims that ███████████████████████████████████

8  ███████████████████████████ based on a misreading of a single document from 2021.

9  Farrell assumes without support that the document—██████████████████████████

10  ██████████████████████████████████—is evidence of PSNS activity

11  across *all* of Facebook. Ex. 1, Farrell Tr. 250:10-15 ("███████████████████

12  ████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████

14  ████████"). Farrell made this assumption despite acknowledging that ██████████████████

15  ████████████████████ *Id.* 32:1-8 ("████████████████████

16  ███████████████████████████████████████████████████████").

17  He compounds this problem by ████████████████████████████████████

18  ███████████████████████████████████████████—rather than "████████

19  ████" which is the metric that Farrell himself chose for assessing market share. Ex. 2, Farrell

20  Rep. ¶253. ("████████████████████████████████████████████████

21  █████████████████████████"). ████████████████████ are not the same,

22  even though Farrell apparently assumes that they are, amounting to his *second* baseless

23  assumption. Take, for example, an article posted to Feed about Steph Curry. The ████████

24  ███████████████████████████████████████████ provides no

25  indication of █████████████████████████████████ The same is true for a post

26  from friends or family.

27      Farrell's analysis then relies on more unsupported assumptions. The ███████████

28  ███████████████████████████████████████████████████████

1  ████████████████████████████████████████████ Ex. 1, Farrell Tr. 251:18-

2  252:5. Farrell reaches his ███████████████████████████████

3  ████████████████████████████████████████" Ex. 2, Farrell

4  Rep. ¶256 n.575. In doing so, Farrell assumes that ██████████████████

5  ████████████████████ in what amounts to his *third* unsupported assumption. Ex. 1,

6  Farrell Tr. 252:6-9. ("███████████████████████████████████████

7  ████████████████████████████████"). This assumption is unsupported and

8  plainly wrong. For example, when asked ███████████████████████████

9  ████████████████████████████████████████████████

10 ████████████████████████" *Id.* 252:10-15. Farrell could have analyzed

11 whether it was quantitatively important by separating out posts from "friends" and posts from

12 "people followed." He just decided not to, and assumed away the latter.

13     Farrell also uses what he calls a ████████████—his *fourth* unsupported

14 assumption—██████████████████████████████████████████

15 ████████████████████ *Id.* 251:18-252:5. He accordingly ███████████

16 ████████████████████████████████████████████████

17 ████████████████████████████ But basing estimates like this on a "rule

18 of thumb," let alone one that is "not widely adopted," is exactly the kind of conjecture that courts

19 routinely exclude. *Williams v. UMG Recordings, Inc.*, 2006 WL 1307922, at *2 (9th Cir. May 12,

20 2006) (affirming a grant of a *Daubert* motion when the "proffered expert provided no rigorous

21 methodology for his calculations and based his estimates on a 'rule of thumb' that is not widely

22 adopted"). In fact, ██████████████████████████████████ Ex. 4, Carlton

23 Rep., tbl. 6 (████████████████████

24 ██████).[2]

25     Farrell's extrapolations and assumptions did not end with his estimate of PSNS activity on

26 _____

27 [2]     Farrell has also inconsistently stated what his ████████████ was, asserting in his report
    that he was █████████████

28 ████████████████ Ex. 1, Farrell Rep. ¶256 n.575. To the extent his share calculations relied on
    an assumption greater than ██%, they are even less reliable.

**PUBLIC REDACTED VERSION**

1    Facebook. His errors are magnified by the fact that ████████████████████████

2    ████████████████████████████████████. Ex. 1, Farrell Tr. 255:8-16 ("███████

3    █████████████████████████████████████████████████████████████████████

4    █████████████████████████████████████████████████████████████████████

5    █████████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████"). Asked to provide a

7    basis for this assumption—his *fifth*, and perhaps his most egregious—Farrell explains ███████

8    █████████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████" *Id.* 255:17-256:3. Farrell

10    even ████████████████████████████████████████████████████████████████

11    █████████████████████████████████" *Id.* 257:5-19.

12        Farrell need only have looked as far as his own reports for those alternatives. For example,

13    one document cited in his rebuttal report explains ████████████████████████████

14    █████████████████████████████████████████████████████████████████████

15    ████████████ Ex. 1, Farrell Tr. 264:16-25. Farrell ignored this ████████████████

16    █████████████████████████████████████████████████████████████████████

17    than what the evidence—not ███████████ or an assumption—showed. When confronted with

18    this data, Farrell did commit to ████████████████████████████████████████████

19    ████████████████████████████████████ Ex. 1, Farrell Tr. 265:21-266:6.

20    That commitment comes too late. Courts exclude such expert opinions when they are entirely

21    divorced from the record, let alone from relevant materials cited in an expert's own report. *See*

22    *Bakst v. Cmty. Mem'l Health Sys., Inc.*, 2011 WL 13214315, at *20 (C.D. Cal. Mar. 7, 2011)

23    (granting *Daubert* as to plaintiffs' damages calculation when it was "based on factual assumptions

24    that are entirely unsupported in the record").

25                           **CONCLUSION**

26        For these reasons, the Court should exclude the market definition, competition, and market

27    share opinions in §§III, IV, V, and VI of Farrell's Opening Report and §§II, III.A.2, III.A.3, III.C,

28    and III.D of Farrell's Rebuttal Report, as well as any testimony drawn from those sections.

Dated:  April 5, 2024

Respectfully submitted,

By: */s/  Sonal N. Mehta*

SONAL N. MEHTA (SBN 222086)
  Sonal.Mehta@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
  David.Gringer@wilmerhale.com
ROSS E. FIRSENBAUM (*pro hac vice*)
  Ross.Firsenbaum@wilmerhale.com
RYAN CHABOT (*pro hac vice*)
  Ryan.Chabot@wilmerhale.com
PAUL VANDERSLICE (*pro hac vice*)
  Paul.Vanderslice@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800

ARI HOLTZBLATT (*pro hac vice*)
  Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
  Molly.Jennings@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000

MICHAELA P. SEWALL (*pro hac vice*)
  Michaela.Sewall@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

*Attorneys for Defendant Meta Platforms, Inc.*

**PUBLIC REDACTED VERSION**

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of April, 2024, I electronically transmitted the public redacted version of the foregoing document to the Clerk's Office using the CM/ECF System and caused the version of the foregoing document filed under seal to be transmitted to counsel of record by email.

By:   */s/ Sonal N. Mehta*
          Sonal N. Mehta