1  **QUINN EMANUEL URQUHART & SULLIVAN, LLP**
   Kevin Teruya (Bar No. 235916)
2   kevinteruya@quinnemanuel.com
   865 South Figueroa Street, 10th Floor
3  Los Angeles, CA 90017
   (213) 443-3000
4

5  **HAGENS BERMAN SOBOL SHAPIRO LLP**
    Shana E. Scarlett (Bar No. 217895)
    shanas@hbsslaw.com
6  715 Hearst Avenue, Suite 202
   Berkeley, CA 94710
7  (510) 725-3000

8  *Interim Co-Lead Consumer Class Counsel*

9  [Additional counsel listed on signature page]

10

11                    **UNITED STATES DISTRICT COURT**

12                   **NORTHERN DISTRICT OF CALIFORNIA**

13                       **SAN FRANCISCO DIVISION**

14  MAXIMILIAN KLEIN, et al.,                Consolidated Case No. 3:20-cv-08570-JD

15             Plaintiffs,                   **CONSUMER PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE PORTIONS OF DR. JOHN LIST'S PROPOSED TESTIMONY**

16       vs.

17  META PLATFORMS, INC.,                    The Hon. James Donato

18             Defendant.                    Hearing Date: June 20, 2024 at 10:00 a.m.

19    This Document Relates To: All Consumer  **PUBLIC REDACTED VERSION**
      Actions
20

21

22

23

24

25

26

27

28

1

## NOTICE OF MOTION AND MOTION

2      **PLEASE TAKE NOTICE** that on June 20, 2024, at 10:00 a.m., before the Honorable James

3   Donato, of the United States District Court of the Northern District of California, San Francisco

4   Division, 450 Golden Gate Avenue, San Francisco, California, Courtroom 11, 19th Floor, Plaintiffs

5   Maximillian Klein, Sarah Grabert, and Rachel Banks Kupcho ("Consumers"), on behalf of

6   themselves and all others similarly situated, hereby move the Court for an order excluding portions

7   of the merits expert reports and testimony of Dr. John List.

8      This motion is based upon this Notice of Motion, the accompanying Memorandum of Points

9   and Authorities, all filed supportive declarations and exhibits, the records, pleadings, and other

10  documents on file in this consolidated action, and any argument that may be presented to the Court.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

I.      INTRODUCTION.................................................................................................1

II.     BACKGROUND...................................................................................................2

III.    LEGAL STANDARDS.........................................................................................3

IV.     DR. LIST'S OPINIONS SHOULD BE EXCLUDED..........................................3

      A.     Dr. List's Testimony About His ██████████ Should Be Excluded..............3

          1.     The ████████ fails to provide any reliable or helpful way to evaluate the relevant market.........................................................3

          2.     The ████████ relies on data Facebook improperly failed to disclose. ......................................................................................6

      B.     Dr. List's Testimony About His ████████ Model Should Be Excluded .............9

      C.     Dr. List's Testimony About India's Ban of Chinese Apps Should Be Excluded........................................................................................11

          1.     Dr. List's India Ban opinions are irrelevant because they cannot be used to evaluate what *is* the relevant market or even whether TikTok is in it. .........................................................................11

          2.     The India Ban does not reliably measure economic substitution.................12

      D.     Dr. List's Testimony About His ██████████ Should Be Excluded............13

V.      CONCLUSION ...................................................................................................14

1

# TABLE OF AUTHORITIES

2

**Page**

3

**Cases**

4

*Bentley v. ConocoPhillips Pipeline Co.*,

5
    2010 WL 11537799 (D. Mont. Feb. 3, 2010) ................................................................. 7, 8, 9

6

*Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*,
    683 F.3d 1144 (9th Cir. 2012) ............................................................................................. 3

7

8

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ...................................................................................................... 3, 11

9

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) ............................................................................................. 3

10

11

*In re Google Play Store Antitrust Litig.*,
    2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) (Donato, J.) ............................................ 5, 12

12

13

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ........................................................................................................... 3

14

*Murray v. S. Route Maritime SA*,
    870 F.3d 915 (9th Cir. 2017) ............................................................................................. 3

15

16

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
    2018 WL 1948593 (N.D. Cal. Apr. 25, 2018) ................................................................. 3

17

18

*Nat'l Collegiate Athletic Ass'n v. Alston*,
    594 U.S. 69 (2021) ........................................................................................................... 10

19

*Nat'l Soc. of Pro. Engineers v. United States*,
    435 U.S. 679 (1978) .................................................................................................... 10, 11

20

21

*PLS.Com, LLC v. Nat'l Assoc. of Realtors*,
    32 F.4th 824 (9th Cir. 2022) ....................................................................................... 10, 11

22

23

*United States v. Sandoval-Mendoza*,
    472 F.3d 645 (9th Cir. 2006) ............................................................................................. 3

24

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
    259 F.3d 1101 (9th Cir. 2001) ...................................................................................... 6, 7, 9

25

**Other Authorities**

26

Fed. R. Civ. P. 26 .................................................................................................................. 1, 3

27

Fed. R. Civ. P. 26(a) ............................................................................................................... 6, 7

28

Fed. R. Civ. P. 26(a)(1)(A)(ii) ........................................................................................ 6

Fed. R. Civ. P. 37 ................................................................................................. 1, 3, 6

Fed. R. Civ. P. 37(c)(1) .......................................................................................... 6, 7, 9

Fed. R. Evid. 702 ...................................................................................................... 3

1  **STATEMENT OF ISSUES TO BE DECIDED**

2  1.  Should this Court exclude Dr. List's testimony regarding his ████████████,

3  where the ██████████████:

4  a.  is unreliable and unhelpful to the fact finder in resolving the definition of the

5  relevant market in this case; and

6  b.  relies on data Facebook improperly failed to disclose to Consumers?

7  2.  Should this Court exclude Dr. List's testimony regarding his ████████████

8  where the ██████████████:

9  a.  relies on the ████████████, which should also be excluded;

10  b.  does not assist the fact finder in defining the relevant market because it relies

11  on a single variable ██████ that is competitively irrelevant; and

12  c.  concludes—contrary to the law—that increased competition *reduces* consumer

13  welfare?

14  3.  Should this Court exclude Dr. List's testimony regarding India's 2020 ban of Chinese

15  apps including TikTok, where:

16  a.  Dr. List offers no opinions regarding what is the relevant market or whether

17  TikTok is even in it; and

18  b.  Dr. List concedes that the India ban ████████████████████

19  ████████

20  4.  Should this Court exclude Dr. List's testimony regarding his ████████████,

21  where:

22  a.  Dr. List concedes that his ██████████████████████████

23  ████████████████████ and

24  b.  ██████████████ does not assist the finder of fact in defining the relevant

25  market because Dr. List concedes he offers no opinion that any of the apps in

26  his ██████████ must actually be included in the relevant market?

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   <u>INTRODUCTION</u>

John A. List, Ph.D. is one of Facebook's two economist relevant market experts who nevertheless fails to offer an opinion on what the relevant market is or whether particular apps are in or out of the relevant market. Instead, Dr. List renders a number of unreliable, legally unsupported, or irrelevant opinions in his report that should be excluded from trial.

***First***, Dr. List relies on a so-called ███████████ to opine that Consumers' Personal Social Network relevant market is not well-defined. In the experiment, ████████████ ████████████████████████████████████████████████ ███ ████████████████████████████████████████████████████ ████████████████████████████████████ ███████ ████████████████████████████████████████ The critical problem for Dr. List, however, is that he admits his ████████████ — ████████████████████ ████████████████████████████████████████████████ ████████████████████—does not allow him to determine whether any particular product or service should be included in the relevant market. Additionally, it is unreliable because the experiment is (a) ████████████████████████████████████ and (b) it ████████████████████████ ████████████████████████████. Separately, opinions based on this experiment should also be excluded as a sanction under Rule 37 because it relied on data Facebook failed to disclose to Consumers as required under Rule 26.

***Second***, Dr. List also relies on a so-called ████████████████████ ████████████████████████████████████. But, this ████████████ depends entirely on the results of the inadmissible ████████████. Furthermore, the ████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████. But, this does not allow Dr. List to reliably evaluate the relevant market because, critically, ████████████████████████████████████████████

1    ████████████████████████████████████████. Moreover, the model's conclusion—that

2    █████████████████████████████████████████████—is contrary

3    to the bedrock of antitrust law and therefore inadmissible on that separate basis.

4    **Third**, Dr. List's observes what apps █████████████████████████████████

5    ████████████████████████ and criticizes Consumers' market definition on this basis. But his

6    ███████████████████████████████████████████████████

7    ████████████████████████████████ It is also unreliable because

8    it is in the wrong geographic market, as Dr. List conceded, and looks at the wrong cross-elasticity of

9    demand (thereby rendering it entirely irrelevant and unhelpful in this case).

10   **Finally**, Dr. List's misleadingly-named ███████████████ opinions should be excluded.

11   ███████████████████████████████████████████████████

12   ███████████████████████████████████████████████████

13   ███████████████████████████████████████████████████

14   ████ This analysis is irrelevant and unreliable because—as Dr. List concedes—it fails to analyze the

15   source of this ████ measure economic substitution, or permit a conclusion about whether any specific

16   app should or should not be in Consumer's proffered PSN Market.

17   **II.    BACKGROUND**

18   Dr. List is a professor who specializes in █████████████████ Ex. 1 (List Rep.) ¶ 24.[1]

19   Neither his scholarship nor course offerings focus on antitrust economics. *Id.* ¶¶ 24-26. He has never

20   offered an opinion in litigation defining a relevant market. Ex. 3 (List Dep) at 179:24-180:1. Nor does

21   he do so in this case: ██████████████████████ *Id.* at 86:8-10. Dr. List's report

22   ███████████████████████████████████████████████████

23   █████████████████████████████ Ex. 1 (List Rep.) ¶ 2. According to Dr.

24   List, none of his analyses—excepting the ███████████████—is an implementation of the

25   Hypothetical Monopolist Test. Ex. 3 (List Dep.) at 86:8-18. Dr. List also criticizes the economic logic

26   and empirical methods used by Consumers' expert economists. Ex. 1 (List Rep.) ¶ 2.

27

28
_____

[1]   All exhibits cited are exhibits to the Declaration of Claire D. Hausman.

1

2   **III.**   **LEGAL STANDARDS**

3          Under *Daubert* and Federal Rule of Evidence 702, the trial court acts as a gatekeeper to ensure

4   that expert testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert v.*

5   *Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137,

6   152 (1999); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). The relevance

7   requirement asks whether the evidence is a "fit" with the issues to be decided, and whether it tends to

8   help the trier of fact understand or determine a fact in issue. *Daubert*, 509 U.S. at 591; *United States*

9   *v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006). "In assessing the relevance or 'fit' of expert

10  testimony, 'scientific validity for one purpose is not necessarily scientific validity for other, unrelated

11  purposes.'" *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 2018 WL

12  1948593, at *2 (N.D. Cal. Apr. 25, 2018). The reliability requirement asks whether the reasoning or

13  methodology underlying the testimony is scientifically valid. *Murray v. S. Route Maritime SA*, 870

14  F.3d 915, 922 (9th Cir. 2017). The proponent of expert testimony has the burden to establish by a

15  preponderance of the evidence that the testimony meets all of these requirements. *Daubert*, 509 U.S.

16  at 592 n.10.; *accord Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144,

17  1154 (9th Cir. 2012).

18  **IV.**   **DR. LIST'S OPINIONS SHOULD BE EXCLUDED**

19          **A.**   **Dr. List's Testimony About His** ███████████ **Should Be Excluded**

20          Dr. List's ████████████ — ████████████████████████████████████████

21  ████████████████████████████████████████████████ —should be excluded

22  because it fails to provide the fact finder any reliable or helpful means to evaluate the relevant market.

23  Separately and independently, it should be excluded as a sanction under Rule 37 because Facebook

24  failed to disclose data the experiment relied on as required under Rule 26.

25                  **1.**   **The** ████████████ **fails to provide any reliable or helpful way to**

26                       **evaluate the relevant market.**

27          Dr. List offers no opinion as to the relevant market Facebook operates in, and his ████████

28  ████████ does not permit him to conclude whether any particular product or service should be

1   included in that market. Ex. 3 (List Dep.) at 104:10–20, 105:10–21. █████████████████

2   ███████████████████████████████████████████████████████████████████████████████

3   ████████████████████. *See* Ex. 1 (List Rep.) at 49-50 (Tables III-9, III-10); Ex. 3 (List Dep.) at

4   70:21-71:3. Notably, the experiment shows ████████████████████████████████████████

5   ████████████ *see* Ex. 1 (List Rep.) at 49-50 (Tables III-9, III-10), which Dr. List acknowledged

6   could cover ███████████████████████████████████████████████████████████████████

7   ██████████████████████    Ex. 3 (List Dep.) at 107:13–108:8. Dr. List's █████████████ is thus

8   ██████████████████████    Ex. 3 (List Dep.) at 107:13–108:8. Dr. List's █████████████ is thus

9   unhelpful to evaluate the relevant market since he does not use it to opine that any apps or █████

10  █████ activities should have been, but were not, included in Consumers' proffered relevant market.

11       Moreover, Dr. List testified he is not offering the opinion that if, as Consumers assert,

12  Snapchat, MeWe, and Instagram are in the same relevant market as Facebook, ████████████████

13  ███████████████████████████████████████████████████████████████████████████████

14  ██████    Ex. 3 (List Dep.) at 87:24–92:12, 138:4–20. Dr. List testified anyone offering that opinion—

15  which reflects an approach called the █████████████—would be wrong as a matter of economics.

16  *Id.* at 88:17–25 ████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████ (emphasis added).

18       Additionally, ███████████████████████████████ is too short to measure

19  long-term substitution because users will not bother to switch services over the short-term due to the

20  cost of doing so. Economists look at long-term substitution for purposes of reliably evaluating a

21  relevant market. *See* Ex. 8, Hendel, Igal, and Aviv Nevo. "Measuring the implications of sales and

22  consumer inventory behavior." *Econometrica* 74, no. 6 (2006): 1637 (short-term estimation results in

23  significant mismeasurement of cross-price elasticity and substitution). Dr. List acknowledged

24  economists typically do so ████████████████████████████████████████████████████

25  ████████████████████████████████████    Ex. 3 (List Dep.) at 259:25–261:15. Yet Dr.

26  List failed to study ██████████████████████████████████████████████████, even

27  though he conceded there could be a difference between how users ████████████████████████

28  ███████████████████████████████████████████████    *Id.* at 174:16–19, 256:15–257:10. Indeed, the

1  ████████████████████████████████████████████ directly biases his results downward. Participants in

2  a ██████████████████████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████████████████████████

4  █████████████████████████████ . ████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████████████████████

9  ██████████████████████████████████████████████████████████████████████████

10  ████████████████████████████ Ex. 4 (Farrell Rebuttal Rep.) ¶ 111, Figures 9-10.

11       Relatedly, Dr. List's ████████████ should be excluded because it is subject to the

12  *Cellophane* fallacy, which he fails to control for, and in response to which he offers only an

13  unsupported assumption. The *Cellophane* fallacy is a well-established concept among economists that

14  explains: "[I]f the inquiry is being conducted after market or monopoly power has already been

15  exercised, using prevailing prices ***can lead to defining markets too broadly and thus inferring that***

16  ***dominance does not exist when, in fact, it does.***" Ex. 9 (2023 Merger Guidelines, § 4.3 Market

17  Definition) at 42–43 n. 83 (emphasis added). In other words, failing to address the problems of the

18  *Cellophane* Fallacy can lead to the wrong conclusion. Dr. List admits that the ████████████████

19  ████████████████████████████████████████████████████████████████████████████

20  ███████████████████████████████ Ex. 3 (List Dep.) at 154:6-10, 232:25-233:20;

21  Ex. 1 (List Rep.) ¶ 273. Dr. List's ████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████████ causing

23  him to run head-first into the *Cellophane* Fallacy. ████████████████████████████

24  ████████████████████████████████████████████████████████████████████████████

25  █████████████████████████████████████████████████████████████████

26  ███████████████████████████████████ Ex. 1 (List Rep.) ¶ 273; Ex. 3 (List Dep.)

27  at 235:15-236:9. The Court should therefore exclude Dr. List's ████████████ because it rests on

28  an unsupported assumption. *See In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *9

1  (N.D. Cal. Aug. 28, 2023) (Donato, J.) (excluding expert opinion where based on "wholly speculative

2  assumptions"). Moreover, even a cursory comparison of the ███████████████████████

3  ███████████████████████████████████████████████████████

4  ███████████████████████████████████████████████████████

5  ███████████████████████████████████████████████████████

6  ███████████████████████████████████████████████████████

7  ████  *Compare* Ex. 5 (Carlton Rep.) Tables 9 & 10, *with* Ex. 1 (List Rep.) Table III-9.

8      **2.    The ████████████ relies on data Facebook improperly failed to**

9      **disclose.**

10      Dr. List's opinions regarding his ████████████—which relies on data that was not

11  disclosed and to which Consumers had no access—is properly excluded as a sanction under Federal

12  Rule of Civil Procedure 37(c)(1). Dr. List began working on his ████████████. Ex. 3

13  (List Dep.) at 44:1–4, 176:18–177:16. In the ████████████ before it disclosed Dr.

14  List's report, Facebook gave Dr. List and his staff carte blanche access to its data servers. Facebook

15  denied Consumers access to this same data and moreover refused to produce data in response to

16  Consumers' discovery requests even though Consumers had made clear it was for their expert case

17  and that Facebook's delay was prejudicing them. The Federal Rules forbid such gamesmanship.

18      Rule 37(c)(1) "forbid[s] the use at trial of any information required to be disclosed by Rule

19  26(a) that is not properly disclosed." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101,

20  1106 (9th Cir. 2001); *see also* Fed. R. Civ. P. 37(c)(1). Rule 26(a) requires disclosure of, among other

21  things, all "electronically stored information . . . that the disclosing party has in its possession,

22  custody, or control and may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(ii).

23  The sanction under Rule 37(c)(1) for failing to do so is "a self-executing, automatic sanction to

24  provide a strong inducement for disclosure of material." *Yeti by Molly, Ltd.*, 259 F.3d at 1106 (cleaned

25  up); *see also* Fed. R. Civ. P. 37 adv. comm.'s note (1993). "[E]xclusion is an appropriate remedy for

26  failing to fulfill the required disclosure requirements of Rule 26(a)" even if a party "never violated an

27  explicit court order to produce" or "absent a showing in the record of bad faith or willfulness." *Yeti*

28

*by Molly, Ltd.*, 259 F.3d at 1106-07. A party may avoid exclusion if it proves its failure to disclose "is substantially justified or harmless." *Id.*; *see* Fed. R. Civ. P. 37(c)(1).

Facebook violated its required disclosure obligations under Rule 26(a) in two ways: (1) the Facebook data Dr. List had access to was ***never*** disclosed to Consumers; and (2) the particular Facebook data Dr. List eventually used as an input in his ███████ was not disclosed to Consumers until Dr. List served his report. Facebook provided Dr. List's staff at Compass Lexecon access to ***all*** Facebook data through a dedicated ████████ ████████████. Ex. 2 (List Rep. Appx.) at C-10; Ex. 3 (List Dep.) at 269:12-270:16. Consumers had no access to this data; as Dr. List testified, ███████ Ex. 3 (List Dep.) at 270:11-16. Additionally, Facebook dedicated several employees, whom Dr. List calls ███████ to provide him ***any*** data that he or his staff requested for his ███ ████ *Id.* at 268:25–269:11. This data included ███████ ████████████ Ex. 2 (List Rep. Appx.) at C-9, C-11, D-14, F-16. Dr. List then received data from Facebook on an ongoing basis, beginning in Fall 2022, Ex. 3 (List Dep.) at 263:15–266:13, but Facebook did not produce it to Consumers at the same time or at any time prior to serving Dr. List's report. *See generally* Ex. 1 (List Rep.) ███████ ████████████. Without the data he received from Facebook, Dr. List could not have run his ███████. Ex. 3 (List Dep.) at 267:1–268:9.

Facebook cannot prove that its failure to disclose this data was justified or harmless, and thus the proper sanction is exclusion of Dr. List's ███████ which relies on it. First, Facebook has no justification for denying Consumers' access to its data. "***There is no justification to handing over documents to an expert but omitting to hand them over to the other side, especially when the information had been requested under the rules.***" See *Bentley v. ConocoPhillips Pipeline Co.*, 2010 WL 11537799, at *8 (D. Mont. Feb. 3, 2010) (emphasis added). That is what Facebook did. On December 23, 2022, after Facebook had already provided Dr. List's staff with this access and began sending them data, Consumers served six discovery requests on Facebook for data. Facebook objected to five of the six requests on the grounds that they were "overly broad, unduly burdensome, and not

1  proportional to the needs of the case" and did not agree to produce **any** responsive data. Ex. 10

2  (Facebook Resps. & Objs. to Consumers' 5th Set Doc. Requests).

3        Consumers now know Facebook could have safely and easily provided them with access to

4  all of its data because it did so with Dr. List ███████████████████████  It did not do so.

5  Instead, four months after serving the requests, Consumers still had not received data from Facebook

6  in response to its requests despite numerous negotiation attempts. *See* Ex. 11 (4/19/2023 Email from

7  C. Hausman). Consumers were clear with Facebook that "Facebook's delay in producing responsive

8  data [was] affecting Consumers ability to prepare their expert case." *Id.* In an attempt to reduce

9  prejudice by getting some Facebook data for their expert analysis as quickly as possible, Consumers

10 requested that Facebook re-produce in this case the data that Facebook had produced to the FTC in

11 the *FTC* action against Facebook. *Id.* Facebook agreed, but still did not start producing that data until

12 another month had passed. *Id.* All the while, Facebook's expert, Dr. List, had preferred and non-

13 reciprocal access to all the Facebook data he wanted.

14        Second, Facebook's failure to disclose its data was not harmless. Facebook's failure to

15 disclose its data "deprived [Consumers] of fully informing [their] own expert." *Bentley*, 2010 WL

16 11537799, at *8. Facebook successfully foreclosed Consumers' economists Drs. Economides and

17 Farrell from using Facebook's full set of data in performing their relevant market analyses.

18 Additionally, "[Facebook] gained an advantage by allowing its expert to rely on things that

19 [Consumers] did not have but should have." *Id.* While Dr. List produced the Facebook data he used,

20 Consumers' expert did not have access to this data that Facebook had not previously produced.

21 Furthermore, what Dr. List produced with his report is a subset of the Facebook data and information

22 at Facebook which he had access to, so Consumers were unable to make a different selection of data

23 to run a different or counter experiment. Facebook also seeks to further gain an unfair advantage by

24 having its own expert testify that Consumers' expert analyses are supposedly deficient because,

25 according to him, ████████████████████████████████  *See, e.g*, Ex. 1 (List Rep.)

26 ¶¶ 238-242. This criticism is baseless, but also unfair, because Consumers' experts never could have

27 conducted an empirical study like Dr. List's ████████████ without the full access to Meta's data

28 servers via a ███████████████████████████████████████████████

1    ███████████ that Dr. List had. "In short, [Facebook] was 'gaming the system' by providing one set

2    of [data] to [Consumers] and another to its expert." *Bentley*, 2010 WL 11537799, at *8. "Here the

3    appropriate sanction is to prohibit the expert witness from testifying or expressing any opinion based

4    on documents [Facebook] should have produced to [Consumers] in its initial disclosures and

5    discovery responses, but failed to do." *Id.*; *accord Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259

6    F.3d at 1107 (affirming decision to exclude expert testimony as sanction under Rule 37(c)(1)).

7        **B.     <u>Dr. List's Testimony About His ███████████ Model Should Be Excluded</u>**

8        Dr. List's ███████████ should be excluded for three independent reasons: (1) it relies on

9    the ███████████ which should also be excluded; (2) it is irrelevant and unhelpful to evaluating

10   the relevant market; and (3) it is contrary to law.

11       ***First***, if the Court excludes Dr. List's ███████████, then Dr. List's opinions on his

12   █████████████████████████████████████████████████████████████████████████████████

13   ███████████████████████████████████ Ex. 3 (List Dep.) at 187:21-188:4; *see also id.* 189:18-

14   190:1 ████████████████████████████████████ Ex. 1 (List Rep.) ¶ 256.

15       ***Second***, Dr. List's testimony about his ███████████ should be excluded as irrelevant to

16   evaluating the market because it focuses solely on a ███████████ that is unimportant to

17   competition and Consumers' claims. Dr. List's ███████████ purports to evaluate Consumers'

18   proffered PSN market by ██████████████████████████████████████████████████████

19   █████████████████████████████████████████████████████████████████████████████████

20   ███████████████████████████████████. Ex. 1 (List Rep.) ¶¶ 16–17, 256, 264.

21   ████████████████████████████████████████████████. *Id.* ¶ 257; Ex. 3 (List

22   Dep.) at 190:20-25.

23   ███████████ Ex. 3 (List Dep.) at 190:9-14. Because, under a variety of assumptions, Dr.

24   List's model concludes that ████████████████████████████████████████████████████

25   ████████████████████████████████████. Ex. 1 (List Rep.) ¶ 267.

26       But Facebook's other economist, Dr. Carlton, testified that ███████—the only variable Dr.

27   List's ███████████ assesses—'██████████████████████████████████████████████████.

28   Ex. 6 (Carlton Dep.) at 118:2-22; Ex. 7 (Carlton *FTC* Rep.) at 10. And there is nothing else to Dr.

1   List's █████████. He concedes that his ██████ ████████

2   ████████████████████████████████████████████████████

3   ██████████████████████ Ex. 3 (List Dep.) at 191:5-8, 192:6-14, 196:9-13. Notably, his

4   model also ████████████████████████████████████████

5   ████████████████████████████████████████████████████

6   ████████████. *See* Ex. 1 (List Rep.) ¶ 264 ████████████

7   ████████████████████████████████████████████████████

8       **Third**, Dr. List's testimony on his ████████ should be excluded because it is contrary

9   to the law under which Consumers bring their claims. "The Sherman Act reflects a legislative

10  judgment that ultimately **competition will produce** not only lower prices, but also **better goods and**

11  **services**." *Nat'l Soc. of Pro. Engineers v. United States*, 435 U.S. 679, 695 (1978). "The assumption

12  that competition is the best method of allocating resources in a free market recognizes that all

13  elements of a bargain—quality, service, safety, and durability—and not just the immediate cost, are

14  favorably affected by the free opportunity to select among alternative offers." *Id.* Accordingly, the

15  Supreme Court has consistently stated for over 40 years that "[t]he statutory policy of the Act is one

16  of competition and it **precludes inquiry into the question whether competition is good or bad**." *Nat'l*

17  *Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 95 (2021) (cleaned up) (quoting *Nat'l Soc. of Pro.*

18  *Engineers*, 435 U.S. at 695). Argument by defendants that less competition in a service "results in a

19  higher quality product" is "nothing less than a frontal assault on the basic policy of the Sherman Act,"

20  and is not permitted. *PLS.Com, LLC v. Nat'l Assoc. of Realtors*, 32 F.4th 824, 836 (9th Cir. 2022).

21      Dr. List's ████████ does just that. Dr. List's conclusion from his model is that █████

22  ████████████████████████████████████████████████████

23  ██████████████████████ Ex. 3 (List Dep.) at 218:14–19; *see also* Ex. 1 (List Rep.) at

24  ¶ 267 ████████████████████████████████████████████

25  ██████████████████ Put more succinctly, Dr. List opines that if the relevant market defined

26  by Consumers ██████████████████████████ *Id.* at 185:17–186:3; Ex. 2 (List Rep.

27  Appx.) at P-14 (████████████████████████████████████

28  ████████████████████████████). In the same vein, Dr. List concludes from his

1  model that ███████████████████████. Ex. 3 (List Dep.) at 218:20–25. Such testimony is

2  "a frontal assault on the basic policy of the Sherman Act" and must be excluded. *PLS.Com, LLC*, 32

3  F.4th at 836; *see Nat'l Soc. of Pro. Engineers*, 435 U.S. at 695.

4        **C.**      <u>**Dr. List's Testimony About India's Ban of Chinese Apps Should Be Excluded**</u>

5        In June 2020, the Indian government banned nearly 60 Chinese apps, including TikTok. Ex.

6  1 (List Rep.) ¶ 140. Dr. List observes that when, as a result, Indian users' time spent on TikTok went

7  to near zero, ████████████████████████████████████████████████

8  ████████████████████  *Id.* ¶ 11. Dr. List opines that this is ████████████████████

9  ████████████████████████████████. *Id.* Dr. List's opinions regarding

10  what he calls ███████████████████—a ban that in reality applied to nearly 60 Chinese apps, of

11  which TikTok is only one—should be excluded because they are irrelevant and unreliable.

12        **1.**      **Dr. List's India Ban opinions are irrelevant because they cannot be used**

13                      **to evaluate what *is* the relevant market or even whether TikTok is in it.**

14        Dr. List's India Ban opinions amount to a simple observation that ████████████████

15  ████████████████████████████████████████████████████, and

16  accordingly, do not "aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591. Dr. List

17  conceded his India Ban analysis has a limited purpose: █████████████████████████████

18  ████████████████████████████████████████████████████████████

19  ███████████████████████████ Ex. 3 (List Dep.) at 174:12-15. Such an observation

20  does not assist the finder of fact to evaluate a relevant market for antitrust purposes. As discussed

21  above, Dr. List is not offering any opinion on what the relevant market *is* that Facebook operates in.

22  Ex. 3 (List Dep.) at 104:10-15. But Dr. List also concedes, ██████████████████████████

23  ████████████████████████████ *Id.* at 104:16–20, 105:10–21. Accordingly, Dr.

24  List's India Ban opinion also does not assist the fact-finder in assessing Consumer's PSN market,

25  which does not include Tik Tok.

26        Nor does Dr. List's comparison of the India Ban to a ████████████████ *id.* at 174:10-11,

27  make it helpful to evaluating the relevant market in this case. As Dr. List described it, a ██████████

28  ████████████████████████████████████████████. *Id.* at

94:12–95:16. To state the obvious, many goods and services "compete" for a consumer's dollar. But as the literature explains, that does not mean all of them are in the same relevant market. Ex. 12 (Newman Article) at 762 ("One might just as well argue that movie theaters, grocery stores, nightclubs and clothing designers all compete for money, and therefore must participate in the same relevant market. But no serious analyst would make such a claim."). Dr. List agreed with this limitation, stating that █████████████████████████████████████████████████████████ ███████████████████████████████████████████ Ex. 3 (List Dep.) at 95:17–25 (emphasis added).

### 2.    The India Ban does not reliably measure economic substitution.

Dr. List admits that the relevant market ███████████████████████████████████████ ████████████ Ex. 3 (List Dep.) at 117:10–11; List ¶ 180, yet concedes that his India Ban analysis ████ ████████████████, Ex. 3 (List Dep.) at 98:17–99:8 █████████████ ████████████████████████████████████████████████; *id.* at 94:12–95:25, 173:6–174:15 ███████████████████████████████████████████████████████████████ ████████████████████████████████████████.

Nor could Dr. List's India Ban opinions be used to reliably measure economic substitution. As Dr. List conceded, the India Ban took place in the wrong geographic market. Ex. 1 (List Rep.) ¶ 138 ████████████████████████████████████████████████████████████; Ex. 3 (List Dep.) at 173:12–174:1 ███████████████████████████████████████████████████ (emphasis added). Natural experiments can be used to analyze market definition only if they "control for . . . differences in the geographic market[.]". Ex. 13 (1-6 Antitrust Law Developments 6B-3-c). Dr. List failed to do this. Instead, Dr. List simply states, without citation or analysis, that ██████████ ████████████████████████████████████████████████ Ex. 1 (List Rep.) ¶ 138. And, Dr. List does not control at all for differences between US consumers' and Indian consumers' use of the apps, or even address this issue. *Id.* Dr. List's *ipse dixit* is not sufficient. *See In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *9 (N.D. Cal. Aug. 28, 2023) (Donato, J.) (excluding expert opinion where "analysis . . . is too anemic" and based on "wholly speculative assumptions that

1    make his opinions ipse dixit").

2         Dr. List's India Ban also measures the wrong movement and cross-elasticity of demand—

3    ██████████████████████████████████████████████████████████████████████████

4    ████████████████████████████. It is well-recognized in the field, including by Facebook's other

5    relevant market economist, that "they are not equal in general." Ex. 14, Perloff and Carlton, *Industrial*

6    *Organization*, 2d ed. at 807; *accord* Ex. 15, Besanko, *Microeconomics*, 3d ed. at 48 (same).

7         Dr. List's India Ban opinions should be excluded because they do not reliably assist a fact-

8    finder in evaluating whether TikTok is in or out of the relevant market and they cannot measure

9    economic substitution at all, let alone do so reliably.

10        **D.**    **Dr. List's Testimony About His** ██████████████ **Should Be Excluded**

11        Facebook operates a ████████████████████████████████████████████████████

12    ████████████████████████████ Ex. 1 (List Rep.) ¶¶ 10, 155. ████████████████████

13    ██████████████████████████████████████████████████████████████████████████

14    ████████████ *Id.* ¶ 155. ████████████████████████ must be excluded because it does not further

15    the inquiry into what is the relevant market in this case, and it is manifestly unreliable for that purpose.

16        ***First***, Dr. List's ████████████████ does not assist in evaluating the relevant market because

17    it ██████████████████████████████████████. Economic literature explains that

18    "[t]he inferences drawn from a natural experiment ***require an understanding of the source of the***

19    ***change/difference in market structure*** and whether these differences are due to the variable of

20    interest or the other underlying market conditions." Ex. 16 (ABA 2008 Study) at 753 (emphasis

21    added). Dr. List's ████████████████ does not do this. Dr. List admitted that his ██████████

22    ██████████████████████████████████████████████████████████████████████████

23    ████████████ *Id.* at 97:9, 98:4, 98:11–12. Accordingly, ████████████████ is a misnomer. ████████

24    ██████████████████████████████████████████████████████████████████████████

25    ██████████████████████████████████████████████████████████████████████████

26    ██████████████████████████████████████████████████████████████████████████

27    ██████████████████████████████████████████████████████████████████████████

28    ██████████████████████████████████████████████████████████████████████ *Id.* ¶ 171

(Figure III-13). ██████████████ amounts at best to a list of apps and categories, some in the PSN Market and some not, ███████████████████████████ with no punchline. *See* Ex. 1 (List Rep) at 71-72 (Tables III-13, III-14).

Additionally, as explained above, Dr. List opines the relevant market ███████████ ████████████████ Ex. 3 (List Dep.) at 117:10–11; List ¶ 180, but conceded his ██████████████████████████. Ex. 3 (List Dep.) at 94:4–6 ██████ ████████████████████████), 96:17–21, 98:13–23.

**Second**, Dr. List's ████████████ does not aid the fact-finder in evaluating Consumer's proffered PSN market. Dr. List's █████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████ Ex. 3 (List Dep.) at 104:10–20, 105:10–21.

**Finally**, Dr. List's comparison of his ███████████████████████, Ex. 3 (List Dep.) at 87:24–88:12, does not save it; as discussed above, ████████████ is neither a helpful nor reliable means of evaluating a relevant market.

## V.   **CONCLUSION**

Consumers respectfully request that Dr. List's opinions regarding his: (1) ████████ ███████ (2) ███████████, (3) India Ban analysis, and (4) ██████████████ be excluded.

1    DATED: April 5, 2024

2    By: /s/ Shana E. Scarlett                          By: /s/ Kevin Y. Teruya

3    **HAGENS BERMAN SOBOL SHAPIRO LLP**    **QUINN EMANUEL URQUHART & SULLIVAN, LLP**
     Shana E. Scarlett (Bar No. 217895)             Kevin Y. Teruya (Bar No. 235916)
4     shanas@hbsslaw.com                             kevinteruya@quinnemanuel.com
     715 Hearst Avenue, Suite 202                   Adam B. Wolfson (Bar No. 262125)
5    Berkeley, CA 94710                              adamwolfson@quinnemanuel.com
     (510) 725-3000                                 Scott L. Watson (Bar No. 219147)
6                                                     scottwatson@quinnemanuel.com
     Steve W. Berman (admitted *pro hac vice*)      Claire D. Hausman (Bar No. 282091)
7     steve@hbsslaw.com                              clairehausman@quinnemanuel.com
     1301 Second Avenue, Suite 2000                 Brantley I. Pepperman (Bar No. 322057)
8    Seattle, WA 98101                               brantleypepperman@quinnemanuel.com
     (206) 623-7292                                 865 South Figueroa Street, 10th Floor
9                                                    Los Angeles, CA 90017-2543
                                                     (213) 443-3000
10   *Interim Co-Lead Consumer Class Counsel*

11                                                   Michelle Schmit (admitted *pro hac vice*)
                                                      michelleschmit@quinnemanuel.com
12   **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**            191 N. Wacker Drive, Suite 2700
     W. Joseph Bruckner (admitted *pro hac*         Chicago, IL 60606-1881
13   *vice*)                                         (312) 705-7400
      wjbruckner@locklaw.com
14   Robert K. Shelquist (admitted *pro hac*        Manisha M. Sheth (admitted *pro hac vice*)
     *vice*)                                         manishasheth@quinnemanuel.com
15    rkshelquist@locklaw.com                        51 Madison Avenue, 22nd Floor
     Brian D. Clark (admitted *pro hac vice*)       New York, New York 10010
16    bdclark@locklaw.com                            (212) 849-7000
     Rebecca A. Peterson (Bar No. 241858)
17    rapeterson@locklaw.com                        *Interim Co-Lead Consumer Class Counsel*
     Kyle Pozan (admitted *pro hac vice*)
18    kjpozan@locklaw.com
     Laura M. Matson (admitted *pro hac vice*)
19    lmmatson@locklaw.com
     100 Washington Avenue South, Suite
20   2200
     Minneapolis, MN 55401
21   (612) 339-6900

22   *Interim Counsel for the Consumer Class*

23

24

25

26

27

28

1

**ATTESTATION OF KEVIN Y. TERUYA**

2      This document is being filed through the Electronic Case Filing (ECF) system by attorney

3 Kevin Y. Teruya. By his signature, Mr. Teruya attests that he has obtained concurrence in the filing

4 of this document from each of the attorneys identified on the caption page and in the above signature

5 block.

6

Dated: April 5, 2024                    By   /s/ Kevin Y. Teruya
7                                                    Kevin Y. Teruya

8

9                              **CERTIFICATE OF SERVICE**

10      I hereby certify that on this 5th day of April 2024, I electronically transmitted the foregoing

11 document to the Clerk's Office using the CM/ECF System, causing it to be electronically served on

12 all attorneys of record.

13

14                              By   /s/ Kevin Y. Teruya
                                          Kevin Y. Teruya

15

16

17

18

19

20

21

22

23

24

25

26

27

28