1

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
 Kevin Teruya (Bar No. 235916)

2
 kevinteruya@quinnemanuel.com
865 South Figueroa Street, 10th Floor

3
Los Angeles, CA 90017
(213) 443-3000

4

**HAGENS BERMAN SOBOL SHAPIRO LLP**

5
 Shana E. Scarlett (Bar No. 217895)
 shanas@hbsslaw.com

6
715 Hearst Avenue, Suite 202
Berkeley, CA 94710

7
(510) 725-3000

8
*Interim Co-Lead Consumer Class Counsel*

9
[Additional counsel listed on signature page]

10

11
**UNITED STATES DISTRICT COURT**

12
**NORTHERN DISTRICT OF CALIFORNIA**

13
**SAN FRANCISCO DIVISION**

14
| | |
|---|---|
| MAXIMILIAN KLEIN, et al., | Consolidated Case No. 3:20-cv-08570-JD |

15
Plaintiffs,

**CONSUMER PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE PORTIONS OF DR. DENNIS CARLTON'S PROPOSED TESTIMONY**

16
    vs.

17
META PLATFORMS, INC.,

The Hon. James Donato

18
Defendant.

Hearing Date: June 20, 2024 at 10:00 a.m.

19
This Document Relates To: All Consumer Actions

**PUBLIC REDACTED VERSION**

20

21

22

23

24

25

26

27

28

1

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on June 20, 2024, at 10:00 a.m., before the Honorable James Donato, of the United States District Court of the Northern District of California, San Francisco Division, 450 Golden Gate Avenue, San Francisco, California, Courtroom 11, 19th Floor, Plaintiffs Maximillian Klein, Sarah Grabert, and Rachel Banks Kupcho ("Consumers"), on behalf of themselves and all others similarly situated, hereby move the Court for an order excluding portions of the merits expert reports and testimony of Dr. Dennis Carlton.

This motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, all filed supportive declarations and exhibits, the records, pleadings, and other documents on file in this consolidated action, and any argument that may be presented to the Court.

1

## **<u>TABLE OF CONTENTS</u>**

<u>Page</u>

2

3    I.      INTRODUCTION....................................................................................................1

4    II.     BACKGROUND.....................................................................................................2

5    III.    LEGAL STANDARDS ..........................................................................................3

6    IV.     ARGUMENT ..........................................................................................................4

7            A.      Dr. Carlton's ▓▓▓▓▓▓ Is Unreliable ......................................................4

8                    1.      Dr. Carlton Fails to Reliably Measure Long-Term Substitution...................4

9                    2.      Dr. Carlton's *Cellophane* Fallacy Claims Are *Ipse Dixit*............................5

10           B.      Dr. Carlton's Opinions Regarding the ▓▓▓▓▓▓▓▓▓▓
                     on Facebook Are Unreliable and Rely on Undisclosed Information ........................7

11
                     1.      Dr. Carlton Blindly Relies on Data that He Concedes Is Unreliable ............7

12
                     2.      Dr. Carlton Relies on Information that Facebook Failed to Disclose ............9

13
             C.      Dr. Carlton's Opinions Regarding the Inclusion of Particular Products in the
14                   Relevant Market and His Resulting Share Calculations Should Be Excluded........11

15                   1.      Dr. Carlton Relies on His Own ▓▓▓▓▓▓▓▓ and on Dr. List's
                             Analyses, All of Which Should Be Excluded ...............................................11

16
                     2.      Dr. Carlton Selectively Relies on the Rejected "Circle Principle" ..............12

17
             D.      Dr. Carlton's Opinion that Competition May ▓▓▓▓▓ or ▓▓▓▓▓▓▓
18                   ▓▓▓▓▓ Is Contrary to Decades of Law..............................................................15

19   V.      CONCLUSION ......................................................................................................15

20

21

22

23

24

25

26

27

28

CONSUMERS' MOTION TO EXCLUDE DR. CARLTON'S PROPOSED TESTIMONY

1

# <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

<u>Cases</u>

4

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
5     303 F.3d 256 (2d Cir. 2002) ................................................................................................. 15

6 *Baker v. Firstcom Music*,
    2018 WL 2676636 (C.D. Cal. May 8, 2018) ......................................................................... 9
7

8 *Bentley v. ConocoPhillips Pipeline Co.*,
    2010 WL 11537799 (D. Mont. Feb. 3, 2010) ...................................................................... 11
9

*Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*,
10     683 F.3d 1144 (9th Cir. 2012) .............................................................................................. 4

11 *Call Delivery Sys., LLC v. Morgan*,
    2022 WL 1252412 (C.D. Cal. Mar. 7, 2022) ........................................................................ 9
12

13 *Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ......................................................................................................... 3, 4
14

*Deficcio v. Winnebago Indus., Inc.*,
15     2014 WL 4211274 (D.N.J. Aug. 25, 2014) ......................................................................... 15

16 *Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) ................................................................................................ 3
17

18 *In re Google Play Store Antitrust Litig.*,
    2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) ................................................................ 7, 14
19

*Kumho Tire Co. v. Carmichael*,
20     526 U.S. 137 (1999) ............................................................................................................. 3

21 *Murray v. S. Route Maritime SA*,
    870 F.3d 915 (9th Cir. 2017) ................................................................................................ 4
22

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
23     2018 WL 1948593 (N.D. Cal. Apr. 25, 2018) ...................................................................... 4

24 *Nat'l Collegiate Athletic Ass'n v. Alston*,
    594 U.S. 69 (2021) ............................................................................................................. 15
25

26 *Nat'l Soc. of Pro. Eng'rs v. United States*,
    435 U.S. 679 (1978) ........................................................................................................... 15
27

*In re TMI Litig.*,
28     193 F.3d 613 (3d Cir. 1999) ................................................................................................. 8

*United Food & Com. Workers Loc. 1776 v. Teikoku Pharma USA,*
   296 F. Supp. 3d 1142 (N.D. Cal. 2017) ................................................................. 15

*United States v. Aetna Inc.,*
   240 F. Supp. 3d 1 (D.D.C. 2017) ........................................................................... 13

*United States v. Eastman Kodak Co.,*
   63 F.3d 95 (2d Cir. 1995) ........................................................................................ 6

*United States v. Sandoval-Mendoza,*
   472 F.3d 645 (9th Cir. 2006) ................................................................................... 3

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,*
   259 F.3d 1101 (9th Cir. 2001) ........................................................................... 9, 10

## **Other Authorities**

Fed. R. Civ. P. 26(a)(1)(A)(ii) .................................................................................. 9

Fed. R. Evid. 702 .................................................................................................... 3

Rule 26 .......................................................................................................... iv, 1, 9

Rule 26(a) .............................................................................................................. 9

Rule 37 .......................................................................................................... iv, 1, 9

Rule 37(c)(1) ..................................................................................................... 9, 10

## STATEMENT OF ISSUES TO BE DECIDED

The issues to be decided with respect to Consumers' Motion are:

1.   Should this Court exclude Dr. Carlton's testimony regarding Meta's October 2021 ▇▇▇▇▇▇ where:

    a.   the results of a ▇▇▇▇▇▇▇▇▇▇ do not provide reliable measures of long-run substitution, which is the type of substitution that economists evaluate for market definition purposes; and

    b.   Dr. Carlton admits that his ▇▇▇▇▇▇ does not control for the *Cellophane* fallacy, and he provides only *ipse dixit* assertions that the fallacy does not invalidate his analysis?

2.   Should this Court exclude Dr. Carlton's testimony regarding ▇▇▇▇▇▇▇ on Facebook where:

    a.   Dr. Carlton blindly relies on data whose reliability he admits he did not independently verify even though Facebook ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇; and

    b.   Dr. Carlton relies on information that Facebook failed to disclose in violation of Rule 26 and that should therefore be excluded as a sanction under Rule 37?

3.   Should this Court exclude Dr. Carlton's testimony that TikTok, YouTube, Twitter, and messaging apps must be included in the relevant market if Snapchat is, and Dr. Carlton's resulting market share calculations, where:

    a.   Dr. Carlton's opinion relies on ▇▇▇▇▇▇▇▇▇▇ and from Dr. List's analyses, all of which should be excluded; and

    b.   Dr. Carlton's opinion relies on the Circle Principle, a rejected methodology that Dr. Carlton himself applies selectively?

4.   Should this Court exclude Dr. Carlton's testimony that competition may ▇▇▇▇▇ ▇▇▇▇▇▇▇▇, where such an argument that "competition is bad" is contrary to decades of law and forbidden as a matter of law?

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.      INTRODUCTION**

3          Dr. Dennis Carlton is one of Facebook's economist experts who offers liability and relevant

4   market opinions. Certain of Dr. Carlton's opinions are unreliable and unhelpful to the fact finder, and

5   they should be excluded.

6          ***First***, Dr. Carlton purports to critique Consumers' proffered Personal Social Network Market

7   based on the results of a ███████████████████████ (Section IV.C.2 of his opening merits

8   report). But, by its very nature, his ██████████ does not measure ***long-run substitution***, which is

9   what economists evaluate for market definition purposes. The conclusions Dr. Carlton draws from

10  his ██████████ therefore do not rely on any sort of well-accepted methodology. Moreover, while

11  Dr. Carlton acknowledges the well-accepted *Cellophane* fallacy, he admits that his ██████████

12  cannot and does not control for its potential effects; his assertion that the fallacy does not

13  meaningfully affect his results is *ipse dixit*.

14         ***Second***, Dr. Carlton opines that ████████████████████████ of the time

15  that users spend on Facebook (Section IV.B.1 of his opening merits report), but bases that opinion on

16  two months of data pulled from a single file Facebook provided and ████████████████

17  ██████████. He nevertheless blindly assumed, but did not verify, the data he used did not suffer

18  from the same problem; he also admits that even the months he did look at contained unreliable data.

19  Dr. Carlton's opinion should also be excluded under Rule 37 because it relies on information from

20  Facebook—how the data should be interpreted, and explanations of ████████████████

21  ██████████—that neither Facebook nor he ever disclosed in violation of Rule 26.

22         ***Third***, Dr. Carlton opines that TikTok, YouTube, Twitter, and various messaging apps are

23  "closer" substitutes to Facebook than Snapchat and should therefore be included in the relevant

24  market if Snapchat is, which supposedly means Facebook lacks monopoly power (Section V.A.I. of

25  his opening report). But, his sole basis for these opinions is the ████████████████████

26  ██████████, as well as Dr. List's analyses, which should be excluded for the reasons set

27  forth in Consumers' contemporaneously-filed *Daubert* motion. Dr. Carlton thus has no basis to assert

28  these products should be in the relevant market nor to calculate market shares based on that

1   assumption. Separately, this opinion is based on the "Circle Principle," a methodology rejected by

2   U.S. competition authorities' Merger Guidelines and Facebook's own expert Dr. List, the limitations

3   of which Dr. Carlton himself recognizes, and that Dr. Carlton applies selectively.

4          **_Finally_**, Dr. Carlton opines that more competition may ███████████████████

5   ███████ for users (Section III.A.3. of his opening report). This, however, is a poorly-disguised

6   argument that "more competition is bad," which is contrary to decades of law and the U.S. Supreme

7   Court's directive that a defendant may not make such arguments as a matter of law.

8   **II.      BACKGROUND**

9          Dr. Carlton is an economist that has appeared multiple times for Facebook in antitrust cases.

10  Ex. 2 (Carlton Tr.) at 140:10–141:1. He offers no affirmative definition of the relevant market. _Id._ at

11  16:7–24, 18:5–19:17. Instead, he argues that Consumers' proffered PSN Market—consisting of

12  Facebook, Instagram, Snapchat, MeWe, and other now-defunct products from Myspace, Friendster,

13  and Orkut—should include other types of products. _Id._ at 19:2–13. To do so, he offers four primary

14  opinions and analyses—the substance of which is summarized below, and the problems of which are

15  discussed in the Argument section.

16         ████████████. On October 4, 2021, all of Meta's apps—including (among others)

17  Facebook, Instagram, WhatsApp, Messenger, and Viewpoints—███████████████████

18  ███████████████ Ex. 1 (Carlton Rep.) ¶ 117. Based on data from a sample of Google

19  Android device users, Dr. Carlton ██████████████████████████████████

20  ████████████████████.[1] _Id._ ¶ 120. He asserts that when Meta's apps went down, various

21  apps outside Consumers' PSN Market—TikTok, YouTube, the Samsung and Google Messages apps,

22  the Google Chrome web browser, Twitter, and the Samsung One UI Home user interface—all gained

23  more time than did Snapchat (which is in Consumers' PSN Market). _Id._ ¶ 120, Table 9.

24         ████████████ **_Usage on Facebook_**. Consumers assert that ████████████████

25  █████████████ for personal social networks like Facebook and differentiates firms in the

26  PSN Market from other types of services that are outside the market. Ex. 1 (Carlton Rep.) ¶ 81. Based

27

28  [1] Dr. Carlton ██████████████████
    ████████████████████████████████████ Ex. 2 (Carlton Tr.) at 113:18–23, 114:14–20.

1   on post-Class Period data from Facebook for June 2022 and January 2023, Dr. Carlton purports to

2   evaluate Consumers' assertion by purporting to analyze what portion of time and content on Facebook

3   constitutes ███████████████. Ex. 1 (Carlton Rep.) ¶ 88, Table 6.

4        ***Relevant Market and Market Share Calculations***. Dr. Carlton opines that if, as Consumers

5   assert, Snapchat is in the relevant market, then other apps that are "closer" substitutes to Facebook

6   and Instagram than Snapchat must be included in the relevant market as well. Ex. 1 (Carlton Rep.) ¶¶

7   121, 144–45. Based on ███████████████████ and Dr. List's analyses, Dr. Carlton

8   opines that YouTube, TikTok, Twitter, and messaging apps ███████████████████

9   █████████████████████████████████. *Id.* Dr.

10  Carlton then ████████████████████████████ various scenarios

11  incorporating these other apps in the market. ████████████████████

12  ████████████████████████████████████████

13  ████████████████████████████████████████

14  ████████████████████████████████████████

15  ████████████████████████████████████████

16  ████████████████████████████████████████

17  ████████ Ex. 2 (Carlton Tr.) at 213:17–214:5, 222:9–223:1; Ex. 1 (Carlton Rep.) ¶ 148, Table 12.

18        ***Deception, Privacy, and Competition***. Dr. Carlton opines that while deception ████

19  ████████████████████████████████████████

20  █████████████████████ Ex. 1 (Carlton Rep.) ¶¶ 8, 25, 28–30.

21  **III.   LEGAL STANDARDS**

22        Under *Daubert* and Federal Rule of Evidence 702, the trial court acts as a gatekeeper to ensure

23  that expert testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert v.*

24  *Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137,

25  152 (1999); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). The relevance

26  requirement asks whether the evidence is a "fit" with the issues to be decided, and whether it tends to

27  help the trier of fact understand or determine a fact in issue. *Daubert*, 509 U.S. at 591; *United States*

28  *v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006). "In assessing the relevance or 'fit' of expert

1  testimony, 'scientific validity for one purpose is not necessarily scientific validity for other, unrelated

2  purposes.'" *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 2018 WL

3  1948593, at *2 (N.D. Cal. Apr. 25, 2018). The reliability requirement asks whether the reasoning or

4  methodology underlying the testimony is scientifically valid. *Murray v. S. Route Maritime SA*, 870

5  F.3d 915, 922 (9th Cir. 2017). The proponent of expert testimony has the burden to establish by a

6  preponderance of the evidence that the testimony meets all of these requirements. *Daubert*, 509 U.S.

7  at 592 n.10; *accord Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144,

8  1154 (9th Cir. 2012).

9  **IV.    ARGUMENT**

10  **A.    Dr. Carlton's ███████ Is Unreliable**

11  Dr. Carlton's ███████ should be excluded first because it fails to measure long-term

12  substitution—what economists evaluate to define a market. Separately, Dr. Carlton's ███████

13  is subject to the *Cellophane* fallacy, for which he admittedly did not control, and in response to which

14  he offers only *ipse dixit* assumptions that he did not test and are based on zero literature.

15  **1.    Dr. Carlton Fails to Reliably Measure Long-Term Substitution**

16  Dr. Carlton's ██████████████████

17  ████████████. Ex. 1 (Carlton Rep.) ¶¶ 117,

18  117 n. 188. As Dr. Carlton explains, ████████████

19  ████████████████████

20  ████████████ Ex. 2 (Carlton Tr.) at 24:11–23. For market definition purposes,

21  however, economic literature explains that economists seek to identify the substitutes to which

22  consumers turn over the ***long-term*** when a given product's price goes up or its quality decreases. *See*

23  Ex. 7 (Hendel, Igal, and Aviv Nevo, "Measuring the implications of sales and consumer inventory

24  behavior." *Econometrica* 74, no. 6 (2006) at p. 1637) (explaining short-term estimation results in

25  significant mismeasurement of cross-price elasticity and substitution, and recognizing distinction

26  between "long- and short-run price effects"). Indeed, in the ordinary course of their duties at the

27  company, ████████████████████

28  ████████████████ Ex. 6 (PALM-003694642)

1    at -644. ███████████████████████████████████████████

2    ███████████████████████████████████████████████

3    ███████████████████████████████ Ex. 5 (Cunningham Tr.) at 79:24–80:16.

4        In the face of a ████████████, rather than seek out a true substitute for the service that is

5    temporarily unavailable, an individual may ████████████████████████

6    ████████████████████████████████████████████ For

7    example, when a person's Xfinity internet service goes out for a few hours, they may read a book or

8    cook salmon rather than incur the time and cost of replacing their Xfinity internet with Verizon

9    internet. Similarly, when a person's Southwest flight is late, they might grab coffee in the airport,

10    rather than replace their flight with another on United. ██████████████████

11    ███████████████████████████████████████████████

12    ███████████████████████████████████████████████

13    ███████████████████████████████████████████████

14    █████████████████████████████████

15        Indeed, Dr. Carlton's █████████████████████████████████

16    ███████████████████████████████████████████████

17    ███████████████████████████████████████████████

18    ██████. Carlton Table 9. Just as reading a book or cooking salmon is not a substitute for internet

19    service, and grabbing coffee at the airport is not a substitute for a flight, all activities on the entire

20    internet (via the Chrome web browser) and doing anything on a device (via the Samsung UI Home

21    interface) are not substitutes for Facebook and Instagram. Dr. Carlton's ████████████ should be

22    excluded because it fails to reliably measure long-run substitution.

23              **2.**    **Dr. Carlton's *Cellophane* Fallacy Claims Are *Ipse Dixit***

24        Dr. Carlton's ████████████ should also be excluded because it is subject to the *Cellophane*

25    fallacy, which he fails to control for, and in response to which he offers only unsupported

26    assumptions. The *Cellophane* fallacy is a well-established concept among economists that explains

27    where a relevant market has already been monopolized, "using prevailing prices can lead to defining

28    markets too broadly and thus inferring that dominance does not exist when, in fact, it does." Ex. 9

1   (2023 Merger Guidelines, § 4.3 Market Definition) at pgs. 42–43 n.83. This is because where a firm

2   has already monopolized the market for a product and then raises prices, consumers may, in the face

3   of that price increase, turn to products that are not actually in the market, giving the false impression

4   they are close substitutes, because "[a]t a high enough price, even poor substitutes look good to the

5   consumer." *United States v. Eastman Kodak Co.*, 63 F.3d 95, 105 (2d Cir. 1995).

6       Dr. Carlton considers the results of ████████████████████████

7   ████—from the real world, where Facebook is an alleged monopolist. In this way, Dr. Carlton

8   runs head-first into the *Cellophane* fallacy. Indeed, Consumers' and ████████████████

9   ████████, all recognize the *Cellophane* fallacy and its potential ramifications in using real-life

10  ████████████ from the actual world, where Facebook is an alleged monopolist, to define the relevant

11  market. ████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████

13  ███; Ex. 3 (List Rep.) ¶ 18. Tellingly, Dr. Carlton acknowledged ████████████████

14  ████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████. Ex.

16  2 (Carlton Tr.) at 249:17–250:3.

17       ████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████

26  ████████████████████████████ *Id.* at 252:21–254:2.

27       But Dr. Carlton conceded that ████████████████████████████

28  ████████████████████████████████████████████████████████. Ex. 2

1    (Carlton Tr.) at 250:20–251:5, 251:20–252:20. ███████████████████████████

2    ██████████████████████████████████████████████. *Id.* at 254:3–25.

3    The Court should therefore exclude Dr. Carlton's ██████████ because his explanation for why

4    the *Cellophane* fallacy does not invalidate his ██████████ rests on an unsupported assumption.

5    *See In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *9 (N.D. Cal. Aug. 28, 2023)

6    (Donato, J.) (excluding expert opinion where based on "wholly speculative assumptions").

7         Moreover, even a cursory comparison of the ████████████████████████████

8    ███████████████████████████████████████████████████████████████████████

9    ███████████████████████████████████████████████████████████████████████

10   ███████████████████████████████████████████████████████████████████████

11   ███████████████████████████████████████████████████████████████████████

12   ███████████████████████████████████████████████████████████████████████

13   ███████████████████████████████████████████████████████████████████████

14   ██████ *Compare* Ex. 1 (Carlton Rep.) Tables 9 & 10, *with* Ex. 3 (List Rep.) Table III-9. ██████

15   ███████████████████████████████████████████████████████████████████████

16   ███████████████████████████████████████████████████████████████████████

17   ████████████████████████████████ Dr. Carlton therefore has no basis for his

18   assumption that ██████████████████ would stay the same absent Facebook's conduct.

19        **B.    Dr. Carlton's Opinions Regarding the** █████████████████████████ **on**
         **Facebook Are Unreliable and Rely on Undisclosed Information**

20        The Court should exclude Dr. Carlton's opinion that █████████████████ reflects a

21   minority of how users spend their time on Facebook because it is based on data from Facebook whose

22   reliability Dr. Carlton blindly accepted, ████████████████████████████.

23   Separately, Dr. Carlton's opinion should be excluded because it relies on information that Facebook

24   failed to disclose during fact discovery and in either of Dr. Carlton's reports.

25        **1.    Dr. Carlton Blindly Relies on Data that He Concedes Is Unreliable**

26        During deposition, Dr. Carlton for the first time revealed a number of irregularities regarding

27   the data that he used to reach his opinions, including, for example:

28



Dr. Carlton offers a single justification for nonetheless using this admittedly flawed data set. He asserts that while data for earlier months in the same data file he uses is unreliable, ████ ██████████████████████████████████████████████████████████ Ex. 2 (Carlton Tr.) at 180:5–12, 183:13–20, at 187:7–18. That does not suffice to satisfy *Daubert*'s reliability requirements.

For one, Dr. Carlton's explanation that the two months of data he analyzed are somehow reliable even though earlier months of data in the same data file are not does not hold water. ████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████. Ex. 1 (Carlton Rep.) ¶ 88 n. 152; Ex. 2 (Carlton Tr.) at 174:22–175:9; *cf. In re TMI Litig.*, 193 F.3d 613, 697 (3d Cir. 1999) ("If the data underlying the expert's opinion are so unreliable that no reasonable expert could base an opinion on them, the opinion resting on that data must be excluded.").

Moreover, Dr. Carlton's assertion that the data he does analyze is reliable even though data from other months in the same file is not is *ipse dixit*. He concedes that neither he nor his staff made *any effort whatsoever* to independently verify the reliability of the data he used; he admits he is

1 ████████████████████████████████████████████████████:

2 • ████████████████████████████████████████████████████
   Ex. 2 (Carlton Tr.) at 180:5–17 (emphasis added).

3 • ████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████

5 ████████████████████████████ *Id.* at 183:21–184:4, 190:22–191:11.

6 • ████████████████████████████████████████████████████
   Ex. 2 (Carlton Tr.) at 197:12–19, 198:9–16 (emphasis added).

In the end, "[e]xperts are expected to verify the reliability of the data underlying their conclusions independently instead of simply adopting the representations of an interested party." *Call Delivery Sys., LLC v. Morgan*, 2022 WL 1252412, at *1 (C.D. Cal. Mar. 7, 2022). Dr. Carlton concedes that he did zero independent verification of the reliability of the data he uses to form his opinion. Instead, he admits that he exclusively relies on ████████████████████████████████ His opinion must therefore be excluded. *See Baker v. Firstcom Music*, 2018 WL 2676636, at *2 (C.D. Cal. May 8, 2018) (excluding expert opinion as unreliable because expert "failed to verify the underlying data at the core of her expert opinion independently" and "appears to rely entirely on [her client's] representations").

### 2. Dr. Carlton Relies on Information that Facebook Failed to Disclose

Dr. Carlton's ████████████████████████████ should also be excluded as a sanction under Rule 37 because it relies on information that Facebook failed to disclose in violation of Rule 26. Rule 26 requires disclosure of all "documents" and "electronically stored information . . . that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(ii). Rule 37(c)(1) "forbid[s] the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). Dr. Carlton's opinion relies on numerous pieces of information Facebook failed to disclose, and Facebook's failure to disclose that information was and continues to be highly prejudicial to Consumers.

For example, Facebook during discovery failed to disclose the reliability issues regarding the data described *supra*. Those issues directly caused Dr. Carlton to make certain decisions regarding

1    ███████████████████████████████████████████████. And even

2    though Dr. Carlton submitted two expert reports in this case—an opening report and a rebuttal

3    report—and he ████████████████████████████████ at the time he submitted his reports,

4    these issues were not disclosed during discovery or in either of his reports. Ex. 2 (Carlton Tr.) at

5    193:24–194:18.

6         In addition, Dr. Carlton testified that his opinion relies on understandings of the data—*e.g.*,

7    what particular fields in the data mean and how to interpret them—████████████████████

8    █████████████████████████████████████████████████████████████████

9    █████████████████████████████████████████████████████████████████

10   ███████ *See* Ex. 2 (Carlton Tr.) at 161:20–162:1, 176:8–11, 177:6–177:12; *see also* 159:25–160:14

11   & 163:22–167:7 ███████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████████.

13   █████████████████████████████████████████████████████████████████

14   █████████████████████████████████████.

15        Dr. Carlton's March 7, 2024 deposition—which came after the close of fact discovery, and

16   after the parties' exchange of expert reports—was the first time that Dr. Carlton and Facebook even

17   hinted at these issues. ████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████. *See,*

19   *e.g.*, Ex. 2 (Carlton Tr.) at 157:23–158:9, 158:24–159:4, 160:4–14, 164:10–22, 167:8–168:9, 176:20–

20   177:1, 186:21–187:11 ████████████████████████████████████████████████

21   █████████████████████████████████████████████████████████████████

22   ██████████████████████ Facebook's failure to disclose these issues was neither justified (it knew

23   of these issues during discovery, and certainly by the time Dr. Carlton's reports were served in

24   January and February 2024), nor harmless. *See Yeti*, 259 F.3d at 1106–07 (noting that a party may

25   avoid exclusion if it proves its failure to disclose "is substantially justified or harmless."); *see also*

26   Fed. R. Civ. P. 37(c)(1).

27        Had Consumers had the same access to information that Facebook provided to Dr. Carlton—

28   ████ ████████████████████████████████—Consumers and their experts could have made

1    additional use of the data that Facebook produced in this litigation. Instead, ███████████

2    ████████████████████████████████████████████████████████████████████████████

3    ██████ Facebook stonewalled Consumers' requests for information regarding Facebook's data.

4    Similarly, ███████████████████████████████████████████████████████████████████

5    Consumers could have undertaken their own further investigation into those issues and further

6    challenged Dr. Carlton's decisions and analyses of the data in Consumers' own expert reports.

7    Facebook prevented that by engaging in gamesmanship.

8           Facebook's failure to disclose these issues makes exclusion of Dr. Carlton's opinion the only

9    appropriate remedy. *Bentley v. ConocoPhillips Pipeline Co.*, 2010 WL 11537799, at \*8 (D. Mont.

10   Feb. 3, 2010) (explaining that "[t]here is no justification to handing over documents to an expert but

11   omitting to hand them over to the other side," and excluding expert testimony since party "gam[ed]

12   the system" and "gained an advantage by allowing its expert to rely on things that [opposing party]

13   did not have but should have.").

### C.    Dr. Carlton's Opinions Regarding the Inclusion of Particular Products in the Relevant Market and His Resulting Share Calculations Should Be Excluded

15          The Court should exclude Dr. Carlton's opinion that certain products must be included in the

16   relevant market if Snapchat is, and his resulting market share calculations, because they depend on

17   ██████████████████████████████████████████ and from Dr. List's analyses, which themselves

18   should be excluded. Moreover, Dr. Carlton's opinion is based on his selective and unreliable

19   application of the Circle Principle—a methodology that has been rejected.

### 1.    Dr. Carlton Relies on ████████████████████████ and on Dr. List's Analyses, All of Which Should Be Excluded

22          Dr. Carlton's opinion that TikTok, Twitter, YouTube, and messaging services must be

23   included in the relevant market if Snapchat is also in the market, as well as his resulting market share

24   calculations, should be excluded because they rely ████████████████████████████████████

25   ████████████, as well as on Dr. List's analyses. Ex. 1 (Carlton Rep.) ¶¶ 125, 144–45. As explained

26   *supra*, ██████████████████████████ should be excluded. And as explained in Consumers'

27   concurrently-filed motion to exclude Dr. List's testimony—████████████████████████████

28   ██████████████████████████████████████ Dr. Carlton's opinion and resulting share

1    calculations, which rely on these analyses, should therefore be excluded as well.

2              **2.      Dr. Carlton Selectively Relies on the Rejected "Circle Principle"**

3              Dr. Carlton's opinion that TikTok, Twitter, YouTube, and messaging services must be

4    included in the relevant market if Snapchat is also in the market should separately be excluded

5    because it relies on the rejected Circle Principle. *See* Ex. 1 (Carlton Rep.) ¶¶ 9, 115, 121, 125; *see*

6    *also* Ex. 2 (Carlton Tr.) at 17:4–7, 58:10–25. The Circle Principle states, "[w]hen applying the

7    hypothetical monopolist test to define a market around a product offered by one of the merging firms,

8    if the market includes a second product, the Agencies will normally also include a third product if

9    that third product is a closer substitute for the first product than is the second product."[2] Ex. 8 (2010

10   U.S. Department of Justice and the Federal Trade Commission Horizontal Merger Guidelines

11   ("Merger Guidelines"), § 4.1.1 The Hypothetical Monopolist Test) at p. 9. This is true even if the first

12   and second products together satisfy the hypothetical monopolist test. *Id.* (Example 6). Dr. Carlton

13   explains the methodology—also referred to as "algorithmic" market definition—as follows: ███

14   ████████████████████████████████████████████████████████████

15   ███████████████████████ Ex. 2 (Carlton Tr.) at 58:10–25.

16         For purposes of this case, Dr. Carlton explains ████████████████████████

17   ████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████

19   ███████  Ex. 2 (Carlton Tr.) at. 17:5–7; Ex. 1 (Carlton Rep.) ¶ 121. There are several problems with

20   Dr. Carlton's opinions that render them inadmissible.

21         ***First***, Dr. Carlton's Circle Principle approach provides no basis ████████████

22   ███████████████████████████████████████. Dr. Carlton's Circle

23   Principle approach relies on ████████████████████████████████████

24   ████████████████████████████████████████████████████████.

25   ████████████████████████████████████████████████████████████

26

27   ───────────────────
     [2]   The hypothetical monopolist test "asks whether eliminating the competition among the group of
     products by combining them under the control of a hypothetical monopolist likely would lead to a

28   worsening of terms of customers." Ex. 9 (2023 Merger Guidelines, § 4.3.A The Hypothetical
     Monopolist Test) at p. 41.

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████████

4 ██████████ Ex. 1 (Carlton Rep.) ¶ 120; Ex. 3 (List Rep.) ¶¶ 64-65, 162. ████████

5 ████████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████████

8 ████████████████████████████████████████████████ Ex. 1 (Carlton Rep.)

9 ¶ 153. ██████████████████████████████████████████████.

10      ***Second***, the Circle Principle is an approach to market definition that has been rejected. It was

11 reflected in the 2010 Merger Guidelines promulgated by the FTC and DOJ Antitrust Division. *See*

12 Ex. 8 (2010 Merger Guidelines, § 4.1.1 The Hypothetical Monopolist Test) at p. 9. However,

13 economists have grown skeptical of the Circle Principle—so much so, that the 2023 Merger

14 Guidelines issued by the FTC and DOJ Antitrust Division do not mention it at all. Instead, the 2023

15 Merger Guidelines make clear that "[t]here may be effective competition among a narrow group of

16 products, . . . making the narrow group a relevant market, even if competitive constraints from

17 significant substitutes are outside the group." Ex. 9 (2023 Merger Guidelines, § 4.3 Market

18 Definition) at p. 40. In other words, a group of products—say A, D, and E—can correctly constitute

19 a relevant market by themselves, even if B and C are closer substitutes to A than D and E. *See Id.* at

20 p. 40 ("The loss of both the competition between the narrow group of products and the significant

21 substitutes outside that group may be even more harmful, but that does not prevent the narrow group

22 from being a market in its own right."); *see also United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 37–

23 40 (D.D.C. 2017) (rejecting Circle Principle).

24      Dr. Carlton provides no support for his opinion, premised on the Circle Principle, ████

25 ████████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████████

27 ██████████████ Ex. 2 (Carlton Tr.) at 61:3–14. But he, for example, cites zero literature in

28 support of his assertion. Expert opinions that amount to "*ipse dixit*" are subject to exclusion. *See*

*Google Play*, 2023 WL 5532128, at *9. And beyond being unsupported, another of Facebook's own economist experts, Dr. List, testified that the Circle Principle ▉▉▉▉. Ex. 4 (List Tr.) at 87:24–92:12

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ (emphasis added).

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉ Ex. 2 (Carlton Tr.) at 69:23–70:17, 71:18–25, 80:19–81:13. To the extent Dr. Carlton has not disavowed his opinions based on the Circle Principle, those opinions should be excluded.

**Finally**, Dr. Carlton's cherry-picking of results from his own analysis is a telling recognition of the Circle Principle's unreliability. He opines that YouTube, TikTok, Twitter, iMessage, Google Messages, and two of Meta's other apps—Messenger and WhatsApp—should be included in the relevant market if Snapchat is based on ▉▉▉▉▉▉▉ Ex. 1 (Carlton Rep.) ¶¶ 144–45. However, the one analysis he performed, ▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

Under Dr. Carlton's own Circle Principle methodology, then, ▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. ▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉ *See Id.*, Carlton Tables 10 & 11.

When confronted with this inconsistency at deposition, Dr. Carlton reversed course, ▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉ Ex. 2 (Carlton Tr.) at 93:4–95:16, 216:19–217:3. ▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. That is a telling admission that

1   shows the unreliability of Dr. Carlton's Circle Principle methodology—█████ ███████████████████

2   █████████████████████████████████████████████████████████████████████████████

3   ███████████████████████████████████████████████████████████████████████████████

4   ███████████████████████████████████████████████████████████████████████████████

5   ███████████████████████████████████████. *See Amorgianos v. Nat'l R.R. Passenger Corp.*,

6   303 F.3d 256, 268 (2d Cir. 2002) (exclusion proper where expert "failed to apply his own

7   methodology reliably"); *Deficcio v. Winnebago Indus., Inc.*, 2014 WL 4211274, at *6 (D.N.J. Aug.

8   25, 2014) (excluding expert opinion because expert "did not follow his own methodology").

9       **D.      Dr. Carlton's Opinion that Competition May "Reduce" or "Lower" Privacy
            Protections Is Contrary to Decades of Law**

10          Dr. Carlton's opinions that competition ████████████████████████████████████████

11   should be excluded as contrary to law. The Supreme Court has long recognized that "competition is

12   the best method of allocating resources" and "ultimately competition will produce not only lower

13   prices, but also better goods and services." *Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679,

14   695 (1978). It is thus well-settled that the Sherman Act "precludes inquiry into the question whether

15   competition is good or bad." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 95 (2021). Dr.

16   Carlton's opinion is a poorly disguised assertion that "competition is bad." His opinion is therefore

17   not only unhelpful to the fact finder, it is forbidden and must be excluded. *See United Food & Com.*

18   *Workers Loc. 1776 v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1183 (N.D. Cal. 2017) (expert

19   opinions that are "contrary to the law" may be excluded "through the *Daubert* process.").

20   **V.      CONCLUSION**

21          Consumers respectfully request that the Court exclude Dr. Carlton's opinions regarding: (1)

22   ██████████████████████; (2) ████████████████████████████; (3) particular products that Dr.

23   Carlton claims must be included in the relevant market, as well as his resulting market share

24   calculations, and (4) competition ████████████████████████████

25

26

27

28

1    DATED: April 5, 2024

2    By: /s/ Shana E. Scarlett                    By: /s/ Kevin Y. Teruya

3    **HAGENS BERMAN SOBOL SHAPIRO LLP**          **QUINN EMANUEL URQUHART & SULLIVAN, LLP**
     Shana E. Scarlett (Bar No. 217895)          Kevin Y. Teruya (Bar No. 235916)
4     shanas@hbsslaw.com                           kevinteruya@quinnemanuel.com
     715 Hearst Avenue, Suite 202                Adam B. Wolfson (Bar No. 262125)
5    Berkeley, CA 94710                           adamwolfson@quinnemanuel.com
     (510) 725-3000                              Scott L. Watson (Bar No. 219147)
6                                                 scottwatson@quinnemanuel.com
     Steve W. Berman (admitted *pro hac vice*)   Claire D. Hausman (Bar No. 282091)
7     steve@hbsslaw.com                            clairehausman@quinnemanuel.com
     1301 Second Avenue, Suite 2000              Brantley I. Pepperman (Bar No. 322057)
8    Seattle, WA 98101                            brantleypepperman@quinnemanuel.com
     (206) 623-7292                              865 South Figueroa Street, 10th Floor
9                                                Los Angeles, CA 90017-2543
10   *Interim Co-Lead Consumer Class Counsel*    (213) 443-3000

11                                               Michelle Schmit (admitted *pro hac vice*)
12   **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**         michelleschmit@quinnemanuel.com
     W. Joseph Bruckner (admitted *pro hac*      191 N. Wacker Drive, Suite 2700
13   *vice*)                                     Chicago, IL 60606-1881
      wjbruckner@locklaw.com                     (312) 705-7400
14   Robert K. Shelquist (admitted *pro hac*
     *vice*)                                     Manisha M. Sheth (admitted *pro hac vice*)
15    rkshelquist@locklaw.com                     manishasheth@quinnemanuel.com
     Brian D. Clark (admitted *pro hac vice*)    51 Madison Avenue, 22nd Floor
16    bdclark@locklaw.com                        New York, New York 10010
     Rebecca A. Peterson (Bar No. 241858)        (212) 849-7000
17    rapeterson@locklaw.com
18   Kyle Pozan (admitted *pro hac vice*)        *Interim Co-Lead Consumer Class Counsel*
      kjpozan@locklaw.com
19   Laura M. Matson (admitted *pro hac vice*)
      lmmatson@locklaw.com
20   100 Washington Avenue South, Suite
     2200
21   Minneapolis, MN 55401
     (612) 339-6900
22
23   *Interim Counsel for the Consumer Class*

24

25

26

27

28

1

**ATTESTATION OF KEVIN Y. TERUYA**

2         This document is being filed through the Electronic Case Filing (ECF) system by attorney

3   Kevin Y. Teruya. By his signature, Mr. Teruya attests that he has obtained concurrence in the filing

4   of this document from each of the attorneys identified on the caption page and in the above signature

5   block.

6
          Dated: April 5, 2024              By   /s/ Kevin Y. Teruya
7                                                Kevin Y. Teruya

8

9                           **CERTIFICATE OF SERVICE**

10        I hereby certify that on this 5th day of April 2024, I electronically transmitted the foregoing

11  document to the Clerk's Office using the CM/ECF System, causing it to be electronically served on

12  all attorneys of record.

13
                                           By   /s/ Kevin Y. Teruya
14                                              Kevin Y. Teruya

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSUMERS' MOTION TO EXCLUDE DR. CARLTON'S PROPOSED TESTIMONY