**HAGENS BERMAN SOBOL SHAPIRO LLP**
Shana E. Scarlett (Bar No. 217895)
shanas@hbsslaw.com
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Kevin Y. Teruya (Bar No. 235916)
kevinteruya@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000

*Interim Co-Lead Consumer Class Counsel*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> META PLATFORMS, INC., <br><br> Defendant. <br><br> This Document Relates To: All Consumer Actions | Consolidated Case No. 3:20-cv-08570-JD <br><br> **CONSUMER PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL** <br><br> The Hon. James Donato <br> Date: TBD <br><br> **REDACTED VERSION** |

1

**NOTICE OF MOTION AND MOTION**

2      **PLEASE TAKE NOTICE** that at a time and place to be determined by the Court, before

3  the Honorable James Donato, of the United States District Court of the Northern District of

4  California, San Francisco Division, 450 Golden Gate Avenue, San Francisco, California,

5  Courtroom 11, 19th Floor, Plaintiffs Maximillian Klein, Sarah Grabert, and Rachel Banks Kupcho

6  ("Consumers"), on behalf of themselves and all others similarly situated, hereby move the Court

7  for an order granting their renewed motion for class certification pursuant to Federal Rule of Civil

8  Procedure 23.

9      This motion is based upon this Notice of Motion, the accompanying Memorandum of Points

10  and Authorities, all filed supportive declarations and exhibits, the records, pleadings, and other

11  documents on file in this consolidated action, and any argument that may be presented to the Court.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   CLASS DEFINITION .......................................................................................... 3

III.  LEGAL STANDARD ........................................................................................... 3

IV.   PROFFER OF COMMON EVIDENCE AND FACTS ........................................ 4

    A.   Facebook has monopoly power in the personal social network market ........................................................................................................ 4

    B.   Common evidence shows Facebook acquired and then *maintained* monopoly power by deceiving the market about its collection and use of consumer data ............................................................................ 7

        1.   Data practices are a key factor for competition in the PSN market ........................................................................................... 7

        2.   Facebook repeatedly misrepresented and omitted key information about its data collection and use practices. ............................ 8

        3.   Facebook's deception prevented consumers and the market from discovering its true data collection and use practices ..................... 10

        4.   Facebook's rivals could not combat its repeated, market-wide deception. ......................................................................... 11

    C.   Common evidence shows antitrust impact to all or nearly all class members. .................................................................................. 12

    D.   Damages will be proven using classwide evidence. ............................. 13

V.    ARGUMENT ..................................................................................................... 13

    A.   The Consumer Class satisfies all the elements of Rule 23(a). ............. 14

        1.   The class is numerous. ................................................................... 14

        2.   Common questions of law and fact exist, given the focus on Facebook's actions (and deceptions). .......................................... 14

        3.   The named plaintiffs' claims are typical of the class. .................. 14

        4.   Named plaintiffs will adequately represent the class. .................. 15

    B.   Common questions predominate under Rule 23(b)(3). .......................... 15

1      1. Facebook acknowledges that market definition is a common
         question. ................................................................................. 16

2

3      2. Facebook's monopoly power in the PSN market is a
         common question. ................................................................... 16

4

5      3. Consumers' antitrust liability theory relies entirely on
         common evidence...................................................................... 17

6      4. Common evidence will demonstrate all class members
7         suffered antitrust impact........................................................... 21

8      5. Using the well-established yardstick model, Dr. Economides
         calculates damages to the class. ............................................... 23

9

10    C. Class treatment is the superior method of adjudication under Rule
      23(b)(3). ........................................................................................... 24

11    D. Consumers request that the Court reaffirm co-lead counsel. ................................ 25

12 VI.  CONCLUSION................................................................................................ 25

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSUMER PLS.' RENEWED MOT. FOR CLASS CERTIFICATION   Case No. 3:20-cv-08570-JD

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Pubs.,*
5   *Inc.,*
   108 F.3d 1147 (9th Cir. 1997) ........................................................................ 3, 18, 19

6

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,*
7   568 U.S. 455 (2013) ................................................................................................ 4, 15

8   *Apple Inc. v. Pepper,*
   139 S. Ct. 1514 (2019) ......................................................................................... 15, 23
9

*Broadcom Corp. v. Qualcomm Inc.,*
10   501 F.3d 297 (3d Cir. 2007) ................................................................................ 17, 18

11
   *In re Capacitors Antitrust Litig.,*
12   2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) ............................................................ 4

13   *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC,*
   148 F.3d 1080 (D.C. Cir. 1998) ............................................................................... 18
14

15   *Carnegie v. Household Int'l, Inc.,*
   376 F.3d 656 (7th Cir. 2004) .................................................................................... 24

16
   *Fed. Trade Comm'n v. Qualcomm Inc.,*
17   969 F.3d 974 (9th Cir. 2020) ...................................................................................... 3

18   *Giuliano v. Sandisk Corp.,*
   2015 WL 10890654 (N.D. Cal. May 14, 2015) ....................................................... 19
19

20   *In re Glumetza Antitrust Litig.,*
   336 F.R.D. 468 (N.D. Cal. 2020) ...................................................... 17, 19, 21, 23

21
   *Hawaii v. Standard Oil Co. of Cal.,*
22   405 U.S. 251 (1972) .................................................................................................... 4

23   *In re HIV Antitrust Litig.,*
   2022 WL 22609107 (N.D. Cal. Sept. 27, 2022) ...................................................... 23
24

25   *Image Tech. Servs., Inc. v. Eastman Kodak Co.,*
   125 F.3d 1195 (9th Cir. 1997) ............................................................................. 3, 23

26
   *Jabbari v. Farmer,*
27   965 F.3d 1001 (9th Cir. 2020) .................................................................................. 18

28

CONSUMER PLS.' RENEWED MOT. FOR CLASS CERTIFICATION        Case No. 3:20-cv-08570-JD

*Jimenez v. Allstate Ins. Co.*,
  765 F.3d 1161 (9th Cir. 2014) ............................................................... 14

*Just Film, Inc. v. Buono*,
  847 F.3d 1108 (9th Cir. 2017) ............................................................... 14

*In re Live Concert Antitrust Litig.*,
  247 F.R.D. 98 (C.D. Cal. 2007) ............................................................ 16

*Moehrl v. Nat'l Ass'n of Realtors*,
  2023 WL 2683199 (N.D. Ill. Mar. 29, 2023) ....................................... 23

*In re Mushroom Direct Purchaser Antitrust Litig.*,
  319 F.R.D. 158 (E.D. Pa. 2016) ............................................................ 16

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
  2023 WL 1813530 (C.D. Cal. Feb. 7, 2023) ......................................... 23

*Ochoa v. McDonald's Corp.*,
  2016 WL 3648550 (N.D. Cal. July 7, 2016) (Donato, J.) ...................... 14

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir.) (2022) (en banc) ..................................... 4, 22, 23

*Pecover v. Elec. Arts Inc.*,
  2010 WL 8742757 (N.D. Cal. Dec. 21, 2010) ...................................... 14

*Ruiz Torres v. Mercer Canyons Inc.*,
  835 F.3d 1125 (9th Cir. 2016) ............................................................... 15

*Soares v. Flowers Foods, Inc.*,
  320 F.R.D. 464 (N.D. Cal. 2017) .......................................................... 24

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  264 F.R.D. 603 (N.D. Cal. 2009) .......................................................... 18

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003) ................................................................. 15

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
  373 F.3d 57 (1st Cir. 2004) ................................................................... 19

*In re Suboxone (Buprenorphine Hydrocholoride & Nalaxone) Antitrust Litig.*,
  421 F. Supp. 3d 12 (E.D. Pa. 2019) ...................................................... 19

*In re Tableware Antitrust Litig.*,
  241 F.R.D. 644 (N.D. Cal. 2007) .......................................................... 14

*In re Terazosin Hydrochloride Antitrust Litig.*,
  220 F.R.D. 672 (S.D. Fla. 2004) ..................................................... 16, 17

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016) ........................................................................................................ 15

*U.S. v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ......................................................................................... 18

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ........................................................................................................ 14

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
   382 U.S. 172 (1965) ........................................................................................................ 18

*In re Warfarin Sodium Antitrust Litig.*,
   391 F.3d 516 (3d Cir. 2004) ........................................................................................... 19

*In re Wellbutrin XL Antitrust Litig.*,
   282 F.R.D. 126 (E.D. Pa. 2011) ..................................................................................... 17

**Federal Statutes**

Sherman Act .................................................................................................................... *passim*

**Federal Rules**

Fed. R. Civ. P. 23 ............................................................................................................ *passim*

**Other Authorities**

6 Newberg & Rubenstein on Class Actions § 20:28 (6th ed.) ................................. 15, 23

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
   Principles and Their Application* ¶ 782b ................................................................... 18

1

## I.     INTRODUCTION

*"The No. 1 thing that people care about is privacy and the handling of their data,"*

Mark Zuckerberg, Facebook CEO.[1]

This is an antitrust case alleging Facebook[2] illegally monopolized and attempted to monopolize the personal social network services (PSNS or PSN) market. Facebook acquired its monopoly position, and has ***maintained*** that position, through repeated misrepresentations over its data collection and use practices. Facebook claimed its focus on users' privacy differentiated its social network from competitors, but its claims were false.

The motive behind Facebook's continued deception is clear: profit. Facebook's business model monetizes user data by selling targeted advertising derived from that data. The more data it collects and uses, the more money it makes. And, as the dominant PSNS provider in the nation, it rakes in advertising dollars at a profit margin far beyond other would-be competitors, all on the backs of its users and their data.

But consumers care deeply about their online privacy and data.[3] To gain user trust sufficient to defeat its competitors allowing it to extract the type of detailed data necessary to sell targeted advertising, Facebook needed to misrepresent and obfuscate the full scope of its data collection and use practices. As the Supreme Court, Ninth Circuit, and multiple other courts recognize, deception is a form of anticompetitive conduct. That is the case here. Facebook's active and repeated deception about its actual data practices (admittedly "██████"[4]), allowed it to artificially maintain its monopoly position in the PSNS relevant market and deprive its competitors of the ability to compete.

Plaintiffs thus bring this challenge to Facebook's deception-based monopoly maintenance

---

[1] Ex. 1 at 2. All Exhibit references are to the Declaration of Shana E. Scarlett, contemporaneously filed herewith. All emphases are added unless otherwise indicated.

[2] Facebook, Inc. legally changed its name to Meta Platforms, Inc. on October 28, 2021. Plaintiffs continue to refer to the defendant as Facebook for numerous reasons. That name applied during the class period, it still refers to the largest of Meta's social network services, and cuts through the company's attempt to rebrand away from its multitude of scandals.

[3] Ex. 2 at 2 ████████████████████████████).

[4] Ex. 3 at 2 (suggesting Facebook should ████████████████████████████████████████ ████████████████████████████).

CONSUMER PLS.' RENEWED MOT. FOR CLASS CERTIFICATION          Case No. 3:20-cv-08570-JD

1   scheme under Section 2 of the Sherman Act, and seek to certify a class consisting of all persons in

2   the United States who maintained and used a Facebook profile between December 3, 2016 and

3   December 3, 2020 (the "Consumer Class").

4       All of the elements of plaintiffs' claim turn on common evidence. Liability, including

5   whether Facebook engaged in a deceptive course of conduct by misrepresenting and failing to

6   disclose relevant facts to the market, focuses entirely on Facebook's acts, as Facebook made its

7   misleading disclosures and omissions market wide. Antitrust impact and damages are also both

8   common issues turning on common evidence. Consumers seek the difference between what

9   Facebook paid them for their data in the monopolized, real world ($0) and what they would have

10  received in compensation in the competitive, *but-for* world (approximately $5/month).

11      This $5/month compensation derives from three factual bases. *First*, is the well-accepted

12  concept of "zero-price markets," where consumers pay no cash for a product, but the product is

13  not free. Consumers pay for the product with something of value other than cash; often, their data.

14  In such markets, competition can force the price "negative," meaning the product provider

15  compensates the user for their data. (Anyone who has received discounts at the supermarket in

16  exchange for providing their purchase history via a "club" card has experienced this concept in

17  practice.) *Second*, this compensation model is also supported by a number of comparable real-

18  world instances where large, well-known companies paid users for their data, including Facebook.

19  Each of these yardsticks occur under circumstances where Facebook and the other companies

20  needed to disclose the full extent of their data collection and use and to compensate users

21  accordingly, just like Facebook would have needed to do in the *but-for* world. The *third* factual

22  basis supporting classwide impact and damages is that, in the actual world, Facebook offered the

23  same terms to all users for their data regardless of their individual preferences. It did not and could

24  not negotiate individual terms with individual users. The same uniform (and inherently common)

25  approach would have held true in the *but-for* world. For that reason, all users suffered the same

26  harm—a $5 monthly overcharge.

27      As this record of common evidence establishes, the Consumer Class satisfies all of Rule

28  23's certification requirements. With respect to Rule 23(a), numerosity exists; class members

number in the millions. Class members share the same liability and damages questions. Typicality is satisfied as Consumers all bring the same two antitrust claims under Section 2, against the same defendant, based on the same legal theories, resulting in the same type of injury. And, the named plaintiffs will adequately protect the Class's interests, as they have doggedly pursued this case for several years and have well-qualified counsel. *See* section V.A, *infra*.

The Class also meets Rule 23(b)(3)'s predominance requirements. Every issue of liability in this case, "(a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury,"[5] and damages will be resolved classwide using common evidence. Class treatment is also the superior method for adjudicating Consumers' claims. *See* section V.B–C, *infra*.

For these reasons, Plaintiffs respectfully request that the Court grant their motion.

## II.    CLASS DEFINITION

Plaintiffs move to certify a class of all persons in the United States who created and used a Facebook profile at any point from December 3, 2016 to December 3, 2020.[6]

## III.    LEGAL STANDARD

The Sherman Act Section 2 prohibits willfully acquiring or maintaining monopoly power in the relevant market. "Monopoly power is 'the power to control prices or exclude competition.'"[7]

Deception is one way monopolists can willfully acquire and/or maintain power.[8] Personal social networks trade on trust. Facebook's users pay for its services with their data. Ex. 4 (Facebook Chief Privacy Officer recognizing that to use Facebook and 

Because users trusted Facebook's abundant (and false) assertions that

---

[5] *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020).

[6] The typical exclusions to this class apply, including: (1) Defendant Meta Platforms, Inc. ("Meta"), any entity in which Meta has an interest, any of Meta's corporate parents, affiliates, subsidiaries, officers, directors, legal representatives, successors and assigns; (2) any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff; (3) any juror; and (4) any experts, consultants, or counsel involved in this litigation, including their staffs.

[7] *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966).

[8] *See, e.g.*, *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Pubs., Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997).

Facebook respects their privacy and gives users full control over what data it collects and who uses their data and how, users preferred Facebook over its competitors. Facebook's resulting monopoly power allowed it to provide less compensation to users for their data (*i.e.*, $0) and to extract more data from users than it could in a competitive market. This is not a consumer protection case, but consumer data and how Facebook used it is crucial to this antitrust claim.

The Supreme Court has long recognized that class actions play a vital role in antitrust enforcement.[9] Class certification requires plaintiffs to demonstrate they meet Rule 23(a); namely, there are "questions of law or fact common to the class," and there is "numerosity, typicality and adequacy of representation.[10] Plaintiffs must next, by a "preponderance of evidence" show the class fits into one of three categories of Rule 23(b).[11] And while the Court's "class certification analysis must be 'rigorous' and may entail some overlap with the merits of the plaintiff's underlying claim, . . . [m]erits questions may be considered to the extent—but only to the extent— that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."[12]

## IV.    PROFFER OF COMMON EVIDENCE AND FACTS

The legal questions before the Court on this motion for class certification are narrow and readily answered. Three of the class certification factors—numerosity, typicality, and commonality—are not seriously disputed. Plaintiffs also easily satisfy the remaining Rule 23 prerequisites. Facebook may attempt to distract the Court with additional matters, but class certification "is decidedly not an alternative form of summary judgment or an occasion to hold a mini-trial on the merits."[13]

### A.    Facebook has monopoly power in the personal social network market.

Common evidence will show the relevant market is personal social network services, also referred to here as the PSNS (or PSN) market. Personal social networks are websites and

---

[9] *See Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 266 (1972).
[10] *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir.) (2022) (en banc).
[11] *Id.* at 665.
[12] *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).
[13] *In re Capacitors Antitrust Litig.*, 2018 WL 5980139, at *10 (N.D. Cal. Nov. 14, 2018).

smartphone apps that facilitate online interactions between users and their friends and family. Participants in this market include Facebook, Instagram (which Facebook owns), Snapchat, and MeWe, and now-defunct products like Google+, Myspace, and Friendster. Economides ¶¶ 8, 24–32.[14] The market's geographic scope is the United States. *Id.* ¶¶ 19, 41–42.

Facebook does not truly dispute that common proof will answer market definition and monopoly power questions classwide. Facebook's only class certification expert, Dr. Tucker, conceded as much. Ex. 5 at 2-3 (Tucker Dep.).

Beyond this concession of predominating proof, Plaintiffs' antitrust economist, Dr. Nicholas Economides, relies on common evidence and established economic principles to define the relevant market and measure Facebook's dominance in it. Defining the relevant market requires identifying products that are reasonable substitutes to the one at issue. A reasonable substitute is a product with the same core use, *i.e.*, it is "reasonably interchangeable" with another product for that same purpose. Economides ¶¶ 24–26. The starting point for his analysis was Facebook's flagship personal social network: Facebook. This product's "core" use is connecting with friends and family. Ex. 6 at 2 (Sandberg IH Tr.). To identify other products with the same core use, Dr. Economides analyzed internal Facebook documents, testimony from Facebook and other industry participants, market analyses, and surveys, all of which is evidence that is common to the class. He concludes that personal social networks such as Instagram (also owned by Facebook), Snapchat, and MeWe, and Google+ were reasonably interchangeable with Facebook during the class period. Economides ¶¶ 27–28. Niche networking services (*e.g.*, LinkedIn and Nextdoor), private messaging services (*e.g.*, iMessage and WhatsApp), and public content services (*e.g.*, YouTube, TikTok, Twitter, Reddit, and Pinterest)—are not. *Id.* ¶¶ 29–32.

Dr. Economides confirmed this market definition using a quantitative SSNIP test (measuring a small but significant and non-transitory increase in price) despite PSN services not charging users a monetary price. A real-world event—Apple's introduction of its "App Tracking Transparency" feature and measuring what happened afterwards—allowed Dr. Economides to

---

[14] "Economides" refers to the Abridged Expert Declaration of Nicholas Economides, Ph.D. in Support of Renewed Motion to Certify Class.

1    assess whether a hypothetical monopolist in the PSN market could profitably impose a SSNIP,

2    SSNDQ (a small but significant and non-transitory decrease in quality), or some combination

3    thereof. Neither this method, nor its answer, differ by Consumer Class member, and the answer

4    confirmed that the PSN market is sufficiently broad to be a relevant antitrust market.

5         To illustrate, Apple in 2021 introduced its "App Tracking Transparency" (ATT) feature.

6    Through a pop-up prompt, ATT required an iOS app (such as Facebook) to obtain users' agreement

7    to "track" users (*i.e.*, collect and use their data) ***outside*** that app. By limiting services' ability to

8    track users, ATT led to a decrease in the effective price of those services (data collection and use).

9    ATT had profound impacts on Facebook (and jointly-owned Instagram) and Snapchat, which

10   comprise the bulk of the PSN market. ████████████████████████████

11   ████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████

15   ██████████████████████████████████████████. All of this confirms

16   users pre-ATT were giving up something of value (their data), and most users chose not to when

17   given the option. Since the post-ATT effective price was imposed from the outside (Apple), it can

18   be thought of as a quasi-regulated price that is lower than the previous, pre-ATT effective price

19   chosen by the services themselves. Moreover, compared to PSN services, non-PSN services were

20   less affected than by ATT. That the ATT price decrease disproportionately impacted personal

21   social networks but they did not, despite that decrease, see large increases in usage away from non-

22   PSN services confirms that a hypothetical PSN monopolist could maintain a profitable SSNIP,

23   showing the PSN market is a valid relevant market. Economides ¶¶ 33–40.

24        Evidence common to the class also shows Facebook has monopoly power within the PSNS

25   market. Monopoly power can be measured in two ways: indirectly (by calculating market shares

26   in a defined relevant market), or directly (by proving a firm can control market-wide prices, reduce

27   product quality, and/or exclude competitors, often evidenced by abnormally high profit margins).

28   *Id.* ¶¶ 43–50. Dr. Economides measured Facebook's monopoly power both ways. He found high

market share (███████████████, depending on the metrics used), and extraordinarily high profits that accompany the ability to continually impose unfavorable terms on users over time. *Id.* ¶ 45.

**B.    Common evidence shows Facebook acquired and then *maintained* monopoly power by deceiving the market about its collection and use of consumer data.**

Deception can be anticompetitive conduct under the Sherman Act. *See infra* at V.B.3 (collecting and discussing cases). Facebook acquired and maintained monopoly power in the PSNS market through systematic misrepresentations and omissions about how much of consumers' data it collected, used, and shared with third parties. All of this evidence focuses on Facebook's conduct, and does not turn on any individual class member's conduct.

**1.    Data practices are a key factor for competition in the PSN market.**

Personal social network market participants compete on how they collect and use consumers' data. Facebook knew this was important to both competition and to users. For example, it publicly stated that ████████████████████████████████████████████████████ ██████████████████████████████████████." Ex. 7. It likewise recognized that ████████████████████████████████████████ and that that trust was predicated on Facebook's data- and privacy-related promises. Ex. 8 at 2.

Facebook executives knew the company's success depended on the appearance of protecting consumers' data and their privacy. Mr. Zuckerberg, Facebook's CEO, emphasized "[t]he No. 1 thing that people care about is privacy and the handling of their data." Ex. 1 at 2. Facebook's Privacy & Data Use leader explained, ██████████████████████████████████ ████████████████████████████████████████." Ex. 9 at 2. Its Marketing Director recognized that ██████████████████████████████████████████████ ████████ Ex. 10. Its former COO, Sheryl Sandberg, admitted that "████████████████ ████████████████████████████████████," and its former CFO admitted users ████████ ████████████████████████████████████." Exs. 11 at 2, 12 at 1(Sandberg Dep.; Wehner Dep.). In sum, ████████████████████████████████████████████████████████ ████████████" Ex. 13 at 2, 4.

Facebook's quantitative studies also show that its leaders were correct about the importance of data practices to competition. An October 2018 survey showed that ████ ████████████████████████" was the ████████████" topic for Facebook to talk about. Ex. 13 at 4. And when consumers had the choice to opt-out of Facebook collecting and using their data through Apple's ATT feature, nearly ██████████ of Facebook users opted-out, even more common proof that data and privacy issues matter to Consumers. Ex. 14 at 2. All of this evidence, common to the class, shows data use and collection are a competitive driver in the PSNS market.

### 2. Facebook repeatedly misrepresented and omitted key information about its data collection and use practices.

Plaintiffs, using evidence common to all class members, will show that Facebook embarked on a continuous campaign promising users control, safety, and security of their data all while promoting itself as a social place for internet users to interact with their friends and family. Executive testimony and documents from Facebook and non-parties confirm Facebook's campaigns were deceptive. As a Facebook economist testified, Facebook has: (1) been "████ ████████████ regarding its data practices; (2) repeatedly ████████████████; and (3) ████ ████████████████████████████████████████████" Ex. 15 at 2-3 (Cunningham Dep.). Facebook recognized that its ████████████████████████████████████ ████████" and those practices are its ████████████████ Ex. 13 at 2; Ex. 16 at 2. So much so that Facebook's own COO testified that drawing attention to Facebook's *actual* data practices would have competitive ramifications, since it would provide a ████████████████████████. Ex. 17 at 2 (Olivan Dep.). Although the proof of this campaign is extensive, consistent with the Court's instruction, Plaintiffs summarize examples of this market-wide conduct below and in Ex. 18.

For example, during the early days of social networks, Facebook made a series of privacy-related misrepresentations and omissions that culminated in a 2011 consent decree with the FTC. The final consent decree provided a laundry list of violations and, *inter alia*, required Facebook to: obtain users' consent *before* sharing data with third parties; establish a "comprehensive privacy

program;" and allow a third-party assessor to conduct biennial audits into whether Facebook's program was effective. The FTC later determined that Facebook did not abide by these minimal requirements, continued to misrepresent and omit information regarding its actual data and privacy practices, and kept all of this secret, resulting in a *$5 billion fine* in 2019 (the largest ever to date) and a new consent decree. *See* Ex. 19. Facebook employees referred to the $5 billion fine as a ████████████" in light of ██████████████████" and recognized Facebook as a ████████." Ex. 20 at 1-2. The FTC asserts that Facebook has continued to violate the 2019 consent decree.

A further example of Facebook's repeated deception is the infamous Cambridge Analytica scandal, which revealed that Facebook had not, contrary to its promises, eliminated its practice of providing the data of Facebook users' friends to third parties. Instead, it continued to provide that data to third parties, such as app developers using the Facebook platform, advertising partners, political campaigns, and device manufacturers like Apple and Samsung. Ex. 21. The Cambridge Analytica scandal came to light only in 2018, but Facebook *still* has not publicly disclosed the extent to which it collects and uses Consumers' data. Ex. 22 at 1 (conceding Facebook cannot make ██████████████" about its data practices, as it "██████████████████████████████████████████████).

Facebook has internally confirmed both the existence and ubiquity of its misstatements. Toward the end of the class period, Facebook launched a ██████████████" to inventory and determine the accuracy of commitments Facebook made to the market about its data practices. Ex. 23 at 2. The ██████████████ found ██████████████ of Facebook's data practices ████████" if not ██████████████." Doubted commitments included statements in Facebook's own ██████████████"—*i.e.*, a common representation to every class member—and representations that users have ██████████████" over ██████████████" they ██████████████". Ex. 24 at 2-4. In all, Facebook has ██████████████████████████████████████████████████. Ex. 25 at 2-3 (Stefancik Dep.) & Ex. 26 at 2 ██████████████). All of these statements, omissions, and their falsity center around a common theme of data, privacy, security, and control.

1

**3.** **Facebook's deception prevented consumers and the market from discovering its true data collection and use practices.**

2

3

Facebook knew neither consumers nor the broader market were aware of its true data

4

collection and use practices. Facebook executive and WhatsApp co-founder, Brian Acton, testified

that ██████████████████████████████████████████." Ex. 27 at 2

5

(Acton Dep.). Facebook itself recognized that certain of its data practices "████████████

6

████████████████" Ex. 28 at 2.

7

Consumers and the market could not understand the full scope of Facebook's true data

8

practices; ***Facebook itself*** did not know and ***hid*** that it did not know. Facebook internally

9

recognized it created data systems with no borders, analogizing it to a █████████████

10

████████████████████████████████████████████

11

████████████████" Ex. 22 at 2. Facebook's internal graphic ████████████

12

████████████████████████████████████████████

13

████████████████████████████████" *Id.*

14

15

16

17

18

19

20

21

22

23

24

25

26

As one Facebook privacy engineer testified: ████████████████████████

27

████████████████████████████████████████████

28

████████████████████████████████████████." Ex. 29 at 2

-10-

1  (Savage Dep.). The same is true for the market as a whole.

2        Facebook also took steps to hide even its minimal and inadequate disclosures about data

3  collection and use. For one, Facebook acknowledged that its privacy policies during the class

4  period ████████████████████████. *E.g.*, Ex. 30 (Facebook Chief Privacy

5  Officer stating "████████████████████████████████████████████

6  ████████████ and recognizing Facebook's actual ████████" practices were contrary

7  to policy). Moreover, these policies themselves were incomprehensible and thus did not convey

8  the full extent of Facebook's data collection and use. As one internal Facebook document bluntly

9  stated regarding the privacy policies: ████████████████████████████████

10  ████████████████████████ Ex. 31. Facebook's VP of Marketing

11  Science agreed that ████████████████████████████████████

12  ████████████████████ Ex. 32 at 2 (Smallwood Dep.).

13      **4.**    **Facebook's rivals could not combat its repeated, market-wide deception.**

14        Facebook's market-wide misrepresentations and omissions regarding its data practices

15  actively undermined its rivals. As the founder of one competing PSNS, MeWe, explained, MeWe

16  tried to differentiate itself from Facebook during the class period in terms of its data practices by

17  collecting no data and showing no ads. After Facebook's role in the Cambridge Analytica scandal

18  became clear in 2018, MeWe expected to ████████" in terms of additional market share, but

19  did not, because Facebook ████████████████████████████████" and

20  ████████████" as a means ████████████████." Ex. 33 at 2-4 (Weinstein Dep.). An

21  executive from Snapchat, another personal social network service, testified that ████████

22  ████████████████████████████████" Ex. 34 at 2-5 (Levenson Dep.).

23  This common proof confirms Facebook's continued deception during the class period prevented

24  MeWe, Snapchat, and other more privacy- and security-centric competitors from gaining ground

25  in the PSNS market.

26        All of this follows a long history of Facebook engaging in deception to its competitors'

27  disadvantage. Facebook gained market share in the 2000s and 2010s because of its supposed focus

28  on privacy, data, security, and control, which competitively differentiated it from other then-

-11-

1    existing personal social networks. Economides ¶¶ 51–59 (collecting common evidence). A 2008

2    internal memo, entitled ███████████████," recognized that ███████████████"

3    to Facebook's early success were ███████████████," and

4    ███████████████." Ex. 35 at 2. Facebook then maintained this public

5    façade, even though its CEO, Mr. Zuckerberg, derogatorily referred to Facebook users as "dumb

6    [expletive]s" for willingly sharing their data with Facebook. Ex. 36; *see also* Ex. 37 (Mr.

7    Zuckerberg explaining that ███████████████

8    ███████████████

9         Deception, by its nature, is hidden, making it difficult to know in real-time that there is a

10   deception to then expose. Facebook also actively hid its data collection and use practices, including

11   that Facebook itself did not know the full extent of those practices. Facebook's rivals, then, could

12   not expose Facebook's actual practices or that Facebook's representations as to them were false.

13   **C.    Common evidence shows antitrust impact to all or nearly all class members.**

14         Common evidence can similarly be used to determine whether Facebook's anticompetitive

15   conduct harmed virtually all members of the class. Basic economic logic explains that increased

16   competition means better terms for consumers. That includes better quality features, like improved

17   data, privacy, and security features and practices, as well as better price terms. While Facebook

18   charges users a monetary price of $0 as an actual-world monopolist, it is not "free." It simply

19   transacts with users in currency in-kind, *i.e.*, the collection and use of their data. Increased

20   competition tends to lead to a decrease in prices. In this way, where Facebook in the actual world

21   offers users a monopoly price of $0 for their data, additional competition would drive the price

22   below $0, meaning consumers in the *but-for* world would be offered monetary (or equivalent)

23   compensation for their data, just as companies in the actual world, including Facebook itself,

24   provide in other comparable contexts. Economides ¶¶ 60–93.

25         All Consumer Class members were harmed by Facebook's failure to provide these better

26   terms in the actual world. As an actual-world monopolist, Facebook does not, and could not,

27   individually negotiate with hundreds of millions of its users. Instead, Facebook offers the same

28   terms to all members of the Consumer Class. Just as Facebook does not vary its terms in the actual

world, the availability of these better terms would not vary by user in the *but-for* world. Nor does any class member's injury turn on their subjective views or preferences: in a *but-for* world free of Facebook's anticompetitive conduct, all class members would have benefited from these better terms, regardless of their subjective views and preferences. In this way, all class members are harmed by Facebook's anticompetitive conduct.

**D.    Damages will be proven using classwide evidence.**

A common method exists to quantify the damages flowing from Facebook's anticompetitive deception. Dr. Economides uses the yardstick method to compare prices in the PSN market—the market affected by the anticompetitive conduct—to prices in other comparable markets unaffected by that conduct. Because Facebook's anticompetitive conduct allowed it to provide Consumer Class members a supracompetitive price of $0 for the collection and use of their data, Dr. Economides identified a comparable market where firms provide monetary compensation to users for the collection and use of their data. In the market research context, many companies (including Google, Amazon, Nielsen, Comscore, and others), pay users a flat, monthly rate for the collection and use of data that is reasonably comparable to the data Facebook collects and uses from class members, but for which it provides no monetary compensation. In fact, Facebook itself has, in certain situations, been transparent about the data it collects and compensated users for that data ████████████████████████). Dr. Economides' 11 real-world yardsticks provide a competitive benchmark for calculating the monthly flat fee that Facebook likely would have provided all Consumer Class members in the *but-for* world ($5), resulting in classwide damages of $52.8 billion, and per-class member damages ranging between $5 and $240. Dr. Economides also presents alternative monthly damage estimates of $3.50 and $6.25, resulting in classwide damages of $37.0 billion or $66.0 billion, and per-class member damages ranging from $3.50 to $168, and from $6.25 to $300, respectively. Economides ¶¶ 94–121.

## V.    ARGUMENT

The Consumer Class easily satisfies the elements of Rule 23(a). The class is numerous, common questions of fact and law exist, and the named plaintiffs are both typical and adequate. *See* section V.A. Under Rule 23(b), Plaintiffs also satisfy the predominance and superiority

CONSUMER PLS.' RENEWED MOT. FOR CLASS CERTIFICATION          Case No. 3:20-cv-08570-JD

1    inquiries. *See* sections V.B–C. Finally, Plaintiffs respectfully request the appointment of class

2    counsel. *See* section V.D.

3    **A.    The Consumer Class satisfies all the elements of Rule 23(a).**

4        **1.    The class is numerous.**

5        The Consumer Class consists of millions of class members. Economides ¶ 14. Rule

6    23(a)(1)'s numerosity requirement is satisfied.[15]

7        **2.    Common questions of law and fact exist, given the focus on Facebook's
             actions (and deceptions).**

8
9        Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed.

10   R. Civ. P. 23(a)(2). This prong of Rule 23 requires only that the claims at issue "depend upon a

11   common contention" whose "determination of its truth or falsity will resolve an issue that is central

12   to the validity of each one of the claims in one stroke."[16] For commonality, not "every question in

13   the case, or even a preponderance of questions" need be "capable of classwide resolution."[17]

14   Instead, "even a single common question will do."[18]

15       Facebook acknowledges (and there is really no dispute) that Consumers' antitrust claims

16   raise ***numerous*** questions common to all class members, including: (1) market definition;

17   (2) monopoly power; (3) the existence of barriers to entry; and (4) the failed attempts by

18   Facebook's rivals to enter the market. Ex. 5 at 2–3 (Tucker Dep.). Commonality is thus assured.[19]

19       **3.    The named plaintiffs' claims are typical of the class.**

20       Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical

21   of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The requirement is permissive,

22   such that representative claims are 'typical' if they are reasonably coextensive with those of absent

23   class members; they need not be substantially identical."[20] Typicality is "established by plaintiffs

24

25       [15] *Ochoa v. McDonald's Corp.*, 2016 WL 3648550, at *4 (N.D. Cal. July 7, 2016) (Donato, J.).
         [16] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

26       [17] *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014).
         [18] *Id.* at 1052.

27       [19] *Pecover v. Elec. Arts Inc.*, 2010 WL 8742757, at *13 (N.D. Cal. Dec. 21, 2010) (commonality
         met because relevant market and whether defendant monopolized it are common questions).

28       [20] *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017) (cleaned up).

and all class members alleging the same antitrust violation by the defendants."[21] Here, the named plaintiffs have used Facebook since December 3, 2016, just like the remainder of the Consumer Class. Scarlett Decl., ¶ 3. They and the rest of the class bring the same antitrust claims, against the same defendant, based on the same conduct and legal theories, resulting in the same type of injury. This renders the named Consumers' claims typical of the class they seek to represent.

### 4.    Named plaintiffs will adequately represent the class.

Rule 23(a)(4) requires that "the representative parties . . . fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Courts in the Ninth Circuit examine whether the representative plaintiffs have any conflicts of interest with class members and will prosecute the action vigorously on behalf of the class.[22] The named plaintiffs satisfy these requirements. There are no speculative, let alone actual, conflicts between the named plaintiffs and the class, and the named plaintiffs have all actively participated in this case for years; each has provided extensive documentary and written discovery, sat for deposition, and followed the progress of this case. Scarlett Decl., ¶¶ 3–4.

### B.    Common questions predominate under Rule 23(b)(3).

Common issues of law and fact also predominate under Rule 23(b)(3). Predominance is not a "matter of nose-counting," and certification may be proper "even though other important matters will have to be tried separately."[23] Consumers must show that common *questions* predominate, "not that those questions will be answered, on the merits, in favor of the Class."[24]

Consumers' case presents the "classic antitrust claim" where a monopolistic company "has used its monopoly to overcharge consumers."[25] In such cases, courts "routinely certif[y] classes alleging that a monopolist's conduct caused a direct and uniform overcharge, as overcharge cases often rely on facts common across the class such as the existence of a relevant market, the

---

[21] *In re Tableware Antitrust Litig.*, 241 F.R.D. 644, 649 (N.D. Cal. 2007).
[22] *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).
[23] *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016); *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).
[24] *Amgen*, 568 U.S. at 459.
[25] *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1519 (2019).

defendant's monopoly power, and the existence of the illegal course of conduct."[26] In the proffer of facts and below, consumers demonstrate that common questions of fact and law further predominate, including in: (1) defining the relevant market; (2) measuring Facebook's monopoly power; (3) assessing Facebook's anticompetitive conduct; (4) evaluating antitrust impact; and (5) calculating damages.

### 1. Facebook acknowledges that market definition is a common question.

As Facebook concedes, market definition is an issue proven by evidence common to the class. Consumers offer the expert analyses of Dr. Economides establishing the PSN market as the relevant market. Dr. Economides's expert analyses are based on well-accepted, qualitative and quantitative economic methodologies, including the Hypothetical Monopolist Test, and other evidence common to the class, including that personal social networks are ***not*** reasonably interchangeable with other services, and that Facebook and other industry participants recognized personal social networking services as the relevant market. As Dr. Economides explained, his relevant market analysis does not vary by class member. Economides ¶¶ 17–40. That suffices to establish that common questions regarding the relevant market predominate.[27]

Moreover, Facebook offers no relevant market expert opinions in response for purposes of class certification. Ex. 5 at 2 (Tucker Dep.). Even if the issue were disputed at this stage, that is a merits question that cannot be resolved at class certification.[28] But it is also a question common to the class, because the answer does not vary by class member.[29]

### 2. Facebook's monopoly power in the PSN market is a common question.

Facebook does not dispute that monopoly power is another issue proven by evidence common to the class. Consumers offer the expert analyses of Dr. Economides establishing that

---

[26] 6 Newberg & Rubenstein on Class Actions § 20:28 (6th ed.) (collecting cases).

[27] *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 696 (S.D. Fla. 2004) (predominance satisfied since all class members sought to establish same relevant market "though common evidence").

[28] *See In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 131 (C.D. Cal. 2007) (common questions as to market definition predominated, and certifying class where parties disputed relevant market).

[29] *Cf. In re Mushroom Direct Purchaser Antitrust Litig.*, 319 F.R.D. 158, 197 (E.D. Pa. 2016) (common questions regarding geographic market predominated because "whether or not there are separate markets or one market [is] . . . a common issue").

Facebook has monopoly power. Dr. Economides's expert analyses are again based on well-accepted economic methodologies and other evidence common to the class, including evidence of Facebook's high share of the relevant market, high barriers to entry into and expansion in the relevant market, and Facebook's power to charge prices above a competitive level and impose terms that consumers would not have accepted in a competitive market, resulting in Facebook's colossal profits. As Dr. Economides explained, his monopoly power analysis is the same for each class member. Economides ¶¶ 43–50. That suffices for predominance purposes.[30]

Facebook does not challenge that monopoly power is a question common to the class. Ex. 5 at 3 (Tucker Dep.). But even if the issue were disputed, Facebook's power is a question common to the class, as the answer also does not vary by class member.[31]

### 3. Consumers' antitrust liability theory relies entirely on common evidence.

Monopolization cases focus on the defendant's conduct—"as opposed to individual plaintiff's conduct"—and are thus well-suited for class treatment.[32] The liability evidence here will focus on Facebook's campaign to deceive the market as to its data collection and use practices.

Deception is a recognized form of anticompetitive conduct sufficient to support a Section 2 claim. For example, in examining whether deceptive conduct in the standard-setting context could rise to the level of a Section 2 claim, the Third Circuit in *Broadcom Corp. v. Qualcomm Inc.* noted: "Anticompetitive conduct may take a variety of forms, but it is generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits."[33] The Third Circuit found the basis of a Section 2 monopolization claim where the defendant made deceptive statements during the standard-setting process by committing to license its technology on certain terms, but later demanded additional royalties.[34] In so finding, the Third

---

[30] *See In re Wellbutrin XL Antitrust Litig.*, 282 F.R.D. 126, 140 (E.D. Pa. 2011) (common questions regarding monopoly power predominated where each class member would be "using the same documents, witnesses, and other evidence.").

[31] *Cf. Terazosin*, 220 F.R.D. at 696 (S.D. Fla. 2004) (predominance satisfied because "whether [defendant] had market power is a question common to all [class] members . . . and the resolution of this common issue will affect all" members the same).

[32] *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 475 (N.D. Cal. 2020).

[33] *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 308 (3d Cir. 2007).

[34] *Id.* at 314.

Circuit examined other contexts in which deceptive conduct had violated the antitrust laws. In one context, deceptive statements by patent holders have violated the antitrust laws where competitors represented they did not hold intellectual property rights in essential technologies, but then, after a standard had been adopted, sought to enforce those rights.[35]

Many other courts have similarly found that deception constitutes anticompetitive conduct. In *U.S. v. Microsoft Corp.*, for example, Microsoft's misstatements that its software-development tools would permit developers to create programs that did not need to run on Microsoft's operating system, when in fact the programs could operate properly *only* on Microsoft's operating system were found to violate Section 2.[36] The Supreme Court has likewise found deceptive statements sufficient to state a Section 2 claim in *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, based on fraud on the Patent Office in obtaining a patent.[37] And legal antitrust scholars Areeda and Hovenkamp have recognized that a "monopolist's misrepresentations encouraging the purchase of its product can fit our general test for an exclusionary practice when the impact on rivals is significant," indeed citing this very case as an example of such conduct.[38]

Turning to the Ninth Circuit, in *Harcourt Brace*, it held that false and misleading advertising can establish a Sherman Act claim if the monopolist made representations about its own or rivals' products that were: (1) continued for prolonged periods, (2) clearly material, (3) clearly false, (4) clearly likely to induce reasonable reliance, (5) made to buyers without knowledge of the subject matter, and (6) not readily susceptible of neutralization or other offset by rivals.[39] The proof establishing each of these factors is inherently common and predominates.[40]

---

[35] *Id.* at 310.

[36] *U.S. v. Microsoft Corp.*, 253 F.3d 34, 76–77 (D.C. Cir. 2001). *See also Broadcom*, 501 F.3d at 312 (discussing same); *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998) (fraudulent misrepresentations regarding defendant's radio service constitute anticompetitive conduct under Section 2).

[37] *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 174 (1965).

[38] Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 782b) (citing this case and others).

[39] *Harcourt Brace*, 108 F.3d at 1152.

[40] *See In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 611 (N.D. Cal. 2009) ("Common liability issues such as . . . monopolization have, almost invariably, been held to predominate over individualized issues"); *cf. Jabbari v. Farmer*, 965 F.3d 1001, 1007 (9th

---

1   Facebook's long-standing campaign of market-wide deception—including both its

2   statements and omissions—focuses entirely on Facebook's conduct. Plaintiffs provide illustrative

3   examples of these misstatements and omissions in Facebook's press releases, public statements,

4   and blog posts, but they certainly blanketed the market throughout the relevant time period. *See*

5   *e.g.,* Ex. 18 (providing a chart of illustrative examples of Facebook's deceptive conduct). That

6   more than suffices for predominance.[41]

7   The question of materiality focuses on whether the deception impacted "competition itself

8   in the relevant market."[42] The competitive harm in this case—whether enough users cared to a

9   sufficient degree about the extent of a personal social network's data collection and use, such that

10  Facebook's data-related deception of the market harmed competition—is a common question that

11  does not differ by class member. Facebook's executives and its internal studies show that its data

12  practices were a critical factor for competition in the market. Exs. 1, 7-14. Facebook's class

13  certification expert, Dr. Tucker, testified that ▮ percent of users, and perhaps as low as ▮ percent,

14  leaving Facebook would be ▮▮▮▮" and could even cause it to ▮▮▮ Ex. 5 at 4

15  (Tucker Dep.). That is consistent with the percentage of the market affected by the conduct which

16  is sufficient to harm competition in other antitrust contexts, like exclusive dealing.[43] All of this

17  

18  Cir. 2020) ("common questions, such as 'whether the fuel economy statements were in fact accurate' and 'whether defendants knew that their . . . statements were false or misleading'" predominate) (cleaned up).

19  [41] *See Glumetza*, 336 F.R.D. at 475 ("Section 2 monopolization claims readily lend themselves to

20  common evidence"); *Giuliano v. Sandisk Corp.*, 2015 WL 10890654, at *17 (N.D. Cal. May 14, 2015) (common questions regarding defendant's deception predominated for fraud-based

21  monopolization claim because "[p]laintiffs will rely on common evidence . . . to show that the Disputed Patents were fraudulently procured"); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d

22  516, 528 (3d Cir. 2004) (same, for deception-based monopolization claim, as claim "depends on evidence which is common to the class members," and "liability depends on the conduct of

23  [defendant], and whether it conducted a nationwide campaign of misrepresentation and deception, it does not depend on the conduct of individual class members.").

24  [42] *Harcourt Brace*, 108 F.3d at 1152. *See also Warfarin*, 391 F.3d 516, 528–29 (3d Cir. 2004)

25  (common issues predominate in deception-based monopolization case as "proof of liability does not depend on evidence that [the defendant] made deceptive communications to individual class

26  members or reliance on those communications); *In re Suboxone (Buprenorphine Hydrocholoride & Nalaxone) Antitrust Litig.*, 421 F. Supp. 3d 12, 60–61 & n.21 (E.D. Pa. 2019) (rejecting argument

27  that proof of individual reliance required in deception-based monopolization case).

28  [43] *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004) (30–40%).

1    proof is inherently common to the class. Economides ¶¶ 51–59.

2           Common evidence will show that Facebook's statements to the market were clearly false.

3    For example, as demonstrated in Plaintiffs' proffer of evidence, Facebook itself recognized at the

4    end of the class period in its ███████████████ that thousands of its data practice statements

5    were ██████████████████████████████████████████. Ex. 23 at 2; Ex.

6    25 at 2–3 (Stefancik Dep.); Ex. 26 at 2 ██████████████████). Similarly, Facebook's

7    acknowledgment of the violation of the terms of its consent decree with the FTC, put in place to

8    protect consumers *prior to* the class period in 2011, but acknowledged to have been violated in

9    2019 and the resulting $5 billion fine, are both common evidence and demonstrative of the

10   falseness of Facebook's data statements. Proving falsity is a simple matter of comparing what

11   Facebook said (or did not say) to the market regarding its data practices and what it actually did—

12   neither of which differ by class member.

13          Common evidence will also show that Facebook's statements were likely to induce

14   reliance. For example, Facebook knew it needed consumers' trust to establish and maintain its

15   dominance. It recognized when discussing ███████████████" on its data practices that

16   ████████████████████████████████ Ex. 8 at 2. And Facebook's COO admitted

17   that Facebook intended its market-wide data statements to ██████████████████████

18   ████ in users' minds. Ex. 16 at 2. Externally, it likewise stated that ██████████████

19   ████████████████████████████████████████████████████████

20   ████████" Ex. 7. Common evidence shows that to maintain this trust, and its monopoly power,

21   Facebook carefully crafted its messaging regarding its data practices to induce its users' reliance.

22          As to whether the statements were made to users without knowledge of the subject matter,

23   one need look no further than Facebook executives' testimony that ██████████████████

24   ████████████████████████████," and Facebook's acknowledgment that

25   *Facebook itself* ██████████████████████████████████ Exs. 27 at 2;

26   Ex. 22 at 2. And the acknowledgment of its privacy engineers that "███████████████████

27   ████████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████████

CONSUMER PLS.' RENEWED MOT. FOR CLASS CERTIFICATION          Case No. 3:20-cv-08570-JD

1    ████    Ex. 29 at 2 (Savage Dep.).

2         Finally, the record shows that these claims were not readily susceptible of neutralization.

3   Documents, witness testimony, and expert analysis confirm Facebook's deception had an

4   anticompetitive effect on and contributed to the defeat of its competitors such as MySpace,

5   Google+, Snapchat, and MeWe. Economides ¶¶ 51–59. Since deception is hidden and Facebook

6   obfuscated its data practices, Facebook's rivals necessarily could not expose Facebook's actual

7   data practices or Facebook's deceptive statements and omissions as to them.

8         Answering questions on Facebook's deception and its impact on the market creates no

9   barrier for class certification. There is no individualized inquiry or proof required to determine

10  Facebook's liability.

11        **4.      Common evidence will demonstrate all class members suffered antitrust**
                    **impact.**

12        At the class certification stage, all that is required for impact is a showing "predominantly

13  with generalized evidence, that all (or nearly all) members of the class suffered damage as a result

14  of defendants alleged anti-competitive conduct."[44] The "driving question" is "what did defendants'

15  scheme do to the market?"[45] Here, consumers answer this common inquiry with common proof

16  establishing that Facebook's deception harmed competition during the Class Period, which in turn

17  harmed ***all*** class members. Classwide antitrust impact therefore predominates.

18        Impact is common to all class members, because in the actual world (where Facebook

19  monopolized the PSN market), all class members paid the same "price" to Facebook: their data.

20  In exchange, class members received the same "overcharge:" zero compensation. Although

21  Facebook operates in a zero-price market, where there is no monetary price, the product is not

22  "free." The concept of zero-price markets is well-accepted, as is the notion that competition in

23  such markets will force the price ***negative*** (*i.e.*, include a payment from the product provider to

24  the consumer). This outcome follows from basic economic principles that show when consumers

25  have competitive alternatives, sellers are forced to lower their prices to maintain market share, and

26  if they do not, they will lose customers. Economides ¶¶ 60–93.

27  ─────────────────

28  [44] *Glumetza*, 336 F.R.D. at 476 (internal citations omitted).
    [45] *Id.*

CONSUMER PLS.' RENEWED MOT. FOR CLASS CERTIFICATION          Case No. 3:20-cv-08570-JD

1    Compensation for data is not new. A common example is supermarket loyalty cards. In

2    exchange for data to supermarket chains about one's shopping habits, consumers receive discounts

3    (monetary compensation) in return. *See* Ex. 38 at 2. This is a well-recognized phenomenon, and

4    many companies in the digital economy (including Nielsen, Comscore, Google, Microsoft,

5    Amazon, and even Facebook itself) have compensated consumers for their data. Economides

6    ¶¶ 94–108.

7    Dr. Economides applies these well-accepted economic theories to the facts of this case,

8    including reviewing internal documents and testimony, market analyses, Facebook's business

9    model for its personal social network (*i.e.*, revenues generated by advertising based on user data

10   Facebook collected from its users), and the real-world prices paid for consumer data. He then

11   concludes that Facebook would have compensated Consumers a certain amount per month for

12   their data in the *but-for* world where consumers knew the truth about Facebook's data practices,

13   because the alternative would have led to an unacceptable loss of market share for Facebook. Had

14   Facebook not compensated its users in the *but-for* world, it would have lost *enough* consumers to

15   lose its dominant position. And even in the face of payments to class members, Facebook would

16   have continued to make comfortable profits even after compensating Consumers. *Id.* ¶¶ 94-108.

17   Dr. Economides concludes that, as in the actual world, Facebook would have compensated

18   all consumers a flat amount in the *but-for* world. Compensation would have been market-wide

19   because all class members would receive compensation (rather than a subset), and flat because the

20   same rate price would have been offered to everyone. This is consistent with the actual world,

21   where Facebook offers the same terms, including "price" (data collection) and compensation for

22   data (none), to every class member that uses Facebook. Real-world evidence supports that

23   Facebook and third parties prefer to pay consumers a flat and market-wide price for their data and

24   that price is not subject to individual negotiation. Ex. 39 at 2-4 (Ben-Zedeff 30(b)(6) Dep.). It

25   would make sense for Facebook to do so given it simplifies execution, is easily understood by

26   consumers, avoids conflicts and fairness issues associated with price discrimination, and

27   minimizes administrative costs. Economides ¶¶ 77–83.

28   The question of antitrust impact here supports a finding of predominance. Given that all

class members purchased a product (Facebook) at a supra-competitive price during the class period, all are harmed similarly, and all are entitled to recover the monopoly overcharge that they paid for that product. In *Olean*, the Ninth Circuit made clear that the relevant question for class certification is simply "whether each member of the class can rely on [the expert's] model to show antitrust impact of any amount."[46] The answer here is yes, because Dr. Economides' analysis is market-wide, applies equally to all consumers, and shows Facebook's anticompetitive deception harmed each class member.

### 5. Using the well-established yardstick model, Dr. Economides calculates damages to the class.

Common evidence is available to quantify the Consumer Class's damages.[47] The total class overcharge is "the difference between what class members actually paid and what they should have paid."[48] Dr. Economides has calculated damages based on what consumers should have received from Facebook for their data, versus the zero compensation they actually received.

Using the well-accepted yardstick method, Dr. Economides calculates a competitive level of monthly compensation .[49] The "yardstick methodology compares the outcome of interest in the affected market" (how much Facebook paid consumers for their data in the actual world, where it monopolized the PSNS market) "to the same outcome in an unaffected benchmark market" (how much other companies in a non-monopolized, comparable market paid individuals for their data).[50] Courts regularly rely on yardstick models to find predominance under Rule 23(b)(3).[51]

---

[46] *Olean*, 31 F.4th 651, 679 (9th Cir.). *See also* 6 Newberg & Rubenstein on Class Actions § 20:28 (6th ed.) (courts "routinely" certify classes in overcharge cases, collecting cases); *see also Glumetza*, 336 F.R.D. at 476–478 (all class members paying overcharge resulting from anticompetitive conduct sufficient to established common questions regarding classwide antitrust impact predominated).

[47] *Apple*, 139 S. Ct. at 1525.

[48] *Glumetza*, 336 F.R.D. at 479.

[49] *See In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 2023 WL 1813530, at *8 (C.D. Cal. Feb. 7, 2023) (yardstick methodology "is an accepted methodology in antitrust cases" for calculating damages); *Moehrl v. Nat'l Ass'n of Realtors*, 2023 WL 2683199, at *8 (N.D. Ill. Mar. 29, 2023) (same).

[50] *Sunday Ticket*, 2023 WL 1813530, at *8 n.1 (sic).

[51] *See, e.g., Sunday Ticket*, 2023 WL 1813530, at *12 (certifying class, and finding expert's yardstick model sufficient to show that "damages are capable of being proven on a classwide basis); *Moehrl*, 2023 WL 2683199, at *18, *20 (certifying class, including based on yardstick-based

---

-23-

1        Dr. Economides' damages model provides exactly such a straightforward, classwide method

2 for measuring damages. Dr. Economides relies on evidence common to the class—11 real-world

3 companies (like Comscore, Nielsen, Amazon, and Google) that monetarily compensated

4 individuals for data comparable to the data Facebook collects from class members here. The

5 yardsticks included, among others, two programs— ██████████████████████████████

6 ██████████████████████████████████████████████████████████████████

7 ████████████████████████████████████████████████. Dr. Economides

8 concludes that in the *but-for* world, Facebook would have compensated users in the amount of $5

9 monthly. Once Dr. Economides had this amount, he calculated the Consumer Class's total damages.

10 He added up the number of monthly active users that Facebook reported for each month of each

11 year of the Consumer Class Damages Period, and then multiplied that number by $5.00, resulting

12 in a total damages number of $52.8 billion. Economides ¶¶ 109–119.

13        Given that damages are demonstrable through common evidence and the question of

14 damages is common to the class, common questions predominate.

15 **C.    Class treatment is the superior method of adjudication under Rule 23(b)(3).**

16        Class certification of Consumers' claims is "superior to other available methods for fairly

17 and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This case is the prototypical

18 case for the class action mechanism. Any class member's individual recovery would be dwarfed

19 by the costs of proving the predominating issues in this litigation.[52] Here, individual class

20 member's damages range from $5 to $240. Economides ¶ 121. No rational person would challenge

21 Facebook, one of the richest companies in the world, to recover this amount in damages. For,

22 indeed, "only a lunatic or a fanatic sues for $30."[53]

23        Plaintiffs satisfy the remaining superiority requirements because no separate cases remain

24 outside this proceeding; Facebook is headquartered in this District and maintains a forum selection

25

26 damages model from Dr. Economides); *see also Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1221 (9th Cir. 1997), *In re HIV Antitrust Litig.*, 2022 WL 22609107, at *39 (N.D. Cal. Sept. 27, 2022).

27 [52] *Soares v. Flowers Foods, Inc.*, 320 F.R.D. 464, 485 (N.D. Cal. 2017) (quoting *Amchem Prods. v. Windsor*, 521 U.S. 591, 616 (1997)).

28 [53] *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).

clause requiring litigation here; and the issues presented are manageable given the class is objectively defined and identifiable from Facebook's records. *See* Fed. R. Civ. P. 23(b)(3)(B)–(D).

**D.    Consumers request that the Court reaffirm co-lead counsel.**

Consumers respectfully request that, pursuant to Rule 23(g), the Court reaffirm the appointment of Ms. Scarlett of Hagens Berman and Mr. Teruya of Quinn Emanuel as Co-Lead Consumer Class Counsel. Ms. Scarlett, Mr. Teruya, and their firms have significant expertise and experience in complex class actions and antitrust litigation and have devoted tremendous resources to the Consumer Class.[54] If appointed as Co-Lead Counsel, Mr. Teruya and Ms. Scarlett will continue to zealously represent this Consumer Class.

## VI.    CONCLUSION

Plaintiffs have met the requirements of Rule 23. The elements of Rule 23(a)—numerosity, commonality, typicality, and adequacy cannot truly be contested. And Facebook has acknowledged that common issues such as market definition and monopoly power predominate. With this motion, Plaintiffs have demonstrated that liability, common impact, and damages are all also issues that will be proven through evidence common to the class. Given this, Consumers respectfully request that the Court certify the class, appoint the named Consumers as class representatives, and appoint the law firms of Hagens Berman and Quinn Emanual as class counsel.

---

[54] ECF Nos. 439, 439-2, 440, 440-1.

CONSUMER PLS.' RENEWED MOT. FOR CLASS CERTIFICATION             Case No. 3:20-cv-08570-JD

1   DATED: May 24, 2024                    Respectfully submitted,

2   By: */s/ Shana S. Scarlett*                By: */s/ Kevin Y. Teruya*

3   **HAGENS BERMAN SOBOL SHAPIRO LLP**        **QUINN EMANUEL URQUHART & SULLIVAN, LLP**
    Shana E. Scarlett (Bar No. 217895)         Kevin Y. Teruya (Bar No. 235916)
4   shanas@hbsslaw.com                         kevinteruya@quinnemanuel.com
    715 Hearst Avenue, Suite 300               Adam B. Wolfson (Bar No. 262125)
5   Berkeley, CA 94710                         adamwolfson@quinnemanuel.com
    Telephone: (510) 725-3000                  Scott L. Watson (Bar No. 219147)
6                                              scottwatson@quinnemanuel.com
7   Steve W. Berman (admitted *pro hac vice*)  Claire D. Hausman (Bar No. 282091)
    steve@hbsslaw.com                          clairehausman@quinnemanuel.com
8   1301 Second Avenue, Suite 2000             Brantley I. Pepperman (Bar No. 322057)
    Seattle, WA 98101                          brantleypepperman@quinnemanuel.com
9   Telephone: (206) 623-7292                  865 South Figueroa Street, 10th Floor
                                               Los Angeles, CA 90017-2543
10  *Interim Co-Lead Consumer Class Counsel*   Telephone: (213) 443-3000

11  **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**       Michelle Schmit (admitted *pro hac vice*)
12  W. Joseph Bruckner (admitted *pro hac vice*)  michelleschmit@quinnemanuel.com
    wjbruckner@locklaw.com                     191 N. Wacker Drive, Suite 2700
13  Robert K. Shelquist (admitted *pro hac vice*)  Chicago, IL 60606-1881
    rkshelquist@locklaw.com                    Telephone: (312) 705-7400
14  Brian D. Clark (admitted *pro hac vice*)   Manisha M. Sheth (admitted *pro hac vice*)
15  bdclark@locklaw.com                        manishasheth@quinnemanuel.com
    Rebecca A. Peterson (Bar No. 241858)       51 Madison Avenue, 22nd Floor
16  rapeterson@locklaw.com                     New York, NY 10010
    Kyle Pozan (admitted *pro hac vice*)       Telephone: (212) 849-7000
17  kjpozan@locklaw.com
18  Laura M. Matson (admitted *pro hac vice*)  *Interim Co-Lead Consumer Class Counsel*
    lmmatson@locklaw.com
19  100 Washington Avenue South, Suite 2200
    Minneapolis, MN 55401
20  Telephone: (612) 339-6900

21  *Interim Counsel for the Consumer Class*

22

23

24

25

26

27

28

CONSUMER PLS.' RENEWED MOT. FOR CLASS CERTIFICATION          Case No. 3:20-cv-08570-JD