**FILED UNDER SEAL**

**BATHAEE DUNNE LLP**
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Andrew C. Wolinsky (CA 345965)
awolinsky@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
Tel.: (332) 322-8835

Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (*pro hac vice*)
egrauman@bathaeedunne.com
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
Tel.: (213) 462-2772

*Interim Co-Lead Counsel for the
Advertiser Class*

[Additional counsel on signature page]

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Amanda F. Lawrence (*pro hac vice*)
alawrence@scott-scott.com
Patrick J. McGahan (*pro hac vice*)
pmcgahan@scott-scott.com
Michael P. Srodoski (*pro hac vice*)
msrodoski@scott-scott.com
156 South Main Street, P.O. Box 192
Colchester, CT 06415
Tel.: (860) 537-5537

Patrick J. Coughlin (CA 111070)
pcoughlin@scott-scott.com
Carmen A. Medici (CA 248417)
cmedici@scott-scott.com
Hal D. Cunningham (CA 243048)
hcunningham@scott-scott.com
Daniel J. Brockwell (CA 335983)
dbrockwell@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: (619) 233-4565

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> META PLATFORMS, INC., <br><br> Defendant. | Case No. 3:20-cv-08570-JD <br><br> Hon. James Donato <br><br> **ADVERTISER PLAINTIFFS' NOTICE OF MOTION, MOTION FOR CLASS CERTIFICATION, AND MEMORANDUM IN SUPPORT** <br><br><br> Hearing Date: To Be Determined <br> Hearing Time: To Be Determined <br> Courtroom 11, 19th Floor |

**FILED UNDER SEAL**

### NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

PLEASE TAKE NOTICE that on a date and time to be determined by the Court, before the Honorable James Donato, of the United States District Court for the Northern District of California, San Francisco Division, 450 Golden Gate Avenue, San Francisco, California, Courtroom 11, 19th Floor, Advertiser Plaintiffs Affilious, Inc., Jessyca Frederick, Mark Berney, 406 Property Services, PLLC, Mark Young, and Katherine Looper, on behalf of themselves and all others similarly situated, will and now do move the Court for an order granting Advertiser Plaintiffs' Motion for Class Certification pursuant to Federal Rule of Civil Procedure 23.

Advertiser Plaintiffs seek entry of an order (1) certifying a proposed Rule 23(b)(3) class; (2) appointing Advertiser Plaintiffs Affilious, Inc., Jessyca Frederick, Mark Berney, 406 Property Services, PLLC, Mark Young, and Katherine Looper as representatives of the Advertiser Class; and (3) appointing Yavar Bathaee of Bathaee Dunne LLP and Amanda F. Lawrence of Scott+Scott Attorneys at Law LLP as Co-Lead Class Counsel for the Advertiser Class. Advertiser Plaintiffs propose that the Advertiser Class for their Sherman Act claims be defined as follows:

### THE ADVERTISER CLASS

> All persons, including entities and/or corporations, in the United States who purchased advertising from Meta Platforms, Inc. (f/k/a Facebook, Inc.) between December 1, 2016, and December 31, 2020 (the "Class Period").

Excluded from the Advertiser Class are Meta Platforms, Inc. (f/k/a Facebook, Inc.) ("Meta") and its officers, directors, employees, and successors; any person or entity who has (or had during the Class Period) a controlling interest in Meta; any affiliate, legal representative, heir, or assign of Meta; any judicial officer presiding over this action and their immediate family members and judicial staffs; and any juror assigned to this action.

This motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, all filed supporting declarations and exhibits, the expert report of Dr. Michael Williams, the records from this action, and any argument that may be presented at or before the hearing on this Motion.

**FILED UNDER SEAL**

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................................1

STATEMENT OF COMMON FACTS.....................................................................................3

    I.     The Proposed Class...............................................................................................3

    II.    Common Classwide Evidence of the Relevant Market ........................................3

    III.   Common Classwide Evidence of Meta's Unlawful Conduct .................................4

    IV.   Common Evidence of Classwide Antitrust Impact..............................................13

           A.     Common Evidence Shows that Meta Had Monopoly Power in the Social Advertising Market .........................................................................13

           B.     Common Evidence Shows that All or Virtually All Class Members Were Injured by Meta's Conduct...............................................................14

           C.     Aggregate Damages Can Be Calculated on a Classwide Basis ................15

ARGUMENT ...........................................................................................................................16

    I.     The Requirements of Rule 23(a) Are Satisfied...................................................16

           A.     Rule 23(a)(1)'s Numerosity Requirement Is Met ....................................16

           B.     Rule 23(a)(2)'s Commonality Requirement Is Met..................................16

           C.     Rule 23(a)(3)'s Typicality Requirement Is Met........................................17

           D.     Rule 23(a)(4) and 23(g) Adequacy Requirements Are Met......................18

    II.    The Requirements of Rule 23(b)(3) Are Satisfied ...............................................19

           A.     The Predominance Requirement Is Met ...................................................19

            B.     The Superiority Requirement Is Met ........................................................24

CONCLUSION.........................................................................................................................24

**FILED UNDER SEAL**

1

**TABLE OF AUTHORITIES**

2

**CASES**

3

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)..................................................................................................2, 20

4

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013)..........................................................................................................19

5

*Bias v. Wells Fargo & Co.*,
   312 F.R.D. 528 (N.D. Cal. 2015)......................................................................................17

6

7

*Cancino Castellar v. Mayorkas*,
   2021 WL 4081559 (S.D. Cal. Sept. 8, 2021)......................................................................3

8

9

*DZ Rsrv. v. Meta Platforms, Inc.*,
   2022 WL 912890 (N.D. Cal. Mar. 29, 2022),
   *aff'd in part*, 96 F.4th 1223 (9th Cir. 2024)............................................................. *passim*

10

11

*Epic Games, Inc. v. Apple, Inc.*,
   67 F.4th 946 (9th Cir. 2023)..............................................................................................21

12

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011)...........................................................................................................20

13

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ............................................................................................21

14

15

*Giuliano v. Sandisk Corp.*,
   2015 WL 10890654 (N.D. Cal. May 14, 2015)..................................................................23

16

*Hill v. Xerox Bus. Servs., LLC*,
   59 F.4th 457 (9th Cir. 2023) ........................................................................................3, 18

17

18

*In re Capacitors Antitrust Litig. (No. III)*,
   2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) ..................................................................24

19

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
   2006 WL 1530166 (N.D. Cal. June 5, 2006)......................................................................23

20

21

*In re Glumetza Antitrust Litig.*,
   336 F.R.D. 468 (N.D. Cal. 2020)..................................................................................20, 22

22

*In re Google Play Store Antitrust Litig.*,
   2022 WL 17252587 (N.D. Cal. Nov. 28, 2022) ...............................................................20

23

24

*In re High-Tech Emp. Antitrust Litig.*,
   985 F. Supp. 2d 1167 (N.D. Cal. 2013) .......................................................................17, 21

25

*In re Hyundai & Kia Fuel Econ. Litig.*,
   926 F.3d 539 (9th Cir. 2019) (*en banc*) .........................................................................19

26

27

28

**FILED UNDER SEAL**

*In re Live Concert Antitrust Litig.,*
   247 F.R.D. 98 (C.D. Cal. 2007) ................................................................22

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.,*
   2013 WL 5979327 (N.D. Cal. Nov. 8, 2013) ...............................................17

*In re Packaged Seafood Prods. Antitrust Litig.,*
   332 F.R.D. 308 (S.D. Cal. 2019) ...............................................................22

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.,*
   967 F.3d 264 (3d Cir. 2020) .....................................................................23

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
   267 F.R.D 583 (N.D. Cal. 2010) .............................................................3, 24

*Johnson v. City of Grants Pass,*
   72 F.4th 868 (9th Cir. 2023) .....................................................................16

*Kumar v. Salov N. Am. Corp.,*
   2016 WL 3844334 (N.D. Cal. July 15, 2016)..............................................18

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC,*
   31 F.4th 651 (9th Cir. 2022) (en banc) ..........................................16, 20, 22, 23

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC,*
   993 F.3d 774 (9th Cir. 2021) .....................................................................22

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd.,*
   20 F.4th 466 (9th Cir. 2021) .....................................................................21

*Roman v. Jan-Pro Franchising Int'l, Inc.,*
   342 F.R.D. 274 (N.D. Cal. 2022)............................................................3, 18

*Ruiz Torres v. Mercer Canyons Inc.,*
   835 F.3d 1125 (9th Cir. 2016)..............................................................17, 23

*Senne v. Kan. City Royals Baseball Corp.,*
   934 F.3d 918 (9th Cir. 2019) .....................................................................16

*Staton v. Boeing Co.,*
   327 F.3d 938 (9th Cir. 2003) .....................................................................18

*Tawfilis v. Allergan, Inc.,*
   2017 WL 3084275 (C.D. Cal. June 26, 2017) ...........................................23, 24

*Tyson Foods, Inc. v. Bouaphakeo,*
   577 U.S. 442 (2016)..............................................................................19, 20

*Vaquero v. Ashley Furniture Indus., Inc.,*
   824 F.3d 1150 (9th Cir. 2016).....................................................................23

*Wal-Mart Stores, Inc. v. Dukes,*
   564 U.S. 338 (2011)..................................................................................17

**FILED UNDER SEAL**

*Wolin v. Jaguar Land Rover N. Am., LLC,*
    617 F.3d 1168 (9th Cir. 2010) ...............................................................................24

**STATUTES AND RULES**

15 U.S.C. §15.....................................................................................................................20

FED. R. CIV. P. 23 ......................................................................................... *passim*

**OTHER AUTHORITIES**

6 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 20:28 (6th ed. 2022) ...................................16

DECL. OF SHALEV HULIO IN SUPPORT OF DEFENDANT'S MOT. TO DISMISS, *WhatsApp Inc.
    v. NSO Group Techs. Ltd.*, No. 4:19-cv-07123-PJH, Dkt. 45-11 (Apr. 2, 2020) ...............7

Advertiser Plaintiffs' Motion for Class Certification

**FILED UNDER SEAL**

### INTRODUCTION

In 2016, Meta Platforms, Inc. ("Meta"), then called Facebook, faced serious threats to its dominance over a unique type of advertising: social advertising. This distinct form of online advertising relies on data derived from, and machine learning/AI models trained using, a social graph, and it is generally delivered on the platform where such a social graph is extant, an online social network. By the early 2010s, Meta had acquired a monopoly in social advertising, bolstered by its acquisition of one of its largest social network competitors (Instagram) and one of its most significant potential rivals (WhatsApp). This monopoly was protected by a powerful barrier to entry linked to Meta's social data and machine learning dominance, the Data Targeting Barrier to Entry ("DTBE").

But the company, led by bellicose founder Mark Zuckerberg, was still restive. By late 2016, Zuckerberg and other company executives feared actual competitors and potential entrants throughout the industry. The most notable among them was Snapchat, a younger-skewing social network that had innovated its way into a direct threat and was aggressively expanding its social advertising offerings ahead of a 2017 initial public offering. Cognizant that its powerful market position afforded it substantial, and growing, pricing power over social advertisers, Meta began an aggressive campaign to maintain and strengthen its monopoly. From 2016 through 2020, Meta wiretapped actual and potential competitors, beginning with Snapchat, to neutralize competition; it bought off would-be competitors like Apple, Sony, and Ticketmaster with competition-restricting API deals; cut a deal with Netflix (whose CEO sat on Facebook's board) to keep the company's advertising signals away from competitors, in exchange for crippling Meta's premium video product; and ceded the open web ad exchange market to Google for that company's active assistance in extending Meta's social advertising dominance. All the while, Meta raced to integrate signals and AI from across its businesses into a central repository, the Facebook Feature Framework ("F3"), and when the FTC investigated Meta's integration, the company misled the agency to avoid divestiture. This multi-pronged campaign worked. Meta was able to substantially forestall the threats to its dominance that its executives feared in late 2016, successfully extending its social advertising monopoly into the next decade and allowing Meta to repeatedly and substantially raise social advertising prices into 2020 without losing market share—all while product quality stagnated.

**FILED UNDER SEAL**

The named Advertiser Plaintiffs—proposed as Class representatives here—are people and companies that bought social advertising at prices inflated by Meta's unlawfully maintained monopoly. Advertiser Plaintiffs seek to certify a single class of Meta advertising purchasers from December 1, 2016, to December 31, 2020. As explained below, their claims are precisely the sort suitable for classwide treatment. Every element required for a Rule 23(b)(3) class is met here.

*First*, there is no question that Advertiser Plaintiffs' claims present issues common to all Class members, including as to Meta's liability under the antitrust laws. Questions such as market definition, market power, and exclusionary conduct will be proven exclusively through common evidence from Meta and third parties. These questions are about ***Meta's*** conduct and are not answered differently for any of the Advertiser Plaintiffs or Class members. Moreover, injury and damages issues also present common questions under the methodology proposed by Advertiser Plaintiffs' experts. Meta's exclusionary conduct maintained its monopoly—unlawfully—during the entire Class Period and a consistent overcharge on each member of the proposed Class was the result.

*Second*, these common questions plainly predominate the issues to be tried. In antitrust cases, liability issues are a canonically predominant common question. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). As to damages, the methodology proposed by Advertiser Plaintiffs' expert, Dr. Michael Williams, arrives at readily calculable overcharge damages for every member of the Class based on a well-established yardstick damages methodology.

*Finally*, the elements of typicality and adequacy are met. Advertiser Plaintiffs purchased ads during the Class Period and are typical of the antitrust claims to be asserted by every member of the Class. As to adequacy, the named Advertiser Plaintiffs have invested significant time and effort in this case, including being deposed and making extensive document productions. Advertiser Plaintiffs' counsel have vigorously litigated the case, including by taking depositions, litigating discovery issues, and overcoming two motions to dismiss by Meta. Put simply, every element for class certification is met here—based on extensive evidence. The Court should certify the proposed Advertiser Class, and this case should be tried on a classwide basis.

**FILED UNDER SEAL**

## STATEMENT OF COMMON FACTS[1]

## I.  THE PROPOSED CLASS

Advertiser Plaintiffs propose a single class for certification, consisting of everyone who bought advertising from Meta between December 1, 2016, and December 31, 2020. While this differs in two respects from the classes proposed in the AFAC, those differences are merited in light of case developments.[2] *First*, the class period is narrower in this motion (here, it ends on December 31, 2020) than in the AFAC (there, it continued to "the present"), reflecting the time period of Meta's exclusionary conduct and classwide overcharge identified in fact and expert discovery. *Second*, the AFAC proposed two classes split in time based on an arbitration clause introduced into Meta's Commercial Terms on April 4, 2018. However, Meta's actions in this case—including vigorously litigating, on the merits, market definition, monopoly power, damages, and anticompetitive conduct issues extending from 2016 through late 2020—have unambiguously waived any right to arbitrate the claims of proposed Class members.[3] Advertiser Plaintiffs' proposed class definition is thus narrower than that proposed in the AFAC, and the changes are minor and non-prejudicial to Meta.[4]

## II.  COMMON CLASSWIDE EVIDENCE OF THE RELEVANT MARKET

The relevant antitrust market in this action—the United States Social Advertising Market—will be defined through common, classwide evidence. As explained by Dr. Williams in his expert

---

[1]      The Statement of Common Facts is cited here as "SOCF."

[2]      Advertiser Plaintiffs' First Amended Complaint ("AFAC") defines two classes: (i) all people who bought advertising from Meta between December 1, 2016, and April 3, 2018, but not after April 3, 2018; and (ii) all people who bought advertising from Meta between April 4, 2018, and the present. ECF No. 237 (AFAC), ¶¶ 839, 842.

[3]      *See Hill v. Xerox Bus. Servs., LLC*, 59 F.4th 457, 469-70 & n.15 (9th Cir. 2023); *DZ Rsrv. v. Meta Platforms, Inc.*, 2022 WL 912890, at *4 (N.D. Cal. Mar. 29, 2022) (Donato, J.), *aff'd in part*, 96 F.4th 1223 (9th Cir. 2024); *Roman v. Jan-Pro Franchising Int'l, Inc.*, 342 F.R.D. 274, 290-94 (N.D. Cal. 2022).

[4]      *See Cancino Castellar v. Mayorkas*, 2021 WL 4081559, at *8 (S.D. Cal. Sept. 8, 2021) ("The definition of the class at the class certification stage may diverge from that set forth in the Complaint, as long as the new class definition is narrower than the original . . . or the proposed change is minor and non-prejudicial to the defendant."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D 583, 590-91 (N.D. Cal. 2010) (modified class definitions permitted where they were "minor, required no additional discovery, and caused no prejudice to defendants").  Unless otherwise noted, emphasis is added and citations are omitted throughout.

**FILED UNDER SEAL**

report,[5] social advertising is advertising that can be targeted based on social data contained in a "social graph." Williams Rpt. ¶ 15. The effectiveness of social advertising depends on both the quality and quantity of social data used to train the offeror's artificial intelligence/machine learning ("AI/ML") models and the possession of effective AI/ML modeling systems, and a nascent Social Advertising Market competitor must reach a critical mass of both social data and AI/ML to meaningfully challenge incumbent firms. *Id.* ¶ 21. Facebook and Instagram sold social advertising during the Class Period, as did Twitter, LinkedIn, and Snap, among others. *Id.* ¶ 21 & Table A1. All of Meta's ad products sold during the Class Period across Facebook and Instagram were social advertising products. *Id.* ¶¶ 20, 21 & Table A1. Meta had a dominant position in the United States Social Advertising Market throughout the Class Period, including the ability to raise prices to supracompetitive levels—which it did. *Id.* ¶¶ 26-55.  At trial, Advertiser Plaintiffs will prove that the United States Social Advertising Market is a relevant antitrust market through common, classwide evidence, *id.* ¶¶ 10-25, through *Brown Shoe* evidence drawn from common sources and well-established economic theories, including Meta's own documents and testimony; the documents and testimony of relevant third parties including advertising purchasers and sellers, regulators, and industry analysts; and Dr. Williams' classwide economic analysis, including a SSNIP evaluation. *See id.* ¶¶ 21 (*Brown Shoe* factors), 18-20 (SSNIP evaluation), Table A2 (evidence).

### III.    COMMON CLASSWIDE EVIDENCE OF META'S UNLAWFUL CONDUCT[6]

Trial in this case will focus principally on common, classwide evidence of Meta's anticompetitive conduct. Specifically, Advertiser Plaintiffs will prove that Meta maintained its monopoly between December 2016 and December 2020 through an anticompetitive course of conduct

---

[5]    *See* Expert Report of Michael A. Williams, Ph.D., May 24, 2024 ("Williams Rpt."), attached as Ex. A to the Declaration of Michael A. Williams, Ph.D.

[6]    Evidentiary citations in this subsection are in footnotes rather than inline to improve readability. Citations to numbered exhibits refer to the exhibits to the accompanying Declaration of Amanda F. Lawrence. Pin citations are cited by the final three digits of the Bates stamp. For purposes of brevity, only a subset of documents cited or discussed in this motion have been included as exhibits, and these have been excerpted. All cited documents are on file, in their entirety, with Advertiser Plaintiffs, and Plaintiffs will promptly provide the Court with the full version of any cited document or exhibit (or all cited documents and exhibits) upon the Court's request.

**FILED UNDER SEAL**

comprising five principal categories of exclusionary acts: (1) Meta's in-app action panel ("IAAP") program, which used complex hacking technology and infrastructure developed by the company's Onavo team to monitor and preempt competitive threats, including from Meta's horizontal Social Advertising competitor Snapchat; (2) Meta's agreements with hand-picked potential entrants, including so-called "Device Integrators" like ███████████████████, for access to private Application Programming Interfaces ("APIs"), which provided these third parties with private Meta user data in exchange for data-linked restrictions on the products the counterparties could build; (3) Meta's agreement with Netflix to continue (and expand) Netflix's large advertising expenditures on Meta to prevent valuable Netflix signals from going to an actual or potential social advertising rival, in exchange for Meta's agreement to scuttle certain aspects of its Facebook Watch product, which had threatened competition with Netflix in its core video streaming market; (4) Meta's "Jedi Blue" agreement with Google in which Meta abandoned entry into Google's ad exchange market, and Google agreed to actively assist Meta's (and only Meta's) expansion of its social advertising products into the open web; and (5) Meta's deception of FTC to forestall divestiture or regulatory scrutiny as Meta integrated signals from across its business into a one-stop "buffet" for AI/ML training. These exclusionary acts will be the unambiguous centerpiece of a trial, and, as shown below, each category will be proved through common, classwide evidence—principally evidence from Meta's own documents and witnesses.

*First*, during the Class Period, Meta used Onavo technology to wiretap its competitors, including Social Advertising rival Snapchat, as part of its so-called IAAP program. In this program, Meta paid people (some of whom were teenagers) to install a "root" digital certificate on their mobile device that redirected proprietary analytics traffic from the Snapchat app to a Meta-controlled server, where this proprietary information was decrypted and used by Meta for competitive analysis.[7] The technical details and competitive impact of this program, including its exclusionary impact on Snapchat and other actual or potential Social Advertising rivals during the Class Period, will be proved through common, classwide evidence.

---

[7]     Ex. 1 (PX 2256) at 799-802; Ex. 2 (PX 414) at 831.

**FILED UNDER SEAL**

1    For example, internal Meta emails, instant messages, and "Quip" documents involving CEO

2   Zuckerberg, now-COO Javier Olivan, Onavo founder Guy Rosen, now-CMO Alex Schultz, high-

3   level Meta technical and engineering executives, and lawyers from across Meta will demonstrate that

4   the creation of Meta's IAAP program was ordered by Zuckerberg himself in response to competitive

5   pressure from Snapchat.[8] They will also show that IAAP intercepted and decrypted encrypted,

6   proprietary analytics traffic from the Snapchat app (and others),[9] and that Meta used this industrial

7   espionage to inform product strategy.[10] Common, classwide evidence—both from Meta and from

8   Snapchat executives—will likewise show that this conduct was intended to, and successfully did,

9   fortify Meta's Social Advertising dominance.[11] This worked by, as a Snapchat executive testified at

10   deposition in this case, "caus[ing] advertisers to not have a clear narrative differentiating Snapchat

---



[8]    *See* Ex. 3 (PX 2255) at 836.

[9]    Ex. 1 (PX 2256) at 799-802; Ex. 2 (PX 414) at 83.

[10]    Ex. 4 (PX 2861 & 2862) at 275 ███████████████████████████████████████

███████████████████████████████████████████████████████████████ Ex. 5 (PX

2984) at 382 ███████████████████████████████████████████████████████████████

███████████████████████████ & 385 ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ PX 2868 at 433 ██████

████████████████████████████████ PX 25 at 981 ████████████████████████████

██████████████████████████████████████████████████ .

[11]    *Compare* PX 557 ██████████████████████████████████████████████████

████████████████████████████████████████████████ , *with* PX 556 ██████████

████████████████████████████████████████████████████████████████ ; *see* Ex. 4 (PX 2861 & PX

2862) at 275 ██████████████████████████████████████████████████████████████

████████████████████████████████████████████████ ██████████████████████████

██████████████████████ ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████ PX 1747 at 236 (███████████████████████████████

██████████████████████████████████████████████ .

**FILED UNDER SEAL**

1  from Facebook and Instagram," which "hamper[ed] Snap's ability to sell ads."[12] Meta's IAAP

2  program was so important to the company that ███████████████████████████████████

3  ████████████████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████████████

5  ███████████████████████████████████████████████.[13]

6      *Second*, during and leading up to the Class Period, Meta secretly entered into private extended

7  API agreements with selected companies with large user bases and data troves that made those

8  companies particularly well-suited to build or equip a potential Social Advertising rival. For example,

9  Meta entered into such agreements with ████████████████████—companies that

10 threatened Meta's DTBE through social elements of their products (*e.g.*, ████████████

11 ████████████████████) that could potentially be leveraged to create a

12 rival social advertising platform or product. These private extended API agreements included

13 ████████████████████████ which helped prevent or restrict

14 entry into the Social Advertising Market by Meta's private API counterparties. The restrictions were

15 in force, and counterparties like ████████████████████ continued to pull data from

16 Meta's private APIs subject to them, ████████████████████

17 All the foregoing will be shown through common, classwide evidence.  For example:

18      • ████████████████████████████████████

19      ████████████████████████████████████████

20      ████████████████████████████████████████

21

22

23  [12]   D. Levenson Dep. Tr. 50:12-22.

24  [13]   *See* Ex. 6 (PX 2989) at 435-36 ███████████████████████

25  ████████████████████████████████████████████████

26  ████████████████████████████████████████████████

27  ████████████████████; Decl. of Shalev Hulio in Support of Defendant's Motion

    to Dismiss, *WhatsApp Inc. v. NSO Group Techs. Ltd.*, Case No. 4:19-cv-07123-PJH, Doc. 45-11 (Apr.

28  2, 2020), at 2 (sworn declaration from NSO's CEO: "In October 2017, NSO was approached by two

    Facebook representatives who asked to purchase the right to use certain capabilities of Pegasus").

**FILED UNDER SEAL**



- ████████████████████████████████████ ;[15]

- ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████ ;[17]

- ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████ ;[19]

- ████████████████████████████████████ ;[20] and

- the agreements themselves, including those described by Meta as ████████
████████ .[21]

---

[14]    PALM-FTC-00246387 at 387-88.

[15]    PX 1322 at 678.

[16]    PALM-002013980, at 017.

[17]    PALM-009577689, at 689.

[18]    Ex. 7 (PALM-FTC-00123557) at 557-59.

[19]    Ex. 8 (PALM-008743868), at 868-69, 871.

[20]    PALM-012438844, at 859-61.

[21]    *See, e.g.,* PALM-002014263, at 264, 267; PALM-ADI-0001000836; J. Chang Dep. Tr. 248:2-250:25; *see also* PALM-FTC-00247120 ████████████████████
████████████████████████████████████ .

Case No. 3:20-cv-08570-JD                                    Advertiser Plaintiffs' Motion for Class Certification

**FILED UNDER SEAL**

*Third,* during the Class Period, Meta entered into an agreement with Netflix that reduced direct competition between the two companies in exchange for benefits to Meta's social advertising monopoly. This agreement and its impacts will be proven through common, classwide evidence—through documents and testimony from Meta witnesses and from Reed Hastings, Netflix's founder and former CEO. For example, Meta documents will show that Hastings was a member of Meta's board from the start of the Class Period through early 2019;[22] that Hastings personally communicated with Meta executives, especially Zuckerberg, about Netflix issues, including data use and ad expenditures;[23] and that by mid-2017, Meta and Netflix were moving into direct competition in video streaming—and the companies' highest-level executives knew it.[24] Meta-produced documents and related testimony will also show that in late 2017 and early 2018, Zuckerberg, Sandberg, and Hastings had numerous in-person meetings and discussions, including a January 2018 "fireside chat" at Netflix in front of "500 senior [Netflix] people" in which Sandberg and Hastings used scripted banter to dance around the companies' "direct video competition" and "FB professional video strategy,"[25] and ███████████████████████████████████████████████████████,"[26] and that shortly thereafter Zuckerberg personally cut about $1 billion from the next year's Facebook Watch budget.[27]

---

[22]     PALM-011831146 ███████████████████.

[23]     PALM-006289050 (2014 emails noting that Meta built custom API for Netflix "after a meeting between [Zuckerberg] and [Hastings]"); PALM-016986654 (2015 Sandberg emails discussing personal negotiations with Hastings about Netflix, "ask[ing] me what # advertiser they are on FB and if they spent $100M in a few years, what # would they be"); PX 608 at 450 (Jan. 2014 1-on-1 email from Hastings to Zuckerberg "writing as Netflix CEO, not FB board member").

[24]     Ex. 9 (PX 607) (Jun. 2017 Hastings email to Zuckerberg, Sandberg, and E. Schrage about "not . . . bidding on the same [original video] content"); Ex. 10 (PALM-003040610) at 610-11 ████████ ███████████████████████████████████████████████████████; PALM-006842466, at 511-12 and 524 ██████████████████████████████; *cf.* PX 614 at 587 ███████████ ██████████████████████████████████████████████████████████████████████████.

[25]     Ex. 11 (PX 605) at 583-84; Ex. 12 (PX 606) at 836-37.

[26]     PALM-016919272, at 272.

[27]     PALM-013499085, at 088-89 ████████████████████████████████████████████; PALM-003130963, at 978 ████████████████████████████████

---

**FILED UNDER SEAL**

1    Common evidence will show that in 2018, ████████████████████████

2    ██████████████████████████████████████████████████████████████

3    ████;[28] that after an agreement was struck, Hastings personally discussed "the data sharing . . .

4    [Meta] asked [Netflix] to do" in a January 2019 lunch with Meta executive Andrew Bosworth;[29] and

5    that in October 2019, when Hastings and Sandberg were about to fly on the same private jet, Hastings

6    emailed Sandberg to give her a heads-up so that Sandberg could be ready to sell more ads to

7    Hastings's own company.[30] Classwide evidence will show that ████████████████████

8    ██████████████████████████████████████████████████████████████

9    ██████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████.[32]

11    *Fourth*, in late September 2018, Meta entered into an agreement with Google in which Meta

12   exited the Google-dominated ad exchange market and Google actively assisted Meta in maintaining

13   its social advertising monopoly. This agreement will be proven exclusively through common,

14   classwide evidence, including a written contract—the September 24, 2018 Google Network Bidding

15   Agreement ("GNBA")[33]—as well as Meta- and Google-produced internal documents and testimony

16   regarding the negotiations, context, and aftereffects of the companies' agreement.

17    Meta and Google documents and testimony will show that by 2017, a competitive collision

18   between Meta and Google was imminent, as header-bidding technology threatened Google's open-

19   _____

20   ██████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████).

22   [28]    PALM-008530029, at 031.

23   [29]    PX 412 at 140.

24   [30]    PX 1926 at 983.

25   [31]    *See* PALM-012215990 at 992 ██████████████████████████████

26   ██████████████████████████████████████████████████████████████

27   ████████████.

28   [32]    *See, e.g.*, SNAP – FTC – No. 191-0134 – 0000051023, at 024 ████████████

29   ██████████████████████████.

30   [33]    Ex. 13 (PX 183).

**FILED UNDER SEAL**

web display advertising dominance and Meta publicly threatened to adopt that technology in connection with its display network, FAN.[34] In response to the threat from header bidding, Google developed a new open-web display product, Exchange Bidding Dynamic Allocation ("EBDA" or "Open Bidding"), which was designed from the start to ███████████████[35] The rising competitive pressure between Google and Meta was deflated by the companies agreeing to refrain from competition in the ad exchange market, after a lengthy negotiation and evaluation process conducted at both companies' highest levels.[36]

The Meta-Google agreement allowed Meta to stave off a threat to its market power in the Social Advertising Market,[37] with Google expressly committing ████████████████████ ████████████████████████████████████████████████ ████████████████[38]███████████████████████████. In exchange,

---

[34] *See* PALM-014453465 ███████████████████; PX 1706 ██████████████████; Ex. 14 (PX 1709) ███████████████████████████; S. Wang Dep. Tr. 238:2-5 ████████████████████████

[35] Ex. 15 (PX 1295) at 704 (██████████████████████████████████ █████████████ PALM-013460551 █████████████████████ ████████████████████████████; PX 1711 at 349 █████████████████████.

[36] *See* PX 1712 ████████████████████████████; PX 1922 ███ ██████████████; PX 1921 ████████████████████████ ████████████████ *see also* PX 1263 ███████████ ████████████████████████████.

[37] *See, e.g.,* PALM-013494016 at 017 ███████████████; PX 1921 at 594 ██ ████████████████████.

[38] Ex. 12 (PX 183) at 359-60 ███████████████████ ████████████████████████████████████████ ████████████████████████████████████████; *see also* PX 1710 ████████████

11

**FILED UNDER SEAL**

Meta agreed to guaranteed purchases from Google's exchange,[39] and abruptly withdrew its support for header bidding.[40] All of this evidence will be common and classwide at trial, principally from the documents and testimony of Meta and Google themselves.

*Fifth*, Meta deceived the FTC and the public during the Class Period regarding the viability of divestiture or segregation of Meta's Facebook Blue, Instagram, WhatsApp, and Messenger business lines, while at the same time racing to implement a companywide integration of machine learning data and models, including those from Instagram and WhatsApp. This conduct, which prevented any divestiture- or segregation-related competitive price check from occurring during the Class Period, will be proven entirely through common, classwide evidence. For example, common evidence will show that by 2019, Meta was creating a ████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████[41] ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████████[42]

████████████████████████████████████████████████████████████; S. Wang Dep. Tr. 207:23-208:3 ████████████████ & 221:18-24 ████████████████████████████████████████.

[39] PX 183 at 361-66.

[40] PX 1267 at 078-79 ████████████████████████████████████████████████ ████████████████████████████████; PX 1269 at 187 ████████████████████ ████████████████████████████████████████████████████████; *id.* at 207 ████████████████████████████████████.

[41] *See, e.g.*, PALM-010434436 ██████████████████████████████████████ ████████████████████████.

[42] PX 119 at 783-807 ████████████████████; J. Parikh Dep. Tr. 151:10-13 ██████ ████████████████████; Meta Platforms, Inc.'s Objections and Responses to Advertiser Plaintiffs' First Set of Requests for Admission ████████████████████████████████████

1  ████████████████████████████████████████████████████████████████████

2  ███████████████████████████████████████████████████████[43] These

3  omissions to the FTC are not only based on common evidence; they are essentially undisputed.

4  **IV.   COMMON EVIDENCE OF CLASSWIDE ANTITRUST IMPACT**

5       Advertiser Plaintiffs rely on widely accepted economic models and other common, classwide

6  economic evidence in evaluating the effects of Meta's conduct on advertisers. For example, Dr.

7  Williams's analysis shows that but for Meta's unlawfully maintained monopoly, Advertiser Plaintiffs

8  and the proposed Class would have paid lower prices and benefited from improvements to quality,

9  choice, and output in purchasing social advertisements during the Class Period.

10      **A.   Common Evidence Shows that Meta Had Monopoly Power in the Social
Advertising Market**

11       Advertiser Plaintiffs will prove through common, classwide evidence that Meta had monopoly

12  power—that is, the ability to enhance its profits by raising prices substantially above marginal costs

13  for a substantial volume of sales—in the United States Social Advertising Market during the Class

14  Period.  *See* Williams Rpt. ¶¶ 26-55. This will be shown through both direct and indirect evidence,

15  on a common, classwide basis, as Dr. Williams explains in his expert report.

16       As direct evidence of Meta's monopoly power in the U.S. Social Advertising Market, Dr.

17  Williams used Meta's economic profit rate ("EPR"), return on capital employed ("ROCE"), and

18  operating margin (calculated by Dr. Williams and by the UK's principal antitrust regulator, CMA) to

19  conclude that Meta had monopoly power during the Class Period.  *See* Williams Rpt. ¶ 29 ████

20  ███████████████████████████████████████████████████████████████████;

21  ¶ 30 ████████████████████████████████████████████████████████████

22  ████████████████████████ ¶ 31 ████████████████████████████████████

23  ████████████████████████████████████████████ These direct measures of market

24  power indicate, through widely accepted economic methods using common evidence, that Meta was

25  _____

26  _____

27  ████████████████████████████████████████████████████████████████████
████████████████████████.

28  [43]    PX 119 at 779.

**FILED UNDER SEAL**

able to enhance its profits by raising prices substantially above marginal costs for a large volume of sales over a sustained period of time. *Id*. at ¶ 31. Additionally, Meta's own documents produced in this case are common evidence that Meta had pricing power, which it exercised by consistently raising prices during the Class Period without sacrificing market share. *Id.* at ¶¶ 27-32, 36; Table A2. Further, competition authorities, industry analysts, and market participants have concluded that Meta had monopoly power in the Social Advertising Market during the Class Period, *id.* at ¶¶ 35-37; Table A3, and Meta- and third-party-produced documents and testimony show that Meta could and did exclude competition from the Social Advertising Market both leading up to and during the Class Period. *Id.* at ¶¶ 38-44; Table A4. All the above is common evidence, based on widely accepted economic methodology, that will show Meta's monopoly power during the Class Period on a classwide basis.

Advertiser Plaintiffs will also show through indirect evidence that Meta had monopoly power in the U.S. Social Advertising Market during the Class Period. *See* Williams Rpt. ¶¶ 45-55. Meta's market share in the U.S. Social Advertising Market increased from ███████████████████, and ranged from ████████ during the Class Period. *Id.* at ¶ 46; *see id.* at ¶¶ 51-53; Table A1 ████████████████████████████████████████ Common evidence, including analyses by competition authorities and academic experts, *id.* at ¶ 55; Table A5, and Meta's own documents, *id.*, will show substantial barriers to entry into the Social Advertising Market—further indirect evidence of Meta's monopoly power given its dominant market position.

**B.      Common Evidence Shows that All or Virtually All Class Members Were Injured by Meta's Conduct**

Dr. Williams uses well-accepted economic methods and common evidence to show that all, or virtually all, members of the proposed Class were injured due to a classwide price inflation in Meta's social advertising prices during the Class Period. Williams Rpt. ¶¶ 71-108. For example, Dr. Williams analyzes the social advertising prices that would have existed in a but-for world in the absence of the alleged conduct that maintained Meta's monopoly during the Class Period, employing a damages methodology that uses firms' EPRs based on a "yardstick" model. *Id.* These are well-accepted economic methods for evaluating anticompetitive price inflation. *Id.* Dr. Williams analyzes classwide economic injury by estimating Meta's but-for advertising revenues based on the EPRs of

**FILED UNDER SEAL**

comparable companies, *id.* at ¶¶ 98-106, and concludes that but for Meta's monopoly-preserving anticompetitive conduct, Meta's advertising revenues would have been at least ▓▓▓▓ lower during the Class Period, *id.* at ¶ 18.  Put another way, Meta's actual advertising revenues were at least ▓▓▓▓ *higher* than they would have been in the but-for world, meaning advertisers were overcharged by at least ▓▓▓▓ as a percentage of but-for values. *Id.* at ¶¶ 18-19.

Dr. Williams also draws on the evidence and his economic expertise to conclude that Meta did not routinely offer discounts to individual advertisers, and that even advertisers who received discounts would have been injured as against the but-for world given the baseline price inflation due to Meta's monopoly-maintaining anticompetitive conduct. Williams Rpt. ¶ 69.[44] In view of the evidence that all or nearly all Meta advertising purchases were made via the same auction process, Dr. Williams concludes that social advertising prices for Meta ads during the Class Period were higher for all or nearly all members of the proposed Class than in a but-for world without Meta's monopoly-maintaining anticompetitive conduct. Williams Rpt. ¶¶ 18, 85.

**C.     Aggregate Damages Can Be Calculated on a Classwide Basis**

Having determined the extent of the overcharge, on a classwide percentage difference basis, between Meta's actual advertising revenues for the proposed Class and its but-for advertising revenues, Dr. Williams multiplies this percentage overcharge by the relevant volume of commerce to calculate aggregate damages on a classwide basis. Williams Rpt. ¶¶ 109-10. Specifically, using ▓▓▓▓▓▓ as the volume of commerce for U.S. Meta advertising during the Class Period, Dr. Williams uses the EPR damages methodology based on a yardstick model that he previously determined resulted in a classwide overcharge of ▓▓▓▓▓▓ (as a percentage of actual values)

---

[44] *See also* R. Goldman Dep. Tr. 13:23-16:24, 26:2-27:4 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓; D. Fischer Dep. Tr. 274:25-275:3 ▓▓▓▓▓▓▓▓▓▓▓; J. Eide Dep. Tr. 42:4-15, 45:25-46:5 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓; *About ad auctions*, https://www.facebook.com/business/help/430291176997542?id=561906377587030 ("Each time there's an opportunity to show an ad to someone, an auction takes place to determine which ad to show to that person."); C. Tucker Merits Dep. Tr. 215:14-16 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

**FILED UNDER SEAL**

1    to calculate classwide damages for the proposed Class, across the Class Period, of ███████

2    ████████. *Id.* Like classwide injury, classwide damages can and will be calculated using well-

3    accepted economic methods, using common evidence. *Id.* And though not required at this stage, Dr.

4    Williams's damages methodology would also permit the calculation of individual damages using a

5    common formulaic method—multiplying the dollar value of a given Class member's advertising

6    purchases by the percentage overcharge. *See id.* at 109-10.

                                    **ARGUMENT**

8        A plaintiff seeking class certification "must satisfy the four requirements of Rule 23(a):

9    (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation." *Senne v. Kan.*

10   *City Royals Baseball Corp.*, 934 F.3d 918, 927 (9th Cir. 2019). The plaintiff also "must show that the

11   class fits into one of three categories" set forth in Rule 23(b). *Olean Wholesale Grocery Coop., Inc.*

12   *v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022) (*en banc*). Here, Advertiser Plaintiffs

13   propose Rule 23(b)(3) class, which a class may be certified if two additional requirements are met—

14   predominance and superiority. *See* FED. R. CIV. P. 23(b)(3). Advertiser Plaintiffs' proposed Class

15   meets these requirements and should be certified.

16   **I.    THE REQUIREMENTS OF RULE 23(A) ARE SATISFIED**

17       **A.    Rule 23(a)(1)'s Numerosity Requirement Is Met**

18       There can be no dispute that the proposed Class is so numerous such that joinder of all

19   members would be "impracticable." FED. R. CIV. P. 23(a)(1). By July 2017, there were ████

20   active U.S. advertisers across Meta platforms, PALM-002742415 at 416, and in 2020 there were

21   ████████████████████████████ PALM-013000862 at 862. The

22   proposed Class easily satisfies the numerosity requirement. *See Johnson v. City of Grants Pass*, 72

23   F.4th 868, 886 (9th Cir. 2023); *DZ Rsrv.*, 2022 WL 912890, at *3.

24       **B.    Rule 23(a)(2)'s Commonality Requirement Is Met**

25       Rule 23(a) also requires one or more questions of law or fact common to the class. FED. R.

26   CIV. P. 23(a)(2).  Rule 23 does not require that ***all*** questions of law and fact be common to every class

27   member; rather, Advertiser Plaintiffs' claims "must depend upon a common contention . . . of such a

28   nature that it is capable of classwide resolution – which means that determination of its truth or falsity

                                        16

**FILED UNDER SEAL**

1    will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*

2    *Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

3          "Antitrust liability alone constitutes a common question that 'will resolve an issue that is

4    central to the validity' of each class member's claim 'in one stroke.'" *In re High-Tech Emp. Antitrust*

5    *Litig.*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013). Indeed, this case presents several common

6    questions of law and fact that satisfy Rule 23's commonality requirement because they will "generate

7    common ***answers*** apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (emphasis

8    in original). Further, each of these common questions is amenable to classwide resolution because

9    each "focuses on the actions of Defendant[] and does not vary by class member." *Bias v. Wells Fargo*

10   *& Co.*, 312 F.R.D. 528, 537 (N.D. Cal. 2015). These common questions include whether, during the

11   Class Period: (1) there existed a relevant antitrust market consisting of social advertising in the United

12   States; (2) Meta possessed monopoly power in that market; (3) Meta willfully maintained its

13   monopoly in or attempted to monopolize that market; (4) Meta entered into an agreement with Google

14   in unreasonable restraint of trade; and (5) all (or nearly all) members of the Class suffered damage as

15   a result of Meta's anticompetitive conduct. Commonality is readily satisfied.

16         **C.      Rule 23(a)(3)'s Typicality Requirement Is Met**

17         Rule 23's typicality requirement is "a 'permissive' standard" that is satisfied when the "claims

18   or defenses of the representative parties are typical of the claims or defenses of the class." *Bias*, 312

19   F.R.D. at 537. "This requirement is usually satisfied if the named plaintiffs have suffered the same or

20   similar injuries as the unnamed class members, the action is based on conduct which is not unique to

21   the named plaintiffs, and other class members were injured by the same course of conduct." *In re*

22   *NCAA Student-Athlete Name & Likeness Licensing Litig.*, 2013 WL 5979327, at *4 (N.D. Cal. Nov.

23   8, 2013). The representative claims need only be "reasonably coextensive with those of absent class

24   members; they need not be substantially identical." *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d

25   1125, 1141 (9th Cir. 2016). Even when Class members "differ in advertising budgets and scope of

26   purchases," these differences do not defeat typicality because the advertising "products, pricing, and

27   programs accessed by class members" are sufficiently similar across Meta's platforms. *DZ Rsrv.*,

28   2022 WL 912890, at *4; *supra*, SOCF § IV.B.

17

**FILED UNDER SEAL**

Nor does Meta's May 2018 arbitration provision pose a challenge to typicality. Not only has Meta waived any right to arbitrate the claims of absent Class members by "vigorously litigat[ing] this lawsuit in federal court as if arbitration were not an option," *DZ Rsrv.*, 2022 WL 912890 at *4; *see also Hill*, 59 F.4th at 469-70 & n.15; *Roman*, 342 F.R.D. at 290-94, but even if arbitration were relevant, it would not defeat typicality (or, for that matter, adequacy). The arbitration provision in Meta's Commercial Terms took effect May 25, 2018. As in *DZ Reserve v. Meta Platforms, Inc.*, Advertiser Plaintiffs "purchased ads both before and after May 2018,"[45] making their claims typical of (and making them adequate representatives for) "advertisers who purchased ads before and after May [25], 2018." 2022 WL 912890, at *4. Advertiser Plaintiffs' claims are the same as the proposed Class members' and based on the same conduct by Meta, and damages can be shown by a common classwide methodology.  *See supra*, SOCF §§ III, IV. Accordingly, typicality is satisfied.

### D.  Rule 23(a)(4) and 23(g) Adequacy Requirements Are Met

Rule 23(a) requires representative plaintiffs to "fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). Likewise, Rule 23(g) requires class counsel to "fairly and adequately represent the interests of the class." FED. R. CIV. P. 23(g)(4). The related inquiries consider "'(1) [whether] the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) [whether] the plaintiffs and their counsel prosecute the action vigorously on behalf of the class.'" *Kumar v. Salov N. Am. Corp.*, 2016 WL 3844334, at *2 (N.D. Cal. July 15, 2016) (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003)). Advertiser Plaintiffs and their counsel readily meet these requirements.

*First*, no conflicts exist between Advertiser Plaintiffs and their counsel and the Class as a whole: their interests are aligned in challenging Meta's anticompetitive conduct. Advertiser Plaintiffs all state that they have "no conflicts of interest with any class member that would prevent [them] from fairly and adequately representing the best interests of the class."[46] And the relief Advertiser Plaintiffs

---

[45]    Berney Dec. ¶¶ 8-20; Frederick Dec. ¶¶ 9-15; Looper Dec. ¶¶ 7-40; Young Dec, ¶¶ 7-13.

[46]    Berney Dec. ¶ 24; Frederick Dec. ¶19; Looper Dec. ¶ 44; Young Dec. ¶ 17.

**FILED UNDER SEAL**

and their counsel seek is the same for the named plaintiffs and the Class: recovery for inflated sums paid to Meta for social advertising.

*Second*, since March 18, 2021, when Advertiser Plaintiffs' counsel were initially appointed as interim lead counsel (ECF No. 73), counsel have vigorously litigated the case on behalf of the proposed Class. Advertiser Plaintiffs' counsel have engaged in more than three years of extensive discovery and motion practice, including: taking 49 depositions of Meta fact witnesses; issuing 30 third-party document subpoenas and participating in 29 third-party depositions; participating in countless meet-and-confers on discovery issues, and bringing those issues to court where required; and reviewing millions of documents produced by Meta and third parties. Advertiser Plaintiffs' counsel have engaged experts that, over the course of two years, have developed opinions on technical issues, market definition, monopoly power, antitrust impact, and damages. Each Advertiser Plaintiff has actively participated in the case by reviewing filings, producing documents, answering interrogatories, and sitting for a deposition, and all state that they understand their duties as Class representatives and remain willing to serve in that role.[47] In sum, Advertiser Plaintiffs and their counsel have and will continue to adequately represent the proposed Class.

## II.    THE REQUIREMENTS OF RULE 23(b)(3) ARE SATISFIED

### A.    The Predominance Requirement Is Met

The predominance requirement is also met here. "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (cleaned up). Plaintiffs need not "prove that each element of their claim is susceptible to classwide proof," *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013) (cleaned up), and "'more important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class.'" *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 557 (9th Cir. 2019) (*en banc*). Thus, "even if just one common question predominates," *id.*, a class may

---

[47]    Berney Dec. ¶¶ 21-23; Frederick Dec. ¶¶16-18; Looper Dec. ¶¶ 41-43; Young Dec. ¶¶ 14-16.

**FILED UNDER SEAL**

be certified under Rule 23(b)(3) "'even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Tyson Foods*, 577 U.S. at 453.[48]

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) (quoting FED. R. CIV. P. 23(b)(3)). For private antitrust actions like this one brought under 15 U.S.C. §15, the elements of a claim are "(i) the existence of an antitrust violation; (ii) 'antitrust injury' or 'impact' flowing from that violation;" and "(iii) measurable damages." *Olean*, 31 F.4th at 665-66. Predominance thus requires that "'essential elements of the cause of action,' such as the existence of an antitrust violation or antitrust impact, are capable of being established through a common body of evidence, applicable to the whole class." *Id.* at 666. As in most antitrust class actions, the proof offered on questions of whether Meta violated the antitrust laws and whether advertisers suffered an impact (in the form of higher ad prices) flowing from those violations would be the same whether the case is tried on an individual or class basis. *See Amchem*, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws."). Aggregate damages can also be calculated here on a classwide basis.

### 1.    Common Questions Predominate as to Meta's Antitrust Violations

Advertiser Plaintiffs allege that Meta has engaged in three types of antitrust violations under the Sherman Act: (1) monopolization under Section 2, 15 U.S.C. §2; (2) attempted monopolization under Section 2; and (3) restraint of trade under Section 1, 15 U.S.C. §1. These violations can and will be established through common evidence, including with respect to market definition, *supra*, SOCF § II, Meta's anticompetitive acts, *id.* § III, and antitrust impact, *id.* § IV.A, as each of them "turns on [**Meta's**] conduct and intent along with the effect on the market, ***not*** on individual class members." *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 475 (N.D. Cal. 2020). Moreover, this common evidence will unquestionably drive the resolution of any trial in this matter.

---

[48]    The predominance requirement overlaps with Rule 23(a)'s commonality requirement, *see Olean*, 31 F.4th at 664, and they may be assessed "in tandem." *In re Google Play Store Antitrust Litig.*, 2022 WL 17252587, at *8 (N.D. Cal. Nov. 28, 2022) (Donato, J.).

**FILED UNDER SEAL**

1    A Section 2 monopolization claim has two elements: "'(1) the possession of monopoly power

2  in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished

3  from growth or development as a consequence of a superior product, business acumen, or historic

4  accident.'" *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023). Attempted

5  monopolization requires: "'(1) specific intent to monopolize a relevant market; (2) predatory or

6  anticompetitive conduct; and (3) a dangerous probability of success.'" *Optronic Techs., Inc. v. Ningbo*

7  *Sunny Elec. Co., Ltd.*, 20 F.4th 466, 481-82 (9th Cir. 2021). "[C]ourts have routinely certified classes

8  alleging that a monopolist's conduct caused a direct and uniform overcharge, as overcharge cases

9  often rely on facts common across the class such as the existence of a relevant market, the defendant's

10  monopoly power, and the existence of the illegal course of conduct." 6 *Newberg and Rubenstein on*

11  *Class Actions* § 20:28 (6th ed. 2022) ("*Newberg*") (collecting cases); *see also Glumetza*, 336 F.R.D.

12  at 475 ("Section 2 monopolization claims readily lend themselves to common evidence."). Here,

13  Advertiser Plaintiffs allege that Meta unlawfully maintained its monopoly, resulting in a classwide

14  overcharge in the form of higher ad prices.[49]

15    Moreover, the alleged antitrust violations here will be established through common evidence,

16  which will predominate at trial. *First*, the five categories of exclusionary conduct by Meta (one of

17  which, Meta's agreement with Google, also underlies the Section 1 claim) will be established entirely

18  through common, classwide evidence—principally from Meta itself—and will be the centerpiece of

19  trial on Advertiser Plaintiffs' claims. *See supra*, SOCF § III; *see also* Williams Rpt. ¶ 59. *Second*, for

20  the Section 2 claims, the existence of the U.S. Social Advertising Market and Meta's power in that

21  market will be established by common evidence that will not vary among plaintiffs. *See supra*, SOCF

---

22  [49]    Advertiser Plaintiffs' Section 1 claim can similarly be established through common evidence.
Section 1 requires a plaintiff to prove "(1) the existence of an agreement, and (2) that the agreement
23  was in unreasonable restraint of trade." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 988-89 (9th Cir. 2020)
(cleaned up). Whether Meta's "Jedi Blue" agreement with Google is evaluated on a *per se* or Rule of
24  Reason basis, the trial evidence necessary to evaluate a Section 1 violation in connection with the
agreement will be essentially coterminous with the evidence set forth to prove that this agreement
25  unlawfully maintained Meta's social advertising monopoly—predominated by common, classwide
evidence including documents and testimony from Meta and Google. *See High-Tech Emp.*, 985 F.
26  Supp. 2d at 1180 ("Where an antitrust conspiracy has been alleged, courts have consistently held that
the very nature of a conspiracy antitrust action compels a finding that common questions of law and
27  fact exist.") (cleaned up); *id.* at 1187-91 (analyzing evidence and finding predominance satisfied).

28

**FILED UNDER SEAL**

§§ II (market definition), IV.A (monopoly power); Williams Rpt. ¶¶ 10-25 (market definition), 26-55 (monopoly power); *see, e.g.*, *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 131 (C.D. Cal. 2007) (market definition and monopoly power established through "the same data, the same experts, the same industry analyses, and the same application of the same economic tests").  In sum, common questions predominate as to the antitrust violation element of Advertiser Plaintiffs' claims. *See, e.g.*, *Glumetza*, 336 F.R.D. at 475-76 (common questions predominated as to § 2 and § 1 violations); *Live Concert*, 247 F.R.D. at 122-32 (same, for § 2 monopolization and attempted monopolization).

### 2.      Common Questions Predominate as to Antitrust Impact and Damages

Common questions also predominate as to antitrust impact and damages. To show antitrust impact at the class certification stage, plaintiffs "'must establish, predominantly with generalized evidence, that all (or nearly all) members of the class suffered damage as a result of [the defendant's] alleged anti-competitive conduct.'" *In re Packaged Seafood Prods. Antitrust Litig.*, 332 F.R.D. 308, 320 (S.D. Cal. 2019), *aff'd sub nom. Olean*, 31 F.4th at 651. As discussed above, Advertiser Plaintiffs' expert, Dr. Williams, uses well-accepted economic methods and common evidence to show that all (or nearly all) members of the proposed class paid inflated prices for Meta ads as a result of Meta's unlawful monopoly. *See, e.g.*, *Olean*, 31 F.4th at 670 (affirming holding that plaintiffs' evidence was capable of establishing antitrust impact, "in the form of higher prices paid by each member of the class," on a classwide basis). He does this by using the EPRs of comparable firms to estimate Meta's social advertising revenues in a but-for world in the absence of Meta's anticompetitive conduct, then comparing them with Meta's actual supracompetitive social advertising revenues during the Class Period. *See supra*, SOCF § IV.B.  Having determined the extent of the overcharge, on a classwide percentage difference basis, and multiplying that by the volume of commerce for Meta advertising during the Class Period, Dr. Williams is also able to calculate aggregate damages. *See supra*, SOCF §IV.C.  This "yardstick" approach to isolate the "but-for" effect of Meta's anticompetitive conduct is a well-established method of proving classwide impact and damages in antitrust cases.  *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 993 F.3d 774, 788-89 (9th Cir. 2021), *vacated on other grounds*, 31 F.4th at 651; *Tawfilis v. Allergan, Inc.*, 2017 WL 3084275, at *6 (C.D.

**FILED UNDER SEAL**

Cal. June 26, 2017); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2006 WL 1530166, at *9-10 (N.D. Cal. June 5, 2006).

Providing a model for estimating aggregate damages is sufficient to establish predominance. *See Ruiz Torres*, 835 F.3d at 1140 ("'[T]here is no absolute requirement in Rule 23 that aggregate damages be calculable, but where they are, they may be all that plaintiffs need to prove.'" (quoting *Newberg* §12:2)); *see also In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264, 271 (3d Cir. 2020) ("Antitrust plaintiffs may satisfy the predominance requirement by using a model that estimates the damages attributable to the antitrust injury, even if more individualized determinations are needed later to allocate damages among class members."). But while "the need for individual damages calculations does not, alone, defeat class certification," *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016), Dr. Williams's damages methodology would also permit the calculation of individual damages using a common formulaic method—multiplying the dollar value of a given Class member's advertising purchases by the percentage overcharge. *See* Williams Rpt. ¶ 108 (damages from Meta's conduct product of percentage overcharge and advertising revenues); *see also, e.g.*, *Suboxone*, 967 F.3d at 272 n.13.

Finally, where, as here, Meta's ad prices are set by a common auction and the Class is one of allegedly overcharged purchasers, common issues of antitrust injury and damages are particularly likely to predominate. As the *en banc* Ninth Circuit has explained, "[i]t is not implausible to conclude that a conspiracy could have a class-wide impact, 'even where the market involves diversity in products, marketing, and prices,' especially 'where . . . there is evidence that the conspiracy artificially inflated the baseline for price negotiations.'" *Olean*, 31 F.4th at 677-78; *see also id.* at 678 ("it is both logical and plausible that the conspiracy could have raised the baseline prices for all members of the class by roughly ten percent"). "Courts have held that even if there is considerable individual variety in pricing because of individual price negotiations, plaintiffs may succeed in proving class-wide impact by showing the minimum baseline for beginning negotiations, or the range of prices which resulted from the negotiation, was artificially raised by anti-competitive actions of the defendant." *Giuliano v. Sandisk Corp.*, 2015 WL 10890654, at *18 (N.D. Cal. May 14, 2015). This principle applies not just to Plaintiffs' antitrust impact analysis, but also to their classwide damages

methodology. *See Tawfilis*, 2017 WL 3084275, at *14 (approving use of yardstick approach to model classwide damages where "[a]pplication of the same percentage decrease to Botox list price in the United States during the class period would have a common impact on all class members, regardless of whether they received a rebate"); *see also In re Capacitors Antitrust Litig. (No. III)*, 2018 WL 5980139, at *9 (N.D. Cal. Nov. 14, 2018) (Donato, J.) (relevant product "customization," "different end uses and demands, and differences among class members with regard to bargaining power and pricing . . . pose no barrier to certification because . . . these kinds of individualized damages variations do not defeat predominance").

### B.    The Superiority Requirement Is Met

Rule 23(b)(3) requires a finding that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). "The purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy. Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (cleaned up). This requirement is met here, as the Class comprises millions of advertisers—many, like Advertiser Plaintiffs, individuals or small businesses who made relatively small ad purchases. *See DZ Rsrv.*, 2022 WL 912890, at *9 (superiority requirement met where Meta advertisers paid relatively small price premium); *supra*, SOCF § IV. Indeed, "[n]o reasonable person is likely to pursue these claims on his or her own, especially given the cost and other resources required to litigate against a company like Meta." *DZ Rsrv.*, 2022 WL 912890, at *9; *see also In re TFT-LCD*, 267 F.R.D. at 314-15 (noting that, in antitrust cases, individual damages "'are likely to be too small to justify litigation, but a class action would offer those with small claims the opportunity for meaningful redress'").

### CONCLUSION

The Court should grant Advertiser Plaintiffs' motion and certify a Class as set forth above.

1  Dated: May 24, 2024

2  **BATHAEE DUNNE LLP**

3

4  By:  */s/ Yavar Bathaee*
   Yavar Bathaee (CA 282388)
   yavar@bathaeedunne.com
5  Andrew C. Wolinsky (CA 345965)
   awolinsky@bathaeedunne.com
6  Andrew M. Williamson (CA 344695)
   awilliamson@bathaeedunne.com
7  Priscilla Ghiţă (*pro hac vice*)
   pghita@bathaeedunne.com
8  Adam Ernette (*pro hac vice*)
   aernette@bathaeedunne.com
9  445 Park Avenue, 9th Floor
   New York, NY 10022
10 Tel.: (332) 322-8835

11 Brian J. Dunne (CA 275689)
   bdunne@bathaeedunne.com
12 Edward M. Grauman (*pro hac vice*)
   egrauman@bathaeedunne.com
13 901 South MoPac Expressway
   Barton Oaks Plaza I, Suite 300
14 Austin, TX 78746
   Tel.: (213) 462-2772

15
   Allison Watson Cross (CA 328596)
16 across@bathaeedunne.com
   3420 Bristol St, Ste 600
17 Costa Mesa, CA 92626-7133

18 *Interim Co-Lead Counsel for the Advertiser Classes*

19

20 **LEVIN SEDRAN & BERMAN LLP**

21 Keith J. Verrier (*pro hac vice*)
   kverrier@lfsblaw.com
22 Austin B. Cohen (*pro hac vice*)
   acohen@lfsblaw.com
23 510 Walnut Street, Suite 500
   Philadelphia, PA 19106-3997
24 Tel.: (215) 592-1500

25 *Members of Executive Committee for the Advertiser Classes*

26

27

28

---

**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**

By:  */s/ Amanda F. Lawrence*
Amanda F. Lawrence (*pro hac vice*)
alawrence@scott-scott.com
Patrick J. McGahan (*pro hac vice*)
pmcgahan@scott-scott.com
Michael P. Srodoski (*pro hac vice*)
msrodoski@scott-scott.com
156 South Main Street, P.O. Box 192
Colchester, CT 06415
Tel.: (860) 537-5537

Patrick J. Coughlin (CA 111070)
pcoughlin@scott-scott.com
Carmen A. Medici (CA 248417)
cmedici@scott-scott.com
Hal D. Cunningham (CA 243048)
hcunningham@scott-scott.com
Daniel J. Brockwell (CA 335983)
dbrockwell@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: (619) 233-4565

Patrick J. Rodriguez (*pro hac vice*)
prodriguez@scott-scott.com
230 Park Avenue, 17th Floor
New York, NY 10169
Tel.: (212) 223-6444

**AHDOOT & WOLFSON, PC**

Tina Wolfson (CA 174806)
twolfson@ahdootwolfson.com
Robert Ahdoot (CA 172098)
rahdoot@ahdootwolfson.com
Theodore W. Maya (CA 223242)
tmaya@ahdootwolfson.com
Henry J. Kelson (*pro hac vice*)
hkelson@ahdootwolfson.com
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
Tel.: (310) 474-9111

<u>**FILED UNDER SEAL**</u>

1

<u>**FILER ATTESTATION**</u>

2      I am the ECF user who is filing this document.  Pursuant to Civil L.R. 5-1(h)(3), I hereby

3 attest that each of the other signatories have concurred in the filing of the document.

4

5 Dated: May 24, 2024                    By:  <u>*/s/ Brian J. Dunne*</u>

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28