**PUBLIC REDACTED VERSION**

| | |
|---|---|
| WILMER CUTLER PICKERING HALE AND DORR LLP | ARI HOLTZBLATT (SBN 354631) Ari.Holtzblatt@wilmerhale.com |
| SONAL N. MEHTA (SBN 222086) Sonal.Mehta@wilmerhale.com 2600 El Camino Real, Suite 400 Palo Alto, California 94306 Telephone: (650) 858-6000 | MOLLY M. JENNINGS (*pro hac vice*) Molly.Jennings@wilmerhale.com 2100 Pennsylvania Ave NW Washington, DC 20037 Telephone: (202) 663-6000 |
| DAVID Z. GRINGER (*pro hac vice*) David.Gringer@wilmerhale.com ROSS E. FIRSENBAUM (*pro hac vice*) Ross.Firsenbaum@wilmerhale.com RYAN CHABOT (*pro hac vice*) Ryan.Chabot@wilmerhale.com PAUL VANDERSLICE (*pro hac vice*) Paul.Vanderslice@wilmerhale.com 7 World Trade Center 250 Greenwich Street New York, New York 10007 Telephone: (212) 230-8800 | MICHAELA P. SEWALL (*pro hac vice*) Michaela.Sewall@wilmerhale.com 60 State Street Boston, Massachusetts 02109 Telephone: (617) 526-6000 |

*Attorneys for Defendant Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> META PLATFORMS, INC., a Delaware Corporation, <br><br> Defendant. | Case No. 3:20-cv-08570-JD <br><br> **DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY AND OPINIONS OF MICHAEL WILLIAMS** <br><br> Hearing Date: To Be Determined <br> Time: To Be Determined <br> Judge: Hon. James Donato |

**PUBLIC REDACTED VERSION**

**TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION ........................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES .................................................................1

INTRODUCTION ..........................................................................................................................1

BACKGROUND ............................................................................................................................3

ARGUMENT ..................................................................................................................................4

I.    WILLIAMS'S YARDSTICK STUDY IS JUNK SCIENCE ................................................4

    A.    Williams Fails To Analyze Prices ........................................................................5

    B.    Williams Fails To Control For Lawful Factors Affecting Profits ............................6

    C.    The Selection Criteria Used To Identify The Yardstick Firms Are Arbitrary ........................................................................................................9

II.    WILLIAMS'S "DURING-AFTER" MODEL IS JUNK SCIENCE ..................................12

CONCLUSION .............................................................................................................................14

# **TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Bazemore v. Friday*,
 478 U.S. 385 (1986) ................................................................................................................. 2

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
 152 F.3d 588 (7th Cir. 1998) ........................................................................... 2, 6, 8, 9, 13

*CDW LLC v. NETech Corp.*,
 906 F. Supp. 2d 815 (S.D. Ind. 2012) ..................................................................... 12

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
 509 U.S. 579 (1993) ..................................................................................................... 1, 14

*Grasshopper House, LLC v. Clean & Sober Media LLC*,
 2019 WL 12074086 (C.D. Cal. July 1, 2019) .......................................................... 7

*El Aguila Food Prod., Inc. v. Gruma Corp.*,
 301 F. Supp. 2d 612 (S.D. Tex. 2003), *aff'd*, 131 F. App'x 450, 453 (5th Cir. 2005) ............................................................................................................................................. 9

*Eleven Line, Inc. v. North Texas State Soccer Ass'n*,
 213 F.3d 198 (5th Cir. 2000) ............................................................................................. 9

*In re Blood Reagents Antitrust Litig.*,
 2015 WL 6123211 (E.D. Pa. Oct. 19, 2015) ............................................................. 12

*In re Google Play Store Antitrust Litig.*,
 2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) ................................................... 5, 11

*In re Live Concert Antitrust Litig.*,
 863 F. Supp. 2d 966 (C.D. Cal. 2012) ................................................................... 2, 8

*Kentucky v. Marathon Petroleum Co. LP*,
 464 F. Supp. 3d 880 (W.D. Ky. 2020) ............................................................................. 6

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*,
 387 F. Supp. 2d 794 (N.D. Ill. 2005) ........................................................................... 12

*Muffett v. City of Yakima*,
 2012 WL 12827492 (E.D. Wash. July 20, 2012) ............................................... 12

*Persian Gulf v. BP West Coast Products*,
 632 F. Supp. 3d 1108 (S.D. Cal. Sept. 30, 2022) ................................................ 3, 13, 14

*Shannon v. Crowley*,
 538 F. Supp. 476 (N.D. Cal. 1981) ............................................................................... 9

**STATUTES, RULES, AND REGULATIONS**

Fed. R. Evid. 702 .................................................................................................................... 1

**OTHER AUTHORITIES**

David L. Faigman et al., *Modern Scientific Evidence: The Law and Science of Expert Testimony* (2022-2023 ed.) ................................................................................................ 6

Phillip A. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and their Application* (2023) ...................................................................... 2, 6

Tim Koller et al., *Valuation: Measuring and Managing the Value of Companies* (2020) ............. 7

**PUBLIC REDACTED VERSION**

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on a date and time to be set by the Court, Defendant Meta Platforms, Inc. will move to exclude the opinions of Advertiser Plaintiffs' putative class certification expert Dr. Michael Williams. Meta's motion is based on this Notice of Motion, the supporting Memorandum of Points and Authorities, and the Declaration of David Gringer filed herewith, along with the accompanying exhibits.

Pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny, Meta requests that the Court exclude the Expert Report of Michael Williams and any testimony drawn therefrom.[1]

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

To certify their proposed class of all advertisers who bought advertising on Meta, Advertisers were required to come forward with a common method of proving that all or nearly all advertisers on Meta were charged supracompetitive prices during the class period and that those supracompetitive prices were because of the alleged conduct. Their putative expert Dr. Michael Williams's second attempt to do so still does not come close.

Disregarding the Court's instruction that Advertisers' new expert report was "not an opportunity to come up with new theories," Apr. 18, 2024 Hr'g Tr. at 31:24-25—Williams's new report conducts a so-called "yardstick" study that differs in material and unexplained ways from his earlier analyses. Williams's many changes increase Advertisers' damages computation by **over $5 billion**. But just like his original model, his analysis (1) only considers profits, not prices, (2) is not tied at all to the challenged conduct, and (3) violates every maxim for a reliable yardstick study. Williams also produces an entirely new "during-after" calculation that repeats all the errors from his new yardstick study. Williams's renewed attempt to support Advertisers' wanting request for class certification is junk science and must be excluded.

---

[1] Citations to the Williams Report reference Dkt. 795-19 submitted with Advertisers' class certification motion. Unless otherwise noted, "Ex." citations reference exhibits to the Gringer Declaration filed herewith, emphasis is added, and objections are omitted for deposition citations.

**PUBLIC REDACTED VERSION**

Although Williams's yardstick methodology and during-after calculation are riddled with problems, this motion focuses on the four most significant problems that render his analyses manifestly unreliable.

*First*, Williams's yardstick study's fundamental premise—that a firm's profits necessarily reflect the price it charged for a particular product—is junk science. As Williams concedes, a firm's profit rate is a function of at least three separate levers: price, quantity, and costs. Yet Williams makes no effort to analyze what changes in costs or quantity would result in a but-for world without the challenged conduct. He just assumes—with no explanation—that Meta's (supposedly) lower profits in the but-for world would have stemmed entirely from decreases in the price of social advertising.

*Second*, Williams's yardstick study fails to comply with the "most important[]" requirement for a "yardstick methodology," which is "to control for any factors that might have influenced" a firm's "performance that are competitively neutral or even procompetitive." Areeda & Hovenkamp, *Antitrust Law* ¶397 (2023). Williams concedes that there are many factors, unrelated to pricing or the allegedly anticompetitive conduct that Advertisers challenge in this case, that can cause a firm to maintain high profits. He controls for none. His analysis is, as a result, "worthless" and "irrelevant." *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) (Posner, J.) ("*BCBS*"); *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 973, 975-76 (C.D. Cal. 2012) (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 n.10 (1986) (Brennan, J., partial concurrence joined by the entire Court)).

*Third,* Williams's selection of supposed "yardstick" firms is based on a set of criteria that is the expert witness equivalent of throwing darts at a wall. The criteria omit nearly all the features usually relied on to assess firms' comparability. As for the criteria that were used, several of them were chosen not to identify genuinely comparable firms, but instead for convenience. Ultimately, all five criteria used to filter down to the supposed "yardstick" firms are ones that say nothing about comparability, or are, at best, based on Williams's *ipse dixit*. Unsurprisingly, this lack of rigor produces unreliable results. The resulting set of firms includes the same three flawed "yardsticks" Williams's first report used: ▮▮▮▮, an alleged direct participant in the challenged

1  conduct; ▆▆, which operates exclusively in China (and had a higher profit rate than Meta); and
2  ▆▆▆▆, a small Polish company that sells tourist packages, architectural plans, and cars.
3  But the new report, by employing a host of different selection criteria, adds numerous, even farther
4  flung yardstick firms—including "▆▆▆▆▆▆▆▆▆▆▆▆▆," "▆▆▆▆▆▆▆,"
5  "▆▆▆▆▆▆," German and British real estate portals, several international car sales
6  websites, American and Chinese stock photography websites, and five firms that do not earn any
7  revenue from advertising. These firms are nothing like Meta. Meanwhile, the firms excluded are
8  those that common sense tells us are more comparable to Meta than the bizarre set of 25 companies
9  ultimately selected.

10  *Fourth*, Williams's entirely new "during-after" model repeats the errors described above
11  to calculate Meta's purportedly excess profits over two different time periods. This model also
12  fails to control for any factors affecting firm profitability, either during or between the two time
13  periods, and thereby calculates a result equally as meaningless as the yardstick study.
14  Compounding this error, Williams concedes that the "during-after" model fails to use a valid
15  benchmark period free of the alleged effects of the challenged conduct, rendering the analysis
16  wholly uninformative and irrelevant to the assessment of injury or damages in this case. *Persian*
17  *Gulf Inc. v. BP West Coast Products LLC*, 632 F. Supp. 3d 1108, 1166-67 (S.D. Cal. 2022).

18  **BACKGROUND**

19  Advertisers submitted Williams's report hoping to prove a common method of showing
20  injury and to identify the damages attributable to the higher prices Meta allegedly charged due to
21  the conduct at issue. To do so, Williams compares what he describes as the "economic profit rate"
22  (or "EPR") for Meta's advertising business to the weighted average EPRs for what he claims are
23  25 "yardstick" firms—▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
24  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
25  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
26  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
27  ▆▆▆▆▆▆▆▆▆▆. Williams Rep. ¶104 tbl.6. Williams lists five criteria—as compared to the
28  six in his original report—that he used to select his 25 yardstick firms. *Id.* ¶99.

1   Next, Williams proposes a hypothetical reduction in advertising revenue that would have lowered Meta's economic profit rate to match the yardstick average. Williams Rep. ¶¶100-09. He then "███████" the percentage reduction "████████████████████████████████████████████," yielding a "████████████████████ ████████████" to the proposed Class. *Id.* ¶110.

That is where Williams's yardstick study stops. He does not analyze whether, in a world where Meta did earn lower profits, that reduction would have flowed from a revenue decrease or some other cause (like cost increases or reductions in sales volume). He does not analyze why Meta's alleged EPR is higher than the yardstick firms', even though he concedes that numerous factors can cause one company to have a higher EPR than others. He does not isolate how much (if any) of that profitability may be due to the challenged conduct versus other factors. And he never analyzes the prices any advertisers actually paid for advertising on Meta.

Finally, in two paragraphs appended to the end of his report, Williams presents an alternative damages model which he calls "████████." Williams Rep. ¶107. He does so by conducting the same yardstick study described above twice, over two different time periods (2016-2020 and 2022-2023), and subtracting Meta's resultant "████████" over the yardsticks' in the two time periods from one another. *Id.* ¶¶107-08. Williams then calculates a revenue reduction that he claims would reduce Meta's class period EPR by the difference between the two excess EPR values and "████████████████████████████████████████████████████████████████████████" using "████████████" he uses in his yardstick study. *Id.* ¶91 n.95. This during-after model produces a damages figure between $7.5 billion and $9.3 billion. *Id.* ¶108.

**ARGUMENT**

I.   **WILLIAMS'S YARDSTICK STUDY IS JUNK SCIENCE**

Williams's approach suffers from three independently fatal flaws that render his yardstick analysis unreliable and inadmissible. First, the study does not analyze Meta's prices at all, only its profits. Second, it assumes that the difference between Meta's EPR and the yardstick firms' is wholly attributable to the challenged conduct, without accounting for salient variables that he

acknowledges affect Meta's profitability. And third, the study employs entirely arbitrary criteria to select the yardsticks, yielding facially absurd comparator firms. The study is junk science, and its results confirm that.

### A. Williams Fails To Analyze Prices

The first error in Williams's study flows from its basic premise—the study looks only at Meta's profits, rather than its prices, to determine whether and to what extent class members were purportedly overcharged. Ex. 1, Williams 6/24 Tr. 44:14-21. But profits are not the same as prices. There are at least three levers that influence a firm's profitability: price, quantity, and costs. *See id.* at 20:12-16 (███████████████████████████). Williams's study entirely ignores two of those three levers. He simply assumes that if Meta's profits had been lower in the but-for world, that reduction in profitability would have come about entirely from a decrease in the price of social advertising. He does not consider whether, in a but-for world without the challenged conduct, Meta's costs or the quantity of advertising that it sold would have been different, and instead assumes that both would be unchanged. *Id.* at 61:9-64:18, 65:13-67:21. Williams has not, and cannot, provide a basis for making those assumptions. As a result, the essential premise of his damages analysis—that a supposed reduction in Meta's profits he believes would have come about in the but-for world can be converted, dollar-for-dollar, into a reduction in advertising prices—is baseless. Williams's hypothesized reduction in Meta's profits could just as well be accomplished through an increase in Meta's costs (if, for instance, divesting Instagram resulted in lost efficiency) or a reduction in sales quantity (if Meta lost market share to new rivals). Williams's study does not even consider those possibilities, let alone attempt to quantify them or rule them out. *Id.* at 40:2-12 (███████████████████████████████████████████████████████████████████████████████████████). The study thus provides no information about whether or how the challenged conduct affected Meta's prices at all. Because the study's profits-based analysis is "based on assumptions" about how a decrease in Meta's profits would have come about in the but-for world "that are not supported by the evidence," it is inadmissible junk science. *In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *9 (N.D. Cal. Aug 28, 2023)

(Donato, J.).

### B. Williams Fails To Control For Lawful Factors Affecting Profits

Williams's study also flunks the "most important[]" requirement for a "yardstick methodology," which is "to control for any factors that might have influenced" a firm's "performance that are competitively neutral or even procompetitive." Areeda ¶397; *see also* Faigman et al., 5 Mod. Sci. Evid. § 43:35 (2022-2023 ed.) (When a "yardstick benchmark is employed, effects on the prices paid by plaintiffs … caused by factors other than the alleged wrongdoing must be taken into account."). A yardstick study that fails to control for such factors is "worthless" and "irrelevant" because it cannot possibly show that any difference is "attributable to the defendant's misconduct." *BCBS*, 152 F.3d at 592-93; *Kentucky v. Marathon Petrol. Co.*, 464 F. Supp. 3d 880, 894 (W.D. Ky. 2020) ("yardstick approach" not "admissible" where it failed to "control for the major differences … that could impact the market price"). This describes Williams's study to a tee.

Disregarding these basic tenets, Williams has no controls whatsoever. Instead, he simply compared Meta's EPRs to the yardsticks' and asserted that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Ex. 1, Williams 6/24 Tr. 52:9-17. This methodology fails because it does not control for a litany of lawful factors unrelated to the challenged conduct that could have (and likely did) cause Meta's EPR to exceed that of the yardstick firms, each of which independently renders the study unreliable and inadmissible.

*First,* even were it proper to assume that Meta's EPR was a product of its ad prices alone (a baseless assumption), Williams would still need to account for the fact that, as he acknowledges, "▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬" Williams Rep. ¶84; Ex. 2, Williams 9/23 Tr. 229:23-230:3 (▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬). These include ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Williams Rep. ¶84; Ex. 2, Williams 9/23 Tr. 70:12-72:12 (▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

**PUBLIC REDACTED VERSION**

1   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓). But Williams fails to account for any of these factors. *See* Ex. 1, Williams
2   6/24 Tr. 39:19-40:1 (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
3   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓).
4   Thus, the yardstick study cannot even speak to the *reasons* for Meta's profits. This is a problem
5   with which Williams is familiar. *See Grasshopper House, LLC v. Clean & Sober Media LLC*, 2019
6   WL 12074086, at *12 (C.D. Cal. July 1, 2019) ("Dr. Williams' methodology is also deficient for
7   failing to consider [] other factors" affecting profitability other than the alleged misconduct). But
8   he repeats the same error here.

9       To excuse this significant failure in his study, Williams asserts EPR is a "▓▓▓▓▓▓
10  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓" between noncomparable firms that
11  implicitly "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
12  ▓▓▓▓▓▓▓▓" Williams Rep. ¶¶76-77; *see also id.* ¶83 ("▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
13  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
14  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓"). He concedes
15  that he did not "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓" factors "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
16  ▓▓▓▓▓▓▓▓▓▓" but claims that he did not need to because those factors are already purportedly
17  "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓." Ex. 1, Williams 6/24 Tr. 105:7-
18  107:8; *see also id.* at 35:11-36:12 (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
19  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
20  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓).

21      Williams cites no authority for that fanciful proposition, and it is wrong. EPRs are not
22  magic. As explained in literature Williams elsewhere relies upon, entirely lawful factors like
23  offering innovative and high-quality products can drive return on invested capital, which in turn
24  can drive economic profits. Ex. 3, Tim Koller et al., *Valuation: Measuring and Managing the*
25  *Value of Companies* (2020) at 40-41, 129, 131. Thus, far from supporting Williams's claim that
26  EPRs somehow normalize innovation, product improvement, and other lawful factors across firms
27  such that there is no need to control for them in a yardstick study, the literature he relies on
28  establishes that those lawful factors contribute directly to firms' EPRs. That means that, unless the

chosen yardsticks have the same degree of innovation, product quality, and the like, Meta's excess EPR over the yardsticks is at least as likely due to lawful factors like innovation and product quality as it is to the challenged conduct. Yet none of Williams's yardstick selection criteria were designed to identify firms comparable to Meta along these dimensions, and Williams does not claim that the final set of chosen yardsticks are in fact so comparable. *See* Williams Rep. ¶100; *see also* Ex. 1, Williams 6/24 Tr. 104:9-17 ("▮▮▮"); *id.* at 106:1-17 (▮▮▮). As a result, Williams's use of EPRs cannot excuse his failure to control for lawful factors affecting Meta's profit rate.

*Second*, Williams fails to distinguish between in-market profits and out-of-market profits. His study examined all of Meta's profits from all the ads that it sells. *See* Ex. 1, Williams 6/24 Tr. 68:22-69:5. But Advertisers allege that Meta monopolizes a submarket of the broader online advertising market that Advertisers call "social" advertising. The broader online advertising market is highly competitive, and, as explained in Meta's concurrently filed class certification opposition and as Advertisers' other experts conceded, not all ads Meta sells are "social." Ex. 4, Fasser Tr. 97:8-12 (ads "placed on Facebook Marketplace that a user would encounter based on their entering of a search term … constitute search advertising"); *id.* at 82:15-83:1 (ads purchased through the Meta Audience Network are not "social advertisements" unless they are "placed on other social media networks"); Ex. 5, Gans Tr. 94:6-11 ("[A]ds that target purely on age and location data" are not "ads that use data on social connections between users."). The contribution to Meta's profitability of its sale of non-"social" ads is yet another "salient factor[] not attributable to the [alleged] misconduct" for which Williams failed to control, requiring exclusion of his study. *BCBS*, 152 F.2d at 593.

Because Williams's study makes no attempt to "account for … other possible explanation(s) for [the] disparity" observed between Meta's EPR and the yardsticks' other than the conduct Advertisers are challenging, it fails the most basic requirement of a reliable yardstick study and must be excluded. *In re Live Concert*, 863 F. Supp. 2d at 975 ("yardstick" study is

admissible only if it "account[s] for … other possible explanation(s) for the disparity" observed between firms before attributing the difference to anticompetitive conduct); *BCBS*, 152 F.3d at 593; *El Aguila Food Prod., Inc. v. Gruma Corp.*, 301 F. Supp. 2d 612, 625 (S.D. Tex. 2003) (excluding damages model that characterized all variance from benchmark as "a result of an antitrust injury" and "ignore[d] market realities and other externalities" that could have caused variance), *aff'd*, 131 F. App'x 450, 453 (5th Cir. 2005).

### C. The Selection Criteria Used To Identify The Yardstick Firms Are Arbitrary

The five selection criteria that Williams utilized (down from the six employed in his original report) to identify the yardstick firms forming the foundation for his study are not the product of a reliable methodology. And the bizarre final set of 25 firms simply confirms the unreliability of the selection process. *See Shannon v. Crowley*, 538 F. Supp. 476, 481 (N.D. Cal. 1981) (a reliable yardstick study must compare the defendant to businesses that are "nearly as identical as possible"); *see also Eleven Line, Inc. v. North Tex. State Soccer Ass'n*, 213 F.3d 198, 208 (5th Cir. 2000) (Plaintiffs bear the burden of "demonstrat[ing] the reasonable similarity" of the defendant's business to the proposed comparators in the yardstick study). Indeed, other than ████ the list lacks any of the companies that commentators typically mention in the same breath as Meta—no Twitter, no LinkedIn, no TikTok, no Snapchat, no Apple, no Amazon, no Reddit.

The factors Williams *does* rely on to produce his yardsticks (considered jointly or independently) do not target comparability. Consider each filter in turn.

*First*, Williams limits the yardstick firms to ████ ████. He does so not because ████ are any more comparable to Meta than ████, but instead for convenience—████ ████ Williams Rep. ¶99 n.101; Ex. 1, Williams 6/24 Tr. 107:9-108:3 ("████ ████"). But whether a firm has ████ says nothing about their comparability to Meta. Indeed, Williams agreed that ████

1   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 109:9-110:4.[2]

2   The fact that Williams chose this filter ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3   ▮▮▮▮▮ does not itself require exclusion of the yardstick study. But it does make clear that this

4   first filter, at least, does not work towards producing a comparable set of firms.

5       *Second*, Williams limits the yardsticks to those that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ That filter brings the set of comparable firms from 33,253 to just

7   154—eliminating 99.5% of possible comparators—and excludes brands with massive online

8   advertising businesses (like Amazon, Microsoft, and Verizon). Williams Rep. ¶99(2). Despite the

9   filter's dramatic effect on his study results, Williams admitted that ▮▮▮▮▮▮▮▮▮▮▮▮

10  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11  ▮▮▮▮. Ex. 2, Williams 9/23 Tr. 214:16-215:16 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); Ex. 1, Williams 6/24 Tr. 114:1-24 (▮▮▮▮▮

13  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). But when pressed

14  to nonetheless justify the filter, Williams nonsensically testified that ▮▮▮▮▮▮▮▮▮▮

15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 2, Williams 9/23 Tr. 209:11-

17  210:1. The goal was to identify firms comparable to Meta, but the way comparators were identified

18  was based on a misclassification of Meta. In an emerging pattern, then, the second filter does

19  nothing to produce a comparable set of firms, and excludes potentially superior comparators to the

20  yardsticks.

21      *Third* and *fourth*, Williams limited the yardsticks to firms with ▮▮▮▮▮▮▮▮

22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23  ▮▮▮▮▮▮▮▮. Williams Report ¶ 99(3), (4). Williams's goal in applying these filters was not

24  to identify comparable firms but instead to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 1, Williams

25  6/24 Tr. 124:24-125:15. Williams testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26

---

27  [2] Advertisers served dozens of non-party subpoenas in this case and had every opportunity to seek
28  relevant financial information from appropriate potential comparators (including privately held companies), which they either did not do or, if they did, did not like what they found.

██████████████████████████████████. *Id.* at 128:21-129:14. That is code for "ipse dixit" and is insufficient to demonstrate that he identified a "'reasonable facsimile'" or "benchmark" firm. *See Play Store*, 2023 WL 5532128, at *9. These filters, then, once again failed to reliably select for comparable firms.

*Fifth*, Williams eliminated any firm that ████████████████████████████████ ███████. Williams Rep. ¶99(5). This filter is likewise an outcome-oriented choice justifiable only by *ipse dixit*. Williams's report just asserts that companies "████████████████████████ ██████████████████████████████████████████████████████████████." *Id.* ¶99 n.104. But Williams admitted that in reality this filter does not "█████████████████████ █████████████" Ex. 1, Williams 6/24 Tr. 143:3-16. And it is common knowledge that companies can have ████████████ before delivering very significant profits, meaning there is no necessary connection between ████████████████████ and a low profit rate over the class period. *Id.* at 142:7-11 ("█████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ███████████████████████████"). Application of this filter substantially undermines the reliability of the methodology—for example, this filter removed Twitter as a comparator to Meta. Williams Rep. ¶104 n.108.

In the end, Williams's selection criteria did *nothing* to select comparable firms—they instead excluded scores of comparable firms in favor of firms with little to no relevance to Meta, including 16 foreign companies, most of which operate principally overseas, 10 firms that derive less than 10% of their revenue from advertising, and five firms which derive **no revenue from advertising**. Williams Rep. ¶104 tbl.6. Williams's report makes no attempt to justify why any of these firms are actually comparable to Meta. His purported benchmarks include outlandish selections like █████████████████████████████████████████████████████████████████ (which, according to Williams, has no ad revenue) and ███████████████████ and ████████ █████████████████████████—the latter of which also (according to Williams) has no ad revenue and whose business, when pressed, Williams could not even explain. Ex. 1, Williams 6/24 Tr. 148:21-149:8. They also include ██████████████, an obscure Polish firm that is a fraction of Meta's size

1 and sells tourist packages, architectural plans, and cars. This was one of the three yardstick firms
2 identified in Williams's prior study. Despite previously testifying that ▮▮▮▮▮
3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
4 ▮▮, Williams inexplicably included ▮▮▮▮▮▮▮ as a yardstick *again* in his new study. Ex.
5 2, Williams 9/23 Tr. 228:11-229:2.

6       To be clear, this is not merely a dispute over the weight the factfinder should give to
7 Williams's study. The phrase "junk science" is "appropriately applied to [a] sampling of
8 supposedly comparable companies" that, as here, lacks any "showing of comparability." *Loeffel*
9 *Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 812, 817 (N.D. Ill. 2005). That is
10 particularly true here because Williams "has failed to perform any substantive analysis of those
11 factors most relevant to comparability." *In re Blood Reagents Antitrust Litig.*, 2015 WL 6123211,
12 at *22 (E.D. Pa. Oct. 19, 2015); *see also Muffett v. City of Yakima*, 2012 WL 12827492, at *3
13 (E.D. Wash. July 20, 2012); *CDW LLC v. NETech Corp.*, 906 F. Supp. 2d 815, 825 (S.D. Ind.
14 2012). The fact that Williams has now twice failed to screen out such obviously erroneous
15 comparators, and ultimately chose this bizarre final set of yardsticks, confirms that his selection
16 criteria are junk science. The yardstick study should therefore be excluded.

17 **II.   WILLIAMS'S "DURING-AFTER" MODEL IS JUNK SCIENCE**

18       Williams's during-after analysis should be excluded because it repeats the same errors
19 endemic to his yardstick analysis and, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, it has no relationship
20 whatsoever to facts of this case.

21       *First*, Williams' during-after model is infected by the same methodological flaws pervasive
22 in his yardstick analysis. The yardsticks for the 2022-2023 period were chosen using the same
23 series of arbitrary filters as his original yardstick study, yielding another baffling set of
24 comparators (which Williams does not even disclose in the body of his report) that satisfied the
25 criteria as of the 2022-2023 period. Williams Rep. ¶107. This model, again, examines Meta's
26 profits, not its prices. And it again contains no controls for any non-price or lawful factors unrelated
27 to the conduct Advertisers challenge, including innovation, product quality, and Meta's sales of
28 non-"social" ads. Ex. 1, Williams 6/24 Tr. 153:11-154:3 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**PUBLIC REDACTED VERSION**

1  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

2  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓").

3  It also introduces a further error by failing to even examine, much less control for, salient

4  differences between the two time periods that could have affected either Meta's or the yardsticks'

5  EPRs. Ex. 1, Williams 6/24 Tr. 167:4-168:2 ("▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

6  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

7  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓"); *id.* at 154:23-156:2 (▓▓▓▓▓▓▓▓▓

8  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

9  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

10 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓). The

11 only such factor Williams even purported to consider was "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓,"

12 Williams Rep. ¶90, but he admitted that he did not do any "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

13 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

14 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓" Ex. 1, Williams 6/24 Tr. 161:17-162:4.

15 That Williams has labeled this model a during-after analysis (as opposed to a yardstick

16 study), does not relieve him of his obligation to account for such confounding factors. A proper

17 during-after study, like a proper yardstick study, must "correct[] … for any nonconspiratorial

18 factors that might have caused the prices that are being compared to be different from each other."

19 *BCBS*, 152 F.3d at 592. Thus, the Court should exclude Williams' during-after analysis for the

20 same reasons it should exclude his failed yardstick study.

21 *Second*, the during-after analysis does not fit the facts of the case. It is a "basic econometric

22 principle" that a benchmarking analysis conducted over two time periods like this one must

23 "select[] a benchmark period that is reasonably free of misconduct so that it can serve its

24 fundamental purpose—to act as a baseline such that conclusions can be drawn about how

25 anticompetitive conduct impacted prices in the damages period." *Persian Gulf*, 632 F. Supp. 3d at

26 1166. By his own admission, Williams does not do this. Instead, he claims that "▓▓▓▓▓▓▓▓▓

27 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

28 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓" and that the 2022-2023 benchmark period

1  he selected still "████████████████████████████████████████." Williams Rep.
2  ¶¶89, 108. Thus, 2022-2023 "is not an approximation of a 'clean period' under any metric."
3  *Persian Gulf*, 632 F. Supp. 3d at 1167. By failing to compare Meta's profits during the period in
4  which the effects of the challenged conduct were allegedly present to a clean benchmark after their
5  terminus, Williams has constructed a damages model "divorced from the reality of the case that
6  [Advertisers] are actually trying to prove." *Id.* This is, again, a problem with which Williams is
7  familiar. *Id.* (excluding Williams's damages model for failure to identify a clean benchmark
8  period). Williams's interim, atmospheric calculation of a "████████," multibillion-dollar
9  damages estimate says nothing about any actual damages sustained by individual advertisers "and
10 is thus not sufficiently tied to [Advertisers'] liability case to help the factfinder." *Id.* at 1167-68. It
11 should therefore be excluded. *See Daubert*, 509 U.S. at 591.

## CONCLUSION

For the foregoing reasons, the Court should exclude the testimony of Michael Williams.

Dated: June 21, 2024

Respectfully submitted,

By: */s/ Sonal N. Mehta*
    Sonal N. Mehta (SBN 222086)

WILMER CUTLER PICKERING HALE
AND DORR LLP
*Attorney for Defendant Meta Platforms, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of June 2024, I electronically transmitted the public redacted version of the foregoing document to the Clerk's Office using the CM/ECF System and caused the version of the foregoing document filed under seal to be transmitted to counsel of record by email.

By: */s/ Sonal N. Mehta*
    Sonal N. Mehta