**PUBLIC REDACTED VERSION**

WILMER CUTLER PICKERING
HALE AND DORR LLP
SONAL N. MEHTA (SBN 222086)
 Sonal.Mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
 David.Gringer@wilmerhale.com
ROSS E. FIRSENBAUM (*pro hac vice*)
 Ross.Firsenbaum@wilmerhale.com
RYAN CHABOT (*pro hac vice*)
 Ryan.Chabot@wilmerhale.com
PAUL VANDERSLICE (*pro hac vice*)
 Paul.Vanderslice@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800

ARI HOLTZBLATT (SBN 354631)
 Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
 Molly.Jennings@wilmerhale.com
2100 Pennsylvania Ave NW
Washington, DC 20037
Telephone: (202) 663-6000

MICHAELA P. SEWALL (*pro hac vice*)
 Michaela.Sewall@wilmerhale.com
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

*Attorneys for Defendant Meta Platforms, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>    v.<br><br>META PLATFORMS, INC., a Delaware Corporation,<br><br>          Defendant. | Case No. 3:20-cv-08570-JD<br><br>**DEFENDANT META PLATFORMS, INC.'S OPPOSITION TO ADVERTISER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date: To Be Determined<br>Time: To Be Determined<br>Judge: Hon. James Donato |

**PUBLIC REDACTED VERSION**

1

**TABLE OF CONTENTS**

2  INTRODUCTION ..............................................................................................................1

3  BACKGROUND ...............................................................................................................3

4  ARGUMENT ....................................................................................................................5

5  I.  INDIVIDUALIZED ISSUES OF ANTITRUST IMPACT PREDOMINATE OVER
   COMMON ONES ................................................................................................. 6

6      A.  Impact Through Ad "Overpayment" Is Individualized .............................6

7          1.  Advertisers Offer No Common Way To Prove Class-Wide
              Overcharge ....................................................................................6

8          2.  Advertisers Cannot Account For Offsetting Benefits With
9              Common Proof...............................................................................12

10     B.  Whether Class Members Participated In The Purported Market For
           "Social Advertising" Is An Individualized Question................................15

11  II.  ADVERTISERS' DAMAGES MODEL FAILS *COMCAST* ............................... 18

12     A.  Advertisers' Damages Model Fails To Identify Damages Traceable
           To Meta's Alleged Anticompetitive Conduct..........................................18

13     B.  Advertisers Cannot Avoid Their *Comcast* Problem By Tying
14         Damages To Monopoly Maintenance Instead Of The Challenged
           Acts ..........................................................................................................21

15  III.  THE NAMED PLAINTIFFS ARE ATYPICAL AND INADEQUATE CLASS
16     REPRESENTATIVES ........................................................................................... 23

   CONCLUSION...............................................................................................................25

17

18

19

20

21

22

23

24

25

26

27

28

**PUBLIC REDACTED VERSION**

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Allegheny Pepsi-Cola Bottling Co. v. Mid-Atlantic Coca-Cola Bottling Co.*,
    690 F.2d 411 (4th Cir. 1982) ........................................................................... 22

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp.*,
    247 F.R.D. 156 (C.D. Cal. 2007) .................................................................. 6, 8

*American Ad Management, Inc. v. General Telephone Co.*,
    190 F.3d 1051 (9th Cir. 1999) ......................................................................... 12

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
    603 F.2d 263 (2d Cir. 1979)........................................................................ 3, 22

*Blue Cross Blue Shield United of Wisconsin v. Marshfield Clinic*,
    152 F.3d. 588 (7th Cir. 1995) .......................................................................... 19

*Bowerman v. Field Asset Services*,
    60 F.4th 459 (9th Cir. 2023) .............................................................................. 6

*Brazil v. Dole Packaged Foods, LLC*,
    2014 WL 2466559 (N.D. Cal. May 30, 2014) ................................................ 19

*Burkhalter Travel Agency v. MacFarms International, Inc.*,
    141 F.R.D. 144 (N.D. Cal. 1991).................................................................... 25

*Cabrera v. Google LLC*,
    2023 WL 5279463 (N.D. Cal. Aug. 15, 2023) .......................................... 16, 18

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)................................................................................... *passim*

*Dreamstime.com, LLC v. Google LLC*,
    54 F.4th 1130 (9th Cir. 2022) .......................................................................... 21

*Fido's Fences, Inc. v. Radio Systems Corp.*,
    999 F. Supp. 2d 442 (E.D.N.Y. 2014) ............................................................ 15

*FTC v. Cardinal Health, Inc.*,
    12 F. Supp. 2d 34 (D.D.C. 1998) .................................................................... 11

*FTC v. Qualcomm, Inc.*,
    969 F.3d 974 (9th Cir. 2020) ........................................................................... 15

*Grasshopper House, LLC v. Clean & Sober Media LLC*,
    2019 WL 12074086 (C.D. Cal. July 1, 2019)................................................. 19

     - ii -      META'S OPPOSITION TO ADVERTISERS'
CLASS CERTIFICATION MOTION

*Image Technical Services, Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) ................................................................. 21, 22

*In re Aluminum Warehousing Antitrust Litigation*,
   336 F.R.D. 5 (S.D.N.Y. 2020) ........................................................................ 12

*In re Facebook, Inc., PPC Advertising Litigation*,
   282 F.R.D. 446 (N.D. Cal. 2012) .................................................................. 25

*In re Flash Memory Antitrust Litig.*,
   2010 WL 2332081 (N.D. Cal. June 9, 2010) .................................................. 9

*In re Google Play Store Antitrust Litig.*,
   2023 WL 5602143 (N.D. Cal. Aug. 28, 2023) ................................................ 5

*In re Graphics Processing Units Antitrust Litig.*,
   253 F.R.D. 478 (N.D. Cal. 2008).................................................................... 8

*In re New Motor Vehicles Canadian Export Antitrust Litigation*,
   522 F.3d 6 (1st Cir. 2008) ....................................................................... 11, 12

*In re Optical Disk Drive Antitrust Litigation*,
   303 F.R.D. 311 (N.D. Cal. 2014) ......................................................... 7, 8, 12

*In re Rail Freight Fuel Surcharge Antitrust Litigation*,
   725 F.3d 244 (D.C. Cir. 2013) ..................................................................... 5, 6

*IntegrityMessageBoards.com v. Facebook, Inc.*,
   2021 WL 3771785 (N.D. Cal. Aug. 24, 2021) .............................................. 23

*Kentucky v. Marathon Petroleum Co. LP*,
   464 F. Supp. 3d 880 (W.D. Ky. 2020).......................................................... 20

*Kottaras v. Whole Foods Market, Inc.*,
   281 F.R.D. 16 (D.D.C. 2012)................................................................... 12, 15

*Leyva v. Medline Industries Inc.*,
   716 F.3d 510 (9th Cir. 2013) .................................................................. 18, 19

*Los Angeles Memorial Coliseum Comm'n v. National Football League*,
   791 F.2d 1356 (9th Cir. 1986) ............................................................... 12, 22

*Mueller v. Puritan's Pride, Inc.*,
   2021 WL 5494254 (N.D. Cal. Nov. 23, 2021) .............................................. 18

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   259 F.3d 154 (3d Cir. 2001)......................................................................... 11

*North Brevard County Hospital District v. C.R. Bard, Inc.*,
   2023 WL 8936389 (D. Utah Dec. 27, 2023).......................................... 8, 10, 21

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) ............................................................. 5

*Postpichal v. Cricket Wireless, LLC*,
    2023 WL 3294852 (N.D. Cal. May 4, 2023) ................................... 19

*Singh v. Google LLC*,
    2022 WL 94985 (N.D. Cal. Jan. 10, 2022) ............................. 24, 25

*Somers v. Apple, Inc.*,
    258 F.R.D. 354 (N.D. Cal. 2009) .................................................. 10

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2013) ........................................................ 15

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*,
    350 F.3d 1181 (11th Cir. 2003) .................................................... 25

*Zamani v. Carnes*,
    491 F.3d 990 (9th Cir. 2007) ........................................................ 7

**STATUTES, RULES, AND REGULATIONS**

Fed. R. Civ. P. 23 ................................................................................. 5, 6

**OTHER AUTHORITIES**

David L. Faigman et al., *Modern Scientific Evidence: The Law and Science of Expert Testimony* (2022-2023 ed.) ................................................ 20

Philip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (2023 ed.)........................... 20, 22

Susan Athey & Joshua Gans, *The Impact of Targeting Technology on Advertising Markets and Media Competition*, 100 Am. Econ. R. 608 (2010) ................... 14

**PUBLIC REDACTED VERSION**

## INTRODUCTION

Meta sells many different types of ads—to a wide range of advertising customers, who pay different prices set in millions of individualized auctions. Advertisers attempt to side-step the individualized nature of advertising purchases on Meta by calculating an average overcharge drawn from an analysis of Meta's profits—not its prices—and seek class certification based on their contention that every class member was overcharged by that exact same, average amount. In doing so, they offer this Court a model of both antitrust impact and damages that is wholly incompatible with class treatment. The problems with Advertisers' model have been exposed for nearly a year. On their second attempt (even after the Court admonished them not to offer new theories or recast their arguments—which they did anyway), it is clear that Advertisers cannot remedy these defects. Their motion should be denied with prejudice.

Advertisers' approach cannot show class-wide impact, for multiple independent reasons. *First*, Meta's relative *profits* cannot show that its conduct had a class-wide impact on the *prices* class members paid. To show an overcharge, Advertisers rely exclusively on the assertion of their putative expert Williams that the difference between Meta's profits and those of so-called "yardsticks" results from supracompetitive prices. But Williams admits that, even if there were excess profits, they could result from things other than excess prices—i.e., that excess profits do not necessarily show an overcharge at all. Williams offers no justification for why he nevertheless attributes the entirety of the profit differential to excess pricing, and Advertisers do not even try to explain how this model shows that Meta overcharged anyone—let alone a putative class of all advertisers—for "social advertising."

*Second,* even if Advertisers could somehow rely on profits alone to establish an overcharge (they cannot), Advertisers' model attempts to calculate only the *average* amount each class member was overcharged. But an average does not show that *all* advertisers were overcharged, and says nothing about which advertisers in fact overpaid for ads. To certify a class, Advertisers needed a model capable of proving that all or nearly all advertisers overpaid for ads. They have not come close. Their model is equally consistent with half of the class members being overcharged by twice the average, and the other half not being overcharged at all. And while Advertisers

fleetingly gesture toward the existence of Meta's auction-based pricing system to justify their use of an average overcharge, that system—which not all class members used to purchase ads—by its very nature generates highly individualized ad prices that vary from advertiser-to-advertiser and from ad-to-ad depending on the composition of bidders in the auction and ad quality, among other factors. The auction model (and the many bespoke agreements Meta has with advertisers) means that prices are in key economic respects akin to negotiated prices, which makes it more, not less, difficult to provide a common means of showing antitrust impact, as required for class certification. Advertisers have offered no classwide method to resolve these complexities.

*Third*, even independent of those problems, Advertisers fail to focus their model on the market they assert. Advertisers have proposed a submarket for "social advertising." Meta is alleged to have a monopoly only in that submarket and, as a result, only purchasers of social advertising were even ostensibly subject to a monopoly overcharge. But the proposed class encompasses *all* purchasers of Meta's ads, even though not all of Meta's ads are "social"—even under Advertisers' hopelessly muddled definition of the term. Advertisers offer no way of identifying who purchased "social" ads and thus who was injured.

*Fourth*, Advertisers ignore the fact that their claims turn on the premise that Meta *improved its offerings*, including through more targeted advertising that yields better results for advertisers, through the challenged conduct. Those improvements make it highly likely that—even if Advertisers' claims are credited—many class members obtained a net benefit from the challenged conduct via lower prices. Thus, an individualized, advertiser-by-advertiser inquiry must be undertaken to assess injury.

Beyond all that, even if Advertisers could show that the challenged conduct resulted in class-wide overcharges for social advertising, the model they have presented fails to measure damages attributable to their theory of liability, as required under *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). Williams's analysis contains none of the hallmarks of a reliable yardstick study. He fails to control for any of the myriad factors other than the challenged conduct that he concedes could have caused the difference between Meta's profits and the yardsticks, and the results of his study thus bear no relation to any effects caused by the acts forming the basis for

**PUBLIC REDACTED VERSION**

1  Advertisers' claims. At best, Advertisers' model calculates an overcharge flowing from the

2  existence of Meta's alleged monopoly, rather than the challenged conduct, and thus purports to

3  claim damages well in excess of what Advertisers would be entitled to under well-settled law.

4  *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 297 (2d Cir. 1979) (monopoly

5  maintenance plaintiff entitled only to "price increment" attributable to exclusionary conduct).

6  Ultimately, Advertisers' approach is so unmoored from reason and evidence that, out of

7  the tens of millions of advertisers that advertise on Meta's services, they could not find a

8  representative advertiser as a named plaintiff. Instead, the named plaintiffs are idiosyncratic

9  advertisers who spent very little on Meta ads and know next to nothing about this case or about

10  Meta's or other companies' ad offerings. They do not represent the interests of the many class

11  members who understand and value precisely the sort of advertising improvements that

12  Advertisers take aim at in this litigation. Thus, this is a case not suited for class treatment. The

13  millions of advertisers who received significant return on investment from their advertising on

14  Meta need not and should not be dragged into this dispute.

15                                          **BACKGROUND**

16  Advertisers challenge five actions they claim enabled Meta to maintain a monopoly in the

17  submarket for "social advertising": (1) using the Facebook Research App ("FBR App")—which

18  Advertisers refer to as Meta's "in-app action panel"—to allegedly "monitor and preempt

19  competitive threats"; (2) imposing privacy-protective restrictions on other companies' use of Meta

20  users' data; (3) supposedly secretly agreeing to scuttle one of Meta's many video features to secure

21  a slight increase in Netflix advertising spend and keep "valuable Netflix signals" for Meta's own

22  use; (4) joining Google's advertising auctions so that Meta could "expand[]" its ad offerings "into

23  the open web"; and (5) trying to deceive the FTC to prevent a lawsuit seeking the divestiture of

24  Instagram (a lawsuit the FTC brought). Dkt. 796 ("Mot.") at 5. Advertisers assert that "[b]ecause

25  of Facebook's conduct, Facebook's [ad] targeting ability vastly increased." First Am. Compl., Dkt.

26  391 ¶825. They seek to litigate those claims on behalf of a class of everyone "in the United States

27  who purchased advertising from Meta Platforms, Inc. … between December 1, 2016 and

28  December 31, 2020." Mot. ii.

**PUBLIC REDACTED VERSION**

1    When Advertisers first moved for class certification, and again at the merits stage, they

2    offered a "yardstick" study by their putative expert, Williams, that they claimed established the

3    existence of a class-wide overcharge for advertising. That model used six selection criteria to

4    identify three comparator firms—███████, the Chinese firm ██████, and a small Polish company

5    called "████████████" that sells tourist packages, architectural plans, and cars. It then

6    compared Meta's "economic profit rate" (or "EPR") to those firms' EPRs, claimed that the

7    difference between those rates was due entirely to the challenged conduct, and used the result to

8    (purportedly) reverse engineer a class-wide overcharge of $21.4 billion. Williams's approach

9    rested on a series of assumptions: that the challenged conduct caused "████████████████████

10   ████████" between Meta's EPR and the yardsticks', that "█████████████████████████████

11   ███████████████████████████████████████████████████████████" and that "█

12   ████████████████████████████████████████████████████████████████████████████

13   ████████████████████" Ex. 1, Williams 9/23 Tr. 73:1-17, 229:3-9, 229:18-22.[1]

14   In support of their latest motion, Advertisers offer a new "yardstick" study, which relies on

15   those same assumptions, Ex. 2, Williams 6/24 Tr. 32:2-9, 66:5-9, but then makes substantial,

16   unexplained departures from Williams's earlier effort. The new study, like Advertisers' old one,

17   does not consider the price Meta charged for any ad, omits any analysis of how benign factors may

18   affect the studied firms' relative profitability, and makes no effort to identify the portion of

19   damages stemming from the challenged conduct. *Id.* at 35:11-36:12, 44:14-21, 60:13-61:8.

20   But despite the Court's clear instruction at the April 18, 2024 status conference that the

21   renewed class certification briefing was "not an opportunity to come up with new theories," and

22   specific directive to Advertiser counsel that "[y]ou are not recasting anything," Hr'g Tr. 31:24-

23   32:7, Advertisers' new study is materially different (though equally, if not more, flawed) from

24   what they submitted in the first round of briefing. The new study uses a different set of selection

25   criteria than the old study, keeping the odd lot of ██████████████████████ but also

26   expanding the pool of comparator firms to twenty-five, including German and British real estate

---

[1] Unless otherwise noted, "Ex." citations reference exhibits to the Gringer Declaration filed herewith, emphasis is added, and objections are omitted for deposition citations. Citations to the Williams Report reference Dkt. 795-19 submitted with Advertisers' class certification motion.

**PUBLIC REDACTED VERSION**

portals, several international car sales websites, American and Chinese stock photography websites, price-comparison websites "████████████" and "████████████" and a Chinese entity called "████████████████████" *See* Williams Rep. ¶¶98-106 In another unexplained departure from Advertisers' prior study, it then creates numerous groups of those firms—ranging from 5 firms to 25 firms apiece—and calculates the weighted average profit rate of each grouping to compute the gap between each group's average and Meta's profit rate during the Class Period. *See id.* ¶¶100-104. But then—just like Advertisers' first study—it asserts that the entire gap between Meta's profit rate and these averages reflects Meta's monopoly profits stemming from the challenged conduct. *See id.* ¶106. The study, like its forerunner, makes no further attempt to link injury or damages to the categories of anticompetitive conduct described above. This new study produces a range of damages figures from $25.5 to $26.6 billion—an increase of more than $5 billion from Advertisers' original model.

Because Advertisers' damages study says nothing on whether all or most class members were impacted by (or faced higher prices due to) the challenged conduct, Williams claims that his damages figure can infer classwide impact from the (supposed) fact that ████████████ ████████████████████████████████████████████████████████████ ████████" Williams Rep. ¶66. From there, Williams asserts "████████████████████ ████████████████████████████████████████████████" *Id.*

**ARGUMENT**

Advertisers' motion first fails because it relies exclusively on Williams's inadmissible "expert" testimony to prove that all Meta advertisers suffered antitrust injury and damages. For the reasons detailed in Meta's concurrently filed *Daubert* motion, Williams's opinions on these matters are junk science. If properly excluded, Advertisers necessarily fail to meet the requirements of Rule 23. *See Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022) (en banc) (plaintiffs bear the burden of proof at class certification); *In re Google Play Store Antitrust Litig.*, 2023 WL 5602143, at *1 (N.D. Cal. Aug. 28, 2023) (Donato, J.); *see also In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 252-53 (D.C. Cir. 2013) ("No damages model, no predominance, no class

**PUBLIC REDACTED VERSION**

1   certification."). But either way, Advertisers cannot satisfy Rule 23's requirements or *Comcast*.

2   **I.    INDIVIDUALIZED ISSUES OF ANTITRUST IMPACT PREDOMINATE OVER COMMON ONES**

3              This Court should deny class certification because Advertisers have failed to show

4   common proof of antitrust impact. *See Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp.*,

5   247 F.R.D. 156, 165 (C.D. Cal. 2007) ("[C]lass certification is precluded where plaintiffs have not

6   shown that the fact of injury element can be proven for all class members with common

7   evidence."). Assessing impact here will require individualized inquiries into (1) whether any

8   advertiser paid supracompetitive prices for "social" ads—including whether the advertiser

9   benefited from the challenged conduct, such that they were not overcharged at all, and (2) whether

10  advertisers even participated in the purported submarket for "social advertising." Each is fatal to

11  class certification. *Bowerman v. Field Asset Servs.*, 60 F.4th 459, 469 (9th Cir. 2023).

12        **A.    Impact Through Ad "Overpayment" Is Individualized**

13              **1.    Advertisers Offer No Common Way To Prove Class-Wide Overcharge**

14             Advertisers claim that Williams's analyses of Meta's profits relative to other firms show

15  that Meta overcharged for ads, and point to the fact that Meta sells ads using an auction to argue

16  that all class members suffered the same overcharge. Mot. 22-24. This approach does not show

17  that any class member was overcharged, let alone all of them, dooming Advertisers' motion.

18  Williams's profits study does not actually show an overcharge, but rather assumes one. At best, it

19  calculates an average overcharge that courts have repeatedly and rightfully held cannot suffice to

20  show common impact. And contrary to Advertisers' arguments, neither Meta's use of an auction

21  nor Advertisers' purported ability to calculate class-wide damages can salvage this injury model.

22                      *i.    Williams's Analysis Does Not Show Any Price Overcharge*

23             As an initial matter, Williams's study does not consider any evidence about what any Meta

24  advertiser paid for ads. None. Instead, Williams's study considers profits; without explanation or

25  justification, he attributes the difference between Meta's and his benchmarks' profitability entirely

26  to supracompetitive pricing caused by the challenged conduct. This analysis is not capable of

27  showing any price impact, let alone a common one. As Williams acknowledged, a firm like Meta

28  may " ███████████████████████████████████████████████████ " including

**PUBLIC REDACTED VERSION**

1  "█████████████████████████████████████████████████████." Williams

2  Rep. ¶84; *see also* Ex. 1, Williams 9/23 Tr. 70:12-72:17, 229:23-230:3. And a firm's profitability

3  is a function of not just prices, but also cost and output. *See* Ex. 2, Williams 6/24 Tr. 20:12-16

4  ("████████████████████████████████"). Williams's model analyzes

5  none of these other factors, and instead simply assumes away or ignores the possibility that they—

6  rather than supracompetitive pricing—contributed to the difference between Meta's EPR and the

7  yardsticks'. *See id.* at 32:2-9 ("████████████████████████████

8  ████████████"); *id.* at 39:19-40:1 ("████████████████

9  ███████████████████████████████████████████████████

10  ███████████████████); *id.* at 66:5-9 (██████████████████

11  ██████████████████).[2] He thus assumes an overcharge without showing one. Because

12  they have no proof of an overcharge (common or otherwise), Advertisers' class certification

13  request fails. *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 317 (N.D. Cal. 2014)

14  ("inability to show a viable method for proving injury on a class-wide basis" is "dispositive").

15          ii.    *Williams Improperly Calculates An Average Overcharge*

16          Even assuming Williams's methodology were valid, his study does not demonstrate that

17  the challenged conduct resulted in any particular advertiser being overcharged. Instead, the study

18  only "determine[s] the extent of the overcharge, on a classwide percentage difference basis." Mot.

19  15, 22. That is another way of saying that the study calculates an *average* overcharge percentage

20  across the proposed class, and then assumes that all class members suffered the exact same

21  percentage overcharge. *See* Mot. 15, 23.[3]

---

22  [2] Williams claims that "███████████████████████████████████

23  ████████████████████████████." Williams Rep.
    ¶110 n.110. That fixes nothing. Cost changes need not correspond to quantity reductions, and

24  Williams concededly evaluated no other potential changes to Meta's costs in the but-for world.
    Ex. 2, Williams 6/24 Tr. 62:11-64:18.

25  [3] Williams's report also contains a short section describing a so-called "during and after model"

26  comparing Meta's EPR to similar sets of "yardstick" firms over two time periods, and asserting
    that the difference between Meta's "excess EPR" in the two time periods constitutes a

27  "████████" estimate of damages. Williams Rep. ¶¶107-108. Advertisers do not rely on this
    analysis in their motion, and have thus forfeited their ability to rely on it as a basis for class

28  certification. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007). Regardless, this model

**PUBLIC REDACTED VERSION**

1    Courts routinely reject class certification analyses that posit classwide antitrust impact

2  based on average overcharges. This is for good reason. Averages mask variations among individual

3  class members, including class members that suffered no injury. "[A] benchmark showing a 30%

4  overcharge could mean half of the class was not overcharged at all and the other half paid a 60%

5  overcharge." *North Brevard Cnty. Hosp. Dist. v. C.R. Bard, Inc.*, 2023 WL 8936389, at *12 (D.

6  Utah Dec. 27, 2023). Using an average "evade[s] the very burden that [Williams] was supposed to

7  shoulder—*i.e.*, that there is a common methodology to measure impact" across class members. *In*

8  *re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 492 (N.D. Cal. 2008). Particularly

9  in a monopolization case like this one, challenging an "'array of anti-competitive conduct having

10  an *indirect effect* on … the general price level' of the products at issue[,] … proof of fact of injury

11  requires much more than a simple showing that the plaintiffs purchased an item in a world where

12  average prices were inflated." *Allied Orthopedic*, 247 F.R.D. at 166; *see* Ex. 2, Williams 6/24 Tr.

13  168:20-169:6 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").

14    Indeed, courts have rejected strikingly similar studies offered as supposed class

15  certification benchmarking analyses. In *North Brevard*, the plaintiff's expert "estimat[ed] the

16  overcharge—the antitrust price injury—using … benchmarks" to compare the defendant's

17  monopoly "margins with competitive margins" and infer an average price overcharge across the

18  class. 2023 WL 8936389, at *11. The Court held that this analysis "fail[ed] to demonstrate a

19  common methodology for proving impact and injury because nothing in the methodology

20  'attempt[ed] to show that all or nearly all purchasers were overcharged in that amount, or in any

21  amount at all.'" *Id.* at *12 (quoting *Optical Disk Drive*, 303 F.R.D. at 321). As in *North Brevard*,

22  Williams's study "assumes the very proposition that [Advertisers are] now offering it … to

23  show"—that all advertisers in the class were subject to the same overcharge. *Id.*

24        *iii.    Meta's Ad Auctions Do Not Justify The Use Of An Average*

25    The assumption that all advertisers would have paid a uniform, average overcharge is

26  untenable given the facts of this case. Meta advertising does not have standard pricing, standard

27  ───────────────

28  suffers from the same defects as Williams's yardstick study—it also computes an average
   percentage overcharge without establishing whether any individual advertiser was overcharged.
   *See* Williams Rep. ¶91 n.95.

**PUBLIC REDACTED VERSION**

products, or standard purchasers. Advertisers instead purchase ads using bespoke contracts, discount and coupon arrangements, or through Meta's ad auction (among other things). *See* Ex. 3, Tucker Rep. ¶¶69-71; Ex. 4, Frederick Tr. 156:7-15. Advertisers defend their use of an average overcharge by pointing to Meta's ad auction, which purportedly serves as a "███████████████" for pricing, Williams Rep. ¶65, and demonstrates that prices "were higher for all or nearly all members of the proposed Class." Mot. 15. But the manner in which prices are set does not say anything about whether they are inflated, let alone whether they are inflated for *everyone*. Neither Advertisers nor Williams ever explain what it is about Meta's auctions, or the existence of a purportedly "████████" pricing mechanism, that ensures an average overcharge would be felt—and felt equally—by all advertisers on Meta. That is because there is no explanation. And as a practical matter, the proposition that Meta's auction makes it more likely than not that all advertisers in the class were subject to the same overcharge is wrong for multiple reasons.

    *First*, the auction's structure makes it far *more* likely that prices will be individualized—especially as compared with ordinary retail goods, where uniform prices are set in advance for all customers.[4] Separate auctions are held for each opportunity to show a user an ad available through the auction system. Pricing for each of the millions of auctions conducted daily is determined by a litany of individualized, transaction-specific factors, including the composition of competing bidders in each auction (which is determined by, among other things, whether the particular user who is to be shown an ad fits the targeting criteria an advertiser has selected), their bidding behavior and strategies, and the quality of their ads. *See* Ex. 3, Tucker Rep. ¶¶62-64; *see also* Ex. 1, Williams 9/23 Tr. 116:9-17 ███████████████). As with negotiated pricing, auction-based pricing generates individualized prices based on factors specific to each customer and each transaction. *See* Ex. 3, Tucker Rep. ¶¶64-67; *In re Flash Memory Antitrust Litig.*, 2010 WL 2332081, at *8 (N.D. Cal. June 9, 2010) ("antitrust claims predicated on negotiated transactions … often entail consideration of individualized proof of impact"). Accordingly, for all advertisers using the auction to have paid the same overcharge, the combination of all of the transaction-

---

[4] To be clear, Meta is not arguing that the existence of an auction necessarily precludes class certification. Advertisers' unsupported theory, however, is that an auction *compels* a uniform overcharge, which is nonsensical.

**PUBLIC REDACTED VERSION**

1   specific factors that determine auction prices would need to have yielded an auction clearing price

2   that was the same percentage higher relative to the but-for world in every single one of the billions

3   of ad auctions that took place during the class period. Advertisers provide no reason to believe this

4   would be true. Ex. 2, Williams 6/24 Tr. 96:15-97:11 ("██████████████████████████████

5   ██████████████████████████████████████████████████████████████████████████████████████

6   ██████████████████████████████.").

7          Advertisers' position echoes another theory the Court in *North Brevard* rejected. There,

8   the plaintiff's expert "constructed a regression model 'to test whether … prices can be determined

9   by common, observable factors'" and concluded that "common factors largely explain … pricing."

10  2023 WL 8936389, at *11. Based on that, the plaintiff asserted that its "model [was] capable of

11  showing antitrust impact and damages through common proof." *Id.* The Court dismissed this as

12  "the statistical equivalent of a tautological statement," reasoning that the plaintiff "essentially

13  sa[id], after accounting for all of the highly individualized factors relevant to pricing …, we have

14  determined these factors establish the price." *Id.* The same logic holds here (minus the existence

15  of any regression, which Williams did not perform). Advertisers' reliance on the auction "entirely

16  glosses over the point," because "[e]ach of those individualized factors relevant to the price" of an

17  ad sold through Meta's auctions "*is* the individualized inquiry that would be required for every

18  class member." *Id.* Advertisers have "failed to propose a model that could adequately account for

19  the morass of variables that make up the … pricing dynamic" in Meta's auctions. *Somers v. Apple,*

20  *Inc.*, 258 F.R.D. 354, 361 (N.D. Cal. 2009).

21          *Second*, the changes to the competitive landscape Advertisers envision in their but-for

22  world would not impact all Meta ad auctions similarly. Advertisers contend that, but for Meta's

23  allegedly anticompetitive conduct, new advertising platforms would have entered the social

24  advertising market and drawn advertisers away from Meta, lowering prices. Ex. 5 at 1687-93.

25  Whether that would affect demand for a category of advertising, or the composition of any ad

26  auction—and thus the price charged—depends on *which* advertisers would have migrated to other

27  platforms and for what ads. *See* Ex. 3, Tucker Rep. ¶68. Yet despite the diversity of the class

28  (which includes every single person or company who purchased ads from Meta during the class

**PUBLIC REDACTED VERSION**

1  period, ranging from barber Mark Young to Procter & Gamble), Advertisers provide no common

2  method for determining which of its members would have switched to supposed new competitors

3  or obtained lower auction prices under their theory. *See* Ex. 1, Williams 9/23 Tr. 156:1-20

4  (█████████████████████████████████████████████████████████

5  ███████████████████████████████████"). It is implausible that it would have been

6  all or nearly all such advertisers. And as a result, Advertisers have no basis to assume that everyone

7  who purchased ads via an auction would have paid higher prices. Proving an overcharge would,

8  instead, require analyzing the composition of each individual class member's ad auctions and

9  assessing how it (and the resulting prices) would have been different in the but-for world.

10      And *third*, as Williams himself conceded, "██████████████████████████

11  ██████." Ex. 1, Williams 9/23 Tr. 87:25-88:6. Some class members purchased "Reach and

12  Frequency" ads with predetermined prices. *See* Ex. 3, Tucker Rep. ¶70. Others used the auction

13  price only as a jumping-off point before individualized discounts, credits, and other incentives

14  modified it. *See id.* ¶69. And still other advertisers—usually large "power" buyers—negotiated

15  bespoke pricing agreements with Meta for custom prices or discounts. *See id.* ¶71; *see also FTC*

16  *v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 59 (D.D.C. 1998) ("the existence of large power buyers

17  mitigate[s] against the ability … to raise prices"). Indeed, Advertisers' industry expert agreed that,

18  due to the diversity of pricing options, "an individualized inquiry is necessary to determine how

19  an ad is purchased and how the pricing of that ad is determined." Ex. 6, Fasser Tr. 148:24-149:3.

20          iv.     *Advertisers' Damages Computation Cannot Substitute For A*

21                  *Showing Of Common Impact*

22      Having failed to defend their average overcharge calculation, Advertisers fall back on the

23  assertion that "[p]roviding a model for estimating aggregate damages is sufficient to establish

24  predominance." Mot. 23. That argument conflates the separate requirements of classwide antitrust

25  *impact* and classwide *damages*. "'The ability to calculate the aggregate amount of damages …

26  does not absolve plaintiffs from the duty to prove each [class member] was harmed by the

27  defendants' practice.'" *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 28

28  (1st Cir. 2008) (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 188

**PUBLIC REDACTED VERSION**

(3d Cir. 2001)). Thus, antitrust plaintiffs claiming an overcharge must provide a model of antitrust impact that can "establish, without need for individual determinations for the many … potential class members, which consumers were impacted by the alleged antitrust violation and which were not." *New Motor Vehicles*, 522 F.3d at 28. And plaintiffs seeking class certification may not simply "rely on an inference that any upward pressure on … pricing would necessarily raise the prices actually paid by individual consumers." *Id.* at 29. Nor may they rest on an expert's "assert[ion] that each class member may calculate his or her damages merely by 'applying [an] overcharge percentage estimated on a class-wide basis to [the member's] individual purchases.'" *Optical Disk Drive*, 303 F.R.D. at 321. Rather, they must provide a method capable of "show[ing] that all or nearly all purchasers were overcharged in that amount." *Id.* Advertisers' model, which "makes no attempt to establish, but instead simply assumes, class-wide impact," falls well short. *Id.*

### 2. Advertisers Cannot Account For Offsetting Benefits With Common Proof

"There can be no antitrust injury if the plaintiff stands to gain from the alleged unlawful conduct." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1056 (9th Cir. 1999). Accordingly, the Sherman Act requires that a court "take into account any benefits which would not have been received by plaintiff 'but for' the defendant's anticompetitive conduct, or amounts a plaintiff would have expended in the absence of the violation." *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1367 (9th Cir. 1986). Where the benefits exceed the harms, there is no injury for which to recover. And where such benefits vary by class member, and thus "require[] an analysis of each putative class member's purchases" to determine which members "suffered net harm," they render antitrust injury an individualized issue, making class certification inappropriate. *Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16, 25 (D.D.C. 2012); *see also In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 59 (S.D.N.Y. 2020) (no "common proof of antitrust injury" where "price increase … was offset—and, at least for some … purchases, wholly offset—by the [conduct's] downward [pricing] impact … thereby eliminating any injury").

Advertisers ignore the substantial, individualized benefits that the challenged conduct (if true) would have delivered to class members. They offer no methodology—let alone a common

**PUBLIC REDACTED VERSION**

1   one—for determining which members suffered a net injury once those benefits are accounted for.

2                   *i.*      *Advertisers' Claims Turn On Advertising Improvements*

3           Advertisers' allegations hinge on the idea that Meta's alleged conduct impeded would-be

4   competitors by either improving Meta's ad targeting capabilities, or causing the introduction of

5   new features and improvements that different advertisers valued in different ways. Since its

6   inception, the central premise of Advertisers' case has been that, "[b]ecause of Facebook's

7   conduct, Facebook's [ad] targeting ability vastly increased." First Am. Compl., Dkt. 391 ¶825.

8   Indeed, Advertisers' motion begins by discussing the supposed "Data Targeting Barrier to Entry"

9   "linked to Meta's social data and machine learning dominance" in ad targeting that allegedly

10  "protect[s]" Meta's monopoly. Mot. 1. And all of the challenged conduct in this case is inextricably

11  intertwined with improvements in the quality of Meta's advertising service.

12          For example, Advertisers claim that Meta's use of data collected through the FBR App led

13  to Meta's launch of Stories—a new advertising format was popular among many advertisers and

14  provided a lower-cost alternative for certain categories of advertisers on Meta's apps. *See* Ex. 3,

15  Tucker Rep. ¶¶39-42; Ex. 5 at 1640-41. They also challenge Meta's Network Bidding Agreement

16  with Google, which enabled Meta advertisers to access ad placements on third-party apps through

17  Google's Open Bidding auction system. This "████████████████████████████████████████

18  ████████████████████████████████████████████████████████████████████████████████████████

19  ████████████████████████," Ex. 7, Crum Tr. 283:24-284:16, and provided many advertisers

20  with additional inventory and better user matches, *see* Ex. 3, Tucker Rep. ¶¶43-45. Advertisers

21  also envision a but-for world without the challenged conduct in which Meta divested Instagram—

22  the integration of which into Meta's ad systems has yielded substantial benefits for advertisers that

23  advertise on Facebook and Instagram, and enhanced ad quality on both apps. *See id.* ¶¶50-51.

24          Moreover, Advertisers have contended that each of the challenged acts improved Meta's

25  ad targeting capabilities. *See* Ex. 13 at 87-89 (FBR App data "████████████████████████████

26  ████████"); *id.* at 164 (Google agreement allowed "██████████████████████████████████████

27  ██████████████████████████████████████████████████"); *id.* at 88 (alleged

28  Netflix agreement provided Meta with "████████████████████████████"); *id.* at 110, 154

**PUBLIC REDACTED VERSION**

1   (challenged API agreements ███████████████████████████████████████████████"

2   which "█████████████████████████"); *id.* at 88 (Instagram integration "█████████████████

3   ███████████████████████████████████████████████).

4                           ii.      *These Improvements Lowered Prices For Some Class Members*

5          The advertising improvements on which Advertisers' claims turn—improved performance,

6   targeting, and measurement, along with the introduction of valuable new advertising formats—

7   would have lowered the price paid by at least some advertisers in at least two ways.

8          *First*, for some advertisers, ad improvements would have brought down the *nominal* price

9   of advertising—that is, the price paid for an ad. Improved targeting can increase the effective

10  supply of advertising, "'push[ing] prices downwards'" for ads. Ex. 8, Susan Athey & Joshua Gans,

11  *The Impact of Targeting Technology on Advertising Markets and Media Competition*, 100 Am.

12  Econ. R. 608, 608 (2010). "[T]argeting allows general outlets to more efficiently allocate scarce

13  advertising space, resulting in an increase in the number of advertisers who can be

14  accommodated," thus "push[ing] prices down." *Id.*; *see also* Ex. 3, Tucker Rep. ¶¶47-49. Beyond

15  that, by allowing the creation of multiple distinct types of ads distinguished by the characteristics

16  of the targeted user base, improved targeting can thin demand for some ad inventory and thus

17  lower prices. *See id.* Assessing these impacts requires inquiry into the forms of targeting each

18  individual advertiser used and demand for the specific ad slots they bought. *Id.*

19         The *second* way the challenged conduct benefited many advertisers is by lowering the

20  *effective* price of advertising—that is, the price advertisers paid to achieve their advertising

21  objectives. That quality-adjusted price is influenced by multiple factors—the nominal price of an

22  ad, to be sure, but also its quality. For example: An advertiser who pays $1 per ad but reaches its

23  desired audience only 10% of the time is effectively paying more for advertising than an advertiser

24  who pays $2 per ad but reaches its desired audience 50% of the time. *See* Ex. 3, Tucker Rep. ¶46.

25  Here, the targeting and measurement improvements that Advertisers' claims suggest Meta

26  improperly obtained would have improved the quality of matches for many advertisers. This would

27  reduce their effective price to a degree depending on their individual objectives, how the

28  improvements affected those objectives, and how those effects compared to any alleged increase

**PUBLIC REDACTED VERSION**

1    in nominal prices.

2    "[W]here each customer's transaction must be evaluated to show injury, 'the level of

3    individualized inquiry required … is cancerous to a finding of commonality; there is no common

4    method for resolving to whom Defendant is liable.'" *Kottaras*, 281 F.R.D. at 25. That is the case

5    here. Advertisers have no common method of identifying the class members to which these

6    benefits accrued or—most importantly—how those benefits impacted the quality-adjusted price

7    the advertiser paid for ads during the class period. Without such a method, there is no common

8    way of determining which class members were actually injured—that is, which actually lost more

9    from purported supracompetitive pricing than they gained from the advertising improvements on

10   which Advertisers' claims turn. "Since benefits must be offset against losses, it is clear that

11   widespread injury to the class simply cannot be proven through common evidence." *Id.*

12        **B.**    **Whether Class Members Participated In The Purported Market For "Social**

13              **Advertising" Is An Individualized Question**

14        Advertisers assert a submarket for "social advertising." That alleged submarket is the only

15   market asserted to have been impacted by Meta's alleged anticompetitive conduct. The class,

16   however, includes "[a]ll persons … who purchased advertising" of *any type* from Meta during the

17   class period. Mot. ii. For class certification to be appropriate, Advertisers needed to provide

18   common proof that those class members all purchased *social* ads in particular—without such

19   proof, they cannot show that antitrust injury is susceptible to class-wide resolution. *See, e.g.*,

20   *Fido's Fences, Inc. v. Radio Sys. Corp.*, 999 F. Supp. 2d 442, 449-50 (E.D.N.Y. 2014) (seller of

21   batteries for containment fences challenging anticompetitive conduct in the "submarket for

22   replacement batteries" had no "concrete, actual, or imminent injury" in the "broader market for

23   electronic pet containment systems"); *see also Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir.

24   2013). An advertiser who purchased only non-social ads from Meta—advertisements outside the

25   market allegedly impacted by Meta's actions—cannot have suffered antitrust injury. *See FTC v.*

26   *Qualcomm, Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (out-of-market harms not cognizable).

27        Advertisers' incoherent definition of "social" ads makes it impossible to determine which

28   class members purchased "social" advertising and which purchased one of the numerous non-

**PUBLIC REDACTED VERSION**

social ad products Meta sells. The first insurmountable difficulty in identifying which class members purchased social advertising is figuring out what Advertisers even mean by "social advertising." Advertisers' motion offers one definition: advertising "that can be targeted using social data contained in a 'social graph.'" Mot. 4. But Williams contradicted that definition, testifying both that it is "possible" for an ad to "constitute social advertising even if it does not use social data contained in a social graph" and—conversely—that he does not "have an opinion on" whether "there could be ads that use social data contained in a social graph but that do not constitute social advertising." Ex. 9, Williams 2/24 Tr. 21:12-23, 23:2-19. As a result, the sole attribute offered to delineate Advertisers' purported market—targeting based on social data in a social graph—is apparently neither necessary nor sufficient to render an ad "social." The result is an I-know-it-when-I-see-it approach under which Williams makes the sweeping claim that ████ ████████████████" were "████" without analysis of whether *any* of Meta's ads meet his convoluted definition. Williams Rep. ¶15. Unsurprisingly, this leads to absurd results: Williams testified that ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████. Ex. 2, Williams 6/24 Tr. 89:13-90:7. Because Advertisers have no coherent definition of social advertising, they have no way to determine which class members purchased "social" ads and therefore suffered antitrust injury. *Cabrera v. Google LLC*, 2023 WL 5279463, at *25 (N.D. Cal. Aug. 15, 2023) (denying certification where plaintiffs did not "offer[] any systemic method for identifying" purchases affected by challenged conduct).

What little Advertisers have offered to define the contours of "social advertising" makes clear that not all ads sold by Meta during the Class Period qualify. Williams testified that he "█ ████████████████████████████████████████████████████████████ ██████████████████████" Ex. 2, Williams 6/24 Tr. 73:12-74:24. Thus, if any workable definition of "social advertising" can be gleaned from Advertisers' deeply flawed efforts to define that term, it is that ads using "social data" for targeting are within the market. But the evidence establishes that many Meta ads do not rely on anything that could be considered "social data."

As Dr. Tucker explains, many of Meta's targeting options rely on basic demographic data

**PUBLIC REDACTED VERSION**

1   that does not turn on users' social connections or friends, i.e., on a "social graph." *See* Ex. 3,

2   Tucker ¶¶ 15-17. Ads relying on that data are thus not "social." Indeed, one of Advertisers' own

3   experts (now dropped in their renewed class certification motion) conceded as much in his

4   deposition. *See* Ex. 10, Gans Tr. 94:6-11 ("[A]ds that target purely on age and location data" are

5   not "ads that use data on social connections between users."). The same goes for ads on certain

6   parts of Meta's apps, like Marketplace (a feature for buying and selling goods), or those placed on

7   third-party apps through the Meta Audience Network—again, Advertisers' own industry expert

8   (whom they have also dropped from their current motion) testified that such ads are generally not

9   "social." Ex. 6, Fasser Tr. 97:8-12 (ads "placed on Facebook Marketplace that a user would

10  encounter based on their entering of a search term … constitute search advertising"); *id.* 82:15-

11  83:1 (ads purchased through the Meta Audience Network are not "social advertisements" when

12  not "placed on other social media networks"). Another extremely popular non-social ad offering

13  is "Custom Audiences," where an advertiser defines a target audience using the advertiser's, not

14  Meta's, own sources of information. Ex. 11; *see also* Ex. 3, Tucker Rep. ¶16. A business may, for

15  instance, use a Custom Audience to match its customers to their Meta accounts without relying on

16  any data about users' social connections. *See* Ex. 12; Ex. 3, Tucker Rep. ¶16. As a result, these ads

17  are not "social advertising" under Advertisers' definition. Custom Audience targeting was the

18  source of ▮▮ *% of all advertising spending* during the class period. Ex. 3, Tucker Rep. ¶16.

19        By contrast, the record confirms that the targeting features Advertisers apparently believe

20  meet their contrived definition of "social advertising" were used infrequently. "Friends of

21  Connections" targeting, which permits advertisers to target users based on their "friends," 

22  accounted for just ▮% of advertising spend on Meta and was used by less than ▮▮▮▮▮ of

23  advertisers on each of Facebook and Instagram. Ex. 3, Tucker Rep. ¶¶22-23. And "Direct

24  Connections" targeting, which targets users based on their interactions with advertisers' pages,

25  was associated with only ▮% of ad spend and used by just over ▮▮▮▮ of advertisers. *Id.* ¶24.

26        If what Advertisers intend to argue is the mere *possibility* of social targeting makes an ad

27  "social," they are likewise out of luck—because it would bust the predicate market definition by

28  sweeping in many (many) rivals. It is commonplace that ads sold online *can* be targeted using

**PUBLIC REDACTED VERSION**

1   social data from a social graph. For example, Meta could advertise on Google's search engine

2   using Google's custom audiences tool with *its own* "social" data. Ex. 3, Tucker Rep. ¶20. Thus,

3   ads on Google's search engine *can* be targeted using social data and thus are social advertisements

4   too. Williams has no explanation for how these ads would not be social—indeed, ███████████

5   ███████████. Ex. 2, Williams 6/24 Tr. 70:3-71:24. If they are, Meta clearly lacks

6   monopoly power, even in a market contrived to establish that it does.

7        Ultimately, given this indeterminacy, identifying which advertisers purchased "social"

8   ads—and thus may have been injured under Advertisers' theory—will require guesswork and a

9   highly individualized inquiry into which ad types an advertiser purchased, and whether those ads

10  were capable of, and actually did, use social data for targeting purposes. Advertisers have

11  identified no class-wide means of answering these questions. While it is easily discernible that a

12  substantial number of Meta's ads are not social, there is no common way of discerning which ads

13  *are* social under Advertisers' contrived definition. These individualized questions will

14  predominate, so class certification is inappropriate. *Cabrera*, 2023 WL 5279463, at *25.

15  **II.   ADVERTISERS' DAMAGES MODEL FAILS *COMCAST***

16        **A.   Advertisers' Damages Model Fails To Identify Damages Traceable To**

17             **Meta's Alleged Anticompetitive Conduct**

18        Advertisers' damages model fails its core task: calculating the damages attributable to the

19  ***conduct*** challenged in this case. "Failure to identify a feasible method for calculating class

20  damages is fatal to class certification." *Mueller v. Puritan's Pride, Inc.*, 2021 WL 5494254, at *6

21  (N.D. Cal. Nov. 23, 2021) (Donato, J.). To provide such a method, a "damages model 'must

22  measure only those damages attributable to' the plaintiff's theory of liability." *Id.* (quoting

23  *Comcast*, 569 U.S. at 35). "[P]laintiffs must be able to show that their damages stemmed from the

24  defendant's actions that created the legal liability," and not from some other cause. *Leyva v.*

25  *Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013). Thus, their model must "bridge the

26  differences between supra-competitive prices in general and supra-competitive prices attributable

27  to the" specific anticompetitive conduct on which their claims turn because "'[t]he first step in a

28  damages study is the translation of the *legal theory of the harmful event* into an analysis of the

**PUBLIC REDACTED VERSION**

economic impact *of that event*.'" *Comcast*, 569 U.S. at 38. In overcharge cases, the damages model may not just "assume[] that the entire price difference of any comparison product or price point was attributable" to the alleged wrongful conduct, given the wide array of lawful reasons that price differences may exist even between generally comparable products. *Postpichal v. Cricket Wireless, LLC*, 2023 WL 3294852, at *2 (N.D. Cal. May 4, 2023); *see also Brazil v. Dole Packaged Foods, LLC*, 2014 WL 2466559, at *16 (N.D. Cal. May 30, 2014).

Advertisers' method of calculating the overcharge supposedly flowing from Meta's alleged anticompetitive conduct fails this requirement because it makes no effort to separate the profits—and assumed corresponding price increases—attributable to the challenged conduct from those concededly attributable to other causes. Instead, Advertisers simply assume that every dollar by which Meta's profits exceeded the average of its (supposedly) peer firms must reflect price increases attributable to the specific anticompetitive conduct challenged in this case. *See* Ex. 2, Williams 6/24 Tr. 28:16-22. But *Comcast* forbids Advertisers from simply assuming, without proof, that their damages stem from the challenged conduct. *See Leyva*, 716 F.3d at 514 ("[P]laintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability."). Williams knows this, yet he repeats his error here. *See Grasshopper House, LLC v. Clean & Sober Media LLC*, 2019 WL 12074086, at *12 (C.D. Cal. July 1, 2019) ("Dr. Williams' methodology is also deficient for failing to consider … other factors" than alleged conduct affecting profitability).

As Williams himself explained, firms may "████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████." Williams Rep. ¶84. *See supra* I.A.1. By nonetheless tying damages to relative profits, without *any* consideration of these possible alternative causes, Advertisers have calculated a damages figure that bears no relation to their theory of liability. *See Blue Cross Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d. 588, 593 (7th Cir. 1995) (yardstick study "worthless" when it "attribute[s] the entire difference between the prices" of firms to anticompetitive conduct without "correct[ing] for salient factors, not attributable to the defendant's misconduct").

**PUBLIC REDACTED VERSION**

1    That problem does not go away just because Advertisers have conducted (so they claim) a

2    yardstick study. The "most important[]" requirement for a "yardstick methodology" is "to control

3    for any factors that might have influenced [a firm's] profit performance that are competitively

4    neutral or even procompetitive." Areeda & Hovenkamp, *Antitrust Law* ¶397 (2023). Yet despite

5    agreeing that a host of other factors can explain firms' differing levels of economic success—

6    including product quality, management quality, human capital, product differentiation, and

7    product innovation—Williams's yardstick analysis does nothing to account for those factors. Not

8    one of the selection criteria Williams used to pick comparable firms has anything to do with those

9    attributes, so it is inconceivable that his model could have accounted for them. Indeed, the model

10   barely attempts to account for *any* potentially confounding variable (for instance, with an

11   accompanying regression analysis). *See Kentucky v. Marathon Petroleum Co. LP*, 464 F. Supp. 3d

12   880, 892 (W.D. Ky. 2020) ("[s]uccessful applications of" a yardstick approach "usually employ a

13   regression analysis" to account for other factors likely to affect profits or prices); Faigman et al.,

14   5 Mod. Sci. Evid. § 43:35 (2022-2023 ed.) (When a "yardstick benchmark is employed, effects on

15   the prices paid by plaintiffs … caused by factors other the alleged wrongdoing must be taken into

16   account. … Economists usually account for the multiple influences on prices with a … multiple

17   regression."). Advertisers have had nearly a year to try to fill this critical gap in their expert's

18   analysis—the fact that they have not makes clear that they cannot.

19   Nor does Williams's use of economic profit rates "███████████████████████████

20   ████████████████████████████████████." Williams Rep. ¶76. Using EPRs is

21   not a license to set aside the rules of economics. The fact that an EPR figure "██████████████

22   ███████████████████████" as Williams says, *is the problem*. *Id.* Because an EPR calculation

23   bakes in *everything* that makes a firm successful—its level of innovation, its employee quality, its

24   management quality, its product quality, as well as any anticompetitive advantage it may have—a

25   comparison of firms' EPRs cannot show which of these myriad factors is responsible for one firm's

26   success as compared to the other. By nonetheless using the entire difference between Meta's EPR

27   and the yardsticks' EPR to calculate damages, Advertisers assert a damages figure that is

28   untethered to the theory for which they seek to recover.

**PUBLIC REDACTED VERSION**

1    Accordingly, as in *Comcast*, Advertisers have failed to meet their burden of providing a

2    damages model that "measure[s] damages resulting from the particular antitrust injury on which

3    [their] liability in this action is premised." *Comcast*, 569 U.S. at 36; *see also North Brevard*, 2023

4    WL 8936389, at *13-14 (rejecting benchmark-based damages model that did "'not account for

5    lawful factors that can explain the difference in margins between'" benchmarks and the defendant,

6    because resulting inability to "distinguish between … lawful and allegedly unlawful charges"

7    rendered model "unable to 'bridge the differences between supra-competitive prices in general and

8    supra-competitive prices attributable' to the plaintiff's theory of harm" (citations omitted)).

9    **B.    Advertisers Cannot Avoid Their *Comcast* Problem By Tying Damages To**

10    **Monopoly Maintenance Instead Of The Challenged Acts**

11    Advertisers attempt to paper over their damages model's weaknesses by asserting that it

12    calculates the damages deriving "from Meta's unlawful monopoly," Mot. 22, and the challenged

13    conduct's alleged "████████████████████████████████," Williams Rep.

14    ¶59. Williams concededly has no opinion about ████████████████████████████

15    ████████████████. Ex. 2, Williams 6/24 Tr. 58:21-59:9. Instead, he "████████████

16    ████████████████████████████." Ex. 1, Williams 9/23 Tr. 60:6-61:2.

17    And he claims that his focus on the alleged *monopoly's* effects (rather than the conduct's) gives

18    Advertisers a get-out-of-*Comcast*-free card if any of their theories are rejected later. *See id.* at 55:5-

19    56:9 ("████████████████████████████████████████████

20    ████████████████████████████████████████████████").

21    Although tying their damages to the alleged monopoly itself inflates Advertisers' potential

22    recovery and avoids the more rigorous economic analysis required to calculate damages, there is

23    a critical flaw in this approach: antitrust law prohibits Advertisers from calculating the price

24    difference attributable to Meta's alleged monopoly power rather than to the specific challenged

25    conduct at issue in this suit. "'The mere possession of monopoly power, and the concomitant

26    charging of monopoly prices, is not only not unlawful; it is an important element of the free-market

27    system.'" *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137 (9th Cir. 2022). As a result,

28    antitrust plaintiffs are entitled solely to the "damages attributable to [the] monopolizing conduct"

**PUBLIC REDACTED VERSION**

1   they challenge, not to any and all damages stemming from the monopoly itself. *Image Tech. Servs.,*

2   *Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1224 (9th Cir. 1997). That is black-letter antitrust law,

3   reinforced by *Comcast*'s requirement that a plaintiff's damages model "must measure only those

4   damages attributable to" the plaintiffs' theory of liability. *Comcast*, 569 U.S. at 35. Therefore, "the

5   true measure of damages" in a monopoly maintenance case "is the price increment caused by the

6   anticompetitive conduct that … augmented the monopolist's control over the market"—not the

7   price increment stemming from the monopoly itself. *Berkey*, 603 F.2d at 297; *see also Los Angeles*

8   *Memorial Coliseum*, 791 F.2d at 1370 (discussing *Berkey* rule approvingly). "[A] purchaser may

9   recover only for the price increment that 'flows from' the distortion of the market caused by the

10  monopolist's anticompetitive conduct"—that is, Advertisers may *not* recover "the entire excess of

11  [Meta's] price over" a non-monopoly price just because (allegedly) Meta's "power has merely

12  been supplemented by improper conduct." *Berkey*, 603 F.2d at 297-98.

13       But that is precisely what Advertisers seek to do—they claim an entitlement to all the

14  asserted damages resulting from Meta's alleged monopoly, just because the challenged conduct

15  allegedly had "████████████████████████████████████████" Williams Rep.

16  ¶59. "[E]ven assuming," as Williams does, that Meta's supposed price increases were "to some

17  extent caused by" the challenged conduct, he concededly "made no attempt to show what *part* of

18  the increase was caused by" that conduct. *Allegheny Pepsi-Cola Bottling Co. v. Mid-Atl. Coca-*

19  *Cola Bottling Co.*, 690 F.2d 411, 415 (4th Cir. 1982). The problem with tying damages to a

20  monopoly, rather than to the conduct challenged, is especially acute in a monopoly maintenance

21  case like this one. That is because a monopoly maintenance case *presumes* that the monopoly

22  predated the challenged conduct—meaning that the profits gained from the monopoly cannot

23  possibly be attributed to the challenged conduct alone. Areeda ¶657 ("[T]he consumer's injury

24  results only from the *increment* in price that results from the unlawful monopolization[.]").

25       Advertisers' monopoly-based (rather than conduct-based) approach to damages would

26  permit them to recover for theories of liability this Court has already held are time-barred and thus

27  unavailable to the class—in other words, to do *exactly* what *Comcast* prohibits. Namely,

28  Advertisers previously alleged claims based on Meta's acquisition of Instagram and WhatsApp

**PUBLIC REDACTED VERSION**

1   (First Am. Compl., Dkt. 391 ¶¶246-301) and based on Meta's 2015 changes to its Platform policies

2   and data sharing practices (*id.* ¶¶119-221). The parties ultimately agreed those claims were time-

3   barred, and the Court held Advertisers could not "seek damages for" that conduct. Dkt. 396 at 2.

4       But Advertisers have never retreated from the position that those actions contributed to

5   Meta's alleged monopoly—indeed, their class certification motion *opens* with a discussion of how

6   Meta's acquisitions of Instagram and WhatsApp "bolstered" its "acqui[sition] of a monopoly in

7   social advertising." Mot. 1. And when Advertisers recounted Meta's supposedly anticompetitive

8   " ████████ " in their interrogatory responses during fact discovery, they emphasized the role

9   Meta's Platform Policies supposedly played in cementing Meta's market power. *See* Ex. 13 at 89-

10  91. As Advertisers see it, that conduct—for which Advertisers concededly have *no* right to

11  recover—played a critical role in cementing Meta's alleged monopoly. And because Advertisers'

12  damages figure calculates the entire overcharge stemming from Meta's alleged monopoly, it seeks

13  damages for this pre-limitations conduct for which Advertisers cannot recover—that is, it measures

14  damages unmoored from Advertisers' remaining theories of liability.

15      This Court has already warned Advertisers that they "will be held to" their promise not to

16  seek damages for actions outside the limitations period. Dkt. 396 at 2 ("[T]he advertisers stated

17  that they will not seek damages for … 'any pre-limitations period conduct.' Facebook has no

18  substantive concerns about this representation, and the advertisers will be held to it." (citations

19  omitted)). *Comcast* does not permit Advertisers to now circumvent that order by hitching their

20  damages case to Meta's alleged monopoly instead of to the actual conduct they challenge.

21  **III.   THE NAMED PLAINTIFFS ARE ATYPICAL AND INADEQUATE CLASS REPRESENTATIVES**

22      A "material difference between the sophistication of a class representative and that of

23  absent class members supports denying certification." *IntegrityMessageBoards.com v. Facebook,*

24  *Inc.*, 2021 WL 3771785, at *8 (N.D. Cal. Aug. 24, 2021) (noting that the class representatives

25  lacked the "degree of preexisting marketing experience" that "many" of the proposed class of

26  Facebook advertisers did). That is precisely the situation here.

27      The named plaintiffs—who include a real estate agent and musician (Mark Berney, and his

28  LLC "406 Property Services"), a wine review website (Affilious, plaintiff Jessyca Frederick's

**PUBLIC REDACTED VERSION**

1   business), the owner of a small-town barbershop who doubles as a self-publishing joke book author

2   (Mark Young), and a resident advertising free concerts in her neighborhood (Kathy Looper)—are

3   not experienced advertising professionals. And, to their credit, they freely admit they do not

4   understand the range of options available to advertisers. Mark Berney testified, "█████████████

5   ████████████████████████████████████████████████████████████████████████████████

6   ████████████. Ex. 14, Berney Tr. 169:17-25, 176:12-20. Mark Young acknowledged that ███

7   ████████████████████████████████████████████████████████████████████████████████

8   ███████ Ex. 15, Young Tr. 34:12-35:11. Jessyca Frederick's business Affilious, Inc. █████

9   ████████████████████████████████████████████████████████████████████████████████

10   ███████████████████████████████████████████. Ex. 4, Frederick Tr. 78:8-79:15,

11   157:25-158:5. Kathy Looper █████████████████████████████████████████████████████

12   ███████████████████████████████████. Ex. 16, Looper Tr. 78:4-7, 80:6-16.

13        These named plaintiffs are all small advertisers whose limited, discrete ad purchases pale

14   in comparison to sophisticated, large-scale advertisers running continuous campaigns across Meta

15   and the wide range of available alternatives. *See* Ex. 17 at 35. They cannot represent tens of

16   millions of diverse advertisers, who differ greatly in terms of marketing experience, marketing

17   objectives, and marketing interests. Even more so because they cannot show that they (or others)

18   lacked alternatives to Meta, because they have no concept of what those alternatives may be. That

19   contrasts sharply with more sophisticated buyers who were aware of—and took advantage of—

20   ample alternative options to Meta for purchasing advertising. Indeed, such buyers not only had

21   alternatives to Meta's offerings, but some were able to negotiate bespoke pricing agreements from

22   Meta—something the named plaintiffs presumably would not have even contemplated. *See* Ex. 3,

23   Tucker Rep. ¶71 (discussing bespoke pricing agreements with, among others, ████████████

24   ██████████████████████). The named plaintiffs are simply too dissimilar in size and

25   sophistication from huge swathes of the class to make them appropriate class representatives. *See*

26   *Singh v. Google LLC*, 2022 WL 94985, at *9 (N.D. Cal. Jan. 10, 2022) ("large disparity in size

27   and sophistication of [named plaintiff] and the members of the proposed class represents an

28   adequacy problem" where plaintiff sought "to represent … advertisers who spend amounts of

Case 3:20-cv-08570-JD   Document 802   Filed 06/21/24   Page 30 of 31

PUBLIC REDACTED VERSION

money that are orders of magnitude higher *per month* than he spends *per year*"); *see also In re Facebook, Inc., PPC Advert. Litig.*, 282 F.R.D. 446, 454 (N.D. Cal. 2012) ("interests of [the named plaintiffs] are different than those of other class members" which included a "diverse group" of "large sophisticated corporations, as well as individuals and small businesses").

That difference is especially salient given the facts of this case—it is implausible to presume that a named plaintiff who did not shop around, plan his or her campaign in a sophisticated way, or track the effectiveness of his or her advertising ultimately paid a similar overcharge compared to a firm that carefully considered and monitored its approach to advertising. And it is equally implausible for the named plaintiffs to seek to represent firms of that sort.

The extraordinary gulf between the knowledge, objectives, and interests of the named plaintiffs and the class they seek to represent further illustrates the problem with trying this case as a class action. If *these* advertisers felt like they had no alternative to advertising on Meta and felt that the end result was unsatisfactory, they can pursue these idiosyncratic views on their own accord. The Clayton Act's attorneys' fee shifting provision and the availability of treble damages incentivizes them to do so. But permitting them to proceed with this case as a class action risks a serious "denial of due process to the absent class members." *Burkhalter Travel Agency v. MacFarms Int'l, Inc.*, 141 F.R.D. 144, 154 (N.D. Cal. 1991). That danger is especially pronounced because those absent class members include advertisers who know, value, and derive great benefit from precisely the sort of advertising improvements challenged in this case. *See supra* I.A.2. Where named plaintiffs "claim to have been harmed by the same conduct that benefitted other members of the class[,] … the named representatives cannot 'vigorously prosecute the interests of the class.'" *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003). Many absent class members have little interest in seeing valuable Meta features threatened or punished to enrich plaintiffs with whom they have nothing in common, let alone those plaintiffs' lawyers.

**CONCLUSION**

The Court should deny Advertisers' motion for class certification. And because Advertisers have now had two attempts to prove their claims meet the requirements for class certification yet still failed to do so, their motion should be denied with prejudice.

No. 3:20-cv-08570-JD                        -25-                    META'S OPPOSITION TO ADVERTISERS'
                                                                      CLASS CERTIFICATION MOTION

**PUBLIC REDACTED VERSION**

Dated:  June 21, 2024

Respectfully submitted,

By: */s/ Sonal N. Mehta*
    Sonal N. Mehta (SBN 222086)

WILMER CUTLER PICKERING HALE
AND DORR LLP
*Attorney for Defendant Meta Platforms, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of June 2024, I electronically transmitted the public redacted version of the foregoing document to the Clerk's Office using the CM/ECF System and caused the version of the foregoing document filed under seal to be transmitted to counsel of record by email.

By:     */s/ Sonal N. Mehta*
        Sonal N. Mehta