**PUBLIC REDACTED VERSION**

| | |
|---|---|
| WILMER CUTLER PICKERING HALE AND DORR LLP | ARI HOLTZBLATT (SBN 354631)<br>  Ari.Holtzblatt@wilmerhale.com |
| SONAL N. MEHTA (SBN 222086)<br>  Sonal.Mehta@wilmerhale.com<br>2600 El Camino Real, Suite 400<br>Palo Alto, California 94306<br>Telephone: (650) 858-6000 | MOLLY M. JENNINGS (*pro hac vice*)<br>  Molly.Jennings@wilmerhale.com<br>2100 Pennsylvania Ave NW<br>Washington, DC 20037<br>Telephone: (202) 663-6000 |
| DAVID Z. GRINGER (*pro hac vice*)<br>  David.Gringer@wilmerhale.com<br>ROSS E. FIRSENBAUM (*pro hac vice*)<br>  Ross.Firsenbaum@wilmerhale.com<br>RYAN CHABOT (*pro hac vice*)<br>  Ryan.Chabot@wilmerhale.com<br>PAUL VANDERSLICE (*pro hac vice*)<br>  Paul.Vanderslice@wilmerhale.com<br>7 World Trade Center<br>250 Greenwich Street<br>New York, New York 10007<br>Telephone: (212) 230-8800 | MICHAELA P. SEWALL (*pro hac vice*)<br>  Michaela.Sewall@wilmerhale.com<br>60 State Street<br>Boston, Massachusetts 02109<br>Telephone: (617) 526-6000 |

*Attorneys for Defendant Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>    v.<br><br>META PLATFORMS, INC., a Delaware Corporation,<br><br>                    Defendant. | Case No. 3:20-cv-08570-JD<br><br>**DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY AND OPINIONS OF NICHOLAS ECONOMIDES**<br><br>Hearing Date: To Be Determined<br>Time: To Be Determined<br>Judge: Hon. James Donato |

**PUBLIC REDACTED VERSION**

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ........................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ...............................................................1

BACKGROUND ..........................................................................................................................2

ARGUMENT ................................................................................................................................4

I.   ECONOMIDES'S OPINIONS ON CLASSWIDE INJURY AND DAMAGES ARE INADMISSIBLE JUNK SCIENCE .................................................................................4

   A.   Economides's Prediction That Common Evidence Could Show Meta Would Pay All Users a Flat Monthly Rate Is Junk Science—Not The Product Of Reliable Principles And Methods ...........................................................4

   B.   Economides's Calculation That Meta Would Have Paid All Class Members $5 Per Month Is Junk Science Not Reflecting Reliable Principles And Methods ..................................................................................................8

II.  ECONOMIDES'S ATTEMPT TO DEFINE A PSNS MARKET SHOULD BE EXCLUDED ..............10

   A.   Economides Uses No Accepted Method to Define His PSNS Market ..................10

   B.   Economides's So-Called SSNIP/SSNDQ Test Is Not A Reliable Application Of The Hypothetical Monopolist Test ................................................13

CONCLUSION ...........................................................................................................................15

**PUBLIC REDACTED VERSION**

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Adams v. A/S (In re Incretin-Based Therapies Prods. Liab. Litig.)*,
    2022 WL 898595 (9th Cir. Mar. 28, 2022) ................................................................................12

*Avila v. Willits Env't Remediation Tr.*,
    633 F.3d 828 (9th Cir. 2011) ....................................................................................................11

*Bakst v. Community Memorial Health Sys., Inc.*,
    2011 WL 13214315 (C.D. Cal. March 7, 2011) .........................................................................4

*Carnegie Mellon Univ. v. Hoffman-LaRoche, Inc.*,
    55 F. Supp. 2d 1024 (N.D. Cal. 1999) .......................................................................................8

*Claar v. Burlington N. R.R. Co.*,
    29 F.3d 499 (9th Cir. 1994) ......................................................................................................12

*Coronavirus Rep. v. Apple Inc.*,
    2021 WL 5936910 (N.D. Cal. Nov. 30, 2021) .........................................................................11

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) ..............................................................................................................1, 8

*Epic Games, Inc. v. Apple Inc.*,
    559 F. Supp. 3d 898 (N.D. Cal. 2021), .................................................................................. 14

*Falcon v. State Farm Lloyds*,
    2014 WL 2711849 (W.D. Tex. June 16, 2014) ........................................................................11

*In re Google Play Store Antitrust Litig.*,
    2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) ..................................................................4, 7, 8

*Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*,
    416 F.2d 71 (9th Cir. 1969) .......................................................................................................4

*Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
    588 F.3d 908 (6th Cir. 2009) ...................................................................................................15

*In re Live Concert Antitrust Litig.*,
    863 F. Supp. 2d 966 (C.D. Cal. 2012) ..........................................................................9, 10, 12

*Martinez v. Rabbit Tanaka Corp.*,
    2006 WL 5100536 (S.D. Fla. Jan. 6, 2006) .............................................................................10

*McGlinchy v. Shell Chem. Co.*,
    845 F.2d 802 (9th Cir. 1988) .....................................................................................................4

*Muffett v. City of Yakima*,
    2012 WL 12827492 (E.D. Wash. July 20, 2012)..................................................................8

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
    20 F.4th 466 (9th Cir. 2021) ...............................................................................................13

*Rodriguez v. Google LLC*,
    2024 WL 38302 (N.D. Cal. Jan. 3, 2024)...........................................................................14

*Shannon v. Crowley*,
    538 F. Supp. 476 (N.D. Cal. 1981) ....................................................................................10

*Sonneveldt v. Mazda Motor of Am., Inc.*,
    2023 WL 2292600 (C.D. Cal. Feb. 23, 2023)....................................................................13

*Sumotext Corp. v. Zoove, Inc.*,
    2020 WL 6544410 (N.D. Cal. Nov. 6, 2020) .....................................................................15

*Teradata Corp. v. SAP SE*,
    570 F. Supp. 3d 810 (N.D. Cal. 2021) ...............................................................................11

*United States v. Adams*,
    444 F. Supp. 3d 1248 (D. Or. 2020) ..................................................................................10

**STATUTES, RULES, AND REGULATIONS**

Fed. R. Evid. 702 ..........................................................................................................................1

**OTHER AUTHORITIES**

Areeda & Hovenkamp, *Antitrust Law* (2023)........................................................................8, 14

**PUBLIC REDACTED VERSION**

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on a date and time to be set by the Court, Defendant Meta Platforms, Inc. will move to exclude the opinions of Dr. Nicholas Economides.

Pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Meta respectfully requests that the Court exclude the "Abridged Expert Declaration of Nicholas Economides, Ph.D." in its entirety and any opinions or testimony drawn therefrom.

**MEMORANDUM OF POINTS AND AUTHORITIES**

Platforms that compete for user time and attention do not pay users for consuming or engaging with content. Many services charge users for viewing content, while others, like Meta, offer the content free of charge and make money by selling ads. Yet to certify the proposed class, Users must demonstrate that, in a but-for-world, Meta would pay hundreds of millions of people a uniform monthly fee for enjoying content they willingly seek out on Facebook. They assert Meta would do so with no impact on user or advertiser behavior, the platform experience, or Facebook's many competitors. For this foundational point, Users' class certification bid rises and falls (and in this case, falls) with Nicholas Economides's opinions. According to him, Meta (and Meta alone) would have paid its users a flat, fixed amount of $5 per month (for a total of $52.8 billion before trebling) but for maintaining a monopoly through scattered statements over a twelve-year period about its data practices that even he admits had nothing to do with Meta's success. Ex. 1, Economides 3/24 Tr. 231:4-21; Dkt. 794-2, Economides Rep. ¶94 (hereinafter "Rep.").[1] His opinion reduces to the assertion that Meta would have undergone a massive transformation in its business model, never undertaken by any firm similarly positioned. All because users—who receive robust privacy disclosures and agree to terms of service with Meta that set forth its data practices—would have fled to MeWe or Google+ if Meta's executives had not made certain statements in interviews or blog posts or the like.

---

[1] Citations to the Economides Report reference Dkt. 794-2 filed with Users' class certification motion. Unless otherwise noted, 'Ex.' citations reference exhibits to the Gringer Declaration filed herewith, emphasis is added, and objections are omitted for deposition citations.

**PUBLIC REDACTED VERSION**

1  These opinions are textbook junk science and should be excluded. Economides offers no reliable underpinning for this speculation about a common antitrust injury and damages. No regression analysis, no mathematical formula, and no reliable economic methodology. Instead, the bases for Economides's opinions are ▆▆▆▆▆▆▆▆▆▆ He also points to Meta's payment of participants in certain *market-research programs* that offer no independent value to their (limited, invited) participants. He admits that these market-research programs are different in kind from Facebook. And he also admits that he cannot identify a service that has ever paid users for consuming or engaging with content as he speculates would uniformly happen in the but-for world.

That leaves Economides's market definition opinion, which is similarly unmoored to sound economic analysis. He claims that Meta is a monopolist in a contrived "Personal Social Network Market" (PSNS) based on his subjective (and shifting) impressions of the "▆▆▆▆▆▆" for various platforms he admits he does not use or understand. He supports this supposed market with an unrecognizable hypothetical monopolist test that features no reliable evidence of a change in usage and no price increase at all. He then attributes revenue earned from non-PSNS aspects of Facebook in a separate *advertising* market he did not analyze to the *user* PSNS market on which he opines. This unreliable *ipse dixit*, like the rest of his opinions, contributes nothing to the issues relevant at class certification and should be excluded.

**BACKGROUND**

Economides's central opinion is that in a but-for world with unspecified additional competition, Meta's only "▆▆▆▆▆▆▆▆" response "▆▆▆▆▆▆▆▆▆▆▆▆" by paying them to use Facebook. Rep. ¶¶60, 113. To substantiate a claimed common antitrust injury and damages, he then opines that Meta would have paid every active Facebook user during the four-year class period a uniform $5 per month. *Id.*, ¶94. He does not arrive at this "▆▆▆▆▆▆▆▆" by looking to firms that he alleges compete with Facebook, or to platforms that (like Facebook) attract users with engaging content or even connect users to one another. *Id.*, ¶¶86, 99. Instead, Economides relies on market research programs that have paid their participants for the installation and maintenance of tracking apps on their devices. *Id.*, ¶105.

**PUBLIC REDACTED VERSION**

1  Economides opines that Meta would have offered this flat compensation market-wide, rather than
2  evaluating payment on a user-by-user basis or setting any criteria before payment was made. *Id.*, ¶77.
3        Economides claims that Meta would have made these payments absent its monopoly over
4  a "PSNS" market, which he defines by reference to his personal impressions of various apps,
5  despite having no expertise in the space. He started with Facebook and identified what he
6  subjectively considers to be the service's "▮▮▮▮▮▮▮": "▮▮▮▮▮▮▮▮▮▮▮▮▮▮
7  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." Rep. ¶25. Economides has never
8  explained which features of Meta's apps serve this use case and are thus in his PSNS market,
9  though he asserts that some aspects of Facebook and Instagram are not PSNS. *See, e.g., id.*, ¶46
10  (users of Facebook and Instagram may utilize the service for "▮▮▮▮▮▮▮▮▮▮▮
11  ▮▮▮▮▮▮."). This indeterminate "▮▮▮▮▮▮" replaces the "▮▮▮▮▮▮
12  ▮▮▮▮▮▮" he relied on in his last report, Ex. 2, Merits Rep. ¶28, and both ways of defining
13  the purported market focus on different features than his initial class certification report, Ex. 3,
14  Economides 9/23 Tr. 202:24-205:10. Explaining the prior shift, Economides testified, "Well, I
15  don't quite recall all the analysis I did." Ex. 1, Economides 3/24 Tr. 58:16-59:1. Asked "if there
16  were particular characteristics that [he] considered" but rejected, he admitted that he did not record
17  what he considered. *Id.* at 62:6-22. That leaves only Economides's conclusion that this PSNS
18  market includes certain unspecified aspects of Facebook, Instagram, Snapchat, Google+, and
19  MeWe (and excludes other unspecified features or use cases) based on his say-so—as someone
20  who is not an expert on social apps and doesn't even use these apps—about what he believes the
21  "▮▮▮▮▮▮" was during the class period. Rep. ¶27.
22        To support his qualitative analysis of the relevant market, Economides purports to conduct
23  a hypothetical monopolist test by way of a "reverse" SSNIP test, also characterized as a "small but
24  significant decrease in quality," or SSNDQ. Rep. ¶¶22, 33-40. Rather than using changes in the
25  dollar price charged by firms in the candidate PSNS market (they are all free), he relies on ▮▮▮
26  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ He
27  asserts that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ was unprofitable for Facebook and Snapchat,
28  acknowledges this is because of a loss in revenue from advertisers across both PSNS and non-

**PUBLIC REDACTED VERSION**

PSNS parts of Facebook, and yet uses the event to try (in his view) to establish a user-side market with no analysis of the advertising market. Notably, in observing this same revenue reduction, the putative expert for the Advertiser class ██████████████████████████████████ ████████████████. Dkt. 795-19, Williams Rep. ¶¶89, 108. Economides never even considers the possibility.

## ARGUMENT

### I.  ECONOMIDES'S OPINIONS ON CLASSWIDE INJURY AND DAMAGES ARE INADMISSIBLE JUNK SCIENCE

Economides's speculation that Meta would have paid people billions of dollars to use Facebook but for the alleged conduct—the purportedly common antitrust injury and entire premise for his subsequent "damages" model—is not serious economic science. The Court should exclude this opinion.

#### A.  Economides's Prediction That Common Evidence Could Show Meta Would Pay All Users a Flat Monthly Rate Is Junk Science—Not The Product Of Reliable Principles And Methods

Citing no historical precedent or economic principle, Economides opines that Meta would necessarily respond to additional competition by compensating users "█████████████████ ███████████████" Rep. ¶60. But opining on the but-for world is not a license for fantasy. Courts thus exclude opinions that rely on "wholly speculative assumptions that make [the expert's] opinions ipse dixit unsuitable for admission at trial." *In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *9 (N.D. Cal. Aug. 28, 2023) (Donato, J.); *see also Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 88 (9th Cir. 1969) (damages opinion should have been excluded because the underlying assumption was "essentially speculative" and "could be very misleading to the average juror"); *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807 (9th Cir. 1988) (affirming exclusion of opinion that "rests on unsupported assumptions" and "has scant basis in the record"); *Bakst v. Community Memorial Health Sys., Inc.*, 2011 WL 13214315, at *19-20 (C.D. Cal. March 7, 2011) (excluding expert's damages calculation "based on factual assumptions that are entirely unsupported in the record"). That is the case here.

**PUBLIC REDACTED VERSION**

1  Economides's imagined compensation regime first ignores entry and market participation in his own alleged market. Facebook competes for user time and attention, as Economides concedes. Ex. 1, Economides 3/24 Tr. 20:16-21:2 ("Facebook would like users to spend time there. This is definitely one of the objectives."). Facebook and similar platforms do this by providing services that users value, a fact that ▮▮▮▮▮▮▮▮▮▮▮ and Economides recognize. Ex. 4, M. Klein Tr. 294:23-295:5; Ex. 5, Grabert Tr. 325:5-327:6; Ex. 6, Kupcho Tr. 53:13-21, 54:4-10, 109:20-110:3; Ex. 3, Economides 9/23 Tr. 71:9-12. So when Snapchat began capturing attention with a Stories feature, Meta did not respond by offering users $5 per month to keep using Facebook. It instead created its own version of Stories with new and engaging features. When TikTok emerged, Meta did not offer all users $5 per month to keep using Facebook. It created Reels (and Snap created Spotlights and YouTube created Shorts) to offer users short-form video. And Snap and TikTok themselves did not compete *with Meta* by offering to pay all of their users. Like Meta, they competed by innovating. As Economides admits, no attention platform has ever responded to competition by paying all its users. Ex. 1, Economides 3/24 Tr. 255:12-23 ("I haven't identified any platforms that pay everybody."). None, including those in the putative PSNS market, pays users for so-called "data collection and use." Courts exclude opinions like this one that have "no visible factual support," *Google Play Store*, 2023 WL 5532128, at *9, and the Court should do so here.

With no real-world support for his conclusions, Economides falls back on inapposite market research programs. Two are from Meta: Study and Research. Unlike Facebook and Instagram, these programs do not offer engaging content or functionality to allow users to communicate. Instead, they offer compensation to attract (quite limited, invite-only) participation in market research that obtains data Meta does not otherwise access through the Facebook or Instagram apps. *See* Ex. 7, Ben-Zedeff, Introducing Study from Facebook, Meta (June 11, 2019); Ex. 8, Background for Ben-Zedeff's 30(b)(6) Deposition. Economides admits that the data Meta collects from Study "is about use of other apps, not Facebook apps," including what "other apps that users may have, what features they use, how much time they spend on them, the type of device

**PUBLIC REDACTED VERSION**

they're using and so on." Ex. 3, Economides 9/23 Tr. 159:1-11. Research collected similar information. *Id.* at 159:22-160:5.

It makes sense then that Meta paid participants to provide this data, because Meta "by creating these programs, was trying to find *extra* data that might be useful to it," i.e., data it cannot already obtain through Facebook or Instagram. Ex. 3, Economides 9/23 Tr. 160:15-23 But programs that do not provide value to users and have relatively few participants say nothing about whether Meta would ever compensate *all* Facebook users. Indeed, *every* app Economides considered compensates people to participate in market research (███████). Rep. ¶104, App. A. None are ad-supported businesses. None pay people to use a service or offer them a service at all—or provide independent value such as entertainment or communication. Simply put, none are anything like Facebook, Instagram, Snapchat, or even MeWe. These fundamental differences from Economides's but-for world preclude their use as reliable benchmarks.[2]

Economides also makes passing reference to grocery store discount programs and American Express rewards. Rep. ¶65. The former, by Economides's own description (and common sense), do not involve payments to customers. *Id.* And Economides makes no effort to explain how "█████████████████████████████████████████" would be probative of Meta's conduct in the but-for world. *Id.* Indeed, both examples involve rewards for taking discrete actions (making purchases). But Economides says Meta would not require users "█████████████████████████████" in the but-for world to obtain compensation, and asserts that programs requiring such actions are unreliable comparators. *Id.*, ¶ 100.

Apart from these inapposite benchmarks, Economides points to █████████████ ██████████████████████████████████████████ Rep. ¶¶71-75. As this Court correctly observed, "just because" Meta considered a proposal does not "mean[] it's in any way realistic." June 22, 2023 Hr'g Tr. 22:2-6. And when "███████████████████████████████

---

[2] In opining that Meta would pay all active users, Economides also cites Viewpoints, through which Meta pays select participants for "████████████████████████████████████." Rep. ¶68 n.125. As even Economides acknowledges, programs like Viewpoints that pay people to do tasks provide no evidence of how Meta would treat all Facebook users in the but-for world. *Id.*; *see also id.* ¶100 (excluding Viewpoints and other programs requiring participants "█████ █████████" from yardstick analysis).

1  " of " ███████ ," Meta never " ███████ " because the company " ███████
2  
3  ███████ ," Ex. 9, Zuckerberg Tr. 52:9-23, with executives calling it " ███████ " and " ███████
4  ███████ " Ex. 10, Baser Tr. 270:4-272:11. Joseph Farrell, Users' other potential economist, has
5  already explained why these proposals made no sense: paying a "negative price" would lead to
6  people joining Facebook for the cash, not authentic engagement. Ex. 11, Farrell Tr. 272:10-273:8
7  ("███████
8  ███████
9  ███████
10 ███████.").

11  Economides gives no reason why Meta's longstanding and absolute opposition would
12 suddenly evaporate in the but-for world. His only "analysis" is that Meta did not previously adopt
13 such proposals because it "███████." Rep. ¶76. But "[w]hy any of this might be true is not
14 said," *Google Play Store*, 2023 WL 5532128, at *9, and Economides saw no need to do any
15 "feasibility study." Ex. 1, Economides 3/24 Tr. 284:1-7.

16  At this point, any real-world observer would find it "intuitively obvious" that Meta would
17 not pay all its users. *Google Play Store*, 2023 WL 5532128, at *7. Economides, however,
18 "guarantee[s]" not only that Meta would have done so, but that compensation would be to all users
19 at a flat monthly rate. Ex. 3, Economides 9/23 Tr. 102:14-20. Again, nothing in the record supports
20 Economides's speculation of a common injury. ███████
21 ███████
22 ███████
23 ███████. Ex. 12, PX-2254, PALM-013818575 at 627 (cited at Rep. ¶71). Indeed, before he
24 started working on this case, Economides explained why any negative pricing would not be
25 universal: "[u]sers vary widely on the value they place on privacy and in the value of their personal
26 information to the platforms. Therefore, in a competitive market for personal information, some
27 users would participate, and others would not. Transaction prices … would also vary and likely be
28 individually negotiated between the platform and the user." Ex. 13, Nicholas Economides &

Ioannis Lianos, *Giving Away Our Data for Free is a Market Failure*, Promarket (Feb. 1, 2021), https://www.promarket.org/2021/02/01/free-data-market-failure-digital-platforms/.

Altogether, Economides's foundational proposition that Meta would have paid every active user—the only means Users offer to prove classwide antitrust injury—is classic junk science: a conclusion with no basis in the record or reality. This *ipse dixit* opinion divorced from real-world facts has "no real analysis or data" to support it, *Google Play Store*, 2023 WL 5532128, at *9-10, and is precisely what the *Daubert* standard is designed to weed out, *see Carnegie Mellon Univ. v. Hoffman-LaRoche, Inc.*, 55 F. Supp. 2d 1024, 1034-35 (N.D. Cal. 1999) (excluding testimony of expert for "failing to address and exclude alternative explanations for the data" and "selectively examining only portions of the data").

**B.   Economides's Calculation That Meta Would Have Paid All Class Members $5 Per Month Is Junk Science Not Reflecting Reliable Principles And Methods**

Economides arrives at the common amount users would be paid—$5 per month, for every active user—in an equally unreliable way. This time, Economides uses what he calls a "yardstick" study. It is hornbook law that the "reliability of the yardstick approach is based on the comparability of that yardstick to the business (or proposed business) involved in the litigation." *Muffett v. City of Yakima*, 2012 WL 12827492, at *3 (E.D. Wash. July 20, 2012). But if "important differences" are "beyond adjustment," then the yardstick approach "will have to be abandoned." Areeda & Hovenkamp, *Antitrust Law*, ¶395b3 (2023).

Economides fails this test too, selecting comparator firms bearing no resemblance to those in the candidate market, while ignoring countless other firms that are much closer to Meta, such as TikTok, X (Twitter), YouTube, or Pinterest. All of those companies, of course, pay users nothing. But instead of looking first to identify *comparable businesses*, Economides asked his staff to presume the desired conclusion and "look around for *payment for data* and find information, present it to me, and then myself, together with them, decided on these particular yardsticks." Ex. 3, Economides 9/23 Tr. 166:17-22. This approach—Economides's ex post attempts to cloak it in objectivity notwithstanding, Rep. ¶98—was concededly designed to find yardsticks with totally dissimilar business models from Facebook. A principal criterion was identifying firms with "█

**PUBLIC REDACTED VERSION**

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." *Id.*, ¶99. Facebook, though, does provide valuable and engaging services to users, as Economides admits. Ex. 3, Economides 9/23 Tr. 71:9-12 (agreeing that "in the real world, Facebook and Instagram offer their users valuable content").

All of the proposed yardsticks, moreover, are available only to limited, select participants—often by invitation only—and many then close once they reach certain quotas, because further participants' information would provide diminishing returns. *See, e.g.*, Ex. 14, Amazon, *Join the Amazon Shopper Panel* ("The Amazon Shopper Panel is an opt-in, invitation-only program … Space is limited."). And the information they collect, often about how people spend their time on their devices across all apps, is much broader than the information Meta can collect on or off its apps. *See, e.g.*, Ex. 1, Economides 3/24 Tr. 275:7-15 ("Q. So you just gave me an example of Google Screenwise, which collects everything on your screen. Facebook doesn't collect everything on your screen, right, you know that? A. Yes.").

Having selected yardsticks that are incomparable by design, Economides cannot use adjustments to correct for the fundamental differences between Facebook and market research firms. But he does not even try. Despite acknowledging that Facebook provides valuable services to users, Economides never incorporates this value into his damages calculation. This is important because the value per month users receive from Facebook in the actual world far exceeds the additional $5 per month payment Economides calculates they would receive in the but-for-world.[3] Nor does he adjust the $5 to account for the admittedly different types of data these programs and Facebook collect. And he never adjusts that $5 for the exponentially higher number of Facebook users compared to the research programs. He did not make any adjustments to account for these major differences at all.

Courts routinely exclude damages models where, as here, they fail to reliably apply a yardstick methodology. *See, e.g.*, *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 974-76

---

[3] In this sense among many, Economides wants to have it both ways. He treats user data as "▮▮▮▮▮" for payment but ignores the intangible benefits received as part of the equation. That is, his analysis assumes the user gets nothing today and so in getting $5 later, means the user is down $5 today. But many Facebook users get many orders of magnitude more than that in value from using Facebook today.

**PUBLIC REDACTED VERSION**

1  (C.D. Cal. 2012) (excluding yardstick study that did not account for effect of artist popularity on
2  concert ticket prices); *Shannon v. Crowley*, 538 F. Supp. 476, 480-81 (N.D. Cal. 1981) (excluding
3  yardstick study because differences between markets in San Francisco and Los Angeles made
4  firms less than "nearly identical"); *Martinez v. Rabbit Tanaka Corp.*, 2006 WL 5100536, at *14
5  (S.D. Fla. Jan. 6, 2006) (excluding yardstick study where expert identified companies "dealing
6  with similar products" rather than "nearly identical businesses"). By selecting yardsticks that are
7  admittedly dissimilar to Facebook, and failing to even attempt to account for those differences,
8  Economides's damages model is "so incomplete as to be inadmissible as irrelevant." *Live Concert*,
9  863 F. Supp. 2d at 974-76 (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 n.10 (1986)).

10  **II.    ECONOMIDES'S ATTEMPT TO DEFINE A PSNS MARKET SHOULD BE EXCLUDED**

11          Neither of the means Economides uses to define his artificially narrow PSNS market
12  reflects a recognized or even remotely reliable methodology. He invented a "[REDACTED]" for
13  PSNS, but his entirely subjective approach forecloses the possibility that "someone else not
14  associated with the case could duplicate it and get the same results." *United States v. Adams*, 444
15  F. Supp. 3d 1248, 1260 (D. Or. 2020). And Economides—who has limited familiarity with the
16  candidate market participants—is not qualified to give this opinion. He then purported to perform
17  a "reverse" SSNIP/SSNDQ test, but misapplies the methodology entirely by failing to measure
18  changes in use and relying on the market for *ad revenue* from both PSNS and non-PSNS aspects
19  of Facebook, instead of his candidate market for PSNS users.

20          **A.    Economides Uses No Accepted Method to Define His PSNS Market**

21          Economides's first method for defining his PSNS market is subjective and shifting,
22  untested and untestable. At the outset, Economides is not qualified to identify a "[REDACTED]."
23  Whatever his economic expertise, he has no technical or other expertise in mobile apps. Indeed,
24  Economides testified he could not recall all the different features of Facebook, had not used
25  Snapchat extensively in months, had not used TikTok at all, and could not identify which app had
26  which features. Ex. 3, Economides 9/23 Tr. 198:13-200:7. Economides baselessly testified that
27  YouTube and TikTok "do not have much … social interactions," "practically nobody leaves
28  comments" on them, and they are just "very much like television." Ex. 1, Economides 3/24 Tr.

1  45:11-46:4, 47:11-48:2, 49:14-50:5. And shockingly, in what would surprise any iPhone user, he
2  testified users cannot "easily and effectively" contact friends with iMessage. *Id.* at 39:12-24. His
3  uninformed, inexpert opinions about "███" app features, and thus his market definition analysis,
4  should be excluded. *See Avila v. Willits Env't Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011)
5  (excluding opinion "outside the areas of [expert's] expertise").

6  His inexperience shows in the unreliable and unreproducible method he used to arrive at
7  his "████████." When asked how someone would replicate his method, he testified, "You
8  would look at the candidate social networks. You would look at the common features they have.
9  And then you would expand the set and see, well, here is TikTok. Is it—what features does it have?
10 And should we put it in the personal social networks or not? This is kind of simple. We're not
11 talking about rocket science here." Ex. 3, Economides 9/23 Tr. 205:11-23. This "eyeballing" of
12 candidate apps, with "no documentation of his methods," "preclude[s] any assessment of the
13 accuracy of his conclusions." *Falcon v. State Farm Lloyds*, 2014 WL 2711849, at *23 (W.D. Tex.
14 June 16, 2014); *see also Teradata Corp. v. SAP SE*, 570 F. Supp. 3d 810, 838 (N.D. Cal. 2021)
15 (excluding expert's qualitative market definition approach that provided "no clear line separating"
16 firms that were in or out of the market); *Coronavirus Rep. v. Apple Inc.*, 2021 WL 5936910, at *8
17 (N.D. Cal. Nov. 30, 2021) (market definition must permit "discern[ing] what is included and what
18 is not").

19 Economides's unreliable process unsurprisingly yielded inconsistent, unreliable results. He
20 initially opined that PSNS had five key characteristics. To him, there was "no doubt" those five
21 were the right ones: "we can ask practically any employee of Facebook" and "they would say these
22 are key features of Facebook." Ex. 3, Economides 9/23 Tr. 202:24-203:12. Yet despite the
23 numerous "employee[s] of Facebook" that actually did testify in this case, Economides offered
24 nothing from the record to support that conclusion. Just four months later, the "key" characteristics
25 changed to only three, and Economides could not "recall" why. Ex. 1, Economides 3/24 Tr. 58:16-
26 59:1. And now, Economides says that PSNS is actually based on a single "████████," which
27 is "████████████████" those that were previously "███" or "██████." Rep. ¶25.
28 This ever-shifting approach to market definition fails *Daubert*'s "testability" factor, which

requires that "someone else using the same data and methods … be able to replicate the results." *Adams v. A/S (In re Incretin-Based Therapies Prods. Liab. Litig.)*, 2022 WL 898595, at *1 (9th Cir. Mar. 28, 2022). As a result, the Court has no way to ensure Economides's "conclusions were not mere subjective beliefs or unsupported speculation." *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994).

Economides then does not even reliably apply his contrived criteria to candidate firms. Take the notion that a user could only view an app as reasonably interchangeable with Facebook if that app's connections graph is "███████████." Rep. ¶25. He assesses whether this criterion is met based on the "number of connections" between users. Ex. 1, Economides 3/24 Tr. 91:13-24. Even setting aside the individualized nature of this consideration, Economides nowhere explains the methodology used to determine whether the extent of connections on an app is "██████" under his own standard. *Id.* at 88:19-91:24. His approach to TikTok is instructive. Rather than assessing that app's connections graph, he predetermined it was not in the market: "given the fact that TikTok is outside the PSNS market, discussing specifics like exactly how big TikTok is, how many users it has, how many connections, whatever, followers it has and so on, it makes—it doesn't make a difference for the determination of PSN and therefore I did not do that." *Id.* at 95:25-96:11. His two other central criteria are "█████████████████████████████" and "█████████████████████████████████████████████" Rep. ¶25. But he did not test whether TikTok or YouTube have such features. He did not measure what percentage of interactions on TikTok or YouTube were between connected versus unconnected users. *See* Ex. 1, Economides 3/24 Tr. 51:18-53:9; 70:2-23. Stunningly, he did not do so for Facebook or Instagram either. *See id.* at 53:10-54:13; 68:22-69:25. Yet Facebook and Instagram went into the market, YouTube and TikTok went out. Economides thus "impermissibly predetermined" the results by putting firms in the market until he liked what he saw. *Live Concert*, 863 F. Supp. 2d at 988. His market definition based on a supposed "██████████" is, accordingly, "hypothetical and without confirmation through either testing or real-world data," and "lacks the basis in 'objective, verifiable evidence' it needs to rise above inadmissible speculation."

*Sonneveldt v. Mazda Motor of Am., Inc.*, 2023 WL 2292600, at *12 (C.D. Cal. Feb. 23, 2023) (citing *Domingo v. T.K.*, 289 F.3d 600 (9th Cir. 2002)).[4]

### B. Economides's So-Called SSNIP/SSNDQ Test Is Not A Reliable Application Of The Hypothetical Monopolist Test

Economides seeks to support his unreliable qualitative market definition with an equally unreliable and unintelligible application of the Hypothetical Monopolist Test, based on what Economides deems a "reverse" SSNIP/SSNDQ test. To start, Economides claims that ▮▮▮▮. Rep. ¶35. But Economides does not and cannot show that this supposed decrease in effective price led to either higher usage or lower revenue in his purported market, rendering his purported test manifestly unreliable.

First, Economides presents no reliable basis to conclude that ▮▮▮▮. A reliable HMT assumes that consumers can "*respond* to a SSNIP" through their consumption habits. *See Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 482 n.1 (9th Cir. 2021). ▮▮▮▮, as Economides says, then users should respond by using Facebook more. *See* Ex. 3, Economides 9/23 Tr. 98:12-19; Rep. ¶35. To confirm this, he would need to measure whether ▮▮▮▮, controlling for other reasons (like the pandemic) why usage might have increased. But Economides never did. Ex. 3, Economides 9/23 Tr. 98:20-99:3. Instead, he ▮▮▮▮. Rep. ¶37. ▮▮▮▮ Economides also does nothing to show this ▮▮▮▮ is statistically significant, different from prior years, or even whether it was due to the introduction of popular new features, e.g., Reels. *Id.* Failing to show that usage changed

---

[4] Indeed, despite extensive evidence that Meta perceived TikTok as its most significant competitor, Economides devotes all of three sentences to explaining why it is not in the relevant market. *Compare, e.g.*, Ex. 15, PALM-DEP-00012790, Zuckerberg FTC Tr. 143:18-144:12 ▮▮▮▮ *with* Rep. ¶32.

**PUBLIC REDACTED VERSION**

1   ▮▮▮▮▮▮▮▮ leaves his "SSNIP" without reliable evidence of how consumers responded—the fundamental thing the HMT is designed to assess. Areeda ¶538 ("The profitability of a hypothetical increase in the price of a hypothetical monopolist of product *A* depends, of course, on the reactions of customers").

Second, Economides tries to "test" ▮▮▮▮▮▮▮▮ without identifying the profits actually attributable to those aspects of the platform. He instead relies on advertising sales from all of Facebook, PSNS and non-PSNS alike. Because a valid HMT must assess the profitability of product changes in the candidate market, those undifferentiated profits cannot reliably define a PSNS-only market. Indeed, Economides has done no analysis at all of the advertising market that provides his measure of profitability. Ex. 3, Economides 9/23 Tr. 114:15-24 (conceding he "did not consider in depth any details of the advertising market"). That leaves him unable to account for *any* confounding factors that would reduce ad revenues, such as changes in ad quality (▮▮▮▮▮▮▮▮), ad budgets, or increased competition from TikTok. *Id.* at 112:12-120:22. These are significant defects; the advertiser plaintiffs have, for example, submitted their own expert report ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮. *See* Dkt. 795-19, Williams Rep. ¶¶89, 108. Economides's assumption that ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ thus lacks any foundation in economic theory or the record, making his purported SSNIP test "wholly unpersuasive of substitution." *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 965 (N.D. Cal. 2021), *rev'd on other grounds*, 67 F.4th 946 (9th Cir. 2023). Courts have found comparable expert testimony that disregards differences in the tested and putative markets unreliable. *Id.* (price changes for in-app purchases "provide no insight into substitution" in an alleged iOS app market).

Economides's use of ▮▮▮▮▮▮▮▮ ▮▮▮ is also not "accepted in a relevant scientific community"—or ever recognized by a court— nor tested, peer reviewed and published, or accompanied by an accepted error rate. *Rodriguez v. Google LLC*, 2024 WL 38302, at *2 (N.D. Cal. Jan. 3, 2024). Courts exclude such unreliable

**PUBLIC REDACTED VERSION**

applications of the HMT. *See Sumotext Corp. v. Zoove, Inc.*, 2020 WL 6544410, at *7-9 (N.D. Cal. Nov. 6, 2020) (supposed "natural SSNIP test" was not "grounded in any accepted methodology for conducting a market analysis"); *Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 918-19 (6th Cir. 2009) (affirming exclusion of expert's "own version of the SSNIP test," "produced solely for this litigation."). The Court should do so here.

## CONCLUSION

For these reasons, the Court should exclude the "Abridged Expert Declaration of Nicholas Economides, Ph.D." in its entirety and any opinions or testimony drawn therefrom.

Dated: June 21, 2024

Respectfully submitted,

By: */s/ Sonal N. Mehta*
    Sonal Mehta (SBN 222086)

WILMER CUTLER PICKERING HALE AND DORR LLP
*Attorneys for Defendant Meta Platforms, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of June, 2024, I electronically transmitted the public redacted version of the foregoing document to the Clerk's Office using the CM/ECF System and caused the version of the foregoing document filed under seal to be transmitted to counsel of record by email.

By: */s/ Sonal N. Mehta*
    Sonal N. Mehta