**PUBLIC REDACTED VERSION**

WILMER CUTLER PICKERING
  HALE AND DORR LLP
SONAL N. MEHTA (SBN 222086)
  Sonal.Mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
  David.Gringer@wilmerhale.com
ROSS E. FIRSENBAUM (*pro hac vice*)
  Ross.Firsenbaum@wilmerhale.com
RYAN CHABOT (*pro hac vice*)
  Ryan.Chabot@wilmerhale.com
PAUL VANDERSLICE (*pro hac vice*)
  Paul.Vanderslice@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800


*Attorneys for Defendant Meta Platforms, Inc.*

ARI HOLTZBLATT (SBN 354631)
  Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
  Molly.Jennings@wilmerhale.com
2100 Pennsylvania Ave NW
Washington, DC 20037
Telephone: (202) 663-6000

MICHAELA P. SEWALL (*pro hac vice*)
  Michaela.Sewall@wilmerhale.com
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC., a Delaware Corporation,<br><br>Defendant. | Case No. 3:20-cv-08570-JD<br><br>**META PLATFORMS, INC.'S OPPOSITION TO USER PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF COUNSEL**<br><br>Hearing Date: To Be Determined<br>Time: To Be Determined<br>Judge: Hon. James Donato |

**PUBLIC REDACTED VERSION**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

BACKGROUND ...............................................................................................................3

ARGUMENT ....................................................................................................................5

I.    USERS' DAMAGES MODEL FAILS *COMCAST* .........................................................6

II.   ANTITRUST INJURY CANNOT BE ESTABLISHED THROUGH COMMON PROOF ......................9

    A.    Individualized Issues Predominate Because Users' Purported Injury Is Speculative And Contrary To The Record ...............................................................9

    B.    Even If Meta Would Have Paid Some Facebook Users, Whether Any Particular User Would Have Been Injured By Lack of Payment Requires An Individualized Inquiry .........................................................................13

        1.    Who might be paid is individualized ...........................................13

        2.    Whether a user would be better off or harmed in the but-for world is individualized ........................................................................16

    C.    Users Provide No Common Means To Determine Whether "Enough" Putative Class Members Were Influenced "To A Sufficient Degree" By The Alleged Deception To Harm Competition .......................................................18

III.  PARTICIPATION IN USERS' PSNS MARKET AND META'S ALLEGED MARKET POWER CANNOT BE ESTABLISHED WITH CLASSWIDE PROOF ...............................................20

IV.   THE NAMED PLAINTIFFS ARE NOT TYPICAL AND ADEQUATE REPRESENTATIVES OF THE PUTATIVE CLASS ..................................................................................22

CONCLUSION...............................................................................................................24

**PUBLIC REDACTED VERSION**

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
190 F.3d 1051 (9th Cir. 1999) ................................................................................17

*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l
Publ'ns, Inc.*,
108 F.3d 1147 (9th Cir. 1997) ................................................................................19

*In re Apple iPhone Antitrust Litig.*,
2022 WL 1284104 (N.D. Cal. Mar. 29, 2022)...................................................9, 13

*In re Arris Cable Modem Consumer Litig.*,
327 F.R.D. 334 (N.D. Cal. 2018)............................................................................23

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979)......................................................................................8

*Blades v. Monsanto Co.*,
400 F.3d 562 (8th Cir. 2005) ..................................................................................22

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017) ................................................................................12

*Burkhalter Travel Agency v. MacFarms Int'l, Inc.*,
141 F.R.D. 144 (N.D. Cal. 1991)............................................................................20

*California v. Infineon Techs. AG*,
2008 WL 4155665 (N.D. Cal. Sept. 5, 2008) .........................................................20

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013).......................................................................................... *passim*

*Dreamstime.com, LLC v. Google LLC*,
54 F.4th 1130 (9th Cir. 2022) ...................................................................................7

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ..................................................................................22

*In re Facebook, Inc., PPC Advert. Litig.*,
282 F.R.D. 446 (N.D. Cal. 2012)............................................................................24

*Garnica v. HomeTeam Pest Def., Inc.*,
230 F. Supp. 3d 1155 (N.D. Cal. 2017) ..................................................................21

*In re Google Play Store Antitrust Litig.*,
2023 WL 5602143 (N.D. Cal. Aug. 28, 2023) ..........................................................5

**PUBLIC REDACTED VERSION**

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) .........................................................................7

*In re Interest Rate Swaps Antitrust Litig.*,
  2023 WL 8675625 (S.D.N.Y. Dec. 15, 2023) ..........................................18

*Klein v. Facebook, Inc.*,
  580 F. Supp. 3d 743 (N.D. Cal. 2022) .....................................................20

*Kottaras v. Whole Foods Market, Inc.*,
  281 F.R.D. 16 (D.D.C. 2012) .....................................................................18

*Lerwill v. Inflight Motion Pictures, Inc.*,
  582 F.2d 507 (9th Cir. 1978) .....................................................................24

*Leyva v. Medline Indus. Inc.*,
  716 F.3d 510 (9th Cir. 2013) ..................................................................6, 7

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
  791 F.2d 1356 (9th Cir. 1986) .....................................................................8

*Major v. Ocean Spray Cranberries, Inc.*,
  2013 WL 2558125 (N.D. Cal. June 10, 2013) ..........................................23

*Mueller v. Puritan's Pride, Inc.*,
  2021 WL 5494254 (N.D. Cal. Nov. 23, 2021) (Donato, J.) ..................2, 6

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
  522 F.3d 6 (1st Cir. 2008) ....................................................................12, 13

*In re Nexium Antitrust Litig.*,
  777 F.3d 9 (1st Cir. 2015) ..........................................................................12

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) (en banc) ..........................................5, 6, 13

*In re Optical Disk Drive Antitrust Litig.*,
  303 F.R.D. 311 (N.D. Cal. 2014) ...............................................................14

*Postpichal v. Cricket Wireless, LLC*,
  2023 WL 3294852 (N.D. Cal. May 4, 2023) ...............................................6

*Probe v. State Teachers' Ret. Sys.*,
  780 F.2d 776 (9th Cir. 1986) .....................................................................12

*In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*,
  725 F.3d 244 (D.C. Cir. 2013) .....................................................................5

*Rodney v. Nw. Airlines, Inc.*,
  146 F. App'x 783 (6th Cir. 2005) ..............................................................21

<u>**PUBLIC REDACTED VERSION**</u>

*Ward v. Apple Inc.*,
    2018 WL 934544 (N.D. Cal. Feb. 16, 2018) ....................................................................10, 13

**STATUES, RULES, AND REGULATIONS**

Fed. R. Civ. P. 23 ................................................................................................................ *passim*

<u>**PUBLIC REDACTED VERSION**</u>

## INTRODUCTION

Users' attempt to certify a class relies on the fantasy that but for the supposedly deceptive statements they (though not their expert) contend created a monopoly, Meta would have made monthly payments to everyone who used Facebook. According to Users, "only" providing the service to users for free was therefore an "overcharge" of the hundreds of millions of people who enjoyed the real-world benefits provided by the platform. There is no support for this speculation in the law or the facts. To the contrary, it is refuted by basic economics and common sense, and Users' expert and the named plaintiffs have admitted that the foundations of this theory are false. Because Users cannot satisfy their burden under Rule 23, the Court should deny the renewed motion for class certification with prejudice.

First, Users have failed to present a damages model that "measure[s] only those damages attributable" to their theory of liability. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34-35 (2013). The premise of Users' case is that "Facebook acquired its monopoly position, and has maintained that position, through repeated misrepresentations over its data collection and use practices." Dkt. 793 ("Mot.") at 1. But Users' expert Nicholas Economides admits that "Facebook beat Myspace on its own merits," that other market participants were not "going to be successful even … without the misrepresentations," and that it was this lawfully obtained market power—not the alleged deception—that "automatically" precluded the success of platforms like Google+. Ex. 1, Economides 3/24 Tr. 229:22-231:21; 240:3-10; 250:3-25.[1] He nevertheless offers a damages model that attributes the entire "overcharge" caused by Meta's alleged monopoly power to the purported deception, making no attempt to control for the effect of market power he concedes was lawfully obtained. As a result, Users have not shown—as they must, by a preponderance of the evidence—how class damages tied to the alleged deception could be reliably determined, let alone that the challenged statements are the reason that Meta did not pay its users 52 billion dollars to use Facebook over the relevant period. That "[f]ailure to identify a feasible method for calculating

---

[1]      Unless otherwise noted, 'Ex.' citations reference exhibits to the Gringer Declaration filed herewith, emphasis is added, and objections are omitted for deposition citations. Citations to the Economides Report reference Dkt. 794-2 filed with Users' class certification motion.

**PUBLIC REDACTED VERSION**

1  damages is fatal to class certification." *Mueller v. Puritan's Pride, Inc.*, 2021 WL 5494254, at *6
2  (N.D. Cal. Nov. 23, 2021) (Donato, J.).

3  Second, Users' theory of classwide injury and damages rests entirely on the baseless
4  speculation that in a world where Facebook had made different statements about its privacy
5  policies and practices, competition would have forced Meta to invent an entirely new business
6  model: paying each of its millions of users five dollars a month in perpetuity to consume content
7  on Facebook. But no court has ever recognized the failure to pay a negative price as a viable
8  antitrust injury. No platform has ever operated this way, and the record shows Meta never would.
9  And because this injury is the only basis for certification that Users argue, the (in)adequacy of
10  Users' evidence is a threshold class certification issue—not just a merits question.

11  Regardless, this alleged injury and the claimed damages are necessarily individualized.
12  Users and Meta agree that Meta values every user differently based on their engagement with its
13  services, and that every user likewise values Meta's services differently. And all agree that Meta
14  paying every user would change Facebook in the but-for world and not universally for the better.
15  Those undisputed facts mean that individualized assessments are required to determine whether
16  any particular person would be better off in Users' but-for world, and thus suffered an injury in
17  the real one. Yet Users ignore the numerous members of the putative class who would be harmed
18  by a pay-for-use Facebook, which the evidence shows would destroy the authentic engagement
19  that attracts people to platforms like Facebook in the first place. Users also disregard that the
20  different value individual users provide to Meta means that whether it would be rational for Meta
21  to pay for their continued use turns on individualized assessments. Indeed, tens of millions of users
22  (or more) do not provide sufficient value to warrant any payment at all, and thus suffer no injury
23  from the lack of compensation. Without any reliable evidence that all members of the putative
24  class suffered an injury, much less a way to determine which ones did, Users are left with *ipse*
25  *dixit* that cannot survive the rigorous assessment of the evidence that this Court must conduct
26  before certification.

27  Third, Users provide no common means for determining which class members participated
28  in their incoherent "Personal Social Networking Services" (PSNS) market, precluding them from

-2-                    META'S OPPOSITION TO USERS'
                                                                                CLASS CERTIFICATION MOTION

demonstrating who could have been injured by Meta's supposed exercise of monopoly power in that market. According to Users' own expert, only *aspects* of Facebook and Instagram are in the PSNS market, and those that are not in the market face vigorous competition from other online platforms. But under their own theory, determining *which* aspects are PSNS turns on how and why individual users are using the services. That renders any assessment of injury necessarily individualized, because only users of Meta's PSNS services could have been affected by the challenged conduct, not all Meta users writ large. It likewise precludes assessing the time spent on PSNS functions—as Users' expert claim is required to show market power—through classwide proof.

These are only some of the defects in Users' class certification bid. Users have also offered no means of determining whether any of the tens of thousands of alleged misrepresentations contributed to the competitive conditions they credit for Meta's success, how those statements did so, or which users (if any) did not consent to the supposedly concealed data practices when agreeing to Facebook's terms of service. And even if someone could represent a class pursuing the unprecedented theory that Meta must retroactively pay users to maintain accounts they long benefited from for free, that person is not among the named plaintiffs. They used Facebook because they enjoy it, and found personalized value in it that Users never account for. They do not use Facebook because of alleged misrepresentations they cannot name and admit they never heard or saw, that concerned practices they concede were irrelevant to their decisions to join and use Facebook. So if the named plaintiffs now wish to use Facebook and be paid for it, despite having testified that the foundations of the class's theory are wrong, Rule 23 requires they do so alone.

## BACKGROUND

### I.   META ATTRACTS AND RETAINS USERS BY PROVIDING VALUABLE SERVICES FOR FREE

To compete against the numerous online platforms that offer the same services, Facebook provides a variety of valued features to its hundreds of millions of users. Ex. 2, Tucker ¶¶18-19. Like Snapchat and iMessage, for example, Facebook allows users to send messages, photos, and videos to other users. Users can post and view videos of varying lengths (including short-form videos called "Reels," *Id.*, ¶30) on Facebook, just as on YouTube, Snapchat, and TikTok.

**PUBLIC REDACTED VERSION**

Facebook also offers Groups and Events functionality, lets users create customizable profiles, provides a newsfeed that displays posts and updates from other users, a marketplace to buy, sell, and exchange goods, as well as other content, and has fundraising tools. Ex. 3, M. Klein Tr. 140:2-3, 161:4-6, 172:2-22. Through these and other aspects of the Facebook platform, users can view content from, and share content with, friends, family, people with similar interests, public figures, and organizations. *See, e.g.*, Ex. 4, Kupcho Tr. 138:19-24.

Meta provides these services for free because its business model largely turns on selling advertising, a market not raised by the Users or analyzed by their expert. An advertising platform requires attracting and retaining a broad user base with high-quality features and content, then serving useful advertisements without disrupting the user experience. This model is hardly new; it began with ad-supported newspapers nearly four hundred years ago and continues to be used by news services, television stations, magazines, and a variety of online platforms (e.g., Snapchat, TikTok, and YouTube). Ex. 2, Tucker ¶¶18, 22. Users are attracted to a platform like Facebook by the content it provides, then choose to spend their time there because of the value they receive from that content. *Id.*, ¶19. Advertisers, in turn, pay platforms to reach users attracted by such content. *Id.*, ¶ 18.

## II.   USERS SEEK TO CERTIFY A CLASS OF FACEBOOK USERS WHO THEY CLAIM WERE INJURED BY NOT BEING PAID FOR USING META'S FREE SERVICES

Users claim that misrepresentations about Meta's "data collection and use practices" are the reason it did not pay all Facebook users $5 per month. Mot. 1; Dkt. 794-2, Economides ¶¶11-12 (hereinafter, "Economides"). Users rely on the struggles or failures of Myspace, Google+, and MeWe to substantiate the anticompetitive effect of the alleged misrepresentations. Mot. 11-12. But Economides has conceded that this is not true because Meta obtained market power "on its own merits":

> Q. So … let's go back and be very clear about this. You testified a few moments ago that you believe that Facebook beat Myspace on its own merits, you'd agree with that?
>
> A. I said that, yes.
>
> Q. Okay. And you stand by that, right?
>
> A. Yes.

**PUBLIC REDACTED VERSION**

Q. And you agree that you're not suggesting that the alleged misrepresentations and omissions in this case were the cause of Myspace's decline, right?

A. That's correct.

Ex. 1, Economides 3/24 Tr. 240:3-15; *see also id.* at 229:22-231:21 (testifying other early rivals would have failed "even without the misrepresentations"). According to Economides, this initial lawful success was "the fundamental reason" later entrants like Google+ became "marginal compan[ies]." *Id.* at 248:16-249:1; *id.* at 250:3-25 (once Facebook was "a monopolist ... that automatically means that the other company like Google+ is not anymore a big competitor").

Despite these admissions, Users assert a damages model that does not distinguish between a supposed overcharge based on an alleged monopoly obtained lawfully versus an alleged monopoly resulting from the claimed deception. Rather, Users argue that their expert has presented a reliable model for assessing the amount of damages (*i.e.*, the value of the data collected and corresponding compensation) suffered by Facebook users who "maintained and used a Facebook Profile between December 3, 2016 and December 3, 2020." Mot. 2, 23-24. Largely relying on payments made by market research programs that monitor all device activity, Users say Meta would have paid every user the same five dollar amount every month. Mot. 24. They estimate total damages at $52.8 billion. *Id.*

**ARGUMENT**

Users' motion first fails because they rely on Economides's inadmissible "expert" testimony to prove a relevant market and that all Facebook users suffered an antitrust injury and damages. Mot. 21-24. For the reasons detailed in Meta's concurrently filed *Daubert* motion, Economides's opinions on these matters are junk science. If properly excluded, Users necessarily fail to meet the requirements of Rule 23. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022) (en banc) (plaintiffs bear the burden of proof at class certification); *In re Google Play Store Antitrust Litig.*, 2023 WL 5602143, at *1 (N.D. Cal. Aug. 28, 2023); *see also In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 252-53 (D.C. Cir. 2013) ("No damages model, no predominance, no class certification.").

But even if Meta's *Daubert* motion is denied, Users cannot satisfy *Comcast* or Rule 23's commonality, predominance, typicality, and adequacy requirements. Users' damages model fails

**PUBLIC REDACTED VERSION**

1   to account for their expert's concession that Facebook obtained any monopoly power through

2   lawful competition and that this market power (not deception) prevented the success of later

3   entrants. The supposed antitrust injury (failure to pay a negative price) is both speculative and

4   individualized. Whether class members participated in the proposed market and the proffered

5   means for assessing market power turn on an incoherent, individualized definition of "personal

6   social networking." And the named plaintiffs—having testified, like Economides, that Users'

7   theory of liability is wrong—are neither typical nor adequate representatives of the putative class.

8         At this stage of the litigation, Users' theory requires them to *prove* that Meta would have

9   paid *all* of its users a uniform monthly fee absent the supposed deception. *Olean*, 31 F.4th at 665.

10  Because they have not, the Court should deny the motion for certification.

11  **I.     USERS' DAMAGES MODEL FAILS *COMCAST***

12        Users' damages model does not "'measure only those damages attributable to' [their]

13  theory of liability." *Mueller*, 2021 WL 5494254, at *6 (quoting *Comcast*, 569 U.S. at 35). Users

14  "must be able to show that their damages"—using Facebook without being paid to do so—

15  "stemmed" from the specific misrepresentations and omissions they say "created the legal

16  liability," and not from some other cause. *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th

17  Cir. 2013). That is because "[t]he first step in a damages study is the translation of the *legal theory

18  of the harmful event* into an analysis of the economic impact *of that event*." *Comcast*, 569 U.S. at

19  38. Critically, the damages model may not simply "assume[] that the entire price difference of any

20  comparison product or price point was attributable" to anticompetitive conduct. *Postpichal v.

21  Cricket Wireless, LLC*, 2023 WL 3294852, at *2 (N.D. Cal. May 4, 2023).

22        Users' overcharge model embraces that fatal assumption by seeking damages based on

23  concededly lawful market power. Economides admits that Meta's initial success was "on its own

24  merits" because of a superior product. Ex. 1, Economides 3/24 Tr. 240:3-15; Ex. 5, Economides

25  9/23 Tr. 96:10-18 ("[T]he privacy settings of Facebook, despite their problems, were better than

26  the alternative, the alternative being Myspace."). When asked to confirm "that you're not

27  suggesting that the alleged misrepresentations and omissions in this case were the cause of

28  Myspace's decline," Economides could not have been clearer: "That's correct." Ex. 1, Economides

**PUBLIC REDACTED VERSION**

1   3/24 Tr. 240:11-15. He then agreed that other early rivals would have likewise failed "even without

2   the misrepresentations." *Id.* at 229:22-231:21. As to later market entrants, Economides asserted

3   that "the fundamental reason" competitors like Google+ became "marginal compan[ies]" "was the

4   achievement of Facebook as a monopoly"—after that happened, it "automatically means" a

5   "company like Google+ is not anymore a big competitor." *Id.* at 248:16-249:1; 250:3-25. In other

6   words, according to Economides, any exclusion of these later rivals followed inexorably from the

7   monopoly won on the merits, not the claimed deception.[2]

8         Economides then makes no effort to identify the "price" Meta could have charged because

9   of its lawful success. He instead assumes that every dollar Meta did not pay Facebook users must

10  be attributable to the challenged statements and omissions. Economides ¶¶109-118. But *Comcast*

11  prohibits precisely that assumption. Under *Comcast*, "plaintiffs must be able to show that their

12  damages stemmed from the defendant's actions that created the legal liability." *See Leyva*, 716

13  F.3d at 514. That is the case even when the purported overcharge is claimed to result from

14  monopoly power, because "'[t]he mere possession of monopoly power, and the concomitant

15  charging of monopoly prices, is not only not unlawful; it is an important element of the free-market

16  system.'" *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137 (9th Cir. 2022). As a result,

17  antitrust plaintiffs are entitled solely to the "damages attributable to [the] monopolizing conduct"

18  they challenge, not to any and all price increases stemming from the monopoly itself. *Image Tech.

19  Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1224 (9th Cir. 1997). Economides's analysis is

20  plainly the latter.

21        The mere assertion that the anticompetitive conduct somehow contributed to the

22  maintenance of that monopoly (Mot. 22) is not sufficient. As an initial matter, Economides has

23  disclaimed that very theory, conceding that the purported deception was not what prevented the

24  success of competitors like Google+ and MeWe. *Supra*, at 4-5; Ex. 1, Economides 3/24 Tr. 240:3-

---

25  [2]      Despite repeatedly and unequivocally reaffirming that the alleged deception had nothing

26  to do with Myspace's failure, Economides submitted a declaration under oath contradicting that

    testimony. *Compare* Economides ¶51 ("████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████████████████████████████").

28  Economides's willingness to disregard his own sworn admissions only confirms the unreliability

    of his opinions.

**PUBLIC REDACTED VERSION**

15, 248:16-249:1. Nor does Economides plausibly explain how paying people to maintain accounts even *could* maintain a monopoly, because the resulting dead or low-engagement accounts contribute nothing to the ongoing success of a platform. *Infra*, at 14, 15, 18. Google+, for example, had more than 2.5 *billion* user profiles in 2015, but failed because it could not generate engagement from that user base. Ex. 2, Tucker ¶38; *see also id.* ("[C]onvincing users to sign up for a platform is not sufficient to ensure that those users will engage with the platform"). Users have presented no evidence that paying millions of people to maintain accounts would be different.

Regardless, "the true measure of damages" in a monopoly maintenance case "is the price increment caused by the anticompetitive conduct that … augmented the monopolist's control over the market"—not the price increment stemming from the monopoly itself. *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 297 (2d Cir. 1979); *see also Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1370 (9th Cir. 1986) (discussing *Berkey* rule approvingly). So even to the extent Users maintain that Meta's market power has "been supplemented by improper conduct," that would still not entitle them to "the entire excess" charge as claimed here. *Berkey*, 603 F.2d at 297-98.

Users try to remedy Economides's dispositive concessions through a yardstick analysis that says nothing about Facebook or platforms like it. Economides opines that damages must be based on an entirely separate "████████████████████████████████████████" based on the amount "████████████████" pay for "████████████████████████████ ████████████████████████████" Economides ¶¶16, 94-95, 105. By Economides's own admission, these programs are "████████████████████████" *Id.*, ¶94. They were instead intentionally selected to ensure they are *not* comparable to Facebook. *Id.*, ¶99. None gives users the ability to connect with "████████████████," permits "████████████████," or relies on a "████ ████" *Id.*, ¶25. Economides never addresses these numerous differences, never explains why prices set by noncompetitors in a distinct, dissimilar market provide a reliable model for calculating damages in the alleged PSN market, and never attempts to adjust the market research programs' price to reflect conditions in the PSNS market. And he does not explain why analysis

1   of these incomparable firms can control for the competition on the "merits" that concededly drove

2   Meta's success. *Supra*, at 1.

3       Because Users have not met their burden of providing a damages model that "measure[s]

4   damages resulting from the particular antitrust injury on which [their] liability in this action is

5   premised," *Comcast*, 569 U.S. at 36, their motion for class certification must be denied.

6   **II.    ANTITRUST INJURY CANNOT BE ESTABLISHED THROUGH COMMON PROOF**

7       Users' speculation that Facebook users suffered a common harm when Meta failed to pay

8   them for some unspecified amount and type of "data" cannot reliably prove the existence of a

9   classwide injury. And even setting that dispositive defect aside, questions predicate to the existence

10   of Users' asserted injury—who would be paid even if Meta were to pay some users, whether

11   members of the putative class would benefit or be harmed by the changes to the platform that

12   would necessarily occur if Facebook paid for use, and who (if anyone) was influenced by Meta's

13   supposedly anticompetitive misrepresentations despite consenting to its data practices—have no

14   common answers, making individual suits the only way to adjudicate Users' claims. Because

15   "[c]lass certification is precluded where plaintiffs have not shown that the antitrust injury element

16   can be proven for all class members with common evidence," Users' motion must be denied. *In re*

17   *Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at *15 (N.D. Cal. Mar. 29, 2022).

18   **A.  Individualized Issues Predominate Because Users' Purported Injury Is**

19   **Speculative And Contrary To The Record**

20       Users' sole claim to common injury is the lack of a uniform payment to all members of the

21   putative class. Thus, unless they can demonstrate with actual evidence that Meta would have paid

22   every Facebook user an equal amount in the but-for world, they have presented no means for

23   litigating this case collectively. Users cannot meet that burden because their injury theory's

24   foundational assumption—that "increased competition" in the absence of the challenged

25   statements and omissions would have forced Meta to "compensate Consumers a certain amount

26   per month for their data," Mot. 12-13, 22—proceeds from rank speculation. This failure to provide

27   any real-world evidentiary support for the only asserted classwide injury precludes certification.

28

**PUBLIC REDACTED VERSION**

1   Facebook is an attention platform. Attention platforms "focus[] on attracting users'
2   attention and engagement by facilitating their consumption of engaging [and usually free]
3   content," then "cross-subsidizing that content infrastructure through advertising revenue." Ex. 2,
4   Tucker ¶18. Users benefit because "the attractiveness of an attention platform to advertisers
5   depends on its ability to attract users who engage with content on the platform." *Id.* As noted, this
6   business model has been employed since ad-supported newspapers first began appearing hundreds
7   of years ago and continues to be employed by online platforms that compete with Facebook.

8   If it were likely that Meta would abandon this approach—as is necessary for Users to prove
9   common injury—there would be evidence that Meta or its competitors (or even companies with
10  similar business models) had made such payments in the past. There would be some evidence (*any*
11  *evidence*) that Users' common injury model was based on the real-world economics that govern
12  the competition Meta allegedly subverted. But there is none. For example, competitors like
13  Google+ and Snapchat entered Users' contrived PSNS market without compensating users.
14  Indeed, no online platform bearing even a passing resemblance to Facebook has adopted the
15  business model underlying Users' theory of common injury. Ex. 5, Economides 9/23 Tr. 115:18-
16  116:2 (Q. "[Y]ou can't think of any examples in the real world where users are paid to consume
17  content? A. I cannot think of an example right now."). None of the firms that Users identify as
18  competing in the supposed PSNS market, for example, pay or have ever paid users for maintaining
19  accounts. Ex. 1, Economides 3/24 Tr. 255:11-23 (Q. "In the time since your class certification
20  deposition and whatever additional work you've done since then, have you identified any platform
21  that pays all of its users for their activity on the platform, just their normal activity? A. Well, I
22  think I understand what you're saying, and, no, since my deposition I haven't identified any
23  platforms that pay everybody."). In fact, Users have not identified any ad-supported platform that
24  pays users for consuming content. Ex. 5, Economides 9/23 Tr. 84:11-16 ("Up to this point in the
25  actual world, this has not happened.").

26  Users instead rely on wildly dissimilar market research programs, Mot. 13, 22-24, that do
27  not constitute the kind of "properly analyzed, reliable evidence" they must provide for class
28  certification. *Ward v. Apple Inc.*, 2018 WL 934544, at *3 (N.D. Cal. Feb. 16, 2018), *aff'd*, 784 F.

**PUBLIC REDACTED VERSION**

1   App'x 539 (9th Cir. 2019). These services collect different kinds of data than Meta does. Ex. 5,

2   Economides 9/23 Tr. 160:15-161:11. And they *must* pay for use because—unlike Facebook,

3   Snapchat, TikTok or YouTube—they provide no value to the user other than the payment. Take

4   Facebook Research. Like most market research programs, it collected data about the use of third-

5   party apps to ██████████████████████████████████████████. Ex. 2, Tucker ¶¶76-79.

6   And like other market research programs, it did not ████████████████████████████████████

7   Ex. 6, PALM-013777098-123 at -102. ██████████████████████████████████████

8   ██████████████████████ Ex. 7, Centercode_00000851; Ex. 8, Sancho Tr. 114:19-22. So too

9   for Facebook Study, which "████████████████████████████████████████████████████

10  ██████████████████████████████████." Ex. 9, Ben-Zedeff Tr. 45:18-46:7. Economides agrees. Ex. 5,

11  Economides 9/23 Tr. 162:8-11 (users received no "additional value outside of the monetary

12  compensation that Facebook Research and Facebook Study" provided).

13         The other paid applications identified by Users are more of the same. ████████████████

14  ████████████████████████████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████████████████████████████

16  ██████████ Economides App. A. ██████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████████████████████████

18  ██████████████ *Id.* At best, these supposed comparators establish that certain market research

19  programs "████████████████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████████," rather

21  than demonstrating that any platforms remotely analogous to Facebook paid users. Ex. 2, Tucker

22  ¶¶68, 78. In fact, Economides explicitly excluded any market research program that provides

23  ██████████████████████████, despite applications like Facebook, Snap, YouTube, and TikTok all

24  providing "██████████████████████████." Economides ¶99. Evidence with such a tenuous

25  connection to Facebook does not offer reliable proof that an injury caused by Meta can be assessed

26  on a classwide basis.

27         There are good reasons that Users' model is based on speculation rather than any real-

28  world parallel: Widespread payments would be economically infeasible, encourage adverse

**PUBLIC REDACTED VERSION**

selection, and be fraught with moral hazard, degrading the quality of any platform that were to offer them. Offering compensation for maintaining and using an account would "attract[] users who are motivated by payments rather than a desire to engage with the platform," leading to reduced engagement with platform content. Ex. 2, Tucker ¶35. Similarly, fake accounts created only to receive payment could proliferate. *Id*., ¶¶39-40. The distorted incentives created by payments "risk[] unraveling the attention platform altogether—authentic, engaged users might spend less time on the platform, advertisers might spend less money on the platform, [and] revenue needed to offer engaging content and innovative features might decrease, leading to a downward spiral." *Id*., ¶33; Mot. 19 (relying on testimony of Meta's expert to assert that "██ percent of users, and perhaps as low as ██ percent, leaving Facebook would be '████████' and could even cause it to 'unravel'"). These concerns are both dispositive of Users' compensation scheme and undisputed. Ex. 10, Farrell Tr. 272:10-273:8 ("████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"); Ex. 5, Economides 9/23 Tr. 253:8-254:16 (conceding that people who will never "use the service" and "were not there before" will "get attracted to Facebook ... because now they get $5.").[3]

Users' asserted classwide injury thus relies on the "implausible" central assumption that Meta would have paid all of its users in the but-for world, without which "the theory collapses." *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 27 (1st Cir. 2008) (rejecting

---

[3] The putative class includes only those who "maintained and *used* a Facebook profile." Mot. 2. Users never say what that means, and indeed elsewhere define the class differently. *Compare* Mot. 2, *with* Mot. 3 (defining as persons who "created and used a Facebook profile"). But under either definition, is merely logging on enough, or do you need to interact with content, and if so, how much? Such indeterminacy in a putative class of hundreds of millions is dispositive. *See Probe v. State Teachers' Ret. Sys.*, 780 F.2d 776, 780 (9th Cir. 1986) (class must be "sufficiently definite to conform to Rule 23"). And although this Court is bound by the Ninth Circuit's incorrect holding that Rule 23 imposes no separate ascertainability requirement, *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1125 & n.4 (9th Cir. 2017), Meta maintains and preserves for appeal the argument that Users' failure to provide an objective means of currently and readily ascertaining the class contravenes Rule 23, *see, e.g.*, *In re Nexium Antitrust Litig.*, 777 F.3d 9, 19 (1st Cir. 2015).

**PUBLIC REDACTED VERSION**

class certification when plaintiffs' "novel and complex" theory of antitrust injury lacked sufficient evidentiary support). This "failure to provide 'properly analyzed, reliable *evidence* that a common method of proof exists to prove impact on a class-wide basis' is fatal." *Ward*, 2018 WL 934544, at *3. And it remains so even when, as here, the putative class claims to offer a common means for assessing injury. *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d at 29.

 **B.** **Even If Meta Would Have Paid Some Facebook Users, Whether Any Particular User Would Have Been Injured By Lack of Payment Requires An Individualized Inquiry**

 Users' classwide injury model independently fails to comply with Rule 23 because it proceeds from the economically irrational premise that *all* Facebook users who maintained and used a Facebook profile would receive equal compensation in a but-for world in which Meta paid users. Mot. 2, 23-24. Even if *some* putative class members were harmed through lack of compensation under Users' theory—i.e., "overcharged" for their data—numerous users would have never received payment or would be worse off in the but-for world, meaning that whether any particular user would suffer an antitrust (or even an Article III) injury is an individualized question. Because Users thus "rely on an unsound methodology, which cannot reliably demonstrate which members, and how many, were injured, as common proof of class wide impact" they "cannot meet their predominance burden." *In re Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at *16; *see also Olean*, 31 F.4th at 669 n.14 ("When 'a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification.'" (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824 (7th Cir. 2012))); *Olean*, 31 F.4th at 682 & n.32 (not reaching whether "the possible presence of a large number of uninjured class members raises an Article III issue").

 **1.**  **Who might be paid is individualized**

 Users' model presumes that Facebook would have been willing to pay users because "██████████████████████████████████████████████████████████ ████████████████████████████████████████████." Economides ¶63; Mot. 1 (Meta "monetizes user data by selling targeted advertising derived from that data. The more data

**PUBLIC REDACTED VERSION**

it collects and uses, the more money it makes."). As such, the value of any individual user turns on Meta's ability to monetize data connected to their account through advertising—that, all agree, is "Facebook's business model." Mot. 1. That means any "compensation," and thus any antitrust injury, "█████████████████████████████████████████████████████████." Economides ¶111. Indeed, Users now expressly characterize the alleged antitrust injury by reference to the "price" class members paid to Meta in terms of data. *Supra*, at 7.

Who would be compensated for their data in Users' but-for world is thus necessarily individualized because not all members of the putative class provide Meta with the same value, or even any value at all. As Economides put it, "different people use Facebook differently," and those uses create different types and amounts of data. Ex. 5, Economides 9/23 Tr. 56:18-24; Ex. 11, Economides Merits Reb. ¶89. Some users create content that attracts other users (and their data) to Facebook, which has significant value to the platform. Ex. 2, Tucker ¶¶21, 51. Others help retain users by engaging with materials posted on Facebook. *Id*., ¶¶21, 52. Still others see and interact with ads, interactions that Meta monetizes through its relationships with advertisers. *Id*., ¶53. Although he ignores the implications for his injury model, Economides █████████████. *See, e.g.*, Ex. 11, Economides Merits Reb. ¶89. As he explained, Meta may even "██████████ █████████████████████████████████████████████████" of Facebook. *Id*.[4]

Many people who maintain and use a Facebook profile, however, provide "██████████ ██████████. Ex. 2, Tucker ¶55. Some people limit how their data can be used to target advertising, or decline to engage with the advertising they are shown—choices that contribute to ████████████████████████████████████████████████████████████

---

[4]     Economides concession that Meta collects different amounts of data from different users also renders Users' claimed overcharge nonsensical. They assert that "all class members paid the same 'price' to Facebook: their data." Mot. 21. But Users have never attempted to establish that all class members actually paid a uniform "price" in data, and present no analysis of the data actually collected in the course of the numerous—different—ways that people use the platform. Such a model, which "makes no attempt to establish, but instead simply assumes, class-wide impact," cannot establish a classwide antitrust injury. *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 321 (N.D. Cal. 2014) (plaintiffs must present a model capable of "show[ing] that all or nearly all purchasers were overcharged in [the claimed] amount").

**PUBLIC REDACTED VERSION**

1            █████████ *See id.*, ¶54 (████████████████████); *see also id.* (█████

2   ████████████████████████████████████████████████████████

3   ███████████████████████████); Ex. 16, Grabert Tr. 106:24-107:13

4   (████████████████████████████████████████████████████████

5   ███). Facebook users also vary wildly in their usage of the platform, with some spending little

6   time on Facebook, logging into the service only rarely. *See, e.g.*, Ex. 3, M. Klein Tr. 249:17-24

7   (████████████████). The extent of that engagement (and the resulting potential for

8   monetization or data collection) can vary too. *See* Ex. 16, Grabert Tr. 309:9-20 (██████████

9   ████████████). All of these factors affect the value of a given Facebook account to Meta,

10  and make it impossible to determine through common proof whether it would be economically

11  rational to compensate any individual user (and thus whether that person would be harmed by the

12  lack of a payment) even in Users' but-for world.

13            Economides confirms that not everyone would be compensated even in his but-for world.

14  As an initial matter, the "yardsticks" he relies on did not involve anything like the widespread,

15  uniform compensation proposed here; they were largely available to users by invitation only, and

16  sought select, limited, and representative panels of participants. *Supra*, at 10-11; Ex. 12, Ben-

17  Zedeff, *Introducing Study From Facebook*, META (June 11, 2019); Ex. 13, Naveh, *Introducing*

18  *Facebook Viewpoints* (Nov. 25, 2019); Economides App. A. These narrow programs provide no

19  support for a but-for world with payments to hundreds of millions of users. *See* Ex. 2, Tucker ¶¶64-

20  68, 75-80. Economides has further argued that in a more competitive market for data,

21  "[c]ompensation would depend on the value of the information of a particular user to the platform,"

22  which "var[ies] widely." Ex. 14, Economides & Lianos, *Giving Away Our Data for Free is a*

23  *Market Failure*, PROMARKET (Feb. 1, 2021) (hereinafter, "*Giving Away*"); *see also* Ex. 5,

24  Economides 9/23 Tr. 257:20-258:1 (when users "become more active ... that's likely to result in

25  more revenue for Facebook"), 269:14-270:9 (comparing users who "create revenue for Facebook"

26  with others "who create[] no revenue"). As a result, "[t]ransaction prices for the sale of personal

27  information would also vary and likely be individually negotiated between the platform and the

28  user," Ex. 14, *Giving Away*, and "the allocation of the benefits between the advertisers, the

**PUBLIC REDACTED VERSION**

intermediary and consumers vary and require a case-by-case assessment," Ex. 15, Economides & Lianos, *Restrictions on Privacy and Exploitation in the Digital Economy*, Journal of Competition Law and Economics (2021) at 46.

Users nevertheless claim that any non-uniform regime would be impossible because Meta "does not, and could not," vary the effective price it charges users. Mot. 12; *see also id.* at 12-13 ("Just as Facebook does not vary its terms in the actual world, the availability of these better terms would not vary by user in the *but-for* world."). This assertion makes no sense. If Meta's real-world approach to Facebook's "price" bounded its conduct in the but-for world, Users have no case—Meta does not pay hundreds of millions of people to use Facebook.

## 2. Whether a user would be better off or harmed in the but-for world is individualized

Users assume that every class member is injured through the lack of monetary compensation, but reinventing Facebook as a pay-for-use platform would necessarily change its functionality for the worse. *Supra*, at 12. As a result, whether users would be better off with $5 and a diminished Facebook depends on the value users personally assign to the services received from Facebook. That determination is highly individualized.

Users receive real-world benefits from Facebook that would be lost in Economides's but-for world of paid use. There is no dispute that Users find value in consuming content on Facebook; watching and sharing videos or photos; advertising or finding local businesses; and being introduced to new content or groups aligned with their interests, to name just a few. Ex. 5, Economides 9/23 Tr. 71:9-12 ("Facebook and Instagram offer their users valuable content."). Studies demonstrate that the monetary value users assign to these benefits vary wildly. *See* Ex. 2, Tucker ¶20 (collecting studies showing the median value users assigned to give up Facebook ranging from $8 a month to more than $100). The named plaintiffs are no different, and value different benefits from Facebook in different ways. *See, e.g.*, Ex. 3, M. Klein Tr. 161:4-11 (███████████████████████████); Ex. 16, Grabert Tr. 324:13-326:10, 326:11-327:6 (███████████████████████████████████████████████████████████████ ████████████████████████████████████████). But Users never address

**PUBLIC REDACTED VERSION**

these benefits, how they would change in the but-for world, or dispute that determining the value of Facebook to any particular user is an individualized question. That matters, because a significant portion of users would be *harmed* in Users' but-for world when the aspects of the Facebook experience they value are destroyed by widespread compensation for use. *Supra*, at 12; Ex. 2, Tucker ¶¶33-47. As noted, no platform has ever adopted such a business model both because of the negative effects on user engagement and experience, and because it would be bad business.[5] The distorted incentives created by payments, not the authentic interactions that make Facebook enjoyable, would drive user behavior on such a service. *Supra*, at 12. Spam, bots, and barely active accounts would predominate. Ex. 2, Tucker ¶¶39-44.

To obviate those problems, Meta would be forced to take steps to incentivize engagement and "minimize inauthentic accounts," such as "develop[ing] new systems to verify users" or implementing "cumbersome authentication measures." Ex. 2, Tucker ¶¶33, 44. But such controls would be intrusive and disruptive, leaving some members of the putative class "worse off." *Id.*, ¶44. If Meta, for example, "require[d] users to provide an official government-issued identification document to access Meta's platforms," it "would estrange users who do not have such identification documents or do not want to share them to receive entertainment, worsen the experience of authentic users who find them to be cumbersome and would delay authentic users from engaging with Facebook." *Id.* So too for information like a home address. Ex. 5, Economides 9/23 Tr. 179:7-16 (saying such information is needed for compensation in the but-for world). Users do not even acknowledge the potential harms to users, much less suggest a way to account for them on a classwide basis. Together with the failure to consider the value to users of Facebook's current services, that means Users' injury model cannot determine whether putative class members "stand[] to gain from the alleged unlawful conduct" because they would value Facebook's services less in the but-for world. *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1056 (9th Cir. 1999). And in such circumstances, "[t]here can be no antitrust injury." *Id.*

---

[5] Users on Facebook want to be entertained. If the platform were not enjoyable to use, $5 or $50 per month would not get people to use it in meaningful numbers. That is why the competitive response in this and countless related industries is to improve quality, not pay people to use services they don't want. *See* Ex. 2, Tucker ¶17.

**PUBLIC REDACTED VERSION**

Having failed to account for these individualized inquiries in their injury model, Users resort to tautologies. They claim that because compensation will be paid to every Facebook user in the but-for world, all putative class members "are harmed by Facebook's anticompetitive conduct." Mot. 13. But Users' own theory presumes additional competition in the but-for world will pressure Meta *by driving users to other services*. Without that migration of time and attention, the vibrant alternatives to Facebook that Users claim would force Meta to start paying people billions of dollars could not exist. Yet after leaving Facebook, the users of those other services would receive no compensation. And without such compensation, there can be no antitrust injury; Users make no effort to substantiate any non-monetary harm or benefit. Although some users might seek to game payments by retaining a Facebook account and merely taking whatever (unspecified) action is required to obtain $5, that only highlights the implausibility of Users' theory. Dead accounts that exist only to harvest cash provide no value to Facebook, and actively degrade the experience of other users. Ex. 2, Tucker ¶¶42-44; *supra*, at 8. In no world, but-for or otherwise, would a company pay for that privilege.

In any event, that a broken damages model (*supra*, at 6-9) necessarily results in payment says nothing about whether the net gain to any individual user in the but-for world is positive. For putative class members that would suffer from the changes in Facebook's services occasioned by a pay-for-use model, it is not. *Kottaras v. Whole Foods Market, Inc.*, 281 F.R.D. 16, 25 (D.D.C. 2012) (declining to certify class when some members benefited from allegedly anticompetitive behavior because calculating "net harm" required individualized inquiry); *id.* ("Since benefits must be offset against losses, it is clear that widespread injury to the class simply cannot be proven through common evidence."); *In re Interest Rate Swaps Antitrust Litig.*, 2023 WL 8675625, at *9 n.6 (S.D.N.Y. Dec. 15, 2023) ("[I]mpact analysis should consider both harms and benefits caused by the" anticompetitive conduct "in the same market and for the same product").

**C. Users Provide No Common Means To Determine Whether "Enough" Putative Class Members Were Influenced "To A Sufficient Degree" By The Alleged Deception To Harm Competition**

Users' theory of common injury starts from the premise that some undefined set of misstatements and omissions induced putative class members to join or stay on Facebook at the

expense of other online platforms. Antitrust claims premised on deception "should presumptively be ignored," and misrepresentations or omissions are presumed to have only a "de minimis" effect on competition. *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997). As Users acknowledge, Meta's conduct could thus only have caused class members an antitrust injury if they can overcome that presumption. Mot. 18. That requires a means for proving with common evidence that Meta made "clearly false" representations that "were clearly material" and "clearly likely to induce reasonable reliance," despite all Facebook users having consented to the collection and use of their data through Facebook's terms of service. *Harcourt Brace*, 108 F.3d at 1152. And even then, Users must ultimately demonstrate that "enough users cared to a sufficient degree about the extent of a personal social network's data collection and use, such that Facebook's data-related deception of the market harmed competition." Mot. 19. But after more than three years of litigation, Users still do not offer any common method for identifying which users heard or read any of tens of thousands of statements, assessing the meaning of those statements, showing that the statements were false in light of Facebook's terms of service, or determining whether users reasonably relied on those statements in choosing which online platforms to use. Mot. 17-21; *see also* Mot. 19 (refusing to identify particular alleged misrepresentations beyond "illustrative examples").

Instead, most of the evidence Users have presented shows that the alleged deception had nothing to do with Meta's success or users' decisions whether to join and stay on Facebook. The named plaintiffs have never heard, much less relied on, the purported misrepresentations. *See infra*, at 23-24. ███████████████████████████████████████████

████████ Ex. 16, Grabert Tr. 144:20-22; Ex. 4, Kupcho Tr. 45:1-2; Ex. 3, M. Klein Tr. 55:19-56:1. Economides disclaimed the reasonableness of relying on the alleged misstatements. Ex. 5, Economides 9/23 Tr. 45:25-46:13 ("Q. It's your view that not all Facebook users would rely on Facebook's representations about its data privacy practices; correct? A. I think it's extremely hard for a user to rely on those representations."). And he could not link any of the misrepresentations or omissions alleged to the actions of users or competitive harm, failing to identify any

**PUBLIC REDACTED VERSION**

misstatement or omission that "caused users to choose Facebook over Google+." Ex. 1, Economides 3/24 Tr. 244:5-19, 246:12-247:5.

The only "evidence" Users provide on reliance and materiality are general statements about users valuing privacy, untethered from the alleged misrepresentations or omissions and competition. Mot. 7-12, 13-21. But whether users "care deeply about their online privacy and data" *id.* at 1, does not demonstrate that they choose online platforms on that basis. And it is not enough to assert that "███ percent of users, and perhaps as low as ███ percent, leaving Facebook would be '████████████' and could even cause it to '██████'" Mot. 19. Users must instead show how they will prove with common evidence what people and Meta actually did, not just what they said they desired, and how they will show this large "enough" number of users were swayed "to a sufficient degree" by the specific deception alleged to exert competitive pressure. Users' motion offers nothing on any of these points, and speaking only "in general and broad terms, without providing a sufficiently detailed explanation as to how [they] actually propose[] to apply any particular methodology to specific facts or data in this case" does not suffice. *California v. Infineon Techs. AG*, 2008 WL 4155665, at *9 (N.D. Cal. Sept. 5, 2008). As a result, Users cannot show through any evidence (common or not) that users "considered Facebook's representations about its data privacy practices important *in determining whether to use* Facebook." *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 801 (N.D. Cal. 2022).

### III.   PARTICIPATION IN USERS' PSNS MARKET AND META'S ALLEGED MARKET POWER CANNOT BE ESTABLISHED WITH CLASSWIDE PROOF

Class certification is independently inappropriate because determining which members of the putative class participated in Users' incoherent PSNS market turns on individualized questions about how people use Facebook and Instagram. Without any common means for proving market participation, Users cannot demonstrate on a classwide basis which class members could have been injured by the alleged deception or Meta's share of the PSNS market. And when, as here, the proposed market and method for assessing market power results in "many cross-cutting factual circumstances among the class members," common issues do not predominate and class certification must be denied. *Burkhalter Travel Agency v. MacFarms Int'l, Inc.*, 141 F.R.D. 144,

154 (N.D. Cal. 1991); *Garnica v. HomeTeam Pest Def., Inc.*, 230 F. Supp. 3d 1155, 1157 (N.D. Cal. 2017) (rejecting certification when plaintiffs "have not met their burden to show that key questions about monopoly power in the [relevant] markets ... are subject to 'common answers'"); *see also Rodney v. Nw. Airlines, Inc.*, 146 F. App'x 783, 787 (6th Cir. 2005) (denying certification when "individual questions predominate on the issue of market definition").

Start with Users' incoherent definition of when putative class members participate in the PSNS market. According to Users, the Facebook platform offers both PSNS and non-PSNS services, and whether any individual feature is PSNS depends on how it is being used. Economides ¶46. For example, Economides says that ███████████████████████████████████████████████████████████████████ " while ███████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ " Ex. 17, Economides CC Rep. ¶80; *id.*, ¶223 ███████████████████████████████████████████ ███████████████████████████████████████████ ). But Users have never been able to consistently define what uses are PSNS, and have variously claimed that Facebook's most popular features (or certain uses of those features) are inside or outside of the alleged market based on an individual's intent. *Compare* Ex. 1, Economides 3/24 Tr. 84:8-22 (short-form video is PSNS), *with* Ex. 17, Economides CC Rep. ¶80 (████████████████████████ ), *and* Ex. 10, Farrell Tr. 15:2-3, 79:21-80:5 (███████████████████████████████████████████████ ). Because Users' market definition "███████████████████████████████████████████████ ████ " it concededly poses "███████████████████ " and creates "███████████████ ," Ex. 10, Farrell Tr. 29:19-31:16, and "███████████████████████████████████████████ ███████████████████████████████████████████████████████████ " Economides ¶46. But Users have never offered any means to determine what features members of the putative class actually use and in what quantity. *See, e.g.*, Ex. 5, Economides 9/23 Tr. 231:19-233:13 (he "wouldn't be able to say" what percentage of time Facebook users spend on functions that do not compete in the PSNS market).

Consider how this approach plays out when Economides compares Facebook and Instagram to other platforms. According to him, if User A posts the exact same short-form video

**PUBLIC REDACTED VERSION**

1   on Facebook, Instagram, TikTok, and YouTube, and then User B watches that same video on all

2   four platforms, "when it happens in Facebook and Instagram" it is PSNS activity because "it is

3   part of the social network, and when it's outside in TikTok or YouTube, which are not PSN[S]

4   apps, it's not." Ex. 1, Economides 3/24 Tr. 86:25-87:16. Put differently, it's PSNS when Facebook

5   (and Instagram) does it and something else when a competitor does. However styled, that approach

6   cannot work.

7        The failure to provide any means (much less a common one) for establishing whether

8   members of the putative class participate in the PSNS market also infects Users' theory of market

9   power. That theory depends on the number of PSNS users and amount of time spent on the PSNS

10  aspects of Facebook and Instagram. Economides ¶45. Yet Economides does not identify which

11  users took part in PSNS activities, or calculate the time spent on such uses. *Id.*, ¶¶45-46. Users'

12  definition of PSNS and theory of market power thus admits "the presence of individualized market

13  conditions, which would require individualized, not common, hypothetical markets—thus

14  individualized, not common, evidence." *Blades v. Monsanto Co.*, 400 F.3d 562, 574 (8th Cir.

15  2005). That precludes certification. *Id.* at 570 (affirming denial of class certification when

16  proposed market was "highly individualized" and included products that were "not homogenous").

17  **IV.   THE NAMED PLAINTIFFS ARE NOT TYPICAL AND ADEQUATE REPRESENTATIVES OF**
18  **THE PUTATIVE CLASS**

19       Each of the named plaintiffs testified that the factual foundations of their theory of antitrust

20  liability are false. Because the named plaintiffs are thus (by their own admission) atypical of the

21  Facebook users allegedly harmed by Meta's conduct, they lack the "same or similar injury" as

22  other members of the putative class and cannot "fairly and adequately protect the[ir] interests."

23  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984-85 (9th Cir. 2011). So to the extent this case

24  is litigated collectively—and it should not be—the class cannot be led by these plaintiffs.

25       If named as representatives, the plaintiffs must prove that (1) in a world without Meta's

26  allegedly anticompetitive conduct, competitors that differentiated their "data privacy practices"

27  would have attracted away so many members of the putative class that Meta would have been

28  forced to pay people to stay; and (2) Meta's alleged misrepresentations about its privacy practices

**PUBLIC REDACTED VERSION**

1    were both "clearly material" and "clearly likely to induce reasonable reliance" among putative

2    class members. Mot. 18. The named plaintiffs, however, have already testified that ████████

3    ████████████████████████████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████████████████████████

5    ██████████████████ Because the plaintiffs' "testimony about [these] issues[s] conflicts with" what

6    they assert the putative class will show at trial, they are not typical or adequate representatives. *In*

7    *re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 359 (N.D. Cal. 2018) (finding plaintiff

8    atypical and inadequate when testimony conflicted with one of two theories of liability); *cf. Major*

9    *v. Ocean Spray Cranberries, Inc.*, 2013 WL 2558125, at *3 (N.D. Cal. June 10, 2013) ("The

10   typicality requirement has been found to not be satisfied where the evidence needed to prove at

11   least one of the named plaintiff's claims is not probative of the other class members' claims").

12       Consider first that the named plaintiffs testified that ███████████████████████

13   ██████████████████████████ the exact opposite of how Users' theory of liability

14   requires a typical Facebook user to behave. Grabert said that she ███████████████████

15   ████████████████████████████████████████████████████████████████████████████████

16   ██████████████ Ex. 16, Grabert Tr. 204:14-205:13. With respect to TikTok and Snapchat

17   specifically, she stated that ████████████████████████████████████████████████

18   *Id.* at 208:14-20, 210:16-211:7. Klein ███████████████████████████████████████

19   ████████████████████████ Ex. 3, M. Klein Tr. 60:25-61:4; *see also, e.g., id.* at 201:1-14

20   (████████████████████████████████████████), 210:2-211:17 (████████████████

21   ████████████████████). So too for Kupcho. Ex. 4, Kupcho Tr. 37:2-16. Privacy, moreover, ████

22   ████████████████████████████████████████████████████████████████████████████████

23   ██████████████████████ *Id.* at 93:21-24 (████████████████████████████████████

24   ████████████████████████████████████████████████); *id.* at 155:6-21

25   (██████████████████████████████████████████████). Such testimony stands

26   in stark contrast to how Users define typical Facebook users, who they claim were deceived into

27   joining or remaining on Facebook because of representations about privacy. Mot. 19; Economides

28   ¶¶29-32.

**PUBLIC REDACTED VERSION**

Any class certified here would also have to prove that Meta's alleged misrepresentations were "clearly material" and "clearly likely to induce reasonable reliance," *supra*, at 19, but the named plaintiffs testified ███████████████████████████████████. Klein said that ██ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ███████████████████████████████████ Ex. 3, M. Klein Tr. 277:6-13, 280:3-281:1, 283:6-12. ████████████████████████████████ ██████████████████████████████████████████████████████████████ ███████████████████████████████ Ex. 16, Grabert Tr. 378:19-379:5, 383:14-20. Kupcho did not ████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ █████████████████ Ex. 4, Kupcho Tr. 77:3-10, 243:21-244:7. ████████████████ (and it is *not* the case) ████████████████████████████. *Id.* at 243:21-244:7. Each of the named plaintiffs further agreed that █████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████ Ex. 18, 2/23 Consumer's Suppl. Resps. to Interrogs. 15 and 16 at 6; Ex. 3, M. Klein Tr. 282:12-283:23.

All of this testimony conflicts with the claims being advanced by plaintiffs' counsel, and evinces the kind of "interests antagonistic to the remainder of the class" that preclude being a class representative. *In re Facebook, Inc., PPC Advert. Litig.*, 282 F.R.D. 446, 454 (N.D. Cal. 2012); *accord Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978).

### CONCLUSION

The Court should deny Users' motion for class certification with prejudice.

**PUBLIC REDACTED VERSION**

Dated: June 21, 2024

Respectfully submitted,

By: */s/  Sonal N. Mehta*
    Sonal N. Mehta (SBN 222086)

WILMER CUTLER PICKERING HALE
AND DORR LLP
*Attorney for Defendant Meta Platforms, Inc.*

**CERTIFICATE OF SERVICE**

    I hereby certify that on this 21st day of June, 2024, I electronically transmitted the public redacted version of the foregoing document to the Clerk's Office using the CM/ECF System and caused the version of the foregoing document filed under seal to be transmitted to counsel of record by email.

By:    */s/ Sonal N. Mehta*
    SONAL N. MEHTA