**HAGENS BERMAN SOBOL SHAPIRO LLP**
Shana E. Scarlett (Bar No. 217895)
shanas@hbsslaw.com
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Kevin Y. Teruya (Bar No. 235916)
kevinteruya@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000

*Interim Co-Lead Consumer Class Counsel*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, *et al.*, | Case No. 3:20-cv-08570-JD |
| Plaintiffs, | **CONSUMER PLAINTIFFS' OPPOSITION TO DEFENDANT META PLATFORMS, INC.'S MOTION TO EXCLUDE EXPERT TESTIMONY AND OPINIONS OF NICHOLAS ECONOMIDES** |
| v. | |
| META PLATFORMS, INC., | |
| Defendant. | **REDACTED PUBLIC VERSION** |
| This Document Relates To: | The Hon. James Donato |
| *All Consumer Actions* | Hearing Date: September 26, 2024 |
| | Hearing Time: 10:00 a.m. |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................................... 1

II.  LEGAL STANDARD ...................................................................................................... 2

III.  DR. ECONOMIDES' ASSESSMENT THAT FACEBOOK WOULD PAY
USERS IN THE BUT-FOR WORLD IS RELEVANT AND RELIABLE ....................... 3

    A.  Dr. Economides used well-accepted economic principles and record
evidence to opine Facebook would have compensated users for
their data in the *but-for* world. ............................................................................ 3

    B.  Dr. Economides' yardstick damages model is relevant and reliable. .................... 7

IV.  DR. ECONOMIDES' MARKET DEFINITION ANALYSIS IS PROPER ..................... 10

    A.  Dr. Economides reliably uses qualitative evidence to define the
relevant market. .................................................................................................. 10

    B.  Dr. Economides properly applied the hypothetical monopolist test. .................... 13

V.  CONCLUSION ............................................................................................................ 15

1

## TABLE OF AUTHORITIES

2

Page(s)

### CASES

3

4

*In re Allstate Corp. Sec. Litig.*,
2022 WL 842737 (N.D. Ill. Jan. 10, 2022) ............................................................................... 6

5

*Bakst v. Cmty. Mem. Health Sys.*,
6   2011 WL 13214315 (C.D. Cal. Mar. 7, 2011) .......................................................................... 5

7   *Brown Shoe Co. v. U.S.*,
370 U.S. 294 (1962) ............................................................................................................. 1, 10

8

*In re Capacitors Antitrust Litig.*,
9   2020 WL 870927 (N.D. Cal. Feb. 21, 2020) ............................................................... 2, 4, 6, 14

10

*In re Capacitors Antitrust Litig.*,
11   2021 WL 5407452 (N.D. Cal. Nov. 18, 2021) .......................................................................... 9

12   *Carnegie Mellon Univ. v. Hoffmann-LaRoche, Inc.*,
55 F. Supp. 2d 1024 (N.D. Cal. 1999) ...................................................................................... 5

13

*Clear-View Techs., Inc. v. Rasnick*,
14   2015 WL 3505003 (N.D. Cal. June 2, 2015) ............................................................................ 2

15   *In re Dealer Mgmt. Sys. Antitrust Litig.*,
581 F. Supp. 3d 1029 (N.D. Ill. 2022) ...................................................................................... 8

16

17   *In re Dealer*,
581 F. Supp. 3d at 1056–57 ..................................................................................................... 11

18

*Droplets, Inc. v. Yahoo! Inc.*,
19   2021 WL 9038355 (N.D. Cal. Aug. 9, 2021) ............................................................................ 4

20   *Falcon v. State Farm Lloyds*,
2014 WL 2711849 (W.D. Tex. June 16, 2014) ....................................................................... 12

21

22   *Fed. Trade Comm'n v. Meta Platforms Inc.*,
654 F. Supp. 3d 892 (N.D. Cal. 2023) ............................................................................... 10, 13

23

*Fed. Trade Comm'n v. Qualcomm Inc.*,
24   2018 WL 6615050 (N.D. Cal. Dec. 17, 2018) ........................................................................ 12

25   *In re Glumetza Antitrust Litig.*,
2021 WL 1817092 (N.D. Cal. May 6, 2021) ............................................................................ 6

26

27   *In re Google Play Store Antitrust Litig.*,
2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) .......................................................................... 5

28

*In re HIV Antitrust Litig.*,
   2022 WL 22609107 (N.D. Cal. Sept. 27, 2022) ........................................................................ 9

*Image Tech. Servs. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997)................................................................................................... 7

*In re Juul Labs, Inc. Mktg. Sales Pracs. & Prod. Liab. Litig.*,
   2022 WL 1814440 (N.D. Cal. June 2, 2022) ............................................................................ 4

*Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
   588 F.3d 908 (6th Cir. 2009)................................................................................................... 14

*In re Live Concert Antitrust Litig.*,
   863 F. Supp. 2d 966 (C.D. Cal. 2012) ............................................................................... 9, 12

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,
   275 F.3d 762 (9th Cir. 2001)................................................................................................... 10

*Martinez v. Rabbit Tanaka Corp.*,
   2006 WL 5100536 (S.D. Fla. Jan. 6, 2006) ............................................................................. 9

*McGlinchy v. Shell Chem. Co.*,
   845 F.2d 802 (9th Cir. 1988)..................................................................................................... 5

*Messick v. Novartis Pharms. Corp.*,
   747 F.3d 1193 (9th Cir. 2014)................................................................................................... 2

*Moehrl v. Nat'l Ass'n of Realtors*,
   2023 WL 2683199 (N.D. Ill. Mar. 29, 2023) ............................................................. 2, 8, 9, 14

*Muffett v. City of Yakima*,
   2012 WL 12827492 (E.D. Wash. July 20, 2012) ..................................................................... 9

*In re NFL Sunday Ticket Antitrust Litig.*,
   2023 WL 1813530 (C.D. Cal. Feb. 7, 2023)......................................................................... 2, 7

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
   20 F.4th 466 (9th Cir. 2021) ................................................................................................... 10

*Plexxikon Inc. v. Novartis Pharms. Corp.*,
   2021 WL 2340144 (N.D. Cal. June 8, 2021) ......................................................................... 11

*Primiano v. Cook*,
   598 F.3d 558 (9th Cir. 2010).................................................................................................... 2

*Rodriguez v. Google LLC*,
   2024 WL 38302 (N.D. Cal. Jan. 3, 2024) ......................................................................... 9, 14

*Seagram v. Hawaiian Oke & Liquors, Ltd.*,
   416 F.2d 71 (9th Cir. 1969)....................................................................................................... 5

-iii-

*Sonneveldt v. Mazda Motor of Am., Inc.*,
   2023 WL 2292600 (C.D. Cal. Feb. 23, 2023) ........................................................................... 12

*St. Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys.*,
   778 F.3d 775 (9th Cir. 2015) ....................................................................................................... 2, 7

*Sumotext Corp. v. Zoove, Inc.*,
   2020 WL 533006 (N.D. Cal. Feb. 3, 2020) ...................................................................... 12, 14

*Syufy Enterprises v. Am. Multicinema, Inc.*,
   793 F.2d 990 (9th Cir. 1986) ............................................................................................................. 7

*In re Twitter, Inc. Sec. Litig.*,
   2020 WL 9073168 (N.D. Cal. Apr. 20, 2020) .................................................................... 2, 6

*United States v. Adams*,
   444 F. Supp. 3d 1248 (D. Or. 2020) ............................................................................................ 12

*United States v. H&R Block, Inc.*,
   833 F. Supp. 2d 36 (D.D.C. 2011) ............................................................................................... 10

*Wendell v. GlaxoSmithKline LLC*,
   858 F.3d 1227 (9th Cir. 2017) .......................................................................................................... 2

*In re Xyrem (Sodium Oxybate) Antitrust Litig.*,
   2023 WL 3440399 (N.D. Cal. May 12, 2023) ............................................................... 2, 7, 9

## OTHER AUTHORITIES

Federal Rule of Evidence 702 ........................................................................... 1, 2, 11, 14

## I.    INTRODUCTION

Meta Platforms, Inc. (Facebook) moves to exclude the antitrust impact, damages, and relevant market opinions offered by plaintiffs' expert, Dr. Nicholas Economides. Ignoring the Court's instructions to "reflect with care on Rule 702 challenges for certification experts,"[1] Facebook's arguments mischaracterize the facts and Dr. Economides' opinions and, at best, raise weight questions only a jury can resolve.

*First*, Facebook challenges Dr. Economides' opinion that, in the competitive *but-for* world, Facebook would have had to fairly compensate users for their data—not their mere use of Facebook, as the motion misstates. Facebook contends these opinions are "speculation," but the opposite is true. Dr. Economides bases his opinions on well-accepted economic theory, Facebook's and other major companies' history of considering and actually paying users for comparable data in exactly the way he predicts, and other common proof. Facebook may dispute this proof and what the but-for world would have looked like, but that is no basis for exclusion.

*Second*, Facebook attacks Dr. Economides' yardstick damages analysis. A yardstick analysis compares prices in comparable—not identical—markets unaffected by anticompetitive conduct to prices in the monopolized market. Dr. Economides identified ███ real-world yardsticks ██████████████████████ and used the results, along with a flat rate pricing model ███████████████████████████████, to calculate class-wide damages. This method is widely accepted and reliably applied. Facebook's criticisms regarding Dr. Economides' selection and use of the yardsticks are a subject for cross-examination, not exclusion. *Finally*, Facebook moves to exclude Dr. Economides' opinions regarding the relevant market. But Dr. Economides' opinions that personal social networks (PSN or PSNS) are a valid, relevant product market is supported with both a qualitative analysis, endorsed by *Brown Shoe*, and a quantitative analysis based on the widely accepted Hypothetical Monopolist Test (HMT). And the PSN Market is well-recognized; the Federal Trade Commission and its expert economists proffered the same market in its parallel antitrust case against Facebook. Facebook's choice to completely ignore the *Brown Shoe* factors also dooms its motion, as a plaintiff may define a relevant market

---

[1] ECF No. 789.

using only a qualitative analysis. In the end, Facebook offers no expert market definition analysis of its own and its critiques of Dr. Economides' implementation of well-accepted methods are quintessential cross-examination issues, not admissibility ones.

## II.    LEGAL STANDARD

Expert testimony must be both "relevant and reliable."[2] "The relevancy bar is low, demanding only that the evidence logically advances a material aspect of the proposing party's case."[3] The reliability prong requires expert testimony "have a reliable basis in the knowledge and experience of the relevant discipline."[4] Specifically, the Court asks "whether the reasoning or methodology underlying the testimony is scientifically valid."[5] Rule 702 and *Daubert* "should be applied with a 'liberal thrust' favoring admission."[6] Courts routinely find the economic analyses Dr. Economides applied in his report—the yardstick method for damages and the hypothetical monopolist test for market definition—satisfy both prongs.[7]

Courts do not weigh the evidence underlying an expert's opinion at this stage. Questions that go to weight include: criticisms of an economist's yardstick selection;[8] an expert's supposedly contradictory prior work;[9] competing factual interpretations;[10] disputes between experts;[11] and proof the court may find unpersuasive.[12] "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."[13]

---

[2] *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014).
[3] *Id.* at 1196.
[4] *Id.* at 1197 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)).
[5] *Id.*
[6] *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017).
[7] *St. Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys.*, 778 F.3d 775, 784 (9th Cir. 2015); *In re NFL Sunday Ticket Antitrust Litig.*, 2023 WL 1813530, at *8 (C.D. Cal. Feb. 7, 2023).
[8] *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 2023 WL 3440399, at *13 (N.D. Cal. May 12, 2023).
[9] *See, e.g.*, *In re Twitter, Inc. Sec. Litig.*, 2020 WL 9073168, at *5 (N.D. Cal. Apr. 20, 2020).
[10] *Moehrl v. Nat'l Ass'n of Realtors*, 2023 WL 2683199, at *6–7 (N.D. Ill. Mar. 29, 2023).
[11] *In re Capacitors Antitrust Litig.*, 2020 WL 870927, at *2 (N.D. Cal. Feb. 21, 2020).
[12] *Clear-View Techs., Inc. v. Rasnick*, 2015 WL 3505003, at *2 (N.D. Cal. June 2, 2015).
[13] *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

**III.   DR. ECONOMIDES' ASSESSMENT THAT FACEBOOK WOULD PAY USERS IN THE BUT-FOR WORLD IS RELEVANT AND RELIABLE**

**A.   Dr. Economides used well-accepted economic principles and record evidence to opine Facebook would have compensated users for their data in the *but-for* world.**

As antitrust economists do, Dr. Economides constructed a world absent the anticompetitive conduct. After extensively examining the record, he concluded that Facebook would have compensated all class members for their data. This *but-for* world follows the well-accepted economic concepts of "zero" and "negative" pricing. While Facebook does not charge users a monetary price—it has a "zero" money price—it is not "free." In the case of PSNs like Facebook, the in-kind consideration users provide is their data. Economides Report (Economides Rep.) ¶ 33. Well-accepted economic principles indicate that when consumers have competitive alternatives, sellers must lower prices to maintain market share or risk losing customers. *Id.* ¶ 62. If the starting money price is "zero," more competition should drive the price "negative," such that users receive compensation. *Id.* ¶ 65. Real-world examples of negative price markets abound. *Id.* ¶ 65 (citing credit card rewards programs as an example).

Competition, governmental, and economic authorities cited in Dr. Economides' report all apply this concept to Facebook. *Id.* ¶ 65. ██████████████████████████████████ ████████████████████████████████████████████████████████████ [4] *Id.* ¶ 80 (citing PALM-016491856).

Notably, as Dr. Economides explains, ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

---

[14] *E.g.*, Scarlett Declaration, Ex. 1 (CONSUMER-FB-0000002291 at -298) (Facebook co-founder explaining it "is not actually free," and "[w]e pay . . . with our data and our attention"); Ex. 2 (PALM-003556066 at -069); Ex. 3 (PALM-FTC-00024133) (similar). Hereinafter references to Ex. __ are to the exhibits accompanying the Declaration of Shana E. Scarlett filed contemporaneously.

1 ████████████████████████████████████████████

2 ████████████████████████████████████████████

3 ████████ After Apple announced its "App Tracking Transparency" feature, which limited iOS

4 apps' ability to track users and collect/use their data, ██████████████████████████

5 ██████████████████████████████████ ████████████████

6 ████████████████████████████████████████

7 ████████████████████████████████████████████

8 ██████████████████████████████████████████████████

9 ██████████████████████████████████████

10 ████████████████████████████████████████████

11 ██████████████████████████████████████████████

12 ████████████████ Despite this, Facebook calls Dr. Economides' but-for world a "fantasy."

That Facebook draws different conclusions from the evidence and literature—and disregards facts it dislikes—is no basis for exclusion.[16] For example, Facebook argues that Dr. Economides "ignores" that no "attention platform" (a label Facebook's economist, Catherine Tucker, applies) has responded to competition by paying all its users.[17] But arguing an expert failed to consider contradictory documents goes to weight, not exclusion.[18] Even were this argument valid, Dr. Economides considered and rejected this point. He explained that the common evidence Facebook cites is from a world tainted by its anticompetitive conduct and thus unpersuasive in the *but-for* world. Economides Rebuttal Report (Economides Rebt.) ¶¶ 37, 89. To the extent Facebook suggests competitors in adjacent markets (*e.g.*, TikTok) compete by providing users with services like short-form videos instead of compensating them for their data, Dr. Economides considered and rejected that, too. Entities cannot compete on features alone, and even "attention platforms" compete on price. *Id.* ¶ 35. While Facebook may disagree with Dr.

---

[15] Ex. 4 (PALM-013553009) at -011.
[16] *In re Capacitors*, 2020 WL 870927 at *2; *Droplets, Inc. v. Yahoo! Inc.*, 2021 WL 9038355, at *11 (N.D. Cal. Aug. 9, 2021).
[17] Mot. at 5.
[18] *In re Juul Labs, Inc. Mktg. Sales Pracs. & Prod. Liab. Litig.*, 2022 WL 1814440, at *4 n.5 (N.D. Cal. June 2, 2022) (denying *Daubert* on this basis).

1    Economides' explanations, that is a matter for cross, not grounds for exclusion.

2        Facebook's cited cases are misplaced. In *Google Play*, this Court excluded the plaintiff

3    expert's opinions at the merits stage because they rested on "unproven assumption" that "cannot

4    be squared with the economic literature," led to absurd conclusions, and had "no visible factual

5    support" and "no real analysis or data."[19] *Joseph E. Seagram & Sons, Inc.* predates *Daubert* by 30

6    years; concerned a different, appellate standard for whether the admission of certain evidence

7    warranted a new trial; and concluded the admissibility of specific damages evidence was

8    "arguably a matter for cross-examination."[20] In *McGlinchy*, the expert's "speculation" about a

9    party's total lost profits had "no basis in the record."[21] In *Bakst*, the court granted a motion *in*

10   *limine* to exclude a plaintiff's lost wages damages calculations for a CEO position as

11   "unsupported" since he never applied for that position during the relevant period.[22] And the court

12   in *Carnegie Mellon University* excluded the expert because he had a financial interest in the

13   litigation, "examin[ed] only subsets of the controls," and "rel[ied] on sentences from scientific

14   literature taken out of context."[23] None of these concerns are present here, where Dr.

15   Economides' opinions square with economic theory and literature concerning negative and zero

16   pricing, competition authorities' analyses, Facebook's own materials and conduct, and the

17   common proof.

18       Facebook erroneously reports that Dr. Economides previously published an article

19   affirming that "negative pricing would not be universal."[24] This argument misrepresents the

20   article and Dr. Economides' testimony. The article explains that Facebook's "market dominance"

21   lets it obligate users to give Facebook personal data for zero dollars, allowing it to "avoid[]

22   monetary payments that would be the norm in the but for world."[25] This article's suggestion that

23

24       [19] *In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *7–10 (N.D. Cal. Aug. 28, 2023).

25       [20] *Seagram v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 88 (9th Cir. 1969).

26       [21] *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807 (9th Cir. 1988).
         [22] *Bakst v. Cmty. Mem. Health Sys.*, 2011 WL 13214315, at *19–*20 (C.D. Cal. Mar. 7, 2011).

27       [23] *Carnegie Mellon Univ. v. Hoffmann-LaRoche, Inc.*, 55 F. Supp. 2d 1024, 1034–35 (N.D. Cal. 1999).

28       [24] Mot. at 7.
         [25] Ex. 5 (Lianos article).

users might be paid different amounts for their data did not—could not—reflect confidential

evidence from Facebook's own files indicating ████████████████████████████████████

██████████████████████████████████████████████████[26] Economides Rebt. ¶¶ 69-

77. Any supposed inconsistency (there is none) is a subject for cross, not exclusion.[27]

Facebook's remaining arguments go to weight, not admissibility, or misstate the record.

Facebook's objection that Dr. Economides discusses ██████████████████████████████████

██████████ is not grounds for exclusion. An antitrust plaintiff does not even "need [to] show

that the [defendant] of our world actually contemplated a given scenario within the but-for

world."[28] Here, however, there is evidence Facebook ████████████████████████████████

██████████████████████████████████████████ Economides Rep. ¶¶ 70–

76. This evidence corroborates Dr. Economides' analysis.

Facebook points to testimony supposedly suggesting that paying users for their data is

fantasy.[29] These factual disputes do not require excluding Dr. Economides testimony.[30] And

Facebook takes this testimony out of context. ███████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████ █████████████

████████████████████████████████████████████████████

---

[26] Ex. 6 (Economides Tr.) at 242:11–243:1, 245:17–247:2.

[27] *Twitter*, 2020 WL 9073168, at *5; *In re Allstate Corp. Sec. Litig.*, 2022 WL 842737, at *13–14 (N.D. Ill. Jan. 10, 2022).

[28] *In re Glumetza Antitrust Litig.*, 2021 WL 1817092, at *13, *16 (N.D. Cal. May 6, 2021); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1070 (N.D. Ill. 2022 (denying *Daubert* and explaining "it is up to the factfinder to decide which expert's 'but for' world is the more convincing one."); *In re EpiPen Mktg. Sales Pracs. & Antitrust Litig.*, 2021 WL 2577490, at *16 (D. Kan. June 23, 2021) (denying *Daubert* and explaining that evidence that antitrust defendants in actual world "considered" course of action predicted in but-for world corroborated expert's analysis); *United Food & Com. Workers Loc. 1776 et al. v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1190 (N.D. Cal. 2017) (rejecting *Daubert* argument that defendant did not consider but-for world conduct in the actual world).

[29] Mot. at 6–7.

[30] *In re Capacitors*, 2020 WL 870927, at *2.

[31] Ex. 7 (Zuckerberg Tr.) at 52:13–53:8, 60:14–61:15.

1    [REDACTED] [32] But here, Facebook would pay users for something they provide (their data).

2    **B.      Dr. Economides' yardstick damages model is relevant and reliable.**

3    Courts routinely find the damages analyses Dr. Economides applied—the yardstick

4    method—both relevant and reliable.[33] Dr. Economides properly applied this method, and

5    Facebook only raises arguments going to weight, not exclusion.

6    Economic literature explains that "[i]n a typical yardstick approach, one compares prices

7    during the period … to prices in other markets" that are "reasonably comparable."[34] Professor

8    Hovenkamp's "Primer on Antitrust Damages"—which both Facebook and its economist, Dr.

9    Tucker, cite—explains that "in exclusionary practice cases" (like this one), experts "might also

10   select a different product market rather than a different geographic market as a 'yardstick.'"[35]

11   And Dr. Tucker testified that an economist may properly "take a different product market as a

12   comparison," and that a yardstick need only be "informative."[36]

13   To calculate class-wide damages, Dr. Economides determined a market price for the data

14   Facebook collects and users from class members. He identified [REDACTED] real-world companies that

15   collect and use comparable data, but are honest about and pay users for it. These programs were

16   [REDACTED]

17   [REDACTED] . Economides Rep. ¶ 105, Table 1. Based on these

18   payments, he conservatively identified $5 per month as what Facebook would most likely pay in

19   the but-for world. He then multiplied the $5 monthly payment by monthly active users across the

20   class period, arriving at class-wide damages, divisible into individual damages. *Id.* ¶¶ 119–121,

21   Table 3. And he conducted a rigorous robustness check, confirming [REDACTED]

22   [REDACTED] *Id.* ¶¶ 109–118. His analysis is a well-grounded damages model.

23   Facebook first criticizes Dr. Economides for not including platforms such as TikTok, X

24   (Twitter), YouTube, or Pinterest, which it claims are "closer to" Facebook. Its critique fails

---

[32] Ex. 8 (Farrell Merits Tr.) at 272:10–273:8.
[33] *NFL*, 2023 WL 1813530, at *8; *St. Alphonsus*, 778 F.3d at 784.
[34] (Measuring Benchmark Damages in Antitrust Litigation at 63).
[35] *Id.* at 31.
[36] Ex. 9 (Tucker Tr.) at 296:16–297:4.

because an argument that there are "more appropriate yardsticks" is not even a basis for exclusion.[37] Moreover, Dr. Economides selected his yardsticks after applying five objective criteria, considering and rejecting firms like the ones Facebook proposes. Economides Rep. ¶¶ 98–105 & Appendix A.

Facebook next disputes the comparability of Dr. Economides' yardsticks on the grounds that they provide no "offsetting services" to users, such as entertainment or social connection. But Dr. Economides intentionally selected yardsticks that offer no independent features to users because doing so allowed him to identify the specific element of price (data compensation) he was trying to measure in the but-for world. Economides Rebt. ¶¶ 92-97.

Facebook attacks Dr. Economides' analysis of two real-world programs where it paid users for their data (Study and Research). ██████████████████████ ██████████████████████████ and their smaller scale makes his damages estimate conservative. Moreover, as Dr. Economides explains, that ████████████████████ ████████████████ is "economically significant evidence of" its "economic incentives, its revealed preferences, and the operation of a market by which consumers receive monetary payments for their data." Economides Rep. ¶ 69. Facebook's dispute over this evidence's significance is a weight question for the jury.[38]

Facebook argues that the yardsticks are also not comparable because they were only available to a limited group of participants.[39] But though these yardsticks are "smaller scale" than Facebook, Facebook has a greater incentive to pay users than the yardsticks do as it would risk losing users in the *but-for* world and has far more at stake. Economides Rep. ¶ 117. His yardsticks are also conservative. The yardsticks' users have a revealed preference for sharing their data, meaning their "effective minimum" price to sell their data is likely lower than Consumers'. *Id.*

Facebook also critiques supposed differences in data collected and used by Facebook

---

[37] *In re Xyrem*, 2023 WL 3440399, at *13; *see also Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1221 (9th Cir. 1997); *Syufy Enterprises v. Am. Multicinema, Inc.*, 793 F.2d 990, 1003 (9th Cir. 1986).

[38] *In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1070 (N.D. Ill. 2022); *Moehrl*, 2023 WL 2683199, at *6–7.

[39] Mot. at 9.

1  versus the yardsticks. But Dr. Economides compared what Facebook obtains to the yardsticks,

2  concluding it is "reasonably comparable," and Facebook identifies no reason (beyond its say so)

3  to conclude otherwise. *Id.* ¶¶ 105, 107–08. Moreover, Facebook clearly believes the yardsticks

4  collected comparable data, ████████████████████████████████████████

5  ████████████████████████████████ *Id.* ¶¶ 72, 107–08.[40]

6  　　　　One case Facebook cites confirms the prices market research firms pay users for data is a

7  reliable proxy for the market price of users' data more broadly.[41] Regardless, yardsticks need not

8  be "the perfect clone," and Facebook's arguments go to "weight, not admissibility[.]"[42]

9  　　　　Facebook's claim that Dr. Economides did not "incorporate[]" the "value" users receive

10 from Facebook "into his damages calculation" is also baseless. He explained that all class

11 members are harmed regardless of the value they assign to Facebook, as they all receive $0 for

12 their data, rather than $5, so there is nothing to offset. Economides Rep. ¶¶ 87–88. In any case,

13 this Court has explained that whether an expert "properly included all variables" is for cross.[43]

14 　　　　None of Facebook's quarrels with Dr. Economides' yardstick analysis identify any

15 methodological flaw, and they are thus a factual jury argument. The selection of yardsticks

16 themselves go to weight, not admissibility.[44] Regardless, Facebook's cited cases either do not

17 apply or support admitting Dr. Economides' opinions. In *Muffett v. City of Yakima*,[45] *In re Live*

18 *Concert Antitrust Litig.*,[46] and *Martinez v. Rabbit Tanaka Corp.*,[47] the experts all either performed

19 no discernible comparability analysis for their yardsticks, or committed fundamental errors in

20 identifying the prices used in the yardsticks they selected. *Shannon v. Crowley* involved a motion

---

[40] *See Moehrl*, 2023 WL 2683199, at *9 (that defendants used some of Dr. Economides' "potential yardsticks" as "comparators" made his yardstick damages opinions reliable).

[41] *Rodriguez v. Google LLC*, 2024 WL 38302, at *12 (N.D. Cal. Jan. 3, 2024) (denying *Daubert* where damages model used prices for data paid by Google Screenwise Meter, one of Dr. Economides' yardsticks, to approximate value of user data collected by Google in other contexts).

[42] *In re HIV Antitrust Litig.*, 2022 WL 22609107, at *39 (N.D. Cal. Sept. 27, 2022).

[43] *In re Capacitors Antitrust Litig.*, 2021 WL 5407452, at *4 (N.D. Cal. Nov. 18, 2021).

[44] *See In re Xyrem*, 2023 WL 3440399, at *13.

[45] 2012 WL 12827492, at *3 (E.D. Wash. July 20, 2012) (used personal memory not data).

[46] 863 F. Supp. 2d 966, 976 (C.D. Cal. 2012) (expert conceded not accounting for "major factor").

[47] 2006 WL 5100536, at *14 (S.D. Fla. Jan. 6, 2006) (expert admitted "he did not consider the similarity of the businesses compared, as required by Florida law").

CONSUMER PLS.' OPP. TO DEF.'S MOT. TO EXCLUDE [**REDACTED**]　　　　Case No. 3:20-cv-08570-JD

*in limine* and a lost profit analysis, which needed to—but did not—account for "the plaintiff's own business."[48] These fact patterns have no application to Dr. Economides, who calculates the competitive price to determine the overcharge (not lost profits), consulted extensive documents and data in support of his comparability analysis, and accurately quoted the prices from his yardsticks.

### IV.   DR. ECONOMIDES' MARKET DEFINITION ANALYSIS IS PROPER

Facebook's market definition challenge is irrelevant and improper. ██████████████

████████████████████████████████████████████████████████████████████████

███████ [49] Facebook's class certification opposition concedes this. Yet much of its *Daubert* motion prematurely challenges Dr. Economides' market definition analysis. The Court should disregard this section of Facebook's motion. And, as discussed below, Facebook's market definition arguments fail on the merits.

### A.   Dr. Economides reliably uses qualitative evidence to define the relevant market.

The Ninth Circuit has been clear that "[t]here is no requirement to use any specific methodology in defining the relevant market."[50] One widely-accepted approach—endorsed by the Supreme Court in *Brown Shoe*—is to use qualitative evidence, which can alone be sufficient to define a market.[51] The *Brown Shoe* factors serve as "evidentiary proxies" for assessing whether products outside a relevant market are "reasonably interchangeable" with those inside of the market.[52] Applying standard economic principles, Dr. Economides considered these factors and qualitative evidence in detail, concluding they show PSNs like Facebook, Instagram, Snapchat, Google+, and MeWe constitute a distinct product market. Economides Rep. ¶¶ 7–8, 17–32, 35–36.

---

[48] 538 F. Supp. 476, 480–81 (N.D. Cal. 1981).
[49] Ex. 14 ███████████████).
[50] *Optronic Techs.*, *Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 482 (9th Cir. 2021).
[51] *Fed. Trade Comm'n v. Meta Platforms Inc.*, 654 F. Supp. 3d 892, 912 (N.D. Cal. 2023); *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962); *Lucas Auto. Eng'g*, *Inc. v. Bridgestone/Firestone*, *Inc.*, 275 F.3d 762, 766–68 (9th Cir. 2001) (qualitative evidence sufficient by itself to define market).
[52] *United States v. H&R Block*, *Inc.*, 833 F. Supp. 2d 36, 51, 54 (D.D.C. 2011).

1    Facebook offers various critiques of Dr. Economides,[53] but none require exclusion. For

2    example, it claims Dr. Economides "invented" the idea that the "core use case" of PSNs like

3    Facebook is facilitating online interactions between users and their friends and family. He did

4    not ███████████████████████████████████████████████████████

5    ████████. Economides Rep. ¶¶ 27, 32 n. 33. Far from being "unmoored to sound

6    economic analysis," Dr. Economides' section on the "Economic Approach to Market Definition"

7    makes clear that economists regularly use qualitative evidence—including the views of industry

8    participants—to determine the core use case of a product and thus identify its reasonable

9    substitutes. *Id.* ¶¶ 20–23 & 24 nn.15–17 (citing Baker, Bresnahan, and Merger Guidelines). As

10   the Court previously explained *in this case*, "statements by companies explaining which products

11   they see as competitors for their own" are "highly probative" of market definition.[54] Courts thus

12   regularly deny *Daubert* motions where, as here, an economist uses a company's "internal []

13   documents, employee testimony, and discovery responses" and "third-party information" to

14   define a market.[55]

15   Facebook also offers attorney argument (not evidence) that YouTube, TikTok, and Apple

16   iMessage should have been included in the market. But that is not even a basis for exclusion.

17   Instead, "the proper treatment" of whether particular firms are (or are not) in the relevant market

18   "is a battle of the experts that should be left to the factfinder[.]"[56] In any case, Dr. Economides

19   considered each of these products and explained why—based on evidence from Facebook and

20   other market participants—they and other niche networking, public content, and private

21   messaging services are *not* reasonable substitutes for PSNs and thus properly excluded from the

22   market. Economides Rep. ¶¶ 29–32. Facebook may dispute this evidence and the conclusions to

23   be drawn from it, but that is for trial.[57]

24

25   [53] Mot. at 10–13.

     [54] ECF No. 214, at 21.

26   [55] *Apple iPod iTunes Antitrust Litig.*, 2014 WL 4809288, at *7 (N.D. Cal. Sept. 26, 2014).

27   [56] *In re Dealer*, 581 F. Supp. 3d at 1056–57 (denying *Daubert* based on exclusion of firm from market).

28   [57] Facebook's claim that Dr. Economides' abridged report spends "three sentences" on TikTok (Opp. at 13 n.4) is baffling. Dr. Economides' multiple full-length reports devote *pages* to TikTok.

Facebook's claim that Dr. Economides' qualitative analysis is "untestable" is also baseless. Not every Rule 702 factor "is relevant to reliability in every case" and "neither Rule 702 nor Daubert precludes qualitative analyses."[58] Regardless, that his analysis is "qualitative" does not make it "unreliable" or "untestable"—a "'qualitative analysis' may bear on the answer to a 'qualitative question'" such as "business models, market characteristics, and the like."[59] That one of Facebook's experts (███████)—though unqualified and his approach itself is flawed—tested Dr. Economides' analysis (but reached different conclusions) defeats Facebook's argument.[60]

Facebook's cited cases in no way preclude certification here. Many involve fact patterns that are a far cry from Dr. Economides' economic analysis, such as testing firearm shell casings and water pumps, or "eye-balling" the cost to repair smoke damage.[61] Another, *Coronavirus Rep. v. Apple Inc.*, involved a motion to dismiss—not *Daubert*.[62] In *Teradata Corp. v. SAP SE*, the expert provided no "further explanation" in support of his market definition views, and the court's decision is currently on appeal to the Ninth Circuit, where the DOJ and a panel of economists (including Facebook's own Dr. Tadelis) urged reversal as wrongly-decided.[63] And in *In re Live Concert Antitrust Litig.*, the expert expressly ***assumed*** the relevant market at issue and was accused of defining the market too broadly.[64] These concerns are simply not present here, where Dr. Economides reliably applied sound economic methods to qualitative evidence and explained why he included particular firms in the market and excluded others. No more is required now.

Facebook portrays Dr. Economides as uninformed about the various apps described in his report.[65] This is disingenuous. Dr. Economides explained ███████████████████████

---

[58] *Plexxikon Inc. v. Novartis Pharms. Corp.*, 2021 WL 2340144, at *3 (N.D. Cal. June 8, 2021).
[59] *Fed. Trade Comm'n v. Qualcomm Inc.*, 2018 WL 6615050, at *4 (N.D. Cal. Dec. 17, 2018) (denying *Daubert* motion on this basis).
[60] Ex. 10 (███████████) at ¶ 10 (███████████████████████████████).
[61] *United States v. Adams*, 444 F. Supp. 3d 1248, 1260 (D. Or. 2020); *Sonneveldt v. Mazda Motor of Am., Inc.*, 2023 WL 2292600, at *51 (C.D. Cal. Feb. 23, 2023); *Falcon v. State Farm Lloyds*, 2014 WL 2711849, at *23 (W.D. Tex. June 16, 2014).
[62] 2021 WL 5936910, at *8 (N.D. Cal. Nov. 30, 2021).
[63] *See* 570 F. Supp. 3d 810, 838 (N.D. Cal. 2021); *Teradata Corp. v. SAP SE*, No. 2022-1286, 2023 WL 4882885, at *1 (Fed. Cir. Aug. 1, 2023).
[64] 863 F. Supp. 2d at 988.
[65] Mot at 10–12.

█████████ [66] Regardless, as a seasoned economist, Dr. Economides does not need to be a technical expert to define a market, which is why courts reject *Daubert* arguments like this.[67]

**B.      Dr. Economides properly applied the hypothetical monopolist test.**

Dr. Economides separately confirmed his relevant market definition using the hypothetical monopolist test (HMT). Economides Rep. ¶¶ 7-8. The HMT asks whether a hypothetical 100% monopolist in a candidate market could profitably impose a small but significant non-transitory increase in price ("SSNIP") above the prices that would prevail if that same market were competitive. *Id.* ¶¶ 21-23. If so, then the candidate market is a properly defined relevant market. *Id.* Dr. Economides examined ███████████████████████████ ███████████████████████████. *Id.* ¶ 39. ATT requires apps used on an iPhone, iPad, or other Apple iOS products to ask users for permission to track them outside the given app. *Id.* ¶ 35. ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

██████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████ Because the imposition of the reverse SSNIP (a decrease in price) to a more competitive level was unprofitable, the imposition of a SSNIP (an increase in price) from a competitive level would be profitable, thereby satisfying the HMT. *Id.* ¶¶ 39-40.

---

[66] Ex. 6 (Economides Tr.) at 198:13–14, 199:4, 199:12–200:1.
[67] *Id.* at 199:12–200:1; *Sumotext Corp. v. Zoove, Inc.*, 2020 WL 533006, at *10 (N.D. Cal. Feb. 3, 2020) (economist need not be "consumer engagement" expert to define market).

In its Motion, Facebook concedes a SSNIP test is a well-accepted application of the hypothetical monopolist test, which is itself a well-accepted method to define a relevant market.[68] Economides Rep. ¶ 21. ████████████████████████████████████████████████ ████████████████████████████████████████.[69] Economides Rep. ¶ 39 n. 53. Facebook nonetheless argues that Dr. Economides' well-accepted methodology should be excluded because he did not sufficiently show ████████████████████████████████████████ ████████████████████████████████[70] But Facebook's dispute with how Dr. Economides implemented this well-accepted methodology and his results are no basis for exclusion.[71]

Facebook's first argument as to engagement misunderstands Dr. Economides' analysis. He did show ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████ Economides Rep. ¶ 39. Facebook's arguments are nothing more than a competing factual assessment, a weight question irrelevant to admissibility.

As to Facebook's second argument, Dr. Economides did show ████████████████ ██████████████████████████ Id. Its claim that Dr. Economides should have separated Facebook's advertising revenue from that earned in the PSN market misrepresents its financial realities. ██████████████████████████, 99% of its revenue primarily comes from targeted advertising drawing on class members' data.[72] Facebook also claims that the reduction in revenue could have been due to competition from TikTok, ████████████████.[73] ████████████ ████████████████████████████████████████████████████████.[74] Economides Rep. ¶ 36. Regardless, contemplating and refuting all possibilities is not the standard

---

[68] Mot. at 13; *see also FTC*, 654 F. Supp. 3d at 912, 919 (HMT and SSNIP tests well-accepted).
[69] Ex. 11 (List Tr.) at 103:24–104:4, 112:1–16 (Facebook's expert describing his use of "a reverse HMT," which he says is "what this entire industry does").
[70] Mot. at 13.
[71] *Moehrl*, 2023 WL 2683199, at *6–7.
[72] Ex. 12 (Meta 2020 Form 10-K at p. 7, 66).
[73] Mot. at 14.
[74] Facebook cites two paragraphs from the report of an expert for the Advertiser class in its separate case (Mot. at 14), but that is not admissible in this case and, in any event, does not show TikTok's market share increased at the expense of Facebook's advertising revenue.

to which experts are held under *Daubert*.[75]

Facebook's cited cases do not say otherwise. *Epic Games, Inc. v. Apple Inc.*, involved findings after a bench trial (not *Daubert*).[76] *In Rodriguez*, the court cited the Rule 702 standards and denied the *Daubert* motion.[77] The cited *Sumotext* decision arose from a new trial motion (not *Daubert*); at the pre-trial stage, the court denied the motion to exclude the "natural SSNIP" analysis.[78] And in *Kentucky Speedway*, the analysis looked at average prices "over an eight-year" span, not "at a particular point in time."[79] Dr. Economides considered the effects from a specific event (███). Facebook's claim that Dr. Economides improperly used a real-world event (███) to confirm his market definition is belied by the fact that Facebook's own experts at the merits stage themselves looked to natural events like outages and bans for market definition; █████████ ███████████.[80]

## V.   CONCLUSION

For these reasons, Consumers respectfully request that the Court deny Facebook's motion.

---

[75] *Moehrl*, 2023 WL 2683199, at *6–7; *In re Capacitors*, 2020 WL 870927, at *2 (this Court explaining that what expert "did or didn't take into account" may be for cross, but not matter for exclusion).
[76] 559 F. Supp. 3d 898, 965 (N.D. Cal. 2021).
[77] 2024 WL 38302, at *2, *13.
[78] 2020 WL 6544410, at *9; 2020 WL 53006, at *11.
[79] *Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 918 (6th Cir. 2009).
[80] Ex. 13 (Tucker Ad. Merits Rep.) ¶ 99.

DATED: July 8, 2024

By: */s/ Shana E. Scarlett*
**HAGENS BERMAN SOBOL SHAPIRO LLP**
Shana E. Scarlett (Bar No. 217895)
shanas@hbsslaw.com
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000

Steve W. Berman (admitted *pro hac vice*)
steve@hbsslaw.com
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292

*Interim Co-Lead Consumer Class Counsel*

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
W. Joseph Bruckner (admitted *pro hac vice*)
wjbruckner@locklaw.com
Robert K. Shelquist (admitted *pro hac vice*)
rkshelquist@locklaw.com
Brian D. Clark (admitted *pro hac vice*)
bdclark@locklaw.com
Rebecca A. Peterson (Bar No. 241858)
rapeterson@locklaw.com
Kyle Pozan (admitted *pro hac vice*)
kjpozan@locklaw.com
Laura M. Matson (admitted *pro hac vice*)
lmmatson@locklaw.com
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900

*Interim Counsel for the Consumer Class*

By: */s/ Kevin Y. Teruya*
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Kevin Y. Teruya (Bar No. 235916)
kevinteruya@quinnemanuel.com
Adam B. Wolfson (Bar No. 262125)
adamwolfson@quinnemanuel.com
Scott L. Watson (Bar No. 219147)
scottwatson@quinnemanuel.com
Claire D. Hausman (Bar No. 282091)
clairehausman@quinnemanuel.com
Brantley I. Pepperman (Bar No. 322057)
brantleypepperman@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
Telephone: (213) 443-3000

Michelle Schmit (admitted *pro hac vice*)
michelleschmit@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606-1881
Telephone: (312) 705-7400
Manisha M. Sheth (admitted *pro hac vice*)
manishasheth@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000

Interim Co-*Lead Consumer Class Counsel*

1

## ATTESTATION OF SHANA E. SCARLETT

2          This document is being filed through the Electronic Case Filing (ECF) system by attorney

3    Shana E. Scarlett. By her signature, Ms. Scarlett attests that she has obtained concurrence in the

4    filing of this document from each of the attorneys identified on the caption page and in the above

5    signature block.

6    Dated: July 8, 2024                    By:  _/s/ Shana E. Scarlett_____
                                                   Shana E. Scarlett
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSUMER PLS.' OPP. TO DEF.'S MOT. TO EXCLUDE [**REDACTED**]              Case No. 3:20-cv-08570-JD

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on July 8, 2024, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System, causing it to be electronically served on all attorneys of record.

By:   */s/ Shana E. Scarlett*
Shana E. Scarlett

CONSUMER PLS.' OPP. TO DEF.'S MOT. TO EXCLUDE [**REDACTED**]          Case No. 3:20-cv-08570-JD