CONSUMERS EX. 5-1

THE ROLE OF THE STATE   ANTITRUST AND COMPETITION   THE DIGITAL ECONOMY   BIG TECH   NEWS   RESEARCH

# Giving Away Our Data for Free is a Market Failure

BY NICHOLAS ECONOMIDES, IOANNIS LIANOS    February 1, 2021



Photo by Yuri Samoilov via Flickr. (CC BY 2.0)

**By convincing users to give away their data for free, digital platforms have caused a market failure. This failure benefits them and harms us, their users.** A recent paper explores different ways to fix this.

———

D igital platforms, such as Google and Facebook, voraciously collect personal information from their users. This information spans many aspects of users' lives, such as location, interests, activities, political opinions, and social interactions. Personal information is collected without compensation to the user, other than providing free internet search by Google or free social networking services by Facebook. Users opt-in by default, providing their personal information to digital

CONSUMERS EX. 5-2

platforms that impose a take-it-or-leave-it requirement contract.

There are clearly two markets here: the "primary" market for digital services:

(A) search in the case of Google, social networking service in the case of Facebook; and

(B) the market for the sale of personal information. In a competitive world, these markets would function separately from each other.

Under competition, in market A, prices for internet search or for social network service would be determined by competitive conditions. In market B, users would be able to sell their personal information if they so wished but could also choose not to do so.

The ability of the digital platforms to drive users to accept their take-it-or-leave-it opt-in contract to provide personal data at zero price is a direct result of their market dominance. The collection of data in this fashion enhances the dominant position of the platforms in their respective primary markets and reinforces their ability to collect even more personal data.

In the competitive world, users by default would opt-out from the market for sale of personal information. If a user wanted to enter this market, she would opt-in, sell her personal information and get compensated by the digital platform. Compensation would depend on the value of the information of a particular user to the platform. A user would accept the offer and participate in market B if the monetary compensation exceeds her value of the loss of privacy implied by the transaction.

Users vary widely on the value they place on privacy and in the value of their personal information to the platforms. Therefore, in a competitive market for personal information, some users would participate, and

CONSUMERS EX. 5-3

others would not. Transaction prices for the sale of personal information would also vary and likely be individually negotiated between the platform and the user.

==In contrast, at present we observe a== *==market failure==* ==where all transactions occur at the same zero price, and some transactions that would have occurred under competition do not occur.== The market failure is a direct result of the imposition of the take-it-or-leave-it contract by dominant digital platforms and the default opt-in.

> "The market failure is a direct result of the imposition of the take-it-or-leave-it contract by dominant digital platforms and the default opt-in."

==A digital platform can benefit from this market failure in at least three ways:== First, it collects and appropriates data directly from the user and combines it with other data it buys from third parties, such as health or credit card transactions data, as well as public census income and race data, to create a profile that is highly desirable to an advertiser or a political campaign and can be sold at a high price. The appropriation of personal information improves the quality of profiles sold to advertisers and enhances the digital platform's market position in advertising.

Second, data has network effects that improve the quality of the primary services of the platforms. Thus, the appropriation of more personal information enhances the dominance of Google and Facebook in their respective primary markets for internet search and social networking.

==Third, the platform does not pay for personal data except by a payment==

CONSUMERS EX. 5-4

in kind with a service that has a negligible incremental cost. Thus, the platform always benefits from the appropriation of data in exchange for its service, even when the data has small benefits in increasing the quality of the user profile sold to advertisers or small network effects in other services sold by the platform. Most importantly, the platform avoids monetary payments that would be the norm in the but for world and enhances its dominance in its primary market.

There are several harms to users and competition resulting from the requirement contract and the market failure. First, the market failure harms users who would be willing to pay for the primary service of the platform but are not willing to sell their personal information to the platform at zero price and therefore presently do not participate in market B. Second, some of the users participating in the market at zero price would be compensated at a positive price under competition. Third, the market failure, through the acquisition of data, enhances the dominant position of digital platforms in their respective primary market. Fourth, the enhancement of the dominant position in the primary market allows platforms to make more users accept the requirement contract, thereby increasing the group of users who accept the requirement contract and the harm to them.

Users are also harmed because of asymmetric information. They do not know the value of their data to advertisers and/or the digital platforms that harvest them as they have no information of its value in digital platform's transactions with advertisers and infomediaries on the other side of the platform. Additionally, users may underestimate the value of their privacy or this value may increase over time in the perception of the user.

There is also the risk that the mode of competition and innovation in the industry will be frozen at a suboptimal equilibrium from the perspective of data protection since the implemented data extraction