**BATHAEE DUNNE LLP**
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Andrew C. Wolinsky (CA 345965)
awolinsky@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
Tel.: (332) 322-8835

Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (*pro hac vice*)
egrauman@bathaeedunne.com
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
Tel.: (213) 462-2772

*Interim Co-Lead Counsel for the
Advertiser Class*

[Additional counsel on signature page]

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Amanda F. Lawrence (*pro hac vice*)
alawrence@scott-scott.com
Patrick J. McGahan (*pro hac vice*)
pmcgahan@scott-scott.com
Michael P. Srodoski (*pro hac vice*)
msrodoski@scott-scott.com
156 South Main Street, P.O. Box 192
Colchester, CT 06415
Tel.: (860) 537-5537

Patrick J. Coughlin (CA 111070)
pcoughlin@scott-scott.com
Carmen A. Medici (CA 248417)
cmedici@scott-scott.com
Hal D. Cunningham (CA 243048)
hcunningham@scott-scott.com
Daniel J. Brockwell (CA 335983)
dbrockwell@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: (619) 233-4565

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> META PLATFORMS, INC., <br><br> Defendant. | Case No. 3:20-cv-08570-JD <br><br> Hon. James Donato <br><br> **ADVERTISER PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION** <br><br><br> Hearing Date: September 26, 2024 <br> Hearing Time: 10:00 a.m. <br> Courtroom 11, 19th Floor |

**FILED UNDER SEAL**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

ARGUMENT ....................................................................................................................1

    I.      COMMON ISSUES AND CLASSWIDE EVIDENCE WILL
           PREDOMINATE ..........................................................................................1

          A.    THE MERITS OF ADVERTISERS' ANTITRUST CASE WILL
                SHOW CLASSWIDE IMPACT ....................................................1

          B.    DR. WILLIAMS'S ANALYSIS IS COMMON EVIDENCE THAT
                META USED ITS MARKET POWER TO EXCLUDE RIVALS,
                RAISE PRICES, AND EXTRACT MONOPOLY PROFITS BY
                OVERCHARGING CLASS MEMBERS ....................................5

    II.    META'S *COMCAST* ARGUMENTS ARE MERITLESS................................10

          A.    META'S EXCLUSIONARY ACTS MUST BE CONSIDERED AS A
                WHOLE FOR THE PURPOSES OF ANTITRUST IMPACT AND
                DAMAGES, NOT DISMEMBERED AND ANALYZED
                INDIVIDUALLY ...........................................................10

          B.    META'S OTHER *COMCAST* ARGUMENTS FAIL ..............................13

    III.    TYPICALITY AND ADEQUACY ARE SATISFIED.......................................14

CONCLUSION.................................................................................................................15

**FILED UNDER SEAL**

1

**TABLE OF AUTHORITIES**

2

**CASES**

3

4    *Apex Hosiery Co. v. Leader*,
     310 U.S. 469 (1940) ........................................................................................3

5    *Brown Shoe Co., Inc. v. United States*,
     370 U.S. 294 (1962) .....................................................................................6, 9
6

7    *Catlin v. Wash. Energy Co.*,
     791 F.2d 1343 (9th Cir. 1986) .......................................................................8

8    *City of Anaheim v. S. Cal. Edison Co.*,
     955 F.2d 1373 (9th Cir. 1992) .....................................................................13
9

10   *Comcast Corp. v. Behrend*,
     569 U.S. 27 (2013) ................................................................................ *passim*

11   *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
     370 U.S. 690 (1962) .....................................................................................13
12

13   *DZ Reserve v. Meta Platforms, Inc.*,
     2022 WL 912890 (N.D. Cal. Mar. 29, 2022) ..............................................15

14   *DZ Reserve v. Meta Platforms, Inc.*,
     96 F.4th 1223 (9th Cir. 2024) ................................................................14, 15
15

16   *Epic Games, Inc. v. Apple, Inc.*,
     67 F.4th 946 (9th Cir. 2023) ...................................................................2, 4, 8

17   *Ewert v. eBay, Inc.*,
     2010 WL 4269259 (N.D. Cal. Oct. 25, 2010) .............................................15
18

19   *FTC v. Indiana Fed'n of Dentists*,
     476 U.S. 447 (1986) .......................................................................................3

20   *Gonzalez v. U.S. Immigr. & Customs Enf't*,
     975 F.3d 788 (9th Cir. 2020) .......................................................................14
21

22   *In re Capacitors Antitrust Litig. (No. III)*,
     2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) ..............................................4

23   *In re Cardizem CD Antitrust Litig.*,
     332 F.3d 896 (6th Cir. 2003) .........................................................................4
24

25   *In re Elec. Books Antitrust Litig.*,
     2014 WL 1282293 (S.D.N.Y Mar. 28, 2015) ...............................................9

26   *In re Google Play Store Antitrust Litig.*,
     2022 WL 17252587 (N.D. Cal. Nov. 28, 2022) ............................................4

27

28

**FILED UNDER SEAL**

*In re Live Concert Antitrust Litig.,*
    247 F.R.D. 98 (C.D. Cal. 2007) .................................................................4

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.,*
    2023 WL 1813530 (C.D. Cal. Feb. 7, 2023).................................8, 12, 13

*In re Online DVD-Rental Antitrust Litig.,*
    779 F.3d 914 (9th Cir. 2015) .................................................................3

*In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.,*
    967 F.3d 264 (3d Cir. 2020)............................................................11, 12

*Knevelbaard Dairies v. Kraft Foods, Inc.,*
    232 F.3d 979 (9th Cir. 2000) .................................................................4

*Nat'l Soc. of Pro. Engineers v. United States,*
    435 U.S. 679 (1978)..............................................................................9

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC,*
    31 F.4th 651 (9th Cir. 2022) (en banc) ...........................................5, 10

*Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa,*
    815 F.2d 270 (3d Cir. 1987)...................................................................4

*Sidibe v. Sutter Health,*
    103 F.4th 675 (9th Cir. 2024) ..............................................................14

*Tele Atlas N.V. v. NAVTEQ Corp.,*
    2008 WL 4911230 (N.D. Cal. Nov. 13, 2008) ....................................13

*Wolin v. Jaguar Land Rover N. Am., LLC,*
    617 F.3d 1168 (9th Cir. 2010) .............................................................15

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
    395 U.S. 100 (1969) ..............................................................................4

**FILED UNDER SEAL**

### INTRODUCTION

Advertisers Plaintiffs' trial will be straightforward. Advertisers will prove that Meta, which had a monopoly in social advertising, acted to strengthen the Data Targeting Barrier to Entry ("DTBE") and to directly exclude rivals, such as Snap, during the Class Period. This conduct maintained Meta's monopoly and the market power that came with it—and it did so by preventing the emergence of competition. Unchecked, Meta raised prices over and again during the Class Period. As an uncontroversial economic matter (and as economic experts will explain at trial), a jury can find antitrust impact on everyone who purchased social advertising during Meta's unlawful monopoly maintenance. All of this will be proven by common evidence, and the Ninth Circuit recently confirmed that antitrust impact follows from proof of the elimination of competition.

Meta's opposition ignores all of this, focusing instead on a single aspect of Dr. Williams's antitrust and damages analysis, Meta's economic profit rate ("EPR"). Meta incorrectly asserts that Plaintiffs hinge their entire theory of impact and damages on that single metric. As explained below, this is simply false—as is Meta's criticism of Dr. Williams. Meta then proceeds to badly misread the Supreme Court's *Comcast* decision—a misreading contrary to *Comcast*'s own terms—and urges this Court to apply an "act-by-act" antitrust damages inquiry squarely foreclosed by controlling precedent. Meta's remaining arguments are factual disputes about the merits of Advertisers' case, not arguments about predominance (or any other class certification issue)—except for a denouement about typicality and adequacy that has no basis in the actual record. The Advertiser Class should be certified.

### ARGUMENT

## I.   COMMON ISSUES AND CLASSWIDE EVIDENCE WILL PREDOMINATE

Meta devotes most of its opposition to predominance. (*See* Opp. at 6-18.) Unfortunately for the Court, however, Meta's purported "predominance" analysis is entirely unhelpful—and indeed, misleading, as it ignores the Ninth Circuit standard and misstates the substance of Advertisers' theory of antitrust impact as well as the trial evidence that will prove it.

### A.   The Merits of Advertisers' Antitrust Case Will Show Classwide Impact

Meta's lead predominance argument flows from (and vigorously attacks) an inaccurate premise—that Advertisers will prove their antitrust claims at trial exclusively through testimony

**FILED UNDER SEAL**

about Meta's economic profit rate during the Class Period. (*See* Opp. at 6-12.) This is incorrect. Advertisers will establish at trial that Meta's exclusionary conduct prevented and impeded competitive entry, including by strengthening the DTBE, and excluded rivals, eliminating the price and product improvement that results from competition. Under these facts, antitrust injury is proven classwide, as increased prices, diminished product quality, and the elimination of consumer choice follow as an economic matter from this anticompetitive conduct. The Ninth Circuit made this point about proving antitrust impact clear in its recent decision in *Epic Games, Inc. v. Apple, Inc.*:

> A plaintiff must also present "some evidence" that the defendant uses [its] market power to harm competition. . . . This inquiry need not always be extensive or highly technical. **It is sufficient that the plaintiff prove the defendant's conduct, as a matter of economic theory, harms competition—for example that it increases barriers to entry or reduces consumer choice by excluding would-be competitors that would offer differentiated products.**

67 F.4th 946, 983-84 (9th Cir. 2023) (cleaned up and emphasis added). The Ninth Circuit did not merely set forth this standard in the abstract; the very next paragraph of the Court's opinion explained the sort of evidence that satisfies this burden. There, Epic had proved that Apple's conduct strengthened barriers to entry, acted to "foreclose would-be competitors," and extracted "extraordinarily high 'operating margins." *Id.* at 984. As the *Epic* court recognized, the Rule of Reason requires proof of antitrust impact, and when a defendant acts to foreclose competition, harm to competition and injury to consumers flow as an economic matter from such conduct. *Id.* at 983-84.

Here, Meta ignores the full range of expert testimony, non-expert evidence from its own files, its own current and former employees' testimony, and evidence from its excluded competitors that will be presented to the jury at trial. This evidence—all of which is indisputably common—will be used to prove that Meta strengthened the DTBE and excluded rivals, harming ad purchasers. Advertisers' Section 2 claims are straightforward on this point: Meta had a monopoly in the Social Advertising Market during the Class Period (December 2016 to December 2020), and it unlawfully maintained that monopoly during the same period through a campaign of exclusionary conduct comprising five categories of acts. (*See* Mot. at 4-13.) Each category of exclusionary conduct—(1) Meta's IAAP program, which used complex hacking technology and infrastructure developed by the

1    company's Onavo to team to monitor and preempt competitive threats, including from Meta's

2    horizontal Social Advertising competitor Snap (*see id.* at 5-7); (2) Meta's private API agreements

3    with hand-picked potential entrants, including so-called "Device Integrators" ███████████

4    ██████████████████████████████████, that provided these third parties with

5    private Meta user data in exchange for restrictions on the products those counterparties could build

6    (*id.* at 7-8); (3) Meta's agreement with Netflix to continue and expand Netflix's large advertising

7    expenditures on Meta to prevent valuable Netflix signals from going to an actual or potential social

8    advertising rival, in exchange for Meta's agreement to scuttle certain directly competitive aspects of

9    its Facebook Watch product (*id.* at 9-10); (4) Meta's "Jedi Blue" agreement with Google, in which

10    Meta abandoned entry into Google's open web ad exchange market, and Google agreed to actively

11    assist Meta's (and only Meta's) expansion of its social advertising products into the open web (*id.* at

12    10-12); and (5) Meta's deception of the FTC to forestall divestiture or regulatory scrutiny as Meta

13    integrated signals from across its lines of business into a one-stop "buffet" for AI/ML training (*id.* at

14    12-13)—separately allowed Meta to unlawfully maintain its monopoly during the Class Period, while

15    that particular conduct occurred. Each category of exclusionary conduct concretely strengthened the

16    DTBE protecting Meta's social advertising monopoly or directly excluded actual or potential rivals,

17    an issue that will be proved classwide at trial not just through Meta's own documents, but through

18    the testimony of one or more Advertiser liability experts. All of Meta's identified acts prevented or

19    restricted competition—competition that a jury could reasonably find would have lowered prices,

20    resulted in better products, and increased consumer choice had Meta's unlawful monopolization not

21    occurred. This is, to put it simply, classwide antitrust impact.

22       To the extent that Meta's "predominance" argument is simply a repudiation of baseline

23    economic theory and common sense that has been part of antitrust jurisprudence since the enactment

24    of the Sherman Act—that competition lowers prices, creates better products, and increases consumer

25    choice and welfare—Meta's argument is foreclosed by decades of case law. *See Apex Hosiery Co. v.*

26    *Leader*, 310 U.S. 469, 493 (1940); *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986); *In re*

27    *Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 922 (9th Cir. 2015) (antitrust injury "can be

28    established by showing that consumers paid higher prices for a product due to anticompetitive actions

1  of a defendant"); *In re Cardizem CD Antitrust Litig.,* 332 F.3d 896, 911 (6th Cir. 2003) ("[P]aying

2  higher prices for a product due to a lack of competition in the market . . . is the type of injury that can,

3  and the plaintiffs have alleged did, flow from the anticompetitive effects of the Agreement");

4  *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000); *Pa. Dental Ass'n v.*

5  *Med. Serv. Ass'n of Pa*, 815 F.2d 270, 275 (3d Cir. 1987). When a monopolist exercises its market

6  power to exclude rivals and raise prices (as Meta has here), it is perfectly reasonable for a factfinder

7  to conclude that prices would have been lower and product quality better absent the exclusionary

8  market restraint. And Advertisers' proof of this—the existence and exercise of monopoly power, the

9  increase in prices over time, and Meta's high profit margins—will all be shown at trial using common

10  evidence from Meta and its competitors in the market. *See In re Google Play Store Antitrust Litig.*,

11  2022 WL 17252587, at *12 (N.D. Cal. Nov. 28, 2022) (like in price-fixing cases where there is a

12  baseline price inflation, "a defendant's common practices are often a good basis for establishing

13  classwide proof of liability and injury").

14       Put simply, using monopoly power to erect barriers to entry and to exclude actual and potential

15  competitors is conduct that prevents competition, and a jury can reasonably conclude that the

16  simultaneous price increases were enabled by that conduct, particularly given Meta's extraordinary

17  profit margins (which Dr. Williams confirms). *See Epic Games*, 67 F.4th at 983-84. That causal nexus

18  can be proven through both direct and indirect evidence, such as the evidence described above from

19  Meta's documents and employees, and evidence from its excluded competitors. As the Supreme Court

20  explained in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, the "burden of proving the fact of

21  damage under § 4 of the Clayton Act is satisfied by . . . proof of some damage flowing from the

22  unlawful conspiracy" (here, monopolization); "inquiry beyond this minimum point goes only to the

23  amount and not the fact of damage." 395 U.S. 100, 115 n.9 (1969) (citations omitted); *see also In re*

24  *Live Concert Antitrust Litig.*, 247 F.R.D. 98, 133 (C.D. Cal. 2007) ("Fact of damage involves two

25  intertwined questions: (1) whether the plaintiff suffered some loss in his business or property, and (2)

26  whether there is a casual relationship between the violation and the loss." (cleaned up)).

27       Advertisers' burden is not to show that "each and every putative class member was harmed

28  before certification can be granted," *In re Capacitors Antitrust Litig. (No. III)*, 2018 WL 5980139, at

**FILED UNDER SEAL**

*7 (N.D. Cal. Nov. 14, 2018) (Donato, J.), but rather to show that individualized evidence will not predominate and overwhelm common issues at trial, *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC ("Olean")*, 31 F.4th 651, 666-67 (9th Cir. 2022) ("In determining whether the 'common question' prerequisite is met, a district court is limited to resolving whether the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial."); *see also id.* at 669 (rejecting view that "Rule 23 does not permit the certification of a class that potentially includes more than a de minimis number of uninjured class members" as "inconsistent with Rule 23(b)(3), which requires only that the district court determine after rigorous analysis whether the common question predominates over any individual questions, including individualized questions about injury or entitlement to damages"). Requiring actual member-by-member *proof* of injury at class certification would be "[s]etting the certification bar at an extreme height" and "would almost certainly kill off most antitrust class actions well before an adjudication of the merits of the case." *In re Capacitors*, 2018 WL 5980139, at *7.

**B.**    **Dr. Williams's Analysis Is Common Evidence that Meta Used Its Market Power to Exclude Rivals, Raise Prices, and Extract Monopoly Profits by Overcharging Class Members**

Ignoring all of the above, Meta spends most of its "predominance" argument attacking a purported assumption by Dr. Williams that all prices paid by class members are anticompetitive overcharges simply because Meta's profits were statistically high. This premise is demonstrably false.

To begin with, there are three aspects of Dr. Williams's analysis that tend to prove classwide injury as to all social advertising purchasers. First, Dr. Williams shows that Meta had market power (or monopoly power)—the power to raise prices without giving up market share. *See* Williams Rpt. ¶¶ 26-55. Second, Dr. Williams analyzes Meta's prices and finds that Meta did in fact consistently raise prices during the class period. *Id.* at ¶¶ 27-32, Table A2. Finally, to connect the increased prices to the exercise of Meta's monopoly and/or market power, Dr. Williams analyzes whether Meta's price increases resulted in outsized profits, consistent with a monopolist exercising its market power. *Id.* at ¶¶ 29-31; Williams Reply ¶¶ 37-136. Dr. Williams uses EPR analysis for this last step. *Id.*[1] This three-

_____

[1] Dr. Williams validated his yardstick analysis by performing a "During-After" analysis, using post-Class Period EPRs to calculate a lower bound on damages. Williams Rpt. ¶¶ 107-08 & Table 7. Meta

**FILED UNDER SEAL**

legged stool of common evidence, taken as a whole, tends to show that Meta's overcharge flowed from its exclusion of competition and maintenance of its monopoly. Indeed, it is Meta's exclusion of competition and fortification of the DTBE that Advertisers contend provided Meta with the monopoly power necessary to raise prices without a competitive check. The underlying sources of Dr. Williams's analysis are indisputably common to the class; they include, for example, Meta's cost-per-click ("CPC") and cost-per-mille ("CPM") pricing for ads, Meta's market and revenue shares during the relevant period, evidence necessary for market definition under the factors set forth in *Brown Shoe Co., Inc. v. United States*, and evidence concerning competitive entry and the DTBE's strength and existence during the Class Period. Williams Rpt. ¶¶ 10-55, Tables A1-A5. Put simply, Meta's argument that Advertisers rest their entire theory of classwide impact on an EPR calculation is a strawman—and a shoddily constructed one at that.

Meta's "predominance" arguments are in fact directed to its disagreements with Dr. Williams's methodology, not to any credible argument about the actual evidence—and the importance of actual individualized issues—in an actual trial in this matter. For example, Meta argues that Dr. Williams's price analysis is not possible on a non-individualized basis because Meta's advertising auction systems supposedly set prices in a manner that varies from customer to customer, akin to a "negotiated price." Opp. at 9. This putative "predominance" argument asserts, citing only to three paragraphs of the Tucker report, that "[a]s with negotiated pricing, auction-based pricing generates individualized prices based on factors specific to each customer and each transaction." Opp. at 9 (citing Tucker Rpt. ¶¶ 64-67). In reality, this entire argument is *ipse dixit* from Meta's paid expert, Dr. Tucker, about how auctions generally compare to negotiated transactions in outcomes and effectiveness. Even so, whether individual auction prices vary within some range based on the participants, supply, and demand at the time of the auction is simply beside the point. As Advertisers will prove at trial, Meta had the market power to control the output of social advertising (*i.e.*, the

---

argues that "Advertisers do not rely on this analysis in their motion, and have thus forfeited their ability to rely on it as a basis for class certification." Opp. at 7 n.3. This is, of course, not the law— Dr. Williams's During-After analysis is *evidence*, not *argument*, and the Court can consider it in its discretion regardless—Meta's head-scratching citation to *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) (not clear error to decline to consider argument first raised in reply), notwithstanding.

**FILED UNDER SEAL**

1  amount of advertising supply), allowing it to inflate ***baseline price*** across all real-time auctions during

2  the Class Period. Mot. at 14-15; Williams Rpt. ¶¶ 18-19. In fact, Meta's own documents show that

3  ████████████████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████████████

8  ███████ Meta ██████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████████████

10  ██████████████████████████████████████████████████. There is no evidence

11  that Meta's management or employees viewed its prices as too varied and individualized for analysis.

12  Rather, Meta's argument is designed for its implausible litigation position, not to reflect reality at

13  Meta or in the market.[2]

14          Meta makes a related, and equally incorrect, argument that the Advertiser Class should not be

15  certified because some unspecified number of class members may not have bought through Meta's

16  auction mechanism, but instead paid fixed or discounted prices. Opp. at 11. This argument too fails

17  to address the evidence that Meta's monopoly power during the Class Period inflated baseline price

18  rates, including by direct control of the supply and output of available social advertising by Meta. Dr.

19  Williams's analysis showed a baseline price inflation across all Meta ads sold during the Class Period.

20  It matters not that some members of the class may have obtained some sort of discount from this

21

---

22  [2] In a footnote, Meta states that it "is not arguing that the existence of an auction necessarily precludes class certification," but that it is refuting the supposed argument by Advertisers' that the auction

23  "compels a uniform overcharge." Opp. at 9 n.4. Meta again lunges at a strawman. Advertisers argue that Meta's auction eliminates the need for individualized negotiations, meaning that a baseline

24  inflation is provable classwide without additional evidence as to each class member's interactions with Meta and other bidders. Mot. at 14-15. Dr. Tucker's own report cites to studies showing that

25  auctions achieve similar price efficiencies as individually negotiated transactions, but that proposition says nothing about whether the auction prices require individualized inquiries to prove the existence

26  of a baseline price inflation. *See* Tucker Rpt. ¶ 67, n.123. Notably, Dr. Tucker performed no study at all of Meta's auction or auction prices; offered no actual evidence that Meta's auction mechanism

27  generates prices that vary significantly based on any individualized factors; and did not bother looking at ██████████████████████████████████████████████.

28

---

7

**FILED UNDER SEAL**

anticompetitively inflated base price—the end price would have been even lower absent the baseline price inflation. *See In re Nat'l Football League's Sunday Ticket Antitrust Litig ("NFL Sunday Ticket")*, 2023 WL 1813530, at *12 (C.D. Cal. Feb. 7, 2023) ("Even if there were some individual differences with how class members were impacted (i.e., some class members negotiating prices or receiving promotional discounts), the Court is satisfied that the models show that all class members suffered some injury. That is, the baseline price to class members would have been lower absent Defendants' market-wide anticompetitive conduct.").) As to supposedly "fixed" prices, there is no plausible argument that individualized issues would predominate because some advertisers paid fixed rates. It is unremarkable that a fixed price can be inflated by baseline price inflation. Meta does not even attempt to provide its own pricing analysis or articulate any specifics about why it believes individualized issues would predominate as to the class members it purports to identify. Instead, Meta blithely points out irrelevant differences among class members, not individualized issues that must necessarily be adjudicated to determine the fact of antitrust injury to members of the Advertiser Class.

Meta's criticism of Dr. Williams's analysis is also wrong because it improperly conflates the fact of antitrust injury (antitrust impact) with damages. *See Catlin v. Wash. Energy Co.*, 791 F.2d 1343, 1350 (9th Cir. 1986) ("[T]he requirement that plaintiff prove both the fact of damage and the amount of damage . . . are two separate proofs." (cleaned up)). As explained above, antitrust impact is shown by proving conduct that as an economic matter harms competition, such as the strengthening of barriers to entry or the exclusion of a rival. *Epic Games*, 67 F.4th at 983-84. Dr. Williams's analysis, which shows the existence of Meta's market power, the increase of prices without any loss of market share, and the extraction of extraordinary profits, is precisely the sort of evidence the Ninth Circuit held tends to show antitrust impact. *Id.* at 984. Meta's arguments about whether Dr. Williams's damages analysis computes an average overcharge or whether the calculated overcharge accounts for supposed—unspecified and unsubstantiated—product improvements, are arguments about the *quantum* of damage, not the fact of antitrust injury.

Moreover, Meta neglects other non-price aspects of antitrust injury and impact that occurred as a result of Meta's exclusion of rivals—including that absent a competitive check, every social advertising purchaser suffered a loss of consumer choice and every such purchaser received a product

**FILED UNDER SEAL**

that was inferior to what competitive forces would have generated. Indeed, Meta's argument about offsetting benefits from its anticompetitive conduct is a *non sequitur*, as the antitrust laws correctly posit that competition would have provided even more benefits than provided by Meta through its anticompetitive conduct—and likely at lower prices. *See Nat'l Soc. of Pro. Engineers v. United States*, 435 U.S. 679, 695 (1978) ("[A]ll elements of a bargain—quality, service, safety, and durability—and not just the immediate cost, are favorably affected by the free opportunity to select among alternative offers"). Meta's radical argument to the contrary, that the social advertising it sold in a competitively distorted market was magically better for consumers, disputes the very economic foundations of the antitrust laws. *See id.* This argument is economically implausible—and Meta offers no evidence for its designed-for-litigation apologia for strengthening entry barriers and excluding competitors from a Meta-dominated market.[3]

Even with respect to damages, Meta cannot simply posit some unspecified benefit to class members to defeat class certification. *See In re Elec. Books Antitrust Litig.*, 2014 WL 1282293, at *17 (S.D.N.Y Mar. 28, 2015) (noting that benefits that "are based purely on conjecture about speculative happenings in the but-for world" must be rejected and that "an antitrust defendant may not alter this well-settled measurement of damages by speculatively raising potential offsets, even when those offsets are directly related to the goods at issue"). Indeed, ███████████████████ ███████████████████████████████████████████████████████ ████████████ Moreover, Meta's entire "product improvement" argument rests on (superseded) allegations, not actual evidence after years of discovery; and even as to those allegations, Meta asserts only that its conduct allegedly ████████████ to power Meta's ad targeting systems. Opp. at 13-14. None of those allegations mean that any efficiencies arising from supposed improvements in Meta's

---

[3] Meta attempts to cast doubt as to whether market participation itself can be proven on a classwide basis. Opp. at 15-18. This argument is nothing more than a complaint about Advertisers' market definition, poorly cloaked as a predominance argument. Meta's argument is, at its core, that it disagrees with the contours of the social advertising product market—namely, the definition of "social advertising." Opp. at 18. But Meta's argument on this point is simply not a class issue. Even if Meta sought to prove at trial that a certain category or categories of its ads were not "social advertising" because they purportedly do not meet specified criteria, *see id.* (discussing identified "ad types" with respect to social advertising), that question could readily be decided categorically. To the extent Meta's argument is that "social advertising" is itself too amorphous to apply to class members, that is a merits argument about market definition—a canonically common question given *Brown Shoe*.

**FILED UNDER SEAL**

ad targeting were passed on to advertisers (even if Meta could prove that such efficiencies existed).

Meta's own internal documents state ████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

████████████████████████████. Moreover, a monopolist with no competitive

check has no incentive to pass on efficiencies, including through lower prices or better products. That

is precisely why it is implausible that Meta's anticompetitive conduct resulted in better economic

value, including as to price and quality, than would have existed in a competitive market. Finally,

even crediting Meta's speculative theory would not preclude class certification, as the presence of

individualized damages issues does not defeat predominance. *See Olean,* 31 F.4th at 668-69; *id.* at

679 ("While individualized differences among the overcharges imposed on each purchaser may

require a court to determine *damages* on an individualized basis, . . . such a task would not undermine

the regression model's ability to provide evidence of common *impact*.").

## II.   META'S *COMCAST* ARGUMENTS ARE MERITLESS

### A.   Meta's Exclusionary Acts Must Be Considered as a Whole for the Purposes of Antitrust Impact and Damages, Not Dismembered and Analyzed Individually

Meta also argues—ostensibly in connection with the Supreme Court's decision in *Comcast Corp. v. Behrend*—that Advertisers' damages model must separately calculate damages for each exclusionary act performed by Meta during the Class Period. Opp. at 18-23. This is a clear misreading of *Comcast*, and ignores both Supreme Court and Ninth Circuit precedent.

Specifically, after stating that *Comcast* requires plaintiffs to calculate damages attributable to their "theory of liability," Meta incorrectly asserts that the five categories of exclusionary conduct identified by Advertisers are in fact separate "theor[ies] of liability." But this is demonstrably untrue. There is only a single theory of antitrust liability and impact here—that Meta, a monopolist in the Social Advertising Market, anticompetitively maintained that monopoly during the Class Period by engaging in conduct that excluded competitive entry. This conduct, which excluded competition by strengthening the DTBE and by directly targeting actual and would-be rivals, including Snap, allowed

**FILED UNDER SEAL**

1    Meta to maintain its monopoly and its market power during the Class Period, which inflated baseline

2    advertising prices (which all Advertiser Plaintiffs and members of Advertiser Class paid).

3          Contrary to Meta's arguments, *Comcast* used the word "theory" to describe plaintiffs' theory

4    of antitrust injury, not each anticompetitive act alleged in an antitrust case. *Comcast* itself states this

5    unambiguously in its holding: "There is no question that the model failed to measure damages

6    resulting from the particular ***antitrust injury*** on which petitioners' liability in this action is premised."

7    569 U.S. at 37. And indeed, the facts of *Comcast* make this point even clearer. There, plaintiffs had

8    built their damages model on four different ***theories*** of antitrust injury: (1) decreased market

9    penetration by satellite providers because of Comcast's withholding of sports programming; (2) the

10   reduction of competition from "overbuilders," companies that built in saturated areas occupied by

11   incumbents; (3) reduced "benchmark" competition used for price comparisons; and (4) an increase of

12   Comcast's bargaining power relative to other providers. *Id.* at 31. The district court accepted only the

13   overbuilder theory of antitrust injury and rejected the rest. *Id.* Each "theory" was a different form of

14   antitrust injury, meaning that the mechanism of price impact on the relevant market differed for each.

15   As the Court explained, plaintiffs were "entitled only to damages resulting from reduced overbuilder

16   competition, since that is the only ***theory of antitrust impact*** accepted for class-action treatment by

17   the District Court. It follows that a model purporting to serve as evidence of damages in this class

18   action must measure only those damages attributable to that ***theory***." *Id.* at 35 (emphasis added).

19   *Comcast*'s "theory" meant the theory of antitrust injury, not each act within an antitrust scheme.

20         Indeed, this is precisely how courts have interpreted the case—that "theory" means theory of

21   antitrust injury, not each dismembered anticompetitive act viewed separately. For example, here is

22   what the Third Circuit recently said in *In re Suboxone (Buprenorphine Hydrochlorine & Naloxone)*

23   *Antitrust Litig.* ("*Suboxone*"), in response to the same incorrect argument Meta makes here:

24               The Purchasers' theory of their case, however, "is not [simply] that
             Reckitt's pricing of brand tablets individually caused harm." Rather,
25           they allege that the totality of Reckitt's actions, such as raising prices,
             withdrawing tablets from the market, providing rebates only for film,
26           disparaging the safety of tablets, and delaying the generics' entry by
             filing a citizen petition and not cooperating in the REMS process,
27           suppressed generic competition and thus violated the antitrust laws.
             They contend that such conduct resulted in **the following antitrust**
28           **injury**: having to pay more for brand Suboxone products when less-

11

**FILED UNDER SEAL**

expensive generic tablets should have been available but were not because of Reckitt's actions. **Reckitt incorrectly asks us to examine each of these acts individually. Rather, we look at "all the acts taken together [to determine whether they] show the willful acquisition or maintenance of a monopoly."** The common evidence here would be used to prove that **these actions occurred and together suppressed generic competition**, and thereby caused the Purchasers to buy the higher-priced brand Suboxone products because Reckitt's actions made it difficult for the less expensive generics to compete. Thus, common evidence exists to prove the Purchasers' antitrust theory and the resulting injury.

967 F.3d 264, 270-71 (3d Cir. 2020) (citations omitted and emphasis added).

Here, there is only one "theory" of antitrust injury within the meaning of *Comcast*. Advertisers will prove at trial that Meta—a monopolist—excluded competitive entry in its dominated market by strengthening the DTBE and directly excluding rivals from the market. The mechanism of antitrust injury is singular: without competition, prices were inflated, consumer choice was reduced, and product quality suffered. Put simply, Advertisers' damages flow directly from the antitrust injury resulting from a lack of competition, allowing Meta to unlawfully maintain its monopoly and exercise its market power. There are no other theories of antitrust injury, such as antitrust injury resulting from unlawful tying or predatory pricing. All of Meta's conduct that will be proven at trial was directed toward preventing competition and competitive entry by actual or potential social advertising rivals, and Advertisers' damages flow only from that theory of antitrust injury. *Cf. Suboxone*, 967 F.3d at 271 n.11 (rejecting similar argument under *Comcast*, noting that "while [the defendant] would argue that each of the six allegedly anticompetitive actions represents a different theory of liability, in fact there is one theory of liability proven by a variety of acts resulting in one antitrust injury").

Meta's misreading of *Comcast* is also foreclosed by Supreme Court and Ninth Circuit precedent, including for monopoly claims involving multiple agreements and generally as to "monopoly broth" cases. The Ninth Circuit's decision in *NFL Sunday Ticket* is instructive. There, the court considered both Section 1 and 2 claims based on a combination of horizontal and vertical agreements that together inflated consumer prices for NFL game telecasts. Specifically, football teams had horizontally agreed to pool the number of telecasts they sold, and then entered into vertical agreements downstream, including an exclusive agreement to distribute NFL broadcasts through a

**FILED UNDER SEAL**

single company. *Id.* at 1153. The Ninth Circuit expressly rejected arguments that each agreement should have been analyzed for antitrust injury separately:

> Contrary to defendants' argument, we are required to take a holistic look at how the interlocking agreements actually impact competition. Indeed, "the essential inquiry" is "whether or not the challenged restraint enhances competition," which is assessed by considering the totality of "the nature or character of the contracts." Thus, the law requires that the "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." Accordingly, we must give plaintiffs "the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."

*Id.* at 1152-53 (cleaned up); *see also id.* at 1159. The Ninth Circuit's holding in *NFL Sunday Ticket* is also consistent with cases—including binding precedent—addressing so-called "monopoly broth" courses of conduct, in which several exclusionary acts, taken together, enable a defendant to unlawfully obtain or maintain it monopoly. *See City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) ("[W]e agree that it would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect."); *Tele Atlas N.V. v. NAVTEQ Corp.*, 2008 WL 4911230, at *1 (N.D. Cal. Nov. 13, 2008). The Supreme Court is also unambiguous on this point. *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698–99, (1962) ("It is apparent from the foregoing that the Court of Appeals approached Continental's claims as if they were five completely separate and unrelated lawsuits. We think this was improper. . . . The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole . . . ." (cleaned up)). Meta's view of *Comcast* is wrong, and the analysis it urges on the Court contravenes binding precedent.

## B.     Meta's Other *Comcast* Arguments Fail

Meta next argues that Dr. Williams's damages model improperly draws on Meta's pre-limitations period behavior—specifically, the fact that Meta first began abusing its developer APIs for competitive gain before December 2016. Opp. at 22-23. Meta's argument on this point is wrong. Although Advertisers cannot obtain (and do not seek) damages that accrued outside of the limitations period, Advertisers can introduce pre-limitations-period evidence—here, for example, agreements signed prior to the limitations period but amended or enforced during the Class Period—to prove their

FILED UNDER SEAL

case, including by providing context. The Ninth Circuit unambiguously made this clear last month in *Sidibe v. Sutter Health*, 103 F.4th 675, 702-03 (2024), rejecting a defendant's argument that pre-limitations evidence "would have invited the jury to hold Sutter liable for conduct from before the damages period began" and holding that the argument was "meritless," as "acts prior to the damages period [are] relevant both to whether a tying arrangement continued into the class period and as direct evidence of whether Sutter's conduct had anticompetitive effects."

### III.   TYPICALITY AND ADEQUACY ARE SATISFIED

Rule 23(a)(3)'s typicality requirement is "permissive." *DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1238 (9th Cir. 2024). "Whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct inform the analysis." *Gonzalez v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788, 809 (9th Cir. 2020) (cleaned up). In this case—rebutting Meta's assertions as to both typicality and adequacy—each proposed class representative displayed an understanding of the case, the injuries caused to the Advertiser Class, and a willingness to represent that Class, which is more than what is required:

- Mark Young, who spent "[a] long time" reviewing the complaint, Young Dep. at 84:23, and testified he was seeking "justice" and to represent the class's best interests, *id.* at 273:21-25, demonstrated a clear understanding of the class and of Advertisers' legal theory, *see, e.g., id.* at 90: 20-22 ("The people in the class are people such as me who purchased advertising who were injured as a result of the ads they purchased"); 132: 8-11 ("I overpaid for the ads. Had it been a free and competitive market, there would have been other options to me and the prices would have been considerably lower."). He added: "the amount of money people spent is irrelevant. What we're looking at here is that people were overcharged for the advertising they bought based on Meta's position in the market . . . ." *Id.* at 201:17-22.

- Katherine Looper runs housing for those disabled from addiction and mental illness and spent $1621 on Facebook ads for concerts she holds for her non-profit. Looper Dep. at 63:14-21, 152. She was similarly clear that she was "asking for acknowledgment and restitution to all the members of my class," *id.* at 179:8-11, and understood the harm and the legal theory, *see, e.g., id.* at 99-100 ("I have an understanding of what laws I believe Facebook broke . . . the reason they're able to fix prices is because they killed all the competition…"). Indeed, when repeatedly asked by Meta's counsel about more sophisticated class members, she was succinct that Meta overcharged everyone. *Id.* at 173-74 ("I believe Facebook overcharged everyone who advertised on Facebook . . . .").

**FILED UNDER SEAL**

- Mark Berney, individually and as the principal of 406 Property Services, PLLC stated his purpose and responsibility in pursuing this action is to represent "any and all of the individuals or businesses that had run [Facebook] ads, paid for these ads during that time period," (Berney Tr. at 96:3-5), and testified "I'm not the only one that this happened to, and that I represent this class, and they need to make restitution, make it right with anyone that they—was using the [Facebook] platform for advertising services during the time period." *Id*. at 143:5-9. Berney understood the legal theory of the case: "Facebook/Meta acquired these businesses, they acquired apps, they went to developers, and they overcharged clients and created a monopoly." *Id*. at 73:25-74:3. "The monopoly was excluding any competition for the advertising for individuals such as myself on the—using Facebook services." *Id*. at 75:3-5.

- Likewise, Jessyca Frederick, individually and on behalf of her company Affilious, Inc., testified that her understanding of this litigation was that "Facebook used its monopoly to set prices which may or may not have been fair," Frederick Dep. 17:11-13, defining the monopoly as Facebook's "audience . . . [o]ther people, other companies, can't reach its audience." *Id*. at 17:18-19. Frederick identified her role as lead plaintiff: "to represent the class of advertisers who might be impacted by the complaint," *id*. at 45:24-46:1, where the Class was "[a]nybody who placed an ad on Facebook. *Id.* at 46:4-5.

Faced with these proposed class representatives, Meta harps on the size and sophistication of some ad buyers in the Advertiser Class. Yet typicality allows for this type of variation between class representatives and other class members; the inquiry's focus is whether proposed representatives suffered the same or similar injury as other class members. *DZ Rsrv.*, 96 F.4th at 1238 ("[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical."); *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). And Meta's argument regarding varying degrees of sophistication has been flatly rejected, including by this Court. *DZ Reserve v. Meta Platforms, Inc.*, 2022 WL 912890 (N.D. Cal. Mar. 29, 2022) ("It may be that class members differ in advertising budgets and scope of purchases, as Meta suggests, but Meta has not shown that these differences defeat typicality or the named plaintiffs' ability to adequately represent all class members."), *aff'd*, 96 F.4th 1223 (9th Cir. 2024); *see also Ewert v. eBay, Inc.*, 2010 WL 4269259, at *3-4 (N.D. Cal. Oct. 25, 2010) (rejecting varying sophistication argument). Here too, Meta presents no serious challenge to typicality or adequacy—as none exist.

**CONCLUSION**

The Court should grant Advertiser Plaintiffs' motion and certify the proposed Class.

Dated: July 8, 2024

**BATHAEE DUNNE LLP**

By:  */s/ Yavar Bathaee*
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Andrew C. Wolinsky (CA 345965)
awolinsky@bathaeedunne.com
Andrew M. Williamson (CA 344695)
awilliamson@bathaeedunne.com
Adam Ernette (*pro hac vice*)
aernette@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
Tel.: (332) 322-8835

Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (*pro hac vice*)
egrauman@bathaeedunne.com
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
Tel.: (213) 462-2772

Allison Watson (CA 328596)
awatson@bathaeedunne.com
3420 Bristol St, Ste 600
Costa Mesa, CA 92626-7133

*Interim Co-Lead Counsel for the Advertiser Class*

**LEVIN SEDRAN & BERMAN LLP**

Keith J. Verrier (*pro hac vice*)
kverrier@lfsblaw.com
Austin B. Cohen (*pro hac vice*)
acohen@lfsblaw.com
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3997
Tel.: (215) 592-1500

*Members of Executive Committee for the Advertiser Class*

**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**

By:  */s/ Amanda F. Lawrence*
Amanda F. Lawrence (*pro hac vice*)
alawrence@scott-scott.com
Patrick J. McGahan (*pro hac vice*)
pmcgahan@scott-scott.com
Michael P. Srodoski (*pro hac vice*)
msrodoski@scott-scott.com
156 South Main Street, P.O. Box 192
Colchester, CT 06415
Tel.: (860) 537-5537

Patrick J. Coughlin (CA 111070)
pcoughlin@scott-scott.com
Carmen A. Medici (CA 248417)
cmedici@scott-scott.com
Hal D. Cunningham (CA 243048)
hcunningham@scott-scott.com
Daniel J. Brockwell (CA 335983)
dbrockwell@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: (619) 233-4565

Patrick J. Rodriguez (*pro hac vice*)
prodriguez@scott-scott.com
230 Park Avenue, 17th Floor
New York, NY 10169
Tel.: (212) 223-6444

**AHDOOT & WOLFSON, PC**

Tina Wolfson (CA 174806)
twolfson@ahdootwolfson.com
Robert Ahdoot (CA 172098)
rahdoot@ahdootwolfson.com
Theodore W. Maya (CA 223242)
tmaya@ahdootwolfson.com
Henry J. Kelson (*pro hac vice*)
hkelston@ahdootwolfson.com
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
Tel.: (310) 474-9111

16

**FILED UNDER SEAL**

1

**FILER ATTESTATION**

2        I am the ECF user who is filing this document.  Pursuant to Civil L.R. 5-1(h)(3), I hereby

3  attest that each of the other signatories have concurred in the filing of the document.

4

5  Dated: July 8, 2024                            By:  _/s/ Brian J. Dunne_

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 3:20-cv-08570-JD                    Advertiser Plaintiffs' Reply in Support of Motion for Class Certification