1

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Shana E. Scarlett (Bar No. 217895)
shanas@hbsslaw.com
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Kevin Y. Teruya (Bar No. 235916)
kevinteruya@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000

2

3

4

5 *Interim Co-Lead Consumer Class Counsel*

6 [Additional counsel listed on signature page]

7

8 **UNITED STATES DISTRICT COURT**

9 **NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

10

11 MAXIMILIAN KLEIN, et al.,

12                  Plaintiffs,

13          vs.

14 META PLATFORMS, INC.,

15                  Defendant.

16 This Document Relates To: All Consumer Actions

17

Consolidated Case No. 3:20-cv-08570-JD

**CONSUMER PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL**

 The Hon. James Donato

Hearing Date: September 26, 2024
Hearing Time: 10:00 a.m.

**REDACTED VERSION FILED PUBLICLY**

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................1

ARGUMENT .....................................................................................................................2

I.    FACEBOOK'S *COMCAST* ARGUMENTS FUNDAMENTALLY MISREPRESENT THE LAW AND CONSUMERS' COMMON DAMAGES MODEL ...................................................................................................................2

    A.    Consumers' Model Calculates Damages Flowing from Facebook's Deception ...........................................................................................................2

    B.    Facebook's "Price Increment" Argument Ignores the Law and Consumers' Model, and, At Best, Presents Yet Another Common, Class-wide Issue .................3

    C.    A Yardstick Model Is Well-Suited to Assess Damages in this Case ........................4

II.   FACEBOOK'S ANTITRUST INJURY CHALLENGES ARE BASELESS.....................4

    A.    Consumers Establish Class-wide Antitrust Impact Based on Extensive Common Record Proof and Accepted Economic Theory, All of Which Facebook Ignores ............................................................................................4

    B.    Facebook's Attempts to Rewrite Consumers' Antitrust Impact Theory as "Individualized" Ignore the Theory's Inherently Common Nature and the Law .....................................................................................................................6

        1.    Facebook Closes Its Eyes to Consumers' Actual Impact Theory .................6

        2.    Facebook's Self-Serving Arguments That Class Members Are "Worse Off" in the But-For World Are Wrong and At Best Raise Merits Disputes ...........................................................................................8

    C.    Caselaw and Common Proof Foreclose Facebook's Arguments Regarding Harm to Competition and Confirm Facebook's Anticompetitive Deception Is a Class-wide Issue ...............................................................................................10

III.  FACEBOOK'S MARKET DEFINITION AND MONOPOLY POWER ARGUMENTS PROVIDE NO BASIS TO DENY CLASS CERTIFICATION ...............13

IV.   NAMED PLAINTIFFS ARE TYPICAL AND ADEQUATE REPRESENTATIVES .................................................................................................14

CONCLUSION ................................................................................................................15

1

## TABLE OF AUTHORITIES

2

**Page**

3

### Cases

4

*Am. Prof'l Testing Servs., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l*
    *Publ'ns., Inc.*,
    108 F.3d 1147 (9th Cir. 1997) ........................................................................... 10, 11

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*,
    568 U.S. 455 (2013) ............................................................................................. 12

*Burkhalter Travel Agency v. MacFarms Int'l, Inc.*,
    141 F.R.D. 144 (N.D. Cal. 1991) ........................................................................ 14

*California v. Infineon Techs. AG*,
    2008 WL 4155665 (N.D. Cal. Sept. 5, 2008) ...................................................... 12

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ................................................................................................. 2

*Comcast. Moehrl v. Nat'l Ass'n of Realtors*,
    2023 WL 2683199 (N.D. Ill. Mar. 29, 2023) ........................................................ 2

*Dial Corp. v. News Corp.*,
    314 F.R.D. 108 (S.D.N.Y. 2015) ........................................................................... 4

*Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*,
    773 F.2d 1506 (9th Cir. 1985) ............................................................................... 4

*DZ Reserve v. Meta Platforms, Inc.*,
    96 F.4th 1223 (9th Cir. 2024) ........................................................................ 12, 15

*DZ Rsrv. v. Meta Platforms, Inc.*,
    2022 WL 912890 (N.D. Cal. Mar. 29, 2022) ................................................. 11, 12

*Garnica v. HomeTeam Pest Defense, Inc.*,
    230 F. Supp. 3d 1155 (N.D. Cal. 2017) ............................................................... 14

*Giuliano v. Sandisk Corp.*,
    2015 WL 10890654 (N.D. Cal. May 14, 2015) ................................................... 11

*Hawaii v. Standard Oil Co. of Cal.*,
    405 U.S. 251 (1972) ............................................................................................. 10

*High Tech. Careers v. San Jose Mercury News*,
    996 F.2d 987 (9th Cir. 1993) ............................................................................... 13

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ............................................................... 4

*In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*,
    276 F.R.D. 364 (C.D. Cal. 2011) ................................................. 6, 8, 10

*In re Arris Cable Modem Consumer Litig.*,
    327 F.R.D. 334 (N.D. Cal. 2018) ......................................................... 15

*In re Capacitors Antitrust Litig. (No. III)*,
    2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) ................................. 1, 15

*In re Elec. Books Antitrust Litig.*,
    2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ..................................... 10

*In re Facebook, Inc., PPC Advert. Litig.*,
    282 F.R.D. 446 (N.D. Cal. 2012) ......................................................... 15

*In re Glumetza Antitrust Litig.*,
    336 F.R.D. 468 (N.D. Cal. 2020) .................................................... 5, 12

*In re Google Play Store Antitrust Litig.*,
    2022 WL 17252587 (N.D. Cal. Nov. 28, 2022) (vacated on other grounds) ........................ 8

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
    2023 WL 1813530 (C.D. Cal. Feb. 7, 2023) .......................................... 9

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
    522 F.3d 6 (1st Cir. 2008) ..................................................................... 5

*In re Online DVD Rental Antitrust Litig.*,
    2010 WL 5396064 (N.D. Cal. Dec. 23, 2010) ............................... 6, 8, 10

*In re Optical Disk Drive Antitrust Litig.*,
    2016 WL 467444 (N.D. Cal. Feb. 8, 2016) ............................................ 9

*In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*,
    421 F. Supp. 3d 12 (E.D. Pa. 2019) ............................................... 3, 11

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004) ........................................................... 11, 12

*Lerwill v. Inflight Motion Pictures, Inc.*,
    582 F.2d 507 (9th Cir. 1978) ............................................................... 15

*Lytle v. Nutramax Labs., Inc.*,
    99 F.4th 557 (9th Cir. 2024) ......................................................... 5, 10

*Major v. Ocean Spray Cranberries, Inc.*,
    2013 WL 2558125 (N.D. Cal. June 10, 2013) ...................................... 15

*Moore v. Int'l Cosms. & Perfumes, Inc.*,
  2016 WL 7644849 (C.D. Cal. Mar. 17, 2016) .......................................................................... 15

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) ............................................................................................. 6, 7, 9

*Rodney v. Northwest Airlines, Inc.*,
  146 Fed. Appx. 783 (6th Cir. 2005) ...................................................................................... 14

*Ward v. Apple Inc.*,
  2018 WL 934544 (N.D. Cal. Feb. 16, 2018) ............................................................................ 5

**<u>Rules</u>**

Rule 23 ............................................................................................................................................. 1

Rule 23(b)(3) .................................................................................................................................... 6

**TABLE OF ABBREVIATIONS**

| Abbreviation | Referenced Document |
|---|---|
| **Ex. __** | All exhibit references are to exhibits to the Declaration of Kevin Y. Teruya in Support of Consumer Plaintiffs' Reply in Support of Renewed Motion for Class Certification and Appointment of Class Counsel, concurrently filed herewith. |
| **Mot. at __** | Consumer Plaintiffs' Renewed Motion for Class Certification and Appointment of Class Counsel, filed at Dkts. 793 and 794-1. |
| **Opp. at __** | Facebook's Opposition to User Plaintiffs' Renewed Motion for Class Certification, filed at Dkts. 805-1 and 806. |
| **Economides ¶ __** | Abridged Expert Declaration of Nicholas Economides, Ph.D. In Support of Renewed Motion to Certify Consumer Class, filed at Dkt. 794-2. |
| **Economides Rebt. ¶ __** | Abridged Rebuttal Expert Declaration of Nicholas Economides, Ph.D. In Support of Renewed Motion to Certify Consumer Class, concurrently filed herewith. |

1

## **INTRODUCTION**

2      Consumers—users of Facebook who maintain accounts—have met all the elements of Rule

3  23. Facebook's opposition to class certification reads more like a motion for summary judgment or a

4  trial brief, attacking the merits of Plaintiffs' liability, impact, and damages theories. But certification

5  "is decidedly not an alternative form of summary judgment or an occasion to hold a mini-trial on the

6  merits." *In re Capacitors Antitrust Litig. (No. III)*, 2018 WL 5980139, at *10 (N.D. Cal. Nov. 14,

7  2018). Facebook also launches baseless attacks on the three named Plaintiffs, suggesting they are not

8  typical or adequate representatives. Each, however, shares the same incentives and interests as absent

9  class members in prosecuting these claims. All of Facebook's arguments lack merit.

10      ***First***, *Comcast* is satisfied. Consumers' expert, Dr. Economides, has proffered a yardstick

11  damages model that is directly tied to Consumers' single, live (not dismissed) liability theory. The

12  record and caselaw shows there is no disaggregation issue—neither Facebook's anticompetitive

13  deception nor its resulting monopoly power has been found lawful. And Facebook's complaints about

14  the comparability and significance of the yardsticks are questions for the jury, ***not*** certification.

15      ***Second***, the extensive, class-wide record evidence and accepted economic theory show

16  antitrust impact here. In the but-for world, Facebook would compensate ***all*** Class members for their

17  data at a competitive flat rate ($5 per month), so ***all*** were harmed in the actual world. Even if disputed,

18  this question would be resolved on a class-wide basis, supporting certification. And because

19  Consumers' model is that ***all*** Class members would be compensated, no individualized issues arise.

20  All the arguments raised by Facebook are disputed class-wide merits issues it can argue to the jury.

21  And, class-wide evidence shows both privacy and data are such critical matters to the market that

22  Facebook's deception regarding them harmed competition—implicating no individual issues.

23      ***Third***, both relevant market and monopoly power are common questions whose answers do

24  not differ by Class member. Facebook's (raised-for-the-first-time) challenges to relevant market and

25  monopoly power fail. It has already conceded these are merits issues, and its expert, Dr. Tucker, offers

26  zero analysis of them for that reason. Challenging them now thus only supports certification.

27      ***Finally***, the named Plaintiffs are both adequate and typical. Each asserts the same claims,

28  based on the same conduct, resulting in the same claimed injury as the Class. And each cares about

their privacy and how Facebook collected and used their data to create and maintain its monopoly. These named Consumers will more than adequately represent the Class.

## ARGUMENT

## I. FACEBOOK'S *COMCAST* ARGUMENTS FUNDAMENTALLY MISREPRESENT THE LAW AND CONSUMERS' COMMON DAMAGES MODEL

Facebook argues that Consumers' "damages model fails *Comcast*." Opp. at 6–9. But each of Facebook's arguments fails, because they misrepresent both the law and Consumers' model.

### A. Consumers' Model Calculates Damages Flowing from Facebook's Deception

Consumers have offered a yardstick damages model, a widely-accepted methodology, which looks at the prices that services pay users for transparent collection and use of their data. Facebook raises, for the first time, an argument that Consumers' theory of liability is unconnected to this damages model but instead seeks damages based on "concededly lawful market power." Opp. at 1, 4–9. Facebook presents this, incorrectly, as a problem under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). Facebook is wrong on the law, and wrong on the facts. *Comcast* requires that a plaintiff's damages model be "consistent with its liability case," such that it "isolate damages resulting from" its liability theory and not seek damages for any dismissed antitrust liability theories. *Comcast*, 569 U.S. at 31–37. That is no issue here: Consumers assert a single liability theory that is live (not dismissed) and a damages model consistent with that theory—that Facebook would have had to compensate users for their data in the but-for world free of its anticompetitive deception. Mot. at 13. Given the damages theory flows directly from Facebook's anticompetitive acts by calculating the price Facebook would had to pay for data based on prices comparable firms pay, Consumers easily satisfy *Comcast*. *Moehrl v. Nat'l Ass'n of Realtors*, 2023 WL 2683199, at *7–8, *20–21 (N.D. Ill. Mar. 29, 2023) ("[n]o *Comcast* problem arises" where plaintiff "asserts only one theory," and certifying class based on Dr. Economides' yardstick model, as liability theory posited all class members overcharged and "damages model aim[ed] to measure the extent of their overpayment").

Facebook's disaggregation arguments are similarly baseless. A disaggregation issue arises where damages are awarded which stem from conduct already adjudged (by the Court or the jury) as lawful. That is not the case here at *class certification*. Consumers challenge Facebook's anticompetitive deception and its resulting illicit monopoly; there has been no determination that

1    either is "lawful." *See In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*,

2    421 F. Supp. 3d 12, 36–39 & n.5 (E.D. Pa. 2019) (certifying class and rejecting argument damages

3    model failed *Comcast* because it did not disaggregate damages from supposedly lawful conduct as

4    "based on hypotheticals that the Court has no basis to consider at this moment") (cleaned up).

5         Facebook's entire "lawful monopoly power" argument is predicated on a few cherry-picked

6    soundbites from and outright mischaracterizations of Dr. Economides' deposition. But contrary to

7    Facebook's claim (Opp. at 4–7) that Dr. Economides ██████████████████████████████████████

8    ████████████████████████████████████████████████████ he expressly testified that

9    Facebook's data-related deception is what impaired each of these PSN rivals and maintained

10   Facebook's monopoly. Ex. 2 (Economides Merits Tr.) at 208:14–24, 226:24–228:11, 228:25–229:8.

11        As to earlier rivals, such as ██████ damages from Facebook's acquisition of its monopoly

12   and defeat of ████████████████████████████ are not included in Plaintiffs' damages

13   calculations (which begin in 2016). Regardless, Facebook disingenuously cites to the unsigned

14   version of Dr. Economides' deposition transcript, despite having received his signed errata over a

15   month before it filed its brief. Dr. Economides clarified that despite any supposed merits advantage

16   Facebook had over ██████ "at some point," Facebook's deception still gave "it a relative

17   competitive advantage" and was a "contributing factor" to ██████ decline; similarly, Facebook's

18   deception harmed early rivals ████ and ████ even if they ultimately were not poised to completely

19   overtake Facebook. Ex. 3 (Errata) at 230:13, 230:20, 231:21, 240:8, 240:15. All of this is consistent

20   with his opinions, first disclosed in his initial class certification report a year ago, and which have

21   remained constant in each expert report since. Ex. 4 ¶¶ 18(b), 30 (first); Economides ¶¶ 51–59 (current).

22       **B.**   **<u>Facebook's "Price Increment" Argument Ignores the Law and Consumers'<br>Model, and, At Best, Presents Yet Another Common, Class-wide Issue</u>**

23        Facebook argues the true measure of damages is the "price increment" associated with the

24   anticompetitive conduct, not with any lawful monopoly. Opp. at 7–8. But Facebook's anticompetitive

25   deception *is* what allowed it to obtain and maintain its unlawful monopoly power and thus overcharge

26   Class members. Ex. 2 (Economides Merits Tr.) at 208:18–20; Economides ¶¶ 60–93; Mot. at 7–12.[1]

27   ─────────────────────

28   [1] Facebook claims *Postpichal v. Cricket Wireless, LLC* holds a model may not  simply "assume that<br>the entire price difference" is due "to anticompetitive conduct." Opp. at 6 (cleaned up). But *Postpichal*

The entire difference between Facebook's monopoly price ($0) and the competitive price ($5) is the "price increment" that can be attributed to Facebook's deceptive data use and collection practices. *Dolphin Tours*, *Inc. v. Pacifico Creative Serv.*, *Inc.*, 773 F.2d 1506, 1509, 1511 (9th Cir. 1985) (an "antitrust violation need not be the 'sole' cause of the injury" and a plaintiff "need not rule out 'all possible alternative sources of injury'"; plaintiff can recover "the difference between what the plaintiff could have made . . . and what the plaintiff actually made" if it establishes violation a "material cause" of its injury). If Facebook contends its monopoly or the "price increment"— collecting and using Class members' data without compensation—stem from something else, that is an argument it can present at trial—and is itself a common, class-wide defense.

### C.       A Yardstick Model Is Well-Suited to Assess Damages in this Case

Facebook's critiques of Dr. Economides' yardstick model are baffling. Opp. at 8–9. Facebook asserts that the model uses "separate" prices that services "outside the PSNS market" pay users for data. But the entire point of a yardstick method is to consider prices of firms "not affected by the anticompetitive conduct at issue." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1221 (9th Cir. 1997). Its claim that the yardsticks are "not comparable to Facebook" is immaterial to certification, as yardstick comparability is "a question of fact for the jury." *Id*. Moreover, these attacks also apply to all Class members and therefore ***support*** certification. *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 118–19 (S.D.N.Y. 2015) (certifying class based on yardstick model and rejecting defendant's substantive challenges to model as those challenges are class-wide merits issues).

## II.       FACEBOOK'S ANTITRUST INJURY CHALLENGES ARE BASELESS

### A.       Consumers Establish Class-wide Antitrust Impact Based on Extensive Common Record Proof and Accepted Economic Theory, All of Which Facebook Ignores

Because competition in the but-for world would have required Facebook to compensate all Consumers through price and quality means, ***all*** Class members suffered antitrust impact because Facebook's deception prevented that but-for world from emerging. Economides ¶¶ 13–14, 84–93. Facebook challenges this as "speculative" and argues Consumers must "prove [now] that Meta would have paid all of its users." Opp. at 6, 9. But this is simply wrong under binding precedent—it is enough

---

involved RICO, ***not*** anticompetitive conduct at all. 2023 WL 3294852, at *2 (N.D. Cal. May 4, 2023). And Consumers offer common evidence, including expert opinions, of that fact, as cited above.

1  that Consumers simply offer class-wide proof of the but-for world and common impact. *See Lytle v.*

2  *Nutramax Labs., Inc.*, 99 F.4th 557, 570–72 (9th Cir. 2024) ("[r]equiring that class action plaintiffs

3  actually prove class-wide injury at this stage would improperly conflate the class certification inquiry

4  with the merits."). Facebook's claim that Consumers' antitrust injury is "speculative" therefore

5  provides no basis to deny certification. *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 477–78 (N.D.

6  Cal. 2020) (certifying class, supposed but-for world "failure of proof" irrelevant to common impact).

7          In any event, Facebook's critiques are incorrect. Opp. at 9–13. Far from being "speculative,"

8  Consumers' theory is based on well-accepted economic and competition literature, robust expert

9  analysis in Dr. Economides' multiple full and abridged reports, and extensive record evidence

10  including ███████████████████████████████████████████████████████████████

11  ████████████████████████████████. Economides ¶¶ 60–83 & nn. 111, 117, 119;

12  Economides Rebt. §§ III–IV. While Facebook may disagree with this proof and its significance, it

13  exists and is common to the Class, unlike Facebook's inapt cases. *Ward v. Apple Inc.*, 2018 WL

14  934544, at *1–3 (N.D. Cal. Feb. 16, 2018) (11-page expert report only described methods expected

15  to be applied in future, based on work of different expert in other case, and "devoid of analysis"); *In*

16  *re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 26–29 (1st Cir. 2008) (expert

17  submitted report stating only he could fashion model later).

18          To Facebook's specific points, Opp. 10–13, Dr. Economides shows that Facebook and the

19  yardsticks ██████████████████████████ (it need not be identical). Economides ¶ 105–

20  08 & Table 1; Economides Rebt. ¶¶ 101–02. He also explains that using yardsticks that provide ███

21  ████████████████████████ is the point, as it allows him to isolate the price Facebook

22  would have to pay in the but-for world. Economides ¶ 99; Economides Rebt. ¶¶ 82, 90–97. Nor is it

23  "economically infeasible" to pay users for their data: Facebook has long done so, already has the

24  know-how and infrastructure to facilitate mass payments (and does so), and the payments ███

25  ████████████████████████████████████████████████████████████████████

26  ████████████████████████████████████. Economides ¶¶ 66–69,

27  111. Similarly, Dr. Economides considered and rejected Facebook's "what ifs" as to adverse

28  selection, moral hazard, "unraveling," and fake accounts (███████████████████████

1   ██████████████████). Economides Rebt. ¶¶ 6, 39–55. These critiques, themselves common,

2   are addressed in Consumers' opposition to Facebook's *Daubert* and do not bar certification.

3   In the end, Facebook's assertions are, at best, merits arguments about what it would have done

4   in the but-for world and why. None of these arguments—many based on its own expert—differ by

5   class member. *See In re Online DVD Rental Antitrust Litig.*, 2010 WL 5396064, at *9–11 (N.D. Cal.

6   Dec. 23, 2010) (certifying class as defendants' arguments about but-for world "themselves" based on

7   "generalized proof applicable to the class" and thus merits disputes). They raise "opposing expert

8   analyses" of "what the 'but for' world would look like," which pose no certification issue.[2] *In re*

9   *Aftermarket Auto. Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 373–74 (C.D. Cal. 2011).

### B.   Facebook's Attempts to Rewrite Consumers' Antitrust Impact Theory as "Individualized" Ignore the Theory's Inherently Common Nature and the Law

11   Facebook opposes certification because it claims there are "uninjured class members." Opp.

12   at 13–18. These arguments are wrong on the facts, but also irrelevant under binding law. *Olean*, the

13   Ninth Circuit case Facebook itself cites, confirms a class's inclusion of "more than a de minimis

14   number of injured class members," is ***no bar*** to certification under Rule 23(b)(3). *Olean Wholesale*

15   *Grocery Coop.*, *Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669, 680 (9th Cir. 2022) (class properly

16   certified even where up to 28% uninjured).[3] Nevertheless, Facebook is simply wrong when it contends

17   there are "uninjured class members." As Consumers explained in their motion and reiterate below,

18   every Class member would have been better off in the but-for world, and Facebook' contrary claims

19   misstate the law, try to rewrite Consumers' inherently common theory, and raise merits disputes.

#### 1.   Facebook Closes Its Eyes to Consumers' Actual Impact Theory

21   Consumers' theory easily shows common impact. In the but-for world, all Class members

22   would have received a competitive, flat rate of compensation for their data ($5 per month), so ***all*** are

---

[2] Facebook admits its "ascertainability" arguments are contrary to binding law. Opp. at 12 n.3. They are also baseless. The Class includes all U.S. persons that "maintained and used" a Facebook profile—*i.e.*, were "active"—at any point during the Class Period. Mot. at 2. Facebook tracks "active" users, which it defines in SEC and similar filings. Economides ¶ 121 n.188. Class members are identifiable through Facebook's own records. If somehow they are not, they can be by notice and a claim form.

[3] Facebook's reliance on the first certification decision in *In re Apple iPhone Antitrust Litig.* is more than a little misleading, since that decision pre-dates *Olean* and turned on an expert's concession that 14.6% of the class was uninjured, all of which the court addressed in its later order ***granting*** certification (which Facebook tellingly omits). *See* 2022 WL 1284104, at *15–16 (N.D. Cal. Mar. 29, 2022); Case No. 4:11-cv-6714 (N.D. Cal. 2024), Dkt. 789 at 24–27.

1    harmed because Facebook deprived **all** of them of that market-wide compensation in the actual world.[4]

2    Mot. at 12–13. While Facebook argues which Class members "might be paid is individualized," it is

3    no defense to class certification to pretend the Class's actual theory does not exist.

4          To the extent Facebook offers an alternative view of the but-for world, where it pays varying

5    amounts to different Consumers, Dr. Economides explains why this would be untenable (and thus not

6    likely). Facebook cannot realistically "individually negotiate with hundreds of millions of its users"

7    nor "customize a payment scheme on a user-by-user basis, which would also impose additional

8    administrative, data, and processing costs." Economides ¶¶ 14, 77–78. Instead, paying all active users

9    at a flat rate is the economically rational response to more competition, is consistent with Facebook's

10   real world practices (where it employs uniformity across users), is easy to implement and explain to

11   users, addresses fairness and political concerns associated with price discrimination, reduces

12   gamesmanship, minimizes any moral hazard and adverse selection concerns, and is consistent with

13   the model used by most services that pay for data. *Id.* ¶¶ 79–83, 85; Economides Rebt. ¶¶ 7, 56–68.

14         Facebook's selective citations to Dr. Economides' academic work does not say otherwise.

15   Opp. at 15–16. The cited portion of his "*Restrictions on Privacy*" article concerns whether, under

16   E.U. law, a given platform's extraction of data is "excessive" (not compensation owed to the user),

17   and the referenced "case-by-case assessment" is between platforms (*e.g.*, Google and Netflix), **not** as

18   between one platform and its own users. Economides Rebt. ¶ 69 & n. 191. Similarly, the cited portion

19   of his "*Giving Away Our Data*" article explores the possibility of price discrimination in paying users

20   for data, which he explains makes less sense than the single flat payment model he proposes here

21   having now reviewed the confidential record in this case. *Id.* ¶¶ 71–77.

22         Facebook's assertions essentially boil down to the argument—largely based on its own expert,

---

[4] Contrary to Facebook's claim, all Class members provide data to Facebook and are uniformly overcharged. Opp. at 14 & n.4. Dr. Economides shows—and common proof confirms—Facebook collects and uses data from all Class members such as "web browser history, app usage, device, location, and ad engagement data." *E.g.*, Economides ¶ 105; Ex. 5 (PALM-000895215) at -216. But, in any event, the relevant question is not whether the "price" users "paid" is the same, but rather whether impact (*i.e.*, overcharge) can be shown using a common method. *Olean*, 31 F. 4th at 679. It is here. As Dr. Economides' explains, all Class members were overcharged because Facebook's illicit monopoly power allowed it to deprive them all of the market-wide competitive compensation Facebook would have needed to provide ($5 per month), which does not turn on an individual user's subjective preferences **or** the amount/type of data they provide. Economides ¶¶ 13–15, 85–90; Economides Rebt. ¶ 87 n. 210.

1   Dr. Tucker—that it would not pay all Class members since many supposedly "█████████

2   ████" to Facebook and because it disputes the application of Dr. Economides' yardsticks and their

3   scale. Opp. at 14–15. Dr. Economides addresses all of these assertions, disagreeing with each. *E.g.*,

4   Economides Rebt. ¶¶ 7, 23–38, 56–68, 82–85. But ultimately Facebook's say-so about what it would

5   (or would not) do in the but-for world does not negate the class-wide nature of Consumers' theory or

6   show any inability to prove common impact under it. Instead, it illustrates the inherently common

7   nature of the parties' dispute—whether Facebook would (or would not) compensate ***all*** active users

8   for their data at a flat rate. The answer to that question does not differ by Class member. Nor do Dr.

9   Economides' and Dr. Tucker's competing views on that common question give a basis to deny

10  certification; they highlight that common proof will decide it. *DVD*, 2010 WL 5396064, at *9–11;

11  *Aftermarket*, 276 F.R.D. at 373–74.

### 2. Facebook's Self-Serving Arguments That Class Members Are "Worse Off" in the But-For World Are Wrong and At Best Raise Merits Disputes

13  As this Court has explained, arguments "that class members may be worse off in plaintiffs'

14  but-for world" are "far too speculative and conditional to be a serious barrier to certification." *In re*

15  *Google Play Store Antitrust Litig.*, 2022 WL 17252587, at *13 (N.D. Cal. Nov. 28, 2022) (vacated

16  on other grounds). They are merits disputes for "trial" that do "not erode plaintiffs' showing of

17  common evidence to prove antitrust impact." *Id.* That alone dooms Facebook's "worse off"

18  arguments against certification. Opp. at 16–18. But those arguments are also baseless, and thus fail.

19  As an initial matter, Facebook's parade of horribles that would supposedly stem from fairly

20  compensating users for their data are unfounded and regardless irrelevant to certification. Opp. at 16–

21  17. Its claim that paying users "would necessarily change its functionality for the worse" presupposes

22  Facebook would change in the but-for world. But Dr. Economides explains that premise is plain

23  wrong, as Facebook would collect and use the same data in the but-for world—and thus provide the

24  same features and functionalities as today—just with honesty and fair compensation. Economides ¶¶

25  63–64; Economides Rebt. ¶¶ 54, 57, 81. As to "bots" and "inauthentic accounts," Facebook itself

26  touts its success in detecting and neutralizing them in the real world. Economides ¶ 66; Economides

27  Rebt. ¶¶ 39–55. And Dr. Tucker, Facebook's own expert, confirmed ████████████████████

28  ████████████████████████████████████████████████████████████████████

1   ███████████████████████████████ Ex. 6 (Tucker Original Class Rept.) ¶ 121. And

2   as to supposedly "cumbersome" authentication and verification systems and "government" ID,

3   Facebook does not require them now when it pays users for data (Economides Rebt. ¶44)—its own

4   expert conceded these concerns were "██████." Ex. 7 (Tucker Class Tr.) at 290:19–291:2.

   Next, Facebook's suggestion that some Class members "stand to gain" from its

5   anticompetitive deception and inadequate compensation strains credulity. Opp. at 17–18. There is no

6   "redeeming virtue in deception," and no Consumer benefits from Facebook's lies. Economides ¶ 52

7   (quoting Areeda). Facebook's focus on the "value of Facebook to any particular user" is similarly

8   misplaced. Class members' subjective views and value they place on Facebook are irrelevant to their

9   overcharge injury—Facebook would have had to make flat payments to all of them in the but-for

10  world.[5] *Cf. In re Optical Disk Drive Antitrust Litig.*, 2016 WL 467444, at *9 (N.D. Cal. Feb. 8, 2016)

11  (certifying class with overcharge damages because "focus on the subjective desires of individual

12  consumers is misplaced" as "[t]he harm lies in paying more than the product is objectively worth").

13  Given Consumers' market-wide loss of compensation, Facebook's citation to *Am. Ad Mgmt.,*

14  *Inc. v. Gen. Tel. Co. of California*—a summary judgment decision—only ***confirms*** no Consumer

15  "stands to gain" from its deception and they thus all suffered antitrust injury. 190 F.3d 1051, 1056–

16  57 (9th Cir. 1999) (plaintiff suffered antitrust injury where defendant caused it to suffer "lost

17  commissions"). Facebook can try convince the jury that some or all Class members somehow benefit

18  from its misconduct, but its arguments based on "the value users personally assign" to it are no basis

19  to deny certification. *See In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 2023 WL

20  1813530, at *12 (C.D. Cal. Feb. 7, 2023) (certifying class, rejecting arguments "mini-trials" required

21  to identify which class members "worse off" in but-for world based on their "unique preferences").

22  The dispute over the existence of any benefits is itself a common question, and, even if disputed,

23  Consumers' evidence of no benefits can resolve it on a class-wide basis. *Olean*, 31 F.4th at 667-668;

24

25

---

26  [5] Facebook's suggestion that some Class members are uninjured because they "would receive no
    compensation" having left Facebook for rivals in the but-for world is baseless. Opp. at 18. The ***threat***
27  of users leaving in the but-for world would lead Facebook to make payments before any mass exodus
    occurred. Economides ¶¶ 77, 99. Similarly, Facebook's *ipse dixit* about the but-for world—a merits
28  issue—does not negate its under-compensation of Class members in the actual world, all of whom
    are necessarily Facebook users and were not paid for their data during the time they used Facebook.

1    *Lytle*, 99 F.4th at 570–72; *DVD*, 2010 WL 5396064, at *9–11; *Aftermarket*, 276 F.R.D. at 373–74.

2          Finally, even if there were any benefits, Facebook's arguments about "the net gain to any

3    individual user in the but-for world" fail. Opp. at 18. Where, as here, there is an "overcharge," antitrust

4    injury is established and "courts will not go beyond the fact of this injury to determine whether the

5    victim … has partially recouped its loss in some other way[.]" *Hawaii v. Standard Oil Co. of Cal.*,

6    405 U.S. 251, 264 n.14 (1972). Facebook's cited cases do not say otherwise.[6]

7          **C.    Caselaw and Common Proof Foreclose Facebook's Arguments Regarding Harm to
                Competition and Confirm Facebook's Anticompetitive Deception Is a Class-wide Issue**

8          Facebook wrongly argues that Consumers do not satisfy the *Harcourt Brace* test because they

9    supposedly offer no common method of identifying which consumers heard or read Facebook's

10   statements, assessing the meaning of Facebook's statements, showing Facebook's statements were

11   false, or determining whether consumers reasonably relied on Facebook's deception. Opp. at 19. Each

12   of these contentions is baseless. Facebook simply ignores Consumers' proffer of common evidence,

13   which shows how class-wide proof will be used to satisfy each *Harcourt Brace* factor (including that

14   Facebook's statements were clearly false and likely to induce reasonable reliance) and establish harm

15   to competition.[7] Mot. at 7–12, 17–21; Dkt. 794-20 (illustrative chart of Facebook's statements and

16   omissions and common proof showing them deceptive). Facebook likewise disregards that deception

17   is a classic predominating common question since the conduct and evidence do not vary by class

18   member. Instead, the focus is on what ***Facebook*** did (or did not) deceptively say to the market, which

19   turns on common evidence like its own press releases and documents recognizing the representations

20   _____

21   [6] In *Kottaras v. Whole Foods Mkt., Inc.*, certification was denied because it was undisputed that the
     class included purchasers of "thousands of products" and some products' prices increased while

22   others decreased. 281 F.R.D. 16, 18–19, 23–25 (D.D.C. 2012). Establishing any class member was
     overcharged thus required individual analysis of each's "purchases" and "the amount by which the

23   price of each product changed as a result of the merger." *Id.* In *In re Int. Rate Swaps Antitrust Litig.*,
     certification was denied because it was undisputed that plaintiffs purchased "different products at

24   different prices," and the court noted the possibility "some received lower prices . . . than they would
     have," but was clear that claimed beneficial "distant second-order effects" need not be considered.

25   2023 WL 8675625, at *8–9 & *9 n.6 (S.D.N.Y. Dec. 15, 2023). These concerns are not present here—
     only one product, Facebook, is at issue, and all Class members "purchased" it and paid the same

26   overcharge. Moreover, Facebook's claimed "benefits" are justifications it can make class-wide. *In re
     Elec. Books Antitrust Litig.*, 2014 WL 1282293, at *16 (S.D.N.Y. Mar. 28, 2014) (certifying class, as
     defendant's purported "offsetting benefits," to extent even cognizable, themselves "common issue").

27   [7] Other decisions have found deception is sufficient to state a Section 2 claim, without requiring the
     factors articulated in *Am. Prof'l Testing Servs., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l*

28   *Publ'ns., Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997). *See* Mot. at 17–18 (collecting cases).

1   in them to be false.[8] Reliance, too, is a common issue, as the question is whether there was reliance

2   by *the market*, not by all Class members or any specific set of individual Class members (as Facebook

3   itself recognizes in arguing Consumers must prove "enough" users cared, Opp. at 19–20).[9] Facebook

4   nowhere engages Consumers' cited cases on these points and itself cites none to the contrary.

5        Next, Facebook concedes consumers care about their privacy and data, but argues "the only

6   evidence" on reliance and materiality is "untethered" from Facebook's misrepresentations and

7   omissions and competition among personal social networks. Opp. at 20. According to Facebook, then,

8   Consumers cannot show through "any evidence (common or not)" consumers considered Facebook's

9   statements important in deciding whether to use Facebook. *Id.* But as this Court has explained,

10  Facebook's argument that "the evidence does not support plaintiffs' case" is a merits challenge, not

11  a certification one. *DZ Rsrv. v. Meta Platforms, Inc.*, 2022 WL 912890, at *6 (N.D. Cal. Mar. 29,

12  2022) (class certified). And contrary to its claim, the common evidence shows Facebook made

13  misrepresentations and omissions *about* its data practices, which were important to consumers'

14  decision on whether to use Facebook or other personal social networks, and therefore important to

15  competition. Mot. at 7–12. This common evidence is thus completely connected, not "untethered."

16       Facebook also argues Consumers provide no common proof that "enough" users care to a

17  sufficient degree about a PSN's data practices, such that Facebook's deception of the market harmed

18  competition. Opp. at 19–20.[10] Facebook simply ignores that Consumers show with common proof

19  that a high percentage of users intensely care about their privacy and data—Mr. Zuckerberg admitted

20  it is their "***No. 1***" concern—and even the risk of losing just ███████████ of users was sufficient

---

[8] *E.g.*, *Giuliano v. Sandisk Corp.*, 2015 WL 10890654, at *17 (N.D. Cal. May 14, 2015) (common questions as to defendant's deception predominated for monopolization claim as "[p]laintiffs will rely on common evidence" to show defendant's fraud); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004) (same, as monopolization claim depended on "common evidence" and deceptive "conduct of" defendant, "not . . . on the conduct of individual class members.").

[9] *See, e.g.*, *Harcourt Brace*, 108 F.3d at 1152; *see also Warfarin*, 391 F.3d at 528–29 (class members' "individual reliance on the misrepresentations was irrelevant to liability" in deception-based monopolization claim); *Suboxone*, 421 F. Supp. 3d at 60–61 & n.21 (E.D. Pa. 2019) (same).

[10] In their initial motion for class certification, Plaintiffs offered testimony from Sarah Lamdan, a Professor at the City University of New York (CUNY) School of Law, who is an expert in data privacy with a focus on the implications of the use of data to target consumers. ECF Nos. 645-10, 645-11. Prof. Lamdan addressed in depth the research and evidence in this case that consumers care about their online privacy and data. Plaintiffs also offered testimony from Robert Klein, who performed a survey confirming social network users care about their data. ECF Nos. 645-8, 645-9.

1   to require a competitive response from Facebook. Mot. at 7–12, 17–21. Moreover, Facebook's PSN

2   competitors Snapchat and MeWe testified that ████████████████████ (Mot. at 11),

3   providing even more common proof (which Facebook nowhere mentions) that enough users care

4   about data such that Facebook's deception on that dimension harmed competition. But even if this

5   evidence were not enough to eventually **win** on the merits, that is irrelevant to certification. *DZ*, 2022

6   WL 912890, at *6. What matters now is that reliance, materiality, and harm to competition are

7   common issues, as is confirmed by the cases Facebook does not address.[11] *E.g.*, *Amgen Inc. v.*

8   *Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 459–60, 467–68 (2013) (materiality and reliance

9   common issues); *Warfarin*, 391 F.3d at 528–29 (common liability issues predominated for deception-

10  based monopolization claim and "individual reliance" irrelevant); *Glumetza*, 336 F.R.D. at 475 (for

11  monopolization claim, "effect on the market" from anticompetitive conduct was common issue).

12         Facebook turns to mischaracterizations of the named Plaintiffs that do not matter to

13  certification. Opp. at 19. As noted, reliance by any particular set of individual Class members is

14  irrelevant to whether Facebook deceived the **market**. Facebook also ignores its omissions (beyond its

15  misrepresentations), and it disregards the named Plaintiffs' interrogatory responses stating ████

16  ████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████

18  ████████████████. Ex. 8; Ex. 9. In addition, the Ninth Circuit has rejected Facebook's

19  suggestion that the named Plaintiffs could not have reasonably relied on its deceptive public

20  misrepresentations and omissions about its data practices because ████████████████

21  ████████████████████ *DZ Reserve v. Meta Platforms, Inc.*, 96 F.4th 1223,

22  1236–37 (9th Cir. 2024) (no defense to certification to say "Plaintiffs should have known better than

23  to rely" where, as here, statements "made with the fraudulent intent of inducing reliance"). Moreover,

24  Facebook ignores the common evidence showing users do not ████████████████, and

25  that in any event, its ██████ did not fully or accurately state its data practices. Mot. at 10–11.

26         Facebook's critiques of Dr. Economides are also baseless. Opp. at 19–20. He testified that it

27

28  ────────────────────
[11] This stands in contrast to the only case Facebook cites, where the issue was whether there was pass-on of overcharge to individual class members, given the class included indirect purchasers. *California v. Infineon Techs. AG*, 2008 WL 4155665, at *6, *9 (N.D. Cal. Sept. 5, 2008). That is no issue here.

would be hard for users to understand and rely on Facebook's privacy policy—due to its length and complexity—not its public (mis)statements and omissions. Ex. 1 (Economides Class Tr.) at 45:1–46:13. Facebook also argues Dr. Economides could not identify any specific misrepresentation or omission that caused users to choose Facebook over Google+. But he testified that but for Facebook's misrepresentations and omissions, either collectively or individually, Google+ would have been more successful. Ex. 2 (Economides Merits Tr.) at 228:25–229:20. None of these gripes bar certification.

### III.    FACEBOOK'S MARKET DEFINITION AND MONOPOLY POWER ARGUMENTS PROVIDE NO BASIS TO DENY CLASS CERTIFICATION

Consumers showed that Facebook's "possession of monopoly power in the relevant market" would be resolved class-wide using common evidence. Mot. at 4–7, 16–17. Facebook's opposition makes no showing to the contrary and does not engage with Consumers' cited cases at all. This is unsurprising given its counsel acknowledged that "market definition" is a "squarely merits issue[.]" Ex. 10. Indeed, Facebook's expert, Dr. Tucker, does not challenge Consumers' personal social networking services ("PSN" or "PSNS") market or offer *any* relevant market opinions at all and ████ ██████████████████████████████████████████████████████████ Ex. 7 (Tucker Class Tr.) at 44:10–22, 45:8–46:17. Defining a relevant market and determining monopoly power are questions common to the Class that likewise yield common answers.

Facebook's different, disguised ascertainability argument—that "determining which members of the putative class participated" in the PSN market "turns on individualized questions" (Opp. at 20)—fails. As Facebook concedes, the Ninth Circuit "imposes no" class member identification requirement at class certification. Opp. at 12 n.3. Regardless, Plaintiffs have offered an objective class: All persons in the U.S. who maintained and used a Facebook profile from Dec. 3, 2016 to Dec. 3, 2020. Facebook has the list of names of these class members in its possession. Indeed, Dr. Economides used ████████████████ ████████████ to determine the number of Class members in calculating damages. Economides ¶ 119. Separately from this proposed, objective class, Plaintiffs propose a relevant market of personal social networks. As the Ninth Circuit confirms, "defining the relevant market is a factual inquiry for the jury." *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993).

None of the cases Facebook cites—which are all about market definition, not about determining who *participated* in the market—support its suggestion Consumers have failed to meet

1    a certification requirement (they have not).[12] Facebook conflates two legal tests: defining a market,

2    and determining class membership, neither of which matter for certification. Regardless, its critique

3    is misplaced. The Class consists of individuals that maintained and used a Facebook account, so they

4    all necessarily used Facebook's PSN services and "participated" in the PSN Market. Economides

5    Rebt. ¶ 33 n. 89. All likewise would have been paid for their data in the but-for world, so Facebook's

6    monopolization of the PSN Market in the actual world necessarily hurt all of them. Economides § VI.

7        Finally, Facebook's throw-away attacks on monopoly power likewise fail. Opp. at 22. To the

8    extent it disputes Dr. Economides' market share calculations based on "time spent," he explains why

9    it is unnecessary to distinguish "PSN" and "non-PSN" features and that even crediting Facebook's

10   argument and applying an adjustment to discount supposedly non-PSN time (per ███████████

11   ██████) still results in sufficiently high share. Economides ¶ 46. To the extent it disputes Dr.

12   Economides' market share calculations based on the number of monthly active users, all Facebook

13   users are necessarily PSN users and properly counted. Economides Rebt. ¶ 33 & n. 89. In any case,

14   all of Facebook's arguments apply class-wide. And they do not apply to Dr. Economides' showing of

15   monopoly power based on direct evidence (Facebook's supracompetitive profits and degrading of

16   terms over time), which Facebook does not mention and has not sought to exclude.

17   **IV.    NAMED PLAINTIFFS ARE TYPICAL AND ADEQUATE REPRESENTATIVES**

18        Both typicality and adequacy are satisfied. Mot. at 14–15. The named Consumers and Class

19   members allege the same antitrust violations, based on the same conduct and theories (anticompetitive

20   deception), resulting in the same type of injury (under-compensation for their data). The named

21   Consumers have also participated in this litigation for years, and they all understand this is an antitrust

22   case about Facebook's data-related deception. Ex. 11 (Grabert Tr.) at 17:20–18:13; Ex. 12 (Klein Tr.)

23   at 48:7–10, 105:3–15; Ex. 13 (Banks Kupcho Tr.) at 28:18–22, 32:1–16. No more is required.

24        Facebook does not engage with these showings. Instead, it mischaracterizes the named

25

---

26   [12] *Garnica v. HomeTeam Pest Defense, Inc.*, 230 F. Supp. 3d 1155, 1157–59 (N.D. Cal. 2017) (need
     to show power in various ***geographic*** markets, which not at issue here); *Burkhalter Travel Agency v.*
27   *MacFarms Int'l, Inc.*, 141 F.R.D. 144, 154 (N.D. Cal. 1991) (individual issues predominated in price-
     fixing case as ***defendants*** in "diversity of markets" and priced products differently); *Rodney v.*
28   *Northwest Airlines, Inc.*, 146 Fed. Appx. 783, 787 (6th Cir. 2005) (individuals issues predominated
     market definition since cross-elasticity analysis would be specific to each of 74 at-issue plane routes).

Plaintiffs as "testif[ying] that the factual foundations of their theory" are "false." Opp. at 22–24. But

its assertions are baseless. Each named Plaintiff testified that privacy and data are important to them

and affected their use of Facebook.[13] And contrary to Facebook's suggestion that no named Plaintiff

"relied on" its deception, each confirmed that they did. Ex. 8 (ROG No. 15) at 6 (███████████████

████████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████); Ex. 9 (ROG No. 7).

   Facebook's attacks are irrelevant to Consumers' claims and to certification. Class members'

individual reliance, exposure, and subjective views are not relevant to liability, injury, or damages—

and Facebook cites no contrary cases. *Supra* Section II(B)–(C); Economides ¶¶ 11–12, 54–55 & n.88,

86–89. Individual experiences therefore have no relation to Plaintiffs' suitability as class

representatives here. *Cf. DZ*, 96 F.4th at 1239 (named plaintiffs' supposed "non-reliance" no basis to

reject them as representatives). Any suggestion that the named Consumers are uninformed is wrong,

*supra*, and also misplaced. *Capacitors*, 2018 WL 5980139, at *10 (Donato, J.) (rejecting "alleged

ignorance" challenges as "disfavored"). And whatever testimony soundbites Facebook thinks may

conflict with Consumers' case are "fodder for cross-examination at trial." *Moore v. Int'l Cosms. &*

*Perfumes, Inc.*, 2016 WL 7644849, at *18 (C.D. Cal. Mar. 17, 2016) (rejecting challenge to class

representative on this basis).[14] The named Consumers will protect the Class, as they have for years.

**CONCLUSION**

   For the foregoing reasons, the Court should grant Consumers' motion for class certification.

---

[13] Ex. 11 (Grabert Tr.) at 199:24–200:1, 207:3–16 (███████████████████████████████████████
████████████████████████████████████████████████████); Ex. 12 (Klein
Tr.) at 26:8–20, 232:17–24, 277:14–23, 279:9–280:19 (███████████████████████████████████████
████████████████████████████████████████████); Ex. 13 (Banks Kupcho Tr.) at 32:7–34:5, 50:1–3, 155:23–
156:20, 216:24–217:10, 233:18–234:10 (██████████████████████████████████████████████████████
████████).

[14] Facebook's cited cases (Opp. at 21, 23) are off point. *See In re Arris Cable Modem Consumer*
*Litig.*, 327 F.R.D. 334, 358–59 (N.D. Cal. 2018) (representative did not even "subscribe" to allegedly
deceptive service that was basis for theory); *Major v. Ocean Spray Cranberries, Inc.*, 2013 WL
2558125, at *3–4 (N.D. Cal. June 10, 2013) (classes included products that representative "did not
purchase"); *In re Facebook, Inc., PPC Advert. Litig.*, 282 F.R.D. 446, 454 (N.D. Cal. 2012)
(representatives subject to contract defense, showed no "concrete injury," sought to represent both
"persons or entities," and conceded "knows essentially nothing about the case"); *Lerwill v. Inflight*
*Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978) (*rejecting* challenge to representatives).

DATED: July 8, 2024

By: */s/ Shana E. Scarlett*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Shana E. Scarlett (Bar No. 217895)
 shanas@hbsslaw.com
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
(510) 725-3000

Steve W. Berman (admitted *pro hac vice*)
 steve@hbsslaw.com
1301 Second Avenue, Suite 2000
Seattle, WA 98101
(206) 623-7292

*Interim Co-Lead Consumer Class Counsel*


**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
W. Joseph Bruckner (admitted *pro hac vice*)
 wjbruckner@locklaw.com
Robert K. Shelquist (admitted *pro hac vice*)
 rkshelquist@locklaw.com
Brian D. Clark (admitted *pro hac vice*)
 bdclark@locklaw.com
Rebecca A. Peterson (Bar No. 241858)
 rapeterson@locklaw.com
Kyle Pozan (admitted *pro hac vice*)
 kjpozan@locklaw.com
Laura M. Matson (admitted *pro hac vice*)
 lmmatson@locklaw.com
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900

*Interim Counsel for the Consumer Class*

By: */s/ Kevin Y. Teruya*

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Kevin Y. Teruya (Bar No. 235916)
 kevinteruya@quinnemanuel.com
Adam B. Wolfson (Bar No. 262125)
 adamwolfson@quinnemanuel.com
Scott L. Watson (Bar No. 219147)
 scottwatson@quinnemanuel.com
Claire D. Hausman (Bar No. 282091)
 clairehausman@quinnemanuel.com
Brantley I. Pepperman (Bar No. 322057)
 brantleypepperman@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
(213) 443-3000

Michelle Schmit (admitted *pro hac vice*)
 michelleschmit@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606-1881
(312) 705-7400

Manisha M. Sheth (admitted *pro hac vice*)
 manishasheth@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Interim Co-Lead Consumer Class Counsel*

**ATTESTATION OF KEVIN Y. TERUYA**

This document is being filed through the Electronic Case Filing (ECF) system by attorney Kevin Y. Teruya. By his signature, Mr. Teruya attests that he has obtained concurrence in the filing of this document from each of the attorneys identified on the caption page and in the above signature block.

Dated: July 8, 2024                    By   */s/ Kevin Y. Teruya*
                                                Kevin Y. Teruya


**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of July 2024, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System, causing it to be electronically served on all attorneys of record.

                                        By   */s/ Kevin Y. Teruya*
                                                Kevin Y. Teruya