**PUBLIC REDACTED VERSION**

| | |
|---|---|
| WILMER CUTLER PICKERING HALE AND DORR LLP | ARI HOLTZBLATT (SBN 354631) Ari.Holtzblatt@wilmerhale.com |
| SONAL N. MEHTA (SBN 222086) Sonal.Mehta@wilmerhale.com 2600 El Camino Real, Suite 400 Palo Alto, California 94306 Telephone: (650) 858-6000 | MOLLY M. JENNINGS (*pro hac vice*) Molly.Jennings@wilmerhale.com 2100 Pennsylvania Ave NW Washington, DC 20037 Telephone: (202) 663-6000 |
| DAVID Z. GRINGER (*pro hac vice*) David.Gringer@wilmerhale.com ROSS E. FIRSENBAUM (*pro hac vice*) Ross.Firsenbaum@wilmerhale.com RYAN CHABOT (*pro hac vice*) Ryan.Chabot@wilmerhale.com PAUL VANDERSLICE (*pro hac vice*) Paul.Vanderslice@wilmerhale.com 7 World Trade Center 250 Greenwich Street New York, New York 10007 Telephone: (212) 230-8800 | MICHAELA P. SEWALL (*pro hac vice*) Michaela.Sewall@wilmerhale.com 60 State Street Boston, Massachusetts 02109 Telephone: (617) 526-6000 |

*Attorneys for Defendant Meta Platforms, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated, <br><br>Plaintiffs,<br><br> v.<br><br>META PLATFORMS, INC., a Delaware Corporation,<br><br>Defendant. | Case No. 3:20-cv-08570-JD <br><br>**DEFENDANT META PLATFORMS, INC.'S REPLY IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY AND OPINIONS OF NICHOLAS ECONOMIDES**<br><br>Hearing Date: September 26, 2024<br>Time: 10:00 AM<br>Judge: Hon. James Donato |

**PUBLIC REDACTED VERSION**

**TABLE OF CONTENTS**

I.  ECONOMIDES'S OPINIONS ON CLASSWIDE INJURY AND DAMAGES ARE JUNK SCIENCE ................................................................................................................. 1

    A.    Economides Speculates That Meta Would Pay All Facebook Users, Without Any Support In The Record Or Economics ................................................. 1

    B.    Economides's Assertion That All Putative Class Members Would Receive $5 Per Month Is Junk Science ................................................................... 4

II. ECONOMIDES'S COMMON "PSNS" MARKET OPINIONS ARE INADMISSIBLE ........................ 6

    A.    Economides Uses No Accepted Method Of Defining A Market ............................. 6

    B.    Economides's So-Called SSNIP/SSNDQ Is Not A Reliable HMT ........................ 7

**PUBLIC REDACTED VERSION**

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Burkhalter Travel Agency v. MacFarms Int'l, Inc.*,
  141 F.R.D. 144 (N.D. Cal. 1991)..................................................................................................6

*In re Capacitors Antitrust Litig. (No. III)*,
  2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) ...............................................................................5

*In re Glumetza Antitrust Litig.*,
  2021 WL 1817092 (N.D. Cal. May 6, 2021)..................................................................................3

*In re Google Play Store Antitrust Litig.*,
  20-cv-05761, Dkt. 449 (N.D. Cal. Aug. 28, 2023) .........................................................................4

*In re Google Play Store Antitrust Litig.*,
  2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) ......................................................................1, 3, 7

*Hambleton Bros. Lumber Co. v. Balkin Enterprises, Inc.*,
  397 F.3d 1217 (9th Cir. 2005) ........................................................................................................5

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) ........................................................................................................4

*In re Live Concert Antitrust Litig.*,
  863 F. Supp. 2d 966 (C.D. Cal. 2012) ............................................................................................8

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) ...........................................................................................................6

*William Inglis & Sons v. Continental Baking Co.*,
  942 F.2d 1332 (9th Cir. 1991) ........................................................................................................5

*In re Xyrem (Sodium Oxybate) Antitrust Litig.*,
  2023 WL 3440399 (N.D. Cal. May 12, 2023)................................................................................5

**STATUTES, RULES, AND REGULATIONS**

Fed. R. Civ. P. 23...............................................................................................................................6

**PUBLIC REDACTED VERSION**

Economides's groundless opinions are Users' sole means of proving a common antitrust injury, classwide damages, and the relevant market. Every step of that putative class wide approach is based on unsupported (and logically unsound) say-so without any analytical rigor or discernible methodology. This speculative approach is the textbook definition of unreliable opinion. An expert cannot, based solely on a cherry-picked "record," simply proclaim that in a but-for fantasy world, a company that offers its service to users for free would instead pay those users $52 billion dollars to enjoy that same service. Something far more must be—and is—required.

Yet rather than confront this central point of Meta's motion—or in many instances even dispute the defects Meta identified—Users rest on the old saw that each of these methodological failures goes to weight, not admissibility. Even at class certification, that fallback cannot save Economides, especially when the methodological failures are looked at together. This Court must "'ensur[e] that an expert's testimony . . . rests on a reliable foundation,'" and this duty "does not change with the different stages of litigation." *In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *5 (N.D. Cal. Aug. 28, 2023) (Donato, J.). That requires—at all times, including at class certification—excluding opinions based on "wholly speculative assumptions" because "*ipse dixit* [is] unsuitable for admission at trial." *Id.* at *9. And that describes—to a T—Economides's subjective approach to common impact, damages, and relevant market.

## I. ECONOMIDES'S OPINIONS ON CLASSWIDE INJURY AND DAMAGES ARE JUNK SCIENCE

### A. Economides Speculates That Meta Would Pay All Facebook Users, Without Any Support In The Record Or Economics

No economic theory supports Economides's opinion that Meta would have competed by paying users. Users argue that "[i]f the starting money price is 'zero,' more competition should drive the price 'negative,' such that users receive compensation." Opp. 3. That is total nonsense. Broadcast TV is one obvious example: when NBC ran Seinfeld and ER on Thursday nights, CBS and ABC did not pay people to watch their shows instead. They stayed free and tried to offer more interesting content. Other attention platforms behave similarly. When TikTok entered the scene, YouTube, Snap, and Facebook all responded with their own short-form video offerings. Economides concedes, as he must, that no platform bearing any resemblance to Facebook has ever

**PUBLIC REDACTED VERSION**

1   responded to more competition by paying all its users. Ex. 16, Economides 9/23 Tr. 84:11-16;[1]
2   Dkt. 805-2, Economides 3/24 Tr. 255:12-23. And when asked whether he could explain why real-
3   world competition never drove any of *Meta's* competitors to pay users, Economides said that he
4   had no opinion on the question. Ex. 16, Economides 9/23 Tr. 74:7-10, 80:20-24.

5      Users' putative merits expert Joseph Farrell, however, explains why no attention platform
6   would do what Economides speculates: ▮
7   ▮
8   ▮
9   ▮ Dkt. 648-3, Farrell Rep. ¶57. He also explains why adopting a
10  "negative price" makes no sense: it would lead users to join Facebook for cash, not authentic
11  engagement. In Farrell's words, "[a]t a negative price, people could take [products] at a negative
12  price and use them for landfill." Dkt. 770-15 at 679; Dkt. 769-6, Farrell 3/24 Tr. 272:10-273:8 ▮
13  ▮
14  ▮
15  ▮
16  ▮. So while Users baldly assert that
17  "[e]ntities cannot compete on features alone, and even 'attention platforms' compete on price,"
18  Opp. 4, that most businesses compete on several factors says nothing about some incremental
19  degree of competition causing Meta to reinvent its business model to pay all users. The mere theory
20  of "negative price markets" therefore cannot bridge the analytical gap between how Meta actually
21  competes for users and how Economides speculates it would.[2]

---

[1] "Ex." citations reference exhibits to the Gringer Declaration filed herewith. Unless otherwise noted, citations to the Economides Report ("Rep.") reference Dkt. 794-2 submitted with Users' class certification motion, emphasis is added, and objections are omitted for deposition citations.

[2] Users' newest preferred example of a negative price market, credit cards (Opp. 3 (citing Rep. ¶65)), says nothing about Facebook. Credit cards do not even charge all holders a negative price—there are annual fees, interest, late fees, and more. Nor do credit card reward programs provide uniform payments. They have minimum thresholds, provide individualized not uniform rewards, and lack universal participation. If Facebook would offer a rewards program like this in Users' but-for world, no class can be certified because there would be no common impact.

Users' best effort at identifying evidence supporting Economides's opinions (Opp. 3-7) is that ███████████████████████████████████████████████████████████████ ████████████████████████████████ (Opp. 3) ████████████████████. See Mot. 6-7.³ ████████████████████████████████████████. As this Court has observed, "just because" Meta considered a proposal does not "mean[] it's in any way realistic." Dkt. 630, June 22, 2023 Hr'g Tr. 22:2-7 ("THE COURT: I don't think just because it went to the C-suite people means it's in any way realistic. And, first of all, what are you going to do with that at trial? Are you going to stand up and tell the jury, 'Here's a program. They never did it, but they thought about it.' That's not going to get you anywhere."). No case Users cite (Opp. 6 n.28) accepted a but-for world based solely on ████████████████████████████████████ ██████████████████████. Instead, as their main case emphasizes, "[w]e construct the but-for world not out of whole cloth, but as a matter of reasoned deviation from the actual world based upon our changed assumption of defendants' lawful conduct," which requires "cogent evidence"—"direct evidence," "competent evidence," and "adequate evidence"—and "no speculation." *In re Glumetza Antitrust Litig.*, 2021 WL 1817092, at *13-15 (N.D. Cal. May 6, 2021) (cited at Opp. 6). Users' best evidence only proves Economides's but-for world is bare speculation constructed out of whole cloth.

The bottom line is that Economides's but-for world falls squarely within those opinions that this Court has excluded because they "rested on 'unproven assumption' that 'cannot be squared with the economic literature,' led to absurd conclusions, and had 'no visible factual support' and 'no real analysis or data.'" Opp. 5 (quoting *In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *7-10). Users' attempt to distinguish *Google Play* because "this Court excluded the plaintiff expert's opinions *at the merits stage*" falls flat. Opp. 5. There, the flaws in the expert's analysis did not become apparent until the merits stage, and, after identifying those

---

³ ████████████████████████████████████████████████████████████████████████████████ Mot. 7.

flaws, the Court decertified the class. *In re Google Play Store Antitrust Litig.*, 20-cv-05761, Dkt. 449 at 1-2 (N.D. Cal. Aug. 28, 2023). Here, the flaws are evident now. There is no reason to delay.

**B.     Economides's Assertion That All Putative Class Members Would Receive $5 Per Month Is Junk Science**

Economides's classwide damages model is a yardstick method in name only. In reality, he assumed the conclusion that he wanted his study to reach—that Meta would pay users—and set out to look for supposed "yardsticks" proving it. He looked only for companies that pay for data, and so that is what he found. Mot. 8-9. Users do not contest that there are better comparators to Facebook—TikTok, X (Twitter), YouTube, or Pinterest to give four of literally thousands of examples—not one of which pays all users to consume their entertaining content or to collect data for advertising. Opp. 7-8. And despite working on this case for years, the best Economides can do is opine that Facebook is like ▮▮▮▮ Of course, no one has shared a picture of their grandkids, followed current events, discovered vintage cars, learned about potential vacation destinations, laughed at a comedy sketch, or done anything on ▮▮▮▮ Economides's comparison of Facebook to ▮▮▮ confirms precisely why his opinions must be excluded.

Likewise, failing to account for the valuable service that Facebook offers—at scale to hundreds of millions of users—is not "conservative." Opp. 8. Market research programs *can* pay their far fewer participants and *must* pay them to gain sufficient participation. Yet Economides indisputably did not adjust his supposed yardsticks' $5 per month to account for the significant value Facebook provides to users. Users' argument that market research participants display a "revealed preference" for sharing data for pay, *id.*, both concedes that Facebook and market research programs attract users based on fundamentally different value propositions and are not comparable, and fails its own logic: if Users are right, then Facebook users have a revealed preference for using Facebook without pay, so Meta would have to pay them nothing.

It is no answer to say that these fundamental flaws are for the jury to sort out. This is a foundationally unsound approach designed to arrive at a foreordained outcome with no basis in science or logic or reality. It has no business in federal court. And it is not admissible just because it applies the "yardstick analysis" label. Opp. 9-10; *see Image Tech. Servs., Inc. v. Eastman Kodak*

**PUBLIC REDACTED VERSION**

*Co.*, 125 F.3d 1195, 1222 (9th Cir. 1997) (yardsticks require "meaningful economic similarity"); *William Inglis & Sons v. Continental Baking Co.*, 942 F.2d 1332, 1341 (9th Cir. 1991) (opinion "was mere speculation" where "the expert was unable to identify any particular significant respect in which Inglis was 'comparable' to the surveyed companies"). Users attempt to distinguish the applicable caselaw by arguing, in effect, that Economides's methodological failings were not so bad. Opp. 9-10. They were. Mot. 8-10. And other cases Users cite involve yardsticks with meaningful economic similarities: a drug for a drug in *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 2023 WL 3440399, at *7 (N.D. Cal. May 12, 2023), and the same market but different time periods in *In re Capacitors Antitrust Litig. (No. III)*, 2018 WL 5980139, at *6 (N.D. Cal. Nov. 14, 2018). Economides's unadjusted reliance on small market research programs is nothing like that.

In any event, Economides's five-bucks-a-month damages model (and Users' bid for class certification) cannot survive Economides's admissions that Meta obtained alleged monopoly power lawfully, because he attributes the entire $5 "overcharge" to deception. *See* Dkt. 805-1 at 1 (citing Economides 3/24 Tr. 229:22-231:21; 240:3-10; 250:3-25). Users try to errata those admissions away, *see* Dkt. 812-1 at 3, but deposition errata are "to be used for corrective, and not contradictory, changes." *Hambleton Bros. Lumber Co. v. Balkin Enterprises, Inc.*, 397 F.3d 1217, 1226 (9th Cir. 2005). Economides provided that testimony under oath repeatedly and unequivocally:

> Q. [L]et's go back and **be very clear about this**. You testified a few moments ago that you believe that **Facebook beat Myspace on its own merits**, you'd agree with that?
> A. **I said that, yes**.
> Q. Okay. And **you stand by that, right?**
> A. **Yes.**
> . . .
> Q. Is there anything in your testimony from today that you want to change or correct or do you stand behind your testimony from today?
> A. No, I don't have anything to correct.
> Q. You stand behind it?
> A. Correct.

Ex. 17, Economides 3/24 Tr. 240:3-15, 295:3-15; Dkt. 805-1 at 1 (collecting admissions). Indeed, Economides said similar things in his first deposition. *See* Ex. 16, Economides 9/23 Tr. 95:3-96:18 ("Well, I'm not sure about the whole period 2007 through '11, but I would say that at the early

1  stage, the privacy settings of Facebook, despite their problems, were better than the alternative, the alternative being Myspace."); *see also id.* 98:16-23. Any attempt to change or contradict those admissions after the fact should be rejected. But even if not, the improper contradictory errata only hedges Economides's admissions to say, for example, that alleged deception might have "▬▬▬ ▬▬▬▬▬▬▬▬▬" alongside Facebook's merits. Dkt. 812-6. It does not deny Economides's repeated unambiguous admissions that competition on the merits played a role in Facebook's success, and it certainly does nothing to try to isolate the impact of the supposed deception versus that lawful success. Since Economides failed to adjust for the monopoly power that he repeatedly admits Meta obtained lawfully, whether in part or in whole, the Court should exclude his baseless calculation of a $5 per month payment, on which Users rest the entire weight of their damages model under *Comcast* and common classwide injury.

**II.     ECONOMIDES'S COMMON "PSNS" MARKET OPINIONS ARE INADMISSIBLE**

Plaintiffs seeking to certify an antitrust class must demonstrate a common means for proving a relevant market. *Burkhalter Travel Agency v. MacFarms Int'l, Inc.*, 141 F.R.D. 144, 154 (N.D. Cal. 1991). Users initially ask the Court to disregard Meta's motion to exclude these opinions because, in a September 2023 email, Meta's counsel suggested that the parties focus class certification expert proceedings on certain issues (Opp. 10). But Users omit their response rejecting that proposal. And more importantly, Users ignore that they themselves have made market definition relevant: offering not one, but two, experts on market definition to support their initial class certification bid and then again relying on Economides's market definition opinions in this renewed motion. Dkt. 794-1 at 5-7. Having put market definition and Economides's supporting opinions at issue, Users cite no authority for ignoring challenges to their admissibility. Indeed, such challenges must be resolved to satisfy Rule 23. *See, e.g.*, *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 670-73 (9th Cir. 2022).

**A.     Economides Uses No Accepted Method Of Defining A Market**

Economides's effort to define a market predicated on a "▬▬▬▬▬▬" should be excluded now because it is unreliable and Economides is woefully unqualified to offer it. Users' only defense of Economides's qualifications is that he "explained ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.″ Opp. 12-13. Not so. *See* Economides 9/23 Tr. 198:13-200:7 ("I do not use
2 TikTok …."); *see also* Mot. 10-11. Plaintiffs' reliance on Economides's scant use of a product to
3 define a market shows that he lacks the *expertise* to offer this opinion, which should be excluded
4 on this ground alone. *See* Mot. 11.

5       Users' defense of Economides's "qualitative" methods is, if anything, further off the mark.
6 Again, Users slap buzzwords like "qualitative" and "*Brown Shoe*" on Economides's work and
7 claim that because some other court has accepted opinions bearing those buzzwords, Economides's
8 opinion must be accepted too. In fact, no court has ever accepted analysis like this and for good
9 reason. Economides did not conduct a *Brown Shoe* analysis in his class reports, and Users do not
10 claim that he did. Instead, his understanding of the "key" characteristics of PSNS changed multiple
11 times, and when implemented, his unreliable method produced (unsurprisingly) unreliable results.
12 *See* Mot. 11-12. Users argue that his moving target is nonetheless testable because Meta's expert
13 Ghose rebutted his analysis. Opp. 12. But, actually, Ghose concluded the opposite—Economides's
14 subjective and shifting factors (like who has a "sufficiently extensive" social graph) could not
15 produce a reliably testable market definition. Ex. 18, Ghose Rep. ¶14. Far from proving the
16 reliability of Economides's analysis, Ghose's work highlights its fatal flaw.

17       **B.**    **Economides's So-Called SSNIP/SSNDQ Is Not A Reliable HMT**

18       Users' "lipstick on a pig" defense reaches its apogee with their defense of Economides's
19 supposed Hypothetical Monopolist Test (HMT). Opp. 14. As elsewhere, that does not work: Users
20 cannot carry their burden to show that Economides's opinions are admissible at the class
21 certification stage merely by invoking the terms HMT and SSNIP/SSNDQ. The Court is charged
22 with evaluating the substance (or lack of substance) of an experts' methodology, not the label that
23 the expert seeks to apply. *See In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *3
24 (excluding unreliable application of a "logit model" despite its being undisputedly "'frequently
25 used in economics'"). Users' passing attempt to distinguish the cases excluding expert opinions
26 under analogous circumstances is conclusory and nonresponsive. *See* Opp. 15.

27       Users' only real attempt to defend this "analysis," then, comes in two short paragraphs
28 responding to Meta's demonstration that the so-called HMT is junk science. Opp. 14-15. Meta

**PUBLIC REDACTED VERSION**

explained that, even accepting Economides's premise that data is a price (it is not), a *reliable* HMT must measure a change in usage—not just "users"—following the supposed change in "price." *See* Mot. 13. Users now concede that an increase in *users* is " ███████ ," but claim that Economides " ████████████████████████████████████████████████ ███ ." Opp. 14 (citing Rep. ¶39). Economides cites no support for his statement (in ¶39) that large increases in usage " ███████ ." And at deposition, he admitted he did not test usage:

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

Ex. 17, Economides 3/24 Tr. 98:20-99:11. In other words, Economides only did what Users now admit was " ███████ ," leaving a fatal gap in Economides's attempted HMT.

On profits, Users appear to concede that Economides must show "a ██████ ██████████████████████████████ ." Opp. 14. Economides did not do that. Not all ad revenue comes from services Economides deems PSNS, which Economides clearly recognizes. *See* Rep. ¶46, n.65 (████████████████████████████████████████████████████████ ████████████████████████████). Economides indisputably did not isolate Facebook's PSNS profits from non-PSNS profits. He also failed to control for any confounding factors ████████████, including for example the emergence of TikTok. Ex. 17, Economides 3/24 Tr. 115:14-120:20. His supposed HMT analysis should be excluded. *See In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 981 (C.D. Cal. 2012) (excluding expert who failed to "account for major factors" and performed analysis "as if they did not exist").

Finally, Users leave Meta's last argument unrebutted: that Economides's reverse SSNIP test (████████) supposedly measuring an unprofitable decrease in price or improvement of quality is not accepted by any court or the relevant scientific community, nor tested, peer reviewed and

**PUBLIC REDACTED VERSION**

published, or accompanied by an accepted error rate. *See* Mot. 14-15 (collecting cases). Users thus cannot justify their request that this Court be the first one, anywhere ever, to accept such a method—let alone certify a class of over 200 million people to seek over $52 billion based on it.

Dated: July 15, 2024                                  Respectfully submitted,

                                                      By: */s/ Sonal N. Mehta*

                                                      WILMER CUTLER PICKERING HALE
                                                      AND DORR LLP
                                                      *Attorney for Defendant Meta Platforms, Inc.*

### CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of July, 2024, I electronically transmitted the public redacted version of the foregoing document to the Clerk's Office using the CM/ECF System and caused the version of the foregoing document filed under seal to be transmitted to counsel of record by email.

                                                      By:   */s/ Sonal N. Mehta*
                                                            Sonal N. Mehta