**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Kevin Y. Teruya (Bar No. 235916)
kevinteruya@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Shana E. Scarlett (Bar No. 217895)
shanas@hbsslaw.com
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000

*Interim Co-Lead Consumer Class Counsel*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, et al.,<br><br>           Plaintiffs,<br><br>     vs.<br><br>META PLATFORMS, INC.,<br><br>           Defendant.<br><br>This Document Relates To: All Consumer Actions | Consolidated Case No. 3:20-cv-08570-JD<br><br>**CONSUMER PLAINTIFFS' PROFFER REGARDING EXPERT TESTIMONY**<br><br>The Hon. James Donato<br><br>**REDACTED VERSION FILED PUBLICLY** |

Consumer Plaintiffs ("Consumers") respectfully submit this proffer in response to the Court's April 18, 2024 minute order regarding expert testimony. The Court's order authorized each party to have two experts—"one liability expert and one damages expert"—for summary judgment and trial purposes, and to make a proffer regarding any requested additional experts. Dkt. 789. Consumers name antitrust economists Dr. Joseph Farrell and Dr. Nicholas Economides as their two economics experts for summary judgment and trial. Dr. Farrell's and Dr. Economides' merits testimony will both address certain liability topics (market definition and indirect evidence of monopoly power), but their testimony will not be redundant. While they have reached the same conclusions, they have performed different economic analyses to reach those conclusions. Otherwise, they will address different topics. These economists' different areas of focus allow them to opine on discrete, complementary issues.

Consumers proffer Professor Sarah Lamdan as an additional merits expert. Professor Lamdan's testimony is highly relevant to Consumers' case. Consumers allege that Facebook knew consumers care about their data and online privacy and Facebook deceived the market about its data abuses in order to gain and maintain monopoly power. Jurors and the Court can better assess this theory aided by the specialized knowledge of Prof. Lamdan, an expert who studies privacy preferences and practices in the market.

## I. DR. JOSEPH FARRELL

Dr. Farrell is an antitrust economist who serves as a Professor in the Department of Economics at the University of California, Berkeley. He previously served as the chief economist at the Federal Trade Commission, the Department of Justice Antitrust Division, and the Federal Communications Commission. He has published extensively on the economics of competition, market definition, industrial organization, and innovation, co-authored the 2010 Horizonal Merger Guidelines, and has served as an expert in a variety of competition-related matters. Consumers intend to offer testimony from Dr. Farrell regarding certain economic analyses of market definition and monopoly power, and competitive harms that can result from deception, as well as rebuttal to Facebook's experts.

*Market Definition.* Based on economic principles and his extensive analysis of the record in this case, Dr. Farrell will show that the Personal Social Network Market ("PSN Market") is a relevant antitrust product market, and the United States is the relevant antitrust geographic market. Dr. Farrell

1  will offer both qualitative and quantitative analyses to support his definition of the relevant market.

2  Dr. Farrell will explain how qualitative evidence confirms that personal social networks—
3  such as apps from Facebook, Instagram, Snapchat, MeWe, and Google+—fulfill a distinct use case
4  for users, facilitating users connecting and sharing content online with their friends and family. In
5  particular, Dr. Farrell will offer his economic analysis of three strands of qualitative evidence:
6
7
8
9
10
11
12  As Dr. Farrell will explain, Facebook's
13
14  Similarly, Facebook's
15  support
16  the PSN Market by showing
17

18  Dr. Farrell will also explain how quantitative analysis further validates the PSN Market. Dr.
19  Farrell performed a quantitative SSNIP (small but significant non-transitory increase in price) test
20  using critical loss analysis ("CLA") and upward pricing pressure ("UPP") analysis that confirmed the
21  PSN Market is, in fact, the correct way to define and view the relevant antitrust market in this case.
22  CLA and UPP analyses are well-accepted, standard tools used by economists for market definition as
23  Dr. Farrell will explain, and he has greatly contributed to the economic literature on them.[1]

24  **Monopoly Power.** Dr. Farrell will also show that Facebook possessed monopoly power in the
25  PSN Market during the Class Period (December 2016–2020). He will do so by using data produced
26  by Facebook and non-parties in this case to calculate Facebook and jointly-owned Instagram's market

---

[1] *See, e.g.*, Joseph Farrell and Carl Shapiro, "Upward Pricing Pressure and Critical Loss Analysis: Response," Competition Policy International Antitrust Journal (2010).

share (on average, ▮), using the number of minutes that users spent on the major apps in the market during the Class Period (Facebook, Instagram, Snapchat, Google+, and MeWe).

***Deception-Based Competitive Harms***. Consumers' theory of anticompetitive conduct is that Facebook obtained and then maintained monopoly power by deceiving the market about its data and privacy practices. Dr. Farrell will testify how, as an economic matter, a firm's deception can give rise to antitrust harm by distorting consumer choice, weakening competitors, and undermining the competitive process. Dr. Farrell will further explain that the anticompetitive effects of deception are well-recognized in the economic field; indeed, he has contributed to the literature on this very issue.[2]

## II. DR. NICHOLAS ECONOMIDES

Dr. Economides is an antitrust economist that serves as a Professor of Economics at the Leonard N. Stern School of Business at New York University. He has published extensively on the economics of industrial organization, network industries, and electronic commerce, serves as the Founder and Executive Director of the Networks, Electronic Commerce and Telecommunications Institute, and has been qualified as an expert economist in a number of matters. Consumers intend to offer testimony from Dr. Economides regarding certain economic analyses of market definition and monopoly power, antitrust impact, and damages, as well as rebuttal to Facebook's experts.

Although Dr. Economides and Dr. Farrell have reached the same conclusion regarding market definition and monopoly power (issues Facebook hotly contests, and on which Facebook offers multiple experts)—they have performed different economic analyses, based on different strands of evidence, and using different data sets, to reach those conclusions. Their different areas of focus within the broad field of economics makes their analyses here complementary, not duplicative.

***Market Definition***. Using non-duplicative analyses, Dr. Economides will explain why the PSN Market is well-defined and it and the United States are the correct relevant product and geographic markets in this case. He will do so by analyzing the product characteristics of Facebook and other online services (and how they are, or are not, interchangeable for a particular use from consumers' standpoint), as well as business documents, testimony, and submissions to antitrust

---

[2] *E.g.* Joseph Farrell et al., "Standard Setting, Patents, and Hold-Up," 73 Antitrust Law Journal, no. 3 (2007): 609. 657 ("deceiving buyers . . . subverts the competitive process," is "antithetical to antitrust policy," and "typically enriches the deceptive party at the expense of others").

authorities from Facebook, industry participants, and their executives. Dr. Economides will further explain how this well-accepted approach is standard for economists,[3] and confirms the PSN Market is a valid relevant market and why other types of services like niche networking services (*e.g.*, LinkedIn and Nextdoor), messaging services (*e.g.*, iMessage and WhatsApp), and public content services (*e.g.*, YouTube, TikTok, Twitter, Reddit, and Pinterest) are properly excluded from that market.

Dr. Economides will also demonstrate how using a real-world event—Apple's introduction of its App Tracking Transparency ("ATT") feature—quantitatively confirms that the PSN Market is the relevant market in this case through a variant of the well-accepted SSNIP test. More specifically, Dr. Economides will show that by limiting the ability of apps like Facebook to track users and collect their data, ATT led to a decrease in the effective price of those services (*i.e.*, data collection and use), disproportionately impacting the revenues of Facebook, jointly-owned Instagram, and Snapchat (which comprise the bulk of the PSN Market) compared to non-PSN services. This shows the effective price decrease to a more competitive level was unprofitable, so, in reverse, an effective price increase from a more competitive level was profitable, thereby showing the PSN Market is a relevant market under the SSNIP test. Dr. Economides will further explain how reverse-SSNIP analyses are accepted by economists in the field.[4]

***Monopoly Power***. Dr. Economides will also show direct evidence of Facebook's monopoly power. Facebook has long maintained supracompetitive profits far exceeding other firms', and it has been able to *worsen* terms—such as by offering inferior data and privacy practices—without adversely impacting its bottom line. Dr. Economides' analysis is non-duplicative, as Dr. Farrell does not analyze direct evidence of Facebook's monopoly power. Using data from Comscore (a different data set than the one Dr. Farrell used), Dr. Economides will also establish indirect evidence of Facebook's monopoly power by calculating it and jointly-owned Instagram's market share in the PSN Market based on two metrics: time spent (at least ▮) and monthly active users (at least ▮).

***Antitrust Impact***. Dr. Economides will show that Facebook's anticompetitive deception

---

[3] *See, e.g.*, Jonathan Baker, "Market Definition: An Analytical Overview," 74 Antitrust Law Journal (2007): 139–41.

[4] *See, e.g.*, Paul de Bijl et al., Interconnected Networks, Tilburg University (TILEC Paper), Feb. 2005, at p. 52 (describing "reverse SSNIP" test).

harmed each Consumer Class member. He will explain that while Facebook charges users a monetary price of $0 as a monopolist in the actual world, it is not "free": Facebook simply transacts with users via currency in-kind (*i.e.*, the collection and use of their data). Dr. Economides will demonstrate that where, as here, the starting price is "zero" (*i.e.*, Facebook offers users $0 for their data, an effective overcharge), increased competition would have led to Facebook compensating users for their data, had it not prevented that increased competition through its anticompetitive deception. Class members are harmed because Facebook's ill-gotten, monopoly power in the actual world allowed it to deprive Class members of these better price and quality terms. And that harm is class-wide, because Facebook does not and cannot individually negotiate user-by-user with hundreds of millions of users, so it would have had to uniformly offer these better terms to all Class members.

*__Damages__*. Dr. Economides will also quantify the harm to Consumer Class members flowing from Facebook's anticompetitive deception. He will offer a damages model based on the yardstick method, which economists regularly use in antitrust cases like this one.[5] Using prices other services that compensate users for their data actually pay, Dr. Economides will identify the likely competitive compensation that Facebook would have provided Class members for their data in the but-for world: $5 per month, with $3.50 or $6.25 as alternatives. Dr. Economides' model uses as yardsticks data compensation services from Comscore, Nielsen, Google, Amazon, Luth Research, Verto Analytics, Strategy Analytics, Embee Mobile, SmartPhoneMate, and Facebook itself, and he will explain why his yardsticks are appropriate comparators and supported by the record in this case.

### III.  PROFESSOR SARAH LAMDAN

Professor Sarah Lamdan is Consumers' requested additional expert. Professor Lamdan is a Professor of Law at the City University of New York School of Law with deep expertise in data privacy, information management, and how data analytics companies use consumers' data for targeted advertising and other purposes. Professor Lamdan has published academic papers on privacy law, studied consumers' data privacy preferences, worked with privacy advocacy organizations, and testified before Congress about the privacy implications from federal agencies' use of data analytics

---

[5] *See, e.g.*, McCrary, Justin and Daniel L. Rubinfeld. "Measuring Benchmark Damages in Antitrust Litigation," Journal of Econometric Methods, Vol. 3, No. 1 (2014): 63.

1   firms (*e.g.*, Thomson Reuters and LexisNexis).

2   Professor Lamdan's testimony would provide the Court and jury a view of issues highly relevant to this case and based on specialized knowledge. Consumers allege that Facebook users care about their data and online privacy, and that Facebook deceived the market about its data and privacy practices to achieve and maintain its monopoly power. This Court and jurors may know they care about their data and privacy. But Facebook apparently intends to contest this issue, and Prof. Lamdan provides a basis for qualitatively and quantitatively establishing that consumers and the market do in fact care about these issues greatly. Professor Lamdan's deep research on these topics will provide valuable tools to both the Court and jurors in assessing these factual issues.

Professor Lamdan's expertise is also crucial to offsetting the information asymmetry that exists between Facebook and the public. The ways in which Facebook collects and uses Class members' data is opaque (by design), and Facebook has long benefited from and exploited this imbalance. Professor Lamdan has spent years researching the data and privacy practices of public and private entities, putting her in a unique position to explain the data that Facebook actually collects and the uses to which that data is put (notwithstanding Facebook's contrary representations and omissions). She will further explain how data analytics companies like Facebook cause and exploit consumers' lack of understanding over the ways their data is collected and used. Given the technical nature of these issues and the well-documented lack of understanding over Facebook's actual privacy and data practices, having an expert with exceptional experience studying how large database-like systems collect, use, track, store, and share user data will be useful to the jury and the Court.

Professor Lamdan's unique expertise will also aid the jury in understanding other non-lay concepts highly relevant to Consumers' case and Facebook's defenses. One example is the so-called "privacy paradox." Facebook's defenses embrace this "paradox," which posits that users paradoxically claim in surveys to value their data and privacy, but supposedly act inconsistently (such as by toggling their privacy settings in ways that are not the most restrictive or privacy-protecting). Professor Lamdan will explain why this paradox (and its predicates) has been disproven in academic literature and by the record. Professor Lamdan will also rebut Facebook's multiple experts who opine on the same or related topics, such as whether Facebook's data practices are best in class or not.

1    Professor Lamdan's testimony would not be redundant. Given her study of privacy beliefs and
2    practices in the market and her deep experience examining data collection, use, and surveillance tools,
3    Professor Lamdan offers a different perspective based on a different type of specialized knowledge
4    from Consumers' economics experts.
5    Consumers respectfully request the Court accept their proffer of Professor Sarah Lamdan as
6    Consumers' privacy expert.

7    DATED: August 9, 2024

8    By: */s/ Shana E. Scarlett*
     **HAGENS BERMAN SOBOL SHAPIRO LLP**
9    Shana E. Scarlett (Bar No. 217895)
      shanas@hbsslaw.com
10   715 Hearst Avenue, Suite 202
     Berkeley, CA 94710
11   (510) 725-3000

12   Steve W. Berman (admitted *pro hac vice*)
      steve@hbsslaw.com
13   1301 Second Avenue, Suite 2000
     Seattle, WA 98101
14   (206) 623-7292

15   *Interim Co-Lead Consumer Class Counsel*

16   **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
17   W. Joseph Bruckner (admitted *pro hac vice*)
      wjbruckner@locklaw.com
18   Robert K. Shelquist (admitted *pro hac vice*)
      rkshelquist@locklaw.com
19   Brian D. Clark (admitted *pro hac vice*)
      bdclark@locklaw.com
20   Rebecca A. Peterson (Bar No. 241858)
      rapeterson@locklaw.com
21   Kyle Pozan (admitted *pro hac vice*)
      kjpozan@locklaw.com
22   Laura M. Matson (admitted *pro hac vice*)
      lmmatson@locklaw.com
23   100 Washington Avenue South, Suite 2200
     Minneapolis, MN 55401
24   (612) 339-6900

25   *Interim Counsel for the Consumer Class*

By: */s/ Kevin Y. Teruya*
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Kevin Y. Teruya (Bar No. 235916)
 kevinteruya@quinnemanuel.com
Adam B. Wolfson (Bar No. 262125)
 adamwolfson@quinnemanuel.com
Scott L. Watson (Bar No. 219147)
 scottwatson@quinnemanuel.com
Claire D. Hausman (Bar No. 282091)
 clairehausman@quinnemanuel.com
Brantley I. Pepperman (Bar No. 322057)
 brantleypepperman@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
(213) 443-3000

Michelle Schmit (admitted *pro hac vice*)
 michelleschmit@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606-1881
(312) 705-7400

Manisha M. Sheth (admitted *pro hac vice*)
 manishasheth@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Interim Co-Lead Consumer Class Counsel*

**ATTESTATION OF KEVIN Y. TERUYA**

This document is being filed through the Electronic Case Filing (ECF) system by attorney Kevin Y. Teruya. By his signature, Mr. Teruya attests that he has obtained concurrence in the filing of this document from each of the attorneys identified on the caption page and in the above signature block.

Dated: August 9, 2024            By   */s/ Kevin Y. Teruya*
                                      Kevin Y. Teruya

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of August 2024, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System, causing it to be electronically served on all attorneys of record.

By   */s/ Kevin Y. Teruya*
     Kevin Y. Teruya