1  WILMER CUTLER PICKERING                    ARI HOLTZBLATT (SBN 354631)
    HALE AND DORR LLP                          Ari.Holtzblatt@wilmerhale.com
2                                             MOLLY M. JENNINGS (*pro hac vice*)
   SONAL N. MEHTA (SBN 222086)                 Molly.Jennings@wilmerhale.com
3   Sonal.Mehta@wilmerhale.com                2100 Pennsylvania Ave NW
   2600 El Camino Real, Suite 400             Washington, DC 20037
4  Palo Alto, California 94306                Telephone: (202) 663-6000
   Telephone: (650) 858-6000
5                                             MICHAELA P. SEWALL (*pro hac vice*)
   DAVID Z. GRINGER (*pro hac vice*)           Michaela.Sewall@wilmerhale.com
6   David.Gringer@wilmerhale.com              60 State Street
   ROSS E. FIRSENBAUM (*pro hac vice*)        Boston, Massachusetts 02109
7   Ross.Firsenbaum@wilmerhale.com            Telephone: (617) 526-6000
   RYAN CHABOT (*pro hac vice*)
8   Ryan.Chabot@wilmerhale.com
   PAUL VANDERSLICE (*pro hac vice*)
9   Paul.Vanderslice@wilmerhale.com
   7 World Trade Center
10 250 Greenwich Street
   New York, New York 10007
11 Telephone: (212) 230-8800

12

13 *Attorneys for Defendant Meta Platforms, Inc.*

14

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC., a Delaware Corporation,<br><br>Defendant. | Case No. 3:20-cv-08570-JD<br><br>**DEFENDANT META PLATFORMS, INC.'S PROFFER OF EXPERT TESTIMONY IN THE USER CASE**<br><br>Judge: Hon. James Donato |

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................................1

ARGUMENT......................................................................................................................................2

I. The Court Should Permit Meta to Offer Dr. List's Report and Testimony ........................2

    A. Dr. List's Report and Testimony Are Relevant and Will Be Helpful to the Jury and to the Court................................................................................................2

    B. Dr. List's Testimony Is Not Duplicative of Meta's Other Experts..........................4

II. The Court Should Permit Meta to Offer Dr. Ghose's Report and Testimony If Ms. Lamdan Is Allowed To Testify .............................................................................................5

    A. Dr. Ghose's Report and Testimony Are Relevant to Rebutting Ms. Lamdan's Claims and Will Be Helpful to the Jury and to the Court........................5

    B. Dr. Ghose's Testimony Is Not Duplicative of Meta's Other Experts......................6

CONCLUSION....................................................................................................................................7

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................................1

ARGUMENT......................................................................................................................................2

I. The Court Should Permit Meta to Offer Dr. List's Report and Testimony ........................2

    A. Dr. List's Report and Testimony Are Relevant and Will Be Helpful to the Jury and to the Court................................................................................................2

    B. Dr. List's Testimony Is Not Duplicative of Meta's Other Experts..........................4

II. The Court Should Permit Meta to Offer Dr. Ghose's Report and Testimony If Ms. Lamdan Is Allowed To Testify .............................................................................................5

    A. Dr. Ghose's Report and Testimony Are Relevant to Rebutting Ms. Lamdan's Claims and Will Be Helpful to the Jury and to the Court........................5

    B. Dr. Ghose's Testimony Is Not Duplicative of Meta's Other Experts......................6

CONCLUSION....................................................................................................................................7

## INTRODUCTION

Meta respectfully seeks leave to offer (1) the expert testimony regarding market definition and market power of Dr. John List, which is based on unique experiments and analysis he performed to test substitution and diversion in the proposed market; and (2) *if the Court allows the testimony proffered by Users on "privacy" of Sarah Lamdan*, rebuttal testimony from Dr. Anindya Ghose.

*Dr. List* will testify on experiments and empirical work he performed involving thousands of Facebook and Instagram users. This analysis provides quantitative evidence of substitution and diversion in Users' purported "Personal Social Networking Services" (PSNS) market. His analysis is not duplicative of Meta's liability expert, Dr. Dennis Carlton, or its damages expert, Dr. Catherine Tucker. Dr. List does not address damages. Although Dr. Carlton offers criticisms of the market advanced by Users' two economists (both of whom offer opinions on market definition), Dr. List's analysis is largely based on the unique experiments that he designed and conducted. This experimental work is particularly useful for testing Users' novel zero-price market, in which responses to changes in a pecuniary price cannot be measured and a significant number of people maintain accounts across multiple services.

Meta offers *Dr. Ghose* only in response to Users' statement that they will proffer supposed "data cartels and privacy" expert Sarah Lamdan. Apr. 18, 2024 Hr'g Tr. 8:10-11. If Ms. Lamdan is permitted to testify (she should not be), Meta should be allowed to rebut her opinions with expert testimony of its own. Dr. Ghose's industry experience and extensive study of the digital economy allow him to address Ms. Lamdan's claims that "there is a definition of privacy that is commonly understood by both Facebook and consumers"; that Facebook "users universally cared about privacy"; that users accept those privacy practices because "users feel forced to use Facebook"; and that Facebook's documents suggest that privacy is important to people. And importantly, insofar as Ms. Lamdan is permitted to testify in support of Users' theory that various privacy statements and omissions that Users have plucked out of the record somehow bear on Users' Section 2 claim, Dr. Ghose explains why those challenged representations lack competitive

significance. Like Dr. List, Dr. Ghose will offer non-duplicative testimony, explaining why Ms. Lamdan's opinions about privacy lack any connection to real-world competition.

The proffered testimony from Dr. List is "useful to the jury and the Court," important to Meta's defenses, and not "duplicative" of any other expert. Dkt. 789 at 1 (Apr. 18, 2024 Order). The same would be true of Dr. Ghose's testimony in the event the Court allowed Ms. Lamdan to testify. The Court should permit Meta to offer Dr. List, and, if Users are allowed to introduce Ms. Lamdan's testimony, Dr. Ghose.[1]

## ARGUMENT

### I.   THE COURT SHOULD PERMIT META TO OFFER DR. LIST'S REPORT AND TESTIMONY

#### A.   Dr. List's Report and Testimony Are Relevant and Will Be Helpful to the Jury and to the Court

Dr. List is a leading experimental and behavioral economist and past Chair of the University of Chicago's Department of Economics. Dr. List was an early pioneer in the use of field experiments to evaluate how behavioral economic theories apply in the real world, and continues to focus his research in the area. If permitted to testify, Dr. List will demonstrate with empirical evidence derived from these experiments that additional services beyond those in the PSNS market—like TikTok and YouTube—are "reasonably interchangeable by consumers." *United States v. Microsoft*, 253 F.3d 34, 52 (D.C. Cir. 2001). Because "[a] threshold step in any antitrust case is to accurately define the relevant market," this testimony is important to Meta's defense. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020).

The core of Dr. List's testimony concerns a large-scale pricing experiment he designed and conducted using his expertise in behavioral economics and field experimentation. This experiment was devised to overcome the difficulty of analyzing substitution among online platforms like Facebook, Instagram, YouTube, TikTok, and others that provide services at a zero price. The experiment involved paying half of the sample of approximately 6,000 people to reduce the amount of time they spent on Meta's services. This payment effectively introduced a positive "price" for using Facebook and Instagram for this "treatment" group—i.e., the compensation foregone

---

[1]   Dr. List's and Dr. Ghose's reports have previously been disclosed to Users, and their experts have had the opportunity to respond to all the proffered opinions.

1   through use. Experiment participants installed a custom monitor that measured the amount of time
2   they spent on various apps on their devices and how usage changed in response to this economic
3   incentive. The behavior of the treatment group was measured against a "control" group that did
4   not face any incentive to reduce use of Meta's services. Dr. List's experiment thus permitted him
5   to evaluate how people react to changes in the effective "price" of Facebook and Instagram in the
6   real world. That is, the experiment identifies what apps users treat as substitutes for Facebook and
7   Instagram.

8         Dr. List will testify that the results of this pricing experiment are inconsistent with Users'
9   alleged PSNS market. Dr. List's analysis of the experimental data indicates that only 6% of time
10  diverted from Facebook and 16% of time diverted from Instagram in response to the financial
11  incentive was captured by other "PSNS" services. Apps outside the candidate market, in contrast,
12  accounted for more than 55% of the diversion from Meta's services, with the remainder diverted
13  to off-device activities. TikTok and YouTube alone accounted for a larger share of diversion than
14  *all* of the putative PSNS apps. Such evidence controverts Users' claim that the supposed PSNS
15  market contains "all products 'reasonably interchangeable by consumers'" with Facebook and
16  Instagram. *Microsoft*, 253 F.3d at 52.

17        Dr. List also conducted two additional empirical studies that undermine Users' market
18  definition.

19        *First*, he examined the effects of a natural experiment: India's 2020 ban on TikTok.
20  Although Users' two economists assert that TikTok is outside of the relevant market, Dr. List's
21  analysis of user behavior following the ban shows that engagement on Facebook and Instagram
22  dramatically increased relative to what would have been expected but for the ban. The effect is
23  large and statistically significant, again demonstrating that real-world users view Facebook and
24  Instagram as substitutes for TikTok, undermining the claim that TikTok is outside the relevant
25  market.

26        *Second*, Dr. List conducted a "switching analysis" that uses data Meta collects in the
27  ordinary course from participants enrolled in its Study panel to evaluate how people trade off time
28  between Facebook, Instagram, and other apps. His analysis of this data provides another source of

empirical evidence relevant to analyzing substitution by identifying which apps and activities gain (or lose) usage when people reduce (or increase) time spent on Facebook or Instagram. Dr. List will explain that under Users' theorized market, the switching analysis would be expected to demonstrate substantial substitution between PSNS apps like Facebook, Instagram, and Snapchat relative to non-PSNS apps. The actual data, however, shows nothing of the sort. Instead, there is relatively little switching among PSNS apps, and much more between PSNS apps and those outside the alleged market (such as TikTok, YouTube, and gaming apps).

### B. Dr. List's Testimony Is Not Duplicative of Meta's Other Experts

Dr. List's report and testimony are distinct from that offered by Meta's primary liability expert, Dr. Carlton. As an initial matter, much of Dr. Carlton's analysis focuses on Users' allegations of anticompetitive conduct, rather than Users' market definition. Dr. Carlton's market definition analysis, moreover, primarily concerns defects in the analytical tools employed by Users' two economists to support the alleged PSNS market, a subject that Dr. List's empirical studies do not address. For example, Dr. Carlton explains why Users' experts' failure to consider the multi-sided, zero-price nature of the PSNS market ignores important dimensions of competition. Dr. Carlton also rebuts Dr. Nicholas Economides's qualitative market definition analysis. Dr. Carlton's report does contain quantitative analysis that confirms Dr. List's empirical studies, and Dr. Carlton references Dr. List's work to support his own opinions on market definition. But those opinions are again not duplicative of the ones on which Dr. List will testify. Dr. Carlton analyzes (1) time spent on PSNS and non-PSNS features of Facebook and Instagram, demonstrating that competition for users of non-PSNS features constrains Meta's conduct; and (2) the diversion of user time and attention following a global service outage that precluded accessing Facebook and Instagram. Dr. List addresses neither subject, and Users have themselves offered a second economist to opine on market definition (Dr. Joseph Farrell) in addition to Dr. Economides. Because Dr. List offers only opinions related to liability, his testimony will not be duplicative of Meta's damages expert.

## II.   THE COURT SHOULD PERMIT META TO OFFER DR. GHOSE'S REPORT AND TESTIMONY IF MS. LAMDAN IS ALLOWED TO TESTIFY

### A.   Dr. Ghose's Report and Testimony Are Relevant to Rebutting Ms. Lamdan's Claims and Will Be Helpful to the Jury and to the Court

Users have stated that they will seek to offer Ms. Lamdan as an additional liability expert on "data cartels and privacy." Apr. 18, 2024 Hr'g Tr. 8:10-11.[2] Users say she will testify "regarding what consumer expectations are as to privacy and whether or not they truly understand the depth of data collection that has been happening." *Id.* at 8:19-9:2; *supra* at 1. As the Court observed, it is not clear "how consumer expectations about data privacy relate to the acquisition of the monopoly power," or even what the proffered testimony "ha[s] to do with Section 2 of the Sherman Act" at all. Apr. 18, 2024 Hr'g Tr. 9:3-9. Ms. Lamdan's opinions do nothing to resolve those questions. They are instead irrelevant and unreliable because Ms. Lamdan just regurgitates cherry-picked statements from Meta's documents, has no relevant qualifications, and has not analyzed the role that privacy plays in the decision whether to *use* an online platform, much less the competitive effect of any of the misrepresentations actually challenged in this case. Indeed, she testified that she could *not* identify the specific data Facebook collects and has no particular expertise or knowledge about Facebook's data practices. But if the Court permits Ms. Lamdan to offer her opinions, Meta should be allowed to rely on Dr. Ghose's responses to them.

Dr. Ghose is an expert on the digital economy and mobile app industry. As the Heinz Riehl Chair Professor of Business at New York University's Stern School of Business, he holds joint appointments as Professor of Technology, Operations, and Statistics and Professor of Marketing. Dr. Ghose focuses his research on economic issues arising in internet and mobile technologies, social media, and digital marketing, and has written extensively on data and privacy. Dr. Ghose will use that experience to explain that Ms. Lamdan's opinions rely on flawed assumptions about "the importance of promising privacy to convince consumers to join and use [Facebook]," which she maintains "was critical to Facebook's success." Dr. Ghose's testimony will be helpful to the

---

[2]   Other than the fact that Ms. Lamdan wrote a book titled "Data Cartels," it is entirely unclear what "data cartels" have to do with this single-firm, monopolization case.

jury and the Court in understanding why, given competitive conditions, Meta did not gain or maintain monopoly power through the alleged misrepresentations about privacy practices.

Dr. Ghose rebuts Ms. Lamdan's opinions by analyzing the academic research and literature regarding privacy preferences—including that privacy preferences are heterogeneous and their effects are difficult to measure due to the "privacy paradox." This analysis, together with Dr. Ghose's evaluation of real-world competitive dynamics that determine the success of mobile apps, shows that it is unlikely that statements about privacy—and the challenged statements in particular—were a significant driver of competition between apps. As a result, the statements were unlikely to have contributed to Meta's position in any relevant market. Contrary to Ms. Lamdan's central claim, that remains true even if users indicate that they value "privacy" in the abstract. Dr. Ghose also explains that the lack of success of apps that have attempted to make privacy a major competitive focus undermines Ms. Lamdan's opinions about the importance of privacy to users, in addition to rebutting Users' claim that Myspace and Google+ declined due to Meta's privacy statements. Finally, Dr. Ghose explains the complexity involved in setting and communicating privacy policies and practices for mobile apps that Ms. Lamdan failed to recognize, then benchmarks Meta's privacy policies and practices against those of other mobile apps to contextualize Meta's privacy protections against those of actual competitors. This analysis indicates that, again contrary to Ms. Lamdan's claims, Meta's actual privacy policies and practices were on par with or superior to those of other apps and thus any deception was unlikely to have impacted competition.

### B.  Dr. Ghose's Testimony Is Not Duplicative of Meta's Other Experts

Dr. Ghose offers opinions and analyses distinct from Meta's other experts. Dr. Ghose offers no opinions on damages, distinguishing his testimony from that of Dr. Tucker. Although Dr. Carlton also evaluates Users' allegations of anticompetitive conduct, he does not address Ms. Lamdan's specific opinions. Only Dr. Ghose rebuts Ms. Lamdan's spurious claims on their own terms, relying on his expertise in data privacy and mobile technologies to examine the competitive effect of the challenged conduct directly.

**CONCLUSION**

For these reasons, Meta respectfully requests that the Court permit Meta to offer the expert testimony of Dr. John List and, if the Court allows Ms. Lamdan to testify, the testimony of Dr. Anindya Ghose.

Dated: August 9, 2024

Respectfully submitted,

By: /s/ Sonal N. Mehta

WILMER CUTLER PICKERING HALE AND DORR LLP
*Attorney for Defendant Meta Platforms, Inc.*