**PUBLIC REDACTED VERSION**

1

WILMER CUTLER PICKERING
HALE AND DORR LLP

2

SONAL N. MEHTA (SBN 222086)
 Sonal.Mehta@wilmerhale.com

3

2600 El Camino Real, Suite 400
Palo Alto, California 94306

4

Telephone: (650) 858-6000

5

6

DAVID Z. GRINGER (*pro hac vice*)
 David.Gringer@wilmerhale.com

7

ROSS E. FIRSENBAUM (*pro hac vice*)
 Ross.Firsenbaum@wilmerhale.com

8

RYAN CHABOT (*pro hac vice*)
 Ryan.Chabot@wilmerhale.com

9

PAUL VANDERSLICE (*pro hac vice*)
 Paul.Vanderslice@wilmerhale.com

10

7 World Trade Center
250 Greenwich Street

11

New York, New York 10007
Telephone: (212) 230-8800

12

13

*Attorneys for Defendant Meta Platforms, Inc.*

ARI HOLTZBLATT (SBN 354631)
 Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
 Molly.Jennings@wilmerhale.com
2100 Pennsylvania Ave NW
Washington, DC 20037
Telephone: (202) 663-6000

MICHAELA P. SEWALL (*pro hac vice*)
 Michaela.Sewall@wilmerhale.com
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

14

**UNITED STATES DISTRICT COURT**

15

**NORTHERN DISTRICT OF CALIFORNIA**

16

**SAN FRANCISCO DIVISION**

17

18

MAXIMILIAN KLEIN, et al., on behalf of
themselves and all others similarly situated,

19

Plaintiffs,

20

v.

21

22

META PLATFORMS, INC., a Delaware
Corporation,

23

Defendant.

24

25

26

27

28

Case No. 3:20-cv-08570-JD

**DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT REGARDING FIRST AMENDED CONSOLIDATED ADVERTISER CLASS ACTION COMPLAINT (Dkt. 237)**

Hearing Date: To Be Determined
Time: To Be Determined
Judge: Hon. James Donato

**PUBLIC REDACTED VERSION**

## TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ...............................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................1

INTRODUCTION .............................................................................................................1

BACKGROUND ...............................................................................................................3

ARGUMENT .....................................................................................................................4

I.    PROOF OF HIGH PROFITS ALONE CANNOT ESTABLISH CAUSAL ANTITRUST INJURY ..........4

    A.    High Profits Cannot Establish Antitrust Injury..................................................4

    B.    High Profits Cannot Establish Injury Traceable To The Challenged
        Conduct ..............................................................................................................7

II.   THE CHALLENGED CONDUCT IS NOT ANTICOMPETITIVE AS A MATTER OF LAW ...............9

    A.    Advertisers Have Not Shown Consumer Harm ..................................................9

    B.    Each Exclusionary Conduct Theory Fails As A Matter Of Law .........................10

        1.    Meta's Supposed Misrepresentations To Regulators Cannot Be
               Exclusionary As A Matter Of Law ...........................................................11

        2.    Meta's Alleged Misappropriation Of Trade Secrets To Copy
               Snapchat Cannot Be Exclusionary As A Matter Of Law .........................13

        3.    The Challenged Vertical Agreements Cannot Be Exclusionary................17

    C.    If Any Conduct Theory Fails, Advertisers Are Not Entitled To Damages............22

III.  ADVERTISERS FAIL TO COHERENTLY DEFINE A RELEVANT PRODUCT MARKET ................23

CONCLUSION ..................................................................................................................25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
  836 F.3d 1171 (9th Cir. 2016) ..................................................................22

*Apple, Inc. v. Samsung Elecs. Co.*,
  2012 WL 3155574 (N.D. Cal. Aug. 2, 2012) ...........................................13

*Aspen Title & Escrow, Inc. v. Jeld-Wen, Inc.*,
  677 F. Supp. 1477 (D. Or. 1987) ..............................................................19

*Augusta News Co. v. Hudson News Co.*,
  269 F.3d 41 (1st Cir. 2001) .......................................................................20

*Aya Healthcare Servs, Inc. v. AMN Healthcare, Inc.*,
  613 F. Supp. 3d 1308 (S.D. Cal. 2020) .....................................................10

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
  9 F.4th 1102 (9th Cir. 2021) ................................................................20, 21

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979).....................................................................4, 9

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
  152 F.3d 588 (7th Cir. 1998) ......................................................................8

*Boone v. Redevelopment Agency of City of San Jose*,
  841 F.2d 886 (9th Cir. 1988) .....................................................................12

*Brantley v. NBC Universal, Inc.*,
  675 F.3d 1192 (9th Cir. 2012) ...................................................................17

*Cal. Computer Prods., Inc. v. Int'l Bus. Machines Corp.*,
  613 F.2d 727 (9th Cir. 1979) .......................................................................9

*City of Anaheim v. S. Cal. Edison Co.*,
  955 F.2d 1373 (9th Cir. 1992) ...................................................................10

*City of Oakland v. Wells Fargo & Co.*,
  14 F.4th 1030 (9th Cir. 2021) ..................................................................7, 8

*City of Vernon v. S. Cal. Edison Co.*,
  955 F.2d 1361 (9th Cir. 1992) ...................................................................22

*Coronavirus Rep. v. Apple Inc.*,
  2021 WL 5936910 (N.D. Cal. Nov. 30, 2021), *aff'd*, 85 F.4th 948
  (9th Cir. 2023)......................................................................................23, 25

*Eagle v. Star-Kist Foods, Inc.*,
   812 F.2d 538 (9th Cir. 1987) ........................................................................................7

*In re Ebay Seller Antitrust Litig.*,
   2010 WL 760433 (N.D. Cal. Mar. 4, 2010), *aff'd*, 433 F. App'x 504
   (9th Cir. 2011).................................................................................................4, 5, 6

*Epic Games, Inc. v. Apple, Inc.*,
   67 F.4th 946 (9th Cir. 2023) ................................................................................9, 20

*Flaa v. Hollywood Foreign Press Ass'n*,
   2020 WL 8256191 (C.D. Cal. Nov. 20, 2020)..........................................................25

*FTC v. Meta Platforms, Inc.*,
   No. 20-cv-03590 (D.D.C.) .......................................................................................12

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ...............................................................9, 18, 21, 23

*Gerlinger v. Amazon.com Inc.*,
   2005 WL 3681827 (N.D. Cal. Nov. 1, 2005), *aff'd*, 526 F.3d 1253
   (9th Cir. 2008)...........................................................................................................6

*Golden Grain Macaroni Co. v. FTC*,
   472 F.2d 882 (9th Cir. 1972) ...................................................................................12

*In re Google Digit. Advert. Antitrust Litig.*,
   627 F. Supp. 3d 346 (S.D.N.Y. 2022)................................................................19, 20

*In re Google Digit. Advert. Antitrust Litig.*,
   721 F. Supp. 3d 230 (S.D.N.Y. 2024)................................................................19, 20

*Hicks v. PGA Tour, Inc.*,
   897 F.3d 1109 (9th Cir. 2018) .................................................................................25

*Holmes v. Sec. Inv. Prot. Corp.*,
   503 U.S. 258 (1992)....................................................................................................7

*IDX Sys. Corp. v. Epic Sys. Corp.*,
   285 F.3d 581 (7th Cir. 2002) ...................................................................................16

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) .................................................................................22

*Imax Corp. v. Cinema Techs., Inc.*,
   152 F.3d 1161 (9th Cir. 1998) .................................................................................16

*Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*,
   518 F.2d 913 (9th Cir. 1975) ...................................................................................25

*Intel Corp. v. Fortress Inv. Grp. LLC*,
  511 F. Supp. 3d 1006 (N.D. Cal. 2021), *aff'd*, 2022 WL 16756365
  (9th Cir. Nov. 8, 2022) ..................................................................................6

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*,
  978 F.3d 653 (9th Cir. 2020) ........................................................................16

*Litton Sys., Inc. v. Honeywell, Inc.*,
  1996 WL 634213 (C.D. Cal. July 24, 1996)...................................................22

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*,
  387 F. Supp. 2d 794 (N.D. Ill. 2005) ..............................................................5

*Magnus Petrol. Co., Inc. v. Skelly Oil Co.*,
  599 F.2d 196 (7th Cir. 1979) ........................................................................19

*Manistee Town Ctr. v. City of Glendale*,
  227 F.3d 1090 (9th Cir. 2000) ......................................................................12

*Masimo Corp. v. Tyco Health Care Grp., L.P.*,
  2004 WL 5907538 (C.D. Cal. June 10, 2004) ................................................14

*Masimo Corp. v. Tyco Health Care Grp., L.P.*,
  2004 WL 7094930 (C.D. Cal. May 28, 2004) .................................................14

*McCarthy v. Bank of Am., N.A.*,
  2024 WL 2206794 (2d Cir. May 16, 2024) ...................................................6, 7

*McSherry v. City of Long Beach*,
  584 F.3d 1129 (9th Cir. 2009) ......................................................................11

*Monahan's Marine, Inc. v. Boston Whaler, Inc.*,
  866 F.2d 525 (1st Cir. 1989) ........................................................................19

*Morton v. Rank Am., Inc.*,
  812 F. Supp. 1062 (C.D. Cal. 1993) ..............................................................14

*Nelson v. Pima Cmty. Coll.*,
  83 F.3d 1075 (9th Cir. 1996) ........................................................................11

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018)......................................................................................20

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
  555 U.S. 438 (2009)......................................................................................10

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ............................................................6, 9, 10, 25

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
  842 F.3d 883 (5th Cir. 2016) ........................................................................14

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2013) .......................................................................................9

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
    803 F.3d 1084 (9th Cir. 2015) ...................................................................................18

*Stephens v. Union Pac. R.R. Co.*,
    935 F.3d 852 (9th Cir. 2019) ..................................................................................6, 12

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961).....................................................................................................19

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
    875 F.2d 1369 (9th Cir. 1989) ...................................................................................25

*Ticketmaster LLC v. RMG Techs., Inc.*,
    536 F. Supp. 2d 1191 (C.D. Cal. 2008) .....................................................................25

*United Mine Workers v. Pennington*,
    381 U.S. 657 (1965).....................................................................................................12

*United States v. Columbia Steel Co.*,
    334 U.S. 495 (1948).....................................................................................................19

*United States v. Google LLC*,
    687 F. Supp. 3d 48 (D.D.C. 2023)..............................................................................22

*United States v. Oracle Corp.*,
    331 F. Supp. 2d 1098 (N.D. Cal. 2004) .....................................................................25

*United States v. Papercraft Corp.*,
    540 F.2d 131 (3d Cir. 1976)........................................................................................12

*W. Parcel Express v. United Parcel Serv. of Am., Inc.*,
    190 F.3d 974 (9th Cir. 1999) .....................................................................................18

*Zoslaw v. MCA Distrib. Corp.*,
    693 F.2d 870 (9th Cir. 1982) .....................................................................................19

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C. §45(b) ..............................................................................................................11

Fed. R. Civ. P. 37 .............................................................................................................13

16 C.F.R. Part 3................................................................................................................12

**OTHER AUTHORITIES**

Areeda & Hovenkamp, *Antitrust Law* (2023)...........................................................8, 14

**PUBLIC REDACTED VERSION**

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE THAT, at a date and time to be determined by the Court, Defendant Meta Platforms, Inc. will move for summary judgment on all claims raised in the First Amended Consolidated Advertiser Class Action Complaint (Dkt. 237). Meta requests that the Court grant summary judgment in Meta's favor on all of Advertisers' claims.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

As this Court recently observed, "Now it's proof time." Dkt. 848 at 18:25. But after extensive discovery (so much that the Court observed Advertisers had "gotten far more than [they] probably should have," Dkt. 630 at 9:13-14), all the Advertisers can muster is that Meta's profits—not its prices—exceed those of a group of foreign companies nothing like Meta. That observation cannot support an antitrust claim on any dimension. Advertisers cannot show, as a matter of law, that they were injured by the challenged conduct, that the challenged conduct—an assortment of unconnected events ranging from a presentation to the FTC to a phantom "agreement" with Netflix—was exclusionary, or that Meta is a monopolist in any recognizable product market. Indeed, the undisputed record following extensive fact and expert discovery confirms that Advertisers' theories are legally untenable and there is no evidence to support their baseless claims. So much so that Meta's motion is based *entirely* on the admissions and opinions of Advertisers' expert witnesses and Advertisers' own contention interrogatory responses. The Court need not consider any other documents, testimony, facts, or even the opinions of Meta's own experts, to grant this motion. Taking Advertisers' claims at face value, their own theories and experts establish that their claims fail as a matter of law.

*First*, Advertisers cannot show antitrust injury because they have presented no evidence that Meta overcharged them for ads. Instead, Advertisers rely solely on a theory that Meta's *profits* have been elevated above a supposed benchmark. Of course, high profits need not—and here have not been shown to—reflect supracompetitive prices. And even if a firm earning higher profits than some benchmark could prove that it also charged higher prices, it could not be these benchmarks, which include twenty-two foreign firms that are nothing like Meta, ten of which make less than

**PUBLIC REDACTED VERSION**

10% of their money selling ads. That is especially true where Advertisers' analysis of profits does not even attempt to determine whether those profits stem from exclusionary conduct, as opposed to competition on the merits. The net of this is, even accepting all of Advertisers' factual contentions and expert theories for purposes of this motion, Advertisers cannot show, as they must, that the challenged conduct caused their supposed injuries.

*Second*, each of Advertisers' theories of exclusionary conduct fails as a matter of law, individually and collectively. Advertisers first claim that, had Meta told the FTC in 2020 about an improvement made to its machine learning systems, the FTC would have unilaterally issued an unprecedented and *ultra vires* order requiring Meta to immediately divest Instagram and WhatsApp, which would have somehow benefitted the class members. This claim is based entirely on naked and implausible speculation that the FTC would have acted beyond its statutory authority (unimpeded, and in record time). Those defects alone doom the claim, but it must also be rejected because it seeks to impose antitrust liability for Meta's representations to the government, which is conduct immune under *Noerr-Pennington*.

Advertisers next raise an untimely claim that Meta allegedly stole Snap's trade secrets to copy Snapchat Stories, a public feature of the Snapchat app. This claim fails for several reasons. Copying a competitor's features is usually procompetitive. And as a matter of law, this sort of alleged intellectual property infringement cannot be anticompetitive because it causes competing products to enter the market, increasing competition. Advertisers also admit that Meta launched its own Stories feature *before* the supposed trade-secret misappropriation took place, and they do not identify any element of Meta's Stories feature that was developed using a supposedly misappropriated Snap trade secret. Even more, Advertisers fail to specify any alleged Snap trade secret with any particularity or explain how Meta supposedly used the trade secret information.

Advertisers also make claims directed at various agreements between Meta and other firms (or in one case, an alleged agreement with Netflix for which there is no evidence of its existence). These claims also fail as a matter of law. The agreements (or speculated agreement) are vertical and concern small volumes of ad sales or developer data access with no direct relationship to advertising, such that none could have caused any cognizable anticompetitive effect. Advertisers'

**PUBLIC REDACTED VERSION**

Section 1 claim directed at one of these agreements (Meta's "Network Bidding Agreement" with Google) fails for the same reasons.

Moreover, Advertisers have failed as a matter of law to offer any evidence that the challenged conduct caused any consumer harm. The only "effect" that Advertisers tie to *any* of the challenged conduct is the "maintenance" of Meta's allegedly pre-existing monopoly power. But the mere "maintenance" of monopoly power is equally consistent with merits competition. That is why neither the possession nor maintenance of a monopoly is unlawful unless it is the result of anticompetitive conduct that causes harm to consumers. Advertisers' experts did not identify any such harm. That requires summary judgment.

***Third***, Advertisers' claims require a relevant antitrust submarket for "social advertising." But Advertisers cannot coherently explain what "social advertising" is (because it does not exist) and have thus provided no way to define a valid relevant market around it.

Summary judgment is therefore warranted on Advertisers' monopolization and attempted monopolization claims under Section 2, and their restraint of trade claim under Section 1.

## BACKGROUND

Advertisers claim Meta supposedly monopolized a market for "social advertising" from December 1, 2016, to December 31, 2020 (the Class Period). What they mean by "social advertising" has never been clear, and four years into this case Advertisers have still offered no meaningful clarification. Advertisers' principal expert (Michael Williams) defines "social advertising" as "███████████████"—but apparently need not be—"███████████████ ███████████████" Ex. 1, 8/24 Williams Rep. ¶27.[1]

Advertisers allege that five unrelated categories of conduct "███████████████ ███████████████" and that, as a result, advertisers paid a higher price for Meta's ads. Ex. 1, 8/24 Williams Rep. ¶23. But this claim is not based on Meta's prices. Instead, Advertisers offer studies that adjust some of Meta's accounting *profits* (producing a so-called "economic profit rate" or "EPR" for Meta's ad business) and compare the result to the

---

[1] Unless otherwise noted, "Ex." citations reference exhibits to the Gringer Declaration submitted herewith, emphasis is added, and objections are omitted for deposition citations.

1    weighted average of profit figures for various, primarily foreign so-called "yardstick" firms,

2    including real estate portals, car sales websites, price-comparison websites, a stock photography

3    website, and a Chinese entity called "███████████████████████" *Id.* ¶¶396-410.

4    Williams maintains that because Meta's profit rate exceeded this average profit rate during the

5    Class Period, Meta must have overcharged class members and that the gap between Meta's EPR

6    and the others' stems entirely from these price overcharges. Williams does not even attempt to

7    provide a basis for these assertions. Advertisers do not analyze prices and therefore have not

8    presented any actual evidence of an overcharge.

9        Advertisers do not attempt to isolate the effect or impact of any of the five alleged

10   categories of conduct individually, all together, or any subset thereof. Their expert testified that

11   ████████████████████████████████████████████████████████████████

12   ██████████████████████████████████████████████████████" Ex. 2, 9/23

13   Williams Tr. 55:5-56:9; Ex. 3, 2/24 Williams Tr. 313:7-23. Advertisers have not independently

14   evaluated the impact of any of these individual acts on Meta's prices, or the relative contribution

15   of each act to Meta's alleged monopoly power. Indeed, Advertisers' overcharge theory is not based

16   on any analysis of Meta's prices (actual or in the but-for world) at all.

17                                    **ARGUMENT**

18   **I.    PROOF OF HIGH PROFITS ALONE CANNOT ESTABLISH CAUSAL ANTITRUST INJURY**

19        **A.    High Profits Cannot Establish Antitrust Injury**

20        Establishing antitrust injury in an overcharge case requires proof that the plaintiff paid

21   higher prices than it would have in a but-for world without the challenged conduct. *In re Ebay*

22   *Seller Antitrust Litig.*, 2010 WL 760433, at *11-14 (N.D. Cal. Mar. 4, 2010), *aff'd*, 433 F. App'x

23   504, 506 (9th Cir. 2011). There can be no antitrust injury "until the [alleged] monopolist actually

24   exercises its illicit power to extract an excessive price," that is, prices higher than those that would

25   have prevailed absent some anticompetitive conduct. *Berkey Photo, Inc. v. Eastman Kodak Co.*,

26   603 F.2d 263, 295 (2d Cir. 1979). A "purchaser has no cause of action" against an alleged

27   monopolist unless that firm has "boost[ed] its price to excessive levels." *Id.*

28        Advertisers offer no evidence about Meta's prices, let alone that Meta's prices were at

excessive levels. They have made no showing that Meta's prices exceeded any relevant benchmark, nor have they compared what Meta charged for ads in the real world to what Meta would have charged in a but-for world without the challenged conduct. Ex. 3, 2/24 Williams Tr. 299:9-16 ("[Q.] My question was[:] you did not do a calculation of what Meta's quality-adjusted prices would have been in a but-for world; isn't that right? A. I don't believe my reports have a specific study talking about quality-adjusted prices."); *see also* Ex. 4, 6/24 Williams Tr. 44:9-25 (agreeing his class report contains "no analysis of the prices that Meta charged advertisers during the class period other than just looking at Meta's revenues overall for advertising," nor "an analysis of Meta's price of advertising relative to any of -- any of its competitors or any yardstick firm," nor any "opinion about what Meta's quality adjusted prices would have been in the but-for world").

Instead, Advertisers' entire legal theory of injury improperly relies on their putative expert Williams's analysis of Meta's supposedly elevated profits. This fails on multiple levels. As an initial matter, the studies forming the basis for this overcharge theory are, for the reasons explained in Meta's contemporaneously filed *Daubert* motion, junk science that cannot be admitted to show an overcharge or for any other purpose. Williams compares Meta's profit rate to a chosen set of companies that look nothing like Meta, such as German and British real estate portals, international car sales websites, a Chinese stock photography website, ten companies that earn less than ten percent of their revenue from advertising, and five companies that earn no advertising revenue at all. Comparing Meta to these companies, which lack any "showing of comparability" to Meta, is "junk science" and plainly not a reliable methodology for calculating an overcharge. *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 812, 817 (N.D. Ill. 2005). If the Court so rules, Advertisers' case is over.

But even if Williams's studies were admissible, they fail as a matter of law to establish antitrust injury. A damages model that "does not measure [prices]"—as Advertisers have presented here—"is insufficient to permit a jury to determine whether the Plaintiffs were overcharged." *In re Ebay Seller*, 2010 WL 760433, at *14. "Even assuming that [Williams's] model shows" that Meta earned excess economic profits, "the model cannot—nor is it designed to—determine whether [those profits] resulted from an increase in [prices] or the imposition of supracompetitive

**PUBLIC REDACTED VERSION**

1    [prices].” *Id.*, at *13. Despite acknowledging that “Meta’s profits can be a function of its costs as

2    well as its revenues,” Ex. 4, Williams 6/24 Tr. 20:12-16, Williams nonsensically ***assumed*** that

3    only Meta’s revenues—and not its costs—drove its profits, *id.* at 32:2-9 (“Q. In your but-for world,

4    Meta’s excess EPRs would come to match the yardstick EPRs based entirely through a reduction

5    in revenue, correct? A. That is correct.”). And Williams further nonsensically ***assumed*** that only

6    Meta’s prices—not its output—drove its revenues. *Id.* at 66:5-9 (“Q. And the excess revenues of

7    the – the revenues are reduced by – only by reducing the price, right? A. That is correct. Quantity

8    is held constant.”). He has no basis for these assumptions. Thus, the connection Williams draws

9    between Meta’s profits and its prices is unsupported and does not provide “any actual proof of

10   antitrust injury caused by [Meta’s] alleged anticompetitive acts.” *In re Ebay Seller*, 2010 WL

11   760433, at *14.

12       This is not a fact question or a judgment call for the jury. An overcharge model relying on

13   a “proxy” metric that does not “measure [prices], or at the very least does not measure them alone,”

14   offers no “probative evidence” as to whether a plaintiff was actually overcharged. *In re Ebay*

15   *Seller*, 2010 WL 760433, at *13-14; *see also McCarthy v. Bank of Am., N.A.*, 2024 WL 2206794,

16   at *3 (2d Cir. May 16, 2024) (rejecting on summary judgment a model relying on “generalized

17   estimations” to “approximate injury”). That is (at best) all Advertisers offer here. Williams’s

18   opinions cannot cure this dispositive defect. “Expert testimony cannot create a genuine issue of

19   material fact if it rests on assumptions that are not supported by evidence.” *Stephens v. Union Pac.*

20   *R.R. Co.*, 935 F.3d 852, 856 (9th Cir. 2019). Even if the Court does not exclude Williams’s

21   testimony, his baseless conflation of profits and prices is manifestly “economically unreasonable”

22   and therefore “insufficient to support a jury verdict” on antitrust injury. *Rebel Oil Co., Inc. v.*

23   *Atlantic Richfield Co.*, 51 F.3d 1421, 1435-36 (9th Cir. 1995).

24       Advertisers thus offer no valid basis for the jury to conclude that the class was subject to

25   overcharges, and that ends their case. Antitrust claims are dismissed *at the pleading stage* if the

26   plaintiffs cannot adequately allege that they “paid supracompetitive prices.” *Intel Corp. v. Fortress*

27   *Inv. Grp. LLC*, 511 F. Supp. 3d 1006, 1027 (N.D. Cal. 2021), *aff’d*, 2022 WL 16756365, at *2 (9th

28   Cir. Nov. 8, 2022); *Gerlinger v. Amazon.com Inc.*, 2005 WL 3681827, at *2 (N.D. Cal. Nov. 1,

2005) (rejecting claim for failure to show "any actual instances of paying increased prices"), *aff'd*, 526 F.3d 1253, 1256 (9th Cir. 2008); *see also McCarthy*, 2024 WL 2206794, at *3 (affirming summary judgment where plaintiffs failed to prove they "actually paid a supracompetitive price"). We are years past that point. Advertisers may not proceed to trial under a theory that they were overcharged based solely on Meta's profits.

      **B.**      **High Profits Cannot Establish Injury Traceable To The Challenged Conduct**

      Even if Advertisers could establish that Meta's prices were higher through an examination of its profits alone, that evidence cannot as a matter of law establish that the higher prices they supposedly paid were proximately caused by anticompetitive conduct. An antitrust plaintiff's "right to sue … require[s] a showing that the defendant's violation … was the proximate cause" of the plaintiff's injury. *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). This requires showing that the injury was not "produced by independent factors" unrelated to the challenged conduct. *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 542 (9th Cir. 1987). Advertisers have made no attempt to—and cannot—do so, for at least two reasons.

      *First*, Williams's profit analyses give the fact finder no "ability to distinguish" between the components of Meta's prices "'attributable to the violation, as distinct from other, independent, factors.'" *City of Oakland v. Wells Fargo & Co.*, 14 F.4th 1030, 1039 (9th Cir. 2021) (quoting *Holmes*, 503 U.S. at 269). Williams concedes a firm can earn high profits " ███████████████████████████ " including ████████████████████████████████████████ " Ex. 1, 8/24 Williams Rep. ¶382; Ex. 2, 9/23 Williams Tr. 229:23-230:3 (agreeing that " ███████████████████████████████████████████ ███████████████████████████████ "); *id.* at 70:12-72:17 (agreeing that a firm " ███ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ). Yet despite these concessions, Williams does nothing to show that the overcharge he calculates is attributable to the challenged conduct, rather than to these other common drivers of high profitability. Ex. 4, 6/24 Williams Tr. 39:19-40:1 ("Q. [B]ecause of the way that you calculated economic profits and Meta's excess profit rates, your model excludes the possibility that Meta's excess economic profits

1     could be the result of those other factors, like product quality, differentiation, or innovation. Do I

2     have that right? A. I would agree with that."). Because Advertisers' models "attribute[] the entire

3     difference between" Meta and the benchmarks to the challenged conduct without "correct[ing] for

4     salient factors" affecting the differential, *Blue Cross & Blue Shield United of Wis. v. Marshfield*

5     *Clinic*, 152 F.3d 588, 593 (7th Cir. 1998), they cannot show the alleged overcharge is "'attributable

6     to the violation'" and thus cannot show causal antitrust injury, *Oakland*, 14 F.4th at 1039.

7         *Second*, and relatedly, even under their own theory, Advertisers have no way to isolate the

8     impact on Meta's ad prices from the challenged conduct versus allegedly pre-existing monopoly

9     power. Distinguishing the effects of pre-existing monopoly power from the effects of the

10    challenged conduct is especially critical in a monopoly maintenance case, like this one. Areeda &

11    Hovenkamp, *Antitrust Law* ¶657b1 (2023) (a plaintiff may not "treat[] the monopolist as if it had

12    charged the perfectly competitive price before the unlawful activity was undertaken"). Advertisers

13    make no effort to do so—instead, their (supposed) proof of injury and damages necessarily

14    conflates pre-existing monopoly power with the effects of the challenged conduct. That is apparent

15    because Advertisers assert that Meta had monopoly power at the start of the Class Period, Ex. 3,

16    2/24 Williams Tr. 287:14-289:6, and are not challenging Meta's acquisition of its alleged

17    monopoly power or otherwise "bas[ing] their Section 2 claims" on anything before the Class

18    Period, Dkt. 396 at 2. Yet they attribute *all* of Meta's supposed monopoly profits (and pricing),

19    from the first day of the Class Period onward, to the challenged conduct.

20         And Williams makes no attempt to identify how much the challenged conduct contributed

21    to Meta's monopoly power—instead, his model presumes the challenged conduct "████████

22    ███████████████████████████" and then calculates the profits (supposedly) flowing from

23    Meta's monopoly power. Ex. 1, 8/24 Williams Rep. ¶356. The studies do not change no matter

24    whether all, some, or just one of Advertisers' theories of exclusionary conduct is viable. *See supra*

25    p.4. In other words, the studies are not meant to, and do not, identify the effects of the challenged

26    conduct, but rather only the effects of the *existence* of Meta's alleged monopoly power. This is

27    improper. The correct "measure of damages" in a monopoly maintenance case "is the price

28    increment caused by the anticompetitive conduct," not "the entire excess of the monopolist's price

over that which would prevail in a competitive market." *Berkey Photo*, 603 F.2d at 296-97. Advertisers' studies improperly calculate only the latter and thus cannot show that any overcharge (if there were one at all) was caused by the challenged conduct. *See Cal. Computer Prods., Inc. v. Int'l Bus. Machines Corp.*, 613 F.2d 727, 732 (9th Cir. 1979) ("plaintiff must prove" that its "injury [is] causally linked to the asserted violation"). Advertisers must show that their claimed injury was "caused by [the defendant's] anticompetitive conduct," and they have offered no basis on which to conclude that it was. *Somers v. Apple, Inc.*, 729 F.3d 953, 963-64 & n.5 (9th Cir. 2013).

## II.    THE CHALLENGED CONDUCT IS NOT ANTICOMPETITIVE AS A MATTER OF LAW

Advertisers' theories of exclusionary conduct depend on the opinions of putative expert Tilman Klumpp. As explained in Meta's concurrently filed *Daubert* motion, those opinions are inadmissible because they lack foundation in reliable economic principles and are based on speculation. If the Court excludes Klumpp's testimony, Advertisers cannot establish that any of the challenged conduct was anticompetitive. But even if the Court credits Klumpp's opinions at this stage of the case, Advertisers' claims still fail because they have failed to offer any proof of consumer harm caused by the challenged conduct and have thus failed as a matter of law to show that any of the challenged conduct was exclusionary. Moreover, Advertisers challenge actions that the law does not deem exclusionary conduct.

### A.    Advertisers Have Not Shown Consumer Harm

"[A]n act is deemed anticompetitive under the Sherman Act only when it harms both allocative efficiency and raises the prices of goods above competitive levels or diminishes their quality." *Rebel Oil*, 51 F.3d at 1433. Thus, "'to be condemned as exclusionary, a monopolist's act must … harm consumers,'" *FTC v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020), through, for example, "'reduced output, increased prices, or decreased quality in the relevant market,'" *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 983-84 (9th Cir. 2023).

Advertisers have not shown that the challenged conduct caused any consumer harm in the alleged relevant market. Klumpp disclaimed offering opinions on any such harm, instead testifying that "the anticompetitive effect is monopoly maintenance in the social advertising market." Ex. 5, Klumpp Tr. 44:11-45:3. He elaborated:

**PUBLIC REDACTED VERSION**

> Q.  [T]ell me if I'm wrong, but what you're saying is the challenged conduct allowed Facebook to maintain a monopoly in social advertising and that was the anticompetitive effect.
> A.  That is a fair overall characterization of what my opinions are.
> Q.  And there's not a different anticompetitive effect, not looking for different words, but there's not a different anticompetitive effect from the challenged conduct that you're saying occurred in social advertisement.
> A.  No, I would—I would characterize my opinions as overall supporting a finding of monopoly maintenance.

*Id.* at 45:4-21. But a firm's maintenance of its monopoly power and any corresponding "reduction of competition does not invoke the Sherman Act until it harms consumer welfare." *Rebel Oil*, 51 F.3d at 1433.

Advertisers' apparent position is that any act perpetuating a firm's monopoly power is exclusionary, even if that act does not harm consumers. That is not the law in this Circuit. The presence of a monopolist does not necessarily harm consumers, and the mere maintenance of a monopoly, by means other than conduct that harms consumers, is not anticompetitive or unlawful. *Rebel Oil*, 51 F.3d at 1433. Advertisers needed to show that the challenged *conduct* harmed advertisers through higher prices, lower quality, or reduced output. Because they have failed to do so—and did not even try—they have failed as a matter of law to show that the challenged conduct harmed consumers and thus was exclusionary, and summary judgment is warranted. *Aya Healthcare Servs, Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1334-36 (S.D. Cal. 2020) (granting summary judgment on monopolization claim for failure to show harm to consumer welfare).

**B.    Each Exclusionary Conduct Theory Fails As A Matter Of Law**

Putting aside the fact that Advertisers lack evidence of any consumer harm, each of their individual theories of exclusionary conduct fails for additional, independent reasons. And because adding up several instances of unrelated lawful conduct can hardly total unlawful conduct, even taken together Advertisers' theories are insufficient. "Two wrong claims do not make one that is right." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 457 (2009). The five here do not either. *See City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) ("if all we are shown is a number of perfectly legal acts, it becomes much more difficult to find overall wrongdoing").

**PUBLIC REDACTED VERSION**

1

> **1.**    **Meta's Supposed Misrepresentations To Regulators Cannot Be Exclusionary As A Matter Of Law**

2

3

4

Advertisers' claim that Meta avoided adverse regulatory action by making supposed misrepresentations to regulators fails both because it is hopelessly speculative and because efforts to influence regulatory action through advocacy are immune from antitrust scrutiny.

5

6

7

8

9

10

11

12

13

14

According to Advertisers, in February 2020, Meta supposedly ███████████████ ██████████ of WhatsApp and Instagram "█████████████████████████████████████ ██████████████████████████████████████" but "████████████████████████████ ███████████████████████████" which Advertisers describe as "███████████████████ ██████████████" Ex. 6, Klumpp Rep. ¶179. Advertisers contend that, had Meta disclosed F3 to the FTC in 2020, it would have been "██████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████" *Id.* ¶182. Advertisers say █████████████████████████████████████████████████████████ ███████████████████████████████████████████ *Id.*

15

16

17

18

Advertisers' theory is legally defective because it is predicated on baseless speculation that the FTC would have unilaterally ordered a divestiture in the but-for world. Advertisers took no discovery from the FTC, nor do they offer any evidence concerning what the Commission was doing or thinking at this time. Klumpp confirmed this:

19

20

21

22

> Q.    Did anyone at the FTC ever tell you that they did not take certain actions as a result of the supposed misrepresentations that Facebook made?
> A.    I haven't talked to anyone at the FTC about whether they took actions or didn't take actions.
> Q.    Have you read any documents that say that the FTC did not take certain actions as a result of the supposed misrepresentation that Facebook made?
> A.    I don't recall seeing documents that indicate that.

23

24

25

26

Ex. 5, Klumpp Tr. 197:7-15. "Mere allegation and speculation do not create a factual dispute for purposes of summary judgment." *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996). "Summary judgment requires facts, not … rank speculation." *McSherry v. City of Long Beach*, 584 F.3d 1129, 1138 (9th Cir. 2009).

27

28

Here, Advertisers' theory has no factual basis at all. First, the claim wrongly assumes the FTC can unilaterally order divestiture or an injunction. It cannot. *See* 15 U.S.C. §45(b) (procedures

for entry of FTC orders); 16 C.F.R. Part 3 (corresponding rules). Second, their claim wrongly assumes the FTC could implement this unlawful divestiture order near instantaneously. It cannot. *See*, *e.g.*, *Golden Grain Macaroni Co. v. FTC*, 472 F.2d 882, 884 (9th Cir. 1972) (discussing FTC "[d]ivestiture proceedings … instituted by a complaint," followed by "lengthy litigation," then a "final order compel[ling] divestiture," and then appeal to the Ninth Circuit); *United States v. Papercraft Corp.*, 540 F.2d 131, 140 n.17 (3d Cir. 1976) ("divestiture cannot be accomplished overnight"). The FTC has, in fact, sought divestiture as a remedy in a suit that it filed against Meta in December 2020; more than four years later, that case remains in litigation and no divestiture order nor even a more limited injunction has issued. *See FTC v. Meta Platforms, Inc.*, No. 20-cv-03590 (D.D.C.). Indeed, the FTC has been on notice of Advertisers' allegations for years—they are public, and the FTC listed this matter as a related case to its suit years ago, *see id.* Dkts. 4, 44—but has never raised the subject matter of the supposed misrepresentation at issue here. Third, Advertisers have no evidence that proves—or even suggests—that the FTC would or could have ordered a divestiture but for Meta's supposedly inaccurate representations. As Klumpp himself testified: "I can't look into the FTC's mind." Ex. 5, Klumpp Tr. 209:10-15. Nor can a jury, which is precisely why Advertisers' speculation is an inadequate basis for their claim to proceed to trial. *See Stephens*, 935 F.3d at 856-57 ("A party's own speculation is insufficient to create a genuine issue of material fact, … and a party cannot make it sufficient simply by finding an expert who is willing to assume its correctness.").

Regardless, Advertisers' theory is barred by *Noerr-Pennington*. Under *Noerr-Pennington*, those "'who petition government for redress are generally immune from antitrust liability.'" *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1092 (9th Cir. 2000). "The doctrine immunizes petitions directed at any branch of government, including … administrative agencies" like the FTC. *Id.* Such "efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition." *United Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965). That is true even if those efforts involve alleged "'misrepresentations'" or supposedly "'false'" statements. *Boone v. Redevelopment Agency of City of San Jose*, 841 F.2d 886, 894 (9th Cir. 1988). Advertisers' claim challenges actions at the heartland of *Noerr-Pennington*'s

<u>PUBLIC REDACTED VERSION</u>

protection: responses and presentations made to agency officials that (according to Advertisers) aimed to persuade officials to follow a particular course of action. Ex. 6, Klumpp Rep. ¶¶178-80.

**2.    Meta's Alleged Misappropriation Of Trade Secrets To Copy Snapchat Cannot Be Exclusionary As A Matter Of Law**

Advertisers' challenge to Meta's supposed use of Snap's trade secrets to copy the Snapchat Stories feature fails because it is not properly before the Court and, in all events, the conduct cannot be exclusionary as a matter of law. This claim is predicated on Meta's alleged use of data acquired from consenting panelists who signed up for the Facebook Research ("FBR") App. The FBR App (which Advertisers call the "In-App Action Panel" or "IAAP") was a paid market research tool through which participants who signed up and agreed to install the FBR App would send Meta data about how they used other apps on their phones, including Snapchat, YouTube, and Amazon. Ex. 7, Jakobsson Rep. ¶¶30-37. Advertisers contend that unspecified data collected through the app was Snap's trade secret and that Meta misappropriated the information to copy Snapchat Stories, a public feature that launched in 2013 and went viral. Ex. 6, Klumpp Rep. ¶¶58-64.

**Rule 37 Bars Advertisers' Untimely Disclosed Claim.** "Under FRCP 37(c), materials that are undisclosed or disclosed late will likely be excluded from use at trial or summary judgment unless permitted otherwise by the Court." Standing Order for Civil Cases Before Judge James Donato ¶24 (Jan. 5, 2017). This is for good reason: where a plaintiff does not "disclose … the bases of its … theories until after the close of discovery," the defendant loses "the opportunity to conduct additional fact discovery regarding [those] new theories." *Apple, Inc. v. Samsung Elecs. Co.*, 2012 WL 3155574, at *5 (N.D. Cal. Aug. 2, 2012). Here, Advertisers' novel trade-secret theory was first disclosed ***six months after*** fact discovery ended. Between December 2020 and January 2024, Advertisers' claim, as explained in their contention interrogatory responses, was that the FBR App allowed Meta to "███████████" and "███████████████████" strengthening supposed entry barriers. Ex. 8, June 2023 Interrog. 20 Resp. at 508. But in January 2024, Advertisers' expert reports reinvented this claim. Advertisers' new explanation for why the FBR App was anticompetitive turns on a brand-new contention not raised in their Complaint or elsewhere: that Meta supposedly misappropriated Snap's trade secrets and thereby produced a "███████████████████████" Ex. 6, Klumpp Rep. ¶¶58-64.

<u>**PUBLIC REDACTED VERSION**</u>

1      Advertisers' untimely disclosure put directly at issue at least (1) whether the data

2  purportedly transmitted from a small panel of users' phones to Snap's servers (which Meta

3  accessed with the users' consent) was somehow Snap's "trade secret," and (2) how the FBR App

4  affected industry-wide innovation, if at all. Because Advertisers never disclosed this theory to

5  Meta during discovery, Meta had no opportunity to develop a record on these points. By waiting

6  until expert discovery to disclose that Snap's data was supposedly a trade secret, Advertisers

7  attempt to side-step these legal requirements and stymie Meta's defense. *See Masimo Corp. v.*

8  *Tyco Health Care Grp., L.P.*, 2004 WL 5907538, at *12-13 (C.D. Cal. June 10, 2004) (rejecting

9  on summary judgment claim that "patent infringement amounts to anticompetitive conduct"

10  because, among other things, it was first raised "'long after the close of discovery and the Court's

11  deadline … for amending the pleadings'"). That is precisely what this Court's Standing Order

12  prohibits.

13      **Meta's Alleged Copying Of Snapchat Stories Cannot Be Exclusionary.** Even if the

14  Court permitted Advertisers' tardy trade secret theory, Meta's alleged copying of Snapchat Stories

15  cannot be exclusionary as a matter of law.

16      *First*, "expropriat[ing] trade secrets … cannot be classified as anticompetitive." *Morton v.*

17  *Rank Am., Inc.*, 812 F. Supp. 1062, 1067-68 (C.D. Cal. 1993). "[A]s a matter of law" the use of

18  another firm's intellectual property, even if contrary to intellectual property law, "do[es] not

19  amount to anticompetitive conduct." *Masimo*, 2004 WL 5907538, at *12-13. That is because it

20  "causes competing products to enter the market, and thereby increases competition." *Retractable*

21  *Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 893 (5th Cir. 2016); *see also Masimo Corp.*

22  *v. Tyco Health Care Grp., L.P.*, 2004 WL 7094930, at *2 (C.D. Cal. May 28, 2004) ("That an

23  innovation … is infringing will not change the fact that the infringing innovation, and not

24  anticompetitive conduct, explains market dominance."). Leading antitrust scholars have described

25  this principle as "[c]learly … correct." *See* Areeda ¶782a.

26      Here, the absence of any evidence of competitive harm underscores the soundness of these

27  principles. The entirety of Klumpp's opinions on this front consists of a single-sentence assertion

28  offered without citation in his report, which states: "█████████████████████████

**PUBLIC REDACTED VERSION**

1

2 ████████████████████████████████████████ " Ex. 6, Klumpp Rep. ¶64. But he was unable,

3 despite being asked nine times at his deposition, to identify even a single piece of record evidence

4 to support this opinion. Ex. 5, Klumpp Tr. 102:22-104:25, 106:6-107:6. He also conceded that he

5 had not "seen any evidence that any of [Meta's] actual or potential competitors knew that Meta

6 was" supposedly "copying Snap using the IAAP program." *Id*. at 109:6-15. If none of Meta's

7 competitors knew of the activity, it necessarily could not have had a chilling effect.

8        *Second*, Advertisers concede that ████████████████████████

9 ████████████████████████████████████████████ rather than

10 data collected through the FBR App, then ████████████████████

11 ████████████████  Ex. 9, Klumpp Reb. ¶161. That is dispositive of this theory because there

12 is no dispute that Meta did, in fact, develop its Stories feature without relying on the at-issue FBR

13 App data. Meta launched Stories on Instagram in August 2016, when the FBR App "was still in

14 the development phase" and had not yet launched. Ex. 10, Jakobsson Tr. 221:16-25 ("Q. Now, as

15 of August 2016, Meta had not yet launched IAAP. Correct? A. That's correct. Q. In fact, Meta was

16 still in the development phase of trying to work out how to design IAAP at the time that Instagram

17 Stories launched in 2016. Correct? A. That is correct."). So, the supposed trade secrets collected

18 via the FBR App were not used to launch Stories because Stories launched before Meta got any

19 data from the FBR App. *Id.* at 223:7-14 ("Q. At the time that Facebook launched Instagram Stories

20 in August 2016, it was not receiving any analytics data from IAAP from Snap. Correct? A. Yes.

21 Correct, as far as I understand."). Thus, by Advertisers' own logic, there can be no legitimate

22 dispute that the launch of Stories was "procompetitive." Ex. 9, Klumpp Reb. ¶161; *see also* Ex. 5,

23 Klumpp Tr. 90:9-91:2 ("Q. So you—to the best of your knowledge, Facebook did not use data

24 from the IAAP program to develop Instagram Stories. Correct? A. Not to develop Instagram

25 Stories initially, but tech companies do not develop a feature and then leave it at that.").

26        If Advertisers contend that Meta further *refined* its own Stories feature (or any other

27 feature) based on data it collected via the FBR App, Advertisers have not and cannot identify a

28 single feature that Meta copied or improved using this information. As Klumpp testified, his report

**PUBLIC REDACTED VERSION**

does "not mention any specific features where [he] ha[s] seen evidence that that feature would not have existed but for the IAAP program." Ex. 5, Klumpp Tr. 89:6-13. Advertisers' supposed technical expert Markus Jakobsson has not identified any such feature either:

> Q. Right. What I'm getting at is, can you identify anything that Facebook actually did, any decisions they made with respect to their products, features, business, technical discussions, anything that Facebook did, based on all the record evidence that you have, in response to the data that was available through IAAP and not available through other means? Can you identify any specific thing they did based on that data?
>
> A. I have the capability of doing that but I haven't been asked to do it.

Ex. 10, Jakobsson Tr. 141:10-21. Advertisers thus cannot identify any competitive harm.

*Third*, any claim based on trade secret misappropriation cannot survive summary judgment unless the party asserting it identifies the trade secret with "sufficient particularity." *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998). Yet Advertisers' sole description of the supposed trade secret is that it consists of ███████████████████████████ ████████████ that Meta "███████████████████████████████" Ex. 6, Klumpp Rep. ¶58. That general description of electronic information, which "does not separate the trade secrets from the other information that goes into" the larger package of information at issue, fails to satisfy the particularity requirement. *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002); *see also InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 659 (9th Cir. 2020). Indeed, the most Klumpp could offer to explain the specific trade secret at issue was a tautology:

> Q. Okay. Tell me with as much specificity as you possibly can what the information is that Facebook collected through the IAAP program that you say is a trade secret.
>
> A. … But your question was, with as much specificity as I possibly can, what is that information. And my answer to that question is that it is in the in-app analytics data that Facebook obtained through the IAAP from Snapchat.
>
> Q. You can't be any more specific than that in describing the information you analyzed to assess the—whether it was from an economic perspective [a] trade secret. Correct?
>
> A. So that is the degree of specificity with which I can answer that question.

Ex. 5, Klumpp Tr. 124:5-125:5. Jakobsson gave no further clarity:

> Q. I'm asking whether from the record evidence that you have can you identify any specific data that was accessed and was used by Facebook to change or implement a feature, either visible or invisible to the user, in Stories specifically.

**PUBLIC REDACTED VERSION**

> A. … I can't name what fields has what, and, in fact, many of these fields it would be requiring some poking around in order to figure out what it means.

Ex. 10, Jakobsson Tr. 240:10-241:7; *see also id.* at 65:11-23, 237:8-21.

That this case involves an antitrust claim based on the supposed misappropriation of a trade secret—rather than a claim under the law governing trade secrets—makes the need for specificity more pressing, not less. The (legally flawed) premise of Advertisers' claim necessarily depends on proving that Meta improperly used *someone else's* supposed trade secret. But with no evidence to identify what Snap's supposed trade secret is, Advertisers have no basis to contend that any information that Meta obtained—from Snapchat's users, not from Snap—was not fair game. In essence, what Advertisers have done is invite this Court to conduct a trial-within-a-trial of a trade secret claim they think Snap might have had against Meta, but forgo the most basic requirements for bringing such a claim. Proceeding to trial in these circumstances would be improper.

### 3.    The Challenged Vertical Agreements Cannot Be Exclusionary

Advertisers' challenges to various agreements Meta allegedly entered with third parties fail as a matter of law. The agreements are all vertical, so Advertisers must show that they "facilitate[d] horizontal collusion" among market participants or "foreclose[d] competitors." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012). Advertisers do not allege any such horizontal collusion, nor could the agreements have caused any cognizable foreclosure.

**The Nonexistent Netflix Agreement.** Advertisers claim that in 2018 Meta entered a secret, unwritten agreement with Netflix "███████████████████████████████████████████████████████████████ Ex. 6, Klumpp Rep. ¶125. This claim fails because, after voluminous discovery, Advertisers have produced no evidence that any such agreement exists. There is no documentary evidence supporting it, every witness from Meta denied its existence, and ████████████████ ███████████████████████████████████████████████████ ██████████████████████ Even Advertisers' own expert is unwilling to say this agreement exists. Klumpp explicitly states he is "not offering an opinion as to whether such an agreement existed," and instead only "analyze[d] the anticompetitive effects of the alleged agreement, assuming it can be shown that the alleged agreement existed." *Id.* As Klumpp admits, he has never

1   seen the agreement nor reviewed its terms. Ex. 5, Klumpp Tr. 276:2-22. He nonetheless opines on

2   this supposed agreement's effects despite needing to assume the agreement even exists. This

3   analysis is thus purely hypothetical (fictional), and the only evidence supporting Advertisers'

4   claim. At minimum, Advertisers needed to put forward "evidence 'that tends to exclude the

5   possibility' that the alleged conspirators acted independently" and they have not done so.

6   *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1088-89 (9th Cir. 2015).

7   Instead, Advertisers' expert testified that Meta's budget cuts to premium video streaming—Meta's

8   supposed quid in Advertisers' fictional quid-pro-quo—were ███████████████████████

9   █████████ and that he had "no basis to believe that" Meta pulling back from its █████████

10  investment in premium video "was not a rational decision." Ex. 5, Klumpp Tr. 288:21-289:11.

11  This concession is fatal to Advertisers' claim. *Stanislaus*, 803 F.3d at 1088-89.

12      Even if the alleged imaginary agreement had existed, it could not have been exclusionary

13  as a matter of law. Advertisers' theory of harm is that ███████████████████████████

14  ████████████████████████████████████████████████████████████

15  ████████████████████████████████████ and that the claimed agreement

16  ensured "██████████████████████████████████████████████████████

17  █████████" Ex. 6, Klumpp Rep. ¶¶126, 132. But this spend never belonged to a rival to "lose."

18  Meta is allowed to sell ads to whomever it wants and even under Advertisers' theory Netflix was

19  free to buy ads from whomever it wanted. "[C]ontracts [that] do not preclude consumers from

20  using other … services" "are legal under antitrust law." *W. Parcel Express v. United Parcel Serv.*

21  *of Am., Inc.*, 190 F.3d 974, 976 (9th Cir. 1999). Nothing about the alleged agreement "'prevent[ed]

22  [Netflix] from purchasing [social advertising] from any other vendor'" in addition to Meta, and

23  there was thus no cognizable foreclosure. *Qualcomm*, 969 F.3d at 1003.

24      Moreover, any market impact of this supposed agreement would be so negligible as to be

25  non-actionable as a matter of law. Advertisers' own analysis shows that the ███████████ allegedly

26  at issue in this agreement involved less than one-third of one percent of market-wide sales. Dkt.

27  813-3 ¶154; Ex. 1, 8/24 Williams Rep. ¶308 & tbl. 3. Meta's rivals were undisputedly free to

28  compete for advertising spend and associated "signals" from the remaining 99+% of the purported

<u>**PUBLIC REDACTED VERSION**</u>

1    market. A vertical agreement's foreclosure of a de minimis share of the relevant market is "not

2    sufficient to injure any competitor," so this alleged agreement—assuming it existed at all—was

3    reasonable as a matter of law. *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961);

4    *United States v. Columbia Steel Co.*, 334 U.S. 495, 520 (1948) (3% foreclosure); *Magnus Petrol.*

5    *Co., Inc. v. Skelly Oil Co.*, 599 F.2d 196, 204 (7th Cir. 1979) ("less than 1%"); *Aspen Title &*

6    *Escrow, Inc. v. Jeld-Wen, Inc.*, 677 F. Supp. 1477, 1487-88 (D. Or. 1987) ("less than 2.0%" was

7    "de minimis" and "inadequate as a matter of law").

8    **The Network Bidding Agreement.** Advertisers challenge an agreement Meta allegedly

9    reached with Google in September 2018—the "Network Bidding Agreement" or "NBA"—

10   permitting Meta to use Google's "Open Bidding" auction system to bid for ad slots on third party

11   apps. The premise of Advertisers' claim is that Google ███████████████████████████

12   █████████████████ in its auctions, Ex. 11, Jan. 2024 Interrog. 24 Resp. at 1732, which

13   "████████████████████████████████████████████

14   ████████████████████████████" Ex. 6, Klumpp Rep. ¶99. There is "nothing

15   anticompetitive in the simple fact that a seller"—Google—"offers … favorable terms[] to some of

16   its [customers]"—Meta—"even though such discrimination harms the non-favored [customers]."

17   *Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 866 F.2d 525, 529 (1st Cir. 1989); *Zoslaw v. MCA*

18   *Distrib. Corp.*, 693 F.2d 870, 887 (9th Cir. 1982) ("price discrimination which results where

19   buyers seek competitive advantages from sellers encourages the aims of the Sherman Act").

20   Accordingly, the district court overseeing multi-district litigation has twice dismissed claims

21   alleging this exact agreement violates the Sherman Act. *In re Google Digit. Advert. Antitrust Litig.*

22   ("*Google I*"), 627 F. Supp. 3d 346, 370-77 (S.D.N.Y. 2022); *In re Google Digit. Advert. Antitrust*

23   *Litig.* ("*Google II*"), 721 F. Supp. 3d 230, 248-50 (S.D.N.Y. 2024).

24   The NBA is "a vertical arrangement between Google in its role as auctioneer and Facebook

25   as auction participant." *Google II*, 721 F. Supp. 3d at 250. Because the NBA is admittedly "not a

26   horizontal agreement," Ex. 5, Klumpp Tr. 274:8-17, it is "properly scrutinized under the rule of

27   reason," *Google I*, 627 F. Supp. 3d at 374-75. The NBA concerns a small segment of Meta's ad

28   business that Advertisers claim accounted for just ██████ of Meta's Class Period ad revenue and

1    thus implicated—at most—less than one percent of market-wide revenue. Ex. 1, 8/24 Williams

2    Rep. ¶¶59, 308 & tbl. 3; *see also* Dkts. 679-1 at 6, 699-1 at 8 n.6. This again does not come

3    anywhere close to the threshold the law requires for actionable foreclosure. *See supra* p.19.

4         Moreover, Advertisers "have not pointed to data or actual instances of harm indicating that

5    competing in-app networks or bidders were placed at anticompetitive disadvantage due to

6    implementation of the NBA." *Google II*, 721 F. Supp. 3d at 250. That is, there is no showing of

7    foreclosure at all. Rather, the NBA "promote[d] competition with Google's in-app network by

8    bringing in a new competing bidder," benefiting advertisers. *Google I*, 627 F. Supp. 3d at 376.

9    Likewise, Google allegedly "provid[ing] Facebook with a unique user-identification advantage,"

10   Ex. 11, Jan. 2024 Interrog. 24 Resp. at 1732, "benefited consumers and competition by facilitating

11   better outcomes for Facebook's advertisers," *Google II*, 721 F. Supp. 3d at 250.

12        Advertisers' restraint of trade claim (Count III), which is predicated solely on the NBA,

13   fails for the same reasons. *See Epic Games*, 67 F.4th at 974 ("Rule of Reason" analysis is

14   "'essentially the same'" under Section 1 and Section 2). Thus, at the very minimum, the Court

15   should grant summary judgment as to Advertisers' *per se* theory based on this agreement because

16   the agreement is vertical. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 540-41 (2018).

17        But even assuming that the NBA were horizontal—a characterization which Advertisers'

18   own expert disavowed, Ex. 5, Klumpp Tr. 274:11-17—the agreement would still not warrant *per*

19   *se* condemnation. "[H]orizontal restraints" are "'exempt from the per se rule'" where they are

20   "'subordinate and collateral to a separate legitimate transaction,'" and "'reasonably necessary' to

21   achieving that transaction's pro-competitive purpose." *Aya Healthcare Servs., Inc. v. AMN*

22   *Healthcare, Inc.*, 9 F.4th 1102, 1109 (9th Cir. 2021). Where a purported "market-sharing"

23   agreement contains no "promis[e] not to compete," but instead involves "potential rivals …

24   combin[ing] to provide offerings … that none could as easily provide by itself," a *per se* claim

25   fails as a matter of law. *Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 48 (1st Cir. 2001).

26   That law applies here because Advertisers do not assert that the NBA contains a promise not to

27   compete. Ex. 6, Klumpp Rep. ¶96. Advertisers instead claim the NBA's anticompetitive effect

28   derives from, as in *Augusta*, the superior offering that Meta and Google's combined efforts

**PUBLIC REDACTED VERSION**

purportedly created: Google gave a "███████████████████████" Ex. 11, Jan. 2024 Interrog. 24 Resp. at 1732, that "███████████████████████████████████████████ ████████████" Ex. 6, Klumpp Rep. ¶99. So, as a matter of law, the NBA is not the kind of "naked" market division agreement subject to *per se* treatment. Summary judgment is thus warranted. *Aya Healthcare*, 9 F.4th at 1113-14.

      **The API Agreements.** Advertisers' claim that Meta entered agreements with certain "Integration Partners" providing access to Meta's application programming interfaces ("APIs") fails as a matter of law because these agreements could not have had any exclusionary effect.

      Meta offers third-party developers access to its APIs, which allow developers' apps to interact with Meta's systems in limited ways. During the Class Period, Meta required some developers using its APIs to agree not to use certain of Meta's data they accessed through the APIs to develop their own competing products, Ex. 6, Klumpp Rep. ¶¶152-60, but did not restrict them from doing so using other data, like their own. Advertisers concede these agreements "established" a "vertical relationship between" Meta and the developers. Ex. 5, Klumpp Tr. 169:16-173:2.

      Advertisers do not even allege these agreements foreclosed competition. Instead, they contend the API Agreements created a ████████████████████████████████████████████ ████████████████████████████████████████████—even when they had not in fact done so—and thus ██████████████████████████████ ████████████████████████ Ex. 6, Klumpp Rep. ¶¶164-67. That is, while the agreements do not bar such investment, and while Advertisers concede "██████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████" Advertisers' claim is premised on the specter of "███████████████ ████████████████████████████████████████████████████████████████████████ *Id.* ¶162. Section 2, however, requires evidence of *actual* harm to competition, not possibilities. *Qualcomm*, 969 F.3d at 990. And, notably, the only "hypothetical" Advertisers offer is the prospect that ████████████████████████████████████████████████████████████████████████████ ████████████████████████, Ex. 6, Klumpp Rep. ¶¶163-64 & n.357—a suggestion belied by the fact that ████████████████████████████████ during the Class Period, yet Meta never threatened it with API

1 litigation and Advertisers do not contend its operation of ███████ was impacted in any way. *See*

2 Ex. 5, Klumpp Tr. 188:12-189:5.

3        No court has ever held that a supposed chilling effect like this—one which (supposedly)

4 stems from the unsubstantiated fear that a defendant could maliciously misinterpret and litigate an

5 otherwise valid agreement—suffices to make a vertical agreement anticompetitive. Advertisers

6 received discovery from several of Meta's API partners and found no evidence that these

7 agreements deterred them from starting a social service. "Speculation that [Meta's] conduct 'can

8 reasonably be expected,' 'might,' or 'could potentially'" have altered developers' incentives "is

9 not evidence of anticompetitive effects in the relevant market[]." *United States v. Google LLC*,

10 687 F. Supp. 3d 48, 81 (D.D.C. 2023) (granting summary judgment in relevant part). Advertisers

11 "needed concrete documentation that [the] agreements prevented" competition, and they have

12 none. *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1182 (9th Cir. 2016) (affirming

13 summary judgment).

14        **C.    If Any Conduct Theory Fails, Advertisers Are Not Entitled To Damages**

15        If the Court grants summary judgment for Meta on any of Advertisers' exclusionary

16 conduct theories, it should also grant summary judgment on their claim for damages. Advertisers'

17 damages model does not provide "a disaggregated measure of damages for each exclusionary act."

18 Dkt. 699-1 at 4. And their expert testified it "████████████████████████████████████"

19 if "███████████████████████████████████████████████████████████████████████████

20 ████████████████" Ex. 2, 9/23 Williams Tr. 55:5-56:9; Ex. 3, 2/24 Williams Tr. 313:7-23. This

21 model is the only evidence of their entitlement to damages.

22        When a "monopolization claim has been dismissed or adjudicated against a plaintiff,

23 damages attributable to that claim must be disaggregated." *Image Tech. Servs., Inc. v. Eastman*

24 *Kodak Co.*, 125 F.3d 1195, 1224 (9th Cir. 1997). Where a plaintiff cannot do so because its "only

25 damage study" assumes "that all of [the challenged] acts contributed to the damage figure, but the

26 district court" finds that some "of those acts were proper," the plaintiff has "no proper proof of

27 damages" and "summary judgment" as to damages is appropriate. *City of Vernon v. S. Cal. Edison*

28 *Co.*, 955 F.2d 1361, 1371-73 (9th Cir. 1992); *see also Litton Sys., Inc. v. Honeywell, Inc.*, 1996

WL 634213, at *3 (C.D. Cal. July 24, 1996) (if "damage model d[oes] not attribute an amount of damages to particular … conduct, but rather attribute[s] a single estimate of damages to all of the challenged conduct taken together—even conduct that [has been] excluded from consideration by the jury—the jury ha[s] no rational basis to determine an appropriate damage award").

Advertisers have been on notice of this fundamental problem with their damages model for over a year, since Meta raised it in connection with its opposition to Advertisers' original class certification motion. Dkt. 671-1 at 19-22. Williams has now submitted seven reports in this case and never even attempted to remedy the issue. If Advertisers could have solved it, they would have. It is evident that they cannot. Accordingly, if the Court dismisses a subset of Advertisers' conduct theories, there is no rational basis in the record for the jury to determine a damages award for any of the remaining conduct, and Advertisers are not entitled to damages as a matter of law.

## III.    ADVERTISERS FAIL TO COHERENTLY DEFINE A RELEVANT PRODUCT MARKET

"A threshold step in any antitrust case is to accurately define the relevant market." *Qualcomm*, 969 F.3d at 992. If "[o]ne cannot discern what is included" in a proposed market "and what is not," the market fails as a matter of law. *Coronavirus Rep. v. Apple Inc.*, 2021 WL 5936910, at *8 (N.D. Cal. Nov. 30, 2021), *aff'd*, 85 F.4th 948, 956 (9th Cir. 2023).

Here, Advertisers have failed to coherently define what "social advertising" is. Their incoherent explanation of the product around which this supposed market is based makes it impossible to determine "what is included and what is not." *Coronavirus Rep.*, 2021 WL 5936910, at *8. Williams offers one definition in his report: "███████████████████████████████ █████████████████████████████████" Ex. 1, 8/24 Williams Rep. ¶27. But Williams has repeatedly contradicted that definition. He testified both that it is "possible" for an ad to "constitute social advertising even if it does not use social data contained in a social graph" and—conversely—that he does not "have an opinion on" whether "there could be ads that use social data contained in the social graph but that do not constitute social advertising." Ex. 3, 2/24 Williams Tr. 21:12-23, 23:2-19. He later backtracked further and testified that an ad targeted based on social data from a social graph "*can be*"—but is not necessarily—social advertising. Ex. 4, 6/24 Williams Tr. 72:16-21. Thus, the sole attribute offered to define the product at the center of

**PUBLIC REDACTED VERSION**

Advertisers' purported market—targeting based on social data in a social graph—is apparently neither necessary nor sufficient to render an ad "social."

Unsurprisingly, this vague and shifting definition of the product at issue creates intractable categorization problems that Advertisers make no attempt to resolve. If what Advertisers mean to contend is that the mere *possibility* of social targeting makes an ad "social," that busts the predicate market definition by sweeping in many (many) rivals who Williams excludes from his candidate market. Most ads sold online ***can*** be targeted using "███████████████████" as Williams uses those terms. According to Williams, a "████████" is a collection of information that includes ███████████████████████████████████ ██████ Ex. 1, 8/24 Williams Rep. ¶27, all of which companies across the advertising industry and outside of Advertisers' purported market—including Google, Amazon, and Apple—obviously have. Confronted, for example, with the reality that advertisers can use their own social data from their own social graphs to target ads shown on Google's search engine, which is outside the alleged social advertising market, Williams had no explanation for why those ads would not be social and admitted he had not formed an opinion on them at all. Ex. 4, 6/24 Williams Tr. 70:3-71:24.

Faced with these issues, Advertisers have eschewed their proffered definition of "social advertising" entirely in favor of an improper *ipse dixit*, I-know-it-when-I-see-it approach to populating their proposed market. This approach consists of Williams's subjective or arbitrary determinations of whether an ad venue qualifies as "social" according to some undisclosed set of criteria (or none at all). Williams asserts that various firms "███████████████" without analyzing whether they have social data contained in social graphs that can be used for ad targeting, and claims that various other forms of advertising are not "social" without reference to the term "social data" at all. *See* Ex. 1, 8/24 Williams Rep. ¶¶61-130. As explained in Meta's concurrently filed *Daubert* motion, this analysis is fatally unreliable and should be excluded—along with the self-styled SSNIP test Williams performed over this proposed market—which ends Advertisers' case.

But even if not excluded, summary judgment in Meta's favor remains warranted. "[A]ttempts to create defensible market boundaries … based on relatively vague product

**PUBLIC REDACTED VERSION**

1    characteristics"—as Advertisers have tried here—"do not meet" the antitrust laws' "requirement

2    that the relevant market be 'well-defined.'" *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098,

3    1120-21 (N.D. Cal. 2004). "[T]he court cannot delineate product boundaries … based upon the

4    mere notion that there is 'something different'" about the products at issue. *Id.* at 1159. "More is

5    required." *Id.* Product differentiation rarely gives rise to distinct submarkets in advertising. *See,*

6    *e.g.*, *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121 (9th Cir. 2018). It can only even arguably do

7    so upon a showing that the "the factors which distinguish one purported submarket from another

8    are 'economically significant,'" *Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*, 518 F.2d 913,

9    932 (9th Cir. 1975)—that is, "a showing of the role" the identified differences "play in motivating

10   and shaping consumer decisions," *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369,

11   1376 (9th Cir. 1989). Accordingly, antitrust claims that (as here) offer only an "ambiguous"

12   description of the actual product at issue fail as a matter of law. *Flaa v. Hollywood Foreign Press*

13   *Ass'n*, 2020 WL 8256191, at *7 (C.D. Cal. Nov. 20, 2020) (dismissing claim because "product

14   description" of ""entertainment news'" was "ambiguous"); *Ticketmaster LLC v. RMG Techs., Inc.*,

15   536 F. Supp. 2d 1191, 1195-96 (C.D. Cal. 2008) (dismissing claim where it was "impossible to

16   tell" which products were at issue). Without sufficient detail about the product the proposed

17   relevant market is defined around, it "is not possible" for the fact finder to make the necessary

18   findings of reasonable interchangeability, *Coronavirus Rep.*, 2021 WL 5936910, at *8, or identify

19   the "field of competition: the group or groups of sellers or producers who have actual or potential

20   ability to deprive each other of significant levels of business," *Thurman Indus.*, 875 F.2d at 1374.

21   Advertisers' approach offers the jury no basis upon which to do so here, so judgment in Meta's

22   favor must follow. *Rebel Oil*, 51 F.3d at 1435.

**CONCLUSION**

24   The Court should grant summary judgment in Meta's favor on all of Advertisers' claims.

PUBLIC REDACTED VERSION

Dated: December 30, 2024

Respectfully submitted,

By: /s/ Sonal N. Mehta
SONAL N. MEHTA

Attorney for Defendant Meta Platforms, Inc.

CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of December, 2024, I electronically transmitted the public redacted version of the foregoing document to the Clerk's Office using the CM/ECF System and caused the version of the foregoing document filed under seal to be transmitted to counsel of record by email.

By:    /s/ Sonal N. Mehta
Sonal N. Mehta