**PUBLIC REDACTED VERSION**

| | |
|---|---|
| WILMER CUTLER PICKERING<br> HALE AND DORR LLP<br><br>SONAL N. MEHTA (SBN 222086)<br> Sonal.Mehta@wilmerhale.com<br>2600 El Camino Real, Suite 400<br>Palo Alto, California 94306<br>Telephone: (650) 858-6000<br><br>DAVID Z. GRINGER (*pro hac vice*)<br> David.Gringer@wilmerhale.com<br>ROSS E. FIRSENBAUM (*pro hac vice*)<br> Ross.Firsenbaum@wilmerhale.com<br>RYAN CHABOT (*pro hac vice*)<br> Ryan.Chabot@wilmerhale.com<br>PAUL VANDERSLICE (*pro hac vice*)<br> Paul.Vanderslice@wilmerhale.com<br>7 World Trade Center<br>250 Greenwich Street<br>New York, New York 10007<br>Telephone: (212) 230-8800 | ARI HOLTZBLATT (SBN 354631)<br> Ari.Holtzblatt@wilmerhale.com<br>MOLLY M. JENNINGS (*pro hac vice*)<br> Molly.Jennings@wilmerhale.com<br>2100 Pennsylvania Ave NW<br>Washington, DC 20037<br>Telephone: (202) 663-6000<br><br>MICHAELA P. SEWALL (*pro hac vice*)<br> Michaela.Sewall@wilmerhale.com<br>60 State Street<br>Boston, Massachusetts 02109<br>Telephone: (617) 526-6000 |

*Attorneys for Defendant Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated,<br><br>　　　　　　　　　　　Plaintiffs,<br><br>　v.<br><br>META PLATFORMS, INC., a Delaware Corporation,<br><br>　　　　　　　　　　　Defendant. | Case No. 3:20-cv-08570-JD<br><br>**DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY AND OPINIONS OF MICHAEL WILLIAMS**<br><br>Hearing Date: To Be Determined<br>Time: To Be Determined<br>Judge: Hon. James Donato |

**PUBLIC REDACTED VERSION**

**TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION ........................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ...............................................................1

INTRODUCTION ........................................................................................................................1

BACKGROUND ..........................................................................................................................2

ARGUMENT................................................................................................................................5

I.     WILLIAMS'S YARDSTICK STUDIES ARE JUNK SCIENCE.........................................................5

      A.     The Chosen Yardsticks And Selection Criteria Are Junk Science ..........................5

      B.     Even If The "Yardsticks" Were Legitimate (They Are Not), Williams's Studies Are Unreliable Because He Examines Meta's Profits, Not Its Prices..........................................................................................................................8

      C.     Even If The "Yardsticks" Were Legitimate (They Are Not) And Even If He Had Successfully Determined An Overcharge Based On Profits (He Did Not), Williams Fails To Control For Lawful Factors Affecting Profits ...........9

II.    WILLIAMS'S "DURING-AFTER" MODEL IS JUNK SCIENCE ..................................................10

III.   WILLIAMS HAS FAILED TO COHERENTLY DEFINE A PRODUCT MARKET ...........................11

IV.   WILLIAMS'S HYPOTHETICAL MONOPOLIST AND SSNIP TEST IS JUNK SCIENCE ................13

CONCLUSION...........................................................................................................................15

**PUBLIC REDACTED VERSION**

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
    152 F.3d 588 (7th Cir. 1998) ...................................................................................................9

*Carter Hawley Hale Stores, Inc. v. Ltd., Inc.*,
    587 F. Supp. 246 (C.D. Cal. 1984) .........................................................................................13

*CDW LLC v. NETech Corp.*,
    906 F. Supp. 3d 815 (S.D. Ind. 2012)....................................................................................6, 7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993)........................................................................................................1, 8, 11

*El Aguila Food Prod., Inc. v. Gruma Corp.*,
    301 F. Supp. 2d 612 (S.D. Tex. 2003), *aff'd*, 131 F. App'x 450 (5th Cir. 2005) ................9, 10

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023) ...................................................................................................14

*In re Google Play Store Antitrust Litig.*,
    2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) ....................................................................9, 13

*Grasshopper House, LLC v. Clean & Sober Media LLC*,
    2019 WL 12074086 (C.D. Cal. July 1, 2019).........................................................................10

*Kentucky Speedway, LLC v. National Ass'n of Stock Car Auto Racing, Inc.*,
    588 F.3d 908 (6th Cir. 2009) ..................................................................................................15

*Kentucky v. Marathon Petrol. Co.*,
    464 F. Supp. 3d 880 (W.D. Ky. 2020)................................................................................9, 10

*In re Live Concert Antitrust Litig.*,
    863 F. Supp. 2d 966 (C.D. Cal. 2012) ...............................................................10, 11, 12, 13

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*,
    387 F. Supp. 2d 794 (N.D. Ill. 2005) ....................................................................................5, 7

*Milan v. Clif Bar & Co.*,
    340 F.R.D. 591 (N.D. Cal. 2021)..............................................................................................1

*Muffet v. City of Yakima*,
    2012 WL 12827492 (E.D. Wash. July 20, 2012).................................................................5, 7

*Persian Gulf Inc. v. BP West Coast Prods. LLC*,
    632 F. Supp. 3d 1108 (S.D. Cal. 2022)...................................................................................11

**PUBLIC REDACTED VERSION**

*Sumotext Corp. v. Zoove, Inc.*,
  2020 WL 6544410 (N.D. Cal. Nov. 6, 2020), *aff'd*, 2021 WL 4988024
  (9th Cir. Oct. 27, 2021), *cert. denied*, 142 S. Ct. 2836 (2022) ..........................................14, 15

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
  546 F.3d 991 (9th Cir. 2008) ...............................................................................................14

*United States v. Google LLC*,
  --- F. Supp. 3d ---, 2024 WL 3647498 (D.D.C. Aug. 5, 2024).....................................................8

*United States v. Oracle Corp.*,
  331 F. Supp. 2d 1098 (N.D. Cal. 2004) ..................................................................................13

**STATUTES, RULES, AND REGULATIONS**

Fed. R. Evid. 702 ......................................................................................................................1, 6

**OTHER AUTHORITIES**

Areeda & Hovenkamp, *Antitrust Law* (2023).................................................................................9

U.S. Dep't of Just. & FTC, *Merger Guidelines* (2023) ..................................................................14

**PUBLIC REDACTED VERSION**

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on a date and time to be set by the Court, Defendant Meta Platforms, Inc. will move to exclude the opinions of Advertiser Plaintiffs' putative expert Michael Williams. Meta's motion is based on this Notice of Motion, the supporting Memorandum of Points and Authorities, and the Declaration of David Gringer filed herewith, along with the accompanying exhibits. Pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny, Meta requests that the Court exclude the Expert Report of Michael Williams and any testimony drawn therefrom.[1]

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

As this Court has often said, the key question is whether the expert's approach is "akin to predicting criminality by feeling the bumps on a person's head." *Milan v. Clif Bar & Co.*, 340 F.R.D. 591, 601 (N.D. Cal. 2021). Not only does Williams engage in the economic equivalent of this approach by attempting to divine a supposed price overcharge using a model that does not consider prices, but he actually created the "bumps on the head" himself by using as the baseline for his entire analysis "yardsticks" that no reasonable factfinder could find comparable.

As a threshold matter, the 25 supposed "yardsticks" that are foundational to Williams's opinions, and the process by which he selected them, clearly reflect junk science. Among these comparators are 22 foreign firms, including German and British real estate portals, several international car sales websites, a Chinese stock photography website, a Japanese shopping website called "▇▇▇▇," a small Polish firm "▇▇▇▇," "▇▇▇▇," and "▇▇▇▇," which Williams could not even describe. Ten of the companies Williams selected are so unlike Meta that they earn less than 10% of their revenues from advertising. Five of those do not sell advertising period. All were chosen pursuant to a series of filtering criteria that are either arbitrary, biased, or both. Williams even admits that he applied these criteria incorrectly or to yield his desired results. No study involving these firms could ever

---

[1] Unless otherwise noted, "Ex." citations reference exhibits to the Gringer Declaration filed herewith, emphasis is added, and objections are omitted for deposition citations.

**PUBLIC REDACTED VERSION**

1  provide reliable or useful information about Meta or its prices.

2  But even if such a study were possible, it is certainly not the one Williams concocted. Williams compares what he describes as the "economic profit rate" of Meta's advertising business to those of the yardstick firms to support an assertion that Meta earned excess economic profits during the class period. He then asserts without any basis or methodology that Meta's supposed excess profit is attributable entirely to supracompetitive pricing that was caused entirely by the challenged conduct. Profits are not prices, and looking solely at Meta's profits cannot tell us whether its prices are supracompetitive. Making matters worse, Williams assumes but does not even attempt to show that the challenged conduct caused the profit differential he observes between Meta and the hodgepodge of firms he selected as yardsticks. Williams's bizarre assertion that economic profits already control for confounding causes is itself junk science.

Williams also offers a "during-after" model—which purports to serve as an alternative damages calculation—that repeats the same errors described above to calculate Meta's purported excess profits over two time periods. Beyond that, Williams concedes that the "during-after" model fails to use a valid benchmark period free of the alleged effects of the challenged conduct, rendering the analysis uninformative and irrelevant to the assessment of damages.

Finally, Williams claims that the results of his "yardstick" studies also constitute a hypothetical monopolist test over his proposed "social advertising" market. They do not, nor do they resemble anything approaching what courts have recognized as a reliable methodology for defining a market. His other market definition analyses fare no better. Although Williams's report offers a definition of "social advertising," as " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" he has contradicted that definition repeatedly and jettisoned it entirely when placing firms inside or outside the market in his report. Williams's inability to land on a coherent definition of "social advertising"—or indeed, to stick to any definition at all—makes it impossible for anyone to determine which firms are in or out of his purported market. His opinion defining a "social advertising" market must therefore be excluded.

**BACKGROUND**

Advertisers submitted Williams's report hoping to establish common impact, identify the

**PUBLIC REDACTED VERSION**

damages attributable to the conduct at issue, and establish a relevant antitrust market. To accomplish all of these tasks, Williams compares what he describes as the "economic profit rate" (or "EPR") for Meta's advertising business to the weighted average EPRs for what he claims are 25 "yardstick" firms—[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]. Ex. 1, Williams Rep. ¶401.

Williams lists five criteria that he used to select his 25 yardstick firms. *Id.* ¶397. He first applied a filter to identify [REDACTED] [REDACTED]. *Id.* This filter cut down the set of potentially comparable firms from 33,253 to just 154, and excluded firms with massive online advertising businesses during the class period, such as Amazon, Microsoft, and Verizon. *Id.* Williams admitted that [REDACTED]

[REDACTED]

[REDACTED]. Ex. 2, 6/24 Williams Tr. 114:1-24; Ex. 3, 9/23 Williams Tr. 214:16-215:16. Williams's next two criteria required firms to [REDACTED] [REDACTED]. Ex. 1, Williams Rep. ¶397. Finally, Williams eliminated firms that [REDACTED] [REDACTED]. *Id.* The firms remaining were deemed yardsticks. Williams offers no opinion that any of the chosen firms is in fact comparable to Meta; they were all selected only because they passed the flawed screening criteria.

Williams then proposes a hypothetical reduction in advertising revenue that would have lowered Meta's economic profit rate to match the yardstick averages. *Id.* ¶409. He then "[REDACTED]" the percentage reduction "[REDACTED] [REDACTED]," yielding a "[REDACTED] [REDACTED]" to the proposed Class. *Id.* ¶410.

That is where Williams's yardstick studies stop. He does not analyze how, in a but-for

**PUBLIC REDACTED VERSION**

1  world without the challenged conduct, a reduction in Meta's economic profit rate would come

2  about. He simply assumes it would be accomplished through his hypothesized revenue reduction:

3  
> Q. In your but-for world, Meta's excess EPRs would come to match the yardstick EPRs based entirely through a reduction in revenue, correct?
4  
> A. That is correct.

5  Ex. 2, 6/24 Williams Tr. 32:2-9. He then assumes that this revenue reduction would be

6  accomplished entirely by a decrease in Meta's prices:

7  
> Q. And the excess revenues or the—the revenues are reduced by—only by reducing the price, right?
8  
> A. That is correct. Quantity is held constant.

9  *Id.* at 66:5-9. And he assumes that the difference between Meta's profitability and the yardsticks',

10 and the price overcharge he derives from it, was caused entirely by the challenged conduct:

11 
> Q. [B]ecause of the way that you calculated economic profits and Meta's excess profit rates, your model excludes the possibility that Meta's excess economic profits could be the result of those other factors, like product quality, differentiation, or innovation. Do I have that right?
12
13 
> A. I would agree with that.

14 *Id.* at 39:19-40:1. He does not analyze whether, in a world where Meta did earn a lower EPR, that

15 reduction would have flowed from a revenue decrease or some other cause (like cost increases or

16 reductions in sales volume). He does not analyze why Meta's alleged EPR is higher than the

17 yardstick firms' EPRs, or attempt to isolate how much (if any) of that profitability may be due to

18 the challenged conduct versus other factors. He performs no regression or otherwise recognized

19 method to show causation. And he looks only at profits, not prices, to find an overcharge.

20         Williams then proposes a relevant market for "social advertising." To analyze this market,

21 Williams describes the advertising businesses of various firms and advertising formats, then

22 announces a conclusion on whether they constitute "social advertising." Though his report defines

23 "social advertising" as "[REDACTED]

24 [REDACTED]," save for a passing remark about YouTube he does not analyze whether any of the firms

25 or ad formats he places in his proposed market with Meta, or any that he excludes, meet this

26 definition or use social data from a social graph for ad targeting. Ex. 1, Williams Rep. ¶27. He

27 purports to validate this market instead through what he describes as a "hypothetical monopolist

28 test." This "test" consists, in its entirety, of Williams asserting that the results of his yardstick

**PUBLIC REDACTED VERSION**

studies demonstrate Meta "███████████████████████████████████████," so a "█████████████████████████████████████████████████████████████████████████████████████████████████████████" *Id.* ¶¶144, 149-53.

Finally, Williams presents an alternative damages model which he calls "█████████" because it yields a smaller number than his primary model. *Id.* ¶407. He does so by conducting the same yardstick studies described above twice, over two time periods (2016-2020 and 2022-2023), and subtracting Meta's resultant "█████████" over the yardsticks' in the two periods from one another. *Id.* ¶¶388-89. Williams then calculates a revenue reduction he claims would reduce Meta's class period EPR by the difference between the two excess EPR values and "████████████████████████████████████████████████████████████████" using "█████████████" he uses in his yardstick study. *Id.* ¶389 n.622. This during-after model produces a damages figure between $7.5 billion and $9.3 billion. *Id.* ¶408.

## ARGUMENT

### I. WILLIAMS'S YARDSTICK STUDIES ARE JUNK SCIENCE

#### A. The Chosen Yardsticks And Selection Criteria Are Junk Science

The comparator firms Williams selected bear no resemblance to Meta. "[T]he reliability of the yardstick approach is based on the comparability of that yardstick to the business (or proposed business) involved in the litigation." *Muffet v. City of Yakima*, 2012 WL 12827492, at *3 (E.D. Wash. July 20, 2012). If the yardsticks are not comparable, the results are not reliable. Indeed, "the phrase 'junk science'" is "appropriately applied to [a] sampling of supposedly comparable companies" that, as here, lacks any "showing of comparability." *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 812, 817 (N.D. Ill. 2005). This is more than a question of weight; it goes to the very heart of the reliability of the methodology. Comparators in a yardstick study "must be fair congeners," and "[i]f they are not, the comparison is manifestly unreliable and cannot 'logically advance[] a material aspect of the proposing party's case.'" *Id.* at 812.

That is exactly so here. Williams' "yardstick" firms exclude nearly all companies typically mentioned in the same breath as Meta—no TikTok, Twitter, LinkedIn, Snapchat, Apple, Amazon, Reddit, or Pinterest. Instead, his yardsticks include 22 foreign firms, most of which principally

operate overseas, and 10 firms that derive less than 10% of their revenue from advertising, including 5 that he admits earn *no revenue from advertising* at all. Ex. 1, Williams Rep. ¶404 & tbl. 8. These firms have almost nothing in common with Meta. Unsurprisingly, Williams never explains why any of these firms are comparable to Meta.

Among Williams's purported benchmarks are selections like the ▮▮▮▮▮ (which, according to Williams, has no ad revenue) and "▮▮▮▮▮." Another supposed yardstick is "▮▮▮▮▮," a Chinese entity that also earns no ad revenue and whose business, when pressed, Williams could not even explain. Ex. 2, 6/24 Williams Tr. 148:21-149:8. The yardsticks also include "▮▮▮▮▮," a Polish firm that is a fraction of Meta's size and which sells tourist packages, architectural plans, and cars. Williams testified that ▮▮▮▮▮, Ex. 3, 9/23 Williams Tr. 228:11-229:2, yet he inexplicably used it as a yardstick. Testimony about Williams's comparisons of this bizarre set of firms to Meta will only confuse the jury. His studies do not provide any reliable information upon which to base an "accurate predict[ion] of what [Meta] would have done" in the but-for world. *CDW LLC v. NETech Corp.*, 906 F. Supp. 3d 815, 824 (S.D. Ind. 2012) (excluding yardstick study lacking "sufficiently comparable" benchmarks).

It is little surprise given the output that the criteria Williams used to select his "yardsticks" were both arbitrary and, by Williams's own admission, applied incorrectly—exactly what Rule 702 prohibits. Firms that made it through his filters were automatically deemed yardsticks; firms that did not were summarily excluded. *See* Ex. 1, Williams Rep. ¶404 n.637 ("▮▮▮▮▮"). Williams identifies no authority endorsing these criteria as a reliable means of selecting comparable firms, and his own testimony confirms that they are not.

Williams's first filter limits candidate firms to those ▮▮▮▮▮ ▮▮▮▮▮ Despite this filter's dramatic effect—eliminating 99.5% of possible comparators—Williams admitted he did not know how ▮▮▮ "actually applied [its] definition" of ▮▮▮▮▮ "to pick which firms are in and out," and that some of the firms in the category

1  do not meet the definition—*including Meta itself*. Ex. 2, 6/24 Williams Tr. 114:1-24; Ex. 3, 9/23
2  Williams Tr. 214:16-215:16 ("█████████████████████████████████████████████
3  █████████████"). And notwithstanding █████████████████████████████████████
4  █████████████████████████████████████████████ Ex. 1, Williams Rep.
5  ¶397(b) n.629, at least ten yardsticks do not satisfy this definition: five earn no advertising revenue
6  at all and ten earn less than 10% of their revenues from advertising. *Id.* ¶404. Williams bafflingly
7  testified that these errors "didn't strike [him] as particularly surprising" because he "knew that
8  [██████] definition was inaccurate," but used it anyway. Ex. 2, 6/24 Williams Tr. 117:8-118:23.
9       Williams's other filters are no better. He admitted that his █████████████████████
10 █████████████████ were chosen to "capture a large number of firms," rather than identify
11 comparable ones. *Id.* at 124:24-125:15. As for Williams's █████████████████ filter, his
12 report purported to justify this filter as excluding "████████████████████████████████
13 ██████." Ex. 1, Williams Rep. ¶397(e) n.631. But he admitted that, in reality, this filter could not
14 "tell [him anything] about the life cycle of firms," Ex. 2, 6/24 Williams Tr. 143:3-16. In the end,
15 Williams's selection criteria did nothing to select comparable firms, and left him comparing Meta
16 to a set of overwhelmingly foreign companies that he knows almost nothing about and that he has
17 not even attempted to justify as legitimate comparators.
18      Courts routinely exclude yardstick studies for just these reasons (even where the
19 comparisons are far closer than here). Comparing Meta, which earns substantially all of its
20 revenues from advertising, to companies that do not sell ads and "offer[] a very large number of
21 other diversified products and services" that Meta does not provides the jury "absolutely nothing"
22 of value. *Loeffel*, 387 F. Supp. 2d at 813. Neither does attempting to compare Meta's profits across
23 broad geographies to Chinese, Japanese, and Polish firms. *See Muffett*, 2012 WL 12827492, at *3
24 (excluding yardstick study where expert offered no "consideration or evidence suggesting that
25 Yakima[, WA] is a similar market to La Habra[, CA], Anaheim, or Seattle"); *CDW*, 906 F. Supp.
26 2d at 824-25 (same regarding comparison of Indianapolis firm to firms in other Midwestern cities).
27 Williams's yardsticks, and the process by which he selected them, are junk science that will be of
28 no assistance to the jury, and his studies based on them must therefore be excluded.

**PUBLIC REDACTED VERSION**

### B. Even If The "Yardsticks" Were Legitimate (They Are Not), Williams's Studies Are Unreliable Because He Examines Meta's Profits, Not Its Prices

Even if Williams had selected legitimate yardstick firms (and he decidedly did not), his analysis would independently fail because of its basic methodological premise: it looks only at Meta's profits, rather than its prices, to determine a price overcharge. Ex. 2, 6/24 Williams Tr. 44:9-13. There are three levers that influence a firm's profitability: price, costs, and of course output—as Williams recognized. *See id.* at 20:12-16 ("Meta's profits can be a function of its costs as well as its revenues."). Yet Williams's yardstick studies entirely ignore two of those three levers. He simply assumes that if Meta's profits had been lower in the but-for world, that reduction in profitability would have come about entirely from a decrease in revenue. *Id.* at 32:2-9 ("Q. In your but-for world, Meta's excess EPRs would come to match the yardstick EPRs based entirely through a reduction in revenue, correct? A. That is correct."). And he assumes that the reduction in revenue would have come about entirely through a decrease in the price of social advertising. *Id.* at 66:5-9 (Q. And the excess revenues or the – the revenues are reduced by – only by reducing the price, right? A. That is correct. Quantity is held constant."). Williams has not, and cannot, provide any basis for making these assumptions. And as pure speculation, they must be excluded. *See Daubert*, 509 U.S. at 590 (expert may not rely on "subjective belief or unsupported speculation").

As a result, the essential premise of Williams's analysis—that a supposed reduction in Meta's profits he believes would have come about in the but-for world can be converted, dollar-for-dollar, into a reduction in advertising prices—is baseless.[2] Consequently, Williams's yardstick

---

[2] Williams does not even focus on the right Meta profits. His studies examined Meta's profits from all forms of advertising it sells. *See* Ex. 1, Williams Rep. ¶¶390-95. But Advertisers allege that Meta monopolizes a submarket of the broader online advertising market that Advertisers call "social" advertising, and under Advertisers' own theory concededly not all ads Meta sells are "social." *See* Ex. 4, Fasser Tr. 97:8-12 (Advertisers' industry expert testifying that ads "placed on Facebook Marketplace that a user would encounter based on their entering of a search term … constitute search advertising"); *id.* at 82:15-83:1 (testifying that ads purchased through the Facebook Audience Network were only "social advertis[ements]" if "placed on other social media networks"); Ex. 5, Gans Tr. 94:6-11 (agreeing that "ads that target purely on age and location" are not "ads that use data on social connections between users"); *United States v. Google LLC*, --- F. Supp. 3d ---, 2024 WL 3647498, at *36 (D.D.C. Aug. 5, 2024) (finding that some Meta ads "qualify" as "search ads"). Williams is thus attempting to divine a price overcharge for social advertising from Meta's profits from the sale of both "social" and non-"social" ads.

1  studies provide no information about whether or how the challenged conduct affected Meta's
2  social advertising prices. The entire study is "based on assumptions … not supported by the
3  evidence" and should be excluded. *In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at
4  *9 (N.D. Cal. Aug. 28, 2023).

      **C.** **Even If The "Yardsticks" Were Legitimate (They Are Not) And Even If He Had Successfully Determined An Overcharge Based On Profits (He Did Not), Williams Fails To Control For Lawful Factors Affecting Profits**

      Williams's yardstick studies also flunk the "most important[]" requirement for a "yardstick methodology," which is "to control for any factors that might have influenced [a firm's] profit performance that are competitively neutral or even procompetitive." Areeda & Hovenkamp, *Antitrust Law* ¶397 (2023). A yardstick study that fails to control for such factors is "worthless" and irrelevant because it cannot possibly show that any difference is "attributable to the defendant's misconduct." *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998); *Kentucky v. Marathon Petrol. Co.*, 464 F. Supp. 3d 880, 894 (W.D. Ky. 2020) ("yardstick approach" not "admissible" where it failed to "control for the major differences … that could impact the market price"); *El Aguila Food Prod., Inc. v. Gruma Corp.*, 301 F. Supp. 2d 612, 625 (S.D. Tex. 2003) (excluding model that characterized all variance from benchmark as "a result of an antitrust injury" and "ignore[d] market realities and other externalities" that could have caused variance), *aff'd*, 131 F. App'x 450, 453 (5th Cir. 2005).

      As Williams concedes, profit rates are influenced by a wide array of factors " █████ █████," including " █████ █████ ." Ex. 1, Williams Rep. ¶382; Ex. 3, 9/23 Williams Tr. 70:12-72:25 (agreeing that a firm could " █████ █████ █████ "). Yet, he made no effort to control for these other factors. Instead, he assumed that the challenged conduct—and nothing else—raised Meta's profits (and, he guessed, its prices). Ex. 2, 6/24 Williams Tr. 39:19-40:1.

      Therefore, Williams's study does not—and cannot—speak to the reasons for Meta's profits, let alone its prices. This renders his methodology wholly unreliable and irrelevant to boot.

**PUBLIC REDACTED VERSION**

1  *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 975 (C.D. Cal. 2012) (excluding yardstick
2  study that "simply assume[d]—without further examination—that the difference" observed was
3  "due entirely to [the] allegedly anticompetitive conduct" and did "not account for *any* other
4  possible explanation(s) for this disparity"). Williams's opinions have been excluded on this basis
5  before, yet he repeats the same error here. *See Grasshopper House, LLC v. Clean & Sober Media
6  LLC*, 2019 WL 12074086, at *12 (C.D. Cal. July 1, 2019) ("Dr. Williams' methodology is also
7  deficient for failing to consider … other factors" affecting profitability other than the alleged
8  misconduct.).

9    Williams attempts to excuse his failure to "independently evaluate" factors "like
10  innovation, R&D, management quality and human capital," by claiming that those factors are
11  already purportedly "baked into the apples to apples comparison and EPR analysis." Ex. 2, 6/24
12  Williams Tr. 105:7-107:8. To Williams, EPRs "███████████████████████████████
13  ███████████" between firms (whether comparable or not) and implicitly "█████████████
14  █████████████████████████████████████████████████████." Ex. 1, Williams
15  Rep. ¶¶374-75. This is economic nonsense. Literature Williams elsewhere relies on confirms that
16  entirely lawful factors like offering innovative and high-quality products contribute directly to
17  firms' EPRs and thereby refutes Williams's claim that EPRs somehow normalize these lawful
18  factors across firms. *See* Ex. 6, Tim Koller et al., *Valuation: Measuring and Managing the Value
19  of Companies* (2020) at 40-41, 129, 131. Common sense does the same. Williams's use of EPRs
20  cannot excuse his failure to control for lawful factors affecting Meta's profit rate and his yardstick
21  studies must be excluded. *Marathon Petrol.*, 464 F. Supp. 3d at 894; *In re Live Concert*, 863 F.
22  Supp. 2d at 975; *El Aguila Food*, 301 F. Supp. 2d at 625.

23  **II.   WILLIAMS'S "DURING-AFTER" MODEL IS JUNK SCIENCE**

24    Williams's so-called "during-after" model should be excluded for the same reasons as his
25  yardstick studies. The same methodological failures pervade this study, which merely conducts an
26  identical set of yardstick studies twice over two time periods. *See* Ex. 2, 6/24 Williams Tr. 153:11-
27  154:3 ("It's using the exact same model that is a – like, a – a yardstick model. It's using the exact
28  same implementation of that model, that is, um, the use of economic profit rates.").

**PUBLIC REDACTED VERSION**

1    Williams also introduces two additional errors that independently warrant exclusion of the
2  during-after model. *First*, he failed to adhere to the "basic econometric principle" that a
3  benchmarking analysis conducted over two time periods must "select[] a benchmark period that is
4  reasonably free of misconduct so that it can serve its fundamental purpose—to act as a baseline
5  such that conclusions can be drawn about how anticompetitive conduct impacted prices in the
6  damages period." *Persian Gulf Inc. v. BP West Coast Prods. LLC*, 632 F. Supp. 3d 1108, 1166
7  (S.D. Cal. 2022). But according to Williams, the "████████████████████████████████████
8  ████████████████████████████████████████," making the "████████████████████████████
9  ████████████████████████████." Ex. 1, Williams Rep. ¶¶387-88. By his own admission then,
10 2022-2023 "is not an approximation of a 'clean period' under any metric." *Persian Gulf*, 632 F.
11 Supp. 3d at 1167. Williams has thus constructed a damages model "divorced from the reality of
12 the case that [Advertisers] are actually trying to prove"—which is again a problem with which
13 Williams is familiar. *Id.* (excluding Williams's damages model for failure to identify a clean
14 benchmark period). The during-after model "is thus not sufficiently tied to [Advertisers'] liability
15 case to help the factfinder," *id.* at 1167-68, and must therefore be excluded, *see Daubert*, 509 U.S.
16 at 591.

17    *Second*, the during-after model fails to examine any differences between the two time
18 periods that could have affected either Meta's or the yardsticks' EPRs. Ex. 2, 6/24 Williams Tr.
19 167:4-168:2; *id.* at 154:23-156:2. The "analysis accounts for no independent variables other than
20 time" and "impermissibly *assumes*" that the profitability differential observed across the time
21 periods "is due entirely to [Meta's] anticompetitive conduct." *In re Live Concert*, 863 F. Supp. 2d
22 at 978. This error, too, requires that the analysis be excluded. *Id.*

23 **III.   WILLIAMS HAS FAILED TO COHERENTLY DEFINE A PRODUCT MARKET**

24    Williams claims "social advertising" as the relevant market but fails to articulate a coherent
25 definition of that market or reliably apply *any* definition. Ex. 1, Williams Rep. ¶21. Williams first
26 defined "social advertising" as "████████████████████████████████████████████████
27 ████████████'" *Id.* ¶27. He subsequently testified that it is "possible" for an ad to "constitute
28 social advertising even if it does not use social data contained in a social graph." Ex. 7, 2/24

**PUBLIC REDACTED VERSION**

1  Williams Tr. 21:12-23. And inversely, he testified that he "[does not] have an opinion" on whether
2  "there could be ads that use social data contained in the social graph but that do not constitute
3  social advertising." *Id.* at 23:2-19. That means an ad targeted based on social data within a social
4  graph is not necessarily social advertising—and selling social advertising does not necessarily
5  mean an advertising provider has or uses a social graph for ad targeting.

6       An expert's market definition opinions should be excluded when they "appl[y] an
7  unreliable methodology" to determine which products "should be included in the relevant product
8  market." *In re Live Concert*, 863 F. Supp. 2d at 996. Williams has not identified any criteria that
9  would allow the factfinder to determine what is and what is not social advertising. And if it is not
10 possible to reliably determine what is or is not social advertising, then it is not possible to determine
11 what is in or outside of the market. It is no surprise, then, that when Williams's report analyzes
12 which firms fall within or outside his market, his definition of the "social advertising" product
13 virtually disappears. The term "social data" *never* appears in Section II.D of his report (where he
14 explains why search, YouTube, and display advertising are not "social"), and he asserts that
15 various firms "sell social advertising" without ever once analyzing whether they have social data
16 contained in social graphs that can be used for ad targeting. *See* Ex. 1, Williams Rep. §II.C.

17      Williams appears to have excluded several firms that fit his proffered definition of "social
18 advertising" without explanation. Williams's definition of a "social graph" encompasses all sorts
19 of firms outside of his purported market. He states that a "social graph" is a collection of
20 information that includes "[REDACTED]," "[REDACTED]"
21 and "[REDACTED]." Ex. 1, Williams Rep. ¶27. Significant advertising competitors such as
22 Amazon, Google (including YouTube), and Apple obviously have users, data about users'
23 connections to one another and to content, and data about users and content. And they have "social
24 data," because, according to Williams, "social data" includes *any* information on a user that is
25 contained in a social graph. *See* Ex. 7, 2/24 Williams Tr. 28:7-13 ("Q. Is it fair to say that in all the
26 work that you've done in this case, you have not identified any data that would be organized in a
27 social graph that would not constitute social data, under your definition of the term as you applied
28 it? A. I can't think of any right now."). Amazon, Google, and Apple therefore have social graphs,

**PUBLIC REDACTED VERSION**

as Williams has defined that term, all sell ads, and all would belong in the purported market, as Williams has defined its bounds; yet they are excluded based on Williams's *ipse dixit*.

Williams's approach to populating the "social advertising" market is not a valid method for an expert market definition analysis. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *In re Google Play Store*, 2023 WL 5532128, at *10. Here, "[t]he relevant product market proposed … is too amorphous" and is therefore "wholly inadequate." *Carter Hawley Hale Stores, Inc. v. Ltd., Inc.*, 587 F. Supp. 246, 253 (C.D. Cal. 1984); *see also United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1159 (N.D. Cal. 2004) (rejecting proposed market lacking clear criteria "that could be used to determine the distinction" between in- and out-of-market products).

The decision in *In re Live Concert* is instructive. There, plaintiffs' expert defined the market as "live rock music concerts," and had to decide "which concerts qualify as 'rock' concerts, such that they should be included in the market as defined." 863 F. Supp. 2d at 994. To do so, he "relied on his own subjective opinion in order to determine which performers qualify as 'rock' artists" and thus belonged in the market. *Id*. The court excluded his market definition opinion because he necessarily "applied an unreliable methodology in determining whether every concert at issue in this litigation qualified as a 'rock' concert, which should be included in the relevant product market." *Id.* at 996. Likewise, Williams in this case has "applied an unreliable methodology" by using his "subjective opinion in order to determine which" advertising providers and ad products they offer qualify as "social advertising" which should be included in the relevant product market—indeed, Williams appears to have followed no methodology at all. As in *In re Live Concert*, that "fatally undermines [his] definition of the relevant product market in its entirety." *Id.* at 996-97.

IV. **WILLIAMS'S HYPOTHETICAL MONOPOLIST AND SSNIP TEST IS JUNK SCIENCE**

Williams's report asserts that his market of "social" advertising is supported by what he describes as an application of the Merger Guidelines' hypothetical monopolist test ("HMT"). But that is not what Williams did. An HMT, properly applied, determines whether a "hypothetical

**PUBLIC REDACTED VERSION**

1  profit-maximizing firm … that was the only present and future seller of a group of products …
2  likely would undertake at least a small but significant and non-transitory increase in price
3  ('SSNIP') … for at least one product in the group." U.S. Dep't of Just. & FTC, *Merger Guidelines*
4  § 4.3 (2023). To that end, a properly conducted SSNIP test must evaluate whether "a significant
5  number of customers would respond to a SSNIP *by purchasing substitute products*" outside the
6  proposed market. *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1002 (9th Cir.
7  2008). SSNIP tests normally examine evidence that bears on consumer substitution, like "past
8  consumer-demand data and/or consumer-survey responses." *Epic Games, Inc. v. Apple, Inc.*, 67
9  F.4th 946, 975 (9th Cir. 2023). To Meta's knowledge, no court has accepted a comparison of firms'
10 profits, especially when the comparison is with firms wholly outside the proposed market, as a
11 SSNIP.
12      Williams's so-called SSNIP test should be excluded because it is not in fact a SSNIP test,
13 as it fails to assess customer substitution as a SSNIP test must. Williams never analyzes whether,
14 in response to a price increase by a monopolist of social advertising, customers would substitute
15 with purchases from other firms. He never analyzes which firms they would substitute to. And he
16 never analyzes whether those substitutions would render a SSNIP unprofitable. As he agreed, he
17 "did not analyze or quantify the percent decrease in the quantity purchased of ads, either from
18 Meta, in a Meta-only candidate market, or from all the firms in [his] candidate social advertising
19 market as a result of a price increase." Ex. 7, 2/24 Williams Tr. 179:4-24. He therefore did not
20 conduct a SSNIP test.
21      Courts routinely exclude self-styled SSNIP tests like Williams's where they replace the
22 established process for conducting such a test with brand-new, made-for-litigation alternatives that
23 lack a foundation in economics or case law. In *Sumotext Corp. v. Zoove, Inc.*, for example, the
24 court excluded an expert's supposed "natural SSNIP test." 2020 WL 6544410, at *7-9 (N.D. Cal.
25 Nov. 6, 2020), *aff'd*, 2021 WL 4988024 (9th Cir. Oct. 27, 2021), *cert. denied*, 142 S. Ct. 2836
26 (2022). Much like here, the expert did not analyze customer substitution in response to price
27 increases. Instead, he based his self-styled SSNIP test on "comparing, over time, prices of" the
28 defendant's product to prices for three expert-selected comparator products. *Id.* at *7. Because that

**PUBLIC REDACTED VERSION**

was not "grounded in any accepted methodology for conducting a market analysis," the court properly excluded it. *Id.* at *9. Likewise, in *Kentucky Speedway, LLC v. National Ass'n of Stock Car Auto Racing, Inc.*, the Sixth Circuit held that the district court properly excluded an expert's so-called SSNIP test because it did not analyze "whether a price increase at a particular point in time would result in consumer substitution of an alternative product" but instead consisted of the expert's "own version of the SSNIP test," which "was produced solely for th[e] litigation." 588 F.3d 908, 918-19 (6th Cir. 2009) (internal quotation marks omitted). Williams's analysis is of a piece with these junk SSNIP tests and so should likewise be excluded.

## CONCLUSION

For the foregoing reasons, the Court should exclude Williams' testimony.

Dated: December 30, 2024

Respectfully submitted,

By: */s/ Sonal N. Mehta*
SONAL N. MEHTA

*Attorney for Defendant Meta Platforms, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of December, 2024, I electronically transmitted the public redacted version of the foregoing document to the Clerk's Office using the CM/ECF System and caused the version of the foregoing document filed under seal to be transmitted to counsel of record by email.

By:   */s/ Sonal N. Mehta*
         Sonal N. Mehta