**PUBLIC REDACTED VERSION**

1

WILMER CUTLER PICKERING
  HALE AND DORR LLP

2

SONAL N. MEHTA (SBN 222086)
  Sonal.Mehta@wilmerhale.com

3

2600 El Camino Real, Suite 400

4

Palo Alto, California 94306
Telephone: (650) 858-6000

5

DAVID Z. GRINGER (*pro hac vice*)

6

  David.Gringer@wilmerhale.com
ROSS E. FIRSENBAUM (*pro hac vice*)

7

  Ross.Firsenbaum@wilmerhale.com
RYAN CHABOT (*pro hac vice*)

8

  Ryan.Chabot@wilmerhale.com

9

PAUL VANDERSLICE (*pro hac vice*)
  Paul.Vanderslice@wilmerhale.com

10

7 World Trade Center
250 Greenwich Street

11

New York, New York 10007

12

Telephone: (212) 230-8800

ARI HOLTZBLATT (SBN 354631)
  Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
  Molly.Jennings@wilmerhale.com
2100 Pennsylvania Ave NW
Washington, DC 20037
Telephone: (202) 663-6000

MICHAELA P. SEWALL (*pro hac vice*)
  Michaela.Sewall@wilmerhale.com
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

13

14

*Attorneys for Defendant Meta Platforms, Inc.*

15

**UNITED STATES DISTRICT COURT**

16

**NORTHERN DISTRICT OF CALIFORNIA**

17

**SAN FRANCISCO DIVISION**

18

19

MAXIMILIAN KLEIN, et al., on behalf of
themselves and all others similarly situated,

20

Plaintiffs,

21

v.

22

META PLATFORMS, INC., a Delaware
Corporation,

23

24

Defendant.

25

Case No. 3:20-cv-08570-JD

**DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY AND OPINIONS OF TILMAN KLUMPP**

Hearing Date: To Be Determined
Time: To Be Determined
Judge: Hon. James Donato

26

27

28

**PUBLIC REDACTED VERSION**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION ...................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................1

INTRODUCTION .....................................................................................................................1

ARGUMENT..............................................................................................................................2

I.      KLUMPP'S OPINIONS ABOUT CONDUCT CONTRIBUTING TO THE ALLEGED
MONOPOLY MAINTENANCE ARE SPECULATIVE, UNRELIABLE AND INADMISSIBLE ..............2

     A.    Klumpp's Speculation About What The FTC Would Have Done Had It
Known About Meta's F3 Project Should Be Excluded ...........................................2

     B.    Klumpp's Opinion That Meta Misappropriated Trade Secrets Through The
Facebook Research App Is Inadmissible Legal Analysis ........................................4

     C.    Klumpp's Opinion That Contract Counterparties Reduced Investment In
Competing Products Based On Litigation Risk Has No Basis In
Economics.................................................................................................................7

     D.    Klumpp Cannot Reliably Opine On Agreements He Never Read,
Especially When They Do Not Exist .......................................................................8

II.     KLUMPP'S OPINIONS SHOULD BE EXCLUDED BECAUSE HE ERRONEOUSLY
CONFLATES MONOPOLY MAINTENANCE WITH ANTICOMPETITIVE EFFECT........................10

CONCLUSION.........................................................................................................................11

<u>PUBLIC REDACTED VERSION</u>

<u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Aguilar v. Int'l Longshoremen's Union Loc. No. 10*,
  966 F.2d 443 (9th Cir. 1992) ...................................................................................................7

*AIG Ret. Servs., Inc. v. Altus Fin. S.A.*,
  2011 WL 13213589 (C.D. Cal. Sept. 26, 2011) .......................................................................3

*Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*,
  805 F.3d 701 (6th Cir. 2015) ...................................................................................................5

*Atmel Corp. v. Info. Storage Devices, Inc.*,
  189 F.R.D. 410 (N.D. Cal. 1999)..............................................................................................5

*CFM Commc'ns, LLC v. Mitts Telecasting Co.*,
  424 F. Supp. 2d 1229 (E.D. Cal. 2005).....................................................................................4

*CZ Servs. v. Express Scripts Holding Co.*,
  2020 WL 4518978 (N.D. Cal. Aug. 5, 2020) ........................................................................6, 7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993)..................................................................................................................1

*Diviero v. Uniroyal Goodrich Tire Co.*,
  114 F.3d 851 (9th Cir. 1997) ...................................................................................................9

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023) ..................................................................................................10

*FTC v. Meta Platforms, Inc.*,
  No. 1:20-cv-3590-JEB (D.D.C.) ...............................................................................................4

*In re Google Play Store Antitrust Litig.*,
  2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) ..........................................................................2

*Maldonado v. Apple, Inc.*,
  2021 WL 1947512 (N.D. Cal. May 14, 2021)...........................................................................8

*Moement, Inc. v. Groomore, Inc.*,
  2024 WL 4830589 (C.D. Cal. Oct. 29, 2024)............................................................................6

*Ollier v. Sweetwater Union High Sch. Dist.*,
  768 F.3d 843 (9th Cir. 2014) ...................................................................................................7

*PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd.*,
  2011 WL 5417090 (N.D. Cal. Oct. 27, 2011)...........................................................................7

**PUBLIC REDACTED VERSION**

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
　　32 F.4th 824 (9th Cir. 2022) ...................................................................................................10

*In re Rezulin Prods. Liab. Litig.*,
　　309 F. Supp. 2d 531 (S.D.N.Y. 2004).......................................................................................4

*State of New York v. Deutsche Telekom AG*,
　　419 F. Supp. 3d 783 (S.D.N.Y. 2019).......................................................................................3

*Twin Cities Bakery Workers Health & Welfare Fund v. Biovail Corp.*,
　　2005 WL 3675999 (D.D.C. Mar. 31, 2005)..............................................................................3

*United States v. Apple, Inc.*,
　　No. 1:12-cv-02826, Dkt. 262 (S.D.N.Y May 24, 2013) ..........................................................11

*United States v. Apple, Inc.*,
　　No. 1:12-cv-02826, Dkt. 265 (S.D.N.Y May 31, 2013) ..........................................................11

*United States v. Tamman*,
　　782 F.3d 543 (9th Cir. 2015) ...................................................................................................6

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
　　540 U.S. 398 (2004).................................................................................................................10

*WeRide Corp. v. Kun Huang*,
　　379 F. Supp. 3d 834 (N.D. Cal. 2019), *modified in part*, 2019 WL 5722620
　　(N.D. Cal. Nov. 5, 2019)...........................................................................................................6

*Williamson Oil Co. v. Philip Morris USA*,
　　346 F.3d 1287 (11th Cir. 2003) ...............................................................................................10

**STATUTES, RULES, AND REGULATIONS**

Fed. R. Evid. 702 ..............................................................................................................................1

**OTHER AUTHORITIES**

FTC, *A Brief Overview of the Federal Trade Commission's Investigative Law
　　Enforcement, and Rulemaking Authority*, https://www.ftc.gov/about-
　　ftc/mission/enforcement-authority..........................................................................................4

PUBLIC REDACTED VERSION

1

## NOTICE OF MOTION AND MOTION

2    PLEASE TAKE NOTICE that on a date to be determined by the Court, Defendant Meta

3 Platforms, Inc. will move for an order granting Meta's Motion to Exclude the Expert Testimony

4 and Opinions of Advertiser Plaintiffs' putative expert Tilman Klumpp.

5    Pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals,*

6 *Inc.*, 509 U.S. 579 (1993), and its progeny, Meta respectfully requests that the Court exclude the

7 testimony and opinions of Tilman Klumpp, contained in both his opening and rebuttal reports, in full.

8

## MEMORANDUM OF POINTS AND AUTHORITIES

9

## INTRODUCTION

10    Advertisers offer Dr. Tilman Klumpp to support their theory that a grab bag of unrelated

11 conduct, including imagined agreements and internal database management, somehow contributed

12 to the maintenance of a monopoly over "Social Advertising."  But rather than rely on his economic

13 training to assess whether such actions (when they occurred at all) actually harmed competition,

14 Klumpp offers a series of speculative pronouncements that have nothing to do with his supposed

15 expertise, then pivots to inadmissible legal commentary about trade secrets he cannot describe and

16 agreements he has never read. And nowhere in his hundreds of pages of reports does Klumpp

17 address whether the alleged conduct actually *harmed consumers*—instead, he concedes that all of

18 his opinions are premised on the fundamentally mistaken view that having a monopoly, standing

19 alone, results in anticompetitive effects. That is wrong as a matter of both law and economics.

20 Klumpp's opinions and testimony should be excluded in full.

21    First, Klumpp opines that Meta did not tell the FTC about a ▇▇▇▇▇▇▇▇▇▇▇▇▇▇

22 ▇▇▇▇▇▇  that, if better publicized, would have caused the agency to order the divestiture of

23 WhatsApp and/or Instagram. But what the FTC might have done is speculation about hypothetical

24 agency action, not economic analysis. Second, Klumpp says that Meta improperly acquired data

25 about how people use Snapchat, and that some aspect of that data (which aspect is never said)

26 constituted a trade secret. Whether Meta misappropriated a trade secret requires legal and technical

27 analysis that Klumpp did not—and is not qualified to—perform. Third, Klumpp asserts that Meta

28 used restrictive contractual language to prevent the development of competing products, but his

**PUBLIC REDACTED VERSION**

1  statements about how Meta or counterparties might interpret contractual terms are both speculative

2  and improper legal analysis. Finally, Klumpp opines that Meta entered into contracts with Netflix

3  and Google that limited competition. These opinions are again pure speculation, and inherently

4  unreliable because Klumpp never reviewed the relevant agreements—it is, of course, impossible

5  for anyone to reliably assess the terms of a deal without reviewing the actual language.

6       Klumpp's opinions are "junk science"; they are nothing more than raw speculation and

7  *ipse dixit* that should not go to the factfinder.

8                                **ARGUMENT**

9  **I.    KLUMPP'S OPINIONS ABOUT CONDUCT CONTRIBUTING TO THE ALLEGED MONOPOLY
        MAINTENANCE ARE SPECULATIVE, UNRELIABLE AND INADMISSIBLE**

10      Klumpp does not use any economic methodology to support his assertion that the

11  challenged conduct allowed Meta to maintain monopoly power. He instead speculates beyond his

12  knowledge and expertise, and then offers inadmissible legal conclusions. Such testimony provides

13  nothing useful to the factfinder, does not "rest[] on a reliable foundation," and must be excluded.

14  *In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *5 (N.D. Cal. Aug. 28, 2023)

15  (Donato, J.).

16      **A.    Klumpp's Speculation About What The FTC Would Have Done Had It
              Known About Meta's F3 Project Should Be Excluded**

17

18      Klumpp, a Canadian economics professor, first makes a series of guesses about what the

19  FTC might have done if it had different information about the "Facebook Feature Framework" or

20  "F3"—an improvement of Meta's machine learning infrastructure that Advertisers describe as a

21  "███████████████████████" Ex. 1, Klumpp Rep. ¶¶171, 179.[1] He claims that during

22  a ██████████████████████████████████████████████████████████

23  ██████████████████████████████████████████████████████████

24  ██████████████████" *Id.* ¶¶178-80. And he asserts that if the FTC had known the

25  supposed truth about Meta's "████████████████████████████████

26  ██████████████████████████████████████████████████████████

27  _____

28  [1] Unless otherwise noted, "Ex." citations reference exhibits to the Gringer Declaration submitted
    herewith, emphasis is added, and objections are omitted for deposition citations.

**PUBLIC REDACTED VERSION**

1  ████████████████████████████████████████████████████

2  ██████████████" thereby increasing competition in the alleged social advertising market and

3  eroding Meta's alleged monopoly. *Id.* ¶182.

4          In deposition, Klumpp repeatedly conceded that his testimony about the FTC is entirely

5  speculative. He admits he has never worked at the FTC, has not spoken to anyone at the FTC

6  regarding this issue, and has not reviewed any documents about how the FTC may have viewed

7  any alleged misrepresentations. Klumpp can only guess what impact—if any—the alleged

8  misrepresentation had on the FTC:

9          Q.  Do you know if the FTC believed any of these misrepresentations?
           A.  I am not the FTC, sir. I have not worked for the FTC. I can't opine on what they
10             believed or not believe.

11  Ex. 2, Klumpp Tr. 196:17-22.

12         Q.  Right. But my—I'm now asking you, there's no way you can know, and you
               don't know, whether what Mr. Parikh said had any effect on anyone at the FTC.
13             Correct?
           A.  I can't look into the FTC's mind.
14

15  *Id.* at 209:10-15.

16         Q.  Did anyone at the FTC ever tell you that they did not take certain actions as a
               result of the supposed misrepresentation that Facebook made?
17         A.  I haven't talked to anyone at the FTC about whether they took actions or didn't
               take actions.
18         Q.  Have you read any documents that say that the FTC did not take certain actions
               as a result of the supposed misrepresentation that Facebook made?
19         A.  I don't recall seeing documents that indicate that.

20  *Id.* at 197:7-15.

21         Because Klumpp's opinion as to what the FTC might have done under hypothetical facts

22  "amount[s] to mere speculation regarding [the FTC's] future behavior," it should be excluded as

23  inherently inadmissible, unreliable, and speculative. *State of New York v. Deutsche Telekom AG*,

24  419 F. Supp. 3d 783, 791 (S.D.N.Y. 2019) (holding that irrelevant or unreliable expert testimony

25  predicting future FCC regulatory action would be excluded). Indeed, courts "routinely reject[]"

26  the type of conjecture offered by Klumpp about what an agency likely would have done under a

27  hypothetical set of facts because it is "unreliable and speculative." *AIG Ret. Servs., Inc. v. Altus*

28  *Fin. S.A.*, 2011 WL 13213589, at *2 (C.D. Cal. Sept. 26, 2011) (citing *Twin Cities Bakery Workers*

**PUBLIC REDACTED VERSION**

1   *Health & Welfare Fund v. Biovail Corp.*, 2005 WL 3675999 (D.D.C. Mar. 31, 2005) (opinions

2   regarding what the FDA would do under a particular set of facts were speculative, unreliable, and

3   inadmissible); *CFM Commc'ns, LLC v. Mitts Telecasting Co.*, 424 F. Supp. 2d 1229, 1236 (E.D.

4   Cal. 2005) (excluding expert opinions predicting the future actions of the FCC as speculative); *In*

5   *re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 545-46, 556-57 (S.D.N.Y. 2004) (concluding

6   that expert opinions on what the FDA might have done in hypothetical circumstances are

7   speculative and inadmissible).

8          Not only does Klumpp speculate as to what the FTC would have done, but his guess that

9   the FTC would order Meta to immediately divest Instagram and/or WhatsApp assumes the FTC

10  would act beyond its authority. The FTC *cannot* unilaterally compel divestiture. *See* FTC, *A Brief*

11  *Overview of the Federal Trade Commission's Investigative, Law Enforcement, and Rulemaking*

12  *Authority*, https://www.ftc.gov/about-ftc/mission/enforcement-authority (last visited Dec. 30,

13  2024) ("Divestiture orders become final after all judicial review is complete."). And even where

14  the FTC seeks divestiture, resolution often takes years, as evidenced by the FTC's lawsuit against

15  Meta in the District of Columbia seeking the divestiture of Instagram and/or WhatsApp, which has

16  been pending for over four years. *See FTC v. Meta Platforms, Inc.*, No. 1:20-cv-3590-JEB

17  (D.D.C.).

18         **B.**    **Klumpp's Opinion That Meta Misappropriated Trade Secrets Through The
                    Facebook Research App Is Inadmissible Legal Analysis**

19
           Klumpp, a non-lawyer, next offers the baseless legal opinion that Meta misappropriated

20
    trade secrets when collecting data about Snap through the Facebook Research App ("FBR App").[2]

21
    Klumpp employs no economic or technical analysis to reach that conclusion—he cannot even

22
    identify what the supposed trade secrets are. Instead, he seeks to apply the U.S. Patent and

23
    Trademark Office's definition of "trade secret" to facts he does not know or understand, then draws

24
    legal conclusions he is not qualified to make. Ex. 1, Klumpp Rep. ¶59. That is not admissible

25
    expert testimony.

26
           ***First***, Klumpp is an economist and lacks the technical and legal expertise necessary to

27
    ---

28  [2] Advertisers refer to data collected through the FBR App as coming from Meta's In-App Action
    Panel (IAAP) program. Ex. 2, Klumpp Tr. 78:19-79:9.

**PUBLIC REDACTED VERSION**

1  apply the USPTO's criteria. Klumpp's entire analysis is confined to a single paragraph outlining

2  the USPTO's three criteria for information constituting a trade secret, including whether the

3  information at issue (i) is generally known; (ii) can be legitimately obtained; and (iii) is subject to

4  reasonable efforts to maintain its secrecy, and claiming the data at issue meets them. *See* Ex. 1,

5  Klumpp Rep. ¶58. But Klumpp cannot, and concededly does not, make that assessment based on

6  any *economic* tools.

7         On the first USPTO criteria, Klumpp conceded that economic theory cannot establish

8  whether a particular piece of information is "generally known" to competitors (or anyone). Ex. 2,

9  Klumpp Tr. 129:19-130:9 (agreeing that he "didn't offer an economic analysis in determining

10  whether or not the information at issue was generally known"). Klumpp admittedly applied no

11  economic reasoning in reaching this opinion:

12         Q. What economic analysis can you conduct to determine whether information is
              generally known?
13         A. Well, I mean, that's—that doesn't require any—any economic theories. It's a
              fact. So the information—if the information is encrypted, it's not general—if
14            the information is encrypted and somebody makes an investment—and I'm
              using Mr. Zuckerberg's words here, so 'investment' is not my word. So another
15            entity makes an investment to acquire that information, then it can't be
16            generally known.

17  *Id.* at 128:12-22. By his own admission, the issue is one of fact and does not require application of

18  economic theories. *See Atmel Corp. v. Info. Storage Devices, Inc.*, 189 F.R.D. 410, 416 (N.D. Cal.

19  1999) (excluding industry expert's opinion on whether information was "generally known" where

20  he had not "educat[ed] himself on the universe of literature in the relevant time frame … or [on]

21  what others in the industry generally knew").

22         Economic theory also does not address whether access to information can be "legitimately

23  obtain[ed]." That requires examination of legal rights and technical considerations like whether

24  information could be obtained through alternative sources, like "reverse engineering" or

25  "observation of the item." *See, e.g.*, *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg.,*

26  *Inc.*, 805 F.3d 701, 704 (6th Cir. 2015). Here again, Klumpp conceded that he did no economic

27  analysis and instead relied only on the fact that the information was supposedly encrypted. Ex. 2,

28  Klumpp Tr. 130:25-132:9 ("Q. What economic analysis did you conduct to reach that opinion?

**PUBLIC REDACTED VERSION**

1   A. … Encrypted traffic means it's protected information. Snapchat—sorry, Snapchat encrypted

2   that traffic. So unless Mr. Zuckerberg obtains Snapchat's consent or Facebook obtained Snapchat

3   consent to acquire that information and decrypt it, it's not legitimately obtainable by Facebook, is

4   my conclusion. And with that, the second element of this definition, from an economic perspective,

5   I make a checkmark there.").

6           Finally, there is no economic methodology or theory for evaluating whether "efforts to

7   maintain" information's "secrecy" are "reasonable," which requires analyzing technical measures

8   employed by the target company to prevent disclosure. *See WeRide Corp. v. Kun Huang*, 379 F.

9   Supp. 3d 834, 847 (N.D. Cal. 2019), *modified in part*, 2019 WL 5722620 (N.D. Cal. Nov. 5, 2019)

10  (listing technical restrictions placed on disclosure of code in assessing reasonableness of efforts to

11  maintain secrecy). This is a fundamentally technical question outside Klumpp's claimed area of

12  expertise. Indeed, Klumpp described the analysis he did do here as "trivial." Ex. 2, Klumpp Tr.

13  143:2-13.

14          ***Second***, Klumpp's ultimate conclusion that Meta improperly obtained "trade secrets"

15  represents an inadmissible legal opinion. "[A]n expert cannot testify to a matter of law amounting

16  to a legal conclusion." *United States v. Tamman*, 782 F.3d 543, 552 (9th Cir. 2015); *CZ Servs. v.*

17  *Express Scripts Holding Co.*, 2020 WL 4518978, at *2 (N.D. Cal. Aug. 5, 2020) (Donato, J.) ("An

18  expert may not give opinions that are legal conclusions, or attempt to advise the jury on the law."

19  (citations omitted)). Here, the term "trade secret" has a specialized legal meaning, as the source

20  from which Klumpp borrows his definition makes clear. Ex. 1, Klumpp Rep. ¶56 (quoting from

21  USPTO policy discussing federal statutory protections for trade secrets). "Because determining if

22  something is a trade secret is a legal conclusion, district courts in this Circuit have held that an

23  expert 'may not testify that certain technology constitutes a trade secret.'" *Moement, Inc. v.*

24  *Groomore, Inc.*, 2024 WL 4830589, at *3 (C.D. Cal. Oct. 29, 2024). Klumpp's assertion that the

25  information obtained through the FBR App "███████████" is just as impermissible. Ex. 1,

26  Klumpp Rep. ¶59. Referencing an "███████████████" while nevertheless opining that conduct

27  "████████████" a legal definition, *id*. ¶58, cannot circumvent that prohibition, *Tamman*,

28  782 F.3d at 553 (relevant question whether testimony "amount[s] to a legal conclusion").

**PUBLIC REDACTED VERSION**

**C.    Klumpp's Opinion That Contract Counterparties Reduced Investment In Competing Products Based On Litigation Risk Has No Basis In Economics**

Klumpp's interpretation of Meta's API agreements has nothing to do with reliable economic analysis and relies on impermissible legal interpretations, technical opinions beyond his expertise, and speculation about how others may have interpreted and reacted to the agreements.

*First*, Klumpp cannot opine on the meaning of Meta's contracts. Klumpp says that supposedly " ███████████████████████████████████████████████████████

████████████████████████████████████████ thereby maintaining Meta's alleged social advertising monopoly. Ex. 1, Klumpp Rep. ¶167. But "[t]he interpretation of a contract is a question of law." *PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd.*, 2011 WL 5417090, at *6 (N.D. Cal. Oct. 27, 2011). "Accordingly, an expert witness should not be allowed to opine on the meaning of a contract or the rights of a party to a contract." *Id.*; *Aguilar v. Int'l Longshoremen's Union Loc. No. 10*, 966 F.2d 443, 447 (9th Cir. 1992) (same). Klumpp nevertheless seeks to offer a legal opinion about the meaning of the API agreements, asserting that they ████████████████████████████████████████████████████

████████████████████████████████████████████████████ Ex. 1, Klumpp Rep. ¶153. That conclusion turns on Meta's right to bring such actions, but "the rights of a party to a contract" are precisely the kind of legal determinations that must be left to the court. *PixArt*, 2011 WL 5417090, at *6; *accord CZ Servs.*, 2020 WL 4518978, at *4 ("[T]estimony about contract compliance would necessarily implicate a legal conclusion.").

*Second*, Klumpp claims that the ████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

Ex. 1, Klumpp Rep. ¶¶163-64. Whether that is so depends on technical and legal questions about, among other things, the data being used and the parties' contractual rights and duties concerning the data at issue—not economic questions—on which Klumpp lacks the expertise to opine. Klumpp's opinion that it would be ████████████████████████████████

██████████████████ is impermissible speculation and should be excluded. *See Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014) (affirming exclusion of

**PUBLIC REDACTED VERSION**

1    experts whose opinions were based on "personal opinions and speculation").

2        ***Third***, Klumpp's ███████████████████████████████████████

3    ███████████████████ is entirely speculative. Klumpp does not cite a single document or

4    line of testimony from these counterparties. Indeed, Advertisers did not even *seek* such evidence,

5    failing to propound a single counterparty deposition notice or document subpoena on the subject.

6    Unsurprisingly, then, Klumpp has no evidence to support his conjecture as to what Meta's

7    counterparties would "likely" have done in the absence of the API agreements.

8        **D.    Klumpp Cannot Reliably Opine On Agreements He Never Read, Especially When They Do Not Exist**

9        Klumpp's two remaining opinions address the purported effects of contracts he has never

10    reviewed. Klumpp's opinions on their effects are therefore irrelevant and unreliable. This is

11    especially true for the Netflix "agreement," which he does not know even exists (it does not).

12        ***First***, Klumpp purports to assess the effects of an alleged unwritten agreement with Netflix.

13    Even setting aside that interpreting a contract involves legal questions not suitable for expert

14    testimony, *supra* pp.7-8, Klumpp never reviewed the alleged agreement in forming his opinions

15    because Advertisers have no evidence that such an agreement existed. Klumpp admits this, stating:

16    "I am not offering an opinion as to whether such an agreement existed. I will, however, analyze

17    the anticompetitive effects of the alleged agreement, assuming it can be shown that the alleged

18    agreement existed." Ex. 1, Klumpp Rep. ¶125. But Klumpp cannot reliably analyze whether the

19    made-up agreement includes terms that give rise to an anticompetitive effect because he cannot

20    review or analyze the purported terms. *See Maldonado v. Apple, Inc.*, 2021 WL 1947512, at *20

21    (N.D. Cal. May 14, 2021) (excluding testimony when "[t]he flaw in [the expert]'s opinion is

22    precisely that the underlying material was *not* communicated to him and he did *not* review it").

23        The Court should not permit Advertisers to introduce—with the imprimatur of expert

24    testimony—opinions that a hypothetical agreement with hypothetical terms that Klumpp never

25    reviewed somehow allowed Meta to maintain its purported monopoly. This is especially true

26    because Klumpp conceded that there were economically rational reasons for Meta reducing its

27    "premium video streaming" budget in the absence of an agreement—as he testified, "I have no

28

1    basis to believe that [Meta's budget cut] was not a rational decision." Ex. 2, Klumpp Tr. 288:21-

2    289:11; *see Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997) (affirming

3    exclusion of expert's opinions as "speculative," in part because of "his inability to dismiss various

4    other possible causes" of the alleged harm).

5            ***Second***, Klumpp's opinions on the Network Bidding Agreement ("NBA") should be

6    excluded. Klumpp says that Meta received favorable terms on bidding for ad impressions through

7    Google's Open Bidding platform to the disadvantage of current or prospective competitors. Ex. 1,

8    Klumpp Rep. ¶¶98-101. According to Klumpp, Google's guarantee to match a Meta user to a

9    certain percentage of bid requests sent to Meta was the "most critical provision" and the "key part

10   of why [he] conclude[s] the agreement was anticompetitive." Ex. 2, Klumpp Tr. 211:3-212:17.

11   But Klumpp acknowledges (as he must) that it is necessary to review each company's terms to

12   assess which are more favorable. *Id.* at 223:16-224:19 ("Q. [I]f I want to assess whether firm F has

13   a better contract with firm G than firm T, I need to know the terms that both firm F and firm T

14   have with firm G. Correct? A. Yes, but, look, I did not—I mean, I—this—what you said may be

15   correct but it's not the opinion that I stated."). And Klumpp admitted in his deposition that he had

16   not reviewed a *single* agreement between Google and any of Meta's purported competitors. *See*

17   *id.* at 230:18-23.

18           Seeking to avoid these fatal defects, Klumpp pivoted to asserting that he never opined that

19   Meta had the most favorable terms, just that he had not seen evidence that other firms received the

20   same terms. *Id.* at 227:1-14 ("Q. So given that you only saw Facebook's agreement for open

21   bidding with Google, it's hardly surprising that you think those are the best terms that anyone got.

22   Correct? A. No, that's a—I—first of all, I didn't say those were the best terms anyone got. That's

23   not my conclusion. My conclusion is I haven't seen evidence that other firms received these same

24   terms …"). That has the burden of proof exactly backwards. And saying "I haven't seen evidence"

25   when you have not looked for it is junk science. But in all events, what is clear from Klumpp's

26   testimony is that he had not reviewed Meta's purported competitors' terms, and so he could not

27   possibly have seen evidence that other firms received the same terms as Meta (or better or worse

28   ones). Klumpp's failure to do so renders his opinion that Meta's terms with Google were more

**PUBLIC REDACTED VERSION**

1  favorable than—or even different from—its competitors unreliable.

2  **II.    KLUMPP'S OPINIONS SHOULD BE EXCLUDED BECAUSE HE ERRONEOUSLY CONFLATES
MONOPOLY MAINTENANCE WITH ANTICOMPETITIVE EFFECT**

3

4       Underlying all of Klumpp's opinions is the assertion that the maintenance of monopoly

5  power on its own constitutes an anticompetitive effect. Proof of an anticompetitive effect,

6  however, requires evidence of actual detrimental effects on competition, "'such as reduced output,

7  increased prices, or decreased quality in the relevant market.'" *Epic Games, Inc. v. Apple, Inc.*, 67

8  F.4th 946, 983-84 (9th Cir. 2023) (quoting *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824,

9  834 (9th Cir. 2022)). The supposed continuation of Meta's alleged monopoly power because of

10  the challenged conduct is not, by itself, an anticompetitive effect: "[T]he possession of monopoly

11  power will not be found unlawful unless it is accompanied by an element of anticompetitive

12  *conduct*." *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407

13  (2004).

14       Klumpp offers no opinion that Meta's conduct caused or threatened to cause any

15  cognizable anticompetitive effect like "'reduced output, increased prices, or decreased quality in

16  the relevant market.'" *Epic Games*, 67 F.4th at 983-84. Instead, he repeatedly testified that he was

17  *not* opining about any of the kinds of effects that could be anticompetitive as a matter of law:

18       Q. I'm just trying to exhaust—make sure for the rest of the day I have an
         understanding of what you're saying is the anticompetitive effect … [T]ell me
19       if I'm wrong, but what you're saying is the challenged conduct allowed
         Facebook to maintain a monopoly in social advertising and that was the
20       anticompetitive effect.
         A. That is a fair overall characterization of what my opinions are.
21       Q. And there's not a different anticompetitive effect, not looking for different
         words, but there's not a different anticompetitive effect from the challenged
22       conduct that you're saying occurred in social advertisement.
         A. No, I would—I would characterize my opinions as overall supporting a finding
23          of monopoly maintenance.

24

25  Ex. 2, Klumpp Tr. 45:4-21.

26       In other words, he failed to show that the challenged conduct harmed advertisers—and did

27  not even try to do so. That makes his opinions both wrong and useless to the jury. *See Williamson*

28  *Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1323 (11th Cir. 2003) (affirming exclusion of

**PUBLIC REDACTED VERSION**

1    plaintiff's expert opinion as irrelevant where expert failed to offer testimony as to the proper legal

2    standards); *United States v. Apple, Inc.*, No. 1:12-cv-02826, Dkts. 262, 265 at 32:9-35:24

3    (S.D.N.Y.) (excluding as irrelevant expert's testimony that depended on a "faulty legal

4    assumption" about the governing standard).

5                                        **CONCLUSION**

6          The Court should exclude Klumpp's testimony in full.

7

8    Dated: December 30, 2024                         Respectfully submitted,

9                                                     By: */s/ Sonal N. Mehta*
                                                        SONAL N. MEHTA
10

11                                                   *Attorney for Defendant Meta Platforms, Inc.*

12

13                                   **CERTIFICATE OF SERVICE**

14         I hereby certify that on this 30th day of December, 2024, I electronically transmitted the

15    public redacted version of the foregoing document to the Clerk's Office using the CM/ECF System

16    and caused the version of the foregoing document filed under seal to be transmitted to counsel of

17    record by email.

18

                                                     By:    */s/ Sonal N. Mehta*
19                                                          Sonal N. Mehta

20

21

22

23

24

25

26

27

28