UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MAXIMILIAN KLEIN, et al.,

    Plaintiffs,

v.

META PLATFORMS, INC.,

    Defendant.

Case No. 20-cv-08570-JD

**ORDER RE DR. NICHOLAS ECONOMIDES AND USER CLASS CERTIFICATION**

In this antitrust action, separate plaintiff groups of users and advertisers sued Meta Platforms, Inc. (Meta), for alleged anticompetitive conduct under the Sherman Act and California state law in connection with the Facebook social-networking app.[1] The user group, headlined by named plaintiffs Maximilian Klein, Sarah Grabert, and Rachel Banks Kupcho, allege that Meta illegally acquired and maintained a monopoly in the "personal social network services" (PSNS)[2] market "through repeated misrepresentations over its data collection and use practices" that "deprive[d] its competitors of the ability to compete." Dkt. No. 793 at 1; *see generally* Dkt. No. 87 (FAC). The user plaintiffs have asked to certify a class of all persons in the United States who used a Facebook profile between December 2016 and December 2020. Dkt. No. 793 at 3.

The certification request rises or falls on the validity and reliability of the opinions of the user plaintiffs' economist, Dr. Nicholas Economides, with respect to antitrust injury and other elements required for proof of a monopolization claim. Meta has asked to exclude the opinions of

---

[1] In 2021, "Facebook, Inc." rebranded to "Meta Platforms, Inc." Dkt. No. 219. For clarity, the Court uses "Meta" to denote the company and "Facebook" for the social-networking service.

[2] The parties dispute market definition, *see* Dkt. Nos. 793 at 16; 806 at 20-22, but for purposes of this order, the Court accepts plaintiffs' alleged PSNS product market.

Dr. Economides under Federal Rule of Evidence 702 and related cases. Dkt. No. 804. Consequently, the threshold question of the admissibility of Dr. Economides' opinions will effectively determine the fate of the user plaintiffs' certification request.[3]

The parties' familiarity with the record is assumed. Although there is no doubt that Dr. Economides is a well-qualified economist, his opinion, among others, that Facebook users suffered antitrust injury because Meta did not pay them $5.00 a month for their personal data is unsupported by the record. His opinions and proposed testimony on antitrust injury are excluded under FRE 702, and the user plaintiffs' request to certify a class is accordingly denied.

## BACKGROUND

The user plaintiffs' main allegation is that Meta illegally acquired and maintained a monopoly in the PSNS market by deceiving users into believing that Facebook's data collection and privacy practices were more protective than they actually were. FAC ¶¶ 101-40. In plaintiffs' view, these false assurances prevented other firms from effectively competing in the alleged PSNS market. *See* Dkt. No. 793 at 7-12. The user plaintiffs contend that this barrier to competition injured them in a manner contemplated by the antitrust laws. *See id.* at 12-13; FAC ¶¶ 221-29.

For the request to certify a class comprised of millions of Americans who used Facebook over the span of four years, the user plaintiffs advance a single theory of antitrust injury. The theory is that, but for the misrepresentations about data privacy, Meta would have found itself in a competitive PSNS market that would have forced it to pay users for their data to retain robust user engagement. Dkt. No. 793 at 12:20-24. This theory is based entirely on the report of Dr. Economides, who opines that "Facebook would have compensated [users] a certain amount per month for their data in the *but-for* world where [users] knew the truth about Facebook's data practices, because the alternative would have led to an unacceptable loss of market share for Facebook." *Id.* at 22; *see* Dkt. No. 794-2 (Economides Rep.) ¶ 60.

---

[3] All references to Dr. Economides' opinions or testimonies are to the "Abridged Expert Declaration of Nicholas Economides, Ph.D," Dkt. Nos. 793-2, 794-2, and "Abridged Rebuttal Expert Declaration of Nicholas Economides, Ph.D," Dkt. Nos. 812-3, 815-2.

Dr. Economides' path to this conclusion is paved with a number of propositions. He starts with the general observation that, in competitive markets, "sellers must lower their prices or else lose market share." Economides Report ¶ 62. This observation requires immediate modification for the alleged PSNS market because, as every online denizen knows, Facebook and other social-networking apps are provided without charge to users. Dr. Economides attempts to account for this fact by saying that, although users do not pay Meta to use Facebook, Meta "charges a price to users in the form of data collection and use." *Id.* He then proposes that, in a but-for world where competition in the PSNS market was not illegally constrained as alleged by plaintiffs, rival apps would offer "more competitive privacy practices" than Facebook, which would compel Meta to compete through "a reduction in the effective price of using Facebook." *Id.* ¶¶ 64-65. Dr. Economides postulates that this "reduction in the effective price" would take the form of a "negative price," by which he means an affirmative payment by Facebook to users for their data. *Id.* ¶ 65. He quantifies this but-for payment to be $5.00 per user per month. *Id.* ¶¶ 90, 94. Consequently, Dr. Economides concludes that the putative class of users suffered antitrust injury by being "overcharged" by Facebook, in that they were not affirmatively paid a flat rate of $5.00 per month for using Facebook, and that this resulted over the relevant class period in "total damages to the Class of $52.8 billion (pre-trebling)." *Id.* ¶¶ 90-91, 94.

Meta says all this amounts to "junk science" that should be excluded from the case under Federal Rule of Evidence 702 and the familiar standards of the *Daubert* line of cases. Dkt. Nos. 802, 804. Meta trains most of its focus on Dr. Economides' opinions on antitrust injury. *See* Dkt. No. 804 at 4-8. In Meta's view, "[t]he mere theory of 'negative price markets' . . . cannot bridge the analytical gap between how [Facebook] actually competes for users and how Economides speculates it would." Dkt. No. 817 at 2; *see* Dkt. No. 804 at 4-6. Meta also contends, without meaningful opposition by plaintiffs, that because "[Dr.] Economides's opinions on [antitrust injury] are junk science," if they are "properly excluded, Users necessarily fail to meet the requirements of Rule 23." Dkt. No. 806 at 5.

3

1

# DISCUSSION

## I. META'S MOTION TO EXCLUDE DR. ECONOMIDES' EXPERT OPINIONS

### A. LEGAL STANDARDS

Amended in December 2023, Federal Rule of Evidence 702 provides that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that," *inter alia*, "the testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Ev. 702(b)-(d). After examining the 2023 amendments in another case, the Court concluded they were "not intended to be a 'seachange' in the performance of the Court's 'gatekeeper' function" and that "cases interpreting FRE 702 that predate the 2023 amendments remain fully applicable." *Reflex Media, Inc. v. SuccessfulMatch.com*, --- F. Supp. 3d ---, 2024 WL 4903267, at *1 (N.D. Cal. Nov. 26, 2024). This was because the Advisory Committee notes made clear that the amendments were intended to amplify, but not displace, the existing requirements of Rule 702. *See* Fed. R. Ev. 702, advisory committee's note to 2023 amendment ("Nothing in the amendment imposes any new, specific procedures. Rather, the amendment is simply intended to clarify that Rule 104(a)'s requirement applies to expert opinions under Rule 702.").

"At all stages, Rule 702 . . . tasks a district court judge with ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *In re Google Play Store Antitrust Litig.*, No. 21-md-02981-JD, 2023 WL 5532128, at *5 (N.D. Cal. Aug. 28, 2023) (cleaned up) (quotation omitted). "The test of reliability is flexible, and the Court looks at whether the reasoning and methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Reflex Media, Inc.*, 2024 WL 4903267, at *2 (cleaned up) (quotations omitted).

An expert's opinions are "inherently unreliable" if they do not rest on a sufficient factual foundation and are "speculative." *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014); *see United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002). In *Daubert*

4

*v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court of the United States explained that the "inquiry envisioned by Rule 702" focuses on the "principles and methodology [of the expert], not on the conclusions that they generate." 509 U.S. at 579, 594-95 (1993).  Notably, the Court put a gloss on that statement by subsequently observing:

> [C]onclusions and methodology are not entirely distinct from one another.  Trained experts commonly extrapolate from existing data.  But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  The federal courts have understood *Joiner* to teach that "while methodology remains the central focus of a *Daubert* inquiry . . . . trial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998); *see also Cohen v. Cohen*, --- F.4th ---, 2025 WL 45704, at *3-4 (3d Cir. 2025); *Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 625 (8th Cir. 2012); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).

To be clear, FRE 702 "does not license a court to engage in freeform factfinding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions at the admissibility stage." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1026 (9th Cir. 2022).  Even so, the Court may evaluate whether the expert proffered sufficient facts or data to "support . . . every necessary link" in her theory, *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 606 (9th Cir. 2002), with an eye toward "foundation, not corroboration," *Elosu*, 26 F.4th at 1025.  If the evidence does not so suffice, the Court may "conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* at 1026 (quoting *Joiner*, 522 U.S. at 146).  In the words of the Advisory Committee, "nothing . . . requires the court to nitpick an expert's opinion," but the rule "does not permit the expert to make claims that are unsupported by the expert's basis and methodology." Fed. R. Ev. 702, advisory committee's note to 2023 amendment.

5

### B.  DR. ECONOMIDES' ANTITRUST INJURY OPINIONS

Meta does not challenge Dr. Economides' qualifications, and rightfully so. The record indicates that he is a qualified antitrust economist. *See* Economides Rep. ¶¶ 1-2; Dkt. No. 645-5 at ECF 157-220. Meta's main criticism is that Dr. Economides' antitrust injury opinion, namely that Facebook users suffered the loss of direct payments for their data that they assertedly would have received in the but-for world, is unsupported by the record. Dkt. No. 804 at 4-8.

The heart of Dr. Economides' theory of antitrust injury is that Meta and its rivals "compete on price and quality, like essentially all firms do in their product and service offerings" and that "any claim to the contrary would be economically baseless." Dkt. No. 812-3 (Economides Rebuttal Rep.) ¶¶ 27, 35; *see also id.* ¶¶ 24, 26, 28-29; Economides Rep. ¶ 62 n.111. His conclusion that Meta would have paid Facebook users in a competitive world is said to "follow[] the well-accepted economic concepts of 'zero' and 'negative' pricing," because "[w]ell-accepted economic principles indicate" that "[i]f the starting money price is 'zero,' more competition should drive the price 'negative,' such that users receive compensation." Dkt. No. 808 at 3.

Without unduly simplifying things, the necessary links in Dr. Economides' theory of antitrust injury are: (1) Meta competes on price and quality, *see* Economides Rep. ¶ 62 n.111; Economides Rebuttal Rep. ¶¶ 27, 35; (2) in the but-for world without the alleged data-privacy deception, Meta would face greater competition from rivals with respect to privacy practices, Economides Rep. ¶¶ 54-60; (3) in response to greater competitive pressure, Meta would compete on price instead of quality to avoid losing users to rivals, *id.* ¶¶ 60-76; (4) even though the price for using Facebook is "zero," in the sense that no money is exchanged, economic theory recognizes that competitive conditions in certain markets can result in "negative" prices, *id.* ¶ 65; (5) accordingly, Meta would pay users a "negative" price to retain them instead of collecting less data, *id.* ¶¶ 63-66.

As general concepts in the economic literature, these propositions are not bunkum. Dr. Economides cites credible sources for the various economic concepts he applies, *see generally* Economides Rep.; Economides Rebuttal Rep., and the Court sees no basis for concluding those theories and principles themselves are not well accepted in the field of economics. Insofar as

6

1  Meta means to suggest that theories of zero-price markets and negative prices are junk science by
2  relying on an anecdote about Seinfeld airing on NBC, Dkt. No. 817 at 1, the comment is frivolous.

3  Meta does not challenge Dr. Economides' belief that Facebook would not change its data-
4  collection practices in the but-for world.  Rather, the thrust of Meta's challenge to his opinions on
5  antitrust injury concerns the third link described above that Facebook would choose to compete on
6  price instead of quality in the but-for world to avoid losing users.  *See* Dkt. No. 804 at 4-8.

7  The point is well taken.  As will be explained, "there is simply too great an analytical gap
8  between" the facts on which Dr. Economides relies and that third link in his theory.  *Elosu*, 26
9  F.4th at 1026 (quoting *Joiner*, 522 U.S. at 146); *see Amorgianos*, 303 F.3d at 267 (explaining that
10 "each step in the analysis" must be "supported by good grounds" under *Daubert* (quoting *In re
11 Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994))); *Goebel v. Denver and Rio Grande
12 Western R. Co.*, 346 F.3d 987, 992 (10th Cir. 2003) ("[A]ny step that renders the analysis
13 unreliable . . . renders the expert's testimony inadmissible." (omission in original) (quotation
14 omitted)); *Sonneveldt v. Mazda Motor of Am., Inc.*, 2024 WL 5242611, at *2 (9th Cir. Dec. 30,
15 2024) (unpublished).  The purpose of the Court's inquiry under FRE 702 is to "ensure that
16 proposed expert testimony imparts 'scientific knowledge' rather than guesswork." *Ruiz-Troche*,
17 161 F.3d at 81 (quoting *Daubert*, 509 U.S. at 592).  Because that necessary third step in his theory
18 of antitrust is without basis, and so rests on guesswork, the Court cannot conclude that Dr.
19 Economides' methodology and opinions are reliable and consequently admissible.

20 To be sure, Dr. Economides relies on economic literature discussing the theory and
21 existence of negative prices in online and double-sided platform markets, which are the types of
22 markets the PSNS market is said to be.  *See* Economides Rep. ¶ 65 n.117.  But economic theory
23 alone does not make his opinions admissible.  The Court must "scrutinize . . . whether those
24 principles and methods have been properly applied to the facts of the case." Fed. R. Ev. 702,
25 advisory committee's note to 2000 amendment.  On that score, there is no dispute that Meta has
26 never competed in the PSNS market by paying its users.  *See* Economides Rebuttal Rep. ¶ 37; Dkt.
27 Nos. 808 at 4; 805-3 (Tucker Rebuttal Rep.) ¶ 32 n.61.  In addition, the user plaintiffs do not even
28 allege, let alone establish with evidence, that any other participant in the PSNS market has ever

United States District Court
Northern District of California

7

competed by paying users. In telling contrast, Meta provided evidence that firms in the PSNS and adjacent markets have never competed via "negative" prices. *See* Tucker Rebuttal Rep. ¶¶ 24-32; Dkt. No. 803-2 (Economides 3/15/24 Tr.) at 255:2-256:17.

The record undercuts the third link in Dr. Economides' theory by demonstrating that firms in the PSNS market, including Meta, have consistently competed on the axis of quality through better content, functionality, services, and the like to keep users engaged and the stream of user data flowing, even if the firms theoretically could compete on price. This undisputed record about the real world, and the lack of any meaningful contrary evidence, is a big red flag for Dr. Economides' theory. Even assuming, as Dr. Economides says, that there is "[s]ubstantial economic support . . . for competitive equilibria where firms compensate users for collection and use of their data," the literature alone is not enough to satisfy FRE 702. Economides Rep. ¶ 65. That is because citations to economic literature do not demonstrate that the economic principles of zero- and negative-price markets were reliably applied to the facts of this case. Dr. Economides' opinions must fit not just the literature but also the facts in the record. The user plaintiffs have not demonstrated that Dr. Economides' conclusions about antitrust injury are anything more than a fanciful application of economic theory untethered to real-world evidence about the alleged PSNS market.

It also bears mention that the literature Dr. Economides cites with respect to online services is far less compelling than he acknowledges. Much of it is merely commentary by other observers. *See, e.g.*, *Unlocking Digital Competition: Report of the Digital Competition Expert Panel* (March 2019), at p. 42 ("Although accessing services for free may appear to be an attractive proposition, this zero-price may in fact be too high . . . . [Consumers] could even be paid for the use of their data, and so effectively receive a negative price."); Written Testimony of FTC Commissioner Rohit Chopra, *Hearing on Online Platforms and Market Power, Part 3: The Role of Data and Privacy in Competition* (Oct. 18, 2019), at 3 ("While the price that people pay in dollars is 'zero,' Google and Facebook reap billions of dollars from us. . . . This means that we are handing over extremely valuable assets to these companies. An economist might say that the real price of using these services should be negative -- that is, they should be paying us."). As the use

8

of "may" and "might" connote, these statements are the speculations of their authors. Other sources cited by Dr. Economides are more circumspect by acknowledging that such firms compete on the axes of price and/or quality while suggesting it is merely "*plausible* that the price charged in more competitive circumstances would be negative." U.K. Competitive & Markets Authority, *Online platforms and digital advertising: Market study final report* (July 1, 2020), at p. 69-70 (emphasis added); *see* Scott Morton, Fiona, et al., *Committee for the Study of Digital Platforms: Market Structure and Antitrust Subcommittee Report*, Stigler Center for the Study of the Economy and the State (draft) (May 15, 2019), at p. 6-7 ("It is possible that a digital market has an equilibrium price that is negative."), 32-33.

Overall, Dr. Economides did not identify reliable and validated economic literature to support his specific conclusion that, upon coming to the proverbial fork in the road between quality and price, Facebook would choose price in the but-for world. *See Amorgianos*, 303 F.3d at 266-67; *see also Cohen*, --- F.4th ---, 2025 WL 45704, at *4-5. This is a further crack in a "necessary link" in Dr. Economides' theory of antitrust injury. *Domingo*, 289 F.3d at 606.

The responses by Dr. Economides and the user plaintiffs to these shortfalls are not convincing. For the evidence indicating that no other firm in the PSNS market, or adjacent markets, has competed by means of negative prices (*i.e.*, payments to users), Dr. Economides says that the behavior of firms in the real world is of little value for figuring out what would happen in the but-for world, because the actual PSNS market is "afflicted by the anticompetitive effects of Facebook's deception." Economides Rebuttal Rep. ¶ 37. To be sure, the existence of contrary evidence does not necessarily make an expert's opinion inadmissible. *See Elosu*, 26 F.4th at 1024. But an expert does not have license to simply disregard reality and base a "necessary link" in his theory on guesswork or speculation. *Domingo*, 289 F.3d at 606. Dr. Economides did not credibly explain why no social-media company, or firm in the PSNS market, has tried to compete by paying rivals, even as he maintains that Facebook would change its product structure do just that when faced with competition. Simply gesturing at perceived "anticompetitive effects" does not provide a useful analysis.

So, too, for Dr. Economides' mentions of preliminary discussions within Meta about paying users for their data. The record demonstrates that these were internal trial balloons that never ripened into serious proposals or an actual practice. *See* Dkt. Nos. 808 at 3-4; 804 at 6-7 (discussing deposition testimony); Economides Rep. ¶¶ 70-76. Whether considered "individually or in combination," these tentative discussions "were not a sufficient basis for the [expert's] opinions." *Joiner*, 522 U.S. at 145, 147.

The research programs cited by Dr. Economides are equally inapposite. He points to research initiatives where Meta paid individuals in test groups to permit Meta to harvest and use a range of data from them. Economides Rep. ¶¶ 68-69. The problem for Dr. Economides is that these market-research programs entailed payments for user data outside the context of Facebook's social-networking services, where Meta is not already "bartering" for user data with Facebook's services and the quality thereof. *Id.* ¶¶ 68, 123-24. Dr. Economides says the programs are "economically significant evidence of . . . the operation of a market [in] which consumers receive monetary payments for their data," *id.* ¶ 69, but he does not explain how or why evidence of these transactions in a wholly different market, where the terms of exchange are different, would be informative of whether Facebook, in the PSNS market, would choose to compete on price as opposed to quality in the but-for world. *See Daubert v. Merrell Dow Pharma., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) ("[E]xperts must explain precisely how they went about reaching their conclusions."); *see also Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1322 (11th Cir. 2022). Instead, he simply says "[t]he fact that Facebook has compensated users for their data in the actual world is compelling evidence that Facebook . . . would have compensated users for their data in the but-for world." Economides Rep. ¶ 69. Expert opinion cannot be deemed reliable under FRE 702 if it is "connected to existing data only by the *ipse dixit* of the expert." *City of Ponoma v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting *Joiner*, 522 U.S. at 146).

The problem of factual fit also affects Dr. Economides' opinions about Meta's internal discussions of paying users. Two discussions that he highlights actually concerned user data that Meta could not or did not already obtain through Facebook's social-networking service.

10

Economides Rep. ¶¶ 71-73.  This is just like the market-research programs that involved data outside the scope collected by Facebook.  *See* Dkt. No. 803-12 at ECF 3 ("Additional Data for Rewards: Value of Offsite Actions"); Economides Rep. ¶ 72 (proposal for "the possibility that Facebook would lose the ability to collect and use certain data generated from Facebook users' 'off-site' data").  Dr. Economides says that these musings are "telling evidence that Facebook could and likely would offer that same compensation in a but-for world where it faced actual competition."  Economides Rep. ¶ 76.  But, as with the market-research programs, he does not explain how or why an internal discussion about payments to individuals for additional data different from that which those individuals would give in exchange for use of Facebook might be probative of whether Meta would choose to charge a negative price versus improve the services' quality when faced with the potential of losing a user to a competitor.  *See Daubert*, 43 F.3d at 1319; *Carrizosa*, 47 F.4th at 1322; *see also Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005) ("[A] trial court may exclude expert testimony that is 'imprecise or unspecific,' or whose factual basis is not adequately explained." (quotation omitted)).

A third proposal discussed by Dr. Economides arose in the context of Apple's 2020 App Tracking Transparency (ATT) feature, which required apps running on Apple products to "obtain users' agreement to 'track' users (*i.e.*, collect and use their data) outside that app" through a pop-up prompt.  Economides Rep. ¶ 35, 75 (emphasis omitted).  This proposal contemplated paying a "data dividend" (i.e., money for relevant purposes) "to users to incentivize them to continue providing their data to Facebook" when confronted with the ATT prompt.  *Id.* ¶ 75.  Here, too, Dr. Economides's analysis of this proposal and its relevancy is perfunctory to the point of being of little utility.  *Id.* (simply quoting who said what about the proposal).

To be sure, a fourth and final proposal did contemplate "pay[ing] users for access to their personal information" as part of a "transparent approach to privacy[ that] should become the model moving forward."  *Id.* ¶ 74.  The individuals within Meta among whom this idea percolated thought that such a move could "rais[e] the bar significantly for user privacy protections" and would "pre-empt[] competitors who might do this."  *Id.*  FRE 702 "does not preclude an expert

11

1  from making projections" based on available data, nor does it permit courts to "overlook[] relevant
2  data submitted as the foundation of an expert's remarks" or "weigh[] the evidence on record."
3  *Elosu*, 26 F.4th at 1020, 1025.  At best, this idea indicates that Meta on one occasion considered
4  competing on "price" in the market (though it is not clear the "competitors" to which those
5  individuals were referring are those that the user plaintiffs contend are in the PSNS market).  But
6  this idea alone, which Meta ultimately rejected, is too thin a reed on which to base the sweeping
7  extrapolation Dr. Economides makes that Meta would pay all U.S. users money every month for
8  using Facebook.  *See, e.g.*, *Elosu*, 26 F.4th at 1025-26 ("Rule 702 instructs a district judge to
9  determine whether an expert 'had sufficient factual grounds on which to draw conclusions.'"
10 (quoting *Damon v. Sun Co.*, 87 F.3d 1467, 1475 (1st Cir. 1996))); *Ruiz-Troche*, 161 F.3d at 81
11 ("[T]rial judges may evaluate the data offered to support an expert's bottom-line opinions to
12 determine if that data provides adequate support to mark the expert's testimony as reliable.");
13 *Cohen*, --- F.4th ---, 2025 WL 45704, at *4-5 (rejecting as baseless and inadmissible an expert's
14 broad claim when it rested upon two studies the results of which were weak due to "small sample
15 sizes").  Not surprisingly, plaintiffs did not cite a case or authority stating that a single and
16 ultimately rejected idea may provide a non-speculative basis for an expert's opinions.  *See* Dkt.
17 No. 808 at 6 n.28, n.30.
18      Even taken as a whole, the four proposals do not provide "sufficient factual grounds,"
19 *Elosu*, 26 F.4th at 1026 (quotation omitted), for the third necessary link in Dr. Economides'
20 theory.  For all four, he opines that "Facebook recognized that the data it was collecting and using
21 was responsible for much of its revenue and that it would make economic sense to compensate
22 users in order to get that data (rather than lose it)."  Economides Rep. ¶ 70.  But that conclusion
23 does not necessarily follow from the starting point.  Dr. Economides never explains why Meta
24 would focus exclusively on answering new competition by paying users.  There is no doubt, as he
25 says, that Meta makes a lot of money from user data, but he did not demonstrate that Meta would
26 be compelled to retain users by paying them, rather than through innovations in services and

product quality.[4] This shortfall goes beyond merely ignoring evidence that Meta in the real world has consistently competed on the basis of quality. *See Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (noting that courts should "not exclude opinions merely because they are impeachable"). It goes to the very heart of Dr. Economides' theory of antitrust injury to the putative class of users. At the end of the day, it is a conclusion of fiat rather than evidence. *See City of Ponoma*, 750 F.3d at 1049.

Consequently, Dr. Economides' opinions cannot be the basis for finding antitrust injury in this case. An expert's job is to consider existing data and make inferences, hypotheses, and extrapolations, and "[f]or this reason, 'an expert is permitted wide latitude to offer opinions.'" *Elosu*, 26 F.4th at 1026 (quoting *Daubert*, 509 U.S. at 592-93). Even so, there must be a sound foundation in the evidence to support every step on the way to their conclusions. Dr. Economides' opinion that Meta, if faced with greater competition, would make a monthly payment to every Facebook user in the United States is inadmissible under FRE 702.

## II. CLASS CERTIFICATION

This conclusion makes relatively short work of plaintiffs' request to certify a user class. The standards for certifying a class action under Federal Rule of Civil Procedure 23 are well established. Rule 23(a) requires "sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation." *In re Capacitors Antitrust Litig.*, No. 17-md-02801-JD, 2018 WL 5980139, at *2 (N.D. Cal. Nov. 14, 2018) (quoting Fed. R. Civ. P. 23(a)). "To obtain a Rule 23(b)(3) class," which is what the user plaintiffs propose here, "plaintiffs must also show that 'questions of law or fact common to class members predominate over any questions affecting only individual members' . . . and that a class action is 'superior to

---

[4] Plaintiffs try to sidestep this problem by saying that Dr. Economides opined that firms "cannot compete on features [i.e., quality] alone." Dkt. No. 808 at 4. Not so. Dr. Economides expressly stated that firms in the PSNS and adjacent markets "compete on price (including effective price) and quality (including content and features)." Economides Rebuttal Rep. ¶ 27; *see id.* ¶¶ 25-29, 35. That premise, again, does not necessarily lead to the conclusion that Meta would compete on price to avoid losing users in the but-for world.

13

other available methods.'" *In re Facebook Biometric Info. Privacy Litig.*, 326 F.R.D. 535, 541 (N.D. Cal. 2018) (quoting Fed. R. Civ. P. 23(b)(3)).

The user plaintiffs "face overwhelming problems with commonality and predominance that in themselves bar certification," so the Court starts and ends there. *Schneider v. YouTube, LLC*, 674 F. Supp. 3d 704, 718 (N.D. Cal. 2023). It is "appropriate to assess Rule 23(a)(2) commonality and Rule 23(b)(3) predominance together." *In re Capacitors Antitrust Litig.*, 2018 WL 5980139, at *3 (collecting cases). Assessing commonality and predominance "begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).

Plaintiffs seek class certification for claims of monopolization and attempted monopolization under Section 2 of the Sherman Act, Pub. L. No. 51-647, 26 Stat. 209 (codified as amended at 15 U.S.C. §§ 1-7).[5] *See* Dkt. No. 793 at 1-2; FAC ¶¶ 260-83. A claim of attempted monopolization requires demonstrating "(1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous probability of achieving 'monopoly power'; and (4) causal antitrust injury." *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995). Monopolization requires "(a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury." *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013) (quoting *Allied Ortho. Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998 (9th Cir. 2010)). Antitrust injury (or antitrust impact) is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

Plaintiffs say that commonality and predominance for antitrust injury are satisfied "with common proof establishing that Facebook's deception harmed competition during the Class Period, which in turn harmed *all* class members." Dkt. No. 793 at 21 (emphasis in original).

---

[5] The Court notes that the Sherman Act provides the relevant substantive antitrust law, but it is the Clayton Act that provides a private cause of action. Pub. L. No. 63-212, 38 Stat. 730 § 4(a) (codified at 15 U.S.C. § 15(a)).

Plaintiffs do not dispute that admissible expert testimony is essential to their ability to prove antitrust injury on a class-wide basis here, especially for an overcharge theory of the sort they advance, and that they rely entirely on Dr. Economides. But as demonstrated, Dr. Economides cannot provide admissible opinions on antitrust injury. Without those opinions, the user plaintiffs cannot establish that they have a class-wide method proving antitrust injury for either of their § 2 claims. *See, e.g.*, *Schneider*, 674 F. Supp. 3d at 722. This is enough to deny certification, and so "the Court declines to discuss the remaining Rule 23 factors." *McCarty v. SMG Holdings, I, LLC*, No. 17-cv-06232-JD, 2022 WL 913092, at *7 (N.D. Cal. Mar. 29, 2022).

## CONCLUSION

Meta's motion to exclude Dr. Economides' expert opinions is granted in part as to his opinions about antitrust injury. Dkt. No. 804. The user plaintiffs' renewed motion for class certification is denied. Dkt. No. 793. The Court will address the associated sealing motions in a separate order. The parties are directed to file by February 10, 2025, a proposed schedule for the remaining pretrial and trial dates.

**IT IS SO ORDERED.**

Dated: January 24, 2025

JAMES DONATO
United States District Judge