**BATHAEE DUNNE LLP**
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Andrew C. Wolinsky (CA 345965)
awolinsky@bathaeedunne.com
Allison Watson (CA 328596)
awatson@bathaeedunne.com
Priscilla Ghiță (*pro hac vice*)
pghita@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
Tel.: (332) 322-8835

Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (*pro hac vice*)
egrauman@bathaeedunne.com
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
Tel.: (213) 462-2772

*Interim Co-Lead Counsel for the
Advertiser Class*

[Additional counsel on signature page]

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Amanda F. Lawrence (*pro hac vice*)
alawrence@scott-scott.com
Patrick J. McGahan (*pro hac vice*)
pmcgahan@scott-scott.com
Michael P. Srodoski (*pro hac vice*)
msrodoski@scott-scott.com
156 South Main Street, P.O. Box 192
Colchester, CT 06415
Tel.: (860) 537-5537

Patrick J. Coughlin (CA 111070)
pcoughlin@scott-scott.com
Carmen A. Medici (CA 248417)
cmedici@scott-scott.com
Hal D. Cunningham (CA 243048)
hcunningham@scott-scott.com
Patrick J. Rodriguez (*pro hac vice*)
prodriguez@scott-scott.com
Daniel J. Brockwell (CA 335983)
dbrockwell@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: (619) 233-4565

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., | Case No. 3:20-cv-08570-JD |
| Plaintiffs, | Hon. James Donato |
| v. | **ADVERTISER PLAINTIFFS'** |
| META PLATFORMS, INC., | **OPPOSITION TO DEFENDANT META PLATFORMS, INC.'S MOTION FOR SUMMARY JUDGMENT** |
| Defendant. | Hearing Date: To Be Determined<br>Hearing Time: To Be Determined |

**FILED UNDER SEAL**

# TABLE OF CONTENTS

INTRODUCTION AND STATEMENT OF ISSUES ....................................................... 1

ARGUMENT .................................................................................................................. 3

    I.    There Are Triable Issues On All Elements Of Advertisers' Monopolization
        Claim ................................................................................................................. 3

        A.    Advertiser Plaintiffs And The Class Suffered Causal Antitrust Injury ....... 4

               1.    Meta's Assertions Regarding "Profits" Misrepresent Dr.
                    Williams's Antitrust Impact Testimony And Are Legally
                    Flawed ......................................................................................... 5

               2.    Meta's Assertions Regarding Consumer Harm Ignore The
                    Record .......................................................................................... 7

        B.    Meta Possessed Monopoly Power In An Economically Coherent
            Antitrust Market During the Class Period ................................................... 8

        C.    Meta Willfully Maintained Its Social Advertising Market Monopoly
            Power Through A Course Of Conduct That Violated The Sherman
            Act ............................................................................................................ 10

               1.    Meta's ▮▮▮ Program ▮▮▮▮▮▮▮ ................................................... 11

               2.    Meta's Web Of API Agreements .................................................. 16

                3.    Meta's Agreement With Google ................................................... 17

                4.    Meta's Netflix Agreement ............................................................ 19

                5.    Meta's Deception Of The FTC ..................................................... 21

        D.    There Are Measurable Damages ............................................................... 23

    II.    There Are Triable Issues On All Elements Of Advertisers' Attempted
        Monopolization Claim ..................................................................................... 24

    III.    There Are Triable Issues FOR Advertisers' Section 1 Claim .............................. 25

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*A. H. Cox & Co. v. Star Mach. Co.*,
    653 F.2d 1302 (9th Cir. 1981) ........................................................................ 15

*Am. Tobacco Co. v. United States*,
    147 F.2d 93 (6th Cir. 1944) ............................................................................ 15

*Ash Grove Cement Co. v. FTC*,
    577 F.2d 1368 (9th Cir. 1978) ................................................................... 21-22

*Chase Mfg., Inc. v. Johns Manville Corp.*,
    2019 WL 2866700 (D. Colo. Jul. 3, 2019) ...................................................... 15

*City of Anaheim v. S. Cal. Edison Co.*,
    955 F.2d 1373 (9th Cir. 1992) ............................................................. 4, 10, 24

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*,
    690 F.2d 1240 (9th Cir. 1982) ........................................................................ 23

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023) ..................................................... 4, 9-10, 21, 25

*FTC v. IQVIA Holdings Inc.*,
    710 F. Supp. 3d 329 (S.D.N.Y. 2023) ............................................................ 10

*FTC v. Meta Platforms, Inc.*,
    2024 WL 4772423 (D.D.C. Nov. 13, 2024) ...................................................... 6

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) .......................................................................... 10

*High Tech. Careers v. San Jose Mercury News*,
    996 F.2d 987 (9th Cir. 1993) .......................................................................... 10

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) .......................................................................... 6

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ........................................................................ 19

*In re Suboxone (Buprenorphine Hydrochlorine & Naxolone) Antitrust Litig.*,
    967 F.3d 264 (3d Cir. 2020) ..................................................................... 10, 24

*Klein v. Facebook, Inc.*,
    580 F. Supp. 3d 743 (N.D. Cal. 2022) .............................................................. 5

*Newcal Indus., Inc. v. Ikon Office Solution*,
    513 F.3d 1038 (9th Cir. 2008) ........................................................................ 25

**CASES (CONT'D)**

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC.,*
    31 F.4th 651 (9th Cir. 2022) (en banc) .................................................4, 23

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.,*
    20 F.4th 466 (9th Cir. 2021) ....................................................................25

*Otter Tail Power Co. v. United States,*
    410 U.S. 366 (1973) ..................................................................................25

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.,*
    778 F.3d 775 (9th Cir. 2015) ...................................................................10

*Snow v. Align Tech., Inc.,*
    586 F. Supp. 3d 972 (N.D. Cal. 2022) ....................................................25

*Sumotext Corp. v. Zoove, Inc.,*
    2020 WL 127671 (N.D. Cal. Jan. 10, 2020) ...........................................10

*Teradata Corp. v. SAP SE.,*
    124 F.4th 557 (9th Cir. 2024) ..................................................................10

*United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund*
    *v. Teikoku Pharma USA,*
    296 F. Supp. 3d 1142 (N.D. Cal. 2017) .....................................................6

*Utah Pie Co. v. Cont'l Baking Co,*
    386 U.S. 685 (1967) ..................................................................................15

*United States v. Google LLC,*
    2024 WL 3647498 (D.D.C. Aug. 5, 2024) .................................................6

*Universal Analytics, Inc. v. MacNeal-Schwendler Corp.,*
    707 F. Supp. 1170 (C.D. Cal. 1989) ................................................... 15-16

*William Inglis & Sons Baking Co. v. Cont'l Baking Co..,*
    942 F.2d 1332 (9th Cir. 1991) ..................................................................23

**STATUTES AND RULES**

15 U.S.C. § 46(a) .................................................................................................21

**OTHER AUTHORITIES**

ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues,*
    ch. 4, § C (3d ed. 2017) ..............................................................................6

Areeda, *Antitrust Law* ¶¶ 203e1 & n.17 ............................................................23

Areeda, *Antitrust Law* ¶¶ 657b .........................................................................24

Areeda, *Antitrust Law* ¶¶ 782a1 .......................................................................16

**OTHER AUTHORITIES (CONT'D)**

Hovenkamp et al., *IP and Antitrust: An Analysis of Antitrust Principles Applied to Intellectual Property Law* § 11.05 (3d ed. Nov. 2024 update)..........................................13

DECL. OF SHALEV HULIO IN SUPPORT OF DEFENDANT'S MOT. TO DISMISS, *WhatsApp Inc. v. NSO Group Techs. Ltd.*, No. 4:19-cv-07123-PJH, Dkt. 45-11 (Apr. 2, 2020) ...............7

**FILED UNDER SEAL**


**TABLE OF ABBREVIATIONS**

AFAC – First Amended Consolidated Advertiser Class Action Complaint (Feb. 28, 2024), Dkt. 237

Jakobsson Reb. – Expert Merits Rebuttal Report of Markus Jakobsson, Ph.D. (Feb. 9, 2024)

Jakobsson Rpt. – Expert Merits Report of Markus Jakobsson, Ph.D. (Jan. 12, 2024)

Klumpp Reb. – Expert Merits Rebuttal Report of Tilman Klumpp, Ph.D. (Feb. 9, 2024)

Klumpp Rpt. – Expert Merits Report of Tilman Klumpp, Ph.D. (Jan. 12, 2024)

Meta – Defendant Meta Platforms, Inc.

Mot. (or Motion) – Defendant Meta Platforms, Inc.'s Notice of Motion for Summary Judgment Regarding First Amended Consolidated Advertiser Class Action Complaint (Dec. 30, 2024)

Williams Class Reply – Expert Reply Report of Michael A. Williams, Ph.D. (Jul. 8, 2024)

Williams Class Rpt. – Expert Report of Michael A. Williams, Ph.D. (May 24, 2024)

Williams Rpt. – Expert Merits Report of Michael A. Williams, Ph.D. (Aug. 5, 2024)

1  **INTRODUCTION AND STATEMENT OF ISSUES**

2    The Court recently observed, "Now it's proof time." As set forth in this brief and its exhibits,

3  Advertisers are ready for trial with substantial proof on every element their claims—for

4  monopolization, for attempted monopolization, and for violation of Section 1 of the Sherman Act.

5    At trial in this case, the jury will hear from Meta's executives, from industry participants and

6  knowledgeable observers, and see Meta's own contracts that describe, characterize, and bound the

7  United States Social Advertising Market, a distinct submarket of overall online advertising. They will

8  hear from Sheryl Sandberg, who

9  ██████████ Ex. 9. They will see a 2019 presentation—prepared for Meta's COO—that

10

11  ██████████ Ex. 11. They will see a commercial agreement between Meta and

12  ██████████ Ex. 10.

13  And they will see direct and indirect evidence of Meta's monopoly power in that market between late

14  2016 and late 2020, including swiftly and consistently rising ad prices—prices, not just profits—and

15  stagnant or declining ad quality throughout the Class Period. Ex. 1 ("Williams Rpt.") ¶¶ 228-352.

16    As to Meta's conduct, the jury will hear evidence of a four-year campaign, instigated by Mark

17  Zuckerberg himself, to maintain Meta's supracompetitive prices in the Social Advertising Market by

18  deterring potential entry and suppressing actual rivals through industrial espionage, anticompetitive

19  agreements, and lying to the government, all of which maintained substantial entry barriers

20  surrounding Meta's ad business and inhibited price competition from other social advertising

21  providers. For example, the jury will hear from Mr. Zuckerberg about

22

23  ██████████ Ex. 18. The jury will hear from Mr.

24  Zuckerberg, Meta COO Javier Olivan, and members of Meta's Onavo team about

25

26

27  The jury will hear from Snap executives

28

1



1      Exs. 22, 23. The jury will see internal Meta chats

2      Ex. 13 at slide 14,

3      Ex. 19, while other Meta executives and managers

4      , Exs. 16, 34.

5      The jury will also hear about Meta's secret agreement with Google to

6

7      . Exs. 70, 77. The jury will see

8 years of secret API agreements executed with handpicked potential social advertising entrants—

9      —that restricted these companies' use of social data, and in the case of

10

11 Ex. 10. The jury will hear from Mr. Zuckerberg and Reed Hastings—then Netflix's CEO and a Meta

12 board member—about an agreement

13

14      Ex. 85. And the jury will hear from a Meta executive, Jay Parikh, about

15

16

17      Ex. 119.

18      This evidence will be analyzed and explained by three Advertiser expert witnesses, including

19 expert economist Dr. Michael Williams, who performed a *Brown Shoe* analysis and Hypothetical

20 Monopolist Test with SSNIP on the social advertising product market, and who will further testify

21 about Meta's monopoly power in that market. Dr. Williams will testify that Meta ad prices rose

22 throughout the Class Period, alongside stagnant or decreasing ad quality as measured by click-through

23 rate. Williams Rpt. ¶¶ 235-42. He will testify that these rising quality-adjusted prices were inflated

24 against a but-for competitive world, including by performing a well-accepted yardstick analysis that

25 measures Meta's monopolistic price inflation during the Class Period. *Id.* ¶¶ 228-34, 368-410. From

26 this analysis, Dr. Williams will quantify and explain causal antitrust injury and damages from Meta's

27 monopoly maintenance conduct. *Id.* ¶¶ 228-410.

28

1   As to the anticompetitive nature of the conduct itself, expert economist Dr. Tilman Klumpp

2   will testify about the economic impact of Meta's ███████████████, its API agreements, its

3   Google agreement, its agreement with Netflix, and its deception of regulators. Ex. 4 ("Klumpp Rpt."),

4   5 ("Klumpp Reb."). Dr. Klumpp will identify anticompetitive harm, including the strengthening of

5   entry barriers and the direct exclusion or suppression of actual and potential social advertising

6   competitors, from each category of Meta's conduct during the Class Period. As to the Ghostbusters

7   program, renowned computer security expert Dr. Markus Jakobsson—former Chief Scientist for

8   ByteDance—will explain to the jury the technical details of its operation, helping laypeople to

9   understand just how far Mark Zuckerberg and his company were willing to go to suppress competitive

10  threats to their social advertising dominance. Ex. 6 ("Jakobsson Rpt."), 7 ("Jakobsson Reb.").

11  But the Court will find none of the above in Meta's summary judgment motion, which begins

12  with the same words as this brief—"proof time"—yet proceeds to ignore the actual evidence and

13  presents a false narrative about the proof in this case. Meta's spaghetti-at-the-wall arguments are

14  nitpicks or outright misrepresentations of fact and law, and they do not justify summary judgment on

15  any issue. As this brief and its exhibits make clear, there are triable issues of fact on each of

16  Advertisers' claims—and the record is ready for Advertisers to present this case to a jury.

17  **ARGUMENT**

18  Advertisers bring three Sherman Act claims in this case—Section 2 claims for monopolization

19  and attempted monopolization of the United States Social Advertising Market, AFAC Counts I & II,

20  and a Section 1 claim for an unlawful agreement between Meta and Google, *id.* Count III. Every

21  element of each claim is supported by substantial evidence—evidence more than sufficient to create

22  triable issues that must be decided by a jury. Meta's Motion picks at nits while ignoring material

23  evidence. It does not support summary judgment on any of Advertisers' claims.

24  **I.     THERE ARE TRIABLE ISSUES ON ALL ELEMENTS OF ADVERTISERS'
        MONOPOLIZATION CLAIM**

25  Advertisers will prove at trial that Meta violated Section 2 of the Sherman Act by unlawfully

26  maintaining a monopoly in the U.S. Social Advertising Market between December 2016 and

27  December 2020, causing damages to Advertiser Plaintiffs and the Class. Specifically, Advertisers

28

will show (i) that Meta possessed monopoly power in a relevant antitrust market, the Social Advertising Market, between 2016 and 2020; (ii) that Meta willfully maintained that power through a course of conduct that violated the antitrust laws; (iii) that Advertiser Plaintiffs and the Class suffered antitrust injury as a result of Meta's monopolization scheme; and (iv) that Plaintiffs and the Advertiser Class were measurably damaged. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023) (monopolization standard); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665-66 (9th Cir. 2022) (en banc) (elements of a private Clayton Act damages claim). As explained below, there are triable issues of fact on all of these elements.

### A. Advertiser Plaintiffs And The Class Suffered Causal Antitrust Injury

To bring a private claim for monopolization, a "Plaintiff must provide proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." *Epic Games*, 67 F.4th at 983.[1] Where as here the monopolist engaged in a course of conduct involving several actions during the class period, "it would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect." *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992). Advertisers have shown the above—sometimes referred to as causal antitrust injury or impact—here, through both Meta and third-party documents and witnesses as well as through expert testimony.

Fact evidence that will be introduced through Meta and third-party witnesses and documents at trial that Meta's complained of conduct fortified the data targeting barrier to entry (DTBE) surrounding its social advertising business and directly suppressed competition, including by frustrating the product differentiation and growth of social advertising upstart Snapchat; disincentivizing large potential social advertising rivals like Apple, Sony, and Microsoft from entry; cutting a deal with Google that strengthened the DTBE and fortified Meta's entrenched monopoly position in social advertising; and deceptively forestalling regulatory intervention. *See infra* § I.C. These actions were intended to, and successfully did, maintain Meta's monopoly power in the Social Advertising Market, causing Meta Ads price increases, stagnant quality, and resulting harm. *See*

---

[1] Unless otherwise indicated, all emphasis added, and all quotations are cleaned up.

Williams Rpt. ¶¶ 229-42, 368-410. The record evidence and expert testimony establish direct exclusion of competition and quantifiable consumer harm; that these injuries are tied to identified conduct by Meta during the Class Period; and that Meta maintained measurable monopoly power as a result of this conduct.

### 1. Meta's Assertions Regarding "Profits" Misrepresent Dr. Williams's Antitrust Impact Testimony And Are Legally Flawed

The opening argument in Meta's summary judgment motion is titled "Proof of High Profits Alone Cannot Establish Causal Antitrust Injury." Mot. 4. This sentence, and the pages of argument that come after it, are a pure strawman, as they do not actually reckon with the proof of causal antitrust injury presented by Advertisers in this case—both by Dr. Williams and elsewhere. Meta's chief argument rests on a gross mischaracterization of the record.

Meta does not dispute that supracompetitive prices paid by advertisers are sufficient to show causal antitrust injury. *See* Mot. 4; *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 827 (N.D. Cal. 2022) (collecting cases). Meta simply argues, "Advertisers offer no evidence about Meta's prices, let alone that Meta's prices were at excessive levels." Mot. 4-5. This is demonstrably false. Here and at class certification, Dr. Williams repeatedly concluded that "the alleged conduct caused all or virtually all proposed Class members to pay supracompetitive prices for social advertising in the Class Period." Williams Rpt. ¶¶ 10, 15, 16, 23, 24, 147-148, 150, 153, 235-42, 353-354, 368-410, 416. And Dr. Williams specifically analyzed whether Meta's "social advertising prices in the Class Period were higher (or lower) than social advertising prices that would have existed in the but-for world in the absence of the alleged conduct." *Id.* ¶16. This includes Meta's internal analyses demonstrating that it did in fact raise prices during the Class Period. *Id.* ¶ 235. To calculate damages and to test whether these price increases were attributable to Meta's anticompetitive conduct or some other factor, Dr. Williams employed two statistical overcharge analyses accepted in antitrust economics and industrial organization more generally: (1) a yardstick comparison of economic profitability ("EPR"), *id.* ¶ 368-406 and (2) a during-after comparison of EPRs, *id.* ¶¶ 407-08. As discussed at length by Dr. Williams, *id.* ¶¶ 379, 384-86, 389 n.622, these methodologies are supported by substantial economic literature and have been accepted by courts in other litigations, none of which Meta questions.

At bottom, Meta's arguments have nothing to do with the type of injury Advertisers sustained; instead, they concern Meta's spurious methodological quibbles with Dr. Williams's damages calculation. Not only are these insufficient to justify exclusion under the Rule 702 and the *Daubert* standard, but they are even less persuasive to justify summary judgment. *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1221 (9th Cir. 1997) (whether the damages expert's "yardstick" comparator "properly compares to the relevant market presents a question of fact for the jury"); *United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1163-64 (N.D. Cal. 2017) ("At most defendants criticize plaintiffs' experts for failing to consider or adequately consider certain points they believe are significant (*e.g.*, risk adversity); those sorts of disagreements are the subject for cross-examination.").

**Profits vs. Prices**: Meta criticizes Dr. Williams's use of EPRs, rather than raw prices, to estimate damages. Mot. 5:23-7:5. This is a meaningless distinction. Both prices and profits can "serve as a proxy to reflect what the plaintiff's experience would have been but for the illegal conduct." ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues*, ch. 4, § C (3d ed. 2017). Total economic profit is a function of price, economic cost, and output. Meta claims Dr. Williams failed to consider the latter two inputs, Mot. 6, but that is wrong. Dr. Williams expressly accounts for quantity and cost. Williams Rpt. ¶ 410 n.639. Beyond being wrong, Meta's argument does not account for the undisputed fact that Meta runs a near-zero marginal cost advertising business. *See FTC v. Meta Platforms, Inc.*, 2024 WL 4772423, at *27 (D.D.C. Nov. 13, 2024) (observing with respect to social-networking services that for digital goods, marginal costs are "essentially zero"); *United States v. Google LLC*, 2024 WL 3647498, at *80 (D.D.C. Aug. 5, 2024). Dr. Williams, though, did account for the zero marginal cost nature of Meta's business. *See* Williams Rpt. ¶ 410 n.639 ("[I]f the quantity of ads sold by Meta Ads and its costs were different in the actual world from what they would have been in the but-for world, a reduction in the quantity of ads sold by Meta Ads that resulting in a corresponding reduction in costs would leave my damages analysis unchanged."). In reaching this conclusion—that a 1% loss in revenue would correspond to a 1% reduction in costs—Dr. Williams was being conservative. As a zero marginal cost operator, just as it costs Meta nothing to display an ad, Meta "saves" nothing by not displaying that ad. Ex. 3 ("Williams Class Reply") ¶ 160.

**"Omitted" Variables**: Meta contends Dr. Williams failed to control for what it terms "lawful factors" that could contribute to its profitability, such as "[i]nvestments in research and development, product quality, and employee training." Mot. 7-8. But by design, EPRs are "comparable across companies, industries, and countries," Williams Class Reply ¶ 62, controlling for "differences in firms' product quality, management, [and] rates of innovation," Ex. 8. Likewise, Dr. Williams's during-after analysis, "by construction, eliminates the effects of any factors that systematically raise [Meta's] EPR above that of comparable firms." Williams Class Reply ¶ 72.

**"Lawful" Monopoly Power**: Finally, Meta claims Advertisers attribute all of Meta's monopoly profits to the challenged conduct. Mot. 8-9. Again, this is demonstrably false. In a perfectly competitive market, EPRs—by definition—are zero. Williams Rpt. ¶ 382. Dr. Williams, however, bases his damages calculation on "Excess EPRs," which is the difference between Meta's EPR "and an appropriately identified benchmark EPR that the firm would earn absent the challenged anticompetitive conduct." Williams Rpt. ¶ 380. This resulted in a but-for world where Meta still earned an EPR well above zero—in fact, but-for world Meta's EPR during the Class Period would be roughly in line with Google's EPR in its market-leading search ads business. Williams Rpt. ¶ 380. It is a gross mischaracterization or misunderstanding of Dr. Williams's conclusions to suggest he attributed ***all*** of Meta's monopoly profits to the challenged conduct. It is more accurate to say that Dr. Williams calculated damages by comparing the Class Period profits actual monopolist Meta made with the profits a slightly-less-powerful-monopolist Meta would have made in the but-for world.

## 2. Meta's Assertions Regarding Consumer Harm Ignore The Record

Separately from its misguided "profits" argument, Meta also asserts that there is no evidence of consumer harm in Advertisers' case. Mot. 9-10. This is clearly wrong in view of the record. First, as discussed later in this brief, Meta's own documents and those of third parties show that its ad prices rose, its ad quality stagnated, and actual and potential social advertising competitors were actually suppressed or excluded during the Class Period. *See infra* § I.B-C. Dr. Klumpp's testimony references much of this evidence, explaining how each category of Meta's conduct excluded or frustrated rivals, including by strengthening entry barriers; reduced quality, innovation, and output in the Social Advertising Market; and ultimately contributed to the maintenance of a monopolized, rather than

competitive, Social Advertising Market during the Class Period. Klumpp Rpt. ¶¶ 13-184.  And Dr. Williams directly analyzes Meta ad prices, Meta ad quality, entry barriers, and economic profits to identify actual consumer harm due to Meta's monopoly maintenance scheme during the Class Period. Williams Rpt. ¶¶ 235-42, 325-352, 368-410. While Meta may dislike this evidence, it cannot wish it away from the summary judgment record.

To the extent that what Meta's "consumer harm" argument is actually directed to is solely non-price harms (reduced output, lower quality) from its monopoly maintenance scheme, (i) decreased output is the economic flip side of the supracompetitive prices shown in the record and analyzed by Dr. Williams,[2] and also follows naturally from the conduct at issue, which limited entry and expansion by actual and would-be competitors, *see infra* § I.C; and (ii) Dr. Williams directly analyzed one measure of social advertising product quality, click-through rate, and found it to be stagnant or decreasing during the Class Period, Williams Rpt. ¶¶ 238-42—a finding consistent with the presence of monopoly power maintained through Meta's complained-of conduct

### B. Meta Possessed Monopoly Power In An Economically Coherent Antitrust Market During the Class Period

Between December 2016 and December 2020, Meta possessed monopoly power in a relevant antitrust market, the U.S. Social Advertising Market. Dr. Williams describes the Social Advertising Market, the evidence supporting its existence as an economically distinct submarket of online advertising, and Meta's monopoly power in the Social Advertising Market between late 2016 and late 2020 in his Expert Merits Report. *See* Williams Rpt. ¶¶ 25-227 (description of Social Advertising Market), 228-352 (Meta's monopoly power in that market).

In characterizing the Social Advertising Market, contrary to Meta's assertions, Dr. Williams says what social advertising is and is not, Williams Rpt. ¶¶ 27-36, 61-130; explains why Meta's advertising products are social advertising, *id.* ¶¶ 37-60; identifies non-Meta products that are and are not social advertising, *id.* ¶¶ 61-130; applies a Hypothetical Monopolist Test under the FTC/DOJ Horizontal Merger Guidelines, including a SSNIP analysis, *id.* ¶¶ 131-54; and analyzes each *Brown*

---

[2] *See In re NFL Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1158 (9th Cir. 2019) ("[W]ith exceptions not relevant here, raising price, reducing output, and dividing markets have the same anticompetitive effects.").

*Shoe* factor, *id.* ¶¶ 135-36, 155-223. To evaluate Meta's monopoly power in the Social Advertising Market during the class period, Dr. Williams analyzes both direct and indirect evidence of such monopoly power, including by analyzing economic profit rates and return on capital employed, *id.* ¶¶ 229-34, 368-410; Meta-produced evidence of its actual ad prices, *id.* ¶¶ 235-37; Meta-produced evidence showing stagnant or indeed reduced ad quality simultaneous with Meta's ad price increases, *id.* ¶¶ 238-42;[3] and Meta's market share and applicable barriers to entry, *id.* ¶¶ 308-52.

Meta's motion does not appear to challenge its possession of monopoly power in the Social Advertising Market during the Class Period, but does (fleetingly) argue there is no triable evidence for a relevant Social Advertising Market. Mot. 23-25. Meta is wrong. That evidence includes:

- Meta's Sheryl Sandberg repeatedly described Facebook's advertising products as "social advertising," including ███████████████. *See, e.g.*, Ex. 9 ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

- Meta's multilateral business agreements, such as its API agreement with ██████ ████████████████████████████████████████████████████ ███████████████████████████████████████████████ *See* Ex. 10 ████████████████████ at 4016-17[4] ██████████████████████████████

- Others, too, acknowledged the Social Advertising Market. ████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████ Ex. 11 at 6965. So did other industry analysts. Ex. 12 ████████████████████ at 8561 ████████ ███████████████████████████████████████.

A surfeit of evidence—both expert and otherwise—shows an economically distinct Social Advertising Market under the relevant legal principles. *See Epic Games*, 67 F.4th at 975 (setting forth

---

[3] Meta repeatedly asserts, across multiple briefs and at prior hearings, that Dr. Williams did not analyze Meta ad prices or quality. This is simply false. Once again, Dr. Williams directly analyzed Meta ad prices and quality, *see* Williams Rpt. ¶¶ 235-37 (price increases over Class Period), 238-42 (stagnant/declining ad quality), and performed an EPR analysis (among other analyses) to show that these ad prices weren't just rising, but in fact measurably inflated against a competitive but-for world, *id.* ¶¶ 229-34, 368-410.

[4] All four-digit pincites are to the last four digits of a PALM-######### Bates number.

considerations for evaluating proposed relevant market, identifying Horizontal Merger Guidelines/SSNIP as well as *Brown Shoe* factors); *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 & n.9 (9th Cir. 2015) (discussing Horizontal Merger Guidelines and SSNIP); *see also United States v. Google LLC*, 2024 WL 3647498 at *81-87 (holding, based on *Brown Shoe*, that search advertising is a relevant market distinct from social advertising); *FTC v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 354-68 (S.D.N.Y. 2024) (holding, based on *Brown Shoe*, that social advertising is not reasonably interchangeable with programmatic advertising targeted at healthcare professionals). Meta's motion simply ignores the evidence, applies an incorrect standard, and invites legal error by asking for summary judgment on this intensely factual—and evidentiarily contested—issue. *See, e.g.*, *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993) ("The process of defining the relevant market is a factual inquiry for the jury. The court may not weigh evidence or judge witness credibility."); *Teradata Corp. v. SAP SE*, 124 F.4th 557, 567-68 (9th Cir. 2024) ("[A]n antitrust plaintiff need not specify a market by precise 'metes and bounds.' Instead, antitrust law recognizes that some artificiality and fuzziness are inherent in any attempt to delineate the relevant market."). To quote another recent case from this district, "[t]his case falls within the ordinary rule that the definition of the relevant market is a factual inquiry for the jury." *Sumotext Corp. v. Zoove, Inc.*, 2020 WL 127671, at *9 (N.D. Cal. Jan. 10, 2020).

### C. Meta Willfully Maintained Its Social Advertising Market Monopoly Power Through A Course Of Conduct That Violated The Sherman Act

The second element of Advertisers' monopolization claim is Meta's willful maintenance of its monopoly power in the Social Advertising Market during the Class Period through anticompetitive conduct. *See Epic Games*, 67 F.4th at 998. "To be condemned as exclusionary, a monopolist's act must have an 'anticompetitive effect'—that is, it must harm the competitive *process* and thereby harm consumers." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020) (emphasis in original). In evaluating the anticompetitive effect of a monopolist's course of conduct, "it would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect." *City of Anaheim*, 955 F.2d at 1376; *accord In re Suboxone (Buprenorphine Hydrochlorine & Naxolone) Antitrust Litig.*, 967 F.3d 264, 270 & n.11 (3d Cir. 2020).

1    Here, there is triable evidence—from Meta and third-party documents and witnesses, as well

2  as from Advertisers' experts—showing that between December 2016 and December 2020, Meta

3  engaged in a course of conduct through (i) use of its ▮▮▮ program, (ii) its web of exclusionary API

4  agreements, (iii) an advertising market allocation agreement with Google, (iv) a Meta-Netflix

5  agreement, and (v) Meta's deception of the FTC, that was anticompetitive and harmed the competitive

6  process in the United States Social Advertising Market, injuring consumers by supracompetitively

7  inflating social advertising prices, while concurrently reducing output and quality as against a but-for

8  market characterized by free competition rather than monopoly. Meta raises discrete challenges to

9  portions of this element, but these challenges are legally flawed and ignore the actual record.

10    **1.  Meta's ▮▮ Program ▮▮▮▮▮**

11    Between late 2016 and early 2019, Meta conducted an illegal surveillance program that

12  targeted actual and potential competitors and successfully suppressed competition in the Social

13  Advertising Market. This program, originally called ▮▮▮▮▮▮▮▮▮▮

14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Ex. 13 at slide 14, ▮▮▮▮▮▮

15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See*

18  *generally* Jakobsson Rpt. ¶¶ 46-140; Ex. 14, 15, 16, 17. ▮▮▮▮▮

19  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20  Ex. 15 at 3800-01.

21    The initial reason for this program was simple: Mark Zuckerberg wanted to ▮▮▮

22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 18 at 4836 ▮▮▮▮▮

24  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Although Meta had long been

26  able to look at Snapchat's and its other competitors' public-facing products, ▮▮▮▮▮

27  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1    *Id.* But there was a

2    problem:

3    *Id.* Shortly thereafter, Meta's Onavo team devised a solution:

4

5

6

7

8    Ex. 14 at 9831-32 & slides 3, 6; Exs. 15; 17, 19.

9    Meta's          program was successful: by 2017, Meta credited its industrial espionage

10   with

11

12   Ex. 21 (attached to

13   Ex. 20). According to Meta executives and managers,

14

15

16   Ex. 19 at 8385.

17

18   *Id.* at 8382.

19   Snapchat itself—despite being unaware of Meta's

20   As a Snap executive

21   wrote in an internal email in September 2017,

22

23   Ex. 22 at 0000051024. As a high-level Snap

24   executive testified at deposition,

25   Ex. 23 (Levenson

26   Dep.). Meta's own executives gloated about

27

28   Ex. 24,

1 ██████████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████████████

3 ███████████████████████████████████████ Ex. 25.

4 Meta's ██████████ program was so successful that ████████████████

5 ██████████████████████████████████████████████████████████

6 ██████████████████████████████████████████████████████████

7 ████████████████████████ Ex. 26 at 6005; Ex. 27 (Ben-Zedeff Dep.); Ex. 15 at 3801. Meta

8 ██████████████████████████████████████████████████████████

9 █████████████ Exs. 15, 16, 28, 29, 30, 31, 32, 33; 34.[5]

10 At trial, the facts and impacts of Meta's ██████████ program will be explained by Meta

11 documents and witnesses, including Mark Zuckerberg ██████████████████████

12 ██████ Ex. 18 at 4836), Meta COO Javier Olivan ████████████████████

13 ██████████████████████ Ex. 14), Meta executives that ███████████████

14 ██████████████████, Exs. 16, 32, 34, and Onavo managers and executives, Ex. 19; third-party

15 witnesses from Snap, who testified at deposition and produced documents, Exs. 23 (Levenson Dep.),

16 38 (Andreou Dep.); and two Advertiser experts, Dr. Jakobsson, a security executive and longtime

17 industry veteran who will help explain complicated technical documents and concepts to the jury, *see*

18 Jakobsson Rpt. & Jakobsson Reb., and Dr. Klumpp, an economics professor who will explain the

19 competitive impacts of the ██████ program, Klumpp Rpt. ¶¶ 13-64; Klumpp Reb. ¶¶ 85-166.

20 Dr. Klumpp will explain that a program like ██████, in which a monopolist wiretaps actual and

21 potential competitors to obtain valuable, proprietary information from them, has a deleterious impact

22 on competition because it tends to maintain entry barriers and frustrate the entry and growth of

23 nascent, innovative rivals and upstarts—just like ████████████████████████

24 ████████████████. Klumpp Rpt. ¶¶ 52-64, Klumpp Reb. ¶¶ 85-166. Discussing economic theory,

25 _____

[5] Meta considered the program so competitively important that ████████████████

██████████████████████████████ Exs. 35, 36 at 8435-36, followed by outreach to Israeli

hacking organization NSO ██████████████████████████████████████████████,

Ex. 37, Decl. of Shalev Hulio in Support of Motion to Dismiss, *WhatsApp et al. v. NSO Group Technologies Ltd., et al.*, No. 4:19-cv-07123-PJH (N.D. Cal.), Dkt. No. 45-11 (Apr. 2, 2020), at 2.

1  Dr. Klumpp explains that where a monopolist misappropriates trade secrets of smaller entrants/rivals,

2  this tends to maintain monopoly and harm consumers, including by chilling entry, innovation, and

3  overall competition in the relevant market. Klumpp Rpt. ¶¶ 52-64, Klumpp Reb. ¶¶ 99-106. This

4  theory is directly in line with the extensive facts about Ghostbusters that will be shown at trial.

5      Meta raises two arguments in connection with its ▮▮▮▮▮ conduct, both of which are flat

6  wrong. *First*, Meta says that the Court cannot consider its ▮▮▮▮▮ conduct at all, purportedly

7  because Dr. Klumpp's timely-served expert report was, somehow, untimely. Mot. 13-14. This is a

8  bizarre complaint, because Meta was clearly on notice of all applicable facts underlying Dr. Klumpp's

9  opinions during the fact discovery period. *See, e.g.*, Dkt. 565 (May 31, 2023 discovery letter brief

10  explaining theory of harm from ▮▮▮▮▮▮▮ program) at 2-3; Ex. 39 (Jun. 20, 2023 rog

11  responses) at 630 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15  ▮▮▮▮▮▮▮▮; Ex. 105 (May 15, 2023 crime-fraud letter). As to the details of Dr. Klumpp's

16  economic opinions, these were timely disclosed according to the operative case schedule, and Meta

17  was able to (and did) serve expert reports rebutting them, *see* Tadelis Reb. ¶¶ 33-72; Zervas Rpt.

18  ¶¶ 66-69, and depose Dr. Klumpp about them.

19      *Second*, Meta argues that its ▮▮▮▮▮ conduct is not anticompetitive as a matter of law

20  because, according to Meta, Advertisers are simply asserting a trade secret claim, and trade secret

21  misappropriation is *per se* competitive. Mot. 14-17. Meta's argument is wrong both factually and

22  legally. As an initial matter, Advertisers are not bringing a claim for trade secret misappropriation,

23  and that is not what the evidence nor Dr. Klumpp's testimony will establish.[6] Rather, it will show

24

---

[6] Dr. Klumpp was quite clear about this point. Klumpp Reb. ¶ 106 ("Facebook's ▮▮▮▮ program was
anticompetitive. This conclusion is independent of whether an intellectual property rights violation is
alleged by Plaintiffs or not."); *see also id.* ¶¶ 105 ("It is not necessary for Plaintiffs to allege an
intellectual property rights violation in order to investigate whether the alleged conduct had
anticompetitive effects because it amounted, from an economic perspective, to an unauthorized use
of a rival's intellectual property. . . . [T]he unauthorized use of a rival's intellectual property is
anticompetitive not because the rival (or anyone else) alleges an intellectual property rights violation,

1  four things. First, the evidence will show that Meta, a monopolist, stole valuable proprietary

2  information (information which, like a trade secret, was both secret (*e.g.*,

3  ████████████████████████████████████████, *see* Ex. 15, Jakobsson Rpt. ¶¶ 46-

4  140) and valuable based on its secrecy (Snapchat executive:

5  ████████████████████████████████████████████████████████

6  ████████ Ex. 38 (Andreou Dep.)). Second, Dr. Klumpp will explain that when a monopolist

7  subverts technological or legal protections for competitively valuable information, such as ████

8  ██████████████████████████████████ this is economically associated with

9  decreased competition, because it frustrates the ability of innovative upstarts to obtain market share

10 from the monopolist and introduce competitive price, output, and quality conditions. Klumpp Rpt.

11 ¶¶ 52-64; Klumpp Reb. ¶¶ 100-106. Third, the evidence will show that this actually happened in the

12 Social Advertising Market during the Class Period due to the ████████ program, including by

13 ████████████████████████████████████████████████████

14 ████████, *see supra*. Fourth, the evidence, including the expert testimony of Dr. Williams,

15 will show that Meta was in fact able to maintain monopoly power, including the ability to charge

16 supracompetitive prices during the Class Period. Williams Rpt. ¶¶ 229-352.

17      Far from somehow insulated as a matter of law from antitrust scrutiny, this fact pattern is

18 precisely what case law and treatises accept as exclusionary and anticompetitive under federal

19 antitrust laws. *See, e.g., Utah Pie Co. v. Cont'l Baking Co.*, 386 U.S. 685, 696-98 (1967) (evidence

20 of industrial espionage probative of lessening of competition); *Am. Tobacco Co. v. United States*, 147

21 F.2d 93, 113 (6th Cir. 1944), *aff'd* 328 U.S. 781 (1946); *Chase Mfg., Inc. v. Johns Manville Corp.*,

22 2019 WL 2866700, at *9 (D. Colo. Jul. 3, 2019) (collecting cases); *cf. A. H. Cox & Co. v. Star Mach.

23 Co.*, 653 F.2d 1302, 1304, 1308 (9th Cir. 1981) (implying that unfair competition, including

24 "elicit[ing] confidential financial data" about competitor, can be an antitrust violation with "proof of

25 anticompetitive effect"); *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 707 F. Supp. 1170,

26 1178 (C.D. Cal. 1989) ("*Absent any countervailing evidence of trade secret misappropriation*, UAI's

27 ─────────────────

28 but because it causes harm to competition—it disincentivizes market entry, product competition, and innovation.").

trade secret allegations cannot form the basis of its Section 2 monopoly claim."), *aff'd*, 914 F.2d 1256 (9th Cir. 1990). Indeed, the very section of the Areeda treatise that Meta cites states that while business torts generally do not harm competition, as opposed to competitors, they may be exclusionary "in monopoly maintenance cases." Areeda, *Antitrust Law* ¶ 782a1. And as explained in a leading treatise by Prof. Hovenkamp and others, trade secret misappropriation can be particularly harmful to competition in high-technology industries—as here:

> [I]n high-technology industries innovation is essential to dynamic competition. Infringement can be a competitive weapon because it imposes delay and costs on the intellectual property owner who must police it and because it reduces the value of intellectual property incentives. In some limited circumstances, the costs that intellectual property infringement impose on intellectual property owners can create significant barriers to entry, facilitating maintenance of monopoly power.

Hovenkamp et al., *IP and Antitrust: An Analysis of Antitrust Principles Applied to Intellectual Property Law* § 11.05 (3d ed. Nov. 2024 update).

### 2. Meta's Web Of API Agreements

During and leading up to the Class Period, Meta secretly entered into private extended API agreements with selected companies with large user bases and data troves, such as ███████ ████████████—potential threats to Meta's monopoly through social elements of their existing products ████████████████████████████████████████████████. Klumpp Rpt. ¶¶ 134-67; *see* Exs. 10 (███████), 40 (███████), 41, 42, 43, 44, 45, 46, 47, 48, 49 (███████), 50 (███████), 51 (███████), 52 (███████), 53, 54, 55, 56 (███████), 57, 58, 59. These private extended API agreements included competitive restrictions tied to ████████████████████ which restricted entry into the Social Advertising Market by Meta's private API counterparties. Klumpp Rpt. ¶¶ 152-67. These restrictions were in force, and counterparties like ████████████ ████████████████████████████████████████████████████████ ██████████. Klumpp Rpt. ¶ 139, 152-60; *see* Ex. 40 at 7689; Ex. 60 at 6387-88; Ex. 61 at 9678; Ex. 62 at 3557-59; Ex. 63 at 8459-61; Ex. 64 at 4264, 4267; Exs. 48, 65, 66.

1   Dr. Klumpp will explain at trial that this web of agreements was exclusionary because it
2   disincentivized or blocked some of Meta's most important would-be social advertising rivals from
3   creating competing social advertising products leading up to and during the Class Period, entrenching
4   Meta's monopoly power and protecting and strengthening the DTBE. Klump Rpt. ¶¶ 161-67; Klumpp
5   Reb. ¶¶ 253-93. Contrary to Meta's assertions, the relevant portions of the challenged API agreements
6   were not "vertical," but instead were directed toward counterparties Meta considered potential future
7   horizontal competitors. Dr. Klumpp is express on this point—the excluded "Integration Partners were
8   potential social networking competitors for Facebook and, thus, could become social advertising
9   competitors." Klumpp Rpt. ¶ 161. Meta's agreement with ██████ is illustrative: ████████████
10  ████████████████████████████████████████████████████████████████████
11  ████████████████████████████████████████████████████████████████████
12  ████████████████████████████████████████████████████████████████████
13  ██████████████████████████ Ex. 10 at 9817; *see* Ex. 40 (Jul. 12, 2017 side letter).
14  And contrary to Meta's further assertions, the complained-of restrictions did in fact—not just
15  hypothetically—prevent entry into Meta's monopolized market by large, well-resourced
16  counterparties during the class period. *See* Klumpp Rpt. ¶ 167. By preventing entry by companies
17  like ████████████████ into the Social Advertising Market—a fact that Meta cannot
18  dispute—Meta's web of private API agreements clearly impacted competition in its monopolized
19  market, as Dr. Klumpp will testify. Meta's main argument regarding the API agreements appears to
20  be that ████████████████ and others did not enter the Social Advertising Market during the
21  Class Period for other reasons, but this is an argument for trial. There is substantial evidence to the
22  contrary, including the agreements themselves and the economic testimony of Dr. Klumpp about their
23  economic impact. Meta's argument is a factual dispute, not a basis for summary judgment.

24          **3.  Meta's Agreement With Google**

25  In late September 2018, Meta entered into a horizontal agreement with Google in which ████
26  ████████████████████████████████████████████████████████████████████
27  ██████████████████. Documents and testimony by Meta executives will show at trial that
28  ████████████████████████████████████████████████████████████████████

1

2

3 . *See* Exs. 67, 68, 69 (S. Wang Dep. I).

4

5 Ex. 70 at 9704

6 ; Ex. 71

7

8

9 ; Ex. 72 at 5349

10

11 . The rising competitive pressure between Google and Meta was deflated when the

12 companies agreed to

13 . *See* Exs. 73

14 ; 74

15 ; 75

16

17 ; *see also* Ex. 76

18 .

19 The Meta-Google agreement allowed Meta to stave off a threat to its monopoly power in the

20 Social Advertising Market,

21

22 . *See,*

23 *e.g.*, Ex. 75 at 9594; Ex. 77 (GNBA agreement) at 2359-60; Ex. 78 (S. Wang Dep. II). In exchange,

24

25

26 Ex. 79 at 3078-79

27

28 ; Ex. 80 at 3187, 3207.

1    The Meta-Google agreement and its impacts will be proved through documents and testimony

2    from Meta and Google executives, as well as through expert testimony from Dr. Klumpp, who will

3    explain that pursuant to the agreement, Google █████████████████████████████████

4    ████████████████████████████████████████████████████████████████████████████

5    █████████████████████████. Klumpp Rpt. ¶¶ 90-101, Klumpp Reb. ¶¶ 186-213. As

6    Dr. Klumpp will further explain, the agreement was a *quid pro quo*, as Meta ████████████

7    ███████████████████████. Klumpp Reb. ¶¶ 201-08, 214-15.

8    In view of both the fact and expert evidence, the Meta-Google agreement does in fact impose

9    a horizontal restraint supported by evidence of actual competitive exclusion in the Social Advertising

10   Market, including Dr. Klumpp's economic analysis directly explaining how the Meta-Google

11   agreement harmed two markets, including the Social Advertising Market, where it helped Meta

12   maintain its monopoly power. *See* Klumpp Reb. ¶¶ 186-213, including ¶¶ 209-13 ("The GNBA

13   helped maintain Facebook's social advertising monopoly"); Klumpp Rpt. ¶¶ 90-101.

14   While Advertisers do not dispute that certain facets of the GNBA could be characterized as

15   vertical, these aspects are not being challenged. Rather, Advertisers challenge the market allocation

16   between Google and Meta, which is plainly a horizontal restraint. *See In re Musical Instruments &*

17   *Equip. Antitrust Litig.*, 798 F.3d 1186, 1192-93 & n.4 (9th Cir. 2015) (in case involving horizontal

18   and vertical agreements, analyzing only horizontal agreements as potential *per se* violations where

19   plaintiffs did not challenge vertical agreements).

20   ### 4. Meta's Netflix Agreement

21   During the Class Period, Meta entered into an agreement with Netflix that reduced direct

22   competition between the two companies where ███████████████████████████████████

23   ██████████████████████████████████. This agreement will be proven through

24   voluminous documents and testimony from Meta witnesses and from Reed Hastings, Netflix's

25   founder and former CEO. For example, documents and testimony will show:

26   • ████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████



[redacted]

In short, Meta entered into an agreement with its horizontal video streaming competitor, Netflix, in which Meta agreed to [redacted] [redacted]. The economic impact of Meta's agreement with Netflix in the Social Advertising Market is analyzed by Dr. Klumpp, who explains that given the economics of monopoly and the diminishing returns to data in AI/ML models used for social advertising targeting, redirecting Netflix signals to Meta instead of a nascent social advertising competitor enhanced the DTBE, thereby contributing to Meta's monopoly maintenance. Klumpp Rpt. ¶¶ 126-33; Klumpp Reb. ¶¶ 225-56.

As with its challenge to the API agreements and the Google agreement, Meta principally argues that the Netflix agreement is "vertical," and that there is no proof that it foreclosed competition. Again, Meta is wrong. First, Meta's agreement with Netflix involved horizontal video streaming competitors, and Meta's agreement reduced its competition with Netflix in that market. And, as Dr. Klumpp explains, the intended and actual result of the Netflix agreement was to reduce competition in the Social Advertising Market by raising the DTBE. An agreement that strengthens entry barriers protecting a monopoly unquestionably forecloses competition. *See Epic Games*, 67 F.4th at 983-84 ("It is sufficient that the plaintiff prove the defendant's conduct, as matter of economic theory, harms competition—for example, that it increases barriers to entry.").

### 5. Meta's Deception Of The FTC

In 2019 and 2020, Meta deceived the FTC regarding [redacted] [redacted] [redacted]. Without this deception, Meta [redacted] [redacted] At the time, the FTC was conducting an antitrust investigation of Meta as a prelude to adjudicatory action. Ex. 98 (CID, FTC File No. 191-0134); *see* 15 U.S.C.§ 46(a); *Ash Grove Cement Co. v. FTC*, 577 F.2d 1368, 1375 (9th

1  Cir. 1978) (FTC has authority to conduct investigations "to assist its enforcement of the acts which it

2  administers," including through "adjudicative enforcement proceeding[s]").

3       This conduct will be shown through Meta documents and the testimony of its former

4  executives. For example, Meta documents and testimony will show that ███████████████████

5  ████████████████████████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████████████████████████

8  ████████*See, e.g.*, Ex. 99 ███████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████████████████████████

10 █████████████████████████████. Despite this ongoing, company-wide effort, ███████████

11 ████████████████████████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████████████████████████[7]██

15 ████████████████████████████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████████████████████████████

17 ██████████████████████████ Ex. 100 at 7779. These omissions to the FTC will be proved through

18 a handful of Meta documents and testimony, and that they actually occurred is essentially undisputed.

19       As to the economic impacts of this conduct, they are straightforward: as Dr. Klumpp explains,

20 ████████████████████████████████████████████ would have imposed a competitive price

21 check on the Social Advertising Market. Klumpp Rpt. ¶¶ 182-84. Again, Meta can hardly dispute that

22 this would be the case—or at least that there is a triable issue of fact as to whether it would be.

23       Despite the straightforward facts and economics behind this theory, Meta urges the Court to

24 grant summary judgment against Advertisers based on (i) highly factual disputes about what the FTC

25 knew and when and (ii) an argument that "Advertisers' theory is barred by *Noerr-Pennington*. Mot.

---

26 [7] *See also* Ex. 102, Meta Platforms, Inc.'s Objections and Responses to Advertiser Plaintiffs' First

27 Set of Requests for Admission ████████████████████████████████████████████████████████

28 ███████████████████████.

11-13. Meta is wrong on both counts. As to its first argument, Meta simply presents a series of factual

disputes—Could the FTC have in fact divested or segregated ████████████████? Would

attempts to do so change Meta's course of action? When and what did the FTC actually know about

████████████? This is the stuff of trial, not summary judgment.

On *Noerr-Pennington*, Meta has the law wrong. Even if the Court accepts that lying to the

FTC in an antitrust investigation is somehow petitioning the government, an argument that lacks clear

precedent, Meta ignores that *Noerr-Pennington* does not immunize fraud in the *adjudicatory*, as

opposed to legislative, context. *See Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*,

690 F.2d 1240, 1261 (9th Cir. 1982) ("[T]he fraudulent furnishing of false information to an agency

in connection with an adjudicatory proceeding can be the basis for antitrust liability . . . ."); *see also*

Areeda, *Antitrust Law* ¶ 203e1 & n.17 ("There certainly is no privilege for misrepresentations to

administrative agencies that base their decisions on information provided by the parties.").

**D. There Are Measurable Damages**

The final element of a monopolization claim is measurable damages. *Olean*, 31 F.4th at 665-

66. Meta does not separately argue that Advertisers have not raised a triable issue regarding damages,

but does assert that "if any conduct theory fails, advertisers are not entitled to damages." Mot. 22.

Meta's argument on this point is legally flawed, and is built on an incorrect factual premise.

As an initial matter, it's not clear what exactly Meta means. Meta does not contend that it is

entitled to summary judgment of no damages—and it could not seriously do so, on the present record.

An antitrust plaintiff must provide "sufficient evidence to permit a just and reasonable estimate of the

damages. This is a liberal proof of damages standard designed to ensure a quantification of injury that

is approximate rather than highly precise and certain." *William Inglis & Sons Baking Co. v. Cont'l

Baking Co.*, 942 F.2d 1332, 1340 (9th Cir. 1991), *vacated in part on other grounds*, 981 F.2d 1023

(9th Cir. 1992). As set forth above and in the attached exhibits, there is both factual and expert

evidence for Meta's monopoly power, for its anticompetitive conduct, for causal antitrust injury

including a consumer overcharge, and for damages, including in expert testimony from Dr. Williams

specifically directed to that subject. *See* Williams Rpt. ¶¶ 368-416. Moreover, as explained above,

Meta is not entitled to summary judgment of legality for any aspect of its challenged conduct.

1    In any event, if what Meta is actually arguing is that summary judgment of no damages should

2 be granted if any aspect of its challenged conduct is found legal, this does not match either the factual

3 record or the applicable law. As far as the evidence, Dr. Williams analyzed the impact of Meta's

4 unlawful monopoly on its social advertising prices, Williams Rpt. ¶¶ 368-416); if any portion of

5 Meta's challenged conduct were deemed lawful, this would not impact the damages analysis unless

6 entire periods of time in the Class Period were left without any unlawful monopoly maintenance

7 conduct. For example, if both Meta's ▮▮▮▮ conduct and its API agreements were found to be lawful,

8 then portions of the Class Period (prior to the Google and Netflix agreements) would have no

9 damages. But this would be a recalculation issue, not a summary-judgment-of-no-damages one, and

10 if *other* aspects of Meta's challenged conduct—its Netflix agreement, for example—were held to be

11 lawful, this would not impact the fact that Meta engaged in an unlawful course of anticompetitive

12 conduct that was intended to and actually did maintain its social advertising monopoly throughout the

13 Class Period. In neither case would summary judgment of no damages be warranted.

14    To the extent that Meta's damages argument is actually just a complaint about Dr. Williams's

15 damages methodology, Meta's argument is contrary to both economic literature and to relevant case

16 law. Dr. Williams's method of evaluating the impact of and damages from Meta's unlawful conduct

17 is the straightforward and necessary result of a factual situation where a monopolist like Meta is so

18 worried about potential entry that it deploys multiple concurrent schemes to flex its market power

19 and crush nascent competition. As stated in one leading authority on the matter:

20    Once any exclusionary practice has been found unlawful and shown to be a
     significant contributor to the monopolist's monopoly price, then the court must

21    indulge a presumption about the size of the contribution. Here, the sensible
     presumption is that in the absence of the unlawful exclusionary practice, the

22    monopolist would have charged the competitive price, so damages should be based

23    on the difference between the monopoly price and the competitive price.

24 Areeda ¶ 657b. *See also City of Anaheim*, 955 F.2d at 1376; *Suboxone*, 967 F.3d at 270 & n.11.

25 **II.    THERE ARE TRIABLE ISSUES ON ALL ELEMENTS OF ADVERTISERS'
     ATTEMPTED MONOPOLIZATION CLAIM**

26    Advertisers also bring a claim for attempted monopolization of the Social Advertising Market.

27 AFAC Count II. An attempted monopolization claim requires three elements: specific intent to

28

monopolize a relevant market, predatory or anticompetitive conduct, and a dangerous probability of success. *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 481-82 (9th Cir. 2021). There are triable issues on each of the above elements in this case, and Meta does not seriously argue otherwise (except as to the second element). As to that second element—anticompetitive conduct—Meta is not entitled to summary judgment for the reasons and evidence outlined in Advertisers' analysis of their monopolization claim. There are triable issues of fact as to whether the conduct identified by Advertisers was anticompetitive.

## III. THERE ARE TRIABLE ISSUES FOR ADVERTISERS' SECTION 1 CLAIM

Finally, Advertisers bring a Section 1 claim based on Meta's late-2018 market allocation agreement with Google. Meta does not separately address this claim in its motion, beyond a bare reference equating it to the monopolization claims with respect to certain of its arguments. Here, the evidence concerning the Google-Meta agreement establishes Section 1 liability under both the *per se* standard—applicable to horizontal market division agreements—and the Rule of Reason. Meta offers little specific argument to the contrary, except to argue generically that the Google-Meta agreement is "vertical" and did not foreclose competitors. Mot. 17, 19-21. Meta is wrong that the Google-Meta agreement is not anticompetitive when viewed under the Rule of Reason. *see, e.g.*, *Epic Games*, 67 F.4th at 974 (Rule of Reason "applies essentially the same regardless of whether the alleged antitrust violation involves concerted anticompetitive conduct under § 1 or independent anticompetitive conduct under § 2."); *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1044 n.3 (9th Cir. 2008) ("The 'relevant market' and 'market power' requirements apply identically under the two different sections of the [Sherman] Act"). But for the reasons discussed above, the Google-Meta agreement is a horizontal market division between potential competitors, actionable under Section 1. *See Snow v. Align Tech., Inc.*, 586 F. Supp. 3d 972, 978 (N.D. Cal. 2022) ("As the Supreme Court has recognized, a market division agreement between potential competitors constitutes a horizontal restraint on trade."); *see also Otter Tail Power Co. v. United States*, 410 U.S. 366, 377 (1973) (holding that "agreements not to compete, with the aim of preserving or extending a monopoly," are unlawful).

## CONCLUSION

The Court should deny Meta's motion for summary judgment.

Dated: January 29, 2025

**BATHAEE DUNNE LLP**

By: */s/ Yavar Bathaee*
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Andrew C. Wolinsky (CA 345965)
awolinsky@bathaeedunne.com
Priscilla Ghiță (*pro hac vice*)
pghita@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
Tel.: (332) 322-8835

Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (*pro hac vice*)
egrauman@bathaeedunne.com
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
Tel.: (213) 462-2772

Allison Watson (CA 328596)
awatson@bathaeedunne.com
3420 Bristol St, Ste 600
Costa Mesa, CA 92626-7133

*Interim Co-Lead Counsel for the Advertiser Classes*

**LEVIN SEDRAN & BERMAN LLP**

Keith J. Verrier (*pro hac vice*)
kverrier@lfsblaw.com
Austin B. Cohen (*pro hac vice*)
acohen@lfsblaw.com
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3997
Tel.: (215) 592-1500

*Members of Executive Committee for the Advertiser Classes*

**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**

By: */s/ Amanda F. Lawrence*
Amanda F. Lawrence (*pro hac vice*)
alawrence@scott-scott.com
Patrick J. McGahan (*pro hac vice*)
pmcgahan@scott-scott.com
Michael P. Srodoski (*pro hac vice*)
msrodoski@scott-scott.com
156 South Main Street, P.O. Box 192
Colchester, CT 06415
Tel.: (860) 537-5537

Patrick J. Coughlin (CA 111070)
pcoughlin@scott-scott.com
Carmen A. Medici (CA 248417)
cmedici@scott-scott.com
Hal D. Cunningham (CA 243048)
hcunningham@scott-scott.com
Patrick J. Rodriguez (*pro hac vice*)
prodriguez@scott-scott.com
Daniel J. Brockwell (CA 335983)
dbrockwell@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: (619) 233-4565

**AHDOOT & WOLFSON, PC**

Tina Wolfson (CA 174806)
twolfson@ahdootwolfson.com
Robert Ahdoot (CA 172098)
rahdoot@ahdootwolfson.com
Theodore W. Maya (CA 223242)
tmaya@ahdootwolfson.com
Henry J. Kelson (*pro hac vice*)
hkelston@ahdootwolfson.com
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
Tel.: (310) 474-9111

1

**FILER ATTESTATION**

2     I am the ECF user who is filing this document.  Pursuant to Civil L.R. 5-1(h)(3), I hereby

3 attest that each of the other signatories have concurred in the filing of the document.

4

5 Dated: January 29, 2025                    By:  */s/ Brian J. Dunne*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28