**PUBLIC REDACTED VERSION**

| | |
|---|---|
| WILMER CUTLER PICKERING HALE AND DORR LLP | ARI HOLTZBLATT (SBN 354631) Ari.Holtzblatt@wilmerhale.com |
| SONAL N. MEHTA (SBN 222086) Sonal.Mehta@wilmerhale.com 2600 El Camino Real, Suite 400 Palo Alto, California 94306 Telephone: (650) 858-6000 | MOLLY M. JENNINGS (*pro hac vice*) Molly.Jennings@wilmerhale.com 2100 Pennsylvania Ave NW Washington, DC 20037 Telephone: (202) 663-6000 |
| DAVID Z. GRINGER (*pro hac vice*) David.Gringer@wilmerhale.com ROSS E. FIRSENBAUM (*pro hac vice*) Ross.Firsenbaum@wilmerhale.com RYAN CHABOT (*pro hac vice*) Ryan.Chabot@wilmerhale.com PAUL VANDERSLICE (*pro hac vice*) Paul.Vanderslice@wilmerhale.com 7 World Trade Center 250 Greenwich Street New York, New York 10007 Telephone: (212) 230-8800 | MICHAELA P. SEWALL (*pro hac vice*) Michaela.Sewall@wilmerhale.com 60 State Street Boston, Massachusetts 02109 Telephone: (617) 526-6000 |

*Attorneys for Defendant Meta Platforms, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> META PLATFORMS, INC., a Delaware Corporation, <br><br> Defendant. | Case No. 3:20-cv-08570-JD <br><br> **DEFENDANT META PLATFORMS, INC.'S REPLY IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY AND OPINIONS OF MICHAEL WILLIAMS** <br><br> Hearing Date: To Be Determined <br> Time: To Be Determined <br> Judge: Hon. James Donato |

**PUBLIC REDACTED VERSION**

# TABLE OF CONTENTS

I.   WILLIAMS'S YARDSTICK STUDIES ARE JUNK SCIENCE ..........................................................1

   A.   The Chosen Comparators And Selection Criteria Are Junk Science ........................1

   B.   Even If The "Yardsticks" Were Legitimate (They Are Not), Williams's Studies Are Unreliable Because He Examines Meta's Profits, Not Its Prices ........................................................................................................................5

   C.   Even If The "Yardsticks" Were Legitimate (They Are Not) And Even If He Had Successfully Determined An Overcharge Based On Profits (He Did Not), Williams Fails To Control For Lawful Factors Affecting Profits ...........6

II.  WILLIAMS'S "DURING-AFTER" MODEL IS JUNK SCIENCE ......................................................8

III. WILLIAMS HAS FAILED TO COHERENTLY DEFINE A PRODUCT MARKET ............................8

IV.  WILLIAMS'S HYPOTHETICAL MONOPOLIST AND SSNIP TEST IS JUNK SCIENCE .................9

**PUBLIC REDACTED VERSION**

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Behrend v. Comcast Corp.*,
   No. 2:03-cv-06604, Dkt. 430 (E.D. Pa. Jan. 7, 2010)..................................................................10

*Carter Hawley Hale Stores, Inc. v. Limited, Inc.*,
   587 F. Supp. 246 (C.D. Cal. 1984) .............................................................................................9

*CZ Servs., Inc. v. Express Scripts Holding Co.*,
   2020 WL 4518978 (N.D. Cal. Aug. 5, 2020) .............................................................................3

*Epic Games, Inc. v. Apple, Inc.*,
   67 F.4th 946 (9th Cir. 2023) .......................................................................................................9

*In re Google Play Store Antitrust Litig.*,
   2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) .......................................................................4, 7

*Grasshopper House, LLC v. Clean & Sober Media LLC*,
   2019 WL 12074086 (C.D. Cal. July 1, 2019).............................................................................7

*Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
   588 F.3d 908 (6th Cir. 2009) ....................................................................................................10

*Klein v. Meta Platforms, Inc.*,
   2025 WL 295361 (N.D. Cal. Jan. 24, 2025)...............................................................................5

*In re Live Concert Antitrust Litig.*,
   863 F. Supp. 2d 966 (C.D. Cal. 2012) ........................................................................................9

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*,
   387 F. Supp. 2d 794 (N.D. Ill. 2005) .....................................................................................1, 2

*In re: NFL "Sunday Ticket" Antitrust Litig.*,
   2024 WL 3628118 (C.D. Cal. Aug. 1, 2024)..............................................................................2

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) .......................................................................................................7

*Stokes v. John Deere Seeding Grp.*,
   2014 WL 675820 (C.D. Ill. Feb. 21, 2014)..............................................................................5, 8

*Sumotext Corp. v. Zoove, Inc.*,
   2020 WL 6544410 (N.D. Cal. Nov. 6, 2020), *aff'd*, 2021 WL 4988024
   (9th Cir. Oct. 27, 2021), *cert. denied*, 142 S. Ct. 2836 (2022) ................................................10

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
   546 F.3d 991 (9th Cir. 2008) ......................................................................................................9

**PUBLIC REDACTED VERSION**

*In re: Turkey Antitrust Litigation*,
   No. 1:19-cv-08318, Dkt. 893 (N.D. Ill. Jan. 26, 2024)............................................................10

*In re: Turkey Antitrust Litigation*,
   No. 1:19-cv-08318, Dkt. 1107 (N.D. Ill. Jan. 22, 2025)..........................................................10

*United States v. Oracle Corp.*,
   331 F. Supp. 2d 1098 (N.D. Cal. 2004) ...................................................................................9

*US Airways, Inc. v. Sabre Holdings Corp.*,
   938 F.3d 43 (2d Cir. 2019).....................................................................................................6, 7

**OTHER AUTHORITIES**

Areeda & Hovenkamp, *Antitrust Law* (2023).....................................................................................6

F. Fisher, et al., *Folded, Spindled, and Mutilated: Economic
   Analysis and* U.S. v. IBM (1985) .............................................................................................7

**PUBLIC REDACTED VERSION**

1    Advertisers' defense of Williams's opinions is baffling. Disregarding the pervasive
2  unexplained gaps in his analysis, Advertisers contend that Williams's opinions all must go to the
3  jury because he supposedly used what they call "considerable professional judgment" to perform
4  (what he calls) a yardstick study. Opp. 4. But there is no "professional judgment" immunity from
5  *Daubert*.

6    To be a reliable yardstick study, Williams needed to identify firms that are reasonably
7  comparable to Meta. Advertisers do not even try to argue that the smattering of foreign real estate,
8  automotive, stock photography, tourism, and price comparison websites Williams came up with
9  are comparable to Meta, and no one could. And yet, from this facially absurd comparison, Williams
10 claims to draw a host of conclusions about the but-for world: that, without the challenged conduct,
11 Meta's profit rate would have been reduced to equal these foreign or otherwise unrelated firms;
12 that Meta's reduced profit rate would stem solely from lower prices at which Meta would have
13 sold ads; and that "social advertising" constitutes a relevant antitrust product market. None of these
14 *ipse dixit* opinions make sense, and none are grounded in reliable and validated economic
15 literature. Instead, Advertisers propose a new law of economics: that so-called "economic" profit
16 rates can be compared across "[REDACTED]" to pinpoint the precise effect
17 of any factor of an expert's choosing. If that were true, Williams would have no need for any
18 methodology or to defend his selection criteria—he could have picked any group of firms at
19 random (which is not far from what he did). Of course, this is not how a comparability analysis
20 works.

21 **I.   WILLIAMS'S YARDSTICK STUDIES ARE JUNK SCIENCE**

22    **A.   The Chosen Comparators And Selection Criteria Are Junk Science**

23    The pervasive defects with Williams's yardstick selections cannot be discounted as mere
24 "quibbles," as Advertisers attempt to characterize them. Opp. 4. As Meta's motion explained (Mot.
25 5), "the phrase 'junk science'" is "appropriately applied to [a] sampling of supposedly comparable
26 companies" that, as here, lacks any "showing of comparability." *Loeffel Steel Prods., Inc. v. Delta*
27 *Brands, Inc.*, 387 F. Supp. 2d 794, 812, 817 (N.D. Ill. 2005). Comparators in a yardstick study
28 "must be fair congeners," and "[i]f they are not, the comparison is manifestly unreliable and cannot

**PUBLIC REDACTED VERSION**

1  'logically advance[] a material aspect of the proposing party's case.'" *Id.* at 812. That is more than
2  a question of weight; it goes to the very heart of the reliability of a methodology.

3  Williams selected yardstick firms using a series of arbitrary filters, none of which reliably
4  selected comparable firms. And those filters predictably resulted in a bizarre array of firms bearing
5  little resemblance to Meta—overwhelmingly foreign firms, including German and British real
6  estate portals, several international car sales websites, a Chinese stock photography website, a
7  Japanese shopping website called "█████████" a small Polish firm "█████████" a British
8  price-comparison website "█████████" and the Chinese firm "█████████
9  █████████" which Williams could not even describe.

10  Advertisers do not even defend Williams's yardsticks as being comparable to Meta.
11  Instead, responding to the inclusion of foreign firms, firms in businesses wholly unlike Meta's (or,
12  in the case of █████████, a firm whose area of business no one has managed to
13  articulate), and firms that earn little to no revenue from advertising, Advertisers retreat to two
14  unavailing defenses. First, they claim that EPRs are "'█████████'" and areas
15  of business. Opp. 6-7 & n.8. That misses the point. The question is not whether EPRs allow one
16  to compare the *profitability* of companies operating in different countries or in different lines of
17  business. The question is whether a yardstick methodology can reliably be applied when
18  comparing wildly different firms' profitability and, if it can, tell you anything about *why* one firm
19  is more profitable than another (e.g., allegedly anticompetitive conduct, or industry dynamics, or
20  something else entirely). It cannot and does not. And comparing EPRs does not magically change
21  that.

22  Second, Advertisers claim that the presence of (numerous) unreliable yardstick firms in
23  Williams's model can be remedied by entrusting the jury to sort out which of his model's 90
24  variations of unreliable yardsticks include only genuinely comparable firms. For one thing, that
25  presents the jury with an unreasonable task. An expert may not offer the jury "multiple variations
26  of the but-for world" without also presenting a reliable analysis of what the but-for world would
27  have actually looked like; an expert's job is to do that analysis, not leave it to the jury to figure out
28  in the first instance. *See In re: NFL "Sunday Ticket" Antitrust Litig.*, 2024 WL 3628118, at *5-6

1  (C.D. Cal. Aug. 1, 2024). And, in all events, no permutation of Williams's broken model can
2  transform it into a reliable one. The problem is not just that the model ultimately includes firms
3  that bear no resemblance to Meta—though, to be sure, that is a problem. The fundamental problem
4  with Williams's analysis is that his criteria selected these firms in the first place. Their inclusion
5  is proof positive that Willams's selection process was broken to the core. That problem cannot be
6  solved by simply removing the most obvious proof of his methodology's unreliability.

7  Finally, in a footnote, Advertisers suggest that junk selection criteria matter only where an
8  expert "kn[ows] almost nothing about the firms [he] selected as comparators." Opp. 4 n.5. No case
9  they cite supports that view, but even if it were right, Williams's opinions suffer from that very
10 problem because he doesn't know anything about the firms he selected. For instance, Williams
11 could not describe ███████████████████ *see* Mot. 6, and Advertisers now assert
12 it is a "███████████████," Opp. 7 n.8, which appears to be incorrect. *See*
13 ████████████████████████████████████████
14 ████████████████████████████████████████
15 ████████████ (last visited Feb. 12, 2025). And both Williams and Advertisers have
16 repeatedly insisted that ███████████████████████" show "████████
17 ████████████" Opp. 7 n.8, when its reports expressly show that its revenue included
18 "sales of tourist [services]," "architectural designs," and "car[s]." Dkt. 819-2 at 16-17.

19 As for the selection process that produced Williams's bizarre set of comparators,
20 Advertisers' lead defense is, tellingly, a thinly veiled *ipse dixit*—a plea that this court simply accept
21 Williams's numerous indefensible methodological choices as exercises of "professional
22 judgment." Opp. 4. As this Court has recognized, invoking "professional judgment" to excuse
23 gaping methodological flaws comes "dangerously close to an expert magically drawing opinions
24 out of a black box." *CZ Servs., Inc. v. Express Scripts Holding Co.*, 2020 WL 4518978, at *8 (N.D.
25 Cal. Aug. 5, 2020) (Donato, J.). Nor can Advertisers paper over the flaws in Williams's yardstick
26 selection criteria by insisting they be "considered jointly." Opp. 5. Here, the sum is no greater than
27 its parts. As Meta's motion explained (Mot. 5-7), whether considered jointly or one-by-one, the
28 selection criteria are a series of arbitrary and misapplied mechanical filters untethered to finding

**PUBLIC REDACTED VERSION**

1  comparability or any accepted methodology for doing so.

2  If anything, Advertisers' attempted defense of Williams's selection criteria makes the
3  criteria's flaws even more apparent. Consider Advertisers' defense of the single most impactful
4  selection criterion, the filter limiting candidate firms to those ▐▐▐▐▐▐▐▐▐▐
5  ▐▐▐▐▐▐▐▐▐▐ Advertisers expressly concede that "▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐
6  ▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐" firms to this category or to any other. Opp.
7  5. That means Williams cannot attest to the reliability of ▐▐▐ selection criteria—because he
8  does not know what those criteria were. And neither this court nor a jury can assess whether
9  ▐▐▐ selection criteria were reliable—because neither the Court nor the jury can possibly know
10 what selection criteria ▐▐ used (and Advertisers and Williams made no effort to investigate
11 this via discovery). If a court cannot admit evidence based on "the *ipse dixit* of the expert," *In re*
12 *Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *10 (N.D. Cal. Aug. 28, 2023) (Donato,
13 J.), it certainly cannot admit evidence based on the *ipse dixit* of a third party (not subject to
14 deposition or cross-examination) that an expert simply regurgitates. That is especially so here,
15 because what little *is* knowable—and known by Williams himself—about ▐▐▐ process reveals
16 that it failed to reliably apply its own definition of "▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐," which should
17 have excluded Meta itself. *See* Mot. 6-7. "Respected" or not, ▐▐▐ is obviously wrong here.

18 Advertisers' defenses of Williams's other filters fare no better. They defend Williams's
19 arbitrary ▐▐▐ and ▐▐▐▐▐▐▐▐ filters on the ground that "▐▐▐▐▐▐▐▐▐▐
20 ▐▐▐▐▐▐▐▐▐" Opp. 5. If a "methodology" requires arbitrary and biased line-drawing, it is
21 not much of a methodology at all. Advertisers present no argument for why the points Williams
22 selected were reasonable—again, they simply invite this Court (and eventually the jury) to blindly
23 accept Dr. Williams's unexplained methodological choice. As for the final filter (limiting firms to
24 those with ▐▐▐▐▐▐▐), Advertisers again lean on Williams's "▐▐▐▐▐▐▐▐▐
25 ▐▐▐▐▐" in lieu of a reasoned justification. Opp. 6. The only fleeting justification they offer is
26 to reiterate that firms "▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐" are not comparable to Meta. *Id.* In
27 so doing, they concede that the point of the exercise was to identify firms "comparable to Meta,"
28 something that they have completely failed to do. Importantly, this justification is irreconcilable

**PUBLIC REDACTED VERSION**

1  with Advertisers' (baseless) claim that using EPRs permits a yardstick study to ignore differences
2  between "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Opp. 6-7. If that were true, there would be no need to
3  eliminate ▮▮▮▮▮▮ from the analysis.

  **B.** **Even If The "Yardsticks" Were Legitimate (They Are Not), Williams's Studies Are Unreliable Because He Examines Meta's Profits, Not Its Prices**

Advertisers double down on their overcharge theory by continuing to claim that *profits* can tell us that Meta's *prices* are too high. Opp. 8. That remains economic nonsense. A simple example explains why: Firm A can have a higher economic profit rate than firm B, even if its prices are lower than firm B. Walmart's prices may be lower than the corner grocery store, but its economic profit rate almost certainly is not. Likewise, Firm C may have a very high economic profit rate compared to Firm D, but because Firm C and D are in different geographies or industries, the delta tells us nothing about whether those differences are due to prices or costs or to quantity. The EPR of a real estate holding company in San Francisco may be lower than one in Nebraska, yet assuredly the prices it would sell its properties for are much higher. And yet, Advertisers ask this Court to find that an EPR calculation on its own establishes higher prices and go so far as to suggest that this analysis is "▮▮▮▮▮▮▮▮" Opp. 9. Conservative junk science is still junk science. *See Stokes v. John Deere Seeding Grp.*, 2014 WL 675820, at *4 (C.D. Ill. Feb. 21, 2014).

Advertisers themselves contend that Meta is a "zero marginal cost" operator, who "'saves' nothing by" displaying fewer ads. Dkt. 892-1 at 6. Thus, if Meta sold fewer ads in the but-for world (for instance, because new entrants attracted some of its customers away), its costs would remain steady and Meta's EPR would decrease with ***no change in its prices***, only a decrease in its output sold. That is to say, according to Advertisers, the but-for world could see Meta earning a lower profit rate without charging lower prices. That concession itself defeats Advertisers' defense of Williams. His damages model assumes (without basis in economics or common sense) that in a but-for world, Meta's EPR would come to match the EPR of Williams's yardstick firms ***entirely*** through a reduction in the price Meta charged for social ads. But that assumption is "unsupported by the record" and thus compels exclusion. *Klein v. Meta Platforms, Inc.*, 2025 WL 295361, at *3 (N.D. Cal. Jan. 24, 2025).

**PUBLIC REDACTED VERSION**

Advertisers' meager efforts to rehabilitate Williams's assumption that profit changes in the but-for world would be wholly price-driven fail. First, Advertisers misleadingly assert that EPRs are a generally accepted measure of antitrust damages, which they apparently believe absolves them of any need to account for non-price factors affecting EPRs. Opp. 7-8. But the "███████ ███" Advertisers cite (Opp. 7-8) say only that EPRs are useful for comparing the *value* of companies (not their prices) or for determining damages stemming from *lost profits* (not overcharges) in antitrust cases brought by competitors (not customers). Second, Advertisers attempt to take refuge in *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43 (2d Cir. 2019). But even a cursory examination of the model used in *Sabre* (which concerned airline booking fees) reveals that it shares little in common with Williams's. For one thing, the expert there calculated a but-for price by performing a "comparison of 'the ***actual*** booking fees that Sabre charged US Airways' and the fees that 'Sabre would have had to charge in order to earn a reasonable profit.'" *Id.* at 61 (emphasis added). In other words, the yardstick model in *Sabre* directly examined the ***actual*** prices that the defendant had charged for the relevant product—precisely what Williams's yardstick model fails to do. Equally significant, the expert in *Sabre* calculated the "reasonable profit booking fee"—i.e., the but-for price—as "a function of all Sabre's costs in a hypothetical competitive market, plus a reasonable return on investment." *Id*. That is, the expert did not simply assume, as Williams did, that costs would be identical in the actual and but-for worlds; he offered a reasoned opinion about costs in the but-for world and adjusted his model to control for those cost changes. Williams did not examine prices or expressly account for confounding variables.

**C.   Even If The "Yardsticks" Were Legitimate (They Are Not) And Even If He Had Successfully Determined An Overcharge Based On Profits (He Did Not), Williams Fails To Control For Lawful Factors Affecting Profits**

Williams's yardstick studies also flunk the "most important[]" requirement for a "yardstick methodology," which is "to control for any factors that might have influenced [a firm's] profit performance that are competitively neutral or even procompetitive." Areeda & Hovenkamp, *Antitrust Law* ¶397 (2023). Advertisers concede, as they must, that "███████████" instructs that firms' EPRs "██████████████████████████████" Opp. 10. Advertisers argue that Williams has accounted for these other factors merely by using EPRs. As

**PUBLIC REDACTED VERSION**

they see it, using EPRs "████████████████████████████" and ████████████
████████████████████████████ that could be responsible for the difference in the firms' profit rates. *Id.*

That is wrong. EPRs are not a magic wand that can wave away the failure to conduct a robust economic analysis. Mot. 10. An injury model, whatever its inputs, must "isolate the impact of the alleged antitrust violations." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 677 (9th Cir. 2022). EPRs do the opposite, by collapsing the effects of the challenged conduct, product quality, human capital, research and development, and every other factor that affects a firm's economic fortunes into a single number. Using EPRs to try to isolate the effect of specific conduct thus makes controlling for other factors essential, not optional. As antitrust expert and economics professor Franklin Fisher (whom Williams himself cites, *see* Ex. 1, Williams Rep. ¶377[1]) wrote with respect to economic profits, "[o]ne normally expects differences in the profitability of different firms in a real competitive market," and those differences may stem from (among other things) "skill or luck," "cost reduction techniques," "product or process innovations," "efficient management organizations," or "more effectively predict[ing] user needs." F. Fisher, et al., *Folded, Spindled, and Mutilated: Economic Analysis and* U.S. v. IBM, at 222 (1985). Even after an analysis has "f[ound] economic profits," it still must "then discover their cause." *Id.* at 223.

Advertisers cite no authority for their contrary view (there is none), and it defies logic to think that Williams has happened upon a new trick to avoid the type of controls that are foundational to legitimate economic analysis. Unsurprisingly, Williams's prior attempts to jettison such controls have been (correctly) rejected. *See Grasshopper House, LLC v. Clean & Sober Media LLC*, 2019 WL 12074086, at *12 (C.D. Cal. July 1, 2019).[2] As all agree, a firm's EPR reflects *everything* that influences a firm's profitability—including lawful and unlawful factors alike. *See* Opp. 10. For that very reason, comparing two firms' EPRs, without additional controls,

---

[1] "Ex." citations reference exhibits to the Gringer Decl. filed with Meta's *Daubert* motion, Dkt. 876.
[2] Advertisers cite Williams's opinion in the *Play Store* litigation as support for his methodology here, Opp. 11, but omit that the Court had no occasion to examine the reliability of his methodology. Nor does the decision in *Sabre* support Williams's approach. *See supra* p.6.

**PUBLIC REDACTED VERSION**

1  tells one nothing whatsoever about the *cause* of any difference between their EPRs, let alone that
2  the cause can be pinpointed to particular forms of supposedly anticompetitive conduct. No one can
3  seriously maintain that the *sole* difference between Meta and firms like ▮▮▮▮▮▮▮▮▮
4  ▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮ is that Meta (supposedly) engaged in the five
5  specific actions Advertisers complain of in this case. Williams's contrary assertion, on which his
6  entire model rests, is junk science. If one picked literally anything that had happened in the world
7  instead of the challenged conduct and did the same comparison, they would get the same result.

8  **II.   WILLIAMS'S "DURING-AFTER" MODEL IS JUNK SCIENCE**

9       Advertisers do not contest that if Williams's yardstick model is junk science, so too is his
10 during-after model. *See* Opp. 11-12. Advertisers briefly attempt to rebut the additional flaws Meta
11 identified with Williams's during-after model—that it failed to control for salient differences
12 between the time periods analyzed and failed to select a benchmark period free from misconduct—
13 on the grounds that those methodological errors were "▮▮▮▮▮▮." Opp. 12. That is no defense.
14 *See Stokes*, 2014 WL 675820, at *4.

15 **III.  WILLIAMS HAS FAILED TO COHERENTLY DEFINE A PRODUCT MARKET**

16      Meta's *Daubert* motion argued that Williams failed to coherently define "social
17 advertising" or articulate any reliable methodology for determining which products fall inside or
18 outside of the purported "social advertising" market. Remarkably, Advertisers' opposition does
19 not even try to explain what "social advertising" is, how to identify it, or how to figure out which
20 firms do or do not sell it. Instead, it disclaims the only (flawed and ambiguous) definition of "social
21 advertising" Advertisers or their experts have *ever* offered—advertising "▮▮▮▮▮▮▮▮
22 ▮▮▮▮▮▮▮▮▮▮▮▮▮"—while offering nothing at all to replace it. Opp.
23 12-13. Without a definition of the relevant market there can be no market.

24      Advertisers' opposition then appears to make up new—and completely unexplained—
25 definitional features of "social advertising" on the fly, asserting that Amazon and Apple could not
26 have sold "social advertisements" because neither "operated a social network in [the Class]
27 period." Opp. 13. Advertisers do not explain why "operating a social network" is a requirement to
28 sell "social advertising"—as opposed to, say, using what Williams called "social data" to sell

No. 3:20-cv-08570-JD                    8                    META'S REPLY IN SUPPORT OF
                                                             MOTION TO EXCLUDE MICHAEL WILLIAMS

**PUBLIC REDACTED VERSION**

1  advertising—and that is not an opinion Williams ever offered. Nor do they explain what they mean
2  by a "social network," or why, for example, YouTube (owned by Google) or Goodreads and
3  Twitch (owned by Amazon) do not qualify. Nor do they explain why Microsoft's ownership of
4  LinkedIn (which Williams believes sells social advertising, *see* Ex. 1, Williams Rep. ¶¶72-75)
5  would not render ads on Bing that use data from LinkedIn "social advertising."

6  The problem is not just that Advertisers and Williams fail to answer these questions—it is
7  that, without a definition of "social advertising" or ***any*** articulated method of placing products
8  inside and outside the market, Williams's analysis is ***incapable*** of answering these questions. Yet
9  he nonetheless picks and chooses what products fall within his purported market—LinkedIn in,
10 YouTube out, Reddit in, Amazon out—with no methodology and no definition at all.

11 The only common thread among these arbitrary selections is that they gerrymander a
12 market where Meta (supposedly) has an ads monopoly. That is clear grounds for excluding his
13 opinions. *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 996 (C.D. Cal. 2012). Williams
14 appears to have followed no methodology at all, which "fatally undermines [his] definition of the
15 relevant product market in its entirety." *Id.* at 996-97; *see also Carter Hawley Hale Stores, Inc. v.
16 Limited, Inc.*, 587 F. Supp. 246, 253 (C.D. Cal. 1984) (proposed "product market … is too
17 amorphous" and therefore "wholly inadequate"); *United States v. Oracle Corp.*, 331 F. Supp. 2d
18 1098, 1159 (N.D. Cal. 2004) (rejecting market lacking clear criteria "that could be used to
19 determine the distinction" between in- and out-of-market products).

20 IV.  **WILLIAMS'S HYPOTHETICAL MONOPOLIST AND SSNIP TEST IS JUNK SCIENCE**

21 Advertisers do not contest that, under binding Ninth Circuit law, a properly conducted
22 SSNIP test must evaluate whether "a significant number of customers would respond to a SSNIP
23 ***by purchasing substitute products***" outside the proposed market. *Theme Promotions, Inc. v. News
24 Am. Mktg. FSI*, 546 F.3d 991, 1002 (9th Cir. 2008) (emphasis added). Nor do they dispute that
25 Williams failed to examine evidence of consumer substitution, like "past consumer-demand data
26 and/or consumer-survey responses." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 975 (9th Cir.
27 2023). In other words, Williams did not conduct a SSNIP test at all, at least as any court or other
28 economist has ever understood the term. As Meta explained in its motion—and Advertisers do not

**PUBLIC REDACTED VERSION**

dispute—no court has ever accepted a comparison of firms' profits as a SSNIP test, especially when the comparison is with firms wholly outside the proposed market. *See* Mot. 14. Advertisers have offered no good reason why Williams's report should be the first.

Instead, Advertisers assert that Williams's SSNIP is not based on a comparison of profits, but instead based on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Opp. 14. Not true. Williams's model tells us nothing about prices. *See supra* pp.5-6. But in any event, a comparison of firms' prices that includes no analysis of customer substitution still would not constitute a reliable SSNIP test because the essential purpose of a SSNIP test is to understand the contours of consumer substitution. *See Sumotext Corp. v. Zoove, Inc.*, 2020 WL 6544410, at *7-9 (N.D. Cal. Nov. 6, 2020), *aff'd*, 2021 WL 4988024 (9th Cir. Oct. 27, 2021), *cert. denied*, 142 S. Ct. 2836 (2022).

The only other bases Advertisers offer for accepting Williams's made-up version of a SSNIP test are two decisions that Advertisers claim endorsed it. That mischaracterizes those cases. The opinion in the first, *In re: Turkey Antitrust Litigation*, does not say whether Williams's analysis examined customer substitution, but the docket *does* make clear that plaintiffs did not move to exclude Williams's market definition, so the court had no occasion to pass on the reliability of his SSNIP test. No. 1:19-cv-08318, Dkt. 1107 at 61 (N.D. Ill. Jan. 22, 2025); Motion to Exclude the Opinions of Michael A. Williams, Dkt. 893 (N.D. Ill. Jan. 26, 2024). And in the second, *Behrend v. Comcast Corp.*, Williams's SSNIP (which appears to have examined prices, not profits) was one of seven proffered grounds for a geographic market, and nothing in the court's decision indicates that it ultimately relied on the SSNIP (as opposed to evidence that "consumers throughout the [geographic area] can face similar competitive choices") to define the market. No. 2:03-cv-06604, Dkt. 430 at 13-15, 29-30 (E.D. Pa. Jan. 7, 2010).

Williams failed to analyze "whether a price increase … would result in consumer substitution of an alternative product." *Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 918-19 (6th Cir. 2009). Instead, he offered his "own version of the SSNIP test" which "was produced solely for this litigation" and followed no established methodology for conducting such a test. *Id.* (internal quotation marks omitted). His opinions must be excluded. *Id.*; *see also Sumotext*, 2020 WL 6544410, at *7-9.

**PUBLIC REDACTED VERSION**

Dated: February 12, 2025

Respectfully submitted,

By: */s/ Sonal N. Mehta*
SONAL N. MEHTA

*Attorney for Defendant Meta Platforms, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of February, 2025, I electronically transmitted the public redacted version of the foregoing document to the Clerk's Office using the CM/ECF System and caused the version of the foregoing document filed under seal to be transmitted to counsel of record by email.

By:  */s/ Sonal N. Mehta*
Sonal N. Mehta