**PUBLIC REDACTED VERSION**

WILMER CUTLER PICKERING
  HALE AND DORR LLP
SONAL N. MEHTA (SBN 222086)
  Sonal.Mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
  David.Gringer@wilmerhale.com
ROSS E. FIRSENBAUM (*pro hac vice*)
  Ross.Firsenbaum@wilmerhale.com
RYAN CHABOT (*pro hac vice*)
  Ryan.Chabot@wilmerhale.com
PAUL VANDERSLICE (*pro hac vice*)
  Paul.Vanderslice@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800

ARI HOLTZBLATT (SBN 354631)
  Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
  Molly.Jennings@wilmerhale.com
2100 Pennsylvania Ave NW
Washington, DC 20037
Telephone: (202) 663-6000

MICHAELA P. SEWALL (*pro hac vice*)
  Michaela.Sewall@wilmerhale.com
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

*Attorneys for Defendant Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated,<br><br>                  Plaintiffs,<br><br>    v.<br><br>META PLATFORMS, INC., a Delaware Corporation,<br><br>                  Defendant. | Case No. 3:20-cv-08570-JD<br><br>**DEFENDANT META PLATFORMS, INC.'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT REGARDING FIRST AMENDED CONSOLIDATED ADVERTISER CLASS ACTION COMPLAINT (Dkt. 237)**<br><br>Hearing Date: To Be Determined<br>Time: To Be Determined<br>Judge: Hon. James Donato |

**PUBLIC REDACTED VERSION**

**TABLE OF CONTENTS**

I.    PROOF OF HIGH PROFITS ALONE CANNOT ESTABLISH CAUSAL ANTITRUST INJURY ............2

    A.    High Profits Alone Cannot Establish Antitrust Injury Under An
         Overcharge Theory ............................................................................2

    B.    Profits Cannot Establish Injury Traceable To The Challenged Conduct................3

II.   THE CHALLENGED CONDUCT IS NOT ANTICOMPETITIVE AS A MATTER OF LAW ................5

    A.    Advertisers Have Not Shown Consumer Harm ........................................5

    B.    Each Exclusionary Conduct Theory Fails As A Matter Of Law ...........................6

        1.    Meta's Supposed Misrepresentations To The FTC Cannot Be
            Exclusionary As A Matter Of Law .............................................6

        2.    Meta's Alleged Misappropriation Of Trade Secrets To Copy
            Snapchat Cannot Be Exclusionary As A Matter Of Law ...........................7

        3.    The Challenged Vertical Agreements Cannot Be Exclusionary................10

    C.    If Any Component of the Challenged Conduct Is Lawful, Advertisers Are
         Not Entitled To Damages.......................................................13

III.  ADVERTISERS FAIL TO COHERENTLY DEFINE A RELEVANT PRODUCT MARKET................14

**PUBLIC REDACTED VERSION**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*A.H. Cox & Co. v. Star Mach. Co.*,
  653 F.2d 1302 (9th Cir. 1981) ..........................................................................10

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
  836 F.3d 1171 (9th Cir. 2016) ..........................................................................13

*American Tobacco Co. v. United States*,
  147 F.2d 93 (6th Cir. 1944) ..............................................................................10

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
  613 F. Supp. 3d 1308 (S.D. Cal. 2020)...............................................................6

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979)................................................................................3

*Biddle v. Walt Disney Co.*,
  696 F. Supp. 3d 865 (N.D. Cal. 2023) ..............................................................11

*Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*,
  637 F.3d 1047 (9th Cir. 2011) ............................................................................6

*Carter Hawley Hale Stores, Inc. v. Limited, Inc.*,
  587 F. Supp. 246 (C.D. Cal. 1984) ...................................................................15

*Chase Manufacturing., Inc. v. Johns Manville Corp.*,
  2019 WL 2866700 (D. Colo. July 3, 2019) ......................................................10

*City of Vernon v. S. Cal. Edison Co.*,
  955 F.2d 1361 (9th Cir. 1992) ..........................................................................14

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*,
  690 F.2d 1240 (9th Cir. 1982) ............................................................................7

*Coronavirus Rep. v. Apple, Inc.*,
  85 F.4th 948 (9th Cir. 2023) .............................................................................10

*Eagle v. Star-Kist Foods, Inc.*,
  812 F.2d 538 (9th Cir. 1987) ..............................................................................5

*Eatoni Ergonomics, Inc. v. Rsch. In Motion Corp.*,
  826 F. Supp. 2d 705 (S.D.N.Y. 2011).................................................................9

*FTC v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ...............................................................10, 11, 15

**PUBLIC REDACTED VERSION**

*FTC v. Tempur Sealy Int'l, Inc*,
  2025 WL 384493 (S.D. Tex. Jan. 31, 2025) ...................................................................15

*ILC Peripherals Leasing Corp. v. Int'l Bus. Mach. Corp.*,
  458 F. Supp. 423 (N.D. Cal. 1978) ...............................................................................14

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) ......................................................................................13

*In re Ebay Seller Antitrust Litig.*,
  2010 WL 760433 (N.D. Cal. Mar. 4, 2010), *aff'd*, 433 F. App'x 504
  (9th Cir. 2011).................................................................................................................3

*In re Google Digit. Advert. Antitrust Litig.*,
  721 F. Supp. 3d 230 (S.D.N.Y. 2024)...........................................................................11

*In re Live Concert Antitrust Litig.*,
  863 F. Supp. 2d 966 (C.D. Cal. 2012) ..........................................................................15

*In re NFL "Sunday Ticket" Antitrust Litig.*,
  2024 WL 3628118 (C.D. Cal. Aug. 1, 2024)................................................................14

*In re Xyrem (sodium oxybate) Antitrust Litig.*,
  2024 WL 4023561 (N.D. Cal. Aug. 26, 2024) ..............................................................12

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*,
  978 F.3d 653 (9th Cir. 2020) ..........................................................................................8

*Klein v. Meta Platforms, Inc.*,
  2025 WL 295361 (N.D. Cal. Jan. 24, 2025) ...................................................................2

*Kottle v. Nw. Kidney Ctrs.*,
  146 F.3d 1056 (9th Cir. 1998) ........................................................................................7

*Litton Sys., Inc. v. Honeywell, Inc.*,
  1996 WL 634213 (C.D. Cal. July 24, 1996)..................................................................14

*McSherry v. City of Long Beach*,
  584 F.3d 1129 (9th Cir. 2009) ......................................................................................12

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
  641 F.3d 834 (7th Cir. 2011) ..........................................................................................7

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Argonaut Ins. Co.*,
  701 F.2d 95 (9th Cir. 1983) ............................................................................................6

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018)......................................................................................................15

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) ...........................................................................................4

*Rathod v. United States*,
  2023 WL 8710550 (9th Cir. Dec. 18, 2023) ........................................................9

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ................................................................4, 5, 6

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
  842 F.3d 883 (5th Cir. 2016) ................................................................9

*Saniefar v. Moore*,
  2017 WL 5972747 (E.D. Cal. Dec. 1, 2017) ....................................................7

*Smith v. City & County of Honolulu*,
  887 F.3d 944 (9th Cir. 2018) ................................................................8

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993) ..........................................................................15

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
  803 F.3d 1084 (9th Cir. 2015) ..............................................................11

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
  875 F.2d 1369 (9th Cir. 1989) ..............................................................15

*United States v. Google*,
  687 F. Supp. 3d 48 (D.C. Cir. 2023) ......................................................11

*Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*,
  707 F. Supp. 1170 (C.D. Cal. 1989) ....................................................8, 9

*Utah Pie Co. v. Continental Baking Co.*,
  386 U.S. 685 (1967) ..........................................................................10

*Witherow v. Paff*,
  52 F.3d 264 (9th Cir. 1995) ................................................................9

**STATUTES, RULES, AND REGULATIONS**

Fed. R. Civ. P. 37 ..............................................................................7

**OTHER AUTHORITIES**

F. Fisher, et al., *Folded, Spindled, and Mutilated: Economic
  Analysis and* U.S. v. IBM (1985) ..........................................................4

Hovenkamp et al., *IP and Antitrust* § 11.05 (2024) ..........................................9

**PUBLIC REDACTED VERSION**

Advertisers inundated this Court with 105 exhibits totaling over 2,200 pages in a transparent attempt to create the illusion of factual disputes where none exist. Advertisers fail to overcome the fact that Meta's summary judgment motion (Dkt. 874-1, "Mot.") relies entirely on the admissions and opinions of Advertisers' experts and Advertisers' own factual contentions. No matter how much irrelevant material Advertisers throw at the Court, none of it undermines a motion premised on the legal defects in their theories. Advertisers' opposition (Dkt. 892-1, "Opp.") only confirms that their claims, by their own terms, fail as a matter of law for at least three reasons.

*First*, Advertisers' theory of antitrust injury is built entirely on a comparison of Meta's *profits* to those of a hodgepodge of disparate foreign firms. Advertisers' purported overcharge model (on which their claim of injury rests) never examines Meta's *prices*. Rather than engage with the legal question of whether this proof is legally adequate (it is not), Advertisers simply deny reality and insist—repeatedly—that their model studies prices. The Court's review of Williams's model will confirm Advertisers' denialism.

*Second*, if the Court reaches Advertisers' exclusionary conduct theories, it will find even more faults. Advertisers' claim that the FTC would have immediately ordered the divestiture of Instagram and WhatsApp if Meta had told it about improvements to its machine learning systems rests on legally inadequate speculation that directly contradicts the FTC's legal authority and, in any event, is barred by *Noerr-Pennington*. Their claim that Meta stole Snap's supposed trade secrets to develop Meta's Stories feature fails for numerous reasons, including that alleged intellectual property infringement of this sort is not anticompetitive as a matter of law, and the facts Advertisers themselves rely on show that Meta launched Stories before any supposed misappropriation occurred (and they point to no changes to Stories based on the allegedly misappropriated data). Likewise, Advertisers' challenges to various agreements fail because those agreements are vertical and concern market shares so small they cannot be exclusionary as a matter of law. Accordingly, every conduct theory fails.

*Finally*, Advertisers' attempt to establish a legally relevant "social advertising" market only deepens their problem. Advertisers concede that the law requires a coherent definition of the relevant product market but do not even attempt to define "social advertising." And in a flailing

attempt to salvage a claim, Advertisers have now thrown out the only (flawed and ambiguous) definition they *ever* had. Whatever "social advertising" means, the only evidence Advertisers muster that such a market exists is that people have used the phrase to talk about Meta's advertising offerings. Advertisers do not offer economically significant evidence to establish a market.

After over four years of litigation and extensive discovery, Advertisers cannot prove a single element of any of their claims as a matter of law. Summary judgment is warranted.

## I.    PROOF OF HIGH PROFITS ALONE CANNOT ESTABLISH CAUSAL ANTITRUST INJURY

### A.    High Profits Alone Cannot Establish Antitrust Injury Under An Overcharge Theory

Michael Williams's expert opinions, which are Advertisers' only attempt to prove injury, cannot show that Meta charged supracompetitive prices for ads.[1] Williams's analysis of antitrust injury looks only at Meta's profits, never at its prices. *See* Mot. 4-9; Dkt. 876-1 at 8-10. It compares Meta's profit rate to the profit rates of various, primarily foreign firms in business lines far afield from advertising, including real estate, car sales, and stock photography. Though Williams concedes, as he must, that profits do not equal prices,[2] he asserts without any explanation or analysis that (1) the gap between Meta's profit rate and the weighted average of those firms' profit rates stems entirely from Meta overcharging for social advertising and (2) those overcharges stemmed entirely from the challenged conduct.

Advertisers' only defense is to claim that "Dr. Williams repeatedly concluded" that Meta charged supracompetitive prices. Opp. 5. Notwithstanding what Williams claims his studies show, his model does not examine the prices Meta or anyone else charged for advertisements. Not once. A model, like Williams's, which relies on a "proxy" metric that does not "measure [prices], or at

---

[1] As explained in Meta's motion and concurrently filed *Daubert*, Williams's opinions regarding antitrust injury are junk science that should be excluded. Because Advertisers identify no other evidence of antitrust injury that would permit this case to proceed to a jury, granting Meta's *Daubert* motion necessarily requires granting summary judgment as well. *Cf. Klein v. Meta Platforms, Inc.*, 2025 WL 295361, at *9 (N.D. Cal. Jan. 24, 2025) (denying class certification where expert's antitrust injury opinions excluded under *Daubert*).

[2] *See, e.g.*, Ex. 12, 8/24 Williams Rep. ¶382; Ex. 13, 6/24 Williams Tr. 20:12-16; Ex. 14, 9/23 Williams Tr. 229:23-230:3; *id.* at 70:12-72:17. Unless otherwise noted, "Ex." citations reference exhibits to the Gringer Reply Decl. submitted herewith, emphasis is added, and objections are omitted for deposition citations.

**PUBLIC REDACTED VERSION**

1    the very least does not measure them alone," offers no "probative evidence" as to whether a

2    plaintiff was overcharged. *In re Ebay Seller Antitrust Litig.*, 2010 WL 760433, at *13-14 (N.D.

3    Cal. Mar. 4, 2010), *aff'd*, 433 F. App'x 504, 506 (9th Cir. 2011). At bottom, Advertisers wish to

4    put an injury model before the jury that asks them to treat the fact that a firm earned high profits

5    (as compared to a disparate set of comparators) as proof that it engaged in anticompetitive conduct

6    that caused advertisers to be overcharged. But it is well established that a "purchaser has no cause

7    of action" against a firm earning monopoly profits unless there is evidence the firm has "boost[ed]

8    its price to excessive levels." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d

9    Cir. 1979). Advertisers have no such evidence.

10        Advertisers cannot salvage Williams's effort to conflate prices with profits by assuming

11    that "a reduction in the quantity of ads sold by Meta Ads **that resulted in a corresponding**

12    **reduction in its costs** would leave [his] damages analysis unchanged." Ex. 12, 8/24 Williams Rep.

13    ¶410 n.639. Advertisers' own brief elsewhere explains that assumption is false: Meta runs a near-

14    zero marginal cost advertising business. Opp. 6. Thus, if Meta sold fewer ads in the but-for world,

15    its costs would remain steady and its EPR would decrease with ***no change in its prices***. That is to

16    say, according to Advertisers, the but-for world could see Meta earning a lower profit rate without

17    charging lower prices—demonstrating why profits and prices cannot be conflated.

18        Advertisers' last-ditch effort to tie their injury analysis to prices is to point in passing (Opp.

19    5) to a chart of the "cost per thousand impressions" ("CPM") of Meta ads contained in Williams's

20    report (Ex. 12, 8/24 Williams Rep. ¶235). But that chart—the ***only*** record material Advertisers

21    offer even remotely related to prices—has nothing to do with Williams's antitrust injury opinions

22    and Williams does not rely on its data to support his injury opinions (including his yardstick study).

23    That is for good reason. The chart encompasses a much longer period than the Class Period, with

24    most of the ▮▮▮▮▮▮▮▮▮▮▮▮▮ *predating* the Class Period. And Williams never conducted

25    *any* analysis tying *any* of the CPM movement shown in this chart to the challenged conduct. *See*

26    Ex. 12, 8/24 Williams Rep. ¶¶235-237 (no discussion of challenged conduct or antitrust injury).

27        **B.    Profits Cannot Establish Injury Traceable To The Challenged Conduct**

28        Even if Williams's analysis of Meta's profits could somehow show an injury in the form

**PUBLIC REDACTED VERSION**

1    of an overcharge, it cannot show *causal* antitrust injury—an injury that "flows from" the

2    challenged conduct. *See Rebel Oil Co. v. Atl. Richfield Co.,* 51 F.3d 1421, 1444 (9th Cir. 1995).

3    Advertisers assert (Opp. 7) they have isolated the effects of the challenged conduct by (1) using

4    "economic profit rates" (EPRs) and (2) setting Meta's but-for profit rate to one based on the profits

5    of firms like ██████████ and ██████████████, rather than setting it to zero.

6        Neither is correct. A firm's EPR reflects *everything* that affects its profit rate, including

7    lawful and unlawful factors alike, a fact that Advertisers do not dispute. Advertisers insist that

8    comparing EPRs thus "controls" for such factors. That reflects a fundamental misunderstanding

9    of what it means to "control for" a confounding factor. "Controlling for" the effect of lawful

10   conduct means "isolat[ing] the impact of the alleged antitrust violations." *Olean Wholesale*

11   *Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 677 (9th Cir. 2022). EPRs do the

12   opposite, by collapsing the effects of the challenged conduct, product quality, human capital,

13   R&D, and every other factor that affects a firm's economic fortunes into a single number. *See* Ex.

14   12, 8/24 Williams Rep. ¶371. Using EPRs to isolate the effect of specific conduct thus makes

15   controlling for other factors essential, not optional. As antitrust expert and economics professor

16   Franklin Fisher (whom Williams himself cites, *see* Ex. 12, 8/24 Williams Rep. ¶377) wrote with

17   respect to economic profits, "[o]ne normally expects differences in the profitability of different

18   firms in a real competitive market," and those differences may stem from (among other things)

19   "skill or luck," "cost reduction techniques," "product or process innovations," "efficient

20   management organizations," or "more effectively predict[ing] user needs." F. Fisher, et al., *Folded,*

21   *Spindled, and Mutilated: Economic Analysis and* U.S. v. IBM, at 222 (1985). Even after an

22   analysis has "f[ound] economic profits," it still must "then discover their cause." *Id.* at 223. This

23   fundamental flaw precludes a jury; it is not a question for one.

24       As for Advertisers' decision to set Meta's but-for EPR above zero, Advertisers also do not

25   explain how doing so isolates the consequences of the five courses of challenged conduct from

26   lawful factors impacting profits. Advertisers' defense appears to be that rather than base their

27   injury on the *entirety* of Meta's monopoly profits, they based it on an arbitrary portion of Meta's

28   monopoly profits. But that analysis is improper. Advertisers must show that their injury was not

**PUBLIC REDACTED VERSION**

1  "produced by independent factors" unrelated to the challenged conduct. *Eagle v. Star-Kist Foods,*

2  *Inc.*, 812 F.2d 538, 542 (9th Cir. 1987). Showing that Meta's profit rate is higher than ████

3  ████ or ████████████ does no such thing—and the fact that ████████

4  and ████████████ have profit rates above zero does not change that.

5       Under Advertisers' logic, they could have picked *any* series of actions Meta took and used

6  Williams's model to assert that Meta's supposedly excess EPR was due entirely to those actions.

7  Because Williams's model has nothing to do with the conduct at issue in this case, it could be used

8  to prove that *any* action inflicted antitrust injury on any set of plaintiffs. Advertisers' so-called

9  proof of causal antitrust injury proves vastly too much and, as a result, nothing at all.

10  **II.   THE CHALLENGED CONDUCT IS NOT ANTICOMPETITIVE AS A MATTER OF LAW**

11       **A.   Advertisers Have Not Shown Consumer Harm**

12       Advertisers do not dispute that a "reduction of competition does not" render an act

13  exclusionary unless "it harms consumer welfare" through increased prices, lower output, or

14  diminished quality. *Rebel Oil*, 51 F.3d at 1433. Advertisers nonetheless rely upon Tilman

15  Klumpp's testimony that Meta's actions "excluded or frustrated rivals" and "contributed to the

16  maintenance of a monopolized" market to establish exclusionary conduct. Opp. 7-8. But that *ipse*

17  *dixit* does not show—as the law requires—that those actions caused anticompetitive harm to

18  advertisers. Advertisers falsely assert that Klumpp testified to "reduced quality, innovation, and

19  output" resulting from Meta's actions. Opp. 7-8. Advertisers offer no citation from the 171 pages

20  of Klumpp's report they reference to support this contention, and Klumpp himself disclaimed *any*

21  opinion about an anticompetitive effect other than "monopoly maintenance" itself. *See* Mot. 9-10

22  (citing Ex. 15, Klumpp Tr. 44:11-45:21). As a matter of law, monopoly maintenance is not a

23  cognizable anticompetitive effect.

24       Williams's testimony cannot make up for the deficiencies in Klumpp's. That is because

25  Williams was exceedingly clear that he is "not opining that the challenged conduct had

26  anticompetitive effect." Ex. 16, 2/24 Williams Tr. 272:15-273:16. If Advertisers' position is that

27  Williams's analysis of the (supposed) price effects of Meta's overall monopoly maintenance can

28  substitute for proof that the challenged conduct itself harmed consumers, that is foreclosed by

Williams's failure to establish a causal connection between the overcharge he claims his model identifies and the particular actions at issue in this case. *See supra* pp.3-5. Since neither expert offered an opinion that those actions harmed consumers, Advertisers' theories are legally inadequate. *Rebel Oil*, 51 F.3d at 1433; *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1334-1336 (S.D. Cal. 2020).

## B.    Each Exclusionary Conduct Theory Fails As A Matter Of Law

### 1.    Meta's Supposed Misrepresentations To The FTC Cannot Be Exclusionary As A Matter Of Law

**Advertisers' Claim Turns On Speculation.** Advertisers have no response to the fact that their theory is based entirely on naked and impossible speculation. Whether the FTC could or would have entered an unlawful order compelling the divestiture of Instagram and WhatsApp in response to a single piece of information about Meta's business is not a "factual dispute" or "the stuff of trial." Opp. 23. It is a fantasy. Advertisers do not dispute that the FTC lacks authority to unilaterally enter such an order, and that—even if it broke the law and purported to enter such an order anyway—the divestiture could not have been accomplished instantaneously or even within the Class Period. *See* Mot. 11-12. And they do not dispute that they have no evidence that the FTC was contemplating or ever would have taken such a drastic, unauthorized, and unprecedented action. *Id.* "[S]weeping conclusory allegations" like Advertisers' do not create a factual dispute, *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011), and the Court cannot "draw inferences favorable to" Advertisers "when they are wholly unsupported," *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Argonaut Ins. Co*., 701 F.2d 95, 97 (9th Cir. 1983).

**Advertisers' Claim Is Barred By *Noerr-Pennington*.** Even if Advertisers could proceed on speculation alone, *Noerr-Pennington* would bar their claim. Advertisers do not dispute that, as a general matter, Meta's representations to the government are immune from antitrust liability under *Noerr-Pennington*. Instead, they claim in a single sentence that the doctrine is inapplicable to representations to regulators made in an adjudicatory context. Opp. 23. That principle is both irrelevant and overstated.

*First*, Advertisers concede Meta's representations were *not* made within an adjudicatory

context, but instead in response to a voluntary request for information. Opp. 21. *See Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1062 (9th Cir. 1998) (proceeding is adjudicatory under *Noerr-Pennington* only if "guided by enforceable standards subject to review").

*Second*, even if the FTC's request for voluntary information were somehow an agency adjudication, Advertisers would still need to establish that Meta's response to it was a "sham." They cannot. For one thing, Advertisers do not claim—let alone provide evidence—that Meta "fraudulent[ly] furnish[ed] … false information," as required for the sham exception to apply. *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1261 (9th Cir. 1982). Advertisers fail to explain why the absence of an express reference to F3 in Meta's voluntary response amounted to fraudulently furnishing false information. Indeed, to Meta's knowledge, no court in this Circuit has found a purported *omission* (rather than a false statement of fact) to constitute a sham. Furthermore, petitioning conduct can only be a sham if a false statement is "material," *Saniefar v. Moore*, 2017 WL 5972747, at *5 (E.D. Cal. Dec. 1, 2017), meaning it has an "ascertainable effect on the proceedings in which [it was] made," *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 843 (7th Cir. 2011). As Meta's motion explained, Advertisers have no evidence that the supposed omissions affected the FTC's decision to take enforcement action. Mot. 11-12.

## 2. Meta's Alleged Misappropriation Of Trade Secrets To Copy Snapchat Cannot Be Exclusionary As A Matter Of Law

**Rule 37 Bars Advertisers' Untimely Disclosed Claim.** Advertisers first raised their trade secret misappropriation claim in an expert report served six months after the close of fact discovery. Advertisers' only response is that this does not matter because Klumpp's report was served according to the case schedule and Meta was supposedly "on notice of all applicable facts underlying" his opinions. Opp. 14. Advertisers' argument makes no sense. If they were right, a party could introduce any new theory of liability for the first time in an expert report if some document or deposition in the case referenced an underlying fact. That would not only gut Rule 37 and paragraph 24 of this Court's Standing Order, but invite trial by ambush in every case. Advertisers' argument also misses the point. The allegation that the data collected through the FBR

**PUBLIC REDACTED VERSION**

App was Snap's "intellectual property" is foundational to Advertisers' untimely exclusionary conduct theory—as Klumpp testified, "it's my economic opinion that Facebook violated the intellectual property of Snapchat and that's what makes it anticompetitive." Ex. 15, Klumpp Tr. 94:16-95:22. Advertisers failed to timely put Meta on notice of this contention and thereby deprived Meta of the opportunity to take discovery of whether the information was Snap's intellectual property and the market impact (if any) of the alleged infringement. *See* Mot. 13-14. The new theory must be barred. *See id.*; *Smith v. City & County of Honolulu*, 887 F.3d 944, 951-952 (9th Cir. 2018).

**Meta's Alleged Copying Of Snapchat Stories Cannot Be Exclusionary.** Advertisers' attempted defense of the merits of their trade secret theory confirms that it fails as a matter of law.

*First*, Advertisers do not defend their failure to identify the specific trade secret Meta supposedly misappropriated. Mot. 16-17. Identifying the specific trade secret at issue is a requirement for trade secret claims generally, *see InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 659 (9th Cir. 2020), and—assuming such a claim were viable at all—an antitrust claim predicated on trade secret misappropriation, *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 707 F. Supp. 1170, 1177 (C.D. Cal. 1989) (dismissing monopolization claim where plaintiff did not identify "precisely which trade secret it alleges was misappropriated").

*Second*, Advertisers' opposition does not discuss—much less rebut—the fact that Meta launched Stories (the only Snapchat feature it supposedly copied using a trade secret) *before* the alleged misappropriation took place. *See* Mot. 15-16. That disposes of this theory. Advertisers concede that Meta's independent development of its own Stories feature was "███████████" Ex. 17, Klumpp Reb. ¶161. Advertisers and their experts have not identified any other feature Meta used the supposed trade secret information to develop. Ex. 15, Klumpp Tr. 89:6-13; Ex. 18, Jakobsson Tr. 141:10-21. Nor does Advertisers' opposition or any of the materials cited in it. And Advertisers have never provided any explanation of how Meta's mere *collection* of supposedly trade secret information, without putting it to use on any feature, could possibly impact competition. Thus, even assuming that Meta misappropriated Snap's trade secrets and that such misappropriation could, in theory, be anticompetitive—neither of which is true—Advertisers point

1   to no evidence that Meta used the purported trade secrets in any way that affected competition.

2   *Third*, Advertisers fail to identify any law supporting their theory that the conduct alleged

3   here could be exclusionary. Meta is not aware of any case, and Advertisers cite none, holding that

4   the unauthorized use of a rival's intellectual property—whether a trade secret or some other

5   unspecified form of "proprietary information" that is "like a trade secret," Opp. 15—could

6   constitute exclusionary conduct. Unanimous authority holds that it cannot because it "causes

7   competing products to enter the market," increasing competition. *Retractable Techs., Inc. v.*

8   *Becton Dickinson & Co.*, 842 F.3d 883, 893 (5th Cir. 2016); *see* Mot. 14 (collecting cases). That

9   is exactly what Advertisers contend happened here. The only case Advertisers cite that even

10  involves alleged trade secret misappropriation is *Universal Analytics*, 707 F. Supp. 1170. There,

11  the Court rejected the Section 2 claim because the alleged trade secret was not specified with

12  particularity and there was no evidence it was misappropriated—defects which also apply to

13  Advertisers' claim—without considering whether, if those predicates were established, the

14  misappropriation could be exclusionary. *Id.* at 1177-1178. Advertisers' reliance (Opp. 16) on a

15  treatise about intellectual property infringement in technology industries is likewise misplaced.

16  That treatise clearly states: "intellectual property infringement … is not itself an antitrust

17  violation." Hovenkamp et al., *IP and Antitrust* § 11.05; *see also Eatoni Ergonomics, Inc. v. Rsch.*

18  *In Motion Corp.*, 826 F. Supp. 2d 705, 708-709 (S.D.N.Y. 2011) (discussing Hovenkamp et al., *IP*

19  *and Antitrust* § 11.05 as a "theoretical discussion").

20  *Fourth*, as Meta explained in its motion and Advertisers fail to address, Advertisers' sole

21  "evidence" of harm to competition is Klumpp's assertion that "entry, innovation, and competition"

22  were "chill[ed]." Mot. 14-15. But this is unsupported say-so, which Klumpp in fact contradicted

23  by testifying that no one knew of the supposed infringement and that, therefore, it logically could

24  not have had any effect at all. Ex. 15, Klumpp Tr. 109:6-111:18. Rank speculation does not create

25  a factual dispute for trial and cannot defeat summary judgment. *See Witherow v. Paff*, 52 F.3d 264,

26  266 (9th Cir. 1995) ("speculation does not create a factual dispute"); *Rathod v. United States*, 2023

27  WL 8710550, at *1 (9th Cir. Dec. 18, 2023) ("Summary judgment is appropriate where a plaintiff's

28  expert fails to identify specific facts in support of a causation analysis.").

**PUBLIC REDACTED VERSION**

1    And even assuming it were true that Meta's conduct ████████████████

2    ████████████ products, Opp. 15, that is not enough. Advertisers needed to show that the

3    challenged conduct "harm[ed] the competitive process as a whole, rather than the success or failure

4    of individual competitors" and they have failed to do so, as Klumpp's testimony makes clear.

5    *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 954-955 (9th Cir. 2023); *see also FTC v. Qualcomm*

6    *Inc.*, 969 F.3d 974, 990 (9th Cir. 2020).

7    *Finally*, Advertisers pivot and argue that they "are not bringing a claim for trade secret

8    misappropriation," but rather a claim predicated on some unspecified form of "industrial

9    espionage." Opp. 14-15. Even though Advertisers' position directly conflicts with their expert's

10    opinions, including opinions cited on the same page of Advertisers' opposition, *see, e.g.*, *id.* at 14

11    n.6 ("[T]he unauthorized use of a rival's *intellectual property* is anticompetitive."), ultimately,

12    whatever distinction Advertisers are attempting to draw makes no difference. None of the cases

13    Advertisers cite find "industrial espionage" to be exclusionary. *Utah Pie Co. v. Continental Baking*

14    *Co.* was a price discrimination case where the Court found that the defendant's use of an "industrial

15    spy" "bore on the issue of [its] predatory *intent*"—not that using a "spy" was itself anticompetitive.

16    386 U.S. 685, 696-698 (1967). *American Tobacco Co. v. United States* involved a resale price

17    maintenance scheme among competitors enforced by "[s]pies pretending to be regular customers."

18    147 F.2d 93, 113 (6th Cir. 1944). Again, the price maintenance—not the use of "spies"—was the

19    exclusionary conduct. *Id.* And in both *Chase Manufacturing., Inc. v. Johns Manville Corp.*, 2019

20    WL 2866700, at *9 (D. Colo. July 3, 2019) and *A.H. Cox & Co. v. Star Mach. Co.*, 653 F.2d 1302,

21    1308 (9th Cir. 1981), the courts dismissed or granted summary judgment because plaintiffs—like

22    Advertisers here—failed to establish that the challenged conduct had any impact on competition,

23    whether characterized as "espionage" or otherwise.

24    **3.    The Challenged Vertical Agreements Cannot Be Exclusionary**

25    **The Nonexistent Netflix Agreement.** Nothing in Advertisers' opposition solves the

26    fundamental problem that there is no agreement and no proof of any supposed agreement.

27    Advertisers attempt to marshal evidence that Meta and Netflix had a motive and opportunity to

28    enter the secret agreement Advertisers have concocted. But that is not the evidence the law

requires. Instead, a plaintiff seeking to prove the existence of an unlawful agreement "must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1088-1089 (9th Cir. 2015). Advertisers' expert admitted there was a rational, non-conspiratorial explanation for Meta's and Netflix's behavior: he had "no basis to believe" that the budget cut to Meta's premium video streaming service supposedly undertaken pursuant to this agreement "was not a rational decision." Ex. 15, Klumpp Tr. 288:21-289:11. The concessions of Advertisers' own expert, and the legal inadequacy of their supposed evidence, require summary judgment as to this claim.

Even if the alleged agreement existed (it does not), nothing in Advertisers' opposition changes the conclusion that it could not have been exclusionary as a matter of law. Advertisers suggest that the agreement should be treated as horizontal because it "involved horizontal video streaming competitors, and Meta's agreement reduced its competition with Netflix in that market." Opp. 21. That is irrelevant. Whatever impacts this supposed agreement might have had in the video streaming market are beyond the scope of this case, where the alleged market is social advertising. "[C]ourts must focus on anticompetitive effects 'in the market where competition is [allegedly] being restrained.'" *Qualcomm*, 969 F.3d at 992; *see also id.* at 999-1000 (out-of-market harms not cognizable); *Biddle v. Walt Disney Co.*, 696 F. Supp. 3d 865, 882 (N.D. Cal. 2023) (same).

Advertisers' only argument that the agreement harmed competition is to say that it "strengthen[ed] entry barriers," which may, "'as [a] matter of economic theory, harm[] competition.'" Opp. 21. This does not suffice in a Section 2 case. A monopolization plaintiff must show "[d]irect evidence … 'of ***actual*** detrimental effects [on competition], … such as reduced output, increased prices, or decreased quality.'" *Qualcomm*, 969 F.3d at 989. Advertisers "may not use *indirect* evidence" or theoretical harms "to prove unlawful monopoly maintenance." *Id.* at 991; *United States v. Google*, 687 F. Supp. 3d 48, 81 (D.C. Cir. 2023) (suggestion that "conduct 'can reasonably be expected'" to impair rivals "is not evidence of anticompetitive effects").

**The Network Bidding Agreement.** Advertisers acknowledge (Opp. 19) that Meta's Network Bidding Agreement with Google created "a vertical arrangement between Google in its role as auctioneer and Facebook as auction participant." *In re Google Digit. Advert. Antitrust Litig.*,

721 F. Supp. 3d 230, 248-250 (S.D.N.Y. 2024). They also do not dispute that the agreement impacted a de minimis share of the alleged social advertising market and is thus reasonable as a matter of law. Mot. 19-20. Indeed, Advertisers now claim they are not challenging any "vertical … aspects" of the agreement. Opp. 19. The Court should take them at their word and grant summary judgment for Meta on any rule of reason challenge to the agreement.

Instead, Advertisers engage in an extended discussion of how the agreement supposedly prompted Meta and Google to ███████████████████████████████ █████████████ "allowed Meta to stave off a threat to its monopoly power" in some unspecified way, and as a result constituted horizontal "market allocation." Opp. 18-19. To begin, Advertisers have not established either market's existence, as is necessary for a market allocation theory to be viable. *See In re Xyrem (sodium oxybate) Antitrust Litig.*, 2024 WL 4023561, at *13 (N.D. Cal. Aug. 26, 2024) ("A market allocation claim requires … a properly defined relevant market."). And any supposed agreement not to compete in markets other than the alleged "social advertising" market is irrelevant. *See supra* p.11. If what Advertisers mean to contend is that Google agreed not to enter the alleged social advertising market, their basis for that claim is entirely unexplained. "Summary judgment requires facts." *McSherry v. City of Long Beach*, 584 F.3d 1129, 1138 (9th Cir. 2009). And in any event, Klumpp disavowed any such arrangement:

> Q. The Network Bidding Agreement does not prevent Google from entering what you call the social advertising market. Correct?
> A. There are no express clauses in the Network Bidding Agreement that state Google is not permitted to enter the social advertising market.

Ex. 15, Klumpp Tr. 279:5-11. Plaintiffs have not contended that there are implied provisions of the agreement. That disposes of Advertisers' claims under both Section 1 and Section 2.

**The API Agreements.** Advertisers rely solely on the testimony of Klumpp for their theory that Meta's API agreements with various "Integration Partners" harmed consumers. *See* Opp. 17. But Klumpp already contradicted Advertisers' theory.

*First*, while Advertisers argue that the agreements were "not 'vertical,'" Opp. 17, Klumpp already testified that they established what he "as an economist … would characterize as a vertical relationship between Facebook and integration partners." Ex. 15, Klumpp Tr. 169:16-173:2.

*Second*, Advertisers claim they will show the agreements "disincentivized or **blocked**" firms from entering social advertising and that "the complained of restrictions did **in fact** … prevent entry." Opp. 17. Klumpp testified just the opposite:

> Q.  Did you see any evidence that but for the API agreements, any what you call integration partner was considering offering a similar advertising product?
> A.  Well, sir, I have not seen evidence that said here is an integration partner and we're trying to develop a social advertising product, but, hey, let's not do this because we're in this API agreement. So I have not seen evidence of that, but the fact that none of – that I haven't seen that evidence I would point out is consistent with the theory of harm that I just described to you. Right? And so obviously I cannot, you know, create evidence for something that didn't happen.

Ex. 15, Klumpp Tr. 173:3-16. Given Klumpp's admission that no evidence shows an API counterparty decided against entering social advertising because of the agreements, Advertisers have nothing but their own speculation that the agreements *might* have "disincentivized" such entry. Mot. 21-22. But neither attorney nor expert speculation creates a factual dispute about why certain firms did or did not enter the alleged market. Advertisers could have asked the API counterparties who provided discovery whether they were "disincentivized," but they chose not to do so. As Meta's motion explained, proving competitive harm requires "concrete documentation that [the] agreements prevented" entry. *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1182 (9th Cir. 2016). Advertisers have none, and do not dispute that without it, summary judgment is required.

## C.    If Any Component of the Challenged Conduct Is Lawful, Advertisers Are Not Entitled To Damages

Advertisers concede, as they must, that an antitrust plaintiff must "provide 'sufficient evidence to permit a just and reasonable estimate of the damages'" to survive summary judgment. Opp. 23. The Ninth Circuit has made clear what that means for plaintiffs, like Advertisers, who challenge multiple distinct courses of conduct without disaggregating effects, antitrust injury, or damages: Where one "claim has been dismissed or adjudicated against a plaintiff, damages attributable to that claim must be disaggregated." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1224 (9th Cir. 1997). If a plaintiff cannot do so because its "only damage study" assumes "that all of [the challenged] acts contributed to the damage figure, but the district court" finds that some "of those acts were proper," the plaintiff has "no proper proof of damages" and

**PUBLIC REDACTED VERSION**

1   "summary judgment" as to damages is appropriate. *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d

2   1361, 1371-1373 (9th Cir. 1992). If the Court grants summary judgment on *any* of Advertisers'

3   exclusionary conduct theories, summary judgment is appropriate for no proof of damages.

4   Advertisers express disbelief (Opp. 23) that this could be correct, but that is what the law requires.

5   *Id.*; *see also ILC Peripherals Leasing Corp. v. Int'l Bus. Mach. Corp.*, 458 F. Supp. 423, 434 (N.D.

6   Cal. 1978) (granting summary judgment where damages study did not separate effects of various

7   acts so that "there was no basis in the record for the jury to determine what the effect on damages

8   would be if it found one or more of the challenged acts lawful").

9        Advertisers' insistence that Williams's model is "not impact[ed]" even if a "portion of

10   Meta's challenged conduct were deemed lawful" does not fix their disaggregation problem. Opp.

11   24. To the contrary, it highlights a problem with the model, which is that it provides "no rational

12   basis to determine an appropriate damage award" if even one of the challenged acts is deemed

13   lawful or otherwise non-cognizable. *Litton Sys., Inc. v. Honeywell, Inc.*, 1996 WL 634213, at *3

14   (C.D. Cal. July 24, 1996); *see also* Ex. 14, 9/23 Williams Tr. 55:5-56:9 (asserting it ██████████

15   ████████████████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████).[3] This cannot be solved by

17   some on-the-fly "recalculation," as Advertisers suggest (Opp. 24), because the jury would have no

18   reasoned way to perform that recalculation. *See In re NFL "Sunday Ticket" Antitrust Litig.*, 2024

19   WL 3628118, at *9-11 (C.D. Cal. Aug. 1, 2024) (vacating "irrational" and "nonsensical" damages

20   recalculation by jury with "inputs not tied to the record").

21   **III.   ADVERTISERS FAIL TO COHERENTLY DEFINE A RELEVANT PRODUCT MARKET**

22        Advertisers claim that Williams's expert report "says what social advertising is and is not,"

23   Opp. 8,  but—tellingly—do not make even a passing attempt to say what his definition is. That is

24   because he, and Advertisers, do not have one. Though Williams's report arguably contained a

25   (flawed and ambiguous) definition of "social advertising," Advertisers' response to Meta's

26   *Daubert* motion expressly disclaimed that definition while offering nothing to replace it. Dkt. 890-

27   1 at 12-13. Rather than explain what "social advertising" is, how to identify it, or how to figure

---

[3] That Williams's model does not change no matter what conduct remains in or out of the case also highlights that it cannot possibly measure injury caused by the challenged conduct.

28

**PUBLIC REDACTED VERSION**

1  out which firms do or do not sell it, Advertisers point to passages of Williams's expert report where

2  he declares—without reference to any discernible standard or definition—that some products are

3  social advertising and others are not. *See* Opp. 8-9. That simply illustrates the problem. Williams

4  picks and chooses what products fall within his purported market—LinkedIn in, YouTube out,

5  Reddit in, Amazon out—following no methodology and no definition at all. This "fatally

6  undermines [plaintiffs'] definition of the relevant product market in its entirety." *In re Live Concert*

7  *Antitrust Litig.*, 863 F. Supp. 2d 966, 996-997 (C.D. Cal. 2012); *see also Carter Hawley Hale*

8  *Stores, Inc. v. Limited, Inc.*, 587 F. Supp. 246, 253 (C.D. Cal. 1984) ("amorphous" market is

9  "wholly inadequate"); Mot. 23-25 (collecting cases).

10  Regardless, whatever Advertisers mean by "social advertising," it is not a valid relevant

11  market. The sole evidence Advertisers offer that such a market exists is that people have used the

12  phrase "social advertising" to refer to some of Meta's advertising products. Opp. 9. That is not

13  sufficient to proceed to a jury. *See id.* Advertisers need, but lack, evidence "showing … the role"

14  that supposed differences between social and non-social advertising "play in motivating and

15  shaping consumer decisions." *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369,

16  1376 (9th Cir. 1989). Without a definition of "social advertising," Advertisers cannot coherently

17  explain how it differs from other advertising products, let alone why such differences affect

18  consumer substitution. *See* Mot. 25. Indeed, they do not even have evidence that the various

19  references to "social advertising" they rely on even referred to the same set of products or firms.

20  Industry "participants at least have to agree on what *products* [a] description actually applies to"

21  for their use of a descriptor (like "social advertising") to even *potentially* be legally relevant. *FTC*

22  *v. Tempur Sealy Int'l, Inc*, 2025 WL 384493, at *17 (S.D. Tex. Jan. 31, 2025). The absence of any

23  basis upon which the jury could evaluate whether "social advertising"—whatever it may be—is

24  an economically distinct antitrust market warrants summary judgment in Meta's favor on all of

25  Advertisers' claims. *See Qualcomm*, 969 F.3d at 989 (monopolization); *Spectrum Sports, Inc. v.*

26  *McQuillan*, 506 U.S. 447, 459 (1993) (attempted monopolization); *Ohio v. Am. Express Co.*, 585

27  U.S. 529, 543 (2018) (Section 1).

28

**PUBLIC REDACTED VERSION**

Dated: February 12, 2025                    Respectfully submitted,

                                            By: */s/ Sonal N. Mehta*
                                            SONAL N. MEHTA

                                            *Attorney for Defendant Meta Platforms, Inc.*


**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of February, 2025, I electronically transmitted the public redacted version of the foregoing document to the Clerk's Office using the CM/ECF System and caused the version of the foregoing document filed under seal to be transmitted to counsel of record by email.

                          By:    */s/ Sonal N. Mehta*
                                 Sonal N. Mehta