**PUBLIC REDACTED VERSION**

WILMER CUTLER PICKERING
 HALE AND DORR LLP
SONAL N. MEHTA (SBN 222086)
 Sonal.Mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
 David.Gringer@wilmerhale.com
ROSS E. FIRSENBAUM (*pro hac vice*)
 Ross.Firsenbaum@wilmerhale.com
RYAN CHABOT (*pro hac vice*)
 Ryan.Chabot@wilmerhale.com
PAUL VANDERSLICE (*pro hac vice*)
 Paul.Vanderslice@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800

ARI HOLTZBLATT (SBN 354631)
 Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
 Molly.Jennings@wilmerhale.com
2100 Pennsylvania Ave NW
Washington, DC 20037
Telephone: (202) 663-6000

MICHAELA P. SEWALL (*pro hac vice*)
Michaela.Sewall@wilmerhale.com
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

*Attorneys for Defendant Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated,<br><br>                              Plaintiffs,<br><br>        v.<br><br>META PLATFORMS, INC., a Delaware Corporation,<br><br>                              Defendant. | Case No. 3:20-cv-08570-JD<br><br>**DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT REGARDING CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT**<br><br>Hearing Date: July 24, 2025<br>Time: 10:00 a.m.<br>Judge: Hon. James Donato |

**PUBLIC REDACTED VERSION**

## TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ...................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................1

INTRODUCTION ...........................................................................................................................1

BACKGROUND .............................................................................................................................4

ARGUMENT ...................................................................................................................................5

I.    PLAINTIFFS CANNOT DEMONSTRATE ANTITRUST INJURY AND STANDING ...........................................................................................................................5

    A.    Plaintiffs Rely Solely On Economides's Unreliable And Inadmissible Opinions To Assert That Facebook Would Be The First Ever Platform To Pay All Of Its Users For Consuming Content ...........................................................5

    B.    The Antitrust Laws Do Not Recognize Plaintiffs' Theory of Injury .......................7

II.    PLAINTIFFS' OWN ALLEGATIONS, THEIR EXPERTS' ADMISSIONS, AND THE PLAINTIFFS' TESTIMONY ALL ESTABLISH THAT THE ALLEGED DECEPTION DID NOT HARM COMPETITION ......................................10

    A.    Monopoly Acquisition .........................................................................................11

    B.    Monopoly Maintenance .......................................................................................13

III.    PLAINTIFFS HAVE NOT ADEQUATELY DEFINED A MARKET AS A MATTER OF LAW .......................................................................................................15

IV.    PLAINTIFFS' CLAIMS ARE TIME BARRED .........................................................18

    A.    Plaintiffs' Claims Accrued Outside The Limitations Period ................................18

    B.    Based On Their Own Theory, Plaintiffs Cannot Establish A Continuing Violation As A Matter Of Law ...........................................................................20

V.    PLAINTIFFS' ATTEMPTED MONOPOLIZATION CLAIM AND ABANDONED REQUEST FOR INJUNCTIVE RELIEF FAIL FOR THE SAME REASONS ............................................................................................................24

CONCLUSION ..............................................................................................................................24

**PUBLIC REDACTED VERSION**

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Airweld, Inc. v. Airco, Inc.*,
    742 F.2d 1184 (9th Cir. 1984) .......................................................................................21

*Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal &
    Pro. Publ'ns, Inc.*, 108 F.3d 1147 (9th Cir. 1997)...........................................2, 10, 11, 13

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983)...................................................................................................7

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*,
    166 F. Supp. 3d 988 (N.D. Cal. 2015) ..............................................................23

*Chang v. Farmers Ins. Co., Inc.*,
    2023 WL 5163288 (C.D. Cal. July 12, 2023)...................................................23

*City of Oakland v. Oakland Raiders*,
    20 F.4th 441 (9th Cir. 2021) ........................................................................8, 10

*Coronavirus Rep. v. Apple Inc.*,
    2021 WL 5936910 (N.D. Cal. Nov. 30, 2021) ...........................................15, 16

*Coronavirus Rep. v. Apple, Inc.*,
    85 F.4th 948 (9th Cir. 2023) .....................................................................15, 16

*Duarte v. Quality Loan Serv. Corp.*,
    2018 WL 2121800 (C.D. Cal. May 8, 2018) ....................................................21

*Electroglas, Inc. v. Dynatex Corp.*,
    497 F. Supp. 97 (N.D. Cal. 1980) .............................................................20, 21

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ..........................................................................15

*Garcia v. Pueblo Country Club*,
    299 F.3d 1233 (10th Cir. 2002) .......................................................................12

*Garrison v. Oracle Corp.*,
    159 F. Supp. 3d 1044 (N.D. Cal. 2016) ......................................................18, 19

*Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.*,
    397 F.3d 1217 (9th Cir. 2005) .........................................................................12

*Holmes v. SIPC*,
    503 U.S. 258 (1992)...........................................................................................7

**PUBLIC REDACTED VERSION**

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) .................................................................................24

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
   19 F.4th 127 (2d Cir. 2021) ..............................................................................7, 9

*In re Online DVD Rental Antitrust Litig.*,
   2011 WL 1629663 (N.D. Cal. Apr. 29, 2011) ........................................................7

*In re Online DVD-Rental Antitrust Litig.*,
   779 F.3d 914 (9th Cir. 2015) ...................................................................................8

*Klehr v. A.O. Smith Corp.*,
   521 U.S. 179 (1997)................................................................................................20

*McCarthy v. Intercontinental Exch., Inc.*,
   2022 WL 4227247 (N.D. Cal. Sept. 13, 2022) .......................................................7

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
   924 F.2d 1484 (9th Cir. 1991) ...............................................................................18

*New York v. Meta Platforms, Inc.*,
   66 F.4th 288 (D.C. Cir. 2023)................................................................................19

*Oliver v. SD-3C LLC*,
   751 F.3d 1081 (9th Cir. 2014) ...............................................................................24

*Pace Indus., Inc. v. Three Phoenix Co.*,
   813 F.2d 234 (9th Cir. 1987) ...............................................................3, 20, 21, 22

*Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
   555 U.S. 438 (2009)................................................................................................12

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997)...................................................................................18

*Rambus Inc. v. FTC*,
   522 F.3d 456 (D.C. Cir. 2008)...............................................................................15

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) .................................................................................16

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
   842 F.3d 883 (5th Cir. 2016) .................................................................................10

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
   471 F. Supp. 3d 981 (N.D. Cal. 2020) ..................................................................19

*Samsung Elecs. Co., Ltd. v. Panasonic Corp.*,
   747 F.3d 1199 (9th Cir. 2014) .........................................................................20, 22

**PUBLIC REDACTED VERSION**

*SaurikIT, LLC v. Apple Inc.,*
    2022 WL 1768845 (N.D. Cal. May 26, 2022) ..........................................................21, 23

*Schachar v. Am. Acad. of Ophthalmology, Inc.,*
    870 F.2d 397 (7th Cir. 1989) ........................................................................................10

*S. Pac. Co. v. Darnell-Taenzer,*
    245 U.S. 531 (1918)........................................................................................................9

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.,* 8
    75 F.2d 1369 (9th Cir. 1989) ........................................................................................18

*Truck-Rail Handling Inc. v. BNSF Ry. Co.,*
    2005 WL 8178364 (N.D. Cal. Mar. 8, 2005)................................................................15

*TYR Sport, Inc. v. Warnaco Swimwear, Inc.,*
    709 F. Supp. 2d 821 (C.D. Cal. 2010) .........................................................................11

*United States v. Microsoft,*
    253 F.3d 34 (D.C. Cir. 2001) .......................................................................................15

*United States v. Oracle Corp.,*
    331 F. Supp. 2d 1098 (N.D. Cal. 2004) .......................................................................18

*Universal Avionics Sys. Corp. v. Rockwell Int'l Corp.,*
    52 F. App'x 897 (9th Cir. 2002) ..................................................................................18

*Yellow Pages Cost Consultants, Inc. v. GTE Directories Corp.,*
    951 F.2d 1158 (9th Cir. 1991) .......................................................................................8

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C. § 15(b) .............................................................................................................18

Fed. R. Civ. P. 56 ...............................................................................................................1

**OTHER AUTHORITIES**

Areeda & Hovenkamp, *Antitrust Law* (2023)..................................................................11

EJ Dickson, *Inside MeWe, Where Anti-Vaxxers and Conspiracy Theorists Thrive,*
    ROLLING STONE (May 23, 2019) ...................................................................................9

**PUBLIC REDACTED VERSION**

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT, on July 24, 2025 at 10:00 a.m., Defendant Meta Platforms, Inc. will move for summary judgment on all claims raised in the Consolidated Class Action Complaint (Dkt. 87, "Compl."). Meta's motion is based on the supporting Memorandum of Points and Authorities below.

Pursuant to Federal Rule of Civil Procedure 56, Meta requests that the Court grant Meta summary judgment on all claims.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

The Court should grant summary judgment for the same reason it denied class certification. Plaintiffs have, for years, advanced a single theory of antitrust injury: Meta's alleged failure to pay every Facebook user five dollars a month. To try to prove that injury, plaintiffs rely entirely on the testimony of Dr. Nicholas Economides. But as the Court already concluded, Economides's injury opinion is unreliable and unsupported—nothing "more than a fanciful application of economic theory untethered to real-world evidence about the alleged PSNS market." Dkt. 905 at 8. The opinion Economides offers at this stage of the litigation is identical to the one the Court excluded under Rule 702. He imagines the same failure to pay, premised on the same economic theory, with the same evidentiary defects. Indeed, the (now-excluded) testimony plaintiffs submitted with their class certification motion expressly incorporated the injury opinions they propose to rely on at trial. Ex. 1, Economides Abridged CC Rep. ¶¶ 3, 84 n.147. So just as when the Court last considered Economides's speculation, "'there is simply too great an analytical gap between' the facts on which Dr. Economides relies" and his assertion that Meta would respond to additional competition by inventing an entirely new business model. Dkt. 905 at 7. The Court should therefore (again) grant Meta's *Daubert* motion seeking to exclude Economides's testimony and grant summary judgment in light of plaintiffs' failure to offer reliable and admissible evidence of antitrust injury.[1]

---

[1] Unless otherwise noted, "Ex." citations reference exhibits to the Gringer Declaration submitted herewith, emphasis is added, internal citations are omitted, and objections are omitted.

**PUBLIC REDACTED VERSION**

Summary judgment is independently warranted for four additional reasons.

*First*, plaintiffs cannot show that the claimed failure to pay every user five dollars a month was proximately caused by the challenged conduct (supposed deception about data practices). Plaintiffs' theory of injury relies on a long, speculative chain of causation that starts with the baseless assumption that people choose online platforms based on representations about data collection and use, reimagines vague statements about "privacy" as critical to Facebook's popularity, and ends with the (again, baseless) assumption that if Meta had faced stronger competition from some unknown firm, it would have been forced to pay people five dollars a month to keep them on Facebook. The antitrust laws and Constitution do not recognize standing to assert injuries premised on such attenuated causal relationships. And they certainly do not do so when the "injury" and damages are the loss of imagined payments for enjoying a free service.

*Second*, plaintiffs' theory of liability fails as a matter of law. Plaintiffs' theory rests entirely on supposed deception, but deception can only violate the antitrust laws if it has a "a significant and enduring adverse impact on competition itself." *Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997). Here, plaintiffs do not connect *any* of the statements or omissions they say were deceptive to *any* of the competitors they assert were harmed, let alone to any harm to market-wide competition; the plaintiffs testified such representations played no role in their decision to use Facebook; and plaintiffs' putative privacy expert concedes that the claimed deception had nothing to do with users' decision to choose Facebook over its rivals. Ex. 2, Lamdan Tr. 78:9-79:14. And while the entire premise of plaintiffs' case has been that Meta obtained monopoly power *by* defeating early competitors like Myspace *through* misrepresentations about data use and collection, Economides admits that "Facebook beat Myspace on its own merits," and that other market participants were not "going to be successful even … without the misrepresentations." Ex. 3, Economides 3/24 Tr. 240:3-10; 229:22-231:21. As for their maintenance theory, Plaintiffs have no plausible explanation or evidence for why Facebook's success over Myspace was competition on the "merits," but that said competition somehow transformed itself later, after Facebook was successful, into exclusionary conduct. Instead, plaintiffs' experts argue that Meta obtained a commanding position in the market

1   and, as a result, could not be overcome by its competitors. That theory is legally untenable; it

2   means that Meta has not engaged in any anticompetitive conduct to obtain or maintain monopoly

3   power.

4       ***Third***, plaintiffs' "personal social networking services" (PSNS) market depends solely on

5   the unreliable testimony of Dr. Joseph Farrell. If the Court grants Meta's concurrently filed

6   *Daubert* motion, plaintiffs have no means to define a market and summary judgment follows.

7   Regardless, the proposed market fails as a matter of law. Facebook offers users all manner of

8   entertainment without charge, from posting text updates, to buying and selling goods, to watching

9   videos created by celebrities and influencers. As to each of these activities and experiences,

10  Facebook faces intense competition for users' time and attention from services ranging from

11  TikTok to X (Twitter) to YouTube to numerous messaging apps. Against this fundamental truth,

12  plaintiffs rely only on Farrell, who had never even *used* any of these apps (including Facebook)

13  on a smartphone. Based on his inadmissible speculation, plaintiffs gerrymander a market around a

14  subset of activities and experiences that they—and only they—term PSNS. But Farrell concedes

15  that determining what features, activities, and experiences are in and out of the market poses

16  "intractable questions" and creates "irreducible gray areas." Ex. 4, Farrell Tr. 30:16-31:16. That is

17  a fatal defect. Absent the ability to discern what is or is not PSNS, plaintiffs cannot identify the

18  contours of the relevant market, much less determine whether competition within that market

19  effectively constrains Meta's conduct.

20      ***Finally***, plaintiffs' submissions since the motion to dismiss have made clear that the

21  "systematic" and "continuous campaign" of deception alleged to be anticompetitive began in 2006,

22  and supposedly resulted in Meta acquiring a monopoly by 2011. This suit was filed in December

23  2020. That is well outside the four-year statute of limitations of the antitrust laws. Plaintiffs have

24  previously invoked the continuing violation doctrine, but that requires proving the deception

25  within the limitations period was more than a "reaffirmation" of earlier conduct and inflicted some

26  "new and accumulating injury." *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th

27  Cir. 1987). Here, plaintiffs and their experts claim the opposite—they say the alleged deception

28  was part of a unified campaign that started in 2006 and offer no theory of "new and accumulating

**PUBLIC REDACTED VERSION**

injury" to users or competition after December 2016. Thus, accepting for purposes of summary judgment their theory of the case, and removing any factual disputes from the equation, plaintiffs' claims are time-barred as a matter of law.

## BACKGROUND

Facebook's business model requires attracting both users and advertisers. On the user side, Facebook accomplishes that goal by providing a variety of free features to its hundreds of millions of users in the United States. The most popular platforms offer overlapping features that serve similar "███████" Ex. 5, Farrell Rep. ¶¶25-30 & n.12. For example, videos from a variety of sources are shared, posted, and viewed on Facebook, just as they can be (and are) shared, posted, and viewed on X, YouTube, Snapchat, and TikTok. *Id.* So too for sharing with family and friends, live streaming, disappearing content, and numerous other features. *Id.* Users have multiple options for each "███████" and Facebook must thus constantly innovate and seek to offer a better user experience. Ex. 4, Farrell Tr. 115:19-25. Facebook provides its services for free by selling advertising, which requires obtaining and retaining advertisers in addition to attracting and retaining engaged users. *Id.* And advertisers, like users, have numerous alternatives to Facebook.

Plaintiffs assert that Meta misrepresented its data collection and use practices to monopolize a market for "personal social networking services." Plaintiffs previously offered dueling testimony from Economides and a second economist, Dr. Joseph Farrell, to support that market. But after the Court ordered plaintiffs to choose one—observing that having both experts testify would either "be different and therefore confusing or consistent and therefore duplicative," Hr'g Tr. 5:4-7 (Nov. 14, 2024)—plaintiffs elected to proceed only with Farrell, Dkt. 859 at 2.

Choosing Farrell has not solved the problem. Farrell defines the PSNS market to include aspects (or, depending on the day, all) of Facebook, Instagram, Google+, Snapchat, and MeWe during the 2016 to 2020 class period, and to have previously included Myspace, Friendster, and Orkut. Ex. 5, Farrell Rep. ¶¶26-27, 247-49. He excludes Meta's closest competitors like TikTok and YouTube from the market by claiming that they do not "████████████████████ █████████" *id.* ¶¶161-64, 182; Ex. 4, Farrell Tr. 14:14-15:14, and assessing whether platforms facilitate "██████████████████████████████████" Ex. 5, Farrell

**PUBLIC REDACTED VERSION**

Rep. ¶138. Farrell, however, has been unable to consistently define what activities are PSNS, and has variously claimed that Facebook's most popular features (or certain uses of those features) are inside or outside of the alleged market. For example, Farrell has testified that watching short-form videos is outside the PSNS market, but might have a "tinge" of PSNS depending on the viewer's subjective and unknowable reasons for watching the video. Ex. 4, Farrell Tr. 15:2-3, 79:21-80:5.

Plaintiffs and their experts know of no firm that pays its users for consuming content online. Ex. 6, Economides 9/23 Tr. 115:18-116:2 (Q. "[Y]ou can't think of any examples in the real world where users are paid to consume content? A. I cannot think of an example right now."); Ex. 3, Economides 3/24 Tr. 255:11-23 (Q. "In the time since your class certification deposition and whatever additional work you've done since then, have you identified any platform that pays all of its users for their activity on the platform, just their normal activity? A. Well, I think I understand what you're saying, and no, since my deposition I haven't identified any platforms that pay everybody."). The plaintiffs testified ███████████████████████████████ Ex. 7, Klein Tr. 289:20-290:24; Ex. 9, Grabert Tr. (Vol. 2) 322:24-323:7; Ex. 10, Kupcho Tr. 234:16-19. Plaintiffs nevertheless assert that they suffered antitrust injury because, absent the claimed deception, Meta would pay every active user five dollars a month. Ex. 11, Economides Merits Rep. ¶276.

## ARGUMENT

### I. PLAINTIFFS CANNOT DEMONSTRATE ANTITRUST INJURY AND STANDING

#### A. Plaintiffs Rely Solely On Economides's Unreliable And Inadmissible Opinions To Assert That Facebook Would Be The First Ever Platform To Pay All Of Its Users For Consuming Content

Plaintiffs' sole theory of antitrust injury turns on Economides's assertion that in a world where Meta made different statements about its privacy practices, additional competition would have forced the company to pay each of the hundreds of millions of people with active Facebook accounts in the United States five dollars a month. Dkt. 905 at 2. The Court already held that such implausible speculation has no basis in the record or reality, *id.* 7-13, so Meta does not detail those findings again here. Economides's opinions are unchanged and remain inadmissible.

Without Economides's speculation about Meta paying its users, plaintiffs cannot demonstrate antitrust injury as a matter of law. As plaintiffs told the Court, "the antitrust injury for

1    the users is a reduction in the level of compensation that would have been paid to all users," Hr'g

2    Tr. 4:9-14 (Oct. 31, 2024), and the only means plaintiffs have ever identified for substantiating

3    that injury is Economides's testimony, *see, e.g.*, Dkt. 793 at 28; Dkt. 820-1 at 4 (designating

4    Economides as sole expert to testify on antitrust injury). Nor have plaintiffs offered evidence of

5    any other injury. For example, plaintiffs and their experts have not (because they cannot)

6    demonstrated that Facebook would have been "better" for the plaintiffs in the but-for world along

7    any other dimension. To the contrary—Economides himself disclaimed offering an opinion on

8    harm through a diminution in quality. Ex. 6, Economides 9/23 Tr. 102:5-13 ("Q. So in your but-

9    for world, Facebook could have responded to more competition by offering better services instead

10   of paying users; correct? A. Not correct. I think that paying users would be a crucial feature of the

11   but-for world to make sure that people come to Facebook. Now, could it—could Facebook also

12   have better features? Possibly. I don't know."). And although Economides has referenced ███

13   ████████████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████ Ex. 11,

15   Economides Merits Rep. ¶225.

16          The undisputed record confirms that the Court was right to reject Economides's injury

17   opinion as nothing "more than a fanciful application of economic theory untethered to real-world

18   evidence about the alleged PSNS market." Dkt. 905 at 8. Contradicting their theory of harm, each

19   of the plaintiffs testified ████████████████████████████████████████████

20   ████████████████████ *See*, Ex. 9, Grabert Tr. (Vol. 2) 322:24-323:7 ("█████████

21   ████████████████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████████████

23   ████████████████████ "); Ex. 7, Klein Tr. 290:11-20 (████); Ex. 10, Kupcho Tr. 234:16-19

24   ("████████████████████████████████████████████████████████████████████

25   ████████████████████ "). And as plaintiffs' experts concede, if a platform did ever try to pay users,

26   it would risk destroying the very experience that brought people to the service in the first place.

27   Ex. 4, Farrell Tr. 272:20-273:8 ("If you pay people to take something that you might otherwise be

28   selling, then you might get some, I'd call it, non-legitimate demand"); Ex. 5, Farrell Rep. ¶112

1  n.322 ("█████████████████████████████████████████████████████

2  ██████████████████████████████████"); Ex. 11, Economides Merits Rep. ¶303

3  ("█████████████████████████████████████████████████████████████████

4  █████████████████████████████████████████████████████████████████

5  ████████████"). These undisputed points, and not a supposed lack of competition, are why Meta

6  does not pay users.

7       Plaintiffs have had years to substantiate their implausible theory that Facebook would pay

8  all its users. Instead, they have only Economides's "conclusion of fiat rather than evidence," Dkt.

9  905 at 13, and their own testimony rejecting the theory. The Court should again exclude

10  Economides's antitrust injury opinion and grant Meta summary judgment.

11       **B.    The Antitrust Laws Do Not Recognize Plaintiffs' Theory of Injury**

12       Plaintiffs' theory of injury separately fails because they cannot demonstrate that Meta's

13  supposed failure to pay all users of Facebook five dollars per month was proximately caused by

14  the alleged deception. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of*

15  *Carpenters*, 459 U.S. 519, 535-37 (1983); *see also Holmes v. SIPC*, 503 U.S. 258, 268 (1992)

16  (antitrust plaintiff's "right to sue . . . require[s] a showing that the defendant's violation not only

17  was a 'but for' cause of his injury but was the proximate cause as well"). While courts may analyze

18  questions of antitrust standing by looking at a series of "factors," the antitrust standing inquiry

19  "remains, fundamentally, one into proximate cause." *In re Am. Express Anti-Steering Rules*

20  *Antitrust Litig.*, 19 F.4th 127, 143 (2d Cir. 2021). And when, as here, a theory of injury depends

21  on speculation and "vaguely defined links" between the harm asserted and the conduct alleged,

22  courts dismiss the claim or grant summary judgment. *Associated Gen. Contractors*, 459 U.S. at

23  540; *see also, e.g., McCarthy v. Intercontinental Exch., Inc.*, 2022 WL 4227247, at *4 (N.D. Cal.

24  Sept. 13, 2022) (Donato, J.) (granting motion to dismiss for lack of antitrust standing where

25  "directness of the injury" was "questionable"); *In re Online DVD Rental Antitrust Litig.*, 2011 WL

26  1629663, at *9 (N.D. Cal. Apr. 29, 2011) (granting summary judgment when plaintiff failed "to

27  satisfy the most 'critical' of antitrust standing requirements here—directness of the injury"). For

28  the same reasons, plaintiffs cannot demonstrate Article III standing. *In re Online DVD-Rental*

**PUBLIC REDACTED VERSION**

1    *Antitrust Litig.*, 779 F.3d 914, 921-22 (9th Cir. 2015).

2    First, plaintiffs cannot show that there is a "direct link" between the challenged statements

3    and Meta not paying people to use Facebook. The directness of injury factor examines "the chain

4    of causation" between plaintiffs' asserted harms and any anticompetitive conduct. *City of Oakland*

5    *v. Oakland Raiders*, 20 F.4th 441, 458 (9th Cir. 2021). The connection must be "close." *Yellow*

6    *Pages Cost Consultants, Inc. v. GTE Directories Corp.*, 951 F.2d 1158, 1162 (9th Cir. 1991).

7    Plaintiffs' theory, even if credited in full, fails that standard because it requires numerous unproven

8    inferences. Meta would have had to face stronger competition absent the challenged statements,

9    that stronger competition would have had to be from a firm whose product was more appealing

10   than Facebook, and Meta would have had to respond to that competition by fundamentally

11   changing its business model (and adopting one that has never previously been used in its industry)

12   through paying all of its users five dollars a month. Even if plaintiffs could prove these logical

13   leaps—and they have provided evidence establishing none of them, *see supra*, at 5-7; *see also*

14   concurrently filed Motion to Exclude Nicholas Economides at 2-4—the mental gymnastics

15   required do not warrant recognizing their claim, meaning it fails as a matter of law.

16   Notably, plaintiffs cannot show that the alleged deception caused enough people to remain

17   active on Facebook that, in the absence of the deception, Meta would have had to start making

18   payments to retain users. For such a theory to be viable, plaintiffs would have to first show that

19   absent the deception, there would have been better competitive alternatives in the alleged PSNS

20   market—without such alternatives, Meta would have no need to pay to keep users. But there is no

21   evidence in the record of competitors offering products that plaintiffs would have preferred to

22   Facebook absent the alleged deception. *See, e.g.*, Ex. 3, Economides 3/24 Tr. 239:1-16 ("Facebook

23   had better privacy practices than Myspace."). There is not even evidence that any competitors were

24   negatively impacted by the alleged statements. Nearly all firms plaintiffs identify as failed

25   competitors or unsuccessful entrants *themselves* attribute their lack of success to ███████████

26   ████████████████████████████████████████████████ *See, e.g.*, Ex. 12, DeWolfe Tr.

27   87:10-15 ("███████████████████████████████████████████████████

28   ████████████████████████████████████████████████████████████

1  ████████████████████████████████████████"); Ex. 13, Horowitz Tr.

2  129:7-17 (███████████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████████████████████

4  ███████████). Economides similarly conceded that MeWe's lack of success was "not connected

5  to a particular deceptive statement" and that he did "not have an opinion on whether MeWe['s] …

6  demise had to do with" other factors like "the views that were expressed there." Ex. 3, Economides

7  3/24 Tr. 233:3-234:2; 235:15-236:3; *see also* EJ Dickson, *Inside MeWe, Where Anti-Vaxxers and*

8  *Conspiracy Theorists Thrive*, ROLLING STONE (May 23, 2019).

9       Regardless, plaintiffs cannot show the requisite impact on competition. For one, plaintiffs'

10  expert Sarah Lamdan argues that no one trusts Facebook on privacy and that the challenged

11  statements were *not* the reason anyone used Facebook. Ex. 2, Lamdan Tr. 77:21-79:1. The named

12  plaintiffs likewise testified ███████████████████████████████████████████████

13  ████████████████████████████ *See, e.g.*, Ex. 8, Grabert Tr. (Vol. 1) 204:14-205:13

14  (explaining that ████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████); *id.* 208:14-211:7

16  ("███████████████████████████████████████████"); Ex. 10, Kupcho Tr. 37:2-16

17  (████████████████████████████████████████████████). Without

18  showing that users were likely to rely on the statements made by Facebook that are at issue,

19  plaintiffs cannot show that there would be any impact on competition. And without showing that

20  the challenged statements were the proximate cause of any loss of competition, plaintiffs

21  necessarily cannot show that the challenged statements are what caused their injury. *See In re Am.*

22  *Express*, 19 F.4th at 139 n.7 (antitrust law "'does not attribute remote consequences to a

23  defendant,' even if those consequences are foreseeable" (quoting *S. Pac. Co. v. Darnell-Taenzer*,

24  245 U.S. 531, 533 (1918))).

25       The Ninth Circuit's decision to affirm the grant of a motion to dismiss on antitrust standing

26  grounds in *City of Oakland* is on all fours and controlling. There, the court held the plaintiff's

27  theory of injury—harms suffered because of the Raiders' move from Oakland to Las Vegas—

28  relied on "too many speculative links in the chain of causation between Defendants' alleged

restrictions on output and the City's alleged injuries." *City of Oakland*, 20 F.4th at 459-60. Oakland alleged that but for the NFL's conduct, which supposedly priced Oakland out of the market for NFL teams, it would have kept the Raiders "or acquired another team." *Id.* The court rejected that theory of injury as leaving too many causal questions unanswered, including "Would new teams have joined the NFL?" "Would they have found Oakland attractive?" and "Would the Raiders have left Oakland in any event?" *Id.* As discussed, substantial causal questions exist here too. And plaintiffs do even less to provide answers, despite being at a later stage of the case. Plaintiffs have failed to establish antitrust injury and Article III standing as a matter of law.

## II.  PLAINTIFFS' OWN ALLEGATIONS, THEIR EXPERTS' ADMISSIONS, AND THE PLAINTIFFS' TESTIMONY ALL ESTABLISH THAT THE ALLEGED DECEPTION DID NOT HARM COMPETITION

Plaintiffs' theory of harm to competition turns on the notion that, beginning in 2006, Facebook's alleged misrepresentations and omissions about its "data practices" convinced "enough users" to join and remain active on Facebook rather than its competitors. Dkt. 793 at 19. Attributing an anticompetitive effect to deception, however, is strongly disfavored. *See, e.g.*, *Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 400 (7th Cir. 1989) (when statements are "false or misleading or incomplete or just plain mistaken, the remedy is not antitrust litigation but more speech—the marketplace of ideas"); *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 895 (5th Cir. 2016) ("false advertising alone hardly ever operates in practice to threaten competition"). So the Ninth Circuit permits such suits only in rare circumstances. *Am. Pro. Testing Serv.*, 108 F.3d at 1152 (observing that deception claims "should presumptively be ignored"). Here, plaintiffs have presented nothing to overcome that presumption. Plaintiffs do not even attempt to demonstrate that "enough users" responded to specific misrepresentations and omissions by remaining active on Facebook—as explained, plaintiffs cannot even show that ▮▮▮ ▮▮ *See, e.g.*, Ex. 8, Grabert Tr. (Vol. 1) 108:6-14 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Ex. 7, Klein Tr. 83:21-84:25 (▮▮▮▮).

In any event, "a plaintiff that has discharged the de minimis presumption is not automatically entitled to its own presumption of significant market effect." *TYR Sport, Inc. v.*

*Warnaco Swimwear, Inc.*, 709 F. Supp. 2d 821, 833 (C.D. Cal. 2010). Plaintiffs must *still* prove that the claimed deception had "a significant and enduring adverse impact on competition itself in the relevant markets to rise to the level of an antitrust violation." *Id.* at 832 (quoting *Am. Pro. Testing Serv.*, 108 F.3d at 1152); Areeda & Hovenkamp, *Antitrust Law* ¶651h (2023) (deception must have "the effect of significantly impairing the ability of rivals to compete").

They cannot. As to acquisition, Economides concedes that Facebook won out over competitors "on its merits." Ex. 3, Economides 3/24 Tr. 231:4-21. As to monopoly maintenance, neither he nor Lamdan can explain how Facebook's continued success had anything to do with the alleged deception, and both now admit that users joined and remained on Facebook because of the initial (again, lawful) success—not statements about data use and collection. *Id.* 231:4-232:3, 240:3-15; Ex. 2, Lamdan Tr. 79:3-14. Thus, whatever plaintiffs will be able to prove regarding whether the at-issue statements were deceptive, there is no evidence of a cognizable effect on competition. And there can be none, because plaintiffs' experts have disclaimed its existence. That defect requires summary judgment. *See TYR Sport, Inc.*, 709 F. Supp. 2d at 838 (granting summary judgment when plaintiff "ha[d] not provided evidence from which a reasonable jury could infer a 'significant and enduring adverse impact on competition'").

### A. Monopoly Acquisition

Starting with monopoly acquisition, plaintiffs' theory is that Facebook's privacy and data promises were critical to the defeat of early competitors like Myspace. Dkt. 793 at 21. But their conduct expert, Economides, has disclaimed that core allegation:

> Q. So let's go back and be very clear about this. You testified a few moments ago that you believe that Facebook beat Myspace on its own merits, you'd agree with that?
>
> A. I said that, yes.
>
> Q. Okay. And you stand by that, right?
>
> A. Yes.
>
> Q. And you agree that you're not suggesting that the alleged misrepresentations and omissions in this case were the cause of Myspace's decline, right?
>
> A. That's correct.

1  Ex. 3, Economides 3/24 Tr. 240:3-15; *see also* Ex. 6, Economides 9/23 Tr. 96:10-18 ("I would say

2  that at the early stage, the privacy settings of Facebook, despite their problems, were better than

3  the alternative, the alternative being Myspace."). He then admitted the same about numerous other

4  firms plaintiffs had identified in the litigation as early rivals in their contrived PSNS market. Ex.

5  3, Economides 3/24 Tr. 229:22-231:3 (Bebo, Friendster, and Orkut failed "even without the

6  misrepresentations"). So despite this entire lawsuit being premised on Facebook having "acquired

7  its monopoly position" "through repeated misrepresentations over its data collection and use

8  practices," Dkt. 793 at 1, plaintiffs' own expert now admits none of that is true. "Facebook won

9  over Myspace" and its other early rivals "on its merits." Ex. 3, Economides 3/24 Tr. 231:4-21.

10  Because Section 2 "targets the willful acquisition or maintenance of [monopoly] power as

11  distinguished from growth or development as a consequence of a superior product, business

12  acumen, or historic accident," this concession means that the challenged conduct is not unlawful.

13  *Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447-48 (2009).

14      Plaintiffs have tried to errata these fatal admissions away, but a "deposition is not a take

15  home examination." *Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1242 n.5 (10th Cir. 2002).

16  Errata are "to be used for corrective, and not contradictory, changes." *Hambleton Bros. Lumber*

17  *Co. v. Balkin Enters., Inc.*, 397 F.3d 1217, 1226 (9th Cir. 2005). And here, Economides could not

18  have been clearer that he stood by his testimony that Facebook won out over rivals like Myspace

19  on the merits. *Supra*, at 11; *see also* Ex. 3, Economides 3/24 Tr. 295:3-15 ("Q. Is there anything

20  in your testimony from today that you want to change or correct or do you stand behind your

21  testimony from today? A. No, I don't have anything to correct. Q. You stand behind it? A.

22  Correct."). It was instead only after Meta filed its initial motion for summary judgment that

23  plaintiffs sought to qualify these answers. The Ninth Circuit prohibits such gamesmanship,

24  rejecting errata submitted "after [defendant's] motion for summary judgment was filed" when the

25  "'corrections' were not corrections at all, but rather purposeful rewrites tailored to manufacture an

26  issue of material fact." *Hambleton*, 397 F.3d at 1225. And in all events, Economides made

27  substantially the same concession in his earlier deposition, testifying that "at the early stage, the

28  privacy settings of Facebook, despite their problems, were better than the alternative, the

1   alternative being Myspace." Ex. 6, Economides 9/23 Tr. 96:10-18. Perhaps because they had not

2   yet seen Meta's motion for summary judgment, plaintiffs never changed that earlier admission.

3         **B.     Monopoly Maintenance**

4         Plaintiffs' monopoly maintenance theory fares no better. They claim that Meta maintained

5   monopoly power by engaging in "continued deception" to attract users since 2006. Dkt. 793 at 1;

6   *supra*, at 10. But plaintiffs concededly offer nothing tying the alleged maintenance of monopoly

7   power to *any* misrepresentations, Ex. 14, Second Supp. Resps. to Interrogs. 6, 7, 8 (Jan. 18, 2023),

8   much less evidence or analysis to explain how deception had a "significant and enduring adverse

9   impact on competition," *Am. Pro. Testing Serv.*, 108 F.3d at 1152. Economides's approach to

10  Google+ is illustrative—he could not identify *any* misstatement or omission that "caused users to

11  choose Facebook over Google+," and disclaimed the need to identify the actual anticompetitive

12  effect of deception on Google+. Ex. 3, Economides 3/24 Tr. 244:5-19; *id.* 246:12-247:5. Instead,

13  he testified that he did "not have a specific statement" or "specific evidence that shows that a

14  specific statement of omission or misrepresentation or anything else" in his report or those of other

15  experts that "would result in a user going to Facebook rather than Google+." *Id.* 244:5-19. And

16  asked whether he had "quantified or even considered whether there were any other factors as part

17  of your opinions that you've offered in the case" that led to Google+'s failure, Economides

18  admitted "I do not believe I have details of other factors that did not help Google+." *Id.* 249:3-10.

19  The same defects infect Economides's analysis of MeWe, the other later "competitor" plaintiffs

20  identify. *See supra*, at 9.

21        Unable to connect the alleged deception to any harm to competition, Economides argues

22  that "the deceptive statements allowed Facebook to become a monopolist ... and *that*

23  *automatically means* that the other companies like Google+ are not anymore a big competitor."

24  Ex. 3, Economides 3/24 Tr. 250:3-25. Setting aside the unexplained inconsistency of this theory—

25  admitting that Facebook beat Myspace and other early competitors on the merits, then claiming

26  without evidence that the deception nevertheless contributed to a monopoly—this would not save

27  plaintiffs' claim. Economides asserts that "the fundamental reason" that competitors like Google+

28  became "marginal compan[ies]" when they tried to enter the alleged market "was the *achievement*

1    *of Facebook as a monopoly.*" *Id.* 248:16-249:1. But, again, according to Economides himself, that

2    "achievement" of initial monopoly power lacks any connection to the claimed deception or

3    anticompetitive conduct. *Supra*, at 11-13. So to the extent he now claims it was the initial (lawful)

4    acquisition of monopoly power that caused later harm to competition, this would not violate the

5    antitrust laws.

6        The plaintiffs' testimony likewise offers no evidence of the effect of the alleged deception,

7    and each explained ███████████████████████████████████████████████

8    ████████████ Sarah Grabert testified ████████████████████████████

9    ███████████████████████████████████████████████████████████████

10   ███████████████████████████████████████████████████████████████

11   Ex. 8, Grabert Tr. (Vol. 1) 204:14-205:13, 208:14-20, 210:16-211:7. Max Klein admitted ██████

12   ██████████████████████████████████████████████████████████ Ex. 7,

13   Klein Tr. 60:25-61:3; 201:1-14; 210:2-211:17. Rachel Banks Kupcho testified ████████████

14   ███████████████████████████████████████████████████████████████

15   ████████████████████ Ex. 10, Kupcho Tr. 37:2-16; 93:21-24. Each of the named plaintiffs also

16   admitted ██████████████████████████████████████████████████████

17   ███████████████████████████████████████████████████████████████

18   ████████████ *See* Ex. 15, Plaintiffs' Suppl. Resps. to Interrogs. 15 and 16 (Feb. 15, 2023) at 6.

19       Lamdan confirmed that the alleged deception had nothing to do with users choosing

20   Facebook over competitors. She testified "I'm not sure how much Facebook's PR about its trust

21   campaign, its trust campaign to the public—I'm not sure how that swayed users." Ex. 2, Lamdan

22   Tr. 77:21-78:7. When asked whether she was "offering an opinion that any public statement

23   Facebook made about privacy was relied on by users," she admitted that the supposed

24   misrepresentations and omissions had no impact:

25       I know that the intent of Facebook was to build trust, but I feel like usually the
26       reason people return to Facebook after leaving Facebook because they have a lack
         of trust is because of the Hobson's choice which I do an in depth analysis about in
27       my reports. I believe that users just feel resigned to use Facebook. Outside studies
         have reiterated that. I didn't invent that. But I think that it's more that people return
28       to using—they don't return to using Facebook because they're so thrilled by these

public statements. They return to using Facebook because they feel they have no other choice.

*Id.* 78:9-79:1. She then went further, asserting that users *did not rely* on the alleged misrepresentations and omissions in deciding to use Facebook. Questioned whether she thought "Facebook users trust Facebook's statements about privacy," she explained:

> No, that's pretty well documented that Facebook users know that Facebook's privacy washing, whatever Facebook says to try to make themselves look more trustworthy, people generally do not trust that Facebook is doing what is best for their data and for their privacy but they feel like they have no other choice but to use Facebook.

*Id.* 79:3-14.

The failure to connect the alleged deception to any harm to competition or anticompetitive effect decides this case. Plaintiffs bear the burden of presenting evidence that deception "harm[ed] consumers" for that conduct "to be condemned as exclusionary." *United States v. Microsoft*, 253 F.3d 34, 58-59 (D.C. Cir. 2001); *id.* ("[T]he plaintiff, on whom the burden of proof of course rests, must demonstrate that the monopolist's conduct indeed has the requisite anticompetitive effect."); *accord Rambus Inc. v. FTC*, 522 F.3d 456, 463 (D.C. Cir. 2008) ("It is settled law that the mere existence of a monopoly does not violate the Sherman Act."). They cannot.

### III. PLAINTIFFS HAVE NOT ADEQUATELY DEFINED A MARKET AS A MATTER OF LAW

Plaintiffs' claims separately fail because they have not defined a legally cognizable market. A Section 2 plaintiff bears the burden of proving "the defendant has monopoly power in the relevant market." *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 954 (9th Cir. 2023). Although defining a market often involves questions of fact—and a number of other factual issues would be raised at any trial—"[a] threshold step in any antitrust case is to *accurately* define the relevant market." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020). This inquiry requires an assessment of reasonable interchangeability, and "*all* products reasonably interchangeable by consumers" must be included in the candidate market. *See Microsoft*, 253 F.3d at 52. When "[o]ne cannot discern what is included and what is not," the market fails as a matter of law. *Coronavirus Rep. v. Apple Inc.*, 2021 WL 5936910, at *8 (N.D. Cal. Nov. 30, 2021) (granting motion to dismiss); *accord Truck-Rail Handling Inc. v. BNSF Ry. Co.*, 2005 WL 8178364, at *6 (N.D. Cal.

**PUBLIC REDACTED VERSION**

1    Mar. 8, 2005) (when "Plaintiffs' evidence 'cannot sustain a jury verdict on the issue of market

2    definition,'" the Ninth Circuit has held that "'summary judgment is appropriate.'" (quoting *Rebel*

3    *Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995))). That is the case here.

4         To begin, the proposed market relies entirely on the inadmissible and internally

5    contradictory testimony of Joseph Farrell. If the Court grants Meta's *Daubert* motion, plaintiffs

6    have offered no evidence of a relevant market and their claims necessarily fail. *Coronavirus Rep.*,

7    85 F.4th at 957 ("Failing to define a relevant market alone is fatal to an antitrust claim.").

8         But even if Farrell's opinion were admitted, summary judgment remains appropriate.

9    Plaintiffs assert that the relevant market includes different uses of certain features on Facebook,

10   Instagram, Google+, Snapchat, and MeWe—for example, looking at certain posts in a feed that

11   are from your friends about their personal lives—and previously included at least aspects of several

12   platforms that were largely defunct by 2016 (Myspace, Friendster, and Orkut). Ex. 5, Farrell Rep.

13   ¶¶26-27, 247-49. At the same time, plaintiffs exclude from their market numerous other firms that

14   compete for user time and attention and offer similar experiences and features, like TikTok,

15   YouTube, Pinterest, X, and Reddit. *Id.* ¶¶37, 161-64, 258; Ex. 4, Farrell Tr. 14:14-15:14. Plaintiffs

16   cannot offer any coherent explanation for this results-driven inconsistency, and have offered no

17   discernable means to identify what constitutes "personal social networking services."

18        Indeed, "what is included and what is not" in the PSNS market has never been clear.

19   *Coronavirus Rep.*, 2021 WL 5936910, at *8. The operative complaint pleads "distinct" markets

20   for "Social Network" and "Social Media" services. Compl. ¶¶37, 260-73, 298-307. Facebook was

21   both, while Instagram was only the latter. *Id.* Plaintiffs then abandoned "Social Media" and

22   revamped their "Social Network" market, contending in June 2023 that it now included Instagram.

23   Ex. 16, Third Supp. Resps. & Objs. to Meta's Interrog. 1 (June 23, 2023). "Social networks" next

24   became "personal social networks," defined by "███████████████" Ex. 17, Economides CC

25   Rep. ¶23. Under this new rubric, Facebook offers both PSNS and non-PSNS services, and whether

26   any individual feature is PSNS depends on how it is being used. *Id.* ¶¶82, 86. Plaintiffs then

27   reinvented their market a *third* time, offering conflicting expert opinions. Economides claimed that

28   every use of every feature of Facebook is PSNS because of a vague "social graph aspect," even

**PUBLIC REDACTED VERSION**

1   when a user is doing the exact same thing—such as watching a short-form video—that she could

2   do on a platform excluded from the market. Ex. 3, Economides 3/24 Tr. 84:8-22. Farrell instead

3   emphasized distinctions within Facebook based on features and how they are being used, including

4   "PSNS versus short-form video," an area where "TikTok and YouTube, they provide considerable

5   competition." Ex. 4, Farrell Tr. 28:5-29:6, 102:2-14; *id.* 23:9-22 ("TikTok primarily offers, as I

6   understand it, short-form videos, and Meta does likewise, and in that product line, whatever the

7   market delineation, they do compete, I think.").

8          Forced to choose, plaintiffs elected to rely on Farrell. Dkt. 859 at 2. But he admits that

9   determining what is or is not PSNS poses "intractable questions" and "irreducible gray areas." Ex.

10  4, Farrell Tr. 30:16-31:16. For example:

11         Q. Okay. If I see a reel video while I'm in Instagram home, is that PSNS?

12         A. I think it depends on the video and ***perhaps on why you're watching that video***.
            So there are some, obviously, difficulties when it comes to evaluating market
13          shares, based on the difficulty of verifying from outside those things. But
            conceptually, if this is a video that you just think will be amusing or educational
14          for you and it has nothing to do with your friends and family, then, no. If it's
            something that your mom sent you saying, let's discuss this next Thanksgiving,
15          then I would say, yes.

16         Q. How would Facebook know in advance whether a video that someone is going
17          to watch is for entertainment, amusement, or friends and family?

18         A. They might not. I don't know.

19  *Id.* 29:19-30:10.

20         According to Farrell, the same video viewed by the same person on the same service could

21  thus be both in and out of the market depending on nothing more than some variance in the user's

22  subjective motivations. Ex. 4, Farrell Tr. 29:19-30:10. But a market that "depends" on both the

23  individual piece of content being viewed by a particular user and that user's reason for viewing it

24  has no discernable bounds. *Id.* Such a definition is impossible to apply *within* a given service,

25  much less across them. And without any coherent way to define what is PSNS, plaintiffs cannot

26  show what is reasonably interchangeable with a PSNS use, or who Meta's relevant competitors

27  are. On plaintiffs' definition, Meta could never even exercise monopoly power, given that whether

28  a particular use is PSNS depends on the subjective intent of a particular user.

**PUBLIC REDACTED VERSION**

1    The net of this is that plaintiffs have "posited a number of different, and inconsistent,

2  theories as to the relevant market for antitrust analysis purposes." *Universal Avionics Sys. Corp.*

3  *v. Rockwell Int'l Corp.*, 52 F. App'x 897, 899 (9th Cir. 2002) (affirming summary judgment "for

4  failure to adequately define a relevant market"); *see also Morgan, Strand, Wheeler & Biggs v.*

5  *Radiology, Ltd*., 924 F.2d 1484, 1489 (9th Cir. 1991) (affirming summary judgment when

6  plaintiffs put forward "insufficient evidence to show either the geographic or the product

7  market."). Plaintiffs thus cannot identify the required "field of competition: the group or groups of

8  sellers or producers who have actual or potential ability to deprive each other of significant levels

9  of business." *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989).

10  Summary judgment is appropriate on that basis alone.

11    Plaintiffs cannot rely on the claim, as Farrell does, that there are vague differences between

12  services depending on a users' subjective intent; "[m]ore is required" than "the mere notion that

13  there is 'something different' about the [in-market] products and all others." *United States v.*

14  *Oracle Corp.*, 331 F. Supp. 2d 1098, 1159 (N.D. Cal. 2004) (rejecting a candidate market that

15  lacked any "quantitative metric" to "determine the distinction" between what is in and out). The

16  question is whether consumers consider services acceptable substitutes notwithstanding such

17  differences. *See, e.g.*, *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir.

18  1997) (market defined by willingness of consumers to substitute even if "there may be some degree

19  of preference for the one [product] over the other"). On that point, plaintiffs have only Farrell's

20  say-so. That provides no reliable way to assess substitution and thus what is in the relevant market.

21  This is not a factual dispute that a jury can or should decide—it is a fundamental failure of

22  plaintiffs' theory that leaves them without any viable market definition and requires judgment as

23  a matter of law.

24  **IV.    PLAINTIFFS' CLAIMS ARE TIME BARRED**

25    **A.    Plaintiffs' Claims Accrued Outside The Limitations Period**

26    Private lawsuits seeking damages under Section 2 of the Sherman Act are subject to a four-

27  year statute of limitations. 15 U.S.C. § 15(b). The default rule is that such claims accrue "at the

28  time of the alleged anticompetitive conduct." *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044,

1   1065 (N.D. Cal. 2016). Plaintiffs filed their complaint on December 3, 2020, challenging an

2   ostensibly "anticompetitive scheme" "that originated many years ago," and supposedly resulted in

3   Meta acquiring monopoly power no later than 2011. Compl. ¶2; Ex. 17, Economides CC Rep. ¶30;

4   Ex. 11, Economides Merits Rep. ¶73. Such claims fall outside the statute of limitations.

5          First, plaintiffs' monopoly acquisition theory turns on conduct occurring long before

6   December 3, 2016. They argue that ███████████████████████████████████████████████

7   ███████████████████████████████████████████ Ex. 17, Economides CC Rep. ¶323; Ex.

8   11, Economides Merits Rep. ¶73 ("███████████████████████████████████████████████

9   ███████████████████████████████████████████████"). Any anticompetitive

10  conduct giving rise to the alleged acquisition of monopoly power in 2011 necessarily occurred

11  before the limitations period began in 2016.

12         Plaintiffs' monopoly maintenance theory also relies on conduct before December 2016.

13  They have asserted that Meta engaged in a "uniform and prolonged deception regarding its data

14  collection and use practices" that began in 2006. Dkt. 648 at 1; Dkt. 793 at 7-9 (describing a

15  "systematic" and "continuous campaign" around a "common theme" from the "early days of social

16  networks"); Ex. 11, Economides Merits Rep., App'x C (███████████████████████████████

17  ████████████████████████████████████████████████████████████████████████████);

18  *id.* ¶9 ██████████████████████ And plaintiffs have failed to identify *any* alleged

19  misrepresentations that affected their decision whether to join or use Facebook, much less

20  deception within the limitations period. *Supra*, at 10, 14.

21         So, as in other cases involving untimely claims based on Facebook's early success,

22  plaintiffs "acknowledge that the initial events giving rise to these claims occurred more than four

23  years" before the filing of the complaint. *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp.

24  3d 981, 991 (N.D. Cal. 2020) (dismissing claims premised on anticompetitive conduct beginning

25  before 2015 as untimely); *see also New York v. Meta Platforms, Inc.*, 66 F.4th 288, 295 (D.C. Cir.

26  2023) (affirming dismissal under analogous laches standard of "old" claims premised on

27  acquisition of monopoly power between 2012 and 2014). That necessarily renders their claims

28  untimely under the default rule. *Garrison*, 159 F. Supp. 3d at 1065.

**PUBLIC REDACTED VERSION**

### B. Based On Their Own Theory, Plaintiffs Cannot Establish A Continuing Violation As A Matter Of Law

Because plaintiffs' claims accrued more than four years before the filing of their complaint, they initially attempted to invoke the continuing violation doctrine to toll the statute of limitations. Dkt. 648 at 3; Compl. ¶¶244-46. After Meta's initial motion for summary judgment showed the doctrine cannot salvage a case based on an allegedly "uniform and prolonged deception regarding [Meta's] data collection and use practices" that began in 2006, Dkt. 648 at 1, plaintiffs abandoned the continuing violation doctrine when last describing how they would prove their claims at trial, Dkt. 793. In all events, proving a continuing violation requires plaintiffs to show that Meta "completed an overt act during the limitations period that meets two criteria: '1) It must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) it must inflict new and accumulating injury on the plaintiff.'" *Samsung Elecs. Co., Ltd. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014) (quoting *Pace Indus.*, 813 F.2d at 238). Beyond that, a continuing violation—as the name suggests—requires demonstrating "a continuing injury to competition" during the limitations period. *Electroglas, Inc. v. Dynatex Corp.*, 497 F. Supp. 97, 105 (N.D. Cal. 1980). Taking their own theory at face value, plaintiffs cannot meet this burden. A claim based on conduct that plaintiffs themselves argue started before the limitations period, continued without change during it, and caused them no new harm after December 2016 is untimely as a matter of law.

*First*, as a legal matter, the continuing violation doctrine has no application to monopoly acquisition when the conduct giving rise to the acquisition occurred entirely before the limitations period. Plaintiffs must (at a minimum) identify an "overt act that is part of the violation" after December 3, 2016. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997). Here, plaintiffs do not identify an overt act relating to the alleged *acquisition* of monopoly power after that date. Indeed, the predicate conduct necessarily occurred no later than 2011. *Supra*, at 19.

*Second*, the continuing violation doctrine cannot resuscitate a monopoly maintenance theory premised on a supposedly "systematic" deception around a single "common theme" that plaintiffs assert began in 2006. Dkt. 793 at 7-9. The law requires plaintiffs to show "a new and

1    independent act that is not merely a reaffirmation of a previous act" and that this post-2016 act

2    caused a "new and accumulating injury." *Pace Indus.*, 813 F.2d at 238. The asserted overt act must

3    "differ from what [Meta] is alleged to have done starting in [2006]," *SaurikIT, LLC v. Apple Inc.*,

4    2022 WL 1768845, at *2 (N.D. Cal. May 26, 2022), personally harm plaintiffs, and itself be

5    actionably anticompetitive, *Pace Indus.*, 813 F.2d at 238-39. Because plaintiffs identify *no* new

6    harm to themselves or competition within the limitations period, assert that the in-period conduct

7    *is* a reaffirmation of prior acts, and argue that it *does not* differ from what occurred before 2016,

8    the Court should grant summary judgment on their monopoly maintenance theory. Indeed,

9    plaintiffs all joined Facebook long before 2016, and testified that they never made decisions about

10   what platforms to use based on representations about data practices, much less representations

11   during the limitations period. *Supra*, at 14. That failure to tie any conduct within the limitations

12   period to any consequence to the plaintiffs precludes a continuing violation.

      13   Moreover, plaintiffs cannot show an overt act within the limitations period that itself

14   "violate[s] antitrust laws." *Pace Indus.*, 813 F.2d at 239. An overt act must cause "continuing

15   antitrust harm, i.e., a continuing injury *to competition*, not merely a continuing pecuniary injury to

16   a plaintiff." *Electroglas, Inc.*, 497 F. Supp. at 105; *Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184,

17   1190 (9th Cir. 1984) ("[F]or the cause of action to reaccrue Airweld was required to show Airco

18   committed acts which not only caused it injury but also caused antitrust injury during the

19   limitations period."). Plaintiffs must therefore demonstrate that the alleged deception harmed

20   competition after December 2016. But they have failed to connect any of the claimed

21   misrepresentations or omissions to the fortunes of Meta's competitors at any time, to say nothing

22   of the failures of rivals occurring within the limitations period. Economides testified that he "didn't

23   quantify the alleged anticompetitive effect in 2011," for example, "and then compare that to the

24   alleged anticompetitive effect of some sort of deception in 2017." Ex. 3, Economides 3/24 Tr.

25   254:7-17; *id.* ("A. I have not done an analysis of that over the period of years, that's right."); *see*

26   *also infra*, at 22-23. Economides's concession that he did no such analysis renders plaintiffs'

27   claims untimely. *Duarte v. Quality Loan Serv. Corp.*, 2018 WL 2121800, at *8 (C.D. Cal. May 8,

28   2018) ("The continuing violation doctrine is inapplicable when, as here, the actions falling within

**PUBLIC REDACTED VERSION**

1   the period of limitations are not themselves violations."). And even if plaintiffs *had* shown some
2   actionable and timely harm to competition (they have not), it would still not save their claims
3   because they have not and cannot identify any connection between the alleged deception, their
4   own use of Facebook, and Meta's failure to pay all of its users five dollars. *Supra*, at 7-10; *see also*
5   *Samsung*, 747 F.3d at 1202 (overt act "must inflict new and accumulating injury *on the plaintiff*"
6   (quoting *Pace Indus.*, 813 F.2d at 238)). Plaintiffs instead testified that the alleged deception had
7   nothing to do whether they used Facebook, and that they would refuse payments. *Supra*, at 6, 14.

8       Plaintiffs have also affirmatively disclaimed the kind of new or different conduct that could
9   constitute a distinct overt act, instead asserting that since "the early days of social networks" Meta
10  has engaged in a "continuous" and "long-standing campaign of market-wide deception" based on
11  a single "common theme." Dkt. 793 at 8-9, 19. Indeed, plaintiffs have refused to separate out the
12  component parts of the allegedly anticompetitive scheme, stating that liability cannot be " ▓▓▓▓
13  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ " Ex. 14, Second Supp. Resps. & Objs. to Meta's Interrogs. 6, 7, 8 (Jan.
14  18, 2023); Ex. 18, Resps. to Meta's Fourth Set of Interrogs. (Mar. 24, 2023) (describing the
15  deception as consisting of "substantially similar practices" and refusing "to identify every
16  permutation or every instance of [them]"). Consistent with this, Economides offered only an
17  opinion "with respect to the alleged anticompetitive effects that takes into account *all* of the
18  statements and omissions," testifying that he had "taken them as a whole." Ex. 3, Economides 3/24
19  Tr. 181:4-16.

20      Even when plaintiffs have made some attempt at identifying specific statements after
21  December 2016 as allegedly false and misleading, they only confirm the unified nature of the
22  alleged deception. Plaintiffs' expert claims, for example, that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
23  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
24  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
25  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 11, Economides Merits
26  Rep. App'x C. The actual statement quoted and alleged to be deceptive is that ▓▓▓▓▓▓▓
27  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
28  do not constitute antitrust violations under any circumstances, and here the lead plaintiff testified

1    ███████████████████████████████████████ Ex. 7, Klein Tr.

2    83:16-20 ("███████████████████████████████████████

3    ███████████████████████████████████████

4    ████████████"). But even if these vagaries could violate the law, they are exactly what plaintiffs

5    claim have been deceptive since 2006. Ex. 11, Economides Merits Rep. App'x C. (████████

6    ███████████████████████████████████████

7    █████████).

8         Other alleged misrepresentations are likewise mere echoes of earlier statements. *Compare*

9    *id.* (███████████████████████████████████████

10   ███████████████████████████████████████

11   ███████████████████████████████████████

12   ██████████████████████████), *with id.* (██████████████████████████

13   ███████████████████████████████████████

14   █████████). Whether such statements are true or false, they indisputably concern the same

15   subject—as even plaintiffs admit. *Id.* (███████████████████████████████████

16   ███████████████████████████████████).

17        Because plaintiffs allege that Meta made additional statements about data use and

18   collection after 2016 that *continued* a uniform campaign, the challenged acts only "reaffirm[]"

19   those earlier acts under plaintiffs' own theory. *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins.*

20   *Co.*, 166 F. Supp. 3d 988, 999 (N.D. Cal. 2015) (engaging in a "continu[ing] stream of

21   communications" does not represent "new or independent action" as required to demonstrate a

22   continuing violation); *see also Chang v. Farmers Ins. Co., Inc.*, 2023 WL 5163288, at *3 (C.D.

23   Cal. July 12, 2023) (misrepresentations about past conduct were "mere reaffirmations" of the

24   original deceptions insufficient to show continuing violation of RICO statute). Accordingly, even

25   taking their deception theory at face value, plaintiffs necessarily fail to establish how Meta's

26   conduct has changed after December 2016, *SaurikIT*, 2022 WL 1768845, at *3, and summary

27   judgment is required.

28

1    **V.    PLAINTIFFS' ATTEMPTED MONOPOLIZATION CLAIM AND ABANDONED REQUEST FOR INJUNCTIVE RELIEF FAIL FOR THE SAME REASONS**

In addition to their acquisition and maintenance theories seeking monthly payments, plaintiffs argue that Meta attempted to monopolize the PSNS market, and their complaint sought injunctive relief. Dkt. 793 at 3; Compl. at Prayer for Relief. Their attempted monopolization claim is subject to the same statute of limitations, and also requires proof of harm to competition, a relevant market, and antitrust standing. *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997). As to relief, plaintiffs' failed motion for class certification only references seeking damages. Regardless, injunctive relief is barred by both laches and the substantive defects discussed above. *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014) (courts "look to the same legal rules that animate the four-year statute of limitations" for laches). Summary judgment is thus appropriate for the same reasons as on plaintiffs' primary theories.

**CONCLUSION**

The Court should grant summary judgment on all claims.


Dated: April 28, 2025                    Respectfully submitted,

                                         By: */s/ Sonal N. Mehta*
                                             Sonal N. Mehta

                                         WILMER CUTLER PICKERING
                                           HALE ND DORR LLP


                                         *Attorney for Defendant Meta Platforms, Inc.*

**PUBLIC REDACTED VERSION**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of April, 2025, I electronically transmitted the public redacted version of the foregoing document to the Clerk's Office using the CM/ECF System and caused the version of the foregoing document filed under seal to be transmitted to counsel of record by email.

By:    */s/ Sonal N. Mehta*
        Sonal N. Mehta