**PUBLIC REDACTED VERSION**

| | |
|---|---|
| WILMER CUTLER PICKERING HALE AND DORR LLP | ARI HOLTZBLATT (SBN 354631)<br>Ari.Holtzblatt@wilmerhale.com |
| SONAL N. MEHTA (SBN 222086)<br>Sonal.Mehta@wilmerhale.com<br>2600 El Camino Real, Suite 400<br>Palo Alto, California 94306<br>Telephone: (650) 858-6000 | MOLLY M. JENNINGS (*pro hac vice*)<br>Molly.Jennings@wilmerhale.com<br>2100 Pennsylvania Ave NW<br>Washington, DC 20037<br>Telephone: (202) 663-6000 |
| DAVID Z. GRINGER (*pro hac vice*)<br>David.Gringer@wilmerhale.com<br>ROSS E. FIRSENBAUM (*pro hac vice*)<br>Ross.Firsenbaum@wilmerhale.com<br>RYAN CHABOT (*pro hac vice*)<br>Ryan.Chabot@wilmerhale.com<br>PAUL VANDERSLICE (*pro hac vice*)<br>Paul.Vanderslice@wilmerhale.com<br>7 World Trade Center<br>250 Greenwich Street<br>New York, New York 10007<br>Telephone: (212) 230-8800 | MICHAELA P. SEWALL (*pro hac vice*)<br>Michaela.Sewall@wilmerhale.com<br>60 State Street<br>Boston, Massachusetts 02109<br>Telephone: (617) 526-6000 |

*Attorneys for Defendant Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated,<br><br>　　　　　　　　　　Plaintiffs,<br><br>　v.<br><br>META PLATFORMS, INC., a Delaware Corporation,<br><br>　　　　　　　　　　Defendant. | Case No. 3:20-cv-08570-JD<br><br>**DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY AND OPINIONS OF JOSEPH FARRELL**<br><br>Hearing Date: July 24, 2025<br>Time: 10:00 a.m.<br>Judge: Hon. James Donato |

**PUBLIC REDACTED VERSION**

**TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION ................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES .......................................................1

INTRODUCTION .................................................................................................................1

BACKGROUND ...................................................................................................................3

ARGUMENT .........................................................................................................................6

I.    FARRELL'S MARKET DEFINITION AND COMPETITION OPINIONS ARE BASED ON UNRELIABLE METHODS OR NO METHOD AT ALL (§§IV.B, VI.A OF OPENING REPORT; §§II.D, III.A.2, III.A.3, III.C OF REBUTTAL REPORT) ..........................................6

    A.    Farrell's Subjective Analysis Of Meta's Response ▮▮▮▮▮ And Meta's ▮▮▮▮▮▮▮▮▮▮▮▮ Is Not The Product Of Any Expert Methodology ...............................................................................6

    B.    Farrell's "Critical Loss" And "Upward Pricing Pressure" Analyses Disregard Basic Economics And His Own Standards .............................9

II.   FARRELL'S MARKET SHARE CALCULATIONS ARE BASED ON UNSUPPORTED ASSUMPTIONS CONTRADICTED BY THE RECORD AND MUST BE EXCLUDED (§VI.B OF OPENING REPORT; §III.D OF REBUTTAL REPORT) .........................................................12

CONCLUSION ...................................................................................................................15

**PUBLIC REDACTED VERSION**

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Bakst v. Cmty. Mem'l Health Sys., Inc.*,
 2011 WL 13214315 (C.D. Cal. Mar. 7, 2011) ................................................................. 15

*Brown Shoe Co. v. United States*,
 370 U.S. 294 (1962) ........................................................................................................ 10

*Clear-View Techs., Inc. v. Rasnick*,
 2015 WL 3505003 (N.D. Cal. June 2, 2015) .................................................................. 12

*Coronavirus Rep. v. Apple Inc.*,
 2021 WL 5936910 (N.D. Cal. Nov. 30, 2021) ................................................................ 10

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
 509 U.S. 579 (1993) ...................................................................................................... 1, 7

*DZ Rsrv. v. Meta Platforms, Inc.*,
 2022 WL 912890 (N.D. Cal. Mar. 29, 2022) .................................................................... 3

*Holley v. Gilead Scis., Inc.*,
 2024 WL 538535 (N.D. Cal. Jan. 29, 2024) ..................................................................... 7

*In re German Auto. Mfrs. Antitrust Litig.*,
 497 F. Supp. 3d 745 (N.D. Cal. 2020) .............................................................................. 5

*In re Google Play Store Antitrust Litig.*,
 2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) ................................................................ 11

*In re Live Concert Antitrust Litig.*,
 863 F. Supp. 2d 966 (C.D. Cal. 2012) ......................................................................... 6, 12

*In re Seagate Tech. LLC*,
 326 F.R.D. 223 (N.D. Cal. 2018) ...................................................................................... 8

*Philips v. Ford Motor Co.*,
 2016 WL 7428810 (N.D. Cal. Dec. 22, 2016) ........................................................... 10, 11

*Samuels v. Holland Am. Line-USA Inc.*,
 656 F.3d 948 (9th Cir. 2011) ............................................................................................ 9

*Siqueiros v. Gen. Motors LLC*,
 2022 WL 74182 (N.D. Cal. Jan. 7, 2022) ......................................................................... 9

*Sugar Ass'n, Inc. v. McNeil-PPC, Inc.*,
 2007 WL 5674021 (C.D. Cal. Dec. 10, 2007) ................................................................ 13

**PUBLIC REDACTED VERSION**

*United States v. Fuentes-Cariaga*,
    209 F.3d 1140 (9th Cir. 2000) ........................................................................................9

*Waymo LLC v. Uber Techs., Inc.*,
    2017 WL 5148390 (N.D. Cal. Nov. 6, 2017) ...................................................................9

*Williams v. UMG Recordings, Inc.*,
    2006 WL 1307922 (9th Cir. May 12, 2006) ..................................................................14

**STATUTES, RULES, AND REGULATIONS**

Fed. R. Evid. 702 ........................................................................................................1, 9, 10

**OTHER AUTHORITIES**

U.S. Dep't of Just. & FTC, *Horizontal Merger Guidelines* (2010) ..................................................5

**PUBLIC REDACTED VERSION**

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE THAT, on July 24, 2025 at 10:00 a.m., Defendant Meta Platforms, Inc., will move to exclude the opinions of Dr. Joseph Farrell as set forth below.

Pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Meta requests that the Court exclude Farrell's opinions on market definition, competition in the proposed market, and market share in §§III, IV, V, and VI of his Opening Merits Report and §§II, III.A.2, III.A.3, III.C, and III.D of his Rebuttal Merits Report, as well as any testimony drawn from those sections.

**MEMORANDUM OF POINTS AND AUTHORITIES**

As explained in Meta's concurrently filed Motion for Summary Judgment, the Court need not take up this motion if it again excludes the antitrust injury opinions of Dr. Nicholas Economides and finds summary judgment appropriate on that (or another) basis.

**INTRODUCTION**

Dr. Joseph Farrell's assignment was to confirm plaintiffs' contrived "personal social networking services" market and then find that Meta has monopoly power. To do so, Farrell relies solely on what he describes as three "strands" of evidence. Two of the three are not the province of economics at all, and Farrell, who is not well versed in "social" apps, is particularly poorly situated to assess them. The third has no utility in zero-price markets involving multisided platforms when the market is defined to include only certain activities users engage in on those platforms. The result is an unreliable hodgepodge that provides no way to determine what is in the market, would deeply confuse the jury, and cannot withstand even minimal scrutiny. Farrell then offers an opinion on market share that relies on unfounded and unsupported assumptions about how people use Facebook and Instagram, and reaches an unreliable result he conceded in his deposition was contradicted by the documents underlying his calculation. The Court should exclude these opinions in full.

Farrell first provides no coherent definition of what is in or out of the candidate market. He has never used the Facebook, Instagram, Snapchat, or TikTok apps, and spent "ten minutes, perhaps" on TikTok's and Snapchat's *websites*. Ex. 1, Farrell Tr. 86:6-18; *id.* 168:3-5. He

**PUBLIC REDACTED VERSION**

nevertheless purports to define a market for "personal social network services" (PSNS) based on his subjective impression of how people use and experience *parts* of these and other apps that relate to "friends and family" sharing. The result, he admits, involves "all kinds of gray areas," because any individual platform contains both PSNS and non-PSNS features, activities, and experiences, while in his world, only the PSNS aspects are in the relevant market. *Id.* 252:20-25. Thus, sometimes reading a newspaper article on Facebook is personal social networking and in the proposed market. Other times it is not. Or maybe it has a "tinge that might sometimes be more than a tinge of PSNS." *Id.* 79:21-80:5. Farrell provides no reliable method for determining that threshold fact. *Id.* 36:14-37:1 (Q. "I'm trying to see if you have a principle regarding whether or not a particular activity is PSNS versus not. A. Well, I would say it's easy to point me to gray areas, and you've been doing that successfully.").[1]

The inability to determine which aspects of Facebook and other platforms are PSNS means Farrell's market definition methodology is unreliable, but that is only the start of the problem. Facebook is offered to users for free and Meta makes nearly all its money from advertising. Farrell thus admits that traditional quantitative tools for testing a relevant user-side market cannot be applied as designed. The accommodation he offers is using Meta's advertising profits as a proxy for a "price" paid by users. Ex. 2, Farrell Rep. ¶¶199-200. That makes no sense because changes in Meta's advertising profits do not affect a user's experience on the app, and Farrell ignores entirely competition on the advertising side of Facebook's business, which is where those profits are determined. He then concedes that his unprecedented zero-price analysis works only if the profits he analyzed are earned from ads shown in Facebook's PSNS uses, but relies on the gross margins from *all* of Facebook's offerings to conduct his analysis, including those he admits are outside his PSNS market. The wrong profits from the wrong side of a free platform say nothing about what users view as substitutes for Facebook or how changes in the platform would affect user demand.

That leaves only Farrell's qualitative analysis, which turns on his personal impressions of

---

[1] Unless otherwise noted, "Ex." citations reference exhibits to the Gringer Declaration filed herewith, emphasis is added, and objections are omitted for deposition citations.

**PUBLIC REDACTED VERSION**

1  ▮▮▮
2  ▮▮▮ He says, for example, that
3  ▮▮▮
4  ▮▮▮
5  ▮▮▮
6  ▮▮▮ Ex. 1, Farrell Tr. 121:9-123:3. ▮▮▮
7  ▮▮▮" *Id.* 129:12-20. As to ▮▮▮
8  ▮▮▮ he opines (again from nothing more than his review of Meta documents) that Meta's
9  "▮▮▮
10 ▮▮▮" *Id.* 201:1-
11 202:6. Even if this were somehow sufficient to inform market definition, in actually selecting what
12 to include in the market, Farrell cherry-picks the apps ▮▮▮
13 ▮▮▮, with no consistent basis for the distinctions. *Id.* 203:15-208:1
14 (▮▮▮).
15 Reading and guessing is not expert analysis, and Farrell's inconsistent view of what actions are
16 meaningful is not sufficiently reliable to assist the jury. *See DZ Rsrv. v. Meta Platforms, Inc.*, 2022
17 WL 912890, at *9 (N.D. Cal. Mar. 29, 2022) (expert testimony that does "not offer any specialized
18 or scientific expertise, or anything beyond the typical knowledge and experience of a jury" is
19 inadmissible).
20      Farrell also offers an opinion on Meta's share of the PSNS market. There he must again
21 confront his incoherent definition of what uses and experiences constitute personal social
22 networking, because the first step in his share calculation is determining the portion of activity on
23 Facebook and Instagram in the candidate market. To do so, he relies entirely on a series of
24 unsupported assumptions about two documents (which themselves contradict the assumptions).
25 As with his market definition, guesses based on misreading documents do not represent reliable
26 expert analysis.
27              **BACKGROUND**
28      Facebook is free for users and makes substantially all its revenue from advertising. Ex. 2,

**PUBLIC REDACTED VERSION**

1  Farrell Rep. ¶¶17, 200. Operating a multisided platform where one of the sides is free "affects, among other things, the app's incentive to improve its product and keep on providing the services" to users. Ex. 1, Farrell Tr. 105:20-23. That is because "regardless of the competition Meta faces on the user side, it's going to have a strong incentive to continue to innovate to keep engaged users on its platform to protect its advertising revenue." *Id.* 115:19-25. Taken together, "you have to pay attention to users and to advertisers" when assessing the relevant market. *Id.* 103:22-25.

Farrell proposes a market for "personal social networking services (PSNS)" on the user side of Facebook. Ex. 2, Farrell Rep. ¶138. The candidate market includes certain activities by users on Facebook, Instagram, Snapchat, Google+, and MeWe. *Id.* ¶250. He gets to that set of participants by defining PSNS as those "████████████████████████████████████████████████████████████████████████████" *Id.* ¶138. Supposedly, PSNS apps offer a ██████████████████████████████████████ *Id.* ¶¶27, 138. Apps with these features also have other "██████" unrelated to PSNS, however, and Farrell attempts to exclude those aspects of the services from his market. A use case is "really the purpose that a user has in mind, consciously or not, in this case, using an app." Ex. 1, Farrell Tr. 70:23-71:14. So, if your sister posts a newspaper article about a sports team on News Feed that you then read, that is "typically not" a PSNS use case, and would be outside the relevant market. *Id.* 79:21-80:5. "But there's a tinge that might sometimes be more than a tinge of PSNS from your sister sending it to you." *Id.* And if "it's a news story that's especially relevant to your friends and family or that you're directed to by friends and family connections," that might be closer to PSNS. *Id.* 79:14-20. If your sister posts a wedding announcement from the newspaper, for example, that *is* PSNS. *Id.* 80:6-16. Sending family members a video clip from a sports game is *not* PSNS, unless a family member is playing for the team. *Id.* 45:25-46:13. The result: "there are all kinds of gray areas in there." *Id.* 252:20-25.

For PSNS to be a relevant market for antitrust purposes, Farrell says ████████ ██████████████████████████████ Ex. 2, Farrell Rep. ¶86. Farrell applies qualitative and quantitative analyses that he characterizes as versions of an HMT.

His qualitative analysis primarily relies on his interpretation of ████████

**PUBLIC REDACTED VERSION**

1  ███████████████████████████████████. *See id*. §IV.B.1. In Farrell's view, ████████
2  ████████████████████████████████████████████████████████████████████████████
3  ██████████████████████████████████████████ *Id*. ¶154; Ex. 1, Farrell Tr. 125:10-17.
4  How this could possibly be the case is never said. Farrell claims that the subjectively ██████
5  ████████████████████████████████████████████████████████████████████████████
6  ████████████████████████████████████████████████████████████████████████████
7  ███ Ex. 1, Farrell Tr. 121:9-125:17. Farrell concludes that ████████████████████
8  ██████████████████████████████████████████████████, Ex. 2, Farrell Rep. ¶¶154-
9  55. However, he acknowledges that Facebook and TikTok compete and ████████████
10 ███████████████████████. *See, e.g.*, Ex. 1, Farrell Tr. 23:9-20 ("TikTok primarily offers,
11 as I understand it, short-form videos, and Meta does likewise, and in that product line, whatever
12 the market delineation, they do compete, I think. And I'm certainly very open to the possibility
13 they compete. I don't say they don't, and I suspect they probably do."); *id.* 140:5-8 ("███████
14 ████████████████████████████████████████████████████████████
15 ████████████████████"). And yet, despite Farrell's analysis pointing to the same result for both,
16 Google+ was in his market and TikTok was not.

17        Farrell's quantitative method employs two closely related tools: critical loss analysis
18 ("CLA") and upward pricing pressure analysis ("UPP"). Ex. 2, Farrell Rep. ¶¶190-219. These tools
19 are not traditional HMTs, which seek to measure reasonable interchangeability or the cross-
20 elasticity of demand by assessing consumers' response to an increase in price ("SSNIP"). *Id.* ¶87.
21 Instead, CLA and UPP test whether a hypothetical monopolist has an *incentive* to implement a
22 hypothetical SSNIP in the proposed market, *id.* ¶¶95-101; Ex. 1, Farrell Tr. 188:18-189:8, and
23 therefore are most commonly used to corroborate the existence of a relevant market already
24 produced by a SSNIP test, *see In re German Auto. Mfrs. Antitrust Litig.*, 497 F. Supp. 3d 745, 758-
25 59 (N.D. Cal. 2020) (citing U.S. Dep't of Just. & FTC, *Horizontal Merger Guidelines* §4.1.3
26 (2010)). CLA and UPP require two inputs: (i) the gross margin for the products included *in the*
27 *market where monopoly power is alleged*; and (ii) diversion ratios, which reflect sales volume lost
28 due to a price increase that would be diverted to other firms inside that same market. Ex. 2, Farrell

**PUBLIC REDACTED VERSION**

1  Rep. ¶197.

2      CLA and UPP are designed to analyze ▮▮▮▮
3  ▮▮▮▮ Ex., 2, Farrell Rep. ¶17. For CLA and UPP to remain reliable in
4  ▮▮▮▮ Farrell explains that
5  ▮▮▮▮ *Id.*; *see also id.* ¶199 ("▮▮▮▮
6  ▮▮▮▮
7  ▮▮▮▮"). To that end, Farrell tries to account for the lack of a monetary price charged
8  to users by relying on gross margins from the advertising side of Facebook, which is not part of
9  the candidate PSNS market. *Compare id.* ¶210 (▮▮▮▮), *with* ¶¶105, 110
10 (▮▮▮▮). In making that switch, Farrell
11 uses gross advertising margins that include revenues drawn from all of Facebook, not just from
12 those parts in his PSNS market; he suggests no way to measure revenues isolated to the PSNS use
13 case. Ex. 1, Farrell Tr. 189:9-11.

14     Finally, Farrell opines on market shares for the five participants in his PSNS market—
15 Facebook, Instagram, Google+, Snapchat, and MeWe—to "▮▮▮▮" of Meta's
16 market power. Ex. 2, Farrell Rep. §VI.B. Farrell bases his calculations on his estimates of ▮▮
17 ▮▮▮▮ on each of the five PSNS market participants during the
18 December 2016 to December 2020 class period. *Id.* ¶¶252-54.

19 <center>**ARGUMENT**</center>

20 I.    **FARRELL'S MARKET DEFINITION AND COMPETITION OPINIONS ARE BASED ON
21     UNRELIABLE METHODS OR NO METHOD AT ALL (§§III, IV, V, VI.A OF OPENING
    REPORT; §§II, III.A.2, III.A.3, III.C OF REBUTTAL REPORT)**

22     A.    **Farrell's Subjective Analysis Of Meta's Response ▮▮▮▮ And Meta's ▮▮
23     ▮▮▮▮ Is Not The Product Of Any Expert Methodology**

24     Farrell's qualitative analysis does not purport to apply an economic methodology,
25 specialized knowledge, or contain anything more than his subjective interpretation of documents
26 and witness testimony. Courts exclude expert testimony seeking to define a market through
27 similarly cherry-picked evidence and vague descriptions of the record, rather than reliable
28 measures of substitution and demand. *See, e.g., In re Live Concert Antitrust Litig.*, 863 F. Supp.

**PUBLIC REDACTED VERSION**

2d 966, 996 (C.D. Cal. 2012). This Court should do the same.

      Start with Farrell's discussion ▮▮▮▮. Farrell speculates ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 2, Farrell Rep. ¶145; Ex. 1, Farrell Tr. 122:24-25 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮). Farrell provides no benchmark or any reliable methodology for distinguishing between ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 1, Farrell Tr. 128:21-129:10 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."). And although Farrell "may well believe that" he can discern some meaningful difference, "expert testimony must be based on 'more than subjective belief or unsupported speculation.'" *Holley v. Gilead Scis., Inc.*, 2024 WL 538535, at *2 (N.D. Cal. Jan. 29, 2024) (quoting *Daubert*, 509 U.S. at 590, and excluding testimony as unreliable).

      Farrell then assumes that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 1, Farrell Tr. 131:14-17 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"). But he never assesses whether those preliminary impressions proved to be accurate or were reflected in actual actions. He concedes, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* 128:21-129:11 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."); *id.* 129:12-20 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."); *id.* 127:7-13 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**PUBLIC REDACTED VERSION**

1  ██████████████████████████████████████████████████████
2  ████████████████████████████████████████").
3        This leaves Farrell with nothing more than a handful of news articles, Facebook documents,
4  and long-ago statements from Facebook executives, Ex. 2, Farrell Rep. ¶¶144-53, which he
5  summarizes in cursory fashion before concluding that Google+ is a competitor in the PSNS market,
6  but that TikTok and YouTube are not. Ex. 1, Farrell Tr. 38:13-21 (█████████████
7  █████████████████████████████████████████████████████."); 
8  *id.* 121:9-123:3 (████████████████████████████████████
9  █████████████████"); *id.* 151:3-13 (admitting that the sole document cited to
10  support the proposition that TikTok was not an especially close competitor "might have been a
11  clumsy cite"). Expert opinions that simply summarize documents are not admissible. *See In re*
12  *Seagate Tech. LLC*, 326 F.R.D. 223, 243 (N.D. Cal. 2018) (excluding "large portions of [expert's]
13  declarations [that] merely summarize [defendant's] documents and advertisements").
14        The same is true of Farrell's analysis of ████████████████████. He claims
15  that "████████████████████████████████████████████████
16  ██████████████████," Ex. 2, Farrell Rep. §IV.B.2.a, and that "████
17  █████████████████████████████████████████████████████
18  █████████████," *Id.* §IV.B.2.b. But his approach is based on no coherent methodology
19  and produces contradictory results. Farrell says, for example, ███████████████
20  ████████████████████████████████. *Id.* ¶171. He then █████████
21  █████████████████████████████████████████████████████
22  ████████ Indeed, *none* of the firms that ultimately constitute his candidate market are ███
23  ███████████████████████████████" *See id.*, fig.4. Similarly, Farrell
24  says that █████████████████████████████████████████████
25  ████████. *Id.* ¶¶176-77 & fig.7. █████████████████████████████
26  █████████████████████████████████████████████████. *Id.*
27  fig.7. When confronted with these inconsistencies, his explanations evince no method; at best, he
28  has offered his conflicting personal impressions of documents, which is particularly dangerous

**PUBLIC REDACTED VERSION**

given his conceded lack of familiarity with "social" apps. *See, e.g.*, Ex. 1, Farrell Tr. 211:6-13 ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████."); *id.* 222:6-12 (basis for his "view" that LinkedIn was not in relevant market was "personal experience," and "quotes"); *id.* 222:23-223:9 (excluding Twitter due to "quote from Twitter," one document, and Farrell's "sense"); *id.* 213:19-214:16 (████████████████████████████████████████████████████████████████████████████████████████████████████").

This subjective (and inconsistent) approach of reviewing and summarizing documents does nothing to assist the factfinder, is based on no established methodology, and should thus be excluded. *Samuels v. Holland Am. Line-USA Inc.*, 656 F.3d 948, 952 (9th Cir. 2011) (explaining that an expert opinion must entail "more than subjective belief or unsupported speculation"). If plaintiffs wish to present evidence that ████████████████ indicate which companies compete with Facebook and Instagram, they may do so, but not under a "misleading façade of expertise." *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 5148390, at *5 (N.D. Cal. Nov. 6, 2017); *United States v. Fuentes-Cariaga*, 209 F.3d 1140, 1142 (9th Cir. 2000) ("Where an expert offers general testimony about an issue within the ken of the jury's knowledge, it is not an abuse of discretion to exclude such testimony under Rule 702."); *Siqueiros v. Gen. Motors LLC*, 2022 WL 74182, at *9 (N.D. Cal. Jan. 7, 2022) (experts "may not restate or summarize record evidence and then state a conclusion without applying a methodology that is reliable and which evinces his/her expertise"). And they certainly must accurately reflect what those restrictions are.

**B.  Farrell's "Critical Loss" And "Upward Pricing Pressure" Analyses Disregard Basic Economics And His Own Standards**

Farrell acknowledges that his CLA and UPP analyses must be "████████" to reliably assess markets (like the zero-price PSNS market) that differ from "████████" ones. Ex. 2, Farrell Rep. ¶17. Yet Farrell does not appropriately modify his models. First, he relies on revenues from the advertiser side of the platform, rather than any "price" that is actually paid by users. Second, he uses gross margins for all of Facebook, rather than the portion he says competes in the PSNS market. Each of these flaws renders Farrell's quantitative analyses inadmissible.

**PUBLIC REDACTED VERSION**

1. **Farrell's CLA And UPP Improperly Rely On Advertising Revenue Rather Than Any Proxy For A Price Paid By Facebook Users**

A relevant market must be "determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *Coronavirus Rep. v. Apple Inc.*, 2021 WL 5936910, at *11 (N.D. Cal. Nov. 30, 2021) ("'Authorities far too numerous to cite or discuss in detail have established' that '[t]he principle most fundamental to product market definition is 'cross-elasticity of demand.'"). Economists typically assess these considerations through a SSNIP, which looks at consumers' responses to changes in the prices that *consumers* pay. Ex. 2, Farrell Rep. ¶¶85-87. That reflects economic common sense; if a change in price is never experienced, it cannot prompt a user to seek substitutes. As Farrell concedes, however, people pay nothing to use Facebook. Ex. 1, Farrell Tr. 49:13-22. And because "it is not meaningful to simulate or consider a price increase that is 5-10% of zero," that precludes using a SSNIP to assess consumer behavior. Ex. 2, Farrell Rep. ¶109.

Farrell posits several ways to account for the fact that plaintiffs pay nothing for Facebook, but never undertakes the analysis he describes. For example, Farrell opines that ███████ ████████████████████████████████████████████████████ ████████████████████████ Ex. 2, Farrell Rep. ¶¶200-01. Similarly, Farrell claims that ████████████████████████████████████████████████ . *Id*. ¶95. But Farrell never actually analyzes ██████ ████████████████ . Ex. 1, Farrell Tr. 119:10-13 ("Q. Are you offering any opinions with regard to the product quality of the Facebook apps? A. The level of product quality? No, I'm not."); *id.* 91:15-23. Instead, he only measures changes in advertising margins.

Expert testimony must both be "the product of reliable principles and methods" and "reflect[] a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(c)-(d). So when an expert fails to apply standards he acknowledges are required for reliability, his testimony is inadmissible. *See Philips v. Ford Motor Co.*, 2016 WL 7428810, at *20-26 (N.D. Cal. Dec. 22, 2016) (excluding an expert's damages methodology as unreliable when it was not applied according to the expert's standards). Here, Farrell fails by his own standards. Despite

**PUBLIC REDACTED VERSION**

1
2
3 ▬▬▬▬▬▬▬▬▬▬—he treats advertising profits as though they can stand for a price
4 paid by users (they cannot). So, as in *Philips*, Farrell's testimony must be excluded for ignoring
5 the economic standards and literature he cites about how to apply CLA and UPP to Meta. 2016
6 WL 7428810, at *26; *see also In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *9
7 (N.D. Cal. Aug. 28, 2023) (excluding the merits opinion of a damages expert whose model fell
8 outside accepted economics and was based on faulty assumptions).

9      **2.    Farrell Concedes His CLA And UPP Rely On The Wrong Gross Margins**

10      Even accepting that a CLA and UPP based on advertising profits could properly be applied
11 to Facebook, Farrell's analyses are unreliable because they use gross margins he concedes are
12 incorrect. Farrell has consistently stated ▬▬▬▬▬▬▬▬
13 ▬▬▬▬▬▬▬▬▬▬ Ex. 2, Farrell Rep. ¶96. Here, according to Farrell, that means
14 advertising margins earned on the PSNS uses of Facebook. Ex. 1, Farrell Tr. 189:2-8 ("▬▬
15 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
16 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
17 ▬▬▬▬"). As Farrell admitted at his deposition, however, he used gross margins on non-
18 PSNS and PSNS uses alike for his analysis. *Id*. 189:9-11 ("Q. You did not, however, have a PSNS-
19 only margin for Facebook, correct? A. Oh, that's right. Yes."); *id.* 189:12-19 ("Q. You looked—
20 the margin you used for your critical loss and UPP analysis included margin outside of PSNS,
21 correct? A. Yes. In the class report I used Meta-wide accounting data. In the merits report, I used
22 app-level data on revenues and did some cost allocation for the cost side. It didn't end up making
23 a great deal of difference."). Farrell sought to excuse this failing as "unfortunate." *Id*. 189:12-
24 190:10. But his failing is not just unfortunate; it renders the analysis unreliable, due to his inability
25 to reliably define what constitutes a PSNS use on the Facebook platform.

26      Farrell's use of gross margin from non-PSNS use cases fundamentally alters his data and
27 renders it unreliable for defining a PSNS market. Meta's advertising margins include revenue from
28 features, surfaces, and activities over which Meta is not alleged to have monopoly power, and have

**PUBLIC REDACTED VERSION**

1  nothing to do with whether Meta could profit from changes to its PSNS offerings. For example,
2  the content shown on Feed is a mix of video, posts from interest-based groups, posts from friends
3  and family, and other content. Advertisements are mixed throughout Feed—they are not solely
4  associated with the friends-and-family content available on Feed. There are also multiple tabs with
5  little to no friends-and-family content, like Reels and Video, that include advertisements. The
6  advertising margins Farrell uses reflect all of this activity, despite his own testimony that doing
7  this is inappropriate. *Supra*, at 11. Because Farrell does not even attempt to control for these non-
8  PSNS margins, his CLA and UPP analyses should be excluded. *See In re Live Concert*, 863 F.
9  Supp. 2d at 981 (excluding expert testimony that failed to "account for major factors" and
10 performed analysis "as if they did not exist").

11 **II.  FARRELL'S MARKET SHARE CALCULATIONS ARE BASED ON UNSUPPORTED ASSUMPTIONS CONTRADICTED BY THE RECORD AND MUST BE EXCLUDED (§VI.B OF OPENING REPORT; §III.D OF REBUTTAL REPORT)**

13  Farrell's market share calculations for Facebook and Instagram rely on no fewer than five
14 unsupported assumptions, most of which are expressly contradicted by the record. Because courts
15 exclude expert testimony that "rests on faulty assumptions," *Clear-View Techs., Inc. v. Rasnick*,
16 2015 WL 3505003, at *2 (N.D. Cal. June 2, 2015), or when "there is simply too great an analytical
17 gap between the data and the opinion proffered," Dkt. 905 at 5, these opinions are inadmissible.

18  To calculate market shares for the five participants in his alleged PSNS market—Facebook,
19 Instagram, Google+, Snapchat, and MeWe—Farrell says he ▮▮▮▮▮
20 ▮▮▮▮▮. Ex. 2, Farrell Rep. ¶253. He begins with actual ▮▮▮▮▮
21 ▮▮▮ during the class period, what he calls ▮▮▮▮▮
22 ▮▮▮▮▮ *Id*. However, because Farrell acknowledges ▮▮▮
23 ▮▮▮▮▮
24 ▮▮▮▮▮ *id*. ¶256, he applies
25 ▮▮▮▮▮
26 ▮▮▮▮▮ Ex. 3, Farrell Rebuttal ¶88. There is nothing scientific or
27 reliable about these "▮▮▮▮" Instead, Farrell relies on several assumptions "without any
28

1  supporting evidence" and a series of extrapolations that render his back-of-the-envelope
2  calculations nothing more than junk science. *See Sugar Ass'n, Inc. v. McNeil-PPC, Inc.*, 2007 WL
3  5674021, at *2 (C.D. Cal. Dec. 10, 2007) (excluding expert's damages calculation when
4  assumptions were "not based on an appropriate methodology").

5        Farrell first mistakenly claims that ▮▮▮▮▮
6  ▮▮▮▮▮ based on a misreading of a single document from 2021.
7  Farrell assumes without support that the document—▮▮▮▮▮
8  ▮▮▮▮▮—is evidence of PSNS activity
9  across *all* of Facebook. Ex. 1, Farrell Tr. 250:10-15 ("▮▮▮▮▮
10 ▮▮▮▮▮
11 ▮▮▮▮▮
12 ▮▮▮"). Farrell made this assumption despite acknowledging that ▮▮▮▮▮
13 ▮▮▮▮▮ *Id*. 32:1-8 ("▮▮▮▮▮
14 ▮▮▮▮▮").
15 He compounds this problem by ▮▮▮▮▮
16 ▮▮▮▮▮—rather than "▮▮
17 ▮▮" which is the metric Farrell himself chose for assessing market share. Ex. 2, Farrell Rep.
18 ¶253. ("▮▮▮▮▮
19 ▮▮▮▮▮"). ▮▮▮▮▮ are not the same, even
20 though Farrell apparently assumes that they are, amounting to his second baseless assumption.
21 Take an article posted to Feed about Stephen Curry. The ▮▮▮▮▮
22 ▮▮▮▮▮ provides no indication of how much
23 ▮▮▮▮▮ The same is true for a post from friends or family.
24       Farrell's analysis then relies on more unsupported assumptions. The ▮▮▮▮▮
25 ▮▮▮▮▮
26 ▮▮▮▮▮ Ex.1, Farrell Tr. 251:18-
27 252:5. Farrell reaches his ▮▮▮▮▮
28 ▮▮▮▮▮ Ex. 2, Farrell

Rep. ¶256 n.575. In doing so, Farrell assumes that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, in what amounts to his third unsupported assumption. Ex. 1, Farrell Tr. 252:6-9. ("▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓"). This assumption is unsupported and plainly wrong. For example, when asked ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *Id.* 252:10-15. Farrell could have analyzed whether it was quantitatively important by separating out posts from "friends" and posts from "people followed." He just decided not to, and assumed away the latter.

Farrell also uses what he calls a ▓▓▓▓▓▓▓▓▓▓▓▓▓▓—his fourth unsupported ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *Id.* 251:18-252:5. He accordingly ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. But basing estimates like this on a "rule of thumb," let alone one that is "not widely adopted," (or, in this case, ever adopted) is conjecture that courts routinely exclude. *Williams v. UMG Recordings, Inc.*, 2006 WL 1307922, at *2 (9th Cir. May 12, 2006) (affirming exclusion when "expert provided no rigorous methodology for his calculations and based his estimates on a 'rule of thumb' that is not widely adopted"). In fact, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 4, Carlton Rep., tbl. 6 (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓).[2]

Farrell's extrapolations and assumptions did not end with his estimate of PSNS activity on Facebook. His errors are magnified by the fact that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 1, Farrell Tr. 255:8-16 ("▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

[2] Farrell has also inconsistently stated what his "▓▓▓▓▓▓▓▓" was, asserting in his report that he was ▓▓▓▓▓▓ Ex. 2, Farrell Rep. ¶256 n.575. To the extent his share calculations relied on an assumption greater than ▓▓, they are even less reliable.

1
2 ▇▇▇"). Asked to provide a
3 basis for this assumption—his fifth, and perhaps his most egregious—Farrell explains that his
4 "motivation was not that I thought it was *necessarily accurate*, let alone provable but rather that if
5 we're going to look at shares at all, we have to figure out something." *Id*. 255:17-256:3. Farrell
6 even admits that he did nothing to actually calculate the share of time on Instagram that is PSNS
7 activity, again acknowledging his methodology's self-inflicted "weaknesses." *Id*. 257:5-19.

8       Farrell need only have looked as far as his own reports for those alternatives. For example,
9 one document cited in his rebuttal report explains ▇▇▇
10 ▇▇▇
11 ▇▇▇ Ex. 1, Farrell Tr. 264:16-25. Farrell ignored this ▇▇▇
12 ▇▇▇
13 than what the evidence—not "▇▇▇" or assumptions—showed. When confronted with
14 this data, Farrell did commit to "▇▇▇
15 ▇▇▇." Ex. 1, Farrell Tr. 265:21-266:6.
16 That commitment comes too late. Courts exclude such expert opinions when they are entirely
17 divorced from the record, let alone from relevant materials cited in an expert's own report. *See*
18 *Bakst v. Cmty. Mem'l Health Sys., Inc.*, 2011 WL 13214315, at *20 (C.D. Cal. Mar. 7, 2011)
19 (granting *Daubert* as to plaintiffs' damages calculation when it was "based on factual assumptions
20 that are entirely unsupported in the record").

21                                **CONCLUSION**

22      For these reasons, the Court should exclude Farrell's opinions on market definition,
23 competition in the proposed market, and market share in §§III, IV, V, and VI of his Opening Merits
24 Report and §§II, III.A.2, III.A.3, III.C, and III.D of his Rebuttal Merits Report, as well as any
25 testimony drawn from those sections.

26
27
28

**PUBLIC REDACTED VERSION**

Dated: April 28, 2025

Respectfully submitted,

By: */s/ Sonal N. Mehta*
Sonal N. Mehta

WILMER CUTLER PICKERING HALE AND DORR LLP

*Attorney for Defendant Meta Platforms, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of April, 2025, I electronically transmitted the public redacted version of the foregoing document to the Clerk's Office using the CM/ECF System and caused the version of the foregoing document filed under seal to be transmitted to counsel of record by email.

By:   */s/ Sonal N. Mehta*
Sonal N. Mehta