1  **QUINN EMANUEL URQUHART & SULLIVAN, LLP**
   Kevin Y. Teruya (Bar No. 235916)
2  kevinteruya@quinnemanuel.com
   865 South Figueroa Street, 10th Floor
3  Los Angeles, CA 90017
   (213) 443-3000
4
   **HAGENS BERMAN SOBOL SHAPIRO LLP**
5  Shana E. Scarlett (Bar No. 217895)
   shanas@hbsslaw.com
6  715 Hearst Avenue, Suite 202
   Berkeley, CA 94710
7  (510) 725-3000

8  *Attorneys for Plaintiffs Maximilian Klein,*
   *Rachel Banks Kupcho, and Sarah Grabert*
9

10  [Additional counsel listed on signature page]

11

12              **UNITED STATES DISTRICT COURT**

13              **NORTHERN DISTRICT OF CALIFORNIA**

14              **SAN FRANCISCO DIVISION**

15  MAXIMILIAN KLEIN, et al.,          Consolidated Case No. 3:20-cv-08570-JD

16              Plaintiffs,            **CONSUMER PLAINTIFFS' NOTICE OF
                                       MOTION AND RENEWED MOTION TO**
17      vs.                            **EXCLUDE PORTIONS OF DR. DENNIS
                                       CARLTON'S PROPOSED TESTIMONY**
18  META PLATFORMS, INC.,
                                       The Hon. James Donato
19              Defendant.
                                       **REDACTED VERSION FILED PUBLICLY**
20
    This Document Relates To: All Consumer
21  Actions

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION**

**PLEASE TAKE NOTICE** that on a date and time to be set by the Court, before the Honorable James Donato, of the United States District Court of the Northern District of California, San Francisco Division, 450 Golden Gate Avenue, San Francisco, California, Courtroom 11, 19th Floor, Plaintiffs Maximillian Klein, Sarah Grabert, and Rachel Banks Kupcho ("Consumers"), on behalf of themselves and all others similarly situated, hereby move the Court for an order excluding portions of the merits expert reports and testimony of Dr. Dennis Carlton.[1]

This motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, all filed supportive declarations and exhibits, the records, pleadings, and other documents on file in this consolidated action, and any argument that may be presented to the Court.

---

[1] Consumers previously moved to exclude certain opinions from another of Facebook's merits experts—Dr. Anindya Ghose—related to the *Brown Shoe* factors, market definition, and monopoly power. *See* Dkt. 778. Consumers understand that Facebook's proffer of Dr. Ghose is conditional on whether the Court allows testimony from Consumers' expert Professor Lamdan, and that to the extent the Court does allow testimony from Dr. Ghose, Facebook no longer intends to offer the challenged testimony from Dr. Ghose regarding *Brown Shoe* factors, market definition, or monopoly power. *See* Dkt. 822 at 5–7. To the extent that Facebook does actually offer such opinions from Dr. Ghose, Consumers reserve their rights, including to seek to exclude or otherwise challenge those opinions.

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ................................................................................................................1

II.  BACKGROUND ...............................................................................................................2

III.  LEGAL STANDARDS ......................................................................................................3

IV.  ARGUMENT ....................................................................................................................4

    A.  Dr. Carlton's Outage Analysis Is Unreliable ........................................................4

        1.  Dr. Carlton Fails to Reliably Measure Long-Term Substitution ...................4

        2.  Dr. Carlton's *Cellophane* Fallacy Claims Are *Ipse Dixit* ............................5

    B.  Dr. Carlton's Opinions Regarding the Share of "Friends and Family" Time on Facebook Are Unreliable and Rely on Undisclosed Information ........................7

        1.  Dr. Carlton Blindly Relies on Data that He Concedes Is Unreliable ............7

        2.  Dr. Carlton Relies on Information that Facebook Failed to Disclose ...........9

    C.  Dr. Carlton's Opinions Regarding the Inclusion of Particular Products in the Relevant Market and His Resulting Share Calculations Should Be Excluded ........11

        1.  Dr. Carlton Relies on His Own Outage Analysis and on Dr. List's Analyses, All of Which Should Be Excluded ................................................11

        2.  Dr. Carlton Selectively Relies on the Rejected "Circle Principle" .............12

    D.  Dr. Carlton's Opinion that Competition May ████████████ ████████ Is Contrary to Decades of Law .............................................15

V.  CONCLUSION ................................................................................................................15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page**

## Cases

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) .................................................................. 15

*Baker v. Firstcom Music*,
2018 WL 2676636 (C.D. Cal. May 8, 2018) .......................................... 9

*Bentley v. ConocoPhillips Pipeline Co.*,
2010 WL 11537799 (D. Mont. Feb. 3, 2010) ........................................ 11

*Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*,
683 F.3d 1144 (9th Cir. 2012) ............................................................... 4

*Call Delivery Sys., LLC v. Morgan*,
2022 WL 1252412 (C.D. Cal. Mar. 7, 2022) ......................................... 9

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) ........................................................................... 3, 4

*Deficcio v. Winnebago Indus., Inc.*,
2014 WL 4211274 (D.N.J. Aug. 25, 2014) ........................................... 15

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ................................................................. 3

*In re Google Play Store Antitrust Litig.*,
2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) .................................. 7, 14

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ............................................................................... 3

*Murray v. S. Route Maritime SA*,
870 F.3d 915 (9th Cir. 2017) ................................................................. 4

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
2018 WL 1948593 (N.D. Cal. Apr. 25, 2018) ....................................... 4

*Nat'l Collegiate Athletic Ass'n v. Alston*,
594 U.S. 69 (2021) ............................................................................... 15

*Nat'l Soc. of Pro. Eng'rs v. United States*,
435 U.S. 679 (1978) ............................................................................. 15

*In re TMI Litig.*,
193 F.3d 613 (3d Cir. 1999) ................................................................... 8

*United Food & Com. Workers Loc. 1776 v. Teikoku Pharma USA*,
    296 F. Supp. 3d 1142 (N.D. Cal. 2017) ................................................................. 15

*United States v. Aetna Inc.*,
    240 F. Supp. 3d 1 (D.D.C. 2017) ............................................................................. 13

*United States v. Eastman Kodak Co.*,
    63 F.3d 95 (2d Cir. 1995) ........................................................................................... 6

*United States v. Sandoval-Mendoza*,
    472 F.3d 645 (9th Cir. 2006) ..................................................................................... 3

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
    259 F.3d 1101 (9th Cir. 2001) ............................................................................ 9, 10

## **Other Authorities**

Fed. R. Civ. P. 26(a)(1)(A)(ii) ............................................................................................ 9

Fed. R. Evid. 702 ................................................................................................................ 3

Rule 26 ........................................................................................................................ iv, 1, 9

Rule 26(a) ............................................................................................................................ 9

Rule 37 ........................................................................................................................ iv, 1, 9

Rule 37(c)(1) .................................................................................................................. 9, 10

**STATEMENT OF ISSUES TO BE DECIDED**

The issues to be decided with respect to Consumers' Motion are:

1.    Should this Court exclude Dr. Carlton's testimony regarding Meta's October 2021 service outage where:

    a.    the results of a fleeting, seven-hour service outage do not provide reliable measures of long-run substitution, which is the type of substitution that economists evaluate for market definition purposes; and

    b.    Dr. Carlton admits that his outage analysis does not control for the *Cellophane* fallacy, and he provides only *ipse dixit* assertions that the fallacy does not invalidate his analysis?

2.    Should this Court exclude Dr. Carlton's testimony regarding friends and family usage on Facebook where:

    a.    Dr. Carlton blindly relies on data whose reliability he admits he did not independently verify even though Facebook ███████████████████ ████████████████████████████; and

    b.    Dr. Carlton relies on information that Facebook failed to disclose in violation of Rule 26 and that should therefore be excluded as a sanction under Rule 37?

3.    Should this Court exclude Dr. Carlton's testimony that TikTok, YouTube, Twitter, and messaging apps must be included in the relevant market if Snapchat is, and Dr. Carlton's resulting market share calculations, where:

    a.    Dr. Carlton's opinion relies on diversion ratios from his outage analysis and from Dr. List's analyses, all of which should be excluded; and

    b.    Dr. Carlton's opinion relies on the Circle Principle, a rejected methodology that Dr. Carlton himself applies selectively?

4.    Should this Court exclude Dr. Carlton's testimony that competition may ████████ ███████████████████, where such an argument that "competition is bad" is contrary to decades of law and forbidden as a matter of law?

### MEMORANDUM OF POINTS AND AUTHORITIES

## I.    <u>INTRODUCTION</u>

Dr. Dennis Carlton is one of Facebook's economist experts who offers liability and relevant market opinions. Certain of Dr. Carlton's opinions are unreliable and unhelpful to the fact finder, and they should be excluded.

***First***, Dr. Carlton purports to critique Consumers' proffered Personal Social Network Market based on the results of a fleeting, seven-hour service outage (Section IV.C.2 of his opening merits report). But, by its very nature, his outage analysis does not measure ***long-run substitution***, which is what economists evaluate for market definition purposes. The conclusions Dr. Carlton draws from his outage analysis therefore do not rely on any sort of well-accepted methodology. Moreover, while Dr. Carlton acknowledges the well-accepted *Cellophane* fallacy, he admits that his outage analysis cannot and does not control for its potential effects; his assertion that the fallacy does not meaningfully affect his results is *ipse dixit*.

***Second***, Dr. Carlton opines that "friends and family usage" reflects a "minority" of the time that users spend on Facebook (Section IV.B.1 of his opening merits report), but bases that opinion on two months of data pulled from a single file Facebook provided and ███████████████████ ██████████. He nevertheless blindly assumed, but did not verify, the data he used did not suffer from the same problem; he also admits that even the months he did look at contained unreliable data. Dr. Carlton's opinion should also be excluded under Rule 37 because it relies on information from Facebook—how the data should be interpreted, and explanations of ████████████████ ████████████—that neither Facebook nor he ever disclosed in violation of Rule 26.

***Third***, Dr. Carlton opines that TikTok, YouTube, Twitter, and various messaging apps are "closer" substitutes to Facebook than Snapchat and should therefore be included in the relevant market if Snapchat is, which supposedly means Facebook lacks monopoly power (Section V.A.I. of his opening report). But, his sole basis for these opinions is the unreliable and unhelpful outage analysis discussed above, as well as Dr. List's analyses, which should be excluded for the reasons set forth in Consumers' contemporaneously-filed *Daubert* motion. Dr. Carlton thus has no basis to assert these products should be in the relevant market nor to calculate market shares based on that

1  assumption. Separately, this opinion is based on the "Circle Principle," a methodology rejected by

2  U.S. competition authorities' Merger Guidelines and Facebook's own expert Dr. List, the limitations

3  of which Dr. Carlton himself recognizes, and that Dr. Carlton applies selectively.

4       **Finally**, Dr. Carlton opines that more competition may ███████████

5  ████████ for users (Section III.A.3. of his opening report). This, however, is a poorly-disguised

6  argument that "more competition is bad," which is contrary to decades of law and the U.S. Supreme

7  Court's directive that a defendant may not make such arguments as a matter of law.

8  **II.**     **BACKGROUND**

9       Dr. Carlton is an economist that has appeared multiple times for Facebook in antitrust cases.

10  Ex. 2 (Carlton Tr.) at 140:10–141:1. He offers no affirmative definition of the relevant market. *Id.* at

11  16:7–24, 18:5–19:17. Instead, he argues that Consumers' proffered PSN Market—consisting of

12  Facebook, Instagram, Snapchat, MeWe, and other now-defunct products from Myspace, Friendster,

13  and Orkut—should include other types of products. *Id.* at 19:2–13. To do so, he offers four primary

14  opinions and analyses—the substance of which is summarized below, and the problems of which are

15  discussed in the Argument section.

16       ***Outage Analysis***. On October 4, 2021, all of Meta's apps—including (among others)

17  Facebook, Instagram, WhatsApp, Messenger, and Viewpoints—were subject to a global service

18  outage for nearly seven hours. Ex. 1 (Carlton Rep.) ¶ 117. Based on data from a sample of Google

19  Android device users, Dr. Carlton ████████████████████████████████████████████

20  ███████████████████████████[2] *Id.* ¶ 120. He asserts that when Meta's apps went down, various

21  apps outside Consumers' PSN Market—TikTok, YouTube, the Samsung and Google Messages apps,

22  the Google Chrome web browser, Twitter, and the Samsung One UI Home user interface—all gained

23  more time than did Snapchat (which is in Consumers' PSN Market). *Id.* ¶ 120, Table 9.

24       ***Friends and Family Usage on Facebook***. Consumers assert that connecting with friends and

25  family is the core use case for personal social networks like Facebook and differentiates firms in the

26  PSN Market from other types of services that are outside the market. Ex. 1 (Carlton Rep.) ¶ 81. Based

27

28  [2] Dr. Carlton ████████████████████████████████
████████████████████████████████████████ Ex. 2 (Carlton Tr.) at 113:18–23, 114:14–20.

on post-Class Period data from Facebook for June 2022 and January 2023, Dr. Carlton purports to evaluate Consumers' assertion by purporting to analyze what portion of time and content on Facebook constitutes "friends and family" sharing. Ex. 1 (Carlton Rep.) ¶ 88, Table 6.

***Relevant Market and Market Share Calculations***. Dr. Carlton opines that if, as Consumers assert, Snapchat is in the relevant market, then other apps that are "closer" substitutes to Facebook and Instagram than Snapchat must be included in the relevant market as well. Ex. 1 (Carlton Rep.) ¶¶ 121, 144–45. Based on diversion ratios from his outage analysis and Dr. List's analyses, Dr. Carlton opines that YouTube, TikTok, Twitter, and messaging apps ████████████████████████████ ██████████████████████████████████████████████████████████ *Id.* Dr. Carlton then ██████████████████████████████████████████ various scenarios incorporating these other apps in the market. He opines that ████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ █████████ Ex. 2 (Carlton Tr.) at 213:17–214:5, 222:9–223:1; Ex. 1 (Carlton Rep.) ¶ 148, Table 12.

***Deception, Privacy, and Competition***. Dr. Carlton opines that while deception ████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████ Ex. 1 (Carlton Rep.) ¶¶ 8, 25, 28–30.

## III.    LEGAL STANDARDS

Under *Daubert* and Federal Rule of Evidence 702, the trial court acts as a gatekeeper to ensure that expert testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). The relevance requirement asks whether the evidence is a "fit" with the issues to be decided, and whether it tends to help the trier of fact understand or determine a fact in issue. *Daubert*, 509 U.S. at 591; *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006). "In assessing the relevance or 'fit' of expert

testimony, 'scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes.'" *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 2018 WL 1948593, at *2 (N.D. Cal. Apr. 25, 2018). The reliability requirement asks whether the reasoning or methodology underlying the testimony is scientifically valid. *Murray v. S. Route Maritime SA*, 870 F.3d 915, 922 (9th Cir. 2017). The proponent of expert testimony has the burden to establish by a preponderance of the evidence that the testimony meets all of these requirements. *Daubert*, 509 U.S. at 592 n.10; *accord Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012).

## IV.    ARGUMENT

### A.    Dr. Carlton's Outage Analysis Is Unreliable

Dr. Carlton's outage analysis should be excluded first because it fails to measure long-term substitution—what economists evaluate to define a market. Separately, Dr. Carlton's outage analysis is subject to the *Cellophane* fallacy, for which he admittedly did not control, and in response to which he offers only *ipse dixit* assumptions that he did not test and are based on zero literature.

#### 1.    Dr. Carlton Fails to Reliably Measure Long-Term Substitution

Dr. Carlton's outage analysis should be excluded since it is based on a fleeting, seven-hour service outage that occurred over part of a single day of a single year. Ex. 1 (Carlton Rep.) ¶¶ 117, 117 n. 188. As Dr. Carlton explains, ███████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████ Ex. 2 (Carlton Tr.) at 24:11–23. For market definition purposes, however, economic literature explains that economists seek to identify the substitutes to which consumers turn over the ***long-term*** when a given product's price goes up or its quality decreases. *See* Ex. 7 (Hendel, Igal, and Aviv Nevo, "Measuring the implications of sales and consumer inventory behavior." *Econometrica* 74, no. 6 (2006) at p. 1637) (explaining short-term estimation results in significant mismeasurement of cross-price elasticity and substitution, and recognizing distinction between "long- and short-run price effects"). Indeed, in the ordinary course of their duties at the company, in-house economists at Facebook recognized that ████████████████████████ █████████████████████████████████████████████ Ex. 6 (PALM-003694642)

1  at -644. As one of those former Facebook in-house economists explained at deposition, this is because

2  ██████████████████████████████████████████████████████████████████████████

3  ████████████████████████████████████ Ex. 5 (Cunningham Tr.) at 79:24–80:16.

4    In the face of a short-run outage, rather than seek out a true substitute for the service that is

5  temporarily unavailable, an individual may instead spend their time on any number of activities that

6  are completely unrelated to the service that is out because they know the service will soon return. For

7  example, when a person's Xfinity internet service goes out for a few hours, they may read a book or

8  cook salmon rather than incur the time and cost of replacing their Xfinity internet with Verizon

9  internet. Similarly, when a person's Southwest flight is late, they might grab coffee in the airport,

10  rather than replace their flight with another on United. The same is true for personal social networks

11  like Facebook and Instagram. When they are down for a few hours, it makes sense that a user would

12  spend more time doing things other than incurring the time and effort of setting up or updating an

13  account on Snapchat, convincing their friends and family to use Snapchat, and the like, as they know

14  Facebook and Instagram will soon become available again.

15    Indeed, Dr. Carlton's outage analysis shows that ██████████████████████

16  ██████████████████████████████████████████████████████████████████████████

17  ██████████████████████████████████████████████████████████████████████████

18  ████████. Carlton Table 9. Just as reading a book or cooking salmon is not a substitute for internet

19  service, and grabbing coffee at the airport is not a substitute for a flight, all activities on the entire

20  internet (via the Chrome web browser) and doing anything on a device (via the Samsung UI Home

21  interface) are not substitutes for Facebook and Instagram. Dr. Carlton's outage analysis should be

22  excluded because it fails to reliably measure long-run substitution.

23    **2.    Dr. Carlton's *Cellophane* Fallacy Claims Are *Ipse Dixit***

24    Dr. Carlton's outage analysis should also be excluded because it is subject to the *Cellophane*

25  fallacy, which he fails to control for, and in response to which he offers only unsupported

26  assumptions. The *Cellophane* fallacy is a well-established concept among economists that explains

27  where a relevant market has already been monopolized, "using prevailing prices can lead to defining

28  markets too broadly and thus inferring that dominance does not exist when, in fact, it does." Ex. 9

(2023 Merger Guidelines, § 4.3 Market Definition) at pgs. 42–43 n.83. This is because where a firm has already monopolized the market for a product and then raises prices, consumers may, in the face of that price increase, turn to products that are not actually in the market, giving the false impression they are close substitutes, because "[a]t a high enough price, even poor substitutes look good to the consumer." *United States v. Eastman Kodak Co.*, 63 F.3d 95, 105 (2d Cir. 1995).

Dr. Carlton considers the results of a Facebook outage—the equivalent of a temporary price increase—from the real world, where Facebook is an alleged monopolist. In this way, Dr. Carlton runs head-first into the *Cellophane* fallacy. Indeed, Consumers' and Facebook's experts, including Dr. Carlton, all recognize ███████████████████████████████████████████████████████████████████████████. Ex. 1 (Carlton Rep.) ¶¶ 113–14 ████████████████████████████████████████████; Ex. 3 (List Rep.) ¶ 18. Tellingly, Dr. Carlton acknowledged ███████████████████████████████████████████████████████████████████████████████████████████████ Ex. 2 (Carlton Tr.) at 249:17–250:3.

Despite acknowledging the *Cellophane* fallacy and its potential impact on the results of his outage analysis, Dr. Carlton's ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 2 (Carlton Tr.) at 249:17–250:3. In other words, whatever the actual diversion ratio numbers, Dr. Carlton ████████████████████████████████████████████████████████████████████████████████ *Id.* at 252:21–254:2.

But Dr. Carlton conceded that ██████████████████████████████████████████████████████████████████████████ Ex. 2

1    (Carlton Tr.) at 250:20–251:5, 251:20–252:20. He also confirmed that █████████████

2    ██████████████████████████████████████████████ *Id.* at 254:3–25.

3    The Court should therefore exclude Dr. Carlton's outage analysis because his explanation for why

4    the *Cellophane* fallacy does not invalidate his outage analysis rests on an unsupported assumption.

5    *See In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *9 (N.D. Cal. Aug. 28, 2023)

6    (Donato, J.) (excluding expert opinion where based on "wholly speculative assumptions").

7         Moreover, even a cursory comparison of the diversion ratios that Dr. Carlton and Dr. List

8    (Facebook's other expert) calculate demonstrate that ██████████████████████████████

9    █████████████████████████████████████████████████████████████████

10   ██████████████████████████████████████ For example, while Dr. Carlton's

11   analysis—which is based on a Meta outage, which amounts to an infinite price increase—finds ████

12   ██████████████████████████ Dr. List's pricing experiment—which is based on a more

13   moderate (*i.e.*, large but not infinite) price increase—finds ███████████████████████

14   ██████ *Compare* Ex. 1 (Carlton Rep.) Tables 9 & 10, *with* Ex. 3 (List Rep.) Table III-9. Contrary to

15   Dr. Carlton's *ipse dixit* assertion █████████████████████████████████████████

16   ██████ (Ex. 2 (Carlton Tr.) at 252:17–20), ███████████████████████████████████

17   █████████████████████████████████████ Dr. Carlton therefore has no basis for his

18   assumption that █████████████████████████████████████████

19   **B.    Dr. Carlton's Opinions Regarding the Share of "Friends and Family" Time on**
         **Facebook Are Unreliable and Rely on Undisclosed Information**

20        The Court should exclude Dr. Carlton's opinion that "friends and family" sharing reflects a

21   minority of how users spend their time on Facebook because it is based on data from Facebook whose

22   reliability Dr. Carlton blindly accepted, ███████████████████████████████████████

23   Separately, Dr. Carlton's opinion should be excluded because it relies on information that Facebook

24   failed to disclose during fact discovery and in either of Dr. Carlton's reports.

25        **1.    Dr. Carlton Blindly Relies on Data that He Concedes Is Unreliable**

26        During deposition, Dr. Carlton for the first time revealed a number of irregularities regarding

27   the data that he used to reach his opinions, including, for example:

28



Dr. Carlton offers a single justification for nonetheless using this admittedly flawed data set. He asserts that while data for earlier months in the same data file he uses is unreliable, ███████ ██████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Ex. 2 (Carlton Tr.) at 180:5–12, 183:13–20, 187:7–18. That does not suffice to satisfy *Daubert*'s reliability requirements.

For one, Dr. Carlton's explanation that the two months of data he analyzed are somehow reliable even though earlier months of data in the same data file are not does not hold water. ████ ██████████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ Ex. 1 (Carlton Rep.) ¶ 88 n. 152; Ex. 2 (Carlton Tr.) at 174:22–175:9; *cf. In re TMI Litig.*, 193 F.3d 613, 697 (3d Cir. 1999) ("If the data underlying the expert's opinion are so unreliable that no reasonable expert could base an opinion on them, the opinion resting on that data must be excluded.").

Moreover, Dr. Carlton's assertion that the data he does analyze is reliable even though data from other months in the same file is not is *ipse dixit*. He concedes ████████████████████ ██████████████████████████████████████████████████████████████████████████████████

1 ███████████████████████████████████████████████████

2 • ██████████████████████████████████████████████ Ex. 2 (Carlton Tr.) at 180:5–17 (emphasis added).

3 • ███████████████████████████████████████████

4 ████████████████████████████████████████ Ex. 2 (Carlton Tr.) at 180:5–17, 193:7–22 (emphasis added).  Nor did ████████

5 ██████████████████████████████████████████ *Id.* at 183:21–184:4, 190:22–191:11.

6 • And as for █████████████████████████████████ Ex. 2 (Carlton Tr.) at 197:12–19, 198:9–16 (emphasis added).

In the end, "[e]xperts are expected to verify the reliability of the data underlying their conclusions independently instead of simply adopting the representations of an interested party." *Call Delivery Sys., LLC v. Morgan*, 2022 WL 1252412, at *1 (C.D. Cal. Mar. 7, 2022). Dr. Carlton concedes that he did zero independent verification of the reliability of the data he uses to form his opinion. Instead, he admits that he exclusively relies ███████████████████████████████████ His opinion must therefore be excluded. *See Baker v. Firstcom Music*, 2018 WL 2676636, at *2 (C.D. Cal. May 8, 2018) (excluding expert opinion as unreliable because expert "failed to verify the underlying data at the core of her expert opinion independently" and "appears to rely entirely on [her client's] representations").

### 2. Dr. Carlton Relies on Information that Facebook Failed to Disclose

Dr. Carlton's "friends and family" minority usage opinion should also be excluded as a sanction under Rule 37 because it relies on information that Facebook failed to disclose in violation of Rule 26. Rule 26 requires disclosure of all "documents" and "electronically stored information . . . that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(ii). Rule 37(c)(1) "forbid[s] the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). Dr. Carlton's opinion relies on numerous pieces of information Facebook failed to disclose, and Facebook's failure to disclose that information was and continues to be highly prejudicial to Consumers.

For example, Facebook during discovery failed to disclose the reliability issues regarding the data described *supra*. Those issues directly caused Dr. Carlton to make certain decisions regarding

████████████████████████████████████████████████ And even though Dr. Carlton submitted two expert reports in this case—an opening report and a rebuttal report—and he ████████████████████████████ at the time he submitted his reports, these issues were not disclosed during discovery or in either of his reports. Ex. 2 (Carlton Tr.) at 193:24–194:18.

In addition, Dr. Carlton testified that his opinion relies on understandings of the data—*e.g.*, what particular fields in the data mean and how to interpret them—████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████. *See* Ex. 2 (Carlton Tr.) at 161:20–162:1, 176:8–11, 177:6–177:12; *see also* 159:25–160:14 & 163:22–167:7 ████████████████████████████████████████████████. Yet, these understandings were not disclosed during discovery or in either of his reports, which do not mention any ██████████████████ at all.

Dr. Carlton's March 7, 2024 deposition—which came after the close of fact discovery, and after the parties' exchange of expert reports—was the first time that Dr. Carlton and Facebook even hinted at these issues. ██████████████████████████████████████████████ *See, e.g.*, Ex. 2 (Carlton Tr.) at 157:23–158:9, 158:24–159:4, 160:4–14, 164:10–22, 167:8–168:9, 176:20–177:1, 186:21–187:11 ████████████████████████████████████████████████

████████████████████. Facebook's failure to disclose these issues was neither justified (it knew of these issues during discovery, and certainly by the time Dr. Carlton's reports were served in January and February 2024), nor harmless. *See Yeti*, 259 F.3d at 1106–07 (noting that a party may avoid exclusion if it proves its failure to disclose "is substantially justified or harmless."); *see also* Fed. R. Civ. P. 37(c)(1).

Had Consumers had the same access to information that Facebook provided to Dr. Carlton—

██████████████████████████████—Consumers and their experts could have made

1  additional use of the data that Facebook produced in this litigation. Instead. ████████

2  █████████████████████████████████████████████████████████████████████████

3  ████████  Facebook stonewalled Consumers' requests for information regarding Facebook's data.

4  Similarly, had Facebook ████████████████████████████████████████████████████████

5  Consumers could have undertaken their own further investigation into those issues and further

6  challenged Dr. Carlton's decisions and analyses of the data in Consumers' own expert reports.

7  Facebook prevented that by engaging in gamesmanship.

8          Facebook's failure to disclose these issues makes exclusion of Dr. Carlton's opinion the only

9  appropriate remedy. *Bentley v. ConocoPhillips Pipeline Co.*, 2010 WL 11537799, at *8 (D. Mont.

10  Feb. 3, 2010) (explaining that "[t]here is no justification to handing over documents to an expert but

11  omitting to hand them over to the other side," and excluding expert testimony since party "gam[ed]

12  the system" and "gained an advantage by allowing its expert to rely on things that [opposing party]

13  did not have but should have.").

## C.  Dr. Carlton's Opinions Regarding the Inclusion of Particular Products in the Relevant Market and His Resulting Share Calculations Should Be Excluded

15          The Court should exclude Dr. Carlton's opinion that certain products must be included in the

16  relevant market if Snapchat is, and his resulting market share calculations, because they depend on

17  diversion ratios from Dr. Carlton's outage analysis and from Dr. List's analyses, which themselves

18  should be excluded. Moreover, Dr. Carlton's opinion is based on his selective and unreliable

19  application of the Circle Principle—a methodology that has been rejected.

### 1.  Dr. Carlton Relies on His Own Outage Analysis and on Dr. List's Analyses, All of Which Should Be Excluded

22          Dr. Carlton's opinion that TikTok, Twitter, YouTube, and messaging services must be

23  included in the relevant market if Snapchat is also in the market, as well as his resulting market share

24  calculations, should be excluded because they rely on the diversion ratios that he obtained from his

25  outage analysis, as well as on Dr. List's analyses. Ex. 1 (Carlton Rep.) ¶¶ 125, 144–45. As explained

26  *supra*, Dr. Carlton's outage analysis should be excluded. And as explained in Consumers'

27  concurrently-filed motion to exclude Dr. List's testimony, Dr. List's pricing experiment, switching

28  analysis, and India ban opinions should be excluded too. Dr. Carlton's opinion and resulting share

1  calculations, which rely on these analyses, should therefore be excluded as well.

2  **2.    Dr. Carlton Selectively Relies on the Rejected "Circle Principle"**

3  Dr. Carlton's opinion that TikTok, Twitter, YouTube, and messaging services must be

4  included in the relevant market if Snapchat is also in the market should separately be excluded

5  because it relies on the rejected Circle Principle. *See* Ex. 1 (Carlton Rep.) ¶¶ 9, 115, 121, 125; *see*

6  *also* Ex. 2 (Carlton Tr.) at 17:4–7, 58:10–25. The Circle Principle states, "[w]hen applying the

7  hypothetical monopolist test to define a market around a product offered by one of the merging firms,

8  if the market includes a second product, the Agencies will normally also include a third product if

9  that third product is a closer substitute for the first product than is the second product."[3] Ex. 8 (2010

10  U.S. Department of Justice and the Federal Trade Commission Horizontal Merger Guidelines

11  ("Merger Guidelines"), § 4.1.1 The Hypothetical Monopolist Test) at p. 9. This is true even if the first

12  and second products together satisfy the hypothetical monopolist test. *Id.* (Example 6). Dr. Carlton

13  explains the methodology—also referred to as "algorithmic" market definition—as follows: ████

14  ████████████████████████████████████████████████████████████

15  ████████████████████████ Ex. 2 (Carlton Tr.) at 58:10–25.

16  For purposes of this case, Dr. Carlton explains ██████████████████████

17  ████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████

19  ████ Ex. 2 (Carlton Tr.) at. 17:5–7; Ex. 1 (Carlton Rep.) ¶ 121. There are several problems with

20  Dr. Carlton's opinions that render them inadmissible.

21  ***First***, Dr. Carlton's Circle Principle approach provides no basis for ████████████

22  ████████████████████████████████████████████████ Dr. Carlton's Circle

23  Principle approach relies on calculating diversion ratios of various products, rank ordering them, and

24  then including in the relevant market those that have higher diversion ratios than does Snapchat. But

25  as to iMessage, Dr. Carlton ████████████████████████████

26

27  _____

[3]  The hypothetical monopolist test "asks whether eliminating the competition among the group of products by combining them under the control of a hypothetical monopolist likely would lead to a

28  worsening of terms of customers." Ex. 9 (2023 Merger Guidelines, § 4.3.A The Hypothetical Monopolist Test) at p. 41.

1    ████████████████████████████████████████████ Dr. Carlton contends that

2    ████████████████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████████████████

4    ███████████████ Ex. 1 (Carlton Rep.) ¶ 120; Ex. 3 (List Rep.) ¶¶ 64-65, 162. iMessage is not available

5    on Android; it is only available on Apple iOS. So, ████████████████████████████████

6    ██████████████████████████████████████████████. And as to YouTube, a video

7    streaming service, Dr. Carlton ████████████████████████████████████████████

8    ████████████████████████████████████████████████ Ex. 1 (Carlton Rep.)

9    ¶ 153. A product in an "adjacent" market necessarily should not be included in the relevant market.

**Second**, the Circle Principle is an approach to market definition that has been rejected. It was

reflected in the 2010 Merger Guidelines promulgated by the FTC and DOJ Antitrust Division. *See*

Ex. 8 (2010 Merger Guidelines, § 4.1.1 The Hypothetical Monopolist Test) at p. 9. However,

economists have grown skeptical of the Circle Principle—so much so, that the 2023 Merger

Guidelines issued by the FTC and DOJ Antitrust Division do not mention it at all. Instead, the 2023

Merger Guidelines make clear that "[t]here may be effective competition among a narrow group of

products, . . . making the narrow group a relevant market, even if competitive constraints from

significant substitutes are outside the group." Ex. 9 (2023 Merger Guidelines, § 4.3 Market

Definition) at p. 40. In other words, a group of products—say A, D, and E—can correctly constitute

a relevant market by themselves, even if B and C are closer substitutes to A than D and E. *See Id.* at

p. 40 ("The loss of both the competition between the narrow group of products and the significant

substitutes outside that group may be even more harmful, but that does not prevent the narrow group

from being a market in its own right."); *see also United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 37–

40 (D.D.C. 2017) (rejecting Circle Principle).

Dr. Carlton provides no support for his opinion, premised on the Circle Principle, that if

25   ████████████████████████████████████████████████████████████████████

26   ██████████████████████████████. At deposition, Dr. Carlton stated ████████████████

27   █████████████████ Ex. 2 (Carlton Tr.) at 61:3–14. But he, for example, cites zero literature in

28   support of his assertion. Expert opinions that amount to "*ipse dixit*" are subject to exclusion. *See*

1  *Google Play*, 2023 WL 5532128, at *9. And beyond being unsupported, another of Facebook's own

2  economist experts, Dr. List, testified that the Circle Principle is ████. Ex. 4 (List Tr.) at 87:24–92:12

3  ████████████████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████ (emphasis added).

6  Indeed, after being confronted with the substance of Dr. List's testimony, Dr. Carlton ████

7  ████████████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████████████

10  ████ Ex. 2 (Carlton Tr.) at 69:23–70:17, 71:18–25, 80:19–81:13. To the extent Dr. Carlton has

11  not disavowed his opinions based on the Circle Principle, those opinions should be excluded.

12      ***Finally***, Dr. Carlton's cherry-picking of results from his own analysis is a telling recognition

13  of the Circle Principle's unreliability. He opines that YouTube, TikTok, Twitter, iMessage, Google

14  Messages, and two of Meta's other apps—Messenger and WhatsApp—should be included in the

15  relevant market if Snapchat is based on ████████████████████ Ex. 1 (Carlton Rep.) ¶¶

16  144–45. However, the one analysis he performed, based on the October 2021 service outage, reported

17  ████████████████████████████████████████████████████████████████████

18  Under Dr. Carlton's own Circle Principle methodology, then, ████████████████

19  ████████████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████ Yet, Dr.

22  Carlton's report ████████████

23  ████████████████████████ *See Id.*, Carlton Tables 10 & 11.

24      When confronted with this inconsistency at deposition, Dr. Carlton reversed course, stating

25  ████████████████████████████████████████████████████████████████████

26  ████████████████████████████████████████████

27  ████████████████ Ex. 2 (Carlton Tr.) at 93:4–95:16, 216:19–217:3. In other words, he would want

28  to analyze the use case, not just the diversion ratio, for the product. That is a telling admission that

1    shows the unreliability of Dr. Carlton's Circle Principle methodology—████████

2    ███████████████████████████████████████████████████████████████████

3    ████████ It also confirms that Dr. Carlton applied his own methodology inconsistently to ████

4    ███████████████████████████████████████████████████████████████████

5    ████████ and provides a separate basis for exclusion. *See Amorgianos v. Nat'l R.R. Passenger Corp.*,

6    303 F.3d 256, 268 (2d Cir. 2002) (exclusion proper where expert "failed to apply his own

7    methodology reliably"); *Deficcio v. Winnebago Indus., Inc.*, 2014 WL 4211274, at *6 (D.N.J. Aug.

8    25, 2014) (excluding expert opinion because expert "did not follow his own methodology").

9          **D.    Dr. Carlton's Opinion that Competition May ████████████████**
                   **████████ Is Contrary to Decades of Law**

10         Dr. Carlton's opinions that competition ███████████████████████████████

11   should be excluded as contrary to law. The Supreme Court has long recognized that "competition is

12   the best method of allocating resources" and "ultimately competition will produce not only lower

13   prices, but also better goods and services." *Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679,

14   695 (1978). It is thus well-settled that the Sherman Act "precludes inquiry into the question whether

15   competition is good or bad." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 95 (2021). Dr.

16   Carlton's opinion is a poorly disguised assertion that "competition is bad." His opinion is therefore

17   not only unhelpful to the fact finder, it is forbidden and must be excluded. *See United Food & Com.

18   Workers Loc. 1776 v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1183 (N.D. Cal. 2017) (expert

19   opinions that are "contrary to the law" may be excluded "through the *Daubert* process.").

20   **V.    CONCLUSION**

21         Consumers respectfully request that the Court exclude Dr. Carlton's opinions regarding: (1)

22   the October 2021 outage; (2) "friends and family" minority usage; (3) particular products that Dr.

23   Carlton claims must be included in the relevant market, as well as his resulting market share

24   calculations, and (4) competition ████████████████████████████████████

25

26

27

28

DATED: April 28, 2025

By: _/s/ Shana E. Scarlett_

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Shana E. Scarlett (Bar No. 217895)
 shanas@hbsslaw.com
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
(510) 725-3000

Steve W. Berman (admitted _pro hac vice_)
 steve@hbsslaw.com
1301 Second Avenue, Suite 2000
Seattle, WA 98101
(206) 623-7292

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
W. Joseph Bruckner (admitted _pro hac vice_)
 wjbruckner@locklaw.com
Robert K. Shelquist (admitted _pro hac vice_)
 rkshelquist@locklaw.com
Brian D. Clark (admitted _pro hac vice_)
 bdclark@locklaw.com
Kyle Pozan (admitted _pro hac vice_)
 kjpozan@locklaw.com
Laura M. Matson (admitted _pro hac vice_)
 lmmatson@locklaw.com
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900

By: _/s/ Kevin Y. Teruya_

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Kevin Y. Teruya (Bar No. 235916)
 kevinteruya@quinnemanuel.com
Adam B. Wolfson (Bar No. 262125)
 adamwolfson@quinnemanuel.com
Scott L. Watson (Bar No. 219147)
 scottwatson@quinnemanuel.com
Claire D. Hausman (Bar No. 282091)
 clairehausman@quinnemanuel.com
Brantley I. Pepperman (Bar No. 322057)
 brantleypepperman@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
(213) 443-3000

Michelle Schmit (admitted _pro hac vice_)
 michelleschmit@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606-1881
(312) 705-7400

Manisha M. Sheth (admitted _pro hac vice_)
 manishasheth@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

_Attorneys for Plaintiffs Maximilian Klein,
Rachel Banks Kupcho, and Sarah Grabert_

**ATTESTATION OF KEVIN Y. TERUYA**

This document is being filed through the Electronic Case Filing (ECF) system by attorney Kevin Y. Teruya. By his signature, Mr. Teruya attests that he has obtained concurrence in the filing of this document from each of the attorneys identified on the caption page and in the above signature block.

Dated: April 28, 2025                    By   /s/ Kevin Y. Teruya
                                              Kevin Y. Teruya

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of April 2025, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System, causing it to be electronically served on all attorneys of record.

By   /s/ Kevin Y. Teruya
     Kevin Y. Teruya