# EXHIBIT 9

 

# Merger Guidelines

**U.S. Department of Justice and the Federal Trade Commission**

Issued: December 18, 2023

# 1. Overview

These Merger Guidelines identify the procedures and enforcement practices the Department of Justice and the Federal Trade Commission (the "Agencies") most often use to investigate whether mergers violate the antitrust laws. The Agencies enforce the federal antitrust laws, specifically Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45; and Sections 3, 7, and 8 of the Clayton Act,[1] 15 U.S.C. §§ 14, 18, 19.[2] Congress has charged the Agencies with administering these statutes as part of a national policy to promote open and fair competition, including by preventing mergers and acquisitions that would violate these laws. "Federal antitrust law is a central safeguard for the Nation's free market structures" that ensures "the preservation of economic freedom and our free-enterprise system."[3] It rests on the premise that "[t]he unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions."[4]

Section 7 of the Clayton Act ("Section 7") prohibits mergers and acquisitions where "in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." Competition is a process of rivalry that incentivizes businesses to offer lower prices, improve wages and working conditions, enhance quality and resiliency, innovate, and expand choice, among many other benefits. Mergers that substantially lessen competition or tend to create a monopoly increase, extend, or entrench market power and deprive the public of these benefits. Mergers can lessen competition when they diminish competitive constraints, reduce the number or attractiveness of alternatives available to trading partners, or reduce the intensity with which market participants compete.

Section 7 was designed to arrest anticompetitive tendencies in their incipiency.[5] The Clayton Act therefore requires the Agencies to assess whether mergers present risk to competition. The Supreme Court has explained that "Section 7 itself creates a relatively expansive definition of antitrust liability: To show that a merger is unlawful, a plaintiff need only prove that its effect '*may be* substantially to lessen competition'" or to tend to create a monopoly.[6] Accordingly, the Agencies do not attempt to

---

[1] As amended under the Celler-Kefauver Antimerger Act of 1950, Pub. L. No. 81-899, 64 Stat. 1125 (1950), and the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a.

[2] Although these Guidelines focus primarily on Section 7 of the Clayton Act, the Agencies consider whether any of these statutes may be violated by a merger. The various provisions of the Sherman, Clayton, and FTC Acts each have separate standards, and one may be violated when the others are not.

[3] *North Carolina State Bd. of Dental Examiners v. FTC*, 574 U.S. 494, 502 (2015).

[4] *NCAA v. Board of Regents*, 468 U.S. 85, 104 n.27 (1984) (quoting *Northern Pac. R. Co. v. United States*, 356 U.S. 1, 4-5 (1958)); *see also NCAA v. Alston*, 141 S. Ct. 2141, 2147 (2021) (quoting *Board of Regents*, 468 U.S. at 104 n.27).

[5] *See, e.g.*, *Brown Shoe Co. v. United States*, 370 U.S. 294, 318 nn.32-33 (1962); *see also United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019) (Section 7 "halt[s] incipient monopolies and trade restraints outside the scope of the Sherman Act." (quoting *Brown Shoe*, 370 U.S. at 318 n.32)); *Saint Alphonsus Medical Center-Nampa v. St. Luke's*, 778 F.3d 775, 783 (9th Cir. 2015) (Section 7 "intended to arrest anticompetitive tendencies in their incipiency." (quoting *Brown Shoe*, 370 U.S. at 322)); *Polypore Intern., Inc. v. FTC*, 686 F.3d 1208, 1213-14 (11th Cir. 2012) (same). Some other aspects of *Brown Shoe* have been subsequently revisited.

[6] *California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990) (quoting 15 U.S.C. § 18 with emphasis) (citing *Brown Shoe*, 370 U.S. at 323).

or simply "relevant markets." Market definition can also allow the Agencies to identify market participants and measure market shares and market concentration.

A relevant antitrust market is an area of effective competition, comprising both product (or service) and geographic elements. The outer boundaries of a relevant product market are determined by the "reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."[76] Within a broad relevant market, however, effective competition often occurs in numerous narrower relevant markets.[77] Market definition ensures that relevant antitrust markets are sufficiently broad, but it does not always lead to a single relevant market. Section 7 of the Clayton Act prohibits any merger that may substantially lessen competition "in any line of commerce" and in "any section of the country," and the Agencies protect competition by challenging a merger that may lessen competition in any one or more relevant markets.

Market participants often encounter a range of possible substitutes for the products of the merging firms. However, a relevant market cannot meaningfully encompass that infinite range of substitutes.[78] There may be effective competition among a narrow group of products, and the loss of that competition may be harmful, making the narrow group a relevant market, even if competitive constraints from significant substitutes are outside the group. The loss of both the competition between the narrow group of products and the significant substitutes outside that group may be even more harmful, but that does not prevent the narrow group from being a market in its own right.

Relevant markets need not have precise metes and bounds. Some substitutes may be closer, and others more distant, and defining a market necessarily requires including some substitutes and excluding others. Defining a relevant market sometimes requires a line-drawing exercise around product features, such as size, quality, distances, customer segment, or prices. There can be many places to draw that line and properly define a relevant market. The Agencies recognize that such scenarios are common, and indeed "fuzziness would seem inherent in any attempt to delineate the relevant . . . market."[79] Market participants may use the term "market" colloquially to refer to a broader or different set of products than those that would be needed to constitute a valid relevant antitrust market.

The Agencies rely on several tools to demonstrate that a market is a relevant antitrust market. For example, the Agencies may rely on any one or more of the following to identify a relevant antitrust market.

   A. Direct evidence of substantial competition between the merging parties can demonstrate that a relevant market exists in which the merger may substantially lessen competition and can be sufficient to identify the line of commerce and section of the country affected by a merger, even if the metes and bounds of the market are only broadly characterized.

---

[76] *Id.* at 325.
[77] *Id.* ("[W]ithin [a] broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes."). Multiple overlapping markets can be appropriately defined relevant markets. For example, a merger to monopoly for food worldwide would lessen competition in well-defined relevant markets for, among others, food, baked goods, cookies, low-fat cookies, and premium low-fat chocolate chip cookies. Illegality in any of these in any city or town comprising a relevant geographic market would suffice to prohibit the merger, and the fact that one area comprises a relevant market does not mean a larger, smaller, or overlapping area could not as well.
[78] *United States v. Cont'l Can Co.*, 378 U.S. 441, 449 (1964); *see also FTC v. Advoc. Health Care Network*, 841 F.3d 460, 469 (7th Cir. 2016) ("A geographic market does not need to include all of the firm's competitors; it needs to include the competitors that would substantially constrain the firm's price-increasing ability." (cleaned up)).
[79] *Phila. Nat'l Bank*, 374 U.S. at 360 n.37.

B. Direct evidence of the exercise of market power can demonstrate the existence of a relevant market in which that power exists. This evidence can be valuable when assessing the risk that a dominant position may be entrenched, maintained, or extended, since the same evidence identifies market power and can be sufficient to identify the line of commerce and section of the country affected by a merger, even if the metes and bounds of the market are only broadly characterized.

C. A relevant market can be identified from evidence on observed market characteristics ("practical indicia"), such as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.[80] Various practical indicia may identify a relevant market in different settings.

D. Another common method employed by courts and the Agencies is the hypothetical monopolist test.[81] This test examines whether a proposed market is too narrow by asking whether a hypothetical monopolist over this market could profitably worsen terms significantly, for example, by raising price. An analogous hypothetical monopsonist test applies when considering the impact of a merger on competition among buyers.

The Agencies use these tools to define relevant markets because they each leverage market realities to identify an area of effective competition.

Section 4.3.A below describes the Hypothetical Monopolist Test in greater detail. Section 4.3.B addresses issues that may arise when defining relevant markets in several specific scenarios.

### 4.3.A.  The Hypothetical Monopolist Test

This Section describes the Hypothetical Monopolist Test, which is a method by which the Agencies often define relevant antitrust markets. As outlined above, a relevant antitrust market is an area of effective competition. The Hypothetical Monopolist/Monopsonist Test ("HMT") evaluates whether a group of products is sufficiently broad to constitute a relevant antitrust market. To do so, the HMT asks whether eliminating the competition among the group of products by combining them under the control of a hypothetical monopolist likely would lead to a worsening of terms for customers. The Agencies generally focus their assessment on the constraints from competition, rather than on constraints from regulation, entry, or other market changes. The Agencies are concerned with the impact on economic incentives and assume the hypothetical monopolist would seek to maximize profits.

When evaluating a merger of sellers, the HMT asks whether a hypothetical profit-maximizing firm, not prevented by regulation from worsening terms, that was the only present and future seller of a group of products ("hypothetical monopolist") likely would undertake at least a small but significant and non-transitory increase in price ("SSNIP") or other worsening of terms ("SSNIPT") for at least one

---

[80] *Brown Shoe*, 370 U.S. at 325, *quoted in United States v. U.S. Sugar Corp.*, 73 F.4th 197, 204-07 (3d Cir. 2023) (affirming district court's application of *Brown Shoe* practical indicia to evaluate relevant product market that included, based on the unique facts of the industry, those distributors who "could counteract monopolistic restrictions by releasing their own supplies").

[81] *See FTC v. Penn State Hershey Med. Center*, 838 F.3d 327, 338 (3d Cir. 2016). While these guidelines focus on applying the hypothetical monopolist test in analyzing mergers, the test can be adapted for similar purposes in cases involving alleged monopolization or other conduct. *See, e.g.*, *McWane, Inc. v. FTC*, 783 F.3d 814, 829-30 (11th Cir. 2015).

product in the group.[82] For the purpose of analyzing this issue, the terms of sale of products outside the candidate market are held constant. Analogously, when considering a merger of buyers, the Agencies ask the equivalent question for a hypothetical monopsonist. This Section often focuses on merging sellers to simplify exposition.

### 4.3.B.  Implementing the Hypothetical Monopolist Test

*The SSNIPT*. A SSNIPT may entail worsening terms along any dimension of competition, including price (SSNIP), but also other terms (broadly defined) such as quality, service, capacity investment, choice of product variety or features, or innovative effort.

*Input and Labor Markets*. When the competition at issue involves firms buying inputs or employing labor, the HMT considers whether the hypothetical monopsonist would undertake at least a SSNIPT, such as a decrease in the offered price or a worsening of the terms of trade offered to suppliers, or a decrease in the wage offered to workers or a worsening of their working conditions or benefits.

*The Geographic Dimension of the Market*. The hypothetical monopolist test is generally applied to a group of products together with a geographic region to determine a relevant market, though for ease of exposition the two dimensions are discussed separately, with geographic market definition discussed in Section 4.3.D.2.

*Negotiations or Auctions*. The HMT is stated in terms of a hypothetical monopolist *undertaking* a SSNIPT. This covers settings where the hypothetical monopolist sets terms and makes them worse. It also covers settings where firms bargain, and the hypothetical monopolist would have a stronger bargaining position that would likely lead it to extract a SSNIPT during negotiations, or where firms sell their products in an auction, and the bids submitted by the hypothetical monopolist would result in the purchasers of its products experiencing a SSNIPT.

*Benchmark for the SSNIPT*. The HMT asks whether the hypothetical monopolist likely would worsen terms relative to those that likely would prevail absent the proposed merger. In some cases, the Agencies will use as a benchmark different outcomes than those prevailing prior to the merger. For example, if outcomes are likely to change absent the merger, e.g., because of innovation, entry, exit, or exogenous trends, the Agencies may use anticipated future outcomes as the benchmark. Or, if suppliers in the market are coordinating prior to the merger, the Agencies may use a benchmark that reflects conditions that would arise if coordination were to break down. When evaluating whether a merging firm is dominant (Guideline 6), the Agencies may use terms that likely would prevail in a more competitive market as a benchmark.[83]

---

[82] If the pricing incentives of the firms supplying the products in the group differ substantially from those of the hypothetical monopolist, for reasons other than the latter's control over a larger group of substitutes, the Agencies may instead employ the concept of a hypothetical profit-maximizing cartel comprised of the firms (with all their products) that sell the products in the candidate market. This approach is most likely to be appropriate if the merging firms sell products outside the candidate market that significantly affect their pricing incentives for products in the candidate market. This could occur, for example, if the candidate market is one for durable equipment and the firms selling that equipment derive substantial net revenues from selling spare parts and service for that equipment. Analogous considerations apply when considering a SSNIPT for terms other than price.

[83] In the entrenchment context, if the inquiry is being conducted after market or monopoly power has already been exercised, using prevailing prices can lead to defining markets too broadly and thus inferring that dominance does not exist when, in

42

*Magnitude of the SSNIPT*. What constitutes a "small but significant" worsening of terms depends upon the nature of the industry and the merging firms' positions in it, the ways that firms compete, and the dimension of competition at issue. When considering price, the Agencies will often use a SSNIP of five percent of the price charged by firms for the products or services to which the merging firms contribute value. The Agencies, however, may consider a different term or a price increase that is larger or smaller than five percent.[84]

The Agencies may base a SSNIP on explicit or implicit prices for the firms' specific contribution to the value of the product sold, or an upper bound on the firms' specific contribution, where these can be identified with reasonable clarity. For example, the Agencies may derive an implicit price for the service of transporting oil over a pipeline as the difference between the price the pipeline firm paid for oil at one end and the price it sold the oil for at the other and base the SSNIP on this implicit price.

### 4.3.C.  Evidence and Tools for Carrying Out the Hypothetical Monopolist Test

Section 4.2 describes some of the qualitative and quantitative evidence and tools the Agencies can use to assess the extent of competition among firms. The Agencies can use similar evidence and analogous tools to apply the HMT, in particular to assess whether competition among a set of firms likely leads to better terms than a hypothetical monopolist would undertake.

To assess whether the hypothetical monopolist likely would undertake at least a SSNIP on one or more products in the candidate market, the Agencies sometimes interpret the qualitative and quantitative evidence using an economic model of the profitability to the hypothetical monopolist of undertaking price increases; the Agencies may adapt these tools to apply to other forms of SSNIPTs.

One approach utilizes the concept of a "recapture rate" (the percentage of sales lost by one product in the candidate market, when its price alone rises, that is recaptured by other products in the candidate market). A price increase is profitable when the recapture rate is high enough that the incremental profits from the increased price plus the incremental profits from the recaptured sales going to other products in the candidate market exceed the profits lost when sales are diverted outside the candidate market. It is possible that a price increase is profitable even if a majority of sales are diverted outside the candidate market, for example if the profits on the lost sales are relatively low or the profits on the recaptured sales are relatively high.

Sometimes evidence is presented in the form of "critical loss analysis," which can be used to assess whether undertaking at least a SSNIPT on one or more products in a candidate market would raise or lower the hypothetical monopolist's profits. Critical loss analysis compares the magnitude of the two offsetting effects resulting from the worsening of terms. The "critical loss" is defined as the number of lost unit sales that would leave profits unchanged. The "predicted loss" is defined as the number of unit sales that the hypothetical monopolist is predicted to lose due to the worsening of terms. The worsening of terms raises the hypothetical monopolist's profits if the predicted loss is less than the

---

fact, it does. The problem with using prevailing prices to define the market when a firm is already dominant is known as the "Cellophane Fallacy."

[84] The five percent price increase is not a threshold of competitive harm from the merger. Because the five percent SSNIP is a minimum expected effect of a hypothetical monopolist of an *entire* market, the actual predicted effect of a merger within that market may be significantly lower than five percent. A merger within a well-defined market that causes undue concentration can be illegal even if the predicted price increase is well below the SSNIP of five percent.