**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Kevin Y. Teruya (Bar No. 235916)
kevinteruya@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Shana E. Scarlett (Bar No. 217895)
shanas@hbsslaw.com
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
(510) 725-3000

*Attorneys for Plaintiffs Maximilian Klein, Rachel Banks Kupcho, and Sarah Grabert*

[Additional counsel listed on signature page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

MAXIMILIAN KLEIN, et al.,

Plaintiffs,

vs.

META PLATFORMS, INC.,

Defendant.

This Document Relates To: All Consumer Actions

Consolidated Case No. 3:20-cv-08570-JD

**CONSUMER PLAINTIFFS' NOTICE OF MOTION AND RENEWED MOTION TO EXCLUDE PORTIONS OF DR. JOHN LIST'S PROPOSED TESTIMONY**

The Hon. James Donato

**REDACTED VERSION FILED PUBLICLY**

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on a date and time to be set by the Court, before the Honorable James Donato, of the United States District Court of the Northern District of California, San Francisco Division, 450 Golden Gate Avenue, San Francisco, California, Courtroom 11, 19th Floor, Plaintiffs Maximillian Klein, Sarah Grabert, and Rachel Banks Kupcho ("Consumers"), on behalf of themselves and all others similarly situated, hereby move the Court for an order excluding portions of the merits expert reports and testimony of Dr. John List.[1]

This motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, all filed supportive declarations and exhibits, the records, pleadings, and other documents on file in this consolidated action, and any argument that may be presented to the Court.

[1] Consumers previously moved to exclude certain opinions from another of Facebook's merits experts—Dr. Anindya Ghose—related to the *Brown Shoe* factors, market definition, and monopoly power. *See* Dkt. 778. Consumers understand that Facebook's proffer of Dr. Ghose is conditional on whether the Court allows testimony from Consumers' expert Professor Lamdan, and that to the extent the Court does allow testimony from Dr. Ghose, Facebook no longer intends to offer the challenged testimony from Dr. Ghose regarding *Brown Shoe* factors, market definition, or monopoly power. *See* Dkt. 822 at 5–7. To the extent that Facebook does actually offer such opinions from Dr. Ghose, Consumers reserve their rights, including to seek to exclude or otherwise challenge those opinions.

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..... 1
II. BACKGROUND ..... 2
III. LEGAL STANDARDS ..... 3
IV. DR. LIST'S OPINIONS SHOULD BE EXCLUDED ..... 3
A. Dr. List's Testimony About His Pricing Experiment Should Be Excluded ..... 3
1. The pricing experiment fails to provide any reliable or helpful way to evaluate the relevant market. ..... 4
2. The pricing experiment relies on data Facebook improperly failed to disclose. ..... 6
B. Dr. List's Testimony About His "De-Merger" Model Should Be Excluded ..... 9
C. Dr. List's Testimony About India's Ban of Chinese Apps Should Be Excluded ..... 11
1. Dr. List's India Ban opinions are irrelevant because they cannot be used to evaluate what *is* the relevant market or even whether TikTok is in it. ..... 11
2. The India Ban does not reliably measure economic substitution. ..... 12
D. Dr. List's Testimony About His Switching Analysis Should Be Excluded ..... 13
V. CONCLUSION ..... 14

# TABLE OF AUTHORITIES

**Page**

## Cases

*Bentley v. ConocoPhillips Pipeline Co.*, 2010 WL 11537799 (D. Mont. Feb. 3, 2010) .......... 7, 8, 9

*Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144 (9th Cir. 2012) .......... 3

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) .......... 3, 11

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011) .......... 3

*In re Google Play Store Antitrust Litig.*, 2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) (Donato, J.) .......... 6, 12

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .......... 3

*Murray v. S. Route Maritime SA*, 870 F.3d 915 (9th Cir. 2017) .......... 3

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 2018 WL 1948593 (N.D. Cal. Apr. 25, 2018) .......... 3

*Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021) .......... 10

*Nat'l Soc. of Pro. Engineers v. United States*, 435 U.S. 679 (1978) .......... 10, 11

*PLS.Com, LLC v. Nat'l Assoc. of Realtors*, 32 F.4th 824 (9th Cir. 2022) .......... 10, 11

*United States v. Sandoval-Mendoza*, 472 F.3d 645 (9th Cir. 2006) .......... 3

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101 (9th Cir. 2001) .......... 6, 7, 9

## Rules/Statutes

Federal Rule of Civil Procedure 26 .......... 1, 3

Federal Rule of Civil Procedure 26(a) .......... 6, 7

Federal Rule of Civil Procedure 26(a)(1)(A)(ii) ........ 6

Federal Rule of Civil Procedure 37 ........ 1, 3, 7

Federal Rule of Civil Procedure 37(c)(1) ........ 6, 7, 9

Federal Rule of Evidence 702 ........ 3

1-6 Antitrust Law ........ 12

Sherman Act ........ 10, 11

## STATEMENT OF ISSUES TO BE DECIDED

1. Should this Court exclude Dr. List's testimony regarding his pricing experiment, where the pricing experiment:

   a. is unreliable and unhelpful to the fact finder in resolving the definition of the relevant market in this case; and

   b. relies on data Facebook improperly failed to disclose to Consumers?

2. Should this Court exclude Dr. List's testimony regarding his "de-merger model," where the de-merger model:

   a. relies on the pricing experiment, which should also be excluded;

   b. does not assist the fact finder in defining the relevant market because it relies on a single variable (ad load) that is competitively irrelevant; and

   c. concludes—contrary to the law—that increased competition *reduces* consumer welfare?

3. Should this Court exclude Dr. List's testimony regarding India's 2020 ban of Chinese apps including TikTok, where:

   a. Dr. List offers no opinions regarding what is the relevant market or whether TikTok is even in it; and

   b. Dr. List concedes that the India ban [REDACTED] [REDACTED]?

4. Should this Court exclude Dr. List's testimony regarding his switching analysis, where:

   a. Dr. List concedes that [REDACTED] [REDACTED]; and

   b. the switching analysis does not assist the finder of fact in defining the relevant market because Dr. List concedes he offers no opinion that any of the apps in his switching analysis must actually be included in the relevant market?

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

John A. List, Ph.D. is one of Facebook's two economist relevant market experts who nevertheless fails to offer an opinion on what the relevant market is or whether particular apps are in or out of the relevant market. Instead, Dr. List renders a number of unreliable, legally unsupported, or irrelevant opinions in his report that should be excluded from trial.[2]

***First***, Dr. List relies on a so-called "pricing experiment" to opine that Consumers' Personal Social Network relevant market is not well-defined. In the experiment, [REDACTED] The critical problem for Dr. List, however, is that he admits his pricing experiment [REDACTED] Additionally, it is unreliable because the experiment is [REDACTED] Separately, opinions based on this experiment should also be excluded as a sanction under Rule 37 because it relied on data Facebook failed to disclose to Consumers as required under Rule 26.

***Second***, Dr. List also relies on a so-called "de-merger" model to similarly opine that

[2] Dr. List offers four primary analyses: (1) a pricing experiment, (2) a de-merger model, (3) an India ban analysis, and (4) a switching analysis. During the November 14, 2024 hearing on the parties' expert proffers, Facebook's counsel stated that Facebook "understand[s] the TikTok ban and the switching analysis are out[.]" November 14, 2024 Hrg. Tr. at 25. The Court's minute order following that hearing likewise stated that Facebook "may offer Dr. List to opine solely on the price experiment that he conducted." Dkt. 853. Consumers therefore understand that Dr. List may only offer testimony regarding his pricing experiment, but not the de-merger model, the India ban analysis, or the switching analysis; to the extent that Facebook does offer Dr. List's latter three analyses, Consumers challenge them here and they should be excluded for the reasons stated herein.

[redacted] But, this "de-merger" model depends entirely on the results of the inadmissible pricing experiment. Furthermore, the model proceeds [redacted] But, this does not allow Dr. List to reliably evaluate the relevant market because, critically, [redacted] Moreover, the model's conclusion—that [redacted]—is contrary to the bedrock of antitrust law and therefore inadmissible on that separate basis.

***Third***, Dr. List's India ban analysis [redacted] But his "India Ban" analysis does not even [redacted] It is also unreliable because it is in the wrong geographic market, as Dr. List conceded, and looks at the wrong cross-elasticity of demand (thereby rendering it entirely irrelevant and unhelpful in this case).

***Finally***, Dr. List's misleadingly-named "switching analysis" opinions should be excluded. Here, Dr. List [redacted] This analysis is irrelevant and unreliable because—as Dr. List concedes—it [redacted]

## II. BACKGROUND

Dr. List is a professor who specializes in "experimental economics." Ex. 1 (List Rep.) ¶ 24.[3] Neither his scholarship nor course offerings focus on antitrust economics. *Id.* ¶¶ 24-26. He has never offered an opinion in litigation defining a relevant market. Ex. 3 (List Dep) at 179:24-180:1. Nor does he do so in this case: [redacted] *Id.* at 86:8-10. Dr. List's report

[3] All exhibits cited are exhibits to the Declaration of Claire D. Hausman.

describes [REDACTED] Ex. 1 (List Rep.) ¶ 2. According to Dr. List, none of his analyses—excepting the de-merger analysis—is an implementation of the Hypothetical Monopolist Test. Ex. 3 (List Dep.) at 86:8-18. Dr. List also criticizes the economic logic and empirical methods used by Consumers' expert economists. Ex. 1 (List Rep.) ¶ 2.

## III. LEGAL STANDARDS

Under *Daubert* and Federal Rule of Evidence 702, the trial court acts as a gatekeeper to ensure that expert testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). The relevance requirement asks whether the evidence is a "fit" with the issues to be decided, and whether it tends to help the trier of fact understand or determine a fact in issue. *Daubert*, 509 U.S. at 591; *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006). "In assessing the relevance or 'fit' of expert testimony, 'scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes.'" *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 2018 WL 1948593, at *2 (N.D. Cal. Apr. 25, 2018). The reliability requirement asks whether the reasoning or methodology underlying the testimony is scientifically valid. *Murray v. S. Route Maritime SA*, 870 F.3d 915, 922 (9th Cir. 2017). The proponent of expert testimony has the burden to establish by a preponderance of the evidence that the testimony meets all of these requirements. *Daubert*, 509 U.S. at 592 n.10.; *accord Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012).

## IV. DR. LIST'S OPINIONS SHOULD BE EXCLUDED

### A. Dr. List's Testimony About His Pricing Experiment Should Be Excluded

Dr. List's pricing experiment—[REDACTED]—should be excluded because it fails to provide the fact finder any reliable or helpful means to evaluate the relevant market. Separately and independently, it should be excluded as a sanction under Rule 37 because Facebook failed to disclose data the experiment relied on as required under Rule 26.

**1. The pricing experiment fails to provide any reliable or helpful way to evaluate the relevant market.**

Dr. List offers no opinion as to the relevant market Facebook operates in, and his pricing experiment does not permit him to conclude whether any particular product or service should be included in that market. Ex. 3 (List Dep.) at 104:10–20, 105:10–21. His pricing experiment therefore [REDACTED] *See* Ex. 1 (List Rep.) at 49-50 (Tables III-9, III-10); Ex. 3 (List Dep.) at 70:21-71:3. Notably, the experiment shows [REDACTED] *see* Ex. 1 (List Rep.) at 49-50 (Tables III-9, III-10), which Dr. List acknowledged [REDACTED] Ex. 3 (List Dep.) at 107:13–108:8. Dr. List's pricing experiment is thus unhelpful to evaluate the relevant market since he does not use it to opine that any apps or [REDACTED] activities should have been, but were not, included in Consumers' proffered relevant market.

Moreover, Dr. List testified he is not offering the opinion that if, as Consumers assert, Snapchat, MeWe, and Instagram are in the same relevant market as Facebook, then other apps with a higher numerical diversion ratio (*e.g.*, TikTok, and YouTube) must also be included in the relevant market. Ex. 3 (List Dep.) at 87:24–92:12, 138:4–20. Dr. List testified anyone offering that opinion—which reflects an approach called the "Circle Principle"—[REDACTED] *Id.* at 88:17–25 [REDACTED] (emphasis added).

Additionally, [REDACTED] of Dr. List's Pricing Experiment is too short to measure long-term substitution because users will not bother to switch services over the short-term due to the cost of doing so. Economists look at long-term substitution for purposes of reliably evaluating a relevant market. *See* Ex. 8, Hendel, Igal, and Aviv Nevo. "Measuring the implications of sales and consumer inventory behavior." *Econometrica* 74, no. 6 (2006): 1637 (short-term estimation results in significant mismeasurement of cross-price elasticity and substitution). Dr. List acknowledged economists typically do so by [REDACTED]



[redacted] Ex. 3 (List Dep.) at 259:25–261:15. Yet Dr. List failed to study how substitution patterns would change beyond [redacted], even though he conceded [redacted] *Id.* at 174:16–19, 256:15–257:10. Indeed, the [redacted] nature of Dr. List's pricing experiment directly biases his results downward. Participants in a [redacted] experiment are unlikely to see the need to replace Facebook or Instagram with another app that allows them to connect with their friends and family because they know they can use those apps once the experiment is complete. Moreover, there would be significant cost in doing so, as a user would face switching costs in moving over to a new app and convincing their friends and family to do so as well. Given these trade-offs, it makes sense that participants instead fill their time with other activities that are not reasonably interchangeable with Facebook, *i.e.*, [redacted] time. Dr. List's results from his own experiment show that short-run substitution is ***different*** from long-run substitution, and that in the short run, most consumers will not incur the switching costs to move their social network to a different service. Ex. 4 (Farrell Rebuttal Rep.) ¶ 111, Figures 9-10.

Relatedly, Dr. List's pricing experiment should be excluded because it is subject to the *Cellophane* fallacy, which he fails to control for, and in response to which he offers only an unsupported assumption. The *Cellophane* fallacy is a well-established concept among economists that explains: "[I]f the inquiry is being conducted after market or monopoly power has already been exercised, using prevailing prices ***can lead to defining markets too broadly and thus inferring that dominance does not exist when, in fact, it does***." Ex. 9 (2023 Merger Guidelines, § 4.3 Market Definition) at 42–43 n. 83 (emphasis added). In other words, failing to address the problems of the *Cellophane* Fallacy can lead to the wrong conclusion. Dr. List admits that the Cellophane Fallacy is an [redacted] Ex. 3 (List Dep.) at 154:6-10, 232:25-233:20; Ex. 1 (List Rep.) ¶ 273. Dr. List's pricing experiment purports to [redacted] Yet Dr. List did not [redacted]

[redacted] Ex. 1 (List Rep.) ¶ 273; Ex. 3 (List Dep.) at 235:15-236:9. The Court should therefore exclude Dr. List's pricing experiment because it rests on an unsupported assumption. *See In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *9 (N.D. Cal. Aug. 28, 2023) (Donato, J.) (excluding expert opinion where based on "wholly speculative assumptions"). Moreover, even a cursory comparison of the diversion ratios that Dr. List and Dr. Carlton (Facebook's other relevant market expert) calculate [redacted] For example, Dr. Carlton's outage analysis [redacted] while Dr. List's pricing experiment [redacted]. *Compare* Ex. 5 (Carlton Rep.) Tables 9 & 10, *with* Ex. 1 (List Rep.) Table III-9.

**2. The pricing experiment relies on data Facebook improperly failed to disclose.**

Dr. List's opinions regarding his pricing experiment—which relies on data that was not disclosed and to which Consumers had no access—is properly excluded as a sanction under Federal Rule of Civil Procedure 37(c)(1). Dr. List began working on his pricing experiment [redacted] Ex. 3 (List Dep.) at 44:1–4, 176:18–177:16. In the following [redacted] before it disclosed Dr. List's report, Facebook gave Dr. List and his staff carte blanche access to its data servers. Facebook denied Consumers access to this same data and moreover refused to produce data in response to Consumers' discovery requests even though Consumers had made clear it was for their expert case and that Facebook's delay was prejudicing them. The Federal Rules forbid such gamesmanship.

Rule 37(c)(1) "forbid[s] the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001); *see also* Fed. R. Civ. P. 37(c)(1). Rule 26(a) requires disclosure of, among other things, all "electronically stored information . . . that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(ii). The sanction under Rule 37(c)(1) for failing to do so is "a self-executing, automatic sanction to provide a strong inducement for disclosure of material." *Yeti by Molly, Ltd.*, 259 F.3d at 1106 (cleaned

up); *see also* Fed. R. Civ. P. 37 adv. comm.'s note (1993). "[E]xclusion is an appropriate remedy for failing to fulfill the required disclosure requirements of Rule 26(a)" even if a party "never violated an explicit court order to produce" or "absent a showing in the record of bad faith or willfulness." *Yeti by Molly, Ltd.*, 259 F.3d at 1106-07. A party may avoid exclusion if it proves its failure to disclose "is substantially justified or harmless." *Id.*; *see* Fed. R. Civ. P. 37(c)(1).

Facebook violated its required disclosure obligations under Rule 26(a) in two ways: (1) the Facebook data Dr. List had access to was ***never*** disclosed to Consumers; and (2) the particular Facebook data Dr. List eventually used as an input in his pricing experiment was not disclosed to Consumers until Dr. List served his report. Facebook provided Dr. List's staff at Compass Lexecon access to ***all*** Facebook data through [REDACTED] Ex. 2 (List Rep. Appx.) at C-10; Ex. 3 (List Dep.) at 269:12-270:16. Consumers had no access to this data; as Dr. List testified, [REDACTED] Ex. 3 (List Dep.) at 270:11-16. Additionally, Facebook dedicated several employees, whom Dr. List calls [REDACTED] to provide him ***any*** data that he or his staff requested for his pricing experiment. *Id.* at 268:25–269:11. This data included [REDACTED] Ex. 2 (List Rep. Appx.) at C-9, C-11, D-14, F-16. Dr. List then received data from Facebook on an ongoing basis, beginning in Fall 2022, Ex. 3 (List Dep.) at 263:15–266:13, but Facebook did not produce it to Consumers at the same time or at any time prior to serving Dr. List's report. *See generally* Ex. 1 (List Rep.) [REDACTED]. Without the data he received from Facebook, Dr. List could not have run his pricing experiment. Ex. 3 (List Dep.) at 267:1–268:9.

Facebook cannot prove that its failure to disclose this data was justified or harmless, and thus the proper sanction is exclusion of Dr. List's pricing experiment which relies on it. First, Facebook has no justification for denying Consumers' access to its data. "***There is no justification to handing over documents to an expert but omitting to hand them over to the other side, especially when the information had been requested under the rules.***" *See Bentley v. ConocoPhillips Pipeline Co.*, 2010 WL 11537799, at *8 (D. Mont. Feb. 3, 2010) (emphasis added). That is what Facebook did. On December 23, 2022, after Facebook had already provided Dr. List's staff with this access and began

sending them data, Consumers served six discovery requests on Facebook for data. Facebook objected to five of the six requests on the grounds that they were "overly broad, unduly burdensome, and not proportional to the needs of the case" and did not agree to produce ***any*** responsive data. Ex. 10 (Facebook Resps. & Objs. to Consumers' 5th Set Doc. Requests).

Consumers now know Facebook could have safely and easily provided them with access to all of its data because it did so with Dr. List via [REDACTED] It did not do so. Instead, four months after serving the requests, Consumers still had not received data from Facebook in response to its requests despite numerous negotiation attempts. *See* Ex. 11 (4/19/2023 Email from C. Hausman). Consumers were clear with Facebook that "Facebook's delay in producing responsive data [was] affecting Consumers ability to prepare their expert case." *Id.* In an attempt to reduce prejudice by getting some Facebook data for their expert analysis as quickly as possible, Consumers requested that Facebook re-produce in this case the data that Facebook had produced to the FTC in the *FTC* action against Facebook. *Id.* Facebook agreed, but still did not start producing that data until another month had passed. *Id.* All the while, Facebook's expert, Dr. List, had preferred and non-reciprocal access to all the Facebook data he wanted.

Second, Facebook's failure to disclose its data was not harmless. Facebook's failure to disclose its data "deprived [Consumers] of fully informing [their] own expert." *Bentley*, 2010 WL 11537799, at *8. Facebook successfully foreclosed Consumers' economists Drs. Economides and Farrell from using Facebook's full set of data in performing their relevant market analyses. Additionally, "[Facebook] gained an advantage by allowing its expert to rely on things that [Consumers] did not have but should have." *Id.* While Dr. List produced the Facebook data he used, Consumers' expert did not have access to this data that Facebook had not previously produced. Furthermore, what Dr. List produced with his report is a subset of the Facebook data and information at Facebook which he had access to, so Consumers were unable to make a different selection of data to run a different or counter experiment. Facebook also seeks to further gain an unfair advantage by having its own expert testify that Consumers' expert analyses are supposedly deficient because, according to him, [REDACTED] *See, e.g.*, Ex. 1 (List Rep.) ¶¶ 238-242. This criticism is baseless, but also unfair, because Consumers' experts never could

have conducted an empirical study like Dr. List's pricing experiment without the full access to Meta's data servers via [REDACTED] "In short, [Facebook] was 'gaming the system' by providing one set of [data] to [Consumers] and another to its expert." *Bentley*, 2010 WL 11537799, at *8. "Here the appropriate sanction is to prohibit the expert witness from testifying or expressing any opinion based on documents [Facebook] should have produced to [Consumers] in its initial disclosures and discovery responses, but failed to do." *Id.*; *accord Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d at 1107 (affirming decision to exclude expert testimony as sanction under Rule 37(c)(1)).

**B. <u>Dr. List's Testimony About His "De-Merger" Model Should Be Excluded</u>**

Dr. List's de-merger model should be excluded for three independent reasons: (1) it relies on the pricing experiment which should also be excluded; (2) it is irrelevant and unhelpful to evaluating the relevant market; and (3) it is contrary to law.

***First***, if the Court excludes Dr. List's pricing experiment, then Dr. List's opinions on his de-merger model must also be excluded as the diversion ratios that result from the pricing experiment [REDACTED] Ex. 3 (List Dep.) at 187:21-188:4; *see also id.* 189:18-190:1 [REDACTED] Ex. 1 (List Rep.) ¶ 256.

***Second***, Dr. List's testimony about his de-merger model should be excluded as irrelevant to evaluating the market because it focuses solely [REDACTED] that is unimportant to competition and Consumers' claims. Dr. List's "de-merger" model purports to evaluate Consumers' proffered PSN market by [REDACTED] Ex. 1 (List Rep.) ¶¶ 16–17, 256, 264. Dr. List [REDACTED] *Id.* ¶ 257; Ex. 3 (List Dep.) at 190:20-25. Dr. List defines [REDACTED] Ex. 3 (List Dep.) at 190:9-14. Because, under a variety of assumptions, Dr. List's model concludes that [REDACTED] Ex. 1 (List Rep.) ¶ 267.

But Facebook's other economist, Dr. Carlton, testified that [REDACTED]—the only variable Dr.

List's de-merger model assesses [redacted] Ex. 6 (Carlton Dep.) at 118:2-22; Ex. 7 (Carlton *FTC* Rep.) at 10, 119. And there is nothing else to Dr. List's de-merger model. He concedes that his de-merger model [redacted] Ex. 3 (List Dep.) at 191:5-8, 192:6-14, 196:9-13. Notably, his model also fails to assess [redacted]—*i.e.*, the heart of Consumers' claims in this case. *See* Ex. 1 (List Rep.) ¶ 264 [redacted]

***Third***, Dr. List's testimony on his de-merger model should be excluded because it is contrary to the law under which Consumers bring their claims. "The Sherman Act reflects a legislative judgment that ultimately ***competition will produce*** not only lower prices, but also ***better goods and services***." *Nat'l Soc. of Pro. Engineers v. United States*, 435 U.S. 679, 695 (1978). "The assumption that competition is the best method of allocating resources in a free market recognizes that all elements of a bargain—quality, service, safety, and durability—and not just the immediate cost, are favorably affected by the free opportunity to select among alternative offers." *Id.* Accordingly, the Supreme Court has consistently stated for over 40 years that "[t]he statutory policy of the Act is one of competition and it ***precludes inquiry into the question whether competition is good or bad***." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 95 (2021) (cleaned up) (quoting *Nat'l Soc. of Pro. Engineers*, 435 U.S. at 695). Argument by defendants that less competition in a service "results in a higher quality product" is "nothing less than a frontal assault on the basic policy of the Sherman Act," and is not permitted. *PLS.Com, LLC v. Nat'l Assoc. of Realtors*, 32 F.4th 824, 836 (9th Cir. 2022).

Dr. List's de-merger analysis does just that. Dr. List's conclusion from his model is that [redacted] Ex. 3 (List Dep.) at 218:14–19; *see also* Ex. 1 (List Rep.) at ¶ 267 [redacted] Put more succinctly, Dr. List opines that if the relevant market defined by Consumers [redacted] *d*. at 185:17–186:3; Ex. 2 (List Rep.

Appx.) at P-14 [redacted] In the same vein, Dr. List concludes from his model that [redacted] Ex. 3 (List Dep.) at 218:20–25. Such testimony is "a frontal assault on the basic policy of the Sherman Act" and must be excluded. *PLS.Com, LLC*, 32 F.4th at 836; *see Nat'l Soc. of Pro. Engineers*, 435 U.S. at 695.

### C. <u>Dr. List's Testimony About India's Ban of Chinese Apps Should Be Excluded</u>

In June 2020, the Indian government banned nearly 60 Chinese apps, including TikTok. Ex. 1 (List Rep.) ¶ 140. Dr. List observes that when, as a result, Indian users' time spent on TikTok went to near zero, [redacted] *Id.* ¶ 11. Dr. List opines that this is [redacted] *Id.* Dr. List's opinions regarding what he calls "India's 2020 TikTok ban"—a ban that in reality applied to nearly 60 Chinese apps, of which TikTok is only one—should be excluded because they are irrelevant and unreliable.

#### 1. Dr. List's India Ban opinions are irrelevant because they cannot be used to evaluate what *is* the relevant market or even whether TikTok is in it.

Dr. List's India Ban opinions amount to a simple observation that [redacted] and accordingly, do not "aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591. Dr. List conceded his India Ban analysis has a limited purpose: [redacted] Ex. 3 (List Dep.) at 174:12-15. Such an observation does not assist the finder of fact to evaluate a relevant market for antitrust purposes. As discussed above, Dr. List is not offering any opinion on what the relevant market ***is*** that Facebook operates in. Ex. 3 (List Dep.) at 104:10-15. But Dr. List also concedes, [redacted] *Id.* at 104:16–20, 105:10–21. Accordingly, Dr. List's India Ban opinion also does not assist the fact-finder in assessing Consumer's PSN market, which does not include Tik Tok.

Nor does Dr. List's comparison of the India Ban to a [redacted] *id.* at 174:10-11,

make it helpful to evaluating the relevant market in this case. As Dr. List described it, a *Id.* at 94:12–95:16. To state the obvious, many goods and services "compete" for a consumer's dollar. But as the literature explains, that does not mean all of them are in the same relevant market. Ex. 12 (Newman Article) at 762 ("One might just as well argue that movie theaters, grocery stores, nightclubs and clothing designers all compete for money, and therefore must participate in the same relevant market. But no serious analyst would make such a claim."). Dr. List agreed with this limitation, stating that Ex. 3 (List Dep.) at 95:17–25 (emphasis added).

**2. The India Ban does not reliably measure economic substitution.**

Dr. List admits that the relevant market Ex. 3 (List Dep.) at 117:10–11; List ¶ 180, yet concedes that his India Ban analysis Ex. 3 (List Dep.) at 98:17–99:8 *id.* at 94:12–95:25, 173:6–174:15

Nor could Dr. List's India Ban opinions be used to reliably measure economic substitution. As Dr. List conceded, the India Ban took place in the wrong geographic market. Ex. 1 (List Rep.) ¶ 138 Ex. 3 (List Dep.) at 173:12–174:1 (emphasis added). Natural experiments can be used to analyze market definition only if they "control for . . . differences in the geographic market[.]" Ex. 13 (1-6 Antitrust Law Developments 6B-3-c). Dr. List failed to do this. Instead, Dr. List simply states, without citation or analysis, that Ex. 1 (List Rep.) ¶ 138. And, Dr. List does not control at all for differences between US consumers' and Indian consumers' use of the apps, or even address this issue. *Id.* Dr. List's *ipse dixit* is not sufficient. *See In re Google Play*

*Store Antitrust Litig.*, 2023 WL 5532128, at *9 (N.D. Cal. Aug. 28, 2023) (Donato, J.) (excluding expert opinion where "analysis . . . is too anemic" and based on "wholly speculative assumptions that make his opinions ipse dixit").

Dr. List's India Ban also measures the wrong movement and cross-elasticity of demand [REDACTED] It is well-recognized in the field, including by Facebook's other relevant market economist, that "they are not equal in general." Ex. 14, Perloff and Carlton, *Industrial Organization*, 2d ed. at 807; *accord* Ex. 15, Besanko, *Microeconomics*, 3d ed. at 48 (same).

Dr. List's India Ban opinions should be excluded because they do not reliably assist a fact-finder in evaluating whether TikTok is in or out of the relevant market and they cannot measure economic substitution at all, let alone do so reliably.

**D. <u>Dr. List's Testimony About His Switching Analysis Should Be Excluded</u>**

Facebook operates a "Study from Facebook" service that pays users for their data, including data on their use of non-Facebook apps. Ex. 1 (List Rep.) ¶¶ 10, 155. Dr. List uses data from Study to [REDACTED] *Id.* ¶ 155. Dr. List's switching analysis must be excluded because it does not further the inquiry into what is the relevant market in this case, and it is manifestly unreliable for that purpose.

***First***, Dr. List's switching analysis does not assist in evaluating the relevant market because it provides no explanation of ***why*** users are "switching" their time. Economic literature explains that "[t]he inferences drawn from a natural experiment ***require an understanding of the source of the change/difference in market structure*** and whether these differences are due to the variable of interest or the other underlying market conditions." Ex. 16 (ABA 2008 Study) at 753 (emphasis added). Dr. List's switching analysis does not do this. Dr. List admitted that [REDACTED] *Id.* at 97:9, 98:4, 98:11–12. Accordingly, "switching" analysis is a misnomer. Dr. List simply [REDACTED]

█ *Id.* ¶ 171 (Figure III-13). His switching analysis amounts at best to a list of apps and categories, some in the PSN Market and some not, that Facebook and Instagram users also spend time on with no punchline. *See* Ex. 1 (List Rep) at 71-72 (Tables III-13, III-14).

Additionally, as explained above, Dr. List opines the relevant market █ Ex. 3 (List Dep.) at 117:10–11; List ¶ 180, but conceded his switching analysis █ Ex. 3 (List Dep.) at 94:4–6 █, 96:17–21, 98:13–23.

***Second***, Dr. List's switching analysis does not aid the fact-finder in evaluating Consumer's proffered PSN market. Dr. List's switching analysis █ Ex. 3 (List Dep.) at 104:10–20, 105:10–21.

***Finally***, Dr. List's comparison of his switching analysis to █ Ex. 3 (List Dep.) at 87:24–88:12, does not save it; as discussed above, █ is neither a helpful nor reliable means of evaluating a relevant market.

**V. <u>CONCLUSION</u>**

Consumers respectfully request that Dr. List's opinions regarding his: (1) pricing experiment, (2) de-merger model, (3) India Ban analysis, and (4) switching analysis be excluded.

DATED: April 28, 2025

By: /s/ Shana E. Scarlett
**HAGENS BERMAN SOBOL SHAPIRO LLP**
Shana E. Scarlett (Bar No. 217895)
shanas@hbsslaw.com
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
(510) 725-3000

Steve W. Berman (admitted *pro hac vice*)
steve@hbsslaw.com
1301 Second Avenue, Suite 2000
Seattle, WA 98101
(206) 623-7292

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
W. Joseph Bruckner (admitted *pro hac vice*)
wjbruckner@locklaw.com
Robert K. Shelquist (admitted *pro hac vice*)
rkshelquist@locklaw.com
Brian D. Clark (admitted *pro hac vice*)
bdclark@locklaw.com
Kyle Pozan (admitted *pro hac vice*)
kjpozan@locklaw.com
Laura M. Matson (admitted *pro hac vice*)
lmmatson@locklaw.com
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900

By: /s/ Kevin Y. Teruya
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Kevin Y. Teruya (Bar No. 235916)
kevinteruya@quinnemanuel.com
Adam B. Wolfson (Bar No. 262125)
adamwolfson@quinnemanuel.com
Scott L. Watson (Bar No. 219147)
scottwatson@quinnemanuel.com
Claire D. Hausman (Bar No. 282091)
clairehausman@quinnemanuel.com
Brantley I. Pepperman (Bar No. 322057)
brantleypepperman@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
(213) 443-3000

Michelle Schmit (admitted *pro hac vice*)
michelleschmit@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606-1881
(312) 705-7400

Manisha M. Sheth (admitted *pro hac vice*)
manishasheth@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiffs Maximilian Klein, Rachel Banks Kupcho, and Sarah Grabert*

**ATTESTATION OF KEVIN Y. TERUYA**

This document is being filed through the Electronic Case Filing (ECF) system by attorney Kevin Y. Teruya. By his signature, Mr. Teruya attests that he has obtained concurrence in the filing of this document from each of the attorneys identified on the caption page and in the above signature block.

Dated: April 28, 2025

By *__/s/ Kevin Y. Teruya__*
Kevin Y. Teruya

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of April 2025, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System, causing it to be electronically served on all attorneys of record.

By *__/s/ Kevin Y. Teruya__*
Kevin Y. Teruya