# EXHIBIT 8

**Background for L. Backstrom 30(b)(6) Deposition**
*Klein v. Meta Platforms, Inc.*, No. 20-cv-8570 (N.D. Cal.)

**Feed**

**Q1 2023 Widely Viewed Content Report**



**Q2 2021 Widely Viewed Content Report**



*Current and archived Widely Viewed Content Reports publicly available at:*
https://transparency.fb.com/data/widely-viewed-content-report

Exhibit 2968

PALM-900000154

# EXHIBIT 9

*The New York Times* | https://www.nytimes.com/2019/05/09/opinion/sunday/chris-hughes-facebook-zuckerberg.html

Opinion

# It's Time to Break Up Facebook

By Chris Hughes

May 9, 2019

**The last time I saw Mark Zuckerberg** was in the summer of 2017, several months before the Cambridge Analytica scandal broke. We met at Facebook's Menlo Park, Calif., office and drove to his house, in a quiet, leafy neighborhood. We spent an hour or two together while his toddler daughter cruised around. We talked politics mostly, a little about Facebook, a bit about our families. When the shadows grew long, I had to head out. I hugged his wife, Priscilla, and said goodbye to Mark.

Since then, Mark's personal reputation and the reputation of Facebook have taken a nose-dive. The company's mistakes — the sloppy privacy practices that dropped tens of millions of users' data into a political consulting firm's lap; the slow response to Russian agents, violent rhetoric and fake news; and the unbounded drive to capture ever more of our time and attention — dominate the headlines. It's been 15 years since I co-founded Facebook at Harvard, and I haven't worked at the company in a decade. But I feel a sense of anger and responsibility.

**Watch: A founder of Facebook says it should be broken up.**

Mark is still the same person I watched hug his parents as they left our dorm's common room at the beginning of our sophomore year. He is the same person who procrastinated studying for tests, fell in love with his future wife while in line for the bathroom at a party and slept on a mattress on the floor in a small apartment years after he could have afforded much more. In other words, he's human. But it's his very humanity that makes his unchecked power so problematic.

Mark's influence is staggering, far beyond that of anyone else in the private sector or in government. He controls three core communications platforms — Facebook, Instagram and WhatsApp — that billions of people use every day. Facebook's board works more like an advisory committee than an overseer, because Mark controls around 60 percent of voting shares. Mark alone can decide how to configure Facebook's algorithms to determine what people see in their News Feeds, what privacy settings they can use and even which messages get delivered. He sets the rules for how to distinguish violent and incendiary speech from the merely offensive, and he can choose to shut down a competitor by acquiring, blocking or copying it.

Mark is a good, kind person. But I'm angry that his focus on growth led him to sacrifice security and civility for clicks. I'm disappointed in myself and the early Facebook team for not thinking more about how the News Feed algorithm could change our culture, influence elections and empower nationalist leaders. And I'm worried that Mark has surrounded himself with a team that reinforces his beliefs instead of challenging them.

The government must hold Mark accountable. For too long, lawmakers have marveled at Facebook's explosive growth and overlooked their responsibility to ensure that Americans are protected and markets are competitive. Any day now, the Federal Trade Commission is expected to impose a $5 billion fine on the company, but that is not enough; nor is Facebook's offer to appoint some kind of privacy czar. After Mark's congressional testimony last year, there should have been calls for him to truly reckon with his mistakes. Instead the legislators who questioned him were derided as too old and out of touch to understand how tech works. That's the impression Mark wanted Americans

to have, because it means little will change.



Mark Zuckerberg testifying on Capitol Hill in 2018.  Tom Brenner/The New York Times

We are a nation with a tradition of reining in monopolies, no matter how well intentioned the leaders of these companies may be. Mark's power is unprecedented and un-American.

It is time to break up Facebook.

**We already have the tools** we need to check the domination of Facebook. We just seem to have forgotten about them.

America was built on the idea that power should not be concentrated in any one person, because we are all fallible. That's why the founders created a system of checks and balances. They didn't need to foresee the rise of Facebook to understand the threat that gargantuan companies would pose to democracy. Jefferson and Madison were

CONSUMER-FB-0000002292

'Don't be too proud to copy.'"

(There is little regulators can do about this tactic: Snapchat patented its "ephemeral message galleries," but copyright law does not extend to the abstract concept itself.)

> Would-be competitors can't raise the money to take on Facebook.

As a result of all this, would-be competitors can't raise the money to take on Facebook. Investors realize that if a company gets traction, Facebook will copy its innovations, shut it down or acquire it for a relatively modest sum. So despite an extended economic expansion, increasing interest in high-tech start-ups, an explosion of venture capital and growing public distaste for Facebook, no major social networking company has been founded since the fall of 2011.

As markets become more concentrated, the number of new start-up businesses declines. This holds true in other high-tech areas dominated by single companies, like search (controlled by Google) and e-commerce (taken over by Amazon). Meanwhile, there has been plenty of innovation in areas where there is no monopolistic domination, such as in workplace productivity (Slack, Trello, Asana), urban transportation (Lyft, Uber, Lime, Bird) and cryptocurrency exchanges (Ripple, Coinbase, Circle).

I don't blame Mark for his quest for domination. He has demonstrated nothing more nefarious than the virtuous hustle of a talented entrepreneur. Yet he has created a leviathan that crowds out entrepreneurship and restricts consumer choice. It's on our government to ensure that we never lose the magic of the invisible hand. How did we allow this to happen?

**Since the 1970s, courts have become increasingly hesitant** to break up companies or block mergers unless consumers are paying inflated prices that would be lower in a competitive market. But a narrow reliance on whether or not consumers have experienced price gouging fails to take into account the full cost of market domination. It doesn't recognize that we also want markets to be competitive to encourage innovation and to hold power in check. And it is out of step with the history of antitrust law. Two of the last major antitrust suits, against AT&T and IBM in the 1980s, were grounded in the argument that they had used their size to stifle innovation and crush competition.

As the Columbia law professor Tim Wu writes, "It is a disservice to the laws and their intent to retain such a laserlike focus on price effects as the measure of all that antitrust was meant to do."

Facebook is the perfect case on which to reverse course, precisely because Facebook makes its money from targeted advertising, meaning users do not pay to use the service. But it is not actually free, and it certainly isn't harmless.

> We pay for Facebook with our data and our attention, and by either measure it doesn't come cheap.

Facebook's business model is built on capturing as much of our attention as possible to encourage people to create and share more information about who they are and who they want to be. We pay for Facebook with our data and our attention, and by either measure it doesn't come cheap.

I was on the original News Feed team (my name is on the patent), and that product now gets billions of hours of attention and pulls in unknowable amounts of data each year. The average Facebook user spends an hour a day on the platform; Instagram users spend 53 minutes a day scrolling through pictures and videos. They create immense amounts of data — not just likes and dislikes, but how many seconds they watch a particular video — that Facebook uses to refine its targeted advertising. Facebook also collects data from partner companies and apps, without most users knowing about it, according to testing by The Wall Street Journal.

Some days, lying on the floor next to my 1-year-old son as he plays with his dinosaurs, I catch myself scrolling through Instagram, waiting to see if the next image will be more beautiful than the last. What am I doing? I know it's not good for me, or for my son, and yet I do it anyway.

The choice is mine, but it doesn't feel like a choice. Facebook seeps into every corner of our lives to capture as much of our attention and data as possible and, without any alternative, we make the trade.

# EXHIBIT 10

 

# Merger Guidelines

**U.S. Department of Justice and the Federal Trade Commission**

Issued: December 18, 2023

### 4.2.B.  Considerations When Terms Are Set by Firms

The Agencies may use various types of evidence and metrics to assess the strength of competition among firms that set terms to their customers. Firms might offer the same terms to different customers or different terms to different groups of customers.

Competition in this setting can lead firms to set lower prices or offer more attractive terms when they act independently than they would in a setting where that competition was eliminated by a merger. When considering the impact of competition on the incentives to set price, to the extent price increases on one firm's products would lead customers to switch to products from another firm, their merger will enable the merged firm to profit by unilaterally raising the price of one or both products above the pre-merger level. Some of the sales lost because of the price increase will be diverted to the products of the other firm, and capturing the value of these diverted sales can make the price increase profitable even though it would not have been profitable prior to the merger.

A measure of customer substitution between firms in this setting is the diversion ratio. The diversion ratio from one product to another is a metric of how customers likely would substitute between them. The diversion ratio is the fraction of unit sales lost by the first product due to a change in terms, such as an increase in its price, that would be diverted to the second product. The higher the diversion ratio between two products made by different firms, the stronger the competition between them.

A high diversion ratio between the products owned by two firms can indicate strong competition between them even if the diversion ratio to another firm is higher. The diversion ratio from one of the products of one firm to a group of products made by other firms, defined analogously, is sometimes referred to as the aggregate diversion ratio or the recapture rate.

A measure of the impact on rivals of competitive actions is the value of diverted sales from a price increase. The value of sales diverted from one firm to a second firm, when the first firm raises its price on one of its products, is equal to the number of units that would be diverted from the first firm to the second, multiplied by the difference between the second firm's price and the incremental cost of the diverted sales. To interpret the magnitude of the value of diverted sales, the Agencies may use as a basis of comparison either the incremental cost to the second firm of making the diverted sales, or the revenues lost by the first firm as a result of the price increase. The ratio of the value of diverted sales to the revenues lost by the first firm can be an indicator of the upward pricing pressure that would result from the loss of competition between the two firms. Analogous concepts can be applied to analyze the impact on rivals of worsening terms other than price.

### 4.2.C.  Considerations When Terms Are Set Through Bargaining or Auctions

In some industries, buyers and sellers negotiate prices and other terms of trade. In bargaining, buyers commonly negotiate with more than one seller and may play competing sellers off against one another. In other industries, sellers might sell their products, or buyers might procure inputs, using an auction. Negotiations may involve aspects of an auction as well as aspects of one-on-one negotiation. Competition among sellers can significantly enhance the ability of a buyer to obtain a result more favorable to it, and less favorable to the sellers, compared to a situation where the elimination of competition through a merger prevents buyers from playing those sellers off against each other in negotiations.

Sellers may compete even when a customer does not directly play their offers against each other. The attractiveness of alternative options influences the importance of reaching an agreement to the

*Magnitude of the SSNIPT*. What constitutes a "small but significant" worsening of terms depends upon the nature of the industry and the merging firms' positions in it, the ways that firms compete, and the dimension of competition at issue. When considering price, the Agencies will often use a SSNIP of five percent of the price charged by firms for the products or services to which the merging firms contribute value. The Agencies, however, may consider a different term or a price increase that is larger or smaller than five percent.[84]

The Agencies may base a SSNIP on explicit or implicit prices for the firms' specific contribution to the value of the product sold, or an upper bound on the firms' specific contribution, where these can be identified with reasonable clarity. For example, the Agencies may derive an implicit price for the service of transporting oil over a pipeline as the difference between the price the pipeline firm paid for oil at one end and the price it sold the oil for at the other and base the SSNIP on this implicit price.

### 4.3.C.  Evidence and Tools for Carrying Out the Hypothetical Monopolist Test

Section 4.2 describes some of the qualitative and quantitative evidence and tools the Agencies can use to assess the extent of competition among firms. The Agencies can use similar evidence and analogous tools to apply the HMT, in particular to assess whether competition among a set of firms likely leads to better terms than a hypothetical monopolist would undertake.

To assess whether the hypothetical monopolist likely would undertake at least a SSNIP on one or more products in the candidate market, the Agencies sometimes interpret the qualitative and quantitative evidence using an economic model of the profitability to the hypothetical monopolist of undertaking price increases; the Agencies may adapt these tools to apply to other forms of SSNIPTs.

One approach utilizes the concept of a "recapture rate" (the percentage of sales lost by one product in the candidate market, when its price alone rises, that is recaptured by other products in the candidate market). A price increase is profitable when the recapture rate is high enough that the incremental profits from the increased price plus the incremental profits from the recaptured sales going to other products in the candidate market exceed the profits lost when sales are diverted outside the candidate market. It is possible that a price increase is profitable even if a majority of sales are diverted outside the candidate market, for example if the profits on the lost sales are relatively low or the profits on the recaptured sales are relatively high.

Sometimes evidence is presented in the form of "critical loss analysis," which can be used to assess whether undertaking at least a SSNIPT on one or more products in a candidate market would raise or lower the hypothetical monopolist's profits. Critical loss analysis compares the magnitude of the two offsetting effects resulting from the worsening of terms. The "critical loss" is defined as the number of lost unit sales that would leave profits unchanged. The "predicted loss" is defined as the number of unit sales that the hypothetical monopolist is predicted to lose due to the worsening of terms. The worsening of terms raises the hypothetical monopolist's profits if the predicted loss is less than the

---

fact, it does. The problem with using prevailing prices to define the market when a firm is already dominant is known as the "Cellophane Fallacy."

[84] The five percent price increase is not a threshold of competitive harm from the merger. Because the five percent SSNIP is a minimum expected effect of a hypothetical monopolist of an *entire* market, the actual predicted effect of a merger within that market may be significantly lower than five percent. A merger within a well-defined market that causes undue concentration can be illegal even if the predicted price increase is well below the SSNIP of five percent.

# EXHIBIT 11

# A Critical Analysis of Critical Loss Analysis

Daniel P. O'Brien and Abraham L. Wickelgren[*]

May 23, 2003

**Abstract**

Critical loss analysis is often used to argue that firms with large margins have more to lose from a reduction in sales and hence are less likely to increase prices. This argument ignores the implication of economic theory that profit-maximizing competitors that do not coordinate their pricing only have large margins if their customers are not very price sensitive. We explore the implications of critical loss analysis using an internally consistent model of oligopoly. We show that for a given degree of substitutability between the merging firms' products, firms with larger pre-merger margins will raise prices more than firms with smaller margins. This reinforces the traditional view that mergers are more likely to harm consumers when the merging firms have greater market power, as measured by their margins. We also derive internally consistent formulas for evaluating the profitability of price increases when defining markets and evaluating unilateral competitive effects.

## I. Introduction

Critical loss analysis is a widely-used technique in antitrust practice.[1] The basic idea is simple. One asks: "given a price increase of X percent,[2] what would the percentage loss in unit sales have to be to make the price increase unprofitable?" This loss is referred to as the "critical loss for an X-percent price increase." If the actual loss is less than the critical loss, the price

---

[*] The authors are economists at the U.S. Federal Trade Commission. Patrick DeGraba, Alan Frankel, Ezra Friedman, Jerry Hausman, Stephen Holland, Dan Hosken, David Scheffman, David Schmidt, Carl Shapiro, Mike Vita and Charlotte Wojcik provided many useful comments and suggestions. The views in this article are those of the authors and do not necessarily reflect those of the Federal Trade Commission or any individual Commissioner.

[1] The use of critical loss analysis was first suggested by Barry C. Harris and Joseph J. Simons, "Focusing Market Definition: How Much Substitution is Necessary?" *Research in Law and Economics*, v. 12, 1989, p.207-226. Since it was proposed, it has appeared in numerous White Papers presented to the antitrust agencies, numerous pre-trial affidavits, and expert testimony offered on behalf of antitrust defendants.

[2] The analysis applies equally well for any potential price increase.

increase would pay. Otherwise it would not.

The most common uses of critical loss analysis are to define relevant markets and assess the competitive effects of mergers. For example, experts representing merging parties often use this technique to argue that where margins are high, the product market must be broader than the government contends. The argument is that the larger are the margins, the greater is the reduction in profits from sales lost after a price increase. Therefore, it takes a smaller critical loss to make a given price increase by a hypothetical monopolist unprofitable. The experts then argue that the actual loss from a 5 percent price increase would surely exceed the critical loss, implying that the relevant market must include substitutes that are not included in the government's alleged market.[3]

Similar logic is often used to argue that a merged firm would not have an incentive to increase price by a given amount following a merger. Again, the argument is that the larger is the merging firm's margin, the less likely it is that a given price increase would be profitable.

Critical loss analysis is simple and has a degree of intuitive appeal. Unfortunately, the standard way that critical loss analysis is applied (henceforth, "standard critical loss analysis") ignores two key points, often leading to inconsistent logic and erroneous conclusions. First, standard critical loss analysis fails to recognize that a firm's margin provides information about the magnitude of the sales it is likely to lose from a price increase. If pre-merger prices are chosen to maximize profits, higher margins typically imply that customers are not very price sensitive (otherwise, a firm could substantially increase its sales by making a small price cut,

---

[3] The FTC/DOJ Merger Guidelines define a product market as the narrowest set of products such that a hypothetical profit-maximizing monopolist would raise price a small but significant amount. U.S. Dep't of Justice and Federal Trade Comm'n, Horizontal Merger Guidelines, §1.1 (1992, rev. 1997). For a discussion of the use of demand elasticities in defining antitrust markets, See Werden, Gregory, "Demand Elasticities in Antitrust Analysis," *Antitrust Law Journal*, 66, 363, 1998.