**PUBLIC REDACTED VERSION**

1

WILMER CUTLER PICKERING
  HALE AND DORR LLP

2

SONAL N. MEHTA (SBN 222086)
  Sonal.Mehta@wilmerhale.com

3

2600 El Camino Real, Suite 400
Palo Alto, California 94306

4

Telephone: (650) 858-6000

5

DAVID Z. GRINGER (*pro hac vice*)
  David.Gringer@wilmerhale.com

6

ROSS E. FIRSENBAUM (*pro hac vice*)
  Ross.Firsenbaum@wilmerhale.com

7

RYAN CHABOT (*pro hac vice*)
  Ryan.Chabot@wilmerhale.com

8

PAUL VANDERSLICE (*pro hac vice*)
  Paul.Vanderslice@wilmerhale.com

9

7 World Trade Center
250 Greenwich Street

10

New York, New York 10007
Telephone: (212) 230-8800

11

12

ARI HOLTZBLATT (SBN 354631)
  Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
  Molly.Jennings@wilmerhale.com
2100 Pennsylvania Ave NW
Washington, DC 20037
Telephone: (202) 663-6000

MICHAELA P. SEWALL (*pro hac vice*)
  Michaela.Sewall@wilmerhale.com
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

13

*Attorneys for Defendant Meta Platforms, Inc.*

14

15

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

16

17

**SAN FRANCISCO DIVISION**

18

MAXIMILIAN KLEIN, et al., on behalf of
themselves and all others similarly situated,

19

20

Plaintiffs,

21

v.

META PLATFORMS, INC., a Delaware
Corporation,

22

23

Defendant.

24

25

Case No. 3:20-cv-08570-JD

**DEFENDANT META PLATFORMS,
INC.'S OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE PORTIONS OF
DR. DENNIS CARLTON'S PROPOSED
TESTIMONY**

Hearing Date: TBD
Time: TBD
Judge: Hon. James Donato

26

27

28

**FILED UNDER SEAL**

1

## **TABLE OF CONTENTS**

2
3
4
5
6
7
8
9
10
11
12
13

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................1

ARGUMENT ........................................................................................................................4

I.      PLAINTIFFS' CRITIQUES OF DR. CARLTON'S OUTAGE ANALYSIS ARE
        WRONG AND CONCERN ONLY THE WEIGHT IT SHOULD BE
        AFFORDED ...............................................................................................................4

II.     DR. CARLTON MEASURED TIME SPENT USING RELIABLE, TIMELY
        PRODUCED DATA ...................................................................................................6

        A.      Dr. Carlton's Friends and Family Usage Opinion Is Based on
                Reliable Data ................................................................................................6

        B.      The Rule 37 Challenge Is Baseless .............................................................10

III.    THERE IS NO BASIS FOR EXCLUDING DR. CARLTON'S SHARE
        CALCULATIONS ....................................................................................................12

IV.     PLAINTIFFS' PRIVACY CRITIQUE TURNS ON MISCHARACTERIZING
        DR. CARLTON'S OPINION ....................................................................................14

CONCLUSION ....................................................................................................................15

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>PUBLIC REDACTED VERSION</u>

<u>**TABLE OF AUTHORITIES**</u>

Page(s)

**CASES**

*Andrews v. Plains All Am. Pipeline, L.P*,
    2019 WL 6647928 (C.D. Cal. Nov. 22, 2019)...................................................................10

*Baker v. Firstcom Music*,
    2018 WL 2676636 (C.D. Cal. May 8, 2018) .............................................................9, 10

*Call Delivery Systems, LLC v. Morgan*,
    2022 WL 1252412 (C.D. Cal. Mar. 7, 2022)...................................................................9

*Cisco Sys. Inc. v. Arista Networks, Inc.*,
    2016 WL 11752975 (N.D. Cal. Nov. 16, 2016) ...............................................................7

*City of Tuscaloosa v. Harcros Chems., Inc.*,
    158 F.3d 548 (11th Cir. 1998) ........................................................................................8

*Claston, LLC by & through Sunset Holdings, LLC v. United States*,
    2012 WL 12957389 (D. N. Mar. I. Oct. 23, 2012).......................................................10

*Droplets, Inc. v. Yahoo! Inc.*,
    2021 WL 9038509 (N.D. Cal. Apr. 27, 2021) .........................................................11, 12

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
    2015 WL 4272870 (N.D. Cal. July 14, 2015)................................................................11

*Hamm v. Mercedes-Benz USA, LLC*,
    2021 WL 1238304 (N.D. Cal. Apr. 2, 2021) ...................................................................8

*In re Google Play Store Antitrust Litigation*,
    2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) ............................................................5, 6

*In re Processed Egg Prod. Antitrust Litig.*,
    81 F. Supp. 3d 412 (E.D. Pa. 2015) ................................................................................8

*Insight Equity v. Transitions Optical, Inc.*,
    252 F. Supp. 3d 382 (D. Del. 2017)................................................................................5

*JH Kelly, LLC v. AECOM Tech. Servs., Inc.*,
    605 F. Supp. 3d 1295 (N.D. Cal. 2022) ..........................................................................8

*Kennedy v. Collagen Corp.*,
    161 F.3d 1226 (9th Cir. 1998) ........................................................................................4

*Khadera v. ABM Indus. Inc.*,
    2011 WL 6813454 (W.D. Wash. Dec. 28, 2011) ............................................................9

*National Society of Professional Engineers v. United States*,
    435 U.S. 679 (1978)........................................................................................15

*Novoa v. GEO Grp., Inc.*,
    2020 WL 8514832 (C.D. Cal. Dec. 18, 2020) ......................................................9

*Rearden LLC v. Walt Disney Co.*,
    2023 WL 6796017 (N.D. Cal. Oct. 13, 2023).......................................................9

*United States v. Aetna Inc.*,
    240 F. Supp. 3d 1 (D.D.C. 2017) .......................................................................13

*United States v. Eastman Kodak Co.*,
    63 F.3d 95 (2d Cir. 1995)....................................................................................5

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
    259 F.3d 1101 (9th Cir. 2001) ...........................................................................10

**STATUTES, RULES, AND REGULATIONS**

Fed. R. Civ. P. 26(a) ........................................................................................10

Fed. R. Civ. P. 37....................................................................................3, 10, 11, 12

Fed. R. Civ. P. 702............................................................................................1, 12

**OTHER AUTHORITIES**

Bryan Keating, Jonathan Orszag & Robert Willig, *The Role of the Circle
    Principle in Market Definition*, ANTITRUST SOURCE (Apr. 2018) ....................................13

Gregory J. Werden, *Gerrymandering Redux: The Relevant Market under the
    Draft Merger Guidelines*, MERCATUS CTR. (Sept. 2023) ..................................13

U.S. Dep't of Just. & FTC, *Merger Guidelines* §2.2 (2023) ...........................................4

**PUBLIC REDACTED VERSION**

**INTRODUCTION**

Dr. Dennis Carlton relied on extensive record evidence, economic literature, and empirical analysis to rebut the core of plaintiffs' case. As Dr. Carlton explained across his reports and testimony, plaintiffs have ignored how people actually use Facebook, Instagram, and the apps that compete with those platforms for users' time and attention, fatally undermining their alleged market, theory of harm to competition, and evidence of monopoly power. Rather than address those opinions, plaintiffs have filed a cross-examination outline covering four subparts (often of other subparts) of Dr. Carlton's analysis. These criticisms are isolated and unavailing. Plaintiffs dispute Dr. Carlton's quantitative analysis of user behavior during an outage of Meta's services, claiming that the time period measured is too short to be relevant. But whatever the impact of these arguments on the weight given to this evidence by the factfinder, it is beyond dispute that empirical analysis of *actual* substitution in the real world is intensely probative of plaintiffs' alleged market. Plaintiffs next challenge the reliability of portions of a single data file Dr. Carlton used to create a table in his opening report, but fail to identify any concerns with the data he actually used. They then suggest that Dr. Carlton's opinions regarding apps that are closer substitutes to Facebook and Instagram than Snapchat improperly relied on principles embraced by the 2010 Horizontal Merger Guidelines, but identify no authority for excluding analysis on that basis. Finally, plaintiffs rewrite five paragraphs in Dr. Carlton's report about how much users value privacy to say that something he never wrote violates a legal standard they invented. None of this contravenes *Daubert* or Rule 702. The Court should deny plaintiffs' motion.

**BACKGROUND**

Dr. Carlton is a renowned economist who has served on the faculties of the University of Chicago and MIT. *See* Ex. 1, Carlton Rep. ¶1.[1] He has written dozens of peer-reviewed articles and co-authored *Modern Industrial Organization*, one of the leading textbooks on the economics of competition. *See id.* ¶2. Dr. Carlton also served as Deputy Assistant Attorney General for Economic Analysis at the Antitrust Division of the U.S. Department of Justice and as a consultant

---

[1] Unless otherwise noted, 'Ex.' citations reference exhibits to the Gringer Declaration submitted herewith, emphasis is added, internal citations are omitted, and objections are omitted throughout.

<u>**PUBLIC REDACTED VERSION**</u>

1    on the 2010 DOJ/FTC Horizontal Merger Guidelines. *See id.* ¶3. No one could—and plaintiffs do

2    not—challenge his qualifications to offer the opinions at issue.

3         Dr. Carlton's opinions go to the heart of plaintiffs' case. For example, Dr. Carlton explains

4    that it is economically implausible that the alleged deception—if it occurred—allowed Meta to

5    gain and maintain monopoly power. *See* Ex. 1, Carlton Rep. Part III. He also opines that there is

6    no economic validity to plaintiffs' so-called "personal social networking services" (or "PSNS")

7    market, which relies on an ill-defined "███████" of "███████████████████████████████████

8    ██████████████████████" to reach aspects of Facebook, Instagram, Google+, Snapchat, and MeWe,

9    while omitting Meta's closest competitors. *See id.* Part IV. And he testifies that plaintiffs have not

10   demonstrated that Meta has monopoly power in a relevant antitrust market. *See id.* Part V.

11        Supporting these opinions, Dr. Carlton offers critiques of the methodologies that plaintiffs'

12   experts employ, none of which are addressed in plaintiffs' motion. *See*, *e.g.*, *id.* ¶9. Indeed,

13   plaintiffs do not seek to exclude any of Dr. Carlton's opinions in their entirety, and instead focus

14   on four supporting components of Dr. Carlton's broader opinions:

15        *First*, plaintiffs dispute (Mot. 4-7) the relevance and reliability of Dr. Carlton's "outage

16   analysis," an aspect of his criticism of the candidate PSNS market. Dr. Carlton opined that several

17   empirical studies contradict plaintiffs' alleged market definition because these analyses

18   individually and together show substitution from Facebook and Instagram to an array of services

19   outside the few firms plaintiffs identify as being *in* PSNS. *See* Ex. 1, Carlton Rep. ¶¶116-25 (citing

20   analyses from Meta data, third parties, and Dr. List). Among those substitution analyses, Dr.

21   Carlton examined usage data during an October 2021 outage—when Facebook and Instagram were

22   unavailable—from ████████████████████████████████████████████████████████████████████████

23   ████████████████████████████  *See id.* ¶120. He found that t████████████████████████████

24   ████████████████████████████████████████████████████████████████████████████████████████████

25   ████████  *See id.* ¶¶120-24, tbl. 9 & tbl. 10. Dr. Carlton relies on the results of this study as support

26   for his opinion that several apps are closer substitutes for Facebook and Instagram than is Snapchat.

27        *Second*, plaintiffs challenge the reliability of data supporting one part of Dr. Carlton's

28   opinion ███████████████████████████████████████████████████████████████████████████████████

**PUBLIC REDACTED VERSION**

1    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Mot. 7-9; Ex. 1, Carlton Rep. ¶¶82-111.

2    In particular, they claim ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 1, Carlton Rep. ¶88, tbl. 6, Dr. Carlton's

4    conclusion ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5    ▮▮▮▮▮▮▮▮▮▮▮▮▮ Mot. 7. Plaintiffs also argue that Meta failed to disclose

6    "understandings" about the data used for this analysis, warranting exclusion as a sanction under

7    Rule 37. *Id.* at 9-11. Plaintiffs do not seek to exclude any other aspect of Dr. Carlton's usage

8    analysis, including Dr. Carlton's finding that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *see* Ex.

10    1, Carlton Rep. ¶92 & tbl. 8.

11    *Third*, plaintiffs challenge (Mot. 11-15) Dr. Carlton's opinion—which underlies his market

12    share calculations—that any relevant antitrust market including Facebook, Instagram, and

13    Snapchat should include services that are closer substitutes to Facebook and Instagram than

14    Snapchat. *See* Ex. 1, Carlton Rep. ¶121. Dr. Carlton's report cites the 2010 Horizontal Merger

15    Guidelines—which were in effect during the period of the challenged conduct—which provide

16    that, "if the market includes a second product, the Agencies will normally also include a third

17    product if that third product is a closer substitute for the first product than is the second product."

18    *Id.* ¶121 n.202.

19    *Fourth*, plaintiffs dispute five paragraphs of Dr. Carlton's analysis of plaintiffs' theory of

20    competition in the PSNS market. Mot. 15. Among other opinions, Dr. Carlton opines ▮▮▮▮

21    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Ex. 1, Carlton Rep.

24    ¶¶17-22. Dr. Carlton explained that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶25.

27    As a result, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28    ▮▮▮▮▮▮▮▮▮▮▮ *See id.*

**PUBLIC REDACTED VERSION**

1

## ARGUMENT

2

**I.    PLAINTIFFS' CRITIQUES OF DR. CARLTON'S OUTAGE ANALYSIS ARE WRONG AND CONCERN ONLY THE WEIGHT IT SHOULD BE AFFORDED**

3

4          Plaintiffs' two challenges to Dr. Carlton's outage analysis are wrong, and, in any event, have nothing to do with the admissibility of his testimony.

5          *First*, plaintiffs argue without support that a short-term outage is not analogous to a long-

6     term price increase, so Dr. Carlton "fails to measure long-term substitution" as is required to

7     evaluate a market. Mot. 4. Plaintiffs' position contravenes both law and economics. If users see

8     other apps as substitutes for marginal minutes of use on any timeframe, then Meta is constrained

9     by the relative attractiveness of those alternatives. *See* U.S. Dep't of Just. & FTC, *Merger*

10    *Guidelines* §2.2 (2023); *see also* Ex. 1, Carlton Rep. ¶115. In other words, consumer substitution

11    patterns during an outage are, at a minimum, informative of what consumers would do in the event

12    of a longer-term price increase because they suggest the very first places consumers will look to

13    go when changing platforms.

14          Plaintiffs of course may disagree about whether an outage analysis is more or less probative

15    than some other measure of substitution, but that disagreement is not a justification for exclusion.

16    Plaintiffs have their own view of the market and the value of short-term substitution in assessing

17    Meta's competition. *See, e.g.*, Ex. 2, Farrell Rebuttal ¶¶106, 109. They may present that view to

18    the finder of fact along with the analogies—however strained—put forward in their brief (Mot. 5)

19    relating to markets far afield. And as a result, the factfinder "may be confronted with opposing

20    experts, additional tests, experiments, and publications, all of which may increase or lessen the

21    value of the expert's testimony." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230-31 (9th Cir.

22    1998). "But their presence should not preclude the admission of the expert's testimony." *Id.*

23          *Second*, plaintiffs argue that the Court should exclude Dr. Carlton's testimony about the

24    October 2021 outage because he purportedly fails to control for the *Cellophane* fallacy. Mot. 5-7.

25    That concept refers to the possibility that consumers in an already-monopolized market will

26    substitute to out-of-market products in response to a further price increase, which could undermine

27    evidence of substitution. Ex. 1, Carlton Rep. ¶114. Plaintiffs' argument again goes only to weight.

28

**PUBLIC REDACTED VERSION**

1    To start, even if the *Cellophane* fallacy applied, it "does not mean experiments about the

2   diversion ratio today are irrelevant. They're quite relevant for understanding . . . the relative

3   diversion among different firms." Ex. 3, Carlton Tr. 249:17-250:3; *see also id.* 250:4-19 ("The

4   cellophane fallacy does not prevent me from using diversion ratios at the current price to determine

5   the relative diversion ratios between different products."); *see also* Ex. 1, Carlton Rep. ¶¶114-15.

6   As a result, plaintiffs' criticism is entirely beside the point. Whether or not they believe Dr. Carlton

7   sufficiently "control[s] for" the concept, Mot. 5, he has explained why the analysis he offers

8   remains probative of consumer behavior in the proposed relevant market, *e.g.*, Ex. 1, Carlton Rep.

9   ¶115. Such reasoned explanations are not "ipse dixit," Mot. 5, and do not warrant exclusion.

10   Indeed, plaintiffs' own market definition expert ███████████████████████████████████

11   ███████████████████████████████████████████████████████████████████████████

12   ███████████████████████████████████████████████████████████████████████████

13   ██████████████████████████████ Ex. 4, Farrell Rep. App'x D & n.623; *id.* §IV.B.3.

14    More fundamentally, the *Cellophane* fallacy only has purchase in a market operating at a

15   "monopolized price," Ex. 1, Carlton Rep. ¶9. Here the price for all of the relevant apps is zero,

16   none of plaintiffs' experts have opined that the alleged monopoly lowered quality, and plaintiffs'

17   motion proceeds on the assumption that this represents a monopoly rate. But the notion that

18   plaintiffs may ultimately carry their burden at trial of establishing monopoly power in a relevant

19   market cannot affect the *admissibility* of testimony addressing the proposed market.

20   Unsurprisingly, then, no court that Meta could identify has ever limited testimony regarding

21   quantitative evidence of substitution—or even discounted the weight of such testimony—because

22   of the *possibility* of the *Cellophane* fallacy. The only court to address the *Cellophane* fallacy in

23   the context of a *Daubert* motion (of which Meta is aware; plaintiffs cite none) held that these are

24   "academic criticisms" that concern weight, not admissibility. *See Insight Equity v. Transitions*

25   *Optical, Inc.*, 252 F. Supp. 3d 382, 389-90 (D. Del. 2017). In the one case plaintiffs cite (Mot. 6),

26   the Second Circuit affirmed the district court decision *rejecting* the government's argument about

27   the *Cellophane* fallacy. *United States v. Eastman Kodak Co.*, 63 F.3d 95, 103-05 (2d Cir. 1995).

28    Plaintiffs also invoke (Mot. 7) *In re Google Play Store Antitrust Litigation*, 2023 WL

**PUBLIC REDACTED VERSION**

1    5532128 (N.D. Cal. Aug. 28, 2023), in which Hal Singer made statements of fact (e.g., that one

2    program was "a reasonable facsimile" of the but-for world) "with no visible factual support." *Id.*

3    at \*9 (noting Singer opined that "Google would have retained a substantial market share of 60

4    percent" because "this was approximately AT&T's market share" without explaining "why the

5    situation AT&T faced in the telecom market in the 1980s is a good benchmark"). Dr. Singer is not

6    Dr. Carlton, and Dr. Singer's excluded analysis bears no resemblance to Dr. Carlton's work here.

7    Dr. Carlton has accurately presented empirical data that plaintiffs challenge based solely on an

8    economic theory that Dr. Carlton has explained does not undermine his opinion.

9         Finally, plaintiffs argue ████████████████████████████████████████

10    ████████████████████████████████████████████████████████████████ Mot.

11    6-7. But the motion mischaracterizes both Dr. Carlton's testimony and the facts. Dr. Carlton

12    explained that ████████████████████████████████████████████████████

13    ████████████████████████████████████████████ Ex. 3, Carlton Tr. 250:20-251:19.

14    The results of Dr. List's experiment are ██████████████████████████████████

15    ████████████████████████████████████ Ex. 5, List Rep. tbl. III-9.

16    **II.    DR. CARLTON MEASURED TIME SPENT USING RELIABLE, TIMELY PRODUCED DATA**

17         **A.    Dr. Carlton's Friends and Family Usage Opinion Is Based on Reliable Data**

18         Dr. Carlton's conclusion ████████████████████████████████████████

19    ████████████████ is supported by extensive documentary evidence and reliable data.[2] Indeed,

20    plaintiffs' own experts rely on some of the same evidence to argue (incorrectly) the opposite

21    position. *Compare, e.g.*, Ex. 1, Carlton Rep. ¶96 (███████████████████████████

22    ████████████████████), *with* Ex. 2, Farrell Rebuttal ¶54 (claiming the same document

23    proves the opposite). Such disagreements between experts about how to interpret common

24    evidence are properly the subject of cross-examination, not *Daubert* motions.

25         Consider first the actual grounds for Dr. Carlton's opinion ██████████████████

26    ██████████ Rather than relying "on two months of data pulled from a single file" (Mot. 1), Dr.

27    Carlton substantiates his opinions with extensive evidence, including company documents, public

---

28    [2] Not to mention the lived experience of virtually every American under the age of 35.

**PUBLIC REDACTED VERSION**

1    statements from Meta executives, and multiple types of data from Meta. *See* Ex. 1, Carlton Rep.

2    ¶89 (██████████████████████████████████████████████████); *id.* ¶100

3    (████████████████████████████████████████████████████████████████████████

4    ██████████████████); *id.* ¶86 (████████████████████████████████████████

5    ███████████████████████████████); *id.* ¶¶83-84 (█████████████████████

6    ███████████████████████████████████████████████████████████████████████

7    ███████████████████████████████). He also analyzed data and deposition testimony

8    regarding ██████████████████████████████████████████████████████████████

9    ███████████████████████████████████████████████████████████████████████

10   ████ to support his conclusion. *Id.* ¶¶84, 99-100 & tbl. 7, figs. 4-5.

11          Plaintiffs take issue with none of this support; instead, they challenge only Dr. Carlton's

12   reliance on a particular file (PALM-017073378) for Table 6 of his report. Mot. 8. Ignoring the

13   additional bases for Dr. Carlton's opinion alone warrants denial of the requested relief. *See Cisco*

14   *Sys. Inc. v. Arista Networks, Inc.*, 2016 WL 11752975, at *11 (N.D. Cal. Nov. 16, 2016) (denying

15   *Daubert* motion challenging reliance on a presentation when the expert "relied on more than that

16   presentation to arrive at" her conclusions and "the totality of evidence" supported the opinion).

17          Regardless, plaintiffs' criticisms of Dr. Carlton's analysis of that data set are neither

18   grounds for exclusion nor supported by the record. Plaintiffs challenge two aspects of Dr. Carlton's

19   analysis of PALM-017073378: ███████████████████████████████████████████████

20   ███████████████████████████████████████████████████████████████████████

21   ███████████████████████████ Ex. 1, Carlton Rep. ¶88. █████████████████████

22   ███████████████████████████████████████████████████████████████████████

23   ███████████████████████████████████████████ Ex. 3, Carlton Tr. 180:5-

24   181:10. As Dr. Carlton explained, ██████████████████████████████████████████

25   ███████████████████████████████████████████████████████████████████████

26   ███████████████████████████████████████████████████████████████████████

27   ███████████████████████ *See id.* 180:5-181:8; *id.* 187:7-22. Notably, plaintiffs have identified

28   ██████████████████████████████████████████████████████ The entirety of their

1    critique concerns ███████████████████████ *Id.* 181:1-18. Speculation that ██████

2    ████████████████████████████████████████████████████████████████

3    ████████ does not suffice for exclusion as a matter of law. *See*, *e.g.*, *City of Tuscaloosa v.*

4    *Harcros Chems., Inc.*, 158 F.3d 548, 567 (11th Cir. 1998) (analysis reliable when data that

5    improperly "skew[ed]" results could be excluded from overall data set); *In re Processed Egg Prod.*

6    *Antitrust Litig.*, 81 F. Supp. 3d 412, 433-34 (E.D. Pa. 2015) ("inconsistent results" from "subsets

7    of the data" did not render overall analysis unreliable).

8    As to ████████████████ Dr. Carlton explained that he ████████████████

9    ████████████████████████████████████████████████████████████████

10   ████████████████████████████ Ex. 1, Carlton Rep. tbl. 6 n.152. ███████████

11   █████████████████████████████████████████ Ex. 3, Carlton Tr. 173:4-22 ███████

12   ████████████████████████████████████████████████████████████████

13   Dr. Carlton decided ██████████████████████████████████████████████

14   ██████████████████████████████████████ *Id.* 173:23-174:7; 175:3-9. Plaintiffs

15   criticize that choice, but again ████████████████████████████████████

16   ████████████████████ *See* Mot. 8.

17   ████████████████████████████████████████████████████████████████

18   ████████████████████████████ "As the Ninth Circuit has repeatedly instructed,

19   alleged errors in [an expert's data] analysis should be tested during trial 'through competing

20   evidence and incisive cross-examination,'" not exclusion. *JH Kelly, LLC v. AECOM Tech. Servs.,*

21   *Inc.*, 605 F. Supp. 3d 1295, 1316 (N.D. Cal. 2022) (denying *Daubert* motion); *see*, *e.g.*, *Hamm v.*

22   *Mercedes-Benz USA, LLC*, 2021 WL 1238304, at *14 (N.D. Cal. Apr. 2, 2021) ("[D]istrict courts

23   within and outside this district have often concluded that experts' decisions about what data to use

24   in their analysis bear on the weight, not the admissibility, of expert testimony."). And here, Dr.

25   Carlton and his team ████████████████████████████████████████████

26

27

28

**PUBLIC REDACTED VERSION**

1 ████████████████████████████████████████████████████████████████

2 ████████████████████████████████████

3 ████████████████████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████████████████

5 ████████████████ *Rearden LLC v. Walt Disney Co.*, 2023 WL 6796017, at *2 (N.D. Cal. Oct. 13,

6 2023). ████████████████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████████████████

8 ██████████████████████████████████████ *Khadera v. ABM Indus. Inc.*, 2011 WL 6813454, at

9 *4 (W.D. Wash. Dec. 28, 2011) (denying *Daubert* motion). ████████████████

10 ████████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████████████████

18 ██████████████ *Novoa v. GEO Grp., Inc.*, 2020 WL 8514832, at *5 (C.D. Cal. Dec. 18, 2020)

19        Plaintiffs cite no contrary authority. *Call Delivery Systems, LLC v. Morgan* involved an

20 expert who had failed to independently investigate *any* of the facts in the case—he "did not review

21 any pleadings, deposition testimony, or even the algorithm." 2022 WL 1252412, at *2 (C.D. Cal.

22 Mar. 7, 2022). His opinion was instead "based entirely on information he received during verbal

23 communication" with a defendant and his lawyer. *Id.* As explained, Dr. Carlton's opinion is based

24 on numerous sources that he independently reviewed, *supra*, at 6-7, and plaintiffs' dissatisfaction

25 with the extent of his review of one of those sources is not grounds for exclusion. *Baker v. Firstcom*

26 *Music*, 2018 WL 2676636 (C.D. Cal. May 8, 2018) has even less relevance; that case concerned a

27 handwriting expert who opined on the authenticity of signatures after *assuming* the control

28 signatures she used for the comparison were "actually genuine and representative of how each

**PUBLIC REDACTED VERSION**

1    person signs their name," *id.* at *2. ████████████████████████████

2    ████████████████████████████████████████████████████████████

3    ████████████████████████████    *Id.*

4    ### B.    The Rule 37 Challenge Is Baseless

5    Plaintiffs also seek relief under Rule 37(c)(1) for a supposed violation of Rule 26(a)—

6    which requires disclosure of "documents" and "electronically stored information"—without

7    identifying a single document or piece of data that Meta failed to disclose. Mot. 9-12. Meta

8    produced the data Dr. Carlton relied on for Table 6 more than a month before the close of fact

9    discovery, and nearly a year before his deposition. *See* Ex. 6, May 22, 2022 Email from M.

10   Jennings. Pursuant to an agreement between the parties, Meta produced further documentation on

11   that data—responses to questions from the FTC—on June 23, 2023, again within the fact discovery

12   period. *See* Ex. 7, June 23, 2023 Ltr. from M. Jennings; Ex. 8, Apr. 27, 2023 Email from K. Teruya

13   to S. Mehta. Disclosures during the fact discovery period are (obviously) timely.

14   Notably, plaintiffs do not contend that any of the data Dr. Carlton relied on was provided

15   after those agreed-upon dates. *Cf. Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101,

16   1105 (9th Cir. 2001) (imposing Rule 37 sanction where party "failed to provide his expert report

17   for two and a half years"). Plaintiffs instead assert that they should have been given something

18   *more* than the file Dr. Carlton used, such as "understandings of the data" and ████████████

19   ████████████████████    Mot. 9-10. But a belated desire to have asked better or different

20   questions about timely productions—questions that were then answered during expert discovery—

21   is not grounds for exclusion. *See, e.g., Claston, LLC by & through Sunset Holdings, LLC v. United*

22   *States*, 2012 WL 12957389, at *2 (D. N. Mar. I. Oct. 23, 2012) (denying motion to exclude because

23   "the underlying data was timely disclosed and not inadmissible pursuant to Rule 37"); *see also*

24   *Andrews v. Plains All Am. Pipeline, L.P*, 2019 WL 6647928, at *5 (C.D. Cal. Nov. 22, 2019)

25   (similar). No authority, rule, or request for production obligated Meta to ██████████████

26   ████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████    Ex. 1, Carlton

28   Rep. tbl. 6, n.152. Plaintiffs' apparent failure to obtain their desired "understandings of the data"

1  ███████████████████████ stems only from their decision not to further probe these

2  understandings ████████████ during fact discovery. Indeed, plaintiffs promulgated—but

3  subsequently withdrew—a Rule 30(b)(6) deposition notice on Meta's data sources and

4  repositories. *See* Ex. 9, May 18, 2022 30(b)(6) Notice; Ex. 10, Sept. 3, 2022 Email from L. Matson.

5  The specific data file at issue, moreover, was reproduced from the FTC litigation at

6  plaintiffs' request and according to the parties' stipulated terms. *See* Ex. 6 at 7, Apr. 19, 2023

7  Email from C. Hausman. After extensive negotiation, including direct lead counsel negotiations,

8  the parties agreed that plaintiffs would immediately review the data Meta produced and determine

9  whether the production resolved their requests for production of data. *See* Ex. 8, Apr. 27, 2023

10  Email from K. Teruya to S. Mehta. The parties' agreement also explicitly stated the warning from

11  Meta to plaintiffs that explanatory documentation would be limited. *See id.* ("Our understanding

12  is that data dictionaries generally do not exist for this data, and were not produced in the FTC

13  case."). With that understanding, lead counsel for plaintiffs subsequently informed the Court that

14  the parties had "reached an agreement" concerning the "FTC data … and the structured data

15  requests, the fifth set of document requests." *See* Hr'g Tr. 4:12-23 (Apr. 27, 2024). And although

16  plaintiffs later raised questions about some of the data reproduced from the FTC litigation, they

17  never asked for any further explanation of PALM-017073378, the file at issue. *See* Ex. 11, June

18  16, 2023 Ltr. from B. Pepperman. Plaintiffs may now regret that they failed to identify the

19  questions later asked at Dr. Carlton's deposition until after fact discovery, but that does not support

20  exclusion. *Cf. Finjan, Inc. v. Blue Coat Sys., Inc.*, 2015 WL 4272870, at *6 (N.D. Cal. July 14,

21  2015) (denying motion to exclude expert and noting that "[b]ecause [p]laintiff failed to ask the

22  necessary questions" during experts' depositions, "it cannot now complain of prejudice from the

23  inability to cross-examine them concerning their opinions").

24  Plaintiffs also fail to identify any prejudice from the information Dr. Carlton testified █

25  ████████████████████████████ a necessary precondition for relief under Rule 37.

26  Experts may speak with a party's employees to gain additional context for company data and

27  documents. *Droplets, Inc. v. Yahoo! Inc.*, 2021 WL 9038509, at *8 (N.D. Cal. Apr. 27, 2021)

28  (denying plaintiff's request to exclude expert testimony under Fed. R. Civ. P. 37(c)(1) because

**PUBLIC REDACTED VERSION**

1  expert's discussions with employees about company data and documents provided "mere context"

2  for opinion and were "substantially harmless"). Had plaintiffs pursued Rule 30(b)(6) or even Rule

3  30(b)(1) testimony on data, they would have had access to similar information during the fact

4  discovery period. And contrary to the claim ███████████████████████████████████

5  ███████████████████████████████████████████ Ex. 2, Farrell Rebuttal ¶¶60-61; *see*

6  *also* Ex. 12, Farrell 3/24 Tr. 37:9-25. Dr. Carlton also testified ████████████████████

7  ████████████████████████████████████████ Ex. 3, Carlton Tr. 175:3-9. Having failed

8  to identify any conceivable prejudice based on their own faulty litigation strategy, plaintiffs' Rule

9  37 challenge should be denied.

10  **III.   THERE IS NO BASIS FOR EXCLUDING DR. CARLTON'S SHARE CALCULATIONS**

11  Dr. Carlton performed alternative market share calculations on the assumption that

12  Facebook and Instagram compete in a market that includes not just Snapchat (and MeWe) but also

13  other apps that empirical evidence showed are closer substitutes for Facebook and Instagram than

14  Snapchat. Those calculations show that Meta does not have a monopoly share of any such market.

15  *See* Ex. 1, Carlton Rep. ¶147, tbl. 11 & tbl. 12. Without disputing those calculations, plaintiffs

16  complain that Dr. Carlton's reason for including those other apps falls below *Daubert* standards.

17  Mot. 11-12. But Dr. Carlton's approach is supported by economic literature and common sense.

18  Any objections to it are a matter for cross-examination and competing expert testimony, not

19  exclusion.

20  *First*, plaintiffs criticize Dr. Carlton's opinions that a candidate market including Facebook

21  and Snapchat should ███████████████████████████████████████████████

22  ██████████████████████ *Id.* at 12-13. Plaintiffs claim that because ███████████████

23  ████████████████████████ it merits exclusion. But Dr. Carlton made a considered judgment███

24  ████████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████████████

27  Plaintiffs can (and did) examine him on that judgment. *See* Ex. 3, Carlton Tr. 114:21-115:5.

28  Nothing about it violates Rule 702.

**PUBLIC REDACTED VERSION**

1    Plaintiffs' claim that Dr. Carlton "provides no basis" for his inclusion of YouTube also

2    fails. Mot. 12. Plaintiffs take one quote out of context from Dr. Carlton's report to suggest that he

3    conceded that YouTube was out of the market. Ex. 1, Carlton Rep. ¶153 (hypothesizing "streaming

4    video as an adjacent market from which entry into the alleged PSNS market could occur"). But

5    even a cursory reading of this section of the report makes clear that this quote is from Dr. Carlton's

6    discussion of entry barriers, which *assumes arguendo* there is such a thing as a "PSNS market"—

7    separate from a broader market that would include Snapchat and closer substitutes—and explains

8    why there are no serious barriers to entering even that putative "PSNS market." *Id.*

9    *Second,* plaintiffs assert that Dr. Carlton wrongly relies on the Circle Principle in

10    concluding the proposed PSNS market is too narrow, because the Circle Principle has supposedly

11    "been rejected." Mot. 13-14. Plaintiffs are wrong that the Circle Principle has been rejected and so

12    their argument fails at the start. The only "rejection" plaintiffs point to is that the Circle Principle

13    appeared in the 2010 Horizontal Merger Guidelines, but not the 2023 Merger Guidelines. *Id.* at 13.

14    There is no reason given—and Meta knows of no reason—to believe that the failure to expressly

15    discuss the Circle Principle in the 2023 Guidelines means that it has somehow been rejected as a

16    reliable input to market definition analysis. Sound reasons remain for its continued vitality, as

17    numerous commentators have noted.[3] Plaintiffs can only cite *United States v. Aetna Inc.*, 240 F.

18    Supp. 3d 1 (D.D.C. 2017), which *acknowledged* the Circle Principle as a concept but refused to

19    block a merger based on that concept's application to specific facts; namely, when the expert's

20    "application" of the principle based on an overly "technical approach" was contradicted by a "wide

21    array of qualitative evidence." *See id.* at 38-40. Here, Dr. Carlton has marshalled substantial other

22    evidence, quantitative and qualitative, to support his analysis of substitutes. *Supra*, at 6-7.

23    *Third,* plaintiffs wrongly claim that Dr. List "testified that the Circle Principle is wrong."

24    Mot. 14. Dr. List actually stated, "I'm not building a market in this case. So to apply a circle

25    principle you'd need to be building a market." Ex. 13, List Tr. 88:7-16. Dr. List then explained

26

27    ─────────────────
[3] *See, e.g.*, Bryan Keating, Jonathan Orszag & Robert Willig, *The Role of the Circle Principle in Market Definition*, ANTITRUST SOURCE (Apr. 2018); Gregory J. Werden, *Gerrymandering Redux: The Relevant Market under the Draft Merger Guidelines*, MERCATUS CTR. (Sept. 2023).

28

1    that he would not *define a market* using the Circle Principle—"I don't think that that's right," *see*

2    Mot. 14—but that he *would* employ the Circle Principle to assess whether a candidate market that

3    had not passed a SSNIP is too narrow, just as Dr. Carlton has done here. *See* Ex. 13, List Tr. 88:7-

4    90:13 ("Now, if [the candidate market] doesn't pass [a SSNIP test or HMT] you might want to put

5    those in [using the circle principle]."); *see also id.* 92:4-12 (same). Here, Dr. Carlton opines that

6    plaintiffs do not have a valid SSNIP test that Facebook, Instagram, and Snapchat alone pass. Ex. 1,

7    Carlton Rep. ¶58. Accordingly, plaintiffs' insistence that Snapchat is in the market leaves them

8    without a valid basis to exclude other apps that evidence shows are closer substitutes. Dr. List

9    never disagreed with that.

10        *Fourth,* plaintiffs argue that because Dr. Carlton's outage analysis showed █████

11    ████████████████████████████████████████████████████████████████████████

12    ████████████████████████████████████████████████████ Mot. 14-15. But as

13    Dr. Carlton explained, ███████████████████████████████████████████████

14    ████████████████████████████████████████████████ Ex. 3, Carlton Tr. 100:7-

15    101:4. And he did *not* ███████████████████████████████████████████ *See*

16    *id.* 104:13-105:15. Rather, Dr. Carlton reasonably opines that ██████████████████████

17    ████████████████████████████████████████████████████████████████████████

18    ████████████████████████████████████████████████████████████████████████

19    precluding a finding of monopoly power. *See* Ex. 1, Carlton Rep. ¶¶144-47 & tbl. 11. Whatever

20    critiques plaintiffs have of that analysis, they go to weight and not admissibility.

21    **IV.    PLAINTIFFS' PRIVACY CRITIQUE TURNS ON MISCHARACTERIZING DR. CARLTON'S**

22         **OPINION**

22        Dr. Carlton opines that ███████████████████████████████████████████

23    ████████████████████████ Plaintiffs fault some of Dr. Carlton's opinions about █████████

24    █████████████████████████████████████████████████████████████ Plaintiffs

25    specifically point (Mot. 3) to five paragraphs:

26        • Ex. 1, Carlton Rep. ¶8: ███████████████████████████████████████

27         ███████████████████████████████████████████████████

28

<u>**PUBLIC REDACTED VERSION**</u>

1    • *Id.* ¶25: ███████████████████████████████████████

2    ████████████████████████████████████████████████

3    ████████████████████████████████████████████████

4    ████████████████████████████████

5    • *Id.* ¶¶28-30: ████████████████████████████████████

6    ██████████████████████████████████████

7    As his actual analysis demonstrates, Dr. Carlton is critiquing ██████████████████

8    ████████████████████████████████    *See, e.g., id.* ¶¶8, 17-22.

9         Expert opinions on what features are competitively significant do not encroach on what the

10   Supreme Court has said about competition. For example, in *National Society of Professional*

11   *Engineers v. United States*, 435 U.S. 679 (1978), the defendant specifically argued that

12   competition would yield "inferior work"—i.e., lower overall quality. *See id.* at 693-94. Here, by

13   contrast, Dr. Carlton's point is that ███████████████████████████████████████

14   ████████████████████████████████████████████████

15   ███████████████████████████████    By analogy, substituting a plastic part for a

16   metal part might result in the production of a less durable tool, but also a tool that can be sold at a

17   much lower price. If consumers (uniformly) believe that the reduction in price outweighs the loss

18   of durability, then competition will favor manufacturers who substitute the plastic part—leading

19   to lower prices *and* less durable (lower quality) tools. That does not mean that competition deprives

20   consumers of what they want; it means that competition reveals what consumers care about. The

21   same applies here: ████████████████████████████████████████████

22   ██████████████████████████████████    *See* Ex. 14, Klein

23   Tr. 84:19-25, 283:6-12; Ex. 15, Kupcho Tr. 93:21-24; Ex. 16, Grabert Tr. 200:2-15, 206:12-16.

24   This is a strong opinion resting on a more than adequate foundation. It should not be excluded.

**CONCLUSION**

26        The Court should deny the motion.

**PUBLIC REDACTED VERSION**

Dated: May 12, 2025

Respectfully submitted,

By: /s/ Sonal N. Mehta

SONAL N. MEHTA (SBN 222086)
 Sonal.Mehta@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
 David.Gringer@wilmerhale.com
ROSS E. FIRSENBAUM (*pro hac vice*)
 Ross.Firsenbaum@wilmerhale.com
RYAN CHABOT (*pro hac vice*)
 Ryan.Chabot@wilmerhale.com
PAUL VANDERSLICE (*pro hac vice*)
 Paul.Vanderslice@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800

ARI HOLTZBLATT (SBN 354631)
 Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
 Molly.Jennings@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000

MICHAELA P. SEWALL (*pro hac vice*)
 Michaela.Sewall@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

*Attorneys for Defendant Meta Platforms, Inc.*

**PUBLIC REDACTED VERSION**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of May 2025, I electronically transmitted the public redacted version of the foregoing document to the Clerk's Office using the CM/ECF System and caused the version of the foregoing document filed under seal to be transmitted to counsel of record by email.

By:    _/s/ Sonal N. Mehta_
         Sonal N. Mehta

META'S OPPOSITION TO MOTION
                                                                          TO EXCLUDE DENNIS CARLTON