**HAGENS BERMAN SOBOL SHAPIRO LLP**
Shana E. Scarlett (Bar No. 217895)
shanas@hbsslaw.com
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Kevin Y. Teruya (Bar No. 235916)
kevinteruya@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000

*Interim Co-Lead Consumer Class Counsel*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

MAXIMILIAN KLEIN, *et al.*,

      Plaintiffs,

    v.

META PLATFORMS, INC.,

      Defendant.

Case No. 3:20-cv-08570-JD

**CONSUMER PLAINTIFFS' OPPOSITION TO DEFENDANT META PLATFORMS, INC.'S MOTION TO EXCLUDE EXPERT TESTIMONY AND OPINIONS OF DR. NICHOLAS ECONOMIDES**

**PUBLIC REDACTED VERSION**

This Document Relates To:

*All Consumer Actions*

The Hon. James Donato
Hearing Date: July 24, 2025
Hearing Time: 10:00 a.m.

1

2

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .......................................................................................................... 1

II.   LEGAL STANDARD.................................................................................................... 2

III.  DR. ECONOMIDES IS WELL QUALIFIED .......................................................... 3

IV.   DR. ECONOMIDES' OPINION THAT FACEBOOK WOULD OFFER
      USERS SOMETHING MORE IN THE BUT-FOR WORLD IS
      ADMISSIBLE............................................................................................................... 3

V.    DR. ECONOMIDES' DAMAGES MODEL IS ADMISSIBLE. ...................................... 8

VI.   DR. ECONOMIDES' HARM TO COMPETITION OPINIONS ARE
      ADMISSIBLE............................................................................................................. 11

VII.  DR. ECONOMIDES PROPERLY CITED THE RECORD AS SUPPORT .................... 15

VIII. CONCLUSION........................................................................................................... 15

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Allstate Corp. Sec. Litig.*,
  2022 WL 842737 (N.D. Ill. Jan. 10, 2022) ............................................................... 12

*Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns, Inc.*,
  108 F.3d 1147 (9th Cir. 1997) ................................................................................. 13

*In re Capacitors Antitrust Litig.*,
  2020 WL 870927 (N.D. Cal. Feb. 21, 2020) ...................................................... 2, 5, 8

*City of Anaheim v. S. California Edison Co.*,
  955 F.2d 1373 (9th Cir. 1992) ................................................................................. 13

*Clear-View Techs., Inc. v. Rasnick*,
  2015 WL 3505003 (N.D. Cal. June 2, 2015) ............................................................ 2

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
  2005 WL 3263288 (W.D. Mo. Dec. 1, 2005) .......................................................... 14

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  581 F. Supp. 3d 1029 (N.D. Ill. 2022) ...................................................................... 6

*Droplets, Inc. v. Yahoo! Inc.*,
  2021 WL 9038355 (N.D. Cal. Aug. 9, 2021) ........................................................ 5, 8

*In re Glumetza Antitrust Litig.*,
  2021 WL 1817092 (N.D. Cal. May 6, 2021) ............................................................ 6

*In re Glumetza Antitrust Litig.*,
  2021 WL 3773621 (N.D. Cal. Aug. 25, 2021) ........................................................ 15

*Huawei Techs., Co, Ltd v. Samsung Elecs. Co., Ltd.*,
  340 F. Supp. 3d 934 (N.D. Cal. 2018) .................................................................... 15

*Image Tech. Servs. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) ................................................................................... 9

*In re Juul Labs, Inc. Mktg. Sales Pracs. & Prod. Liab. Litig.*,
  2022 WL 1814440 (N.D. Cal. June 2, 2022) ............................................................ 5

*Messick v. Novartis Pharms. Corp.*,
  747 F.3d 1193 (9th Cir. 2014) ................................................................................... 2

*Moehrl v. Nat'l Ass'n of Realtors*,
  2023 WL 2683199 (N.D. Ill. Mar. 29, 2023) .................................................. 2, 6, 11

*Mueller v. Puritan's Pride, Inc.*,
 2021 WL 5494254 (N.D. Cal. Nov. 23, 2021)................................................................. 8

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
 2023 WL 1813530 (C.D. Cal. Feb. 7, 2023)............................................................... 2, 8

*Primiano v. Cook*,
 598 F.3d 558 (9th Cir. 2010)........................................................................................ 2

*In re Seroquel XR (Extended Release Quetiapine Fumarate) Antitrust Litig.*,
 2025 WL 992004 (D. Del. Apr. 2, 2025)...................................................................... 6

*St. Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys.*,
 778 F.3d 775 (9th Cir. 2015)..................................................................................... 2, 8

*Sumotext Corp. v. Zoove, Inc.*,
 2020 WL 533006 (N.D. Cal. Feb. 3, 2020) .................................................................. 3

*Syufy Enterprises v. Am. Multicinema, Inc.*,
 793 F.2d 990 (9th Cir. 1986)........................................................................................ 9

*In re Twitter, Inc. Sec. Litig.*,
 2020 WL 9073168 (N.D. Cal. Apr. 20, 2020) ....................................................... 2, 12

*TYR Sport, Inc. v. Warnaco Swimwear, Inc.*,
 709 F. Supp. 2d 821 (C.D. Cal. 2020) ...................................................................... 14

*UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*,
 949 F.3d 825 (3d Cir. 2020)...................................................................................... 14

*Wendell v. GlaxoSmithKline LLC*,
 858 F.3d 1227 (9th Cir. 2017)...................................................................................... 2

*In re Xyrem (Sodium Oxybate) Antitrust Litig.*,
 2023 WL 3440399 (N.D. Cal. May 12, 2023) ................................................. 2, 10, 11

## FEDERAL RULES

Fed. R. Civ. P. 23(b)(3)...................................................................................................... 8

Fed. R. Evid. 702 .............................................................................................................. 2

1

**GLOSSARY OF TERMS**

| Abbreviated Term | Full Title |
|---|---|
| Economides Abridged Class Rep. | Abridged Class Certification Expert Report of Dr. Nicholas Economides, filed May 24, 2024 |
| Economides Merits Tr. | Deposition Transcript of Nicholas Economides, Ph.D., taken in the above-referenced action on March 15, 2024 |
| Economides Rebut. | Expert Rebuttal Report of Dr. Nicholas Economides, dated February 9, 2024 |
| Economides | Expert Report of Dr. Nicholas Economides, dated January 12, 2024 |
| Economides Tr. | Deposition Transcript of Nicholas Economides, Ph.D., taken in the above-referenced action on September 14, 2023 |
| Mot. | Defendant Meta Platforms, Inc.'s Notice of Motion and Motion to exclude Expert Testimony and Opinions of Nicholas Economides, filed under seal April 28, 2025, ECF No. 927 |
| Scarlett Decl. | Declaration of Shana E. Scarlett in Support of Consumer Plaintiffs' Opposition to Defendant Meta Platforms, Inc.'s Motion to Exclude Expert Testimony and Opinions of Nicholas Economides, filed concurrently herewith |
| Teruya Decl. Ex. | Exhibit to the Declaration of Kevin Y. Teruya in Support of Consumer Plaintiffs' Opposition to Facebook's Motion for Summary Judgment Regarding Consolidated Consumer Class Action Complaint, filed concurrently herewith |

## I.    INTRODUCTION

Meta Platforms, Inc. (Facebook) moves to exclude the antitrust injury, harm to competition, and damages opinions offered by Consumers' expert, Dr. Nicholas Economides. In a brief light on the legal standards it purports to apply, Facebook mischaracterizes the facts, distorts Dr. Economides' opinions, and assumes this Court's prior Order renders this distinct exclusion motion a foregone conclusion.[1] The motion should be denied.

*First*, Facebook challenges Dr. Economides' opinion that, in the competitive but-for world, Facebook would have had to fairly compensate users for their data (either with a monetary payment, or a better quality service). While Facebook chides these opinions, they are consistent with the record, including that even in the real world where it is a monopolist, Facebook strongly considered the but-for world Dr. Economides carefully and expertly constructed from well-accepted economic theory and Facebook's own internal documents. Facebook may dispute this proof and what the but-for world would have looked like, but that is a jury question and is certainly no basis for exclusion.

*Second*, Facebook attacks Dr. Economides' yardstick damages analysis. A yardstick analysis compares prices in comparable—not identical—markets unaffected by anticompetitive conduct, to prices in the monopolized market. Dr. Economides identified and analyzed eleven real-world yardsticks (two from Facebook itself) and used the results, along with a flat rate pricing model that Facebook's own documents and actions show it prefers and uses, to calculate class-wide damages. This method is widely accepted and reliably applied. Facebook's criticisms regarding his selection and use of the yardsticks are a subject for cross-examination, not a basis for exclusion.

*Third*, Facebook's critiques of Dr. Economides' opinions that Facebook's deception harmed competition lack merit. Citing economic literature, he explained how deception can be anticompetitive as an economic matter. He then applied those principles reliably to the record, which confirms privacy and data are critical competitive dimensions, and Facebook's deception impeded competitors (as Facebook's competitors ██████ and ██████ confirmed under oath).

---

[1] The Ninth Circuit declined to review that Order on an interlocutory basis, but it remains subject to appellate review after final judgment. Plaintiffs note their continuing objection to that Order, as well as the Court's other orders *sua sponte* limiting the number and scope of their experts (contrary to Facebook's statement (Mot. 1, 3), Consumers did not "withdraw" any).

*Finally,* Facebook's characterization of Dr. Economides' analysis as mere "recitation of record evidence" is baseless. Experts can (and are expected to) provide factual context for their expert opinions and to apply their methodology to record evidence, which is what he did here.

## II.    LEGAL STANDARD

Expert testimony must be both "relevant and reliable."[2] "The relevancy bar is low, demanding only that the evidence logically advances a material aspect of the proposing party's case."[3] Reliability requires that expert testimony "have a reliable basis in the knowledge and experience of the relevant discipline."[4] Specifically, courts ask "whether the reasoning or methodology underlying the testimony is scientifically valid."[5] Rule 702 and *Daubert* "should be applied with a 'liberal thrust' favoring admission."[6] Courts routinely find the economic analyses Dr. Economides applied in his report—the yardstick method for damages and the hypothetical monopolist test for market definition—are both relevant and reliable.[7]

Courts do not weigh the evidence underlying an expert's opinion in disposing of a motion to exclude the expert. Questions that go to weight include: criticisms of an economist's yardstick selection;[8] an expert's supposedly contradictory prior work;[9] competing factual interpretations;[10] disputes between experts;[11] and proof the court may find unpersuasive.[12] "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."[13]

---

[2] *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014).

[3] *Id.* at 1196 (internal quotation marks omitted).

[4] *Id.* at 1197 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)).

[5] *Id.*

[6] *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017).

[7] *St. Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys.*, 778 F.3d 775, 784 (9th Cir. 2015); *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 2023 WL 1813530, at *8 (C.D. Cal. Feb. 7, 2023).

[8] *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 2023 WL 3440399, at *13 (N.D. Cal. May 12, 2023).

[9] *See, e.g.*, *In re Twitter, Inc. Sec. Litig.*, 2020 WL 9073168, at *5 (N.D. Cal. Apr. 20, 2020).

[10] *Moehrl v. Nat'l Ass'n of Realtors*, 2023 WL 2683199, at *6–7 (N.D. Ill. Mar. 29, 2023).

[11] *In re Capacitors Antitrust Litig.*, 2020 WL 870927, at *2 (N.D. Cal. Feb. 21, 2020).

[12] *Clear-View Techs., Inc. v. Rasnick*, 2015 WL 3505003, at *2 (N.D. Cal. June 2, 2015).

[13] *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

### III.    DR. ECONOMIDES IS WELL QUALIFIED

Facebook's motion begins not with the law it purports to apply, but with a wholesale attack on Dr. Economides' credibility, bereft of legal standard. It asserts Dr. Economides is no expert "on the social apps he purports to analyze or the competition between them," assembling a host of cherry-picked testimony designed only to distract and embarrass. Mot. 2. This argument is disingenuous. An expert economist need not be an expert in the underlying field in order to perform an economic analysis of it; an expert economist testifying in an agricultural antitrust case, for example, need not be a farmer. *Id.* at 199:12–200:1; *Sumotext Corp. v. Zoove, Inc.*, 2020 WL 533006, at *10 (N.D. Cal. Feb. 3, 2020) (economist need not be "consumer engagement" expert to define market); *see also* Order on Class Certification at 6, Feb. 13, 2025, ECF No. 905. ("Meta does not challenge Dr. Economides' qualifications, and rightfully so."). Dr. Economides' expert report explained the apps and platforms he analyzed in great detail, *e.g.*, Ex. 1[14] (Economides ¶¶ 299-304, Appendix E), and Dr. Economides used the platforms described in his report Ex. 2 (Economides Tr.) at 198:13–14, 199:4, 199:12–200:1. He relied on "internal [] documents, employee testimony, … discovery responses," and "third-party information" to assess competitive harm and measure damages, which courts find sufficient to deny *Daubert* motions. *Apple iPod iTunes Antitrust Litig.*, 2014 WL 4809288, at *7 (N.D. Cal. Sept. 26, 2014). No more is required.

### IV.    DR. ECONOMIDES' OPINION THAT FACEBOOK WOULD OFFER USERS SOMETHING MORE IN THE BUT-FOR WORLD IS ADMISSIBLE

Dr. Economides constructed a but-for world absent Facebook's anticompetitive conduct based on proven, properly applied economic principles and Facebook's own documents and testimony. After extensively examining the record, he concluded that Facebook would have compensated all Facebook users for their data, either in the form of a monetary payment (such as cash or points) or a better quality service (such as one with better data collection and use practices or an "opt-out"). This but-for world follows the well-accepted economic concepts of "zero" pricing. While Facebook does not charge users a monetary price – it has a "zero" money price – it is not

---

[14] Unless otherwise noted, all "Ex." references are to the Declaration of Shana E. Scarlett in Support of Plaintiffs' Opposition to Defendant Meta Platforms, Inc.'s Motions to Exclude the Opinions of Dr. Nicholas Economides and Sarah Lamdan, filed concurrently herewith.

"free." In the case of Personal Social Networking Services ("PSNS") like Facebook, the in-kind consideration users provide is their data. Ex. 1, Economides ¶ 132. Well-accepted economic principles indicate that, when consumers have competitive alternatives, sellers must lower prices to maintain market share or risk losing customers. *Id.* ¶ 214. If the starting money price is "zero," more competition should drive the price lower, which can be thought of as a "negative" price, such that users receive positive compensation. *Id.* ¶ 247-251. Economic authorities cited in Dr. Economides' report apply this concept to Facebook. *Id.* ¶ 214. In the FTC's antitrust case against Facebook, its expert (Prof. Hemphill) opined that in a more competitive world, Facebook could "provide greater value to users through rewards and incentives" (monetary and non-monetary). A former chief economist at the DOJ Antitrust Division (Prof. Scott Morton) opined similarly, leading a UK court to certify a class in a similar case there. *See* Teruya Decl. Exs. 4, 5. Facebook acknowledged these facts in its own documents, noting it understood ███████████████████

███████████.[15] Ex. 1, Economides ¶ 263 (citing PALM-016491856).

   Notably, as Dr. Economides explains, ███████████████████████

████████████████████████████████████████████████

████████ Ex. 1, Economides ¶¶ 237-245. For example, ██████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████ *Id.* ¶ 241 (citing PALM-013785714). That same year, ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ *Id.* ¶ 243 (citing PALM-013788535). After Apple announced its "App Tracking Transparency" feature, which limited iOS apps' ability to track users and collect/use their data, ████████████████████████████

████████████████████████████ *Id.* ¶ 242 (quoting PALM-013553009). ██

████████████████████████████████████████████████

---

   [15] *E.g.*, Teruya Decl. Ex. 3 (CONSUMER-FB-0000002291 at -298) (Facebook co-founder explaining it "is not actually free," and "[w]e pay . . . with our data and our attention"); Ex. 3 (PALM-003556066 at -69); Teruya Decl. Ex. 61 (PALM-FTC-00024133) (similar).

1  *Id.* ██████████████████████████████████████████████████████

2  ████████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████████

4  ████  *Id.* ¶ 238 (citing PALM-013818575 at -627). ██████████████████

5  ████████████████████████████████████████████████████████████

6  ██████████████████████████████████████████████████. *Id.* Despite this,

7  Facebook calls Dr. Economides' but-for world a "fantasy."

Facebook's various arguments about Dr. Economides' antitrust injury opinions lack merit.

*First*, Facebook blindly relies on this Court's prior class certification Order. Mot. 3–4. But the Court then had only abridged versions of Dr. Economides' class certification reports—not as it has now, full-length merits reports and much of the underlying proof he relied on (which are attached as exhibits to the Scarlett and Teruya Declarations).

*Second*, Facebook merely draws different conclusions from the evidence and literature and disregards facts it dislikes. But that is no basis for exclusion.[16] Mot. 2–3. For example, Facebook argues that Dr. Economides's opinion is fanciful because no personal social networking service has ever paid users for their data.[17] An argument that an expert failed to consider contradictory documents goes to weight, not exclusion, so Facebook's argument (even if credited) fails.[18] Even were Facebook's critique valid (it is not), Dr. Economides considered and rejected this point. He explained that the evidence Facebook cites is from a world tainted by its anticompetitive conduct and thus does not persuade regarding the but-for world. Ex. 1, Economides ¶ 226, 239. To the extent Facebook suggests competitors in adjacent markets (*e.g.*, TikTok) compete by providing users with services like short-form videos instead of compensating them for their data, Dr. Economides considered and rejected that, too. Entities cannot compete on features alone, and even "attention

---

[16] *In re Capacitors*, 2020 WL 870927 at *2; *Droplets*, *Inc. v. Yahoo! Inc.*, 2021 WL 9038355, at *11 (N.D. Cal. Aug. 9, 2021).

[17] Mot. 3.

[18] *In re Juul Labs, Inc. Mktg. Sales Pracs. & Prod. Liab. Litig.*, 2022 WL 1814440, at *4 n.5 (N.D. Cal. June 2, 2022) (denying *Daubert* on this basis).

platforms" compete on price. *Id.* ¶ 143-45. While Facebook may disagree with Dr. Economides' explanations, that is a matter for cross-examination, not grounds for exclusion.

Moreover, Facebook's argument ignores that other so-called "attention" platforms do compensate users. Platforms like ███████████████████████████████ ████████████████ pay users for their data or attention (or both). Ex. 1 (Economides) at Appendix E ¶¶ 5, 22, 24–25. In addition, Facebook and other companies actually pay users for their data in the analogous market research context, *id.* ¶¶ 341, 345, and Facebook and other platforms pay certain users ("creators") (Ex. 4, Economides Rebut. ¶¶ 277–84).

In addition, as Dr. Economides explained, that Facebook strongly considered paying users for their data in the real world is "economically significant evidence of" its "economic incentives, its revealed preferences, and the operation of a market by which consumers receive monetary payments for their data." Ex. 1, Economides ¶ 133, 237-245. Facebook seeks to discount these proposals and argue they require exclusion of Dr. Economides' opinions because they have not yet been implemented. Facebook's argument is wrong. For one, Facebook's dispute over this evidence's significance—such as what it means that the proposals in the actual world have not yet been implemented—is, at best, a weight question for the jury, not a basis for exclusion.[19] Moreover, Facebook's arguments ignore the explanation—supported by record evidence—that Facebook did not implement the proposals ***not*** because they were infeasible, but instead because it did not want to fairly compensate users for data that its monopoly power allowed it to take for free. *See* Teruya Decl. Exs. 28, 32, 50 51 61, 62. And an antitrust plaintiff "need not show that the [defendant] of our world actually contemplated a given scenario within the but-for world" because to insist on such proof "rests upon the befuddling notion that our actors must have contemplated what they would have done in a but-for world which, due to defendants' antitrust violation, *never happened*"

---

[19] *In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1070 (N.D. Ill. 2022); *Moehrl*, 2023 WL 2683199, at *6–7.

CONSUMER PLS.' OPP'N TO DEF.'S MOT. TO EXCLUDE ECONOMIDES        Case No. 3:20-cv-08570-JD

and "cannot be the law."[20] In short, the existence of proof that Facebook in the actual world *did* contemplate the course of action Dr. Economides predicted bolsters his opinions.

*Third*, Facebook's arguments about compensation in the form of money ignore Dr. Economides' opinions about compensation in other forms. Facebook asserts that Dr. Economides opined Facebook "would compete only through payments" in the but-for world. Mot. 3. That is demonstrably false: Dr. Economides actually opined that Facebook, in addition or in the alternative to payments in cash, could have made payments in points, *or* offered better services, such an "opt out" feature to limit the data that Facebook collects and uses from consumers. *E.g.*, Ex. 1 (Economides) § V.E. & ¶¶ 273, 291 ("Facebook Would Have Offered Users as a Flat Fee as Compensation, *with Opt-Out and Non-Financial Alternatives*," a situation where users are still harmed by at least same amount as value of monetary compensation) (emphasis added).

*Finally*, Facebook's arguments that Plaintiffs supposedly testified that Dr. Economides' "injury opinions are wrong" (Mot. 4) are both factually and legally misguided. As Facebook would tell it, each Plaintiff supposedly testified that Facebook should not pay them or they would not accept a cash payment for their data. But Plaintiff Klein specifically said he would consider doing so. Ex. 5 (M. Klein Tr.) at 288:13-289:14 (stating "It's possible" and "it depends."). As to Plaintiff Banks Kupcho, the portion of her deposition that Facebook cites actually states that Ms. Banks Kupcho did not think she should be paid for her "use[]" of Facebook—again, Plaintiffs' claims are based on compensation *for data*—and she thought "Facebook should pay for breach" and "the sale of the data." Ex. 6 (Banks Kupcho Tr.) at 76:19–79:4. Plaintiff Grabert likewise stated she was confused by Facebook's question, and testified that she believed "everyone's . . . data all has value." Ex. 7 (Grabert Tr. Vol. I) at 79:12-14; *see also* 79:22-24 ("I just know that all of us have data. It's valuable. But I don't know what it's worth."); Ex. 8 (Grabert Tr. Vol. II) at 322:20-323:7.

In any case, an individual consumer's subjective preferences about whether they would accept cash payments is irrelevant to their injury. There is a market value for data, and Facebook collected and used consumers' data without providing that value, thereby overcharging them.

---

[20] *In re Glumetza Antitrust Litig*., 2021 WL 1817092, at \*13–15 (N.D. Cal. May 6, 2021); *In re Seroquel XR (Extended Release Quetiapine Fumarate) Antitrust Litig.*, 2025 WL 992004, at \*4 (D. Del. Apr. 2, 2025).

Consumers are thus harmed in the actual world regardless of whether they would "sell" their data in the but-for world, just as a worker is harmed if his compensation is actually suppressed by wage-fixing even though he likes his job and might hypothetically work for free. Ex. 1 (Economides) ¶¶ 286–87. Facebook's argument also ignores Dr. Economides' opinions about compensation in the form of better services like a data "opt-out"; he explains a user who would have "opted out" and not accepted the payment is still harmed by the same amount (if not a higher one, because they have a higher reserve price to sell their data). *Id.* ¶¶ 273, 291.

Facebook miscites *Mueller v. Puritan's Pride, Inc.* for the proposition that an expert's model contradicted by plaintiff testimony is inadmissible. 2021 WL 5494254, at *7 (N.D. Cal. Nov. 23, 2021) (cited at Mot. 4). To begin, *Mueller* is a consumer protection (not antitrust case) about expectation damages, and it denied certification of a Rule 23(b)(3) damages class; it did not exclude the expert's testimony. Moreover, unlike in *Mueller* where the named plaintiffs' deposition testimony was inconsistent with the expert's opinion, Plaintiffs' testimony here does not contradict Dr. Economides' opinion. In addition, the expert's model in *Mueller* was supported by "nothing in the record, *id.* at *7, which as, discussed next, is not the case here since Dr. Economides created it based on carefully and objectively-selected yardsticks, including two from Facebook itself. *Infra*. Sec. V. And Facebook's deceptive argument deflects from its own documents supporting Dr. Economides' opinions, including that Facebook knew user data has monetary value such that Facebook paid users for it in the analogous market research context and strongly considered paying users for it in this one too. *See supra* Sec. IV; *see also In re Capacitors*, 2020 WL 870927 at *2 ("strong disagreements" about experts' analyses of facts" not a basis for exclusion); *Droplets, Inc.*, 2021 WL 9038355 at *11 (defendant's disagreement with expert's analysis does not make it "*ipse dixit*" so as to require exclusion where based on "studies" consistent with defendant's "own internal analysis, notwithstanding the different contexts.").

## V.    DR. ECONOMIDES' DAMAGES MODEL IS ADMISSIBLE.

Courts routinely find the damages analyses Dr. Economides applied—the yardstick method—both relevant and reliable. *NFL*, 2023 WL 1813530, at *8; *St. Alphonsus*, 778 F.3d at 784. Economic literature explains that a typical yardstick analysis "compares prices during the

period … to prices in other markets" that are "reasonably comparable." Teruya Decl. Ex. 8 at 63 (Measuring Benchmark Damages in Antitrust Litigation). Professor Hovenkamp's "Primer on Antitrust Damages"—which both Facebook and its economist, Dr. Tucker—explains that "in exclusionary practice cases" (like this one), experts "might also select a different product market rather than a different geographic market as a 'yardstick.'" *Id.* at 31. The point of this is to identify comparable prices from a market unaffected by anticompetitive conduct, to measure what prices would have been in the at-issue market in the but-for world. Indeed, Dr. Tucker testified that an economist may properly "take a different product market as a comparison," and that a yardstick need only be "informative." Ex. 9 (Tucker Tr.) at 296:16–297:4.

Dr. Economides properly applied this yardstick method to calculate damages. He identified eleven real-world companies that collect and use comparable data, but are honest about their data and privacy practices and pay users for their data. These programs were from Facebook itself (Facebook Research & Facebook Study), Google, Amazon, Nielsen, SmartPhoneMate, Strategy Analytics AppOptix Panel, Embee Mobile Performance Meter, Comscore, and Luth Research. Ex. 1, Economides ¶ 305. Based on these payments, he conservatively identified $5 per month as the most likely value of what Facebook would provide in the but-for world (whether as a direct monetary payment or as a service improvement). He conducted a robustness check, confirming that Facebook could make these payments while still turning a profit. *Id.* ¶¶ 252-258. His analysis is a well-grounded damages model, and he consulted extensive documents and data in support of his comparability analysis.

Facebook's hodgepodge of critiques against Dr. Economides' damages model all fail.

*First*, Facebook erroneously contends that Dr. Economides' analysis "assumed the desired conclusion[.]" Mot. 4. But Dr. Economides selected his yardsticks after applying five objective criteria, which considered many yardsticks and then whittled them down to eleven, including two from *Facebook itself*. Ex. 1, Economides ¶¶ 299-304 & Appendix E.

*Second*, Facebook's quibbles that Dr. Economides uses "yardsticks with totally different business models from Facebook" ignore blackletter law on yardstick comparability. Ninth Circuit precedent is clear: with respect to the "'yardstick' methodology in calculating damages," whether

the "'unaffected' business properly compares to the relevant market presents a question of fact for the jury." *Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1221 (9th Cir. 1997); *accord Syufy Enterprises v. Am. Multicinema, Inc.*, 793 F.2d 990, 1003 (9th Cir. 1986) (yardstick "[c]omparability is a question of fact."). That is why courts regularly reject *Daubert* arguments like those Facebook offers here and explain that arguments that "different" products "would be more appropriate yardsticks" "can be explored in cross-examination or by proffering an alternative analysis" but are no basis for exclusion. *In re Xyrem*, 2023 WL 3440399, at *13. Facebook's motion completely disregards this case law.

*Third*, even if the Court were to entertain Facebook's various arguments on yardstick selection—it should not, as they are jury questions, as discussed *supra*—Dr. Economides considered and rejected them. Mot. 4–5. As to Facebook's argument that, unlike Facebook, the market research yardsticks provide "no offsetting services provided to users," Dr. Economides explained that "the but-for world has intense competition, no deception, no misrepresentation, no omissions, and a payment. When we get down to the payment, we need to find out what's the appropriate payment. And the appropriate payment is calculated using these yardsticks." Ex. 2 (Economides Tr.) at 167:10-18. Yardsticks (proposed by Facebook but not used by Dr. Economides) that "provid[e] extensive services to users" are inappropriate "because that does not reflect the tradeoff faced by Facebook users in the but-for world." Ex. 1, Economides ¶ 300. That is because the but-for world tradeoff is either to use Facebook's PSNS and have their data collected and used, but receive the amount of compensation required to convince users to allow for its collection and use of their data; or to use comparable competing PSNS and not have their data collected and used in the same manner, but receive no compensation. The net tradeoff is the amount of compensation required to convince users to allow their data's collection and use. Using yardsticks that offer no "offsetting" services reflect the same tradeoff and allows for isolation and calculation of required compensation. Ex. 1, Economides ¶ 300; Ex. 4, Economides Rebut. ¶ 331.

The same is true for Facebook's argument that unlike Facebook, the yardsticks are "restricted to limited, select participants[.] Mot. 5. Dr. Economides explained that self-selecting volunteers to offer their data for market research (by the yardsticks Dr. Economides considered)

have a "revealed preference" for sharing their data such that they "likely are willing to share their data at a lower price than the average user" which would make damages estimates based on the yardstick prices conservative, because PSN users "might demand more compensation for their data than the users choosing to participate in the yardstick programs." Ex. 1, Economides ¶ 347.

Facebook's argument based on supposed differences in the data that Facebook and the yardsticks collect is likewise misplaced. Mot. 5. While Facebook points out that Dr. Economides stated at deposition that the data is not identical, *id.*, it does not need to be. *See Xyrem*, 2023 WL 3440399, at *13 ("differences between" yardstick and product at issue "does not fatally undermine" choice of yardstick; "it is often very difficult to select a yardstick . . . that perfectly tracks"). The standard requires reasonable comparability, not identity. Based on Facebook's and the yardsticks' own descriptions, Dr. Economides analyzed the data that they collect and determined they were reasonably comparable. Ex. 1, Economides ¶¶ 328–333, Table 5 (comparing collection of web browser history, app usage, device, location, and ad engagement data by Facebook and yardsticks).

Perhaps most telling is that, while Facebook's litigation position is that Facebook and Dr. Economides' yardsticks are dissimilar, Facebook's ordinary-course documents state the opposite. When it was considering compensating users in the manner Dr. Economides opines, Facebook looked to several of the same yardsticks as Dr. Economides did (such as Facebook Study and Google Screenwise Meter) and concluded "the basic premise is the same." Ex. 1, Economides ¶¶ 239, 242, 332; *see also* Teruya Decl. Ex. 50 (PALM-013553009) at -11.[21]

## VI.     DR. ECONOMIDES' HARM TO COMPETITION OPINIONS ARE ADMISSIBLE

Facebook challenges as "unreliable" Dr. Economides' opinions that Facebook's data-related deception harmed competition. Its arguments are based on misstatements of Dr. Economides analyses and the law, and they should all be rejected.

*First*, Facebook asserts that Dr. Economides offers no "support or analysis" that Facebook's deception harmed competition. Mot. 5. That is wrong. Dr. Economides explains how, as an economic matter, deception "impairs the efficient functioning of markets" and "subverts the

---

[21] *See also Moehrl*, 2023 WL 2683199, at *9 (that defendants used some of Dr. Economides' "potential yardsticks" as "comparators" made his yardstick damages opinions reliable).

competitive process[.]" Ex. 1, Economides ¶¶ 184–99; *see also* Ex. 10, Economides Abridged Class Rep. ¶¶ 51–54 & nn. 82–83 (collecting literature). He then explains how data and privacy issues are critical dimensions of competition, and how Facebook's deception over those very subjects—at the same time other rivals like ████████████████ were trying to distinguish themselves from Facebook on that basis—harmed Facebook's PSN rivals, and thus competition. *E.g.*, Ex. 1, Economides ¶¶ 200–209 (analyzing record evidence). Put another way, Dr. Economides articulated economic principles based on literature, and then applied those principles to the record, including by evaluating specific competitors that attempted to compete on the very competitive dimension Facebook deceived about, and noted that Facebook engaged in deception on that subject at specific times when those competitors were ascendant.

While Facebook bemoans this as mere "summaries of documents," such qualitative analysis is common in antitrust cases like this one. What Facebook really complains about is Dr. Economides' conclusions, which is no basis for exclusion. Facebook's reference to Dr. Economides' early article for the proposition that anticompetitive conduct should not be "presume[d]" as "responsible for the creation of market share inequality or very high profitability for a firm," Mot. 6, does not move the needle. Dr. Economides did not ***presume*** Facebook's deception contributed to its monopoly; he identified economic principles and applied them to the record. Regardless, supposed "contradictions" between an expert's opinions and his prior scholarship" are "not a ground for exclusion[.]"[22]

*Second*, Facebook's assertion that Dr. Economides "wouldn't stand by" his opinions is baseless. It focuses on Dr. Economides' testimony about early rivals like Myspace, but the fact that he testified that Facebook had better practices than Myspace at one point in time is much ado about nothing, because it does not mean that Facebook did not have worse practices at other times, or that Facebook's deception still did not harm Myspace (or others) by making Facebook appear (falsely) better than it really was. In his various reports, Dr. Economides explained deception is ***not*** competition on the merits and "Facebook's misinformation gave Facebook an edge over

---

[22] *In re Twitter*, 2020 WL 9073168 at *5 ; *In re Allstate Corp. Sec. Litig.*, 2022 WL 842737, at *13 (N.D. Ill. Jan. 10, 2022).

competitors like Myspace[.]" *E.g.*, Ex. 1 (Economides) ¶¶ 183–204, 248; Ex. 4 (Economides Rebut.) ¶ 269; Ex. 10 (Economides Class Abridged Rep.) ¶ 51. He also explained that whether the deception harmed rivals and advantaged Facebook does not turn on whether it did or did not offer better privacy and data practices than rivals. Ex. 1, Economides ¶ 200; Ex. 10, Economides Abridged Class Rep. ¶ 55 n.85. Moreover, Facebook's focus on early rivals confuses Consumers' monopoly *maintenance* claims with monopoly acquisition, and indeed Dr. Economides was clear that Facebook's data deception allowed it to maintain monopoly power over *later* rivals like Snapchat and MeWe, ███████████████████████████████████████. Ex. 11 (Economides Merits Tr.) at 198:12–20, 223:3–234:2, 227:20–228:11; Ex. 1, Economides ¶¶ 207–208.

    *Third*, Facebook complains that Dr. Economides purportedly did not do a statement-by-statement analysis of Facebook's more than tens of thousands of deceptive statements also lacks merit. Mot. 5. For one, Facebook cites no authority requiring such a statement-by-statement approach[23]; indeed, it is not necessary.[24] Moreover, Facebook ignores that Dr. Economides did consider how particular instances of Facebook's deception—*e.g.*, around its earlier FTC privacy consent decree and regarding Cambridge Analytica—affected particular competitors like Google+, Snapchat, and MeWe. Ex. 1, Economides ¶¶ 204–08.

    *Fourth*, Facebook's mischaracterizations of Plaintiffs deposition testimony does not require exclusion of Dr. Economides' harm to competition opinions. Mot. 6–7. Contrary to Facebook's innuendo, each Plaintiff testified that privacy and data are important to them and affected their use of Facebook, and each stated in interrogatory responses that they read content where Facebook's

---

[23] Facebook cites the Ninth Circuit's decision applying a six-part test to deception-based disparagement claims in *Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997). Consumers dispute Facebook's characterization of *Harcourt Brace* as setting forth the "governing precedent," and indeed there are other frameworks for evaluating whether deception harms competition. *See* ECF No. 794 at 17–19 (collecting cases). Regardless, Plaintiffs satisfy *Harcourt Brace*, and Dr. Economides offers opinions that could support its factors, which Facebook never addresses. Ex. *1*, Economides ¶¶ 186–91.

[24] *City of Anaheim v. S. California Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) ("it would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect").

1    representations were made, those statements and omissions gave them understandings as to

2    Facebook's data practices, and based on those understandings they "continued to use Facebook and

3    did not see a reason" to use Facebook less or its PSNS rivals more.[25] Regardless, whether a

4    particular plaintiff individually relied on a particular Facebook misstatement is irrelevant; what

5    matters is whether the market did. Ex. 10, Economides Abridged Class Rep. ¶ 89.

6        *Fifth*, Facebook mischaracterizes some cases, which when properly understood do not

7    require exclusion here. Mot. 7–8. It cites, for example, *TYR Sport, Inc. v. Warnaco Swimwear, Inc.*

8    for the proposition that an expert's failure to consider data for "more than a subset of competitors"

9    requires exclusion. That is not what *TYR Sport* held; rather, it excluded the expert's report because

10   it compared ***only the plaintiff's and defendant's market shares***, so the court could not determine

11   how the overall market, and thus competition—as opposed to a single competitor—was affected.

12   709 F. Supp. 2d 821, 834 (C.D. Cal. 2010). In contrast, Dr. Economides considered and analyzed

13   the performance of Facebook and ***multiple*** participants that together comprised the market,

14   concluding that Facebook grew or maintained its power at their expense, which is confirmed by the

15   record. Ex. 1, Economides ¶¶ 207 n. 535 & 208; *see also* Teruya Decl. Ex. 72 (Cunningham Tr.) at

16   115:3–119:10; Teruya Decl. Ex. 37 (PALM-009048148) at -149 (Facebook was "frugal with the

17   truth" regarding its data practices in the "early years" when it was competing against Myspace

18   which allowed it "to cut corners in order to achieve scale").

19       Facebook's citation of *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 2005 WL 3263288,

20   at *8 (W.D. Mo. Dec. 1, 2005), is likewise misplaced. There, the expert admitted he "never

21   analyze[d]" the at-issue conduct, merely stated that the conduct was anticompetitive "on the face

22   of it," and relied on a "telephone conference with the owner" of a market participant. Dr.

23   Economides did well more than that, citing economic literature indicating deception is

24   anticompetitive, analyzing the record based on those principles, and reaching a conclusion that is

25   further bolstered by ███████████████████████████████████. *Supra* at Sec. VI.

26       Finally, *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 834

27   (3d Cir. 2020), is plainly inapposite. There, the Third Circuit considered the limited question of

28

---

[25] *See* Plaintiffs' concurrently filed Opposition to Facebook's MSJ at 14 (collecting evidence).

-14-

"the standard for the admissibility of expert testimony in a condemnation proceeding under the Natural Gas Act[.]" *Id.* at 829. The expert relied on "anecdotal experience in his grandfather's appliance shop" to derive damages, which was "far-flung" from the question of whether "property values declines near the Three Mile Island catastrophe," and the expert admitted that his theories "can't be proven" and were the result of "put[ting] this all in my little mixing bowl and I come up with what I thought was common sense reasonable[.]" *Id.* at 834–35. In contrast, Dr. Economides' harm to competition opinions are based on well-established economic theory and record evidence.

## VII.   DR. ECONOMIDES PROPERLY CITED THE RECORD AS SUPPORT

Facebook vaguely moves to exclude specific ***paragraphs*** (not opinions) of Dr. Economides' reports for "restat[ing] or summar[izing] record evidence[.]" Mot. 8. Facebook's argument is misguided. Facebook makes blanket challenges to the record bases and factual predicates for Dr. Economides' opinions. As such, Dr. Economides' reports contain citations to the record to "provide factual context" for his opinions. *Huawei Techs., Co, Ltd v. Samsung Elecs. Co., Ltd.*, 340 F. Supp. 3d 934, 993 (N.D. Cal. 2018). That is why courts in antitrust cases routinely reject arguments like Facebook's, because "[i]t is common, indeed required, . . . for an expert to summarize the facts and data considered in their report," such that the expert economist "must be allowed to discuss facts apropos to [their] opinions." *In re Glumetza Antitrust Litig.*, 2021 WL 3773621, at *20 (N.D. Cal. Aug. 25, 2021) (denying *Daubert* motion arguing that antitrust economist improperly acted as a "human highlighter"). While Facebook purports to cite Dr. Economides' deposition, what he actually testified is that, at trial, he is not going to offer his "judgment" on factual issues like Facebook's data practices or privacy policies, but provide context for his opinions where there is record evidence ***from*** Facebook that supports them. Ex. 2 (Economides Tr.) at 169:3–171:8. That is allowed and provides no basis to "strike the factual background paragraphs from [Dr. Economides'] reports"; Plaintiffs will not "substitute expert testimony for that of fact witnesses," and to the extent Facebook has an objection to specific testimony at trial, the Court can "entertain the appropriate objection at that time." *Huawei*, 340 F. Supp. 3d at 992–93.

## VIII.   CONCLUSION

For these reasons, Consumers respectfully request that the Court deny Facebook's motion.

-15-

DATED: May 12, 2025

Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By: */s/ Shana E. Scarlett*
    Shana E. Scarlett (Bar No. 217895)
shanas@hbsslaw.com
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000

Steve W. Berman (admitted *pro hac vice*)
steve@hbsslaw.com
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292

*Interim Co-Lead Consumer Class Counsel*

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
W. Joseph Bruckner (admitted *pro hac vice*)
wjbruckner@locklaw.com
Robert K. Shelquist (admitted *pro hac vice*)
rkshelquist@locklaw.com
Brian D. Clark (admitted *pro hac vice*)
bdclark@locklaw.com
Kyle Pozan (admitted *pro hac vice*)
kjpozan@locklaw.com
Laura M. Matson (admitted *pro hac vice*)
lmmatson@locklaw.com
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900

*Interim Counsel for the Consumer Class*

By: */s/ Kevin Y. Teruya*
    Kevin Y. Teruya (Bar No. 235916)
kevinteruya@quinnemanuel.com
Adam B. Wolfson (Bar No. 262125)
adamwolfson@quinnemanuel.com
Scott L. Watson (Bar No. 219147)
scottwatson@quinnemanuel.com
Claire D. Hausman (Bar No. 282091)
clairehausman@quinnemanuel.com
Brantley I. Pepperman (Bar No. 322057)
brantleypepperman@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
Telephone: (213) 443-3000

Michelle Schmit (admitted *pro hac vice*)
michelleschmit@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606-1881
Telephone: (312) 705-7400

Manisha M. Sheth (admitted *pro hac vice*)
manishasheth@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000

*Interim Co-Lead Consumer Class Counsel*

1

**ATTESTATION OF SHANA E. SCARLETT**

2          This document is being filed through the Electronic Case Filing (ECF) system by attorney

3    Shana E. Scarlett. By her signature, Ms. Scarlett attests that she has obtained concurrence in the

4    filing of this document from each of the attorneys identified on the caption page and in the above

5    signature block.

6    Dated: May 12, 2025                          By:   */s/ Shana E. Scarlett*
                                                         Shana E. Scarlett
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSUMER PLS.' OPP'N TO DEF.'S MOT. TO EXCLUDE ECONOMIDES          Case No. 3:20-cv-08570-JD

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on May 12, 2025, I electronically transmitted the foregoing document

3   to the Clerk's Office using the CM/ECF System, causing it to be electronically served on all

4   attorneys of record.

5                                          By:   */s/ Shana E. Scarlett*

6                                               Shana E. Scarlett

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28