**PUBLIC REDACTED VERSION**

| | |
|---|---|
| WILMER CUTLER PICKERING HALE AND DORR LLP | ARI HOLTZBLATT (SBN 354631) Ari.Holtzblatt@wilmerhale.com |
| SONAL N. MEHTA (SBN 222086) Sonal.Mehta@wilmerhale.com 2600 El Camino Real, Suite 400 Palo Alto, California 94306 Telephone: (650) 858-6000 | MOLLY M. JENNINGS (*pro hac vice*) Molly.Jennings@wilmerhale.com 2100 Pennsylvania Ave NW Washington, DC 20037 Telephone: (202) 663-6000 |
| DAVID Z. GRINGER (*pro hac vice*) David.Gringer@wilmerhale.com ROSS E. FIRSENBAUM (*pro hac vice*) Ross.Firsenbaum@wilmerhale.com RYAN CHABOT (*pro hac vice*) Ryan.Chabot@wilmerhale.com PAUL VANDERSLICE (*pro hac vice*) Paul.Vanderslice@wilmerhale.com 7 World Trade Center 250 Greenwich Street New York, New York 10007 Telephone: (212) 230-8800 | MICHAELA P. SEWALL (*pro hac vice*) Michaela.Sewall@wilmerhale.com 60 State Street Boston, Massachusetts 02109 Telephone: (617) 526-6000 |

*Attorneys for Defendant Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> META PLATFORMS, INC., a Delaware Corporation, <br><br> Defendant. | Case No. 3:20-cv-08570-JD <br><br> **DEFENDANT META PLATFORMS, INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE PORTIONS OF DR. JOHN LIST'S PROPOSED TESTIMONY** <br><br> Hearing Date: TBD <br> Time: TBD <br> Judge: Hon. James Donato |

**PUBLIC REDACTED VERSION**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................................1

BACKGROUND ...................................................................................................................................2

ARGUMENT..........................................................................................................................................4

I.      Dr. List's Pricing Experiment Is Relevant And Reliable .........................................4

      A.      Plaintiffs' Critiques Of Dr. List's Pricing Experiment Are Incorrect And, If Anything, Concern Weight Not Admissibility.......................................................4

      B.      Dr. List Properly Disclosed The Data Relied On In The Pricing Experiment ...........................................................................................................8

II.     Dr. List's De-Merger Analysis Is Relevant And Reliable.....................................11

III.    Dr. List's Analysis of India's TikTok Ban Is Relevant And Reliable ...................13

IV.    Dr. List's Switching Analysis Is Relevant And Reliable ......................................14

CONCLUSION.....................................................................................................................................15

**PUBLIC REDACTED VERSION**

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Bentley v. ConocoPhillips Pipeline Co.*,
   2010 WL 11537799 (D. Mont. Feb. 3, 2010) ........................................................................... 11

*Biestek v. Berryhill*,
   587 U.S. 97 (2019) ...................................................................................................................... 8

*Bush v. Rust-Oleum Corporation*,
   2024 WL 536897 (N.D. Cal. Feb. 10, 2024) ........................................................................... 8, 9

*D&M Holdings, Inc. v. Sonos, Inc.*,
   2018 WL 734649 (D. Del. Feb. 6, 2018) ................................................................................. 11

*In re Google Play Store Antitrust Litigation*,
   2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) ........................................................................ 7, 8

*Insight Equity v. Transitions Optical, Inc.*,
   252 F. Supp. 3d 382 (D. Del. 2017) ........................................................................................... 7

*Sumotext Corp. v. Zoove, Inc.*,
   2020 WL 264701 (N.D. Cal. Jan. 17, 2020) ......................................................................... 4, 13

*Tevra Brands LLC v. Bayer HealthCare LLC*,
   2024 WL 2261946 (N.D. Cal. May 16, 2024) ...................................................................... 4, 12

*United States v. General Dynamics Corp.*,
   415 U.S. 486 (1974) .................................................................................................................. 12

*United States v. H&R Block, Inc.*,
   833 F. Supp. 2d 36 (D.D.C. 2011) ............................................................................................ 15

*United States v. United States Sugar Corp.*,
   73 F.4th 197 (3d Cir. 2023) ...................................................................................................... 12

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
   259 F.3d 1101 (9th Cir. 2001) .................................................................................................. 11

**STATUES, RULES, AND REGULATIONS**

Fed. R. Civ. P. 26(a) .............................................................................................................. 1, 8, 9

**OTHER AUTHORITIES**

FTC & U.S. Dep't of Just. Antitrust Division, Hart-Scott-Rodino Annual Report
   Fiscal Year 2023, App'x A,
   https://www.ftc.gov/system/files/ftc_gov/pdf/fy2023hsrreport.pdf ......................................... 12

**PUBLIC REDACTED VERSION**

U.S. Dep't of Just. & FTC, *Merger Guidelines* §4.3.A (2023) ...................................................12

**PUBLIC REDACTED VERSION**

**INTRODUCTION**

Dr. John List is a world-renowned (and Nobel Prize shortlisted) economist with decades of experience designing behavioral experiments. Here, he conducted an experiment to test substitution in plaintiffs' novel zero-price market by introducing a positive "price" for using Facebook through small payments to users for reducing their time on the app. This experiment showed that when faced with a small increase in the price of using Facebook, users shifted more of their time to apps outside of the alleged "Personal Social Networking Services" market, like TikTok and YouTube, than to the apps plaintiffs claim are within it. He then used the results of this experiment to conduct a "de-merger analysis" that evaluates ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Combined with other empirical analyses—a natural experiment analyzing India's 2020 ban on TikTok, and a switching analysis that measures how people trade off time between Meta's services—Dr. List's analyses undermine plaintiffs' proposed relevant market through real world data on consumer behavior. Meta's primary economist Dr. Carlton then relies on Dr. List's empirical work to support his opinions, making Dr. List's experiments highly relevant twice over. They are also the most extensive evidence of real-world substitution the factfinder will consider when evaluating plaintiffs' proposed market definition.

Plaintiffs dispute the reliability and relevance of Dr. List's testimony, but nothing in their motion warrants precluding the factfinder from considering his uniquely probative analysis. Their criticisms largely reduce to the legally erroneous claim that Dr. List—a defense witness—was required to proffer his *own* market definition to offer relevant opinions. But no decision of this court or any other supports that position. Plaintiffs also contest whether the data Dr. List relied on was properly disclosed, repackaging their belated realization that they conducted discovery poorly as a Rule 26(a) violation despite Meta's timely and comprehensive productions. Their remaining arguments—including that Dr. List's pricing experiment was too short or subject to the *Cellophane* fallacy—are wrong as a matter of both law and fact, but in any event go only to the weight Dr. List's testimony should eventually be afforded. The Court should deny the motion.

**PUBLIC REDACTED VERSION**

# BACKGROUND

Dr. List is a leading experimental and behavioral economist. He was a pioneer in the use of field experiments to evaluate how behavioral economic theories apply in the real world, and continues to focus his research on the "use of experimental economics to evaluate a wide variety of issues, including . . . how individuals make decisions [and] the validity of experimental and behavioral economic analysis." Ex. 1, List Rep. ¶24.[1] He serves on the faculties of both the University of Chicago and the Research School of Economics at Australian National University. *Id.* ¶19. He has authored more than 270 peer-reviewed articles and serves as an editor of the *Journal of Political Economy* and *Journal of Political Economy Microeconomics*. *Id.* ¶¶20, 25.

Dr. List offers two primary opinions: (1) the purported market for "Personal Social Networking Services" (PSNS) "excludes many apps and websites that are economic substitutes for Facebook and Instagram," and (2) the methods used by plaintiffs' expert Dr. Joseph Farrell to define the PSNS market are based on unsound economic logic and methods. *Id.* ¶2.

Plaintiffs do not contest Dr. List's qualifications to testify, or his second opinion rebutting Dr. Farrell, but challenge the four empirical analyses described below.[2]

***Pricing Experiment:*** To overcome the challenge of analyzing substitution involving zero-price services, Dr. List conducted an experiment involving 6,000 participants that provided users with economic incentives to reduce the amount of time they spend on Facebook or Instagram. *Id.* ¶¶6-7. This amounts to raising the price incurred by using Facebook or Instagram. *Id.* Dr. List analyzed how users in the experimental group diverted their time to other apps and activities in response to these incentives compared to those in a control group that did not face the price increase. *Id.* Dr. List found that apps that Dr. Farrell says are PSNS (Instagram, Snapchat, Google+, and MeWe) accounted for only 6% of the time diverted from Facebook. *Id.* ¶129. TikTok and YouTube, which are not part of Dr. Farrell's market, together accounted for 13% of time

---

[1] Unless otherwise noted, "Ex." citations reference exhibits to the Gringer Declaration submitted herewith, emphasis is added, internal citations are omitted, and objections are omitted throughout.

[2] The Court ordered that Meta "may offer Dr. List to opine solely on the price experiment that he conducted." Dkt. 853. Because plaintiffs have moved to exclude all of Dr. List's empirical analyses, Meta responds to the arguments raised in plaintiffs' motion.

**PUBLIC REDACTED VERSION**

1  diverted from Facebook. *Id.* Time diverted to browsers, games, and off-device activities accounted
2  for 10%, 14%, and 39% of diverted time, respectively. *Id.* For users facing a price for using
3  Instagram, PSNS apps accounted for 16% of diverted time, TikTok and YouTube accounted for
4  29%, browsers accounted for 18%, games accounted for 3%, and off-device activities accounted
5  for 29%. *Id.* ¶132.

6      *De-Merger Analysis:* Dr. Farrell claims that in his PSNS market, a hypothetical monopolist
7  test must measure "█████████████████████████████████████████
8  ███████████████████████████████████████████████████████
9  █████████████" Ex. 2, Farrell Rep. ¶109. In response, Dr. List evaluated whether a "de-merger"
10 ███████████████████████████████████████████████████████
11 ████████████████████████████████████████████████ Ex. 1, List
12 Rep. ¶16. This analysis is equivalent to a reverse HMT because it evaluates █████████
13 ████████████████████████████████████████████ *Id.* Dr. List found
14 that the de-merger would █████████████████████████████████████████
15 ██████████████████████████████████████████████ *Id.* ¶17.

16     *Analysis of India TikTok Ban:* Dr. List analyzed changes in user behavior in response to
17 India's June 2020 decision to ban TikTok and other Chinese apps. *Id.* ¶9. He found that
18 engagement on Facebook and Instagram increased following the ban, both in absolute levels and
19 relative to the rest of the world. *Id.* Section III(B)(2)(ii). Dr. List concluded that this analysis is
20 inconsistent with plaintiffs' claim that Facebook and Instagram participate in a market that
21 excludes TikTok. *Id.* ¶153. Dr. List noted that ██████████████████████████
22 ███████████████████████████████████████████████████████
23 ███████████████████████████████████████████████████████
24 ████████████████████████ *Id.* ¶139.

25     *Switching Analysis:* Dr. List analyzed ████████████████████████████
26 ███████████████████████████████████████████████████████
27 ███████████████████████████████████████████████████████
28 ████ *Id.* ¶¶156, 162. He found that users who change their time spent on Facebook distribute that

**PUBLIC REDACTED VERSION**

time across a variety of apps, with little time moving to or from the other "PSNS" apps. *Id.* ¶¶169-72. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *Id.* Neither is in Dr. Farrell's PSNS market.

## ARGUMENT

### I. DR. LIST'S PRICING EXPERIMENT IS RELEVANT AND RELIABLE

Plaintiffs seek to exclude Dr. List's pricing experiment by distorting the law and ignoring the record. Plaintiffs misstate which party has the burden on market definition, misstate Dr. List's opinion, and manufacture a discovery violation when in fact the parties agreed to the production schedule. The Court should not exclude this highly probative experiment that directly measures consumer behavior in response to price changes in the proposed market.

#### A. Plaintiffs' Critiques Of Dr. List's Pricing Experiment Are Incorrect And, If Anything, Concern Weight Not Admissibility

Plaintiffs' relevance and reliability arguments amount to a weak cross-examination. They do not come close to justifying exclusion.

*First*, plaintiffs get the law backwards in asserting that a defense expert's testimony on market definition is irrelevant unless he proffers his own market definition. Mot. 4. There is no requirement that defense experts, let alone defendants, offer a competing market definition. This burden rests with plaintiffs alone; it "is well accepted that a defendant has no responsibility to put forth a market definition." *Tevra Brands LLC v. Bayer HealthCare LLC*, 2024 WL 2261946, at *2 (N.D. Cal. May 16, 2024); *Sumotext Corp. v. Zoove, Inc.*, 2020 WL 264701, at *3 (N.D. Cal. Jan. 17, 2020) ("[Plaintiff] has offered no authority for the proposition that [a defense expert] must offer her own market definitions in order to criticize Dr. Sullivan's market definitions."). A defense expert—like Dr. List—may instead testify that a "'plaintiff's expert's methodology was conducted improperly in some way.'" *Sumotext Corp.*, 2020 WL 264701, at *3. So Dr. List properly "evaluate[d] [plaintiffs'] proposed market definition and the analysis supporting this definition," Ex. 1, List Rep. ¶2, and need not "conceive and build a new market," Ex. 3, List Tr. 105:10-15.

*Second,* plaintiffs argue that the pricing experiment improperly considered short-term substitution and "off-device" diversion activities, Mot. 4-5, but these are contentions about the

1  *value* of the evidence and classic questions of weight—not reliability. For good reason: Dr. List's
2  use of a field experiment is a well-accepted and uniquely probative method to evaluate patterns of
3  diversion as part of assessing the relevant market. Dr. Farrell agrees. Ex. 2, Farrell Rep. ¶287 n.623
4  ("███████████████████████████"). Over the past two decades, the
5  use of field experiments in empirical economic research has grown rapidly across a range of
6  economic disciplines. Ex. 1, List Rep. ¶63. And an experiment is particularly useful in this case,
7  where Facebook and Instagram are available free of charge. That makes the traditional data on
8  consumer responses to price changes used to develop demand elasticities and cross-elasticities
9  unavailable. *Id.* ¶55. Dr. List applied these "widely accepted principles and tools of economic
10 experimentation" to collect the most relevant information about substitution possible. *Id.* ¶66.
11 Notably, none of these criticisms apply to Dr. List's separate finding that participants "did not
12 significantly differ" in *which* aspects of Facebook and Instagram they reduced their use of, Ex. 1,
13 List Rep. ¶¶196-200, which independently undermines Dr. Farrell's opinion that "friends and
14 family" uses of Meta's services would be less substitutable with non-PSNS apps, Ex. 2, Farrell
15 Rep. ¶19.

16      Dr. List's considered decisions about the length of his experiment only confirm its
17 reliability. The eight-week—not four, Mot. 4—time span of the pricing experiment served as a
18 surrogate for long-term substitution and was chosen based on Dr. List's 35 years of experience
19 conducting field experiments and generating surrogates for long-run predictions. Ex. 3, List Tr.
20 284:14-285:2. As Dr. List explained in detail, if a short-term experiment is stable, as it is here, it
21 can operate as a long-term proxy. *See id.* 253:24-255:3, 256:24-257:10, 259:25-260:12, 284:14-
22 285:7.

23      These decisions were well-grounded in the evidence. For *three years* before launching the
24 pricing experiment, Dr. List conducted preliminary studies and pretested the experiment, using
25 multiple pilot programs to ensure that the design and implementation were reliable. Ex. 1, List
26 Rep. ¶¶8, 69; Ex. 3, List Tr. 79:20-81:12, 243:24-244:18, 249:13-250:1, 251:7-253:23. And as Dr.
27 List explained, he had every reason to conclude that his experimental observations were probative
28 of longer-term behavior: In the pilot programs, "things settled down after about a week and then

**PUBLIC REDACTED VERSION**

1  they stayed pretty solid at that time . . . . So [he] made the decision that this is going to be my
2  surrogate. And this surrogate is going to give me a relationship or a proxy of my diversion rates."
3  Ex. 3, List Tr. 253:24-255:3. Based on his analysis of the durability of these preliminary results,
4  the pricing experiment's experimental arm spanned four weeks and included data on participants'
5  engagement for the preceding four weeks. *See* Ex. 1, List Rep. ¶¶89-90. Nothing about this
6  evidence-based process evinces unreliability.

7  Plaintiffs then ignore Dr. List's actual analysis in arguing that the degree of diversion to
8  "off-device" activities during the experiment—*i.e.*, things that do not involve using an app—
9  undermines the relevance and reliability of his opinions. As plaintiffs admit, Dr. List *did not* opine
10 that off-device activities were "useful substitutes" for Facebook, nor did he assert that they should
11 be included in a relevant market. *See, e.g.*, Ex. 3, List Tr. 108:1-109:2. Instead, the inclusion of
12 off-device time necessarily followed from the comprehensiveness of the experiment, which
13 tracked everything that participants did when not using Facebook. *Id.* Dr. List's actual opinions
14 instead turn on his analysis of how consumers substituted between apps in the proposed relevant
15 market *as compared* to apps and activities outside of it. Ex. 1, List Rep. ¶11. These results, as
16 explained, showed that PSNS is "not a well-defined market." Ex. 3, List Tr. 113:8-114:7. Dr. List
17 was not required to opine that "'Off-Device' activities should have been, but were not, included
18 in" that market for his opinion to be relevant. Mot. 4.

19 *Third*, plaintiffs make both factual and legal errors in arguing that Dr. List failed to control
20 for the *Cellophane* fallacy. Mot. 5-6. Dr. List *did* account for the *Cellophane* fallacy—he devotes
21 an entire subsection of his report to addressing why it does not affect the results of his pricing
22 experiment. Ex. 1, List Rep. ¶¶268-79. As he explained, there is no evidence that the principle
23 applies in the first instance, *id.* ¶¶270-71, and "no basis to conclude that substitution patterns based
24 on current patterns of app use would be likely to be materially different from those expected in the
25 'but for' world," *id.* ¶272. Dr. List further explained that as a monopolist raises prices or degrades
26 the quality of its product, "consumers that were on the margin between switching to another
27 product at the competitive price are replaced by a new set of consumers that are on the margin at
28 the monopoly price or quality." *Id.* ¶273. Accordingly, there is no reason to "expect that diversion

1   rates between the new and old marginal customers would differ." *Id.* So whether or not plaintiffs
2   believe Dr. List sufficiently "control[s] for" the concept, Mot. 5, he has explained why the analysis
3   he offers remains probative of consumer behavior in the proposed market, *e.g.*, Ex. 1, List Rep.
4   ¶¶268-73. Such reasoned explanations are not "ipse dixit," Mot. 6, and do not warrant exclusion.

5     The *Cellophane* fallacy also only has purchase in a market operating at a "monopolized
6   price." Ex. 4, Carlton Rep. ¶9. Here the price for all of the relevant apps is zero, none of plaintiffs'
7   experts have opined that the alleged monopoly lowered quality, and plaintiffs' motion proceeds on
8   the assumption that this monetary price represents a monopoly rate. But the notion that plaintiffs
9   may ultimately carry their burden at trial of establishing monopoly power in a relevant market
10  cannot affect the *admissibility* of testimony addressing the proposed market. Unsurprisingly, then,
11  no court that Meta could identify has ever limited testimony regarding quantitative evidence of
12  substitution—or even discounted the weight of such testimony—because of the *possibility* of the
13  *Cellophane* fallacy. The only court to address the *Cellophane* fallacy in the context of a *Daubert*
14  motion (of which Meta is aware; plaintiffs cite none) held that these are "academic criticisms" that
15  concern weight, not admissibility. *See Insight Equity v. Transitions Optical, Inc.*, 252 F. Supp. 3d
16  382, 389-90 (D. Del. 2017).

17    Plaintiffs also analogize Dr. List's analysis to the testimony of Hal Singer that this Court
18  excluded in *In re Google Play Store Antitrust Litigation*, 2023 WL 5532128 (N.D. Cal. Aug. 28,
19  2023). But Dr. List is not Hal Singer, and his analysis is entirely different (and more methodical
20  and reasoned) than that at issue in *Google Play*. There, this Court excluded Singer's testimony
21  because his model was "not within accepted economic theory and literature, and [was] based on
22  assumptions . . . not supported by the evidence." *Id.* at *9. Singer's "wholly speculative
23  assumptions" were made "with no visible factual support" or "real analysis or data." *Id.* at *9-10
24  (noting Singer opined "I assume conservatively that Google would have retained a substantial
25  market share of 60 percent" because "this was approximately AT&T's market share" without
26  explaining "why the situation AT&T faced in the telecom market in the 1980s is a good benchmark
27  for Google's app store practices today"). By contrast, Dr. List's conclusion was indisputably based
28

**PUBLIC REDACTED VERSION**

on "real analysis [and] data," *id.* at *10, using a tested and methodically rigorous experiment.[3]

### B. Dr. List Properly Disclosed The Data Relied On In The Pricing Experiment

Without authority and contrary to the parties' express agreement, plaintiffs argue that the pricing experiment should be excluded because (1) "Dr. List's staff at Compass Lexecon [had] access to all Facebook data," when plaintiffs did not; and (2) data that "Dr. List eventually used as an input in his pricing experiment was not disclosed to [plaintiffs] until Dr. List served his report." Mot. 7. These arguments are wrong about Rule 26(a), ignore the trove of data Meta made available to plaintiffs' experts in full satisfaction of plaintiffs' discovery requests, and disregard Dr. List's timely production of all the data he considered in preparing his experiment.

#### 1. Plaintiffs Are Not Entitled To "Carte Blanche Access" To Meta's Servers

Plaintiffs' assertion that Meta violated Rule 26(a) by not producing all data made available to Dr. List's staff conflates *access* to data by a testifying expert's consulting *staff* with data the *expert actually considered*. Mot. 6, 8. An expert must disclose only "the facts or data considered *by the witness* in forming" his opinions. Fed. R. Civ. P. 26(a)(2)(B)(ii); *accord Biestek v. Berryhill*, 587 U.S. 97, 104 (2019) ("[I]n federal court . . . an expert witness must produce all data she has considered in reaching her conclusions."). This obligation, by its own terms, does not extend to material reviewed by the testifying expert's staff but not the expert. And here the parties agreed to an even narrower obligation, committing to disclose only, "for all calculations appearing in the report, the data set and programs underlying the calculations that were *relied upon* by the expert." Dkt. 175 at 2-3. Nothing in the rule, the parties' agreement, or any authority plaintiffs have identified requires production of every piece of data any staff member had access to at any time.

*Bush v. Rust-Oleum Corporation*, 2024 WL 536897 (N.D. Cal. Feb. 10, 2024), is squarely on point. There, the court denied a motion to exclude expert testimony for non-disclosure where the data at issue was analyzed by the "expert's contractor or employee" but "never actually provided to" the expert. *Id.* at *4. The court held that "[t]he Ninth Circuit has said that the data an expert 'considered' under Rule 26(a) refers to data the expert 'was provided or otherwise exposed

---

[3] Dr. List's de-merger analysis evaluates ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ *See* Ex. 1, List Rep. ¶269.

**PUBLIC REDACTED VERSION**

to in the course of developing his or her opinions.'" *Id.* (quoting *Republic of Ecuador v. Mackay*, 742 F.3d 860, 869-70 (9th Cir. 2014)). Here, as in *Bush*, "[t]he plaintiff cites no cases indicating otherwise in the context of an expert's contractor or employee," and the express language of Rule 26(a) controls. *Id.* So here, as in *Bush*, plaintiffs are not entitled to documents accessible to Dr. List's consulting staff but never considered by Dr. List in preparing his expert report.

Plaintiffs also make much of supposed production delays and "gamesmanship," Mot. 6, but ignore that the scope and pace of data discovery derived only from their own procrastination. Fact discovery began on April 2, 2021. *See* Dkt. 82. As plaintiffs acknowledge, they inexplicably waited until their *fifth* set of RFPs to seek data on Meta users, and served those requests on December 23, 2022 (Mot. 7-8)—four days after the substantial completion deadline for document production and more than 18 months after fact discovery began. Following the belated RFPs, Meta proposed "produc[ing] daily user-level data for the last week of April and the first week of October each year between January 1, 2012 and June 30, 2022 for an anonymized random sample of 100,000 users." Ex. 5, Mar. 17, 2023 Letter from M. Jennings to K. Teruya. Plaintiffs ultimately rejected negotiating a production tailored to this case, and asked that Meta "simply re-produce the structured data that it had already produced to the FTC, as that data seemed to overlap" with plaintiffs' RFPs. Dkt. 587 at 1. Meta warned plaintiffs that the FTC production was voluminous, but they nevertheless sought a carbon copy. After extensive negotiation, including directly between lead counsel, the parties agreed that Meta would hand over all data produced in the FTC action—over 1.25 terabytes of data—along with communications describing what was in the data to the extent they existed. Critically, the reproduction was conditioned on plaintiffs' agreement that they would "not seek to reopen resolved issues related to Users' Fifth Set of RFPs." Ex. 6, Apr. 27, 2023 E-mail from K. Teruya to S. Mehta.[4] When plaintiffs were overwhelmed by the amount of data Meta produced (and setting aside that their brief here complains about not receiving

---

[4] Plaintiffs also agreed that they would "make best efforts" to immediately raise any follow-up questions about the FTC production, and "promptly meet and confer" with Meta's counsel if they identified "any open items." Ex. 6 at 3. Plaintiffs used that opportunity to ask additional questions, but none had anything to do with the arguments raised in the motion. The motion's attempt to reopen discussion in contravention of the agreement is thus doubly untimely.

*enough* data), they asked for an extension of the expert discovery schedule. Dkt. 587 at 3. The Court denied that request. Hr'g Tr. 4:15-17 (June 22, 2023).

Any supposed prejudice resulting from the time plaintiffs had to analyze Meta's productions, Mot. 7-9, thus directly results from plaintiffs' own delay in seeking data and their choice to rely on the requests made in the FTC case rather than their own. This is not a record of prejudice but of plaintiffs' willful procrastination in timely seeking data that plaintiffs now contend their experts needed to prepare their reports. Plaintiffs' claim that some collateral, unspecified, additional data—beyond the terabytes of data that Meta already made available to plaintiffs' experts based on the parties' agreement—would have allowed them to "run a different or counter experiment," Mot. 8, is not credible.

### 2. Dr. List Produced All The Data He Relied Upon, Consistent With The Parties' Stipulated Order Regarding Expert Discovery

Plaintiffs next fault Meta for producing data on a schedule they negotiated, claiming that "the particular Facebook data Dr. List eventually used as an input in his pricing experiment" should have been disclosed before he served his report. Mot. 7. But the parties explicitly agreed to produce materials relied upon by experts *after* the exchange of reports. Dkt. 173-2 at 2 ("The parties agree that the following materials will be disclosed within three days of each expert report . . . copies of all materials relied upon by the expert in forming any opinions in his or her report . . . that were not previously produced and that are not readily available publicly;" and "for all calculations appearing in the report, the data set and programs underlying the calculations that were relied upon by the expert"). Indeed, that is how plaintiffs produced the data their own experts relied upon. The data Dr. List relied upon as an input in his pricing experiment was likewise timely produced—as agreed—on January 16, 2024. Production per the parties' stipulation alone suffices to reject plaintiffs' non-disclosure claim.

As against this express agreement, plaintiffs appear to suggest Dr. List's "input" data was independently responsive to the December 2022 RFPs discussed above. Mot. 8. Exactly *which* of those requests required production of the data is never said. Regardless, plaintiffs' argument again ignores their own agreements. As explained, plaintiffs agreed that Meta's reproduction of the

**PUBLIC REDACTED VERSION**

1  terabytes of data produced to the FTC resolved the December 2022 requests. *Supra*, at 9. Plaintiffs
2  cannot now—years after the close of discovery—relitigate the choices that *they* made about how
3  to address their data requests.

4  Without any facts to support their position, plaintiffs turn to inapposite caselaw. Mot. 9.
5  *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101 (9th Cir. 2001), concerned an
6  untimely expert *report*, not its accompanying data. And there, the defendants had waited "almost
7  two years after the close of discovery, more than one year *after* [plaintiff's] [opening] report was
8  last supplemented, and just 28 days prior to trial" to disclose the report. *Id.* at 1105. Here there is
9  no dispute that Dr. List's report was timely disclosed. *Bentley v. ConocoPhillips Pipeline Co.* is
10 no more persuasive—the court excluded portions of a report that expressly relied on policies the
11 defendant claimed to, but had not in fact, produced. 2010 WL 11537799, at *7-8 (D. Mont. Feb.
12 3, 2010). Plaintiffs, in contrast, acknowledge that "Dr. List produced the Facebook data he used."
13 Mot. 8. No authority cited in the motion bears even a passing resemblance to the facts here.

14 Finally, even if plaintiffs *could* establish that Meta improperly failed to disclose any data—
15 and they cannot—any such non-disclosure was substantially harmless. Plaintiffs received all of the
16 data Dr. List relied on with his opening report, plaintiffs had the opportunity to depose Dr. List on
17 that data six weeks later, and it is clear from his deposition testimony how he used the data in his
18 pricing experiment. If plaintiffs have more questions they are free to cross-examine Dr. List at
19 trial. *See D&M Holdings, Inc. v. Sonos, Inc.*, 2018 WL 734649, at *2 (D. Del. Feb. 6, 2018) ("If
20 plaintiffs want to cross-examine [defendant's employee] or [defendant's expert] or both on [the
21 report], they know what to ask, either at deposition or at trial.").

22 **II.   DR. LIST'S DE-MERGER ANALYSIS IS RELEVANT AND RELIABLE**

23 Plaintiffs assert that Dr. List's use of the pricing experiment's results as an input to his de-
24 merger model requires excluding the latter, Mot. 9, but as explained the experiment provides
25 reliable, relevant evidence, *supra*, at 4-8. And regardless, plaintiffs ignore that Dr. List conducted
26 a version of the de-merger analysis that did not rely on the experiment. *See* Ex. 7, List Reply Rep.
27 ¶36. Plaintiffs' remaining challenges to the de-merger analysis fare no better.

28 *First*, plaintiffs' attack on Dr. List's use ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

1   misconstrues the testimony of Meta's primary economist, Dr. Carlton. Plaintiffs selectively quote

2   Dr. Carlton's testimony to suggest that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ but the full sentence

3   they quote actually says ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

4   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *Compare* Mot. at 9-10, *with*

5   Ex. 8, Carlton Tr. 118:2-22. In other words, Dr. Carlton testified ▇▇▇▇▇▇▇▇

6   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Moreover, it is plaintiffs' *own expert* who ▇▇▇▇

7   ▇▇▇▇▇▇▇▇▇▇▇▇▇ Dr. Farrell states that ▇▇▇▇▇▇▇▇▇▇▇▇

8   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

9   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

10  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Ex. 2, Farrell Rep. ¶109. And yet Dr. Farrell does not

11  actually analyze ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *Id.* ¶210. Dr.

12  List's analysis is therefore admissible—at the very minimum—as showing "the ultimate

13  conclusion that [Farrell] makes is flawed because a superior methodology provides a different

14  result." *Tevra Brands LLC*, 2024 WL 2261946 at *2.

15       *Second*, plaintiffs argue that Dr. List's opinion that a de-merger ▇▇▇▇▇▇▇▇ is

16  "contrary to law," but get the law (and economics) wrong. It is hornbook law that not all mergers

17  lead to anticompetitive effects. *United States v. General Dynamics Corp.*, 415 U.S. 486, 503-04

18  (1974). That is why the vast majority of mergers are approved. *See* FTC & U.S. Dep't of Just.

19  Antitrust Division, Hart-Scott-Rodino Annual Report Fiscal Year 2023, App'x A,

20  https://www.ftc.gov/system/files/ftc_gov/pdf/fy2023hsrreport.pdf (noting that of 1,805

21  transactions reported in FY 2023, only 37 of them led to a Second Request). Moreover, of the

22  mergers that are challenged, not all challenges succeed. *See, e.g.*, *United States v. United States*

23  *Sugar Corp.*, 73 F.4th 197, 207-08 (3d Cir. 2023). To assess the potential effects of a merger on

24  competition, economists and courts use econometric tools like an HMT. U.S. Dep't of Just. &

25  FTC, *Merger Guidelines* §4.3.A (2023). That is exactly what Dr. List has done. His analysis

26  suggests that there is no PSNS market ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

27  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Ex.

28  1, List Rep. ¶267; *see also* Ex. 8, Carlton Tr. 243:18-244:16 (endorsing analysis).

**PUBLIC REDACTED VERSION**

More fundamentally, plaintiffs ignore that Meta operates in a multisided market with offsetting incentives that render the theoretical effect of reduced competition ambiguous. Plaintiffs' claim that increased competition from a de-merger *must* benefit users as a matter of law—in addition to being wrong on its own terms—elides those tradeoffs by focusing on only one side of the market in which Meta competes. And as Dr. List explains, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Ex. 1, List Rep. ¶¶259-62. For example, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ *Id.* ¶¶260-63. Dr. List's analysis is fully consistent with this economic theory.

### III.   DR. LIST'S ANALYSIS OF INDIA'S TIKTOK BAN IS RELEVANT AND RELIABLE

Dr. List's TikTok ban analysis reliably measures the existence of substitution and provides relevant evidence of how consumers view apps in and out of the proposed market. Using the Synthetic Control Method and statistical analysis to assess how much the TikTok ban affected engagement on Facebook and Instagram, Dr. List concludes that the "TikTok ban had an immediate and sizeable long-term effect on engagement on both Facebook and Instagram in India." Ex. 1, List Rep. ¶¶137-54. Plaintiffs do not raise any concerns with Dr. List's rigorous methodology, data, or analysis of the time users spent on Facebook and Instagram during the TikTok ban—only the relevance of looking at the ban at all. But the ban is relevant because it provides a natural experiment showing how users view TikTok vis-à-vis Facebook and Instagram.

Plaintiffs primarily reprise the legally baseless claim that the TikTok ban analysis is irrelevant because Dr. List does not define his own market. Mot. 11. But as explained, *supra*, at 4-5, Dr. List is not required to define a relevant market to critique plaintiffs' proposed market. Dr. List's analysis and conclusion that plaintiffs improperly excluded TikTok as an economic substitute show that "plaintiff[s'] expert's methodology was conducted improperly in some way." *Sumotext Corp.*, 2020 WL 264701, at *3.

Plaintiffs also argue that analyzing diversion in India *from* (rather than to) TikTok undermines relevance, Mot. 12-13, but Dr. List addressed the effect of geography, and the direction of diversion is immaterial. Dr. List acknowledges that there are geographic limitations to the

**PUBLIC REDACTED VERSION**

1  natural experiment, yet explained that the ban still provides useful data on user behavior because
2  "there is no material difference in these apps between India and the United States." Ex. 1, List
3  Rep. ¶138. That kind of functional analysis is employed (albeit incorrectly) by Dr. Farrell in
4  advancing his market definition, and plaintiffs identify no authority for excluding Dr. List's
5  analysis on that basis. Dr. List then further supported the relevance of his comparison by ▮▮▮▮
6  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
7  ▮▮▮▮▮▮▮ *Id.* ¶139. Plaintiffs' assertion that the TikTok ban measures the "wrong movement and
8  cross-elasticity of demand" is just as wrong. The very authority cited for the claim announces the
9  opposite principle, explaining that there *is* a presumption that the direction of substitution will be
10 symmetric, even if the cross-elasticities are not equal. *See* Dkt. 936-9 at 4, Perloff & Carlton,
11 *Modern Industrial Organization*, 2d ed. at 807 n.18. Conducting analysis according to established
12 economic theories does not warrant exclusion.
13     Dr. Farrell has also conceded the relevance of analyzing the TikTok ban. Ex. 9, Farrell 9/23
14 Tr. 48:7-50:20. Indeed, after Meta's counsel "suggested that [Farrell] spend more time looking at
15 TikTok" during his September 22, 2023 deposition, Dr. Farrell included an analysis of the India
16 TikTok ban in his own opening report in further support of his opinion. Ex. 10, Farrell 3/24 Tr.
17 190:25-192:7; Ex. 2 Farrell Rep. ¶163 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"). Plaintiffs'
19 apparent position that the natural experiment was fair game for Dr. Farrell to consider in offering
20 a market but not fair game for Dr. List to consider in rebutting that market makes no sense. And
21 in any event, the differences at most go to the weight to be assigned to the analysis.
22 **IV.   DR. LIST'S SWITCHING ANALYSIS IS RELEVANT AND RELIABLE**
23     Plaintiffs do not challenge the methodology underlying Dr. List's switching analysis and
24 instead raise more baseless relevance objections. Mot. 13. But the fact that the switching analysis
25 does not explain *why* users shift more time from Facebook to TikTok and YouTube than Instagram
26 and Snapchat has no bearing on its utility. As Dr. List explained, the switching analysis "should
27 be viewed as a complement to the substitution exercise." Ex. 3, List Tr. 97:12-98:16. When courts
28 have considered similar switching or "share of wallet" exercises in other cases, they rightly admit

**PUBLIC REDACTED VERSION**

the evidence and "treat it as another data point," particularly where "no more refined historical data apparently exists." *See, e.g.*, *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 65 (D.D.C. 2011). Contrary to plaintiffs' argument, the switching analysis does more than enough to "further the inquiry into what is the relevant market in this case," Mot. 13, by corroborating the pricing experiment with data from a vast pool of users over a multiyear period. Excluding it would deprive the factfinder of some of the only real-world evidence of user behavior in this case. And plaintiffs' contention that the switching analysis does not "permit a conclusion" that a given app should be in the relevant market, Mot. 14, again misses the point. Defense experts are not required to affirmatively define a market, and the analysis helps explain why plaintiffs' market is deficient. *Supra*, at 4-5.

**CONCLUSION**

The Court should deny the motion.[5]

Dated: May 12, 2025

Respectfully submitted,

By: */s/ Sonal N. Mehta*

SONAL N. MEHTA (SBN 222086)
  Sonal.Mehta@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

*Attorney for Defendant Meta Platforms, Inc.*

---

[5] Plaintiffs purport to reserve their right to move to exclude Dr. Anindya Ghose, an expert Meta proffered to rebut Sarah Lamdan's opinions in the event the Court permits her to testify. Mot. 1 n.1. The court-ordered deadline for Rule 702 motions was April 28, 2025, Dkt. 896, and any such motion would be untimely.

**PUBLIC REDACTED VERSION**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of May, 2025, I electronically transmitted the public redacted version of the foregoing document to the Clerk's Office using the CM/ECF System and caused the version of the foregoing document filed under seal to be transmitted to counsel of record by email.

By:   */s/ Sonal N. Mehta*
      Sonal N. Mehta

No. 3:20-cv-08570-JD                                    META'S OPPOSITION TO MOTION
                                                         TO EXCLUDE JOHN LIST