1

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Shana E. Scarlett (Bar No. 217895)
shanas@hbsslaw.com
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Kevin Y. Teruya (Bar No. 235916)
kevinteruya@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000

2

3

4

5

6

*Attorneys for Plaintiffs Maximilian Klein,*
*Rachel Banks Kupcho, and Sarah Grabert*

7

[Additional counsel listed on signature page]

8

9

10

11

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

12

13

14

15

16

17

18

19

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., | Consolidated Case No. 3:20-cv-08570-JD |
| Plaintiffs, | **CONSUMER PLAINTIFFS' OPPOSITION TO FACEBOOK'S MOTION FOR SUMMARY JUDGMENT REGARDING CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT** |
| vs. | |
| META PLATFORMS, INC., | The Hon. James Donato |
| Defendant. | Hearing Date: July 24, 2025 at 10:00 a.m. |
| This Document Relates To: All Consumer Actions | **REDACTED VERSION FILED PUBLICLY** |

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ................................................................................................. 1

II.  BACKGROUND ................................................................................................ 2

    A.  Evidence That Facebook Wields Monopoly Power in the PSNS Market ................. 3

    B.  Evidence That Facebook Has Acquired and Maintained Its Monopoly Power By Deception ................................................................................ 4

    C.  Evidence That Facebook's Anticompetitive Deception Has Harmed Users ............. 6

III.  LEGAL STANDARD ......................................................................................... 7

IV.  ARGUMENT ..................................................................................................... 8

    A.  Consumers Have Demonstrated Antitrust Injury and Standing ............................ 8

    B.  The Extent to Which Facebook's Deception Harmed Competition Turns on Disputed Facts That the Jury Must Resolve ............................................. 13

        1.  Substantial Evidence Shows Facebook's Deception Harmed Competition .................................................................................... 13

        2.  Rather Than Engage With the Record, Facebook Mischaracterizes Consumers' Testimony and Their Experts' Opinions .......................... 14

    C.  Ample Evidence Would Allow Reasonable Jurors To Find That Consumers' Market Definition Is Correct ........................................................... 18

    D.  Facebook Is Not Entitled to Summary Judgment on Timeliness Grounds ............. 21

        1.  Facebook Committed Multiple New Instances of Anticompetitive Deception During the Limitations Period .................................... 22

        2.  Facebook's New Instances of Deception Inflicted New and Accumulating Injuries on Competition and Consumers Within the Limitations Period ....................................................................... 23

    E.  Facebook's Attempted Monopolization and Injunctive Relief Arguments Fail ........................................................................................ 25

CONCLUSION ......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Airweld, Inc. v. Airco, Inc.*,
   742 F.2d 1184 (9th Cir. 1984) ................................................................................. 25

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*,
   190 F.3d 1051 (9th Cir. 1999) ................................................................................. 10

*Am. Ad Mgmt., Inc. v. GTE Corp.*,
   92 F.3d 781 (9th Cir. 1996) ....................................................................................... 8

*AngioDynamics, Inc. v. C.R. Bard, Inc.*,
   537 F. Supp. 3d 273 (N.D.N.Y. 2021) ....................................................................... 8

*Apple Inc. v. Pepper*,
   587 U.S. 273 (2019) ................................................................................................. 10

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*,
   166 F. Supp. 3d 988 (N.D. Cal. 2015) ..................................................................... 23

*Chang v. Farmers Ins. Co., Inc.*,
   2023 WL 5163288 (C.D. Cal. July 12, 2023) .......................................................... 23

*City of Anaheim v. S. California Edison Co.*,
   955 F.2d 1373 (9th Cir. 1992) ................................................................................. 16

*City of Oakland v. Oakland Raiders*,
   20 F.4th 441 (9th Cir. 2021) .................................................................................... 12

*Conwood Co. v. U.S. Tobacco Co.*,
   290 F.3d 768 (6th Cir. 2002) ................................................................................... 13

*Coronavirus Rep. v. Apple Inc.*,
   85 F.4th 948, 956 (9th Cir. 2023) ............................................................................ 20

*Coronavirus Rep. v. Apple Inc.*,
   2021 WL 5936910 (N.D. Cal. Nov. 30, 2021) ......................................................... 20

*Duarte v. Quality Loan Serv. Corp.*,
   2018 WL 2121800 (C.D. Cal. May 8, 2018) ............................................................ 25

*DZ Rsrv. v. Meta Platforms, Inc.*,
   96 F.4th 1223 (9th Cir. 2024) .................................................................................. 18

*Electroglas, Inc. v. Dynatex Corp.*,
   497 F. Supp. 97 (N.D. Cal. 1980) ............................................................................ 25

1    *Fed. Trade Comm'n v. D-Link Sys., Inc.,*
        2018 WL 6040192 (N.D. Cal. Nov. 5, 2018) ................................................ 8
2
3    *Fed. Trade Comm'n v. Meta Platforms, Inc.,*
        2024 WL 4772423 (D.D.C. Nov. 13, 2024) ................................. 18, 19, 20
4
     *Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.,*
5        397 F.3d 1217 (9th Cir. 2005) ................................................................ 16
6    *Hanover Shoe, Inc. v. United Shoe Mach. Corp.,*
        245 F. Supp. 258 (M.D. Pa. 1965) ......................................................... 22
7
8    *Hanover Shoe, Inc. v. United Shoe Mach. Corp.,*
        392 U.S. 481 (1968) ............................................................................... 22
9
10   *Hauk v. JP Morgan Chase Bank USA,*
        552 F.3d 1114 (9th Cir. 2009) .................................................................. 8
11   *Heckman v. Live Nation Ent., Inc.,*
        2025 WL 1141266 (C.D. Cal. Apr. 11, 2025) ......................................... 12
12
13   *Hennegan v. Pacifico Creative Serv., Inc.,*
        787 F.2d 1299 (9th Cir. 1986) ................................................................ 22
14
     *High Tech. Careers v. San Jose Mercury News,*
15       996 F.2d 987 (9th Cir. 1993) ................................................................... 18
16   *Insignia Sys. v. News Am. Mktg. In-Store, Inc.,*
        661 F. Supp. 2d 1039 (D. Minn. 2009) .................................................... 14
17
18   *In re Am. Express Anti-Steering Rules Antitrust Litig.,*
        19 F.4th 127 (2d Cir. 2021) ..................................................................... 12
19
20   *In re Facebook Biometric Info. Priv. Litig.,*
        2018 WL 2197546 (N.D. Cal. May 14, 2018) ........................................... 7
21   *In re Glumetza Antitrust Litig.,*
        2021 WL 1817092 (N.D. Cal. May 6, 2021) ...................................... 12, 19
22
23   *In re Google Play Store Antitrust Litig.,*
        2022 WL 17252587 (N.D. Cal. Nov. 28, 2022) ....................................... 25
24
     *In re Google Play Store Antitrust Litig.,*
25       Case No. 21-md-02981-JD (N.D. Cal.) ............................................. 19, 21
26   *In re Online DVD Rental Antitrust Litig.,*
        2011 WL 1629663 (N.D. Cal. Apr. 29, 2011) ......................................... 12
27
28   *In re Online DVD-Rental Antitrust Litig.,*
        779 F.3d 914 (9th Cir. 2015) ................................................................... 12

*In re Optical Disk Drive Antitrust Litig.*,
    2016 WL 467444 (N.D. Cal. Feb. 8, 2016) ............................................................................ 9

*In re Seroquel XR Antitrust Litig.*,
    2025 WL 992004 (D. Del. Apr. 2, 2025) ............................................................................... 12

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997) ............................................................................................................... 21

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*,
    762 F.3d 1114 (10th Cir. 2014) ............................................................................................ 13

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,
    275 F.3d 762 (9th Cir. 2001) ................................................................................................ 19

*McCarthy v. Intercontinental Exch., Inc.*,
    2022 WL 4227247 (N.D. Cal. Sept. 13, 2022) ..................................................................... 12

*Meijer, Inc. v. 3M*,
    2005 WL 1660188 (E.D. Pa. July 13, 2005) ........................................................................ 24

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
    924 F.2d 1484 (9th Cir. 1991) .............................................................................................. 21

*Oliver v. SD-3C LLC*,
    751 F.3d 1081 (9th Cir. 2014) ........................................................................................ 22, 24

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997) ................................................................................................. 21

*Rodriguez v. Google LLC*,
    2025 WL 50425 (N.D. Cal. Jan. 7, 2025) ............................................................................ 11

*Samsung Elecs. Co. v. Panasonic Corp.*,
    747 F.3d 1199 (9th Cir. 2014) ........................................................................................ 21, 23

*SaurikIT, LLC v. Apple Inc.*,
    2022 WL 1768845 (N.D. Cal. May 26, 2022) ..................................................................... 23

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
    875 F.2d 1369 (9th Cir. 1989) .............................................................................................. 21

*Trendsettah USA, Inc. v. Swisher Int'l Inc.*,
    2016 WL 6822191 (C.D. Cal. Jan. 21, 2016) ...................................................................... 21

*TYR Sport, Inc. v. Warnaco Swimwear, Inc.*,
    709 F. Supp. 2d 821 (C.D. Cal. 2010) ................................................................................. 14

*United States v. Oracle Corp.*,
    331 F. Supp. 2d 1098 (N.D. Cal. 2004) ............................................................................... 21

*Univac Dental Co. v. Dentsply Int'l, Inc.*,
    702 F. Supp. 2d 465 (M.D. Pa. 2010) ............................................................................. 25

*Universal Avionics Sys. Corp. v. Rockwell Int'l Corp.*,
    52 F. App'x 897 (9th Cir. 2002) .................................................................................... 20

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004) ............................................................................................ 14

*Whirlpool Corp. v. U.M.C.O. Int'l Corp.*,
    748 F. Supp. 1557 (S.D. Fla. 1990) ............................................................................... 11

*Xechem, Inc. v. Bristol-Myers Squibb Co.*,
    372 F.3d 899 (7th Cir. 2004) .......................................................................................... 22

**Statutes**

Fed. R. Civ. P. 56(a) ....................................................................................................................... 7

I.       **<u>INTRODUCTION</u>**

Facebook acquired and maintained a monopoly in the Personal Social Networking Services ("PSNS") Market by deceiving the market about its data and privacy practices, which destroyed competition from early rivals like Myspace and Google+ and later ones like MeWe and Snapchat. In a but-for world where Facebook competed fairly, consumers would enjoy more personal social networks to choose from, better data practices and other service quality from those networks, and a competitive level of compensation—either monetary or in-kind—for the data they provide. Facebook's deception prevented that world, causing classic antitrust injury and damages. Plaintiffs ("Consumers") have adduced considerable lay and expert evidence in support, and their case should proceed to trial. Nothing in Facebook's summary judgment motion ("Mot.") shows otherwise.

*First*, Facebook contends Consumers lack antitrust standing because, in the actual world, Facebook is "free" in the sense that users pay with their data rather than money, and Consumers' injuries are, according to Facebook, speculative. Facebook's argument would give bad actors like Facebook a free pass simply because they take payment in a non-monetary form. That is not the law and disregards the record. While Facebook points to this Court's prior class certification and *Daubert* order, the Court did not then have before it Dr. Economides' full-length merits reports or the underlying proof on which he relies. Regardless, Facebook never grapples with the reality (as Dr. Economides opines) that the increased compensation could have taken the form of money *or* better services (including more protective data practices). Facebook's focus on Dr. Economides' expert opinions also ignores that, expert opinions aside, lay evidence itself raises a triable issue. Facebook's causation arguments likewise turn on disputed facts that a jury must decide.

*Second*, Facebook contends that Consumers have not established Facebook's deception harmed competition. But Facebook does not contest that it engaged in deception, the subject of its deception (its data practices) was highly technical, the deception persisted over time, or the deception could not be neutralized by competitors. Instead, it asserts that its deception was "no harm no foul" to competition, *i.e.*, consumers or competitors. But Facebook's argument relies only on misleading soundbites from two of Consumers' experts (Dr. Economides and Prof. Lamdan) and Consumers, while ignoring other portions of the record from Facebook *and* its competitors that require a trial.

***Third***, Facebook claims that Consumers' proffered PSNS Market—which includes general purpose social networks like Facebook, Instagram, Snapchat, MeWe, and Google+—fails as a matter of law. Facebook is wrong: even though Facebook has long described itself as "***the*** social network," it now feigns ignorance as to what that term means. Its about-face does not pass muster: reams of evidence confirm that the PSNS Market exists and Facebook dominates it. Ignoring this evidence, Facebook instead criticizes Consumers' expert Dr. Farrell, the former chief economist at the DOJ, FTC, and FCC. Facebook's critiques mischaracterize his written opinions and testimony, and those critiques are also irrelevant because they do not matter to his actual analysis and ignore qualitative lay evidence that itself raises a triable issue on market definition. The Ninth Circuit has held that market definition is usually a highly factual inquiry for the jury, and the court overseeing the FTC's antitrust case against Facebook denied summary judgment on a near-identical market. The same result should follow here.

***Fourth***, Facebook argues Consumers' claims are untimely because Facebook started its deception prior to the limitations period and then engaged in more deception during it. As Facebook would have it, an ill-gotten and ill-**maintained** monopoly cannot be challenged once achieved, and a defendant's performing new bad acts during the limitations period that are of the same kind as its bad acts before that period, and inflict upon consumers new overcharges and other injuries during the limitations period, cannot suffice. But the continuing violations doctrine rejects that approach, which is why Facebook's same legal arguments were already rejected by Judge Koh at the motion to dismiss stage. Nor does Facebook's mischaracterization (or disregard) of the record—including from Consumers, their experts, and Facebook and its competitors—move the needle. Consumers are entitled to seek damages for Facebook's anticompetitive conduct ***during*** the limitations period.

***Finally***, Facebook asserts that summary judgment should be granted on Consumers' attempted monopolization and injunctive relief claims "for the same reasons" as for Consumers' monopolization claim. Facebook's arguments fail as to the monopolization claim, so these recycled arguments should be rejected for the attempted monopolization and injunctive relief claims too.

## II.   BACKGROUND

Consumers assert two claims against Facebook: for monopolization and attempted

1    monopolization of the PSNS Market in violation of Section 2 of the Sherman Act. Dkt. 793.[1]

2    **A.    Evidence That Facebook Wields Monopoly Power in the PSNS Market**

3    The PSNS Market in the United States is the relevant market for Consumers' claims. The

4    PSNS Market consists of general purpose social networking products, which allow and facilitate

5    interactions between users and their friends and family. The PSNS Market includes products from

6    current market participants like Facebook, Instagram, Snapchat, and MeWe, and former participants

7    like Google+, Myspace, Friendster, Orkut, and Bebo. Ex. 1 (3/29/23 Response to ROG No. 1) at 5.

8    Using quantitative and qualitative methods, Dr. Farrell confirmed that the PSNS Market is a

9    valid relevant market. Ex. 20 (Farrell Rept.) §§ IV–V. Using data from Facebook and non-parties, he

10    then confirmed Facebook and jointly-owned Instagram dominate that market. Ex. 20 (Farrell Rept.)

11    § VI. Based on time spent by users, Dr. Farrell calculated Facebook and Instagram's combined market

12    share as ***at least*** ▇▇▇ during the limitations period.[2] Ex. 20 (Farrell Rept.) ¶¶ 252–58.

13    Facebook does not dispute the geographic market is the United States. Ex. 69 (Carlton Tr.) at

14    24:3–10. It also offers no actual product market of its own, instead claiming it competes for "time

15    and attention" with some undefined universe of other products—its motion mentions TikTok, Twitter

16    (now X), YouTube, Pinterest, Reddit, and "messaging apps." Mot. 2, 16. But ample record evidence

17    demonstrates that, from users' perspectives, these services are ***not*** reasonably interchangeable with

18    personal social networks for the same purposes: *i.e.*, connecting with friends and family:

19    _____

20    [1]    During merits expert discovery, Consumers submitted and relied on reports from Professor
Lamdan, Dr. Economides, Dr. Farrell, Mr. Klein, Mr. Barnes, and Becky Yoose. The Court *sua sponte*

21    limited the number of Consumers' experts, leaving Consumers with Dr. Farrell, Dr. Economides, and
Prof. Lamdan. Dkts. 789, 853. The Court's orders, *inter alia*, limited Dr. Farrell and Dr. Economides

22    from both offering their complementary but distinct analyses as to market definition and Facebook's
monopoly power, made Professor Lamdan's testimony subject to a proffer that the Court has not ruled

23    on as of this date, and precluded Consumers from offering the opinions of their other experts Mr.
Klein (who ran a consumer survey regarding the materiality of Facebook's statements), Mr. Barnes

24    (who performed financial analyses of Facebook and comparators' profits, supporting Dr.
Economides' monopoly power and damages opinions), and Becky Yoose (who addressed data and

25    privacy issues in rebuttal to Facebook's experts). Consumers note their continuing objection to the
Court's orders and submit that this case (and Facebook's motion) should be decided on the full record.

26    [2]    Even including other non-PSN services in the market, Facebook and Instagram still have
sufficiently high market share for monopoly power. Facebook's expert Dr. Carlton admitted that

27    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Ex. 69 (Carlton Tr.) at 222:9–223:1. Dr. Farrell
similarly performed alternative share calculations showing that including ▇▇▇▇▇▇▇▇▇▇▇, or

28    ▇▇▇▇▇▇▇▇▇, would leave Facebook and Instagram with sufficient market share to confer
monopoly power. Ex. 20 (Farrell Rept.) ¶ 258.

- **TikTok**: TikTok executives testified that TikTok is ***not*** ████████████, it is s████████████████████████████████████████████████. Ex. 70 (Chandlee FTC Tr.) at 15:11–19:21; Ex. 83 (Pappas FTC Tr.) at 14:10–15:10.

- **YouTube**: Facebook's own Market Strategy team recognized that ████████████████████. Ex. 24 (PALM-002323203) at -213; Ex. 42 (PALM-012242227) at -247.

- **Pinterest**: Pinterest testified it ████████████████████ and ████████. Ex. 86 (Roberts Tr.) at 128:15–129:3, 264:7–265:11.

- **Twitter**: Twitter explained that it is not ████████, and Facebook and Twitter are ████ and Facebook's own Market Strategy team likewise confirmed ████████████████████. Ex. 41 (PALM-012185162) at -162, 174, 181.

- **Reddit**: Reddit testified it is not ████████, interacting with ████████ is not part of its experience, and ████████. Ex. 84 (Raymond FTC Tr.) at 223:7–16, 232:19–233:7; Ex. 85 (Raymond Klein Tr.) at 8:2–9:6. Facebook itself recognized ████████. Ex. 39 PALM-011987916 at Slides 3, 7, 19.

- **Messaging**: In an ***antitrust-related filing to the government***, Facebook stated ████████████████████. Ex. 44 (PALM-012368730) at -785.

Facebook employees recognized the company ████████. Ex. 36 (PALM-008231320) at -321. Confirming its dominance, they said that Facebook's ████████████████. *Id.* at -320.

B.    **Evidence That Facebook Has Acquired and Maintained Its Monopoly Power By Deception**

From the start, Facebook has understood that giving users the semblance of ████████ is key to its success. Ex. 26 (PALM-003182426) at -427. It continues to know that ████████████████████████████████████. Ex. 47 (PALM-012991911) at -914. Indeed, Mr. Zuckerberg has stated "[t]he ***No. 1 thing that people care about is privacy and the handling of their data***" (Ex. 65 (PX-2253) at 5), and ████████████████████ (Ex. 92 (Zuckerberg FTC IH Tr. Vol. I) at 197:15–18). Other Facebook executives recognize that ████████████████████████████ Ex. 55 (PALM-014362572 at -573) (emphasis added).

Cognizant of this fundamental truth, Facebook embarked on an anticompetitive scheme to acquire and maintain dominance by deceiving the market as to its data practices. Ex. 18 (Economides Rept.) § IV. By Facebook's own estimates, it has made ████████████

to the market regarding its privacy and data practices over time. Ex. 45 (PALM-012846445) at -447; Ex. 40 (PALM-012003899) at Slide 4. Much of what it has said (or not said, in the case of omissions) about those practices has been deceptive. Examples of its early deception include its statements about its ███████████████████████ features. Ex. 15 (6/23/23 Response to ROG No. 8).

Facebook then engaged in additional acts of deception during the limitations period, including: (1) ███████████████████████████████████; (2) ████████████████████████████████████; (3) ████████████████████████████████████ (4) ████████████████████████████████; (5) ████████████████████████████; (6) ███████████████████████████████████████████████████████████████████████; (7) ██████████████████████; and (8) ███████████████████████████████████████████████████████████████████████████████████████.[3]

Facebook's motion does ***not*** dispute that Facebook deceived. Nor could it, since Facebook's own personnel recognized ███████████████████ as to its data practices and ████████████████████████████████ Ex. 72 (Cunningham Tr.) at 115:3–119:10; Ex. 27 (PALM-003543014). Facebook likewise recognized ████████████████████████ ██████████████████████. Ex. 33 (PALM-006006351) ███████████████████████ Executives from Facebook's competitors ████████████ testified that ████████████████████████



---

[3] Ex. 10 (1/18/23 Response to ROG No. 6); Ex. 14 (6/20/23 Response to ROG No. 22); Ex. 60 (PALM-ADI-0000653883) at -884; Ex. 71 (Chen Tr.) at 24:12–25:12, 92:21–93:2, 95:6–14, 100:1–18, 103:24–104:8; Ex. 67 (PX-2438) at 12–13; Ex. 30 (PALM-00396172) at -720; Ex. 91 (Zuckerberg Klein Tr.) at 39:12–24, 41:22–42:2; Ex. 88 (Stefancik Tr.) at 22:13–24, 59:2–60:5, 91:2–17; Ex. 49 (PALM-013003886); Ex. 43 (PALM-012266626) at -627; Ex. 38 (PALM-010069776) at -784.

1    ▮▮. Ex. 89 (Weinstein Tr. II) at 284:22–290:13; Ex. 90 (Weinstein Klein Tr.) at 41:15–43:8, 61:17–

2    62:11, 68:17–70:15, 74:14–75:10, 77:20–78:14; Ex. 81 (Levenson Tr.) at 85:21–96:10, 97:2–15.

3    **C.    Evidence That Facebook's Anticompetitive Deception Has Harmed Users**

4        Consumers' economic experts detail how Facebook's deception destroyed competition and

5    explain how that harmed its users (including consumers). Ex. 20 (Farrell Rept.) § VII; Ex. 18

6    (Economides Rept.) §§ IV–VII. Relying on literature from economic, competition, and government

7    authorities and the record in this case, Dr. Economides explains, for example, that Facebook is not

8    "free" (users pay with their data instead of cash), and increased competition generally causes firms to

9    compete on price and service such that, in the but-for world that Facebook's deception prevented

10   from existing, users would have received something more—either in the form of money or in-kind

11   equivalent—for their data, as is true in other transactions. Ex. 18 (Economides Rept.) ¶¶ 214–17, 288.

12   Other economists agree: in its antitrust case against Facebook, the FTC's expert (Prof. Hemphill)

13   opined that in a more competitive world, Facebook could "provide greater value to users through

14   rewards and incentives" (monetary and non-monetary) (Ex. 4 (FTC Disputed Facts) at 1018, 1846–

15   57); a former chief economist at the DOJ Antitrust Division (Prof. Scott Morton) opined similarly,

16   leading to class certification of a similar case in the United Kingdom (Ex. 5 (Gormsen Order)).

17       The record supports Dr. Economides' conclusions. Facebook's co-founder and ▮▮▮▮

18   ▮▮▮ confirmed that Facebook "is not actually free" and users "pay" for Facebook with their data.

19   Ex. 3 (CONSUMER-FB-0000002291) at -298; Ex. 61 (PALM-FTC-00024133). Companies have

20   long compensated customers for their data, from credit cards, grocery stores, and airlines, to well-

21   known companies like Nielsen, Comscore, Microsoft, Amazon, Google, and even Facebook itself in

22   the market research context. *E.g.*, Ex. 22 (MS-LIT_0000027675, slide 25); Ex. 18 (Economides

23   Rept.) §§ V.D., V.E., VII.A., VII.B. Facebook recognized internally that ▮▮▮▮▮▮▮▮

24   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 50 (PALM-

25   013553009) at -11. Even in the real-world where Facebook is a monopolist, Mr. Zuckerberg conceded

26   that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1    ███████████ Ex. 92 (Zuckerberg FTC IH Tr.) at 166; Ex. 91 (Zuckerberg Klein Tr.) at 52:9–61:15.

2    Consumers attach multiple such proposals that were ██████████

3    ███████████. Ex. 54 (PALM-013818575); Ex. 56 (PALM-014789823) at -823, -833; Ex. 53

4    (PALM-013788535); Ex. 48 (PALM-012998742); Ex. 66 (PALM-017014984). While Facebook has

5    not yet implemented these proposals to ██████████████, they were ██████████

6    ████████████████████ Facebook employees likewise confirmed that

7    ████████████████████████████

8    ████████████ Ex. 52 (PALM-013785714). The record indicates that Facebook ███

9    ████████████████████████████

10   ████████████████████ Indeed, it did not want users to ███

11   ████████████████ (Ex. 62 (PALM-FTC-00118192)); was cognizant that ███

12   ████████████████████████ and a ███

13   ████████████████████ (Ex. 28 (PALM-003543936) at

14   -942; Ex. 32 (PALM-005598281) at -282–83)); and did not want ████████████

15   ██████ as doing ████████████████████████

16   ████████████████████████████

17   Ex. 61 (PALM-FTC-00024133); Ex. 51 (PALM-013570800); Ex. 50 (PALM-013553009) at -10.

18   Having determined that Facebook's deception caused users to suffer multiple antitrust injuries

19   including reduced compensation, innovation, product quality, *and* choice (Ex. 18 (Economides Rept.)

20   ¶¶ 282–88), Dr. Economides quantified those injuries. Dr. Economides concluded that each user was

21   injured by $5 per month (with alternate amounts of $3.50 to $6.25)—whether considered as a loss of

22   a monetary payment or a better quality service—each month they were active on Facebook and

23   provided their data. Ex. 18 (Economides Rept.) § V.E. & ¶¶ 273, 291.

24   **III.    LEGAL STANDARD**

25   Summary judgment is appropriate only where the movant "shows that there is no genuine

26   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

27   P. 56(a). The Court must "view the evidence in the light most favorable to the non-moving party and

28   draw 'all justifiable inferences' in that party's favor." *In re Facebook Biometric Info. Priv. Litig.*,

2018 WL 2197546, at *2 (N.D. Cal. May 14, 2018) (Donato, J.). It "may not weigh the evidence or make credibility determinations." *Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1118 (9th Cir. 2009). "[T]rials are the best way to resolve legal disputes." *Fed. Trade Comm'n v. D-Link Sys., Inc.*, 2018 WL 6040192, at *1 (N.D. Cal. Nov. 5, 2018) (Donato, J.). This is particularly true in antitrust cases, which "consist of primarily factual disputes" such that "summary judgment should be used 'sparingly.'" *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 788 (9th Cir. 1996) (cleaned up).

## IV.    ARGUMENT

### A.    Consumers Have Demonstrated Antitrust Injury and Standing

Facebook's grab bag of arguments that Consumers cannot show antitrust injury or standing are based on mischaracterizations of both the record and the law. They should be rejected.

**First**, Facebook asserts antitrust injury is lacking since Dr. Economides' "opinions are unchanged and remain inadmissible" based on the Court's order denying class certification. Mot. 5. But the Court then had only abridged versions of his class certification reports—not as it has now, his hundreds of pages of full-length merits reports and much of the underlying proof he relied on. To the extent Facebook seeks to exclude Dr. Economides' merits opinions, Consumers respond in their opposition to its *Daubert* motion. Facebook's arguments as to Dr. Economides are also irrelevant, as lay evidence alone (on which Consumers also rely here) can defeat summary judgment as to antitrust injury. *AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273, 324 n.15 (N.D.N.Y. 2021).

**Second**, Facebook mischaracterizes the record. Mot. 6–7. While Facebook asserts that the "only" expert Consumers have to establish antitrust injury is Dr. Economides (Mot. 6), it ignores **Dr. Farrell's** opinions explaining how ██████████████████████ Ex. 20 (Farrell Rept.) § VII; Dkt. 821 at 4 (proffer). And it misstates Dr. Economides' opinions and testimony. His merits report explains that, besides not receiving monetary compensation for Facebook's collection and use of their data, consumers were also harmed because they could have received better quality (such as superior features or data practices or decreased "ad load") and increased choice (among other PSNS apps). *E.g.*, Ex. 18 (Economides Rept.) ¶¶ 225, 259–60, 272–73, 276, 282–88.

Facebook next selectively cites Dr. Economides' class certification testimony (Mot. 6). It omits his description of money ████████████████████████████████

█████████████████████████████████████████████████████

██████ . Ex. 73 (Economides Class Tr.) at 101:19–102:13 ████████

███████████████████ . Facebook likewise misstates (Mot. 6) Dr. Economides' opinions about "non-cash compensation," which can either be points (instead of cash) *or* better features; as he explained, either has monetary value and would be given to users in exchange for their data. Ex. 18 (Economides Rept.) § V.E. & ¶¶ 273, 291 █████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████ (emphasis added). All of this is supported by █████████████████████████████████ . *E.g.*, Ex. 35 (PALM-006750852) ████████████████████████████████████████████████

██████████████████████████████████████████████████ PALM-013818575 ██████████████████████████████████████████████

█████████████████████████████████████████████████████

Facebook's references to Consumers' testimony regarding whether they would "accept payments" for their data is misplaced. Mot. 6. There is a market value for data, and Facebook collected and used Consumers' data without providing that value, thereby overcharging them. Consumers are thus harmed in the actual world regardless of whether they would "sell" their data in the but-for world, just as a worker is harmed if his compensation is actually suppressed by wage-fixing even though he likes his job and might hypothetically work for free. Ex. 18 (Economides Rept.) ¶¶ 286–87; *cf. In re Optical Disk Drive Antitrust Litig.*, 2016 WL 467444, at *9 (N.D. Cal. Feb. 8, 2016) ("individual user's desire or lack of desire for a specific feature" irrelevant to antitrust injury, as "[t]he harm lies in paying more than the product is objectively worth"). Dr. Economides explains a user who would have "opted out" and not accepted the payment is still harmed by the same amount (if not a higher one, because they have a higher reserve price to sell their data). *E.g.*, Economides Rept. ¶¶ 273, 291.

Nor did Consumers' experts "concede" that Facebook's compensating users for their data would "destroy" the "experience." Mot. 6–7. The cited portion of Dr. Farrell's deposition concerns █

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

1  ██████████████. Ex. 76 (Farrell Tr.) at 272:3–273:22; Ex. 20 (Farrell Rept.) ¶ 112 n.322.

2  Similarly, the cited portion of Dr. Economides' report notes that ████████████████

3  ████████████████████████████████████████████████████████████████████

4  ████████████████████████████████████████, Ex. 18 (Economides Rept.) ¶¶ 269, 303.

5      ***Finally***, Facebook's causation arguments are all factual disputes about what Facebook would

6  (or would not have done) in the but-for world and why (or why not). Mot. at 7–10. Facebook phrases

7  its challenge as one of "antitrust standing," which considers: (1) whether the plaintiff's injuries are of

8  "the type the antitrust laws were intended to forestall"; (2) "the directness of the injury"; (3) the

9  "speculative measure" of the harm; (4) "the risk of duplicative recovery"; and (5) "the complexity in

10  apportioning damages." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1054 (9th

11  Cir. 1999). A "court need not find in favor of the plaintiff on each factor," *id.* at 1055, and indeed

12  Facebook really only challenges the second and third factors, so three of the five are undisputed now.[4]

13      Facebook's arguments are disputes about the factual predicates for Consumers' theories,

14  which only highlight hotly-contested issues that preclude summary judgment. Mot. 8–9. Based solely

15  on Dr. Economides' purported testimony ████████████████████████████████████

16  ████████ Facebook asserts "there is no evidence in the record" of "better competitive alternatives."

17  *Id.* at 8. That is false: Facebook ***itself*** ████████████████████████████████████

18  ████████████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████████████

20  ████████████████████████████████████████ Ex. 31 (PALM-005278255);

21  Ex. 23 (PALM-001552680) at -681; Ex. 29 (PALM-003804550) at -551; Ex. 25 (PALM-002345985).

22      Facebook's assertion that "[t]here is not even evidence that any competitors were negatively

23  impacted" by its deception is also misguided. Mot. 8–9. While Facebook points to supposed testimony

24  from ████████████████████ attributing their declines to different causes, that says nothing

25  about whether Facebook's deception harmed other rivals: ████████████ executives testified

26  ───────────────────────

27  [4]  While Facebook contends "the antitrust laws do not recognize" Consumers' theory, Mot. 7, Facebook does not meaningfully challenge the first factor. Nor could it: Consumers are direct purchasers from Facebook and assert it has "used its monopoly to overcharge" them, which "is a

28  classic antitrust claim." *Apple Inc. v. Pepper*, 587 U.S. 273, 276 (2019) (finding standing); *see also infra* at 13 (discussing *Harcourt Brace* and other frameworks recognizing Consumers' theory).

1  unequivocally ████████ *supra* at 5–6, which Facebook ignores. Even ████████████ were

2  deceived and may not have known it: evidence shows that privacy and data are critical dimensions of

3  competition and Facebook deceived over those dimensions *while* it was competing with ████████

4  ████████ harming them. *Infra* at 16. As to ████████, Facebook misstates Dr. Economides' testimony;

5  he was clear that ████████████████████████████████████████████████████████

6  ████████████████████ and ████████████████████████████████████████

7  ████████████. Ex. 75 (Economides Merits Tr.) at 198:5–20, 233:3–234:2. In any event, Facebook's

8  proffered reasons for its rivals' decline simply raises a dispute for trial. *Whirlpool Corp. v. U.M.C.O.*

9  *Int'l Corp.*, 748 F. Supp. 1557, 1567 (S.D. Fla. 1990) (whether competitor's decline due to defendant

10 or its "own competitive shortcomings" was a dispute precluding summary judgment).

11     Facebook also wrongly contends that Consumers "cannot show the requisite impact on

12 competition" and points to supposed testimony from Prof. Lamdan and the named Consumers

13 regarding non-reliance on Facebook's misrepresentations. Mot. 9. Facebook's characterizations are

14 not only factually wrong but also legally irrelevant; Consumers address them *infra* in Section IV.B.

15     Facebook's argument that paying "users for consuming content online" has "never previously

16 been" adopted in "its industry" also fails. Mot. 5, 8. Consumers' theory is based on compensating

17 users *for providing their data* (not for mere "use" of a service or "consuming content"). Moreover,

18 according to Facebook, ████████████████████████████████████ Dkt. 670 at 6–7. Multiple

19 such platforms like ████████████████████████████ search engines and ████████████ web

20 browsers pay users for their data or attention (or both). Ex. 18 (Economides Rept.) at Appendix E ¶¶

21 5, 22, 24–25. In addition, Facebook and other companies actually pay users for their data in the

22 analogous market research context. *Rodriguez v. Google LLC*, 2025 WL 50425, at *10 (N.D. Cal.

23 Jan. 7, 2025) (denying summary judgment on device owners' claims that company "failed to pay for

24 the data it collected despite there being a market for it," citing *Brown* case involving company's own

25 market research service as proof of market for data). Facebook even ████████████████████

26 ████████████████████████. *Supra* at 6–7. While Facebook in the actual world has not yet

27 implemented such payments to PSNS users—the reasons why are a disputed issue (*id.*)—an antitrust

28 plaintiff "need not show that the [defendant] of our world actually contemplated a given scenario

within the but-for world" because to insist on such proof "rests upon the befuddling notion that our actors must have contemplated what they would have done in a but-for world which, due to defendants' antitrust violation, *never happened*" and "cannot be the law." *In re Glumetza Antitrust Litig.*, 2021 WL 1817092, at \*13–15 (N.D. Cal. May 6, 2021) (rejecting argument; denying summary judgment); *In re Seroquel XR Antitrust Litig.*, 2025 WL 992004, at \*4 (D. Del. Apr. 2, 2025) (same). Here, Facebook ***did*** contemplate paying users, and that supports (not undermines) Consumers' case.

Consumers transact with Facebook and are thus in a direct-purchaser relationship with Facebook; they assert the "fairly straightforward" theory that Facebook's deception destroyed competition, "immunizing [it] from price competition and allowing it to charge inflated fees" directly to Consumers by not providing them a competitive level of compensation for their data. *Heckman v. Live Nation Ent., Inc.*, 2025 WL 1141266, at \*6 (C.D. Cal. Apr. 11, 2025) (directness and non-speculative factors satisfied). While Facebook contests the factual predicates for that theory and what it would have done in the but-for world, those are matters for trial, not bases for summary judgment.

Facebook's cases (Mot. at 7–10) are all inapposite. *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 134, 139–43 (2d Cir. 2021), and *In re Online DVD Rental Antitrust Litig.*, 2011 WL 1629663, at \*1, \*9 (N.D. Cal. Apr. 29, 2011), involved "umbrella" plaintiffs who did not transact with the wrongdoer defendants but instead with the defendants' competitors, who merely raised their prices in response to defendants' increases. *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 923 (9th Cir. 2015), found a lack of evidence specific to that case—whether Netflix would have lowered its prices—which is not the case here given the vast evidence ███████ ███████████████████████████████████████████ *McCarthy v. Intercontinental Exch., Inc.*, 2022 WL 4227247, at \*1, \*4 (N.D. Cal. Sept. 13, 2022), involved conclusory allegations as to "whether (and which) plaintiffs" even transacted with defendants and paid the challenged supracompetitive fees; Consumers here are indisputably Facebook users and did not receive compensation from Facebook. *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 458–60 (9th Cir. 2021), found no antitrust standing as the plaintiff city was a ***non-purchaser*** that was "priced out of the market" and sought lost investment, tax, and property value, which "present[s] a special problem" not present where, as here, "direct purchasers" seek to recover an "overcharge" paid to the defendants.

**B.** **The Extent to Which Facebook's Deception Harmed Competition Turns on Disputed Facts That the Jury Must Resolve**

Facebook next argues its deception did not harm competition because "[a]ttributing an anticompetitive effect to deception" is typically "disfavored." Mot. 11–15. But Facebook's own economic expert—Dr. Carlton—█████████████████████████████████, Ex. 69 (Carlton Tr.) at 255:17–20, and the Ninth Circuit so held in *Harcourt Brace* (in accord with other circuits, Dkt. 793 at 17–19), which is why Judge Koh rejected Facebook's argument at the motion to dismiss stage. Dkt. 214 at 39. Facebook's arguments ignore the substantial record evidence demonstrating that its deception harmed competition. Separately, its arguments rely on mischaracterizations of Consumers' testimony and their experts' opinions, which only highlights the genuine disputes of material fact.

**1.** **Substantial Evidence Shows Facebook's Deception Harmed Competition**

Facebook asserts that Consumers rely on a "presumption of significant market effect." Mot. 10. In fact, Consumers rely on extensive evidence proving Facebook's deception harmed competition.

*First*, consider Facebook's own documents. As noted *supra* at 4, Mr. Zuckerberg and other Facebook executives ████████████████████████████████████████████████████ ███████████ Facebook also recognized █████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████ Ex. 34 (PALM-006175265); Ex. 58 (PALM-016467831); Ex. 59 (PALM-016517685) at -691; Ex. 82 (Olivan Tr.) at 56:21–57:3. There is thus significant evidence from Facebook showing that ██████████████████████████████████████, such that it is a reasonable inference that if Facebook *deceived* the market and consumers about data and privacy—a fact Facebook's motion does not even contest—then that deception harmed competition.

*Second*, evidence from Facebook's competitors makes these same points. As discussed *supra*, executives from █████████████—Facebook and Instagram's two primary PSNS rivals within the limitations period—testified that ███████████████████████. *Supra* at 5–6. Such harm to competitors raises a jury question as to harm to competition. *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 790 (6th Cir. 2002) (slowing of two competitors' growth sufficient to support jury verdict of harm to competition from conduct, including deception); *Lenox MacLaren Surgical Corp. v.*

*Medtronic, Inc.*, 762 F.3d 1114, 1117, 1130 (10th Cir. 2014) (denying summary judgment as defendant's conduct, including deception, "inhibited competition by other smaller firms"); *Insignia Sys. v. News Am. Mktg. In-Store, Inc.*, 661 F. Supp. 2d 1039, 1056 (D. Minn. 2009) (similar, where defendant's conduct, including deception, affected its "two largest" rivals; *compare TYR Sport, Inc. v. Warnaco Swimwear, Inc.*, 709 F. Supp. 2d 821, 834 (C.D. Cal. 2010) (cited at Mot. 11) (summary judgment granted as plaintiff only identified evidence of harm to itself, not other market participants).

**Finally**, additional expert evidence also demonstrates the genuine dispute regarding anticompetitive harm. Dr. Farrell, one of Consumers' economic experts, explained—based on record evidence and well-accepted economic literature—how ███████████████████████████ Ex. 20 (Farrell Rept.) ¶¶ 259–78. Facebook's motion nowhere mentions this analysis; nor does Facebook seek to exclude it. This is yet more evidence on which reasonable jurors could rely.

### 2. Rather Than Engage With the Record, Facebook Mischaracterizes Consumers' Testimony and Their Experts' Opinions

The above evidence by itself demonstrates a triable issue as to how Facebook's deception harmed competition. Rather than engage with that proof, Facebook resorts to mischaracterizing the testimony of Consumers and the opinions of Dr. Economides and Prof. Lamdan with a few, cherry-picked deposition soundbites. But all this does is highlight the parties' genuine disputes.

**First**, Facebook misstates Consumers' testimony in arguing they did not rely on Facebook's deception. Mot. 10, 14. As an initial matter, Consumers' individual reliance is irrelevant; what matters in an antitrust case is whether the ***market*** was deceived. *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528–29 (3d Cir. 2004) ("individual reliance on the misrepresentations was irrelevant to liability" in deception-based antitrust case). Also, each testified ████████████████████ ████████████████████████████████ Ex. 77 (Grabert Tr. I) at 199:24–200:1, 207:3–16; Ex. 80 (Klein Tr.) at 26:8–20, 232:17–24, 277:14–23, 279:9–280:19; Ex. 68 (Banks Kupcho Tr.) at 32:7–34:5, 50:1–3, 155:23–156:20, 216:24–217:10, 233:18–234:10. Similarly, each stated in interrogatory responses that they ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████ Ex. 11 (1/18/23 Response to ROG No. 7); Ex. 12 (2/15/23 Response to ROG No. 15).

***Second***, Facebook misrepresents Dr. Economides' opinions, both by ignoring his reports and misciting his testimony. It claims Dr. Economides admitted Facebook acquired its monopoly power "on its merits," so there supposedly can be no claim because success on the merits is not anticompetitive and is not a violation of Section 2. Mot. 10–12. For one, Facebook's argument is factually wrong. In his reports, Dr. Economides explained deception is ***not*** competition on the merits and ████████████████████████████████████████████████████████████ *E.g.*, Ex. 18 (Economides Rept.) ¶¶ 183–204, 248; Ex. 19 (Economides Reb. Rept.) ¶ 269; Ex. 16 (Economides Class Abridged Rept.) ¶ 51 ████████████████████████████████████████████████████ ████████████████████ (emphasis added). And in his deposition, Dr. Economides was clear that ████ ████████████████████████████ Ex. 75 (Economides Merits Tr.) at 247:7–18. Regardless, Facebook's argument confuses Consumers' monopoly ***maintenance*** claims with monopoly acquisition, the latter of which is not the basis for Consumers' liability or damages claims within the limitations period, rendering Facebook's arguments about acquisition legally irrelevant.

Facebook's other deposition critiques are more of the same. As to Myspace, Facebook makes much of Dr. Economides' supposed testimony that Facebook's deception was not "***the*** cause of Myspace's decline." Mot. 11–12 (emphasis added). That Dr. Economides may have said Facebook had certain better practices "at the time" Facebook surpassed Myspace, Ex. 75 (Economides Merits Tr.) at 231:4–21, does not mean Facebook had better data practices than Myspace at other times, such as in 2010 or 2011 ████████████████████████████████████████ ████████████████████████████████████████████ Moreover, there is ample record evidence that Facebook ████████████████████████████████████████ ████████████ (Ex. 87 (Schnitt Tr.) at 30:3–14)), that ██████████████████████████████ ████████████████████████████████████████████████████████ (Ex. 33 (PALM-006006351)), and that ██████████████████████████ ████████████████████████████████████ (Ex. 72 (Cunningham Tr.) at 115:3–119:10 & Ex. 37 (PALM-009048148) at -149). Reasonable jurors thus could find that Facebook deceived the market about its data practices to "achieve scale" at the expense of Myspace and competition.[5]

---

[5]    In errata, Dr. Economides clarified that, even if Facebook at times had a merits advantage over

Facebook complains Dr. Economides did not do a statement-by-statement analysis to show any specific statement harmed a Facebook competitor. Mot. 13. It cites no authority requiring that analysis. The Ninth Circuit and Judge Koh held it is unnecessary: "it would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect." *City of Anaheim v. S. California Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992); Dkt. 214 at 70–71. In any case, Dr. Economides did consider how particular instances of Facebook's deception— ███████████████—affected particular competitors like ███████████. *Supra* at 11.

Facebook's gripes about ██████ misstate Dr. Economides' testimony, but also miss the point. Mot. 13. He testified, for example: (1) Facebook engaged in numerous acts of deception between █████ entry in 2011 and its exit around 2018; (2) he analyzed "the competitive effects" of Facebook's deception ████████████████████████████████████ ██████████; and (3) that analysis shows █████████████████████████████ ████████████████████ Ex. 75 (Economides Merits Tr.) at 248:2–14, 250:3–25, 252:4–19, 253:17–254:5; Ex. 18 (Economides Rept.) at Appx. C ████████████████ ████████████████████████████ His reports do the same. Ex. 17 (Economides Full Class Rept.) ¶¶ 18(c), 30, 290, 335–42, 346–48; Ex. 18 (Economides Rept.) ¶¶ 205–06. So while he did not analyze the individual effect each instance of Facebook's deception had on █████—and *Anaheim* makes clear he did not need to—the jury could find Facebook's overall deception and its combined effect harmed █████. Moreover, ███████████████████████████ ████████████████ (Ex. 78 (Horowitz FTC Tr.) at 167:1–168:2; Ex. 79 (Horowitz Klein Tr.) at 21:12–22:15, 35:15–36:6), and Facebook saw competitive significance in ████████ ██████████ (Ex. 34 (PALM-006175265); Ex. 58 (PALM-016467831)); a jury could thus find—separate from Dr. Economides' analysis—Facebook's deception harmed █████.

early rivals like Myspace, Bebo, and Orkut, Facebook's ██████████████████ ██████████████ Ex. 74 (Errata) at 230:13, 230:20, 231:21, 240:8, 240:15. Contrary to Facebook's innuendo (Mot. 12), that is consistent with his written opinions. Ex. 18 (Economides Rept.) ¶ 200 ████████████████████████████████ ██████████████████████ The errata makes clarifying, not contradictory, changes that are additive to the lay evidence, unlike in Facebook's case, *Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.*, 397 F.3d 1217, 1225 (9th Cir. 2005) (applying "sham" affidavit rule where errata used to alone withstand summary judgment).

1    Facebook's complaints about Dr. Economides' ███ testimony are also spurious. Mot. 9,

2  13. Contrary to Facebook's claim that Dr. Economides "conceded" ███ "lack of success was not

3  connected to a particular deceptive statement," *id.* at 9, Dr. Economides testified Facebook's

4  deception regarding ██████████ (a specific event) harmed ███. Ex. 75 (Economides

5  Merits Tr.) at 198:12–20, 227:20–228:11. While Dr. Economides did not have in mind one ***particular***

6  deceptive statement that "creates the biggest problem" for ███—*i.e.*, the definitive blow—he noted

7  ███ itself believed Facebook's "deceptive conduct in general" harmed ███. *Id.* at 232:5–234:2.

8  Facebook never actually addresses the testimony from ███ founder that ██████████

9  ██████████████████████████. *Supra* at 5–6. And to the

10 extent Facebook has competing explanations for ███ demise (Mot. 9), that is for the jury.

11   Facebook also misstates Dr. Economides' testimony as Facebook gained its monopoly power

12 lawfully, so its acquisition of that power could not "cause[] later harm to competition." Mot. 13–14.

13 Facebook says Dr. Economides testified ███ and other early rivals failed due to the "achievement

14 of Facebook as a monopoly." *Id.* But it omits the very next words in his actual response: "achievement

15 of Facebook as a monopoly ***as a result of the deceptive practices***." Ex. 75 (Economides Merits Tr.)

16 at 248:16–249:1. Also, it ignores Consumers' claims for monopoly maintenance (after acquisition).

17   ***Finally***, Facebook cherry-picks portions of Prof. Lamdan's deposition to assert that

18 Facebook's deception "had nothing to do with users choosing Facebook over competitors" and users

19 "did not rely on" Facebook's deception in deciding to use Facebook. Mot. 14–15. But Facebook

20 ignores her opinions that ██████████████████████████████████

21 ██████████████████████ Ex. 21 (Lamdan Merits Rept.) ¶¶ 8(c), 73, 77–80,

22 89–90. Instead, it latches onto "gotcha" soundbites from her deposition. For example, it relies on

23 testimony where she was discussing users who left Facebook because they somehow learned of its

24 bad acts and later returned only because of a lack of choice (Mot. 14–15). But that says nothing about

25 whether those users were deceived and/or relied in the first place (before they left), or other users.

26   The other referenced portion of Prof. Lamdan's testimony says, at most, that users are

27 generally distrustful of Facebook's statements (Mot. 15). That, too, says nothing about whether users

28 relied on Facebook's specific statements (what else could users rely on to understand Facebook's data

practices?) or its omissions. Also, to the extent Facebook relies on Prof. Lamdan to assert that nobody could rely on its statements because "no one trusts Facebook" since it is a known liar, that contradicts the Ninth Circuit's ruling rejecting that argument from Facebook: it is no defense for a bad actor to deceive and intend for an audience to rely, only to turn around and argue "Plaintiffs should have known better[.]" *DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1236–37 (9th Cir. 2024).

In any case, Facebook's motion ignores the avalanche of proof from ***Facebook*** demonstrating, for example, that ███████████████████████████████████████████ ██████ (Ex. 26 (PALM-003182426)) and ████████████████████████████████████ ██████ (Ex. 64 (PX-2252) at -257); ████████████████████████████████████ ████████████████████████████████████████████████ (Ex. 46 (PALM-012965558) (emphasis added)); and █████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████ Ex. 57 (PALM-015654588); Ex. 59 (PALM-016517685) at -686. Prof. Lamdan's opinions aside, this proof itself creates a triable issue.

## C. Ample Evidence Would Allow Reasonable Jurors To Find That Consumers' Market Definition Is Correct

Facebook's arguments that the PSNS Market fails "as a matter of law" lack merit.

***First***, Facebook ***agrees*** that market definition "often involves question of fact," Mot. 15, but seeks summary judgment anyway. The Ninth Circuit has explained that "defining the relevant market is a factual inquiry for the jury." *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993). Facebook provides no reason to depart for this general rule. Tellingly, Facebook's motion completely omits that the court in the *FTC* case ***denied*** Facebook's motion for summary judgment on the existence of the nearly identical PSN Market based on an overlapping record and the arguments Facebook raises here. *Fed. Trade Comm'n v. Meta Platforms, Inc.*, 2024 WL 4772423, at *8–19 (D.D.C. Nov. 13, 2024). For these reasons alone, summary judgment must be denied.

***Second***, Facebook's argument that Consumers' "market relies entirely on the inadmissible" testimony of Dr. Farrell (Mot. 16) is wrong for numerous reasons. As an initial matter, Dr. Farrell used widely-accepted economic methods and applied them reliably; Consumers address these points in their opposition to Facebook's *Daubert* motion and do not repeat them here. Moreover, even aside

from Dr. Farrell's expert analysis, the lay evidence (*supra* at 3–4)—which Facebook's motion does not address—itself suffices to allow the jury to find non-PSN services are ***not*** reasonably interchangeable with PSN services like Facebook, and the PSNS Market is properly defined. *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 275 F.3d 762, 765–68 (9th Cir. 2001) (reversing summary judgment; qualitative evidence alone raised fact question as to market).

**Third**, Facebook complains that Dr. Farrell excludes from the PSNS Market TikTok, YouTube, Pinterest, Twitter, Reddit, and messaging apps. Mot. 3, 16. That is a classic fact dispute about what products or use cases are (or are not) in the market. *Glumetza*, 2021 WL 1817092, at *6 (denying summary judgment as "question of fact" on whether market included "other" products).

**Fourth**, Facebook's gripes about the history of Consumers' market are wrong and also irrelevant. Mot. 16–18. Consumers' complaint asserted two markets—the Social Network and Social Media Markets—and both were found well-pled at the motion-to-dismiss stage. Dkt. 214 at 7–25. As to the Social Media Market, Consumers elected to streamline their case and forego it; Facebook and this Court were notified. Dkt. 431 (Jan. 19, 2023 Hrg. Tr.) at 41. As to the Social Network Market, Consumers added the word "Personal" as a descriptor to make clear the market includes general purpose social networking apps and excludes niche ones—like professional and local networking services—that were already ***not*** in the market. And while Consumers fine-tuned their analyses since this case was filed—that is to be expected after years of discovery—the PSNS Market is similar to the Social Network Market already found sufficiently pled here and the PSN Market found sufficient at both the motion-to-dismiss and summary judgment stages in the *FTC* case. Dkt. 214 at 3, 9–20; *FTC*, 2024 WL 4772423, at *7–17. No more is required at summary judgment: "if the relevant markets are in dispute . . . they don't have to [be] completely 100 percent rock solid," they just need "to make it past pleading issues," and anything else "are facts" and "issues" for trial. *In re Google Play Store Antitrust Litig.*, Case No. 21-md-02981-JD (N.D. Cal.) (Donato, J.), Dkt. 569 at 35.

**Fifth**, Facebook asserts that "what is included" in the PSNS Market and "what is not" is unclear. Mot. 16–18. If Facebook is in the dark, it is because it buried its head in the sand. Consumers ***years ago*** in fact discovery identified the market and its current primary players and former participants (Ex. 1 (3/29/23 Response to ROG No. 1)); those contours remained true across class and

merits expert discovery. Facebook's reliance (Mot. 15–17) on *Coronavirus Rep. v. Apple Inc.* is thus entirely misplaced. 2021 WL 5936910, at *7–9 (N.D. Cal. Nov. 30, 2021) (dismissing complaint that "references at least fifteen different markets" and did not specify products included in markets); 85 F.4th 948, 956 (9th Cir. 2023) (complaint "made no effort at all to define the markets or distinguish them from one another"). Facebook's citation (Mot. 18) of the unpublished *Universal Avionics Sys. Corp. v. Rockwell Int'l Corp.*, 52 F. App'x 897, 899 (9th Cir. 2002), is unavailing: summary judgment was granted because the plaintiff ***denied*** the existence of market in discovery in requests for admission, then shifted and relied on that market at summary judgment (*id.*), which is not true here.

  ***Finally***, Facebook's complaints about Dr. Farrell's analysis do not support summary judgment. Mot. 17–18. While Facebook makes much of Dr. Farrell's testimony about "intractable questions" and "irreducible gray areas," Mot. 17, Facebook both mischaracterizes his testimony and its import. What Facebook is referencing is minutiae in how Dr. Farrell measured Facebook's market share in the PSNS Market, ***not*** the definition of the market in the first place. Facebook's objection is that when using "time spent" as the measure of market share, time spent doing certain activities on Facebook and Instagram should be counted towards Facebook's PSNS market share, only if the subjective motivation was to connect with friends and family. Mot. 16–17. To address that potential objection, using ███████████████████████████ Dr. Farrell applied a █████ reduction to ██████████████████████████████████████████ time spent for market share calculation purposes, explaining that even doing so—and even *arguendo* including non-PSN apps ██████ ████████████████—is immaterial, as Facebook and Instagram would ***still*** have above the share threshold for monopoly power. Ex. 20 (Farrell Rept.) ¶¶ 252–58. This is consistent with Dr. Farrell's testimony, which Facebook references (Mot. 17–18) but mischaracterizes and miscites. *E.g.*, Ex. 76 (Farrell Tr.) at 29:19–31:16 (referring to ███████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ Facebook raised a similar argument in the *FTC* case, which the court considered and rejected in denying summary judgment as to both market definition and monopoly power. *See FTC*, 2024 WL 4772423, at *15–17, *19–21.

  In any case, Facebook's critiques of Dr. Farrell's supposed testimony about time spent on

certain activities on various apps say nothing about his ***actual*** market definition analysis, which is based on: (1) identifying a candidate market of apps using qualitative analysis; and (2) then confirming that market passes the Hypothetical Monopolist Test using quantitative critical loss and upward pricing pressure analyses. Ex. 20 (Farrell Rept.) §§ IV, VI.A. Facebook's cited cases (Mot. 18) thus do not help it. *See Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.,* 924 F.2d 1484, 1489–90 (9th Cir. 1991) ("no evidence" to support excluding various services from market); *Thurman Indus., Inc. v. Pay 'N Pak Stores*, *Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989) (assessing only qualitative evidence and noting plaintiff offered "no evidence to counter" defendant's "showing of economic substitutability" between products inside and outside market); *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1101, 1159 (N.D. Cal. 2004) (decision after bench trial, not on summary judgment; expert also conceded no "quantitative metric"); *Queen City Pizza, Inc. v. Domino's Pizza, Inc*., 124 F.3d 430, 437–39 (3d Cir. 1997) (evaluating single-brand "aftermarket" limited to Domino's supplies). While Facebook and its experts may dispute Dr. Farrell's approaches, that is not a basis for summary judgment. *Trendsettah USA*, *Inc. v. Swisher Int'l Inc.*, 2016 WL 6822191, at *6 (C.D. Cal. Jan. 21, 2016) ("conflicting expert testimony" on market definition precluded summary judgment).

### D.    <u>Facebook Is Not Entitled to Summary Judgment on Timeliness Grounds</u>

Facebook's statute of limitations arguments misconstrue Consumers' claims, the record, and the law. Mot. 18–23. As an initial matter, Facebook's fixation on monopoly ***acquisition*** (*id*. 19–20), has nothing to do with the timeliness of Consumers' claims. Consumers' damages claims are based on Facebook's monopoly ***maintenance*** between December 2016 and December 2020. So while Facebook's pre-limitations conduct is part of the "Conduct Period" and relevant as "table setting," the claims' timeliness does not depend on that pre-limitations period conduct, and Facebook's arguments about acquisition and the supposed "default rule" are irrelevant. *In re Google Play Store Antitrust Litig.*, Case No. 21-md-02981-JD, Dkt. 569 at 27–29, Dkt. 571 (N.D. Cal.) (denying summary judgment on this basis). Regardless, by: (1) committing overt acts to ***maintain*** its monopoly within the limitations period, and (2) causing accumulating injuries during that period—Facebook "start[ed] the statutory period running again" each time it deceived anew. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997); *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir.

2014). Contrary to Facebook's claim that Consumers "abandoned the continuing violations doctrine" (Mot. 20), they did not, and their claims are timely under both of its elements as explained below.

### 1. Facebook Committed Multiple New Instances of Anticompetitive Deception During the Limitations Period

The thrust of Facebook's argument is that because it began deceiving the market before December 2016, each new instance of deception within the limitations period cannot be an "overt act" because it is part of a "unified campaign" that consists of the same type of conduct (deception) and is thus not "new or different conduct[.]" Mot. 20–23. However, just as at the beginning of this case, where its same argument was rejected as a matter of law, "Facebook provides no authority for its argument that an act is not 'new and independent' simply because the defendant has previously committed the same type of act as part of a unified anticompetitive strategy." Dkt. 214 at 57. As the Supreme Court held in a seminal case on continuing violations, the statute of limitations restarted for a plaintiff each time a monopolist committed "substantially uniform" anticompetitive acts for more than *42 years*. *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968); *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 245 F. Supp. 258, 264-65 (M.D. Pa. 1965). And, "Facebook's argument ignores the Ninth Circuit's clear guidance" that also *rejects* its legal argument. Dkt. 214 at 57; *see also Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014) (continuing violation doctrine met where defendant committed the same type of conduct—price-fixing—before and during the limitations period); *Hennegan v. Pacifico Creative Serv.*, *Inc.*, 787 F.2d 1299, 1300–02 (9th Cir. 1986) (same, where "tour operators shepherded tourists" to plaintiff's competitors before and during limitations period); *accord Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004) (new sham patent listing during limitations period was overt act for monopolization claim, even though defendant also fraudulently listed patents before limitations period as well).

Besides being legally wrong, Facebook's "overt act" arguments are also factually incorrect. Facebook's premise is that Consumers supposedly assert that Facebook engaged in "uniform" data-related deception that "continued without change" during the limitations period. Mot. 20–23. But the fact that Facebook's deception was about "the same subject"—its data and privacy practices (*id.* at 23)—does *not* mean that Facebook's specific statements did not change over time. Indeed, Consumers assert more than verbatim recitations of the same deception Facebook committed before

1  the limitations period. For example, in 2018 and after, Facebook and its executives deceptively: (1)

2  ███████████████████████████████████████████; (2) ███████████████████████████

3  ███████████ (3)

4  █████████████████████████████████████████████████████████████████████████

5  ███████ and (5) ██████████████████████████████████████████████████████████

6  ████████████████████████. *Supra* at 4–6. These (and other) acts of deception that occurred

7  during the limitations period cannot, contrary to Facebook's claim, be "mere reaffirmations" of its

8  pre-limitations deception, because they concerned and responded to events—*e.g.*, █████████

9  █████████████████████████████████████████████████████████████████████████

10 █████████████████████████████████████████████████████████████████████████—

11 that did not occur until the limitations period (after 2016). While Facebook half-heartedly claims to

12 compare pre- and post-limitations period statements (Mot. 22), it does not actually engage with its

13 making **new, different** statements (and thus overt acts). *Samsung*, 747 F.3d at 1204 ("the typical

14 antitrust continuing violation occurs" when defendants "fine-tune their" anticompetitive conduct).

15        Facebook's cited cases (Mot. 23) do not support summary judgment here. *Bay Area Surgical*

16 *Mgmt. LLC v. Aetna Life Ins. Co.*, held that alleging a "continuing stream of communications" into

17 the limitations period did not suffice because of a lack of specificity regarding those communications.

18 166 F. Supp. 3d 988, 999 (N.D. Cal. 2015) (cleaned up). *SaurikIT, LLC v. Apple Inc.*, found certain

19 acts **were** overt acts that satisfied the continuing violations doctrine, and others were not because they

20 were alleged conclusorily. 2022 WL 1768845, at *2–3 (N.D. Cal. May 26, 2022). *Chang v. Farmers*

21 *Ins. Co., Inc.*, a *pro se*, RICO (not antitrust) case, involved "mere[] reaffirmations" of pre-limitations

22 deceptive statements (not, as here, completely new acts of deception) and anyway applied the

23 "separate accrual" rule specific to RICO claims. 2023 WL 5163288, at *1–3 (C.D. Cal. July 12, 2023)

24 (cleaned up). In any event, unlike in *BASM*, *SaurikIT*, and *Chang*, Consumers have not only alleged

25 new and independent acts within the limitations period and explained how those acts differ from

26 Facebook's pre-limitations conduct, they have **adduced evidence** regarding those acts. *Supra* at 4–6.

27        **2.    Facebook's New Instances of Deception Inflicted New and Accumulating**
              **Injuries on Competition and Consumers Within the Limitations Period**

28 Facebook next claims that Consumers cannot demonstrate "new and accumulating" injury

during the limitations period. Mot. 20–23. Facebook's arguments turn on incorrect statements of the law and genuinely disputed material facts; they should therefore be rejected.

**First**, Facebook's assertion that Consumers "identify no new harm to themselves or competition within the limitations period" is simply wrong. Mot. 21. As an initial matter, Facebook's deception harmed Consumers by restricting choice and reducing product quality (like data practices) across the relevant market within the limitations period. Ex. 18 (Economides Rept.) ¶ 276. Beyond that harm, Consumers assert that, in **each month** that users provided their data to Facebook and received its monopoly price of $0 in return, rather than competitive compensation (*e.g.*, $5), that was a new overcharge. To assert otherwise would be tantamount to stating that **each time** a consumer buys a product like a cup of coffee and is overcharged, there is no new and accumulating injury because the consumer also bought that product and paid the overcharge in connection with a separate earlier purchase. That is obviously not the law, and Consumers here more than establish "new and accumulating" injuries.[6] *Oliver*, 751 F.3d at 1086–87 & n.5 (each new sale of price-fixed product at inflated price causes new injury to consumers for continuing violation); *Meijer, Inc. v. 3M*, 2005 WL 1660188, at *2–5 (E.D. Pa. July 13, 2005) (explaining for continuing violation in Section 2 case, "the requisite injurious act within the limitations period can include being overcharged") (collecting cases).

Facebook's other arguments about lack of harm to competition "after December 2016" miss the mark. Mot. 21–22. Facebook misstates Dr. Economides' testimony when it contends (Mot. 21–22) that he did not analyze whether the deception had anticompetitive effects in the limitations period. In fact, Dr. Economides explained multiple times "that even one of" the alleged acts of deception—which included multiples acts within the limitations period—would have had anticompetitive effects during the limitations period. Ex. 75 (Economides Merits Tr.) at 181:17–185:24.

Moreover, Facebook simply ignores the extensive record evidence that Facebook's deception during the limitations period harmed competition. For example, Facebook ████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████

---

[6] Consumers address *supra* Facebook's challenges to the nexus between Facebook's deception, harm to competition, and the resulting overcharge to Consumers, and Facebook's mischaracterizations of Consumers' testimony as to reliance and acceptance of payments for data. *See* Mot. 21–22.

1   Ex. 63 (PX-1304); Ex. 2 (BBC Article). ███ founder testified that ███

2  ███████████████████████████████████████████████████████████

3  ████████████ *Supra* at 5–6. Similarly, ███████ was well-positioned ███████

4  ███████████████████████████ but, as a ███████ executive testified,

5  ███████████████████████. Ex. 93 (SNAP – FTC – No. 191-0134 –

6  0000096663); Ex. 94 (SNAP – FTC – No. 191-0134 – 0000121470 at -546); Ex. 81 (Levenson Tr.)

7  at 85:21–96:10, 97:2–15. This evidence of harm to Facebook's competitors ***during*** the limitations

8  period confirms that summary judgment is inappropriate. *Univac Dental Co. v. Dentsply Int'l, Inc.*,

9  702 F. Supp. 2d 465, 480–82 (M.D. Pa. 2010) (denying summary judgment because triable issues

10  existed regarding whether defendant's conduct harmed competitors during limitations period).

11  Facebook's cited cases do not hold otherwise. *See Electroglas, Inc. v. Dynatex Corp.*, 497 F. Supp.

12  97, 105 (N.D. Cal. 1980) ("any harm to competition occurred and was complete" before limitations

13  period); *Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184, 1190 (9th Cir. 1984) (merely citing legal standard

14  and finding no tying overt act occurred in limitations period); *Duarte v. Quality Loan Serv. Corp.*,

15  2018 WL 2121800, at *4, *8 (C.D. Cal. May 8, 2018) (pleading decision, applying rule specific to

16  Equal Credit Opportunity Act—not antitrust—case, and not addressing harm to competition at all).

17  **E.    Facebook's Attempted Monopolization and Injunctive Relief Arguments Fail**

18  Facebook's throw-away arguments regarding Consumers' attempted monopolization claim

19  and their request for injunctive relief fail. Mot. 25. As discussed *supra*, Facebook's arguments do not

20  require summary judgment on Consumers' full-blown monopolization claims for damages, so they

21  do not require summary judgment as to the attempt claim or the request for an injunction either.

22  Facebook's argument that the named Consumers "abandoned" their request for an injunction by

23  moving to certify only a damages class is also baseless; Consumers moved to certify a damages class

24  because while they do seek an injunction, the "primary relief they seek" is monetary, and there is

25  nonetheless a "possibility of an injunction ancillary to an award of damages[.]" *In re Google Play*

26  *Store Antitrust Litig.*, 2022 WL 17252587, at *15 (N.D. Cal. Nov. 28, 2022) (Donato, J.).

**CONCLUSION**

28  For the foregoing reasons, Facebook's motion should be denied in its entirety.

1  DATED: May 12, 2025

2  By: /s/ Shana E. Scarlett                    By: /s/ Kevin Y. Teruya

3  **HAGENS BERMAN SOBOL SHAPIRO LLP**    **QUINN EMANUEL URQUHART & SULLIVAN, LLP**
   Shana E. Scarlett (Bar No. 217895)        Kevin Y. Teruya (Bar No. 235916)
4   shanas@hbsslaw.com                        kevinteruya@quinnemanuel.com
   715 Hearst Avenue, Suite 202              Adam B. Wolfson (Bar No. 262125)
5  Berkeley, CA 94710                         adamwolfson@quinnemanuel.com
   (510) 725-3000                            Scott L. Watson (Bar No. 219147)
6                                              scottwatson@quinnemanuel.com
   Steve W. Berman (admitted *pro hac vice*)  Claire D. Hausman (Bar No. 282091)
7   steve@hbsslaw.com                          clairehausman@quinnemanuel.com
   1301 Second Avenue, Suite 2000            Brantley I. Pepperman (Bar No. 322057)
8  Seattle, WA 98101                          brantleypepperman@quinnemanuel.com
   (206) 623-7292                            865 South Figueroa Street, 10th Floor
9                                            Los Angeles, CA 90017-2543
                                             (213) 443-3000
10
   **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
11  W. Joseph Bruckner (admitted *pro hac*   Michelle Schmit (admitted *pro hac vice*)
   *vice*)                                     michelleschmit@quinnemanuel.com
12   wjbruckner@locklaw.com                   191 N. Wacker Drive, Suite 2700
   Robert K. Shelquist (admitted *pro hac*   Chicago, IL 60606-1881
13  *vice*)                                   (312) 705-7400
    rkshelquist@locklaw.com
14  Brian D. Clark (admitted *pro hac vice*)  Manisha M. Sheth (admitted *pro hac vice*)
    bdclark@locklaw.com                        manishasheth@quinnemanuel.com
15  Kyle Pozan (admitted *pro hac vice*)     295 5th Avenue, 9th Floor
    kjpozan@locklaw.com                      New York, New York 10016
16  Laura M. Matson (admitted *pro hac vice*)  (212) 849-7000
    lmmatson@locklaw.com
17  100 Washington Avenue South, Suite
   2200
18  Minneapolis, MN 55401
   (612) 339-6900
19
20
21            *Attorneys for Plaintiffs Maximilian Klein,*
             *Rachel Banks Kupcho, and Sarah Grabert*
22

23

24

25

26

27

28

1

**ATTESTATION OF KEVIN Y. TERUYA**

2      This document is being filed through the Electronic Case Filing (ECF) system by attorney

3   Kevin Y. Teruya. By his signature, Mr. Teruya attests that he has obtained concurrence in the filing

4   of this document from each of the attorneys identified on the caption page and in the above signature

5   block.

6

Dated: May 12, 2025                    By   _/s/ Kevin Y. Teruya_____

7                                            Kevin Y. Teruya

8

9

**CERTIFICATE OF SERVICE**

10      I hereby certify that on this 12th day of May 2025, I electronically transmitted the foregoing

11   document to the Clerk's Office using the CM/ECF System, causing it to be electronically served on

12   all attorneys of record.

13

By   _/s/ Kevin Y. Teruya_____

14                                            Kevin Y. Teruya

15

16

17

18

19

20

21

22

23

24

25

26

27

28