**PUBLIC REDACTED VERSION**

WILMER CUTLER PICKERING
 HALE AND DORR LLP

SONAL N. MEHTA (SBN 222086)
 Sonal.Mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
 David.Gringer@wilmerhale.com
ROSS E. FIRSENBAUM (*pro hac vice*)
 Ross.Firsenbaum@wilmerhale.com
RYAN CHABOT (*pro hac vice*)
 Ryan.Chabot@wilmerhale.com
PAUL VANDERSLICE (*pro hac vice*)
 Paul.Vanderslice@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800

ARI HOLTZBLATT (SBN 354631)
 Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
 Molly.Jennings@wilmerhale.com
2100 Pennsylvania Ave NW
Washington, DC 20037
Telephone: (202) 663-6000

MICHAELA P. SEWALL (*pro hac vice*)
Michaela.Sewall@wilmerhale.com
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

*Attorneys for Defendant Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC., a Delaware Corporation,<br><br>Defendant. | Case No. 3:20-cv-08570-JD<br><br>**DEFENDANT META PLATFORMS, INC.'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT REGARDING CONSOLIDATED CONSUMER CLASS ACTION COMPLAINT**<br><br>Hearing Date: July 24, 2025<br>Time: 10:00 a.m.<br>Judge: Hon. James Donato |

**PUBLIC REDACTED VERSION**

**TABLE OF CONTENTS**

INTRODUCTION ..........................................................................................................................1

ARGUMENT ..................................................................................................................................2

I. PLAINTIFFS CANNOT DEMONSTRATE ANTITRUST INJURY AND STANDING ..............................................................................................................2

    A. Plaintiffs' Sole Theory Of Antitrust Injury Depends On Economides's Unreliable Payment Opinion, Which Is Unchanged Since Class Certification ..........................................................................................................2

    B. Plaintiffs' Supposed Alternatives To Economides Cannot Demonstrate Antitrust Injury ....................................................................................................6

    C. Summary Judgment Would Be Warranted Even If Plaintiffs' Alternative Injury Theories Were In The Case ......................................................................7

    D. Plaintiffs' Theory Of Injury Remains Too Speculative As A Matter Of Law ....................................................................................................................10

II. THE ALLEGED DECEPTION DID NOT HAVE A "SIGNIFICANT AND ENDURING" EFFECT ON COMPETITION ..................................................................11

III. PLAINTIFFS HAVE NOT ADEQUATELY DEFINED A MARKET AS A MATTER OF LAW ......................................................................................................13

IV. PLAINTIFFS' CLAIMS ARE TIME BARRED .............................................................14

CONCLUSION .............................................................................................................................15

**PUBLIC REDACTED VERSION**

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns, Inc.*,
    108 F.3d 1147 (9th Cir. 1997) ..................................................................................... 11, 12

*Coleman v. Quaker Oats Co.*,
    232 F.3d 1271 (9th Cir. 2000) ............................................................................................. 9

*Conwood Co. v. U.S. Tobacco Co.*,
    290 F.3d 768 (6th Cir. 2002) ............................................................................................ 12

*Electroglas, Inc. v. Dynatex Corp.*,
    497 F. Supp. 97 (N.D. Cal. 1980) .................................................................................... 14

*FTC v. Meta Platforms, Inc.*,
    2024 WL 4772423 (D.D.C. Nov. 13, 2024) ..................................................................... 13

*Jefferson v. Chase Home Fin.*,
    2008 WL 1883484 (N.D. Cal. Apr. 29, 2008) .................................................................... 9

*Jimmie's Limousine Serv., Inc. v. City of Oakland*,
    2005 WL 2000947 (N.D. Cal. Aug. 18, 2005), *aff'd*, 252 F. App'x 847
    (9th Cir. 2007) ............................................................................................................... 9, 10

*McGlinchy v. Shell Chem. Co.*,
    845 F.2d 802 (9th Cir. 1988) ............................................................................................... 9

*Pace Indus., Inc. v. Three Phoenix Co.*,
    813 F.2d 234 (9th Cir. 1987) ............................................................................................. 14

*Persian Gulf Inc. v. BP W. Coast Prods. LLC*,
    632 F. Supp. 3d 1108 (S.D. Cal. 2022) ............................................................................. 11

*Toscano v. PGA Tour, Inc.*,
    201 F. Supp. 2d 1106 (E.D. Cal. 2002) .............................................................................. 9

*TYR Sport, Inc. v. Warnaco Swimwear, Inc.*,
    709 F. Supp. 2d 821 (C.D. Cal. 2010) .............................................................................. 12

*Universal Avionics Sys. Corp. v. Rockwell Int'l Corp.*,
    52 F. App'x 897 (9th Cir. 2002) ....................................................................................... 13

**PUBLIC REDACTED VERSION**

### INTRODUCTION

The opposition imagines a case that plaintiffs did not bring and could not prove. The case plaintiffs litigated from December 2020 until last week was focused entirely on the theory that absent supposed deception, Meta would have paid all its users the made-up figure of $5 per month. As plaintiffs' counsel represented to the Court, "the antitrust injury for the users is a reduction in the level of compensation that would have been paid to all users." Hr'g Tr. 4:9-14 (Oct. 31, 2024). Plaintiffs said they will demonstrate that injury using only their expert Nicholas "Economides' analysis." Dkt. 793 at 23. Plaintiffs' experts have, in turn, expressly disclaimed offering any opinion regarding the quality of Meta's services. *See, e.g.*, Ex. 19, Economides 9/23 Tr. 102:5-13; Ex. 20, Farrell Tr. 119:10-13. Only now, after the Court held that plaintiffs' theory is nothing "more than a fanciful application of economic theory untethered to real-world evidence about the alleged PSNS market," Dkt. 905 at 8, has the story changed. Today, the lost "compensation" would have been a "better" Facebook for the three plaintiffs, all of whom testified ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. It is too late for this dramatic shift, even if there were any evidence to support it—and there is not. There is also no evidence even suggesting that the three plaintiffs suffered an antitrust injury because they "would enjoy more personal social networks to choose from" in a world where Meta had made different statements about its data practices. Opp. 1. Instead, as plaintiffs and their experts have repeatedly told the Court, the only antitrust injury they have sought to substantiate is not receiving $5 a month for using Facebook. That lack of compensation is also the only basis plaintiffs have ever offered for the claimed damages.[1]

Plaintiffs' actual theory fares no better at summary judgment than it did at class certification. Though plaintiffs claim Economides's "full-length" report has more "proof," Economides himself conceded that at trial he would offer the same opinions—resting on the same flawed evidence—as he did when the Court last rejected his speculation about compensation. Mot. 1-2, 5-7. Whatever the opposition's obfuscations, that concession decides this case. Plaintiffs told the Ninth Circuit as much, arguing that the Court's earlier decision "prejudges the outcome of

---

[1] Unless otherwise noted, "Ex." citations reference exhibits to the Gringer Declaration filed herewith, emphasis is added, and objections are omitted for deposition citations.

**PUBLIC REDACTED VERSION**

Facebook's motion for summary judgment." Ex. 21, Pet. 21. The Court should thus again grant Meta's motion to exclude Economides's testimony, Dkt. 927, and grant Meta summary judgment for the same reason it denied class certification, Mot. 5-7. Plaintiffs have no way to prove the case they brought.

The remainder of the opposition similarly trades meaningful engagement with Meta's arguments for revisionist history. Plaintiffs cannot dispute that any of their theories of injury depend on a lengthy causal chain supported only by Economides's *ipse dixit* about the effect of deception on competition. Far from their experts "detail[ing] how Facebook's deception destroyed competition," Opp. 6, plaintiffs' experts actually disclaimed analyzing the statements alleged to be deceptive. Similarly, what plaintiffs try to dismiss as "gotcha soundbites" are repeated and uniform concessions that Meta's superior services—not the allegedly anticompetitive conduct—caused Facebook's success. Plaintiffs likewise attempt to sidestep their market definition expert's concession that he cannot actually say what is in or out of the market, but the notion that *some* market definition question may turn on factual issues cannot excuse the failure here to offer *any* coherent definition. And plaintiffs' response to Meta's statute of limitations arguments again effectively concedes away their case, acknowledging that any challenge to the acquisition of monopoly power is untimely and that plaintiffs cannot make out an antitrust violation within the limitations period. These defects are dispositive and infect the entirety of plaintiffs' case. The Court should grant summary judgment.

## ARGUMENT

**I.     PLAINTIFFS CANNOT DEMONSTRATE ANTITRUST INJURY AND STANDING**

**A.     Plaintiffs' Sole Theory Of Antitrust Injury Depends On Economides's Unreliable Payment Opinion, Which Is Unchanged Since Class Certification**

Plaintiffs long ago conceded that they cannot demonstrate antitrust injury without Economides's speculation that Meta would have paid all Facebook users. Mot. 5-7. The opposition confirms that his opinion is no different or more reliable now than it was when excluded.

Plaintiffs primarily argue that Economides has provided additional support for his opinion in his "hundreds of pages of full-length merits reports," but exactly *how* those hundreds of pages

1. remedy the defects the Court identified is never said. Opp. 8. For good reason: Economides's "merits reports" were written **before** the reports the Court reviewed at class certification, were expressly incorporated into those "abridged" class reports, and rely on the same conjecture that Facebook would have been the first platform to ever pay all its users for consuming content. Ex. 22, Economides Abridged CC Rep. ¶¶3, 84 n.147. As a result, the failures the Court identified have not been fixed. Nothing in the opposition addresses Economides's failure to connect economic literature to the realities of the alleged PSNS market or the undisputed fact that neither Meta nor "any other participant in the PSNS market has ever competed by paying users." Dkt. 905 at 7-9. Plaintiffs raise the same "preliminary discussions within Meta about paying users for their data" that the Court held "were internal trial balloons that never ripened into serious proposals or an actual practice," and the same "research programs" that the Court determined were "equally inapposite." *Compare id.* at 10, *with* Opp. 11-12. Indeed, the specific examples that plaintiffs say should change the Court's opinion—" ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌. Opp. 11; *see also* Ex. 22, Economides Abridged CC Rep. ¶102 ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌").[2]

Because Economides's actual injury opinion remains inadmissible, plaintiffs invent ones he did not offer that have even less support in the record.

*First*, plaintiffs falsely claim that Economides opined that users were injured because they would have received "better features" in the but-for world. Opp. 9. But Economides himself unequivocally denied offering an opinion on Facebook's quality:

> Q. So in your but-for world, **Facebook could have responded to more competition by offering better services instead of paying users**; correct?
>
> A. **Not correct**. I think that paying users would be a crucial feature of the but-for world to make sure that people come to Facebook. **Now, could it—could Facebook also have better features? Possibly. I don't know.** But that's not guaranteed. That's not the crucial feature.

---

[2] Plaintiffs also omit that Dr. Economides's merits reports *were* filed for the Court's consideration, including by plaintiffs in contravention of the Court's order. *See* Dkts. 770-2, 770-3, 853, 857, 907. And it was only *after* the Court reviewed thousands of pages of expert materials that plaintiffs were required to file more concise reports. Hr'g Tr. 16:14-18:1 (Apr. 18, 2024).

**PUBLIC REDACTED VERSION**

> Q. And in your but-for world, it's guaranteed that Facebook would be paying users?
>
> A. Yes, it is guaranteed that Facebook would be paying users because that's the way to attract users to Facebook, which are immensely valuable because they generate revenue from—from advertisers, from advertisers.

Ex. 19, Economides 9/23 Tr. 102:5-20. He instead testified that Meta's services would "remain the same":

> Q. In your but-for world, are you assuming that Facebook and Instagram would remain the same products as they are in the actual world?
>
> A. Well, you have to keep in mind that the but-for world is an unknown, and we do the best approximation that we can with them. So at the first approximation, the answer is yes, *we expect Facebook and Instagram to remain the same products*.

*Id.* 144:20-145:2. As he explained in his merits report, his opinion is that Meta would have ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓" Ex. 23, Economides Rep. ¶280; *accord id.* ¶277 ("▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓").

The citations plaintiffs offer to rewrite these denials are distressingly misleading. They claim that Economides testified that "other features" is one of the "the crucial two dimensions" of competition in the but-for world, Opp. 9, but Economides actually testified that "paying users and *not making deceptive statements and omissions*" are "the crucial two dimensions." Ex. 19, Economides 9/23 Tr. 101:19-102:4. He then said that "some personal social network companies have different features than Facebook" and "there could be competition in other dimensions as well," but immediately conceded that he was not opining on whether *Facebook* would have better features. *Id.* 101:19-102:20.

Plaintiffs' citations to Economides's report are no better—¶273 (cited at Opp. 9) states without reference to any evidence that Facebook would have ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, but a conclusory aside with no connection to the record is just as "fanciful" as Economides's payment scheme, Dkt. 905 at 8. Especially because Facebook has long provided extensive user controls over how information is

1   used, including opt-outs for various kinds of targeted advertising. And regardless, Economides

2   conceded that

3

4   ▓▓▓. Ex. 23, Economides Rep. ¶291. Plaintiffs also point to ¶291

5   to suggest that Economides offered an opinion on quality, Opp. 9, but there he opines only that

6

7   Ex. 23, Economides Rep. ¶291 & n.709. That has nothing to do with quality.

8   ▓▓▓ does not obviate the central defect in Economides's opinion—as the Court

9   recognized, there is no reliable basis to opine that Meta would pay Facebook users *at all*.

10         *Second*, plaintiffs again ignore the actual testimony and record to claim that Economides

11  offered an opinion about "increased choice" among PSNS apps in the but-for world. Opp. 8.

12  Economides's discussion of choice in the but-for world is bizarre to the point of incoherence and

13  creates no triable issue. He at first claims that "in the world in which Facebook doesn't monopoly

14  power [sic], there is much more competition," but then asserts that this competition would not

15  result in any users exercising the option to leave Facebook for an alternative platform:

16         Q. So when—when this intense competition for Facebook and Instagram emerge,
           does Facebook at present—does Facebook have all of the users it has today?
17
           A. Well, I—the way I have thought of it, yes, the Facebook has the users that it has
18         today, hasn't lost users.

19         Q. And so this intense competition wouldn't actually result in people leaving
           Facebook?
20
           A. Well, in my but-for world, when they receive the $5, they will not leave. They
21         will stay.

22  Ex. 19, Economides 9/23 Tr. 154:23-155:9. That makes no sense. Economides never explains how,

23  if Facebook maintained all of its present users, any of the (unidentified) competitors could enter

24  the market. But more importantly, it demonstrates that plaintiffs' newly identified argument again

25  collapses into Economides's payment scheme. Per Economides, the only harm users have suffered

26  from the lack of "choice" is that Meta does not need to pay them $5 a month.

27         *Third*, plaintiffs make the irrelevant assertion that Economides's compensation opinion

28  turns on "paying users for their data," rather than use. Opp. 11-12. But Economides has always

1  claimed ███████████████████████████████████████████████████████████
2  ████████████████████████████████████████████████████████████ *See, e.g.*, Ex.
3  22, Economides Abridged CC Rep. ¶13 ████████████████████████████████
4  ████████████████████████████████████ That is precisely the opinion this Court
5  excluded. Dkt. 905 at 2 (Economides's opinion "that Facebook users suffered antitrust injury
6  because Meta did not pay them $5.00 a month *for their* personal data is unsupported by the
7  record").

8      Nothing in the opposition can salvage plaintiffs' reliance on Economides's payment
9  scheme. Plaintiffs have maintained for years that the antitrust injury they suffered is lost
10 compensation, to be proven at trial through Economides's testimony. That testimony is unchanged
11 from (and indeed preceded) class certification and is inadmissible. The alternatives the opposition
12 purports to find buried amongst the thousands of pages of reports Economides has submitted over
13 the life of this case are imagined, unsupported, or both. Summary judgment remains warranted.

14      **B.     Plaintiffs' Supposed Alternatives To Economides Cannot Demonstrate Antitrust Injury**

15      Without Economides to rely on, plaintiffs improperly invoke the testimony of other
16 economists to substantiate their claimed injury. Opp. 6, 8. Some of these references are absurd.
17 Whether experts retained by the FTC in a separate litigation that does not involve the precise
18 market alleged here or these individual plaintiffs—let alone an expert Quinn Emanuel retained in
19 a case in a different country—opined about the "value" Facebook could provide in a more
20 competitive world is irrelevant to whether plaintiffs could carry their burden at trial on the record
21 *in this case*. Opp. 6. Plaintiffs then turn to their other economist, Joseph Farrell, claiming that he
22 offered an opinion on "harm to competition" too. Opp. 8. But Farrell has *never* opined on any
23 antitrust injury suffered by the individual plaintiffs now litigating this case. His "█████
24 ██████" opinion instead of consists of a brief discussion of the generic economic theory that
25 ████████████████████████████████████████████████████████████████
26 █████ Ex. 24, Farrell Rep. ¶260, followed by ████████████████████████
27 ████████████████ *id.* ¶¶268-78. The only references to harm to users are several conclusory
28

1 sentences asserting a "█████████████████████████████████████████████████████"
2 *Id.* ¶¶264, 266. What that "████" amounts to he never says. Farrell did not "quantify in any way the
3 harm to competition," and offers no opinion on whether the consequences of the claimed deception
4 had any "significance." Ex. 20, Farrell Tr. 270:10-14 ("Q. And did you attempt to quantify in any
5 way the harm to competition from these alleged deceptive statements? A. No."); *id.* 268:15-22
6 ("Q. Are you offering an opinion regarding the significance of the allegedly deceptive conduct?
7 A. No. I offer opinions, some of which are of the form if the conduct is sufficiently consequential,
8 then the following additional issues might arise. But I don't offer an opinion regarding whether it
9 was."). Testimony about unquantified, potential effects that "might arise" does not address whether
10 a defendant's conduct was "consequential" and cannot demonstrate antitrust injury.

11   Regardless, plaintiffs may not offer both Economides and Farrell to opine on antitrust
12 injury. Plaintiffs told the Court that Farrell and Economides would both offer opinions on "relevant
13 market and antitrust injury or harm to competition." Hr'g Tr. 4:8-16 (Nov. 14, 2024). The Court
14 rejected that approach, stating "You are not going to be allowed to have two experts testify to the
15 same opinions. That is duplicative, wasteful and inefficient. I will not allow that." *Id.* 6:5-23. The
16 Court also explained that plaintiffs may not "offer alternative theories to the jury because that's
17 going to be confusing and misleading." *Id*. The opposition seeks to do precisely that.

18   Plaintiffs then briefly allude to "lay" evidence of injury, but the entirety of their argument
19 is the assertion that it exists. Opp. 8. That is particularly weak here because the only plaintiffs in
20 the case—the named plaintiffs—all testified ██████████████████████████████████
21 ██████ Plaintiffs elsewhere appear to claim that such evidence could support their lost
22 compensation theory (Opp. 6-7), but the documents and testimony cited are the same materials
23 Economides relied on. This Court has already found that evidence insufficient to support the claim
24 that Meta would have paid all Facebook users.

25   **C.**  **Summary Judgment Would Be Warranted Even If Plaintiffs' Alternative Injury Theories Were In The Case**
26
27   The supposed alternatives to Economides's monthly payment are deficient for three additional, independent reasons: (1) they have no connection to the individual plaintiffs now
28

1  litigating this case; (2) plaintiffs have no means of establishing the resulting damages; and (3) they
2  were raised too late. So even if the Court were to conclude that plaintiffs could seek to prove injury
3  with something other than the opinion it already excluded—and it should not—summary judgment
4  would still be required.

5      *First*, plaintiffs have no evidence that *they* suffered any harm from a diminution in quality
6  or reduced choice. Plaintiffs' opposition—through the repeated reference to "consumers"—
7  appears to labor under the misimpression that this is still a class action. But class certification was
8  denied. What matters now is whether the three named plaintiffs can establish injury. None of
9  plaintiffs' experts addressed the circumstances of any of the individual plaintiffs; they instead
10 relied on Economides's conclusion that *all* users would receive payment in his but-for world to tie
11 the allegedly anticompetitive conduct to their individual injuries. As explained, that theory fails
12 on its own terms because the plaintiffs testified ▉▉▉▉▉▉▉
13 Mot. 6. But without a uniform payment, there is no connection at all—plaintiffs have no evidence
14 that they would have benefited from any increase in quality or choice. And their own testimony
15 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
16 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ *See* Ex. 25, Grabert Tr. (Vol. 1) 204:14-205:13, 208:14-
17 20, 210:16-211:7; Ex. 27, Klein Tr. 60:25-61:4, 201:1-14; Ex. 28, Kupcho Tr. 37:2-16, 93:21-24.

18     *Second*, plaintiffs have no way to prove damages caused by anything other than lost
19 compensation. The only damages calculation plaintiffs have ever advanced is Economides's
20 claimed payment. But Economides sought to identify the amount of money that would be
21 necessary to pay users "▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
22 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉" Ex. 23, Economides Rep. ¶328. And that calculation
23 is unreliable and inadmissible—he determined the amount based on the same comparisons to
24 market research programs that this Court held were "inapposite," Dkt. 905 at 10.

25     More fundamentally, the amount of money people would need to be paid to stay on
26 Facebook has nothing to do with any claimed change in quality or loss of choice. As to those
27 purported injuries, plaintiffs have never identified any measure of damages at all, despite being
28 ordered by the Court to disclose any theories beyond lost compensation after deficient initial

**PUBLIC REDACTED VERSION**

disclosures. Dkt. 162 at 4 ("If the Consumer Plaintiffs seek damages based on something other than the uncompensated value of their data, they must describe with greater specificity the nature of the harm for which they claim damages, the methodology on which they rely to compute damages, and an estimate of the amount of damages claimed."). In response, plaintiffs identified only lost compensation:

[REDACTED]

Ex. 29, Plfs' Third Am. Initial Disclosures at 49 (June 23, 2023); *see also id.* at 54 ([REDACTED]). Nowhere in the court-ordered explication of their damages calculations do plaintiffs offer a means for determining damages from a degradation of quality or loss of choice. That provides an independent basis for summary judgment even if Economides had offered such opinions. *See McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 808 (9th Cir. 1988) (affirming summary judgment after exclusion of expert left plaintiffs with "no expert witnesses or designated documents providing competent evidence from which a jury could fairly estimate damages"); *Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1125-26 (E.D. Cal. 2002) (granting summary judgment when plaintiff "never provide[d] a theoretical foundation for his proof of damages").

*Third*, even if plaintiffs could find something in the record supporting their alternative injuries, "[n]ew theories may not be raised to defeat summary judgment." *Jimmie's Limousine Serv., Inc. v. City of Oakland*, 2005 WL 2000947, at *5 (N.D. Cal. Aug. 18, 2005), *aff'd*, 252 F. App'x 847 (9th Cir. 2007). The Ninth Circuit has explained that "adding a new theory of liability at the summary judgment stage would prejudice the defendant who faces different burdens and defenses under the second theory of liability." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000); *Jefferson v. Chase Home Fin.*, 2008 WL 1883484, at *6 (N.D. Cal. Apr. 29, 2008) ("Courts regularly refuse to allow new theories in opposition to summary judgment where the defendant would suffer prejudice."). That is the case here, where the parties conducted years of

discovery on Economides's claim of lost compensation—not the new theory they have now invented after the Court's rejection of Economides at class certification. *See Jimmie's Limousine Serv.*, 2005 WL 2000947, at *5 (granting summary judgment without considering new theories when "[d]iscovery ended months ago" and "the trial is only two months away").

### D. Plaintiffs' Theory Of Injury Remains Too Speculative As A Matter Of Law

Plaintiffs' theory of injury separately fails because the supposed failure to pay all Facebook users $5 a month is too attenuated from the claimed deception and relies on a series of unsupported inferences about how people and competitors would behave in Economides's but-for world. Mot. 7-10. The opposition asserts that Meta raises only "disputes about the factual predicates for [their] theories," Opp. 10, but ignores that *even accepting* the individual links in plaintiffs' alleged chain of causation, the loss of payment is too remote from the claimed deception, Mot. 8. More fundamentally, nothing in the opposition obviates the failures of proof identified in the motion. The absence of evidence cannot create a dispute of material fact.

To start, plaintiffs identify no evidence to support the foundation of their theory of injury: stronger competition in the absence of the claimed deception. Plaintiffs do not meaningfully address this argument, instead asserting that Economides testified that real world competitors already offered better services. Opp. 10. But if the alleged deception did not preclude rivals from introducing attractive alternatives, that would only undermine the claimed connection between deception and the availability of alternatives. And again, plaintiffs concede through omission that they have no evidence that a but-for world without deception would have additional competition— Economides never identified what that competition would look like, and plaintiffs offer no alternative to his *ipse dixit*. These are fatal failings, because without evidence of stronger competition in the but-for world, the need to pay all users disappears. Mot. 8.

Plaintiffs' supposed evidence that the alleged deception harmed real-world competitors is similarly deficient. They resist the concessions from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, but identify no contrary evidence, implausibly claiming only that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ "may not have known" the harms they were suffering. Opp. 10-11. It is unlikely that Economides knows what

**PUBLIC REDACTED VERSION**

1  ▓▓▓ did not, and speculation contradicting the record evidence cannot create a triable issue.
2  The testimony cited from ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ likewise either contradicts plaintiffs'
3  theories or offers nothing more than countervailing speculation. ▓▓▓▓▓▓▓▓▓▓
4  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
5  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ then claimed that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
6  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
7  Ex. 30, Weinstein Tr. 73:13-74:12, 71:17-73:7. The series of anecdotes plaintiffs offer cannot
8  support the competitive effects they claim. *See, e.g.*, *Persian Gulf Inc. v. BP W. Coast Prods. LLC*,
9  632 F. Supp. 3d 1108, 1173 (S.D. Cal. 2022) (granting summary judgment where lay witness
10 testimony did not "allow an inference, without engaging in speculation, that the alleged
11 anticompetitive conduct was a material cause of the injury" (quotation marks omitted)). Without
12 evidence of these and other links in the causal chain necessary to prove lost compensation resulting
13 from the alleged deception, plaintiffs' theory of injury fails as a matter of law.

14 **II.   THE ALLEGED DECEPTION DID NOT HAVE A "SIGNIFICANT AND ENDURING" EFFECT ON COMPETITION**

15 Plaintiffs do not contest that antitrust claims premised on deception are strongly disfavored
16 and "should presumptively be ignored." *Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich
17 Legal & Pro. Publ'ns, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997). Instead, they claim that their
18 allegations are the exceptional case. Opp. 13-18. The record demonstrates otherwise.

19 *First*, plaintiffs assemble ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
20 ▓▓▓, Opp. 13, but fail to identify any evidence that the deception alleged here influenced anyone's
21 decision to use Facebook. To the contrary—both the individual plaintiffs and plaintiffs' "privacy"
22 expert ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
23 Mot. 14-15. As plaintiffs' expert put it, "I'm not sure how much Facebook's PR about its trust
24 campaign—you know, its trust campaign to the public—I'm not sure how that swayed users." Ex.
25 31, Lamdan Tr. 77:21-78:7. Generic observations about "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
26 ▓▓▓" cannot establish harm to competition over that countervailing evidence. Opp. 13.
27 *Second*, plaintiffs return to the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
28

**PUBLIC REDACTED VERSION**

Opp. 13-14, but again fail to identify any link to the supposed deception challenged in this case, *supra*, at 10-11. Plaintiffs also confuse their burden at summary judgment, which requires them to "provide affirmative evidence of harm to *competition*," *TYR Sport, Inc. v. Warnaco Swimwear, Inc.*, 709 F. Supp. 2d 821, 836 (C.D. Cal. 2010), not "merely upon a competitor," *Am. Pro. Testing Serv.*, 108 F.3d at 1151. Plaintiffs' citations do not even support the latter, and they have no evidence of any marketwide harm—to the contrary, the record demonstrates robust competition over time, with numerous alternatives to Meta's services entering the market over the conduct period.

Nor does plaintiffs' caselaw establish that these statements are "sufficient to support [a] jury verdict of harm to competition." Opp. 13 (citing *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 790 (6th Cir. 2002)). In *Conwood*, for example, a competitor testified that the defendant's activity "restricted [the competitor's] growth," but it was that statement *in combination with* expert testimony demonstrating defendant's actions "caused higher prices and reduced consumer choice" and evidence that plaintiff's growth slowed significantly during the relevant period that showed harm. *Id.* at 789-90. Here, plaintiffs have none of that corroborating evidence.

*Third*, plaintiffs dispute Economides's concession that any market power Meta possessed was obtained "on its merits," Opp. 15-16, but cannot overcome his actual words. Whatever plaintiffs' attempts to rewrite that testimony through citations to his reports or deposition errata, *id.*, Economides's words speak for themselves. When confronted, he clearly and unequivocally admitted (and then reaffirmed) that "Facebook beat Myspace on its own merits" and agreed he was "not suggesting that the alleged misrepresentations and omissions in this case were the cause of Myspace's decline." Ex. 32, Economides 3/24 Tr. 240:3-15. Plaintiffs' assertion that a factfinder could *ignore* those admissions is no basis to deny summary judgment. Opp. 15.

*Fourth*, plaintiffs defend their failure to present any evidence of the effect of the particular misrepresentations and omissions alleged through obfuscation. Opp. 16. Repeatedly stating that Economides "did consider how particular instances of Facebook's deception" harmed competition does not make it so, *id.*, and plaintiffs have affirmatively disclaimed presenting such evidence, Mot. 13. Economides's testimony is in accord, and he agreed (for example) that he did "not have

1  a specific statement" or "specific evidence that shows that a specific statement of omission or
2  misrepresentation or anything else" in his report or those of other experts that "would result in a
3  user going to Facebook rather than Google+." Ex. 32, Economides 3/24 Tr. 244:5-19.
4      *Finally*, plaintiffs take offense at "'gotcha' soundbites" from Lamdan's deposition, Opp.
5  17, but cannot contest that she explicitly agreed she was not offering the testimony plaintiffs
6  require to prove harm to competition, Mot. 14-15. Nothing in the opposition can obviate Lamdan's
7  repeated admission that she cannot say whether the allegedly deceptive statements "swayed users,"
8  and does not believe the alleged deception caused people to stay on the platform. Ex. 31, Lamdan
9  Tr. 77:21-79:14. Plaintiffs cannot defeat summary judgment by dismissing dispositive admissions
10 as a "gotcha"—experts are cross-examined precisely to put their opinions to the test and plaintiffs
11 cannot ignore that cross-examination in hopes of creating a factual dispute where there is none.
12 **III.   PLAINTIFFS HAVE NOT ADEQUATELY DEFINED A MARKET AS A MATTER OF LAW**
13     Plaintiffs' defense of their market definition relies primarily on the denial of summary
14 judgment in *FTC v. Meta Platforms, Inc.*, a different case with a different proposed market,
15 supported by different expert testimony. The FTC has claimed that *all* aspects of Facebook and
16 the other platforms alleged to be "PSNS" are within the market. *FTC v. Meta Platforms, Inc.*, 2024
17 WL 4772423, at *15-16 (D.D.C. Nov. 13, 2024). That definition fails on its own terms, but does
18 not present the deficiencies identified in Meta's motion. Here, plaintiffs cannot even say which
19 features and uses of Facebook or any other app are PSNS. Plaintiffs do not dispute that according
20 to Farrell, the same video viewed by the same person on the same service could be both in and out
21 of the market depending on nothing more than some variance in the user's subjective motivations.
22 Ex. 20, Farrell Tr. 29:19-30:10. A market that "depends" on both the individual piece of content
23 being viewed by a particular user and that user's reason for viewing it has no discernable bounds,
24 *id.*, and that "failure to adequately define a relevant market" does not carry plaintiffs' burden at
25 summary judgment, *Universal Avionics Sys. Corp. v. Rockwell Int'l Corp.*, 52 F. App'x 897, 899
26 (9th Cir. 2002) (affirming summary judgment).
27     Plaintiffs' inability to define the PSNS market is not "minutiae in how Dr. Farrell measured
28 Facebook's market share." Opp. 20. Plaintiffs chose to advance a market definition based primarily

**PUBLIC REDACTED VERSION**

on a qualitative comparison of Facebook and other apps' features. Ex. 24, Farrell Rep. ¶¶124-89. Having chosen to rely on such functional differences, they cannot now disclaim the need to be able to reliably apply them. That this definition concededly produces what Farrell himself described as "intractable questions" and "irreducible gray areas," Opp. 20, warrants summary judgment.

IV. **PLAINTIFFS' CLAIMS ARE TIME BARRED**

Plaintiffs concede that their monopoly acquisition claim is time-barred and do not defend it. Opp. 21 (asserting that "monopoly acquisition . . . has nothing to do with the timeliness of Consumers' claims" because "Consumers' damages claims are based on Facebook's monopoly maintenance"). That suffices to grant summary judgment on plaintiffs' acquisition theory.

Plaintiffs likewise concede the untimeliness of their monopoly maintenance theory, contending only that it can be saved through application of the continuing violation doctrine. Opp. 21-25. Their primary argument is to invoke Judge Koh's motion to dismiss opinion, Opp. 22, but Judge Koh addressed only whether the allegations in the complaint were timely at that stage of the litigation. A court cannot permanently decide issues against the defendant "as a matter of law" on a motion to dismiss. And the record developed since that decision has demonstrated that plaintiffs cannot prove a continuing violation. Mot. 20-23.

*First*, plaintiffs cannot establish an overt act within the limitations period that itself "violate[s] antitrust laws." *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 239 (9th Cir. 1987). Such an act must cause "continuing antitrust harm, i.e., a continuing injury *to competition*, not merely a continuing pecuniary injury to a plaintiff." *Electroglas, Inc. v. Dynatex Corp.*, 497 F. Supp. 97, 105 (N.D. Cal. 1980). But because plaintiffs have never identified competitive harms caused by *any* of the allegedly deceptive statements, much less the handful plaintiffs assert occurred within the limitations period, there is no evidence of harm to competition caused by the allegedly timely overt acts. Mot. 21-22. Plaintiffs present attorney argument on the effect of ▮▮▮▮▮, but that cannot substitute for their experts' conceded failure to conduct the analysis necessary to show ongoing harm—and even then, plaintiffs claim only "harm to Facebook's competitors," not competition. Opp. 25. The fact witness testimony plaintiffs cite, *id.*, suffers from similar defects and again ▮▮▮▮▮

FOR SUMMARY JUDGMENT

**PUBLIC REDACTED VERSION**

1 ███████████████████████████ *See, e.g.*, Opp. Ex. 81, 93:11-94:5 (██████
2 ████████████████████████████████████████████████████████████). Instead,
3 competitors largely attributed their lack of success to ████████████████
4 ████████████████████████ Ex. 33, DeWolfe Tr. 87:10-15 ("████████████████
5 ████████████████████████████████████████████████████████████████████████
6 ████████████████████████████████████████████████████████████████████████
7 ████████████████████"); Ex. 34, Horowitz Tr. 129:7-17 (████████████████
8 ████████████████████████████████████████████████████████████████████████
9 ████████████████████████████████████████████████████).

     *Second*, plaintiffs cannot establish any "new and accumulating injury" that they suffered after 2016. Mot. 20. There is no evidence or testimony to support the injuries identified in the opposition—reduced quality, lack of choice, and lost compensation—and, in any event, they are identical to the injuries claimed to have been suffered from the onset of the alleged monopoly. Plaintiffs also fail to address entirely how *they* were harmed during the limitations period by some reduction in quality or choice, and the idea that ████████████████████████████████████████ ████████████████████████████████████████████████ Mot. 6-7. But these omissions are unsurprising; none of the plaintiffs could ████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ *See* Ex. 26, Grabert Tr. (Vol. 2) 258:21-260:17.

     Taken together, plaintiffs alleged a "uniform and prolonged deception" that began in 2006, Dkt. 648 at 1, then failed to identify any harm to themselves or competition from the aspects of that "continuous campaign" that are alleged to have occurred within the limitations period, Dkt. 793 at 7-9. That cannot constitute a continuing violation as a matter of law.[3]

## CONCLUSION

     The Court should grant Meta's motion for summary judgment.

---

[3] The parties agree that plaintiffs' attempted monopolization claim and request for injunctive relief rise and fall with the Court's decision on plaintiffs' monopolization claim. Opp. 25.

**PUBLIC REDACTED VERSION**

Dated: May 19, 2025

Respectfully submitted,

By: */s/ Sonal N. Mehta*
  Sonal N. Mehta

WILMER CUTLER PICKERING
 HALE AND DORR LLP

*Attorney for Defendant Meta Platforms, Inc.*

**PUBLIC REDACTED VERSION**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of May, 2025, I electronically transmitted the public redacted version of the foregoing document to the Clerk's Office using the CM/ECF System and caused the version of the foregoing document filed under seal to be transmitted to counsel of record by email.

By: */s/ Sonal N. Mehta*
Sonal N. Mehta