**PUBLIC REDACTED VERSION**

| | |
|---|---|
| WILMER CUTLER PICKERING HALE AND DORR LLP | ARI HOLTZBLATT (SBN 354631) Ari.Holtzblatt@wilmerhale.com |
| SONAL N. MEHTA (SBN 222086) Sonal.Mehta@wilmerhale.com 2600 El Camino Real, Suite 400 Palo Alto, California 94306 Telephone: (650) 858-6000 | MOLLY M. JENNINGS (*pro hac vice*) Molly.Jennings@wilmerhale.com 2100 Pennsylvania Ave NW Washington, DC 20037 Telephone: (202) 663-6000 |
| DAVID Z. GRINGER (*pro hac vice*) David.Gringer@wilmerhale.com ROSS E. FIRSENBAUM (*pro hac vice*) Ross.Firsenbaum@wilmerhale.com RYAN CHABOT (*pro hac vice*) Ryan.Chabot@wilmerhale.com PAUL VANDERSLICE (*pro hac vice*) Paul.Vanderslice@wilmerhale.com 7 World Trade Center 250 Greenwich Street New York, New York 10007 Telephone: (212) 230-8800 | MICHAELA P. SEWALL (*pro hac vice*) Michaela.Sewall@wilmerhale.com 60 State Street Boston, Massachusetts 02109 Telephone: (617) 526-6000 |

*Attorneys for Defendant Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC., a Delaware Corporation,<br><br>Defendant. | Case No. 3:20-cv-08570-JD<br><br>**META PLATFORMS, INC.'S REPLY IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY AND OPINIONS OF NICHOLAS ECONOMIDES**<br><br>Hearing Date: July 24, 2025<br>Time: 10:00 AM<br>Judge: Hon. James Donato |

**PUBLIC REDACTED VERSION**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................1

ARGUMENT .................................................................................................................................2

I.   Economides's Only Injury Opinion Is The Failure To Pay $5, Which Remains As Unreliable As It Was The Last Time The Court Excluded It ..............................................2

II.  Economides's Damages Model Relies On Comparators The Court Already Held Were "Inapposite," And Is Unreliable Regardless .................................................................6

III. Economides's Competitive Effects Opinion Is Even More Speculative Than His Injury And Damages Opinions ........................................................................................8

IV.  The Portions Of Economides's Reports That Restate Or Summarize Evidence With No Economic Analysis Should Be Excluded.............................................................9

CONCLUSION..............................................................................................................................10

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*City of Ponoma v. SQM N. Am. Corp.*,
    750 F.3d 1036 (9th Cir. 2014) ....................................................................................2

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)....................................................................................................3

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ....................................................................................7

*In re Capacitors Antitrust Litig. (No. III)*,
    2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) ...........................................................8

*In re Glumetza Antitrust Litig.*,
    2021 WL 1817092 (N.D. Cal. May 6, 2021) .............................................................3

*In re Glumetza Antitrust Litig.*,
    2021 WL 3773621 (N.D. Cal. Aug. 25, 2021) .........................................................10

*In re Live Concert Antitrust Litig.*,
    863 F. Supp. 2d 966 (C.D. Cal. 2012) .......................................................................8

*In re Xyrem (Sodium Oxybate) Antitrust Litig.*,
    2023 WL 3440399 (N.D. Cal. May 12, 2023) ...........................................................8

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*,
    387 F. Supp. 2d 794 (N.D. Ill. 2005), *amended*, 2005 WL 8178971
    (N.D. Ill. Sept. 8, 2005) .........................................................................................6, 7

*Mueller v. Puritan's Pride, Inc.*,
    2021 WL 5494254 (N.D. Cal. Nov. 23, 2021) ...........................................................6

*Ollier v. Sweetwater Union High Sch. Dist.*,
    768 F.3d 843 (9th Cir. 2014) ......................................................................................5

*Siqueiros v. Gen. Motors LLC*,
    2022 WL 74182 (N.D. Cal. Jan. 7, 2022) ................................................................10

*William Inglis & Sons v. Cont'l Baking Co.*,
    942 F.2d 1332 (9th Cir. 1991), *modified on other grounds*,
    981 F.2d 1023 (9th Cir. 1992) ....................................................................................7

**PUBLIC REDACTED VERSION**

# INTRODUCTION

Nothing has changed since the Court decided that "Economides' opinions cannot be the basis for finding antitrust injury in this case." Dkt. 905 at 13. Despite devoting their opposition to relitigating the Court's order on the ground that Economides submitted longer merits reports, the evidence plaintiffs identify was already advanced at class certification—as would be expected, given that Economides wrote his "merits" reports a year before the Court's order, then incorporated them wholesale into his class submissions. Mot. 1, 3-4. Plaintiffs point only to the same broad economic principles about the effect of competition on price (ignoring that competition has already brought the price of Facebook down to zero), the same "internal trial balloons that never ripened into serious proposals or an actual practice," and the same market research programs that this Court found "inapposite." Dkt. 905 at 8-10. They continue to concede, then ignore, that "no personal social networking service has ever paid users for their data." Opp. 5. And they once more refuse to acknowledge that the Facebook users in this case—who are now the only plaintiffs—testified ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Mot. 4. Indeed, the only "new" argument plaintiffs advance is their purported discovery of an opinion on quality, Opp. 7, that Economides testified he did not give, Ex. 13, Economides 9/23 Tr. 102:5-20. There is thus nothing to change the Court's initial decision that Economides's opinion on injury should be excluded.[1]

Economides's other opinions are no more reliable, and the rest of the opposition does nothing to address the defects identified in Meta's motion. Economides's damages opinion is based on his compensation theory and relies exclusively on the same "inapposite" market research programs to reach a $5 a month payment. Plaintiffs simply saying that market research programs are somehow analogous to Facebook and other attention platforms cannot make it so, and nodding to the "yardstick method" does not redress Economides's failure to apply it reliably. Opp. 8-9. Economides's competitive effects opinion is similarly speculative, and the opposition cannot overcome Economides's and the plaintiffs' own concessions. As Economides testified, much of

---

[1] Unless otherwise noted, "Ex." citations reference exhibits to the Gringer Declaration filed herewith, emphasis is added, and objections are omitted for deposition citations.

**PUBLIC REDACTED VERSION**

1   Meta's success can be attributed to lawful competition and he never analyzed the effects of the
2   actual conduct claimed to be deceptive. Mot. 5-6. The plaintiffs, █████████████████████
3   ████████████████████████████████████████████████████████████████████████
4   ████████████████████████████████████ Mot. 6-7. So as with
5   Economides's injury opinion, his testimony on damages and harm to competition is "connected to
6   existing data only by the *ipse dixit* of the expert." Dkt. 905 at 10 (quoting *City of Ponoma v. SQM*
7   *N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014)). The Court should exclude all of it.

**ARGUMENT**

I.   **ECONOMIDES'S ONLY INJURY OPINION IS THE FAILURE TO PAY $5, WHICH REMAINS AS UNRELIABLE AS IT WAS THE LAST TIME THE COURT EXCLUDED IT**

The opposition recycles the arguments this Court rejected at class certification, then asserts Economides offered an opinion about service quality he expressly disclaimed. These arguments cannot remedy the "'analytical gap between' the facts on which Dr. Economides relies" and his "fanciful" opinion that Meta would pay hundreds of millions of people to use Facebook. Dkt. 905 at 7-8, 13.

Plaintiffs' challenges to the Court's order excluding Economides's theory of compensation identify nothing that decision failed to address. Opp. 3-8. Consider the allusions to "[w]ell-accepted economic principles," "[e]conomic authorities," and experts in a different action who plaintiffs did not retain that supposedly support Economides's payment scheme. Opp. 4. The FTC's experts have never opined that Meta would pay every user five dollars a month (while attributing Meta's supposed monopoly to entirely different conduct), and plaintiffs cannot explain how generic principles like "sellers must lower prices to maintain market share or risk losing customers" support Economides's application of negative prices to his PSNS market. *Id.* That lack of fit between broad economic principles and the alleged market was central to the Court's prior opinion—as the Court observed, Economides cited plenty of papers, but "did not identify reliable and validated economic literature to support *his specific conclusion* that, upon coming to the proverbial fork in the road between quality and price, Facebook would choose price in the but-for world." Dkt. 905 at 9. Instead, the undisputed evidence demonstrates that Facebook and other PSNS platforms have consistently competed on quality, and never used payments to attract users. *Id.*

The opposition's extended discussion of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ is likewise identical to the submissions at class certification. Opp. 4-7. ***Every*** document plaintiffs cite to substantiate Economides's opinion on this point was referenced in his excluded class certification report and already considered by the Court. *Id.* at 4-5. And ***every*** ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ As a result, the Court held that these ▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ "were not a sufficient basis for the [expert's] opinions." Dkt. 905 at 10 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 145, 147 (1997)). Plaintiffs identify no new authority accepting a but-for world based solely on ▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Instead, as their main case emphasizes, "[w]e construct the but-for world not out of whole cloth, but as a matter of reasoned deviation from the actual world based upon our changed assumption of defendants' lawful conduct," which requires "cogent evidence"—"direct evidence," "competent evidence," and "adequate evidence"—and "no speculation." *In re Glumetza Antitrust Litig.*, 2021 WL 1817092, at *13-15 (N.D. Cal. May 6, 2021) (cited at Opp. 7 n.20). The facts are and remain that when faced with competition, Meta and every other app or service like it do not pay all users to keep them engaged because that strategy would fail miserably.

Economides's analogies to market research programs are also unchanged, Opp. 6, and the opposition does not even attempt to address the reasons the Court concluded they were an unreliable basis for Economides's opinion. As the Court explained, "[t]he problem for Dr. Economides is that these market-research programs entailed payments for user data outside the context of Facebook's social-networking services, where Meta is not already 'bartering' for user data with Facebook's services and the quality thereof." Dkt. 905 at 10. And rather than rejecting the comparison simply because these programs operate in another market, Opp. 9, the Court found fundamental (and obvious) differences that Economides did not account for: "he does not explain how or why evidence of these transactions in a wholly different market, where the terms of exchange are different, would be informative of whether Facebook, in the PSNS market, would choose to compete on price as opposed to quality in the but-for world," Dkt. 905 at 10. The opposition addresses none of this—instead, plaintiffs choose to emphasize ▇▇▇▇▇▇▇▇

1 ▉

2 *Compare* Opp. 6 ("▉

3 ▉"), *with* Ex. 14, Economides Abridged CC Rep. ¶102 ("▉

4 ▉

5 ▉"). In any event, these programs are largely ▉

6 ▉ *See,*

7 *e.g.*, Ex. 15, Microsoft 30(b)(6) Tr. 206:10-14 ("▉

8 ▉

9 ▉").

10    Without anything to save Economides's actual opinion, plaintiffs invent one he did not
11 give. They assert that Economides *also* opined that users were harmed because Facebook would
12 have somehow been better in the but-for world. Opp. 7. This, of course, cannot save his unreliable
13 payment opinion. But Economides also expressly disclaimed offering this opinion, even when
14 Meta's counsel gave him the opportunity:

15    Q. So in your but-for world, ***Facebook could have responded to more competition by offering better services instead of paying users***; correct?

16    A. ***Not correct***. I think that paying users would be a crucial feature of the but-for world to make sure that people come to Facebook. ***Now, could it—could Facebook also have better features? Possibly. I don't know.*** But that's not guaranteed. That's not the crucial feature.

19    Q. And in your but-for world, it's guaranteed that Facebook would be paying users?

20    A. Yes, it is guaranteed that Facebook would be paying users because that's the way to attract users to Facebook, which are immensely valuable because they generate revenue from—from advertisers, from advertisers.

22 Ex. 13, Economides 9/23 Tr. 102:5-20. He instead testified that Meta's services would "remain
23 the same":

24    Q. In your but-for world, are you assuming that Facebook and Instagram would remain the same products as they are in the actual world?

25    A. Well, you have to keep in mind that the but-for world is an unknown, and we do the best approximation that we can with them. So at the first approximation, the answer is yes, ***we expect Facebook and Instagram to remain the same products***.

28 *Id.* 144:20-145:2. As he explained in his report, his opinion is that ▉
▉

**PUBLIC REDACTED VERSION**

1  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
2  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 16, Economides Rep. ¶280; *accord id.* ¶277 ▓▓
3  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
4  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

5  The specifics of this newly imagined and never disclosed opinion are themselves junk science. Based on a brief (and unsupported) reference in Economides's report to the possibility that users would be able to "opt out" of having Facebook collect data and pay them in the but-for world, plaintiffs claim that the failure to offer "an 'opt out' feature to limit the data that Facebook collects and uses from consumers" in the real world could constitute an antitrust injury. Opp. 7. Neither plaintiffs nor Economides ever explain *what* data a user could opt out of having collected, and the entirety of Economides's discussion on the subject is snippets of three paragraphs among his thousands of pages of reports. In any event, these "speculative" asides do not "rest on a sufficient factual foundation," making them "inherently unreliable." Dkt. 905 at 4 (quoting *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014)). Economides either did not know or never bothered to check whether Facebook *already* offered "opt out features." Facebook has long provided extensive user controls over how information is used, including opt-outs for various kinds of targeted advertising. Economides never addresses how or whether his "opt out" would be any different—he simply ignores the controls Facebook already offered. That kind of speculation and disregard for the record renders any opt out opinion just as "fanciful" as his payment scheme. *Id.* at 8. But even setting all of that aside, Economides ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 16, Economides Rep. ¶291. So even plaintiffs describe this supposed "opt out" as simply another form of "compensation." Opp. 7-8.

Plaintiffs' remaining responses are brief and unavailing. They do not meaningfully address their concessions that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *Compare* Opp. 7, *with* Mot. 4. Plaintiffs can obfuscate all they want, but the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**PUBLIC REDACTED VERSION**

1  ████████████████████████████████████████████████████████

2  ███████████████████ Ex. 17, Grabert Tr. (Vol. 2) 322:24-323:7. Plaintiffs then misread this Court's decision in *Puritan's Pride*, which found that an expert's "expected discount model" did not "reliably determine the value of the alleged misrepresentations" because it "did not account for plaintiffs' deposition testimony" and "nothing in the record indicates that a plaintiff thought about her purchases in the way the model assumes." *Mueller v. Puritan's Pride, Inc.*, 2021 WL 5494254, at *7 (N.D. Cal. Nov. 23, 2021). Those same defects infect Economides's injury opinion.

**II.    ECONOMIDES'S DAMAGES MODEL RELIES ON COMPARATORS THE COURT ALREADY HELD WERE "INAPPOSITE," AND IS UNRELIABLE REGARDLESS**

Plaintiffs effectively concede that if the Court excludes Economides's injury opinion, exclusion of his damages opinion follows. Opp. 8-11. Nothing in the opposition identifies any reason that, if the fact of payment is premised on speculation, Economides should nevertheless be permitted to testify as to the amount of a payment that would not exist. So for the reasons explained, the Court should exclude both. *Supra*, at 2-5; Mot. 3-5. In all events, plaintiffs' defense of Economides's damages analysis fails on its own terms.

To start, Economides's damages model is a yardstick method in name only. He assumed the conclusion that he wanted his study to reach—that Meta would pay users—and set out to look for supposed "yardsticks" proving it. He looked only for companies that pay for data, and so that is what he found. Mot. 4-5. Plaintiffs do not contest that there are better comparators to Facebook—TikTok, X (Twitter), YouTube, or Pinterest, to give four of literally thousands of examples—not one of which pays all users to consume their entertaining content or to collect data for advertising. Opp. 10. And despite working on this case for years, the best Economides can do is opine that Facebook is like ██████. Of course, no one has shared a picture of their grandkids, followed current events, discovered vintage cars, learned about potential vacation destinations, laughed at a comedy sketch, or done anything else of value *to them* on ██████. Such a comparison only confirms why his opinions must be excluded—comparators in a yardstick study "must be fair congeners," and "[i]f they are not, the comparison is manifestly unreliable and cannot 'logically advance[] a material aspect of the proposing party's case.'" *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 812 (N.D. Ill. 2005), *amended*, 2005 WL 8178971 (N.D. Ill.

**PUBLIC REDACTED VERSION**

Sept. 8, 2005); *accord Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1222 (9th Cir. 1997) (yardsticks require "meaningful economic similarity").

Nor is Economides's failure to account for the valuable service that Facebook offers—at scale to hundreds of millions of users—"conservative." Opp. 11. Instead, it ensures that his opinions are unreliable. Market research programs can pay their far fewer participants and must pay them to gain sufficient participation. Yet Economides indisputably did not adjust his supposed yardsticks' $5 per month to account for the significant value Facebook provides to users. Mot. 2, 5. Dismissing this break in comparability as isolating a "tradeoff" plaintiffs would face in the but-for world—use Facebook and get paid for data, or use a different platform that does not pay but also does not collect data—is no more grounded in the evidence. Opp. 10. The existence of competing firms that do not pay but also do not collect data derives only from Economides's *ipse dixit*, and he conceded that "I **haven't done an analysis** for the other companies in the but-for world" with respect to the terms they would offer users. Ex. 13, Economides 9/23 Tr. 102:21-103:12. Plaintiffs' alternative argument that market research participants display a "revealed preference" for sharing data for pay, Opp. 10-11, concedes that Facebook and market research programs attract users based on fundamentally different value propositions and are not comparable, then fails its own logic: if plaintiffs are right, Facebook users have a revealed preference for using Facebook without pay, so Meta would have to pay them nothing.

These fundamental flaws are not—as plaintiffs tritely argue—for the jury to sort out. Opp. 10. Economides's work is foundationally unsound and designed to arrive at a foreordained outcome with no basis in science or reality. It has no business in federal court. And it is not admissible just because it applies the "yardstick analysis" label. Opp. 8-9; *see Image Tech. Servs.*, 125 F.3d at 1222; *William Inglis & Sons v. Cont'l Baking Co.*, 942 F.2d 1332, 1341 (9th Cir. 1991) (opinion "was mere speculation" where "the expert was unable to identify any particular significant respect in which Inglis was 'comparable' to the surveyed companies"), *modified on other grounds*, 981 F.2d 1023 (9th Cir. 1992); *Loeffel Steel Prods.*, 387 F. Supp. 2d at 812 (damages model that lacked "the requisite showing of comparability" was "impermissibly speculative and conjectural"). Plaintiffs try to distinguish the applicable caselaw by arguing, in

**PUBLIC REDACTED VERSION**

1  effect, that Economides's methodological failings were not so bad. Opp. 9-10. They were. Mot. 4-
2  5. And other cases plaintiffs cite involve yardsticks with meaningful economic similarities: a drug
3  for a drug in *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 2023 WL 3440399, at *7 (N.D. Cal.
4  May 12, 2023), and the same market but different time periods in *In re Capacitors Antitrust Litig.*
5  *(No. III)*, 2018 WL 5980139, at *6 (N.D. Cal. Nov. 14, 2018). Economides's unadjusted reliance
6  on small market research programs collecting different data is nothing like that because they are
7  nothing like Meta.

**III.   ECONOMIDES'S COMPETITIVE EFFECTS OPINION IS EVEN MORE SPECULATIVE THAN HIS INJURY AND DAMAGES OPINIONS**

Economides's competitive effects opinion is based on no methodology, divorced from the record, and contradicted by his own testimony. Mot. 5-8. Plaintiffs try to repackage this "analysis" into something resembling accepted economics, but this is a motion to exclude Economides's opinions, not plaintiffs' attempt to salvage them.

Plaintiffs first cannot dispute that Economides never analyzes the effect on competition of any of the alleged misrepresentations and omissions. He offers no analysis of changes in Facebook's user growth or time spent in response to these alleged misrepresentations. Ex. 18, Economides 3/24 Tr. 188:18-189:7. Nor does he attempt to quantify how many users ever read or heard these alleged misrepresentations. *Id.* 192:2-14. Instead, Economides simply declares that every single allegedly deceptive statement or omission has the "same effect" on competition, *id.* 183:19-184:21, and plaintiffs would be able to establish harm if "even one" of the individual alleged misrepresentations is found to be deceptive, *id.* 181:17-182:10. These are transparently implausible opinions—the representations alleged to be deceptive range from *undelivered* talking points to a factual mistake in a New York Times interview corrected within hours. Stating that all such representations, whenever and however made, caused so much harm to competition that they allowed Meta to maintain a monopoly does not evince the application of any reliable methodology.

Plaintiffs then offer no authority for their contention that such scattered "qualitative analysis is common in antitrust cases like this one." Opp. 12. Qualitative analysis may be acceptable in some instances, but subjective ipse dixit with no analysis never suffices. *See, e.g.*, *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 989-90 (C.D. Cal. 2012) (excluding an

**PUBLIC REDACTED VERSION**

1  economist's opinion based on a qualitative assessment where it included no "meaningful expert
2  economic analysis"). Plaintiffs' characterization of Meta's argument as turning on Economides's
3  failure to apply a *particular* methodology is a non sequitur; here the problem is that Economides
4  applied nothing even resembling a methodology. Opp. 13. And the portions of Economides's
5  report that plaintiffs assert *do* contain some kind of more rigorous analysis have nothing of the
6  sort. *Id.* at 13. They apply no economic methods and instead summarize documents or testimony
7  asserting ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
8  ▮▮▮▮ Ex. 16, Economides Rep. ¶¶204-08. Plaintiffs' attempts to distinguish the authority in
9  Meta's motion are similarly deficient, and turn on the (again, unsupported) assertion that
10 Economides conducted some kind of economic analysis of harm to competition. Opp. 14-15.

11      Finally, plaintiffs have no answer for Economides's testimony conceding the absence of
12 harm to competition. Mot. 6-7. Plaintiffs try to distance themselves from the things Economides
13 actually said—including his stark admission that Facebook obtained its early success "on its own
14 merits," Ex. 18, Economides 3/24 Tr. 240:3-10—by relying on portions of a report that
15 Economides immediately renounced when questioned under oath. That they can find no better in
16 the thousand-plus pages of expert reports he offered in this case (all before the class certification
17 opinions the Court already rejected) only confirms the lack of any reliable basis for Economides's
18 opinions. Opp. 12-13.

19      Plaintiffs' treatment of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Opp. 14. And regardless, Economides's
22 failure to even *address* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24  IV.   **THE PORTIONS OF ECONOMIDES'S REPORTS THAT RESTATE OR SUMMARIZE
              EVIDENCE WITH NO ECONOMIC ANALYSIS SHOULD BE EXCLUDED**
25
        There is nothing "vague[]" about Meta's request to exclude those portions of Economides's
26
   report that merely discuss documents in the record. Opp. 15. The specific paragraphs are listed and
27
   the Court can decide for itself whether this is economic analysis or lawyer argument. Mot. 8.
28
   Plaintiffs cite *In re Glumetza* for the proposition that "'[i]t is common, indeed required, . . . for an

**PUBLIC REDACTED VERSION**

expert to summarize the facts and data considered in their report,' such that the expert economist 'must be allowed to discuss facts apropos to [their] opinions.'" Opp. 15 (quoting *In re Glumetza Antitrust Litig.*, 2021 WL 3773621, at *20 (N.D. Cal. Aug. 25, 2021)). However, an expert may not merely "summarize record evidence and then state a conclusion without applying a methodology that is reliable and which evinces his/her expertise." Mot. 8 (quoting *Siqueiros v. Gen. Motors LLC*, 2022 WL 74182, at *9 (N.D. Cal. Jan. 7, 2022)). Indeed, the Court in *In re Glumetza* goes on to state that the expert's trial testimony "must remain tethered to the expert opinions he provides." 2021 WL 3773621, at *20. Economides's reports fail that test, quoting and summarizing record evidence without applying any analysis at all. Mot. 8. Plaintiffs do not meaningfully respond to that defect. Such summaries are impermissible and warrant exclusion.

## CONCLUSION

The Court should exclude the "Expert Report of Dr. Nicholas Economides" in its entirety, the "Expert Rebuttal Report of Dr. Nicholas Economides" in its entirety, and any opinions or testimony drawn therefrom.

Dated: May 19, 2025

Respectfully submitted,

By: */s/ Sonal N. Mehta*
Sonal N. Mehta

WILMER CUTLER PICKERING
HALE AND DORR LLP

*Attorney for Defendant Meta Platforms, Inc.*

**PUBLIC REDACTED VERSION**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of May, 2025, I electronically transmitted the public redacted version of the foregoing document to the Clerk's Office using the CM/ECF System and caused the version of the foregoing document filed under seal to be transmitted to counsel of record by email.

By:   */s/ Sonal N. Mehta*
       Sonal N. Mehta