**Pages 1 - 71**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

| | |
|---|---|
| MAXIMILLIAN KLEIN, et al., on behalf of themselves and all others similarly situated, | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) **No. 3:20-CV-08570-JD** |
| META PLATFORMS, INC., a Delaware corporation, | ) ) ) |
| Defendant. | ) ) ) |

San Francisco, California
Thursday, June 5, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

SCOTT & SCOTT
156 South Main Street
Post Office Box 192
Colchester, Connecticut 06415
BY: **AMANDA LAWRENCE, ATTORNEY AT LAW**

For Defendant:

WILMER CUTLER PICKERING HALE & DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
BY: **SONAL N. MEHTA, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
CSR No. 7445, Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For Defendant:

                        WILMER CUTLER PICKERING HALE & DORR LLP
                        7 World Trade Center
                        New York, New York 10007
               BY:   **DAVID Z. GRINGER, ATTORNEY AT LAW**
                      **PAUL VANDERSLICE, ATTORNEY AT LAW**
                      **ERIN HUGHES, ATTORNEY AT LAW**

Also Present:         **Eric Meiring**
                      **Arif Dhilla**

**Thursday - June 5, 2025**                                    **10:13 a.m.**

                            **P R O C E E D I N G S**

                                ---o0o---

        **THE COURTROOM DEPUTY:**  Calling Civil 20-8570, Klein, et al. versus Meta Platforms, Inc.

    Counsel, please state your appearances for the record. Come to the podium.

        **MS. LAWRENCE:**  Good morning, Your Honor.  Amanda Lawrence from Scott & Scott on behalf of plaintiffs.

        **MS. MEHTA:**  Good morning, Your Honor.  Sonal Mehta from WilmerHale on behalf of Meta Platforms.  With me today are my colleagues Mr. Gringer, Mr.  Vanderslice, Ms. Hughes.  And then we have two people from Meta here, Eric Meiring and Arif Dhilla.

        **THE COURT:**  Okay.  Let's have the lawyers return to the gallery, and we'll swear in our expert witnesses.

        **THE COURTROOM DEPUTY:**  Will the experts please stand and raise their right hands.

        **THE COURT:**  Well, let's let the lawyers go back first.     "Gallery" means behind the bar.

    All right.  Wait.  Why are there two people at this table?

        **MS. MEHTA:**  Your Honor, this is just our tech person who's here --

        **THE COURT:**  Ah.

        **MS. MEHTA:**  -- with slides.

THE COURT:  Okay.  All right.

MS. MEHTA:  Thank you.

THE COURT:  All right.  Okay.

THE COURTROOM DEPUTY:  If you can stand and raise your right hand.

**CATHERINE TUCKER, Ph.D. and MICHAEL WILLIAMS, Ph.D.** called as witnesses for the concurrent expert proceeding, having been duly sworn, testified as follows:

DR. WILLIAMS:  I do.

DR. TUCKER:  I do.

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  All right.  We're here for a concurrent expert evidentiary proceeding with -- are you both doctors? Yes, okay -- Dr. Williams and Dr. Tucker.

So I'm going to start us off.  It's going to be a dialogue.  I can't remember whether you've done these with me before.  You may have.  Maybe not.

DR. TUCKER:  I've done one.

THE COURT:  Okay.  A little dialogue back and forth. I'm going to be your moderator.  I'm going to hit some things that I'm particularly interested in and also just ask some basic comprehension questions.  And then we'll kind of proceed in the order of that statement that I asked you to file at Docket 940-1, although we're not going to cover a lot -- I don't need you to cover much of that because I have a handle on

it.

I want to start with this, and I'm going to start with you, Dr. Williams. I am trying to get a better handle on what you think the relevant product market is. I know you defined it as social advertising, but I want to get a better sense of what you understand that to mean with respect to the specifics of the proposed classes, who's in it, why are they in it, and what does it cover. So we'll start with that.

**DR. WILLIAMS:** Sure. So, Your Honor, as you said, I've defined the relevant product market as social advertising. I have --

**THE COURT:** You're going to have to get, I think, a little closer. Just pull that thing towards you.

**DR. WILLIAMS:** Sorry.

**THE COURT:** You can move it, yes.

**DR. WILLIAMS:** Thank you, Your Honor.

The firms that are in it would be Meta, LinkedIn, Pinterest, Reddit, Snapchat, TikTok, and X, formerly Twitter. There's some very small other players, but those are the firms that I think are in the relevant market.

Your Honor, my report contains both a detailed Brown Shoe analysis -- which I won't bore you with; but it goes on at length about why I think that industry analysts, government agencies, Meta's documents, the documents of Meta's rivals, all, in my opinion, following that Brown Shoe methodology, lead

very clearly to a conclusion:  in particular, that social advertising is a different -- advertising on social advertising, that's different than search, in particular. I think it's different than open Web display.  I know -- I think there's a wealth of support for that position, that search is a separate antitrust market.

And I've also -- as you are probably aware, I've also conducted a SNIP test following the merger guidelines using a methodology that I've used in a number of other antitrust cases.  And in brief, Your Honor, that methodology looks at a natural market experiment.

The natural market experiment is that, in my opinion, there has been a 30.1 percent overcharge on the part of --

THE COURT:  Before --

DR. WILLIAMS:  Sure.

THE COURT:  -- you get to that, let's just stick with the basics.

DR. WILLIAMS:  Sure.

THE COURT:  My basics.

DR. WILLIAMS:  Yes.

THE COURT:  Not you.  For me.

DR. WILLIAMS:  Thank you.

THE COURT:  It's still not clear to me who among the ad buyers are in the social advertising market.

DR. WILLIAMS:  Well, I would say for the purposes of

this one, it's what's defined in the legal papers.  It's people that bought advertising on Meta.

THE COURT:  Everybody?

DR. WILLIAMS:  Everybody, yes.

THE COURT:  So I think the class period is something like 2016 to 2020 --

DR. WILLIAMS:  It's December 2016 to December 2020.

THE COURT:  All right.  Okay.  So you're defining the relevant product market to be everyone -- all social ads placed on Meta during that time period, all advertising buys on Meta during that time period?

DR. WILLIAMS:  Well, they would be -- that's the relevant class.

The relevant product would be social advertising.  And the competitors to Meta in that time period would be, as I said, LinkedIn, Pinterest, Reddit, Snapchat, TikTok, and X.

THE COURT:  All right.  What's -- I mean, in terms of defining that class, what's the commonality that makes sense for me to treat them as one group?

I'll tell you what I'm thinking about.

DR. WILLIAMS:  Sure.

THE COURT:  Your colleague here, Dr. Tucker, points out that a very sizable percentage of the ad buys in the class period -- something like close to 42 percent -- were what she called custom audience ads.  And that's where someone tells

Meta, "Here are the exact people I want you to contact on my behalf," as I understand it, whereas I think your social advertising class was more along the lines of a user or buyer telling Meta, "We'd like to reach runners because we sell track shoes.  So go out and find the runners for us."

In other words, in the custom ad space, the buyer is telling Meta who they should reach.  In the social advertising space, as I understand you're defining it, the user is telling Meta, "Please help me find potential consumers."

Those don't seem like they're the same groups of people.

**DR. WILLIAMS:**  I think they are, Your Honor.  The commonality is that -- and this is discussed at length in Meta's submission to the FTC, what was called their "Collation of Responses and Questions."

The commonality is that all of the ads on Meta use a social graph, including the ones -- the ones that you referenced earlier, which -- there is -- in those, some information is provided, I agree.  Some information was provided by the buyers, but that's just the start of it.

Meta's social graph algorithm then uses that dynamically over time to provide a wealth of information that's not directly provided by an individual advertiser.  So --

**THE COURT:**  Well, let me ask you this.

**DR. WILLIAMS:**  Sure.

**THE COURT:**  In your understanding, how are the ad

prices set for the custom audience ad people?

**DR. WILLIAMS:**  Well, all the -- almost all of the ad prices on Meta are set in auctions.

**THE COURT:**  Including the custom ads?

**DR. WILLIAMS:**  Yes.

**THE COURT:**  Okay.  Dr. Tucker?

**DR. TUCKER:**  Your Honor, I think you've hit on a really key --

**THE COURT:**  You need to get a little closer.

**DR. WILLIAMS:**  Oh.

**THE COURT:**  You can move it to you rather than -- yeah.

**DR. WILLIAMS:**  Shuffling.

**THE COURT:**  Move the -- my mother used to say, "Move the soup to you; don't move yourself to the soup."

(Laughter.)

**DR. TUCKER:**  So I think Your Honor has hit on a really key point, and I want you to think about this.

**THE COURT:**  Keep your voice up a little bit.

**DR. TUCKER:**  Let's --

**THE COURT:**  Key point, you want me to think about it. I heard that part.  Okay.

**DR. TUCKER:**  Great.  Okay.  So this is it.  So imagine I'm an ad buyer and I have a video ad which I think is effective, and I want to show it to a certain set of eyeballs

and I've identified that set of eyeballs.  Perhaps they've already visited my website.  I think they're in the market for my product.

Now, I can choose to show that ad on YouTube Shorts, on Facebook Reels, a video ad in Meta's Feed, and it's going to look identical; it's going to be shown to the same set of eyeballs.  And it's just illogical to me, as an economist, given this is obviously a substitute, to exclude it from the market, which is what Dr. Williams has done.

THE COURT:  But if the pricing is the same -- is it priced through an auction?

DR. TUCKER:  Yes.

THE COURT:  Does that really matter then?  Because the point here is that all the prices charged by Meta, according to the plaintiffs, are overcharges, supercompetitive overcharges.  So what does it matter why you're buying it or how you're buying it if the pricing mechanism is the same for every buyer?

DR. TUCKER:  Well, I mean, I think the question on market definition is substitution.  And in each case, I'm going to be putting a bid into a second-price auction, one in Google Ads one on Facebook Ads.  So for a matter of substitution, it seems clear to me that we're really dealing with an identical process.

THE COURT:  Okay.  Dr. Williams?

DR. WILLIAMS:  I'm having a little trouble hearing or

understanding what she's saying.

But if -- I think what you just said -- tell me if this is wrong.  I think you just said that you -- and I think you said this in your merits report -- you believe that advertising -- search advertising on Google is in the same antitrust product market as advertisements on Meta.  I think that's your position.  Right?

**DR. TUCKER:**  Well, that is my position.  But I was actually giving the illustration of YouTube, which is something --

**DR. WILLIAMS:**  Right.

**DR. TUCKER:**  -- you exclude from your market.

And I was saying you could have an identical ad, exactly the same video.  It could be the case that someone just visited my website.  I know they're in their market.  I want to show them the video to entice them.  I can easily do that in exactly the same way on YouTube and on Meta.

**DR. WILLIAMS:**  Okay.

**DR. TUCKER:**  And, therefore, it is illogical for me, as an economist, thinking about substitution, to be excluding YouTube from the market.

**DR. WILLIAMS:**  Okay.  So there's a number of problems with what she just said.

First, I don't exclude YouTube from the market.  In fact, if you look at Table 2 of my --

**THE COURT:**  Table 2 --

**DR. WILLIAMS:**  -- class --

**THE COURT:**  -- of what, your opening report?

**DR. WILLIAMS:**  If you look at Table 2 of my class report, you can see that I --

**THE COURT:**  Wait.  This is your opening report?

**DR. WILLIAMS:**  It's May 24th, 2024.

**THE COURT:**  Okay.  Which page is it on?

**DR. WILLIAMS:**  Page 21.

**THE COURT:**  21.

**DR. WILLIAMS:**  You can see that the last column is "YouTube."  So I did consider including YouTube.

**THE COURT:**  Okay.  My page 21 is -- oh, YouTube. Okay.  YouTube advertising revenue.

**DR. WILLIAMS:**  Right.  So I -- if you look, Your Honor, if you look at page -- at the prior page, page 20, I do believe that the relevant antitrust market is best represented by what's in Table 1.  But I did, as a sensitivity test, include YouTube, and it doesn't change any of my conclusions.

**THE COURT:**  Okay.

**DR. WILLIAMS:**  But the other problem with what Dr. Tucker just said -- and this is why I think there's a wealth of evidence that YouTube is not in the relevant product market -- is advertisements on YouTube do not get the benefit

of a social graph.

If you advertise on YouTube, it's -- think about it this way:  You could see -- I think this is what Dr. Tucker was driving at.  You could see an advertisement on Facebook and you could see the same advertisement on the back of a bus.  That doesn't mean they're in the same antitrust market.  It's the same ad.  You could see it in -- so the fact that one is -- that the ads look the same I don't think is dispositive at all as to whether or not, from a buyer's perspective, they're substitutes.  Advertising on the back of a bus is not an adver- -- is not a substitute for advertising on a social network.

And advertising on YouTube -- as I said, I did consider including YouTube.  Doesn't change any of my answers.

But I think there's a wealth of evidence in the documentary evidence, in the statements from Meta's own documents, Meta's rivals, there's a wealth of evidence that YouTube does not have a social graph.

When you watch YouTube videos, YouTube doesn't know your birthday; they don't know your best friends; they don't know that you like to bicycle.  They don't know that.  But when you advertise on Facebook, Facebook does know that.  It's a fundamentally different platform.

**THE COURT:**  Dr. Tucker?

**DR. TUCKER:**  So I think Dr. Williams does not

understand what a custom audience is.

A custom audience is, for example, me saying, as an advertiser:  This person has just visited my website.  This person is part of my frequent flier program.  I want to show them an ad.

Now, Google is able to do that because it has means of tracking eyeballs.  Programmatic advertising, the open Web can do that because they have means of tracking eyeballs.  In no sense are you using the social graph.

In no sense is Meta offering something unique.  What the advertiser has done is say:  I want to show it to this set of eyeballs, show the ad to this set of eyeballs.  And that's why these ads are substitutes.

And also, just to get back to the class question, why it is that they don't seem to be susceptible to common proof, they actually bought the product, which is central to your market definition exercise.

**THE COURT:**  Well, that's why I asked.  So help me understand why that's, in your view, not true.

**DR. WILLIAMS:**  I'm sorry.  Can you ask the question again, Your Honor?  I want to make sure.  I'm having a little trouble understanding her.

**DR. TUCKER:**  And I'm so sorry.

**THE COURT:**  You know, maybe, Lisa, can you turn that up a little bit?

We have a new sound system.

**DR. TUCKER:** And I've got an accent, and I've got a soft voice. So I apologize, Dr. William.

**DR. WILLIAMS:** No. It's --

**THE COURT:** No, no, it's not accent based. It's just volume.

Is it already all the way up?

Let's see if we can do this without a screaming feedback fit. Good?

Oh, okay. I'm a little loud.

Okay. You've just got to get right on top of it. Okay?

All right. So Dr. Williams has asked you to clarify the question.

**DR. WILLIAMS:** Thank you.

**DR. TUCKER:** Okay. So we're bringing it back to the question of common proof. And what I was saying is that for a custom audience, you're not using the social graph. What's happening is that an advertiser is saying: Hey, there's this set of eyeballs I want to show an ad to; and maybe that's because they're part of my frequent flier program; maybe that's because they visited my website. And then both YouTube, which you say doesn't have a social graph, or Google Ads will be able to identify that pair of eyeballs and show the ad.

So, therefore, it seems to me, and the argument in my report was, that these people don't seem to be buying the

product which is central to your product market; and therefore, it's not susceptible to common proof.

DR. WILLIAMS:  So I just want to make sure I understand.  So -- because I've read your merits report.  And in your merits report, you say my product market is too narrow, that I should have included YouTube; I should have included Google Search Ads, for example.

That's correct; right?

DR. TUCKER:  Yes.  I personally believe that you should be thinking about performance advertising in -- yes.

DR. WILLIAMS:  I think -- I think you described -- you said the relevant market, I believe you said it was online advertising.

DR. TUCKER:  Yes, that's right.  So --

DR. WILLIAMS:  Right.

DR. TUCKER:  -- digital advertising.

DR. WILLIAMS:  Yeah, I understand.

DR. TUCKER:  So that's what I --

DR. WILLIAMS:  I understand.

DR. TUCKER:  -- believe the product market is.

DR. WILLIAMS:  Okay.

DR. TUCKER:  But in the end, you have defined a product market, and, you know, I do believe it's too narrow.

THE COURT:  Let me just jump in.

Here's what I'm asking, based on Dr. Tucker's report.

This is the sealed version, but it's Docket Number 801-4.

So on page 9, after discussing custom audience ads, she says, quote [as read]:

"Custom audience ads are targeted based on data from an external source as opposed to data contained in Meta's social graph, and therefore do not meet the Williams Report's definition of Social Advertising."

So why is that wrong, in your view?

**DR. WILLIAMS:**  Yeah.

**THE COURT:**  It seemed right to me, but why is that wrong?

**DR. WILLIAMS:**  Well, let me say, Your Honor, that that's -- that's discussed in a report that I --

**THE COURT:**  Forget all that.  Just tell me now.  Look me in the eye and tell --

**DR. WILLIAMS:**  Yeah.

**THE COURT:**  -- me why that's wrong.

**DR. WILLIAMS:**  So I would say, look, Meta is very clear in their response to the FTC.  All ads shown on Facebook use their social graph.  That's absolutely clear in their response to the FTC.

I agree that for the particular kinds of ads that Dr. Tucker is talking about, some information is provided by the buyer.  That's helpful.  I'm sure that's helpful.  But that doesn't negate the fact that the -- that information is

supplemented by a wealth of information, namely, all the information that Meta has that they use to more accurately target the ads. It's a dynamic process. They begin with information provided by buyers, but that's hardly the end of it.

And as I said, Meta's absolutely clear that -- in fact, if you look, you know, at statements from Meta's own executives, they're adamant that Meta is different. Meta is not TV. Meta is not search. We're a different thing, they emphasize over and over again.

But they never say, "We're different things." There's different --

THE COURT: Let me just jump in.

DR. WILLIAMS: Yeah.

THE COURT: So the way that custom audiences is discussed by Dr. Tucker is that they're custom because the buyer is saying: Here are the exact people we want to reach --

DR. WILLIAMS: Sure.

THE COURT: -- because we can track them on our Pixel or we've been following them on our website because we have cookies that are enduring.

DR. WILLIAMS: Right.

THE COURT: What is it, in your view, that Meta is adding to that?

DR. WILLIAMS: Well, I think it's a question of, over

time, what Meta adds to it.  You know, that -- again, Meta starts with information that's provided by the buyer.  That's helpful.  That's good.  But there's a wealth of other information.

I mean, Meta obviously has a vast amount of information that's been collected for -- in the damages period, had already been collected for many years.  That information is used to better target the ads over time.  And so it certainly is true, it absolutely is true that for these custom audience ads, some information at the start is provided by buyers, but that's not the end of the process.  And as I said, Meta's -- Meta is -- their statement to the FTC is absolutely clear.  Every single ad on Meta uses an auction.  Every single ad on Meta uses their social graph.

THE COURT:  All right.  But would you agree that if custom audience ads provide data that is not based on Meta's social graph, they would not properly be in your class analysis?

DR. WILLIAMS:  Well, now, that's an interesting question, Your Honor, because, remember, Dr. Tucker is saying that my product market is too small.  She's saying I should have included YouTube, I should have included Google.  Now we're going in the opposite direction, that the product market is smaller than all the advertisements on Meta, that it's a sub- -- it should exclude a certain subset of ads.

So that's -- again, that wouldn't have changed -- that wouldn't change any of my methodology about estimating, for example --

**THE COURT:**  But the question is:  Would they properly be in your proposed class?

**DR. WILLIAMS:**  Now, my opinion is yes, because I think that the Brown Shoe analysis and I think that the SNIP analysis shows that.  But it would not be -- it wouldn't change any of my conclusions about common impact, about average overcharges.

But if you were to make that decision, I suppose one -- again, it's not -- now we're not saying that the market's too -- her position is that my market is too narrow.  Now -- but now we're hypothesizing that maybe it's not narrow enough. Maybe we need to exclude some ads within Meta.  And I have -- I just don't think that's consistent with the evidence.  I don't think that's consistent with Meta's statements.

I've never seen Meta say, "Hey, some of our ads are not social ads.  The ones where we get some information on buyers, that's really different."  I've never seen a Meta ad -- document that says that.

**THE COURT:**  Okay.  Dr. Tucker?

**DR. TUCKER:**  Look, in the end, a class methodology has to show that class members actually bought the product at the heart of a product market.  And if we're now saying that maybe 42 percent of the time people were not buying the product in

the heart of the product market, that honestly seems to me to be a big problem.

THE COURT:  Problem with respect to the definition of the product market?

DR. TUCKER:  Problem, I think -- again, I'm not a lawyer, but it seems that we have to have some kind of common proof.  And I'm not sure -- if you're saying that a lot of the people in the class didn't actually buy something in the product market, then everything seems to fall down, quite honestly.

THE COURT:  Let me ask you this:  You also reference something like 20 percent of ad buyers supplying their own, what you call, demographic information.  Is that 20 percent on top of the custom ad people, or is that 20 percent within the custom ad people?  In other words, are you saying 62 percent of ad buyers are off the social graph, or are you saying only 42 percent?

DR. TUCKER:  Well, I'm sorry.  I don't have my report in front of me, which is a mistake.

THE COURT:  That's fine.

DR. TUCKER:  But -- I'm sorry.  I'm not going to be able to answer that without my report in front of me.  I'm just so sorry.

THE COURT:  Well, it's in paragraph 16 and 17 of your report.  Paragraph 16 says 41.6 percent of users during the

class period are custom ad, and then paragraph 17 says nearly 20 percent of other people provide demographic data.  And I just couldn't tell whether the 41 includes the 20 percent or whether the 20 percent is on top of the 41 percent.

**DR. TUCKER:**  Could Your Honor give me minute to just look at the table?

**THE COURT:**  Yeah.  Sure.  16 and 17.

**DR. TUCKER:**  Let me get that.

Oh, so I think -- sorry.  I'm reading this after a bit of distance.  But I think we are switching in paragraph 16 and 17 between my analysis of the entire class to the named plaintiffs.

**THE COURT:**  So what do those two numbers mean?  Do they add up, or are they just different numbers?

**DR. TUCKER:**  They're different numbers because there's a different denominator.  One is the named plaintiffs, and one is all potential class members.

**THE COURT:**  Okay.  And then, Dr. Williams, back to you.  So Table 3 in your report, you have YouTube and Google Display.

**DR. WILLIAMS:**  Correct.

**THE COURT:**  So you factor those in, and you say it makes no difference.  Why is that?

**DR. WILLIAMS:**  Well, remember, this section of my report is looking at the indirect structural evidence that Meta

has monopoly power.

So if you look at the -- for example, if we look at Table 2, Your Honor, you can see that, including -- in the damages period, Meta's market share is still in excess of 75 percent, even when we include YouTube.  And, of course, coupling that with the presence of barriers to entry, that would lead -- that leads me, at any rate, to a conclusion that this is one piece of evidence that Meta had substantial monopoly power in the damages period.

And a similar answer, not quite as strong, in Table 3.  If we include also all Google Display Ads, then you can see that Meta's market share is in the neighborhood of 67 to 69 percent.  Again, I think that a basic result from the field of industrial organization will be a firm with a 67 to 69 percent market share coupled with barriers to entry, that still would be evidence -- indirect evidence of substantial market power.

**THE COURT:**  Okay.  Any last thoughts on class definition and social advertising?

**DR. WILLIAMS:**  No, Your Honor.  I don't -- I actually do not have the report where I responded to Dr. Tucker's arguments on this exact point about custom ads.  I wish I had it in front of me, but I don't, and it's been a while since I've looked at it.

It's not one of the three topics for today, but I appreciate that it's a topic that's top of your mind.

**THE COURT:** Every topic is a topic for today, Doctor.

**DR. WILLIAMS:** Yes. So at any rate, unfortunately, I don't have that report in front of me. But I know that my reply report to Dr. Tucker's report had a long discussion about why I thought her analysis of custom ads was incorrect. And as I said, I just don't have it in front of me right now.

**THE COURT:** All right. Okay. Let's move on to economic profit rates.

I have to say, Dr. Williams, I've done many overcharge cases. Not one of them has said: Let's figure out the price overcharge by looking at profits. I'm not saying that's necessarily wrong, but I will tell you, it's certainly exotic and slightly idiosyncratic.

So I'm just struggling. Why -- every other overcharge case I've had -- and all of them have been in the tech space with one exception. One was a commodity. Everything else was in the tech space -- has been able to calculate a percentage overcharge on a class-wide basis or at least had a method that was sound, valid, and reliable for trying to do that. Okay?

**DR. WILLIAMS:** Sure.

**THE COURT:** EPR, why did you do that?

**DR. WILLIAMS:** Sure. So --

**THE COURT:** Why didn't you do it the tried-and-true way of just finding a percentage overcharge, which, by the way -- I know your side is fond of the *Sabre* case from years

ago, which appears to be the only other case that ever used EPR in this context. And I will point out that even there, as I understand it, the expert who was the proponent of the EPR method still came up with an actual overcharge percentage figure for use in damages. So even that case didn't go as far as you seem to be wanting to go, which is you use EPR for everything: liability and damages.

So why are we fiddling around with this EPR thing and not just going right to the heart of the matter?

**DR. WILLIAMS:** Well, first, I think my methodology is the same as what was -- I think it is the same as what was done in the --

**THE COURT:** It was not used for damages in *Sabre*.

**DR. WILLIAMS:** No. The --

**THE COURT:** The damages were based on an actual overcharge percentage number that the expert came up with.

**DR. WILLIAMS:** Right. But, actually, if we look at Slide -- Your Honor, if you could take a look at Slide 16 -- oh, I'm sorry. I misspoke. Could we do -- let's -- why don't we go --

**THE COURT:** Let's just start with my question.

**DR. WILLIAMS:** Yeah, let's start at the beginning.

**THE COURT:** Why did you do this?

**DR. WILLIAMS:** Yeah, I'll tell you exactly why.

So, Your Honor, this -- I've worked on a large number of

price-fixing cases, and I've always done what you're familiar with, which is to estimate an overcharge regression, in all the price-fixing. I've done that in -- I did that in the *Olean* case that went to the Ninth Circuit. I've done it in many, many cases.

This is not a price-fixing case. It's a monopoly maintenance case. And, in particular, there's not a clean benchmark period because Meta had monopoly power before the start date to the damages period. There's also -- and I'll describe it for you in a moment. There's also a fundamental econometric problem with attempting to estimate an overcharge regression in this case.

But the first reason is that, as you know, in order to estimate a reliable overcharge using an overcharge regression, you have to have a clean benchmark period. We don't have a clean benchmark period in this case. And as I said, there's also a fundamental econometric problem, which I'm happy to describe to you, that would prevent us -- me from using an overcharge regression to estimate the overcharge.

THE COURT: Just at a high level --

DR. WILLIAMS: Sure.

THE COURT: -- what is that --

DR. WILLIAMS: Yeah, yeah. I'll explain it to you.

THE COURT: -- problem?

DR. WILLIAMS: So think about my overcharge regression

in the *Olean* case.  I was looking at the price of tuna, and I have to know something about the supply and demand factors, the non-conspiratorial supply and demand factors that affect the price of tuna.  So I need to know the demand for tuna.

Now, ask yourself this question:  Did the tuna conspiracy affect the demand for tuna?  That is, did it make it shift -- did the demand curve shift to the left or the right because of the conspiracy?  And the answer is no, it did not.

The conspiracy raised the price.  So it changes the point where the supply curve crosses the demand curve.  In other words, it changes the quantity demanded.  But it doesn't shift the demand curve to the left or right.  There's still a market demand for tuna.

But now think about this case.  If we were to try and estimate an overcharge regression that would explain variations in prices on Meta, again, first problem is we don't have a clean period, so it's really not possible.  But if you tried to do it, you would run into the following intractable -- and I'm using that word on purpose -- intractable econometric problem; that is, there's no solution for it.

The problem is that in -- for example, in my *Olean* report, I have -- I think it was either GDP or personal income, some demand measure, in other words, that's going to measure the demand for tuna.

Here, the demand for advertising depends on the

willingness to pay of buyers.  But think about what's the difference between the actual world and the but-for world in this case.  The but-for world is exactly the same as the actual world, except for the disputed conduct.  In the but-for world, what would there be?  There would be more successful entry. Firms like Snap, Twitter, Pinterest, they wouldn't have been handicapped by the alleged conduct.

**THE COURT:**  Or Google+.

**DR. WILLIAMS:**  Or Google+.  Yeah, Google+, all of those firms.

It would have been a more vibrant social advertising market in which advertisers who in the real world advertised on Meta would have had more options.  What does that mean?  That means that their willingness to pay for advertisements on Meta would shift to the left because they have more options.

But now you have a fundamental econometric problem that, literally, there's no solution to it; and that is that, unlike in the *Olean* case where I could put in national income or per capita income or GDP, the demand curve for the advertising on Meta itself is affected by what?  It's affected by the disputed conduct.

You cannot put an explanatory variable into a regression. It's affected by the disputed conduct.  It's not exogenous. It's not -- you understand what I'm saying, I hope, that in the -- in the -- in an overcharge regression, all the experts

you've seen, they've always -- I'm sure they've said something like this to you:  Your Honor, all of the explanatory variables in my overcharge regression are -- they're exogenous; they're not affected by the disputed conduct.  So the dummy variable that's picking up the overcharge, that's picking up -- that's the only thing it's picking up.

But you can't do that in this case.  You can't do it because the demand variable is affected by the conduct.  The demand for advertising on Meta would shift to the left because in the but-for world, those buyers who, in the -- buyers in the actual world, they would have had more options, as you say, like Google+.  They would have had more options in the but-for world.  The demand curve facing Meta would shift to the left.  Now we have a problem for which there literally is no solution in econometrics.  You cannot --

THE COURT:  Okay.  Let me just pause you there.

DR. WILLIAMS:  Go ahead, please.

THE COURT:  All right.  Dr. Tucker?

DR. TUCKER:  So there was a lot --

THE COURT:  This is an impossible econometric dilemma that can be solved only by EPR.

DR. TUCKER:  So I completely disagree.

And I think there were a lot of conflated arguments in what we just heard from Dr. Williams which perhaps are not very coherent.

I think what Dr. Williams is saying is that he felt he couldn't run a regression with a dummy variable in it.  I think that's what we heard.  And therefore, he uses a yardstick methodology.  Nothing is wrong so far.

The problem is that the yardstick methodology he uses --

THE COURT:  Being an EPR yardstick?

DR. TUCKER:  So it is an EPR yardstick, not a pricing yardstick.

I mean, he could deal with this problem --

THE COURT:  Before that, is that right about the econometric dilemma, that no equation can capture the independent variable that's attributable only to the anticompetitive conduct?

DR. TUCKER:  So I don't believe that is completely true.  I think it is --

THE COURT:  Because?

DR. TUCKER:  -- perfectly possible to write a model which will model out how quantity is changing.

Certainly, you might have to do some more statis- -- complex econometrics than just putting in a dummy variable, but yes, I mean, it is possible.

THE COURT:  Is there a model name, like Lucas, like something -- what would be -- what would an economist say this is the model -- this is the theory that you should have used to enhance your econometrics?

**DR. TUCKER:** All right. So what I would -- what I think Dr. Williams was saying is that he believes that in the but-for world, there would be more competition --

**THE COURT:** Yes.

**DR. TUCKER:** -- and, therefore, more outside options.

Now, many economists, IO economists have built out structural models, which are built exactly to deal with that problem, which can tell you what happens when you put in one firm, take out one firm. I mean, they're built to deal with that issue.

**THE COURT:** And is there a name?

**DR. TUCKER:** Oh, yes. So, you know, examples would be models like BLP.

**THE COURT:** BLP?

**DR. TUCKER:** Yes.

**THE COURT:** B, as in "boy," L-P?

**DR. TUCKER:** Yes. It's the names of the economists --

**THE COURT:** That's fine.

**DR. TUCKER:** -- who came up with it.

**THE COURT:** The BLP model?

**DR. TUCKER:** BLP -- there's a general -- my advisor was one of the pioneers of this, Tim Bresnahan.

But there's this idea that you can actually model how options change econometrically. We call it structural econometrics.

And BLP is one of the examples of the models used --

**THE COURT:** Let me just make sure I understand because this is of interest to me. Where it goes, I don't know, but I'm interested.

It's your view that you can have a situation where there is no but-for world and still use overcharge econometrics as enhanced by this other set of considerations, like BLP, to model a hypothetical but-for world and see how that might affect the variables.

**DR. TUCKER:** That's right. It's possible -- still possible and, I would say, necessary to model out the but-for world, because one of the areas of Dr. Williams' approach is we're not modeling out anything which is changed about cost, quantity at all in his methodology.

**THE COURT:** What would that give you, though? Would that give you a range of potential overcharges, or what would be the output of that?

**DR. TUCKER:** It would look much like a normal regression. You get a coefficient measure.

**THE COURT:** Okay.

**DR. WILLIAMS:** You know, what she's speculating about has never been done in antitrust, to my knowledge. I don't -- the reduced form regressions that are used in antitrust analysis are not capable of handling the problem that I'm describing. She's speculating that maybe somebody could

develop some kind of other model.

THE COURT: Dr. Tucker identified BLP.

DR. WILLIAMS: Yeah. That's just a model in which firms -- in which you can reverse-engineer a firm's -- the demand elasticity facing firms. It's not going to solve this problem.

THE COURT: So you felt, your view, Dr. Williams, you had no tool but EPR to assess overcharges?

DR. WILLIAMS: Well, it's -- as I said, I think -- when you're saying -- you're saying EPR. It's yardstick EPR model. Right?

So as I said, there's -- there are two reasons, in my opinion, why the yardstick EPR model -- same one that Dr. Zimmerman and Stiglitz used -- why the yardstick EPR model is the right one. There's not a clean period, and you can't include a demand variable that's going to capture the exogenous changes in demand because the conduct itself is changing the demand. So those two reasons mean that a regression approach is not going to work. It's not going to be a reliable way --

THE COURT: Here's what I'm getting hung up --

DR. WILLIAMS: Yeah.

THE COURT: -- on.

And I'm not an economist.

DR. WILLIAMS: Sure.

THE COURT: Profits are not prices.

**DR. WILLIAMS:**  Absolutely.

**THE COURT:**  I don't quite --

**DR. WILLIAMS:**  Yeah.

**THE COURT:**  The translation table, the Rosetta Stone --

**DR. WILLIAMS:**  Yeah.

**THE COURT:**  -- it's just missing.

I'm not seeing it.

**DR. WILLIAMS:**  Well, here, let -- I can walk you through it, Your Honor.

If you take a look -- let's take a look at what Dr. Zimmerman did.  If you could go to Slide 18.

**MS. LAWRENCE:**  Your Honor, may I approach with the slides?

**THE COURT:**  Wait.  Who's Dr. Zimmerman?  Is that the guy in *Sabre*?

**DR. WILLIAMS:**  Yes.  He's the accountant.

**THE COURT:**  Forget about him.  I want to know what you did.

**DR. WILLIAMS:**  Okay.  Sure.  Sure.

**THE COURT:**  Forget about *Sabre*.

**DR. WILLIAMS:**  Okay.

**THE COURT:**  Okay.  Bring that thing up.

**DR. WILLIAMS:**  Okay.

**THE COURT:**  Yeah.

**DR. WILLIAMS:**  So --

**THE COURT:**  Can you pass them around?

(Pause in proceedings.)

**MS. MEHTA:**  Your Honor, while we're passing around slides, can I come up and pass around Dr. Tucker's so we save time?

**THE COURT:**  Yeah.  Sure, that's fine.

**MS. MEHTA:**  Thank you.

**THE COURT:**  Okay.  Now, which slide, Dr. Williams?

**DR. WILLIAMS:**  All right.  Well, here, let's go to a -- let's go to a different slide.  Let's just go to Slide 7.

So Dr. Tucker says --

**THE COURT:**  7.  Okay.

**DR. WILLIAMS:**  Yes.  Dr. Tucker starts by saying profits are not prices.  I haven't analyzed prices.  That's not correct.  In fact, the equation for EPR, you can see it in Slide 7, it starts with price:  price times quantity minus cost divided by capital.  You can't -- there's a fundamental connection between profits and prices.

You know, what is monopoly power?  Monopoly power is the ability to set prices substantially in excess of cost, and that generates profits.  Profits and prices are inextricably interlinked.

So the claim that I did not analyze prices, that's not correct.  The yardstick -- the EPR method literally cannot be

used without --

**THE COURT:**  Let me just jump in.

**DR. WILLIAMS:**  Yeah.

**THE COURT:**  Of course profits and prices are related.

**DR. WILLIAMS:**  Sure.

**THE COURT:**  I don't think anyone's arguing about that. I don't see how that gets you to proving an overcharge, is what I'm saying.

**DR. WILLIAMS:**  Sure.

**THE COURT:**  So the fact that Meta had outstanding profits --

**DR. WILLIAMS:**  Yep.

**THE COURT:**  -- doesn't necessarily mean that they were overcharging everybody they did business with on the ad side.

**DR. WILLIAMS:**  Oh, I absolutely agree with that.

**THE COURT:**  Tell me why.

**DR. WILLIAMS:**  Yeah.  So -- well, that's, of course, what the yardstick does.  The yardstick says:  I've -- I've got five filters that -- I start with 33,000 firms.  I apply five filters.  I get down to 25 firms.  I then added back five firms that Meta requested.  That gives me 30 firms.

From those 30 firms, I defined 90 different sets of firms. Each one is a separate yardstick index.  They range in size from five firms up to 30 firms.

And what I did then was calculate the -- what's Meta's

EPR.  It's 43.6 percent in the damages period.  That puts Meta in the -- they're more profitable than 99 percent of the firms in the United States.  What is the EPR for the 90 different yardstick indexes?  And they're less than half that.

So, in other words, looking at 30 different firms in 90 different ways, their economic profit rate is less than half of Meta's, even though they're in the same industry, they meet all the five criteria.  By the way, the same industry, that's being defined by S&P Global, Standard & Poor's.

So we have 30 firms that are -- 25 that are in the same industry, five more that were requested by Meta.  Those 30 firms, again, using them to create 90 different sets of firms, 90 different yardstick indexes, those 90 different yardstick indexes range from a low of 17 percent to a high of 23 percent. So it's a very tight range.  All of those economic profit rates are less than half of Meta's.

Now, as you know, as a damage expert, I'm obligated to assume that plaintiff's claims are correct.  That's part of my job.  And so if plaintiff's claims are correct, then given that we've got 30 different firms, including Google, Amazon, Apple, Twitter, Pinterest, Snap, Weibo, a whole -- a variety of firms analyzed in a multitude of different ways gives me an EPR that's less than half of Meta's.

Then, to specifically answer your question, how do I get to an overcharge, there's a very -- there's a mathematical

relationship between EPRs and prices.  And so what I do is I lower the price on Meta until its EPR drops from 43.6 down to one of the yardstick EPRs.  I use the most conservative yardstick one, the highest EPR from any of the 90.  That -- in order to reduce Meta's EPR from 43.6 down to the highest one of the 90, Meta's prices have to come down by 30.1 percent.

**THE COURT:**  So that, in your view, is the average overcharge?

**DR. WILLIAMS:**  That's exactly right, Your Honor.

**THE COURT:**  All right.  So just to make sure I understand --

**DR. WILLIAMS:**  Yep.

**THE COURT:**  -- two things.

First, you're not here to opine in the case -- you're doing damages only.  You're not doing any liability --

**DR. WILLIAMS:**  That's right.

**THE COURT:**  -- in the case; right?

**DR. WILLIAMS:**  I'm not offering any merits opinions.

**THE COURT:**  All right.  Okay.  And then, second, assuming anticompetitive conduct --

**DR. WILLIAMS:**  Yep.

**THE COURT:**  -- the difference in EPR between Meta and the 30-plus companies you analyzed is necessarily reflective of anticompetitive conduct.

**DR. WILLIAMS:**  On the assumption that the plaintiff's

claims are correct.

**THE COURT:** I understand. Yes?

**DR. WILLIAMS:** Yep.

**THE COURT:** Okay. You're with me on that?

**DR. WILLIAMS:** Yep.

**THE COURT:** Okay. And to gauge the -- to translate that to percentage overcharge, you just kept reducing the prices down until Meta's hypothetical price was the same as, say, the top -- next top -- second-most-successful EPR company that you looked at?

**DR. WILLIAMS:** Yeah. That's the intuition of it, Your Honor. We just -- we drop the price so that Meta's revenues fall. And Meta's revenue fall -- as Meta's revenue falls, its economic profit rate is falling. And we do that until we get to the highest of the 90 EPRs, and that's a 30.1 percent overcharge, or in other words --

**THE COURT:** Conservative in the sense that you gave Meta the highest next EPR?

**DR. WILLIAMS:** Correct, out of the 90.

**THE COURT:** You didn't do an average of the top five, which would have been --

**DR. WILLIAMS:** No.

**THE COURT:** -- an even larger hypothetical overcharge?

**DR. WILLIAMS:** Yes. Any overcharge -- any EPR other than the highest would produce bigger damages.

THE COURT:  Okay.  Dr. Tucker, now, look, this is just method.  All right?  It has to be sound and reliable.  It doesn't have to be right.  It doesn't have to be the best.  It doesn't have to be the only.

It's just, is this enough for me to certify a class because this is not junk science?  That's the only inquiry.  This doesn't sound like junk science.  It may be a little exotic, but what's wrong with all that?

DR. TUCKER:  All right.

THE COURT:  Why is this junk science?  Why is this like reading the bumps in your noggin to determine whether you're a criminal, as Justice Stevens once famously said?  That's junk science.

DR. TUCKER:  Okay.  Let me explain why it's both unsound and unreliable, in my opinion.

THE COURT:  All right.

DR. TUCKER:  And I want to highlight two key things.

And the first is, Dr. Williams just took you to his Slide 7, and I think therein lies a big problem.

THE COURT:  That's just his EPR calculation.

DR. TUCKER:  That's his EPR calculation.

THE COURT:  Yes.

DR. TUCKER:  And I'd just like to take you to my Slide 3 --

THE COURT:  3?

**DR. TUCKER:**  -- which is going to explain why this is so unsound and so unreliable.

**DR. WILLIAMS:**  I don't have a copy.

**DR. TUCKER:**  Oh, I'm so sorry.

(Pause in proceedings.)

**THE COURT:**  You said Slide 3?

**DR. TUCKER:**  Yes.

**THE COURT:**  Okay.  [As read]:

"Dr. Williams Does Not Calculate an Overcharge."

**DR. TUCKER:**  Right.

**THE COURT:**  Okay.

**DR. TUCKER:**  So it's just there in the equation; right?  EPR is -- or economic profits are not the same as a price.  Therefore, for example, a firm can have a high EPR because it's got lower costs but charges the same price.  A firm can have a high EPR because it sells more at the same price.  Nothing is saying that price has to change.

And Dr. Williams is just assuming all that away, and it's this assuming this away which is what makes his method unsound and unreliable.

**THE COURT:**  Okay.  But let me just pause.

I will tell you that my initial sense is these are wonderful cross-examination points to tell the jury why you should not invest in Dr. Williams' conclusions, but they're not -- this does not say to me "junk science."

What you need to tell me is:  No respectable economist in this field, antitrust economics, would ever have done something akin to what Dr. Williams did.

And I see you quibbling with the variables.  I don't say "quibbling" in a provocative way.  I see you arguing with the variables and the inputs and the weighting of certain things.  I don't hear you saying -- maybe I missed it -- that no respectable economist would ever do this because it's just wrong.

**DR. TUCKER:**  Okay.  I will tell you that no respectable economist would ever do this because this is wrong.  In the end, this is an overcharge case.  We are trying to calculate a but-for price.

Now, the reason you have never seen this methodology before is, as you said, rightly, prices are not profits.

Now, just to give you an example, if Dr. Williams had done something which might be more logical, such as using yardstick prices -- right? -- I mean, an economist might well say:  Okay.  There's some troubles here.  It's a monopolization case.  I'm going to use yardsticks.

**THE COURT:**  Let me just ask.

**DR. TUCKER:**  But you would always use prices, not profits.

**THE COURT:**  Whose prices would be a yardstick?

**DR. TUCKER:**  Well, let me give you an example.  So

say, for example -- you know, if you look at indices, one of the least ridiculous "Large Six" is Google.  And I've actually looked at Google's CPM prices, which is one of the metrics that Dr. Williams has talked about; and when you look at Google's CPM prices, they're higher than Meta's.  So --

THE COURT:  Let me just jump in now.

Is that apples to apples?  I mean, Dr. Williams says Google is search based.  This is social connection based.  Totally different phenomenon for advertising.

Can you pick one that's more like Meta, just so we don't have to get into that?  Is there any -- what's your yardstick that's most like Meta, in your view, for comparing prices?

DR. TUCKER:  So if we were to go outside -- given we were to go outside the market, let's go to, say, if we were to look at YouTube CPMs, for example.

THE COURT:  YouTube?  Okay.

DR. TUCKER:  Right.  It would seem reasonable for me to compare a CPM -- if I was an economist, what would be natural to me is to look at CPMs at YouTube, look at CPMs at Facebook.  I might want to make some quality adjustments.  But I would be looking at prices; I wouldn't be looking at profits. If I want to use --

THE COURT:  Well, let me just jump in.

DR. TUCKER:  -- another yardstick methodology, I want to use prices.

**THE COURT:**  I don't see that -- how is YouTube a yardstick for Meta?  Totally different model.  Totally different interaction with users.  I'm anonymous -- well, within reason -- on YouTube.  On Meta, my face, my name, and all my friends are right there for Meta to look at and send ads to.  Is that really a comparable yardstick?

**DR. TUCKER:**  Well, again, we've got to think about a yardstick from an advertiser's perspective.  Right?

And we were just talking about custom audiences.  I want to show the ad in front of your eyeballs.  I've chosen you as my target.  I'm going to show the same ad on either YouTube or on Meta.

And so it seems reasonable to me, and I'm just saying that it seems natural, if we're trying to construct a but-for advertising price, to actually look at but-for advertising prices as our yardsticks rather than this hodgepodge of many different factors which is in EPR.

**THE COURT:**  Okay.  But -- okay.  So you would have preferred it if he had done sort of a real-world rough approximation by looking at YouTube, Google prices, just to get a ballpark, see if the EPR results look right.  But -- maybe he should have done that.  I didn't see that he did.  We'll hear from him in a moment.

Okay.  So he didn't cross every "T" and dot every "I" that way, but what is -- I mean, you said it was just junk science

for an economist to do this at all.  I'm still not quite getting why.

DR. TUCKER:  The junk science part?

THE COURT:  Yeah.

DR. TUCKER:  I think it sort of -- it goes down to -- okay.  So it's junk science to, when you have data on prices and you're in an overcharge case, to completely throw away that data on prices and use this measure which no one's ever really used to look at prices before.  EPRs were developed to try and understand how efficient firms are with their capital.  They're not something obvious, you know, that everyone's using as a proxy for prices.  They're not even close.

So, I mean, I understand, you know, we -- you know, we want to, first of all, look at prices, and then, of course, there may be some quibbling about proxies you can use, but we're using something which is just not a proxy.

THE COURT:  Okay.  And just so I'm clear, what specific data on prices do you think Dr. Williams just ignored?

DR. TUCKER:  Well, plaintiffs ask for this whole slew of data on every -- of prices that advertisers were playing impressions.  And if you look through my reports, I actually have some data on prices that advertisers would charge on Meta. I showed, actually, if you keep quality constant, it looks pretty constant.

Dr. Williams also used this data when he was studying

monopoly power to establish his viewpoint that Meta had high prices.  So he definitely knew the data was there; he just ignored it.

**THE COURT:**  Okay.  All right.  Junk science.

**DR. WILLIAMS:**  Boy, there's about 19 things she just said that --

**THE COURT:**  Well, let's just start with the big one.

**DR. WILLIAMS:**  Okay.

**THE COURT:**  According to Dr. Tucker, no credible economist would touch this.

**DR. WILLIAMS:**  No --

**THE COURT:**  Why is that not right?

**DR. WILLIAMS:**  She's literally -- look-it, what she said is 100 percent wrong.  In fact, what I'm doing is exactly what Joe Stiglitz did in the *US Air* case.  It's right in the PowerPoint, Your Honor.

What Joe Stiglitz did --

**THE COURT:**  Where is it?

**DR. WILLIAMS:**  Let's go to -- let's go to Slide 17.

**THE COURT:**  17.  Okay.

**DR. WILLIAMS:**  Yes.  So this is *US Airways v. Sabre*.  Here's the accountant, Jerold Zimmerman, and the damage expert, Joe Stiglitz.  They're working for US Air in a monopolization case against Sabre.

So what did Dr. Zimmerman do at Dr. Stiglitz's request?

He has -- if you look at Slide 18, you can see he does a yardstick analysis.  He identified 12 firms.  He -- if you look at the far right, you can see he calculates the economic profit rate for these 12 firms.

That's methodologically exactly what I have done.  Exactly -- not sort of the same, not kind of the same -- exactly what I have done.

Now, he only did it one time.  I've done it 90 different times using 30 firms.  He did it one time using 12 firms.  So that's -- it's not --

**THE COURT:**  Let me just pause there.

**DR. WILLIAMS:**  Yep.

**THE COURT:**  Okay.  Well, Dr. Tucker, it looks like at least --

**DR. TUCKER:**  Okay.

**THE COURT:**  -- another --

**DR. WILLIAMS:**  Well, I --

**THE COURT:**  One other highly regarded economist has used this method.

**DR. WILLIAMS:**  Can I -- Your Honor --

**DR. TUCKER:**  Can I save --

**THE COURT:**  Just one second.

**DR. TUCKER:**  -- the reputation of economics here.

(Simultaneous cross-talk.)

(Court reporter requests clarification for the record.)

**DR. TUCKER:** Can I save the reputation of economics here? Dr. Stiglitz is indeed a wonderful economist, but he didn't do --

**THE COURT:** I want to know about price.

**DR. TUCKER:** Yeah, he did. He's great. He did exactly what I'm saying you should do.

In the *Sabre* case, he went and looked -- it's an overcharge case. He went and looked at prices.

**DR. WILLIAMS:** That's not true.

**DR. TUCKER:** He went to --

**THE COURT:** Hold on.

**DR. TUCKER:** -- look at what South- -- no, that's untrue.

He was looking at the price that Southwest was paying. He argued that Southwest was not subject to the same contract conditions, and therefore the fee or price that Southwest was paying to *Sabre* is a good benchmark. And then he asked Dr. Zimmerman to do some cost counterfactuals to make sure that Sabre could afford to pay -- charge that price.

But to say that Dr. Stiglitz didn't do what exactly you'd expect an economist to do, which is to look at prices, is just plainly untrue. You must remember he used the Southwest benchmark fee, and that was his primary analysis.

**DR. WILLIAMS:** Well, just to be clear, Dr. -- first, your suggestion that I do a yardstick comparison of prices

between different social network platforms is -- and I think you know this -- it's completely unrealistic.  There is no way to hold constant -- if I had done that, I think your report would have gone absolutely apoplectic and said there are 92,000 factors that Dr. Williams has not held constant.

There's a reason that Dr. Zimmerman and Dr. Stiglitz did this, and you can see it right in -- as we go -- look at Slide 21.  Dr. Stiglitz said to Dr. Zimmerman, "I want you to calculate for me the normal profit booking fee."

Dr. Zimmerman did not run any regressions.  He used the difference in the EPR between *Sabre* and the benchmark, the yardstick, and he said:  If I'm going to drop Sabre's booking fee, how far do I have to drop it to get back this normal profit booking fee?

That's exactly what I have done -- not kind of like what I've done.  Not sort of like what I've done -- exactly what I have done.

**THE COURT:**  Okay.

**DR. WILLIAMS:**  And just to dot the "I," Your Honor, if you take a look at Slide 22, I've provided for you a table that compares what I've done with what Dr. Zimmerman and Dr. Stiglitz did.

Did they use a yardstick EPR methodology?  Yes.

Did I?  Yes.

Did Dr. Zimmerman make any, quote, additional adjustments

after he calculated the EPRs for the 12 firms in Slide 18?  No.

Did I make any additional adjustments after I calculated the EPRs for the 30 firms and then produced the 90 different yardstick indexes?  No, because none are required because EPRs, by definition, are apples to apples.

Let me make sure I'm clear on that.  Two firms that have the same EPR have exactly the same market power.  That's the sense in which they're apples to apples.  That's why we can reduce Meta's EPR in the actual world down to the but-for world as provided by these 90 different indexes and we know exactly what the price decrease is.

Did Dr. -- did Dr. Zimmerman and Dr. Stiglitz, did they calculate yardstick EPRs based on comparable firms?

(Reporter interrupts to clarify the record.)

**DR. WILLIAMS:**  Did they calculate the EPR based on comparable firms for the yardstick?  Yes.  They used 12 firms. They calculated one yardstick EPR.

I used 25 firms, plus the five that Meta argued for.  That gives me 90 different yardstick indexes.

Did they determine price overcharges based on EPRs?  Yes.

Did I do that?  Yes.

Did they consider the -- and one thing that -- I've got to say, one other thing that Dr. Tucker said that was wrong. She's -- on page 3 of her PowerPoint, this is hugely, really, really misleading.  The middle bullet is incredibly misleading.

And the reason it's misleading is they didn't actually quote my whole answer.

Your Honor, if you take a -- so Dr. Tucker said, which is false, that I held quantity constant, that the only thing I did was reduce price.

That's absolutely not true.  In fact, Your Honor, if you take a look at Slide Number 9 in my PowerPoint -- and this was also in my deposition, which they've conveniently left out of that middle box on Slide 3 -- my EPR model yields exactly the same damages when quantity, cost, and capital are proportional. So if there's a 20 percent reduction in Meta's quantity in the but-for world, I'm assuming there's a 20 percent reduction in cost.

It's not true that I -- that I held quantity constant. They're leave -- that's not -- that was not my whole answer in that question.  I specifically cited a footnote where I explained this, and they've conveniently left it out.

What's true is what's in Slide 9.  Any -- as long as the -- my base model -- and I'll talk about what I adjusted it to.  But my base model assumes that any reduction in quantity, a percentage reduction in quantity -- there's the quantity of ads that Meta is selling in the but-for world.

(Reporter interrupts to clarify the record.)

**DR. WILLIAMS:**  The quantity of -- I'm sorry.  I'm talking too fast.  I'll slow down.

The quantity of ads that Meta is selling in the but-for world.  Suppose there's a 10 percent reduction compared to the actual world.  My base model assumes that there's a 10 percent reduction in Meta's costs and a 10 percent reduction in Meta's capital.  And when that's true, damages are completely unaffected because the overcharge is unaffected.

I also studied, Your Honor -- and I won't walk you through all the details, but this is in Slides 10 through 13, and I explain why that's a conservative assumption.

If you look at Slide 10, you can see the point I just made, which is that if -- you see the 0.8 in the right-hand side equation, Your Honor, the 0.8 on quantity, the 0.8 on cost, the 0.8 on capital?

So what that's saying is if there was a 20 percent -- 20 percent reduction in Meta's -- I'm sorry -- if there was a 20 percent reduction in Meta's quantity in the but-for world and a 20 percent reduction in cost and a 20 percent reduction in capital, then the price overcharge remains exactly the same and the damages remain exactly the same.

Now, suppose that that wasn't true.  Suppose my assumption is wrong.  I studied that, and, in fact, my assumption is extremely conservative.  And the reason it's conservative -- Your Honor, if you could take a look at Slides 11 and 12, you can see that my assumption is actually not true.

What's really true is that when Meta reduces its output,

its cost -- by, say, 10 percent, its costs fall by more than 10 percent.

And when that happens -- this is in Slide 13.  When that happens -- so you can see in Slide 13 --

**THE COURT:**  Yes, I see it.

**DR. WILLIAMS:**  Yeah.  So you see the 0.8?  So Meta's quantity is falling by 20 percent because it's going from 1 to 0.8, but its cost is falling by more than 20 percent; it's falling by 60 percent here.  It's falling by 1 to 0.4.  Its capital is falling by 1 to 0.4.

When that happens, which is what's shown, that's exactly what happens in reality or -- as shown in Slide 12.  When that happens, the overcharge has to be bigger.  Just algebraically, it has to be bigger.

So my assumption that there's a proportional relationship between changes in Meta's costs in the actual -- in the but-for world and changes in Meta's -- I'm sorry -- changes in Meta's quantity -- sorry -- changes in Meta's quantity lead to proportional changes in Meta's costs and capital.  That's extremely conservative because it's not actually true.  There are bigger reductions in costs when Meta's quantity goes down, and when that happens, the overcharge is even larger.

So just to review the bidding then, what I've done is, in my opinion, absolutely not junk science.  It's the same methodology -- you cannot run a price regression in this case.

I've run price regressions in many, many price-fixing cases. It can't be done in this case. There's not a clean benchmark period, which is required in order to run a price regression like this, and there's a fundamental problem with the demand variable. It's completely unlike what I did in *Olean*, Your Honor.

The accepted method -- and by the way, Your Honor, if I could flag one other thing for you, you said earlier that what I'm doing is idiosyncratic. I would agree that it's unusual. I absolutely agree with you on that. It's unusual even in --

**THE COURT:** That was not meant to be provocative.

**DR. WILLIAMS:** No, no. It's fine. You're right. You're right. It is unusual.

I've worked on I don't know how many big price-fixing cases. I've never done a yardstick model because I always had the price data and a clean benchmark period.

As you know, Your Honor, in price-fixing cases, there's a well-defined damage period. The plaintiffs assert here's the start date to the conspiracy; there's a clean benchmark period. That makes it doable.

That can't be done here. I know it can't be done because I have a -- as you know, I have a vast amount of experience in price-fixing cases. Just -- *Olean* is just one of many price-fixing cases that I've worked on.

I thought really carefully, Your Honor, for a long time

about could I run a price overcharge regression in this case. I do not believe it's possible.  It cannot be done in a reliable way.

Instead, what I decided to do was follow a Nobel Prize winner and use a yardstick EPR model.  I want to emphasize again, in my opinion, Dr. Tucker's suggestion that I could have done a yardstick comparison of pricing, I think that's completely -- I don't think it's realistic at all.  The things that you would --

**THE COURT:**  Here's the question.

**DR. WILLIAMS:**  Yeah.  Sorry.

**THE COURT:**  The question is:  Is what you did valid and reliable?

**DR. WILLIAMS:**  I understand.

**THE COURT:**  That's all we need to focus on.

**DR. WILLIAMS:**  I understand.  And I think it is because I'm literally standing --

**THE COURT:**  I understand.

**DR. WILLIAMS:**  I'm standing on the shoulders of a giant.

**THE COURT:**  Now, let me ask you this, though.

**DR. WILLIAMS:**  Yeah.

**THE COURT:**  Then I'm going to hear from Dr. Tucker.

**DR. WILLIAMS:**  Thank you.

**THE COURT:**  So you've got 30.1 percent is the average

overcharge.  When it comes time -- say, class is certified.  It comes time to --

DR. WILLIAMS:  Yep.

THE COURT:  -- calculate damages.

When we get down to the granularity of cutting checks --

DR. WILLIAMS:  Yep.

THE COURT:  Don't panic anyone.  I'm just talking out loud.

DR. WILLIAMS:  Sure.

THE COURT:  You will look at a user -- what are you going to do with that 30.1 percent figure --

DR. WILLIAMS:  I'll tell you --

THE COURT:  -- per user?

DR. WILLIAMS:  Yeah.  I'll tell you exactly, Your Honor.  In fact, if you -- I put -- to save time, if you want to take a look at my -- the statement for today that Dr. Tucker and I both produced 250 words per topic.

THE COURT:  Oh, yes.

DR. WILLIAMS:  Do you have that around?

THE COURT:  I do.  Just so we're clear on the record, that's Docket Number 940-1.  Okay.

DR. WILLIAMS:  So, Your Honor, if you could take a look at the fourth paragraph, I show exactly -- remember I said you could either think of it as it's a 30.1 percent overcharge or, in other words, the but-for prices would be 23.1 percent

less than the actual prices.  It's the same thing.  It's just starting from -- either starting from the but-for price or starting from the actual price.

So what I would do, then, Your Honor, is I gave an example.  There's a named plaintiff named --

THE COURT:  Wait a moment.  I'm sorry.

DR. WILLIAMS:  Oh, I'm sorry.

THE COURT:  What paragraph is this?

DR. WILLIAMS:  Paragraph 4.  It starts "My yardstick model."

THE COURT:  Okay.  That docket number I just gave is not -- I only have one submission about your statements, and that's Docket Number 140.  I don't have a paragraph starting with "My yardstick model."

DR. WILLIAMS:  "My yardstick damages model"?  It doesn't start with that?

THE COURT:  I have one paragraph saying "My economic profit rate yardstick model."  Is that the one you're referring to?

MS. MEHTA:  Your Honor, that's the correct paragraph.

THE COURT:  Okay.  I do have that one.  Okay.  Now I see it.  Okay.  Go ahead.

In my doc- -- I don't know why we have different documents.  That's the second paragraph in my document.  Here's what it says [as read]:

"My economic profit rate EPR yardstick model directly considers prices because of the basic fact . . . ."

And it goes on from there.  Is that the right paragraph?

**DR. WILLIAMS:**  Oh, I'm sorry.  Your Honor, I see the -- just so you understand, we're looking at the same thing, but mine is split up into different paragraphs --

**THE COURT:**  Okay.  All right.

**DR. WILLIAMS:**  -- in a way that yours isn't.

**THE COURT:**  We're on the right paragraph.  Then you go on to --

**DR. WILLIAMS:**  Sorry.

**THE COURT:**  -- reference McCray and Rubinfeld.

**DR. WILLIAMS:**  Right.

**THE COURT:**  Okay.

**DR. WILLIAMS:**  Right.  Okay.  So if we go to the sentence that starts "For example."

**THE COURT:**  Yes.

**DR. WILLIAMS:**  "For example" -- are you with me?

**THE COURT:**  Yes.

**DR. WILLIAMS:**  Okay.

[As read]:

"For example, named plaintiff Katherine Looper on January 31st, 2017, purchased advertising from Meta for $33.87.  So her damages equal $33.87 times

23.1, or $7.87."

**THE COURT:** Why isn't that 30.1?  This is what I'm not --

**DR. WILLIAMS:** Yeah.  Your Honor, it's just -- you know, when you take a percent change, it depends on if you start with the high number or the low number.

So when we do overcharges, we're starting with the low number.  So we're saying the overcharge is 30.1.  That's -- arithmetically, that's exactly the same as saying that the -- sorry -- that the -- that the prices would be -- that the but-for prices will be 23.1 percent lower than the actual prices.  It's the same thing.

**THE COURT:** I'm not following that.  Why is that --

**DR. WILLIAMS:** Well, here, let me say it again, then. Give me just one second.

**THE COURT:** Take your time.

**DR. WILLIAMS:** Yeah, yeah, yeah.

**THE COURT:** There's no rush.

**DR. WILLIAMS:** I'll find it.

(Pause in proceedings.)

**DR. WILLIAMS:** Okay.  So think about it -- suppose I said:  What's the percent change from 100 to 110?  Is that the same as the percent change from 110 down to 10?  And the answer is no, it's not the same because you're using different bases. The first one, you're starting with 100 and you're saying:

What's the percent change to get up to 110?  And then the other one, you're starting with a bigger base, 110, and you're saying:  What's the percent reduction to get down to 100?  Those percents are not the same.  It's just arithmetic.

And so when we talk about overcharges in antitrust, we're always starting with the lower number.  What's the overcharge?  How much higher --

THE COURT:  Oh, I see.

DR. WILLIAMS:  And the 23 percent is just starting with the higher number and saying:  How much lower would the prices be than the actual prices?

So it's exactly the same difference.  It's just which side of the -- we're starting with the low base or the high base.

THE COURT:  So you'll take an individual plaintiff's ad spend on Meta --

DR. WILLIAMS:  Yep.

THE COURT:  -- and then multiply that by 23.1 percent, and the --

DR. WILLIAMS:  Correct.

THE COURT:  -- resulting figure is your estimate of damages?

DR. WILLIAMS:  $7.82.

THE COURT:  Per person.  Okay.  All right.

DR. WILLIAMS:  Well, on this particular purchase.

THE COURT:  Yeah, I get it.

Okay. That's just a class-wide algorithm. You can put everybody in. And there's no uncertainty about ad spend. Right? You can determine reasonableness?

**DR. WILLIAMS:** No. There's --

**THE COURT:** -- reasonable degree of particular --

**DR. WILLIAMS:** Yeah. I mean, no, there's detailed information at the transaction level.

**THE COURT:** Okay. All right. Dr. Tucker, you get the last word. That was a lot to unpack. But anything you want to add?

**DR. TUCKER:** Yes, of course.

**THE COURT:** So I'll let you start, but I would be curious in hearing -- are you -- were you -- did you overstate that chart on page 3 a little bit?

**DR. TUCKER:** So I don't think I overstated it in that I think Dr. Williams' Slide 10 makes clear exactly what I'm saying in that, in the end, Dr. Williams, for his methodology to be correct, everything has to be proportional.

If one of these figures is not 0.8, then he would be wrong, and the method is unsound and unreliable.

**THE COURT:** Well, what about the --

**DR. TUCKER:** And so we sort of see a knife --

**THE COURT:** What about the chart on page -- if I may.

**DR. WILLIAMS:** That's absolutely not true.

**THE COURT:** When I talk, everyone stops. Okay?

That's where the Oxford Club ends.  When I talk, everybody stops.

What about that chart on page 13, though, where there are different variables?

**DR. TUCKER:**  So this is a knife edge.  Basically, everything has to be right for the method to be sound.

And there's two ways of looking at that chart.  The first thing is saying, you know, the assumption is wrong.  And it is wrong.  That's what that chart is telling you.

But also, that chart isn't actually that informative for an economist in that, remember, we're wanting to build out what happens in the but-for world, how quantities and costs would change in the but-for world.

And indeed, Professor Zimmerman, who Dr. Williams likes to quote a lot, if you actually look at his but-for analysis, it's all about thinking about the cost counterfactuals, how things change.

All we have here is annual data plotted out from the actual world in a way which, honestly, seems bizarre to me because fixed costs are shifting, which they shouldn't do.  So there seems to be a lot of errors in the actual figure.  But it's about the actual world.  It's not doing what an economist needed to, which was actually state how they think both costs and quantity would change in the but-for world, which is what you need to be doing.

**THE COURT:**  Okay.  But the experiments that Dr. Williams did, he says, looked at variability and quantity and cost and capital, and it didn't make any difference.

**DR. TUCKER:**  So what he's showing -- I just want to be clear what that graph is showing.  It is taking annual data in a period where Meta is growing, and there's a shift in -- and what it's plotting out is how over time their costs and quantity evolved in this actual world.

Now, what Dr. Williams needed to do for his methodology to be correct is to not just plot these data points, which, as I say, don't make much sense to me because I have no idea why fixed costs are moving when they shouldn't be moving in the way he says they are.

But we have -- all it's really doing is showing that Dr. Williams' previous assumption that everything was proportional is wrong.  And we know that.  And that even emphasizes to me even more that he has to build out what would happen to cost and quantity in the but-for world, you know, for this -- for this -- I mean, because the EPR -- it just renders the EPR method completely unsound that he did not do so.

And, again, when Professor Zimmerman did this confirmatory analysis, which was to try and figure out could Sabre actually afford the benchmark price from Southwest which Dr. Stiglitz had identified, he did those counterfactuals.  He really did.  And that just wasn't done in this case.

**THE COURT:**  Let me ask you this.  You sound like you've spent some time looking at what happened in that *Sabre* case.  Dr. Williams says he faithfully applied the exact same methods.  What do you think -- what's the essential big difference between what you think Dr. Williams did and what happened in *Sabre*?

**DR. TUCKER:**  That Dr. Stiglitz looked at prices.

**THE COURT:**  Whose prices?

**DR. TUCKER:**  So Dr. Stiglitz is the Nobel Prize winner.

**THE COURT:**  Yes.

**DR. TUCKER:**  And what he -- as we've heard before.

**THE COURT:**  Yeah, I know.  The Nobel Prize --

**DR. TUCKER:**  He's the giant.

**THE COURT:**  -- comes out all the time.

**DR. TUCKER:**  We've heard that a bit.

**THE COURT:**  Yes.

**DR. TUCKER:**  But I feel I would salvage his reputation by just pointing out, the main thing he did, as you'd expect an economist to do, is, yes, he did benchmarking; yes, he tried to find a yardstick.  And he found that yardstick in Southwest.  He looked at the fee that Southwest was paying to Sabre and said:  That seems a reasonable approximation of what the fee would be in the but-for world.  He then described the analysis which Dr. Williams keeps on talking to as something he did to

confirm the original fee -- benchmark fee.

So the key difference for me is that Dr. Stiglitz actually looked at prices, and he certainly didn't just look at EPRs.

**THE COURT:**  Well, let me ask you this.  Let's say that that was available to Dr. Stiglitz in that case.  He had a reliable Southwest price as a yardstick, so he had an extra plus that maybe isn't the factor here.

The fact that, as Dr. Williams said, he couldn't find something that would be meaningful that way in this case, why does that mean his model isn't good?

**DR. TUCKER:**  So in any overcharge case, you're always going to have a yardstick price which is not perfect.  Right? And certainly, the Southwest price was not a perfect yardstick, and Dr. Stiglitz was very clear about that.

But every single piece of antitrust methodology says, okay, you find the best yardstick you can and then you make adjustments for the imperfection of that yardstick.

In the end, we have the twin error here that this is an overcharge case with prices, and Dr. Williams is not looking at prices; he's looking at profits.

And then, even looking at profits, he didn't make any corrections or any -- put in place any controls for the vast differences between Meta and the benchmark EPRs he was using. And, I mean, so it's just completely unsound.

**DR. WILLIAMS:**  I -- I --

**THE COURT:** Let me just ask, first. Then I'll take your comment. Then we're going to wrap up soon.

So the proposition from Dr. Tucker, which has some intuitive appeal to a judge, is an overcharge case, you have to have at least one yardstick price or the whole thing just doesn't work. Do you agree with that?

**DR. WILLIAMS:** No. I mean, let's look at Slide 16. I'm sorry. It's Slide 21.

**THE COURT:** 21. Okay.

**DR. WILLIAMS:** What did -- what did Dr. Stiglitz tell Dr. Zimmerman to do? He said: I want you to use the financial data that's not Southwest. I want you to use the financial data from Sabre and tell me, Dr. Stiglitz, what is the normal profit booking fee?

And just to be clear, Your Honor, if I could ask you to take a look at -- if I could ask you to turn to Slide 27, please.

**THE COURT:** Yes.

**DR. WILLIAMS:** Okay. So let me tell you what's going on in Slide 27.

For starters, you see right at the top it says 72,409 EPR values?

**THE COURT:** Yes.

**DR. WILLIAMS:** Okay. I didn't calculate any of those. Those are being calculated by a firm called Institutional

Shareholder Services.  And as Institutional Shareholder Services says -- this is a direct quote -- economic -- well, economic profit rates are -- and then this is the quote -- comparable across companies, industries, and countries.

So Institutional Shareholder Services, Your Honor, produces, at great expense, economic profit rates for thousands of different companies, and then they sell that information to investors.

So these 72,409 EPRs for more than 8,000 companies, that's not me.  That's an independent firm characterizing those economic profit rates.

If you ask the question "Where is Meta in here?" Meta is 43.6.  They're in the 98.9th percentile.

If you ask out of the 90 different yardstick indexes that I analyze based on 30 different firms, five of which were advocated by Meta, what's the single highest EPR, you can see it right there.  The single highest one is 23.1 percent. That's in the 96.9th percentile.

And, finally, Your Honor -- well, actually, let me make one more point -- or two more points.

One is, if you ask what is the EPR for Amazon, Apple, Google, Pinterest, Snap, and Twitter, five of those firms being argued for by Meta, it's 19.4 percent.  That puts you in the 95.9th percentile.

Now, I want to explain something that Dr. Stiglitz did

that is actually much more aggressive than what I did.  So if we could go back just for a moment, Your Honor, to Slide 21.

You see in Slide 21, Dr. Stiglitz said to Dr. Zimmerman: I want you to calculate for me a booking fee that Sabre would charge that would give them, as he calls it, a normal profit.

What does that -- you're probably wondering what the heck does that mean?  What the heck is a normal profit?

Your Honor, if we go to Slide 27, the normal profit is 0.0.  That's what economists mean by "the normal profit." It's what a competitive firm would earn.

So what Dr. Stiglitz did was say:  I think the difference between Sabre's booking fees and the normal profit booking fee which Dr. Zimmerman calculated for me, that formed the basis for one of his damage models, exactly as I have done.  Not kind of like what I've done.  Exactly what I have done.

But what Dr. Stiglitz did was actually much more aggressive than what I'm doing because, you see, what I'm doing is I'm saying, in the actual world, Meta's EPR is 43.6, and I'm reducing that down to the highest of the 90, 23.1.  That leads to that 30.1 percent overcharge, or the 23.1 percent change from the actual to the but-for.

What Dr. Zimmerman -- I'm sorry.  What Dr. Stiglitz did, if I were to do that here, what he's saying is:  Well, don't stop at the highest of the yardstick.  I want you to keep going down until you reduce Meta's prices until we get to a zero EPR,

the normal profit EPR.  That's what Dr. Stiglitz did.

THE COURT:  Let me ask you -- I appreciate -- let me ask you this:  What is your understanding of what Zimmerman and Stiglitz did with respect to Southwest's yardstick price?

DR. WILLIAMS:  Yeah, yeah.  So there was a -- Dr. Stiglitz, I think correctly, believed that there was an apples-to-apples price comparison he could make.

Actually, I'm oversimplifying a little bit.  He knew that it wasn't exactly apples to apples because, obviously, US Air is not like Southwest.  You know, they have different cost structures and so on.  But he thought that it was a reasonable price benchmark that he could use, and then he -- but then he also did what I just described.

So now, what's different here, Your Honor, is that --

THE COURT:  What is your understanding of what he did with the Southwest price?

DR. WILLIAMS:  I think he produced -- now, some of it's redacted, but he produced a damage number, I believe, based on the Southwest booking fee versus the --

THE COURT:  Just that?  Just based on the Southwest --

DR. WILLIAMS:  I think that's right.

THE COURT:  All right.

DR. WILLIAMS:  But then he also --

THE COURT:  What did he do?  Did he use that to compare to the EPR model?

**DR. WILLIAMS:** Yeah. Then he did exactly what he says in Slide 21.

He also calculated a booking fee which was the difference between the Sabre booking -- actual Sabre booking fee and the normal profit booking fee, the one that would give Sabre -- because it was Dr. Stiglitz's conclusion that in the but-for world, Sabre would have been no more profitable than a highly competitive firm; and so they would have -- in his opinion, in the but-for world, they would have zero EPR. So that's what -- that's what he did in Slide 21.

**THE COURT:** Okay.

Okay. Any last comments on that?

**DR. TUCKER:** There was a lot there, but I think the key point which I will, again, reiterate is that when economists are thinking about overcharges, they do look at prices.

And that's what happened in the *Sabre* case. And, yes, there was --

**THE COURT:** Let me just jump in.

**DR. TUCKER:** Yes.

**THE COURT:** On page 21 of the -- the slide we were just looking at doesn't indicate that at all. In fact, it indicates that they're not looking at actual or yardstick prices.

**DR. TUCKER:** So I am not sure why Dr. Williams

completely ignored that Dr. Stiglitz started off with a benchmark price, which was the Southwest price.

And then a natural question for an economist is:  Can the firm afford to charge that price, more broadly?

And so he asked Dr. Zimmerman, who's an accounting professor, to do a counterfactual analysis where you set profits at zero -- or economic profits at zero and say:  If they're earning zero profits, could they -- what price could they afford to charge?

And, yes, you've got that analysis.  It tells you that Sabre could afford to charge that price.  But it was then transposed on top of the fact that he benchmarked a price.

I don't understand, and I think it's, you know, honestly a bit misleading why we have all these expert reports from Dr. Stiglitz which don't mention the fact he benchmarked prices.

**THE COURT:**  Okay.

Okay.  That was very productive for me.  Thank you very much.  Appreciate your coming in.  And that's it for today.

Thank you.

**DR. WILLIAMS:**  Thank you.

**DR. TUCKER:**  Thank you.

**THE COURTROOM DEPUTY:**  All rise.  Court is in recess.

(Proceedings adjourned at 11:39 a.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Thursday, June 12, 2025

_Ana Dub_

_____

Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

CSR No. 7445, Official United States Reporter