WILMER CUTLER PICKERING
HALE AND DORR LLP

SONAL N. MEHTA (SBN 222086)
 Sonal.Mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
 David.Gringer@wilmerhale.com
ALEX W. MILLER (*pro hac vice*)
 Alex.Miller@wilmerhale.com
PAUL VANDERSLICE (*pro hac vice*)
 Paul.Vanderslice@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800

MOLLY M. JENNINGS (*pro hac vice*)
 Molly.Jennings@wilmerhale.com
2100 Pennsylvania Ave NW
Washington, DC 20037
Telephone: (202) 663-6000

*Attorneys for Defendant Meta Platforms, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| MAXIMILIAN KLEIN, et al., on behalf of themselves and all others similarly situated,<br><br>                         Plaintiffs,<br><br>     v.<br><br>META PLATFORMS, INC., a Delaware Corporation,<br><br>                         Defendant. | Case No. 3:20-cv-08570-JD<br><br>**DEFENDANT META PLATFORMS, INC.'S TRIAL BRIEF** |

**TABLE OF CONTENTS**

I.  PLAINTIFFS' CLAIMS WILL FAIL AT TRIAL ............................................................ 4
    A.  Meta Does Not Have Monopoly Power In Any Relevant Antitrust Market ............ 4
    B.  Plaintiffs Cannot Show The Alleged Deception Harmed Competition ................... 5
    C.  Plaintiffs Do Not Have Antitrust Standing And Are Not Entitled To Relief .......... 7
II. PLAINTIFFS' CLAIMS ARE TIME-BARRED ............................................................. 9

# TABLE OF AUTHORITIES

Page(s)

### CASES

*Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns, Inc.*, 108 F.3d 1147 (9th Cir. 1997) ................................................................. 2, 6, 7

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ................................................................................................. 7

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F. Supp. 3d 988 (N.D. Cal. 2015) ........................................................................................................... 10

*Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104 (1986) ............................................. 8

*Cash & Henderson Drugs, Inc. v. Johnson & Johnson*, 799 F.3d 202 (2d Cir. 2015) ................................................................................................................... 9

*City of Oakland v. Oakland Raiders*, 20 F.4th 441 (9th Cir. 2021) .................................. 8

*FTC v. Meta Platforms, Inc.*, No. 20-cv-3590 (D.D.C. June 3, 2025) .............................. 9

*FTC v. Qualcomm, Inc.*, 969 F.3d 974 (9th Cir. 2020) ..................................................... 4

*Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044 (N.D. Cal. 2016) .................................. 9

*In re Google Play Store Antitrust Litig.*, 147 F.4th 917 (9th Cir. 2025) ........................... 9

*Int'l Tel. & Tel. Co. v. Gen. Tel. & Elecs. Co.*, 518 F.2d 913 (9th Cir. 1975) ................ 10

*Oliver v. SD-3C LLC*, 751 F.3d 1081 (9th Cir. 2014) .................................................... 10

*Pace Indus., Inc v. Three Phoenix Co.*, 813 F.2d 234 (9th Cir. 1987) .............................. 9

*Rebel Oil Co.. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995) ............................... 4, 5

*Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981 (N.D. Cal. 2020) ................................................................................................................... 9

*Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199 (9th Cir. 2014) ......................... 9

*SaurikIT, LLC v. Apple Inc.*, 2022 WL 1768845 (N.D. Cal. May 26, 2022) ..................... 9

### STATUTES, RULES, AND REGULATIONS

15 U.S.C. § 15(b) .............................................................................................................. 9

This is a case brought by three individuals seeking $720 for their free use of Facebook. The Plaintiffs allege they should be paid for using Facebook because, starting nearly two decades ago, Meta supposedly deceived *other users* (not the Plaintiffs themselves, though, by their own admission) about Meta's data collection and use practices. They claim this alleged deception somehow maintained a monopoly in a market Plaintiffs cannot define. This claim has no basis in fact or law; certainly not the antitrust laws. This Court already rightly concluded that Plaintiffs' payment-for-use theory is nothing "more than a fanciful application of economic theory untethered to real-world evidence." Dkt. 905 at 8. It will fail at trial, if it makes it past summary judgment at all. Plaintiffs fare no better on the other components of their claims.

***First***, Plaintiffs cannot prove that "personal social networking services" ("PSNS") is a relevant market. Plaintiffs define the PSNS market to include aspects (or, depending on the day, all) of Facebook, Instagram, Snapchat, and MeWe, and to have previously included Myspace, Google+, Friendster, and Orkut. This market is supposedly oriented around sharing with friends and family when, in reality, Meta offers users all manner of social entertainment and more without charge, from posting text updates, messaging, buying and selling goods, to watching videos created by celebrities and influencers. As to each of these activities and experiences, Meta faces intense competition for users' time and attention from services ranging from TikTok to X to YouTube to numerous messaging apps like iMessage.

Plaintiffs nonetheless gerrymander a market to exclude Meta's closest competitors and instead orient their market around a subset of activities and experiences that they—but no one who actually competes in this industry—term PSNS. Plaintiffs offer the opinion of putative economic expert Joseph Farrell. But fatally for Plaintiffs, Farrell concedes that determining what features, activities, and experiences are in and out of the boundaries of this market poses "intractable questions" and creates "irreducible gray areas." Dkt. 925-5, Farrell 3/24 Tr. 30:16-31:16. Meta's expert, Dr. Dennis Carlton, will explain that Farrell's approach to defining the market is conceptually wrong and unreliable. The economic tools that Farrell uses—including modified versions of "critical loss" and "upward pricing pressure" analyses that do not even evaluate the user side of Meta's platforms—produce nonsensical results. Without a viable relevant market,

Plaintiffs' claims fail because Meta cannot be said to have monopoly power or a dangerous probability of obtaining monopoly power.

***Second***, even if Plaintiffs could prove that Meta had monopoly power, Plaintiffs' contention that Meta unlawfully maintained a monopoly through deception of the "market" fails. Antitrust claims predicated on deception "should presumptively be ignored," and Plaintiffs offer no reason why this case should be any different. *Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997). *Harcourt Brace* sets out a demanding six-part test for the viability of deception-based antitrust claims that Plaintiffs all but concede they cannot meet. Indeed, Plaintiffs uniformly testified that the challenged representations played no role in their decision to use Facebook. Tellingly, Plaintiffs' putative privacy expert Sarah Lamdan (whose potential testimony the Court has questioned the relevance and helpfulness of[1]) concedes that the claimed deception had nothing to do with users' decisions to choose or stay on Facebook over its rivals. And while the entire premise of Plaintiffs' case is that Meta defeated competitors like Myspace through misrepresentations about data use and collection, Plaintiffs' expert Dr. Nicholas Economides admits that "Facebook won over Myspace on its merits," and that other market participants were not "going to be successful even … without the misrepresentations." Dkt. 925-4, Economides 3/24 Tr. 240:3-10; 229:22-231:21. There is nothing in the record to support the notion that the hodgepodge of challenged statements influenced anyone, let alone everyone, to keep using Facebook.

***Third***, Plaintiffs cannot show that Meta avoided paying every user five dollars a month because of any supposed deception about data practices. Instead, the evidence is uniform that Meta never paid users because it is a terrible idea and contrary to any company in this industry's business model. Meta succeeds in the face of intense competition against numerous other online platforms because it has consistently offered users valued features and engaging content. It provides these

---

[1] Dkt 788, Apr. 18, 2024 Hr'g Tr. 9:3-10:8 ("THE COURT: What does that have to do with Section 2 of the Sherman Act? … I don't understand how consumer expectations about data privacy relate to the acquisition of monopoly power … Why is that even expert testimony? … If she's just going to get up and say 'these are a bunch of data pirates who steal your information,' that's not expert testimony."). The Court has not yet ruled on whether Lamdan will be allowed to testify at all. *See* Dkt. 820-1 (Plaintiffs' proffer); Dkt. 931-1 (Meta's *Daubert* motion).

services for free—and always has—because it must offer a high-quality user experience to compete for user engagement that it can monetize by selling advertising. Meta's fiercest competitors for that engagement (including, e.g., TikTok and YouTube) use the same business model. Meta's users come to Facebook and Instagram because of the content and social experiences they offer. Meta is incentivized to continually innovate to improve that experience because, if it did not, users would readily switch to TikTok, YouTube, and other places where they can get a similar experience and find the same content.

Perhaps recognizing the folly of their position, Plaintiffs have made a last-ditch effort to change their theory of injury. Now, after expressly disclaiming as much throughout the case,[2] Plaintiffs contend that the injury they suffered is that a "better" version of Facebook would have emerged. Miraculously, according to Plaintiffs, the delta between the actual version of Facebook and the unspecified "better" version is the same five dollars per month per user, based on the same flawed opinion testimony that the Court has already excluded. Beyond that, Plaintiffs say nothing about what this better version of Facebook would have looked like, and the record is unmistakably clear that Meta innovated and improved its products continuously. The Court should not allow Plaintiffs to put forward this theory of injury at all, but if it does, it would be rejected by any reasonable jury.

*Finally*, even if Plaintiffs could somehow overcome these hurdles, their claims are tardy. Plaintiffs filed their complaint on December 3, 2020. It challenged an ostensibly "anticompetitive scheme … that originated many years ago," Compl. ¶2, which supposedly resulted in Meta acquiring monopoly power no later than 2011. According to Plaintiffs, this "scheme" continued unchanged for many years thereafter and allowed Meta to maintain its monopoly power. Thus, the conduct Plaintiffs' claims are based on occurred well before the limitations period began in 2016. Such claims fall outside the four-year statute of limitations and are time barred.

---

[2] *See, e.g.*, Dkt. 848, Oct. 31, 2024 Hr'g Tr. 4:9-14 ("[T]he antitrust injury for the users is a reduction in the level of compensation that would have been paid to all users."); Ex. 3 to Meta's concurrently filed Motion *In Limine* No. 6 (damages are "the difference between the compensation that Facebook actually provided for the data that Facebook collected … and the compensation that [Plaintiffs] should have received for that data in a competitive world").

I.     **PLAINTIFFS' CLAIMS WILL FAIL AT TRIAL**

Plaintiffs assert that Meta engaged in unlawful monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. "To establish liability under § 2, a plaintiff must show: '(a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury.'" *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 990 (9th Cir. 2020). Plaintiffs' attempted monopolization claim—which is not properly before the Court because Plaintiffs' sole theory is monopoly maintenance—also requires proof of a relevant market, anticompetitive conduct, and causal antitrust injury, as well as a specific intent to, and a dangerous probability of, achieving monopoly power. *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995). Plaintiffs cannot prove these elements.

A.     **Meta Does Not Have Monopoly Power In Any Relevant Antitrust Market**

Plaintiffs cannot meet their burden of proving that PSNS is a relevant antitrust market in which Meta has monopoly power.

Plaintiffs' theory is that no apps other than Snapchat and the irrelevant, barely known, and little-used MeWe exert constraining competition on Facebook and Instagram. That theory is implausible on its face and will be belied by overwhelming and unanimous evidence at trial, including empirical studies, scores of contemporaneous documents, and testimony from numerous market participants. All of this evidence demonstrates that TikTok and YouTube—among many others including iMessage, X, Reddit, and Pinterest—are far more important (that is, constraining) competitors. The record unambiguously refutes Plaintiffs' attempt to restrict the competitive set to Facebook, Instagram, Snapchat, and MeWe. Competition for marginal minutes that users spend online is dynamic and evolving, and users have many acceptable substitutes for the many different things they do on Meta's apps.

Plaintiffs have no evidentiary support for their results-driven relevant market; they cannot even define it coherently. Indeed, what is and is not included in the PSNS market has never been clear. For example, Dr. Farrell contends that the same video viewed by the same person on the same service could be both in and out of the market depending on some variance in the user's subjective motivations. Such a definition is impossible to apply *within* a given service, much less

across them. And without any coherent way to define what is PSNS, Plaintiffs cannot show what is reasonably interchangeable with a PSNS use, or who Meta's relevant competitors are. Dr. Farrell even admits that determining what is or is not PSNS poses "intractable questions" and "irreducible gray areas." Dkt. 925-5, Farrell 3/24 Tr. 30:16-31:16. These "intractable questions" will be readily apparent to the jury, who will find it incredible that Meta faces competition from MeWe but not TikTok or YouTube.

Plaintiffs' attempt to define a market around a narrow use case is misguided and reflects a misunderstanding of the industry in which Meta operates. Empirical evidence and ordinary course business documents show that competition among social apps for marginal minutes is not limited by use case. New technologies, changing norms, and new entrants compete for *all* time spent on Meta's apps—friends and family sharing included—forcing Meta to evolve or fail. Meta has invested billions of dollars and transformed its business to meet the existential competitive threats posed by streaming video giants (like YouTube) and, more recently, short-form videos and AI-powered content delivery systems (driven by TikTok), which have proved more effective at offering users engaging social content than social graphs and friend connections.

Nor can Plaintiffs prove monopoly power through direct evidence. Direct evidence of monopoly power requires proof that Meta "restricted output" and charged "supracompetitive prices" relative to benchmark competitive levels. *Rebel Oil*, 51 F.3d at 1434. The competitive price for all ad-supported social apps with user-generated content is zero; certainly no such app has ever charged *less*, and Meta could not charge more without losing user time to myriad other free services. Output has surged at this constant price, with consistent growth both within Plaintiffs' concocted PSNS market and across the broader range of apps with which Meta actually competes.

The evidence at trial will show that Meta continues to face, as it has for many years, intense competition from firms that compete with it for user time and attention. It does not and cannot exercise anything remotely resembling monopoly power over any relevant antitrust market.

### B.   Plaintiffs Cannot Show The Alleged Deception Harmed Competition

Plaintiffs cannot prove that the alleged deception allowed Meta to maintain a monopoly, or had any effect on competition whatsoever.

The Ninth Circuit permits antitrust claims predicated on deception only in rare circumstances, and such claims "should presumptively be ignored." *Harcourt Brace*, 108 F.3d at 1152. This case is a good illustration of why. The allegedly anticompetitive conduct Plaintiffs challenge in this case includes the following:

- A Meta website post announcing, "[W]e have been coding non-stop for two days to get you better privacy controls."
- A Meta employee's response to an interviewer's question that he misunderstood and as a result answered incorrectly, which was corrected in two days by "post[ing] a clarification on [Meta's] blog, on [its] faq page and [its] press page along with several third party sites."
- A statement to the press that "Facebook stands with many technology companies to protect you and your information."

To overcome the presumption of *de minimis* effect on competition, Plaintiffs must establish "that the representations were [1] clearly false, [2] clearly material, [3] clearly likely to induce reasonable reliance, [4] made to buyers without knowledge of the subject matter, [5] continued for prolonged periods, and [6] not readily susceptible of neutralization or other offset by rivals." *Harcourt Brace*, 108 F.3d at 1152. Plaintiffs have offered no evidence that any—let alone all—of the alleged deceptions they challenge satisfy "*all* six elements to overcome [the] de minimis presumption." *Id.* There is no evidence that any of the statements were false, much less "clearly" so. The vast majority of the challenged statements are puffery that no reasonable person would rely on. The overwhelming evidence also shows that representations about data privacy are *not* material to users' choices of where to spend their time online—empirical studies of the well-established "privacy paradox" demonstrate that most users do not act in accordance with expressed concerns about privacy (if they express such concerns at all), which Meta's contemporaneous documents confirm. And Plaintiffs themselves contend that the supposedly deceptive acts were continuously "discovered" by the public. If there was any attempt to deceive anyone (and there was not), it was unsuccessful under Plaintiffs' own theory, and Meta has sophisticated competitors who could have readily neutralized this if it had any competitive significance.

Recognizing that they cannot meet this test, Plaintiffs are now trying to evade it. But their previous concession that *Harcourt Brace* is controlling authority for their claims was correct. Dkt. 788, Apr. 18, 2024 Hr'g Tr. 9:10-18 ("The test that applies to the case that the consumers have

brought … is under a Ninth Circuit called *Harcourt Brace*. And there are six factors."). Moreover, even if Plaintiffs could rebut the de minimis presumption, *Harcourt Brace* requires that they *further prove* that the claimed deception had "a significant and enduring adverse impact on competition itself in the relevant market[]." 108 F.3d at 1152. But the evidence shows that, even when the supposed deception was "discovered," usage of Meta's apps did not change at all, and no "privacy"-focused competitor emerged to challenge Meta on this dimension.

In reality, and what Plaintiffs' expert concedes, is that Meta succeeded "on its merits," rather than through any alleged deception. Dkt. 925-4, Economides 3/24 Tr. 231:4-21. Plaintiffs offer nothing tying the alleged maintenance of monopoly power to any misrepresentations. Indeed, each Plaintiff testified that they either did not hear the supposedly deceptive statements when made (and did not even know about them before joining this lawsuit), or that the statements—and data privacy generally—had no impact on their decisions to join (and remain on) Facebook.

### C. Plaintiffs Do Not Have Antitrust Standing And Are Not Entitled To Relief

Plaintiffs bear the burden of establishing their antitrust standing by proving an antirust injury that was proximately caused by the alleged deception. *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535-37 (1983). Plaintiffs cannot do so. For the same reasons, Plaintiffs are not entitled to injunctive relief.

Plaintiffs' sole theory of antitrust injury that is properly before the Court depends on the premise that, in a world where Meta made different statements about its privacy practices, additional competition would have forced the company to pay each of the hundreds of millions of people with active Facebook accounts in the United States five dollars a month, every month. Dkt. 905 at 2. The Court already held that such implausible speculation has no basis in the record or reality, where there is no evidence that either Meta or "any other participant in the PSNS market has ever competed by paying users." *Id.* at 7-9. There is no reason to believe that Plaintiffs will be able to revive that claim (or even present it to the jury) at trial. In a last-ditch effort to save their case after the Court's ruling, Plaintiffs sought to invent a new injury theory premised on the contention that users would have had "better features" or "increased choice" in the but-for world. The supposed value of these new features—which Plaintiffs have never described and which all

of their experts disclaimed offering opinions about—just so happens to also be five dollars. So no matter what, Plaintiffs' case is about whether they are entitled to five dollars a month for using Facebook.

Plaintiffs cannot show that there is a "direct link" between the challenged statements and Meta's failure to pay them. The directness of injury factor examines "the chain of causation" between plaintiffs' asserted harms and any anticompetitive conduct. *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 458 (9th Cir. 2021). Plaintiffs' theory, even if credited in full, fails that standard because it requires numerous unproven inferences: Meta would have had to face stronger competition absent the challenged statements, that stronger competition would have had to be from a firm whose product was more appealing than Facebook, and Meta would have had to respond to that competition by fundamentally changing its business model (and adopting one that has never previously been used in its industry) through paying all Facebook users five dollars a month. Plaintiffs cannot prove these logical leaps and have provided evidence establishing none of them.

And even if Plaintiffs could somehow show that they would have been better off in the but-for world, their damages would be entirely speculative. *City of Oakland*, 20 F.4th at 460-461 (no antitrust standing when "damages are only speculative"). Plaintiffs' proposed five dollars per month figure is based entirely on a junk science "yardstick" study conducted by Economides that the Court has already once excluded. The supposed comparators used to derive this amount were market research firms like Nielsen that offer no features to users and are nothing like Facebook. Plaintiffs cannot benchmark the level of compensation they would have received from Meta to any valid comparators because no app like Facebook has ever paid its users. Moreover, Plaintiffs have not, and cannot, prove how any supposed reduction in quality of Meta's products, which are free and offered in unlimited quantities, would cause them quantifiable economic injury such that a jury could award damages based on Plaintiffs' late-breaking quality degradation theory.

For substantially the same reasons, Plaintiffs cannot establish their entitlement to any injunctive relief. Plaintiffs bear the burden of proving a "threatened" loss from an imminent antitrust injury to obtain an injunction. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 112 (1986). But just as they cannot show they suffered past antitrust injury, Plaintiffs "cannot show a

1  reasonable probability of future injury because … the allegations fail for lack of evidence." *Cash
2  & Henderson Drugs, Inc. v. Johnson & Johnson*, 799 F.3d 202, 215 (2d Cir. 2015). Moreover, due
3  to the intense competitive pressure from TikTok as Meta's fiercest rival, Plaintiffs cannot show
4  that Meta currently possesses monopoly power and therefore cannot show that Meta is currently
5  violating the antitrust laws. That is an independent reason why Plaintiffs are not entitled to
6  injunctive relief. *See FTC v. Meta Platforms, Inc.*, No. 20-cv-3590, Dkt. 610 at 1-2 (D.D.C. June
7  3, 2025); *see also In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 946 (9th Cir. 2025).

## II. PLAINTIFFS' CLAIMS ARE TIME-BARRED

Private lawsuits seeking damages under Section 2 of the Sherman Act are subject to a four-year statute of limitations. 15 U.S.C. § 15(b). Such claims accrue "at the time of the alleged anticompetitive conduct." *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1065 (N.D. Cal. 2016). Plaintiffs allege that Meta possessed monopoly power by 2011 and unlawfully maintained that monopoly through a "uniform and prolonged deception regarding its data collection and use practices" that began in 2006. Dkt. 648 at 1. But Plaintiffs filed their complaint on December 3, 2020, meaning "the initial events giving rise to [their] claims occurred more than four years" before filing and their claims are presumptively time-barred. *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 991 (N.D. Cal. 2020).

Plaintiffs' only response is to invoke the continuing violation doctrine, which requires Plaintiffs to show that Meta "completed an overt act during the limitations period that meets two criteria: '1) It must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) it must inflict new and accumulating injury on the plaintiff.'" *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014). Thus, the asserted overt act must "differ from what [Meta] is alleged to have done starting in [2006]," *SaurikIT, LLC v. Apple Inc.*, 2022 WL 1768845, at *2 (N.D. Cal. May 26, 2022), personally harm Plaintiffs, and itself be actionably anticompetitive, *Pace Indus., Inc v. Three Phoenix Co.*, 813 F.2d 234, 238-239 (9th Cir. 1987).

Plaintiffs cannot establish a continuing violation. They explicitly assert—and the evidence at trial will show—that the in-period conduct they challenge *is* a reaffirmation of prior acts, *does not* differ from what occurred before 2016, and caused no new injury to Plaintiffs or competition.

Under Plaintiffs' own theory, the allegedly deceptive statements and omissions made within the limitations period are mere echoes of earlier statements. They contend that the alleged deception dating back to "the early days of social networks" constitutes a "continuous" and "long-standing campaign" based on a single "common theme." Dkt. 793 at 8-9, 19. The challenged statements concern subjects like the collection and use of user data and users' control over their information, which Plaintiffs claim Meta has been making deceptive statements about since 2006. Additional statements on these same topics after 2016 as part of a supposedly uniform campaign only "reaffirm[]" those earlier statements under Plaintiffs' own theory. *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F. Supp. 3d 988, 999 (N.D. Cal. 2015) (engaging in a "continu[ing] stream of communications" does not represent "new or independent actions"). Plaintiffs also have no evidence that any of the post-2016 statements caused a new or different injury or harm to competition. Plaintiffs offer only Economides to establish the competitive effects of the alleged deception. But he has done no work to tie any alleged competitive harm to specific misrepresentations, Dkt. 925-4, Economides 3/24 Tr. 181:4-16, and offers no opinions focused on the effects of the conduct that occurred within the limitations period.

Plaintiffs' request for injunctive relief is also barred by laches. *See Oliver v. SD-3C LLC*, 751 F.3d 1081, 1085-086 & n.4 (9th Cir. 2014) ("the same legal rules that animate the four-year statute of limitations" apply to laches). "The bare fact of [Plaintiffs'] delay" in bringing suit fourteen years after the challenged conduct began, and nine years after Meta allegedly became a monopolist—for which they have provided no excuse—"creates a rebuttable presumption of prejudice." *Int'l Tel. & Tel. Co. v. Gen. Tel. & Elecs. Co.*, 518 F.2d 913, 926 (9th Cir. 1975). Plaintiffs have no way to rebut this presumption, as the "[t]he potential for economic disruption" from their still as-yet unspecified requested injunction will undoubtedly be "great," particularly given that Plaintiffs "sle[pt] through" over a decade of public conduct before deciding many years later that those actions were supposedly antitrust violations. *Id.* at 927.

| | | |
|---|---|---|
| 1 | | |
| 2 | Dated: September 11, 2025 | Respectfully submitted, |
| 3 | | By: */s/ Sonal N. Mehta* |
| 4 | | Sonal N. Mehta |
| 5 | | WILMER CUTLER PICKERING HALE ND DORR LLP |
| 6 | | |
| 7 | | *Attorney for Defendant Meta Platforms, Inc.* |