1

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Shana E. Scarlett (Bar No. 217895)
shanas@hbsslaw.com
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Kevin Y. Teruya (Bar No. 235916)
kevinteruya@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000

**WILMER CUTLER PICKERING HALE AND DORR LLP**
SONAL N. MEHTA (SBN 222086)
 Sonal.Mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
David.Gringer@wilmerhale.com
PAUL VANDERSLICE (*pro hac vice*)
Paul.Vanderslice@wilmerhale.com
ALEX W. MILLER (*pro hac vice*)
Alex.Miller@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800

*Attorneys for Plaintiffs Maximilian Klein, Rachel Banks Kupcho, and Sarah Grabert*

*Attorneys for Defendant Meta Platforms, Inc.*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

MAXIMILIAN KLEIN, et al.,

Plaintiffs,

vs.

META PLATFORMS, INC.,

Defendant.

Consolidated Case No. 3:20-cv-08570-JD

**META'S OMNIBUS MOTIONS *IN LIMINE* AND PLAINTIFFS' RESPONSES THERETO**

 The Hon. James Donato

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION ............................................................................................3

MOTION *IN LIMINE* NO. 1: TO EXCLUDE EVIDENCE OR ARGUMENT REGARDING SETTLEMENTS, LAWSUITS, AND REGULATORY MATTERS ...........4

PLAINTIFFS' RESPONSE TO META'S MIL NO. 1 .......................................................................7

MOTION *IN LIMINE* NO. 2: TO EXCLUDE EVIDENCE OR ARGUMENT REGARDING DECEPTIVE CONDUCT NOT PREVIOUSLY DISCLOSED .................10

PLAINTIFFS' RESPONSE TO META'S MIL NO. 2 ......................................................................13

MOTION *IN LIMINE* NO. 3: TO EXCLUDE EVIDENCE OR ARGUMENT REGARDING SUBSEQUENT REMEDIAL MEASURE ....................................................16

PLAINTIFFS' RESPONSE TO META'S MIL NO. 3 ......................................................................19

MOTION *IN LIMINE* NO. 4: TO PRECLUDE PLAINTIFFS FROM INTRODUCING PUBLIC REPORTING ON UNDERLYING EVENTS FOR THEIR TRUTH .................22

PLAINTIFFS' RESPONSE TO META'S MIL NO. 4 ......................................................................24

MOTION *IN LIMINE* NO. 5: TO PRECLUDE PLAINTIFFS FROM INTRODUCING EVIDENCE OR ARGUMENT REGARDING INFLAMMATORY AND IRRELEVANT MATTERS ..........................................................................................26

PLAINTIFFS' RESPONSE TO META'S MIL NO. 5 ......................................................................29

MOTION *IN LIMINE* NO. 6: TO PRECLUDE PLAINTIFFS FROM OFFERING EVIDENCE OR ARGUMENT ON INJURY OR DAMAGES THEORIES NOT PREVIOUSLY DISCLOSED, CONTRADICTED BY THEIR PRIOR STATEMENTS TO THE COURT, OR DISCLAIMED ......................................................31

PLAINTIFFS' RESPONSE TO META'S MIL NO. 6 ......................................................................34

MOTION *IN LIMINE* NO. 7: TO PRECLUDE PLAINTIFFS FROM OFFERING EVIDENCE OR ARGUMENT ADVANCING A MARKET DEFINITION INCONSISTENT WITH THE "PSNS" MARKET DEFINED BY PLAINTIFFS' EXPERT DR. JOSEPH FARRELL ......................................................................................37

PLAINTIFFS' RESPONSE TO META'S MIL NO. 7 ......................................................................40

## <u>NOTICE OF MOTION AND MOTION</u>

PLEASE TAKE NOTICE that, on September 25, 2025 at 1:30 p.m., Defendant Meta Platforms, Inc. will move the Court for orders *in limine* to:

- Exclude evidence or argument regarding settlements, lawsuits, or regulatory matters;

- Exclude evidence or argument regarding deceptive conduct not previously disclosed;

- Exclude evidence or argument regarding subsequent remedial measure;

- Preclude plaintiffs from introducing public reporting on underlying events for their truth;

- Preclude plaintiffs from introducing evidence or argument regarding inflammatory and irrelevant matters;

- Preclude plaintiffs from offering evidence or argument on injury or damages theories not previously disclosed, contradicted by their prior statements to the Court, or disclaimed; and

- Preclude plaintiffs from offering evidence or argument advancing a market definition inconsistent with the "PSNS" market defined by plaintiffs' expert Dr. Joseph Farrell.

This Motion is based on this Notice of Motion and Motions, Memorandum of Points and Authorities, and such other matters as may be presented to the Court at the time of or before the hearing.

**MOTION *IN LIMINE* NO. 1: TO EXCLUDE EVIDENCE OR ARGUMENT REGARDING SETTLEMENTS, LAWSUITS, AND REGULATORY MATTERS**

The Court should exclude any reference to Meta's settlements, other legal or investigatory proceedings, and regulatory matters. This trial is about the evidence and legal standards applicable to plaintiffs' claims in *this* action, not in any other. References to other proceedings concerning other claims, facts, and records would be irrelevant, invite jury confusion, and risk multiple mini-trials within the trial about the legal and factual context of those other proceedings, and severely prejudice Meta as plaintiffs attempt to tag it with other legal disputes not at issue here. As this Court has done in other cases, it should exclude evidence regarding other lawsuits, settlements, investigations, or regulatory proceedings. *See* Pretrial Order at 3, *In re Google Play Store Antitrust Litig.*, 3:21-md-2981 (N.D. Cal. Oct. 20, 2023) (Donato, J.), Dkt. 700.

This is not a hypothetical concern. Plaintiffs have consistently sought to inject other proceedings involving Meta into this case (including FTC investigations, Meta's compliance with FTC consent orders, a U.S. House of Representatives Antitrust Subcommittee investigation, and litigation filed by State Attorneys General, and in the parties' recent meet and confer, plaintiffs refused to stipulate to excluding these not-at-issue proceedings into the trial. *See, e.g.*, Dkt. 87, Compl., ¶¶ 12, 62 & n.25, 121, 127-129, 145, 149-154, 240-241 (Apr. 22, 2021); Renewed Mot. for Class Cert., Dkt. 806 at 8:24-9:08 (May 24, 2024); Opp'n to Mot. for Summary Judgment, Dkt. 952-1, at 2, 4, 6, 18, 19, 20. Evidence of these proceedings are inadmissible under FRE 401, 402, 403, 408, and 802.

***First***, evidence of any separate litigation against Meta—including lawsuits brought by State AGs, the FTC's positions regarding the relevant market, allegedly unlawful monopoly maintenance, and Meta's market power raised in *FTC v. Meta Platforms, Inc.*, 20-cv-3590 (D.D.C.), and other litigation regarding Cambridge Analytica or any other aspect of Meta's privacy practices—should all be excluded. *In re Capacitors Antitrust Litig.*, No. 3:17-cv-07046, Dkt. 292 (N.D. Cal. Nov. 12, 2022) (Donato, J.) (excluding evidence of related civil cases); *Costco Wholesale Corp. v. AU Optronics Corp.*, 2014 WL 4674390, at *6 (W.D. Wash. Sept. 17, 2014) (excluding reference to trials regarding the same conduct at issue as irrelevant and "dangerous," emphasizing that jurors may be swayed by

evidence of other trials when awarding damages). Permitting such evidence runs the "danger" of "unfair prejudice, confusing the issues, misleading the jury, undue delay" and "wasting time," FRE 403, since the underlying factual and legal questions are not the same. This evidence would mire the parties and the Court in "a separate mini-trial" to distinguish the allegations between proceedings and to resolve disputes about the merits of those claims, "would take an inordinate amount of time and muddy the issues to be decided by the jury." *Morton & Bassett, LLC v. Organic Spices, Inc.*, 2017 WL 3838097, at *5 (N.D. Cal. Sept. 1, 2017). Evidence regarding this separate litigation—which involves different plaintiffs pleading different facts under different legal standards—has no probative value to outweigh the obvious prejudicial effects because the mere fact that Meta is engaged in other litigation involving related subject matters says nothing about the veracity of plaintiffs' claims in this case. As one example, plaintiffs should not be able to bolster their claims by pointing to the fact that the FTC has filed topically similar claims based on the shared counter-factual that Meta does not compete with firms like TikTok and YouTube. *See Costco Wholesale Corp.*, 2014 WL 4674390, at *2.

**Second**, evidence of the FTC consent orders should be excluded under Rule 408. Under the rule, "settlement ... agreements are not admissible to prove ... the validity or the amount of a disputed claim." *David Sansone Co., Inc. v. Waiaha Ridge LLC*, 2023 WL 6958813, at *2 (D. Haw. Oct. 20, 2023); *In re Static Random Access Memory Antitrust Litig.*, 2010 WL 10086747, at *3 (N.D. Cal. Dec. 16, 2010) (excluding "[r]eferences to settlements"). "'[P]roving liability for the claim[s]'" underlying these orders "is the only conceivable purpose for" introducing evidence of them. *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-cv-7789, Dkt. 1872 at 1 (S.D.N.Y. Sept. 2, 2022). Rule 408 "applies to civil consent decrees" and consent orders, because jurors may improperly infer liability therefrom. *N.J. Tpk. Auth. v. PPG Indus., Inc.*, 16 F. Supp. 2d 460, 473 (D.N.J. 1998); *see also In re Tenet Healthcare Corp. Sec. Litig.*, 2007 WL 5673884, at *2 (C.D. Cal. Dec. 5, 2007). Thus, it is "well settled that a consent judgment in a civil case, or any evidence thereof, is not admissible in a treble damage action." *Cinema Serv. Corp. v. Twentieth Century-Fox Film Corp.*, 477 F. Supp. 174, 178 (W.D. Pa. 1979). The consent orders should also be excluded on the independent ground that they are clearly prejudicial

to Meta under Rule 403. These orders are "not evidence of culpability," carry no admission of wrongdoing but may (wrongly) suggest that the plaintiffs' theories "probably or actually occurred." *U.S. Sec. & Exch. Comm'n v. Jensen*, 835 F.3d 1100, 1116 (9th Cir. 2016); *see also United States v. Pac. Gas & Elec. Co.*, 178 F. Supp. 3d 927, 948 (N.D. Cal. 2016) (conclusions from government investigation would result in jury "improperly substitut[ing] [government] findings ... for [its] own"). Plaintiffs raising these orders will inevitably import a mini-trial about the FTC's underlying legal theories into this trial and mislabel Meta as a bad actor in the eyes of the jury. And again, there is no probative value to any of this evidence.

**Third**, evidence of any matters or investigations instigated by state, federal, or international legislative or regulatory bodies—including the U.S. House of Representatives Antitrust Subcommittee investigation—and any attendant reports, should also be excluded. There is a serious danger of "unfair prejudice" to Meta because of the "undue weight that a jury is likely to attach to the official reports from Congress" or "the often inflammatory or exaggerated statements made in testimony" before investigative or regulatory bodies by officials. *Pearce v. Hutton Grp., Inc.*, 653 F. Supp. 810, 814 (D.D.C. 1987). Further, reports about or from these investigations are inadmissible hearsay if offered for their truth as they are out-of-court, unsworn statements and no applicable hearsay exception applies. FRE 802, 805, 803(8)(B). Courts have routinely excluded this type of evidence. *See, e.g., In re Tesla, Inc. Sec. Litig.*, 2022 WL 17582008, at *18-19 (N.D. Cal. Dec. 7, 2022) (concluded no hearsay exception applies to SEC complaints); *United States v. Shaw*, 2023 WL 3569992, at *2 (N.D. Cal. May 19, 2023) (excluding evidence related to civil litigation where government argued that such evidence is inadmissible hearsay); *Richmond Med. Ctr. v. Hicks*, 301 F. Supp. 2d 499, 512 (E.D. Va. 2004) (excluding House Report that "represents the political position of the representatives who voted for it"), *rev'd on other grounds*, 570 F.3d 165 (4th Cir.). For congressional reports specifically, "[g]iven the obviously political nature of Congress, it is questionable whether any report by a committee or subcommittee of that body could be admitted under rule 803[(8)(B)]" as "[t]here would appear to be too great a danger that political considerations might affect the findings of such a report." *Pearce*, 653 F. Supp. at 814. The congressional reports plaintiffs aim to introduce are precisely this kind of political report.

**PLAINTIFFS' RESPONSE TO META'S MIL NO. 1**

Plaintiffs do not seek to introduce evidence of, or judgments or settlements from, other proceedings to prove the fact that Meta is liable, nor the amount of Meta's liability. Meta's motion, however, seeks to prohibit evidence far beyond such a limit and, where it does, should be denied.

***First***, some of Meta's misrepresentations at the center of Plaintiffs' monopolization claim are Meta's promises to the market and its users that it complied with the FTC consent decrees regarding Meta's privacy and data practices (one in 2011, and another in 2019 which Meta entered into after purportedly violating the 2011 one). To assuage the market that Meta had turned the page on its prior privacy woes, Meta in 2018, for example, swore that it had not violated the 2011 FTC consent decree and had "respected the privacy settings that people had in place" because "[p]rivacy and data protections are fundamental to every decision we make." *See* Ex. A (Plaintiffs' January 18, 2023 Second Supplemental Response to ROG Nos. 6-8) at 11. In fact, internally, Meta had found it had ***not*** complied with the consent decree, and an internal Meta team recognized it "likely" would be found to have violated the decree in "multiple" respects. *Id.* at 31. Plaintiffs contend that Facebook deceived the market about its compliance with the FTC consent decree to repel competitors. And, where, as here, a defendant deceives ***about*** a consent decree, evidence of the consent decree and the defendant's related deception ***is*** admissible. *Sec. & Exch. Comm'n v. Davenport*, 2024 WL 3513011, at *2 (C.D. Cal. Apr. 29, 2024) (denying motion *in limine* to exclude evidence regarding consent decrees when offered for the purpose of "show[ing] Defendants made material misrepresentations about them" because "highly relevant," any supposed prejudice could be addressed through jury instruction).[1]

In addition, some of the statements that Plaintiffs contend were false were made in the context of the consent decree. For example, Meta CEO Mark Zuckerberg issued a public press release announcing the 2011 consent decree and, in it, subsequently promised that Meta would be "giving you tools to control who can see your information and then making sure only those people you intend

---

[1] Similarly, Plaintiffs challenge as untruthful certain statements Facebook employees made in widely publicized Congressional proceedings, such as Mr. Zuckerberg's public testimony in April 2018. To the extent Facebook's motion *in limine* demands exclusion of this material merely because these statements occurred in government proceedings, it should be denied. To do otherwise creates a perverse incentive of immunizing evidence of deception if committed in a government setting.

can see it." Ex. A at 8. Plaintiffs contend that representation was false, because, for example, such controls were ineffective. *Id.* at 23. Plaintiffs cannot be precluded from using this evidence simply because in the same statement, Mr. Zuckerberg referenced an "agreement" with "the FTC." Meta cannot object to this limited use of the consent decree when Meta's own misrepresentations are responsible for placing the decree at issue and the decree is needed context.

**Second**, there are admissible statements and documents from other proceedings that provide evidence relevant to overlapping issues in this case—*for example*, other apps and services Meta considers to be its competitors (or non-competitors). There are many such statements that may serve as impeachment if a Meta witness decides to provide different testimony in this case. Utilizing such statements can be done by providing the jury with a minimal amount of context that does not, as Meta misstates, risk a "mini-trial within the trial about the legal and factual context of those other proceedings."[2] The Rules of Evidence permit the introduction of opposing party statements and declarant-witness's prior statements where they are relevant—which necessarily includes statements from, *inter alia*, prior proceedings. *See* Fed. R. Ev. 401, 402, 801.

As some examples, Meta in this case claims Plaintiffs' proffered PSNS market is too narrow because it excludes messaging services which Meta claims it competes with. But in a prior government antitrust investigation, Meta swore that "[f]rom a user's perspective, a social networking service is not a substitute for a consumer communications service (or *vice versa*)." Ex. B (PALM-012368730) at -785. Such evidence is admissible here, as market definition is a contested issue, and industry participants' (including Meta's) contemporaneous views as to what services are or are not substitutes bears on that issue. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Plaintiffs should not be precluded from using such relevant evidence simply because it might reveal a proceeding involving Meta (which would not be the focus of Plaintiffs' questioning, and to which Meta could object). *See TravelPass Grp., LLC v. Caesars Ent. Corp.,* 2021 WL 6333018, at *1 (E.D. Tex. Oct. 18, 2021) (denying motion in limine to preclude references to FTC investigation and consent decree concerning party and documents from FTC proceeding). Meta's motion is also

---

[2]  Indeed, complete blinders to Meta's other proceedings is not possible, as many of the documents Meta produced in this case bear Bates numbers referencing Meta's other proceedings, such as "FTC."

perplexing as its exhibit list in this case contains: (a) Meta's discovery responses in the parallel *FTC* matter; (b) exhibits introduced at the depositions of non-parties taken jointly across this and the *FTC* case; and (c) a report from the European Commission regarding the Facebook-WhatsApp merger— all of which means some utterance of other Meta proceedings will undoubtedly be necessary.

Moreover, if Meta or its employees offer contradictory testimony in this case, Plaintiffs should be able to either introduce their past statement as evidence (where permitted under the Rules) or use them for impeachment. Indeed, Meta acknowledges the FTC's antitrust lawsuit against Meta raises overlapping issues, such as market definition. Many of Meta's fact and expert witnesses from that case are likely witnesses in this one too. Some of the likely Meta witnesses in this case have also testified in FTC investigations and private litigation involving Meta's privacy and data practices, and this Court compelled Meta to produce their prior deposition transcripts to Plaintiffs. Dkt. 424. To the extent these witnesses offer conflicting testimony here, Plaintiffs should be allowed to impeach them based on their prior testimony (which would necessarily require some brief mention of the prior matters against Meta). To the extent Meta's motion demands a contrary result, it should be denied.[3] *See Barker v. Yassine*, 2016 WL 4264149, at *3 (E.D. Cal. Aug. 15, 2016) (denying motion in limine regarding other lawsuits "to the extent it seeks to entirely bar evidence from other lawsuits for purposes of impeachment under Rule 801(d)(1)(A)"); *Gleason v. Franklin*, 2022 WL 18399928, at *2 (C.D. Cal. Oct. 17, 2022) (similar); *Kong v. Lopez*, 2020 WL 2404899, at *3 (C.D. Cal. Feb. 11, 2020) (allowing evidence regarding prior litigations "for purposes of impeachment").

***Third***, evidence regarding Meta's ***violation*** of the consent decrees is relevant for purposes other than using the ***fact*** of the consent decrees to show liability. *See* Fed. R. Evid. 408(b) (allowing use for "another purpose"). For example, after the 2019 consent decree, Meta employees recognized Meta was a "monopoly" and that paying the $5 billion fine was "like a speeding ticket." PALM-008231320. That shows: (a) Meta's monopoly power (Meta felt it could engage in the conduct because no competitor could effectively constrain it); and (b) motive and that data has value (the potential gains from the deception were so great that the risk was worth it to Meta).

---

[3]   Meta apparently will argue the PSNS market is "gerrymandered" and recognized by "no one." If Meta opens the door by making such argument, Plaintiffs should be permitted to respond, including with reference to the FTC's and other competition authorities' recognition of similar markets.

## MOTION *IN LIMINE* NO. 2: TO EXCLUDE EVIDENCE OR ARGUMENT REGARDING DECEPTIVE CONDUCT NOT PREVIOUSLY DISCLOSED

The Court should exclude references to alleged deception not enumerated in plaintiffs' responses to Meta's Interrogatories No. 6, 21, & 22 and Appendix C of Nicholas Economides's and Sarah Lamdan's merits expert reports. Those sources contain the full disclosure plaintiffs provided during discovery of the allegedly deceptive statements and omissions they are challenging in this case. Any references to other purportedly deceptive conduct at trial would run afoul of plaintiffs' disclosure obligations and should be excluded because they were not disclosed—and trial by surprise would unduly prejudice Meta, which based its discovery and case development on plaintiffs' disclosures.

Plaintiffs contend that Facebook engaged in a scheme to maintain monopoly power by deceiving users about its privacy and data use practices. Dkt. 952-1 at 4-5. But for over a year, plaintiffs' only support for this allegation were broad, unspecific references to deception. Seeking clarity on these allegations, Meta served plaintiffs with Interrogatory No. 6, seeking each statement or omission that plaintiffs challenged as misleading or deceptive. Plaintiffs responded with a list of allegedly deceptive statements or omissions that they were challenging. Ex. 1, Pls.' Second Supp. Resps. to Interrogs. 6, 7, 8 (Jan. 18, 2023).[4] But plaintiffs consistently purported to reserve the "right to amend or supplement" their response—which they have not done since January 18, 2023—and refused to provide a complete response to the interrogatory, maintaining that "Consumer Plaintiffs do not agree to identify every permutation or every instance of substantially similar misleading or deceptive statements or omissions that are located in different sources or made on different dates by different speakers." *Id.* at 5, 13. Plaintiffs later served responses to two other interrogatories (Nos. 21 and 22) identifying allegedly deceptive "practices" and "representations." Ex. 2, Pls.' Resp. to Meta's Fourth Set of Interrogs. (Mar. 24, 2023); Ex. 3, Pls.' Resp. to Meta's Fifth Set of Interrogs. (June 20, 2023). One of these responses was expressly caveated as "illustrative" and "non-exhaustive," and both responses contained a disclaimer that plaintiffs may amend or supplement them—which they

---

[4]   "Ex." citations reference exhibits to the Gringer Declaration filed with this motion.

never did. *Id.*

When plaintiffs served their merits expert reports in January 2024, two of those reports contained identical appendices (which the experts confirmed were provided by plaintiffs' counsel) identifying other purportedly deceptive statements and omissions. Dkt. 948-2, Economides Merits Rep. App'x C; Dkt. 857-2, Lamdan Merits Rep. App'x C. At the close of all discovery, the full list of purportedly deceptive statements and omissions plaintiffs had disclosed to Meta were contained in either their responses to Interrogatories No. 6, 21, & 22, or Appendix C to Economides's and Lamdan's merits reports.

Despite this, plaintiffs have continued to reference separate and often unspecified allegedly deceptive conduct that was not within the scope of their prior disclosures. For example, in their opposition to Meta's motion for summary judgment, they claimed that "[m]uch of" the "between *50,000 and 85,000*" statements Meta has supposedly made about its data practices were "deceptive." Dkt. 952-1 at 4-5. Trying a case on record of tens of thousands of supposed statements—the vast majority of which have never been identified to Meta—would not only be plainly unworkable, but raises the troubling prospect of trial by ambush where plaintiffs turn to undisclosed statements as the case based on the disclosed statements fails.

References to these undisclosed allegedly misleading or deceptive statements should be excluded because they violate plaintiffs' disclosure obligations. Fed. R. Civ. P. 37. "A party is not allowed to use undisclosed 'information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.'" *Medina v. Mapes*, 2025 WL 2307719, at *6 (E.D. Cal. Aug. 11, 2025). If a party fails to justify an "eleventh hour disclosure," then "the improperly withheld information should be excluded." *Ingenco Holdings, LLC v. Ace Am. Ins. Co.*, 921 F.3d 803, 821 (9th Cir. 2019) (affirming lower court's holding that plaintiff's untimely disclosure should be excluded as it "was not substantially justified, and was not harmless because it disrupted both [defendant's] and the court's schedules"). Introducing new allegations of deceptive conduct at this stage is not substantially justified and would be inconsistent with both plaintiffs' obligations under Rule 26(a) and Rule 37 and the Court's standing orders requiring timely supplementation of the parties' responses. *See Standing Order For Civil Cases Before Judge James*

*Donato* ¶24 ("Under FRCP 37(c), materials that are undisclosed or disclosed late will likely be excluded from use at trial or summary judgment unless permitted otherwise by the Court."); *Standing Order For Discovery In Civil Cases Before Judge Donato* ¶6 ("Except for good cause, no item shall be received as case-in-chief evidence if the proponent failed to produce it in response to a reasonable and proper discovery request covering the item[.]").

Permitting plaintiffs to disregard their disclosure obligations and make an eleventh-hour disclosure would harm Meta as it would cause severe prejudice and disrupt its ability to prepare an adequate defense in the manner that fact discovery in civil litigation is designed to guarantee. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292-93 (9th Cir. 2000) ("[H]aving focused on [another theory] ... [plaintiffs] cannot turn around and surprise the [defendant]" at later stages). As just one example of this prejudice, Meta would not have the ability, at this late date, to take discovery from competitors on the impact of plaintiffs' late-breaking deceptive statements, as it has done with the statements that plaintiffs previously disclosed. *See Nichols v. City of San Jose*, 2017 WL 3641833, at *2 (N.D. Cal. Aug. 24, 2017) (alternate theory before trial "would significantly prejudice [d]efendant" where defendant did not "gather evidence" related to new theory relying on plaintiff's representations); *Amini Innovation Corp. v. Anthony California Inc.*, 2006 WL 6855371, at *10 (C.D. Cal. Sept. 21, 2006) (similar). Moreover, Meta would be deprived of the opportunity to test plaintiffs' experts' opinions—and the bases and bounds of those opinions—prior to trial as to these new allegedly deceptive statements, as is its right to do.

For the foregoing reasons, the Court should grant Meta's motion and limit plaintiffs to the alleged statements and omissions claimed to be deceptive and anticompetitive as identified in their responses to Interrogatories No. 6, 21, & 22 and Appendix C of Nicholas Economides's and Sarah Lamdan's merits expert reports.

1

## PLAINTIFFS' RESPONSE TO META'S MIL NO. 2

2      Meta seeks sweeping exclusionary sanctions based on supposed discovery violations that it

3  never raised during discovery and cannot even specifically identify now. Meta's motion should be

4  denied, without prejudice to Meta's ability to raise specific objections at trial.

5      *First*, Meta's argument that Plaintiffs intend to refer to statements and omissions that Plaintiffs

6  did not properly disclose in discovery centers on a single sentence from Plaintiffs' summary judgment

7  opposition—*i.e.*, that Meta has made between "50,000 and 85,000 'commitments'" about its data and

8  privacy practices, and many were deceptive. But these numbers are admissions from Meta's ***own***

9  ***documents*** about the number of privacy commitments that Meta made, and their veracity. *See* Dkt.

10  952-1 at 4-5. Contrary to the misstatement in Meta's motion, Plaintiffs are not going to "try[] a case

11  on record of tens of thousands of supposed statements[.]" Rather, Plaintiffs intend to offer this

12  evidence ***as statistics*** to show that Meta's statements about data and privacy were numerous, and that

13  Meta has made so many statements about its privacy and data practices it has lost track of them and

14  thus cannot, despite its repeated promises to the market, guarantee users "control" over their data.

15      There can be no serious dispute this was adequately disclosed in discovery. Plaintiffs'

16  interrogatory responses explain how despite Meta's promises to the market about "control," Meta

17  internally recognized, for example, "we can't enumerate all the data we have" and "[w]e do not have

18  an adequate level of control . . . over how our systems use data, and thus, we can't confidently make

19  . . . external commitments, such as 'we will not use *X data for Y purpose*.'" Ex. K (Plaintiffs' June

20  23, 2023 Supp. Response to ROG No. 8) at 8, 16. Moreover, this was an extensive topic of questioning

21  at depositions in this case, and, indeed, the documents that are referenced in the very sentence that

22  Meta cites from Plaintiffs' summary judgment opposition were exhibits marked at deposition, cited

23  in expert reports, and used in class certification briefing. *See, e.g.*, Dkt. 952-2 (Exs. 40 & 45 to

24  Plaintiffs' opposition to Meta's summary judgment motion); Dkt. 645-1 (Plaintiffs' September 15,

25  2023 Class Cert. Mot.) at 11–12 (citing evidence that Meta is "not aware of all the commitments we

26  have made"); Ex. L (Economides Merits Rept.) ¶¶ 13, 187 & App'x C at 17 ("Facebook, itself, has

27  estimated making between 60,000 and 85,000 of these representations regarding its privacy and data

28  collection and use practices over time" but "itself did not know the full extent and contours of its data

collection and use" and "did not disclose that at least thousands of its data collection and use 'commitments' are potentially inaccurate or are incapable of being verified."). Tellingly, Meta never sought to strike the mention of these materials or Plaintiffs' related arguments from any discovery response, expert report, or class certification or summary judgment brief. Nor did Meta ever seek any new discovery based on Plaintiffs' use of these materials or Plaintiffs' arguments based on them. Meta does not and cannot show prejudice from Meta's own analysis of its privacy and data-related commitments being offered in this manner.

Meta's argument that these statements "have never been identified to Meta" makes no sense. Again, Plaintiffs are not going to "[t]ry a case on a record of tens of thousands of supposed statements[.]" And to the extent Meta is complaining about Plaintiffs' use of this statistical evidence, that was disclosed as detailed above. In any event, Meta identifies no prejudice from Plaintiffs using Meta's own admissions in this case, based on statistics that Meta itself compiled in documents that Meta itself produced, about the number of data-related statements it has made, in a case hinging on how Meta regularly misrepresented its data and privacy practices. There is none, and Meta's motion should be denied, as that is the only "issue" it even attempts to identify.

**Second**, to the extent that Meta's motion speculates that Plaintiffs at trial will use statements and omissions that materially differ from those Plaintiffs have disclosed, Meta's motion is based on conjecture and is premature. Despite Meta's vague insinuations to the contrary, Plaintiffs **do not** intend to present new and undisclosed theories at trial. Instead, Plaintiffs intend to focus their trial presentation on the statements and omissions disclosed in discovery and the existing record, like those in Plaintiffs' discovery responses, expert reports, and briefs, described in deposition, and/or which otherwise come directly from Meta's own files.

Moreover, to the extent Meta contends Plaintiffs have offered an undisclosed statement or omission, Meta can object then, and the Court can resolve that objection, with context, at that time. Indeed, any such dispute—which is, at this time, hypothetical—is better addressed on a statement-by-statement or omission-by-omission basis. As Meta acknowledges, Federal Rule 37 permits use of undisclosed materials when the non-disclosure was "substantially justified or is harmless." The Court should afford Plaintiffs an opportunity to respond to any supposed instance of non-disclosure—if

any—when it specifically arises, *i.e.*, by showing that disclosure was sufficiently made elsewhere (*e.g.*., in Plaintiffs' Complaint, one of Plaintiffs' discovery responses, Plaintiffs' expert reports, or referenced during deposition), or that Meta was not harmed by the failure to disclose because it developed a sufficient record regarding the specific misstatement anyways.

***Finally***, Meta should not be granted a sanctions windfall, over a hypothetical violation, when it failed to move to compel during discovery. Meta's motion quotes how Plaintiffs' disclosures themselves indicated they were "non-exhaustive," and Plaintiffs explicitly stated in their objections that they did not believe that describing every permutation of Meta's deceptive acts was necessary. While Plaintiffs did provide a complete disclosure of their contentions, Meta's failure to move to compel further responses counsels strongly against the drastic relief that Meta requests. *See Seal4Safti, Inc. v. California Expanded Metal Prods. Co.*, 2022 WL 2199831, at *1 (C.D. Cal. Apr. 26, 2022) (finding on a motion in limine that a party "waived any argument that Defendant insufficiently answered these interrogatories" when it "filed no motion to compel further responses"); *Susilo v. Wells Fargo Bank, N.A.*, 2012 WL 12894745, at *2 (C.D. Cal. Nov. 26, 2012) (similar).

None of Meta's cited authority supports Meta's request. In *Ingenco Holdings, LLC v. Ace Am. Ins. Co.*, the Court affirmed Rule 37 sanctions only after a party provided no disclosure whatsoever of its damages theory in its initial disclosures and interrogatories. 921 F.3d 803, 821 (9th Cir. 2019). In *Amini Innovation Corp. v. Anthony California Inc.*, the court denied an attempt to belatedly offer an advice of counsel defense when a party stated it would not offer that defense in response to an interrogatory. 2006 WL 6855371, at *10 (C.D. Cal. Sept. 21, 2006). In *Nichols v. City of San Jose*, the court did not even analyze Rule 37, but merely denied plaintiff's request to amend her complaint on the eve of trial. 2017 WL 3641833, at *2 (N.D. Cal. Aug. 24, 2017). These cases do not resemble the situation here, where any failure of disclosure is hypothetical, hyper-technical, and non-prejudicial.

For all of these reasons, Meta's motion should be denied.

## MOTION *IN LIMINE* NO. 3: TO EXCLUDE EVIDENCE OR ARGUMENT REGARDING SUBSEQUENT REMEDIAL MEASURE

The Court should preclude plaintiffs from offering any evidence or argument regarding Meta's Commitments Review process. The Commitments Review process is a voluntary measure that Meta put into place following the entry of an FTC consent order concerning alleged deceptive practices. It is designed to ensure that Meta's past and future representations to users concerning privacy are and were accurate, and to correct those that were not. It is thus straightforwardly a subsequent remedial measure under Federal Rule of Evidence 407 that cannot be offered to show "culpable conduct." Plaintiffs have made clear that they intend to do just that, and the Court should prohibit them from doing so.

Rule 407 bars the introduction of evidence concerning voluntary measures, taken after an alleged injury or harm and that "would have made [the] earlier injury or harm less likely to occur," to establish liability. FRE 407; *In re Aircrash in Bali, Indonesia*, 871 F.2d 812, 817 (9th Cir. 1989). The Commitments Review plainly meets these criteria.

*First*, Meta introduced the Commitments Review process at issue here in October 2020, after the FTC entered a consent order against it in April 2020. Ex. 4, Stefancik 30(b)(6) Tr. 16:20¬17:4. The 2020 order related to Meta's public statements regarding its data use and privacy practices, which the FTC contended were unfair and/or deceptive. *See* Compl., *United States v. Facebook, Inc.*, No. 19-cv-2184 (D.D.C. July 24, 2019), Dkt. 1; Order Modifying Prior Decision & Order, *In the Matter of Facebook, Inc.*, No. C-4365 (F.T.C. April 27, 2020).

*Second*, the Commitments Review process is designed "to make sure that [Meta's] representations to the folks who use Facebook and externally were accurate." Ex. 4, Stefancik 30(b)(6) Tr. 18:4-6; *see id.* 17:2-18. That is, the Commitments Review was intended to remediate the FTC's allegations of past deception—by updating, clarifying, deprecating, or remediating prior statements that no longer reflect the way Meta's products work, and implementing a procedure for verifying the accuracy of planned future statements. Ex. 5, Meta's Am. Supp. Resp. to Interrog. 7 at 4-5 (Jul. 10, 2023). The process entails (1) identifying Meta's "past or potential future public statements that relate to how Meta maintains privacy or security of User Data"; (2) evaluating those

statements and defining the "legal interpretation" for each Commitment, "which is a description of how Meta understands a particular Commitment may be interpreted by a reasonable consumer"; (3) providing "adequate evidence by the Implementing team to demonstrate support of the Commitment," which may include "technical and non-technical artifacts ... used to demonstrate adequate implementation of the Commitment"; and (4) verifying assembled evidence "to confirm adequate implementation." *Id.* at 3. Adherence to this process to ensure that privacy-related statements are adequately substantiated and align with Meta's practices would make any alleged past deception less likely to have occurred. Courts have routinely recognized that evidence concerning internal policy changes that address alleged past harms just like the Commitments Review cannot be admitted to show liability pursuant to Rule 407. *Williams v. J.B. Hunt Transport, Inc.*, 2025 WL 2315897, at *12 (9th Cir. Aug. 12, 2025); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-cv-7789, Dkt. 1872 at 8 (S.D.N.Y. Sept. 2, 2022) ("Closing down chat rooms that allegedly created the conditions for a conspiracy is a paradigmatic [subsequent remedial] measure" and "[t]he same goes for strengthening corporate policies").

*Third*, Meta implemented the Commitments Review process voluntarily. It "goes beyond any requirement" of the FTC's 2020 consent order. Ex. 5, Meta's Am. Supp. Resp. to Interrog. 7 at 4 (Jul. 10, 2023). For example, it requires "exhaustive historical search[es]" for prior statements to ensure any such statements "that may no longer reflect the way the company's products presently work are deprecated," which the 2020 Consent Order does not require. *Id*. The Commitments Review process also requires Meta to take the extra step to "vet every single public statement that [Meta] makes related to user data" for accuracy prior to release. *Id.* at 4-5. In short, nothing in the FTC's order required Meta to adopt the Commitments Review process.

Plaintiffs have made clear they intend to offer evidence concerning the Commitments Review process to show that Meta has engaged in culpable conduct. This is impermissible and should be precluded. Plaintiffs rely on the results of the Commitments Review process in an attempt to show deceptive conduct by Meta—and, under plaintiffs' theory—harm to competition. *See, e.g.*, Dkt. 794-1 at 9 ("Facebook has internally confirmed both the existence of and ubiquity of its misstatements" and alleging that "Facebook has identified *thousands* of public commitments regarding its data

practices as inaccurate or otherwise incapable of verification"); Dkt. 952-1 at 4-5 (claiming that "much of" "50,000 [to] 85,000 'commitments'" identified through Commitments Review were deceptive). This is exactly the type of evidence and argument Rule 407 is intended to bar, lest "prospective defendants ... forego ... improvements because they fear that these improvements will be used against them as evidence of their liability." *In re Aircrash*, 871 F.2d at 816. Evidence regarding the identification, review, and (where necessary) deprecation, clarification, or remediation of prior statements cannot be admitted to show deception. *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1417 (9th Cir. 1986) ("[I]nvestigation and measures taken by the defendant ... were remedial measures taken after the incident."); *see also Mahnke v. Wash. Metro. Area Transit Auth.*, 821 F. Supp. 2d 125, 151-52 (D.D.C. 2011) (similar).

Because evidence concerning the Commitments Review process cannot be offered to show liability—and because plaintiffs have proffered no other purpose for which such evidence could be validly offered—the Court should exclude any evidence concerning Meta's Commitments Review process.

1    <u>**PLAINTIFFS' RESPONSE TO META'S MIL NO. 3**</u>

2         Meta's motion is based on the mistaken premises that: (1) its "Commitment Review" is a

3    "subsequent remedial measure"; and (2) that any evidence of a "subsequent remedial measure" is

4    automatically inadmissible for all purposes. Neither is true, and Meta's motion should be denied.

5         ***First***, Meta's "Commitments Review" is not a subsequent remedial measure under Rule 407.

6    Rather, it is the result of Meta's investigation into whether it had collected and used users' data

7    contrary to what it had publicly "committed."

8         In 2019, Meta began investigating and reviewing the historical statements it had made

9    regarding its privacy and data practices. The goal of this process, known as "Commitments Review,"

10   was "to identify and investigate statements we have made through public statements, marketing

11   materials, and in our products that describe our data practices and limit our future options." Ex. C

12   (Stefancik 30(b)(6) Tr.) at 35:20-36:5. Meta's internal investigation of its own conduct is not an

13   inadmissible subsequent remedial measure under Fed. R. Evid. 407, and to hold otherwise would

14   effectively preclude use of any evidence regarding a corporate audit or internal investigation. The law

15   is to the contrary.[5] *Gray v. Golden Gate Nat. Recreational Area*, 866 F. Supp. 2d 1129, 1141 (N.D.

16   Cal. 2011) ("a self-analysis of deficiencies" does not qualify as a subsequent remedial measure);

17   *Hansen v. Werner Enters. Inc.*, 2016 WL 7479349, at *4 (C.D. Cal. May 18, 2016) (Rule 407 "does

18   not apply to Defendants' internal investigations or reports created in the process of <u>determining</u> the

19   appropriate remedial actions"); *Rigsbee v. City & Cnty. of Honolulu*, 2019 WL 1102496, at *2 (D.

20   Haw. Mar. 7, 2019) ("Fed. R. Evid. 407 does not preclude post-incident investigations and reports.");

21   *Kingston v. Int'l Bus. Machines Corp.*, 2021 WL 1158191, at *3 (W.D. Wash. Mar. 26, 2021)

22   ("subsequent remedial measures include only the actual remedial measures themselves and not the

23   initial steps toward ascertaining whether any remedial measures are called for").

24         To the extent that Meta contends that, as a ***consequence*** of the Commitments Review process,

25

26   ─────────────
     [5]   Meta's own motion confirms that Commitments Review was an investigative effort that, at most,
27   preceded later remedial measures. Meta acknowledges the core process it undertook was
     "identifying" its past statements, "evaluating those statements" and how they were likely to be
     interpreted, compiling "evidence" regarding the statements' implementation, and then "verifying"
28   that evidence. These steps all are all classic elements of a corporate investigation into how Meta's
     past statements actually align with its practice.  None of these steps "remediates" anything.

─────────────

Meta sometimes "deprecated" certain prior statements (*e.g.*, took them down from its website), that does not transform the Commitments Review into a remedial measure either. *See Hansen*, 2016 WL 7479349 at *4 ("Defendants' internal investigations or reports created in the process of <u>determining the appropriate remedial actions</u>" are not within the scope of Rule 407) (emphasis in original). Indeed, Meta's corporate representative on its Commitments Review, Mr. Stefancik, was clear that these actions were highly individualized and took place ***outside*** of the normal Commitments Review effort. Rather, when Meta identifies a commitment that it believes requires remediation, Meta "consult[s]" with others and "make[s] the appropriate changes," which are analyzed and decided upon "depending on the commitment." Ex. C (Stefancik 30(b)(6) Tr.) at 80:25-81:19.

Meta also argues that Commitments Review should be excluded because it was done "following" Facebook's FTC consent decree. If anything, that favors ***admission***, not exclusion. As an initial matter, while Meta asserts it "introduced the Commitments Review process at issue here in October 2020, after the FTC entered a consent decree against in April 2020," its Commitments Review designee actually testified the process began "sometime in 2019 and then was expanded beyond that." Ex. C (Stefancik 30(b)(6) Tr.) 23:4-14. Similarly, Michel Protti, one of Meta's Chief Privacy Officers, testified he "initiated in 2019" the effort to "build this inventory" of Meta's past representations. Protti Tr. 75:3-21. It does not follow, then, that Commitments Review, which predated the entry of the FTC order, is in response to that order. *See In re Aircrash*, 871 F.3d at 816 (Meta's cited case, explaining that a report that was "many months in the making" and "dated only one day after" crash is "not a response to the crash" so as to be a "subsequent remedial measure").

Moreover, even if Meta—in whole or in part—initiated or implemented Commitments Review in response to an FTC investigation and order, that, too, favors admission. Meta asserts that "nothing in the FTC's order required Meta to adopt the Commitments Review process," so it was "voluntary," and thus qualifies as a subsequent remedial measure. That is dubious. Meta's 2012 and 2020 FTC consent decrees require Facebook to "maintain" information bearing on "all widely disseminated statements" regarding the extent to which Meta "maintains and protects the privacy, security, and confidentiality" of its users' data. *In re Facebook, Inc.*, 2012 FTC LEXIS 135, *13; *In re Facebook, Inc.*, 2020 FTC LEXIS 80, *46. Moreover, Meta's contemporaneous documents

indicate for example, that: (a) in connection with an "FTC Implementation Working Session," Meta was working on "the Commitment Tracker," and (b) "the FTC Assessor" imposed a "deadline" regarding Commitment Review. Ex. D (PALM-009847296); Ex. E (PALM-017042708). All of this indicates Meta's effort to inventory its (mis)statements was compelled by the FTC consent decree(s). Meta's own cited case, *In re Aircrash*, confirms "Rule 407 is not implicated" where "the defendant did not voluntarily participate." 871 F.2d at, 817. Even if the Court were to credit Meta's self-serving interrogatory response that Commitments Review "goes beyond any requirement of the FTC's 2020 consent order," that is of no moment. Its Commitments Review was not truly or completely "voluntary," and thus does not fall within Rule 407's scope.[6] *See United States v. Pac. Gas & Elec. Co.*, 178 F. Supp. 3d 927, 952–53 (N.D. Cal. 2016) (rejecting defendant's "voluntariness" argument; where government agency "heavily involved in requiring" changes after incident, defendant's subsequent efforts "anything but voluntary" and "therefore fall outside the scope of Rule 407").

**Second**, even if Commitments Review qualified as a "subsequent remedial measure" (it does not), that "do[es] not render" all Commitments Review evidence "inadmissible for *all* purposes." *Davenport*, 2024 WL 3513011, at *3 (emphasis in original). Indeed, Rule 407 itself makes clear that such evidence may be admitted "for another purpose[.]" *See* Fed. R. Evid. 407. Aside from matching up whether Facebook later determined earlier individual statements were true or false, there are such other purposes here. These include establishing: (1) the number of data-related statements Meta made over time; (2) Meta's general (in)ability to inventory all of its statements; and (3) statements about data and privacy are competitively important (why else would Meta make so many).

---

[6] Meta's cited cases are inapposite. *In re Aircrash* **affirmed** the admission of the at-issue reports. 871 F.3d at 817. *Williams v. J.B. Hunt Transp., Inc.*, involved the plaintiffs' attempt to introduce its cell phone reimbursement policy **after plaintiffs' very lawsuit** was filed, 2025 WL 2315897, at *12 (9th Cir. Aug. 12, 2025), but the Commitments Review effort here is not Meta's change vis-à-vis this lawsuit. Moreover, none of *Williams*, *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, *Maddox v. City of Los Angeles*, or *Mahnke v. Washington Metro. Area Transit Auth.*, involved a private defendant's "involuntary" investigation in response to a government order; in fact, *Maddox* and *Mahnke* were cases **against** the government and involved those agencies' internal disciplinary processes. *See* 2025 WL 2315897, at *12; 2022 WL 4087842, at *4 (S.D.N.Y. Sept. 6, 2022); 821 F. Supp. 2d 125, 150 (D.D.C. 2011); 792 F.2d 1408, 1417 (9th Cir. 1986).

## MOTION *IN LIMINE* NO. 4: TO PRECLUDE PLAINTIFFS FROM INTRODUCING PUBLIC REPORTING ON UNDERLYING EVENTS FOR THEIR TRUTH

This Court should preclude plaintiffs from introducing public reporting on events related to their allegations for the truth of the matters asserted in those reports. FRE 802, 805. Plaintiffs' claims involve conduct covered by the press, and despite years of expansive party and non-party discovery, plaintiffs continue to rely on news reports to advance their case. Plaintiffs should be precluded from using this reporting to evade the burden of proving their allegations with competent evidence. This is a straightforward application of hearsay rules. Unfortunately, however, Meta is compelled to seek a pre-trial instruction as to the application of those rules because of how plaintiffs have litigated this case and their unwillingness to stipulate to basic applications of Rule 802 and Rule 805.

Plaintiffs' Complaint cites more than forty articles from publications like *The New York Times*, *CNN*, and the *Wall Street Journal*, ostensibly to substantiate events underlying dozens of allegations about Meta's market position and anticompetitive conduct. *See, e.g.*, Dkt. 87, Compl., at nn.3, 7, 22, 34, 38-39, 44, 51, 56, 63, 80, 87-88, 95-97, 100, 104, 106, 110, 112, 114-115, 119, 125-26, 137, 142, 144, 156-157, 159-160, 163, 165, 172-174, 177-179, 181-183, 185, 188-189. The merits of this approach as a pleading tactic aside, over four years later, at this late stage of the case, plaintiffs are *still* relying on public reporting—rather than facts adduced in discovery—to substantiate their claims. Plaintiffs' initial motion for class certification, for example, cited at least ten news articles, including several *New York Times* articles cited in their Complaint. *See* Dkt. 645-1 at 10, 15. And their summary judgment opposition brief, filed in May of this year, continues to cite news reports, including to bolster allegations of purported "new instances of deception." Dkt. 952-1 at 24-25; *see also id.* at 6.

But in the Ninth Circuit, "[n]ewspaper articles are classic hearsay and, in a court of law, cannot be relied upon for the truth of the statements made therein." *Musk v. OpenAI, Inc.*, 769 F. Supp. 3d 1017, 1026 (N.D. Cal. 2025); *Asetek Danmark A/S v. CMY USA, Inc.*, 2014 WL 12644295, at *2 (N.D. Cal. Nov. 19, 2014) ("Statements reported in magazine articles and newspapers are hearsay if offered to prove the truth of the matter asserted."); *Persian Gulf Inc. v. BP West Coast Products LLC*,

1    632 F. Supp. 3d 1108, 1132 (S.D. Cal. 2022) (applying the rule against hearsay to blogs). No

2    applicable hearsay exception applies. Thus, the articles are inadmissible.

3        Further, plaintiffs have not identified any valid basis to introduce these materials—despite

4    Meta diligently seeking clarification or explication during a recent pre-trial meet-and-confer between

5    the parties. They have provided no reason to believe that these reports are relevant, accurate,

6    objective, or otherwise probative of any issue. Plaintiffs also offer no reason to believe that the

7    introduction of news reports—drafted by parties with no relevance to and no first-hand knowledge of

8    the facts of this case—would avoid unfair prejudice, confusion, or wasted time. Again, this is a

9    straightforward application of the hearsay rules; newspaper articles—classic out of court

10   statements—may not be offered to a jury to prove the truth of the matters asserted. It is regrettable

11   that plaintiffs are forcing motion *in limine* practice over this issue.

12        The Court should grant Meta's motion.

1

## PLAINTIFFS' RESPONSE TO META'S MIL NO. 4

2       Meta broadly moves to preclude Plaintiffs from "introducing public reporting on events

3   related to their allegations." Its motion is premature and should therefore be denied, without prejudice

4   to Meta raising objections to specific documents if and when Plaintiffs seek to introduce them at trial.

5       As an initial matter, Meta's request for a blanket order is improper. Notably, Meta does not

6   actually identify any specific article, post, blog, or other specific source it actually seeks to exclude.

7   That is why, when the parties met-and-conferred, Plaintiffs suggested that Meta's objection is better

8   dealt with on an exhibit-by-exhibit basis, by reference to: (a) particular exhibits; and (b) the particular

9   purposes for which each exhibit might be offered. Meta refused and insisted on bringing this motion.

10      To be clear, there are many permissible purposes for which "public reports" (or portions of

11  them) may be introduced in this case.[7] For example, much of the at-issue reporting contains opposing

12  party admissions from Meta and its employees—such as op-eds or quotations from Mr. Zuckerberg.

13  These are some of the very statements that Plaintiffs contend are deceptive. And, even though they

14  appear in public reporting, these statements themselves are exempt from hearsay rules, including as

15  party-opponent admissions under Rule 801(d)(2). *See Alley v. Cnty. of Pima*, 2024 WL 1908965, at

16  *17 (D. Ariz. May 1, 2024) (defendant employee's statements in "media segments and newspaper

17  articles," such as "statements made to 60 Minutes," were "non-hearsay opposing party statements");

18  *McDaniel v. City of Indianola, Mississippi*, 2018 WL 4924014, at *2 (N.D. Miss. Oct. 10, 2018)

19  (defendant employee's "letter to the editor" admissible under Rule 801(d)(2)).

20      In addition, a number of likely exhibits reflect Meta's (and its employees') internal discussions

21  of, and responses to, public reporting. In such circumstances, evidence regarding the public reporting

22  is not necessarily being introduced for the truth of the reporting, but rather to show, for example: (a)

23

24  ---
[7]   Meta apparently agrees. While Meta contends Plaintiffs improperly intend to "rely on news reports"

25  to "advance" claims "about Meta's market position and anticompetitive conduct," Meta's own exhibit
    includes many such analogous documents. For example, Meta's exhibit list includes multiple articles

26  on "The Verge" blog related to Facebook and Instagram supposedly becoming more like TikTok,
    ostensibly in support of Meta's market definition arguments. Similarly, Meta's exhibit includes

27  multiple articles on "TechCrunch" related to Facebook's purported privacy efforts, apparently to
    support Meta's arguments that it did not engage in deception. And while Meta's motion calls out
    Plaintiffs' supposed reliance on articles from CNN, The New York Times, and The Wall Street

28  Journal, Facebook's own exhibit list includes multiple articles from those newspapers (among others).

---

the significant responses the sources triggered on Meta's part, including private and public statements made by Meta and changes to Meta's policies and procedures; and (b) and for the effect they had on Meta and its employees. *O'Hailpin v. Hawaiian Airlines, Inc.*, 2025 WL 1549442, at *4 (D. Haw. May 30, 2025) (news articles are admissible "to show the effect on the listener[,]" including where there is evidence "the information [in the article] formed part of the reason why Defendants implemented" certain policies).

Refreshing a witness's recollection and impeachment are additional, permissible reasons why public reporting evidence may be introduced. For example, if a Meta witness purports to forget a particular event or statement, a public report can be used with the witness to remind them. *See Boyd v. City of Oakland*, 458 F. Supp. 2d 1015, 1050 (N.D. Cal. 2006) (newspaper article properly used to ask witness "whether he made" statements "to the reporter"); *Mayes v. Bartlett*, 2012 WL 1965678, at *9 (D. Or. Apr. 13, 2012) (evidence "not presented for its truth, but rather to refresh [witness's] recollection" is "not hearsay"). Similarly, if a Meta witness claims that a particular event did not occur or that a statement was not made, they can be cross-examined using the public source. *See United States v. Miller*, 874 F.2d 1255, 1271 n.9 (9th Cir. 1989) ("statement" that is "offered only for impeachment" and "not for the truth of the matter asserted" is "not hearsay").

Plaintiffs submit that the prudent course is to deny Meta's motion without prejudice. If and when Plaintiffs seek to introduce a particular "public reporting" exhibit, Meta can object, and the Court can resolve the objection by considering that specific exhibit, its context, and the purpose for which it is being offered. For now, Meta's motion is premature, overbroad, and unnecessary.[8] *See Salem Water Users Ass'n, Inc. v. City of Benton*, 2001 WL 36386246, at *2 (E.D. Ark. Aug. 28, 2001) (denying motion *in limine* regarding "newspaper articles" without prejudice because "[t]he Court will be in a petter position to determine the articles' admissibility . . . at trial").

---

[8]    Meta's cited authorities do not help it. Two of the three cases do not even address motions *in limine*, and they favor Plaintiffs' approach, not Meta's, because they resolve specific objections to particular documents on a document-by-document basis. *See Musk v. OpenAI, Inc.*, 769 F. Supp. 3d 1017, 1026 (N.D. Cal. 2025) (preliminary injunction; addressing three specific news articles); *Persian Gulf Inc. v. BP W. Coast Prods. LLC*, 632 F. Supp. 3d 1108, 1132 (S.D. Cal. 2022) (summary judgment; addressing objection to one specific blog post). The one that does address a motion *in limine denies* it, recognizing that "articles" can properly be introduced for "a non-hearsay purpose." *Asetek Danmark A/S v. CMI USA, Inc.*, 2014 WL 12644295, at *2 (N.D. Cal. Nov. 19, 2014).

## MOTION *IN LIMINE* NO. 5: TO PRECLUDE PLAINTIFFS FROM INTRODUCING EVIDENCE OR ARGUMENT REGARDING INFLAMMATORY AND IRRELEVANT MATTERS

This Court should preclude plaintiffs from introducing evidence and argument—or attempting to elicit testimony from fact or expert witnesses—concerning highly inflammatory matters that are legally irrelevant to this case. In particular, plaintiffs should be barred from attempting to draw purported connections between Meta's services and mental health issues or child sexual abuse material. There is no basis in the record for such inflammatory and prejudicial matters, but plaintiffs refuse to agree not to raise these topics at trial. Doing so would serve no purpose other than to sidetrack this case—miring it in mini-trials over the steps Meta takes to combat policy-violating content on its apps—and baselessly incite the jury's hostility towards Meta, while forcing Meta to waste valuable trial time addressing accusations with no support in the record and no bearing whatsoever on plaintiffs' claims.

Meta did not anticipate needing to file this motion. In the over four-and-a-half years of this case, plaintiffs have never raised any alleged connections between Meta's services and users' mental health or child sexual abuse material and have not adduced any evidence on the subject. Presumably because this is an antitrust case concerning whether Meta maintained a monopoly through misrepresentations about data privacy. The relevant issues are whether Meta has monopoly power, whether the challenged conduct harmed competition, and whether the plaintiffs were injured as a result. Any supposed relationship between Meta's services and mental health or child sexual abuse has no bearing on any of those issues. Evidence on these topics is therefore irrelevant, plainly prejudicial, and not admissible. *See Mech. Mktg., Inc. v. Sixxon Precision Mach. Co., Ltd.*, 2016 WL 7740506, at *2 (N.D. Cal. Mar. 24, 2016) ("Irrelevant evidence is not admissible."). As part of the pre-trial filings preparation process, Meta proposed a stipulation to plaintiffs precluding evidence on these topics. Without explanation, plaintiffs refused, requiring Meta to seek a ruling *in limine* from the Court.

Meta would be severely prejudiced by any such evidence or argument. Unfairly prejudicial evidence is that which has "an undue tendency to suggest decision on an improper basis, commonly,

though not necessarily, an emotional one." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). Few topics are as emotionally charged as the sexual exploitation or the mental wellbeing of children. *See, e.g.*, *United States v. Ham*, 998 F.2d 1247, 1252 (4th Cir. 1993) (recognizing that "no evidence could be more inflammatory or more prejudicial than allegations of child molestation"). Injecting these issues into an antitrust trial would serve no legitimate purpose in this case, and would inflame jurors' emotions, distract from the facts, and invite speculation about Meta's culpability in acts with no connection at all to plaintiffs' claims. *See United States v. Schuette*, 2023 WL 163490, at *3 (N.D. Cal. Jan. 11, 2023) (excluding material about child exploitation "given its inflammatory nature").

Such evidence promotes ill will against Meta without any probative value, creating "a serious risk that the jury would be drawn to" hold Meta liable "based on some perceived and repeated danger to the public" and "tempt[ing] jurors to punish [Meta] for that" rather than neutrally evaluating the facts of this case. *United States v. Pac. Gas & Elec. Co.*, 178 F. Supp. 3d 927, 966 (N.D. Cal. 2016). And even if plaintiffs could articulate some legitimate purpose for which such evidence could be offered—which they have never done—any probative value would be far outweighed by the serious risk that these highly attenuated topics could "lure the fact finder into declaring guilt on a ground different from proof specific to the offense" alleged. *Old Chief*, 519 U.S. at 180; *see also Tennison v. Circus Circus Enterprises, Inc.*, 244 F.3d 684, 690 (9th Cir. 2001) (affirming exclusion of evidence that "would create a significant danger that the jury would base its assessment of liability on remote events"). It would also create a sideshow of trials-within-a-trial about the adequacy of Meta's efforts to eliminate abusive content, which has nothing to do with whether it violated the antitrust laws. *See, e.g.*, *Carroll v. Trump*, 124 F.4th 140, 176-177 (2d Cir. 2024) (per curiam) (finding no abuse of discretion in excluding evidence that would create "a trial within a trial" that would result in "unfair prejudice" and "wasting time"); *White v. United States*, 148 F.3d 787, 792 (7th Cir. 1998) (finding no abuse of discretion in exclusion of eight trial witnesses whose testimony "had the clear potential to develop into a trial within a trial"); *Ricketts v. City of Hartford*, 74 F.3d 1397, 1414 (2d Cir. 1996) (finding no abuse of discretion "in determining that a trial within a trial ... would have been more confusing than helpfully probative").

Accordingly, any evidence or argument purporting to draw a connection between Meta's services and users' mental health or child sexual abuse material—or any other similar inflammatory and irrelevant matters—has no place in this trial and should be excluded.

## **PLAINTIFFS' RESPONSE TO META'S MIL NO. 5**

Meta seeks to preclude evidence or argument regarding "connections between Meta's services and mental health issues or child sexual abuse material." Meta's motion should be denied. Plaintiffs do not intend to introduce evidence regarding "mental health issues" (which Plaintiffs told Meta during the parties' meet-and-confer). Plaintiffs likewise do not intend to introduce evidence regarding "child sexual abuse material," but Meta has, however, put those matters, including the collection and use of data from and about children, at issue through its experts' opinions, and Plaintiffs must be given the opportunity to respond to those sorts of arguments in kind if Meta opens the door.[9]

**First**, Meta's request to preclude evidence or argument regarding "connections between Meta's services" and "mental health issues" should be moot. During the parties' meet-and-confer, Plaintiffs asked Meta to identify what it was that Meta sought to preclude as to "mental health issues." For example, Plaintiffs asked Meta if Meta was concerned that Plaintiffs were going to raise issues like those at play in *In re Social Media Adolescent Addiction/Personal Injury Products Liability. Litigation*, involving allegations that Meta "developed and implemented features that it knows induce young users' extended, addictive, and compulsive use of social media" and that those features may result in suicide, self-injury, or mental health issues among those young users. 753 F. Supp. 3d 849, 867–73 (N.D. Cal. 2024). Plaintiffs were clear: if that is Meta's concern, Plaintiffs do not intend to present such evidence or argument, unless Meta opens the door.

**Second**, Meta's request to wholesale preclude evidence or argument regarding a link between Meta's services and "child sexual abuse material" should be rejected. To be clear, as Plaintiffs told Meta during the parties' meet-and-confer, Plaintiffs do not intend to affirmatively offer evidence or argument regarding "child sexual abuse material" or the extents to which Meta's services invite such material. However, Meta has signaled its potential to put such matters at issue, including through

---

[9]   Meta's motion is styled as one to broadly preclude "evidence and argument . . . concerning highly inflammatory matters" but then proceeds to only identify "mental health issues" and "child sexual abuse material." Plaintiffs therefore address those two specific topics. If there are other supposedly "highly inflammatory matters" that Meta seeks to exclude, Meta has not identified them, and they are thus not properly the subject of Meta's present motion. It bears noting that Plaintiffs proposed a mutual stipulation that would bar evidence of any party's "intimate or personal life details," but Meta refused, requiring Plaintiffs to seek relief through their own motion *in limine*.

1    Meta's own experts. For example, Dr. Dennis Carlton and Anindya Ghose (if allowed to testify) each

2    apparently plan to counter Plaintiffs' theory that Myspace was harmed by Meta's data-related

3    deception by arguing that Myspace instead failed because it was a "cesspool" for "obscene and

4    offensive images and messages" and "a predator's dream come true." Ex. F (Ghose Merits Rept.) ¶¶

5    261–62; Ex. G (Carlton Merits. Rept.) ¶ 36. Moreover, Ghose further plans to testify that Meta's

6    privacy and data practices are superior to other companies', specifically pointing to the supposed

7    failures of TikTok, Google, and YouTube when it comes to the proper collection and use of children's

8    data. Ex. F (Ghose Merits Rept.) ¶¶ 303–04. If Meta opens the door by offering such evidence or

9    argument, Plaintiffs must be given the opportunity to respond in kind, including as to Meta's track

10   record on these issues.

## MOTION *IN LIMINE* NO. 6: TO PRECLUDE PLAINTIFFS FROM OFFERING EVIDENCE OR ARGUMENT ON INJURY OR DAMAGES THEORIES NOT PREVIOUSLY DISCLOSED, CONTRADICTED BY THEIR PRIOR STATEMENTS TO THE COURT, OR DISCLAIMED

The Court should preclude plaintiffs from offering evidence or argument on injury or damages theories that they failed to disclose or previously disclaimed. Thus, plaintiffs should be barred from offering evidence or argument to support the theory, raised for the first time in their opposition to Meta's April 28, 2025 Motion for Summary Judgment and Motion to Exclude Economides, that plaintiffs were harmed because there would have been a "better" version of Facebook (with perhaps unspecified different features or something else plaintiffs do not identify) absent the allegedly anticompetitive conduct. *See* Dkt. 952-1 at 8 (claiming Economides's "merits report explains that ... consumers were also harmed because they could have received better quality ... and increased choice[.]"); Dkt. 948-1 at 7 (similar).

This theory was invented only after the Court granted Meta's *Daubert* motion and denied class certification. Indeed, until the Court's ruling, Professor Economides had testified under oath that there was no quality-related injury. The Court's standing orders are very clear that "materials that are undisclosed ... will likely be excluded from use at trial[.]" *Standing Order For Civil Cases Before Judge James Donato* ¶24; *see also Standing Order For Discovery In Civil Cases Before Judge Donato* ¶6 ("Except for good cause, no item shall be received as case-in-chief evidence if the proponent failed to produce it in response to a reasonable and proper discovery request covering the item[.]"). Parties may not raise new claims or theories at trial that were not asserted "in any filing prior to [their] opposition to [a] Motion for Summary Judgment." *Masimo Corp. v. Tyco Health Care Grp.*, 2004 WL 5907538, at *13 (C.D. Cal. June 10, 2004). That law squarely governs here and bars plaintiffs' last-minute, novel injury and damages theory.

Until their summary judgment and *Daubert* oppositions were filed on May 11, 2025, plaintiffs had advanced a single theory of injury and damages: absent the alleged deception, Meta would have paid all users the made-up figure of $5 per month. *See* Dkt. 848, Hr'g Tr. 4:9-14 (Oct. 31, 2024) ("[T]he antitrust injury for the users is a reduction in the level of compensation that would have been

paid to all users."); Ex. 6, Pls.' First Am. Rule 26(a)(1) Disclosures at 13-14 (Aug. 24, 2021) (basis for plaintiffs' damages estimates was "reports indicating that Facebook has, itself, calculated a market price at which to pay users for their data ... and publicly-available articles regarding the rates at which other companies compensate users for their data."); Ex. 3, Pls.' Resp. to Fifth Set of Interrogs. at 48 (Jun. 20, 2023) (damages are "the difference between the compensation that Facebook actually provided for the data that Facebook collected ... and the compensation they should have received for that data in a competitive world. That compensation could have taken the form of either direct monetary payments, or in-kind consideration.").

Plaintiffs and their putative injury and damages expert Economides never advanced the theory that Meta's conduct led to reduced quality. Indeed, Economides consistently confirmed that his only theory of injury and damages was reduced payment to users, while expressly disclaiming any opinion based on a theory about product quality. Dkt. 794-2, Economides CC Rep. ¶13 ("[C]onsumers in the but-for world would be offered monetary (or equivalent) compensation for their data[.]"); Dkt. 959-2, Economides 9/23 Tr. 101:19-25 ("paying users and not making deceptive statements and omissions" are "the crucial two dimensions" of competition in the but-for world); *id*. at 102:5-16 ("Q. So in your but-for world, Facebook could have responded to more competition by offering better services instead of paying users; correct? A. Not correct. ... Q. And in your but-for world, it's guaranteed that Facebook would be paying users? A. Yes, it is guaranteed[.]"); *see also* Dkt. 929-2, Farrell 3/24 Tr. 119:10-13 ("Q. Are you offering any opinions with regard to the product quality of the Facebook apps? A. The level of product quality? No, I'm not.").

Whatever the practical necessity of plaintiffs' eleventh-hour invention after the Court's class certification decision, it has no basis in the record and substantially prejudices Meta. *See* Fed. R. Evid. 403. Courts regularly refuse to allow parties to change their theory of the case in the later stages of litigation. *See, e.g., Nichols v. City of San Jose*, 2017 WL 3641833, at *2 (N.D. Cal. Aug. 24, 2017) (alternate theory before trial "would significantly prejudice [d]efendant"); *Amini Innovation Corp. v. Anthony Cal. Inc.,* 2006 WL 6855371, at *10 (C.D. Cal. Sept. 21, 2006) (similar). "Rules 26(a) and 37(c) work in tandem 'to allow parties to prepare their cases for trial and to avoid unfair surprise.' Rule 26(a) requires parties to make certain pretrial disclosures of relevant ... evidence while Rule

37(c) provides an enforcement mechanism by requiring courts to exclude undisclosed ... evidence 'unless the failure [to] disclose was substantially justified or harmless.'" *San Francisco Baykeeper v. City of Sunnyvale*, 2025 WL 1616643, at *3 (N.D. Cal. June 6, 2025). The failure to disclose here is far from harmless. Permitting plaintiffs to offer evidence of the "product quality theory" at this stage would result in unfair surprise. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292-1293 (9th Cir. 2000) ("[H]aving focused on [another theory] ... [plaintiffs] cannot turn around and surprise the [defendant]" at later stages).

That prejudice would be significant here because, for roughly four and a half years, Meta litigated this case based on plaintiffs' representations that they were pursuing only a payments-based injury theory. As a result, Meta did not conduct discovery on the then- (and still-) undisclosed bases for plaintiffs' claimed change in quality—let alone how a supposed reduction in quality of Meta's products, which are offered for free and in unlimited quantities, would cause a quantifiable economic injury to plaintiffs. It would be unfair to allow plaintiffs to change the fundamental element of their case weeks away from trial, when Meta has not been afforded the opportunity to build a defense to plaintiffs' reinvented theory of the case. The Court should grant Meta's motion.

<u>**PLAINTIFFS' RESPONSE TO META'S MIL NO. 6**</u>

Meta's motion in *limine* to preclude evidence or argument regarding supposedly undisclosed or "disclaimed" damages theories should be denied. The relief Meta seeks is not properly sought by *motion in limine*. Even if it were, Meta is simply wrong that there is any non-disclosure of Plaintiffs' damages theories, including Plaintiffs' theory that increased competition in the but-for world would have led to Facebook to offer higher quality services or collect less data.

**First**, Meta's motion *in limine* is a rehash of its not-yet-ruled-upon motion for summary judgment. *See* MSJ at 5–6. But as this Court has made clear, "[m]otions in limine may not request that a . . . damages claim . . . be excluded on legal grounds" and "are not substitutes for summary judgment or other dispositive motions[.]" *DZ Reserve v. Meta Platforms, Inc.*, Case No. 18-cv-4978-JD (N.D. Cal.), Dkt. 478; Standing Order for Civil Jury Trials Before Judge James Donato, ¶ 6. This alone is sufficient grounds to deny Meta's improper motion.

**Second**, there is no non-disclosure of Plaintiffs' damage theories. Plaintiffs' theory, as is evident in their consolidated complaint, has always been that "[a]bsent Facebook's anticompetitive scheme, fair competition would have required Facebook to provide consumers **greater value** in return for consumers' data[.]" Dkt. 87 ("CC") ¶ 10. Plaintiffs' primary theory is that value would have likely taken the form of cash, or cash-equivalent (such as points). But Plaintiffs have for years also contended, as is again clear from their consolidated complaint, that increased value could have alternatively taken the form of "**non-price attributes such as data privacy practices**" and "**quality**," like "**superior product features**," "**options regarding data collection and usage practices**," or even **not** "**having to surrender as much personal data to Facebook**," "resulting in a **better Facebook or better alternatives**[.]" CC ¶¶ 223–228.

Meta's assertion that Plaintiffs "never advanced" these alternative theories until May 11, 2025—when Plaintiffs filed their summary judgment and *Daubert* oppositions—makes no sense. These theories appear on the face of Plaintiffs' consolidated complaint, **filed almost four years prior** in April 2021. Moreover, if, as Meta misstates, Plaintiffs did not offer these theories until May 2025, then the Court could not have acknowledged them in its January 2022 order denying Meta's motion to dismiss. But the Court did, crediting Plaintiffs' allegations that "had Facebook not eliminated

competition . . . Consumers would have been able to select a social network" with "***options***" regarding "***content displayed, quantity and quality of advertising***, and "***data collection and usage practices***," such as "***without having to surrender as much personal data***[.]" Dkt. 214 at 68.

Meta's "citations" miss the mark. For example, Meta references Plaintiff counsel's statement during the October 31, 2024 class certification hearing that "the antitrust injury . . . is a reduction in the level of compensation that would have been paid to all users." But Meta omits Plaintiff counsel's statement at that same hearing that Plaintiffs' complaint and experts explain the compensation "could have taken different forms" such as "more cash," "better product" or "less data extracted," and "all of those things should have similar value to a person in a transaction." Dkt. 848 at 20–21.

Meta next "cites" Plaintiffs' initial disclosures and interrogatory responses. As to the former, Plaintiffs' August 24, 2021 disclosures, served at the beginning of the case, describe Plaintiffs' damages as "the difference between the ***reduced value*** that Facebook provided . . . and the ***value*** that competition . . . would have required Facebook to provide . . . ***including*** adequate compensation for the data that Consumer Plaintiffs provided." Ex. H at 13. In other words, Plaintiffs' injury is based on the difference in "value" (which is not limited to cash), and one possible, non-exclusive form that greater value could have taken was cash. To the extent this was not already clear, Plaintiffs indisputably laid it out further in their November 3, 2021 disclosures, unmentioned by Meta, but which further explain that the "compensation" Meta would have provided "could have taken the form of either direct monetary payments, or in-kind consideration," and then cites an economist's study that "a consumer ***might actually be paid in terms of better services*** or even cash." Ex. I at 22–23. Similarly, Meta fixates on "direct monetary payments, or in-kind consideration" as used in Plaintiffs' interrogatory response. But Meta takes too narrow a view of "in-kind consideration." "In kind" means "[i]n goods or services rather than money." *See* IN KIND, Black's Law Dictionary (12th ed. 2024). Indeed, the very sentence of the interrogatory response that Meta relies on immediately proceeds to cite a number of sources explaining the sentence, including the same economist's study that explains payment "***in terms of better services*** or even cash." Ex. J at 48–9.

Meta's "citations" to Professor Economides' depositions and expert reports are more of the same. Plaintiffs addressed Meta's mischaracterizations of them in their opposition to Meta's motion

for summary judgment. *See* Dkt. 952-1 at 8–9. At deposition, he testified that money payment was "the crucial feature" in the but-for world—meaning the most likely possibility—which does not rule out the alternative possibility of service improvement, which he expressly acknowledged. Dkt. 952-3 (Ex. 73) at 101:19–102:13 ("other features" is one of "the crucial two dimensions" and "can happen"). Further, Economides opined that as an "alternative" to a "direct monetary payment," there could be "some form of non-cash compensation . . . *e.g.*, points or ***other forms of non-cash compensation that have monetary value***[.]" Ex. L (Economides Rept.) ¶ 225. He then explained one example of a feature Meta could have offered—"an opt-out" that Plaintiffs could have used to limit Meta's collection or use of their data—as well as other ways in which users would have benefitted "***beyond only price***," including "***different product features***" (including "a decrease in ad-load"), "different choices regarding data collection and use," "different monetization strategies," and more innovation. *Id.* ¶¶ 272-73, 282-85, 291. These "non-cash consideration" situations, he explains, "would not reduce an estimate of harm," *i.e.*, damages, "because any consideration provided to users would have to have been worth at least as much to them as cash, otherwise the compensation would not have been sufficient to keep them on the Facebook platform." *Id.* ¶¶ 273, 291.

Plaintiffs sufficiently disclosed these damages theories, and Meta's claims of "unfair surprise" ring hollow. Moreover, Meta's claims of "prejudice" and a need to "conduct discovery" on the features/data theories—as distinct from the "cash compensation" theory—are hyperbolic. Economides' damages calculations remain the same: $5 per month per Plaintiff for each month they were active on Facebook and thus provided their data to Meta, but did not receive a competitive level of value in return. The $5 is the estimate of the increased incremental value—whether an actual $5 cash payment, or points, or better features, or reduced data collection and use—Meta would have had to give users for them to continue providing their data to Meta in the face of more competition. It does not differ by the form in which the "compensation" (cash or otherwise) is provided, as all forms would have to be worth roughly the same to induce users to continue providing Meta their data.[10]

---

[10]    Professor Economides proffers $5 per month as the most likely value Facebook would have to provide but also offers alternatives of $3.50 and $6.25 per month. The jury can reasonably select any of these, or it may come up with its own number at trial.

1    **MOTION *IN LIMINE* NO. 7: TO PRECLUDE PLAINTIFFS FROM OFFERING**

2    **EVIDENCE OR ARGUMENT ADVANCING A MARKET DEFINITION INCONSISTENT**

3    **WITH THE "PSNS" MARKET DEFINED BY PLAINTIFFS' EXPERT DR. JOSEPH**

4    **FARRELL**

5         This Court should preclude plaintiffs from introducing evidence or arguments that advance a

6    different definition for their "personal social networking services" ("PSNS") market than has already

7    been proffered by Dr. Joseph Farrell in his expert reports and deposition. Throughout this litigation,

8    plaintiffs have attempted to jigsaw dueling testimony from Dr. Nicholas Economides and Farrell to

9    support their PSNS market. However, on November 14, 2024, this Court ordered plaintiffs to proffer

10   only one expert witness to opine on market definition and market power because allowing two experts

11   to "testify to the same opinions" would be "duplicative, wasteful and inefficient" and "confusing and

12   misleading" to the jury. Dkt. 856, Hr'g Tr. 6:5-23. Following this Court's order, plaintiffs elected to

13   proceed only with Farrell as their expert economist and rely on his opinions on market definition and

14   market power. Dkt. 859 at 1. Plaintiffs made their choice and cannot now—in defiance of this Court's

15   direction—try to offer Economides's opinions under the guise of Farrell's market definition and

16   analysis.

17        Farrell's PSNS market, which plaintiffs chose, depends on "the purpose that a user has in

18   mind, consciously or not ... using an app." Dkt. 929-2, Farrell 3/24 Tr. 70:23-71:14. This definition

19   is based predominantly on the subjective, fleeting intent of an individual user when using Facebook.

20   Dkt. 820-1 at 1-2; Dkt. 941-2, Farrell Rep. ¶¶124-189. Take a simple news article on Facebook as an

21   example. According to Farrell's market definition, if that news story is "directed to" you "by friends

22   and family connections," then it is in the PSNS market, but if that news story was "about a

23   professional sports match," then it is not. *Compare* Dkt. 929-2, Farrell 3/24 Tr. 80:6-16 *with id.* 79:21-

24   80:5. If a video is sent by a family member with a note saying it would be discussed at Thanksgiving,

25   it is in the PSNS market, but if the same video was viewed on a user's home tab, it is not. *Compare*

26   *id.* 29:19-30:6 *with id.* 79:21-80:5. Farrell himself has conceded that this definition inevitably results

27   in "intractable questions" and "irreducible gray areas." *Id.* 30:16-31:16.

28

To compensate for these glaring vulnerabilities in Farrell's market definition, plaintiffs offered two incongruous expert opinions and conflated their market definitions when it suited them. For example, plaintiffs relied in their initial Motion for Class Certification on Economides's "everything is PSNS" rule that *every feature* of Facebook is PSNS—no matter how an individual consumer uses the app—because of the "social graph aspect" of Facebook (so joining a group about fishing is "PSNS" even if every other group member is a stranger and the consumer watches only public videos about fishing). Dkt. 925-4, Economides 3/24 Tr. 84:8-22; *see* Dkt. 645-1 at 4, 20. In the same breath, plaintiffs also relied on Farrell's opinion that the designation of Facebook feature as PSNS or not depends upon the nuances of the feature, how it is being used, and the user's intent behind using the feature. *See* Dkt. 929-2, Farrell 3/24 Tr. 70:23-71:14 (determining the "purpose that a user has in mind" by asking questions such as, "What are you trying to do? Are you trying to keep up with friends and family? Are you trying to waste a few minutes while you wait for your kid to come out of school? Are you trying to figure out the incomprehensible assembly instructions on a piece of furniture from IKEA?"); Dkt. 645-1 at 4, 20.

Ultimately, plaintiffs' plan was to proffer these two inconsistent opinions "to offer alternative theories to the jury." Dkt. 856, Hr'g Tr. 6:10-11 (Nov. 14, 2024). Now that plaintiffs have been prohibited from doing so, any assertion by plaintiffs or their experts that all Facebook features are uniformly in the PSNS market would be directly inconsistent with this Court's order and plaintiffs' subsequent proffer. *See* Dkt. 853 at 1; Dkt. 859 at 2. Plaintiffs cannot now shift to a broader "everything is PSNS" market definition to avoid any evidence that many of Facebook's features compete directly with YouTube and TikTok or any other vulnerabilities created by Farrell's market definition.

Allowing plaintiffs to shift market definition after plaintiffs' proffer over ten months ago and on the eve of trial would only result in unfair prejudice in violation of Federal Rule of Evidence 403. "A primary purpose of pretrial orders is to prevent unfair surprise by providing 'fair notice' and 'a fair opportunity to present evidence refuting' the opposing party's theories of liability or non-liability." *TDN Money Sys., Inc. v. Everi Payments, Inc.*, 796 F. App'x 329, 331 (9th Cir. 2019) (quoting *DP Aviation v. Smiths Indus. Aerospace & Def. Sys. Ltd.*, 268 F.3d 829, 842-44 (9th Cir.

2001)). Pretrial practice allows "parties to adequately prepare their cases for trial and to avoid unfair surprise." *San Francisco Baykeeper v. City of Sunnyvale*, 2025 WL 1616643, at *3 (N.D. Cal. June 6, 2025) (determining that an expert's trial testimony is limited to her expert report). These considerations are particularly acute here where the definition of the relevant market plaintiffs must prove is of utmost importance in an antitrust case.

It is well established that courts do not permit plaintiffs to change market definition this late in a case. *See W. Parcel Express v. United Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d 1052, 1059-60 (N.D. Cal. 1998) (characterizing as improper, and rejecting, plaintiff's shifting market definitions), *aff'd*, 190 F.3d 974 (9th Cir. 1999); *see also, e.g.*, *Cont'l Trend Res., Inc. v. OXY USA Inc.*, 44 F.3d 1465, 1481 n.19 (10th Cir. 1995) (affirming district court's refusal to permit plaintiffs to narrow market definition at summary judgment), *judgment vacated on other grounds*, 517 U.S. 1216 (1996); *Deselms v. Occidental Petrol. Corp.*, 2024 WL 4103602, at *3 (D. Wyo. July 29, 2024) (granting defendant's motion *in limine* to preclude evidence or argument in support of a new market definition, because "it is necessary to limit the scope of possible theories, in the name of fairness and judicial efficiency," at trial). Meta has based its litigation strategy on Farrell's subjective market definition. Plaintiffs cannot now backtrack on their commitment to proving the PSNS market using only Farrell's market definition and analysis.

Accordingly, the Court should grant Meta's motion.

## PLAINTIFFS' RESPONSE TO META'S MIL NO. 7

Meta moves to preclude "evidence or arguments that advance a different definition" of the relevant market than the one advanced by Plaintiffs' expert, Professor Farrell. It should be denied.

**First**, Meta's entire motion is predicated on the unsubstantiated assertion that Plaintiffs are going to "backtrack on their commitment" and violate the Court's order limiting experts. Plaintiffs previously offered opinions from both Professor Farrell and Professor Economides on market definition and power, as they offered distinct analyses based on different data and evidence. *See* Dkt. 821. The Court subsequently ruled that Plaintiffs "may present one expert economist to opine on market definition and market power." Dkt. 853. While Plaintiffs respectfully maintain and preserve their objections to the Court's order, Plaintiffs, in response to that order, identified Professor Farrell "as their expert economist to affirmatively opine on market definition and power." Dkt. 859. Meta asserts—with zero support—that Plaintiffs will "try to offer Economides's opinions under the guise of Farrell's market definition analysis." That is not Plaintiffs' intent, which is exactly what Plaintiffs told Meta during the parties' pre-trial meet-and-confer, making the purpose of Meta's motion entirely unclear. Professor Farrell's opinions are what they are, and if Meta believes Farrell offers something different at trial, then Meta can object, or cross-examine him, or move to strike. Until then, Meta's motion is premature and unnecessary.

**Second**, Meta cannot use a motion *in limine* to impose a mischaracterization of Professor Farrell's opinions and then seek an advisory ruling that Professor Farrell can then only offer that mischaracterization as his testimony or that the jury can only find what Meta mischaracterizes as his view of the PSNS Market. Professor Farrell will offer his views. If Meta mischaracterizes them, then he or Plaintiffs can respond accordingly. Moreover, if the jury finds, based on the evidence at trial, some permutation of the PSNS Market—*e.g.*, includes in it a firm that Farrell would not but concludes Meta still has power in that market—that is entirely permissible. Meta's motion *in limine* cannot pre-ordain otherwise. *See Epic Games, Inc. v. Apple*, Inc., 67 F.4th 946, 978 n.9 (9th Cir. 2023) (explaining that "antitrust claims" do not "automatically fail[]" where "the parties offer dueling market definitions" and the fact finder finds an "in-between market . . . rather than the plaintiff's

market."); *Google Play*, 3:21-md-2981-JD (N.D. Cal.), Dkt. 849 at 3244-45 (this Court recognizing that a "case does not collapse on the relevant market definition" and jury can find its own).

**Finally**, Plaintiffs' motion *in limine* is yet another poorly-disguised *Daubert* and summary judgment motion. Meta's motion in *limine* nakedly refers to supposed "vulnerabilities" in "Farrell's market definition," which Meta also contends is "subjective." These characterizations are misguided: they conflate Professor Farrell's opinions regarding how to measure monopoly power based on counting time spent on particular activities, versus how to define the market (*i.e.*, a relevant grouping of products) in the first place. They are also regurgitations from Meta's not-yet-ruled-upon motion for summary judgment of the same mischaracterizations of Farrell's opinions and analyses. *See* Dkt. 926 at 15–18. Whatever Meta's views as to the persuasiveness of Professor Farrell's opinions and analyses, they are not a basis for a motion *in limine*. *See DZ Reserve v. Meta Platforms, Inc.*, Case No. 18-cv-4978-JD (N.D. Cal.), Dkt. 478 ("Motions in limine may not request that a liability or damages claim or defense be excluded on legal grounds, or that an expert witness be precluded from testifying under FRE 702"); *see also* Standing Order for Civil Jury Trials Before Judge James Donato, ¶ 6 ("Motions in limine may not be used to request summary judgment or raise *Daubert* challenges unless the Court has specifically granted prior approval," which it has not in this case).

DATED: September 11, 2025

By: /s/ Shana E. Scarlett

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Shana E. Scarlett (Bar No. 217895)
  shanas@hbsslaw.com
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
(510) 725-3000

Steve W. Berman (admitted *pro hac vice*)
  steve@hbsslaw.com
1301 Second Avenue, Suite 2000
Seattle, WA 98101
(206) 623-7292

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
W. Joseph Bruckner (admitted *pro hac vice*)
  wjbruckner@locklaw.com
Robert K. Shelquist (admitted *pro hac vice*)
  rkshelquist@locklaw.com
Brian D. Clark (admitted *pro hac vice*)
  bdclark@locklaw.com
Laura M. Matson (admitted *pro hac vice*)
  lmmatson@locklaw.com
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900

Kyle Pozan (admitted *pro hac vice*)
  kjpozan@locklaw.com
1165 N Clark Street, Suite 700
Chicago, IL 60610
(312) 470-4333

By: /s/ Kevin T. Teruya

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Kevin Y. Teruya (Bar No. 235916)
  kevinteruya@quinnemanuel.com
Adam B. Wolfson (Bar No. 262125)
  adamwolfson@quinnemanuel.com
Scott L. Watson (Bar No. 219147)
  scottwatson@quinnemanuel.com
Claire D. Hausman (Bar No. 282091)
  clairehausman@quinnemanuel.com
Brantley I. Pepperman (Bar No. 322057)
  brantleypepperman@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
(213) 443-3000

Michelle Schmit (admitted *pro hac vice*)
  michelleschmit@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606-1881
(312) 705-7400

Manisha M. Sheth (admitted *pro hac vice*)
  manishasheth@quinnemanuel.com
295 5th Avenue, 9th Floor
New York, New York 10016
(212) 849-7000

*Attorneys for Plaintiffs Maximilian Klein,
Rachel Banks Kupcho, and Sarah Grabert*

By: /s/ Sonal N. Mehta

**WILMER CUTLER PICKERING
HALE AND DORR LLP**
Sonal N. Mehta (SBN 222086)
  Sonal.Mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

David Z. Gringer (*pro hac vice*)
  David.Gringer@wilmerhale.com
Paul Vanderslice (*pro hac vice*)
  Paul.Vanderslice@wilmerhale.com
Alex W. Miller (*pro hac vice*)
  Alex.Miller@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800

Molly M. Jennings (*pro hac vice*)
  Molly.Jennings@wilmerhale.com
2100 Pennsylvania Ave NW
Washington, DC 20037
Telephone: (202) 663-6000

*Attorneys for Defendant Meta Platforms, Inc.*

## ATTESTATION OF SONAL MEHTA

This document is being filed through the Electronic Case Filing (ECF) system by attorney Sonal Mehta. By her signature, Ms. Mehta attests that she has obtained concurrence in the filing of this document from each of the attorneys identified on the caption page and in the above signature blocks.

Dated: September 11, 2025        By   /s/ Sonal Mehta
                                      Sonal Mehta