1    **HAGENS BERMAN SOBOL SHAPIRO LLP**
Shana E. Scarlett (Bar No. 217895)
2    shanas@hbsslaw.com
715 Hearst Avenue, Suite 300
3    Berkeley, CA 94710
Telephone: (510) 725-3000
4

5    **QUINN EMANUEL URQUHART &**
**SULLIVAN, LLP**
6    Kevin Y. Teruya (Bar No. 235916)
kevinteruya@quinnemanuel.com
7    865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
8    Telephone: (213) 443-3000

9

10

11    *Attorneys for Plaintiffs Maximilian Klein,*
*Rachel Banks Kupcho, and Sarah Grabert*

**WILMER CUTLER PICKERING**
  **HALE AND DORR LLP**
Sonal N. Mehta (SBN 222086)
  Sonal.Mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

David Z. Gringer (*pro hac vice*)
  David.Gringer@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800

*Attorneys for Defendant Meta Platforms,*
*Inc.*

12

13    [Additional counsel listed on signature page]

14

15    **UNITED STATES DISTRICT COURT**

16    **NORTHERN DISTRICT OF CALIFORNIA**

17    **SAN FRANCISCO DIVISION**

18    MAXIMILIAN KLEIN, et al.,

19                    Plaintiffs,

20        vs.

21    META PLATFORMS, INC.,

22                    Defendant.

23    This Document Relates To: All Consumer
Actions

24

Consolidated Case No. 3:20-cv-08570-JD

**JOINT SUBMISSION OF PROPOSED JURY
INSTRUCTIONS**

 The Hon. James Donato

 Pretrial Conference: September 25, 2025
 Trial:                    November 17, 2025

25

26

27

28

1

# TABLE OF CONTENTS

**Page**

2

Stipulated Instruction No. 1 Re DUTY OF JURY .................................................................. 2

Disputed Instruction No. 2 Re CLAIMS AND DEFENSES – PLAINTIFFS' PROPOSED INSTRUCTION ....................................................................................................................... 3

Disputed Instruction No. 2 Re CLAIMS AND DEFENSES – META'S PROPOSED INSTRUCTION ....................................................................................................................... 4

Plaintiffs' Argument Re Instruction No. 2 ............................................................................. 5

Defendant's Argument Re Instruction No. 2 .......................................................................... 7

Stipulated Instruction No. 3 Re BURDEN OF PROOF –PREPONDERANCE OF THE EVIDENCE ............................................................................................................................. 9

Stipulated Instruction No. 4 Re CORPORATIONS – FAIR TREATMENT ...................... 10

Stipulated Instruction No. 5 Re WHAT IS EVIDENCE ..................................................... 11

Stipulated Instruction No. 6 Re WHAT IS NOT EVIDENCE ............................................ 12

Disputed Instruction No. 7 Re DIRECT AND CIRCUMSTANTIAL EVIDENCE – PLAINTIFFS' PROPOSED INSTRUCTION ....................................................................... 13

Disputed Instruction No. 7 Re DIRECT AND CIRCUMSTANTIAL EVIDENCE – META'S PROPOSED INSTRUCTION ................................................................................. 14

Plaintiffs' Argument Re Instruction No. 7 ........................................................................... 15

Defendant's Argument Re Instruction No. 7 ........................................................................ 16

Stipulated Instruction No. 8 Re RULING ON OBJECTIONS ............................................ 17

Stipulated Instruction No. 9 Re DEPOSITION IN LIEU OF LIVE TESTIMONY ............ 18

Stipulated Instruction No. 10 Re CREDIBILITY OF WITNESSES ................................... 19

Stipulated Instruction No. 11 Re EXPERT OPINION ........................................................ 20

Stipulated Instruction No. 12 Re CHARTS AND SUMMARIES ....................................... 21

Stipulated Instruction No. 13 Re STIPULATIONS OF FACT ............................................ 22

Disputed Instruction No. 14 Re ANTITRUST LAWS – PURPOSE – PLAINTIFFS' PROPOSED INSTRUCTION ............................................................................................... 23

Plaintiffs' Argument Re Instruction No. 14 ......................................................................... 24

Defendant's Argument Re Instruction No. 14 ...................................................................... 25

Disputed Instruction No. 15 Re SECTION 2 OF THE SHERMAN ACT – MONOPOLIZATION – ELEMENTS – PLAINTIFFS' PROPOSED INSTRUCTION ...................................................... 26

Disputed Instruction No. 15 Re SECTION 2 OF THE SHERMAN ACT – MONOPOLIZATION – ELEMENTS – META'S PROPOSED INSTRUCTION ............................................................ 28

Plaintiffs' Argument Re Instruction No. 15 ......................................................................... 29

Defendant's Argument Re Instruction No. 15 ...................................................................... 31

Disputed Instruction No. 16 Re MONOPOLIZATION – MONOPOLY POWER DEFINED – PLAINTIFFS' PROPOSED INSTRUCTION .................................................................... 33

Disputed Instruction No. 16 Re MONOPOLIZATION – MONOPOLY POWER DEFINED – META'S PROPOSED INSTRUCTION .............................................................................. 34

Plaintiffs' Argument Re Instruction No. 16 ......................................................................... 35

Defendant's Argument Re Instruction No. 16 ...................................................................... 37

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Disputed Instruction No. 17 Re MONOPOLIZATION –RELEVANT PRODUCT MARKET – PLAINTIFFS' PROPOSED INSTRUCTION ............................................................. 39

Disputed Instruction No. 17 Re MONOPOLIZATION –RELEVANT PRODUCT MARKET – META'S PROPOSED INSTRUCTION ............................................................. 40

Plaintiffs' Argument Re Instruction No. 17 ............................................................. 41

Defendant's Argument Re Instruction No. 17 ............................................................. 42

Disputed Instruction No. 18 Re RELEVANT GEOGRAPHIC MARKET – PLAINTIFFS' PROPOSED INSTRUCTION ............................................................. 43

Disputed Instruction No. 18 Re RELEVANT GEOGRAPHIC MARKET – META'S PROPOSED INSTRUCTION ............................................................. 44

Plaintiffs' Argument Re Instruction No. 18 ............................................................. 45

Defendant's Argument Re Instruction No. 18 ............................................................. 46

Stipulated Instruction No. 19 Re MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER –TYPES OF PROOF ............................................................. 47

Disputed Instruction No. 20 Re MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – DIRECT PROOF – PLAINTIFFS' PROPOSED INSTRUCTION ............................................................. 48

Disputed Instruction No. 20 Re MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – DIRECT PROOF – META'S PROPOSED INSTRUCTION ............................................................. 50

Plaintiffs' Argument Re Instruction No. 20 ............................................................. 52

Defendant's Argument Re Instruction No. 20 ............................................................. 53

Disputed Instruction No. 21 Re MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – INDIRECT PROOF – PLAINTIFFS' PROPOSED INSTRUCTION ............................................................. 54

Disputed Instruction No. 21 Re MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – INDIRECT PROOF – META'S PROPOSED INSTRUCTION ............................................................. 57

Plaintiffs' Argument Re Instruction No. 21 ............................................................. 59

Defendant's Argument Re Instruction No. 21 ............................................................. 61

Disputed Instruction No. 22 Re MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER THROUGH ANTICOMPETITIVE ACTS – PLAINTIFFS' PROPOSED INSTRUCTION ............................................................. 63

Disputed Instruction No. 22 Re MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER THROUGH ANTICOMPETITIVE ACTS – META'S PROPOSED INSTRUCTION ............................................................. 65

Plaintiffs' Argument Re Instruction No. 22 ............................................................. 67

Defendant's Argument Re Instruction No. 22 ............................................................. 69

Disputed Instruction No. 23 Re SPEECH AS ANTICOMPETITIVE CONDUCT – PLAINTIFFS' PROPOSED INSTRUCTION (If Given Over Plaintiffs' Objection) ............................................................. 71

Disputed Instruction No. 23 Re SPEECH AS ANTICOMPETITIVE CONDUCT – META'S PROPOSED INSTRUCTION ............................................................. 72

Plaintiffs' Argument Re Instruction No. 23 ............................................................. 73

Defendant's Argument Re Instruction No. 23 ............................................................. 75

Disputed Instruction No. 24 Re ATTEMPT TO MONOPOLIZE – ELEMENTS – PLAINTIFFS' PROPOSED INSTRUCTION ............................................................. 77

Disputed Instruction No. 24 Re ATTEMPT TO MONOPOLIZE – ELEMENTS – META'S PROPOSED INSTRUCTION ............................................................. 78

Plaintiffs' Argument Re Instruction No. 24 ................................................................ 79

Defendant's Argument Re Instruction No. 24 .............................................................. 80

Disputed Instruction No. 25 re ATTEMPT TO MONOPOLIZE – ANTICOMPETITIVE CONDUCT – PLAINTIFFS' PROPOSED INSTRUCTION .......................................... 81

Disputed Instruction No. 25 re ATTEMPT TO MONOPOLIZE – ANTICOMPETITIVE CONDUCT – META'S PROPOSED INSTRUCTION.................................................. 82

Plaintiffs' Argument Re Instruction No. 25 ................................................................ 83

Defendant's Argument Re Instruction No. 25 .............................................................. 84

Disputed Instruction No. 26 Re ATTEMPT TO MONOPOLIZE – SPECIFIC INTENT – PLAINTIFFS' PROPOSED INSTRUCTION .......................................................... 85

Disputed Instruction No. 26 Re ATTEMPT TO MONOPOLIZE – SPECIFIC INTENT – META'S PROPOSED INSTRUCTION.................................................................... 86

Plaintiffs' Argument Re Instruction No. 26 ................................................................ 88

Defendant's Argument Re Instruction No. 26 .............................................................. 90

Disputed Instruction No. 27 Re ATTEMPT TO MONOPOLIZE – DANGEROUS PROBABILITY OF SUCCESS – PLAINTIFFS' PROPOSED INSTRUCTION ........................ 91

Disputed Instruction No. 27 Re ATTEMPT TO MONOPOLIZE – DANGEROUS PROBABILITY OF SUCCESS – META'S PROPOSED INSTRUCTION ................................. 92

Plaintiffs' Argument Re Instruction No. 27 ................................................................ 93

Defendant's Argument Re Instruction No. 27 .............................................................. 94

Disputed Instruction No. 28 re ANTITRUST INJURY AND CAUSATION – PLAINTIFFS' PROPOSED INSTRUCTION........................................................................... 95

Disputed Instruction No. 28 re ANTITRUST INJURY AND CAUSATION – META'S PROPOSED INSTRUCTION........................................................................... 97

Plaintiffs' Argument Re Instruction No. 28 ................................................................ 99

Defendant's Argument Re Instruction No. 28 ............................................................ 101

Disputed Instruction No. 29 Re ANTITRUST INJURY: BUSINESS OR PROPERTY – PLAINTIFFS' PROPOSED INSTRUCTION .......................................................... 103

Plaintiffs' Argument Re Instruction No. 29 .............................................................. 104

Defendant's Argument Re Instruction No. 29 ............................................................ 105

Stipulated Instruction No. 30 Re DAMAGES – INTRODUCTION AND PURPOSE............... 106

Disputed Instruction No. 31 Re ANTITRUST INJURY AND DAMAGES – DAMAGES FOR PURCHASERS: OVERCHARGES – PLAINTIFFS' PROPOSED INSTRUCTION................. 107

Plaintiffs' Argument Re Instruction No. 31 .............................................................. 108

Defendant's Argument Re Instruction No. 31 ............................................................ 109

Disputed Instruction No. 32 DAMAGES – CAUSATION AND DISAGGREGATION – PLAINTIFFS' PROPOSED INSTRUCTION (If Given Over Plaintiffs' Objection) ................ 110

Disputed Instruction No. 32 DAMAGES – CAUSATION AND DISAGGREGATION – META'S PROPOSED INSTRUCTION........................................................................... 111

Plaintiffs' Argument Re Instruction No. 32 .............................................................. 113

Defendant's Statement Re Instruction No. 32 ............................................................ 115

Stipulated Instruction No. 33 Re CALCULATION OF DAMAGES ......................................... 117

Disputed Instruction No. 34 re RELEVANT TIME PERIOD – PLAINTIFFS' PROPOSED INSTRUCTION ................................................................................................................ 118

Disputed Instruction No. 34 re RELEVANT TIME PERIOD ........................................... 119

Offered by Defendant ........................................................................................................ 119

Plaintiffs' Argument Re Instruction No. 34 ...................................................................... 120

Defendants' Argument Re Instruction No. 34 ................................................................... 122

Disputed Instruction No. 35 Re STATUTE OF LIMITATIONS – PLAINTIFFS' PROPOSED INSTRUCTION (If Given Over Plaintiffs' Objection) ............................................... 123

Disputed Instruction No. 35 Re STATUTE OF LIMITATIONS – META'S PROPOSED INSTRUCTION ................................................................................................................ 124

Plaintiffs' Argument Re Instruction No. 35 ...................................................................... 126

Defendants' Argument re Instruction No. 35 .................................................................... 127

Stipulated Instruction No. 36 Re DUTY TO DELIBERATE ........................................... 128

Stipulated Instruction No. 37 Re CONSIDERATION OF THE EVIDENCE – CONDUCT OF THE JURY ................................................................................................................ 129

Stipulated Instruction No. 38 Re USE OF NOTES ......................................................... 130

Stipulated Instruction No. 39 Re COMMUNICATION WITH THE COURT ............................ 131

Stipulated Instruction No. 40 Re RETURN OF VERDICT ............................................. 132

Pursuant to Section 7 of the Court's Standing Order for Civil Jury Trials, Plaintiffs Maximilian Klein, Sarah Grabert, and Rachel Banks Kupcho ("Plaintiffs") and Defendant Meta Platforms, Inc. ("Meta"), by and through their undersigned counsel, submit the following set of stipulated and disputed jury instructions. The parties reserve their rights to supplement or modify these instructions and their proposals, including based on developments at trial.

**Stipulated Instruction No. 1 Re DUTY OF JURY**

Members of the jury, now that you have heard all the evidence, it is my duty to instruct you on the law that applies to this case. You will each be given a copy of these instructions to refer to during your deliberations.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you, whether you agree with it or not. You must not be influenced by any personal likes or dislikes, opinions, prejudices or sympathy. You should also not be influenced by any person's race, color, religion, national ancestry, or gender.

All of this means that you must decide the case solely on the evidence before you. Please keep in mind that you took an oath to do so.

Do not read into these instructions or anything I may say or do that I have an opinion regarding the evidence or what your verdict should be. That is for you to decide.

**Authority**: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592 (Instruction No. 1).

**Disputed Instruction No. 2 Re CLAIMS AND DEFENSES – PLAINTIFFS' PROPOSED INSTRUCTION**

I will give you a brief summary of the positions of the parties.

The Plaintiffs are Maximilian Klein, Rachel Banks Kupcho, and Sarah Grabert. The defendant is Meta Platforms, Inc., referred to as "Meta."

Plaintiffs contend that Meta has violated federal antitrust laws by unlawfully monopolizing, or attempting to monopolize, an alleged market for Personal Social Networking Services, or "PSNS." Plaintiffs further assert that Meta maintained its monopoly power by deceiving the market—through misrepresentations and omissions—regarding Meta's data collection, use, security, and privacy practices, and that Meta's alleged conduct has harmed consumers and competition by reducing the competitive level of compensation that users receive for their data.

Meta denies Plaintiffs' claims. Meta contends that Plaintiffs have failed to meet their burden of proving that the relevant market is Personal Social Networking Services, or "PSNS." Meta contends that PSNS is a construct developed for this case and that Meta's competition is far broader than the few firms Plaintiffs contend. Meta disputes that the relevant market in which it competes is limited to Facebook, Instagram, Snapchat, Google +, and MeWe, and should include, at least, TikTok, YouTube, and iMessage. Meta further contends that it has disclosed how it collects and uses user data and that Plaintiffs have not proven that users were deceived by the challenged statements. Meta further contends that none of the challenged statements had any impact on competition and that Plaintiffs have not shown that they were personally injured by any of the conduct at issue.

**Authority**: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592 (Instruction No. 2) (modified).

**<u>Disputed Instruction No. 2 Re CLAIMS AND DEFENSES – META'S PROPOSED INSTRUCTION</u>**

I will give you a brief summary of the positions of the parties.

The Plaintiffs are Maximilian Klein, Rachel Banks Kupcho, and Sarah Grabert. The defendant is Meta Platforms, Inc., referred to as "Meta."

Plaintiffs contend that Facebook has violated federal antitrust laws by unlawfully monopolizing, or attempting to monopolize, an alleged market for Personal Social Networking Service, or "PSNS." Plaintiffs further assert that Facebook maintained its monopoly power by deceiving the market—through misrepresentations and omissions—regarding Facebook's data collection, use, security, and privacy practices, and that Facebook's alleged conduct has harmed consumers and competition by reducing the competitive level of compensation that users receive for their data.

Meta denies Plaintiffs' claims. Meta contends that Plaintiffs have failed to meet their burden of proving that the relevant market is Personal Social Networking Services, or "PSNS." Meta contends that PSNS is a construct developed for this case and that Meta's competition is far broader than the few firms Plaintiffs contend. Meta disputes that the relevant market in which it competes is limited to Facebook, Instagram, Snapchat, Google+, and MeWe, and should include, at least, TikTok, YouTube, and iMessage. In a properly defined market, Meta is not a monopolist. Meta further contends that it disclosed how it collects and uses user data and that Plaintiffs have not proven that users were deceived by the challenged statements. Thus, Meta has not unlawfully monopolized or unlawfully attempted to monopolize any market. Meta further contends that none of the challenged statements had any impact on competition and that Plaintiffs have not shown that they were personally injured by any of the conduct at issue.

**Authority**: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592 (Instruction No. 2)

1          **Plaintiffs' Argument Re Instruction No. 2**

2          The parties agree on the subject of Instruction No. 2, but disagree as to its specific wording.

3    The Court should adopt Plaintiffs' version and reject Meta's.

4          ***First***, Meta objects to (here and elsewhere) to references to Plaintiffs' ***attempted***

5    monopolization claim, as distinct from Plaintiffs' monopolization claim. Meta's objection should be

6    overruled. Plaintiffs have, and will try, two claims: one for monopolization (Count I), and another for

7    attempted monopolization (Count II).

8          Plaintiffs' operative complaint reflects separate counts for both monopolization and attempted

9    monopolization. *See* Dkt. 87 ¶¶ 260–83. This Court acknowledged both of Plaintiffs' monopolization

10   and attempted monopolization claims in its class certification order. *See* Dkt. 905 at 2. Indeed, as

11   recently as April of this year, Meta acknowledged Plaintiffs' standalone attempted monopolization

12   claim, when Meta sought summary judgment on it. Dkt. 926 at 24. The Court has not yet ruled on

13   Meta's summary judgment motion, and at no point has the Court dismissed Plaintiffs' attempt claim.

14   Therefore, Instruction No. 2—and others in this set of jury instructions—should reflect both

15   Plaintiffs' monopolization claim ***and*** their attempt claim.

16         Meta's entire argument—raised for the first time in connection with the parties' pre-trial

17   preparations—is that Plaintiffs' attempt claim is somehow gone "because the evidence and theory of

18   liability [Plaintiffs] have advanced are inconsistent with such a claim." Meta's argument appears to

19   be that because Plaintiffs factually contend Meta gained its monopoly before December 2016 (the

20   start of the limitations period), and Plaintiffs in opposition to Meta's summary judgment motion

21   confirmed that Plaintiffs are only pursuing damages between December 2016 and December 2020,

22   there can be no "attempted" monopolization during that period because Meta had already "acquired"

23   its monopoly by then. But Meta never advanced that argument. To the contrary, Meta's summary

24   judgment reply brief argues that Plaintiffs' "attempted monopolization claim . . . rise[s] and fall[s]

25   with the . . . monopolization claim." Dkt. 958 at 15 n.3. As Meta admits, both the monopolization and

26   attempted monopolization claims are overlapping, and the jury should therefore be instructed on both.

27         To be sure, Plaintiffs' primary claim is for monopolization. Plaintiffs submit that there is

28   compelling evidence that Meta already "acquired" a monopoly by December 2016 (the start of the

1   limitations period) such that its conduct during the limitations period acted to maintain that monopoly.

2   But, Meta's distinction between "acquisition" and "maintenance" is wordplay. If the jury disagrees

3   that Meta actually had monopoly power during the limitations period, it might nonetheless find that

4   Meta ***attempted*** to obtain a monopoly (or maintain one that Meta previously had). That is perfectly

5   acceptable: a claim for attempted monopolization may succeed where a claim for actual

6   monopolization does not. It is why, for example, the Ninth Circuit has made clear that "the minimum

7   showing of market share required in an attempt case is a lower quantum than the minimum showing

8   required in an actual monopolization case." *Rebel Oil Co. v. Atl. Richfield Co*., 51 F.3d 1421, 1438

9   (9th Cir. 1995). And it is also why—contrary to Meta's suggestion—courts, including the Ninth

10  Circuit, have acknowledged claims for an "attempt to maintain a monopoly." *See, e.g.*, *SolarCity*

11  *Corp. v. Salt River Project Agric. Improvement & Power Dist*., 859 F.3d 720, 723 (9th Cir. 2017)

12  (dismissing appeal from denial over claim defendant "had attempted to maintain a monopoly");

13  *accord Chase Mfg., Inc. v. Johns Manville Corp*., 84 F.4th 1157, 1170 (10th Cir. 2023) ("A company

14  violates § 2 when it maintains or ***attempts to maintain a monopoly*** by engaging in exclusionary

15  conduct.") (emphasis added).[1]

16      ***Second***, the Court should reject Meta's attempts to insert naked argument into Instruction No.

17  2. In an effort to compromise, Plaintiffs have already agreed to include much of Meta's statement of

18  its defenses, including Meta's contentions regarding market deception and its statements and

19  omissions regarding its privacy and data practices. There is therefore no need to ***also*** include Meta's

20  self-serving say-so that "In a properly defined market, Meta is not a monopolist" and "Thus, Meta

21  has not unlawfully monopolized or unlawfully attempted to monopolize any market." Those are

22  disputed issues for the jury to decide, not stipulated ones the jury should be instructed.

---

24  [1]  Meta's citation to *LePage's Inc. v. 3M*, is unpersuasive. 277 F.3d 365, 387 (3d Cir. 2002). The Third Circuit is not the Ninth Circuit, which in at least *SolarCity* has referenced a claim for "attempt[] to maintain a monopoly[.]" Moreover, the *LePage's* decision Meta cites arises from the district court's ***post-trial*** ruling after a jury verdict: the court allowed both the monopolization and attempted monopolization claim to be tried before the jury and then granted judgment as a matter of law on the attempt claim after the jury found for the plaintiff on monopolization. Moreover, the Third Circuit ***vacated*** the decision that Meta cites when it took the case *en banc* and found it unnecessary to "consider" the attempt claim because it affirmed the jury's verdict for the plaintiff on the monopolization claim. *LePage's Inc. v. 3M*, 324 F.3d 141, 169 (3d Cir. 2003).

1

### Defendant's Argument Re Instruction No. 2

2   Meta objects to the inclusion of references to attempt because plaintiffs' theory of liability, to

3   say nothing of the evidence, is inconsistent with any timely attempt claim.  Instructing the jury on a

4   theory contradicted by plaintiffs' own arguments and the record is confusing and unduly prejudicial

5   to Meta.  *See Dang v. Cross*, 422 F.3d 800, 805 (9th Cir. 2005) (instructions on party's theory of case

6   require "foundation in the evidence"); *Guardant Health, Inc. v. Natera, Inc.*, 2025 WL 2106522, at

7   *10 (N.D. Cal. July 28, 2025) ("due process requires a jury instruction 'be given *only* when the

8   evidence warrants such an instruction'" (quoting *Hopper v. Evans*, 456 U.S. 605, 611 (1982))).

9   Plaintiffs have consistently maintained that Meta acquired monopoly power in a Personal

10  Social Networking Services market no later than 2011, which they have conceded renders any claims

11  related to acquisition untimely.  Their expert, for example, claims that "[b]y 2011, Facebook had

12  defeated Myspace and had acquired monopoly power in the Personal Social Network Market."

13  Economides CC Rep. ¶323, Dkt. 925-18; Economides Merits Rep. ¶73, Dkt. 925-12 ("By 2009,

14  however, Facebook had overtaken Myspace to become the dominant social network in the number of

15  unique U.S. visitors.").   And indeed, plaintiffs have represented to the Court that "monopoly

16  acquisition . . . has nothing to do with the timeliness of Consumers' claims" because it allegedly

17  occurred before the limitations period, meaning that "Consumers' damages claims are based on

18  Facebook's monopoly maintenance" alone.  MSJ Opp. 21, Dkt. 952-01; *see also* Farrell Daubert Opp.

19  3, Dkt. 941-1 (describing "the situation alleged in this case" as "a pre-existing exercise of market

20  power").  As a result, plaintiffs have asserted that any arguments concerning monopoly acquisition

21  are "irrelevant," MSJ Opp. 21, Dkt. 952-01, and concededly have no timely claim for attempted

22  monopoly acquisition—according to plaintiffs, plaintiffs' experts, and plaintiffs' purported evidence,

23  any attempt would have occurred before the onset of the limitations period.  Instructing the jury on a

24  time-barred claim that relies on a waived theory of liability would be prejudicial error.

25  When Meta proposed removing references to attempt from these instructions to reflect

26  plaintiffs' theory and evidence, plaintiffs argued for the first time that Meta attempted to *maintain* a

27  monopoly during the limitations period.  Their theory appears to be that Meta possessed monopoly

28  power during the limitations period, unlawfully sought to maintain that power, then lost it. Such a

1    theory contravenes the law.  No attempted maintenance instructions should be given.  Plaintiffs' claim

2    that Meta belatedly raised this issue is also wrong.  Only in plaintiffs' opposition to summary

3    judgment did they concede the untimeliness of their acquisition theory, and only when negotiating

4    jury instructions did plaintiffs raise attempted maintenance.

5         *First*, no authority recognizes plaintiffs' "attempted monopoly maintenance" claim.  For good

6    reason: "exclusionary conduct by a monopolist within its own market, whether successful or not, is

7    best treated as an aspect of the full monopolization offense," and the leading treatise "exclude[s] the

8    possibility that the attempted monopolization notion might include the conduct of one who is already

9    a monopolist." Areeda & Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their

10   Application ¶806. (Fourth and Fifth Editions, 2025 Cum. Supp. 2018-2023).  So as the Third Circuit

11   explained, "Section 2 of the Sherman Act does not create a cause of action for an 'attempt to maintain

12   a monopoly.'"  *LePage's Inc. v. 3M*, 277 F.3d 365, 385 (3d Cir. 2002), *vacated on other grounds*,

13   324 F.3d 141 (3d Cir. 2003).  Plaintiffs identify two cases with passing references to attempted

14   maintenance, but neither address the viability of such a theory.

15        *Second*, recognizing attempted monopoly maintenance claims is inconsistent with the purpose

16   of Section 2, which is to remedy the existence of unlawful monopolies and "protect the public from

17   the *failure* of the market."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) (emphasis

18   added).  Permitting plaintiffs to challenge conduct that resulted in a purported monopolist *losing*

19   market power—i.e., one that attempted to maintain a monopoly but failed in that undertaking—

20   contravenes that goal.

21        *Third*, attempted monopolization requires proof that a defendant had a "a dangerous

22   probability of *achieving* monopoly power," which is facially inconsistent with attempted

23   maintenance. *Spectrum Sports, Inc.*, 506 U.S. at 456 (emphasis added).  The remainder of the model

24   attempt instructions bear that inconsistency out—it makes no sense to repeatedly instruct the jury that

25   it must determine whether there was "dangerous probability that defendant would achieve monopoly

26   power" if plaintiffs' theory turns on Meta already having such power, then losing it.

27        Finally, plaintiffs improperly object to Meta's inclusion of its positions.  The instruction is

28   titled "claims and defenses."  Meta's defenses should be included.

1

2

## **Stipulated Instruction No. 3 Re BURDEN OF PROOF –PREPONDERANCE OF THE EVIDENCE**

3

4

5

When a party has the burden of proving any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.

6

You should base your decision on all of the evidence, regardless of which party presented it.

7

8

9

**Authority**: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592 (Instruction No. 14).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  **Stipulated Instruction No. 4 Re CORPORATIONS – FAIR TREATMENT**

2  The defendant in this case is a corporation. All parties are equal before the law and a

3  corporation is entitled to the same fair and conscientious consideration by you as any party.

4  Under the law, a corporation is considered to be a person. It can only act through its

5  employees, agents, directors, or officers. Therefore, a corporation is only responsible for the acts of

6  its employees, agents, directors, and officers, performed within the scope of their authority. An act is

7  within the scope of a person's authority if it is within the range of reasonable and foreseeable activities

8  that an employee, agent, director, or officer engages in while carrying out that person's business.

9

10  **Authority**: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592

11  (Instruction No. 3).

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

### <u>Stipulated Instruction No. 5 Re WHAT IS EVIDENCE</u>

2    The evidence you are to consider in deciding what the facts are consists of:

3    1.    the sworn testimony of any witness;

4    2.    the exhibits that are admitted into evidence;

5    3.    any facts to which the lawyers have agreed; and

6    4.    any facts that I may instruct you to accept as proved.

7

8    **Authority**: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592
9    (Instruction No. 4).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **Stipulated Instruction No. 6 Re WHAT IS NOT EVIDENCE**

In reaching your verdict, you may consider only the testimony and exhibits received into evidence, any facts to which the lawyers have agreed, and any facts that I may instruct you to accept as proved. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

1.      Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

2.      Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the Court's ruling on it.

3.      Testimony that was excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered. In addition, some evidence was received only for a limited purpose; when I instruct you to consider certain evidence only for a limited purpose, you must do so and you may not consider that evidence for any other purpose.

4.      Anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

**Authority**: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592 (Instruction No. 5).

1    **<u>Disputed Instruction No. 7 Re DIRECT AND CIRCUMSTANTIAL EVIDENCE –</u>**

2    **<u>PLAINTIFFS' PROPOSED INSTRUCTION</u>**

3         Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as

4    testimony by a witness about what that witness personally saw or heard or did. Circumstantial

5    evidence is proof of one or more facts from which you could find another fact. You should consider

6    both kinds of evidence. The law makes no distinction between the weight to be given to either direct

7    or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

8

9         **Authority**: *In re: Capacitors Antitrust Litigation*, Case No. 3:14-cv-03264-JD, Dkt. 2899

10   (Instruction No. 8); *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592

11   (Instruction No. 6); *Frasco v. Flo Health, Inc. et al*, Case No. 3:21-cv-00757-JD, Dkt. 744 at 9

12   (Instruction No. 8).

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **<u>Disputed Instruction No. 7 Re DIRECT AND CIRCUMSTANTIAL EVIDENCE – META'S</u>**

2    **<u>PROPOSED INSTRUCTION</u>**

3    Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as

4    testimony by a witness about what that witness personally saw or heard or did. Circumstantial

5    evidence is proof of one or more facts from which you could find another fact. You should consider

6    both kinds of evidence.

7

8    **Authority**: *Adapted from In re: Capacitors Antitrust Litigation*, Case No. 3:14-cv-03264-JD,

9    Dkt. 2899 (Instruction No. 8); *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD,

10    Dkt. 592 (Instruction No. 6).

1

**<u>Plaintiffs' Argument Re Instruction No. 7</u>**

2      The parties agree that an instruction regarding direct and circumstantial evidence is

3  appropriate, and they are largely agreed on what it should say. The sole disagreement appears to be

4  Plaintiffs' proposal to include in Instruction No. 7 the following two sentences: "The law makes no

5  distinction between the weight to be given to either direct or circumstantial evidence. It is for you to

6  decide how much weight to give to any evidence." Meta refuses to include this language.

7      Ninth Circuit Model Civil Jury Instruction No. 1.12 includes exactly these two sentences:

8  "The law makes no distinction between the weight to be given to either direct or circumstantial

9  evidence. It is for you to decide how much weight to give to any evidence." This Court has likewise

10 included this exact language in its instructions regarding direct and circumstantial evidence, such as

11 in *Capacitors*, *Epic*, and *Frasco* (a recent case against Meta). *See In re: Capacitors Antitrust*

12 *Litigation*, Case No. 3:14-cv-03264-JD, Dkt. 2899 (Instruction No. 8); *Epic Games, Inc. v. Google*

13 *LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592 (Instruction No. 6); *Frasco v. Flo Health, Inc. et al*,

14 Case No. 3:21-cv-00757-JD, Dkt. 744 at 9 (Instruction No. 8). It should be included here as well.[2]

15     Meta's argument to the contrary fails to persuade. Meta claims that it is incorrect that the "law

16 makes no distinction between the weight to be given to either direct or circumstantial evidence"

17 because such "evidence is treated differently in antitrust cases." Meta does not explain, why, then,

18 this Court included Plaintiffs' proposed language in two antitrust cases—*Capacitors* and *Epic*.

19 Moreover, the one "difference" Meta points to is direct evidence of market power versus

20 "circumstantial" evidence of market power (*i.e.*, defining a market and showing power by calculating

21 share). But while antitrust law might distinguish—*i.e.*, acknowledge—those two types of proof in that

22 context, it does not distinguish "***between the weight to be given***" as between them (which is the

23 subject of the parties' dispute on this instruction).

24

25

26

27 _____
[2]  Where Plaintiffs rely on this Court's jury instructions in *Epic* and/or the ABA Model Instructions
28 for Civil Antitrust Cases, Plaintiffs also rely on the authorities cited therein and the arguments made
   in support thereof.

1

## Defendant's Argument Re Instruction No. 7

2     The use of circumstantial or indirect evidence in antitrust cases is more limited than direct

3 evidence and plaintiffs' instruction collapses that distinction.  For example, "a plaintiff may not use

4 indirect evidence to prove unlawful monopoly maintenance via anticompetitive conduct under § 2."

5 *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020); *see also Rebel Oil Co. v. Atl. Richfield*

6 *Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (distinguishing direct evidence of market power from

7 "circumstantial" evidence).  Thus, plaintiffs are wrong that "[t]he law makes no distinction between

8 the weight to be given to either direct or circumstantial evidence," and the jury may not treat

9 circumstantial and direct evidence interchangeably.  Meta's proposed instruction, which omits the

10 two sentences from plaintiffs' instruction that draw the false equivalence, accurately reflects that

11 circumstantial or indirect evidence is treated differently in antitrust cases.  Meta's proposed

12 instruction has been used in this district, in an antitrust case.  *See In re Tableware Antitrust Litig.*,

13 2007 Jury Instr. LEXIS 1458, *19 (N.D. Cal.) (giving instruction as proposed by Meta in this case).

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## Stipulated Instruction No. 8 Re RULING ON OBJECTIONS

2       There are rules of evidence that control what can be received into evidence. When a lawyer

3  asked a question or offered an exhibit into evidence and a lawyer on the other side thought that it was

4  not permitted by the rules of evidence, that lawyer objected. If I overruled the objection, the question

5  was answered, or the exhibit received. If I sustained the objection, the question was not answered, or

6  the exhibit was not received. Whenever I sustained an objection to a question, you must ignore the

7  question and must not guess what the answer might have been.

8       Sometimes I ordered that you disregard or ignore that evidence. That means that when you

9  are deciding the case, you must not consider the stricken evidence for any purpose.

10

11       **Authority**: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592

12  (Instruction No. 7).

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **<u>Stipulated Instruction No. 9 Re DEPOSITION IN LIEU OF LIVE TESTIMONY</u>**

2    During the trial, you heard testimony by witnesses in the form of previously recorded

3    deposition testimony, rather than live here in court. A deposition is the sworn testimony of a witness

4    taken before trial. The witness was placed under oath to tell the truth, and lawyers for each side asked

5    questions. The questions and answers were recorded.

6    Insofar as possible, you should consider deposition testimony presented to you in court in lieu

7    of live testimony, in the same way as if the witnesses had been present to testify.

8

9    **Authority**: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592

10    (Instruction No. 8).

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Stipulated Instruction No. 10 Re CREDIBILITY OF WITNESSES**

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness said, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

1.    the opportunity and ability of the witness to see or hear or know the things testified to;

2.    the witness's memory;

3.    the witness's manner while testifying;

4.    the witness's interest in the outcome of the case, if any;

5.    the witness's bias or prejudice, if any;

6.    whether other evidence contradicted the witness's testimony;

7.    the reasonableness of the witness's testimony in light of all the evidence; and

8.    any other factors that bear on believability.

Sometimes a witness may have said something that is not consistent with something else he or she said. Sometimes different witnesses gave different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

**Authority**: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592 (Instruction No. 9).

1

## <u>Stipulated Instruction No. 11 Re EXPERT OPINION</u>

2        You have heard testimony from expert witnesses who testified to opinions and the reasons for

3 their opinions. This opinion testimony was allowed because of the education or experience of the

4 expert witness.

5        Such opinion testimony should be judged like any other testimony. You may accept it, reject

6 it, or give it as much weight as you think it deserves, considering the witness's education and

7 experience, the reasons given for the opinion, and all the other evidence in the case.

8

9        **Authority**: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592

10 (Instruction No. 10).

1

## **Stipulated Instruction No. 12 Re CHARTS AND SUMMARIES**

During trial, certain charts and summaries were shown to you in order to help explain the contents of books, records, documents, or other evidence in the case. Some of those charts or summaries may have been admitted into evidence, while others were not.

Charts and summaries are only as good as the evidence that supports them. You should, therefore, give them only such weight as you think the evidence supporting them deserves.

**Authority**: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592 (Instruction No. 11).

1

## **<u>Stipulated Instruction No. 13 Re STIPULATIONS OF FACT</u>**

2        The parties have agreed to certain facts that I will now read to you. You must treat these facts

3   as having been proved.

4        [Insert stipulations].

5

6        **Authority**: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592

7   (Instruction No. 12).

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **Disputed Instruction No. 14 Re ANTITRUST LAWS – PURPOSE – PLAINTIFFS'**

2    **PROPOSED INSTRUCTION**

3    Plaintiffs Klein, Grabert, and Banks Kupcho assert two claims in this case. In the first, they

4    assert that Facebook unlawfully monopolized the alleged Personal Social Networking Services

5    Market. In the second, they assert that Facebook unlawfully attempted to monopolize the Personal

6    Social Networking Services Market. Both of these claims arise under the Sherman Act.

7    The purpose of the Sherman Act is to preserve free and unfettered competition in the

8    marketplace. The Sherman Act rests on the central premise that competition produces the best

9    allocation of our economic resources, the lowest prices, the highest quality, and the greatest material

10    progress.

11

12    **Authority**:    *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592

13    (Instruction No. 15) (modified).

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### Plaintiffs' Argument Re Instruction No. 14

Meta objects wholesale to the inclusion of an instruction regarding the purpose of the antitrust laws. Meta's objection should be overruled, and Plaintiffs' Instruction No. 14 should be given.

The Supreme Court has long made clear that: "[t]he Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress[.]" *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 104 n.27 (1984). As such, the ABA Model Jury Instructions in Civil Antitrust Cases provide an instruction—the very first one in the entire ABA set—regarding the antitrust laws' purpose and containing that language. Indeed, courts, including this one, regularly instruct the jury that: "The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace. The Sherman Act rests on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress." *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592 (Instruction No. 15).

Plaintiffs' proposed Instruction No. 14 is based on this Court's instruction in *Epic*, as well as the ABA Model. It is a neutral statement of the law, and it orients the jury as to disputed issues in this case that the jury must decide, including whether: (1) Meta's deception promotes competition (or not); and (2) Plaintiffs' claimed injuries are of the type of injury that the antitrust laws were intended to prevent. Plaintiffs therefore submit that this Instruction should be given at the outset of the substantive instructions regarding Plaintiffs' antitrust claims, as this Court and countless others have repeatedly done before.

To the extent Meta objects to this instruction because it refers to both Plaintiffs' monopolization **and** *attempted* monopolization claim, that fails too: as Plaintiffs explained *supra*, their attempted monopolization claim is live in this case, it has not disappeared, and it must be decided by the jury.

## <u>Defendant's Argument Re Instruction No. 14</u>

Meta respectfully objects to the inclusion of this instruction as superfluous and redundant of others, adding length to the charge without any benefit.  The claims brought by the plaintiffs and the purpose of antitrust laws are adequately explained in the subsequent instructions, and the Court has previously omitted this instruction.  *See* Jury Instructions, *In re Capacitors Antitrust Litig.*, No. 3:17-md-02801-JD (N.D. Cal. May 17, 2023), Dkt. 1923; Jury Instructions, *In re Capacitors Antitrust Litig.*, No. 3:14-cv-03264-JD (N.D. Cal. Dec. 13, 2021), Dkt. 2899.  Moreover, the instruction is unbalanced, suggesting that plaintiffs seek to protect competition without explaining that conduct that harms competitors, even when undertaken by a monopolist, often represents competition on the merits and does not violate the antitrust laws.  Finally, Meta objects to plaintiffs' inclusion of a reference to an attempted monopolization claim, for the reasons set forth in Meta's argument on Instruction No. 2.

**Disputed Instruction No. 15 Re SECTION 2 OF THE SHERMAN ACT –**

**MONOPOLIZATION – ELEMENTS – PLAINTIFFS' PROPOSED INSTRUCTION**

Plaintiffs Klein, Grabert, and Banks Kupcho bring two antitrust claims, which I will now explain. The antitrust laws prohibit companies from willfully acquiring or maintaining monopolies in relevant markets through anticompetitive conduct. In addition, the antitrust laws also prohibit companies from attempting to acquire or maintain monopolies in relevant markets through anticompetitive conduct. Plaintiffs assert both these claims here: first, a claim for monopolization, and second, a claim for attempted monopolization.

The elements for these claims are largely similar. I will explain where they differ.

I will first explain Plaintiffs' monopolization claim under Section 2 of the federal Sherman Antitrust Act.  Plaintiffs contend that they were injured by Meta unlawfully maintaining a monopoly of an alleged market for personal social networking services.

To prevail on a claim that Meta has unlawfully monopolized an alleged relevant market, Plaintiffs must prove each of the following elements by a preponderance of the evidence for that market:

1.    that the alleged relevant market is a valid antitrust market;

2.    that Meta possesses monopoly power in the alleged relevant market;

3.    that Meta willfully acquired or maintained its monopoly power in the alleged relevant market by  engaging in anticompetitive conduct;

and

4.    that Plaintiffs were injured in their business or property because of Meta's anticompetitive conduct.

If you find that Plaintiffs have failed to prove by a preponderance of the evidence any of these elements, then you must find for Meta and against Plaintiffs on the claim for unlawful monopolization.  If you find that Plaintiffs have proven each of these elements by a preponderance of

the evidence, then you must find for Plaintiffs and against Meta on the claim for unlawful monopolization.

**Authority**: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592 (Instruction No. 16) (modified).

1

2

**Disputed Instruction No. 15 Re SECTION 2 OF THE SHERMAN ACT –**

**MONOPOLIZATION – ELEMENTS – META'S PROPOSED INSTRUCTION**

3    I will now explain the plaintiffs' monopolization claim under Section 2 of the federal

4    Sherman Antitrust Act.  The plaintiffs allege that they were injured by Meta unlawfully maintaining

5    a monopoly of an alleged market for personal social networking services.

6    To prevail on a claim that Meta has unlawfully maintained a monopoly of an alleged relevant

7    market, the plaintiffs must prove each of the following elements by a preponderance of the evidence

8    for that market:

9         1.   that the alleged relevant market is a valid antitrust market;

10        2.   that Meta possesses monopoly power in the alleged relevant market;

11        3.   that Meta willfully maintained its monopoly power in the alleged relevant market by

12             engaging in exclusionary conduct;

13        4.   that the exclusionary conduct resulted in anticompetitive effects;

14        5.   Meta's conduct occurred in or affected interstate or foreign commerce; and

15        6.   that the plaintiffs were injured in their business or property because of Meta's

16             exclusionary conduct.

17    If you find that the plaintiffs have failed to prove by a preponderance of the evidence any of

18    these elements, then you must find for Meta and against the plaintiffs on the claim for unlawfully

19    monopolizing that market.  If you find that the plaintiffs have proven each of these elements by a

20    preponderance of the evidence, then you must find for the plaintiffs and against Meta on this claim.

21

22    *Authority*: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592

23    (Instruction No. 16) (modified)

24

25

26

27

28

1

**Plaintiffs' Argument Re Instruction No. 15**

2    Plaintiffs' proposed instruction as to the elements of their monopolization claim is consistent

3 with this Court's instruction in *Epic*, as well as the caselaw. Meta's is not, and it should be rejected.

4    ***First***, Plaintiffs' proposal makes clear that Plaintiffs bring two separate claims for

5 monopolization and attempted monopolization, provides a neutral summary of the concepts of

6 monopolization and attempted monopolization, and then provides instructions regarding

7 monopolization, previewing that instructions for Plaintiffs' second claim (attempted monopolization)

8 will follow. The Court provided a similar roadmap to the jury in *Epic* in its instruction on the elements

9 for monopolization. *See Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592

10 (Instruction No. 16) ("Epic brings two types of antitrust claims, which I will now explain" and "I will

11 first explain Epic's monopolization claims under Section 2 of the federal Sherman Antitrust Act.").

12 There is no good reason for Meta's objection to a similar roadmap being provided to the jury here.

13 And if Meta's objection is that such a roadmap is unnecessary because there only a claim for

14 monopolization and not attempted monopolization, that is wrong, as Plaintiffs explain above.

15    ***Second***, the Court's instruction should instruct the jury that an element of Plaintiffs'

16 monopolization claim is whether Plaintiffs "willfully acquired or maintained" power, not just

17 "maintained." As with other instructions, Meta seeks to engage in linguistic wordplay regarding

18 "acquired or maintained." Given the usual four-year statute of limitations, and to streamline the issues

19 for trial, Plaintiffs only seek damages from December 2016 onwards (the start of the limitations

20 period). Because Plaintiffs' factual contention is that Meta "acquired" its monopoly before 2016,

21 Plaintiffs have clarified—in response to Meta's statute of limitations arguments—that under

22 Plaintiffs' worldview, Plaintiffs' claims are for "maintenance" in that limited sense. However, the

23 jury could find that Meta did ***not*** acquire a monopoly before 2016, such that its conduct during in

24 2016 and after ***was*** "acquisition" not "maintenance." Plaintiffs' proposal allows for that flexibility.

25 Indeed, Epic's claims against Google before this Court were based on monopoly "maintenance." Case

26 No. 3:21-md-2981-JD, Dkt. 641 at 1 (Epic's trial brief, asserting Google "maintained durable

27 monopolies"). Yet, the Court's jury instruction gave the jury flexibility to determine whether "Google

28 willfully acquired or maintained monopoly power through anticompetitive acts[.]" *Epic Games, Inc.*

1   *v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592 (Instruction No. 23).

2       ***Third***, in instructing the jury and describing what conduct Section 2 prohibits, the Court

3   should use Plaintiffs' "anticompetitive" and reject Meta's "exclusionary."[3] "Exclusionary" is a lay

4   word that the jury could misinterpret to mean, incorrectly, that Meta's conduct must ***completely***

5   foreclose rivals. That is not what Section 2 requires; rather, the challenged conduct need only

6   ***unreasonably*** restrain competition. Modern case law often uses the term "anticompetitive," rather

7   than "exclusionary." *See, e.g., CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 2025 WL 2573045, at

8   *5-6 (9th Cir. Sept. 5, 2025) (explaining that plaintiffs must "plausibly allege that the defendant

9   engaged in anticompetitive conduct," and then explaining "[t]he anticompetitive-conduct

10  requirement"). Similarly, this Court used "anticompetitive" rather than "exclusionary," as does the

11  ABA Model. *See Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592

12  (Instruction No. 16); ABA Model Jury Instructions in Civil Antitrust Cases A-102.

13      ***Fourth***, the Court should reject Meta's efforts to invent a distinct requirement "that the

14  exclusionary conduct resulted in anticompetitive effects." Whether Meta's conduct had

15  anticompetitive effects is analytically assessed in determining whether the conduct was

16  anticompetitive—*i.e.*, the "conduct" element, not as a separate element. That is why the parties'

17  proposed instructions regarding the conduct element address "anticompetitive effects" as part of the

18  rule of reason's burden-shifting framework germane to that element. And it is why, consistent with

19  Plaintiffs' proposal, neither the Court's instruction in *Epic* nor the ABA Model list "anticompetitive

20  effects" as a separate element. *See Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-

21  JD, Dkt. 592 (Instruction No. 16); ABA Model Jury Instructions in Civil Antitrust Cases A-102.

22  ---

23  [3]  Plaintiffs recognize that this Court in *Epic* instructed the jury that a monopolization claim requires "that the alleged relevant market is a valid antitrust market[.]" *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592 (Instruction No. 16). The Ninth Circuit, however, has recognized that "defining the relevant market" is a "threshold step" in "most, ***though not all***, Rule of Reason cases[.]" *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 974 (9th Cir. 2023); *see also Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 n.3 (3d Cir. 2007) ("relevant market definition is not a necessary component of a monopolization claim where there is direct evidence of monopoly power") (cleaned up) (collecting cases). Plaintiffs therefore maintain and preserve their objection to any instruction that necessarily requires defining a market as an element for Plaintiffs' claims. Meta relies below on language in *Qualcomm* (and *Coronavirus*) that market definition is "essential to any antitrust case," but the Ninth Circuit in *Epic* explained that language is "dicta." 67 F.4th at 974 n.6.

1          **<u>Defendant's Argument Re Instruction No. 15</u>**

2          Plaintiffs' proposed instruction includes waived, untimely, and noncognizable claims, then

3    elides the requirement that plaintiffs prove the challenged conduct had an anticompetitive effect.

4    Meta's instruction reflects the law and record.

5          *First*, plaintiffs' instruction refers to an untimely theory of monopoly acquisition that they

6    conceded was time barred and waived when opposing summary judgment—as plaintiffs put it, their

7    "claims are based on Facebook's monopoly ***maintenance***" and acquisition is "irrelevant."  MSJ

8    Opp. 21, Dkt. 952-01 (emphasis original). Plaintiffs' claims are governed by a four-year statute of

9    limitations.  15 U.S.C. § 15(b).  Because plaintiffs filed suit on December 3, 2020, their claims must

10   be premised on conduct occurring later than December 3, 2016.  Meta's MSJ 18-19, Dkt. 925-01;

11   *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1065 (N.D. Cal. 2016) (antitrust claims accrue "at

12   the time of the alleged anticompetitive conduct.")   Plaintiffs and their experts have, however,

13   repeatedly argued that their acquisition claims are predicated solely on conduct occurring well

14   before the limitations period.  *See, e.g.*, Economides CC Rep. ¶323, Dkt. 925-18 ("By 2011,

15   Facebook had defeated Myspace and had acquired monopoly power in the Personal Social Network

16   Market."); Economides Merits Rep. ¶73, Dkt. 925-12 ("By 2009, however, Facebook had overtaken

17   Myspace to become the dominant social network in the number of unique U.S. visitors.").

18   Unsurprisingly, then, plaintiffs waived presenting any acquisition claim to the jury in their

19   opposition to Meta's motion for summary judgement:

20          Facebook's fixation on monopoly ***acquisition*** (id. 19–20), has nothing to do with the
            timeliness of Consumers' claims. Consumers' damages claims are based on
21          Facebook's monopoly ***maintenance*** between December 2016 and December 2020.
            So while Facebook's pre-limitations conduct is part of the "Conduct Period" and
22          relevant as "table setting," the claims' timeliness does not depend on that pre-
            limitations period conduct, and Facebook's arguments about acquisition and the
23          supposed "default rule" are irrelevant.

24   MSJ Opp. 21, Dkt. 952-01; *accord* Farrell Daubert Opp. 3 (describing "the situation alleged in this

25   case" as "a pre-existing exercise of market power").  Plaintiffs then confirmed when meeting and

26   conferring regarding these instructions that they were not advancing any acquisition claims.  Those

27

28

1    concessions alone require removal of all references to acquisition in the instructions—instructing
2    the jury on an abandoned theory that cannot be the basis for liability will only cause confusion.

3        *Second*, plaintiffs' instruction improperly references attempt claims that are contradicted by
4    the record and their theory of liability, in addition to being unrecognized as a matter of law.  *See*
5    Meta's Objection to Instruction No. 2.

6        *Third*, plaintiffs' instruction ignores that "'[t]o be condemned as exclusionary, a
7    monopolist's act must have an "anticompetitive effect"'—that is, it 'must harm the competitive
8    process and thereby harm consumers.'"  *FTC v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020)
9    (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001)).  As the Ninth Circuit
10   has explained, "[a]llegations that conduct has the effect of reducing consumers' choices or
11   increasing prices to consumers do[ ] not sufficiently allege an injury to competition ... [because]
12   [b]oth effects are fully consistent with a free, competitive market."  *Id.* (internal quotation marks
13   omitted).  Meta's proposed instruction thus properly directs the jury that they must determine
14   whether "the exclusionary conduct resulted in anticompetitive effects."  Plaintiffs do not dispute
15   that the law requires this finding, and their proposal to address it by cross-referencing another
16   instruction in a long set of charges prejudices Meta's defense.

17       *Finally*, to the extent plaintiffs dispute that they must prove a relevant market, their position
18   is foreclosed by binding precedent.  Defining a relevant market is the cornerstone of *any* antitrust
19   liability in this circuit—without it, there is nothing for Meta to have monopolized.  *See Coronavirus*
20   *Rep. v. Apple, Inc.*, 85 F.4th 948, 955-57 (9th Cir. 2023) ("Market definition is essential to any
21   antitrust case . . . Without a defined relevant market in terms of product or service, one cannot
22   sensibly or seriously assess market power."); *Qualcomm Inc.*, 969 F.3d at 992 ("A threshold step in
23   any antitrust case is to accurately define the relevant market.").  Plaintiffs' footnote from *Epic*
24   *Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023) is inapposite—*Epic Games* was decided
25   before *Coronavirus*, and there discusses per se and quick look cases. This Court has thus properly
26   instructed the jury that the first element of a Section 2 monopolization claim is proof "that the
27   alleged relevant market is a valid antitrust market."  *Epic Games, Inc. v. Google LLC et al*, No. 3:20-
28   cv-05671-JD (N.D. Cal. Dec. 6, 2023), Dkt. 592 (Instruction No. 16). It should do the same here.

1    **Disputed Instruction No. 16 Re MONOPOLIZATION – MONOPOLY POWER DEFINED –**

2    **PLAINTIFFS' PROPOSED INSTRUCTION**

3         To prove their monopolization claim, Plaintiffs must prove that Meta has monopoly power in

4    a relevant antitrust market. Monopoly power is the power to increase prices, restrict output, decrease

5    quality, or exclude competition in a relevant antitrust market. For example, a firm is a monopolist if

6    it can profitably raise or maintain prices substantially above (or reduce or maintain quality or output

7    substantially below) the competitive level for a significant period of time.

8         I will provide further instructions about how you may determine whether Plaintiffs have met

9    their burden of proving monopoly power in a relevant market.

10

11        **Authority**: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592

12   (Instruction No. 17) (modified).

1    **<u>Disputed Instruction No. 16 Re MONOPOLIZATION – MONOPOLY POWER DEFINED –</u>**
2    **<u>META'S PROPOSED INSTRUCTION</u>**

3    To prove their monopolization claim, plaintiffs must prove that Meta has monopoly power

4 in a relevant antitrust market. Monopoly power is the power to increase prices, restrict output, or

5 exclude competition in a relevant antitrust market. More precisely, a firm is a monopolist if it can

6 profitably raise or maintain prices substantially above (or reduce or maintain output substantially

7 below) the competitive level for a significant period of time.

8    I will provide further instructions about how you may determine whether plaintiffs have met

9 their burden of proving monopoly power in a relevant market.

10

11    **Authority**: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592

12 (Instruction No. 17) (modified)

### Plaintiffs' Argument Re Instruction No. 16

The parties' proposals are largely similar but differ in one main respect. In defining monopoly power, Plaintiffs propose to a reference to "quality"—*i.e.*, monopoly power is the power to "increase prices, restrict output, ***decrease quality***, or exclude competition in a relevant antitrust market."[4] In the next sentence illustrating when "a firm is a monopolist," Plaintiffs likewise propose to make clear that in addition to raising or maintaining prices, or reducing or maintaining output, a firm is also monopolist if it can "reduce or maintain ***quality***." Meta refuses Plaintiffs' inclusion of "quality."

Plaintiffs' proposal is consistent with the caselaw and this Court's prior jury instructions. For example, the Ninth Circuit recently confirmed "reduced output, increased prices, *or* decreased quality in the relevant market may serve as proof of actual detrimental effects on competition," *i.e.*, "direct evidence of monopoly power." *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 2025 WL 2573045, at *7 (9th Cir. Sept. 5, 2025) (original emphasis) (cleaned up). Similarly, this Court in *Epic* instructed the jury that that "a firm is a monopolist if it can . . . ***reduce or maintain quality substantially below*** [] the competitive level[.]" *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592 (Instruction No. 17) (emphasis added).

During the parties' meet-and-confer, Meta stated that it wanted to include references to "output." Plaintiffs agreed to do so, but explained that the jury should also be instructed on "quality." Meta refused, because, according to Meta, there is no evidence regarding decreased quality and none of Plaintiffs' experts offered any opinions regarding product quality. That is demonstrably false. Plaintiffs' relevant market expert, Professor Farrell, for example, explains that "competition may well focus on aspects other than prices," including "quality[.]" Farrell Rept. ¶ 108. The jury will also hear mountains of evidence regarding how Meta offered inferior product quality—such as worse data collection and use practices, as is confirmed by events like Cambridge Analytica—but still was able to sustain market share. From this, the jury could conclude that Meta's ability to reduce quality is direct evidence of its monopoly power. While Meta may disagree with the persuasiveness of this "quality" evidence, that does not mean the jury should not be instructed on it.

---

[4] Plaintiffs maintain and preserve their objection to any instruction that would necessarily require the definition of a relevant market as an element of their claims.

1      To the extent that Meta contends "quality" should not be referenced in the monopoly power

2  instruction because Plaintiffs supposedly did not timely disclose a damages theory based on a

3  reduction of product quality (rather than Meta not providing users a cash payment for their data),

4  Meta is incorrect. As explained in their opposition to Meta's motion *in limine* No. 6, Plaintiffs have

5  pursued a damages theory based on increased quality (or collection and use of less data) in the but-

6  for world since this case's start. Moreover, Meta's mischaracterization aside, Plaintiffs' ***damages***

7  theory does not dictate what should be included in the Court's jury instruction on ***monopoly power***.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## Defendant's Argument Re Instruction No. 16

2      The parties disagree throughout their proposed instructions on whether changes in quality

3   should be referenced.  Because plaintiffs have presented no evidence regarding any change in quality

4   among Meta's services, and their experts expressly disclaimed offering opinions on quality, such

5   references lack the necessary support in the record and will only confuse the jury if part of the

6   instructions.  They further risk the jury finding Meta liable for theories that the record cannot support

7   as a matter of law.  The Court should instead use Meta's instructions, which excise references to

8   quality but otherwise largely mirror the model instructions and those the Court has previously given.

9      To start, plaintiffs' proposed means of proving monopoly power has nothing to do with

10  quality, rendering references to quality as part of *this* instruction particularly incongruous and

11  confusing.  Plaintiffs have instead explained that they will seek to prove monopoly power by reference

12  "time spent by users" on Facebook, Instagram, and other apps in the putative PSNS market.  MSJ

13  Opp. 3, Dkt. 952-01; *see also* Farrell Daubert Opp. 3 ("Dr. Farrell computed market share during the

14  class period for the five companies in the PSNS market using time spent by users on the apps.").

15  Nowhere in plaintiffs' descriptions of how they seek to prove monopoly power is quality referenced;

16  the jury should not be told to consider evidence plaintiffs themselves have admitted they are not

17  advancing.

18      References to quality are also inappropriate because plaintiffs' experts affirmatively

19  disclaimed offering opinions on changes in quality.  *See, e.g.*, Economides 9/23 Tr. 102:05-13, Dkt.

20  925-07 ("Q. So in your but-for world, Facebook could have responded to more competition by

21  offering better services instead of paying users; correct? A. Not correct. I think that paying users

22  would be a crucial feature of the but-for world to make sure that people come to Facebook. Now,

23  could it—could Facebook also have better features? Possibly. I don't know.").  Plaintiffs' quotation

24  of Farrell's reference to the possibility of quality changes is misleading—he actually testified that he

25  was offering no such opinion.  Farrell 3/24 Tr. 119:10-13, Dkt. 957-03 ("Q. Are you offering any

26  opinions with regard to the product quality of the Facebook apps? A. The level of product quality?

27  No, I'm not.").  And indeed, Economides has testified that Meta *did not* use its market power to

28  degrade the quality of its offerings, instead testifying that in a but-for world without the allegedly

anticompetitive conduct, Facebook and Instagram would "remain the same products." Economides 9/23 Tr. 144:20-145:02, Dkt. 957-02 ("Q. In your but-for world, are you assuming that Facebook and Instagram would remain the same products as they are in the actual world? A. Well, you have to keep in mind that the but-for world is an unknown, and we do the best approximation that we can with them. So at the first approximation, the answer is yes, we expect Facebook and Instagram to remain the same products.").

Because plaintiffs have advanced no monopoly power arguments involving evidence of changes of in quality, and their experts have in fact disclaimed offering such opinions, instructing the jury to consider quality is unwarranted, prejudicial, and confusing.

1    **<u>Disputed Instruction No. 17 Re MONOPOLIZATION –RELEVANT PRODUCT MARKET –</u>**

2    **<u>PLAINTIFFS' PROPOSED INSTRUCTION</u>**

3    In this case, Plaintiffs contend that there is a relevant product market for Personal Social

4    Networking Services. You should consider whether Plaintiffs have proven by a preponderance of the

5    evidence this or any other market.

6    In determining the relevant market, the "area of effective competition" must be determined

7    by reference to: (1) a product market; and (2) a geographic market.

8    In determining the product market, the basic idea is that the products within it are reasonable

9    substitutes for each other from the buyer's point of view. This does not mean two products must be

10   identical to be in the same relevant market, or, conversely, that any two products that "compete" in

11   any sense of that word are in the same relevant market. Rather, products must be, as a matter of

12   practical fact (including the marketing efforts of sellers) and the actual behavior of consumers,

13   substantially or reasonably interchangeable to fill the same consumer needs or purposes.

14

15   **Authority:**     *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592

16   (Instruction No. 18) (modified); ABA Model Jury Instructions in Civil Antitrust Cases A-108

17   (modified).

18

19

20

21

22

23

24

25

26

27

28

## Disputed Instruction No. 17 Re MONOPOLIZATION –RELEVANT PRODUCT MARKET – META'S PROPOSED INSTRUCTION

Plaintiffs must prove by a preponderance of the evidence that Facebook had monopoly power. That requires Plaintiffs to define the relevant market.

In determining the relevant market, the "area of effective competition" must be determined by reference to: (1) a product market; and (2) a geographic market.

In this case, Plaintiffs contend that there is a relevant product market for Personal Social Networking Services. You should consider whether Plaintiffs have proven this market by a preponderance of the evidence. To make this judgment, you must be able to determine what, if any, economic forces restrain Meta's freedom to set prices. The most likely and most important restraining force will be actual and potential competition from other firms and their products. This includes all firms and products that act or likely could act as restraints on Meta's power to set prices as it pleases because customers could switch to them if Meta sets its own prices too high. All the firms and products that exert such restraining force are within what is called the relevant market.

In determining the product market, the basic idea is that the products within it are reasonable substitutes for each other from the buyer's point of view; that is, the products compete with each other. This does not mean two products must be identical to be in the same relevant market, or, conversely, that any two products that "compete" in any sense of that word are in the same relevant market. Rather, products must be, as a matter of practical fact (including the marketing efforts of sellers) and the actual behavior of consumers, substantially or reasonably interchangeable to fill the same consumer needs or purposes. Thus, for example, if consumers seeking to cover leftover food for storage considered certain types of flexible wrapping material—such as aluminum foil, or plastic containers—to be reasonable alternatives, then all those products may be in the same relevant product market.

**Authority**: Modified ABA Model Civil Antitrust Jury Instructions 3.A.3 & 3.A.4*; Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592 (Instruction No. 18).

1

**<u>Plaintiffs' Argument Re Instruction No. 17</u>**

2    Plaintiffs' proposed product market instruction is straightforward and based on this Court's

3  similar instruction in *Epic*, as well as the ABA model. Meta's proposal is convoluted and

4  argumentative, it misstates the law, and it should be rejected.

5    ***First***, Meta's instruction wrongly states that proving monopoly power "requires Plaintiffs to

6  define the relevant market." That is incorrect. As stated above, "defining the relevant market" is not

7  required in all rule-of-reason cases, such as where an antitrust plaintiff shows the defendant's

8  monopoly power via direct evidence. *See Epic Games, Inc. v. Apple*, *Inc.*, 67 F.4th 946, 974 & n.6

9  (9th Cir. 2023) (market definition a "threshold step" "[i]n most, though not all, Rule of Reason cases,"

10  describing language Meta relies on below from *Qualcomm*, later cited in *Coronavirus*, as "dicta");

11  *accord Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 n.3 (3d Cir. 2007) ("direct proof of

12  monopoly power does not require a definition of the relevant market").

13    ***Second***, Meta's proposed instruction contains extraneous language that is also one-sided. It

14  states, for example, that the jury "must be able to determine what, if any, economic forces restrain

15  Meta's freedom to set ***prices***," and then connects defining a market to firms that can restrain "Meta's

16  power to set ***prices***[.]" Ostensibly, this is all part of Meta's defense that it has no power because its

17  products are "free." But, whether Meta's products are actually "free" is a disputed issue the jury must

18  decide. And, in any event, "price" is but one dimension of competition (aside from, for example,

19  quality and output), making Meta's instruction incomplete. Further, Meta proposes to include an

20  example based on "covering leftover food for storage" and "reasonable alternatives" based on

21  "flexible wrapping material." This Court did not load up its relevant product market instruction to the

22  jury with such supposed "explanations" or parables. *See Epic Games, Inc. v. Google LLC et al*, Case

23  No. 3:20-cv-05671-JD, Dkt. 592 (Instruction No. 18). It should not do so here. If Meta wishes to

24  make such arguments, it may do so through its experts.

25

26

27

28

**<u>Defendant's Argument Re Instruction No. 17</u>**

Meta's additions to this instruction are drawn from this Court's prior instructions and the American Bar Association's Model Civil Antitrust Jury Instructions, and plaintiffs have identified no legal error or other reason not to give them. Taken together, Meta's proposed additions add to the jury's understanding of the concept of a relevant antitrust market, a hotly disputed issue in the case.

***First,*** plaintiffs seek to evade the requirement they define a relevant market. Defining a relevant market is the cornerstone of *any* Section 2 antitrust liability in this circuit—without it, there is nothing for Meta to have monopolized. *See Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 955-57 (9th Cir. 2023) ("Market definition is essential to any antitrust case . . . Without a defined relevant market in terms of product or service, one cannot sensibly or seriously assess market power."); *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) ("A threshold step in any antitrust case is to accurately define the relevant market."). In *Epic*, this Court thus properly instructed the jury that the first element of a Section 2 monopolization claim is proof "that the alleged relevant market is a valid antitrust market." *Epic Games, Inc. v. Google LLC et al*, No. 3:20-cv-05671-JD (N.D. Cal. Dec. 6, 2023), Dkt. 592 (Instruction No. 16). For the same reasons, this instruction should explain to the jury that defining a market is necessary to liability.

***Second***, the specific language that plaintiffs call "extraneous" and "one-sided" is drawn directly from the ABA Model Instructions. *See* ABA Model Civil Antitrust Jury Instructions 3.A.3, 3.A.4. This language has also been given by courts in this district. *See, e.g.*, Jury Instructions, *Sumotext Corp. v. Zoove, Inc.*, No. 16-cv-01370 (N.D. Cal. Mar. 4, 2020), Dkt. 468 (Instruction No. 35). The additional explanations provided by the model instructions and contained in Meta's proposal will assist the jury in evaluating the relevant market, and plaintiffs identify no legal error. To the extent plaintiffs take particular issue with the references to "prices," their entire theory of injury and damages is premised on arguments about the "effective price" of Meta's services, reinforcing that Meta's proposed instructions are relevant and appropriate.

## Disputed Instruction No. 18 Re RELEVANT GEOGRAPHIC MARKET – PLAINTIFFS' PROPOSED INSTRUCTION

The relevant geographic market is the area in which Meta faces competition from other firms that compete in the relevant product market and to which customers can reasonably turn to for substitutes. When analyzing the relevant geographic market, you should consider whether changes in prices, output, quality, or product offerings in one geographic area have substantial effects on prices, output, quality, or product offerings in another geographic area, which would tend to show that both areas are in the same relevant geographic market. The geographic market may be as large as global or nationwide, or as small as a single town or neighborhood.

Plaintiffs have the burden of proving the relevant geographic market by a preponderance of the evidence. In this case, Plaintiffs claim that the relevant geographic market is the United States. In determining whether Plaintiffs met their burden and demonstrated that their proposed geographic market is proper, you may consider several factors, including:

1. The geographic area in which Meta offers personal social networking services and where Meta's users are located;

2. The geographic area to which Meta's users turn (or can turn) for substitute personal social networking services;

3. The geographic area to which Meta's users have turned or have seriously considered turning;

4. The geographic areas that Meta's users view as potential sources of substitute personal social networking services; and

5. Whether governmental licensing requirements, taxes, quotas, or regulations have the effect of limiting competition in certain areas.

**Authority**: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592 (Instruction No. 19) (modified); ABA Model Jury Instructions in Civil Antitrust Cases A-113 (modified).

1    **<u>Disputed Instruction No. 18 Re RELEVANT GEOGRAPHIC MARKET – META'S</u>**

2    **<u>PROPOSED INSTRUCTION</u>**

3    The relevant geographic market is the area in which Meta faces competition from other firms

4    that compete in the relevant product market and to which customers can reasonably turn to for

5    substitutes. When analyzing the relevant geographic market, you should consider whether changes in

6    prices or output in one geographic area have substantial effects on prices or output in another

7    geographic area, which would tend to show that both areas are in the same relevant geographic

8    market. The geographic market may be as large as global, or as small as a single town or

9    neighborhood.

10    Plaintiffs have the burden of proving the relevant geographic market by a preponderance of

11    the evidence. In this case, plaintiffs claim that the relevant geographic market is the United States. In

12    determining whether plaintiffs met their burden and demonstrated that their proposed geographic

13    market is proper, you may consider several factors, including:

14

15    1.   The geographic area in which Meta offers personal social networking services and

16         where Meta's users are located;

17    2.   The geographic area to which Meta's users turn (or can turn) for substitute personal

18         social networking services;

19    3.   The geographic area to which Meta's users have turned or have seriously considered

20         turning;

21    4.   The geographic areas that Meta's users view as potential sources of substitute personal

22         social networking services; and

23    5.   Whether governmental licensing requirements, taxes, quotas, or regulations have the

24         effect of limiting competition in certain areas.

25

26    **Authority**: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592

27    (Instruction No. 19) (modified).

28

**Plaintiffs' Argument Re Instruction No. 18**

Plaintiffs' instruction is based on the geographic market instruction that this Court gave in *Epic*, with several additions from the ABA model instruction. The Court should adopt Plaintiffs' proposal and reject Meta's.

***First***, Plaintiffs' proposal instructs the jury that in evaluating the geographic market, it should consider "whether changes in ***prices, output, quality, or product offerings*** in one geographic area have substantial effects on ***prices, output, quality, or product offerings*** in another geographic area[.]" By contrast, Meta's proposal refers to "prices" and "output" only. As to "quality," this Court's instruction in *Epic* referred to "prices" and "product quality" (like what Plaintiffs propose) but ***not*** output (as Meta proposes).[5] *See Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592 (Instruction No. 19). Plaintiffs' proposal regarding "product offerings" likewise stems from the ABA model, which includes that language. *See* ABA Model Jury Instructions in Civil Antitrust Cases A-113.

Meta's counsel has indicated that Meta now intends to challenge Plaintiffs' definition of the geographic market as being the United States (rather than worldwide). The jury will hear evidence regarding the quality, features, and offerings of various products around the world—not just their "price" and "output"—and argument regarding how that did or did not influence Meta's products in the United States. Therefore, the jury should be instructed that both "quality" and "product offerings" are pertinent metrics by which they should evaluate the geographic market.

---

[5] Nonetheless, Plaintiffs agreed to include "output" (Meta's request, absent from this Court's *Epic* instruction), but requested that likewise Meta agree to include "quality" (included in this Court's *Epic* instruction). Meta refused.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>Defendant's Argument Re Instruction No. 18</u>**

Meta objects to the inclusion of references to quality in this instruction for the reasons given in its objection to Instruction No. 16.  Plaintiffs have presented no evidence or expert analysis of changes in quality and changes in quality are not recognized in the case law as supporting a geographic market.  Plaintiff's expert did not purport to perform a geographic market exercise based on changes in quality either.  Directing the jury to consider information about quality that is not in the record—and indeed that plaintiffs' experts disclaimed offering—when evaluating the relevant geographic market will be confusing and prejudicial to Meta.

1

**Stipulated Instruction No. 19 Re MONOPOLIZATION – EXISTENCE OF MONOPOLY**

2

**POWER –TYPES OF PROOF**

3       If you find that Plaintiffs have proven a relevant market, then you should determine whether

4   Meta has monopoly power in that market.

5       You can consider two kinds of proof to determine whether Meta has monopoly power: (1)

6   direct proof, and (2) indirect proof.  In the following instructions, I will explain to you these two kinds

7   of proof that you can consider.

8

9       **Authority**: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592

10  (Instruction No. 20).

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 20 Re MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – DIRECT PROOF – PLAINTIFFS' PROPOSED INSTRUCTION**

There are two ways to provide direct proof of monopoly power, which I will now explain.

Raising or Maintaining Prices Above, or Reducing Quality or Output Below, Competitive Levels

In order to provide direct proof of monopoly power, Plaintiffs have the burden of proving that Meta has the ability to raise or maintain the prices that it charges for goods or services in the relevant market above competitive levels, or to reduce or maintain the quality or output of goods or services in the relevant market below competitive levels. Plaintiffs must prove that Meta has the power to do so by itself—that is, without the assistance of, and despite competition from, any existing or potential competitors.

Plaintiffs also have the burden of proving that Meta has the power to maintain prices for personal social networking services above a competitive level, or quality or output below the competitive level, for a significant period of time. If Meta attempted to maintain personal social networking services prices above competitive levels, or reduce quality or output below competitive levels, but would lose enough business to other competitors that the price increase, quality decrease, or output reduction would become unprofitable and would have to be withdrawn, then Meta does not have monopoly power.

Power to Exclude Competition

In the alternative, to provide direct proof of monopoly power, Plaintiffs must prove that Meta has the ability to exclude competition. For example, if Meta attempted to maintain prices above competitive levels or reduce quality or output below competitive levels, but new competitors could enter the relevant market or existing competitors could expand their sales and take so much business that the price increase, quality decreases, or output reduction would become unprofitable and would have to be withdrawn, then Meta does not have monopoly power.

The ability to earn high profit margins or a high rate of return does not necessarily mean that Meta has monopoly power. Other factors may enable a company without monopoly power to sell at higher prices or earn higher profit margins than its competitors, such as superior products or services,

low costs, or superior advertising or marketing. However, an ability to sell at higher prices or earn higher profit margins than other companies for similar goods or services over a long period of time may be evidence of monopoly power. By contrast, evidence that Meta would lose a substantial amount of sales if it raised prices for personal social network services or reduced quality or output substantially, or that Meta's profit margins were low compared to its competitors, or that Meta's margins go up and down or are steadily decreasing, might be evidence that Meta does not have monopoly power.

**Authority**: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592 (Instruction No. 21) (modified).

**Disputed Instruction No. 20 Re MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – DIRECT PROOF – META'S PROPOSED INSTRUCTION**

There are two ways to provide direct proof of monopoly power, which I will now explain.

Raising or Maintaining Prices Above, or Reducing Output Below, Competitive Levels

In order to provide direct proof of monopoly power, plaintiffs have the burden of proving that Meta has the ability to raise or maintain the prices that it charges for goods or services in the relevant market above competitive levels, or to reduce or maintain the output of goods or services in the relevant market below competitive levels. Plaintiffs must prove that Meta has the power to do so by itself—that is, without the assistance of, and despite competition from, any existing or potential competitors.

Plaintiffs also have the burden of proving that Meta has the power to maintain prices for personal social networking services above a competitive level, or output below the competitive level, for a significant period of time. If Meta attempted to maintain personal social networking services prices above competitive levels, or reduce output below competitive levels, but would lose enough business to other competitors that the price increase or output reduction would become unprofitable and would have to be withdrawn, then Meta lacks monopoly power.

Power to Exclude Competition

To provide direct proof of monopoly power, plaintiffs must also prove that Meta has the ability to exclude its rivals from the relevant market. For example, if Meta attempted to maintain prices above competitive levels or reduce output below competitive levels, but new competitors could enter the relevant market or existing competitors could expand their sales and take so much business that the price increase or output reduction would become unprofitable and would have to be withdrawn, then Meta does not have monopoly power.

The ability to earn high profit margins or a high rate of return does not necessarily mean that Meta has monopoly power. Other factors may enable a company without monopoly power to sell at higher prices or earn higher profit margins than its competitors, such as superior products or services, low costs, or superior advertising or marketing. However, an ability to sell at higher prices or earn higher profit margins than other companies for similar goods or services over a long

period of time may be evidence of monopoly power.  By contrast, evidence that Meta would lose a substantial amount of sales if it raised prices for personal social network services or reduced output substantially, or that Meta's profit margins were low compared to its competitors, or that Meta's margins go up and down or are steadily decreasing, might be evidence that Meta does not have monopoly power.

1

### Plaintiffs' Argument Re Instruction No. 20

2      Plaintiffs' proposed instruction is based on this Court's instruction regarding direct evidence

3  of monopoly power in *Epic* and follows the case law. Meta's is not, and it should be rejected in favor

4  of Plaintiffs' proposal.

5      ***First***, Plaintiffs propose to include references to "quality" (as in "reduced quality") where the

6  instruction references "price" increases or "output" reductions (Meta's proposed terms). Plaintiffs'

7  proposal follows this Court's instruction in *Epic*, while Meta's does not, because this Court included

8  language regarding both price and quality, but not output. *See Epic Games, Inc. v. Google LLC et al*,

9  Case No. 3:20-cv-05671-JD, Dkt. 592 (Instruction No. 21). Plaintiffs agreed to Meta's request to

10  include language regarding "output" even though not in this Court's *Epic* instruction, but Meta

11  refused Plaintiffs' request to include language regarding "quality" which ***is***. The jury will hear

12  evidence regarding the respective quality of various services (including as to data and privacy), and

13  it should be instructed that it can consider that evidence in determining whether Meta has monopoly

14  power (such as by sustaining market share notwithstanding its known privacy and data fiascos).

15      ***Second***, Meta's proposal invites legal error. Under the heading "Power to Exclude

16  Competition," Meta would have this Court instruct the jury that "To provide direct proof of monopoly

17  power, plaintiffs must ***also*** prove that Meta has the ability to exclude[.]" In other words, Meta would

18  instruct the jury that to find direct evidence of Meta's monopoly power, the jury must find both: (a)

19  that Meta has the ability to raise prices; ***and*** (b) to exclude competitors. That is unequivocally ***not*** the

20  law. The Supreme Court, for example, has long made clear that "[m]onopoly power is the power to

21  control prices ***or*** exclude competition." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S.

22  377, 391 (1956) (emphasis added). Indeed, this Court was presented with a similar proposal in *Epic*

23  and rejected it, instead instructing the jury that "***In the alternative***, in order to provide direct proof of

24  monopoly power, Epic must prove that Google has the ability to exclude competition." *Epic Games,*

25  *Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592 (Instruction No. 21). That is exactly

26  the formulation—"In the alternative" but not "also"—that Plaintiffs propose here.

27

28

1

## Defendant's Argument Re Instruction No. 20

2      Meta objects to the inclusion of references to quality in this instruction for the reasons given

3   in its objection to Instruction No. 16.  Plaintiffs have presented no evidence or expert analysis of

4   changes in quality.  Directing the jury to consider information about quality that is not in the record—

5   and indeed that plaintiffs' experts disclaimed offering—when evaluating proof of monopoly power

6   will be confusing and prejudicial to Meta.

7      Meta further objects to plaintiffs' assertion that they can meet their burden of proving

8   monopoly power *either* through "Raising or Maintaining Prices Above, or Reducing Output Below,

9   Competitive Levels," or through proof of the "Power to Exclude Competition."  Meta has proposed

10  language directly from the ABA Model Instruction, which provides that a plaintiff must "prove that

11  defendant has the power to maintain prices above a competitive level" ___and___ "[s]imilarly, plaintiff

12  must prove that defendant has the ability to exclude competition." ABA Model Civil Antitrust Jury

13  Instr. 3.A.8; *see also* Jury Instructions at 37, *Tevra Brands LLC v. Bayer HealthCare LLC*, No. 19-

14  cv-04312 (N.D. Cal. Aug. 1, 2024), Dkt. 482 (giving instruction using model language).  These are

15  separate, independently necessary showings.  *See, e.g.*, *W. Parcel Exp. v. United Parcel Serv. of

16  Am., Inc.*, 190 F.3d 974, 977 (9th Cir. 1999) (plaintiff failed to prove market power because

17  defendant lacked "ability to exclude competition"); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421,

18  1441 (9th Cir. 1995) ("[N]o market power exists in 'a market with low entry barriers or other

19  evidence of a defendant's inability to control prices *or* exclude competitors'" (emphasis added)).

20  Plaintiffs' instruction should be rejected because it does not require demonstrating both aspects of

21  direct proof of monopoly power.

22

23

24

25

26

27

28

## Disputed Instruction No. 21 Re MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – INDIRECT PROOF – PLAINTIFFS' PROPOSED INSTRUCTION

Plaintiffs may prove Meta's monopoly power indirectly.  As I instructed you earlier, monopoly power is the power to control prices, decrease quality, reduce output, or exclude competition in a relevant antitrust market.

Market Share

The first factor that you should consider is Meta's share of the market for personal social networking services.  Based on the evidence that you have heard about Meta's market share, you should determine Meta's market share as a percentage of total sales, users, or time spent doing activities in the relevant market.

Meta must have a significant share of the market in order to possess monopoly power. A market share below 50 percent is ordinarily not sufficient to support a conclusion that a defendant has monopoly power. A higher market share than 50 percent may still be insufficient to confer monopoly power, depending on the other factors that I will set forth now.

In evaluating whether Meta's market share supports a finding of monopoly power, you also should consider other aspects of the relevant market, such as market share trends, the existence of barriers to entry, the ease of entry and exit by other companies, and the number and size of Meta's competitors.  Along with Meta's market share, these factors should inform you as to whether Meta has monopoly power. The higher the company's share, the higher the likelihood that a company has monopoly power.

Market Share Trends

The trend in Meta's market share is something you may consider. An increasing market share may strengthen an inference that a company has monopoly power, particularly where that company has a high market share, while a decreasing share might show that a company does not have monopoly power.

Barriers to Entry

You may also consider whether there are barriers to entry into the relevant market.  Barriers to entry make it difficult for new competitors to enter the relevant market in a meaningful and timely

way.  Barriers to entry might include network effects (which make a product more valuable or attractive as more use it), switching costs (which impose time, expense, and other constraints in moving from one product to another product), intellectual property rights (such as patents or trade secrets), the large financial investment required to build a plant or satisfy governmental regulations, specialized marketing practices, and the reputation of the companies already participating in the market (or the brand name recognition of their products).  Evidence of low or no entry barriers may be evidence that Meta does not have monopoly power, regardless of Meta's market share, because new competitors could enter easily if Meta attempted to raise prices or reduce quality or output for a substantial period of time.  If you do not find evidence of significant barriers to entry, Plaintiffs have not established monopoly power through indirect evidence.  By contrast, evidence of high barriers to entry along with high market share may support an inference that Meta has monopoly power.

### Entry and Exit by Other Companies

The history of entry and exit in the relevant market may be helpful to consider.  Entry of new competitors or expansion of existing competitors may be evidence that Meta lacks monopoly power.  On the other hand, departures from the market, or the failure of firms to enter the market, particularly if prices and profit margins are relatively high, may support an inference that Meta has monopoly power.

### Number and Size of Competitors

You may consider whether Meta's competitors are capable of effectively competing.  In other words, you should consider whether the financial strength, market shares, and number of competitors act as a check on Meta's ability to price its personal social networking services.  If Meta's competitors are vigorous or have large or increasing market shares, this may be evidence that Meta lacks monopoly power.  On the other hand, if you determine that Meta's competitors are weak or have small or declining market shares, this may support an inference that Meta has monopoly power.

### Conclusion

If you find that Meta has monopoly power in the relevant market, then you must consider the remaining elements of Plaintiffs' monopolization claim.  If you find that Meta does not have monopoly power, then you must find for Meta and against Plaintiffs on the monopolization claim.

1      **Authority**: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592

2   (Instruction No. 22) (modified); ABA Model Instruction A-115 (modified); *Rebel Oil Co. v. Atl.*

3   *Richfield Co.,* 51 F.3d 1421, 1434 (9th Cir. 1995); *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc*.,

4   2025 WL 2573045, at *8 (9th Cir. Sept. 5, 2025).

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2

**Disputed Instruction No. 21 Re MONOPOLIZATION – EXISTENCE OF MONOPOLY**
**POWER – INDIRECT PROOF – META'S PROPOSED INSTRUCTION**

3    Plaintiffs may prove Meta's monopoly power indirectly.  As I instructed you earlier,
4  monopoly power is the power to control prices or reduce output and exclude competition in a relevant
5  antitrust market.

6    Market Share

7    The first factor that you should consider is Meta's share of the market for personal social
8  networking services—if you find that this is a proper antitrust relevant market based on plaintiffs'
9  evidence.  Based on the evidence that you have heard about Meta's market share, you should
10 determine Meta's market share as a percentage of total time spent doing activities in the relevant
11 market.

12   Meta must have a predominant share of the market in order to possess monopoly power. A
13 market share below 65 percent is ordinarily not sufficient to support a conclusion that a defendant has
14 monopoly power. A higher market share than 65 percent may still be insufficient to confer monopoly
15 power, depending on the other factors that I will set forth now.

16   In evaluating whether Meta's market share supports a finding of monopoly power, you also
17 should consider other aspects of the relevant market, such as market share trends, the existence of
18 barriers to entry, the ease of entry and exit by other companies, and the number and size of Meta's
19 competitors.  Along with Meta's market share, these factors should inform you as to whether Meta
20 has monopoly power.

21   Market Share Trends

22   The trend in Meta's market share is something you may consider. An increasing market share
23 may strengthen an inference that a company has monopoly power, particularly where that company
24 has a high market share, while a decreasing share might show that a company does not have monopoly
25 power, even if the share is above the 65 percent threshold.

26   Barriers to Entry

27   You must also consider whether there are barriers to entry into the relevant market.  Barriers
28 to entry make it difficult for new competitors to enter the relevant market in a meaningful and timely

1    way.  Barriers to entry might include intellectual property rights (such as patents or trade secrets) and

2    the reputation of the companies already participating in the market.  Evidence of new competitors

3    entering the relevant market or current competitors rapidly growing indicate that there are low or no

4    barriers to entry.

5         Evidence of low or no entry barriers is evidence that Meta does not have monopoly power,

6    regardless of Meta's market share, because new competitors could enter easily if Meta attempted to

7    raise prices or reduce output for personal social networking services above competitive levels for a

8    substantial period of time.  If you do not find evidence of significant barriers to entry, plaintiffs have

9    not established monopoly power through indirect evidence.  By contrast, evidence of high barriers to

10   entry along with high market share may support an inference that Meta has monopoly power.

11        <u>Entry and Exit by Other Companies</u>

12        The history of entry and exit in the relevant market may be helpful to consider.  Entry of new

13   competitors or expansion of existing competitors may be evidence that Meta lacks monopoly power

14   or that barriers to entry are low or nonexistent.

15        <u>Number and Size of Competitors</u>

16        You may consider whether Meta's competitors are capable of effectively competing.  In other

17   words, you should consider whether the financial strength, market shares, and number of competitors

18   act as a check on Meta's ability to price its personal social networking services.  If Meta's competitors

19   are vigorous or have large or increasing market shares this may be evidence that Meta lacks monopoly

20   power.  On the other hand, if you determine that Meta's competitors are weak or have small or

21   declining market shares, this may support an inference that Meta has monopoly power.

22        <u>Conclusion</u>

23        If you find that Meta has monopoly power in the relevant market, then you must consider the

24   remaining elements of plaintiffs' monopolization claim.  If you find that Meta does not have

25   monopoly power, then you must find for Meta and against plaintiffs on this claim.

26        **Authority**: *Modified Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt.
     592 (Instruction No. 22); ABA Model Civil Antitrust Jury Instruction 3.A.7; *Rebel Oil Co. v. Atl.*
27   *Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); *Oahu Gas Service, Inc. v. Pacific Resources, Inc.*,
     838 F.2d 360 (9th Cir. 1988).

28

1
<u>**Plaintiffs' Argument Re Instruction No. 21**</u>

2      Plaintiffs proposed an indirect evidence of monopoly power instruction is largely based on

3 the one that this Court gave in *Epic*. The Court should adopt Plaintiffs' proposal and reject Meta's.

4      **First**, Plaintiffs propose to conform the description of monopoly power in this instruction to

5 match the description of monopoly power that Plaintiffs propose in other instructions. In other words,

6 when the Court defines monopoly power in this instruction, Plaintiffs submit it should reference "the

7 power to control prices, decrease quality, reduce output, or exclude competition," for the same reasons

8 Plaintiffs have explained regarding their similar proposals for other instructions.

9      **Second**, the Court should omit Meta's definition of monopoly power as "the power to control

10 prices or reduce output **and** exclude competition[.]" Monopoly power does not necessarily require

11 "the power to control prices" **and "**exclude competition[.]" Rather, either is sufficient. *United States*

12 *v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956) ("[m]onopoly power is the power to

13 control prices **or** exclude competition.") (emphasis added). **Third**, the Court should reject Meta's

14 "Market Share" proposals. The Court need not caveat its instruction to the jury to consider Meta's

15 share in PSNS with "if you find that this is a proper antitrust relevant market based on plaintiffs'

16 evidence." The jury will already receive instructions on how to assess Plaintiffs' proffered market,

17 and Meta's addition is advocacy that urges the jury to reject it. Indeed, this Court did not include this

18 language in its *Epic* instruction. Moreover, in instructing the jury how to "determine Meta's market

19 share as a percentage," the Court should refer to "users," not just "time spent." Dr. Carlton, Meta's

20 relevant market expert, intends to rebut Plaintiffs' showing of Meta's share based on Meta's number

21 of monthly active users. And, in describing the "share" Meta needs for share to be proof of its power,

22 the Court should adopt Plaintiffs' proposal ("significant"), not Meta's ("dominant"). This Court in

23 *Epic* and the ABA Model used "significant," not "dominant."

24      Moreover, Meta's proposal to instruct the jury that "below 65 percent is ordinarily not

25 sufficient" share to support monopoly misstates the law. The Ninth Circuit has made clear that it is

26 "reluctant to apply such bright-line rules regarding market share" and that "[c]ourts should be wary

27 of the numbers game[.]" *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 n.10 (9th Cir. 1995).

28 Moreover, Plaintiffs' proposal is consistent with the ABA Model, which provides a presumptive "50

1  percent" minimum threshold, and the caselaw, like *Rebel Oil*, which indicates market share **below**

2  50% generally fails for monopoly power while market **above** 60% can suffice. *Rebel Oil*, 51 F.3d at

3  1438 ("a market share of **less than 50 percent** is presumptively insufficient"); *CoStar Grp., Inc. v.*

4  *Com. Real Est. Exch., Inc.*, 2025 WL 2573045, at *8 (9th Cir. Sept. 5, 2025) ("Market shares on the

5  order of **60 percent** to 70 percent have supported findings of monopoly power.") (cleaned up); *Fed.*

6  *Trade Comm'n v. Meta Platforms, Inc.*, 775 F. Supp. 3d 16, 48 (D.D.C. 2024) ("60% market share"

7  is "threshold" and Meta surpassed it). Given all this, it make no sense, and would be error to, as Meta

8  proposes, instruct the that **below 65%** "is ordinarily not sufficient." In addition, consistent with its

9  instruction in *Epic*, which Meta omits from its proposal, the Court should instruct the jury that the

10  "higher" a company's share, the more likely it has monopoly power.

11      **Fourth,** as to "Barriers to Entry," Meta's proposal omits Plaintiffs' neutral description of

12  barriers that are either (1) tailored to this case (network effects and switching costs), or (2) included

13  in this Court's instruction in *Epic* (large financial investment, specialized marketing practices, and

14  brand name recognition). There is no good reason to do so. Meta's proposal further deviates from this

15  Court's *Epic* instruction by stating the jury "must"—rather than "may"—consider entry barriers.

16      **Fifth**, Meta's description of the significance of "Entry and Exit by Other Companies" is one-

17  sided. It insists on including language of what "may be" evidence that Meta lacks power, but it omits

18  the neutral counter-statement of what may **be** evidence of power (departures from the market, failure

19  of firms to enter, etc.) that this Court included in *Epic* (as Plaintiffs propose here).

1

<u>**Defendant's Argument Re Instruction No. 21**</u>

2    Plaintiffs' proposal rejects language compelled by law, omits explanations that will be helpful

3 to the jury in assessing monopoly power, and uses language not supported by the evidence or their

4 theories.

5    ***First***, Meta objects to plaintiffs' use of "significant" to describe the market share necessary to

6 possess monopoly power.  Meta's proposal—"predominant share"—reflects binding precedent and

7 should be used.  *See, e.g.*, *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 2025 WL 2573045, at *6

8 (9th Cir. Sept. 5, 2025) ("[M]onopoly power can be shown either directly, through evidence of the

9 exercise of monopoly power, or indirectly, through evidence of a firm's ***predominant*** market share."

10 (emphasis added)); *Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822, 841 (N.D. Cal. 2024) ("The existence

11 of [market] power ordinarily is inferred from the seller's possession of a predominant share of the

12 market." (quoting *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir.

13 1997))); *see also Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995) ("A mere

14 showing of substantial or even dominant market share alone cannot establish market power sufficient

15 to carry out a predatory scheme.").

16    ***Second***, Meta objects to plaintiffs' use of 50% as the minimum share supporting a finding of

17 market power.  As with their use of "significant," this proposal contravenes the caselaw—instead, as

18 in Meta's instruction, "[c]ourts generally require a 65% market share to establish a prima facie case

19 of market power." *Lambrix*, 737 F. Supp. 3d at 841 (quoting *Image Tech. Servs., Inc.*, 125 F.3d at

20 1206 (9th Cir. 1997)); *see also Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 995 (9th Cir.

21 1986) ("[A]s far as we know, neither the Supreme Court nor any other court has ever decided whether

22 a market share as low as 60-69% is sufficient, standing alone, to sustain such a finding"); *Kolon Indus.*

23 *Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 174 (4th Cir. 2014) ("[T]he Supreme Court has

24 never found a party with less than 75% market share to have monopoly power").

25    ***Third***, Meta objects to plaintiffs' proposal to make consideration of barriers to entry

26 discretionary by changing "must" to "may also consider."  In the Ninth Circuit, proof of such barriers

27 is mandatory: "A mere showing of substantial or even dominant market share alone cannot establish

28 market power sufficient to carry out a predatory scheme. The plaintiff must show that new rivals are

1    barred from entering the market and show that existing competitors lack the capacity to expand their

2    output to challenge the predator's high price." *Rebel Oil Co.*, 51 F.3d at 1439; *see also id.* at 1434

3    ("[A] plaintiff ***must***: (1) define the relevant market, (2) show that the defendant owns a dominant

4    share of that market, ***and*** (3) show that there are significant barriers to entry and show that existing

5    competitors lack the capacity to increase their output in the short run." (emphasis added)).

6        ***Fourth***, Meta objects to plaintiffs' removal of explanatory language that will help the jury

7    understand the interaction of the elements they must evaluate.  The reference to evaluating indirect

8    evidence only after having found "that this is a proper antitrust relevant market based on plaintiffs'

9    evidence" reflects that the jury should not proceed to evaluating proof of monopoly power until it has

10   determined the existence of a relevant market.

11       ***Finally***, Meta objects to the inclusion of references to quality in this instruction for the reasons

12   given in its objection to Instruction No. 16.  Plaintiffs have presented no evidence or expert analysis

13   of changes in quality.  Directing the jury to consider information about quality that is not in the

14   record—and indeed that plaintiffs' experts disclaimed offering—when evaluating proof of monopoly

15   power will be confusing and prejudicial to Meta.  For similar reasons, the Court should not instruct

16   the jury on alternative means for calculating market share (i.e., "percentage of total sales" or "users")

17   because plaintiffs' theory involves only "time spent by users."  *See, e.g.*, MSJ Opp. 3, Dkt. 952-1.

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Disputed Instruction No. 22 Re MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER THROUGH ANTICOMPETITIVE ACTS – PLAINTIFFS' PROPOSED INSTRUCTION

To prove their monopolization claim, Plaintiffs must prove that Meta willfully acquired or maintained monopoly power through anticompetitive acts or practices.  Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market.

Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition.  Some examples of harm to competition include increased prices, decreased production levels, and reduced quality.

Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws.  The acquisition or maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, is not unlawful.

A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws.  A monopolist's conduct only becomes unlawful where it involves anticompetitive acts.

The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine.  This is because all companies have a desire to increase their profits and increase their market share.  These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals—or the achievement of these goals—unlawful, so long as a company does not use anticompetitive means to achieve these goals.

In determining whether Meta's conduct was anticompetitive, you should determine whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.

The acts or practices that result in the maintenance of monopoly power must represent something more than the conduct of business that is part of the normal competitive process or commercial success.  They must represent conduct that has made it very difficult or impossible for

1   competitors to compete and that was taken for no legitimate business reason.  You may not find that

2   a company willfully maintained monopoly power through anticompetitive means if it has maintained

3   that power solely through the exercise of superior foresight, management and skill; or because of

4   natural advantages such as economic or technological efficiency, including efficiency resulting from

5   scientific research; or by obtaining a lawful patent or patents; or because changes in cost or consumer

6   preference have driven out all but one supplier.

7          In summary, you must first determine whether Plaintiffs have proven that Meta's conduct has

8   caused substantial harm to competition in a relevant market. If Plaintiffs have done so, you must then

9   determine whether Meta has justified its conduct by proving that its conduct was reasonably necessary

10  to achieve benefits for consumers. However, if Plaintiffs have proven that Meta could have readily

11  achieved the same benefits using reasonably available alternative means that would have created

12  substantially less harm to competition, then those benefits cannot justify Meta's conduct.  You must

13  then balance any competitive harms you found against any competitive benefits you found.  If the

14  harms to competition resulting from Meta's conduct substantially outweigh the competitive benefits,

15  then you must find that Meta willfully maintained monopoly power through anticompetitive acts.

16         If you find that Meta willfully acquired or maintained monopoly power through

17  anticompetitive acts in a relevant market, then you must consider whether Plaintiffs have proven the

18  remaining elements of their monopolization claim.  If, however, you find that Meta did not willfully

19  acquire or maintain monopoly power through anticompetitive acts in the alleged relevant market, then

20  you must find for Meta and against Plaintiffs on their monopolization claim.

21

22         **Authority**: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592

23  (Instruction No. 23) (Modified).

24

25

26

27

28

**Disputed Instruction No. 22 Re MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER THROUGH ANTICOMPETITIVE ACTS – META'S PROPOSED INSTRUCTION**

To prove their monopolization claim, Plaintiffs must prove that Meta willfully maintained monopoly power through anticompetitive acts or practices. Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market. Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition. Some examples of harm to competition include increased prices and decreased production levels.

Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. The maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, is not unlawful. A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws. A monopolist's conduct only becomes unlawful where it involves anticompetitive acts.

The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine. This is because all companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals—or the achievement of these goals—unlawful, so long as a company does not use anticompetitive means to achieve these goals. In addition, not every unlawful act is anticompetitive. A monopolist may engage in illegal conduct without that conduct contributing to the maintenance of their monopoly.

In determining whether Meta's conduct was anticompetitive, you should determine whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.

The acts or practices that result in the maintenance of monopoly power must represent something more than the conduct of business that is part of the normal competitive process or

1    commercial success.  They must represent conduct that has made it very difficult or impossible for

2    competitors to compete and that was taken for no legitimate business reason.  You may not find that

3    a company willfully maintained monopoly power through anticompetitive means if it has maintained

4    that power solely through the exercise of superior foresight, management and skill; or because of

5    natural advantages such as economic or technological efficiency, including efficiency resulting from

6    scientific research; or by obtaining a lawful patent or patents; or because changes in cost or consumer

7    preference have driven out all but one supplier.

8         In summary, you must first determine whether Plaintiffs have proven that Meta's conduct has

9    caused substantial harm to competition in a relevant market. If Plaintiffs have done so, you must then

10   determine whether Meta has justified its conduct by proving that its conduct was a form of

11   competition on the merits because it involves, for example, greater efficiency or enhanced consumer

12   appeal.  However, if Plaintiffs have proven that Meta could have readily achieved the same benefits

13   using reasonably available alternative means that would have created substantially less harm to

14   competition, then those benefits cannot justify Meta's conduct.   You must then balance any

15   competitive harms you found against any competitive benefits you found.  If the harms to competition

16   resulting from Meta's conduct substantially outweigh the competitive benefits, then you must find

17   that Meta willfully maintained monopoly power through anticompetitive acts.

18        If you find that Meta willfully maintained monopoly power through anticompetitive acts in

19   the alleged relevant market, then you must consider whether Plaintiffs have proven the remaining

20   elements of their monopolization claim.  If, however, you find that Meta did not willfully maintain

21   monopoly power through anticompetitive acts in the alleged relevant market, then you must find for

22   Meta and against Plaintiffs on their monopolization claim.

23

24        **Authority**: *Epic Games, Inc. v. Google LLC et al*, No. 3:20-cv-05671-JD (N.D. Cal. Dec. 6,

25   2023), Dkt. 592 (Instruction No. 23) (modified)*; Verizon Commc'ns. v. Law Offices of Curtis V.*

26   *Trinko*, 540 U.S. 398, 407 (2004).

27

28

**Plaintiffs' Argument Re Instruction No. 22**

Plaintiffs' proposed instruction regarding anticompetitive conduct is consistent with this Court's instruction in *Epic*, the case law, and Plaintiffs' claims. Meta's is not and should be rejected.

**First**, the parties dispute the inclusion of language regarding monopoly "acquisition" (and the like) as opposed to just monopoly "maintenance." The Court should adopt Plaintiffs' proposal and include instruction containing both formulations—*i.e.*, "Meta willfully acquired or maintained monopoly power[.]"

Plaintiffs' position is that Meta obtained a monopoly by the early 2010s, and then has maintained that monopoly since then by deceiving the market as to its privacy and data practices. At the motion to dismiss stage, the Court rejected Meta's statute of limitations defense and found that Plaintiffs' deception-based claims, at least to the extent predicated on conduct after December 3, 2016 (the start of the limitations period, four years before Plaintiffs filed this case), were timely. *See* Dkt. 214 at 55-58. To streamline the issues for trial, Plaintiffs in class certification and summary judgment briefing confirmed that they are only seeking damages based on Meta's post-2016 conduct. Because Plaintiffs assert that Meta had already acquired a monopoly by then, Meta contends that any reference to monopoly "acquisition"—rather than monopoly "maintenance"—is improper.

Meta is incorrect. While Plaintiffs submit that Meta had "acquired" a monopoly before the limitations period such that its conduct during the limitations period served to "maintain" that already-acquired monopoly, that is an issue for the jury to decide. Indeed, it is possible the jury could find that Meta did not have a monopoly ***until*** the limitations period, in which case it would make sense that Meta "acquired" power during the limitations period. Indeed, Epic's claims against Google before this Court were based on monopoly "maintenance." *See* Case No. 3:21-md-2981-JD, Dkt. 641 at 1 (Epic's trial brief, asserting that Google "maintained durable monopolies . . ."). Yet, the Court's jury instruction was written in the disjunctive, giving the jury flexibility to determine whether "Google ***willfully acquired or maintained*** monopoly power through anticompetitive acts[.]" *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592 (Instruction No. 23).

**Second**, the parties dispute whether the Court's explanation of "examples of harm to competition" should include "reduced quality" (Plaintiffs' proposal) in addition to only "increased

1   prices" and "decreased production levels" (Meta's proposal). As Plaintiffs have explained as to their

2   other proposed instructions, quality—particular data collection and use—is an important dimension

3   of competition in this case. Indeed, Plaintiffs' proposal to reference "increased prices, decreased

4   production levels, and reduced quality" is consistent with this Court's instruction in *Epic*.

5       **Third**, the Court should reject Meta's proposal to include language that "not every unlawful

6   act is anticompetitive" and a "monopolist" can "engage in illegal conduct without that conduct

7   contributing to the maintenance of their monopoly."  If Meta or its counsel wish to make such

8   arguments to the jury, they can do so, but it need not be included in the Court's instruction, and indeed

9   the Court did not include such language in its instruction in *Epic*. Meta's stated concern that the jury

10  will punish it for acts that are "unlawful for reasons unrelated to antitrust laws" is already addressed

11  by the language in Plaintiffs' proposal that the challenged conduct must "involve[] anticompetitive

12  acts" and must harm competition.

13      **Fourth**, with respect to the rule-of-reason burden-shifting framework, the Court should

14  instruct the jury to consider whether Meta has justified its conduct by proving that its conduct "was

15  ***reasonably necessary to achieve benefits for consumers***." That is the language this Court included

16  in *Epic*, which the Ninth Circuit recently affirmed the use of. *See In re Google Play Store Antitrust*

17  *Litig.*, 147 F.4th 917, 944 (9th Cir. 2025).

18      **Fifth**, Meta's proposed concluding paragraph is confusing and misstates the law. Meta

19  suggests that the jury must find that Plaintiffs prove that Meta "willfully maintained monopoly power

20  through anticompetitive acts in ***the alleged relevant market***," and, if not, "then you must find for

21  Meta[.]" Plaintiffs believe that the evidence of their "alleged" Personal Social Networking Services

22  Market is compelling. But if the jury finds some permutation of the PSNS market (rather than exactly

23  that market), Plaintiffs' case is not over, as the jury can find an "in-between" market in which Meta

24  has power. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 978 n.9 (9th Cir. 2023). Contrary to

25  Meta's assertion below, that other language in this instruction refers to "***the*** relevant market," that is

26  not the same as Meta's reference to "the ***alleged*** relevant market." The former correctly allows the

27  jury to find an "in-between" market—consistent with *Epic*—while the latter (Meta's proposal),

28  incorrectly does not.

1                    **<u>Defendant's Argument Re Instruction No. 22</u>**

2          Meta objects to language regarding plaintiffs' time-barred, abandoned acquisition claim for

3   the reasons given in its objections to Instructions No. 2 and 15.  Meta similarly objects to language

4   regarding quality for the reasons given in its objection to Instruction No. 16.  Plaintiffs have presented

5   no evidence or expert analysis of changes in quality.  Directing the jury to consider information about

6   quality that is not in the record—and indeed that plaintiffs' experts disclaimed offering—when

7   evaluating proof of anticompetitive conduct will be confusing and prejudicial to Meta.

8          Plaintiffs' proposed instruction also improperly removes the correct statements of law that

9   "not every unlawful act is anticompetitive" and "[a] monopolist may engage in illegal conduct without

10  that conduct contributing to the maintenance of their monopoly."  *See, e.g.*, *Am. Council of Certified*

11  *Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 323 F.3d 366, 372 (6th Cir.

12  2003) ("[I]solated business torts . . . do not typically rise to the level of a section 2 violation unless

13  there is harm to competition itself.").  Whether Meta's conduct is unlawful or illegal under some *other*

14  legal regime is therefore insufficient to prove a violation of the antitrust laws without further proof of

15  harm to competition.  That distinction matters here, because plaintiffs' allegations involve or allude

16  to claims of conduct jurors may believe is unlawful for reasons unrelated to the antitrust laws, such

17  as the purported violation of an FTC consent decree and misuse of user data.  Instructing the jury that

18  illegality is not dispositive of whether conduct is anticompetitive (as required to violate Section 2) is

19  thus necessary to avoid prejudicing Meta's defense—a lay juror may well otherwise conclude that

20  unrelated legal duties are conclusive violations of the antitrust laws.  Plaintiffs have no basis for

21  objecting to the inclusion of this caution beyond their intention to conflate those inquiries.

22         Plaintiffs' proposed instruction then misstates the test for Meta's business justification

23  defense, asserting that Meta must prove the challenged conduct was "reasonably necessary to

24  achieve benefits for consumers."  The Ninth Circuit has held that "if a plaintiff successfully

25  establishes a prima facie case under § 2 by demonstrating anticompetitive effect, then the monopolist

26  may proffer a 'procompetitive justification' for its conduct."  *FTC v. Qualcomm Inc.*, 969 F.3d 974,

27  991 (9th Cir. 2020) (quoting *Microsoft*, 253 F.3d at 59).  A "procompetitive justification," in turn,

28  is defined as "nonpretextual claim that [defendant's] conduct is indeed a form of competition on the

merits because it involves, for example, greater efficiency or enhanced consumer appeal." *Id.* Meta's proposed instruction simply restates the law, which does not limit procompetitive justifications to those "reasonably necessary to achieve benefits for consumers."

Finally, the Court should include Meta's proposed instruction that plaintiffs must prove Meta "willfully maintained monopoly power through anticompetitive acts in ***the alleged relevant market***." Plaintiffs advance only the PSNS market, and references to other undefined markets will be confusing to the jury and prejudicial to Meta. And indeed, the parties have agreed to use language mirroring Meta's earlier in this instruction: "Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers *within the relevant market*."

1    **<u>Disputed Instruction No. 23 Re SPEECH AS ANTICOMPETITIVE CONDUCT –</u>**

2    **<u>PLAINTIFFS' PROPOSED INSTRUCTION (If Given Over Plaintiffs' Objection)</u>**

3         Plaintiffs contend that Meta's representations and omissions about Meta's privacy and data

4    practices were deceptive and harmed competition. Deceptive statements and omissions can be

5    anticompetitive where they, for example, were:

6        1.   clearly false;

7        2.   clearly material;

8        3.   clearly likely to induce reasonable reliance;

9        4.   made to persons without knowledge of the subject matter;

10       5.   continued for prolonged periods; and

11       6.   not readily susceptible of neutralization or other offset by rivals.

12

13        **Authority**: *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l*

14   *Pub'ns, Inc.,* 108 F.3d 1147, 1152 (9th Cir. 1997).

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 23 Re SPEECH AS ANTICOMPETITIVE CONDUCT – META'S PROPOSED INSTRUCTION**

Plaintiffs claim that representations about Meta's privacy practices harmed competition.  In evaluating the claimed representations, you must consider only statements attributable to Meta. Recall that Meta, as a corporation, can act only through its authorized agents or employees (See Instruction No. [TK]).

Representations are presumed to have a de minimis effect on competition.  This presumption can only be overcome through proof, by a preponderance of the evidence, that the alleged representations were:

    1.   clearly false (clearly means that reasonable minds could not differ on the matter);

    2.   clearly material;

    3.   clearly likely to induce reasonable reliance;

    4.   made to persons without knowledge of the subject matter;

    5.   continued for prolonged periods; and

    6.   not readily susceptible of neutralization or other offset by rivals.

In order for the plaintiffs to overcome the presumption, you must find that they have met their burden of proof as to each and every one of these elements for each of the alleged representations.

In assessing whether a representation was clearly material and clearly likely to induce reasonable reliance, you must determine whether the representation was likely to be a significant cause of a person's decision whether to join, use, and stay on Facebook, to the exclusion of Facebook's competitors, although the representation need not be the only cause of that decision.

If plaintiffs can overcome the presumption, you must decide whether the representations had a significant and enduring adverse impact on competition itself in the alleged relevant market.  Only representations with such an effect on competition may rise to the level of an antitrust violation.

**Authority**: *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Pub'ns, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997).

**Plaintiffs' Argument Re Instruction No. 23**

Plaintiffs object to the inclusion of a separate instruction regarding "speech as anticompetitive conduct." If, however, the Court were inclined to offer such an instruction over Plaintiffs' objection, then the Court should use Plaintiffs' proposal rather than Meta's.

*First*, the parties dispute the proper legal framework for assessing whether Facebook's deception is anticompetitive so as to satisfy Section 2's anticompetitive conduct element. Plaintiffs submit that there is no special test for deception of the market, and the jury should instead evaluate Meta's deception as it would any other anticompetitive conduct, consistent with Plaintiffs' proposed instruction (No. 22) regarding willful acquisition or maintenance of monopoly power.

Meta, by contrast, contends there is a "presumption" that "speech" has a "*de minimis* effect on competition" unless the plaintiff can show *each* challenged representation meets six elements. Meta's assertion is based on the Ninth Circuit's decision in *Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publications, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997). But *Harcourt Brace* addresses a defendant's *disparagement of a rival*, not, as here, a defendant's deception of the market to adopt its own product. This is evident from *Harcourt Brace* itself . *See Id.* at 1151 (describing contention "that Harcourt's implementation of a campaign *designed to disparage American's bar review courses*"); *Id.* at 1152 ("false or misleading advertising *directed solely at a single competitor* may not be competition on the merits," but to be actionable, "*the fliers in question* must have a significant and enduring adverse impact on competition"); *Id.* at 1152 ("*the disparagement* must overcome a presumption that the effect on competition . . . was de minimis"); *Id.* at 1152 (policy considerations regarding "a seller's *disparaging comments about a rival seller*"). While Judge Koh found, over Plaintiffs' objection, *Harcourt Brace* applicable here at the motion to dismiss stage (Dkt. 214 at 39), Plaintiffs maintain and preserve their objection to its application.

Scores of cases find that a defendant's deception of the market regarding its own product or technology is anticompetitive without applying the six-part test. For example, in the seminal *United States v. Microsoft Corp.*, the D.C. Circuit found anticompetitive Microsoft's deceiving developers to believe they were developing cross-platform applications when, in truth, the applications they were developing would run only on Microsoft's Windows operating system. 253 F.3d 34, 76–77 (D.C. Cir.

2001). Just recently, and *after* Judge Koh's decision, the Ninth Circuit found that an online platform's alleged deception regarding the terms of which its own service would be available is anticompetitive under Section 2, cited *Microsoft*, and made no mention of *Harcourt Brace* or the six-part test. *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc*., 2025 WL 2573045, at *12 (9th Cir. Sept. 5, 2025). Similarly, in *Hynix Semiconductor Inc. v. Rambus, Inc*., the court found that a defendant's deception of a standard-setting body to adopt its technology "can be considered anticompetitive conduct under the Sherman Act," again nowhere mentioning *Harcourt Brace* or its six-part test. *See* 527 F. Supp. 2d 1084, 1098 (N.D. Cal. 2007). During the parties' exchange, Meta pointed, as support for its proposed instruction in this case, to a *proposed* instruction in *Arista Networks, Inc. v. Cisco Sys. Inc*., but the *court* there found—as Plaintiffs assert here—*Harcourt Brace* is about "whether the 'disparagement of a rival'" is anticompetitive and is "inapplicable" to other sorts of deception. 2018 WL 11230167, at *12 (N.D. Cal. May 21, 2018) ("open early, closed late scheme" not subject to six-part test).

**Second**, Meta's proposed instruction is confusing and erroneous to the extent it states that "clearly" in "clearly false" "means that reasonable minds could not differ on the matter." It invites misunderstanding as to what specifically "reasonably minds could not differ" on. It also invents legal requirements that do not exist: *Harcourt Brace* did not set any such standard for falsity, and Judge Koh stated simply the challenged misrepresentation must be *objectively* false. Dkt. 214 at 54.

**Third**, Meta's proposal incorrectly states that the jury must find that Plaintiffs "have met their burden of proof as to each and every one" of the six elements "for each of the alleged representations." To prevail, Plaintiffs do not need to establish that *all* of the challenged representations (and omissions, which Meta does not mention) harmed competition, else take nothing; it is enough if Plaintiffs establish one of them did. Similarly, assuming *Harcourt Brace* even applies, Plaintiffs do not need to mechanically establish each element as to each challenged statement and omission. That is not the standard applied at the motion to dismiss stage. Dkt. 214 at 62-65 (considering whether Plaintiffs established Facebook's deception "clearly material" based on "the importance of data privacy to users," rather than statement-by-statement). Similarly, even *Harcourt Brace* itself states a plaintiff may overcome the presumption "*by cumulative proof*" and evaluated the five at-issue fliers holistically. *Harcourt Brace*, 108 F.3d at 1152.

Case 3:20-cv-08570-JD    Document 991    Filed 09/11/25    Page 80 of 140

**<u>Defendant's Argument Re Instruction No. 23</u>**

1

2      Meta's proposed instruction states the legal test for monopolization claims premised on

3  deceptive speech, which is what plaintiffs have alleged.  Renewed Mot. CC 19, Dkt. 794-01.

4  Antitrust claims premised on deception "should presumptively be ignored" and the Ninth Circuit

5  has established a six-part test to identify those rare instances in which such allegations can

6  "overcome a presumption that the effect on competition . . . [i]s de minimis." *Am. Pro. Testing Serv.,*

7  *Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publications, Inc.*, 108 F.3d 1147, 1151-52 (9th

8  Cir. 1997).  Plaintiffs expressly told this Court their claims were subject to the *Harcourt* test, Hr'g

9  Tr. 9:10-18 (Apr. 26, 2024),[6] and failed to challenge application of *Harcourt* in their opposition to

10  Meta's motion for summary judgment. MSJ Opp. 10, 13, & n.4.  The argument they now advance—

11  that *Harcourt* only applies to so-called rival disparagement claims—has already been rejected ***in***

12  ***this case***.  In response to plaintiffs' similar argument on their motion to dismiss, the Court found

13  that the *Harcourt* test applies to claims like this one, where the claim is that "the defendant made

14  false statements about its own product.  *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 785 (N.D.

15  Cal. 2022) (citing cases); *see also* Areeda & Hovenkamp, Antitrust Law ¶782b (recognizing

16  application of *Harcourt* to statements about a defendant's products); *Genus Lifesciences Inc. v.*

17  *Lannett Co., Inc.,* 378 F. Supp. 3d 823, 841-42 (N.D. Cal. 2019) (allegedly deceptive statements

18  regarding defendant's own products must have "more than *de minimis* effect on competition" and

19  "satisfy all six elements" of the *Harcourt* test to support liability).

20      None of plaintiffs' citations are to the contrary.  *CoStar* held only that the defendant "engaged

21  in anticompetitive conduct by entering de facto exclusive agreements and constructing technological

22  barriers." *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 2025 WL 2573045, at *12 (9th Cir. Sept.

23

---

24  [6] "MS. SCARLETT: The test that applies to the case that the consumers have brought—separate
from the advertisers—is under a Ninth Circuit called Harcourt Brace. And there are six factors. One
25  whether or not the deceptive conduct continued for a prolonged period, whether it was clearly
material to consumers, whether it was clearly false, whether or not it was likely to induce reasonable
26  reliance, and whether it was made to buyers with knowledge of the subject."  Plaintiffs again invoked
*Harcourt* at the Court's hearing on expert proffers to explain why their testimony would be relevant.
27  Hr'g Tr. 20:1-7 (Nov. 14, 2024) ("And in the *Harcourt Brace* decision, for example, the Ninth
Circuit listed elements for an antitrust claim based on deception, you know, for example, materiality
28  of statements, whether they are prolonged, you know, whether they are likely.").

-75-                                   Case No. 3:20-cv-08570-JD
JOINT SUBMISSION OF PROPOSED JURY INSTRUCTIONS

5, 2025). The discussion of deception is little more than an aside, and even then concerns "technological barriers" that were "*particularly* problematic because of their deceptive element," *id.* (emphasis added)—not pure speech claims like those advanced by plaintiffs. *Microsoft* likewise involved conduct reaching far beyond the deception alleged here, *United States v. Microsoft Corp.*, 253 F.3d 34 60-78 (D.C. Cir. 2001), and of course could not overcome the Ninth Circuit's *Harcourt* decision if it did. *Hynix Semiconductor* involved "deceptive conduct before a standards setting organization," *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1089 (N.D. Cal. 2007), not anything resembling plaintiffs' claims about representations to the public (which was also the situation in *Harcourt*). And indeed, application of the *Harcourt* test does not appear to have been raised or disputed in plaintiffs' cases at all. Contrast that to this litigation, where the applicability of *Harcourt* was litigated and resolved against plaintiffs three years ago.

The jury should also be instructed that plaintiffs must meet their burden of proof "for each of the alleged representations." The *Harcourt* test applies to discrete acts by its own terms—that is the only way to evaluate whether the challenged deception was "clearly false," "clearly material," "clearly likely to induce reasonable reliance," "made to persons without knowledge of the subject matter," and "not readily susceptible of neutralization or other offset by rivals." The alleged representations cannot be evaluated against these elements in gross; an individual statement may be true or false, or susceptible to neutralization, while others may not. Meta must be permitted to defend itself, and plaintiffs' instruction would deny it the opportunity to challenge the anticompetitive effect of the alleged deception. *Harcourt*'s reference to "cumulative proof" is not to the contrary, and indicates only that plaintiffs may use "cumulative proof" to demonstrate that individual statements meet the test—indeed, the court evaluated the text of each of the allegedly deceptive fliers, referring to them together only in concluding that plaintiffs failed to offer sufficient evidence to overcome the *de minimis* presumption. 108 F.3d at 1152.

Finally, plaintiffs' instruction fails to direct the jury that they must find the challenged deception had a "significant and enduring adverse effect on competition," as is their ultimate burden. *Harcourt*, 108 F.3d at 1152 ("[T]he fliers in question must have a significant and enduring adverse impact on competition itself in the relevant markets to rise to the level of an antitrust violation").

**<u>Disputed Instruction No. 24 Re ATTEMPT TO MONOPOLIZE – ELEMENTS –</u>**

**<u>PLAINTIFFS' PROPOSED INSTRUCTION</u>**

In addition to Plaintiffs' monopolization claim under Section 2 of the Sherman Act, Plaintiffs also assert an attempted monopolization claim against Meta based under that same statute. Specifically, Plaintiffs contend that they were injured by Meta's unlawful attempt to monopolize the market for Personal Social Networking Services.

To prevail on their claim of attempted monopolization, Plaintiffs must prove each of the following elements by a preponderance of the evidence:

(1)     that Facebook engaged in anticompetitive conduct;

(2)     that Facebook had a specific intent to achieve monopoly power in a relevant market;

(3)     that there was a dangerous probability that Facebook would achieve its goal of monopoly power in the relevant market;

and

(5)     that Plaintiffs were injured in their business or property by Facebook's anticompetitive conduct.

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for Meta and against Plaintiffs on Plaintiffs' claim for attempted monopolization. If you find that the evidence is sufficient to prove all these elements as to Meta, then you must find for Plaintiffs and against Meta on Plaintiffs' claim of attempted monopolization.

Plaintiffs' monopolization and attempted monopolization claims are similar, yet distinct, claims.  You may find for Plaintiffs on one or the other, both, or neither. Several of the elements for Plaintiffs' attempted monopolization claim overlap with the elements for Plaintiffs' monopolization claim, while others differ. I will now further instruct you on the elements for Plaintiffs' attempted monopolization claims.

**Authority**: ABA Model Jury Instructions in Civil Antitrust Cases D-155 (modified).

1    **Disputed Instruction No. 24 Re ATTEMPT TO MONOPOLIZE – ELEMENTS – META'S**

2    **PROPOSED INSTRUCTION**

3        In addition to Plaintiffs' monopolization claim under Section 2 of the Sherman Act, Plaintiffs

4    also assert an attempted monopolization claim against Meta based under that same statute.

5    Specifically, Plaintiffs contend that they were injured by Meta's unlawful attempt to monopolize the

6    market for Personal Social Networking Services.

7        To prevail on their claim of attempted monopolization, Plaintiffs must prove each of the

8    following elements by a preponderance of the evidence:

9        (1)    that Meta engaged in exclusionary conduct that resulted in anticompetitive effects;

10       (2)    that Meta had a specific intent to achieve monopoly power in a relevant market;

11       (3)    that there was a dangerous probability that Meta would achieve its goal of monopoly

12              power in the relevant market;

13       (4)    that Meta's conduct occurred in or affected interstate commerce; and

14       (5)    that Plaintiffs were injured in their business or property by Facebook's anticompetitive

15              conduct.

16       If you find that the evidence is insufficient to prove any one or more of these elements, then

17    you must find for Meta and against Plaintiffs on Plaintiffs' claim for attempted monopolization. If

18    you find that the evidence is sufficient to prove all five elements as to Meta, then you must find for

19    Plaintiffs and against Meta on Plaintiffs' claim of attempted monopolization.

20       I will now further instruct you on the elements for Plaintiffs' attempted monopolization claim.

21

22    **Authority**: ABA Model Jury Instructions in Civil Antitrust Cases 3.D.1. (modified)

23

24

25

26

27

28

1

**<u>Plaintiffs' Argument Re Instruction No. 24</u>**

2        Meta objects to Plaintiffs' proposed instruction—and any regarding attempted

3   monopolization—because Meta contends that Plaintiffs cannot maintain an attempted

4   monopolization claim, but instead only one for actual monopolization. As Plaintiffs explain above in

5   their statement regarding Instruction No. 2, Plaintiffs' attempt claim has not somehow disappeared,

6   and it is logically and legally consistent to assert alternative claims for monopoly maintenance and

7   attempted monopolization (and doing so provides the jury necessary flexibility). Plaintiffs' proposed

8   instruction is based on the ABA Model, and it should be adopted.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## Defendant's Argument Re Instruction No. 24

2          For the reasons explained in Meta's objections to Instruction No. 2, Meta objects to the

3     inclusion of attempt instructions because plaintiffs' theory of liability, to say nothing of the

4     evidence, is inconsistent with any timely attempt claim.  Instructing the jury on a theory contradicted

5     by plaintiffs' own arguments and the record is confusing and unduly prejudicial to Meta—in

6     particular given that plaintiffs have identified no authority for their novel attempted maintenance

7     theory, nor any model instructions to guide the Court in explaining the elements of attempted

8     maintenance.  If the Court gives this instruction over Meta's objection, however, it should modify

9     the first element to reflect that exclusionary conduct must also have an anticompetitive effect.  *See*

10    Meta's Objection to Instruction No. 15.  Finally, the Court should omit plaintiffs' reference to the

11    interaction between their attempt and monopolization claims, which poses a great risk of confusing

12    the jury, leading to inconsistent verdicts.  The jury could not, for example, conclude that Meta failed

13    to acquire monopoly power but also attempted to maintain it.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **Disputed Instruction No. 25 re ATTEMPT TO MONOPOLIZE – ANTICOMPETITIVE**

2    **CONDUCT – PLAINTIFFS' PROPOSED INSTRUCTION**

3        It is not sufficient for Plaintiffs to prove that Meta intended to monopolize the relevant market.

4    Plaintiffs must also show that Meta engaged in anticompetitive conduct, coupled with an intent to

5    monopolize and a dangerous probability that Meta would succeed. I have instructed you on the

6    standard for finding anticompetitive conduct in connection with Plaintiffs' monopolization claim in

7    Instruction No. __.  That same instruction applies to the anticompetitive conduct element of Plaintiffs'

8    attempted monopolization claim.

9

10        **Authority**: ABA Model Jury Instructions in Civil Antitrust Cases 3.D.2. (modified).

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**Disputed Instruction No. 25 re ATTEMPT TO MONOPOLIZE – ANTICOMPETITIVE**

**CONDUCT – META'S PROPOSED INSTRUCTION**

3    Meta opposes the inclusion of this instruction for the reasons stated in Meta's below

4    Argument. To the extent Meta's objection is overruled, Meta agrees to the wording of Plaintiffs'

5    proposed instruction.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Plaintiffs' Argument Re Instruction No. 25**

Meta objects to Plaintiffs' proposed instruction because Meta disputes that Plaintiffs can pursue an attempted monopolization claim. Assuming the Court disagrees with Meta and finds that Plaintiffs can assert claims for both actual monopolization and attempted monopolization and then instructs the jury regarding Plaintiffs' attempt claim, the parties agree on the language of this proposed instruction.

As Plaintiffs explain above in their statement regarding Instruction No. 2 and elsewhere, Plaintiffs' attempt claim has not somehow disappeared, and it is logically and legally consistent to assert alternative claims for monopoly maintenance and attempted monopolization. The Court should therefore offer Plaintiffs' proposed instruction.

1

## Defendant's Argument Re Instruction No. 25

2          For the reasons explained in Meta's objections to Instruction No. 2, Meta objects to the

3    inclusion attempt instructions because plaintiffs' theory of liability, to say nothing of the evidence, is

4    inconsistent with any timely attempt claim.  Instructing the jury on a theory contradicted by plaintiffs'

5    own arguments and the record is confusing and unduly prejudicial to Meta—in particular given that

6    plaintiffs have identified no authority for their novel attempted maintenance theory, nor any model

7    instructions to guide the Court in explaining the elements of attempted maintenance. If the Court

8    gives this instruction over Meta's objection, however, the parties agree on the language.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  **Disputed Instruction No. 26 Re ATTEMPT TO MONOPOLIZE – SPECIFIC INTENT –**
2  **PLAINTIFFS' PROPOSED INSTRUCTION**

3    The second element that Plaintiffs must prove for their attempted monopolization claim is that
4  Meta had a specific intent to monopolize a relevant market. If you find that Plaintiffs have proven a
5  relevant market, you must then decide whether Meta had the specific intent to monopolize that market.
6  In other words, you must decide if the evidence shows that Meta acted with the conscious aim of
7  acquiring the power to control prices, reduce quality, or exclude or destroy competition in the relevant
8  market.

9    There are several ways in which Plaintiffs may prove that Meta had the specific intent to
10 monopolize. There may be evidence of direct statements of Meta's intent to obtain a monopoly in the
11 relevant market. Such proof of specific intent may be established by documents prepared by
12 responsible officers or employees of Meta at or about the time of the conduct in question or by
13 testimony concerning statements made by responsible officers or employees of Meta. You must be
14 careful, however, to distinguish between a defendant's lawful intent to compete aggressively, which
15 may be accompanied by aggressive language, and a true intent to acquire monopoly power by using
16 anticompetitive means.

17   Even if you decide that the evidence does not prove directly that Meta actually intended to
18 obtain a monopoly, specific intent may be inferred from what Meta did. For example, if the evidence
19 shows that Meta lacked a legitimate business justification and the natural and probable consequence
20 of Meta's conduct in the relevant market was to give Meta control, for example, over prices or to
21 exclude or destroy competition, and that this was plainly foreseeable by Meta, then you may (but are
22 not required to) infer that Meta specifically intended to acquire or maintain monopoly power.

23

24   **Authority**:    ABA Model Jury Instructions in Civil Antitrust Cases D-160 (modified).

25

26

27

28

1    **Disputed Instruction No. 26 Re ATTEMPT TO MONOPOLIZE – SPECIFIC INTENT –**
2    **META'S PROPOSED INSTRUCTION**

3        The second element that Plaintiffs must prove for their attempted monopolization claim is that
4    Meta had a specific intent to monopolize a relevant market. To do so, Plaintiffs must first prove that
5    the market it is talking about—the Personal Social Networking Services Market—is a relevant market
6    for antitrust purposes. Plaintiffs must then prove that Meta had a specific intent to monopolize that
7    market. I will begin by instructing you on the relevant market, and I will then discuss specific intent.

8        I have already instructed you on how to determine whether there is a relevant market for
9    antitrust purposes in connection with Plaintiffs' monopolization claim in Instructions Nos.___ through
10   ___. Those same instructions apply to this element of Plaintiffs' attempted monopolization claim as
11   well.

12       If you find that Plaintiffs have proven a relevant market, you must then decide whether Meta
13   had the specific intent to monopolize that market. In other words, you must decide if the evidence
14   shows that Meta acted with the conscious aim of acquiring the power to control prices and to exclude
15   or destroy competition in the relevant market.

16       There are several ways in which Plaintiffs may prove that Meta had the specific intent to
17   monopolize. There may be evidence of direct statements of Meta's intent to obtain a monopoly in the
18   relevant market. Such proof of specific intent may be established by documents prepared by
19   responsible officers or employees of Meta at or about the time of the conduct in question or by
20   testimony concerning statements made by responsible officers or employees of Meta. You must be
21   careful, however, to distinguish between a defendant's lawful intent to compete aggressively, which
22   may be accompanied by aggressive language, and a true intent to acquire monopoly power by using
23   anticompetitive means.

24       Even if you decide that the evidence does not prove directly that Meta actually intended to
25   obtain a monopoly, specific intent may be inferred from what Meta did. For example, if the evidence
26   shows that Meta lacked a legitimate business justification and the natural and probable consequence
27   of Meta's conduct in the relevant market was to give Meta control over prices and to exclude or

28

1    destroy competition, and that this was plainly foreseeable by Meta, then you may (but are not required

2    to) infer that Meta specifically intended to acquire or maintain monopoly power.

4        **Authority**:    ABA Model Jury Instructions in Civil Antitrust Cases 3.D.3. (modified)

1    **Plaintiffs' Argument Re Instruction No. 26**

2         The parties disagree as to whether an instruction on specific intent for purposes of attempted

3    monopolization should be given at all, and, if so, what it should say. The Court should adopt Plaintiffs'

4    proposal.

5         **First**, as Plaintiffs have explained, their attempted monopolization claim has not disappeared,

6    it is consistent to present alternative claims for monopolization and attempted monopolization, and

7    Plaintiffs intend to pursue the attempted monopolization claim at trial. Specific intent is a unique

8    element of attempted monopolization, so an instruction regarding it is appropriate.

9         **Second**, to prevail, Plaintiffs need only prove that there is a relevant market and "Meta had

10   specific intent to monopolize that market." In other words, even if the jury disagrees with Plaintiffs

11   that the relevant market is personal social networking services, that does not end the case, because

12   the jury could find some permutation of the PSNS Market and that Meta was attempting to

13   monopolize that market. By not rigidly tying Plaintiffs' success or failure to the PSNS Market,

14   Plaintiffs' proposed instruction allows for that possibility. Indeed, this is consistent with the Ninth

15   Circuit's statement in *Epic v. Apple* that the finder of fact can find an "in-between" market, as well

16   as this Court's approach in *Epic v. Google*. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 978 n.9

17   (9th Cir. 2023); *In re Google Play Store Antitrust Litig.*, Case No. 3:21-md-2981-J.D. (N.D. Cal.) at

18   861 & 849 at 3244–45.

19        **Third**, the Court should, in the first paragraph, instruct the jury to "decide if the evidence

20   shows that Meta acted with the conscious aim of acquiring the power to control prices, ***reduce quality***,

21   ***or*** to exclude or destroy competition in the relevant market." The Court should, not, as Meta proposes,

22   omit a reference to "quality" and instruct the jury that power requires "control over prices ***and*** to

23   exclude or destroy competition[.]" As to the former, the modern caselaw explains that "reduced

24   output, increased prices, *or* decreased quality" can show power. *CoStar Grp., Inc. v. Com. Real Est.*

25   *Exch., Inc.*, 2025 WL 2573045, at *7 (9th Cir. Sept. 5, 2025) (original emphasis). Contrary to Meta's

26   assertions, the jury will hear evidence regarding decreased quality, particularly as to privacy and data

27   practices, making the inclusion of quality important. And as to the latter, the Supreme Court has made

28   clear that power can be shown by control over prices ***or*** the ability to exclude rivals—both are not

1   necessarily required. *See United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)

2   "[m]onopoly power is the power to control prices *or* exclude competition.") (emphasis added). For

3   that reason, too, the Court should not, as Meta proposes in the final paragraph, instruct the jury to

4   evaluate whether "the natural and probable consequence of Meta's conduct was to give control over

5   prices ***and*** to exclude or destroy competition." Instead, the Court should make the "and" an "or," as

6   Plaintiffs' proposal does.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **<u>Defendant's Argument Re Instruction No. 26</u>**

2          For the reasons explained in Meta's objections to Instruction No. 2, Meta objects to the

3    inclusion of attempt instructions because plaintiffs' theory of liability, to say nothing of the

4    evidence, is inconsistent with any timely attempt claim.  Instructing the jury on a theory contradicted

5    by plaintiffs' own arguments and the record is confusing and unduly prejudicial to Meta—in

6    particular given that plaintiffs have identified no authority for their novel attempted maintenance

7    theory, nor any model instructions to guide the Court in explaining the elements of attempted

8    maintenance.  This is not a question of presenting alternate theories—plaintiffs have presented no

9    argument or evidence consistent with an attempt theory of liability.

10         Meta further objects to plaintiffs' proposed instruction referencing quality for the reasons

11   given in Meta's objections to Instruction No. 16.  Because plaintiffs have presented no evidence

12   regarding any change in quality among Meta's services, and their experts expressly disclaimed

13   offering opinions on quality, such references lack the necessary support in the record and will only

14   confuse the jury if part of the instructions.  They further risk the jury finding Meta liable for theories

15   that the record cannot support as a matter of law.

16         Finally, Meta objects to plaintiffs' assertion that they can meet their burden of proving

17   specific intent to monopolize by reference to "control, for example, over prices or to exclude or

18   destroy competition."  Plaintiffs have altered the ABA Model Instruction, which states "control over

19   prices ***and*** to exclude or destroy competition."   These are separate, independently necessary

20   showings.  *See, e.g.*, *W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*, 190 F.3d 974, 977 (9th Cir.

21   1999) (plaintiff failed to prove market power because defendant lacked "ability to exclude

22   competition"); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1441 (9th Cir. 1995) ("[N]o market

23   power exists in 'a market with low entry barriers or other evidence of a defendant's inability to

24   control prices *or* exclude competitors.'" (emphasis added)).  Plaintiffs' instruction should be

25   rejected because it does not require demonstrating both elements.

26

27

28

**Disputed Instruction No. 27 Re ATTEMPT TO MONOPOLIZE – DANGEROUS**

**PROBABILITY OF SUCCESS – PLAINTIFFS' PROPOSED INSTRUCTION**

If you find that Meta had the specific intent to achieve a monopoly and engaged in significant anticompetitive conduct, you also must determine if the evidence shows the next element of attempt to monopolize: namely, that there was a dangerous probability that Meta would succeed in achieving monopoly power if it continued to engage in the same or similar conduct.

I have already instructed you on the standard for finding monopoly power when I read the instructions regarding Plaintiffs' monopolization claim in Instructions Nos. ___ through ___. The "dangerous probability of success" element in obtaining monopoly power for an attempted monopolization claim requires a lesser showing from Plaintiffs than does the monopoly power element of a monopolization claim.

I will now explain what it means to prove that there was a dangerous probability that Meta would achieve monopoly power.

In determining whether there was a dangerous probability that Meta would acquire monopoly power, you should consider such factors as:

- Meta's market share;
- the trend in Meta's market share;
- whether the barriers to entry into the market made it difficult for competitors to enter the market; and
- the likely effect of any anticompetitive conduct on Meta's share of the market.

Again, the purpose of looking at these and other factors is to determine whether there was a dangerous probability that Meta would ultimately acquire monopoly power. A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that Meta would ultimately acquire monopoly power.

**Authority**:    ABA Model Jury Instructions in Civil Antitrust Cases D-164; *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995).

**Disputed Instruction No. 27 Re ATTEMPT TO MONOPOLIZE – DANGEROUS**

**PROBABILITY OF SUCCESS – META'S PROPOSED INSTRUCTION**

If you find that Meta had the specific intent to achieve a monopoly and engaged in significant anticompetitive conduct, you also must determine if the evidence shows the next element of attempt to monopolize: namely, that there was a dangerous probability that Meta would succeed in achieving monopoly power if it continued to engage in the same or similar conduct.

I have already instructed you on the standard for finding monopoly power when I read the instructions regarding Plaintiffs' monopolization claim in Instructions Nos. __ through __.

I will now explain what it means to prove that there was a dangerous probability that Meta would achieve monopoly power.

In determining whether there was a dangerous probability that Meta would acquire monopoly power, you should consider such factors as:

- Meta's market share;
- the trend in Meta's market share;
- whether the barriers to entry into the market made it difficult for competitors to enter the market; and
- the likely effect of any anticompetitive conduct on Meta's share of the market.

Again, the purpose of looking at these and other factors is to determine whether there was a dangerous probability that Meta would ultimately acquire monopoly power. A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that Meta would ultimately acquire monopoly power.

**Authority**:    ABA Model Jury Instructions in Civil Antitrust Cases 3.D.4. (modified)

**Plaintiffs' Argument Re Instruction No. 27**

The parties disagree as to whether an instruction regarding the "dangerous probability" element for attempted monopolization should be given, and, if so, what it should say. The Court should adopt Plaintiffs' proposal.

To the extent Meta objects because it contends that Plaintiffs cannot pursue an attempted monopolization claim—just one for actual monopolization—Meta is incorrect. The Court has not dismissed Plaintiffs' attempt claim, and pursuing alternative claims for monopolization and attempted monopolization is consistent with the law and common sense.

As to the substance of the instruction, the Court should include language that clarifies the required showing for "dangerous probability" for an attempt claim is lower than that for monopoly power for actual monopolization. That is consistent with the caselaw. *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) ("the minimum showing of market share required in an attempt case is a lower quantum than the minimum showing required in an actual monopolization case."). While the ABA Model instruction does not itself include this language, its guidance does. *See* ABA Model Jury Instructions in Civil Antitrust Cases D-164 n.1 ("Generally, courts consider the same factors that they consider in assessing whether a defendant has sufficient market power for monopolization, ***but because the attempt offense requires only a dangerous probability, a lesser showing is required in an attempted monopolization case***."). Plaintiffs' proposal includes this "lesser showing" language to avoid confusing the jury by providing clarity as to how the jury should evaluate these overlapping elements between Plaintiffs' monopolization and attempted monopolization claims.

1

**<u>Defendant's Argument Re Instruction No. 27</u>**

2     For the reasons explained in Meta's objections to Instruction No. 2, Meta objects to the

3 inclusion of attempt instructions because plaintiffs' theory of liability, to say nothing of the evidence,

4 is inconsistent with any timely attempt claim.  Instructing the jury on a theory contradicted by

5 plaintiffs' own arguments and the record is confusing and unduly prejudicial to Meta—in particular

6 given that plaintiffs have identified no authority for their novel attempted maintenance theory, nor

7 any model instructions to guide the Court in explaining the elements of attempted maintenance.  If

8 the Court gives this instruction over Meta's objection, however, it should give the ABA Model

9 instruction concerning attempted monopoly acquisition.   Plaintiffs' addition of the vague standard

10 "a lesser showing" provides no guidance to the jury on what that showing should be, inviting

11 confusion.  Plaintiffs also identify no instruction actually given to a jury that includes such language,

12 and this Court appears to never have used it.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 28 re ANTITRUST INJURY AND CAUSATION – PLAINTIFFS' PROPOSED INSTRUCTION**

If you find that Meta has violated the antitrust laws as alleged by Plaintiffs, then you must consider whether Plaintiffs were injured as a result of Meta's violations of the antitrust laws by applying the following elements:

1.    Plaintiffs were in fact injured as a result of Meta's alleged violations of the antitrust laws;

2.    Meta's alleged anticompetitive conduct was a material cause of Plaintiffs' injury; and

3.    Plaintiffs' injury is an injury of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage."  For Plaintiffs to establish that Meta violated the antitrust laws, they must prove that they were injured as a result of Meta's allegedly anticompetitive conduct. Proving the fact of damage does not require Plaintiffs to prove the dollar value of their injury. It requires only that Plaintiffs prove that they were in fact injured by Meta's alleged antitrust violations.

Second, Plaintiffs must offer evidence that establishes by a preponderance of the evidence that Meta's allegedly anticompetitive conduct was a material cause of Plaintiffs' injury.  This means that Plaintiffs must have proved that some damage occurred to Plaintiffs as a result of Meta's alleged antitrust violations, and not some other cause.  Plaintiffs are not required to prove that Meta's alleged antitrust violations were the sole cause of Plaintiffs' injury; nor need Plaintiffs eliminate all other possible causes of injury.  It is enough if Plaintiffs have proved that Meta's alleged antitrust violations were a material cause of Plaintiffs' injury.

Finally, Plaintiffs must establish that Plaintiffs' injury is the type of injury that the antitrust laws were intended to prevent.  This is sometimes referred to as "antitrust injury."  If Plaintiffs' injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then Plaintiffs' injuries are antitrust injuries.  On the other hand, if Plaintiffs' injuries were caused by heightened competition, the competitive process

1  itself, or by acts that would benefit consumers, then Plaintiffs' injuries are not antitrust injuries and

2  Plaintiffs may not recover damages for those injuries under the antitrust laws.

3        In summary, if Plaintiffs can establish that they were in fact injured by Meta's conduct, that

4  Meta's conduct was a material cause of Plaintiffs' injury, and that Plaintiffs' injury was the type that

5  the antitrust laws were intended to prevent, then Plaintiffs have proven this aspect of their claim.

6

7        **Authority**: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592

8  (Instruction No. 39) (modified).

**Disputed Instruction No. 28 re ANTITRUST INJURY AND CAUSATION – META'S**
**PROPOSED INSTRUCTION**

To find that Meta has violated the antitrust laws as alleged by plaintiffs, you must next consider whether the plaintiffs were injured because of Meta's allegedly anticompetitive conduct by applying the following elements of injury and causation:

1. The plaintiffs were in fact injured as a result of Meta's allegedly anticompetitive conduct;

2. Meta's allegedly anticompetitive conduct was a material cause of plaintiffs' injury; and

3. Plaintiffs' injury is an injury of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For plaintiffs to establish that Meta violated the antitrust laws, they must prove that they were injured as a result of Meta's allegedly anticompetitive conduct. Proving the fact of damage does not require plaintiffs to prove the dollar value of their injury. It requires only that plaintiffs prove that they were in fact injured by Meta's alleged antitrust violation. It is important to understand that injury and amount of damage are different concepts and that you cannot consider the amount of damage, if any, unless and until you have concluded that plaintiffs established they were in fact injured.

Second, plaintiffs must offer evidence that establishes by a preponderance of the evidence that Meta's allegedly anticompetitive conduct was a material cause of the plaintiffs' injury. This means that plaintiffs must have proved that some damage occurred to plaintiffs as a result of Meta's allegedly anticompetitive conduct, and not some other cause. Plaintiffs are not required to prove that Meta's allegedly anticompetitive conduct was the sole cause of plaintiffs' injury; nor need plaintiffs eliminate all other possible causes of injury. It is enough if plaintiffs have proved that the allegedly anticompetitive conduct was a material cause of plaintiffs' injury.

You should bear in mind that businesses may maintain a high profit rate or charge higher prices for many reasons that the antitrust laws are not designed to prohibit or protect against—such as where they offer better products or services, or where they reduce expenses through superior

efficiency.  The antitrust laws do not permit a plaintiff to recover damages based on outcomes—including a defendant's high profit rate or elevated prices—that were caused by the competitive process or by conduct that benefits consumers.

Finally, plaintiffs must establish that plaintiffs' injury is the type of injury that the antitrust laws were intended to prevent.  This is sometimes referred to as "antitrust injury."  If plaintiffs' injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then plaintiffs' injuries are antitrust injuries.  On the other hand, if plaintiffs' injuries were caused by heightened competition, the competitive process itself, normal business activity, or by acts that would benefit consumers, then plaintiffs' injuries are not antitrust injuries and plaintiffs may not recover damages for those injuries under the antitrust laws.

In summary, if plaintiffs can establish that they were in fact injured by Meta's conduct, that Meta's conduct was a material cause of plaintiffs' injury, and that plaintiffs' injury was the type that the antitrust laws were intended to prevent, then plaintiffs have proven this aspect of their claim.

**Authority**: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592 (Instruction No. 39) (modified).

**Plaintiffs' Argument Re Instruction No. 28**

Plaintiffs' proposed instruction regarding antitrust injury and causation is straightforward and largely tracks the similar instruction that this Court gave in *Epic*. Meta's does not.

**First**, Plaintiffs' proposal explains that "If you find that Meta has violated the antitrust laws," then the jury "must consider" whether Plaintiffs "were injured as a result of Meta's antitrust violations." Meta's, by contrast states that "***To find*** that Meta has violated the antitrust laws," the jury must consider whether Plaintiffs were injured "***because of***" Meta's conduct. But Meta's use of "To find" confuses the fact of violation (*i.e.*, whether Facebook anticompetitively acquired or maintained a monopoly, or attempted to do so), with whether the violation, once found, then caused Plaintiffs antitrust injury. Moreover, Meta's use of "because of"—rather than "as a result of"—suggests a higher standard of causation than what is required. Indeed, this Court in its *Epic* instructed used Plaintiffs' formulation (*i.e.*, "If you find" and "injured as a result of"), and it should do so again here. *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592 (Instruction No. 39).

**Second**, in describing the "fact of damage" element, Meta adds unnecessary language. Plaintiffs propose—and Meta's latest proposed instruction now apparently agrees—that in instructing the jury on "injury in fact," the Court should state that "Proving the fact of damage does not require Plaintiffs to prove the dollar value of their injury. It requires only that Plaintiffs prove that they were in fact injured by Facebook's alleged antitrust violation." Meta's additional language is unnecessary, given the parties' Stipulated Instruction No. 30 that the jury "should not consider the issue of damages" if it finds for "Meta on the issue of liability[.]" It is also argumentative (by suggesting Plaintiffs were not "in fact injured"). The Court did not include Meta's proposed language in its *Epic* instruction. *See Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592 (Instruction No. 39). It should not include Meta's proposed language here, either.

**Third**, the Court should reject Meta's inclusion of a paragraph that "businesses may maintain a high profit rate or charge higher prices" for reasons not prohibited by the antitrust laws. The Court did not include such language in its injury and causation instruction in *Epic. See Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592 (Instruction No. 39). And, indeed, Meta's requested statements regarding high profit rates and prices not necessarily indicating an antitrust

JOINT SUBMISSION OF PROPOSED JURY INSTRUCTIONS

1  violation or ill-gotten monopoly power are addressed in other instructions, making their inclusion in

2  this one unnecessary.

3      ***Fourth***, in instructing the jury on antitrust injury, the Court should reject Meta's inclusion of

4  language regarding "normal business activity." "Normal business activity" is hopelessly vague,

5  leaving the jury to guess what it means and whether injuries are or are not ***antitrust*** injuries. The

6  Court did not include Meta's proposed language in its *Epic* instruction, and it should not do so here.

7  .

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **<u>Defendant's Argument Re Instruction No. 28</u>**

2        Meta's proposed instruction is supported by the law and model instructions.

3        *First*, Meta's instruction accurately states that plaintiffs must establish an antitrust injury to

4    prove an antitrust violation.  As the Ninth Circuit has explained, a Section 2 claim requires proving

5    that "(1) the defendant possesses monopoly power in the relevant market; (2) the defendant has

6    willfully acquired or maintained that power; *and* (3) the defendant's conduct has caused antitrust

7    injury."  *Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 949 (9th Cir. 1996) (emphasis

8    added).  Meta's  instruction reflects that requirement; plaintiffs' does not.  Meta proposes that "*[t]o*

9    *find* that Meta has violated the antitrust laws as alleged by plaintiffs, you must next consider whether

10   the plaintiffs were injured because of Meta's allegedly anticompetitive conduct by applying the

11   following elements of injury and causation."  Plaintiffs' proposal improperly asserts that "*[i]f you*

12   *find* that Meta has violated the antitrust laws as alleged by Plaintiffs, then you must consider whether

13   Plaintiffs were injured as a result of Meta's anticompetitive conduct."  Because plaintiffs cannot

14   establish an antitrust violation without demonstrating a cognizable injury, only Meta's articulation

15   reflects the law.

16       *Second***,** Plaintiffs erroneously claim that "Meta adds [sic] omits key detail and then adds

17   unnecessary language."  Meta proposed instruction includes the exact same language on "injury in

18   fact" that Plaintiffs request the Court adopt: "Proving the fact of damage does not require Plaintiffs

19   to prove the dollar value of their injury."  Meta's additional language is not argumentative—it

20   accurately reflects the law that jurors may consider a damages amount only after determining that the

21   plaintiffs were injured, and comes verbatim from ABA Model Instruction 6.A.1 ("injury and amount

22   of damage are different concepts and that you cannot consider the amount of damage unless and until

23   you have concluded that plaintiff has established that it was in fact injured").

24       *Third***,** the Court should include Meta's paragraph explaining that "businesses may maintain

25   a high profit rate or charge higher prices" for reasons not prohibited by the antitrust laws.

26   Supracompetitive pricing must be attributed to the harm to competition that resulted from the

27   violation.  A monopolist's high prices can be the result of many different legal actions, such as

28   innovation or product quality. Meta's instruction appropriately recognizes that just because an act is

found anticompetitive does not automatically mean it is the cause of higher prices. Meta's proposed language explaining that higher prices could be caused by "normal business activity" adds additional clarity to the law that there must be causal antitrust injury.

JOINT SUBMISSION OF PROPOSED JURY INSTRUCTIONS

1

**Disputed Instruction No. 29 Re ANTITRUST INJURY: BUSINESS OR PROPERTY –**

2

**PLAINTIFFS' PROPOSED INSTRUCTION**

3        Plaintiffs must establish that the injury they claim to have suffered was an injury to their

4    business or property.

5        The term "business" includes any commercial interest or venture. Plaintiffs have been injured

6    in their business if you find that they have suffered injury to any of their commercial interests or

7    enterprises as a result of Meta's alleged antitrust violation.

8        The term "property" includes anything of value Plaintiffs own, possess, or in which Plaintiffs

9    have a protectable legal interest. Plaintiffs have been injured in their property if you find that anything

10   of value that they own, possess, or has a legal interest in has been damaged as a result of Meta's

11   alleged antitrust violation. Plaintiffs have been injured in their property if you find that they have paid

12   an inflated price for goods, services, any legal interest of value, or have lost money or other

13   consideration as a result of Meta's alleged antitrust violation.

14       In considering whether Plaintiffs have established this element, you may consider whether

15   Plaintiffs have proven that the data they provide Meta has value and that Plaintiffs may have received

16   something more for their data—such as compensation in the form of money or the equivalent, better

17   quality services, including better privacy or data practices, or providing less data—in a world free

18   from Meta's alleged antitrust violation.

19

20       **Authority**: ABA Model Jury Instructions in Civil Antitrust Cases A-303 (modified); *Klein v.*

21   *Facebook, Inc*., 580 F. Supp. 3d 743, 803–04 (N.D. Cal. 2022).

22

23

24

25

26

27

28

1

**Plaintiffs' Argument Re Instruction No. 29**

2      The Clayton Act authorizes suits for damages "by any person who shall be in his business or

3  property by reason forbidden in the antitrust laws[.]" 15 U.S.C. § 15(a). Plaintiffs' Instruction No. 29

4  should be included to instruct the jury on the "what" that Plaintiffs must establish is injured—business

5  or property. It also necessarily explains to the jury what "business" and "property" means and

6  includes, including reduced value for the data that users provide to Meta, whether in the form of

7  money or the equivalent, better quality services, including better privacy or data practices, or

8  providing less data. This instruction is important in this case, because Meta intends to argue that there

9  can be no injury to Plaintiffs in their "business" or "property" because Meta's services are supposedly

10 "free." The sorts of injuries reflected in Plaintiffs' proposal are cognizable, but may be ones that jurors

11 may not understand as "injury" without further instruction. Indeed, Plaintiffs' proposal is based on

12 the motion to dismiss ruling in this very case, where price, quality, features, and the level of data

13 provided were all recognized as legally valid antitrust injuries. *See Klein v. Facebook, Inc.*, 580 F.

14 Supp. 3d 743, 803-04 (N.D. Cal. 2022). During the parties' meet-and-confer, Meta did not state a

15 basis for why this instruction is not properly included. A version of this instruction is included in the

16 ABA Model Jury Instructions in Civil Antitrust Cases and should likewise be included here.[7]

17

18

19

20

21

22

23

24

25

---

[7]  To the extent Meta objects to Plaintiffs' instruction because it includes references to injuries based

26 on diminished product quality and providing more than a competitive level of data, Meta's objection
should be overruled. As Plaintiffs explained in their opposition to Meta's motion *in limine* No. 6,

27 these theories have been a part of Plaintiffs' case for years, which is why they are reflected in
Plaintiffs' consolidated complaint, the Court's motion to dismiss order, discovery responses, and

28 expert reports.

1

<u>**Defendant's Argument Re Instruction No. 29**</u>

2          Plaintiffs' proposed instruction is entirely redundant of other instructions and largely

3   contains attorney argument about the nature of the claimed injury, including contentions that have

4   been waived as explained in Meta's Objection to Instruction No. 16.  Putting the Court's imprimatur

5   on such arguments serves no proper purpose and invites the jury to accept contested injury theories

6   on grounds other than the record evidence.  Plaintiffs also assert no "business" injury, rendering that

7   portion of the instruction confusing and superfluous.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>Stipulated Instruction No. 30 Re DAMAGES – INTRODUCTION AND PURPOSE</u>**

If you find that Meta violated the antitrust laws and that this violation caused injury to Plaintiffs, then you must determine the amount of damages, if any, Plaintiffs are entitled to recover.

The fact that I am giving you instructions concerning the issue of Plaintiffs' damages does not mean that I believe Plaintiffs should, or should not, prevail in this case. If you reach a verdict for Meta on the issue of liability, you should not consider the issue of damages, and you may disregard the damages instructions that I am about to give.

The law provides that Plaintiffs should be fairly compensated for all damages that were a direct result or likely consequence of the conduct that you have found to be unlawful.

Antitrust damages are only compensatory, meaning their purpose is to put an injured Plaintiff as near as possible in the position in which it would have been had the antitrust violation not occurred. The law does not permit you to award damages to punish a wrongdoer—what we sometimes refer to as punitive damages—or to deter particular conduct in the future.

Furthermore, you are not permitted to award Plaintiffs an amount for attorneys' fees or the costs of maintaining this lawsuit.

**Authority**: *In re Capacitors Antitrust Litigation*, Case No. 17-cv-07046-JD, Dkt. 375 at 33 (Instruction No. 26).

1    **<u>Disputed Instruction No. 31 Re ANTITRUST INJURY AND DAMAGES – DAMAGES FOR</u>**

2    **<u>PURCHASERS: OVERCHARGES – PLAINTIFFS' PROPOSED INSTRUCTION</u>**

3        If you have determined that Meta committed an antitrust violation that caused some injury to

4    Plaintiffs, you must now determine the amount of damages to award to Plaintiffs. The proper way to

5    calculate those damages is to determine the difference between the effective prices Plaintiffs actually

6    paid for Meta's personal social networking services and the effective prices Plaintiffs would have

7    paid had Meta committed no antitrust violation. This is referred to as the overcharge.

8        Users do not typically pay a money price to use Facebook. Plaintiffs contend that Meta is not

9    "free," and users instead pay an effective price by providing their data to Meta, which Plaintiffs

10   contend has a monetary value. Meta disputes Plaintiffs' contentions. In calculating any "overcharge"

11   damages, you may consider the difference between the value that users received for their data in the

12   real world and the value that users may have received for their data—such as compensation in the

13   form of money or the equivalent, better quality services, including better privacy or data practices, or

14   providing less data—in a world free from Meta's alleged antitrust violation.

15

16       **Authority**:    ABA Model Jury Instructions in Civil Antitrust Cases B-5 (modified); *Klein v.*

17   *Facebook, Inc.*, 580 F. Supp. 3d 743, 803–04 (N.D. Cal. 2022).

18

19

20

21

22

23

24

25

26

27

28

1

**<u>Plaintiffs' Argument Re Instruction No. 31</u>**

2          Plaintiffs' Instruction should be included to instruct the jury on how to determine the amount

3   of damages to award to Plaintiffs in the event that the jury determines that Meta committed an antitrust

4   violation that caused some injury to Plaintiffs. Meta has proposed no alternative instruction to the

5   jury on this issue, which invites jury error. Plaintiffs' proposal is a modified version of an instruction

6   included in the ABA Model Jury Instructions in Civil Antitrust Cases, and it should also be included

7   here. While the ***name*** of the ABA's Model references "Horizontal" offenses, that does not mean it is

8   in only applicable in Section 1 cases. The ***subject*** of Model is a theory of damages based on a

9   purchaser's "overcharge," which is the type of damages that Plaintiffs seek here. *Apple Inc. v. Pepper*,

10  587 U.S. 273, 276 (2019) ("A claim that a monopolistic retailer . . . has used its monopoly to

11  overcharge consumers is a classic antitrust claim."). Plaintiffs' instruction accurately states the law

12  that a proper way to calculate antitrust injury is by determining the overcharge.  *See Olean Wholesale*

13  *Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022). It then proceeds to

14  describe Plaintiffs' theory of overcharge in this case, and it includes a neutral counterstatement that

15  Meta denies Plaintiffs' contentions.[8]

16

17

18

19

20

21

22

23

24

25   _____

26   [8]  To the extent Meta objects to Plaintiffs' instruction because it includes references to injuries based on diminished product quality and providing more than a competitive level of data, Meta's objection

27   should be overruled. As Plaintiffs explained in their opposition to Meta's motion *in limine* No. 6, these theories have been a part of Plaintiffs' case for years, which is why they are reflected in

28   Plaintiffs' consolidated complaint, the Court's motion to dismiss order, discovery responses, and expert reports.

1

## <u>Defendant's Argument Re Instruction No. 31</u>

2          Plaintiffs propose using an inapposite ABA Model Instruction largely replaced with attorney

3   arguments, and identify no court to have given their proposed instruction in a Section 2 case.  Model

4   Instruction 6.B.5 addresses "Overcharges Based on Horizontal Price Fixing, Output Restriction,

5   Market Allocation, or Other Agreements Not to Compete," not anything resembling plaintiffs' theory

6   in this case.  Nearly all of the proposed instruction simply restates plaintiffs' damages theory, seeking

7   to use the Court as a mouthpiece for their positions.  A contested issue in this case is whether users

8   pay to use Meta today, notwithstanding the fact that it is free.  The proposed instruction takes side in

9   that dispute, which if the case proceeds to trial, is for the jury. Meta also objects to this instruction to

10  the extent it advances waived theories of injuries and damages.  *See* Meta's Objection to Instruction

11  No. 32.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **<u>Disputed Instruction No. 32 DAMAGES – CAUSATION AND DISAGGREGATION –</u>**

2    **<u>PLAINTIFFS' PROPOSED INSTRUCTION (If Given Over Plaintiffs' Objection)</u>**

3        If you find that Meta violated the antitrust laws and that Plaintiffs were injured by that

4    violation, Plaintiffs are entitled to recover for such injury that was the direct result or likely

5    consequence of the unlawful acts of Meta.  Plaintiffs bear the burden of showing that their injuries

6    were materially caused by Meta's antitrust violation, as opposed to any other factors.  If you find that

7    Plaintiffs' alleged injuries were caused in part by Meta's alleged antitrust violation and in part by

8    other factors, then you may award damages only for that portion of Plaintiffs' alleged injuries that

9    was caused by Meta's alleged antitrust violation.

10        Plaintiffs claim that they suffered injury because they received less for their data than they

11    would have received in an allegedly more competitive world, whether measured in the form of money

12    or cash-like equivalents, better quality services, including better privacy or data practices, or

13    providing less data in the first place—all of which Plaintiffs contend is valued at approximately $5

14    per month.  Meta disputes Plaintiffs' claims, and Meta claims that it would never have paid all of its

15    users, or any of the three Plaintiffs, for using its free services, that Plaintiffs already received far more

16    than $5 per month in benefits from using Meta's services, and that the alleged deception is not why

17    Meta chose not to pay all of its users.

18        Plaintiffs only may recover for damages caused by the alleged antitrust violation. Plaintiffs

19    bear the burden of proving damages by a preponderance of the evidence, including apportioning

20    damages between lawful and unlawful causes.  If you find that Plaintiffs were injured by Meta's

21    alleged antitrust violation, and there is a reasonable basis to apportion Plaintiffs' alleged injury

22    between lawful and unlawful causes, then you may award damages.

23        If you find that Plaintiffs' alleged injuries were caused by factors other than Meta's alleged

24    antitrust violation, then you must return a verdict for Meta.  If you find that there is no reasonable

25    basis to apportion Plaintiffs' alleged injury between lawful and unlawful causes, or that

26    apportionment can only be accomplished through speculation or guesswork, then you may not award

27    any damages at all.

28        **Authority**: *Modified ABA Model Instruction B-4*

1    **Disputed Instruction No. 32 DAMAGES – CAUSATION AND DISAGGREGATION –**

2    **META'S PROPOSED INSTRUCTION**

3    If you find that Meta violated the antitrust laws and that plaintiffs were injured by that

4    violation, plaintiffs are entitled to recover for such injury that was the direct result or likely

5    consequence of the unlawful acts of Meta.  Plaintiffs bear the burden of showing that their injuries

6    were materially caused by Meta's antitrust violation, as opposed to any other factors.  If you find that

7    plaintiffs' alleged injuries were caused in part by Meta's alleged antitrust violation and in part by

8    other factors, then you may award damages only for that portion of plaintiffs' alleged injuries that

9    was caused by Meta's alleged antitrust violation.

10    Plaintiffs claim that they suffered injury because Meta did not pay them $5 per month for

11    using Facebook.  They assert that if Meta had not made the statements they claim were deceptive,

12    Meta would have paid every one of its billions of users—including each of them—$5 per month.

13    Meta claims that it would never have paid all of its users, or any of the three plaintiffs, for using its

14    free services, that plaintiffs already received far more than $5 per month in benefits from using Meta's

15    services, and that the alleged deception is not why Meta chose not to pay all of its users. You may not

16    consider any other theory of damages.

17    Plaintiffs only may recover for damages caused by the alleged antitrust violation. Plaintiffs

18    bear the burden of proving damages by a preponderance of the evidence, including apportioning

19    damages between lawful and unlawful causes.  If you find that plaintiffs were injured by Meta's

20    alleged antitrust violation, and there is a reasonable basis to apportion plaintiffs' alleged injury

21    between lawful and unlawful causes, then you may award damages. Plaintiffs must present evidence

22    that establishes the reasonableness of each of the assumptions upon which any damages calculation

23    is based.

24    If you find that plaintiffs' alleged injuries were caused by factors other than Meta's alleged

25    antitrust violation, then you must return a verdict for Meta.  If you find that there is no reasonable

26    basis to apportion plaintiffs' alleged injury between lawful and unlawful causes, or that apportionment

27    can only be accomplished through speculation or guesswork, then you may not award any damages

28    at all.

**Authority**: Modified ABA Model Civil Antitrust Jury Instruction 6.B.4; *In re Capacitators Antitrust Litig.*, Case No. 3:14-cv-03264-JD, Dkt. 2899 at 40 (N.D. Cal. Dec. 13, 2021); *In re Capacitators Antitrust Litig.*, Case No. 3:17-cv-07046-JD, Dkt. No. 375 at 34 (N.D. Cal. May 17, 2023)

1

**<u>Plaintiffs' Argument Re Instruction No. 32</u>**

2        Plaintiffs dispute that any "disaggregation" instruction is warranted. If, however, the Court

3  were to give one over Plaintiffs' objection, then it should adopt Plaintiffs' proposal and reject Meta's.

4        ***First***, Meta's proposed instruction that "You should not interpret the fact that I am giving you

5  instructions about damages as an indication I believe plaintiffs should or should not win this case. It

6  is your task to decide first whether Meta is liable per the foregoing instructions. I am instructing you

7  on damages only so you will have guidance in the event you decide Meta is liable" should be excluded

8  because it is repetitive and duplicative of identical instructions that have been given in previous jury

9  instructions regarding damages. *See* Stipulated Instruction No. 30. Accordingly, it is unnecessary

10  and a waste of time.

11        ***Second***, Meta's proposed instruction that "Antitrust damages are only compensatory, meaning

12  their purpose is to put an injured plaintiff as near as possible in the position in which it would have

13  been but for the alleged antitrust violation, if you find such a violation. The law does not permit you

14  to award damages to punish a wrongdoer—what we sometimes refer to as punitive damages—or to

15  award a damages amount in order to deter certain conduct in the future" should be excluded for the

16  same reason. It is repetitive and duplicative of identical instructions that have been given in previous

17  jury instructions regarding damages. Accordingly, Meta's proposal is unnecessary and a waste of

18  time. *See* Stipulated Instruction No. 30.

19        ***Third***, Meta's proposed instruction regarding Plaintiffs' theory of injury, and the amount of

20  the injury, should not be included because it is both inaccurate and improperly includes Meta's

21  advocacy. Plaintiffs do not allege that they were injured solely because "Meta did not pay them $5

22  per month for using Facebook." Plaintiffs' damages expert opines in his report that damages are

23  approximately $5 because they could properly fall within a stated range that is both less and more

24  than $5. Moreover, Plaintiffs contend—and their damages expert Professor Economides Plaintiffs'

25  opines—that in the but-for world, Plaintiffs could have received more for their data in the form of

26  cash-like equivalents, better quality services, better data practice, or the provision of less data in the

27  first place, ***not*** solely "$5 per month for using Facebook." *See* Plaintiffs' Opposition to Meta's MIL

28  No. 6.

1    **Fourth**, Meta's proposed description of Plaintiffs' claim—that "Meta would have paid ***every***

2    ***one of its billions of users***"—is improper advocacy that is not properly included in neutral jury

3    instructions.[9]  Plaintiffs' proposed description of their theory of injury, and its amounts—Plaintiffs

4    claim that "they received less for their data than they would have received in an allegedly more

5    competitive world, whether measured in the form of money or cash-like equivalents, better quality

6    services, including better privacy or data practices, or providing less data in the first place—all of

7    which Plaintiffs contend is valued at approximately $5 per month"—is an accurate and neutral

8    statement of their claim and therefore should be included instead.

9    **Finally**, Meta's proposed instruction that the jury "may not consider any other theory of

10   damages" is legally incorrect and should be excluded. The jury is not limited to awarding damages

11   that are an identical match to the opinions stated in the expert report of Plaintiffs' damages expert.

12   For example, the jury could find, based on evidence presented, that Meta would have paid Plaintiffs

13   $10 per month for their data; as one example, Meta apparently paid some of its "Research App" users

14   $20 per month for comparable data.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[9]   Meta's characterization of Plaintiffs' theory is also factually incorrect. Plaintiffs' claims and theories are based on the United States geographic market. Meta does not have "billions of users" in the United States, which would be more than the entire U.S. population, multiple times over.

## **Defendant's Statement Re Instruction No. 32**

A disaggregation instruction is warranted because the law provides that plaintiffs can only recover for injuries caused by conduct they prove to be unlawful.  Absent this instruction, the jury will have no guidance on applying that undisputed rule.  Plaintiffs' proposed instruction then improperly injects waived damages theories that lack evidentiary support and removes accurate statements of law the Court has routinely given in its instructions with no justification.  The Court should use Meta's version.

***First***, plaintiffs have waived any theory of damages other than paying all users every month for maintaining their Facebook accounts.  Plaintiffs assert that the jury should be instructed that damages can be assessed by referenced to "better quality services, including better privacy or data practices, or providing less data in the first place," but as explained in Meta's Objection to Instruction No. 16, plaintiffs have identified no evidence regarding changes in quality or damages derived therefrom.  Plaintiffs were in fact ordered by the Court to disclose any theories beyond lost compensation for use after deficient initial disclosures.  Dkt. 162 at 4 ("If the Consumer Plaintiffs seek damages based on something other than the uncompensated value of their data, they must describe with greater specificity the nature of the harm for which they claim damages, the methodology on which they rely to compute damages, and an estimate of the amount of damages claimed."). In response, plaintiffs identified only lost compensation for use:

> Consumer Plaintiffs' and the Consumer Class' damages are thus the difference between the compensation that Facebook actually provided for the data that Facebook collected from them and put to use, and the compensation that they should have received for that data in a competitive world.

Dkt. 957-12, Plfs' Third Am. Initial Disclosures at 49 (June 23, 2023); *see also id.* at 54 (describing measure of damages as "price Facebook would have paid to Consumer Class member per month in return for his or her data" minus "[a]ctual monetary price ($0.00) paid"). Nowhere in the court-ordered explication of their damages calculations do plaintiffs offer a means for determining damages from a degradation of quality or change in data collection. Meta's proposed language—that according to plaintiffs, Meta would have paid each of its users—simply describes plaintiffs' claim.

Plaintiffs' instruction is even more confusing and prejudicial because their damages expert expressly disclaimed offering the theories plaintiffs seek to include.  Economides testified that in a but-for world without the allegedly anticompetitive conduct, Facebook and Instagram would "remain the same products." Economides 9/23 Tr. 144:20-145:2, Dkt. 957-02 ("Q. In your but-for world, are you assuming that Facebook and Instagram would remain the same products as they are in the actual world? A. Well, you have to keep in mind that the but-for world is an unknown, and we do the best approximation that we can with them. So at the first approximation, the answer is yes, we expect Facebook and Instagram to remain the same products.").  Such testimony precludes deriving damages from changes in Meta's services, and the jury should not be instructed on injury or damages related to a change in Meta's offerings when their expert's injury and damages model explicitly finds no such change.

*Second*, the jury should be instructed that "plaintiffs must present evidence that establishes the reasonableness of each of the assumptions upon which any damages calculation is based."  This language is taken verbatim from the Court's damages instructions in the *In re Capacitors Antitrust Litigation*, Case No. 3:14-cv-03264-JD, Dkt. 2899 at 40 (N.D. Cal. Dec. 13, 2021) ("DPPs must prove the reasonableness of each of the assumptions upon which the damages calculation is based."), and the *Avnet* trial, Case No. 3:17-cv-07046-JD, Dkt. No. 375 at 34 (N.D. Cal. May 17, 2023) ("Avnet must prove the reasonableness of each of the assumptions upon which the damages calculation is based."), and originally comes from ABA Model Civil Antitrust Jury Instruction 6.B.3 ("Plaintiff must prove the reasonableness of each of the assumptions upon which the damages calculation is based.").  There is no reason to discard an accurate statement of law that this Court and others have given in numerous cases.

1    **Stipulated Instruction No. 33 Re CALCULATION OF DAMAGES**

2          You are permitted to make just and reasonable estimates in calculating Plaintiffs' damages.

3    You are not required to calculate damages with mathematical certainty or precision. However, the

4    amount of damages must have a reasonable basis in the evidence and must be based on reasonable,

5    non-speculative assumptions and estimates.  Damages may not be based on guesswork or speculation.

6    Plaintiffs must prove the reasonableness of each of the assumptions upon which the damages

7    calculation is based.

8          If you find that Plaintiffs have provided a reasonable basis for determining damages, then you

9    may award damages based on a just and reasonable estimate supported by the evidence.

10         If you find that Plaintiffs have failed to carry their burden of providing a reasonable basis for

11   determining damages, then you may not award actual damages, provided however, in that event, you

12   may award nominal damages not to exceed one dollar per Plaintiff.

13

14         **Authority**: *Modified In re Capacitors Antitrust Litig.*, Case No. 17-cv-07046-JD, Dkt. 375 at

15   34 (May 17, 2023)*;* ABA Model Jury Instructions in Civil Antitrust Cases 6.B.3.

16

17

18

19

20

21

22

23

24

25

26

27

28

1  **Disputed Instruction No. 34 re RELEVANT TIME PERIOD – PLAINTIFFS' PROPOSED**

2  **INSTRUCTION**

3       The relevant damages period in this case is December 3, 2016 through December 3, 2020. The

4  relevant time period for the antitrust laws preclude recovery in this case for any injuries caused by

5  conduct that occurred before December 3, 2016. You have heard evidence in this trial concerning

6  conduct that occurred before December 3, 2016. That conduct may be considered as background to

7  help you understand the claims and defenses in this case, but you may not rely on that conduct to be

8  part of the conduct that Plaintiffs are seeking damages for in this case.

9

10       **Authority**:  *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592

11  (Instruction No. 40) (modified).

**<u>Disputed Instruction No. 34 re RELEVANT TIME PERIOD</u>**

**<u>Offered by Defendant</u>**

The relevant time period for the antitrust laws preclude recovery in this case for any injuries caused by conduct that occurred before December 3, 2016. You have heard evidence in this trial concerning conduct that occurred before December 3, 2016. That conduct may be considered as background to help you understand the claims and defenses in this case, but you may not rely on that conduct to be part of the conduct that Plaintiffs are challenging as unlawful or seeking damages for in this case.

1

**<u>Plaintiffs' Argument Re Instruction No. 34</u>**

2          The parties agree on the inclusion of a jury instruction regarding the relevant damages period.

3 However, the parties appear to have one disagreement as to an individual phrase.

4          Meta proposes that in describing the significance of conduct the jury hears about that occurs

5 before December 3, 2016—four years before Plaintiffs filed this case, and thus, the start of the

6 limitations period—the Court instruct the jury that "[t]hat conduct may be considered as background

7 to help you understand the claims and defenses in this case, but you may not rely on that conduct to

8 be part of the conduct that Plaintiffs are **challenging as unlawful or** seeking damages for in this

9 case." Plaintiffs object to Meta's inclusion of "challenging as unlawful," and Plaintiffs instead

10 propose that the instruction read "[t]hat conduct may be considered as background to help you

11 understand the claims and defenses in this case, but you may not rely on that conduct to be part of the

12 conduct that Plaintiffs are seeking damages for in this case." Meta's addition should be rejected.

13          Plaintiffs contend that by deceiving the market about its privacy and data practices, Meta

14 initially acquired a monopoly before the limitations period, and, by engaging in new acts of deception

15 during the limitations period, then maintained its monopoly during the limitations period. However,

16 Plaintiffs are only seeking damages for Meta's anticompetitive deception ***during*** the limitations

17 period (*i.e.*, on or after December 3, 2016). Nonetheless, as the Ninth Circuit, this Court, and others

18 have recognized, pre-limitations period conduct is still relevant in antitrust cases like this one. *See,*

19 *e.g.*, *Sidibe v. Sutter Health*, 103 F.4th 675, 689, 692–93 699 (9th Cir. 2024) (pre-limitations period

20 conduct is "context" for "history and purpose" of the conduct, serves as proof of the defendant's

21 "motives" into the limitations period, and "can explain, among other things, the 'effects of the

22 conduct'"); *In re Google Play Store Antitrust Litig.*, Case No. 21-md-02981-JD, Dkt. 569 at 26–29

23 (this Court explaining that plaintiffs "can use some table setting," such as "this has been a longtime

24 practice of the company" and "this is part and parcel of who they are and how they do business,"

25 where plaintiffs are not "mak[ing] any argument for damages . . . based on those older agreements,"

26 because "[t]his is not a bootstrap" but instead "pattern and practice," which "happens all the time.");

27 *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 296 (2d Cir. 1979) ("a purchaser suing a

28

1    monopolist for overcharges paid within the previous four years" can "point[] to anticompetitive
2    actions taken before the limitations period.").

3          Meta's proposal is confusing, prejudicial, and erroneous. Meta's assertion that the jury should
4    be instructed that Plaintiffs cannot rely on pre-2016 conduct as "part of the conduct that Plaintiffs are
5    **_challenging as unlawful_**" suggests to the jury that Plaintiffs agree the pre-2016 conduct **_is_** "lawful."
6    Plaintiffs do not agree that Meta's deception—in any time period—is lawful. While Plaintiffs do not
7    intend to seek **_damages_** based on pre-2016 conduct, they may—consistent with *Sidibe*, *Google Play*,
8    and other antitrust cases—introduce evidence of that conduct for other purposes, such as for
9    background, context, motive, intent, and effect. Plaintiffs' proposal makes all of this clear, by
10   instructing the jury that it may consider pre-2016 conduct "as background" but not as "part of the
11   conduct that Plaintiffs are seeking damages for in this case." The Court should therefore adopt
12   Plaintiffs' proposal and reject Meta's.

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    **<u>Defendants' Argument Re Instruction No. 34</u>**

2          Nothing cited in plaintiffs' argument supports omitting the phrase "part of the conduct that

3    Plaintiffs are challenging as unlawful."  Meta's proposed instruction includes the language that

4    plaintiffs have suggested regarding consideration of pre-limitations period conduct as

5    "background."  Because the jury will hear about pre-limitations period conduct, but may only

6    consider it as "background," it is appropriate to instruct the jury on the purposes for which they may

7    not consider such evidence.  And in light of plaintiffs' abandonment of their claims premised on

8    pre-December 3, 2016 conduct, *see* Meta's Objections to Instructions No. 2 and 16, Meta's

9    instruction accurately reflects what conduct plaintiffs are now "challenging as unlawful."

1   **<u>Disputed Instruction No. 35 Re STATUTE OF LIMITATIONS – PLAINTIFFS' PROPOSED</u>**

2   **<u>INSTRUCTION (If Given Over Plaintiffs' Objection)</u>**

3          Meta contends that Plaintiffs' lawsuit was not filed within the time set by law.  To succeed on

4   this defense, Meta must prove that Plaintiffs' claimed harm occurred before December 3, 2016 and

5   that all conduct that caused Plaintiffs' harm occurred prior to December 3, 2016.

6

7          **Authority**: CACI No. 454; 15 U.S.C. § 15b.

1    **Disputed Instruction No. 35 Re STATUTE OF LIMITATIONS – META'S PROPOSED**

2    **INSTRUCTION**

3      Meta asserts the statute of limitations as a defense to plaintiffs' antitrust claims. The fact that

4    I am giving you instructions concerning the issue of the statute of limitations defense does not mean

5    that I believe there was any violation of the law.

6      A statute of limitations is a law that establishes a legal deadline for filing a lawsuit. If a

7    plaintiff does not file suit by the deadline, then the law bars its claim. The time period within which

8    an antitrust lawsuit must be brought begins when a defendant commits an act that allegedly injures a

9    plaintiff.

10     The applicable statute of limitations period for plaintiffs' antitrust claims is four years.

11   Plaintiffs filed this lawsuit on December 3, 2020. Therefore, Meta's alleged acts that injured plaintiffs

12   must have been committed on or after December 3, 2016. Meta claims that plaintiffs' suit is barred

13   here because Meta's allegedly anticompetitive conduct began, and any alleged injuries first occurred,

14   before December 3, 2016.

15     Plaintiffs assert that their claims are not barred by the statute of limitations because Meta's

16   allegedly anticompetitive statements constitute a "continuing violation" of the antitrust law, which

17   restarts the statute of limitations. A "continuing violation" requires an overt act by Meta, and the

18   statute of limitations runs from the last overt act. An overt act that will restart the statute of limitations

19   (1) must be a new and independent act that is not merely a reaffirmation of a previous act; and (2)

20   must inflict new and accumulating injury on plaintiffs. Both elements are necessary for a continuing

21   violation; a plaintiff must prove both that a new injury within the limitations period occurred and that

22   injury was caused by a new, anticompetitive act. Meta asserts that the statements made after

23   December 3, 2016 alleged to be deceptive were, at most, merely reaffirmations of prior acts

24   undertaken before December 3, 2016 and therefore not new and independent acts constituting a

25   continuing violation. Meta further asserts that plaintiffs have not identified any "new and

26   accumulating" injury after December 3, 2016.

27     Meta has the burden of proving the statute of limitations defense. In other words, Meta must

28   prove by a preponderance of the evidence that plaintiffs did not bring the suit within the applicable

1    time period. Plaintiffs have the burden of proving, again by a preponderance of the evidence, any

2    "continuing violation" exception to the statute of limitations.

3

4    **Authority**: 15 U.S.C. § 15b; *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237-238

5    (9th Cir. 1987); *Gamboa v. Apple Inc.*, No. 24-CV-01270-EKL, 2025 WL 1684890, at *6 (N.D.

6    Cal. June 16, 2025)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### Plaintiffs' Argument Re Instruction No. 35

Plaintiffs object to Meta's proposed jury instruction as legally improper, unnecessary, a waste of time, and prejudicial. Meta cites no authority where a similar "continuing violation" doctrine instruction has been given to a jury. Moreover, Plaintiffs did not, as Meta misstates, "concede[]" that their claims are "untimely" and must be "salvaged by the continuing violations doctrine." 15 U.S.C. § 15b generally sets a four year statute of limitations on private antitrust claims for damages. Plaintiffs here seek damages only since the start of the limitations period (*i.e.*, December 3, 2016, four years before Plaintiffs filed this case). Therefore, there is no statute of limitations issue here.

Meta seeks to use the continuing violation doctrine as a sword, but, if anything, it bolsters Plaintiffs' claims. *Samsung Elecs. Co. v. Panasonic Corp.,* 747 F.3d 1199, 1202 (9th Cir. 2014). Indeed, the Court already found Plaintiffs' claims timely and rejected Meta's statute of limitations arguments at the motion to dismiss stage. *See* Dkt. 214 at 55–58. Meta's proposed instruction turns the continuing violations exception on its head and improperly states it as an additional burden of proof ***Plaintiffs*** must meet in order to prove their claim and recover damages. This is contrary to the law.

To the extent an instruction is needed at all on Meta's statute of limitations defense, Plaintiffs' proposed instruction should be used. It properly and simply states the law in a neutral fashion and is based on a jury instruction on the statute of limitations that has been used in many trials. It is undisputed that Plaintiffs filed this lawsuit on December 3, 2020. Accordingly, to succeed on its statute of limitations defense, Meta must prove that Plaintiffs' claimed harm occurred before December 3, 2016 and that all conduct that caused Plaintiffs' harm occurred prior to December 3, 2016.

1          **<u>Defendants' Argument re Instruction No. 35</u>**

2          Plaintiff's proposal that the jury not be instructed on the continuing violation doctrine results

3   in instructions that are incomplete on the law, likely to create confusion for the jury, unduly prejudice

4   Meta, and result in a verdict that is unsupported by the jury's factual findings. Plaintiffs have already

5   conceded that their claims are untimely and can only be salvaged by the continuing violation doctrine.

6   MSJ Opp. 21-25, Dkt. 957-01. If the jury finds, consistent with plaintiffs' concession, that plaintiffs'

7   claims are untimely, the burden shifts back to plaintiffs to establish the elements of a continuing

8   violation. MTD Order 55-56, Dkt. 214; *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321,

9   341 (1971) (describing plaintiff's burden to "convince the District Court" that elements of continuing

10  violation had been established).

11         To find a continuing violation, the jury is required to make a factual finding that Meta

12  committed an "overt act" that is (1) "a new and independent act that is not merely a reaffirmation of

13  a previous act" and (2) "inflict[ed] new and accumulating injury on the plaintiff." *Samsung Elecs.*

14  *Co., Ltd. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014) (quoting *Pace Indus.*, 813 F.2d at

15  238). Without providing any instruction on the continuing violation doctrine, the jury will have no

16  information on how to make such a finding, which could result in a verdict for plaintiffs without the

17  jury having found the predicate facts necessary for plaintiffs to establish the existence of a continuing

18  violation. Finally, the Court did not rule on Meta's motion to dismiss that plaintiffs' claims were

19  timely.  The Court's ruling could only be what it was:  that the question of timeliness was a disputed

20  factual issue based on the allegations in the complaint.

21

22

23

24

25

26

27

28

**Stipulated Instruction No. 36 Re DUTY TO DELIBERATE**

When you begin your deliberations, elect one member of the jury as your presiding juror who will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so. Your verdict, whether liable or not liable, must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your opinion if the discussion persuades you that you should. But do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Perform these duties fairly and impartially. Do not allow personal likes or dislikes, sympathy, prejudice, fear, or public opinion to influence you. You should also not be influenced by any person's race, color, religion, national ancestry, gender, sexual orientation, profession, occupation, economic circumstances, or position in life or in the community.

It is your duty as jurors to consult with one another and to deliberate with one another with a view towards reaching an agreement if you can do so. During your deliberations, you should not hesitate to reexamine your own views and change your opinion if you become persuaded that it is wrong.

**Authority**: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592 (Instruction No. 41).

1    **Stipulated Instruction No. 37 Re CONSIDERATION OF THE EVIDENCE – CONDUCT OF**

2    **THE JURY**

3    Because you must base your verdict only on the evidence received in the case and on these

4    instructions, I remind you that you must not be exposed to any other information about the case or to

5    the issues it involves. Except for discussing the case with your fellow jurors during your deliberations:

6    Do not communicate with anyone in any way and do not let anyone else communicate with

7    you in any way about the merits of the case or anything to do with it. This includes discussing the

8    case in person, in writing, by phone or electronic means, via email, text messaging, or any Internet

9    social media site, blog, website or other feature. This applies to communicating with your family

10   members, your employer, the media or press, and the people involved in the trial. If you are asked or

11   approached in any way about your jury service or anything about this case, you must respond that

12   you have been ordered not to discuss the matter and report the contact to the Court.

13   Do not read, watch, or listen to any news or media accounts or commentary about the case or

14   anything to do with it; do not do any research, such as consulting dictionaries, searching the Internet,

15   or using other reference materials; and do not make any investigation or in any other way try to learn

16   about the case on your own.

17   The law requires these restrictions to ensure the parties have a fair trial based on the same

18   evidence that each party has had an opportunity to address. A juror who violates these restrictions

19   jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire

20   trial process to start over. If any juror is exposed to any outside information, please notify the Court

21   immediately.

22

23   **Authority**: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592

24   (Instruction No. 42).

25

26

27

28

1    **Stipulated Instruction No. 38 Re USE OF NOTES**

2    Some of you have taken notes during the trial. Whether or not you took notes, you should rely

3    on your own memory of what was said. Notes are only to assist your memory. You should not be

4    overly influenced by your notes or those of your fellow jurors.

5

6    **Authority**: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592

7    (Instruction No. 43).

1      **Stipulated Instruction No. 39 Re COMMUNICATION WITH THE COURT**

2          If it becomes necessary during your deliberations to communicate with me, you may send a

3    note through Ms. Clark, signed by any one or more of you. No member of the jury should ever attempt

4    to communicate with me except by a signed writing, and I will respond to the jury concerning the

5    case only in writing or here in open court. If you send out a question, I will consult with the lawyers

6    before answering it, which may take some time. You may continue your deliberations while waiting

7    for the answer to any question. Remember that you are not to tell anyone—including me or Ms.

8    Clark—how the jury stands, numerically or otherwise, on any question submitted to you, including

9    the question of Meta's liability, until after you have reached a unanimous verdict or have been

10   discharged.

11

12          **Authority**: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592

13   (Instruction No. 44).

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **Stipulated Instruction No. 40 Re RETURN OF VERDICT**

2       A verdict form has been prepared for you. After you have reached unanimous agreement on a

3  verdict, your presiding juror should complete the verdict form according to your deliberations, sign

4  and date it, and advise Ms. Clark that you are ready to return to the courtroom.

5

6       **Authority**: *Epic Games, Inc. v. Google LLC et al*, Case No. 3:20-cv-05671-JD, Dkt. 592

7  (Instruction No. 45).

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    DATED: September 11, 2025

2    By: */s/ Shana E. Scarlett*               By: */s/ Kevin Y. Teruya*
     **HAGENS BERMAN SOBOL SHAPIRO LLP**        **QUINN EMANUEL URQUHART & SULLIVAN, LLP**
3    Shana E. Scarlett (Bar No. 217895)        Kevin Y. Teruya (Bar No. 235916)
       shanas@hbsslaw.com                         kevinteruya@quinnemanuel.com
4    715 Hearst Avenue, Suite 202              Adam B. Wolfson (Bar No. 262125)
     Berkeley, CA 94710                          adamwolfson@quinnemanuel.com
5    (510) 725-3000                            Scott L. Watson (Bar No. 219147)
                                                 scottwatson@quinnemanuel.com
6    Steve W. Berman (admitted *pro hac vice*)  Claire D. Hausman (Bar No. 282091)
       steve@hbsslaw.com                          clairehausman@quinnemanuel.com
7    1301 Second Avenue, Suite 2000            Brantley I. Pepperman (Bar No. 322057)
     Seattle, WA 98101                           brantleypepperman@quinnemanuel.com
8    (206) 623-7292                            865 South Figueroa Street, 10th Floor
                                               Los Angeles, CA 90017-2543
9    **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**      (213) 443-3000
10   W. Joseph Bruckner (admitted *pro hac
     vice*)                                    Michelle Schmit (admitted *pro hac vice*)
       wjbruckner@locklaw.com                    michelleschmit@quinnemanuel.com
11   Robert K. Shelquist (admitted *pro hac    191 N. Wacker Drive, Suite 2700
     vice*)                                    Chicago, IL 60606-1881
12     rkshelquist@locklaw.com                 (312) 705-7400
     Brian D. Clark (admitted *pro hac vice*)
13     bdclark@locklaw.com                     Manisha M. Sheth (admitted *pro hac vice*)
     Laura M. Matson (admitted *pro hac vice*)   manishasheth@quinnemanuel.com
14     lmmatson@locklaw.com                    295 5th Avenue, 9th Floor
     100 Washington Ave South, Suite 2200      New York, New York 10016
15   Minneapolis, MN 55401                     (212) 849-7000
     (612) 339-6900
16
     Kyle Pozan (admitted pro hac vice)
17     kjpozan@locklaw.com
     1165 N Clark Street, Suite 700
18   Chicago, IL 60610
     (312) 470-4333
19
20                    *Attorneys for Plaintiffs Maximilian Klein,*
                      *Rachel Banks Kupcho, and Sarah Grabert*
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DATED: September 11, 2025

By:   */s/ Sonal N. Mehta*
**WILMER CUTLER PICKERING HALE
AND DORR LLP**
SONAL N. MEHTA (Bar No. 222086)
  Sonal.Mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
  David.Gringer@wilmerhale.com
ALEX W. MILLER (*pro hac vice*)
  Alex.Miller@wilmerhale.com
PAUL VANDERSLICE (*pro hac vice*)
  Paul.Vanderslice@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800

MOLLY M. JENNINGS (*pro hac vice*)
  Molly.Jennings@wilmerhale.com
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000

*Attorneys for Defendant Meta Platforms, Inc.*

1

**ATTESTATION OF KEVIN Y. TERUYA**

2          This document is being filed through the Electronic Case Filing (ECF) system by attorney

3    Kevin Y. Teruya. By his signature, Mr. Teruya attests that he has obtained concurrence in the filing

4    of this document from each of the attorneys identified on the caption page and in the above signature

5    block.

6
          Dated: September 11, 2025          By   _/s/ Kevin Y. Teruya_____
7                                                    Kevin Y. Teruya

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28