United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MAXIMILIAN KLEIN, et al.,
Plaintiffs,
v.
META PLATFORMS, INC.,
Defendant.

Case No. 20-cv-08570-JD

**ORDER RE FRE 702 AND DR. MICHAEL A. WILLIAMS**

In this antitrust action, Affilious, Inc. and other named plaintiffs,[1] on behalf of themselves and a putative class of advertisers, sued defendant Meta Platforms, Inc. (Meta)[2] for anticompetitive conduct under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, in the market for online "social advertising." Dkt. No. 86. Plaintiffs allege that Meta forced them to pay supracompetitive prices for ads on Facebook.

Plaintiffs ask to certify under Federal Rule of Civil Procedure 23(b)(3) a national class of persons who purchased advertising from Meta. Dkt. No. 795-1. In support of certification, plaintiffs rely upon the opinions of Dr. Michael A. Williams, an economist and expert witness, to establish that questions of antitrust injury and damages can be answered across the class with common evidence. Dkt. No. 795-19 (Williams report).[3] To that end, Dr. Williams opined that an

---

[1] Maximilian Klein was the named plaintiff for a companion case of Facebook users. A prior judge consolidated the user and advertiser claims, and allowed each plaintiff group to file a separate consolidated complaint. *See* Dkt. No. 74 at 2. For unclear reasons, the advertisers filed theirs with Klein in the caption. Dkt. No. 86. Summary judgment was granted against the user plaintiffs, and that case was closed. Dkt. No. 1000.

[2] Following prior practice, the Court uses "Meta" to denote the company and "Facebook" for the social-networking service. *See* Dkt. No. 905 at 1 n.1.

[3] Citations to the parties' papers are to the unredacted versions filed under seal. Publicly available versions may be found at Dkt. Nos. 800, 811, 819 (motion to exclude Dr. Williams' class certification opinions, opposition, and reply, respectively).

"economic profit rate" (EPR) analysis validly and reliably established classwide injury and damages caused by Meta's practices. *See, e.g., id.* ¶¶ 77-80.

Meta says that Dr. Williams' work is junk science because profitability is a poor proxy for the supracompetitive prices said to have been charged, and is affected by factors other than anticompetitive conduct that Dr. Williams did not account for. *See* Dkt. No. 799-1 at 4. In Meta's view, this warrants exclusion of his opinions under Federal Rule of Evidence 702 and allied cases.

The parties' familiarity with the record is assumed. Plaintiffs have carried their burden of demonstrating that Dr. Willimas' opinions are admissible. Consequently, exclusion is denied.

**DISCUSSION**

**A. LEGAL STANDARDS**

Federal Rule of Evidence 702 provides that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that," *inter alia*, "the testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d). "[A] proponent of expert testimony must always establish the admissibility requirements of Rule 702 by a preponderance of the evidence." *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025). The "inquiry envisioned by Rule 702" focuses on the "principles and methodology [of the expert], not on the conclusions that they generate." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594-95 (1993).

In the class certification context, the *Daubert* inquiry may be "full" or "limited." *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1030 (9th Cir. 2024), *cert. denied,* 145 S. Ct. 1308, 221 L. Ed. 2d 396 (2025). Here, where "discovery has closed and an expert's analysis is complete and [his] tests fully executed," the Court conducts a "full-blown *Daubert* assessment." *Id.* at 1031.

Rule 702 "tasks a district court judge with ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *In re Google Play Store Antitrust Litig.*, No. 21-md-02981-JD, 2023 WL 5532128, at *5 (N.D. Cal. Aug. 28, 2023) (cleaned up). "The test

United States District Court
Northern District of California

of reliability is flexible, and the Court looks at whether the reasoning and methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Reflex Media, Inc. v. SuccessfulMatch.com*, 758 F. Supp. 3d 1046, 1049 (N.D. Cal. 2024).

An expert's opinions are "inherently unreliable" if they do not rest on a sufficient factual foundation and are "speculative." *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014); *see also United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). In the words of the Advisory Committee, "nothing . . . requires the court to nitpick an expert's opinion," but the rule "does not permit the expert to make claims that are unsupported by the expert's basis and methodology." Fed. R. Evid. 702, advisory committee's note to 2023 amendment.

Even so, FRE 702 "does not license a court to engage in freeform factfinding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions at the admissibility stage." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1026 (9th Cir. 2022). "Rule 702 is concerned with the soundness of the expert's methodology, rather than the correctness of the expert's conclusions." *Engilis*, 151 F.4th at 1050 (quotations and brackets omitted). "If the proposed testimony meets the thresholds of relevance and reliability, its proponent is entitled to have the jury decide upon its credibility, rather than the judge." *Elosu*, 26 F.4th at 1024 (quotations and brackets omitted).

**B. DR. WILLIAMS**

**1. Professional Qualifications**

Meta does not suggest that Dr. Williams is unqualified to be an expert witness in this case, and for good reason. Dr. Williams is a managing director at Berkeley Research Group, an economic consulting firm, and served as an economist in the Antitrust Division of the United States Department of Justice. Dkt. No. 795-19 ¶¶ 1, 3. He obtained a Ph.D. in economics from

the University of Chicago, has published articles in various economics journals, and has been involved with antitrust issues as an economist throughout his career, including engagements as an antitrust expert by the Federal Trade Commission and the Canadian Competition Bureau. *Id.* at Appendix I. Dr. Williams has been qualified to testify as an antitrust expert in multiple federal courts and in tribunals abroad. *See id.* ¶¶ 1-2. He is so qualified here, and Meta does not contend otherwise.

**2. Summary of Opinions**

As antitrust expert work goes, Dr. Williams' opinions are not particularly abstruse or recondite. To fine-tune the parties' debate about Dr. Williams' work, the Court held a concurrent expert evidence proceeding in which Dr. Williams and his opposing colleague sponsored by Meta, Dr. Catherine Tucker, exchanged their opinions under oath in response to the Court's questions. *See* Dkt. No. 973 (hearing transcript). Each expert presented his or her main opinions and responses to the other's comments. Their testimony closely tracked their written reports, and is used here, in conjunction with their reports, to summarize their work.

As Dr. Williams testified, he elected to use a "yardstick EPR model" to measure injury and damages to the class. Dkt. No. 973 at 33:9-15. Dr. Williams compared Meta's profitability, which was assumed to be artificially inflated by anticompetitive practices, with that of a set of competitive "yardstick" firms, to define the pricing effects of the challenged conduct. Dkt. No. 795-19 ¶¶ 81-83.

To identify the yardstick firms, Dr. Williams started with a broad set of publicly traded companies and filtered for those with "Interactive Media and Services" as their primary industry, revenues and market capitalizations of at least 0.1% of Meta's, and positive net incomes. *Id.* ¶¶ 98-99. At Meta's request, Dr. Williams included in this group five specific companies, namely Twitter, Snap, Pinterest, Amazon, and Apple, which yielded a yardstick set of 30 comparators. *See* Dkt. No. 795-19 at 51 n.108; Dkt. No. 973 at 36:17-21. From the 30 yardstick firms, he created 90 different EPR measures, each comprising between 5 and 30 firms. Dkt. No. 973 at 36:22-24.

Dr. Williams compared Meta's EPR with the EPRs in each of the 90 yardstick measures. He did this because economic profit is a firm's "operating returns minus the opportunity cost of the capital employed." Dkt. No. 795-19 ¶ 27. A firm's economic profit rate is its "economic profits divided by its economic capital." *Id.* Dr. Williams determined that Meta's EPR was "43.6 percent in the damages period," which indicated that Meta was more profitable than 99% of companies in the United States. Dkt. No. 973 at 36:25-37:4. The EPRs of the 90 yardstick companies was "less than half" of Meta's. *Id*. at 37:4.

Dr. Williams used Meta's EPR to determine a price overcharge percentage for the class as whole. As he stated during the concurrent evidence proceeding, the equation for EPR "starts with price" because "[p]rofits and prices are inextricably interlinked." *Id.* at 35:16-23. Because EPR and prices have a "mathematical relationship," Dr. Williams lowered Meta's prices until its EPR was the same as the next highest EPR in the yardstick group. *Id*. at 37:25-38:4. To bring Meta's EPR down to the next highest EPR observed among the 90 yardstick indexes, Dr. Williams calculated that Meta's prices would need to be reduced by 30.1%. *Id*. at 38:4-6. He concluded that this figure represented the price overcharge across the class attributable to Meta's anticompetitive conduct. *Id.* at 37:24-38:9.

In response to the Court's questions, Dr. Williams summarized why he did not use a more price-centric analysis such as the regression formulas frequently applied to determine an overcharge in price-fixing cases. In a typical case of that type, an economist would use a multiple regression analysis to control for price changes attributable to "product characteristics, input costs, customer type, and variables related to consumer preference and demand," that are unaffected by the alleged conduct. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 671 (9th Cir. 2022) (en banc) (describing an overcharge multiple regression); *see also In re Capacitors Antitrust Litig. (No. III)*, No. 14-CV-03264-JD, 2018 WL 5980139, at *6 (N.D. Cal. Nov. 14, 2018) (same). After controlling for these exogenous factors, a single remaining variable would capture the overcharge caused by the anticompetitive practices. *See, e.g., Olean,* 31 F.4th at 671; Daniel Rubinfeld & David Card, *Reference Guide on Multiple Regression and Advanced Statistical Models*, in Fed. Judicial Ctr., *Reference Manual on Scientific Evidence* 577, 580 (4th

ed. 2025) ("Multiple regression involves a variable to be explained -- called the dependent variable or outcome variable -- and additional explanatory variables that are thought to produce or be associated with changes in the dependent variable.").

This case is different. As Dr. Williams stated, the advertisers' claims focus on Meta's monopoly conduct, which is not the same as price fixing. Dkt. No. 973 at 26:6-7. In his view, the regressions used in price-fixing cases are a poor fit here because the evidence lacked a "clean benchmark period" typically required for the regressions, *id.* at 26:7-16, and because the demand for advertising on Meta was affected by Meta's anticompetitive conduct. Dr. Williams means by this that ad buyers such as plaintiffs would have had many more options to buy from rivals to Meta in a but-for world free of the challenged conduct. In his view, this made the use of conventional price-fixing regressions unsuitable. It was not possible to isolate a single variable that captured an overcharge because the disputed conduct affected both the explanatory control variables and the dependent variable. *Id.* at 27:5-29:15.[4]

Dr. Williams stated that he found a precedent for his work in the opinions of experts for the plaintiff that were admitted into evidence in *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43 (2d Cir. 2019). There, plaintiff US Airways presented evidence of supracompetitive prices at trial based in substantial part on an analysis of economic profits. *Id.* at 62. Professor Jerold L. Zimmerman testified that Sabre's economic profits were "much higher than the comparable companies," akin to Dr. Williams' opinions here. *Id.* The but-for price derived from the economic profit rate analysis was used during trial as a cross-check for the classwide damages figure proposed by the plaintiff. *See* Case No. 11-cv-02725-LGS (S.D.N.Y.) Dkt. No. 755 (November 2, 2010 Trial Tr.) at 1602:24-1603:15, 1608:2-15; Dkt. No. 761 (November 10, 2016 Trial Tr.) at 2127:18-2130:8.

**C. ADMISSIBILITY**

The overarching criticism levied by Meta against Dr. Williams' work is that "this is an overcharge case" and "prices are not profits." Dkt. No. 973 at 42:12-15. In Meta's view, Dr.

[4] It bears repeating that all of this is spelled out in detail in Dr. Williams' report. The transcript of the evidence proceedings provides a convenient summary but is not a substitute for the report.

Williams' use of the EPR analysis is unprecedented to the point of being unreliable and something no reasonable economist would do. *See, e.g.,* Dkt. 799-1 at 4-5.

A novel method of analysis is not, of course, a reason in itself for exclusion under FRE 702. During the concurrent evidence proceeding, the Court noted the EPR approach might be seen as "exotic" in using profits rather than actual prices to analyze potential overcharges. Dkt. No. 973 at 24:12-13. Dr. Williams forthrightly agreed that it was "unusual," *id*. at 54:13, and explained why he chose to go in that direction. The salient point here is that a method is not inherently flawed simply because it hasn't been frequently used before. Rule 702 does not forbid new methodologies or analyses. It is true that "well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended." *Daubert*, 509 U.S. at 592 n.11. But general acceptance of a method is no guarantee of reliability, and is not a touchstone of admissibility under Rule 702. *Kumho Tire*, 526 U.S. at 151 ("Nor, on the other hand, does the presence of *Daubert*'s general acceptance factor help show that an expert's testimony is reliable where the discipline itself lacks reliability, as, for example, do theories grounded in any so-called generally accepted principles of astrology or necromancy."). The "gatekeeping inquiry must be tied to the facts of a particular case," and so it is not necessarily "surprising" for expert opinions to be based on methods that are new and not been the subject of peer review. *Id.* at 150-51 (cleaned up).

Meta's objections to Dr. Williams' methods do not command exclusion of his opinions. To start, Meta's insistence that Dr. Williams chose an indefensible indirect measure of overcharge misapprehends his work. As discussed, Dr. Williams cogently explained why he used the EPR approach to determine the overcharge on a classwide basis, with detailed attention to why the standard regressions in price-fixing cases were not suitable here. Dr. Williams' concern about the problem of not being able to isolate an overcharge variable unaffected by the challenged conduct is a problem recognized by economists. *See, e.g.,* Rubinfeld & Card, *supra*, at 611 ("It is essential in multiple regression analysis that the explanatory variable of interest not be correlated perfectly with one or more of the other explanatory variables.").

Dr. Williams demonstrated that using EPR to determine the overcharge in light of this problem is a valid methodology, and not junk science "akin to predicting criminality by feeling the bumps on a person's head," as Meta urges. *Milan v. Clif Bar & Co.*, 340 F.R.D. 591, 601 (N.D. Cal. 2021) (citing *Gen. Elec. Co.*, 522 U.S. at 153 n.6 (1997) (Stevens, J., concurring in part)). Specifically, Dr. Williams validated the key assumption underlying the translation of profits to prices using Meta's own real-world data. As both experts agreed, economic profit rates depend on exactly four inputs: price, quantity, cost, and capital. *See* Dkt. No. 801-4 (Tucker report) ¶ 28; Dkt. No. 940-1 (concurrent expert proceeding joint statement) at ECF p. 2. Consequently, if the relationship between the three non-price inputs held steady -- that is, if the cost and capital required to supply each additional unit are constant -- then a change in EPR would be reflected in the remaining variable, price.

Dr. Williams used this relationship to calculate the price overcharge. He began with Meta's actual EPR, reduced it to the EPR Meta would have earned in the but-for world, and then translated the EPR reduction into a price reduction. Dkt. No. 973 at 39:6-16. He assumed that costs and capital remained proportional to ad quantity. *See* Dkt. No. 795-19 at 57 n.110; Dkt. No. 973 at 51:3-52:22. This was a conservative assumption, and one favorable to Meta, because the data indicated that Meta's costs and capital actually rose faster than ad quantity did. Dkt. No. 810-3 at Fig. 2. In effect, Meta experienced diseconomies of scale in that its cost per ad and capital per ad increased. By assuming proportionality, Dr. Williams flattened the impact of rising cost and capital pressure, and so calculated a smaller price overcharge than he otherwise would have using Meta's own data. Consequently, Dr. Williams' method understated the price overcharge tied to EPR, and did not inflate it, as Meta suggests. Overall, this assumption was reasonable and fit the evidence available in this case.

Meta says that Dr. Williams' model cannot account for legitimate reasons why Meta's EPR is higher than that of other firms, such as greater innovation or a better product. This, too, misapprehends Dr. Williams' opinions. Dr. Williams' yardstick methodology is designed to isolate the anticompetitive component of Meta's EPR by benchmarking against firms that also earned returns from innovation and quality. In a perfectly competitive market, EPRs trend to zero.

Dkt. No. 795-19 ¶ 78. Consequently, a positive EPR reflects departures from perfect competition possibly attributable to innovation, product differentiation, a supply or demand shock, market power, or similar factors. *Id.* ¶ 84. Dr. Williams did not simply model a but-for world in which Meta's EPR dropped to zero. Rather, he reduced it to the EPR earned by comparable firms operating in the same product market during the same period -- firms that were themselves innovative, such as Google, Baidu, and Tencent. *See id.* at Tables 5 and 6. He then tested the yardstick's robustness by adding Twitter, Snap, Pinterest, Amazon, and Apple, and found that doing so only increased Meta's estimated excess EPR. *See id.* at 51 n.108.

By yardsticking against innovative peers, Dr. Williams' method separated the lawful returns to innovation from the returns attributable to anticompetitive conduct. Under the assumption of liability -- which Dr. Williams acknowledged in his report, *id.* ¶¶ 56, 71 -- Meta's EPR reflected both innovation and anticompetitive conduct. The yardstick firms' EPR reflected innovation alone. Subtracting the yardstick EPR from Meta's EPR reasonably controlled for the lawful premium Meta earned by being a more innovative or efficient firm, leaving the portion attributable to the assumed anticompetitive conduct.

Meta suggests that it was so much more innovative than Google, Baidu, Tencent, Twitter, Snap, Pinterest, Apple, and Amazon that most of its excess EPR was attributable to lawful conduct. But such objections go to the weight that might be accorded to Dr. Williams' opinions, not to their admissibility. It may be that Dr. Willaims' opinions on this score are impeachable, but that does not make them nonsense. *See Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.,* 738 F.3d 960, 969 (9th Cir. 2013) ("[T]he judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable."). So too for Meta's suggestion that Dr. Williams did not properly define the yardstick companies. *See In re Capacitors Antitrust Litig.*, No. 14-CV-03264-JD, 2020 WL 870927, at *2 (N.D. Cal. Feb. 21, 2020) (challenges to the variables used by expert "do not go to the admissibility of his opinions, but rather to matters of weight and probative value for a jury to evaluate") (cleaned up). These and other suggestions of shakiness in Dr. Williams' work are the grist of cross-examination, not

United States District Court
Northern District of California

United States District Court
Northern District of California

exclusion. *See Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), *as amended* (Apr. 27, 2010).[5]

**CONCLUSION**

Overall, the advertiser plaintiffs have demonstrated by a preponderance that Dr. Williams' opinions are based on reliable evidence, are the product of valid principles and methods reliably applied to the facts of the case, and will help the jury understand the evidence. Fed. R. Evid. 702. Exclusion of Dr. Williams' opinions under Rule 702 is denied.

**IT IS SO ORDERED.**

Dated: September 1, 2026

JAMES DONATO
United States District Judge

[5] Meta's objection to the before-after model Dr. Williams used as a cross-check, which is based on the same EPR criticisms, *see* Dkt. No. 799-1 at 12-14, is denied for the reasons discussed.